## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| RYAN, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 3:24-cv-986 |
| FEDERAL TRADE COMMISSION, | |
| Defendant. | |

## COMPLAINT

Plaintiff Ryan, LLC, alleges as follows:

## I.    INTRODUCTION

1.    The Federal Trade Commission has adopted a new rule outlawing the use of nearly all non-compete agreements by every employer, in every industry, across the entire United States ("Non-Compete Rule").  According to the Commission, it has the authority to take this momentous step, which retroactively invalidates 30 million employment contracts and preempts the regulatory regimes of at least 46 States, because a provision of the Federal Trade Commission Act ("FTC Act") that authorizes *procedural* rules supposedly also authorizes a sweeping *substantive* prohibition on "unfair methods of competition"—and because, the FTC maintains, non-competes are nearly always "unfair."  If ever a federal agency attempted to pull an elephant out of a mousehole, this is it.  What's more, the Non-Compete Rule rests on an open-ended statutory phrase—"unfair methods of competition"—that provides no intelligible principle to guide the agency or constrain its policy preferences, in violation of the Constitution's restriction on the delegation of legislative powers.  Perhaps unsurprisingly, this brazen power grab has been perpetrated by a politically unaccountable "independent" agency that is unconstitutionally

insulated from the President's removal powers.  This action contravenes the FTC Act, violates the Constitution, and is arbitrary, capricious, and otherwise unlawful.

2.      For hundreds of years, employers and employees have had the freedom to negotiate mutually beneficial non-compete agreements, under which employees agree not to compete with the employer's core business during the employment relationship and for a time-limited period after it ends.  Among other benefits, non-compete agreements incentivize investment in research and development, solve a free-rider problem that would otherwise suppress worker training, and facilitate the sorts of collaborative work environments needed for firms to innovate in the modern economy.

3.      The vast majority of States permit non-compete agreements.  Under the prevailing state-law approach, courts use a case-by-case analysis to balance the benefits of a non-compete agreement against the potential burden it imposes on the worker—a fact-specific inquiry designed to determine whether a particular non-compete agreement is reasonable and thus enforceable. Aspects such as the temporal and geographic scope of the agreements are common considerations. That approach has enabled employers and employees to reap the benefits of non-compete agreements while protecting employees from abusive restrictions.

4.      Federal antitrust law has taken the same case-by-case approach, applying the "rule of reason" to non-competes.

5.      Upending that long history of case-by-case analysis of non-compete agreements, the Commission has finalized a one-size-fits-all rule outlawing nearly all non-compete agreements, declaring them to be per se unfair methods of competition in violation of Section 5 of the FTC Act.

6.     The Non-Compete Rule far exceeds the Commission's authority under the FTC Act.  The Commission's claimed statutory authority—a provision allowing it "[f]rom time to time" to "classify corporations and . . . make rules and regulations," 15 U.S.C. § 46(g)—authorizes only procedural rules, as the Commission itself recognized for decades.  This is confirmed by, among other statutory features, Congress's decision to adopt special procedures for the substantive rulemaking authority it *did* grant the Commission, for rules on "unfair or deceptive acts or practices."  *Id.* § 57a.  Moreover, even if Congress did grant the Commission authority to promulgate *some* substantive unfair-competition rules, it did not invest the Commission with authority to decide the major question of whether non-compete agreements are categorically unfair and anticompetitive, a matter affecting tens of millions of workers, millions of employers, and billions of dollars in economic productivity.

7.     Indeed, Congress could not constitutionally have conferred this authority on the Commission with the open-ended language to which the Commission points.  The Constitution vests all legislative powers in Congress, which may delegate rulemaking responsibility to an agency only when it provides an intelligible principle to guide the agency's discretion, such that the agency's role is to fill in details and find facts.  Under the statutory language at issue here, there is no intelligible principle to direct the Commission's determination of what constitutes an unfair method of competition, and when and what sort of regulation is appropriate in response.

8.     Compounding the constitutional problems, the Commission itself is unconstitutionally structured because it is insulated from presidential oversight.  The Constitution vests the Executive Power in the President, not the Commission or its Commissioners.  Yet the FTC Act insulates the Commissioners from presidential control by restricting the President's ability to remove them, shielding their actions from appropriate political accountability.

9.     In short, the Non-Compete Rule is an unauthorized, unconstitutional attempt to eliminate a long-established private economic arrangement.

II.    **PARTIES**

10.     Plaintiff Ryan, LLC ("Ryan") is a Delaware limited liability company with its principal place of business in the Northern District of Texas.

11.     Ryan is a global tax services firm that provides an integrated suite of federal, state, local, and international consulting services to corporate clients to liberate them from the burdens of over-taxation.

12.     Ryan is owned and operated by 200-plus principals, who are sought-after tax experts.   Each principal is a Ryan shareholder.   The shareholder agreements contain post-employment non-competes to protect Ryan's confidential information and business strategies and to prevent departing principals from poaching Ryan's clients and employees.  Although Ryan does not have non-compete agreements with the vast majority of its more than 4,000 non-principal employees, other shareholders also sign a shareholder agreement, and Ryan occasionally enters into non-compete agreements with employees who have access to particularly sensitive business information.  All Ryan principals and employees are subject to clauses prohibiting the disclosure of confidential information and solicitation of Ryan clients and employees.  Ryan's non-compete clauses and non-solicitation clauses are temporally limited.

13.     Defendant Federal Trade Commission is an agency of the United States government created by the Federal Trade Commission Act, 15 U.S.C. § 41, and is headquartered at 600 Pennsylvania Avenue, NW, Washington, DC 20580.

## III.    JURISDICTION AND VENUE

14.    This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  This Court therefore has subject-matter jurisdiction under 28 U.S.C. § 1331.

15.    Ryan has standing to challenge the Commission's action at issue here because the Non-Compete Rule prevents Ryan from enforcing its non-compete agreements with its shareholders and others and prohibits it from forming similar agreements in the future.  By nullifying these agreements, the Non-Compete Rule puts Ryan's confidential business information at risk, permits departing shareholders to poach clients, and enables competitors to poach shareholders for whom Ryan expended training resources.  The Rule also will force Ryan to shrink the size of the teams it uses to serve clients, to contain the harms to the firm that may be caused by departing shareholders.  This reduction in internal information-sharing will increase the costs of providing client services.

16.    Those are just some of the serious and irreparable injuries that the Non-Compete Rule will inflict on Ryan.

17.    Venue is proper under 28 U.S.C. § 1391(e)(1) because this is an action against an agency of the United States, Ryan resides in this judicial district, and no real property is involved in this action.

## IV.    BACKGROUND

### A.    Congress did not grant the Commission authority to issue unfair-competition rules.

18.    In 1914, Congress enacted the Federal Trade Commission Act, establishing the Commission as a multimember "independent" agency.  *See* Federal Trade Commission Act, ch. 311 § 5, 38 Stat. 717 (1914) (codified at 15 U.S.C. §§ 41 *et seq.*).  The Commission is "composed

of five Commissioners . . . [n]ot more than three of" whom "shall be members of the same political party." 15 U.S.C. § 41.  The President appoints the Commissioners, with the advice and consent of the Senate.  But the President can only remove a Commissioner "for inefficiency, neglect of duty, or malfeasance in office."  *Id.*; *see Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935).

19.    From the Commission's inception, Section 5 of the FTC Act has "empowered and directed" it "to prevent" the use of "unfair methods of competition."  15 U.S.C. § 45(a)(2). In 1938, Congress amended Section 5 to give the Commission the additional power and responsibility to prevent "unfair or deceptive acts or practices."  Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111–12.

20.    No provision in the FTC Act authorizes the FTC to promulgate rules to outlaw unfair methods of competition.  Rather, Congress created a comprehensive adjudicatory framework for the Commission to address unfair methods of competition.  Specifically, Section 5 of the FTC Act empowers the Commission to hold a hearing to determine whether a person is employing an unfair method of competition and then to issue a cease-and-desist order if the conduct is determined to be unlawful.  15 U.S.C. § 45(b).  Section 5 provides for judicial review of the Commission's cease-and-desist orders, *id.* § 45(c), and penalties for violating such orders, *id.* § 45(*l*).

21.    Section 6 of the FTC Act provides the Commission with ancillary powers to aid that adjudicatory scheme.  Most of those powers are investigatory.  *See* 15 U.S.C. § 46(a), (b), (c), (d), (h), (i), (j).  Others are ministerial, such as the power to make recommendations, *see id.* § 46(e), (k), and publish reports, *see id.* § 46(f).  One provision, which has been in place since the Commission's inception in 1914, grants the Commission the power to "classify corporations and

6

. . . to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id.* § 46(g); *see also* 38 Stat. at 722 (granting this power in 1914).  The FTC Act does not impose a penalty for violating rules promulgated under Section 6(g).

22.     For approximately the first half of its existence, the FTC "did not assert the power to promulgate substantive rules" and affirmatively declared "that it lacked such power."  *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973); *see also id.* at 693 n.27. For example, just eight years after its creation, the FTC explained that it was a "common mistake[] . . . to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it."  Annual Report of the Federal Trade Commission 36 (1922); *see also* Hearings on H.R. 2321 Before the H. Comm. on Interstate & Foreign Com., 82d Cong., 1st Sess. 160 (1951) (statement of Henry Miller, Assistant General Counsel, FTC).

23.     In 1962, the Commission, for the first time, claimed that Section 6(g) granted it the power to promulgate substantive rules defining unfair methods of competition.  In 1973, the D.C. Circuit agreed with that interpretation.  *See Nat'l Petroleum*, 482 F.2d at 697–98.

24.     That decision was controversial at the time and has not aged well.  As one scholar has put it, "the method of statutory interpretation that the D.C. Circuit used in *National Petroleum Refiners* has never been embraced by the Supreme Court; it has not been used by any court in decades; and, it is inconsistent with the principles of separation of powers that the Supreme Court has emphasized for decades."  Richard J. Pierce Jr., *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works 1561, at 9 (2021).  Section 6(g) of the FTC Act grants the Commission authority only to promulgate *procedural* rules, consistent with the Act's enumeration of ancillary powers to aid the Commission's adjudicatory authority.

25.     The absence of any penalty for violating rules promulgated under Section 6(g) confirms that the provision confers no substantive rulemaking authority.  In the early 20th century, Congress followed "a convention for indicating whether an agency had the power to promulgate legislative rules," under which grants of substantive rulemaking authority were coupled with "a separate provision in the statute attaching 'sanctions' to the violation of" those rules.  Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 493 (2002).  The FTC Act provides no "sanction for the violation of rules adopted under section 6(g)."  *Id.* at 504–05.  *National Petroleum* ignored these important features of the Act.  *See id.* at 554–57.

26.     Two years after *National Petroleum* was decided, it was sharply undercut by Congress.  In 1975 Congress enacted the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975), which authorizes the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 57a(a)(1)(B).  That amendment would have been pointless if the Commission, as it claimed, already had substantive rulemaking authority under Section 6(g).

27.     Moreover, the Magnuson-Moss Act conspicuously did *not* authorize the Commission to promulgate substantive rules regarding unfair methods of competition.

28.     Congress further amended the FTC Act in 1980 by enacting additional procedural steps the Commission must follow to promulgate rules addressing unfair or deceptive acts or practices.  *See* 15 U.S.C. § 57a(b)–(d).  Here again, the focus on Commission rulemaking regarding unfair or deceptive acts or practices reinforced the absence of congressional authorization to promulgate rules addressing unfair methods of competition.

29.     For decades after the Magnuson-Moss Act, just as for decades following enactment of the Federal Trade Commission Act itself, the Commission did not attempt to promulgate an unfair-competition rule.  The Non-Compete Rule is the first such rule since the late 1960s.  *See* 32 Fed. Reg. 15,584 (Nov. 9, 1967) (promulgating a rule addressing discriminatory practices in men's and boys' tailored clothing industry); *see also* 59 Fed. Reg., No. 94-4040 (Feb. 23, 1994) (uncategorized document) (repealing that rule).

30.     Although the Commission's rulemaking authority is the same as it was in 1914—except for the explicit addition of authority to promulgate rules on unfair or deceptive acts or practices, and on certain other specific topics—the nature of the Commission has evolved in other important ways.  As originally chartered, the Supreme Court has said, the Commission's "duties [were] neither political nor executive, but predominantly quasi judicial and quasi legislative." *Humphrey's Executor*, 295 U.S. at 624.  If that were ever true, it no longer is:  The Commission has since been granted decidedly executive authority, including to "commence a civil action to recover a civil penalty," 15 U.S.C. § 45(m), and to bring a civil action for violating unfair or deceptive acts or practices rules, *id.* § 57b.

**B.     Reasonable non-compete agreements benefit workers, firms, and the economy.**

31.     Far from being, as the Commission has asserted, exploitative and coercive, non-compete agreements are often a mutually beneficial, negotiated term of employment.  *See* Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57 Wake Forest L. Rev. 631, 677 (2022).  Workers, firms, and the economy all benefit from reasonable non-compete agreements.

32.     For one, non-compete agreements promote worker training.  Without non-competes, firms are incentivized to free-ride on each company's employee training, hiring away a competitor's workers after they have been trained.  That market failure depresses investment in worker training, to the detriment of workers and firms alike.  Both theoretical and empirical

research confirms that non-compete agreements solve that free-rider problem. *See* John M. McAdams, FTC, *Non-Compete Agreements: A Review of the Literature* 13 (2019); Evan P. Starr, James J. Prescott & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 80 (2021); Meese, *supra*, at 679–84, 697–704. Deterring free-riding benefits both workers—who receive training that they could not otherwise afford—and firms—which benefit from the increased worker skill and productivity. The economy as a whole benefits from this investment in human capital.

33. Relatedly, non-competes can increase workers' earnings. Workers who receive training—made possible by non-competes—often enjoy higher salaries, reflecting their improved productivity. *See* Starr et al., *supra*, at 80. That is, non-competes typically are "signed in exchange for higher compensation." FTC, *Forum Examining Proposed Rule to Ban Noncompete Clauses* 18–19 (Feb. 16, 2023) (testimony of LeAnn Goheen).

34. Non-compete agreements also foster innovation, in at least two ways. First, they incentivize investments in research and development by inhibiting poaching of employees. *See* McAdams, *supra*, at 19 (collecting papers). Without non-competes, firms' investments in new and innovative ideas could easily be pilfered by other companies hiring away their workers. This is especially so for innovative startups whose endgame is often to get acquired by a larger firm that would have no incentive to invest in the acquisition if it could instead hire the startup's workers.

35. Second, non-compete agreements encourage collaboration within firms, which in Ryan's experience often catalyzes innovative ideas. And non-compete agreements encourage workers to stay at the firm long enough to gain the expertise needed to innovate.

36.     Additionally, non-compete agreements help new firms survive, and to create more jobs.  When non-competes are enforceable, the new firms that enter the market are "larger, faster growing, and have a higher likelihood of surviving the initial years."  McAdams, *supra*, at 17; *see also* Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment* 16 (Fed. Reserve Bank of Phila. Working Paper 21–26, 2021); Evan Starr, Natarajan Balasubramanian & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552, 561 (2018).  In other words, non-competes enable fledgling firms to survive, grow, and ultimately hire more workers and generate greater economic output.

37.     Finally, non-compete agreements can reduce prices.  *See* Umit G. Gurun, Noah Stoffman & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).  Particularly in industries, such as tax consulting, where client relationships are critical, non-competes allow firms to provide better prices, because they do not need to compensate for the risk of losing the client to a departing consultant.

**C.     The enforceability of non-compete agreements is determined on a case-by-case basis.**

38.     Because reasonable non-compete agreements benefit workers, employers, and overall economic output, they have been recognized as legally enforceable for centuries.

39.     Under the pre-Founding common law of contracts, a non-compete agreement was an enforceable contract unless it was found to have an unreasonable scope.  *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625 (1960).  The standard was first articulated in *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (Q.B. 1711).  In that seminal case, the court explained that "general restraints," not restricted in geographic or temporal scope, were unenforceable restraints on trade, but that "particular" restraints, limited to particular regions,

times, or customers, were enforceable as any other contract would be. Blake, *supra*, at 629–30 (discussing *Mitchel*). From 1711 through "the end of the nineteenth century both English and American courts regarded *Mitchel v. Reynolds* as the fundamental authority to be applied in employee-restraint cases," "formulat[ing] the 'reasonableness' test in more specific terms" to fit each case. *Id.* at 638–39. Thus, at common law, reasonable non-competes were lawful, enforceable contracts.

40.    In the vast majority of States, that remains true. Forty-six States permit non-compete agreements, either explicitly by statute or by common-law rule. Although some States have prohibited employers from enforcing non-compete agreements against low-wage workers, and a very small handful have effectively banned most non-compete agreements, the vast majority of States recognize reasonably tailored non-compete agreements as beneficial, pro-competitive, and lawful. A few States have even taken affirmative steps to make non-compete agreements *more* enforceable by loosening the standards for reasonableness applied by the courts. *See, e.g.*, Fla. Stat. Ann. § 542.335; Ga. Code Ann. §§ 13-8-50–54 (Restrictive Covenant Act).

41.    The federal antitrust laws provide for the same type of individualized analysis of non-compete agreements as most States' contract law.

42.    Federal courts have long taken two alternative approaches to analyzing whether agreements violate the antitrust laws: the rule of reason, which requires individualized analysis of the specific agreement, and per se rules, which categorically condemn a class of restraint. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018). Per se prohibitions are reserved for cases where "courts can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason" because the restraint has "manifestly anticompetitive

effects and lack[s] . . . any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) (citations and quotation marks omitted).

43.     Because non-compete agreements have significant redeeming benefits, federal courts have consistently examined them under the rule of reason and invalidated such agreements only when unreasonable in scope. *See, e.g.*, *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that covenants not to compete should be examined under the rule of reason."); *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983).

44.     Thus, under both state contract law and federal antitrust law, non-compete agreements are analyzed individually on a case-by-case basis and, in light of the range of benefits they can generate, upheld as lawful, enforceable contracts where they are reasonable in scope.

**D.     From its creation until 2022, the Commission effectively never applied the FTC Act to non-compete agreements.**

45.     Although the Commission was established more than one hundred years ago, and non-compete agreements are widely used in a range of industries across the country, until 2022, the Commission had only sued a company *once* over a non-compete agreement. And it lost. In keeping with the longstanding individualized analysis of non-competes, the Seventh Circuit explained that non-compete agreements are not an unfair method of competition "unless they are unreasonable as to time or geographic scope," and held that the non-compete agreement at issue was reasonable and thus lawful. *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963).

46.     Then, in late 2022 and days before publicly announcing its proposed ban on non-compete agreements, the Commission "rushed out the announcement of three consent agreements that resolve allegations that non-compete provisions constitute an unfair method of competition." Non-Compete Clause Rule, 88 Fed. Reg. 3482, 3542 (Jan. 19, 2023) (Commissioner Wilson's

dissent).  The Commission has since announced an additional consent agreement resolving a similar allegation.  *See In re Anchor Glass Container Corp.*, 2023 WL 3856535, at *1 (May 18, 2023).

  **E.**  **The Commission's Rule now outlaws nearly all non-compete agreements.**

  47.  Despite hundreds of years of court decisions recognizing the pro-competitive benefits of non-compete agreements and analyzing their lawfulness on an individualized, case-by-case basis—and despite its own lack of rulemaking authority in the area—on April 23, 2024 the Commission finalized the Non-Compete Rule, effectively outlawing non-competes across the entire U.S. economy.

  48.  The Non-Compete Rule declares that "it is an unfair method of competition for a person: (i) To enter into or attempt to enter into a non-compete clause; (ii) To enforce or attempt to enforce a non-compete clause; or (iii) To represent that the worker is subject to a non-compete clause."  16 C.F.R. § 910.2(a)(1).  "Worker" is defined to include anyone "who works or who previously worked, whether paid or unpaid," for anyone else, regardless of employee or independent contractor status.  *Id.* § 910.1(f).  The Non-Compete Rule renders existing non-compete agreements unenforceable in 120 days.  *Id.* § 910.2(b).  It exempts non-compete clauses "entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets" and causes of action that "accrued prior to the effective date."  *Id.* § 910.3(a), (b).  It also creates an exception allowing enforcement of existing non-compete agreements with "senior executives," but prohibits the formation of new non-compete agreements with such employees.  *Id.* § 910.2(a)(2)(ii).

  49.  The Non-Compete Rule purports to supersede state laws that would "permit or authorize" non-compete agreements.  *See* 16 C.F.R. § 910.4.

50.     The Commission estimates that its Rule will invalidate the contracts of "one in five American workers—or approximately 30 million workers"—thereby upending reliance interests and entrenched business models.  The Commission predicts the economic impact of the Rule will exceed hundreds of *billions* of dollars.

## COUNT ONE

**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)
(NO STATUTORY AUTHORITY)**

51.     Ryan incorporates by reference the allegations of the preceding paragraphs.

52.     The Non-Compete Rule declares virtually all non-compete agreements to be unfair methods of competition under Section 5 of the FTC Act.  The Commission has no statutory authority to promulgate such a rule.

53.     To start, the Commission does not have statutory authority to promulgate substantive rules regarding unfair methods of competition at all.

54.     The Commission's purported authority—Section 6(g) of the FTC Act—only grants the authority to promulgate procedural rules.  The statutory language on which the Commission relies is found in a section that lists ancillary powers to aid the Commission in adjudicating cases and appears in the same sentence as the Commission's authority to classify corporations.  Nowhere in the FTC Act did Congress prescribe a penalty for violating rules promulgated under Section 6(g).  This context makes clear that Congress did not intend Section 6(g) as a far-reaching grant of substantive rulemaking authority empowering the Commission to extinguish tens of millions of existing non-compete agreements.  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

55.     The Commission's lack of statutory authority is confirmed by Congress's decision to grant the Commission authority to promulgate substantive rules regarding unfair or deceptive acts or practices in the Magnuson-Moss Act, but to withhold similar authority with respect to unfair methods of competition.  That choice "support[s] a sensible inference that the [rulemaking authority] left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  Likewise, the imposition of procedural requirements beyond those required by the Administrative Procedure Act for rules regarding unfair or deceptive acts or practices demonstrates that Congress gave the Commission *no* rulemaking authority over unfair methods of competition.  *See* 15 U.S.C. § 57a(b)–(d).  Until now, the Commission has not even attempted to promulgate an unfair-competition rule in the nearly five decades the Magnuson-Moss Act has been on the books.

56.     The "major questions doctrine" underscores that the Commission lacks the authority to ban non-competes by declaring them an unfair method of competition.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022).  The Non-Compete Rule will invalidate 30 million employment contracts, directly affecting one-fifth of American workers and generating an economic impact of hundreds of billions of dollars.  It upsets long-settled expectations.  And by preempting the laws of at least 46 States in an area that has been regulated by the States since before the Founding, the Rule "intrudes into an area that is the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam).  There is no doubt that the Rule is of "vast economic and political significance."  *West Virginia*, 142 S. Ct. at 2605.  Nor are those consequences the limit of the Commission's claimed authority, since non-competes are but one of countless competition-related practices the Commission

evidently claims authority to regulate from coast-to-coast—overturning state laws and established expectations—based on little more than its determination that a practice is "unfair."

57.    To promulgate such sweeping rules, an agency must have clear and unmistakable authority.  The modest powers afforded the Commission in Section 6(g) do not come close to that standard.

58.    Finally, as discussed *infra*, if Section 6(g) were a grant of substantive rulemaking authority, it would constitute an unconstitutional delegation of legislative power.  The constitutional avoidance canon requires that any "ambiguous statutory language be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

## COUNT TWO

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(B), (C) (NONDELEGATION DOCTRINE)

59.    Ryan incorporates by reference the allegations of the preceding paragraphs.

60.    If Congress did grant the FTC the authority to promulgate substantive rules regarding unfair methods of competition, that grant is an unconstitutional delegation of legislative power in violation of Article I of the Constitution.

61.    The Constitution vests "[a]ll [the] legislative Powers" it grants in "Congress." U.S. Const. art. I, § 1.  Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  It can delegate legislative power only if it provides an "intelligible principle" by which the agency can exercise it.  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  More precisely, Congress may authorize agencies only to "fill[] up details and find[] facts." *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting).

62.     The FTC Act does not set forth an intelligible principle to guide an unfair-competition rulemaking, let alone assign the Commission the limited role of finding facts or filling up details.  As construed by the Commission, the determination of which trade practices are "unfair" is a subjective, open-ended inquiry for which Congress provided no guideposts.  Yet the Constitution does not allow the Commission "to exercise an unfettered discretion to make whatever laws [it] thinks may be needed or advisable."  *Schechter*, 295 U.S. at 537–38.

63.     Indeed, the Commission's asserted authority to promulgate rules establishing unfair methods of competition is virtually identical to the authority to issue "codes of fair competition" that the Supreme Court held to be an unconstitutional delegation in *Schechter*.  295 U.S. at 532–34.  *Schechter* contrasted those constitutionally impermissible "codes" with the Commission's case-by-case adjudication of "unfair methods of competition" under Section 5 of the FTC Act, indicating that the incremental, case-specific nature of the Commission's authority was instrumental to its constitutionality. *See id.* at 532–33.  But here, the Commission has jettisoned that circumscribed case-by-case approach in favor of a sweeping rulemaking power wholly unconstrained by congressional guardrails.

## COUNT THREE

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(B)
### (U.S. CONSTITUTION ARTICLE II)

64.     Ryan incorporates by reference the allegations of the preceding paragraphs.

65.     Because Article II of the Constitution vests the entire executive power in the President, "lesser officers" within the Executive Branch "must remain accountable to the President."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).  That accountability is accomplished by the President's "unrestricted removal power."  *Id.* at 2198–2200.

66.     The FTC Act restricts the President's ability to remove Commissioners by granting them fixed terms and providing that they can be removed only for "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  It is therefore unconstitutional.

67.     Although the Supreme Court upheld the FTC Act's removal restriction in *Humphrey's Executor*, 295 U.S. at 626, that decision depended on the Court "view[ing] the FTC (as it existed in 1935) as exercising 'no part of the executive power,'" *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's Ex'r*, 295 U.S. at 628).  The FTC exercised at most an "'executive *function*,'" the Court said, and even then "only in the discharge of its 'quasi-legislative or quasi-judicial powers.'"  *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 628).

68.     The "conclusion that the FTC did not exercise executive power has not withstood the test of time."  *Seila Law*, 140 S. Ct. at 2198 n.2.  The FTC now exercises "executive power in the constitutional sense."  *Humphrey's Ex'r*, 295 U.S. at 628; *see also Seila Law*, 140 S. Ct. at 2198.  The FTC Act's removal protection for Commissioners is therefore a violation of the Vesting Clause of Article II.  *See* U.S. Const. art. II, § 1, cl. 1.[1]

## COUNT FOUR

## DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201

69.     Ryan incorporates by reference the allegations of the preceding paragraphs.

---

[1] Ryan recognizes that the Fifth Circuit recently held that "although the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court . . . to answer." *Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *see also Consumers' Research v. Consumer Product Safety Comm'n*, 91 F.4th 342, 353–54, 356 (5th Cir. 2024) (holding that the Consumer Product Safety Commission's "exercise[] [of] substantial executive power" does not "remove[]" it "from the *Humphrey's* exception," and instead, that "[p]rincipal officers may retain for-cause protection when they act as part of an expert board").  Ryan respectfully preserves this argument for further review, in light of Judge Jones's contrary opinion in *Consumers' Research* that "for-cause removal protection violates the constitutional separation-of-powers" whenever the agency "exercise[s] executive power," 91 F.4th at 358 (Jones, J., dissenting), and in light of the *Consumers' Research* majority's observation that "[t]he logic of *Humphrey's* may have been overtaken," *id.* at 346 (maj. op.).

70.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

71.     For the reasons articulated in Counts One through Three, there is a real and actual controversy as to whether the Commission has violated the Administrative Procedure Act and the United States Constitution by issuing the Non-Compete Rule, thereby causing substantial injury to Ryan.

72.     Ryan seeks a judicial declaration that the Non-Compete Rule violates the Administrative Procedure Act because the Commission exceeded its statutory authority and acted arbitrarily and capriciously.

73.     Ryan seeks further declarations that Section 5 of the FTC Act violates the Constitution's nondelegation doctrine and that the FTC is unconstitutionally structured in violation of Article II.

74.     The Court should grant declaratory relief and any further necessary and proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201, 2202.

**PRAYER FOR RELIEF**

75.     For these reasons, Ryan respectfully requests entry of an order and judgment:

a.      Vacating and setting aside the Non-Compete Rule;

b.      Declaring that the FTC does not have the authority to issue rules defining acts to be unfair methods of competition;

c.      Declaring that Section 5 of the FTC Act violates the Constitution's nondelegation doctrine;

      d.      Declaring that the FTC is unconstitutionally structured in violation of Article II because its Commissioners are improperly insulated from presidential removal;

      e.      Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

      f.      Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  April 23, 2024

/s/ Elizabeth A. Kiernan
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:     214.698.3100
Facsimile:      214.571.2900
ekiernan@gibsondunn.com

Eugene Scalia*
Amir C. Tayrani*
Andrew Kilberg*
Aaron Hauptman*
Joshua R. Zuckerman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:     202.955.8500
Facsimile:      202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*Application for admission *pro hac vice*
forthcoming

/s/ Charles W. Fillmore
Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
The Fillmore Law Firm LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone:     817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

*Attorneys for Ryan, LLC*