**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| RYAN, LLC,<br><br>   Plaintiff,<br><br> v.<br><br>FEDERAL TRADE COMMISSION,<br><br>   Defendant. | Civil Action No. 3:24-cv-986-E |

**AMENDED COMPLAINT**

Plaintiff Ryan, LLC, alleges as follows:

**I. INTRODUCTION**

1. The Federal Trade Commission has adopted a new rule outlawing the use of nearly all non-compete agreements by every employer, in every industry, across the entire United States ("Non-Compete Rule"). *See* Ex. A. According to the Commission, it has the authority to take this momentous step, which retroactively invalidates 30 million employment contracts and preempts the regulatory regimes of at least 46 States, because a provision of the Federal Trade Commission Act ("FTC Act") that authorizes *procedural* rules supposedly also authorizes a sweeping *substantive* prohibition on "unfair methods of competition"—and because, the FTC maintains, non-competes are nearly always "unfair." If ever a federal agency attempted to pull an elephant out of a mousehole, this is it. What's more, the Non-Compete Rule rests on an open-ended statutory phrase—"unfair methods of competition"—that provides no intelligible principle to guide the agency or constrain its policy preferences, in violation of the Constitution's restriction on the delegation of legislative powers. Perhaps unsurprisingly, this brazen power grab has been perpetrated by a politically unaccountable "independent" agency that is unconstitutionally

insulated from the President's removal powers.  This action contravenes the FTC Act, violates the Constitution, and is arbitrary, capricious, and otherwise unlawful.

2.      For hundreds of years, employers and workers have had the freedom to negotiate mutually beneficial non-compete agreements, under which workers agree not to compete with the employer's core business during the employment relationship and for a time-limited period after it ends.  Among other benefits, non-compete agreements incentivize investment in research and development, solve a free-rider problem that would otherwise suppress worker training, and facilitate the sorts of collaborative work environments needed for firms to innovate in the modern economy.

3.      The vast majority of States permit non-compete agreements.  Under the prevailing state-law approach, courts use a case-by-case analysis to balance the benefits of a non-compete agreement against the potential burden it imposes on the worker—a fact-specific inquiry designed to determine whether a particular non-compete agreement is reasonable and thus enforceable. Aspects such as the temporal and geographic scope of the agreements are common considerations. That approach has enabled employers and workers to reap the benefits of non-compete agreements while protecting workers from abusive restrictions.

4.      Federal antitrust law has taken the same case-by-case approach, applying the "rule of reason" to non-competes.

5.      Upending that long history of case-by-case analysis of non-compete agreements, the Commission has finalized a one-size-fits-all rule outlawing nearly all non-compete agreements, declaring them to be per se unfair methods of competition in violation of Section 5 of the FTC Act.

6.    The Non-Compete Rule far exceeds the Commission's authority under the FTC Act.  The Commission's claimed statutory authority—a provision allowing it "[f]rom time to time" to "classify corporations and . . . make rules and regulations," 15 U.S.C. § 46(g)—authorizes only procedural rules, as the Commission itself recognized for decades.  This is confirmed by, among other statutory features, Congress's decision to adopt special procedures for the substantive rulemaking authority it *did* grant the Commission, for rules on "unfair or deceptive acts or practices."  *Id.* § 57a.  Moreover, even if Congress did grant the Commission authority to promulgate *some* substantive unfair-competition rules, it did not invest the Commission with authority to decide the major question of whether non-compete agreements are categorically unfair and anticompetitive, a matter affecting tens of millions of workers, millions of employers, and billions of dollars in economic productivity.

7.    Indeed, Congress could not constitutionally have conferred this authority on the Commission with the open-ended language to which the Commission points.  The Constitution vests all legislative powers in Congress, which may delegate rulemaking responsibility to an agency only when it provides an intelligible principle to guide the agency's discretion, such that the agency's role is to fill in details and find facts.  Under the statutory language at issue here, there is no intelligible principle to direct the Commission's determination of what constitutes an unfair method of competition, and when and what sort of regulation is appropriate in response.

8.    Compounding the constitutional problems, the Commission itself is unconstitutionally structured because it is insulated from presidential oversight.  The Constitution vests the Executive Power in the President, not the Commission or its Commissioners.  Yet the FTC Act insulates the Commissioners from presidential control by restricting the President's ability to remove them, shielding their actions from appropriate political accountability.

3

9.      Finally, the Commission's justifications for banning non-competes are arbitrary and capricious.  The Non-Compete Rule is premised on a logically inconsistent, results-oriented analysis of limited, flawed, untested, and inconclusive evidence about the competitive effects of non-competes.  And its conclusions are based largely on the Commission's assessment of non-competes' purported effects on *labor* markets, which is not even a proper basis for the Commission to regulate since its statutory mandate is to protect *consumers.*

10.     In short, the Non-Compete Rule is an unauthorized, unconstitutional attempt to eliminate a long-established private economic arrangement.

## II.    PARTIES

11.     Plaintiff Ryan, LLC ("Ryan") is a Delaware limited liability company with its principal place of business in the Northern District of Texas.

12.     Ryan is a global tax services firm that provides an integrated suite of federal, state, local, and international consulting services to corporate clients to liberate them from the burdens of over-taxation.

13.     Ryan's ownership and management structure includes over 200 principals, who are required to become shareholders of the firm by purchasing equity and joining a shareholder's agreement, which contains a post-employment non-compete.  As a result of joining the shareholder's agreement, Ryan's individual shareholders become subject to a non-compete.  Ryan also has non-compete agreements with certain other team members who are key contributors to the firm.

14.     Ryan's non-competes are an important tool to prevent departing principals and other team members from poaching Ryan's clients and team members.  Ryan has seen from its own experience that non-competes fill a gap in protecting a company's confidential business information, as well as promoting the free exchange of information and ideas within the firm and

supporting team members training that is critical to a professional services firm like Ryan.  By contrast, non-disclosure agreements and trade secrets laws do not always provide perfect protection because, by their very nature, violations can be difficult to uncover and enforcement usually occurs after a violation has already happened.

15.     Defendant Federal Trade Commission is an agency of the United States government created by the Federal Trade Commission Act, 15 U.S.C. § 41, and is headquartered at 600 Pennsylvania Avenue, NW, Washington, DC 20580.

## III.     JURISDICTION AND VENUE

16.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  This Court therefore has subject-matter jurisdiction under 28 U.S.C. § 1331.

17.     Ryan has standing to challenge the Commission's action at issue here because the Non-Compete Rule prevents Ryan from enforcing its non-compete agreements with its shareholders and others and prohibits it from forming similar agreements in the future.  By nullifying these agreements, the Non-Compete Rule permits departing shareholders and other team members to poach clients, enables competitors to poach shareholders and other team members for whom Ryan expended training resources, and puts Ryan's confidential business information at serious risk.  Further, Ryan will need to spend significant resources considering alternative contractual covenants that may provide second-best protection as alternatives to its non-competes, and to update existing agreements.  It also must prepare, and be prepared to send, notices to all current and former shareholders and other team members subject to non-competes.

18.     Those are just some of the serious and irreparable injuries that the Non-Compete Rule has already begun to inflict on Ryan.

19.     Venue is proper under 28 U.S.C. § 1391(e)(1) because this is an action against an agency of the United States, Ryan resides in this judicial district, and no real property is involved in this action.

## IV.     BACKGROUND

### A.     Congress did not grant the Commission authority to issue unfair-competition rules.

20.     In 1914, Congress enacted the Federal Trade Commission Act, establishing the Commission as a multimember "independent" agency.  *See* Federal Trade Commission Act, ch. 311 § 5, 38 Stat. 717 (1914) (codified at 15 U.S.C. §§ 41 *et seq.*).  The Commission is "composed of five Commissioners . . . [n]ot more than three of" whom "shall be members of the same political party."  15 U.S.C. § 41.  The President appoints the Commissioners, with the advice and consent of the Senate.  But the President can only remove a Commissioner "for inefficiency, neglect of duty, or malfeasance in office."  *Id.*; *see Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935).

21.     From the Commission's inception, Section 5 of the FTC Act has "empowered and directed" it "to prevent" the use of "unfair methods of competition."   15 U.S.C. § 45(a)(2). In 1938, Congress amended Section 5 to give the Commission the additional power and responsibility to prevent "unfair or deceptive acts or practices."  Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111–12.

22.     No provision in the FTC Act authorizes the FTC to promulgate rules to outlaw unfair methods of competition.   Rather, Congress created a comprehensive adjudicatory framework for the Commission to address unfair methods of competition.  Specifically, Section 5 of the FTC Act empowers the Commission to hold a hearing to determine whether a person is employing an unfair method of competition and then to issue a cease-and-desist order if the

conduct is determined to be unlawful.  15 U.S.C. § 45(b).  Section 5 provides for judicial review of the Commission's cease-and-desist orders, *id.* § 45(c), and penalties for violating such orders, *id.* § 45(*l*).

23.     Section 6 of the FTC Act provides the Commission with ancillary powers to aid that adjudicatory scheme.  Most of those powers are investigatory.  *See* 15 U.S.C. § 46(a), (b), (c), (d), (h), (i), (j).  Others are ministerial, such as the power to make recommendations, *see id.* § 46(e), (k), and publish reports, *see id.* § 46(f).  One provision, which has been in place since the Commission's inception in 1914, grants the Commission the power to "classify corporations and . . . to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id.* § 46(g); *see also* 38 Stat. at 722 (granting this power in 1914).  The FTC Act does not impose a penalty for violating rules promulgated under Section 6(g).

24.     For approximately the first half of its existence, the FTC "did not assert the power to promulgate substantive rules" and affirmatively declared "that it lacked such power."  *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973); *see also id.* at 693 n.27. For example, just eight years after its creation, the FTC explained that it was a "common mistake[] . . . to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it."  Annual Report of the Federal Trade Commission 36 (1922); *see also* Hearings on H.R. 2321 Before the H. Comm. on Interstate & Foreign Com., 82d Cong., 1st Sess. 160 (1951) (statement of Henry Miller, Assistant General Counsel, FTC).

25.     In 1962, the Commission, for the first time, claimed that Section 6(g) granted it the power to promulgate substantive rules defining unfair methods of competition.  In 1973, the D.C. Circuit agreed with that interpretation.  *See Nat'l Petroleum*, 482 F.2d at 697–98.

26.     That decision was controversial at the time and has not aged well.  As one scholar has put it, "the method of statutory interpretation that the D.C. Circuit used in *National Petroleum Refiners* has never been embraced by the Supreme Court; it has not been used by any court in decades; and, it is inconsistent with the principles of separation of powers that the Supreme Court has emphasized for decades."  Richard J. Pierce Jr., *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works 1561, at 9 (2021).  Section 6(g) of the FTC Act grants the Commission authority only to promulgate *procedural* rules, consistent with the Act's enumeration of ancillary powers to aid the Commission's adjudicatory authority.

27.     The absence of any penalty for violating rules promulgated under Section 6(g) confirms that the provision confers no substantive rulemaking authority.  In the early 20th century, Congress followed "a convention for indicating whether an agency had the power to promulgate legislative rules," under which grants of substantive rulemaking authority were coupled with "a separate provision in the statute attaching 'sanctions' to the violation of" those rules.  Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 493 (2002).  The FTC Act provides no "sanction for the violation of rules adopted under section 6(g)."  *Id.* at 504–05.  *National Petroleum* ignored these important features of the Act.  *See id.* at 554–57.

28.     Two years after *National Petroleum* was decided, it was sharply undercut by Congress.  In 1975 Congress enacted the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975), which authorizes the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 57a(a)(1)(B).  That amendment would have

been pointless if the Commission, as it claimed, already had substantive rulemaking authority under Section 6(g).

29.     Moreover, the Magnuson-Moss Act conspicuously did *not* authorize the Commission to promulgate substantive rules regarding unfair methods of competition.

30.     Congress further amended the FTC Act in 1980 by enacting additional procedural steps the Commission must follow to promulgate rules addressing unfair or deceptive acts or practices. *See* 15 U.S.C. § 57a(b)–(d).  Here again, the focus on Commission rulemaking regarding unfair or deceptive acts or practices reinforced the absence of congressional authorization to promulgate rules addressing unfair methods of competition.

31.     For decades after the Magnuson-Moss Act, just as for decades following enactment of the Federal Trade Commission Act itself, the Commission did not attempt to promulgate a rule based on its purported authority under Section 6(g).  The Non-Compete Rule is the first such rule since the late 1970s.   The Commission has identified only one rule before the Non-Compete Rule that defines an act or practice to be an unfair method of competition without also relying on its authority to prevent unfair or deceptive acts or practices.  *See* 32 Fed. Reg. 15,584 (Nov. 9, 1967) (promulgating a rule addressing discriminatory practices in men's and boys' tailored clothing industry); *see also* 59 Fed. Reg., No. 94-4040 (Feb. 23, 1994) (uncategorized document) (repealing that rule).

32.     Although the Commission's rulemaking authority is the same as it was in 1914— except for the explicit addition of authority to promulgate rules on unfair or deceptive acts or practices, and on certain other specific topics—the nature of the Commission has evolved in other important ways.  As originally chartered, the Supreme Court has said, the Commission's "duties [were] neither political nor executive, but predominantly quasi judicial and quasi legislative."

*Humphrey's Executor*, 295 U.S. at 624.  If that were ever true, it no longer is:  The Commission has since been granted decidedly executive authority, including to "commence a civil action to recover a civil penalty," 15 U.S.C. § 45(m), and to bring a civil action for violating unfair or deceptive acts or practices rules, *id.* § 57b.

**B.    Reasonable non-compete agreements benefit workers, firms, and the economy.**

33.    Far from being, as the Commission has asserted, exploitative and coercive, non-compete agreements are often a mutually beneficial, negotiated term of employment.  *See* Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57 Wake Forest L. Rev. 631, 677 (2022).  Workers, firms, and the economy all benefit from reasonable non-compete agreements.

34.    For one, non-compete agreements promote worker training.  Without non-competes, firms are incentivized to free-ride on each company's worker training, hiring away a competitor's workers after they have been trained.  That market failure depresses investment in worker training, to the detriment of workers and firms alike.  Both theoretical and empirical research confirms that non-compete agreements solve that free-rider problem.  *See* John M. McAdams, FTC, *Non-Compete Agreements: A Review of the Literature* 13 (2019); Evan P. Starr, James J. Prescott & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 80 (2021); Meese, *supra*, at 679–84, 697–704.  Deterring free-riding benefits both workers—who receive training that they could not otherwise afford—and firms—which benefit from the increased worker skill and productivity.  The economy as a whole benefits from this investment in human capital.

35.    Relatedly, non-competes can increase workers' earnings.  Workers who receive training—made possible by non-competes—often enjoy higher salaries, reflecting their improved productivity.  *See* Starr et al., *supra*, at 80.  That is, non-competes typically are "signed in exchange

for higher compensation."  FTC, *Forum Examining Proposed Rule to Ban Noncompete Clauses* 18–19 (Feb. 16, 2023) (testimony of LeAnn Goheen).

36.     Non-compete agreements also foster innovation, in at least two ways.  First, they incentivize investments in research and development by inhibiting poaching of workers.  *See* McAdams, *supra*, at 19 (collecting papers).  Without non-competes, firms' investments in new and innovative ideas could easily be pilfered by other companies hiring away their workers.  This is especially so for innovative startups whose endgame is often to get acquired by a larger firm that would have no incentive to invest in the acquisition if it could instead hire the startup's workers.

37.     Second, non-compete agreements encourage collaboration within firms, which in Ryan's experience often catalyzes innovative ideas.  And non-compete agreements encourage workers to stay at the firm long enough to gain the expertise needed to innovate.

38.     Additionally, non-compete agreements help new firms survive, and to create more jobs.  When non-competes are enforceable, the new firms that enter the market are "larger, faster growing, and have a higher likelihood of surviving the initial years."  McAdams, *supra*, at 17; *see also* Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment* 16 (Fed. Reserve Bank of Phila. Working Paper 21–26, 2021); Evan Starr, Natarajan Balasubramanian & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552, 561 (2018).  In other words, non-competes enable fledgling firms to survive, grow, and ultimately hire more workers and generate greater economic output.

39.     Finally, non-compete agreements can reduce prices.  *See* Umit G. Gurun, Noah Stoffman & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial*

*Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).  Particularly in industries, such as tax consulting, where client relationships are critical, non-competes allow firms to provide better prices, because they do not need to compensate for the risk of losing the client to a departing consultant.

        **C.**    **The enforceability of non-compete agreements is determined on a case-by-case basis.**

      40.    Because reasonable non-compete agreements benefit workers, employers, and overall economic output, they have been recognized as legally enforceable for centuries.

      41.    Under the pre-Founding common law of contracts, a non-compete agreement was an enforceable contract unless it was found to have an unreasonable scope.  *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625 (1960).  The standard was first articulated in *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (Q.B. 1711).  In that seminal case, the court explained that "general restraints," not restricted in geographic or temporal scope, were unenforceable restraints on trade, but that "particular" restraints, limited to particular regions, times, or customers, were enforceable as any other contract would be.  Blake, *supra*, at 629–30 (discussing *Mitchel*).  From 1711 through "the end of the nineteenth century both English and American courts regarded *Mitchel v. Reynolds* as the fundamental authority to be applied in employee-restraint cases," "formulat[ing] the 'reasonableness' test in more specific terms" to fit each case.  *Id.* at 638–39.  Thus, at common law, reasonable non-competes were lawful, enforceable contracts.

      42.    In the vast majority of States, that remains true.  Forty-six States permit non-compete agreements, either explicitly by statute or by common-law rule.  Although some States have prohibited employers from enforcing non-compete agreements against low-wage workers, and a very small handful have effectively banned most non-compete agreements, the vast majority of States recognize reasonably tailored non-compete agreements as beneficial, pro-competitive,

and lawful.  A few States have even taken affirmative steps to make non-compete agreements *more* enforceable by loosening the standards for reasonableness applied by the courts.  *See, e.g.*, Fla. Stat. Ann. § 542.335; Ga. Code Ann. §§ 13-8-50–54 (Restrictive Covenant Act).

43.     The federal antitrust laws provide for the same type of individualized analysis of non-compete agreements as most States' contract law.

44.     Federal courts have long taken two alternative approaches to analyzing whether agreements violate the antitrust laws:  the rule of reason, which requires individualized analysis of the specific agreement, and per se rules, which categorically condemn a class of restraint.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018).  Per se prohibitions are reserved for cases where "courts can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason" because the restraint has "manifestly anticompetitive effects and lack[s] . . . any redeeming virtue."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) (citations and quotation marks omitted).

45.     Because non-compete agreements have significant redeeming benefits, federal courts have consistently examined them under the rule of reason and invalidated such agreements only when unreasonable in scope.  *See, e.g.*, *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that covenants not to compete should be examined under the rule of reason."); *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983).

46.     Thus, under both state contract law and federal antitrust law, non-compete agreements are analyzed individually on a case-by-case basis and, in light of the range of benefits they can generate, upheld as lawful, enforceable contracts where they are reasonable in scope.

**D.      From its creation until 2022, the Commission effectively never applied the FTC Act to non-compete agreements.**

47.      Although the Commission was established more than one hundred years ago, and non-compete agreements are widely used in a range of industries across the country, until 2022, the Commission had only sued a company *once* over a non-compete agreement.  And it lost.  In keeping with the longstanding individualized analysis of non-competes, the Seventh Circuit explained that non-compete agreements are not an unfair method of competition "unless they are unreasonable as to time or geographic scope," and held that the non-compete agreement at issue was reasonable and thus lawful.  *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963).

48.      Then, in late 2022 and days before publicly announcing its proposed ban on non-compete agreements, the Commission "rushed out the announcement of three consent agreements that resolve allegations that non-compete provisions constitute an unfair method of competition." Non-Compete Clause Rule, 88 Fed. Reg. 3482, 3542 (Jan. 19, 2023) (Commissioner Wilson's dissent).  The Commission has since announced an additional consent agreement resolving a similar allegation.  *See In re Anchor Glass Container Corp.*, 2023 WL 3856535, at *1 (May 18, 2023).

**E.      The Commission's Rule now outlaws nearly all non-compete agreements.**

49.      Despite hundreds of years of court decisions recognizing the pro-competitive benefits of non-compete agreements and analyzing their lawfulness on an individualized, case-by-case basis—and despite its own lack of rulemaking authority in the area—on January 19, 2023, the Commission proposed a rule effectively banning non-compete agreements.  *See* Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (Jan. 19, 2023).

50.      The proposal was the subject of enormous public attention.  The Commission received nearly 27,000 comments on the proposed rule.  Many of these comments, including

Ryan's, pointed out numerous flaws in the Commission's legal justifications for the rule and reasons for proposing it. Besides the Commission's lack of authority for the Non-Compete Rule, commenters pointed out—among many other things—that the evidence the Commission was relying on was too new, too flawed, and too inconclusive to justify a per se rule over-ruling the policies of 46 States and hundreds of years of precedent allowing reasonable non-compete agreements. Indeed, one of the Commission's own economists concluded in 2019 that "there is little evidence on the likely effects of broad prohibitions of non-compete agreements," John M. McAdams, Federal Trade Commission, *Non-Compete Agreements: A Review of the Literature* 4 (2019), because "[d]ata on non-compete use in the U.S. are sparse," *id.* at 3, and the methodological approaches to measuring the competitive effects of non-competes using that sparse data are often flawed, *see id.* at 10–13.

51.     Commenters likewise suggested that the Commission was inconsistently weighing the evidence on the competitive effects of non-compete agreements by overlooking flaws in studies cited to support its decision while declining to credit studies of equal or better quality.

52.     Commenters also advised the Commission that because antitrust law asks whether a restraint on trade is "harmful to the consumer," evidence of anticompetitive effects in the labor market could not be used to justify the Non-Compete Rule in any event. *Leegin*, 551 U.S. at 877. By relying on non-compete agreements' putative effect on the labor market, the Commission failed to base its decision on the "relevant factors" set forth in the FTC Act's consumer-protection provisions. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

53.     Finally, commenters pointed out numerous flaws in the Commission's cost-benefit analysis. Commenters explained that the Non-Compete Rule's projected benefits were overstated, and costs understated, because the Commission mis-analyzed the evidence on non-competes.

Commenters also explained that the Commission substantially downplayed or ignored compliance costs, the costs of litigating trade secret claims, the cost of the economic drag caused by increased worker turnover, and the potential inflationary effects of the Non-Compete Rule.

54.   Despite those and other criticisms of the proposal, on April 23, 2024, the Commission released a final Non-Compete Rule, effectively outlawing non-competes across the entire U.S. economy.

55.   The Non-Compete Rule declares that "it is an unfair method of competition for a person: (i) To enter into or attempt to enter into a non-compete clause; (ii) To enforce or attempt to enforce a non-compete clause; or (iii) To represent that the worker is subject to a non-compete clause."  16 C.F.R. § 910.2(a)(1).  "Worker" is defined to include anyone "who works or who previously worked, whether paid or unpaid," for anyone else, regardless of employee or independent contractor status.  *Id.* § 910.1(f).  The Non-Compete Rule renders existing non-compete agreements unenforceable in 120 days.  *Id.* § 910.2(b).  It exempts non-compete clauses "entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets" and causes of action that "accrued prior to the effective date."  *Id.* § 910.3(a), (b).  It also creates an exception allowing enforcement of existing non-compete agreements with "senior executives," but prohibits the formation of new non-compete agreements with such workers.  *Id.* § 910.2(a)(2)(ii).  The Non-Compete Rule requires businesses to send a "clear and conspicuous notice" to any worker subject to a non-compete informing him that his "non-compete clause will not be, and cannot legally be, enforced against the worker."  *Id.* § 910.2(b).  The Non-Compete Rule is effective 120 days after its publication in the Federal Register.  *Id.* § 910.6.

56.     The Non-Compete Rule purports to supersede state laws that would "permit or authorize" non-compete agreements.  *See* 16 C.F.R. § 910.4.

57.     The Commission estimates that its Non-Compete Rule will invalidate the contracts of "one in five American workers—or approximately 30 million workers"—thereby upending reliance interests and entrenched business models.  The Commission predicts the economic impact of the Non-Compete Rule will exceed hundreds of *billions* of dollars.

58.     The Commission's conclusion that non-competes are an unfair method of competition is based in part on its determination that non-compete agreements are "restrictive and exclusionary."  Rule at 113.  But that is no more than saying that non-compete agreements are non-compete agreements.  Indeed, the Commission admits as much, stating that "[t]he restrictive nature of non-competes is evident from their name and function: Non-competes restrict competitive activity."  *Id.*  And, further, the Commission asserts "that non-competes are exclusionary conduct because they tend to impair . . . the ability of a rival firm to hire" workers "subject to non-competes."  *Id.* at 114.  The Commission attempts to create the illusion of actual analytical work by incanting a collection of adjectives:  "Indicia of unfairness include the extent to which the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature."  *Id*. at 55.  But these broad, undefined terms do not meaningfully limit or guide the Commission's analysis.  Notwithstanding hundreds of years of statutory and common law stretching back to 1711 establishing that reasonably tailored non-competes are permissible and procompetitive, the Commission from the start stacks the deck in its favor through little more than *ipse dixit*.

59.     The Commission likewise based the Non-Compete Rule in part on the radical and unsubstantiated claim that for all American workers other than "senior executives," employment

by a U.S. corporation is inherently "coercive and exploitative," because employers purportedly exercise market power that enables them to impose terms and conditions of employment unilaterally, with no negotiation with individual employees.  Rule at 117-19.  This pejorative characterization of the U.S. employment relationship—by an agency that has neither expertise nor authority regarding employment matters—wholly overlooks the vibrant inter-firm competition among American employers that produces improvements in the terms and conditions of employment intended to attract and retain American workers.  Professional service firms such as Ryan, for example, compete in a nationwide market for highly-skilled professionals who have many employment options.  In ignoring such employees' ability to affect employment terms by taking advantage of the robust competition for workers among U.S. businesses, the Commission also ignored, and made no reference to, the widely-discussed "worker shortage," which in recent years has been characterized, among other things, by millions more open jobs than unemployed workers seeking jobs, and which has been credited with substantial increases in wages and other material improvements in the terms and conditions of employment in the last five years alone.  The Commission's observation that non-competes are not always individually negotiated, therefore, fails to account for the capacity of inter-company competition to influence and discipline the use of non-competes—and fails to account, as well, for the possibility that non-competes remain in common use because other employment terms are far more important to workers or because, numerous commenters explained, workers themselves benefit from non-competes.

60.     The Commission's further justifications for the final rule are flawed in the same ways as its justifications for the proposed rule.  For example, the Commission's cost-benefit analysis is flawed because it understates costs and exaggerates benefits.  One grossly understated cost is the cost of legal fees in complying with the Non-Compete Rule.  The Commission values a

lawyer's time at only $134.62 and assumes without explanation that the average business would need only one hour of legal work.  Rule at 490, n.1158, 543.  But the average cost of a lawyer in the United States was $327 per hour in 2023, Clio, *Legal Trends Report 2023* at 15, and the largest firms may need hundreds of hours of attorney review.  The Commission likewise understates the likely effect on investment in human capital.  Though it admits the Non-Compete Rule might cost up to $41 billion in human capital investment, it declines to fully account for it by overstating the uncertainty of that measure.  *See* Rule at 480–81.

61.     The Commission also exaggerates the benefits of the Non-Compete Rule by arguing that it would increase worker earnings.  Rule at 441.  Though the Commission based the Non-Compete Rule in substantial part on the claim that "non-competes suppress workers' earnings," Rule at 140, it finds that the Rule would increase wages a paltry 0.86%.  Rule at 465. Wages grew more than that in the fourth quarter of 2023 alone.  *See* Employment Cost Index – December 2023 at 2, Bureau of Labor Statistics, https://www.bls.gov/news.release/pdf/eci.pdf. The Commission nowhere revisited its conclusion that non-competes "suppress" earnings in light of its separate conclusion that outlawing non-competes nationwide would have a minimal wage impact.  Moreover, the Proposed Rule projected that CEOs and physicians would be among the principal beneficiaries of projected wage gains under the Rule, but the Adopting Release obscures and fails to address which workers would experience wage gains from the final Rule.  *See* 88 Fed. Reg. 3,482, 3,523–24 (Jan. 19, 2023).  It therefore also fails to address whether it is reasonable to provoke a massive disruption in U.S. employment practices to benefit well-heeled workers so capable of fending for themselves that Congress has exempted them from key requirements of the federal wage and hour laws.  *See* 29 U.S.C. § 213(a)(1).

62.     In any event, to whatever extent the rule would increase wages, the Commission's accounting for it as a benefit is puzzling in light of its admission that ""[in] many settings," "increases in workers' earnings from restricting non-competes may increase consumer prices," such that any benefits to workers—which are not a basis for regulations promulgated under the FTC Act—would come at a cost to the consumers whom the Commission is supposed to protect. Rule at 479.   Despite the centrality of consumer protection and price competition to its mission, moreover, the Commission rushed the Rule forward based on data regarding price effects in a single market—for physician and clinical services—rather than conducting the study necessary to ascertain the Non-Compete Rule's impact on prices more broadly.

63.     Further, the evidence cited by the Commission does not show that non-competes for all but the most senior executives are *per se* unfair.  The Commission nowhere demonstrates that non-competes in all industries, in all circumstances, are always an unfair method of competition.  And the Commission made no finding that non-competes are an unfair method of competition in the tax services industry.  Yet the Commission abolishes 30 million non-competes across every industry, without meaningfully considering alternatives such as occupation-specific restrictions based on the limited empirical work cited in the basis for the Non-Compete Rule.

64.     Moreover, the Commission continued to inconsistently evaluate the empirical studies on non-compete agreements.  For example, the Commission continued to rely on studies finding that non-competes are associated with lower earnings by measuring earnings against *twelve* different metrics of how enforceable non-competes are, only one of which is whether non-competes are permitted.  Non-Compete Rule at 141–42.  As commenters pointed out, those studies thus could not establish that non-competes being banned caused earnings to increase, but the Commission credited them.  At the same time, the Commission declined to credit studies finding

that the use of non-competes are associated with higher earnings because they are "unlikely to reflect causation."  Non-Compete Rule at 145–46.

65.     The Commission also relies on inconsistent and contradictory reasoning.   For example, the Commission claims that eliminating non-competes will increase innovation by eliminating obstacles to information-sharing.  Non-Compete Rule at 236.  But the Commission simultaneously claims that employers can use "alternatives to non-competes," such as NDAs and trade secret law to prevent information sharing.  Rule at 288–90.  The Commission does not explain how both can be true.  If NDAs and trade secret law were sufficient to prevent information-sharing, abolishing non-competes would not increase innovation because employers would simply replace the non-competes with comprehensive NDAs and vigorous (and costly) enforcement of trade secret law.  Alternatively, NDAs and trade secret law might be more difficult and costly to enforce than non-competes, which can effectively prevent any communication between a firm's former workers and its competitors; the Non-Compete Rule would then increase information-sharing at the cost of an innovative firm's competitive advantage.

## COUNT ONE

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706
### (NO STATUTORY AUTHORITY)

66.     Ryan incorporates by reference the allegations of the preceding paragraphs.

67.     The Non-Compete Rule declares virtually all non-compete agreements to be unfair methods of competition under Section 5 of the FTC Act.  The Commission has no statutory authority to promulgate such a rule.

68.     To start, the Commission does not have statutory authority to promulgate substantive rules regarding unfair methods of competition at all.

69.     The Commission's purported authority—Section 6(g) of the FTC Act—only grants the authority to promulgate procedural rules.  The statutory language on which the Commission relies is found in a section that lists ancillary powers to aid the Commission in adjudicating cases and appears in the same sentence as the Commission's authority to classify corporations.  Nowhere in the FTC Act did Congress prescribe a penalty for violating rules promulgated under Section 6(g).  This context makes clear that Congress did not intend Section 6(g) as a far-reaching grant of substantive rulemaking authority empowering the Commission to extinguish tens of millions of existing non-compete agreements.  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

70.     The Commission's lack of statutory authority is confirmed by Congress's decision to grant the Commission authority to promulgate substantive rules regarding unfair or deceptive acts or practices in the Magnuson-Moss Act, but to withhold similar authority with respect to unfair methods of competition.  That choice "support[s] a sensible inference that the [rulemaking authority] left out must have been meant to be excluded."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  Likewise, the imposition of procedural requirements beyond those required by the Administrative Procedure Act for rules regarding unfair or deceptive acts or practices demonstrates that Congress gave the Commission *no* rulemaking authority over unfair methods of competition.  *See* 15 U.S.C. § 57a(b)–(d).

71.     The "major questions doctrine" underscores that the Commission lacks the authority to ban non-competes by declaring them an unfair method of competition.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022).  The Non-Compete Rule will invalidate 30 million employment contracts, directly affecting one-fifth of American workers and generating an

unfavorable economic impact to American businesses of hundreds of billions of dollars.  It upsets long-settled expectations.  And by preempting the laws of at least 46 States in an area that has been regulated by the States since before the Founding, the Rule "intrudes into an area that is the particular domain of state law."  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam).  There is no doubt that the Rule is of "vast economic and political significance."  *West Virginia*, 142 S. Ct. at 2605.  Nor are those consequences the limit of the Commission's claimed authority, since non-competes are but one of countless competition-related practices the Commission evidently claims authority to regulate from coast-to-coast—overturning state laws and established expectations—based on little more than its determination that a practice is "unfair."

72.     To promulgate such sweeping rules, an agency must have clear and unmistakable authority.  The modest powers afforded the Commission in Section 6(g) do not come close to that standard.

73.     Finally, as discussed *infra*, if Section 6(g) were a grant of substantive rulemaking authority, it would constitute an unconstitutional delegation of legislative power.  The constitutional avoidance canon requires that any "ambiguous statutory language be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

## COUNT TWO

## ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706
## (NONDELEGATION DOCTRINE)

74.     Ryan incorporates by reference the allegations of the preceding paragraphs.

75.     If Congress did grant the FTC the authority to promulgate substantive rules regarding unfair methods of competition, that grant is an unconstitutional delegation of legislative power in violation of Article I of the Constitution.

76.     The Constitution vests "[a]ll [the] legislative Powers" it grants in "Congress." U.S. Const. art. I, § 1.  Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  It can delegate legislative power only if it provides an "intelligible principle" by which the agency can exercise it.  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  More precisely, Congress may authorize agencies only to "fill[] up details and find[] facts." *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting).

77.     The FTC Act does not set forth an intelligible principle to guide an unfair-competition rulemaking, let alone assign the Commission the limited role of finding facts or filling up details.  As construed by the Commission, the determination of which trade practices are "unfair" is a subjective, open-ended inquiry for which Congress provided no guideposts.  Yet the Constitution does not allow the Commission "to exercise an unfettered discretion to make whatever laws [it] thinks may be needed or advisable." *Schechter*, 295 U.S. at 537–38.

78.     Indeed, the Commission's asserted authority to promulgate rules establishing unfair methods of competition is virtually identical to the authority to issue "codes of fair competition" that the Supreme Court held to be an unconstitutional delegation in *Schechter*.  295 U.S. at 532–34.  *Schechter* contrasted those constitutionally impermissible "codes" with the Commission's case-by-case adjudication of "unfair methods of competition" under Section 5 of the FTC Act, indicating that the incremental, case-specific nature of the Commission's authority was instrumental to its constitutionality. *See id.* at 532–33.  But here, the Commission has jettisoned

24

that circumscribed case-by-case approach in favor of a sweeping rulemaking power wholly unconstrained by congressional guardrails.

79.    The Non-Compete Rule is thus the product of an unconstitutional exercise of power.

**COUNT THREE**

**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706**
**(U.S. CONSTITUTION ARTICLE II)**

80.    Ryan incorporates by reference the allegations of the preceding paragraphs.

81.    Because Article II of the Constitution vests the entire executive power in the President, "lesser officers" within the Executive Branch "must remain accountable to the President." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).  That accountability is accomplished by the President's "unrestricted removal power." *Id.* at 2198–200.

82.    The FTC Act restricts the President's ability to remove Commissioners by granting them fixed terms and providing that they can be removed only for "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  It is therefore unconstitutional.

83.    Although the Supreme Court upheld the FTC Act's removal restriction in *Humphrey's Executor*, 295 U.S. at 626, that decision depended on the Court's "view[ing] the FTC (as it existed in 1935) as exercising 'no part of the executive power,'" *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's Ex'r*, 295 U.S. at 628).  The FTC exercised at most an "'executive *function*,'" the Court said, and even then "only in the discharge of its 'quasi-legislative or quasi-judicial powers.'"  *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 628).

84.    The "conclusion that the FTC did not exercise executive power has not withstood the test of time."  *Seila Law*, 140 S. Ct. at 2198 n.2.  The FTC now exercises "executive power in the constitutional sense."  *Humphrey's Ex'r*, 295 U.S. at 628; *see also Seila Law*, 140 S. Ct. at

2198.  The FTC Act's removal protection for Commissioners is therefore a violation of the Vesting Clause of Article II.  *See* U.S. Const. art. II, § 1, cl. 1.[*]

85.     The Non-Compete Rule is thus the product of an unconstitutional exercise of power.

## COUNT FOUR

### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706
### (ARBITRARY AND CAPRICIOUS DECISIONMAKING)

86.     Ryan incorporates by reference the allegations of the preceding paragraphs.

87.     The Commission's reasons for categorically condemning non-compete agreements as unfair methods of competition are arbitrary and capricious because the Commission, among other things, failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  For example, and without limitation:

> a.      The Commission justifies the Non-Compete Rule by citing purported harms in the labor market, which are not a factor Congress directed the Commission to consider.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *supra* ¶ 52; *see also, e.g.*, Rule at 105-06.  Further, the Commission bases the Rule in part on its supposedly positively impact on

---

[*] Ryan recognizes that the Fifth Circuit recently held that "although the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court . . . to answer." *Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *see also Consumers' Research v. Consumer Product Safety Comm'n*, 91 F.4th 342, 353–54, 356 (5th Cir. 2024) (holding that the Consumer Product Safety Commission's "exercise[] [of] substantial executive power" does not "remove[]" it "from the *Humphrey's* exception," and instead, that "[p]rincipal officers may retain for-cause protection when they act as part of an expert board").  Ryan respectfully preserves this argument for further review, in light of Judge Jones's contrary opinion in *Consumers' Research* that "for-cause removal protection violates the constitutional separation-of-powers" whenever the agency "exercise[s] executive power," 91 F.4th at 358 (Jones, J., dissenting), and in light of the *Consumers' Research* majority's observation that "[t]he logic of *Humphrey's* may have been overtaken," *id.* at 346 (maj. op.).

worker earnings, yet never re-considers that rationale—and the justification of the Rule—in light of its finding that the Rule would increase wages less than 1 percent, with higher-wage workers potentially capturing much of those gains.

b.     The Commission does not adequately determine whether and to what extent the Rule will raise prices, an "important aspect of the problem" in light of the Commission's core mission of protecting consumers.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *supra* ¶ 62.

c.     The Commission inconsistently weighed the evidence, used empirical studies in an opportunistic, inconsistent matter, and gave logically inconsistent reasons for the Rule.  Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce of U.S.A. v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018); *see also Air Line Pilots Ass'n v. FAA*, 3 F.3d 449, 454 (D.C. Cir. 1993); *supra* ¶¶ 51, 64.

d.     In concluding that non-competes (and presumably all terms of employment in the U.S.) are "unfair" because American employers have "market power" that they use to contract with workers on terms that supposedly are "exploitative and coercive," the Commission ignored the obvious and widespread evidence of inter-firm competition for workers, the employment options this competition presents to workers—particularly to highly-trained professionals in nationwide markets for professional services—and how those factors and the "worker shortage" empower workers and favorably influence their terms and conditions of employment.  Similarly, in finding non-competes to be "unfair" because they are "restrictive," the Commission engaged in a vacuous and circular

interpretation of the FTC Act that is irreconcilable with the widespread acceptance of non-competes long before the Act's passage to more than a century later. *See supra* ¶ 59

e.      The Commission's decision to institute a categorical ban on non-competes is arbitrary and capricious because the Commission did not sufficiently establish that non-competes are unfair and harmful methods of competition in all industries—including, specifically, in the market for the tax services provided by Ryan—and the Commission did not adequately explain its decision to depart from the case-by-case approach supported by hundreds of years of precedent and used by the vast majority of States and by the Commission itself in its prior, limited regulation of non-competes. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48; *supra* ¶¶ 50, 63.

f.      The evidence does not support the Commission's conclusion that *all* non-compete agreements, no matter how narrowly tailored, are an unfair method of competition. The Commission's finding from the start assumes its conclusion and fails to support its nationwide, omni-industry determination. There is therefore no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also supra* ¶ 63.

g.      The Commission ignored numerous categories of costs the Rule will impose, and overstated the Rule's benefits, resulting in a "serious[ly] flaw[ed]" cost-benefit analysis that "render[s] the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012); *see also supra* ¶¶ 53, 60–62.

h.      The Commission did not meaningfully consider the many alternative approaches to its per se prohibition on non-competes. *See Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984); *supra* ¶ 63.

i.    The Commission also "fail[ed] to respond to comments" which "demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Wages and White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1140 (5th Cir. 2021) (quoting *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020)). For example, the Commission did not adequately respond to the argument, raised by commenters, including Ryan, that principals and partners in businesses such as consulting firms are often core to the businesses and therefore have considerable bargaining power when negotiating noncompetes.   This argument is important because it supports a reasonable alternative to the Rule that the Commission failed to consider: exempting those who hold equity in a business.   The Commission merely stated that "proposals to except partners, shareholders, and similar groups are likely covered by the sale of business exception if they sell their share of the business upon leaving."  Rule at 279.  But at the same time the Commission made it clear that many common terms in shareholder agreements would exclude those non-competes from the exception's coverage.  Rule at 342.

## COUNT FIVE

**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706**
**(CONTRARY TO LAW AND UNCONSTITUTIONAL TAKING - RETROACTIVITY)**

88.    Ryan incorporates by reference the allegations of the preceding paragraphs.

89.    The Commission does not have the authority to issue "retroactive rules."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).   That authority must be "conveyed by Congress in express terms."  *Id.*   There is nothing in the FTC Act that comes close to expressly granting the authority to promulgate retroactive rules.

90.    Retroactive laws also violate Due Process and the Fifth Amendment's Takings Clause by "depriv[ing] citizens of legitimate expectations and upset[ting] settled transactions." *Eastern Enters., v. Apfel*, 524 U.S. 498, 533 (1998).

91.    The Non-Compete Rule regulates retroactively.  It invalidates over 30 million existing non-compete agreements, even though employers may have already performed their end of the bargain.  The Rule is therefore unconstitutional, contrary to law, and without statutory authority.

## COUNT SIX

## DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, 2202

92.    Ryan incorporates by reference the allegations of the preceding paragraphs.

93.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

94.    For the reasons articulated in Counts One through Five, there is a real and actual controversy as to whether the Commission has violated the Administrative Procedure Act and the United States Constitution by issuing the Non-Compete Rule, thereby causing substantial injury to Ryan.

95.    Ryan seeks a judicial declaration that the Non-Compete Rule violates the Administrative Procedure Act because the Commission exceeded its statutory authority and acted arbitrarily and capriciously.

96.    Ryan seeks further declarations that Section 5 of the FTC Act violates the Constitution's nondelegation doctrine and that the FTC is unconstitutionally structured in violation of Article II.

97.     The Court should grant declaratory relief and any further necessary and proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201, 2202.

## PRAYER FOR RELIEF

98.     For these reasons, Ryan respectfully requests entry of an order and judgment:

a.     Vacating and setting aside the Non-Compete Rule;

b.     Declaring that the Commission does not have the authority to issue rules defining acts to be unfair methods of competition;

c.     Declaring that Section 5 of the FTC Act violates the Constitution's nondelegation doctrine;

d.     Declaring that the Commission is unconstitutionally structured in violation of Article II because its Commissioners are improperly insulated from presidential removal;

e.     Declaring that the Non-Compete Rule is the product of arbitrary and capricious decisionmaking;

f.     Declaring that the Non-Compete Rule is unlawfully and unconstitutionally retroactive;

g.     Staying the effective date of the Non-Compete Rule and preliminarily enjoining the Commission from enforcing the Rule;

h.     Permanently enjoining the Commission from enforcing the Non-Compete Rule;

i.     Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

j.     Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  May 1, 2024

*/s/ Allyson N. Ho*
Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:    214.698.3100
Facsimile:     214.571.2900
aho@gibsondunn.com
ekiernan@gibsondunn.com

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:    202.955.8500
Facsimile:     202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*/s/ Charles W. Fillmore*
Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone:    817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

*Attorneys for Ryan, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 1, 2024, I caused the foregoing motion to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

Dated:  May 1, 2024

Respectfully submitted,

*/s/ Allyson N. Ho*
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
aho@gibsondunn.com