# EXHIBIT A

**BILLING CODE: 6750-01-P**

**FEDERAL TRADE COMMISSION**

**16 CFR Part 910**

**RIN 3084-AB74**

**Non-Compete Clause Rule**

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** Pursuant to sections 5 and 6(g) of the Federal Trade Commission Act ("FTC Act"), the Federal Trade Commission ("Commission") is issuing the Non-Compete Clause Rule ("the final rule"). The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for persons to, among other things, enter into non-compete clauses ("non-competes") with workers on or after the final rule's effective date. With respect to existing non-competes—*i.e.*, non-competes entered into before the effective date—the final rule adopts a different approach for senior executives than for other workers. For senior executives, existing non-competes can remain in force, while existing non-competes with other workers are not enforceable after the effective date.

**DATES:** The final rule is effective [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

**FOR FURTHER INFORMATION CONTACT:** Benjamin Cady or Karuna Patel, Office of Policy Planning, 202-326-2939 (Cady), 202-326-2510 (Patel), Federal Trade Commission, 600 Pennsylvania Avenue, NW, Mail Stop CC-6316, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

1

### A. Summary of the Final Rule's Provisions

The Commission proposed the Non-Compete Clause Rule on January 19, 2023 pursuant to sections 5 and 6(g) of the FTC Act.[1] Based on the Commission's expertise and after careful review and consideration of the entire rulemaking record—including empirical research on how non-competes affect competition and over 26,000 public comments—the Commission adopts this final rule addressing non-competes.

The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for employers to, inter alia, enter into non-compete clauses with workers on or after the final rule's effective date.[2] The Commission thus adopts a comprehensive ban on new non-competes with all workers.

With respect to existing non-competes, *i.e.*, non-competes entered into before the final rule's effective date, the Commission adopts a different approach for senior executives[3] than for other workers. Existing non-competes with senior executives can remain in force; the final rule does not cover such agreements.[4] The final rule allows existing non-competes with senior executives to remain in force because this subset of workers is less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers subject to existing non-competes and because commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives. For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[5] Employers must provide such workers with existing non-competes notice that they are no longer

---

[1] Non-Compete Clause Rule, NPRM, 88 FR 3482 (Jan. 19, 2023) (hereinafter "NPRM").
[2] § 910.2(a)(1)(i) and § 910.2(a)(2)(i).
[3] *See* § 910.1 (defining "senior executive").
[4] *See* Part IV.C.3.
[5] § 910.2(a)(1)(ii).

enforceable.[6] To facilitate compliance and minimize burden, the final rule includes model language that satisfies this notice requirement.[7]

The final rule contains separate provisions defining unfair methods of competition for the two subcategories of workers. Specifically, the final rule provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; to enforce or attempt to enforce a non-compete clause; or to represent that the worker is subject to a non-compete clause.[8] The Commission describes the basis for its finding that these practices are unfair methods of competition in Parts IV.B.1 through IV.B.3.

The final rule provides that, with respect to a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; to enforce or attempt to enforce a non-compete clause entered into after the effective date; or to represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.[9] The Commission describes the basis for its finding that these practices are unfair methods of competition in Part IV.C.2.

The final rule defines "non-compete clause" as "a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from (1) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (2) operating a business in the United States after the conclusion of the employment that includes

---

[6] § 910.2(b)(1).
[7] § 910.2(b)(4).
[8] § 910.2(a)(1).
[9] § 910.2(a)(2).

the term or condition."[10] The final rule further provides that, for purposes of the final rule, "term or condition of employment" includes, but is not limited to, a contractual term or workplace policy, whether written or oral.[11] The final rule further defines "employment" as "work for a person."[12]

The final rule defines "worker" as "a natural person who works or who previously worked, whether paid or unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person."[13] The definition further states that the term "worker" includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.[14]

The final rule does not apply to non-competes entered into by a person pursuant to a bona fide sale of a business entity.[15] In addition, the final rule does not apply where a cause of action related to a non-compete accrued prior to the effective date.[16] The final rule further provides that it is not an unfair method of competition to enforce or attempt to enforce a non-compete or to make representations about a non-compete where a person has a good-faith basis to believe that the final rule is inapplicable.[17]

The final rule does not limit or affect enforcement of State laws that restrict non-competes where the State laws do not conflict with the final rule, but it preempts State laws that

---

[10] § 910.1.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] § 910.3(a).
[16] § 910.3(b).
[17] § 910.3(c); *see also* Part V.C.

conflict with the final rule.[18] Furthermore, the final rule includes a severability clause clarifying the Commission's intent that, if a reviewing court were to hold any part of any provision or application of the final rule invalid or unenforceable—including, for example, an aspect of the terms or conditions defined as non-competes, one or more of the particular restrictions on non-competes, or the standards for or application to one or more category of workers—the remainder of the final rule shall remain in effect.[19] The final rule has an effective date of [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].[20]

## B. Context for the Rulemaking

### 1. Growing Concerns Regarding the Harmful Effects of Non-Competes

The purpose of this rulemaking is to address conduct that harms fair competition. Concern about non-competes dates back centuries, and the evidence of harms has increased substantially in recent years. However, the existing case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets.

The ability of employers[21] to enforce non-competes has always been restricted, based on public policy concerns that courts have recognized for centuries. For example, in *Mitchel v. Reynolds* (1711), an English case that provided the foundation for American common law on non-competes,[22] the court noted that workers were vulnerable to exploitation through non-competes and that non-competes threatened a worker's ability to practice a trade and earn a

---

[18] § 910.4.
[19] § 910.5.
[20] § 910.6.
[21] For ease of reference, the Commission uses the term "employer" in this Supplementary Information to refer to a person for whom a worker works. The text of part 910 does not use the term "employer."
[22] Harlan Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 629-31 (1960).

living.[23] These concerns have persisted. Today, non-competes between employers and workers are generally subject to greater scrutiny under State common law than other employment terms "because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood."[24] For these reasons, State courts often characterize non-competes as "disfavored."[25]

Furthermore, as "contract[s] . . . in restraint of trade,"[26] non-competes have always been subject to our nation's antitrust laws.[27] As early as 1911, in the formative antitrust case of *United States v. American Tobacco Co.*, the Supreme Court held that several tobacco companies violated both section 1 and section 2 of the Sherman Act because of the "constantly recurring" use of non-competes, among other practices.[28]

Concerns about non-competes have increased substantially in recent years in light of empirical research showing that they tend to harm competitive conditions in labor, product, and service markets. Changes in State laws governing non-competes[29] in recent decades have allowed researchers to better isolate the effects of non-competes, giving rise to a body of empirical research documenting these harms. This research has shown that the use of non-

---

[23] The *Mitchel* court expressed concern that non-competes threaten "the loss of [the worker's] livelihood, and the subsistence of his family." *Mitchel v. Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711). The court likewise emphasized "the great abuses these voluntary restraints" are subject to—for example, "from masters, who are apt to give their apprentices much temptation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves." *Id.*

[24] Restatement (Second) of Contracts sec. 188, cmt. g (1981).

[25] *See, e.g.*, *Navarre Chevrolet, Inc. v. Begnaud*, 205 So. 3d 973, 975 (La. Ct. App. 3d 2016); *Eastman Kodak Co. v. Carmosino*, 77 A.D.3d 1434, 1435 (N.Y. App. Div. 4th 2010); *Access Organics, Inc. v. Hernandez*, 175 P.3d 899, 904 (Mont. 2008); *Bybee v. Isaac*, 178 P.3d 616, 621 (Idaho 2008); *Softchoice, Inc. v. Schmidt*, 763 N.W.2d 660, 666 (Minn. Ct. App. 2009).

[26] 15 U.S.C. 1.

[27] *See, e.g.*, *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[28] 221 U.S. 106, 181-83 (1911).

[29] *See* NPRM at 3494 (describing recent legislative activity at the State level).

competes by employers tends to negatively affect competition in labor markets, suppressing

earnings for workers across the labor force—including even workers not subject to non-

competes.[30] This research has also shown that non-competes tend to negatively affect

competition in product and service markets, suppressing new business formation and

innovation.[31]

      Alongside this large body of empirical work, news reports revealed that employers

subject even middle-income and low-wage workers to non-competes on a widespread basis.[32]

Workers came forward to recount how—by blocking them from taking a better job or starting

their own business, and subjecting them to threats and litigation from their employers—non-

competes derailed their careers, destroyed their finances, and upended their lives.[33]

      Yet despite the mounting empirical and qualitative evidence confirming these harms and

the efforts of many States to ban them, non-competes remain prevalent in the U.S. economy.

Based on the available evidence, the Commission estimates that approximately one in five

American workers—or approximately 30 million workers—is subject to a non-compete.[34] The

evidence also indicates that employers frequently use non-competes even when they are

unenforceable under State law.[35] This suggests that employers may believe workers are unaware

of their legal rights; that employers may be seeking to take advantage of workers' lack of

---

[30] *See* Parts IV.B.3.a and IV.C.2.c.ii.

[31] *See* Parts IV.B.3.b and IV.C.2.c.i.

[32] *See, e.g.*, Dave Jamieson, *Jimmy John's Makes Low-Wage Workers Sign 'Oppressive' Noncompete Agreements*, HuffPost, Oct. 13, 2014, https://www.huffpost.com/entry/jimmy-johns-non-compete_n_5978180; Spencer Woodman, *Exclusive: Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes,* The Verge, Mar. 26, 2015, https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-exclusive-noncompete-contracts.

[33] *See, e.g.*, Conor Dougherty, *How Noncompete Clauses Keep Workers Locked In,* N.Y. Times, May 13, 2017, https://www.nytimes.com/2017/05/13/business/noncompete-clauses.html; Lauren Weber, *The Noncompete Clause Gets a Closer Look*, Wall St. J., Jul. 21, 2021, https://www.wsj.com/articles/the-noncompete-clause-gets-a-closer-look-11626872430.

[34] *See* Part I.B.2. As described therein, this is likely a conservative estimate.

[35] *See* Part IV.B.2.b.i.

knowledge of their legal rights; or that workers are unable to enforce their rights through case-by-case litigation.[36] In addition, the ability of States to regulate non-competes effectively is constrained by employers' use of choice-of-law provisions, significant variation in how courts apply choice-of-law rules in disputes over non-competes, and the increasingly interstate nature of work. As the public comments attest, this patchwork of laws and legal uncertainty has become extremely burdensome for both employers and workers.[37]

As concern about the harmful effects of non-competes increased, the Commission began exploring the potential for Federal rulemaking on non-competes. In 2018 and 2019, the Commission held several hearings on twenty-first century competition and consumer protection issues, including "the use of non-competition agreements and the conditions under which their use may be inconsistent with the antitrust laws."[38] In January 2020, the Commission held a public workshop on non-competes. The speakers and panelists who participated in the workshop—and the hundreds of public comments the Commission received in response to the workshop—addressed a wide range of issues, including statutory and judicial treatment of non-competes; the economic literature regarding the effects of non-competes; and whether the Commission should initiate a Federal rulemaking on non-competes.[39] The Commission also sought public comment on non-competes as part of an August 2021 solicitation for public comment on contract terms that may harm competition and a December 2021 public workshop on competition in labor markets.[40] The Commission has also addressed non-competes in

---

[36] *See id.*
[37] *See* Part IX.C.2.
[38] Hearings on Competition and Consumer Protection in the 21st Century, Notice, 83 FR 38307, 38309 (Aug. 6, 2018).
[39] FTC, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (Jan. 9, 2020), https://www.ftc.gov/news-events/events/2020/01/non-competes-workplace-examining-antitrust-consumer-protection-issues.
[40] FTC, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021),

connection with its merger review work.[41]

In 2021, the Commission initiated investigations into the use of non-competes. In 2023, the Commission secured final consent orders settling charges that certain firms engaged in an unfair method of competition in violation of section 5 because their use of non-competes tended to impede rivals' access to the restricted employees' labor, harming workers, consumers, and competitive conditions.[42]

The Commission also secured a final consent order settling charges that another firm violated section 5 by using non-competes with its employees.[43] The Commission's complaint alleged the firm's imposition of non-competes took advantage of the unequal bargaining power between the firm and its employees, including low-wage security guard employees, and thus reduced workers' job mobility; limited competition for workers' services; and ultimately deprived workers of higher wages and more favorable working conditions.[44]

Based on the feedback obtained from years of extensive public outreach and fact-gathering, in January 2023, the Commission published a notice of proposed rulemaking (NPRM) concerning non-competes.[45] The proposed rule would have categorically banned employers from

---

https://www.regulations.gov/document/FTC-2021-0036-0022; FTC, *Making Competition Work: Promoting Competition in Labor Markets* (Dec. 6-7, 2021), https://www.regulations.gov/docket/FTC-2021-0057/comments.
[41] *See* NPRM at 3498-99.
[42] FTC, Press Release, *FTC Approves Final Orders Requiring Two Glass Container Manufacturers to Drop Noncompete Restrictions That They Imposed on Workers* (Feb. 23, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-approves-final-orders-requiring-two-glass-container-manufacturers-drop-noncompete-restrictions; FTC, Press Release, *FTC Approves Final Order Requiring Anchor Glass Container Corp. to Drop Noncompete Restrictions That It Imposed on Workers* (June 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-approves-final-order-requiring-anchor-glass-container-corp-drop-noncompete-restrictions-it.
[43] FTC, Press Release, *FTC Approves Final Order Requiring Michigan-Based Security Companies to Drop Noncompete Restrictions That They Imposed on Workers* (Mar. 8, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-approves-final-order-requiring-michigan-based-security-companies-drop-noncompete-restrictions.
[44] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.* at 1 (Jan. 4, 2023).
[45] NPRM, *supra* note 1.

using non-competes with all workers and required rescission of all existing non-competes.[46]

In response to the NPRM, the Commission received over 26,000 public comments.[47] The comments reflected a diverse cross-section of the U.S. The Commission received comments from employers and workers in a wide range of industries and from every State;[48] from small, medium, and large businesses; and from workers with wide-ranging income levels.[49] The Commission also received comments from representatives of different industries through trade and professional groups as well as from academics and researchers. Federal, State, and local governmental representatives also submitted public comments.

Among these comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes. Among the public commenters were thousands of workers who described how non-competes prevented them from taking a better job or starting a competing business, as well as numerous small businesses who struggled to hire talented workers. Commenters stated that non-competes have suppressed their wages, harmed working conditions, negatively affected their quality of life, reduced the quality of the product or service their company provided, prevented their business from growing and thriving, and created a climate of fear that deters competitive activity. The following examples are illustrative of the

---

[46] *Id.* at 3482-83.

[47] The public comments are available online. *See* Regulations.gov, Non-Compete Clause Rule (NPRM), FTC-2023-0007, https://www.regulations.gov/docket/FTC-2023-0007/comments. The Commission cannot quantify the number of individuals or entities represented by the comments. The number of comments undercounts the number of individuals or entities represented by the comments because many comments, including comments from different types of organizations, jointly represent the opinions or interests of many.

[48] This reflects information provided by commenters. Commenters self-identify their State and are not required to include geographic information.

[49] Though most commenters identifying as workers did not provide information regarding their income or compensation levels, many provided information about their particular jobs or industries from which the Commission was able to infer a broad range of income levels based on occupational data from the Bureau of Labor Statistics ("BLS"). BLS wage data for each year can be found at Occupational Employment and Wage Statistics, *Tables Created by BLS*, https://www.bls.gov/oes/tables.htm (hereinafter "BLS Occupational Employment and Wage Statistics"). The Commission used data from the May 2022 National XLS table, generally for private ownership.

comments the Commission received:[50]

- I currently work in sales for an asphalt company in Michigan. The company had me sign a two year non-compete agreement to not work for any other asphalt company within 50 miles if I decide to resign. After two years with the company I have been disheartened at how poorly customers are being treated and how often product quality is sub-par. I would love to start my own business because I see this as an opportunity to provide a better service at a lower cost. However, the non-compete agreement stands in the way even though there are no trade secrets and too many customers in this market.[51]

- [I] signed a non-compete clause for power-washing out of duress. My boss said that if I didn't sign before the end of the week, not to come in the next week. . . . I'd like to start my own business but I would have to find another job and wait 5 years. All I know is power-washing and these business owners all want me to sign a non-compete clause. It's one big circle of wealthy business owners keeping the little man down. Essentially, non-compete clauses limit an employee's opportunity to excel in whatever skill or trade they're familiar with. In the land of the free, we should be free to start a business not limited by greedy business owners.[52]

- In October 2020, I started working as a bartender at a company called [REDACTED] for $10 an hour. On my first day, I unknowingly signed a 2-year non-compete, slipped between other paperwork while my boss rushed me, and downplayed its importance. . . . At [REDACTED], I was sexually harassed and emotionally abused. I needed money, so I searched for a new job while remaining at [REDACTED] for one year. I was eventually offered a bartending job at a family-owned bar with better wages, conditions, and opportunities. Upon resigning, I was threatened with a non-compete I didn't know existed. Still, I couldn't take it anymore, so believing it was an unenforceable scare tactic, I took the new job, thinking our legal system wouldn't allow a massive company with over 20 locations to sue a young entry-level worker with no degree. In December 2021, I was sued for $30,000 in "considerable and irreparable damages" for violating the non-compete. . . . [53]

- I am a physician in a rural underserved area of Appalachia. . . . "[N]on-compete" clauses have become ubiquitous in the healthcare industry. With hospital systems merging, providers with aggressive non compete clauses must abandon the community that they serve if they chose to leave their employer. . . . Healthcare providers feel trapped in their current employment situation, leading to significant burnout that can shorten their career longevity. Many are forced to retire early or take a prolonged pause in their career when

---

[50] To be clear, the Commission does not rely on any particular individual comment submission for its findings, but rather provides here (and throughout this final rule) examples of comments that were illustrative of themes that spanned many comments. The Commission's findings are based on consideration of the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition.

[51] Individual commenter, FTC-2023-0007-2215. Comment excerpts have been cleaned up for grammar, spelling, and punctuation.

[52] Individual commenter, FTC-2023-0007-12689.

[53] Individual commenter, FTC-2023-0007-8852.

they have no other recourse to combat their employer.[54]

- I am a practicing physician who signed an employment contract containing a noncompete agreement in 2012, entering into this agreement with an organization that no longer exists. My original employer merged with, and was made subsidiary to, a new organization that is run under religious principles in conflict with my own. . . . I would have never signed such an agreement with my new employer, yet I am bound to this organization under threat of legal coercion. To be clear, the forced compromise of my religious principles does direct harm to me. My only recourse to this coercion is to give up medical practice anywhere covered by my current medical license, which is injurious to the patients in my care, and to myself.[55]

- I am the owner of a small-midsize freight brokerage, and non-competes of large brokerages have time and time again constrained talent from my business. Countless employees of [a] mega brokerage . . . have left and applied for our company and we must turn them away. These are skilled brokers that are serving the market and their clients well due to THEIR skillsets. . . . These non-competes affect not just me but the clients they work with as these skilled brokers are forced out of the entire logistics market for an entire year and possibly a lifetime when they pick up a new career in a different field because of these aggressive non-competes. . . . [56]

- I was laid off from my company in 2008 due to the economy, not to any fault of my own. However, when I was offered a job at another company, my former company threatened them and my offer was rescinded. I was unable to find gainful employment for months, despite opportunities in my field, and had to utilize unemployment when I otherwise would not have needed it. To find work, I ultimately had to switch fields, start part time somewhere, and just continue to work my way up. All of this because I was laid off to no fault of my own.[57]

- I was terminated by a large hospital organization suddenly with a thriving, full Pediatric practice. . . . My lawyer and I believe the non-compete does not apply in my circumstances and that the noncompete is overly broad, restrictive and harmful to the public (my patients). I started seeing my patients mostly gratuitously in their homes so they would not go without the care they wanted and needed. . . The judge awarded the order and I was told I cannot talk to patients on the phone, text patients, zoom visits or provide any pediatric care within my non-compete area. Patients are angry and panicked. I'm worried every day about my patients and how I can continue to care for them. . . . Patients have a right to choose and keep their doctor. The trust built between a patient and his doctor is crucial to keeping a patient healthy. It's not a relationship that can or should be replaced. . . . Patients should always come first and that is not happening.[58]

---

[54] Individual commenter, FTC-2023-0007-0026.
[55] Individual commenter, FTC-2023-0007-9671.
[56] Individual commenter, FTC-2023-0007-6142.
[57] Individual commenter, FTC-2023-0007-15497.
[58] Individual commenter, FTC-2023-0007-14956.

- When I first graduated veterinary school I signed a noncompete clause that was for 7 years. I tried to negotiate it to a more reasonable time period but the employer wouldn't budge. There weren't many job openings for new graduates at the time and I had student loans to pay back so I signed it. . . . I moved back home to a small town and took a job that required a 10-radial-mile, 2-year noncompete (this is currently considered "reasonable/standard" in my industry). Unfortunately since it's a rural area the 10 miles blocked me out of the locations of all other veterinary clinics in the county and I had to commute an hour each way to work in the next metropolitan area. This put a lot of stress on my family since I have young children. Some days I didn't even get to see them when they were awake.[59]

- I work for a large electronic health records company . . . that is known for hiring staff right out of college, myself included. I was impressed with their starting salary and well-advertised benefits, so I was quick to accept their offer. After accepting their offer, I was surprised to receive a contract outlining a strict non-compete agreement . . . I feel disappointed that this information was not made apparent to me prior to my acceptance of the position, and now I feel stuck in a job that I've quickly discovered is not a good long-term fit for me. I am certain that many other recent graduates often find themselves in a similar position – they accept shiny offers from a workplace, not knowing whether the company and position will be the right fit for them, and find themselves trapped by such contracts as mine.[60]

- Non competes are awful. I am being sued right now for going into business on my own in Boston, Massachusetts, by my former employer who says I signed a non-compete in 2003, 20 years ago. . . . I am fighting them in court. Hopefully I will prevail . . . . [The] corporation I worked for is a billion-dollar corporation. And they just keep trying scare tactics to make me back down. They went as far as trying to get a preliminary injunction ordered against me. And the judge refused but I still have to spend $1,000 an hour to defend myself.[61]

- I have been working in the field of multi-media in the DC/Baltimore region since the early 2000s. . . . I was 26 when I first became employed, and at that time a requirement was that I sign a non-compete agreement. . . . This means I can't be an entrepreneur-which kills any opportunities for me to grow something of my own- which could potentially provide jobs for others in the future. So what this non-compete does is basically enables businesses to be small monopolies. I could literally have a new lease on my career if non competes were abolished. As of now, when I think of working someplace else I have to consider changing careers altogether.[62]

- A former employer had me sign a non-compete when I started employment at an internship in college. It was a part-time position of 20 hours of work as an electrical engineer, while I finished university. After university, I worked for this employer another

---

[59] Individual commenter, FTC-2023-0007-0922.
[60] Individual commenter, FTC-2023-0007-10729.
[61] Individual commenter, FTC-2023-0007-10871.
[62] Individual commenter, FTC-2023-0007-10968.

4 years full time, but then found a better job in another state. It was not a competitor, but a customer of my former employer. My former employer waited till the day after my 4-week notice to tell me that I had signed a non-compete agreement and that it [barred] me from working for any competitor, customer or any potential customer up to 5 years after leaving the company with no geographic limitations. This was effectively the entire semi-conductor industry and put my entire career at risk.[63]

- Non-competes serve little more purpose than to codify and entrench inefficiencies. I have seen this firsthand in the context of a sophisticated management consulting environment where company owners provided ever less support in terms of contributing to projects or even to sales of new business while still feeling secure through agreements that substantially limited anyone from working in the relevant industry for two years on a global basis after leaving. . . . The reality is that there are innumerable retention mechanisms (such as good working conditions, compensation, culture, management, growth trajectory and/or strategy) that can contribute to loyal employees without the need for non-competes.[64]

The Commission has undertaken careful review of the public comments and the entirety of the rulemaking record. Based on this record and the Commission's experience and expertise in competition matters, the Commission issues this final rule pursuant to its authority under sections 5 and 6(g) of the FTC Act.

## 2. Prevalence of Non-Competes

Based on its own data analysis, studies published by economists, and the comment record, the Commission finds that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups, albeit with some differences in the magnitude of the prevalence based on industries and demographics. The Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete.[65]

---

[63] Individual commenter, FTC-2023-0007-16347.

[64] Individual commenter, FTC-2023-0007-3963.

[65] This is likely a conservative estimate. Surveys of workers likely underreport the share of workers subject to non-competes, since many workers may not know they are subject to a non-compete. *See, e.g.*, Alexander J.S. Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete Agreements*, Report (Dec. 10, 2019) at 3.

As described in Part II.F, the inquiry as to whether conduct is an unfair method of competition under section 5 focuses on the nature and tendency of the conduct, not whether or to what degree the conduct caused actual harm.[66] Although a finding that non-competes are prevalent is not necessary to support the Commission's determination that the use of non-competes by employers is an unfair method of competition, the Commission finds that non-competes are prevalent and in widespread use throughout the economy, which is why researchers have observed such significant negative actual effects from non-competes on competitive conditions in labor markets and markets for products and services.[67]

A 2014 survey of workers finds that 18% of respondents work under a non-compete and 38% of respondents have worked under one at some point in their lives.[68] This study has the broadest and likely the most representative coverage of the U.S. labor force among the prevalence studies discussed here.[69] This study reports robust results contradicting the prior assumptions of some that non-competes were, in most cases, bespoke agreements with sophisticated and highly-paid workers. It finds that, among workers without a bachelor's degree, 14% of respondents reported working under a non-compete at the time surveyed and 35% reported having worked under one at some point in their lives.[70] For workers earning less than $40,000 per year, 13% of respondents were working under a non-compete and 33% worked under one at some point in their lives.[71] Furthermore, this survey finds that 53% of workers

---

[66] *See infra* note 288 and accompanying text.
[67] *See* Parts IV.A through IV.C (describing this evidence).
[68] Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021).
[69] The final survey sample of 11,505 responses represented individuals from nearly every demographic in the labor force. *Id.* at 58.
[70] *Id.* at 63.
[71] *Id*.

covered by non-competes are hourly workers.[72] The survey suggests that a large share of workers subject to non-competes are relatively low-earning workers. In addition, a survey from the Federal Reserve Board of Governors found that 11.4% of workers have non-competes, including workers with relatively low earnings and low levels of education. The survey finds some degree of geographic heterogeneity, though it finds that large numbers of workers in all regions of the country have non-competes (including 7.0% of workers in States which broadly do not enforce non-competes).[73]

Furthermore, a survey of workers conducted in 2017 estimates that 24.2% of workers are subject to a non-compete.[74] This survey also finds that non-competes are often used together with other restrictive employment agreements, including non-disclosure agreements ("NDAs") and non-recruitment and non-solicitation agreements.[75] A methodological limitation of this survey is that it is a convenience sample of individuals who visited Payscale.com during the time period of the survey and is therefore unlikely to be fully representative of the U.S. working population. While weighting based on demographics helps, it does not fully mitigate this concern.

Additionally, a 2017 survey of business establishments with 50 or more employees estimates that 49% of such establishments use non-competes for at least some of their employees, and 32% of such establishments use non-competes for all of their employees.[76]

---

[72] Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022) (analyzing data from the Starr, Prescott, & Bishara survey).
[73] Tyler Boesch, Jacob Lockwood, Ryan Nunn, & Mike Zabek, *New Data on Non-Compete Contracts and What They Mean for Workers* (2023), https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers.
[74] Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (Jan. 18, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403.
[75] *Id.* at 11 (reporting that if a worker has a non-compete, there is a 70%-75% chance that all three restrictive covenants are present).
[76] Colvin & Shierholz, *supra* note 65 at 1.

Other estimates of non-compete use cover subsets of the U.S. labor force. One 2022 study is based on National Longitudinal Survey of Youth (NLSY) data.[77] The NLSY is an often-used labor survey conducted by the Bureau of Labor Statistics ("BLS") that consists of a nationally representative sample of 8,984 men and women born from 1980-84 and living in the U.S. at the time of the initial survey in 1997; it is a subset of the workforce by age of worker.[78] The 2022 study using NLSY data reports prevalence of non-competes to be 18%, in line with the number estimated based on the 2014 survey of workers directed solely at calculating the prevalence of non-competes.[79]

Non-competes are pervasive across occupations. For example, a survey of independent hair salon owners finds that 30% of hair stylists worked under a non-compete in 2015.[80] A survey of electrical and electronic engineers finds that 43% of respondents signed a non-compete.[81] A different study finds that 45% of physicians worked under a non-compete in 2007.[82] One study published in 2021 finds that 62% of CEOs worked under a non-compete between 1992 and 2014.[83] Another, published in 2023, supports that finding and reflects an upward trend in the use of non-competes among executives—specifically, the proportion of executives working under a non-compete rose from "57% in the early 1990s to 67% in the mid-2010s."[84] The 2014 survey reports industry-specific rates ranging from 9% in the Agriculture and

---

[77] Donna S. Rothstein & Evan Starr, *Noncompete Agreements, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997*, June 2022 Mthly. Lab. Rev. (2022).

[78] BLS, *NLSY97 Data Overview*, https://www.bls.gov/nls/nlsy97.htm.

[79] Rothstein & Starr, *supra* note 77 at 1.

[80] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?*, 57 J. Hum. Res. 689, 700 (2022).

[81] Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Socio. Rev. 695, 702 (2011). Calculated as 92.60% who signed a non-compete of the 46.80% who were asked to sign a non-compete.

[82] Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020).

[83] Omesh Kini, Ryan Williams, & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation*, 34 Rev. Fin. Stud. 4701, 4707 (2021).

[84] Liyan Shi, *Optimal Regulation of Noncompete Contracts*, 91 Econometrica 425, 447 (2023).

Hunting category to 32% in the Information category.[85] The Balasubramaian et al. survey reports industry-specific rates ranging from 12% in the Arts, Entertainment, and Recreation category to 30% in the Professional, Scientific, and Technical category.[86] The same survey also reports occupation-specific rates ranging from 8% in the Community and Social Services category to 32% in the Computer and Mathematical category.[87]

In addition, commenters presented survey data on the prevalence of non-competes in various occupations and industries. The Commission does not rely on these surveys to support its finding that non-competes are in widespread use throughout the economy. Because the Commission lacked access to a detailed description of the methodology for these surveys (unlike for the surveys described previously), the Commission cannot evaluate how credible their research designs are. However, they generally confirm the Commission's finding that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups.

For example, commenters reported that 33% of practitioners in the applied behavioral analysis field reported being subject to a non-compete,[88] along with 68% of cardiologists,[89] 42% of colorectal surgeons,[90] 72% of members of the American Association of Hip and Knee

---

[85] Starr, Prescott, & Bishara, *supra* note 68 at 67.
[86] Balasubramanian et al., *supra* note 74 at 47.
[87] *Id.*
[88] Kristopher J. Brown, Stephen R. Flora, & Mary K. Brown, *Noncompete Clauses in Applied Behavior Analysis: A Prevalence and Practice Impact Survey*, 13 Behavioral Analysis Practice 924 (2020) (survey of 610 workers).
[89] Comment of Am. Coll. of Cardiology, FTC-2023-0007-18077, at 2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents or the time period.
[90] William C. Cirocco. *Restrictive Covenants in Physician Contracts: An American Society of Colon and Rectal Surgeons' Survey*, 54 Diseases of the Colon and Rectum 482 (2011). The survey examined 157 colorectal surgeons who had completed their residency in the prior decade.

Surgeons,[91] and 31% of wireless telecommunications retail workers.[92] Other commenters cited a

2019 study finding that 29% of businesses where the average wage is below $13 per hour use

non-competes for all their workers.[93]

Several trade organizations included information in their comments about the percentage

of their members that use non-competes for at least some of their workers, based on surveys of

their membership. For the National Association of Wholesaler-Distributors, this figure was

80%;[94] for the Independent Lubricant Manufacturing Association, 69%;[95] for the Michigan

Chamber of Commerce, 73%;[96] for the Gas and Welding Distributors Association, 80%;[97] and

for the National Association of Manufacturers, 70%.[98] One industry organization said its survey

found that 57% of respondents require workers earning over $150,000 to sign non-competes.[99] A

survey by the Authors Guild finds that 19.2% of respondents reported that non-competes

prevented them from publishing a similar or competing book.[100] The HR Policy Association

---

[91] Comment of Am. Ass'n of Hip and Knee Surgeons, FTC-2023-0007-21076, at 4. The comment said the internal poll was conducted in early 2023, but the comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[92] Comm. Workers of Am. and Nat'l Employment L. Project, *Broken Network: Workers Expose Harms of Wireless Telecom Carriers' Outsourcing to 'Authorized Retailers'* (Feb. 2023), https://cwa-union.org/sites/default/files/2023-02/20230206_BrokenNetwork.pdf, at 12. The survey had 204 respondents.

[93] Colvin & Shierholz, *supra* note 65 at 13.

[94] Comment of Nat'l Assoc. of Wholesaler-Distribs., FTC-2023-0007-19347, at 2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[95] Comment of Indep. Lubricant Mfrs. Ass'n, FTC-2023-0007-19445, at 3. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[96] Calculated as 77%*95% (assuming that the 95% reported in their comment applies to the 77% who reported using restrictive covenants). Comment of Mich. Chamber of Com., FTC-2023-0007-20855. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[97] Comment of Gas and Welding Distribs. Ass'n, FTC-2023-0007-20934, at 2-3. The comment did not provide a citation to the survey or the underlying data. The comment said the survey took place after the NPRM was proposed and had 161 respondents.

[98] Comment of Nat'l Ass'n of Mfrs., FTC-2023-0007-20939, at 2 (citing Nat'l Ass'n of Mfrs., Noncompete Survey Data Report, https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf). The survey had 150 respondents.

[99] Comment of Soc. for Hum. Res. Mgmt., FTC-2023-0007-20903, at 5 n.2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[100] Comment of The Authors Guild, FTC-2023-0007-20854, at 7. The comment did not provide a citation to the survey or the underlying data, but said it had 630 respondents.

stated that 75% of respondents indicated they use non-competes for less than 10% of their workers, and nearly one third indicated they use non-competes for less than 1% of their workers.[101] The association stated that its survey covered 3 million workers and argued that its survey finding less usage of non-competes was more representative than studies cited in the NPRM.[102] However, the commenter did not provide the data underlying its claims. The Retail Industry Leaders Association stated that a recent survey of its members indicated that, among members that use non-competes, the majority do so with less than 1% of their workforce and an additional quarter use non-competes with less than 10% of their workforce.[103] Additionally, a commenter referenced a survey of small business owners finding that 48% use non-competes for their own business.[104]

Several commenters misrepresented the Commission's finding related to prevalence as based on "a single study from 2021" (Starr, Prescott, and Bishara, 2021), which relied on survey data from 2014. The Commission's finding is not based on a single study. The NLSY study reaches similar conclusions about the prevalence of non-competes across the economy,[105] and the occupation-specific studies indicate that non-competes are pervasive in various occupations.[106] Furthermore, despite its methodological limitations, the data submitted by commenters generally comport with the estimates reported in the academic literature. One commenter stated the respondents to the Starr, Prescott, and Bishara survey were not necessarily representative of the population. The Commission believes that the weighting of the data

---

[101] Comment of HR Policy Ass'n, FTC-2023-0007-20998, at 8.
[102] *Id*.
[103] Comment of Retail Indus. Leaders Ass'n, FTC-2023-0007-20989, at 6. The comment did not provide a citation to the survey or the underlying data, including the number of respondents or the time period.
[104] Comment of Sm. Bus. Majority, FTC-2023-0007-21093 (citing Small Business Majority, Opinion Poll: Small Business Owners Support Banning Non-Compete Agreements (Apr. 13, 2013), https://smallbusinessmajority.org/sites/default/files/research-reports/2023-non-compete-poll-report.pdf).
[105] *See* Rothstein & Starr, *supra* note 77 and accompanying text.
[106] *See supra* notes 80-87 and accompanying text.

sufficiently addresses this concern.

Another commenter argued that individuals may misunderstand contracts that they have signed, leading them to mistakenly believe they are bound by a non-compete. The Commission does not find this to be a plausible explanation for the high numbers of workers, businesses, and trade associations that report that non-competes are prevalent.

The Commission appreciates the additional estimates provided by commenters. The comments broadly corroborate the Commission's finding that non-competes are used across the workforce, with some heterogeneity in the magnitude of the prevalence. The Commission finds that this heterogeneity is insufficient to warrant industry-specific exclusions from coverage under the final rule in part because employers' use of non-competes is prevalent across labor markets and for the reasons discussed in Part V.D regarding requests for exclusions.

## II. Legal Authority

### A. The History of the Commission and Section 5 of the FTC Act

The FTC Act was enacted in 1914.[107] Section 5 of that Act "declared" that "unfair methods of competition in commerce" are "unlawful," and it "empowered and directed" the Commission "to prevent" entities subject to its jurisdiction from "using" such methods.[108] Congress removed certain enumerated industries, activities, or entities—such as banks[109]—from the Commission's jurisdiction but otherwise envisioned a Commission whose purview would cover commerce across the national economy.

[107] Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717, 719 (hereinafter "FTC Act of 1914").
[108] FTC Act of 1914, 38 Stat. at 719. Section 5 is codified as amended at 15 U.S.C. 45. Congress later amended the term "in commerce" to "in or affecting commerce." The Supreme Court has explained that this amended phrase makes section 5 of the FTC Act "coextensive with the constitutional power of Congress under the Commerce Clause." *United States v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 n.6 (1975). For simplicity, this statement of basis and purpose often refers to "unfair methods of competition" without the commerce requirement, but the Commission acknowledges that it has power to prevent only such methods that are in or affect commerce as that term is defined in the Act. *See* 15 U.S.C. 44.
[109] *See* 15 U.S.C. 45(a)(2).

21

The term "'unfair methods of competition' . . . was an expression new in the law" when it first appeared in the FTC Act.[110] Congress purposely introduced this phrase to distinguish the Commission's authority from the definition of "unfair competition" at common law. Because the "meaning which the common law had given to ['unfair competition'] was . . . too narrow," Congress adopted "the broader and more flexible phrase 'unfair methods of competition.'"[111] Using this new phrase also made clear that Congress designed section 5 to extend beyond the reach of other antitrust laws—most notably, the Sherman Act—whose text did not include the term "unfair methods of competition."[112] In particular, Congress wanted the Commission to apply a standard that would reach conduct not captured by other antitrust laws and the rule of reason, which courts applied when interpreting the Sherman Act, making it "impossible to predict with any certainty" whether courts would condemn the many "practices that seriously interfere with competition."[113] Allowing the Commission to prevent unfair methods of competition would also help the Commission achieve a core purpose of the Act: to stop "trade restraints in their incipiency" before they grew into violations of other antitrust laws.[114]

By design, the new phrase "unfair methods of competition" did "not 'admit of precise definition.'"[115] Congress intentionally gave the Commission flexibility to adapt to changing circumstances.[116] The Supreme Court has affirmed the more inclusive scope of section 5 on

---

[110] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532 (1935).

[111] *See FTC v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 310-11 (1934); *see also Schechter Poultry*, 295 U.S. at 532.

[112] *See E.I. du Pont de Nemours v. FTC* (*Ethyl*), 729 F.2d 128, 136 (2d Cir. 1984) ("Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled.").

[113] S. Rep. No. 62-1326, at 14 (1913) (hereinafter "Cummins Report"). After analyzing a series of Supreme Court decisions interpreting the Sherman Act—*e.g.*, *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 60 (1911)—the Senate committee feared that the rule of reason meant that "in each instance it [would be] for the court to determine whether the established restraint of trade is a due restraint or an undue restraint" and that this made it "imperative to enact additional legislation." Cummins Report at 11-12.

[114] *FTC v. Brown Shoe Co.*, 384 U.S. 316, 322 (1966); *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953).

[115] *R.F. Keppel & Bro.*, 291 U.S. at 312.

[116] *Id.* at 311 n.2.

numerous occasions[117] and has affirmed the Commission's power under the Act to condemn coercive and otherwise unfair practices that have a tendency to stifle or impair competition.[118] Federal appellate courts have likewise consistently held that the Commission's authority under section 5 extends beyond "the letter" of other antitrust laws.[119]

Congress further expanded the Commission's jurisdiction over time. Congress extended the Commission's authority in 1938 by adding the further prohibition on "unfair or deceptive acts or practices."[120] And in 1975, Congress amended the phrase "in commerce" in section 5 to "in or affecting commerce," a change that was "specifically designed to expand the Commission's jurisdiction . . . to make it coextensive with the constitutional power of Congress under the Commerce Clause."[121]

Congress gave careful thought to the structure of the FTC as an independent agency entrusted with this considerable responsibility. The Commission would consist of five members, no more than three of whom could be part of the same political party, who would serve for terms of seven years.[122] The Commission would draw on trained expert staff to develop the body of law regarding what constitutes unfair methods of competition (and, later, unfair and deceptive

---

[117] *See, e.g., id.* at 311; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532 (1935); *Brown Shoe Co.*, 384 U.S. at 320-22.

[118] *FTC v. Texaco*, 393 U.S. 223, 225-26 (1968) (citing *Atl. Refin. Co. v. FTC,* 381 U.S. 357, 376 (1965)).

[119] *Spiegel, Inc. v. FTC*, 540 F.2d 287, 292 (7th Cir. 1976) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)); *cf.*, *Chuck's Feed & Seed Co. v. Ralston Purina Co*., 810 F.2d 1289, 1292-93 (4th Cir. 1987).

[120] Federal Trade Commission Act, Public Law No. 447, 75th Cong., 3d Sess. (March 21, 1938) c. 49; 52 Stat. 111 (1938).

[121] *United States v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 n.6 (1975). As noted, the Commission's authority does not reach certain enumerated industries or activities—a list that has also grown over time. *See* 15 U.S.C. 45(a)(2); *see also* Part II.E.1. Some of these industries are statutorily prohibited from engaging in unfair or deceptive practices or unfair methods of competition under different laws overseen by other agencies. *See, e.g.*, 49 U.S.C. 41712(a) (allowing the Secretary of Transportation to "decide whether an air carrier, foreign air carrier, or ticket agent" has engaged in such conduct).

[122] 15 U.S.C. 41.

practices),[123] both through acting as "a quasi judicial body"[124] that determines whether conduct is an unfair method of competition in adjudications and through authority to promulgate legislative rules delineating conduct that constitutes an unfair method of competition. Recognizing that the Commission is an expert agency in making such determinations about anticompetitive conduct, courts reviewing Commission determinations as to what practices constitute an unfair method of competition have given the Commission's decisions "great weight."[125]

The FTC Act today reflects a careful balance from Congress. Congress has directed the Commission to proceed against a broader range of anticompetitive conduct than other antitrust laws like the Sherman and Clayton Acts can reach. On the other hand, Congress has never established a private right of action under section 5,[126] nor has it authorized the Commission to recover civil penalties or other monetary relief from parties who engage in unfair methods of competition.[127] Instead, the Commission may either pursue an adjudication under section 5(b) or seek an injunction in Federal court under section 13(b) against a party that has engaged in an unfair method of competition.[128] As explained below, it may also promulgate rules prohibiting unfair methods of competition. The Commission cannot obtain civil penalties or other monetary relief against parties for using an unfair method of competition, although it can obtain civil penalties in court if a party is ordered to cease and desist from a violation and fails to do so.[129]

---

[123] *Id.* (anticipating that the Commission would "build up a comprehensive body of information for the use and advantage of the Government and the business world"); *id.* at 11,092 ("[W]e want trained experts; we want precedents; we want a body of administrative law built up.").

[124] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935).

[125] *FTC v. Cement Inst.*, 333 U.S. 683, 720 (1948); *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 368 (1965); *FTC v. Texaco*, 393 U.S. 223, 226 (1968); *Official Airline Guides, Inc. v. FTC* , 630 F.2d 920, 927 (2d. Cir. 1980) (quoting *Cement Inst.*, 333 U.S. at 720); *see also FTC v. Motion Picture Advert. Serv. Co*., 344 U.S. 392, 396 (1953); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

[126] *See, e.g.*, *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 988-89 (D.C. Cir. 1973); *Liu v. Amerco*, 677 F.3d 489, 492 (1st Cir. 2012).

[127] Congress has authorized the FTC to seek civil monetary remedies against parties who engage in unfair or deceptive acts or practices under some circumstances. *See* 15 U.S.C. 45(m); 15 U.S.C. 57b.

[128] *See* 15 U.S.C. 45(b); 15 U.S.C. 53(b).

[129] *See* 15 U.S.C. 45(l).

### B. The Commission's Authority to Promulgate the Rule

Alongside section 5, Congress adopted section 6(g) of the Act, in which it authorized the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, which include the Act's prohibition of unfair methods of competition.[130] The plain text of section 5 and section 6(g), taken together, empower the Commission to promulgate rules for the purpose of preventing unfair methods of competition. That includes legislative rules defining certain conduct as an unfair method of competition.

The Commission has exercised its authority under section 6(g) to promulgate legislative rules on many occasions stretching back more than half a century. Between 1963 and 1978,[131] the Commission relied on section 6(g) to promulgate the following rules: 1) a rule declaring it an unfair method of competition ("UMC") and an unfair or deceptive act or practice ("UDAP") to mislead consumers about the size of sleeping bags by representing that the "cut size" represents the finished size;[132] 2) a rule declaring it a UMC and UDAP to use the word "automatic" or similar words to describe household electric sewing machines;[133] 3) a rule declaring it a UMC and UDAP to misrepresent nonprismatic instruments as prismatic;[134] 4) a rule declaring it a

---

[130] 15 U.S.C. 46(g).

[131] As explained in more detail later in this Part, Congress added section 18 to the FTC Act in 1975, and that section provides the process the Commission must go through to promulgate rules defining unfair or deceptive acts or practices. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. 93-637, 88 Stat. 2183 (Jan. 4, 1975) (hereinafter "Magnuson-Moss Act"); 15 U.S.C. 57a. Congress provided, however, that "[a]ny proposed rule under section 6(g) . . . with respect to which presentation of data, views, and arguments was substantially completed before" section 18 was enacted "may be promulgated in the same manner and with the same validity as such rule could have been promulgated had" section 18 "not been enacted." 88 Stat. 2198; 15 U.S.C. 57a note. This list therefore includes a handful of rules promulgated under section 6(g) but after 1975 because those rules were substantially completed before section 18's enactment.

[132] Advertising and Labeling as to Size of Sleeping Bags, 28 FR 10900 (Oct. 11, 1963), *repealed by* 60 FR 65528 (Dec. 20, 1995).

[133] Misuse of "Automatic" or Terms of Similar Import as Descriptive of Household Electric Sewing Machines, 30 FR 8900 (Jul. 15, 1965), *repealed by* 55 FR 23900 (June 13, 1990).

[134] Deception as to Nonprismatic and Partially Prismatic Instruments Being Prismatic Binoculars, 29 FR 7316 (Jun. 5, 1964), *repealed by* 60 FR 65529 (Dec. 20, 1995).

UMC and UDAP to advertise or market dry cell batteries as "leakproof;"[135] 5) a rule declaring it a UMC and UDAP to misrepresent the "cut size" as the finished size of tablecloths and similar products;[136] 6) a rule declaring it a UMC and UDAP to misrepresent that belts are made of leather if they are made of other materials;[137] 7) a rule declaring it a UMC and UDAP to represent used lubricating oil as new;[138] 8) a rule declaring it a UDAP to fail to disclose certain health warnings in cigarette advertising and on cigarette packaging ("Cigarette Rule");[139] 9) a rule declaring it a UMC and UDAP to fail to disclose certain features of light bulbs on packaging;[140] 10) a rule declaring it a UMC and UDAP to misrepresent the actual size of the viewable picture area on a TV;[141] 11) a rule declaring a presumption of a violation of section 2(d) and (e) of the amended Clayton Act for certain advertising and promotional practices in the men's and boy's clothing industry;[142] 12) a rule declaring it a UMC and UDAP to fail to make certain disclosures about the handling of glass fiber products and contact with certain products containing glass fiber;[143] 13) a rule declaring it a UMC and UDAP to make certain

---

[135] Deceptive Use of "Leakproof," "Guaranteed Leakproof," etc., as Descriptive of Dry Cell Batteries, 29 FR 6535 (May 20, 1964), *repealed by* 62 FR 61225 (Nov. 17, 1997).

[136] Deceptive Advertising and Labeling as to Size of Tablecloths and Related Products, 29 FR 11261 (Aug. 5, 1964), *repealed by* 60 FR 65530 (Dec. 20, 1995).

[137] Misbranding and Deception as to Leather Content of Waist Belts, 29 FR 8166 (Jun. 27, 1964), *repealed by* 61 FR 25560 (May 22, 1996).

[138] Deceptive Advertising and Labeling of Previously Used Lubricating Oil, 29 FR 11650 (Aug. 14, 1964), *repealed by* 61 FR 55095 (Oct. 24, 1996).

[139] Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 FR 8324 (July 2, 1964), *repealed by* 30 FR 9485 (July 29, 1965). As explained in more detail herein, Congress superseded this rule with legislation.

[140] Incandescent Lamp (Light Bulb) Industry, 35 FR 11784 (Jul. 23, 1970), *repealed by* 61 FR 33308 (Jun. 27, 1996).

[141] Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets, 31 FR 3342 (Mar. 3, 1966), *repealed by* 83 FR 50484 (Oct. 9, 2018).

[142] Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 32 FR 15584 (Nov. 9, 1967), *repealed by* 59 FR 8527 (Feb. 23, 1994).

[143] Failure to Disclose that Skin Irritation May Result from Washing or Handling Glass Fiber Curtains and Draperies and Glass Fiber Curtain and Drapery Fabrics, 32 FR 11023 (Jul. 28, 1967), *repealed by* 60 FR 65532 (Dec. 20, 1995).

misrepresentations about transistors in radios;[144] 14) a rule declaring it a UDAP to fail to disclose certain effects about inhaling certain aerosol sprays;[145] 15) a rule declaring it a UMC and UDAP to misrepresent the length or size of extension ladders;[146] 16) a rule declaring it a UDAP to make certain misrepresentations, or fail to disclose certain information, about games of chance;[147] 17) a rule declaring it a UMC and UDAP to mail unsolicited credit cards;[148] 18) a rule declaring it a UMC and UDAP to fail to disclose the minimum octane number on gasoline pumps ("Octane Rule");[149] 19) a rule declaring it a UMC and UDAP to sell finished articles of clothing without a permanent tag or label disclosing care and maintenance instructions;[150] 20) a rule declaring a UMC and UDAP for a grocery store to offer products for sale at a stated price if those products will not be readily available to consumers ("Unavailability Rule");[151] 21) a rule declaring it a UMC and UDAP for a seller to fail to make certain disclosures in connection with a negative option plan ("Negative Options Rule");[152] 22) a rule declaring it a UDAP for door-to-door sellers to fail to furnish certain information to buyers;[153] 23) a rule declaring it a UMC and UDAP to fail to make certain disclosures about sound power amplification for home entertainment products;[154] 24) a rule declaring it a UDAP for sellers failing to include certain contract provisions preserving

---

[144] Deception as to Transistor Count of Radio Receiving Sets, Including Transceivers, 33 FR 8446 (Jun. 7, 1968), *repealed by* 55 FR 25090 (Jun. 20, 1990).

[145] Failure to Disclose the Lethal Effects of Inhaling Quick-Freeze Aerosol Spray Products Used for Frosting Cocktail Glasses, 34 FR 2417 (Feb. 20, 1969), *repealed by* 60 FR 66071 (Dec. 21, 1995).

[146] Deceptive Advertising and Labeling as to Length of Extension Ladders, 34 FR 929 (Jan. 22, 1969), *repealed by* 60 FR 65533 (Dec. 20, 1995).

[147] Games of Chance in the Food Retailing and Gasoline Industries, 34 FR 13302 (Aug. 16, 1969), *repealed by* 61 FR 68143 (Dec. 27, 1996).

[148] Unsolicited Mailing of Credit Cards, 35 FR 4614 (Mar. 17, 1970), *repealed by* 36 FR 45 (Jan. 5, 1971). This rule was rescinded in response to an amendment to the Truth in Lending Act that prohibited similar conduct. *See* Pub. L. 91-508, 84 Stat. 1126 (1970).

[149] Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 FR 23871 (Dec. 16, 1971), *repealed by* 43 FR 43022 (Sept. 22, 1978). This rule was superseded by the Petroleum Marketing Practices Act, Pub. L. No. 95-297, 92 Stat. 333 (June 19, 1978). A similar regulation was promulgated under that law at 16 CFR part 306.

[150] Care Labeling of Textile Wearing Apparel, 36 FR 23883 (Dec. 16, 1971).

[151] Retail Food Store Advertising and Marketing Practices, 36 FR 8777 (May 13, 1971).

[152] Use of Negative Option Plans by Sellers in Commerce, 38 FR 4896 (Feb. 22, 1973).

[153] Cooling-off Period for Door-to-Door Sales, 37 FR 22934 (Oct. 26, 1972).

[154] Power Output Claims for Amplifiers Used in Home Entertainment Products, 39 FR 15387 (May 3, 1974).

claims and defenses in consumer credit contracts ("Holder Rule");[155] 25) a rule declaring it a UMC or UDAP to solicit mail order merchandise from a buyer unless the seller can ship the merchandise within 30 days ("Mail Order Rule");[156] and 26) a rule declaring it a UDAP for a franchisor to fail to furnish a franchisee with certain information.[157]

Some of these rules attracted significant attention. For instance, the Commission began the rulemaking process to require warnings on cigarette packages just one week after the Surgeon General's "landmark report" that determined smoking is a health hazard,[158] and that rule was front-page news.[159] Following a lobbying campaign by the tobacco industry,[160] Congress supplanted the Commission's regulation with the Cigarette Labeling and Advertising Act but did not disturb the Commission's rulemaking authority.[161] The Unavailability Rule was likewise front-page news upon its release in 1971, and Congress left it intact.[162]

In *National Petroleum Refiners Association v. FTC* ("*Petroleum Refiners*"), the D.C. Circuit expressly upheld the Octane Rule as a proper exercise of the Commission's power under

---

[155] Preservation of Consumers' Claims and Defenses, 40 FR 53506 (Nov. 18, 1975).

[156] Mail Order Merchandise, 40 FR 49492 (Oct. 22, 1975) (regulatory text), 40 FR 51582 (Nov. 5, 1975) (statement of basis and purpose). The Mail Order Rule has since been updated to become the Mail, Internet, or Telephone Order Merchandise Rule, or MITOR. *See* 79 FR 55619 (Sept. 17, 2014). The updates to the rule were based on the Commission's authority to regulate unfair or deceptive acts or practices.

[157] Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 FR 59614 (Dec. 21, 1978).

[158] Teresa Moran Schwartz & Alice Saker Hrdy, *FTC Rulemaking: Three Bold Initiatives and Their Legal Impact*, 2-3 (Sept. 22, 2004).

[159] *U.S. to Require Health Warning for Cigarettes*, N.Y. Times (June 25, 1964) at 1, 15 (tobacco industry indicating plans to immediately challenge the Commission's authority to issue the regulation), https://www.nytimes.com/1964/06/25/archives/us-to-require-health-warning-for-cigarettes-trade-commission-orders.html.

[160] Tobacco Inst., *Tobacco—A Vital U.S. Industry* (1965), https://acsc.lib.udel.edu/exhibits/show/legislation/cigarette-labeling.

[161] Pub. L. 89-92, 79 Stat. 282 (July 27, 1965); *see* 15 U.S.C. 1331 *et seq.*

[162] *FTC Bars Grocery Ads for Unavailable Specials*, N.Y. Times (May 13, 1971) at 1, https://www.nytimes.com/1971/05/13/archives/f-t-c-bars-grocery-ads-for-unavailable-specials-ftc-bars-grocery.html; 16 CFR 424.1 and 424.2. The rule was amended after its enactment in 1971 to add an exception and defenses but otherwise remains intact as promulgated. Amendment to Trade Regulation Rule Concerning Retail Food Store Advertising and Marketing Practices, 54 FR 35456-08 (Aug. 28, 1989); *see also* Retail Food Store Advertising and Marketing Practices Rule, 79 FR 70053-01 (Nov. 25, 2014).

section 6(g) to make rules regulating both unfair methods of competition and unfair or deceptive acts or practices.[163] After construing "the words of the statute creating the Commission and delineating its powers," the court held "that under the terms of its governing statute … and under Section 6(g) … the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent."[164] That interpretation was also "reinforced by the construction courts have given similar provisions in the authorizing statutes of other administrative agencies."[165] The Seventh Circuit later agreed with the D.C. Circuit's decision and "incorporate[d] [it] by reference" when rejecting a challenge to the Mail Order Rule.[166]

Following such rulemakings and the D.C. Circuit's confirmation of the Commission's rulemaking power in *Petroleum Refiners*, Congress in 1975 enacted a new section 18 of the FTC Act. This new section introduced special procedures, beyond those required under the Administrative Procedure Act, for promulgating rules for unfair or deceptive acts or practices, and it eliminated the Commission's authority to issue such rules under section 6(g).[167] But Congress pointedly chose not to restrict the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g). That choice was deliberate. While considering this legislation, Congress knew that the Commission had promulgated rules regulating unfair methods of competition and that the D.C. Circuit in *Petroleum Refiners* had

---

[163] *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973).
[164] *Nat'l Petroleum Refiners*, 482 F.2d at 674, 698; *see also Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 967 (D.C. Cir. 1985) (concluding, after extensive review of the legislative history related to the FTC's rulemaking authority originating in 1914 and extending through amendments to the FTC Act in 1980, that "Congress has not at any time withdrawn the broad discretionary authority originally granted the Commission in 1914 to define unfair practices on a flexible, incremental basis.").
[165] *Nat'l Petroleum Refiners*, 482 F.2d at 678.
[166] *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).
[167] Magnuson-Moss Act, 88 Stat. 2183; *see* 15 U.S.C. 57a.

confirmed the Commission's authority to do so.[168] And Congress expressly considered—but rejected—an amendment to the FTC Act under which "[t]he FTC would have been prohibited from prescribing rules with respect to unfair competitive practices."[169]

Instead, the enacted section 18 confirmed the Commission's authority to make rules under section 6(g). The law expressly preserved "any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce."[170] Congress also made clear that Section 18 "shall not affect the validity of any rule which was promulgated under section 6(g)."[171] And it provided that "[a]ny proposed rule under section 6(g)" with certain components that were "substantially completed before" section 18's enactment "may be promulgated in the same manner and with the same validity as such rule could have been promulgated had this section not been enacted."[172] Among the substantially completed rules at the time was the Mail Order Rule, which proposed to define—and upon promulgation did define—certain conduct as both an unfair method of competition and an unfair or deceptive act or practice.[173] The 1975 legislation thus expressly permitted the Commission to promulgate a rule under section 6(g) that defined an unfair method of competition and evinces Congress's intent to leave in place the Commission's authority to promulgate such rules under section 6(g). As the Seventh Circuit later put it, "Congress . . . considered the controversy surrounding the Commission's substantive rulemaking power under Section 6(g) to have been settled by the *Octane Rating* case."[174]

---

[168] S. Rep. No. 93-151, at 32 (1973).
[169] H.R. Conf. Rep. No. 93-1606, at 30 (1974).
[170] 15 U.S.C. 57a(a)(2).
[171] Magnuson-Moss Act, 88 Stat. 2183.
[172] Magnuson-Moss Act, 88 Stat. 2183.
[173] *See* Undelivered Mail Order Merchandise and Services, 36 FR 19092 (Sept. 28, 1971) (initial NPRM); 39 FR 9201 (Mar. 8, 1974) (amended NPRM); 40 FR 49492 (Oct. 22, 1975) (final regulatory text).
[174] *United States v. JS & A Grp.*, 716 F.2d 451, 454 (7th Cir. 1983).

Congress again confirmed the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g) when it enacted section 22 of the FTC Act as part of the Federal Trade Commission Improvements Act of 1980.[175] Section 22 imposes certain procedural requirements the Commission must follow when it promulgates any "rule." Section 22(a) defines "rule" as "any rule promulgated by the Commission under section 6 or section 18" while *excluding* from that definition "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice."[176] Thus, by its terms, section 22(a) demonstrates the 1980 Congress's understanding that the Commission maintained authority to promulgate rules under section 6 that are not merely "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice."[177] Section 22 envisions rules that will have the force of law as legislative rules and defines "rule" based on whether it may "have an annual effect on the national economy of $100,000,000 or more," "cause a substantial change in the cost or price of goods or services," or "have a significant impact upon" persons and consumers.[178] Section 22(b) of the Act similarly contemplates authority to make legislative rules by imposing regulatory analysis obligations on any rules that the Commission promulgates under section 6.[179] The specific obligations in section 22(b), such as the requirement for the Commission to conduct a cost-benefit analysis, assume that section 6(g) authorizes substantive and economically significant rules.

Both the 1975 and 1980 amendments to the FTC Act thus indicate that Congress

---

[175] Pub. L. 96-252, 94 Stat. 374 (1980).
[176] *Id.*; *see* 15 U.S.C. 57b-3(a)(1).
[177] 15 U.S.C. 57b-3(a)(1).
[178] *Id.*
[179] 15 U.S.C. 57b-3(b).

understood the Commission possessed rulemaking power under section 6(g) and chose to leave

that authority in place.[180] As the Supreme Court has observed, "[t]he long time failure of

Congress to alter" a statutory provision, like section 6(g) here, "after it had been judicially

construed, and the enactment by Congress of legislation which implicitly recognizes the judicial

construction as effective, is persuasive of legislative recognition that the judicial construction is

the correct one."[181] That is especially true when, as here, "the matter has been fully brought to

the attention of the public and the Congress, the latter has not seen fit to change the statute."[182]

Were there any doubt that the 1914 Congress granted the Commission the authority to make

rules under section 6(g) to prevent unfair methods of competition, the Congresses of 1975 and

1980 eliminated such doubt by ratifying the D.C. Circuit's decision holding that the Commission

has such authority.

## C. Comments and Responses Regarding the Commission's Legal Authority

The Commission received many comments supporting, discussing, or questioning its

authority to promulgate the final rule. Numerous commenters supported that the Commission has

such authority, including, among others, legal scholars and businesses.[183] In addition, hundreds

of small businesses—hailing from 45 States and the District of Columbia—joined a comment by

the Small Business Majority supporting the final rule.[184]

Commenters questioning the Commission's authority typically advanced one of three

arguments. First, some commenters claimed that the FTC Act does not grant the Commission

authority to promulgate the rule. Second, some commenters contended that the validity of non-

---

[180] Congress has also amended section 6 since the D.C. Circuit decided *Petroleum Refiners*, but it left section 6(g) untouched. *See* Pub. L. 109-455, 120 Stat. 3372 (2006).
[181] *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 488 (1940).
[182] *Id.* at 489.
[183] *See, e.g.*, Comment of Lev Menand et al., FTC-2023-0007-20871; Comment of Peter Shane et al., FTC-2023-0007-21024; Comment of Yelp, FTC-2023-0007-20974; Comment of Veeva Systems, FTC-2023-0007-18078.
[184] Comment of Sm. Bus. Majority, FTC-2023-0007-21022.

competes is a major question that Congress has not given the Commission the authority to address. And third, some commenters argued that Congress had impermissibly delegated to the Commission authority to promulgate nationwide rules governing methods of competition. A smaller number of comments asserted other, miscellaneous reasons the Commission allegedly lacked authority to promulgate the rule. The Commission has considered these comments and disagrees for the reasons explained below.

### 1. The Commission's Authority Under the FTC Act

The Commission received numerous comments claiming that it lacks authority under the FTC Act to promulgate rules prohibiting unfair methods of competition. The Commission disagrees. Congress expressly granted the Commission authority to promulgate such rules in the original FTC Act of 1914, Congress enacted legislation in 1975 expressly preserving that authority,[185] and it imposed requirements in 1980 that presumed that authority.

The Commission is not persuaded by commenters' arguments in opposition to its authority. For instance, some commenters argued that Congress's choice to exclude certain industries from the Commission's jurisdiction indicates that Congress did not intend to give the Commission power to pass rules that affect commerce across the national economy.[186] But Congress expressly "empowered and directed" the Commission to prevent unfair methods of competition throughout the economy,[187] in any activities "in or affecting commerce," subject only to limited exceptions. The final rule will apply only to the extent that the Commission has jurisdiction under the FTC Act. The Act does not limit the Commission's authority to pursue, for

---

[185] Some commenters argued that the 1975 Magnuson-Moss Act, which created additional procedures the Commission must use to promulgate rules regulating unfair or deceptive acts or practices, implies that the Commission entirely lacks authority to promulgate rules regulating unfair methods of competition. The Commission disagrees with these comments and notes the effect of the 1975 legislation, which preserved the Commission's existing rulemaking authority.
[186] *E.g.*, Comment of Fed'n of Am. Hosps., FTC-2023-0007-21034.
[187] 15 U.S.C. 45(a)(2).

example, industry-specific rulemaking. Where Congress wished to limit the scope of the Commission's authority over particular entities or activities, it did so expressly, demonstrating its intent to give the Commission broad enforcement authority over activities in or affecting commerce outside the scope of the enumerated exceptions.[188] That section 22 of the FTC Act requires the Commission to perform a regulatory analysis for amendments to rules based on, *inter alia*, "their annual effect on the national economy" confirms the same.[189]

Other commenters argued that the Commission is relying on vague or ancillary provisions for its authority and invoked the familiar refrain that Congress "does not . . . hide elephants in mouseholes."[190] None of the provisions on which the Commission is relying are either vague or ancillary. As explained earlier, preventing unfair methods of competition is at the core of the Commission's mandate, the plain text of the Act gives the Commission rulemaking authority to carry out that mandate, and the Commission has exercised this rulemaking authority before.[191] The D.C. Circuit and Seventh Circuits have upheld that exercise of authority, and Congress preserved this authority in subsequent amendments to the Act following the D.C. Circuit's decision.[192]

Additional commenters cited select legislative history from the 1914 FTC Act to suggest the Commission lacks authority to promulgate rules regulating competition.[193] "[T]here is no reason to resort to legislative history" when, as here, the text of the statute speaks plainly. [194]

---

[188] 15 U.S.C. 45(a)(2),(3).
[189] 15 U.S.C. 57b-3 (outlining requirements of the Commission's rulemaking process for new rules and amendments); *see also* Part II.E (discussing the Commission's jurisdiction).
[190] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see, e.g.*, Comment of La. And 12 Other States, FTC-2023-0007-21094.
[191] *See* Part II.B (discussing the Commission's history of using section 6(g) to promulgate rules).
[192] *Id.*
[193] *E.g.*, Comment of Nat'l Ass'n of Mfrs., FTC-2023-0007-20939; Comment of La. And 12 Other States, FTC-2023-0007-21094.
[194] *United States v. Gonzales*, 520 U.S. 1, 6 (1997).

Even if that were not the case, however, the legislative history does not unambiguously compel a different conclusion. Faced with similar arguments to those raised by commenters here, in *National Petroleum Refiners*, the D.C. Circuit conducted an exhaustive review of the 1914 FTC Act and concluded that "the legislative history of section 5 and Section 6(g) is ambiguous" and "certainly does not compel the conclusion that the Commission was not meant to exercise the power to make substantive rules with binding effect[.]"[195] As the D.C. Circuit explained, even individual statements by some Congresspeople that might suggest otherwise,[196] when properly contextualized, "can be read to support substantive rule-making of the kind asserted by the" Commission.[197]

Statements from the enactment of the 1975 Magnuson Moss Act, which added section 18 to the FTC Act, confirms the Commission's authority to promulgate rules under section 6(g). That legislative history reveals Congress in 1975 made a considered decision to reject an effort to overturn the D.C. Circuit's interpretation of the FTC Act and instead confirmed that section 6(g) authorizes the Commission to promulgate legislative rules concerning unfair methods of competition.[198] More importantly, these sorts of individual statements cannot trump the plain text

---

[195] *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 686 (D.C. Cir. 1973).
[196] *Id.* at 704; *see also, e.g.*, Comment from La. and 12 Other States, FTC-2023-0007-21094 (identifying statements and failed bills that, the commenters say, show the Commission was not intended to possess rulemaking authority).
[197] *Nat'l Petroleum Refiners*, 482 F.2d at 709.
[198] For example, while the Senate was considering amendments to the FTC Act, Senator Hart read excerpts of *Nat'l Petroleum Refiners* into the record. *See* 120 Cong. Rec. 40712 (Dec. 18, 1974). These short excerpts included the court acknowledging that it was considering whether the Commission "is empowered to promulgate substantive rules" that would "give greater specificity and clarity to the broad standard of illegality—'unfair methods of competition' . . .—which the agency is empowered to prevent." *Id.* (quoting *Nat'l Petroleum Refiners*, 482 F.2d at 673). Senator Hart then explained that the "procedural requirements . . . respecting FTC rulemaking" in the bill under consideration "are limited to unfair or deceptive acts or practices rules." *Id.* "These provisions and limitations," he explained, "are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition." *Id.* "Rules respecting unfair methods of competition," Senand Hart said, "should continue to be prescribed in accordance with" the APA. *Id.*; *see also* Comment of Lev Menand et al., FTC-2023-0007-20871 at 3-6 (recounting legislative history that preceded the 1975 amendments to the FTC Act).

of the Act that Congress passed,[199] which gave the Commission the authority "to make rules and regulations for the purpose of carrying out the provisions" of the FTC Act. Indeed, even if the legislative history were to be selectively read to cut against the Commission's authority, the Commission would still conclude that section 6(g) confers authority to promulgate this final rule because the plain text of the statute (including both the original 1914 Act and subsequent enacted amendments to the FTC Act) unambiguously confers that authority.

In short, neither the legislative history of the FTC Act, nor any of the other arguments that commenters raised about the Commission's rulemaking authority overcome the plain meaning of the Act or Congress's ratification of the Commission's power to make rules preventing unfair methods of competition, as discussed in Part II.B.[200]

The Commission acknowledges that individual members of the Commission have, at times, disclaimed the Commission's authority to promulgate rules regulating unfair methods of competition.[201] The statement of an individual Commissioner does not reflect the views of or bind "[t]he Commission itself," which has concluded—just as it did when it issued such rules in the past—that it does possess such authority.[202] In any event, the Commission has reviewed these statements, along with the many comments it received, and does not believe any of the arguments raised in support of that position overcome the plain meaning of the FTC Act provisions.

### 2. Major Questions Doctrine

Many commenters assert that the Commission lacks the authority to adopt the final rule

---

[199] *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002) ("Floor statements from two Senators [who were sponsors of the bill] cannot amend the clear and unambiguous language of a statute.").
[200] This includes arguments about the legislative intent, structure, or post-enactment history of the 1914 FTC Act.
[201] *See, e.g., Nat'l Petroleum Refiners*, 482 F.2d at 695-96 & n. 32, 38-39; NPRM at 3544 (dissenting statement of Commissioner Wilson).
[202] *Nat'l Petroleum Refiners*, 482 F.2d at 694; *see also* 16 CFR 4.14(c) ("Commission action" requires "the affirmative concurrence of a majority of the participating Commissioners").

based on the major questions doctrine. That doctrine, as the Supreme Court recently explained in *West Virginia v. EPA*, "teaches that there are extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."[203] In such cases, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims."[204] Having considered the factors that the Supreme Court has used to identify major questions, the Commission concludes that the final rule does not implicate the major questions doctrine. And even if that doctrine did apply, the Commission concludes that Congress provided clear authorization for the Commission to promulgate this rule.[205]

The agency authority underlying this final rule rests on firm historical footing. There is nothing novel about the Commission's assertion of authority to promulgate legislative rules under section 6(g).[206] As explained in Part II.B, the Commission has used this authority for more than 60 years to promulgate many rules defining unfair methods of competition and/or unfair or deceptive acts or practices.[207] The Commission's use of this power sometimes garnered significant attention, such as when it made national news by requiring cigarette warnings in the immediate wake of the Surgeon General's groundbreaking report on the health effects of

---

[203] *W. Va. v. EPA,* 597 U.S. 697, 721 (2022) (cleaned up).

[204] *Id.* at 723 (cleaned up).

[205] The Commission notes that some commenters either implicitly or explicitly focused on the Commission's *rulemaking* authority, as opposed to the Commission's authority to define non-competes as an unfair method of competition, as a major question. The Commission has already addressed the source of its rulemaking authority, *see* Part II.B. But to be clear, the Commission concludes that neither its rulemaking authority under section 6(g) nor its authority to use that power to define non-competes as an unfair method of competition implicates the major questions doctrine, and that even assuming either did, Congress has provided express statutory authority for both.

[206] *W. Va. v. EPA,* 597 U.S. at 725.

[207] *See* Part II.B (discussing the Commission's history of promulgating rules under section 6(g)).

smoking.[208] And the Commission's rulemaking authority was long ago "addressed"—and affirmed—"by a court."[209] Moreover, after that high-profile rulemaking and judicial affirmation, Congress considered—and twice reaffirmed—the Commission's authority to issue legislative rules defining unfair methods of competition under section 6(g).[210] Indeed, even when Congress decided to displace the FTC's Cigarette Rule with legislation, it left the Commission's rulemaking authority in place.[211] Likewise, when Congress added procedural steps that the Commission must take when promulgating rules concerning unfair or deceptive acts or practices, it expressly allowed the Commission to complete certain ongoing rulemakings, including one that relied on section 6(g) to define an unfair method of competition.[212] This is not a situation where Congress "conspicuously and repeatedly" declined to grant the agency the claimed power.[213]

Nor does the substance of the rule represent any departure from the Commission's past practices. Since its establishment in 1914, the Commission has had the authority to determine whether given practices constitute unfair methods of competition. Rather than trying to define all the many and varied practices that are unfair, Congress empowered the Commission to respond to changing market conditions and to bring specialized expertise to bear when making unfairness determinations.[214] As noted in Part I.B, the Commission has previously secured consent orders

---

[208] *See* Part II.B (discussing Cigarette Rule and Holder Rule); *see also* "U.S. to Require Health Warning for Cigarettes," N.Y. Times (June 25, 1964) at 1, 15 (tobacco industry indicating plans to immediately challenge the Commission's authority to issue the regulation).
[209] *W. Va. v. EPA*, 597 U.S. at 725; *see* Part II.B (discussing decisions from the D.C. Circuit and Seventh Circuit affirming the Commission's rulemaking power under section 6(g)).
[210] *See* Part II.B (discussing the history and content of sections 18 and 22 of the FTC Act).
[211] *See* Federal Cigarette Labeling and Advertising Act, Pub. L. 89-92, 79 Stat. 282 (July 27, 1965).
[212] 15 U.S.C. 57a(a)(2); *see* Part II.B (discussing the Mail Order Rule).
[213] *W. Va. v. EPA*, 597 U.S. at 724.
[214] *See, e.g.*, *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 311 n.2, 314 (1934).

premised on the use of non-competes being an unfair method of competition,[215] and there is little question that the Commission has the authority to determine that non-competes are unfair methods of competition through adjudication.[216] Indeed, one commenter who asserted the rule would violate the major questions doctrine expressly agreed that the Commission could determine that a specific non-compete is an unfair method of competition through case-by-case adjudication.[217] The Commission is making the same kind of determination here through rulemaking rather than adjudication.[218] And because the rulemaking process allows all interested parties a chance to weigh in, this process "may actually be fairer to parties than total reliance on case-by-case adjudication."[219] This is thus not a situation where the agency's action would fundamentally change the nature of the regulatory scheme. Determining whether a practice is an "unfair method of competition" under section 5 has been a core task of the Commission for more than a century—and, indeed, goes to the heart of its mandate.

Additionally, non-competes have already been the subject of FTC scrutiny and enforcement actions, so subjecting them to rulemaking is a more incremental—and thus less significant—step than it would be for an agency to wade into an area not currently subject to its enforcement authority. And the present rulemaking is consistent with both Congress's intent for the Commission and the Commission's prior practice. Congress "empowered and directed" the

---

[215] In those orders, the party agreed, inter alia, to cease and desist from enforcing or attempting to enforce existing non-competes and from entering into or attempting to enter into new ones, and also agreed to provide notice to affected employees that they are no longer subject to a non-compete. *See* Part I.B n.42-44 (citing recent Commission investigations and consent orders involving non-competes).

[216] To the extent that any commenters argued that the Commission lacked authority over the entire subject matter of non-compete agreements, the Commission did not see any compelling explanation that an agreement not to compete falls outside the meaning of a "method of competition."

[217] Comment of Int'l Ctr. For L. & Econs., FTC-2023-0007-20753, at 75-76.

[218] *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 at 685 (D.C. Cir. 1973) (recognizing that the Commission may "choose[]to elaborate" section 5's "comprehensive statutory standards through rule-making or through case-by-case adjudication").

[219] *Id*. at 681; *see generally* Part IX.C.2 (discussing the value of rulemaking).

Commission "to prevent persons, partnerships, or corporations" within the Commission's jurisdiction "from using unfair methods of competition in or affecting commerce."[220] Following that directive, the Commission has previously used its section 6(g) authority to promulgate rules that reach industries across the economy. For example, the Mail Order Rule placed restrictions on any sale conducted by mail,[221] and the Negative Options Rule requires certain disclosures for some negative option plans. These rules—promulgated nearly 50 or more years ago—applied across the industries within the FTC's jurisdiction, yet no court has held that they exceeded the Commission's authority.[222] Indeed, the Seventh Circuit upheld the Mail Order Rule as a valid exercise of that authority.[223]

Congress itself recognized that the Commission's authority will sometimes affect firms across the economy. Indeed, addressing unfair methods of competition and unfair and deceptive practices across industries (other than the industries, activities, or entities Congress expressly exempted) is the core of the Commission's mandate—and the Commission has long pursued that mandate through both rulemaking[224] and adjudication.[225] Congress imposed certain requirements in section 22 on any amendment to a Commission rule promulgated under section 6 (or section

---

[220] 15 U.S.C. 45(a)(2).

[221] Mail Order Merchandise, 40 FR 49492 (Oct. 22, 1975); *see* 16 CFR part 435.

[222] *See* Part II.B (listing rules promulgated by the FTC exercising authority under sections 5 and 6(g)).

[223] *United States v. JS & A Grp.*, 716 F.2d 451, 454 (7th Cir. 1983).

[224] *See* Part II.B.

[225] The Commission's adjudicatory power, like its rulemaking power, stretches across the national economy. For instance, the Commission has found companies in a variety of industries participated in price-fixing conspiracies that violated section 5 and ordered them to cease and desist from such practices following an adjudication. *See, e.g.*, *Eugene Dietzgen Co. v. FTC*, 142 F.2d 321 (7th Cir. 1944) (scientific instruments); *U.S. Maltsters Ass'n v. FTC*, 152 F.2d 161 (7th Cir. 1945) (malt manufacturers); *Keasbey & Mattison Co. v. FTC*, 159 F.2d 940 (6th Cir. 1947) (asbestos insulation); *Allied Paper Mills v. FTC*, 168 F.2d 600 (7th Cir. 1948) (book paper manufacturers); *Bond Crown & Cork. Co. v. FTC*, 176 F.2d 974 (4th Cir. 1949) (bottle cap manufacturers). Price-fixing is just one example. The Commission's adjudicatory power also supported a cease-and-desist order concerning a food manufacturer's resale practices more than 100 years ago. *FTC v. Beech-Nut Packing*, 257 U.S. 441 (1922). And it supported a cease-and-desist order within the past few years enjoining a pharmaceutical company from entering into reverse payment settlement schemes. *Impax Labs., Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021). In the century between, the Commission has found section 5 violations based on false advertising, monopoly maintenance, exclusive dealing, and more in diverse sectors throughout the country.

18) that would have certain substantial effects on the national economy, the price of goods or services, or regulated entities and consumers.[226] Congress thus anticipated—and intended—that the Commission's rulemaking power carried the potential to affect the economy in considerable ways, and Congress already considered and specified the necessary steps and checks to ensure the Commission's exercise of that power is appropriate. For all these reasons, the final rule does not involve a "major question" as the Supreme Court has used that term.

Even if the final rule does present a major question, the final rule passes muster because the FTC Act provides clear authorization for the Commission's action. In cases involving major questions, courts expect Congress to "speak clearly" if it wishes to assign the disputed power.[227] Congress did so when it "declared unlawful" in the FTC Act "[u]nfair methods of competition" and empowered the Commission "to make rules and regulations for the purpose of carrying out the provisions of th[e] Act."[228] Congress "[i]n large measure" left "the task of defining 'unfair methods of competition' . . . to the Commission."[229] That is precisely what the Commission has done here, for the reasons elaborated in detail in Part IV. Finally, there is no doubt that the Commission has expertise in the field (competition) that it is regulating here.[230] For these reasons, even if the final rule involves a major question, Congress has clearly delegated to the Commission the authority to address that question.

---

[226] 15 U.S.C. 57b-3; *see also* Part II.B.

[227] *W. Va. v. EPA*, 597 U.S. 697, 716, 723 (2002).

[228] FTC Act of 1914, 38 Stat. at 721-22; *see* 15 U.S.C. 45(a), 46(g); *see also* Part II.A (discussing the Commission's rulemaking authority).

[229] *FTC v. Texaco, Inc.*, 393 U.S. 223, 225 (1968).

[230] *Cf. W. Va. v. EPA*, 597 U.S. at 729 (noting the Court's view that the EPA had traditionally lacked the expertise needed to develop the rule at issue); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, at 764-65 (2021) (questioning the link between the Center for Disease Control and an eviction moratorium); *see also* Part II.A (discussing Congress's creation of the Commission as an expert body); Parts IV.B and IV.C (discussing the rationale for the rule and explaining the negative effects non-competes have on competition). The Commission also notes that through, inter alia, the roundtables and enforcement actions described in Part I.B, and through this rulemaking process, it has acquired expertise on non-competes specifically. The Commission further notes that non-competes are, inherently, a method of competition.

### 3. Non-Delegation Doctrine

Some commenters also objected that Congress violated the non-delegation doctrine by empowering the Commission to promulgate rules regulating unfair methods of competition. The Commission disagrees. The non-delegation doctrine provides that "Congress generally cannot delegate its legislative power to another Branch."[231] But the Constitution does not "prevent Congress from obtaining the assistance of its coordinate Branches."[232] "So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power."[233] Applying this rule, the Supreme Court has "over and over upheld even very broad delegations" including those directing agencies "to regulate in 'the public interest,'…to set 'fair and equitable' prices and 'just and reasonable' rates," and "to issue whatever air quality standards are 'requisite to protect the public health.'"[234] "The Supreme Court has" also "explained that the general policy and boundaries of a delegation 'need not be tested in isolation'" and "[i]nstead, the statutory language may derive content from the 'purpose of the Act, its factual background and the statutory context in which they appear.'"[235]

Here, Congress "declared unlawful" any "unfair methods of competition in or affecting commerce" and "empowered and directed" the Commission "to prevent" entities within its jurisdiction "from using unfair methods of competition."[236] Congress also instructed the

---

[231] *Mistretta v. United States*, 488 U.S. 361, 372 (1989).
[232] *Id.*
[233] *Id.* (alteration in original).
[234] *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943); *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24 (1932); *Yakus v. United States*, 321 U.S. 414, 422 (1944); *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944); and *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)).
[235] *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)).
[236] 15 U.S.C. 45(a)(1)-(2).

Commission to "make rules and regulations for the purpose of carrying out the provisions" of the FTC Act.[237] Congress's stated purpose and policy in section 5 provides the Commission with an intelligible principle to guide its section 6(g) rulemaking authority.[238]

Were there any doubt, the Supreme Court has laid it to rest in *A.L.A. Schechter Poultry Corp. v. United States*.[239] *Schechter Poultry* marked one of two occasions "in this country's history" that the Supreme Court "found a delegation excessive," and "in each case . . . Congress had failed to articulate *any* policy or standard to confine discretion."[240] The Court offered the FTC Act, however, as a counterexample of proper Congressional delegation. The Court recognized that the phrase "unfair methods of competition" in the FTC Act was "an expression new in the law" without "precise definition," but that Congress had empowered the Commission to "determine[] in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest" whether a method of competition is unfair.[241] The FTC Act stood in contrast, the Court explained, to the National Industrial Recovery Act ("NIRA"), which the Court held included an unconstitutional delegation.[242]

The Commission recognizes that *Schechter Poultry* approved of the FTC Act's adjudicatory process for determining unfair methods of competition without commenting on the Act's rulemaking provision. But the "unfair method of competition" authority the Court

---

[237] 15 U.S.C. 46(g).
[238] As the D.C. Circuit noted in *Nat'l Petroleum Refiners Ass'n v. FTC*, "the Supreme Court has ruled that the powers specified in Section 6 do not stand isolated from the Commission's enforcement and law applying role laid out in Section 5." 482 F.2d 672, 677 (D.C. Cir. 1973) (citing *United States v. Morton Salt Co.*, 338 U.S. 632 (1950)).
[239] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).
[240] *Gundy*, 588 U.S. at 2129 (internal quotation omitted); *cf. also Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) (finding impermissible delegation).
[241] *Schechter Poultry*, 295 U.S. at 532-33.
[242] *Id.* at 529-42.

approvingly cited in *Schechter Poultry* is the same intelligible principle the Commission is applying in this rulemaking. And just as the adjudication process provides for a "formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate evidence, and for judicial review,"[243] the APA rulemaking process provides for a public notice of proposed rulemaking, the opportunity to "submi[t] . . . written data, views, or arguments," agency consideration of those comments, and judicial review.[244] If Congress may permissibly delegate the authority to determine through adjudication whether a given practice is an unfair method of competition, it may also permit the Commission to do the same through rulemaking.[245]

For these reasons, Commission concludes that its authority to promulgate rules regulating unfair methods of competition is not an impermissible delegation of legislative authority.

### 4. Other Challenges to the Commission's Authority

Finally, a handful of comments raised other, miscellaneous arguments contending that the Commission lacks authority to promulgate the rule. The Commission has reviewed and considered these comments and concludes they do not undercut the Commission's authority to promulgate the final rule.

The Commission received several comments about the Commerce Clause. That clause allows Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes."[246] Consistent with that clause, the FTC Act empowers the Commission

---

[243] *Id.* at 533.

[244] 5 U.S.C. 553, 702.

[245] *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 685 (D.C. Cir. 1973); *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947) ("Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.").

[246] U.S. Const. art. I, sec. 8, cl. 3.

44

to prevent unfair methods of competition "in or affecting commerce," which the Act also defines consistently with the Constitution.[247] One commenter wrote to support the rule and emphasized that non-competes restrict the free flow of interstate commerce. Others argued that the proposed rule would violate the Commerce Clause by regulating local commerce. The Commission has considered these comments and concludes that it may promulgate the final rule consistent with the Commerce Clause. The final rule extends to the full extent of the FTC's jurisdiction, which in turn extends no further than the Commerce Clause permits. As the Supreme Court has explained, the phrase "in or affecting commerce" in section 5 of the FTC Act is "coextensive with the constitutional power of Congress under the Commerce Clause."[248] In this final rule, the Commission finds that the use of non-competes by employers substantially affects commerce as that term is defined in the FTC Act. The final rule is therefore a lawful exercise of Congress's delegated power.[249]

Relatedly, one commenter objected that the rule would violate the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[250] But as just explained, the Constitution grants Congress the power to regulate interstate commerce, and pursuant to that power Congress granted the Commission authority to prevent unfair methods of competition in or affecting commerce. The Commission is not intruding on any power reserved to the States.

---

[247] 15 U.S.C. 44, 45(a)(1).
[248] *United States v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277, n.6 (1975).
[249] *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) ("Congress's power" under the Commerce Clause "is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others."); *see also* Part I.B.2 (discussing prevalence of non-competes) and Part IX.C.2 (addressing the need for a nationwide regulation prohibiting non-competes).
[250] U.S. Const. amend. X.

Some commenters objected that the rule infringes on the right to contract. One of these commenters acknowledged that the Constitution's Contracts Clause does not apply to the Federal government.[251] Regardless, even assuming that the Constitution protects a right to contract that can be asserted against a Federal regulation, that right sounds in substantive due process, and the Commission must offer only a rational basis for the rule.[252] As relevant here, the final rule advances the Commission's congressional mandate to prevent unfair methods of competition and will promote competition and further innovation among its many benefits.[253] There is a rational relationship between regulating non-competes and these legitimate government purposes.

One commenter argued that the proposed rule was unconstitutionally vague. This commenter's objection focused on the proposed provision governing *de facto* non-competes. The Commission is not adopting that proposed language in the final rule. Instead, the Commission has clarified the scope of its definition of non-compete clause. Whether a specific clause falls within the scope of the final rule will necessarily depend on the precise language of the agreement at issue, but the text of the final rule provides regulated parties with sufficient notice of what the law demands to satisfy any due process vagueness concerns.

## D. Compliance with the Administrative Procedure Act ("APA")

Some commenters also contended that the Commission has not complied with the Administrative Procedure Act ("APA").[254] At a high level, the APA requires prior public notice,

---

[251] *See* U.S. Const. art. I, sec. 10, cl. 1.
[252] *See, e.g.*, *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 522 (8th Cir. 1985).
[253] *See* Parts IV.B and IV.C, Part X.F.6.
[254] This includes, for example, a commenter who argued that that the NPRM was not the product of reasoned decision-making, asserting that the Commission had failed to consider key aspects of the rule or misconstrued evidence; commenters who argued that the rule was arbitrary and capricious for failing to consider less restrictive alternatives; commenters who argued that the NPRM failed to consider State policy or that the Commission would be acting arbitrarily by not passing a uniform rule; and commenters who argued that the Commission had failed to consider reliance interests. The Commission has addressed the concerns underlying these comments in other parts of this statement of basis and purpose.

an opportunity to comment, and consideration of those comments before an agency can promulgate a legislative rule.[255] The Commission has engaged in that process, which has led to this final rule and the accompanying explanation. Some comments failed to recognize that the NPRM was a preliminary step that did not fossilize the Commission's consideration of arguments or weighing of evidence. Moreover, the APA "limits causes of action under the APA to final agency action."[256] It is this final rule, not the NPRM, that constitutes final agency action. Before adopting this final rule, the Commission reviewed and considered all comments received. In many instances, the Commission has made changes relative to the proposed rule to address concerns that commenters raised. In all cases, however, the Commission has complied with the APA.

### E. The Commission's Jurisdiction Under the FTC Act

The Commission's jurisdiction derives from the FTC Act. Employers that are outside the Commission's jurisdiction under the FTC Act are not subject to the final rule. The Commission clarifies in the definition of person in § 910.1, that the rule applies only to those within the Commission's jurisdiction. Some commenters sought a more detailed accounting of the Commission's jurisdiction under the FTC Act. The Commission addresses those comments in this section. Comments seeking an exclusion for entities within the Commission's jurisdiction are addressed in Parts V.D.3 and V.D.4.

#### 1. Generally

Certain entities that would otherwise be subject to the final rule may fall outside the FTC's jurisdiction under the FTC Act. The FTC Act exempts certain entities or activities from

---

[255] 5 U.S.C. 553; *see also Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 5 (D.C. Cir. 2011) (APA "generally require[s] an agency to publish notice of a proposed rule in the Federal Register and to solicit and consider public comments upon its proposal.").
[256] *Trudeau v. FTC*, 456 F.3d 178, 188-89 (D.C. Cir. 2006) (internal quotation marks omitted); *see* 5 U.S.C. 704.

the Commission's enforcement jurisdiction, which otherwise applies to "persons, partnerships, or corporations."[257] For example, the Act exempts "banks" and "persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act."[258] And the Act excludes from its definition of "corporation" any entity that is not "organized to carry on business for its own profit or that of its members."[259] The NPRM explained that, where an employer is exempt from coverage under the FTC Act, the employer would not be subject to the rule.[260] The NPRM also explained that State and local government entities—as well as some private entities—may not be subject to the rule when engaging in activity protected by the State action doctrine.[261] Some commenters stated that the Commission should restate, clarify, interpret, or limit the reach of its authority under the FTC Act in the rule.

In response, the Commission explains that the final rule extends to covered persons that are within the Commission's jurisdiction. The Commission does not believe restating or further specifying each jurisdictional limit in the final rule's text is necessary; the FTC Act defines the limits of the Commission's jurisdiction and those limits govern this rule. Moreover, the Commission cannot here provide guidance that applies to every fact and circumstance. Whether an entity falls under the Commission's jurisdiction can be a fact-specific determination. An attempt by the Commission to capture all potential interpretations of the laws governing exclusions from the FTC Act may create confusion rather than clarity. In response to commenters who asked the Commission to affirm that the final rule does not bind agencies that regulate firms outside the Commission's jurisdiction under the FTC Act, the Commission affirms

---

[257] 15 U.S.C. 45(a)(2); *see also FTC v. AT&T Mobility LLC*, 883 F.3d 848, 853-56 (9th Cir. 2018) (*en banc*).
[258] 15 U.S.C. 45(a)(2).
[259] 15 U.S.C. 44.
[260] NPRM at 3510.
[261] *Id.* (citing *Parker v. Brown*, 317 U.S. 341, 350-51 (1943)).

that the Commission applies the final rule only to entities that are covered by the FTC Act.[262]

A State government agency commenter suggested that the Commission explicitly exempt State and local governments from the rule. The commenter pointed to conflicts-of-interest policies used by some State agencies to preclude former employees from working on related projects or jobs in the private sector, which the commenter stated do not implicate the policy concerns the FTC seeks to address in the rule. The commenter also noted the complexity of when the Commission's jurisdiction might extend to State and local governments. The Commission clarifies in the definition of "person" in § 910.1 that the final rule applies only to a legal entity within the Commission's jurisdiction. The Commission also explains in Part III.E that the definition of "person" is coextensive with the Commission's authority to issue civil investigative demands. Nothing in this rule changes the extent of the Commission's jurisdiction over State and local governments. The Commission declines to specify all circumstances under which a governmental entity or quasi-governmental entity would or would not be subject to the Commission's jurisdiction and, thus, this final rule. In any event, with respect to the government ethics policies referenced by the commenter, to the extent the commenter is referring to traditional "cooling off" policies that preclude former government employees from working on discrete, specific projects that fell within the scope of their former official governmental position to address ethical concerns, such policies would not meet the definition of "non-compete clause" in § 910.1 because they do not prohibit, penalize or function to prevent a worker from switching jobs or starting a new business.

---

[262] For example, a few community bank commenters expressed concern that because the Federal Deposit Insurance Corporation ("FDIC") can enforce the FTC Act against banks, the rule could be applied by the FDIC to banks. The FTC Act is the Commission's organic statute, and interpretive authority of the FTC Act rests with the Commission. Whether other agencies enforce section 5 or apply the rule to entities under their own jurisdiction is a question for those agencies. At the same time, as discussed in this Part II.E.1, the Commission applies and enforces the rule only to the extent of its jurisdiction.

## 2.  Jurisdiction Over Entities Claiming Nonprofit Status Under the FTC Act or the Internal Revenue Code

Commenters from the healthcare industry argued that the Commission should restate, clarify, interpret, or limit the reach of its authority under the FTC Act specifically for the healthcare industry. They pointed to the prevalence of healthcare organizations registered under section 501(c) of the Internal Revenue Code claiming tax-exempt status as nonprofits. Commenters contended that these organizations are categorically outside the Commission's authority under the FTC Act. In fact, under existing law, these organizations are not categorically beyond the Commission's jurisdiction. To dispel this misunderstanding, the Commission summarizes the existing law pertaining to its jurisdiction over non-profits.

### a.  Comments Received

Business and trade industry commenters from the healthcare industry, including, for example, hospitals, physician practices, and surgery centers, focused on whether the Commission has jurisdiction over nonprofit organizations registered under section 501(c)(3) of the Internal Revenue Code in light of the FTC Act's definition of "corporation." Section 501(c)(3) exempts from taxation certain religious, charitable, scientific, educational, and other corporations, "no part of the net earnings of which inure[] to the benefit of any private shareholder or individual."[263] An entity is a "corporation" under the FTC Act only if it is "organized to carry on business for its own profit or that of its members."[264] Several industry commenters argued that the Commission does not have jurisdiction over entities that claim tax-exempt status as nonprofits because they are, by definition, not "organized to carry on business for [their] own

---

[263] 26 U.S.C. 501(c)(3). Other, less frequently invoked paragraphs of section 501(c) also identify corporations and organizations that qualify for tax-exempt status. The distinctions between these entities and those claiming tax-exempt status under 501(c)(3) are analyzed under the same standard.
[264] 15 U.S.C. 44.

profit or that of [their] members." The Commission presumes that commenters self-identifying as or referring to "nonprofits," "not-for-profits," or other similar terms without further explanation are referencing entities claiming tax-exempt status under section 501(c)(3) or other provisions of the Internal Revenue Code. Some commenters contended that, to avoid confusion, the rule should state that it does not apply to entities claiming tax-exempt status as non-profits. At least one commenter stated that the Commission should clarify whether and how the rule would apply to healthcare entities claiming tax-exempt status as nonprofits and then reopen the comment period. One commenter sought clarification on how ownership interest in a for-profit entity or joint venture with a for-profit partner by an entity that claims tax-exempt status as a nonprofit would affect the rule's applicability.

### b. The Final Rule

The final rule applies to the full scope of the Commission's jurisdiction. Many of the comments about nonprofits erroneously assume that the FTC's jurisdiction does not capture any entity claiming tax-exempt status as a nonprofit. Given these comments, the Commission summarizes Commission precedent and judicial decisions construing the scope of the Commission's jurisdiction as it relates to entities that claim tax-exempt status as nonprofits and to other entities that may or may not be organized to carry on business for their own profit or the profit of their members.

Congress empowered the Commission to "prevent persons, partnerships, or corporations" from engaging in unfair methods of competition.[265] To fall within the definition of "corporation" under the FTC Act, an entity must be "organized to carry on business for its own profit or that of its members."[266] These FTC Act provisions, taken together, have been interpreted in

---

[265] 15 U.S.C. 45(a)(2). The Commission focuses on coverage as "corporations" in this section.
[266] 15 U.S.C. 44.

Commission precedent[267] and judicial decisions[268] to mean that the Commission lacks

jurisdiction to prevent section 5 violations by a corporation not organized to carry on business

for its own profit or that of its members.

The Commission stresses, however, that both judicial decisions and Commission

precedent recognize that not all entities claiming tax-exempt status as nonprofits fall outside the

Commission's jurisdiction. As the Eighth Circuit has explained, "Congress took pains in drafting

§ 4 [15 U.S.C. 44] to authorize the Commission to regulate so-called nonprofit corporations,

associations and all other entities if they are in fact profit-making enterprises."[269] The

Commission applies a two-part test to determine whether a corporation is organized for profit

and thus within the Commission's jurisdiction. As the Commission has explained, "[t]he not-for-

profit jurisdictional exemption under Section 4 requires both that there be an adequate nexus

between an organization's activities and its alleged public purposes and that its net proceeds be

properly devoted to recognized public, rather than private, interests."[270] Alternatively stated, the

Commission looks to both "the source of the income, *i.e.*, to whether the corporation is organized

for and actually engaged in business for only charitable purposes, and to the destination of the

income, *i.e.*, to whether either the corporation or its members derive a profit."[271] This test reflects

the Eighth Circuit's analysis in *Community Blood Bank of Kansas City Area, Inc. v. FTC* and

"the analogous body of federal law which governs treatment of not-for-profit organizations under

the Internal Revenue Code."[272] Under this test, a corporation's "tax-exempt status is certainly

---

[267] *In the Matter of Coll. Football Ass'n*, 117 F.T.C. 971, 992-999 (1990).
[268] *California Dental Ass'n v. FTC*, 526 U.S. 756, 766 (1999); *Cmty. Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011, 1016 (8th Cir. 1969); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1214 (11th Cir. 1991).
[269] *Blood Bank*, 405 F.2d at 1018; *see also, e.g.*, *FTC v. Nat'l Comm'n on Egg Nutrition*, 517 F.2d 485, 488 (7th Cir. 1975).
[270] *Coll. Football Ass'n*, 117 F.T.C. at 998.
[271] *Id.* at 994 (internal quotation and citation omitted).
[272] *Id.* at 994.

52

one factor to be considered," but that status "does not obviate the relevance of further inquiry into a [corporation's] operations and goals."[273]

Merely *claiming* tax-exempt status in tax filings is not dispositive. At the same time, if the Internal Revenue Service ("IRS") concludes that an entity does not qualify for tax-exempt status, such a finding would be meaningful to the Commission's analysis of whether the same entity is a corporation under the FTC Act. Administrative proceedings and judicial decisions involving the Commission or the IRS[274] have identified numerous private benefits that, if offered, could render an entity a corporation organized for its own profit or that of its members under the FTC Act, bringing it within the Commission's jurisdiction. For instance, the Commission has exercised jurisdiction in a section 5 enforcement action over a physician-hospital organization because the organization engaged in business on behalf of for-profit physician members.[275] That organization, which consisted of over 100 private physicians and one non-profit hospital, claimed tax-exempt status as a nonprofit.[276] Similarly, the Commission has exercised jurisdiction over an independent physician association claiming tax-exempt status as a nonprofit. The association consisted of private, independent physicians and private, small group practices.[277] That association was organized for the pecuniary benefit of its for-profit members because it "contract[ed] with payers, on behalf of its [for-profit] physician members, for the

---

[273] *In the Matter of the Am. Med. Assoc.*, 94 F.T.C. 701, 1979 WL 199033, at *221 (FTC Oct. 12, 1979).
[274] The Commission offers examples of decisions from the IRS and Tax Court as examples that the Commission may deem persuasive. Although "[r]ulings of the Internal Revenue Services are not binding upon the Commission," the Commission has recognized that "a determination by another Federal agency that a respondent is or is not organized and operated exclusively for eleemosynary purposes should not be disregarded." *Am. Med. Assoc.*, 1979 WL 199033 at *221.
[275] *In the Matter of Preferred Health Servs., Inc.*, FTC No. 41-0099, 2005 WL 593181, at *1 (Mar. 2, 2005).
[276] *Id.* at *1.
[277] *In the Matter of Boulder Valley Individual Prac. Assoc.*, 149 F.T.C. 1147, 2010 WL 9434809, at *2 (Apr. 2, 2010).

provision of physician services for a fee."[278] Under IRS precedent in the context of purportedly

tax-exempt nonprofit hospitals and other related entities that partner with for-profit entities,

where the purportedly nonprofit entity "has ceded effective control" to a for-profit partner,

"conferring impermissible private benefit," the entity loses tax-exempt status.[279] The IRS has

also rejected claims of nonprofit tax-exempt status for entities that pay unreasonable

compensation, including percentage-based compensation, to founders, board members, their

families, or other insiders.[280]

These examples are illustrative. As has been the case for decades, under Commission

precedent and judicial decisions construing the scope of the Commission's jurisdiction, any

entity satisfying the two-prong test falls within the Commission's jurisdiction. Such entities

would thus be bound by the final rule.[281]

## F.  The Legal Standard for Unfair Methods of Competition Under Section 5

In section 5 of the FTC Act, "unfair methods of competition in or affecting commerce"

are "declared unlawful."[282] In enacting section 5, Congress intentionally did not mirror either the

common law  or the text or judicial interpretations of the Sherman Act, but instead adopted this

---

[278] *Boulder Valley*, 2010 WL 9434809, at *2. The Commission has similarly exercised jurisdiction where an entity claiming nonprofit tax-exempt status provides pecuniary benefit to for-profit entities or individuals. *See, e.g.*, *In the Matter of Mem'l Hermann Health Network Providers*, 137 F.T.C. 90, 92 (2004); *Preferred Health*, 2005 WL 593181, at *1-*2; *Advoc. Health Partners*, F.T.C. No. 31-0021, 2007 WL 643035, at *3-*4 (Feb. 7, 2007); *Conn. Chiropractic Ass'n*, F.T.C. No. 71-0074, 2008 WL 625339, at *2 (Mar. 5, 2008); *Am. Med. Ass'n v. FTC*, 638 F.2d 443 (2d Cir. 1980), aff'd, 455 U.S. 676 (1982).

[279] *Redlands Surgical Servs. v. Comm'r*, 242 F.3d 904, 904-05 (9th Cir. 2001); *see also St. David's Health Care Sys. v. United States*, 349 F.3d 232, 239 (5th Cir. 2003).

[280] *See Fam. Tr. of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 155-156 (D.D.C. 2012); I.R.S. G.C.M. 39,674 (Oct. 23, 1987); *Bubbling Well Church of Universal Love, Inc. v. Comm'r*, No. 5717-79X, 1980 WL 4453 (T.C. June 9, 1980) ("[E]xcessive payments made purportedly as compensation constitute benefit inurement in contravention of section 501(c)(3).").

[281] The Commission cannot predict precisely how many entities claiming nonprofit tax-exempt status may be subject to the final rule. The Commission finds that the benefits of the final rule justify implementing it no matter how many nonprofit entities claiming tax-exempt status it ultimately reaches—including under the unlikely assumption that it does not reach any of them.

[282] 15 U.S.C. 45(a)(1).

new term.[283] As the Supreme Court has confirmed, this different term reflects a distinct

standard.[284] Under section 5, the Commission assesses two elements: (1) whether the conduct is a

method of competition, as opposed to a condition of the marketplace, and (2) whether it is unfair,

meaning that it goes beyond competition on the merits. The latter inquiry has two components:

(a) whether the conduct has indicia of unfairness and (b) whether the conduct tends to negatively

affect competitive conditions. These two components are weighed according to a sliding scale.

Indicia of unfairness include the extent to which the conduct may be coercive,

exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a

similar nature.[285] Indicia of unfairness may also be present if the conduct is otherwise restrictive

or exclusionary, depending on the circumstances, such as the nature of the commercial setting

and the current and potential future effects of the conduct.[286] Notably, section 5 does not limit

---

[283] The Clayton Antitrust Act (38 Stat. 730, ch. 323, P.L. 63-212, Oct. 15, 1914) was signed into law weeks after the FTC Act of 1914, 38 Stat. 717.

[284] *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *FTC v. Sperry & Hutchinson*, 405 U.S. 233, 243-44 (1972); *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321 (1966); *FTC v. Motion Picture Advert. Serv.*, 344 U.S. 392, 394-95 (1953); *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 309-10 (1934). While some commenters argued the Commission should apply the rule of reason in this rule, as outlined in Parts II.A, II.B, II.C, and II.F, neither the text of section 5, the Supreme Court and other courts' interpretation of section 5, nor the legislative history support the conclusion that the Commission should apply the rule of reason to determine whether conduct violates section 5 as an unfair method of competition. The Commission outlines the legal standard for finding certain uses of non-competes to be unfair methods of competition in the final rule in this Part II.F.

[285] *See e.g.*, *Sperry & Hutchinson Co.*, 405 U.S. at 243 (holding section 5 reaches conduct shown to exploit consumers, citing *R.F. Keppel & Bro.*, 291 U.S. at 313); *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 369 (1965) (holding that the "utilization of economic power in one market to curtail competition in another . . . . bolstered by actual threats and coercive practices" was an unfair method of competition*); FTC v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding that use of "dominant economic power . . . in a manner which tended to foreclose competition" is an unfair method of competition*); E.I. du Pont de Nemours v. FTC (Ethyl)*, 729 F.2d 128, 137, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive or deceitful" as well as "exclusionary").

[286] *See, e.g.*, *Motion Picture Advert. Serv. Co.*, 344 U.S. at 395-96; *Luria Bros. & Co. v. FTC*, 389 F.2d 847, 860-61 (3d Cir. 1968). As the Supreme Court has made clear, the inquiry into the nature of the commercial setting does not, however, require market definition or proof of market power. *See, e.g.*, *Atl. Refin. Co.*, 381 U.S. at 371 (finding it "unnecessary to embark upon a full scale economic analysis of competitive effect"). On November 10, 2022, the Commission issued a policy statement describing the key principles of general applicability concerning whether conduct is an unfair method of competition under section 5. FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022) (hereinafter "FTC Policy Statement"). The FTC Policy Statement cites a number of cases explaining that section 5 does not require market definition or proof of market power. *Id.* at 10.

indicia of unfairness to conduct that benefits one or more firms and necessarily disadvantages others. Instead, restrictive and exclusionary conduct may also be unlawful where it benefits specific firms while tending to negatively affect competitive conditions.[287]

The second prong, whether conduct tends to negatively affect competitive conditions, focuses on the nature and tendency of the conduct. It does not turn on whether the conduct directly caused actual harm in the specific instance at issue and therefore does not require a detailed economic analysis or current anticompetitive effects.[288] Instead, the inquiry examines whether the conduct has a tendency to negatively affect competitive conditions, including by raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing or excluding other market participants, reducing the likelihood of potential or nascent competition, reducing labor mobility, suppressing worker compensation or degrading working conditions for workers. These concerns may arise when the conduct is examined in the aggregate along with the conduct of others engaging in the same or similar conduct.[289] Section 5 does not require a separate showing of market power or market definition.[290] Nor does section 5 import

---

[287] *See, e.g.*, *Brown Shoe Co.*, 384 U.S. at 320 ("Thus the question . . . is whether the Federal Trade Commission can declare it to be an unfair practice for Brown, the second largest manufacturer of shoes in the Nation, to pay a valuable consideration to hundreds of retail shoe purchasers in order to secure a contractual promise from them that they will deal primarily with Brown and will not purchase conflicting lines of shoes from Brown's competitors. We hold that the Commission has power to find, on the record here, such an anticompetitive practice unfair . . . .")

[288] *Atl. Refin. Co.*, 381 U.S. at 371 (It is "unnecessary to embark upon a full scale economic analysis of competitive effect."); *Texaco*, 393 U.S. at 230 ("It is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); *Union Circulation Co. v. FTC*, 241 F.2d 652, 657 (2d Cir. 1957) ("The agreements should be struck down if their reasonable tendency, as distinguished from actual past effect, is to injure or obstruct competition. Under the Federal Trade Commission Act, industry agreements and practices have been enjoined without an actual showing of injury to competition . . . ."). *See also Sperry & Hutchinson Co.*, 405 U.S. at 244 ("[U]nfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws."); *Ethyl*, 729 F.2d at 138 (finding that evidence of actual harm is not required); *In re Coca-Cola Co.*, 117 F.T.C. 795, 915 n.25 (1994) (rejecting argument that section 5 violation requires showing of "anticompetitive effects").

[289] *Motion Picture Advert. Serv. Co.*, 344 U.S. at 395; *Union Circulation Co.*, 241 F.2d at 658 ("The tendency of the 'no-switching' agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well-established signatory agencies and to the disadvantage of infant organizations.").

[290] *Atl. Refin. Co.*, 381 U.S. at 371; *Texaco*, 393 U.S. at 230; *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 19-20 (7th Cir.

the rule-of-reason analysis applied under other antitrust laws, including in some Sherman Act cases.[291]

The Commission weighs the two elements—indicia of unfairness and tendency to negatively affect competitive conditions—on a sliding scale. Where the indicia of unfairness are clear, conduct may be an unfair method of competition with only a limited showing of a tendency to negatively affect competitive conditions.[292] For example, conduct that is coercive and exploitative evinces facial unfairness and weighs heavily as clear indicia of unfairness.[293] Where indicia of unfairness are less clear, conduct may still violate section 5 where it tends to negatively affect competitive conditions, but a stronger showing of such tendency is required.

In many cases the Commission (and courts) have held conduct to constitute an unfair method of competition by pointing to clear indicia of unfairness, including coercive or exploitative conduct, without conducting a detailed economic analysis of its effects. In *Atlantic Refining Co. v. FTC* and *FTC v. Texaco, Inc.*, the Supreme Court held that the Commission established an unfair method of competition where an oil company used its economic power over its gas stations to coerce them into buying certain tires, batteries, or accessories only from firms that paid the oil company a commission.[294] The Court determined in *Atlantic Refining* that "a full-scale economic analysis of competitive effect" was not required and the Commission needed only to show that the conduct burdened "a not insubstantial portion of commerce."[295] The Court

---

1971) (no proof of foreclosure of a relevant market necessary in an exclusive dealing contract case under section 5 (citing *Brown Shoe*)).

[291] *See* Part II.A.

[292] *See, e.g.*, *Ethyl*, 729 F.2d at 137-39; FTC Policy Statement, *supra* note 286, at 9.

[293] *See e.g.*, *Sperry & Hutchinson Co.*, 405 U.S. at 243; *Ethyl*, 729 F.2d at 139, 140 (finding that unfair methods of competition include practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); FTC Policy Statement, *supra* note 286, at 7, 9.

[294] *Atl. Refin. Co.*, 381 U.S. at 369-70; *Texaco*, 393 U.S. at 228-29.

[295] *Atl. Refin. Co.*, 381 U.S. at 371. *See also Texaco*, 393 U.S. at 230 (finding that the practice unfairly burdened competition for a not insignificant volume of commerce); *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 309 (1934) ("A

reiterated this standard in *Texaco* holding that, even though the impact was less harmful than the conduct in *Atlantic Refining*, "the anticompetitive tendencies of [the challenged] system are clear, and . . . the Commission was properly fulfilling the task that Congress assigned it in halting this practice in its incipiency."[296] As the Court observed, "[t]he Commission is not required to show that a practice it condemns has totally eliminated competition."[297] In *FTC v. R.F. Keppel & Brother, Inc.*, the Supreme Court held that the Commission established an unfair method of competition where a manufacturer exploited the inability of children to protect themselves in the marketplace by marketing inferior goods to them through use of a gambling scheme.[298] The Court considered the extent of the practice and concluded "[the practice] is successful in diverting trade from competitors" without engaging in a full-scale economic analysis.[299]

In other cases, the Commission (and courts) have held exclusionary or restrictive conduct was an unfair method of competition based on evidence of the conduct's tendency to negatively affect competitive conditions without focusing on the indicia of unfairness, including whether the conduct is coercive or exploitative. But an evidentiary showing or detailed economic analysis that such conduct generated actual anticompetitive effects or would do so in the future still was not required. For example, in *Union Circulation Company v. FTC,* the Second Circuit held the Commission established an unfair method of competition where a group of door-to-door subscription solicitation agencies agreed not to hire workers who were previously employed by

---

practice so widespread and so far reaching in its consequences is of public concern if in other respects within the purview of the statute.").

[296] *Texaco*, 393 U.S. at 230 (further noting that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce.").

[297] *Id*. at 230. *See also Shell Oil Co. v. FTC*, 360 F.2d 470, 487 (5th Cir. 1966) ("A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord.").

[298] 291 U.S. 304, 313.

[299] 291 U.S. at 308-09.

another signatory agency.[300] The court looked to whether the "reasonably foreseeable effect" of the agencies' conduct would be to "impair or diminish competition between existing [competitors]" or prevent potential new rivals.[301] In finding that the conduct was an unfair method of competition, the court concluded that "[t]he tendency of the . . . agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well established signatory agencies and to the disadvantage of infant organizations."[302] In *FTC v. Brown Shoe Co.*, the Supreme Court held that an exclusive dealing arrangement under which the Brown Shoe Company offered shoe retailers "a valuable consideration . . . to secure a contractual promise from them that they will deal primarily with Brown and will not purchase conflicting lines of shoes from Brown's competitors" violated section 5 consistent with the Commission's authority "to arrest trade restraints in their incipiency."[303] Of course, evidence of actual adverse effects on competition meets the requirement to show a *tendency* to negatively affect competitive conditions. For example, in *FTC v. Motion Picture Advertising Service Co.*, the Supreme Court held that an exclusive dealing arrangement violated section 5 where there was "substantial evidence" that the contracts "unreasonably restrain competition."[304]

---

[300] 241 F.2d 652, 655 (2d Cir. 1957).

[301] *Id.* at 658. Notably, the court also considered facially coercive conduct by which the door-to-door subscription agencies coerced magazine publishers into not doing business with one of their competitors because the competitor hired their former workers. *Id.* at 655-56. The court upheld the Commission's order concluding this conduct was an unfair method of competition under section 5. The court did not conduct any related economic analysis and simply concluded that the "illegal scheme of coercion . . . is clearly unjustified." *Id.*

[302] *Id.* at 658; *see also Nichols v. Spencer Intern. Press, Inc.*, 371 F.2d 332, 334 (7th Cir. 1967) ("Granting that the antitrust laws were not enacted for the purpose of preserving freedom in the labor market, nor of regulating employment practices as such, nevertheless it seems clear that agreements among supposed competitors not to employ each other's employees not only restrict freedom to enter into employment relationships, but may also, depending upon the circumstances, impair full and free competition in the supply of a service or commodity to the public.")

[303] *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320, 322 (1966).

[304] *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 395-96 (1953); *see also L.G. Balfour Co. v. FTC*, 442 F.2d 1, 14 (7th Cir. 1971) (holding that a firm's exclusive dealing contracts violated section 5 where such contracts were 'anti-competitive'").

Respondents in unfair method of competition cases sometimes assert purported justifications as an affirmative defense. Some courts have declined to consider justifications altogether. However, where defendants raise justifications as an affirmative defense, the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[305] Additionally, to the extent justifications are asserted, they must be legally cognizable,[306] non-pretextual,[307] and any restriction used to bring about the benefit must be narrowly tailored to limit any adverse impact on competitive conditions.[308]

## III. Section 910.1: Definitions

Section 910.1 sets forth definitions of several terms used in the final rule.

### A. Definition of "Business Entity"

The Commission adopts the definition of "business entity" as proposed.

#### 1. Proposed Definition

The Commission proposed to define "business entity" as "a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary

---

[305] *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 371 (1965) (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *FTC v. Texaco*, 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear")*; Balfour*, 442 F.2d at 15 (while relevant to consider the advantages of a trade practice on individual companies, this cannot excuse an otherwise illegal business practice). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through section 5.

[306] *See, e.g.*, *FTC v. Ind. Fed. Dentists*, 476 U.S. 447, 463 (1986); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 468 (1941); *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423-24 (1990).

[307] *See, e.g.*, *Ind. Fed'n of Dentists*, 476 U.S. at 464. *See also United States v. Microsoft Corp.*, 253 F.3d 35, 62-64, 72, 74, 76-77 (D.C. Cir. 2001); *Eastman Kodak Co. v. Image Technical Tech. Svcs*, 504 U.S. 541, 472, 484-85 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-10 (1985).

[308] *NCAA v. Alston*, 594 U.S. 69, 100-101 (2021); *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines, sec. 3.36b. *See also Union Circulation Co. v. FTC*, 241 F.2d 652, 658 (2d Cir. 1957) ("The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices.").

thereof."[309] The term "business entity" was used in two places: (1) in proposed § 910.3, which contained an exception for certain non-competes entered into in the context of a sale of a business by a substantial owner of, or substantial member or substantial partner in, the business entity,[310] and (2) in proposed § 910.1(e), which defined "substantial owner, substantial member, or substantial partner" as an owner, member, or partner holding at least a 25% ownership interest in a business entity.

The Commission explained in the NPRM that it proposed including divisions and subsidiaries in the definition of "business entity" to apply the sale-of-a-business exception where a person is selling a division or subsidiary of a business entity.[311] The Commission stated that the primary rationale for the sale-of-business exception—to help protect the value of a business acquired by a buyer—also applies where a person is selling a division or subsidiary of a business entity.[312]

### 2. Comments Received

Two commenters specifically addressed the definition of business entity. One commenter suggested a new definition using a functional test that the commenter asserted would prevent employers from structuring their businesses as several smaller legal entities in order to fall within the sale-of-a-business exception. Another commenter also suggested that the definition be amended to explicitly include "general partnerships" and trusts.

### 3. The Final Rule

The Commission adopts the definition of "business entity" as proposed. The Commission declines to adopt a functional test for the definition of "business entity." As described in greater

---

[309] NPRM, proposed § 910.1(a).
[310] *Id.* at 3508.
[311] *Id.* at 3509.
[312] *Id.*

detail in Part V.A, the sale-of-a-business exception in the final rule does not contain a 25% ownership threshold, so employers will not have an incentive to structure their businesses as several smaller legal entities in order to fall within the sale-of-a-business exception. The Commission also believes that replacing the current bright-line definition of "business entity" with a functional test would make it more difficult for workers and employers to know whether a given non-compete is enforceable in the context of the sale of a business. The Commission concludes adding the terms "general partnerships" and "trusts" to the definition is unnecessary, because the phrase "other legal entity" already includes those entity types.

### B.  Definition of "Employment"

The Commission proposed to define "employment" as "work for an employer, as the term employer is defined in § 910.1(c)."[313] That provision defined "employer" as "a person, as defined in 15 U.S.C. 57b-1(a)(6) [section 20 of the FTC Act], that hires or contracts with a worker to work for the person."[314] Section 20 defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law." The Commission intended the proposed definition of "employer" to clarify that an employment relationship exists, for purposes of the final rule, regardless of whether an employment relationship exists under another law, such as a Federal or State labor law.[315] The final rule clarifies the definitions to better reflect that intent.

While commenters generally did not address the proposed definition of "employment," many commenters expressed concern that the proposed definition of "employer" would exclude workers hired by one entity to work for another, such as workers hired through a staffing agency.

---

[313] *Id.*, proposed § 910.1(d).
[314] *Id.*, proposed § 910.1(c).
[315] *Id.* at 3510.

To avoid excluding such workers, and consistent with the Commission's intent to cover workers irrespective of whether they are classified as in an "employer-employee" relationship under other State and Federal laws, the final rule defines "employment" as "work for a person" and makes corresponding changes to the definition of "employer," described in Part III.C. This definition of "employment" better clarifies that an employment relationship exists, for purposes of the final rule, regardless of whether an employment relationship exists under another law, such as a Federal or State labor law.

### C. Proposed Definition of "Employer"

The Commission proposed to define employer as a "person, as defined in 15 U.S.C. 57b-1(a)(6) [section 20 of the FTC Act], that hires or contracts with a worker to work for the person."[316] Section 20 defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law."[317] The Commission clarified in the NPRM that a person meeting the definition of an employer under proposed § 910.1(c) would be an employer regardless of whether the person meets another legal definition of employer, such as a definition in Federal or State labor law.[318] In response to concerns raised by commenters, the final rule does not adopt a definition of "employer."

### 1. Comments Received

Several commenters expressed support for the proposed definition of "employer." A few commenters suggested changes to the definition of "employer" to maximize the final rule's coverage and close potential loopholes. Worker and employer advocates noted that the proposed

---

[316] *Id.*, proposed § 910.1(c).
[317] 15 U.S.C. 57b-1(a)(6).
[318] NPRM at 3510.

definition appeared to exclude certain persons who are commonly understood to be a worker's employer because it assumed that a worker's employer is the same legal entity that hired or contracted with the worker. These commenters contended that the proposed definition would not cover arrangements such as when a worker is employed through a contractual relationship with a professional employer organization or staffing agency; under a short-term "loan-out arrangement," during which a worker hired by one employer may work for another employer; under contract with a parent, subsidiary, or affiliate of the business who hired them; or by persons or entities who share common control over the worker's work. A few of these commenters also stated that the proposed definition creates a loophole allowing evasion of the rule through third-party hiring. Most commenters that addressed this issue suggested listing one or more such arrangements in the definition of "employer" to ensure that these kinds of arrangements are covered.

One worker advocacy group argued that the term "hires or contracts" in the proposed definition of "employer" is in tension with the Commission's stated intent to broadly cover all workers, including externs, interns, and volunteers. This commenter suggested that the definition of "employer" incorporate language from the Fair Labor Standards Act ("FLSA") definition of "employ," which includes to "suffer or permit to work."[319] The commenter suggested this language because of its breadth, noting that the language originated in State laws designed to reach businesses that use third parties to illegally hire and supervise children.

One industry trade organization argued that, to minimize inconsistencies with the FLSA, the Commission should incorporate the FLSA's definition of "employer."

### 2. Final Rule

---

[319] 29 U.S.C. 203(g).

After considering the comments, the Commission has revised the definitions of "non-compete clause" and "worker" as described in Parts III.D and III.G. These revisions make the definition of "employer" unnecessary, so the Commission is not finalizing a definition of "employer."

These revisions clarify that the final rule covers all workers regardless of whether they work for the same person that hired or contracted with them to work. As explained in Part III.D, in the definition of "non-compete clause," the Commission has revised the phrase "contractual term between an employer and a worker" to read "term or condition of employment" and has revised the phrase "after the conclusion of the worker's employment with the employer" to read "after the conclusion of the employment that includes the term or condition." Furthermore, as explained in Part III.G, in the definition of "worker," the Commission has revised the phrase "a natural person who works, whether paid or unpaid, for an employer" to read "a natural person who works or who previously worked, whether paid or unpaid."

The Commission is adopting this more general language, rather than listing the exact kinds of contractual arrangements and entities (*e.g.*, staffing agencies, affiliates, joint employers, etc.) to avoid unnecessary or confusing terminology, evasion of the final rule through complex employment relationships, and the need to specify myriad fact-specific scenarios. The language is designed to capture indirect employment relationships as a general matter without regard to the label used.

## D.  Definition of "Non-Compete Clause"

Based on the comments received, the Commission adopts a slightly modified definition of "non-compete clause" in § 910.1. Section 910.1 defines a "non-compete clause" as a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to

65

prevent a worker from (A) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (B) operating a business in the United States after the conclusion of the employment that includes the term or condition. Section 910.1 further provides that, for purposes of the final rule, "term or condition of employment "includes, but is not limited to, a contractual term or workplace policy, whether written or oral." Similar to the proposed rule, the final rule applies to terms and conditions that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends, as well as agreements that penalize or effectively prevent a worker from doing the same.

### 1. Proposed Definition

The Commission's proposed definition of "non-compete clause" consisted of proposed § 910.1(b)(1) and (b)(2). Proposed § 910.1(b)(1) would have defined "non-compete clause" as "a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer." Proposed § 910.1(b)(2) would have provided that the definition in proposed § 910.1(b)(1) includes "a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer."

The Commission explained that the proposed definition of non-compete clause would be limited to non-competes between employers and workers and would not apply to other types of non-competes, for example, non-competes between two businesses.[320] The Commission further

_____

[320] NPRM at 3509.

explained that the definition would be limited to post-employment restraints (*i.e.*, restrictions on what the worker may do after the conclusion of the worker's employment) and would not apply to concurrent-employment restraints (*i.e.*, restrictions on what the worker may do during the worker's employment).[321]

In the NPRM, the Commission noted that, rather than expressly prohibiting a worker from competing against their employer, some non-competes require workers to pay damages if they compete against their employer. The Commission explained that courts generally view these contractual terms as non-competes and that proposed § 910.1(b)(1) encompassed them.[322]

The Commission also expressed concern that workplace policies—for example, a term in an employee handbook stating that workers are prohibited from working for certain types of firms or in certain fields after their employment ends—could have the same effects as a contractual non-compete even if they are not enforceable, because workers may believe they are bound by the policy. The Commission sought comment on whether the term "non-compete clause" should expressly include a provision in a workplace policy.[323]

The Commission stated that proposed § 910.1(b)(1) was a generally accepted definition of non-compete clause that covers both express non-competes and terms purporting to bind a worker that have the same functional effect as non-competes.[324] The Commission stated that the definition would generally not apply to other types of restrictive employment agreements that do not altogether prevent a worker from seeking or accepting other work or starting a business after their employment ends and do not generally prevent other employers from competing for that

---

[321] *Id.*
[322] *Id.*
[323] *Id.* at 3510.
[324] *Id.* at 3509.

worker's labor.[325] At the same time, the Commission expressed concern about unusually restrictive employment agreements that, while not formally triggered by seeking or accepting other work or starting a business after their employment ends, nevertheless restrain such an unusually large scope of activity that they have the same functional effect as non-competes.[326] The Commission noted judicial opinions finding some such restrictive employment agreements to be *de facto* non-competes.[327]

Proposed § 910.1(b)(2) accordingly sought to clarify that the definition in proposed § 910.1(b)(1) includes contractual terms that are *de facto* non-competes because they have the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. It then provided two illustrative, non-exhaustive examples of contractual terms that may be such functional non-competes: (1) an NDA between an employer and a worker written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment with the employer; and (2) a training-repayment agreement ("TRAP") that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred to train the worker.[328]

### 2. Coverage of the Definition

#### a. Comments Received

---

[325] *Id.*

[326] *Id.*

[327] *Wegmann* v. *London,* 648 F.2d 1072, 1073 (5th Cir. 1981) (holding that liquidated damages provisions in a partnership agreement were *de facto* non-compete clauses "given the prohibitive magnitudes of liquidated damages they specify"); *Brown* v. *TGS Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 306, 319 (Cal. Ct. App. 2020) (holding that an NDA that defined "confidential information" "so broadly as to prevent [the plaintiff] in perpetuity from doing any work in the securities field" operated as a *de facto* non-compete clause and therefore could not be enforced under California law, which generally prohibits enforcement of non-compete clauses).

[328] NPRM, proposed § 910.1(b)(2).

Most of the comments on the definition of "non-compete clause" addressed whether, and under what circumstances, the rule should apply to functional non-competes.[329] Many commenters that generally supported the NPRM agreed that the definition of non-compete clause should cover other restrictive employment agreements when they function as non-competes. These commenters argued that, when restraints on labor mobility are banned, companies switch to functionally equivalent restraints. Some commenters asked the Commission to adopt a broader definition of functional non-competes or to expand the rule to ban additional types of restrictive employment agreements altogether. A few commenters asked the Commission to broaden proposed § 910.1(b)(1)-(2) by replacing the terms "prevent" and "prohibit" with "restrains" and "limits."

In contrast, many commenters who generally opposed the NPRM stated that proposed § 910.1(b)(2) was overinclusive. Many such commenters also asserted that the definition was vague and could lead to confusion and significant litigation. Several comments suggested clarifications, such as including additional examples of functional non-competes; creating safe harbors for certain restrictive employment covenants; replacing proposed § 910.1(b)(2) with a standard based on antitrust law's "quick look" test;[330] or revising the provision to focus on the "primary purpose" of a restrictive employment covenant. Several commenters argued that the Commission failed to cite evidence that functional non-competes are anti-competitive. Other commenters expressed concern that prohibiting functional non-competes would undermine the rule's intent to permit less restrictive alternatives to non-competes.

---

[329] While the NPRM generally used the term "*de facto* non-competes," the final rule uses the term "functional non-competes." The Commission believes this term more clearly conveys that certain terms are considered non-competes under the final rule where they function to prevent workers from seeking or accepting other work or starting a business after their employment ends.

[330] *See, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770-71 (1999).

At least one commenter argued that proposed § 910.1(b)(2) should be removed because it was redundant, as the proposed definition of non-compete clause in proposed § 910.1(b)(1) already captured any term that prevents an employee from seeking alternative employment, without regard to how the term is labeled. Some commenters who generally supported the NPRM also expressed concern that ambiguity in proposed § 910.1(b)(2) could enable employers to intimidate workers by suggesting that restrictive employment agreements used to evade a final rule are not non-competes under the functional test. Other commenters who generally supported the rule asked for greater specificity in proposed § 910.1(b)(2) to prevent adverse judicial interpretations that could undermine the effectiveness of the rule.

Many commenters addressed issues specific to other types of restrictive employment agreements, including NDAs (also sometimes referred to as confidentiality agreements), TRAPs, non-solicitation agreements, and garden leave and severance agreements.

With respect to NDAs, some commenters stated that the Commission rightly identified overbroad NDAs as a potential method of evasion of the rule and supported the Commission's recognition of overbroad NDAs as functional non-competes. In contrast, some commenters contended that by covering functional non-competes, the proposed rule would limit their ability to use NDAs. Some commenters argued that providing that overbroad NDAs may be functional non-competes would be inconsistent with the proposed rule's separate preliminary finding that NDAs are less restrictive alternatives to non-competes. Similarly, some commenters contended that a functional test may frustrate employers' ability to use NDAs to protect legitimate trade secrets or to enjoin a former worker employed with a competitor under the Defend Trade Secrets Act of 2016, in part because they would be concerned about potential legal liability. Some commenters contended that the example of an overbroad NDA in proposed § 910.1(b)(2) would

discourage the use of NDAs, including the use of narrowly tailored NDAs, and undermine confidence in their enforceability. Some commenters stated that reference to cases, including *Brown v. TGS Management Co.*[331] and similar cases represent outliers that are likely to cause more confusion than clarity.

Other commenters addressed the proposed definition's application to TRAPs, which are agreements in which the worker agrees to pay the employer for purported training expenses if the worker leaves their job before a certain date. Several commenters asked the Commission to ban all forms of TRAPs. These commenters argued that employers are increasingly adopting TRAPs and that abusive TRAPs are pervasive throughout the economy. Some commenters asserted that millions of workers are likely bound by TRAPs. Commenters stated that TRAPs may impose penalties that are disproportionate to the value of training that workers received or require the worker to pay alleged training expenses for on-the-job training. Some commenters contended that TRAPs may be even more harmful than non-competes, because while non-competes prohibit or prevent workers from seeking or accepting other work or starting a business after they leave their job, TRAPs can prevent workers from leaving their job for any reason.

Some commenters expressed concern that the example in proposed § 910.1(b)(2)(ii) of a TRAP that was a functional non-compete was too narrow, and that the Commission should not imply that TRAPs with penalties that *are* reasonably related to an employer's training expenses cannot be functional non-competes. One commenter asked the Commission to adopt the standard for TRAPs in the Uniform Restrictive Employment Agreement Act.[332] Another commenter suggested that the Commission ban TRAPs below an income threshold of $75,000. Another commenter asked the Commission to clarify that costs that are inherent in any employer-

---

[331] *See supra* note 327 and accompanying text.
[332] *See* ULC, *Uniform Restrictive Employment Agreement Act* (2021), sec. 14.

employee relationship—such as time spent by a supervisor training a new employee how to perform routine business procedures typical for their position or role—should not be considered costs that are "reasonably related to the costs" of training.

At least one commenter urged the Commission to treat as functional non-competes other employment terms similar to TRAPs such as equipment loans, where employers provide employees with a loan to purchase equipment that the worker needs in order to perform their job, and damages provisions containing open-ended costs related to the employee's departure—including hiring and training replacements or vague harms such as reputational damages, loss of good will or lost profits. In contrast, some commenters argued that TRAPs should be excluded from coverage under proposed § 910.1(b)(2) because they are not unfair or anti-competitive.

Regarding non-solicitation agreements—which prohibit a worker from soliciting former clients or customers of the employer—a few commenters expressed concern that overbroad non-solicitation agreements may be permitted because they were not listed in the regulatory text for proposed § 910.1(b)(2) as examples of functional non-competes (although the Commission described them in the preamble to the proposed rule as restrictive employment agreements that may fall within the definition of non-compete clause if they restrain such an unusually large scope of activity that they are *de facto* non-compete clauses).[333] These commenters asked the Commission to revise proposed § 910.1(b)(2) to expressly cover non-solicitation agreements that prohibit workers from doing business with prospective or actual customers to an extent that would effectively preclude them from continuing to work in the same field or that prevent a worker from doing business with their former employer's client where the client solicits the worker directly. Other commenters, however, expressed concern that the proposed rule could

---

[333] NPRM at 3509.

undermine employers' confidence in the enforceability of non-solicitation agreements and asked that the final rule clarify that non-solicitation agreements are generally not prohibited, or exclude them altogether.

Some comments addressed no-hire clauses, which bar former workers from hiring their former colleagues. One employment lawyer stated that these are less restrictive than non-compete clauses. Other commenters stated that no-hire clauses can still limit careers or make it hard for new businesses to find staff. Some commenters expressed concerns with no-business or non-dealing clauses, which bar former workers from doing business with former clients or customers even if the clients or customers sought them out. These commenters stated that such agreements limit the options of clients and customers.

Many commenters raised questions about forfeiture-for-competition clauses, which they stated are often a component of deferred compensation arrangements for executives. Commenters stated that deferred compensation plans often include forfeiture clauses, or contingencies on receiving the promised compensation, to incentivize their recipients to act in ways that benefit the employer. These commenters stated that agreements not to compete for a period of time after employment ends are a common feature of forfeiture clauses. Some commenters stated that such forfeiture-for-competition clauses are non-competes and have the same negative effects as non-competes because they are contingent on competition—they require workers to give up bonus pay or other post-employment benefits if they work for a competing employer or start a competing business, and they keep other employers from being able to hire those workers. Other commenters stated that forfeiture-for-competition clauses are a common and important component of deferred compensation arrangements for highly compensated

employees and senior executives.[334] Other commenters argued that the clauses allow workers to choose between receiving the deferred compensation and forfeiting it if they choose to work for a competitor, and thus they are not non-competes. Other commenters urged the Commission to either clarify that forfeiture-for-competition clauses are not non-competes or to carve them out explicitly.

Many commenters also addressed the application of the rule to garden leave agreements. In using the term "garden leave," commenters seemed to be referring to a number of different types of agreements. Some commenters referred to garden leave agreements as those in which, before a worker left their job, they remained employed and received full pay for a specified period of time but their access to co-workers and company facilities was restricted. In contrast, other commenters considered "garden leave" an arrangement to make payments to a worker after their employment concluded. Commenters used different terminology to refer to these kinds of agreements, including severance pay, partial pay, and full pay akin to administrative leave, in exchange for an agreement not to compete. Some commenters argued that it is coercive for a worker to sign a non-compete in exchange for severance pay and argued that garden leave arrangements are non-competes because they limit a worker's options to work for a competitor. Some commenters asked the Commission to adopt a durational limit for garden leave. At least one commenter also urged the Commission to clarify that an employer cannot unilaterally terminate garden leave.

Other commenters requested clarification that garden leave was not a non-compete on the basis that garden leave does not create a legal obligation on the part of the worker to refrain from competing. Some commenters requested a specific exclusion for garden-leave arrangements.

---

[334] Commenters also provided purported business justifications for forfeiture-for-competition clauses, which are addressed in Part IV.D.2.

They argued that by forcing employers to pay workers, garden leave would reduce the overuse of non-competes. One talent industry commenter argued that the rule should expressly allow for "fee tails," which require talent agents to pay a portion of future commissions to former employers.

### b. The Final Rule

After considering the comments, the Commission has slightly modified the definition of non-compete clause to clarify its scope. In the final rule, § 910.1 defines "non-compete clause" as a term or condition of employment that either "prohibits" a worker from, "penalizes" a worker for, or "functions to prevent" a worker from (A) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (B) operating a business in the United States after the conclusion of the employment that includes the term or condition.

Pursuant to the term "prohibits," the definition applies to terms and conditions that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends. Examples of such agreements would be a contractual term between a national sandwich shop chain and its workers stating that, for two years after the worker leaves their job, they cannot work for another sandwich shop within three miles of any of the chain's locations,[335] or a contractual term between a steelmaker and one of its executives prohibiting the executive from working for any competing business anywhere in the world for one year after the end of the executive's employment.[336] The vast majority of existing agreements covered by the

---

[335] This example is based on the agreements described in Jamieson, *supra* note 32. The company agreed to remove the non-competes in 2016 as part of a settlement. Office of the Att'y Gen. of the State of N.Y., Press Release, *A.G. Schneiderman Announces Settlement With Jimmy John's To Stop Including Non-Compete Agreements In Hiring Packets* (June 22, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-settlement-jimmy-johns-stop-including-non-compete.

[336] This example is based on *AK Steel Corp.* v. *ArcelorMittal USA, LLC*, 55 N.E.3d 1152, 1156 (Ohio Ct. App. 2016).

final rule fall into this category of agreements that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends.

Pursuant to the term "penalizes," the definition also applies to terms and conditions that require a worker to pay a penalty for seeking or accepting other work or starting a business after their employment ends. One example of such a term is a term providing that, for two years after the worker's employment ends, the worker may not engage in any business within a certain geographic area that competes with the employer unless the worker pays the employer liquidated damages of $50,000.[337] Because such an agreement penalizes the worker for seeking or accepting other work or for starting a business after the worker leaves their job, it would be a non-compete clause under § 910.1. Indeed, where an agreement restricts who a worker can work for or their ability to start a business after they leave their job, State courts generally characterize the agreement as a non-compete, regardless of whether the agreement contains an express prohibition or requires the worker to pay liquidated damages.[338]

Another example of a term that "penalizes" a worker, under § 910.1, is an agreement that extinguishes a person's obligation to provide promised compensation or to pay benefits as a result of a worker seeking or accepting other work or starting a business after they leave their job. One example of such an agreement is a forfeiture-for-competition clause, which, similar to the agreement with liquidated damages described previously, imposes adverse financial consequences on a former employee as a result of the termination of an employment relationship, expressly conditioned on the employee seeking or accepting other work or starting a business

---

[337] This example is based on *Press-A-Dent, Inc. v. Weigel*, 849 N.E.2d 661, 668-70 (Ind. Ct. App. 2006) (holding that the agreement was an unlawful non-compete).

[338] *See, e.g.*, *Wichita Clinic, P.A.* v. *Louis*, 185 P.3d 946, 951 (Kan. Ct. App. 2008); *Grayhawk Homes, Inc. v. Addison*, 845 S.E.2d 356 (Ga. Ct. App. 2020); *Salewski v. Pilchuck Veterinary Hosp., Inc.*, 359 P.3d 884 (Wash. Ct. App. 2015).

after their employment ends. An additional example of a term that "penalizes" a worker under § 910.1 is a severance arrangement in which the worker is paid only if they refrain from competing. The Commission also notes that a payment to a prospective competitor to stay out of the market may also violate the antitrust laws even if it is not a non-compete under this rule.[339]

The common thread that makes each of these types of agreements non-compete clauses, whether they "prohibit" or "penalize" a worker, is that on their face, they are triggered where a worker seeks to work for another person or start a business after they leave their job—*i.e.*, they prohibit or penalize post-employment work for another employer or business. As elaborated in Part IV, such non-competes are inherently restrictive and exclusionary conduct, and they tend to negatively affect competitive conditions in both labor and product and service markets by restricting the mobility of workers and preventing competitors from gaining access to those workers.

Pursuant to the term "functions to prevent," the definition of non-compete clause also applies to terms and conditions that restrain such a large scope of activity that they function to prevent a worker from seeking or accepting other work or starting a new business after their employment ends, although they are not expressly triggered by these specific undertakings. This prong of the definition does not categorically prohibit other types of restrictive employment agreements, for example, NDAs, TRAPs, and non-solicitation agreements. These types of agreements do not by their terms prohibit a worker from or penalize a worker for seeking or accepting other work or starting a business after they leave their job, and in many instances may not have that functional effect, either. However, the term "functions to prevent" clarifies that, if

---

[339] *See., e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) ("[A]greements between competitors to allocate territories to minimize competition are illegal" (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)); *FTC v. Actavis, Inc.*, 570 U.S. 136, 154 (2013) ("payment in return for staying out of the market" may violate the antitrust laws).

an employer adopts a term or condition that is so broad or onerous that it has the same functional effect as a term or condition prohibiting or penalizing a worker from seeking or accepting other work or starting a business after their employment ends, such a term is a non-compete clause under the final rule.

In response to the comments alleging that covering "de facto" or "functional" non-competes is overinclusive or vague, the Commission notes that the definition's three prongs—"prohibit," "penalize," and "function to prevent"—are consistent with the current legal landscape governing whether a particular agreement is a non-compete. In addition to generally accepted definitions of non-competes encompassing the "prohibits" prong of the definition, terms that "penalize" workers for seeking or accepting other work or starting a business after they leave their job (for example, by requiring them to pay liquidated damages) are typically considered non-competes under State law.[340] And the "functions to prevent" prong of the definition is likewise consistent with legal decisions holding that restrictive employment agreements other than non-competes may be analyzed under the State law test applicable to non-competes where they function similarly to non-competes.[341] As the First Circuit stated in a recent opinion, "[O]verly broad nondisclosure agreements, while not specifically prohibiting an employee from entering into competition with the former employer, raise the same policy concerns about restraining competition as noncompete clauses where, as here, they have the effect of preventing the defendant from competing with the plaintiff."[342] The fact that whether a given restrictive covenant rises to the level of being a functional non-compete will turn on the facts and

---

[340] *See supra* note 338 and accompanying text.
[341] *See, e.g.*, *Brown v. TGS Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 306, 316-19 (Cal. Ct. App. 2020); *Wegmann v. London*, 648 F.2d 1072, 1073 (5th Cir. 1981); *TLS Mgmt. & Mktg. Servs. v. Rodriguez-Toledo*, 966 F.3d 46, 59-60 (1st Cir. 2020).
[342] *TLS Mgmt. & Mktg. Servs.*, 966 F.3d at 57.

circumstances of particular covenants and the surrounding market context does not render this aspect of the final rule overinclusive or vague. Such covenants would be subject to case-by-case adjudication for whether they constitute an unfair method of competition even in the absence of the final rule.

In response to the comments alleging that the Commission failed to cite evidence that functional non-competes harm competition, the Commission disagrees. This final rule is based on a robust evidentiary record that includes significant empirical evidence and thousands of public comments, as well as the Commission's longstanding expertise in evaluating competition issues. Based on this record, the Commission finds that non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets and markets for products and services.[343] In addition, the Commission finds that, with respect to workers other than senior executives, non-competes are exploitative and coercive.[344] The Commission finds that the functional equivalents of non-competes—because they prevent workers from engaging in the same types of activity—are likewise restrictive and exclusionary conduct that tends to negatively affect competitive conditions in a similar way. In response to the commenters who expressed concern that prohibiting functional non-competes would undermine the rule's intent to permit reasonable substitutes, the Commission stresses that, as described throughout this Part III.D, the "functions to prevent" prong of the definition of non-compete clause captures only agreements that function to prevent a worker from seeking or accepting other work or starting a business after they leave their job—not appropriately tailored NDAs or TRAPs that do not have that functional effect.

While many commenters requested that the Commission state expressly in the final rule

---

[343] *See* Parts IV.B and IV.C.
[344] *See* Part IV.B.2.b.

whether various specific restrictive employment agreements satisfy the definition of non-compete clause, the Commission declines to adopt a definition that attempts to capture or carve out every edge case. Rather, the final rule focuses on providing a clear, understandable, and generally applicable definition of non-compete clause that reflects the need for case-by-case consideration of whether certain restrictive covenants rise to the level of being functional non-competes—which is fully consonant with the legal landscape that employers generally face today. The Commission nevertheless here responds to comments regarding the restrictive clauses that commenters contended should be expressly addressed in the final rule.

        As noted in this Part III.D, restrictive employment agreements other than non-competes—such as NDAs, non-solicitation agreements, and TRAPs—do not by their terms or necessarily in their effect prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job. For example, a garden-variety NDA in which the worker agrees not to disclose certain confidential information to a competitor would not prevent a worker from seeking work with a competitor or from accepting such work after the worker leaves their job. Put another way, an NDA would not be a non-compete under § 910.1 where the NDA's prohibitions on disclosure do not apply to information that (1) arises from the worker's general training, knowledge, skill or experience, gained on the job or otherwise; or (2) is readily ascertainable to other employers or the general public.[345]

        However, NDAs may be non-competes under the "functions to prevent" prong of the definition where they span such a large scope of information that they function to prevent workers from seeking or accepting other work or starting a business after they leave their job. Examples of such an agreement may include an NDA that bars a worker from disclosing, in a

---

[345] This example is based on sec. 9 of the Uniform Restrictive Employment Agreement Act, *supra* note 332.

future job, any information that is "usable in" or "relates to" the industry in which they work.[346]

Such an agreement would effectively prevent the worker from working for another employer in

that industry. A second example would be an NDA that bars a worker from disclosing any

information or knowledge the worker may obtain during their employment whatsoever, including

publicly available information.[347] These agreements are so broadly written that, for practical

purposes, they function to prevent a worker from working for another employer in the same field

and are therefore non-competes under § 910.1.

 Under the final rule's definition of non-compete clause, the same inquiry applies to non-

solicitation agreements. Non-solicitation agreements are generally not non-compete clauses

under the final rule because, while they restrict who a worker may contact after they leave their

job, they do not by their terms or necessarily in their effect prevent a worker from seeking or

accepting other work or starting a business. However, non-solicitation agreements can satisfy the

definition of non-compete clause in § 910.1 where they function to prevent a worker from

seeking or accepting other work or starting a business after their employment ends. Whether a

non-solicitation agreement—or a no-hire agreement or a no-business agreement, both of which

were referenced by commenters, as discussed previously—meets this threshold is a fact-specific

inquiry. The Commission further notes that—like all the restrictive employment agreements

described in this Part III.D—non-solicitation agreements, no-hire, and no-business agreements

are subject to section 5's prohibition of unfair methods of competition, irrespective of whether

they are covered by the final rule.

 Depending on the facts and circumstances, a TRAP can also function to prevent a worker

---

[346] This example is based on *Brown v. TGS Mgmt.*, 57 Cal. App. 5th at 316-19 ("Collectively, these overly restrictive provisions [in the NDA at issue] operate as a de facto noncompete provision; they plainly bar Brown in perpetuity from doing any work in the securities field.").
[347] This example is based on *TLS Mgmt. & Mktg. Servs.*, 966 F.3d at 57 (holding that the NDA was unenforceable).

from working for another firm or starting a business. For example, one commenter cited a TRAP that required entry-level workers at an IT staffing agency who were earning minimum wage or nothing at all during their training periods to pay over $20,000 if they failed to complete a certain number of billable hours.[348] The commenter also cited a TRAP requiring nurses to work for three years or else repay all they have earned, plus paying the company's "future profits," attorney's fees, and arbitration costs.[349] These types of TRAPs may be functional non-competes because, faced with significant out-of-pocket costs for leaving their employment—dependent on the context of the facts and circumstances—workers may be forced to remain in their current jobs, effectively preventing them from seeking or accepting other work or starting a business.

In response to the comments, the Commission declines at this time to either categorically prohibit all TRAPs related to leaving employment, or to exempt such provisions altogether. The Commission agrees with comments raising substantial concerns about the potential effects of such agreements on competitive conditions. As noted in the summary of the comments, commenters cited TRAPs that impose penalties that are disproportionate to the value of training workers received and/or that claimed training expenses for on-the-job training. However, the evidentiary record before the Commission principally relates to non-competes, meaning on the present record the Commission cannot ascertain whether there are any legitimate uses of TRAPs that do not tend to negatively affect competitive conditions. When TRAPs function to prevent a worker from seeking or accepting other work or starting a business after the employment associated with the TRAP, they are non-competes under § 910.1.

The Commission notes that clauses requiring repayment of a bonus when a worker leaves their job would not be non-competes under § 910.1 where they do not penalize or function to

---

[348] Comment of Jonathan F. Harris, Dalié Jiménez, & Jonathan Glater, FTC-2023-0007-20873 at 4.
[349] *Id.* at 6-7.

prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job. For example, a provision requiring the repayment of a bonus if the worker leaves before a certain period of time would not be a non-compete under § 910.1 where the repayment amount is no more than the bonus that was received, and the agreement is not tied to who the worker can work for, or their ability to start a business, after they leave their job. Similarly, a term or condition under which a worker loses accrued sick leave when their employment ends would not function to prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job.

With respect to garden leave agreements, as noted previously, commenters used the term "garden leave" to refer to a wide variety of agreements. The Commission declines to opine on how the definition of non-compete clause in § 910.1 would apply in every potential factual scenario. However, the Commission notes that an agreement whereby the worker is still employed and receiving the same total annual compensation and benefits on a *pro rata* basis would not be a non-compete clause under the definition,[350] because such an agreement is not a post-employment restriction. Instead, the worker continues to be employed, even though the worker's job duties or access to colleagues or the workplace may be significantly or entirely curtailed. Furthermore, where a worker does not meet a condition to earn a particular aspect of their expected compensation, like a prerequisite for a bonus, the Commission would still consider the arrangement "garden leave" that is not a non-compete clause under this final rule even if the employer did not pay the bonus or other expected compensation. Similarly, a severance agreement that imposes no restrictions on where the worker may work following the

---

[350] The term and practice of "garden leave" appears to have a British origin and is recognized by the Government of the United Kingdom. *See* Gov.UK, *Handing in your notice*, https://www.gov.uk/handing-in-your-notice/gardening-leave ("Your employer may ask you not to come into work, or to work at home or another location during your notice period. This is called 'gardening leave'.").

employment associated with the severance agreement is not a non-compete clause under § 910.1, because it does not impose a post-employment restriction.

The Commission declines a commenter's request to replace the term "prevent" with "restrains" or "limits." Commenters generally did not express concern about the term "prevent" and the Commission is concerned that different language could greatly expand the scope of the definition and reduce its clarity.

The Commission also declines to adopt alternative *de facto* tests raised by commenters, such as a version of the "quick look" test. As described in Part II.F, the legal standard under section 5 of the FTC Act is distinct from that of the Sherman Act. The Commission also declines to adopt a test that would consider the primary purpose of a restrictive employment agreement. The Commission believes that it can be difficult to establish an employer's subjective "purpose" in entering into an agreement. In addition, such a test could allow extremely overbroad agreements that dramatically restrict a worker's ability to compete against the employer—and have the negative effects described in Parts IV.B and IV.C—as long as the employer entered into the agreement without the subjective intent to restrict competition.

The Commission agrees with the commenter who stated that proposed § 910.1(b)(2) was redundant because proposed § 910.1(b)(1) was already a functional definition. In the final rule, the Commission has revised the text of the definition of non-compete clause to address confusion among commenters about whether proposed § 910.1(b)(2) clarified the definition or extended it.

In response to the commenters requesting that the Commission clarify the circumstances under which the definition would apply to various other types of restrictive employment agreements, the Commission declines at this time to enumerate every circumstance that may arise. As noted, a restrictive employment covenant may be a non-compete clause under § 910.1 if

it expressly prohibits a worker from, or penalizes a worker for, seeking or accepting other work or starting a business, or if it does not do so expressly but is so broad or onerous in scope that it functionally has the same effect of preventing a worker from doing the same.

### 3. International Application of the Rule

#### a. Comments Received

The Commission received several comments expressing concern about whether the final rule would apply to non-competes that restrict work outside the U.S. In response, the final rule's definition of non-compete clause clarifies that it applies only to work in the U.S. or operating a business in the U.S.

Some commenters raised concerns about the cross-border movement of workers. A research center commenter asserted there is a global shortage of science and technology workers and stated that the final rule's adoption could exacerbate the U.S. shortage by allowing other countries to more easily poach U.S. workers. An academic commenter argued that banning non-competes might deter foreign investors from sending workers to the U.S. if the final rule would invalidate their non-competes.

Some commenters argued that legal systems in the People's Republic of China or other jurisdictions provide insufficient protection for U.S. companies' trade secrets, confidential information, or patent rights, and contended employers need non-competes as *ex ante* protection. These commenters generally say that trade secrets litigation is more challenging in some jurisdictions outside the U.S., for example because of less extensive discovery processes, less frequent use of preliminary injunctions, insufficient remedies, and a lower propensity to prosecute criminal intellectual property cases. An academic commenter argued that some courts may have fewer protections for confidential information compared to the U.S., so a suit

concerning only a non-compete is less likely to reveal trade secrets through the course of litigation and thus more effectively prevent technologies from leaking to other governments and protecting U.S. national security interests. However, the comments provided limited evidence on non-competes and trade secret protection outside the U.S., and collectively only discussed evidence from a few jurisdictions. One commenter noted that legal information and data from some jurisdictions may not be fully accurate because not all court decisions are public.

Two commenters highlighted the domestic semiconductor industry and the CHIPS Act of 2022, arguing the Chinese government seeks to acquire IP related to semiconductors and semiconductor experts with relevant knowledge and information. Those comments expressed concern that a ban on non-competes would damage the semiconductor industry, which relies on skilled workers and trade secrets, by weakening trade secrets protection and disincentivizing investment. Another commenter argued that the proposed rule would undermine export controls designed to prevent foreign countries from acquiring U.S. technology and knowledge by allowing workers to move to foreign competitors. One commenter argued the proposed rule conflicts with an October 2022 Bureau of Industry and Security ("BIS") export control rulemaking, stating that the rulemaking limits worker mobility in certain industries from the U.S. to the People's Republic of China. Another commenter suggested the proposed rule would violate the World Trade Organization's Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), which requires that persons "shall have the possibility of preventing information lawfully within their control from being disclosed to, acquired by, or used by others without their consent . . . ."[351] Finally, one commenter argued that by making it more difficult for

---

[351] Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, sec. 7, art. 39, para. 2, 33 I.L.M. 81 (as amended Jan. 23, 2017).

businesses to protect against international theft of their intellectual property, the rule is at odds

with the purposes of the Protecting American Intellectual Property Act of 2022.[352]

Some of these commenters made recommendations for the final rule. A law firm

suggested that the final rule prevent evasion by barring employers from selecting the law of non-

U.S. jurisdictions to govern employment contracts with U.S.-based workers. A trade association

requested that the final rule cover only agreements subject to the law of a U.S. State. An

academic commenter suggested revisions to the text of the proposed rule to ensure the final rule

applies only within the U.S. The commenter also recommended stating that a non-compete

restricting work outside the U.S. is not a *per se* unfair method of competition and providing

guidance on how employers should evaluate international non-competes, using factors such as

the business justification for the non-compete and the impact on the worker. The commenter

recommended applying the law of the jurisdiction where the worker seeks to be employed.

### b. The Final Rule

In response to commenters' concerns, in this final rule the Commission adopts changes to

the definition of "non-compete clause" that expressly limit the definition of non-compete to

terms or conditions that prevent workers from seeking or accepting work in the U.S. or operating

a business in the U.S. The final rule does not apply to non-competes if they restrict only work

outside the U.S. or starting a business outside the U.S.

This revision clarifies for stakeholders the scope of the final rule and confirms it does not

prohibit employers from using non-competes that restrict work outside the U.S., in compliance

with those jurisdictions' own laws. The Commission understands that, as a commenter noted,

some companies operating or competing globally already draft non-competes that comply with

---

[352] 50 U.S.C. 1709.

the laws of multiple jurisdictions and, thus, amending their non-competes to reflect this application of the final rule would not pose a significant challenge for those entities.

The Commission's revision clarifying the final rule's application to work or starting a business only in the U.S. also addresses the concerns from some commenters about key U.S. workers and technology flowing overseas, because the final rule does not ban non-competes that restrict workers from working or starting a business outside the U.S. It also clarifies that the final rule would not invalidate non-competes entered into by foreign companies with foreign workers unless they restrict a worker's ability to work or start a business inside the U.S. Other questions about the final rule's application to cross-border or non-U.S. employment are also addressed by the Foreign Trade Antitrust Improvements Act, codified at 15 U.S.C. 45(a)(3)

The Commission agrees with the academic commenter that, for non-competes that apply outside the U.S., the law of the relevant jurisdiction should govern any issue other than restricting work or starting a business in the U.S. However, the Commission declines to adopt a balancing test for non-competes restricting a worker's ability to work or start a business outside the U.S., as a bright-line rule that applies only to work or starting a business in the U.S. is more administrable. In addition, the Commission declines to add language in the final rule stating that it does not apply to overseas employers or to non-competes not subject to U.S. State law. The final rule may apply to overseas employers if the non-compete purports to restrict work or starting a business in the U.S. and the reviewing court applies U.S. law.

The empirical evidence cited in the NPRM focused on the U.S., primarily consisting of studies based on the effects of changes in State laws in the U.S. The comments provided limited evidence on non-competes and trade secret protection outside the U.S., leaving many issues and most jurisdictions unaddressed. The Commission also notes, as one commenter did, that legal

information and data from some jurisdictions may not be fully accurate because not all court decisions are public. On the current record, the Commission cannot reach conclusions on whether other jurisdictions have sufficient alternatives to non-competes, the scope of any potential risk, and many of the other issues raised. As a result, the Commission limits application of the final rule to work in the U.S., where the Commission has ample evidence on non-competes' negative effects.

One commenter argued the rule conflicts with BIS's October 2022 export control rulemaking, which restricts the ability of U.S. persons to support development or production at certain semiconductor facilities in the People's Republic of China without a license from BIS.[353] While the revision addresses the commenter's underlying concern about protection of sensitive technology from other governments by not banning non-competes that restrict the movement of workers to and in other jurisdictions, neither the NPRM nor the final rule is inconsistent with the BIS rule. The final rule will not affect BIS's ability to grant or decline to grant a license. With respect to the commenter that suggested the rule would violate TRIPS, the Commission has found that U.S. law provides alternative means of protecting trade secrets,[354] and TRIPS does not require enforcement of non-competes.

With respect to the commenter that stated that the final rule should include a choice-of-law provision to prevent evasion, there is an existing body of law in the U.S. governing choice of law and conflict of law issues. Accordingly, the Commission declines to add any provisions concerning choice of law or conflict of law to the final rule. Rather, such questions are left to the relevant jurisdiction, whether that is a U.S. State, the Federal government, or another

---

[353] Implementation of Additional Export Controls: Certain Advanced Computing and Semiconductor Manufacturing Items; Supercomputer and Semiconductor End Use; Entity List Modification, Interim Final Rule, 87 FR 62186 (Oct. 13, 2022).
[354] *See* Part IV.D.2.

jurisdiction, as determined by applicable law.

### 4. Other Issues Relating to the Definition

#### a. Comments Received

While most commenters focused on the proposed definition's application to functional non-competes or international application, some commenters addressed other issues relating to the proposed definition. Several commenters stated that the definition should cover workplace policies or handbooks, to minimize confusion and make clear that employers are prohibited from including non-competes in workplace policies or handbooks, even if such clauses are unenforceable because they are not formal binding contracts. Some commenters stated that such policies or handbooks can affect a worker's decision to leave their job to work with a competitor or start their own businesses. Others stated the same about oral agreements. One commenter stated that the definition should not cover workplace policies because they apply only during, not after, employment.

A few commenters said the Commission should state explicitly in the definition of "non-compete clause" that restrictions on concurrent employment, such as prohibitions on "moonlighting" with competitors, are excluded. Other commenters urged the Commission to expand the definition to include restraints on concurrent employment because workers often need to take additional jobs during economic downturns, and low-wage workers generally need to take on additional jobs.

An organized labor commenter argued that no-raid agreements, which the commenter described as agreements between labor organizations not to attempt to organize workers already under representation by another union, should be exempted from the definition. An industry trade organization asked the Commission to clarify whether the definition would apply to non-

competes in agreements between motor carriers and brokers in the trucking industry. In addition, a few commenters stated that proposed § 910.1(b)(1) was too broad or potentially ambiguous without pointing to any specific features of the definition.

### b. The Final Rule

To address the concerns raised by commenters about workplace policies and handbooks, the definition of non-compete clause in § 910.1 uses the phrase "a term or condition of employment" instead of "contractual term." The definition further clarifies that term or condition of employment includes "a contractual term or workplace policy, whether written or oral." The Commission finds that employers have used restrictions in handbooks, workplace policies, or other vehicles that are not formal written contracts to successfully prevent workers from seeking or accepting other employment or starting a new business. The Commission finds, consistent with the views expressed by commenters, that such restrictions in handbooks, workplace policies, or other such vehicles have the same tendency to negatively affect competitive conditions as a formal binding contract term. To provide that such conduct is covered by the definition of non-compete clause, this language clarifies that the definition of non-compete clause is not limited to clauses in written, legally enforceable contracts and applies to all forms a non-compete might take, including workplace policies or handbooks and informal contracts. Given the comments expressing concern about oral representations, the Commission clarifies in the definition of non-compete clause that clauses that purport to bind a worker are covered, whether written or oral, and provides in § 910.2(a)(1) and § 910.2(a)(2) that it is an unfair method of competition to make representations that a worker is subject to a non-compete. (However, as explained in Part V.C, such representations are not prohibited where the person has a good-faith basis to believe that the final rule is inapplicable.)

The Commission declines to extend the reach of the final rule to restraints on concurrent employment. Although several commenters raised this issue, the evidentiary record before the Commission at this time principally relates to post-employment restraints, not concurrent-employment restraints. The fact that the Commission is not covering concurrent-employment restraints in this final rule does not represent a finding or determination as to whether these terms are beneficial or harmful to competition. The Commission relatedly clarifies that fixed-duration employment contracts, *i.e.*, contracts between employers and workers whereby a worker agrees to remain employed with an employer for a fixed term and the employer agrees to employ the worker for that period, are not non-compete clauses under the final rule because they do not restrain post-employment conduct.

While the final rule does not extend to restraints on concurrent employment, the Commission has made a technical edit to the definition of non-compete to clarify how it relates to seeking and accepting employment. Proposed § 910.1(b) defined non-compete clause as a contractual term that "prevents the worker from seeking or accepting employment with a person . . . after the conclusion of the worker's employment with the employer." Because, as a technical matter, non-competes can also prevent workers from seeking or accepting future employment with another person before their work for their previous employer has concluded, the Commission has clarified the relevant language to read "that prevents a worker from seeking or accepting work in the United States with a different person *where such work would begin after* the conclusion of the employment that includes the term or condition" and "that prevents a worker from operating a business in the United States *after the conclusion of the employment* that includes the term or condition" (emphases added).

In addition, in response to comments expressing concern about evasion of the rule

through third-party hiring,[355] the Commission has revised the phrase "after the conclusion of the worker's employment with the employer" to read "after the conclusion of the employment that includes the term or condition." The Commission recognizes that non-competes can cover workers who are hired by one party but work for another, such as workers hired through staffing agencies. The Commission intends for the final rule to apply to such non-competes, and for this revision to eliminate any ambiguity as to whether such clauses are covered by the definition of non-compete clause in § 910.1.

With respect to the comment about union no-raid agreements, the Commission notes that the definition would apply only to the extent the agreement is a "term or condition of employment" and only if the agreement "prevents a worker from seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition" or "operating a business in the United States after the conclusion of the employment that includes the term or condition."[356] The Commission's understanding is that union no-raid agreements are not terms and conditions of employment that prevent workers from seeking or accepting work or operating a business.

With respect to the comment asking whether the definition would apply to non-competes in agreements between motor carriers and brokers in the trucking industry, the Commission notes as a general matter that the definition would not apply to non-competes between businesses, but the Commission declines to opine on specific factual circumstances.

## E.  Definition of "Person"

The proposed rule did not separately define the term "person." Instead, proposed § 910.1(c)—the proposed definition of "employer"—stated that an employer "means a person, as

---

[355] These comments are described in greater detail in Part III.G.
[356] § 910.1.

defined in 15 U.S.C. 57b-1(a)(6), that hires or contracts with a worker to work for the person."
The statutory provision cross-referenced in proposed § 910.1(c) is section 20(a)(6) of the FTC
Act, which defines "person" for purposes of the Commission's authority to issue civil
investigative demands. Section 20(a)(6) defines "person" as "any natural person,
partnership, corporation, association, or other legal entity, including any person acting under
color or authority of State law." No comments were received concerning the use of "person" in
proposed § 910.1(c).

As explained in Part III.C, the Commission has removed the defined term "employer"
from the regulatory text of the final rule. However, the regulatory text still uses the term
"person." For example, § 910.2(a)(1) prohibits a "person" from, among other things, entering
into a non-compete clause. As a result, the Commission has adopted a separate definition of the
term "person." Section 910.1 defines "person" as "any natural person, partnership, corporation,
association, or other legal entity within the Commission's jurisdiction, including any person
acting under color or authority of State law." This text consists of the proposed definition from
section 20(a)(6), plus the phrase "within the Commission's jurisdiction," which clarifies that
only persons within the Commission's jurisdiction are subject to the final rule.

### F.  Definitions Related to Senior Executives

With respect to existing non-competes, *i.e.*, non-competes entered into before the final
rule's effective date, the Commission adopts a different approach for "senior executives" than for
other workers. Existing non-competes with senior executives can remain in force; the final rule
does not cover such agreements.[357] For workers who are not senior executives, existing non-
competes are no longer enforceable after the final rule's effective date.[358] The Commission

---

[357] *See* Part IV.C.3.
[358] *See* § 910.2(a)(1)(i) .

describes its rationale for the final rule's differential treatment of senior executives in Part IV.C.

Section 910.1 defines the term "senior executive" as well as related terms. Because the Commission's rationale for the final rule's differential treatment of senior executives provides important context for these definitions, the Commission describes these definitions in Part IV.C.4.

## G. Definition of "Worker"

### 1. Proposed Definition

In the NPRM, the Commission proposed to define "worker" in proposed § 910.1(f) as "a natural person who works, whether paid or unpaid, for an employer."[359] Proposed § 910.1(f) also stated that "the term [worker] includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer."[360]

In the NPRM, the Commission explained that it intended the term "worker" to include not only employees, but also individuals classified as independent contractors, as well as other kinds of workers.[361] The Commission explained that, under proposed § 910.1(f), the term "worker" would include any natural person who works, whether paid or unpaid, for an employer, without regard to whether the worker is classified as an "employee" under the FLSA or any other statute that draws a distinction between "employees" and other types of workers.[362]

The Commission stated in the NPRM that it was concerned that if the rule were to define workers as "employees" according to, for example, the FLSA definition, employers may

---

[359] NPRM, proposed § 910.1(f).
[360] Id.
[361] Id. at 3511.
[362] Id.

95

misclassify employees as independent contractors to evade the rule's requirements.[363] The Commission explained it had no reason to believe non-competes that apply to workers who are treated as independent contractors under the FLSA or interns tend to negatively affect competitive conditions to a lesser degree than non-competes that apply to employees, and that such non-competes may, in fact, be more harmful to competition, given that these other types of workers tend to have shorter working relationships.[364] In addition, the Commission explained that the purported business justifications for applying non-competes to independent contractors would not be different or more cognizable from those related to employees.[365]

Proposed § 910.1(f) also stated that the term worker "does not include a franchisee in the context of a franchisee-franchisor relationship."[366] The Commission explained that the relationship between a franchisor and franchisee may in some cases be more analogous to the relationship between two businesses than the relationship between an employer and a worker, and that the evidentiary record before the Commission related primarily to non-competes arising solely out of employment.[367] The Commission therefore stated that it believed it would be appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a "worker" for purposes of proposed § 910.1(f).[368]

Proposed § 910.1(f) further clarified, however, that the term worker "includes a natural person who works for the franchisee or franchisor," and that "non-competes between franchisors and franchisees remain subject to [F]ederal antitrust law as well as all other applicable law."[369] The Commission explained that these laws include State laws that apply to non-competes in the

---

[363] *Id.*
[364] *Id.*
[365] *Id.*
[366] *Id.* at 3511, 3520.
[367] *Id.*
[368] *Id.*
[369] *Id.* at 3511.

franchise context.[370] The Commission also clarified that it was not proposing to find that non-competes between franchisors and franchisees are beneficial to competition.[371]

### 2. Comments Received

Several commenters stated that they agreed with the proposed definition of "worker" because it applies to all workers without regard to their classification. Many of these commenters specifically urged the Commission to adopt a final definition that includes all categories of workers regardless of whether they are classified as employees, including independent contractors, "gig" workers, and others. These commenters pointed to the Commission's preliminary finding that non-competes are widely used across the economy. They cited employers' frequent misclassification of workers as independent contractors, agreeing with concerns raised in the NPRM that, if "worker" excludes independent contractors, employers may misclassify workers as independent contractors to avoid complying with the rule. Many commenters stated that millions of workers are misclassified as independent contractors, including a disproportionate number of women, people of color, and low-income workers. These commenters expressed concern that, if the rule excluded independent contractors from coverage, it would fail to benefit these groups, for whom non-competes may be particularly exploitative and coercive.

On the other hand, several commenters suggested removing bona fide independent contractors and sole proprietors from the definition of "worker." Two industry groups contended that there is a lack of data regarding the prevalence and effects of non-competes among independent contractors as opposed to other kinds of workers and that, as a legal matter, the evidence is insufficient to justify including independent contractors as "workers" under the rule.

---

[370] *Id.*
[371] *Id.*

97

A few industry organizations also contended that, because they have more control over their work and generally work for more than one employer, independent contractors have greater bargaining power than other workers. One academic commenter suggested that non-competes between employers and independent contractors are more akin to agreements between businesses than agreements between employers and workers. A few of these industry organizations also contended that non-competes are justified because independent contractors provide services outside the scope of their employers' expertise and thus have greater access to sensitive information than other workers. Other industry organizations contended that small businesses employ more independent contractors than their larger rivals. These commenters stated that, to protect small businesses from being impacted disproportionately by the rule, the definition of "worker" should exclude independent contractors. Finally, a few industry trade organizations and an academic commenter stated that independent contractors should be excluded from coverage under the rule to avoid "free riding," in which a contractor working for one firm can use that firm's assets—like tools or databases—to benefit another firm.

Several commenters suggested changes to the definition of "worker" to maximize the rule's coverage and close potential loopholes. One worker advocacy group noted that, combined with the proposed definition of "employer," the proposed definition of "worker"—a natural person who works "for an employer"—appeared to exclude workers who work for a person other than the person who hired or contracted with them to work. The commenter noted that workers are often employed indirectly—by way of a contractual relationship with a staffing agency, an affiliate of their common-law employer, or some entity other than their common-law employer— and that non-competes are often imposed on workers by the non-hiring party. In order to ensure these workers are covered by the rule, the commenter suggested that the definition of "worker"

should also cover a person who works "directly or indirectly" for an employer and that the definition specifically include "a person who works for the employer under an arrangement with a professional employer organization, statutory employer, wholly owned entity of which the person is the sole or principal employee or service provider, loan-out arrangement or similar arrangement."

The same commenter also argued that employers often impose non-competes on workers who own a portion of the business while not applying the same restriction to outside investors who do not work for the company, and that such worker-owner non-competes should be treated as employment-related non-competes. In order to ensure these workers are covered by the rule, the commenter suggested that "worker" should also include "a person who holds direct or indirect equity or other interest in the employer and who provides services to or for the benefit of the employer." Another commenter suggested that, for clarity, "worker" should specifically exclude a "substantial owner, member or partner" as defined in the sale-of-business exception.

Several State attorneys general, local government commenters, academic commenters, and a worker advocacy group warned that categorically excluding franchisees from the definition of "worker" would lead employers to misclassify workers as franchisees to evade the rule's requirements. Some commenters suggested incorporating the "ABC" test—a common law test designed to determine whether a worker is an employee based on fact-specific conditions—into the definition of "worker" to prevent evasion.[372]

Some commenters requested that the Commission revise the definition of "worker" to exclude or include certain workers from coverage under the rule. These comments are addressed in Part IV.C (comments requesting an exclusion for senior executives) and in Part V.D

---

[372] *See, e.g.*, *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 955-957 (Cal. 2018).

(comments requesting exclusions for other categories of workers).

### 3. The Final Rule

After considering the comments, the Commission revised the definition of "worker" in three ways to clarify that the term covers all current and former workers, regardless of which entity hired or contracted with them to work, and regardless of a worker's title or status under any other applicable law.

First, the Commission added "or who previously worked" to the basic definition of "worker" as "a natural person who works." This revision is designed to clarify that former workers are considered "workers" under the final rule, such as where an employer is required to notify a former worker that their non-compete is no longer enforceable.[373]

Second, the Commission removed "for an employer" from the definition. This revision is designed to ensure that the final rule covers workers who are hired by one party but work for another, closing the unintended loophole identified by commenters regarding third-party hiring.

Third, the Commission added "without regard to the worker's title or the worker's status under any other State or Federal laws" prior to the list of examples of different categories of workers that the definition covers. This change is designed to make more explicit that the term "worker" includes all workers regardless of their titles, status under other laws, or the details of the contractual relationship with their employer.

The Commission has made two additional changes to the definition for clarity. First, the Commission has revised the phrase "individual classified as an independent contractor" to "independent contractor." Second, the Commission has added "a natural person who works for a franchisee or franchisor" to the non-exclusive list of examples of types of workers that would be

---

[373] *See* § 910.2(b).

covered by the definition. This language is simply moved from elsewhere in the definition. Third, the Commission has removed the sentence reading "[n]on-competes between franchisors and franchisees would remain subject to Federal antitrust law as well as all other applicable law" from the definition to avoid the implication that only such non-competes remain subject to Federal antitrust law and other applicable law.

The Commission declines to specify that a "worker" includes an owner who provides services to or for the benefit of their business because the definition already encompasses the same.

The Commission is not persuaded by commenters' arguments that independent contractors or sole proprietors are inherently different from other kinds of workers with respect to non-competes, and therefore declines to exclude them from the definition of "worker." Commenters did not present persuasive evidence that non-competes that apply to independent contractors or sole proprietors tend to negatively affect competitive conditions to a lesser degree—or are restrictive, exclusionary, exploitative, or coercive to a lesser degree—than non-competes that apply to other workers. As noted by commenters who supported including independent contractors, non-competes' tendency to negatively affect competitive conditions by restricting workers' ability to change jobs or start businesses is not contingent on whether the worker is an employee or an independent contractor. While some commenters contended that independent contractors have more independence and more access to intellectual property than other workers, commenters did not provide evidence that this is the case. Moreover, even were this to be true, it would not justify an exclusion, because the Commission generally declines to exclude workers based on their access to intellectual capital or their independence for the reasons explained in Part V.D.

Furthermore, whether a worker is an employee or an independent contractor does not impact employers' ability to exploit imbalances of bargaining power or limit employers' ability to use less restrictive alternatives to non-competes to protect their intellectual property. While commenters who supported excluding independent contractors contended that independent contractors have more bargaining power than other workers, this contention is not backed by evidence. While some economists hypothesize that, theoretically, independent contractors may have more bargaining power *vis-à-vis* employers than employees do, they do not provide empirical evidence to support that assertion. Furthermore, as described by a report from the Treasury Department that was based on an extensive literature review, independent contractors may have less bargaining power than employees in many respects.[374]

The Commission is also not persuaded that non-competes are necessary to prevent "free riding" by independent contractors who use one firm's assets to benefit another. The final rule prohibits agreements that restrain a worker from working after the scope of employment has ended and does not prohibit agreements which prevent a worker from working for two firms simultaneously. In addition, any "free riding" may be addressed through less restrictive means, including through agreements prohibiting an independent contractor from using assets provided by one firm to benefit another.

Nor is the Commission persuaded that small businesses will be disproportionately harmed by a rule which prohibits non-competes for independent contractors. Commenters did not provide evidence to support their assertion that small businesses employ more independent contractors than larger ones.

The Commission agrees with the commenters who contended that excluding independent

---

[374] U.S. Treasury Dep't, Report, *The State of Labor Market Competition* (Mar. 7, 2022) (hereinafter "Treasury Labor Market Competition Report").

contractors may have the effect of excluding misclassified workers, who may be among the most vulnerable to exploitation and coercion. The recent overview by the U.S. Department of Labor ("DOL") of the evidence on misclassification led it to conclude that although the prevalence of misclassification of employees as independent contractors is unclear, there is evidence that it is nonetheless "substantial" and has a disproportionate effect on workers who are people of color or immigrants because of the disparity in occupations most affected by misclassification, which include jobs in construction, trucking, delivery, home care, agriculture, personal care, ride-hailing services, and janitorial and building services.[375] The Commission also agrees with commenters that contended that excluding independent contractors from the definition of "worker" could increase employers' incentive to misclassify workers as independent contractors. Indeed, misclassification is often motivated by attempts to evade the application of laws.

Because there is no reason to believe that non-competes that apply to independent contractors or sole proprietors tend to negatively affect competitive conditions to a lesser degree, or are restrictive, exclusionary, exploitative, or coercive to a lesser degree, than non-competes that apply to employees—and in light of substantial evidence of widespread employee misclassification—the Commission declines to exclude independent contractors from the definition of "worker." For this reason, the Commission also declines to incorporate the "ABC" test or other tests designed to differentiate between independent contractors and employees.

## IV. Section 910.2: Unfair Methods of Competition

### A. Introduction

#### 1. Overview of the Commission's Findings and Determinations

In the NPRM, the Commission proposed to categorically ban employers from using non-

---

[375] Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 FR 1638, 1735 (Jan. 10, 2024).

competes with all workers, including existing agreements. However, the Commission sought comment on whether it should adopt different standards for non-competes with senior executives, and, if so, how it should define senior executives.[376] Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that non-competes with all workers are an unfair method of competition—although its rationale differs with respect to workers who are and are not senior executives.

The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for employers to, inter alia, enter into non-competes with workers on or after the final rule's effective date.[377] The Commission thus adopts a comprehensive ban on new non-competes with all workers. With respect to existing non-competes, *i.e.*, non-competes entered into before the final rule's effective date, the Commission adopts a different approach for senior executives[378] than for other workers. Existing non-competes with senior executives can remain in force; the final rule does not cover them.[379] For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[380] Employers must provide such workers with existing non-competes notice that the non-competes will not be enforced after the final rule's effective date.[381]

Specifically, with respect to workers who are not senior executives, the Commission determines that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause; or represent to

---

[376] NPRM at 3519.
[377] *See* § 910.2(a)(1)(i) and § 910.2(a)(2)(i).
[378] *See* § 910.1 (defining "senior executive").
[379] *See* Part IV.C.3.
[380] *See* § 910.2(a)(1)(ii) and § 910.2(a)(1)(iii).
[381] *See* § 910.2(b).

the worker that the worker is subject to a non-compete clause.[382] The Commission finds that with respect to these workers, these practices are unfair methods of competition in several independent ways:

- The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets.

- The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets.

- The use of non-competes is exploitative and coercive conduct that tends to negatively affect competitive conditions in labor markets.

- The use of non-competes is exploitative and coercive conduct that tends to negatively affect competitive conditions in product and service markets.

In contrast, with respect to senior executives, the Commission determines that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause entered into after the effective date; or represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date. The Commission does not find that non-competes with senior executives are exploitative and coercive. With respect to senior executives, the Commission finds that non-competes are unfair methods of competition in two independent ways:

- The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets.

- The use of non-competes is restrictive and exclusionary conduct that tends to negatively

---

[382] *See* § 910.2(a)(1).

affect competitive conditions in labor markets.

The final rule allows existing non-competes with senior executives to remain in force. Because the harm of these non-competes is principally that they tend to negatively affect competitive conditions (rather than exploiting or coercing the executives themselves), and due to practical concerns with extinguishing existing non-competes for such executives, the final rule prohibits employers only from entering into or enforcing new non-competes with senior executives.

Parts IV.B and IV.C set forth the findings that provide the basis for the Commission's determinations that the foregoing practices are unfair methods of competition under section 5 for these two categories of workers, respectively.[383] In these sections, the Commission also describes and responds to comments regarding the preliminary findings in the NPRM that informed its preliminary determinations related to unfair methods of competition.

## 2. Analytical Framework for Assessing Empirical Evidence

Before turning to the basis for its findings, the Commission describes the analytical framework it has applied in assessing the empirical evidence on non-competes. In the NPRM, the Commission discussed the existing empirical literature on non-competes and its assessment of those studies, including its preliminary view of which studies were more robust and thus should be given more weight.[384] In response, some commenters argued that the Commission gave too much weight to certain studies or too little weight to others.[385]

---

[383] In addition to the findings described in Parts IV.B and C, the Commission finds that the use of non-competes by employers substantially affects commerce as that term is defined in section 5 and burdens a not insubstantial portion of commerce. The findings in Parts IV.B and C apply with respect to senior executives and other workers, whether considered together or respectively. The evidence establishes that non-competes affect labor mobility, workers' earnings, new business formation, and innovation, including empirical evidence specifically identifying cross-border effects with respect to earnings, *see infra* notes 464-468 and accompanying text, and innovation, *see infra* note 563 and accompanying text.

[384] *See* NPRM at 3484-93.

[385] The Commission discusses comments addressing specific studies in Parts IV.B, IV.C, and IV.D.

The Commission notes that the methodologies of empirical studies on the effects of non-competes vary widely. In this final rule, based on the Commission's longstanding expertise assessing empirical evidence relating to the effects of various practices on competition, the Commission gives more weight to studies with methodologies that it finds are more likely to yield accurate, reliable, and precise results. In evaluating studies, the Commission utilized the following five principles that reflect best practices in the economic literature.

First, the Commission gives more weight to studies examining the effects of a change in legal status or a change in the enforceability of non-competes, and less weight to studies that simply compare differences between workers who are subject to non-competes and those who are not. Studies that look at what happens before and after a change in State law that affects the enforceability of non-competes provide a reliable way to study the effects of the change. This is especially true when only the enforceability of non-competes changes, and not other factors affecting firms and workers. If other substantial changes do not also occur around the same time, this study design often allows the researcher to infer that the change *caused* the effects—since the likelihood that confounding variables are driving the effects or outcomes is minimal.[386]

In contrast, other studies of the use of non-competes compare a sample of workers who are subject to non-competes with a sample of workers who are not subject to non-competes. The shortcoming of these studies is that they cannot easily differentiate between correlation and causation. For example, if such a study shows that workers with non-competes earn more, there

---

[386] In Parts IV.B and C, the Commission describes how these "enforceability" studies show that increased enforceability of non-competes results in various harms, such as reduced earnings, new business formation, and innovation. Notably, the available evidence also shows that workers are chilled from engaging in competitive activity even where a non-compete is likely unenforceable—for example, because they are unaware of the law or unable to afford a legal battle against the employer. *See* Part IV.B.3.a.i. The fact that many workers may *not* adjust their behavior in response to changes in State-level enforceability of non-competes suggests that the final rule could result in even greater effects than those observed in the research, particularly because it would require employers to provide workers with notice that their non-compete is no longer in effect, which would help correct for workers' lack of knowledge of the law. *See* § 910.2(b).

could be many confounding reasons for this result. For example, employers may be more likely to enter into non-competes with workers who earn more. In contrast, a study showing that workers' earnings increase or decrease when non-competes are made more or less enforceable provides much stronger evidence regarding the effect of non-competes, in isolation. Researchers studying non-competes are aware of this bias and frequently caution that estimates of the correlation between outcomes and the use of non-competes should not be misinterpreted as causal.[387]

Second, the Commission gives more weight to studies examining the effects of changes in non-compete enforceability and less weight to studies that simply compare economic outcomes between States where non-competes are more enforceable and States where non-competes are less enforceable. This latter category of studies is known as "cross-sectional studies of enforceability." Like studies based on the use of non-competes, these cross-sectional studies of enforceability cannot easily differentiate between correlation and causation. This is because differences between States that are unrelated to non-competes and their enforceability can easily pollute comparisons. For example, non-competes are less enforceable in California than in Mississippi, and the cost of living is higher in California than in Mississippi. However, the difference in the cost of living is likely to be due to underlying differences between the economies and geographies of the two States, rather than being attributable to non-competes. In contrast, studies examining how *changes* in enforceability of non-competes affect various outcomes—studies that look at what happens within States before and after a change in State law

---

[387] *See, e.g.*, Starr, Prescott, & Bishara, *supra* note 68 at 73 ("Our analysis of the relationships between noncompete use and labor market outcomes . . . is best taken as descriptive and should not be interpreted causally."); Johnson & Lipsitz, *supra* note 80 at 711 ("These regressions [of firm investment on non-compete use] should be interpreted as correlations rather than causation, since the decisions to make these investments and use [non-competes] are made jointly.").

that affects the enforceability of non-competes—allow researchers to infer that the change caused the effects.[388]

Despite having this limitation, the Commission believes that cross-sectional studies of enforceability are still superior to the "use" studies described under the first principle. This is because although comparisons of different States *may* have unreliable results due to confounding variables—depending on which States are compared—"use" studies are inherently unreliable due to confounding effects. For example, because employers enter into non-competes more often with highly paid workers, all "use" studies related to worker earnings are inherently unreliable, although studies that utilize data on the use of non-competes but employ a design that plausibly identifies a causal effect may be less unreliable.

Third, the Commission gives more weight to studies assessing changes in the enforceability of non-competes in multiple States. This reduces the possibility that the observed change in economic outcomes was driven by an idiosyncratic factor unique to a particular State. For example, assume State X changed its laws to make non-competes less enforceable, and new business formation subsequently increased compared with other States. However, around the same time it changed its non-compete law, State X also enacted legislation to provide attractive tax incentives to entrepreneurs. It would be difficult to isolate the effect of the change in non-compete law from the effect of the tax law change. For this reason, the Commission gives more weight to studies that analyze the effects of multiple changes in enforceability. For example, if a study shows that, compared with other States that did not change their non-compete laws, new business formation rose not only in State X, but also in several other States that changed their

---

[388] Matthew S. Johnson, Kurt J. Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility,* Nat'l Bureau of Econ. Rsch. 2 (2023) ("…cross-sectional variation in enforceability might be correlated with other unobserved differences across states.").

laws to make non-competes less enforceable, the Commission would be more confident inferring that changes in non-compete law caused these effects.

Fourth, the Commission gives more weight to studies that use sophisticated, nuanced measures of enforceability, such as non-binary measures of non-compete enforceability that capture multiple dimensions of non-compete enforceability. This fourth guiding principle ensures accuracy and granularity in the measurement of non-compete enforceability.

There are a variety of different factors that affect the enforceability of non-competes from State to State, including (among others) the permissible geographic scope and duration of non-competes and how high the employer's burden of proof is to establish that a non-compete is enforceable. Given the different factors involved, the overall level of non-compete enforceability from State to State falls along a spectrum; it is not as simple as whether non-competes are enforceable or not. Thus, scales which use binary measures miss nuance between States. This is true for enforceability overall (*e.g.*, scales which simply assign States to "enforcing" or "non-enforcing" categories) and for elements of enforceability (*e.g.*, scales which assess whether a non-compete is enforceable if a worker is fired with a yes or no answer). While no scale is perfect, scales which allow for multidimensionality and granularity measure non-compete enforceability (and thus the effects that stem from it) with a higher degree of accuracy.[389]

Fifth, the Commission gives more weight to studies in which the outcome studied by the researchers is the same as the outcome the Commission is interested in or is an effective proxy for the outcome the Commission is interested in. It gives less weight to studies that use ineffective proxies. For example, some outcomes are relatively easy to study. There is extensive data on workers' earnings at the State level, so researchers can simply use this data to study how

---

[389] Jonathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. Chi. L. Rev. 953 (2020).

changes in non-compete enforceability affect workers' earnings in a State. Other outcomes, however, may be more challenging to quantify directly, and thus researchers may use proxies for understanding the effect they are studying. For example, there is no single metric that measures innovation in the economy. For this reason, to learn about how non-competes affect innovation, a researcher might study the effect of changes in non-compete enforceability on the number of patents issued in the State as a proxy for innovation. However, proxies can sometimes be ineffective or inapt. For example, a study that analyzes the effect of non-compete enforceability on the number of patents issued is generally a weaker proxy for innovation than a study that also takes into account the quality of patents issued. For this reason, the Commission gives more weight to studies that measure the exact outcome of interest or studies that use effective proxies.

While these five guiding principles are important indicators of the relative strength of empirical studies evaluated by the Commission for the purpose of this final rule, the Commission's assessment of empirical studies was holistic and relied on its economic expertise. In addition to the guiding principles described in this Part IV.A.2, the Commission's holistic, expert assessment of the empirical evidence also included considering characteristics of studies important in any context, such as data quality, statistical precision, and other factors.

In some instances, the Commission cites studies beyond those discussed in the NPRM. The Commission cites such studies only where they check or confirm analyses discussed in the NPRM, or where the Commission is responding to comments raising them. The Commission's findings do not rest on these studies, however, and they are not necessary to support its findings.

## B. Section 910.2(a)(1): Unfair Methods of Competition—Non-Competes with Workers Other Than Senior Executives

The Commission now turns to the basis for its findings that non-competes with workers

other than senior executives are an unfair method of competition. As explained in Part II.F, under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace, and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness, and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.

Non-competes with workers other than senior executives satisfy all the elements of the section 5 inquiry.[390] As described in Part IV.B.2, such non-competes are facially unfair because they are restrictive and exclusionary, and because they are exploitative and coercive. And as described in Part IV.B.3, such non-competes tend to negatively affect competitive conditions in labor markets and markets for products and services. As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a *tendency* to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused *actual* harm in a specific instance. Here, the tendency of non-competes to impair competition is obvious from their nature and function. And even if this tendency were not facially obvious, the evidence confirms that non-competes do in fact have a negative effect on competitive conditions.

The Commission finds that the empirical research described in this Part IV.B supports findings related to workers other than senior executives.[391]

### 1. The Commission Finds That Non-Competes Are a Method of Competition, Not a

---

[390] For the sake of readability, in this Part IV.B, the Commission refers to non-competes with workers other than senior executives as "non-competes."

[391] Some of the studies described in Part IV.B analyze non-competes between employers and workers across the labor force. Other studies analyze non-competes with particular populations of workers. In each of the studies described in Part IV.B, non-competes with workers other than senior executives represented a large enough segment of the sample that the study supports findings related to the effects of non-competes for such workers. Studies that focus primarily on non-competes for senior executives are described in Part IV.C, which explains the Commission's findings related to non-competes with senior executives.

**Condition of the Marketplace**

With respect to the first element, whether the conduct is a method of competition, the Commission preliminarily found in the NPRM that non-competes are a method of competition under section 5 because they are specific conduct undertaken by an actor in a marketplace, as opposed to merely a condition of the marketplace.[392] No commenters disagreed with this finding, and the Commission reaffirms its preliminary finding that non-competes are a method of competition.

### 2. The Commission Finds That Non-Competes Are Facially Unfair Conduct

The Commission finds that non-competes are facially unfair conduct under section 5 because they are restrictive and exclusionary. The Commission further finds that non-competes are facially unfair under section 5 because they are exploitative and coercive.

### a. Non-competes are restrictive and exclusionary conduct.

Under section 5, indicia of unfairness may be present where conduct is restrictive or exclusionary, provided that the conduct also tends to negatively affect competitive conditions.[393] In the NPRM, the Commission explained that non-competes are restrictive conduct.[394] No commenters disputed this analysis, and the Commission reaffirms its preliminary finding that non-competes are restrictive.

The restrictive nature of non-competes is evident from their name and function: Non-competes restrict competitive activity. They do so by restricting a worker's ability to seek or accept other work or start a business after the worker leaves their job, and by restricting competitors from hiring that worker. Because non-competes facially restrict competitive activity,

---

[392] NPRM at 3504.
[393] *See* Part II.F.
[394] NPRM at 3500.

courts have long held they are restraints of trade and proper subjects for scrutiny under the antitrust laws.[395]

The restrictions that non-competes impose on workers are often substantial. Non-competes can severely restrict a worker's ability to compete against a former employer. For most workers, the most natural alternative employment options are jobs in the same geographic area and in the same field. These are the very jobs that non-competes typically prevent workers from taking. Furthermore, for most workers, the most practical entrepreneurship option is starting a business in the same field. This is the very opportunity that non-competes typically prevent workers from pursuing. Moreover, the record before the Commission reflects that non-competes are often so broad as to force a worker to sit out of the labor market altogether.

In the NPRM, the Commission used the term "restrictive" to encompass both restrictive and exclusionary conduct.[396] In this final rule, in addition to finding that they are restrictive conduct, the Commission separately finds that non-competes are exclusionary conduct because they tend to impair the opportunities of rivals. Where a worker is subject to a non-compete, the ability of a rival firm to hire that worker is impaired. In addition, where many workers in a market are subject to non-competes, the ability of firms to expand into that market, or entrepreneurs to start new businesses in that market, is impaired.

For the foregoing reasons, the Commission finds that the use of non-competes with

---

[395] *See, e.g.*, *Am. Tobacco Co.*, 221 U.S. 106, 181-83 (1911) (holding that several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-competes); *Newburger, Loeb & Co., Inc.*, 563 F.2d 1057, 1082 (2d Cir.) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).
[396] NPRM at 3500 ("Non-competes also restrict rivals from competing against the employer to attract their workers.").

workers other than senior executives is facially unfair under section 5 because it is conduct that is restrictive or exclusionary.

### b. Non-competes are exploitative and coercive conduct.

Conduct may violate section 5 where it is exploitative or coercive and tends to negatively affect competitive conditions.[397] Indeed, where conduct is exploitative or coercive, it evidences clear indicia of unfairness, and less may be necessary to show a tendency to negatively affect competitive conditions.[398]

In the NPRM, the Commission preliminarily found that non-competes with workers other than senior executives were exploitative and coercive because in imposing them on workers, employers take advantage of their unequal bargaining power.[399] The Commission also preliminarily found that non-competes are exploitative and coercive at the time of the worker's potential departure, because they force a worker to either stay in a job the worker wants to leave or force the worker to bear other significant harms and costs, such as leaving the workforce or their field for a period of time; relocating to a different area; violating the non-compete and facing the risk of expensive and protracted litigation; or attempting to pay the employer to waive the non-compete.[400]

The Commission received an outpouring of comments on the question of whether non-competes were exploitative or coercive. Thousands of workers described non-competes as pernicious forces in their lives that took advantage of their lack of bargaining power and forced them to make choices that were detrimental to their finances, their careers, and their families. Above all, the predominant themes that emerged from the comments were powerlessness and

---

[397] *See* Part II.F.
[398] *See id.*
[399] NPRM at 3502-04.
[400] *Id.* at 3504.

fear.

Thousands of workers reported feeling powerless to avoid non-competes, either because the worker needed the job or because non-competes were pervasive in the worker's field. Hundreds of workers reported that non-competes were unilaterally imposed on them. Workers overwhelmingly reported that they did not bargain over non-competes, did not receive compensation for non-competes, and were not represented by counsel in connection with non-competes, with only rare exceptions.

And hundreds of workers reported that even where they wanted a job with better pay or working conditions, or to strike out on their own, the fear of litigation from a deep-pocketed employer or the fear of being without work prevented them from doing so. Hundreds of workers described how this fear coerced them into remaining in jobs with poor conditions or pay, including dangerous or toxic work environments; into leaving an industry or profession that they invested, trained, studied, or were experienced in, damaging or derailing their careers; into moving away from their home, uprooting or separating their families; or into enduring long-distance commutes, which made it harder to care for and spend precious time with their loved ones. Many workers described how this fear hung above them even if they thought the non-compete was overbroad and probably unenforceable under State law, because having to defend a lawsuit from an employer for any length of time would devastate their finances.

Based on the entirety of the record, for the following reasons, the Commission finds non-competes with workers other than senior executives are exploitative and coercive because they are unilaterally imposed by a party with superior bargaining power, typically without meaningful negotiation or compensation, and because they trap workers in worse jobs or otherwise force workers to bear significant harms and costs.

116

### i. Non-competes with workers other than senior executives are unilaterally imposed.

The Commission finds that employers almost always unilaterally impose non-competes, exploiting their superior bargaining power to impose—without any meaningful negotiation or compensation—significant restrictions on a worker's ability to leave for a better job or to engage in competitive activity.

The Commission finds that employers have significantly more bargaining power than workers. Most workers, especially workers other than senior executives, depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and put food on the table. The loss of a job or a job opportunity can severely damage workers' finances and is far more likely to have serious financial consequences for a worker than the loss of a worker or a job candidate would have for most employers.

The Treasury Department, in a report based on an extensive literature review, finds that firms generally have considerable labor market power.[401] The report states that concentration in particular industries and locations can increase employers' labor market power.[402] However, the report explains that, even in the absence of concentration, firms have significant labor market power due to a variety of factors.

As the report notes, some of these factors are inherent in the firm-worker relationship. The report states that workers are at an informational disadvantage relative to firms, often not knowing what other workers earn or the competitive wages for their labor.[403] The report states further that workers often have limited or no ability to switch locations and occupations quickly

---

[401] Treasury Labor Market Competition Report, *supra* note 374 at i-ii.
[402] *Id.* at i.
[403] *Id.*

117

and may lack the financial resources to support themselves while they search for jobs that pay more and better match their skills and abilities.[404] According to the report, these conditions often enable firms to exert market power even in labor markets that are not highly concentrated.[405]

In addition to factors inherent to the employer-worker relationship, the report concludes that firms use a wide range of practices to restrain competition for workers, including sharing wage information and conspiring to fix wages with other firms; agreeing not to hire other firms' workers; and adopting non-competes, mandatory arbitration agreements, and overbroad NDAs.[406] The report also states that practices such as outsourcing and worker misclassification have further diminished workers' market power.[407] Overall, the report finds that employers' labor market power has resulted in a 20% decrease in wages relative to the level in a fully competitive market.[408]

The Commission finds that employers are able to exploit their considerable labor market power—and indeed routinely do so—with respect to non-competes imposed on workers other than senior executives. Employers are repeat players who are likely to have greater experience and skill at bargaining than individual workers in the context of negotiating employment terms such as non-competes.[409] Research has found that employers present non-competes in standard-form contracts,[410] which workers are unlikely to read,[411] and that workers rarely bargain over

---

[404] *Id.*
[405] *Id.*
[406] *Id.*
[407] *Id.* at ii.
[408] *Id.*
[409] *See, e.g.*, *Samuel Stores, Inc. v. Abrams*, 108 A. 541, 543 (Conn. 1919); *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 753 (Del. Ct. Chancery 2023).
[410] Starr, Prescott, & Bishara, *supra* note 68 at 72 ("Taken together, the evidence in this section indicates that employers present (or employees receive) noncompete proposals as take-it-or-leave-it propositions.").
[411] *See, e.g.*, Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 Harv. L. Rev. 1173 (1983); Russell Korobkin, *Bounded Rationality, Standard-Form Contracts, and Unconscionability*, 70 U. Chi. L. Rev. 1203, 1217 (2003).

non-competes and rarely seek the assistance of counsel in reviewing non-competes.[412] Many
workers also lack the legal training or legal knowledge necessary to understand whether a
particular non-compete is enforceable or the consequences of entering into a non-compete. The
available evidence indicates that many workers are not aware of the applicable law governing
non-competes or their rights under those laws.[413] Research has also found that employers exploit
their power over workers by providing them with non-competes after they have accepted the job
offer—and in many cases, on or after their first day of work—when the worker's negotiating
power is at its weakest, since the worker may have turned down other job offers or left their
previous job.[414]

The comment record provides strong support for the Commission's finding that non-
competes are coercive and exploitative because they are typically unilaterally imposed by
employers on workers other than senior executives. Illustrative examples of the comments the
Commission received include the following:

- I am a practicing OB/GYN physician in Shreveport, LA. . . . I was put into a non-
  negotiable, vague non-compete with NO expiration date. . . . I needed a job. I was in a
  large amount of debt with accumulating interest during my four years of residency with a
  minimal salary. Honestly, I could not afford an attorney. So naively I trusted that the
  people that had been training me for the past 4 years would not take advantage of me in a
  contract. I did not have the ability to seek advice on "how" to negotiate a contract with
  my mentors since my mentors were the ones who wrote the contract.[415]

- As [a] physician who recently negotiated a new contract, I support FTC changes to the
  non-compete rules. . . . All three institutions [I considered working for] had unreasonable
  and onerous non-competes. Essentially making it impossible to get another job in the
  entire state of NJ – not just a few mile radius but two thirds of the state. . . . Non-
  competes are never negotiable even when hiring a lawyer to review and negotiate the
  contract. Hospitals refused to negotiate on the majority of the contract citing it is [an]

---

[412] Starr, Prescott, & Bishara, *supra* note 68 at 72.
[413] J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability*, Forthcoming, J. L. Stud. 10-11
(2022).
[414] Marx (2011), *supra* note 81 at 706.
[415] Individual commenter, FTC-2023-0007-4414.

across the board provision that cannot be altered.[416]

- I'm a worker that has had to consider whether to take a job that requires signing a no-compete agreement . . . . Several times in my career, after weeks of interviewing and salary negotiation, I've found myself facing a required no-compete agreement that would drastically limit my future career options and negotiating power. Several times I've accepted these agreements because I had already turned down competing offers and found myself with limited options.[417]

- I'm a project manager at an Interior Design & Home Staging company in Manhattan; we're the largest staging company on the East Coast. After I accepted my job offer and went in to file paperwork, I was very briefly walked through what this non-compete means (the details were not made entirely clear; I believe they left it intentionally murky) and it was buried deep in the new employee rules and regulations packet I needed to read and sign at my onboarding. I personally am very against these agreements because, as mine states, I cannot work with "a competing staging company" or for any of the clients of my current company. Again, we're the largest staging firm on the east coast and have a lot of clients (we do over 100 stagings per year). Essentially, I am completely shut out of working in the industry in NYC as there are only a handful of other staging companies that can pay me a living wage to do so.[418]

- You might say that we might be able to negotiate out of a non-compete in our contract, but that is simply not true. In my hospital, I was already established, owning a house and having kids in school in a spouse in a career when the Hospital came forward and sit on my next contract renewal that I had no choice, but to sign a noncompete. They had me over a barrel. At my next contract negotiation, I try to negotiate out of the noncompete, with less salary or less benefits, and it was a nonstarter. There is zero tolerance for negotiating out of the noncompete.[419]

- At the end of 2018, as a Manager at a small business (150 employees) in a niche technology industry, I was offered shares in our company as we were acquired by a Private Equity firm. . . . I worked with a company-provided attorney on an Employment Agreement. This agreement offered a 6-month severance with a 1-year non-compete period, which I negotiated down to a 6-month non-compete to match the severance period. Later that month, I was sent an additional, previously unseen 120-page Share Agreement that governed how I would vest the shares I had earned. I didn't realize it at the time, but buried toward the end of this document was another non-compete that had a much longer timeframe dictated - 1 year from when I no longer held any shares. As it would potentially take up to 6 years for the company to sell again, that meant an incredibly long and indefinite sounding time period. I was given only one business day to review this agreement, and was sent a signature packet the following day. I honestly thought I was signing my Employment Agreement negotiated with a company attorney,

[416] Individual commenter, FTC-2023-0007-10547.
[417] Individual commenter, FTC-2023-0007-12428.
[418] Individual commenter, FTC-2023-0007-12480.
[419] Individual commenter, FTC-2023-0007-14706.

not the share agreement that neither myself nor the attorney had reviewed, and which I had only received the day prior.[420]

- Desperate to obtain an entry level job in the Accounting field in which I am currently obtaining my Associate's degree, I was presented with an offer of employment and a non-compete agreement contract to sign. Because I needed to pay rent, I signed it.[421]

- On the first day of my husband's employment, without prior notice, an extensive 2 year non-compete clause was put in his employment contract and while it was noted within the clause he could seek counsel, when you are in the middle of your first day of work it's not practical. In addition, for most people, if it is your first experience with a non-compete, you likely do not have the funds to pay a $750 per hour lawyer to advise and negotiate on your behalf, nor realize the possible long-term consequences.[422]

Many commenters agreed with the Commission's preliminarily finding that employers generally have considerable labor market power. Even commenters opposing the NPRM did not generally dispute the notion that there is unequal bargaining power between employers and workers. Many workers stated that non-competes are pervasive in their industry, meaning they could not find a job without one. Many commenters stated that high wages or skills do not automatically translate into more bargaining power or sufficiently mitigate the harms from non-competes, especially in concentrated markets or markets where so many employers use non-competes that workers effectively have no choice but to sign them. Commenters also said that underrepresented groups may have even less bargaining power to negotiate non-competes and are less likely to have the resources for litigation, which could have an increased deterrent effect on worker mobility.

Hundreds of commenters stated that workers are rarely, if ever, able to negotiate their non-competes because non-competes are typically presented in a take-it-or-leave-it fashion.

---

[420] Individual commenter, FTC-2023-0007-2347.
[421] Individual commenter, FTC-2023-0007-2600.
[422] Individual commenter, FTC-2023-0007-5933.

These comments spanned both lower-wage workers and workers in high-wage industries.[423] Workers often stated that they were "forced" to sign a non-compete. Very few workers said they were able to decline signing a non-compete and still be hired or employed. An employment law firm also agreed with the Commission and stated that non-competes are rarely subject to negotiation.

Confirming the research described in this Part IV.B.2.b.i, many workers—including highly paid and highly skilled workers—stated that they did not receive notice that they would be required to sign a non-compete until after accepting a job offer. Some workers said they were told of the non-compete after accepting the job but before starting work. Many workers who described when they were notified of a non-compete said it was on their first day of work or even later. Many workers stated that they were required to sign their non-compete after a merger or acquisition—*i.e.*, after they were already on the job but there was a change in ownership of the company. For example, a trade organization stated that it is common for the purchaser of a business to impose non-competes on its workers, which may trap workers in an organization different from the one they originally agreed to work for. An employment law firm commented that even highly paid or highly skilled workers do not always receive notice of non-competes with the employment offer.

Many workers also stated that non-competes are often hidden or obscured. Several workers said their non-compete was buried in other paperwork or confusingly worded or vague. Some commenters stated that their employer refused to allow them to have a copy of their non-

---

[423] Industries that the Commission considered as higher wage industries included but were not limited to engineers, entertainment (namely on-air talent), entrepreneurs, financial services, dentists, physicians, sales workers, tech industry workers, and veterinarians. Industries were assessed as high wage based on BLS occupational wage data. BLS, *Occupational Employment and Wage Statistics*, https://www.bls.gov/oes/tables.htm (based on the May 2022 National XLS table).

compete. Many workers said their employers gave them misleading or incorrect information about the terms or enforcement of non-competes. Each of the above categories included not only workers from low-wage industries, but also workers from high-wage industries. While these practices appear to be commonplace, based on the comments, the Commission also notes that even workers who knew about non-competes before accepting the job offer—and who did not report being misled about the non-compete—did not report bargaining or negotiating over it.

Only a small number of workers reported *any* negotiating over non-competes. For example, a sales worker said they were able to negotiate a non-compete, though that worker still supported the proposed rule. A surgeon group stated that hospitals were willing to negotiate over non-competes, but that hospitals use the non-competes as a negotiating tactic to drive down surgeon salaries.

Few workers who submitted comments reported being compensated for signing a non-compete. Among those workers who did report receiving compensation, most still said they considered their non-competes to be exploitative or coercive. For example, some workers said they were laid off and then required to sign a non-compete as a condition for receiving severance. A few workers said their employer had threatened to withhold their commissions and/or pay on departure if they did not sign a non-compete. One worker reported never receiving the compensation associated with a non-compete, because they were terminated two months after signing.

In addition, the Commission finds that employers frequently impose non-competes even when they are unenforceable under State law. An economist suggested that non-competes may be used in States in which they are unenforceable because the employer hopes the State's policy might change, or the employer might be able to forum-shop to apply the law of another

123

jurisdiction more favorable to non-competes. Some commenters stated that firms may remind workers that they are subject to a non-compete upon departure even when those non-competes are unenforceable because they hope that workers and competitors will abide by them.

These comments that employers often use unenforceable non-competes are supported by research finding that employers frequently use non-competes even when they are unenforceable under State law.[424] This research suggests that employers may believe workers are unaware of their legal rights, or that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights or the challenges workers face enforcing their rights.

A far smaller number of commenters—a group that included many businesses and trade organizations, and very few workers—argued that non-competes were not exploitative or coercive. An industry organization said non-competes are understandable to a layperson with respect to their geographic scope, time in effect, and industry to which they apply, while an alternative trade secret case would be more complex. But even if workers understand the basic terms of non-competes, that does not alter the Commission's core concern that non-competes are exploitative and coercive because they take advantage of unequal bargaining power between employers and workers and force workers to stay in jobs they want to leave or otherwise bear significant harms or costs. It also does not alter the Commission's concern that non-competes tend to negatively affect competitive conditions. Moreover, the Commission notes that the available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws.[425] In addition, many commenters stated that non-competes were not disclosed to them before they started their job. Furthermore, the Commission addresses why trade secret law is a less restrictive alternative for protect employers' legitimate

---

[424] Starr, Prescott, & Bishara, *supra* note 68 at 81.
[425] *See supra* note 413 and accompanying text.

interests in Part IV.D.2.

A few commenters stated that unequal bargaining power does not constitute an unfair method of competition. In response, the Commission notes that it does not find that unequal bargaining power itself is an unfair method of competition; rather, unequal bargaining power informs its analysis of exploitation and coercion.

The comment record indicates that while some highly paid workers may seek the assistance of counsel when negotiating non-competes, many do not. Commenters did not present studies or other quantitative evidence that undermines the finding in Starr, Prescott, & Bishara that less than 8% of workers seek assistance of counsel in connection with non-competes.[426] The Commission thus finds that the vast majority of workers lack assistance of counsel in connection with entering non-competes. The Commission believes that its definition of senior executives, discussed in Part IV.C.4, captures those workers who are most likely to seek assistance of counsel. To the extent any other individual workers seek assistance of counsel and/or are able to actually bargain over non-competes sufficient that a given non-compete is not exploitative and coercive, the Commission still finds that such non-competes are unfair methods of competition for the independent reason that they are restrictive and exclusionary conduct that tends to negatively affect competitive conditions.

Overall, the comments provide strong support for the Commission's finding that, with respect to workers other than senior executives, employers almost always unilaterally impose non-competes—exploiting their superior bargaining power to significantly restrict a worker's ability to leave for a better job or engage in competitive activity.

### ii.  Non-competes with workers other than senior executives trap

---

[426] Starr, Prescott, & Bishara, *supra* note 68 at 72.

**workers in jobs or force them to otherwise bear significant harms and costs.**

The Commission finds that non-competes are exploitative and coercive because they force workers to either stay in a job they want to leave or bear other significant harms and costs, such as leaving the workforce or their field for a period of time; relocating out of their area; or violating the non-compete and facing the risk of expensive and protracted litigation. In addition, the Commission finds non-competes exert a powerful *in terrorem* effect: they trap workers in jobs and force them to bear these harms and costs even where workers believe the non-compete is overbroad and unenforceable, due to workers' fear that having to defend a lawsuit from their employer for any length of time would devastate their finances or ruin their professional reputations.

The comment record provides strong support for this finding. Many workers submitted comments supportive of the Commission's preliminary finding that non-competes coerce workers into remaining in their current jobs. Many workers reported staying in their job because they feared harm to their careers if they were forced out of their field; feared having to relocate or endure a lengthy commute due to a non-compete; or feared their non-competes would cause them to be unemployed if they left. Several workers reported they were unable to take a specific desired job because of a non-compete. Many workers recounted how non-competes trapped them in jobs with poor working conditions or where they were subject to illegal conduct, including sexual harassment.[427] Some workers said they were subject to particularly broad, even global, non-competes, meaning leaving their field was their only option if they left their current job. These comments spanned both lower-wage workers and workers in high-wage industries.

---

[427] These comments are addressed in greater detail in Part IV.B.3.a.iii.

Illustrative examples of the comments the Commission received include the following:

- I am a journalist who has been forced to move across the country three times, and leave my field entirely for one year, in order to comply with stringent non-compete agreements . . . . In [one] situation, I was stuck working for abusive management who fostered a toxic and abusive workplace, and I had to work there for more than a year until I could find a job in another city entirely because they had threatened to sue me under the non-compete if I left and worked for another local station. . . . [E]ven if these clauses are unenforceable, as we've all heard before, who can afford the legal representation to go up against a corporation and their lawyers when the lawsuit threat comes? My life would have been very different if I weren't trapped by non-competes at points in my career.[428]

- As a veterinarian I support the elimination of non-compete agreements. In our profession they still are overwhelmingly the normal expectation with contracts. . . . [C]ompanies use the fear of litigation to enforce them. As veterinary medicine very quickly becomes more corporate owned, basically they pit us as a singular employee against large corporations that have substantial means both financially and legally. No reasonable employee wants to take on that battle or even can financially take on that battle. So regardless if the clauses are 'unenforceable' they are enforced via intimidation. . . . When [my] job was a terrible fit and my boss ultimately ended up 'not renewing my contract' I was still left with a noncompete. This basically eliminated my ability to work within a reasonable distance of our home. I ended up commuting an hour and 15 minutes one way for 10 months until my husband, myself, and my very young child were able to move closer to my new job. While it was likely legally unreasonable in nature, I did not have the resources financially to even consider the legal battle that would have had to happen for reconsideration and I desperately needed an income to continue to pay the student debt that comes with being a young doctor. Furthermore I had a baby that needed my focus as well.[429]

- I was fired unjustly 11/2021 for declining the Covid vaccine. My medical and religious exemptions were both denied. In addition to this, I was required by my former employer contract to abide by the two-year 10 mile restrictive covenant. This greatly hindered my ability to find employment, and I was out of work for approximately three months. I could only find part-time work for a fraction of my former salary. Had I not had the noncompete clause, I could have found a full-time job almost immediately.[430]

- Unfortunately, the average dental school graduate has nearly $300,000 in student loan debt, and most new dentists are unable to make their practice-ownership dreams a reality immediately after residency. Thus, we rely on entry-level associate dentist positions to gain experience, pay off debt, and become fiscally/professionally prepared to become practice owners. Much to my dismay, upon interviewing for my first associate dentist position, I quickly realized how non-competes are being used in the dental profession to prevent vulnerable young dentists like myself from taking the next step in our careers. . . .

[428] Individual commenter, FTC-2023-0007-0747.
[429] Individual commenter, FTC-2023-0007-2855.
[430] Individual commenter, FTC-2023-0007-7561.

Although dental associate positions come with relatively high compensation, it doesn't make this issue any less problematic.[431]

- My daughter had an inter-state non-compete enforced as a minimum wage medical scribe. Originally she was working with a medical scribe company in Indiana prior to Covid. Due to COVID and graduating from college she then moved to our home in Oregon. She applied for a medical scribe job in Oregon with a company that did not provide any scribe services in Indiana. But her original scribe company had 1 "office" they were providing scribe services to in Salem, Oregon. My daughter had applied with the local scribe company to provide services but when examined further found that her original scribe company from Indiana was going to enforce a $5000 non-compete buy-out fee on her to provide the services in Salem, Oregon that were within the sphere of restriction for her "new" local scribe opportunity.[432]

Many commenters explained that non-competes forced them to relocate and described the toll that the relocation took on their families. Other commenters stated that their families have been forced to live apart, or that they had been separated from elderly relatives, due to a non-compete forcing the relocation of one of the family members. Many commenters described how long commutes undertaken to avoid non-competes increased transportation costs and caused the worker to lose precious time with their families.

The comment record bolsters the Commission's finding that employers wield non-competes to coerce and exploit workers into refraining from competitive activity even where non-competes are unenforceable. Many workers explained that they—and others in their industry—abided by non-competes, even where they believed the non-compete was overbroad and likely unenforceable. According to a law firm specializing in executive compensation, even workers who can afford counsel may be unwilling to mount a long and uncertain legal battle to challenge a non-compete. The firm said employers almost always have deeper pockets and more access to counsel than individual workers, making workers more reluctant to litigate.

---

[431] Individual commenter, FTC-2023-0007-8858.
[432] Individual commenter, FTC-2023-0007-15249.

Commenters further stated that employers may be able to deduct litigation costs as a business expense, giving them the wherewithal to enforce their non-competes.

Many workers with non-competes stated that they feared legal action from their employer or enormous legal fees if they left their current job, and most of those workers said they could not afford litigation. Workers also stated that they are reluctant to engage in litigation against an employer because it would harm their reputation in their industry.

Many workers reported being threatened with litigation over a non-compete when they attempted to leave an employer. Some commenters said their non-competes contained additional clauses making litigation more difficult, such as attorneys' fee-shifting provisions or forced arbitration. Other workers feared having to pay financial penalties or feared having their compensation clawed back if their employer claimed they violated the non-compete. Each of the above comment categories included numerous comments from workers in high-wage industries.

Commenters asserted that employers have several advantages in litigation, further increasing the risk of challenging a non-compete. A commenter said even an extremely overbroad non-compete may be enforceable because a court can modify it to reduce its scope or duration. An employment attorney said employers who use overbroad non-competes to stifle competition suffer few if any negative consequences for doing so. The employment attorney further said that most employers do well even in a legal regime that nominally disfavors non-competes, due to the chilling effect of the threat of litigation. One researcher cited in the NPRM stated that non-competes have a powerful chilling effect because State laws generally do not prohibit employers from requiring employees to sign overbroad non-competes. Accordingly, the researcher recommended that non-competes be banned rather than restricted in scope, thereby preventing the possibility of lawsuits (and the threat thereof).

No commenters submitted studies or empirical evidence to contradict or otherwise call into question the research cited in the NPRM finding that employers frequently use non-competes even when they are unenforceable under State law. Many commenters said they perceived non-competes to be a tool used to intimidate workers, and others specifically said they had been intimidated when their employers took legal action against other workers who left. These comments spanned workers in both lower-wage and high-wage industries.

The comments reflected that fields with high compensation levels were not immune from coercion and exploitation, and that, to the contrary, specialization can increase employers' ability to coerce and exploit workers. For example, some commenters said highly trained and/or specialized workers face heightened challenges in finding a job that does not violate a non-compete without relocating or become entirely unemployable, given the smaller number of such specialized jobs available. One commenter said that many workers are compensated highly because they are in a small field or have a niche skillset, meaning non-competes significantly limit their ability to find another job in their field. Some commenters in professions requiring advanced education also submitted comments stating that significant student loan debt decreased their bargaining power or increased the financial risk of attempting to change jobs. An employment law firm stated that highly paid or highly skilled workers in roles that are not limited to a single industry or business, such as finance or human resources, are more likely to be able to find employment in another industry, while those with training and expertise in a particular industry or type of business are at a greater risk of unemployment. Some medical organizations and others pointed out that non-competes can be particularly exploitative and coercive for professions such as physicians that require State licenses, credentials, and insurance, making relocation even more difficult.

A far smaller number of commenters asserted that non-competes are not exploitative or coercive and do not trap workers in jobs or force workers to bear significant harms or costs. Several commenters argued that, because non-competes are often not exploitative and coercive at the time of contracting, they are also not exploitative and coercive at the time the worker seeks to leave their job. According to these commenters, to the extent a non-compete is bargained for and fairly compensated, that same non-compete does not become exploitative and coercive at the time of departure. In response, the Commission notes that commenters overwhelmingly reported that workers rarely bargain in connection with, or receive compensation for, non-competes,[433] and the mere existence of compensation does not automatically make that compensation fair.

Some business and business association commenters contended that workers with higher earnings can more easily forgo wages to wait out non-competes, and thus do not feel forced to stay in their jobs. These commenters also argued that non-competes for these workers are often tied to equity or severance, which the worker can choose to forego if they want to compete. These comments are contrary to the extensive comment record indicating that even workers with higher earnings cannot afford to forgo compensation and feel forced to stay in jobs they want to leave due to non-competes. To the extent any such individual workers bargained for or received compensation for a non-compete, the Commission still finds that such non-competes are unfair methods of competition for the independent reason that they are restrictive and exclusionary conduct that tends to negatively affect competitive conditions.

Overall, the comments provide strong support for the Commission's finding that non-competes are exploitative and coercive because they trap workers in jobs or force them to bear significant harms and costs.

---

[433] *See* Part IV.B.2.b.i.

For the foregoing reasons, the Commission finds that non-competes with workers other than senior executives are exploitative and coercive and thus facially unfair under section 5.

### 3. The Commission Finds That Non-Competes Tend to Negatively Affect Competitive Conditions

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes tend to negatively affect competitive conditions in labor markets for the reasons explained in this Part IV.B.3.a. (As explained in Part IV.B.3.b, the Commission further finds that non-competes tend to negatively affect competitive conditions in markets for products and services.)

As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a *tendency* to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused *actual* harm in a specific instance. Here, the tendency of non-competes to impair competition is clear from their nature and function. In any event, the evidence confirms that non-competes do in fact have a negative effect on competitive conditions.

The Commission turns now to the significant evidence of harm to competition in labor markets from non-competes, including evidence of suppressed labor mobility, suppressed earnings, and reduced job quality.

### a. Non-competes tend to negatively affect competitive conditions in labor markets.

The Commission finds that non-competes tend to negatively affect competitive conditions in labor markets by inhibiting efficient matching between workers and employers.

Labor markets function by matching workers and employers. In a competitive labor market, workers compete for jobs by offering their skills and time (*i.e.*, their labor services) to employers, and employers in turn compete for those labor services by offering better pay, benefits, or other elements of job satisfaction.[434] A worker who is seeking a better job—more pay, better hours, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Prospective employers can compete for the worker's services, and the worker's current employer may also compete by seeking to retain the worker—*e.g.*, by offering a raise, promotion, or other enticement.[435] Ultimately, the worker chooses the job that best meets their objectives, and the employer chooses the worker who best meets theirs. In general, the more jobs and the more workers that are available—*i.e.*, the more competing options the worker and employer each have—the stronger the match will be.

Thus, a key component of a competitive labor market is voluntary labor mobility. Choice—the ability of market participants to satisfy their preferences where possible—facilitates competition. In the labor market, voluntary labor mobility reflects both the choices or preferences of workers and that of rival competitors.

However, non-competes introduce a major friction that tends to impair the competitive functioning of labor markets. Non-competes inhibit the efficient matching between workers and employers via the competitive process because, even if a competing employer offers a better job and the worker wants to accept that better job, the non-compete will prevent the worker from accepting it if the new job is within the scope of the non-compete (or if the worker is unsure or afraid it may be). Meanwhile, the employer who would like to hire the worker is prevented from competing to attract that talent. The result is less competition among employers for the worker's

---

[434] *See* Treasury Labor Market Competition Report at 3-4.
[435] *See id.*

services and less competition among workers for available jobs. Since the worker is prevented from taking many jobs that would otherwise be available, the worker may decide not to look for a job at all. Or the worker may enter the labor market but take a job in which they are less productive, such as when a non-compete forces a worker to leave their field of expertise and training.

In this way, non-competes frustrate competitive processes in labor markets. In competitive markets, the "unrestrained interaction of competitive forces" yields a variety of benefits such as lower prices for consumers, better wages and working conditions for workers, and higher quality products.[436] In contrast, when "[i]ndividual competitors lose their freedom to compete" in the labor market, the importance of worker preference in setting the level of wages and working conditions is reduced, which is "not consistent with [the] fundamental goal of antitrust law."[437] The restraint imposed by non-competes on the interaction of competing employers and competing workers directly undercuts the functioning of the competitive process in determining wages and working conditions. Accordingly, non-competes facially harm the competitive process and tend to negatively affect competitive conditions in labor markets. Evidence that non-competes have in fact had actual detrimental impacts on outcomes of the competitive process—such as workers' earnings, new business formation, and innovation—demonstrate that non-competes do in fact harm competition.

The Commission notes that the actual effect of any one individual non-compete on the overall level of competition in a particular labor market may be marginal or impossible to discern statistically. However, as explained in Part I.B.2, non-competes are prevalent across the U.S. labor force. The empirical literature and other record evidence discussed in this section

---

[436] *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).
[437] *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 106-07 (1984).

reflect that non-competes, in the aggregate, negatively affect competitive conditions in labor markets—resulting in harm not only to workers subject to non-competes and the employers seeking to hire them, but also workers and employers who lack non-competes.

The Commission finds that evidence of the effects of non-competes on workers' labor mobility and earnings is sufficient to support its finding that non-competes tend to negatively affect competitive conditions in labor markets.[438] In addition, the Commission believes that this finding is further bolstered by strong qualitative evidence that non-competes reduce job quality.[439]

The Commission's findings relating to labor mobility and earnings are principally based on the empirical evidence described in Parts IV.B.3.a.i and ii. However, the comments provide strong qualitative evidence that bolsters these findings. Furthermore, the Commission notes that the legal standard for an unfair method of competition under section 5 requires only a *tendency* to negatively affect competitive conditions; empirical evidence of actual harm is not necessary to establish that conduct is an unfair method of competition. In the case of non-competes, however, there is extensive empirical evidence, as well as extensive corroborating public comments, that non-competes negatively affect competitive conditions in labor markets.

### i. Non-competes suppress labor mobility.

*Evidence of suppressed labor mobility*

The Commission finds that non-competes tend to negatively affect competitive conditions in labor markets by suppressing labor mobility, which inhibits efficient matching between workers and employers. The evidence indicates that non-competes reduce labor mobility. Several empirical studies find that non-competes limit the movement of workers

---

[438] *See* Part IV.B.3.a.i-ii.
[439] *See* Part IV.B.3.a.iii.

between firms and reduce the pool of labor available to existing employers and potential entrants.[440]

In the NPRM, the Commission described the empirical research on non-competes and labor mobility.[441] The Commission stated that, across the board, studies of non-competes and labor mobility find decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within-industry and between-industry mobility.[442] Based on that body of empirical evidence and its review of the record as a whole following the comment period, the Commission finds that non-competes reduce labor mobility.

Several empirical studies find that non-competes reduce labor mobility. Some of these studies analyze the effects of non-competes on labor mobility across the labor force.

A study by Johnson, Lavetti, and Lipsitz examined the impact on labor mobility of all legal changes in the enforceability of non-competes from 1991 to 2014 across the entire labor force.[443] This study finds that substantial decreases in non-compete enforceability cause a significant increase in job-to-job mobility in industries that use non-competes at a high rate.[444]

Evan Starr's study comparing workers in occupations that use non-competes at a high versus low rate finds that a State moving from mean enforceability to no enforceability would cause a decrease in employee tenure for workers in high-use occupations of 8.2%, compared with those in low-use occupations. Tenure in this study serves as a proxy for mobility, since

---

[440] As the Commission stated in the NPRM, it does not view reduced labor mobility as a harm in and of itself. *See* NPRM at 3490. Instead, the Commission finds that the empirical evidence showing non-competes reduce labor mobility is powerful evidence that non-competes do indeed restrict labor market competition by inhibiting the movement of workers between firms—and therefore efficient matching between workers and firms.
[441] NPRM at 3489.
[442] *Id.*
[443] Johnson, Lavetti, & Lipsitz, *supra* note 388. This study was updated in 2023. The updated version of the study reports results slightly differently than the 2022 version cited in the NPRM, but the analysis and results themselves do not meaningfully change. Accordingly, the update to Johnson, Lavetti, and Lipsitz does not materially affect the Commission's analysis of the study.
[444] *Id.* at 21.

136

tenure is the absence of prior mobility.[445] This use of a proxy means the outcome of interest is not precisely measured, and the study is less robust than those that examine changes in legal enforceability of non-competes. The study's findings are, however, consistent with the other studies finding that non-competes reduce labor mobility.

Starr, Prescott, and Bishara's study of non-compete use likewise finds that having a non-compete was associated with a 35% decrease in the likelihood that a worker would leave for a competitor.[446] While this finding is based on the use of non-competes (and is accordingly given less weight), the authors also survey workers, who report that the cause of their reduced mobility is their non-compete. The study finds that the mechanism underlying reduced mobility is not whether non-competes are legally enforceable or not, but rather, it is the worker's belief about the likelihood that their employer would seek to enforce a non-compete. Workers who did not believe that employers would enforce non-competes in court were more likely to report they would be willing to leave for a competitor.[447] This study thus not only supports the Commission's finding that the use of non-competes impacts labor mobility, but also supports the Commission's finding that non-competes can exert an *in terrorem* effect on labor mobility even where they are unenforceable.[448] This supports the need to ensure that workers are aware of the prohibition on non-competes.[449]

Other studies analyze how non-competes affect the labor mobility of specific populations of workers. A study by Jessica Jeffers finds that decreases in non-compete enforceability were

---

[445] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783 (2019). The value is calculated as 8.2%=0.56/6.46, where 0.56 is the reported impact on tenure and 6.46 is mean tenure in the sample.

[446] Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J. L., Econ., & Org. 633, 652 (2020).

[447] *Id.* at 664.

[448] *See* Part IV.B.2.b.ii.

[449] *See* Part IV.E (describing the final rule's notice requirement).

associated with a substantial increase in departure rates of workers, especially for other employers in the same industry.[450] This study's sample is limited to knowledge workers (*i.e.*, workers whose primary asset is applying their mental skills to tasks), and the study uses a binary—rather than continuous—measure of non-compete enforceability. It does, however, examine several changes in the enforceability of non-competes to generate its results, making it fairly robust.

In addition, two recent studies examined subgroups of the population that were affected by State law changes and find major effects on those populations' labor force mobility. Balasubramanian et al., in 2022, focused on Hawaii's ban of non-competes for high-tech workers and find that the ban increased mobility by 12.5%.[451] Lipsitz and Starr, in 2022, focused on Oregon's ban of non-competes for hourly workers and find that mobility increased by 17.3%.[452]

***Comments pertaining to labor mobility evidence and Commission responses***

The Commission's finding that non-competes suppress labor mobility is principally based on the empirical evidence described in this Part IV.B.3.a.i. However, the comments provide strong qualitative evidence that bolsters this finding.

Many commenters agreed with the Commission's preliminary finding that non-competes suppress labor mobility and stated that this reduction in labor mobility leads to less labor market competition and poorer wages and working conditions.

In response to the NPRM's discussion of this literature, some commenters questioned the adequacy of the studies. For example, one commenter stated that the available research is either

---

[450] Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1 (2024). The 2024 version of Jeffers' paper finds a decline in the departure rate of 7% of the sample mean, and a decline in the within-industry departure rate of 10%.
[451] Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (2022).
[452] Lipsitz & Starr, *supra* note 72 at 157.

limited to specific sectors of the economy, limited geographically, or limited by small sample sizes. Some commenters claimed the empirical research lacked appropriate counterfactuals.

The Commission acknowledges that some of the studies focus on specific industries or specific geographies, and that the studies vary in the methodologies the authors rely on. These arguments do not undermine the utility of the studies, particularly given that they all find that non-competes reduce labor mobility. Moreover, the Commission finds that each of the studies discussed in this Part IV.B.3.a.i conduct their analyses against appropriate counterfactuals. And while there may be some variation in the magnitude of the effect on mobility among industries, several of the empirical studies find economy-wide effects. That evidence shows that non-competes restrict the movement of workers to a significant degree.

Additionally, the record is replete with examples of commenters who recounted personal stories that accord with the empirical literature. The Commission received comments from several thousand individual workers stating that their mobility is or has been restricted by a non-compete. While some commenters who opposed the proposed rule disputed that non-competes prevent workers from finding other jobs in their industry, the Commission finds the weight of the evidence clearly demonstrates a significant effect on labor mobility.

The Commission further notes that many commenters' submissions substantiated its finding that non-competes can have an *in terrorem* effect on labor mobility even where they would not ultimately be enforceable in court.[453] As many commenters explained, the high costs and complexities of non-compete litigation can have a chilling effect on workers and thus reduce worker mobility regardless of whether a court would enforce the non-compete. For this reason, the very existence of a non-compete is likely to deter workers from switching jobs or starting

---

[453] *See* Part IV.B.2.b.ii.

their own business, even if it would ultimately not be enforced. This supports the Commission's view that not only should non-competes' enforcement be prohibited, it is also important to provide a readily understandable, uniform Federal approach, and notice to workers of unenforceability.[454]

Some commenters who generally opposed the rule questioned the virtue of labor mobility, arguing that when colleagues leave, remaining workers can experience increased workloads or harm to their employer. However, this comment ignores the benefits that will also accrue from those same firms having more ready access to *incoming* potential colleagues as well. The Commission also notes that unfair conduct cannot be justified on the basis that it provides the firm undertaking the conduct with pecuniary benefits.[455]

Some commenters argued that labor mobility has generally been increasing in the U.S. labor market. Setting aside whether this is true, it is not probative of whether the practice of using non-competes is reducing labor mobility or negatively affecting labor market competition.

For these reasons, the empirical evidence that non-competes suppress labor mobility supports the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets.

### ii. Non-competes suppress workers' earnings.

---

[454] *See* Part IX.C. *See also supra* note 386 (explaining that studies assessing changes in enforceability of non-competes likely underestimate the effects of non-competes, given that workers may refrain from seeking or accepting work or starting a business even if the non-compete is likely unenforceable, and explaining the importance of notice to workers).

[455] *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 371 (1965) (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *FTC v. Texaco*, 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such a system [were] clear"); *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 15 (7th Cir. 1971) ("While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice."). Justifications that are not cognizable under other antitrust laws are also not cognizable under section 5.

***Evidence of suppressed earnings***

The Commission finds that non-competes suppress workers' earnings as a result, in part, of decreased labor mobility, supporting the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets. As the NPRM explained, many studies find that increased enforceability of non-competes reduces earnings for workers across the labor market generally; for specific types of workers; and even for workers who are *not* subject to non-competes.[456] There are several major empirical studies of how changes in non-compete enforceability affect workers' earnings, all of which show that increased enforceability of non-competes suppresses workers' earnings.

A study conducted by Johnson, Lavetti, and Lipsitz finds that non-competes limit workers' ability to leverage favorable labor markets to receive greater pay.[457] The authors find that when non-competes are more enforceable, workers' earnings are less responsive to low unemployment rates, which workers typically leverage to negotiate pay raises. The authors estimate that a nationwide ban on non-competes would increase average earnings by approximately 3-14%.[458] Of the studies of how non-competes affect earnings, this study has the broadest coverage. It spans the years 1991 to 2014, examines workers across the labor force, and uses all known common law and statutory changes in non-compete enforceability to arrive at its estimates. This study is very robust, as it satisfies all of the principles outlined in Part IV.A.2.

The same study also finds that non-competes increase racial and gender wage gaps by disproportionately suppressing the wages of women and non-White workers. While the study

---

[456] NPRM at 3486-88.
[457] Johnson, Lavetti & Lipsitz, *supra* note 388 at 37.
[458] *Id.* at 3. The NPRM reported an increase in average earnings of 3.3-13.9%. Those numbers were taken from an earlier version of the Johnson, Lavetti, and Lipsitz paper. The updated paper finds an increase in average earnings of 3.2-14.2%. The change does not materially affect the paper's findings or the Commission's analysis of the paper.

estimates that earnings of White men would increase substantially if a nationwide ban on non-competes is enacted, the comparable earnings increase for workers in other demographic groups would be up to twice as large, depending on the characteristics of the group.[459] The authors estimate that making non-competes unenforceable would close racial and gender wage gaps by meaningful amounts, although the mechanism behind this effect is unclear.[460]

Furthermore, a study conducted by Evan Starr estimates that earnings fall by about 4% where a State shifts its policy from non-enforcement of non-competes to a higher level of enforceability.[461] This study covers a sample which is broadly representative of the entire labor force from 1996 to 2008. Unlike many of the other studies described in this Part IV.B.3, this study does not use a change in enforceability of non-competes to analyze the impact of enforceability. Rather, it examines the differential impact of enforceability on workers in occupations that use non-competes at a high rate versus workers in occupations that use non-competes at a low rate. As described in Part IV.A.2, studies comparing differential usage of non-competes are generally less informative than studies examining changes in enforceability, although in this particular study the comparison between workers in high- and low-use occupations may effectively control for State-level differences between labor markets, lending more credibility to the estimates. More importantly, the Commission notes that the study corroborates the estimates from other studies that rely on more credible research designs, and therefore is appropriately viewed as additional evidence supporting the range of estimated effects on wages across the labor market.

---

[459] *Id.* at 42. The 2023 version of the paper by Johnson, Lavetti, and Lipsitz reports earnings increases of 1.3% for White men, and increases between 1.5-3.2% for workers in other demographic groups, corresponding to a change in non-compete enforceability equal to the difference between the 75th and 25th percentiles. These differences are statistically significant for Black men and non-White, non-Black women.

[460] *Id.* The 2023 version of the paper reports that the earnings gaps would close by 1.5-3.8% given a change in non-compete enforceability equal to the difference between the 75th and 25th percentiles.

[461] Starr, *supra* note 445 at 783.

Two additional studies analyze effects of non-competes on earnings for specific populations of workers. A study conducted by Lipsitz and Starr focuses on a natural experiment in Oregon, where non-competes were banned for hourly workers with relatively low earnings. The study estimates that when Oregon stopped enforcing non-competes for hourly workers, their wages increased by 2-3% relative to workers in States that did not experience legal changes. The study also finds a greater effect (4.6%) on workers in occupations that used non-competes at a relatively high rate.[462] The authors additionally find that women's earnings increased at a higher rate, with earnings increases after the non-compete ban of 3.5% for women, versus 1.5% for men.

A study by Balasubramanian et al. focuses on a natural experiment in Hawaii, which banned non-competes for high-tech workers in 2015. The study finds earnings of new hires increased by about 4% after the ban, relative to earnings in other States without bans.[463]

In addition to this research, which shows that increased enforceability of non-competes reduces workers' earnings across the labor market generally and for specific types of workers, two empirical studies find that increased enforceability of non-competes suppresses earnings even for workers who are *not* subject to non-competes.

 The Johnson, Lavetti, and Lipsitz study, in a separate analysis, isolates the impact of a State's enforceability policy on workers not directly affected by that policy to demonstrate that non-competes affect not just the workers subject to non-competes, but the broader labor market as well. The study finds that increases in non-compete enforceability in one State have negative impacts on workers' earnings in bordering States, and that the effects are nearly as large as the effects in the State in which enforceability changed (but taper off as the distance to the bordering

---

[462] Lipsitz & Starr, *supra* note 72 at 143.
[463] Balasubramanian et al., *supra* note 451 at S349.

State increases).[464] The study estimates that a legal change in one State has an effect on the earnings of workers just across that State's border that is 76% as great as for workers in the State in which the law was changed.[465] In other words, when one State changes its law to be more permissive of non-competes and itself experiences a decrease in workers' earnings of 4%, workers just across the border (*i.e.,* workers who share a labor market)[466] would experience decreased earnings of 3%.[467] The authors conclude that, since the workers across the border are not *directly* affected by the law change (*i.e.*, contracts that they have signed do not become more or less enforceable), this effect must be due to changes in the local labor market.[468] The researchers based their analysis on where workers worked, rather than their residence, so the results are not tainted by workers who worked in the State where the law changed but lived across the border.

The second of these studies, a study conducted by Starr, Frake, and Agarwal, analyzed workers without non-competes who worked in States and industries in which non-competes were used at a high rate.[469] The authors find that, when the rate of use of non-competes in an industry in a State is higher, wages are lower for workers who do not have non-competes but who work in the same State and industry. This study also finds that this effect is stronger where non-competes

---

[464] The NPRM cited an earlier version of Johnson, Lavetti, and Lipsitz's study that estimated that a legal change in one State would have an effect on the earnings of workers just across that State's border that was 87% as great as for workers in the State in which the law was changed. NPRM at 3488. The data cited in this final rule reflect an updated version of this study.

[465] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 51. Seventy-six percent is calculated as the coefficient on the donor State NCA score (-.137) divided by the coefficient on own State NCA score (-.181).

[466] See U.S. Econ. Rsch. Serv., Commuting Zones and Labor Market Areas, https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/.

[467] The Commission notes that the estimates in the updated version of Johnson, Lavetti, and Lipsitz's study are slightly different, but qualitatively similar to the earlier estimates noted in the NPRM. The results remain statistically significant and do not materially affect the Commission's analysis.

[468] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 30.

[469] Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961 (2019), online ahead of print at https://pubsonline.informs.org/doi/abs/10.1287/orsc.2018.1252 at 6.

are more enforceable.[470]

The authors show that the reduction in earnings (and in labor mobility) is due to a reduction in the rate of job offers. Individuals in State/industry combinations that use non-competes at a high rate do not receive job offers as frequently as individuals in State/industry combinations in which non-competes are not frequently used.[471] The authors also demonstrate that decreased mobility and earnings are *not* due to increased job satisfaction (*i.e.*, if workers are more satisfied with their jobs, they may be less likely to change jobs, and more likely to accept lower pay).[472]

Given some methodological limitations of this study, the Commission views it as supporting the other evidence that non-competes have negative spillover effects on earnings for workers without non-competes and reduce labor mobility. Namely, the research design relies on cross-sectional differences in enforceability of non-competes. Although this study also examines the use of non-competes, it does not compare individuals who are bound by non-competes to individuals who are not. Instead, it examines the rate of use across industries and States, and therefore avoids the statistical biases inherent in studies which compare individuals with and without non-competes. The authors also employ tests to increase confidence in the causal interpretation of these results, but they cannot conclusively rule out explanations outside of the scope of their data.

Several additional studies examine the association between non-compete use—rather than enforceability—and earnings. For the reasons described in Part IV.A.2, the Commission finds that these studies are less credible in measuring how non-competes affect earnings, and

---

[470] *Id.* at 11.
[471] *Id.* at 10.
[472] *Id.* at 13.

accordingly the Commission gives these studies minimal weight.

In one such study, Starr, Prescott, and Bishara examine survey results and find that non-compete use is associated with 6.6% to 11% higher earnings.[473] In another study, using Payscale.com data, Balasubramanian, Starr, and Yamaguchi find that individuals with non-competes (regardless of what other post-contractual restrictions they had) had 2.1-8.2% greater earnings than individuals with no post-contractual restrictions. However, this positive association may be due to non-competes often being bundled with NDAs. The authors find that, compared with individuals subject only to NDAs, non-competes are associated with a 3.0-7.3% *decrease* in earnings, though the authors do not disentangle this effect from the effects of non-solicitation and non-recruitment provisions.[474] Another study, by Lavetti, Simon, and White, finds that use of non-competes among physicians is correlated with greater earnings (by 14%) and greater earnings growth.[475] Finally, Rothstein and Starr find that greater use of non-competes is correlated with higher earnings.[476]

Because these studies merely reflect correlation and are unlikely to reflect causation, the Commission gives them little weight. The NPRM noted that the Lavetti, Simon, and White physician study partially mitigates this methodological flaw by comparing earnings effects in a high- versus a low-enforceability State (Illinois versus California). However, at best, this comparison is a cross-sectional comparison with a minimally small number of States being compared. The study does not consider changes in non-compete enforceability over time. Therefore, it is impossible to disentangle underlying differences in those two States from the

---

[473] Starr, Prescott, & Bishara *supra* note 68 at 75.
[474] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 40. The percentage range is calculated as $e^{-0.030}-1$ and $e^{-0.076}-1$, respectively.
[475] Lavetti, Simon, & White, *supra* note 82 at 1051. The increase in earnings is calculated as $e^{0.131}-1$.
[476] Rothstein & Starr, *supra* note 77 at 1.

effects of non-compete enforceability. The Commission accordingly gives this study, like the other studies reliant on comparisons of populations using non-competes and not using non-competes, little weight, though the shortcoming is slightly mitigated in the case of this study. While this study is specific to physicians, the Commission nonetheless finds that studies employing stronger methodologies (especially studies of workers positioned similarly in the income distribution[477] and studies which broadly represent the U.S. workforce[478]) provide compelling evidence that non-competes significantly suppress wages.

### Comments pertaining to suppressed earnings and Commission responses

The Commission's finding that non-competes suppress earnings is principally based on the empirical evidence described in this Part IV.B.3.a.ii. However, the comments provide strong qualitative evidence that bolsters this finding.

The Commission received thousands of comments from workers describing how non-competes suppressed their earnings. These commenters spanned a wide variety of industries, hailed from across the U.S., and recounted a common experience: a non-compete prevented them from earning more. Illustrative examples of these comments include the following:

- I worked at a TV station. A corporation owned us and forced me to sign a yearly non-compete in order to remain in my position. After a few years, I was offered a management job with a much bigger title and much more money. . . . However, the corporation that owned us wouldn't even talk about letting me out of the non-compete. They wouldn't even discuss a settlement. They totally refused to allow me to pursue a much higher salary and a much higher position, no matter what was offered. I was forced to choose between staying in my current job, and not being able to improve my job or money, or being unemployed for 6 months.[479]

- I have been subject to a non-compete for 11 years in aggregate as a physician. Because of my non-compete, I am unable to take a position with another organization without having to drive much farther outside of my non-compete stipulated geographic restrictions (which would add to the time that I am away from my family, and costs more in fuel and

---

[477] Balasubramanian et al., *supra* note 451.
[478] Johnson, Lavetti, & Lipsitz, *supra* note 388.
[479] Individual commenter, FTC-2023-0007-8067.

vehicle maintenance). Because of my non-compete, I haven't had a raise in 6 years, because I can't negotiate with my employer because I have no bargaining position to negotiate from if I don't have options of alternate employment within the restrictions of my non-compete.[480]

- I recently received two job offers with better compensation, but I had my non-compete reviewed by an attorney and learned that it would open myself up to a significant lawsuit and potential fines. I most likely have to sit out a year and either work completely outside my field where I have advanced degrees or not work at all. Since I am the primary breadwinner, this is not financially possible for my family, so I have to stick with my current employer who has not given me a pay increase in 2 years.[481]

- I am a Certified Nurse Practitioner and signed [a non-compete]. I live in Minnesota and would be required to travel one hour one way in order to fulfill [the] agreement. . . . My employer increased my responsibilities (on-call hours added) without additional pay using vague language in my binding agreement. I would have to hire a lawyer and spend thousands of dollars to file a lawsuit to get the agreement releasing me. . . . My employer took advantage of my binding agreement and did not increase my [Relative Value Unit] rate in 5 years for my or other Nurse Practitioners in our organization.[482]

- I was just starting out in my career when I finally got a part time job in my field of geology. Unfortunately, it didn't last long and I was let go. But because of a non compete agreement I had to sign I couldn't take another job in my field even though I had a good lead on one. Instead I had to take a job as a waitress making less than minimum wage.[483]

- I work for an IT company, low-level employee just above minimum wage, and I had to sign one of these to get the job even though I don't know any knowledge above what someone could learn in 10 or 15 hours on YouTube, yet I still had to sign this which makes it so I can't compete . . . if they offered me better pay.[484]

- I began working for my employer 10 years ago as a very young and inexperienced single mother. I desperately needed a job that could pay more than minimum wage, and I eagerly accepted my position and non-compete status. I have now been working at almost the same rate of pay (as raises are not readily given to us regardless of recessions or cost of living increases) - for a DECADE. My children are approaching college age, and I will absolutely need a higher income to help fund their educations.[485]

- I am in the laboratory medicine field and was laid off from a job as an implementation rep for an instrument vendor. Other companies were the competition, and I was held to a

[480] Individual commenter, FTC-2023-0007-0616.
[481] Individual commenter, FTC-2023-0007-0651.
[482] Individual commenter, FTC-2023-0007-0857. Relative value units are a component of a methodology that calculates earnings for some healthcare workers.
[483] Individual commenter, FTC-2023-0007-11973.
[484] Individual commenter, FTC-2023-0007-11137.
[485] Individual commenter, FTC-2023-0007-7238.

non-compete. This caused me to go from a six figure salary with great benefits back to the hospital making barely 60k as a single mother with twins and no emergency fund saved! I later went into the UV disinfection field and developed a tremendous amount of knowledge regarding minimizing the spread of infections in hospitals (pre-covid). After 5 years, I was laid off and prevented from continuing in this niche field that I had spent so much time developing a skillset and statistics within. I was only given a 2 week severance (along with a reminder of legal action if I worked for the competition). Companies use this as a bully tactic![486]

In addition to receiving thousands of comments recounting personal stories of non-competes stymieing the commenters' ability to get a better-paying job or a raise, many commenters also described how, over the long term, non-competes can lower wages and diminish career prospects for workers forced to sit out of the market or start over in a new field. The Commission also received numerous comments stating that non-competes exacerbate wage gaps based on gender and race, including by decreasing entrepreneurship and wages to a greater extent for women and people of color and by giving firms more power to engage in wage discrimination.[487]

With respect to the empirical literature, numerous commenters agreed that there is a wealth of empirical evidence to support the Commission's preliminary finding that, by inhibiting efficient matching between workers and employers, the use of non-competes is harming workers by suppressing their earnings. In addition to the literature discussed in the NPRM and in this final rule, some commenters pointed to a 2016 report from the Treasury Department that examines the correlation between non-compete enforceability and both earnings and earnings growth at the State level. The Treasury report finds that a one-standard-deviation increase in State-level enforceability of non-competes is correlated with 1.38% to 1.86% lower earnings, which can be found in both lower earnings upon starting a job and lower earnings growth.[488] The

---

[486] Individual commenter, FTC-2023-0007-2416.
[487] *See also* Part IV.B.3.a.iii (summarizing comments from workers and worker advocates stating that non-competes increase illegal conduct by employers and make it harder for workers to report illegal conduct).
[488] Dept. of the Treasury, *Non-Compete Contracts: Economic Effects and Policy Implications* (March 2016) at 20.

Commission agrees with commenters that this provides additional support for the final rule. However, the Commission gives less weight to cross-sectional studies of enforceability, like the 2016 Treasury report, that examine the correlation between non-compete enforceability and earnings growth.[489] The Commission relies more heavily on the studies that find that non-competes suppress earnings based on examining natural experiments.

Some commenters opposing the rule argued that studies of non-compete use, including the studies described in this Part IV.B.3.a.ii, show a positive association between non-compete use and earnings, especially when early notice of non-competes is provided, while others cautioned against interpreting these relationships as causal. The Commission agrees with commenters who caution against a causal interpretation of these studies, which are unable to determine whether non-compete use causes differences in earnings, whether earnings cause differences in non-compete use, or whether a third factor simultaneously determines both, as discussed in Part IV.A.2.

Some commenters opposing the rule stated that the most comprehensive study of the earnings effects of non-competes (the Johnson, Lavetti, and Lipsitz study described in this Part IV.B.3.a.ii) examines only relatively incremental changes in laws governing the enforceability of non-competes (*i.e.*, changes other than full bans), and claimed that this study thus does not shed light on the effects of a full prohibition. In response, the Commission notes that the analysis in Johnson, Lavetti, and Lipsitz finds that the effects of changes in non-compete enforceability are broadly linear. This means the effect of a change in enforceability twice the size of another change results in a change in workers' earnings that is approximately twice as large. As a result, the Commission finds that it would be appropriate to extrapolate from the effects of incremental

---

[489] *See* Part IV.A.2.

changes in non-compete laws to the effects of prohibitions, at least in the context of worker earnings.[490] In other words, if incremental changes in enforceability lead to a certain level of earnings effects, it is reasonable to presume—based on the linearity of the relationship between changes in enforceability and workers' earnings—larger changes will lead to larger effects.

That said, in the regulatory impact analysis, the Commission does not extrapolate from the incremental changes observed in these studies with respect to earnings effects.[491] Instead, the Commission follows a conservative approach and assumes that the prohibition in the final rule, even though it is comprehensive, will have the same effects on earnings as the incremental legal changes observed in these studies. Therefore, even if the effects of changes in non-compete enforceability are not linear, the Commission's analysis of the economic impacts of the final rule is not undermined because, if anything, it underestimates the benefits of the rule.

A commenter argued that the Johnson, Lavetti, and Lipsitz dataset is outdated because it examines enforceability between 1991 and 2014. In response, the Commission finds that while the enforceability measures contained in that dataset do not perfectly reflect current enforceability due to changes in State law in the intervening several years, the measures still reflect the impacts of non-compete enforceability on economic outcomes, and likely still have strong predictive power.

Some commenters opposing the rule asserted that the overall competitiveness of U.S. labor markets undermines the argument that workers suffer from non-competes. In response, the Commission notes that a range of factors have weakened competition in labor markets.[492] In any event, the level of competitiveness of a labor market does not justify use of a practice that tends

---

[490] *See* Figure 3; Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.
[491] *See* Part X.F.5.
[492] See Treasury Labor Market Competition Report at i.

to negatively affect competitive conditions.

Some commenters opposing the rule pointed to academic writings, including a summary of the research by an FTC economist writing in his personal capacity in 2019, stating that there was limited evidence on the effects of such clauses. The Commission finds that these writings are generally outdated and disagrees with them. As the various explanations of the empirical research in Parts IV.B and IV.C illustrate, much of the strongest evidence on the effects of non-competes has been published in recent years. The Commission notes further that Evan Starr, one expert who voiced concerns over the state of the evidence in the past, submitted a comment that was broadly supportive of the interpretation of the evidence in the NPRM and of the proposed rule.[493]

Other comments opposing the rule stated that the heterogeneity of the impact of a non-compete ban on earnings undermined the Commission's preliminary finding regarding the effects of non-competes on earnings. These commenters asked whether the population-wide average effects noted in certain studies apply across the workforce or only to certain individuals (*e.g.*, at certain points in the income distribution), certain professions, or in certain geographies (*e.g.*, where local labor markets tend to be more concentrated). Another commenter argued that if a ban on non-competes drives up earnings for highly skilled workers, wages might decrease for other categories of workers.[494]

In response to these comments, the Commission finds that, while estimates of the magnitude of the effect of non-competes on earnings vary to some extent across groups of workers, the effects are directionally and qualitatively similar across groups. For example, while

---

[493] Comment of Evan Starr, FTC-2023-0007-20878.
[494] These commenters were generally referring to higher-wage workers, but not senior executives. Comments that focused on senior executives are addressed in Part IV.C.

Balasubramanian et al. do not report a table with average earnings for workers in their study, workers in the high tech jobs studied tend to be relatively highly paid, and the study finds non-competes suppress these workers' earnings.[495] On the lower end of the earnings spectrum, Lipsitz and Starr report average earnings of $16.41 per hour for workers in their study, which corresponds to annual earnings of approximately $34,133 per year (assuming 2,080 hours worked per year), and their study likewise finds that non-competes suppress the earnings of these workers.[496]

Additionally, Johnson, Lavetti, and Lipsitz's study of workers across the economy shows that, while college-educated workers and workers in occupations and industries in which non-competes are used at a high rate experience relatively larger adverse effects on their earnings from non-compete enforceability, the estimated effect of increased enforceability on other workers is still negative (albeit statistically insignificant in this study).[497] In short, while these studies do not estimate the magnitude of negative effects for every subset of the population, the finding of negative effects on earnings is consistent across dissimilar subsets of the population.

A commenter that opposed the NPRM asserted that a categorical ban could decrease wages for highly paid workers, arguing that such workers could negotiate higher wages in exchange for the non-compete that they would lose with a ban. This speculative assertion is belied by the comment record, which indicates that the highly paid, highly skilled workers who are not senior executives are also unlikely to negotiate non-competes.[498] It is also belied by

---

[495] Workers in the occupation Computer and Information Research Scientists (SOC code 15-1221) in the private sector had median earnings of $156,620 in 2022, while Software Developers (SOC code 15-1252) in the private sector had median earnings of $127,870 in 2022. BLS, Occupational Employment and Wage Statistics, https://www.bls.gov/oes/tables.htm. These private-sector data are from the May 2022 National industry-specific and by ownership XLS table (*see* table labeled "national_owner_M2022_dl").

[496] Lipsitz & Starr, *supra* note 72 at 148.

[497] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 57.

[498] *See* Parts IV.B.2.b.i and IV.C.1.

empirical evidence that non-competes suppress earnings for highly paid workers.[499]

Similarly, commenters opposing the rule questioned whether earnings effects merely result from firms hiring different types of workers after changes in non-compete enforceability (for example, workers with different levels of experience or education). In response to these comments, the Commission first notes that the studies find adverse impacts across the labor force. Therefore, even if a different mix of types of workers were hired due to non-compete enforceability, the evidence shows workers' wages are suppressed across the labor force when non-competes are more enforceable. Additionally, the Commission notes that the study by Lipsitz and Starr compares the earnings growth of individual workers before and after the legal change in Oregon, showing that earnings growth increased after the non-compete ban. This provides some evidence that the effects observed in the literature are not simply due to substitution, since individual workers' earnings trajectories would not be changed if all the effects were simply due to firms substituting one type of worker for another.[500]

Some commenters opposing the rule asserted that enforceability indices are likely measured with substantial error. These commenters argue that the indices are based on qualitative analyses of State laws and not data on how frequently non-competes are actually enforced or the results of these enforcement cases. The Commission finds the enforceability indices are sufficiently reliable, because they are generated through careful analysis of State law that takes into account variation in legal enforceability along multiple dimensions.[501] Moreover, a 2024 study using enforcement outcome data finds that a non-compete ban in Washington

---

[499] *See, e.g.*, Balasubramanian et al., *supra* note 451.

[500] Lipsitz & Starr, *supra* note 72, Online Appendix at 18.

[501] Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy*, 13 U. Pa. J. Bus. L. 751 (2011); Barnett & Sichelman, *supra* note 389.

increased earnings, consistent with the studies using enforceability indices.[502]

Some commenters opposing the rule asserted that Hawaii's prohibition of non-competes in the technology industry may not have covered the workers claimed (in particular, omitting workers in the broadcast industry).[503] These commenters also asserted that Hawaii simultaneously banned non-solicitation clauses.

The Commission finds the study of Hawaii's non-compete ban to be informative, despite these limitations. First, any workers omitted from coverage by the statute, but considered as affected in the study, would lead to a phenomenon known as "attenuation bias," which causes estimated effects to underestimate the true impact.[504] Second, the non-solicitation agreements banned by the Hawaii law were *non-solicitation of coworker* agreements (otherwise known as non-recruitment agreements)—agreements under which workers are barred from recruiting former coworkers, as opposed to *non-solicitation of client* agreements, under which workers are barred from soliciting former clients. While non-solicitation of coworker agreements may have a marginal impact on workers' earnings (*e.g.*, in situations in which workers only find out about job opportunities via past coworkers), the Commission does not find it likely that they have a major effect on workers' earnings. They may prevent some workers from hearing about some job opportunities, but unlike non-competes, they do not prevent workers from taking those opportunities. And unlike non-solicitation of client agreements, they do not frustrate workers' ability to build up a client base after moving to a new employer. The Commission therefore finds it likely that much of the impact identified in the study of the Hawaii law is due to non-competes.

---

[502] Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach* (2024),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674.
[503] Balasubramanian et al., *supra* note 451.
[504] Attenuation bias occurs when the independent variable (here, whether a worker is covered by the ban) is measured with error.

The Commission also notes that the Hawaii study is directionally consistent with the results from other more robust studies that use different methodologies.

Some commenters opposing the rule argued that the impact of Oregon banning non-competes for low-wage workers may have been limited because the law did not affect existing non-competes; because non-competes were already disfavored in Oregon before the law change; and because the law included multiple carve-outs. Commenters also argued the negative effects on earnings found in Oregon may have been confounded by the Great Recession.

The Commission finds that those concerns are not a compelling reason to discard the study. The study carefully examines multiple comparisons of workers within Oregon and across States. The results therefore cannot be explained by a differential response of Oregon to the Great Recession, a differential response of hourly workers to the Great Recession, or even a differential response of hourly workers in Oregon to the Great Recession. The Commission also does not believe that the study is undermined because the law did not affect existing non-competes and included multiple carve-outs, or because non-competes were disfavored in Oregon before the law changed. These factors likely mitigated the magnitude of the law's negative effect on earnings, rather than exaggerating it.

Some commenters opposing the rule argued that Johnson, Lavetti, and Lipsitz[505] claim that "[t]he overall effect of [non-compete] enforceability on earnings is ambiguous," and that this undermines the Commission's preliminary findings. However, these commenters take this quote out of context. The authors were referring to a theoretical model, not to the empirical work in their paper. When economists do empirical research, they often begin by constructing a theoretical model and describing what the theory would predict; they then describe their

---

[505] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2021) at 11; https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.

empirical findings, which may show a different result. The authors described that it is unclear, theoretically, whether non-compete enforceability would increase or decrease earnings. However, the empirical findings of the study were clear: as the authors stated, "We find that increases in [non-compete] enforceability decrease workers' earnings."[506] The fact that the authors described the theoretical results of a hypothesized model as ambiguous does not undermine the fact that their study had clear empirical results.

Some healthcare businesses and trade organizations opposing the rule argued that, without non-competes, physician shortages would increase physicians' wages beyond what the commenters view as fair. The commenters provided no empirical evidence to support these assertions, and the Commission is unaware of any such evidence. Contrary to commenters' claim that the rule would increase physicians' earnings beyond a "fair" level, the weight of the evidence indicates that the final rule will lead to fairer wages by prohibiting a practice that suppresses workers' earnings by preventing competition; that is, the final rule will simply help ensure that wages are determined via fair competition. The Commission also notes that it received a large number of comments from physicians and other healthcare workers stating that non-competes exacerbate physician shortages.[507]

One commenter opposing the rule criticized the analysis in the Johnson, Lavetti, and Lipsitz study, suggesting that data on where individuals live are not necessarily indicative of where individuals work, and that identified spillover effects may simply be due to cross-border commuters. The Commission disagrees, because, as noted, the study considers whether the workers are subject to enforceable non-competes based on their work location.

A commenter also argued that if the absence of non-competes helped workers, one would

---

[506] *Id.* at 2.
[507] *See* Part IV.B.3.b.iv for a more detailed summary of these comments.

expect California, North Dakota, and Oklahoma to have the highest median incomes among all the States. The Commission believes this expectation is inapt. Given the evidence that non-competes suppress workers' earnings, earnings in California, North Dakota, and Oklahoma are likely higher than they would be if non-competes were enforceable, but there is no reason to expect they would necessarily be higher than all other States.

One commenter opposing the rule asserted that the Commission's citation of one study in the NPRM was insufficient to show that non-competes are directly tied to discriminatory behavior by employers, or that non-competes worsen racial or gender wage gaps. The Commission does not rest its finding in this final rule that non-competes tend to negatively affect competitive conditions on findings of increased discriminatory behavior or exacerbation of gender and wage gaps. The Commission merely notes that there are two empirical studies—described under "Evidence of suppressed earnings"—that find that non-competes do, in fact, exacerbate earnings gaps.

One commenter opposing the rule stated that closing racial and gender wage gaps may harm racial minorities and women if their wages were to fall in absolute terms. Another commenter argued that the proposed rule would reduce capital investment and output, which would decrease White male workers' wages. In response, the Commission notes that the study by Johnson, Lavetti, and Lipsitz shows that the impact of a decrease in non-compete enforceability on earnings is positive for workers in each of these groups.

The empirical evidence makes clear that, by restricting a worker's ability to leave their current job to work for a competitor or to start a competing business, non-competes reduce workers' earnings, supporting the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets.

### iii.  Non-competes reduce job quality.

In the NPRM, the Commission recognized that non-competes may also negatively affect working conditions, *i.e.*, job quality,[508] although this had not been studied in the empirical literature (likely because it is harder to quantify). Competition in labor markets yields not only higher earnings for workers, but also better working conditions.[509] In a well-functioning labor market, workers who are subject to poor working conditions can offer their labor services to an employer with better working conditions. Such workers can also start businesses, giving them more control over working conditions. Non-competes frustrate this competitive process by restricting a worker's ability to switch jobs or start a business. Furthermore, in a well-functioning labor market, employers compete to retain their workers by improving working conditions. Where workers are locked into a job—because their alternative employment options are restricted—those competitive forces are diminished and working conditions can suffer. The Commission accordingly sought comment on this topic.

In response, thousands of workers with non-competes described how, by frustrating these competitive processes, non-competes prevent them from escaping poor working conditions or demanding better working conditions. Based on the large number of comments the Commission received on this issue and the wide variety of negative and severe impacts commenters described, the Commission finds that, in addition to suppressing earnings, non-competes negatively affect working conditions for a significant number of workers.

The Commission finds that the effects of non-competes on labor mobility and workers' earnings are sufficient, standing alone, to support its finding that non-competes with workers other than senior executives tend to negatively affect competitive conditions in labor markets.

---

[508] NPRM at 3504.
[509] Treasury Labor Market Competition Report at i.

However, the Commission believes its finding that non-competes are an unfair method of competition is further bolstered by this strong qualitative evidence related to non-competes degrading working conditions.

Numerous workers and worker advocacy organizations described how non-competes compel workers to endure jobs with poor working conditions. Illustrative examples of these comments include the following:

- In March 2018, I was fired from a job in local news for refusing to go into an unsafe situation. I'd recently received a letter from a man threatening to kidnap me. When my boss decided he would still send me out alone in the field, I fought him on it, lost, and was terminated. Three weeks later, I found out I was pregnant. Unable to work in my field because of a noncompete enforced even AFTER I was terminated, I had no choice but to apply for WIC and government assistance, and work at a retail job making half my previous salary. I wanted to work. I wanted money to support my child. I wanted money to move closer to home, to escape a domestic violence situation. My noncompete kept me in a horrible spot, and nearly cost me my life.[510]

- I started my first job as a Nurse Practitioner in 2019. All positions I interviewed for required a non-compete. . . . In my case, I work for an employer that is hostile, discriminated against me during pregnancy and maternity leave and has raised his voice at me in meetings. He told me I was lucky to even have a job after becoming pregnant. I learned after starting at the practice that he has shown this pattern before with previous employees. I say this because all of these above-mentioned reasons are why I have the right to want to quit my job and move on. I desperately want to leave and start another job but I can't because of the non compete. I feel like a prisoner to my job. I feel depressed in my work conditions and I feel like I have no way out.[511]

- I'm a barber and violated a non-compete about 6 months ago. . . . I worked for my previous employer for two years in a toxic environment. I told my employer how work was affecting my home life on more than one occasion and she did nothing. . . . How was I to know that I would be working in a toxic environment when I applied? So ultimately, I decided in order to be happy and make a living wage, I'd have no choice but to violate my non-compete. She came after me in no time flat. Now I'm paying legal fees and at risk of going to court and losing my job for 6 more months. . . . [I]f I'm working in poor working conditions, I should be able to work where I please. For two years, my job and employer affected my mental health. I chose to take anti-depressants after things got bad at work, upped my dosage twice as work became progressively worse and since I've left, I've stopped taking my medication.[512]

---

[510] Individual commenter, FTC-2023-0007-12813.
[511] Individual commenter, FTC-2023-0007-4989.
[512] Individual commenter, FTC-2023-0007-3323.

- I am a commissioned employee in the mortgage world, and I had a non-compete with my former company in Ohio. Near the end of my time at this company, they merged with another company and put the new company in charge of the sales staff. It was miserable. We started having issues, even with having basic supplies, and it went from just harming me to harming my ability to get business complete, which harms the consumer. I left and I was sued for a three year period. . . . I really do not feel that [non-competes] should be allowed. You are stuck at employers and they can treat you in any manner that they please because they know that they can make your life a living hell if you leave them.[513]

- Like many new graduates in the medical field, I signed on with a company that made numerous empty promises. . . . What I was not prepared for, was the company's strategic increase in facilities in which I was to perform services under this contract. In the short span of 2 years, I did neurophysiological monitoring for 24 facilities . . . . When working conditions fell apart regardless of my requests for adequate sleep following 36 hours straight of working on call at my designated stroke hospital, time for meals or breaks within 18+ hour work days, and a reasonable travel distance within the area the company demanded I relocate to, I was met with threats from HR regarding my non-compete if I were to leave. . . . Working conditions became so intense, I was placed on migraine medications at the recommendations of my doctor and required three separate trips in the ER for medical conditions related to stress, inability to eat or drink while tied within tens of hours long surgeries . . . . Again I was met with threats from HR and now their legal team.[514]

Many commenters stated that non-competes harm working conditions for lower-wage workers. However, there were many commenters in higher-wage jobs who also stated that non-competes harmed their working conditions. For example, numerous physicians explained that they were trapped in jobs with poor working conditions because of non-competes. Many of these physicians described how non-competes accelerate burnout in their profession by making it harder for workers to escape bad working conditions or demand better working conditions. Many commenters recounted how they left poor work environments but non-competes harmed them by forcing them to leave their field, move out of the area where they lived, or spend time and money defending themselves from legal action. Many commenters argued that prohibiting non-competes would increase workers' bargaining power and in turn incentivize employers to

[513] Individual commenter, FTC-2023-0007-3955.
[514] Individual commenter, FTC-2023-0007-1252.

provide better work environments.

Workers in both high-wage and low-wage professions, as well as worker advocacy groups, stated that by diminishing workers' competitive alternatives, non-competes keep workers trapped in jobs where they experience dangerous, abusive, or toxic conditions; discrimination; sexual harassment; and other forms of harassment. These commenters also described how non-competes trap some workers in jobs where their employer commits wage and hour violations, such as wage theft, as employers that use non-competes can insulate themselves from the free and fair functioning of competitive markets and are thus more likely to be able to steal worker wages with impunity. Several commenters said they were unable to receive benefits because a non-compete rendered them unable to switch to a job with better benefits or rendered them unable to leave their job when their employer took their benefits away. A professional membership network for survivors of human trafficking explained that traffickers masquerading as legitimate businesses use non-competes to prevent trafficking victims from leaving.

Some workers and advocacy organizations stated that non-competes increase the potential for harm from retaliation. These commenters stated that restricting a worker's employment opportunities makes it even harder for workers to find new jobs after experiencing retaliation. These commenters argued that this discourages workers from reporting fraud, harassment, discrimination, or labor violations. A labor union commented that, by making it harder for workers to find new jobs, non-competes can deter unionization and chill activities protected by the National Labor Relations Act, including activities to address unsafe, unfair, or unsatisfactory working conditions. According to a trade organization of attorneys, whistleblower protections may come too late for a fired whistleblower who cannot obtain another job because of a non-compete. Several commenters provided survey or case evidence showing that workers

who report sexual harassment, wage theft, or poor working conditions are frequently retaliated against, including by being fired.[515] These commenters stated that, because non-competes make it harder for these workers to find new jobs, non-competes decrease the likelihood that workers report these kinds of harms.

Many workers described how, by limiting their ability to get out of harmful workplace environments, non-competes contributed to stress-related physical and mental health problems. Many commenters, particularly in the healthcare profession, stated that suicide is a major problem in their profession and described non-competes as one of the stressors, because non-competes make it harder to leave jobs with unsustainable demands, leaving workers feeling trapped.

While thousands of commenters described, often in personal terms, how non-competes have negatively affected their working conditions, the Commission received few comments from workers or worker advocates stating that non-competes improved working conditions. The few comments received stated that workers who remain with an employer can be harmed by departing and competing colleagues, via increased workloads or harm to their employer.

Taken together, these comments provide strong qualitative evidence that non-competes degrade working conditions, which supports the Commission's finding that non-competes tend to negatively affect competition in labor markets.

### b. Non-competes tend to negatively affect competitive conditions in product and service markets.

---

[515] For example, the National Women's Law Center, which operates and administers the TIME'S UP Legal Defense Fund, reported that among individuals who contacted the Fund to request legal assistance related to sexual harassment in the workplace, 72% reported facing retaliation, and, among those, 36% had been fired. Comment of Nat'l Women's L. Ctr., FTC-2023-0007-20297 at 5 (citing Jasmine Tucker & Jennifer Mondino, *Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund*, 4 (Oct. 2020), https://nwlc.org/wp-content/uploads/2020/10/NWLC-Intake-Report_FINAL_2020-10-13.pdf).

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes tend to negatively affect competitive conditions in markets for products and services by inhibiting new business formation and innovation.

New businesses are formed when new firms are founded by entrepreneurs or spun off from existing firms. New business formation increases competition by reducing concentration, bringing new ideas to market, and forcing incumbent firms to respond to new firms' ideas instead of stagnating. New businesses disproportionately create new jobs and are, as a group, more resilient to economic downturns.[516] With respect to spinoffs, research shows that spinoffs within the same industry are highly successful relative to other entrepreneurial ventures.[517]

Non-competes, however, tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation in two ways. First, since many new businesses are formed by workers who leave their jobs to start firms in the same industry, non-competes reduce the number of new businesses that are formed in the first place.[518] Second, non-competes deter potential entrepreneurs from starting or spinning off new businesses—and firms from expanding their businesses—by locking up talented workers.[519] Non-competes thus create substantial barriers to potential new entrants into markets and also stymie competitors' ability to grow by making it difficult for those entrants to find skilled workers.

Innovation refers to the process by which new ideas result in new products or services or improvements to existing products or services. Innovation may directly improve economic

---

[516] *See, e.g.*, *The Importance of Young Firms for Economic Growth*, Policy Brief, Ewing Marion Kauffman Foundation (Sept. 24, 2015).
[517] Aaron K. Chatterji, *Spawned With a Silver Spoon? Entrepreneurial Performance and Innovation in the Medical Device Industry*, 30 Strategic Mgmt. J. 185 (2009).
[518] *See, e.g.*, Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552 (2018).
[519] *See, e.g.*, Shi, *supra* note 84.

outcomes by increasing product quality or decreasing prices, and innovation by one firm may also prompt other firms to compete and improve their own products and services. However, non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting innovation.

Non-competes tend to reduce innovation in three ways. First, non-competes prevent workers from starting businesses in which they can pursue innovative new ideas.[520] Second, non-competes inhibit efficient matching between workers and firms.[521] Where workers are less able to match with jobs that maximize their talents, employers' ability to innovate is constrained. Third, and relatedly, non-competes reduce the movement of workers between firms.[522] This decreases knowledge flow between firms, which limits the cross-pollination of innovative ideas.

As described in Parts IV.B.3.b.i and ii, the Commission finds that the effects of non-competes on new business formation and innovation are sufficient to support its finding that non-competes tend to negatively affect competitive conditions in product and service markets. In addition, as described in Parts IV.B.3.b.iii and iv, the Commission believes this finding is further bolstered by evidence that non-competes increase concentration and consumer prices, as well as evidence that non-competes reduce product quality.

The Commission's findings relating to new business formation and innovation are principally based on the empirical evidence described in Parts IV.B.3.b.i and ii. However, the comments provide strong qualitative evidence that bolsters these findings. Furthermore, the Commission notes that the legal standard for an unfair method of competition under section 5

---

[520] *See* Part IV.B.3.b.i.
[521] *See* Part IV.B.3.a. While the Commission focuses on the most direct negative effects on competition in product and service markets in this Part IV.B.3.b, inefficient matching between workers and firms may have additional negative effects, including on output.
[522] *See* Part IV.B.3.a.i.

requires only a *tendency* to negatively affect competitive conditions; empirical evidence of actual harm is not necessary to establish that conduct is an unfair method of competition. In the case of non-competes, however, there is extensive empirical evidence, as well as extensive corroborating public comments, that non-competes negatively affect competitive conditions in product and service markets.

### i. Non-competes inhibit new business formation.

***Evidence of inhibited new business formation***

The Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation. The weight of the empirical evidence establishes that when non-competes become more enforceable, the rate of new business formation (*i.e.*, the number of new businesses formed) declines.

Several empirical studies assess the effects of non-competes on the rate of new business formation. A study conducted by Jessica Jeffers examines several State law changes in the technology sector and the professional, scientific, and technical services sector and finds a decline in new firm entry when non-competes become more enforceable. Jeffers finds that as non-competes became more enforceable, the entry rate of new firms decreases substantially.[523] Jeffers' study uses several changes in non-compete enforceability that are measured in a binary fashion. While this study therefore does not satisfy all the principles outlined in Part IV.A.2, it satisfies most of them and is accordingly quite robust and weighted highly.

Another study, conducted by Matt Marx, examines the impact of several changes in non-compete enforceability between 1991 and 2014 on new business formation, and likewise finds a negative effect of non-competes on new business formation.[524] Marx finds that, when non-

---

[523] Jeffers, *supra* note at 450. The 2024 version of Jeffers' study reports a 7% impact.
[524] Matt Marx, *Employee Non-Compete Agreements, Gender, and Entrepreneurship*, 33 Org. Sci. 1756 (2022).

competes become more enforceable, men are less likely to found a rival startup after leaving their employer, that women are even less likely to do so (15% less likely than men), and that the difference is statistically significant.[525] This study therefore supports both that non-competes inhibit new business formation and that non-competes tend to have more negative impacts for women than for men. Marx uses several changes in non-compete enforceability measured in a continuous fashion. The study therefore satisfies the principles outlined in Part IV.A.2 and is weighted highly.

In addition, Johnson, Lipsitz, and Pei analyze the extent to which non-compete enforceability affects the rate of firm entry in high-tech industries. They find that an average increase in non-compete enforceability decreases the establishment entry rate by 3.2%.[526] Outside of examining only innovative industries, this study's methodology is otherwise strong, and the study is therefore weighted highly. While this study uses multiple changes in a granular measure of non-compete enforceability, a quite robust methodology, the study is limited to high-tech industries.

In addition, a study conducted by Can and Fossen indicates that decreases in enforceability of non-competes in Utah and Massachusetts increased entrepreneurship among low-wage workers.[527] Can and Fossen examine just two changes in non-compete enforceability, measured in a binary fashion, and the study is therefore given slightly less weight than studies which examine more changes or use a more granular measure of enforceability. The study corroborates the results of studies using these stronger methodologies.

---

[525] *Id.* at 1763.
[526] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non-Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36.
[527] Ege Can and Frank M. Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. of Entrepreneurship and Pub. Pol. 223 (2022).

Furthermore, a study conducted by Benjamin Glasner focused on high-tech industries finds that technology workers increased entrepreneurial activity in Hawaii after non-competes were restricted, but finds no effect on entrepreneurial activity from Oregon's restriction on non-competes with low-wage workers.[528] Similar to the study by Can and Fossen, this study by Glasner uses two changes in non-compete enforceability measured in a binary fashion. Additionally, a study published by Stuart and Sorenson shows that increased enforceability of non-competes decreases the amount by which firm acquisitions and IPOs induce additional local business formation.[529] This study uses cross-sectional variation in non-compete enforceability measured in a binary fashion, and studying the amount by which firm acquisitions and IPOs induce additional local business formation does not cover all entrepreneurship. These studies are thus given more limited weight, but generally are in line with other evidence that non-competes reduce new business formation and innovation.

Additionally, a study conducted by Starr, Balasubramanian, and Sakakibara analyzes the effect of non-compete enforceability on spinouts (*i.e.*, when a firm creates a new business by splitting off part of its existing business). The authors find that, when non-compete enforceability increases by one standard deviation, the rate of spinouts within the same industry decreases by 32.5%—a major decrease in new business formation.[530] Research shows that spinouts within the same industry are highly successful, on average, when compared with typical entrepreneurial ventures.[531] This study uses cross-sectional differences in non-compete enforceability, measured

---

[528] Benjamin Glasner, *The Effects of Noncompete Agreement Reforms on Business Formation: A Comparison of Hawaii and Oregon*, Econ. Innovation Group White Paper (2023), https://eig.org/noncompetes-research-note/.
[529] Toby E. Stuart & Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin. Sci. Q. 175 (2003).
[530] Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 561. 32.5% is calculated as 0.0013/0.004, where 0.0013 is the coefficient reported in Table 2, Column 6, and 0.004 is the mean WSO entry rate reported in Table 1 for "nonlaw" firms.
[531] For reviews of the literature, *see, e.g.*, Steven Klepper, *Spinoffs: A Review and Synthesis*, 6 European Mgmt. Rev.

in a continuous fashion, though it attempts to avoid problems related to the use of cross-sectional differences in non-compete enforceability by using law firms—which likely do not use non-competes due to ethical limits in the legal profession[532]—as a control group. The Commission therefore gives this study somewhat less weight than studies of changes in non-compete enforceability, though the findings corroborate the findings of the studies by Jeffers and Marx.

In addition, a study by Salomé Baslandze shows that non-competes reduce new business formation, finding that greater non-compete enforceability inhibits entry by spinouts founded by former employees of existing firms.[533] Baslandze notes that spinouts tend to innovate more and are relatively higher quality than other new firms. This study examines changes in non-compete enforceability on a continuous measure but assumes that changes over a 19-year period occur smoothly over time instead of identifying exactly when the legal changes were made. While this study uses changes in non-compete enforceability and corroborates the findings of the aforementioned studies on new business formation, the assumption regarding the timing of changes yields an imprecise measure of non-compete enforceability over time. The Commission therefore gives this study somewhat less weight than studies which precisely identify the timing of changes in non-compete enforceability.

Finally, in a 2011 study, Samila and Sorenson find that when non-competes are more enforceable, rates of entrepreneurship, patenting, and employment growth slow. They find that an increase in venture capital funding creates three times as many new firms where non-

---

159 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions*, in Handbook of Entrepreneurship Research 81 (2005).
[532] *See* Am. Bar Ass'n, Model Rule 5.6, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_5_6_restrictions_on_rights_to_practice/.
[533] Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth*, Fed. Res. Bank of Atlanta Working Paper No. 2022-10 (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4277191.

competes are unenforceable, compared to where non-competes are enforceable.[534] This study uses cross-sectional variation in non-compete enforceability along two dimensions, both of which are measured in a binary fashion. Due to this measurement, the Commission gives this study less weight, though its results corroborate the findings of the other studies on new business formation.

There are two additional studies that the Commission gives minimal weight. One of these studies estimates that the job creation rate at startups increased by 7.8% when Michigan increased non-compete enforceability.[535] However, the Commission places less weight on this study than the studies discussed previously because it examines only one legal change in one State and because the change to non-compete enforceability was accompanied by several other simultaneous changes to Michigan's antitrust laws. Thus, it is not possible to isolate the effect of the change in non-compete enforceability standing alone.

The other study finds mixed effects of non-compete enforceability on the entry of businesses into Florida. The study examines a legal change in Florida which made non-competes more enforceable. They find that larger businesses entered the State more frequently (by 8.5%), but smaller businesses entered less frequently (by 5.6%) following the change.[536] Similarly, Kang and Fleming find that employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change.[537] This study examines a single change in non-compete enforceability. However, the Commission gives this study

---

[534] Samila & Sorenson find that a 1% increase in venture capital funding increased the number of new firms by 0.8% when non-competes were enforceable, and by 2.3% when non-competes were not enforceable. Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425, 432 (2011). The values are calculated as 0.8%=$e^{0.00755}$-1 and 2.3%=$e^{0.00755+0.0155}$-1, respectively.

[535] Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, Fed. Res. Bank of Phila. Working Paper No. 21-26 at 16 (2021).

[536] Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663, 673 (2020).

[537] *Id.* at 674. The value is calculated as 15.8%=$e^{0.1468}$-1.

minimal weight because the study does not examine new business formation specifically; instead, it assesses the number of "business entries," which does not necessarily reflect new business formation because it also captures existing businesses moving to the State.

Additional research analyzes the effects of non-competes on the number of jobs created by new businesses.[538] While the research described previously shows that non-competes inhibit the rate of new business formation, this research indicates that even where new businesses are created, these new businesses have fewer workers where non-competes are more enforceable. This evidence suggests that non-competes not only prevent small businesses from being formed, they also hinder entrepreneurship by tending to reduce the number of employees that new firms are able to hire.

In addition to analyzing the rate of firm entry in high-tech industries, Johnson, Lipsitz, and Pei analyzes the number of jobs created at newly founded firms in innovative industries.[539] Using evidence from several State law changes, the authors find that increases in non-compete enforceability lead to a reduction in the number of jobs created at newly founded firms in innovative industries (though not necessarily across all industries or all types of firms) by 7.2%.[540]

A study by Starr, Balasubramanian, and Sakakibara finds that increases in non-compete enforceability decreased average per-firm employment at new firms.[541] In the NPRM, the Commission stated that this study found that several increases in non-compete enforceability

---

[538] In the NPRM, the Commission stated that the evidence relating to the effects of non-competes on job creation was inconclusive. However, in the final rule, the Commission does not make a separate finding that non-competes reduce job creation. Instead, it cites the research described herein—which relates solely to job creation at newly founded firms—to support its finding that non-competes inhibit new business formation.

[539] Johnson, Lipsitz, and Pei, *supra* note 526 at 36.

[540] *Id*. While this study satisfies each of the other metrics outlined in Part IV.A.2, the sample is restricted to firms in innovative industries, and therefore the outcome of interest is not reflective of the entire population.

[541] Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 552.

were associated with a 1.4% increase in average per-firm employment at new firms.[542] However, upon further review of the study, the Commission interprets this study as finding that increases in non-compete enforceability decreased average per-firm employment at new firms—both for spinouts within the same industry and spinouts into a different industry.[543] For spinouts into a different industry, average per-firm employment at the time of founding decreases by 1.4% due to greater non-compete enforceability. For spinouts into the same industry, average per-firm employment decreases by 0.3%.[544] At seven years after founding, the results are similar: spinouts into a different industry have average per-firm employment that is 1.5% lower due to greater non-compete enforceability, while spinouts into the same industry have per-firm employment that is 0.7% lower.[545] The Commission notes that this study compares States with different levels of enforceability, using law firms as a control group, instead of considering changes in non-compete enforceability. It is therefore given less weight than studies with stronger methodologies.[546]

***Comments pertaining to inhibited new business formation and the Commission's responses***

     The Commission's finding that non-competes inhibit new business formation is

---

[542] NPRM at 3488-89.

[543] While this study satisfies some of the principles for robust design outlined in Part IV.A.2, the Commission notes that average per-firm employment does not precisely correspond to the economic outcome of interest, which is overall employment or job creation.

[544] Calculated as 1.4%-1.1%, based on the effect for non-within-industry spinouts (1.4%) and the relative impact on within-industry spinouts compared with non-within-industry spinouts (-1.1%). *See* Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 561.

[545] Calculated as 1.5%-0.7%, based on the effect for non-within-industry spinouts (1.5%) and the relative impact on within-industry spinouts compared with non-within-industry spinouts (-0.8%). *See id.* at 563.

[546] There are also two studies analyzing how non-competes affect job creation or employment generally. Neither study relates to new business formation specifically. Goudou finds a decreased job creation rate from an increase in non-compete enforceability in Florida. Felicien Goudou, *The Employment Effects of Non-compete Contracts: Job Retention versus Job Creation* (2023), https://www.jesugogoudou.me/uploads/JMP_Felicien_G.pdf. This study considers just one change in non-compete enforceability, and is therefore given less weight, though the results corroborate findings in papers which satisfy more of the guideposts in Part IV.A.2. Additionally, the 2023 version of Johnson, Lavetti, & Lipsitz, *supra* note 388, finds that increased non-compete enforceability reduces employment by 1.9%, though they do not estimate the impact on job creation directly. Rather, the authors look only at the closely related metric of changes in overall employment. This study otherwise has a strong methodology, as discussed in Part IV.B.3.a.ii.

principally based on the empirical evidence described in this Part IV.B.3.b.i. However, the comments provide strong qualitative evidence that bolsters this finding.

Hundreds of commenters agreed with the Commission's preliminary finding that non-competes reduce new business formation. Illustrative examples of comments the Commission received include the following:

- I am a hairstylist . . . and have been with the company for 11 years. Our work conditions have changed drastically over the years and Covid has really sent us on a sharp decline. It is not the same salon I signed on to work for. That being said, a few coworkers want to open a salon and take some of us with them to bring back the caliber of service we want to give our clients. Our non-compete contracts state that we can't work within 30 miles of this salon. We didn't expect that standards would drop so low and they would raise prices so high that we lost so many clients. . . . We have all had enough of the toxic environment and need to be free of this unfair contract.[547]

- I am a veterinarian that has had to suffer under non-compete clauses my entire career. I have had to sell my home and relocate several times including moving out of State due to non-compete clauses. I'm currently stuck in a [non-compete covering a] 30 mile radius of all 4 practices of a group of hospitals I work for. This basically keeps me from working in an enormous area. I had to sign it due to circumstances out of my control and they took advantage of my situation. I recently tried to start my own business, not related to the type of practice that I have the non-compete clause with, and had to abandon the idea because I couldn't get funding without my current employer releasing me from the contract or by relocating again out of the huge area of non-compete.[548]

- We own a small family practice in urban Wisconsin. I previously was employed by a large healthcare organization and burned out. When I left to star[t] my own business, I was restricted from working close by, by a non-compete. I spent $24,000 [in] legal fees challenging this successfully. . . . Now as a business owner for 5 years, we have the opportunity to hire some physician assistants who have been terminated without cause from my prior employer. I am unable to do so because they also had to sign non-competes. I have seen many disgruntled patients who have delayed care because of this.[549]

- I am aesthetic nurse practitioner wanting to start my own business but I am tied to a 2 year 10 mile non compete. I was basically obligated to sign the non-compete when I needed to reduce my hours to finish my master's degree (that I paid for and they wanted me to get). I feel forced to stay at a job that is not paying me what I am worth.[550]

---

[547] Individual commenter, FTC-2023-0007-3299.
[548] Individual commenter, FTC-2023-0007-1448.
[549] Comment of Three Oaks Health, FTC-2023-0007-1397.
[550] Individual commenter, FTC-2023-0007-10157.

- I am a licensed social worker with a non-compete which is hindering my employment options. . . . I would like to start my own business as the mental health facility I work for is not supportive of mental health. This rule would be a great benefit for mental health professionals and those seeking quality mental health services.[551]

- As a recently graduated physician, I wanted to start my own practice and become a small business owner. However, I also needed a source of income to start out and wanted to work part time at a local hospital for income and benefits. However, due to a non-compete clause in their contracts, I could not start my own business and practice in the same city if I was to work with them. This hindered my ability to work as much as I wanted (ended up having to work as an independent contractor for significantly less shifts per month and no benefits), and made it more difficult to get my business off the ground due to expenses for providing my own benefits. Banning non-compete clauses would significantly help the ability for citizens to pursue starting small businesses or other work to increase their income and prosperity.[552]

- Mr. Z had worked for a company for over 15 years installing windshields in vehicles. He was a lower-level employee making $18.50 an hour and did not learn any trade secrets or confidential information. After years of working for the company the employer refused to raise his wages despite his experience, so he decided to start his own business. Shortly after giving notice and beginning his new endeavor, he received a letter from his previous employer informing him that he was in breach of his non-compete agreement and the employer would enforce it if he continued with his business plan.[553]

- Non-competes have prohibited me from making a living as a fitness and wellness professional to such an extent, that it hurt me economically. I opened up my own business that was different than my previous employer, even though it was different and I told him I was going to focus on a different area in wellness, my previous employer sued me. I ended up having to hire an attorney to defend myself and when it was all said and done, I spent close to 12,000 in fees and penalties.[554]

- Non compete agreements are detrimental to the average worker, preventing them from pursuing better paying job offers or from starting their own business in the same industry. I am directly affected by a non-compete clause I had signed as part of a job acceptance. I am now forming my own business in the same industry as my employer, and cannot do business within a 50-mile radius of my employer. That radius covers the hometown I live in. Even though we are in the same industry, we have very different target markets.[555]

As these comment excerpts reflect, many potential entrepreneurs wrote to the

---

[551] Individual commenter, FTC-2023-0007-11922.
[552] Individual commenter, FTC-2023-0007-11777.
[553] Comment of N.W. Workers' Justice Project, FTC-2023-0007-15199 (discussing a client).
[554] Individual commenter, FTC-2023-0007-12904.
[555] Individual commenter, FTC-2023-0007-12697.

Commission to describe how they wanted to strike out on their own, but a non-compete preventing them from doing so. These comments indicate that non-competes have deprived communities of homegrown businesses—with respect to everything ranging from tech companies, to hair salons, to physician practices, and many more types of firms. This deprives markets of competing firms that can reduce concentration—which in turn has benefits for lowering prices and raising the quality of products and services, and increasing innovation in bringing new ideas to market—as well as depriving communities of opportunities for new job creation.

Even where entrepreneurs were able to start businesses, they explained how non-competes prevented them from hiring talented workers and made it harder for their nascent businesses to grow and thrive. Many other commenters described personal experiences in which their newly formed businesses were threatened by litigation costs related to non-competes. Other commenters stated that the threat of litigation related to non-competes increases the risk and cost of starting a new business, particularly if that business intends to compete against a large incumbent firm. One commenter stated that incumbent firms can use non-compete litigation as a mechanism to chill startup formation where startups lack the resources to contest a non-compete.

Numerous small businesses and organizations representing small businesses submitted comments expressing support for the proposed rule and describing how it would help small business owners. These commenters contend that categorically prohibiting non-competes will empower small businesses by providing them with new access to critical talent and will drive small business creation as entrepreneurial employees will be free to compete against their former employers. Many small businesses also argued that non-competes can hinder small business formation and can keep small businesses from growing once they are formed. The extensive

comments the Commission received from small businesses are also addressed in Part XI.C.

Some small businesses said they spent tens or hundreds of thousands of dollars defending themselves from non-compete lawsuits. A one-person surveying firm said it has to regularly turn down work because of the former employer's threat to sue over a non-compete. A small, five-worker firm said it was sued by a billion-dollar company for violating a non-compete despite the fact that the firm waited out the non-compete period and did not use proprietary information or pursue the former employer's customers; it fears the legal fees will force it out of business. A legal aid organization relayed the story of a client, a self-employed beauty worker who was unable to provide their service during a non-compete lawsuit despite working outside the non-compete geographic radius. The CEO of one small transport and logistics company said a ban would remove a tool used mostly by the largest companies in each industry to maintain their market dominance, as small competitors cannot match their legal budgets. Further, many workers said they would open their own business if non-competes were banned.

Many small businesses shared their experiences of how non-competes have made hiring more difficult. For example, a small physician practice said non-competes made it difficult to compete with larger practices to attract and retain physicians. A small business and a medical association said small businesses could not afford a lawsuit when hiring workers. An IT startup tried to hire an executive who had retired from a large firm, but the large firm sued the startup to enforce what the startup said was an unenforceable non-compete. According to the startup, because a lawsuit would have cost up to $200,000, it was forced to settle and could not work with numerous potential clients, and its growth was significantly slowed. It stated that it continues to turn away many potential hires to avoid being sued over non-competes.

Other commenters raised additional issues relevant to hiring. According to one

176

technology startup organization, the inability to assemble the right team is a major reason startups fail, and small businesses lose opportunities because they must avoid hiring workers who are subject to even unenforceable non-competes. That organization also said startups currently face legal and time costs from navigating the patchwork and complexity of State non-compete laws, especially when trying to determine if a potential hire's non-compete is enforceable; the time and expense of navigating this landscape will thus often cause the startups to forego that hire. That organization said some non-competes prevent experienced workers from counseling, advising, or investing in startups, and such mentoring can double a startup's survival rate.

Several self-identified entrepreneurs commented that because of their non-competes, they feared not being able to operate, build, or expand their business. Numerous workers reported that they wanted to or planned to start their own business, but their non-compete made them too afraid to do so. A public policy organization referenced the Census Bureau's Annual Business Survey to argue that a majority of business owners and an even higher majority of Black business owners view starting their own business as the best avenue for their ideas, and that non-competes may prevent these potential entrepreneurs' ideas from coming to market.

Several commenters stated that non-competes make it harder for new businesses to hire workers with relevant experience or industry knowledge. Some commenters argued that non-compete bans, such as in California, have contributed to higher rates of successful start-ups, while new firms in States where non-competes are more enforceable tend to be smaller and are more likely to fail.

In contrast, several commenters opposed to the rule argued that non-competes promote new business formation by protecting small and new firms' investments, knowledge, and

workers from appropriation by dominant firms poaching their employees. Commenters also theorized that, while non-competes directly inhibit employee spinoffs, they may encourage businesses to enter the market by enhancing their ability to protect their investments. As described in Part IV.D.2, the Commission finds that firms have viable alternatives for protecting these investments that burden competition to a less significant degree than non-competes. The Commission further notes that these commenters did not provide evidence to support their assertions.

In addition, when assessing how non-competes affect new business formation, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.B.3.b.i can be occurring at the same time. That is, a non-compete might in some instances be protecting a firm's investments in a manner that is productivity-enhancing holding all else equal. But even that same non-compete can—and certainly non-competes in the aggregate do—inhibit new business formation by prohibiting workers from starting new businesses and by locking up talented workers, preventing the worker from efficiently matching with the job that is the highest and best use of their talents. What the empirical evidence shows is that non-competes reduce new business formation, overall and on net, indicating that the tendency of non-competes to inhibit new business formation more than counteracts any tendency of non-competes to promote new business formation.

Other commenters said non-competes protect firms' value and assets for sale in future acquisitions, which they said drives seed capital investment in start-ups. An investment industry organization commented that private-equity financing, particularly for early-stage companies, often includes non-competes and is used to support growth, in turn increasing competition. In

response, the Commission notes that these commenters provided no empirical evidence that decreases in non-compete enforceability have affected seed capital investment and private-equity financing. Moreover, the Commission notes that there is no indication that small businesses or early-stage companies in States that have banned or limited non-competes have been unable to obtain financing. To the contrary, California, where non-competes are unenforceable, has a thriving start-up culture.

Other commenters addressed empirical research related to new business formation. Some commenters similarly argued that research on the average quality of employee spinouts due to changes in non-compete enforceability may imply negative effects of the rule (*e.g.*, if prohibiting non-competes decreases average employment or average survival rates of new firms). Some commenters also noted that the Baslandze study finds that weaker non-compete enforceability increases the rate at which spinouts form but result in a lower proportion of high-quality spinouts.[556]

In response to these comments, the Commission notes commenters primarily referenced Starr, Balasubramanian, & Sakakibara[557] to support this view. The findings in this study have been misinterpreted by commenters. This study actually finds that spinouts that form when non-compete enforceability is stricter are *lower* quality (*i.e.*, create fewer jobs), but that the effect is less drastic for spinouts within the same industry versus spinouts into different industries. Coupled with other evidence discussed in Part IV.B.3.b.i, the weight of which points to increased job creation due to the rule, the Commission finds that empirical studies have not established that non-competes lead to higher-quality startups or higher-quality spinouts. The Commission also notes that the result in the Baslandze study regarding the quality of spinouts is theoretical, and

---

[556] Baslandze, *supra* note 533 at 40.
[557] Starr, Balasubramanian, & Sakakibara, *supra* note 518.

the study does not test this theory empirically.

Commenters also argued that non-competes may have different effects on different types of workers—for example, across different industries, occupations, or levels of pay—and that these differences may affect the impacts of non-competes on new business formation. In response, the Commission notes that the studies show negative effects across a range of industries and are directionally consistent, even if they do not provide results for all subgroups.

Commenters asserted that non-competes may affect job creation through several different mechanisms. The Commission agrees and finds that, regardless of the specific mechanism, the weight of the evidence indicates that non-competes inhibit job creation.

Commenters opposing the rule also questioned the usefulness of studies of Michigan's law change, given that existing non-competes remained enforceable under the Michigan law; they state that as a result, it would take longer for effects from the law to be realized. As noted under "Evidence of inhibited new business formation," the Commission gives minimal weight to this study, but for other reasons.

In an ex parte communication entered into the record, the author of the study of the Michigan law change expressed concern over the Commission's interpretation of the study.[558] In particular, he stated that his methodology mitigated concerns that the study's findings of an increase in the job creation rate may be due to decreases in that rate's denominator (total employment). While the Commission does not agree with this assessment,[559] the Commission

---

[558] Ex Parte Communication: Email from G. Carlino to E. Wilkins (Jan. 30, 2023),
https://www.ftc.gov/system/files?file=ftc_gov/pdf/P201200NonCompeteNPRMExParteCarlinoRedacted.pdf.
[559] In particular, the long time period and the difference-in-difference methodology used in the study do not mitigate concerns that decreases in employment due to non-compete enforceability could drive increases in the job creation rate. The concern is not that the findings somehow represent effects on anything other than the average job creation rate (as noted by the author in his ex parte communication), but that a rate is comprised of a numerator and denominator, and effects on either may drive effects on the rate as a whole. This concern is shared by at least two empirical studies of non-competes. *See* Johnson, Lavetti, & Lipsitz *supra* note 388 at 19 and Johnson, Lipsitz, & Pei *supra* note 526 at 19.

places less weight on the study for different reasons, as noted.

Some commenters who opposed the rule also addressed the evidence relating to non-competes and job creation, although these commenters generally did not focus on job creation related to new businesses specifically. Some of these commenters asserted that the studies addressed in the NPRM indicated that non-competes are associated with a greater number of jobs available and increased rates of job creation, rather than decreased rates of job creation. Some asserted that the evidence on job creation is mixed and that the issue is understudied. In the NPRM, the Commission stated that the evidence relating to the effects of non-competes on job creation was inconclusive. However, in the final rule, the Commission does not make a separate finding that non-competes reduce job creation. Instead, it cites the research described herein—which relates to job creation at newly founded firms—to support its finding that non-competes inhibit new business formation.

### ii. Non-competes inhibit innovation.

***Evidence of inhibited innovation***

The Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting innovation. Three highly reliable empirical studies find that non-competes reduce innovation.

One such study, a study by Zhaozhao He, finds that the value of patents, relative to the assets of the firm, increases by about 31% when non-compete enforceability decreases.[560] In contrast to some other studies of innovation discussed here, He's study focuses on the value of patents, rather than the mere number of patents. The study does so to mitigate concerns that

---

[560] Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 21 (2023), https://ssrn.com/abstract=3846964. Thirty one percent is calculated as $e^{0..272}$-1.

patenting volume may not represent innovation.[561] The study analyzes the impact of several legal changes to non-compete enforceability, using a binary measure of non-compete enforceability. While this study therefore does not satisfy all the principles outlined in Part IV.A.2, it nonetheless satisfies many of them and contains a reasonably strong methodology.

A second study, by Johnson, Lipsitz, and Pei, finds that increased enforceability of non-competes decreases the rate of "breakthrough" innovations and innovations which make up the most cited patents. This study lends weight to the finding that non-competes harm both the quantity and the quality of innovation.[562] The authors also show that when non-compete enforceability decreases, patenting increases even in industries where most new innovations are patented. These increases imply that the effect is a true increase in innovation, rather than firms substituting between patents and non-competes.

Johnson, Lipsitz, and Pei also show that State-level changes in non-compete policy do not simply reallocate innovative activity across State lines, which would result in no change in innovation at the national level. Instead, they find that decreasing non-compete enforceability, even in one State, increases innovative activity nationally.[563] Johnson, Lipsitz, and Pei's study uses several legal changes to analyze the impact of enforceability. It also uses several metrics of quality and quantity to mitigate concerns over whether patenting is an accurate reflection of innovation, especially in this context. The study thus satisfies all the principles outlined in Part IV.A.2 and is therefore given substantial weight by the Commission.

A third study, by Rockall and Reinmuth, finds that non-competes have a significant negative impact on innovation. They further find that this effect is not driven solely by the entry

---

[561] *Id.* at 17.
[562] Johnson, Lipsitz, & Pei, *supra* note 526.
[563] *Id.*

of new businesses. Their work suggests a potentially central role for knowledge spillovers, which are hampered when worker mobility is diminished. The study uses many changes to non-compete enforceability quantified on a continuous basis and considers several metrics which represent the quantity and quality of patenting, in order to accurately capture the relationship between non-competes and innovation.[564] Similar to the study by Johnson, Lipsitz, and Pei, this study therefore satisfies all the principles described in Part IV.A.2 and is given substantial weight.

The Commission places the greatest weight on the foregoing three studies, in which factors unrelated to the legal changes at issue are less likely to drive the results. There are additional studies that relate to non-competes and innovation, but the Commission gives them less weight.

A study by Samila and Sorenson finds that venture capital induced less patenting by 6.6 percentage points when non-competes are enforceable.[565] However, the authors note that patenting may or may not reflect the true level of innovation, as firms may use patenting as a substitute for non-competes where they seek to protect sensitive information.[566] Furthermore, this study assesses only the quantity of patents and does not take into account the quality of patents, which would be a better proxy for innovation. For this reason, the Commission gives less weight to this study (although its findings are directionally consistent with the first three studies described herein). This study also uses cross-sectional variation in non-compete enforceability, which is measured along two dimensions in a binary fashion. In addition, a study by Gerald Carlino examined how patenting activity in Michigan was affected by an increase in

---

[564] Emma Rockall & Kate Reinmuth, *Protect or Prevent? Non-Compete Agreements and Innovation* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683.
[565] Samila & Sorenson, *supra* note 534 at 432. The value is calculated as $6.6\% = e^{0.0208+0.0630} - e^{0.0208}$.
[566] *Id.*

non-compete enforceability. The study finds that mechanical patenting increased following the change in the law, but that drug patenting fell, and that the quality of computer patents fell.[567] However, the increase in mechanical patenting appears to have primarily occurred approximately 14 years after non-compete enforceability changed. This suggests that some other mechanism may have led to the increase in patenting activity.[568] Moreover, the study uses a single change in non-compete enforceability to generate its results, and it uses only one measure of innovation outside of patent quantity—quality as measured by patent citations. Finally, this study examines a change to non-compete enforceability which was accompanied by several other changes to Michigan's antitrust laws, making it impossible to identify the effect of the change in non-compete enforceability standing alone. For these reasons, the Commission gives less weight to this study.

A study by Clemens Mueller does not estimate the overall impact of non-compete policy on innovation, but instead focuses on career detours of inventors.[569] Mueller shows that inventors are more likely to take "career detours"—that is, to change industries to avoid the reach of their non-compete—when enforceability of non-competes is stricter. Due to the lower match quality between that inventor and their new industry, the innovative productivity of those inventors suffers after they take career detours. However, the Commission assigns this study less weight because, while its methodology satisfies the principles outlined in Part IV.A.2, the study is only informative of the productivity of individuals taking career detours. It does not address whether innovation in the aggregate increases. Mueller uses several changes in non-compete

---

[567] Carlino, *supra* note 535 at 40.
[568] *Id.* at 48.
[569] Clemens Mueller, *Non-Compete Agreements and Labor Allocation Across Product Markets,* Proceedings of the EUROFIDAI-ESSEC Paris December Finance Meeting 2023 (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4283878.

enforceability to generate results, but those changes are measured in binary—rather than continuous—fashion.

Coombs and Taylor examine the impact of non-compete enforceability on innovation. They find that research productivity, as measured by the number of products in biotechnology firms' prospectuses, was lower in California than other States, which they suggest implies that California's ban on non-competes hampers research productivity.[570] However, this study is purely cross-sectional, and results may be due to other differences between California and other States; the Commission accordingly places less weight on this study.

Two additional studies address firm strategies related to innovation. However, the Commission gives them little weight because the outcomes studied do not inform how non-competes would affect the overall level of innovation in the economy. The first, by Raffaele Conti, uses two changes in non-compete enforceability (in Texas and Florida), and indicates that firms engage in riskier strategies with respect to research and development ("R&D") when non-compete enforceability is greater.[571] However, this study does not address whether these riskier strategies lead to greater innovation. The second, by Fenglong Xiao, finds that increases in non-compete enforceability led to increases in exploitative innovation (*i.e.*, innovation which stays within the bounds of the innovating firm's existing competences) in the medical device industry.[572] The study finds this increase in exploitative innovation leads to an increase in the rate at which new medical devices are introduced. However, the study also finds that explorative innovation (*i.e.*, innovation which moves outside those bounds) decreased, and explorative

---

[570] Porcher L. Taylor, III, and Joseph E. Coombs, *Non-Competition Agreements and Research Productivity in the Biotechnology Industry,* 26 Frontiers of Entrepreneurship Rsch. 1 (2006).
[571] Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Risky R&D Strategies?*, 35 Strategic Mgmt. J. 1230 (2014).
[572] Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices*, 51 Rsch. Pol'y 1 (2022).

innovation is the mode of innovation which the empirical literature has found to be associated with high growth firms.[573] The net impact on innovation from this study is thus unclear. The study examines several changes in non-compete enforceability, measured with a binary indicator of non-compete enforceability.

***Comments pertaining to inhibited innovation and the Commission's responses***

The Commission's finding that non-competes inhibit innovation is principally based on the empirical evidence described in this Part IV.B.3.b.ii. However, the comments provide strong qualitative evidence that bolsters this finding.

Several academics and economic research groups, among other commenters, agreed with the Commission's preliminary finding that non-competes inhibit innovation. Commenters argued that non-competes reduce knowledge flow and collaboration, force workers to leave their field of expertise, and discourage within-industry spinouts that promote innovation. Many commenters stated that banning non-competes would make it easier for workers to pursue innovative ideas and to hire the best talent to help develop those ideas. Illustrative examples of comments the Commission received include the following:

- I am a geneticist at Stanford University, and I am co-founding a biotech startup that aims to discover new cancer immunotherapies. Many of the most talented geneticists, immunologists, cancer biologists, and other scientists with unique and valuable skillsets for drug development are bound by non-competes that prevent them from leaving jobs at big pharma companies to join biotech startups like mine. The result is artificial scarcity in the market for top scientific talent -- a phenomenon that precludes healthy competition between industry incumbents and new entrants. Given that much of our country's most cutting-edge translational research happens within biotech startups, and given that many of the most successful drugs on the market originate in biotech startups, non-competes in pharma and biotech prevent the most talented scientists from working on the most innovative science and obstruct the development of new treatments and cures for human disease -- leaving our society worse off.[574]

[573] Alessandra Colombelli, Jackie Krafft & Francesco Quatraro, *High-Growth Firms and Technological Knowledge: Do Gazelles Follow Exploration or Exploitation Strategies?*, 23 Indus. And Corp. Change 262 (2014).
[574] Individual commenter, FTC-2023-0007-0198.

- As a practicing Physician for over thirty years, and one who trained fellows in pain management, who followed many of their students' careers, I was able to see the detriments of unfair Non-Compete clauses in their contracts. Often a physician would take a job, and if it did not work out, the restrictions were so severe, that they would need to move to a new geographic location in order to be employed. . . . Other scenarios exist as well. Where large institutions can block scientific discovery of their research physicians from moving to other institutions which may be better able to support their research, potentially blocking the promotion of scientific discovery.[575]

- I am an engineer in the orthopedic space. I have an idea for a truly innovative foot and ankle plating system that I believe could become the standard of care for fracture fixation and foot deformity correction. It could save 10-15 minutes of operating room time per surgery, which studies show carries a cost of $1000 (times millions of surgeries annually). It does not directly compete with my former employer's product, but I have to wait a year to start engaging surgeons about it because of a very broad non-compete, for a product that does not even compete.[576]

- I currently work as a mid-level technical employee at a company that enforces long (a year or longer) noncompetes. . . . After working for larger companies for a few years after college, many of my friends started their own companies. Some succeeded massively and some didn't but what was common among most of them was that the companies they started were somewhat related to what they were working on before. They either saw a gap in the industry while working for a larger company, or had a bold idea in their domains that they wanted to quit their jobs and try executing it. All this risk taking has in turn resulted in innovation, more competition, and hundreds of jobs. This would not have been possible if these people were under non-compete agreements from their previous employers. In fact, many of my friends who are currently working for companies that have non-competes have personally told me that they want to try a different approach than the current incumbents in their industry, but they simply can't take this risk because of the long non-competes they are under. Note that non-competes are even more consequential for workers of relatively less experience because sitting out for 1 year while only having 3 to 4 years of experience is a lot more detrimental to one's career when compared to an individual with 20 years of experience. Given that younger workers are more willing to take risks and try new ideas, the impact of non-competes on innovation is far worse than many think.[577]

- I am an engineer who has worked on software and hardware in several domains, including the semiconductor industry. I perceive non-competes to not only be detrimental to free trade but also to be detrimental to American innovation and manufacturing. If the United States is serious about supporting the growth of the semiconductor industry in the U.S., it must ensure that semiconductor companies inside the United States truly act to benefit American innovation. . . . The FTC would act prudently to ban such

---

[575] Individual commenter, FTC-2023-0007-3885.
[576] Individual commenter, FTC-2023-0007-0760.
[577] Individual commenter, FTC-2023-0007-19807.

agreements.[578]

- I am a physician. I have worked for public entities for my entire career. I have worked under non-competes for my entire career. The result of these non-compete clauses is that myself and my colleagues keep our imagination and creativity locked away. We see novel applications of pharmaceuticals and medical devices which our leadership does not want to pursue, and we are also precluded from pursuing these ideas due to the noncompete. We see new ways to reach people and help people with our unique skill sets, and our noncompete keeps us from being able to reach them. The noncompete allows our employer to own us. They monopolize the talent of their workforce and this deprives the community of the innovation that may stem from the unleashing of the creativity of the physician workforce. I see the direct impact of non-compete clauses. The public has so much to gain by releasing healthcare workers from their noncompete clauses. These talented individuals, once released from their noncompetes, will begin to contribute to their communities with new ideas and innovation that will serve their communities. Many entities have so many reasons to avoid innovation and this stifles the individuals who work for them and oppresses new ideas. Once released from the bureaucracy and burden of non-competes I believe you will see an abundance of community outreach, device innovation and community service from many physicians currently subjugated by their noncompete clauses.[579]

A research organization said a ban on non-competes would increase the value workers realize from creativity and inventiveness, though it also asserted that non-competes can incentivize firms to create and share information. Some workers commented that they had innovative ideas or research that their employer was unwilling to pursue, but the worker could not leave to pursue their ideas elsewhere. A commenter also argued that captive workforces can stifle competition for workers and for clients or patients that leads to innovation. According to several commenters, trapping workers in jobs can also lead to decreased productivity and so-called "quiet quitting."

Some commenters contended that California's ban on non-competes helped Silicon Valley and other industries in California thrive. For example, a public policy organization pointed to industry clusters where studies have identified job hopping, which may otherwise be

---

[578] Individual commenter, FTC-2023-0007-12872.
[579] Individual commenter, FTC-2023-0007-2340.

prohibited by non-competes, as the primary mechanism of knowledge diffusion and argued that restricting non-competes for knowledge workers would improve the U.S.'s competitiveness. Other commenters questioned whether non-competes played a role in Silicon Valley's growth. In response, the Commission notes that it does not attribute California's success in the technology industry to its non-compete laws. The Commission merely notes (in Part IV.D) that the technology industry is highly dependent on protecting trade secrets and that it has thrived in California despite the inability of employers to enforce non-competes, suggesting that employers have less restrictive alternatives for protecting trade secrets.

Other commenters opposing the rule argued that non-competes may promote innovation by encouraging firms to make productivity-enhancing investments and by decreasing the risk of workers leaving. These commenters stated that non-competes protect firms' investments in workers, R&D, intellectual capital, and innovation. The Commission does not believe that non-competes are needed to protect valuable firm investments. As described in Part IV.D.2, the Commission finds that firms have less restrictive alternatives that protect these investments adequately while burdening competition to a less significant degree.

In addition, when assessing how non-competes affect innovation, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.B.3.b.ii can be occurring at the same time. That is, a non-compete might in some instances be protecting a firm's investments in a manner that is productivity-enhancing holding all else equal. But even that same non-compete can—and certainly non-competes in the aggregate do—inhibit innovation by preventing workers from starting new businesses in which they can pursue innovative ideas; inhibiting efficient matching between workers and firms; and reducing the movement of workers

189

between firms. What the empirical evidence shows is that non-competes reduce innovation, overall and on net, indicating that the tendency of non-competes to inhibit innovation more than counteracts any tendency of non-competes to promote innovation.

The Commission addresses the available evidence on the relationship between non-competes and firm investment in Part IV.D.1.

A business commenter contended that worker mobility does not necessarily improve innovation since the new firm may be unable or unwilling to use the worker's knowledge or ideas, or the new start-up may fail and leave consumers with less innovative products and services. In response, the Commission notes that it is certainly possible that some workers switch jobs to firms that are unable or unwilling to use their knowledge or ideas, or to startups that may fail. However, the fact that the empirical evidence shows that reduced non-compete enforceability increases innovation suggests that these effects are outweighed by workers who can switch jobs to firms that make better use of their talents, or to startups that thrive and bring innovative new products to market.

Other commenters stated that non-competes promote the sharing of ideas and information within firms and incentivize risk-taking. The Commission is not aware of evidence that non-competes promote the sharing of ideas within firms specifically, but in any event the Commission explains in Part IV.D.2 that trade secrets and NDAs provide less restrictive means than non-competes for protecting confidential information. With respect to risk-taking, the Commission notes that the Conti study finds that firms engage in riskier R&D strategies when non-compete enforceability is greater, but it is not clear whether these riskier R&D strategies translate into increased innovation.

Commenters also argued that non-competes may have different effects on different types

of workers—for example, across different industries, occupations, or levels of pay—and that these differences may affect the impacts of non-competes on innovation. In response, the Commission notes that the most methodologically robust studies show negative effects across a range of industries and are directionally consistent, even if they do not provide results for all subgroups.

A research organization argued that non-competes decrease the likelihood that innovative technologies are developed outside the U.S. and that non-competes promote economic growth, competitiveness, and national security. The Commission is not aware of any reliable evidence of the effects of non-competes on whether innovative technologies are developed outside the U.S. However, the weight of the empirical evidence indicates that non-competes reduce the amount of innovation occurring within the U.S.

Some commenters noted that innovation hubs have emerged in States that enforce non-competes. In response, the Commission notes that it does not find that it is impossible for innovation hubs to emerge where non-competes are enforceable. Instead, the Commission finds that, overall, non-competes inhibit innovation.

One commenter performed an empirical exercise in which he correlated Global Innovation Index rankings of innovation clusters with the enforceability of non-competes in each location. The commenter found that only one of the top five clusters bans non-competes, and only three others in the top 100 ban non-competes. The commenter cited the success of Chinese innovation clusters, noting that non-competes are permitted in each of them.[580] The Commission does not find this evidence persuasive. Other differences across countries may explain these results better than policy towards non-competes, which is one factor among many that affect the

---

[580] Comment of Mark Cohen, FTC-2023-0007-12064, at 12-13.

level of innovation in an economy.

Some commenters argued that the empirical research cited in the NPRM has mixed results. These commenters point to the study by Xiao (2022) showing that non-competes increase exploitative innovation (innovation that incrementally extends firms' existing capabilities), but not explorative innovation (innovation that extends the scope of firms' capabilities). In response, the Commission notes that, within this particular study, the net impact of non-competes on innovation was unclear. But the Commission does not believe the evidence overall is mixed, given that the three empirical studies of the effects of non-competes on innovation that use the most reliable empirical methods all find that non-competes reduce innovation.

Some commenters claimed that two studies cited in the NPRM—the Xiao and Conti studies—had findings that were omitted or misinterpreted: first, the Xiao finding that non-compete enforceability increases the rate of new discoveries of medical devices due to increases in the rate of exploitative innovation but not explorative innovation); and second, the Conti finding that greater non-compete enforceability leads to riskier innovation, which these commenters assert is a positive outcome.[581] In response, the Commission notes that the NPRM described both of these findings and did not omit or misinterpret them.[582] The Commission explains why it gives these studies little weight under "Evidence of inhibited innovation."

A commenter asserted that the He study is insufficient evidence to support a finding, and that the study examines the effects of non-compete enforceability on the value of patents, which the commenter asserts misses other aspects of innovation. In response, the Commission believes that the He study is methodologically robust and that, while no single metric can capture all aspects of innovation, the value of patents is a meaningful proxy. The Commission also notes

---

[581] Referring to Xiao, *supra* note 572 and Conti, *supra* note 571.
[582] NPRM at 3492-93.

that the effects observed in the He study are considerable, as the study finds that the value of patents, relative to the assets of the firm, increases by about 31% when non-compete enforceability decreases. In addition, the Commission notes that the comment record provides substantial qualitative support in line with the empirical findings. Furthermore, additional research, published since the release of the NPRM, helps confirm the Commission's finding regarding the effect of non-competes on innovation. As described under "Evidence of inhibited innovation," this evidence moves beyond assessing the impact of non-competes on the value of patents or the number of patents to identify the quality of new innovation, as well as the mechanisms underlying these effects.

Many commenters referred to a law review article, which was also submitted as a comment itself, that critiques the literature on non-competes and innovation.[583] First, the authors argue that a measure of enforceability used in part of the economic literature is incorrect and that a more recently developed measure is imperfect but better.[584] The Commission agrees with the authors that the more recently developed measure of enforceability, the scale based on Bishara (2011), is stronger than other measures of enforceability due to its granularity. This metric is used in many studies cited in this final rule, including the Johnson, Lipsitz, and Pei study, which largely reinforces the conclusions in the He study, lending weight to the conclusions in these studies that non-competes suppress the overall level of innovation in the economy.

Second, the authors argue that a given non-compete may be governed by the laws of a State other than the State where the worker lives, which undermines the reliability of studies

---

[583] Barnett & Sichelman, *supra* note 389.
[584] The allegedly flawed measures use binary indicators for enforcement versus non-enforcement, or binary indicators for several facets of enforceability (Stuart and Sorenson, *supra* note 529; Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J. L., Econ., & Org. (2011)), and the more recent measure is more nuanced (Bishara, *supra* note 501).

analyzing the effects of non-compete enforceability. The authors argue that cross-border enforcement of non-competes may be a difficult issue to properly address in empirical work and has not been accounted for in the work to date. In response, the Commission notes that if the State law that applied to a given non-compete were totally random—for example, if a non-compete in Oregon was no more likely to be governed by Oregon's law than any other State's law—we would expect to observe no effects on economic outcomes (such as earnings, innovation, and new business formation) from changes in State law. Instead, the empirical research shows that changes in State law have clear impacts on economic outcomes in particular States. This indicates that enough non-competes within a particular State are subject to that State's law for changes in that State's law to affect economic outcomes in that State.

Third, the authors argue that there is a lack of data on the use of non-competes and that such data are needed to completely assess the effects of non-competes. Although there is not comprehensive data on individual workers' employment agreements, the Commission believes the studies that examine changes in enforceability do so based on sufficient data to be reliable and are otherwise methodologically sound. These studies are also highly probative with respect to the effects of the final rule because what they are examining—how changes in the enforceability of non-competes affect various outcomes—matches closely with what the final rule does. The Commission also notes that there is considerable data regarding the prevalence of non-competes, which it discussed in Part I.B.2.

Fourth, the article argues that some studies of non-competes have small sample sizes, which may lead to measurement error. In response to concerns about small sample sizes, the Commission notes that the most recent studies use a greater breadth of variation in the legal environment surrounding non-competes, overcoming this obstacle. Fifth, the article expresses

194

concern about certain studies that are based on legal changes in Michigan. The Commission

takes this critique into account throughout this final rule and notes it when discussing the

applicable studies that examine legal changes in Michigan, including under "Evidence of

inhibited innovation."

In an ex parte communication included in the public record, the author of one of the

studies of innovation stated that studies which examine multiple legal changes may be biased,

since affected parties may anticipate the legal change and adjust their behavior prior to the date

that the legal change is made. The author stated that examination of the legal change in Michigan

was therefore preferable, since it was "inadvertent" and therefore not subject to anticipation

effects.[585] The Commission agrees that, in general, anticipation effects can bias the findings of

empirical studies. However, empirical work shows that the legal changes used in much of the

literature on non-competes are not subject to anticipation effects.[586] This may be because the vast

majority are changes based on judicial decisions, rather than statutory changes, as hypothesized

by researchers.[587] Moreover, even if anticipation effects occur in studies of non-compete

enforceability, that would likely not change the measurable observed benefits of reducing non-

compete enforceability, and may indeed lead to underestimation of observed benefits.

Underestimation would occur if parties were adjusting their behavior in advance of the change in

enforceability in the same direction as the effects observed after the change. This would occur if,

for example, firms began to decrease use of non-competes in advance of a decrease in non-

compete enforceability, knowing that those non-competes would soon be less enforceable. This

ultimately would mean that the actual effects on labor mobility, earnings, new business

---

[585] Ex Parte Communication: Email from G. Carlino, *supra* note 558.
[586] Johnson, Lavetti & Lipsitz, *supra* note 388 at 12-14.
[587] *Id.* at 12.

formation, innovation, and other outcomes could be even greater. Additionally, the legal change in Michigan is subject to other criticism, as discussed under "Evidence of inhibited innovation" and by commenters.

### iii. Non-competes may increase concentration and consumer prices.

*Evidence of increased concentration and consumer prices*

As described in Parts IV.B.3.b.i and ii, the Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation and innovation, and have in fact done so. The Commission finds that these effects, standing alone, are sufficient to support its finding that non-competes tend to negatively affect competitive conditions in product and service markets.

However, the Commission notes that there is also evidence that non-competes increase industrial concentration more broadly, which in turn tends to raise consumer prices. The empirical literature on these effects is less developed than the empirical work documenting declines in new business formation and innovation; specifically, the empirical evidence on consumer prices relates only to healthcare markets (though the evidence on concentration spans all industries in the economy). For this reason, the Commission does not rest its finding that non-competes tend to negatively affect competitive conditions in product and service markets on a finding that non-competes increase concentration and consumer prices. However, there are several reliable studies finding that non-competes increase concentration and/or consumer prices, bolstering the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.

The Commission finds that non-competes reduce new business formation.[588] By doing so,

---

[588] *See* Part IV.B.3.b.i.

non-competes may increase concentration. Non-competes may also stunt the growth of existing firms that would otherwise better challenge dominant firms, for example, by limiting potential competitors' access to talented workers.[589]

Non-competes may also affect prices in a variety of ways. By suppressing workers' earnings, non-competes decrease firms' costs, which firms may theoretically pass through to consumers in the form of lower prices. However, non-competes may also have several countervailing effects that would tend to increase prices. First, non-competes may increase concentration, which could lead to less competition between firms on price, and therefore higher prices for consumers. Second, by inhibiting efficient matching between workers and firms, non-competes may reduce the productivity of a firm's workforce, which may lead to higher prices. Third, by inhibiting innovation, non-competes may hinder the development of lower-cost products or more efficient manufacturing processes.

One study, by Hausman and Lavetti, focuses on physician markets. The study finds that as the enforceability of non-competes increases, these markets become more concentrated, and prices for consumers for physician services increase. The study finds that while non-competes allow physician practices to allocate clients more efficiently across physicians, this comes at the cost of greater concentration and higher consumer prices. This study examines several changes in non-compete enforceability measured continuously. The authors note that, in theory, if decreased non-compete enforceability *decreases* earnings, then the fall in prices may simply be due to pass-through of labor costs. However, empirical research shows that decreased non-compete enforceability *increases* earnings (as discussed in Part IV.B.3.a.ii). Even if that were not the case,

---

[589] *See* Part IV.C.2.c.i (describing a study addressing how non-competes force firms to make inefficiently high buyout payments).

Hausman and Lavetti show that labor cost pass-through cannot explain their findings.[590] This study satisfies all of the principles described in Part IV.A.2, and is accordingly weighted highly by the Commission.

Another study, by Lipsitz and Tremblay, examines all industries in the economy and shows empirically that increased enforceability of non-competes at the State level increases concentration.[591] Lipsitz and Tremblay theorize that non-competes inhibit entrepreneurial ventures that could otherwise enhance competition in goods and service markets. The authors show that the potential for harm is greatest in the industries in which non-competes are likely to be used at the highest rate.[592]

If the general causal link governing the relationship between enforceability of non-competes, concentration, and consumer prices acts similarly to that identified in the study by Hausman and Lavetti, then it is plausible that increases in concentration identified by Lipsitz and Tremblay would lead to higher prices in a broader set of industries than healthcare. Lipsitz and Tremblay use several changes in non-compete enforceability measured in a continuous fashion, but do not measure the impact on consumer prices or welfare. The Commission therefore finds the study's conclusion that non-competes increase concentration highly robust, but the study is not itself direct empirical evidence of a relationship between non-competes and prices.

Two additional studies assess the effects of non-competes on concentration and prices. However, the Commission gives these studies little weight.

A study of physician non-competes by Lavetti, Simon, and White finds that prices

---

[590] Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am. Econ. J. Applied Econ. 278 (2021).
[591] Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* 6 (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864. Concentration is measured by an employment-based Herfindahl-Hirschman Index (HHI).
[592] *Id.* at 3.

charged by physicians with non-competes are similar to those charged by physicians without non-competes.[593] The Commission gives this study less weight because it merely analyzes differences between workers based on the use of non-competes.[594]

A study by Younge, Tong, and Fleming finds that non-competes contribute to economic concentration because non-compete enforceability increases the rate of mergers and acquisitions.[595] This study uses one change in non-compete enforceability—in Michigan—to generate its results. However, in addition to its use of a single legal change in a single State, the change to non-compete enforceability was accompanied by several other changes to Michigan's antitrust laws, so it is not possible to identify the effect of the change in non-compete enforceability standing alone.

### *Comments pertaining to increased concentration and consumer prices and the Commission's responses*

Several commenters addressed the question of whether non-competes affect concentration and consumer prices. Some commenters asserted that the rule would lower consumer prices by improving matches between employers and workers, increasing productivity. Commenters also argued that locking up talent, particularly in specialized markets, prevents entrepreneurship and new business formation and can thus contribute to increased concentration.

Some commenters opposing the NPRM claimed that banning non-competes could increase concentration. These commenters argued that larger firms could discourage companies from expanding into new and underserved markets by poaching, or threatening to poach, their key employees, leading to increased costs that could force some firms out of business. These

---

[593] *See* Lavetti, Simon, & White, *supra* note 82.
[594] *See* Part IV.A.2 (describing the shortcomings of such studies).
[595] Kenneth A. Younge, Tony W. Tong, & Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence From a Natural Experiment*, 36 Strategic Mgmt. J. 686 (2015).

commenters also argued that non-competes protect small businesses from dominant consolidators, as high recruitment, retention, and other costs may induce small businesses to sell or larger businesses may hire away their workers. A medical trade organization stated that without non-competes, independent practices might not be able to afford to hire and thus may be unable to grow or compete.[596]

While these commenters theorize that prohibiting non-competes would increase concentration, the Commission notes that the available evidence indicates that non-competes increase concentration, rather than reducing it. The Commission further notes that these theories are inconsistent with the robust empirical literature finding that non-competes reduce new business formation, as well as with the hundreds of comments from small businesses, including physician practices, recounting how non-competes stymied their ability to enter markets or grow because they make it harder to hire talent.

Several commenters claimed that prohibiting non-competes would increase worker earnings and increase transaction costs related to hiring, which firms would pass through to consumers in the form of higher prices. However, the only study of how non-competes affect prices—the Hausman and Lavetti study—finds that decreased non-compete enforceability *decreases* prices in the healthcare market, rather than increasing them. Moreover, while it is theoretically possible that higher labor costs could be passed on to consumers in the form of higher prices, there are several countervailing effects from prohibiting non-competes that would tend to lower prices. Additionally, empirical research shows that labor cost pass-through cannot explain decreases in prices in healthcare markets associated with non-competes becoming less enforceable.[597]

---

[596] *See also* Part XI.C.2, which addresses these types of comments in greater detail.
[597] Hausman & Lavetti, *supra* note 590.

An insurance company stated that insurance premiums would increase if the rule allows non-profit hospitals to dominate the hospital market and have more leverage in network negotiations. These commenters do not provide any empirical evidence to support this assertion. Moreover, for the reasons described in Part V.D.5, the Commission disagrees that the ability to use non-competes will provide a material competitive advantage to non-profit hospitals. Another commenter stated that if non-competes are prohibited, physicians will leave States with lower market reimbursement rates for those with higher rates, increasing healthcare costs and shortages. Commenters did not cite any empirical evidence that supports this hypothetical assertion that the final rule would increase healthcare costs or shortages due to physicians leaving States with lower reimbursement rates, and the Commission is aware of none. However, the Commission notes that it received many comments from doctors, nurses, and other healthcare professionals asserting that non-competes worsen healthcare shortages.[598]

Some commenters stated that non-competes may improve access to physicians due to non-compete-led consolidation or more efficient patient-sharing within practices, and that Hausman and Lavetti's study is unable to quantify these benefits. In response, the Commission notes that there is no empirical literature bearing out this theory, and that the commenters overwhelmingly stated that non-competes decrease patients' access to the physicians of their choice, increase healthcare shortages, and negatively affect the quality of health care.[599]

### iv. Non-competes may reduce product and service quality and consumer choice.

The negative effects of non-competes on competition may also degrade product and service quality and consumer choice. Competition encourages firms to expand their product

---

[598] These comments are summarized in greater detail in Part IV.B.3.b.iv.
[599] *See* Part IV.B.3.b.iv.

offerings and innovate in ways that lead to new and better products and services.[600] However, by inhibiting new business formation, increasing concentration, and reducing innovation, non-competes reduce competitive pressure in product and service markets, which may reduce product quality and consumer choice. In addition, poor working conditions and less optimal matching of workers and firms may lead to reductions in the quality of products and services. For these reasons, non-competes may tend to negatively affect competitive conditions in product and service markets by reducing product quality and consumers' options.

Such effects are less readily quantifiable than the other negative effects of non-competes on product and service markets—*i.e.*, the negative effects on new business formation, innovation, concentration, and consumer prices. It is thus unsurprising that there are not reliable empirical studies of these effects. However, the Commission received an outpouring of public comments on this issue. Hundreds of commenters, primarily from the healthcare field, described how non-competes reduce product and service quality and consumer choice.

The large number of comments the Commission received on this issue, the wide variety of impacts commenters describe, and the fact that the impacts commenters describe are overwhelmingly negative, indicate that non-competes reduce product quality and consumer choice, further bolstering the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.[601]

The commenters who addressed the effects of non-competes on product quality and consumer choice primarily discussed the healthcare industry. The majority of these comments

---

[600] In the NPRM, the Commission noted that innovation and entrepreneurship can, in turn, have positive effects on product quality. *See* NPRM at 3492. The Commission did not make specific findings on the effect of non-competes on consumer choice. However, the Commission discussed the closely related questions of how non-competes affect new business formation, innovation, concentration, and consumer prices. *See id.* at 3490-93.

[601] As described in Parts IV.B.3.b.i and ii, the Commission finds that the effects of non-competes on new business formation and innovation, standing alone, are sufficient to sustain its finding that non-competes tend to negatively affect competitive conditions in product and service markets.

focused on how non-competes harm patient care. Hundreds of physicians and other commenters in the healthcare industry stated that non-competes negatively affect physicians' ability to provide quality care and limit patient access to care, including emergency care. Many of these commenters stated that non-competes restrict physicians from leaving practices and increase the risk of retaliation if physicians object to the practices' operations, poor care or services, workload demands, or corporate interference with their clinical judgment. Other commenters from the healthcare industry said that, like other industries, non-competes bar competitors from the market and prevent providers from moving to or starting competing firms, thus limiting access to care and patient choice. Physicians and physician organizations said non-competes contribute to burnout and job dissatisfaction, and said burnout negatively impacts patient care.

In addition, physicians and physician organizations stated that, to escape non-competes, physicians often leave the area, and that this severs many physician/patient relationships. These commenters stated that non-competes therefore cause patients to lose the knowledge, trust, and compatibility that comes with long-established relationships. These commenters also said that strong physician/patient relationships and continuity of care improve health outcomes, particularly for complex, chronic conditions or patients who need multiple surgeries. These commenters described how patients who lose their physicians to non-competes either travel long distances to see that physician, switch physicians, or lose access entirely if no other physicians are available. One physician argued that taking away a patient's ability to choose their provider violates the Patients' Bill of Rights.[602]

One medical society cited a 2022 survey of Louisiana surgeons in which 64.4% of the

---

[602] *See* President's Advisory Commission on Consumer Protection and Quality in the Health Care Industry, *Consumer Bill of Rights and Responsibilities, Executive Summary* (1997), https://govinfo.library.unt.edu/hcquality/cborr/index.htm.

surgeons believed non-competes force patients to drive long distances to maintain continuity of care, and 76.7% believed they force surgeons to abandon their patients if they seek new employment.[603] This study had a small sample size and thus the Commission gives it limited weight, but the Commission notes that it accords with the many comments the Commission received describing how patients must drive long distances to maintain continuity of care—or are unable to do so, resulting in harms to their health. Illustrative comments on how non-competes affect the quality of patient care include the following:

- As a primary care physician I truly hope to see [the rule] move forward. I recently left my position at one company and for a year commuted an hour to be outside of my non-compete radius. I recently returned to my community and discovered I have more patients than I can count who simply didn't get care for over a year because they didn't want to find a new [primary care physician] but also couldn't make the hour drive to see me at my new location. The commute was annoying for me, but ultimately the only ones truly hurt were patients. Let's stop hurting our patients by restricting their ability to see their physicians.[604]

- My practice has operated since the 1990s in Danville, Kentucky. We are the only cardiology practice that has been present and has worked tirelessly to serve this rural community. The practice was a private practice originally. Unfortunately, just as most cardiac practices throughout the country have had to, our practice had to come under the control of these hospital systems to maintain its viability. . . . The CEO and the administration . . . have squeezed us out and forced us to leave the area with the employment contract non-compete in place. . . . I have spent the last 6 months hugging patients, medical staff, nursing who are stricken by the fact that we are being pushed out. Patients desperately ask me how they can maintain care if they have to travel up to an hour to see their doctors with this change. They worry how they can pay for the steep gas prices to see their doctors. . . . They are truly concerned for the health of their families. All the while all I can do is tell them that my non-compete does not allow me, their cardiologist for the past decade, to give them any advice on how to maintain their care.[605]

- As a Physician, I had a non compete clause in my contract that extended two counties wide (100 square miles). . . . [W]hen I would not sign a contract amendment regarding pay that was very unfavorable and nebulous I was called in and summarily dismissed 'no cause.' Because of that I had to work out of state and my patients were instantly without a

---

[603] *See* William F. Sherman et al., *The Impact of a Non-Compete Clause on Patient Care and Orthopaedic Surgeons in the State of Louisiana: Afraid of a Little Competition?*, 14 Orthopedic Revs. (Oct. 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9569414/.
[604] Individual commenter, FTC-2023-0007-19853.
[605] Individual commenter, FTC-2023-0007-4072.

physician. The community did not have enough physicians to be able to care for the patients who now had no medical provider. During COVID this lack of access to healthcare for patients most certainly led to increased unnecessary illness and death. . . . Patients are suffering with access to healthcare, and physician shortages are being exacerbated because every time a physician has to leave because of a non compete clause they start hiring and credentialing all over again and it can take months for them to be able to work again.[606]

- Being a therapist, non-competes are extremely scary when it comes to patient care. Some include date ranges in which we cannot communicate with our patients, some of whom have severe trauma histories or suicidal ideations. If a clinician changes companies but is unable to continue meeting a patient, who is at fault if there is an injury or death? . . . Some non-competes include mileage in which a clinician cannot create their own company or rent out an office within a certain radius - how is this a safe practice? How can clients continue to work on their mental health and desire to stay alive if they have to change clinicians due to a noncompete clause?[607]

- Due to mistreatment and to escape workplace toxicity, one of my colleagues left our practice in compliance to our non-compete conditions, even though they caused great hardship. I, too, wanted to leave, but could not because doing so would have harmed my family's well being. What I witnessed in the aftermath was unconscionable. There was a void in patient care and months later, there still is a void. Not only was this physician required to move quite a distance from the practice, he was forbidden to even inform his patients that he was leaving. The practice in turn, did not inform the patients, and when asked, just informed them that he was no longer with the practice. Consequently, wait times to treat cancers doubled and now tripled.[608]

- I would like to open a new clinic in my town, but my noncompete would disallow that from happening immediately. Furthermore, I worry that my patients that need medical care wouldn't be able to access it at my current clinic because the providers are booked out 6+ months, and if one left that would make those immediately increase to nearly a year, which could potentially cause my patient lasting damage. If I could open my own clinic locally without the constraints of the noncompete, those patients would be able to continue care as necessary with me, and I wouldn't feel stuck with poor management worsening patient care for my patients.[609]

- As a veterinarian, I can personally assure the FTC that such restrictions have caused both death and permanent disability of pets. . . . In nearly every scenario I have heard of, the veterinary business that requires and enforces non-compete clauses is underserving the pet-owning public. This is the current situation for veterinary medicine on a national level. Hospitals are so overwhelmed that they are not accepting new patients, turning away emergency cases, and imposing extremely long (several months or more) waiting

[606] Individual commenter, FTC-2023-0007-4440.
[607] Individual commenter, FTC-2023-0007-4270.
[608] Individual commenter, FTC-2023-0007-2384.
[609] Individual commenter, FTC-2023-0007-1206.

lists for appointments and/or scheduled procedures. If a hospital cannot accommodate the patients who require veterinary care, that hospital is not able to compete with the existing demand for services. . . . Is it fair for pet owners who cannot get their pets in to see a veterinarian (even on emergency situations) to have the veterinary hospitals who refuse to see their pets remove other options for care via non-compete clauses? These clauses are being blatantly abused by certain large veterinary businesses so that these organizations can maintain a pool of potential patients (on waiting lists) to draw from. Unfortunately, many of these dogs and cats die while waiting to be seen. At least in my profession, the non-compete concept has reached an epitome of unethical conduct. In addition, economic growth has been stunted due to self-serving greedy people in power. Please get rid of this horrible clause and lets make sure pets and their owners get what they need, when they need it.[610]

Some hospital associations argued that a study of physician markets[611] shows that non-competes improve patient care. According to these commenters, this research finds that non-competes make in-practice referrals more likely, increasing revenue and wages and providing patients with more integrated and better care. In response, the Commission notes that while the study finds that non-competes make physicians more likely to refer patients to other physicians within their practice—increasing revenue for the practice—it makes no findings on the impact on the quality of patient care. The Commission further notes that pecuniary benefits to a firm cannot justify an unfair method of competition.[612]

Some medical practices argued that within-group referrals allow physicians to coordinate care plans and simplify logistics, and that non-competes protect the stability of those care teams to patients' benefit. Some industry associations and hospitals argued that non-competes improve patient choice and continuity of care because they stop physicians from leaving a health provider, benefiting patients who cannot follow the provider due to geographic or insurance limitations. One physician association said physicians leaving jobs can be costly to patients, who

---

[610] Individual commenter, FTC-2023-0007-0677.
[611] Lavetti, Simon, & White, *supra* note 82.
[612] *See supra* note 305 and accompanying text.

must transfer records and reevaluate insurance coverage.

The Commission notes that the vast majority of comments from physicians and other stakeholders in the healthcare industry assert that non-competes result in worse patient care. The Commission further notes that the American Medical Association discourages the use of non-competes because they "can disrupt continuity of care, and may limit access to care."[613] In addition, there are alternatives for improving patient choice and quality of care, and for retaining physicians, that burden competition to a much less significant degree than non-competes.

A related issue frequently raised in the comments is the impact non-competes have on healthcare shortages. According to many commenters, non-competes contribute to shortages by preventing physicians from moving to areas where their skills and specialties are needed; forcing physicians out of such areas; or forcing them out of practice entirely due to contractual restrictions or burnout. Such shortages, according to these commenters, decrease access to care, increase wait times, lead to canceled procedures, and decrease the quality of care. Many commenters stated that these effects of non-competes are particularly acute in rural, underserved, and less affluent areas that already have difficulty attracting healthcare professionals. Some commenters argued that provider shortages can, in combination with non-competes, create monopolies.

A smaller number of commenters from the healthcare industry argued that non-competes alleviate healthcare shortages and prevent hospital or facility closures by keeping physicians from leaving underserved areas and reducing fluctuations in labor costs. Some of these

---

[613] *See, e.g.*, Comment of Am. Med. Ass'n, FTC-2023-0007-21017, at 4-5 (citing AMA *Code of Medical Ethics* Opinion 11.2.3.1). After the comment period closed, the AMA adopted a policy supporting banning non-competes for physicians in clinical practice who are employed by hospitals, hospital systems, or staffing companies, though not those employed by private practices. This policy change does not have legal effect. Andis Robeznieks, *AMA Backs Effort to Ban Many Physician Noncompete Provisions*, Am. Med. Ass'n (Jun. 13, 2023), https://www.ama-assn.org/medical-residents/transition-resident-attending/ama-backs-effort-ban-many-physician-noncompete.

commenters asserted that a ban on non-competes would upend healthcare labor markets, thereby exacerbating healthcare workforce shortages, especially in rural and underserved areas. A medical society argued that non-competes can allow groups to meet contractual obligations to hospitals, as physicians leaving can prevent the group from ensuring safe care. As the Commission notes, there are not reliable empirical studies of these effects, and these commenters do not provide any. However, the Commission notes that the rule will increase labor mobility generally, which makes it easier for firms to hire qualified workers.

Commenters in a variety of industries beyond healthcare markets also provided a wide range of examples of how non-competes diminish the quality of goods and services, including preventing businesses from hiring experienced staff and creating worker shortages. Commenters stated that, where firms in a market use non-competes, it can be difficult for other firms to remain in the market, and consumers thus lose the freedom to choose providers. Several comments pointed favorably to the American Bar Association's longstanding ban on non-competes for most lawyers to protect clients' freedom to choose their lawyer, in contrast with other highly paid and highly skilled professions such as physicians and their patients or clients.[614]

Commenters from outside the healthcare industry mainly focused on how non-competes increase concentration within industries, which reduces firms' incentive to innovate and results in consumers having fewer choices. Other commenters described how non-competes lock highly talented workers out of their fields or force them into jobs where they are less productive, depriving the marketplace of the products and services they would have developed. Illustrative examples of these comments include the following:

- As a software developer who often works under contracts containing sections stipulating

_____

[614] See Model Rule 5.6, *supra* note 532.

non-compete agreements, I have observed first hand how they can harm the economy by bolstering monopolies, such as in sectors where clientele only have a single choice for meeting their engineering needs. Often, these clients have no other options and are forced to meet whatever arbitrary price point is set by the leading (sole) company, and that company may in turn operate howsoever they choose without feeling the need to adopt reasonable business practices that might exist were there competition.[615]

- As an aspiring tree care professional, non-compete agreements prevent me from switching employers/companies to access better work conditions or opportunities. No tree service company has ever invested in me. I learned to climb and saw while working for Federal agencies (USDA and NPS), and also through self-education and practice on my own. I believe that non-compete agreements have adversely limited competition in the tree service industry. This hurts employees who could do better if they were free to change their place of employment, and it hurts consumers who have fewer tree service providers to choose from.[616]

- I worked in a business supplying technology and materiel considered critical for national defense. I was labeled an expert in the field by my DoD customers and commended multiple times for solving logistical and technical problems with protective equipment during the previous two wars. I lead development contracts from the DoD to advance the state-of-the-art in warfighter protection, which set multiple records for figures of merit within my business, and which our program manager volunteered was the most exciting technology she had ever managed. When my business decided to discontinue that technology and transfer me, my noncompete agreement prevented me from continuing to support the DoD. I was removed from consideration at another firm in the third round of interviews because of my noncompete agreement -- again, for a technology my business had decided to not pursue and had transferred me out of. So, instead of having the opportunity to advance my career into management in the service of protecting warfighters, I had to exit that industry and move laterally, into a different industry that cannot value 20 years of my expertise, and which will not further the defense of my country. If the FTC had nationalized a prohibition on noncompete clauses two years ago, this would not have happened, and I would have had the opportunity to advance my career, improve my family's economic fortune, and continue to contribute to our nation's defense.[617]

Overall, the Commission believes that the large number of comments it received on the issue of product quality and consumer choice and the wide variety of overwhelmingly negative impacts commenters describe further bolsters the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.

---

[615] Individual commenter, FTC-2023-0007-5818.
[616] Individual commenter, FTC-2023-0007-1980.
[617] Individual commenter, FTC-2023-0007-4446.

### 4. Prohibitions in Section 910.2(a)(1)

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission adopts § 910.2(a)(1), which defines unfair methods of competition related to non-competes with respect to workers other than senior executives. Section 910.2(a)(1) provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause; or represent that the worker is subject to a non-compete clause.

Part IV.A sets forth the Commission's determination that the foregoing practices are unfair methods of competition under section 5, and Parts IV.B.1 through IV.B.3 explain the findings that provide the basis for this determination. In this Part IV.B.4, the Commission explains the three prongs of § 910.2(a)(1) and addresses comments on proposed § 910.2(a).[618]

### a. Entering Into or Attempting to Enter Into (§ 910.2(a)(1)(i))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "enter into or attempt to enter into a non-compete clause with a worker." The Commission adopts this same language in the final rule in § 910.2(a)(1)(i). As a result, the final rule prohibits persons from entering into or attempting to enter into non-competes with workers other than senior executives as of the effective date. (Section 910.2(a)(2)(i) separately prohibits persons from entering into or attempting to enter into non-competes with senior executives as of the effective date.)

A business commenter requested that the Commission remove "attempt to enter into"

---

[618] Several commenters requested changes to proposed § 910.2(a) to provide various exceptions to coverage under the final rule. The Commission addresses these comments in Part V.C.

from § 910.2(a) on the basis that it may encourage workers to sue employers for contractual provisions that have no practical effect on the worker or which are not finalized in any employment agreement. The Commission disagrees that conduct that would be covered by the attempt provision—such as presenting the worker with a non-compete, even if the employer and worker do not ultimately execute the non-compete—has no practical effect on the worker. The Commission is concerned that such attempts to enter into non-competes still have *in terrorem* effects that deter competition. For example, workers presented with non-competes may not realize they are not bound by them. Such workers may therefore refrain from seeking or accepting other work or starting a business, yielding the same tendency of non-competes to negatively affect competitive conditions that motivate this final rule.

The Commission accordingly finalizes the language as proposed.

### b.  Enforcing or Attempting to Enforce (§ 910.2(a)(1)(ii))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "maintain with a worker a non-compete clause." In addition, proposed § 910.2(b)(1) would have provided that, to comply with this prohibition on maintaining a non-compete, an employer that entered into a non-compete with a worker prior to the compliance date must "rescind the non-compete no later than the compliance date."

As elaborated in Part IV.E, the Commission has decided not to finalize a rescission requirement. As a result, the Commission also removes "maintain" from the text of § 910.2(a), to avoid any ambiguity about whether the final rule contains a rescission requirement. Instead of a rescission requirement, the final rule focuses more narrowly on the future enforcement of existing non-competes with workers other than senior executives. It provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to

enforce or attempt to enforce a non-compete clause. An employer attempts to enforce a non-compete where, for example, it takes steps toward initiating legal action to enforce the non-compete, even if the court does not enter a final order enforcing the non-compete.

For workers other than senior executives, this prohibition on enforcing a non-compete applies to all non-competes, but affects only enforcement or attempted enforcement conduct taken after the effective date of the rule. In so doing, the Commission reduces the burden on employers by eliminating the need to take steps to formally rescind provisions of existing contracts, instead simply requiring that employers refrain from enforcing or attempting to enforce in the future (after the effective date) non-competes that are rendered unenforceable by this provision of the rule.

As explained in Part IV.C, the Commission in the final rule does not prohibit the future enforcement or attempted enforcement of existing non-competes with senior executives. The Commission considered whether to take this approach for workers other than senior executives, but based on the totality of the evidentiary record concludes that such non-competes should not remain in force after the effective date for three main reasons. First, existing non-competes with workers other than senior executives negatively affect competitive conditions to a significant degree, for the same reasons as new non-competes. The Commission believes that non-competes with such workers that were entered into before the effective date implicate the concerns described in Part IV.B.3—relating to the negative effects of non-competes on competitive conditions in labor, product, or service markets—to the same degree as non-competes entered into as of the effective date. Of course, the Commission notes that the empirical evidence quantifying the harms to competition from non-competes by definition relates to existing non-competes.

Second, for workers other than senior executives, existing non-competes not only impose acute, ongoing harms to competition, they also impose such harms on individual workers by restricting them from engaging in competitive activity by seeking or accepting work or starting their own business after their employment ends. As described in Part IV.B.2.b, the Commission received thousands of comments from workers that described non-competes as pernicious forces in their lives that forced them to make choices that were detrimental to their finances, their careers, and their families. These concerns are less present for senior executives, who are far more likely than other workers to have negotiated their non-compete and received compensation in return, thereby mitigating this kind of acute, ongoing harm.

Third, because the Commission finds that non-competes with workers other than senior executives generally are not bargained for and such workers generally do not receive meaningful, if any, compensation for non-competes, the practical considerations that are present with respect to existing non-competes for senior executives (discussed in Part IV.C.3) are far less likely to be present for other workers. For these reasons, the Commission concludes that, consistent with the proposed rule, existing non-competes with workers other than senior executives should not remain in force after the effective date.

Several commenters argued that the Commission should allow all existing non-competes to remain in effect. Some of these commenters argued that the rule would upset bargained-for agreements. Commenters asserted that workers who received benefits in exchange for agreeing to non-competes would receive a windfall if such clauses cannot be maintained and are no longer enforceable. A few of these commenters also argued that invalidating existing non-compete agreements will upset workers' economic interests because they will lose out on enhanced compensation that they have received or expect to receive in exchange for their non-competes.

Some commenters contended that invalidating existing non-competes would be especially harmful to workers' interests in non-competes tied to particularly large amounts of compensation, complex compensation arrangements, or unique forms of compensation such as equity grants. Relatedly, some commenters expressed concern that the NPRM did not explain whether employers could recoup benefits already paid in exchange for non-competes. A few commenters suggested that they have given workers confidential and trade secret information in exchange for the worker agreeing to a non-compete that may no longer be enforceable.

The Commission is not persuaded by comments arguing that the rule would upset existing bargained-for agreements. As noted in Part IV.B and Part IV.C, the Commission finds that workers who are not senior executives are unlikely to negotiate non-competes or to receive compensation for them. Moreover, the Commission has also determined that non-competes with senior executives that predate the effective date may be enforced,[619] which will substantially reduce the number of workers with complex compensation arrangements whose non-competes are rendered unenforceable after the effective date.

Other commenters argued that employers relied on the expectation of a non-compete when deciding how much to invest in training their workers or the extent to which they share trade secrets with their workers. In response, the Commission notes that firms that are concerned about retention have tools other than non-competes for retaining workers, including fixed-duration employment contracts (*i.e.*, forgoing at-will employment and instead making a mutual contractual commitment to a period of employment) and providing improved pay and benefits (*i.e.*, competing on the merits to retain the worker's labor services). In addition, while some workers that have received training may leave a firm for a competitor, firms will also be able to

---

[619] *See* Part IV.C.3.

attract highly trained workers *from* competitors, and this increased job-switching will likely lead to more efficient matching between workers and employers overall.[620]

The Commission is not persuaded by commenters who contended that invalidating existing non-competes would disturb employer expectations with respect to sharing trade secrets or other commercially sensitive information. As explained in Part IV.D.2, the Commission finds that employers have adequate alternatives to non-competes to protect these interests, including trade secret law and NDAs, and that these alternatives do not impose the same burden on competition as non-competes. Some commenters contended that employers may not have adequate alternatives in place for existing non-competes and that former workers may not agree to new NDAs. But the Commission finds that it is rare for an employer who entered into a non-compete agreement as a means of protecting trade secrets or commercially sensitive information to have not also entered into an NDA with the worker.[621] This is especially true given that non-competes are generally less enforceable than NDAs.[622] In any event, nothing in the final rule prevents employers from entering new NDAs with workers.

Some commenters contended that invalidating existing non-competes would enable new employers to "free ride" off former employers' investments in training. The Commission addresses comments about "free riding" and training investments in Part IV.D.2.

Several comments argued that a final rule should not invalidate existing non-competes because the economic impact is too unpredictable. These commenters maintained that the

---

[620] *See* Part IV.B.3.a.
[621] *See, e.g.*, Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 35 (finding that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and 74.7% of workers with non-competes are subject to all three provisions).
[622] Camilla A. Hrdy & Christopher B. Seaman, *Beyond Trade Secrecy: Confidentiality Agreements that Act Like Noncompetes*, 133 Yale L. J. 669, 676 (2024) ("Courts across jurisdictions routinely give confidentiality agreements 'more favorable treatment' than noncompetes. And confidentiality agreements are not typically subject to the same limitations that are applied to noncompetes. . . . Overall, courts tend to apply a default rule of enforceability.") (internal citations omitted).

number of individual employment contracts that would be invalidated means that the economic impact would be exceptionally widespread, and likely impossible to accurately predict. In response, the Commission notes that it has assessed the benefits and costs of the final rule and finds that the final rule has substantial benefits that clearly justify the costs (even in the absence of full monetization).[623]

### c. Representing (§ 910.2(a)(1)(iii))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause." The Commission adopts the same language in the final rule. Pursuant to § 910.2(a)(1)(iii), it is an unfair method of competition for an employer to represent that a worker other than a senior executive is subject to a non-compete clause. The "good faith" language remains in the final rule but, for clarity, it has been moved to § 910.3, which contains exceptions to the final rule.[624]

Under this "representation" prong, the final rule prohibits an employer from, among other things, threatening to enforce a non-compete against the worker; advising the worker that, due to a non-compete, they should not pursue a particular job opportunity; or telling the worker that the worker is subject to a non-compete. The Commission believes that this prohibition on representation is important because workers often lack knowledge of whether employers may enforce non-competes.[625] In addition, the evidence indicates that employers frequently use non-competes even when they are unenforceable under State law, suggesting that employers may

---

[623] *See* Part X.E.
[624] *See* Part V.C.
[625] *See* Prescott & Starr, *supra* note 413 at 10-11.

believe workers are unaware of or unable to vindicate their legal rights.[626] Employers can exploit the fact that many workers lack knowledge of whether non-competes are unenforceable under State law by representing to workers that they are subject to a non-compete when they are not or when the non-compete is unenforceable. Such misrepresentations can have *in terrorem* effects on workers, causing them to refrain from looking for work or taking another job, thereby furthering the adverse effects on competition that the Commission is concerned about.

In addition, threats to litigate against a worker—even where the worker is aware of the Commission's rule and believes the non-compete is unenforceable—may deter the worker from seeking or accepting work or starting their own business. As explained in Part IV.B.2.b.ii, many commenters—including highly paid workers—explained in their comments that they believed their non-compete was unenforceable, but they nevertheless refrained from seeking or accepting work or starting their own business because they could not afford to litigate against their employer for any length of time. For this reason, the Commission believes it is important for the final rule to prohibit employers not only from enforcing or attempting to enforce non-competes against workers other than senior executives, but also threatening to do so.

A commenter suggested limiting the "representation" prong to instances where the employer has no good-faith basis to believe the non-compete is valid "under local or State law," even if the non-compete is invalid under the final rule. The Commission does not adopt this approach because representing to workers that they are subject to a non-compete, where the rule provides that the non-compete is unenforceable, would mislead the worker and would tend to deter them from competing against the employer by seeking or accepting work or starting a business.

---

[626] *See* Starr, Prescott, & Bishara, *supra* note 68 at 81.

## C. Section 910.2(a)(2): Unfair Methods of Competition—Non-Competes with Senior Executives

In the NPRM, the Commission proposed to prohibit non-competes—including non-competes entered into before the effective date—with all workers.[627] The Commission preliminarily found that all non-competes, whether with senior executives or other workers, were restrictive conduct that negatively affected competitive conditions.[628] However, while the Commission preliminarily found that non-competes with workers other than senior executives were exploitative and coercive, the Commission stated that this finding did not apply to senior executives.[629] The Commission requested comment on that preliminary finding, as well as on whether non-competes with senior executives should be excluded from the rule or otherwise subject to a different standard. The NPRM did not define the term "senior executive," but sought comment on potential approaches to defining the term.[630]

In the final rule, the Commission does not find that senior executives—specifically, highly paid workers with the highest levels of authority in an organization—are exploited or coerced in connection with non-competes, and it describes the record on this issue in Part IV.C.1. The Commission does, however, find that non-competes with senior executives are an unfair method of competition, based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that impair competitive conditions in the economy. Specifically, the Commission finds that such non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets and labor markets. Indeed, non-competes

---

[627] NPRM, proposed § 910.2(a).
[628] *Id.* at 3500.
[629] *Id.* at 3502-04.
[630] *Id.* at 3520.

with senior executives may tend to negatively affect competitive conditions in product and service markets to an even greater degree than non-competes with other workers, given the outsized role senior executives play in forming new businesses and setting the strategic direction of firms with respect to innovation. The Commission explains the basis for these findings in Part IV.C.2.

Because non-competes with senior executives are not exploitative or coercive, however, this subset of workers is less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers subject to existing non-competes. In addition, commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives. For these reasons, as described in Part IV.C.3, the Commission allows existing non-competes with senior executives to remain in force—unlike existing non-competes with all other workers, which employers may not enforce after the effective date.

In Part IV.C.4, the Commission explains the final rule's definition of "senior executive" and the related definitions it is adopting.[631] The Commission finds that the final rule's definition of "senior executive" appropriately captures the workers that are more likely to have complex compensation packages that present practical challenges to untangle, and who are less likely to be exploited or coerced in connection with their non-competes. To capture this subset of workers for whom the Commission decides to leave existing non-competes unaffected, the final rule adopts a definition of senior executive that uses both an earnings test and a job duties test. Specifically, the final rule defines the term "senior executive" to refer to workers earning more than $151,164 who are in a "policy-making position" as defined in the final rule.[632]

Finally, in Part IV.C.5, the Commission explains the regulatory text it is adopting in

---

[631] *See* § 910.1.
[632] *Id.*

§ 910.2(a)(2), which defines unfair methods of competition related to non-competes with senior executives.

### 1. The Commission Does Not Find that Non-Competes with Senior Executives are Exploitative or Coercive

The Commission stated in the NPRM that its preliminary finding that non-competes are exploitative and coercive did not apply to senior executives. The Commission stated that non-competes with senior executives are unlikely to be exploitative or coercive at the time of contracting, because senior executives are likely to negotiate the terms of their employment and may often do so with the assistance of counsel.[633] The Commission also stated that such non-competes are unlikely to be exploitative or coercive at the time of the executive's potential departure, because senior executives are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete.[634] The Commission sought comment on whether there are other categories of highly paid or highly skilled workers (*i.e.*, other than senior executives) who are not exploited or coerced in connection with non-competes.[635]

Based on the totality of the record, including the many comments submitted on these questions, the Commission finds that senior executives—specifically, highly paid workers with the highest levels of authority in an organization—are substantially less likely than other workers to be exploited or coerced in connection with non-competes. For these reasons, the Commission does not find that non-competes with senior executives are exploitative or coercive.

There is little empirical evidence on the question of whether non-competes with senior

---

[633] NPRM at 3503.
[634] *Id.* at 3504.
[635] *Id.* at 3503-04.

executives are exploitative or coercive. A 2006 study of non-competes with CEOs finds that many of these workers negotiated a severance period as long or longer than their non-compete period, making it easier to sit out of the market.[636] However, this study was limited to very-high-earning CEOs at large public companies—the average total compensation of the CEOs studied was $1.65 million[637]—so its findings do not necessarily capture the experiences of other senior executives. Many Americans work in positions with "senior executive" classifications. According to BLS, there were almost 3.4 million "top executives" in the U.S. in 2022 at firms under private ownership, and the median income for these workers was $99,240.[638]

The comment record on whether senior executives experience exploitation and coercion in relation to their non-competes is mixed. Many commenters asserted that, because some senior executives negotiate their non-competes with the assistance of expert counsel, they are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete, and thus their non-competes are not exploitative or coercive. Several commenters stated that senior executives frequently negotiate non-competes for valuable consideration and/or typically agree to non-competes only in exchange for compensation. Some senior executives said they were not exploited or coerced in connection with non-competes.[639] Several commenters agreed with the Commission's preliminary finding that senior executives often obtain the assistance of counsel with respect to non-competes. Some commenters stated that to the extent a non-compete is not exploitative or coercive at the time of contracting, it is

---

[636] Stewart J. Schwab & Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?*, 63 Wash. & Lee L. Rev. 231, 256-57 (2006).
[637] *Id.* at 244.
[638] BLS, Occupational Employment and Wage Statistics, *Tables Created by BLS*, https://www.bls.gov/oes/tables.htm. These data are from the May 2022 National XLS table for Top Executives under private ownership.
[639] For the sake of readability, the Commission refers to the commenters based on how they described themselves. For example, if a commenter said they were a senior executive, the Commission refers to them as a senior executive (rather than as a "self-described senior executive").

also not exploitative or coercive at the time of departure. One CEO stated that non-competes should be permissible for senior executives when they are entered into in exchange for severance and when the senior executive leaves voluntarily.

The Commission notes that a relatively small number of self-identified senior executives submitted comments in their personal capacity. While the Commission did receive some comments from self-identified senior executives suggesting that their non-competes were exploitative and coercive, such comments were far less common than for other workers. However, some senior executives did report experiencing similar issues of exploitation and coercion. Several senior executives said that their non-competes were required and non-negotiable. Multiple senior executives described their own non-competes as "one-sided" in favor of the employer. Some senior executives said they were not given consideration for the non-compete, and even some who said they received consideration still said their non-competes were exploitative and coercive. For example, some senior executives said they: (1) were required to sign a non-compete under threat of losing their job or their earned compensation; (2) were forced into a stock share buyout that included a non-compete; or (3) could obtain long-term compensation only if they signed a non-compete. Two advocacy groups stated that many senior executives may lack power to avoid non-competes and that employers still hold most of the leverage in employment negotiations, even with respect to senior executives. An employment law firm stated that in its experience, it had not seen higher compensation for senior executives and other highly paid workers in jurisdictions where non-competes were allowed, and that employers rarely provide compensation for non-competes. The firm said that senior executives and other highly paid workers are more likely to receive severance payments, but such payments are paid only in some cases. It said that even when paid, the severance payments often do not

fully compensate for what a senior executive could have otherwise earned during the non-compete period.

Furthermore, several self-identified senior executives said they felt unable to leave their company because of their non-competes. Many of these commenters said they feared being unemployed. Some senior executives said they feared or could not afford litigation, while two senior executives said that they could not afford to fight non-competes they believed were unenforceable. Several self-identified senior executives, having spent their careers in one industry, said they were forced to sit out of the market for long periods, forgoing earnings and the ability to work. Others reported struggling to find a job and suffering financially, including living on Social Security or nearing bankruptcy.

One law firm specializing in executive compensation said many senior executives may have achieved top roles at companies because they have spent decades in the same industry and would struggle to find work with firms other than competitors. Another law firm said senior executives blocked from an industry could lose their long-cultivated reputation in the industry and, as a result, time out of an industry could harm their careers. Worker advocacy organizations and a law firm said senior executives tend to be relatively older and, as older workers are forced out of the job market, they are likely to be losing out on increasingly scarce employment opportunities relative to their younger counterparts. Another advocacy group argued that the Commission did not provide sufficient evidence to support its preliminary finding that non-competes are not exploitative and coercive for senior executives. A few commenters suggested that senior executives from historically marginalized groups may be paid less and have less bargaining power than other senior executives.[640]

---

[640] One of those commenters cited two *USA Today* articles that examined Federal workforce records for 88

Critically, the Commission received an outpouring of comments indicating that highly paid workers who are *not* senior executives (*i.e.*, who are not workers with the highest levels of authority in an organization) are often coerced or exploited via non-competes. The Commission received many comments from workers in relatively higher-wage fields—such as medicine, engineering, finance and insurance, and technology—who stated that employers exploited and coerced them through the use of non-competes.[641] The vast majority of higher-wage workers who are not senior executives reported that they lacked bargaining power in relation to their employer; did not negotiate their non-compete or receive compensation for it; and/or were not informed of the non-compete until after they received the job offer. Many of these workers stated that their non-compete was hidden or obscured; that their employers misled them about the terms of a non-compete; and/or that the non-compete was confusingly worded or vague. In addition, many high-wage workers recounted how non-competes coerced them into refraining from competing against their employer by forcing them to stay in jobs they wanted to leave or forcing them to leave their profession, move their families far away, and/or commute long distances. And a large share of high-wage workers argued that even where their non-competes were overbroad and likely unenforceable, they were deterred from seeking or accepting other work or starting a business by the threat of a lawsuit from their employer, which they said would be

---

companies in the S&P 100 to assess the number of Asian and Latina women in executive positions. The articles did not include the underlying data used for the evaluation. *See* Jessica Guynn & Jayme Fraser, *Asian Women Are Shut Out of Leadership at America's Top Companies. Our Data Shows Why*, USA Today (Apr. 25, 2022), https://www.usatoday.com/story/money/2022/04/25/asian-women-executives-discrimination-us-companies/7308310001/?gnt-cfr=1; Jessica Guynn & Jayme Fraser, *Only Two Latinas Have Been CEOs at a Fortune 500 Company: Why So Few Hispanics Make It to the Top*, USA Today (Aug. 2, 2022), https://www.usatoday.com/story/money/2022/08/02/hispanic-latina-business-demographics-executive/10157271002/?gnt-cfr=1. These news reports find a disparity in the number of Asian and Latina women in senior executive roles at these companies but make no specific findings on bargaining power. While lack of representation and other factors may impact bargaining power, the Commission believes that these two articles (with no underlying data provided) are insufficient evidence at this time to find exploitation and coercion with respect to this subset of senior executives.

[641] *See* Part IV.B.2.b.i-ii.

ruinous to their finances and professional reputations.[642] The Commission accordingly finds that higher-wage workers who are not senior executives are often exploited and coerced through employers' use of non-competes.

In addition, the Commission believes it is appropriate to conclude that lower-earning workers, regardless of their job title or function in an organization, are more likely to be exploited or coerced in connection with non-competes. As noted, many workers classified as "top executives" make under $100,000. Commenters did not self-report their income, so the Commission cannot definitively determine that the self-identified senior executives who reported exploitation and coercion are lower-wage senior executives. Because of their incomes, however, lower-wage senior executives are likely subject to many of the same exploitative and coercive factors that affect other workers, such as the inability to afford a non-compete lawsuit, forgo work for a lengthy period, leave the field, or relocate.[643] Comments from some senior executives confirmed that they did not have sufficient bargaining power to negotiate the non-compete or consideration for it, suffered serious financial harm from non-competes, and could not afford to litigate their non-competes. Accordingly, the Commission finds that a mere job title alone is insufficient to confer bargaining power on a worker, and lower-wage senior executives can be subject to the same exploitation and coercion that other workers face.

However, having considered the comments and the available empirical evidence on this question, the Commission does not find that non-competes with highly paid workers who are also senior executives are likely to be exploitative or coercive. The Commission stresses that it is not affirmatively finding that such non-competes can never be exploitative or coercive. The Commission has simply determined that the record before it is insufficient to support such a

---

[642] *See* Part IV.B.2.b.ii.
[643] *See id.*

finding at this time.

## 2. The Use of Non-Competes with Senior Executives is an Unfair Method of Competition Under Section 5

While the Commission does not find that non-competes with senior executives are exploitative and coercive, the Commission determines that these non-competes are nonetheless unfair methods of competition, for the reasons described herein.

To determine whether conduct is an unfair method of competition under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.[644]

Non-competes with senior executives satisfy all the elements of the section 5 inquiry. As described in Part IV.C.2.a, these non-competes are methods of competition. As described in Part IV.C.2.b, these non-competes are facially unfair conduct because they are restrictive and exclusionary. And as described in Part IV.C.2.c, these non-competes tend to negatively affect competitive conditions in product and service markets and in labor markets. Because the Commission finds that non-competes with senior executives are unfair methods of competition, the Commission declines to exclude them from the final rule. However, as described in Part IV.C.3, the final rule allows existing non-competes with senior executives to remain in effect, due to the considerations described therein.

### a. The Commission finds that non-competes with senior executives are a

---

[644] *See* Part II.F.

**method of competition, not a condition of the marketplace.**

With respect to the first element—whether conduct is a method of competition—the Commission finds that non-competes with senior executives are a method of competition for the same reasons as non-competes with other workers.[645]

### b. Non-competes with senior executives are facially unfair conduct because they are restrictive and exclusionary.

In Part IV.B.2.a, the Commission finds that non-competes with workers other than senior executives are facially unfair conduct because they are restrictive and exclusionary. The Commission finds that non-competes with senior executives are facially unfair conduct for the same reasons.

Like non-competes for all other workers, the restrictive nature of non-competes with senior executives is evident from their name and function: non-competes restrict competitive activity. They prevent senior executives from seeking or accepting other work or starting a business after leaving their job. And like non-competes for all other workers, non-competes with senior executives are exclusionary because they impair the opportunities of rivals. Where a worker is subject to a non-compete, the ability of a rival firm to hire that worker is impaired. In addition, where many workers in a market are subject to non-competes, the ability of firms to expand into that market, or entrepreneurs to start new businesses in that market, is impaired. While non-competes may impair the opportunities of rivals in all labor markets, non-competes for senior executives are especially pernicious in this regard. Senior executives are relatively few in number, are bound by non-competes at high rates,[646] and have highly specialized knowledge and skills. Therefore, it can be extremely difficult for existing firms and potential new entrants to

---

[645] *See* Part IV.B.1.
[646] *See* Part I.B.2 (noting studies estimating that about two-thirds of senior executives work under non-competes).

hire executive talent and to form the most productive matches.

Because senior executives are often compensated in return for their promise not to compete, some commenters argue that non-competes with senior executives are not unfair methods of competition. However, agreements can present concerns under the antitrust laws even when both parties benefit. Here, non-competes with senior executives are not unfair methods of competition under section 5 because they are unfair to the individual executive, but because they tend to negatively impact competitive conditions—*i.e.*, harm competition in product and service markets, as well as in labor markets—by imposing serious negative externalities on other workers, rivals, and consumers.[647]

### c. Non-competes with senior executives tend to negatively affect competitive conditions.

The Commission finds that non-competes with senior executives tend to negatively affect competitive conditions in product and service markets and in labor markets. As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a *tendency* to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused *actual* harm in a specific instance. Here, the tendency of non-competes to impair competition is obvious from their nature and function, as it is for non-competes with workers who are not senior executives. And even if this tendency were not facially obvious, the evidence confirms that non-competes with senior executives do in fact negatively affect competitive conditions.

### i. Non-competes with senior executives tend to negatively affect competitive conditions in product and service markets.

---

[647] *See* Part IV.C.2.i-ii (describing the negative effects of non-competes with senior executives on markets for products and services and labor markets).

In the NPRM, the Commission stated that non-competes with senior executives may harm competition in product and service markets in unique ways.[648] The Commission stated that non-competes with senior executives may contribute more to negative effects on new business formation and innovation than non-competes with other workers, to the extent that senior executives may be likely to start competing businesses, be hired by potential entrants or competitors, or develop innovative products and services.[649] The Commission also stated that non-competes with senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants.[650] The Commission preliminarily concluded that, as a result, prohibiting non-competes for senior executives may have relatively greater benefits for consumers than prohibiting non-competes for other workers.[651]

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes with senior executives tend to negatively affect competitive conditions in markets for products and services, inhibiting new business formation and innovation.

***Non-competes with senior executives inhibit new business formation and innovation***

In Part IV.B.3.b, the Commission described the extensive empirical evidence indicating that non-competes inhibit new business formation and innovation. The Commission's finding in Part IV.B.3.b that non-competes inhibit new business formation and innovation does not examine non-competes with senior executives specifically. However, the Commission finds that non-competes with senior executives inhibit new business formation and innovation at least as

---

[648] NPRM at 3502.
[649] *Id.* at 3513.
[650] *Id.*
[651] *Id.*

much as non-competes with other workers and likely to a greater extent, given the outsized role of senior executives in forming new businesses, serving on new businesses' executive teams, and setting the strategic direction of businesses with respect to innovation.

Specifically, non-competes with senior executives tend to negatively affect competitive conditions in product and service markets in three ways. First, non-competes with senior executives inhibit new business formation. In Part IV.B.3.b.i, the Commission finds that non-competes with workers other than senior executives inhibit new business formation. The Commission finds that non-competes with senior executives inhibit new business formation as much as non-competes with other workers and likely to a greater extent, due to the important role senior executives play in new business formation.

Senior executives are particularly well-positioned to form new businesses because of their strategic expertise and business acumen; knowledge of multiple facets of their industries; experience making policy decisions for businesses; and ability to secure financing. Senior executives are also often crucial to the formation of startups, because startups often begin by forming a leadership team, which is often comprised of experienced and knowledgeable executives from elsewhere in the industry.[652] Empirical research shows that when startups hire top management teams from other firms, they are more likely to grow beyond their initial stages[653] and that top managers' experience in an industry allows startups to grow more quickly.[654] Additionally, empirical research finds that startups that hire top management teams

---

[652] *See, e.g.*, Leslie Crowe, *How to Hire Your First Leadership Team* (Oct. 24, 2023), https://baincapitalventures.com/insight/how-to-hire-your-first-leadership-team-as-a-startup-founder/.

[653] Bradley Hendricks, Travis Howell, & Christopher Bingham, *How Much Do Top Management Teams Matter in Founder-Led Firms?*, 40 Strategic Mgmt. J. 959 (2019).

[654] Yasemin Y. Kor, *Experience-Based Top Management Team Competence and Sustained Growth*, 14 Org. Sci. 707 (2003).

with experience are more likely to become successful businesses.[655] Empirical research also finds that, in addition to experience, top management teams that have worked together in the past are more successful than those that have not.[656] For these reasons, non-competes with senior executives not only inhibit new business formation by blocking the executives from forming new businesses; they also prevent other potential founders from forming new businesses, because potential founders are less likely to start new businesses when they are unable to assemble the executive team they need because so many executives in the industry are tied up by non-competes. By inhibiting new business formation, these non-competes deprive product and service markets of beneficial competition from new entrants—competition that in turn tends to benefit consumers through lower prices or better product quality.

Second, non-competes with senior executives inhibit innovation. In Part IV.B.3.b.ii, the Commission finds that non-competes with workers other than senior executives inhibit innovation. The Commission finds that non-competes with senior executives inhibit innovation at least as much as non-competes with other workers and likely to a greater extent, because senior executives play a crucial role in setting the strategic direction of firms with respect to innovation.

Non-competes with senior executives inhibit innovation by impeding efficient matching between workers and firms. As described in Part IV.B.3.a, labor markets function by matching workers and employers. The same is true for senior executives. Executives compete for roles at firms, and firms compete to attract (often highly sought-after) executives; executives choose the role that best meets their objectives, and firms choose the executive who best meets theirs. Non-

---

[655] Agnieszka Kurczewska & Michał Mackiewicz, *Are Jacks-of-All-Trades Successful Entrepreneurs? Revisiting Lazear's Theory of Entrepreneurship*, 15 Baltic J. of Mgmt. 411 (2020).
[656] Kathleen M. Eisenhardt, *Top Management Teams and the Performance of Entrepreneurial Firms*, 40 Small Bus. Econ. 805 (2013).

competes impede this competitive process by blocking executives from pursuing new opportunities (*i.e.*, positions that are within the scope of their non-compete) and by preventing firms from competing to attract their talent. Thus, because non-competes are prevalent, the quality of the matches between executives and firms suffers.

By inhibiting efficient matching between firms and executives, non-competes frustrate the ability of firms to hire executives who can best maximize the firm's capacity for innovation. Senior executives play an important role in advancing innovation at firms.[657] Senior executives are often a fundamental part of the innovative process, guiding the strategic direction of the firm in terms of topics of new research and the depth of new research; determining the allocation of R&D funding; and making the decision to develop (and supervising the development of) new products and services.[658]

Research shows that labor mobility among senior executives may tend to foster innovation. Empirical research finds that executives with shorter job tenures tend to engage in more innovation than those who are longer tenured at firms.[659] In addition, empirical research shows that the strength of executives' external networks—which are likely stronger among executives hired externally—increase the rate of innovation.[660] Finally, when senior executives

---

[657] *See, e.g.*, Jean-Philippe Deschamps, *Innovation Leaders: How Senior Executives Stimulate, Steer and Sustain Innovation* (John Wiley & Sons, 2009); Jean-Philippe Deschamps & Beebe Nelson, *Innovation Governance: How Top Management Organizes and Mobilizes For Innovation* (John Wiley & Sons, 2014).
[658] Christopher Kurzhals, Lorenz Graf-Vlachy, & Andreas König, *Strategic Leadership and Technological Innovation: A Comprehensive Review and Research Agenda*, 28 Corp. Governance: An Int'l Review 437 (2020); Pascal Back & Andreas Bausch, *Not If, But How CEOs Affect Product Innovation: A Systematic Review and Research Agenda*, 16 Int'l J. of Innovation and Tech. Mgmt. 1930001 (2019); Vassilis Papadakis & Dimitris Bourantas, *The Chief Executive Officer as Corporate Champion of Technological Innovation: An Empirical Investigation*, 10 Tech. Analysis & Strategic Mgmt. 89 (1998) (finding that CEO characteristics significantly influence technological innovation, and that the influence is particularly powerful for new product introductions).
[659] Vincent L. Barker III & George C. Mueller, *CEO Characteristics and Firm R&D Spending*, 48 Mgmt. Sci. 782 (2002).
[660] Qing Cao, Zeki Simsek, & Hongping Zhang, *Modelling the Joint Impact of the CEO and the TMT on Organizational Ambidexterity*, 47 J. of Mgmt. Stud. 1272 (2010); Olubunmi Faleye, Tunde Kovacs, & Anand Venkateswaran, *Do Better-Connected CEOs Innovate More?*, 49 J. of Fin. And Quant. Analysis 1201 (2014).

are hired by new companies, they bring their experience and understanding of the industry, which may cross-pollinate with the capabilities of the new company, cultivating new research which would not otherwise be achieved.[661] By inhibiting efficient matching between executives and firms, non-competes impede the ability of firms to develop innovative products and services that benefit consumers.

Furthermore, empirical research shows that better matching among executives and firms drives productivity as well as innovation. When firms and executives have a higher quality match, the firm as a whole is more productive.[662] By inhibiting efficient matching between firms and executives, non-competes tend to reduce the productivity of firms.

In theory, firms that seek to hire an executive could just pay the executive's employer (or former employer) to escape the non-compete. However, research by Liyan Shi describes how non-competes with senior executives force firms to make inefficiently high buyout payments. Shi ultimately concludes that "imposing a complete ban on noncompete clauses would be close to implementing the social optimum."[663]

Shi explains that firms and executives jointly create market power by entering into non-competes and excluding rivals from hiring experienced labor in a competitive labor market. The existence of a non-compete forces rivals to make an inefficiently high buyout payment, where the inefficiency arises due to the market power of the incumbent firm created by the non-compete. Rival firms must either make these payments, which therefore lead to deadweight economic loss, or forgo the payment—and, consequently, the ability to hire a talented executive

---

[661] *See, e.g.*, Orly Lobel, *Talent Wants to Be Free* (Yale Univ. Press, 2013).
[662] Yihui Pan, *The Determinants and Impact of Executive-Firm Matches*, 63 Mgmt. Sci. 185 (2017); Matthew Ma, Jing Pan, & Xue Wang, *An Examination of Firm-Manager Match Quality in the Executive Labor Market* (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3067808.
[663] Shi, *supra* note 84 at 427.

(and perhaps the ability to enter the market at all, for potential new firms).[664] New and small businesses in particular might be unable to afford these buyouts. By calibrating this theoretical model to data on executive non-competes and executive compensation, the study shows that banning non-competes would result in nearly optimal social welfare gains.

Shi notes that such a mechanism could be tempered by the ability of a labor market to provide viable alternative workers for new or competing businesses. However, when a particular type of labor is somewhat scarce, when on-the-job experience matters significantly, or when frictions prevent workers from moving to new jobs—all of which tend to be the case for senior executives—there is no way for the market to fill the gap created by non-competes.

Some of the evidence in this study arises from analysis of non-compete use coupled with non-compete enforceability. Other evidence in the study, including the finding that a ban on non-competes is close to optimal, relies not on use at the individual level, but on prevalence of non-competes across a labor market. The latter approach does not rely, therefore, on comparing individuals with and without non-competes, and is therefore not subject to the estimation bias that leads the Commission to give less weight to evidence based on the use of non-competes.

### Relevant comments and Commission responses

Many commenters stated that non-competes with senior executives reduce new business formation and innovation, confirming the Commission's findings. Several senior executives recounted personal experiences in which a non-compete prevented them from starting a business. A tech executive stated that they knew many tech executives who would have left their roles to start within-industry spinoffs if not for their non-competes. A senior executive stated that they had planned to start a small business that would not have harmed the former employer but had

---

[664] *Id.*

signed a non-compete that prevented them from doing so. A former executive stated that they were sued after starting a new business despite confirming with the CEO of their former employer that doing so would not violate the non-compete. Another senior executive said their non-compete prevented them from taking a job at a smaller, more innovative company in their industry. Some commenters warned that permitting non-competes for senior executives would reinforce dominant positions for industry incumbents who can foreclose new entrants from access to critical talent and expertise. An advocate for startups stated that small businesses significantly benefit from mentorship from experienced founders, which can be inhibited by non-competes.

Other commenters argued that the Commission should exclude senior executives from coverage under the final rule because doing so would benefit competition in product and service markets. These commenters generally stated that non-competes may promote innovation by encouraging firms to make productivity-enhancing investments, such as investments in developing trade secrets. The Commission does not believe that non-competes are needed to protect valuable firm investments. As discussed in Part IV.D, the Commission finds that employers have less restrictive alternatives for protecting valuable investments and that these alternatives are available for senior executives as well as for other workers.

In addition, when assessing how non-competes with senior executives affect competition in product and service markets, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.C.2.c.i can be occurring at the same time. That is, a non-compete with a senior executive might in some instances be protecting a firm's investments in a manner that is productivity-enhancing, holding all else equal. At the same time, however, that

same non-compete may restrict the executive's ability to start a new business after leaving the firm. And even that same non-compete can—and certainly non-competes in the aggregate do—prevent the most efficient match between senior executives and the firms that can make the highest and best use of their talents, and decrease knowledge flow between firms, which limits the cross-pollination of innovative ideas. What the empirical evidence shows is that overall, *i.e.*, in net effect, non-competes reduce new business formation and innovation,[665] indicating that the tendency of non-competes to inhibit new business formation and innovation more than counteracts any effect of non-competes on promoting new business formation and innovation by protecting a firm's investments.

A commenter—referencing the Shi study—argued that banning buyout clauses in non-competes would enhance economic efficiency relative to banning non-competes altogether. Other commenters, including Shi, the author of the study, disagreed with this claim.[666] In response to these comments, the Commission finds that prohibiting buyout clauses would not enhance efficiency relative to prohibiting non-competes altogether. The Commission does not believe prohibiting buyout clauses would address the tendency of non-competes for senior executives to negatively affect competitive conditions, because it would mean that fewer executives could escape their non-competes, reducing labor mobility and efficient matching between executives and firms even further.

Some commenters disputed the Commission's legal rationale for prohibiting non-competes with senior executives. One comment stated that the NPRM did not cite any case law where a non-compete for a senior executive violated antitrust law and argued that there is no widespread case law to support a *per se* ban. In response, the Commission notes that it is

---

[665] *See* Part IV.B.3.b.i-ii.
[666] Comment of Liyan Shi, FTC-2023-0007-19810.

determining that non-competes are an unfair method of competition under section 5, not a *per se* violation of the Sherman Act. For the reasons described in this Part IV.C.2, the Commission finds that non-competes are restrictive and exclusionary and that, based on the totality of the evidence, they tend to negatively affect competitive conditions at least as much as non-competes with other workers, and likely even more so, given the outsize role of senior executives in new business formation and innovation. For these reasons, the Commission finds that these non-competes are an unfair method of competition under section 5.

Another commenter stated that the NPRM did not satisfy the standard for finding a tendency to negatively affect competitive conditions for senior executives as set forth in the Commission's section 5 Policy Statement.[667] The commenter stated that a *per se* ban on non-competes considers neither the size, power, or purpose of the firm nor how non-competes interact with individual markets. The commenter argued that the evidence cannot justify an economy-wide ban.

The Commission finds that non-competes for senior executives are an unfair method of competition under section 5 for all the reasons described in this Part IV.C.2. The Commission states the applicable legal standard under section 5 in Part II.F, which is consistent with the standard set forth in the Policy Statement. As noted in Part II.F, the Commission need not make a separate showing of market power or market definition. Nor must the Commission show that the conduct directly caused actual harm in the specific instance at issue. Instead, the inquiry under section 5 focuses on the nature and tendency of the conduct. Moreover, as noted in Part II.F, the Commission may consider the aggregate effect of conduct as well. The language in the Policy Statement stating that the size, power, and purpose of the respondent may be relevant is not

---

[667] *See* FTC Policy Statement, *supra* note 286.

limiting, but instead provides guidance regarding factors the Commission may consider in evaluating potentially unfair methods of competition. This guidance may be especially relevant in individual cases and less so in section 5 rulemakings. Finally, as described in Part II.F, a finding that conduct is an unfair method of competition does not require definition of a market or consideration of individual markets. Moreover, as described in Part V.D, the Commission considered and finds no basis for excluding particular industries or workers.

### ii.  Non-competes with senior executives tend to negatively affect competitive conditions in labor markets.

The effects of non-competes with senior executives on product and service markets are the primary reason why the Commission finds that non-competes with senior executives are an unfair method of competition. However, non-competes also tend to negatively affect competitive conditions in labor markets.

***Non-competes with senior executives suppress labor mobility and earnings***

In Part IV.B.3.a, the Commission describes extensive empirical evidence that non-competes reduce labor mobility and worker earnings. The Commission's finding in Part IV.B.3.a that non-competes suppress labor mobility and earnings does not examine non-competes with senior executives specifically. However, the evidence cited by the Commission is also probative with respect to non-competes with senior executives.

Non-competes reduce labor mobility for senior executives for the same reasons they reduce labor mobility for other workers—they directly restrict workers from seeking or accepting other work or starting a business after they leave their job. In Part IV.B.3.a.i, the Commission cites empirical evidence that non-competes reduce labor mobility. This evidence shows that non-competes reduce labor mobility for all subgroups of workers that have been studied, including

inventors, high-tech workers, low-wage workers, and workers across the labor force. The impact of non-competes on labor mobility is direct, since non-competes directly prohibit certain types of mobility. Therefore, the Commission finds the non-competes restrict the labor mobility of senior executives as well.

This finding is supported by Mark Garmaise's study of the relationship between non-compete enforceability and the labor mobility and earnings of executives.[668] Garmaise finds that stricter non-compete enforceability reduces within-industry executive mobility by 47% and across-industry executive mobility by 25%. The study, which is limited to senior executives, uses multiple legal changes in non-compete enforceability, measured along multiple dimensions in a binary fashion. The Shi study qualitatively confirms these results—that executives experience greater labor mobility in the absence of non-competes.[669] However, that study examines use, and not just enforceability, of non-competes, so the Commission gives it less weight.

Furthermore, by inhibiting efficient matching between executives and firms—through a similar mechanism as for all other workers[670]—non-competes reduce executives' earnings. Like non-competes for other workers, non-competes block senior executives from switching to a job in which they would be better paid. And by doing so, non-competes decrease opportunities (and earnings) for senior executives who are not subject to non-competes—as well as for workers who are not senior executives, but who would otherwise move into one of those roles.

As described in Part IV.B.3.a.ii, the empirical research indicates that non-competes suppress wages for a wide range of subgroups of workers across the spectrum of income and job function, including workers who are *not* subject to non-competes. Importantly, an empirical

---

[668] Garmaise, *supra* note 584.
[669] Shi, *supra* note 84.
[670] *See* Part IV.B.3.a.

study that does focus on senior executives finds that non-competes suppress earnings of senior executives. The Garmaise study finds that decreased enforceability of non-competes increases executives' earnings by 12.7%.[671] Garmaise also finds that decreased enforceability of non-competes increases earnings growth for CEOs by 8.2%. Since much of the increase in earnings is attributable to an increase in earnings growth (as opposed to earnings at the start of the employment relationship), Garmaise hypothesizes that earnings increase because CEOs are more likely to invest in their own human capital when they have no non-compete.[672] However, Garmaise also notes that while non-competes may offer benefits to firms which use them, there may be negative impacts across the labor markets in which they are used.[673] This is the only study of executive earnings that does not examine the use of non-competes: it examines multiple legal changes in non-compete enforceability, measured along multiple dimensions (though in a binary fashion).

As noted in Part IV.C.1, many senior executives negotiate valuable consideration for non-competes. However, the evidence suggests that non-competes still have a *net* negative effect on senior executives' earnings, because the suppression of earnings through reduced labor market competition more than cancels out the compensation that some of these executives individually receive for their non-competes.

A second study, by Kini, Williams, and Yin,[674] simultaneously estimates the impact of non-compete enforceability and non-compete use on earnings and finds a positive correlation. The Commission gives this study less weight because it analyzes the use of non-competes. As

---

[671] Garmaise, *supra* note 584 at 403. The reduction in earnings is calculated as $e^{-1.3575*0.1}-1$, where -1.3575 is taken from Table 4.
[672] *Id.* at 402.
[673] *Id.* at 379.
[674] Kini, Williams, & Yin, *supra* note 83.

described in Part IV.A.2, such studies cannot easily differentiate between correlation and causation. Kini, Williams, and Yin use an enforceability measure to generate their estimates, but do not estimate models that omit use of non-competes, meaning that the Commission does not interpret the findings as representing a causal relationship.

***Relevant comments and Commission responses***

Many commenters addressed negative effects of non-competes with senior executives on competition in labor markets. Non-competes, these commenters stated, can negatively affect a senior executive's career when they leave their field or sit out of the workforce for a period, causing their skills and knowledge (particularly in fast-paced fields) to stagnate and affecting their reputations. Like other workers, some senior executives said their non-compete limited their options and earnings in their specialized field.

Other commenters argued that the Commission should exclude senior executives from the rule because they earn more compensation, including higher wages, for non-competes than they would gain under the final rule. Many of these commenters argued that because senior executives have bargaining power, any findings on decreased wages would not apply to them. Some employers stated that they compensated their senior executives for non-competes. Some industry organizations stated that some additional compensation and bonuses might not be offered if non-competes are banned. One business stated that the compensation it pays executives takes their non-competes into account. Another business stated that it provides severance benefits in exchange for non-competes that fully compensate the executive for the duration of the non-compete.

In response to these comments, the Commission notes that the Garmaise study indicates that non-competes have a net negative effect on earnings for senior executives in the aggregate

because they suppress competition, even if individual senior executives receive some amount of compensation for their personal non-compete. Garmaise's analysis accounts for any compensation the executive receives for the non-compete.

An industry trade organization stated that non-competes create job opportunities for executives and other highly skilled workers, rather than restricting them, because, without non-competes to protect confidential information, employers will often be reluctant to expand their executive teams. The Commission notes that this assertion is unsupported by empirical evidence, and the Commission finds that firms have less restrictive alternatives for protecting confidential information.[675]

An investment industry organization stated that the Commission cannot assume that senior executives will be equally or more effective at new firms compared to their old firms. In response, the Commission notes that voluntary labor mobility—for senior executives and all workers—typically reflects a mutually beneficial outcome. To the extent a firm is willing to pay more to attract a particular worker to come work for them, it is typically because the firm places a higher value on the worker's productivity than the worker's current employer. In addition, the Commission notes that many commenters stated that non-competes often force senior executives to sit out of the workforce, causing them to lose valuable knowledge and skills. In general, senior executives are more likely to be effective when they can remain in the industry in which they have experience and expertise, rather than starting over in a new industry because of a non-compete.

An industry trade organization stated that the Commission's assertion that wages are reduced across the labor market is inconsistent with the NPRM's preliminary finding that non-

---

[675] *See* Part IV.D.2.

competes are not coercive or exploitative for senior executives, because when more issues are left for negotiation, the job market is increasingly competitive, as workers can differentiate themselves through their terms and tailor their terms to each employer. The Commission does not believe these findings are in tension. Agreements do not need to be exploitative or coercive to inhibit efficient matching between workers and firms or to negatively affect competitive conditions. Furthermore, the Commission believes that executives have many other ways to differentiate themselves other than based on non-compete terms.

One commenter argued that the findings in the Kini, Williams, and Yin study should not be interpreted as representing a causal relationship. Upon further consideration, the Commission agrees with this comment and does not interpret this study causally, as described in this Part IV.C.2.c.ii.

For these reasons, the Commission finds that non-competes with senior executives are an unfair method of competition. As a result, the Commission declines to exclude senior executives from the final rule altogether.

### 3. The Final Rule Allows Existing Non-Competes With Senior Executives to Remain in Effect

The final rule prohibits employers from, among other things, entering into or enforcing new non-competes with senior executives—*i.e.*, non-competes entered into on or after the effective date.[676] However, the Commission decides to allow existing non-competes with senior executives—*i.e.*, non-competes entered into before the effective date—to remain in effect. The Commission describes the basis for this determination in this Part IV.C.3.

The Commission believes the evidence could provide a basis for prohibiting employers

---

[676] § 910.2(a)(2).

from enforcing existing non-competes with senior executives, as the final rule does for all other workers, given the tendency of such agreements to negatively affect competitive conditions.[677] However, the Commission has decided to allow existing non-competes for senior executives to remain in effect, based on two practical considerations that are far more likely to be present for senior executives than other workers. First, as described in Part IV.C.1, senior executives are substantially less likely than other workers to be exploited or coerced in connection with non-competes. As a result, this subset of workers is substantially less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers with existing non-competes (even if senior executive's existing non-competes are still harming competitive conditions in the economy overall). Second, commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives, as described in this Part IV.C.3.[678]

Numerous businesses and trade associations argued that, if the final rule were to invalidate existing non-competes for senior executives, that would present practical challenges for employers, because many such non-competes were exchanged for substantial consideration. According to commenters, consideration exchanged for non-competes includes long-term incentive plans, bonuses, stock awards, options, or severance payments, among other arrangements.

Some commenters were concerned about a potential windfall for workers. They argued that if the non-compete portion of the contract were rescinded or otherwise invalidated, the worker may be left with any benefits already received in exchange for the non-compete, such as

---

[677] *See* Part IV.C.2

[678] Because the Commission proposed to require employers to rescind existing non-competes—*see* NPRM, proposed § 910.2(b)(1)—many of these comments addressed the proposed rescission requirement specifically. Comments that pertain only to the issue of rescission, and that do not apply to whether existing non-competes for senior executives may remain in effect generally, are addressed in Part IV.E.

equity or bonuses, and could also compete. An industry association stated that some of its members' workers have already received thousands or hundreds of thousands of dollars in additional compensation alongside non-competes, though it was unclear what each worker received. Some business associations said businesses do not have a clear way to recover those payments or benefits. A commenter asked whether a worker who forfeited equity for competing could get the equity back or if executives who were compensated by their new employers for the non-compete would be paid twice.

The Commission views the problem as more complex than these commenters suggest. First, the empirical evidence and comments illustrate that in many cases, non-competes are currently trapping workers, including senior executives, in their jobs, meaning the employer is getting not only the benefit of trapping that individual worker, but also the benefit of non-competition.[679] In such circumstances, employers may have already received part or all of the benefit they sought from entering a non-compete, though the value would be difficult if not impossible to quantitatively assess. Moreover, it is impracticable for the Commission to untangle whether, to the extent some workers received compensation that was denominated consideration for a non-compete, that non-compete simultaneously suppressed other compensation to the worker such as wages. For example, some commenters who described negotiating their non-competes stated the employer used it as a tactic to drive down wages.

In addition, most workers subject to a non-compete are subject to other restrictive covenants,[680] both mitigating any purported harm and complicating any quantitative valuation of a non-compete.

---

[679] *See* Part IV.B.2.b.
[680] *See* Balasubramanian, Starr, & Yamaguchi, *supra* note 74 (finding that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or non-recruitment agreement, and 74.7% of workers with non-competes are also subject to all three other types of provisions).

The Commission also notes that, to the extent equity was provided as consideration, owning a share in the prior employer may induce workers not to risk lowering the value of that equity by competing. However, the concern about workers seeking already-forfeited compensation is misplaced, as the final rule will not impact workers who forfeited compensation for competing under a then-valid non-compete.

Overall, however, where an employer has provided meaningful consideration in exchange for a non-compete, the comments indicate that being unable to enforce that non-compete may complicate that exchange in a way that would be difficult to value and untangle. These difficult practical assessments indicate that the final rule should contain a limited, easily administrable exception for existing non-competes with senior executives, who are considerably more likely than other workers to have negotiated non-competes and received substantial consideration in return.

In addition, an employment attorney suggested that employers may suspend any mid-stream benefits and terminate unvested options and stock and cancel bonuses. One commenter suggested employers may seek refunds from workers, which could create uncertainty. Similarly, an industry association said senior workers who signed a non-compete as part of a severance agreement might see their severance payments taken away, as employers would need to decide whether to continue paying despite the elimination of non-competes or, to the extent they legally can, attempt to renegotiate any outstanding severance agreements. Finally, a business said executives in the middle of their contracts might need to renegotiate those contracts. The Commission shares these concerns about the practicalities of untangling non-competes that are more likely to have been bargained for. Senior executives who engaged in a fair bargaining process may have obtained significant consideration and planned accordingly, as have their

employers. While employers' ability to stop payments or claw back consideration is uncertain, any efforts to do so could be disruptive.

Other commenters stated that they believed rescission could result in litigation against workers. An employment lawyer said litigation was difficult to predict but that there could be litigation seeking declarations from courts on how the rule impacts existing contracts. A group of commenters stated that rescinding or invalidating agreements would lead to increased litigation against workers who received the benefit of the bargain but were no longer bound by a non-compete in exchange, and that such litigation would seek to nullify severance agreements, employment agreements, clawback agreements, and others.

One business said the NPRM was silent on how to address specially taxed arrangements, but the business did not provide additional details on any such arrangements. A law firm said workers who received consideration in a prior year would have paid taxes on it and would now need to amend their prior tax return to get a refund if they have to pay back that consideration, while employers might have to amend their return to reflect the loss of a deduction. That law firm also said some executives and other workers use and plan for non-competes to reduce their "golden parachute" tax burden.

Finally, an accountant explained that valuations of senior executive non-competes are conducted during many merger and acquisition transactions. Similarly, an industry association said acquisition prices may include the value of non-competes that ensure the buyer retains certain talent, so if non-competes were rescinded or invalidated the buyer would lose the value of what they paid for with no way to recoup the costs. The commenter stated that the bargained-for value of such sales may decrease if existing senior executive non-competes cannot be enforced. The exemption for existing non-competes addresses this concern. Moreover, this concern does

247

not exist for future transactions in any event, since they would not account for non-competes that have been banned.

In response to the foregoing comments, the Commission finds it plausible that rendering existing non-competes with senior executives enforceable could create some of these practical implementation challenges. The Commission accordingly elects to exclude existing non-competes with senior executives from the rule, reducing the burden of implementation of the final rule.

The Commission also understands that some of these practical concerns could arise for workers other than senior executives if they received substantial consideration in exchange for a non-compete. However, the evidence indicates that any such agreements with workers other than senior executives are very rare, and that such workers are more likely to experience exploitation and coercion in connection with non-competes. Therefore, allowing only existing non-competes with senior executives to remain in force will significantly reduce these practical concerns for employers. In contrast, a wider exemption for all existing agreements would leave in place a large number of non-competes that tend to harm competitive conditions, including a large number of exploitative and coercive non-competes for which no meaningful consideration was received.

Some commenters suggested that the Commission exempt from the final rule non-competes in exchange for which the worker received consideration. One business asked for an exception to the final rule for paid non-competes, asserting that such an exception would allow workers to receive guaranteed payments while accessing information and training and would allow workers to start their own businesses after the non-compete period. Another business recommended allowing non-competes that provide severance equal to a worker's salary for the

non-compete period. An employment attorney suggested an exception from the rule for non-competes that are part of a severance agreement or where the worker receives a paid non-compete period or garden leave, which the attorney says do not align with the Commission's concerns about non-competes and represent a balanced trade-off.

The Commission declines to adopt an exception for non-competes in exchange for which the worker received consideration (whether under an existing or future non-compete). The fact that a worker received compensation for a non-compete does not mean the worker received fair compensation, *i.e.*, compensation commensurate with earnings that would be received in a competitive labor market. In addition, such an exception would raise significant administrability concerns. For example, a rule that exempts non-competes exchanged for "substantial consideration" or "meaningful consideration" would not provide sufficient clarity to employers and workers to avoid significant compliance costs and litigation risks. Requiring a brighter-line specific amount (or standard) of compensation would be unlikely to appropriately capture highly fact-specific, varying financial circumstances of workers and firms. Moreover, it would be difficult to prevent employers from suppressing compensation or benefits along other dimensions (*e.g.*, a requirement for severance equal to the worker's salary during the non-compete period as one commenter suggested could lead to the salary being suppressed). The Commission also notes, however, that while it is not adopting a blanket exemption from the final rule for non-competes in exchange for which the worker received consideration, it is satisfying this request to some extent by adopting an exemption for existing non-competes for senior executives, which are the non-competes most likely to have been exchanged for consideration.

Finally, the Commission concludes that allowing existing non-competes for senior executives to remain in effect is appropriate despite the significant negative effects of such non-

competes on competition described in Part IV.C.2. The Commission took into consideration that non-competes with senior executives are less likely to be causing ongoing harm to individuals by preventing them from seeking or accepting other work or starting their own business, because such non-competes were likely to have been negotiated or exchanged for consideration. In addition, the negative effects of these non-competes on competitive conditions will subside over time as these non-competes expire.

### 4. Defining Senior Executives

As noted earlier, the Commission did not define the term "senior executive" in the NPRM. Instead, the Commission requested comment on how the term should be defined.[681] In this final rule, the Commission adopts a definition of "senior executive" to isolate the workers who are least likely to have experienced exploitation and coercion and most likely to have bargained for meaningful compensation for their non-compete. Workers for whom exploitation and coercion concerns are likely most relevant and who are unlikely to have bargained for or received meaningful consideration for a non-compete—namely, lower-earning workers, and relatively higher paid or highly skilled workers who lack policy-making authority in an organization—do not fall within this final definition.

This definition is relevant because, as explained in Part IV.C.2, the basis for the Commission's findings that non-competes with senior executives are unfair methods of competition differs in some ways from the evidence and rationales underpinning its findings that non-competes with other workers are unfair methods of competition. Furthermore, as explained in Part IV.C.3, the final rule allows existing non-competes with senior executives to remain in force, while prohibiting employers from enforcing existing non-competes with other workers

---

[681] NPRM at 3520.

after the effective date.

The Commission defines "senior executives" based on an earnings test and a job duties test. In general, the term "senior executives" refers to workers earning more than $151,164[682] who are in a "policy-making position" as defined in the final rule. The Commission adopted this definition after considering the many comments on who senior executives are and how to define them. Notably, the Commission concluded that, unlike highly paid senior executives, highly paid workers other than senior executives and lower-wage workers with senior executive titles as a formal matter likely experience exploitation and coercion and are unlikely to have engaged in bargaining in connection with non-competes, much like lower-wage workers.[683] In other words, the Commission finds that the only group of workers that is likely to have bargained for meaningful compensation in exchange for their non-compete is senior executives who are both highly paid and, as a functional matter, exercise the highest levels of authority in an organization.[684] The Commission estimates that approximately 0.75% of workers are such senior executives.[685]

### a. Definition of "Senior Executive"

The NPRM requested comment on how to define senior executives while providing sufficient clarity to employers and workers.[686] The NPRM stated that there is no generally accepted legal definition of "senior executive" and that the term is challenging to define given the variety of organizational structures used by employers.[687] The NPRM raised the possibility of looking to existing Securities and Exchange Commission ("SEC") definitions; adopting a

---

[682] This threshold is based on the 85th percentile of earnings of full-time salaried workers nationally. *See* Part IV.C.4.b.
[683] *See* Part IV.C.1.
[684] *See id.*
[685] *See* Part X.F.11.
[686] NPRM at 3520.
[687] *Id.*

definition closely based on a definition in an existing Federal regulation; adopting a new definition; defining the category according to a worker's earnings; using some combination of these approaches; or using a different approach.[688] Commenters proposed a wide variety of definitions, largely focused on two types: an exception based on a worker's job duties or title, and an exception based on a compensation threshold. Upon review of the full record, the Commission determines that a test that combines both of these criteria best captures the subset of workers who are likely to have bargained for meaningful compensation in exchange for their non-compete in a readily administrable manner.

### i. The Need for a Two-Part Test

Many commenters suggested combining a compensation threshold with a job duties test. For example, one business supported excepting workers who met a combination of tests based on a compensation threshold, FLSA exemption status, and access to trade secrets. A law firm suggested the final rule should account for both pay, exempting only low-wage hourly workers, and job duties in determining an exception. One commenter suggested defining "senior executive" based on total compensation, job title, and job duties. Though the Commission does not adopt these specific duties and wage combinations, the Commission agrees that a combined approach is necessary.

The Commission has determined that the definition of "senior executive" should include both a compensation threshold and job duties test, similar to the DOL regulations that define and delimit the FLSA's exemption for executive employees.[689] The key advantage of a compensation threshold, as one industry organization commenter stated, is that compensation thresholds are

---

[688] *Id.*
[689] The FLSA is the Federal statute establishing minimum wage, overtime, recordkeeping, and youth employment standards. *See* 29 U.S.C. 201 *et seq.*

objective and easily understood by all stakeholders—yielding significant administrability benefits. However, since not all workers above any given compensation threshold are senior executives, a job duties test is also needed to identify senior executives.

The two-part test isolates the workers most likely to have bargaining power to negotiate meaningful consideration for a non-compete and least likely to experience exploitation and coercion in connection with non-competes. A compensation threshold ensures that stakeholders do not need to spend time assessing the job duties of workers below the threshold—minimizing the amount of detailed analysis stakeholders must undertake. A compensation threshold also helps ensure that workers who work in positions with "senior executive" classifications but likely lack meaningful bargaining power due to their relatively low incomes and who likely did not receive meaningful consideration for a non-compete are excluded from the definition. The job duties test ensures that the definition identifies the individuals most likely to have bespoke, negotiated agreements—those with the highest level of authority over the organization—while also ensuring that high-earning workers who are not senior executives, who likely experience exploitation and coercion from non-competes and do not generally bargain over them, are not captured by the definition.[690]

Clarity from a compensation threshold is essential, as without clarity workers and employers would often be uncertain about a non-compete's enforceability (absent adjudication), and such uncertainty often fosters *in terrorem* effects.[691] For example, an attorney commenter stated that an exception for executive, management, and professional employees and those with access to trade secrets would inherently lack clarity. A lack of clarity could also facilitate evasion by employers, as one law firm commented.

---

[690] *See* Part IV.C.1.
[691] *See* Part IX.C.

While there may be some workers other than senior executives as defined here who may have bargained for consideration for a non-compete, the benefits to workers and employers of a clear and administrable definition outweigh the risk that some bargained-for non-competes are invalidated. In Part IV, the Commission finds even bargained-for non-competes tend to negatively affect competitive conditions. The Commission finds that the need to avoid an overinclusive exception that increases those harms to competitive conditions outweighs the risk that in rare instances private parties with non-competes other than with senior executives may need to restructure their employment agreements to utilize less restrictive alternatives that burden competition to a lesser degree.

Many commenters sought an exception for senior executives and/or highly paid and highly skilled workers based on justifications such as access to trade secrets or confidential information, rather than compensation thresholds. Some argued that compensation thresholds do not align with or allow individualized assessments of which workers meet a given justification such as access to confidential information. One law firm commented that a bright-line compensation threshold would eliminate non-competes for lower wage workers while allowing non-competes for what the commenter viewed as legitimate business purposes. Some commenters opposed an exception for senior executives because they believed "senior executive" would be too difficult to define. In Part V.D.2, the Commission explains why it is not adopting an exception for workers based on their access to trade secrets and other intellectual property. Further, in the Commission's view, eliminating the need for individualized assessments for most workers is the primary advantage of a compensation threshold, not a drawback (although the Commission declines to adopt a compensation threshold alone for reasons stated previously and in Part V.D.1). However, the evidence indicates that an exception for existing

senior executive non-competes is appropriate, which the Commission defines here.

Commenters, both those supporting and opposing the rule, pointed out several issues with compensation thresholds standing alone. Some commenters were concerned a compensation threshold would exclude some workers, such as many physicians, from the final rule's benefits based on their income level. Two commenters said an exception would penalize the advancement of workers near a threshold and those workers may have to choose between higher wages or being free from a non-compete. Including the job duties tests alongside the compensation threshold mitigates the risk of such cliff effects, assuming they exist (which is far from clear).

Some commenters asserted a threshold would need to be updated for inflation, while one law firm commented that frequent updates would make the final rule more difficult to understand and implement. Commenters also pointed out the need to explain when the threshold would be measured. While adjusting for inflation could be important to ensure the final rule continues serving its intended function if the compensation threshold governed a total exemption from the rule (as these commenters assume), it is unnecessary to the final rule because the exception adopted applies only to existing non-competes (*i.e.*, it has only one-time application). The Commission explains in Part IV.C.4.b its reasons for declining to adopt a locality adjustment.

### ii. The Final Rule's Definition of "Senior Executive"

Based on the considerations described in Part IV.C.4.a.i, the Commission adopts a two-pronged definition of "senior executive" in § 910.1. Under § 910.1, a senior executive is a worker who was in a policy-making position and who received from a person for the employment:

- Total annual compensation of at least $151,164 in the preceding year (under paragraph (2)(i)); or

- Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year (under paragraph (2)(ii)); or

- Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete (under paragraph (2)(iii)).

Paragraph (2)(ii) applies to workers who were in a policy-making position during only part of the preceding year, which includes workers who were hired or who left a business entity within the preceding year as well as workers who were promoted to or demoted from a policy-making position in the preceding year. Paragraph (2)(iii) ensures that the exception applies to senior executives who departed from the employer more than one year before the effective date but are still subject to a non-compete (*e.g.*, a worker who left more than a year ago and has a non-compete term of 18 months). To account for those senior executives, paragraph (2)(iii) considers total annual compensation in the year preceding their departure.

To clarify the definition's compensation threshold, the final rule includes definitions of "total annual compensation" and "preceding year." To clarify the job duties test, the final rule includes definitions of "policy-making position" as well as two additional terms that are in the definition of "policy-making position": "officer" and "policy-making authority." These definitions are described in Parts IV.C.4.b and IV.C.4.c.

### b. Defining the Compensation Threshold

Pursuant to § 910.1, the senior executive exception applies only to workers who received total annual compensation of at least $151,164 from a person for employment in a policy-making position in the most relevant preceding year. Section 910.1 further defines "total annual compensation" and "preceding year," respectively. This threshold is based on the 85th percentile

of earnings of full-time salaried workers nationally.[692]

The Commission draws this line between more highly paid and less highly paid workers based on its assessment of which workers are more likely to experience exploitation and coercion and less likely to have engaged in bargaining in connection with non-competes and the need to implement a two-part test. As commenters noted, there is no single compensation threshold above which zero workers will have been coerced and exploited and below which zero workers will have been uncompensated for the non-compete that binds them. Based on the Commission's expertise and after careful review of the rulemaking record, including relevant data, the empirical research, and the public comments, the Commission concludes $151,164 in total annual compensation reflects a compensation threshold under which workers are likely to experience such exploitation and coercion and are less likely to have bargained for their non-competes, while providing employers a readily administrable line. With this line, market participants can easily know that workers below the line cannot be subject to non-competes, minimizing both *in terrorem* effects and eliminating the administrative burden of conducting a job duties test for those workers.

The Commission looked to several sources and suggestions from the comments in selecting a threshold. Numerous commenters suggested the Commission should look to the FLSA, and some specifically recommended the FLSA regulations' threshold for highly compensated employees.[693] DOL sets the compensation threshold for highly compensated employees in its overtime regulations under the FLSA based on earnings of full-time salaried workers. Since January 2020, based on a regulation adopted in 2019, that threshold is $107,432

---

[692] BLS, Labor Force Statistics from the Current Population Survey, https://www.bls.gov/cps/research/nonhourly/earnings-nonhourly-workers.htm (based on the data from the table "Annual average 2023").

[693] However, at the time of commenting the highly compensated employee threshold was $107,432 and the Department had not proposed a new threshold.

and reflects the 80th percentile of full-time salaried workers nationally using combined 2018 and 2019 data.[694] In September 2023, DOL proposed raising that threshold to the 85th percentile of full-time salaried workers nationally and, inter alia, updating the amount to reflect more current earnings data. For 2023, the 85th percentile of full-time salaried workers nationally is $151,164.[695] The Commission recognizes DOL's expertise in determining who qualifies as a highly compensated worker and employers' likely familiarity with DOL regulations. Given this familiarity, the Commission borrows from DOL's definition of compensation to minimize compliance burdens on employers.

Another Federal regulatory threshold for high wage workers noted by commenters also aligns with the 85th percentile of full-time salaried workers nationally in 2023 or approximately $150,000. In the retirement context, the IRS sets a threshold for highly compensated employees at $150,000 for 2023 and $155,000 for 2024.[696] Additionally, the District of Columbia bans non-competes for workers making less than $150,000.[697]

The Commission analyzed occupational wage data to identify a threshold that would capture more highly paid senior executives, who are likely to have bespoke, negotiated non-competes. BLS's most recent wage data indicates that workers in the "chief executive" category

---

[694] 29 CFR 541.601; *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, NPRM, 88 FR 62152, 62157 (Sept. 8, 2023) (hereinafter "2023 FLSA NPRM").

[695] *See* Bur. Of Labor Stats., Research Series on Percentiles of Usual Weekly Earnings of Nonhourly Full-Time Workers, at https://www.bls.gov/cps/research/nonhourly/earnings-nonhourly-workers.htm (based on the table "Annual average 2023"); 2023 FLSA NPRM at 62153. The DOL proposed a threshold at $143,998, the 85th percentile of full-time salaried workers at the time the 2023 FLSA NPRM was proposed. When the highly compensated employee test was originally created in 2004, its $100,000 threshold exceeded the annual earnings of 93.7% of salaried workers. *Id*. at 62159.

[696] IRS, *Definitions*, (Aug. 29, 2023) (Highly Compensated Employees), https://www.irs.gov/retirement-plans/plan-participant-employee/definitions; IRS, *COLA Increases for Dollar Limitations on Benefits and Contributions*, (updated Nov. 7, 2023), https://www.irs.gov/retirement-plans/cola-increases-for-dollar-limitations-on-benefits-and-contributions.

[697] D.C. Code sec. 32-581.02(a)(1) (effective Oct. 1, 2022) (where the employee's compensation is less than $150,000, or less than $250,000 if the employee is a medical specialist, employers may not require or request that the employee sign an agreement or comply with a workplace policy that includes a non-compete).

have a median wage of $209,810.[698] Thus, most "chief executives," most if not all of whom would meet the duties component of the two-part test in this final rule, earn well above the $151,164 compensation threshold, ensuring that the threshold is likely not underinclusive. The Commission notes that some very high-wage occupations have a median wage above $151,164, including: physicians; surgeons; computer and information systems managers; and dentists.[699] To qualify for the exemptions, these workers would have to also meet the job duties portion of the senior executive test, which is appropriate because the Commission finds that workers in these professions are often subject to coercion and exploitation and rarely have bespoke, negotiated non-competes.

The Commission also considered a lower wage threshold of approximately $100,000, which would be closer in range to the DOL highly compensated employee threshold of $107,432 that DOL adopted in 2019. According to 2022 BLS data, the median wage for "top executives" in the U.S. is $99,240.[700] Workers in the "top executive" category include "chief executives," but also include officials with less authority like "general and operations managers." The latter have an annual median wage of $97,030 with their earnings at the 75th percentile being $154,440.[701] The Commission believes that a significant number of general and operations managers (some of whom may be in a policy-making position) likely do not have bespoke, negotiated non-competes. For example, a vice president of operations of a local retail chain with only a few locations would likely be in this category. The same vice president—unlike the vice president of a multinational corporation—is unlikely to possess the same bargaining power or to have a

---

[698] BLS Occupational Employment and Wage Statistics, *supra* note 49. These data are from the May 2022 National XLS table for Chief Executives under private ownership.
[699] *See id.* These data are from the May 2022 National XLS table for private ownership.
[700] *Id.* These data are from the May 2022 National XLS table for Top Executives under private ownership.
[701] *Id.* These data are from the May 2022 National XLS table for General and Operations Managers under private ownership.

bespoke, negotiated employment agreement. Moreover, to the extent an individual's total compensation is under $151,164, in the unlikely event the individual received consideration for their non-compete, such consideration is unlikely to represent a significant part of their compensation.

Similarly, the Commission believes a $107,432 (or thereabouts) threshold would be overinclusive and individuals who likely do not have bespoke, negotiated non-competes—and who were likely to be exploited and coerced—could meet the threshold test. The $107,432 threshold was adopted based on earnings in 2018 and 2019. Adjusting for inflation, $107,432 in June 2019 is the equivalent of $130,158 in February 2024. Moreover, as noted previously, BLS data reflect that chief executives generally earn significantly more than $130,158. In contrast, occupations with a median wage below $151,164 but above $107,432 include: advertising, marketing, promotions, public relations, purchasing, and sales managers; financial managers; software developers; physician assistants; optometrists; nurse practitioners; and pharmacists.[702] These are occupations that the comment record reflects often experience coercion and exploitation with respect to non-competes and rarely have negotiated or compensated non-competes. A civic organization commenter also argued that the DOL regulations' "highly compensated employee" definition's $107,432 threshold was close to the median wage in some industries and areas and cited several cases that it said demonstrate that adopting this threshold would exclude workers who are vulnerable to exploitation and coercion.

Accordingly, the Commission adopts a threshold of $151,164. This threshold, combined with the duties test, reflects highly compensated individuals who are most likely to have the bespoke, complex non-competes that the Commission elects to leave undisturbed, and who the

---

[702] *Id.*

Commission finds are less likely to experience coercion and exploitation. This threshold also has significant administrability benefits, as it is calculated in accord with definitions used in FLSA compliance, with which employers are generally familiar. This alignment will yield efficiency benefits that reduce compliance burdens on employers.

After careful review, the Commission decided not to choose a threshold higher or lower in part because as the compensation threshold in the rule increased, fewer small businesses and firms in areas with lower wages and costs of living would have senior executives with non-competes who would qualify for the exception as compared to larger businesses. Similarly, the lower a threshold is, the more workers who live in areas with higher wages and costs of living would fall above the threshold.[703]

The Commission also declines to adopt a locality adjustment. Some commenters said that a uniform national threshold could lead to geographic disparities because of the different cost of living and average incomes in different areas. Geographic disparities are difficult to resolve, as disparities often exist not just between States, but, for example, between urban and rural areas within a State. The Commission considered this factor in selecting the $151,164 threshold compared to other options. Tailoring a compensation threshold to every locality or even State or region would be burdensome and generate significant confusion for workers and employers. The Commission finds that the importance of a uniform threshold to avoid confusion and for administrability outweighs the drawbacks of any geographic disparities, particularly in light of comments from employers stating that the existing patchwork of State laws is burdensome to navigate. The Commission notes that neither DOL nor IRS have adopted thresholds for highly compensated individuals that vary geographically. Given the rise in remote work, applying

---

[703] *See also* 2023 FLSA NPRM at 62176.

geographic variation to employers and workers would also prove burdensome. Moreover, total annual compensation under § 910.1 includes traditional bonuses or compensation a senior executive might receive, such as a bonus tied to performance that is paid pursuant to any prior contract, agreement, or promise. The rule also allows for the entire amount of such bonuses to be credited to total annual compensation, thus, increasing the likelihood of capturing highly compensated policy-making individuals across the nation.

The Commission estimates that approximately 92% of workers will fall below this compensation threshold, ensuring that existing non-competes will be unenforceable for the vast majority of workers most likely to experience exploitation and coercion in connection with non-competes.[704] The Commission also estimates that approximately 0.75% of workers are likely to be considered senior executives.[705] The compensation threshold reflects the Commission's finding that non-competes are very rarely bargained for, and to the extent they are, below $151,164 such bargaining is almost non-existent and consideration for a non-compete, if any, is likely to be relatively small. Pairing the compensation threshold with the duties test will also minimize compliance costs, as employers and the Commission will not need to conduct job duties tests for those workers whose compensation fall below the threshold.

### i. Definition of "Total Annual Compensation"

Section 910.1 provides that "total annual compensation" is based on the worker's earnings over the preceding year. It is based on DOL's regulation defining "total annual compensation" for highly compensated employees in 29 CFR 541.601(b)(1) and matches DOL's

---

[704] *See* Steven Ruggles, Sarah Flood, Matthew Sobek, Daniel Backman, Annie Chen, Grace Cooper, Stephanie Richards, Renae Rodgers, & Megan Schouweiler. IPUMS USA: Version 15.0 [dataset]. Minneapolis, MN: IPUMS, 2024. https://doi.org/10.18128/D010.V15.0 (American Community Survey 2022 data, adjusted to 2023 dollars and excluding government and non-profit workers).
[705] *See* Part X.F.11.

determination of what types of compensation can count towards total annual compensation for highly compensated employees.

Section 910.1, like DOL's definition, states that total annual compensation may include salary, commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during that 52-week period. Nondiscretionary bonuses and compensation includes compensation paid pursuant to any prior contract, agreement, or promise, including performance bonuses the terms of which the worker knows and can expect.[706] The definition further states that total annual compensation does not include board, lodging and other facilities as defined in 29 CFR 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other similar fringe benefits. Section 541.606 is part of DOL's regulations concerning salary requirements for employees employed in a bona fide executive, administrative, or professional capacity, and applies to highly compensated employees.[707] That regulation cross-references DOL's regulations on wage payments under the FLSA in 29 CFR part 531, including the term "other facilities" defined in 29 CFR 531.32.

This regulatory text makes one modification to the DOL approach to correspond to the final rule's purposes and the non-compete context. Based on comments received, the Commission decided not to adopt DOL's base salary requirement for highly compensated employees in its definition of compensation, which serves a different purpose than the definition adopted here. The 2019 DOL regulation requires that a portion of the worker's total annual compensation must be paid on a salary or fee basis in order to qualify as a highly compensated

---

[706] 29 CFR 778.211(c); *see also* U.S. DOL, Fact Sheet #56C: Bonuses under the Fair Labor Standards Act (FLSA) (Dec. 2019), https://www.dol.gov/agencies/whd/fact-sheets/56c-bonuses.
[707] 29 CFR 541.601(a)(1) ("[A]n employee with total annual compensation of at least $107,432 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee as identified in subparts B, C or D of this part.").

employee, to ensure that the worker receives at least a base salary and to guard against potential abuses.[708] In contrast, the exception in § 910.2(a)(2) applies only to senior executives. The Commission understands that compensation for senior executives can be structured in many different ways. A law firm commented that senior executive compensation can be particularly complex, as base salary may be 20% or less of a senior executive's annual pay, and much of their pay is variable and does not vest until the end of the year. One comment said some CEOs receive only a $1 salary and receive the rest of their compensation in other forms. The definition of total annual compensation in the final rule is designed to allow for different forms of nondiscretionary compensation without requiring employers to pay a particular amount as salary.

### ii. Definition of "Preceding Year"

The definitions of "senior executive" and "total annual compensation" in § 910.1 use the term "preceding year." To provide clarity and facilitate compliance, the Commission defines the term "preceding year" in § 910.1 as a person's choice among the following time periods: the most recent 52-week year, the most recent calendar year, the most recent fiscal year, or the most recent anniversary of hire year. The term "preceding year" is drawn from DOL's FLSA regulations in 29 CFR 541.601(b)(4), which states that "[t]he employer may utilize any 52-week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year. If the employer does not identify some other year period in advance, the calendar year will apply." Here, the Commission similarly gives employers flexibility to minimize compliance costs, as many employers may have compensation more readily available based on the last calendar year,

---

[708] 29 CFR 541.601(b)(1); Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 FR 22122, 22175 (Apr. 23, 2004) ("This change will ensure that highly compensated employees will receive at least the same base salary throughout the year as required for exempt employees under the standard tests, while still allowing highly compensated employees to receive additional income in the form of commissions and nondiscretionary bonuses.").

their fiscal year, or the anniversary of a worker's hire as part of tax and other reporting requirements.

### iii.  Other Proposed Compensation Thresholds

In seeking to exempt senior executives and highly paid workers from the rule altogether, commenters suggested several possible wage-related thresholds, including specific dollar thresholds (*e.g.*, $100,000) not tied to any existing metric or standard; whether the worker is an hourly worker; annual compensation at or above some multiple of the Federal poverty level or minimum wage, as in New Hampshire, Maine, and Rhode Island statutes; State average wages or ten times the local median wage; and $330,000, the IRS annual compensation limit for 401(k) retirement contributions.[709]

As explained in Part V.D, the Commission declines to exempt workers from the rule altogether based on their earnings. With respect to defining the workers whose *existing* non-competes the Commission exempts, the Commission also declines to use these thresholds or standards. For the reasons described in this Part IV.C.4.b, the Commission believes the compensation threshold it is adopting—in combination with the job duties test it is adopting—most effectively isolates the workers (namely, senior executives) who are likely to bargain with employers and receive compensation for their non-competes and who are unlikely to be exploited or coerced in connection with non-competes. While thresholds based on State lines or metrics would reflect differences in wages and costs of living among States, they would not reflect differences between, for example, urban and rural areas within a State and could generate confusion where the threshold varies between States, in addition to increasing compliance

---

[709] IRS, *COLA Increases for Dollar Limitations on Benefits and Contributions*, (updated Nov. 7, 2023), https://www.irs.gov/retirement-plans/cola-increases-for-dollar-limitations-on-benefits-and-contributions; Treas. Reg. sec. 1.401(a)(17)-1.

burdens by requiring employers to assess which State adjustment applies—a particularly challenging task in increasingly cross-border and remote work environments. Using the local median wage would generate too much unpredictability for employers and workers and would face the same administrability and confusion challenges to an even higher degree. In contrast, a uniform national compensation threshold as part of the test provides clarity that reduces the risks of *in terrorem* effects and increases ease of compliance. Finally, the $330,000 threshold is an annual compensation limit, while the IRS has a different test to identify highly compensated employees. A $330,000 threshold would be too high for employers in areas with lower average incomes and costs of living and would likely exclude from the definition many senior executives who bargained for their non-compete in exchange for consideration.

One business recommended an exception for individuals in the top 10% income tier at their respective employers to exempt workers at start-ups that might not be able to compensate their workers at a high level but whose workers may still be exposed to trade secrets. Another proposed using Internal Revenue Code section 414(q), defining highly compensated employee as the highest paid 1% or 250 employees in the corporation. A percentage threshold, however, has significant practical issues including workers entering and exiting, earnings changes, and factoring in independent contractors, workers at subsidiaries, or workers at parent companies. It would also lead to disparities between large and small firms, as large firms could use non-competes for far more workers than could small firms.

Other commenters pointed to State laws setting a compensation threshold to support excluding highly paid workers from the final rule or suggested the Commission look to those States as an example. A public policy organization that supported a categorical ban said any threshold should be at least higher than $100,000, citing research on Washington's non-compete

reforms that indicated employers did not value non-competes up to that threshold.[710] The compensation threshold the Commission is adopting is higher than this amount.

### c. Defining the Job Duties Component

#### i. Definitions of "Officer," "Policy-Making Authority," and "Policy-Making Position"

In NPRM, the Commission suggested that the final rule's definition of senior executive could be based on SEC Rule 3b-7.[711] The Commission did not receive comments specifically addressing this option, but the Commission carefully considered arguments for and against job duties or job title distinctions as well as numerous comments on potential job duties tests, alone or in combination with compensation thresholds, before determining that a modified version of SEC Rule 3b-7's job duties requirements would best meet the exception's goals. The duties test adopted by the Commission is precise and more tailored than the other definitions proposed by commenters[712] and minimizes the risk that workers who likely experienced exploitation and coercion are included in the definition of senior executive. The test focuses primarily on job duties, rather than solely on job titles, because businesses do not all use the same job titles, and a job title might not reflect the worker's actual level of authority in an organization, which is a key indicator of whether a worker is likely to face exploitation and coercion or to have bargained in connection with non-competes.

Section 910.1 defines "policy-making position" as a business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority, or any other natural person who has policy-making authority for the business entity

---

[710] Hiraiwa, Lipsitz & Starr, *supra* note 502.
[711] 17 CFR 240.3b-7; NPRM at 3520.
[712] *See* Part IV.C.4.c.ii.

similar to an officer with policy-making authority. The definition of "policy-making position" further states that an officer of a subsidiary or affiliate of a business entity that is part of a common enterprise who has policy-making authority for the common enterprise may be deemed to have a policy-making position for the business entity for purposes of this paragraph. Finally, the definition of "policy-making position" states that a natural person who does not have policy-making authority over a common enterprise may not be deemed to have a policy-making position even if the person has policy-making authority over a subsidiary or affiliate of a business entity that is part of the common enterprise.

Section 910.1 also defines terms used in the definition of "policy-making position." Section 910.1 defines "officer" as a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any natural person routinely performing corresponding functions with respect to any business entity whether incorporated or unincorporated. To account for differences in the way business entities may use and define job titles, the definition includes workers in equivalent roles. By incorporating this definition of "officer," "senior executive" applies to workers at the highest levels of a business entity.

This definition is nearly verbatim of the SEC definition of "officer" in 17 CFR 240.3b-2. That term "officer" is used in SEC Rule 3b-7.[713] To maintain consistency with the SEC regulations by ensuring that "officer" has the same meaning, and to utilize the SEC's expertise in this area, the Commission adopts the SEC's definition of "officer."

---

[713] 17 CFR 240.3b-7 ("The term executive officer, when used with reference to a registrant, means its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant."); 17 CFR 240.3b-2 ("The term officer means a president, vice president, secretary, treasury or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated.").

Section 910.1 defines "policy-making authority" as final authority to make policy decisions that control significant aspects of a business entity or a common enterprise. The definition further states that policy-making authority does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise.

Accordingly, for a worker to be a senior executive, in addition to meeting the compensation threshold, the worker must be at the level of a president, chief executive officer or the equivalent, officer (defined in § 910.1), or in a position that has similar authority to a president or officer. Further, an officer or other qualifying person must have policy-making authority. Presidents, chief executive officers, and their equivalents are presumed to be senior executives (*i.e.*, employers do not need to consider the further element of "policy-making authority"). The term "chief executive officer or the equivalent" was added to the definition of "policy-making position" to increase clarity on who was included and to reflect the wider range of businesses with various structures that are subject to the final rule (as compared to SEC Rule 3b-7). The definition of "policy-making position" includes workers with equivalent authority because job titles and specific duties may vary between companies. This ensures that the term "senior executive" is broad enough to cover more than just a president or chief executive officer, especially for larger companies, as others may have final policy-making authority over significant aspects of a business entity.

For example, many executives in what is often called the "C-suite" will likely be senior executives if they are making decisions that have a significant impact on the business, such as important policies that affect most or all of the business. Partners in a business, such as physician partners of an independent physician practice, would also generally qualify as senior executives

under the duties prong, assuming the partners have authority to make policy decisions about the business. The Commission notes that such partners would also likely fall under the sale of business exception in § 910.3 if the partner leaves the practice and sells their shares of the practice. In contrast, a physician who works within a hospital system but does not have policymaking authority over the organization as a whole would not qualify.

The Commission changed some aspects of SEC Rule 3b-7 to fit the context of this rulemaking. First, because § 910.2(a)(2) will extend to non-public companies, unlike SEC regulations, the final rule's definition of "policy-making position" does not include the phrase "any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance)" in the definition of "executive officer."[714] The Commission believes that in the context of this final rule, in which the definition is relevant to a broader array of entities than public companies, that phrase would encompass workers who, despite their titles, are among those who are likely to be coerced or exploited by non-competes. For example, this aspect of the definition can be too easily applied to managers of small departments, who the Commission finds are unlikely to have bargained for their non-competes. At the same time, a manager who does in fact have policy-making authority would meet the definition of "officer" in § 910.1 and thus be included in the definition of senior executives (if the manager also meets the compensation threshold). Similarly, depending on the organization, a vice president may have final policy-making authority over significant aspects of a business entity. The adapted definition is based on functional job duties rather than formal job titles.

Second, SEC Rule 3b-7 uses the term "policy making function" as part of its definition of the types of job duties that could classify a person as an "executive officer."[715] While the term

---

[714] 17 CFR 240.3b-7.
[715] *Id.*

270

"policy making function" is undefined in SEC Rule 3b-7 and other SEC regulations, the Commission believes that defining the term "policy-making authority" in § 910.1 would provide greater clarity and facilitate compliance with the final rule. The final rule applies to a wider range of business entities than SEC rules, and the Commission seeks to minimize the need to consult with counsel about the meaning of this term. The Commission is also concerned that if the term is left undefined, employers could, inadvertently or otherwise, label too many workers who have any involvement in the employer's policy making as senior executives, especially workers without bargaining power.

In defining this term, the Commission seeks to broadly align with the SEC's definition of "executive officer" while focusing on *senior* executives in a wider variety of entities, who are less likely to experience exploitation and coercion. As explained in Part IV.C.4.b with respect to the compensation threshold, there is no job duties test that will exclude every worker who experiences exploitation and coercion with respect to non-competes while including every worker who does not. Building on the SEC definition provides firms and workers with a more administrable definition that isolates workers at the most senior level of an organization.

To ensure that the final rule's job duties test for senior executives broadly aligns with the SEC definition, the Commission looked to case law interpreting that SEC definition. Few courts have interpreted SEC Rule 3b-7's "policy making function" language, though some courts view it as an officer test.[716] In the most in-depth discussion, the U.S. District Court for D.C. considered a defendant who was a member of a corporate body that discussed important policy

---

[716] *See, e.g.*, *SEC v. Enters. Solutions*, 142 F. Supp. 2d 561, 570, 574 (S.D.N.Y. 2001) (finding that a so-called consultant's role was "sufficiently similar to the duties of an officer or director of the company that his involvement, along with his history of criminal and regulatory violations, ought to have been disclosed" where the consultant controlled the company, including hiring the CEO, arranging loans from companies controlled by the consultant, negotiating acquisitions, and putting his daughter on the board in his place); *In re Weeks*, S.E.C. Release No. 8313 at *9 (Oct. 23, 2003) (finding a consultant was *de facto* in charge of the company while the officers and directors were figureheads who lacked authority and influence over the company).

decisions and made recommendations to the CEO, and supervised and had "substantial influence" over a major aspect of the company's business. However, the court held that only the CEO, and not the defendant, had authority to make company policy and ultimate decisions on significant issues.[717] The court conducted a fact-intensive analysis of the defendant's duties and held that the defendant did not have the authority to make policy. The court also held that the term did not include individuals solely "involved in discussing company strategy and policy."[718]

The Commission finds this case law instructive and thus defines "policy-making authority" in the final rule as "final authority to make policy decisions that control significant aspects of a business entity and does not include authority limited to advising or exerting influence over such policy decisions." Adding this definition provides stakeholders with additional clarity as to what type of authority meets the definition of "senior executive" and prevents overbroad application of the definition. It expressly does not include workers who merely advise on or influence policy, as a wide range of workers in an organization can advise on or influence policy without being a senior executive.

In order to ensure that lower-level workers, whom the Commission finds likely experience exploitation and coercion, are not included in the definition of senior executive, policy-making authority is assessed based on the business as a whole, not a particular office, department, or other sublevel. It considers the authority a worker has to make policy decisions that control a significant aspect of a business entity without needing a higher-level worker's approval. For example, if the head of a marketing division in a manufacturing firm only makes policy decisions for the marketing division, and those decisions do not control significant aspects of the business (which would likely be decisions that impact the business outside the marketing

---

[717] *SEC v. Prince*, 942 F. Supp. 2d 108, 133-36 (D.D.C. 2013).
[718] *Id*. at 136.

division), that worker would not be considered a senior executive. Similarly, in the medical context, neither the head of a hospital's surgery practice nor a physician who runs an internal medical practice that is part of a hospital system would be senior executives, assuming they are decision-makers only for their particular division. The definition is limited to the workers with sufficient pay and authority such that they are more likely to have meaningful bargaining power and actually negotiated their non-competes.

For the same reason, the Commission added language to the definitions of "policy-making authority" and "policy-making position" to exclude from the definition of "senior executives" workers with policy-making authority over only a subsidiary or affiliate of a common enterprise who do not have policy-making authority over the common enterprise. One commenter argued that the proposed definition of "business entity" would allow firms to divide themselves into separate entities to evade the final rule. In addition to sharing this concern, the Commission is concerned that executives of subsidiaries or affiliates of a common enterprise[719] could rely on their final authority to make policy decisions for only that subsidiary or affiliate to classify the head of each office as a senior executive even though that individual only has authority over one component of a coordinated common enterprise. Rather, the worker must have policy-making authority with respect to the common enterprise as a whole, not just a segment of it, to be a senior executive. Workers who head a subsidiary or affiliate of a common enterprise are similar to department heads; the senior executives controlling the entire common enterprise control those individual subsidiaries and affiliates. As the Commission has explained, the Commission finds that department heads and other highly paid non-senior executives do not have sufficient bargaining power to avoid exploitation and coercion and are unlikely to have

---

[719] *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) ("[C]ourts have justly imposed joint and several liability where a common enterprise exists").

bargained in connection with non-competes. The job duties test identifies the workers with the highest levels of authority in an organization, *i.e.*, the workers most likely to have bargaining power and a bespoke, negotiated agreement, and a common enterprise is effectively a single organization. Such workers may have a senior executive job title, but they are unlikely to meet the job duties test.

To be considered a "common enterprise" for the purposes of defining policy-making authority and policy-making position, the Commission looks beyond legal corporate entities to whether there is a common enterprise of "integrated business entities."[720] This means that the various components of the common enterprise have, for example, one or more of the following characteristics: maintain officers, directors, and workers in common; operate under common control; share offices; commingle funds; and share advertising and marketing.[721] Therefore, the definitions of policy-making authority and policy-making position include provisions whose purpose is to exclude those executives of a subsidiary or affiliate of a common enterprise from being considered senior executives. For example, if a business operates in several States and its operations in each State are organized as their own corporation, assuming these businesses and the parent company meet the criteria for a common enterprise, the head of each State corporation would not be a senior executive. Rather, only the senior executives of the parent company (or whichever company is making policy decisions for the common enterprise) could qualify as

---

[720] *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636-37 (6th Cir. 2014).

[721] *See id.* ("'If the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness. Courts generally find that a common enterprise exists 'if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing.'") (quoting *FTC v. Wash. Data. Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012)). In assessing a common enterprise, "no one factor is controlling," and "federal courts routinely consider a variety of factors." *FTC v. Wyndham Worldwide Corp.*, No. CIV.A. 13-1887 ES, 2014 WL 2812049, at *7 (D.N.J. Jun. 23, 2014); *see also Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) ("[T]he pattern and frame-work of the whole enterprise must be taken into consideration.")

senior executives for purposes of this final rule, because they are the workers with the highest level of authority in the organization and most likely to have bargaining power and a bespoke, negotiated agreement. However, a worker could qualify as a senior executive even if they were an executive of one or more subsidiaries or affiliates of the common enterprise, so long as that senior executive exercised policy-making authority over the common enterprise in its entirety. These provisions are consistent with the approach taken elsewhere in this final rule to focus on real-world implications and authority rather than formal titles, labels, or designations. This exclusion from the definitions of "policy-making authority" and "policy-making position" applies only to common enterprises; for subsidiaries or affiliates that are not part of a common enterprise, a worker could qualify as a senior executive if they have policy-making authority over that subsidiary or affiliate and meet all of the requirements.

The Commission has also substituted "business entity" in the definitions of "officer" and "policy-making position" where SEC Rule 3b-7 uses the word "registrant" and 17 CFR 240.3b-2 uses "organization," because "registrant" has a specific meaning in the SEC context that is inapplicable to the wider array of business entities covered by this final rule and because "business entity" is defined in § 910.1 and is used throughout this final rule. The Commission substituted "natural person" where SEC Rule 3b-7 and 17 CFR 240.3b-2 use "person" because "person" is separately defined for purposes of this final rule in § 910.1.

### ii.  Other Proposed Job Duties Tests

*The FLSA*

Numerous commenters suggested basing a job duties test on the categories of occupations that are exempt from requirements under the FLSA. Some commenters suggested using only

some of the exemptions such as executive employees,[722] administrative employees, learned or creative professionals, or workers in the practice of medicine.[723] DOL's regulations also set a salary threshold at not less than $684 per week ($35,568 annually),[724] though other commenters suggested using a higher compensation threshold.

One civic organization opposed applying any FLSA exemptions, stating that the FLSA provides numerous exemptions that do not relate to any non-compete policy considerations, and an exception or more lenient standards for FLSA-exempt workers would not solve the problems caused by non-competes. It opposed using the FLSA's executive, administrative, or professional exemptions, arguing that updates to the FLSA's salary threshold are often delayed and outdated, often falling below the poverty threshold, and the duties test serves as a loophole for wage and hour protections.

Commenters offered several reasons for adopting the FLSA exemptions: these categories are already well-established in Federal law; nonexempt workers under the FLSA tend not to have access to trade secrets or be able to take an employer's goodwill and are thus less likely to harm the employer; the exemptions would capture both wage and job duties tests; some States use a similar standard to the FLSA in their non-compete statutes; and the exemptions would ban non-competes for low-skilled workers for whom there are insufficient justifications for non-competes. An employment attorney also pushed back on the NPRM's concerns that the FLSA exemptions could enable misclassification,[725] asserting that misclassification under the FLSA is unlawful and penalized, and thus usually inadvertent.

---

[722] *See* 29 CFR 541.100(a).
[723] *See* DOL, Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA) (revised Sept. 2019), https://www.dol.gov/agencies/whd/fact-sheets/17a-overtime.
[724] *Id.*
[725] *See* NPRM at 3511.

The Commission does not adopt the FLSA exemptions for purposes of this final rule because it would exempt millions of non-competes that harm competition and workers. For example, the FLSA exempts most highly paid and highly skilled workers,[726] who the Commission finds experience exploitation and coercion (except where those workers are also senior executives).[727] The Commission also adopts brighter-line rules than the FLSA to ease compliance burdens and address *in terrorem* effects that result from uncertainty about whether a non-compete is unenforceable.[728] Although the Commission does not believe that the FLSA job duties tests are appropriate for this final rule, it does view the FLSA wage threshold methodology for "highly compensated employees" as a useful benchmark.[729]

### *Trade Secret and Confidential Information Exceptions*

Numerous commenters urged the Commission not to ban non-competes for workers who have access to trade secrets and confidential information, often noting this justification is commonly used for highly paid and highly skilled workers, including senior executives. One comment expressly stated that this exception should apply regardless of earnings, though many others did not mention compensation thresholds. One business suggested a bright-line rule for the types of confidential business information that can be protected by a non-compete based on existing State statutes, to increase certainty about what is allowed. Commenters suggested exceptions based on a variety of job types they viewed as more likely to be exposed to trade secrets and confidential information, including all highly skilled workers; key scientific, technical, R&D, or sales workers; or workers with highly detailed knowledge of business and

---

[726] *See* 2023 FLSA NPRM at 62190 (estimating that 36.4 million salaried, white-collar employees currently qualify as FLSA-exempt executive, administrative, or professional employees).
[727] *See* Part IV.C.1.
[728] *See* Part IX.C.
[729] *See* Part IV.C.4.b.

marketing plans. The Commission explains why it is not adopting exceptions based on access to trade secrets or other intellectual property in Parts V.D.1 and V.D.2.

***Additional Proposed Job Duties and Job Title Tests***

The Commission carefully considered several other proposed tests. The NPRM stated that the Commission could base the definition of senior executive on SEC Regulation S-K's definition of senior executives.[730] Commenters did not discuss this potential option. The Commission is not adopting this approach because it bears little relation to the likelihood that a senior executive bargained for a non-compete, and because it would designate roughly seven individuals per company as "senior executives" regardless of their compensation level or the size of the company, meaning it would not apply equally among employers or workers.[731] For example, a ten-person company could potentially use non-competes for most of its workforce irrespective of whether they are senior executives, whereas a company with ten thousand employees would be limited to the same number.[732]

One commenter proposed adopting a definition similar to the tax code provision on "golden parachute payments."[733] Several commenters drafted their own definition of senior executive based on job duties, titles, or ownership status, such as C-suite executives and their immediate subordinates, partners and equity holders, managers, workers involved in strategic decision-making, and more.

The Commission carefully considered each proposed definition and how it would operate

---

[730] *See* NPRM at 3520 (citing 17 CFR 229.402(a)(3)).

[731] *See* 17 CFR 229.402(a)(3).

[732] Additionally, while the reporting obligations of public companies may provide them with an incentive to avoid generating a profusion of "senior executives," privately held companies would not face a similar constraint and could potentially avoid any "per-company" limitations through corporate restructuring.

[733] This provision determines who is an "officer" "on the basis of all the facts and circumstances in the particular case (such as the source of the individual's authority, the term for which the individual is elected or appointed, and the nature and extent of the individual's duties) . . . ." Treas. Reg. sec. 1.280G-1, Q/A-18.

in practice before selecting the two-part test. Elements of some of these proposals, such as strategy development or decision-making, are also similar to the job duties test the Commission is finalizing. The Commission believes that definitions based on job titles alone would be inadequate because, as one industry association commented, employers define job titles differently, and a title might not accurately reflect a worker's job duties. The other definitions proposed by commenters, such as the provision on golden parachute payments, would generally require a more fact-intensive analysis than the job duties test the Commission is adopting. Market participants would need to conduct the analysis for more workers, including workers who are exploited and coerced by non-competes. A more fact-intensive analysis would require more resources for litigation and is thus likely to have *in terrorem* effects for lower-wage workers.[734] Moreover, many of these proposals would exempt more workers than the Commission's definition, such as managers, even though workers in such roles and occupations are often coerced and exploited by non-competes.

As explained in this Part, the Commission pairs a relatively easy-to-apply job duties test with a compensation threshold to maximize administrability and clarity while identifying those senior executives most likely to have actually bargained for non-competes. In addition, proposals to except partners, shareholders, and similar groups are likely covered by the sale of business exception if they sell their share of the business upon leaving.

### 5. Prohibitions in Section 910.2(a)(2)

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission adopts § 910.2(a)(2), which defines unfair methods of competition

---

[734] *See* Part IX.C.

related to non-competes with respect to senior executives. Section 910.2(a)(2) provides that, with respect to a senior executive, it is an unfair method of competition for a person: (i) to enter into or attempt to enter into a non-compete clause; (ii) to enforce or attempt to enforce a non-compete clause entered into after the effective date; or (iii) to represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date. Part IV.A.1 sets forth the Commission's determination that the foregoing practices are unfair methods of competition under section 5, and Part IV.C.2 explains the findings that provide the basis for this determination.

Section 910.2(a)(2) uses similar language as § 910.2(a)(1); however, there are two key differences. First, the prohibition in § 910.2(a)(2)(ii) on enforcing or attempting to enforce a non-compete applies only to non-competes entered into after the effective date. Second, the prohibition in § 910.2(a)(2)(iii) on representing that a senior executive is subject to a non-compete applies only where the non-compete was entered into after the effective date. Sections 910.2(a)(2)(ii) and (iii) include this language because, for the reasons described in Part IV.C.3, the Commission has determined not to prohibit existing non-competes with senior executives—*i.e.*, non-competes entered into before the effective date—from remaining in effect.

Otherwise, the explanation of the three prongs of § 910.2(a)(1) in Part IV.B.4—relating to issues such as, for example, what "attempt to enter into" and "attempt to enforce" mean, and what conduct the "representation" prong applies to—is applicable to the corresponding language in § 910.2(a)(2). The good-faith exception in 910.3 is also applicable to the relevant prohibitions with respect to senior executives and is explained in Part V.C.

### D. Claimed Justifications for Non-Competes Do Not Alter the Commission's Finding that Non-Competes Are an Unfair Method of Competition

For the reasons described in Parts IV.B and IV.C, the Commission determines that certain practices related to non-competes are unfair methods of competition under section 5. In this Part IV.D, the Commission finds that the claimed justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition.

As noted in Part II.F, some courts have declined to consider justifications altogether and the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[735] However, where defendants raise justifications as an affirmative defense, they must be legally cognizable,[736] and non-pretextual,[737] and any restriction used to bring about the benefit must be narrowly tailored to limit any adverse impact on competitive conditions.[738]

In the NPRM, the Commission considered the commonly cited business justifications for non-competes and preliminarily found they did not alter the Commission's determination that non-competes are an unfair method of competition.[739] The Commission has reviewed and considered the comments on its analysis of the justifications for non-competes. For two reasons, the claimed justifications for non-competes do not alter the Commission's determination that

---

[735] *Atl. Refin. Co.*, 381 U.S. at 371 (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *FTC v. Texaco*, 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"); *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 15 (7th Cir. 1971) ("While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice."). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through section 5.

[736] *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 463 (1986); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 467-68 (1941); *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423-24 (1990).

[737] *See, e.g.*, *Ind. Fed'n of Dentists*, 476 U.S. at 464. *See also United States v. Microsoft Corp.*, 253 F.3d 35, 62-64, 74 (D.C. Cir. 2001); *Eastman Kodak Co. v. Image Tech. Svcs.*, 504 U.S. 451, 484-85 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-10 (1985).

[738] *NCAA v. Alston*, 594 U.S. 69, 99-104 (2021); *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines, sec. 3.36b. *See also Union Circulation Co. v. FTC*, 241 F.2d 652, 658 (2d Cir. 1957) ("The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices.").

[739] NPRM at 3504-08.

non-competes are an unfair method of competition. First, employers have more narrowly tailored alternatives to non-competes for protecting valuable investments that tend to negatively affect competitive conditions to a lesser degree. Second, the asserted benefits from the claimed business justifications from non-competes do not justify the considerable harm from non-competes.

### 1. Claimed Business Justifications for Non-Competes and Empirical Evidence

Claimed business justifications for non-competes relate to increasing employers' incentives to make productive investments, such as investments in worker human capital (worker training), client and customer attraction and retention, or in creating or sharing trade secrets or other confidential information with workers. According to these asserted justifications, without non-competes, employment relationships are subject to an investment hold-up problem. Investment hold-up would occur where an employer—faced with the possibility that a worker may depart after receiving some sort of valuable investment or obtaining valuable information— opts not to make that investment in the first place, thereby decreasing the firm's productivity and overall social welfare. For example, according to this claimed justification, an employer may be more reticent to make capital investments or invest in workers' human capital by training its workers if it knows the worker may depart for or may establish a competing firm. Similarly, commenters argued that employers may decrease investments or experience harm if a worker takes a trade secret or other confidential information to a competitor.

Courts have cited these justifications when upholding non-competes under State common law and in cases challenging non-competes under the Sherman Act.[740] However, courts have not considered non-competes' aggregate harms, and neither legislatures nor courts have had occasion

---

[740] *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898); *Polk Bros., Inc. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985).

to consider these justifications in the context of section 5. The Commission has considered them and found them unavailing in cases in which it has successfully obtained consent decrees against non-competes alleged to be an unfair method of competition in violation of section 5.[741]

There is some empirical evidence that non-competes increase investment in human capital of workers, capital investment, and R&D investment. However, the Commission also finds that there are alternatives that burden competition to a lesser degree,[742] and, in any event, these claimed benefits do not justify the harms from non-competes.[743]

As explained in the NPRM, a study by Evan Starr finds that moving from mean non-compete enforceability to no non-compete enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-competes at a high rate (relative to a control group of occupations that use non-competes at a low rate).[744] The study further finds that changes in training are primarily due to changes in firm-sponsored, rather than employee-sponsored, training.[745]

Firm-sponsored training is the type of investment in human capital that non-competes are often theorized to protect, as the firm may be unwilling to make an unprotected investment. However, the study does not distinguish between core training, *i.e.*, training required to perform job duties, and advanced training, *i.e.*, training with potential to increase productivity beyond the baseline requirements for job performance. When non-competes are more enforceable, workers

---

[741] *See* FTC, *In the Matter of O-I Glass, Inc and In the Matter of Ardagh Group S.A., Ardagh Glass Inc., and Ardagh Glass Packaging Inc.*, Analysis of Agreements Containing Consent Order to Aid Public Comment, FTC File No. 2110182 (Jan. 4, 2023) at 6-7; FTC, *In the Matter of Prudential Security, Inc., et al.*, Analysis of Agreement Containing Consent Order to Aid Public Comment, FTC File No. 2210026 (Jan. 4, 2023) at 7; FTC, *In the Matter of Anchor Glass Container Corp. et al.*, FTC File No. 2210182 Analysis of Agreement Containing Consent Order to Aid Public Comment (Mar. 15, 2023) at 6.
[742] *See* Part IV.D.2.
[743] *See* Part IV.D.3.
[744] Starr, *supra* note 445 at 796-97.
[745] *Id.* at 797.

may receive additional core training rather than advanced training, but this may actually reflect a reduction in efficiency. When non-competes are more enforceable, labor mobility decreases and workers may also move to new industries to avoid potentially triggering non-compete clause violations (as discussed in Part IV.B.2.b.ii), both of which make experienced workers less often available for hire. Firms therefore may need to train workers at a greater rate because they will hire inexperienced workers who require more core training. On the other hand, advanced training can be associated with productivity gains, and firms using non-competes may increase rates of advanced training for experienced workers because non-competes increase the likelihood that firms receive a return on the training investment. The study does not distinguish between these types of training, and thus leaves unclear whether the observed increases in training reflect productivity gains or losses (or neither in net).

Additionally, the Starr study uses data on the use of non-competes, comparing high- and low-use occupations, rather than changes in enforceability; however, the study does not examine differences between individuals who are bound by non-competes and individuals who are not. This study is the only study that attempts to identify the causal link between non-competes and worker human capital investment, and the Commission gives it some weight, though not as much weight as it would receive if it examined changes in non-compete enforceability. The Commission also weights it less highly because it does not distinguish between core and advanced training.

The second study, by Jessica Jeffers, finds that knowledge-intensive firms invest substantially less in capital equipment following decreases in the enforceability of non-competes, though the effect is much more muted (and statistically insignificant) when considering all

industries.[746] While firms may invest in capital equipment for many different reasons, Jeffers examines this outcome (as opposed to labor-focused outcomes) to avoid looking at R&D expenditure as a whole, which is in large part composed of labor expenses. This allows the study to isolate the effects of non-compete enforceability on investment from other effects of non-competes, such as reduced worker earnings.

Jeffers finds that there are likely two mechanisms driving these effects: first, that firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (*i.e.*, the return on investment in capital equipment is greater when workers are more highly trained); and second, that non-competes reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[747] Jeffers does not find any impact of non-compete enforceability on R&D expenditure (intangible investment). The sample in this study's examination of capital investment is limited to incumbent firms, and the study also finds decreases in new firm entry due to increases in non-compete enforceability. The study therefore does not offer clear insights into the overall net effect on capital investment (which includes investment by incumbent firms as well as investment by entering firms). Additionally, the Commission notes that if Jeffers' hypothesis—that firms increase investment in capital because of decreased competition—is correct, then this increased capital investment may not necessarily reflect increased economic efficiency. Jeffers uses multiple changes in non-compete enforceability, measured in a binary fashion, and the Commission therefore gives this study substantial weight, but less weight than studies which additionally measure enforceability in a

---

[746] Jeffers, *supra* note 450 at 28. Jeffers reports 34%-39% increases in capital investment due to increases in non-compete enforceability at knowledge-intensive firms in the 2024 version of the study, and the Commission calculates increases of 7.9% across all sectors (see Part X.F.9.a.i).
[747] *Id.* at 29.

non-binary fashion.

Two studies published after the release of the NPRM also assess the effects of non-competes on firm investments. A study by Johnson, Lipsitz, and Pei revisits the form of the regressions used by Jeffers. The authors find that greater non-compete enforceability increases R&D expenditure.[748] This is consistent with the NPRM's preliminary finding, and the finding of the Jeffers study, that there is evidence that non-competes increase employee human capital investment and other forms of investment. The Commission gives this study substantial weight because it examines multiple changes in non-compete enforceability measured in a non-binary fashion.

Similarly, a study by Liyan Shi examines the relationship between non-compete enforceability, the use of non-competes among executives, and firm investment.[749] Shi finds that intangible capital (expenditure on R&D) is positively associated with use of non-competes, especially in States that enforce non-competes more strictly. However, Shi finds that—unlike in the Jeffers study—physical capital expenditure has no relationship with the use of non-competes, even in high enforceability States. The Commission notes that this evidence pertains specifically to non-competes with highly paid senior executives: the executives in Shi's study earned $770,000 in cash compensation, on average. The Commission also notes that this evidence arises from analysis of non-compete use coupled with non-compete enforceability. The Commission therefore gives less weight to these empirical findings.

As the NPRM described, there are also two studies examining the impact of non-compete use (as opposed to non-compete enforceability) on investment. However, these studies simply compare differences between samples of workers that do and do not use non-competes, a

---

[748] Johnson, Lipsitz, and Pei, *supra* note 526.
[749] Shi, *supra* note 84.

methodology the Commission gives less weight to.[750] The first is a study by Starr, Prescott, and Bishara using their 2014 survey of non-compete use. They find no statistically significant association with either training or the sharing of trade secrets (after inclusion of control variables) but do not examine other investment outcomes.[751] The second study, by Johnson and Lipsitz, examines investment in the hair salon industry. That study finds that firms that use non-competes train their employees at a higher rate and invest in customer attraction through the use of digital coupons (on so-called "deal sites") to attract customers at a higher rate, both by 11 percentage points.[752]

As the Commission stated in the NPRM, it gives these two studies (the 2021 Starr, Prescott, and Bishara studies and the 2021 Johnson and Lipsitz studies) minimal weight, because they do not necessarily represent causal relationships, a point recognized by the authors of both of these studies.[753] Similar to other studies of non-compete use—as opposed to changes in non-compete enforceability—these studies are less reliable because the use of non-competes and the decision to invest may be jointly determined by other characteristics of the firms, labor markets, or product markets.[754]

One additional study, by Younge and Marx, finds that the value of publicly traded firms increased by 9% due to an increase in non-compete enforceability.[755] As the Commission noted in the NPRM, the authors attribute this increase to the value of retaining employees, which comes with the negative effects to parties other than the firm (employees, competitors, and

---

[750] *See* Part IV.A.2.
[751] Starr, Prescott, & Bishara, *supra* note 68 at 76.
[752] Johnson & Lipsitz, *supra* note 80 at 711.
[753] Starr, Prescott, & Bishara, *supra* note 68 at 73; Johnson & Lipsitz, *supra* note 80 at 711.
[754] *See* Part IV.A.2 (describing the analytical framework the Commission is applying to weigh the empirical studies, including why it assigns greater weight to studies assessing changes in non-compete enforceability than to studies of non-compete use).
[755] Kenneth A. Younge & Matt Marx, *The Value of Employee Retention: Evidence from a Natural Experiment*, 25 J. Econ. & Mgmt. Strategy 652 (2016).

consumers) described in Parts IV.B and IV.C. As the NPRM stated, if the benefits to the firm arise primarily from reductions in labor costs, then the increase in the value of firms is in part a transfer from workers to firms and is therefore not necessarily a benefit of non-competes. However, the authors do not explore the extent to which increases in firm value arise from decreases in labor costs. The authors additionally note that since the time frame used in the study is short, "there may be deleterious effects of non-competes in the long run" which are absent in their findings.[756] This study does not address the effects of non-competes on firm investments specifically.

As the Commission stated in the NPRM, it is unaware of any evidence of a relationship between the enforceability of non-competes and the rate at which companies invest in creating or sharing trade secrets.[757] Similarly, the Commission is unaware of any evidence non-competes reduce trade secret misappropriation or the loss of other types of confidential information, difficult areas for researchers to study given the lack of reliable data on firms' trade secrets and confidential information.[758] As explained in Part IV.D.2, even assuming non-competes do reduce misappropriation or information loss, the Commission finds that there are alternatives to protect these investments that burden competition to a lesser degree.

### 2. Employers Have Alternatives to Non-Competes for Protecting Valuable Investments

#### a. The Proposed Rule

In the NPRM, the Commission preliminarily found that employers have alternatives to

---

[756] *Id.* at 674.

[757] Recent evidence suggests that trade secret litigation does not increase following bans on non-competes. Brad N. Greenwood, Bruce Kobayashi, Evan Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation* (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4771171. The Commission does not rely on this study to support the findings described in this Part IV.D.

[758] *See, e.g.*, David S. Levine & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act*, 53 Wake Forest L. Rev. 106, 120-22 (2018).

non-competes for protecting valuable investments.[759] The Commission stated that these alternatives may not be as protective as employers would like, but they reasonably accomplish the same purposes as non-competes while burdening competition to a less significant degree.[760]

The Commission stated that trade secret law—a form of intellectual property law that protects confidential business information—already provides significant legal protections for an employer's trade secrets.[761] The Commission also stated that employers that seek to protect valuable investments are able to enter into NDAs with their workers. NDAs, which are also commonly known as confidentiality agreements, are contracts in which a party agrees not to disclose or use information designated as confidential.[762] The Commission further stated that, if an employer wants to prevent a worker from leaving right after receiving valuable investment in their human capital, the employer can sign the worker to an employment contract with a fixed duration.[763] In addition, the Commission stated that employers that wish to retain their workers can also pay their workers more, offer them better hours or better working conditions, or otherwise improve the conditions of their employment—*i.e.*, compete to retain their labor services.[764]

The Commission also noted that in three States—California, North Dakota, and Oklahoma—employers generally cannot enforce non-competes, so they must protect their investments using one or more of these less restrictive alternatives.[765] The Commission stated that the economic success in these three States of industries that are highly dependent on trade

---

[759] NPRM at 3505-07.
[760] *Id.*
[761] *Id.* at 3505-06.
[762] *Id.* at 3506-07.
[763] *Id.* at 3507.
[764] *Id.*
[765] Since the NPRM was issued, Minnesota has become the fourth State to make non-competes unenforceable. *See* Minn. Stat. Ann. sec. 181.988 (effective July 1, 2023).

secrets and other confidential information illustrates that companies have viable alternatives to non-competes for protecting valuable investments.[766]

### b.  The Commission's Final Findings

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the asserted business justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition. Employers have alternatives to non-competes for protecting valuable investments that burden competition to a less significant degree. Rather than restraining a broad scope of beneficial competitive activity—by barring workers altogether from leaving work with the employer or starting a business and by barring competing employers and businesses from hiring those workers—these alternatives are much more narrowly tailored to limit impacts on competitive conditions.

For the protection of trade secrets and other confidential information, these alternatives include enforcement of intellectual property rights under trade secret and patent law, NDAs, and invention assignment agreements. Employers also have alternative mechanisms to protect their investments in worker human capital, including fixed duration contracts, and competing on the merits to retain workers by providing better pay and working conditions.

The experiences of certain States in banning non-competes bolster this conclusion. Non-competes have been void in California, North Dakota, and Oklahoma since the 1800s.[767] In these

---

[766] NPRM at 3507.

[767] Non-competes have been void in California since 1872, in North Dakota since 1865, and in Oklahoma since 1890. *See* Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Non-Compete Clauses*, 74 N.Y.U. L. Rev. 575, 616 (1999) (California); *Werlinger v. Mut. Serv. Casualty Ins. Co.*, 496 N.W.2d 26, 30 (N.D. 1993) (North Dakota); Brandon Kemp, *Noncompetes in Oklahoma Mergers and*

three States, employers generally cannot enforce non-competes, so they must protect their investments using one or more less restrictive alternatives. There is no evidence that employers in these States have been unable to protect their investments (whether in human capital, physical capital, intangible assets, or otherwise) or have been disincentivized from making them to any discernible degree. Rather, in each of these States, industries that depend on highly trained workers and trade secrets and other confidential information have flourished. California, for example, is home to four of the world's ten largest companies by market capitalization, and it also maintains a vibrant startup culture.[768] Technology firms are highly dependent on highly-trained and skilled workers as well as protecting trade secrets and other confidential information—and, since the 1980s, California has become the epicenter of the global technology sector, even though employers cannot enforce non-competes.[769] Indeed, researchers have posited that high-tech clusters in California may have been aided by increased labor mobility due to the unenforceability of non-competes.[770] In North Dakota and Oklahoma, the energy industry has thrived, and firms in the energy industry depend on highly-trained workers as well as the ability to protect trade secrets and other confidential information.

The Commission finds that the economic success in these three States of industries that are highly dependent on highly trained workers, trade secrets, and other confidential information illustrates that non-competes are not necessary to protect employers' legitimate interests in

---

*Acquisitions*, 88 Okla. Bar J. 128 (2017) (Oklahoma). Minnesota also recently prohibited non-competes, through a law that took effect in July 2023. *See* Minn. Stat. sec. 181.988. However, Minnesota's experience is too new to draw conclusions about the ability of industries that depend on trade secrets to thrive where non-competes are unenforceable.

[768] Josh Dylan, *What Is Market Cap In Stocks?*, Nasdaq.com (Aug, 12, 2022), https://www.nasdaq.com/articles/what-is-market-cap-in-stocks; Ewing Marion Kauffman Found., *State Entrepreneurship Rankings*, https://www.realclearpublicaffairs.com/public_affairs/2019/02/25/kauffman_foundation_state_entrepreneurship_rankings.html.

[769] *See, e.g.*, Gilson, *supra* note 767 at 594-95.

[770] *See, e.g.*, *id.* at 585-86, 590-97; Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rev. Econ. & Statistics 472, 477 (2006).

trained workers or securing their intellectual property and confidential information. These alternatives are available to employers and viable both with respect to senior executives and to workers other than senior executives. The Commission addresses these alternatives in this Part IV.D.2.b and summarizes and responds to the comments on these alternatives in Part IV.D.2.c.

### i.  Trade Secret Law

The Commission finds that trade secret law provides employers with a viable, well-established means of protecting investments in trade secrets, without the need to resort to the use of non-competes with their attendant harms to competition. Trade secret law is a form of intellectual property law that is specifically focused on providing employers with the ability to protect their investments in trade secrets.[771]

Forty-seven States and D.C. have adopted the Uniform Trade Secrets Act ("UTSA").[772] The UTSA provides a civil cause of action for trade secret misappropriation, which refers to disclosure or use of a trade secret by a former employee without express or implied consent.[773] The UTSA also provides for injunctive and monetary relief, including compensatory damages, punitive damages, and attorney's fees.[774]

In addition, in 2016, Congress enacted the Defend Trade Secrets Act of 2016 ("DTSA"), which established a civil cause of action under Federal law for trade secret misappropriation.[775] The DTSA brought the rights of trade secret owners "into alignment with those long enjoyed by owners of other forms of intellectual property, including copyrights, patents, and trademarks."[776]

---

[771] Brian T. Yeh, *Protection of Trade Secrets: Overview of Current Law and Legislation*, Cong. Rsch. Serv. 4 (Apr. 22, 2016) (Report R43714), https://sgp.fas.org/crs/secrecy/R43714.pdf.

[772] *See* Levine & Seaman, *supra* note 758 at 113. The three States that have not adopted the UTSA offer protection to trade secrets under a different statute or under common law. Yeh, *supra* note 771 at 6 n.37.

[773] Uniform Trade Secrets Act with 1985 Amendments (Feb. 11, 1986) at sec. 1(2).

[774] *Id.* at secs. 2-4.

[775] Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376, 379 (2016).

[776] U.S. Senate, Report to Accompany S. 1890, the Defend Trade Secrets Act of 2016, S. Rep. No. 114-220 at 3 (2016).

Similar to State laws modeled on the UTSA, the DTSA authorizes civil remedies for trade secret misappropriation, including injunctive relief, damages (including punitive damages), and attorney's fees.[777] The DTSA also authorizes a court, in "extraordinary circumstances," to issue civil ex parte orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action."[778] There is thus a clear Federal statutory protection that specifically governs protection of trade secrets.

Trade secret theft is also a Federal crime. The Economic Espionage Act of 1996 ("EEA") makes it a Federal crime to steal a trade secret for either (1) the benefit of a foreign entity ("economic espionage") or (2) the economic benefit of anyone other than the owner ("theft of trade secrets").[779] The EEA authorizes substantial criminal fines and penalties for these crimes.[780] The EEA further authorizes criminal or civil forfeiture, including of "any property constituting or derived from any proceeds obtained directly or indirectly as a result of" an EEA offense.[781] The EEA also requires offenders to pay restitution to victims of trade secret theft.[782]

Under the UTSA, DTSA, and EEA, the term "trade secret" is defined expansively and includes a wide range of confidential information.[783] The viability of trade secret law as a means

---

[777] 18 U.S.C. 1836(b)(3).
[778] 18 U.S.C. 1836(b)(2).
[779] 18 U.S.C. 1831 (economic espionage); 18 U.S.C. 1832 (theft of trade secrets).
[780] 18 U.S.C. 1831-1832.
[781] 18 U.S.C. 1834, 2323.
[782] 18 U.S.C. 1834, 2323.
[783] The UTSA generally defines a "trade secret" as information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use and (2) is the subject of reasonable efforts to maintain its secrecy. UTSA, *supra* note 773 at sec. 1(4). The DTSA and EEA use a similar definition. 18 U.S.C. 1839(3). The Supreme Court has held that "some novelty" is required for information to be a trade secret, because "that which does not possess novelty is usually known." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974). As the high court of one State noted in applying a State statute based on the UTSA, "business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures." *U.S. West Commc'ns, Inc. v. Off. of Consumer Advoc.*, 498 N.W.2d 711, 714 (Iowa 1993). *See also Confold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 959 (7th Cir. 2006) ("A trade secret is really just a piece of information (such as a customer list, or a method of production, or a secret formula for a soft drink) that the holder tries to keep secret by

for redressing trade secret theft is illustrated by the fact that firms regularly bring claims under trade secret law. A recent analysis by the legal analytics firm Lex Machina finds that 1,156 trade secret lawsuits were filed in Federal court in 2022.[784] In addition, an analysis by the law firm Morrison Foerster finds that 1,103 trade secret cases were filed in State courts in 2019.[785] The number of cases filed in State court has held steady since 2015, when 1,161 cases were filed.[786] The fact that a considerable number of trade secret lawsuits are filed in Federal and State courts—over 2,200 cases per year—and the fact that this number has held relatively steady for several years suggests that many employers themselves view trade secret law as a viable means of obtaining redress for trade secret theft.

The use of trade secret law burdens competition to a lesser degree than the use of non-competes. Trade secret law provides firms with a viable means of redressing trade secret misappropriation—and deterring trade secret misappropriation by workers—without blocking beneficial competitive activity, such as workers switching to jobs in which they can be more productive or starting their own businesses.

### ii. NDAs

NDAs provide employers with another well-established, viable means for protecting valuable investments.[787] NDAs are contracts in which a party agrees not to disclose and/or use

---

executing confidentiality agreements with employees and others and by hiding the information from outsiders by means of fences, safes, encryption, and other means of concealment, so that the only way the secret can be unmasked is by a breach of contract or a tort.").
[784] Gloria Huang, *Lex Machina Releases its 2023 Trade Secret Litigation Report*, Lex Machina (Jul. 13, 2023), https://lexmachina.com/blog/lex-machina-releases-its-2023-trade-secret-litigation-report/.
[785] Kenneth A. Kuwayti & John R. Lanham, Morrison Foerster, Client Alert,
*Happy Anniversary, DTSA: The Defend Trade Secrets Act at Five* (May 25, 2021), https://www.mofo.com/resources/insights/210525-defend-trade-secrets-act-dtsa.
[786] *Id.* at n.5.
[787] The Commission uses the term "NDA" to refer to contractual provisions that are designed to protect trade secrets or other business information that has economic value. Employers may also seek to use NDAs to protect other kinds of information, such as information about discrimination, harassment, sexual assault, corporate wrongdoing, or information that may disparage the company or its executives or employees. These types of NDAs have been widely

information designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract.[788] Employers regularly use NDAs to protect trade secrets and other confidential business information. Researchers estimate that between 33% and 57% of U.S. workers are subject to at least one NDA.[789] One study finds that 95.6% of workers with non-competes are also subject to an NDA; 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement; and 74.7% of workers with non-competes are subject to all three provisions.[790] In most States, NDAs are more enforceable than non-competes.[791] While some commenters argued that NDAs would not be an adequate alternative to non-competes because of the NPRM's proposed functional definition of "non-compete clause," the final rule will not prevent employers from adopting garden-variety NDAs; rather, it prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business.[792]

Appropriately tailored NDAs burden competition to a lesser degree than non-competes. Such NDAs may prevent workers from disclosing or using certain information, but they generally do not prevent workers from seeking or accepting other work, or starting their own business, after their employment ends. As the Tenth Circuit has stated, workers subject to NDAs, unlike workers subject to non-competes, "remain free to work for whomever they wish,

criticized for, among other things, their pernicious effects on workers. *See, e.g.*, Rachel S. Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining In Non-Disclosure Agreements*, UC-Hastings Research Paper 2-6 (Jan. 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4022812.
[788] *See* Chris Montville, *Reforming the Law of Proprietary Information*, 56 Duke L.J. 1159, 1168 (2007).
[789] Arnow-Richman, *supra* note 787 at 2-3.
[790] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 44. The value 97.5% is calculated as (1-0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete (see Table 1 on page 36), and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete, regardless of what other post-employment restrictions they have.
[791] Montville, *supra* note 788 at 1179-83.
[792] *See* Part III.D.2.b.

wherever they wish, and at whatever they wish," subject only to the terms that prohibit them from disclosing or using certain information.[793]

### iii. Other Means of Protecting Valuable Investments

The Commission finds that employers have additional well-established means of protecting valuable investments in addition to trade secret law and NDAs. For the protection of trade secrets and other confidential information, the Commission finds that these additional means include patent law and invention assignment agreements. Patent law provides inventors with the right, for a certain period of time, to exclude others from making, using, offering for sale, or selling an invention or importing it into the U.S.[794] During the period when patent protection is effective, patents grant the patent holder these exclusive rights, while other firms may use trade secrets if they are independently developed, reverse-engineered, or inadvertently disclosed.[795] In some cases, however, firms may choose to keep their invention a trade secret rather than seeking a patent because patent protection only lasts a certain number of years, after which the invention becomes part of the public domain.[796] Where a technology, process, design, or formula is able to meet the rigorous standards for patentability, patent law provides companies with a less restrictive alternative than non-competes for protecting it.[797]

Employers can further protect their property interests in these forms of intellectual property through appropriately tailored invention assignment agreements. These are agreements that give the employer certain rights to inventions created by the employee during their

---

[793] *MAI Basic Four, Inc. v. Basis, Inc.*, 880 F.2d 286, 288 (10th Cir. 1989).
[794] 35 U.S.C. 271.
[795] Yeh, *supra* note 771 at 3-4.
[796] *Id.* at 4-5. *See also United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 186 (1933) (rather than seeking a patent, an inventor "may keep his invention secret and reap its fruits indefinitely.").
[797] Yeh, *supra* note 771 at 4-5.

employment with a firm.[798] Like patent law, this tool, when appropriately tailored, provides employers with additional protection for some of their most valuable intellectual property interests.

With respect to investments in worker human capital, the Commission finds that these less restrictive alternatives include fixed duration contracts and competing on the merits to retain workers. If an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration. An employer can establish a term that is long enough for the employer to recoup its human capital investment, without restricting who the worker can work for, or their ability to start a business, after their employment ends. In doing so, the employer makes a commitment to the worker and vice versa.

Finally, instead of using non-competes to lock in workers, the Commission finds that employers that wish to retain their workers can also compete on the merits for the worker's labor services—*i.e.*, they can provide a better job than competing employers by paying their workers more, offering them better hours or better working conditions, or otherwise improving the conditions or desirability of their employment. These are all viable tools for protecting human capital investments and other investments an employer may make that do not rely on suppressing competition.

### c. Comments and Responses to Comments

Many commenters agreed with the Commission's preliminary finding that employers have less restrictive alternatives to non-competes. These commenters asserted that trade secret law, combined with NDAs, creates a powerful deterrent to post-employment disclosures of trade

---

[798] *See, e.g.*, *Milliken & Co. v. Morin*, 731 S.E.2d 288, 294-95 (S.C. 2012); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 759-60 (Iowa 1999); *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 886-87 (N.J. 1988).

secrets and confidential information, and that these tools adequately protect valuable investments in the absence of non-competes. The Commission agrees with these commenters. Other commenters asserted that the alternatives to non-competes identified in the NPRM are inadequate for protecting employer investments. The Commission summarizes and responds to the comments it received on less restrictive alternatives in this Part IV.D.2.c.

### i. Comments and Responses to Comments on Trade Secrets and Other Confidential Information

Several commenters who generally supported the proposed rule stated that trade secret law and NDAs offer meaningful enforcement advantages to employers compared with non-competes. A few commenters stated that, unlike non-competes, trade secret law and NDAs are broadly enforceable in all fifty States. A few commenters stated that, while monetary penalties for breaching non-competes are ordinarily difficult to obtain, employers can obtain substantial monetary recovery for trade secret law and NDA violations. The Commission agrees with these comments.

Several commenters stated that the scope of trade secret law is limited in various respects. Several commenters stated, for example, that customer lists, pricing, and bid development information are typically excluded from the definition of "trade secret" under the DTSA and the law of many States. In response to these comments, the Commission notes that customer information may be classified as trade secrets under certain circumstances, such as when the information is not generally known or not otherwise easy to obtain and when a firm has taken measures to protect the confidentiality of the information.[799] Employers may also use

---

[799] *See U.S. West Commc'ns, Inc. v. Off. of Consumer Advoc.*, 498 N.W.2d 711, 714 (Iowa 1993) ("business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs . . ."); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) ("A customer

NDAs to protect such information. NDAs broadly protect all information defined as confidential, regardless of whether such information constitutes a "trade secret" under State or Federal law.[800]

Some commenters argued that other tools under intellectual property law, such as patent and trademark law, are inadequate to protect employers' investments. These commenters misinterpret the Commission's findings. The Commission did not find in the NPRM, nor does it find in this final rule, that patent law standing alone or trademark law standing alone provide employers benefits equal to the benefits they may reap from an unfair method of competition, namely the use of non-competes. Rather, the Commission finds that patent law can be used, together with the other tools the Commission cites, including NDAs and fixed-term employment contracts, to protect legitimate investments in intellectual property and worker human capital investment and therefore that these tools, taken together, are viable alternatives to non-competes.

A number of commenters stated that there are enforceability disadvantages to trade secret law and NDAs compared to non-competes. Several commenters stated that trade secret law and NDAs are inadequate to protect employer investments prophylactically because employers can enforce them only after the trade secrets or other confidential information have already been disclosed. These commenters stated that trade secrets and confidential information can be highly valuable, and its value could be destroyed as soon as a worker discloses such information to a competing employer. Additionally, some commenters argued that trade secret law and NDAs are inadequate to protect employers' investments because enforcement outcomes for trade secrets and NDAs are less predictable and certain than with non-competes. Some comments suggested

---

list may be a trade secret, but not all customer lists are trade secrets under Texas law. The broader rule of trade secrets, that they must be *secret*, applies to customer lists"); *Home Paramount Pest Control Cos. v. FMC Corporation/Agricultural Prods. Group*, 107 F. Supp. 2d 684, 692 (D. Md. 2000) ("There is no question that a customer list can constitute a trade secret."); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 922 (2005) ("[W]hether customer lists are trade secrets depends on the facts of each case.").

[800] *See, e.g.*, *Tendeka, Inc. v. Glover*, No. CIV.A. H-13-1764, 2015 WL 2212601 at *14 (S.D. Tex. May 11, 2015).

that this purported clarity of non-competes benefits workers, arguing that non-competes offer bright lines workers can follow to ensure against unintended violations. Other commenters assert that non-competes themselves are not necessarily effective as a prophylactic remedy, because it is often unclear whether a particular non-compete is enforceable, and non-competes are difficult to enforce in many jurisdictions. A few commenters stated that prophylactic remedies are already available under trade secret law in almost half of U.S. States where the doctrine of inevitable disclosure is recognized, while other commenters were concerned that not all States recognize the doctrine. Other commenters argued the inevitable disclosure doctrine may be worse for workers, and one commenter argued that the final rule would increase the use of the inevitable disclosure doctrine and thus reduce worker mobility.

Some commenters stated that prophylactic remedies are necessary to adequately protect trade secrets and confidential information because workers can exploit their former employers' trade secrets and confidential information without ever disclosing the information themselves, thus leaving aggrieved employers with no recourse under trade secret law or an NDA. Specifically, these commenters argued that when workers take new roles, they will inevitably use their knowledge of former employers' confidential information. For example, where a worker has experience with attempts and failures to develop new ideas or products with a former employer, they will likely use this knowledge to prevent a new employer from making similar mistakes, thus free riding off the former employer's development efforts, costs, and time. A commenter argued that preventing non-competes from restricting this type of misappropriation would discourage investment and harm innovation in the long run.

The Commission believes that what some commenters describe as the "prophylactic" benefits of non-competes—that an employer can block a worker from taking another job, without

respect to any alleged misconduct—is also the source of their overbreadth because it enables employers to restrict competition in both labor markets and product and service markets, as detailed in Parts IV.B and IV.C. That employers prefer to wield non-competes as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition. The Commission also disagrees that banning non-competes would discourage investment and would harm innovation in the long run. As discussed in Part IV.B.3.b.ii, the Commission finds that the weight of the evidence indicates that non-competes reduce innovation by preventing workers from starting businesses in which they can pursue innovative new ideas; inhibiting efficient matching between workers and firms (making it less likely that workers match with firms that can maximize their talent and productivity); and decreasing the cross-pollination of ideas.

Additionally, the Commission notes that non-compete agreements themselves cannot be said to provide ironclad "prophylactic" protections against disclosure of trade secrets and other confidential information. As other commenters point out, in the absence of this rule, it is often unclear whether and to what extent a specific non-compete is enforceable, and they are difficult to enforce in many jurisdictions. Moreover, non-competes do not prevent the worker from disclosing trade secrets or confidential information after the end of the non-compete period or outside of the clause's geographic restriction. The Commission also notes that, as a few commenters stated, prophylactic remedies are already available under trade secret law in almost half of U.S. States where the doctrine of inevitable disclosure is recognized.[801]

---

[801] In some States, under the "inevitable disclosure doctrine," courts may enjoin a worker from working for a competitor of the worker's employer where it is "inevitable" the worker will disclose trade secrets in the performance of the worker's job duties. *See, e.g.*, *PepsiCo, Inc.* v. *Redmond*, 54 F.3d 1262, 1269, 1272 (7th Cir.

Several commenters argued that detecting and proving violations of NDAs and trade secret law is more difficult than for non-competes, and that enforcement is accordingly more expensive, because it is more difficult to detect and obtain evidence of the disclosure or use of confidential information than it is to determine that a former worker has moved to a competitor. Some commenters asserted that trade secret litigation is expensive because the cases are fact-intensive and involve litigating multiple challenging issues. Some commenters argued that as a result, the proposed rule conflicted with Congressional intent underlying the DTSA. A few commenters similarly argued that breaches of non-solicitation agreements are difficult to detect and can be enforced only after the solicitation has occurred. While the Commission recognizes that trade secrets litigation and NDA and non-solicitation enforcement may be more costly than non-compete enforcement in some instances, the Commission is not persuaded that higher costs associated with alternative tools make those tools inadequate. The comments do not establish that pursuing remedies through trade secrets litigation or NDA enforcement are prohibitively expensive. In any event, the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[802] While employers may find that protecting trade secrets and confidential information or customer relationships by using non-competes to restrict worker mobility, regardless of whether that worker would misappropriate confidential information or solicit customers, is easier for them, the Commission finds that same overbreadth of non-competes imposes significant negative

---

1995). The inevitable disclosure doctrine is controversial. Several States have declined to adopt it altogether, citing the doctrine's harsh effects on worker mobility. *See Bayer Corp.* v. *Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999); *LeJeune* v. *Coin Acceptors, Inc.*, 849 A.2d 451, 470-71 (Md. 2004). Other States have required employers to meet high evidentiary burdens related to inevitability, irreparable harm, and bad faith before issuing an injunction pursuant to the doctrine. *See generally* Eleanore R. Godfrey, *Inevitable Disclosure of Trade Secrets: Employee Mobility* v. *Employer Rights*, 3. J. High Tech. L. 161 (2004).
[802] *See supra* note 305 and accompanying text.

externalities on workers, consumers, businesses, and competition as a whole.[803] This overbreadth that employers benefit from wielding is what causes the harms from non-competes relative to more narrowly-tailored alternatives.

Some commenters contended that higher burdens for establishing violations of trade secret and IP laws will harm employer incentives to share trade secrets with workers and to invest in valuable skills training. The Commission is not persuaded that higher evidentiary burdens render trade secret law and NDAs inadequate for protecting employers' valuable investments. Heightened standards are a valuable mechanism to filter out overbroad restrictions on beneficial competitive activity. The comment record is replete with examples of workers bound by non-competes who lacked knowledge of trade secrets or whose employment with a competitor never threatened their previous employer's investments. To the extent that trade secret law and NDAs require higher evidentiary showings, that makes these alternatives more tailored tools for protecting employers' valuable investments without unduly restricting a worker from engaging in competitive activity.

Some commenters argued that, without non-competes, employers would limit access to valuable trade secrets within the workplace because trade secret law requires employers to show reasonable efforts to maintain the secrecy of an alleged trade secret to prove a violation, and that reduced rates of intrafirm trade secrets sharing will ultimately harm innovation as well as workers. In response, the Commission notes that the empirical evidence indicates otherwise: when non-competes are more enforceable, the overall level of innovation decreases.[804] Furthermore, these comments seem to overstate the burden of reasonable efforts to keep information secret. Under the DTSA, courts have found that employers meet this requirement by

---

[803] *See* Parts IV.B and IV.C.
[804] *See* Part IV.B.3.b.ii.

sharing information at issue only among workers bound by NDAs or maintaining such information in password-protected digital spaces.[805] Accordingly, assertions that employers will need to take extraordinary precautions to maintain secrecy over trade secrets and confidential information are inconsistent with standards courts typically recognize for determining whether reasonable efforts were taken to keep such information confidential. The Commission is not persuaded that requirements in trade secret law to show reasonable efforts to maintain secrecy will deter intrafirm information sharing, or otherwise make alternative tools inadequate.

Several commenters argued that the Commission should not find that employers have adequate alternatives to protecting their valuable investments because there is a lack of empirical evidence specifically showing that trade secret law and NDAs are effective for the purpose of protecting trade secrets and confidential information. In response, the Commission notes that trade secret law is a body of law that is specifically designed to protect the interests being asserted; employers consistently bring cases under this body of law; and a preference among firms for a blunter instrument for protecting trade secrets and confidential information cannot justify an unfair method of competition that imposes significant negative externalities on workers, other firms, consumers, and the economy.[806] An industry trade organization commenter stated that neither fixed-duration employment contracts nor improved pay, benefits, or working conditions specifically protect against the disclosure of confidential information. In response, the Commission notes that firms can protect against the disclosure of confidential information using trade secret law and NDAs, and, where applicable, patent law and invention assignment agreements. And in response to these commenters, the Commission notes that companies in

---

[805] *See e.g.*, *In re Adegoke*, 632 B.R. 154, 167 (Bankr. N.D. Ill. 2021); *Houser v. Feldman*, 569 F. Supp. 3d 216, 230 n.7 (E.D. Pa. 2021); *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011).
[806] *See* Parts IV.B. and IV.C (describing the negative externalities from non-competes).

California, North Dakota, and Oklahoma have been able to protect their trade secrets and other confidential information adequately using tools other than non-competes since the late nineteenth century. Industries that are highly dependent on trade secrets and other confidential information have flourished in those States even though non-competes have been unenforceable.

A few commenters disputed the NPRM's contention that the rate at which employers pursue trade secrets litigation is evidence of the viability of trade secret law as a means for redressing trade secret theft or protecting confidential information, in part because those employers were not necessarily relying exclusively on trade secret law. The Commission does not assert that these data, alone, conclusively establish that trade secret law is a perfect vehicle for redressing trade secret theft. Rather, the data show that trade secret litigation is more than a mere theoretical possibility—it is an avenue that many companies choose to redress trade secret theft and indeed it is the body of law designed and developed for this very purpose. Accordingly, the Commission believes that the fact that many companies bring claims under the well-established body of State and Federal law on trade secrets is relevant evidence that trade secret law provides a viable means for redressing trade secret theft.

Some commenters suggested that a higher volume of trade secrets litigation in California may reflect a higher rate of trade secret disclosure due to the State's policy against enforcing non-competes. However, these commenters did not provide evidence to support this hypothesis. The Commission also notes that industries in California that depend on protecting trade secrets have thrived despite the inability to enforce non-competes; indeed, the State is the capital of the global technology industry. Therefore, regardless of whether there is a higher rate of trade secret litigation in California, the less restrictive alternatives identified in this Part IV.D have provided sufficient protection to enable these companies to grow, thrive, and innovate. Furthermore, the

rate of trade secret litigation in California may result from factors unique to California's economy, such as California's high concentration of technology companies relative to other States. As such, the Commission does not believe there is credible evidence to suggest that trade secrets are disclosed at a higher rate in California than in other jurisdictions.[807]

Many commenters agreed with the Commission's preliminary conclusion that the economic success in California, North Dakota, and Oklahoma of industries highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-competes for protecting valuable investments. In contrast, a few commenters argued that the Commission mischaracterized California's non-compete ban because they claim that California permits non-competes to protect trade secrets, citing dicta from the 1965 California Supreme Court case *Muggill v. Reuben H. Donnelley Corp.*[808] However, the Commission is unaware of any cases in which a California court has actually upheld a non-compete agreement under California law based on the dicta in this opinion, and commenters do not point to any.[809] To the contrary, California courts have consistently refused to enforce non-competes even where employers alleged they were needed to protect trade secrets.[810]

Another commenter argued that California's experience does not necessarily demonstrate anything about the effect of banning non-competes because California employers impose non-competes at rates comparable to other States. In response, the Commission notes that while Starr, Prescott, and Bishara state that workers are covered by non-competes at "roughly the same rate"

---

[807] *See* NPRM at 3507.
[808] 62 Cal. 2d 239, 242 (Cal. 1965).
[809] *See generally* David R. Trossen, Edwards *and Covenants Not to Compete in California: Leave Well Enough Alone*, 24 Berkeley Tech. L.J. 539, 546 (2009).
[810] *See, e.g., D'sa v. Playhut, Inc.*, 102 Cal. Rptr. 2nd 495, 497-501 (Cal. Ct. App. 2nd 2000); *Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 11 (Cal. Ct. App. 2nd 2009); *Arthur J. Gallagher & Co. v. Lang*, 2014 WL 2195062 (N.D. Cal. May 23, 2014) at *4 n.3.

in States where non-competes are unenforceable and enforceable,[811] when the authors control for employee characteristics to compare "observationally equivalent employees," they find that non-competes are less common (by 4-5 percentage points) in nonenforcing States compared to States that permit vigorous enforcement of non-competes.[812] Additionally, California, North Dakota, and Oklahoma are still distinct from other States because employers may not actually enforce non-competes, even if employers in those States continue to enter into them.

A commenter argued that the Commission misattributes California's success in the technology industry and North Dakota's and Oklahoma's success in the energy industry to their non-compete laws, rather than the presence of top universities and venture capital firms in the State (in the case of California) or of abundant natural resources in the State (in the case of North Dakota and Oklahoma). The Commission believes that this commenter mischaracterizes its analysis. The Commission does not attribute California's success in the technology industry and North Dakota's and Oklahoma's success in the energy industry to their non-compete laws. The Commission merely notes that these industries are highly dependent on protecting trade secrets and having highly trained workers, and that these industries have thrived in these States despite the inability of employers to enforce non-competes.

One commenter argued that there are no alternatives that adequately protect employers' legitimate interests because other restrictive employment agreements do not sweep as broadly as non-competes. In this Part IV.D, the Commission concludes that less restrictive alternatives such as trade secret law, IP law, and NDAs are adequate to protect trade secrets and other confidential information even where they do not sweep as broadly as non-competes. Indeed, the Commission believes that non-competes are overbroad with respect to protecting trade secrets and other

---

[811] Starr, Prescott & Bishara, *supra* note 68 at 81.
[812] *Id*. at 68.

confidential information, because they enable employers to restrict a wide swath of beneficial competitive activity without respect to any alleged misconduct. That employers prefer to wield non-competes as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition.

### ii. Comments and Responses to Comments on Human and Physical Capital Investment

Several commenters addressed the evidence concerning the effects of non-competes on human capital investment and other investment. Several commenters asserted that, even if non-competes increased human capital investment, they still left workers worse off because they suppressed workers' mobility and wages overall. Workers and worker advocates also argued that workers lose the value of their skills and human capital investment when non-competes force them to sit out of the workforce, and non-competes can decrease their incentive to engage in human capital investment since they cannot capitalize on their skills and knowledge. These commenters stated that many workers, particularly highly skilled workers, have had some form of education prior to working for their employer, diminishing any potential need for non-competes to protect the employers' human capital investment. For example, many physicians pointed out that they had to go through medical school, residency, internships, and/or fellowships—significant investments that they made, not their employers.

Some commenters questioned the link between increased human capital investment and non-compete enforcement, arguing that employer human capital investment will still be provided without non-competes. Other commenters also stated that prohibiting non-competes would make it easier for firms to hire trained workers, because it would be easier for them to switch jobs.

More generally, one advocacy organization said that employers frequently make investments that do not work out and should not place the risk of that investment onto their workers. A commenter who discussed physician non-competes argued that investment-based justifications for non-competes overestimate the value added by employers while failing to recognize the value physicians bring to employers.

Some businesses and trade organizations argued that employers invest significant time and money into training workers who lack the specific skills needed for the job. These commenters stated that, without non-competes, employers risk the worker taking that investment to a competitor. Some commenters state that this risk is greatest in underserved areas and when there are worker shortages. Several commenters said that employment restrictions such as non-competes incentivize businesses to pay for credentials, training, and advanced education that low-wage and other workers would be unable to afford on their own, facilitating upward mobility. For highly educated workers, such as physicians, some employers said they need non-competes to protect payments for continuing education as well as mentorships and on the job training. Businesses and their advocates asserted that in some industries, many new employees are unprofitable for a significant period, requiring up-front investment and training from employers who want to recoup that investment.

In response, the Commission notes that, as described in Part IV.D.2.b.iii, firms have less restrictive alternatives for protecting human capital investments, including fixed-duration contracts and competing on the merits for the worker's labor services through better pay, benefits, or working conditions. Through these means, employers can retain workers without restricting who they can work for, or their ability to start a business, after their employment ends. The Commission also notes that these commenters often inaccurately describe the increased

labor mobility afforded by the final rule as a one-way street. While it will be easier under the final rule for workers to switch jobs and work for a competitor, it will also be easier for firms to hire talented workers, since those workers are not subject to non-competes. In general, firms will benefit from access to a wider pool of labor, because the rule eliminates the friction non-competes impose on the free functioning of competition in labor markets. Whether this will be a net benefit to a particular firm, or not, will depend on the firm's ability to compete for workers on the merits to attract and retain talent.

A group of healthcare policy researchers stated that the investment justifications offered by corporate owners of physician practices are misleading since the true value of the investment in the practice is the book of business and referrals. These researchers suggested that non-competes are used to circumvent laws that prohibit payment for physician referrals. The Commission notes that this comment aligns with a statement by researcher Kurt Lavetti at the Commission's 2020 forum on non-competes. Lavetti stated that patient referrals are a valuable asset, but buying or selling those referrals is illegal, so non-competes are a secondary method of protecting that asset.[813]

Commenters also stated that non-competes protect investments other than in human capital, capital expenditures, and R&D, including recruiting and hiring, providing client and customer service, facilities, marketing, and technology, among others. The Commission is unaware of any empirical evidence showing that non-competes increase these types of investments, and commenters did not provide any. In general, however, firms can protect investments in trade secrets and confidential information, and investments in workers, through

---

[813] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements*, Remarks at the FTC Workshop on Non-Competes in the Workplace, at 145-46 (Jan. 9, 2020), at https://www.ftc.gov/system/files/documents/ public_events/1556256/non-compete-workshop-transcript-full.pdf.

the less restrictive alternatives described in Part IV.D.2.b.

Two trade organizations stated that prohibiting non-competes could cause businesses to lose staff, and that losing staff could cause them to reduce investments that may be based on staffing assumptions. These commenters did not provide empirical evidence to support these arguments. The Commission also notes that firms would not necessarily lose workers because of the final rule. As described previously, some firms may lose workers because it will be easier for workers to leave for better opportunities, while some firms may gain workers by attracting workers from other firms. Additionally, firms can retain workers by competing on the merits for their labor services—*i.e.*, by offering better jobs than their competitors.

Commenters asserted that Starr, Prescott, and Bishara[814] found that notice of non-competes alongside a job offer is positively correlated with training compared to later notice. In response, the Commission notes that the evidence is a correlation between early notice and training, not a causal finding, so the Commission gives it minimal weight. In addition, regardless of whether there is an increase in training where notice of non-competes is provided along with the job offer instead of later on, this data is not salient on the question of whether employers have less restrictive alternatives to protecting training investments.

A few commenters stated that non-competes protect against the "disclosure" of general trade knowledge and skills, while the less restrictive alternatives cited in the NPRM do not. Relatedly, some commenters argued that prohibiting non-competes and broadly enabling workers to take general trade knowledge and skills to competitors will mean that their new employers will free ride off investments the former employers made in their human capital, which will discourage future investment in human capital. The Commission does not believe that

---

[814] Starr, Prescott & Bishara, *supra* note 68 at 53.

preventing workers from using their general trade knowledge and skills, including their gains in trade knowledge and skills through experience with a particular employer, is a legally cognizable or legitimate justification for non-competes. Under State common law, preventing a worker from using their general knowledge and skills with another employer is not a legitimate interest that can justify a non-compete.[815] Indeed, there is a general principle in the law of restrictive employment agreements—and trade secret law as well—that these tools cannot be used to prevent workers from using their general trade knowledge and skills.[816] The Commission does not view the inability to prevent disclosure or use of general skills and knowledge as a shortcoming of trade secret law and NDAs; instead, it considers the use of general skills and knowledge as beneficial competitive activity. Moreover, the Commission notes that sectoral job training strategies can be a tool for employers and workers to access worker training that is transferrable across employers.[817]

One commenter asserted that trade secret law and NDAs are inadequate to protect employers' goodwill, while another commenter asserted that these tools are inadequate to protect investments in relationships with clients. Regarding whether trade secret law and NDAs are adequate to protect employers' client relationships, the Commission interprets this to refer to employers' concern that a client will follow a worker to a competitor. The Commission believes that employers have alternatives for protecting these investments, including fixed-duration contracts (in the case of goodwill), NDAs (in the case of client lists), and competing on the merits to retain workers and/or clients. Firms can seek to protect client relationships by offering

---

[815] *See* NPRM at 3495 n.162.
[816] *See* Montville, *supra* note 788 at 1161.
[817] *See, e.g.*, Mayu Takeuchi & Joseph Parilla, *Federal Investments in Sector-Based Training Can Boost Workers' Upward Mobility*, Brookings Inst. (Dec. 7, 2023), https://www.brookings.edu/articles/federal-investments-in-sector-based-training-can-boost-workers-upward-mobility/.

superior service and value—through the free and fair functioning of competition. These more narrowly tailored alternatives reasonably protect the applicable interest while burdening competition to a lesser degree because they do not restrict the worker's ability to seek or accept work or start a business after their employment ends. Therefore, while trade secret law and NDAs may not protect goodwill or client relationships, the Commission finds that employers have adequate alternative tools to protect these interests. Furthermore, the Commission notes that the final rule does not restrict employers from using trade secret law and NDAs in tandem— along with other alternatives—to protect their investments, and comments maintaining that employers lack adequate alternatives to non-competes because the commenter views just one of these mechanisms as inadequate are unpersuasive.

A commenter argued that the final rule may implicate the ability of Federal contractors to provide letters of commitment, which are often required by government agencies and require contractors to identify key personnel who will work on an awarded contract, sometimes for years in the future. In response, the Commission notes that contractors have alternatives to non-competes to retain key personnel, including by using fixed-term employment contracts or providing the key personnel a better job than competitors.

A commenter stated that fixed-duration employment contracts are not necessarily effective at protecting human capital investments because employers may not know at the time of hiring when they will be providing training to a worker. This commenter also stated that improving the pay, benefits, and working conditions of workers is not necessarily an effective means for protecting human capital investments. In response, the Commission notes that employers may enter into fixed-duration employment contracts with their workers at any time, not just at the outset of the employment relationship. It further notes that competing to retain a

trained worker will not work in every instance, but it is an important option available to employers and the provision of training can itself be a competitive differentiator for an employer.

A commenter also asserted that California has the highest cost of living and that, if this is attributable to the absence of non-competes, the proposed rule could risk increasing the cost of living nationwide. The commenter did not provide evidence to support the existence of an inverse relationship between non-compete enforceability and cost of living, and the Commission is aware of no such evidence. The Commission thus does not believe that there is a basis to conclude that the final rule would increase the cost of living nationwide.

### iii.  Comments Regarding Alternatives to Non-Competes for Senior Executives

Commenters offered the same justifications for non-competes with senior executives: that they increase employers' incentive to make productive investments. However, many commenters argued that senior executives are more likely than other workers to have knowledge of trade secrets and other competitively sensitive information or to have customer relationships and thus non-competes for senior executives are necessary, and other tools such as trade secret law and NDAs are not viable alternatives.

In response, the Commission finds that these tools—trade secret law, NDAs, patents, and invention assignment agreements—provide viable means of protecting valuable investments against disclosure by senior executives, just as they do for all other workers. Commenters do not identify any reasons why senior executives are uniquely situated with respect to these less restrictive alternatives—*i.e.*, why trade secret law or NDAs may not adequately protect firm investments from disclosure by senior executives specifically—and the Commission is not aware of any such reasons.

Some commenters argued that non-competes with executives and high-wage workers promote competition because they encourage innovation in businesses by providing investors with more confidence that executives will not share trade secrets with competitors, decreasing competition. An industry organization asserted that non-competes allow executives to share ideas and business decisions with other workers within the business and collaborate to make strategic decisions. A commenter stated that an executive leaving to start a competing product could also delay the timeline for both the former employer's product and the competing product. As noted previously, the Commission does not believe there is reliable empirical data on the relationship between non-competes and disclosure of confidential information, but employers have alternatives to protect such information. Further, the empirical evidence shows that non-competes overall inhibit innovation on the output side; therefore, to the extent any of these effects are occurring, they are more than outweighed by the negative effects of non-competes on innovation.[818]

According to some commenters, an executive moving to a competitor could unfairly advantage the competitor and irreparably harm the former employer. In response, the Commission notes that there is nothing inherently unfair about an executive moving to a competitor, particularly if this results from competition on the merits (such as the competitor paying more or otherwise making a more attractive offer). If companies seek to retain their executives, they have other means for doing so—such as increasing the executives' compensation or entering fixed-duration contracts—that do not impose significant negative externalities on other workers and on consumers, as non-competes do.[819]

Some commenters also said senior executives may have more client, business partner,

---

[818] *See* Part IV.B.3.b.ii.
[819] *See* Part IV.C.2 (describing the negative externalities of non-competes for senior executives).

and customer relationships than other employees and may contribute substantially to a firm's goodwill. The Commission believes that employers have alternatives for protecting goodwill and client/customer relationships. For example, if a firm wants to keep a worker from departing and taking goodwill or clients or customers with them, it can enter a fixed-duration contract with the worker, otherwise seek to retain the worker through competition on the merits, or seek to retain the client/customer through competition on the merits.

An accountant with experience analyzing executive non-competes for business valuations said such valuations are calculated based on the potential harm if the executive violated the non-compete. In addition, some commenters argued that non-competes for senior executives and other important workers increase the value of firms in mergers and acquisitions because they ensure those valuable workers stay after the sale. An investment industry organization said that investors seek to ensure that the right workers who know the business stay and run the newly acquired business. In addition, that investment industry organization said some institutional investors may require contracts retaining key workers.

In response, the Commission notes that valuation of senior executive non-competes in such contexts is part of the reason the Commission is allowing such existing senior executive non-competes to remain in force.[820] In future transactions, businesses and investors have other methods of incentivizing senior executives and other workers to remain, including fixed duration contracts and competing to retain workers on the merits, and thereby enhancing the value of firms and transactions—methods that do not impose such significant externalities on other workers and consumers.

Some industry organizations said non-competes increase employer investment in

---

[820] *See* Part IV.C.3.

management and leadership training for executives. An investment industry organization said non-competes allow senior executives to access training and experience for their own benefit and the benefit of investors in the firm. In response, the Commission notes that employers have alternative mechanisms to protect their investments in worker training, including fixed-duration contracts and improved compensation.

Some commenters argued that non-competes may improve executive performance, as some executives have non-competes tied to deferred compensation and other future benefits, which encourages long-term value creation by incentivizing executives to focus on long-term rather than short-term gains. A law firm said that forfeiture-for-competition clauses are an important component of deferred compensation agreements, and deferred compensation incentivizes long-term value-building and penalizes, via reduction or forfeiture, harm to the business, which the commenter said includes working for a competitor. The commenter claimed that if forfeiture-for-competition clauses are banned, firms would shift some of the deferred compensation to more short-term awards, which would in turn increase risk-taking and decrease overall wealth accumulation. The commenter cited a review by the Federal Reserve after the 2008 financial crisis which found that deferred compensation can mitigate executive risk-taking activities.[821] It also cited other Federal agencies and court decisions recognizing the value of deferred compensation to mitigate risk. Separately, the firm argued that without forfeiture-for-competition clauses, an executive who moves to a competitor will compete less against their former employer so as not to devalue their equity award, thus degrading competition. Commenters also contended that State courts have recognized forfeiture-for-competition clauses

---

[821] *See* Bd. of Govs. of the Fed. Reserve Sys., *Incentive Compensation Practices: A Report on the Horizontal Review of Practices at Large Banking Organizations* (Oct. 2011), https://www.federalreserve.gov/publications/other-reports/files/incentive-compensation-practices-report-201110.pdf.

to be reasonable and that some State statutes governing non-competes carve them out.

In response, the Commission recognizes that many existing deferred compensation contracts may have been negotiated to include non-competes or forfeiture-for-competition clauses that may not be easily separated, and the final rule allows existing senior executive non-competes to remain in force.[822] However, the Commission is not persuaded that non-competes are necessary for future deferred compensation agreements. The Federal Reserve study on the value of deferred compensation does not mention non-competes or forfeiture-for-competition clauses. While the study states that clawback provisions may discourage specific types of behavior, it notes that they do not affect most risk-related decisions.[823] The commenter did not explain why non-competes are necessary for deferred compensation to reduce risk-taking or how post-employment competition could impact performance while at the firm. The commenter also did not explain why firms would forgo the benefits of deferred compensation even without a forfeiture-for-competition clause. The commenter separately argued that an executive who moves to a competitor will be conflicted and compete less against their former employer so as not to devalue their equity award. The comment framed this as an anticompetitive problem akin to interlocking directorates under the Clayton Act, as it could increase collusion (though the commenter provided no support for this argument). The commenter did not, however, explain why an executive would move to a competitor if doing so would devalue their own equity. The Commission also does not believe that the solution to this type of anticompetitive behavior, even if it were to occur, is to further restrict competition by blocking the executive from moving to the competitor in the first place.

Some commenters argued that forfeiture-for-competition clauses, which are sometimes

---

[822] *See* Part IV.C.3.
[823] Federal Reserve Report on Incentive Compensation Practices, *supra* note 821 at 16-17.

attached to deferred compensation arrangements, were also justified. Some commenters contended that workers subject to forfeiture-for-competition clauses who choose to work for a competitor are likely to be compensated by the competitor for whom they will be working. Separately, a law firm and an investment industry organization stated that it would be unfair for companies to continue making deferred compensation or other payments to former workers who now work for a competitor if forfeiture-for-competition clauses were banned. A law firm also stated that forfeiture-for-competition clauses allow senior executives to retire without losing their deferred compensation, which in turn clears a path for younger workers to move up, while protecting senior executives' retirement benefits. In response, the Commission notes that pre-existing agreements for senior executives are not banned under the final rule.[824] The Commission also sees no reason why deferred compensation, including for retiring workers, cannot be used without forfeiture-for-competition clauses.

Some commenters stated that the study by Kini, Williams, and Yin, discussed in the NPRM with respect to senior executive earnings,[825] finds that CEOs with non-competes are more frequently forced to resign their position. Commenters note that Kini, Williams, and Yin also find that CEO contracts more closely align the incentives of executives (with respect to stock prices and risk taking) with shareholders when the executives have non-competes or when those non-competes are more enforceable. In response, the Commission notes that, as indicated by commenters, this study examines the use of non-competes in conjunction with their enforceability. The Commission therefore finds that the results may not reflect a causal relationship. For example, the use of non-competes and the propensity of the board to force an executive to resign may be jointly determined by the strength of the relationship or the trust

---

[824] *See* § 910.2(a)(2).
[825] *See* Kini, Williams, & Yin, *supra* note 83.

between management and the board, rather than the use of non-competes causing forced turnover. The Commission also notes that—as shown in the study—there are other methods by which boards may encourage executives to perform, such as by structuring financial incentives to encourage or discourage risk taking, according to the preferences of the board. Boards can also fire poorly performing executives even without non-competes.

One commenter said that a ban on non-competes may encourage U.S. companies to relocate their executive teams outside the U.S. in order to continue using non-competes. The commenter did not provide specific evidence to support this assertion. The Commission believes that firms' decisions on where to locate their executive teams are likely influenced by a multitude of factors other than whether the firm may or may not use non-competes.

### 3. The Asserted Benefits from These Justifications Do Not Justify the Harms from Non-Competes

#### a. The Commission's Final Findings

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the claimed business justifications for non-competes do not justify the harms from non-competes—for either senior executives or for workers other than senior executives, whether considered together or separately—because the evidence indicates that increasing enforceability of non-competes has a net negative impact along a variety of measures. Whether the benefits from a practice outweigh the harms is not necessarily an element of section 5,[826] but, in any event, the benefits from the justifications cited in Part IV.D.1 clearly do not justify the harms from non-competes.

---

[826] *See* Part II.F (stating that the inquiry as to whether conduct tends to negatively affect competitive conditions focuses on the nature and tendency of the conduct and does not require a detailed economic analysis).

Not all the harms from non-competes are readily susceptible to monetization.[827] However, even the quantifiable harms from non-competes are substantial and clearly not justified by the purported benefits. Non-competes cause considerable harm to competition in labor markets and product and service markets. Non-competes obstruct competition in labor markets because they inhibit optimal matches from being made between employers and workers across the labor force through the process of competition on the merits for labor services. The available evidence indicates that increased enforceability of non-competes substantially suppresses workers' earnings, on average, across the labor force generally and for specific types of workers.[828]

In addition to the evidence showing that non-competes reduce earnings for workers across the labor force, there is also evidence that non-competes reduce earnings specifically for workers who are not subject to non-competes.[829] These workers are harmed by non-competes, because their wages are depressed, but they do not necessarily benefit from any purported incentives for increased human capital investment that non-competes may provide. Overall, these harms to labor markets are significant. The Commission estimates that the final rule will increase workers' total earnings by an estimated $400 billion to $488 billion over ten years, at the ten-year present discounted value.[830]

The available evidence also indicates that non-competes negatively affect competition in product and service markets. The weight of the evidence indicates that non-competes have a negative impact on new business formation and innovation.[831] There is evidence that non-

---

[827] *See, e.g.*, Parts IV.B.3.a.iii and IV.B.3.b.iv.
[828] *See* Part IV.B.3.a.ii; Part IV.C.2.c.ii.
[829] *See* Part IV.B.3.a.ii.
[830] *See* Part X.F.6.
[831] *See* Part IV.B.3.b.i-ii; Part IV.C.2.c.i.

competes increase consumer prices and concentration in the health care sector.[832] There is also evidence that non-competes foreclose the ability of competitors to access talent.[833] While available data do not allow for precise quantification of some of these effects, they are nonetheless substantial: the Commission estimates that the rule will reduce spending on physician services over ten years by $74-194 billion in present discounted value, will result in thousands to tens of thousands of additional patents per year, and will increase in the rate of new firm formation by 2.7%.[834]

In the Commission's view, the asserted benefits from non-competes do not justify their harms. Even if the businesses using non-competes benefit, pecuniary benefits to the party undertaking the unfair method of competition are not a sufficient justification under section 5.[835] As described in Part IV.D.1, the most commonly cited justifications for non-competes are that they increase employers' incentive to make productive investments in, for example, trade secrets, customer lists, and human and physical capital investment. There is some evidence that non-competes increase human and physical capital investment, as noted previously.[836] However, the empirical literature does not show the extent to which human capital investment and other investment benefits from non-competes accrue to any party besides the employer, and to the extent it addresses this issue it suggests otherwise. For example, in theory, if increased human capital investment from non-competes benefited workers, they would likely have higher earnings when non-competes are more readily available to firms (i.e., when legal enforceability of non-competes increases). However, as explained in Parts IV.B.3.a.ii and IV.C.2.c.ii, the empirical

---

[832] *See* Part IV.B.3.b.iii.
[833] *See* Part IV.C.2.c.i.
[834] *See* Part X.F.6.
[835] *See* Part II.F.
[836] *See* Part IV.D.1.

evidence indicates that, on net, greater enforceability of non-competes *reduces* workers' earnings. Likewise, in theory, if increased human capital investment increased innovation that redounds to the benefit of the economy and society as a whole, one would expect to see legal enforceability of non-competes yield such benefits, but as elaborated in Part IV, the empirical evidence on innovation effects indicates the opposite.

Moreover, the Commission is also not aware of any evidence that these potential benefits of non-competes lead to reduced prices. Indeed, the only empirical study of the effects of non-competes on consumer prices—in the health care sector—finds increased prices as the enforceability of non-competes increases.[837] That study, which finds that non-compete enforceability increased physician pay, also finds that labor cost pass-through is not driving price decreases.[838]

Furthermore, there is no evidence that, in the three States in which non-competes are generally void, the inability to enforce non-competes has materially harmed employers, consumers, innovation (or economic conditions more generally), or workers. As a result, the Commission finds that the asserted benefits from non-competes do not justify the harms they cause.

The Commission finds that the harms from non-competes are clearly not justified by the purported benefits, regardless of whether one considers senior executives or workers other than senior executives together or separately. In this Part IV.D.3, the Commission explains why, for workers overall, the asserted benefits from non-competes do not justify the harms they cause. This is at least as true for senior executives as for other workers. As described in Part IV.C.2.c.i, non-competes with senior executives tend to negatively affect competitive conditions in product

---

[837] *See* Part IV.B.3.b.iii.
[838] *See* Hausman & Lavetti, *supra* note 590 at 278.

and service markets at least as much as non-competes with other workers—and likely to a greater extent—given the outsized role of senior executives in forming new businesses, serving on new businesses' executive teams, and setting the strategic direction of businesses with respect to innovation. At the same time, firms have the same less restrictive alternatives available for senior executives as they do for other workers, as described in Part IV.D.2.c.iii. For these reasons, whether one considers non-competes with senior executives or non-competes with other workers, the claimed business justifications for non-competes do not justify the harms from non-competes.

### b. Responses to Comments

Commenters focused on the question of whether employers have adequate alternatives to non-competes and the analysis of costs and benefits of the proposed rule in the preliminary regulatory impact analysis, rather than the balancing analysis discussed in this Part IV.D.3 specifically. These comments are addressed in Part IV.D.2 and in Part X, respectively.

### E. Section 910.2(b): Notice Requirement for Existing Non-Competes

The Commission proposed to require employers to rescind (*i.e.*, legally modify) existing non-competes and provide notice to inform workers that they are no longer bound by existing non-competes.[839] Based on comments, the Commission is not adopting a rescission requirement in the final rule. Rather than require employers to legally modify existing non-competes, the final rule prohibits employers from enforcing existing non-competes with workers other than senior executives after the compliance date.

The final rule adopts the notice requirement—for workers who are not senior executives—with minor revisions to facilitate compliance and to improve the likelihood of

---

[839] *See* NPRM, proposed § 910.2(b).

workers being meaningfully informed. The revisions include an option for employers to make the notice more accessible to workers who speak a language other than English. The final rule also simplifies compliance and ensures that workers have prompt notice that their non-competes are no longer in force by requiring employers to provide notice by the effective date, rather than 45 days thereafter.

### 1. The Proposed Rule

Proposed § 910.2(b)(1) would have required employers to rescind existing non-competes with all workers. Proposed § 910.2(b)(2) would have required employers that rescinded non-competes to provide notice to the affected workers that their non-compete is no longer in effect and may not be enforced.

As proposed, § 910.2(b)(2) had three subparagraphs that imposed various requirements related to the notice. Proposed § 910.2(b)(2)(i) stated that an employer that rescinds a non-compete pursuant to § 910.2(b)(1) must provide notice in an individualized communication to the worker that the worker's non-compete is no longer in effect and may not be enforced. The Commission stated in the NPRM that an employer could not satisfy the notice requirement by, for example, posting a notice at the employer's workplace.[840] Proposed § 910.2(b)(2)(i) also stated that the employer must provide the notice in writing on paper or in a digital format such as an email or text message within 45 days of rescinding the non-compete.

Proposed § 910.2(b)(2)(ii) stated that the employer must provide the notice to both current workers and former workers when the employer has the former worker's contact information readily available. To ease the burden of compliance, proposed § 910.2(b)(2)(iii) provided model language that would satisfy the notice requirement. Proposed § 910.2(b)(2)(iii)

---

[840] *Id.* at 3513.

and § 910.2(b)(3) provided a safe harbor for employers using the model language, while also permitting an employer to use different language, provided that the language communicates to the worker that the worker's non-compete is no longer in effect and may not be enforced.[841]

In the NPRM, the Commission stated that the purpose of the proposed notice requirement was to ensure that workers are informed that their existing non-competes are no longer in effect. The Commission cited evidence indicating that many workers are not aware of the applicable law governing non-competes or their rights under those laws, and stated that it was therefore concerned that, absent a notice requirement, workers may not know that their non-competes are no longer enforceable as of the effective date.[842]

### 2. The Final Rule

#### a. The Final Rule Does Not Require Rescission (Legal Modification) of Existing Non-Competes

The Commission has eliminated the proposed rule's requirement that employers rescind (*i.e.*, legally modify) existing non-competes. The Commission believes the proposed rescission requirement would have imposed unnecessary burdens on employers, as other aspects of the final rule provide less burdensome means of ensuring that workers other than senior executives will not be bound or chilled from competitive activity by non-competes after the effective date. Under § 910.2(a)(1)(ii), it is an unfair method of competition for a person to enforce or attempt to enforce a non-compete (except where, under § 910.3 the person has a good-faith basis to believe that the final rule is inapplicable). Further, under § 910.2(b)(1), the person who entered into the non-compete must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete clause is no longer in effect and will not be, and cannot

---

[841] *Id.* at 3514.
[842] *Id.* at 3513.

legally be, enforced against the worker. These provisions are sufficient to achieve the purposes of the proposed rescission requirement without requiring any affirmative conduct beyond the notice requirement.

The Commission has also eliminated the proposed rescission requirement in response to comments expressing confusion about the requirement and concern about its practical implications. Some comments interpreted the proposed rescission requirement to mean that the worker and employer must be returned to their original positions (*i.e.*, on the day they entered into the non-compete) and presumed to not have entered into it or that it mandated wholly new contracts to replace any existing agreements that contained non-competes. Some commenters objected to what they considered the high compliance costs of rescinding and revising every employment contract with a non-compete. Some businesses said their contracts with senior executives and potentially other workers would be unwound by a rescission requirement. Other commenters said that if the Commission promulgated the proposed rescission requirement, it would be disregarding the role non-competes played in the overall value of the exchange for an employment contract. An industry association said rescission would require assessment of each contract's severability under relevant State law, and the answers would vary widely.

The Commission does not intend for the final rule to have such effect and has omitted the rescission requirement proposed in the NPRM. The Commission also adopts § 910.3(b), which provides an exception for causes of action that accrued before the effective date, to be clear that the final rule does not render any existing non-competes unenforceable or invalid *from the date of their origin*. Instead, it is an unfair method of competition to enforce certain non-competes *beginning on the effective date*. Actions taken before the effective date—for example, enforcing an existing non-compete or making representations related to an existing non-compete—are not

unfair methods of competition under the final rule. As noted elsewhere, the Commission also exempts from the rule future enforcement of existing non-competes with senior executives.

Commenters also argued that a rescission requirement would be impermissibly retroactive, present due process concerns, and/or constitute an impermissible taking under the Fifth Amendment. The Commission responds to these comments in Part V.B.

Numerous commenters opposed the proposed rescission requirement based on perceived challenges presented by proposed § 910.1(b)(2), which addressed *de facto* non-competes, and its purported ambiguity with respect to which contractual terms employers would be required to rescind. The Commission has removed the rescission requirement for the reasons described in this Part IV.E.2.a and has also revised the proposed rule's language concerning *de facto* non-competes to clarify the scope of the definition.

### b. The Final Rule's Notice Requirement

While the final rule does not require rescission (*i.e.*, legal modification) of existing non-competes, the final rule does prohibit enforcement of existing non-competes after the effective date and requires the person who entered into the non-compete with the worker to provide clear and conspicuous notice to the worker, by the effective date, that the worker's non-compete will not be, and cannot legally be, enforced against the worker.[843] The notice must identify the person who entered into the non-compete with the worker and must be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the

---

[843] § 910.2(b)(1).

worker.[844]

Several commenters emphasized the importance of notice, especially for former workers who may be actively refraining from competitive activity (in compliance with a non-compete), and who may continue to do so if they are not informed that their non-compete is no longer in effect. One commenter highlighted the importance of notice, because a non-compete may be coercive regardless of its enforceability. Many commenters emphasized the need for clear and concise language in the notices, including in languages other than English. One commenter asked the Commission to use concrete, lay-friendly terms to help reduce workers' fears of being sued. A commenter that recommended notice in languages other than English suggested that such a requirement apply to medium and large businesses with a threshold percentage of workers (such as 10%) who primarily speak a language other than English.

Commenters also suggested changes in notice procedures to improve the chances of workers receiving and understanding the notice. One commenter stated that text messages should not qualify as a primary means of individual notice because they are too casual, may be automatically deleted, and the sender may not be identifiable. However, in this commenter's view, text messages could be a secondary form of notice. Some commenters suggested that in addition to individual notice, the final rule should require an employer to post a copy of the notice in the workplace and/or online.

A number of commenters asserted that the requirement for employers to provide notice to former workers when "the employer has the worker's contact information readily available"

---

[844] This language mirrors language in other Federal regulations. *See, e.g.*, 17 CFR 9.11 (notice of disciplinary action must be made personally by mail at the person's last known address or last known email address); 29 CFR 38.79 (written notice must be sent to a "complainant's last known address, email address (or another known method of contacting the complainant in writing)"); 16 CFR 318.5 (providing for written notification at an individual's last known address, or email if the individual chooses that option).

was confusing or burdensome. A commenter stated that employers do not update former employees' contact information, so such information is likely incomplete and might be inaccurate. One commenter asserted that a requirement to provide notice within 45 days of the effective date is too difficult for small businesses. Another commenter suggested that the final rule should require contacting only former workers who left the firm two years or less before the effective date, unless the non-compete has elapsed.[845] Some commenters expressed concern that former workers might not be notified under the "readily available" standard. A commenter stated that, to avoid confusion and evasion, employers should be required to send notice to former workers at the worker's last known home address, email address, or cell phone number. Commenters also contended that the meaning of "individualized communication" was not clear or that compliance with it would be too difficult or burdensome.

The Commission finalizes the proposed rule's notice requirement largely as proposed, with minor revisions to facilitate compliance, reduce burdens on employers, and improve accessibility for non-English speakers.[846] The final rule also requires covered businesses to provide notice by the effective date, rather than 45 days thereafter, to simplify the final rule and to secure its benefits for competition in labor markets and product and service markets as soon as practicable.

The Commission finalizes a notice requirement because the available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights

---

[845] Under the final rule, notice is only required for existing non-competes, *i.e.*, those that have not elapsed.

[846] The Commission notes that this required notice is a routine disclosure of valuable, factual information to workers that does not implicate the First Amendment. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-53 (2010) (citing *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)). As described in this Part IV.E, the Commission adopts this notice requirement to ensure workers do not wrongly believe they remain bound by unenforceable non-competes after the rule goes into effect. The Commission's conclusion that such notice is necessary to achieve the full benefits of the final rule is based on its expertise and on empirical evidence supporting the Commission's finding of an *in terrorem* effect related to non-competes.

under those laws, or are unable to enforce their rights—and are chilled from engaging in competitive activity as a result. The evidence shows that even when employers impose non-competes that are unenforceable under State law, many workers believe they are bound by them (or are otherwise unable to enforce their rights to be free of non-competes).[847] As a result, the Commission finds that even after the final rule is in effect, absent a clear notice requirement, many workers may be unaware that, because of the final rule, their employer cannot enforce a non-compete and that the Commission has the authority to take action against employers who violate the final rule. Accordingly, absent notice, these workers may continue to be chilled from switching jobs or starting their own business. This would tend to negatively affect competitive conditions in the same manner as if non-competes were in full force and effect.

A notice requirement helps address this concern by informing individual workers, to the extent possible, that after the effective date the employer will not enforce any non-compete against the worker. The Commission believes that prompt and clear notice to workers other than senior executives that non-competes are no longer enforceable is essential to furthering the purposes of the final rule—to allow workers to seek or accept another job or to leave to start and run a business, and to allow other employers to compete freely for workers. Indeed, the Commission has refined the model language to make it shorter and clearer than the proposed model language.

While the proposed rule would have required employers to provide the notice no later than 45 days after the compliance date, the final rule requires notice no later than the effective date (*i.e.*, no later than 120 days after the final rule is published in the *Federal Register*). The

---

[847] *See* Prescott & Starr, *supra* note 413; *see also* Part IV.B.2.b.ii (describing the Commission's finding that non-competes are exploitative and coercive where they trap workers in jobs or force them to bear significant harms or costs, even where workers believe the non-compete is unenforceable).

Commission believes that it is practicable and reasonable for employers to provide the notice by the effective date. The Commission has designed the notice requirement to make compliance as easy as possible for employers. The final rule provides safe harbor model language that satisfies the notice requirement;[848] gives employers several options for providing the notice—on paper, by mail, by email, or by text;[849] and exempts employers from the notice requirement where the employer has no record of a street address, email address, or mobile telephone number for the worker.[850]

In addition, while the model language in the proposed rule used the phrase "the non-compete clause in your contract is no longer in effect,"[851] the model language in the final rule uses the phrase "[EMPLOYER NAME] will not enforce any non-compete clause against you."[852] Because this language does not identify the recipient as having a non-compete, the employer does not need to determine which of its workers have non-competes; instead, it can simply send a mass communication such as a mass email to current and former workers.

Furthermore, requiring notice by the effective date simplifies the final rule and allows its benefits to begin sooner. In response to commenters that contended that they need more time to provide workers notice, the Commission believes that providing notice should not be time-consuming, even for small businesses, particularly given that the final rule provides model language, allows use of the worker's last known contact information for notice, allows digital notice, and (unlike in the proposed rule) categorically exempts an employer who has no such information from the notice requirement. Moreover, as described in Part IV.B.2.b.ii, non-

---

[848] § 910.2(b)(4)-(5).
[849] § 910.2(b)(2)(ii).
[850] § 910.2(b)(3).
[851] NPRM, proposed § 910.2(b)(2)(iii).
[852] § 910.2(b)(4).

competes trap workers in jobs or force them to bear other significant harms or costs—even where workers believe the non-compete is unenforceable. Given the limited burdens associated with providing notice only to workers whose last known contact information is on file and employers' option to simply copy and paste the safe harbor model notice, as well as the known and currently ongoing acute harms of non-competes (including their *in terrorem* effects) and the importance of workers knowing as soon as possible that their non-compete is unenforceable, the Commission declines to extend the time to provide notice.[853] The Commission finds that 120 days is more than adequate for employers to complete this task.

In response to comments expressing concern that the NPRM's "individualized communication" requirement was unclear or burdensome, the Commission has removed that language. Instead, the final rule ensures each worker will receive notice while specifying several permissible methods for providing the notice, which furthers compliance certainty while giving employers a range of options and an efficient means of complying. By allowing a number of formats for such communications, including digital formats, employers are more likely to be able to contact workers rapidly, individually, and have flexibility to do so at low cost. Accordingly, § 910.2(b)(2) of the final rule allows for notice by text message, by email, as well as paper notice by hand or by mail to the worker's last known street address. The final rule gives employers flexibility to choose among these methods. In responses to the concerns expressed by the commenter about text messages, the Commission believes that text messages should be a permissible method for providing the notice because they are widely used, delivered quickly, low-cost for employers, and an effective means of communication for workers who do not have email accounts.

---

[853] The Commission addresses the effective date in Part VIII.

In response to comments contending that notice to former workers is too burdensome or difficult, the Commission believes that providing notice to former workers is critical because former workers may be refraining from competitive activity because they believe they are subject to a non-compete. The Commission disagrees that providing notice to former workers will be burdensome. The Commission believes that most employers have contact information for former workers who may be subject to non-competes.[854] And under the final rule, in those rare cases in which an employer has no record of a street address, email address, mobile telephone number, or other method of contacting the worker or former worker, § 910.2(b)(3) exempts the employer from the final rule's notice requirement with respect to the worker. Furthermore, by specifying the circumstances under which notice may not be provided, this exemption also addresses concerns expressed by some commenters that ambiguity in the proposed rule's "readily available" standard for notifying former workers would lead to fewer former workers being notified.

In response to comments contending that notice to former workers is too burdensome or difficult, the Commission believes that providing notice to former workers is critical because former workers may be refraining from competitive activity because they believe they are subject to a non-compete. In light of the comments about the proposed "readily available" contact information standard, the Commission in this final rule does not adopt that language and instead requires that the notice must be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the

---

[854] Employers have many record-keeping requirements under State and Federal laws under which they may retain the contact information described in § 910.2(b)(2)(ii). *See, e.g.*, IRS, Circular E, Employer's Tax Guide, Pub. 15, 8 (2024) ("Keep all records of employment taxes for at least 4 years," including addresses of employees and recipients and forms with addresses.); USCIS, Handbook for Employers M-274, Sec. 10.0, Retaining Form I-9 (requiring retention of I-9 form, which includes employees' addresses, email addresses, and telephone numbers).

worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker. The Commission agrees with commenters that stated that most employers have such contact information for both present and former workers. For those rare cases in which an employer has no record of a street address, email address, mobile telephone number, or other method of contacting the worker or former worker, § 910.2(b)(3) exempts the employer from the final rule's notice requirement.

The Commission agrees with comments that notices in other languages spoken by workers would help achieve the goal of informing workers that their non-competes are no longer enforceable and help employers to comply with the final rule. However, to avoid imposing a burden of translation on employers, § 910.2(b)(6) makes it optional to provide notices in languages other than English. The Commission encourages employers to provide this notice to workers who speak languages other than English. To facilitate the provision of notices in other languages, the final rule provides a model notice in English and links to translations of other languages that are commonly spoken in U.S. homes, including Spanish, Chinese, Arabic, Vietnamese, Tagalog, and Korean.[855]

## V.  Section 910.3: Exceptions

### A.  Section 910.3(a): Exception for Persons Selling a Business Entity

In the NPRM, the Commission proposed an exception for certain non-competes between the seller and the buyer of a business that applied only to a substantial owner, member, or partner, defined as an owner, member, or partner with at least 25% ownership interest in the business entity being sold. Based on comments, the Commission adopts an exception for the

---

[855] *See* Sandy Dietrich & Erik Hernandez, Census Bureau, *Nearly 68 Million People Spoke a Language Other Than English at Home in 2019* (Dec. 6, 2022) at Table 1, https://www.census.gov/library/stories/2022/12/languages-we-speak-in-united-states.html.

bona fide sale of a business without requiring that the seller have at least a 25% ownership interest.

### 1. The Proposed Rule

Proposed § 910.3 allowed non-competes where the restricted party is "a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or . . . selling all or substantially all of a business entity's operating assets," and is also "a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete."[856] The Commission proposed to define "substantial owner, substantial member, and substantial partner" as "an owner, member, or partner holding at least a 25 percent ownership interest in a business entity."[857] The text of proposed § 910.3 stated that non-competes allowed under the proposed exception would remain subject to Federal antitrust law and all other applicable law.

The Commission stated in the NPRM that its proposal to exempt from the rule non-competes between the seller and the buyer of a business did not reflect a finding that such non-competes are beneficial to competition.[858] Rather, the Commission explained that such non-competes may implicate unique interests and have unique effects, and the evidentiary record did not permit the Commission to thoroughly assess the full implications of restricting their enforceability.[859] The Commission noted that because all States permit non-competes between the seller and the buyer of a business to some degree, and because the laws that apply to these types of non-competes have seen fewer changes recently than the laws applicable to non-competes that arise solely out of employment, there have not been natural experiments allowing

---

[856] NPRM, proposed § 910.3.
[857] *Id.*, proposed § 910.1(e).
[858] *Id.* at 3515.
[859] *Id.* at 3514-15.

researchers to assess this type of non-compete's effect on competition.[860]

### 2. Comments Received

A few commenters suggested eliminating the proposed exception. These commenters contended that non-competes between the seller and the buyer of a business may still be exploitative and coercive, particularly in the case of small business owners in transactions with larger, better-resourced corporations. However, most commenters who addressed the issue supported an exception that would allow certain non-competes between the seller and the buyer of a business. These commenters agreed with the NPRM that State common law generally applies less-intensive scrutiny to non-competes ancillary to the sale of a business and that every State statute banning non-competes has an exception which allows some or all non-competes between the seller and the buyer of a business. Most of the commenters who supported some form of exception for non-competes between the seller and the buyer of a business contended that they are necessary to protect the value of the sale by ensuring the effective transfer of the business's goodwill. According to these commenters, a buyer will be less willing to pay for a business if they cannot obtain assurance that they will be protected from future competition by the seller, and so a failure to exempt related non-competes may chill acquisitions. Commenters stated that sellers of a business have more bargaining power than workers do and generally receive a portion of the sales price, making exploitation and coercion less likely. They also noted that non-competes between the seller and the buyer of a business remain subject to State limitations on scope, duration, and reasonableness.

Some commenters supported the proposed 25% ownership threshold. However, most commenters who otherwise supported the exception stated that the proposed 25% ownership

---

[860] *Id.*

threshold is too high. They argued that the 25% threshold does not account for the reality of most transactions, in which owners with less than 25% interest in a business may have significant goodwill and receive significant proceeds from a sale. Some commenters focused on the tax costs of the threshold, pointing to IRS provisions that currently allow taxpayers to deduct from their taxable income the portion of the sales price made in exchange for non-competes. Others argued that the 25% threshold would disincentivize equity-based consideration. To avoid these harms, these commenters suggested a variety of other thresholds, including the 5% ownership threshold used in SEC regulations.[861] Some commenters contended that the Commission failed to provide evidence justifying the proposed 25% ownership threshold. Others questioned the effectiveness of ownership as a proxy for goodwill or the likelihood of exploitation and coercion. As examples, these commenters pointed to passive investors who may have significant ownership stakes in a business but none of its goodwill, and owners whose interests may be purchased for less than fair market value or who are excluded from sales negotiations.

A few commenters argued that the proposed 25% threshold would preempt the laws of California and other States which ban non-competes except in the sale of a business, none of which require that the seller have a substantial ownership stake. They pointed to cases in which California courts applied the exception and allowed enforcement of non-competes against shareholders holding as little as a 3% ownership interest. In light of these statutes, some of these commenters urged the Commission to adopt an exception for agreements that involve the sale of a business or equity in a company without a threshold ownership requirement.

Some commenters urged the Commission to adopt a case-by-case assessment of business sales based on State law, such as a "totality of the circumstances" or "reasonableness" test.

---

[861] *See, e.g.*, 17 CFR 240.13d-1 (requiring reporting by beneficial owners holding more than 5% interest in an equity security).

Others proposed replacing the ownership-based exception with an exception for founders, key workers with IP access, and/or those with goodwill. At least one commenter asked the Commission to use a bright-line rule rather than a functional or definitional test that would require adjudication and interpretation by courts.

Some commenters presented empirical evidence to justify a lower ownership threshold. A few commenters pointed to data suggesting that more than 96% of CEOs of the 3,000 largest publicly traded companies own less than 25% of their company. One commenter pointed to data suggesting that the average duration of a startup's life from fundraising to acquisition is 6.1 years, arguing that it is unlikely for venture-capital backed businesses to operate and grow for that period of time without accepting funding that dilutes founders' and key employees' equity stake in the business. Other commenters supporting a lower threshold provided anecdotal evidence that businesses cede large shares to financial backers, resulting in many owner-operators holding significantly less than a 25% share in their business.

Finally, some commenters focused on eliminating potential loopholes to the proposed exception. Some commenters expressed concern that employers may set up sham transactions with wholly owned subsidiaries in order to impose non-competes that would otherwise be prohibited under the rule, urging the Commission to clarify that the exception applies only to bona fide transfers to an independent third party. Some commenters contended that firms may use "springing" non-competes (in which a worker must agree at the time of hiring to a non-compete in the event of some future sale) and repurchase rights, mandatory stock redemption programs, or similar stock-transfer schemes (pursuant to which a worker may be required to sell their shares if a certain event occurs) to impose non-competes on their workers which would otherwise be prohibited. They urged the Commission to address those instances specifically,

including by defining the exception by the percentage of total equity value received in liquid proceeds at the time of the relevant transaction.

### 3.  The Final Rule

The Commission adopts a sale of business exception for substantially the same reasons articulated in the NPRM. However, in response to comments concerning the ownership percentage threshold, the Commission modifies § 910.3(a) so that it no longer includes the proposed requirement that the restricted party be "a substantial owner of, or substantial member or substantial partner in, the business entity" to fall under the exception. The Commission otherwise adopts this provision largely as proposed. To address commenters' concerns that employers will use sham transactions, stock-transfer schemes or other mechanisms designed to evade the rule, § 910.3(a) requires that, to fall under the exemption, a non-compete must be entered into pursuant to a bona fide sale.

The Commission reiterates that § 910.3(a) does not reflect a finding that non-competes between the seller and the buyer of a business are beneficial to competition or that they are not restrictive and exclusionary or exploitative and coercive. Indeed, the Commission acknowledges that some non-competes between the seller and buyer of a business may be exploitative and coercive due to an imbalance in bargaining power and/or may tend to harm competitive conditions. However, commenters did not present empirical research on the prevalence of non-competes between the seller and the buyer of a business or on the aggregate economic effects of applying additional legal restrictions to non-competes between the seller and buyer of a business. The Commission's decision to adopt § 910.3(a) reflects the view of the Commission and most commenters that, compared to non-competes arising solely out of an employment relationship, non-competes between the sellers and buyers of businesses may implicate unique interests and

have unique effects that this rulemaking record does not address.[862]

The proposed requirement that an excepted non-compete bind only a "substantial" owner, member or partner of the business entity being sold was designed to allow those non-competes between the seller and the buyer of a business which are critical to effectively transfer goodwill while prohibiting those which are more likely to be exploitative and coercive due to an imbalance of bargaining power between the seller and the buyer. However, commenters persuasively argued that the proposed 25% ownership threshold was too high because it failed to reflect the relatively low ownership interest held by many owners, members, and partners with significant goodwill in their business. The Commission declines to maintain the "substantial" interest requirement with a lower percentage threshold for the same reason.

The Commission also declines to adopt a threshold of $1 million, $250,000, or some other dollar limit on the proceeds received by the seller. On the current record, these thresholds were not sufficiently correlated to sellers' goodwill or bargaining power for a broadly generalizable approach. The Commission declines to adopt a "totality of the circumstances" or "reasonableness" test in the text of § 910.3(a) because they would provide little meaningful guidance to buyers and sellers and would be difficult to administer. For the same reasons, the Commission declines to replace the ownership-based exception with an exception for founders, key workers, workers with access to intellectual property, and/or workers with goodwill. Furthermore, non-competes allowed under the exception will continue to be governed by State law, which generally requires a showing that a non-compete is necessary to protect the value of the business being sold, as well as Federal antitrust law.[863]

---

[862] *See* NPRM at 3514-15.
[863] *See, e.g.*, *U.S. v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) ("For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements [*inter alia*] by the

Finally, the Commission agrees with commenters' concerns about the risks that firms may abuse the exception through sham transactions with wholly owned subsidiaries, "springing" non-competes, repurchase rights, mandatory stock redemption programs, or similar evasion schemes. The Commission adds the term "bona fide" and makes changes clarifying that any excepted non-compete must be made "pursuant to a bona fide sale" to ensure that such schemes are prohibited under the rule. A bona fide sale is one made in good faith as opposed to, for example, a transaction whose sole purpose is to evade the final rule.[864] In general, the Commission considers a bona fide sale to be one that is made between two independent parties at arm's length, and in which the seller has a reasonable opportunity to negotiate the terms of the sale. So-called "springing" non-competes and non-competes arising out of repurchase rights or mandatory stock redemption programs are not entered into pursuant to a bona fide sale because, in each case, the worker has no good will that they are exchanging for the non-compete or knowledge of or ability to negotiate the terms or conditions of the sale at the time of contracting. Similarly, sham transactions between wholly owned subsidiaries are not bona fide sales because they are not made between two independent parties.

The Commission declines to specifically delineate each kind of sales transaction which is not a bona fide sale under the exception to avoid the appearance that any arrangement not listed is allowed under the exception. Courts have effectively identified and prohibited such schemes pursuant to State statutes prohibiting non-competes.[865] In addition, non-competes allowed under

---

seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold . . . . Before such agreements are upheld, however, the court must find that the restraints attempted thereby are reasonably necessary . . . to the enjoyment by the buyer of the property, good will, or interest in the partnership bought . . . .").

[864] Black's Law Dictionary defines bona fide as "[m]ade in good faith; without fraud or deceit," and "[s]incere; genuine." (11th ed. 2019).

[865] *See, e.g.*, *Bosley Med. Grp. v. Abramson*, 161 Cal. App. 3d 284, 291 (Cal. Ct. App. 1984) (refusing to enforce non-compete imposed on physician under agreement requiring physician to purchase 9% of stock at hiring and resell

the sale-of-business exception remain subject to Federal and State antitrust laws, including section 5 of the FTC Act.

## B. Section 910.3(b): Exception for Existing Causes of Action

Proposed § 910.2(a) would have prohibited employers from maintaining an existing non-compete with a worker. The proposed rule also would have required employers to rescind existing non-competes.[866] Commenters argued that any invalidation or rescission required of existing non-competes would be impermissibly retroactive, present due process concerns, and/or constitute an impermissible taking under the Fifth Amendment.

As described in Part IV.C.5, the Commission adopts a modified § 910.2(a) under which existing non-competes for workers who are not senior executives are no longer enforceable. The Commission adds an exception in § 910.3(b) in response to comments raising concerns related to retroactivity. Section 910.3(b) specifies that the final rule does not apply if a cause of action related to a non-compete provision accrued prior to the effective date. This includes, for example, where an employer alleges that a worker accepted employment in breach of a non-compete if the alleged breach occurred prior to the effective date. This provision responds to concerns that the final rule would apply retroactively by extinguishing or impairing vested rights acquired under existing law prior to the effective date.[867] In this Part V.B, the Commission addresses commenters' arguments regarding retroactivity, due process, and impermissible taking

---

to corporation upon termination because agreement "was devised to permit plaintiffs to accomplish that which the law otherwise prohibited: an agreement to prevent defendant from leaving plaintiff medical group and opening a competitive practice").

[866] *See* proposed § 910.2(b)(1).

[867867] As discussed in Part V.B.1, courts have explained that an "administrative . . . rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed." *Regents of the Univ. of Cal. v. Burwell*, 155 F. Supp. 3d 31, 44 (D.D.C. 2016) (alteration in original) (quoting *Nat'l Min. Ass'n v. DOL*, 292 F.3d 849, 859 (D.C. Cir. 2002)). But a regulation is *not* retroactive simply because it "impair[s] the future value of past bargains" if it does not also "render[] past actions illegal or otherwise sanctionable." *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009).

under the Fifth Amendment.

## 1. Retroactivity

A number of commenters asserted that applying the final rule to prohibit the enforcement of existing non-competes would render the final rule impermissibly retroactive. The Commission disagrees. A rule "does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the [rule's] enactment, or upsets expectations based in prior law."[868] Rather, courts have explained that an "administrative . . . rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed."[869] "A rule that 'alter[s]' the past legal consequences of 'past action' is retroactive," while a rule that "'alter[s] only the 'future effect' of past actions, in contrast, is not."[870] Agency action "that only upsets expectations based on prior law is not retroactive."[871]

The final rule is not impermissibly retroactive because it does not impose any legal consequences on conduct predating the effective date. The Commission is not creating any new obligations, imposing any new duties, or attaching any new disabilities for past conduct.[872] And to minimize concerns about retroactivity, the Commission adopts § 910.3(b), which states that the final rule does not apply where a cause of action related to a non-compete accrues before the effective date. The notice requirement in § 910.2(b) likewise does not render the final rule impermissibly retroactive because that requirement merely requires notice that non-competes

---

[868] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994).
[869] *Burwell*, 155 F. Supp. 3d at 44 (alteration in original) (quoting *Nat'l Min. Ass'n*, 292 F.3d at 859).
[870] *Id*. (alterations in original) (quoting *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 14 (D.C. Cir. 2011)).
[871] *Nat'l Cable*, 567 F.3d at 670 (internal quotation omitted) (quoting *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006)).
[872] For instance, the D.C. Circuit found that agency action impermissibly attached a "new disability" when a Department of Interior rule made mine operators ineligible for a surface mining permit based on "pre-rule violations." *Nat'l Min. Ass'n v. U.S. DOI*, 177 F.3d 1, 8 (D.C. Cir. 1999). Here, the final rule imposes no penalties or other disabilities on persons who entered into non-competes before the effective date.

that exist after the effective date will not be enforced in the future with respect to workers other than senior executives. No penalties attach to persons who entered non-competes before the effective date.

This final rule is analogous to the FCC rulemaking upheld in *National Cable & Telecommunications Ass'n v. FCC*. There, the agency promulgated a rule that "forbade cable operators not only from entering into new exclusivity contracts, but also from enforcing old ones."[873] The court upheld the rule against a retroactivity challenge because the FCC had "impaired the future value of past bargains but ha[d] not rendered past actions illegal or otherwise sanctionable."[874] This final rule does the same with existing non-competes. The final rule does not render it illegal or otherwise sanctionable for parties to have entered into non-competes before the effective date; it merely provides that persons cannot enforce or attempt to enforce such agreements with workers other than senior executives or represent to such workers that they are bound by an enforceable non-compete after the effective date. It is thus not impermissibly retroactive.

In *National Cable*, the court also considered whether the agency had "balance[d] the harmful 'secondary retroactivity' of upsetting prior expectations or existing investments against the benefits of applying [its] rules to those preexisting interests."[875] While commenters did not frame their objection as one of "secondary retroactivity," some did object that the final rule would upset the benefits of pre-existing bargains. As in *National Cable*, however, the Commission has "expressly consider[ed] the relative benefits and burdens of applying its rule to existing contracts."[876] This consideration led the Commission to adopt the various exceptions

---

[873] *Nat'l Cable*, 567 F.3d at 661.
[874] *Id.* at 670.
[875] *Id.* at 670.
[876] *Id.* at 671.

described in the final rule, including the decision not to apply the final rule to non-competes entered into with senior executives before the effective date. As explained in Part IV.B, however, the Commission has determined that, for workers other than senior executives, there are substantial benefits to applying the rule to prohibit the future enforcement of non-competes entered into before the effective date. These benefits include the anticipated increase in worker earnings, new business formation, and innovation.[877] Additionally, the Commission finds such agreements are generally coercive and exploitative, so prohibiting their future enforcement is also a benefit.[878]

In the Commission's view, these significant benefits justify any burdens of applying the final rule to the future enforcement of pre-existing agreements with workers other than senior executives. Having balanced the burdens and benefits of so applying the final rule, the Commission has satisfied its obligation to consider the secondary retroactivity effects of the final rule. Moreover, the Commission notes that non-competes were already subject to case-by-case adjudication under section 5.[879] Employers were thus already responsible, even before the final rule, for ensuring their non-competes are not unfair methods of competition.

## 2. Takings

The Commission also disagrees with commenters who contended that applying the final rule to non-competes entered into before the effective date would violate the Fifth Amendment by effecting a taking without due compensation. Some comments interpreted the proposed rescission requirement to mean that the worker and employer must be returned to their original positions (*i.e.*, on the day they entered into the non-compete) and presumed to not have entered

---

[877] *See* Part IV.B.
[878] *See* Part IV.B.2.b.
[879] Part I.B.1.

the agreement, or that the rule would mandate wholly new contracts to replace any existing

agreements that contained non-competes. The Commission does not intend the final rule to have

such effect and has omitted the rescission requirement proposed in the NPRM. The Commission

also adopts § 910.3(b), which provides an exception for causes of action that accrued before the

effective date, to clarify that the final rule is purely prospective. The final rule does not render

any existing non-competes unenforceable or invalid *from the date of their origin*. Instead, under

the final rule, it is an unfair method of competition to enforce certain non-competes *beginning on

the effective date*. Action taken before the effective date to enforce an existing non-compete or

representations made before the effective date related to an existing non-compete are not an

unfair method of competition under the final rule. The final rule does not effectuate a taking.

The Takings Clause provides that "private property" shall not "be taken for public use,

without just compensation."[880] When, as here, "the government, rather than appropriating private

property for itself or a third party, imposes regulations that restrict an owner's ability to use his

own property," courts consider whether the regulation "goes too far" and constitutes a

"regulatory taking."[881] Consistent with the Supreme Court's decision in *Penn Central

Transportation Co. v. City of New York* ("*Penn Central*"), this is necessarily an "ad hoc, factual

inquir[y]" and focuses on three factors: "the economic impact of the regulation on the claimant";

"the extent to which the regulation has interfered with distinct investment-backed expectations";

and "the character of the governmental action."[882] "[T]he *Penn Central* inquiry turns in large

part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the

degree to which it interferes with legitimate property interests."[883] As a general matter, "the fact

---

[880] U.S. Const. amend. V.
[881] *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).
[882] *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104 (1978).
[883] *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005).

that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking."[884]

Under the *Penn Central* test, the final rule does not effect a taking as a matter of law. First, the economic impact of the regulation on employers with existing non-competes with workers who are not senior executives is insufficient to constitute a taking.[885] The Commission has found that such agreements are rarely the product of bargaining, and that little to nothing is offered in exchange for them. And research has confirmed that for many such agreements, employers do not value the ability to enforce the agreements.[886] The final rule also includes provisions that allow employers and workers to "moderate and mitigate the economic impact" of the final rule.[887] The Commission has made clear that employers may continue to use reasonable NDAs and trade secrets law to protect their interests, including customer goodwill.[888] In fact, one study finds that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and 74.7% of workers with non-competes are subject to all three provisions.[889] And in cases where non-competes with workers other than senior executives were tied to benefits like cash or equity, the Commission has provided time for those agreements to be renegotiated if necessary.[890] For senior executives, the Commission allows existing agreements to continue to be enforced.

The character of the governmental action here also counsels against viewing the final rule as a taking. "A 'taking' may more readily be found when the interference with property can be

---

[884] *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986); *see also Nat'l Min. Ass'n v. Babbitt*, 172 F.3d 906, 917 (D.C. Cir. 1999) (applying *Connolly* to a Takings challenge to an administrative rule).
[885] *Murr v. Wis.*, 582 U.S. 383, 405 (2017); *see also Connolly*, 475 U.S. at 225.
[886] *See* Hiraiwa, Lipsitz, & Starr (2023) (showing that firms do not value the ability to enforce non-competes for workers earning up to $100,000 per year and potentially more).
[887] *Connolly*, 475 U.S. at 225-26.
[888] *See* Part IV.D.2.
[889] Balasubramanian, Starr, & Yamaguchi, supra note 74 at 35.
[890] *See* § 910.6.

348

characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."[891] There is no physical invasion here, and the final rule is promulgated under the Commission's authority to identify and prohibit unfair methods of competition.[892] Among other economic benefits described in Part IV.B, the Commission finds economy-wide benefits, including increases in new business formation and innovation. The Commission also finds that the final rule will increase earnings for workers by preventing enforcement of agreements that suppress their earnings. Moreover, non-competes have long been subject to government regulation, including not only section 5 of the FTC Act, but also State common law, State enactments, and other Federal antitrust laws.

Finally, the final rule does not upset investment-backed expectations to the extent necessary to constitute a taking. Even in States that prohibit some or all non-competes, employers make many investments in workers that they would continue to make regardless of their ability to use non-competes, such as training, or that would be protected by other mechanisms, such as reasonable NDAs, trade secret law, and/or fixed term contracts. In other words, non-competes are not a prerequisite to employers' productivity and output, in large part because (as described in Part IV.D) employers have reasonable alternatives to protecting the investments they make. The Commission has also lessened the economic burden of the final rule by creating an exception for situations where a cause of action accrued before the effective date.[893] Furthermore, States and the Federal government have regulated and considered further regulating non-competes for years, and the Commission issued the NPRM more than 18 months

---

[891] *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978) (internal citation omitted).
[892] *See* 15 U.S.C. 45(a); *see also* Parts IV.B and C (the Commission's findings outlining the public benefits of the final rule and the public harm from the use of non-competes).
[893] *See* § 910.3(b).

before the effective date—and began exploring whether to regulate non-compete agreements more than five years ago.[894] There has thus been ample notice that non-competes may become unenforceable by rule,[895] and prior to this rule non-competes were already subject to case-by-case adjudication under section 5. For all these reasons, the Commission does not believe the final rule constitutes a taking.

### 3. Due Process

Similarly, the Commission disagrees with commenters who argued that applying the final rule to existing non-competes would present due process concerns. Assuming that these due process concerns are independent of other constitutional concerns like the alleged retroactive application of the final rule,[896] which are addressed in Parts V.B.1 and V.B.2, the Commission disagrees that there is any due process infirmity. Due process requires the government, at a minimum, to provide notice and an opportunity to be heard before depriving any person of property.[897] By issuing the NPRM and engaging in notice-and-comment rulemaking, the Commission has provided sufficient due process. And on top of the notice-and-comment process, there will be further process in an administrative adjudication or in court before any person is found to have violated the rule.

### C.  Section 910.3(c): Good Faith Exception

The Commission adds an exception in § 910.3(c) in an abundance of caution to ensure the final rule does not infringe on activity that is protected by the First Amendment[898] and to

---

[894] *See* Part I.B.

[895] *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 226 (1986).

[896] Commenters invoking a due process concern outside the retroactivity context provided little contextual detail on the precise substance of the concern, nor did they explain what further process would be due before the Commission could promulgate the rule.

[897] *See, e.g.*, *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976)).

[898] The Commission adopts § 910.3(b)(3) out of an abundance of caution and does not believe that any of the

improve clarity in § 910.2(a). The exception states: "It is not an unfair method of competition to enforce or attempt to enforce a non-compete clause or to make representations about a non-compete clause where a person has a good-faith basis to believe that this part 910 is inapplicable." A similar "good-faith basis" clause was in proposed § 910.2(a).

As described in Parts IV.B.4 and IV.C.5, the final rule includes a prohibition on enforcing or attempting to enforce non-competes in both § 910.2(a)(1) and § 910.2(a)(2). Under the *Noerr-Pennington* doctrine, filing a lawsuit—even if the suit may tend to restrict competition and is ultimately unsuccessful—is typically protected under the First Amendment right to petition and immune from antitrust scrutiny.[899] However, courts have recognized that where a lawsuit is a "sham," *i.e.*, objectively baseless and subjectively designed solely to prevent competition, it is not protected.[900] For a non-compete covered by the final rule, enforcing or attempting to enforce the non-compete would likely be considered a "sham" lawsuit. Accordingly, such a lawsuit would not enjoy protection under the First Amendment. Section 910.3(b) ensures, however, that if a circumstance arises under which an employer's enforcement of or attempt to enforce a non-compete is protected by the First Amendment, the final rule does not run afoul of it.

As explained in Parts IV.B.4 and IV.C.5, the Commission adopts a prohibition on "representing" that a worker is subject to a non-compete in § 910.2(a)(1)(iii) and § 910.2(a)(2)(iii). In § 910.3(c), the Commission incorporates a "good-faith" exception that applies to the prohibition on "representing" that the worker is subject to a non-compete. Taken

---

requirements in the final rule run afoul of the First Amendment because the Commission finds that the use of certain existing non-competes is an unlawful unfair method of competition.

[899] *See E.R.R. Presidents' Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[900] *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).

together, these provisions of the final rule prohibit an employer from representing to a worker that the worker is subject to a non-compete unless the employer has a good-faith basis to believe that the worker is subject to an enforceable non-compete.

The Supreme Court has held "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."[901] Accordingly, "[t]he government may ban forms of communication more likely to deceive the public than to inform it, . . . or commercial speech related to illegal activity."[902] The final rule does not cover protected speech because it prohibits only misrepresentations about whether a non-compete covered by the rule is enforceable. The good-faith exception in § 910.3(b) ensures, however, that the final rule does not run afoul of the First Amendment if a circumstance arises under which an employer's representation that a worker is subject to a non-compete is protected by that Amendment.

In the NPRM, the Commission stated that an employer would have no good faith basis to believe that a worker is subject to an enforceable non-compete "where the validity of the rule . . . has been adjudicated and upheld." Some commenters stated that legal challenges to the final rule will create uncertainty and unpredictability related to compliance. The Commission believes the foregoing statement in the NPRM would contribute to this confusion and does not adopt it in this final rule. The Commission clarifies that the absence of a judicial ruling on the validity of the final rule does not create a good-faith basis for non-compliance. If the rule is in effect, employers must comply.

### D.  Requests to Expand Final Rule Coverage or to Provide an Exception From Coverage Under the Final Rule

---

[901] *Cent. Gas & Elec.* v. *Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980).
[902] *Id.* at 563-64.

In the NPRM, the Commission preliminarily concluded that applying the rule uniformly to all employers and workers would advance the proposed rule's objectives to a greater degree than differentiating among workers on the basis of industry or occupation, earnings, another factor, or some combination of factors, and that it would better ensure workers are aware of their rights under the rule.[903] The Commission sought comment on this topic, including what specific parameters or thresholds, if any, should apply in a rule differentiating among workers.[904]

The vast majority of commenters supported the Commission's proposal to ban non-competes categorically for all workers.[905] Commenters from a broad spectrum of job types and industries stated that non-competes harm competition in a way that hurts workers and employers. Commenters also supported the rule with perspectives specific to particular industries. In response to the Commission's request for comment on the issue, some commenters argued that the Commission should further expand the rule to cover non-competes between franchisors and franchisees.

Other commenters argued the Commission should differentiate among workers and employers along different parameters. They stated that workers with higher earnings, higher skills, specific job titles, or access to specific types of information should be excluded. Some stated that particular industries should be excluded wholesale, including all workers in an industry regardless of their job duties, while some stated that only certain workers in particular industries should be excluded.

In adopting the final rule, the Commission considered each request for exclusion from or

---

[903] NPRM at 3518. The NPRM's proposed definition of "worker" excluded franchisees in the context of franchisee-franchisor relationships. *Id.* at 3520. The NPRM also proposed an exception for certain non-competes between the seller and the buyer of a business.

[904] NPRM at 3519.

[905] The Commission received over 26,000 public comments from a wide range of stakeholders. Among these comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes.

expansion of coverage under the final rule and concludes that the use of covered non-competes is an unfair method of competition. The Commission also concludes that applying the final rule as adopted in part 910 to the full extent of the Commission's jurisdiction with respect to covered workers advances the final rule's objectives to a greater degree than differentiating among workers. In response to, inter alia, comments regarding the potential costs and difficulties that may result from invalidating existing non-competes for certain senior executives, however, the final rule differentiates between senior executives and other workers by allowing existing non-competes for senior executives to remain in force. The final rule adopts a uniform rule categorically banning new non-competes for all workers. The Commission substantiates its finding that the use of non-competes with workers is an unfair method of competition in Parts IV.B and IV.C.

In this Part V.D, the Commission addresses comments related to differentiation or exclusion of certain workers, employers, or industries. Comments related to expanding or limiting the definition of worker or employer are addressed in Parts III.C and III.G. Comments related to the Commission's jurisdiction and exclusions from the Commission's jurisdiction in the FTC Act are addressed in Part II.E. Comments related to the prevalence of non-competes within and across industries are addressed in Part I.B.2.

Overall, the Commission is committed to stopping unlawful conduct related to the use of certain non-competes to the full extent of its authority and jurisdiction. The Commission finds every use of a non-compete covered by the final rule to be an unfair method of competition under section 5 of the FTC Act for the reasons in Parts IV.B and IV.C. The use of an unfair method of competition cannot be justified on the basis that it provides a firm with pecuniary

benefits.[906] To the extent commenters argue for an exception based on this justification, the Commission declines to create any exception on that basis. Moreover, a uniform rule carries significant benefits, which many commenters who otherwise opposed the NPRM acknowledged.[907] Among those benefits is the certainty for both workers and employers from a uniform rule, which also lessens the likelihood of litigation over uncertain applications. Exceptions for certain industries or types of workers would likely increase uncertainty and litigation costs, as parties would dispute whether a specific business falls within an industry-wide exception. Most importantly, exceptions would fail to remedy the tendency of non-competes to negatively affect competitive conditions in the excepted industries or for excepted types of workers and would likely have *in terrorem* effects.

### 1. Differentiation by Worker Compensation or Skills

Many commenters sought an exception for highly paid or highly skilled workers, often alongside requests for an exception for senior executives, while many others asked the Commission to keep these workers within the scope of the final rule. Commenters seeking an exception argued that highly paid and highly skilled workers in particular did not experience exploitation and coercion and were more likely to have access to confidential information or client or customer relationships, along with the other justifications for non-competes discussed in Part IV.D. Commenters' specific arguments on the evidence concerning highly paid or highly skilled workers are considered in the relevant subsections of Part IV.B. Many commenters proposed using a compensation threshold to differentiate highly paid workers and senior

---

[906] *See, e.g.*, *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 371 (1965) ("Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves."); *see also* Part II.F.
[907] *See* Part IX.C.

executives, discussed in IV.C.4.b. Other commenters suggested an exception based on the FLSA exemptions or the worker's level of access to confidential information, discussed in Parts IV.C.4. and V.D.2.

The Commission finds that non-competes have a tendency to negatively affect competitive conditions in labor markets and product and service markets, including non-competes binding highly paid and highly skilled workers. The evidence shows that, among the other effects described in Part IV.B, non-competes for highly paid and highly skilled workers suppress wages for these workers,[908] restrict competitors' access to highly skilled workers,[909] and restrict entrepreneurship.[910] Notably, as described in Parts IV.B.2 and IV.C.1, the Commission concludes that non-competes for highly paid or highly skilled workers who are not senior executives are generally exploitative and coercive. The Commission finds that highly paid and highly skilled workers who are not senior executives only rarely negotiate meaningful consideration in exchange for a non-compete. As the Commission finds, the overwhelming response from commenters, particularly workers, was that non-competes are exploitative and coercive for many workers in highly paid professions other than senior executives.[911] While there may be highly paid or highly skilled workers who do not meet the definition of "senior executive" and who are not exploited or coerced, including workers above the definition's total compensation threshold, the Commission explains in Part IV.C.4 why a compensation threshold is necessary—but not sufficient—for purposes of defining senior executives whose existing non-competes may remain in force under the final rule. Further, the Commission finds that employers

---

[908] *See* Part IV.B.3.a.ii.
[909] *See* Part IV.C.2.c.i.
[910] *See* Part IV.B.3.b.i.
[911] *See* Part IV.B.2.b.

have sufficient alternatives to non-competes for highly paid and highly skilled workers.[912] The Commission also explains why it is not exempting all non-competes that were exchanged for consideration in Part IV.C.3. Accordingly, the final rule does not include any workers other than highly paid senior executives in the exception from the ban on enforcing existing non-competes. To ensure that only workers for whom there is insufficient evidence of exploitation and coercion are included in the exception, the final rule narrowly defines senior executive in § 910.1.[913]

### 2. Differentiation by Worker Access to Information

Some commenters suggested excluding workers with access to trade secrets, confidential business information, or other intellectual capital. Commenters contended these workers are uniquely situated because of their access to valuable employer information. Many commenters responded to these arguments and disagreed with them. Some commenters stated that employers overstate the proportion of workers who have access to such information. Commenters also stated that employers exaggerate the amount or quality of information that should be appropriately considered a trade secret, confidential business information, or other intellectual capital, and therefore exaggerate the purported cost to the firm of not being able to use non-competes. Commenters also stated that employers have alternatives to non-competes that generate less harm to competition, to workers, to the economy, and to rival firms, including NDAs and fixed-term employment contracts.

The Commission declines to adopt an exclusion based on workers' access to trade secrets, confidential business information, or other intellectual capital because it finds such an exclusion would be unnecessary, unjustified, unworkable, and prone to evasion. The Commission finds the use of non-competes to be an unfair method of competition and addresses

---

[912] *See* Part IV.D.2.
[913] For a more detailed discussion of proposed § 910.1(i), *see* Part IV.C.4.a.

claimed justifications related to trade secrets, confidential business information, or other intellectual capital in Part IV.D. The Commission finds that protecting trade secrets, confidential information, and other intellectual capital is an insufficient justification for non-competes because employers have less restrictive alternatives for protecting such information. Moreover, if the Commission were to exempt workers with access to confidential information, employers could argue that most or all workers fall under the exception, requiring workers to engage in complex and fact-specific litigation over the protected status of the underlying information. As explained in Part IX.C, such case-by-case adjudication of the enforceability of non-competes has an *in terrorem* effect that would significantly undermine the Commission's objective to address non-competes' tendency to negatively affect competitive conditions in a final rule.

### 3. Differentiation by Industry Other Than Healthcare

Some businesses and organizations argued that specific industries should be exempt from the final rule. The Commission carefully considered these comments and declines to adopt any industry-based exceptions. The Commission notes that while some commenters characterized purported justifications for an exclusion from the final rule as unique to a particular industry, the purported justifications were in fact the same as the those addressed in Part IV.D, namely, the need to protect investments in labor, trade secrets, confidential business information, or other intellectual capital. The Commission addresses those arguments in full in Part IV.D, but in this Part V.C.3 further discusses examples of comments seeking industry-based exceptions.

#### a. Client- and sales-based industries

Some commenters in client- or sales-based industries, including real estate and insurance, argued they are unique and should be excluded from any rule. A real estate commenter argued that job switching by real estate employees is similar to the sale of a business where the goodwill

and book of business generated by the departing employee must remain with the business. A timeshare industry commenter claimed the industry had unique features justifying the use of non-competes with highly paid workers, such as the cost of marketing and cultivation of relationships to bring in and maintain customers as well as the need to protect proprietary targets and strategies for resort development, due in part to the limited number of available resort contracts. A commenter representing insurance marketing organizations (IMOs), which serve as facilitators between insurance carriers, agents, and consumers similarly argued for an exclusion, citing client goodwill, purported trade secrets in sales methods, sales leads, unique compensation structures, and company analyses, and consumer harm from potential agent misconduct if the agent moves to a new IMO and changes the consumer's policy. Some businesses stated that non-competes rarely impact a worker's ability to find other work in their industry, sometimes because the new employer "buys out" the non-compete.

The majority of commenters from the real estate and insurance industry workers and small, independent insurance agencies, supported a comprehensive ban. These comments painted a picture consistent with the Commission's findings in Part IV.B regarding indicia of unfairness, including facial unfairness, and the tendency of non-competes to negatively affect competitive conditions in the labor and product and service markets. A worker from the real estate industry stated that non-competes are standard in the industry for all workers, regardless of their position in a company. Commenters stated that they were asked to sign after starting their job, with one worker stating that they faced the option of either signing the non-compete or leaving and losing future commissions for work they had done. Workers noted that they were terminated without cause and still required to comply with a non-compete, and that they had no bargaining power for promotion or wage increases. The following examples are illustrative of the comments the

Commission received:

- As an aspiring entrepreneur in the real estate space, I am in a relatively small market where one company dominates. I recently ended my employment with them. They use non-competes to restrict competition and trap employees. The abolition of non-competes is paramount as small towns/cities grow. . . .[914]

- I signed a non-compete after working at a Real Estate Brokerage for several months. I was told I had to sign it or I would not be paid on the transactions I had pending. The non-compete was so overreaching–there was no geographical scope, the penalty was more than prohibitive. I was told that no one really enforces them or attempts to. I signed it, collected my outstanding pay and left the company within 90 days. Fast forward 4 years, I have been defending myself in litigation over this non-compete for over 3 years. Unable to afford qualified representation.[915]

- I am a business owner and have had 40 independent contractors under my business at my peak. They were all under non-compete, and if I could go back, I would eliminate the non-compete. It doesn't help the employee or contractor, and it doesn't help the business either. It spurs an unhealthy work environment. Clogs up the judicial system with frivolous cases where they try and scare people from earning a living. . . . I 100% support this ban, and it should go into effect immediately.[916]

Commenters stated that non-competes are standard in the insurance industry and that the industry is facing significant consolidation, fueled in part by private equity firms. These commenters argued that workers in the insurance industry are prohibited from seeking jobs with higher pay and better benefits in their specialty. Commenters stated that they were not able to negotiate better conditions at their current job and that employers can change the employment terms at will, so workers face reduced commissions and pay while still being held to a non-compete. Commenters stated that insurance agents are highly trained and specialized, and non-competes force them to leave their specialty and start over in a new specialty for less pay. Commenters also argued that non-competes thwart consumer choice because insurance agents

---

[914] Individual commenter, FTC-2023-0007-10710.
[915] Individual commenter, FTC-2023-0007-5502.
[916] Individual commenter, FTC-2023-0007-6782.

create relationships with their customers, and customers lose the ability to choose the same agent

if the agent is bound by a non-compete. Commenters also noted that standard employment

agreements in the insurance industry require workers to pay their own costs to defend against

noncompete litigation even if the worker is successful in the challenge such that even if a worker

does not violate the terms of a noncompete, or the noncompete is not enforceable, workers who

change jobs or start a new agency are often faced with significant legal bills. Commenters noted

that although independent licensing agents are meant to be able to contract with multiple

insurance companies, they are heavily restricted by non-competes, creating regional monopolies.

The following examples are illustrative of the comments the Commission received:

- As a captive "Independent Contractor" for a large insurance company, this rule would be a lifeline should I decide to pursue an independent agent opportunity. The insurance company I represent, has gradually cut commissions over the past few years . . . that makes it extremely uncompetitive compared to peers. There is absolutely no reason why I should be held prisoner and not be able to pursue far more favorable, and beneficial opportunities, for both myself and my family.[917]

- Ideally I would like to start my own insurance agency but am currently prevented from doing so due to a non-compete clause. We are already somewhat limited in employment opportunities here in rural West Texas . . . . I'm finding it difficult to find a path to provide for my family during the two year period [of the non-compete], and therefore am considering scrapping the new business idea and remaining at my current job. . . . In a sense, I feel trapped at my current job, and ultimately I feel hobbled from achieving my full potential as a future small business owner.[918]

The Commission declines to adopt an exclusion for client- or sales-based industries such

as real estate and insurance. The use of non-competes is an unfair method of competition and the

purported justifications raised by commenters do not change the Commission's finding. The

Commission also notes that, to the extent commenters seeking an exception are referencing

different restrictive covenants, including some garden variety non-solicitation agreements, which

---

[917] Individual commenter, FTC-2023-0007-10919.
[918] Individual commenter, FTC-2023-0007-19441.

do not prohibit or function to prevent a worker from switching jobs or starting a new business as described in Part III.D, the final rule does not apply to them. Thus, the Commission focuses on commenters' purported need for an exclusion based on non-competes alone.

In response to commenters arguing that information and techniques related to sales, including strategy on developing business, is confidential or proprietary and that workers' ability to move to another job or start a business would thus harm them, the Commission notes that any specific information or truly proprietary techniques can be protected by much less restrictive alternatives, such as trade secret law and NDAs. For example, proprietary targets and strategies for timeshares or unique compensation structures or company analyses cited by IMOs can be otherwise protected. Moreover, companies can compete on the merits to retain their customers by offering better products and services. Requiring workers to leave the industry or the workforce is an overbroad restriction that tends to negatively affect—and actually harms— competition with attendant harm to workers and rivals, as outlined in Part IV.B.

With respect to commenter arguments that non-competes are needed to protect specialization related to particular products and skills related to sales, as the Commission finds in Part IV.D, preventing workers from using their general trade knowledge and skills, including their gains in the same through experience with a particular employer, is not a legally cognizable justification for non-competes. That a real estate, insurance, or any other sales agent inherently learns skills and gains knowledge in the performance of their job, becoming a more effective salesperson over time, is not itself a cognizable justification for preventing the worker from re-entering the labor market as a worker or business owner. Employers' efforts to use non-competes to prevent workers from using general trade knowledge and skills is an unfair method of

competition under section 5 because it is an attempt to avoid competition on the merits.[919] To the extent employers seek to protect legitimate investments in training, the Commission finds employers have less restrictive alternatives, including fixed duration contracts and better pay or other terms and conditions of employment to retain the worker. Finally, the Commission notes that because all covered employers can no longer maintain or enforce non-competes with workers who are not senior executives, employers may also have a larger pool of trained and experienced workers to hire from.

The Commission disagrees with commenters arguing that a worker leaving a sales position is akin to the sale of a business. Unlike the seller of a business, a worker is in an unequal bargaining position and does not receive compensation when leaving the firm. The fact that a worker generates goodwill for an employer is not a cognizable justification for non-competes. First, it not clear that the employer would lose goodwill associated with their business if a particular worker leaves. Moreover, commenters do not specify the extent to which their legitimate investment in the worker—separate from employing the worker to use their general skills and knowledge to successfully perform the job—generates such goodwill. To the extent employers do seek to protect investments in goodwill, the employer has less restrictive alternatives to attract and retain workers and customers or clients.

### b. Industries with apprenticeships or other required training

Some commenters representing industries with apprenticeships or that require training as a part of employment, such as real estate appraisers, plumbers, and veterinarians, argued their industry should be excluded from the final rule. These commenters contended that a significant

---

[919] *See Nat'l Soc'y of Prof. Engrs. v. United States*, 435 U.S. 679 (1978) (confirming that limiting competition, even if based on the specific advantages of doing so because of the particular nature of an industry, is not a cognizable justification).

investment is needed to make workers productive in their industries and that they need to use non-competes to protect that investment. Each commenter cited an apprenticeship or training period during which they are not able to bill or must bill a lower amount for a worker's labor.

Worker commenters from these industries stated that non-competes leave them unable to launch or progress in their career because non-competes tie them to their first employer. Some appraiser commenters noted that, while their share of the appraisal fee rises to some extent after completing their apprenticeship, they cannot negotiate higher shares of the fee or other better working conditions because of non-competes. A union commenter representing plumbers noted that plumbers with non-competes are not able to accept better offers of employment, with better pay and benefits, including union positions. Other worker commenters mentioned geographic overbreadth and excessively long non-competes of two years. Many veterinarian commenters supported the proposed rule, stating that non-competes artificially held down their compensation and did not allow them to start new practices in areas where the need for more veterinary services is great, with some commenters stating that this contributed to consolidation.

The Commission declines to exclude industries, such as real estate appraisal, plumbing, and veterinary medicine, in which an industry must purportedly invest in significant training or apprenticeship of workers before the employer considers them to be productive. The Commission finds that these employers have less restrictive alternatives—namely fixed duration contracts—to protect their investment in worker training. A return on investment in the training does not require that the worker be unable to work for a period after leaving employment. Moreover, employers stand to benefit from the final rule through having access to a broader labor supply—including incoming experienced workers—with fewer frictions in matching with the best worker for the job.

### c.  Financial services

Some commenters representing financial services companies opposed the rule, arguing non-competes are necessary for the industry and their industry is unique because non-competes have been used for decades, while numerous firms have entered the market, workers are mobile, and there is no evidence of blocked or curbed entry, lack of access to talent, lower innovation, or other negative impacts in that market. These commenters mention that mobility and access to talent is possible because new employers often "buy out" a worker's non-compete to hire a worker who may be otherwise bound by a non-compete. Several commenters also contend that non-competes are especially vital to firms that focus on securities or commodities trading because disclosure of commercially sensitive information to competitors can be extremely damaging to their former employers' profitability.

Commenters identified three studies which they contend suggest that non-competes improve worker productivity. First, commenters identified two studies on the Broker Protocol, an agreement among financial advisory firms which ostensibly limited the use of NDAs, non-solicitation agreements, and non-competes simultaneously. One study by Gurun, Stoffman, and Yonker finds that firms that joined the Protocol experienced higher rates of employee misconduct and earned increased fees.[920] The other study, by Clifford and Gerken, finds that firms which joined the Protocol invested more heavily in licensure and experienced fewer customer complaints.[921] Commenters noted that these two studies have conflicting findings on advisor misconduct. The authors themselves discuss these findings, with each criticizing the approach of the other. One commenter stated that, from a technical standpoint, the Clifford and

---

[920] Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. of Fin. Econ. 1218-43 (2021).
[921] Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives*, 76 J. of Fin. 2409-45 (2021).

Gerken study has a superior approach due to its substantially larger sample size and its analysis of the assumptions underlying the methodologies used in both studies. A third study—a study of the mutual fund industry by Cici, Hendriock, and Kempf—finds that mutual fund managers increase their firms' revenue when non-competes are more enforceable by investing in higher performing funds, attracting new clients, and increasing revenue from fees.[922] This study uses three changes in non-compete enforceability, measured in a binary fashion.

A commenter representing a large group of public equity investors supported the rule, stating that a comprehensive ban would create an inclusive labor market, which is integral to long-term corporate value and a dynamic, innovative, and equitable economy. Financial services worker commenters also supported the rule, citing to their failure to be paid for their skills over time, the threat of litigation in seeking new employment, and the overbroad nature of non-competes in the industry. The following example is illustrative of the comments the Commission received:

- I am a female finance professional with strong qualifications and experience. I am subject to an extremely long and comprehensive non compete contract which I was induced to sign at a young age. I have been offered many positions at other firms who would be more willing to provide me with leadership opportunities and a path to further advancement, but I am unable to consider them and I am essentially trapped at my firm. . . .[923]

The Commission declines to exclude financial services companies over which it has jurisdiction from the final rule. The Commission finds in Part IV.C that non-competes are restrictive, exclusionary, and also exploitative and coercive for higher wage and highly skilled workers, including workers in finance. The Commission also finds in Part IV.B and IV.C that non-competes tend to negatively affect competitive conditions in labor market through reduced

---

[922] Gjergji Cici, Mario Hendriock, & Alexander Kempf, *The Impact of Labor Mobility Restrictions on Managerial Actions: Evidence from the Mutual Fund Industry*, 122 J. of Banking & Fin. 105994 (2021).
[923] Individual commenter, FTC-2023-0007-0953.

labor mobility and in the product and services market through reduced innovation and new business formation. Evidence that new employers sometimes buy out non-competes also suggests that such clauses harm competition by raising the cost to compete and creating deadweight economic loss for the new employer.[924]

The empirical evidence provided by commenters arguing for differentiation for the finance industry does not support their claims. The Commission finds that it is difficult to weigh the evidence in the two studies of the Broker Protocol because they reach conflicting results, though the Commission agrees that the technical approach in the Clifford and Gerken study is superior due to its larger sample size. More importantly, both studies primarily concerned non-solicitation agreements, and do not isolate any effects of non-competes. So even if the studies did not reach conflicting results, the Commission believes they still would yield little reliable information about the effects of non-competes specifically. With respect to the study of the mutual fund industry, the Commission notes that under section 5, firms may not justify unfair methods of competition based on pecuniary benefit to themselves.[925] The study does not establish that there were societal benefits from the attraction of new clients or the increased fee revenue—just that the firms benefited. Therefore, this study does not establish a business justification that the Commission considers cognizable under section 5.

### d.  On-air talent

Some commenters opposing the rule stated that investment in on-air talent would be considerably reduced without non-competes. Commenters argued that on-air talent becomes well-known because of employers' investment and reputation and that employers must be able to use non-competes to protect this investment. The Commission also received a number of

---

[924] *See* Part IV.C.2.c.i.
[925] *Id.*

comments from and on behalf of on-air talent. Those commenters stated that non-competes are

ubiquitous for on-air talent, that they are often localized geographically, that they suppress

compensation, and that they force workers seeking a better match to move out of their localities.

The following example is illustrative of the comments the Commission received:

- I am a professional broadcast journalist subject to a non-compete agreement with every employment contract I have ever signed, which is the industry standard. I understand the need for contractual agreements with on-air talent and some off-air talent, but non-compete agreements have historically offered nothing to employees besides restricting where they work, and how much money they are able to earn . . . [while] knowing that employees would have to completely relocate if they wanted to seek or accept another opportunity.[926]

The Commission declines to exclude on-air talent from the final rule. The Commission

finds the use of non-compete agreements is an unfair method of competition as outlined in Part

IV.B, and commenters do not provide evidence that a purported reduction in investment in on-air

talent would be so great as to overcome that finding. Specifically, the success of on-air talent is a

combination of the employer's investment and the talent of the worker, both of which benefit the

employer. As noted in Part IV.D, other less restrictive alternatives, including fixed duration

contracts and competing on the merits to retain the talent, allow employers to make a return on

their own investments. Moreover, as stated in Part II.F, firms may not justify unfair methods of

competition based on pecuniary benefit to themselves. Employers in this context do not establish

that there are societal benefits from their investment in on-air talent, but only that the firms

benefited.

### e. Construction

A commenter representing companies who provide skilled workers in construction stated

that the Commission should exclude the industry from the rule because non-competes are

---

[926] Individual commenter, FTC-2023-0007-12779.

necessary to the industry's success. The commenter states that non-competes are necessary for investment in innovation and productivity in the industry. The comment cites to three studies. Two of the studies find a general reduction in productivity in construction and conclude, inter alia, further study is warranted to better understand the trend—Goolsbee and Syverson[927] and Huang, Chapman, and Burty ("NIST study"[928]). The third study is a McKinsey & Company report published in 2020 predicting innovation in the construction industry in the coming years.[929]

The evidence cited by this commenter is exclusively about broad trends in productivity in the industry, and what may impact those trends. None of the studies explicitly examines non-competes, and they do not support inferences on the effects of non-competes in this particular industry. Indeed, the Commission finds that the final rule addresses issues raised by the commenter. For example, the commenter notes that productivity in the industry has been broadly declining for years. Notably, this downward trend exists with non-competes in use in the industry. The Commission notes that, under its analysis of the effect of the final rule, productivity will benefit because the final rule frees up labor and allows for greater innovation. The NIST study raises "skilled labor availability" as the very first factor that affects productivity. The Commission finds in Part IV that non-competes suppress labor mobility and the Commission believes the final rule will result in firms having access to workers who are a better, more productive fit. The McKinsey & Company report notes that changes in the industry will require adaptation by firms. The Commission believes the final rule will facilitate this adaptation

---

[927] Austan Goolsbee & Chad Syverson, *The Strange and Awful Path of Productivity in the U.S. Construction Sector* (NBER Working Paper 30845, Jan. 2023).

[928] Allison L. Huang, Robert E. Chapman, & David Burty, *Metrics and Tools for Measuring Construction Productivity: Technical and Empirical Considerations*, Nat'l Inst. of Standards and Tech., Bldg. and Fire Rsch. Lab., NIST Special Publication 110 (September 2009).

[929] McKinsey & Co., *The Next Normal in Construction: How Disruption is Reshaping the World's Largest Ecosystem* (June 2020).

by sharing non-confidential know-how across firms through increased mobility of workers. The rule may also help mitigate, and certainly will not exacerbate, concerns over increased concentration in the industry raised in the McKinsey & Company report, as the Commission finds that non-competes inhibit new business formation in Part IV.B.3.b.i. Moreover, the Commission believes non-competes may increase concentration, as discussed in Part IV.B.3.b.iii.

Additionally, the Commission finds that less restrictive alternatives, including appropriately tailored NDAs and non-solicitation agreements, are sufficient to address disclosure of confidential information and concerns related to client business. With respect to concerns that the construction industry as a whole is suffering from under-investment in capital and that the final rule may further disincentivize capital investment, as the Commission finds in Part IV.B.3.b.i, non-competes inhibit new business formation. The increase in new business formation from the final rule will bring new capital to bear in the industry. The Commission addresses the empirical literature and comments related to capital investment in detail Part IV.D.1. The Commission notes here that it is not clear any purported capital investment associated with non-competes is entirely beneficial because it may be the result of firms over-investing in capital because they do not face competition on the merits. Even if there is some net decrease in capital investment due to the final rule, commenters provide no reason to believe it would be a material amount.

### 4. Exclusion for Covered Market Participants that Have Competitors Outside the FTC's Jurisdiction

The Commission explained in the NPRM that some entities that would otherwise be employers may not be subject to the final rule to the extent they are exempted from coverage

under the FTC Act.[930] As described in Part II.E.1, the Act exempts, *inter alia*, "banks," "persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act of 1921"[931] as well as an entity that is not "organized to carry on business for its own profit or that of its members."[932] A few business and trade organization commenters argued the Commission should rescind the proposal or should not promulgate the rule because limits on the Commission's jurisdiction mean that the rule will distort competitive conditions where coverage by the final rule may not be universal. These commenters identified industries where employers excluded from the Commission's jurisdiction compete with covered persons, including livestock and meatpacking industries, and areas where government or private employers subject to the State action doctrine compete with covered employers. They contended that excluded employers will be able to use non-competes while their covered competitors are legally prohibited from doing so, advantaging excluded employers.

The Commission declines to rescind the proposal or otherwise refrain from promulgating a rule simply because the rule would not cover firms outside the Commission's jurisdiction. As an initial matter, jurisdictional limits are not unique to the Commission. All agencies have limits on their jurisdiction—many of which do not neatly map to all competitors in a particular market. Moreover, as explained in Parts IV and X, the final rule will have substantial benefits notwithstanding the FTC Act's jurisdictional limits, including increases in worker earnings, new firm formation, competition, innovation, and a decrease in health care prices (and potentially other prices). Furthermore, the Commission finds the risk of material disparate impact in markets where some but not all employers are covered by the final rule is minimal and, in any event, the

---

[930] NPRM at 3510.
[931] *Id.* (citing 15 U.S.C. 45(a)(2)).
[932] *Id.* (citing 15 U.S.C. 44).

final rule's overall benefits justify any such potential impact. As commenters acknowledged, excluded employers already compete with covered employers in the same markets. That is, coverage under the FTC Act—whether an employer is subject to the FTC Act and enforcement by the FTC—differs across a range of topics and long predates this final rule, which does not materially alter the status quo in that respect. Moreover, even in the absence of the rule, firms within the jurisdiction of the FTC Act are already subject to potential FTC enforcement against unfair methods of competition, including against non-competes, while firms outside the FTC's jurisdiction are not. The final rule does not alter that basic landscape.

At least one financial services industry commenter stated that national banks are outside of the Commission's jurisdiction and argued the final rule should exclude bank holding companies, subsidiaries, and other affiliates of Federally regulated banks to avoid disparate treatment of workers employed by different affiliates within the same organization, and because those entities are already heavily regulated. The Commission declines to exclude bank holding companies, subsidiaries, and other affiliates of Federally regulated banks that fall within the Commission's jurisdiction. While these institutions may be highly regulated, and depending on the corporate structure non-competes may be allowed for some workers but not others, the Commission finds that neither factor justifies excluding them from the final rule. If Federally regulated banks are concerned about disparate treatment of workers employed by their own different affiliates, they have the option to stop using non-competes across all their affiliates.

A corporation wholly owned by an Indian tribe asserted that the Commission should exclude Indian tribes and their wholly owned business entities from the definition of "employer." The commenter asserted that the FTC Act does not explicitly grant jurisdiction over Indian tribes and their corporate arms. The commenter further argued that critical tribal revenue will be lost if

372

tribal businesses' ability to retain skilled workers is impacted. The Commission declines to categorically exclude tribes or tribal businesses from coverage under the final rule. The FTC Act is a law of general applicability that applies to Indians, Indian Tribes, and tribal businesses.[933] The Commission recognizes, however, that in some instances these entities may be organized in such a way that they are outside the Commission's jurisdiction.[934] Whether a given Tribe or tribal business is a corporation within the FTC Act will be a fact-dependent inquiry. The Commission is aware of no evidence suggesting that the final rule would disproportionately impact tribes or tribal businesses.[935]

### 5. Coverage of Healthcare Industry

Many commenters representing healthcare organizations and industry trade associations stated that the Commission should exclude some or all of the healthcare industry from the rule because they believe it is uniquely situated in various ways. The Commission declines to adopt an exception specifically for the healthcare industry. The Commission is not persuaded that the healthcare industry is uniquely situated in a way that justifies an exemption from the final rule. The Commission finds use of non-competes to be an unfair method of competition that tends to negatively affect labor and product and services markets, including in this vital industry; the

---

[933] *See Fed. Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 116-17 (1960) (examining case law supporting the conclusion that "a general statute in terms applying to all persons includes Indians and their property interests"); *FTC v. AMG Servs., Inc.*, No. 2:12-CV-00536-GMN, 2013 WL 7870795, at *16-*21 (D. Nev. July 16, 2013), *report and recommendation adopted,* No. 2:12-CV-00536-GMN, 2014 WL 910302 (D. Nev. Mar. 7, 2014) (discussing the FTC Act's applicability to Indian Tribes and tribal businesses).

[934] *See, e.g.*, *AMG Servs.*, 2013 WL 7870795, at *22 (finding genuine dispute of material fact barring summary judgment on question of whether tribal chartered corporations were corporations under the FTC Act).

[935] The commenter also asked the Commission to engage Indian tribes about the proposed rule, citing Executive Order 13175. However, the Commission notes that Executive Order 13175, which requires consultation with Indian Tribes before promulgating certain rules, does not apply to independent regulatory agencies such as the Commission. E.O. No. 13175, 65 FR 67249 (Nov. 6, 2000) (stating that the term "agency," which governs the applicability of the executive order, excludes agencies "considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5)"); 44 U.S.C. 3502(5) (listing the Commission as an "independent regulatory agency"). The Commission did, however, provide extensive opportunities for public input from any and all stakeholders, including a 120-day comment period (extended from 90 days) and a public forum held on February 16, 2023, that provided an opportunity to directly share experiences with non-competes.

Commission also specifically finds that non-competes increase healthcare costs. Moreover, the Commission is unconvinced that prohibiting the use of non-competes in the healthcare industry will have the claimed negative effects.

### a. Comments Received

Many business and trade industry commenters from the healthcare industry seeking an exception, including, for example, hospitals, physician practices, and surgery centers, focused on whether the Commission has jurisdiction to regulate nonprofit entities registered under section 501(c) of the Internal Revenue Code. The Commission addresses its jurisdiction in Part II.E and considers comments related to requests for an industry-based exclusion for all or part of the healthcare industry in this section. As stated in Part II.E, entities claiming tax exempt status are not categorically beyond the Commission's jurisdiction, but the Commission recognizes that not all entities in the healthcare industry fall under its jurisdiction.

Based on the assumption that entities claiming tax-exempt status as nonprofits and publicly owned healthcare organizations would be exempt, many industry commenters contended that for-profit healthcare organizations must be also exempted from the rule as a matter of equal treatment. Commenters cited data from the American Hospital Association (AHA) indicating that as many as 58% of all U.S. hospital systems claim tax-exempt status as nonprofits, 24% are for-profit hospitals, and 19% are State and local government hospitals. One commenter cited AHA data indicating that 78.8% of for-profit hospitals are located in the same Hospital Referral Region (HRR) as at least one entity that claims tax-exempt status as a nonprofit. Many commenters argued that for-profit entities and entities that claim nonprofit status compete for patients, physician and non-physician staff, and market share. These commenters contended that a rule covering only for-profit healthcare entities will distort the

market in favor of entities claiming tax-exempt status as nonprofits, which would continue using non-competes. One commenter identifying as an entity claiming nonprofit tax-exempt status argued that such entities need to rely on non-competes to compete with for-profit competitors because, unlike for-profit health systems, they invest significantly in specialized training and mentorship, and offer a guaranteed minimum salary to recent graduates.

Some commenters contended that favoring entities claiming tax-exempt status as nonprofits would have negative effects. Some commenters argued that disparate coverage under the rule may exacerbate consolidation in the healthcare industry by advantaging entities that claim tax-exempt status as nonprofits. They stated that increased consolidation would reduce the available supply of skilled labor for for-profit hospitals, increasing labor costs and contributing to higher prices paid by patients. Commenters noted a trend in physicians increasingly leaving private practice to work at large hospital groups claiming tax-exempt status as nonprofits, which, they contended, may continue to lock those physicians up using non-competes. Industry commenters also argued that insurance premiums will rise more than they would absent the rule because of the greater market power and resulting leverage of entities that claim tax-exempt status as nonprofits in provider network negotiations. One manufacturing industry association commenter argued that the burden of rising premiums will be passed on to manufacturers who provide health insurance to their employees.

Commenters also argued that a rule covering for-profit healthcare providers would cause independent, physician-owned practices, and small community practices to suffer a competitive disadvantage compared to larger entities that claim tax-exempt status as nonprofits and public hospital groups, reducing the number of these practices and interrupting continuity of care for their patients. Commenters stated that such practices will suffer these consequences acutely in

States or localities that are particularly saturated with entities that claim tax-exempt status as nonprofits or exempt State or local hospitals, and cited New York and Mississippi as examples. A commenter claimed that public hospitals regulated by the Commission will incur losses because of their reduced ability to hire and retain physicians that perform profitable procedures. One commenter cited a 1996 Commission study to contend that, all else equal, hospitals that claim tax-exempt status as nonprofits set higher prices when they have more market power. A business commenter contended that, given what they considered a large-scale exemption of certain physician employers from the Commission's jurisdiction, the States are more appropriate regulators of non-competes between physicians and employers. Other commenters claimed that the Commission must further study the consequences of differential treatment.

Conversely, many commenters vociferously opposed exempting entities that claim tax-exempt status as nonprofits from coverage under the final rule. Several commenters contended that, in practice, many entities that claim tax-exempt status as nonprofits are in fact "organized to carry on business for [their] own profit or that of [their] members" such that they are "corporations" under the FTC Act. These commenters cited reports by investigative journalists to contend that some hospitals claiming tax-exempt status as nonprofits have excess revenue and operate like for-profit entities. A few commenters stated that consolidation in the healthcare industry is largely driven by entities that claim tax-exempt status as nonprofits as opposed to their for-profit competitors, which are sometimes forced to consolidate to compete with the larger hospital groups that claim tax-exempt status as nonprofits. Commenters also contended that many hospitals claiming tax-exempt status as nonprofits use self-serving interpretations of the IRS's "community benefit" standard to fulfill requirements for tax exemption, suggesting that the best way to address unfairness and consolidation in the healthcare industry is to strictly

376

enforce the IRS's standards and to remove the tax-exempt status of organizations that do not comply. An academic commenter argued that the distinction between for-profit hospitals and nonprofit hospitals has become less clear over time, and that the Commission should presumptively treat hospitals claiming nonprofit tax-exempt status as operating for profit unless they can establish that they fall outside of the Commission's jurisdiction.

The Commission also received many comments about coverage of the health care sector generally under the rule. Some commenters urged the Commission to ensure that health care workers, including doctors and physicians, were covered by the final rule. Several commenters stated that eliminating non-competes would allow doctors wishing to change jobs to stay in the same geographic area, fostering patient choice and improving continuity of care. Other commenters urged the Commission to create an exception for health care workers. Some argued that the evidence does not support the Commission's conclusion that non-competes depress earnings in health care. Other reasons commenters cited in support of an exception included concerns about continuity and quality of care for patients, the increased costs for employers of health care workers, physicians' negotiating power with their employers, and the effect on incentives for employers to train their health care workers.[936]

Thousands of healthcare workers submitted comments supporting a ban on non-competes. Worker commenters did not always identify whether they were working at for-profit organizations, entities that claim tax-exempt status as nonprofits, or State or local healthcare organizations, but each category was represented in the comments. These commenters detailed the negative effects of non-competes on their families, their mental health, their financial health,

---

[936] Some commenters also contended that the health care industry should be exempt from the rule because many health care providers fall outside of the Commission's jurisdiction. The Commission summarizes and responds to those commenters in Part II.E.2.

and their career advancement, as elaborated in Part IV.B.2.b.ii. Specifically, healthcare workers commented that because non-competes prohibited them from switching jobs or starting their own businesses, they had to stay at jobs with unsafe and hostile working conditions, to take jobs with long commutes, to relocate their families, to give up training opportunities, and to abandon patients who wanted to continue seeing them. Illustrative comments are highlighted in Parts I and IV.

Additionally, commenters stated the hardship patients have suffered because of non-competes when, for example, their physician was required to move out of their area to work for a different employer. The Commission highlights some of these comments in Part IV.B.2.b.ii and includes two further illustrative comments here:

- As a patient, non compete clauses are affecting mine and my [family's] ability to receive medical care. Our pediatrician left a practice and we aren't able to be informed where they are going. When we find out, it is an hour away [because] of the non compete. And when we look for other [doctors] closer they aren't accepting new patients. So for an entire year we are driving 2 [hours] round trip to see our pediatrician until they can move back to a local medical group. The non compete clause is not just affecting the life of the [doctor], but is also impacting many of us who rely on their services.[937]

- As a family physician this has caused much grief and obstructs my desire to work and provide care for underserved populations. I am a NHSC scholarship recipient and due to non compete clauses was unable to continue working in the town I served due to its rurality. This created a maternity desert in the region I served. Now in a more metropolitan area, there has been an exodus of physicians in the area due to non compete clauses that has caused worsening access to primary care, specialty services, including behavioral health and substance use disorder treatment.[938]

A number of physician group commenters stated that nonprofit healthcare organizations regularly impose non-competes on physicians, and that the impact of the rule would be limited if nonprofits are not required to comply. Some physician group commenters urged the Commission to work with other agencies to fill in gaps in applying the rule based on the Commission's

---

[937] Individual commenter, FTC-2023-0007-10085.
[938] Individual commenter, FTC-2023-0007-0924.

jurisdiction, citing the importance of banning non-competes as widely as possible because of the harms they impose on physicians and patients irrespective of employer status. Specifically, commenters suggested that the Commission use its antitrust and referral authority to aggressively monitor nonprofit organizations for antitrust violations, to collaborate with other Federal agencies, including the IRS, and to provide incentives and guidance to States, which can enact measures to ensure that a prohibition on non-competes is implemented comprehensively. One commenter also noted that a ban would bring scrutiny to non-competes and would likely intensify pressure to eliminate them. A few commenters also contended that entities claiming tax-exempt status as nonprofits are subject to the Commission's jurisdiction as "persons" under the FTC Act.

### b. The Final Rule

After carefully considering commenters' arguments, the Commission declines to exempt for-profit healthcare employers or to exempt the healthcare industry altogether.

First, as described in Part IV, the Commission finds that certain uses of non-competes are an unfair method of competition. The use of unfair methods of competition cannot be justified on the basis that it provides a firm with pecuniary benefits to help them compete with other firms that use similar tactics.[939] In this case, for-profit and other covered entities have urged the Commission to allow them to continue to employ an unfair method of competition (*i.e.*, use non-competes) because some competitors are not prohibited from doing so as they are beyond the Commission's jurisdiction. The Commission is committed to stopping unlawful conduct to the full extent of its jurisdiction. For example, the Commission would not refrain from seeking to

---

[939] *See Atl. Refin. Co. v. FTC*, 381 U.S. 357, 371 (1965) ("Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves.").

enjoin unlawful price fixing by a for-profit within its jurisdiction because entities outside its jurisdiction under the FTC Act would not be subject to the same FTC action.

Second, the Commission disagrees with commenters' contention that all hospitals and healthcare entities claiming tax-exempt status as nonprofits necessarily fall outside the Commission's jurisdiction and, thus, the final rule's purview. As explained in Part II.E.2, a corporation's "tax-exempt status is certainly one factor to be considered," but that status is not coterminous with the FTC's jurisdiction and therefore "does not obviate the relevance of further inquiry into a [corporation's] operations and goals."[940] Accordingly, as noted by commenters, entities that claim tax-exempt nonprofit status may in fact fall under the Commission's jurisdiction. Similarly, whether the final rule would apply to quasi-public entities or certain private entities that partner with States or localities, such as hospitals affiliated with or run in collaboration with States or localities, depends on whether the particular entity or action is an act of the State itself under the State action doctrine, which is a well-established, fact-specific inquiry.[941] Thus, some portion of the 58% of hospitals that claim tax-exempt status as nonprofits and the 19% of hospitals that are identified as State or local government hospitals in the data cited by AHA likely fall under the Commission's jurisdiction and the final rule's purview. Further, many States have banned non-competes for a variety of healthcare professionals in both for-profit and nonprofits entities by statute.[942] Even if the final rule's coverage extends only to

---

[940] *In the Matter of the Am. Med. Assoc.*, 94 F.T.C. 701, 1979 WL 199033 (FTC Oct. 12, 1979).

[941] *In the Matter of Ky. Household Goods Carriers Ass'n, Inc.*, 139 F.T.C. 404, 405 (2005) ("The Supreme Court has made clear that the state action doctrine only applies when (1) the challenged restraint is clearly articulated and affirmatively expressed as state policy, and (2) the policy is actively supervised by the State itself.") (citation and alterations omitted)*; see also id.* at 410-13 (applying test); *Elec. Inspectors, Inc. v. Vill. of East Hills*, 320 F.3d 110, 117-19 (2d Cir. 2003).

[942] Colo. Rev. Stat. sec. 8-2-113(5)(a) (Colorado statute banning non-competes for physicians); D.C. Code sec. 32-581.01 (D.C. statute banning non-competes for medical specialists earning less than $250,000, compared to $150,000 for other workers); Fla. Stat. sec. 542.336 (Florida statute banning non-competes for physician specialists in certain circumstances); Ind. Code Ann. secs. 25-22.5-5.5-2 and 2.5(b) (Indiana statute banning non-competes for

hospitals that do not identify as tax-exempt non-profits based on AHA data, as explained in Part IV.A.1, the Commission finds every use of covered non-competes to be an unfair method of competition and concludes that the evidence supports the Commission's decision to promulgate this final rule, which covers the healthcare industry to the full extent of the Commission's authority.

Relatedly, in response to commenters' concern that large numbers of healthcare workers will not benefit from the final rule because they work for entities that the final rule does not cover, the Commission notes many workers at hospitals, including those that claims tax-exempt status as a nonprofit or government-owned hospital, contract with or otherwise work for a for-profit entity, such as a staffing agency or physician group. Although some of these individuals may work at an excluded hospital, the final rule applies to their employer—the staffing agency or for-profit physician group—because it is covered by the final rule.

The Commission disagrees with commenters stating the ability to use non-competes will provide a material competitive advantage to entities claiming tax-exempt status as nonprofit or publicly owned entities that are beyond the Commission's jurisdiction. To the contrary, those entities outside FTC jurisdiction that continue to deploy non-competes may be at a self-inflicted disadvantage in their ability to recruit workers, even if they derive some short-term benefit from trapping current workers in their employment. Furthermore, commenters' concern that for-profit healthcare entities will be at a competitive disadvantage is based on the false premise that entities outside the jurisdiction of the FTC will not be otherwise regulated or scrutinized with respect to

---

primary care physicians and restricting non-competes for other physicians); Iowa Code sec. 135Q.2(3)(a) (banning non-competes for health care employment agency workers who provide nursing services); Ky. Rev. Stat. sec. 216.724(1)(a) (Kentucky statute banning non-competes for temporary direct care staff of health care services agencies); N.M. Stat. Ann. secs. 24-1I-1 and 2 (New Mexico statute banning non-competes for several types of health care practitioners); S.D. Codified Laws secs. 53-9-11.1-11.2 (South Dakota statute banning non-competes for several types of healthcare practitioners); Tex. Bus. & Com. Code secs. 15.50-.52 (Texas statute restricting the use of non-competes for physicians).

the use of non-competes. States currently regulate non-competes by statute, regulation, and common law. According to the AHA data cited by commenters, over 12% (398/3,113) of nonprofit hospitals and 13% of government hospitals (187/1,409) are in States that ban non-competes for all employers. In any event, even if true, arguments that for-profit and other covered entities could suffer competitive harm by not being able to employ an unfair method of competition would not change the Commission's finding that use of certain non-competes is an unfair method of competition, as further discussed in Part IV.

While the Commission shares commenters' concerns about consolidation in healthcare, it disagrees with commenters' contention that the purported competitive disadvantage to for-profit entities stemming from the final rule would exacerbate this problem. As some commenters stated, the Commission notes that hospitals claiming tax-exempt status as nonprofits are under increasing public scrutiny. Public and private studies and reports reveal that some such hospitals are operating to maximize profits, paying multi-million-dollar salaries to executives, deploying aggressive collection tactics with low-income patients, and spending less on community benefits than they receive in tax exemptions.[943] Economic studies by FTC staff demonstrate that these

---

[943] *See, e.g.*, Press Release, Office of U.S. Sen. Chuck Grassley, *Bipartisan Senators Probe Potential Abuse Of Tax-Exempt Status By Nonprofit Hospitals* (Aug. 9, 2023), https://www.grassley.senate.gov/news/news-releases/bipartisan-senators-probe-potential-abuse-of-tax-exempt-status-by-nonprofit-hospitals; Request for Information Regarding Medical Payment Products, 88 FR 44281 (July 12, 2023); U.S. Gov't Accountability Off., Testimony Before the Subcommittee on Oversight, Committee on Ways and Means, House of Representatives, *Tax Administration: IRS Oversight of Hospital's Tax-Exempt Status*, GAO-23-106777 (Apr. 26, 2023), https://www.gao.gov/assets/gao-23-106777.pdf; *Pottstown Sch. Dist. v. Montgomery Cnty. Bd. of Assessment Appeals*, 289 A.3d 1142 (Pa. Commw. Ct. 2023) (holding that for-profit hospitals purchased by nonprofit claiming tax exempt status under Federal law do not qualify under State law for nonprofit tax exemption); *Phoenixville Hosp., LLC v. Cnty. of Chester Bd. of Assessment Appeals*, 293 A.3d 1248 (Pa. Commw. Ct. 2023); *Brandywine Hosp., LLC v. Cnty. of Chester Bd. of Assessment Appeals*, 291 A.3d 467 (Pa. Commw. Ct. 2023); *Jennersville Hosp., LLC v. Cnty of Chester Bd. of Assessment Appeals*, 293 A.3d 1248 (Pa. Commw. Ct. 2023); The Daily, *How Nonprofit Hospitals Put Profits Over Patients* (Jan. 5, 2023), https://www.nytimes.com/2023/01/25/podcasts/the-daily/nonprofit-hospitals-investigation.html; Gov't Accountability Off., *Tax Administration: Opportunities Exist to Improve Oversight of Hospitals' Tax-Exempt Status*, GAO-20-679 (Sept. 17, 2020), https://www.gao.gov/products/gao-20-679; Danielle Ofri, *Why Are Nonprofit Hospitals So Highly Profitable?*, N.Y. Times, Feb. 20, 2020, https://www.nytimes.com/2020/02/20/opinion/nonprofit-hospitals.html; Maya Miller & Beena

hospitals can and do exercise market power and raise prices similar to for-profit hospitals.[944]

Thus, as courts have recognized, the tax-exempt status as nonprofits of merging hospitals does

not mitigate the potential for harm to competitive conditions.[945]

Commenters provide no empirical evidence, and the Commission is unaware of any such

evidence, to support the theory that prohibiting non-competes would increase consolidation or

raise prices. To the contrary, as elaborated in Parts IV.B.3.a and IV.B.3.b, the empirical literature

suggests, and the Commission finds, that the final rule will increase competition and efficiency

in healthcare markets, as workers at for-profit healthcare entities will be able to spin off new

practices or work for different employers where their productivity is greater. This is true even if

the Commission does not reach some portion of healthcare entities. While the Commission's

prior research may indicate, as one commenter suggested, that nonprofit hospitals set higher

---

Raghavendran, *Thousands of Poor Patients Face Lawsuits From Nonprofit Hospitals That Trap Them in Debt*, ProPublica (Sept. 13, 2019), https://www.propublica.org/article/thousands-of-poor-patients-face-lawsuits-from-nonprofit-hospitals-that-trap-them-in-debt.

[944] *See, e.g.*, Michael G. Vita & Seth Sacher, *The Competitive Effects of Not-For-Profit Hospital Mergers: A Case Study*, 49 J. Indus. Econ. 63 (2001), http://onlinelibrary.wiley.com/doi/10.1111/1467-6451.00138/epdf (finding substantial price increases resulting from a merger of nonprofit, community-based hospitals, and determining that mergers involving nonprofit hospitals are a legitimate focus of antitrust concern); Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction*, 18 Int'l J. Econ. Bus. 65, 79 (2011), http://www.tandfonline.com/doi/full/10.1080/13571516.2011.542956 (finding evidence of post-merger price increases ranging from 28%-44%, and concluding that "[o]ur results demonstrate that nonprofit hospitals may still raise price quite substantially after they merge. This suggests that mergers involving nonprofit hospitals should perhaps attract as much antitrust scrutiny as other hospital mergers.").

[945] *See, e.g.*, *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1081 (N.D. Ill. 2012) ("[T]he evidence in this case reflects that nonprofit hospitals do seek to maximize the reimbursement rates they receive."); *FTC v. ProMedica*, No. 3:11 CV 47, 2011 WL 1219281 at *22 (N.D. Ohio Mar. 29, 2011) (finding that a nonprofit hospital entity "exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans."); *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284-87 (7th Cir. 1990) (rejecting the contention that nonprofit hospitals would not seek to maximize profits by exercising their market power); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1213-14 (11th Cir. 1991) ("[T]he district court's assumption that University Health, as a nonprofit entity, would not act anticompetitively was improper."); *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1390-91 (7th Cir. 1986) (rejecting the contention that nonprofit hospitals would not engage in anticompetitive behavior). *See also* FTC & Dep't of Jusitce, *Improving Health Care: A Dose of Competition* 29-33 (2004), https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf (discussing the significance of nonprofit status in hospital merger cases, and concluding that the best available empirical evidence indicates that nonprofit hospitals exploit market power when given the opportunity and that "the profit/nonprofit status of the merging hospitals should not be considered a factor in predicting whether a hospital merger is likely to be anticompetitive").

prices when they have more market power, the Commission finds that the final rule is not likely to increase healthcare prices through this same mechanism because it is unlikely to lead to significant increases in healthcare nonprofits' market share, if at all.

Moreover, the Commission has other tools to address consolidation in healthcare markets and is committed to using them. The Clayton Act grants the Commission authority to enforce compliance with, *inter alia*, section 7 of the Clayton Act. The Clayton Act does not include any carveout for entities that are nonprofit or otherwise do not operate for profit—and the FTC's jurisdictional limit based on the definition of "corporation" in the FTC Act does not apply in this context.[946] Accordingly, the Commission has authority under the Clayton Act to review and challenge mergers and acquisitions involving healthcare entities or hospitals regardless of nonprofit status.[947] Thus, even if the jurisdictional limitations of the final rule were to somehow incentivize some hospitals and other healthcare entities claiming non-profit status to consolidate, the Commission will continue to scrutinize those mergers and work with State partners to vigorously defend competition.[948] For the same reason, the Commission disagrees with commenters who contended that the effects of consolidation and staffing shortages will be worse in areas highly saturated with nonprofits claiming tax-exempt status.

Finally, the Commission disagrees with commenters that stated the Commission must further study the final rule's effect on healthcare workers and entities. The Commission has specific, long-time expertise in the healthcare market as anticompetitive mergers and conduct in

---

[946] 15 U.S.C. 18; 15 U.S.C. 45; *Univ. Health, Inc.*, 938 F.2d at 1214-16.
[947] *Id.*
[948] *See, e.g.*, *In the Matter of RWJ Barnabas Health and Saint Peters Healthcare Sys.*, Docket No. 9409 (Jun. 2, 2022) (complaint); *FTC v. Advoc. Health Care*, No. 15 C 11473, 2017 WL 1022015, at *1 (N.D. Ill. Mar. 16, 2017); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 332 (3d Cir. 2016).

healthcare markets have long been a focus of FTC law enforcement, research, and advocacy.[949] This work includes economic analyses of the effects of mergers involving nonprofit hospitals and studies of the impacts of hospital mergers.[950] Accordingly, given this expertise and the extensive record in the rulemaking, the Commission finds it has sufficient understanding of healthcare markets and that the evidence supports the final rule's application to the healthcare industry.

### 6. Coverage of Franchisors vis-à-vis Franchisees

#### a. The Proposed Rule

The Commission proposed to exclude franchisees from the definition of "worker" and requested comment on whether and to what extent the rule should cover non-competes between franchisors and franchisees ("franchisor/franchisee non-competes").[951] The Commission explained that it proposed to exclude franchisees from the definition of "worker" because, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker.[952]

---

[949] *See, e.g.*, FTC, *Competition in the Health Care Marketplace*, https://www.ftc.gov/tips-advice/competition-guidance/industry-guidance/health-care; FTC, *Overview of FTC Actions in Health Care Services and Products* (2022), https://www.ftc.gov/system/files/ftc_gov/pdf/2022.04.08%20Overview%20Healthcare%20%28final%29.pdf; Joseph Farrell et al., *Economics at the FTC: Retrospective Merger Analysis with a Focus on Hospitals*, 35 Rev. Indus. Org. 369 (2009), http://link.springer.com/content/pdf/10.1007%2Fs11151-009-9231-2.pdf; FTC, *Examining Health Care Competition* (Mar. 20-21, 2014), https://www.ftc.gov/news-events/events-calendar/2014/03/examining-health-care-competition; FTC & Dep't of Justice, *Examining Health Care Competition* (Feb. 24-25, 2015), https://www.ftc.gov/news-events/events-calendar/2015/02/examining-health-care-competition; *Improving Health Care: A Dose of Competition*, *supra* note 945.

[950] *See, e.g.*, FTC, *FTC Policy Perspectives on Certificates of Public Advantage* (Aug. 15, 2022), www.ftc.gov/copa; FTC, *Physician Group and Healthcare Facility Merger Study* (ongoing, initiated Jan. 2020), https://www.ftc.gov/enforcement/competition-matters/2021/04/physician-group-healthcare-facility-merger-study; Christopher Garmon, *The Accuracy of Hospital Merger Screening Methods*, 48 RAND J. of Econ. 1068 (2017), https://www.ftc.gov/system/files/documents/reports/accuracy-hospital-merger-screening-methods/rwp_326.pdf; Joseph Farrell, et al., *Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets*, 39 Rev. Indus. Org. 271 (2011), http://link.springer.com/content/pdf/10.1007%2Fs11151-011-9320-x.pdf; Devesh Raval, Ted Rosenbaum, & Steve Tenn, *A Semiparametric Discrete Choice Model: An Application to Hospital Mergers*, 55 Econ. Inquiry 1919 (2017).

[951] NPRM at 3511, 3520.

[952] *Id.* at 3511.

The Commission also noted that the evidentiary record relates primarily to non-competes that arise out of employment. However, the Commission stated that, in some cases, franchisor/franchisee non-competes may present concerns under section 5 similar to the concerns presented by non-competes between employers and workers and sought comment on coverage of franchisor/franchisee non-competes.[953]

### b. Comments Received

Many commenters requested that the final rule cover franchisor/franchisee non-competes. Numerous commenters contended the franchisee-franchisor relationship is closer to a relationship between a worker and an employer than a relationship between businesses. These commenters argued that franchisees are often individual business owners who, like workers, lack bargaining power to negotiate over non-competes. One commenter stated that the Commission acknowledged in the Franchise Rule that franchisees generally lack bargaining power.[954] Several commenters, including industry commenters representing franchisees, argued that franchisees tend to suffer even greater power imbalances than workers because many risk significant personal assets to start their franchises. According to these commenters, this risk places acute strain on franchisees' bargaining leverage when negotiating to renew franchise agreements because, if they choose to reject a new agreement, they not only lose the opportunity to continue working in the same field due to their non-compete, but also the value of their investment.

Commenters seeking coverage of franchisor/franchisee non-competes also stated that these non-competes do not protect legitimate interests because franchisors generally do not entrust franchisees with trade secrets or details about their broader commercial strategy. These commenters stated that, even if franchisees do receive such information, franchisors have less

---

[953] *Id.* at 3520.
[954] Trade Regulation Rule on Franchising and Business Opportunity Ventures, 43 FR 59614, 59625 (Dec. 21, 1978).

restrictive alternatives for protecting it, including NDAs and trade secret law. Some commenters also stated that non-competes have anticompetitive effects because franchisors may degrade the quality of inputs or raise input prices without fearing that their existing franchisees will leave for a competitor.

Many franchisee commenters also stated their desire to compete after exiting their franchise relationships. Franchisees also stated that their non-competes harm their negotiating position in bargaining over franchise renewal terms. These franchisees stated that franchisors can impose higher royalty rates or other less favorable terms over time as the franchisees feel powerless to refuse or make effective counteroffers, due to their non-competes. Many franchisees asserted that their non-competes are overbroad because they restrain individual owners' spouses and other close relatives from competing in the same industry. Some franchisees stated that their non-competes include penalties for choosing not to renew their contracts even if they do not compete.

Other commenters, primarily franchisors and trade organizations, stated that franchisor/franchisee non-competes should be excluded from the final rule. Many of these commenters argued that franchisor/franchisee non-competes are more similar to restrictive covenants between businesses than non-competes between employers and workers. Some of these commenters argued that franchisor/franchisee non-competes are more justified than non-competes in the employment context because, unlike employment relationships, entering into a franchise agreement is completely voluntary. Some commenters argued that, unlike non-competes in the employment context, franchisor/franchisee non-competes are only entered into by individuals with access to substantial capital and who therefore always have the option of starting their own businesses.

Many of these commenters argued that prohibiting non-competes for franchisees would threaten to severely disrupt or destroy the franchise business model, and that this would harm franchisors and franchisees alike, as franchising offers a unique opportunity for working people to become entrepreneurs with established brands. Commenters asserted that non-competes are critical to the franchise business model because they offer both franchisors and franchisees confidence that existing franchisees will likely stay with a brand and refrain from using a franchise's trade secrets to unfairly compete against the franchisor. Commenters also asserted that franchisees are often exposed to proprietary information through training manuals and operational support and that non-competes help protect this information. In addition, commenters contended that franchisor/franchisee non-competes protect investments made by other franchisees and maintain a franchise's goodwill.

Commenters supporting the exclusion of franchisor/franchisee non-competes from the final rule also asserted that the Commission lacked an evidentiary basis for covering such non-competes. These commenters also stated that no State has prohibited non-competes for franchisees, and the Commission would therefore lack data from natural experiments to justify extending a final rule to the franchise context.

### c. The Final Rule

The Commission continues to believe that, as many commenters attested, franchisor/franchisee non-competes may in some cases present concerns under section 5 similar to the concerns presented by non-competes between employers and workers. The comments from franchisors, franchisees, and others provide the Commission with further information about non-competes in the context of the franchisor/franchisee relationship, but the evidentiary record before the Commission continues to relate primarily to non-competes that arise out of

employment. Accordingly, the final rule does not cover franchisor/franchisee non-competes. Non-competes used in the context of franchisor/franchisee relationships remain subject to State common law and Federal and State antitrust laws, including section 5 of the FTC Act.

## VI. Section 910.4: Relation to State Laws and Preservation of State Authority and Private Rights of Action

In proposed § 910.4, the Commission addressed State laws and preemption. Based on comments, the Commission adopts a modified provision clarifying and explaining that States may continue to enforce laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than the final rule.[955]

### A. The Proposed Rule

The NPRM contained an express preemption provision, proposed § 910.4, that explained the proposed rule preempted State laws that are inconsistent with the rule and did not preempt State laws that offer greater protection than the rule. The NPRM explained that when a State law offers greater protection than the rule, employers would be able to comply with both the NPRM and the State law. Thus, the proposed rule would have established a regulatory floor, but not a ceiling. The NPRM provided two hypothetical examples, one of a State law that would be inconsistent with, and therefore preempted by, proposed § 910.2(a) and one that would not because it satisfied the savings clause by offering greater protection and was not inconsistent with proposed part 910.[956]

### B. Authority for Preemption

Numerous commenters supported the preemption of inconsistent State laws. Some

---

[955] State statutes, regulations, orders, or interpretations, including State common law, are referred to as "State laws" for ease of reference.
[956] NPRM at 3515.

commenters asserted the Commission lacks the legal authority to preempt State laws, including State common law, on non-competes because Congress allegedly did not confer the necessary authority to the Commission or because of federalism principles. They argued there must be clear Congressional intent to preempt State laws relating to non-competes.[957] Numerous commenters asserted the Commission lacks clear authority from Congress to preempt State laws on non-competes arguing that the FTC's statutory authority neither expressly nor impliedly authorizes preemption of non-competes. Commenters made similar points based on cases about the preemptive force of the Commission's UDAP regulations. For example, one commenter asserted that the FTC may not have the authority to preempt less restrictive State laws, citing *American Optometric Association v. FTC,* in which the court noted the need for congressional authorization for the Commission to preempt an entire field of State laws that arise from the State's police powers.[958]

The Commission finds that it has the authority to promulgate regulations that preempt inconsistent State laws under section 6(g), together with section 5, of the FTC Act. Even without an express preemption provision, Federal statutes and regulations preempt conflicting State laws. Under the Supreme Court's conflict preemption doctrine, a Federal statute or regulation impliedly preempts State laws when it is impossible for the regulated parties to comply with both the Federal and the State law, or when a State law is an obstacle to achieving the full purposes and objectives of the Federal law.[959] "Federal regulations have no less pre-emptive effect than Federal statutes."[960] Indeed, even commenters who questioned the FTC's authority to preempt

---

[957] Comments on the Commission's authority to promulgate this final rule, separate from the issue of preemption of State law, are summarized in Part II.

[958] *Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 910 (1980).

[959] *See, e.g.*, *Federal Preemption: A Legal Primer*, Cong. Rsch. Serv., 23 (May 18, 2023) (Report R45825), https://crsreports.congress.gov/product/pdf/R/R45825/3.

[960] *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

State laws agreed that if a Federal agency promulgates a rule pursuant to its Congressionally conferred authority, the rule preempts conflicting State laws.

As discussed in Parts II.A, II.B, and II.C, the Commission has the authority to promulgate this final rule. Accordingly, the final rule preempts conflicting State laws. To provide a clear explanation of the Commission's intent and the scope of preemption effected by the final rule, the final rule includes an express preemption provision at § 910.4.[961] As discussed in Part VI.D, the Commission has modified proposed § 910.4 to make clear that even when the scope of non-compete prohibitions under a State law is less than that of the final rule, State authorities and persons may enforce the State law by, for example, bringing actions against non-competes that are illegal under the State law.

### C.  The Benefits of Preemption

Numerous commenters stated that variations in State laws chill worker mobility and expressed support for a uniform Federal standard. Some commenters explained that a preemption clause could bring clarity to the law's effect.

The U.S. Department of Justice commented that, due to the patchwork of State laws, a

---

[961] Many FTC regulations, including regulations promulgated under section 6(g) of the FTC Act, include provisions addressing State laws and preemption. *See, e.g.*, Funeral Rule, 16 CFR 453.9 (exempting from preemption State laws that "afford an *overall* level of protection that is *as great as, or greater than*, the protection afforded by" the FTC's Rule) (emphasis added); Concerning Cooling Off Period for Sales Made at Homes or at Certain Other Locations, 16 CFR 429.2(b) (exempting laws and ordinances that provide "a right to cancel a door-to-door sale that is *substantially the same or greater* than that provided in this part") (emphasis added); Business Opportunity Rule, 16 CFR 437.9(b) ("The FTC does not intend to preempt the business opportunity sales practices laws of any [S]tate or local government, except to the extent of any conflict with this part. A law is not in conflict with this Rule if it affords prospective purchasers *equal or greater protection*[.]") (emphasis added); Mail, Internet, or Telephone Order Merchandise Rule, 16 CFR 435.3(b) ("This part does supersede those provisions of any State law, municipal ordinance, or other local regulation which are inconsistent with this part to the extent that those provisions do not provide a buyer with rights which are *equal to or greater* than those rights granted a buyer by this part.") (emphasis added); Franchise Rule, 16 CFR 436.10(b) ("The FTC does not intend to preempt the franchise practices laws of any [S]tate or local government, except to the extent of any inconsistency with part 436. A law is not inconsistent with part 436 if it affords prospective franchises *equal or greater protection*[.]") (emphasis added); Labeling and Advertising of Home Insulation, 16 CFR 460.24(b) (preemption of "State and local laws and regulations that are inconsistent with, or frustrate the purposes of this regulation"). *See also* Part II.B.

worker may be free to switch jobs in one jurisdiction but subject to a non-compete in another, creating uncertainty as to the non-compete's enforceability for both firms and workers.[962] In another commenter's view, the variation in State non-compete laws creates competitive disadvantages for companies in States that ban such clauses, necessitating a Federal ban.

Another commenter pointed out that most States have not passed statutes that ban or restrict non-competes, and that existing statutes cover different categories of workers and different wage levels, making it difficult for workers to know whether employers can enforce a particular non-compete. The commenter stated that variations in the legal authority of State attorneys general to take action on the public's behalf also limit the effectiveness of State restrictions on non-competes. A number of commenters explained that the difficulties arising from variations in State non-compete laws are exacerbated by the increase in remote and hybrid work, and workers who travel to work across State lines. Accordingly, many commenters favored a uniform Federal standard that would promote certainty for employers and workers. Even some commenters who generally opposed banning non-competes favored preemption to eliminate the patchwork of State laws that makes it difficult for workers to know the applicable law and encourages forum shopping by employers who want to bring suits in sympathetic jurisdictions.

Other commenters opposed preemption, asserting that State legislatures and courts are best situated to address non-competes and that the States have historically regulated this area. They contended States should be allowed to continue adjusting the scope of restrictions on non-competes including applicability to different types of workers, time span, and geographic scope.

The Commission finds that preemption of State laws, including State common law, that

---

[962] Comment of Dep't of Justice Antitrust Div., FTC-2023-0007-20872 at 7.

conflict with the final rule best mitigates the negative effects of the patchwork of State laws, including chilling worker mobility and undercutting competitive conditions in labor and product and services markets.[963] Preempting this patchwork with a Federal floor is particularly important given the increase in work across State lines, and remote and hybrid work, since the COVID-19 pandemic.

Moreover, as discussed in Part IX.C, preemption furthers a primary goal of the final rule: to provide a uniform, high level of protection for competition that is easy for both employers and workers to understand and makes it less likely that employers will subject workers to illegal non-competes or forum shop. Indeed, some commenters who otherwise opposed the proposed ban on non-competes regarded the patchwork itself burdensome to employers as well as workers and noted the rule would reduce burden by eliminating uncertainty and confusion caused by State law variations.[964] As described in Part IX.C, the Commission has determined that declining to issue this final rule and continuing to rely solely on State laws and case-by-case adjudication would be less effective than issuing a clear national standard. The Commission concludes, however, that supplementing the final rule with additional State authority and resources, so long as the State laws are not inconsistent with the final rule, will assist in protecting both workers and competition.

### D.  The Extent of Preemption

Some commenters strongly supported the NPRM but expressed concern that the preemption provision as proposed could undermine States' efforts to curb non-competes and would thereby undercut the final rule's effectiveness. These commenters stated that under one

---

[963] *See* Part IX.C.
[964] *See, e.g.*, Comment of Mech. Contractors Ass'n of Am., FTC-2023-0007-18218 (although opposed to the proposed rule, MCCA's position supports a single Federal rule and some level of preemption).

interpretation, proposed § 910.4 could preempt State laws that prohibit non-competes for workers earning less than a specified income because the law as a whole may not be deemed to provide greater protection than the final rule. In their view, such an interpretation would not further the final rule's goals, because States with income-based restrictions on non-competes rather than complete bans may offer covered workers protections against non-competes that the FTC's proposed rule would not provide, such as State enforcement, private rights of action, and certain financial penalties.[965]

These commenters also asserted that in many cases, State agencies and residents could be better positioned to respond to unlawful non-compete use specific to a particular State, but they would be unable to do so and dependent on the Commission if their laws were fully preempted. To enable concurrent enforcement of State laws that restrict the use of non-competes, thereby increasing the enforcement resources devoted to the issue, they recommended a "savings clause" that would exempt from preemption State laws that provide workers with protections that are substantially similar to or greater than those afforded by the rule.[966] They also recommended that the rule not preempt State antitrust and consumer protection laws that may protect workers against non-competes and other restrictive employment arrangements as those laws can provide another enforcement avenue for State agencies and residents.

Another commenter recommended including a narrow reverse preemption provision so that relevant State laws in States that enact the Uniform Restrictive Employment Agreement

---

[965] *See* Comment of the Attys. Gen. of 17 States and D.C., FTC-2023-0007-21043, at 14-15 ("jurisdictions like Colorado, Illinois, Washington, and the District of Columbia have passed laws that ban non-competes for workers making under a specified income threshold and also include remedies provisions that authorize [S]tate agencies and residents to enforce the law"); *id.* at 9-11 (discussing State enforcement, private action, and damages in several State non-compete laws).

[966] Another comment recommended a similar formulation, which would exempt from preemption State laws that offer workers protection that is equal to or greater than the protection provided by the final rule. This commenter asserted that this formulation would allow existing State law to stand.

Act[967] would not be preempted.[968] The comment asserted that by doing so, a final rule would preserve a role for the States and encourage their cooperation with the Commission, and also provide greater protections for employees than the proposed rule provided in several ways, such as allowing for greater enforcement and including classes of employers that the final rule would not cover.[969] The uniform law would ban non-competes for workers earning at or below the State's annual mean wage and would allow non-competes for those earning more, but apply limits and require disclosures for any non-compete.

Based on comments, the Commission has modified the final rule's preemption provision to clarify and explain that State laws that restrict non-competes and do not conflict with the final rule are not preempted. Section 910.4 also expressly references State common law, antitrust law, and consumer protection law, so that the intended scope of preemption is clear. State common law is expressly referenced because many States do not have a general non-compete statute, and the common law varies considerably.

Section 910.4(b) reflects the Commission's intent that States may continue to enforce in parallel laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than that of the final rule. That is, State laws cannot authorize non-competes that are prohibited under this final rule, but States may, for example, continue to pursue enforcement actions under their laws prohibiting non-competes even if the State law prohibits a narrower subset of non-competes than this rule prohibits.

Accordingly, § 910.4(a) states that the final rule will not be construed to annul, or exempt any person from complying with, any State statute, regulation, order, or interpretation applicable

---

[967] *See* Uniform Restrictive Employment Agreement Act, *supra* note 332 at sec. 5, sec. 8.
[968] *See* Comment of ULC, FTC-2023-0007-20940.
[969] *See also* Part II.E (discussing comments on the Commission's jurisdiction under the FTC Act).

to a non-compete, including, but not limited to, State antitrust and consumer protection laws and State common law. Rather, the final rule supersedes such laws to the extent, and only to the extent, that such laws would otherwise permit or authorize a person to engage in conduct that is an unfair method of competition under § 910.2(a) or conflict with the notice requirement in § 910.2(b).[970] These revisions provide that when States have restricted non-competes and their laws do not conflict with the final rule, employers must adhere to both provisions, and workers are protected by both provisions (including State restrictions and penalties that exceed those in Federal law).

For example, § 910.4 makes clear that the final rule does not preempt State law enforcement where a State bans non-competes only for workers earning below a certain amount and thus has a ban that is narrower than the final rule. Thus, if a State's law bars non-competes only for workers who earn less than $150,000 per year, the final rule and the law are different in scope of protection but not directly inconsistent. The State may continue to enforce its ban for workers earning less than $150,000, but all non-competes covered by the final rule, regardless of a worker's earnings, remain an unfair method of competition under the final rule and are therefore unlawful.

In response to concerns raised by commenters and to further bolster the consistent use of State laws, the Commission expressly recognizes State authority and the existence of private rights of action arising under State laws that restrict non-competes or bar unfair methods of competition. This is set forth in § 910.4, now titled "Relation to State laws and preservation of State authority and private rights of action," and is detailed in § 910.4(b). That section provides that unless a State law conflicts with the final rule and is superseded as described in § 910.4(a),

---

[970] The effect of part 910 is limited to non-competes. It would not broadly preempt other uses of State antitrust and consumer protection law.

part 910 does not limit or affect the authority of State attorneys general and other State agencies or the rights of a person to bring a claim or regulatory action arising under State laws, including State antitrust and consumer protection laws and State common law. Section 910.4(b) also explains that persons retain the right to bring a claim or regulatory action under State laws unless the laws conflict with the final rule and have been superseded as described in § 910.4(a).

These modifications are consistent with many commenters' recommendations and recognize State-based enforcement as a potent force that supplements Federal enforcement. In addition, the modifications, particularly those that explain that § 910.4 does not exempt any person from complying with State laws, are intended to curb the use of preemption as a defense against State restrictions of non-competes.[971] Under the final rule, States may continue to play a critical role in restricting the use of non-competes. In contrast to the FTC Act, which cannot be enforced by private persons or State authorities,[972] the non-compete laws of numerous States provide for such enforcement.[973] Non-competes that are outside the FTC's jurisdiction or otherwise outside the scope of the final rule may be covered by State non-compete laws.[974] State penalties can be substantial and may be particularly important as a deterrent.

The modifications also reflect the Commission's long history of working in concert with

---

[971] *See, e.g.*, *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-70 (2002) (finding Federal Boat Safety Act did not relieve defendant from liability for State common law tort claim because it did not expressly nor impliedly preempt State common law).

[972] *See, e.g.*, FTC, A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority App. A (May 2021), https://www.ftc.gov/about-ftc/mission/enforcement-authority; *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 997 (D.C. Cir. 1973).

[973] Comment of the Attys. Gen. of 17 States and D.C., FTC-2023-0007-21043 at 7 ("jurisdictions like Colorado, Illinois, Washington, and the District of Columbia have passed laws that ban non-competes for workers making under a specified income threshold and also include remedies provisions that authorize state agencies and residents to enforce the law"). *See also* 2023 Cal. Legis. Serv. Ch. 157 (S.B. 699) West (adding Cal. Bus. & Prof. Code sec. 16600.5, Sept. 1, 2023) (providing for a private right of action in regard to California's non-compete statute).

[974] *See* Part II.E (discussing the Commission's jurisdiction under the FTC Act). *See, e.g.*, Cal. Bus. & Prof. Code secs. 16600-16602 (broad coverage); Minn. Stat. Ann. sec. 181.988, subdiv. 1 (b) ("'Employer' means any individual, partnership, association, corporation, business, trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee.").

States and encouraging concurrent enforcement of State laws to pursue common goals. While the Commission recognizes this will leave some variation in the enforcement exposure covered persons face among States, that variation will be greatly reduced by the final rule, which sets a floor that applies nationally.[975] As it has done in the past, the Commission will "share the field" with States and partner with them in the battle against abusive non-competes.[976] As set out in Part IX.C, the Commission considered and rejected the alternative of relying on existing State laws alone. Consistent with that determination, the Commission declines to adopt the suggestion from a comment that relevant State laws in States that enact the Uniform Restrictive Employment Agreement Act not be preempted.

## VII.  Section 910.5: Severability

The Commission stated in the NPRM that it may adopt a severability clause[977] and it received a comment stating the Commission should adopt such a clause in order to protect the rights and securities of workers if one part of the rule or one category of workers were invalidated. The Commission adds § 910.5, together with this section, to clarify the Commission's intent.[978]

Section 910.5 states that if any provision of the final rule is held to be invalid or unenforceable either facially, or as applied to any person or circumstance, or stayed pending further agency action, such invalidity shall not affect the application of the provision to other persons or circumstances or the validity or application of other provisions. Section 910.5 also

---

[975] The Commission has taken this position in previous regulations. *See, e.g.*, Part 429—Cooling-Off Period for Door-to-Door Sales, 37 FR 22934 (Oct. 26, 1972).

[976] For a previous example, *see* Trade Regulation Rule; Funeral Industry Practices, 47 FR 42260, 42287 (Sept 24, 1982) (noting the purpose of the rule's provision addressing relation of the rule to State law is "to encourage [F]ederal-[S]tate cooperation by permitting appropriate [S]tate agencies to enforce their own [S]tate laws that are equal to or more stringent than the trade regulation rule").

[977] NPRM at 3518-19 & n.429.

[978] In the NPRM, proposed § 910.5 addressed the compliance date.

states that if any provision or application of the final rule is held to be invalid or unenforceable, the provision or application shall be severable from the final rule and shall not affect the remainder thereof. This provision confirms the Commission's intent that the remainder of the final rule remain in effect in the event that a reviewing court stays or invalidates any provision, any part of any provision, or any application of the rule—including, for example, an aspect of the terms and conditions defined as non-competes, one or more of the particular restrictions on non-competes, or the standards for or application to one or more categories of workers.

The Commission finds that each of the provisions, parts of the provisions, and applications of the final rule operate independently and that the evidence and findings supporting each provision, part of each provision, and application of each provision stand independent of one another. In this final rule, the Commission determines that certain conduct is an unfair method of competition in Part IV.B and Part IV.C and differentiates between senior executives and workers who are not senior executives with respect to existing non-competes. The final rule distinguishes between the two in both the final rule's operation and in the bases for adopting the final rule. The difference in restrictions among different workers, and the distinct bases for adopting the restrictions, is described in detail in Parts IV.B and IV.C. The Commission also estimates the effect of excluding senior executives entirely from the rule in Part X.F.11, and finds that the benefits of covering only those workers who are not senior executives justify the costs.

The Commission promulgates each provision, part of each provision, and application of each provision as a valid exercise of its legal authority. Were any provision, part of any provision, or any application of any provision of the final rule stayed or held inapplicable to a particular category of workers, to particular conduct, or to particular circumstances, the

Commission intends the remaining elements or applications of the final rule to prohibit a non-compete between covered persons and covered workers as an unfair method of competition.

In Parts IV.B and IV.C, the Commission finds that the use of non-competes is an unlawful unfair method of competition under section 5 of the FTC Act because it is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in several independent ways. In support of its finding that the use of non-competes is an unlawful unfair method of competition for workers who are not senior executives, the Commission additionally finds that the use of non-competes is exploitative and coercive in Part IV.B.2.b.

The Commission relies principally on empirical evidence regarding the effects of changes in non-compete enforceability, both when finding in Part IV.B.3.a and Part IV.C.2.c.ii that the use of non-competes tends to negatively affect competitive conditions in labor markets, and when finding in Part IV.B.3.b and Part IV.C.2.c.i that the use of non-competes tends to negatively affect competitive conditions in product and service markets. The Commission further analyzes and quantifies these effects in Part X.F.6, including sensitivity analyses that compare the estimated effects of smaller changes in enforceability and larger changes in enforceability.

Based on this empirical evidence and analysis, the Commission believes that more limited application of the rule—which might result were a court to render the final rule inapplicable in some way—may be equivalent to smaller changes in the enforceability of non-competes in the empirical literature. As described in Part IV.B.3.a and IV.B.3.b, smaller changes in enforceability change the magnitude, but not the directional nature, of the labor market and product and service market effects.[979] Accordingly, consistent with the findings related to the use of certain non-competes being an unfair method of competition in Part IV, the empirical

---

[979] *See also* Part X.F.6.

evidence on the use of non-competes, the regulatory impact analysis in Part X, and its expertise, the Commission finds that any smaller reduction in enforceability resulting from circumstances in which a court stays or invalidates some application of the final rule would not impair the function of the remaining parts of the final rule nor would it undermine the justification or necessity for the final rule as applied to other persons, conduct, or circumstances. The Commission intends for any remaining application of the final rule to be in force because it is committed to stopping any and all unlawful conduct related to the use of certain non-competes and the Commission finds every use of a non-compete covered by the final rule to be an unlawful unfair method of competition under section 5 of the FTC Act.[980]

In Part X, the Commission conducts a regulatory impact analysis for the final rule as applied to all workers, as applied to all workers other than senior executives, and as applied to senior executives. The Commission finds that the asserted benefits of the use of non-competes do not justify the harms from the use of non-competes for any category of workers. The Commission's findings and differential analysis demonstrate that the asserted benefits from the use of non-competes do not justify the harms from the use of non-competes for higher- or lower-wage earners, including, for example, lower-wage workers defined as workers whose total annual compensation is less than $151,164.

For instance, if, for any reason, a reviewing court were to stay or invalidate the final rule as applied to senior executives, the Commission would intend for the remainder of the final rule to apply to all workers other than senior executives. Likewise, if a reviewing court were to stay or invalidate the final rule to apply to workers other than senior executives, the Commission would intend for the remainder of the final rule to apply to senior executives. Additionally, if a

---

[980] *See* NPRM at 3518-19.

reviewing court were to stay or invalidate the final rule as applied to some other subset of workers, the Commission would intend for the remainder of the final rule to apply to all but those workers. So, for example, if a reviewing court were to stay or invalidate the final rule as applied to workers other than lower-wage workers—defined as workers whose total annual compensation is less than $151,164—the Commission would intend for the remainder of the final rule to apply to those workers, and further notes that the evidentiary record demonstrates that application of the rule to those remaining workers would be beneficial and achieve lawful objectives. In the same way, if a reviewing court were to stay or invalidate the provision of the final rule regarding enforcing an existing non-compete or the notice requirement, the Commission would intend for the remainder of the final rule to apply. As described in Part IX.C, although the Commission concludes that a national standard is most effective, a number of States currently apply different standards to different workers and States also apply a myriad of legal standards to non-competes generally. Accordingly, were a reviewing court to stay or invalidate a particular application of the final rule, a covered person could simply comply with the provisions, parts of provisions or applications of the final rule that remain in effect.

The Commission's adoption of the final rule does not hinge on the same restrictions applying to all non-competes, on the final rule applying to all workers, or on joint adoption or operation of each provision. Accordingly, the Commission considers each of the provisions adopted in the final rule to be severable, both within each provision and from other provisions in part 910. In the event of a stay or invalidation of any provision, any part of any provision, or of any provision as it applies to certain conduct or workers, the Commission's intent is to otherwise preserve and enforce the final rule to the fullest possible extent.

**VIII.  Section 910.6: Effective Date**

The Commission adopts a uniform effective date of 120 days after publication of the final rule in the *Federal Register.* The final rule will go into effect, and compliance with the final rule will be required, on that date. Based on comments urging the Commission to reduce the compliance period from the 180-day period proposed in the NPRM so that the benefits of the final rule may be obtained as soon as possible, the Commission's findings that the use of non-competes is exploitative and coercive for the vast majority of workers, and modifications in the final rule that reduce covered entities' compliance burden, the Commission modifies the date that compliance with the final rule is required from 180 days to 120 days after publication in the *Federal Register*.

## A. The Proposed Rule

In the NPRM the Commission proposed a compliance date of 180 days after publication of the final rule in the *Federal Register*. The Commission stated that, during the compliance period, employers would need to: (1) assess whether to implement replacements for existing non-competes (such as NDAs), draft those covenants, and then negotiate and enter into those covenants with the relevant workers; (2) remove any non-competes from employment contracts that they provide to new workers; and (3) rescind, no later than the date that compliance is required, any non-competes that it entered into prior to the compliance date.[981] The Commission preliminarily found that 180 days would be enough time for employers to accomplish all of these tasks.[982] The NPRM would have also required employers to provide the notice specified in proposed § 910.2(b)(2) within 45 days of rescinding the non-compete.[983]

---

[981] *Id.* at 3483, 3515-16. In the NPRM and herein, the Commission refers to the period between the publication of the final rule and the date on which compliance with the final rule is required as the "compliance period." *See id.* at 3515.

[982] *Id.* at 3516.

[983] *Id.* (addressing compliance with proposed § 910.2(b)(2)).

The Commission also stated that it proposed to establish an effective date of 60 days after the final rule is published in the *Federal Register* even though compliance would not be required for 180 days.

## B. Comments Received

Many worker commenters urged the Commission to act as quickly as possible to bring the final rule into force, citing the current acute, ongoing harms to their earnings, mobility, quality of life, and other significant impacts and noting the final rule's potential for immediate relief if their non-compete was no longer in force. Representatives of many local governments from different States contended that the negative effects of non-competes and the anticipated benefits of the proposed rule justified allowing the Commission's rule to go into effect as soon as possible. Other commenters supported the compliance date as proposed or favored other measures to obtain the anticipated benefits of the final rule as soon as practicable. Another commenter contended that the 180-day compliance period was sufficient to allow businesses to ensure compliance and suggested that the Commission move the effective date back to the day or the day after the final rule is published.[984]

Several commenters suggested that the Commission adopt a longer compliance period of one year, 18 months, or two years. These commenters generally stated that businesses need more time to adjust their compensation packages, contracting practices, and employee policies to comply with the rule and to protect their intellectual property. At least one commenter also argued that the Commission should adopt a two-year compliance period to allow courts sufficient time to hear and resolve challenges to the final rule. One commenter asserted that the compliance period would be especially burdensome for smaller business. Another industry

---

[984] The comment did not consider the limitations on the effective date imposed by the CRA.

commenter argued that application of the rule should be phased in over time.

### C. The Final Rule

The Commission adopts a 120-day compliance period. As outlined in Parts IV.B and IV.C, based on both voluminous comments from the public as well as a significant body of empirical evidence, the Commission finds that the use of non-competes is coercive and exploitative for the vast majority of workers across different earnings levels and occupations and that for all workers it tends to negatively affect competitive conditions in labor markets and also tends to negatively affect competitive conditions in product and service markets—and that such actual harms are in fact currently ongoing. The Commission adopts a 120-day compliance period in order to stop these unfair methods of competition as soon as practicable. The Commission finds that a 120-day period appropriately balances the interests at hand.

The Commission has taken several steps in the final rule to make compliance as simple as possible for employers. These steps make it practicable and reasonable to require compliance within 120 days. The final rule allows regulated entities to enforce existing non-competes with senior executives, who commenters contended are most likely to have complex compensation arrangements that include non-competes. Accordingly, there is no need for a lengthy compliance period, as the most complex existing arrangements are left in place. The Commission also eliminated the rescission requirement for all workers. Under the final rule, employers will not need to rescind (*i.e.*, legally modify) existing non-competes for any workers; rather, employers will simply be prohibited from enforcing them after the effective date of the final rule and will be required to provide the notice in § 910.2(b)(1).[985] While employers are required to provide notice to workers with existing non-competes who are not senior executives, under § 910.2(b), the final

---

[985] *See* Part IV.E (describing why the Commission is not finalizing a rescission requirement).

rule provides model safe harbor language that satisfies the notice requirement.[986] The final rule gives employers several options for providing the notice—on paper, by mail, by email, or by text.[987] And employers are exempt from the notice requirement where the employer has no record of a street address, email address, or mobile telephone number for the worker.[988] Furthermore, as explained in Part IV.E, the Commission has simplified the notice requirement to facilitate employers' ability to comply by simply sending a mass communication such as a mass email to current and former workers.

Starting on the effective date of the final rule, employers will be prohibited from entering into new non-competes barred by this final rule and from enforcing non-competes that the employer entered into prior to that date with workers other than senior executives. Prior to the effective date employers will need to identify each of their workers with existing non-compete agreements and can assess which, if any, are senior executives and determine if they wish to maintain those non-competes. Employers will also need to assess and revise, if necessary, any employment policies or handbooks that purport to bind workers even after the effective date.

To the extent they have confidential business information, trade secrets, or other investments to protect with respect to a particular worker, employers will be able to assess their options to lawfully protect that information. However, new protections will be unnecessary in many cases, because, for example, 95.6% of workers subject to non-competes are already subject to an NDA.[989] In the rare case where compensation might be tied to a non-compete that is not with a senior executive, the employer and worker can determine whether to amend their original employment agreement. The Commission concludes that the 120-day compliance period gives

---

[986] § 910.2(b)(4)-(5).
[987] § 910.2(b)(2)(ii).
[988] § 910.2(b)(3).
[989] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 44.

employers more than sufficient time to complete these tasks. For example, firms routinely complete entire onboarding processes for new employees in much shorter timeframes than 120 days.

The Commission also finds that the 120-day compliance period gives small businesses enough time to comply with the final rule. Although small businesses may have limited staff and funds compared to larger firms, they also have fewer workers, and the exclusion for existing non-competes for senior executives will relieve the compliance burden altogether for those small firms that use non-competes only with those workers. Moreover, the steps the Commission has taken to reduce the compliance burden of § 910.2(b) will further simplify and streamline compliance for small businesses.

The Commission has also determined that it is not necessary to extend the compliance period to give courts time to adjudicate pending non-compete litigation because, as described in Part V.C.3, the Commission has adopted § 910.3(b), which provides that the final rule does not apply where a cause of action related to a non-compete arose prior to the effective date. The Commission also finds that a longer compliance period is not needed to hear and resolve challenges to the final rule, especially given the ability of a challenger to seek a preliminary injunction.

In sum, the Commission finds that due to modifications reducing covered entities' burden to comply with the final rule, a compliance period of 120 days is sufficient time to comply with the final rule. Given these changes the longer compliance period proposed in the NPRM is no longer warranted and would allow the use of certain non-competes that are an unfair method of competition—and their related harms and costs—to continue for longer than necessary. The substantial benefits to competition and to workers of the final rule taking effect as soon as

possible outweigh any concerns about potential difficulties in meeting an earlier compliance date.

The Commission also adopts a 120-day effective date. The Commission concludes that it would ease the burden of implementation and reduce possible confusion by having a uniform date for when the final rule goes into effect and when compliance under the final rule is required. A 120-day effective date complies with the requirements of the Congressional Review Act that a "major rule" may not take effect fewer than 60 days after the rule is published in the *Federal Register*.

## IX.  Alternative Policy Options Considered

The Commission proposed to ban non-competes categorically, with a limited exception for non-competes entered into by a person who is selling a business entity. In the NPRM, the Commission discussed and sought comment on potential alternatives to the proposed categorical ban, including discrete alternatives that would implement a rebuttable presumption of unlawfulness or apply different standards to different categories of workers.[990] The Commission also sought comment on whether a rule should apply a different standard to senior executives, and whether, in lieu of the proposed rule, the Commission should adopt a disclosure rule or reporting rule.[991] The Commission sought comment on all aspects of potential alternatives, including whether the Commission should adopt one of the identified alternatives or some other alternative instead of the proposed rule.[992] The Commission also sought comment on the extent to which a uniform Federal standard for non-competes would promote certainty for employers and workers.[993]

---

[990] NPRM at 3516.
[991] *Id.* at 3519-21.
[992] *Id.* at 3521.
[993] *Id.* at 3497.

The Commission received many comments on these questions, as well as on the question of whether the Commission should issue a Federal standard for non-competes or continue relying on existing law and case-by-case litigation to address harms from non-competes. In this section, the Commission discusses the comments received regarding these alternatives and the reasons it has decided not to adopt them. This Part IX addresses these comments but does not address alternatives related to the design of specific regulatory provisions, which are discussed in the Part addressing the relevant provision.

## A. Categorical Ban vs. Rebuttable Presumption

### 1. The Rebuttable Presumption Alternative Generally

While preliminarily finding that a categorical ban would best achieve the proposed rule's objectives, the Commission nevertheless sought comment on the alternative of a rebuttable presumption, under which it would be presumptively unlawful for an employer to use a non-compete, but a non-compete would be permitted if the employer could meet a certain evidentiary burden or standard.[994] The Commission also sought feedback on the form any rebuttable presumption should take.[995]

Most commenters that addressed this issue, including those both supporting and opposing the proposed rule, discouraged the Commission from including a rebuttable presumption in the final rule. These commenters contended that a rebuttable presumption would add complexity and uncertainty to the rule.

Supporters of the proposed rule asserted that a rebuttable presumption would undermine the rule's effectiveness, failing to deter employers from imposing non-competes while making litigation too uncertain and costly for most workers to pursue. Some of these commenters

---

[994] *Id.* at 3517.
[995] *Id.* at 3517-19.

contended that a rebuttable presumption would also do little to reduce the chilling effects of non-competes. They argued that employers would continue to impose non-competes that are unlikely to survive a rebuttable presumption.

Many commenters critical of the proposed rule opposed a rebuttable presumption for essentially the same reasons they opposed the rule in general. They contended that, in States where non-competes are generally enforceable, a rebuttable presumption would inappropriately shift the burden of proof from workers to employers. Many of these commenters specifically opposed a rebuttable presumption that would use a test similar to antitrust law's "quick look" analysis, contending that the Commission's analysis of empirical research on non-competes cannot substitute for the lengthy experience courts usually have with a particular restraint before giving it quick-look treatment. A few commenters contended that a rebuttable presumption would increase litigation and raise employers' compliance costs by complicating the determination of whether a given non-compete is likely valid, requiring more lawyer involvement in drafting clauses and more reliance on courts to determine a non-compete's validity.

A few commenters supported a rebuttable presumption, arguing the Commission's proposed ban on non-competes was too blunt an instrument. Some also contended that a rebuttable presumption would offer a more flexible approach akin to the majority of State law approaches. At least one commenter stated that a rebuttable presumption would make the final rule more likely to survive judicial review. A few commenters stated that a rebuttable presumption would provide more protections than most State laws by allowing only non-competes that the commenter contended are not unfair to the worker, such as where highly paid workers agree to narrow non-competes in exchange for bargained-for consideration. One

commenter argued that a rebuttable presumption would enable the Commission to accrue more experience adjudicating non-competes and assessing their impact on competition.

Commenters advocating for a rebuttable presumption generally preferred a test focusing on one or more factors, including: the non-compete's geographic scope and duration; the presence and amount of any liquidated damages or penalty provision; whether the clause is narrowly tailored to prevent competition with actual competitors; the restrained worker's duties and income; and the availability of less restrictive alternatives. A few commenters supported a "preponderance" (as opposed to a "clear and convincing") standard to permit as many non-competes as possible but acknowledged that such a rule may be so similar to the existing common law as to be redundant.

After carefully reviewing and considering the comments, the Commission concludes that a rule implementing a rebuttable presumption is not preferrable to the final rule as adopted. Based on the Commission's expertise, including careful review and consideration of the entire rulemaking record, the Commission finds that a rebuttable presumption would be less effective than the final rule for achieving the Commission's stated goals. A rebuttable presumption also presents administrability concerns that the final rule does not.

Overall, the comments reinforced the Commission's concerns that a rebuttable presumption would foster substantial uncertainty about the validity of a given non-compete and would do little to reduce the *in terrorem* effects of non-competes. Research demonstrates that employers maintain non-competes even where they likely cannot enforce them,[996] that many workers are not aware of the applicable law governing non-competes or their rights under those laws,[997] and that the degree to which non-competes inhibit worker mobility is affected not only

---

[996] *See* Part IV.B.2.b.
[997] *See* Prescott & Starr, *supra* note 413.

by whether a non-compete is actually enforceable but also on whether a worker believes their employer may enforce it.[998] Accordingly, the Commission concludes that a rule implementing a rebuttable presumption would be inadequate to reduce the prevalence of non-competes, their chilling effect on worker mobility, or their tendency to negatively affect competitive conditions. Relatedly, the Commission believes that a rebuttable presumption would increase litigation costs for workers and employers relative to the final rule as adopted.

The Commission also believes that, in important respects, a rebuttable presumption for non-competes is inconsistent with the Commission's findings in this final rule. As discussed in greater detail in Part IX.C, a rule that provides for case-by-case, individualized assessment of non-competes is unlikely to address the negative effects of non-competes on competition in the aggregate. In addition, by focusing on considerations specific to the worker and the employer, a rebuttable presumption is unlikely to address the external effects of non-competes (*i.e.*, the effects on persons other than the parties to the non-compete), including their negative effects on the earnings of workers who are not covered by non-competes.

The Commission recognizes that there may be some benefits to a rebuttable presumption relative to the status quo. Because it puts the burden of proof on employers, a rebuttable resumption would be stricter than the current law in States where non-competes are allowed, and research suggests that even a small decrease in enforceability would increase worker mobility, raise wages, and promote innovation.[999] But the categorical ban adopted in the final rule would have greater benefits in these respects without the drawbacks explained in this Part IX.A.1.

## 2. Discrete Alternatives Related to Rebuttable Presumptions

---

[998] Starr, Prescott, & Bishara, *supra* note 68 at 633, 652, 664.
[999] Johnson, Lavetti, & Lipsitz, *supra* note 388 (decreasing enforceability increases worker mobility and earnings); Johnson, Lipsitz, & Pei, *supra* note 526 at 2-5 (enforceability negatively impacts patent quantity and quality).

In the NPRM, the Commission also sought comment on four discrete alternatives to the proposed rule: Alternative #1 (categorical ban below some threshold, rebuttable presumption above); Alternative #2 (categorical ban below some threshold, no requirements above); Alternative #3 (rebuttable presumption for all workers); and Alternative #4 (rebuttable presumption below some threshold, no requirements above).[1000]

As explained in Part IX.A.1, the Commission finds a rebuttable presumption would be ineffective in addressing the harms to competitive conditions caused by non-competes. For the same reasons, the Commission declines to adopt Alternatives #1, #3, and #4, all of which contemplated a rebuttable presumption for some or all workers.

While the vast majority of commenters supported the Commission's proposal to ban non-competes categorically for all workers, a number of commenters suggested that the Commission permit non-competes with senior executives (or other highly skilled or highly paid workers) and other workers. The Commission addresses these comments in Part IV.C and V.D.1, where it finds that such non-competes tend to negatively affect competitive conditions in labor markets and in product and service markets, and that non-competes are also exploitative and coercive for workers other than senior executives. For these reasons, the Commission declines to adopt Alternative #2, which contemplated imposing no requirements on workers above a certain wage or other threshold.

## B. Other Discrete Alternatives

### 1. Disclosure Rule

In the NPRM, the Commission sought comment on the potential alternative of adopting

---

[1000] NPRM at 3519.

disclosure requirements related to non-competes.[1001] The Commission explained that the rule could, for example, require an employer to disclose to a worker prior to making an employment offer that the worker will be subject to a non-compete and/or to explain the terms of the non-compete and how the worker would be affected by signing it.[1002] The Commission noted that a 2021 study by Starr, Prescott, and Bishara finds that disclosure of non-competes to workers prior to the acceptance of a job offer was associated with increased earnings, rates of training, and job satisfaction.[1003] The authors of the study, however, cautioned that their analysis "should not be interpreted causally," a point the Commission noted in explaining why it gave minimal weight to the study.[1004] The Commission preliminarily concluded in the NPRM that a disclosure requirement would not achieve the objectives of the proposed rule.[1005]

In general, commenters stated that they agreed with the Commission's preliminary view that, while there may be some benefits to a disclosure rule, it would not achieve the objectives of the rule. Workers and worker advocacy groups stated that non-competes are often presented to workers on their first day on the job, or after they accept an employment offer. Although these commenters generally supported a comprehensive ban, they noted that if the Commission did not pursue a ban, a disclosure requirement may help improve workers' awareness of non-competes before accepting an offer. On the other hand, these commenters contended that a disclosure rule would do little to reduce the prevalence of non-competes, because workers have little choice but to accept non-competes, which are typically presented as "take-it-or-leave-it" terms and are ubiquitous in many fields.

---

[1001] *Id.* at 3521 n.446 (noting that the Commission's Franchise Rule, 16 CFR 436.5(i); 436.5(q), requires non-competes to be disclosed to a franchisee).

[1002] *Id.* at 3521.

[1003] *Id.*, citing Starr, Prescott, & Bishara, *supra* note 68 at 75.

[1004] *Id.* at 3487, citing Starr, Prescott, & Bishara, *supra* note 68 at 73.

[1005] *Id.* at 3521.

Many trade organizations, advocacy groups, and academics who were generally supportive of the rule stated that a disclosure rule would fail to mitigate the competitive harms caused by non-competes in the aggregate. While acknowledging that a disclosure rule may ameliorate some problems related to worker awareness of non-competes, these commenters contended that non-competes are unfair and coercive because employees generally lack adequate bargaining power to refuse to sign or bargain over non-competes even when they are presented at the time of an employment offer, and that a disclosure rule would therefore not have the effect of making non-competes less unfair or coercive. A few commenters opposed a disclosure rule generally but urged the Commission to adopt a disclosure requirement for any non-competes permitted by the final rule, including for any non-competes entered into by a person who is selling a business.

On the other hand, some trade organizations, advocacy groups, and businesses that generally opposed the rule advocated for the Commission to adopt a disclosure rule in lieu of the proposed categorical ban. These commenters contended that a disclosure rule would substantially mitigate the unfairness of non-competes that are entered into without adequate notice to the worker without drastically altering the legal status quo, thereby maintaining the protections for trade secrets, training expenditures, and intellectual property they contend that non-competes provide. They stated that eight States and the District of Columbia have statutory notice requirements for non-competes.

Most of the commenters who supported a disclosure rule also argued that rather than demonstrating that non-competes tend to negatively affect competitive conditions, the available evidence merely demonstrates opportunistic behavior by employers (such as presenting non-competes only after prospective workers have taken hard-to-reverse steps towards accepting

employment) and workers (such as seeking to be excused from a non-compete after recognizing its impact on future job prospects). These commenters asserted that a disclosure rule would be better suited to address these types of opportunistic behaviors than a categorical ban.

Some commenters based their support for a disclosure rule on their contention that workers have sufficient bargaining power to negotiate over non-competes when they are provided with notice of them. One such commenter pointed to the cited research by Starr, Prescott, and Bishara finding that disclosure of non-competes to workers prior to acceptance of a job offer may increase earnings, increase rates of training, and increase job satisfaction.[1006] The commenter also referenced the study's finding that of those workers who did not attempt to negotiate a non-compete, 52% reported that they thought the terms were reasonable and 41% reported that they assumed the terms to be non-negotiable.[1007] The commenter contended that a disclosure rule would decrease the number of workers who assumed non-competes were non-negotiable.

A few commenters contended that a disclosure rule may be more likely to withstand judicial review because the Commission could promulgate a disclosure rule in this context under its UDAP authority pursuant to the Magnuson-Moss Act. In addition, a few commenters requested that the Commission adopt timing rules for when the disclosure must be provided, such as by requiring that employers disclose a non-compete in the job advertisement, at the time of the job offer, or at least five business days prior to the worker's deadline to sign an employment agreement.

The Commission declines to adopt a disclosure rule.[1008] The Commission finds that

---

[1006] Starr, Prescott, & Bishara, *supra* note 68 at 75.
[1007] *Id.* at 72.
[1008] The Commission notes that the Franchise Rule requires franchisors to disclose any non-compete that franchisees

merely ensuring that workers are informed about non-competes would not address the negative externalities that non-competes impose on workers, rivals, and consumers. As described in Part IV.B.3.a.ii, non-competes suppress wages for workers across the labor force, including workers who are not subject to non-competes. Ensuring that a worker who enters into a non-compete is informed about the non-compete does not address the harm to these other workers. In addition, it does not address the ways in which non-competes harm consumers and the economy through reduced new business formation and innovation, described in Part IV.B.3.b. In other words, non-competes have negative spillover effects on workers, consumers, businesses, and the economy that disclosure cannot remediate.

The Commission also finds that a disclosure requirement would not be as effective as a categorical ban in addressing the exploitation and coercion of workers through non-competes. As described in Part IV.B.2.b.i, there is a significant imbalance in bargaining power between employers and most workers, which is particularly acute in the context of negotiating employment terms such as non-competes. And, as many comments from workers and worker advocacy groups attest, non-competes are often included in standard-form contracts and offered on a take-it-or-leave-it basis.[1009] As a result, workers have limited practical ability to negotiate non-competes even if they are notified of such clauses prior to accepting their employment offer. Indeed, as described in Part IV.B.2.b.i, the comment record reflects that very few workers (other than senior executives) bargain over their non-competes—whether the worker knew about the non-compete before the job offer and understood its terms, or not.

The Commission gives the findings of the Starr, Prescott, and Bishara study on the

---

must impose on managers. 16 CFR 436.5(o)(3). These non-competes are prohibited by the final rule. *See* Parts III.D and V.D.6.

[1009] *See* Part IV.B.2.b.i.

impacts of disclosure little weight because the study reflects only correlation, not causation, with respect to the effects of a disclosure rule (similar to the "use" studies the Commission gives little weight to, as described in Part IV.A.2). The study merely compares a set of workers whose firms disclosed the non-compete and workers whose firms did not, and any correlation may thus be attributable to confounding factors. This comparison—similar to comparisons of workers with and without non-competes—may be polluted by differences between firms that opt to disclose non-competes and those that do not, or differences between workers who are the beneficiaries of disclosure versus those who are not.[1010] For example, it is possible that firms that disclose non-competes are also more responsible employers in general that tend to pay their workers more, train their workers more, and have more satisfied workers. The Commission therefore does not find that this evidence represents a causal relationship between the disclosure of non-competes and earnings and other outcomes. Moreover, the weight of the evidence discussed in Parts IV.B and IV.C finding increased earnings, new business formation, and innovation from the final rule significantly surpass the potential effects of disclosing non-competes.

One commenter stated that the Starr, Prescott, and Bishara study suggests that a disclosure rule would decrease the number of workers who assume a non-compete with which they are presented is non-negotiable. The study suggests that the potential effects of a disclosure rule in this respect would be, at best, limited.[1011] For the reasons described in this Part IX.B.1, the Commission is skeptical that a disclosure requirement would meaningfully increase the share of workers who actually bargain over non-competes.

A disclosure rule may address some deceptive or misleading practices in connection with

---

[1010] Indeed, the authors of this study note that "unobservables may more plausibly account for these estimates." *See* Starr, Prescott, & Bishara, *supra* note 68 at 77 n.35.
[1011] *Id.* at 72. The study finds that 38% of workers asked to sign a non-compete before accepting a job offer assumed they could not negotiate, versus 48% of workers asked after accepting a job offer.

non-competes. However, considering that a disclosure rule is not likely to significantly reduce the negative competitive impacts of non-competes on labor markets and on product and service markets, this benefit is significantly outweighed by the limitations of a disclosure rule.[1012]

The Commission further concludes that a disclosure rule is not necessary for non-competes in the context of sales of a business entity. As described in Part V.A, persons selling a business entity tend to have bargaining power in the context of the transaction, and the Commission is unaware of evidence that deceptive and misleading practices in connection with non-competes (such as waiting to disclose a non-compete until after the job offer) are common with respect to business sales.

### 2. Reporting Rule

In the NPRM, the Commission sought comment on a reporting rule as a potential alternative to the proposed rule.[1013] The Commission stated that it could require employers to report certain information to the Commission relating to their use of non-competes; for example, employers that use non-competes could be required to submit a copy of the non-compete to the Commission.[1014] As the Commission explained, a reporting rule might enable the Commission to monitor the use of non-competes and could potentially discourage employers from using non-competes that are not clearly justified under existing law.[1015]

The Commission stated in the NPRM that it did not believe a reporting rule would achieve the objectives of the proposed rule. The Commission stated that merely requiring employers to report their non-competes to the Commission would not meaningfully reduce the

---

[1012] The Commission considered whether a disclosure rule would be appropriate for senior executives, but concludes that it is not because it would fail to address many of the ways in which non-competes are restrictive and exclusionary and tend to negatively affect competitive conditions.
[1013] *Id.* at 3521.
[1014] *Id.*
[1015] *Id.*

prevalence of non-competes and would therefore fail to reduce the negative effects non-competes have on competitive conditions in labor markets and product and service markets.[1016] At the same time, the Commission stated that a reporting rule would impose significant and recurring compliance costs on employers.[1017]

Most commenters addressing this topic agreed with the Commission's preliminary view that a reporting rule would not achieve the goals of the proposed rule. At least one business opposed any reporting requirement due to the cost of compliance and to avoid exposing any confidential information contained in employment agreements. At the same time, some commenters stated that a reporting rule may assist enforcement and provide quantitative data sets to measure compliance, while recognizing that such benefits would lose significance if the Commission were to adopt the proposed rule. One commenter suggested that, to improve the effectiveness of any reporting rule, any such rule should include a provision stating that any non-competes which were not properly disclosed to State and Federal authorities are null and void.

The Commission declines to adopt a reporting rule. A reporting rule would impose recurring compliance costs on employers, compared with the proposed rule, which largely imposes one-time costs. At the same time, a reporting rule would be inadequate to address the negative effects of non-competes on competitive conditions in labor markets and product and service markets, or the Commission's concerns about exploitation and coercion through the use of non-competes, since it would allow for the continued use of non-competes.

### 3. Limitations on Scope and Duration

In addition to those alternatives listed in the NPRM, a few commenters suggested adopting an alternative rule that allows non-competes but sets a limitation on their geographic

---

[1016] *Id.*
[1017] *Id.*

scope and/or duration. Some commenters suggested a geographic limit of five, ten, or thirty miles and/or a temporal limit of six months or one, two, or three years, while others suggested a fact-specific requirement that the geographic scope or duration of a non-compete be "reasonable." Many of these commenters cited State laws that take a similar approach.

A few commenters opposed this alternative. One worker advocacy group argued that any bright-line limit may end up serving as a default, encouraging employers to impose non-competes of the maximum allowable scope or duration even if that limit is longer or broader than they otherwise would have imposed. At least one academic commenter argued that setting geographic scope or duration limitations on non-competes is unlikely to have a substantial impact, pointing to the continued prevalence of overly broad non-competes despite State laws designed to set upper limits on geographic scope and duration.

The Commission declines to adopt a standard providing that the geographic scope or duration of non-competes must be "reasonable." The Commission is concerned that a reasonableness standard would foster significant uncertainty among workers and businesses about the enforceability of non-competes, for the same reasons a rebuttable presumption would. In addition, as described in Part II.C.1 of the NPRM, all States where non-competes are enforceable currently apply a reasonableness standard, so a Federal reasonableness standard would not mitigate the negative effects of non-competes that are presently occurring.

The Commission also declines to adopt the alternative of imposing limits on the scope and duration of non-competes. Such a rule would be insufficient to address the negative effects of non-competes on competitive conditions in labor markets or products and services markets. Although a non-compete that lasts for a shorter duration or within a smaller geographic area curtails job mobility for the individual worker it binds to a lesser degree, it nonetheless curtails

the worker's job mobility and the ability of competing employers to recruit and access talent. Non-competes limited in duration and scope still tend to inhibit efficient matching between workers and employers, with spillover effects on new business formation and innovation through the mechanisms described in Parts IV.B and IV.C. Furthermore, limitations on the scope and duration of non-competes would not address the spillover effects from non-competes on other workers and consumers. In short, even if a non-compete applies only to a relatively delimited location or time period, it still—by design—cuts off free and fair competition in labor and product and service markets.

In addition, most of the commenters who stated that they were exploited and coerced by non-competes did not do so on the basis that the non-compete was overbroad in scope or duration. Instead, most of the commenters who described the terms of their non-competes described limits on scope and duration that were within the bounds of what is typically permissible under State law.[1018] Some of these commenters even stated expressly that they were subject to the non-compete that was standard or typical in their field. Even these commenters, however, explained how they were exploited and coerced in connection with non-competes because the non-compete was unilaterally imposed and because the non-compete trapped them in worse jobs or forced them to bear significant harms or costs. For these reasons, the Commission declines to adopt bright-line limits on the scope and duration of non-competes.

### 4. Compensation Requirement

Some commenters requested that the Commission adopt an alternative that would permit non-competes so long as the worker is compensated. Some commenters pointed to Massachusetts and Oregon law governing non-competes under which, for certain workers, non-

---

[1018] *See* Part IV.B.2.b.

competes may be enforced if, inter alia, they include a minimum level of compensation or consideration to the worker separate from compensation for employment.[1019]

The Commission declines to adopt a rule requiring compensation for non-competes. First, such a rule would not address the harms to competitive conditions that non-competes cause, which result in harm to other workers, to rivals of employers, and to consumers. The Commission finds in Parts IV.B.3.a.ii and IV.C.2.c.ii. that non-competes harm workers other than the workers who sign them, by reducing the number of job opportunities and thereby inhibiting efficient matching for all workers. The Commission further finds in Parts IV.B.3.b and IV.C.2.c.i that non-competes inhibit new business formation and innovation, which affects consumers. Therefore, even if a worker were fully compensated for a non-compete, the fact of that compensation would not redress these negative externalities. Second, this alternative would be ineffective or significantly less effective because of the *in terrorem* effect of non-competes, which the Commission finds to be grounded in empirical evidence and supported by the comment record described in Part IV.B.2.b. Third, such a rule would be difficult to administer and potentially easy to evade, as employers could suppress other wages or job quality while labeling some compensation as attributable to the non-compete.

### 5. Combination of Different Alternatives

Some commenters suggested the possibility of combining two or more of the alternatives discussed in this Part IX in place of a categorical ban. While a combination of these regulations or limitations might modulate some of the ways in which non-competes are exploitative and coercive, they would not be as effective as a comprehensive ban. In particular, a combination approach would lack the clarity of a comprehensive ban and thus would not be as effective as a

---

[1019] Mass. Gen. Laws Ann. ch. 149, sec. 24L; Or. Rev. Stat. Ann. sec. 653.295.

categorical ban in addressing the exploitation and coercion of workers through non-competes. Moreover, as noted previously, the alternatives discussed would do little to address the tendency of non-competes to negatively affect competitive conditions and to cause spillover effects on other workers and on consumers. Accordingly, a combination of these alternative regulations or limitations would fail to remedy the aggregate and spillover effects of non-competes and thus would not achieve the Commission's stated goals.

### C. The No-Action Alternative: Reliance on Existing Legal Frameworks Instead of a Clear National Standard

The Commission sought comment on whether a Federal standard for non-competes would promote certainty for employers and workers.[1020] The Commission finds that a clear national standard for non-competes will more effectively address non-competes' tendency to negatively affect competitive conditions than case-by-case adjudication or relying on existing law alone. The Commission also finds that declining to adopt the final rule, and instead relying on case-by-case adjudication or existing law alone, would not address the exploitation and coercion of workers through non-competes.

### 1. Comments Received

Many commenters expressed support for the NPRM because they viewed current laws as insufficient to protect all workers, rivals, or consumers, regardless of where they are located, from the negative effects of non-competes on competitive conditions in labor markets and markets for products and services. Numerous workers, businesses, and other commenters said the patchwork of State laws and confusion about those laws, particularly reasonableness tests, makes it difficult for workers and businesses to understand the law and in turn contributes to the

---

[1020] NPRM at 3497.

use of unenforceable or overbroad non-competes and chills worker mobility. Several commenters also said that case-by-case adjudication and reasonableness tests make it difficult for parties to predict outcomes, which in turn raises litigation costs. Even some organizations opposed to the proposed rule or who supported a different policy believed that a Federal rule could be beneficial, such as to businesses operating in multiple jurisdictions.

In addition, according to commenters, case-by-case adjudication under State law cannot address the harms caused by non-competes through their use in the aggregate. Some commenters also asserted that the patchwork of State laws is complicated by remote and hybrid workers. Others argued that State laws are skewed in favor of employers or leave workers vulnerable to unreasonable agreements. Some argued that many workers, businesses, non-competes, and labor markets cross State lines, demonstrating the need for one standard. Several State Attorneys General also said that numerous complications arise when localities span more than one State and those States have different laws on non-competes; workers become confused and enforcement of non-competes can have spillover effects in another State.[1021]

In contrast, many commenters stated that case-by-case adjudication is preferable to a Federal rule because it allows individual facts to be considered. In addition, many commenters argued that existing State legislative and judicial decisions are sufficient to impose limitations on non-competes while recognizing legitimate business interests. Commenters also argued that States should be allowed to continue their natural experiments with non-competes; that non-competes historically have been and should remain an issue of State law; and that States are best suited to make policy judgments for their citizens.

Some commenters argued that unenforceable or overly broad non-competes are not a

---

[1021] Comment of the Attys. Gen. of 17 States and D.C., FTC-2023-0007-21043 at 11.

problem because courts can strike down or reform them. Some employers asserted that they specifically, or employers more generally, did not enter into unenforceable non-competes. Other commenters argued that employers did not use choice of law clauses to evade State laws, stating the clauses are the products of arms-length bargaining and provide certainty and predictability.

## 2. Responses to Comments and the Commission's Findings

### a. The Value of Rulemaking

The Commission has the authority to make rules and regulations to carry out the FTC Act's prohibition on unfair methods of competition under sections 5 and 6(g) of the FTC Act as described in Parts II.A through II.C, and the Supreme Court has stated that agencies generally have discretion to choose between rulemaking and adjudication.[1022] Based on the empirical evidence, the comments, and the Commission's expertise, the Commission finds that rulemaking is the appropriate method of addressing non-competes.

The prevalence of non-competes across the economy, described in Part I.B.2, and the scale of the harms they cause, described in Parts IV.B and IV.C, show that it is more efficient to address the harms to competition from non-competes via rulemaking compared to case-by-case adjudication. As the D.C. Circuit stated in ruling that the Commission had the authority to promulgate unfair methods of competition rules, "the availability of substantive rule-making gives any agency an invaluable resource-saving flexibility in carrying out its task of regulating parties subject to its statutory mandate."[1023] The Commission estimates that there are 2.92 million firms using non-competes in the U.S.[1024] Adjudicating individual cases against even just

---

[1022] *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947); *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974); Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023).
[1023] *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 681-82 (D.C. Cir. 1973); *see also id.* at 690 (stating that "the historic case-by-case purely adjudicatory method of elaborating the Section 5 standard and applying it to discrete business practices has not only produced considerable uncertainty" but has also spawned lengthy litigation).
[1024] *See* Part X.F.6 (estimating that 49.4% of the 5.91 million firms in the U.S. use non-competes).

one-tenth of 1% of these employers would be slow, inefficient, and costly for the Commission, employers, and workers. Rulemaking provides notice of the application of section 5 to non-competes in a clearer and more accessible way than piecemeal litigation and avoids compliance delays.[1025] The final rule will provide all market participants greater clarity about their obligations under section 5 of the FTC Act, facilitating compliance. Additionally, the final rule will simplify enforcement proceedings by streamlining the proof required.[1026]

In addition, the principal harms from non-competes arise from their tendency to negatively affect competitive conditions in the aggregate. A single non-compete with a single worker may not do much to inhibit efficient matching between workers and employers across a labor market or suppress new business formation or innovation (and what effects it does have would be difficult to measure), but the Commission finds based on empirical evidence that the use of many non-competes across the labor market does have these aggregate net negative effects.[1027] For this reason, rulemaking is preferable to individual litigation for addressing the negative effects of non-competes. Past Commission experience has also illustrated that case-by-case enforcement, education, and other enforcement mechanisms are not always sufficient to stop widespread harms.[1028] A Federal rulemaking is the most efficient method to address the scale of harm to competitive conditions in labor, product, and service markets caused by non-

---

[1025] *See* Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023); *Nat'l Petroleum Refiners*, 482 F.2d at 690 ("[W]hen delay in agency proceedings is minimized by using rules, those violating the statutory standard lose an opportunity to turn litigation into a profitable and lengthy game of postponing the effect of the rule on their current practice. As a result, substantive rules will protect the companies which willingly comply with the law against what amounts to the unfair competition of those who would profit from delayed enforcement as to them.") (citation omitted).

[1026] *See Nat'l Petroleum Refiners*, 482 F.2d at 690 ("With the issues in Section 5 proceedings reduced by the existence of a rule delineating what is a violation of the statute or what presumptions the Commission proposes to rely upon, proceedings will be speeded up.").

[1027] *See* Part IV.B.3.a-b.

[1028] *See, e.g.*, Combating Auto Retail Scams Trade Regulation Rule, 89 FR 590, 600 (Jan. 4, 2024) (stating that rulemaking was necessary because certain unfair and deceptive acts and practices had persisted despite more than a decade of Federal and State enforcement, education, and other action in the motor vehicle dealer marketplace).

competes.

Finally, "utilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticism, advice and data that is ordinarily less likely to be forthcoming in adjudication."[1029] Rulemaking is particularly beneficial when, as here, "a vast amount of data had to be compiled and analyzed, and the Commission, armed with these data, had to weigh the conflicting policies."[1030] Rulemaking also allows for more fulsome engagement from the public by providing for public comment on a complete regulatory scheme. The Commission greatly benefited from the submitted comments.

### b.  Case-by-Case Litigation Alone Cannot Address the Negative Effects of Non-Competes on Competition

The Commission finds that case-by-case litigation alone is insufficient to address the harms to competition from non-competes due to the cost of litigation, which deters many workers from challenging non-competes, and the limited resources of public enforcement agencies. In addition, individual litigation is not well-suited to redress the negative externalities that non-competes impose on other workers, other employers, consumers, and the economy from their use in the aggregate.

Many commenters addressed the shortcomings of individual litigation as a means for addressing the harms of non-competes. Numerous commenters noted that litigation is costly and many workers cannot afford to litigate their non-competes.[1031] Many commenters, including workers, entrepreneurs, and employment attorneys, shared examples of five-figure and six-figure

---

[1029] *Nat'l Petroleum Refiners*, 482 F.2d at 683 (citations omitted); *see also* Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023).
[1030] *Nat'l Petroleum Refiners*, 482 F.2d at 683 (citations omitted).
[1031] *See also* Part IV.B.2.b.ii (describing exploitative and coercive effects of the risk and cost of being subject to a non-compete suit).

litigation costs related to non-compete lawsuits. Numerous commenters reported that the fear of litigation costs induced them to refrain from seeking or accepting other work or starting a business, even though they thought the non-compete was likely unenforceable. Many other commenters stated that they complied with a non-compete after they were threatened with enforcement, even though they were unsure about the non-compete's enforceability. One study finds that 53% of workers subject to non-competes are hourly workers,[1032] who are particularly unlikely to be able to afford a court challenge.

Commenters also noted that some non-competes include liquidated damages clauses or fee-shifting provisions requiring the worker to pay the employer's attorney and other costs if the employer wins, further increasing the costs (and risks) of challenging a non-compete. In addition, commenters stated that litigation is time-consuming and could take as long or longer than the non-compete period. For example, one commenter shared a decision in the commenter's own case where the appellate court found that the non-compete violated public policy by leaving an area with only one surgeon in a specialty—but reached that decision only after the two-year non-compete had already run its course.[1033] Commenters also said workers who sued their employer could experience reputational harm and difficulty finding work going forward.

Litigation can be even riskier if a court might reform a non-compete, which leaves the worker subject to some restrictions even if the initial non-compete was impermissibly broad. Several commenters cited a *Harvard Law Review* article that discusses the consequences of allowing courts to sever or reform overbroad non-competes:

> For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the

---

[1032] Lipsitz & Starr, *supra* note 72 at 144 (analyzing data from the Starr, Prescott, & Bishara survey).
[1033] *Graham v. Cirocco*, 69 P.3d 194, 200 (Kan. App. 2003).

> mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable.[1034]

If there is no penalty for drafting overbroad non-competes (as is true in most States),[1035] employers have little incentive to draft non-competes narrowly, particularly if a court is likely to revise it rather than strike it down, or if a worker is unlikely to be able to litigate at all. An employment attorney commented that it is particularly difficult to advise workers about whether their specific non-compete is enforceable when it is possible that a court may modify the underlying non-compete.

Case-by-case litigation under other antitrust laws alone is also insufficient to address the harms from non-competes. Non-competes restrain trade and therefore are subject to the Sherman Act.[1036] While private litigants may bring private causes of action to enforce the Sherman Act,[1037] the Commission views private litigation under the Sherman Act as an ineffectual response in the context of non-competes based on the history of cases by private litigants arising under that Act, as explained in the NPRM.[1038] For an individual litigant, proving harm to competition in the relevant geographic and product markets is a resource-intensive task that typically requires expert testimony.[1039] This makes an already expensive proposition even less palatable for most workers and further tips the risk-versus-reward calculus away from litigation.

---

[1034] Blake, *supra* note 22 at 682-83 (noting that this may not be applicable if the worker has bargaining power and it may be inefficient to tailor non-competes to each worker, and recommending that courts only sever when they determine the employer acted fairly).

[1035] *See* NPRM at 3495.

[1036] *See* Part I.B.1.

[1037] *See* 15 U.S.C. 15.

[1038] NPRM at 3496.

[1039] *See, e.g.*, *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993) ("In practice, the frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify.").

In addition, to succeed on a Sherman Act claim, a plaintiff must show harm to competition as a whole, not just to themselves. It may be difficult or impossible for a worker to establish that their individual non-compete—or a single firm's use of a non-compete—adversely affected competition in a labor market or product/service market sufficiently to violate the Sherman Act.[1040] Section 5, on the other hand, is more inclusive than the Sherman Act.[1041] As outlined in Part II.F, section 5 requires a showing of indicia of unfairness and a tendency to negatively affect competitive conditions. It does not require a separate showing of market power or market definition—nor does it require proof of harm to competition by each non-compete.[1042]

Case-by-case litigation by public enforcers, such as the Commission or State attorneys general, is a potential alternative or supplement to private litigation under other antitrust laws. But the ability of public enforcers to engage in effective case-by-case litigation related to non-competes, absent a rule, is limited.

As cited in Parts I.B. and II.C.2, the FTC has previously secured consent orders premised on the use of non-competes being an unfair method of competition under section 5, and the Commission has the authority to determine that non-competes are unfair methods of competition through adjudication. However, FTC resource constraints limit the potential effectiveness of enforcement of section 5 on a purely case-by-case basis. The Commission is an independent agency that works to promote fair and open markets and protect the entire American public from unfair and deceptive business practices. The Commission has fewer than 1,500 employees for its entire body of work related to this mission,[1043] which includes investigating, challenging, and

---

[1040] *See* NPRM at 3496-97 (discussing non-compete cases that have been brought under the antitrust laws).
[1041] *See* Part II.A.
[1042] *See* Part II.F.
[1043] FTC, *Congressional Budget Justification – Fiscal Year 2025*, at 8 (2024), https://www.ftc.gov/system/files/ftc_gov/pdf/fy25-cbj.pdf.

litigating anticompetitive mergers and conduct; processing and reviewing merger filings; and investigating and challenging a wide range of consumer protection issues.[1044]

Similarly, several State Attorneys General commented that the multi-factor common law approaches to non-compete law result in piecemeal decisions that do not address the non-compete problem in a uniform manner.[1045] These State Attorneys General also noted that some State enforcement agencies lack straightforward authority to enforce existing common law protections related to non-competes and argued that the challenges associated with common law enforcement underscore the need for a Federal rule.[1046] And the resource limitations to pursue non-competes comprehensively through enforcement limit States equally—if not more.

The Commission estimates that there are approximately 30 million individual non-competes in the U.S.[1047] In contrast to the large volume of non-competes, the resources of public enforcement agencies are limited. Public enforcers must balance competing demands for resources and priorities when they bring public enforcement actions. Public enforcers cannot conceivably investigate the specific details of every non-compete or initiate litigation concerning more than a small fraction of unlawful non-competes. A Federal rule provides clarity to market participants, engages all stakeholders in the development of the rule, and more effectively ceases an unfair method of competition.

The significant limitations on the ability of private and public litigants to challenge unlawful non-competes have practical implications. Courts cannot strike down an unenforceable non-compete that they never had the opportunity to review. Moreover, as detailed in Part IV.B.2.b, non-compete restrictions may still have significant *in terrorem* effects when workers

---

[1044] *Id.*
[1045] Comment of the Attys. Gen. of 17 States and D.C., FTC-2023-0007-21043 at 7.
[1046] *Id*.
[1047] *See* Part I.B.2.

are uncertain about the enforceability of their non-competes or lack the ability to challenge their use.

Furthermore, case-by-case litigation is insufficient to address negative externalities from non-competes (*i.e.*, harms non-competes cause to persons other than the parties to the non-compete). As described in Parts IV.B and IV.C, non-competes impose significant negative externalities on other workers, other firms, consumers, and the economy. Individual non-compete cases are not well-suited for redressing these harms. For example, while the precise reasonability test for non-competes differs from State to State, the test typically considers the business interest asserted by the employer; the harm to the worker; and the injury to the public from the loss of the worker's services.[1048] This test does not generally account for the harms experienced by other workers, other firms, consumers, and the economy resulting from the negative effects of non-competes on competition.

Furthermore, because the significant harms of non-competes result from their aggregate use, they are unlikely to be captured by an assessment of an individual worker's non-compete or an individual firm's use of non-competes. This is true regardless of whether those non-competes are challenged under State non-compete laws or under other antitrust laws. It is likewise true regardless of whether non-competes are challenged by private litigants or public enforcers. Accordingly, the Commission finds that case-by-case litigation alone is insufficient to address the negative externalities of non-competes.

The Commission, by contrast, is well-positioned to evaluate non-competes holistically. The Commission is an expert agency and has used its expertise to assess the weight of the empirical evidence and comment record to evaluate the aggregate effects of non-competes. The

---

[1048] *See* NPRM at 3494-95.

Commission here implements a clear national standard through notice-and-comment rulemaking to protect competition, based on the evidence that the use of non-competes in the aggregate negatively affects competition and harms workers and consumers.

For all these reasons, the Commission finds that case-by-case litigation is not a viable alternative to the final rule.[1049]

### c. State Law Alone Cannot Address the Negative Effects of Non-Competes on Competition

The Commission appreciates that States have enacted legislation in recent years to ban or restrict non-competes and ameliorate their negative effects.[1050] The Commission has long recognized the value of concurrent enforcement of Federal and State law and believes States have an important role to play in restricting the use of non-competes. Indeed, in this final rule, the Commission has revised § 910.4 to ensure that States may continue to enforce laws that restrict non-competes and do not conflict with the final rule. However, the Commission believes that reliance on State law alone is insufficient to address the negative effects of non-competes on competition. The practical ability of States to address the harms to their residents from non-competes is limited by various factors, including employers' use of choice-of-law, forum-selection, and arbitration clauses; significant confusion among both employers and workers resulting from the patchwork of State law, which chills workers from engaging in competitive

---

[1049] A few commenters suggested that the Commission could create guidelines instead of a rule to explain what factors the agency would look at in an enforcement action. By definition, however, a guidance document would "not have the force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Guidelines would not bind employers or courts and would not provide workers with the same clarity about the enforceability of their non-competes. Moreover, case-by-case litigation itself is not suited to address the negative externalities of non-competes, a concern the issuance of guidelines would not address. The Commission finds that the issuance of guidelines is not a viable alternative to the final rule for the same reasons that it finds that the no-action alternative generally is not a viable alternative to the final rule.

[1050] *See* NPRM at 3494 (summarizing recent State non-compete legislation).

activity even where non-competes are likely unenforceable under State law and also increases employers' compliance costs, particularly given the increase in interstate remote work; spillover effects from other States' laws; and incentives for States to adopt permissive non-compete policies.

Many States have adopted statutory restrictions or compete bans on non-competes. Four States—California, Minnesota, North Dakota, and Oklahoma—have adopted statutes rendering non-competes void for nearly all workers.[1051] The majority of the remaining 46 States have statutory provisions or case law that ban or limit the enforceability of non-competes for workers in certain specified occupations.[1052] The general language of the test for whether a non-compete is reasonable is fairly consistent from State to State.[1053] However, the specifics of the application of the standard differ from State to State. For example, States vary in how narrowly or broadly they define legitimate business interests and the extent to which courts are permitted to modify an unenforceable non-compete. States also differ with respect to statutory restrictions on non-competes.[1054] As a result, among the 46 States where non-competes may be enforced, variation exists with respect to the enforceability of non-competes.[1055]

State law also differs with respect to the steps courts take when they conclude that a non-compete is unenforceable as drafted. As noted in the NPRM, the majority of States have adopted the "reformation" or "equitable reform" doctrines, which allow courts to revise the text of an

---

[1051] *See* Cal. Bus. & Prof. Code sec. 16600; N.D. Cent. Code sec. 9-08-06; Okla. Stat. Ann. tit. 15, sec. 219A. Minnesota banned non-competes signed on or after July 1, 2023, after the comment period closed. Minn. Stat. Ann. sec. 181.988.

[1052] In most States, those limits apply to just one or two occupations (most commonly, physicians). *See* Beck Reed Riden LLP, *Employee Noncompetes: A State-by-State Survey* (Feb. 19, 2024), https://beckreedriden.com/wp-content/uploads/2024/02/BRR-Noncompetes-20240219-50-State-Noncompete-Survey-Chart.pdf (hereinafter "Beck Reed Riden Chart").

[1053] *See* NPRM at 3494-95.

[1054] *See, e.g.*, Beck Reed Riden Chart, *supra* note 1052.

[1055] NPRM at 3495.

unenforceable non-compete to make it enforceable. [1056]

Because the enforceability of non-competes and courts' positions with respect to

unenforceable non-competes vary from State to State, the question of which State's law applies

in a legal dispute can determine the outcome of a non-compete case. Non-competes often contain

choice-of-law provisions designating a particular State's law for resolution of any future

dispute.[1057] Furthermore, some non-competes include forum-selection provisions specifying the

court and location where a dispute may be heard.[1058] The default rule under conflict-of-laws

principles is that the court honors the parties' choice of law, meaning that the burden is typically

on the worker—the vast majority of whom the Commission finds are exploited and coerced

when entering into a non-compete—to negotiate for the law of a different forum to apply.[1059]

There is significant variation, however, in how courts apply choice of law rules in

disputes over non-competes.[1060] As a result, it can be difficult for employers and workers to

predict how disputes over choice of law (and, in turn, the enforceability of the non-compete) will

be resolved.[1061] Several commenters agreed that a Federal rule would alleviate these problems.

Choice of law provisions may also mean that workers lose their own State's protections.

For example, workers from States where non-competes are banned commented that they faced

enforcement of non-competes that selected the law of another State. This raises the concern that

---

[1056] *Id.*

[1057] Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective*, 31 Comp. Lab. & Pol'y J. 389, 396-402 (2010).

[1058] *Id.* at 402-04.

[1059] *Id.* at 397 ("In general, courts defer to choice of law clauses because they are presumed to represent the express intention of the parties."). *Cf.* Cal. Lab. Code sec. 925(a) (stating that employers shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would either (1) require the employee to adjudicate outside of California a claim arising in California or (2) deprive the employee of the substantive protection of California law with respect to a controversy arising in California).

[1060] Lester & Ryan, *supra* note 1057 at 394-95.

[1061] *Id.* at 395 ("The state of the law is perhaps characterized more by inconsistency than anything else, so much so that commentators lament the 'disarray' and 'mish-mash' of the law, and criticize courts for their 'post-hoc rationalizing of intuitions' or their use of a 'hodgepodge of factors, often with insignificant explanation of how they decide what weight to give each.'") (internal citations omitted).

choice of law clauses can be used to evade State bans or restrictions by forum shopping.[1062] As two scholars note, when "the parties or issues involved have connections to multiple jurisdictions," the law "confounds lawyers and commentators because of its complexity and unpredictability."[1063]

Employers may also impose arbitration clauses, which require that legal disputes with the employer—including disputes related to non-competes—be resolved through binding arbitration rather than in court.[1064] Where such clauses are valid, the Federal Arbitration Act requires that courts enforce them.[1065] Choice of law, forum selection, and arbitration clauses create opportunities for employers to forum-shop in ways that undermine any given State's ability to effectively regulate non-competes.

Numerous workers, businesses, and other commenters said the patchwork of State laws and confusion about those laws makes it difficult for workers and businesses to understand whether a particular non-compete would be enforceable. The lack of a clear national standard, and resulting confusion, contributes to non-competes being used in jurisdictions where they are unenforceable. Starr, Prescott, and Bishara find that employers frequently use non-competes even when they are unenforceable under State law.[1066] Similarly, Colvin and Shierholz find that 45.1% of workplaces in California use non-competes even though they are unenforceable

---

[1062] *See generally* Timothy P. Glynn, *Interjurisdictional Competition in Enforcing Non-Compete Agreements: Regulatory Risk Management and the Race to the Bottom*, 65 Wash. & Lee L. Rev. 1381, 1386 (2008) (noting "judicial attempts to preempt other courts from disregarding the parties' choice of law"). Some States have attempted to defend against this by enacting statutes banning selection of a different State's law for a non-compete. *See* Minn. Stat. Ann. sec. 181.988(3)(a) (Minnesota); Cal. Lab. Code sec. 925 (California); Colo. Rev. Stat. sec. 8-2-113(6) (Colorado); Mass. Gen. Laws ch. 149, sec. 24L(e) (Massachusetts); La. Rev. Stats. 23:921(2) (Louisiana). Many of these statutes are relatively recent, however, and it remains to be seen how effective they will be.
[1063] Lester & Ryan, *supra* note 1057 at 389.
[1064] *See, e.g.*, Alexander J.S. Colvin, Econ. Pol'y Inst., Report, *The Growing Use of Mandatory Arbitration* (Apr. 6, 2018).
[1065] *See, e.g.*, *Nitro-Lift Techs. v. Howard*, 568 U.S. 17, 20-22 (2012).
[1066] Starr, Prescott, & Bishara, *supra* note 68 at 53, 81.

there.[1067] Anecdotally, an economist commented that the Commission's *Prudential Security* case, in which the employer continued using non-competes after they were held unenforceable by a court, was an example of employers enforcing unenforceable non-competes.[1068]

While the Commission has no doubt that many employers aim to ensure their contracts comply with applicable law, the empirical evidence indicates that at least some employers are using unenforceable non-competes, and some workers are turning down jobs where their non-competes are likely unenforceable. Some commenters referenced Starr, Prescott, and Bishara's finding that workers frequently cite non-competes as a factor in turning down job offers in both States that enforce non-competes and in those that do not.[1069] The study also finds that workers are more likely to report that they would be willing to leave for a competitor when they did not believe their employer would attempt to enforce a non-compete in court.[1070] The study suggests that whether a worker's non-compete is enforceable may matter less than whether the employer is willing to try to enforce it.[1071] The Commission notes that this study does not necessarily indicate a causal relationship, but it does indicate that for many workers, the *in terrorem* effect of non-competes may outweigh any State protections.

Furthermore, the ability of States to address harms to their residents from non-competes is limited by spillover effects from other States. The economies of States are closely interconnected. Therefore, even where a State adopts a law that strictly regulates non-competes, such a law can be undermined by permissive non-compete laws in a nearby State.[1072]

---

[1067] Colvin & Shierholz, *supra* note 65 at 5-6.

[1068] *See* FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.*, Matter No. 211 0026 at 1, 5-7 (Dec. 28, 2022).

[1069] Starr, Prescott, & Bishara, *supra* note 68 at 633, 663.

[1070] *Id.* at 633, 652, 664.

[1071] *Id.*

[1072] *See, e.g.*, Johnson, Lavetti, & Lipsitz, *supra* note 388 (finding that increases in non-compete enforceability in one State have negative impacts on workers' earnings in bordering States, and that the effects are nearly as large as

Finally, several comments argued that State regulation of non-competes should continue by quoting Justice Brandeis's dissent in *New State Ice Co. v. Leibmann*: "[i]t is one of the happy incidents of the [F]ederal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."[1073] The Commission disagrees that further laboratory testing by States is needed. States have been experimenting with non-compete regulation for more than a century, with laws ranging from full bans to notice requirements, compensation thresholds, bans for specific professions, reasonableness tests, and more.[1074] Past State experimentation and legal changes yielded a considerable body of empirical research, which as described in Parts IV.B and IV.C, demonstrates that non-competes negatively affect competitive conditions in labor markets and in product and service markets. This evidence supports the Commission's finding that non-competes are an unfair method of competition.

Individual States' non-compete policies can cause spillover effects that negatively affect competitive conditions in other States. Individual States' non-compete policies can also affect the operation of legal regimes in other States. Choice of law provisions cause confusion for workers even in States where non-competes are unenforceable. There are incentives for some States to adopt extremely permissive non-compete policies to attract employers that favor non-competes, and potentially even to enable employers to "export" those permissive policies to other States through choice-of-law provisions.[1075] In short, States are interconnected with respect

the effects in the State in which enforceability changed, but taper off as the distance to the bordering State increases).

[1073] *New State Ice Co. v. Leibmann*, 285 U.S. 262, 311 (1932) (Brandeis, dissenting).

[1074] *See* Beck Reed Riden Chart, *supra* note 1052.

[1075] *See, e.g.*, Glynn, *supra* note 1062 at 1385-86 (stating that "because employers typically are the first movers in [non-compete] litigation, they often can litigate in a hospitable judicial forum," and noting a rise in interjurisdictional disputes related to non-compete enforcement and "judicial attempts to preempt other courts from disregarding the parties' choice of law").

to non-competes. Without a uniform standard through the final rule, States are forced to balance the benefit to their residents of laws regulating non-competes against the fear that some employers may shift jobs to States where non-competes are more enforceable. One benefit of the Commission's rulemaking is it resolves this problem. The rulemaking record shows banning non-competes will improve competitive conditions in all States and will benefit workers in all States.

## X. Regulatory Analysis

### A. Introduction

The Commission has examined the economic impacts of the final rule as required by section 22 of the FTC Act (15 U.S.C. 57b-3). Section 22 directs the Commission to issue a final regulatory analysis that analyzes the projected benefits and any adverse economic effects and any other effects of the final rule. The final regulatory analysis must also summarize and assess any significant issues raised by comments submitted during the public comment period in response to the preliminary regulatory analysis.[1076]

### B. Preliminary Analysis

Pursuant to section 22 of the FTC Act, the Commission issued a preliminary regulatory analysis of its proposed rule.[1077] The preliminary regulatory analysis contained (1) a concise description of the need for, and objectives of, the proposed rule; (2) a description of any reasonable alternatives to the proposed rule that may accomplish the stated objective of the final rule in a manner consistent with applicable law; and (3) for the proposed rule and for each of the alternatives described, a preliminary analysis of the projected benefits and any adverse economic

---

[1076] 15 U.S.C. 57b-3(b)(2)(C), (E).
[1077] NPRM at 3521-31.

effects and any other effects.[1078]

In the preliminary regulatory analysis, the Commission described the anticipated effects of the proposed rule and quantified the benefits and costs to the extent possible. For each benefit or cost quantified, the analysis identified the data sources relied upon and, where relevant, the quantitative assumptions made. The preliminary analysis measured the benefits and costs of the proposed rule against a baseline in which the Commission did not promulgate a rule regarding non-competes and included in the scope of the analysis the broadest set of economic actors possible. Several of the benefits and costs were quantifiable, but not monetizable—especially with respect to differentiating between transfers, benefits, and costs. The Commission preliminarily found that others were not quantifiable. The preliminary analysis discussed any bases for uncertainty in the estimates.

The Commission preliminarily found substantial positive effects of the proposed rule: an increase in workers' earnings by $250-$296 billion annually (with some portion representing an economic transfer from firms to workers); an increase in new firm formation and competition; a reduction in health care prices (and prices in other markets may also fall); and an increase in innovation. The Commission noted that several of these benefits overlap (*e.g.*, increases in competition may fully or in part drive decreases in prices and increases in innovation). The Commission also preliminarily found some costs of the proposed rule. Direct compliance and contract updating would result in $1.02 to $1.77 billion in one-time costs, and firm investment in human capital and capital assets would fall.

The Commission preliminarily concluded that the substantial labor market and product and service market benefits of the proposed rule would exceed the costs. Furthermore, the

---

[1078] *See* 15 U.S.C. 57b-3(b)(1)(A)-(C).

Commission preliminarily found the benefits would persist over a substantially longer time horizon than most costs of compliance and contract updating.

## C.  Public Comments on the Preliminary Regulatory Impact Analysis

Based on the comments received, the final regulatory analysis reflects greater quantification where possible and includes sensitivity analyses to reflect different assumptions, including assumptions commenters suggested. The final regulatory analysis concludes, consistent with the preliminary analysis, that the benefits of the final rule justify the costs.

Some commenters urged the Commission to quantify the costs and benefits to a greater degree. In the final analysis, the Commission incorporates greater quantification where possible. That some effects cannot be quantified or monetized does not, however, undermine the Commission's conclusion that the benefits justify the costs.

Some commenters focused on the methodology used to estimate earnings effects in the preliminary analysis, stating that extrapolating estimated effects on earnings based on linear predictions may result in incorrect estimates. These commenters stated that linear predictions might be particularly unreliable outside the range observed in the data. While as a general matter, linear extrapolation may not be appropriate in all circumstances, especially in the absence of data supporting such an approach, the Commission notes the linear effect of non-compete enforceability on earnings was statistically tested in the economic literature.[1079]

Nevertheless, to test and confirm the robustness of the conclusions drawn in the preliminary analysis from the linear approach, in this final analysis, the Commission uses several estimation approaches. For its primary analysis, the Commission adopts an approach that does not rely on extrapolation. Specifically, the Commission assumes that the historical average

---

[1079] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.

change[1080] in non-compete enforceability observed at the State level represents the total change in enforceability that results from the rule. This approach is hereafter referred to as the "average enforceability change approach." It likely underestimates the effects of the rule because the State-level changes that would occur under the rule (which adopts a near comprehensive ban) would be substantially larger than the changes observed historically. The Commission also conducted sensitivity analyses with two other approaches—described further in Parts X.C and X.F.6.a—that use linear extrapolation to scale up the effects estimated in the literature to estimate the effects of the final rule (*i.e.*, a near comprehensive ban).

Some commenters stated that the proposed rule would increase inflation. Some commenters also stated that the proposed rule would harm shareholders by decreasing corporate profits. In response, the Commission notes that the regulatory analysis attempts to quantify and monetize real costs and benefits of the final rule as opposed to nominal costs and benefits. Therefore, net benefits are benefits that represent increased economic efficiency resulting from the final rule rather than increases in the dollar value of output that may be due to inflation. Additionally, earnings increases are due, at least in part, to increased economic efficiency, which would likely lower prices. Accordingly, the Commission does not expect that prices will rise because of the rule. Indeed, empirical evidence shows that in physician clinics, prices fall with decreased non-compete enforceability.[1081] Similarly, while the effect of the final rule on corporate profits is unclear,[1082] the Commission's analysis is focused on overall gains or losses in economic surplus—*i.e.*, the net benefits to society, not to individual corporations.

---

[1080] In other words, taking all changes in non-compete enforceability between 1991 and 2014 (the range studied in the relevant literature) into account, the Commission considers a change whose magnitude is equal to the average of the magnitudes of all those changes. *See* Johnson, Lavetti, & Lipsitz, *supra* note 388 for more details.
[1081] Hausman & Lavetti, *supra* note 590.
[1082] The evidence in the empirical literature is mixed. Younge & Marx (*supra* note 755) find an increase in firm value when non-competes became enforceable in Michigan. Hiraiwa, Lipsitz, & Starr (*supra* note 502) find no effect on firm value when non-competes were prohibited for the majority of workers in Washington.

Some commenters stated that certain costs may be missing from the preliminary analysis, including costs related to worker misconduct and litigation over the validity of the final rule. The Commission finds no evidence or compelling arguments directly linking non-competes to worker misconduct and therefore does not consider such costs.[1083] Costs related to litigation over the validity of the rule are outside the scope of the regulatory analysis under section 22, which is concerned with costs and benefits should the final rule be implemented.

Some commenters stated that the rule may have beneficial tax ramifications for businesses and workers with non-competes that are no longer enforceable, including based on changes in amortization schedules. In response, the Commission notes that any tax savings under the final rule represent transfers from the government to firms that previously used non-competes. Significantly, the Commission is allowing existing non-competes with senior executives, who may be most likely to have non-competes with tax implications, to remain in effect. This will mitigate the need for tax-related administrative work. In response to comments on the tax ramifications of clawed back pay, the final rule does not encourage or require firms to "claw back" compensation and given the exclusion for senior executives' existing non-competes in the final rule, situations in which a firm would be in a position to consider clawing back pay are likely to be extremely limited, if any.

Some commenters stated that workers may be harmed if firms claw back workers' earnings, if workers lose long-term incentive payments, retention bonuses, and severance payments, or if workers must pay for training out of pocket in response to the rule. First, in Parts IV.B.3.a.iiv and X.F.6.a, the Commission finds earnings increases overall associated with decreases in non-compete enforceability. With respect to existing non-competes, non-competes

---

[1083] *See* Part V.D.3.

with senior executives, which are most likely to be structured with incentive payments, bonuses, and severance, may remain in effect under the final rule. To the extent any other existing non-competes with such structures are not excluded from the final rule, as noted in Parts III.D and IV.D, deferred compensation and other structured payments generally have many material contingencies other than a non-compete, which means incentive payments and retention bonuses will continue to retain value for the employer. Going forward, under the final rule, agreements for deferred compensation and other structured payments may be permissible as long as they do not fall within the definition of non-compete clause in § 910.1. With respect to payments for training, the Commission notes evidence that worker-sponsored training is unaffected by legal enforceability of non-competes,[1084] and it is therefore unlikely that workers will incur costs related to training as a result of the final rule.

Some commenters disagreed with the Commission's use of patenting activity as a proxy for innovation in the preliminary analysis, stating that the value of innovation may not be captured in patenting, in part because employers may use patents as a substitute for non-competes. First, the Commission agrees that innovation likely has value above and beyond patenting. That patenting does not capture the full value of innovation is not a basis for dismissing its value as a proxy altogether. Second, while it is theoretically possible firms may substitute from the use of non-competes to the use of patents to protect intellectual property, the empirical literature shows increases in innovation do not follow from the simple substitution of protections between non-competes and patents. Specifically, the empirical literature confirms the innovations prompted by decreased non-compete enforceability are qualitatively valuable, and—examining the relationship between non-compete enforceability and patenting for drugs and

---

[1084] Starr, *supra* note 445.

medical devices, where patenting is ubiquitous[1085]—it shows the patents reflect true net increases in innovation (as opposed to substitutions). One commenter stated there can be difficulty ascertaining the value of patenting. The Commission finds that there are several estimates of the private value of a patent (*e.g.*, the value to the patenting firm) in the literature, but no estimates of the social value of a patent, as further discussed in Part X.F.6.b. The Commission therefore stops short of monetizing this benefit. The final analysis addresses effects on innovation in greater detail in Part X.F.6.b.

Some commenters asserted the research related to investment in human capital does not distinguish between two different types of training: core training, *i.e.*, training required to perform job duties, and advanced training, *i.e.*, training with potential to increase productivity beyond the baseline requirements for job performance.[1086] Commenters stated that when non-competes are more enforceable, workers may receive additional core training rather than advanced training. In other words, when non-competes are more enforceable, labor mobility decreases and workers may also move to new industries to avoid potentially triggering non-compete clause violations (as discussed in Part IV.B.3.b.ii), both of which make experienced workers less often available for hire. Firms therefore may need to train workers at a greater rate because they will hire inexperienced workers who require more core training. Research finding increases in training associated with increases in non-compete enforceability therefore may not imply increases in advanced training—*i.e.*, the kind of training that increases productivity of workers already able to perform job duties, with net benefits for society as a whole. In response, the Commission agrees that decreases in training under the final rule may represent decreases in core, rather than advanced, training. It is not possible to discern whether the observed effects on

---

[1085] See Part IV.B.3.b.ii, discussing Johnson, Lipsitz, & Pei, *supra* note 526.
[1086] Commenters used the words "requisite" and "discretionary" in lieu of "core" and "advanced," respectively.

training in the literature represent core versus advanced training because evidence that would facilitate such an analysis does not exist. Importantly, a decrease in core training would be economically beneficial because it would reflect a more efficient use of the labor force. Therefore, to the extent a decrease in training reflects a change in core training, this would be a net *benefit* of the final rule—not a cost. On the other hand, to the extent a decrease in training is due to a change in advanced training, this would represent a net cost of the final rule. The Commission further discusses investment in human capital in Part X.F.7.a

Some commenters stated that costs associated with rescinding existing non-competes and updating contractual practices may be greater than estimated in the NPRM and attributed the greater cost to the need for high-cost outside counsel. In response, the Commission finds it likely that many firms will not need to use costly outside counsel (or indeed, any counsel) to comply with the final rule. This is especially true since the final rule allows non-competes for senior executives to remain in effect, since it does not require rescission of any existing contracts, and since it provides a model safe harbor notice for other workers and makes other adjustments to simplify the notice process. In response to commenters stating that firms will need more time to implement than estimated in the NPRM, the Commission conducts an updated analysis in Part X.F.7.b. The Commission notes that the model language provided in the final rule and allowing employers to use the last known address, mail or electronic, will significantly simplify the notice process for employers. Additionally, the Commission performs two sensitivity analyses in Part X.F.7.b. The first assumes an attorney's time is more costly—it replaces the primary estimate of the average hourly productivity of an attorney ($134.62 per hour, based on BLS earnings data) with an estimated rate of the cost of outside counsel who is a tenth-year attorney ($483 per

hour).[1087] The second makes different assumptions about the time spent by employers related to existing non-competes that will be no longer be enforceable and updating contractual practices. Finally, the Commission clarifies the definition of "non-compete clause" in Part III.D to reduce confusion and give employers and workers a clearer understanding of what is prohibited. This, in turn, will reduce compliance costs and potential litigation costs over what constitutes a non-compete.

One commenter from the retail industry stated that the cost of implementing the proposed rule could be $100,000 to $200,000 per firm but did not support this assertion with any evidence. The Commission disagrees with this assertion, which does not align with its careful estimates based on empirical evidence and significant expertise presented in Part X.F.7.b.ii. The Commission's estimates also acknowledge and account for potentially heterogeneous costs across firms.

Some commenters stated that employers would need to spend substantial resources to litigate trade secret disputes and violations of post-employment restrictions other than non-competes. One commenter stated that the cost of a trade secret case may range from $550,000 to $7.4 million, depending on the monetary value of the trade secret claim. The Commission analyzes costs of litigation in Part X.F.7.c. The Commission agrees with commenters that trade secret litigation, and litigation over post-employment restrictions other than non-competes, may

[1087] This estimate is drawn from the Fitzpatrick Matrix, which is a fee schedule used by many U.S. courts for determining the reasonable hourly rates in the District of Columbia for attorneys' fee awards under Federal fee-shifting statutes. It is used here as a proxy for market rates for litigation counsel in the Washington, D.C. area, which likely represent the high end of rates for litigation counsel in the U.S. The estimate is therefore adjusted to reflect a national rate by multiplying by the ratio of the hourly wage of attorneys nationwide to the hourly wage of attorneys in the Washington, D.C. metro area, based on BLS Occupational Employment and Wage Statistics data. The Commission conservatively uses the rates of a tenth-year attorney—a much more experienced attorney than is likely to be needed (and indeed no attorney at all may be needed). *See* Fitzpatrick Matrix, https://www.justice.gov/usao-dc/page/file/1504361/dl?inline. *See* BLS Occupational Employment and Wage Statistics, https://www.bls.gov/oes/data.htm.

be costly. However, the Commission notes that no evidence exists to support the hypothesis that litigation on these fronts will increase because of the final rule. Indeed, recent evidence suggests that trade secret litigation does not increase following bans on non-competes.[1088] Moreover, the final rule, with its clear and bright-line standard (as compared to the current patchwork of State laws), would likely decrease litigation attempting to enforce non-competes, including litigation initiated by former employers against workers who start their own business or who find a new employer. While the Commission does not have evidence on the frequency of these different types of litigation, it expects the decrease in non-compete litigation would likely offset potential increases in other litigation.

Positing that firms will be reluctant to share trade secrets with workers under the rule, some commenters also stated that the costs of lessened sharing of trade secrets should be taken into account. Since no data exists on the effect of non-competes on the monetary value of shared trade secrets, the Commission does not quantify or monetize this effect. Moreover, there is no evidence that employers will lessen the extent to which they share trade secrets under the final rule, much less that any change would be material. As detailed in Part IV.D, employers have less restrictive alternatives to non-competes that mitigate these concerns.

Some commenters reference the Starr, Balasubramanian, and Sakakibara study[1089] and the Commission's interpretation of it in the NPRM to assert that firms founded because of the rule may be of lower quality than existing firms in terms of average employment and survival rates, and adjustments should be made to the Commission's analysis to account for these

---

[1088] Greenwood, Kobayashi & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.
[1089] Starr, Balasubramanian, & Sakakibara, *supra* note 518.

differences. Upon further review, the Commission interprets the authors' findings to show that within-industry spinouts resulting from lessened non-compete enforceability tend to be lower quality than non-within industry spinouts resulting from lessened non-compete enforceability. However, both types of spinouts are better, on average, than spinouts that form under stricter non-compete enforceability. The study's results therefore suggest that, if anything, the Commission underestimates the final rule's benefits from new business formation, because the estimates do not adjust for quality.

Some commenters asserted that, because of the positive effects of the proposed rule on labor mobility, firms may face greater costs associated with turnover (especially firms that currently use non-competes) due to the cost of finding a replacement, the cost of training a replacement, and the cost of lost productivity. Based on Pivateau (2011),[1090] one commenter estimated that turnover costs 25% of the annual salary of a worker. Some commenters also argued that some firms may face decreased costs of turnover, because more plentiful availability of labor can reduce the cost of hiring. The Commission finds that there may be distributional effects of increased turnover—benefits for firms that face a lower cost of hiring and costs for firms losing workers who had been bound by non-competes—and assesses the same in Part X.F.9.c.

Some commenters offered additional empirical evidence not discussed in the NPRM that was not specific to the proposed regulatory analysis. The Commission responds to those comments in Part IV.

### D.  Summary of Changes to the Regulatory Analysis

In the final regulatory analysis presented in Part X.F, the Commission updates its

---

[1090] Griffin Toronjo Pivateau, *Preserving Human Capital: Using the Noncompete Agreement to Achieve Competitive Advantage*, 4 J. Bus. Entrepreneurship & L. 319 (2010).

analyses based on the parameters of the final rule, comments received, supporting empirical evidence raised by commenters, changes in the status quo regarding regulation of non-competes, and reanalysis of evidence presented in the NPRM.[1091] This includes the Commission's attempt to quantify and monetize, to the extent feasible, all costs and benefits of the final rule, as well as transfers and distributional effects. The Commission additionally analyzes hypothetical scenarios to assess what otherwise unmonetized benefits and costs would lead to a final rule that is net beneficial. Finally, the Commission elects to include an analysis of an alternative the Commission considered, namely an analysis of fully excluding senior executives.[1092]

Under the final rule, existing non-competes with senior executives may remain in effect. While this change likely affects some costs and benefits associated with the final rule temporarily, the Commission does not specifically quantify or monetize those effects. The effect on persistent costs and benefits would be temporary, as senior executives will eventually move out of their jobs and retire or move into new jobs, to which the final rule will apply. The Commission notes throughout its analysis, however, how different estimates may be affected by this differential treatment of senior executives even if it cannot quantify the precise effect.

### E.  Summary of Benefits and Costs

The Commission considered several effects of the final rule on economic outcomes: earnings, innovation, entrepreneurship, distributional effects on workers, investment in human capital, capital investment, legal and administrative costs, prices, labor mobility and turnover, and litigation costs.

The Commission describes the primary estimates of benefits, transfers, costs, and

---

[1091] As described in detail in this Part X, the Commission's final analysis, including its quantification and monetization of effects, therefore is not precisely the same as its preliminary analysis.
[1092] The Commission is not required to analyze costs and benefits of regulatory alternatives in its final regulatory analysis. *See* 15 U.S.C. 57b-3(b)(2)(B).

distributional effects associated with each of these outcomes in Table 1. Table 1 also reports whether the outcome for each effect is quantifiable or monetizable and discusses important nuance or uncertainty.

**Table 1.**

| Category | Extent of Characterization | Description of estimate | Discussion |
|---|---|---|---|
| Earnings | Quantified | The estimated ten-year present discounted value of increased worker earnings is $400-$488 billion. Effect on earnings partially represents a **transfer** and partially represents a **benefit** of the final rule. | The extent to which the estimated increase in worker earnings represents a benefit versus a transfer is unclear, though there is evidence to suggest that a substantial portion is a benefit. |
| Innovation | Quantified | Annual count of new patents estimated to rise by 3,111-5,337 in the first year, rising to 31,110-53,372 in the tenth year. Annual spending on R&D estimated to fall by $0-$47 billion. Effect on innovation represents a **benefit** of the final rule. | Estimates of the societal value of innovation are not available. The two effects on innovation together represent a benefit because more output (amount of innovation) is produced with less input (R&D spending). |
| Prices | Partially Quantified | The estimated ten-year present discounted value of decreases in spending on physician and clinical services is $74-$194 billion. Prices in other sectors may decrease as well but are not quantified. The effect on prices partially represents a **transfer** and partially represents a **benefit** of the final rule. | Price changes encompass transfers (from firms to consumers) and benefits (since price changes are likely due to increased competition); however, the exact split is not clear. Increased competition may also increase consumer quantity, choice, and quality. Prices outside of physician and clinical services may fall due to changes in competition because of new entrants; however, the literature |

| | | | has not quantified this effect. |
|---|---|---|---|
| Investment in Human Capital | Monetized | The estimated ten-year present discounted value of the net effect of the final rule on investment in human capital ranges from a benefit of $32 billion to a cost of $41 billion. The effect on investment in human capital may represent a **cost** or **benefit** of the final rule. | The range in estimates reflects uncertainty over whether decreased investment in human capital under the final rule reflects reductions in advanced investment (which the firms opt into to increase productivity) or core investment (which is no longer necessary if more experienced workers are hired) and uncertainty over the workers for whom investment in human capital (all workers or workers in occupations which use non-competes at a high rate) is affected. |
| Legal and Administrative Costs | Monetized | One-time legal and administrative costs are estimated to total $2.1-$3.7 billion. Legal and administrative costs represent a **cost** of the final rule. | |
| Litigation Effects | Not quantified or monetized | The final rule may increase or decrease litigation costs. Effects on litigation costs may represent a **cost** or **benefit** of the final rule. | Estimates of the effect of the final rule on total litigation costs are not quantifiable. Litigation costs may rise or fall depending on firms' subsequent use of other contractual provisions and trade secret law and how the costs of such litigation compare to the cost of non-compete litigation, as well as the decreased uncertainty associated with a bright-line rule on non-competes |
| Firm Expansion | Quantified | The final rule is estimated to | New firm formation is generally |

| | | | |
|---|---|---|---|
| and Formation | | increase new firm formation by 2.7-3.2% and decrease capital investment at incumbent firms by 0-7.9%. These effects represent a shift in productive capacity from incumbent firms to new firms. The overall effect on firm expansion and formation represents a **distributional effect** of the final rule. | a benefit, but may also crowd out incumbent firms and is therefore not a pure benefit. Decreased capital investment at incumbent firms may be counterbalanced by increased capital investment at new firms or rebalancing across industries, and therefore may or may not be a cost in net. |
| Distributional Effects on Workers | Not quantified or monetized | The rule may reduce the gender and racial earnings gap, may disproportionately encourage entrepreneurship among women, and may mitigate legal uncertainty for workers, especially relatively low-paid workers. The differential effect on different groups of workers represents a **distributional effect** of the final rule. | |
| Labor Mobility | Partially Monetized | Some firms may save on turnover costs (due to easier hiring as more potential workers are available), while some firms may have greater turnover costs (due to lost workers newly free from non-competes). The latter is estimated to be no more than $131 per worker with a non-compete, while estimates are not available to monetize the former. While it is unclear whether labor mobility costs represent a net cost or benefit | The estimate of the increase in turnover costs for firms using non-competes is an upper bound, since it encompasses effects on investment in workers' human capital, hiring workers, and lost productivity of workers, all of which are expected to diminish under the final rule. |

| | | of the final rule, they likely represent a **distributional effect** (costing firms which use non-competes and helping firms which do not) of the final rule. | |
|---|---|---|---|

Note: Present values are calculated using discount rates of 2%, 3%, and 7%.

The Commission finds that, even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs.

While data limitations make it challenging to monetize all the expected effects of the final rule, the Commission believes it has quantified the effects of the final rule likely to be the most significant in magnitude, and thus, potentially drive whether and the extent to which the final rule is net beneficial. This includes both benefits and costs. Based on those quantifications, the Commission is able to make conservative assumptions, based on its expertise, under which the final rule would be net beneficial. In this context, by conservative assumption, the Commission means that it is presuming the benefits it quantifies to be relatively low in value for purposes of this analysis, *i.e.*, lower than it believes is likely the case. With respect to costs, the Commission assumes costs are on the higher end of the estimated range, which is higher than the Commission believes is likely to be the case. Through this analysis, provided in detail in Part X.F.10, the Commission further bolsters its finding that the benefits of the final rule justify the costs.[1093]

---

[1093] The Commission notes that it does not believe there is a likely scenario in which firm exit and lost capital investment, especially when balanced against firm entry and gained capital investment at new firms, would change this outcome. Firm exit and lost capital investment, which are not quantified and are discussed as distributional effects in Part X.F.9, would not, for example, result in costs large enough to overcome the break-even analyses (even if, for example, the value of earnings representing productivity increases or the social value of patents had to be marginally higher) or the finding that the benefits justify the costs.

Specifically, the Commission finds that even if only 5.5% of the estimated $400-$488 billion increase in worker earnings represents increased productivity resulting from improved, more productive matches between workers and employers, the benefits will outweigh the costs. In Part X.F.6.a, the Commission explains that the economic literature does not provide a way to separate increased productivity from the total effect on earnings (*i.e.*, transfers versus benefits in the regulatory impact analysis sense). However, the Commission finds that based on the literature, some part of the increase in worker earnings represents increased productivity and believes that 5.5%, and likely more, represents increased productivity. Similarly, even presuming that no part of the effect on earnings is a benefit (as opposed to a transfer), the Commission finds that if the social value of a patent were at least $297,144, then the monetizable benefits will exceed monetized costs. Notably, the literature finds that the average private value of a patent may be as high as $32,459,680, again making this assumption regarding the social value of a patent quite conservative. Finally, even presuming none of the earnings are benefits (rather than transfers) and that the social value of a patent is zero (an implausibly low estimate), if all the lost investment in human capital is core, the monetized benefits would also exceed monetized costs. Notably, in conducting these analyses, in each instance, the Commission further makes the very conservative assumption that monetizable benefits other than the benefit being analyzed are zero. That is, the Commission assumes that patents have no social value and that no reduced investment in human capital is core when considering how much of earnings must represent increased productivity in order for the monetized benefits to exceed the monetized costs. This break-even analysis shows that while data limitations making it challenging to monetize all of the expected benefits of the rule, the Commission finds that the final rule can be shown to be net beneficial even under very conservative assumptions.

### F. Final Regulatory Analysis

#### 1. Background

As discussed in Part IV.B.3.a, non-competes inhibit worker mobility, creating worse matches between workers and firms and decreasing workers' productivity and therefore their earnings. Non-competes also prevent firms from hiring talented and experienced workers; inhibit new business formation; and reduce the flow of innovative workers between firms, harming innovation. The final rule increases competition in labor markets by allowing workers to move more freely between jobs and increases competition in product and service markets by ensuring that firms are able to hire appropriate workers, that workers are able to create new entrepreneurial ventures, and that worker flow between firms enhances innovation.

#### 2. Economic Rationale for the Final Rule

The final rule addresses two primary economic problems. First, non-competes tend to harm competitive conditions in labor markets. Non-competes increase barriers to voluntary labor mobility and prevent firms from competing for workers' services, thus creating frictions and obstructing the functioning of labor markets. These frictions inhibit the formation of optimal and efficient matches in the labor market, resulting in diminished worker and firm productivity and in lower wages.

The second economic problem is that non-competes tend to harm competitive conditions in product and service markets. Non-competes create a barrier to new business formation and entrepreneurial growth, which negatively affects consumers by lessening competition in product and service markets. Non-competes also make it difficult for competitors to hire talented workers, which reduces these competitors' ability to effectively compete in the marketplace.

457

Additionally, non-competes impede innovation by preventing the churn[1094] of innovative workers between firms, limiting the spread and recombination of novel ideas, which may negatively affect technological growth rates.

### 3. Purpose of the Final Rule

The final rule provides that, with respect to a worker other than a senior executive, it is an unfair method of competition—and thus a violation of section 5 of the FTC Act—for a person to enter into or attempt to enter into a non-compete; enforce or attempt to enforce a non-compete; or represent that the worker is subject to a non-compete.[1095] The final rule also provides that, with respect to senior executives, it is an unfair method of competition—and thus a violation of section 5 of the FTC Act—for a person to enter into or attempt to enter into a non-compete; enforce or attempt to enforce a non-compete entered into after the effective date; or represent that the worker is subject to a non-compete, where the non-compete was entered into after the effective date.[1096]

### 4. Baseline Conditions

#### a. Estimate of the Affected Workforce

As described in Part II.E, some workers may not be subject to the final rule to the extent they are employed by an entity or in a capacity that is exempted from coverage under the FTC Act. The Commission estimates the fraction of the workforce who would be covered under the final rule (the "coverage rate") by applying conservative assumptions to individual-level data on the characteristics of the workforce from the American Community Survey (ACS) for 2017 to

---

[1094] Churn in this context means turnover that is neither job creation nor job destruction—essentially the movement of workers among jobs.
[1095] *See* § 910.2(a)(1).
[1096] *See* § 910.2(a)(2).

2021.[1097] Residents of four States (California, Minnesota, North Dakota, and Oklahoma) are excluded from the sample used for the computation, since these States already generally do not enforce non-compete agreements.

To estimate the coverage rate, workers are classified according to three criteria: (1) whether the individual is identified as working for the government; (2) whether the individual is identified as working for a non-profit organization; and (3) whether the individual works in an industry or in a capacity that is likely to be outside the jurisdiction of the FTC Act. Government employment consists of employment with local, State, and Federal governments, in addition to individuals on active duty in the U.S. Armed Forces or Commissioned Corps. Nonprofit status is self-reported by survey respondents. Industries are defined based on the North American Industry Classification System (NAICS).

Such a classification of workers is necessarily imperfect as the FTC's jurisdiction does not exclude all workers that may be identified in the data as government employees or map directly into the data on non-profit status or the NAICS classifications that are available within the ACS. For example, the FTC Act is likely to exempt some firms that are classified as non-profits but not others, as described in Part II.E. Also, in some instances, only a subset of a given NAICS category (and not the entire category) appeared likely to fall outside the jurisdiction of the FTC Act. When ambiguity arose, the Commission was overinclusive in excluding workers. For example, the Commission classified all nonprofits as outside the coverage of the final rule for the purposes of estimating the coverage rate. Moreover, in estimating the coverage rate, the Commission excluded entire industries in calculating the coverage rate when some subset of that industry appeared to be outside the Commission's jurisdiction. This over-inclusiveness has the

---

[1097] The preliminary analysis in the NPRM did not estimate or apply a coverage rate based on jurisdiction.

effect of underestimating the coverage rate of the final rule, and thus the overall net effect of the final rule will be conservative.

Using data from the ACS and the assumptions detailed in Part X.F.4, the Commission estimates that the final rule is likely to cover 80% of the private U.S. workforce.

### b. Non-Compete Enforceability

For regulatory analyses, the effects of the final rule are measured against a baseline representing conditions that would exist in the absence of the rule. The extent of the final rule's costs and benefits depends on the degree to which it will change the enforceability of non-competes relative to what it would be in the baseline. Currently, non-competes are broadly prohibited in four States: California, North Dakota, Oklahoma, and Minnesota. In some other States, non-competes are prohibited for some, but not all, workers. For non-competes that are not prohibited expressly by statute, some version of a reasonableness test is used under State law to determine whether a given non-compete is enforceable or not. These reasonableness tests examine whether the restraint is greater than needed to protect an employer's purported business interest. Non-competes can also be found unreasonable where the employer's need for the non-compete is outweighed by the hardship to the worker or the likely injury to the public. Because these cases arise in the context of individual litigation, courts focus the "likely injury to the public" inquiry on the loss of the individual worker's services and not on the aggregate effects of non-competes on competition in the relevant market or overall in the economy.[1098]

Researchers have used various scoring systems to capture the enforceability of non-competes State by State over time. As described in Part IV.A.2, the Commission gives greatest weight to studies that measure enforceability granularly (*i.e.*, not using a binary score but, for

---

[1098] *See* NPRM at 3493-97 (describing the law governing non-competes at the time the NPRM was published). Minnesota prohibited non-competes after the publication of the NPRM. *See* Minn. Stat. Ann. sec. 181.988.

example, an integer scale) and along various dimensions (*e.g.*, the employer's burden of proof in non-compete litigation and the extent to which courts are permitted to modify unenforceable non-competes to make them enforceable). The scoring system which fits these criteria best[1099] has been used to study the effect of non-compete enforceability on several economic outcomes. This score, which varies across States and across years, measures non-compete enforceability along a scale which runs from zero to one.[1100] A score of zero indicates enforceability equal to that of the State which enforces non-competes least (North Dakota). A score of one indicates enforceability equal to that of the State which enforces non-competes most readily (Florida). The final analysis relies on this score heavily as a granular and reliable scoring system that allows the Commission to consider the effect of non-compete enforceability on several economic outcomes. The studies that use this score form much of the basis for the final regulatory analysis.

### 5.  Estimating the Effect of the Rule on a State-Level Enforceability Metric

In the absence of the rule, the average State enforceability score—in States that do not broadly prohibit them—when measured on a scale of 0 (lowest enforceability) to 1 (highest enforceability), is 0.78. The final rule will result in State-level enforceability of non-competes falling from its level in the absence of the rule to zero (*i.e.*, an average decrease of 0.78, excluding States that broadly prohibit non-competes).[1101] Using data on scores from 1991 to 2014, researchers report that the average magnitude of a change in the score (*i.e.,* the size of the change, regardless of whether it was a score increase or decrease) from year to year was

---

[1099] Bishara, *supra* note 501 at 751.

[1100] Different researchers have rescaled this score in different ways (*e.g.*, from zero to 470, or scaled such that the mean score is zero and the standard deviation of the score is 1). The Commission uses the scaling from zero to one because that is the way it is used in the majority of the studies which are relied on in the final analysis, as well as for easy interpretability and consistency across the final analysis.

[1101] Calculated using data from 2009, the most recent year with publicly available data, and rescaled to a zero to one scale. *See* Starr, *supra* note 445.

0.081.[1102] In other words, when a State's score changed from one year to the next, the average magnitude of that change was 0.081, on a scale of zero to one. Since the decrease that will result from the final rule is significantly larger than the average decrease considered in the literature (0.78 v. 0.081), the Commission considered different methods for the primary estimate in this final analysis. Consistent with the NPRM, this final analysis could attempt to scale up, or extrapolate, estimated effects to account for this larger decrease. As discussed in Part X.C, some commenters criticized this approach, stating that it may result in unreliable estimates absent evidence that the economic effects the Commission is attempting to measure would scale up linearly.

The Commission notes in X.C that empirical studies show that a linear extrapolation is appropriate for measuring earnings effects.[1103] However, similar evidence supporting the use of linear extrapolation is not available for all economic outcomes the Commission is measuring in this final analysis. To maintain consistent reporting across economic outcomes and to avoid extrapolation, the final analysis considers the effect of a change equal to 0.081 when possible.[1104] That is, for the purposes of the final analysis, the Commission conservatively assumes the projected effects on economic outcomes due to the final rule are equal to the effects the

---

[1102] Changes of zero (*i.e.*, years in which the score in a given State was the same as the prior year) were excluded from this calculation. The Commission notes that the study which reports this average (Johnson, Lipsitz, & Pei, *supra* note 526) was released after publication of the NPRM. The Commission also notes that the data underlying this calculation were used in other studies discussed in the NPRM; Johnson, Lipsitz, & Pei report the average score in the most accessible fashion and is therefore used here. The average they report is the average change in the analysis sample they select, which is chosen for analytical reasons to ensure accuracy of their estimates. Use of the underlying data to re-calculate the average score or use of scores provided by other researchers would not change the overall outcomes, conditional on sample selection. Moreover, the Commission reports the estimates resulting from a full extrapolation in this final analysis, which does not use this average score change in its sensitivity analysis, and is the method used in the NPRM. As noted, the Commission believes that the full extrapolation method is a valid, but potentially less precise method. Accordingly, the use of this score supplements—but is not necessary to support—the Commission's ultimate finding that the benefits to the final rule justify the costs.
[1103] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.
[1104] When considering studies which do not report the relationship between non-compete enforceability and economic outcomes based on a numeric score, the Commission is unable to scale the effect to reflect the average magnitude change of 0.081.

economic literature associates with an average magnitude change in the non-compete enforceability score from year to year. The economic literature reports enforceability changes as simply increases or decreases in some studies,[1105] and the magnitude of those legal changes in this final analysis is assumed to mirror the average magnitude change of 0.081. The Commission makes these assumptions to avoid the possibility of inadvertently inflating the effects of changes in the enforceability score. The final rule will result in greater changes in enforceability than the changes examined in empirical studies. There is a possibility that the magnitude of change for particular economic outcomes will not be the same in response to every reduction in enforceability. For example, it is possible that for some economic outcomes, as enforceability gets closer to zero, the changes in the outcome being measured will be lower with each change in enforceability.

At the same time, the Commission notes that this may result in underestimating benefits of the final rule—the average magnitude change of 0.081 is much smaller than the average 0.78 change it would take for enforceability to reflect the final rule. To reflect this possibility, the final analysis includes sensitivity analyses which extrapolate beyond an average magnitude change. In these sensitivity analyses, the estimated effects from the empirical literature are scaled up on a State-by-State basis (rather than taking the average) to account for the estimated size of the decrease in each State's score. The Commission notes that linear extrapolation provides a robust estimate of earnings changes based on the empirical literature, but for consistency, the Commission reports effects based on the average magnitude change as its primary analysis.

### 6. Benefits of the Rule

---

[1105] *See, e.g.*, Jeffers, *supra* note 450.

The Commission finds several benefits attributable to the final rule, as reflected in part by the effects of the rule on earnings and prices, and all of the effects on output and innovation, as summarized in Table 1 in Part X.E.

### a. Earnings

The Commission finds that labor markets will function more efficiently under the final rule, which will lead to an increase in earnings or earnings growth. Specifically, in this regulatory analysis, the Commission finds that the estimated ten-year present discounted value of increased worker earnings is $400-$488 billion. The final rule will result in additional earnings stemming from improvements in allocative efficiency due to more productive matching between businesses, which are economic benefits. In other words, the increase in worker mobility will allow employers to hire workers who are a better, more productive fit with the positions they are seeking to fill, which in turn will increase productivity overall. A portion of the additional earnings are transfers from firms to workers resulting from more plentiful employment options outside the firm,[1106] as workers who are not bound by non-competes will be in a different bargaining position with their employer. To the extent other better opportunities with different employers exist for a given worker, their current employers will now be competing with those other employers and may increase worker compensation to keep those workers. The Commission finds that the economic literature does not provide a way to separate the total effect on workers' earnings into transfers and benefits.

The increase in worker earnings resulting from the final rule is calculated as follows:

*Increase in worker earnings = (% Increase in Earnings caused by the change in*

---

[1106] By transfers, the Commission refers to "a gain for one group and an equal-dollar-value loss for another group." *See* Off. of Mgmt. & Budget, *Circular A-4* (Nov. 9, 2023), 57, https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.

*enforceability of non-competes) * (Total Affected Earnings)*

The primary approach in this analysis is to estimate the percentage increase in earnings assuming that the effect of the final rule will be the same as the effect of an average magnitude change in non-compete enforceability, as discussed in Part X.F.5. The Commission estimates the percentage increase in workers' earnings to be 0.86%.[1107] The Commission estimates total affected annual earnings to be $6.2 trillion (in 2023 dollars).[1108]

Multiplying the percentage effect (0.86%) by overall affected annual earnings ($6.2 trillion) results in an annual earnings effect of $53 billion. The ten-year effect on earnings, discounted separately by 2%, 3%, and 7%, is reported in the first row of Table 2.[1109]

This primary approach requires no extrapolation (*i.e.*, it does not scale the effect on economic outcomes to account for the fact that the effect of the rule on enforceability scores will be greater than the changes studied in the economic literature). However, it may understate the increase in workers' earnings resulting from the final rule. Thus, the Commission conducts two sensitivity analyses to assess how the estimated effect of the rule would change if effects are

---

[1107] Calculated as $-(e^{-0.107*0.081}-1)$, where -0.107 is the estimated coefficient of earnings on non-compete enforceability score in Johnson, Lavetti, & Lipsitz (*supra* note 388), and 0.081 represents the size of an average magnitude change calculated in Johnson, Lipsitz, & Pei (*supra* note 526) which scales the effect to represent the effect of an average sized change in the non-compete enforceability score.

[1108] This figure represents total annual earnings in the U.S. in the most recent year with data available (2022), adjusted to 2023 dollars: see https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0. Earnings from California, North Dakota, Oklahoma, and Minnesota (States which broadly do not enforce non-competes) are subtracted out, since enforceability in those States will be broadly unaffected by the rule. The estimate is additionally adjusted to account for the proportion of the workforce the Commission estimates are currently covered by the Commission's jurisdiction (80%), as discussed in Part X.F.4.a. Numerically, $6.2 trillion is calculated as ($9.1 trillion - $1.6 trillion) * 80% = $6.0 trillion, adjusted to $6.2 trillion to adjust to 2023 dollars. $9.1 trillion is total private earnings in 2022 in the U.S. (the most recent year with data available), and $1.6 trillion is total private earnings in 2022 in CA, ND, OK, and MN.

[1109] For illustrative purposes, State-specific estimates are displayed in Appendix Table A.1. In this table, the estimated number of covered workers is calculated as 80% * (total employed population in the State); the estimated increase in total earnings is calculated as 0.86% * (estimated total covered earnings), where estimated total covered earnings is calculated as (estimated number of covered workers) * (average annual earnings); and the estimated increase in average earnings is calculated as 0.86% * (average annual earnings). Total employed population and average annual earnings are taken from the Census Bureau Quarterly Census of Employment and Wages for 2022 (see https://www.bls.gov/cew/data.htm).

extrapolated to represent changes in enforceability scores greater than those examined in the literature.

The first sensitivity analysis, hereafter referred to as the "full extrapolation" approach, calculates the effect on worker earnings in an identical fashion to the primary analysis but relies on an estimate of the percentage increase in worker earnings which extrapolates to the effect of a complete prohibition on the use of non-competes. This results in an effect on worker earnings equal to 3.2% (instead of 0.86% in the primary analysis).[1110] For this estimate, total affected earnings are equal to $7.3 trillion in 2023 dollars.[1111] The estimated effect on earnings across the workforce for this first sensitivity analysis is therefore given by the percentage effect on earnings (3.2%) multiplied by the total annual wages in the U.S. for the affected population ($7.3 trillion). This results in an annual estimated earnings gain of $234 billion.[1112] The ten-year effect, discounted at 2%, 3%, and 7%, is displayed in the second row of Table 2.

---

[1110] The percentage effect, 3.2%, is reported by Johnson, Lavetti, & Lipsitz (*supra* note 388) as the lower end of a range of possible effects of a ban on non-competes, relative to non-compete enforceability in 2014. The estimate is constructed by calculating the change in the enforceability score in each State which would bring that State's score to zero (representing no enforceability of non-competes) and scaling the estimated effect on worker earnings by that amount. The Commission uses the low end of the reported range in order to exercise caution against extrapolation, since the estimate uses an out-of-sample approximation: the changes in most States necessary to arrive at a score of zero are greater than the changes examined in the study (though this approximation is consistent with the results of a test in Johnson, Lavetti, and Lipsitz which shows that the effect of enforceability on earnings is roughly linear: namely, a change in enforceability that is twice as large results in a change in earnings that is twice as large). The Commission also notes that the estimated range is based on enforceability in 2014. Since then, some changes in State law have made non-competes more difficult to enforce for subsets of their workforces so that a prohibition on non-competes today is likely to have a slightly lesser effect than a prohibition would have had in 2014.

[1111] This estimate differs from total affected earnings for the primary analysis because the estimate of 3.2% takes into account enforceability in California, North Dakota, and Oklahoma. Earnings in those States is therefore added back into total affected earnings. However, earnings in Minnesota are still omitted, since the prohibition in that State was enacted after the conclusion of the study period in Johnson, Lavetti, and Lipsitz (2023): see Minn. Stat. sec. 181.988.

Total annual earnings in the U.S. for the affected population excluding MN are calculated as ($9.1 trillion - $0.2 trillion) * 80%, updated to adjust to 2023 dollars. $9.1 trillion is earnings for all workers in the US in 2022 (the most recent year with available data) and $0.2 trillion is earnings for workers in MN. See https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0 .

[1112] This estimate is comparable to the estimate of $250 billion per year reported in the NPRM. *See* NPRM at 3523. The estimate in the NPRM was based on earnings in 2020 (as opposed to 2022 in this final regulatory analysis), included earnings in Minnesota (which has since passed a bill prohibition non-competes), and did not adjust for the estimate of the affected workforce discussed in Part X.F.4.a.

The second sensitivity analysis, hereafter referred to as the "partial extrapolation" approach, uses the same formula as the other two analyses (% effect on earnings * total affected earnings) but is more conservative in its estimate of the percent effect on earnings than the full extrapolation estimate. The full extrapolation approach assumes that enforceability scores fall to zero. The partial extrapolation approach instead assumes that enforceability scores fall to the minimum observed enforceability score ignoring scores in States that broadly prohibit non-competes (a more moderate extrapolation). The minimum observed enforceability score excluding States that broadly prohibit non-competes is 0.53 (on a scale of zero to one), which is the enforceability score in New York.[1113] This analysis calculates the change in each State's score that would bring it to 0.53, and scales the effect on worker earnings estimated in the empirical literature by that amount.[1114] For example, West Virginia's enforceability score is 0.59. To change to New York's enforceability score would imply a decrease in West Virginia's score of 0.06 (calculated as 0.59 - 0.53). This implies a percent effect on earnings in West Virginia of 0.64%.[1115]

Total affected earnings in each State are calculated by multiplying total earnings in that State (adjusted to 2023 dollars) by the estimated percentage of covered workers (80%). For example, in West Virginia, total earnings are estimated to be $0.24 trillion.[1116]

---

[1113] Enforceability score data come from Starr (2019), which reports scores for 2009 (the most recent data available). Scores are adjusted to a scale of zero to one.

[1114] In particular, for each State, the Commission calculates the percentage effect on earnings as $e^{(0.107*\Delta Enf)}-1$, where $\Delta Enf$ is equal to the enforceability score in that State minus the lowest observed enforceability score, excluding CA, ND, OK, and MN (0.53).

[1115] Calculated as $-(e^{-0.107*0.064}-1)$, where -0.107 is the estimated coefficient of earnings on non-compete enforceability score in Johnson, Lavetti, & Lipsitz (*supra* note 388), and 0.064 represents the scaling factor due to West Virginia's score change.

[1116] Calculated as $0.29 trillion * 80%, where $0.29 trillion is earnings in WV in 2022 (the most recent year with data available) adjusted to 2023 dollars. See https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0.

Next, the percent increase in earnings in each State is multiplied by total affected earnings in that State. In West Virginia, this results in an earnings increase of 0.64% * $0.24 trillion = $152 million. Finally, the earnings increases are added across States. The overall estimated effect is an annual increase in earnings of $161 billion. The ten-year effect, discounted at 2%, 3%, and 7%, is displayed in the third row of Table 2.

**Table 2.**

|  | Estimated Ten-Year Increase in Earnings ($ billions), Assuming: | | |
|---|---|---|---|
|  | 2% Discount Rate | 3% Discount Rate | 7% Discount Rate |
| Primary estimate (average enforceability change) | $488 | $468 | $400 |
| Estimate (full extrapolation) | $2,148 | $2,060 | $1,762 |
| Estimate (partial extrapolation) | $1,488 | $1,427 | $1,221 |

The estimated effects on earnings in Table 2 are based on estimates of the percentage change in earnings from a study in the empirical literature that aligns with the metrics outlined in Part IV.A.2. Another study in the literature estimates earnings effects using a comparison between workers in occupations that use non-competes at a high rate versus a low rate.[1117] After adjusting the finding from that study to the average magnitude enforceability change, the estimated effect on worker earnings is 0.5%,[1118] or $31 billion annually.[1119]

The Commission notes that, as discussed in Part X.E, earnings of senior executives who continue to work under non-competes are included in the calculations in this Part X.F.6.a. If the Commission were able to identify those senior executives, their omission from the calculations

---

[1117] For further discussion of this study, see the discussion in Part IV.B.3.a.ii of Starr, *supra* note 445.
[1118] The change in enforceability which generates the estimate in Starr (*supra* note 445) is a one standard deviation change, as measured using non-compete enforceability scores for all 50 States and the District of Columbia in 1991, which is a change on a scale of zero to one of approximately 0.17, calculated as 1/[1.60-(-4.23)]. Scaling the estimate, a change equal to 0.081would result in an earnings effect of 0.5%, calculated as $e^{(0.0099*0.081/0.172)}$-1.
[1119] Calculated as $6.2 trillion * 0.5%.

would decrease the earnings effect of the final rule, since the earnings effect for those senior executives (and others, because of spillovers) would be pushed further into the future, causing steeper discounting. However, while senior executives are paid relatively highly, there are relatively few of them: for example, based on BLS data on earnings by occupation, Chief Executives' earnings comprise just 0.5% of all earnings.[1120] Therefore, the impact on the earnings calculations of omitting or pushing forward the earnings of senior executives who would continue to work under a non-compete is limited.

*Discussion of Transfers Versus Benefits*

It is difficult to determine the extent to which the earnings effects represent transfers versus benefits. Transfers, in this context, refer to "a gain for one group and an equal-dollar-value loss for another group."[1121] Such transfers do not represent a net benefit or cost to the economy as a whole for purposes of regulatory impact analysis.

To the extent a prohibition on non-competes leads to greater competition in the labor market and a more efficient allocation of labor by allowing workers to sort into their most productive matches with firms (including new firms that may be formed), then the resulting earnings increases may reflect higher productivity and so represent a net benefit to the economy. However, some increases in earnings when non-competes are prohibited may simply represent a transfer of income from firms to workers (or, if firms pass labor costs on to consumers, from consumers to workers).

Several pieces of evidence support the Commission's finding that at least part of the

---

[1120] Calculated as (199,240 * 246,440) / (147,886,000 * 61,900), where 199,240 and 147,886,000 are employment for Chief Executives and All Workers, respectively, and 246,440 and 61,900 are dollar earnings for Chief Executives and All Workers, respectively, in 2022. See Occupation Employment and Wage Statistics, BLS, https://www.bls.gov/oes/tables.htm. The Commission notes that Chief Executives are used as an illustrative example, and are an imperfect proxy for senior executives: some Chief Executives (as classified by BLS) may not be senior executives under the final rule, and some senior executives under the rule may not be Chief Executives.
[1121] Off. of Mgmt. & Budget, *Circular A-4* (Nov. 9, 2023) at 57.

increase in earnings represents a social benefit or net benefit to the economy, rather than just a transfer. As described in Part IV.B.3.a.ii, two studies have sought to estimate the external effect of non-compete use or enforceability: that is, the effect of use or enforceability on individuals other than those directly affected by non-compete use or enforceability.

One study directly estimates the external effect of a change in non-compete enforceability.[1122] While use of non-competes is not observed in the study, the effects of changes in a State's laws are assessed on outcomes in a neighboring State. Since the enforceability of the contracts of workers in neighboring States are not affected by these law changes, the effect must represent a change related to the labor market which workers in both States share. The estimate suggests that workers in the neighboring State experience effects on their earnings that are 76% as large as workers in the State in which enforceability changed.[1123] In other words, two workers who share a labor market would experience nearly the same increase in their earnings from a prohibition on non-competes, even if the prohibition only affects one worker. While the study does not directly estimate the differential effects by use, the effects on workers unaffected by a change in enforceability may be similar to the effects on workers not bound by non-competes.

A second study demonstrates that when the use of non-competes by employers increases, wages decrease for workers who do not have non-competes but who work in the same State and industry. This study also finds that this effect is stronger where non-competes are more enforceable.[1124] Since the affected workers are not bound by non-competes themselves, the differential in earnings likely does not completely represent a transfer resulting from a change in bargaining power between a worker bound by a non-compete and their employer.

---

[1122] Johnson, Lavetti, & Lipsitz, *supra* note 388.
[1123] *Id.* (note: a new version of this paper, posted in 2023 after the NPRM was published, revised this estimate slightly).
[1124] Starr, Frake, & Agarwal, *supra* note 469.

Overall, these studies suggest there are market-level dynamics governing the relationship between earnings and the enforceability of non-competes: specifically, restrictions on the enforceability of non-competes affect competition in labor markets by alleviating frictions and allowing for more productive matching. Changes in enforceability or use of non-competes have spillover effects on the earnings of those workers who should not be directly affected because they do not have non-competes or they work in nearby labor markets that did not experience changes in enforceability. If non-competes simply changed the relative bargaining power of workers and firms, without affecting market frictions or competition, then these patterns are less likely to be observed. Additionally, new business formation when non-competes are less enforceable (see Part IV.B.3.b.i for a discussion of the evidence) may create new productive opportunities for workers.

Due to the uncertainty related to earnings as transfers versus benefits, the Commission analyzes various scenarios that allocate the percent of the earnings effect to a benefit at different levels in Part X.F.10. This does not represent a finding that no part or only a small part of the effect on earnings is a benefit; rather, it is to ensure that the total estimated effect of the final rule is robust for the purposes of the regulatory impact analysis to the possibility that a small percentage of the effect on earnings represents a net benefit.[1125]

### b. Innovation

The Commission finds that an additional benefit of the rule would be to increase the annual count of new patents by 3,111-5,337 in the first year, rising to 31,110-53,372 in the tenth year. By alleviating barriers to knowledge-sharing that inhibit innovation, and by allowing

---

[1125] The Commission notes that Part IV.B.3.a.ii does not measure or consider whether earnings are transfers or benefits because to the extent that the earnings that are transfers represent firms' ability to suppress earnings using an unfair method of competition, the transfer of such earnings from firms to workers through the use of non-competes still reflect the tendency of non-competes to negatively affect competitive conditions in the labor market.

workers greater opportunity to form innovative new businesses, the final rule will increase innovation. Studies have sought to directly quantify this effect, primarily focused on patenting activity. The Commission therefore considers the effect on patenting in support of its findings related to innovation. Lacking an estimate of the social value of a patent, the Commission does not monetize this benefit. The Commission also finds that the rule will reduce expenditure on R&D by $0 to $47 billion per year. In light of the increase in overall innovation, this reduction is a cost savings for firms, but may not reflect a market-level effect because it does not measure potential expenditure on R&D by new firms formed as a result of the final rule. The change in patenting due to the rule for each year is calculated as follows:

*Increase in # of Patents = (% Increase in Patenting) \* (Total # of Affected Patents)*

The Commission estimates the percentage increase in patenting to average 10.9%-18.7% annually over a ten-year period,[1126] which is the percentage effect on patenting of an average magnitude change in non-compete enforceability, as discussed in Part X.F.5. The Commission assumes that the full effect on patenting phases in over the course of a ten-year period, resulting in an effect of 2.0%-3.4% in the first year, increasing to 19.8%-34.0% by the tenth year.[1127] The total number of affected patents in each year is 156,976.[1128]

The results of the analysis, for the top and bottom end of the reported range of percentage

---

[1126] These values represent the range reported in Johnson, Lipsitz, & Pei, *supra* note 526, considering both raw patent counts and patent counts weighted by a measure of their quality: the number of citations received in the five years after the patent is granted. The findings by Johnson, Lipsitz, & Pei are qualitatively confirmed in the literature, with similar estimates generated by He (*supra* note 560)—a study discussed in the NPRM—and Rockall & Reinmuth (*supra* note 564).

[1127] This analysis assumes that the effect on patenting increases by an identical amount each year (2.0-3.4%), ensuring that the overall average annual change is equal to that reported in Johnson, Lipsitz, & Pei (*supra* note 526).

[1128] This is the number of granted utility patents, which are patents for new or improved innovation and are the types of patents studied by Johnson, Lipsitz, & Pei (*Id.*). The figure comes from 2020, which is the most recent data available from the U.S. Patent and Trademark Office. It excludes States in which non-competes are not enforceable (California, Oklahoma, North Dakota, and Minnesota). Data available at https://www.uspto.gov/web/offices/ac/ido/oeip/taf/st_co_20.htm.

increases in patenting, are displayed in Table 3.

As a sensitivity analysis, mirroring the analysis in Part X.F.6.a, the Commission assumes that enforceability scores in each State will fall to the lowest observed score among States which do not broadly prohibit non-competes. The Commission calculates the percentage change in patenting in each State by extrapolating the percentage increase in patenting to reflect the size of the change in that State's enforceability score. For example, as noted in Part X.F.6.a, West Virginia's score would fall from 0.59 to 0.53 as a result of this analysis. The percentage change in patenting in West Virginia would therefore average 9.0%-16.6%,[1129] resulting in an increase of 1.9%-3.6% in the first year, rising to 19.2%-35.6% by the tenth year.

The annual State-specific percentage changes are multiplied by the number of annual patents granted in each State.[1130] Finally, the changes in patenting across States are combined across States for a national estimate. The results are reported in Table 3. As States have broadly decreased legal enforceability of non-competes in recent years, the changes necessary to move to lower enforceability are likely overestimated in this sensitivity analysis. This causes the values estimated by this method to likely overestimate the true extent of the benefit.

**Table 3.**

| Year Relative to Publication of the Rule | Estimated annual count of additional patents using low estimate of innovation effect | Estimated annual count of additional patents using high estimate of innovation effect | Estimated annual count of additional patents using low estimate of innovation effect and extrapolation approach | Estimated annual count of additional patents using high estimate of innovation effect and extrapolation approach |
|---|---|---|---|---|
| 1 | 3,111 | 5,337 | 8,927 | 19,306 |
| 2 | 6,222 | 10,674 | 17,853 | 38,611 |
| 3 | 9,333 | 16,012 | 26,780 | 57,917 |

[1129] Calculated as $e^{(1.43*0.06)}-1$ and $e^{(2.56*0.06)}-1$, where 1.43 and 2.56 represent the coefficients reported in Johnson, Lipsitz, &Pei (*Id.*) as the lower and upper bounds of the reported coefficient range, and 0.06 is the decline in the enforceability score in West Virginia.
[1130] Data available at https://www.uspto.gov/web/offices/ac/ido/oeip/taf/st_co_20.htm.

| | | | |
|---|---|---|---|
| 4 | 12,444 | 21,349 | 35,706 | 77,222 |
| 5 | 15,555 | 26,686 | 44,633 | 96,528 |
| 6 | 18,666 | 32,023 | 53,560 | 115,833 |
| 7 | 21,777 | 37,360 | 62,486 | 135,139 |
| 8 | 24,888 | 42,697 | 71,413 | 154,444 |
| 9 | 27,999 | 48,035 | 80,339 | 173,750 |
| 10 | 31,110 | 53,372 | 89,266 | 193,055 |

The Commission is not aware of estimates that assess the overall social value of a patent and therefore the Commission does not monetize the estimated effects on innovative output. Estimates of the effect of a patent on a firm's value in the stock market exist in the empirical literature,[1131] as do estimates of the sale value of a patent at auction.[1132] However, those estimates do not include the effects on follow-on innovation, consumers (who may benefit from more innovative products), competitors, or the rents that are shared with workers, and instead reflect solely the private effect of a patent to the relevant firms.

The Commission notes that patent counts may not perfectly proxy for innovation. However, by using citation-weighted patents, as well as other measures of quality, the study by Johnson, Lipsitz, and Pei shows that patent quality, not just patent quantity, increase when non-competes become less enforceable.[1133] Similarly, the study by He shows that the value of patents also increases when non-competes become less enforceable.[1134]

The second effect of the final rule associated with innovation is a possible change in spending on R&D. The change in R&D spending due to the final rule is calculated as follows:

---

[1131] Leonid Kogan, Dimitris Papanikolaou, Amit Seru, & Noah Stoffman, *Technological Innovation, Resource Allocation, and Growth*, 132 The Quarterly J. of Econ. 665 (2017).
[1132] Ariel Pakes, *Patents as Options: Some Estimates of the Value of Holding European Patent Stocks*, 54 Econometrica 755 (1986).
[1133] Johnson, Lipsitz, & Pei, *supra* note 526.
[1134] He, *supra* note 560.

*Reduction in R&D Spending = (% Reduction in Spending) * (Total Affected Spending)*

The Commission estimates that the percentage reduction in spending is 0-8.1%, with the broad range reflecting disagreement in the empirical literature.[1135] Total affected spending is $575 billion (in 2023 dollars).[1136] Multiplying the percentage effect by total affected spending, the overall annual effect is a reduction of $0-$47 billion in R&D spending in 2023 dollars.

The Commission notes that, in light of the increases in innovation identified in this Part X.F.6.b, reductions in R&D spending represent a cost savings for firms. Put differently, reductions in R&D spending may cause commensurate reductions in innovative output. Insofar as reductions in R&D spending resulting from the rule could have countervailing effects on innovation, the estimated increase in innovative output represents the net effect, which would otherwise be even larger, if R&D spending were held constant.

Notably, empirical estimates of R&D spending are based on observed changes among incumbent firms and therefore may not reflect market-level effects. Decreased investment at the firm level (the level of estimation in the studies that report effects of enforceability on R&D spending) does not necessarily mean that investment would decrease at the market level, since new firms entering the market may contribute additional R&D spending not captured in the referenced studies. For these reasons, the Commission stops short of classifying the effect on R&D spending as a benefit of the final rule.

---

[1135] Johnson, Lipsitz, & Pei (*supra* note 526) find a negative effect on R&D spending of 8.1% due to an average magnitude change in non-compete enforceability, while Jeffers (*supra* note 450) finds no economically or statistically significant effect on R&D spending.

[1136] Total U.S. R&D spending was estimated by the NSF in 2019, the most recent available year with finalized estimates, excluding nonprofits, higher education, and nonfederal and Federal government. Nat'l Ctr. for Sci. and Engrg. Stats., *New Data on U.S. R&D: Summary Statistics from the 2019-20 Edition of National Patterns of R&D Resources* (Dec. 27, 2021), https://ncses.nsf.gov/pubs/nsf22314; Nat'l Ctr. for Sci. and Engrg. Stats., *U.S. R&D Increased by $51 Billion in 2020 to $717 Billion; Estimate for 2021 Indicates Further Increase to $792 Billion* (Jan. 4, 2023), https://ncses.nsf.gov/pubs/nsf23320. Note that the data are not broken out by State, and therefore the final analysis cannot exclude CA, ND, OK, and MN.

The Commission notes that, as discussed in Part X.E, the estimated effects on innovation do not take into account that some senior executives may continue to work under non-competes under the rule. The Commission is unable to separate the effects of senior executives' non-competes from other workers' non-competes on innovation. Some effects estimated in this Part X.F.6.b may occur further in the future than assumed in this analysis, based on the extent of continued use of non-competes for senior executives.

Overall, the Commission finds that the final rule will significantly increase innovation. Furthermore, the increase in innovation may be accompanied by a decrease in spending on R&D that would, thus, be a cost saving to firms.

### c. Prices

The Commission finds that consumer prices may fall under the final rule because of increased competition. The only empirical study of this effect concerns physician practice prices. Based on this study, the Commission estimates the ten-year present value reduction in spending for physician and clinical services from the decrease in prices is $74-$194 billion. The Commission finds some of the price effects may represent transfers from firms to consumers and some may represent benefits due to increased economic efficiency. Some of the benefits may overlap with benefits otherwise categorized, such as benefits related to innovation.

The decrease in prices for physician services because of the final rule is calculated as follows:

*Decrease in Prices = (% Decrease in Prices) * (Total Affected Spending)*

The Commission estimates the percentage decrease in prices for physician services to be 3.5%.[1137] Total spending on physician and clinical services was $801 billion in 2023 dollars,

---

[1137] 3.5% is calculated as $-(e^{(0.427*0.081)}-1)$, where 0.427 is the coefficient relating non-compete enforceability and

excluding States that broadly do not enforce non-competes.[1138] The Commission separately multiplies spending by 35%, 61.9%, and 75% (estimates of the proportion of hospitals covered by the Commission's jurisdiction as a proxy for total physician and clinical services spending covered by the Commission's jurisdiction) to arrive at total affected spending.[1139] The ten-year sum of discounted spending decreases for these analyses are presented in Table 4.

As a sensitivity analysis, mirroring the analysis in Part X.F.6.a, the Commission assumes that enforceability scores in each State will fall to the lowest observed score among States which do not broadly prohibit non-competes. The Commission calculates the percentage change in prices in each State by extrapolating the percentage decrease in prices to reflect the size of the change in that State's enforceability score. As noted in Part X.F.6.a, West Virginia's score would fall from 0.59 to 0.53 as a result of this analysis. The percentage decrease in prices in West Virginia would therefore be 2.5%.[1140] This percentage decrease is multiplied by State-specific physician spending, adjusted by the relevant multiplier to account for the Commission's jurisdiction, and summed over States.

The ten-year present discounted value of the spending decreases estimated by this

---

physician prices in Hausman & Lavetti (*supra* note 590), and 0.081 represents the average magnitude non-compete enforceability score, as described in Part X.F.5.

[1138] See https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsStateHealthAccountsProvider. Spending in 2020, the most recent year with available data, was $679 billion, which is $801 billion adjusted to 2023 dollars. CA, ND, OK, and MN are omitted.

[1139] In the absence of data on the percentage of physician practices that are non-profit, the Commission uses a range of three different assumptions on the share of covered hospitals. In the first two scenarios, the Commission assumes that the set of covered hospitals is all hospitals that are not non-profit. The first scenario uses 2020 data from the American Hospital Association indicating that 65% of hospitals report that they are non-profits (based on data available at https://www.ahadata.com/aha-dataquery). The second scenario uses 2017-2021 data from the American Community Survey indicating that 38.1% of hospital employment is at non-profits (see https://www.washingtonpost.com/business/2023/05/12/force-behind-americas-fast-growing-nonprofit-sector-more/). Finally, consistent with the Commission's findings in Part V.D.4, the percentages of firms that report themselves as nonprofit in the data, which reflects registered tax-exempt status under IRS regulations, does not equate to the Commission's jurisdiction. It is likely the Commission may have jurisdiction over some hospitals and other healthcare organizations identified as nonprofits. Therefore, the third scenario assumes that 75% are covered.

[1140] Calculated as $e^{(0.427*0.06)}-1$, where 0.427 is the coefficient reported in Hausman and Lavetti (*supra* note 590), and 0.06 is the decline in the enforceability score in West Virginia.

analysis are presented in Table 4.

**Table 4.**

| | Assumed percent of physicians covered | Estimated Spending Reduction over ten years (billions of dollars)- assuming: | | |
|---|---|---|---|---|
| | | 2% discount rate | 3% discount rate | 7% discount rate |
| Primary estimate (average magnitude enforceability change) | 35% | $90 | $87 | $74 |
| | 61.9% | $160 | $153 | $131 |
| | 75% | $194 | $186 | $159 |
| Sensitivity analysis (partial extrapolation approach) | 35% | $257 | $247 | $211 |
| | 61.9% | $455 | $437 | $373 |
| | 75% | $552 | $529 | $459 |

Several effects of the final rule, including changes in capital investment, new firm formation, and innovation, may possibly filter through to consumer prices. Prices, therefore, may act as a summary metric for the effects on consumers. The Commission notes, however, that prices are an imperfect measure for the effect on consumers. For example, increased innovation catalyzed by the final rule could result in quality increases in products, which might increase prices (all else equal), but nevertheless, consumers may be better off. New firm formation may result in a broader set of product offerings, even if prices are unaffected. Finally, some portion of this effect may represent a transfer from physician practices to consumers. For all these reasons, as well as to avoid double-counting (since prices may reflect changes in innovation, investment, market structure, wages, and other outcomes that are measured elsewhere), the Commission considers evidence on prices to be corroborating evidence, rather than a unique cost or benefit, though some portion of the total effect likely represents a standalone benefit of the rule. The Commission also notes increased competition brought about by the final rule will likely increase consumer quantity, choice, and quality. These effects are not quantified in the literature.

To draw inferences to other industries, the Commission notes that if the relationship

between non-compete enforceability and prices observed in healthcare markets holds in other industries, then under the final rule prices would likely decrease, and product and service quality would likely increase. Insofar as such effects may be driven by increases in competition, as discussed in Part IV.B.3.b.iii, *e.g.*, because of new firm formation, it is likely output would also increase. However, the evidence in the literature addresses only healthcare markets and therefore the Commission cannot say with certainty that similar price effects would be present for other products and services.

In many settings, it is possible that increases in worker earnings from restricting non-competes may increase consumer prices because of higher firms' costs.[1141] There is no empirical evidence that enforceability of non-competes increase prices due to increased labor costs. Additionally, greater wages for workers freed from non-competes may result from better worker-firm matching, which could simultaneously increase wages and increase productivity, leading to lower prices.

The Commission notes that, as discussed in Part X.E, the estimates of the effect of the rule on prices do not separately account for the effect of senior executives who may continue to have non-competes under the rule. The Commission is unable to monetize or quantify these effects separately because there is no accounting in the applicable literature of why, nor to which groups of workers, the observed price effects occur. If such non-competes have a large impact, some of the effects estimated in this section may occur further in the future than described in this Part X.F.6.c.

### 7.  Costs of the Final Rule

---

[1141] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through*, 54 J. Money, Credit & Banking 7 (2022).

The Commission finds costs associated with the final rule, including legal and administrative costs, and possibly costs related to investment in human capital and litigation, as summarized in Table 1 in Part X.E. The Commission notes the final analysis includes effects on investment in human capital and litigation costs in this Part X.F.7 discussing costs associated with the final rule, though it is not clear whether effects associated with investment in human capital are costs or benefits, and it is not clear whether litigation costs would rise or fall under the final rule.

### a. Investment in Human Capital

The Commission estimates the ten-year present discounted value of the net effect of the final rule on investment in human capital (*i.e.*, worker training) ranges from a benefit of $32 billion to a cost of $41 billion. The Commission notes that this wide range represents substantial uncertainty in the interpretation of the estimates that exist in the economic literature. The estimates contained in this Part X.F.7.a are separated along lines created by that uncertainty.

There are two primary sources of uncertainty. The first pertains to the extent to which lost investment in human capital is "core" versus "advanced." As discussed in Part IV.B.3.b.ii, when non-competes are enforceable, fewer workers will be available due to decreased labor mobility, including workers who would be a good skills match for a particular job, as well as workers moving to new industries to avoid triggering a potential non-compete clause violation. This may require retraining of workers forced into a new field that would not otherwise be necessary for an experienced worker within the same industry. The departure of experienced workers from the industry also means firms will be required to invest in the human capital of inexperienced workers who replace them. This type of investment in training to address a skills mismatch—which is referred to as the "core" training scenario—contrasts with what is referred to as the

"advanced" training scenario, which is investment in training that builds upon the productivity of workers who may already be experienced in an industry. Insofar as reductions in investment in human capital due to the final rule represent reductions in core investment, the rule will save firms money and will additionally not require workers to forgo time spent producing goods and services to train. Therefore, such reductions would represent a benefit of the final rule. However, insofar as reductions in investment in human capital from the final rule represent reductions in advanced investment, there may be productivity losses for workers. The estimates in the literature do not allow the Commission to distinguish between the types of forgone human capital investment in the final analysis. This final analysis therefore separately estimates the effects assuming lost investment in human capital is core and assuming it is advanced.

The second source of uncertainty pertains to the specific estimates of the effect of non-compete enforceability on investment of human capital. Starr (2019) estimates the differential effect of non-compete enforceability on training in occupations which use non-competes at a high rate versus those that use non-competes at a low rate but does not estimate the absolute effect on investment across the workforce. Therefore, this final analysis separately estimates the effects on training under two different assumptions—that the increase in training due to greater non-compete enforceability affects all workers, or only workers in high-use occupations—to demonstrate how this uncertainty affects the estimates.[1142]

The Commission notes that some of the estimates described in this Part X.F.7 may overlap with estimates reported in other sections of the regulatory analysis. For example, if

---

[1142] Whether this assumption yields an overestimate or underestimate depends on what happens to training of workers in occupations with a low-rate of non-competes use when the enforceability of non-competes changes. If the effect of a change in non-compete enforceability on workers in occupations that use non-competes at a low rate is small, this assumption yields an overestimate of the overall effect on training. If the effect on those workers is large, it results in an underestimate.

decreased enforceability of non-competes decreases investment in workers' human capital, and this decreased investment would be reflected in lower wages for workers, then the estimate of the wage increase resulting from the final rule will already account for the extent to which decreased investment decreases wages. That is, if investment were held constant, the earnings increase associated with the final rule may be even larger.

### i. Estimates assuming lost investment in human capital is core training

The first set of estimates assumes that all lost training is core. This results in estimated effects of the final rule that represent upper bounds on the benefits associated with the final rule's effect on investment in human capital. In these scenarios, the final rule will allow firms to hire experienced workers instead of needing to provide costly training to workers new to the industry or a position. The change in investment in core training brought about by the rule is calculated as follows:

*Effect of Decreased Investment in Core Training = Additional Output of Workers Resulting From Less Time Spent Training + Reduced Direct Outlays on Training*

**Additional output of workers resulting from less time spent training**

The first component is additional output of workers resulting from less time spent on otherwise unnecessary training if they were better matched with firm and industry. The change in the output of workers from less time spent training because of the final rule is calculated as follows:

*Additional Output of Workers Resulting from Less Time Spent Training = (Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers) * (Average Hours Spent Training Per Worker) * (Average Hourly Output of Workers)*

The Commission estimates the total number of affected workers as 101.1 million

workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in

high-use occupations are affected.[1143] The percentage point decrease in trained workers is

estimated to be 0.4.[1144] Average hours spent training per worker is estimated to be 85 hours per

year.[1145] Average hourly output of workers is estimated to be $60.77.[1146]

The total additional output due to forgone training time is therefore calculated as $1.9

billion per year when all workers are assumed to be affected, or $0.8 billion per year when only

workers in high-use occupations are assumed to be affected.

### *Reduced direct outlays on human capital investment*

The second component of the economic effect calculated in the final analysis is reduced

direct outlays on human capital investment—or the out-of-pocket cost to firms for training. The

change in direct outlays on human capital investment resulting from the rule is calculated as

---

[1143] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr, *supra* note 445; see https://www.bls.gov/oes/tables.htm. The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. The Commission notes that these estimates include public employment, as data on occupation-specific employment at the State level are not available by firm ownership. Occupation-specific employment data are necessary to split workers into low- and high-use occupations. Workers including those estimated to be bound by non-competes and those who are not are included in this estimate, since the empirical estimate of the increase in training reflects a sample representative of the full workforce, not just those bound by non-competes.

[1144] The coefficient reported by Starr (*supra* note 445), 0.77%, corresponds to a one standard deviation increase on Starr's scale, and represents the percentage point effect on the percentage of workers trained (rather than the amount of training they receive). Rescaling to a scale of zero to one, a one standard deviation increase is equal to a change in the enforceability measure of 0.17. Since estimates for earnings and innovation use a mean enforceability change of 0.081 on a scale of zero to one, the coefficient in Starr is rescaled to 0.77*(0.081/0.17)=0.364%, which represents the change in the fraction of covered workers receiving training due to an average magnitude change of 0.081.

[1145] 85 hours per year is calculated as 5.7 weeks per year * 20.1 hours per week * 73.9%, where 73.9% is the percentage of training that is firm-sponsored (the type of training likely to be affected by the final rule). These three estimates (5.7 weeks per year, 20.1 hours per week, and 73.9% of training being firm sponsored) are estimated in Harley J. Frazis & James R. Spletzer, *Worker Training: What We've Learned from the NLSY79*, 128 Monthly Lab. Rev. 48 (2005).

[1146] The Commission assumes that the average hourly output of workers is twice their average earnings and estimates average earnings to be $30.38 per hour, which is the average hourly earnings for workers in training ages 22-64 currently holding one job in the Survey of Income and Program Participation for all waves from 1996 to 2008. The dollar value is adjusted to 2023 dollars.

follows:

*Reduced Direct Outlays = [(Total Direct Outlays) / (# of Workers Receiving Training)]* *

*[(Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers)]*

Total direct outlays on human capital investment are estimated to be $105 billion in 2023 dollars.[1147] The estimated number of workers receiving training is 23.5 million workers.[1148] The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1149] The percentage point decrease in trained workers is estimated to be 0.4.[1150]

This calculation results in annual cost savings of $1.6 billion, assuming the training rates of workers in all occupations are affected and $0.7 billion assuming the training rates of workers only in high-use occupations are affected. The ten-year present value effects of the final rule on investment in human capital, assuming that lost investment is core investment, discounted at 2%, 3%, and 7% and separately assuming effects on workers in all occupations versus just workers in occupations that use non-competes at a high rate, are presented in the first two rows of Table 5.

### ii. Estimates assuming lost investment in human capital is advanced training

---

[1147] 2022 Training Industry Report, Training Magazine (Nov. 2022) at 17.
[1148] Calculated as 15.8% * 148.9 million, where 15.8% is the percentage of workers who receive training, according to Frazis & Spletzer *supra* note 1145 at 48. 148.9 million is the estimated number of workers in the US in May 2022 according to https://www.bls.gov/oes/tables.htm. Note that all workers are included in this estimate (not just workers in States which enforce non-competes) because the estimate of training expenditures also covers all workers.
[1149] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr (*supra* note 445) (see https://www.bls.gov/oes/tables.htm). The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. *See supra* note 1143.
[1150] As discussed in Part X.F.7.a.i.

The second set of estimates of the effects on human capital investment in the final analysis assumes all training is advanced. The Commission begins with the same approach (calculated in Part X.F.7.a.i) to estimate the direct gain in output of workers and reduced direct outlays from foregone advanced human capital investment because such investment is costly for firms and results in decreased time spent on productive activities by workers, regardless of whether the investment is core or advanced. The major difference is that the Commission nets out an additional component which represents lost long-term productivity of workers caused by lost investment in their human capital. The Commission nets out this additional component based on the assumption that advanced human capital investment results in some increased long-term productivity in workers (because it assumes that firms would not otherwise make such a costly investment). This results in estimated effects of the final rule that represent upper bounds on the costs associated with changes in investment in human capital. Therefore, the estimated effect of the rule on advanced human capital investment is calculated as follows:

*Effect of Decreased Investment in Advanced Training = Additional Output of Workers Resulting from Less Time Spent Training + Reduced Direct Outlays on Training – Lost Output Resulting from Foregone Advanced Training*

The first two components—additional output of workers due to less time spent training and reduced direct outlays on training—are calculated in Part X.F.7.a.i. The lost output of workers due to lost investment in their human capital due to the rule in each year is calculated as follows:

*Lost Output from Lost Investment in Human Capital = (Total # of Affected Workers) \* (Percentage Point Decrease in Trained Workers) \* (Average Hourly Output of Workers) \* (Average Hours Worked per Year) \* (% Productivity Loss)*

485

The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1151] The percentage point decrease in trained workers is estimated to be 0.4.[1152] Average hourly output of workers is estimated to be $60.77.[1153] The average number of hours worked per year is 1,784.[1154] The Commission assumes the percent productivity loss to be 6.4%.[1155]

In the first year, this yields a total estimate of lost output from lost investment in human capital of $1.5 billion or $0.7 billion (under the separate assumptions of all workers being affected and only high-use occupation workers being affected). Since the returns to advanced training persist to some extent over time, in the second year, returns to advanced training from the first year are assumed to depreciate by 20%,[1156] and the calculation is redone according to the depreciated return to advanced training. In the third year, training from the first year again depreciates, and so on until the tenth year (the end of the horizon considered).

---

[1151] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May, 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr (*Id.*) (see https://www.bls.gov/oes/tables.htm). The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. *See supra* note 1143.

[1152] As discussed in Part X.F.a.i.

[1153] The Commission assumes that the average hourly output of workers is twice their average earnings and estimates average earnings to be $30.38 per hour, which is the average hourly earnings for workers in training ages 22-64 currently holding one job in the Survey of Income and Program Participation for all waves from 1996 to 2008. The dollar value is adjusted to November 2023 dollars using https://www.bls.gov/data/inflation_calculator.htm.

[1154] See https://fred.stlouisfed.org/release/tables?rid=50&eid=6462#snid=6449, which reports average weekly hours and overtime of all employees on private nonfarm payrolls by industry sector, seasonally adjusted. The reported value, 34.3, is multiplied by 52 to get annual hours worked.

[1155] This figure is the midpoint of two estimates in the literature: Harley Frazis & Mark A. Loewenstein, *Reexamining the Returns to Training: Functional Form, Magnitude, and Interpretation*, 40 J. Hum. Res. 453 (2005) [3.7%] and Gueorgui Kambourov, Iourii Manovskii, & Miana Plesca, *Occupational Mobility and the Returns to Training*, 53 Can. J. of Econ. 174 (2020) [9.1%].

[1156] There is no perfect estimate of the rate of human capital depreciation in the economic literature. Studies typically make assumptions they deem reasonable to estimate this rate, with 20% representing neither the low end nor the high end of the range of such assumptions. *See, e.g.*, Rita Almeida & Pedro Carneiro, *The Return to Firm Investments in Human Capital*, 16 Lab. Econs. 97 (2009), who assume that the human capital depreciation rate may range from 5% to 100%.

Additionally, in the second year, a new round of advanced training is forgone. An additional $1.5 billion or $0.7 billion in lost output is therefore incurred in the second year under the final rule, and the depreciation calculations are again repeated for the new round of advanced training until year ten. New rounds of advanced training are forgone in each year through the tenth. Lost output from lost advanced training in the tenth year is therefore the sum of a depreciated return to training from each of the prior nine years plus lost output from lost training in the tenth year itself.

To arrive at estimates of overall lost productivity due to lost advanced training, lost productivity in each year (separately due to lost training in each prior year) is added together. Finally, lost productivity due to lost advanced training is subtracted from the two components calculated in Part X.F.7.a.i (additional output of workers from less time spent training and reduced direct outlays). The ten-year discounted effects of the final rule on investment in human capital, assuming lost investment is advanced training investment, discounted at 2%, 3%, and 7%, and separately assuming workers in all occupations versus just workers in occupations that use non-competes at a high rate, are presented in the last two rows of Table 5.

**Table 5.**

|  | 2% discount rate | 3% discount rate | 7% discount rate |
|---|---|---|---|
| Estimated discounted ten-year effect assuming lost training is **core** and workers in **all occupations** are affected | $32 | $31 | $27 |
| Estimated discounted ten-year effect assuming lost training is **core** and workers in **high-use occupations** are | $14 | $14 | $12 |

487

| affected | | | |
|---|---|---|---|
| Estimated discounted ten-year effect assuming lost training is **advanced** and workers in **all occupations** are affected | -$41 | -$39 | -$31 |
| Estimated discounted ten-year effect assuming lost training is **advanced** and workers in **high-use occupations** are affected | -$19 | -$17 | -$14 |

Note: All values in billions of 2023 dollars. Negative values represent net cost estimates, while positive values represent net benefit estimates.

As discussed in Part X.E, the Commission notes that the estimates in this Part X.F do not account for senior executives who continue to work under non-competes under the rule. If the effects on training are due to effects on such senior executives, then the effects discussed herein would occur further into the future than discussed.

### b. Legal and Administrative Costs Related to Compliance

The Commission finds that firms with existing non-competes will have related legal and administrative compliance costs as a result of the final rule. The Commission quantifies and monetizes these costs and conducts related sensitivity analyses.

### i. Legal Costs

The Commission finds one-time legal costs related to firms' compliance with the final rule are estimated to total $2.1-$3.7 billion. The Commission estimates two main components of legal costs: (1) updating existing employment agreements or terms to ensure new hire employment terms comply with the final rule; and (2) advising employers about potential

operational or contractual changes for workers who will no longer have enforceable non-competes. The latter includes determination of workers whose non-competes are no longer enforceable under the rule, as opposed to those that fall under the exemption for senior executives.

For the first component, firms must consider what changes to their contractual practices are needed to ensure that incoming workers are not offered or subject to non-competes and what revisions to human resources materials and manuals are needed to ensure they are not misused on a forward-going basis. Firms may respond by removing specific non-compete language from standard contracts and human resources (H.R.) materials and manuals used for future employees. The second component involves strategic decisions and changes in response to the final rule. For example, firms may adjust other contractual provisions such as NDAs. This legal work is not mandated or required by the rule; it would be undertaken only by the subset of firms and workers for whom firms conclude that such alternatives would be desirable. Additionally, such adjustments are likely unnecessary for senior executives whose non-competes continue to be enforceable under the rule. Therefore, this component additionally involves identifying senior executives whose existing non-competes are unaffected. For any such legal work, firms may use in-house counsel or outside counsel.

Legal costs are therefore calculated as follows:

*Legal Costs = Modify Standard Contract Language/H.R. Materials and Manuals Costs + Revise Contractual Practices Costs*

One component of the legal cost will be due to the modification of standard contracts to remove prohibited language regarding non-competes which is calculated as follows:

*Modify Standard Contract Language/H.R. Materials and Manuals = (Average Hours*

*Necessary for Modification) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates that, on average, modifying standard contract language and H.R. materials and manuals would take the equivalent of one hour of a lawyer's time.[1157] The estimated cost per hour is $134.62 in 2023 dollars,[1158] and the number of affected businesses is 3.4 million.[1159] This results in a total one-time modification cost of $457 million.

Another component of legal costs relates to any firm-level revision to their contractual practices, including identification of senior executives, which is calculated as follows:

*Revise Contractual Practices Costs = (Average Hours Necessary to Update Contractual Practices) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates that the average firm employs the equivalent of four to eight hours of a lawyer's time to update its contractual practices and determine which employees may fall under the final rule's exemption.[1160] The Commission estimates the cost of a lawyer's time to

---

[1157] This process would likely be straightforward for most firms (*i.e.*, simply not using non-competes or removing one section from a boilerplate contract). There may be firms for which it is more difficult and requires more time. This analysis uses an average time spent of one hour, which conservatively represents the *average* time spent to do so, and accounts for variation across firms.

[1158] According to BLS, the median wage for a lawyer was $65.26 per hour in 2022, or $67.31 in 2023 dollars. See https://www.bls.gov/ooh/legal/lawyers.htm. As in Part X.F.7.a, the Commission doubles this number to reflect the lost productivity of the worker.

[1159] Calculated as 6.88 million * 0.494. Here, 6.88 million is the number of establishments in the U.S. (excluding California, North Dakota, Oklahoma, and Minnesota, where non-competes are broadly unenforceable) in 2021 (the most recent year with data available): see https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html. This value is multiplied by 49.4%, the percentage of firms using non-competes in the U.S. according to Colvin & Shierholz (*supra* note 65).

[1160] The Commission emphasizes that this is an average to underscore that there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those that use non-competes only with workers who do not have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect sensitive information, may opt to do nothing. There is evidence indicating that firms that use non-competes are already using other types of restrictive employment provisions: Balasubramanian et al. (2024) find that 95.6% of workers with non-competes are also subject to an NDA, 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and that 74.7% of workers with non-competes are also subject to all three other types of provisions. See Balasubramanian, Starr, & Yamaguchi (*supra* note 74). Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract. The estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-competes opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because

be $134.62 as discussed in this Part X.F.7.b.i. The number of affected businesses is estimated to be 2.9 million.[1161]

Under the assumption that the average firm that uses a non-compete employs the equivalent of four to eight hours of a lawyer's time, the total one-time expenditure on revising contractual practices would range from $1.6 billion (assuming four hours are necessary) to $3.1 billion (assuming eight hours are necessary).

Some commenters indicated that some firms may use outside counsel, which is more costly to firms, to remove non-competes from contracts of incoming workers and to update contractual practices. While commenters did not provide data to support this assertion, as a sensitivity analysis, the Commission replaces the estimate of the hourly earnings of a lawyer with an estimate of the cost of outside counsel ($483 per hour), conservatively overestimating costs by using the estimated rate of a tenth-year lawyer.[1162] Under this sensitivity analysis, the Commission estimates the total cost of ensuring that incoming workers' contracts do not contain non-competes would be $1.6 billion and the cost of updating contractual practices would be $5.6-$11.3 billion. Some commenters stated that the hourly cost of lawyers' time may be even greater than the value assumed in the sensitivity analysis ($483 per hour). The Commission finds

---

they are using non-competes with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 days of an attorney's time, this would result in the estimate of 4-8 hours on average.

[1161] Calculated as 5.91 million * 0.494. Here, 5.91 million is the number of firms in the U.S. (excluding California, North Dakota, Oklahoma, and Minnesota, where non-competes are broadly unenforceable) in 2021 (the most recent year with data available): *see* https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html. This value is multiplied by 49.4%, the percentage of firms using non-competes in the U.S. according to Colvin & Shierholz (*supra* note 65). The Commission notes that this analysis assumes that decisions regarding protection of sensitive information and contract updating are made at the firm (a collection of establishments under shared ownership and operational control), rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. This explains the difference between the number of businesses used here (2.9 million) versus the number used in to calculate the cost of contract revision (3.4 million).

[1162] This estimate is drawn from the Fitzpatrick Matrix. *See supra* note 1087 and accompanying text. Note that the Commission does not double this number to reflect productivity, since the cost of outside counsel's time likely already reflects the productivity of that worker.

that the sensitivity analysis assuming a rate of $438 per hour provides a reasonable estimate of the costs under the assumption that outside counsel would be used, and that higher rates (*e.g.*, $749 per hour, as stated by one commenter) are unreasonably high, especially as an average across many firms.

The Commission believes that the exclusion of existing non-competes with senior executives could result in lower net legal costs than the Commission's estimate. First, for senior executives who currently work under a non-compete, firms will have a longer time period during which they may update contractual practices. For example, for a senior executive who does not change jobs for 5 years after the compliance date of the final rule, the firm will have 5 years to determine how it wants to update contractual practices for an incoming senior executive who replaces the current one. Delaying costs in this way reduces their economic effect due to discounting. Additionally, if a senior executive remains in their job for over ten years, then the cost of updating contractual practices would fall outside the scope of the Commission's estimates altogether.

At the same time, when the final rule goes into effect, firms will need to identify senior executives whose existing non-competes are not covered by the final rule in order to determine which contractual practices they may need to update immediately. The Commission does not include a separate legal cost for identifying senior executives and estimates the range of attorney time for revising contractual practices under the final rule, which encompasses identifying senior executives, to be the same as the estimate for the proposed rule—4 to 8 hours. This is in part because the strategic considerations involved in revision of contractual practices will likely include such identification. Moreover, the Commission believes the identification of such workers will not be difficult or time consuming. Firms can use the compensation threshold to

rule out the vast majority of workers from the exemption and the definition of senior executive in § 910.1 includes clear duties to determine whether any executives who meet the compensation threshold are senior executives under the final rule. It also provides that the CEO and/or president of a firm is a senior executive without the need to conduct any duties analysis.

Another reason the Commission does not add to its estimate of 4 to 8 hours to account for identification of senior executives is that excluding existing non-competes with senior executives would otherwise decrease this estimate, likely to a greater degree than the cost of identifying senior executives. As noted, a significant amount of time spent by attorneys as estimated in the NPRM was intended to account for revising contractual practices for more complex agreements. Commenters noted that employment terms with senior executives are often individualized so that attorney and firm time would be spent on their agreements regardless of whether a non-compete may be included. Since firms use non-competes for senior executives at a high rate,[1163] revising contractual practices for senior executives may constitute a significant portion of the overall estimate of the cost of revising contractual practices, and given their exclusion, the Commission finds that the cost estimate for revising contractual practices likely represents an overestimate overall. The Commission does not, however, reduce its final cost estimates to account for this change. As noted in Part X.D, this final analysis generally does not account for the temporal difference in coverage of non-competes for senior executives. The same is true here and, to be consistent across the estimates in this final regulatory analysis, the Commission does not estimate a reduction in legal cost but notes potential bases for differences in estimates where relevant.

Overall, the Commission acknowledges that there may be substantial heterogeneity in the

---

[1163] More than 60%; *see* Part I.B.2.

costs for individual firms; however, these numbers may be overestimates. For firms whose costs of removing non-competes for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with the costs of updating contractual practices.

## ii. Administrative Costs for Notification Requirement

The Commission finds the total one-time costs for implementing the notification requirement are estimated to be $94 million. These costs relate to the provision of notice to workers other than senior executives as required by § 910.2(b). Notably, firms may use the model notice language provided by the Commission, and the form of this model notice enables firms to choose to send the notice to workers regardless of whether they have non-competes as described in Part IV.E. The notice provision cost is calculated as follows:

*Notice Provision Cost = Digital Notice Provision Costs + Mailed Notice Provision Costs*

The first component, digital notice provision costs, are calculated as follows:

*Digital Notice Provision Costs = (Average Hours Necessary to Compose and Send Notice) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates that 20 minutes (1/3 of one hour) are necessary for a human resources specialist to compose and send this notice in a digital format to all of a firm's workers who are not senior executives[1164] and applicable former workers, on average.[1165] The cost per

---

[1164] The Commission notes that identification of such workers is accounted for in revision of contract costs calculated in Part X.F.7.b.i.

[1165] *See, e.g.*, the supporting statement for the Notice of Rescission of Coverage and Disclosure Requirements for Patient Protection under the Affordable Care Act (CMS-10330/OMB Control No. 0938-1094) at 5, which estimates time spent customizing and sending similar notice. Available at https://www.reginfo.gov/public/do/DownloadDocument?objectID=119319401.

hour is estimated to be \$63.70.[1166] The estimated number of affected businesses is 3.4 million.[1167] The digital notice provision cost is therefore estimated to be \$72 million.

Businesses may not have digital contact information for some workers. The cost of mailed notice provision would include the cost of postage and the cost of a human resource professional's time. Mailed notice provision costs are therefore calculated as follows:

*Cost of Mailed Notice Provision = Number of Workers with Non-competes Receiving Physical Notice \* (Cost of One Printed Page + Mailing Cost + Cost of Human Resource Professional's Time)*

The number of workers with non-competes receiving physical notice is the total number of covered workers (101.1 million; see Part X.F.7.a.i) times the percentage of workers who have non-competes (18.1%) times the percentage of workers who require mailed notice (assumed to be 66% of workers[1168]), for a total of 12.3 million workers. The Commission notes that the percentage of workers who require mailed notice is likely a substantial overestimate, since it is estimated based on the percentage of individuals who receive health information digitally. The Commission believes that employers are more likely to have digital means of providing the notice to their current workers especially, but also to their former workers. The Commission adopts this estimate as an upper bound.

The cost per worker is estimated as 5 cents for one printed page plus mailing cost of 70

---

[1166] According to BLS, the median wage for a human resources specialist was \$30.88 per hour in 2022, which is equivalent to \$31.85 in November 2023 dollars, updated for inflation using https://www.bls.gov/data/inflation_calculator.htm. See https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm. As in Part X.F.7.a, the Commission doubles this number to reflect the lost productivity of the worker.

[1167] As calculated in Part X.F.7.b.i., the Commission conservatively assumes that each establishment—a physical location of a business—must engage in its own communication, and that each establishment has digital contact information for at least one worker, and will therefore engage in digital notice provision.

[1168] See *infra* note 1165 (CMS Supporting Statement assumes 66% of workers require mailed notice from their health insurance companies).

cents plus one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. The overall cost of mailed notice provision is therefore estimated to be $22 million. The total cost of the notice provision is therefore $94 million.

Commenters stated that it may take two hours of a legal professional's time to provide notice. The Commission finds this estimated time to be a substantial overestimate and reiterates that this analysis incorporates a legal professional's time necessary to identify senior executives and to strategize updates to firm contractual practices into its estimate of legal costs in X.F.7.b.i. The model notice language alleviates the need for a legal professional's time and the Commission finds it unreasonable to assume that such a notice would need to actually be sent by a legal professional. While firms may opt to use original language drafted by an attorney to notify workers, the Commission notes that the model language satisfies the notification requirement and therefore does not include the cost of original language as a regulatory cost estimate in the final analysis. However, under these assumptions, the cost of providing the notice is estimated at $5.2 billion.

The Commission notes that communication is conducted at the establishment level and time costs do not vary based on the number of existing senior executives with non-competes that the final rule does not cover. While establishments with only senior executives with non-competes would not incur any notification costs because the final rule does not cover existing non-competes with senior executives, without an estimate of the percentage of firms for which this is true, the Commission conservatively assumes that all establishments estimated to use non-competes engage in this notification.

Legal and administrative costs are summarized in Table 6. The Commission notes that, since all costs are assumed to be borne in the first year, there is no discounting applied and

therefore only one estimate for each analysis is presented.

**Table 6.**

|  | ($ billions) |
|---|---|
| *Cost of modifying standard contract language/H.R. materials and manuals* |  |
| Primary | **$0.5** |
| Sensitivity analysis (outside counsel cost of $483) | **$1.6** |
|  |  |
| *Cost of reviewing and revising contractual practices* |  |
| Primary, four hours | **$1.6** |
| Primary, eight hours | **$3.1** |
| Sensitivity analysis (four hours, outside counsel cost of $483) | **$5.6** |
| Sensitivity analysis (eight hours, outside counsel cost of $483) | **$11.3** |
|  |  |
| *Administrative Costs for Notification Requirement* |  |
| Primary | **$0.09** |

### c. Litigation Effects

Theoretically, under the final rule, certain litigation costs may fall. Litigation related to non-competes may decrease because the final rule creates bright line rules, reducing uncertainty about the enforceability of non-competes. On the other hand, litigation costs may rise if firms turn to litigation to protect trade secrets and if that litigation is more expensive than enforcing (or threatening to enforce) non-competes, and/or if firms elect to litigate over what constitutes a non-compete.

The Commission finds there are plausible but directionally opposite theoretical outcomes for the different types of litigation that may be affected by the final rule. In fact, some recent evidence suggests trade secret litigation falls as a result of bans on non-competes taking

effect.[1169] The Commission finds no evidence increased litigation will result in increased costs associated with the final rule. The Commission cannot quantify or monetize the overall effect as a cost or benefit, but estimates the magnitude of any change would be sufficiently small as to be immaterial to the Commission's assessment of whether the benefits of the rule justify its costs.

### 8. Transfers

As discussed in Part X.F.6.a, some portion of the earnings effect associated with the final rule represents a transfer: while workers may earn more with greater productivity resulting from the rule, some of their earnings increase may result from enhanced bargaining power, which constitutes a transfer from firms to workers.

Similarly, some portion of the price effects associated with the final rule represents a transfer: while consumers may achieve greater surplus with increased competition, the price decrease itself is partially a transfer from firms to consumers.

### 9. Distributional Effects

The Commission finds several distributional effects associated with the final rule, including those associated with firm expansion and formation, distributional effects on workers, and labor mobility, as summarized in Table 1 in Part X.E.

### a. Firm Expansion and Formation

When non-competes are prohibited, new firms may enter the market but incumbent firms may opt to invest less in capital, leaving the overall effect on total capital investment unclear. Similarly, while new firms may enter the market, it is theoretically possible that incumbent firms may exit the market without the ability to use non-competes (though no evidence of this effect

---

[1169] Greenwood, Kobayashi, & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

exists) or contract. Research finds that decreased non-compete enforceability increases new firm formation by 2.7% and may have no effect on capital investment or may decrease capital investment at incumbent firms by up to 7.9%. To the extent there may be a decrease in capital investment at incumbent firms as a result of the final rule, it may represent a shift in productive capacity from incumbent firms to new firms. As discussed in Part IV.D, another purported justification for non-competes is that they allow firms to protect trade secrets, which in theory might allow firms to share those trade secrets more freely with workers, and so improve productivity. However, no empirical evidence substantiates this claim or would allow quantification or monetization of this effect.

Empirical evidence has studied parts, but not all, of the contrasting effects on capital investment and new firm formation. Studies have examined effects of non-competes on capital investment by large, publicly traded firms, who are likely incumbents. [1170] However, no study examines the effect of capital investment economy-wide, nor does any study specifically examine capital investment for new firms. Similarly, studies have examined new firm formation, but no studies look at firm exit among incumbents.

It is thus not possible to measure the benefit and costs of the full economy-wide effects on firm expansion and formation. The calculations that may be performed using available data will necessarily omit components of the tradeoff. The final analysis therefore quantifies the effects that the literature has examined but does not monetize those effects.

### i. Capital Investment

Research finds that capital investment for incumbent firms at the firm level may decrease under the final rule for the economy as a whole, though effects for high-tech industries may be

---

[1170] Jeffers, *supra* note 450; Johnson, Lipsitz, & Pei, *supra* note 526.

positive, negative, or close to zero. The Commission notes that the capital investment discussed in this Part X.F.9 relates to tangible capital, does not reflect capital investment by newly-formed firms, and is distinct from R&D spending, which is discussed in Part X.F.6.b.

One estimate of the overall effect of non-compete enforceability on capital investment by incumbent firms, which some commenters pointed to, is estimated with substantial uncertainty and is statistically indistinguishable from zero (*i.e.*, statistically insignificant): a decline in capital investment of 7.9% for the average incumbent publicly-traded firm.[1171] Another study finds no effect on capital investment, but includes the use of non-competes in its estimating procedure, leading to concerns that the finding does not support a causal interpretation, as explained in Part IV.A.2.[1172]

The Commission notes two additional estimates specific to high-tech or knowledge firms: a decline in capital investment among incumbent publicly-traded firms of 34%-39% (an estimate which corresponds to the estimate of a decline of 7.9% when all publicly traded firms are examined),[1173] and an *increase* in capital investment of 3.1% for the average publicly-traded high-tech firm (an estimate that is statistically insignificant).[1174] The Commission notes that the study finding an increase in capital investment of 3.1% uses a more granular measure of non-compete enforceability than the study finding a decrease of 34%-39%, and the Commission

---

[1171] The increase, 7.9%, is calculated as 0.00317/0.04, where 0.00317 is the reported coefficient (Table 4, Panel A, Column 1), and 0.04 is the mean investment per million dollars of assets ratio, across all firms (Table 2, Panel C). Due to statistical uncertainty, the estimate cannot rule out (with 95% confidence) values ranging from a *gain* in capital investment equal to 6.7% to a *loss* in capital investment equal to 22.5% for the average firm. See Jeffers, *supra* note 450.

[1172] Shi, *supra* note 84.

[1173] Jeffers, *supra* note 450. The estimate pertains to firms in Technology and Professional, Scientific, and Technical Services.

[1174] Johnson, Lipsitz, & Pei, *supra* note 526. The estimate pertains to firms classified as high-technology by the National Science Foundation: see https://nsf.gov/statistics/seind14/index.cfm/chapter-8/tt08-a.htm.

therefore gives it more weight.[1175]

      The Commission reiterates that any change in investment at the firm level does not necessarily mean that investment would change at the market level, since increased firm entry may also increase the employed capital stock and investment in that capital stock, which may offset any possible decreases in investment for incumbent firms. These potential positive offsetting effects are not captured in the estimates herein.

### ii.  New Firm Formation

      Research finds that new firm formation increases by 2.7% across the economy due to decreases in non-compete enforceability.[1176] The Commission also notes an estimate specific to high-tech industries: that decreases in non-compete enforceability led to a 3.2% increase in the establishment entry rate.[1177]

      The benefits associated with new firm entry may include added surplus for consumers (*e.g.*, from increased competition) or workers (from expanded labor demand). However, the Commission is unable to quantify those beneficial effects, though some may be captured by the effect on prices discussed in Part X.F.6.c. Nor is it able to quantify whether existing firms might exit or contract in response to this new firm entry (*i.e.*, whether the new firms' output would be

---

[1175] The two studies are otherwise identical in the extent to which they satisfy the criteria for assessing empirical research laid out in Part IV.A.2.

[1176] Jeffers (*supra* note 450) does not report an effect for the economy as a whole. However, Jeffers reports coefficients of -0.103 for the effect of increased non-compete enforceability on firms founded per million people in knowledge-sector industries and 0.008 for non-knowledge sector industries, with respective sample sizes of 78,273 and 190,665 (Table 9, Panel A, Columns 1 and 2). Using the sample sizes as weights, the Commission estimates a weighted average of these coefficients of -0.024. Applying this estimate to the average number of firms founded per million people (Table 2, Panel B) results in an estimated increase in new firm formation of 2.7%. The Commission did not calculate the effect for the economy as a whole in the NPRM. The NPRM reported that increases in non-compete enforceability decreased new firm entry by "0.06 firms per million people (against a mean of 0.38) for firms in the knowledge sector," NPRM at 3526, which was consistent with the version of the Jeffers study cited in the NPRM. The final rule cites the updated version of the Jeffers study, published in 2024. The Commission notes that estimation of the uncertainty in the combined estimate requires information on the covariance of the estimated coefficients, which is not reported in Jeffers' study. See Jeffers, *supra* note 450.

[1177] Johnson, Lipsitz, & Pei, *supra* note 526. The estimate pertains to firms classified as high-technology by the National Science Foundation: see https://nsf.gov/statistics/seind14/index.cfm/chapter-8/tt08-a.htm.

wholly additive or crowd out some amount of existing firms' output). New firm entry may also drive some of the innovative effects of the final rule if new firms are engaging in substantial innovation.

Overall, the Commission finds that the rule will likely result in a 2.7% increase in new firm formation and is unable to quantify the net effects of this on the productive capacity of the economy. Benefits from new firm entry and possible costs from decreased capital investment may offset each other but the degree to which this happens is not quantifiable. The effect of the final rule on firm expansion and formation likely results in productive capacity shifting from incumbent firms to new firms. Consistent with findings in Part IV.B.3.b.iii, productive capacity shifting from incumbent to new firms may decrease concentration, possibly contributing to decreases in prices, as discussed in Part X.F.6.c.

### b. Distributional Effects on Workers

The Commission finds that the final rule may reduce gender and racial earnings gaps, may especially encourage entrepreneurship among women, and may mitigate legal uncertainty for workers, especially relatively low-paid workers.

Specifically, the Commission finds that gender and racial wage gaps may close significantly under a nationwide prohibition on non-competes, according to economic estimates.[1178] Another estimate indicates that the negative effect of non-compete enforceability on within-industry entrepreneurship is significantly greater for women than for men.[1179]

The Commission finds that the rule may be especially helpful for relatively low-paid workers, for whom access to legal services may be prohibitively expensive. Workers generally may not be willing to file lawsuits against deep-pocketed employers to challenge their non-

---

[1178] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 38.
[1179] Marx (2022), *supra* note 524 at 8.

competes, even if they predict a high probability of success. The Commission finds that the bright-line prohibition in the final rule, which the Commission could enforce, may mitigate uncertainty for workers.[1180]

### c. Labor Mobility

The Commission finds the overall effect of the final rule on turnover costs due to increased labor mobility is ambiguous and represents a distributional effect of the rule. The Commission finds turnover costs for firms seeking new workers may fall with a greater availability of experienced labor. For firms losing workers newly freed from non-competes, the Commission estimates the effect of the final rule to be $131 per worker with a non-compete. The Commission therefore finds the effect on turnover costs represents a distributional effect of the final rule because it costs firms that use non-competes to constrain workers and benefits firms that do not.

To calculate the potential $131 increase in turnover costs for workers whose non-competes are no longer enforceable after the rule, this final analysis calculates:

*Additional Turnover Cost per Worker with a Non-compete = (Baseline Turnover Rate) \* (% Increase in Turnover) \* (Rate of Use of Non-competes in Affected Industries) \* (Overall Earnings of Affected Workers) \* (Cost of Turnover as % of Earnings) / (Number of Workers in Affected Industries with Non-competes)*

The Commission estimates the baseline turnover rate, *i.e.*, the turnover rate in the status quo, to be 47% annually.[1181] The estimated percent increase in turnover from the final rule is

---

[1180] NPRM at 3531.

[1181] Based on annual worker mobility rates (separations divided by employment) in 2022 as calculated using the Job Openings and Labor Turnover Survey, conducted by BLS.

1.0%.[1182] The estimated rate of use of non-competes in affected industries is 23.9%.[1183] Estimated overall earnings of affected workers is $5.25 trillion.[1184] The estimated cost of turnover as a percentage of earnings is 25%.[1185] Finally, the estimated number of workers in affected industries with non-competes is 11.8 million.[1186]

The annual estimated increase in turnover costs per worker with a non-compete is $131.

The Commission notes the actual costs of turnover to businesses may be substantially lower under the final rule than this estimate reflects. This is because the specific components of turnover costs—finding a replacement, training, and productivity—are likely to be affected by the final rule. An increased availability of experienced workers results when non-competes no longer constrain those workers, and finding replacements will be less costly to firms. Additionally, training should not be counted in the costs of turnover presented in this Part X.F.9.c, since it is separately accounted for in Part X.F.7.a, but is nevertheless included in the 25% estimate used to arrive at the estimate of $131 per worker with a non-compete, since there is no reliable way to remove training costs from that estimate; it is thus double-counted. Finally, because the Commission finds increased labor mobility will likely increase worker productivity due to better matching between workers and firms, the cost of lost productivity will be lower. The cost of lost productivity will also be lessened because the pool of workers available to firms

---

[1182] Calculated as -(e^((-0.241+0.112)*0.081)-1), where -0.241+0.112 represents the estimated effect in Johnson, Lavetti, and Lipsitz (*supra* note 388) on workers in high use industries. The corresponding estimate for other industries is statistically indistinguishable from zero and those industries are therefore omitted from calculations. The multiplier 0.081 is the average magnitude change in non-compete enforceability, as discussed in Part X.F.5.
[1183] Calculated as the average usage rate in high-use industries in Starr, Prescott & Bishara (*supra* note 68).
[1184] Based on data from BLS for industries classified as high-use in Starr, Prescott & Bishara (*supra* note 68), excluding CA, ND, OK, and MN. See https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables.
[1185] See Pivateau, *supra* note 1090.
[1186] Calculated as 49.4 million * 23.9%. 49.4 million is equal to 0.8 * 61.8 million, where 0.8 is the coverage rate (see Part X.F.4.a) and 61.8 million is the number of workers in high-use industries (https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables). 23.9% is the average usage rate in high-use industries in Starr, Prescott, & Bishara (*supra* note 68).

may be more talented or experienced, since such workers would no longer be bound by non-competes (relative to new entrants to the workforce, who are not experienced and also are not bound by non-competes). This would allow firms to recruit workers who are more likely to be highly productive upon entry at a new job.

The Commission reiterates its finding that the costs of turnover for many firms may diminish due to a more plentiful supply of available labor. Without estimates of the effect of the final rule on the cost of recruiting a worker, the net effect of the final rule on turnover costs is not quantified.

### 10. Break-Even Analysis

The Commission believes it has quantified the effects of the final rule that are likely to be the most significant in magnitude, but data limitations make it challenging to *monetize* all of the expected effects of the final rule, *i.e.*, to numerically estimate the impact of particular effects on the economy as a whole. Most of the estimated costs of the final rule are monetized in Part X.F.7. However, the Commission is unable to monetize the estimated benefits of the final rule without additional assumptions. Two of the major benefits—innovation and earnings—are quantified but they are not monetized because a particular parameter or data point that would allow the Commission to estimate their effect in dollars is unavailable. For earnings, this parameter is an estimate of the percentage of the effect on earnings that represents a benefit versus a transfer.[1187] For innovation, this parameter is an estimate of the social value of a patent. Making an assumption about these parameters allows the Commission to monetize the benefits associated with the effect on earnings and innovation. A break-even analysis based on such assumptions confirms the Commission's finding that the benefits of the rule clearly justify the

---

[1187] Though the estimated effect on earnings is presented in dollars, the Commission considers this value to be quantified, but not monetized, since some part of the estimate may represent a transfer and not a benefit.

costs.

The analysis in this Part X.F.10 calculates the sum of the monetizable costs of the rule, separately under the assumption that lost investment in human capital is core training (in which case monetizable costs are direct compliance costs and the cost of updating contractual practices), and under the assumption that lost investment in human capital is advanced training (in which case monetizable costs are the net cost of lost productivity from decreased human capital investment, direct compliance costs, and the cost of updating contractual practices). The analysis conservatively assumes that training for all workers is affected (versus just those in high-use occupations, as described in Part X.F.7.a).

If the Commission assumes the decrease in human capital investment is a decrease in core training, the final rule results in net benefits without monetizing or counting *any* positive effects on the economy from earnings or innovation. The savings or benefit to the economy from reduced core training would be greater than the combined monetized costs of the final rule in X.F.7.b. In other words, even if the benefit to the economy from earnings and innovation were assumed to be zero (an implausible and extremely conservative assumption), the final rule would be net beneficial under the assumption that estimates of reduced training reflect better matching of workers and firms and therefore a reduced need to provide workers with core training.

Under the assumption that lost human capital investment is advanced, the Commission calculates values of the social value of a patent and the benefit percentage of the earnings effect that would fully offset the net monetizable costs of the final rule.

### a. Estimate of net benefit assuming lost human capital investment is core training

Under the assumption that lost human capital investment is core, the sum of the present

discounted value of direct compliance costs and the cost of contractual updating (the monetizable

costs of the rule), using a 3% discount rate, is $3.7 billion. In this case, the final rule is net

beneficial even ignoring the benefits associated with innovation and earnings. This is because the

net monetized cost ($3.7 billion) is less than the monetized benefit associated with investment in

human capital ($31 billion or $13.9 billion, when all occupations are assumed to be affected

versus just high-use occupations, respectively). The net monetizable benefit of the final rule—

even ignoring benefits associated with innovation and earnings—is therefore $27.3 billion or

$10.2 billion, respectively.

### b. Estimate of net benefit assuming lost human capital investment is advanced training

In this Part X.F.10.b, the Commission calculates the net monetizable costs and benefits of

the final rule assuming that lost human capital investment is advanced training, and under

varying assumptions about the values of the two monetization parameters identified (the social

value of a patent and the percentage of the earnings effect that represents a benefit). Then, the

Commission calculates break-even points: values for the monetization parameters which would

fully offset the net monetizable costs of the final rule.

Break even points are calculated by finding the values of the social value of a patent and

the benefit percent of the earnings increase such that:

*(Net Costs Associated with Investment in Human Capital) + (Direct Compliance Costs)*

*+ (Costs of Updating Contracts) = (Earnings Increase) \* (Benefit % of Earnings Increase) +*

*(Patent Increase) \* (Social Value of Patent)*

As calculated in Part X.F.7, assuming a 3% discount rate, the net cost associated with

investment in human capital is $39.0 billion.[1188] Direct compliance costs plus the cost of updating contracts are estimated to be $3.7 billion.[1189] Net monetizable costs therefore total $42.7 billion.

The estimated earnings increase of the final rule over ten years, discounted at 3% is $468 billion. The estimated effect of the rule on innovation (using the low end of the primary estimate) ranges from an additional 3,111 patents per year to 31,110 patents per year, increasing as time goes on.[1190]

The Commission presents estimates that demonstrate break-even points by making an assumption for the value of one of the two monetization parameters, and calculating the value of the other which implies equal monetized costs and benefits. Based on estimates of the private value of a patent, the Commission separately assumes that the social value of a patent is $94,886, $234,399, $5,865,833, or $32,459,680.[1191] In addition to spanning a wide range of possible valuations, these values all represent the private value of a patent to certain actors (*e.g.*, the purchaser or seller of a patent, or shareholders of a patenting company). These values do not account for innovative spillovers (*e.g.*, follow-on innovation) or product market spillovers to competitors (who may lose business to innovating firms), and therefore do not necessarily

---

[1188] Note that this calculation considers the net cost of lost investment in human capital (*i.e.*, the cost of lost productivity, minus the savings on direct outlays and gained output due to less time spent training). The Commission reiterates that this calculation assumes that lost human capital investment is advanced, rather than core.

[1189] This calculation assumes that updating contractual practices takes, on average, eight hours per firm.

[1190] The estimates presented here conservatively assume zero effect on R&D spending.

[1191] The Commission points out that the economic literature has not explored the *social* value of a patent, but has explored the *private* value of a patent, with highly varied conclusions (all reported here adjusted to 2023 dollars). Serrano estimates the average value of a patent (in terms of its sale price at auction) to be between $234,399 and $289,022. Pakes estimates the average value of a patent (in terms of stock market reactions to announcements) to be $5,865,833. Kogan et al. estimate the average value of a patent (also in terms of stock market reactions to announcements) to be $32,459,680. Outside of the academic literature, a Richardson Oliver Insights report notes that the average sale price of U.S. issued patents on a brokered market was $94,886. *See* Carlos J. Serrano, *Estimating the Gains from Trade in the Market for Patent Rights*, 59 Int'l Econ. Rev. 1877 (2018); Pakes, *supra* note 1132; Kogan, et al., *supra* note 1131; Richardson Oliver Insights Report (2022): https://www.roipatents.com/secondary-market-report.

represent the social value of a patent. However, they serve as benchmarks against which to assess the breakeven points of the analysis of the final rule.

No studies have assessed what percentage of the earnings effect of non-compete enforceability is a benefit versus a transfer. The Commission separately assumes that the percentage is equal to 0%, 5%, 10%, and 25%.

The computed breakeven points are reported in Table 7, under the assumption that lost investment in human capital is advanced. Panel A reports necessary benefit percentages, under each of the four assumed social values of a patent, that would cause the rule to result in zero net monetized benefit. A reported value of 0% indicates that the assumed value of a patent itself covers the net monetized costs of the final rule. Panel B reports the necessary social value of a patent, under each of the four assumed benefit percentages, that would cause the rule to result in zero net monetized benefit. A reported value of $0 indicates that the benefits associated with earnings cover the net monetized costs of the final rule on their own.

**Table 7.**

Panel A.

| Assumed Social Value of a Patent | Necessary Benefit Percentage on Earnings |
|---|---|
| $94,886 | 5.5% |
| $234,399 | 1.7% |
| $5,865,833 | 0.0% |
| $32,459,680 | 0.0% |

Panel B.

| Assumed Benefit Percentage on Earnings | Necessary Patent Value |
|---|---|
| 0% | $297,144 |
| 5% | $134,202 |
| 10% | $0 |
| 25% | $0 |

Panel A shows that, even assuming a value of patenting ($94,886) that is substantially

lower than the estimates in the economic literature, only 5.5% of the earnings effect must be an economic benefit (as opposed to a transfer) for the benefits associated with innovation and earnings to outweigh the monetized costs of the rule. Panel B shows that, even if no part of the earnings effect of the final rule reflects an economic benefit (which the Commission finds to be unlikely, in light of the evidence discussed in Part IV.B.3.a.ii), the social value of a patent would need to be only $297,144 in order to cover the monetized costs of the rule—well within the range of (private) values of a patent found in the literature.

The Commission additionally notes that Table 7 omits other benefits of the rule. The estimated benefits do not include the benefits arising from decreased consumer prices or increased workforce output. The estimates also omit possible changes in litigation costs associated with the rule. The Commission finds it likely that the omitted benefits substantially exceed the omitted costs, and additionally reiterates that the estimated values in Table 7 assume that lost investment in human capital is fully advanced. Therefore, the Commission views the values reported in Table 7 as conservative estimates of the breakeven points of the rule under those scenarios.

### 11.  Analysis of Alternative Related to Senior Executives

The Commission elects to provide an analysis of the effects of an alternative with more limited coverage. Specifically, the Commission provides an analysis of a rule that would cover— and therefore ban—non-competes with all workers except senior executives. As compared to the final rule, under this alternative, it would not be an unfair method of competition to enter into non-competes with senior executives after the effective date. The Commission finds that excluding all non-competes with senior executives from coverage under the rule (as opposed to the final rule, which excludes only existing non-competes with senior executives) would

diminish both costs and benefits, but would still result in substantial benefits on net.

### a. Analysis of Lost Benefits and Costs if Senior Executives are Excluded

Several costs and benefits may be affected if senior executives are excluded from coverage by the final rule. The Commission now discusses each of those costs and benefits relative to the final rule.

The Commission finds that some benefits related to labor market competition and workers' earnings would be lost if senior executives were entirely excluded from the final rule. This is especially true because those workers have high earnings, meaning that a given percentage increase in their earnings yields a greater overall effect compared with relatively lower earning individuals. However, those workers make up a small portion of the workforce—approximately 0.75% of the workforce, based on data from the American Community Survey.[1192] The overall change in the earnings benefit is therefore limited, but would exceed senior executives' share of the workforce. Support for this finding is discussed in Part IV.C. Garmaise (2011) finds that earnings of senior executives are negatively affected by non-competes. Countervailing evidence exists, but it is based on evaluation of the use of non-competes, which the Commission gives less weight.[1193] The Commission notes that the definition of senior executive used in Garmaise (2011) does not map perfectly to the definition of senior executives in this final rule, though there is likely substantial overlap.

The Commission is unable to quantify the lost benefits related to innovation if senior executives were excluded from coverage under the final rule but finds that their exclusion would

---

[1192] In particular, 0.75% represents the percentage of employed individuals from 2017-21 ages 22-64, excluding residents of CA, ND, OK, and MN, and excluding workers reporting working for non-profits or the government, whose earnings are above the inflation-adjusted threshold and who are coded as having occupation "Top Executive." The Commission notes that this estimate may not exactly match the definition in the final rule but the Commission believes that this provides a reasonable estimate.

[1193] *See* Part IV.A.2 (explaining the Commission's concerns with these types of studies).

diminish the innovation benefits of the final rule. Senior executives are involved in determination of the strategic path of the firm and its execution, which likely has a substantial effect on innovation. The Commission cannot quantify what percentage of the innovation effect is due to senior executives versus other workers, though it is likely shared by both groups.

The Commission finds that benefits related to consumer prices would fall significantly if senior executives were excluded from coverage. By increasing competition, increases in new firm formation and increased ability to hire talented workers may be key drivers of the effect of the final rule on consumer prices. As discussed in Part IV.C, senior executives have the knowledge and skills necessary to found new firms, or to be key members of other firms. Therefore, if senior executives are excluded from the final rule, some benefits associated with new firm foundation and innovation would be lost, though the exact proportion cannot be estimated. The Commission notes that benefits associated with lower prices through increased competition might also be lost but cannot be quantified.

Turning to costs, the Commission finds that costs associated with investment in human capital may fall if senior executives were excluded from the rule. The productivity of senior executives may benefit from investment in their human capital.[1194] The precise monetary contribution of investment in senior executives' human capital to the productivity of firms has not been estimated, nor has the empirical literature separately assessed the effect of non-competes on human capital investment for senior executives. If senior executives benefit from advanced, rather than core, training investment (as described in Part X.F.7.a), their exclusion will reduce costs. Because senior executives are a small part of the workforce and must be highly

---

[1194] Solomon Akrofi, *Evaluating the Effects of Executive Learning and Development on Organisational Performance: Implications for Developing Senior Manager and Executive Capabilities*, 20 Int'l. J. of Training and Dev. 177 (2016).

skilled, locking them up with non-competes could theoretically mean that firms would need to invest in relatively more core training for senior executives if they were excluded from the final rule.

The Commission finds that the direct costs of compliance with the final rule may be partially affected if senior executives were categorically excluded. The final rule allows employers to enforce existing non-competes for senior executives, so there are no notice and re-negotiation costs for senior executives. However, in this scenario, costs associated with ensuring incoming senior executives' contracts do not have non-competes would be substantially reduced. Because senior executives' contracts are generally more complex than other workers' contracts, this reduction may be relatively large, even though there are relatively few senior executives in the workforce (approximately 0.75%). With respect to the costs of updating contractual practices, commenters noted the costs of updating senior executives' contracts may be greater than for other workers because of the complexity of their contracts. Therefore, excluding senior executives categorically might reduce costs associated with updating contractual practices substantially. At the same time, senior executives' contracts may already be bespoke and individualized to such an extent that removing a non-compete would not considerably raise the costs associated with revising contractual practices. Moreover, these contracts may be even more likely than other workers to already include NDAs and other similar provisions.

Finally, the Commission finds that exclusion of senior executives may reduce litigation costs from the final rule, though the overall effect is unclear. Senior executives are highly likely to have access to sensitive business information. To the extent costs associated with trade secret litigation or litigation over other restrictive covenants increase under the final rule, though no evidence supports this possibility, then exclusion of senior executives may substantially reduce

these costs. Litigation related to whether a worker meets the definition of a senior executive may also increase if senior executives are categorically excluded.

Overall, excluding senior executives from the final rule would substantially reduce the benefits of the rule—especially those associated with new firm formation, innovation, and prices—but would also likely reduce costs, especially those associated with investment in human capital and updating contractual practices. The Commission finds that the benefits of a rule excluding senior executives would justify the costs of such a rule.

### b. Analysis of Benefits and Costs to Workers Other than Senior Executives

Now, the Commission turns to an analysis of the benefits and costs that remain if senior executives are excluded from the rule.

The Commission finds there would be substantial benefits to labor market competition and workers' earnings even if senior executives were categorically excluded. The evidence on earnings discussed in Part IV.B.3.a.ii does not exclude senior executives, but based on the percentage of the population that represents senior executives, the evidence largely pertains to workers other than senior executives. Therefore, while studies focused on senior executives (largely) do not apply, studies of the entire workforce mostly reflect the effects of non-competes on other workers. In addition to the broader evidence on earnings discussed in Part IV.B.3.a.ii, one study analyzes a population exclusively comprised of hourly workers, nearly all of whom are highly likely not to be senior executives, supporting the finding that even with senior executives excluded from a rule, there would be substantial benefits to labor market competition and workers' earnings.[1195]

The Commission is unable to quantify to what extent the estimated effects on innovation

---

[1195] Lipsitz & Starr, *supra* note 72.

are driven by senior executives versus other workers, but still finds that a final rule excluding

these senior executives would result in substantial benefits to innovation. First, there is evidence

that productivity of inventors decreases when they take career detours because of non-

competes.[1196] Second, insofar as effects on innovation are driven by increased idea

recombination, having access to those ideas (which innovators actively engaged in R&D must)

implies that moving to new firms would increase innovation. Empirical studies have not

quantified the size of these effects relative to the overall effect of banning non-competes for

workers including senior executives on innovation, however.

The Commission finds that a rule excluding senior executives would still yield substantial

benefits with respect to consumer prices. Many entrepreneurs were not formerly senior

executives, meaning that encouraging entrepreneurship among workers who are not senior

executives by prohibiting non-competes will yield more business formation. That business

formation increases competition, which may lead to lower prices. Additionally, firms will not be

foreclosed access to talent (which is likely important across the spectrum of workers, though

evidence only specifically exists for senior executives), which may also lead to lower prices. In

the absence of empirical evidence demonstrating which workers' non-competes affect consumer

prices, the Commission cannot estimate how much of the effect is due to coverage of which

workers.

The Commission finds that a rule excluding senior executives would result in decreased

levels of investment in workers' human capital. The empirical literature has not separately

assessed the effect of non-competes on investment in human capital for senior executives versus

other workers, though the study finding that training decreases with greater non-compete

---

[1196] Mueller, *supra* note 569.

enforceability includes both workers who are and are not senior executives. The Commission therefore believes that some or much of any cost or benefit of the rule from changing investment in human capital would pertain to workers who are not senior executives. However, the Commission notes that, as discussed in Part X.F.7.a, if lost training under the rule is lost "core" (as opposed to "advanced") training, then the final rule will cause a cost *savings* for firms, which will have greater access to experienced workers and will therefore spend less on "core" training.

The Commission finds that the direct costs of compliance with the final rule may be partially diminished if senior executives were excluded. First, the Commission reiterates that notice is not required for senior executives under the final rule. Therefore, that component of the direct costs of compliance would not be affected. However, even with those senior executives excluded, costs associated with ensuring incoming workers' contracts do not have non-competes would still be present. Insofar as senior executives' contracts may be more complex than other workers' contracts, this cost may be substantially diminished, however. Similarly, with respect to the costs of updating contractual practices, as noted by commenters, these costs may be substantially greater for the contracts of senior executives due to the complexity of their contracts and the sensitivity of the information they possess. Therefore, while some costs associated with updating contractual practices would survive if senior executives were excluded, their exclusion may reduce costs associated with the rule disproportionately to their (relatively low) share of the workforce.

Finally, some litigation costs may still be present if senior executives are excluded. Litigation costs associated with non-competes would still likely fall for workers other than senior executives due to the bright-line coverage in the rule. Costs associated with litigation other than non-compete litigation may rise if firms turn to those methods, though no evidence suggests they

516

will.

Overall, a rule that excludes senior executives will likely result in substantial benefits, as well as some costs. While the Commission largely cannot quantify the extent to which benefits and costs would fall if senior executives were excluded from coverage under the rule, the Commission finds that the benefits quantified and monetized elsewhere in this impact analysis would likely be diminished relative to the final rule as adopted, especially those associated with innovation and prices, but costs would also be diminished, especially those associated with investment in human capital and updating contractual practices. The Commission finds that, even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs, which remains true even if senior executives were excluded from coverage.

## XI. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to provide an Initial Regulatory Flexibility Analysis ("IRFA") and Final Regulatory Flexibility Analysis ("FRFA") of any final rule subject to notice-and-comment requirements, unless the agency head certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities.[1197] In the NPRM, the Commission provided an IRFA, stated its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered.[1198] In addition to publishing the NPRM in the Federal Register, the Commission announced the proposed rule through press and other

---

[1197] 5 U.S.C. 603-605.
[1198] NPRM at 3531.

releases,[1199] as well as through other outreach including hosting a public forum on the proposed

rule[1200] and attending the U.S. Small Business Administration Office of Advocacy's ("SBA

Advocacy") roundtable on the proposed rule with small entities,[1201] in keeping with the

Commission's history of small business guidance and outreach.[1202]

The Commission thereafter received over 26,000 public comments, many of which

identified themselves as being from small businesses, industry associations that represent small

businesses, and workers at small businesses.[1203] The Commission greatly appreciates and

thoroughly considered the feedback it received from such stakeholders in developing the final

rule. The Commission made changes from the proposed rule in response to such feedback and

will continue to engage with small business stakeholders to facilitate implementation of the final

rule. Further, the Commission is publishing compliance material to assist small entities in

complying with the final rule.

Specifically, based on the Commission's expertise and after careful review and

consideration of the entire rulemaking record—including empirical research on how non-

competes affect competition and over 26,000 public comments—the Commission adopts this

---

[1199] FTC, Press Release, *FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition* (Jan. 5, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.
[1200] FTC, FTC Forum Examining Proposed Rule to Ban Noncompete Clauses (Feb. 16, 2023), https://www.ftc.gov/news-events/events/2023/02/ftc-forum-examining-proposed-rule-ban-noncompete-clauses.
[1201] Commission staff attended the February 28, 2023, roundtable. *See also* Comment from SBA Off. of Advocacy, FTC-2023-0007-21110 at 2.
[1202] Each year since FY2002, the Small Business Administration (SBA) Office of the National Ombudsman has rated the Federal Trade Commission an "A" on its small business compliance assistance work. *See, e.g.*, SBA Office of the Nat'l Ombudsman, 2021 Annual Report to Congress at 47.
[1203] The Commission received over 26,000 comment submissions in response to its NPRM. *See* Regulations.gov, *Non-Compete Clause Rule* (Jan. 9, 2023), https://www.regulations.gov/document/FTC-2023-0007-0001. To facilitate public access, 20,697 such comments have been posted publicly at www.regulations.gov. *Id.* (noting posted comments). Posted comment counts reflect the number of comments that the agency has posted to Regulations.gov to be publicly viewable. Agencies may redact or withhold certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. Gen. Servs. Admin., Regulations.gov Frequently Asked Questions, https://regulations.gov/faq.

final rule, including with changes relative to the proposal to reduce compliance burdens on small business and other entities. For example, the Commission allows existing non-competes with senior executives to remain in force,[1204] amends the safe harbor notice requirement to ease compliance,[1205] removes the requirement to rescind existing non-competes, and removes the ownership threshold from the sale of business exception.[1206] In light of the comments, the Commission has carefully considered whether to certify that the final rule will not have a significant impact on a substantial number of small entities. The Commission continues to believe that the final rule's impact will not be substantial in the case of most small entities, and in many cases the final rule will likely have a positive impact on small businesses. However, the Commission cannot fully quantify the impact the final rule will have on such entities. Therefore, in the interest of thoroughness and an abundance of caution, the Commission has prepared the following FRFA with this final rule.

Although small entities across all industrial classes—*i.e.*, all NAICS codes—would likely be affected, the estimated impact on each entity would be relatively small. The Small Business Administration ("SBA") states that, as a rule of thumb, the impact of a rule could be significant if the cost of the rule (a) eliminates more than 10% of the businesses' profits; (b) exceeds 1% of the gross revenues of the entities in a particular sector; or (c) exceeds 5% of the labor costs of the entities in the sector.[1207] As calculated in Part XI.F, the Commission estimates that legal and administrative costs would result in costs on average of $712.45 to $1,250.93 for single-

---

[1204] *See* Part IV.C.3.
[1205] *See* Part IV.E.
[1206] *See* Part V.A.
[1207] SBA, *A Guide for Government Agencies: How to Comply With the Regulatory Flexibility Act*, at 19 (Aug. 2017) https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/a-guide-for-government-agencies-how-to-comply-with-the-regulatory-flexibility-act/ (hereinafter "RFA Compliance Guide").

establishment firms with 10 workers.[1208] These costs would exceed the SBA's recommended thresholds for significant impact only if the average profit of regulated entities with 10 workers is $7,125 to $12,509, average revenue is $71,245 to $125,093, or average labor costs are $14,249 to $25,019, respectively. Furthermore, while there are additional nonmonetizable costs associated with the final rule, there are also nonmonetizable benefits which would at least partially offset those costs, as explained in Part X.F.6.

## A. Reasons for the Rule

The Commission describes the reasons for the final rule in Parts IV.B and IV.C.

## B. Statement of Objectives and Legal Basis

The Commission describes the objectives and legal basis for the final rule in Part IV.B and IV.C and the legal authority for the final rule in Part II.

## C. Issues Raised by Comments, the Commission's Assessment and Response, and Any Changes Made as a Result

### 1. Comments[1209] on Benefits to Small Businesses and the Commission's Findings[1210]

#### a. Comments

Numerous small businesses and small business owners generally supported the proposed rule and shared two primary reasons, among others, that the rule may uniquely benefit small

---

[1208] Ten workers is chosen as an illustrative example. For this example, the Commission calculates the cost of notification based on 10 workers and applies legal costs consistent with the average per establishment cost calculated in X.F.7.

[1209] The U.S. SBA publishes a Table of Small Business Size Standards based on the North American Industry Classification System (NAICS), determining the maximum number of employees or annual receipts allowed for a concern and its affiliates to be considered small. 13 CFR 121.201; *see also* Small Bus. Admin., *Table of Size Standards*, https://www.sba.gov/document/support-table-size-standards. Because commenters did not provide their NAICS number or annual receipts, and many did not provide the number of workers, the Commission is unable to determine whether each individual commenter meets the SBA's definition of a small business. Instead, for purposes of considering comments from small businesses, the Commission relies on the commenter's self-description of being a small business or start-up.

[1210] This section captures comments related to the potential benefits of the final rule for small businesses. These comments do not directly address the IRFA. Comments on the IRFA are captured in Part XI.G. Many comments and issues concerning small businesses are also discussed in Part IV.B.3.b.i.

business owners. First, because non-competes are expressly designed to prevent workers from starting new businesses within the industry and geographic market that worker is experienced in, commenters said non-competes prevent new business formation and threaten new small businesses. Thus, consistent with the empirical evidence,[1211] commenters said a ban on non-competes will drive small business creation as entrepreneurial employees will be free to compete against their former employers. Second, commenters said non-competes harm small businesses by preventing them from hiring experienced workers. The Commission considered all comments related to small businesses and addresses many of them in Parts IV.B and IV.C and throughout this document.

Many comments from small businesses align with the findings in Part IV.B.3.b.i, namely that non-competes inhibit new business formation. A vast majority of such new businesses will be small businesses. For example, Kang and Fleming find that when Florida made non-competes more enforceable, larger businesses entered the State and increased employment while small businesses entered less frequently, and employment for them did not change.[1212] An economist stated that the NPRM's findings show that non-competes harm small business formation and that firms struggle to hire and grow in States that are more likely to enforce non-competes. Another commenter identified an additional study showing that Hawaii's ban on non-competes in the technology industry increased the number of technology startups.[1213]

Some commenters cited the Small Business Majority's polling data on non-competes. The survey finds that 67% of small businesses that currently use non-competes support the

---

[1211] *See* Part IV.B.3.b.i.
[1212] Kang & Fleming, *supra* note 536.
[1213] *See* Glasner, *supra* note 528.

proposed ban[1214] and 46% of small business owners have been subject to a non-compete that prevented them from starting or expanding their own businesses.[1215] Additionally, 35% of small business respondents reported that they have been prevented from hiring an employee because of a non-compete.[1216] The survey also finds that of the 312 small businesses that responded, 59% expressed agreement that NDAs could likely protect confidential information or trade secrets as effectively as a non-compete.[1217] The online survey had a small sample size of 312 small business owners and decision-makers, and had a margin of error of +/- 6%.[1218] An economist commented that these survey findings provide specific evidence underlying the mechanisms identified in the empirical studies finding that non-competes decrease new business formation and prevent new firms from hiring and growing. While the survey has too small of a sample size to be fully representative of small businesses, the survey illustrates that non-competes have prevented or delayed small businesses from starting or expanding.

Small businesses stated non-competes hindered their small business, including through costly lawsuits from former employers. Many commenters said non-competes were preventing them from starting a business.[1219] One technology startup organization cited the thousands of startups formed by alumni of five leading tech companies as well as key within-industry spinoffs in the aerospace industry and suggested the number of spinoffs could be greater with a nationwide ban on non-competes. The commenter stated that even delays in founding a startup slow innovation. The commenter looked at the employment history of these aerospace startup

---

[1214] Sm. Bus. Majority, Opinion Poll, *Small Business Owners Support Banning Non-Compete Agreements* 2 (Apr. 13, 2023). The survey also finds that 51% of small businesses that do not use non-competes support the proposed ban.
[1215] *Id*.
[1216] *Id*.
[1217] *Id*. at 3 (finding that 24% strongly agreed and 35% somewhat agreed).
[1218] *Id*. at 2.
[1219] *See* Part IV.B.3.b.i (summarizing these comments).

founders and stated that, while it could not determine whether they had non-competes, their work history suggested they were not constrained in the labor market.

Many small businesses commented that non-competes prevented them from hiring the right talent and harmed their businesses, often because small businesses could not afford a lawsuit or even the legal costs of determining whether a non-compete with a perspective employee was unenforceable.[1220] A technology startup organization stated that startups are much more likely to survive with experienced counselors and mentors.[1221] A policy organization stated that non-competes favor established and large companies, because they can use non-compete litigation strategically to chill movement of experienced executives to startups and smaller firms that lack the resources to contest the non-competes in court. The policy organization also stated workers with non-competes often go to an established competitor that has the resources to protect them in case of a suit rather than a small firm, meaning small firms are disadvantaged in hiring. Similarly, a law firm commenter stated that small firms are less able to compensate new hires who have forfeiture-for-competition clauses compared to larger firms.

Commenters made several other arguments in favor of the rule covering small businesses. Several commenters pointed out that small businesses have not struggled to thrive in States where non-competes have long been prohibited, including California, Oklahoma, and North Dakota. A startup organization agreed with data cited in the NPRM indicating non-competes disproportionately reduce entrepreneurship for women, and argued that disproportionate financial challenges for women mean women entrepreneurs have fewer resources to withstand other harms from non-competes, including lack of access to talent.[1222] A law firm stated that a

---

[1220] *Id*.
[1221] *Id*.
[1222] *See also* Marx (2022), *supra* note 519.

small business exception to the rule would lead to an inefficient "cliff" effect, where small businesses who previously fell within the exception would need to rescind their existing non-competes after surpassing a threshold. Finally, and importantly, numerous workers at small businesses reported substantial harms from non-competes consistent with the harms cited in Part IV.B.2 and IV.B.3.a, just as workers for large employers did.

### b. Responses to Comments

As the Commission explained in Parts IV.B.3.b and IV.C.2.c, the weight of the empirical evidence supports the conclusion that non-competes inhibit new business formation and foreclose small and other businesses from accessing the talent they need to grow and succeed. Most new businesses are small, and non-competes are expressly designed to prevent workers from starting new businesses in the fields they know best. The Commission appreciates the small businesses and entrepreneurs who shared their experiences in the comments. These comments and the many comments discussed in Parts IV.B.2 and IV.B.3 from small businesses align with and bolster the empirical evidence. The comments illustrate the real-world impacts of non-competes on entrepreneurs and would-be entrepreneurs, both before and after formation of a business. Moreover, the labor market effects—including reducing labor mobility and artificially suppressing wages and job quality—are not different or mitigated when a worker works for a small business rather than a large one. Studies finding harm from non-competes examined both large and small businesses, and the Commission believes that small businesses' use of non-competes causes the same harms set forth in Parts IV.B and IV.C, including harm to other small businesses.

Based on these and other comments, the Commission believes that many small businesses are blocked from hiring workers that could help their business grow and have fewer

resources than larger businesses to evaluate the risk of hiring a worker subject to a non-compete, to pay to "release" a worker they want to hire from a non-compete, such as a forfeiture-for-competition clause, and defend themselves from a non-compete suit.

In response to the comments on small business successes in States where non-competes are banned, the Commission notes that it recognizes that there are many successful small businesses in States that ban non-competes, but is not aware of any empirical evidence considering success rates of small businesses based on enforceability of non-competes.

In response to the comment discussing startups in the aerospace industry, the Commission notes that the conclusions of the commenter align with the empirical evidence that the most successful startups are within-industry spinoffs.[1223] However, the Commission notes that according to the data presented in the comment, some of the founders the comment described as being unrestrained in the labor market have significant gaps in their work history, though the Commission cannot determine the cause of any gaps.

As explained in Part IV.C, the Commission adopts a partial exception in § 910.2(a)(2) for senior executives under which their existing non-competes—non-competes entered into before the effective date—are not covered by the final rule. Employers cannot, however, enter into new non-competes with senior executives as of the effective date. The evidence and comments describing the importance of freeing senior executives from non-competes with respect to founding and supporting new and small businesses contributed to the Commission's decision to ban future non-competes for senior executives instead of excepting senior executives entirely from the final rule. The Commission is aware that existing non-competes with senior executives will reduce some of the benefits for new and small businesses as fewer senior executives will be

---

[1223] *See* Part IV.B.3.b.i.

free to join or found those businesses beginning on [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*]. However, senior executives are a small, narrowly defined group, meaning there will still be numerous experienced workers freed from non-competes that can found or support small businesses, and senior executive non-competes will eventually become phased out. In addition, the Commission expects small businesses to receive the other anticipated benefits of the final rule.

### 2. Comments Arguing the Rule will Harm Small Businesses and the Commission's Findings[1224]

#### a. Comments

Some small businesses and industry groups stated they believe a ban on non-competes would harm small businesses. Several commenters requested an exception for small businesses or certain types of small businesses, such as independent medical practices. The Commission addresses these comments in this Part XI.C.2 and addresses direct potential costs in Part XI.E. The Commission appreciates the small businesses and entrepreneurs who shared their experiences in the comments.

Commenters raised concerns that eliminating non-competes for all businesses would allow larger businesses and incumbents to easily hire away talent from smaller competitors and startups. Other small businesses said they had been harmed in the past by former workers competing against them, including by recruiting clients and other workers, or by large competitors hiring their workers. Similarly, some industry associations and small businesses said non-competes protect independent businesses, including medical practices, from dominant

---

[1224] This section captures comments that do not directly address the IRFA but that are related to the potential costs of the final rule for small businesses. Comments directly addressing the IRFA are captured in Part XI.G. Many comments concerning small businesses are also discussed in Part IV.B.3.b.i.

consolidators, as high recruitment, retention, and other costs may induce small businesses to sell their business to consolidators. Relatedly, some healthcare organizations argued a ban that does not cover nonprofit hospitals and health systems would provide those large nonprofits with an unfair advantage over independent medical practices.

Some small businesses offered the same justifications as other businesses for using non-competes but emphasized the heightened potential damage to smaller businesses less able to bear costs, including being forced to close or sell.[1225] Many of these comments asserted that small businesses relying on legitimate trade secrets would be especially harmed if a worker took that information to a competitor or new business, particularly because they would be least equipped to detect theft or retain sophisticated legal counsel to litigate potential trade secrets or NDA claims, thus reducing investment and innovation.[1226] A law firm argued that trade secrets litigation often costs millions, and few attorneys are willing to work on contingency, so startups would struggle to litigate against larger well-financed firms, especially as large firms can drive costs up to force the startup out of the litigation. SBA Advocacy asserted that if competitive information is not protected, some small businesses could face a serious risk of loss or potential closure and could not afford alternative means of protection.

One industry organization stated more generally that protecting information is a high priority for emerging growth companies. Some small businesses stated if non-competes are banned, they might silo workers and information to limit the potential harm from a worker leaving for a larger competitor and would harm the business. One business stated that while banning non-competes might allow more market entrants, those new entrants will be more likely to fail without the protection of non-competes for worker retention and confidential information.

---

[1225] *See, e.g.*, SBA Off. of Advocacy, FTC-2023-0007-21110 at 3.
[1226] *Id*.

Some business associations stated small business owners often rely on independent contractors and sole proprietors such as marketers to build their businesses and share proprietary information with them (meaning contractors may have access to information from multiple competitors) and covering such groups under the rule would harm their growth.

Small businesses also stated they use non-competes to protect investments, including in training, to prevent workers from taking clients or customers, and to increase retention and stability. For example, some small businesses shared that they started using non-competes after workers they had trained extensively went to a larger competitor or started their own business. One small business organization stated the proposed requirement to relate "costs incurred" to TRAPs would be harder for small businesses who are more likely to train on the job. A physician practice stated that a partner leaving for a hospital would destabilize and increase costs for the practice, but a non-compete that is bought out helps practices afford those extra expenses or otherwise prevents that destabilization.

Commenters provided additional reasons small businesses use non-competes. A business stated that they could not afford to pay workers as much as larger businesses, so will be unable to find workers. A small business association stated that banning non-competes would exacerbate the labor shortage for small businesses by decreasing investment in training, when there are already insufficient qualified applicants. A commenter stated that the NPRM did not provide any examples of small businesses using non-competes in an unfair way. SBA Advocacy also stated that some small business employment contracts compensate workers for non-competes. One business stated small businesses may not be able to afford to fight larger businesses using borderline *de facto* non-competes.

A banking association stated that new businesses that cannot protect their business would

be less able to attract capital than more established businesses, while a community bank similarly said it may be unable to lend to small businesses that cannot protect their workers, customers, and proprietary information with non-competes. A small business stated that NDAs and non-solicitation clauses were too difficult to enforce, as it was told by judges that in order to win a non-solicitation suit against a former worker who purportedly took clients, the business would need to subpoena its own former clients to testify, which would damage the business's reputation.

A physician said they were able to start an independent practice while complying with a non-compete and hire others in compliance with their non-competes. One small business said they were able to work out solutions when hiring a worker subject to a non-compete to avoid violating it.

SBA Advocacy relayed the concern of one 8(a)[1227] small business that feared if entities in the 8(a) business development program cannot control their talent, the money the Federal government has spent helping these companies would be wasted. Accordingly, SBA Advocacy asserted that the proposed rule conflicted with the Congressional law creating the 8(a) program.[1228]

A small Federal contractor stated that larger companies could poach workers who are skilled and/or who are already cleared by the government to work on projects from small businesses, potentially putting them out of business, and would damage contractors' ability to provide stability to the agencies.

---

[1227] Sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10) and 637(a)) authorize the SBA to establish a business development program, which is known as the 8(a) Business Development program. The 8(a) program is a robust nine-year program created to help firms owned and controlled by socially and economically disadvantaged individuals. SBA, *8(a) Business Development Program* (last updated Jan. 25, 2024), https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.
[1228] SBA Off. of Advocacy, FTC-2023-0007-21110 at 3.

Some commenters expressed concern that the proposed 25% threshold[1229] for the sale of business exception would cause small businesses to lose value when acquired because owners and key workers are critical contributors to the business and non-competes are intangible assets, making buyers less likely to buy. Some commenters requesting a small business exception suggested various definitions of "small business," including based on the number of employees.

Finally, SBA Advocacy encouraged the Commission to adopt an approach addressing the different concerns of small entities and consider, analyze, and tailor alternatives to the size and type of entity to minimize adverse impacts to small entities.[1230] It stated that a categorical ban was inappropriate given the range of industries and nature of economic impacts.[1231] One business requested an exception for highly paid workers at small businesses, to create a predictable bright-line rule while leveling the playing field for small businesses. An industry association asked for an exception for newly formed businesses in order to encourage capital formation among start-up entities.

### b. Responses to Comments

First and foremost, the Commission finds, based on its expertise, the empirical evidence, and the record before it, that non-competes tend to negatively affect competitive conditions in both labor and product and service markets, including by inhibiting new business formation.[1232] The Commission is not aware of any empirical research on existing firm closures—including small business closures—being correlated with decreased non-compete enforceability. The Commission is also not aware of empirical research on specific business closure patterns. Rather, the empirical evidence shows that non-competes overall increase new business formation and

---

[1229] NPRM, proposed § 910.1(e).
[1230] SBA Off. of Advocacy, FTC-2023-0007-21110 at 3.
[1231] *Id*.
[1232] *See* Parts IV.B and IV.C.

decrease concentration, indicating that the final rule will likely increase the overall number of small businesses. The Commission is focused on the aggregate effects of non-competes on competitive conditions and here considers the overall effect on small businesses. While an individual small business may benefit from prohibiting one of its workers from joining a competitor or from keeping a competitor from entering the market, non-competes have a substantial net negative aggregate impact on competitive conditions in both labor markets and product and services markets, including negative spillover effects on other small businesses that do not use non-competes.[1233]

The Commission has assessed the evidence on protection of trade secrets and proprietary information in Part IV.D and finds that businesses have sufficient, less restrictive alternatives to protect such information. These options, such as NDAs, protection under trade secrets law, and importantly, competing on the merits to retain workers, are also accessible to small businesses. On the latter, small businesses have potentially distinct options from larger firms because of their greater ability to be flexible and responsive to their workers' preferences. Moreover, the Commission notes that no evidence exists to support the hypothesis that trade secret litigation will increase after the final rule takes effect. Recent evidence suggests trade secret litigation does not increase following bans on non-competes.[1234] With a bright-line rule banning non-competes, small businesses, like other business, will not face or have to undertake litigation related to non-competes, which may partially offset other litigation costs if firms do substitute other litigation. In fact, the purported dynamic where small firms are outspent and outmatched by large firms that

---

[1233] *See id.*

[1234] Greenwood, Kobayashi, & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

drive up the cost of trade secrets litigation, is the exact dynamic many small businesses face when sued over a non-compete, which can also force small businesses to close.[1235] While the Commission does not have data on the frequency of each type of litigation or how often it forces small businesses to close, these comments indicate that this alleged legal threat is already present in a different form. Moreover, the overbreadth of non-competes that employers cite as the source of their benefits for reducing litigation costs is also the source of the negative effects of non-competes on competitive conditions, and pecuniary benefits to a firm engaged in an anticompetitive practice are not a cognizable justification for an anticompetitive practice.[1236]

Additionally, the Commission is unaware of any evidence that small businesses in States where non-competes are less enforceable are more likely to experience trade secret misappropriation, or evidence that small businesses are at a distinct disadvantage in these States. Finally, the Commission notes that despite claims that using non-competes to protect trade secrets supports innovation, the empirical evidence shows that increased enforceability of non-competes on net in the aggregate harms innovation. Again, the Commission considers the overall effect on all business, including small businesses, and finds that the final rule will not reduce innovation by small business.

In response to the comments that businesses would limit sharing confidential information with their workers or that a small business's inability to protect confidential information would cause new businesses to fail, the Commission notes that use of less restrictive alternatives, including, for example, NDAs, fixed term contracts, and worker retention policies, would allow small businesses to maintain the same or near same level of protection for the confidential information they might share and want to protect. Accordingly, to the extent it is productive for a

---

[1235] *See* Parts IV.D and X.F.7.c.
[1236] *See* Part II.F.

small business to protect such information or share it with a worker, the firm would adopt these alternatives and be able to continue to operate with the same or similar use of confidential information. Moreover, the Commission is not aware of any empirical evidence supporting the conclusion that firms would share less confidential information or be less able to protect it. In fact, the evidence shows that both within-industry and non-within industry spinouts are better quality, on average, when non-competes are less enforceable, which reinforces the conclusion that small businesses do not rely on non-competes to thrive.[1237] Indeed, no empirical evidence shows new businesses fail at a higher rate when (or because) non-competes are less enforceable. To the extent some businesses may choose to limit information sharing (as some individual comments suggest), the Commission concludes that the benefits of the final rule with respect to earnings, new business formation, and innovation justify any limited resulting negative effect.

In Parts IV.D.1 and X.F.7.a, the Commission examines the evidence on human capital investment and other investment and finds uncertainty regarding whether the effects on training and other investment will be benefits or costs under the final rule. The Commission distinguishes between core training and advanced training, finding that businesses may be able to spend less on core training under the final rule to the extent businesses are able to better match workers with their needs. The Commission similarly finds that new business formation under the final rule could result in an increase in overall capital investment or serve to offset any decreased capital investment in incumbent firms. As noted in comments from small businesses, non-competes limit their ability to hire experienced, productive workers. While it may be true in some cases that large businesses will be able to "poach" workers from smaller business, smaller businesses would also be better able to hire talent from large (or other) businesses under the final

---

[1237] *See* Part X.F.9.a.

rule. In fact, theoretically, the final rule would be more beneficial to smaller businesses because they would no longer be hamstrung by the threat of non-compete litigation by large firms when hiring experienced workers from those firms. To the extent large firms can afford to pay out a worker non-compete or to litigate or threaten litigation in order to secure talent they want from a small firm, a ban on non-competes will better level the playing field between small and large firms competing for talent. While as stated by one commenter, some small businesses may be successful if they are able to use non-competes, the empirical evidence supports the conclusion that new business formation will increase overall under the final rule, and the Commission is not aware of any evidence of small business closure patterns. Businesses also have other alternatives to retain workers.[1238] Finally, the empirical evidence demonstrates ways in which non-competes advantage large businesses against smaller ones.[1239]

　　　　In response to comments that argued non-competes were needed to promote stability and worker retention, the Commission notes that there is no evidence that stability and worker retention are economically productive in and of themselves. The overall evidence on the harms from non-competes demonstrates that retention of workers through non-competes has considerable costs to both labor markets and product and service markets. Importantly, businesses also have other, less restrictive alternatives—that do not tend to negatively affect competitive conditions—to retain workers as discussed in this Part and in Part IV.D.2. In response to the comment that small businesses will be less likely to afford retaining workers than large businesses that can pay more, the Commission notes that increases in innovation are likely to make small businesses more productive and successful, allowing them to better compete with their larger competitors. Moreover, the Commission notes that, in addition to those retention

---

[1238] *See* Part IV.D.2.
[1239] *See* Part IV.B.3.b.

alternatives, many workers commented that their non-competes prevented them from seeking jobs with better working conditions, shorter commutes, more flexible hours, or more career advancement opportunities, among others.[1240] Small businesses have ways to compete for workers beyond wages alone.

Many of the comments from small businesses, as well as from other commenters, appear to confuse non-competes with other types of agreements, such as non-solicitation agreements or NDAs, and argue that non-competes are needed to prevent former workers from taking the employer's customers or clients or disclosing confidential information. The final rule does not ban non-solicitation clauses unless they meet the definition of non-compete clause.[1241] While one commenter argued that non-solicitation clauses may be more difficult to enforce than non-competes, the Commission weighs the cost of this potential increased difficulty against the harms from non-competes and finds that any marginal benefit compared to a non-solicitation clause does not justify the costs of non-competes. And as explained previously, pecuniary benefits to a firm from an anticompetitive practice are not a cognizable defense.[1242]

In response to comments that small businesses are more reliant on independent contractors and without non-competes independent contractors might have access to confidential information for multiple competitors, the Commission first notes that the final rule does not prohibit agreements preventing a worker from working for two firms simultaneously.[1243] Many alternatives to non-competes allow businesses working with independent contracts to protect their confidential information, including maintaining security of confidential information as well as NDAs and other such agreements, as described in Part IV.D. There is no evidence that

---

[1240] *See* Part IV.B.3.a.iii.
[1241] *See* Part III.D.
[1242] *See* Part II.F.
[1243] *See* Part III.D.

independent contractors are more likely to use or share confidential business information and, in fact, they are likely to be working under an agreement detailing their responsibilities and to be more familiar with ways to assure clients that any confidential business information shared with them will remain confidential.

In response to comments that banks might decrease lending without non-competes, the Commission notes that there is no indication that small businesses in States that have banned or limited non-competes have been unable to obtain financing and commenters provide no related evidence. Again, small businesses will have less restrictive alternatives as a means of protecting confidential information. Moreover, with respect to new business formation, workers seeking to start their own businesses will be able to reassure banks that their business will not face the threat of litigation or a court enjoining them from continuing with their business because of a non-compete.

In response to SBA Advocacy's comment on compensation for non-competes, the Commission considered this issue in Part IV.C. and decided to allow existing non-competes with senior executives, which the Commission finds are most likely to have involved consideration, to remain in force.

In response to the comment on the (8)(a) business development program, the Commission notes that there are likely program participants in States where non-competes are banned or partially banned and, thus, are not able to use non-competes. Moreover, the program aims to help firms owned and controlled by socially and economically disadvantaged individuals with various supports and assistance to improve their success in securing government contracts. There is no basis to believe that such assistance hinges on these small businesses being able to use non-competes with their workers. Like other firms, program participants have viable, less

restrictive alternatives that do not tend to negatively affect competitive conditions. The evidence presented in this Part shows that on the whole, small businesses—including 8(a) participants—are expected to benefit from the ban on non-competes by, for example, having a larger pool of talent from which to hire workers.

In response to the comment that large businesses may use borderline *de facto* non-competes, the Commission notes that it provides greater clarity on the definition of non-compete clause in Part III.D, which the Commission believes will reduce both confusion and evasion. To the extent the commenter is raising the possibility that such other restrictive employment terms may tend to negatively affect competitive conditions, the Commission notes that section 5 and the other antitrust laws apply to those terms and govern whether such terms might be unlawful.

In response to comments on the proposed sale of business threshold, as explained in Part V.A, the Commission is eliminating the 25% threshold, meaning more small businesses will be able to utilize non-competes for more owners when they are selling their business. While individual businesses might see decreased value in a sale from being unable to use non-competes for workers, any decrease is justified by the net aggregate benefits of freeing labor markets and product and service markets from non-competes. Again, pecuniary benefits to a firm engaged in an anticompetitive practice is not a cognizable defense.[1244]

In response to the proposed definitions of "small business," first, as explained in Part X.H, the Commission declines to create an exception for small businesses. Second, the SBA already defines "small business" based on size standards set forth in 13 CFR 121.201, and agencies are prohibited from deviating from this definition without following the procedures set

---

[1244] *See* Part II.F.

out in 13 CFR 121.903.[1245]

In response to the comments arguing that the Commission's jurisdiction does not extend to tax-exempt nonprofit hospitals and healthcare organizations and that the final rule would, thus, give large nonprofits an unfair advantage over small practices, the Commission addresses this question in Parts II.E.2 and V.D.4. In response to the comment on difficulties in using TRAPs under the proposed rule, the Commission notes the final rule does not ban TRAPs, but covers terms and conditions of employment that meet the definition of non-compete clause as delineated in § 910.1 and described in Part III.D.

The commenter asserting that the final rule would exacerbate a labor shortage for small businesses did not provide evidence to support this claim. The Commission, however, finds that a ban on non-competes will increase labor mobility and enable skilled workers who are currently trapped by non-competes to work for others in the industry.

Finally, the Commission notes that numerous workers at small businesses have shared how non-competes have harmed them.

The Commission has carefully considered all of SBA Advocacy's and other stakeholders' comments, including those requesting a small business exception. The Commission has made the following changes, which the Commission believes will benefit small entities: adding an exception for existing senior executive non-competes; amending the notice requirement to ease compliance; and eliminating the sale of business ownership threshold. The Commission believes that the final rule will benefit small businesses overall. The Commission notes that no State has exempted small businesses from any State statutes regulating non-competes.[1246] There is no

---

[1245] RFA Compliance Guide, *supra* note 1207 at 14. One business suggested that the SBA definition is prone to confusion and litigation but did not provide any additional information to explain why or how.

[1246] *See generally* Beck Reed Riden Chart, *supra* note 1052. In 2023, Maryland increased its non-compete

empirical evidence that a small business exception is necessary or appropriate. Further, the evidence indicating that a ban on non-competes will benefit the economy accounts for non-competes used by both large and small businesses. In sum, the evidence indicates that the final rule will, in the aggregate, benefit both small businesses and workers who work for small businesses—not to mention the consumers who in turn benefit. More small businesses are expected to enter the market, and the final rule will remove barriers to their growth.

### D. Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result

The Commission received and carefully reviewed the comment from the SBA.[1247] The issues raised by the SBA and the Commission's responses are included in Parts XI.C and XI.F.

### E. Description and Estimated Number of Small Entities to Which the Rule Will Apply

The final rule will impact all small businesses, across all industry classes, that use non-competes. It may also impact some small businesses that do not use non-competes but are impacted by other businesses' use of non-competes. The Commission does not expect that there are classes of businesses which will face disproportionate impacts from the final rule.

For the vast majority of industries, there is no nationwide granular data regarding the percentage of firms that use non-competes, which would facilitate calculating the number of small entities in a given industry using non-competes. Because of this data limitation and given the relatively stable percentage of firms using non-competes across the size distribution,[1248] the Commission estimates the total number of small firms across all industries in the U.S. economy.

---

compensation threshold to $19.88 per hour and set a slightly lower threshold for small employers at $19.20 per hour. Md. Lab. & Empl. Code sec. 3-716.

[1247] SBA Off. of Advocacy, FTC-2023-0007-21110.

[1248] *See* Colvin & Shierholz, *supra* note 65 at 5. The Commission emphasizes that, since smaller firms generally use non-competes at a lower rate, based on the numbers reported in Table 1, the estimate of the number of affected small entities is likely larger than is true in practice.

The Commission then calculates the number of firms estimated to use non-competes by applying an estimate of the percentage of firms using non-competes to that total. Using the size standards set by the SBA,[1249] the Commission calculates that there are 5.25 million small firms and 5.48 million small establishments in the U.S.[1250] Assuming that 49.4% of firms or establishments use non-competes,[1251] an estimated 2.59 million small firms, comprising 2.71 million small establishments, would be affected by the final rule. These calculations—the counts of businesses and the percentage of businesses that use non-competes—are based on small businesses with employees, since sole proprietorships are unlikely to use non-competes. Since the estimate cannot account for differential use of non-competes across industries, these firms span all industries and various sizes below the standards set in the SBA's size standards.

The Commission sought comments on all aspects of the IRFA, including the description and estimated number of small entities to which the rule would apply. A business association claimed the IRFA estimated the number of small businesses solely based on one incomplete study, the Colvin and Shierholz study, which it argued counted only firms with no union members who said all employees signed non-competes, risking significantly undercounting the number of impacted businesses. This comment misreads the study. The cited statement explained

---

[1249] *See* Small Bus. Admin., *Table of Size Standards*, https://www.sba.gov/document/support-table-size-standards.
[1250] The Commission uses the latest data available from the Census Bureau's Statistics of U.S. Businesses database, available based on firm revenue and firm size. Census Bureau, *Statistics of U.S. Businesses (SUSB)* (last revised Nov. 17, 2023), https://www.census.gov/programs-surveys/susb.html. Values are deflated to current dollars using https://www.bls.gov/data/inflation_calculator.htm. As used in this analysis, per the Census Bureau, "a firm is a business organization consisting of one or more domestic establishments in the same geographic area and industry that were specified under common ownership or control." On the other hand, "an establishment is a single physical location at which business is conducted or services or industrial operations are performed." *See* Census Bureau, *Glossary*, https://www.census.gov/programs-surveys/susb/about/glossary.html. The number of small firms calculated here has decreased compared to the IRFA based on the updated Census Bureau data and SBA size standards.
[1251] *See* Colvin & Shierholz, *supra* note 65. The Commission notes that the estimated percentage of firms which use non-competes is based on a survey of businesses with employees. In addition, the Small Business Majority's recent survey of small businesses finds that 48% of respondents use non-competes. Sm. Bus. Majority Opinion Poll, supra note 1214. The Commission does not find that this survey has a sufficiently representative sample size to be considered definitive but notes that it aligns with the Colvin & Shierholz estimate.

540

that when tabulating the share of businesses where all employees sign non-competes, the study counted only firms with no union members as it did not have information on whether union members signed non-competes.[1252] That does not mean that only firms with no union members where all employees signed non-competes were included in the study. In fact, the study divided its results between the share of workplaces where all employees and only some employees were subject to non-competes.[1253] The comment cites to only one component of the study results. Moreover, the study states that anecdotal evidence indicates it is rare for unions to agree to non-competes,[1254] and comments the Commission received align with that anecdotal evidence.

### F.  Projected Reporting, Recordkeeping, and Other Compliance Requirements

In order to comply with the final rule, small entities must do three things. First, to comply with § 910.2(a)(1)(i) and § 910.2(a)(2)(i), which state it is an unfair method of competition to enter into a non-compete with a worker, small entities can no longer enter into new non-competes with incoming workers, including senior executives. This may include revising human resources materials and manuals and template or form contracts to ensure they are not misused on a forward-going basis, and making strategic decisions regarding workers' employment terms. Second, to comply with § 910.2(a)(1)(ii) and (iii), small entities cannot enforce (or make misrepresentations about) existing non-competes for workers other than senior executives after the effective date. That is, businesses must refrain from suing or threatening to sue workers other than senior executives regarding a non-compete after the effective date; but formal contract rescission is not required. Third, businesses must provide notice to workers other than senior executives that the worker's non-compete will not be enforced against the worker. The

---

[1252] *See* Colvin & Shierholz, *supra* note 65.
[1253] *See generally id.*
[1254] *Id.*

Commission provides a safe harbor notice that must be provided only to workers with known contact information. These foregoing steps entail some potential legal and administrative costs.

As calculated in Parts X.D.1.a and X.D.2.a, the Commission estimates that the legal and administrative costs would total $538.48 to $1,076.96 for each small firm, plus an additional $155.85 for each establishment owned by that firm, plus an additional $1.81 per worker. A single-establishment firm with 10 workers, for example, would bear estimated costs of $712.45 to $1,250.93.[1255] Only a small portion of the average cost estimated for each small firm—$155.85 per establishment, plus $1.81 per worker—is required under the rule. The remainder of the estimated cost is attributable to legal costs which firms may (but are not required to) undertake to revise their contractual practices. The FRFA assumes that the value of human resource professionals' times and legal professionals' time is equal to twice their average wages, which results in updated estimates.[1256] In an abundance of caution, the Commission has erred on the side of overestimating costs.

As described in greater detail in Part X.F.7.a, the Commission also finds that firm investment in human capital may increase or decrease under the final rule, depending on the type of training affected. Given the evidence available, the Commission is unable to fully monetize the estimates of firm investment in human capital. It concludes, however, that even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs.

### 1. Legal Costs

---

[1255] Ten workers is chosen as an illustrative example.

[1256] See Part X.F.7.b for a detailed description of the calculation and assumptions. The Commission notes that a typographical error in the IRFA resulted in the Commission reporting preliminary figures that were substantially larger than the comparable calculations in the preliminary section 22 analysis, which accounts for some of the differential between the preliminarily reported figures in the IRFA and the final estimates here.

To ensure that incoming workers' contracts do not include non-competes and that they fully comply with the final rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete). For many firms, this process would likely be straightforward (*i.e.*, simply not using non-competes or removing one section from a boilerplate contract). Other firms may have more complex agreements or choose to use more time. The Commission assumes that, on average, ensuring that contracts for incoming workers do not have non-competes would take the equivalent of one hour of a lawyer's time (valued at $134.62),[1257] resulting in a total cost of $134.62*2.71 million=$364.8 million. There may be substantial heterogeneity in the costs for individual firms; however, the Commission believes this number is conservative. For firms whose costs of removing non-competes for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with the costs of updating contractual practices, described in Part X.F.7.b.

For each establishment of each firm, estimated direct compliance costs total $21.23+$134.62=$155.85, plus $1.81 per worker with a non-compete.

Some business commenters have indicated that they may add or expand the scope of NDAs or other contractual provisions. This legal work is not mandated or required by the rule; it would be undertaken only by the subset of firms and workers for whom firms conclude that such alternatives would be desirable. Additionally, such adjustments are likely unnecessary for senior executives whose non-competes continue to be enforceable under the final rule. Therefore, this component additionally involves identifying senior executives whose existing non-competes are

---

[1257] BLS, *Occupational Outlook Handbook*, *Lawyers* (last modified Sept. 6, 2023), https://www.bls.gov/ooh/legal/lawyers.htm (updated for inflation to 2023 dollars and based on updated BLS data). Assumed lost productivity is twice the median wage.

unaffected. For any such legal work, firms may use in-house counsel or outside counsel. To do so, firms may use in-house counsel or outside counsel to revise current contracts or enter into new, different contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to revise their contractual practices when they can no longer use non-competes, and commenters did not provide evidence on costs. However, there is evidence indicating that firms that use non-competes are already using other types of restrictive employment provisions. Balasubramanian et al. find that 95.6% of workers with non-competes are also subject to an NDA, 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and that 74.7% of workers with non-competes are also subject to all three other types of provisions.[1258] Firms that are already using multiple restrictive covenants may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-competes,[1259] the Commission assumes that the average firm employs the equivalent of four to eight hours of a lawyer's time to revise its contractual practices.[1260] The Commission emphasizes that this is an average to underline the fact that there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those that use non-competes only with workers who do not have access to sensitive information, or those that are already using other types of restrictive employment provisions to protect sensitive information, may opt to make no changes. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new

---

[1258] Balasubramanian, Starr, & Yamaguchi, *supra* note 74. The value 97.5% is calculated as (1-0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete, regardless of what other post-employment restrictions they have.
[1259] Colvin & Shierholz, *supra* note 65 at 1.
[1260] Part X.F.7.b.i.

contract.[1261] The estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-competes opt to make no changes to their contractual practices (for example, because their workers are among the 97.5% of workers that already have other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-competes with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 working days of an attorney's time, this would result in the estimate of 4-8 hours on average.

The Commission further emphasizes that this estimate is an average across all employers that would be covered by the final rule. There is likely substantial heterogeneity in the amount of time firms would use to revise contractual practices; very large firms that use non-competes extensively would likely incur greater costs.

Under the assumption that the average firm that uses a non-compete employs the equivalent of four to eight hours of a lawyer's time, this analysis calculates the total expenditure on updating contractual practices to range from $134.62*4*2.59 million=$1.4 billion to $134.62*8*2.59 million=$2.8 billion. Note that this assumes that decisions regarding protection of sensitive information and contract updating are made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm.

For each affected small business, the estimated cost of updating contractual practices is $134.62*4=$538.48 to $134.62*8=$1,076.96.

## 2. Administrative Costs for Notification Requirements

In order to reduce compliance costs and increase compliance certainty, § 910.2(b)(5)

---

[1261] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-competes. Commenters did not provide additional information or data that could be used to update these estimates.

provides that an employer complies with the notice requirement in § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(4). Furthermore, § 910.2(b)(4) includes model language that constitutes notice to the worker that the worker's non-compete is no longer in effect. The Commission estimates that composing and sending this message in a digital format to all of a firm's workers and applicable former workers for whom digital contact information is available would take 20 minutes of a human resources specialist's time.[1262] According to BLS, the median wage for a human resources specialist was $31.85 per hour in 2023.[1263] The cost of compliance for currently employed workers with digital contact information available is therefore ($31.85*2)/3=$21.23 per establishment. As estimated in Part XI.E, there are 2.59 million small firms, comprising 2.71 million small establishments, in the U.S. that use non-competes.[1264] Conservatively assuming that each establishment must engage in its own communication (*i.e.*, that a firm's headquarters does not have the ability to send a company-wide e-mail, for example), this means that the total direct compliance cost for workers who are already employed and for whom digital contact information is available is $21.23*2.71 million=$57.5 million.

Each small firm must additionally mail notice to workers with non-competes for whom a physical address is available, but digital contact information is not. The cost per notice is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. Given an estimated count

---

[1262] *See* Part X.F.7.

[1263] *See* BLS, *Occupational Outlook Handbook*, *Human Resources Specialists*, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm (last modified Sept. 6, 2023) (updated for inflation to 2023 dollars).

[1264] The dataset is available at Census Bureau, *2021 SUSB Annual Data Tables by Establishment Industry*, Industry (Feb. 2022) (last revised Sept. 15, 2023), https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html.

of affected workers with non-competes at small businesses of 584,843,[1265] the overall cost of mailed notice provision is therefore estimated to be $1.1 million.

## G.  Comments and Responses to Comments on the IRFA

The IRFA explained the Commission's preliminary assessment of the direct compliance costs for employers, both for rescinding non-competes for workers who are already employed as well as the costs of an attorney to ensure contracts for incoming workers do not have non-competes.[1266] The IRFA also explained the Commission's assessment of the costs of updating contractual practices, if the employer seeks to do so, by expanding the scope of other contractual provisions to protect trade secrets and other valuable investments.[1267] The Commission sought comment on all aspects of the IRFA.[1268]

In support of the proposed rule, one employment law firm said there are no significant recurring compliance costs to the final rule that would create an undue burden for small employers compared to larger employers. The Commission agrees. The final rule is designed to require only a one-time action and no recurring compliance requirements in order to minimize compliance costs for employers. A technology startup organization said the rule would save small businesses significant legal costs from the complex legal analysis currently necessary when trying to hire a worker subject to a non-compete, particularly when trying to assess the patchwork of State laws, "reasonableness" tests, and choice-of-law issues, which startups have few resources to pay.

---

[1265] Estimated as 80% * 18.1% * 66% * (33,271,644-27,151,987), where 80% is the percentage of covered workers (see Part X.F.4.a), 18.1% is the estimated percentage of workers with non-competes (see Starr, Prescott, & Bishara, *supra* note 68), 67% is the assumed percent of workers without digital contact information, and 6,119,657 = 33,271,644-27,151,987 is the count of workers at small businesses (see https://advocacy.sba.gov/wp-content/uploads/2023/11/2023-Small-Business-Economic-Profile-US.pdf).
[1266] *See* NPRM at 3532.
[1267] *See id.* at 3532-33.
[1268] *See id.* at 3531.

Some commenters raised concerns about the preliminary assessment of direct compliance costs, primarily concerning unsubstantiated costs of consulting with counsel. Some commenters said small businesses would need to consult with outside counsel to ensure they properly comply with the final rule, though they did not explain why. Another business association said most small businesses do not have the organizational development required to issue the notice and would need to hire outside counsel. A group of industry associations said the estimated costs of $317.68 to $563.84 were not realistic and did not reflect the cost of discussions with outside counsel on its existing agreements and contracts and its contract negotiation practices, but the comment did not provide information to support a different estimate. Some commenters argued that small businesses lacking internal counsel or employment lawyers on retainer would face substantial unplanned expenses when seeking outside counsel on whether other restrictive covenants violated the proposed *de facto* non-compete provision. These commenters did not provide cost estimates.

First, in response to the proposed rule's Preliminary Regulatory Impact Analysis, commenters discussed that the estimated compliance costs and costs of contractual updating may underestimate true costs for the broader business community and provided alternative estimates of the time employers might spend complying with the rule and updating contractual practices, as well as the charged rates of outside counsel. These comments are addressed in the sensitivity analyses presented in Part X.F.7. The Commission has also updated the estimated legal costs in this Part. Commenters also argued that small businesses would face greater costs associated with the use of outside counsel but did not quantify those costs for small businesses. Again, the Commission provides a sensitivity analysis reflecting the cost of experienced outside counsel for all firms in Part X.F.7.b.i. Moreover, as the Commission notes, the estimate reflects significant

heterogeneity, so that it is likely that some firms will simply be able to remove the paper or electronic copy of the non-compete from their website or workplace manual—requiring no attorney time—while others, like the commenter, may spend more time consulting with counsel.

Second, in response to these and other comments and as explained in Part III.D, the definition of non-compete clause has been revised to reduce confusion and give employers and workers a clearer understanding of what is prohibited, which will in turn reduce compliance costs. Third, the FRFA includes updated compliance costs to reflect any remaining need to assess contracts under § 910.2(a). Fourth, the Commission has made the notice requirement as simple as possible by providing model language for the notice in § 910.2(b)(4) and a safe harbor allowing employers to use a last known address and an exception for employers who do not have a workers' contact information. Employers can provide the notice by hand or through the mail, email, or a text message,[1269] and employers are not required to provide notice if they have no method of contacting a worker by paper or digital format.[1270] An employer is required only to notify workers that existing non-competes are no longer in effect and refrain from including non-competes in future contracts. This process is designed to be as easy as possible for employers. Employers should rarely need to seek outside legal assistance for complying with the notice requirement, and commenters do not provide an explanation of why legal assistance would be a necessary part of this process, though the cost of any such legal assistance (to identify senior executives for whom notice is not required) is accounted for in Part XI.F.1. Finally, the Commission will provide guidance materials for small entities to explain how to comply with the final rule.

The estimated compliance costs do not directly include any costs or savings from the

---

[1269] § 910.2(b)(2).
[1270] § 910.2(b)(3).

senior executive exception, because the number of workers the exception might apply to is such a small portion of workers overall that any effect is *de minimis*. At an individual firm level, small businesses might not be impacted by the exception (if no workers earn above the total compensation threshold). Others might face increased compliance costs if they choose to use the exception and need to evaluate whether a worker meets the definition of senior executive (as accounted for in Part XI.F.1). However, the total compensation threshold included in the final rule's definition of "senior executive" is designed to ensure that employers and workers do not need to conduct a job duties assessment for every worker, only workers making above the threshold. In addition, in many cases it may be clear that a worker does or does not meet the test for whether a worker is a "senior executive" without a detailed assessment. For example, CEOs and Presidents are presumed to be in a policy-making position under § 910.1 and will not be otherwise subject to a job duties test, while highly paid workers in a non-executive role such as many physicians will not. Other small businesses might see decreased or eliminated direct and indirect compliance costs if they can maintain existing senior executive non-competes.

Many commenters also stated there are other indirect costs. SBA Advocacy suggested that the IRFA did not account for additional potential costs, including the costs of services, including higher legal fees to protect information, potential increased training, hiring and retention costs, and process changes.[1271] Similarly, a business association argued small businesses could face additional costs for finding alternatives to protect assets and to alter hiring, training, and retention processes. Some business associations argued that the cost of updating contractual practices would be higher because businesses would need to consult counsel, and many small businesses may be unable to afford to do so. A business organization stated that the

---

[1271] SBA Off. of Advocacy, FTC-2023-0007-21110 at 3.

Commission should consider the costs from a small business diminishing in value to potential buyers because it cannot record the value of its non-competes.

Another business organization said costs to small businesses are not limited to updating contractual agreements, mentioning the use of non-competes to protect assets and investments. A law firm suggested that trade secrets litigation often costs unspecified millions in attorney and expert fees and investigations costs. A business association commented that the rule would likely trigger additional litigation costs for trade secret protection and satisfying standards for injunctive relief, as well as unspecified additional costs related to lost business relationships and ideas. The business association cited an article from the biotech industry as saying a ban will force biotech companies to find other ways to protect themselves, likely through increased trade secret litigation, and recognizing that non-competes are critical to startups in the industry.

Two comments requested that the Commission publish a supplemental IRFA to account for the rule's potential impact.

The Commission notes that agencies are generally not required to consider indirect costs, though it is considered a best practice.[1272] While commenters raised categories of indirect costs that may be implicated (and it is not clear exactly what potential costs may fit into those categories), commenters did not provide any data or information that could enable the Commission to estimate any indirect costs. Some of these costs are also attenuated and speculative. Many of these concerns are also addressed in Parts IV.D and XI.C. The commenters also misunderstand the calculations in the IRFA and RIA; the estimates are an average across

---

[1272] *Mid-Tex Elec. Co-op., Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985) ("[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities[,]" and the court inferred that "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy."); *see also* RFA Compliance Guide, *supra* note 1207 at 22-23, 64-68.

employers using non-competes, and there is likely to be substantial heterogeneity. The calculations account for the assumption that some firms may spend more than this amount. In response to comments on hiring costs, some firms may save on hiring costs from easier hiring, while others might have increased turnover costs.[1273] Businesses also have other options to compete on the merits besides raising wages, as many commenters indicated they sought jobs with better hours, more flexible schedules, shorter commutes, career opportunities, and other benefits.[1274] Businesses will be better able to hire workers experienced in their field who require less training than workers new to an industry.[1275]

Even if commenters' unsupported assertions that trade secret litigation and NDA enforcement may be more costly for businesses, including small businesses, are correct, such costs are justified by the benefits of the rule and in any event pecuniary benefits to a firm from an anticompetitive practice are not a cognizable justification.[1276] The Commission estimates that the final rule may increase or decrease overall litigation costs, and there is no evidence in the literature to allow the Commission to quantify those costs or benefits.[1277]

The comment citing an article on the biotech industry overstates the article's statements. The article said the existing increase in trade secrets litigation was likely to continue if the rule were adopted, did not cite any evidence for this prediction other than that non-competes are often used to protect trade secrets, and noted that companies may also use NDAs or restrict access to sensitive information.[1278] The article did not say that non-competes are critical to biotech

---

[1273] *See* Part X.F.9.
[1274] *See* Part XI.C.2.b.
[1275] *See* Part X.F.7.a.
[1276] *See* Parts IV.D.3, X.F.5-6, II.F.
[1277] *See* Part X.F.7.c.
[1278] Rosemary Scott, *FTC's Non-Compete Law Could Propel Rise in Trade Secrets Lawsuits*, BioSpace (Feb. 8, 2023), https://www.biospace.com/article/ftc-s-non-compete-law-could-propel-rise-in-trade-secrets-lawsuits-/.

startups.[1279]

    The commenter asking the Commission to consider small business valuation changes did not provide any potential estimates of such a cost, nor did the commenter demonstrate that such costs exist. It is unclear whether this commenter was referring to the value of non-competes for owners or for workers, but some such non-competes may fall within the exceptions for existing senior executive non-competes or for owners in a sale of business.[1280] To the extent there are any remaining non-competes that increase the value of a business in a sale, the Commission finds that any marginal decrease is justified by the substantial overall benefits of the rule.

    In response to the requests for a supplemental IRFA, one is not required by law, and this FRFA responds to all comments on the IRFA. A supplemental IRFA would not provide the public with additional relevant information that the IRFA did not.

## H. Discussion of Significant Alternatives

    The RFA requires that agencies include a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.[1281] Statutory examples of "significant alternatives" include different requirements or timetables that take into account the resources available to small entities; the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; the use of performance rather than design standards; and an exemption from coverage of the rule, or any

---

[1279] *Id.*
[1280] *See* § 910.3.
[1281] 5 U.S.C. 604(a)(6).

part thereof, for small entities.[1282]

In Part IX, the Commission discusses significant alternatives to the final rule. Part IX also includes an assessment determining that each of the significant alternatives would not accomplish the objectives of the final rule. The Commission did incorporate some of the alternatives proposed in the NPRM and in comments into the final rule, namely the exception for existing senior executive non-competes, simplifying notice requirements, eliminating rescission requirements, and eliminating the 25% threshold for the sale of business exception. In addition, the Commission's analysis of benefits and costs in Part X includes an assessment of the benefits and costs of excluding senior executives. The Commission notes that it has designed the final rule to minimize compliance costs for all businesses and that the final rule does not include any reporting requirements. As stated in Part X.F.7.b, the Commission estimates that direct compliance costs and the costs of updating contractual practices would result in costs of $538.48 to $1,076.96 for each firm. As previously noted, the Commission does not believe the final rule imposes a significant economic impact on a substantial number of small entities. The Commission has also described how the final rule will benefit and increase the number of small businesses.

After careful consideration, the Commission is not creating an exception for small entities or different regulatory requirements for small entities. The final rule provides that for workers other than senior executives, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete, enforce or attempt to enforce a non-compete, or represent that the worker is subject to a non-compete.[1283] For senior executives, the final rule provides that it is an unfair method of competition for a person to enter into or attempt to enter

---

[1282] *See* 5 U.S.C. 603(c)(1)-(4).
[1283] *See* § 910.2(a)(1).

into a non-compete, enforce or attempt to enforce a non-compete entered into after the effective date, or represent that the worker is subject to a non-compete, where the non-compete was entered into after the effective date.[1284] Based on the available evidence, the Commission does not believe that the analysis in Parts IV.B and IV.C is fundamentally different for non-competes that are imposed by small entities. For this reason, the Commission is not creating an exception for small entities or different regulatory requirements for small entities.

The Commission is not delaying the effective date of the final for small entities. Under § 910.6, the final rule is effective 120 days after publication in the *Federal Register* on [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*]. One small business asked that the final rule's effective date be delayed for two years to give the business time to silo its intellectual property and implement safeguards to protect its information. In the Commission's view, the rule's effective date of [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*] will afford small entities a sufficient period of time to comply with the final rule, and commenters have not provided evidence that more time is necessary.[1285]

## XII. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 ("PRA"),[1286] Federal agencies must obtain approval from the Office of Management and Budget ("OMB") for each collection of information they conduct or sponsor. The term "collection of information" includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.[1287] Under the PRA, the Commission may not conduct or sponsor, and,

---

[1284] *See* § 910.2(a)(2).
[1285] *See* Part VIII.
[1286] 44 U.S.C. 3501 *et seq.*
[1287] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).

notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.[1288]

### A. The Proposed Rule

In the NPRM, the Commission stated that it believed the proposed rule would contain a disclosure requirement that would constitute a collection of information requiring OMB approval under the PRA. The Commission stated that this disclosure requirement was proposed § 910.2(b)(2), which would have required employers to provide notice to a worker with an existing non-compete—*i.e.*, a non-compete that was entered into prior to the effective date—that the non-compete is no longer in effect and may not be enforced against the worker.[1289] Conservatively assuming that each establishment must engage in its own communication—*i.e.,* a firm's headquarters does not have the ability to send a company-wide email, for example—the Commission estimated that covered employers would incur an estimated labor cost burden of 1,310,747 hours to comply with this requirement (3,932,240 establishments × 20 minutes). The Commission estimated the associated labor cost for notifying affected workers who are already employed is $9.98 × 7.96 million × 0.494 = $39,243,755.[1290]

The Commission stated that the proposed rule would impose only *de minimis* capital and non-labor costs. The Commission anticipated that covered employers would already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the proposed rule would require a one-time disclosure to some workers subject to a rescinded non-compete, the Commission anticipated that this one-time disclosure would not

---

[1288] 44 U.S.C. 3506(c)(1)(B); 5 CFR 1320.5(a)(3).
[1289] NPRM at 3533.
[1290] *Id.* at 3534.

require substantial investments in new systems or other non-labor costs. The Commission noted that, moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.[1291]

The Commission sought comment on all aspects of its PRA analysis, including (1) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information would have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of these information collections on respondents.

## B.  Comments Received

No commenters specifically addressed the PRA analysis in the NPRM. However, the Commission received extensive comments on its Preliminary Regulatory Impact Analysis and Initial Regulatory Flexibility Act Analysis, and many of these commenters addressed the Commission's estimates related to the cost of compliance. These comments are summarized in Parts X (the Commission's Final Regulatory Analysis) and XI (the Commission's Final Regulatory Flexibility Act Analysis). The Commission also received comments on the proposed notice requirement itself. These comments are summarized in Part IV.E.

## C.  Final PRA Analysis

The Commission finalizes the proposed rule's notice requirement largely as proposed, with some adjustments to even further ease compliance. In the final rule, § 910.2(a)(1)(ii) prohibits employers from enforcing existing non-competes—*i.e.*, non-competes entered into

---

[1291] *Id.*

prior to the effective date—with respect to workers other than senior executives. Section 910.2(b)(1) as finalized states further that for each existing non-compete that it is an unfair method of competition to enforce or attempt to enforce under § 910.2(a)(1)(ii)—*i.e.*, non-competes entered into with workers other than senior executives—the person who entered into the non-compete with the worker must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete will not be, and cannot legally be, enforced against the worker.

Pursuant to § 910.2(b)(2), the notice must (i) identify the person who entered into the non-compete with the worker and (ii) be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.

Section 910.2(b)(3) provides an exception to the notice requirement in § 910.2(b)(1) where the person that would otherwise be required to provide the notice has no record of a street address, email address, or mobile telephone number.

Section 910.2(b)(4) provides model language that employers may use to comply with the notice requirement. Section 910.2(b)(5) states that an employer presumptively complies with the notice requirement in § 910.2(b)(1) where the employer provides a notice to the worker pursuant to § 910.2(b)(4). And § 910.2(b)(6) allows but does not require employers, in addition to providing the required notice in English, to provide the notice in another language (or languages). Section 910.2(b)(6) also permits employers to use any Commission-provided translation of the model language in § 910.2(b)(4).

The notice requirement has changed in two important respects from the proposed rule.

First, employers are no longer required to provide the notice to senior executives with existing non-competes. Second, as long as employers provide the notice in English, they are permitted to provide the notice in a language other than English. However, neither of these changes significantly affects the burden of complying with the notice. Senior executives are only 0.75% of workers, so the cost savings to employers of not needing to provide the notice to senior executives are minimal. Plus, no employer is required to provide the notice in a different language, so the rule does not require employers to incur any compliance costs for doing so.

The Commission estimates that composing and sending the notice in a digital format to workers for whom digital contact information is available would take 20 minutes of a human resources specialist's time. According to BLS, the median wage for a human resources specialist in 2022 was $31.85 per hour in 2023 dollars.[1292] The cost of compliance for currently employed workers is therefore ($31.85*2)/3=$21.23 per establishment.[1293] According to the Census Bureau's Statistics of U.S. Businesses database, in 2021 (the most recent year for which data are available), there were 5.91 million firms and 6.88 million establishments in the U.S.[1294] The Commission estimates the percentage of firms using non-competes in the U.S. at 49.4%.[1295] The Commission conservatively assumes that each establishment must engage in its own communication—*i.e.*, that a firm's headquarters does not have the ability to send a company-wide e-mail, for example. This yields an estimated 3,397,545 covered establishments which would incur an estimated labor cost burden of 1,132,515 hours to comply with this requirement (3,397,545 establishments × 20 minutes). The Commission estimates the associated labor cost

---

[1292] BLS, *Occupational Outlook Handbook: Human Resources Specialists*, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm. The value in 2022 was $30.88, which was updated to 2023 dollars.
[1293] The lost productivity of workers is assumed to be twice the median wage. *See* Part X.F.7.b.ii.
[1294] Census Bureau, *2021 SUSB Annual Data Tables by Establishment Industry* (December 2023), https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html.
[1295] *See* Colvin & Shierholz, *supra* note 65 at 4.

for notifying affected workers who are already employed and for whom digital contact information is available is $21.23 × 6.88 million × 0.494 = $72,141,201.

Businesses may not have digital contact information for workers. The number of workers with non-competes who must therefore receive physical notice is the total number of covered workers (101.1 million; see Part X.F.7.a.i) times the percentage of workers who have non-competes (18.1%) times the percentage of workers who require mailed notice (assumed to be 66% of workers[1296]), for a total of 12.1 million workers. The Commission notes that the percentage of workers who require mailed notice is likely a substantial overestimate, since it is estimated based on the percentage of individuals who receive health information digitally. The Commission believes that employers are more likely to have digital means of providing the notice to their current workers especially, but also to their former workers. The Commission conservatively adopts this estimate as an upper bound. The cost of mailed notice provision includes some capital costs (the cost of postage and mailing materials) and the cost of a human resource professional's time. The cost per worker is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus the cost of one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. The overall cost of mailed notice provision is therefore estimated to be $22 million.

As the Commission stated in the proposed rule, the Commission anticipates that covered employers already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the final rule requires a one-time disclosure to some workers, the Commission anticipates that this one-time disclosure will not require substantial investments in new systems or other non-labor costs. Moreover, many establishments are likely

---

[1296] See supra note 1165 (CMS Supporting Statement assumes 66% of workers require mailed notice from their health insurance companies)

to provide the disclosure electronically, further reducing total costs.

## XIII.  Other Matters

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of

Information and Regulatory Affairs designated this final rule as a "major rule," as defined by 5

U.S.C. 804(2).

## List of Subjects in 16 CFR Part 910

Antitrust.

For the reasons set forth above, the Federal Trade Commission adds a new subchapter J,

consisting of part 910, to chapter I in title 16 of the Code of Federal Regulations:

1. Add new subchapter J, consisting of parts 910 and 915, to read as follows:

## SUBCHAPTER J—RULES CONCERNING UNFAIR METHODS OF COMPETITION

## PART 910—NON-COMPETE CLAUSES

Sec.
910.1. Definitions.
910.2. Unfair methods of competition.
910.3. Exceptions.
910.4. Relation to State laws and preservation of State authority and private rights of action.
910.5. Severability.
910.6. Effective date.
**Authority:** 15 U.S.C. 45 and 46(g).

## § 910.1 Definitions.

As used in this part:

*Business entity* means a partnership, corporation, association, limited liability company,

or other legal entity, or a division or subsidiary thereof.

*Employment* means work for a person.

*Non-compete clause* means:

(1) A term or condition of employment that prohibits a worker from, penalizes a worker

561

for, or functions to prevent a worker from:

(i) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or

(ii) operating a business in the United States after the conclusion of the employment that includes the term or condition.

(2) For the purposes of this part 910, term or condition of employment includes, but is not limited to, a contractual term or workplace policy, whether written or oral.

*Officer* means a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any natural person routinely performing corresponding functions with respect to any business entity whether incorporated or unincorporated.

*Person* means any natural person, partnership, corporation, association, or other legal entity within the Commission's jurisdiction, including any person acting under color or authority of State law.

*Policy-making authority* means final authority to make policy decisions that control significant aspects of a business entity or common enterprise and does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise.

*Policy-making position* means a business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority, or any other natural person who has policy-making authority for the business entity similar to an officer with policy-making authority. An officer of a subsidiary or affiliate of a business entity that is part of a common enterprise who has policy-making authority for the common enterprise may be

562

deemed to have a policy-making position for purposes of this paragraph. A natural person who does not have policy-making authority over a common enterprise may not be deemed to have a policy-making position even if the person has policy-making authority over a subsidiary or affiliate of a business entity that is part of the common enterprise.

*Preceding year* means a person's choice among the following time periods: the most recent 52-week year, the most recent calendar year, the most recent fiscal year, or the most recent anniversary of hire year.

*Senior executive* means a worker who:

(1) Was in a policy-making position; and

(2) Received from a person for the employment:

(i) Total annual compensation of at least $151,164 in the preceding year; or

(ii) Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year; or

(iii) Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete clause.

*Total annual compensation* is based on the worker's earnings over the preceding year. Total annual compensation may include salary, commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during that 52-week period. Total annual compensation does not include board, lodging and other facilities as defined in 29 CFR 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other similar fringe benefits.

*Worker* means a natural person who works or who previously worked, whether paid or

unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person. The term worker includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.

## § 910.2 Unfair methods of competition.

(a) *Unfair methods of competition*—(1) *Workers other than senior executives*. With respect to a worker other than a senior executive, it is an unfair method of competition for a person:

(i) To enter into or attempt to enter into a non-compete clause;

(ii) To enforce or attempt to enforce a non-compete clause; or

(iii) To represent that the worker is subject to a non-compete clause.

(2) *Senior executives*. With respect to a senior executive, it is an unfair method of competition for a person:

(i) To enter into or attempt to enter into a non-compete clause;

(ii) To enforce or attempt to enforce a non-compete clause entered into after the effective date; or

(iii) To represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.

(b) *Notice requirement for existing non-compete clauses*—(1) *Notice required*. For each existing non-compete clause that it is an unfair method of competition to enforce or attempt to enforce under paragraph (a)(1)(ii) of this section, the person who entered into the non-compete clause with the worker must provide clear and conspicuous notice to the worker by the effective

date that the worker's non-compete clause will not be, and cannot legally be, enforced against the worker.

(2) *Form of notice.* The notice to the worker required by paragraph (b)(1) of this section must:

(i) Identify the person who entered into the non-compete clause with the worker;

(ii) Be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.

(3) *Exception.* If a person that is required to provide notice under paragraph (b)(1) of this section has no record of a street address, email address, or mobile telephone number, such person is exempt from the notice requirement in paragraph (b)(1) of this section with respect to such worker.

(4) *Model language.* For purposes of paragraph (b)(1) of this section, the following model language constitutes notice to the worker that the worker's non-compete clause cannot legally be enforced and will not be enforced against the worker.

Figure 1 to paragraph (b)(4)—Model Language

A new rule enforced by the Federal Trade Commission makes it unlawful for us to enforce a non-compete clause. As of [DATE EMPLOYER CHOOSES BUT NO LATER THAN EFFECTIVE DATE OF THE FINAL RULE], [EMPLOYER NAME] will not enforce any non-compete clause against you. This means that as of [DATE EMPLOYER CHOOSES BUT NO LATER THAN EFFECTIVE DATE OF THE FINAL RULE]:

- You may seek or accept a job with any company or any person—even if they compete with [EMPLOYER NAME].

- You may run your own business—even if it competes with [EMPLOYER NAME].

- You may compete with [EMPLOYER NAME] following your employment with [EMPLOYER NAME].

The FTC's new rule does not affect any other terms or conditions of your employment. For more information about the rule, visit [*link to final rule landing page*]. Complete and accurate translations of the notice in certain languages other than English, including Spanish, Chinese, Arabic, Vietnamese, Tagalog, and Korean, are available at [URL on FTC's website].

(5) *Safe harbor*. A person complies with the requirement in paragraph (b)(1) of this section if the person provides notice to a worker pursuant to paragraph (b)(4) of this section.

(6) *Optional notice in additional languages*. In addition to providing the notice required in paragraph (b)(1) of this section in English, a person is permitted to provide such notice in a language (or in languages) other than English or to include internet links to translations in

additional languages. If providing optional notice under this paragraph (b)(6), a person may use any Commission-provided translation of the model language in paragraph (b)(4) of this section.

**§ 910.3 Exceptions.**

(a) *Bona fide sales of business.* The requirements of this part 910 shall not apply to a non-compete clause that is entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets.

(b) *Existing causes of action.* The requirements of this part 910 do not apply where a cause of action related to a non-compete clause accrued prior to the effective date.

(c) *Good faith.* It is not an unfair method of competition to enforce or attempt to enforce a non-compete clause or to make representations about a non-compete clause where a person has a good-faith basis to believe that this part 910 is inapplicable.

**§ 910.4 Relation to State laws and preservation of State authority and private rights of action.**

(a) This part 910 will not be construed to annul, or exempt any person from complying with any State statute, regulation, order, or interpretation applicable to a non-compete clause, including, but not limited to, State antitrust and consumer protection laws and State common law, except that this part 910 supersedes such laws to the extent, and only to the extent, that such laws would otherwise permit or authorize a person to engage in conduct that is an unfair method of competition under § 910.2(a) or conflict with the notice requirement in § 910.2(b).

(b) Except with respect to laws superseded under paragraph (a) of this section, no provision of this part 910 shall be construed as altering, limiting, or affecting the authority of a State attorney general or any other regulatory or enforcement agency or entity or the rights of a

person to bring a claim or regulatory action arising under any State statute, regulation, order, or interpretation, including, but not limited to, State antitrust and consumer protection laws and State common law.

### § 910.5 Severability.

If any provision of this part 910 is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision shall be construed so as to continue to give the maximum effect to the provision permitted by law and such invalidity shall not affect the application of the provision to other persons or circumstances or the validity or application of other provisions. If any provision or application of this part is held to be invalid or unenforceable, the provision or application shall be severable from this part 910 and shall not affect the remainder thereof.

### § 910.6 Effective date.

This part 910 is effective [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION OF THE FINAL RULE].


PART 915—[Reserved]

By direction of the Commission.

**April J. Tabor,**

*Secretary*.

**Appendix Table A.1**

| State | Estimated # Covered Workers | Estimated Increase in Total Annual Worker Earnings | Estimated Increase in Average Annual Worker Earnings |
|---|---|---|---|
| Alabama | 1,620,882 | $822,829,396 | $508 |
| Alaska | 251,167 | $145,317,588 | $579 |
| Arizona | 2,460,342 | $1,410,771,964 | $573 |
| Arkansas | 999,178 | $478,239,544 | $479 |
| California | - | - | - |
| Colorado | 2,251,980 | $1,484,772,427 | $659 |
| Connecticut | 1,314,029 | $945,571,637 | $720 |
| Delaware | 367,291 | $220,637,013 | $601 |
| District of Columbia | 598,990 | $604,415,889 | $1,009 |
| Florida | 7,486,582 | $4,229,047,004 | $565 |
| Georgia | 3,764,270 | $2,188,893,667 | $581 |
| Hawaii | 495,988 | $270,123,206 | $545 |
| Idaho | 656,688 | $315,487,683 | $480 |
| Illinois | 4,735,066 | $3,051,620,266 | $644 |
| Indiana | 2,490,735 | $1,280,797,352 | $514 |
| Iowa | 1,229,598 | $624,937,405 | $508 |
| Kansas | 1,112,654 | $553,683,941 | $498 |
| Kentucky | 1,536,365 | $759,416,081 | $494 |
| Louisiana | 1,492,474 | $747,953,455 | $501 |
| Maine | 501,216 | $258,101,666 | $515 |
| Maryland | 2,112,817 | $1,378,702,305 | $653 |
| Massachusetts | 2,876,506 | $2,288,111,777 | $795 |
| Michigan | 3,440,754 | $1,946,978,052 | $566 |
| Minnesota | - | - | - |
| Mississippi | 916,362 | $384,971,511 | $420 |
| Missouri | 2,256,955 | $1,184,012,673 | $525 |
| Montana | 396,982 | $191,696,465 | $483 |

| | | | |
|---|---|---|---|
| Nebraska | 787,174 | $399,373,568 | $507 |
| Nevada | 1,177,510 | $646,371,090 | $549 |
| New Hampshire | 536,516 | $343,360,391 | $640 |
| New Jersey | 3,307,696 | $2,301,979,408 | $696 |
| New Mexico | 666,290 | $326,156,344 | $490 |
| New York | 7,411,689 | $5,879,334,118 | $793 |
| North Carolina | 3,759,643 | $2,105,343,963 | $560 |
| North Dakota | - | - | - |
| Ohio | 4,314,090 | $2,330,837,261 | $540 |
| Oklahoma | - | - | - |
| Oregon | 1,560,619 | $916,694,759 | $587 |
| Pennsylvania | 4,690,586 | $2,795,472,689 | $596 |
| Rhode Island | 385,074 | $220,004,925 | $571 |
| South Carolina | 1,745,274 | $858,798,497 | $492 |
| South Dakota | 354,502 | $169,742,169 | $479 |
| Tennessee | 2,526,310 | $1,389,744,066 | $550 |
| Texas | 10,599,295 | $6,535,957,999 | $617 |
| Utah | 1,320,994 | $715,807,809 | $542 |
| Vermont | 241,017 | $127,248,043 | $528 |
| Virginia | 3,166,902 | $1,995,480,948 | $630 |
| Washington | 2,809,814 | $2,090,953,114 | $744 |
| West Virginia | 539,026 | $253,817,680 | $471 |
| Wisconsin | 2,301,874 | $1,207,149,373 | $524 |
| Wyoming | 217,787 | $108,650,236 | $499 |
| | | | |
| Full US, excluding CA, ND, OK, MN | 101,785,552 | $53,291,058,349 | $524 |

Note: the estimated number of covered workers is calculated as 80% * (total employed population in the state); the estimated increase in total earnings is calculated as 0.86% * (estimated total covered earnings), where estimated total covered earnings is calculated as (estimated number of covered workers) * (average annual earnings); and the estimated increase in average earnings is calculated as 0.86% * (average annual earnings). Total employed population and average annual earnings are taken from the U.S. Census Bureau Quarterly Census of Employment and Wages for 2022 (see https://www.bls.gov/cew/data.htm). National totals may not equal the sum of state-specific estimates due to rounding.