IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

RYAN, LLC,

               Plaintiff,

      v.

FEDERAL TRADE COMMISSION,

               Defendant.

Civil Action No. 3:24-cv-986-E

## RYAN, LLC'S BRIEF IN SUPPORT OF
## MOTION FOR STAY OF EFFECTIVE DATE AND
## PRELIMINARY INJUNCTION

### *EXPEDITED TREATMENT REQUESTED*

Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
aho@gibsondunn.com
ekiernan@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone: 817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew G. I. Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*Attorneys for Ryan, LLC*

# TABLE OF CONTENTS

Page(s)

REQUEST FOR EXPEDITION ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

BACKGROUND ..........................................................................................4

    I.     The Federal Trade Commission Act.................................................4

    II.    Non-Compete Agreements ..............................................................7

    III.   The Non-Compete Rule ...................................................................9

    IV.   Ryan, LLC .....................................................................................11

STATEMENT OF NATURE AND STAGE OF PROCEEDING ............12

STATEMENT OF ISSUES AND STANDARD OF REVIEW ...............12

ARGUMENT ..............................................................................................12

    I.     Ryan Is Likely To Succeed On The Merits. ...............................13

       A.    The Commission Lacks Statutory Authority To Issue The Non-Compete Rule. ...................................................................................13

       B.    A Grant Of Rulemaking Authority To Define Unfair Methods Of Competition Would Violate The Constitution. .......................21

       C.    The Commission Is Unconstitutionally Insulated From The President. 24

    II.    Ryan Will Suffer Irreparable Harm Without A Stay Or Preliminary Injunction. ...................................................................25

    III.   The Balance Of Equities And Public Interest Favor Preliminary Relief. ..27

CONCLUSION ...........................................................................................28

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
 295 U.S. 495 (1935)............................................................21, 22, 23

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
 141 S. Ct. 2485 (2021).........................................................18

*AMG Cap. Mgmt., LLC v. FTC*,
 593 U.S. 67 (2021).............................................................15

*Armendariz-Mata v. DEA*,
 82 F.3d 679 (5th Cir. 1996) ...................................................27

*Biden v. Nebraska*,
 143 S. Ct. 2355 (2023).........................................................17

*BST Holdings, LLC v. OSHA*,
 17 F.4th 604 (5th Cir. 2021) ..................................................27

*Chevron U.S.A. Inc. v. Echazabal*,
 536 U.S. 73 (2002).............................................................16

*Consumers' Research v. CPSC*,
 91 F.4th 342 (5th Cir. 2024) ..................................................25

*Dayton Bd. of Educ. v. Brinkman*,
 439 U.S. 1358 (1978)..........................................................27

*Eichorn v. AT&T Corp.*,
 248 F.3d 131 (3d Cir. 2001) ...................................................8

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009)...........................................................23

*FTC v. Sperry & Hutchinson Co.*,
 405 U.S. 233 (1972)...........................................................22

Page(s)

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ....................................................................21

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935).................................................................4, 24

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ......................................................25

*J.M. Fields of Anderson, Inc. v. Kroger Co.*,
    310 F.2d 562 (5th Cir. 1962) ........................................................26

*McDonald v. Longley*,
    4 F.4th 229 (5th Cir. 2021) ...........................................................12

*Mistretta v. United States*,
    488 U.S. 361 (1989)........................................................................21

*Mitchel v. Reynolds*,
    24 Eng. Rep. 347 (Q.B. 1711) ........................................................7

*Nat'l Petroleum Refiners Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973)..........................................6, 15, 19

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932)........................................................................19

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................27

*Providence Title Co. v. Fleming*,
    2023 WL 316138 (5th Cir. Jan. 19, 2023).......................................26

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)........................................................................15

*Rest. Law Ctr. v. DOL*,
    66 F.4th 593 (5th Cir. 2023) ..........................................................27

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020)....................................................................24

Page(s)

*Snap-On Tools Corp. v. FTC*,
   321 F.2d 825 (7th Cir. 1963) ................................................................9, 18

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) ................................................................................19

*Texas v. Becerra*,
   577 F. Supp. 3d 527 (N.D. Tex. 2021) ...................................................27

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) ...................................................................27

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016). .................................................................27

*UARG v. EPA*,
   573 U.S. 302 (2014) ................................................................................18

*Wavetronix LLC v. Iteris, Inc.*,
   2015 WL 300726 (W.D. Tex. Jan. 22, 2015) ..........................................26

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ......................................................................17, 18

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ................................................................................14

## Constitutional Provisions

U.S. Const. art. I, § 1 ...................................................................................21

## Statutes

5 U.S.C. § 551(4) ........................................................................................23

5 U.S.C. § 706 .............................................................................................12

15 U.S.C. § 41 ........................................................................................4, 24

15 U.S.C. § 45 ........................................................................................5, 14

15 U.S.C. § 45(a)(2) ......................................................................................5

Page(s)

15 U.S.C. § 45(b) ............................................................................................5

15 U.S.C. §45(*l*) .............................................................................................5

15 U.S.C. § 45(*l*)-(m) ....................................................................................15

15 U.S.C. § 45(m) ..........................................................................................24

15 U.S.C. § 45a .......................................................................................7, 17

15 U.S.C. § 46 ...............................................................................................14

15 U.S.C. § 46(a)-(d) ......................................................................................5

15 U.S.C. § 46(e) ............................................................................................5

15 U.S.C. § 46(f) .............................................................................................5

15 U.S.C. § 46(g) .....................................................................................6, 13

15 U.S.C. § 46(h)-(j) .......................................................................................5

15 U.S.C. § 46(k) ............................................................................................5

15 U.S.C. § 53(b) ..........................................................................................24

15 U.S.C. § 57a(a)(1)(B) ..........................................................................6, 16

15 U.S.C. § 57a(a)(2) ....................................................................................16

15 U.S.C § 57a(b)-(d) .....................................................................................7

15 U.S.C. § 57b(a) ........................................................................................24

15 U.S.C. § 1194(c) .................................................................................7, 17

15 U.S.C. § 2302 ...........................................................................................16

15 U.S.C. § 2302(b) ........................................................................................7

15 U.S.C. § 2302(d) ........................................................................................7

15 U.S.C. § 2310(a) ...................................................................................7, 16

Page(s)

15 U.S.C. § 2310(b) ....................................................................7, 16

28 U.S.C. § 2201 ...........................................................................12

28 U.S.C. § 2202 ...........................................................................12

Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-
    447, 52 Stat. 111 ......................................................................5

FTC Act, ch. 311, 38 Stat. 717 (1914).......................................4, 6, 14, 15

Ga. Code Ann. §§ 13-8-50-54 ........................................................19

Magnuson-Moss Warranty-Federal Trade Commission Improvement
    Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975)...............................6, 16

Minn. Stat. § 181.988 (2023) .........................................................19

**Regulatory Materials**

16 C.F.R. § 910.1 ..........................................................................9

16 C.F.R. § 910.1(f) ......................................................................9

16 C.F.R. § 910.2(a)(1) ..................................................................9

16 C.F.R. § 910.2(a)(2)(ii) ..............................................................9

16 C.F.R. § 910.2(b) ......................................................................10

16 C.F.R. § 910.3(a).......................................................................10

16 C.F.R. § 910.3(b) ......................................................................10

16 C.F.R. § 910.4 ..........................................................................9

16 C.F.R. § 910.6 ..........................................................................10

Federal Trade Commission, Deceptive Advertising and Labeling of
    Previously Used Lubricating Oil, 29 Fed. Reg. 11,650 (Aug. 14,
    1964) .....................................................................................6

vi

Page(s)

Federal Trade Commission, Non-Compete Clause Rule (rel. Apr. 23, 2024), *available at* https://tinyurl.com/2s4kcf84 ............ 6, 10, 17, 19, 20, 21, 23

Federal Trade Commission, Proposed Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (Jan. 19, 2023) ......................................................... 18

**Other Authorities**

Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625 (1960) .................................................................................. 7

Crowell & Moring LLP, Client Alert, https://tinyurl.com/yf689cac (Apr. 24, 2024) ................................................................................... 26

Epstein Becker & Green, P.C., *50-State Noncompete Survey* (2023), https://tinyurl.com/52r2tu65 ............................................................... 7

Annual Report of the Federal Trade Commission (1922) ...................... 15

Oral Statement of Commissioner Andrew N. Ferguson, https://tinyurl.com/2far6mmb ...................................................... 3, 17

Goodwin Procter LLP, Alert, https://tinyurl.com/2b7y7f57 (Apr. 25, 2024) .................................................................................................... 26

Umit G. Gurun et al., Unlocking Clients: *The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021) ........................................................................................... 8

Oral Statement of Commissioner Melissa Holyoak, https://tinyurl.com/44rw98n6 ............................................................. 3

Int'l Franchise Ass'n, *International Franchise Association Statement on Final FTC Noncompete Rule* (Apr. 25, 2024), https://tinyurl.com/2mzn68b2 ........................................................... 11

Maysoon Khan, *New York governor vetoes bill that would ban noncompete agreements*, Associated Press (Dec. 23, 2023), https://tinyurl.com/yne98v45 ............................................................. 19

Brian M. Malsberger, *Covenants Not to Compete* (13th ed. 2021) ........................... 7

Page(s)

John M. McAdams, FTC, Non-Compete Agreements: A Review of
the Literature (2019) ...................................................8

Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57
Wake Forest L. Rev. 631 (2022) ...................................8

Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the
Force of Law: The Original Convention*, 116 Harv. L. Rev. 467
(2002)................................................................14

Richard J. Pierce Jr., *Can the Federal Trade Commission Use
Rulemaking to Change Antitrust Law?*, GW Law Faculty
Publications & Other Works 1561 (2021)..........................20

Evan P. Starr et al., *Noncompete Agreements in the U.S. Labor Force*,
64 J.L. & Econ. 53 (2021) ...........................................8

## REQUEST FOR EXPEDITION

As detailed in a concurrently filed motion to expedite, Plaintiff Ryan, LLC ("Ryan") respectfully requests that the Court shorten the briefing schedule on Ryan's Motion for Stay of Effective Date and Preliminary Injunction, hold a hearing within 21 days after briefing is completed, and decide the Motion by **July 3, 2024**. Expedition is necessary to avoid irreparable injury to Ryan and countless other businesses, which are already incurring significant costs to comply with a new Federal Trade Commission regulation that will put their confidential business information at serious risk of disclosure.  Absent expedition, the rule will take effect September 4, 2024, nullifying 30 million contracts and preempting the laws of 46 States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Federal Trade Commission by a 3-2 vote has adopted an economically destabilizing, legally unprecedented rule outlawing the use of nearly all non-compete agreements by every employer, in every industry, across the entire United States ("Non-Compete Rule" or "Rule").[1]  According to the Commission, it has the authority to take this momentous step, because a provision of the Federal Trade Commission Act ("FTC Act") that authorizes *procedural* rules supposedly also

---

[1] Attached as Exhibit A to Amended Complaint, ECF 22-1.

authorizes a sweeping *substantive* prohibition on "unfair methods of competition"—and because, the Commission maintains, non-competes are nearly always "unfair."

If ever a federal agency attempted to pull an elephant out of a mousehole, this is it.  What's more, the Rule rests on an open-ended statutory phrase—"unfair methods of competition"—that provides no intelligible principle to guide the agency or constrain its policy preferences, in violation of the Constitution's restriction on the delegation of legislative powers.  Perhaps unsurprisingly, this brazen power grab has been perpetrated by a politically unaccountable "independent" agency that is unconstitutionally insulated from the President's removal powers.  This action contravenes the FTC Act, violates the Constitution, and is arbitrary, capricious, and otherwise unlawful under the Administrative Procedure Act ("APA").

For hundreds of years, employers and employees have had the freedom to negotiate mutually beneficial non-compete agreements.  Reasonably tailored non-competes are permitted by the vast majority of States—including Texas, where Ryan is headquartered—which apply state statutes and a rich body of state common law to determine on a case-by-case basis when a non-compete is reasonable in duration, geographic scope, and other respects.  The Commission has nonetheless finalized a one-size-fits-all rule outlawing nearly all non-compete agreements, declaring them to be per se unfair methods of competition in violation of Section 5 of the FTC Act.

The Non-Compete Rule far exceeds the Commission's statutory authority. The Commission cannot promulgate substantive rules defining unfair methods of competition.   And, even if Congress did grant the Commission authority to promulgate some substantive unfair-competition rules, it did not invest the Commission with authority to decide the major question of whether non-compete agreements are categorically unfair and anticompetitive, a question with seismic consequences affecting tens of millions of workers, millions of employers, and billions of dollars in economic productivity.   Indeed, Congress could not constitutionally have conferred this authority on the Commission with the open-ended language to which the Commission points.   As Commissioner Ferguson summarized in his oral dissent, the Commission does not have "the power to nullify tens of millions of existing contracts; to preempt the laws of forty-six States; to declare categorically unlawful a species of contract that was lawful when the [FTC Act] was adopted in 1914; and to declare those contracts unlawful across the whole country irrespective of their terms, conditions, historical contexts, and competitive effects."[2]

This immensely disruptive Rule should be stayed and barred from taking effect during the pendency of this litigation.   Non-competes have been actively

---

[2] Oral Statement of Commissioner Andrew N. Ferguson at 2, https://tinyurl.com/2far6mmb ("Ferguson Dissent"); *accord* Oral Statement of Commissioner Melissa Holyoak, https://tinyurl.com/44rw98n6.

authorized and supervised by the States for centuries—there is no need for them to be invalidated nationwide with scarcely four months' notice by the diktat of one impatient federal agency.  Allowing the Rule to go into effect only to later vacate it would create the worst of all worlds, where workers are informed their non-competes are unenforceable, only for that message to be later countermanded.  In the meantime, people would have moved jobs, the market goodwill and customer relationships that were previously safeguarded by non-competes would have already been misused, and confidential business information could have been disclosed to competitors.

Ryan therefore seeks a stay of the Non-Compete Rule's effective date and a preliminary injunction against its enforcement.

## BACKGROUND

### I.    The Federal Trade Commission Act

In 1914, Congress enacted the FTC Act, establishing the Commission as a multimember "independent" agency.  *See* FTC Act, ch. 311, 38 Stat. 717 (1914) (codified as amended at 15 U.S.C. §§ 41 *et seq.*).  The Commission is "composed of five Commissioners … [n]ot more than three of" whom "shall be members of the same political party."  15 U.S.C. § 41.  The President appoints the Commissioners, with the advice and consent of the Senate.  But the President can remove a Commissioner only "for inefficiency, neglect of duty, or malfeasance in office."  *Id.*; *see Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935).

4

Since the Commission's inception, Section 5 of the FTC Act has "empowered and directed" it "to prevent" the use of "unfair methods of competition."  15 U.S.C. § 45(a)(2).   In 1938, Congress amended Section 5 to give the Commission the additional power and responsibility to prevent "unfair or deceptive acts or practices." Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111-12.

Section 5 of the Act creates a comprehensive scheme for the Commission to prevent unfair methods of competition through case-by-case adjudication.  *See* 15 U.S.C. § 45.  Congress empowered the Commission to hold a hearing and issue a cease-and-desist order if the hearing reveals the respondent is engaging in an unfair method of competition; the Act provides for penalties for violating such an order.  *Id.* § 45(b), (*l*).

Section 6 of the Act grants the Commission ancillary powers to support this adjudicatory scheme.  Most of those powers are investigatory.  *See* 15 U.S.C. § 46(a)-(d), (h)-(j).   Others are ministerial, such as the powers to make recommendations, *see id.* § 46(e), (k), and publish reports, *see id.* § 46(f).  One provision, Section 6(g), which has been in place since the Commission's inception in 1914, grants the Commission the power to "classify corporations and … to make rules and regulations for the purpose of carrying out the provisions of this

subchapter." *Id.* § 46(g); *see also* 38 Stat. at 722. The Act does not authorize penalties for violating rules promulgated under Section 6(g).

From 1914 until 1962, the Commission did not invoke Section 6(g) as a grant of substantive rulemaking authority, and in fact expressly disclaimed such authority. *See Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 & n.27 (D.C. Cir. 1973) (recounting this history). Then, in the 1960s and 1970s, the Commission promulgated several rules declaring certain actions to be unfair or deceptive acts or practices, citing Section 6(g) as its authority. Rule at 25-28. Some of these rules also declared the same actions to be unfair methods of competition. *See, e.g.*, Rule at 26 n.138 (citing Deceptive Advertising and Labeling of Previously Used Lubricating Oil, 29 Fed. Reg. 11,650 (Aug. 14, 1964)). From 1978 until the Non-Compete Rule, however, the Commission did not promulgate a single rule under Section 6(g).

That is likely because in 1975, in the wake of the controversial D.C. Circuit decision the Commission relies upon in this case, Congress reinforced the fact that Section 6(g) did not grant substantive rulemaking authority. In the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975), Congress empowered the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a(a)(1)(B). In doing so, it

6

imposed tight constraints on the manner in which such rules could be adopted.  *Id.* § 57a(b)-(d).  Congress also empowered the Commission to prescribe rules regarding written warranties, *id.* §§ 2302(b), (d), 2310(a), and declared "fail[ure] to comply with … a rule" promulgated under the Magnuson-Moss Act to be a violation of Section 5, *id.* § 2310(b).  Congress later gave the Commission other targeted rulemaking powers.  *See, e.g.*, 15 U.S.C. §§ 45a (rules related to labelling), 1194(c) (rules related to the flammability of fabrics).  Conspicuously absent, however, was conferral of authority to adopt rules regarding unfair methods of competition.

## II.   Non-Compete Agreements

For hundreds of years, firms and workers have freely negotiated mutually beneficial agreements for a worker not to compete with an employer's core business during the employment relationship and for a time-limited period after it ends.  The standard governing these agreements was first articulated in *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (Q.B. 1711), which held that "particular" restraints, limited to specific regions, times, or customers, were enforceable just like any other contract.  *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 629-30 (1960).  That general reasonableness test became the standard approach in "both English and American courts," *id.* at 638-39, leading to a rich body of state law and application of the "rule of reason" under federal antitrust law, *see generally* Brian M. Malsberger, *Covenants Not to Compete* (13th ed. 2021); Epstein Becker & Green,

P.C., *50-State Noncompete Survey* (2023), https://tinyurl.com/52r2tu65; *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that covenants not to compete should be examined under the rule of reason.").  Until the Commission issued its Non-Compete Rule, reasonably tailored non-compete agreements were legal under federal antitrust law and the laws of 46 States (including Texas).

That is because workers, firms, and the economy all benefit from reasonable non-compete agreements.  *See* Amended Complaint, ECF 22 at ¶¶ 33-39.  Non-compete agreements promote training by solving a free-rider problem.  *See* John M. McAdams, FTC, Non-Compete Agreements: A Review of the Literature 13 (2019).  By so doing, they can increase workers' earnings.  *See* Evan P. Starr et al., *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 80 (2021).  Non-compete agreements also incentivize R&D investment and facilitate innovation by helping firms protect their intellectual property, in addition to other tools.  *See* McAdams, *supra*, at 19 (collecting papers).  And in certain industries where client relationships are critical—such as tax consulting—non-compete agreements can reduce prices.  *See* Umit G. Gurun et al., Unlocking Clients: *The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).

Reasonably tailored non-compete agreements are thus a mutually beneficial, negotiated term of employment.  *See* Alan J. Meese, *Don't Abolish Employee*

8

*Noncompete Agreements*, 57 Wake Forest L. Rev. 631, 677 (2022).  That may be why, until 2022, the Commission had only once claimed a non-compete agreement was an unfair method of competition—and lost in court.  *See Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963).

## III.  The Non-Compete Rule

On April 23, 2024, a bare majority of the Commission voted to promulgate the Non-Compete Rule.  The Non-Compete Rule declares that "it is an unfair method of competition for a person: (i) To enter into or attempt to enter into a non-compete clause; (ii) To enforce or attempt to enforce a non-compete clause; or (iii) To represent that the worker is subject to a non-compete clause."   16 C.F.R. § 910.2(a)(1).  "Worker" is defined to include anyone "who works or who previously worked, whether paid or unpaid," for anyone else, regardless of employee or independent contractor status.  *Id.* § 910.1(f).  The Rule also purports to supersede state laws that would "permit or authorize" non-compete agreements.  *Id.* § 910.4.

The exceptions are extremely limited.  Employers can enforce existing non-competes—but cannot enter new ones—with "senior executives," defined to include CEOs, presidents, and other senior corporate officers who "control significant aspects of a business entity or common enterprise."   16 C.F.R. §§ 910.1, 910.2(a)(2)(ii).  Non-competes remain legal when "entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a

9

business entity, or of all or substantially all of a business entity's operating assets." *Id.* § 910.3(a). And causes of action that "accrued prior to the [Rule's] effective date" may be pursued. *Id.* § 910.3(b). Otherwise, any non-compete agreement with any worker earning any salary in any industry is outlawed, and businesses must send a "clear and conspicuous notice" to any worker currently subject to a non-compete informing him that his "non-compete clause will not be, and cannot legally be, enforced against the worker." *Id.* § 910.2(b).

In short, the Commission has declared that more than 99% of non-competes across the whole country, in all industries, in all circumstances—without any individualized consideration—"are exploitative and coercive" and must be eradicated. Rule at 79, 251. The FTC made no finding that non-competes are an unfair method of competition in the tax-services industry specifically.

By the Commission's own estimates, the Rule massively reworks the American economy. The Commission estimates—"conservative[ly]"—that the Rule will invalidate the contracts of "approximately 30 million workers." Rule at 7 & n.34. And the Commission predicts the economic impact of the Rule will exceed *hundreds of billions* of dollars. *See, e.g.*, *id.* at 441.

The Rule takes effect just 120 days after its publication in the Federal Register. 16 C.F.R. § 910.6.

## IV.   Ryan, LLC

Ryan is a global tax-consulting firm headquartered in Dallas.  It employs over 2,500 people in the United States and serves over 30,000 clients.  Ryan's principals and other workers are sought-after tax experts who frequently join Ryan after years of experience in the tax industry.

Ryan's principals and many of its other workers agree to temporally limited non-compete clauses.  Those covenants are one type of tool used to protect Ryan's confidential information, including Ryan's playbooks for advising clients, which are often developed through a collaborative process that can take years of research and trial and error to perfect.  Ryan's non-competes are also a tool used to prevent departing workers from poaching Ryan's clients and workers.

Once the Non-Compete Rule takes effect in scarcely four months, Ryan will immediately be prohibited from enforcing the vast majority of its non-compete agreements and will have to inform current and former workers that those agreements no longer apply to them.  That places Ryan's business secrets at serious risk of exposure, and may lead to poaching of Ryan's clients and workers.  Countless professional-services firms, as well as businesses that own intellectual property, rely on skilled labor, and have generated goodwill in the marketplace with existing and potential customers, will face difficult choices in protecting these well-established, legitimate business interests.  *See, e.g.*, Int'l Franchise Ass'n, *International*

11

*Franchise Association Statement on Final FTC Noncompete Rule* (Apr. 25, 2024), https://tinyurl.com/2mzn68b2 (condemning "the harm [the Rule] will bring to competition and intellectual property").

## STATEMENT OF NATURE AND STAGE OF PROCEEDING

Ryan filed its complaint on April 23, 2024, and an amended complaint on May 1.  ECF 1, 22.  Ryan's claims arise under the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  The Commission has not yet responded to the amended complaint.

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue presented is whether a stay of the Non-Compete Rule's effective date and a preliminary injunction prohibiting the Commission from enforcing the Rule is warranted.  Ryan is entitled to a preliminary injunction if "(1) [it is] likely to succeed on the merits, (2) [it is] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest."  *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (quotation marks omitted).

## ARGUMENT

The Non-Compete Rule is a gross abuse of statutory and constitutional limits on government power.  It runs roughshod over the laws of nearly every State and, in little more than four months from now, will massively and needlessly disrupt the

12

business operations of Ryan and countless other U.S. employers.  The Rule should be stayed, and the Commission barred from enforcing it, unless and until the agency can justify the Rule on the merits before this Court.

## I.    Ryan Is Likely To Succeed On The Merits.

Ryan is likely to succeed because the Non-Compete Rule is patently unlawful. The text, history, and structure of the FTC Act make clear that Section 6(g)—the Commission's claimed authority—does not grant the Commission the power to issue rules defining unfair methods of competition.  Were there any doubt, the major questions doctrine would resolve it.  If the Commission's reading were correct, moreover, Section 6(g) would be an unconstitutional delegation of legislative authority because the FTC Act does not provide an intelligible principle guiding the Commission's exercise of rulemaking authority.  On top of all that, the Rule is invalid because the Commission is unconstitutionally structured.

### A. The Commission Lacks Statutory Authority To Issue The Non-Compete Rule.

The Commission claims authority to adopt the Non-Compete Rule under Section 6(g) of the FTC Act, which says the agency may "[f]rom time to time classify corporations and … make rules and regulations for the purpose of carrying out the provisions of this subchapter."  15 U.S.C. § 46(g).  This language does not grant the substantive rulemaking authority the Commission claims.

13

### 1. The Text, Structure, And History Of The FTC Act Make Clear That Section 6(g) Does Not Authorize Substantive Rules.

**a.** "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). But that is exactly what the Commission claims Congress did in the FTC Act. Section 5 of the FTC Act creates a comprehensive scheme to prevent unfair methods of competition through case-by-case adjudication. *See* 15 U.S.C. § 45. Section 6, in turn, lays out ancillary powers that generally aid in the administration of that adjudication-focused scheme. *See id.* § 46. The Commission's claimed rulemaking authority is the latter half of the seventh such ancillary power, a subsection captioned "classifying corporations." *See* FTC Act, 38 Stat. at 722. It is unfathomable that Congress, in one half of one subsection of a provision addressing procedural matters, provided the Commission with the far-reaching power to issue substantive rules categorically condemning economic practices as unfair methods of competition on a nationwide basis.

**b.** The lack of a statutory penalty for violating rules promulgated under Section 6(g) further demonstrates that those rules cannot be substantive. In 1914, when the provision was enacted, it was unheard of for Congress to grant broad legislative rulemaking authority without also enacting a provision providing penalties for violating those rules. *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev.

14

467, 549-57 (2002).  There is no penalty provision for Section 6(g) rules.  By contrast, there is now, and was then, a penalty provision for violating orders that result from Section 5 adjudications.  *See* 15 U.S.C. § 45(*l*)-(m); FTC Act, ch. 311 § 5, 38 Stat. at 720.

    **c.**  The Commission's own early understanding of its powers likewise counsels against reading Section 6(g) to grant substantive rulemaking authority.  For the first forty-eight years of its existence, the Commission explicitly disclaimed substantive rulemaking authority.  *See Nat'l Petroleum*, 482 F.2d at 693 & n.27.  For example, in 1922 the Commission cautioned that "[o]ne of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it."  Annual Report of the Federal Trade Commission 36 (1922).  The Commission's historical interpretation of its own powers thus confirms that its present "reading would allow a small statutory tail to wag a very large dog."  *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021); *see id.* at 72 (instructing courts to construe the FTC Act in light of "how the Commission's authority (and its interpretation of that authority) has evolved over time").

    **d.**  Moreover, subsequent amendments to the FTC Act would be wholly superfluous if Section 6(g) granted substantive rulemaking authority.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged

15

to give effect, if possible, to every word Congress used.").   In 1975, Congress enacted the Magnuson-Moss Act, which among other things created a new Section 18 of the FTC Act.  Section 18 authorizes the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 57a(a)(1)(B).  That would make little sense if Section 6(g) already provided substantive rulemaking power. And the Magnuson-Moss Act conspicuously did not grant the Commission the authority to promulgate rules defining unfair methods of competition, instead merely stating that it did "not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition."  *Id.* § 57a(a)(2).  The Magnuson-Moss Act therefore "support[s] a sensible inference that the [rulemaking authority] left out must have been meant to be excluded."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).

The Magnuson-Moss Act also authorizes the Commission to promulgate rules regarding warranties without complying with the procedures of Section 18, *see* Magnuson-Moss §§ 102, 110(a), 88 Stat. at 2186, 2190 (codified at 15 U.S.C. §§ 2302, 2310(a)), and provides that failing to comply with those rules violates Section 5 of the FTC Act, *id.* § 110(b) (codified at 15 U.S.C. § 2310(b)).  Again, under the Commission's view that Section 6(g) already generally authorized

substantive rules, the power to specifically promulgate rules related to warranties is entirely superfluous.[3]

### 2. The Major Questions Doctrine Confirms The Commission's Lack Of Authority.

Were there any doubt remaining, it would be resolved by the major questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022). That doctrine embodies the "'common sense'" principle that Congress does not delegate massive powers in "'vague terms.'" *Id.* at 2609. Agencies cannot regulate "a question of deep economic and political significance" absent "clear" authority from Congress. *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (quotation omitted).

Contrary to the Commission's assertion, *see* Rule at 37-41, the Non-Compete Rule presents a quintessential major question. *First*, the Rule indisputably has enormous economic significance. The Commission itself estimates that the Rule will render approximately "30 million" contracts unenforceable, affect "one in five American workers," and have an economic impact in the hundreds of billions of dollars. Rule at 7, 441; *see* Ferguson Dissent at 3 ("There is no doubt that the Final Rule presents a major question.").

*Second*, the major questions doctrine applies when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative

---

[3] Other later grants of rulemaking authority by Congress to the Commission would likewise be superfluous if Section 6(g) conferred substantive rulemaking authority. *See, e.g.*, 15 U.S.C. §§ 45a, 1194(c).

expansion in [its] regulatory authority.'" *West Virginia*, 142 S. Ct. at 2610 (quoting

*UARG v. EPA*, 573 U.S. 302, 324 (2014)). As explained above, other than a brief

fifteen-year interlude ended by enactment of the Magnuson-Moss Act, the

Commission—throughout its 110-year history—has not claimed that Section 6(g)

grants it substantive rulemaking authority and instead has proceeded, as Congress

intended, on a case-by-case basis.

*Third* and similarly, courts regularly invoke the major questions doctrine

when an agency seeks to effectuate "fundamental revision of [a] statute, changing it

from one sort of scheme of regulation into an entirely different kind." *West Virginia*,

142 S. Ct. at 2587 (brackets and ellipsis omitted). By transforming the FTC Act

from an antitrust statute into a worker-protection statute, the Commission has

fundamentally changed the FTC Act. The Commission's suggestion that it has a

history of regulating non-compete agreements is risible. *See* Rule at 39. Excepting

one failed adjudication, *see Snap-On Tools*, 321 F.2d at 837, the Commission had

never addressed non-competes until it "rushed out" a handful of consent agreements

in the months before the Commission proposed the Rule in a transparent attempt to

create a paper trail. *See* 88 Fed. Reg. 3,482, 3,542 (Jan. 19, 2023) (Proposed Non-

Compete Clause Rule) (Commissioner Wilson, dissenting).

*Finally*, the Rule "intrudes into an area that is the particular domain of state

law." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489

18

(2021).   Non-compete agreements have been regulated by state law since the Founding.  *See supra* at 7-8.  And the proper way to regulate them at the state level remains a question of deep political significance that is vigorously debated today. For example, Minnesota banned non-compete agreements last year, Minn. Stat. § 181.988 (2023), while New York's governor vetoed a similar ban, *see* Maysoon Khan, *New York governor vetoes bill that would ban noncompete agreements*, Associated Press (Dec. 23, 2023), https://tinyurl.com/yne98v45.  Other States, such as Georgia, have made non-competes easier to enforce.  *See* Ga. Code Ann. §§ 13-8-50-54.  If Congress had intended to permit the Commission to terminate those "economic experiments," it would have clearly said so.  *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-74 (2001).

### 3.  The Commission's Counterarguments Are Meritless.

The Commission's claim of statutory authority to promulgate rules declaring unfair methods of competition relies primarily on *National Petroleum*.  *See* Rule at 28-29.  That decision was wrong when decided and has not aged well.

The D.C. Circuit based its decision largely on its belief that rulemaking was a superior method of regulation than adjudication, and that interpreting Section 6(g) to grant rulemaking authority was thus necessary to "render the statutory design effective."  482 F.2d at 681-84, 688, 690-91.  As one leading scholar put it, "the

method of statutory interpretation that the D.C. Circuit used in *National Petroleum Refiners* has never been embraced by the Supreme Court; it has not been used by any court in decades; and, it is inconsistent with the principles of separation of powers that the Supreme Court has emphasized for decades."  Richard J. Pierce Jr., *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works 1561, at 9 (2021).  Instead of substituting its preferred procedural mechanism for Congress's, the court should have interpreted Section 6(g) in light of its plain language and statutory context.

The Commission nevertheless contends that the Magnuson-Moss Act effectively codified *National Petroleum* by creating enhanced rulemaking procedures for rules defining unfair or deceptive acts or practices while not "restrict[ing] the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g)."  Rule at 29.  That argument has it backwards:  Congress did not expressly give the Commission "UDAP" rulemaking authority—and tightly restrict it—only to confer *sub silentio* unlimited authority to adopt unfair-competition rules.

Nor is it true that the Rule "rests on firm historical footing."  Rule at 37.  The Commission cited Section 6(g) in a spate of rules it issued between 1963 and 1978. *See id.* at 25-28.  But only one relied on the Commission's power to prevent unfair methods of competition alone; the rest declared an action to be an unfair or deceptive

20

act or practice as well as (sometimes) an unfair method of competition.  *Id.*  And seventy percent of those rules were later repealed.  *Id.*  In any event, fifteen years of aggressive agency activity sandwiched between decades of acknowledgment that the Commission lacks authority to issue rules defining unfair methods of competition is hardly compelling evidence of a consistent, unbroken practice.

## B. A Grant Of Rulemaking Authority To Define Unfair Methods Of Competition Would Violate The Constitution.

If Section 6(g) did grant the Commission authority to issue substantive unfair-competition rules, then Section 6(g) would be an unconstitutional delegation of legislative power.  This is further reason to reject the Commission's overbroad reading of the statute.

The Constitution vests "[a]ll [the] legislative Powers" it grants in "Congress." U.S. Const. art. I, § 1.  Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  Rather, Congress can delegate power to an agency only if it provides an "intelligible principle" by which the agency can exercise it.  *Mistretta v. United States*, 488 U.S. 361, 372 (1989). More precisely, Congress may authorize agencies only to "fill[] up details and find[] facts."  *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting).

21

The FTC Act does not provide an intelligible principle to guide a rulemaking defining unfair methods of competition.   Section 6(g) states only that the Commission can make "rules and regulations for the purpose of carrying out the provisions of this subchapter."  And Section 5, the subchapter's primary substantive provision, prohibits "unfair methods of competition"—a phrase that "does not admit of precise definition," *Schechter*, 295 U.S. at 532, and allows the Commission to "measur[e] a practice against the elusive … standard of fairness," *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).  That sort of subjective, value-laden phrase does not provide an intelligible principle to guide the Commission.

The Supreme Court's decision in *Schechter* easily demonstrates that point.  In *Schechter*, the Court held that the National Industrial Recovery Act unconstitutionally authorized the President to adopt "codes of fair competition." 295 U.S. at 521-23.  The FTC Act was different, the Court explained, precisely because the authority it gave the Commission over "unfair methods of competition" was to be exercised through adjudications, not rulemakings.  *Id.* at 533.  The Commission could declare something an unfair method of competition only "in particular instances" after "formal complaint," "notice and hearing," "findings of fact," and "judicial review."  *Id.*  The Recovery Act, on the other hand, "dispense[d] with that administrative procedure," authorizing the promulgation of a "legislative code."  *Id.*

22

at 533, 539.  That "code-making authority … [was] an unconstitutional delegation of legislative power."  *Id.* at 542.

The Commission's claimed authority to promulgate rules defining "unfair methods of competition" is virtually identical to the authority to issue "codes of fair competition" held unconstitutional in *Schechter*.

The Commission's attempt to put some meat on the bones that Congress left bare only reinforces the elusiveness of Section 5's standards.  The Commission asserts that "indicia of unfairness include the extent to which the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature."  Rule at 55.  But stringing together various adjectives does not meaningfully clarify the standard being applied to establish a rule of "general … applicability and future effect," 5 U.S.C. § 551(4)—as demonstrated by the fact that the non-competes the Commission condemns with these terms have been found perfectly "reasonable" by state courts for centuries.  Regardless, the fact that the Commission feels the need to provide (illusory) guardrails demonstrates that Congress itself provided none.

At minimum, the Commission's interpretation of the FTC Act urges caution.  "[A]mbiguous statutory language [must] be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  The Court

should construe Section 6(g) not to provide authority to promulgate rules defining unfair methods of competition.

### C. The Commission Is Unconstitutionally Insulated From The President.

Because Article II of the Constitution vests the entire executive power in the President, "lesser officers" within the Executive Branch "must remain accountable to the President." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). Accountability is accomplished by the President's "unrestricted removal power." *Id.* at 2198-200. The FTC Act unconstitutionally restricts that power. *See* 15 U.S.C. § 41.

Although the Supreme Court upheld the FTC Act in *Humphrey's Executor*, it relied on the premise that "the FTC as it existed in 1935 exercis[ed] no part of the executive power." *Seila Law*, 140 S. Ct. at 2198-200 (quotation omitted). But the "conclusion that the FTC did not exercise executive power has not withstood the test of time." *Id.* at 2200 n.2. Subsequent amendments to the FTC Act have given the Commission expanded enforcement powers that are plainly executive in nature. *See* 15 U.S.C. §§ 45(m), 53(b), 57b(a). Commissioners' removal protections are consequently unconstitutional even under the reasoning of *Humphrey's Executor*.

The Rule must therefore be vacated so the Commission can consider anew—with proper presidential oversight—whether to adopt the Rule.[4]

## II. Ryan Will Suffer Irreparable Harm Without A Stay Or Preliminary Injunction.

If the Non-Compete Rule takes effect, Ryan's non-compete agreements with present and former principals would be invalidated, Ryan would be barred from entering into new non-compete agreements, and it would have to inform its workers that their non-competes are invalid.  This will meaningfully increase the risk that departing workers may take Ryan's intellectual property and proprietary methods to its competitors.  *See* Tice Decl. ¶ 21.  Contrary to the Commission's assumption, that risk cannot be perfectly mitigated by trade secret laws and non-disclosure agreements ("NDAs").  Rule at 312.  Non-competes are prophylactic, and violations are visible to all and easily proved.  By contrast, proving violations of trade-secret statutes and NDAs is usually *post hoc*, and often difficult—by the time a company has discovered a violation of an NDA or trade-secret law, significant damage has almost always been done.  And even if Ryan could reassert the validity of its non-competes after the Rule is vacated—which surely would engender lengthy,

---

[4] The Fifth Circuit recently held that *Humphrey's* continuing force "is for the Supreme Court … to answer."  *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023).  Ryan respectfully preserves this argument for further review.  *See Consumers' Research v. CPSC*, 91 F.4th 342, 346 (5th Cir. 2024) ("[t]he logic of *Humphrey's* may have been overtaken").

expensive litigation and potentially require workers to leave newly acquired jobs—Ryan's confidential information would already have been exposed.

Similarly, the Rule would announce open season for poaching of clients and workers. *See* Tice Decl. ¶ 21. "The siphoning away of the business, profits, customers, and goodwill" of a firm constitutes "continuing and irreparable damages." *J.M. Fields of Anderson, Inc. v. Kroger Co.*, 310 F.2d 562, 564 (5th Cir. 1962); *see also Wavetronix LLC v. Iteris, Inc.*, 2015 WL 300726, at *7 (W.D. Tex. Jan. 22, 2015) ("irreparable harm" where competitor "poached" and "threatens to poach" clients); *Providence Title Co. v. Fleming*, 2023 WL 316138, at *5 (5th Cir. Jan. 19, 2023) (similar).

In the absence of a stay or injunction, moreover, Ryan must undertake substantial efforts in the upcoming months to counteract the Rule's pernicious consequences. Ryan would need to evaluate existing and alternative measures to shield sensitive competitive information and strategies within the firm. Tice Decl. ¶ 22.

Ryan would also need to spend significant resources updating existing agreements. Tice Decl. ¶ 18.[5] It would further need to prepare notices to all current

---

[5] *See, e.g.*, Crowell & Moring LLP, Client Alert, https://tinyurl.com/yf689cac (Apr. 24, 2024) (urging businesses "to re-examine their existing non-compete agreements and audit their protections and controls over confidential and trade secret information"); Goodwin Procter LLP, Alert, https://tinyurl.com/2b7y7f57 (Apr. 25, 2024) (urging business to take steps to comply "[i]f no injunction invalidating or delaying the Final Rule is issued in the near term").

and former workers subject to existing non-competes.  *Id.* ¶ 16.  Such "purely economic costs" are irreparable, *Rest. Law Ctr. v. DOL*, 66 F.4th 593, 597, 600 (5th Cir. 2023), because sovereign immunity bars monetary damages in APA actions, *Armendariz-Mata v. DEA*, 82 F.3d 679, 682 (5th Cir. 1996).  Indeed, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).

## III.   The Balance Of Equities And Public Interest Favor Preliminary Relief.

The balance of equities and public interest—which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)— support a stay and preliminary injunction.  To begin, there is "no public interest in the perpetuation of unlawful agency action." *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021).

Moreover, a nationwide preliminary injunction would "maintain[] … the status quo."  *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978).  Countless businesses, including Ryan, "have serious reliance interests on preserving the status quo," which allows them to use non-compete agreements to prevent their workers from taking confidential information and customers to competitors.  *Texas v. Becerra*, 577 F. Supp. 3d 527, 561 (N.D. Tex. 2021).

By contrast, a preliminary injunction "will do [the Commission] no harm whatsoever."  *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Having waited more than one hundred years to regulate non-competes, it cannot credibly claim harm from waiting a few more months.

In short, the risk of error is greater if a preliminary injunction is denied than if it is granted.  The question in the case is whether the Court, at the behest of three unelected, unaccountable bureaucrats, should uphold the retroactive eradication of 30 million contracts and the laws of 46 States, or should vacate one unprecedented and illegal Rule.  Until this matter is fully litigated, the appropriate course is plain.

## CONCLUSION

The Court should stay the Non-Compete Rule's effective date and preliminarily enjoin its enforcement pending a ruling on the merits.

Respectfully submitted,

Dated:  May 1, 2024

/s/ *Allyson N. Ho*

Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
aho@gibsondunn.com
ekiernan@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone: 817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew G. I. Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*Attorneys for Ryan, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume requirements of Judge Brown's Case Management Procedure II.A because it contains 6,225 words; and

2.      This document complies with the typeface requirements of Judge Brown's Case Management Procedure II.A because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated:  May 1, 2024                          Respectfully submitted,

                                             */s/ Allyson N. Ho*
                                             Allyson N. Ho
                                             GIBSON, DUNN & CRUTCHER LLP
                                             2001 Ross Avenue, Suite 2100
                                             Dallas, TX 75201
                                             214.698.3100
                                             aho@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on May 1, 2024, I caused the foregoing motion to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

Dated: May 1, 2024                      Respectfully submitted,

*/s/ Allyson N. Ho*
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
aho@gibsondunn.com