# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

RYAN, LLC,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION,

*Defendant*.

**Case No. 3:24-cv-986-E**

# PLAINTIFF-INTERVENORS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff-Intervenors the Chamber of Commerce of the United States of America, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce, by and through undersigned counsel, bring this complaint for declaratory and injunctive relief against Defendant Federal Trade Commission alleging as follows:

## INTRODUCTION

1.      The true strength of a company lies in its people.  Recognizing this, many businesses invest considerable sums in training and developing their employees to maximize their potential and to hone their skills.  And particularly for companies in highly competitive and innovative industries, those same employees serve as the guardians of businesses' second most valuable asset, which is the highly sensitive and proprietary information that allows them to succeed.

2.      Having invested in their people and entrusted them with valuable company secrets, businesses have strong interests in preventing others from free-riding on those investments or gaining improper access to competitive, confidential information.  For centuries, businesses throughout the United States have relied on reasonable noncompete agreements to protect those critical interests.

3.      Many businesses continue to rely on targeted noncompete agreements for these same reasons today.  Those agreements typically require that an employee agree, as a condition of employment or in exchange for compensation, that if he

decides to leave the company, he will not work for the employer's competitors for a limited period of time thereafter. These agreements benefit employers and workers alike—the employer protects its workforce investments and sensitive information, and the worker benefits from increased training, access to more information, and an opportunity to bargain for higher pay.

4.     Policymakers and courts have long recognized the benefits of noncompete agreements. At the same time, they have also recognized that noncompetes may pose an unreasonable burden for some types of workers and may be inappropriately restrictive—for instance, by preventing a worker from accepting employment with a business hundreds of miles away or many years after leaving a job. To address those concerns, each State has developed its own body of law to determine when noncompete agreements are enforceable, and when they go too far. And States are also actively experimenting in this area. In recent years, a number of States have enacted laws that either restrict or expand the enforceability of noncompetes.

5.     Noncompetes have never been regulated at the federal level. Although some Members of Congress have recently taken an interest in the issue and proposed legislation that would establish national rules for noncompete agreements, those proposals have never received a Committee vote, let alone a vote from either House of Congress. Without such authorizing legislation, federal agencies have not

previously sought to play a role in regulating noncompete agreements on a nationwide basis.

6.     That all changed in January 2023, when the Federal Trade Commission proposed a rule that would enact a total nationwide *ban* on worker noncompete agreements.  *See* Fed. Trade Comm'n, *Non-Compete Clause Rule*, 88 Fed. Reg. 3482 (Jan. 19, 2023).  As authority for that rule, the Commission relied on an obscure and rarely invoked provision of the Federal Trade Commission Act, claiming that it authorized the agency to issue rules outlawing "unfair methods of competition."  On April 23, 2024, the Commission voted to finalize that rule.  *See* Fed. Trade Comm'n, *Non-Compete Clause Rule*, RIN2084-AB74 (Apr. 23, 2024) (Final Rule).

7.     The Commission's Noncompete Rule is striking in its breadth:  it prohibits any contractual provision that "penalizes a worker for, or functions to prevent a worker from," "seeking or accepting work" or "operating a business" in the United States, Final Rule, at 561-562, a definition that sweeps in many bargained-for contracts that pose no threat to competition—such as a senior executive's agreement to receive millions in compensation in exchange for not working for her former employer's competitors, *id*. at 73.  The rule defines "worker" to include both employees and independent contractors, and, going forward, allows no distinction based on the seniority of the worker covered, the nature of the

information protected, or the bargaining power of the parties involved.  *Id*. at 563-564.

8.     The rule goes even further than that.  Beyond making virtually all noncompetes illegal going forward, the Noncompete Rule also purports to *retroactively invalidate* roughly tens of millions of existing agreements.  *See* Final Rule, at 344-345.  As a result, businesses that bargained for noncompetes will lose the protections of those agreements—even if they already held up their end of the bargain.

9.     By invalidating existing noncompete agreements and prohibiting businesses and their workers from ever entering into such agreements going forward, the rule will force businesses all over the country—including in this District—to turn to inadequate and expensive alternatives to protect their confidential information, such as nondisclosure agreements and trade-secret lawsuits.  And many workers, including highly-skilled experts and executives, will be unable to bargain for increased compensation in return for a noncompete agreement.

10.     The Commission's astounding assertion of power breaks with centuries of state and federal law and rests on novel claims of authority by the Commission. From the Founding forward, States have always regulated noncompete agreements. And prior to January 2023, the Commission had never taken the position that individual noncompete agreements were "unfair methods of competition" under the

FTC Act, 15 U.S.C. § 45(a)(1).  In 2021, however, President Biden issued an Executive Order calling on the Commission to "exercise the FTC's statutory rulemaking authority under the Federal Trade Commission Act to curtail the unfair use of non-compete clauses and other clauses or agreements that may unfairly limit worker mobility."  Exec. Order No. 14,036, 86 Fed. Reg. 36,987, 36,992 (July 9, 2021).  Shortly after that Order, the Commission began soliciting comments and holding public workshops to carry out the President's political directive.

11.  Then in November 2022, the Commission issued a radical new Policy Statement regarding its authority under Section 5 of the FTC Act—one that would ultimately clear the path for its nationwide regulation of noncompete agreements. *See* Fed. Trade Comm'n, *Policy Statement Regarding the Scope of Unfair Methods of Competition* 6, 8-9 (Nov. 10, 2022) (Section 5 Policy Statement).  In Section 5, Congress "declared unlawful" "[u]nfair methods of competition."  15 U.S.C. § 45(a)(1).  Decades of bipartisan enforcement policy had interpreted Section 5 to prohibit only practices that cause actual harm to competition and are not outweighed by procompetitive justifications.  That guidance aligned with the Commission's decades-long practice of challenging alleged "unfair methods of competition" in individual enforcement proceedings, which turned on the facts of the particular case. But the Commission's Section 5 Policy Statement, adopted on a partisan basis over a vigorous dissent by Commissioner Wilson, abandoned that approach and decreed

that the Commission may punish private businesses for any conduct that violates "not only 'the letter,' but also 'the spirit' of the antitrust laws."  Section 5 Policy Statement at 6.  As Commissioner Wilson explained in her dissent, the Section 5 Policy Statement amounted to an assertion that a majority of the Commission may declare conduct unlawful based on its own political or policy preferences, without any meaningful guardrails on the agency's power.  *Dissenting Statement of Commissioner Christine S. Wilson Regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition,"* 7-8 (Nov. 10, 2022).

12.    The Commission now advances an additional and equally novel claim of authority: the power to issue substantive, binding regulations prohibiting "unfair methods of competition" under Section 6(g) of the FTC Act.  Section 6 authorizes the Commission to "from time to time classify corporations and . . . to make rules and regulations for the purpose of carrying out the provisions" of the Act.  15 U.S.C. § 46.  Although Section 6(g) has been part of the FTC Act since it was first enacted in 1914, the Commission has *never* enforced a binding regulation to broadly proscribe "unfair methods of competition" standing alone, Final Rule, at 25-26—and has often taken the position that it lacks authority to issue substantive rules at all.  *See National Petroleum Refiners Ass'n* v. *Fed. Trade Comm'n*, 482 F.2d 672, 693 (D.C. Cir. 1973) ("[T]he agency itself did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently before that time that

it lacked such power."); *see generally* Maureen Ohlhausen & Ben Rossen, *Dead End Road:* National Petroleum Refiners Association *and FTC 'Unfair Methods of Competition' Rulemaking*, Truth on the Market (July 13, 2022). Although the Commission briefly tried to promulgate rules implementing Section 5 in the 1960s and 1970s, *see* Final Rule, at 25-26, the Commission has not claimed the authority to make rules regarding "unfair methods of competition" for the last half century. In 1975, Congress expressly authorized the agency to issue regulations regarding "unfair or deceptive acts or practices," *see* 15 U.S.C. § 57a(a), and did not grant similar rulemaking authority for "unfair methods of competition."

13.    Armed with its novel interpretations of Section 5 and Section 6, the Commission proposed its Noncompete Rule on January 5, 2023. *See* Fed. Trade Comm'n, Non-Compete Clause Rulemaking (Jan. 5, 2023), https://www.ftc.gov/legal-library/browse/federal-register-notices/non-compete-clause-rulemaking; Fed. Trade Comm'n, *Non-Compete Clause Rule*, 88 Fed. Reg. 3482 (Jan. 19, 2023). Having freed itself of the need to establish actual competitive harm for each noncompete agreement, the Proposed Rule called for a categorical ban on worker noncompete agreements, which the Commission justified on the grounds that worker noncompete agreements were unfair to *all* workers and were harming competition in the market for labor, goods, and services. *See* 88 Fed. Reg. at 3485. According to the Commission, implementing a national ban on worker noncompetes

7

would increase wages throughout the economy—even though research presented to the Commission as recently as 2020 explained that the economics literature does not "fully understand the distribution effects of non-competes on workers" and is "still far from reaching a scientific standard of concluding that noncompete agreements are bad for overall welfare." Kurt Lavetti, *Effects of Non-Compete Clauses: Analysis of Current Economic Literature and Topics for Future Research*, Remarks at the FTC Workshop on Non-Compete Clauses in the Workplace 138-140 (Jan. 9, 2020). Although the Proposed Rule made passing references to the procompetitive justifications for noncompete agreements, it asserted that businesses had other means to achieve their objectives without noncompete agreements and that, even if they did not, the purported benefits of the Commission's ban would outweigh its immediate and measurable costs. *See* 88 Fed. Reg. at 3528-3530. Based on that analysis, the Commission proposed banning all noncompete agreements going forward *and* retroactively invalidating millions of noncompetes that are already in place. Commissioner Wilson dissented from the Proposed Rule. She explained that the Noncompete Rule would "lead to protracted litigation" as to the rule's validity "in which the Commission is unlikely to prevail." 88 Fed. Reg. at 3540 (Wilson dissent). She also criticized the Commission for moving forward despite "the lack of clear evidence to support" its categorical ban. *Id.*

14.    The Commission received more than 26,000 comments on the Proposed Rule.  Small businesses, tech startups, trade associations, and economists opposed it.  Their comments explained both that the Commission lacked the legal authority to issue a rule regulating worker noncompete agreements, and that even if it had such authority, its categorical ban was undermined by a large body of precedent and research demonstrating that noncompete agreements often promote competition. Plaintiff-Intervenors the Chamber of Commerce of the United States of America and Business Roundtable also submitted comments explaining the many defects in the Proposed Rule and calling on the Commission to rescind or substantially revise it. *See* U.S. Chamber of Commerce, Comment Letter on Non-Compete Clause Rule (April 17, 2023), https://www.regulations.gov/comment/FTC-2023-0007-19345; Business Roundtable, Comment Letter on Non-Compete Clause Rule (April 17, 2023), https://www.regulations.gov/comment/FTC-2023-0007-19341.

15.    On April 23, 2024, the Commission finalized its Noncompete Rule. Rejecting the criticisms of the Proposed Rule raised during the public comment period, the final Noncompete Rule is nearly identical to the Commission's proposal: it bans noncompetes nationwide regardless of whether they harm competition or are necessary to support valid business interests, and, going forward, it includes no exceptions based on the worker's salary, skill set, or seniority; the type of information protected by the agreement; or the context of the negotiation.  The only

9

meaningful limit the Commission adopted in the Final Rule was a carve-out for existing (but not future) noncompetes involving "senior executives."  Final Rule, at 564.  That vague qualification appeared nowhere in the proposed rule, makes little sense, and does little to mitigate the vast overbreadth of the Commission's ban.

16.    The Noncompete Rule set an effective date of 120 days from publication in the *Federal Register*.  At that point, tens of millions of workers and businesses will be bound by an unprecedented regulation the Commission has no power to impose.  The burdens of the Noncompete Rule will be immediate and significant.  Businesses will have to identify all pre-existing noncompetes, many of which were bargained for as part of a broader compensation package, and notify employees and former employees that their noncompetes are no longer enforceable. Companies will face substantial legal costs as they are forced to resort to other tools to attempt to protect their investments.  Workers will lose important training opportunities and will have diminished bargaining power when negotiating their compensation.  And the economy as a whole will suffer as start-ups and small businesses are unable to prevent dominant firms from hiring their best employees and gaining access to their confidential information.

17.    This Court should stop that effort in its tracks because the Commission's Noncompete Rule violates the law in numerous ways.

10

18.   *First*, the Commission lacks the authority to issue regulations proscribing "unfair methods of competition."  Congress has never empowered the Commission with general rulemaking authority regarding matters under its jurisdiction.  On the contrary, Congress has carefully limited the Commission's authority to write regulations to a variety of specific contexts, and the Commission has for decades respected those limits.  Despite that history, the Commission now claims that the ministerial authority provided by Section 6 of the FTC Act empowers it to issue any rule it deems necessary.  The text, structure, and history of that provision confirm that it does not support the Commission's newfound assertion of regulatory power.

19.   If there were any doubt about the Commission's authority under Section 6, it is resolved by the major-questions doctrine.  The Supreme Court has repeatedly invoked that doctrine in recent years to reject similar attempts by administrative agencies to take unprecedented actions with vast economic and political significance based on nothing more than ambiguous and ancillary statutory text—particularly where the agency has never before pointed to that text as a font of regulatory power.

20.   *Second*, even if the Commission had any authority to issue substantive regulations proscribing "unfair methods of competition," the Noncompete Rule would still be unlawful because noncompete agreements are not categorically

11

unlawful under Section 5.   As Commissioner Wilson explained in dissent, the Noncompete Rule "represents a radical departure from hundreds of years of legal precedent that employs a fact-specific inquiry" for noncompete agreements.   88 Fed. Reg. at 3540 (Wilson Dissent).   Noncompete agreements are widely used throughout the U.S. economy, and they have long been regulated (and routinely enforced) under state law—including at the time of the FTC Act's passage and decades before. Although Members of Congress have in recent years proposed legislation to regulate noncompete agreements at the federal level, those efforts have uniformly failed. Each of those facts cuts against the Commission's claim that *all* noncompetes constitute "unfair methods of competition."   And here again, the sheer economic and political significance of a nationwide noncompete ban demonstrates that this is a question for Congress to decide, rather than an agency.   If the Commission were right that Section 5 empowers the Commission to declare an ordinary business practice unlawful notwithstanding the history, precedent, and economic evidence demonstrating the practice's competitive benefits, then Section 5 would reflect a boundless and unconstitutional delegation of legislative power to the Executive Branch.

21.   *Third*, the Noncompete Rule is impermissibly retroactive.   If the Noncompete Rule goes into effect, parties that bargained for the protection afforded by a noncompete agreement will no longer be able to enforce those contracts going

12

forward, even if they already upheld their obligations under the contract.  In order to promulgate regulations with retroactive effect, administrative agencies are required to point to clear congressional authorization.  Even if the FTC Act empowered the Commission to issue substantive rules related to "unfair methods of competition," it clearly does not authorize retroactive rulemaking.   And if the Noncompete Rule were permitted to authorize such an extreme step, it would raise serious doubts under the Fifth Amendment, which has long been understood to bar the federal government from retroactively disrupting settled legal rights.

22.    *Fourth* and finally, the Noncompete Rule reflects an arbitrary and capricious exercise of the Commission's powers.  The Commission's categorical ban on virtually all noncompetes amounts to a vast overhaul of the national economy, and applies to a host of contracts that could not harm competition in any way.  The Commission offered no research to support such a categorical prohibition, instead relying on a series of studies that examined the economic effects of much narrower regulations and that suffered from a variety of limitations and flaws—all of which the Commission ignored.  Moreover, the Commission moved ahead with its across-the-board ban even though commenters offered a range of superior alternatives.  The Commission's Noncompete Rule gave short shrift to these alternatives and failed to meaningfully engage with the arguments against its chosen policy.  The Commission

13

also badly miscalculated the costs and benefits, conducting an "analysis" that illustrated the pre-determined nature of its decision.

23.    In all of these ways, the Commission's Noncompete Rule reflects an unlawful and unprecedented exercise of bureaucratic power.  The Commission has no authority to issue the rule, and even if it did, it has exercised that authority in a manner that flouts the fundamental requirements of the APA.  As a result, this Court should declare the Noncompete Rule unlawful and set it aside.

## PARTIES

24.    Plaintiff-Intervenor Chamber of Commerce of the United States of America (U.S. Chamber) is the world's largest business federation, with over 300,000 members, including members in the Northern District of Texas.   A 501(c)(6) nonprofit headquartered in Washington, D.C., the U.S. Chamber represents more than 3 million companies and professional organizations of every size, in every industry sector, and from every region in the United States.   An important function of the U.S. Chamber is to represent the interests of its members before Congress, the Executive Branch, and the courts in conjunction with its mission to advocate for policies designed to help businesses create jobs and grow the national economy.   The U.S. Chamber has numerous members who use noncompete agreements for entirely legitimate purposes and will be adversely affected by the Noncompete Rule.

25.     To further its core purposes, the U.S. Chamber has challenged actions and rulemaking by federal agencies.  *See, e.g.*, *Chamber of Commerce* v. *EPA*, 24-1051 (D.C. Cir. 2024); *Chamber of Commerce* v. *U.S. Dep't of Labor*, 5:17-cv-00009 (W.D. Okla. Mar. 11, 2024); *Chamber of Commerce* v. *EPA*, 3:23-cv-00007 (E.D. Ky. 2023).

26.     Plaintiff-Intervenor Business Roundtable is a 501(c)(6) non-profit association of chief executive officers of America's leading companies representing every sector of the U.S. economy.  These companies have employees in every state, including Texas.  Business Roundtable works to promote a thriving United States economy and economic opportunity for all Americans by advocating for sound public policies.  Business Roundtable is headquartered in Washington, D.C.  Many of the members of Business Roundtable are CEOs of companies that have noncompete agreements and are adversely affected by the Noncompete Rule.

27.     Plaintiff-Intervenor Texas Association of Business is the state chamber of commerce for Texas and the largest general business association in the state.  TAB represents members companies—large and small—to create a policy, legal, and regulatory environment that allows them to thrive in business.

28.     Plaintiff-Intervenor the Longview Chamber of Commerce represents Longview area businesses.  The Longview Chamber of Commerce maintains its principal place of business at 410 N. Center St., Longview, Texas 75601.  The

Longview Chamber also has members that utilize noncompete agreements and will be adversely affected by the Noncompete Rule.

29.    Plaintiff-Intervenors bring this action on behalf of their members to advance their interests as well as the interests of the entire business community.  As part of advocating for their members, Plaintiff-Intervenors are committed to ensuring that employers, employees, and independent contractors have the opportunity to bargain for mutually beneficial agreements.  Specifically, Plaintiff-Intervenors are concerned that the Commission's sweeping ban on worker noncompete agreements would invalidate millions of contractual provisions that pose no threat to competition.

30.    The Noncompete Rule's categorical ban on worker noncompete agreements will deprive Plaintiff-Intervenors' members of the opportunity to protect their investments in research and development, promote specialized workforce training, reduce free-riding by competitors, and achieve many other valid and procompetitive objectives.  If the Noncompete Rule goes into effect, Plaintiff-Intervenors' members will suffer the immediate costs associated with the inability to enforce existing noncompete agreements, and will be forced to utilize less effective alternatives going forward.  They may also have to take on the burden of expensive nondisclosure and trade-secret litigation or decrease investment in their workforce, causing long-term harm to their businesses and their employees.

31.    For all of these reasons, Plaintiff-Intervenors and many of their members strongly opposed the Noncompete Rule.  *See, e.g.*, Chamber of Commerce of the U.S., Comment Letter on Non-Compete Clause Rule (April 17, 2023), https://www.regulations.gov/comment/FTC-2023-0007-19345;             Business Roundtable, Comment Letter on Non-Compete Clause Rule (April 17, 2023), https://www.regulations.gov/comment/FTC-2023-0007-19341.

32.    Defendant Federal Trade Commission is a U.S. governmental agency headquartered in Washington, D.C.   The Commission is subject to the Administrative Procedure Act pursuant to 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

33.    Plaintiff-Intervenors bring this action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff-Intervenors' claims arise under the Constitution of the United States and the APA.  The Court has the authority to grant the requested declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

34.    Plaintiff-Intervenors have associational standing to bring this suit on behalf of their various members.  Their members are directly and adversely affected by the Noncompete Rule and accordingly have standing to sue in their own right.  Specifically, Plaintiff-Intervenors' members will be harmed by the rescission of their

noncompete agreements and the inability to use noncompetes to protect their confidential information and investments in the workforce in the future. Those members will also incur significant compliance costs and will be forced to immediately change their business practices to avoid violating the Rule. The interests Plaintiff-Intervenors seek to protect are germane to their purposes. Each Plaintiff-Intervenor organization is committed to protecting the interests of its members, as well as the broader business community, and regularly advocates for reforms that reduce the regulatory burdens on its members. Finally, neither the claims asserted nor the declaratory and injunctive relief requested requires an individual member to participate in the suit. *See Association of Am. Physicians & Surgeons, Inc.* v. *Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt* v. *Wash*. *State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

35.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because it is an action against an agency and officer of the United States, no real property is involved, and Plaintiff Ryan, LLC resides in this district. Venue is proper in this division because Plaintiff Ryan, LLC resides in this division.

## BACKGROUND

**A.    The Widespread Use Of Noncompete Agreements In The U.S. Economy**

36.    Noncompete agreements are commonplace in the economy.  According to the Commission's own estimates, one-fifth of all workers in the United States are parties to noncompete agreements—roughly 30 million people.  *See* Final Rule, at 14; 88 Fed. Reg. at 3485.

37.    Noncompete agreements serve a wide range of legitimate interests. Businesses use reasonable noncompete agreements to prevent the disclosure of sensitive and confidential information, to protect significant investments in specialized workforce training and development, and to structure their compensation and incentive pay programs.  *See generally* Jonathan Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. Chi. L. Rev. 953 (2020).

38.    Many workers use negotiations over noncompete agreements to increase their compensation and training opportunities.  For instance, testimony before the Commission explained that many noncompetes "have been signed as part of a negotiated severance payment, which the employee is not otherwise entitled to." Fed. Trade Comm'n, *Forum Examining Proposed Rule to Ban Noncompete Clauses* 42 (Feb. 16, 2023) (Testimony of Eric Poggemiller); *see id.* at 18-19 (Testimony of LeAnn Goheen).   Other employees bargain for "forfeiture-for-competition"

agreements, which provide the employee with additional compensation that will be forfeited if the employee works for a competitor. Those provisions do not restrict where an employee can work; they simply allow the former employer to stop making payments if the employee does not hold up his end of the bargain. Some firms also negotiate noncompete agreements as part of the sale of a business. These agreements prevent the seller from turning around and competing with the company that just bought his business.

39. Economic research supports the benefits of reasonable worker noncompete agreements. For example, one recent survey of the economic literature concluded that "noncompetes support employers' incentives to invest in employees' human capital and [research and development] projects that would otherwise be subject to expropriation by departing employees." Barnett & Sichelman, *The Case for Noncompetes*, *supra*, at 974. Another study confirmed that, by allowing companies to protect their confidential and proprietary information, noncompete agreements promote workforce training opportunities and wage increases. *See* Geoffrey A. Manne & Dirk Auer, *Comments of the International Center for Law & Economics Regarding Contract Terms that May Harm Fair Competition* 10 (September 30, 2021). A recent report from the Government Accountability Office, although critical of noncompetes in certain respects, acknowledged studies showing that "workers in occupations that use [noncompetes] frequently are more likely to

receive firm-sponsored training in states with stronger [noncompete] enforcement environments."   GAO, *Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility, and May Affect Wages* 34 (May 2023).

### B.      Longstanding State Regulation Of Noncompete Agreements

40.      Noncompete agreements have been regulated by state law since the Founding.   *See, e.g.*, *Pierce* v. *Fuller*, 8 Mass. 223 (1811).   In most States, noncompete agreements are considered on a case-by-case basis and enforced so long as they are reasonable.   In Texas, for example, a noncompete agreement will be enforced only if it is "limited appropriately as to time, territory, and type of activity." *See, e.g.*, *DeSantis* v. *Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990).  Similarly in Michigan, a statute lists factors for courts to consider in determining whether a noncompete agreement is valid and enforceable, including the duration of the agreement, its geographic scope, and the line of business involved.  *See* Mich. Comp. Laws § 445.774a(1).   Those statutory factors resemble the requirements that developed under the common law of Michigan, Texas, and many other States to determine when a particular agreement is "reasonable."   *See Bristol Window and Door, Inc.* v. *Hoogenstyn*, 650 N.W.2d 670, 679 (Mich. Ct. App. 2002); *DeSantis*, 793 S.W.2d at 681-682.

41.    Some States have chosen to place more targeted conditions on the enforceability of noncompete agreements.  For example, in Massachusetts, the term of noncompete agreements normally must not "exceed 12 months."  Mass. Gen. Laws ch. 149, § 24L(b)(iv).  Massachusetts also has a strict notice requirement, mandating that the agreement "be provided to the employee by the earlier of a formal offer of employment or 10 business days before the commencement of the employee's employment."  *Id*. at § 24L(b)(i).  Other States regulate noncompete agreements by making them unenforceable against certain types of workers, particularly low-wage employees.  *See* R.I. Gen. Laws § 28-59-3(a)(4) ("A noncompetition agreement shall not be enforceable against . . . [a] low-wage employee," defined as an employee whose annual salary is not more than 250% of the federal poverty level); 820 Ill. Comp. Stat. 90/10 § 10(a) ("No employer shall enter into a covenant not to compete with any employee unless the employee's actual or expected annualized rate of earnings exceeds $75,000 per year.").

42.    Only a few States prohibit noncompete agreements or treat them as largely unenforceable.  *See, e.g.*, Brandon Kemp, *Noncompetes in Oklahoma Mergers and Acquisitions*, 88 Okla. B.J. 128, 128 (2017) (explaining that noncompete agreements "have been prohibited by statute in Oklahoma since 1890," before Oklahoma was admitted as a state).  In California, for example, an agreement

"by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal. Bus. & Prof. Code § 16600.

43.    The debate over the enforceability of noncompete agreements continues in statehouses around the country, with over a dozen States considering new noncompete legislation in the last two years.  *See* 42 Noncompete Bills in 18 States—and 3 Federal Bills, Fair Competition Law (Feb. 5, 2023), https://faircompetitionlaw.com/2023/02/05/42-noncompete-bills-in-18-states-and-3-federal-bills/.  And the legislative innovation goes in both directions.  Although many States have placed additional restrictions on noncompetes, Georgia enacted a law that *expanded* the enforceability of noncompetes by rejecting demanding standards developed by its courts.  *See* Ga. Code Ann. § 13-8-50 *et. seq.*  As a result of these developments, there is currently significant variation (and innovation) regarding the treatment of noncompete agreements in the United States.  But the vast majority of States continue to recognize that reasonable noncompete agreements provide meaningful benefits to workers and businesses alike, and thus should be enforced in many circumstances.

### C.    The Congressional Debate Over Noncompete Agreements

44.    Federal legislators are also engaged in an active debate over noncompete agreements.  In recent years, some Members of Congress have proposed bills to impose broad restrictions on their enforceability.  *See, e.g.*, Restoring

23

Workers' Rights Act of 2022, H.R. 8755, 117th Cong. (2022) (proposed legislation that would ban noncompete agreements for low- to middle-income workers); Freedom To Compete Act of 2019, S. 124, 116th Cong. (2019) (proposed legislation that would prevent employers from using noncompete agreements in employment contracts subject to the Fair Labor Standards Act).  Others have proposed bills that would regulate the enforceability of noncompetes on a much more limited basis, such as when an employee applies to work for a Veterans' Affairs hospital.  *See* VA Hiring Enhancement Act, H.R. 5521, 115th Cong. (2018) (providing that "any covenant not to compete . . . shall have no force or effect" with respect to a newly hired Veterans Health Administration employee); *see also* EVEN Act, H.R. 527, 118th Cong. (2023) (proposed legislation that would prohibit an employer from enforcing a noncompete agreement with an employee or former employee who has been fired for not receiving a Covid-19 vaccine).

45.     Notably, many of those proposals proceed from the necessary premise that the Commission does not currently have the authority to regulate noncompete agreements.  For example, Members of the Senate and House recently reintroduced the Workforce Mobility Act, which prohibits the use of noncompete agreements except in certain circumstances.  *See* Workforce Mobility Act of 2023, S. 220, H.R. 731, 118th Cong. §§ 3, 6 (2023).  That legislation would give the Commission authority to treat worker noncompetes as "unfair or deceptive" acts (a provision for

24

which the Commission is empowered to issue binding regulations), not as "unfair method[s] of competition" (a provision for which the Commission has no rulemaking authority).   Other legislative proposals targeting noncompete agreements would not provide any role for the Commission in enforcing the law, but would instead authorize the National Labor Relations Board to do so.  *See, e.g.*, Restoring Workers' Rights Act of 2022, H.R. 8755, 117th Cong. (2022) (prohibiting noncompetes by amending the Fair Labor Standards Act); Freedom to Compete Act, *supra* (same).

46.   Every one of those proposed bills has failed.  In fact, none has even received a committee vote.  As a result, there is no federal statute that speaks to the enforceability of noncompete agreements, let alone a statute that authorizes the Commission to categorically prohibit them.

47.   Congress's increased attention on noncompetes makes two things abundantly clear.  First, Congress is well aware that any federal regulation of noncompetes must be through new legislation because there is no statute on the books that permits a federal agency to act.  And second, there is no consensus that noncompetes should be regulated at the federal level at all, let alone categorically banned.

### D.   President Biden's Executive Order

48.    Despite that lack of legislative authority, President Biden instructed the Commission to regulate noncompete agreements nationwide.   On July 9, 2021, President Biden issued an Executive Order on "Promoting Competition in the American Economy,"   which directed various Executive Branch agencies to take specific actions related to conditions in the economy.   Exec. Order No. 14,036, 86 Fed. Reg. 36987 (July 9, 2021).   As relevant here, that Executive Order stated that "[t]o address agreements that may unduly limit workers' ability to change jobs, the Chair of the FTC is encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority under the Federal Trade Commission Act to curtail the unfair use of non-compete clauses and other clauses or agreements that may unfairly limit worker mobility." *Id.* at 36992.

49.    Shortly after President Biden's Executive Order, the Commission solicited public comments on "non-compete clauses that prevent workers from seeking employment with other firms."  Fed. Trade Comm'n, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021).   A few months later, the Commission partnered with the Department of Justice on a workshop entitled "Making Competition Work:  Promoting Competition in Labor Markets," where it again considered noncompete agreements.   *See* Fed. Trade Comm'n, *Event Description: Making Competition Work* (Dec. 6-7, 2021),

https://www.ftc.gov/news-events/events/2021/12/making-competition-work-promoting-competition-labor-markets.

### E. The Commission's Unprecedented Enforcement Actions Challenging Noncompete Agreements

50. Before 2023, the Commission had never successfully pursued an enforcement action challenging a worker noncompete agreement. And, as far as Plaintiff-Intervenors are aware, no court had ever held that an individual noncompete agreement violated the FTC Act, Sherman Act, or any other federal antitrust law.

51. That is not surprising. Across the last several decades, plaintiffs have occasionally tried to invalidate worker noncompetes under the antitrust laws. But as the Commission recognized in its Noncompete Rule, none of those claims has succeeded. *See* 88 Fed. Reg. at 3496-3497. Some failed because the challenged agreements were procompetitive. *See Lektro-Vend Corp.* v. *Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981) (explaining that "[t]he recognized benefits of reasonably enforced noncompetition covenants are by now beyond question"). Others failed because the plaintiff was unable to show that a noncompete agreement with a single worker harmed competition in the market for that worker's labor—an essential prerequisite for liability under the antitrust laws. *See Caremark Homecare, Inc.* v. *New England Critical Care, Inc.*, 700 F. Supp. 1033, 1035-1036 (D. Minn. 1988).

52.     Nonetheless, as part of its newfound assertion of regulatory authority, the Commission announced its first-ever enforcement actions targeting noncompetes on January 4, 2023—the day before it proposed banning nearly all worker noncompete agreements throughout the country.  *See* Fed. Trade Comm'n, *FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers* (Jan. 4, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.   One of those enforcement actions concerned a security company in Michigan that had highly restrictive noncompete agreements with its security guards that a Michigan court had already found were unreasonable under state law.  *See Prudential Security, Inc.* v. *Pack*, No. 18-015809-CB (Mich. Cir. Ct. Apr. 18, 2019).  The other enforcement actions were brought against the two largest manufacturers of glass food and beverage containers in the United States.  Fed. Trade Comm'n, *Glass Container Non-Compete Restrictions*, 88 Fed. Reg. 2618, 2619 (Jan. 17, 2023).  Both manufacturers had imposed extremely broad noncompete agreements with hundreds of employees.  The Commission resolved each of these matters through coercive settlements, rather than testing its legal theories in a court of law.  And notably, the Commission justified each enforcement action by looking to the specific conduct of the defendant, not on the ground that

every noncompete agreement is categorically unfair. *See* Compl. ¶¶ 9-11, *In re Ardagh Grp. S.A. et al.* (Feb. 21, 2023).

53.    Commissioner Christine Wilson dissented from each of those enforcement actions. As to the glass manufacturers, she noted many obvious defects in the Commission's approach that represented a sharp break from precedent in unfair-competition enforcement, including that the Commission (i) did not allege that the challenged agreements were actually enforced by the employer; (ii) did not establish that the challenged agreements had any effect whatsoever on competition in any market (and did not even define a relevant market); and (iii) dismissed evidence of procompetitive justifications for the challenged agreements, such as the business's interest in protecting its investment in workforce training. Commissioner Wilson also explained that, in recent years, parties frequently settle with the Commission to avoid the burden of onerous and irrelevant document requests, even when they know the Commission would not prevail if the matter were actually litigated on the merits. *Dissenting Statement of Commissioner Christine S. Wilson*, *Glass Container Non-Compete Restrictions*, 88 Fed. Reg. 2618, 2623-2624 (Jan. 17, 2023). As to the enforcement action against the security company, Commissioner Wilson explained that her "vote reflect[ed] [her] continuing disagreement with the new Section 5 Policy Statement and its application to these facts," and noted that the agreements at issue were already unenforceable under state law. *Dissenting*

*Statement of Commissioner Christine S. Wilson*, *In re Prudential Security*, No. 211-0026 (Jan. 4, 2023).

54.     A few months later, the Commission pursued another enforcement action challenging a business's noncompete agreements.  *See In re Anchor Glass Container Corp.*, No. 211-0182 (Mar. 14, 2023).  Once again, Commissioner Wilson dissented, noting that the Commission had "fail[ed] to provide facts to support the hypothesized outcome" that "non-compete agreements ha[ve] a tendency to harm competition and workers."  *Dissenting Statement of Commissioner Christine S. Wilson*, *In re Anchor Glass Container Corp.*, No. 211-0182 (Mar. 14, 2023).

55.     As it stands today, the Commission's handful of enforcement actions in 2023 remain its only attempts to establish that individual noncompete agreements violate the FTC Act.  And given the atypical facts of those investigations, they do not provide the Commission with any relevant expertise that would support its nationwide ban on noncompete agreements.

## THE COMMISSION'S NONCOMPETE RULEMAKING

### A.     The Commission's Proposed Noncompete Ban

56.     On January 5, 2023, the Commission proposed a rule to "ban noncompete clauses."  FTC News Release (Jan. 5, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.     The   Commission's   Proposed   Rule

"prohibit[ed] employers from using noncompete clauses," and "ma[de] it illegal for an employer to: enter into or attempt to enter into a noncompete with a worker; maintain a noncompete with a worker; or represent to a worker, under certain circumstances, that the worker is subject to a noncompete." *Id*.

57.     The Proposed Rule was breathtaking in its sweep.   It reached agreements with employees and independent contractors; defined "non-compete clauses" to include any agreement that has the effect of "prevent[ing] [a] worker from seeking or accepting employment"; and drew no distinctions between workers based on their seniority, their access to competitively sensitive or proprietary information, the skill required to perform their jobs, their bargaining power, their compensation, or a host of other seemingly relevant factors.  88 Fed. Reg. at 3482-83.  The Proposed Rule even applied to partners or owners selling a stake in their business, so long as that stake represented less than 25 percent of the total firm.  *Id*. at 3483.  All told, the Commission proposed a virtual federal ban on noncompete agreements.

58.     The Proposed Rule also sought to *retroactively* invalidate millions of private agreements.   The Commission proposed to invalidate *all* noncompetes currently in force and to require employers to notify all affected employees, even former ones.  *Id.*  By the Commission's own estimate, it would automatically and retroactively invalidate 30 million existing noncompete agreements, even if the

business protected by the noncompete had already paid valuable consideration under the parties' contract. *Id.* at 3485. And it would require businesses with noncompete agreements to notify employees that those clauses were rescinded. *Id.* at 3483. The Proposed Rule did not explain whether a business would need to keep performing on a contract that included a noncompete provision—such as by making severance payments to a former employee who had agreed not to work for a competitor—after the noncompete clause was wiped out.

59.    The Proposed Rule's assessments of costs and benefits demonstrated that it was the product of political pressure, not careful economic analysis. For starters, the Proposed Rule addressed only some of the potential costs imposed by its ban, and even then significantly undercounted the burdens on businesses and workers. Most significantly, the Commission made *no* attempt to measure the costs associated with decreased employee-training opportunities, even though it concluded that "[a]ny investment which is lost due to the inability of firms to use non-compete clauses would likely represent the greatest cost of the proposed rule." 88 Fed. Reg. at 3493. Nor did it measure the costs businesses would suffer if they were unable to protect their sensitive information as a result of the Proposed Rule.

60.    The Commission also low-balled the only compliance costs it did attempt to calculate. In total, the Commission estimated that the approximately 4 million businesses that use noncompetes will collectively bear $39.25 million in

human resource-related expenses and $241.96 million in legal fees, for a total of $281.21 million in direct compliance costs. *Id.* at 3528. But that figure included only the costs of notifying employees—it failed to even consider legal expenses associated with trade-secret lawsuits or litigation over nondisclosure agreements, even though the Commission itself acknowledged that businesses would need to rely on those alternatives once noncompetes were no longer available. The Commission also estimated that businesses would spend between $742.07 million and $1.48 billion to update their contracts, including to expand the scope of nondisclosure agreements. *Id.* at 3529.

61.    When it came to projecting the purported benefits of the Rule, however, the Commission was notably less circumspect. The Commission estimated that by banning noncompetes, around 30 million Americans could see expanded career opportunities. *Id.* at 3485, 3501. The Commission also asserted that banning noncompetes would increase innovation and lower healthcare costs. *Id.* at 3526-3527. But in announcing those rosy projections, the Commission ignored or minimized the body of literature pointing the other way, including the expert analysis from its 2020 workshop explaining that the economic evidence related to noncompetes was inconclusive and "context-specific." Lavetti, *Economic Welfare Aspects of Non-Compete Agreements*, *supra* ¶ 13, at 55.

62.    The Commission requested comments on possible alternatives to its Proposed Rule.  According to the Commission, "these alternatives flow from two key questions: (1) whether the rule should impose a categorical ban on noncompete clauses or a rebuttable presumption of unlawfulness, and (2) whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers."  88 Fed. Reg. at 3516.  With respect to the second question, the Proposed Rule stated that the Commission would explore partial bans that "apply different rules to different categories of workers based on a worker's job function, occupation, earnings, another factor, or some combination of factors."  *Id.* at 3518.  For example, the Commission requested comments on an approach that would prohibit noncompete clauses for most workers, but not senior executives or other "highly paid and highly skilled workers."  *Id.* at 3502.

**B.     The Commission's Purported Authority For the Noncompete Rule**

63.    As supposed authority for its novel and sweeping Noncompete Rule, the Commission relied on Sections 5 and 6 the Federal Trade Commission Act.  *See* 15 U.S.C. §§ 45, 46.  According to the Commission, Section 5 authorizes it to categorically deem noncompete agreements unlawful, while Section 6 empowers it to adopt binding substantive regulations implementing that across-the-board prohibition.  Although the relevant language of both sections has remained

34

unchanged for more than a century, this is the first time the Commission has ever attempted to issue a regulation of this kind.

### 1.    The Commission's Unprecedented Interpretation Of Section 5.

64.    As first enacted in 1914, Section 5 of the FTC Act "declared unlawful" "unfair methods of competition" and authorized the Commission to pursue individual enforcement actions against alleged violators.  Federal Trade Commission Act, § 5, 38 Stat. 717, 719 (Sept. 26, 1914) (codified at 15 U.S.C. § 45).  In 1938, Congress amended Section 5 to also prohibit "unfair or deceptive acts or practices." Pub. L. 75-447, § 3, 52 Stat. 111, 111-114 (1938).  Since that time, the Commission has consistently relied on individual adjudications against individual defendants, rather than rulemakings, to determine what amounts to "unfair methods of competition" prohibited by Section 5.  *See AMG Cap. Mgmt, LLC* v. *Fed. Trade Comm'n*, 141 S. Ct. 1341, 1346 (2021).

65.    In exercising its authority to ban "unfair methods of competition," the Commission has long employed familiar antitrust principles.  For decades, it brought cases only where it believes that the defendant's specific conduct harmed consumer welfare through increased prices or reduced output, and it evaluated most categories of challenged conduct under a "rule of reason" framework, which weighed the competitive harm of a defendant's actions against the asserted business

justifications.  During the Obama Administration, the Commission articulated its longstanding approach in a policy statement, which was adopted on a bipartisan basis.  *See* Fed. Trade Comm'n, *Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act* (Aug. 13, 2015).  That policy stated that (i) the Commission's enforcement decisions would "be guided by the public policy underlying the antitrust laws, namely, the promotion of consumer welfare," and (ii) the Commission would "evaluat[e]" challenged conduct "under a framework similar to the rule of reason," which requires showing that "an act or practice challenged by the Commission must cause, or be likely to cause, harm to competition or the competitive process, taking into account any associated cognizable efficiencies and business justifications."  *Id*.

66.    The Commission rescinded the Obama-era policy statement in July 2021.  *See* Fed. Trade Comm'n, *Statement of the Commission on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act* (July 9, 2021).  Then in November 2022, the Commission adopted a new policy, this time on party lines, that reflected a sharp break from decades of Commission practice.  *See* Section 5 Policy Statement, *supra* ¶ 11, at 9.  According to the new policy, the Commission would no longer be motivated by consumer welfare, nor would it need to point to harms to competition or a lack of offsetting justifications.  Instead, an entire category of conduct or

business practices would be deemed an "unfair method of competition" so long as the Commission (or a majority of Commissioners) believes it is (i) "coercive, exploitative, collusive, abusive, deceptive, predatory, or involve[s] the use of economic power of a similar nature," and (ii) "negatively affect[s] competitive conditions."  Section 5 Policy Statement, *supra* ¶ 11, at 9.

67.     Commissioner Wilson vigorously dissented from the Section 5 Policy Statement, noting that it allowed the Commission to outlaw ordinary business practices based on nothing more than "nefarious-sounding adjectives."  Fed. Trade Comm'n, *Dissenting Statement of Commissioner Christine S. Wilson*, *Regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act,"* 2  (Nov. 10, 2022).  She explained that the Commission's new policy offered no meaningful guidance to regulated parties; ignored the Supreme Court's guidance that antitrust laws protect consumers rather than competitors; and departed from "a vast body of relevant precedent that requires the agency to demonstrate a likelihood of anticompetitive effects, consider business justifications, and assess the potential for procompetitive effects before condemning conduct."  *Id*. at 3.

68.     Continuing to disregard these objections, the Commission then relied on its novel interpretation of Section 5 as the substantive authority for its Noncompete Rule.  88 Fed. Reg. at 3499 & n.230 (Proposed Rule).  Drawing on the

unbounded authority the Commission had granted itself in that policy, the Commission asserted that worker noncompete agreements are categorically "unfair" for *all* workers, including senior executives, and "negatively affect competitive conditions" in *every* sector of the Nation's economy. *Id*. at 3499.

### 2. The Commission's Unprecedented Interpretation of Section 6.

69.     Section 5 does not grant the Commission any rulemaking authority.  It instead authorizes the Commission to enforce the law only through individual enforcement actions.  So to support its novel effort to promulgate a binding rule categorically deeming a common business practice an unfair method of competition, the Commission turned to Section 6(g) of the FTC Act—a provision it has not relied on to regulate private parties in more than five decades.

70.     Also first enacted in 1914, Section 6 of the FTC Act lists certain "additional powers of Commission."   15 U.S.C.  § 46.   Section 6 provides the Commission with various investigative and administrative powers in conjunction with its investigative and enforcement authority, including the authority to "gather and compile information" as part of its investigations, "to require" regulated parties "to file . . . annual and special" reports,  to "investigate and report the facts relating to any alleged violations of the antitrust [laws]," and to publish reports in the public interest.  *Id.*  Section 6(g), in turn, also authorizes the Commission to "from time to

time classify corporations and . . . to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id*. § 46(g).  Section 6 says nothing about unfair methods of competition or any other substantive authority of the Commission.

71.    Section 6 emerged from Congress's debates over the FTC Act in 1914. At that time, the House of Representatives envisioned the Commission as a purely investigative body, which would gather information, produce reports, and make recommendations to the Attorney General regarding suspected violations.  The House drafted the statutory text that became Section 6—including its reference to "rules and regulations" necessary to carry out its investigative functions—with that vision in mind.  By contrast, the Senate envisioned the Commission as an enforcement agency, and wrote what became Section 5 to empower the Commission to enforce the law through case-by-case adjudications.  Following negotiations between the two chambers, the FTC Act included both provisions:  the Senate-proposed enforcement powers became Section 5 of the Act, and the House-proposed investigative powers became Section 6. *See* Thomas W. Merrill & Kathryn T. Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002)*;*  Noah Joshua Phillips, *Against Antitrust Regulation*, Am. Enter. Inst., 2 (2022).  At no point during Congress's deliberations, however, did the House or the Senate even *suggest* that the newly formed Commission would have

substantive rulemaking authority over the entire economy—a proposition that would have been unheard of in 1914, decades before the creation of the modern administrative state.

72.     In the years following passage of the FTC Act, the other Branches signaled a common understanding that the Commission lacked substantive rulemaking authority under Section 6(g).  In 1922, the Commission itself wrote to Congress that "[o]ne of the most common mistakes is to suppose that the [C]ommission can issue orders, rulings, or regulations unconnected with any proceedings before it."  Merrill & Watts, *supra* ¶ 73, at 506 (quoting *Annual Report of the Federal Trade Commission* 36 (1922)).  That understanding was then echoed by the Attorney General in his Final Report on the Administrative Procedure Act. *Id.* (citing *The Attorney General's Comm. on Admin. Procedure, U.S. Dep't of Justice, Monograph No. 6, The Federal Trade Commission* 67 (1939)) (concluding that rules issued by the Commission should be called "advisory interpretations" rather than "rules," because "[n]othing in the statutes administered by the Commission makes any provision for the promulgation of rules applicable to whole industries").     And in resolving a challenge to the constitutionality of the Commission, the Supreme Court explained in 1935 that Section 6 only authorized

40

the Commission to "mak[e] investigations and reports thereon for the information of Congress." *Humphrey's Executor* v. *United States*, 295 U.S. 602, 627-628 (1935).*

73. Further confirming that the Commission lacks *general* rulemaking authority, Congress has enacted various laws granting the Commission *specific* rulemaking authority to address discrete industries and issues. Those statutes include the Wool Products Labeling Act, 15 U.S.C. § 68d; the Textile Fiber Products Identification Act, 15 U.S.C. § 70e(c); the Fur Products Labeling Act, 15 U.S.C. § 69f(b); the Flammable Fabrics Act, 15 U.S.C. § 1194(c); and the Fair Packaging and Labeling Act, 15 U.S.C. § 1454(a). For each of these statutes—and unlike Section 6(g)—Congress identified the subject matter the Commission was permitted to regulate, or specifically authorized rulemaking "as may be necessary and proper for administration and enforcement of this Chapter." *See, e.g.*, 15 U.S.C. § 1194(c).

---

\* The Noncompete Rule is also unlawful because the FTC Act violates Article II of the U.S. Constitution, which has long "been understood to empower the President to keep officers accountable," including by "removing them from office, if necessary." *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477, 483 (2010) (citing *Myers* v. *United States*, 272 U.S. 52, 135 (1926)). Under the FTC Act, the President may remove Commissioners only for "inefficiency, neglect of duty, or malfeasance in office," 15 U.S.C. § 41, which limits the President's ability to hold those officials fully accountable by removing them from office as the President deems appropriate. Although this argument is foreclosed by circuit precedent, *Illumina, Inc.* v. *Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023), Plaintiff-Intervenors nevertheless preserve the argument for further review.

74.    In 1975, Congress enacted a major overhaul of the Commission's enforcement authority in the Magnuson-Moss Warranty—FTC Improvement Act (Magnuson-Moss Act).  For the first time—again confirming that the Commission lacked any general rulemaking authority to enforce Section 5—the Magnuson-Moss Act authorized the Commission to issue binding regulations in furtherance of *some* of its Section 5 enforcement powers.  Specifically, that legislation expressly authorized rulemaking related to "unfair or deceptive acts and practices."  Pub. L. 93-637, § 202 (codified at 15 U.S.C. § 57a).  The legislation made no change to the Commission's authority respecting "unfair methods of competition."

75.    Notably, Congress set a number of guardrails around this new substantive rulemaking authority.  Under the Magnuson-Moss Act, the Commission must follow extensive procedural requirements before it issues regulations related to "unfair or deceptive acts and practices."  Specifically, the Commission must hold an informal hearing, if requested, that includes, among other things, cross-examination of witnesses by interested parties.  *See* 15 U.S.C. § 57a(c).  Moreover, when exercising that authority, the Commission must show that the act or practice "cause[s] substantial injury to consumers which is not reasonably avoidable by consumers themselves and [is] not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).

76.     Prior to the Noncompete Rule, the Commission had only briefly tried to invoke Section 6(g) as a source of substantive rulemaking authority, *see* Final Rule, 25-28 —a step that led Congress to immediately clarify the Commission's rulemaking authority through the Magnuson-Moss Act.  Nor has the Commission ever enforced a rule based solely on its authority to proscribe "unfair methods of competition."  Yet the Commission relied on Section 6(g) as its statutory basis for issuing the Noncompete Rule, outlawing a common business practice and binding tens of millions of American businesses and workers.

### C.     The Comment Period

77.     The Commission received more than 26,000 comments on its Proposed Rule.  Those comments were submitted by a range of businesses, public interest organizations, and economic researchers.  Many small business groups—including the U.S. Small Business Administration's Office of Advocacy—vigorously opposed the Noncompete Rule.  *See* Comment of U.S. Small Business Administration Office of Advocacy (Mar. 20, 2023), https://advocacy.sba.gov/wp-content/uploads/2023/03/FTC-Noncompete-Clause-Comment-Letter-Filed.pdf.  As the SBA Office of Advocacy explained, the Commission's proposal ignored certain costs associated with its noncompete ban, including "the costs of hiring additional legal resources" and "hiring and retaining workers, which some small entities are currently struggling with."  *Id.* at 3.

43

78.    A number of commenters raised serious concerns about other aspects of the proposed rule:

- **The National Small Business Association:** The proposed rule disproportionately burdens small businesses and does "not consider important distinctions that exist among business sectors, employee classifications, or company sizes." National Small Business Association, Comment Letter on Non-Compete Clause Rule, 1 (April 19, 2023), https://www.regulations.gov/comment/FTC-2023-0007-21018.

- **The Consumer Technology Association:** "Companies utilize non-compete agreements because they . . . need to protect themselves against unfair and unethical competitors and the theft of much of their goodwill and intellectual capital." Consumer Technology Association, Comment Letter on Non-Compete Clause Rule, 2 (May 3, 2023), https://www.regulations.gov/comment/FTC-2023-0007-21028.

- **The Small Business Legislative Counsel:**  The proposed rule would impact small businesses' "ability to protect their confidential information and business relationships and, in turn, their willingness to recruit and trust new high level talent."  Small Business Legislative

Council, Comment Letter on Non-Compete Clause Rule, 1 (April 19, 2023), https://www.regulations.gov/comment/FTC-2023-0007-20856.

- **Stamford Health:** The proposed rule "errs by seeking to create a one-size-fits-all rule for all employees across all industries."  Stamford Health., Comment Letter on Non-Compete Clause Rule, 1 (April 1, 2023), https://www.regulations.gov/comment/FTC-2023-0007-20829.

- **A group of law professors, economists, and business school professors:**  Research by Jonathan Barnett and Ted Sichelman "shows that neither theory nor empirics supports the economic arguments commonly made in favor of prohibiting noncompetes" and "identifies serious factual and methodological deficiencies in several widely-cited empirical studies [relied on by the Commission], which cast substantial doubt on those studies' findings and policy implications."  Kristina M. L. Acri *et al.*, Comment Letter on Non-Compete Clause Rule, 1 (April 19, 2023), https://www.regulations.gov/comment/FTC-2023-0007-21045.

- **The California Chamber of Commerce (CCC):**  "[T]he proposed 'functional test' for determining whether a contractual term is a *de facto* non-compete" "may have . . . unintended consequences," including by

disincentivizing employers from offering benefit programs tied to an employee's tenure at the company and by failing to adequately protect trade secrets.  California Chamber of Com., Comment Letter on Non-Compete Clause Rule, 1 (Jan. 19, 2023), https://www.regulations.gov/comment/FTC-2023-0007-20866.

79.    Based on these concerns, many commenters, including Plaintiff-Intervenor the U.S. Chamber, called on the Commission to rescind or, at a minimum, substantially narrow its Proposed Rule.

80.    In the face of overwhelming public interest in and criticism of the Proposed Rule, the Commission extended the deadline for comments from March 20, 2023 to April 19, 2023.  *See* Fed. Trade Comm'n, *FTC Extends Public Comment Period on its Proposed Rule to Ban Noncompete Clauses Until April 19* (Mar. 6, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-extends-public-comment-period-its-proposed-rule-ban-noncompete-clauses-until-april-19.

**D.    The Final Noncompete Rule**

81.    The Commission issued the Final Noncompete Rule on April 23, 2024. Despite the numerous objections raised during the comment period, the Commission has persisted in finalizing an unlawful rule it has no authority to issue.

82.    First, the Commission continues to claim that Section 5 and Section 6 provide it with authority to issue the Noncompete Rule.  As for Section 6, which the

46

Commission cites as authority to issue a binding regulation proscribing unfair methods of competition, the Commission points to a flurry of regulations published between 1963 and 1978, hoping that the quantity of citations can make up for their poor quality. Nearly all of those regulations relied on the Commission's authority over both "unfair methods of competition" and "unfair and deceptive acts and practices," meaning that the reference to "unfair methods of competition" was irrelevant. *See* Final Rule, at 25-28. And none of those regulations was a stand-alone "unfair method of competition" rule. Perhaps most importantly, the Commission has not relied on Section 6(g) to promulgate an unfair-competition rule of any kind since the Magnuson-Moss Act gave the Commission the authority to issue regulations respecting only "unfair and deceptive acts and practices" and not "unfair methods of competition." *Id*. at 25 n. 131. Simply put, the Commission cannot point to a single rulemaking in the last half century that is analogous to the Noncompete Rule.

83.     As to Section 5, which authorizes the Commission to address "unfair methods of competition," the Commission relies on its radical 2022 Policy Statement, eschewing decades of bipartisan consensus that required the Commission to carefully weigh the competitive effects of each individual act challenged as an anticompetitive. *See* Final Rule, at 55-57 & nn.286 & 292-293. Even with that redefinition, the Commission has not established that *all* noncompetes are an unfair

method of competition.  The Commission also persists in making its rule unlawfully retroactive—claiming that a rule that outlaws millions of private contracts is somehow not a "retroactive" application of the law.  *See* Final Rule, at 343.

84.    Second, the Commission's Final Rule fails to cure the flawed decisionmaking process reflected in its proposal.   Although the Commission tweaked the definition of "Non-Compete Clause," its national ban still sweeps in tens of millions of agreements, despite the lack of evidence supporting that unprecedented regulation.  *See* Final Rule, at 561-562.  It disregards a host of alternatives—including continuing its decades-long practice of proceeding case-by-case under Section 5—that would have allowed the Commission to address its supposed concerns without outlawing millions of valid and beneficial contracts.  *See, e.g.*, *id.* at 428-434.  And it engaged in a flawed cost-benefit analysis that was clearly designed to achieve a predetermined outcome.  *See id*. at 451-455.

85.    The only substantive change to the Final Rule is the adoption of a carve-out for "senior executives" who are subject to *existing* noncompete agreements. Under that limited exception, businesses would be able to enforce noncompetes they previously negotiated with "senior executives"—defined as workers who earned more than $151,164 in the prior year and hold a "policy-making position"—but would be barred from negotiating such agreements in the future.  Final Rule, at 563. The Commission did not propose that carve-out in its Proposed Rule, meaning that

48

the agency did not have the benefit of public comment when it decided to impose an arbitrary salary threshold and draw a distinction between current and future agreements.  And the proposed carve-out does little to mitigate the harms of the Rule.  The Commission offers no sound basis to conclude that a noncompete agreement signed with a senior executive in August 2023 is "fair" but the same agreement signed in August 2024 would be "unfair."  Nor does it put forward any empirical evidence supporting its threshold.  *See id*. at 243 (concluding that "the evidence could provide a basis for prohibiting employers from enforcing existing non-competes with senior executives" but deciding not to do so because of "practical considerations").

86.    Unless this Court acts, the Noncompete Rule will become effective in just over four months.  At that time, businesses around the country will lose a vital tool to protect their information and will be forced to incur substantial costs to comply with the Rule's notice procedures and to protect their interests through expensive and inadequate alternatives.  And workers will lose the opportunity to bargain for substantial additional compensation and specialized training and development that follow from noncompetes—benefits the Commission acknowledges in its Rule. *See* Final Rule, at 283.  And even before the Noncompete Rule goes into effect, businesses around the country will be put to the choice of abandoning noncompetes (thereby putting their information at risk) or facing the

prospect of a Commission enforcement action in the future, and will be unable to effectively negotiate new agreements with their workforce.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (Not in Accordance with Law — Lack of Substantive Rulemaking Authority)
### 5 U.S.C. § 706

87.     Plaintiff-Intervenors repeat and incorporate by reference all of the allegations set forth above.

88.     Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law."  5 U.S.C. § 706(2)(A).

89.     The Noncompete Rule is final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because the Commission does not have the authority to issue binding regulations related to "unfair methods of competition."  *Id.* § 706(2)(C).

90.     The Commission claims that Section 6(g) of the FTC Act gives it the authority to regulate noncompetes through a binding regulation.  But the structure and history of the FTC Act, the Commission's own historical understanding of its authority, and Congress's subsequent amendments to the FTC Act demonstrate that Section 6(g) empowers the Commission only to develop internal rules to govern how it conducts investigations and carries out its functions, not to promulgate substantive

rules that bind private parties and declare common business practices categorically unlawful.   And if there were any doubt about the Commission's rulemaking authority under Section 6(g), the major-questions doctrine confirms that the Commission lacks the power to issue substantive competition rules.

91.     For these reasons, the Commission's promulgation of the Noncompete Rule was not in accordance with law.  Plaintiff-Intervenors are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Noncompete Rule should be held unlawful and set aside.

## COUNT II
### Administrative Procedure Act
### (Not in Accordance with Law —  Unlawful Interpretation of "Unfair Methods of Competition")
5 U.S.C. § 706

92.     Plaintiff-Intervenors repeat and incorporate by reference all of the allegations set forth above.

93.     Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law."  5 U.S.C. § 706(2)(A).

94.     The Noncompete Rule violates the law because the Commission's attempt to designate *all* noncompete agreements as "unfair methods of competition" is contrary to Section 5 and thus exceeds the Commission's authority under that provision.

95.    The Commission's categorical ban is inconsistent with history and precedent and departs from the Commission's longstanding interpretation of Section 5, which considers the procompetitive benefits of any agreement that is not a *per se* violation of the antitrust laws.  Here, the Commission did not even attempt to conduct that agreement-specific analysis, and noncompete agreements are not *per se* antitrust violations.  Again, were there any doubt, the Commission's conclusion that it can deem worker noncompetes as categorically unfair also cannot survive scrutiny under the major-questions doctrine.

96.    For these reasons, the Commission's promulgation of the Noncompete Rule was not in accordance with law.  Plaintiff-Intervenors are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Noncompete Rule should be held unlawful and set aside.

**COUNT III**
**Administrative Procedure Act**
**(Not in Accordance with Law – Unconstitutional Delegation)**
5 U.S.C. § 706

97.    Plaintiff-Intervenors repeat and incorporate by reference all of the allegations set forth above.

98.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

99.     To the extent Section 5 of the FTC Act could be interpreted so broadly as to permit the Commission to adopt the Rule's categorical prohibition of noncompetes, that provision violates the nondelegation doctrine.   A statutory delegation to an executive agency is constitutional only when "Congress 'lay[s] down by legislative act an intelligible principle'" to cabin the agency's discretion. *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Mistretta* v. *United States*, 488 U.S. 361, 372 (1989)).   Under the Commission's view of its own authority—reflected in its unprecedented and partisan Section 5 Policy Statement—it can condemn a widespread and long-accepted business practice as an "unfair method of competition" without ever showing that the challenged agreements harm competition or lack procompetitive benefits.  If that is the proper reading of the FTC Act, then Section 5 imposes no intelligible limit on the Commission's power and reflects a clear violation of the Constitution's nondelegation principle.

100.   For these reasons, the Commission's promulgation of the Noncompete Rule was not in accordance with law.  Plaintiff-Intervenors are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Noncompete Rule should be held unlawful and set aside.

**COUNT IV**
**Administrative Procedure Act**
**(Not in Accordance with Law — Unlawful Retroactivity)**
5 U.S.C. § 706

101.   Plaintiff-Intervenors repeat and incorporate by reference all of the allegations set forth above.

102.   Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law."  5 U.S.C. § 706(2)(A).

103.   The Noncompete Rule violates the law because the Commission does not have the authority to issue retroactive regulations.  *See Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority will not . . . be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.").

104.   The Commission's Noncompete Rule imposes considerable retroactive consequences on businesses and workers in every sector of the economy.  If the Rule goes into effect, it will unilaterally void almost every existing noncompete agreement, thereby disrupting the settled expectations of parties that rely on the enforceability of reasonable noncompete agreements and depriving those who have given consideration for such agreements of the benefits of their bargain.  The FTC Act does not include any language that clearly authorizes that extreme retroactive

result.  And even if it did, the Noncompete Rule would raise serious questions under the Fifth Amendment of the U.S. Constitution, which prevents the government from imposing retroactive burdens that "deprive citizens of legitimate expectations and upset settled transactions."  *Eastern Enters.*, v. *Apfel*, 524 U.S. 498, 533 (1998).

105.   For these reasons, the Commission's promulgation of the Noncompete Rule was not in accordance with law.  Plaintiff-Intervenors are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Noncompete Rule should be held unlawful and set aside.

**COUNT V**
**Administrative Procedure Act**
**(Arbitrary and Capricious — Failure to Engage in Reasoned Decisionmaking)**
5 U.S.C. § 706

106.   Plaintiff-Intervenors repeat and incorporate by reference all of the allegations set forth above.

107.   Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

108.   The APA mandates that federal agencies "articulate a satisfactory explanation for [their] action[s]" and establish "a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted); *see Mexican Gulf Fishing*

*Co.* v. *U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023) ("Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made.").

109.   The record before the Commission does not remotely support its decision to categorically ban all noncompete agreements.

110.   First, the Commission imposed a nationwide ban that is not supported by the record.  Courts and policymakers have long recognized the procompetitive benefits of noncompetes, and economic evidence demonstrates the benefits of those agreements.  The Commission has never before sought to categorically prohibit an ordinary business practice, and its decision to do so is striking in light of its acknowledgement that noncompetes promote investments in the workforce and allow businesses to protect their confidential information.  Under the APA, a choice to fundamentally remake the American economy requires substantial factual support.  But here, the Commission has opted for an unprecedented and extreme policy, without pointing to any economic evidence that supports that decision.

111.   Second, the Noncompete Rule rests on a deeply flawed cost-benefit analysis, which leans heavily on inconclusive, ungeneralizable studies, while disregarding more robust research showing that noncompete agreements can benefit workers and competition.

112.    For these reasons, the Commission's promulgation of the Noncompete Rule was arbitrary and capricious.  Plaintiff-Intervenors are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Noncompete Rule should be held unlawful and set aside.

**COUNT VI**
**Administrative Procedure Act**
**(Arbitrary and Capricious — Failure to Consider Alternative Proposals)**
5 U.S.C. § 706

113.    Plaintiff-Intervenors repeat and incorporate by reference all of the allegations set forth above.

114.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

115.    Under the APA, "an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."  *Farmers Union Cent. Exch., Inc.* v. *FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984); *see also Huawei Techs. USA*, *Inc.* v. *Fed. Trade Comm'n*, 2 F.4th 421, 449 (5th Cir. 2021) (noting that an "agency violates the arbitrary-and-capricious standard 'if it fails to respond to significant points and consider all relevant factors raised by the public comments'") (quoting *Carlson* v. *Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)).

116.   The Commission requested comments related to two specific alternatives:  "(1) whether the rule should impose a categorical ban on noncompete clauses or a rebuttable presumption of unlawfulness, and (2) whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers."  88 Fed. Reg. 3482, 3516.

117.   In addition to those specific alternatives, regulated parties also raised a number of other options available to the Commission and explained why those proposals would allow the Commission to achieve its objectives while imposing fewer costs.  Those alternatives include:

- Narrowing the Rule's definition of "non-compete clause" to exclude non-disclosure agreements;

- Amending the Rule to apply only to new noncompete agreements going forward;

- Amending the Rule's definition of "worker" to exclude independent contractors;

- Amending the Rule to exempt all noncompete agreements associated with severance payments, retirement, or garden leave;

- Amending the Rule to exempt forfeiture-for-competition agreements or agreements that allow a worker to join a competitor upon payment of a reasonable liquidated damages amount.

118.   The Commission failed to meaningfully engage with any of these alternatives.   By giving short shrift to the less extreme and more reasoned alternatives provided by commenters, the Commission confirmed that its ultimate goal was never to implement a final rule that balances the costs and benefits of a ban on noncompete agreements but rather to achieve a politically pre-determined objective.

119.   For these reasons, the Commission's promulgation of the Noncompete Rule was arbitrary and capricious.   Plaintiff-Intervenors are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Noncompete Rule should be held unlawful and set aside.

## PRAYER FOR RELIEF

Wherefore, Plaintiff-Intervenors respectfully request that this Court enter judgment in its favor and against Defendant as follows:

(i)   A declaratory judgment that the Noncompete Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A);

(ii)    An order vacating and setting aside the Noncompete Rule in its entirety pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2);

(iii)    An order permanently enjoining the FTC from enforcing the Noncompete Rule against Plaintiff-Intervenors' members;

(iv)    An order issuing all process necessary and appropriate to delay the effective date and implementation of the Noncompete Rule pending the conclusion of this case;

(v)    An order awarding Plaintiff-Intervenors their reasonable costs, including attorneys' fees, incurred in bringing this action; and

(vi)    Any other relief as the Court deems just and equitable.

Dated:  May 9, 2024

Jordan L. Von Bokern*
Tyler S. Badgley*
U.S. CHAMBER LITIGATION
 CENTER
1615 H Street NW
Washington,  D.C.  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
tbadgley@uschamber.com


Liz Dougherty*
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Washington, DC 20024
202-872-1260
ldougherty@brt.org


*  *Pro hac vice pending*

/s/ *Robert L. Sayles*
Robert L. Sayles (Texas Bar No.
24049857)
Boyce Holleman (Texas Bar No.
24126727)
BRADLEY ARANT BOULT
CUMMINGS LLP
1445 Ross Avenue
Suite 3600
Dallas, TX 75202
Tel: (214) 257-9800
Fax: (214) 939-8787
rsayles@bradley.com
bholleman@bradley.com

Jeffrey B. Wall* (Georgia Bar No.
750427)
Judson O. Littleton* (D.C. Bar No.
1027310)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com

*Counsel for Plaintiff-Intervenors
Chamber of Commerce of the United
States of America, Business
Roundtable, Texas Association of
Business, and Longview Chamber of
Commerce*

61