## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

RYAN, LLC,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION,

*Defendant.*

Case No. 3:24-cv-986-E

## BRIEF IN SUPPORT OF PLAINTIFF-INTERVENORS'
## MOTION FOR STAY OF EFFECTIVE DATE
## AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT....................................................1

BACKGROUND..........................................................................6

   A.   The Commission's Authority Under The Federal Trade Commission Act.............................................................................................6

   B.   Existing Regulation Of Worker Noncompete Agreements.................8

   C.   The Commission's Rulemaking ...............................................9

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS.............10

STATEMENT OF ISSUES AND STANDARD OF REVIEW....................10

ARGUMENT .........................................................................10

I.    PLAINTIFF-INTERVENORS ARE LIKELY TO PREVAIL ON THE MERITS..........................................................................11

   A.   The Noncompete Rule Exceeds The Commission's Statutory Authority .......................................................................11

      1.   The Commission Lacks Authority To Prohibit Unfair Methods Of Competition Through Rulemaking  (Count I)....................11

      2.   The Commission's Classification Of All Noncompetes As "Unfair Methods of Competition" Is Contrary To Section 5 (Counts II, III) .............................................................19

      3.   The Commission's Rule Is Unlawfully Retroactive (Count IV) ............................................................................24

   B.   The Noncompete Rule Is The Product Of Flawed Decisionmaking .................................................................25

      1.   The Rule's Broad Ban Is Not Supported By Its Limited Evidence..........................................................................25

      2.   The Rule Brushes Aside Superior Alternatives........................27

3.    The Rule's Cost-Benefit Analysis Is Deeply Flawed ..............29

II.   PLAINTIFF-INTERVENORS WILL BE IRREPARABLY
HARMED ...........................................................................................30

III.  THE PUBLIC INTEREST SUPPORTS PRELIMINARY
RELIEF...............................................................................................31

CONCLUSION...............................................................................................32

# TABLE OF AUTHORITIES

*Page(s)*

CASES:

*Alabama Ass'n of Realtors* v. *HHS,*
141 S. Ct. 2485 (2021) ............................................................22

*Barnhart* v. *Sigmon Coal Co.,*
534 U.S. 438 (2002)...............................................................19

*Boise Cascade Corp.* v. *FTC,*
637 F.2d 573 (9th Cir. 1980)...................................................21

*Bowen* v. *Georgetown Univ. Hosp.,*
488 U.S. 204 (1988)................................................................24

*Bradford* v. *New York Times Co.,*
501 F.2d 51 (2d Cir. 1974) .....................................................21

*Career Colleges and Schools of Texas* v. *U.S. Dep't of Educ.,*
2024 WL 1461737 (5th Cir. April 4, 2024) .............................10

*Chrysler Corp.* v. *Brown,*
441 U.S. 281 (1979)................................................................13

*DeSantis* v. *Wackenhut Corp.,*
793 S.W.2d 670 (Tex. 1990) .....................................................8

*E.I. Du Pont de Nemours & Co.* v. *FTC,*
729 F.2d 128 (2d Cir. 1984) ...................................................20

*Eastern Enters.* v. *Apfel,*
524 U.S. 498 (1998)................................................................25

*Gundy* v. *United States,*
139 S. Ct. 2116 (2019) ............................................................24

*Humphrey's Executor* v. *United States,*
295 U.S. 602 (1935)................................................................15

*Impax Labs., Inc.* v. *FTC*,
  994 F.3d 484 (5th Cir. 2021)......................................................20

*Louisiana* v. *Biden*,
  55 F.4th 1017 (5th Cir. 2022) ..................................................10

*Metropolitan Life Ins. Co.* v. *Massachusetts*,
  471 U.S. 724 (1985)...................................................................22

*Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ....................................................25

*Miles* v. *Apex Marine Corp.*,
  498 U.S. 19 (1990).....................................................................21

*National Petroleum Refiners* v. *FTC*,
  482 F.2d 672 (D.C. Cir. 1973)..............................................18, 19

*NFIB* v. *OSHA*,
  595 U.S. 109 (2022).............................................................17, 22

*North Tex. Specialty Physicians* v. *FTC*,
  528 F.3d 326 (5th Cir. 2008)....................................................20

*Pierce* v. *Fuller*,
  8 Mass. 223 (1811) .......................................................................8

*Snap-On Tools Corp.* v. *FTC*,
  321 F.2d 825 (7th Cir. 1963).....................................................21

*Texas* v. *Biden*,
  10 F.4th 538 (5th Cir. 2021) .....................................................31

*Texas* v. *EPA*,
  983 F.3d 826 (5th Cir. 2020)......................................................30

*USFS* v. *Cowpasture River*
  *Preservation Assn.*,
  140 S. Ct. 1837 (2020) ...............................................................22

*Wages & White Lion Inv., LLC* v. *FDA*,
  16 F.4th 1130 (5th Cir. 2021) ...................................................29

*West Virginia* v. *EPA*,
  597 U.S. 697 (2022)...................................................................3, 22

*Whitman* v. *American Trucking Ass'ns*,
  531 U.S. 457 (2001)........................................................................18

STATUTES:

5 U.S.C. § 705 ...................................................................................10

15 U.S.C. § 45 ..........................................................................2, 7, 14

15 U.S.C. § 46 .............................................................................7, 12

15 U.S.C. § 57a ...........................................................................7, 15

15 U.S.C. § 1194(c) ............................................................................7

Act of July 22, 1813, Ch. 16, § 4 ....................................................12

FTC Act Amendments of 1994, Pub. L. 103-312................................16

Cal. Bus. & Prof. Code § 16600 ......................................................26

Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv)......................................9

REGULATIONS:

*In re Matter of the Enhancement and Standardization of*
  *Climate-Related Disclosures for Investors*,
  No. S7-10-22 (Apr. 4, 2024) ...........................................................32

OTHER AUTHORITIES:

FTC, *Policy Statement Regarding the Scope of Unfair Methods*
  *of Competition* (Nov. 2022)..............................................................23

McAdams, *Non-Compete Agreements: A Review of the*
  *Literature*, FTC Bureau of Economics Research Paper (2019) ...................8

Merrill & Watts, *Agency Rules with the Force of Law: The*
  *Original Convention*,
  116 Harv. L. Rev. 467 (2002) ................................................6, 13, 14

## PRELIMINARY STATEMENT

Many businesses expend considerable time and resources training and developing their employees. They also give those employees access to highly sensitive, proprietary information. Having invested in their people and entrusted them with valuable company secrets, those businesses have strong interests in preventing competitor businesses from free-riding on those investments or gaining improper access to confidential information. For centuries, U.S. businesses have sought to protect those critical interests by entering into reasonable noncompete agreements with their employees, who can also benefit from increased training, access to more information, and a chance to bargain for higher pay.

Policymakers and courts have long understood the benefits of reasonable noncompete agreements. At the same time, they have also recognized that some noncompetes may present an undue burden for certain workers or impose overly broad restrictions—for instance, by preventing an employee from working for a firm hundreds of miles away. And each State has developed its own body of law to strike what it believes is the right balance. At the federal level, Congress has never enacted a law regulating

noncompetes.    And without authorizing legislation, federal agencies appropriately have never attempted nationwide regulation of noncompetes.

Until now.   For the first time in its history, the Federal Trade Commission has issued a sweeping rule largely banning worker noncompete agreements nationwide, decreeing that nearly every one of them constitutes an "unfair method of competition" under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  By the Commission's own estimates, the Noncompete Rule will retroactively invalidate 30 million contracts.  And by categorically banning noncompetes going forward, the Rule will impose huge costs both on workers (by depriving them of the specialized training and additional compensation benefits such agreements can help secure) and on businesses (by forcing them to rely on burdensome and uncertain methods to protect their confidential business information).  Plaintiff-intervenors easily satisfy the requirements for an order staying the Rule's effective date, preliminarily enjoining the Commission from enforcing it, or both.

First, plaintiff-intervenors are overwhelmingly likely to prevail on the merits because the Commission has no authority to issue regulations prohibiting "unfair methods of competition."  For decades, the Commission has addressed unfair-competition practices through individual adjudications,

applying standard antitrust principles to the facts of each case. The Commission now claims that a seldom-used housekeeping provision of the FTC Act, Section 6(g), actually grants a long-dormant power to issue substantive rules declaring business practices unlawful economy-wide. The text, context, structure, and history of Section 6(g) say otherwise. And if there were any doubt, it is resolved by the major-questions doctrine, which recognizes that Congress must "speak clearly if it wishes to assign an agency decisions of vast economic and political significance." *West Virginia* v. *EPA*, 597 U.S. 697, 716 (2022).

Even if the Commission had the authority to engage in unfair-competition rulemaking, categorically prohibiting *all* worker noncompete agreements as "unfair methods of competition" cannot be squared with the meaning of that phrase in Section 5 of the FTC Act. Under established law, a business practice is only unfairly competitive if it produces anticompetitive harm that outweighs any procompetitive benefits. The Commission did not even attempt to make that showing for the entire class of noncompetes. Instead it relied on a radical reinterpretation of Section 5 in a 2022 "Policy Statement," under which a majority of the Commission can condemn conduct as "unfair" without having to show any actual harm to consumers or

competition.  That novel interpretation of Section 5 is wrong on its own terms, upends the States' longstanding role in regulating noncompetes, and violates the major-questions doctrine.  The Commission's view also would make Section 5 so boundless as to reflect an unconstitutional delegation of legislative power from Congress.

Independent of those and other statutory defects, the Rule is a textbook example of arbitrary and capricious decisionmaking.  Here, the Commission adopted a sweeping, categorical rule that has no relationship to the existing evidence on noncompete agreements.  It ignored a range of narrower alternative proposals that would have achieved the Commission's purported objectives without imposing onerous burdens.  And its cost-benefit analysis grossly undercounts the costs of the rule while crediting it with speculative benefits based on stale data.  Commenters explained those errors during the notice-and-comment period, but the Commission failed to address them.

Second, plaintiff-intervenors need immediate relief because the Rule will cause irreparable harm to businesses and employees.  The Rule takes effect less than four months from now.  At that moment, virtually all existing noncompete agreements will instantly become unenforceable.  Parties that currently rely on noncompetes will be forced to choose between terminating

4

those agreements or risking an enforcement action.  In the meantime, those existing agreements will be thrown into serious doubt, as parties now lack any assurance that their earlier bargain remains enforceable.  And companies will be reluctant to enter into noncompetes with new hires under the looming shadow of a Rule that deems those agreements unlawful.

Third, the balance of hardships and the public interest also favor interim relief.  Issuing a stay of the Noncompete Rule's effective date and preliminarily enjoining its enforcement will preserve a status quo that has been in place since the Founding.  Allowing the Rule to take effect and be enforced while this litigation is pending would thus be extremely disruptive to the public.  The Commission cannot remotely claim to suffer that type of harm. It has been nearly three years since President Biden's Executive Order instructing the Commission to curtail noncompete agreements, and the Commission itself delayed the Rule's effective date by four months.  Any harm to the Commission from maintaining the status quo is vastly outweighed by the harm to the public from allowing a likely unlawful and massively important regulation to unsettle a wide swath of the Nation's economy.

## BACKGROUND

### A.   The Commission's Authority Under The Federal Trade Commission Act

In the FTC Act of 1914, Congress "declared unlawful" "unfair methods of competition" and created the Commission to enforce that prohibition.  The FTC Act reflected two different views in Congress about how the Commission should operate.  The House envisioned the Commission as a purely investigative body, which would gather information, produce reports, and make recommendations to the Attorney General for enforcement.  Meanwhile, the Senate envisioned the Commission as a separate enforcement agency that would enforce the antitrust laws through case-by-case adjudication.  Notably, there is no suggestion in the congressional debates that anyone in Congress believed the FTC would have substantive *rulemaking* authority.

What emerged was a combination: the Senate-proposed enforcement powers became Section 5 of the Act, while the House-proposed investigative powers became Section 6.  *See* Merrill & Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002).  In Section 5, Congress authorized the Commission to pursue individual enforcement actions against alleged violators.  15 U.S.C. § 45(a)-(b).  And in Section 6, titled "Additional powers," Congress authorized the Commission to

6

undertake other activities to further its enforcement authority, such as compelling parties to produce "annual or special" reports and "investigat[ing]" violations of the antitrust laws that may be referred to the Attorney General. 15 U.S.C. § 46.  Relevant here, in Subsection (g)—which is titled "Classification of corporations; regulations"—Congress granted the Commission the power to "[f]rom time to time classify corporations and . . . *to make rules and regulations for the purpose of carrying out the provisions of this subchapter.*" *Id.* § 46(g) (emphasis added).

Congress has revisited the FTC Act many times since 1914.  In 1938, Congress amended Section 5 to also prohibit "unfair or deceptive acts or practices."  Pub. L. 75-447, § 3.  In 1975, Congress expressly authorized the Commission to issue binding regulations related to "unfair or deceptive acts and practices," but only after following detailed procedural requirements. Pub. L. 93-637, § 202 (codified at 15 U.S.C. § 57a).  Congress has also provided the Commission with narrow rulemaking authority over specific topics.  *See, e.g.*, 15 U.S.C. § 1194(c) ("violation[s] of such rules … shall be an unfair method of competition and an unfair and deceptive act or practice").  Outside of those specific statutes, Congress has never expressly authorized the Commission to issue rules prohibiting "unfair methods of competition."

7

### B.    Existing Regulation Of Worker Noncompete Agreements

By the Commission's own estimates, there are 30 million noncompetes in the United States.  *See* FTC, Non-Compete Clause Rule, RIN3084-AB74, at 14 (Apr. 23, 2024) (Final Rule).  Reasonable noncompete agreements allow businesses to protect sensitive and confidential information and give employers increased flexibility in compensation.  They also benefit employees by incentivizing specialized training and development opportunities that would otherwise be unavailable.  *See* McAdams, *Non-Compete Agreements: A Review of the Literature*, FTC Bureau of Economics Research Paper 6 (2019).

Noncompetes pre-date the Founding and have been regulated exclusively by the States for centuries.  *See, e.g.*, *Pierce* v. *Fuller*, 8 Mass. 223 (1811).  States have developed varying approaches to ensuring that noncompetes do not unduly restrict workers.  In many States, including Texas, a noncompete agreement will be enforced so long as it is "limited appropriately as to time, territory, and type of activity."  *See, e.g.*, *DeSantis* v. *Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990).  Some States have enacted statutes prohibiting certain kinds of noncompetes.  *See, e.g.*,  Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv) (prohibiting noncompetes that "exceed 12 months").  And four States—California, Oklahoma, North Dakota, and Minnesota—have

8

enacted legislation treating noncompetes in the employment context as largely unenforceable, each ban narrower than the Rule.  By contrast, no federal law addresses the enforceability of noncompetes.

### C.    The Commission's Rulemaking

Despite extensive case law and economic research confirming the benefits of reasonable noncompete agreements, the Commission in January 2023 proposed a broad rule that would ban those agreements nationwide. Compl. ¶ 57.  The proposed rule prompted swift pushback from businesses, workers, economists, and former governmental officials.   And plaintiff-intervenors and others showed that the Commission lacks authority to issue a competition regulation of any kind or to categorically prohibit noncompete agreements.  Compl. ¶¶ 79-81.

On April 23, 2024, the Commission issued its final rule, which changed little from the proposal.  *See* Final Rule, at 561-565.  The main substantive change was a carve-out for existing (but not future) noncompetes with "senior executives," defined as workers making over $151,164 who hold a "policy-making position."  *Id*. at 563.

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff-intervenors moved to intervene on May 8, 2024.  Their claims arise under the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

Plaintiff-intervenors seek a stay of the Noncompete Rule's effective date and a preliminary injunction barring its enforcement.  *See* 5 U.S.C. § 705.  Plaintiff-intervenors are entitled to that relief if (i) they show a "likelihood … of success on the merits," (ii) they face "a substantial threat of irreparable harm," and (iii) the "balance of harms" and "public interest" favors relief.  *See Career Colleges and Schools of Tex.* v. *U.S. Dep't of Educ.*, 2024 WL 1461737, at *7, 26 (5th Cir. April 4, 2024) (stay); *Louisiana* v. *Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (preliminary injunction).

## ARGUMENT

The Noncompete Rule is an unlawful assertion of power that will impose widespread and substantial harms on businesses and employees across the country.  Applying the established requirements for preliminary relief, this Court should stay the effective date of the Rule, preliminarily enjoin its enforcement, or both.

## I.   PLAINTIFF-INTERVENORS ARE LIKELY TO PREVAIL ON THE MERITS.

### A.   The Noncompete Rule Exceeds The Commission's Statutory Authority.

The FTC Act does not authorize the Rule for three independent reasons. First, no provision of the FTC Act empowers the Commission to issue substantive unfair-competition rules.  The Commission relies on Section 6(g), but that ancillary provision cannot support such an expansive and unprecedented claim of regulatory power.  Second, Section 5 of the FTC Act cannot be read to allow the Commission to outlaw *all* noncompete agreements. The Commission's interpretation is divorced from history and precedent and would result in an unconstitutional delegation of power from Congress to the Commission.   Third, at a minimum, the FTC Act contains no language authorizing the Commission to retroactively invalidate millions of existing noncompetes.

#### 1.   The Commission Lacks Authority To Prohibit Unfair Methods Of Competition Through Rulemaking (Count I).

The Commission has no general, freestanding authority to issue binding regulations.  Unlike agencies that Congress authorized to make substantive rules addressing all matters under their jurisdiction, the Commission was not established as a rulemaking body.  Instead, Congress gave it the power to (i)

11

pursue individual enforcement actions and (ii) investigate potential wrongdoing and publish reports. Although Congress has since vested the Commission with specific rulemaking authority over certain matters, it has never done so for "unfair methods of competition."

a.    The Commission claims to have found general rulemaking authority in a single clause tucked within a provision setting forth its investigative powers. Section 6(g) authorizes the Commission to "[f]rom time to time classify corporations and . . . *make rules and regulations for the purpose of carrying out the provisions of [the Act]*." 15 U.S.C. § 46(g) (emphasis added). That formulation is markedly different from other statutes that for centuries have expressly provided agencies with the power to issue binding substantive rules. *See, e.g.*, Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22, 26 (agency may "establish regulations" that "shall be binding" on private parties). To authorize legislative rulemaking, Congress also has historically prescribed sanctions for violations of the agency's rules, confirming that those rules create substantive obligations for regulated parties. *See* Merrill & Watts, *supra*, at 494-495. By contrast, when a rulemaking provision does not expressly indicate that the agency may issue regulations that will bind the

12

public, the provision is "simply a grant of authority to the agency to regulate its own affairs." *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 309 (1979).

The "broader context of the statute as a whole" confirms that Section 6(g) does not give the Commission substantive rulemaking authority. *See Utility Air Reg. Grp.* v. *EPA*, 573 U.S. 302, 321 (2014). Section 6(g) begins with the power to "[f]rom time to time classify corporations." Congress did not slip in substantive rulemaking authority over all business practices in the American economy after first granting that mundane power. Moreover, Section 6(g) is the seventh in a list of twelve lettered subsections setting forth "[a]dditional powers" of the Commission, which largely consist of investigative authorities to request information and produce reports. Section 6 does not mention Section 5 or any other substantive authority. And it provides no standards to guide the Commission—like the "public interest" standard that applies to enforcement actions under Section 5. 15 U.S.C. § 45(b). All of that makes sense only if Section 6(g) does not confer the power to issue binding substantive rules.

b.    The FTC Act's history further confirms that Section 6(g) does not provide substantive rulemaking authority. Section 6 emerged from an agreement between those who wanted the FTC to pursue its own enforcement

actions (ultimately reflected in Section 5) and those who wanted the FTC to serve as a purely investigative body (reflected in Section 6).  *See* pp. 6-7, *supra*. Neither camp even suggested giving the Commission the power to issue legislative rules that would bind every sector of the economy.

In fact, both during and after the Act's passage, all three Branches expressly stated their view that the Commission *lacked* rulemaking authority. Representative Covington advocated for the FTC Act by arguing that the Commission would "not be exercising power of a legislative nature."  Merrill & Watts, *supra*, at 506 (quoting 51 Cong. Rec. 14,932 (1914)).  Shortly after the law was passed, the Commission itself wrote to Congress that "[o]ne of the most common mistakes is to suppose that the [Commission] can issue orders, rulings, or regulations unconnected to any proceedings before it."  *Id.* (quoting Annual Report of the Federal Trade Commission 36 (1922)).  That understanding was echoed by Attorney General Jackson in his Final Report on the APA.  *Id.*  And in resolving a constitutional challenge to the Commission's structure in 1935, the Supreme Court explained that Section 6 only authorized the Commission to "mak[e] investigations and reports thereon for the information of Congress."  *Humphrey's Executor* v. *United States*, 295

U.S. 602, 627-628 (1935).  The consensus understanding has long been that Section 6(g) does not authorize substantive rules.

c.   Subsequent amendments to the FTC Act provide further confirmation that Section 6(g) does not grant general substantive rulemaking authority.  First, Congress has enacted targeted amendments to the FTC Act that expressly allow rulemaking related to specific subjects, like dangerous items in the marketplace.  *See, e.g.*, Pub. L. 90-189, § 4 (1967).  Those statutes would have been entirely unnecessary if Section 6(g) already empowered the Commission to make substantive rules.

Second, in the Magnuson-Moss Act of 1975, Congress granted the Commission rulemaking authority related to "unfair or deceptive acts and practices"—but *not* "unfair methods of competition." 15 U.S.C. § 57a(a).  And Congress imposed extensive procedural requirements before the Commission could issue any rules under that statute.  *See, e.g.*, 15 U.S.C. § 57a(b)(2).  It is implausible that Congress expressly granted substantive rulemaking authority subject to procedural hurdles for "unfair and deceptive acts or practices," while implicitly allowing the Commission to make binding "unfair method of competition" rules at will.

15

Third, Congress again revisited the Commission's rulemaking authority in 1994, codifying the substantive analysis the agency must undertake when defining "unfair or deceptive acts and practices."  *See* Pub. L. 103-312, § 9; S. Rep. 103-130 at 12.  Again, Congress gave no indication that the Commission could issue rules defining "unfair methods of competition."  *See* H.R. Rep. 103-138, at 4 (Commission's authority related to unfair methods of competition is "limited … to case-by-case adjudication").

d.     Any doubt about the meaning of Section 6(g) is resolved by the major-questions doctrine.  It is hard to imagine a more major question than whether an agency may assert rulemaking authority to decide what constitutes fair competition throughout the entire country.  This case shows how awesome that power is:  by a vote of 3-2, the Commission has overridden the laws of at least 46 States and declared tens of millions of noncompete agreements unenforceable.  And of course if the Commission may declare that all noncompetes are unfair methods of competition, it may take the same approach to any other business practice or category of conduct.  The Commission's approach would break from decades of its own case-by-case adjudication, and (as here) potentially centuries of state law.  The Commission has nothing remotely resembling clear congressional authorization to assert

16

powers of such vast "political and economic significance." *Biden*, 55 F.4th at 1033; *see NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022).

If more were needed, the Commission has "claim[ed] to discover" this "unheralded power" in a "long-extant statute." *Biden*, 55 F.4th at 1033. Section 6(g) is tucked away in a corner of the FTC Act that relates to investigative powers, and it includes no reference to any substantive power of the Commission. The Commission understood Section 6(g)'s limited scope for decades, and did not attempt to issue a rule under that provision until fifty years after the FTC Act's passage. To be sure, the Commission experimented with a short-lived effort to issue joint deceptive-practices and unfair-competition rules in the 1960s and 1970s, *see* Final Rule, at 25-28—which prompted Congress to clarify the Commission's rulemaking authority through the Magnuson-Moss Act, which conferred such authority *only* for unfair or deceptive acts or practices. Since that time, the Commission has never until now relied on Section 6(g) as granting substantive rulemaking authority.

e.     The Commission largely relies on one decision to defend its claim of rulemaking authority: *National Petroleum Refiners* v. *FTC*, 482 F.2d 672

(D.C. Cir. 1973).  *See* Final Rule, at 29-30.[*]  That decision is a relic of a bygone era that was wrong then and is obviously so now.  In holding that Section 6(g) "empowered [the Commission] to promulgate substantive rules of business conduct," *National Petroleum Refiners* rested on the fact that Congress had not expressly *excluded* that authority.  482 F.2d at 673, 686.  That gets it exactly backward.  Agencies do not have unlimited power to accomplish their policy preferences until Congress stops them; they have only the powers that Congress grants through a "textual commitment of authority."  *Whitman* v. *American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  And under the major-questions doctrine, the more important the agency's claim of authority, the clearer must be the textual commitment.

The court of appeals in *National Petroleum Refiners* also reasoned that its "duty [was] to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment."  482 F.2d at 689.  That policy-based reasoning should have cut the other way:

---

[*] The only other decision cited in the Rule "incorporated" *National Petroleum Refiners* "by reference" on the ground that "Congress [did not] intend[]" "the issue of Section 6(g) rulemaking power" "to be litigated each time the Commission seeks to enforce a trade regulation rule."  *United States* v. *JS&A Grp., Inc.*, 716 F.3d 451, 454 (7th Cir. 1983).

in 1914, Congress designed Sections 5 and 6 to grant adjudicative and investigative powers, but not substantive rulemaking authority. But in any event, the perils of that approach are one reason why today courts "will not alter the text in order to satisfy the policy preferences" of the Commission. *Barnhart* v. *Sigmon Coal Co.*, 534 U.S. 438, 462 (2002). Whatever persuasive authority *National Petroleum Refiners* might have had in 1973 has long since evaporated. Perhaps that is why the Commission had not relied on it for the last half-century until this Rule.

> **2.    The Commission's Classification Of All Noncompetes As "Unfair Methods of Competition" Is Contrary To Section 5 (Counts II, III).**

Even if the Commission may make rules to govern "unfair methods of competition" under Section 6(g), the Noncompete Rule is still unlawful. It has long been settled that to constitute an "unfair method of competition" under Section 5, the conduct at issue must harm competition more than help it. Some individual noncompete agreements may impose harms that are not outweighed by procompetitive benefits, but plainly not all of them do. Accordingly, the Commission could not simply declare all noncompetes *per se* unlawful under Section 5.

19

a.     "It is the function of the court[s] to determine the scope" of the phrase "unfair methods of competition." *E.I. Du Pont de Nemours & Co.* v. *FTC*, 729 F.2d 128, 136 (2d Cir. 1984) (*Ethyl*).  To distinguish "anticompetitive" from "legitimate conduct," *id.*, courts have consistently required the Commission to prove in each case that the challenged conduct (i) produces anticompetitive effects, *see, e.g.*, *North Tex. Specialty Physicians* v. *FTC*, 528 F.3d 346, 362-363 (5th Cir. 2008); *Ethyl*, 729 F.2d at 141; and (ii) is not offset by legitimate, procompetitive justifications, *see, e.g.*, *Impax Labs., Inc.* v. *FTC*, 994 F.3d 484, 497 (5th Cir. 2021); *Ethyl*, 729 F.2d at 140.  Under this settled interpretation of Section 5, in order to show that *all* noncompetes constitute "unfair methods of competition," the Commission had to show that every noncompete causes competitive harm that is not outweighed by procompetitive benefits.

The Commission did not even try to show that all noncompete agreements do more competitive harm than good.  Instead the Commission argued that noncompetes harm competition in the *aggregate*.  *See* Final Rule 132-135.  But courts have correctly rejected that type of aggregated approach. *See*, *e.g.*, *Boise Cascade Corp.* v. *FTC*, 637 F.2d 573, 582 (9th Cir. 1980) ("[T]o allow a finding of a Section 5 violation on the theory that the mere widespread

20

use of [a] practice[] makes it [unlawful] would blur the distinction between guilty and innocent commercial conduct."). If some noncompetes harm competition and others do not, only the former are "unfair methods of competition." *See Snap-On Tools Corp.* v. *FTC*, 321 F.2d 825, 837 (7th Cir. 1963); *Bradford* v. *New York Times Co.*, 501 F.2d 51, 59 (2d Cir. 1974).

Nor did the Commission attempt to show that the supposed anticompetitive effects of noncompetes are not offset by procompetitive benefits—such as promoting specialized training or protecting businesses' sensitive information. The Commission acknowledged that noncompetes serve many legitimate business interests, Final Rule at 283, but it never attempted to show that those benefits were outweighed by the anticompetitive harms for every noncompete agreement prohibited by its Rule. *See id.* at 282.

b. Again, if there were any doubt about the meaning of Section 5, several settled interpretive principles would resolve it. Courts "assume that Congress is aware of existing law" when it enacts a statute. *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Noncompete agreements date back to the Founding, and there is no indication that Congress in 1914 intended for the Commission to outlaw a common, well-accepted business practice. Moreover, Congress must use "exceedingly clear language if it wishes to

21

significantly alter the balance between federal and state power," *USFS* v. *Cowpasture River Preservation Assn.*, 590 U.S. 604, 622 (2020)—particularly when acting in an area of "traditional state regulation," *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 740 (1985).  Here, States have always regulated noncompetes, and federal law has had nothing to say on the subject.

In addition, as with its reading of Section 6, the Commission's interpretation of Section 5 runs headlong into the major-questions doctrine. By the Commission's lights, the Rule would affect every industry in America based on across-the-board generalizations of what practices a majority of Commissioners believes are "unfair."  *See NFIB*, 595 U.S. at 117.  And it would allow the agency to substitute its judgment for that of Congress, which has declined to enact noncompete legislation for years, as well as the States, most of which have widely enforced noncompetes.  *See West Virginia*, 597 U.S. at 731-732; *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021) (explaining that the major-questions doctrine applies when an agency "intrudes into an area that is the particular domain of state law").  Congress has not authorized any of this, let alone clearly.

c.     Finally, if the Commission's interpretation of "unfair methods of competition" were correct, Section 5 would unconstitutionally delegate

legislative power.  To excuse its failure to show that all noncompetes cause unjustified competitive harm, the Rule relies on the Commission's interpretation of "unfair methods of competition" adopted in a 2022 Policy Statement.  *See* Final Rule, at 55-57.  Breaking with decades of case law interpreting Section 5, that Policy Statement says that the Commission may determine that conduct violates Section 5 so long as (i) it is "undertaken by an actor in the marketplace," (ii) it is "coercive, exploitative, collusive, abusive, deceptive, [or] predatory," and (iii) it "tend[s] to negatively affect competitive conditions" by, for example, "impair[ing] the opportunities" of a competitor. *Id.*; FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition* 8-9 (Nov. 2022) (Policy Statement).

If those vague requirements are all that is necessary to declare a business practice unlawful, then there are no meaningful guardrails on the Commission's power.  Indeed, the Commission goes so far as to claim that it can prohibit any conduct that violates "the spirit of the antitrust laws," so long as that conduct "limit[s] choice" or "impair[s] other market participants." Policy Statement, at 9-10.  Understood that way, Section 5 lacks any "intelligible principle" to guide the Executive's discretion.  *Gundy* v. *United*

*States*, 139 S. Ct. 2116, 2123 (2019).  The Commission's interpretation would thus amount to an unconstitutional delegation of legislative power.

### 3.   The Commission's Rule Is Unlawfully Retroactive (Count IV).

At a minimum, the Commission's attempt to invalidate all existing noncompetes exceeds its authority.  "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules." *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Agencies seeking to issue retroactive rules must point to clear congressional authorization to do so.  *Id.*

The Commission did not attempt to identify a clear congressional authorization to engage in retroactive rulemaking.  The Rule nonetheless voids nearly all existing noncompetes, even if the parties bargained for that protection in return for valuable consideration.  *See* Final Rule, at 343.  Even assuming Section 6(g) authorizes the Commission to issue unfair-competition regulations, nothing in that provision blesses the Commission's attempt to retroactively unwind private contracts.  This Court should avoid the serious questions that arise under the Fifth Amendment when the government imposes retroactive burdens that "deprive citizens of legitimate expectations

24

and upset settled transactions." *Eastern Enters.* v. *Apfel*, 524 U.S. 498, 533 (1998).

## B. The Noncompete Rule Is The Product Of Flawed Decisionmaking.

In addition to lacking statutory authority for the Noncompete Rule, the Commission violated the APA in adopting it. "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023). Here, the Commission fell short of the APA's standard in numerous ways.

### 1. The Rule's Broad Ban Is Not Supported By Its Limited Evidence.

The Noncompete Rule defines "non-compete clause" to cover every "term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a work from . . . seeking or accepting work [or] operating a business" in the United States. Final Rule, at 561-562. It draws no distinction between employees and independent contractors, *id.* at 563-564, sweeps in nondisclosure agreements that the Commission believes "function" in a manner similar to noncompetes, *id.* at 77-79, and applies to senior executives making millions per year.

25

None of the evidence cited by the Commission could justify such a sweeping rule. The Commission relies on a handful of studies that examined the economic effects of various state policies toward noncompetes. *See* Final Rule, at 107. But no State has ever adopted a rule as broad as the Commission's. Even California defines noncompetes more narrowly than the Commission's functional test. *See* Cal. Bus. & Prof. Code § 16600. Moreover, many of those studies compared different States' approaches to enforcing noncompetes on particular facts—and thus say nothing about the merits of a *categorical ban*. *See* Final Rule, at 136-138. Without those studies, the Commission has no reasoned basis for imposing its sweeping prohibition.

The Commission's categorical ban is even more indefensible in light of the extensive case law and economic literature showing that reasonable noncompetes promote competition. *See* pp. 8-9, *supra*. Unless *all* noncompetes harm competition—a showing the Commission does not attempt to make—then the Commission needs a reasoned basis for painting with a broad brush rather than targeting those noncompete agreements that are actually harmful. It has offered none.

## 2.   The Rule Brushes Aside Superior Alternatives.

Commenters offered various alternatives that would allow the Commission to achieve its aims at lower cost.  For example, commenters proposed replacing the Rule's categorical ban with a case-by-case approach. That proposal was consistent with state courts' longstanding approach to assessing noncompetes (as well as the Commission's own historical practice enforcing Section 5).  But the Commission rejected that alternative, arguing that a case-by-case approach would not allow enforcers to address the use of noncompetes "in the aggregate."  Final Rule, 428-434.  Notably, that argument effectively concedes that many agreements would be enforceable under a case-by-case test.  *Id.* at 431.  Yet the Commission made no attempt to explain why it was sensible to wipe out potentially millions of agreements that even the Commission does not think would harm competition.

Commenters also proposed a host of other alternatives.  Plaintiff-intervenor U.S. Chamber proposed excluding independent contractors and severance agreements.  *See* U.S. Chamber Comment Letter 44-45 (Apr. 17, 2023).  The Investment Adviser Association asked for the Rule to apply only prospectively, with an 18-month transition period.  *See* IAA Comment Letter Rule 2-3 (Apr. 17, 2023).  And even some groups that were generally hostile to

27

noncompetes asked the Commission to adopt a narrower rule that would require employers to show a "compelling business interest" for enforcing such an agreement. *See* American Academy of Anesthesiologist Assistants Comment Letter 1 (May 3, 2023).

Other commenters proposed specific exclusions or exemptions. The Small Business Legislative Council asked for the Rule to clearly exclude moonlighting and non-solicitation clauses. *See* SBLC Comment Letter 3-4 (Apr. 19, 2023). And healthcare organizations requested exemptions for healthcare professionals, doctors, and senior hospital executives. *See, e.g.*, Stamford Health Comment Letter Rule 5 (Apr. 1, 2023).

The Commission summarily rejected each of these proposals based on little more than *ipse dixit*—single-sentence, unexplained assertions that employers had other means for protecting their interests, *see* Final Rule, at 364 (discussing industries with apprenticeships), or that business justifications did not outweigh the supposed harms, *see id.* at 361. The casual flippancy with which the Commission dismissed alternatives to a categorical ban is remarkable. That approach fails to adequately explain why it adopted its chosen rule over "less disruptive alternatives." *Wages & White Lion Inv., LLC* v. *FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021).

28

### 3.    The Rule's Cost-Benefit Analysis Is Deeply Flawed.

Although the Commission acknowledged some of the Rule's costs—such as the substantial compliance costs for businesses, *see* Final Rule, at 488-497—it failed to consider others.  The Commission waved away the litigation costs inherent in relying on trade-secret suits to protect businesses' information, reasoning that those costs "are not quantifiable."  *Id.* at 453.  Most importantly, the Commission dismissed the cost of businesses' inability to protect their confidential information, assuming (without evidence or analysis) that firms can rely on other tools like nondisclosure agreements to achieve similar levels of protection.  *Id.* at 532-33.  But the Commission acknowledged elsewhere that its broad definition of noncompetes may sweep in nondisclosure agreements.  *Id.* at 78-79.  The Commission cannot simultaneously claim that nondisclosure agreements are a viable tool to offset the costs of the Rule while also adopting a regulation that would invalidate many of them.

The Commission's assessment of benefits was equally flawed.  As discussed above, the Commission's projected benefits relied largely on studies examining the effects of narrower State policies.  And those studies are based on methodological flaws that were thoroughly explained to the Commission

29

during the comment period.  *See, e.g.*, Kristina M. L. Acri *et al.*, Comment Letter 1-2 (April 19, 2023).  The data underlying those studies are also now quite stale; even the Commission acknowledged that many of its conclusions were based on datasets that ended in 2009 or 2014.  *See* Final Rule, at 461, 467 n.1113.  And changes to state law call into question the rationale for a categorical ban in the first place.  If current state laws are already weeding out unreasonable noncompetes, there is no benefit to a federal rule that wipes out reasonable and procompetitive noncompetes as well.

## II.   PLAINTIFF-INTERVENORS   WILL   BE   IRREPARABLY HARMED.

"Complying with a regulation later held invalid almost *always* produces … irreparable harm."  *Texas* v. *EPA*, 829 F.3d 405, 435 (5th Cir. 2016).  Here, the harms from the Noncompete Rule will be immediate and severe.  Even before the Rule goes into effect, businesses cannot rely on their existing noncompetes or enter into new ones under the looming shadow of a Rule deeming those agreements unlawful.  *See* TAB Decl. ¶¶ 8-9 (Ex. B); Longview Chamber Decl. ¶¶ 10-12 (Ex. C).

On the day that the Rule takes effect, millions of workers and businesses will instantly lose bargained-for contractual protections.  Employers will need to take on the "administrative and labor costs associated with issuing notices

that noncompete agreements cannot be enforced and changing company policies." U.S. Chamber Decl. ¶ 10 (Ex. D). Going forward, workers and businesses will be unable to rely on noncompetes to protect investments in specialized training or to avoid free-riding by competitors. *See* Highland Landscaping Decl. ¶ 6 (Ex. E) (discussing "employee training program[s]" protected by noncompetes); Alloy Precision Technologies Decl ¶7 (Ex. F) (explaining competitors' efforts to poach employees "after the company has incurred the substantial expenses of workforce training"). Those burdens readily constitute "harm for which there is no adequate remedy at law," *Biden*, 55 F.4th at 1033-1034 (citations omitted).

## III. THE PUBLIC INTEREST SUPPORTS PRELIMINARY RELIEF.

"There is generally no public interest in the perpetuation of unlawful agency action." *Texas* v. *Biden*, 10 F.4th 538, 560 (5th Cir. 2021); *see Nken* v. *Holder*, 556 U.S. 418, 435 (2009) (balance of hardships and public interest "merge when the Government is the opposing party"). A stay and injunction would preserve the longstanding status quo, and the Commission cannot claim to be meaningfully harmed by its inability to enforce a Rule that it took years to complete.

The Commission's decision to postpone the Rule's effective date for roughly four months does not change the calculus. That delayed effective date does not help businesses, who do not know whether their current agreements will be enforceable and cannot reasonably negotiate or maintain such agreements knowing they may soon be unenforceable. Given the importance of the Rule and the number of agreements it stands to affect, plaintiff-intervenors urged the Commission to enter its own stay during this litigation. *See, e.g.*, Order Issuing Stay, *In re Matter of the Enhancement and Standardization of Climate-Related Disclosures for Investors*, No. S7-10-22 (Apr. 4, 2024). Because it has refused, and because only a stay and preliminary injunction can ensure that the Rule receives full judicial review before going into effect, the public interest favors interim relief.

## CONCLUSION

Plaintiff-intervenors respectfully request that the Court stay the Rule's effective date, preliminarily enjoin its enforcement, or both.

Dated:  May 10, 2024                       Respectfully submitted,


                                           /s/ *Robert L. Sayles*
Jordan L. Von Bokern (D.C. Bar             Robert L. Sayles (Texas Bar No.
No. 1032962)                               24049857)
Tyler S. Badgley* (D.C. Bar No.            Boyce Holleman (Texas Bar No.
1047899)                                   24126727)
U.S. CHAMBER LITIGATION                    BRADLEY ARANT BOULT
CENTER                                     CUMMINGS LLP
1615 H Street NW                           1445 Ross Avenue
Washington, D.C.  20062                    Suite 3600
Tel:  (202) 463-5337                       Dallas, TX 75202
jvonbokern@uschamber.com                   Tel: (214) 257-9800
tbadgley@uschamber.com                     Fax: (214) 939-8787
                                           rsayles@bradley.com
                                           bholleman@bradley.com

Liz Dougherty* (D.C. Bar No.
457352)                                    Jeffrey B. Wall (Georgia Bar No.
BUSINESS ROUNDTABLE                        750427)
1000 Maine Avenue SW                       Judson O. Littleton (D.C. Bar No.
Washington, D.C. 20024                     1027310)
202-872-1260                               SULLIVAN & CROMWELL LLP
ldougherty@brt.org                         1700 New York Avenue, N.W.
                                           Washington, D.C.  20006-5215
* *Pro hac vice* pending                   Tel:  (202) 956-7000
                                           wallj@sullcrom.com
                                           littletonj@sullcrom.com

                                           *Counsel for Plaintiff-Intervenors*
                                           *Chamber of Commerce of the*
                                           *United States of America, Business*
                                           *Roundtable, Texas Association of*
                                           *Business, and Longview Chamber*
                                           *of Commerce*

## CERTIFICATE OF WORD COUNT

This Brief In Support of Motion for Stay of Effective Date and Preliminary Injunction complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, Rule II(A), because it contains 6,248 words.

/s/ *Robert L. Sayles*
Robert L. Sayles

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2024, I electronically transmitted the attached document to the Clerk of the Court and all counsel of record using the ECF System for filing and service in accordance with Local Rule 5.1.

/s/ *Robert L. Sayles*
Robert L. Sayles