# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>*Defendant.* | **Case No. 3:24-cv-986-E** |

# DECLARATION OF MICHAEL CANTY, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF ALLOY PRECISION TECHNOLOGIES, INC.

1

Pursuant to 28 U.S.C. § 1746, I, Michael Canty, hereby declare as follows:

1. I am the President and Chief Executive Officer of Alloy Precision Technologies, Inc. ("Alloy"). I make this declaration based on my own personal knowledge, and over 40 years of experience manufacturing and distributing products in the U.S. and competing and selling products both domestically and internationally.

2. Alloy Precision Technologies is a metal fabrication company located in Mentor, Ohio, that manufacturers bellows and flexible sealing assemblies, precision machining, welding, tubing, and other highly engineered products. Alloy sells to, among others, the power generation, petrochemical, aerospace, defense, and semiconductor industries. Alloy employs roughly 100 professionals as salesman, machinists, highly technical engineers and quality personnel, as well as several other types of skilled and unskilled personnel. Alloy develops a wide range of proprietary equipment, processes, and products to compete both domestically and globally.

3. Alloy is a member of Plaintiff the Chamber of Commerce of the United States of America.

4. Alloy enters into noncompete agreements with most (though not all) of its employees. Specifically, Alloy has entered into noncompete agreements with its sales and marketing staff, its professional personnel, and all of those employees in a position to have access to proprietary information, processes, and technologies. These agreements generally prevent employees who leave Alloy from accepting employment with a competitor for a limited period of time (generally 2 years) after leaving the company.

5. Noncompete agreements are important to Alloy in a number of ways. For example, such agreements protect the company's confidential information by preventing larger competitors from gaining access to Alloy's proprietary technology, financial data, and other highly sensitive information by simply hiring its employees. Alloy has previously been forced to invoke its noncompete agreements where former employees began working for domestic or foreign competitors and had access to Alloy's sensitive pricing data, proprietary processes, customer contract data, and other proprietary information. In those situations, clear and readily enforceable noncompete agreements prevented competitors from gaining an unfair advantage over Alloy.

6. Noncompete agreements also protect Alloy from foreign competitors, such as those from China, England, and Germany, who would otherwise be able to hire members of Alloy's workforce and gain access to its secrets and customer base to compete unfairly. Notably, the Federal Government requires manufacturing companies that sell to the U.S. defense industry (like Alloy) to take steps to protect sensitive information. Noncompete agreements are an important tool to achieve that objective.

7. Alloy's noncompete agreements also promote investments in the workforce. In particular, Alloy is able to expend considerable resources on employee training opportunities while ensuring that competitors will not be able to free-ride on those investments. Without the ability to enter into noncompete agreements, competitors would be able to hire Alloy's employees after the company has incurred the substantial expenses of workforce training (and have in fact tried to do so), and Alloy would have less incentive to offer those programs.

8. Reflecting the value Alloy places on the benefits of noncompete agreements, its employees who have entered into noncompete agreements often receive higher compensation than they would if noncompete agreements were not available. In addition, Alloy's ability to protect its proprietary secrets

encourages it to hire more U.S. employees instead of shipping those jobs overseas.

9. I understand that the Federal Trade Commission has adopted a rule that would prohibit Alloy from entering into noncompete agreements in the future and require the company to void nearly all existing noncompete agreements. If this rule goes into effect, it will create significant risks for and impose direct costs on Alloy. Alloy's secret technologies and proprietary information would become fair game for domestic and foreign-based competitors: A competitor would be able to swoop in, offer much higher compensation to encourage employees to join the competitor, then terminate the employees once the competitor has obtained the secret Alloy information. Alloy has in fact witnessed such efforts in the past. On top of these costs, Alloy would also immediately incur the costs of issuing notices to employees or former employees who signed noncompete agreements, notifying them that those agreements are no longer enforceable.

10. If this noncompete rule goes into effect, Alloy will be unable to rely on noncompete agreements to protect confidential business information and to promote investments in the workforce. As a result, the noncompete rule will put Alloy's confidential information at risk and will decrease incentives for

workforce training. It may also force Alloy to consider moving jobs overseas to reduce its costs since it will no longer be able to protect the information and processes that allow it to compete with foreign and domestic actors.

11. The noncompete rule also creates considerable uncertainty as to whether similar kinds of agreements with employees—such as non-disclosure agreements, liquidated damages provisions, and non-solicitation agreements—are lawful and enforceable going forward. Because of that uncertainty, Alloy will likely need to incur substantial costs to obtain legal advice regarding future contracts with employees, and may incur costs associated with defending lawful agreements.

12. Many of these costs discussed above may be incurred even before the rule goes into effect. That is because Alloy will need to change its business practices and employment agreements in anticipation of the noncompete rule. For example, Alloy will not be able to offer higher pay in exchange for an employee's agreement to abide by a noncompete if it is possible that noncompete will become unenforceable in the near future.

13. Alloy cannot rely on alternatives to achieve the benefits of noncompete agreements. In Alloy's experience, nondisclosure agreements are difficult to monitor and enforce and trade secret suits do not protect all of the

company's sensitive information or investments in workforce training. Moreover, attempting to enforce a nondisclosure agreement or to establish a trade secret violation requires expensive and time-consuming litigation, a burden that Alloy will likely be unable to bear. Alloy has previously incurred high costs to protect its information through trade secret litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 10, 2024 at Mentor, Ohio.

_____
Michael Canty