## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

RYAN, LLC, *et al.*,

     Plaintiffs,

  v.

FEDERAL TRADE COMMISSION,

     Defendant.

Civil Action No. 3:24-cv-986-E

**BRIEF OF *AMICI CURIAE* NATIONAL RETAIL FEDERATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC., INTERNATIONAL FRANCHISE ASSOCIATION, ASSOCIATED BUILDERS AND CONTRACTORS, INC., AMERICAN HOTEL & LODGING ASSOCIATION, NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, INDEPENDENT ELECTRICAL CONTRACTORS, CONSUMER TECHNOLOGY ASSOCIATION, UNITED STATES COUNCIL FOR INTERNATIONAL BUSINESS, THE HOME CARE ASSOCIATION OF AMERICA, AND THE RESTAURANT LAW CENTER (THE "*AMICI*") IN SUPPORT OF PLAINTIFFS' MOTIONS TO STAY EFFECTIVE DATE AND PRELIMINARY INJUNCTION (THE "MOTIONS"), ECF NOS. 23 & 46**

Edward J. Loya Jr.
 Texas Bar No. 24103619
EPSTEIN, BECKER & GREEN, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201
Tel: 214-930-3735
eloya@ebglaw.com

Carolyn O. Boucek
 (*pro hac vice* motion forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
227 W. Monroe Street, Suite 4500
Chicago, Illinois 60606
Tel: 312-499-1486
cboucek@ebglaw.com

Erik W. Weibust
Katherine G. Rigby
 (*pro hac vice* motions forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
125 High Street, Suite 2114
Boston, Massachusetts 02100
Tel: 617-603-1090
eweibust@ebglaw.com
krigby@ebglaw.com

A. Millie Warner
 (*pro hac vice* motion forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Tel: 212-351-4752
mwarner@ebglaw.com

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ..................................................................1

II.  INTEREST OF THE *AMICI CURIAE* .................................................1

III.   INTRODUCTION AND SUMMARY OF ARGUMENTS ...........................1

IV.  ARGUMENT ........................................................................................4

    A.  The Commission Premised the Final Rule on a Seriously Flawed Cost-Benefit Analysis: The Commission Cherrypicks Data to Support its Pre-Set Agenda to Strike Down Noncompetes while Ignoring Well-Established Evidence of Their Benefits..............................................................5

    1.  Noncompetes are not regularly used for low wage workers........................6

    2.  Noncompetes do not reduce workers' wages. ...............................................8

    3.  Noncompetes do not stifle new business and ideas. ...................................10

    4.  Employers do not regularly coerce workers into signing noncompetes. ....11

    5.  Noncompetes do not harm consumers. ........................................................12

    B.  The Commission's "Reasoning" is Fallacious, Internally Inconsistent, Confirmation Bias Dressed as "Empirical Evidence." ...............................13

    1.  The Commission's Reliance on "Empirical" "Data" is Thin, Inconsistent, and Highly Suspect. ..................................................................................14

    2.  The Commission's Reliance on "Qualitative" "Data" from Worker Comments is Misplaced. ............................................................................21

    3.  In Producing the Final Rule, the Commission Shirks One of the Only Democratic Safeguards to its Unelected Bureaucratic Regime by Failing to Respond to Several Significant Comments.................................................24

V.   CONCLUSION.....................................................................................26

VI.   CERTIFICATE OF COMPLIANCE .........................................................27

VII.   CERTIFICATE OF SERVICE..................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking and Health v. C.A.B.*,
   699 F.2d 1209 (D.C. Cir. 1983) ............................................................5

*Chamber of Com. of U.S. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) ...............................................................25

*Hauwei Techs., USA, Inc. v. Fed. Commc'ns Comm'n*,
   2 F.4th 421 (5th Cir. 2021) ..................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................6

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015)..............................................................................24

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947).............................................................................5

*Sierra Club v. EPA*,
   939 F.3d 649 (5th Cir. 2019) ................................................................5

*United States v. Garner*,
   767 F.2d 104 (5th Cir. 1985) ................................................................5

*United States v. Johnson*,
   632 F.3d 912 (5th Cir. 2011) ..............................................................24

**Statutes**

Administrative Procedure Act, 5 U.S.C.A. § 500, *et seq*................................5, 24, 25

Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*. .........................................23

Illinois Freedom to Work Act, 820 ILCS § 90/1, *et seq*. .........................................19

**Other Authorities**

16 C.F.R. Part 910 and 912 (May 7, 2024) ................................................................ 1

89 FR 38371 ............................................................................................................. 25

*Dissenting Statement of Commissioner Christine S. Wilson
Concerning the Notice of Proposed Rulemaking for the Non-
Compete Clause Rule*, FEDERAL TRADE COMMISSION (Jan. 5, 2023) .4, 10, 12, 25

Epstein Becker & Green, P.C. *50-State Noncompete Survey (2023)*,
https://tinyurl.com/52r2tu65 ........................................................................ 7, 8, 12

Evan P. Starr, *et al.*, *Noncompete Agreements in the US Labor Force*,
64 J. L. & Econ. 53, 53 (2021) ......................................................................... 9, 20

*FTC Cracks Down on Companies that Impose Harmful Non-Compete
Restrictions on Thousands of Workers*, FEDERAL TRADE COMMISSION
(Jan. 4, 2023), https://www. ftc.gov/news-events/news/press-
releases/2023/01/ftc-cracks-down-companies-impose-harmful-
noncompete-restrictions-thousands-workers ........................................................ 17

FTC-2023-0007-21073, at p. 30 ............................................................................. 20

Interview by Andrew Ross Sorkin with Lina Khan, CNBC, in New
York, NY (Apr. 25, 2024) (emphasis added). ...................................................... 25

Lina M. Khan, "Noncompetes Depress Wages and Kill Innovation,"
*New York Times* (Jan. 9, 2023) ......................................................................... 8, 9

Matthew S. Johnson, Kurt Lavetti, and Michael Lipsitz, *The Labor
Market Effects of Legal Restrictions on Worker Mobility.* SSRN
(2021), https://ssrn.com/abstract=3455381 ........................................................... 9

Tyler Boesch, *et al.*, "New data on noncompete contracts and what
they mean for workers," FEDERAL RESERVE BANK OF MINNEAPOLIS
(June 21, 2023), https://www.minneapolisfed.org/article/2023/new-
data-on-non-compete-contracts-and-what-they-mean-for-workers ................... 19

## I.   <u>PRELIMINARY STATEMENT</u>

The eleven *amici* represent thousands of companies that collectively employ tens of millions of employees at all levels across virtually every facet of the U.S. economy. The Federal Trade Commission's Non-Compete Clause Rule, 16 C.F.R. Part 910 and 912 (May 7, 2024) (the "Final Rule" or "F.R."), is based on cherrypicked data that predictably supports the result desired by the Commission's majority, while ignoring or summarily dismissing data that contradicts its preferred policy outcome. But the data the Commission selectively chose to credit bears no rational relationship to the *amici*'s centuries of collective experience concerning how employers in their respective industries utilize noncompetes. The Final Rule is the very definition of arbitrary and capricious rulemaking. The Court should grant Plaintiffs' Motions.

## II.   <u>INTEREST OF THE *AMICI CURIAE*</u>

The *amici* are national and international trade organizations (descriptions of which are included as <u>Exhibit A</u>), and their interest in the outcome of the litigation is that most of their members would qualify as "employers" under the Final Rule and the Final Rule would upend their contractual relations with their workforces.

## III.   <u>INTRODUCTION AND SUMMARY OF ARGUMENTS</u>

The Commission clearly lacks authority to ban noncompetes. However, to avoid repeating arguments Plaintiffs have made in support of the Motions, which the *amici* fully endorse, the *amici* instead focus this brief on additional arguments that further justify injunctive relief, namely that the Final Rule is arbitrary and capricious.

1

Specifically, the Final Rule is contradicted by centuries-old law dating back to the founding of our nation, legal principles that form the bedrock of our justice system, and basic logic. It cannot be afforded any deference for at least two reasons.

First, the Final Rule is a textbook example of arbitrary and capricious rulemaking. Whether a method of competition is unfair has always been an individualized assessment in a particular factual context arising among specific workers, employers, and competitors. Here, the Commission deviated from that inquiry and decreed that the test for determining whether noncompetes are unfair is whether they could theoretically result in generalized social outcomes that the Commission views as negative in the aggregate—ignoring the benefits of permitting employers and employees the freedom to bargain over reasonable post-employment restrictions.

In doing so, the Commission ignores that, since its birth, our nation has maintained a deeply-rooted history and tradition recognizing noncompetes as contractual relationships necessary to protect the legitimate business interests of employers—relationships that have been the province of state law for over 200 years. As with any contract, they are the product of a bargained-for-exchange, the terms of which can be fair and, in some cases, *more than fair* to workers. But, unlike other contracts, courts already subject noncompetes to a reasonableness inquiry and some states impose heightened consideration requirements, all of which is specifically designed and intended to protect workers.

Worse yet, to support its pre-set agenda to ban noncompetes, the Commission's stated reasoning for the Final Rule is incoherent, relies on cherrypicked data, and ignores the myriad concrete benefits of noncompetes. In other words, despite spending more than a year crafting the Final Rule after posting the Notice of Proposed Rulemaking ("NPRM"), the best the Commission could manufacture to support its predetermined outcome is a collection of poorly reasoned, self-serving, and aggrandizing conclusions. That is the *sine qua non* of arbitrary and capriciousness.

Second, as an administrative agency, the Commission is led and staffed by unelected bureaucrats who are not politically accountable. The Commission borrows derivative and expressly delegated Congressional authority. Such authority is predicated and contingent on the Commission complying with certain procedural safeguards designed to hold administrative agencies like the Commission to public account, such as the public comment period for proposed rulemaking. In mandating the Final Rule, the Commission shirked this democratic safeguard. The Commission failed to account for the significant points made in the public comments that highlight the numerous logical fallacies in the Final Rule, and either ignored or summarily dismissed a multitude of thoughtful and well-reasoned comments. If permitted to stand, the Commission's Final Rule poses a real threat to executive accountability.

3

Because the Final Rule is the result of demonstrably arbitrary and capricious rulemaking that was plainly intended to reach a predetermined policy outcome, it must be afforded no deference. Plaintiffs' request for injunctive relief is appropriate and necessary to avoid the immediate and irreparable harm the Final Rule would impose on the hundreds of thousands of American businesses that appropriately rely on narrowly tailored noncompetes to protect their sensitive business information, customer relationships, and competitive postures, not to mention the benefits millions of American workers enjoy in exchange for their agreement not to unfairly compete with their former employers for a limited period of time post-employment.

## IV.   ARGUMENT

As detailed further below, former Commissioner Christine Wilson's thoughtful and well-reasoned dissent to the NPRM is equally germane to the Final Rule, if not more so given that the Commission spent more than a year since announcing the NPRM "finetuning" its purported rationale for taking such draconian action. *See Dissenting Statement of Commissioner Christine S. Wilson Concerning the Notice of Proposed Rulemaking for the Non-Compete Clause Rule*, FEDERAL TRADE COMMISSION (Jan. 5, 2023). In addition to acting far beyond the authority Congress has granted to it, as set forth in Plaintiffs' Briefs, the Commission's findings in support of the Final Rule are a classic case of arbitrary and capricious rulemaking.

**A.    The Commission Premised the Final Rule on a Seriously Flawed Cost-Benefit Analysis: The Commission Cherrypicks Data to Support its Pre-Set Agenda to Strike Down Noncompetes while Ignoring Well-Established Evidence of Their Benefits.**

"Agencies 'are required to engage in 'reasoned decisionmaking.'" *Hauwei Techs., USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 432 (5th Cir. 2021) (quoting *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) and others). That means an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Sierra Club*, 939 F.2d at 664 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)). Agency decisions that are not the product of reasoned decisionmaking are arbitrary and capricious and must be held unlawful and set aside under the Administrative Procedure Act ("APA"). 5 U.S.C.A. § 706(2)(A); *see e.g.*, *United States v. Garner*, 767 F.2d 104, 117–18 (5th Cir. 1985); *Action on Smoking and Health v. C.A.B.*, 699 F.2d 1209, 1218 (D.C. Cir. 1983).

The arbitrary and capricious standard under the APA focuses on the rationality (or lack thereof) of the agency's articulated rationale, as opposed to the substance of the decision. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Garner*, 767 F.2d at 104 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 50). Post-hoc explanations "are simply inadequate." *Id.* at 117. Courts may not supply reasoned bases for an agency's decision that the agency failed to provide. *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947). Similarly, courts must not simply accept any stated reason that the agency happens to provide for its decision; agency decisions that fail to consider "an important aspect of the problem" or that run "counter to the evidence before the agency" are arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

Here, the Commission provided five rationales for the Final Rule that it claims to have arrived at by assessing a series of studies: (1) noncompetes are regularly used for low wage workers; (2) noncompetes reduce workers' wages; (3) noncompetes stifle new business and ideas; (4) employers regularly coerce workers into signing noncompetes; and (5) noncompetes harm consumers. *See* F.R. 7–21. None of these rationales match the extensive experience of the *amici* in their respective industries.

### 1.   Noncompetes are not regularly used for low wage workers.

In the *amici's* collective experience, low wage workers are almost never subject to noncompetes in their respective industries. Indeed, the *amici* discourage such practices. While there are always outliers, the Commission cites no empirical evidence that the use of noncompetes with low wage workers is the norm, only anecdotes. But low wage workers are only one facet of the workforce. And anecdotes are not evidence of a systemic issue.

Behind the scenes in each of the *amici's* industries there are all manner of employees who have access to their employers' most sensitive business and technical

6

information, as well as relationships with their employers' vendors and customers. These roles can range from senior executives, to finance, to marketing, to buyers, to information technology, to supply chain, to logistics—and many other roles where employees are compensated well in exchange for agreeing to reasonable noncompetes. If any such employee were free to leave at will, cross the street, and immediately start working for a direct competitor in the same or similar capacity, loss of highly confidential information is virtually inevitable—notwithstanding trade secret law and applicable confidentiality agreements—and by the time it is discovered it is often too late. However, properly tailored noncompetes can protect against such inevitable harm.

Indeed, if protecting low-wage workers were truly the Commission's concern, it could have taken a far more modest approach, as several states have recently done, such as limiting the Final Rule based on some form of generally applicable compensation threshold as Oregon, Illinois, Massachusetts, Maine, Maryland, New Hampshire, Rhode Island, Virginia, Washington, Nevada, Colorado, and the District of Columbia have done. *See* Epstein Becker & Green, P.C. *50-State Noncompete Survey (2023)*, https://tinyurl.com/52r2tu65. A full-scale ban goes well beyond what would be appropriate to accomplish the Commission's purported goal of protecting low-wage workers. Given the lack of evidence that noncompetes are regularly used with low-wage workers and the statutory protections already in place for employees

7

in several states—with more following the trend of placing restrictions on the use and enforcement of noncompetes each year, *see id.*—the Final Rule is akin to using a sledgehammer to kill a fly.

### 2. Noncompetes do not reduce workers' wages.

Second, "[t]he Commission estimates that the final rule will increase workers' total earnings by an estimated $400 billion to $488 billion over ten years, at the ten-year present discounted value." F.R. 321. In other words, $40 to $48.8 billion per year. As an initial matter, this is a far cry from the Commission's initial estimate just last year in the NPRM that the proposed rule "would increase workers' total earnings by *$250 to $296 billion annually*." F.R. 441 (emphasis added). The Commission attempts surreptitiously to bury this *six-fold decrease* in estimated increased earnings to employees in the middle of its 570-page Final Rule without any explanation for the discrepancy in a number that the Commission initially touted as one of the primary bases for the purported need to ban noncompetes, including in a *New York Times* Op-Ed by the Chair. *See* Lina M. Khan, "Noncompetes Depress Wages and Kill Innovation," *New York Times* (Jan. 9, 2023), https://www.nytimes.com/2023/01/09/opinion/linakhan-ftc-noncompete.html ("Surveying the literature, F.T.C. economists *conservatively estimate* that noncompetes suppress American workers' income by roughly 3 percent to 4 percent, or $250 billion to $296 billion.") (emphasis added). That, in and of itself, renders the Final Rule arbitrary and capricious.

Nevertheless, to support this conclusion, the Commission relies predominantly upon a 2023 study co-authored by a Commission employee, purporting to "find[] that non-competes limit workers' ability to leverage favorable labor markets to receive greater pay." F.R. 141. The Commission contends that "this study has the broadest coverage" and "is very robust." *Id.* But what the Commission omits is that in an earlier version of this study—the version cited in the NPRM—the authors acknowledged that noncompetes "might increase incentives for firms to invest in training, knowledge creation, and other portable assets . . . that could increase their workers' productivity and earnings." Matthew S. Johnson, Kurt Lavetti, and Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*, SSRN (2021), https://ssrn.com/abstract=3455381. The same study admitted that its findings with respect to the effect of noncompetes on wages were based on a "back of the envelope calculation using an out-of-sample extrapolation," and even then it only "implies" that banning noncompetes would increase wages. *Id.* Yet that went completely unmentioned in the Final Rule.

Indeed, as the Commission acknowledges (but then summarily dismisses), there are, in fact, reputable studies showing correlationally exactly the opposite of what the Commission claims—*i.e.*, that workers who are presented with noncompetes before accepting job offers receive *higher wages* and *more training*, and are *more satisfied in their jobs* than those who are not bound by noncompetes. Evan P. Starr, *et*

9

*al.*, *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021). As former Commissioner Wilson aptly pointed out in her dissent to the NPRM, the research on this subject "reveals a mixed bag. . . . An alternative interpretation of these findings is that the scientific literature is still muddled as to who is helped and who is harmed by non-compete clauses."

Regardless, the Commission's bald conclusion is simply not borne out in the *amici's* experience in their respective industries. To the contrary, employees are often asked to voluntarily sign noncompetes in connection with long term incentive plans, as consideration for discretionary bonuses, or in connection with promotions or generous separation packages. These not only provide consideration for the noncompete, but can be very substantial, which obviously *increases* the recipient's overall compensation. While they may not be "wages" *per se*, these are potentially lucrative forms of compensation that would not be provided in many cases absent the protection of noncompetes.

### 3. Noncompetes do not stifle new business and ideas.

Third, noncompetes do not stifle innovation in the *amici's* respective industries. If noncompetes really did make markets less competitive and discourage new ideas, then, until recently, most innovation in the U.S. would have come from California, North Dakota, and Oklahoma—the only states prohibiting post-employment noncompetes until Minnesota passed legislation doing so in mid-2023. But that is not

the case, with many of the more recent hubs of innovation being in states that enforce noncompetes, including Arizona, Massachusetts, Texas, and Utah.

As Plaintiff suggests, the Commission's claim that abolishing noncompetes fosters innovation by removing barriers to information sharing is self-defeating because the Commission simultaneously claims that employers will mitigate the damage a prohibition on noncompetes would cause by swapping noncompetes for other barriers to information sharing, such as non-disclosure agreements ("NDAs") and trade secret protections, without any cogent data to suggest that such other barriers affect innovation differently than noncompetes. *See* ECF No. 22 ¶ 65. To be sure, banning noncompetes nationwide would likely *weaken* competition, in that new market entrants would be at enhanced risk of having key employees and critical information, techniques, and strategies stripped from them by well-heeled large companies. One might think the Commission would want to encourage small business formation of this sort.

### 4. Employers do not regularly coerce workers into signing noncompetes.

Fourth, it is simply untrue that employers in the *amici's* respective industries regularly coerce employees into signing noncompetes. While there undoubtedly are bad actors, the Commission has cited no evidence that employers regularly—or even often—coerce employees to sign noncompetes. To suggest otherwise ignores that employees often receive substantial consideration in exchange for signing

11

noncompetes, not only in the form of a job, a salary, and benefits, but often also equity and other potentially lucrative forms of compensation, as discussed above.

The Commission claims that there is unequal bargaining power between employers and employees. While that may have been true historically for certain positions, that paradigm has shifted in the post-COVID era, as open positions often outstrip demand among the pool of available employees, and some businesses have been forced to close for lack of staffing. In any event, eight states and the District of Columbia have enacted laws to address this purported inequity by requiring advance notice of noncompetes often weeks before they are to take effect, giving employees time to make informed decisions before accepting new jobs and resigning from old ones, and notice of a right to counsel, all of which would address any bargaining-power disparity favoring the employer. *See* Epstein Becker & Green, P.C. *50-State Noncompete Survey (2023)*, https://tinyurl.com/52r2tu65.

### 5.  Noncompetes do not harm consumers.

Finally, far from harming consumers in the *amici's* respective industries, noncompetes benefit them in various ways. For example, it is a truism in any industry that an increase in the cost of wages—indeed, virtually all increased costs—is passed along to the consumer. Assuming the opposite is illogical. Indeed, as former Commissioner Wilson pointed out in her dissent, the NPRM (and now the Final Rule) "omits studies showing that reducing the enforceability of non-compete restrictions

12

leads to higher prices for consumers." Thus, to the extent that noncompetes drive down wages (which the *amici* deny), even the Commission admits that lower prices are the natural result: "By suppressing workers' earnings, non-competes decrease firms' costs, which firms may theoretically pass through to consumers in the form of lower prices." F.R. 197.

The opposite is indisputably true too; if noncompetes are prohibited, any increase in the cost of wages will likewise be passed along to consumers in the form of higher prices. Again, the Commission acknowledges that "it is theoretically possible that higher labor costs could be passed on to consumers in the form of higher prices," but quickly and curiously dismisses that possibility, summarily concluding that "there are several countervailing effects from prohibiting non-competes that would tend to lower prices." F.R. 200.

### B.   The Commission's "Reasoning" is Fallacious, Internally Inconsistent, Confirmation Bias Dressed as "Empirical Evidence."

Upon closer inspection, and after wading through the Commission's mire of qualifications and hedges, the Commission's "empirical evidence" is vanishingly thin and self-contradictory. The *amici* initially intended to highlight all the fallacies in the Commission's reasoning, but space constraints preclude the *amici* from listing them all. Nevertheless, this brief sets out a representative sample of the significant contradictions and fallacies in the Commission's so-called "reasoning" that demonstrates just how arbitrary and capricious the Final Rule is.

13

### 1. The Commission's Reliance on "Empirical" "Data" is Thin, Inconsistent, and Highly Suspect.

What the Commission lacks in legal authority, it fails to make up for with either logical principles or cogent quantitative analysis. For instance, when commenters pointed to academic writings, including 2019 research by one of the *Commission's own economists* stating that there was limited evidence about the effects of noncompetes, the Commission responded by noting dismissively that the author wrote in his personal capacity and that "[t]he Commission finds these writings are generally outdated and disagrees with them," F.R. 152, despite being from 2019 and that the Commission relied on far older data. Yet when faced with anecdotes and conjecture from anonymous and unverified individual commenters that support its preordained outcome, the Commission has no such reservations.

When confronted with issues in the methodologies or resulting conclusions of studies the Commission cites in support of the Final Rule, the Commission either downplays or altogether denies reliance on those studies in issuing the Final Rule. To illustrate, the Commission cites a study suggesting that noncompetes negatively affect the race and gender gap for support of its Final Rule. F.R. 141. More than fifteen pages later, and only when confronted with a commenter's criticism of its reliance on that study, does the Commission state that it "does not rest its finding in this final rule that non-competes tend to negatively affect competitive conditions on findings of increased discriminatory behavior or exacerbation of gender and wage gaps." F.R. 158.

14

Similarly, despite its earlier bravado that noncompetes affect consumer pricing, the Commission tucked away a note admitting that the empirical literature on the effects of noncompetes on consumer pricing is thin—even thinner than the "evidence" on which the Commission relied with regard to new business formation and innovation (almost all of which had to be qualified and/or was criticized by experts, including the studies' own authors). F.R. 196. This informational bait-and-switch occurs with so much frequency, the *amici* have difficulty identifying the "empirical evidence" that the Commission actually relied on to pass the Final Rule.

Furthermore, the Commission appears to have selected the studies it chose to credit not based on scientific methodology, but on whether the outcome corresponded with the Commission's pre-set agenda to ban noncompetes. To illustrate, the Commission references Professor Evan Starr 115 times and Professors Norman Bishara and J.J. Prescott another 46 times each in its commentary, yet it cherrypicks which *individual findings* of those studies to credit. The Commission relies extensively on the three professors' seminal noncompete study for its conclusions that noncompetes are used with all manner of employees, F.R. 15–16, that employees rarely "seek assistance of counsel in connection with non-competes," *id.* 125, and that "employers frequently use non-competes even when they are unenforceable under State law," *id.* 437. Yet the Commission curiously gave only "minimal weight" to that study's conclusion that workers who are presented with noncompetes before accepting

15

job offers receive higher wages and more training, and are more satisfied in their jobs than those who are not bound by noncompetes, because it "does not find that this evidence represents a causal relationship." *Id*; *see also id.* 311 ("Commenters asserted that Starr, Prescott, and Bishara found that notice of noncompetes alongside a job offer is positively correlated with training compared to later notice. In response, the Commission notes that the evidence is a correlation between early notice and training, not a causal finding, so the Commission gives it minimal weight."). Similarly, the Commission gives curiously "little weight" to several other studies showing that noncompete use is associated with higher earnings because they "merely reflect correlation and are unlikely to reflect causation." *Id.* 146. This is a common refrain throughout the Commission's commentary when faced with a study's result it does not care for. *See, e.g.*, *id.* 150, 152, 240, 311, 418.

But in giving this back-of-the-hand treatment to disfavored findings, the Commission overlooks the inconvenient fact that virtually all the studies it chose to rely on are themselves correlational and not causational; indeed, the Commission itself identifies *only one* study it relied upon that even "attempts to identify [a] causal link." F.R. 284. The Commission's apparent lack of qualms about relying on correlational studies that support its preferred policy outcome belies the Commission's stated rationale for dismissing contrary findings as "merely" correlational.

16

In what can only be described as a self-serving attempt to explain which studies it chose to weigh more heavily, the Commission states that it "gives more weight to studies with methodologies that it finds are more likely to yield accurate, reliable, and precise results," and then goes on to identify five "guiding principles" that give the Commission virtually unfettered discretion in determining which studies to credit. F.R. 107–11. Moreover, the Commission acknowledges that "[w]hile these five guiding principles are important indicators of the relative strength of empirical studies evaluated by the Commission for the purpose of this final rule, the Commission's assessment of empirical studies was holistic and relied on its economic expertise." *Id.* 111. In other words, the Commission set its own subjective and unspecified standards for determining which studies to credit, which it may or may not (it does not actually say) have disregarded in favor of an undefined "holistic" assessment based on its purported "economic expertise."[1] Unsurprisingly, this results-oriented "analysis" led to the Commission crediting only those studies that support the worldview its Chair has publicly espoused for years.

---

[1] Almost comically, the Commission claims this purported "expertise" based on its assertion that "non-competes have already been the subject of FTC scrutiny and enforcement actions, so subjecting them to rulemaking is a more incremental—and thus less significant—step than it would be for an agency to wade into an area not currently subject to its enforcement authority" F.R. 39. What the Commission leaves out, however, is that these three "enforcement actions," all of which ended in consent decrees, were announced just *one day* before it announced the NPRM, which ostensibly was timed so that the Commission could claim such expertise. Indeed, in the press release announcing the enforcement actions, the Commission acknowledged that "these actions mark the first time that the agency has sued to halt unlawful noncompete restrictions." *See FTC Cracks Down on Companies that Impose Harmful Non-Compete Restrictions on Thousands of Workers*, FEDERAL TRADE COMMISSION (Jan. 4, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.

The Commission's logic is lacking in several other respects. For instance, the Commission cites a study of Hawaii's tech industry noncompete and no-poach ban to make conclusions about noncompetes, dismissing the effect on wages from the no-poach ban as unlikely to have a "major effect" (whatever that means), in part because while no-poach agreements "may prevent some workers from hearing about some job opportunities, [] unlike noncompetes, they do not prevent workers from taking those opportunities." F.R. 155. The Commission must have a very dim view of its audience if it expects anyone to believe that preventing a worker from learning of a job does not also mean preventing the worker from taking it.

Additionally, the Commission asserts that noncompetes have long been "disfavored" as a reason to eliminate them, F.R. 6, while ignoring that they have nevertheless existed since the nation's founding because of their recognized value despite how supposedly "disfavored" they may be. The Commission's view that "existing case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets," F.R. 5, is fallacious for the reasons set forth above. But even if true, the Final Rule is not the solution.

Indeed, many state legislatures have been revising their noncompete laws, some recently enough that the statistics upon which the Commission bases its rationale are outdated and not reflective of the current market realities. For instance,

the data the Commission used to claim that 30 million workers are subject to a noncompete is from 2019, F.R. 14, before Illinois passed the Illinois Freedom to Work Act, 820 ILCS 90/1, *et seq.* (as just one example), and before the pandemic changed the landscape of remote work. Indeed, the Commission's conclusions are based on outdated data; to illustrate, the most recent data in a study the Commission touts as "very robust" is already a decade old. F.R. 141.

Better, more recent data has become available, such as a 2023 report issued by the Federal Reserve Bank of Minnesota that calls into question many of the assumptions in the Commission's analysis, finding, for example, that only 11.4%, not 20–25% (as the Commission claims), of workers are subject to a noncompete. *See* Tyler Boesch, *et al*., "New data on noncompete contracts and what they mean for workers," FEDERAL RESERVE BANK OF MINNEAPOLIS (June 21, 2023), https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers. Notably, while Minnesota is the only state to ban noncompetes in well over a century, every other state that has considered doing so since 1890 has either enacted compromise legislation that suits the needs of its own economy and preferred socioeconomic outcomes, and balances the interests of *all* stakeholders, or has done nothing.[2]

---

[2] Michigan banned noncompetes in 1905, but repealed the ban in 1985.

Moreover, several of the "studies" the Commission cites are more accurately described as "surveys" that ask employees and employers about their experience with noncompetes, and then extrapolate and draw conclusions from the survey results. *See, e.g.*, Starr, *et al.*, *supra* § A.2. But this methodology has at least one major flaw. Specifically, as the term "noncompete" is a common colloquialism used to refer to all manner of post-employment restrictive covenants, the survey respondents, no matter how sophisticated they are, may not distinguish between noncompetes and other types of post-employment restrictions, claiming to be bound by "noncompetes" when that is not technically accurate. *See* Comment of Practicing Attorneys, FTC-2023-0007-21073, at p. 30. While the surveys may be designed to avoid this, that is easier said than done, as the Commission itself concedes in another context: "Many of the comments from small businesses, as well as from other commenters, appear to confuse non-competes with other types of agreements, such as non-solicitation agreements or NDAs, and argue that non-competes are needed to prevent former workers from taking the employer's customers or clients or disclosing confidential information." F.R. 535. In other words, the Commission relies on surveys that necessarily require the surveyed employees to fully understand this distinction, and assumes that they do, but dismisses comments from small business owners and others for purportedly not being able to do so.

These examples are only a small subset of the logical and statistical fallacies pervading the Commission's analysis. That the Commission made selective choices among stale data in support of its pre-set agenda does not a reasoned decision make.

### 2. The Commission's Reliance on "Qualitative" "Data" from Worker Comments is Misplaced.

Perhaps a nod to the gaping holes in its quantitative analysis, the Commission relies heavily in numerous places on the "qualitative evidence" of the harms of noncompetes as "demonstrated" by workers in the comments to the NPRM, stating that "the comments provide strong support for the Commission's finding that non-competes are exploitative and coercive because they trap workers in jobs or force them to bear significant harms and costs." F.R. 131; *see also id.* 10–14, 119–121, 127–28, 147–49, 163, 360, 366, 368, 378. The Commission's reliance on certain comments for support, while ignoring and downplaying others, is questionable at best and certainly not grounds to overhaul employment relationships for hundreds of thousands of employers and tens of millions of employees nationwide.

First, the "exemplary" comments the Commission decided to pull from the 26,000+ submitted are from workers in various industries, such as asphalt sales, power-washing, bartending, etc., as well as from physicians and other professionals. *Id*. 11.[3] While those individuals may bring their personal perspectives and

---

[3] The Commission asserts that "Among these [26,000+] comments [it received], over 25,000 expressed support for the Commission's proposal to categorically ban non-competes." F.R. 10. But that is a red herring. It is also unsurprising. It is, of course, far simpler to email a one or two sentence message of

speculations about market conditions and forces, the overwhelming majority of worker-commenters lack the economic and analytic backgrounds to assess the relevant factors on a sociological scale or to determine whether a complete ban on noncompetes would actually help their economic condition (as opposed to potential less-draconian regulations).

Second, commenters are neither a monolith in support of a total ban, nor are they necessarily representative of the average worker subject to a noncompete, as the Commission would have the public believe. The Commission claims that thousands of the 25,000 comments supporting the Final Rule were from workers who have been subject to noncompetes. F.R. 10. But that figure undoubtedly conflates support for additional regulations of noncompetes with a total ban, or at the very least infers positions from comments that are not necessarily intended.

Third, the Commission overplays worker support of its ban. Although "thousands" of workers submitted supportive comments, F.R. 10, that is only a miniscule percentage of the *30 million Americans* the Commission claims are subject to noncompetes (less than one tenth of one percent, in fact). Furthermore, the

---

support, as many of these 25,000+ commenters did, than to prepare a thoughtful, substantive opposition, as most of the opponents did. Not to mention, the companies that oppose the Commission's efforts are all possible targets of the Commission's enforcement activities—hence the dearth of individual company responses in opposition to the NPRM, and their reliance instead on industry organizations like the *amici* to communicate their views. This is likely another reason the Commission announced the resolution of several enforcement actions just one day before announcing the NPRM—ironic, indeed, given the Commission's stated distaste for the purported *in terrorem* effects of noncompetes.

Commission inexplicably ignores the participation bias in that figure because only workers with strong negative experiences are likely to comment publicly. The Commission completely ignored the 29.99 million or so impacted American workers (according to its own count) who lacked strong enough views to comment. Because the worker-commenters are not a random sample, they are not representative of the general population. Additionally, as the Commission noted, "[f]ew workers who submitted comments reported being compensated for signing a non-compete[,]" F.R. 123, rendering them poor representatives. Accordingly, the Commission's "strong" reliance on anecdotal evidence of anonymous and unverified commenters is unfounded and irrational.

Fourth, the *amici* cannot ignore that the Commission uses worker-commenters' anecdotal allegations of illegal workplace conduct, such as sexual harassment, to exemplify harms purportedly caused by noncompetes. F.R. 126. While these are no doubt serious issues, they have nothing whatsoever to do with the Commission's authority under Section 5 of the FTC Act, no matter how broadly the Commission interprets that authority.  Moreover, that logic is absurd and highly disrespectful to victims of workplace misconduct. The cause of sexual harassment is the sexual harasser. Congress and the states have already created a comprehensive statutory and regulatory framework to address sexual harassment in the workplace and that framework is overseen by other agencies. Critiques of the efficacy of those

regulations should be addressed to the agencies with appropriate Congressional authority over such issues not made into a strawman argument for an overbroad national mandate on a completely unrelated issue from unelected bureaucrats who have no expertise in workplace harassment and no authority to address it.

### 3. In Producing the Final Rule, the Commission Shirks One of the Only Democratic Safeguards to its Unelected Bureaucratic Regime by Failing to Respond to Several Significant Comments

The APA sets out strict rulemaking requirements for agencies like the Commission to follow before promulgating legislative rules, rules like the Final Rule, that will have the force and effect of law. 5 U.S.C.A. § 553. It is a three-step process starting with (1) the agency issuing a notice of proposed rulemaking, followed by (2) notice of a public comment period, and finished with (3) the agency considering and responding to significant comments received during the public comment period. *Id.*; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The process is designed to "assure fairness and mature consideration of rules having a substantial impact on those regulated." *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) (citation omitted). And yet, the Commission ignored the APA in numerous respects.

First, the exception for senior executives containing both a salary threshold and a policy-making duties test was not in the NPRM and, therefore, was not subject to public comment or the procedural safeguards inherent therewith. And the Commission cannot explain why future noncompetes with senior executives are so egregious as to

24

warrant banning forevermore, yet existing noncompetes with the same class of employee are fine. Indeed, this "exception" is so ambiguous and poorly conceived that even the Chair does not fully understand it.[4]  Second, where, as here, the agency blindly maintains commitment to its position that noncompetes should be banned despite evidence in the comments undermining the rationale for its conclusion, the agency fails to demonstrate that the proposed rule is a product of reasoned decisionmaking.[5]  *See, e.g.*, *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 777–80 (5th Cir. 2023).

As it stands, the Commission is a regulating body consisting of unelected political appointees and staffed by career bureaucrats that has shirked one of the only democratic safeguards on its otherwise unfettered authority. Just as former Commissioner Wilson said in her dissent to the NPRM, the *amici* are, and respectfully submit that the Court should be, "dubious that three unelected technocrats have somehow hit upon the right way to think about non-competes, and that all the preceding legal minds to examine this issue have gotten it wrong. The current rulemaking record does not convince [the *amici*] otherwise," nor should it the Court.

---

[4] During a recent interview on CNBC, the Chair said the following in response to a question about the use of noncompetes with television personalities, who are decidedly not "senior executives" under the Final Rule: "If you have a current contract that reflects the fact that this noncompete is in the contract, your compensation package probably also reflects that. *We don't want to disturb that because we realize that for people who are doing very well for themselves, who are well-situated to bargain, the contract and the compensation already reflects the value of the noncompete.*" Interview by Andrew Ross Sorkin with Lina Khan, CNBC, in New York, NY (Apr. 25, 2024) (emphasis added). But while that is an accurate factual statement, and perhaps should be the policy, it is not what the Final Rule actually says. Not even close.

[5] Indeed, the Commission failed to even address certain kinds of agreements (*i.e.*, direct hire fee provisions) that were raised by commenters such as the Home Care Association of America. *See* 89 FR 38371. The failure to even acknowledge (let alone explain) the impact of this rule on such agreements raised in the comments violates the APA on its face.

25

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the *amici* respectfully submit that the Court should grant Plaintiffs' Motions and stay the effective date of the Final Rule.

Respectfully submitted,

*/s/ Edward J. Loya Jr.*

Edward J. Loya Jr.
  Texas Bar No. 24103619
EPSTEIN, BECKER & GREEN, P.C.
100 Crescent Court, Suite 700
Dallas, Texas 75201
Tel: 214-930-3735
eloya@ebglaw.com

Carolyn O. Boucek
  (*pro hac vice* motion forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
227 W. Monroe Street, Suite 4500
Chicago, Illinois 60606
Tel: 312-499-1486
cboucek@ebglaw.com

Erik W. Weibust
Katherine G. Rigby
  (*pro hac vice* motions forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
125 High Street, Suite 2114
Boston, Massachusetts 02100
Tel: 617-603-1090
eweibust@ebglaw.com
krigby@ebglaw.com

A. Millie Warner
  (*pro hac vice* motion forthcoming)
EPSTEIN, BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Tel: 212-351-4752
mwarner@ebglaw.com

Counsel for *Amici Curiae*

Dated: May 14, 2024

## VI.   <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify the foregoing complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, that the foregoing brief contains 6,215 words, including footnotes, and excluding the case caption, table of contents, table of authorities, signature block, and certificates, and that foregoing is typed in 14-point font and the footnotes are typed in 11-point font.

Date: May 14, 2024

*/s/  Edward J. Loya Jr.*

Edward J. Loya Jr.

## VII.   <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, the foregoing document was electronically filed in this matter with the Clerk of Court, using the ECF system, which sent notification of such filing to all counsel of record.

Date: May 14, 2024

*/s/    Edward J. Loya Jr.*
Edward J. Loya Jr.
