UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RYAN LLC,<br><br>                 Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>                 Defendant. | No. 3:24-v-00986-E |

**BRIEF OF *AMICUS CURIAE* OF THE SOCIETY FOR HUMAN RESOURCE MANAGEMENT IN SUPPORT OF PLAINTIFF'S AND INTERVENORS' <u>MOTION FOR STAY AND PRELIMINARY INJUNCTION</u>**

*/s/ Tricia W. Macaluso*
Tricia W. Macaluso
Texas State Bar No. 24013773
Seyfarth Shaw LLP
2323 Ross Avenue, Suite 1660
Dallas, TX  75201
(469) 608-6700
tmacaluso@seyfarth.com

Eron F. Reid
Texas State Bar No. 24100320
Seyfarth Shaw LLP
700 Milam Street, Suite 1400
Houston, TX  77002
(713) 225-2300
ereid@seyfarth.com

Michael D. Wexler
Marcus L. Mintz
(*pro hac vice* motions forthcoming)
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 460-5000
mwexler@seyfarth.com
mmintz@seyfarth.com

Counsel for *Amici Curiae*

## <u>TABLE OF CONTENTS</u>

INTEREST OF THE *AMICI CURIAE* AND SUMMARY OF ARGUMENT.........1

ARGUMENT ..................................................................................................3

    I.    *Amici's* Members will be Irreparably Harmed if the Injunction
           is not Granted. ......................................................................................3

    II.    The Rule Will Harm Workers and Diminish Training and
           Investment in Human Capital.................................................................6

    III.    The FTC Arbitrarily and Capriciously Disregarded the
           Empirical Evidence of the Mutual Benefits to Employers and
           Workers. ...............................................................................................9

    IV.    The FTC Failed to Consider Less Onerous Alternatives to the
           Rule.....................................................................................................12

CONCLUSION ...........................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Chamber of Commerce of U.S. v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ...................................................................................9

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) ...................................................................................9

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020) ..................................................................................9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................10

*Polk Bros., Inc. v. Forest City Enters.*,
    776 F.2d 185 (7th Cir. 1985) .................................................................................12

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ...................................................................................9

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ..................................................................................3

*Texas v. U.S.*,
    809 F.3d 134 (5th Cir. 2015) .............................................................................3, 16

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) .......................................................................................12

*United Techs. Corp. v. U.S. Dep't of Def.*,
    601 F.3d 557 (D.C. Cir. 2020) ................................................................................9

*W. Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................................................14, 15, 16

*Wenner v. Tex. Lotter Comm'n*,
    123 F.3d 321 (5th Cir. 1997) ..................................................................................4

**Statutes**

820 ILCS 90 ...................................................................................................14

820 ILCS 90/15 ..............................................................................................13

26 MRSA § 599 ..............................................................................................14

Conn. Gen. Stat. Ann. § 20-14p .....................................................................14

Conn. Gen. Stat. Ann. § 31-50a .....................................................................14

Conn. Gen. Stat. Ann. § 31-50b .....................................................................14

Del. Code Ann. tit 6., § 2707 .........................................................................14

Employment Freedom for All Act ...................................................................15

Fair Labor Standards Act ................................................................................15

Fla. Stat. Ann., § 542.335 ..............................................................................14

Freedom To Compete Act of 2022 .................................................................15

Freedom to Work Act .....................................................................................14

FTC Act Sections 5 and 6(g) ..........................................................................16

FTC Whistleblower Act of 2021......................................................................15

Idaho Code §§44-2701-2704 ..........................................................................13

Ind. Code Ann. § 25-22.5................................................................................14

Iowa Code § 135Q.1-2.....................................................................................14

KRS § 216.724 ................................................................................................14

Mass. Gen. Laws ch. 112, §§ 74D 135C, 186 ...............................................14

Mich. Comp. Laws Ann. § 445.774a(1) .........................................................13

ORS 653.295(c) ...............................................................................................13

Restoring Workers' Rights Act of 2022 ..........................................................15

RSA 329:31-a .................................................................................. 14

Section 24L(b)(iii) .......................................................................... 13

Sherman Act ................................................................................... 12

VA Hiring Enhancement Act .......................................................... 15

Workforce Mobility Act of 2021 .................................................... 15

**Other Authorities**

89 Fed. Reg. 38,342 (May 7, 2024) ..................................... *passim*

89 Fed. Reg. 38,390 (May 7, 2024) ............................................... 11

89 Fed. Reg. 38,399 (May 7, 2024) ............................................... 11

89 Fed. Reg. 38,422 (May 7, 2024) ......................................... 10, 12

Evan P. Starr, et al., *Noncompete Agreements in the US Labor Force*,
    64 J. L. & Econ. 53, 53 (2021) ........................................... 7, 11

Evan Starr, *Consider This: Training, Wages, and the Enforceability of
    Covenants Not to Compete* ............................................ 7, 8, 10

H.R.1367 ........................................................................................ 15

H.R.3401 ........................................................................................ 15

H.R.5851 ................................................................................... 15, 16

H.R.6093 ........................................................................................ 15

H.R. 8755 ....................................................................................... 15

Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and
    Concentration: Evidence From a Florida Case Study* ...................... 11

Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on
    Corporate Investment and Entrepreneurship* ........................... 7

Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of
    Restricting Mobility of Skilled Service Workers: Evidence from
    Physicians* ......................................................................... 11

Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non- Compete Agreements* ..................................................8

*Non-Compete Clause Rule*, FEDERAL TRADE COMMISSION (Jan. 5, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/dissenting-statement-commissioner-christine-s-wilson-concerning-notice-proposed-rulemaking-non ......................11

## INTEREST OF THE *AMICI CURIAE* AND SUMMARY OF ARGUMENT

As the trusted authority on all things work, the Society for Human Resource Management ("SHRM") is the foremost expert, researcher, advocate, and thought leader on issues and innovations impacting today's evolving workplaces. With nearly 340,000 members in 180 countries, SHRM touches the lives of more than 362 million workers and families globally. SHRM's membership of HR professionals and business executives sits at the intersection of all things work, helping to set positive collaboration and workplace cultures where workers and employers thrive together. This includes ensuring that proper protections are in place to safeguard proprietary information and intellectual property. Therefore, on behalf of our members, we respectfully submit this amicus brief for the Court's consideration.

On April 23, 2024, the Federal Trade Commission ("FTC") issued its final Non-Compete Clause Rule, RIN3084-AB74, at 14 (Apr. 23, 2024), which would effectively ban all non-compete agreements in the United States, except in cases involving pre-existing agreement with the most senior executives or a sale of business. The *amici* have an interest in the outcome of this litigation because SHRM members invest considerable resources in providing training and educational assistance to their employees as well as effectuating the employee hire and exit process. Without the use of reasonable, narrowly tailored non-compete agreements, employers will be precluded from recouping their investments in employees as well

1

as intellectual capital. By the same token, workers will lose opportunities for job-related training, developing trade secrets, and access to customer relationships as empirical evidence shows. The FTC's Rule will force employers to abandon training and education programs, to the detriment of workers who will bear the cost as a result, and the American workforce at large.

SHRM writes separately to add its perspective as an advocate for policies that create a thriving labor market where individuals and organizations both benefit. SHRM supports allowing parties to consent to well-structured, focused non-compete agreements versus a blanket ban on such agreements. It is SHRM's position that blanket bans stifle innovation, limit training opportunities and harm businesses and workers alike. The FTC's Rule fails to strike an equitable balance between the interests of the employer and the employee and upends the current system which affords states the authority to determine what is best for their residents.

SHRM fully endorses the Plaintiff's and Intervenors' Motions (ECF Nos. 23 and 46) and strongly encourages the Court to enjoin the Rule and issue a stay of the Effective Date during the pendency of this litigation *because failure to do so will disrupt human resource professionals* that manage the recruitment, training and exiting of employees and rely on certainty during the hiring process.

## ARGUMENT

**I.     *Amici*'s Members will be Irreparably Harmed if the Injunction is not Granted.**

Employers have a vested interest in their workers, and vice versa, and human resource professionals stand on the frontlines of recruitment, development, and retention of a workforce that is empowered and armed with all of the necessary skills and training. Human resource professionals manage and implement policies for the human capital of an organization and by virtue of their role are uniquely impacted by the FTC's Rule which will be disruptive to SHRM's members if allowed to take effect on September 4, 2024, without a final adjudication of its applicability.

There is a presumption that compliance with a regulation later held to be invalid results in irreparable harm to those subject to the regulation. *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("Complying with a regulation later held invalid almost always produces . . . irreparable harm."). Indeed, human resources professionals face specific harms should an injunction not be issued. SHRM advocates for an injunction to be issued to stay the Rule's effective date and maintain the status quo until a final decision is made on whether the FTC has the authority to promulgate the Rule. *Texas v. U.S.*, 809 F.3d 134, 187 (5th Cir. 2015) ("Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be

fashioned.") (citing *Wenner v. Tex. Lotter Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997)).

The FTC's issuance of its overly broad Rule has already begun to have an adverse effect on human resources professionals presently faced with uncertainty by placing the employment agreements that are a central part of the regular hiring process in flux. The employment agreement is the essential functionary in the worker-employer relationship and with the current uncertainty of the state of the law, neither workers nor employers can reasonably rely on their existing agreements until the legality of the Rule is determined. In the interim, employers, and specifically the human resources professionals who develop and administer hiring and training programs, face an economic burden in the form of additional administrative and organizational costs to change, adapt, and enforce company policies and agreements that remain unsettled and may be moot in time.

Absent injunctive relief, human resource professionals have no guidance to know:

- Should noncompetes be entered into with employees during the pendency of this litigation due to the lack of certainty caused by the Rule?

- What is the scope of restrictive covenant agreements that employers and employees should enter into during litigation?

- Will noncompetes entered into prior to the Effective Date be rendered invalid and require rescission or be deemed unenforceable *ab initio*?

- After the Effective Date, will employers be required to furnish new consideration to employees who would otherwise have been party to noncompetes (due to role or function) if the Rule is later invalidated?

- What tools are available to human resources professionals to protect their investments in training and human capital, such as garden leave arrangements or specific term employment agreements, during the pendency of litigation?

- Are employers better off not hiring employees while litigation challenging the enforceability of the Rule is pending?

If an injunction is not issued and the status quo is not maintained, the Rule will result in confusion and disruption that can be readily avoided. Consider a scenario where an employer who negotiated noncompetes preventing her workers from joining a direct competitor with whom the employer might share valuable trade secrets has those agreements arbitrarily invalidated by the FTC's Rule. If the Rule is later reversed by the judiciary, is the employer required to provide *new* consideration to resume the old arrangement? Is the noncompete duration tolled in the interim? Is a worker liable for breach in the interim? Will workers' wages overall be suppressed or hiring stunted due to uncertainty and the additional economic burden on employers?

These are the type of issues that human resource professionals across the nation will confront as they attempt to grapple with the uncertain legal landscape. Employers, out of caution that the Rule will be upheld, may reduce hiring or choose not to invest in workplace training or innovation. Workers who leave their

employment for a competitor in reliance on the FTC's Rule may likewise be placed in a precarious position if the Rule is invalidated and their unenforceable noncompete is suddenly revived.

The disruption and confusion can be avoided by an injunction maintaining the current status quo until the legal challenges to the Rule are resolved. Maintaining the status quo will prevent drastic changes to the employment market and provide stability to human resource professionals, employers, and workers through guidance with familiar practices as to how hiring and exiting an organization will be handled. If the Rule is permitted to go into effect, uncertainty will lead employers to:

- Roll back investments in innovations for fear of unrecouped time and resources invested in workers who can leave for a competitor or with their employer's customers or trade secrets with no recourse.

- Limit employer investments in training, skill development, and educational assistance programs thereby limiting worker advancement opportunities, wage growth, and ultimately reducing future career mobility.

An injunction will provide certainty until the Rule's legality is determined and will lessen the economic burden to all involved stakeholders in the interim.

## II.    The Rule Will Harm Workers and Diminish Training and Investment in Human Capital.

Employers invest heavily in various training and education programs to compete in the marketplace and enable the professional development of their workforces. Employers make such investments with the expectation and upon the

6

condition of, obtaining a return on such investments. Workers, in turn, receive higher wages and opportunities for job training and education. Studies of the American labor market show this to be true, and that workers presented with noncompetes before accepting job offers receive higher wages and more training than those who are not bound by noncompetes. Evan P. Starr, et al., *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021). Empirical studies also show that the use of noncompete agreements is positively correlated with increases in employer-sponsored training,[1] investment in capital equipment,[2] and research and development (R&D) expenditures.[3]

Training and educational development go well beyond formal training programs; they extend to on-the-job learning, promotional and credentialing activities, mentorship, and other opportunities. Employers recoup their investment through the development of their workforce and the competitive advantages such investments bestow. It is reasonable to expect that after an employer invests in its workers, those workers will not immediately join a competitor who may freely acquire and exploit those investments made by the previous employer.

---

[1] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783, 796-97 (2019) (finding that moving from mean non-compete enforceability to no non-compete enforceability would decrease the number of workers receiving training by 14.7& in occupations that use non-competes at a high rate).

[2] Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1, 28 (2024) (noting a 34%-39% increases in capital investments at knowledge-intensive firms).

[3] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non- Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36.

Without noncompetes, employers are faced with an "investment hold-up" problem in which employers are disinclined to invest in training, education, and worker human capital for fear that the worker will depart and another employer will reap the benefit of the prior employer's investment. The disincentive is not limited to training and education, but also the creation and sharing of trade secrets or other confidential information with workers, which leads to reduced innovation and efficiency. Studies show that employers spend more on training and human capital when noncompetes are enforceable. Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783, 796-97 (2019) (finding that moving from mean non-compete enforceability to no non-compete enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-competes at a high rate); Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non- Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36; Liyan Shi, Optimal Regulation of Noncompete Contracts, 91 Econometrica 425, 447 (2023).

The FTC's sweeping noncompete ban will hinder employers' ability to recoup their investments in workers and intellectual capital. Without the use of reasonable, narrowly tailored noncompete agreements, employers may be forced to abandon programs, which in turn, shifts those costs to the workers. Meanwhile, workers will be deprived of beneficial training and educational assistance, to the detriment of

workers, employers, and the American workforce. The FTC failed to adequately consider these aggregate effects in its rulemaking, rendering the Commission's action arbitrary and capricious.

## III. The FTC Arbitrarily and Capriciously Disregarded the Empirical Evidence of the Mutual Benefits to Employers and Workers.

The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 855 (5th Cir. 2022). The FTC's near-total ban on noncompetes is unreasonable and lacks justifiable explanation because it ignores the strong empirical evidence undermining the Rule.

The arbitrary-and-capricious standard "requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Commerce of U.S. v. SEC*, 85 F.4th 760, 744 (5th Cir. 2023). Nodding to concerns raised by commentors only to dismiss them in a conclusory manner is a hallmark of unreasoned decision making. *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (quoting *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)). Agencies should not be given deference for conclusory or unsupported positions. *Id* (citing *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2020) ("We do not defer to the agency's conclusory or unsupported suppositions.")). Agency decisions that run "counter to the evidence before the

9

agency" are arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).

In spite of the demonstrable benefits to both employers and workers, the Commission disregards these findings through specious, unsupported reasoning to reach its pre-determined conclusion that the benefits of training and human capital investment do not justify any potential harms from noncompetes. *See* 89 Fed. Reg. 38,422 (May 7, 2024). For each study that proved the benefits of noncompetes, the Commission tacitly acknowledged the positive effects on worker training and investment, then hurriedly discounted the finding on a peremptory point of error without providing real context or controverting evidence to justify its own position.

Throughout the rulemaking process, the Commission ignored empirical evidence unsupportive to its cause by giving little to no weight to results it dismisses as correlative rather than causative. However, in the only study acknowledged by the Commission as examining the causal link between noncompetes and worker human capital investment, researchers indisputably found that noncompetes ***directly lead to increased investments by employers in their workers***. Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783, 796-97 (2019). The FTC quickly dismissed the study's findings without a clear, objective basis for doing so. *See* 89 Fed. Reg. 38,422 (May 7, 2024). Indeed, the FTC fails to cite a single study or instance that informed its rulemaking

10

in which the use or enforceability of noncompetes had a negative or noncompetitive outcome on worker training or human capital investment. Additionally, SHRM argues the FTC similarly discounted other empirical evidence that suggested that noncompetes do not reduce workers' wages,[4] stifle new business,[5] or increase consumer pricing,[6] which ran contrary to its pre-ordained course of action.

As another *amicus* points out, the FTC not only selected the studies it chose to credit based on whether the outcome supported its agenda to ban noncompetes, but also cherry picked which individual findings of those studies to credit. *See* ECF No. 53, at 15. Former FTC Commissioner Christine M. Wilson warned early in the rulemaking process that the Commission's asymmetric treatment of the evidence of harms (mixed evidence given great credence) and benefits (robust evidence given no credence) would provide "little confidence in the integrity of the rulemaking process or the ultimate outcome." *See Dissenting Statement of Commissioner Christine S. Wilson Concerning the Notice of Proposed Rulemaking for the Non-Compete Clause Rule*, FEDERAL TRADE COMMISSION (Jan. 5, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-

---

[4] Evan P. Starr, et al., *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021).
[5] 89 Fed. Reg. 38,390 (May 7, 2024) (*citing* Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663, 673 (2020)).
[6] 89 Fed. Reg. 38,399 (May 7, 2024) (*citing* Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020)).

statements/dissenting-statement-commissioner-christine-s-wilson-concerning-

notice-proposed-rulemaking-non.

SHRM would express concern about the appearance that the FTC may have

overlooked the work of qualified economists who studied the effects of noncompetes

on the labor markets (and on whose studies the FTC has at times relied), as well as

courts who cited to these justifications when upholding noncompetes under state

common law[7] or challenging noncompetes under the Sherman Act[8] by claiming that

they have failed to consider the aggregate harms of noncompete agreements. *See* 89

Fed. Reg. 38,422 (May 7, 2024).

It is SHRM's argument that the FTC's overreliance on favorable evidence

does not hold up under legal scrutiny. The FTC's decision to ignore credible

evidence contrary to its noncompete ban was arbitrary and capricious and the Rule

should be invalidated.

## IV.   The FTC Failed to Consider Less Onerous Alternatives to the Rule.

In the past several years, noncompetes have been a matter of robust political

discourse, with numerous states considering and enacting new laws regulating their

use. These regulations have taken a myriad of approaches including bans on the use

of restrictive covenants with low-wage workers, imposing minimum compensation

---

[7] *See, e.g., United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898).
[8] *Polk Bros., Inc. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985).

thresholds, requiring notice periods, requiring specific consideration for noncompetes, and other terms. Legislatures have taken the lead to enact targeted legislation to mitigate the potential abuses resulting from noncompetes or pass laws subject to common law principles of equity that safeguard against the potential harm from an overly broad or burdensome contract, including noncompetes.

There are several options available to legislatures to protect vulnerable workers without the need for a near-total ban on noncompetes. State legislatures are adept at utilizing these options, including:

- Imposing minimum compensation thresholds to enforce restrictive covenants. As adopted by several states,[9] minimum compensation thresholds will ensure that lower-wage workers who are unlikely to pose a risk of unfair competition after termination of employment are not subject to noncompete agreements.

- Limiting non-competes to highly compensated employees or those employees with material access to competitively sensitive information and development.[10] SHRM data shows that the vast majority of employers only use non-competes with high-level employees.[11] Limiting the use of noncompete agreements to high-level employees who are likely to have access to and/or develop confidential and strategic information is consistent with present practice and allows for the use of noncompetes to

---

[9] *See, e.g.,* Illinois, 820 ILCS 90/15; Massachusetts, Section 24L(b)(iii), Oregon, ORS 653.295(c); Mich. Comp. Laws Ann. § 445.774a(1).

[10] In contrast, the overly restrictive Rule will only permit existing non-compete agreements entered into prior to the Effective Date with executives who both make over $151,164 and who hold a "policy-making position." This exception is not only ambiguous, but suggests only C-Suite employees may be covered by the FTC's narrow exception despite substantial numbers of employees who are highly-compensated, and have access to and develop confidential information and trade secrets, but who may not fall under the "policy-making position" definition.

[11] In February 2023, prior to FTC's publication of the Rule, SHRM surveyed its members on the FTC's proposal to ban noncompetes. 57% of survey respondents require only workers that earn over $150,000 to sign noncompete agreements.

prevent unfair competition and protect trade secrets from inevitable disclosure and use.[12]

- <u>Prohibiting or limiting noncompetes in specific industries where such agreements are against public policy</u>. Some states have expressly carved out or limited the use of noncompetes in certain industries.[13]

- <u>Creating presumptions of enforceability and unenforceability depending on duration, geographic scope, and/or activity restrictions</u>. Some states, either through statute or common law, have created presumptions of enforceability based on the specific terms of the restraint.[14] Employers are thus motivated to draft narrow restraints to fit within the statutory presumptions.

- <u>Limiting noncompetes on the precondition that material compensation and/or benefits be provided to the employee</u>. Illinois, through bipartisan legislation, amended its Freedom to Work Act to explicitly require minimum consideration to enforce a noncompete, including two years of continuous employment or some combination of employment and other financial or professional benefits.[15]

These are just a few less-restrictive measures that states have enacted to better balance the interests of both employer and employees that the Commission failed to consider, or gave short shrift, in promulgating its near-total ban on noncompetes. As the Supreme Court readily recognizes, "States [] serve as "laborator[ies]" for "novel social and economic experiments." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2618 (2022)

---

[12] *See also*, Idaho Code §§44-2701-2704 (limiting non-competes to "key employees").
[13] *See, e.g.*, Conn. Gen. Stat. Ann. §§ 20-14p, 31-50a, 31-50b (physicians); Del. Code Ann. tit 6., § 2707 (physicians); Ind. Code Ann. § 25-22.5 (physicians); Iowa Code § 135Q.1-2 (health care agency workers providing direct services or nursing services to health care entity consumers); KRS § 216.724(direct care workers); 26 MRSA § 599 (employees earning wages at or below 400% of the federal poverty level); Mass. Gen. Laws ch. 112, §§ 74D 135C, 186 (registered nurses); NH RSA 329:31-a (physicians).
[14] *See, e.g.*, Fla. Stat. Ann., § 542.335.
[15] *See* 820 ILCS 90.

(internal citations omitted). In view of the alternatives available to the FTC, the Rule appears even more arbitrary and capricious.[16]

In addition, the substantial legislative activity described above is indisputable evidence of the economic and political significance of noncompetes. At the federal level, Congress considered—but failed to enact—numerous bills that would have banned or placed limits on the use of noncompetes with workers. *See* VA Hiring Enhancement Act (H.R.3401) (to void noncompetes for physicians going to work at VA hospitals); Workforce Mobility Act of 2021 (H.R.1367) (to ban employee noncompetes); Workforce Mobility Act of 2021 (S.483) (same); Freedom To Compete Act of 2022 (S.2375) (to ban noncompetes for workers who are not exempt under the Fair Labor Standards Act); Restoring Workers' Rights Act of 2022 (H.R. 8755) (same); FTC Whistleblower Act of 2021 (H.R.6093) (to void noncompetes for whistleblowers to the FTC); Employment Freedom for All Act (H.R.5851) (to void noncompetes for any employee who is fired for not complying with their employer's COVID-19 vaccine mandate). Clearly, Congress has not left the question of noncompetes to the FTC.

Even with the significant time and resources committed to discussing noncompetes in employment contracts, Congress has yet to pass any legislation that

---

[16] Separate but related, the Rule also violates the Major Questions doctrine. *Id.* at 2609. In that case, the Court explained that administrative agencies must point to "clear congressional authorization" before issuing regulations of "economic and political significance." *Id.*

would preempt state law and completely ban their use in the manner that the FTC has done. Nor has Congress delegated that authority to the FTC.[17] Instead, Congress appropriately observed the states' efforts to strike the right balance to protect the interests of all stakeholders from unfair competition. Congress tacitly recognizes that a broad, blanket ban on all noncompete agreements might harm and stifle workplace innovation. "When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States." *Id.*, 142 S. Ct. at 2621; *see also Tex. v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance. Agency announcements to the contrary are greet[ed] with a measure of skepticism.") (internal citations omitted).

Accordingly, SHRM respectfully submits that the FTC's Rule is a legally impermissible delegation of congressional authority.

---

[17] For the sake of brevity, SHRM does not revisit the arguments that the FTC has exceeded the statutory authority granted under Sections 5 and 6(g) of the FTC Act, which has been extensively briefed to this Court.

16

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motions requesting a stay and a preliminary injunction.

Dated:  May 24, 2024

Respectfully submitted,

*/s/ Tricia W. Macaluso*
Tricia W. Macaluso
Texas State Bar No. 24013773
Seyfarth Shaw LLP
2323 Ross Avenue, Suite 1660
Dallas, TX  75201
(469) 608-6700
tmacaluso@seyfarth.com

Eron F. Reid
Texas State Bar No. 24100320
Seyfarth Shaw LLP
700 Milam Street, Suite 1400
Houston, TX  77002
(713) 225-2300
ereid@seyfarth.com

Michael D. Wexler
Marcus L. Mintz
(*pro hac vice* motions forthcoming)
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 460-5000
mwexler@seyfarth.com
mmintz@seyfarth.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume requirements of Judge Brown's Motion Practice procedures II.A because it contains 3,917 words; and

2.      This document complies with the typeface requirements of Judge Brown's Motion Practice procedures II.A because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font in the body and 11-point Times New Roman font in the footnotes.

Dated: May 24, 2024                      */s/ Tricia W. Macaluso*               
                                                    Tricia W. Macaluso

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 24, 2024, I caused the foregoing document to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

Dated: May 24, 2024            Respectfully submitted,


*/s/ Tricia W. Macaluso*
Tricia W. Macaluso