## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| RYAN, LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>FEDERAL TRADE<br>COMMISSION,<br><br>            Defendant. | Civil Action No. 3:24-cv-00986-E |

### BRIEF OF THE PARTNERSHIP FOR NEW YORK CITY
### AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF'S AND PLAINTIFFS-
### INTERVENORS' MOTIONS TO STAY EFFECTIVE DATE AND FOR
### PRELIMINARY INJUNCTION

Arthur J. Burke
(*pro hac vice* pending)
Christopher Lynch
(*pro hac vice* pending)
Neal Mehrotra
(*pro hac vice* pending)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
arthur.burke@davispolk.com
christopher.lynch@davispolk.com
neal.mehrotra@davispolk.com


Counsel for Amicus Curiae

# TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENTS .............................. 3

ARGUMENT ................................................................................................ 5

I.    The FTC Lacks Statutory Authority to Promulgate a UMC Rule
Banning Noncompete Clauses .................................................. 5

II.   The Final Rule Addresses a Major Question That Requires Clear
Congressional Authorization That Was Never Granted. ...................... 10

III.  The FTC Misrepresents Evidence Making Its Final Rule Arbitrary and
Capricious .............................................................................. 14

CONCLUSION ............................................................................................ 17

CERTIFICATE OF COMPLIANCE .............................................................. 18

CERTIFICATE OF SERVICE ....................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking and Health v. C.A.B.*,
  699 F.2d 1209 (D.C. Cir. 1983) ..................................................... 14

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs*
  594 U.S. 758 (2021) ..................................................... ............................11

*AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) .........................................7

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) .........................................................11,12

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)…………………………..7

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)……….…....7,9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .........................................................................15

*Nat'l Petroleum Ref'rs Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973)…............9,10

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).................................................8

*United States v. Garner*,
  767 F.2d 104 (5th Cir. 1985) ........................................................................14

*West Virginia v. EPA*, 597 U.S. 697 (2022)...............................................10, 11, 12

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001)………………….............7

**Statutes**

Administrative Procedure Act, 5 U.S.C.A. § 500, *et seq*. .................................... 14

Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-06.........................8

Employment Freedom for All Act (H.R.5851)........................................................13

Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*.................................*passim*

Freedom To Compete Act of 2022 (S.2375)...........................................................12

FTC Whistleblower Act of 2021 (H.R.6093)....................................................12,13

Magnuson-Moss Act, 88 Stat. 2183; 15 U.S.C § 57a....................................8, 9, 14

Restoring Workers' Rights Act of 2022 (H.R.8755)..............................................12

VA Hiring Enhancement Act (H.R.3401)..............................................................12

Workforce Mobility Act of 2021 (H.R.1367)........................................................12

Workforce Mobility Act of 2021(S.483)................................................................12

**Other Authorities**

Aaron Nielson, *D.C. Circuit Review: Reviewed: Was National Petroleum Refiners Association v. FTC Correctly Decided*? YALE JOURNAL ON REGULATION (Jan. 10, 2020). ......................................................................................................10

*Comments of the Antitrust Law Section of the American Bar Association in Connection with the Federal Trade Commission Workshop on "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues,"* AMERICAN BAR ASSOCIATION (Sept. 15, 2021)…….…................... 9

Evan P. Starr, *et al.*, *Noncompete Agreements in the U.S. Labor Force*, 64 J. L. & ECON. 53, 53 (2021)..............................................................................16

Jeffrey S. Lubbers, *It's Time to Remove the "Mossified" Procedures for FTC Rulemaking*, 83 GEO. WASH. L. REV. 1979 (2015) ..........................................8

*FTC Announces Rule Banning Noncompetes*, FEDERAL TRADE COMMISSION (Apr. 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-announces-rule-banning-noncompetes..........................................................13

*FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers*, FEDERAL TRADE COMMISSION (Jan. 4, 2024), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers....................................................................................................5

Matthew S. Johnson, Kurt Lavetti, and Michael Lipsitz, *The Labor Market Effects of Legal* Restrictions *on Worker* Mobility. SSRN (2021), https://ssrn.com/abstract=3455381 ....................................................... 15

## INTERESTS OF AMICUS CURIAE

The Partnership for New York City (the "Partnership") is a nonprofit membership organization representing New York City's business leadership and its largest private sector employers. The Partnership's membership comprises a wide variety of industries, including accounting, advertising, arts and entertainment, consulting, hospitality and retail, education, energy, engineering, financial services, health care, insurance, law, manufacturing, media, real estate, technology, telecommunications, and transportation. Partnership members employ nearly a half million workers in New York City and support over one million jobs citywide. The Partnership's members also account for 20% ($236 billion) of the gross city product of New York City.

New York City has a unique concentration of diverse business talent and a highly competitive labor market. The city's economic output exceeded $1 trillion in 2022, accounting for 5% of United States gross domestic product. New York City is the second-largest metro-area economy in the world, trailing only Tokyo, Japan. New York City accounts for 57% of New York State's economic output and 48% of statewide employment.

Of particular note, New York City is also the capital of the nation's securities industry and accounts for 18% of all United States securities jobs. The securities industry accounts for 14% of the city's economic activity, 7% of city tax

collections, and 27% of New York State's tax collections.  The securities industry directly or indirectly supports one in 11 jobs in New York City.

The Partnership's mission is to engage the business community in efforts to strengthen the economy of New York City and maintain the city's position as a center of commerce, finance, culture, and innovation.  In advancing these goals, the Partnership collaborates with government and the civic sector and conducts research and policy advocacy at the city, state, and federal levels.

The present litigation challenges the Federal Trade Commission's Non-Compete Clause Rule, 16 C.F.R. Part 910 and 912 (May 7, 2024) (the "Final Rule" or "Rule"), which prohibits almost all noncompetes in employment agreements. The Partnership has a strong interest in the outcome of the litigation because noncompete agreements play an important role in the New York City business environment and the Partnership's members would qualify as "employers" under the Final Rule.  Noncompete agreements promote stability in highly competitive industries.  Many New York employers rely upon noncompete agreements with their senior employees to protect their intellectual property, proprietary information, and client relationships.  Without these agreements, employers will be discouraged from disclosing confidential information to key employees and investing in their training and will need to rely upon litigation to protect their confidential information.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENTS</u>

On April 23, 2024, the Federal Trade Commission (FTC), in a three-two vote, with two lengthy dissenting statements, issued the Final Rule that bans noncompete clauses between workers and employers as "unfair method[s] of competition" under Section 5 of the FTC Act, 15 U.S.C. § 45, subject to only a few exceptions.  This sweeping Rule tracks closely the FTC's substantially similar proposed rule released well over a year ago on January 5, 2023.

The Rule defines "noncompete clause" broadly to include any term or condition of employment that "prohibits," "penalizes" or "functions to prevent" a worker from seeking or accepting work or operating a business in the United States after the conclusion of employment that included the term or condition.  The broad language means that nondisclosure and nonsolicitation clauses that frequently accompany the contracts of many employees may be within the scope of the Rule, compromising trade secrets, client information, and business negotiations. Without noncompetes, New York technology and financial services companies, among others, may be discouraged from disclosing information to key employees and investing in their training.

The FTC claims to derive its authority to issue the Rule from Section 5 of the FTC Act, which declares unlawful "unfair methods of competition" ("UMC") and Section 6, which authorizes the Agency "to make rules and regulations for the

purpose of carrying out the provisions" of the Act.  But the legal basis for the FTC's position suffers from at least three fatal defects.

*First*, the FTC lacks statutory authority to create substantive UMC rules under the FTC Act.  This alone must invalidate the Rule.  If the Rule were upheld, it would effectively grant the FTC unfettered authority to regulate virtually all aspects of the United States economy (excepting a small list of industries excluded from the FTC Act).  Simply put, the FTC's assertion of authority to issue UMC rules represents a staggering power grab that must be rejected by the Court.

*Second*, even if the FTC had substantive UMC rulemaking authority as a general matter, the FTC's wide-ranging Rule, which purports to upend the contract employment arrangements of 30 million American workers, would violate the "major questions" doctrine.  The decision to ban noncompetes nationwide addresses the type of "major question" of vast economic and political salience that requires clear and direct authorization from Congress for the FTC to act.  Congress has not provided such authority.

*Third*, in addition to the FTC's dubious claim of authority, the Rule itself is arbitrary and capricious because it does not stem from reasoned decision-making. The FTC misrepresented the evidence it relied upon and cherrypicked data, resulting in its fatally flawed cost-benefit analysis (which was also internally inconsistent).

To be sure, the Partnership is sympathetic to criticisms that have been raised concerning the use of overly expansive and potentially unreasonable noncompete agreements, particularly with respect to lower-wage workers. But the FTC must use the appropriate tools to address those concerns, as it has previously done by bringing enforcement actions challenging such improper noncompetes. *FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers*, FEDERAL TRADE COMMISSION (Jan. 4, 2024), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.

The FTC should use case-by-case litigation, amicus briefs, competition advocacy, speeches, reports, and perhaps guidelines to advance its goals regarding noncompetes. These tools could identify specific instances in which the costs of noncompetes may outweigh procompetitive benefits. But it is the domain of the U.S. Congress to decide whether to enact broad federal legislation on issues impacting interstate commerce, such as noncompetes.

## **ARGUMENT**

### I.   The FTC Lacks Statutory Authority to Promulgate a UMC Rule Banning Noncompete Clauses

The FTC claims to derive its authority to issue the Rule from Section 5 of the FTC Act, 15 U.S.C. § 45, which declares unlawful "unfair methods of competition" and Section 6, which authorizes the Agency "to make rules and

regulations for the purpose of carrying out the provisions" of the Act, 15 U.S.C. § 46(g). The FTC's interpretation of the FTC Act is fatally flawed, however, and exceeds its statutory authority.

The FTC Act's text and structure, as well as recent precedent from the Supreme Court, confirm that the FTC lacks statutory authority to promulgate a substantive UMC rule banning or severely restricting noncompetes. As an initial matter, nothing in the text of the Act gives the FTC authority to prohibit, by rulemaking, conduct that the FTC has deemed to be an UMC. Nowhere, for example, does the Act state that the FTC "shall or may" promulgate rules to determine whether certain types of business practices are per se fair or unfair, to supplant state law, or to invalidate or proscribe entire categories of business contracts. Indeed, such a broad grant of statutory authority would have been extraordinary, as it would have allowed a majority of commissioners (which can be made up of as few as two people), with little or no guidance from the President or Congress, to dictate commercial practices and to override state laws, across virtually the entire United States economy.

The FTC's reliance upon Section 6(g) as a basis for such wide-ranging rule-making authority is misplaced for multiple reasons.

*First*, Section 6(g) is located in a section of the FTC Act relating solely to the FTC's *investigative* powers. In this context, it is best interpreted as an ancillary

provision granting the FTC limited ministerial rulemaking powers, rather than broad substantive authority to prohibit entire categories of business conduct.  This conclusion accords with a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The Supreme Court relied upon similar reasoning in *AMG Capital Management, LLC v. FTC*, where the Court unanimously rejected the FTC's long-standing interpretation of some of its remedial authority that was not supported by any express textual grant of authority from Congress.  593 U.S. 67 (2021).  In its decision, the Supreme Court stressed that the FTC must operate within the strict confines of the statutory language: "to read those words [in Section 13(b)] as allowing what they do not say, namely, as allowing the FTC to dispense with administrative proceedings to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter."  *Id.* at 76–77.

7

*Second*, it is evident that Congress knows how to delegate substantive rulemaking authority to the FTC and it did not do so here.  In particular, in contrast to the FTC Act's silence on such authority, Congress has expressly specified detailed procedures for the FTC to promulgate *other rules*.  For example, statutes such as the Children's Online Privacy Protection Act expressly grant the FTC the authority to engage in notice and comment rulemaking to enforce their provisions.  *See* Jeffrey S. Lubbers, *It's Time to Remove the "Mossified" Procedures for FTC Rulemaking*, 83 GEO. WASH. L. REV. 1979, 1991–92 (2015).  And the Magnuson-Moss Act expressly confers detailed rulemaking authority to prohibit unfair and deceptive acts and practices under strict conditions, but *does not* provide similar authority to prohibit UMCs, *see* 15 U.S.C. § 57a, suggesting strongly that Congress did not intend to confer UMC rulemaking authority to the FTC.  *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978).  The FTC claims these provisions left undisturbed the FTC's authority to issue legislative rules governing unfair methods of competition but provides no explanation why Congress would impose heightened requirements for unfair acts or practices but not unfair methods of competition.

*Third*, the FTC Act fails to provide for any sanctions for violations of rules promulgated pursuant to Section 6, strongly reinforcing the point that Congress never intended to give the FTC substantive UMC rulemaking authority.  As the

American Bar Association (ABA) explained, the Act's "fail[ure] to provide any sanctions for violating any rule adopted pursuant to Section 6(g) . . . strongly suggest[s] that Congress did not intend to give the agency substantive rulemaking powers when it passed the Federal Trade Commission Act." *See Comments of the Antitrust Law Section of the American Bar Association in Connection with the Federal Trade Commission Workshop on "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues,"* AMERICAN BAR ASSOCIATION (Sept. 15, 2021). By contrast, Congress clearly provided the FTC in the Magnuson-Moss Act the authority to initiate civil actions for unfair or deceptive act or practice rule violations.

It is true that, approximately fifty years ago, the D.C. Circuit approved an FTC UMC rule purportedly based upon Sections 5 and 6(g). *See*, *e.g., Nat'l Petroleum Ref'rs Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973). But this decision is not binding on the Court and predates the Supreme Court precedents discussed above concerning statutory interpretation of agency authority. And the D.C. Circuit did not put any stock in the fact that the FTC had disclaimed such authority for fifty years and did not try to invoke it, a fact that the Supreme Court has since considered relevant in statutory interpretation. *See*, *e.g., Brown & Williamson Tobacco Corp.*, 529 U.S. at 146. For these reasons, Professor Richard Pierce—a leading expert on administrative law who has testified in front of Congress and

9

been cited approvingly by the current Supreme Court—has bluntly stated that no current Supreme Court Justice would approach statutory interpretation the way that the D.C. Circuit did in *National Petroleum Refiners*.  Indeed, he has stated that he teaches *National Petroleum Refiners* each semester as a case that would not be decided the same way today.  *See* Aaron Nielson, *D.C. Circuit Review: Reviewed: Was National Petroleum Refiners Association v. FTC Correctly Decided*? YALE JOURNAL ON REGULATION (Jan. 10, 2020).  Accordingly, the D.C. Circuit's decision should carry no weight in this Court, where it is not controlling precedent.

In sum, applying modern principles of statutory interpretation, Section 6(g) is best understood as granting the FTC only ministerial authority to specify how it will carry out its adjudicative, investigative, and informative functions—not substantive legislative authority.

## II.  The Final Rule Addresses a Major Question That Requires Clear Congressional Authorization That Was Never Granted.

Under the major questions doctrine, "where a statute . . . confers authority upon an administrative agency," a court must ask "whether Congress in fact meant to confer the power the agency has asserted."  *West Virginia v. EPA*, 597 U.S. 697, 701 (2022).  The Supreme Court explained in *West Virginia v. EPA* that an agency's exercise of statutory authority involves a major question where the "history and the breadth of the authority that the agency has asserted, and the

economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.*

The major questions doctrine mandates that courts reject agency claims of regulatory authority when (1) the underlying claim of authority concerns an issue of "vast economic and political significance," and (2) Congress has not clearly empowered the agency with such authority. *Id.* at 716. In *West Virginia v. EPA*, the Supreme Court rejected the EPA's "discovery [of a "newfound power" that] allowed it to adopt a regulatory program that Congress had conspicuously and repeated declined to enact itself." *Id.* at 725. Furthermore, according to the Supreme Court, "[t]his view of the EPA's authority was not only unprecedented; it also effected a fundamental revision of the statute, changing it from [one sort of] scheme of … regulation into an entirely different kind." *Id.* at 728. Other Supreme Court cases confirm that the doctrine reaches cases of agency overreach. For example, in *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs*, when considering whether a decades-old statute that authorized the Centers for Disease Control and Prevention ("CDC") to implement measures like fumigation and pest extermination allowed it to enact a nationwide eviction moratorium, the Supreme Court stated that "[i]t strains credulity to believe that this statute grants the CDC the sweeping authority that it asserts." 594 U.S. 758, 760 (2021). And in the recent decision in *Biden v. Nebraska*, the Supreme Court rejected the Biden

administration's claim of broad authority to enact widespread student loan forgiveness because "[w]hat the Secretary has actually done is draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text." 143 S. Ct. 2355, 2371 (2023).

The Final Rule is invalid under the major questions doctrine for at least two reasons.

*First*, the regulation of noncompete clauses is a question of major political significance. Congress has considered and rejected bills significantly limiting or banning noncompetes on numerous occasions, a strong indication that the FTC is trying to "work around" the legislative process to resolve a question of political significance. *See West Virginia v. EPA*, 142 S. Ct. at 2621 (Gorsuch, J., concurring). To give some examples, in the past few years, Congress itself has considered, but failed to enact, numerous bills that would have banned or placed limitations on the use of noncompetes with workers. *See* VA Hiring Enhancement Act (H.R.3401) (to void noncompetes for physicians going to work at VA hospitals); Workforce Mobility Act of 2021 (H.R.1367) (to ban employee noncompetes); Workforce Mobility Act of 2021(S.483) (same); Freedom To Compete Act of 2022 (S.2375) (to ban noncompetes for workers who are not exempt under the Fair Labor Standards Act); Restoring Workers' Rights Act of 2022 (H.R.8755) (same); FTC Whistleblower Act of 2021 (H.R.6093) (to void

noncompetes for whistleblowers to the FTC); Employment Freedom for All Act (H.R.5851) (to void noncompetes for any employee who is fired for not complying with their employer's COVID-19 vaccine mandate).

*Second*, the Rule regulates a significant portion of the American economy through a ban on noncompetes. According to the FTC, "[a]n estimated 30 million workers nearly one in five Americans—are subject to a noncompete." *See FTC Announces Rule Banning Noncompetes*, FEDERAL TRADE COMMISSION (Apr. 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-announces-rule-banning-noncompetes. Thus, the FTC's Rule will affect tens of millions of freely negotiated contractual agreements in a broad array of industries across the United States economy. Regulating this practice through federal administrative agency fiat is particularly problematic given that noncompete agreements have been the domain of state law for over a hundred years and that over forty-five states permit them in some capacity.

Therefore, there can be no serious debate that this a major question requiring the FTC to identify clear congressional authorization to impose such a rule. But, as discussed above, the language in Section 6(g) contains no such clear grant of authority. Congress cannot be reasonably understood, let alone clearly understood, to have given the FTC substantive authority to enact rules through such oblique and indirect language. Moreover, the deliberate decision by Congress to omit

13

unfair methods of competition rulemaking in the Magnuson-Moss Act was

reaffirmed when it chose not to alter the scope of the FTC's authority in the FTC

Improvements Act of 1980.

Most importantly, if the FTC is permitted to regulate any activity it

declares to be an "unfair method of competition," particularly one that is widely

used as illustrated by the statistical information above (30 million workers, over 45

states permitting), that would amount to an incredible exercise of self-

aggrandizement.  The FTC would assume for itself a vast authority to regulate

interstate commerce through rulemaking, effectively usurping the power assigned

to Congress in the Constitution.  That is unlawful.

## III.    The FTC Misrepresents Evidence Making Its Final Rule Arbitrary and Capricious

Agency decisions that are not the product of reasoned decision-making are

arbitrary and capricious and must be held unlawful and set aside under the

Administrative Procedure Act ("APA").  5 U.S.C.A. § 706(2)(A); *see e.g.*, *United*

*States v. Garner*, 767 F.2d 104, 117–18 (5th Cir. 1985); *Action on Smoking and*

*Health v. C.A.B.*, 699 F.2d 1209, 1218 (D.C. Cir. 1983).  The arbitrary and

capricious standard under the APA focuses on the rationality (or lack thereof) of

the agency's articulated rationale, as opposed to the substance of the decision.  "It

is well-established that an agency's action must be upheld, if at all, on the basis

articulated by the agency itself."  *Garner*, 767 F.2d at 104 (quoting *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)).

The FTC's Rule is arbitrary and capricious and therefore invalid under the APA for a host of reasons, many of which are discussed in great detail in submissions by the parties in comments during the rulemaking process and briefs by other amici.  Below, we set forth just a few illustrative examples typical of many others discussed in other filings by the parties and other amici.

*First*, the FTC materially misrepresented evidence that it cited to reach the conclusion it wanted that noncompetes depress wages and harm innovation.  It relied predominantly upon a 2023 study co-authored by an FTC employee, purporting to "find[] that non-competes limit workers' ability to leverage favorable labor markets to receive greater pay."  Final Rule at 141.  The FTC contends that "this study has the broadest coverage" and "is very robust."  *Id.*  But what the FTC did not say is that in an earlier version of this study—the version cited in the Notice of Proposed Rulemaking—the authors acknowledged that noncompetes "might increase incentives for firms to invest in training, knowledge creation, and other portable assets . . . that could increase their workers' productivity and earnings."  Matthew S. Johnson, Kurt Lavetti, and Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility.* SSRN (2021), https://ssrn.com/abstract=3455381.  The same study admitted that its findings with

respect to the effect of noncompetes on wages were based on a "back of the envelope calculation using an out-of-sample extrapolation," and even then, the study only "implies" that banning noncompetes could increase wages. *Id*. The FTC did not acknowledge that its findings were based on admittedly "back of envelope" calculations.

*Second*, the FTC acknowledges (but then summarily dismisses) that there are highly reputable studies showing exactly the opposite of what the FTC claims—i.e., that workers who are presented with noncompetes before accepting job offers receive higher wages and more training and are more satisfied in their jobs than those who are not bound by noncompetes. *See* Evan P. Starr, *et al.*, *Noncompete Agreements in the U.S. Labor Force*, 64 J. L. & ECON. 53, 53 (2021). Likewise, the FTC's assertion that employers regularly or often coerce employees to sign noncompetes is unsupported by any evidence in the record. Importantly, any bargaining power disparity that the FTC cites does not apply in situations involving high-level employees like executives, yet the Rule nonetheless applies to such individuals. And to take another example, the FTC even acknowledges its claims regarding the impact of noncompetes on consumer pricing are thin. Final Rule at 196. These points are emblematic of a broader pattern in which the FTC pre-determined an outcome and then ignored or minimized evidence to the contrary, which is the hallmark of arbitrary and capricious decision-making.

## **CONCLUSION**

For the foregoing reasons, the Partnership respectfully submits that the Court should grant Plaintiff's and Plaintiffs-Intervenors' Motions and stay the effective date of the Final Rule.

Respectfully submitted,

*/s/ Christopher Lynch*

Christopher Lynch
(*pro hac vice* pending)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
christopher.lynch@davispolk.com

Counsel for Amicus Curiae

Dated: May 24, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify the foregoing complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, that the foregoing brief contains 3,679 words, including footnotes, and excluding the case caption, table of contents, table of authorities, signature block, and certificates, and that foregoing is typed in 14-point font and the footnotes are typed in 11-point font.

Date: May 24, 2024

*/s/ Christopher Lynch*
Christopher Lynch
(*pro hac vice* pending)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, the foregoing document was electronically filed in this matter with the Clerk of Court, using the ECF system, which sent notification of such filing to all counsel of record.

Date: May 24, 2024

*/s/ Christopher Lynch*
Christopher Lynch
