# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC,<br><br>    Plaintiff,<br><br>CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>    Plaintiff-Intervenors,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>    Defendant. | CASE NO.: 3:24-CV-986-E |

## DEFENDANT'S CONSOLIDATED BRIEF IN RESPONSE TO PLAINTIFFS' MOTIONS FOR STAY OF EFFECTIVE DATE AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.  THE FEDERAL TRADE COMMISSION ACT ................................................. 3

  A.  The Commission's Directive to Prevent Unfair Methods of
      Competition .................................................................................................. 3

  B.  The Commission's Section 5 Adjudicatory Authority .............................. 5

  C.  The Commission's Section 6 Rulemaking Authority ................................ 5

II.  THE NON-COMPETES RULEMAKING ......................................................... 9

  A.  The Proposed Rule ...................................................................................... 9

  B.  The Commission's Findings and Public Comments ................................ 10

  C.  The Final Rule ........................................................................................... 12

PROCEDURAL HISTORY .......................................................................................... 13

LEGAL STANDARD .................................................................................................... 13

ARGUMENT ................................................................................................................ 14

I.  PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS. ........... 14

  A.  The Commission Has Statutory Authority to Promulgate the Final
      Rule ............................................................................................................. 15

      1.  Ordinary Tools of Statutory Interpretation Make Clear
          That Congress Conferred Legislative Rulemaking Authority
          on the Commission in Section 6. ..................................................... 16

      2.  This Case Does Not Implicate the Major Questions
          Doctrine. .......................................................................................... 21

  B.  The Commission Properly Determined That All Non-Competes
      Are "Unfair Methods of Competition." ................................................... 25

  C.  Congress Lawfully Delegated Authority to the Commission .................... 29

ii

     D.     The Act's Removal Restrictions Are Lawful.................................................. 32

     E.     The Rule Is Not Unlawfully Retroactive. ...................................................... 32

     F.     The Rule Is Not Arbitrary and Capricious..................................................... 34

II.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM. ......... 38

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION. ............................................... 39

IV.   ANY RELIEF SHOULD BE TAILORED. ........................................................ 40

CONCLUSION ............................................................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) .................................................................................... 31

*Alabama Ass'n of Realtors* v. *HHS,*
594 U.S. 758 (2021) .................................................................................... 25

*Biden v. Missouri,*
595 U.S. 87 (2022) ...................................................................................... 24

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ................................................................................ 23

*Big Time Vapes, Inc. v. FDA,*
963 F.3d 436 (5th Cir. 2020) ................................................................. 29, 30

*Boise Cascade Corp. v. FTC,*
637 F.2d 573 (9th Cir. 1980) ...................................................................... 27

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) .................................................................................... 20

*Bradford v. New York Times Co.,*
501 F.2d 51 (2d Cir. 1974) .......................................................................... 27

*Bristol Meyers Co.,*
102 F.T.C. 21 (1983) ...................................................................................... 5

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .................................................................................... 40

*Cascabel Cattle Co. v. U.S.,*
955 F.3d 445 (5th Cir. 2020) ...................................................................... 18

*City of Arlington v. FCC,*
668 F.3d 229 (5th Cir. 2012) ...................................................................... 22

*City of Hous. v. FAA,*
679 F.2d 1184 (5th Cir. 1982) .................................................................... 17

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021) ............................................................................... 32

*Commodity Futures Trading Comm'n v. Schor,*
    478 U.S. 833 (1986) .................................................................................. 16

*Corley v. U.S.,*
    556 U.S. 303 (2009) .................................................................................. 18

*Eastern Enterprises v. Apfel,*
    524 U.S. 498 (1998) .................................................................................. 33

*Emily's List v. FEC,*
    581 F.3d 1 (D.C. Cir. 2009) ...................................................................... 36

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .................................................................................. 34

*Fed. Power Comm'n v. Hope Natural Gas Co.,*
    320 U.S. 591 (1944) .................................................................................. 30

*Foley v. Biden,*
    2021 WL 7708477 (N.D. Tex. Oct. 6, 2021) ............................................ 14

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
    129 F.3d 826 (5th Cir. 1997) .................................................................... 41

*FTC v. Brown Shoe Co.,*
    384 U.S. 316 (1966) .............................................................................. 3, 30

*FTC v. Motion Picture Advert. Serv. Co.,*
    344 U.S. 392 (1953) ........................................................................ 4, 27, 31

*FTC v. R.F. Keppel & Bro. Inc.,*
    291 U.S. 304 (1934) ................................................................................ 3, 4

*FTC v. Raladam Co.,*
    283 U.S. 643 (1931) .................................................................................. 30

*FTC v. Texaco, Inc.,*
    393 U.S. 223 (1968) ............................................................................ 25, 30

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .............................................................................. 40

*Gundy v. U.S.*,
    588 U.S. 128 (2019) ................................................................. 29

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ................................................. 32

*Impax Lab'ys, Inc. v. FTC*,
    994 F.3d 484 (5th Cir. 2021) ................................................... 27

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) ............................................................... 40

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ................................................................. 33

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................... 39

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024) ................................................... 38

*Mistretta v. U.S.*,
    488 U.S. 361 (1989) ................................................................. 29

*Mitchel v. Reynolds*,
    1 P. Wms. 181 (Q.B. 1711) ...................................................... 9

*Mobile Relay Assocs. v. FCC*,
    457 F.3d 1 (D.C. Cir. 2006) ..................................................... 32

*N. Tex. Specialty Physicians v. FTC*,
    528 F.3d 346 (5th Cir. 2008) ................................................... 27

*N.Y. Cent. Secs. Corp. v. U.S.*,
    287 U.S. 12 (1932) ................................................................... 30

*Nat'l Broad. Co. v. U.S.*,
    319 U.S. 190 (1943) ................................................................. 30

*Nat'l Cable & Telecommc'ns Ass'n v. FCC*,
    567 F.3d 659 (D.C. Cir. 2009) ........................................... 32, 33

*Nat'l Petroleum Refiners, Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) ....................................... 6, 17, 21

*Natural Res. Def. Council v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020) ................................................................. 26

*NFIB v. DOL,*
    595 U.S. 109 (2022) ............................................................................. 22

*NLRB v. Bell Aerospace Co.,*
    416 U.S. 267 (1974) ............................................................................. 15

*Peerless Prods., Inc. v. FTC,*
    284 F.2d 825 (7th Cir. 1960) ................................................................ 29

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez,*
    403 F.3d 324 (5th Cir. 2005) ........................................................... 13, 14

*Plaquemines Par. v. Chevron USA, Inc.,*
    84 F.4th 362 (5th Cir. 2023) ................................................................. 38

*Seila Law, LLC v. CFPB,*
    591 U.S. 197 (2020) ............................................................................. 21

*Silva-Trevino v. Holder,*
    742 F.3d 197 (5th Cir. 2014) ................................................................ 17

*Snap-On Tools Corp. v. FTC,*
    321 F.2d 825 (7th Cir. 1963) ........................................................... 27, 28

*Spiegel, Inc. v. FTC,*
    540 F.2d 287 (7th Cir. 1976) ................................................................ 32

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ................................................................. 38

*U.S. v. Am. Tobacco Co.,*
    221 U.S. 106 (1911) ............................................................................... 9

*U.S. v. JS&A Group, Inc.,*
    716 F.2d 451 (7th Cir. 1983) .............................................................. 6, 21

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ...................................................................... *passim*

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ..................................................................29, 30, 32

*Winter v. NRDC,*
555 U.S. 7 (2008) ............................................................................................ 39

*Yakus v. U.S.,*
321 U.S. 414 (1944) ........................................................................................ 30

*Ysleta Del Sur Pueblo v. Texas,*
596 U.S. 685 (2022) ........................................................................................ 18

**FEDERAL STATUTES**

5 U.S.C. § 705 ...................................................................................................... 40

15 U.S.C. § 45 ............................................................................................... *passim*

15 U.S.C. § 46 ............................................................................................... *passim*

15 U.S.C. § 53 ......................................................................................................... 5

15 U.S.C. § 57a ............................................................................................7, 8, 17, 19

15 U.S.C. § 57b-3 ...................................................................................... 8, 17, 24, 37

15 U.S.C. § 1194 ................................................................................................... 19

15 U.S.C. § 2310 ................................................................................................... 19

15 U.S.C. § 7607 ................................................................................................... 19

Federal Trade Commission Act of 1914,
Pub. L. No. 63-203, 38 Stat. 717
(codified as amended at 15 U.S.C. §§ 41-58) ........................................3, 5, 16

Cigarette Labeling and Advertising Act of 1965,
Pub. L. No. 89-92, 79 Stat. 282 (codified as amended at 15 U.S.C. § 1333) .............. 6

Magnuson-Moss Warranty- Federal Trade Commission Improvement Act,
Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) .......................................... 7

Federal Trade Commission Improvements Act of 1980,
Pub. L. No. 96-252, 94 Stat. 374 ..................................................................... 8

**STATE STATUTES**

LA Rev Stat § 51:1405 (2023) ............................................................................. 29

N.Y. Gen. Bus. Law §§ 340 *et seq.*..................................................................... 29

**REGULATIONS**

16 C.F.R. pt. 3 .................................................................................................... 5

29 C.F.R. § 910.3 .............................................................................................. 33

Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the
    Health Hazards of Smoking,
    29 Fed. Reg. 8,324 (July 2, 1964) ................................................................. 6

Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps,
    36 Fed. Reg. 23,871 (Dec. 16, 1971),
    *repealed by* 43 Fed. Reg. 43,022 (Sept. 22, 1978)...................................... 6

Non-Compete Clause Rule,
    88 Fed. Reg. 3,482 (Jan. 19, 2023) ........................................................ 10, 12

Non-Compete Clause Rule,
    89 Fed. Reg. 38,342 (May 7, 2024) .................................................... *passim*

**OTHER AUTHORITIES**

120 Cong. Rec. 39,579 (1974) ............................................................................ 7

FTC-2023-0007-21045,
    https://perma.cc/UR3S-R372................................................................... 37

H.R. Rep. No. 103-138 (1993) ......................................................................... 17

Harlan M. Blake, *Employee Agreements Not to Compete*,
    73 Harv. L. Rev. 625 (1960) ........................................................................ 9

*In re POM Wonderful LLC*, No. 9344, Final Order (FTC Jan. 10, 2013) ......................... 5

Policy Statement Regarding the Scope of Unfair Methods of Competition Under
    Section 5 of the Federal Trade Commission Act 8, Comm'n File No. P221202
    (Nov. 10, 2022),
    https://perma.cc/2G3F-2UW9 ..................................................................... 4

S. Conf. Rep. 93-1408 (1974) ............................................................................ 7

Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467 (2002)...........................................20, 21

## INTRODUCTION

Non-compete clauses ("non-competes") restrict competition in labor, product, and service markets by preventing workers from taking new jobs or starting new businesses. Because they undermine competition, non-competes have been scrutinized by courts for hundreds of years and are prohibited or restricted to some degree in most States. Yet non-competes continue to impair competition, suppressing wages, entrepreneurship, and economic liberty.

Congress charged the Federal Trade Commission ("the Commission") through the Federal Trade Commission Act ("the Act" or "FTC Act") with preventing unfair methods of competition in or affecting commerce. Recognizing the need to address harms caused by non-competes, the Commission conducted an extensive inquiry into the issue spanning two presidential administrations, including a robust review of the literature, the Commission's own empirical analysis, and collection of input from market participants.

The Commission received overwhelming evidence from the public about the detrimental effects of non-competes. The Commission heard from doctors about rural healthcare shortages caused by non-competes, from aspiring innovators blocked from bringing to market a better product at a better price, from scientists for whom non-competes had impeded collaboration and delayed discovery of breakthrough cancer treatments, and from businesses prevented from expanding because dominant corporations had locked up key talent. The Commission's expert analysis of the record

1

culminated in the promulgation of a rule declaring most existing non-competes unenforceable, subject to an exception for certain senior executives, and banning the future use of most non-competes. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ("Rule" or "Final Rule").

Plaintiffs, a private company and group of business-interest associations, challenge the Commission's effort to promote fair competition, seeking a stay of the Rule's effective date and a preliminary injunction. But Plaintiffs have not satisfied the demanding standard to justify extraordinary, emergency relief.

Plaintiffs are unlikely to succeed on the merits of their claims. Plaintiffs have not meaningfully contested that the use of non-competes is an unfair method of competition or that the Commission has authority to regulate non-competes through adjudication. Rather, Plaintiffs' arguments center on whether the Commission can prohibit the use of non-competes through rulemaking. But Congress authorized the Commission in clear language to prevent unfair methods of competition through both adjudication and rulemaking, and the Commission's choice of rulemaking to address the anti-competitive effects of non-competes is both logical and unremarkable. The major questions doctrine is also not implicated here, as the Rule falls squarely within the Commission's expertise and delegated authority. Plaintiffs have not offered a persuasive reason that the Commission cannot regulate "unfair methods of competition" generally and instead must apply a specific Sherman Act framework on a case-by-case basis, particularly given that Congress designed the FTC Act to bolster the

2

Sherman Act. The FTC Act also provides an intelligible principle by which the Rule can be measured, and the Rule is not unlawfully retroactive since it has only prospective effects. The Commission also easily satisfies the deferential arbitrary-and-capricious standard given its exhaustive study of non-competes and thorough economic justifications for the Rule.

## BACKGROUND

### I.   THE FEDERAL TRADE COMMISSION ACT

Congress established the Commission in 1914 as a bipartisan expert agency. Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717, codified as amended at 15 U.S.C. §§ 41-58. The Commission has two core mandates, set forth in Section 5 of the Act, codified at 15 U.S.C. § 45. First, Congress "empowered and directed [the Commission] to prevent … unfair methods of competition in or affecting commerce." *Id.* § 45(a)(2). Second, Congress empowered and directed the Commission to prevent "unfair or deceptive acts or practices [("UDAPs")] in or affecting commerce." *Id.*

### A. The Commission's Directive to Prevent Unfair Methods of Competition

Section 5's directive to prevent "unfair methods of competition" confers on the Commission "broad powers to declare trade practices unfair." *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320-21 (1966). The phrase that Congress intentionally chose—"unfair methods of competition"—was then new in the law. The initial proposal used the

3

phrase "unfair competition," which had a recognized common law definition. *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 310-11 (1934). Congress found that phrase "too narrow," and substituted for it the "broader and flexible phrase 'unfair methods of competition.'" *Id.* at 311-12. The Supreme Court has recognized that "unfair methods of competition" encompasses conduct beyond that which violates the Sherman or Clayton Acts, and that the FTC Act "supplement[s] and bolster[s]" those statutes. *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953).

To fall within Section 5's ambit, conduct must first be a "method of competition" "as opposed to merely a condition of the marketplace, … such as high concentration or barriers to entry." Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act 8, Comm'n File No. P221202 (Nov. 10, 2022), *available at* https://perma.cc/2G3F-2UW9. ("Section 5 Policy Statement") (synthesizing caselaw). The conduct must also be "unfair," which means it "goes beyond competition on the merits." Section 5 Policy Statement at 8-9. As articulated in caselaw and the Act's legislative history, whether competition goes beyond the merits requires both of "two key criteria": (1) whether the conduct is "coercive, exploitative, collusive, abusive, deceptive, predatory" or "otherwise restrictive or exclusionary;" and (2) whether the conduct "tend[s] to negatively affect competitive conditions," for example by tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement at 9 & nn.51, 52; *see also* 89 Fed. Reg. at 38,358-59.

4

## B. The Commission's Section 5 Adjudicatory Authority

The Commission carries out its mandates—preventing unfair methods of competition and UDAPs—through various mechanisms, including adjudication and rulemaking. Pursuant to Section 5 of the Act, enforcement actions subject to adjudication before the Commission are governed by formal procedures and subject to judicial review. 15 U.S.C. § 45(b), (c); 16 C.F.R. pt. 3. These adjudications are precedential and apply to future Commission action.[1] The Commission may also seek injunctive relief in district court. 15 U.S.C. § 53(b).

## C. The Commission's Section 6 Rulemaking Authority

Section 6 of the Act, codified at 15 U.S.C. § 46, contains "additional powers" of the Commission, including significant investigative authority and rulemaking authority pertaining to any provision of the Act. *Id.* Section 6(g) empowers the Commission "to make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722, *see also* 15 U.S.C. § 46(g). It also provides the Commission authority to "classify corporations." *Id.*

Before statutory amendments that created separate procedural requirements for UDAP rulemakings, *see infra*, the Commission used its Section 6(g) authority to promulgate 26 rules combatting various violations of Section 5, including both unfair methods of competition and UDAPs. *See* 89 Fed. Reg. at 38,349-50. For example, the

---

[1] For example, the Commission announced its "competent and reliable scientific evidence" standard in an adjudication decades ago, *Bristol Meyers Co.*, 102 F.T.C. 21, 312, 315 (1983), and has regularly invoked that standard since, *e.g.*, *In re POM Wonderful LLC*, No. 9344, Final Order (FTC Jan. 10, 2013).

Commission's "Octane Rule" declared it to be both an unfair method of competition and a UDAP to fail to disclose the minimum octane number on gasoline pumps. Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971), *repealed by* 43 Fed. Reg. 43,022 (Sept. 22, 1978).

Some rules attracted Congressional attention and were displaced by legislation. *See, e.g.*, Cigarette Labeling and Advertising Act of 1965, Pub. L. No. 89-92 (1965), 79 Stat. 282, codified as amended at 15 U.S.C. § 1333 (displacing Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8,324 (July 2, 1964)). Yet Congress took no action to limit the scope of the Commission's rulemaking authority with respect to unfair methods of competition. The Commission's rulemakings also withstood judicial challenges to the Commission's statutory authority to promulgate such rules. The D.C. Circuit held that the Commission "is authorized to promulgate rules defining the meaning of the statutory standards of the illegality that the Commission is empowered to prevent," including unfair methods of competition. *Nat'l Petroleum Refiners, Ass'n v. FTC*, 482 F.2d 672, 698 (D.C. Cir. 1973) ("*National Petroleum*"). The Seventh Circuit later agreed and "incorporate[d] by reference that case's lengthy discussion of the Commission's rulemaking authority under section 6(g)." *U.S. v. JS&A Group, Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).

After the D.C. Circuit upheld the Commission's rulemaking authority with respect to both UDAPs and unfair methods of competition in *National Petroleum*,

Congress amended the Act to add additional procedural requirements for UDAP rulemakings while declining to disturb the Commission's authority to issue rules regarding unfair methods of competition. *See* Magnuson-Moss Warranty- Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) ("1975 Amendments"). The House initially proposed to prohibit the Commission from "prescribing rules with respect to unfair competitive practices." S. Conf. Rep. 93-1408 § 202 (1974). But the Senate rejected the House's proposal, and the Conference report adopting the final text of the 1975 Amendments made clear that "[t]he conference substitute does not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition …." *Id.*

Debate immediately before the Senate vote on the conference report further demonstrated Congress's awareness of the holding in *National Petroleum*, with a statement quoting from the decision and noting that, because the 1975 Amendments concerned consumer protection provisions, the new procedural requirements "are limited to unfair or deceptive acts or practices rules." 120 Cong. Rec.  39,579, 40,713 (1974) (statement of Sen. Hart). Debate also made clear that the amendments "are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition" and the Commission may continue to do so. *Id.*

The 1975 Amendments, which became Section 18 of the Act, codified at 15 U.S.C. § 57a, created special procedures for Rules defining UDAPs while explicitly preserving the Commission's Section 6(g) authority to promulgate rules for unfair

methods of competition. Section 18a(a)(2) provides:

> "The Commission shall have no authority under [the Act], other than its authority under this section, to prescribe any rule with respect to [UDAPs].... *The preceding sentence shall not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition*...."

15 U.S.C. § 57a(a)(2) (emphasis added). Congress also amended Section 6(g) to reference Section 18, stating that the Commission may issue rules and regulations "except as provided in [Section 18(a)(2)]." *Id.* § 46(g).

In the Federal Trade Commission Improvements Act of 1980 ("1980 Amendments"), Congress again amended the Act. Pub. L. No. 96-252, 94 Stat. 374. These amendments, codified at 15 U.S.C. § 57b-3, created additional procedural steps for the Commission's rulemakings. Confirming that both Section 6(g) and Section 18(a) provide substantive rulemaking authority, Congress defined "rule" by reference to those sections and exempted from the new procedural requirements "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." 15 U.S.C. § 57b-3(a)(1). Congress also demonstrated its awareness of the scope of rules promulgated under Sections 6(g) and 18(a) by recognizing that amendments to those rules could have "an annual effect on the national economy of" at least $100 million. *Id.* § 57b-3(a)(1)(A).

## II.    THE NON-COMPETES RULEMAKING

### A. The Proposed Rule

Non-competes prevent individuals from moving freely to switch jobs or start their own businesses. For centuries, courts have scrutinized non-competes, recognizing their anticompetitive nature and pernicious effects. *See* Harlan M. Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. 625, 636 (1960) (in *Dyer's Case*, the Court of Common Pleas in 1414 declared it "illegal at common law" to condition a promise on an agreement "not [to] practice his trade for a period of six months in the plaintiff's town"); *Mitchel v. Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711) (recognizing that non-competes may threaten "the loss of [the worker's] livelihood, and the subsistence of his family"). Non-competes are also subject to the Sherman Act. *See U.S. v. Am. Tobacco Co.*, 221 U.S. 106, 181-83 (1911). All States restrict non-competes to some degree, and four States have banned them.

In recent decades, a robust empirical literature studying non-competes has developed. Changes in state law have provided natural experiments enabling economists to isolate and quantify the harms caused by (not just correlated with) non-competes. 89 Fed. Reg. at 38,382-84. It has also become clear that non-competes are widespread, proliferating far beyond the boardroom to middle- and low-wage workers. *Id.* at 38,346. Furthermore, even in States where non-competes are unlawful, employers continue to use them. *Id.* at 38,429. And employers and workers face a confusing patchwork of non-compete policies. *Id.* at 38,465.

9

Beginning in 2018, the Commission studied the extent of non-competes and their effects through public hearings and workshops; invitations for public comment; and a review of academic studies. *See* 89 Fed. Reg. at 38,343-44. In 2021, the Commission initiated several investigations into the use of non-competes, which resulted in consent decrees settling charges that those agreements were unfair methods of competition under Section 5 and requiring firms to eliminate non-competes for thousands of workers. *Id.* at 38,344.

In 2023, the Commission proposed a rule that would require employers to rescind all existing non-competes and prohibit employers from entering into new ones. Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (Jan. 19, 2023).

### B. The Commission's Findings and Public Comments

Before adopting the Final Rule, the Commission conducted an exhaustive survey and analysis of the economic literature regarding non-competes and considered public comments. In its expert judgment, the Commission found that all non-competes: (1) are a method of competition as opposed to a condition of the marketplace, 89 Fed. Reg. at 38,374; (2) are facially unfair because they are restrictive and exclusionary, *id.*; and (3) tend to negatively affect competition in labor, product, and service markets, *id.* at 38,379-402, 38,406-11. The Commission also found that non-competes with non-senior executives are exploitative and coercive because they are often imposed unilaterally. *Id.* at 38,374-79. However, the same is not true for senior executives, who often have an opportunity to bargain for, and receive compensation for, non-competes.

*Id.* at 38,405-06.

For labor markets, the evidence showed that non-competes tend to reduce competition by inhibiting efficient matching between workers and employers. *Id.* at 38,379. That is, non-competes reduce labor mobility by limiting the movement of workers between firms. *Id.* at 38,380-81. This in turn suppresses wages, even for workers *not* subject to non-competes. *Id.* at 38,382-84. For product and service markets, the weight of the empirical evidence showed that non-competes inhibit new business formation by preventing workers from leaving their jobs to start firms, and by preventing existing businesses from hiring talented workers. *Id.* at 38,388-91. And for similar reasons, non-competes inhibit innovation. *Id.* at 38,394-95. The Commission also found that rulemaking (as opposed to case-by-case adjudication) is particularly appropriate here because, by preventing efficient matching between workers and employers, non-competes can have negative externalities that are difficult to capture in an adjudication. *Id.* at 38,463.

The overwhelming public support for the proposed rule reinforced these empirical findings. *See id.* at 38,344 (over 25,000 of the 26,000 comments received supported the proposed rule). Thousands of workers explained how restrictive non-competes prevent them from taking a better job or starting a competing business, which in turn keeps their wages low, subjects them to poor working conditions, and reduces the quality and increases the prices of goods or services their employers offer. *Id.* at 38,340-46; *contra* Ryan Mot. 8 (mistakenly suggesting that non-competes are

11

"mutually beneficial"). Numerous small businesses and small business associations also supported the Rule. 89 Fed. Reg. at 38,491-92.

The Commission estimated that prohibiting non-competes would increase new business formation by 2.7% annually and spur innovation, leading to over 100,000 new patents over ten years. 89 Fed. Reg. at 38,433, 38,470. Worker earnings would increase by $400 to $488 billion over ten years, *id.*, and consumer prices would fall, *id.* at 38,478.

### C. The Final Rule

For those reasons, the Commission adopted the Final Rule, which provides that it is an unfair method of competition under Section 5 for employers to enter into non-competes after the Rule's effective date, September 4, 2024. 89 Fed. Reg. at 38,342. The Rule also prohibits employers from enforcing existing non-competes and requires employers to provide notices that those clauses are unenforceable, except with respect to senior executives. *Id.* Existing non-competes with senior executives—which the Rule defines as any worker who makes above $151,164 annually and is in a policy-making position—may remain in effect. *Id.*; *id.* at 38,414.

The Rule leaves undisturbed the myriad tools businesses have to protect trade secrets and their investment in employees, such as trade secret law, appropriately tailored non-disclosure agreements, fixed duration employment agreements, and competing on the merits. *Id.* at 38,424-26.

## PROCEDURAL HISTORY

Plaintiff Ryan, LLC ("Ryan") initiated this suit on April 23, 2024. Compl., ECF No. 1. On May 1, 2024, Ryan amended its complaint, challenging the Rule on several constitutional and statutory bases under the Administrative Procedure Act ("APA"). Am. Compl. ¶¶ 66-97, ECF No. 22. Ryan also moved to stay the effective date of the Rule and for a preliminary injunction. *See* ECF No. 24 ("Ryan Mot.").

On May 9, 2024, the Court granted intervention to four associations who previously filed suit in the Eastern District of Texas: the U.S. Chamber of Commerce, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce (collectively, "Association Plaintiffs"; collectively with Ryan, "Plaintiffs"). Order, ECF No. 34. Association Plaintiffs challenged the Rule on similar, though not entirely, overlapping grounds. Pl.-Intervenors Compl. ¶¶ 87-119, ECF No. 37, and moved for a stay of the Rule's effective date and preliminary injunction. *See* ECF No. 47 ("Association Mot.").

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly [met] all four requirements:" (1) "a substantial likelihood of success on the merits;" (2) a "substantial threat" of irreparable harm absent an injunction; (3) a balance of hardships in the movant's favor; and (4) no "disserv[ice] to the public interest." *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329

(5th Cir. 2005).[2] "Issuance of a preliminary injunction is to be treated as the exception rather than the rule," and Plaintiffs have "a heav[y] burden … to establish that injunctive relief is appropriate." *Foley v. Biden*, 2021 WL 7708477 at *1 (N.D. Tex. Oct. 6, 2021).

## ARGUMENT

### I.     PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS.

The Commission properly determined that non-competes are "unfair methods of competition" because they "tend to negatively affect competition conditions in labor markets" as well as in "markets for products and services." 89 Fed. Reg. at 38,379. The Commission found that non-competes prevent efficient matching between employees and employers, reduce wages, inhibit new business formation and innovation, and ultimately may result in higher prices and lower quality products for consumers. *See id.* at 38,379-402. The Commission also concluded that non-competes with workers other than senior executives "are exploitative and coercive" because employers often impose them unilaterally "without meaningful negotiation or compensation" and because they "trap workers in worse jobs" and "force workers to bear significant harms and costs." *Id.* at 38,375-79.

Plaintiffs do not meaningfully challenge the Commission's conclusion that non-competes are an "unfair method of competition." Rather, Plaintiffs primarily contend

---

[2] Unless indicated, internal quotations and citations omitted throughout.

that, even accepting the Commission's conclusion, the Commission is powerless to promulgate a rule banning non-competes as violative of the Act. But that view of the Commission's authority is not supported by the statutory text or any relevant principle of construction. The Commission lawfully exercised its statutorily granted rulemaking authority to regulate non-competes. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). Plaintiffs' additional challenges to the Rule are similarly unpersuasive.

### A. The Commission Has Statutory Authority to Promulgate the Final Rule.

The FTC Act declares unlawful "unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). Congress "empowered and directed" the Commission to prevent the use of unfair methods of competition through both adjudication, *id.* § 45(b), and rulemaking, *id.* § 46(g). Plaintiffs' effort to cabin that authority to "procedural" or "investigative" rules fails because the Act provides the Commission with a clear grant of regulatory authority, and contains no such textual limit on the types of rules the Commission may promulgate. *See* Association Mot. 13-14; Ryan Mot. 14. Plaintiffs' invocation of the major questions doctrine is inapposite, because unfair methods of competition are at the core of the Commission's expertise. *Cf. West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

1. **Ordinary Tools of Statutory Interpretation Make Clear That Congress Conferred Legislative Rulemaking Authority on the Commission in Section 6.**

The statutory text and legislative history make clear that Congress conferred on the Commission the authority to promulgate legislative rules prohibiting unfair methods of competition. Section 6(g) states: "The Commission shall also have power ... to make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722, *see also* 15 U.S.C. § 46(g) (substituting "subchapter" for "Act"). That provision thus permits the Commission to promulgate all "rules and regulations"— without any textual limitation—to implement Section 5(a)'s prohibition on unfair methods of competition. The Rule plainly falls within that ambit because it prohibits the use of non-competes as unfair methods of competition. And the Commission's power is confirmed by the Act's directive to the Commission to "prevent" entities subject to its jurisdiction "from using unfair methods of competition," *id.* § 45(a)(2). That directive inherently contemplates that the Commission will use forward-looking rulemaking to "prevent" unfair methods of competition.

Confirming that Section 6(g) confers legislative rulemaking authority, including authority to define unfair methods of competition, Congress ratified this interpretation in the 1975 Amendments. *See CFCT v. Schor*, 478 U.S. 833, 846 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by

Congress."). Congress enacted the 1975 Amendments against the backdrop of the then-recent decision in *National Petroleum*, which held that Section 6(g) empowers the Commission to issue rules defining unfair methods of competition.[3] 482 F.2d 672. Congress rejected a proposal to limit the Commission's rulemaking authority for unfair methods of competition, adopting instead statutory text explicitly preserving that authority consistent with the holding of *National Petroleum. See supra*, Background Part I.C; *see also* 15 U.S.C. § 57a(a)(2) (limits on the Commission's UDAP rulemaking authority "shall not affect any authority of the Commission to prescribe rules ... with respect to unfair methods of competition"); *City of Hous. v. FAA*, 679 F.2d 1184, 1196 (5th Cir. 1982) (demonstrating ratification with "excerpts from the legislative record").[4]

Congress revisited the Commission's rulemaking authority again in the 1980 Amendments but left unchanged Section 6(g) as well as the language in Section 18 preserving the Commission's authority to regulate unfair methods of competition, further ratifying the Commission's authority. *See Silva-Trevino v. Holder*, 742 F.3d 197, 202-03 (5th Cir. 2014) (Congress "expects" courts to "abide" by construction when "relevant language remained unchanged" and lawmakers had "revisited" issue.). The

---

[3] Both Association Plaintiffs and Ryan argue that *National Petroleum* was wrongly decided. Association Mot. 17-19; Ryan Mot. 19-20. But the "correctness" of that decision is irrelevant to the key point here: The holding of that case provided the basis for the Congressional ratification confirming that Section 6(g) extends to rules related to unfair methods of competition.

[4] An errant statement in a preliminary report on amendments adopted nearly twenty years later incorrectly describing the Commission's pre-1975 "unfairness authority" is no basis to question the statutory text and clear indication of Congressional ratification. *Contra* Association Mot. 16 (citing H.R. Rep. No. 103-138, at 4 (1993)).

1980 Amendments further defined "rule" as one promulgated under Section 6 or 18 of the Act but excluded non-legislative rules. 15 U.S.C. § 57b-3(a)(1). This exclusion makes sense only if Congress understood rules issued under Section 6 to include legislative rules prohibiting unfair methods of competition.

Plaintiffs' reading of the statute is also "at odds with one of the most basic interpretive canons," because it would render language in Section 6(g) and 18(a)(2) "inoperative or superfluous." *Corley v. U.S.*, 556 U.S. 303, 314 (2009). Section 6(g) empowers the Commission to make rules "for the purpose of carrying out" the Act "*except* as provided in section [18(a)(2)]," which circumscribes the Commission's rulemaking authority only with respect to UDAPs. 15 U.S.C. § 46(g). This statutory carve-out would have no "independent significance" if Section 6(g) did not allow the Commission to make legislative rules before the 1975 Amendments. *See Cascabel Cattle Co. v. U.S.*, 955 F.3d 445, 451 (5th Cir. 2020). The explicit reservation of rulemaking authority for unfair methods of competition in Section 18(a)(2) would similarly be superfluous if the Commission did not possess that authority. Plaintiffs' reading of Section 6(g) impermissibly asks the Court not to "give effect" to that reservation. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 699 (2022).

Plaintiffs' view of the amendments is incompatible with the text of the statute and the unambiguous legislative history. Plaintiffs characterize the 1975 Amendments as *granting* rulemaking authority for UDAPs, but this authority already existed under Section 6(g) and, indeed, the Commission had exercised it for the several decades

preceding. *See supra*, Background Part I.C. Rather, the 1975 amendments *narrowed* the Commission's pre-existing authority to issue rules regarding UDAPs by permitting only rules that "define with specificity" such acts and limiting all other UDAP rules. 15 U.S.C. § 57a(a)(1)(B); *see also id.* § 57a(a)(2). It is thus no surprise that the 1975 Amendments did not "grant" rulemaking authority for unfair methods of competition, as Congress understood that such authority already existed and had ratified that authority in the 1975 Amendments. *See* Association Mot. 15; Ryan Mot. 16.

It is also of no import that Congress routinely directs the Commission to issue rules targeting specific practices that Congress determines violate Section 5. *E.g.*, 15 U.S.C. § 2310(a)(1)-(2) (the Commission "shall prescribe" rules setting forth the minimum requirements for informal warranty dispute resolution procedures); *id.* § 1194(c) ("direct[ing]" the Commission to issue rules regarding flammable fabrics). These provisions do not, as Plaintiffs suggest, limit the Commission's rulemaking authority. Association Mot. 15; Ryan Mot. 16-17. Instead, they represent explicit directions from Congress to exercise the Commission's authority to prevent specific violations of Section 5. Indeed, even after the 1975 Amendments directing specific procedures for UDAP rulemakings, Congress continued to enact statutes directing the Commission to define specific UDAPs. *E.g.*, 15 U.S.C. § 7607.

Plaintiffs' remaining arguments are unpersuasive. Plaintiffs give the text of Section 6(g) short shrift, arguing that the location of Section 6(g) in the Act controls its interpretation. Association Mot. 12-13; Ryan Mot. 14. But there is nothing remarkable

about the location of the Commission's substantive rulemaking authority. Section 6 is titled "additional powers," suggesting that Congress conferred these powers *in addition to* the Commission's adjudicatory authority. While it is true, as Ryan notes, that Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," Ryan Mot. 14, that maxim has no place here. The Act is a "major piece" of antitrust legislation "written in starkly broad terms," *cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 680 (2020), notwithstanding Plaintiffs' view that the rule is an "unexpected application" of the Act. *Id.*

Plaintiffs also advocate for a new canon of interpretation presuming that Congress followed a convention whereby it would not grant "broad legislative rulemaking authority without also enacting a provision providing penalties for violating those rules." Ryan Mot. 14-15; Association Mot. 12-13. This purported convention, proffered in an academic journal more than twenty years ago, should not be adopted here for the first time. *See id.* (citing Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 549-57 (2002)). Even the authors of the article concede that "the convention was never explicitly memorialized in an authoritative text," "Congress was not infallibly attentive to the drafting convention," earlier justices on the Supreme Court "had no knowledge of the convention," and there are barriers that are "likely to give the Court significant pause before endorsing the convention." *Agency Rules with the Force of Law*, 116 Harv. L. Rev. at 495, 519, 529, 587.

20

Finally, to the extent the Commission's historical understanding of its rulemaking authority is relevant, *see* Association Mot. 14; Ryan Mot. 15, the Court should take the rules that the Commission has issued under Section 6(g), *see supra*, Background Part I.C, as the definitive statement of its authority rather than cherry-picked statements from the historical record. And, contrary to Association Plaintiffs' suggestion, Association Mot. 14, the Supreme Court has not definitively spoken on the scope of the Commission's rulemaking authority. *See Seila Law, LLC v. CFPB*, 591 U.S. 197, 219 n.4 (2020) ("[P]erhaps the FTC possessed broader rulemaking, enforcement, and adjudicatory powers than the *Humphrey's* Court appreciated."). Indeed, the only courts to squarely address the question held that Section 6 authorizes the Commission to promulgate rules regulating unfair methods of competition. *See Nat'l Petroleum*, 482 F.2d 672; *JS&A Group*, 716 F.2d at 454.

## 2. This Case Does Not Implicate the Major Questions Doctrine.

Plaintiffs also invoke the major questions doctrine. But that doctrine is reserved only for "extraordinary" cases, those "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721. Congress "directed" the Commission to "prevent" the use of "unfair methods of competition." 15 U.S.C. § 45(a)(2). In the more than hundred years since, the Commission has done just that, both by adjudication and rulemaking. *See supra*, Background Parts I.B-C. Finding that the use of non-competes is

21

an unfair method of competition thus goes to the heart of the Commission's mandate under the Act and is not a "transformative expansion [of its] regulatory authority." *West Virginia*, 597 U.S. at 724.

Plaintiffs miss the point in focusing on the Commission's use of rulemaking authority versus adjudication to regulate non-competes. No party contests that the Commission could bring an enforcement action under Section 5 charging that the use of non-competes is an unfair method of competition. Plaintiffs' argument thus amounts to the proposition that the Commission's use of rulemaking to address non-competes, as opposed to adjudication, is the major question meriting review. But the doctrine applies when an agency steps outside of its area of expertise to regulate an issue beyond its core mandate, not when an agency chooses one method of regulation over another. *See, e.g.*, *West Virginia*, 597 U.S. at 729 (characterizing agency as making "a different type of policy judgment" based on "expertise ... *not* traditionally needed in [the agency's] regulatory development"); *NFIB v. DOL*, 595 U.S. 109, 117-18 (2022) (applying major questions doctrine to rule setting "public health measures" that were "outside of OSHA's sphere of expertise" rather than "workplace safety standards"). Congress directed the Commission to "prevent" unfair methods of competition, and "agencies typically enjoy very broad discretion in deciding whether to proceed by way of adjudication or rulemaking." *City of Arlington v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012).

Ryan errs in contending that the Commission's use of its rulemaking authority represents a "fundamental revision" of the Act, transforming it "from an antitrust

statute into a worker-protection statute." Ryan Mot. 18. Far from transforming the Act, the Rule is consistent with the Commission's purpose in preventing unfair methods of competition. *See supra*, Background Part II.B. Ryan's misleading framing further ignores the Rule's numerous pro-competitive benefits, such as the promotion of new business formation. *See supra*, Background Part II.C. The Commission is not claiming the authority to regulate employer-employee relationships writ large or wading outside its expertise in competition. Rather, it used its rulemaking authority to prevent a particular unfair method of competition, as Congress explicitly directed it to do. This case is therefore readily distinguishable from *Biden v. Nebraska*, where the Court rejected a reading of the statute that would allow the Secretary to "rewrite" the Education Act by waiving or modifying any provision in case of national emergency. 143 S. Ct. 2355, 2373 (2023).

The Commission's historical use of Section 6(g) to promulgate legislative rules further distinguishes it from major questions cases. In *West Virginia*, the seminal major questions doctrine case, the Court recounted the EPA's one prior rule under the relevant section, noting that "the legality of that choice was controversial at the time and was never addressed by a court." 597 U.S. at 725. Contrary to that case, where the challenged rule had "no precedent" because it operated differently from the sole prior rule, the Commission's Rule is consistent with its historical use of Section 6(g), including for rules defining certain unfair methods of competition. And courts upheld the Commission's rulemaking authority. *See supra*, Background Part I.C.

Stripping away Plaintiffs' dispute over the Commission's choice to proceed by rulemaking, Plaintiffs appear to argue that the major questions doctrine applies simply because the Rule "indisputably has enormous economic significance." Ryan Mot. 17; *see also* Association Mot. 16. But the scale of the Commission's action is not what determines whether this case should be analyzed under the major questions doctrine. *See Biden v. Missouri*, 595 U.S. 87, 95 (2022) (not applying major questions doctrine despite agency action "go[ing] further than what the Secretary has done in the past"). The Commission was designed to prevent unfair methods of competition "in or affecting commerce," 15 U.S.C. § 45(a)(2), showing that Congress intended the Commission to take actions affecting commerce throughout the national economy, *see, e.g.,* § 57b-3(a)(1)(A) (defining "rule" with reference to "annual effect on the national economy of $100,000,000 or more"). And Association Plaintiffs are wrong to suggest that the Rule opens the floodgates to rules banning "any other business practice or category of conduct." Association Mot. 16. The standard for future action by the Commission remains the same today as it was prior to issuance of the Rule: a determination that a method is an unfair method of competition under Section 5, and compliance with the procedural and substantive requirements of either adjudication under Section 5 or regulation under Section 6. Association Plaintiffs' argument that the major questions doctrine applies when an agency "intrudes into an area that is the particular domain of state law," Association Mot. 22 (quoting *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021)), also has no place here. Regulation of unfair methods

24

of competition is clearly *not* the particular domain of State law given Congress's delegation of authority to the Commission to prevent such acts.

In any event, the Commission has "clear Congressional authorization" to issue rules relating to the Act, including unfair methods of competition, for all the reasons explained *supra*, Section II.A.1. *See West Virginia*, 597 U.S. at 724.

## B. The Commission Properly Determined That All Non-Competes Are "Unfair Methods of Competition."

Plaintiffs do not generally dispute that the Commission is permitted to designate non-competes as an unfair method of competition. Instead, Association Plaintiffs argue only that, even if many or most non-competes are exploitative and reduce competition, the Rule violates Section 5 because, in their view, some individual non-competes may have procompetitive effects. Association Mot. 19-24. This argument minimizes the Commission's mandate to "prevent" unfair methods of competition, 15 U.S.C. § 45(a)(2), including through promulgating "rules and regulations," *id.* § 46(g). That mandate necessarily requires the Commission to take account of the widespread adoption of practices across industry, not just the individual, isolated effects of a single contract. The Commission need not demonstrate actual anticompetitive harm to establish a violation—Section 5 reaches "incipien[t] acts" and conduct with a "dangerous tendency … to hinder competition." *FTC v. Texaco, Inc.*, 393 U.S. 223, 224 (1968) (even where arrangement may not "foreclose[e] competitors," when "the anticompetitive tendencies of such a system are clear," the Commission acted properly

25

"in halting this practice in its incipiency" before it had "totally eliminated competition"). Here, the Commission properly determined that non-competes, as a class, tend to and in fact do have actual current anticompetitive effects in labor, product, and service markets; an additional showing of such effects for every individual noncompete the Rule covers is not required.[5]

Moreover, Association Plaintiffs misunderstand the Commission's assessment of the aggregate effects of non-competes. The Commission did not find that some non-competes may individually be beneficial and some may individually be harmful— rather, the Commission found that the use of *any* non-compete is an unfair method of competition because non-competes, by definition, hinder competition and impose negative externalities beyond one individual agreement. *See, e.g.*, 89 Fed. Reg. at 38,407, 38,428. The Commission additionally found that non-competes are unjustified because employers have other means to protect their legitimate interests without the same burdens on competition. *Id.* at 38,421-34.[6]

---

[5] Even if Association Plaintiffs were correct that the Rule sweeps too broadly because some hypothetical set of non-competes may not constitute unfair methods of competition, that would not provide any basis to enjoin or stay the Rule entirely rather than as applied to that limited set of non-competes. *See Natural Res. Def. Council v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020) (explaining that "a court may invalidate only some applications" of a regulation). But Association Plaintiffs make no attempt to show that the non-competes they use fall within that hypothetical set and thus have not demonstrated any entitlement to relief even assuming the correctness of their statutory argument.

[6] Association Plaintiffs' citation to *Boise Cascade Corp. v. FTC*, 637 F.2d 573 (9th Cir. 1980), which involved an adjudication, is irrelevant. *Boise Cascade* held that "the mere widespread use" by petitioner of a pricing practice did not suffice for Section 5 liability—it did not speak to whether the Commission can consider the economy-wide impact of non-competes and how their use, both individually and broadly, results in significant anticompetitive effects. *See id.* at 582.

Association Plaintiffs also invoke a specific doctrinal framework—a showing that the conduct (1) produces anticompetitive effects that (2) are not offset by procompetitive benefits, *see* Association Mot. 20—that does not apply here. That is a partial description of the "rule of reason," which applies to some Sherman Act claims. But the FTC Act was specifically enacted to supplement the Sherman Act and the rule of reason, and the Supreme Court has repeatedly affirmed that Section 5 reaches conduct that would not itself violate the Sherman Act. *Motion Picture Advert. Serv. Co.*, 344 U.S. at 394-95. Association Plaintiffs' cases applying the rule of reason to adjudications thus have no relevance here. *See Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021); *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 354-55, 363-70 (5th Cir. 2008).

Association Plaintiffs' citations to cases involving specific non-competes are similarly inapposite. In *Bradford v. New York Times Co.*, the court (in dicta) observed that courts had not recognized non-competes as a per se—i.e., automatic—violation of the Sherman Act, a more stringent mode of analysis than the rule of reason. 501 F.2d 51, 59 (2d Cir. 1974). Likewise, in *Snap-On Tools Corp. v. FTC*, the court (again in dicta and again applying Sherman Act principles) noted that it was not "prepared to say" that the non-compete agreement at issue was per se invalid. 321 F.2d 825, 837 (7th Cir. 1963). These cases say nothing about the Commission's ability to regulate non-competes through a rulemaking under the FTC Act.

27

In any event, the Commission *did* thoroughly consider possible procompetitive justifications of non-competes, ultimately concluding that the harm outweighed any benefits. The Commission examined commonly cited business justifications and found that employers have alternatives to non-competes—whether considered individually or in the aggregate—that burden competition to a lesser degree while still protecting investments. 89 Fed. Reg. at 38,421-433. The Commission further considered the possible procompetitive justifications in the aggregate and concluded that they "do not justify the harms from non-competes … because the evidence indicates that increasing enforceability of non-competes has a net negative impact along a variety of measures," *id.* at 38,433; *see also id.* at 38,393 (new business formation); *id.* at 38,395-97 (innovation); *id.* at 38,409 (how non-competes with senior executives affect competition). The Commission's quantitative cost-benefit analysis also supported its determination that the Rule "has substantial benefits that clearly justify the costs." *Id.* at 38,490.

Association Plaintiffs are also incorrect to suggest that, since the Founding, non-competes have been a "common and well-accepted business practice" that fall under the exclusive province of the states. Association Mot. 21. Plaintiffs' suggestion that the federal government is precluded from regulating certain business practices under the Act simply because state law may also address those practices is contrary to law. *See Peerless Prods., Inc. v. FTC*, 284 F.2d 825, 827 (7th Cir. 1960) (federal government can regulate unfair business practices "even if the activities or industries have been the subject of legislation by a state"). As described, *supra*, Background Part II.A, courts have

invalidated non-competes for centuries, and non-competes have also long been subject to federal antitrust laws. Indeed, it is commonplace for antitrust law to involve overlapping jurisdiction between states and the federal government. *See, e.g.*, LA Rev Stat § 51:1405 (2023); N.Y. Gen. Bus. Law §§ 340 *et seq.*

### C. Congress Lawfully Delegated Authority to the Commission.

Plaintiffs' nondelegation challenges lack merit. The nondelegation doctrine requires that Congress articulate "an intelligible principle" to guide the agency. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). That standard is "not demanding." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020). It stems from the "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989). The Supreme Court has only twice found a congressional delegation of power unconstitutional, and only because "Congress had failed to articulate any policy or standard" to confine the agency's discretion. *Gundy v. U.S.*, 588 U.S. 128, 130 (2019) (plurality opinion).

Section 5's directive that the Commission prevent "unfair methods of competition in or affecting commerce," 15 U.S.C. § 45(a), easily meets the intelligible-principle test. For decades, the Supreme Court has approved of Congress's delegation of authority to the Commission to regulate "unfair methods of competition." *E.g.*, *Texaco*, 393 U.S. at 225; *Brown Shoe*, 384 U.S. at 320. The Court has described the

meaning of the phrase "unfair methods of competition" as "obvious": "[T]he word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors." *FTC v. Raladam Co.*, 283 U.S. 643, 649 (1931). This standard is not nearly as sweeping as other delegations previously upheld by the Supreme Court, such as the authority to set "fair and equitable" prices, *Yakus v. U.S.*, 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" require, *Nat'l Broad. Co. v. U.S.*, 319 U.S. 190, 225-26 (1943); to allow railroad acquisitions in the "public interest," *N.Y. Cent. Secs. Corp. v. U.S.*, 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health[,]" *Whitman*, 531 U.S. at 472.

Further, the Fifth Circuit has instructed that in analyzing a nondelegation claim, courts should consider" the statute's "purpose," its "factual background[,] and the statutory context" in addition to the text. *Big Time Vapes*, 963 F.3d at 443. Congress enacted the FTC Act "to supplement and bolster" the Sherman and Clayton Acts, and courts have interpreted the meaning of unfair methods of competition accordingly. *Motion Picture Advert. Serv. Co.*, 344 U.S. at 394-95; *see also supra*, Background Part I.A. *A.L.A. Schechter Poultry Corp. v. United States* further underscores the validity of the Act's delegation. 295 U.S. 495 (1935). The Court there contrasted the National Industrial Recovery Act's impermissible delegation to regulate "fair competition" with the

30

permissible delegation in the Act to regulate "unfair methods of competition." *Id.* at 531-36. Even though the latter was also "an expression new in the law" without "precise definition," the Commission could determine what constituted "unfair methods of competition" "in the light of particular competitive conditions and of what is found to be a specific and substantial public interest." *Id.* at 532-33.

Contrary to Ryan's claims, Ryan Mot. 22-23, the *Schechter* Court also disclaimed reliance on the Commission's function as a quasi-judicial body, stating that "the difference between the code plan of the Recovery Act and the scheme of the [FTC] Act lies not only in procedure but in subject matter." *Schechter*, 295 U.S. at 533-34. The Court understood the phrase "fair competition" as having "a much broader range and a new significance" than "unfair methods of competition." *Id.* at 534. Ryan identifies no case supporting its novel theory that a statutory phrase can constitute a lawful delegation in the context of adjudication but an unlawful delegation with respect to rulemaking.

Ryan also contends that the Commission's identification in the Section 5 Policy Statement of specific criteria it will consider when determining whether a method of competition is unfair shows Section 5 lacks an intelligible principle. *See* Ryan Mot. 23. But agencies frequently elaborate on statutory standards without raising a nondelegation issue, and the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75. Further, while Ryan contends that the fact that States have upheld non-competes in the past suggests Congress has not

offered an intelligible principle here, courts have "rejected the argument that a practice, legal under local law, could not be banned under Section 5." *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976). Finally, constitutional avoidance does not apply here, because the Commission has clear rulemaking authority. *See supra*, Section I.A.

### D. The Act's Removal Restrictions Are Lawful.

As Ryan concedes, Ryan Mot. 25 n.4, the Fifth Circuit's recent decision in *Illumina, Inc. v. FTC* forecloses the challenge to the Act's removal restrictions. 88 F.4th 1036, 1047 (5th Cir. 2023) ("[W]hether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer."). Even if that were not the case, this challenge would fail because Ryan has failed to show any harm from the Commissioners' tenure protection. *See Collins v. Yellen*, 141 S. Ct. 1761, 1781 (2021).

### E. The Rule Is Not Unlawfully Retroactive.

A regulation operates retroactively where it "alters the *past* legal consequences of past actions." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006). By contrast, agency action "that only upsets expectations based on prior law"—"but has not rendered past actions illegal or otherwise sanctionable"—"is not retroactive." *Nat'l Cable & Telecommc'ns Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) ("*National Cable*").

Under that well-established framework, the Rule is not retroactive, because it does not impose "past legal consequences" for any conduct predating its effective date. Rather, it renders certain existing contractual terms prospectively unenforceable and

restricts conduct in the future. Those are commonplace effects of changes in the law. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 n.24 (1994). The D.C. Circuit's analysis in *National Cable* is on all fours with this case. The regulation challenged there prohibited cable companies from both "enforcing existing exclusivity contracts" and "executing … new ones," finding that such contracts were unfair methods of competition. 567 F.3d at 662. The court explained that the rule was not retroactive, because while it "impaired the future value of past bargains," it did not impose any liability based on those bargains. *Id.* at 670.[7] Association Plaintiffs' cursory argument that the Rule implicates the Fifth Amendment also lacks merit. *See* Association Mot. 24-25. Their sole authority for that contention, *Eastern Enterprises v. Apfel*, 524 U.S. 498, 534 (1998), involved a statute that imposed "substantial and … far reaching" financial liabilities for events decades in the past, thereby "divesting [the plaintiff] of property long after [it] believed [those] liabilities … to have been settled." The Rule, by contrast, does not divest Plaintiffs of any property, imposes no financial penalties, and has purely prospective effect.

### F. The Rule Is Not Arbitrary and Capricious.

In applying the APA's arbitrary-and-capricious standard, a court's role is limited to "ensur[ing] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the

---

[7] The Rule preserves an employer's ability to pursue causes of action for non-compete violations that accrued before the effective date. 89 Fed. Reg. at 38,439 (29 C.F.R. § 910.3(b)).

decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Commission's decision to adopt a bright-line prohibition against non-competes—subject to a narrow exception for existing non-competes binding senior executives—readily satisfies this standard.

Association Plaintiffs' counterarguments are unpersuasive. *See* Association Mot. 25-30. First, they fault the Commission for relying on data from States whose regulatory approach is more permissive than the approach that the Rule adopts. *See id.* at 26, 29. This argument proceeds from the mistaken premise that an agency cannot adopt a policy without empirical evidence drawn from another jurisdiction that has already adopted that identical policy. Rather, an agency is entitled to "ma[ke] a reasonable predictive judgment based on the evidence it ha[s]." *Prometheus Radio Project*, 592 U.S. at 427.

Here, the Commission thoroughly explained how the evidence on which it relied supports the conclusions drawn. For example, regarding earnings effects, the Commission noted that "the most comprehensive study" found that "the effects of changes in non-compete enforceability are broadly linear," and thus it would be reasonable to "extrapolate" that "larger changes will lead to larger effects." 89 Fed. Reg. at 38,385. Nevertheless, the Commission "follow[ed] a conservative approach" and assumed only that the Rule "will have the same effects on earnings as the incremental legal changes observed" in cited studies. *Id.* Thus, "if anything," the Commission's analysis "underestimates the benefits of the [R]ule." *Id.*

Association Plaintiffs also are mistaken to contend that the Commission relied principally on studies that "compared different States' approaches to enforcing non-competes on particular facts." Association Mot. 26, 29. Rather, the Commission placed limited weight on such State-to-State comparisons, precisely because they are generally less probative of causation than before-and-after analysis of a given State's change in approach to non-competes. 89 Fed. Reg. at 38,373-74; *see, e.g.*, *id.* at 38,382.

Plaintiffs also fail to establish that the Rule likely was arbitrary and capricious in adopting a bright-line rule, rather than a case-by-case, multi-factor standard. *See* Association Mot. 26-27. The Commission offered compelling justifications supporting that decision: "[r]esearch demonstrates that employers maintain non-competes even where they likely cannot enforce them," and "the degree to which non-competes inhibit worker mobility is affected not only by whether a non-compete is actually enforceable but also on whether a worker believes their employer may enforce it." 89 Fed. Reg. at 38,458. Relatedly, a categorical rule "provide[s] all market participants," including businesses, "greater clarity" than a piecemeal approach. *Id.* at 38,462-63. Further, case-by-case adjudication is insufficient because "many workers cannot afford to litigate their non-competes," and an unreasonably broad non-compete may expire before a court can rule on its validity. *Id.* at 38,463-64. And rulemaking, unlike case-by-case adjudication, addresses "negative externalities" of non-competes "on other workers, other firms, consumers, and the economy." *Id.* at 38,462-63.

35

This analysis readily satisfies the APA's demands. Even where agencies employ "bright-line rules" solely "for reasons of administrative convenience"—without the other benefits that the Commission identified here—they satisfy "the APA's deferential arbitrary-and-capricious standard, … so long as those rules fall within a zone of reasonableness and are reasonably explained." *Emily's List v. FEC*, 581 F.3d 1, 22 n.20 (D.C. Cir. 2009) (Kavanaugh, J.). There accordingly is no basis for Plaintiffs' suggestion that the Commission can adopt a categorical rule only if a case-by-case approach would yield identical results. *See* Association Mot. 26-27.

Additionally, the Commission adequately justified its decision not to create additional exceptions to the Rule. *See* 89 Fed. Reg. at 38,371 (independent contractors), *id.* at 38,412-13 (severance agreements); *id.* at 38,402-04 (existing non-competes for non-senior executives); *id.* at 38,458-59 (a rebuttable presumption against non-competes); *id.* at 38,447-51 (healthcare workers); *contra* Association Mot. 28. Conversely, the Commission clearly stated that the Rule does not apply to concurrent-employment restrictions ("moonlighting" restrictions) and does not change the law governing non-solicitation agreements. 89 Fed. Reg. at 38,368, 38,444.

Association Plaintiffs also challenge the reasonableness of the Commission's cost-benefit analysis, *see* Association Mot. 29-30, but the Act precludes judicial review of "[t]he contents and adequacy of" that regulatory analysis. 15 U.S.C. § 57b-3(c)(1). Although the Act requires the Commission to "issue a final regulatory analysis" for all final rules, it bars "any judicial review" of that analysis. *Id.* § 57b-3(b)(2), (c)(1).

In any event, Association Plaintiffs' objections to the cost-benefit analysis lack merit. For example, the Commission did not "wave[] away" the possibility that trade secret litigation expenses may increase as a result of the Rule. Association Mot. 29. Rather, it found that overall litigation costs "may rise or fall," depending on firms' subsequent use of other contractual provisions and trade secret law and how the costs of related litigation compare to the decrease in costs of non-compete litigation, given the decreased uncertainty associated with a bright-line rule on non-competes. 89 Fed. Reg. at 38,470-71. As discussed, the Commission drew reasonable conclusions from available data and explained how the data supported those conclusions. *Contra* Association Mot. 29-30. And the Commission explained that the Rule does not prevent employers from using "garden-variety NDAs" (non-disclosure agreements) to safeguard their sensitive business information; it "prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business." 89 Fed. Reg. at 38,426, 38,444; *contra* Association Mot. 29. The Commission also thoroughly addressed the study discussed in the comment submitted by professors including Dr. Acri. *Compare* FTC-2023-0007-21045, *available at* https://perma.cc/UR3S-R372, *with* 89 Fed. Reg. at 38,397-98 & n.583. Finally, Plaintiffs offer no support for their assertion that economic analysis of data from 2009 or 2014 is too "stale" to be useful. Association Mot. 30.

## II.   PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM.

Plaintiffs' failure to establish a likelihood of success on the merits is a sufficient

basis to deny their motions. *See, e.g.*, *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024).

In any event, Plaintiffs also fail to establish that a preliminary injunction is necessary to

prevent imminent, irreparable harm.

For example, Association Plaintiffs argue that their members face irreparable

harm absent a stay or injunction because "[p]arties that currently rely on noncompetes

will be forced to choose between terminating those agreements or risking an

enforcement action." Association Mot. 4-5. But it is well established that "[m]ere

litigation expense, even substantial and unrecoupable cost, does not constitute

irreparable injury." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 375 (5th Cir.

2023). And this alleged harm is not attributable to the Rule, because the Commission

may undertake an enforcement action against those same entities pursuant to Section 5

even without the Rule in place. In any event, any harm that arises from Plaintiffs' own

choice to violate the Rule would constitute "self-inflicted" injury, which "does not

qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam).

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION.

Finally, the balance of equities and public interest weigh markedly in Defendant's

favor. Plaintiffs mistakenly conflate their merits arguments with the distinct

requirement to demonstrate that the balance of equities and public interest tip in their

favor. They characterize the Rule as "unlawful agency action" and proceed to argue that there is no public interest in its enforcement. Ryan Mot. 27; Association Mot. 31. Conversely, whenever the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Thus, Plaintiffs' framing would collapse the merits prong of the preliminary injunction standard with the equities and public interest factors. But the Supreme Court has made clear that a likelihood of success on the merits, standing alone, is not a sufficient basis for that extraordinary remedy. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 26 (2008) (reversing the lower courts' entry of a preliminary injunction on the ground "that the balance of equities and consideration of the overall public interest" weighed in favor of the government). Thus, even if Plaintiffs had established a likelihood of success on the merits—which they have not—the Court still should deny their preliminary injunction motions on the distinct ground that they fail to meaningfully address the remaining requirements, much less establish that they weigh in Plaintiffs' favor.

Indeed, Plaintiffs make no effort to establish that any costs they may incur outweigh the Rule's expected benefits. Those benefits include increasing new business formation by 2.7%; spurring innovation, including by leading to over 100,000 new patents over the next decade and by increasing patent value; increasing wages by $524 annually for the average worker; decreasing healthcare spending by between $74 billion and $194 billion over the next decade; and protecting the fundamental freedom of

workers to pursue employment. 89 Fed. Reg. at 38,433, 38,476-77, 38,506. For that reason alone, Plaintiffs fail to satisfy the requirements for a stay or preliminary injunction.

## IV.   ANY RELIEF SHOULD BE TAILORED.

If the Court determines that emergency relief is warranted, any injunction or stay should be limited to the extent necessary to redress Plaintiffs' injuries. Under Article III's case-or-controversy requirement, a court may grant relief only insofar as it remedies "the inadequacy that produced [a plaintiff's] injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018). Reinforcing that constitutional limitation is the traditional equitable principle that an injunction must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). These principles apply equally to Plaintiffs' request for a stay of the Rule's effective date under 5 U.S.C. § 705, which likewise limits relief "to the extent necessary to prevent irreparable injury." *See also Labrador v. Poe,* 144 S. Ct. 921, 923, 925-28 (2024) (Gorsuch, J., concurring) (documenting the significant legal and practical problems with nonparty relief generally and universal injunctions specifically). And narrow tailoring is especially important here because the Rule's severability provisions make clear that the Commission intended the Rule to remain in effect to the maximum extent possible if any portion is held "invalid or unenforceable" or is "stayed." 89 Fed. Reg. at 38,505 (§ 910.5).

Finally, with respect to Association Plaintiffs, any relief should be limited to their identified members for the same constitutional, equitable, and practical reasons. Moreover, none of those Plaintiffs have properly demonstrated that they have the authority to litigate claims on behalf of their millions of anonymous businesses, or that those businesses have agreed to be bound by any judgment. *See Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997).

## CONCLUSION

Plaintiffs' motions for a stay of effective date and preliminary injunction should be denied.

Dated: May 29, 2024                  Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

LESLEY R. FARBY
Assistant Branch Director

*/s/ Rachael L. Westmoreland*
RACHAEL L. WESTMORELAND
(GA Bar No. 539498)
TAISA M. GOODNATURE
MADELINE M. MCMAHON
ARJUN MODY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-1280
E-mail:
rachael.westmoreland@usdoj.gov

## CERTIFICATE OF WORD COUNT

This document complies with the Court's word count requirement, as amended

by the Court's May 10, 2024 Order, ECF No. 42, because it contains 9993 words.

Dated: May 29, 2024                     _/s/ Rachael L. Westmoreland_
                                        RACHAEL L. WESTMORELAND (GA Bar
                                        No. 539498)
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, D.C. 20005
                                        Tel: (202) 514-1280
                                        E-mail: rachael.westmoreland@usdoj.gov

## CERTIFICATE OF SERVICE

On May 29, 2024, I electronically filed the above response with the clerk of court for the U.S. District Court, Northern District of Texas. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Rachael L. Westmoreland*

Rachael L. Westmoreland