UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RYAN, LLC,

         Plaintiff,

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA, et al.,

         Plaintiff-Intervenors,

         v.

FEDERAL TRADE COMMISSION,

         Defendant.

No. 3:24-cv-00986-E

**BRIEF OF AMICI CURIAE PUBLIC CITIZEN AND
NATIONAL EMPLOYMENT LAW PROJECT
IN SUPPORT OF DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTIONS FOR STAY OF EFFECTIVE DATE AND
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. ii

INTEREST OF AMICI CURIAE ............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT........................................2

ARGUMENT ...........................................................................................................3

I.      The Rule significantly benefits workers, including low-wage workers..........3

        A. Noncompete provisions are prevalent in employment contracts,
           including for low-wage workers..................................................................3

        B. Noncompetes are often imposed without meaningful consent. ...............5

        C. Noncompetes harm workers....................................................................8

            1.  Noncompetes reduce wages and job mobility for all workers............. 8

            2.  Noncompetes impose significant harms on low-wage workers..........11

II.     The Rule does not operate retroactively. ...................................................... 16

CONCLUSION......................................................................................................19

CERTIFICATE OF WORD COUNT.....................................................................20

CERTIFICATE OF SERVICE ..............................................................................20

i

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*FDIC v. Faulkner*,
   991 F.2d 262 (5th Cir. 1993) .......................................................................... 17

*Hartford Casualty Insurance v. FDIC*,
   21 F.3d 696 (5th Cir. 1994) ............................................................................ 17

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994) .................................................................................. 16, 17

*Lopez Ventura v. Sessions*,
   907 F.3d 306 (5th Cir. 2018) .......................................................................... 16

*Mobile Relay Associates v. FCC*,
   457 F.3d 1 (D.C. Cir. 2006) ............................................................................ 17

*National Cable & Telecommuncations Ass'n v. FCC*,
   567 F.3d 659 (D.C. Cir. 2009) ........................................................................ 17

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
   202 F.3d 489 (2d. Cir. 2000) .......................................................................... 18

*United States v. Trans-Missouri Freight Ass'n*,
   166 U.S. 290 (1897) ........................................................................................ 18

*Viacom Inc. v. Ingram Enterprises, Inc.*,
   141 F.3d 886 (8th Cir. 1998) .......................................................................... 18

## Regulatory Materials

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024).................... *passim*

Comments on Non-Compete Clause Rule, Notice of Proposed Rulemaking,
  https://www.regulations.gov/docket/FTC-2023-0007/comments.................. 4

  American Federation of Labor and Congress of Industrial Organizations
  (AFL-CIO), FTC-2023-0007-21103,
  Comment Letter (Apr. 19, 2023) ...................................................................... 5

  Center for Law and Social Policy, FTC-2023-0007-20946,
  Comment Letter (Apr. 18, 2023) ........................................................... 14, 15

  Justice at Work Pennsylvania, FTC-2023-0007-19417,
  Comment Letter (Apr. 17, 2023) ................................................................ 7, 8

  The Leadership Conference on Civil and Human Rights,
  FTC-2023-0007-21100, Comment Letter (Apr. 19, 2023) ............... 7, 14, 16

  The Legal Aid Society, FTC-2023-0007-20967,
  Comment Letter (Apr. 17, 2023) ......................................................... 5, 7, 13

  Mobilization for Justice, FTC-2023-0007-19361,
  Comment Letter (Apr. 17, 2023) ................................................................... 7

  National Employment Law Project, FTC-2023-0007-20862,
  Comment Letter (Apr. 19, 2023) ............................................ 6, 9, 10, 11, 13

  Public Justice Center, FTC-2023-0007-20893,
  Comment Letter (Apr. 3, 2023) ............................................................... 8, 15

  Public Rights Project, FTC-2023-0007-20926,
  Comment Letter (Apr. 14, 2023), ............................................................... 14

  18 State Attorneys General, FTC-2023-0007-21043,
  Comment Letter (Apr. 19, 2023) .................................. 4, 6, 8, 11, 12, 13, 14

  Texas RioGrande Legal Aid, FTC-2023-0007-21014,
  Comment Letter (Apr. 19, 2023) ......................................................... 12, 14

## Articles

Natarajan Balasubramanian et al., *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403 ........................... 4

Natarajan Balasubramanian et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349 (Apr. 2022), https://jhr.uwpress.org/content/wpjhr/57/S/S349.full.pdf ...................... 9, 10

Tyler Boesch et al., Federal Reserve Bank of Minneapolis, *Non-compete contracts sideline low-wage workers* (Oct. 15, 2021), https://www.minneapolisfed.org/article/2021/non-compete-contracts-sideline-low-wage-workers ........................................................... 3, 6, 11, 12

Alexander Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete agreements* (2019), https://www.epi.org/publication/noncompete-agreements/ ......................... 4

Jane Flanagan, *No Exit: Understanding Employee Non-Competes and Identifying Best Practices to Limit Their Overuse*, Am. Const. Soc'y (Nov. 2019), https://www.acslaw.org/wp-content/uploads/2019/11/Understanding-Employee-Non-Competes-and-Identifying-Best-Practices-to-Limit-Their-Overuse.pdf ............................... 5

Matthew S. Johnson et al., *The Labor Market Effects of Legal Restrictions on Worker Mobility* (Nat'l Bureau of Econ. Research, Working Paper No. 31929, 2023)....................................................... 9, 10, 11

Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2022)............................... 9, 10

Matt Marx & Ryan Nunn, *The Chilling Effect of Non-compete Agreements*, The Hamilton Project (May 20, 2018), https://www.hamiltonproject.org/publication/post/the-chilling-effect-of-non-compete-agreements/ ...................................................................... 13

Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indus. & Labor Rel. Rev. 783 (2019)........... 8

Evan Starr et al., *Noncompete Agreements in the US Labor Force*,
    64 J.L. & Econ. 53 (2021) .................................................................. 3, 5, 6, 7

# INTEREST OF AMICI CURIAE

Amicus curiae Public Citizen is a nonprofit consumer advocacy organization with members in all 50 states. Among other things, Public Citizen works for enactment and enforcement of laws to protect workers, consumers, and the public, including federal agency efforts to administer and enforce worker protections. Public Citizen frequently appears as amicus curiae to address issues of statutory interpretation and administrative law. In response to the FTC's notice of proposed rulemaking and request for comment, Public Citizen submitted a comment in support of the proposed rule.

Amicus curiae National Employment Law Project (NELP) is a nonprofit organization with over 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. In collaboration with community partners, including grassroots groups, national organizations, worker centers and unions, and local, state, and federal agencies, NELP seeks to ensure that all employees—especially the most vulnerable—can take advantage of the basic workplace protections guaranteed in our nation's labor and employment laws. In response to the FTC's notice of proposed rulemaking and request for comment, NELP submitted a comment in support of the proposed rule.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Noncompete clauses in employment contracts are prevalent throughout the United States, including in employment contracts for low-wage workers. In promulgating its Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024), the Federal Trade Commission (FTC) determined that approximately one in five workers in the United States is subject to a noncompete. For workers earning $20 per hour or less, approximately 12 percent are subject to a noncompete restriction.

The Rule's prohibition of noncompete clauses will significantly benefit workers. Noncompete provisions lower wages and reduce workers' job mobility, as numerous economic studies demonstrate. According to one study in the rulemaking record, rendering noncompete provisions unenforceable nationwide would increase wages by up to 14 percent for all workers. In addition, as the record shows, these provisions are often imposed by employers on workers without meaningful consent. For low-wage workers, who often lack bargaining power and access to legal resources, the consequences of a noncompete provision can impose particular hardship, making it difficult to leave underpaid and even harmful work environments.

The motions for stay of the Rule's effective date and preliminary injunction filed by Plaintiff and Plaintiff-Intervenors (collectively, Plaintiffs) should be denied because their challenges to the Rule are not likely to succeed. The Rule has a strong

basis in the record. And contrary to Plaintiff-Intervenors' contention, the Rule is not impermissibly retroactive because it does not impose legal consequences for conduct predating the Rule's effective date. That the Rule may upset expectations about the enforceability of pre-existing noncompete provisions does not make the Rule retroactive.

## ARGUMENT

### I.    The Rule significantly benefits workers, including low-wage workers.

#### A. Noncompete provisions are prevalent in employment contracts, including for low-wage workers.

Noncompete provisions are used widely throughout the United States. The FTC "estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete." 89 Fed. Reg. at 38,343. According to a leading study analyzing nationally representative survey data for 11,505 workers, "38.1 percent of [United States] labor force participants have agreed to a noncompete at some point in their lives and … 18.1 percent, or roughly 28 million individuals, currently work under one." Evan Starr et al., *Noncompete Agreements in the US Labor Force*, 64 J.L. & Econ. 53, 60 (2021) (footnote omitted), *cited in* 89 Fed. Reg. at 38,346 n.68.

Low-wage workers are subject to noncompete provisions on a widespread basis. 89 Fed. Reg. at 38,343. For example, an analysis of 2017–2018 survey data from the Bureau of Labor Statistics found that "[a]mong low- and moderate-income

workers, more than one in ten reported having a non-compete contract." Tyler Boesch et al., Fed. Reserve Bank of Minn., *Non-compete contracts sideline low-wage workers* (Oct. 15, 2021), https://www.minneapolisfed.org/article/2021/non-compete-contracts-sideline-low-wage-workers, *cited in* 18 State Attorneys General (State AGs), FTC-2023-0007-21043, Comment Letter 4 n.17 (Apr. 19, 2023). In addition, the analysis found that "[o]f workers earning $20 per hour or less, 12 percent reported having a noncompete contract in their current or most recent job." *Id*.[1]

According to another study in the rulemaking record, approximately 30 percent of businesses have subjected all their workers making $17 per hour or less to noncompete provisions. Alexander Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete agreements* (2019), https://www.epi.org/publication/noncompete-agreements/ (analyzing 2017 data from a national survey), *cited in* 89 Fed. Reg. at 38,346 at n.65. And a study surveying nearly 70,000 workers found that approximately 17 percent of food preparation and service workers, approximately 19 percent of building and grounds cleaning and maintenance workers, and approximately 20 percent of transportation and materials-moving workers have signed noncompetes. *See* Natarajan Balasubramanian et al., *Employment*

---

[1] The comments received by the FTC in response to its Notice of Proposed Rulemaking are available at https://www.regulations.gov/docket/FTC-2023-0007/comments.

*Restrictions on Resource Transferability and Value Appropriation from Employees* 47 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403, *cited in* 89 Fed. Reg. at 38,345 n.74. Noncompete agreements are also imposed on "home health aides, dance instructors, and nail salon workers," The Legal Aid Society, FTC-2023-0007-20967, Comment Letter 5 (Apr. 17, 2023), as well as "camp counselors, unpaid interns, and doggy daycare workers," American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), FTC-2023-0007-21103, Comment Letter 10 (Apr. 19, 2023).

Moreover, "employers frequently impose non-competes even when they are unenforceable under State law." 89 Fed. Reg. at 38,377. Indeed, "employers use noncompetes virtually as often in states where such restrictions are clearly unenforceable." Starr et al., *Noncompete Agreements in the US Labor Force*, *supra* p. 3, at 81. This evidence suggests that "employers may be seeking to take advantage of workers' lack of knowledge of their legal rights; or that workers are unable to enforce their rights through case-by-case litigation." 89 Fed. Reg. at 38,343.

**B. Noncompetes are often imposed without meaningful consent.**

The suggestion that noncompetes are "bargain[ed]" agreements, Plaintiff-Intervenors' Br. 1 (ECF No. 47), "is largely legal fiction." Jane Flanagan, *No Exit: Understanding Employee Non-Competes and Identifying Best Practices to Limit Their Overuse*, Am. Const. Soc'y (Nov. 2019), https://www.acslaw.org/wp-

content/uploads/2019/11/Understanding-Employee-Non-Competes-and-Identifying-Best-Practices-to-Limit-Their-Overuse.pdf, *cited in* State AGs, FTC-2023-0007-21043, Comment Letter 7 n.42. Evidence in the record shows that for workers who are not senior executives, noncompetes are often "unilaterally imposed" by the employer, "without meaningful negotiation or compensation." 89 Fed. Reg. at 38,375; *see also* Boesch et al., *supra* p. 3 (finding that workers "rarely negotiate over non-competes and frequently misunderstand whether and to what extent their non-competes are enforceable").

A leading 2021 study shows that "employers present (or employees receive) non-compete proposals as take-it-or-leave-it propositions," where workers must either sign the noncompete or reject the job. Starr et al., *Noncompete Agreements in the US Labor Force*, *supra* p. 3, at 72. Indeed, "only 10 percent of employees report attempting to negotiate over the terms of their noncompete or asking for additional compensation or benefits in exchange for agreeing to such an employment condition." *Id*. at 71. Rather, "[w]hen presented with a noncompete, most respondents report just reading and signing it, with a nontrivial fraction not even reading it." *Id.* at 71–72. Numerous comments from workers and worker advocacy groups confirm these findings, "attest[ing] [that] non-competes are often included in standard-form contracts and offered on a take-it-or-leave-it basis." 89 Fed. Reg. at 38,460; *see* National Employment Law Project (NELP), FTC-2023-0007-20862,

Comment Letter 2 (Apr. 19, 2023) ("Far from an agreement negotiated at arm's length, [noncompetes] have become a routine condition of employment for many."); *see also* The Legal Aid Society, FTC-2023-0007-20967, Comment Letter 2; Mobilization for Justice, FTC-2023-0007-19361, Comment Letter 1 (Apr. 17, 2023); Justice at Work Pennsylvania, FTC-2023-0007-19417, Comment Letter 3 (Apr. 17, 2023); The Leadership Conference on Civil and Human Rights, FTC-2023-0007-21100, Comment Letter 1 (Apr. 19, 2023).

In addition, many workers are presented with a noncompete only *after* they have accepted the job offer. According to one study, "approximately 30 percent [of workers] first learn they will be asked to agree only after they have already accepted their offers." Starr et al., *Noncompete Agreements in the US Labor Force*, *supra* p. 3, at 69. Of those who learned about the noncompete after accepting their job offer, "26 percent report that if they had known about their employer's noncompete plans earlier, they would have reconsidered accepting the offer." *Id.* Comments from workers confirmed that "they did not receive notice that they would be required to sign a non-compete until after accepting a job offer." 89 Fed. Reg. at 38,377. Further, "[m]any workers … stated that non-competes are often hidden or obscured," for example, by being "buried in other paperwork or confusingly worded or vague." *Id.* Commenters also described noncompetes that were written in English but imposed on workers with limited English proficiency, without any accompanying translation;

the workers thus did not "fully understand[] the implications" of the noncompetes. Justice at Work Pennsylvania, FTC-2023-0007-19417, Comment Letter 3; *see* Public Justice Center, FTC-2023-0007-20893, Comment Letter 2 (Apr. 3, 2023).

### C. Noncompete provisions harm workers.

#### 1.   Noncompetes reduce wages and job mobility for all workers.

Noncompete provisions suppress wages and reduce job mobility for all workers. As a comment submitted on behalf of 18 state attorneys general stated, "[r]esearchers have found that where states have passed ... laws [banning noncompetes], workers across all income strata experience gains in wages and job mobility." State AGs, FTC-2023-0007-21043, Comment Letter 3. By contrast, "in states where non-competes are more enforceable, all workers, including those who have not signed non-competes, experience relatively reduced job mobility and lower wages compared to states where non-competes are less enforceable." *Id.*

For example, a 2019 study cited by the FTC found that wages were four percent higher in states that do not enforce noncompetes as compared to states with average levels of enforceability. *See* Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indus. & Labor Rel. Rev. 783, 785 (2019), *cited in* 89 Fed. Reg. at 38,381 n.445. Another study cited by the FTC similarly found, based on data from all 50 states and the District of Columbia from 1991 and 2014, that "[m]oving from the 25th to the 75th percentile in enforceability

is associated with an approximately 2% decrease in the average worker's earnings." Matthew S. Johnson et al., *The Labor Market Effects of Legal Restrictions on Worker Mobility* 3 (Nat'l Bureau of Econ. Research, Working Paper No. 31929, 2023), *cited in* 89 Fed. Reg. at 38,373 n.388. According to that study, extrapolating its results suggests that "rendering [noncompetes] unenforceable nationwide would increase average earnings among *all* workers by 3.2% to 14.2%." *Id.*

Case studies of state laws banning noncompetes for certain workers are illustrative. A study analyzing an Oregon law banning noncompetes for hourly and low-wage workers found that the ban "increased hourly wages by 2.2%–3.1% on average, with effects as great as 6% over a seven-year period." Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022), *cited in* 89 Fed. Reg. at 38,346 n.72. Similarly, a study examining Hawaii's law banning noncompetes for technology workers found that the law increased monthly earnings by 4.2 percent for those workers. *See* Natarajan Balasubramanian et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (Apr. 2022), *cited in* 89 Fed. Reg. at 38,381 n.452.

Noncompetes also reduce worker mobility, thereby "damaging … the overall job market." NELP, FTC-2023-0007-20862, Comment Letter 3. More specifically, noncompetes "often prevent workers from taking jobs in their field of expertise[,]

9

… forc[ing] many workers to remain in a job in which they are less productive and end up being paid less than what workers could obtain in the broader job market." *Id.* (footnote omitted). Thus, the record shows that "across the board, studies of non-competes and labor mobility find decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within-industry and between-industry mobility." 89 Fed. Reg. at 38,380.

For example, the study of data from 1991 to 2014 found that "moving from the 25th to the 75th percentile of [noncompete] enforceability" decreases within-industry job mobility by nearly 6 percent in industries that use noncompetes at a high rate. Johnson et al., *supra* p. 9, at 20. Case studies of specific states show even greater increases in job mobility: After Oregon banned noncompetes for hourly workers, "mobility increased by 17.3%." 89 Fed. Reg. at 38,381 (citing Lipsitz & Starr, *supra* p. 9). Hawaii's ban on noncompetes for high-tech workers "increased mobility by 12.5%." *Id.* (citing Balasubramanian et al., *Locked In?*, *supra* p. 9).

Women and people of color are disproportionately harmed by noncompetes. For example, as amicus NELP explained in its comment to the FTC, a 2020 study found that "the earnings of women and workers of color are reduced by twice as much as white, male workers when there is stricter noncompete enforcement." NELP, FTC-2023-0007-20862, Comment Letter 6 (citing Johnson et al., *supra* p. 9). The study concluded that "banning noncompetes would close the earnings gap

10

between white men and Black women by 4.6 percent; 5.6 percent for white women; 8.7 percent for Black men; and 9.1 percent for non-Black, non-white women." *Id.* (same).

### 2. Noncompetes impose significant harms on low-wage workers.

For low-wage workers, the imposition of noncompetes is "especially concerning." Boesch et al., *supra* p. 3. To begin with, the justification that noncompetes "protect companies' confidential information, including their trade secrets, intellectual property, and other know-how," Securities Industry & Financial Markets Ass'n et al. Amici Br. 7 (ECF No. 57), "often does not withstand scrutiny when applied to low- and middle-wage workers," State AGs, FTC-2023-0007-21043, Comment Letter 4. "[M]any workers—especially low-wage workers—do not possess important trade secrets, and even for those who do, the protections provided by trade-secrets law can be sufficient (and better targeted) to address this specific concern." Boesch et al., *supra* p. 3.

Moreover, as the FTC found and numerous commenters explained, "non-competes are exploitative and coercive" for "workers other than senior executives," including low-wage workers. 89 Fed. Reg. at 38,375. State attorneys general from across the country stated that they "have seen firsthand how non-competes and restrictive employment arrangements can substantially harm low- and middle-wage workers." State AGs, FTC-2023-0007-21043, Comment Letter 3. The imposition of

11

noncompetes on low- and middle-wage workers "is particularly troubling because such workers often lack bargaining power to negotiate the terms of their employment." *Id.* at 4. Moreover, because "low-wage workers have less access to legal advice than other workers have, … it [is] more difficult for them to enter a fair, well-informed negotiation with employers over their non-compete contracts." Boesch et al.*, supra* p. 3.

Further, the record shows that even if the noncompete is likely unenforceable, low-wage workers "generally may not be willing to file lawsuits against deep-pocketed employers to challenge their non-competes." 89 Fed. Reg. at 38,486. Low-wage workers often lack "access to legal resources to challenge the non-compete." State AGs, FTC-2023-0007-21043, Comment Letter 4; *see* 89 Fed. Reg. at 38,486 (stating that "for relatively low-paid workers, … access to legal services may be prohibitively expensive"). As a legal aid organization explained, "[l]itigation of non-compete provisions, even in cases against low-wage workers where the employer is unlikely to be successful, can be costly and lengthy endeavors." Texas RioGrande Legal Aid (TRLA), FTC-2023-0007-21014, Comment Letter 5 (Apr. 19, 2023) (explaining that the question of enforceability under state law "is an intensely fact-specific inquiry" that "turns on whether the non-compete is reasonable"); *see* State AGs, FTC-2023-0007-21043, Comment Letter 7. Accordingly, low-wage workers may be "discouraged by litigation costs even if they have cases where they are likely

to prevail—and indeed, low-income workers are likely to have meritorious cases under common law reasonableness tests." State AGs, FTC-2023-0007-21043, Comment Letter 7.

In addition, low-wage workers may be more vulnerable to "coercive methods" utilized by employers seeking to enforce noncompetes. NELP, FTC-2023-0007-20862, Comment Letter 2. For example:

> Employers send threatening cease-and-desist letters to former employees "reminding them" of their signed agreement. If an initial letter does not result in the response they want, some employers then take it a step further and call the new employer to threaten litigation.

*Id.* at 2–3. Even if the noncompete is likely unenforceable, "few employees are aware of this, and unscrupulous employers exploit their lack of knowledge … by filing lawsuits that they know they would not win if the workers were able to secure legal representation." The Legal Aid Society, FTC-2023-0007-20967, Comment Letter 5. For example, The Legal Aid Society noted a case in which an employer "promptly agreed to dismiss the action" after the organization appeared on behalf of the worker, but that "for a worker without a lawyer, such a case can cause considerable distress and expense, even if the case has no merit, not to mention the waste of judicial resources." *Id.*

The result is that "many workers simply comply with the agreements rather than risk a lawsuit, even where the agreement would not be legally enforceable." NELP, FTC-2023-0007-20862, Comment Letter 3 (citing Matt Marx & Ryan Nunn,

*The Chilling Effect of Non-compete Agreements*, The Hamilton Project (May 20, 2018), https://www.hamiltonproject.org/publication/post/the-chilling-effect-of-non-compete-agreements/). Thus, as the FTC found and commenters described, "non-competes exert a powerful in terrorem effect: they trap workers in jobs and force them to bear these harms and costs even where workers believe the non-competes are overbroad and unenforceable." 89 Fed. Reg. at 38,378; *see, e.g.*, TRLA, FTC-2023-0007-21014, Comment Letter 5–6 (discussing the "in terrorem effects" of noncompetes); State AGs, FTC-2023-0007-21043, Comment Letter 8 (same).

Those harms and costs can be devastating. "Most workers … depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and put food on the table." 89 Fed. Reg. at 38,375. Noncompetes, however, can "forc[e] workers to either stay in jobs where they are underpaid and undervalued, to change industries, … or to travel great distances to make ends meet." Center for Law and Social Policy, FTC-2023-0007-20946, Comment Letter 4 (Apr. 18, 2023). In particular, as 11 local governments, agencies, and elected officials from across the country explained, low-wage workers "lack the savings necessary to relocate, change their line of work, or survive periods of unemployment," as they would need to do if they wanted to switch jobs but were subject to a noncompete. Public Rights Project, FTC-2023-0007-20926, Comment Letter 4 (Apr. 14, 2023); *see* The Leadership Conference on Civil and Human Rights, FTC-2023-0007-21100,

Comment Letter 4 (Apr. 19, 2023) ("In order to increase wages, people … would need to change industries or move to a new area, something that many cannot afford to do.").

Noncompetes also "make it difficult to address workplace violations, which are often disproportionately higher in industries paying low wages." Center for Law and Social Policy, FTC-2023-0007-20946, Comment Letter 3. For example, commenters described noncompetes that "trap[ped] some workers in jobs where their employer commits wage and hour violations, such as wage theft." 89 Fed. Reg. at 38,388; *see* Public Justice Center, FTC-2023-0007-20893, Comment Letter 3 (describing its representation of "a group of home care workers [subject to a noncompete] whose employer … failed to pay them their earned wages, including overtime and travel-time wages, as required by federal and state law").

In addition, as the FTC found, "by diminishing workers' competitive alternatives, non-competes keep workers trapped in jobs where they experience dangerous, abusive, or toxic conditions; discrimination; sexual harassment; and other forms of harassment." 89 Fed. Reg. at 38,388; *see id.* at 38,378 (providing examples). For example, "[s]everal comments said they were unable to receive benefits because a non-compete rendered them unable to switch to a job with better benefits or rendered them unable to leave their job when their employer took their benefits away." *Id.* at 38,388. Another commenter stated that "[d]ue to stricter non-

15

compete enforcement and the fear of violating these agreements, many workers who have been or continue to be victims of sexual harassment are afraid to report it or to leave their job." The Leadership Conference on Civil and Human Rights, FTC-2023-0007-21100, Comment Letter 4.

* * *

For all these reasons, the FTC had strong factual support for its determination that noncompete provisions are unfair methods of competition that harm workers by reducing wages and impeding the ability to change jobs.

## II.    The Rule does not operate retroactively.

Plaintiff-Intervenors contend that the Rule exceeds the FTC's authority because the FTC "engage[d] in retroactive rulemaking." Pl.-Intervenors' Br. 24 (ECF No. 47). They are not likely to succeed on the merits of that claim.

A statute or regulation operates retroactively if it "attaches new legal consequences to events completed before its enactment." *Lopez Ventura v. Sessions*, 907 F.3d 306, 314 (5th Cir. 2018) (citation omitted). A law is retroactive only if it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). Importantly, a law is not retroactive simply because it "upsets expectations based in prior law." *Landgraf*, 511 U.S. at 269. Indeed, a business often will "find its

16

expectations frustrated when the law changes," but "[t]his has never been thought to constitute retroactive lawmaking." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (citation omitted); *see Landgraf*, 511 U.S. at 269 n.24. "Even when the later-occurring circumstance depends upon the existence of a prior fact, that interdependence, without more, will not transform an otherwise prospective application into a retroactive one." *FDIC v. Faulkner*, 991 F.2d 262, 266 (5th Cir. 1993) (citation omitted); *see Landgraf*, 511 U.S. at 270 n.24 (stating that a law is not retroactive "merely because it draws upon antecedent facts for its operation" (citation omitted)).

Here, the Rule does not impose liability or other legal consequences on parties who entered into or enforced noncompete provisions before the Rule's effective date. Rather, it prohibits *future* enforcement of noncompete provisions for certain workers. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 661, 670 (D.C. Cir. 2009) (holding that the application to existing contracts of an FCC regulation that "forbade cable operators not only from entering into new exclusivity contracts [with apartment building owners], but also from enforcing old ones" was not retroactive). Although the Rule may "impair[] the future value of past bargains," it has not "rendered past actions illegal or otherwise sanctionable." *Id.* at 670. Moreover, unlike the statute of limitations in *Hartford Casualty Insurance Co. v. FDIC*, 21 F.3d 696, 702 (5th Cir. 1994), which extinguished claims predating the

17

statute's enactment, the Rule does not apply to a cause of action accruing before the Rule's effective date. *See* 89 Fed. Reg. at 38,504.

Finally, Plaintiff-Intervenors are wrong that the Rule is retroactive because it "voids" or "unwind[s] private contracts" predating the Rule's effective date. Pl.-Intervenors' Br. 24. As the Supreme Court has explained, a law that does not make unlawful any act "which occurred before it was passed," but rather prohibits "continuing" to adhere to the unlawful agreement in the future, is not retroactive. *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 342 (1897) (holding that applying an antitrust law to invalidate a pre-existing contract among railroads "give[s] … the law no retroactive effect"); *see Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 502 (2d. Cir. 2000) (holding that an injunction requiring a business to relinquish a website domain that violated the Federal Trademark Dilution Act was not retroactive, although the statute was enacted after the entity had contracted to acquire that domain); *Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 889 (8th Cir. 1998) (holding application of a trademark statute to a lawsuit commenced before the statute's enactment was not retroactive, where the conduct at issue was the defendant's future conduct, "not its pre-enactment conduct").

Here, because the Rule regulates only conduct occurring *after* its effective date, it is not retroactive.

## CONCLUSION

For the foregoing reasons and those set forth by the FTC, the Court should deny Plaintiffs' motions for stay of effective date and preliminary injunction.

May 30, 2024

Respectfully submitted,

/s/ John E. Wall, Jr.
John E. Wall, Jr. (Texas Bar No. 20756750)
Law Office of John E. Wall, Jr.
5728 Prospect Avenue, Suite 1003
Dallas, TX 75206
(214) 887-0100
jwall@jwall-law.com

Wendy Liu (*pro hac vice* motion pending)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amici Curiae*
*Public Citizen and National Employment*
*Law Project*

## CERTIFICATE OF WORD COUNT

I hereby certify that pursuant to the Court's Procedures and Standing Order, this brief contains 4,031 words, excluding the case caption, table of contents, table of authorities, signature block, and certificates, but including the footnotes, as calculated by my word processing software (Microsoft Word for Office 365).

/s/ John E. Wall, Jr.
John E. Wall, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2024, I electronically filed this document using the ECF System, which will send notification to the ECF counsel of record.

/s/ John E. Wall, Jr.
John E. Wall, Jr.