RYAN, LLC,
*et al.*,

      Plaintiffs and Plaintiff-Intervenors,

v.

      Case No. 3:24-cv-986-E

FEDERAL TRADE COMMISSION,

      Defendant.

_____

**PROPOSED BRIEF OF TWELVE TEXAS LOCAL ELECTED OFFICIALS AS *AMICI CURIAE* IN OPPOSITION TO THE PENDING MOTIONS FOR STAY OF EFFECTIVE DATE OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT.................................................................................. 1

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ...... 3

STATEMENT OF ISSUES AND STANDARD OF REVIEW ..................... 3

ARGUMENT.................................................................................. 4

   I.  The FTC Appropriately Considered The Costs
And Benefits Of The Rule .................................................... 4

      A.  The FTC properly found that noncompete agreements harm
communities in several ways .......................................... 5

         1.  Noncompetes limit the creation of small businesses. ............... 5

         2.  Noncompete limit innovation .................................. 6

         3.  Noncompete interfere with patient care ................................. 8

         4.  Noncompetes restrict wages ..................................... 9

      B.  The FTC properly recognized that employers can protect their
investments without noncompetes ............................... 10

  II. Delaying The Effective Date Of The FTC Rule Would Harm Our
Communities........................................................... 13

CONCLUSION .......................................................................... 14

APPENDIX—List of Amici ....................................................... 15

**TABLE OF AUTHORITIES**

**CASES**

*Chamber of Commerce, et al. v. FTC*
 No. 6:24-cv-00148 (E.D. Tex.) .......................................................... 3

*Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.,*
 710 F.3d 579, 582 (5th Cir. 2013). ................................................... 4

*Hippocratic Med. v. U.S. Food & Drug Admin.,*
 78 F.4th 210 (5th Cir. 2023) ............................................................. 4

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n,*
 720 F.3d 370 (D.C. Cir. 2013)......................................................... 13

*Nichols v. Alcatel USA, Inc.,*
 532 F.3d 364 (5th Cir. 2008). ............................................................ 4

**STATUTES**

18 U.S.C. § 1836(b)............................................................................ 11

Tex. Bus. & Com. Code § 15.50(a)............................................... 12, 13

Tex. Bus. & Com. Code § 15.50(b)................................................... 8

Tex. Civ. Prac. & Rem. Code § 134A.003 ........................................ 11

**ADMINISTRATIVE MATERIALS**

Non-Compete Clause Rule; Extension of Comment Period, 88 Fed.
 Reg. 20,441 (Apr. 6, 2023)............................................................. 3

Noncompete Clause Rule, 89 Fed. Reg. 38,342
 (May 7, 2024) ........................................................................*passim*

# OTHER AUTHORITIES

Alexander Colvin & Heidi Shierholz, *Noncompete agreements*,
Economic Policy Institute (Dec. 10, 2019),
https://perma.cc/4GBT-PA9V ........................................................ 5

Amy K. Glasmeier, *El Paso City Council Sets Goal to Increase
Minimum Wage to $15 by 2026*, Massachusetts Institute of
Technology, Living Wage Calculator (Mar. 2023),
https://perma.cc/J7HZ-49UJ......................................................... 2

Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-
Hopping in Silicon Valley: Some Evidence Concerning the
Microfoundations of a High-Technology Cluster*, 88 Rev. Econ. &
Statistics 472, 477 (2006)............................................................. 7

City of San Antonio, *Historic $2 Million Investment to Help Local
Small Businesses* (Feb. 2024), https://perma.cc/5AUN-K5DQ........ 2

Comment of Small Business Majority,
https://perma.cc/PA49-AM5R........................................................ 6

Ege Can & Frank M. Fossen, *The Enforceability of Non-Compete
Agreements and Different Types of Entrepreneurship: Evidence
From Utah and Massachusetts*, 11 J. of Entrepreneurship and Pub.
Pol. 223 (2022) ............................................................................ 6

Eushrah Hossain, Valencia Scott, & Josh Rosenthal,
*Unconventional Tools for States and Cities to Build Worker Power*,
57 UC Davis L. Rev. __ (forthcoming, 2024),
https://perma.cc/UGK3-ZTK5........................................................ 9

Jonathan Fisher, et al., Fed. Res. Bank of Boston, *Estimating the
Marginal Propensity to Consume Using the Distributions of
Income, Consumption, and Wealth* (Fed. Res. Bank of Boston
Research Dept. Working Paper No. 19-4, 2019),
https://perma.cc/FD88-LAYP ....................................................... 10

Ken Jacobs, et al., U.C. Berkeley Labor Center, *The High Public Cost of Low Wages* (Apr. 2015) https://perma.cc/PY62-5XZB ............. 10

Laila Assanie & Yichen Su*, Texas Economy Rides Wave of Changing Technology and Diffusion of Know-How*, Fed. Res. Bank of Dallas (2022), https://perma.cc/J9P7-CM7L ............................................... 1

Lauren Coleman-Lochner, *Austin Wealth Boom Expands Health Care for Poor Seeking Relief*, https://perma.cc/4KF3-8Q5Z. ................... 2

Margie Townsend, *Dallas Launches Small Business Support Programs, Focuses on Inclusion and Education*, Hoodline (Apr. 17, 2024), https://perma.cc/LXZ7-7XUU .............................. 1

Matthew S. Johnson, et al., *Innovation and the Enforceability of Non-Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023)..................................................... 7

Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am Econ. J. Applied Econ. 278 (2021).................................................... 8

Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth* (Fed. Res. Bank of Atlanta Working Paper No. 2022-10, 2022), https://perma.cc/MAF4-NW5J........................ 7

Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425 (2011) ............................................................................................ 7

Texas Association of Business, *Tech is Big- and Getting Even Bigger- in Texas* (Feb. 14, 2024), https://perma.cc/ED6T-8GP8 ................. 7

## STATEMENT OF INTEREST OF AMICI
## AND SUMMARY OF ARGUMENT

*Amici Curiae* are twelve current and former local elected officials from across Texas who work every day to build a state whose inhabitants thrive amid a prosperous economy.[1] *Amici* see the essential role that small businesses play to stitch together the fabric of our communities. Many of these small businesses join with larger counterparts to fuel our State's economic growth through innovation across sectors: from energy and biotech to aerospace and electronics.[2] Beyond these high-level economic measures, *amici* assist their constituents with the constant challenge of obtaining quality health care at a reasonable cost. And they see the families in each community that stretch each paycheck to make basic needs.

*Amici* have made efforts to promote the growth of small business, support workers, and increase access to health care in our various jurisdictions. The city of Dallas launched the Dallas Small Business Center in 2024, offering support for local small business and entrepreneurs including microgrants to technical advising.[3] Dallas also recently launched its FreshStart Employment Program, aiming to assist individuals in securing stable employment.[4] The city of San Antonio announced the

---

[1] A complete list of *amici* is attached as an Appendix.
[2] Laila Assanie & Yichen Su, *Texas Economy Rides Wave of Changing Technology and Diffusion of Know-How*, Fed. Res. Bank of Dallas (2022), https://perma.cc/J9P7-CM7L.
[3] Margie Townsend, *Dallas Launches Small Business Support Programs, Focuses on Inclusion and Education*, Hoodline (Apr. 17, 2024), https://perma.cc/LXZ7-7XUU.
[4] *Id.*

1

relaunch and expansion of its Zero Percent Interest Loan Program in 2024 as a strategic investment to strengthen the city's small business landscape.[5] The El Paso City Council set a goal to increase the minimum wage for its employees to $15 by 2026.[6] Travis County approved an increase to property tax rates in 2023 to fund Central Health, a public hospital that collects taxes to fund medical care for low-income residents.[7]

*Amici*'s response to the economic and social needs of Texas communities reaffirms their support of the Federal Trade Commission (FTC) in promulgating its Noncompete Clause Rule (the "Rule"). As the FTC's extensive analysis of quantitative and qualitative data reveals, noncompete agreements undermine each of these building blocks for a strong Texas: small-business creation, innovation, health care quality and affordability, and strong household wages. They do so despite less socially harmful means of protecting employers' legitimate interests, such as nondisclosure agreements (NDAs) and trade-secret protections. Accordingly, the FTC's decision to adopt its rule was far from arbitrary or capricious—rather, it was a sensible response to a widespread practice.

---

[5] City of San Antonio, *Historic $2 Million Investment to Help Local Small Businesses* (Feb. 2024), https://perma.cc/5AUN-K5DQ.
[6] Amy K. Glasmeier, *El Paso City Council Sets Goal to Increase Minimum Wage to $15 by 2026*, Massachusetts Institute of Technology, Living Wage Calculator (Mar. 2023), https://perma.cc/J7HZ-49UJ.
[7] Lauren Coleman-Lochner, *Austin Wealth Boom Expands Health Care for Poor Seeking Relief* (Oct. 7, 2023), https://perma.cc/4KF3-8Q5Z.

Apart from the general soundness of the Rule, a delay would be particularly harmful for Texans who are currently subject to unenforceable noncompetes, as well as their communities. Although these agreements would not stand up in a court of law, they nonetheless restrict many workers in Texas and elsewhere. An immediate, bright-line rule is necessary to prevent these continued harms.

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

The FTC initially proposed a rule to regulate noncompete agreements on January 5, 2023.[8] After extending its comment period[9] and spending over a year reviewing the ensuing comments, the commission voted to adopt its final rule on April 23, 2024 (the "Rule"). Plaintiff Ryan LLC filed this lawsuit that day, ECF 1, and Plaintiff-Intervenors filed a lawsuit in the federal district court for the Eastern District of Texas the following day.[10] Plaintiff-Intervenors then intervened in this matter, ECF 32. Both Plaintiffs and Plaintiff-Intervenors have moved for a stay and/or preliminary injunction [ECF 23, 46] and the FTC has responded [ECF 81].

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

Plaintiff and Plaintiff-Intervenors have moved for a postponement of the effective date of the Rule, pursuant to 5 U.S.C. § 705, and a preliminary injunction to prevent it from being enforced. For them to obtain this relief, this Court must

---

[8] Non-Compete Clause Rule; Extension of Comment Period, 88 Fed. Reg. 20,441 (Apr. 6, 2023) (noting the date the notice of proposed rulemaking was made publicly available).
[9] *Id.*
[10] *See Chamber of Commerce, et al. v. FTC*, No. 6:24-cv-00148 (E.D. Tex.).

determine that Plaintiffs (1) show a likelihood of success on the merits, (2) that the applicant will be irreparably injured absent a stay, (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest.[11] "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements."[12]

## ARGUMENT

### I.    The FTC Appropriately Considered The Costs And Benefits Of The Rule.

The FTC considered a wide range of potential effects of the rule—positive and negative—before adopting the final rule. Ultimately, this detailed analysis of the Rule correctly recognized that substantial benefits will accrue to markets and communities and that negative effects on employers can be minimized. Thus, contrary to Intervenors' insistence that the FTC's analysis failed to justify the Rule or to properly conduct cost benefit analysis [ECF 47 at 31-36] the Rule is well suited to provide ample benefits with limited (and avoidable) legitimate costs. This is only one reason the agency is likely to succeed on the merits, and no stay or preliminary injunction should issue.

---

[11] *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). The same factors apply to the stay because a stay has the practical effect of an injunction. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 242 (5th Cir. 2023), *cert. granted on other grounds* 144 S. Ct. 537.
[12] *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

**A.**    <u>The FTC properly found that noncompete agreements harm communities in several ways.</u>

The FTC's analysis comports with a wide range of evidence that shows the multiple harms of noncompetes, not just to the workers subject to the agreements but to communities more broadly. Here in Texas, non-competes are pervasive, with 60% of businesses using these provisions.[13] By limiting the free movement of labor, noncompete agreements impede small-business formation and innovation, undermine patient care, and restrict wages. These benefits amply justify the Rule.

### 1.    *Noncompetes limit the creation of small businesses.*

Noncompetes prevent new small businesses both directly and indirectly. Most obviously, workers subject to a noncompete cannot open a small business in competition with their prior employer. In one survey, forty-six percent of current small-business owners reported that they had been previously prevented from opening a business because of a noncompete.[14] This survey accords with several additional studies cited by the agency, as well as numerous individual commenters who described the ways that noncompetes undermined their efforts at entrepreneurship.[15] Two studies considered by the agency found a decline in new

---

[13] Alexander Colvin & Heidi Shierholz, *Noncompete agreements*, Economic Policy Institute (Dec. 10, 2019), https://perma.cc/4GBT-PA9V.

[14] *See* Noncompete Clause Rule, 89 Fed. Reg. 38,342, 38,491 (May 7, 2024).

[15] 89 Fed. Reg. at 38,391–92.

firm entry when noncompetes become enforceable.[16] In addition, a study considered by the agency found that decreases in enforceability of noncompetes in Utah and Massachusetts increased entrepreneurship among low-wage workers.[17]

Beyond the explicit prohibition on opening a competitor, noncompetes further undermine small businesses by restricting their ability to hire skilled workers within an industry. One study considered by the agency found that workers subject to a noncompete are 35% less likely to take a job with a competitor.[18] This leaves new businesses starved for talent or subject to extortionary "buyout fees."[19] It is no wonder that more than a third of surveyed small-business owners reported that a noncompete agreement prevented them from hiring a desired employee.[20]

### 2. *Noncompetes limit innovation.*

Noncompetes also slow innovation. In part, this results from the negative effects of small-business formation described above. In states that prohibit non-competes, higher levels of startup activity have both generated new ideas and forced larger corporations to improve their own products and services.[21] One study found

---

[16] 89 Fed. Reg. at 38, 389 (citing Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1 (2024); Matt Marx, *Employee Non-Compete Agreements, Gender, and Entrepreneurship*, 33 Org. Sci. 1756 (2022)).

[17] 89 Fed. Reg. at 38,389 (citing Ege Can & Frank M. Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. of Entrepreneurship and Pub. Pol. 223 (2022)).

[18] 89 Fed. Reg. at 38,408.

[19] 89 Fed. Reg. at 38,408.

[20] Comment of Small Business Majority, https://perma.cc/PA49-AM5R.

[21] 89 Fed. Reg. at 38,390 (discussing Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425, 436 (2011)).

that "breakthrough" innovations are less likely as noncompetes become more enforceable. This innovation effect shows at the Patent Office: as non-competes become less enforceable, inventors file more patents. [22] In addition, a study considered by the FTC found that greater noncompete enforceability inhibits entry of spinouts founded by former employees which tend to innovate more and are relatively higher quality than other new firms.[23] Contrary to one *amicus*'s suggestion [ECF 53 at 11] there is no inconsistency between this innovation effect and the continued availability of NDAs for *company-specific* information; innovation thrives amid the "spread and recombination of novel ideas," when workers can engage in new combinations.[24]

These effects are particularly strong in Texas's leading industries, such as technology and energy. The technology sector now accounts for roughly 20% of the State's GDP, wages, and employment.[25] Scholars have credited the lack of non-compete clause enforceability in California for the growth of Silicon Valley.[26] Likewise, the energy industry has flourished in North Dakota and Oklahoma, not

---

[22] 89 Fed. Reg. at 38,394 (discussing Matthew S. Johnson, et al., *Innovation and the Enforceability of Non-Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36).

[23] 89 Fed. Reg. at 38,390 (citing Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth* (Fed. Res. Bank of Atlanta Working Paper No. 2022-10, 2022), https://perma.cc/MAF4-NW5J).

[24] 89 Fed. Reg. at 38,472.

[25] Texas Association of Business, *Tech is Big- and Getting Even Bigger- in Texas* (Feb. 14, 2024), https://perma.cc/ED6T-8GP8; Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rev. Econ. & Statistics 472, 477 (2006).

[26] 89 Fed. Reg. at 38,424 (considering Fallick, et al., 88 Rev. Econ. & Statistics at 472-81).

only because of their resource endowments but also because their courts do not strongly enforce non-competes.[27]

### 3. *Noncompetes interfere with patient care.*

The use of noncompete agreements in the health care sector can have dire consequences, as patients are not mere consumers. Noncompetes decrease patients' access to the physicians of their choice, increase healthcare shortages, and negatively affect the quality of health care.[28] Additionally, a study found that the increased enforceability of noncompetes increases consumer prices for healthcare.[29] The American Medical Association has long recognized that "covenants not-to-compete restrict competition, can disrupt continuity of care, and may limit access to care," and recently adopted a policy banning noncompetes for many doctors.[30]

For these reasons, Texas has already imposed special limits on noncompetes for doctors.[31] These limits ensure, for instance, that a patient experiencing "acute illness" is not forced to switch doctors. Even with these limits, however, a noncompete can have stark effects on underserved and rural medical communities, imposing longer wait times and reduced access to care. In a community without enough doctors, it makes little sense to force a doctor to move 50 miles away if she

---

[27] 89 Fed. Reg. at 38,425.
[28] 89 Fed. Reg. at 38,399.
[29] 89 Fed. Reg. at 38,433 (citing Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am Econ. J. Applied Econ. 278 (2021)).
[30] 89 Fed. Reg. at 38,401 (citing the AMA Code of Medical Ethics Opinion 11.2.3.1)
[31] Tex. Bus. & Com. Code § 15.50(b).

wants to leave her practice. Importantly, Texas' limitation only applies to physicians. The agency received comments from other medical providers, such as nurse practitioners, physician assistants, and others who provide essential care—and often form close relationships—to patients.[32] These providers and their patients do not benefit from protections afforded by Texas law.

Based on prior research on noncompete agreements as applied to physicians, the agency estimates that the rule will save $74–194 billion over ten years.[33] This sophisticated estimate accounts for the existing variation on noncompete enforceability across states and is reflective of the careful approach that the agency took to estimating the effects of the Rule.

### 4.    *Noncompetes restrict wages.*

Alongside the effects on small businesses, innovation, and healthcare, noncompete agreements often affect our communities most deeply through their effects on workers' paychecks. The agency estimated that the Rule will boost wages by $400–488 billion over ten years.[34] When the people we represent take home less money each week, they also have less money to spend to support our local economies.

---

[32] *See, e.g.,* 89 Fed. Reg. at 38,384, 38,387. A recent independent review of comments to the rule reviewed dozens of comments by various health care providers. Eushrah Hossain, Valencia Scott, & Josh Rosenthal, *Unconventional Tools for States and Cities to Build Worker Power*, 57 UC Davis L. Rev. __ (forthcoming, 2024), https://perma.cc/UGK3-ZTK5.
[33] 89 Fed. Reg. at 38,478.
[34] 89 Fed. Reg. at 38,470.

In part, these wage boosts result from the increased productivity of workers (including executives) being able to move to employers to which they are better suited. Noncompete agreements interfere with this "matching" process, potentially benefiting one firm but constraining overall economic activity.[35] Thus, these wage boosts are more than a mere monetary transfer from employers to workers.

The Rule will particularly contribute to wage gains for low-wage workers, which have particularly positive effects for our communities. Nationally, over 53% of all workers who are subjected to non-competes are hourly workers who are less able to negotiate new contracts, higher pay, and better working conditions.[36] When these workers receive pay increases, they require less support from the public fisc,[37] and the funds are likely to be spent in the local economy to meet those workers' basic needs.[38]

**B.** **The FTC properly recognized that employers can protect their investments without noncompetes.**

The FTC carefully examined the other ways that employers can address legitimate concerns through alternative means like non-disclosure agreements

---

[35] 89 Fed. Reg. at 38,408.
[36] 89 Fed. Reg. at 38,463 (citing Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 162 (2021)).
[37] Ken Jacobs, et al., U.C. Berkeley Labor Center, *The High Public Cost of Low Wages* (Apr. 2015) https://perma.cc/PY62-5XZB.
[38] Jonathan Fisher, et al., Fed. Res. Bank of Boston, *Estimating the Marginal Propensity to Consume Using the Distributions of Income, Consumption, and Wealth* (Fed. Res. Bank of Boston Research Dept. Working Paper No. 19-4, 2019), https://perma.cc/FD88-LAYP.

("NDAs") and protection for trade secrets.[39] Trade secrets receive extensive protection under both Texas and federal law, each of which allow a prior employer to enjoin a worker to prevent future misappropriation of a trade secret.[40] The federal Defend Trade Secrets Act even authorizes a court to issue civil *ex parte* orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret."[41] Nondisclosure agreements can likewise provide for specific-performance relief and compensation where there is a risk that valuable non-public information would be shared.

While Plaintiff-Intervenors raise hazy concerns that the rule would interfere with these protections [ECF 47 at 35] the Rule itself makes clear that legitimate NDAs remain available.[42] While the Rule prohibits any agreement (however characterized) that "functions to prevent a worker from" starting another business or working for another employer,[43] the agency has made clear this does not prohibit "appropriately tailored NDAs: . . . [A]n NDA would not be a non-compete under § 910.1 where the NDA's prohibitions on disclosure do not apply to information that (1) arises from the worker's general training, knowledge, skill or experience, gained on the job or otherwise; or (2) is readily ascertainable to other employers or the

---

[39] 89 Fed. Reg. at 38,424–26 (describing these alternative means).
[40] 18 U.S.C. § 1836(b)(3)(A); Tex. Civ. Prac. & Rem. Code § 134A.003.
[41] 18 U.S.C. § 1836(b)(2).
[42] 89 Fed. Reg. at 38,365.
[43] 89 Fed. Reg. at 38,502 (to be codified at 16 C.F.R. § 910.1).

general public."[44] This leaves ample protection for employers' specific and confidential information.

Nor is there merit to Plaintiff-Intervenors' complaints about the agency's analysis of litigation costs to enforce NDAs and trade secrets. [ECF 47 at 35]. The agency carefully examined the likely effects on litigation and identified two likely effects: first, the Rule would shift the burden of litigation from individual workers, who now must bear substantial cost and risk to challenge a potentially invalid noncompete, to employers, who may need to pursue litigation to enforce an NDA or protect a trade secret.[45] Second, there may be less litigation overall because the Rule establishes a bright-line, unlike the laws currently governing noncompetes in Texas and many other states.[46] Ultimately, while the agency did not aspire to attach a falsely certain numerical value, it determined the net "magnitude of any change would be sufficiently small as to be immaterial."[47] "[T]he law does not require agencies to measure the immeasurable. [FTC]'s discussion of unquantifiable benefits fulfills its statutory obligation to consider and evaluate potential costs and benefits."[48]

---

[44] 89 Fed. Reg. at 38,365.
[45] 89 Fed. Reg. at 38,484, 38,494.
[46] 89 Fed. Reg. at 38,484; *see, e.g.,* Tex. Bus. & Com. Code § 15.50(a) (establishing fact-specific limitations on noncompetes).
[47] 89 Fed. Reg. at 38,484.
[48] *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013).

In sum, the FTC identified the legitimate interests that noncompetes served and examined how these alternative mechanisms serve to protect them. Examining the potential consequences on this greater reliance on NDAs, trade-secret protections, and other methods, the agency found that the substantial benefits—to innovation, small-business creation, health care, wages, and other areas not discussed in this brief—outweigh the costs. There is no reason to doubt or disturb this finding.

## II. Delaying The Effective Date Of The FTC Rule Would Harm Our Communities.

The clarity the FTC's action provides makes the urgency of the Rule even more clear. Currently, many workers in Texas and elsewhere are presented with noncompetes of dubious validity. For example, even though Texas (like many other states) only allows for enforcement of "reasonable" and proportional noncompetes,[49] "employers frequently use non-competes even when they are unenforceable under State law."[50] Many workers nonetheless operate under the assumption that a noncompete agreement is unenforceable, either because they are unaware of their legal protections or because they lack the means to litigate the issue.[51]

The delay sought by Plaintiff and Plaintiff-Intervenors will stall the creation of small businesses, block innovation, undermine health care, and depress wages—

---

[49] Tex. Bus. & Com. Code § 15.50(a).
[50] 89 Fed. Reg. at 38,377.
[51] 89 Fed. Reg. at 38,381.

not only due to employers' lawful noncompetes but also pursuant to contracts with no legal basis.

## **CONCLUSION**

For the reasons described above, *amici* State and Local Officials respectfully respect that the Court deny Plaintiff's and Plaintiff-Intervenors' motions for a stay and preliminary injunction.

Respectfully submitted,

/s/ Darren P. Nicholson
Darren P. Nicholson (SBN 24032789)
Warren T. Burns (SBN 24053119)
Kyle Oxford (SBN 24095806)
**BURNS CHAREST, LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dnicholson@burnscharest.com
koxford@burnscharest.com

Joshua A. Rosenthal*
Eushrah Hossain*
**PUBLIC RIGHTS PROJECT**
490 43rd Street, Unit #115
Oakland, CA 94609
Tel. (510) 738-6788
josh@publicrightsrproject.org
eushrah@publicrightsproject.org

**Counsel for *Amici Curiae***

*Pro hac vice* application forthcoming.

Joshua Acevedo
*El Paso City Council Representative*

Adam Bazaldua
*Member, Dallas City Council*

Crystal Chism
*Member, Austin City Council*

Teri Castillo
*Member, San Antonio City Council*

Elias Diaz
*Member, Eagle Pass City Council*

Vanessa Fuentes,
*Member, Austin City Council*

Alyssa Garza
*Member, San Marcos City Council*

Tartisha Hill
*Former Member, Balch Springs City Council*

Jalen McKee-Rodriguez
*Member, San Antonio City Council*

David Stout
*El Paso County Commissioner*

Zo Qadri
*Member, Austin City Council*

Jose "Chito" Vela
*Member, Austin City Council*

## **CERTIFICATE OF WORD COUNT**

I hereby certify the foregoing complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, that the foregoing brief contains 3250 words, including footnotes, and excluding the case caption, table of contents, table of authorities, signature block, Appendix and certificates, and that foregoing is typed in 14-point font and the footnotes are typed in 11-point font.

Date: May 31, 2024

/s/ Darren P. Nicholson
Darren P. Nicholson


## **CERTIFICATE OF SERVICE**

I certify that on May 31, 2024, I electronically filed this document using the ECF System, which will send notification to the ECF counsel of record.

/s/ Darren P. Nicholson
Darren P. Nicholson