# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

RYAN LLC,

      Plaintiff,

v.

FEDERAL TRADE COMMISSION,

      Defendant.

Case No. 3:24-v-00986-E

## BRIEF OF LEGAL SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT FEDERAL TRADE COMMISSION'S OPPOSITION TO PLAINTIFF'S AND INTERVENORS' MOTIONS FOR A PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

I.   INTRODUCTION..............................................................................................................1

II.   ARGUMENT...................................................................................................................2

   A.   The FTCA's plain text authorizes the FTC to make legislative rules regarding unfair competition like the Rule here.......................................................................................2

   B.   The legislative history also affirms the Commission's power to promulgate legislative rules concerning unfair competition like the Rule here. ...................................7

   C.   The major questions doctrine does not apply, and even if it did, the FTC has clear congressional authorization to make the Rule. ....................................................... 12

III.   CONCLUSION............................................................................................................ 14

# TABLE OF AUTHORITIES

## Cases

*Am. Min. Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ............................................................................ 16

*Apex Hosiery Co. v. Leader*,
  310 U.S. 469 (1940) ........................................................................................... 15

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ....................................................................................... 12

*Bostock v. Clayton Cty.*,
  140 S.Ct. 1731 (2020) ........................................................................................... 7

*Hibbs v. Winn*,
  542 U.S. 88, 101 (2004) ........................................................................................ 5

*Hubbard v. United States*,
  514 U.S. 695 (1995) ........................................................................................... 15

*Indep. Bankers Asso. v. Heimann*,
  613 F.2d 1164 (D.C. Cir. 1979) ........................................................................... 16

*Johnson v. Transportation Agency, Santa Clara Cty*,
  480 U.S. 616 (1987) ............................................................................................. 6

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................................................... 15

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ........................................................................................... 13

*Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ............................................................................................. 7

Nat'l Petroleum Refiners Ass'n v. FTC,
  482 F.2d 672 (D.C. Cir. 1973), cert. denied, 415 U.S. 951 (1974) ..........................passim

*National Association of Pharmaceutical Manufacturers v. FDA*,
  637 F.2d 877 (2d Cir. 1981) ................................................................................ 16

*NLRB v. Wyman-Gordon*,
  394 U.S. 759 (1969) ........................................................................................... 16

*Ratzlaf v. United States*,
  510 U.S. 135 (1994) ............................................................................................. 7

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ............................................................................................... 15

*Util. Air Regul. Grp. v. E.P.A.*,
573 U.S. 302 (2014) ........................................................................... 13

*West Virginia v. EPA*,
597 U.S. 697 (2022) ...............................................................12, 13, 14

## **Statutes**

120 Cong. Rec. 40713 (1974) ............................................................ 11

15 U.S.C. § 57a(a)(2) ....................................................................... 4, 5

15 U.S.C. § 57b-3 ..................................................................................6

H.R. 7917, 93d Cong., 2d Sess. ......................................................... 10

H.R. Rep. No. 1606 at 30-32 .............................................................. 11

Pub. L. No. 93-637, 88 Stat. 2183 .................................................... 3, 5

S. Rep. No. 93-151 (1973) ...........................................................8, 9, 10

## **Other Authorities**

120 Cong. Rec. 40173 (Sen. Hart) ...................................................... 12

Amy Coney Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev.
317 (2005) ...................................................................................... 15

*Francis v. Southern Pac. Co.*,
333 U.S. 445 (1948) ....................................................................... 16

Luke Herrine, *The Folklore of Unfairness*, 96 N.Y.U. L. REV. 431 (2021) ........................... 11

Michael Pertschuk, Revolt Against Regulation: The Rise and Pause of the Consumer
Movement (1982) ........................................................................... 11

The Legislative History of the Federal Antitrust Laws and Related Statutes (Earl W.
Kintner ed., 1978) ......................................................................... 11

# I.    INTRODUCTION

*Amici*—eighteen distinguished law professors and antitrust practitioners—have a strong interest in resolving questions of law that go to the core of their professional expertise and scholarship, namely, the scope of the authority of the Federal Trade Commission (FTC) to enact its Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the Rule).[1]

The text, structure, and history of the Federal Trade Commission Act (FTCA) clearly authorize the FTC to promulgate legislative rules like the Rule here. So does precedent: In *Nat'l Petroleum Refiners Ass'n v. FTC*,[2] the D.C. Circuit carefully considered the issue, which was squarely presented, and upheld the FTC's rulemaking authority. Legislators followed the litigation closely, declined to reverse the D.C. Circuit, and instead ratified the court's decision in multiple provisions.

As a result, this court is not faced with a question of first impression. Section 6(g) and the FTC's rulemaking authority have already been subject to an explicit dialogue between the judicial and legislative branches. *Amici* urge the Court not to upset that dialogue and read into the FTCA a limit on the FTC's rulemaking authority. Instead, the Court should deny Plaintiff's and Intervenors' requests to preliminarily enjoin the Rule.

---

[1] A complete list of *amici* is attached as an Appendix.

[2] 482 F.2d 672 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 951 (1974).

## II.    ARGUMENT

**A.    The FTCA's plain text authorizes the FTC to make legislative rules regarding unfair competition like the Rule here.**

The FTC Act's plain text authorizes the FTC to promulgate rules to prevent unfair competition. Section 5 of the FTC Act "empower[s] and direct[s]" the FTC "to prevent [certain] persons, partnerships, or corporations … from using unfair methods of competition affecting commerce."[3] Section 6(g) grants the Commission the "power … to make rules and regulations for the purpose of carrying out the provisions of this Act."[4]

Despite this clear grant of authority, Plaintiff and Intervenors argue—based largely on a reading of the legislative history of the original statute[5]—that Congress intended Section 6(g) to apply only to "procedural" rules or non-binding rule-like statements. *See* Doc. 47 at 14-15; Doc. 57-2 at 17-18. In 1973, the D.C. Circuit considered and rejected that view in *National Petroleum Refiners Association v. FTC*.[6] That court held that Section 6(g) authorizes the Commission to promulgate legislative unfair competition rules and declined to "import … a restriction" into the statutory text that

---

[3] 15 U.S.C. § 45(a)(1).

[4] 15 U.S.C. § 46(g)

[5] Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717.

[6] *Nat'l Petroleum Refiners Ass'n v. FTC,* 482 F.2d 672 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 951 (1974). The panel consisted of Chief Judge David Bazelon; J. Skelley Wright, later Chief Judge; and Spottswood William Robinson III, later also Chief Judge.

was not there.[7] The D.C. Circuit reasoned, "we are hardly at liberty to override the plain, expansive language of Section 6(g),"[8] the court wrote, as "ambiguous legislative history cannot change the express legislative intent."[9]

Two years later, in 1975, Congress ratified the D.C. Circuit's decision. The Magnuson-Moss FTC Improvement Act, signed into law by President Ford on January 4, 1975, amended Section 18 of the FTCA to give the FTC the power to prescribe "rules which define with specificity acts or practices which are unfair or deceptive acts or practices" (UDAP) and created new procedural requirements for doing so.[10] Plaintiff and Intervenors argue that because Congress did not amend unfair-competition rulemaking under Section 6(g) to include similar language, "[t]he Magnuson-Moss Act therefore "'support[s] a sensible inference that the [rulemaking authority] left out must have been meant to be excluded.'" Doc. 24 at 16 (alterations in Doc. 24); *see also* Doc 57-2 at 17 ("That Congress expressly granted the FTC the power to promulgate rules with respect to unfair or deceptive practices, but not with respect to unfair methods of competition, shows that it intended to exclude the latter.").

But the opposite is true. When Congress amended Section 18, it included a savings clause. The savings clause stated that the changes "shall not affect any authority

---

[7] *Id.* at 693.

[8] *Id.* at 686.

[9] *Id.* at 693.

[10] Pub. L. No. 93-637, 88 Stat. 2183.

of the Commission to prescribe *rules (including interpretive rules)*, and general statements of policy, *with respect to unfair methods of competition in or affecting commerce.*[11] This savings clause clarified that the new procedural requirements in Magnuson-Moss do not apply to unfair-competition rulemaking, which, as the D.C. Circuit had recently held, is separately authorized under Section 6(g). By specifying "rules (including interpretive rules)"—using the same word, "rules," as it used to describe the unquestionably legislative UDAP rules governed by Section 18—Congress affirmed that Section 6(g) authorizes rules that carry the force of law. Any other interpretation of this sentence would render "(including interpretive rules), and general statements of policy" mere surplusage.

Plaintiff's and Intervenors' response is to pretend this language does not exist. Plaintiff Ryan includes an ellipsis to elide the clear implication that if Congress recognized the Commission's authority to "prescribe rules (including interpretive rules)," it affirmed the Commission's authority to issue rules *other than* interpretive rules, such as the one in this case. *See* Doc. 24 at 16 (Congress was "merely stating that it did 'not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition.'" (quoting 15 U.S.C. § 57a(a)(2)) (ellipsis in Doc. 24)). The Plaintiff-Intervenors insert the word "*not*" (in italics) to reverse the savings clause's meaning. *See* Doc. 47 at 15 ("[T]he Magnuson-Moss Act of 1975, Congress granted the

---

[11] 15 U.S.C. § 57a(a)(2) (emphasis added).

Commission rulemaking authority related to 'unfair or deceptive acts and practices'—but *not* 'unfair methods of competition.'" (quoting 15 U.S.C. § 57a(a)) (emphasis in Doc. 47)). *Amici* in support of Plaintiff and Intervenors do not refer to the savings clause at all.

What's more, Congress *did* amend Section 6(g) to recognize the Commission's legislative-rulemaking authority in Magnuson-Moss. Congress amended Section 6(g) by adding the phrase "(except as provided in section 18(a)(2) of this Act)"[12] before "to make rules and regulations for the purpose of carrying out the provisions of this [Act]."[13] The new language affirms that the text that follows it authorizes the FTC to enact legislative rules. If Congress had the view that Section 6(g) conveys no such authority, the new language in Section 6(g) regarding Section 18 would not change the legal powers of the FTC—it would, in other words, serve no purpose—and "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[14]

---

[12] Pub. L. No. 93-637, 88 Stat. 2183.

[13] *See* 15 U.S.C. § 46(g).

[14] *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). Congress also provided in Section 18 that the Commission has "no authority under this Act, other than its authority under this [new] section, to prescribe any rule with respect to unfair or deceptive acts or practices." 15 U.S.C. § 57a(a)(2). Such a restriction would not change the Commission's powers in any relevant respect unless the Commission would otherwise have had another source of authority to issue legislative UDAP rules, *i.e.*, Section 6(g).

While reexamining and amending the statutory provisions just interpreted by the D.C. Circuit, Congress easily could have reversed the court's findings. "When a court says to a legislature: 'You (or your predecessor) meant X,' it almost invites the legislature to answer: 'We did not.'"[15] Instead, here, Congress added both a savings clause and an exception applicable only to UDAP rulemakings, codifying the holding in *National Petroleum Refiners Association*.

And in 1980, Congress again ratified the FTC's unfair competition rulemaking authority, adding new procedural requirements in Section 22 that apply to "any rule promulgated by the Commission under *section 6 or* section 18, *except that such term does not include* interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice."[16] Congress treated the word "rules" in Section 6(g) as encompassing legislative rules. Not only does the 1980 amendment expressly reference "rules" promulgated by the Commission under Section 6(g) and impose additional procedural requirements on those rules, but it limits those requirements to Section 6(g) rules that carry the force of law by expressly carving out interpretive rules, rules involving management or personnel, general statements of policy, and rules relating to organization, procedure, or practice.

---

[15] *Johnson v. Transportation Agency, Santa Clara Cty*, 480 U.S. 616, 629 n.7 (1987) (quoting Guido Calabresi, A Common Law for the Age of Statutes 31-32 (1982)).

[16] 15 U.S.C. § 57b-3 (emphasis added).

When examining the statute today, the only way to read the word "rules" in Sections 18 and 22 *in pari materia* with the word "rules" in Section 6(g) is if Section 6(g) authorizes legislative rulemaking. Especially given that Section 6(g) cross-references Section 18, and Section 22 cross-references Section 6(g), it would be illogical to think that Congress meant for "rule" to mean something entirely different in Section 6(g) than in those other two sections of the Act.

## B.    The legislative history also affirms the Commission's power to promulgate legislative rules concerning unfair competition like the Rule here.

The text and structure of the statute demonstrate that Section 6(g) grants the FTC the power to engage in legislative rulemaking. As the statutory text is clear, there typically would be no need to consult legislative history.[17] But because Plaintiff and Intervenors have raised the issue (*see* Doc. 24 at 14; Doc. 47 at 13-15; Doc. 57-2 at 17), it is important to set the record straight: the relevant legislative history reveals that Congress in 1975 considered the matter and rejected an effort to overturn the D.C. Circuit's interpretation of the statute, instead confirming that Section 6(g) authorizes the Commission to promulgate legislative rules concerning unfair competition.

---

[17] "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Bostock v. Clayton Cty.*, 140 S.Ct. 1731 (2020) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)); *see also Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

By way of background, in *National Petroleum Refiners Association* the D.C. Circuit exhaustively reviewed the 1914 legislative history of Section 6(g) and concluded that "the *specific* intent of Congress here cannot be stated with any assurance,"[18] that "the crucial debates and reports … do not illuminate the meaning of Section 6(g),"[19] that "evidence of clear congressional rejection or approval of substantive rule-making is scanty on both sides and not compelling,"[20] that the floor comments are "utterly unhelpful,"[21] and that "the history of the pertinent 1914 debates leaves us with a few affirmative indications that Section 6(g) encompassed substantive rule-making and a few cryptic indications that this is not so."[22]

Because Congress amended the statute to affirm the D.C. Circuit's interpretation of Section 6(g) in 1975 and 1980, if any legislative history is relevant today, it is the legislative history of those amendments, not of the 1914 Act. That legislative history begins before the D.C. Circuit rendered its decision in *National Petroleum Refiners*, when the Senate passed a bill by a vote of 72-2 to reverse the D.C. *district* court decision in that case, which had reached the opposite conclusion.[23] Because the bill would have

---

[18] *Nat'l Petroleum Refiners Ass'n. v. FTC*, 482 F.2d 672, 686 (D.C. Cir. 1973).

[19] *Id.* at 704.

[20] *Id.* at 706.

[21] *Id.* at 709.

[22] *Id.*

[23] S. Rep. No. 93-151, at 11 (1973).

also added new procedural requirements to the Commission's UDAP rulemaking authority (along the lines of those ultimately adopted in 1975), when Congress reconvened in 1973, the Commission requested that the Senate withdraw the new provision from the proposed legislation (which it had to take up anew since the House had not passed its 1972 bill).

FTC Chairman Lewis A. Engman wrote to the Senate, in a letter published in the record, stating his confidence that the Commission's "rulemaking authority will be upheld by the court of appeals" and that therefore the Commission "would oppose any statutory rulemaking provision limiting the flexibility of [its] present authority."[24] The Senate deleted the relevant provisions, noting that if not for the Commission's preference it would have "reaffirm[ed] the legislative rulemaking authority of the Commission."[25] In the Committee report accompanying the revised bill, Warren Magnuson, Chairman of the Senate Committee on Commerce, "pledged … to reintroduce legislation granting the Commission the power to promulgate legislative rules in the event of a decision by the courts which is adverse to the Commission on this issue."[26] Magnusson reiterated the point by emphasizing that "the deletion of rulemaking powers by the Committee is not to be read in any way as a reversal of the

---

[24] *Id.* at 57-58.

[25] *Id.* at 32

[26] *Id.*

Senate's position in the 92d Congress, when it passed legislation by a vote of 72-2 which expressly conferred legislative rulemaking power upon the Commission."[27]

In 1974, in response to the D.C. Circuit's decision, several House members added language to a House bill to prohibit unfair competition rulemaking.[28] But the House's proposed modifications were rejected by the conference committee, which instead substituted language affirming the FTC's powers, drawn from the bill that had passed in the Senate in 1972. The final act, while adding heightened procedural requirements for UDAP rulemaking, affirmed the Commission's power to promulgate other substantive rules according to ordinary notice and comment procedures. Senator Hart explained the arrangement on the Senate floor:

> Because [the bill] primarily concerns consumer protection matters, the procedural requirements in title 2 respecting FTC rulemaking are limited to unfair or deceptive acts or practices rules. These provisions and limitations are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition. Rules respecting unfair methods of competition should continue to be prescribed in accordance with the informal rulemaking procedures in Section 553, title 5 United States Code. This dual approach by the

---

[27] *Id.*

[28] The House proposal would have expressly stricken the Commission's power to make rules and regulations from Section 6(g). H.R. 7917, 93d Cong., 2d Sess., at 55:6-8. In its place, the House bill added a section authorizing the Commission "to issue (A) procedural, administrative, and advisory rules, and (B) rules defining with specificity acts or practices which are unfair or deceptive." *Id.* at 47:6-10. The bill, however, provided that the change "shall not affect the validity of any rule which was promulgated under section 6(g) of the Federal Trade Commission Act prior to the date of enactment of this section." *Id.* at 55:9-13. In other words, even opponents of FTC rulemaking power in the House acknowledged the authority as valid under Section 6(g).

Commission in prescribing rules will afford the Congress the unique opportunity to assess and compare actual experience and results under somewhat different approaches to the rulemaking process, and it is expected that the FTC will promptly commence rulemaking proceedings under both procedures.[29]

The conference committee report reflects a similar understanding.[30]

The Plaintiff-Intervenors argue that the 1975 Act should not be interpreted as affirming the D.C. Circuit's view, based on the premise that Congress would have imposed the same heightened procedural requirements on unfair competition rulemakings that the new Section 18 applied to UDAP rulemakings. Doc. 47 at 15. But not only is that speculation inconsistent with the plain text, it is out of step with the legislative history. Magnuson-Moss was driven by energy from consumer groups and targets consumer protection issues.[31] Accordingly, many legislators may simply have not focused on competition rulemaking or antitrust at the time. Senator Hart, who did

---

[29] 120 Cong. Rec. 40713 (1974), *reprinted in* The Legislative History of the Federal Antitrust Laws and Related Statutes 5337-38 (Earl W. Kintner ed., 1978).

[30] H.R. Rep. No. 1606 at 30-32 (explaining that under "the House amendment" the FTC "would have been prohibited from prescribing rules with respect to unfair competitive practices" and that "a new section 18 … would have established detailed procedures which the FTC would have had to follow in prescribing *all* substantive rules under the Act" [emphasis added] but that "[t]he conference substitute," which adds a new section 18 for UDAP rules, "does not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition in or affecting commerce").

[31] *See* Michael Pertschuk, Revolt Against Regulation: The Rise and Pause of the Consumer Movement 43-45 (1982); Luke Herrine, *The Folklore of Unfairness*, 96 N.Y.U. L. REV. 431, 489 n.334 (2021).

reflect on both of the FTC's mandates, saw the heightened procedures for UDAP as an experiment: "An assessment and comparison … of the experiences and results of this dual approach to FTC rulemaking will facilitate future congressional determination of what, if any, changes should be made in [the rulemaking provisions] of this bill."[32]

## C. The major questions doctrine does not apply, and even if it did, the FTC has clear congressional authorization to make the Rule.

Plaintiffs and their Amici suggest that because the FTC's proposed rule has substantial economic impact and has not previously been in force, the FTC has run afoul of the Supreme Court's recent decision in *West Virginia v. EPA*, 597 U.S. 697 (2022). Doc. 24 at 17-19; Doc. 47 at 3-4, 16-19; Doc. 57-2 at 21-22. That argument is mistaken for three reasons.

First, the Court did not hold in that case that ordinary principles of statutory construction should be abandoned whenever an agency action is consequential. Rather, *West Virginia v. EPA* emphasized the importance of context when a court interprets a delegation to an administrative agency.[33] The Court in *West Virginia v. EPA* explained that when an agency claims a newer and broader regulatory authority than previously confirmed, and its assertion of that authority has various indicia warranting

---

[32] 120 Cong. Rec. 40173 (Sen. Hart). Besides, if this speculative style of argument is fair game, it should be taken to its logical conclusion. What sense, after all, would it make for Congress to give the FTC UDAP rulemaking authority but not unfair competition authority, given the centrality of unfair competition to the statutory scheme?

[33] *See Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J. concurring).

heightened judicial scrutiny, reviewing courts must examine the relationship between the agency's assertion and the history and context of the relevant congressional authorization.[34] In such special cases, and only in such special cases, the agency needs to offer more than a "colorable textual basis" to regulate.[35] It must point to "'clear congressional authorization' for the power it claims."[36]

But there is no novelty here. The FTC is doing what it has done before: promulgating rules to govern competition. And it is doing so pursuant to an explicit grant of authority on which it has previously relied. As the D.C. Circuit concluded when it addressed this exact question in 1973, the "plain language" of the statute is clear: it authorizes the FTC to "'make rules and regulations for the purpose of carrying out the provisions of [the Act].'"[37] The situation is therefore completely different from *West Virginia v. EPA*, where the Court held that the agency inappropriately sought to use authority in a novel fashion with respect to a new issue in ways not supported by the text of the statute or the broader context.[38]

---

[34] *Id.* at 722-25.

[35] *Id.* at 722.

[36] *Id.* at 723 (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)).

[37] *Nat'l Petroleum Ref'rs Ass'n*, 482 F.2d at 677 (quoting 15 U.S.C.A. § 46(g)).

[38] *See* 597 U.S. at 727-28 (calling the EPA's view of its authority "unprecedented" and "a 'fundamental revision of the statute, changing it from [one sort of] scheme of ... regulation' into an entirely different kind" (quoting *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994))).

Second, assuming for the sake of argument that the agency's interpretation of its authority was inappropriately novel, the necessary indicia warranting heightened judicial scrutiny are not present here. For example, the FTC is not seeking to use its assertion of authority to "adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[39] Nor is there a "mismatch" between the agency's action and its mission and expertise.[40] Noncompete agreements—contracts between private parties restricting competition with markets—are solidly within the ambit of a competition authority like the FTC.

Third, even if a reviewing court were to subject the FTC's rule to a higher standard under *West Virginia*, it should survive because, for the reasons stated above, the FTCA as amended clearly authorizes competition rulemaking with the force of law.

## III. CONCLUSION

Plaintiff and Intervenors, coming late to a debate resolved by the courts and Congress in the 1970s, now argue that the court should read into the Act a limit on the FTC's rulemaking authority. In support of their position, they rehash arguments from the 1960s and early 1970s considered and rejected in the *National Petroleum Refiners* decision.

---

[39] *Id.* at 724.

[40] *Id.* at 748-49 (Gorsuch, J. concurring).

Plaintiff and Intervenors explain away that decision because it "was wrong when decided and has not aged well" (Doc. 24 at 19); "is a relic of a bygone era" (Doc. 47 at 18); and "is out of step with modern jurisprudence" (Doc. 57-2 at 18). But even they must concede that the *National Petroleum Refiners* court carefully considered the issue, which was squarely presented, and then upheld the FTC's rulemaking authority.[41] After the Supreme Court denied certiorari, rather than reverse the D.C. Circuit, Congress instead ratified the court's decision in multiple provisions.

The undeniable fact is that Section 6(g) and the FTC's rulemaking authority has already been subject to an explicit dialogue between the judicial and legislative branches. "The long time failure of Congress to alter [a law] after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one."[42] As the Court has explained, "This is the more so

---

[41] Indeed, reinterpretations of statutes by the Supreme Court are genuinely rare and are generally on constitutional grounds. Just three Supreme Court decisions since 1986 appear to overturn a statutory interpretation and two of those involved broad legal standards. *State Oil Co. v. Khan*, 522 U.S. 3 (1997); *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). The third, *Hubbard v. United States*, 514 U.S. 695 (1995), concerned the definition of "department or agency of the United States" within a federal statutory provision criminalizing certain false statements, and whether a court fits into that definition. The Court justified its decision by reference to the rise of a doctrine (the judicial function exception) that made the precedent shaky if not untenable in light of other law, and the absence of reliance interests.

[42] *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 488-89 (1940). *See also* Amy Coney Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 334 (2005). ("When the Court interprets a statute, it sometimes attributes significance to

where … the application of the statute … has brought forth sharply conflicting views both on the Court and in Congress, and where after the matter has been fully brought to the attention of the public and the Congress, the latter has not seen fit to change the statute."[43] *National Petroleum Refiners* is such a precedent, properly treated today as "part of the warp and woof of the legislation."[44]

Importantly, the settled expectations extend beyond the FTC. The reasoning in *National Petroleum Refiners* undergirds rulemaking authority at other agencies with similar language in their organic acts. In landmark administrative law opinions, the federal courts have interpreted these general grants of rulemaking authority to convey the authority to issue substantive rules.[45] Congress is free to return to the question at any

---

congressional inaction in the face of lower court interpretations of the same statute— but only when circumstances make it likely that Congress was actually aware of those decisions.").

[43] *Id.*

[44] *Francis v. Southern Pac. Co.*, 333 U.S. 445, 450 (1948).

[45] *See, e.g.*, *NLRB v. Wyman-Gordon*, 394 U.S. 759, 763 (1969) (plurality) (describing the general rulemaking grant in section 6 of the National Labor Relations Act as "the rule-making provisions of the Act" which ordinarily would have to be used to issue a "valid substantive regulation"); *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (defining legislative rules, as opposed to merely interpretative rules, according to "whether the agency has explicitly invoked its general legislative authority"); *National Association of Pharmaceutical Manufacturers v. FDA*, 637 F.2d 877 (2d Cir. 1981) (upholding substantive rulemaking authority under the FDA's general rulemaking authority, 21 U.S.C. § 371(a)); *Indep. Bankers Asso. v. Heimann*, 613 F.2d 1164, 1169 (D.C. Cir. 1979) ("The Comptroller was given authority to promulgate regulations in order to facilitate execution of his statutory powers. *See* 12 U.S.C. § 1818(n). It would

time, but the agency and courts are bound by what has already transpired. It is for neither judges nor commissioners now to disturb long-settled expectations about the meaning of Section 6(g). And so, *Amici* respectfully request that the Court deny Plaintiff's and Intervenors' requests for a preliminary injunction.

Respectfully submitted,

/s/ Darren P. Nicholson
Darren P. Nicholson (SBN 24032789)
Warren T. Burns (SBN 24053119)
Kyle Oxford (SBN 24095806)
**BURNS CHAREST, LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dnicholson@burnscharest.com
koxford@burnscharest.com

**Counsel for *Amici Curiae***

---

undermine the regulatory purpose of Congress to assume that the Comptroller must proceed solely by separate 'cease and desist' cases.").

# APPENDIX—List of Amici

Lev Menand
Associate Professor of Law
Columbia Law School

Tim Wu
Julius Silver Professor of Law, Science and Technology
Columbia Law School

Ashraf Ahmed
Associate Professor of Law
Columbia Law School

Rebecca Haw Allensworth
David Daniels Allen Professor of Law
Vanderbilt Law School

Kate Andrias
Patricia D. and R. Paul Yetter Professor of Law
Columbia Law School

Bill Baer
Former Assistant Attorney General for Antitrust
U.S. Department of Justice

Lisa Schultz Bressman
David Daniels Allen Distinguished Chair in Law
Vanderbilt Law School

Richard Briffault
Joseph P. Chamberlain Professor of Legislation
Columbia Law School

Jessica Bulman-Pozen
Betts Professor of Law
Columbia Law School

Harry First
Charles L. Denison Professor of Law
NYU School of Law

Eleanor Fox
Walter J. Derenberg Professor of Trade Regulation Emerita
NYU School of Law

Luke Herrine
Assistant Professor of Law
University of Alabama School of Law

Robert H. Lande
Venable Professor of Law Emeritus
University of Baltimore School of Law

Jonathan Masur
John P. Wilson Professor of Law
University of Chicago School of Law

Sanjukta Paul
Professor of Law
University of Michigan Law School

Morgan Ricks
Herman O. Loewenstein Chair in Law
Vanderbilt Law School

Noah Rosenblum
Assistant Professor of Law
NYU School of Law

Peter L. Strauss
Betts Professor of Law Emeritus
Columbia Law School

**CERTIFICATE OF WORD COUNT**

I hereby certify that this brief contains 4,233 words, excluding the case caption, table of contents, table of authorities, signature block, Appendix, and certificates, but including the footnotes, as determined by the word-count feature of Microsoft Word, and that the foregoing is typed in 14-point font.

/s/ Kyle Oxford
Kyle Oxford

**CERTIFICATE OF SERVICE**

I certify that on May 31, 2024, I electronically filed this document using the ECF System, which will send notification to the ECF counsel of record.

/s/ Kyle Oxford
Kyle Oxford