# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

RYAN, LLC, *et al.*,

    Plaintiffs,

    v.

FEDERAL TRADE COMMISSION,

    Defendant.

Case No. 3:24-v-00986-E

# [PROPOSED] AMICUS BRIEF OF SMALL BUSINESS MAJORITY AND PROFESSOR EVAN STARR

Eric A. Posner
1111 E. 60th St.,
Chicago, IL 60637
(773) 702-0425
eposner@uchicago.edu

Jamie Crooks
 *Counsel of Record*
Alexander Rose
FAIRMARK PARTNERS LLP
1001 G Street, NW, Ste. 400E
Washington, DC 20001
(617) 721-3587
jamie@fairmarklaw.com

Counsel for *Amici Curiae*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................ 1

INTEREST OF AMICI CURIAE ............................................................ 2

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT ........................................................................................ 6

I.    Noncompete Agreements Harm Small Businesses and
Entrepreneurship ................................................................ 6

II.    Employers, Including Small Businesses,
Overwhelmingly Support the Federal Trade
Commission's Noncompete Ban ................................................ 12

III.    Noncompete Agreements Harm Both Workers and
Consumers ................................................................................ 16

IV.    Existing Enforcement Mechanisms Chill Employee Choice
and Ineffectively Police Unenforceable Noncompete
Agreements ................................................................................ 20

CONCLUSION ...................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

Complaint, *In re Matter of Prudential Security, Inc.*, at 3-5 (F.T.C. Feb. 23, 2023) https://www.ftc.gov/system/files/ftc_gov/pdf/c47872210026prudentialsecurityfinalconsent.pdf ......................................................................... 18

**Other Authorities**

Andre Perry, Manann Donoghoe & Hannah Stephens, *Who Is Driving Black Business Growth? Insights from the Latest Data on Black-Owned Businesses*, BROOKINGS INSTITUTION (May 24, 2023), https://www.brookings.edu/articles/who-is-driving-black-business-growth-insights-from-the-latest-data-on-black-owned-businesses/ ...... 8

Atul Gupta *et al.*, *Owner Incentives and Performance in Healthcare: Private Equity Investment in Nursing Homes*, REV. OF FIN. STUDIES, vol 37, 1029-77 (Nov. 22, 2023), *available at* https://academic.oup.com/rfs/article/37/4/1029/7441509. ...................... 9

B. N. Greenwood, B. H. Kobayashi, & E. Starr *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation*, Donald G. Costello College of Business at George Mason Univ., Research Paper (Apr. 11, 2024) .......................................................... 18

Benjamin Glasner, *The Effects of Noncompete Agreement Reforms on Business Formation: A Comparison of Hawaii and Oregon*, ECON. INNOVATION GRP. (Mar. 2023), *available at* https://eig.org/noncompetes-research-note/ ......................................... 17

Benjamin King, Martin Ganco, & Evan Starr, *Reconciling theories on why employees of small firms are more likely to become entrepreneurs*, INDUS. & CORP. CHANGE, Vol. 33, 194-215 (Feb. 2024) (collecting research), *available at* https://doi.org/10.1093/icc/dtad024. ................... 7

Bhargav Gopal & Li Xiangru, *Training and Job Separation in Imperfect Labor Markets: The Case of Non-Compete Agreements*, (Jan. 2024)

(working paper), *available at* https://bhargavgopal.com/resources/paper2.pdf. ................................. 17

Brad Greenwood, Bruce Kobayashi, & Evan Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Protection*, at 3 (2024), *available via SSRN at* t.ly/4ctJq. ................... 13

Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rᴇᴠ. Eᴄᴏɴ. & Sᴛᴀᴛɪsᴛɪᴄs 472 (2006) ........................................................... 11

Catherine L. Fisk, *Reflections on the New Psychological Contract and the Ownership of Human Capital*, 34 Cᴏɴɴ. L. Rᴇᴠ. 765 (2001). ....... 23

Clarissa Hawes, *TQL's noncompete hurts ex-employee's job prospects, lawsuit claims*, FʀᴇɪɢʜᴛWᴀᴠᴇs (Aug. 31, 2022), *available at* https://www.freightwaves.com/news/tqls-noncompete-hurts-ex-employees-job-prospects-lawsuit-claims. ............................................ 24

Donna Rothstein & Evan Starr, *Noncompete agreements, bargaining, and wages*, Mᴏɴᴛʜʟʏ Lᴀʙᴏʀ Rᴇᴠ (2022), *available at* https://www.jstor.org/stable/48716860 ........................................... 17, 23

Emma Rockall & Kate Reinmuth, *Protect or Prevent? Noncompete Agreements and Innovation* (working paper) (Jan. 2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683. ......... 19

Erik Weibust and Stuart Gerson, *FTC's Noncompete Proposal Is Based On Misrepresentations* (2023), *available at* t.ly/nA9Av ...................... 21

Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 ILR Rᴇᴠ. 783 (2019) ............................. 11, 17

Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J. L., Eᴄᴏɴ., & Oʀɢ. 633 (2020) ..... 11, 23

Evan Starr, James J. Prescott, & Norman D. Bishara, *Noncompete agreements in the U.S. labor force*, J. ᴏꜰ L. ᴀɴᴅ Eᴄᴏɴ. 64, no. 1, 53-84 (2021)................................................................................................. 17

Evan Starr, *Noncompete Clauses: A Policymaker's Guide through the Key Questions and Evidence*, at 19, ECON. INNOVATION GRP. (Oct. 2023), *available at* https://eig.org/wp-content/uploads/2023/10/Noncompete-Clauses-A-Policymakers-Guide.pdf............................................................ 20, 21, 22, 23

Hyo Kang & Lee Fleming, *Non-competes, Business Dynamism, and Concentration: Evidence from a Florida Case Study*, J. OF ECON. & MGMT. STRATEGY, vol. 29, 663-85 (2020) ............................................. 19

J.J. Prescott & Evan Starr, *Subjective Beliefs about Contract Enforceability*, (2022) Forthcoming at Journal of Legal Studies. ........ 24

Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, REV. OF FIN. STUDIES (2024), *available at* t.ly/UQSC4 ................................................................ 11, 19

Johnson, Lipsitz, & Pei, *Innovation and the Enforceability of Noncompete Agreements: Evidence from State Law Changes,* NAT'L BUREAU OF ECON RES. (working paper) (July 2023), *available at* https://www.nber.org/papers/w31487 .................................................... 11

K. A. Younge, T. W. Tong, & L. Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence From a Natural Experiment*, STRAT. MGMT. J., vol. 36, 686-708 (2014), *available at* https://funginstitute.berkeley.edu/wp-content/uploads/2014/05/smjyoungetongfleming1.pdf......................... 19

Kadhim Shubber, *Cushman v the cleaner: the fight over non-competes*, FINANCIAL TIMES (2018), *available at* https://www.ft.com/content/bfb69d30-ce44-11e8-b276-b9069bde0956. .................................................................................................... 22

Liyan Shi, *Optimal Regulation of Noncompete Contracts*, 91 ECONOMETRICA 425 (2023), https://www.econometricsociety.org/doi/10.3982/ECTA18128 ............ 11

Lynda Lee, *Minority Business Ownership Differs by Sector*, CENSUS.GOV (Jan. 4, 2023), https://www.census.gov/library/stories/2023/01/who-

owns-americas-businesses.html; Annual Report, National Women's Business Council (2023), https://www.nwbc.gov/wp-content/uploads/2023/12/NWBC_AR_2023_FINAL-508.pdf. ................ 8

Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J. L., ECON., & ORG. 376 (2011) ........................................................................................... 11

Matt Marx, Deborah Strumsky, & Lee Fleming, *Mobility, Skills, and the Michigan Non-Compete Experiment*, 55 MGMT. SCI. 875 (2009) ... 11

Matt Marx, *Employee Non-compete Agreements, Gender, and Entrepreneurship*, ORGANIZATION SCIENCE, vol. 33, 1756-72 (2022), *available at* https://pubsonline.informs.org/doi/epdf/10.1287/orsc.2021.1506. ... 8, 19

Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381. ......... 11

Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381 .......... 18

Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Noncompete Agreements*, NAT'L BUREAU OF ECON RES. (working paper) (July 2023), *available at* https://www.nber.org/papers/w31487 .................................................. 19

Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 MGMT. SCI. 143 (2021) ................................................................................................ 11, 17, 22

Michael Lipsitz & Mark J. Tremblay, *Noncompete Agreements and the Welfare of Consumers*, AM. ECON. ASS'N (2021), *available at* t.ly/jUJPv. ............................................................................................ 19

Naomi Hausman & Kurt Lavetti, *Physician practice organization and negotiated prices: evidence from state law changes*, AM. ECON. J.:

APPLIED ECON., vol. 13, 258-96 (2021), *available at*
https://www.aeaweb.org/articles?id=10.1257/app.20180078............... 20

Natarajan Balasubramanian *et al.*, *Locked In? The Enforceability of*
*Non-Compete Clauses and the Careers of High-Tech Workers*, 57 J.
HUM. RES. S349 (2022) .................................................................. 11, 17

Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi,
*Employment Restrictions on Resource Transferability and Value*
*Appropriation from Employees* (last revised May 2024) (working
paper), *available at*
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403... 17, 21,
23

*Noncompete Agreements: Use is Widespread to Protect Business' Stated*
*Interests, Restricts Job Mobility, and May Affect Wages*, at 8, GOV'T
ACCOUNTABILITY OFF., 8 (2022), *available at*
https://www.gao.gov/assets/gao-23-103785.pdf. .................................. 22

Opinion Survey*, Small business owners support banning non-compete*
*agreements*, SMALL BUSINESS MAJORITY (2023) ("SBM Noncompete
Survey"), *available at*
https://smallbusinessmajority.org/sites/default/files/research-
reports/2023-non-compete-poll-report.pdf.......................... 13, 14, 15, 18

Ronald J. Gilson, *The Legal Infrastructure of High Technology*
*Industrial Districts: Silicon Valley, Route 128, and Covenants Not to*
*Compete*, 74 N.Y.U. L. Rev. 575 (1999). ........................................... 9, 10

*Spencer Woodman*, Exclusive: Amazon Makes Even Temporary
Warehouse Workers Sign 18-Month Non-Competes, THE VERGE
(2015), *available at*
https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-
exclusive-noncompete-contracts ......................................................... 22

Starr, Evan, Justin Frake, & Rajshree Agarwal, *Mobility Constraint*
*Externalities*, (2019) Organization Science, *30*(5)................................. 18

Suzanne Lucas, *Warning: Your Internship May Come with a Non-Compete Agreement*, INC. MAGAZINE (2019), *available at* https://www.inc.com/suzanne-lucas/warning-your-internship-may-come-with-a-non-compete-agreement.html........................................ 22

Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do firms value court enforceability of noncompete agreements? a revealed preference approach*, REV. OF ECON. & STATS. (forthcoming), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674. ... 17, 24

*The State of Small Business Now*, U.S. Chamber of Commerce (Apr. 10, 2023), *available at* https://www.uschamber.com/small-business/state-of-small-business-now. ............................................................ 7

## Regulations

16 C.F.R. § 910, 912.......................................................... 1, 6, 8

**PRELIMINARY STATEMENT**

Noncompete agreements ("noncompetes") are harmful to the free, fair, and open competition that is fundamental to sustaining small businesses and a thriving and equitable economy. Like other restraints of trade, noncompetes both discourage workers from finding employment with businesses that place the highest value on their skills and hinder innovators from creating startups and launching careers as entrepreneurs. A large body of academic research shows that noncompetes interfere with labor mobility, lower wages, reduce competition, stifle innovation and entrepreneurship, and may increase consumer prices. As common law regulation of noncompete agreements has proven inadequate, and the state bans are isolated and not always enforced, the Federal Trade Commission's rule banning noncompetes, 16 C.F.R. Part 910 and 912 (May 7, 2024) ("FTC Rule") provides a much-needed and much-supported bulwark against economic and entrepreneurial stagnation. *Amici* submit this brief to aid the Court's understanding of the FTC Rule's benefits, and to clarify how well the Rule is supported by the most advanced economic literature.

## INTEREST OF *AMICI CURIAE*

*Amici* have an interest in the outcome of this litigation, because they have surveyed and studied the effects of noncompetes on workers, small businesses, and the broader economy. In the case of Small Business Majority, the organization represents members who are adversely affected by noncompetes. Thus, *amici* have an informed perspective relevant to this litigation that will aid the Court in its decisionmaking.

Small Business Majority is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. It engages its network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth. Its work is bolstered by extensive research, including a recent survey concerning noncompetes, and deep connections with the small business community that enable it to educate stakeholders about key issues impacting America's entrepreneurs, with a special focus on the smallest businesses and those facing systemic inequities and barriers to entry. Small Business Majority's members are particularly disadvantaged by noncompetes,

because these members are impeded in finding new talent to innovate and grow their businesses by the artificial restriction on employee mobility that noncompetes impose. Indeed, Small Business Association's survey, discussed at length herein, concluded that nearly half of all small businesses cite a noncompete as an impediment to starting or growing their own business.

Evan Starr is an economist and Associate Professor of Management and Organization at the University of Maryland's Robert M. Smith School of Business.[1] He has studied noncompetes and related labor restraints for over a decade. Across more than a dozen published studies in leading economics and management journals, and several recent working papers, his research examines the use of noncompetes and other restrictive covenants, the contracting process, the effects noncompetes and state noncompete laws, and litigation behavior related to restrictive covenants and trade secret law. He has helped develop and deploy at least five different surveys of restrictive covenants, including of employees, employers, and employment attorneys, including working

---

[1] Professor Starr's views expressed herein are his own and do not necessarily represent those of his employer.

with the Bureau of Labor Statistics to add a question on noncompetes to their long-running panel survey, the National Longitudinal Survey of Youth.

## SUMMARY OF ARGUMENT

Noncompetes are harmful to the free, fair, and open competition that is fundamental to a thriving and equitable economy. Noncompetes, like other restraints of trade, both discourage workers from finding employment with businesses that place the highest value on their skills and hinder innovators from creating startups and launching careers as entrepreneurs. A large body of academic research shows that noncompetes interfere with labor mobility, reduce competition, stifle innovation and entrepreneurship, and increase consumer prices, including among vulnerable populations.

Common law courts have subjected noncompetes and related restraints to heightened review due to their negative impacts, as they do for similar contractual provisions like liquidated damages. Some states, most notably California, ban noncompetes altogether. But the common law regulation of noncompetes has proven to be inadequate, and the state bans are isolated and not always effective. The FTC's ban on

noncompetes is thus necessary for eliminating the harm to competition that these agreements inflict on small businesses and the broader economy.

Noncompetes particularly harm small businesses. Small business owners and entrepreneurs who aspire to launch new businesses have trouble overcoming noncompete barriers to start new business and face challenges hiring staff because so many workers are bound by noncompetes. This hurts the health of startups and entrepreneurial ventures.

Regardless of business size, noncompetes stunt innovation, new business formation, labor mobility, worker earnings, competition, and many other aspects of a healthy economy, according to a large body of empirical economic research, discussed below. Current enforcement mechanisms, whether enacted through state policy or by common law, are inadequate vehicles for protecting businesses and workers as both enforceable and unenforceable noncompete agreements continue to proliferate and stymie innovation and worker choice. It is therefore imperative, for businesses of all sizes and workers alike, that the FTC's widely supported rule banning noncompetes not be vacated.

# ARGUMENT

## I.   Noncompete Agreements Harm Small Businesses and Entrepreneurship

Small businesses play a vital and storied role in the American economy. Many of the country's most successful businesses—Microsoft and Apple, for example, which today are the first and second largest companies in the world—began as tiny partnerships with a handful of employees. The startup culture of Silicon Valley, which sparked the tech boom, is just a culture of small business, where entrepreneurs relying on loans from friends and family are encouraged to tinker in their garages in the search of the next innovation. At the same time, small businesses are a part of the texture of everyday American life. Small businesses include most restaurants, dry cleaners, boutique retailers, bodegas, tax preparation services, hair stylists, medical clinics, manufacturers, farms, and many other common firms. Small business owners are admired for their entrepreneurial instincts, autonomy, and self-reliance, and they play leadership roles in community and civic associations.

As the U.S. Chamber of Commerce has acknowledged, "In terms of their impact on the economy, small businesses aren't actually that

small."[2] It notes that the approximately 33 million small businesses in the United States compose 99.9% of all businesses, and that small businesses create the majority of new jobs.[3] Economists have also recognized that vital entrepreneurial role played by small businesses in the U.S. economy.[4]

Noncompetes have long been a plague on small business. By their nature, small businesses depend more on the quality and productivity of the few workers they hire. Yet noncompetes shut small businesses out of hiring workers with the most related skills and knowledge—even if those workers would be a better fit in the small business. A small business cannot afford to pay an employee at another firm to take a one- or two-year vacation while his or her noncompete expires, and indeed many noncompetes prevent employees from even negotiating with competing employers while the noncompete is in force. Lacking the resources of major corporations, small businesses cannot help potential recruits to

_____

[2] *The State of Small Business Now*, U.S. Chamber of Commerce (Apr. 10, 2023), *available at* https://www.uschamber.com/small-business/state-of-small-business-now.
[3] *Id.*
[4] *See, e.g.*, Benjamin King, Martin Ganco, & Evan Starr, *Reconciling theories on why employees of small firms are more likely to become entrepreneurs*, INDUS. & CORP. CHANGE, Vol. 33, 194-215 (Feb. 2024) (collecting research), *available at* https://doi.org/10.1093/icc/dtad024.

litigate when their former employers sue them to enforce a possibly overbroad and illegal noncompete. Small businesses also must take care to avoid being sued themselves for tortiously interfering with a contract if they inadvertently hire a former employee subject to a noncompete.[5]

Noncompetes are an especially significant obstacle for small business owners in under-resourced communities, where there has been a notable increase in business formation and where entrepreneurship plays a vital role in fostering a more equitable economy. Many comments to the FTC Rule observed the outsized negative effect that noncompete agreements appear to have on discourage minority and female entrepreneurship,[6] which would exacerbate the many other barriers to successful small business ownership faced by these communities.[7]

---

[5] *See* FTC Rule at 176-77 (discussing comments).

[6] *See id.* at 97; *see also* Matt Marx, *Employee Non-compete Agreements, Gender, and Entrepreneurship*, ORGANIZATION SCIENCE, vol. 33, 1756-72 (2022), *available at* https://pubsonline.informs.org/doi/epdf/10.1287/orsc.2021.1506.

[7] *See* Andre Perry, Manann Donoghoe & Hannah Stephens, *Who Is Driving Black Business Growth? Insights from the Latest Data on Black-Owned Businesses*, BROOKINGS INSTITUTION (May 24, 2023), https://www.brookings.edu/articles/who-is-driving-black-business-growth-insights-from-the-latest-data-on-black-owned-businesses/; Lynda Lee, *Minority Business Ownership Differs by Sector*, CENSUS.GOV (Jan. 4, 2023), https://www.census.gov/library/stories/2023/01/who-owns-americas-businesses.html; Annual Report, National Women's Business Council (2023), https://www.nwbc.gov/wp-content/uploads/2023/12/NWBC_AR_2023_FINAL-508.pdf.

Noncompetes harm not only small businesses, but the economic ecosystem in which they operate. If a small business cannot hire sufficient staff because noncompetes bind qualified lateral hires, then they cannot operate in an economy that is ever more dominated by huge corporations. They cannot offer goods and services at competitive prices, and they cannot hire workers at competitive wages. Some small businesses will go out of business. Others sell out to private equity firms that "roll up" competing small businesses and create monopolies out of them. The monopolistic harm caused by such roll-ups is well-documented,[8] and makes it even more difficult for small businesses to compete with competitors with higher market share.

The link between small business entrepreneurship and noncompetes was first noticed by Columbia law professor Ronald Gilson in an influential article published during the dot-com boom in 1999.[9] Gilson argued that the legal ban on noncompetes in California

_____

[8] As an example, a recent study found that roll-ups of nursing homes has led to higher mortality rates for their residents as the quality of care suffered. Atul Gupta *et al.*, *Owner Incentives and Performance in Healthcare: Private Equity Investment in Nursing Homes*, REV. OF FIN. STUDIES, vol 37, 1029-77 (Nov. 22, 2023), *available at* https://academic.oup.com/rfs/article/37/4/1029/7441509.

[9] Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. Rev. 575 (1999).

contributed to the extraordinary technological innovation and economic prosperity of Silicon Valley. He drew a comparison to the Route 128 tech corridor near Boston which benefited from advantages similar to those enjoyed by Silicon Valley—proximity to major research universities, an agglomeration of computer-related businesses, a history of innovation, and a highly-educated population. But it was Silicon Valley alone that produced startup culture and the innovative firms that would spark the tech boom. The difference between the two hubs, Gilson argued, was the legal regime: Massachusetts enforced noncompetes while California banned them.[10] As a result, Silicon Valley engineers could, and did, switch from firm to firm in rapid succession, while Route 128 firms grew into vertically integrated behemoths in which employees idled away their entire careers.[11] Contrary to expectations of noncompete supporters, the rapid labor turnover in Silicon Valley did not harm employers but instead spread expertise far and wide, creating "knowledge spillovers" that supercharged innovation.[12]

---

[10] *Id.* at 578.
[11] *Id.* at 591-94, 605-07.
[12] *Id.* at 596, 608-09.

Numerous peer-reviewed academic studies have tested Gilson's hypothesis. As the FTC reports in the preamble to the Rule, the studies have consistently found that in states in which businesses are given the greatest latitude to enforce noncompetes, there are "decreased rates of [labor] mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within- and between industry mobility."[13] Moreover, recent evidence finds that even when startups form, more vigorous noncompete enforceability reduces the innovativeness of startups.[14]

---

[13] FTC Rule at 136; *see also* Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 REV. ECON. & STATISTICS 472 (2006); Matt Marx, Deborah Strumsky, & Lee Fleming, *Mobility, Skills, and the Michigan Non-Compete Experiment*, 55 MGMT. SCI. 875 (2009); Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J. L., ECON., & ORG. 376 (2011); Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, REV. OF FIN. STUDIES (2024), *available at* t.ly/UQSC4; Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 ILR REV. 783 (2019); Liyan Shi, *Optimal Regulation of Noncompete Contracts*, 91 ECONOMETRICA 425 (2023), https://www.econometricsociety.org/doi/10.3982/ECTA18128; Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J. L., ECON., & ORG. 633 (2020); Natarajan Balasubramanian *et al.*, *Locked In? The Enforceability of Non-Compete Clauses and the Careers of High-Tech Workers*, 57 J. HUM. RES. S349 (2022); Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 MGMT. SCI. 143 (2021); Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.

[14] See Johnson, Lipsitz, & Pei, *Innovation and the Enforceability of Noncompete Agreements: Evidence from State Law Changes*, NAT'L BUREAU OF ECON RES. (working paper) (July 2023), *available at* https://www.nber.org/papers/w31487.

In sum, noncompete agreements and other restrictive employment clauses pose significant challenges to small businesses and entrepreneurship. By hindering the ability of individuals to start their own companies, work for small businesses, and contribute to a competitive market, these agreements stifle innovation and economic growth, and interfere with the provision of goods and services in cities and towns across the country. Noncompetes eliminate not only competition, as their name suggests; they interfere with the knowledge spillovers that have been so essential for the booming tech economy. By eliminating noncompete agreements, the FTC Rule will promote small business and economic prosperity.

## II. Employers, Including Small Businesses, Overwhelmingly Support the Federal Trade Commission's Noncompete Ban

On April 23, 2024, FTC issued its final rule, 16 C.F.R. §§ 910, 912, after four months of reviewing public comments. Of the over 26,000 comments submitted for FTC review, roughly 25,000, or 96%, were in support of banning noncompetes.

These results are in keeping with other surveys regarding noncompetes, including those focused particularly on small businesses. For instance, a 2023 national poll of 312 small businesses conducted by

*amicus* Small Business Majority found that 59% of respondents support the Federal Trade Commission's proposed rule to ban noncompete agreements, with only 14% opposing the ban. Only 4% of respondents strongly opposed a noncompete ban.[15] Additionally, more than one-third of small business owners reported being prevented from hiring an employee due to a non-compete agreement, and nearly half said that they have been subject to a non-compete agreement that prevented them from starting or growing a business of their own.[16] Notably, 67% of respondents who in fact used noncompetes in their own businesses when the poll was taken were supportive of a noncompete ban,[17] and 69% of respondents felt that nondisclosure agreements were sufficient to protect confidential company information and/or trade secrets.[18]

Jacob Hanson, a constituent member of *amicus* Small Business Majority who owns a company called Panache based in Minnesota, noted

---

[15] Opinion Survey, *Small business owners support banning non-compete agreements*, SMALL BUSINESS MAJORITY (2023) (hereinafter "SBM Noncompete Survey"), *available at* https://smallbusinessmajority.org/sites/default/files/research-reports/2023-non-compete-poll-report.pdf.

[16] *Id.*

[17] *Id.*

[18] *Id.* In fact, recent research has shown that bans on noncompete agreements actually reduce the net total of trade secret-related litigation, perhaps due to the fact that such claims are often appended onto claims about violating noncompetes. Brad Greenwood, Bruce Kobayashi, & Evan Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Protection*, at 3 (2024), *available via SSRN at* t.ly/4ctJq.

noncompetes interfere with the incentives employers normally experience to maintain employees through job satisfaction, rather than the threat of legal sanction if employees leave for a competitor. "I can only do so much to keep people here. I simply make it difficult for them to want to leave. The best way I can go about it is to do what I can to make them stay." Hanson reported. "I see how companies use non-competes as a weapon and harass people," he continued. "They inhibit their ability to provide for their families. I think that there needs to be more education for employees. From what I've witnessed, I think non-competes are used to penalize employees and people are manipulated."[19] Jean Underwood, another constituent of *amicus* Small Business Majority who owns Design Mavens Architecture added: "I think it's a hindrance to people that want to start a small business. I think it's ridiculous. I didn't have a choice but to sign it. I was looking at a promotion and was told what's the big deal? You're not going anywhere, just sign it. It turns out the agreement wasn't well written, however enforceable in the state of

---

[19] *SBM Noncompete Survey, supra* n.15.

Illinois. I had to wait one year before being able to start the business with my partners."[20]

The Small Business Majority survey shows that, as a quantitative matter, noncompetes are unpopular with employers; but it also shows that, qualitatively, employers and employees working at small businesses have experienced firsthand how these restrictive terms have inhibited worker career growth, curtailed business development, and stunted entrepreneurial innovation. For example, other constituents of *amicus* Small Business Majority from around the country reported similar frustrations to those quoted above, and have noted the fundamental unfairness inherent in noncompetes:

- Tracy DuCharme, Color Me Mine (Colorado): "I honestly think doing a better job at your business is the way you compete, not by squashing the competition with legal arguments. I can't control any business except my own, and I succeed if I do a great job with my business. I hope to corner the market on Paint Your Own Pottery in my area just by being awesome at it. I have no problem with disallowing non-competes in most situations."

- Shirley Modlin, 3D Design and Manufacturing, LLC (Virginia): "I have never believed that any employer has the right to restrict opportunities of workers as relative to the worker's well-being and that of their family. As workers gain skills and experience throughout their careers, they must be

---

[20] *Id.*

15

allowed to use that knowledge to further their livelihoods in ways that are in their best interest."

- Filipe Monteiro, Guardian Capital Security (Massachusetts): "It's not fair to them. I understand life changes and is very difficult at this time. So, if they have a better opportunity and a better chance, I won't prevent that. I call it a containment of control. It's like being in prison if I'm making you sign a non-compete but the guy next door has a security company to pay you $3 an hour more and it's within a mile distance from your home. I can totally understand."

As these and the myriad other comments submitted to the FTC and to Small Business Majority indicate, most small businesses and the people who make them run are hindered by noncompetes and view them as fundamentally unfair.

## III. Noncompete Agreements Harm Both Workers and Consumers

Proponents of noncompete agreements who believe that labor markets are *de facto* competitive presume that workers would not agree to restrictions on employment freedom such as noncompetes unless they were paid more or otherwise received benefits from the employer in return for signing the noncompete. These proponents emphasize correlational studies documenting that find that workers with

noncompetes earn higher wages than those without such restrictions.[21] However, none of these studies are able to separate correlation from causation, and the studies that do account for selection into the use of any restrictive covenants finds negative earnings effects between 3-7%.[22]

More broadly, studies of what happens to wages when noncompetes are banned or a state begins to enforce noncompetes more vigorously find wages tend to fall by 3-4% across the board when states increase noncompete enforcement.[23] This is true for both low-wage workers and high-tech workers.[24] Leo Carr of Elite Group, a constituent member of

---

[21] *See* Donna Rothstein & Evan Starr, *Noncompete agreements, bargaining, and wages*, MONTHLY LABOR REV (2022), *available at* https://www.jstor.org/stable/48716860; *see also* Evan Starr, James J. Prescott, & Norman D. Bishara, *Noncompete agreements in the U.S. labor force*, J. OF L. AND ECON. 64, no. 1, 53-84 (2021). The only longitudinal study of noncompetes finds that noncompetes are associated with higher wages but no differences in wage growth. Bhargav Gopal & Li Xiangru, *Training and Job Separation in Imperfect Labor Markets: The Case of Non-Compete Agreements*, (Jan. 2024) (working paper), *available at* https://bhargavgopal.com/resources/paper2.pdf.

[22] Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (last revised May 2024) (working paper), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403.

[23] *See* Starr, *Consider This, supra* n.13.

[24] For a study of the Oregon law, *see* Lipsitz & Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements, supra* n.13. For a study of the Hawaii law *see* Balasubramanian, *Locked In?, supra* n.13; *see also* Benjamin Glasner, *The Effects of Noncompete Agreement Reforms on Business Formation: A Comparison of Hawaii and Oregon*, ECON. INNOVATION GRP. (Mar. 2023) (finding that the Hawaii ban increased new firm formation, though the Oregon one did not), *available at* https://eig.org/noncompetes-research-note/. For a study of high-wage noncompete bans, *see* Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do firms value court enforceability of noncompete agreements? a revealed preference approach*, REV. OF ECON. & STATS. (forthcoming), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674. For a study that aggregates across all low and high-wage noncompete bans, *see* B. N. Greenwood, B. H. Kobayashi, & E.

*amicus* Small Business Majority, captured the inherent logic of this outcome: "Non-compete agreements tend to only benefit the previous employer. Employees working under the mandates of a non-compete agreement are restricted from seeking new employment, prevented from opportunities to earn more in wages, upward mobility with another company, etc. It prevents the employee from capitalizing on their own skills and knowledge."[25]

Workers also need not be bound by a noncompete to experience their harms. In labor markets where enforceable noncompetes are common, the whole labor market is less dynamic: fewer workers change jobs, wages are lower, regardless of whether the workers are bound by a noncompete.[26] Similarly, when states more vigorously enforce noncompetes, wages fall not only for workers in the state, but also for workers in neighboring states who share a local labor market.[27] It is in

---

Starr *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation*, Donald G. Costello College of Business at George Mason Univ., Research Paper (Apr. 11, 2024).

[25] *SBM Noncompete Survey*, *supra* n.15.

[26] Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, (2019) ORGANIZATION SCIENCE, 30(5), 961-80.

[27] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.

this sense that noncompetes diminish the dynamism of labor markets broadly, even for workers who are not subject to them.

For consumers, the arithmetic is simple: they are harmed by the diminishment of innovation and product market competition due to the enforcement of noncompetes. Proponents of noncompetes rely on theoretical ideas that restrictions on worker mobility can spur firm investment, but ignore the strong empirical evidence that enforcing noncompetes actually reduces innovation substantially.[28] Moreover, enforcing noncompete agreements concentrates markets by reducing business formation and increasing the number of mergers, ultimately resulting in higher prices and diluted, reduced outputs.[29] For example, the main study on prices in the healthcare context—done by Naomi

---

[28] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Noncompete Agreements*, NAT'L BUREAU OF ECON RES. (working paper) (July 2023), *available at* https://www.nber.org/papers/w31487; Emma Rockall & Kate Reinmuth, *Protect or Prevent? Noncompete Agreements and Innovation* (working paper) (Jan. 2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683.

[29] *See* Hyo Kang & Lee Fleming, *Non-competes, Business Dynamism, and Concentration: Evidence from a Florida Case Study*, J. OF ECON. & MGMT. STRATEGY, vol. 29, 663-85 (2020); *see also* Michael Lipsitz & Mark J. Tremblay, *Noncompete Agreements and the Welfare of Consumers*, AM. ECON. ASS'N (2021), *available at* t.ly/jUJPv. Jeffers, *Impact of Restricting Labor Mobility*, *supra* n.13; Matt Marx, *Employee Non-compete Agreements, Gender, and Entrepreneurship*, ORGANIZATION SCIENCE, vol. 33, 1756-72 (2022), *available at* https://pubsonline.informs.org/doi/epdf/10.1287/orsc.2021.1506; K. A. Younge, T. W. Tong, & L. Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence From a Natural Experiment*, STRAT. MGMT. J., vol. 36, 686-708 (2014), *available at* https://funginstitute.berkeley.edu/wp-content/uploads/2014/05/smjyoungetongfleming1.pdf.

Hausman and Kurt Lavetti—finds that noncompete enforcement has directly led to higher prices and increased market concentration.[30] Further, concerns that the increase in wages expected from banning noncompetes (*i.e.*, due to the increase in employee mobility) will lead directly to increased prices for consumers ignore the well-established proposition that competition in both product and labor markets tends to *lower* prices, while increasing both output and product quality.[31] Thus, not only small businesses and employers will benefit from the increased competition the FTC Rule will foster—so too will consumers in the form of increased innovation, lower prices, and higher quality goods and services.

## IV. Existing Enforcement Mechanisms Chill Employee Choice and Ineffectively Police Unenforceable Noncompete Agreements

Noncompete regulatory policy is largely determined by states and common law. Excluding California, Minnesota, North Dakota, and Oklahoma, all states have adopted a regulatory approach to noncompetes

---

[30] Naomi Hausman & Kurt Lavetti, *Physician practice organization and negotiated prices: evidence from state law changes*, AM. ECON. J.: APPLIED ECON., vol. 13, 258-96 (2021), *available at* https://www.aeaweb.org/articles?id=10.1257/app.20180078.

[31] *See* Evan Starr, *Noncompete Clauses: A Policymaker's Guide through the Key Questions and Evidence*, at 19, ECON. INNOVATION GRP. (Oct. 2023), *available at* https://eig.org/wp-content/uploads/2023/10/Noncompete-Clauses-A-Policymakers-Guide.pdf.

premised on "reasonableness."[32] Interpreting this framework, courts generally deem noncompetes reasonable if they do not unduly harm a worker or society—a malleable and haphazardly enforced standard—and are no broader than necessary to protect employers' legitimate interests (e.g., trade secrets).[33] Proponents of this standard claim that the reasonableness standard sufficiently guards against anticompetitive harms, arguing that illogical and inherently unenforceable noncompetes, such as those foisted on low-wage workers, are "outlier cases."[34]

But seemingly illogical or outright unenforceable noncompetes are far from outliers in the United States workforce. A 2017 national survey of 634 private-sector businesses done by Alexander Colvin and Heidi Shierholz found that 31.8% of respondents reported using noncompetes for all employees, and 49.4% used them for some employees.[35] A different 2017 survey of 1,500 businesses found that 29.5% used noncompetes for all employees, while 66% used them for some employees.[36] A 2022 U.S.

---

[32] *Id.* at 2.

[33] *Id.*

[34] Erik Weibust and Stuart Gerson, *FTC's Noncompete Proposal Is Based On Misrepresentations* (2023), *available at* t.ly/nA9Av.

[35] Balasubramanian, *et al.*, *Employment Restrictions on Resource Transferability*, *supra* n.22, at 6.

[36] Starr, *Noncompete Clauses: A Policymaker's Guide*, *supra* n.31, at 4.

Government Accountability Office survey of the Society of Human Resources ("SHRM") database found that 55% of firms use noncompetes with some workers. That survey revealed that, among employers using noncompetes that have hourly workers, 55% used noncompetes across all positions, including for those hourly workers.[37] These surveys reveal a troubling reality: Noncompetes are often not tailored to specific roles, levels of seniority, or compensation rates, as required by state law. They are applied against janitors,[38] unpaid interns,[39] temporary Amazon packers,[40] and volunteers at nonprofits.[41] In fact, a 2014 nationally representative survey found that the typical worker with a noncompete was paid hourly, making $14 per hour at the median.[42]

---

[37] *Noncompete Agreements: Use is Widespread to Protect Business' Stated Interests, Restricts Job Mobility, and May Affect Wages*, at 8, GOV'T ACCOUNTABILITY OFF., 8 (2022), *available at* https://www.gao.gov/assets/gao-23-103785.pdf.

[38] Kadhim Shubber, *Cushman v the cleaner: the fight over non-competes*, FINANCIAL TIMES (2018), *available at* https://www.ft.com/content/bfb69d30-ce44-11e8-b276-b9069bde0956.

[39] Suzanne Lucas, *Warning: Your Internship May Come with a Non-Compete Agreement*, INC. MAGAZINE (2019), *available at* https://www.inc.com/suzanne-lucas/warning-your-internship-may-come-with-a-non-compete-agreement.html.

[40] *Spencer Woodman*, Exclusive: Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes, THE VERGE (2015), *available at* https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-exclusive-noncompete-contracts.

[41] Starr, *Noncompete Clauses: A Policymaker's Guide*, *supra* n.31, at 3 (citing the Girls on the Run International ("GOTR") online volunteer application form).

[42] *See generally* Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 MGMT. SCI. 143 (2021).

Many employers are clearly aware that noncompetes will deter employees from leaving jobs, regardless of their legality or enforceability.[43] For example, in California, where noncompetes have been unenforceable since 1872, 29.3% of employers still apply noncomplete clauses to all worker agreements.[44] In fact, nearly every nationally representative study of noncompete use determines that they are found in similar levels in states that will and will not enforce them.[45] For sophisticated employers, there is a presumptive reliance on the "*in terrorem* value" of a noncompete agreement when the employee does not know it is unenforceable.[46] Regardless of enforceability, noncompetes are tethered to reduced employee mobility and associated with alterations to search and recruitment behavior from competitors and noncompetitors.[47] Workers believe noncompetes are enforceable, and beliefs about the

---

[43] Starr, *Noncompete Clauses: A Policymaker's Guide*, *supra* n.31, at 4.

[44] *Id.*

[45] *See* Balasubramanian, *et al.*, *Employment Restrictions on Resource Transferability*, *supra* n.22; Evan Starr, James J. Prescott, & Norman D. Bishara, *Noncompete agreements in the U.S. labor force*, J. OF L. AND ECON. 64, no. 1, 53-84 (2021); Donna Rothstein & Evan Starr, *Noncompete agreements, bargaining, and wages*, MONTHLY LABOR REV. (2022), *available at* https://www.jstor.org/stable/48716860.

[46] Catherine L. Fisk, *Reflections on the New Psychological Contract and the Ownership of Human Capital*, 34 CONN. L. REV. 765, 782-83 (2001).

[47] Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J. L., ECON., & ORG. 633 (2020).

law—as opposed to the law itself—are consequential to their actions.[48] Indeed, when presented with the opportunity to purchase the ability to enforce noncompetes by giving workers small raises, employers were not willing to do so—instead relying on either unenforceable noncompetes or other, less restrictive terms.[49]

Even when courts explicitly deem noncompetes unreasonable and unenforceable, employers continue to foist such terms on employees. For example, in 2019, a Michigan court found that Prudential Security's noncompete for security guards—which had a $100,000 damages clause for violations of its terms—was unreasonable and therefore unenforceable. After the ruling, Prudential kept using that exact noncompete for security guards.[50] Another employer, Total Quality Logistics, was recently found to have been using the exact noncompete language that had previously been deemed overbroad.[51] Employers can

---

[48] J.J. Prescott & Evan Starr, *Subjective Beliefs about Contract Enforceability*, (2022) Forthcoming at Journal of Legal Studies.

[49] *See* Hiraiwa, *et al.*, *Do firms value court enforceability of noncompete agreements?*, *supra* n.24.

[50] *See* Complaint, *In re Matter of Prudential Security, Inc.*, at 3-5 (F.T.C. Feb. 23, 2023) https://www.ftc.gov/system/files/ftc_gov/pdf/c47872210026prudentialsecurityfinalconsent.pdf.

[51] *See* Clarissa Hawes, *TQL's noncompete hurts ex-employee's job prospects, lawsuit claims*, FREIGHTWAVES (Aug. 31, 2022), *available at* https://www.freightwaves.com/news/tqls-noncompete-hurts-ex-employees-job-prospects-lawsuit-claims. Specifically, the attorney notes: "The big problem with TQL's noncompete is

incorporate unenforceable noncompete clauses into employment contracts without fear of legal liability in most states. If the noncompete ever reaches court, the court will either decline to enforce it or "blueline" a narrower version of it; there is rarely a penalty and sanction for deliberately using a noncompete that an employer knows to be unenforceable.

Both enforceable and unenforceable noncompetes chill employee choice and mobility (albeit, as noted above with respect to the experience in California, *see supra* at 8-10, less forcefully for unenforceable noncompetes), and status quo enforcement mechanisms premised on an ad-hoc reasonableness assessment fail to dissuade employers from using noncompetes. The use and efficacy of noncompetes is therefore not fully tethered to their enforceability; employers will continue using them regardless of legality and many employees will continue to reasonably believe in their enforceability and react accordingly. Hence the need for the FTC Rule, which requires employers to inform employees that their noncompetes are illegal, and establishes a clear, national framework

---

that 'it's drafted so broadly, everyone knows it's overbroad and won't be enforced as written. And courts have held that it is overbroad and can't be enforced as written. But Ohio has a doctrine that authorizes courts to reform overbroad noncompetes.'"

governing noncompetes that recognizes the impact these restrictions have across our entire economy.

## CONCLUSION

For the foregoing reasons, the *amici* respectfully submit that the Court should deny Plaintiffs' Motions to stay the effective date of the Final Rule.

Respectfully submitted,

June 4, 2024

Eric A. Posner
1111 E. 60th St.,
Chicago, IL 60637
(773) 702-0425
eposner@uchicago.edu

/s/ Jamie Crooks

Jamie Crooks
  *Counsel of Record*
Alexander Rose
FAIRMARK PARTNERS LLP
1001 G Street, NW, Ste. 400E
Washington, DC 20001
(617) 721-3587
jamie@fairmarklaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify the foregoing complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, that the foregoing brief contains 5,309 words, including footnotes, and excluding the case caption, table of contents, table of authorities, signature block, and certificates, and that the foregoing is typed in 14-point font and the footnotes are typed in 11-point font.

Date: June 4, 2024

/s/ Jamie Crooks
Jamie Crooks

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the foregoing document was electronically filed in this matter with the Clerk of Court, using the ECF system, which sent notification of such filing to all counsel of record.

Date: June 4, 2024

/s/ *Jamie Crooks*
Jamie Crooks