**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

RYAN, LLC,

          *Plaintiff*,

   v.

          Civil Action No. 3:24-cv-0986-E

FEDERAL TRADE COMMISSION,

          *Defendant*.

**AMICUS BRIEF OF U.S. REPRESENTATIVE MATT GAETZ
IN SUPPORT OF DEFENDANT FEDERAL TRADE COMMISSION**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................ii

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................... 1

SUMMARY OF ARGUMENT ....................................................................... 2

ARGUMENT ..................................................................................................... 5

   I. CONGRESS GAVE THE FEDERAL TRADE COMMISSION AUTHORITY TO ISSUE SUBSTANTIVE RULES. ................................................................ 5

   II. CONGRESS PROVIDES REGULAR OVERSIGHT OF THE FEDERAL TRADE COMMISSION AND HAS AUTHORITY TO OVERTURN ITS RULES. ......................................................................................................... 9

   III. THE FEDERAL TRADE COMMISSION'S RULE BANNING NONCOMPETES HELPS AMERICAN WORKERS AND FOLLOWED A LAWFUL AND COMPREHENSIVE ISSUANCE PROCESS ...................... 13

   IV. CONCLUSION ........................................................................... 16

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Humphrey's Executor v. United States*,

    295 U.S. 602, 648 (1935) .........................................................................................6

*Nat'l Petroleum Refiners Ass'n v. F.T.C.*,

    482 F.2d 672, 674 (D.C. Cir. 1973).....................................................................4, 7

*Standard Oil Co. of New Jersey v. U.S.*,

    221 U.S. 1, 60 (1911) ..............................................................................................5

*United States v. JS & A Group, Inc.*,

    716 F.2d 451, 454 (7th Cir. 1983) ..........................................................................9

## <u>Statutes</u>

15 USC § 46(g) ...............................................................................................................6

15 U.S.C. § 57a ..............................................................................................................8

5 U.S.C. § 551 ..............................................................................................................11

5 U.S.C.A. § 801 ..........................................................................................................11

Federal Trade Commission, 63d Cong, 3d Sess, in 51 Cong. Rec. 13047 (1914).........6

H.J. Res. 109, 118th Congress (2023-2024) ...............................................................11

H.J. Res. 88, 118th Congress (2023-2024) .................................................................11

H.R. Rep. No. 93-1107 (1974).......................................................................................8

H.R. Rep. No. 96-917 (1980).........................................................................................9

Magnuson-Moss Warranty Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975) .................8

S.J. Res. 23, 118th Congress (2023-2024)....................................................................11

S.J. Res. 58, 118th Congress (2023-2024)....................................................................11

S.J. Res. 61, 118th Congress (2023-2024)....................................................................11

S.J. Res. 62, 118th Congress (2023-2024)....................................................................11


**Other Authorities**

Alexander J.S. Colvin & Heidi Shierholz, *Noncompete Agreements*,

  Econ. Policy Inst. Rep. (2019)......................................................................................14

Brian Feinstein, *Congress in the Administrative State*,

  95 Wash. U.L. Rev. 1189 (2018)..................................................................................12

Control of Corporations, Persons, and Firms Engaged in Interstate Commerce, S Rep

  No 1326, 62d Cong, 3d Sess 1, at 10 (1913)..............................................................6

Dow Vatow, *Antitrust in 1914: The Climate of Opinion*, American Bar Association,

  Section of Antitrust Law, vol. 24, at p. 14 (1964).....................................................5

Efraim Benmelech & Nittai K. Bergman & Hyunseob Kim, *Strong Employers and

  Weak Employees*, Journal of Human Resources, vol 57(S), S200-S250 (2022)......13

Federal Trade Commission, Noncompete Clause Rule, 16 CFR Part 910, Section

  IV.D.2.b. ...............................................................................................................14, 15

Individual commented, FTC-2023-0007-12813 ............................................................15

Individual commenter, FTC-2023-0007-0509 ...............................................................15

Individual commenter, FTC-2023-0007-2996 ............................................................ 15

Individual commenter, FTC-2023-0007-3499 ............................................................ 15

Individual commenter, FTC-2023-0007-4541 ............................................................ 15

Individual commenter, FTC-2023-0007-6489 ............................................................ 15

Individual commenter, FTC-2023-0007-7561 ............................................................ 15

Individual commenter, FTC-2023-0007-8852 ............................................................ 15

Individual commenter, FTC-2023-0007-9563 ............................................................ 15

Individual commenter, FTC-2023-0007-9920 ............................................................ 15

José Azar & Ioana Marinescu & Marshall Steinbaum & Bledi Taska, *Concentration in*

*US labor markets: Evidence from online vacancy data*, Labour Economics, vol 66.

(2020) ...................................................................................................................... 13

Josh Chafetz, *Congress's Constitution*, 160 U. Pa. L. Rev. 715 (2012) ...................... 10

Justin Hurwitz, *Chevron and the Limits of Administrative Antitrust*, 76 U Pitt L Rev

209, 250–52 (2014) ................................................................................................... 8

Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of*

*Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022) ....................................... 14

*The Congressional Review Act (CRA): A Brief Overview*,

CONGRESSIONAL RESEARCH SERVICE (2023) ............................................................ 11

## INTEREST OF AMICUS CURIAE

*Amicus curiae* is a Member of Congress, sitting on the House Judiciary Committee. *Amicus curiae* has a special interest in ensuring that federal administrative agencies are able to faithfully exercise the authorities Congress delegated to them by statute without undue judicial interference.

*Amicus curiae* believes that the Federal Trade Commission issued a final rule banning certain noncompete clauses from employment agreements after thorough and comprehensive review of evidence. Furthermore, *amicus* believes that the substance of the final rule is a reasonable exercise of the Federal Trade Commission's delegated authority, and that it is the purview of Congress and the President to overturn or amend it, if they believe it to be bad policy.

## SUMMARY OF ARGUMENT

Economic liberty is the foundation of a free society and the bedrock of American democracy. The promise that hard work, competitive vigor, and individual effort will be rewarded with prosperity is one that has flourished in America from the very beginning. This proposition has not been untested. In 1890, our forebearers in Congress adopted the Sherman Act in the face of widespread public recognition that uncontrolled economic individualism had led to private restraints that tolerated neither individualism nor freedom. And after the Supreme Court in 1911 watered down the Sherman Act's prohibition against restraints of trade, Congress adopted the Federal Trade Commission Act in 1914 with the intent of limiting judicial activism and creating a more efficient system of enforcement to protect American consumers, workers, and entrepreneurs. The FTC Act created a commission composed of five members appointed by the President, subject to the advice and consent of the Senate, and unambiguously vested them with rulemaking authority.

The creation of the Federal Trade Commission was a lawful exercise of Congress's Article I legislative power. For over a century, Congress's express delegation of substantive rulemaking authority to the Commission's term-appointed members has enhanced the fairness of the American economy for workers, consumers, and small businesses. The Federal Trade Commission's rule banning certain noncompete clauses has nevertheless revived a debate over the extent of the Commission's rulemaking

authority – one which Congress has repeatedly settled. Following the United States Court of Appeals for the District of Columbia Circuit's decision in *National Petroleum* – holding that such rulemaking authority extended to substantive rules – Congress twice amended the Federal Trade Commission Act. In both instances, Congress expressly declined to limit the Commission's relevant statutory rulemaking authority.

The final rule banning certain noncompete clauses is squarely within the Commission's statutory rulemaking authority, first legislated by Congress over a century ago and repeatedly reaffirmed since. The rule is the result of an extensive economic and legal inquiry into the harms of noncompete clauses to workers, consumers, and small businesses. The deliberative process went above and beyond ordinary notice-and-comment rulemaking requirements, extending the comment period by over a month and eliciting over 26,000 public comments.  These comments were the subject of careful consideration by the Commission and fully addressed in the final rule. It is the work of a politically accountable body that Congress created to fulfill this precise purpose, to provide more efficient enforcement of an intentionally broad prohibition against "unfair methods of competition."

The current challenge to the Commission's rule banning noncompetes is more than just an academic inquiry into the Commission's powers. For over 30 million impacted American workers, the rule represents the right to seek work and be productive in one's chosen profession or trade. The final rule promises to restore the ability of

3

workers to negotiate for improved working conditions, and to avoid being doubly harmed by the enforcement of a noncompete clause following termination of employment for any reason. It represents over $30 billion per year in lost wages, flowing from the reduced bargaining power of workers who derive leverage from the ability to take their labor elsewhere.

"The Federal Trade Commission is a creation of Congress, not a creation of judges' contemporary notions of what is wise policy." *Nat'l Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672, 674 (D.C. Cir. 1973). Congress is the body best situated to oversee the Commission, and Congress is the appropriate check to rules issued by Executive branch administrative agencies. Congress intended to – and did – provide the Federal Trade Commission with authority to prohibit noncompete clauses as an unfair method of competition, and *Amicus* calls on this Court to give weight to that intent.

**ARGUMENT**

## I.   CONGRESS GAVE THE FEDERAL TRADE COMMISSION AUTHORITY TO ISSUE SUBSTANTIVE RULES.

In creating the Federal Trade Commission, Congress designed an efficient and politically accountable system for protecting and enhancing the fairness of the American economy. The Federal Trade Commission Act was adopted by Congress in 1914 in the wake of concern that the nation's foundational antitrust law, the Sherman Act of 1890, had been eroded by the Supreme Court's decision in *Standard Oil Co. v. United States*, which held that only "undue" restraints of trade or commerce were prohibited by the Sherman Act.[1]  Supporters of strict enforcement against restraints of trade were worried that *Standard Oil* would relax rather than increase control over competition.[2] But business groups also had cause for concern. To them, *Standard Oil* represented the precarity of their position becoming even more uncertain with the ascendancy of judicial discretion.[3]

Congress, for its part, also saw *Standard Oil* as an out and out grab by the judiciary of legislative power. In a 1913 Report to the Senate Committee on Interstate Commerce, Senator Cummins warned against "substitut[-ing] the court in the place of Congress."[4] The Cummins Report cautioned against testing every potential restraint of trade "by the

---

[1] *Standard Oil Co. of New Jersey v. U.S.*, 221 U.S. 1, 60 (1911).
[2] Dow Vatow, *Antitrust in 1914: The Climate of Opinion*, American Bar Association, Section of Antitrust Law, vol. 24, at p. 14 (1964).
[3] *Id.*, at 15.
[4] Control of Corporations, Persons, and Firms Engaged in Interstate Commerce, S Rep No 1326, 62d Cong, 3d Sess 1, at 10 (1913) (the "Cummins Report")

5

economic standard which the individual members of the court happen to approve."[5] A year prior to the birth of the Federal Trade Commission, the Cummins Report recommended "establishing a commission for the better administration of the law and to aid in its enforcement."[6] And Congress did precisely that.

With the Federal Trade Commission Act of 1914, Congress created an administrative body "to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed."[7] And it endowed the Federal Trade Commission with authority "to make rules and regulations for the purpose of carrying out the provisions of this Act."[8] It was an unambiguous grant of authority, adopted by overwhelming majorities of both chambers of Congress, following testimony that a politically accountable commission under the aegis and constant supervision of Congress was preferred to the "abstract propositions [] argued in the seclusion of the courts."[9] In 1973, the United States Court of Appeals for the District of Columbia Circuit clarified that the Federal Trade Commission's authority extended to the issuance of substantive rules, not just procedural ones, holding that the text of Section 6(g) "as clear as it is unlimited."[10] The *National Petroleum* case was a challenge by two trade associations and 34 gasoline refining companies to a rule declaring that failure to post

---

[5] *Id.*
[6] *Id.*
[7] *Humphrey's Executor v. United States*, 295 U.S. 602, 648 (1935)
[8] 15 USC § 46(g).
[9] Federal Trade Commission, 63d Cong, 3d Sess, in 51 Cong. Rec. 13047 (1914).
[10] *Nat'l Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672, 693 (D.C. Cir. 1973).

octane rating numbers on gasoline pumps at service stations was an unfair method of competition and an unfair or deceptive act or practice.[11] The D.C. Circuit held that the Commission had issued its rule "to carry out what the Congress agreed was among its central purposes: expedited administrative enforcement of the national policy against monopolies and unfair business practices."[12] The court continued: "Under the circumstances, since Section 6(g) plainly authorizes rule-making and nothing in the statute or in its legislative history precludes its use for this purpose, the action of the Commission must be upheld." *Id.*

In 1975, two years after the D.C. Circuit Court's ruling in *National Petroleum*, Congress amended the FTC Act for the first time since the Wheeler-Lea Amendment of 1938. If Congress disagreed with the court's holding in *National Petroleum*, it could have limited the Commission's substantive rulemaking authority. Instead, Congress doubled down, enacting the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act ("Magnuson-Moss") to remove any doubt that the FTC has express authority to issue substantive, industry-wide rules.[13] Specifically, Magnuson-Moss expanded the Commission's authority to issue rules prohibiting "unfair or deceptive acts or practices," subject to heightened procedural requirements, and left intact the Commission's authority to issue rules regarding "unfair methods of competition."[14] In

---

[11] *Id.*, at 674.
[12] *Id.*, at 693.
[13] Magnuson-Moss Warranty Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).
[14] *Id.*, at Sec. 202(a).

doing so, Congress *expressly* rejected a House version of the bill that would have curtailed the FTC's rulemaking authority regarding "unfair methods of competition."[15] Instead, in the wake of the District Court's affirmation of substantive rulemaking authority in *National Petroleum*, Congress expressly re-affirmed that the law did "not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce."[16] The United States Court of Appeals for the Seventh Circuit concurred, holding that "[i]n enacting Section 202 [of the Magnuson-Moss Act], Congress intended to preserve the Commission's existing substantive rulemaking authority while providing additional procedural safeguards for such rulemaking in the future only."[17]

Five years after Magnuson-Moss, Congress again reaffirmed the FTC's rulemaking authority with respect to "unfair methods of competition" when it adopted the Federal Trade Commission Improvements Act of 1980. As with Magnuson-Moss, the 1980 amendments added further procedural requirements to the Commission's rulemaking authority over "unfair or deceptive acts or practices," but again expressly

---

[15] H.R. Rep. No. 93-1107 (1974); *see also* Justin Hurwitz, *Chevron and the Limits of Administrative Antitrust*, 76 U Pitt L Rev 209, 250–52 (2014).

[16] Pub. L. No. 93–637, 88 Stat. 2183 (1975); 15 U.S.C. § 57a.

[17] *United States v. JS & A Group, Inc.*, 716 F.2d 451, 454 (7th Cir. 1983) (citing H.R.Rep. 93–1606, 93rd Cong., 2d Sess. 31–32; H.R.Rep. 93–1107, at 45–46; U.S. Code Cong. & Admin. News 1974, p. 7702; 120 Cong.Rec. 31738, 41406)

declined to amend the Commission's Section 6(g) authority to issue rules regarding "unfair methods of competition."[18]

The Court should reject the present effort to revive a long-settled debate regarding the Federal Trade Commission's authority to issue substantive rules. The Commission's Section 6(g) rulemaking power is not an open question, and Congress did not intend for the issue to be litigated each time the Commission seeks to adopt or enforce a rule.[19] And in fact, it is precisely concern over judicial activism that gave rise to these, and other, delegations of authority to federal agencies. Repeatedly, when faced with the opportunity to amend the Federal Trade Commission Act, Congress has upheld, or even expanded the Commission's substantive rulemaking authority over unfair methods of competition.

## II.    CONGRESS PROVIDES REGULAR OVERSIGHT OF THE FEDERAL TRADE COMMISSION AND HAS AUTHORITY TO OVERTURN ITS RULES.

Congress' delegation of rulemaking authority to the Federal Trade Commission does not obviate Congress's ongoing oversight of, and influence upon, the priorities and actions of the agency. To the contrary, Congress retains its general legislative power, which gives it the ability to conduct oversight, modify or repeal regulations, and amend agencies' underlying statutory authority. Congress's direct powers are well known. They

---

[18] H.R. Rep. No. 96-917, at 1146–47 (1980)
[19] *JS & A Grp., Inc.*,, at 454 (7th Cir. 1983)

9

include Congress's legislative and appropriations authority, contempt proceedings, and its Article II authority to advise and consent regarding the nomination and appointment of judges and "principal" officers – including members of the Federal Trade Commission. Each of these powers militate against potential abuses of the authority delegated to administrative agencies by Congress.[20]

Congress's soft powers – including its regular oversight of administrative agencies – provide other potent mechanisms for influencing administrative action. Derived from the legislative powers vested in Congress by Article I of the Constitution, the "power of Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins v. United States*, 354 U.S. 178, 187 (1957). Congress's power to oversee administrative agencies is reinforced by statute, and Congress has, over time, strengthened its oversight of the administrative rulemaking process. The Congressional Review Act of 1996, for instance, requires administrative agencies to report the issuance of "rules," defined broadly,[21] to Congress and provides Congress with authority to overturn rules through special procedures, namely a joint resolution of disapproval.[22] That authority is not dormant: the Congressional Review Act has been employed successfully to overturn 20 administrative rules, 19 of them since

---

[20] Josh Chafetz, *Congress's Constitution*, 160 U. Pa. L. Rev. 715, 725-741 (2012).
[21] 5 U.S.C. §551.
[22] 5 U.S.C.A. § 801.

2017.[23] An additional joint resolution of disapproval has passed both chambers of Congress and is awaiting action by the President,[24] and an additional six joint resolutions of disapproval have passed one chamber of Congress and are pending before the other chamber.[25] Since the Federal Trade Commission adopted its final rule prohibiting noncompete agreements, no such joint resolution of disapproval has been introduced in either chamber of Congress.

The breadth of Congress's oversight of administrative rulemaking extends to the hundreds of oversight hearings held by Congress and its Committees every year. Beyond Congress's direct staff-level engagement with administrative agencies, both chambers hold televised hearings to engage in periodic review of agency authorities and appropriations, including interrogation of principal and subordinate officers of administrative agencies. These proceedings are not without effect and carry with them the implicit and actual threat of sanctions or future legislation if an agency does not alter its behavior to be more consistent with Congressional preferences. An empirical study of Congressional oversight of administrative agency "infractions," or agency actions that are potential subjects of oversight hearings, reveals that when Congress holds an oversight hearing, the likelihood of an infraction reoccurring is reduced by 18.5

---

[23] *The Congressional Review Act (CRA): A Brief Overview,* CONGRESSIONAL RESEARCH SERVICE (2023).
[24] H.J. Res. 109, 118th Congress (2023-2024).
[25] S.J. Res. 62, 118th Congress (2023-2024); S.J. Res. 23, 118th Congress (2023-2024); S.J. Res. 58, 118th Congress (2023-2024); S.J. Res. 61, 118th Congress (2023-2024); H.J. Res. 88, 118th Congress (2023-2024); S.J. Res. 62, 118th Congress (2023-2024).

percent.[26] Far from an abdication of Congress's legislative duties, Congress's routine oversight of administrative agency rulemaking reduces the recidivism of agencies operating inconsistently with Congress's intent, and provides a critical Constitutional check on presidential administration.

Although a lack of political will or the presence of genuine disagreement may sometimes lead to gaps or imperfections in Congressional oversight, there is no question that Congress is equipped with powerful oversight tools. When Congress feels that an Executive Branch agency is overstepping its bounds, Congress does act. In the current Congress, impeachment proceedings have been initiated against officers of the United States precisely on the grounds of their stubborn noncompliance with congressional oversight, and a number of Congressional Review Act rules have been introduced. Conversely, less than a month ago, the Chairwoman of the FTC herself testified before the House Appropriations Subcommittee on Financial Services and General Government to reiterate her agency-wide appropriations request. The challenged rule itself was a subject of discussion at that hearing, and while not technically within the bounds of any federal abstention doctrine, the pendency of such "merits proceedings" in Congress should give coequal branches pause before wading in.

---

[26] Brian Feinstein, *Congress in the Administrative State*, 95 Wash. U.L. Rev. 1189, 1236 (2018).

### III. THE FEDERAL TRADE COMMISSION'S RULE BANNING NONCOMPETES HELPS AMERICAN WORKERS, AND FOLLOWED A LAWFUL AND COMPREHENSIVE ISSUANCE PROCESS

The Federal Trade Commission's rule prohibiting most employers from entering into or enforcing noncompete agreements with certain workers, subject to narrow exceptions, is a vindication of economic freedom and free enterprise. Rooted in Section 5 of the FTC Act's prohibition against "unfair methods of competition," the rule reflects the ideal that all power concentrations in the United States, whether public or private, should be limited. Recent studies have found a direct relationship between job market concentration and wage stagnation.[27] Noncompete agreements exacerbate that harm by further restricting workers from seeking opportunities in their chosen profession or trade and, in turn, reducing their bargaining power to seek a fair wage and working conditions. The Commission found noncompete agreements to be "pervasive across industries," conservatively estimating that approximately one in five American workers – or approximately 30 million workers – is subject to a noncompete agreement.[28] A large share of workers subject to noncompete agreements are relatively low-earning workers, and 53 percent of workers covered by noncompete agreements are hourly workers.[29]

---

[27] José Azar & Ioana Marinescu & Marshall Steinbaum & Bledi Taska, *Concentration in US labor markets: Evidence from online vacancy data*, Labour Economics, vol 66. (2020); Efraim Benmelech & Nittai K. Bergman & Hyunseob Kim, *Strong Employers and Weak Employees* Journal of Human Resources, vol 57(S), S200-S250 (2022)

[28] Alexander J.S. Colvin & Heidi Shierholz, *Noncompete Agreements*, Econ. Policy Inst. Rep. (2019)

[29] Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022)

The Federal Trade Commission's final rule is deeply rooted in empirical research and careful consideration of tens of thousands of public comments. While comprehensive in its approach to protecting most workers from the harms of noncompete agreements, it is also tailored in other ways that demonstrate the Commission's careful consideration of the evidence. For instance, the final rule would not invalidate existing noncompete agreements for certain senior executives, which makes sense. These noncompete agreements are more likely the result of tailored negotiations and less likely to be exploitative or coercive.[30] The final rule also makes exception for noncompete agreements entered into in the context of a bona fide sale of a business entity, based on comments that noncompetes between the seller and the buyer of a business might be necessary to protect the value of the sale by ensuring the effective transfer of the business's goodwill.[31]

The extensive public comments received by the Federal Trade Commission are testament to the need for this rule. In the span of just 104 days, the Commission received more than 26,000 comments on the proposed rule, with the vast majority—over 25,000 comments—in support of the proposed ban on noncompetes. Many of the comments reveal the disturbing and offensive nature of noncompete agreements. Multiple commenters describe being restrained by a noncompete clause and being sued for

---

[30] Federal Trade Commission, Noncompete Clause Rule, 16 CFR Part 910, Section IV.D.2.b.
[31] *Id.*, at V.A.2.

violation of a noncompete clause after they were fired for declining the Covid vaccine.[32] Other commenters were prevented from seeking alternate employment after enduring sexual assault, harassment, and emotional abuse in the workplace.[33] Numerous workers report being forced to file for unemployment compensation after being terminated from employment because noncompete clauses remained enforceable– sometimes for years.[34] Dozens of workers report having filed for bankruptcy after being barred from alternate employment, or after facing prolonged litigation for unwitting violation of a noncompete clause.[35] Hundreds of comments were submitted anonymously, likely out of fear that their employers would retaliate against them if their names became public.

These stories speak to a broader problem. Just as our forebearers toward the end of the 19th Century began to recognize that uncontrolled economic individualism had led to private restraints that tolerated neither individualism nor freedom, *Amicus* similarly recognizes that noncompete agreements are often coercive private restraints masquerading as freedom of contract. Banning these restraints is well within the Federal Trade Commission's prerogative, mandated by Congress, to prohibit unfair methods of competition and issue substantive rules in furtherance of that intent.

---

[32] Individual commenter, FTC-2023-0007-7561; Individual commenter, FTC-2023-0007-6489; Individual commenter, FTC-2023-0007-3499

[33] Individual commenter, FTC-2023-0007-0509; Individual commenter, FTC-2023-0007-8852; Individual commenter, FTC-2023-0007-2996.

[34] Individual commenter, FTC-2023-0007-9563; Individual commented, FTC-2023-0007-12813

[35] Individual commenter, FTC-2023-0007-4541; Individual commenter, FTC-2023-0007-9920

## IV.   CONCLUSION

For the foregoing reasons, *Amicus* Member of Congress Representative Matt Gaetz respectfully requests that this Court give credence to Congress' express and repeated grant of rulemaking authority to the Federal Trade Commission and uphold the Commission's final rule banning noncompetes as a valid exercise of that authority.


Dated: June 4, 2024                                         Respectfully submitted,



                                                            By: */s/ Andrew Kloster*
                                                            Andrew Kloster
                                                            New York State Bar No. 4960399
                                                            (*Pro hac vice* forthcoming)

                                                            2021 Rayburn HOB
                                                            Washington, D.C. 20515
                                                            andrew.kloster@mail.house.gov

                                                            **Counsel for Amicus Curiae**



                                                            Matt Gaetz, Member of Congress (FL-01)


16