# EXHIBIT A



UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, D.C. 20580

Office of Commissioner
Andrew N. Ferguson

**Dissenting Statement of Commissioner Andrew N. Ferguson**

**Joined by Commissioner Melissa Holyoak**

In the Matter of the Non-Compete Clause Rule
Matter Number P201200
June 28, 2024

On April 23, 2024, the Commission promulgated the Non-Compete Clause Rule ("Final Rule").[1] It bans all employee noncompete agreements—agreements in which an employee agrees not to work for his or her employer's competitor after his or her employment. It is by far the most extraordinary assertion of authority in the Commission's history. It categorically prohibits a business practice that has been lawful for centuries. It invalidates thirty million existing contracts. It redistributes nearly half a trillion dollars of wealth. And it preempts the law of forty-six States. It does all of this on the basis of a few words in a 110-year-old statute—the Federal Trade Commission Act ("FTC Act")[2]—words that the Commission had never used to regulate noncompete agreements until the day before this rulemaking began.

Whatever the Final Rule's wisdom as a matter of public policy, it is unlawful. Congress has not authorized us to issue it. The Constitution forbids it. And it violates the basic requirements of the Administrative Procedure Act.

I therefore respectfully dissent.

I

A noncompete agreement is exactly what it sounds like. It is an agreement between two parties limiting the extent to which they will compete with each other. These agreements take many forms,[3] but we are here concerned with only one type: agreements in which an employee

---

[1] Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024).

[2] 15 U.S.C. §§ 45(a), 46(g).

[3] For example, noncompete agreements are a "classic 'ancillary'" restraint accompanying the sale of a business, in which the seller agrees not to compete with the purchaser of the business in order to ensure that the purchaser can realize the full value of the business he or she is purchasing. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.3 (1988). The Final Rule does not reach these agreements. Final Rule, 89 Fed. Reg. at 38,504.

1

agrees not to compete against his or her employer, including securing employment with a competitor of his or her employer, after the conclusion of their employment relationship.[4]

A

Noncompete agreements are not new. They are much older than the Republic.[5] And they have been the subject of extensive and complex regulation for centuries. The reason for their regulation is obvious. The Anglo-American legal tradition protected the right to ply one's trade.[6] English "law abhor[red] idleness"[7] and viewed noncompete agreements as imposing idleness on a society that could ill afford it.[8] Medieval English courts therefore uniformly proscribed agreements that prohibited tradesmen from practicing their trades.[9]

Regulatory hostility to noncompete agreements loosened as the economy became more complex.[10] Then in 1711, the Queen's Bench decided the seminal case of *Mitchel v. Reynolds*.[11] The noncompete agreement there forbade a baker who leased his business from competing against the lessor for the duration of the lease.[12] The *Mitchel* court explained that such restraints had traditionally been proscribed because of "the mischief which may arise . . . to the party, by the loss of his livelihood, and the subsistence of his family," and "to the publick, by depriving it

---

[4] Final Rule, 89 Fed. Reg. at 38,502–03.

[5] See Charles E. Carpenter, *Validity of Contracts Not to Compete*, 76 U. Pa. L. Rev. 244, 244–45 (1928) (discussing reported cases addressing species of noncompete agreements dating back to the fourteenth and fifteenth centuries); see also Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 626 (1960) (explaining that noncompete agreements "comprise one of the traditional common-law 'restraints of trade' and present problems which have kept them before the courts for more than five hundred years").

[6] See 1 William Blackstone, Commentaries *427 ("At common law, every man might use what trade he pleased."); *Darcy v. Allein*, 77 Eng. Rep. 1260, 1263 (K.B. 1603) ("[E]very man's trade maintains his life, and therefore he ought not to be deprived or dispossessed of it, no more than of his life."); *Corfield v. Coryell*, 6 F. Cas. 546, 551–52 (C.C.E.D. Pa. 1823) (including the practice of one's chosen trade among the privileges and immunities of "citizens of all free governments"); *Golden Glow Tanning Salon, Inc. v. City of Columbus*, 52 F.4th 974, 982–84 (5th Cir. 2022) (Ho, J., concurring) (expounding history of Anglo-American protections of the right to "pursue one's occupation against arbitrary government restraint").

[7] *The Case of Tailors of Ipswich*, 77 Eng. Rep. 1218, 1219 (K.B. 1615) ("[A]t the common law, no man could be prohibited from working in any lawful trade, for the law abhors idleness . . . .").

[8] Carpenter, *supra* note 5, at 245; *see also* Catherine L. Fisk, *Working Knowledge: Trade Secrets, Restrictive Covenants in Employment, and the Rise of Corporate Intellectual Property, 1800–1920*, 52 Hastings L.J. 441, 455 (2001) (During the Middle Ages, "when the economy was still reeling from the death of half the workforce due to the Plague, the inability to practice one's trade was not only disastrous for the individual but a serious loss to the public as well. Enforced idleness would also run afoul of the Statute of Labourers, which responded to the labor shortage caused by the Plague by regulating wages and making it a crime for an able-bodied person without independent means to refuse to work.").

[9] Carpenter, *supra* note 5, at 244–45.

[10] See *Alger v. Thacher*, 36 Mass. 51, 53 (1837) (describing early seventeenth century cases approving of limited noncompete agreements after "the most ancient rules of the common law" forbidding such agreements had "continued unchanged and without exceptions" "[f]or two hundred years.").

[11] 24 Eng. Rep. 347 (Q.B. 1711).

[12] *Id.* at 347.

2

of an useful member."[13] But noncompete agreements also conferred social benefits by, for example, permitting business owners to sell their businesses profitably (because no one would buy a business if the seller could immediately compete with the purchaser in the same field).[14] Although the *Mitchel* court continued to treat "general" restraints—those that applied indefinitely throughout England—as categorically proscribed, "particular" restraints limited in geographic scope and applicable only to certain "persons" were permitted.[15] So long as the particular restraint was "reasonable" in scope, it could be enforced.[16]

B

*Mitchel*'s approach—often described as the earliest application of what we today call the "rule of reason"[17]—replaced the general medieval proscription of noncompete agreements.[18] "*Mitchel* established a multifactored analysis of reasonableness that has ever since dominated the law's approach to contractual restraints on the practice of a trade . . . ."[19] By the nineteenth century, English courts upheld noncompete agreements if "the restraint is such only as to afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public."[20]

American state courts similarly adopted a multifactor reasonableness test in the nineteenth century, and generally enforced noncompete agreements under four conditions. First, the agreement had to be "ancillary" to some other valid agreement, such as an employment contract or business-sale agreement.[21] Second, the restraint had to be "no greater than is required to protect the promisor."[22] Third, the restraint could "not impose undue hardship on the promisor."[23] Finally, the restraint "must not [have] be[en] injurious to the public."[24]

This background is important for understanding the Final Rule. Not only have noncompete agreements been around, and been regulated, for more than half a millennium, they

---

[13] *Id.* at 350.
[14] *Ibid.*; see also *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 689 (1978) ("The long-run benefit of enhancing the marketability of the business itself—and thereby providing incentives to develop such an enterprise—outweighed the temporary and limited loss of competition.").
[15] *Mitchel*, 24 Eng. Rep. at 348–49.
[16] See, e.g., *id.* at 352.
[17] *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 688.
[18] See *Blake, supra* note 5, at 639–40.
[19] Fisk, *supra* note 8, at 456.
[20] *Horner v. Graves*, 131 Eng. Rep. 284, 287 (C.P. 1831).
[21] 15 Corbin on Contracts § 80.7 (2024).
[22] *Id.* § 80.6.
[23] *Ibid.*
[24] *Ibid.*; see also Restatement (2d) of Contracts § 188 (1981) (proposing essentially the same reasonableness test).

3

have been, until today, the province almost exclusively of state legislative authority.[25] And the States have vigorously exercised that authority to take a variety of different regulatory approaches.[26] All fifty States regulate noncompete agreements extensively. The vast majority retain the common-law reasonableness approach, either codified in statute or elaborated in judicial decisions.[27] Some States apply the common-law rule to most restraints, but proscribe them entirely for certain classes of workers.[28] Virginia is a good example of this approach. It has long applied the common-law reasonableness test to noncompete agreements.[29] But its legislature recently forbade noncompete agreements for employees who earn less than the weekly average wage.[30] A handful of States replaced the common-law approach with a comprehensive statutory scheme governing the scope and duration of noncompete agreements and the employees subject to them.[31] Only four States have banned noncompete agreements outright.[32]

State regulatory regimes are not static. "States have been experimenting with non-compete regulation for more than a century, with laws ranging from full bans to notice requirements, compensation thresholds, bans for specific professions, reasonableness tests, and more."[33] Not all of these changes restricted noncompete agreements. Between 2014 and 2020, state legislatures enacted "[n]ineteen changes [that] reduced [noncompete] enforceability and six [that] enhanced it …."[34] State legislatures continue to experiment today, "weigh[ing] the

---

[25] Kenneth G. Dau-Schmidt, Xiaohan Sun & Phillip J. Jones, *The American Experience with Employee Noncompete Clauses: Constraints on Employees Flourish and Do Real Damage in the Land of Economic Liberty*, 42 Compar. Lab. L & Pol'y J. 585, 589 (2022) ("In the United States there is no federal law that is currently used to regulate employment noncompetes.").

[26] See *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("This federalist structure of joint sovereigns . . . assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society" and "allows for more innovation and experimentation in government."); see also *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring) ("[T]he States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear.").

[27] Dau-Schmidt, Sun & Jones, *supra* note 25, at 589–90 & n.26.

[28] See Stewart J. Schwab, *Report to the Study Committee on Covenants Not to Compete, Uniform Law Commission*, at 2–3 & Appendix Table A-1 (Dec. 13, 2019), available at https://tinyurl.com/yewcux9k.

[29] See, e.g., *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012) ("Restraints on trade are not favored in Virginia; hence, contracts in restraint of trade are enforceable only if 'narrowly drawn to protect the employer's legitimate business interest, . . . not unduly burdensome on the employee's ability to earn a living, and . . . not against public policy.'" (quoting *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005)).

[30] Va. Code Ann. § 40.1-28.7:8.

[31] Dau-Schmidt, Sun & Jones , *supra* note 25, at 589 & n.25.

[32] Final Rule, 89 Fed. Reg. at 38,465.

[33] *Id.* at 38,466.

[34] Johnathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. Chi. L. Rev. 953, 961 (2020).

competing policy interests at stake" and altering their regimes sometimes to expand the enforceability of noncompete agreements, other times to curtail it.[35]

Into this established system of sensible state regulation bursts the Final Rule.

## C

There is no tradition of federal regulation of noncompete agreements. No federal statute addresses them directly. The common law treated noncompete agreements as a "contract in restraint of trade,"[36] however, and the Sherman Act regulates such contracts.[37] But in the 134 years since Congress passed the Sherman Act, there have been only "17 cases . . . in which private plaintiffs or the federal government have challenged a non-compete clause between an employer and a worker under either Section 1 or an analogous provision in a state antitrust statute."[38] Almost every single suit failed.[39]

There has been even less action on noncompete agreements under Section 5 of the FTC Act. The Commission has enjoyed unprecedented power to define the key term—"unfair methods of competition"[40]—in our organic statute.[41] Yet, in the first 109 years of our existence,

---

[35] Comment by West Virginia and 17 other States, FTC-2023-0007-20892, at 13–14.

[36] Amasa M. Eaton, *On Contracts in Restraint of Trade*, 4 Harv. L. Rev. 128 (1890).

[37] See 15 U.S.C. § 1 (declaring "[e]very contract . . . in restraint of trade or commerce among the several States . . . to be illegal").

[38] Non-Compete Clause Rule, NPRM, 88 Fed. Reg. 3,482, 3,496 (Jan. 19, 2023) (hereinafter "NPRM") (citing cases).

[39] *Id.* The Commission says that two of the challenges were "successful to some degree," but even that is overstating. *Id.* One example of "success" that the Commission provides is an unpublished order denying a motion to dismiss on the ground that noncompete agreements are within the ambit of Section 1 of the Sherman Act. *Signature MD, Inc. v. MDVIP, Inc.*, No. 14-5453 DMG, 2015 WL 3988959, at *6–7 (C.D. Cal. Apr. 21, 2015). But that is not "success." That is blackletter law and is true of almost every contract. See, e.g., *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977) ("[E]mployee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act."). The court then held that whether a noncompete agreement violates Section 1 turns entirely on its particular competitive effects. *Signature MD*, 2015 WL 3988959, at *6.

The Commission also dramatically overstates the Supreme Court's holding in *United States v. American Tobacco Co.*, 221 U.S. 106 (1911). The Commission says that *American Tobacco* "held that several tobacco companies violated both section 1 and section 2 of the Sherman Act because of the 'constantly recurring' use of non-competes, among other practices." Final Rule, 89 Fed. Reg. at 38,343; see also NPRM, 88 Fed. Reg. at 3,496 (*American Tobacco* "is the only case the Commission has identified in which a court analyzed the collective, rather than isolated, use of non-compete clauses."). But the Supreme Court did not address the lawfulness of noncompete agreements at all. It held only that the use of "constantly recurring stipulations" requiring manufacturers, stockholders, or employees not to compete against the tobacco trust was one of many facts that demonstrated that the trust was an "illegal combination" under Sections 1 and 2. 221 U.S. at 182–83. The Court expressly abjured the "legality" of those agreements when considered "isolatedly" from the many other acts and practices unrelated to noncompete agreements in which the trust engaged. *Id.* at 183. *American Tobacco* therefore did not address under Section 1 the question the Commission considers today under Section 5.

[40] 15 U.S.C. § 45(a).

[41] See *infra* Section III.B.

we did not bring a single enforcement action against any noncompete agreement between an employer and employee.[42]

Notwithstanding federal law's silence on noncompete agreements, the Commission received an order from on high in 2021. As part of a "whole-of-government competition policy," President Biden "encouraged" the Commission to "exercise" its "statutory rulemaking authority under the [FTC] Act to curtail the unfair use of non-compete clauses and other clauses or agreements that may unfairly limit worker mobility."[43]

The majority got the message loud and clear. On January 4, 2023, the Commission announced consent orders against three businesses enjoining them from enforcing noncompete agreements against their employees.[44] The Commission did not adjudicate the alleged Section 5 violations, nor did it take the claims to federal court. It obtained no money from the alleged offenders. And the orders contained no admission that the noncompete agreements violated Section 5. Rather, the respondents agreed not to enforce their noncompete agreements in exchange for the Commission leaving them alone.[45] These three consent orders embodied the sum total of our "experience" with noncompete agreements under Section 5 in more than a century.

The next day—before the settlements had even become final—the Commission issued a 55-page Notice of Proposed Rulemaking to ban all noncompete agreements.[46] All three members of the majority invoked the previous day's enforcement actions as a rationale for the proposed rule.[47]

---

[42] We attempted to enforce Section 5 against one noncompete agreement in 1963. See *Snap-On Tools Corp. v. FTC*, 321 F.2d 825 (7th Cir. 1963). But the enforcement action did not involve an employment noncompete and would not be covered by the Final Rule. And, inconveniently for the Final Rule, we lost on precisely the argument that the Final Rule forbids an employer from making—that the particular terms of the noncompete agreement were reasonable. See *id.* at 837.

[43] Exec. Order No. 14,036 of July 9, 2021: Promoting Competition in the American Economy, 86 Fed. Reg. 36,987, 36,992 (July 14, 2021).

[44] See Agreement Containing Consent Order, *In the Matter of O-I Glass, Inc.*, FTC File No. 211-0182 (Jan. 4, 2023); Agreement Containing Consent Order, *In the Matter of Ardagh Group S.A. et al.*, FTC File No. 211-0182 (Jan. 4, 2023); Agreement Containing Consent Order, *In the Matter of Prudential Security, Inc. et al.*, FTC File No. 221-0026 (Jan. 4, 2023).

[45] Settlements are a great thing, but they shed little light on the state of the law absent a confession of guilt.

[46] See NPRM, 88 Fed. Reg. at 6,482. The Federal Register published the NPRM on January 19, 2023, but the Commission announced it to the public on January 5, 2023. Fed. Trade Comm'n, *FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition* (January 5, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.

[47] See NPRM, 88 Fed. Reg. at 3,536–37 (Statement of Chair Lina M. Khan Joined by Comm'r Rebecca Kelly Slaughter and Comm'r Alvaro M. Bedoya); *id.* at 3539 n.4 (Statement of Comm'r Rebecca Kelly Slaughter Joined by Comm'r Alvaro M. Bedoya).

On April 23, 2024, the Commission issued the Final Rule. The Final Rule declares that employee noncompete agreements—which it calls "non-compete clauses"—are unfair methods of competition in violation of Section 5.[48] It defines a "non-compete clause" as any "term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from (i) [s]eeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment" subject to that agreement; or (ii) "[o]perating a business in the United States after the conclusion of the employment" subject to such agreement.[49] The prohibition applies both prospectively and retrospectively with only one exception: Employers may enforce noncompete agreements against "senior executive[s]"—employees who were "in a policy-making position" and whose total annual compensation was at least $151,164—so long as those agreements predate the Final Rule.[50]

II

Lawmaking by the administrative state sits uncomfortably in a democracy. Our Constitution assigns Congress the legislative power because Congress answers to the People for its choices.[51] We are not a legislature; we are an administrative agency wielding only the power lawfully conferred on us by Congress.[52] Americans cannot vote us out when we get it wrong.[53] And Congress has tried to insulate us from the one person in the Executive Branch whom the people *can* vote out,[54] separating us even further from those whose lives we claim to govern.[55]

---

[48] Final Rule, 89 Fed. Reg. 38,502–03.

[49] *Id.* at 38,502.

[50] *Id.* at 35,802–03.

[51] U.S. Const. art I, § 1, cl. 1; see *The Federalist No. 52*, at 325 (J. Madison) (Clinton Rossiter ed., 1961) (The body wielding the legislative power "should have an immediate dependence on, and frequent sympathy with, the people," and "[f]requent elections are unquestionably the only policy by which this dependence and sympathy can be effectually secured."); see also The Federalist No. 37, at 223 (James Madison) ("The genius of republican liberty seems to demand on one side, not only that all power should be derived from the people, but that those intrusted with it should be kept in dependence on the people . . . .").

[52] *FEC v. Cruz*, 596 U.S. 289, 301 (2022) ("An agency, after all, 'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986))); *NFIB v. Dep't of Labor*, 595 U.S. 109, 117 (2022) (per curiam) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

[53] See *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497–98 (2010) ("The people do not vote for the 'Officers of the United States'" (quoting U.S. Const. art. II, § 2, cl. 2)).

[54] 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."); see *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629–30 (1935) (holding that Section 1's limitations on the President's power to remove commissioners were constitutional); but see *Seila Law LLC v. Consumer Fin. Protection Bureau*, 591 U.S. 197, 239 (2020) (Thomas, J., concurring in part and dissenting in part) (explaining that the "independence" guaranteed by *Humphrey's Executor* "poses a direct threat to our constitutional structure and, as a result, the liberty of the American people," and "the Court has repudiated almost every aspect of *Humphrey's Executor*.").

To be sure, the administrative state can act with greater dispatch than Congress; but the difficulty of legislating in Congress is a feature of the Constitution's design, not a fault.[56] The administrative state cannot legislate just because Congress declines to do so.[57]

Thus, whenever we undertake to make rules governing the private conduct of hundreds of millions of people who do not vote for us, we should not begin with determining what the right answer to the policy question is. Rather, we must first assure ourselves of the power to answer the question at all.

We do not have the power to issue the Final Rule. I agree with Commissioner Holyoak that Section 6(g) of the Federal Trade Commission Act[58] does not authorize the Commission to make substantive rules regulating private conduct, and I join in full her scholarly dissent.[59] The best interpretation of Section 6(g) is that it authorizes the Commission to make rules governing its internal affairs and procedures rather than generally applicable rules governing private conduct.

Even if Section 6(g) of the FTC Act grants us substantive rulemaking authority, it does not grant us the authority to issue *this* rule. Under the major-questions doctrine, administrative agencies may enact rules of great "economic and political significance" only if Congress has clearly and unambiguously granted them the authority to do so.[60] Congress has not clearly and

---

[55] *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote."); *Seila Law*, 591 U.S. at 222–24 (discussing the President's removal power as a key to ensuring the executive branch is accountable to the people through the President—"the most democratic and politically accountable official in Government"); *Free Enterprise Fund*, 561 U.S. at 498 (Executive officers "instead look to the President to guide the assistants or deputies subject to his superintendence. Without a clear and effective chain of command, the public cannot determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." (cleaned up)); *Myers v. United States*, 272 U.S. 52, 131 (1926) (discussing the First Congress's concern that restricting the President's removal power would undermine "the great principle of unity and responsibility in the executive department, which was intended for the security of liberty and the public good").

[56] *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) ("The Constitution's deliberative process was viewed by the Framers as a valuable feature, not something to be lamented and evaded." (citations omitted)); *West Virginia v. EPA*, 597 U.S. 697, 738 (2022) (Gorsuch, J., concurring) ("[T]he framers deliberately sought to make lawmaking difficult by insisting that two houses of Congress must agree to any new law and the President must concur or a legislative supermajority must override his veto.").

[57] *The Federalist No. 73*, at 442 (Alexander Hamilton) ("The injury which may possibly be done by defeating a few good laws will be amply compensated by the advantage of preventing a number of bad ones.").

[58] 15 U.S.C. § 46(g).

[59] Melissa Holyoak, Comm'r, Fed. Trade Comm'n, Dissenting Statement regarding In the Matter of the Non-Compete Clause Rule, Matter Number P201200 (June 28, 2024) (hereinafter "Comm'r Holyoak Dissent").

[60] *West Virginia*, 597 U.S. at 721, 725.

unambiguously granted us the authority we today claim. The Final Rule is therefore unlawful even if Congress has conferred on us some substantive rulemaking power.

A

The major-questions doctrine is the name recently given to a longstanding principle governing the interpretation of statutes conferring power on administrative agencies.[61] The principle is simple. When an agency claims to have the power to issue rules of "extraordinary . . . economic and political significance," it must "point to 'clear congressional authorization' for the power it claims."[62] Whether understood as a clear-statement rule[63] or "as part of the context in which a delegation occurs,"[64] the doctrine rests on "both separation of powers principles and a practical understanding of legislative intent."[65]

Article I vests the legislative power in Congress.[66] This vesting is both exclusive and indefeasible.[67] Congress, and Congress alone, may exercise the legislative power. No other branch of the federal government may take that power away from Congress, nor may Congress willingly cede it to anyone else.[68] The line between the exercise of legislative power and the other government powers is not always perfectly clear.[69] But when a "particular function requires the exercise of a certain type of power, . . . then only the branch in which that power is vested can perform it."[70] This principle of exclusive vesting is also known in our law as "nondelegation," a term describing the prohibition on Congress willingly delegating its exclusive powers to some other entity.[71]

Against the backdrop of exclusive vesting and nondelegation, the major-questions doctrine has emerged. It may be understood in either of two ways. First, it may be understood as a clear-statement rule enforcing the constitutional prohibition on the delegation of legislative

---

[61] *Id.* at 724 ("As for the major questions doctrine 'label,' it took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." (cleaned up)).

[62] *Id.* at 721, 723 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000), and *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

[63] See *West Virginia*, 597 U.S. at 736 (Gorsuch, J., concurring).

[64] *Biden v. Nebraska*, 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring).

[65] *West Virginia*, 597 U.S. at 723.

[66] U.S. Const. art. I, § 1, cl. 1.

[67] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001).

[68] *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.) ("Congress, this Court explained early on, may not transfer to another branch 'powers which are strictly and exclusively legislative.'").

[69] *Ass'n of Am. R.R.*, 575 U.S. at 69 (Thomas, J., concurring in the judgment) ("[I]t does not follow that there is no overlap between the three categories of governmental power. Certain functions may be performed by two or more branches without either exceeding its enumerated powers under the Constitution.").

[70] *Ibid.*

[71] See *infra* Part III.

9

authority, thereby protecting the separation of powers.[72] In this sense, the doctrine operates just like other clear-statement rules that protect important constitutional interests like state sovereignty, state and federal sovereign immunity, Indian treaty rights, the powers of the federal courts, or the protection against retroactive laws.[73] This rule does not forbid Congress from conferring on agencies the power to make rules of vast economic and political significance; rather, to protect the separation of powers from an accidental or thoughtless breach, the rule requires Congress to state its intention to confer that power clearly and unambiguously.[74]

Second, the doctrine may be understood as the "context" against which a statutory delegation is enacted, and therefore "a tool for discerning—not departing from—the text's most natural interpretation."[75] On this understanding, the doctrine is not a substantive rule it all. Rather, it forms part of the backdrop against which Congress enacts statutes conferring authority on administrative agencies.[76] Here, common sense—informed by constitutional structure—tells us that "Congress normally 'intends to make major policy decisions itself, not leave those decisions to agencies.'"[77] The presumption that Congress reserves the answers to major policy questions for itself "makes eminent sense in light of our constitutional structure, which is itself part of the legal context framing any delegation."[78] At bottom, this understanding of the major-questions doctrine tells us that "in a system of separated powers, a reasonably informed interpreter would expect Congress to legislate on 'important subjects' while delegating away only 'the details.'"[79] We therefore "should 'typically greet' an agency's claim to 'extravagant statutory power' with at least some 'measure of skepticism.'"[80]

---

[72] See *West Virginia*, 597 U.S. at 737–40 (Gorsuch, J., concurring).

[73] *Gregory*, 501 U.S. at 464 (state sovereignty); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984) (state sovereign immunity); *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33, 35 (1992) (federal sovereign immunity); *South Dakota v. Bourland*, 508 U.S. 679, 686–87 (1993) (Indian treaty rights); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47–48 (1991) (inherent powers of the federal courts); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997) (retroactive application). See also Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 118–19 (2010) (discussing a broad range of substantive canons of construction and clear-statement rules); John F. Manning, *Clear Statement Rules and the Constitution*, 110 Colum. L. Rev. 399, 402–04 (2010) (explaining that clear-statement rules "impose something of a clarity tax upon legislative proceedings" that touch on sensitive constitutional values, thereby protecting those values by requiring Congress to be particularly clear when it wishes to "sacrifice a specified constitutional value in pursuit of its regulatory agenda").

[74] *West Virginia*, 597 U.S. at 736 (Gorsuch, J., concurring).

[75] *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring).

[76] *Id.* at 2388 (Barrett, J., concurring).

[77] *Id.* at 2380 (Barrett, J., concurring) (quoting *U.S. Telecom. Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc)).

[78] *Ibid.*

[79] *Id.* at 2380–81 (Barrett, J., concurring) (quoting *Wayman v. Southard*, 23 U.S (10 Wheat.) 1, 43 (1825)).

[80] *Id.* at 2381 (Barrett, J., concurring) (quoting *Util. Air*, 573 U.S. at 324).

No matter how one understands the doctrine, it requires us to make two determinations. First, we must determine whether the Final Rule presents a "major question." Second, if it does, we must determine whether we have "clear congressional authorization" to issue the Final Rule.[81]

B

The Final Rule presents a major question because it is an administrative decision of vast "economic and political significance."[82] Indeed, if the Final Rule does not present a major question, I cannot imagine what would.

Several factors guide the threshold major-question inquiry. First and foremost is the economic significance of the rule, that is, whether the rule regulates "'a significant portion of the American economy.'"[83] This factor accounts both for how much economic activity the rule regulates, as well as the costs it imposes on the public.[84] Second is the political significance of the rule.[85] A politically significant rule requires "consequential tradeoffs" on "major social and economic policy decisions,"[86] or it addresses issues that have "been the subject of an earnest and profound debate across the country."[87] The third factor is whether the rule "intrudes into an area that is the particular domain of state law."[88] All three factors cut decisively in favor of treating the Final Rule as presenting a major question.

---

[81] *West Virginia*, 597 U.S. at 743, 746 (Gorsuch, J., concurring) (explaining how to determine, first, "when an agency action involves a major question for which clear congressional authority is required," and second, "what qualifies as a clear congressional statement authorizing an agency's action").

[82] *Id.* at 721; see also *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (per curiam) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." (quotation marks omitted)).

[83] *Id.* at 722 (quoting *Util. Air*, 573 U.S. at 324)); accord *id.* at 744 (Gorsuch, J., concurring).

[84] See *West Virginia*, 597 U.S. at 729–30 (considering the "consequential" nature to the economy of the tradeoffs embodied in EPA rule); *NFIB*, 595 U.S. at 117 (considering both the "breadth of authority" claimed by the government, as well as the costs imposed on regulated firms, in treating a workplace vaccine-mandate as a major question); *Ala. Ass'n of Realtors*, 594 U.S. at 764 (considering the scope and breadth of regulation, as well as the costs imposed on regulated entities).

[85] See, e.g., *NFIB*, 595 U.S. at 117 (assessing the number of Americans subject to the rule); *Ala. Ass'n of Realtors*, 594 U.S. at 764 (similar).

[86] *West Virginia*, 597 U.S. at 729–30 (quotation marks omitted); accord *id.* at 744 (Gorsuch, J., concurring).

[87] *Id.* at 732 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)); accord *id.* at 743 (Gorsuch, J., concurring).

[88] *Ala. Ass'n of Realtors*, 594 U.S. at 764; *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring). Rules that intrude on the traditional legislative prerogatives of the States are already subject to a different clear-statement rule: The requirement that Congress use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020). This principle is grounded in longstanding "background principles of construction" that preserve "the relationship between the Federal Government and the States under our Constitution." *Bond v. United States*, 572 U.S. 844, 857–58 (2014). "Federal statutes impinging upon important state interests 'cannot . . . be construed without regard to the implications of our dual system of government. . . . [W]hen the Federal Government takes over . . . local radiations

1

The Final Rule regulates "a significant portion of the American economy"—indeed, nearly the entire economy.[89] The Final Rule's breadth is sweeping. It purports to apply to every for-profit business in every sector of the American economy except for those few that lie outside our jurisdiction.[90] And the practice it prohibits in those sectors is pervasive.[91] Nearly one-fifth of employees in the United States are currently subject to a noncompete agreement, meaning that the Final Rule abrogates nearly thirty million existing contracts.[92] And nearly two-fifths of employees will be subject to such an agreement at some point in their careers.[93] Abrogating nearly thirty million existing contracts, irrespective of the costs, is a question of vast "economic … significance."[94]

The Final Rule's incredible costs confirm its economic significance. The Commission estimates that the Final Rule could cost employers between $400 billion and $488 billion in additional wages and benefits over the next ten years alone.[95] And that estimate wildly understates the costs of the Final Rule for two reasons. First, it accounts neither for the increased costs that employers will incur to protect trade secrets and other proprietary information, nor for the loss in value that former employers will suffer when former employees disseminate trade secrets and other proprietary information. The enforcement of non-disclosure agreements and trade-secret laws will presumably deter some dissemination. But litigation is costly and difficult—especially the enforcement of non-disclosure agreements[96]—and some dissemination will go either undetected or unremedied in court.

---

in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit.'" *BFP v. Resol. Trust Corp.*, 511 U.S. 531, 544 (1994) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539–40 (1947)). Thus, the Supreme Court does not recognize abrogations of sovereign immunity or the preemption of state law absent clear statements of congressional intent. *Bond*, 572 U.S. at 857–58. "Th[ese] plain statement rule[s are] nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory*, 501 U.S. at 461.

[89] *West Virginia*, 597 U.S. at 722; accord *id.* at 744 (Gorsuch, J., concurring).

[90] See Final Rule, 89 Fed. Reg. at 38,357–58.

[91] *Id.* at 38,343.

[92] *Id.* at 38,346 ("The Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete. . . . A 2014 survey of workers finds that 18% of respondents work under a non-compete and 38% of respondents have worked under one at some point in their lives.").

[93] *Ibid.*

[94] *West Virginia*, 597 U.S. at 721.

[95] Final Rule, 89 Fed. Reg. at 38,470.

[96] See Nathaniel Grow, *Free Agency for the Front Office: How Data Analytics and Noncompete Agreements Threaten to Disrupt Competitive Balance in U.S. Professional Sports Leagues*, 58 Am. Bus. L.J. 121, 137 (2021) ("However, even under the best of circumstances, enforcing a nondisclosure agreement against a former employee can be difficult due to the inability to closely monitor how the ex-employee is using the knowledge he or she gained while working for his or her former employer."); David Lincicum, Note, *Inevitable Conflict?: California's Policy of*

Second, the Commission does not even try to quantify the costs of nullifying almost every single noncompete in force across the country.[97] Those costs are very real. Unlike the prospective prohibition of new noncompete agreements, the nullification of existing contracts leaves well-meaning and honest businesses exposed to the consequences of decisions made in reliance on these agreements, such as liberally sharing valuable information with their employees. Many employers likely would have made different hiring and operational decisions if they had known that the noncompete agreements they signed would become unenforceable as a matter of federal law.

And those are just the costs inflicted on employers. The Commission further estimates that the Final Rule will impose costs on the general economy in the form of a 7.9% decrease in capital investment in existing businesses.[98] Given that nonfarm capital investment across the United States totaled $1.9 trillion in 2022,[99] the Commission's forecasted decrease could easily reach $100 billion. The Commission hopes that effect will be offset by an increase in new firm formation and corresponding investment, but it concedes that might not be the case.[100]

The transfer of value from employers to employees, from some competitors to other competitors, and from incumbents to new entrants may very well be sound policy. But it is a decision of undoubted economic significance—one we would expect Congress to make on behalf of its constituents rather than unelected technocrats. We therefore should not presume to undertake the "consequential tradeoffs involved in such a choice" unless Congress told us unambiguously to do it.[101]

2

The rule also addresses "the subject of an earnest and profound debate across the country,"[102] and "seeks to 'intrud[e] into an area that is the particular domain of state law.'"[103] The regulation of contracts, including employment contracts, is a core exercise of the States' police power.[104] There has been a robust and lengthy debate among the States on how best to

---

*Worker Mobility and the Doctrine of "Inevitable Disclosure," * 75 S. Cal. L. Rev. 1257, 1271 (2002) ("[C]onfidentiality agreements, which theoretically prevent employees from disclosing trade secrets . . . are hard to enforce because monitoring departed employees is difficult.").

[97] Final Rule, 89 Fed. Reg. at 38,433; see also *id.* at 38,470.

[98] *Id.* at 38,470.

[99] United States Census Bureau, *U.S. Nonfarm Employer Businesses Capital Investment up to $1,899.9 Billion in 2022* (Feb. 28, 2024), https://www.census.gov/newsroom/press-releases/2024/nonfarm-employer-business-capital-investment.html.

[100] See Final Rule, 89 Fed. Reg. at 38,470.

[101] See *West Virginia*, 597 U.S. at 730.

[102] *Id.* at 732 (quoting *Gonzales*, 546 U.S. at 267–68 (2006)); see also *id.* at 743 (Gorsuch, J., concurring).

[103] *Id.* at 744 (Gorsuch, J., concurring) (quoting *Ala. Ass'n of Realtors*, 594 U.S. at 764).

[104] See, e.g., *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 397–98 (1937); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434–35 (1934); *Manigault v. Springs*, 199 U.S. 473, 480 (1905).

regulate noncompete agreements.[105] The overwhelming majority of States permit noncompete agreements subject to regulations of the types of professions who can be made to sign them, pay thresholds, time-frames, geographic reach, and damages.[106] An exceedingly small minority ban them outright.[107] More than half the States have altered their laws governing noncompete agreements in the last two decades.[108]

Noncompete agreements have also been the subject of considerable debate in Congress. Since 2015, Congress has considered and rejected a host of bills that would have regulated noncompete agreements,[109] including six that would have imposed the same policy the Final Rule imposes.[110]

This extensive state and congressional action on noncompete agreements demonstrates that this issue is politically significant and the subject of a roiling debate across the country. The Commission's termination of the democratic process and preemption of the existing laws of forty-six States presents a major question.[111]

C

Because the Final Rule presents a major question, the Commission must have "clear congressional authorization" to promulgate it.[112] Nothing in the FTC Act comes close to clearing that bar. The Commission's statutory argument combines two phrases from two different provisions of the FTC Act to create the incredible rulemaking power it asserts today: Congress's

---

[105] See *supra* Section I.B.

[106] Final Rule, 89 Fed. Reg. at 439; *id.* at 460 n.1098.

[107] Final Rule, 89 Fed. Reg. at 38,472–73 ("Currently, non-competes are broadly prohibited in four States: California, North Dakota, Oklahoma, and Minnesota.").

[108] See *supra* Section I.B.; see also Comment by West Virginia and 17 other States, FTC-2023-0007-20892, at 13 ("Since 2011, 29 States and the District of Columbia have passed bills changing their noncompete laws."); *id.* at 13–14 (noting that some States have recently loosened restrictions on noncompete agreements, while other States have rejected proposals to tighten restrictions).

[109] See, e.g., Mobility and Opportunity for Vulnerable Employees Act ("MOVE Act"), S. 1504, 114th Cong. (2015) (forbidding noncompete agreements for low-wage workers); Limiting Ability to Demand Detrimental Employment Restrictions Act ("LADDER Act"), H.R. 2873, 114th Cong. (2015) (same); Freedom for Workers to Seek Opportunity Act, H.R. 4254, 114th Cong. (2015) (forbidding noncompete agreements for grocery-store employees); Freedom to Compete Act, S. 124, 116th Cong. (2019) (preventing employers from using non-compete agreements in employment contracts for certain employees).

[110] See, e.g., Workforce Mobility Act of 2021, S. 483, 117th Cong. (2021); Workforce Mobility Act of 2021, H.R. 1367, 117th Cong. (2021); Workforce Mobility Act of 2019, S. 2614, 116th Cong. (2019); Workforce Mobility Act of 2020, H.R. 5710, 116th Cong. (2020); Workforce Mobility Act of 2018, S. 2782, 115th Cong. (2018); Workforce Mobility Act of 2018, H.R. 5631, 115th Cong. (2018).

[111] See *West Virginia*, 597 U.S. at 732 ("'The importance of the issue,' along with the fact that the same basic scheme EPA adopted 'has been the subject of an earnest and profound debate across the country, . . . makes the oblique form of the claimed delegation all the more suspect.'" (quoting *Gonzales*, 546 U.S. at 267–68)).

[112] *Ibid.* (quotation marks omitted).

14

grant of authority to "prevent" the use of "unfair methods of competition" in Section 5,[113] together with Section 6's grant of authority to "[f]rom time to time classify corporations and … to make rules and regulations for the purpose of carrying out the provisions of" the FTC Act.[114] But this bank-shot statutory argument is not "clear congressional authorization"[115] to issue the Final Rule.

1

Whether Congress has provided clear congressional authorization is, like any statutory-interpretation question, primarily a textual one. Of course, text cannot be read in isolation. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[116] Context is particularly critical for the "extraordinary cases" where an agency invokes the power to issue rules of vast "economic and political significance."[117] In every major-questions-doctrine case, the agency's "regulatory assertions had a colorable textual basis."[118] But resorting to "the outer limits of [the text's] definitional possibilities" does not fly when an agency is claiming vast regulatory authority.[119] When an agency claims such power, the text on which it relies must be read with a careful eye to its "place" in "the overall statutory scheme."[120] "Where an agency relies on "oblique or elliptical language," or combines a series of "modest words, vague terms, or subtle devices,"[121] it will not prevail even if its reading "would have been plausible if the relevant statutory text were read in a vacuum."[122] The doctrine's emphasis on statutory context reflects "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."[123] When Congress intends to give away a core part of its power, that intention will be screamingly obvious in the context of the statutory scheme.[124]

---

[113] 15 U.S.C. § 45(a)(2).

[114] 15 U.S.C. § 46(g).

[115] *West Virginia*, 597 U.S. at 732 (quotation marks omitted).

[116] *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quotation marks omitted).

[117] *West Virginia*, 597 U.S. at 721 (quotation marks omitted).

[118] *Id.* at 722.

[119] *FCC v. AT&T, Inc.*, 562 U.S. 397, 407 (2011) (quotations marks omitted); see also *West Virginia*, 597 U.S. at 732.

[120] *Brown & Williamson*, 529 U.S. at 133; see also *id.* at 132 ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.").

[121] *West Virginia*, 597 U.S. at 723 (quotation marks omitted).

[122] *Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring).

[123] *Brown & Williamson*, 529 U.S. at 133.

[124] *West Virginia*, 597 U.S. at 723 ("Congress [does not] typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme."); *Id.* at 746 (Gorsuch, J., concurring) ("[W]e look for clear evidence that the people's representatives in Congress have actually afforded the agency the

15

Nothing about the Commission's statutory argument demonstrates that "Congress in fact meant to confer the power the agency has asserted."[125] Section 5(a) is a general grant of authority to "prevent … unfair methods of competition."[126] The remainder of that section is not addressed to rulemakings at all. It instead lays out the procedures for what was always understood to be the Commission's lone enforcement mechanism—case-by-case adjudication through a "quasi judicial" process.[127] This highly general grant of authority comes nowhere near to the specificity that the major-questions doctrine requires.[128]

The Commission reasons that the specificity comes from Section 6(g). Section 6 is titled "Additional powers of Commission"[129]—language should warn an ordinary reader that what follows are "ancillary … gap filler[s]," rather than "clear congressional authorization" to restructure the American labor market.[130] And sure enough, that is what Section 6(g) is. It reads: "The Commission shall also have power to … [f]rom time to time classify corporations and (except as provided in [the Magnuson-Moss Act]) to make rules and regulations for the purpose of carrying out the provisions of this subchapter."[131] So the Commission's argument rests entirely on the second half of a single sentence—contained in the "Additional powers" section of our organic statute—the primary purpose of which is authorizing the Commission to classify corporations. This text is far less "clear congressional authorization" for the immense power the Commission today claims than the argument the Supreme Court rejected in *West Virginia*.[132] This "oblique and elliptical" language in an "ancillary" provision of the FTC Act is simply not enough

---

power it claims."); *Nebraska*, 143 S. Ct. at 2383 ("[A] reasonable speaker would not understand Congress to confer an unusual form of authority without saying more.") (Barrett, J. concurring).

[125] *West Virginia*, 597 U.S. at 721.

[126] 15 U.S.C. § 45(a)(2).

[127] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935) ("What are 'unfair methods of competition' are thus to be determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest. To make this possible, Congress set up a special procedure. A commission, a quasi judicial body, was created." (internal citations omitted)).

[128] *West Virginia*, 597 U.S. at 721 ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." (quoting *Brown & Williamson*, 529 U.S. at 159)).

[129] 5 U.S.C. § 46.

[130] *West Virginia*, 597 U.S. at 724.

[131] 15 U.S.C. § 46(g).

[132] See *West Virginia*, 597 U.S. at 732–35 (holding that statute authorizing EPA to promulgate "standard[s] of performance" for "sources" of "air pollutants" based on "the best system of emission reduction" that it finds "has been adequately demonstrated" was insufficiently clear to authorize EPA to require coal-fired plants to outright "reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources," and not just increase their own pollution performance).

to justify the Final Rule, even if you believe that some substantive rulemaking is within the "definitional possibilities" of Section 6(g).[133]

2

The Commission's prior rulemakings, as well the complete absence of any Section 5 enforcement actions against noncompete agreements before this rulemaking, confirm that Sections 5 and 6(g) do not contain clear congressional authorization for the Final Rule. Executive-branch practice has long been relevant to interpreting the scope of Congress's grant of authority to administrative agencies.[134] "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."[135] Put another way, "[f]ailure to use such an important power for so long a time indicates . . . that the Commission did not believe the power existed."[136]

We have never invoked these sections of the FTC Act to do anything remotely similar to the Final Rule—strong evidence that the Final Rule lies beyond our authority. The Commission insults the reader by claiming that "non-competes have already been the subject of FTC scrutiny and enforcement," thereby making this rule "a more incremental—and thus less significant—step than it would be for an agency to wade into an area not currently subject to its enforcement authority."[137] The truth is that, in the 109 years between Section 5's adoption in 1914[138] and the day before releasing the NPRM, the Commission did not bring a single enforcement action against an employee noncompete agreement under Section 5.[139] Not one. The first time it did was the day before issuing the NPRM—suspicious timing to say the least.[140] And none of the enforcement actions filed on that day were litigated. In each case, the Commission accused an employer of violating Section 5 through the enforcement of noncompete agreements, and the employer settled without conceding a violation of Section 5.[141] It beggars belief to contend that Section 5 contains within it a categorical prohibition on *all* noncompete agreements when the Commission did not enforce Section 5 against a single noncompete agreement in its entire 109-

---

[133] *Id.* at 723, 733.
[134] See, e.g., *Bittner v. United States*, 598 U.S. 85, 97 (2023) ("[C]ourts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court."); *West Virginia*, 597 U.S. at 724–25; *id.* at 747 (Gorsuch, J., concurring) ("[C]ourts may examine the age and focus of the statute" as well as "the agency's past interpretations of the relevant statute.").
[135] *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941).
[136] *Fed. Power Comm'n v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 513 (1949).
[137] Final Rule, 89 Fed. Reg. at 38,353.
[138] Federal Trade Commission Act, ch. 311, § 5, 38 Stat. 719 (1914).
[139] See *supra* Section I.C.
[140] See *ibid.*
[141] See *ibid.*

17

year history until a day before this rulemaking.[142] "This 'lack of historical precedent,' coupled with the breadth of authority that the [Commission] now claims, is a 'telling indication' that the [Final Rule] extends beyond the [Commission]'s legitimate reach."[143]

The same is true when Sections 5 and 6(g) are considered together. The Commission has deployed this bank-shot rulemaking theory only once in its history. In 1967, it issued a two-page rule addressing the circumstances under which an "advertising payment or promotional allowance" paid by a manufacturer of "men's, youths' and boys' suits, coats, overcoats, topcoats, jackets, dress trousers and uniforms" to resellers of those clothing items would be treated as violating the antitrust laws.[144] This insignificant, and legally dubious, rule was issued with no fanfare; was never enforced; was never subject to judicial review; and was repealed more than thirty years ago.[145] That means that the Commission has invoked this statutory theory twice in 110 years: once to alert a single industry to the antitrust consequences of an isolated practice, and again to redistribute nearly half a trillion dollars within the general economy by banning a centuries-old contract deployed in every industry in the country. This is precisely the sort of statutory theory the Court condemned in *West Virginia*: claiming to "'discover'" the power to "restructure the American [labor] market" in the "vague language of an 'ancillary provision' of the" FTC Act, "one that was designed to function as a gap filler and had rarely been used in the preceding decades."[146]

The Commission mines the historical record for additional support and comes up with rules it promulgated in reliance on its power to prevent "unfair or deceptive acts or practices."[147] This argument fails. As Commissioner Holyoak ably explains, the Commission did not have the power to issue any rules, including those, until Congress enacted the Magnuson-Moss Act in 1975, and no one thought it had such power for nearly fifty years after Section 6(g) became

---

[142] Noncompete agreements are contracts in restraint of trade, and therefore subject to the rule of reason under Section 1 of the Sherman Act and Section 5 of the FTC Act. See *supra* note 37; see also *infra* notes 284, 286. But as is true of all agreements that do not implicate one of the few *per se* rules, whether a given noncompete agreement violates the antitrust laws will turn entirely on the particular circumstances and competitive effects of that agreement. See *infra* Section IV.A. The Final Rule rests on a far more aggressive proposition: that Section 5 categorically forbids every single noncompete agreement irrespective of their particular effects. Section 5 contains no such categorical prohibition, and the Commission's failure to enforce this claimed prohibition against a single noncompete agreement until the day before this rulemaking confirms the absence of such a prohibition.

[143] *NFIB*, 595 U.S. at 119–20 (quoting *Free Enterprise Fund*, 561 U.S. at 505); see also *Bunte Bros.*, 312 U.S. at 352; accord *West Virginia*, 597 U.S. at 725; *id.* at 747–48 (Gorsuch, J., concurring).

[144] Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 32 Fed. Reg. 15,584, 15,585 (Nov. 8, 1967).

[145] See Repeal of Trade Regulation Rule: Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 59 Fed. Reg. 8527 (Feb. 23, 1994).

[146] *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324, and *Whitman*, 531 U.S. at 468).

[147] See Final Rule, 89 Fed. Reg. at 38,349–50. Congress conferred that power on us in the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).

law.[148] But even assuming Section 6(g) confers rulemaking power, the question is not whether the Commission has the power to issue some rules; it is whether Congress has made clear our power to make a "decision of such economic and political significance" as the one embodied in the Final Rule.[149]

That we have issued rules in the past does not answer that question. In *NFIB*, for example, the agency issued dozens of rules on workplace safety under the statute it invoked to issue the vaccine mandate.[150] But it had never promulgated a regulation "of th[e] kind" embodied in the vaccine mandate, which reached much further than any previous rule.[151] Similarly, EPA had issued multiple rules relying on the same statute it used to issue carbon-emissions standards in *West Virginia*.[152] But it had never relied on the statute to issue the sort of market-transforming rule the Court struck down in that case.[153] And in *Nebraska*, the agency had invoked the relevant statute dozens of times to issue waivers and modifications of student loans "addressing . . . specific issues."[154] But the Court rejected the agency's invocation of the statute "to release 43 million borrowers from their obligations to repay $430 billion in student loans" because the agency "had never previously claimed powers of this magnitude."[155]

The same is true here. "No regulation premised on" Sections 5 and 6(g) "has even begun to approach the size or scope" of the Final Rule.[156] The rules the Commission cites were part of a rash of rulemakings in the 1960s and 1970s—more than fifty years after Congress enacted the relevant language in Sections 5 and 6(g)—known as "Trade Regulation Rules."[157] These rules were overwhelmingly "minor" and "uncontroversial."[158] It was initially unclear whether they carried the force of law at all.[159] They applied to specific practices carried out in specific markets and industries rather than general practices pervasive in the general economy. Almost every single rule applied to representations or disclosures about specific products or practices. Even the more controversial rules in the bunch bore no resemblance to the Final Rule, applying only to

---

[148] Comm'r Holyoak Dissent, *supra* note 59, at Part II.
[149] *West Virginia*, 597 U.S. at 729 (quoting *Brown & Williamson*, 529 U.S. at 160); see also *id.* at 721 ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." (quotation marks omitted)).
[150] See *NFIB*, 595 U.S. at 133 (Breyer, Sotomayor, and Kagan, JJ., dissenting).
[151] *Id.* at 119–20 (per curiam).
[152] See *West Virginia*, 597 U.S. at 710–11; *id.* at 776–77 (Kagan, J., dissenting).
[153] See *id.* at 726–30; *id.* at 749 (Gorsuch, J., concurring).
[154] *Nebraska*, 143 S. Ct. at 2363.
[155] *Id.* at 2372.
[156] *Ala. Ass'n of Realtors*, 594 U.S. at 765.
[157] Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 552 (2002).
[158] *Id.* at 554 & n.456; see also *id.* at 552–53 ("None of these early rules stirred much controversy.").
[159] *Id.* at 552 & n.442.

labels and warnings for two specific products.[160] None of these rules governed any aspect of the labor market in any industry, much less the entire labor market across the whole country. They provide no support for the proposition that Sections 5 and 6(g) contain the authority that the Commission today claims.[161]

Even accepting the Commission's view of which rules are relevant to the historical inquiry, that inquiry cuts decisively against the Final Rule. The Commission's own conduct for its first fifty years suggests that it understood Section 6(g) to contain "oblique or elliptical language" that was "designed to function as a gap filler" rather than confer transformative regulatory authority.[162] The Commission's statutory theory is thus precisely what the major-questions doctrine prohibits: the exploitation of "some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond those the people's representatives actually conferred on them."[163]

***

There are sound arguments in favor of regulating noncompete agreements. Every State does. But "no matter how important, conspicuous, and controversial the issue," and no matter how wise the administrative solution, "an administrative agency's power to regulate . . . must always be grounded in a valid grant of authority from Congress."[164] When an agency does something as big as the Commission does in the Final Rule, the grant of authority it relies upon must be more than oblique language tucked away in an ancillary subsection of its organic act. But that is all the Commission has to justify the Final Rule. It is therefore unlawful.

III

Even if the Commission has the statutory authority to issue the Final Rule, it must surmount another hurdle. A federal agency may act only upon a "*valid* grant of authority from Congress."[165] A grant of authority is "valid" only if it is a lawful exercise of Congress's legislative authority under the Constitution. If Sections 5 and 6(g) grant us the power to issue the Final Rule, I believe that grant would be an unconstitutional delegation of legislative power.

---

[160] See *id.* at 553–55 (describing the controversy surrounding, and congressional action repealing, the Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324 (July 2, 1964), *repealed by* 30 Fed. Reg. 9485 (July 29, 1965), and Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971), *repealed by* 43 Fed. Reg. 43,022 (Sept. 22, 1978)).

[161] *NFIB*, 595 U.S. at 119 ("This 'lack of historical precedent,' coupled with the breadth of authority that the [Commission] now claims, is a 'telling indication' that the mandate extends beyond the [Commission]'s legitimate reach." (quoting *Free Enterprise Fund*, 561 U.S. at 505)).

[162] *West Virginia*, 597 U.S. at 723–24.

[163] *Id.* at 742 (Gorsuch, J., concurring) (quotation marks omitted).

[164] *Brown & Williamson*, 529 U.S. at 161 (cleaned up).

[165] *Id.* (emphasis added).

20

A

Because the Constitution vests all legislative power exclusively in Congress, Congress may not delegate it away.[166] Courts enforce this principle through the "nondelegation doctrine."[167] Although the courts sometimes speak as though the doctrine assesses whether a particular delegation is constitutional,[168] the prohibition on delegation is categorical.[169] Congress may never delegate the legislative power that the Constitution vests in it.[170]

Not every grant of authority to the executive branch, however, is a delegation of legislative power. "Certain functions may be performed by two or more branches without either exceeding its enumerated powers under the Constitution."[171] And "a certain degree of discretion … *inheres* in most executive or judicial action."[172] Conferring discretionary authority on the executive branch to perform a function that is not an exercise of purely legislative power, even if Congress could also perform it, is not a delegation of legislative power.[173] Congress thus has power to "obtain[ ] the assistance of its coordinate Branches"[174] in the implementation of national policy by, for example, directing the President to apply a statutory command only under certain circumstances and investing him with the authority to determine whether those circumstances in fact exist.[175]

The "core of the legislative power," which only Congress may exercise, is the power to make "generally applicable rules of private conduct,"[176] or, put differently, to "prescribe general rules for the government of society."[177] But "classifying governmental power is an elusive

---

[166] See *supra* Section II.A; *Gundy*, 588 U.S. at 135 ("Accompanying that assignment of power to Congress is a bar on its further delegation.").

[167] *Id.* at 132 ("The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government."); *Mistretta v. United States*, 488 U.S. 361, 371–72 ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government," and "mandate[s] that Congress generally cannot delegate its legislative power to another Branch.").

[168] See, e.g., *Gundy*, 588 U.S. at 135 (deploying the nondelegation doctrine to assess whether "a statutory delegation is constitutional"); *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441–42 (5th Cir. 2020) (explaining circumstances when "[d]elegations are constitutional"); *United States v. Dhafir*, 461 F.3d 211, 215 (2d Cir. 2006) (defining circumstances when "[d]elegations of congressional authority are upheld").

[169] *Whitman*, 531 U.S. at 472 ("This text permits no delegation of those powers . . . .").

[170] *Touby v. United States*, 500 U.S. 160, 165 (1991) ("Congress may not constitutionally delegate its legislative power to another branch of Government.").

[171] *Ass'n of Am. R.R.*, 575 U.S. at 69 (2015) (Thomas, J., concurring in the judgment).

[172] *Mistretta*, 488 U.S. at 417 (Scalia, J., dissenting).

[173] *Wayman*, 23 U.S. (10 Wheat.) at 42, 43 ("Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself" so long as those powers are not "strictly and exclusively legislative.").

[174] *Mistretta*, 488 U.S. at 372.

[175] See, e.g., *Marshall Field & Co. v. Clark*, 143 U.S. 649, 683–89 (1892) (explaining operation of conditional legislation).

[176] *Ass'n of Am. R.R.*, 575 U.S. at 76 (Thomas, J., concurring in the judgment).

[177] *Gundy*, 588 U.S. at 153. (Gorsuch, J., dissenting) (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810)).

21

venture."[178] To draw "the true distinction . . . between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution,"[179] the Supreme Court has turned to the "intelligible-principle rule." That "rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes."[180] The rule requires that Congress "lay down by legislative act an *intelligible principle* to which the person or body authorized to [exercise the power conferred] is directed to conform."[181] If it does, then the law is not an unconstitutional delegation of legislative authority.[182]

B

"In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency."[183] The "answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides."[184] The inquiry is not as specific as whether Section 5 prohibits the noncompete agreements that the Final Rule bans. Rather, it is whether Section 5 "lays down . . . an intelligible principle,"[185] that is, whether it "provide[s] sufficiently 'definite' standards" to "guide[ ] executive discretion to accord with Article I."[186] Only if "unfair methods of competition" is a "definite" constraint on the exercise of our discretion will it pass constitutional muster.

1

The operative word in the phrase "unfair methods of competition" is "unfair." "[M]ethods of competition" are business practices affecting competition in which businesses engage.[187] "[U]nfair" describes the standard, such as it is, to which private parties must conform when engaging in business practices, and therefore is also the "congressionally mandated standard" guiding the Commission's discretion.[188]

---

[178] *Ass'n of Am. R.R.*, 575 U.S. at 76 (Thomas, J., concurring in the judgment).
[179] *Marshall Field*, 143 U.S. at 693–94 (quotation marks omitted).
[180] *Loving v. United States*, 517 U.S. 748, 771 (1996).
[181] *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).
[182] *Ibid.*
[183] *Whitman*, 531 U.S. at 472.
[184] *Gundy*, 588 U.S. at 136 (quoting *Whitman*, 531 U.S. at 473; *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104–105 (1946)).
[185] *Id.* at 135 (quoting *J. W. Hampton*, 276 U.S. at 409).
[186] *Id.* at 135–36.
[187] See, e.g., *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 138–39 (2d Cir. 1984).
[188] See *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972) (The FTC Act instructs the Commission to "measur[e] a practice against the elusive, but congressionally mandated standard of fairness").

"Unfair" is hardly a definite constraint on our discretion. "The term 'unfair' is an elusive concept, often dependent upon the eye of the beholder."[189] A practice is unfair if it is "not impartial," "unjust," "involving a trick or artifice,"[190] or "inequitable."[191] On the theory elaborated in the Final Rule, then, the Commission has the power to proscribe *ex ante* any method of competition that is "unjust" or "inequitable." That does not sound like the sort of "intelligible principle"[192] that meaningfully constrains our rulemaking authority. It sounds instead like the exercise of legislative power which only Congress may wield.

The legislative history sheds more light on the statute's meaning, but compounds the delegation problem. Congress adopted the phrase "unfair method of competition" because of its incredible breadth.[193] Congress considered a narrower phrase with "a well settled meaning at common law"—"unfair competition"—but rejected it as "too narrow."[194] It instead chose "unfair methods of competition" because it was "broader and more flexible."[195] Section 5, a sponsor declared, "covers every practice and method between competitors upon the part of one against the other that is against public morals . . . or is an offense for which a remedy lies either at law or in equity."[196]

Congress declined to define the term at all, worried that it would be "impossible to frame definitions which embrace all unfair practices."[197] Because "[t]here is no limit to human inventiveness in this field," Congress feared that any list of definitions it could create would quickly become outdated and "it would be at once necessary to begin over again."[198] It concluded that the "better" course was to "condemn[ ] unfair practices" by a "general declaration" and "leave it to the commission to determine what practices were unfair," rather than "attempt[ing] to define the many and variable unfair practices which prevail in commerce."[199] As one of the FTC Act's legislative champions put it: "My belief is that [Section 5] will cover everything that we want, and will have such an elastic character that it will meet

---

[189] *E.I. du Pont de Nemours*, 729 F.2d at 137.
[190] Webster's Complete Dictionary of the English Language 1442 (1886).
[191] 8 The Century Dictionary & Cyclopedia 6606 (1901).
[192] *Gundy*, 588 U.S. at 135.
[193] See generally Neil W. Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act*, 21 B.C. L. Rev. 227, 229–38 (1980) (describing legislative history of the Act and Congress's insistence on adopting a "vague and general language" to maximize Commission's discretion).
[194] *FTC v. Raladam Co.*, 283 U.S. 643, 648 (1931); see also *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 311–12 & nn.2–3 (1934).
[195] *R.F. Keppel & Bro.*, 291 U.S. at 311.
[196] 51 Cong. Rec. 11,112 (1914) (remarks of Sen. Newlands).
[197] H.R. Rep. No. 63-1142, at 19 (1914) (Conf. Rep.).
[198] *Ibid.*
[199] S. Rep. No. 63-597, at 13 (June 13, 1914).

every new condition and every new practice that may be invented with a view to gradually bringing about monopoly through unfair competition."[200]

Congress resolved this textual indeterminacy by leaving the scope of "unfair methods of competition" to "an administrative body of practical men . . . who will be able to apply the rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations."[201] It created the Commission "with the avowed purpose of lodging the administrative functions committed to it in 'a body specially competent to deal with them by reason of information, experience and careful study of the business and economic conditions of the industry affected,'" and organized it "'with respect to the length and expiration of the terms of office of its members, as would 'give to them an opportunity to acquire the expertness in dealing with these special questions.'"[202] Congress gave the Commission "wide latitude . . . to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop."[203]

The legislative history thus confirms what the text suggests. Congress enacted a prohibition of tremendous "sweep and flexibility"[204] and declined to define the conduct it was prohibiting in anything but the vaguest sense because it intended the Commission to do the defining. It therefore left the key legislative task—the definition of the private conduct prohibited by law—to the executive branch.

2

The nondelegation problem with Section 5 is obvious. Indeed, "[m]any congressmen had expressed doubt about the constitutionality of Section 5."[205] One Senator warned that the Act was tantamount to "appoint[ing] a commission and authoriz[ing] that commission to pass such laws as it pleases or to deal with business conditions as it pleases."[206] Such a law "[o]bviously … would be beyond [Congress's] power, because that would be to delegate [Congress's] power and [Congress's] authority."[207]

---

[200] 51 Cong. Rec. 12,024 (July 13, 1914) (remarks of Sen. Newlands).

[201] *Atl. Refining Co. v. FTC*, 381 U.S. 357, 367 (1965) (quoting H.R. Rep. No. 63-1142, at 19 (1914) (Conf. Rep.)).

[202] *R.F. Keppel & Bro.*, 291 U.S at 314 (quoting S. Rep. No. 63-597, at 9, 11 (June 13, 1914)).

[203] *FTC v. Standard Educ. Soc.*, 86 F.2d 692, 696 (2d Cir. 1936) (Hand, J.), rev'd on other grounds, 302 U.S. 112 (1937); accord *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 453 (1922); see also S. Rep. No. 63-597, at 22 (June 13, 1914) ("The organization should be quasi judicial in character. We want traditions; we want a fixed policy; we want trained experts; we want precedents; we want a body of administrative law built up.").

[204] *Sperry & Hutchinson Co.*, 405 U.S. at 241.

[205] Averitt, *supra* note 193, at 298 n.300.

[206] See, e.g., 51 Cong. Rec. 12816 (remarks of Sen. Sutherland).

[207] *Ibid.*; see also 51 Cong. Rec. 11113 (remarks of Sen. Reed) ("The people must, through their representatives, lay down the law that defines what is legal and illegal. . . . Congress cannot create a tribunal and authorize it to create

Apparently aware of the nondelegation danger, the Supreme Court tried to articulate some limitations on the Commission's discretion.[208] In its first case considering the question, the Court acknowledged that "[t]he words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute."[209] It defined the term as encompassing those "practices . . . opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly."[210] In subsequent cases, the Court limited Section 5's reach to violations of the existing antitrust laws.[211]

The Court began to abandon this limitation in the 1930s. In *FTC v. R.F. Keppel & Brother, Inc.*, the Court upheld a Commission order prohibiting a marketing scheme "of the sort which the common law and criminal statutes have long deemed contrary to public policy," but which did not violate the antitrust laws.[212] Section 5's application therefore now reached further than the antitrust laws. For a while, however, the Supreme Court continued to link Section 5 to the antitrust laws by treating Section 5 as a mandate "to stop in their incipiency acts and practices which, when full blown, would violate" the antitrust laws, as well as to condemn "as unfair methods of competition" existing violations of them.[213]

---

laws. Congress cannot create a board and empower it to govern by its own reason, to rule by its own discretion, to do what which to it seems proper, and penalize the citizen for refusing to render obedience.").

[208] Averitt, *supra* note 193, at 298 ("The Commission's power over 'unfair methods of competition' could have been a classic example of excessive delegation. . . . [T]he Supreme Court may have been endeavoring to shield Section 5 as a whole from constitutional infirmity." (internal quotations omitted)).

[209] *FTC v. Gratz*, 253 U.S. 421, 427 (1920).

[210] *Ibid.*

[211] *Beech-Nut Packing*, 257 U.S. at 453; see also *FTC v. Curtis Publ'g Co.*, 260 U.S. 568, 579–82 (1923) (setting aside Commission order based on a "vague general complaint charging unfair methods of competition" unrelated to any existing statement of public policy); *FTC v. Sinclair Oil Co.*, 261 U.S. 463, 473–76 (1923); see also *Raladam Co.*, 283 U.S. at 649 ("It is obvious that the word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors.").

[212] 291 U.S. at 243–44.

[213] *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394–95 (1953); see also *FTC v. Brown Shoe Co.*, 384 U.S. 316, 322 (1966) ("We . . . hold that the Commission has power under § 5 to arrest trade restraints in their incipiency without proof that they amount to an outright violation of § 3 of the Clayton Act or other provisions of the antitrust laws."); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 463, 466 (1941) ("If the purpose and practice of the combination . . . runs counter to the public policy declared in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it as an unfair method of competition. . . . It was the object of the Federal Trade Commission Act to reach not merely in their fruition but also in their incipiency combinations which could lead to these and other trade restraints and practices deemed undesirable."); *Atl. Refining Co.*, 381 U.S. at 369 ("As our cases hold, all that is necessary in § 5 proceedings to find a violation is to discover conduct that runs counter to the public policy declared in the Act. But this is of necessity, and was intended to be, a standard to which the Commission would give substance. In doing so, its use as a guideline of recognized violations of the antitrust laws was, we believe, entirely appropriate." (internal quotation marks and citations omitted)).

The Court has since abandoned even that limitation. In *FTC v. Sperry & Hutchinson Co.*, the Court surveyed the Act's legislative history and concluded that the Commission had authority to act "like a court of equity" and "consider[ ] public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws" when it "measur[ed] a practice against the elusive, but congressionally mandated standard of fairness."[214] And with that, the Commission's Section 5 authority reached as far as its backers had hoped, and its critics had feared. The Commission now enjoyed unfettered discretion to proscribe "not only practices that violate the Sherman Act and the other antitrust laws . . . but also practices that the Commission determines are against public policy for other reasons."[215]

3

The Commission's views on the meaning of "unfair methods of competition" have similarly evolved in just the past few years. Our interpretation of the text does not resolve the constitutional question,[216] but it further demonstrates the text's broad reach and indeterminacy.

In 2015, a bipartisan majority of the Commission issued a policy statement announcing the Commission's understanding of the meaning of "unfair methods of competition."[217] It repeated the familiar mantra—Congress did not define the words, but left it to an "expert administrative body" to "develop" the prohibition on a "flexible case-by-case basis" in the light of "changing markets and business practices."[218] But it adopted the pre-1970s understanding of the law by declaring that "Section 5's ban on unfair methods of competition encompasses not only those acts and practices that violate the Sherman or Clayton Act but also those that contravene the spirit of the antitrust laws and those that, if allowed to mature or complete, could violate the Sherman or Clayton Act."[219] It then announced that in "standalone" Section 5 cases, the Commission would "adhere[ ]" to the Sherman Act's well-established rule-of-reason analysis that weighted a practice's "harm to competition or the competitive process" against its "associated cognizable efficiencies and business justifications."[220] It also declared that it would "be guided by the public policy underlying the antitrust laws, namely, the promotion of consumer

---

[214] 405 U.S. at 244.

[215] *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (citations omitted).

[216] *Whitman*, 531 U.S. at 473 ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. . . . Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer.").

[217] Fed. Trade Comm'n, Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act, 80 Fed. Reg. 57056 (Aug. 13, 2015) ("Chairwoman Ramirez and Commissioner Brill, Commissioner Wright, and Commissioner McSweeny voting in the affirmative, and Commissioner Ohlhausen dissenting.").

[218] *Ibid.*

[219] *Ibid.*

[220] *Ibid.*

26

welfare."[221] In short, the Commission announced its view that the words of delegation, more or less, recapitulated the command of the Sherman and Clayton Acts. This view remained the Commission's governing interpretation until 2021.

In 2021, after a substantial change in personnel, the Commission rescinded the 2015 Policy Statement on a party-line vote.[222] In her concurring opinion, the Chair explained that the majority had rescinded the 2015 Policy Statement because it "largely wr[ote] the FTC's standalone authority out of existence" by limiting the reach of Section 5 to violations of other antitrust statutes.[223] In the majority's view, Section 5 imposed a mandate "broader than the Sherman or Clayton Acts."[224]

The Commission, once again in a party-line vote, issued a new policy statement the next year interpreting Section 5 as "broader than, and different from, the Sherman and Clayton Acts."[225] It reasoned that Congress rejected "a static definition" of the conduct Section 5 proscribed because such a definition "would soon become outdated," and "Congress wanted to give the Commission flexibility to adapt to changing circumstances."[226] Section 5 therefore "reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions."[227] The Commission proposed limiting the reach of the word "unfair" by requiring that the conduct (1) "may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature," and (2) "must tend to negatively affect competitive conditions."[228] But even these limitations seem to do little more than synonymize the statutory terms.

---

[221] *Ibid.*
[222] Lina M. Khan, Chair, Fed. Trade Comm'n, Joined by Comm'r Rohit Chopra and Comm'r Rebecca Kelly Slaughter, Statement on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act (July 1, 2021); Noah Joshua Phillips, Comm'r, Dissenting Remarks Regarding the Commission's Withdrawal of the Section 5 Policy Statement (July 1, 2021); Christine S. Wilson, Comm'r, Dissenting Statement, Open Commission Meeting on July 1, 2021 (July 1, 2021).
[223] Lina M. Khan, Chair, Fed. Trade Comm'n, Joined by Comm'r Rohit Chopra and Comm'r Rebecca Kelly Slaughter, Statement on the Withdrawal of the Statement of Enforcement Principles regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act, 1 (July 1, 2021); see also *id.* at 2 ("By tethering Section 5 to the Sherman and Clayton Acts, the 2015 Statement negates the Commission's core legislative mandate, as reflected in the statutory text, the structure of the law, and the legislative history, and undermines the Commission's institutional strengths.").
[224] *Id.* at 4.
[225] Fed. Trade Comm'n, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act, 3 (Nov. 10, 2022) (hereinafter "2022 Section 5 Policy Statement"); see Christine S. Wilson, Comm'r, Fed. Trade Comm'n, Dissenting Statement regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act" (Nov. 10, 2022).
[226] 2022 Section 5 Policy Statement, *supra* note 225, at 3.
[227] *Id.* at 1.
[228] *Id.* at 9 (citations omitted).

C

Given the way the Commission and courts have interpreted Section 5, it is well-nigh impossible to identify what "intelligible principle" Congress provided to constrain our discretion. Section 5 does not "lay[ ] down policies and establish[ ] standards, while leaving to" the Commission "the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply."[229] It does not "establish primary standards" and leave it to the Commission "'to fill up the details' under the general provisions made by the Legislature."[230] There is instead "an absence of standards for the guidance of the [Commission's] action," making it "impossible . . . to ascertain whether the will of Congress ha[d] been obeyed" in a particular rulemaking.[231] This is not an intelligible principle; it "is delegation running riot."[232]

The Commission responds, however, that "any doubt" about Section 5's constitutionality was "laid … to rest in *A.L.A. Schechter Poultry Corp. v. United States*."[233] The Commission reasons that *Schechter Poultry* expressly blessed "unfair methods of competition" as a lawful conferral of executive authority rather than an unconstitutional delegation of legislative power.[234]

The Commission is correct that *Schechter Poultry* eliminates any doubt about the constitutionality of our *adjudicative authority* under Section 5. But it confirms the unconstitutionality of *rulemaking authority* under Section 5.

As part of its suite of New Deal legislation, Congress enacted the National Industrial Recovery Act ("NIRA") and authorized the President to approve "codes of fair competition" with the force of law for various industries.[235] The Court held that the provision conferring the

---

[229] *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935).

[230] *Id.* at 426 (quoting *Wayman*, 23 U.S. (10 Wheat.) at 43)).

[231] *Yakus v. United States*, 321 U.S. 414, 426 (1944).

[232] *Schechter Poultry*, 295 U.S. at 553 (Cardozo, J., concurring). Justice Thomas has long criticized the intelligible-principle doctrine as inconsistent with the Constitution's original meaning and incapable of restraining unconstitutional delegations, and has urged its reconsideration. See, e.g., *Whitman*, 531 U.S. at 487 (Thomas, J., concurring) ("I am not convinced that the intelligible principle doctrine serves to prevent all cessions of legislative power."); *Ass'n of Am. R.R.*, 575 U.S. at 66–87 (arguing that the modern application of doctrine is inconsistent with the original meaning of the Vesting Clauses). Other Justices now agree with him. See *Gundy*, 588 U.S. at 149 (Alito, J., concurring in the judgment) ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years [in nondelegation cases], I would support that effort."); *id.* at 152–69 (Gorsuch, J., with whom Roberts, C.J. joins, dissenting) (arguing that the intelligible-principle doctrine is inconsistent with the Constitution's original meaning and ought to be discarded). Justice Thomas is correct. The intelligible-principle test is impossible to square with the original understanding of the Vesting Clause. Because granting rulemaking authority under Section 5 fails the less-exacting intelligible-principle test, I do not address the original meaning of the Vesting Clause here.

[233] Final Rule, 89 Fed. Reg. at 38,354 (citing *Schechter Poultry*, 295 U.S. at 495).

[234] *Ibid*.

[235] See National Industrial Recovery Act, Pub. L. No. 73–67, § 3, 48 Stat. 195, 196–97 (June 16, 1933).

power on the President to promulgate "codes of fair competition" was an unconstitutional delegation. The Court framed the question as whether the phrase "fair competition . . . refer[s] to a category established in the law" that "limit[s]" the President's "authority to make codes . . . accordingly," or whether it is "a convenient designation for whatever set of laws . . . the President" concludes are "wise and beneficent provisions" for that industry.[236] "Unfair competition" was a traditional common law category.[237] And although "[t]he codes" could, "indeed, cover conduct which existing law condemns," they were "not limited to conduct of that sort."[238] Instead, the only statutory guidance given to the President on the content of the codes were the precatory "general purposes" laid out in the statute's "Declaration of Policy."[239] The Court concluded that the delegation of the power to issue "codes of fair competition," undefined and untethered from the common law of "unfair competition," granted the President "unfettered discretion to make whatever laws he thinks maybe needed" to ensure fair competition.[240] As a result, NIRA was an unconstitutional delegation of Congress's lawmaking power to the President.

NIRA sounds awfully familiar. "Unfair methods of competition" in the FTC Act is similarly undefined and divorced from existing legal categories.[241] The Supreme Court has described it as "a broad delegation of power,"[242] as "sweep[ing]," "flexib[le]," "elusive,"[243] and as constrained only by the FTC Act's general "aim" of "protect[ing] the public from the evils likely to result from the destruction of competition or the restriction of it."[244] Indeed, "unfair methods of competition" is even more capacious than "unfair competition."[245] If "unfair competition" is not an intelligible principle, "unfair methods of competition" is not either.

The *Schechter Poultry* Court, plainly aware of what its analysis might portend for Section 5, distinguished Section 5 from NIRA by the method each statute used to accomplish its objectives. Under the FTC Act, the Commission determined whether a practice was an "unfair method of competition . . . in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest."[246] To make this determination, "Congress set up . . . a quasi judicial body" and provided "for formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate

---

[236] *Schechter Poultry*, 295 U.S. at 531.
[237] *Ibid.*
[238] *Id.* at 532.
[239] *Id.* at 534–35.
[240] *Id.* at 537–38.
[241] See *supra* Subsection III.B.2.
[242] *Atl. Refining Co.*, 381 U.S. at 367.
[243] *Sperry & Hutchinson Co.*, 405 U.S. at 241, 244.
[244] *Raladam Co.*, 283 U.S. at 647.
[245] *Id.* at 648; see also *R.F. Keppel & Bro.*, 291 U.S. at 311–12 & nn.2–3.
[246] *Schechter Poultry*, 295 U.S. at 533.

evidence, and for judicial review."[247] NIRA, by contrast, "dispense[d] with the" FTC Act's adjudicatory procedures and authorized "code-making"—the "legislative undertaking" of announcing *ex ante* generally applicable rules of private conduct.[248] The FTC Act's grant of authority to the Commission was constitutional, then, because the authority was confined to case-by-case fact-finding and adjudication.

The Commission concedes "that *Schechter Poultry* approved of the FTC Act's adjudicatory process for determining unfair methods of competition without commenting on the Act's rulemaking provision."[249] But the distinction makes no difference, the Commission reasons, because "[i]f Congress may permissibly delegate the authority to determine through adjudication whether a given practice is an unfair method of competition, it may also permit the Commission to do the same through rulemaking."[250]

That argument is wrong. It advances precisely the opposite rule from the one announced in *Schechter Poultry*. The primary distinction the Court drew between the two was that the FTC Act made the Commission an adjudicator, and NIRA made the President a code-maker. If making rules about "unfair methods of competition" enjoyed the same constitutional status as making determinations through adjudication, then NIRA's code-making should have presented no constitutional problem.

The *Schechter Poultry* Court also suggested a difference in the "subject-matter" covered by the two acts.[251] The Court rejected the government's argument that NIRA was like Section 5, which "merely" granted the authority "to deal with 'unfair competitive practices' which offend against existing law, and could be the subject of judicial condemnation without further legislation, or to create administrative machinery for the application of established principles of law to particular instances of violation."[252] Instead, it held that NIRA was unconstitutional because it gave the President the authority to prescribe in the codes any provision that "may tend to effectuate" any of a litany of general purposes listed in NIRA, the literal meaning of "codes of fair competition" notwithstanding.[253] And anything in those codes was also treated as an unfair method of competition under the FTC Act.[254]

---

[247] *Ibid.*
[248] *Id.* at 533, 541–43.
[249] Final Rule, 89 Fed. Reg. at 38,354. I would not have expected the *Schechter Poultry* Court to have addressed "the Act's rulemaking provision" since no one at the time thought that Section 6(g) conferred substantive rulemaking authority at all. See *supra* Section II.C.; see also Comm'r Holyoak Dissent, *supra* note 59, at Part I.
[250] Final Rule, 89 Fed. Reg. 38354–55.
[251] *Schechter Poultry*, 295 U.S. 533–34.
[252] *Id.* at 535.
[253] *Ibid.*
[254] *Id.* at 534 ("[W]hen a code is approved, its provisions are to be the 'standards of fair competition' for the trade or industry concerned, and any violation of such standards in any transaction in or affecting interstate or foreign

That is the power the Commission claims in the Final Rule—the power to determine the meaning of "unfair methods of competition" through *ex ante* rules having the force and effect of law, without regard for the distinguishing features of individual circumstances. And that power is procedurally and substantively more akin to NIRA-style code-making than even the most expansive characterization of Section 5 offered by the *Schechter Poultry* Court—the power "to create administrative machinery for the application of established principles of law to particular instances of violation."[255] When combined with the Supreme Court's and the Commission's expansive definitions of "unfair methods of competition" since the 1970s, the Final Rule obliterates whatever "subject-matter" distinction the Court identified in 1935.[256]

There is another problem with the Commission's assertion that it is merely doing through rulemaking what it could already do through adjudication. It is not "appl[ying] … established principles of law *to particular instances of* violation."[257] It is proscribing every single iteration of a practice no matter its unique effects. We would not, and could not, proscribe every single noncompete agreement in America through adjudication.

Consider the three enforcement actions the Commission ginned up the day before this rulemaking began. The complaints in all three actions alleged that the noncompete agreements were unfair methods of competition because of the unique effects they had on the particular employees subject to them and on potential rivals trying to enter the product markets in which the employers operated.[258] The Commission's theory in those matters had nothing to do with the "cumulative" effects of other noncompete agreements for other employees in unrelated industries. The Commission was focused only on the specific noncompete agreements that were the subject of the enforcement action and their specific effects.

---

commerce is to be deemed 'an unfair method of competition' within the meaning of the Federal Trade Commission Act.").

[255] *Id.* at 535.

[256] See *supra* Subsections III.B.2, 3.

[257] *Schechter Poultry*, 295 U.S. at 535 (emphasis added).

[258] *See* Analysis of Agreement Containing Consent Order to Aid Public Comment, *In the Matter of Prudential Sec., Inc., et al.*, FTC File No. 2210026 (Jan. 4, 2023) at 5–6 (noting that the employees "earned low wages, were not permitted to negotiate the terms of the Non-Compete Restrictions, and did not consult attorneys," that they "did not receive any money, job security, or other compensation in exchange for" the noncompete agreements, that the company enforced the noncompete agreements to "discourage, delay, and prevent them from" accepting other jobs, and that the noncompete agreements covered a "broad geographic area"); Complaint, *In the Matter of Prudential Sec., Inc., et al.,* FTC File No. 2210026 (Jan. 4, 2023) at 3–5 (employees had little bargaining power, earned low pay, received no additional compensation for the noncompete agreements, and sometimes remained subject to them even after the defendant had exited the market); Analysis of Agreements Containing Consent Order to Aid Public Comment, *In the Matter of O-I Glass, Inc.* and *In the Matter of Ardagh Grp. S.A., Ardagh Glass Inc., and Ardagh Glass Packaging Inc.*, FTC File No. 2110182 (Jan. 4, 2023) at 5 (concluding that the specific agreements had an anti-competitive effect because "the ability to identify and employ personnel with skill and experience in glass container manufacturing is a substantial barrier to entry and expansion").

That is a far cry from what the Final Rule does. The Final Rule generalizes about the "cumulative" effect of all noncompete agreements without assessing the specific effects of any particular agreement, and it treats them all as unfair methods of competition. That mode of analysis bears no relation to our adjudicative procedures. Instead, it moves the Commission out of the "quasi judicial" process blessed in *Schechter Poultry* and into the sort of "virtually unfettered ... code-making authority" that the Court condemned.[259] We are no longer making determinations about unfairness "in particular circumstances, upon evidence, in the light of particular competitive conditions."[260] Instead, we are "dispens[ing] with this administrative procedure and with any administrative procedure of an analogous character," and legislating unchecked.[261] That is precisely what *Schechter Poultry* forbade.[262]

## D

Even if one disagrees with my reading of *Schechter Poultry*, the constitutional question is undoubtedly a close one. That alone is sufficient reason to reject the Final Rule.

Since at least the early nineteenth century, courts have applied an interpretive principle we today call the "avoidance canon."[263] In its earliest form, the canon instructed that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [the interpreter's] plain duty is to adopt that which will save the Act."[264] But since the early twentieth century,[265] the scope of the canon expanded beyond interpretations that in fact violated the Constitution.[266] Now, the canon teaches that "[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a

---

[259] *Schechter Poultry*, 295 U.S. at 533, 542.

[260] *Id.* at 533.

[261] *Ibid.*

[262] The Commission suggests that the Administrative Procedure Act's rulemaking procedures eliminate this concern by imposing procedures on Section 5 rulemaking similar to the adjudicative procedures on which *Schechter Poultry* distinguished NIRA and the FTC Act. Final Rule, 89 Fed. Reg. 38,354. This is a strange argument. First, Congress did not adopt the APA until 1946, so even on the Commission's theory, Section 5 rulemaking suffered from a serious constitutional problem for the first three decades we had it. See Administrative Procedure Act of 1946, Pub. L. No. 79-404, 60 Stat. 237. Second, the APA's procedures for informal rulemaking bear no resemblance to the "quasi judicial" procedures that the *Schechter Poultry* Court said distinguished the FTC Act from NIRA. There is no "complaint," no "notice and hearing," and no "findings of fact supported by adequate evidence" in an informal rulemaking procedure. Compare *Schechter Poultry*, 295 U.S. at 533, with 5 U.S.C. § 553. The APA therefore does not solve the nondelegation problem.

[263] See Barrett, *supra* note 73, at 139 ("The unconstitutionality canon . . . seems to have emerged in 1814 and matured by the late nineteenth century.").

[264] *Blodgett v. Holden*, 275 U.S. 142, 148 (1927); see also *Clark v. Martinez*, 543 U.S. 371, 395 (2005) (Thomas, J., dissenting) ("Traditionally, the avoidance canon . . . commanded courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading.").

[265] *United States ex rel. Attorney General v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909).

[266] *Rust v. Sullivan*, 500 U.S. 173, 190–91 (1991) (explaining distinction between the two versions of the avoidance canon).

cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."[267] A court need conclude only that one of the potential interpretations raises constitutional doubts in order to avoid that interpretation.[268]

 The Supreme Court has relied on nondelegation concerns to "giv[e] narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional."[269] In *Kent v. Dulles*, for example, the Secretary of State refused to issue a passport to a communist, invoking a statute that authorized him to "grant and issue passports . . . under such rules as the President shall designate and prescribe."[270] The Court declined to "reach the question of constitutionality" of the denial, and instead read the delegation narrowly to avoid giving the Secretary the power to withhold a passport because of a person's beliefs.[271] The Court has similarly adopted narrowing constructions of other delegation statutes to avoid interpretations "that might be unconstitutional under the Court's reasoning in [*Schechter Poultry*]."[272]

 We should have done the same here. The canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."[273] Where the statute is unambiguous, the canon does not apply.[274] Sections 5 and 6(g) unambiguously do not confer on us the authority to proscribe all noncompete agreements, both because Section 6(g) does not confer any rulemaking authority at all and because, even if it did, Sections 5 and 6(g) together do not confer power to proscribe every single noncompete agreement.[275]

 But even if one disagrees, the statutes are at least ambiguous. The suggestion that the text of Sections 5 and 6(g) unambiguously authorize the Final Rule—especially after applying the major-questions doctrine—is not a serious one. And the Commission has before it two potential

---

[267] *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring).

[268] See, e.g., *United States v. Palomar-Santiago*, 593 U.S. 321, 328–29 (2021) ("Courts should indeed construe statutes 'to avoid not only the conclusion that [they are] unconstitutional, but also grave doubts upon that score.'" (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)); Eric S. Fish, *Constitutional Avoidance as Interpretation and as a Remedy*, 114 Mich. L. Rev. 1275, 1281–82 (2016) (recounting development of the two versions of the canon).

[269] *Mistretta*, 488 U.S. at 373 n.7.

[270] 357 U.S. 116, 123 (1958).

[271] *Id.* at 129 ("Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it.").

[272] *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (Occupational Safety and Health Act); *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) (reading the Federal Communications Act "narrowly to avoid constitutional problems" under "the requirement of *Schechter* and *Hampton*").

[273] *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quotation marks and citation omitted).

[274] *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019) (The canon of constitutional avoidance "applies only when ambiguity exists").

[275] See *supra* Part II; see also Comm'r Holyoak Dissent, *supra* note 59, at Part I.

interpretations of Sections 5 and 6(g) to resolve the ambiguity—one that authorizes a rule that, at the very least, raises grave constitutional concerns under *Schechter Poultry*, and one that does not. The avoidance canon compels us to choose the latter, under which we lack authority to issue the Final Rule. But the Commission has chosen the former, and thereby blundered into an unconstitutional reading of our organic statute.

IV

Thus far, my objections to the Final Rule have all been about the Commission's power to issue it. But even if you think I am reading the FTC Act and the Constitution incorrectly, the Final Rule is still unlawful. Not only must an agency have power to issue a rule,[276] it must comply with the substantive and procedural requirements of the Administrative Procedure Act (APA).[277] "The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions are reviewed by the courts.'"[278] Relevant here, the APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'"[279] Under this standard, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[280] "Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce."[281] To satisfy the APA, then, the Commission must demonstrate that the evidence on which it relies in fact supports the conclusion it has reached—that every single noncompete agreement[282] in America is unfair and anticompetitive in violation of Section 5 of the FTC Act.

The Final Rule falls woefully short of satisfying this requirement. Noncompete agreements are not the type of agreements that the antitrust laws categorically proscribe. The antitrust laws do not treat vertical restraints[283] as inherently anticompetitive. Rather, whether a

---

[276] See *supra* Section II.A.

[277] 5 U.S.C. § 551 *et seq.*

[278] *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

[279] *Ibid.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015), and 5 U.S.C. § 706(2)(A)).

[280] *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 246 (1962); see also *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

[281] *Allentown Mack Sales & Servs. v. NLRB*, 522 U.S. 359, 374 (1998).

[282] I recognize that the Commission has exempted an indeterminate number of existing noncompete agreements involving senior executives from the Final Rule's ambit. 89 Fed. Reg. at 38,502–03. But the Commission concluded that these agreements are unfair methods of competition. *Id.* at 38,411. It excepted those agreements from the Final Rule "because of . . . practical considerations." *Ibid.*

[283] A vertical restraint is an agreement between persons or firms at different levels of a supply chain—for example, between a supplier and a retailer. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). Employee

vertical agreement violates the antitrust laws depends on its unique terms and effects. That is how federal courts have always analyzed vertical noncompete agreements under the antitrust laws.[284] This antitrust principle aligns with the common law, which has for centuries approached the validity of noncompete agreements on a case-by-case, rather than a categorical, basis.[285] Given the overwhelming tradition of assessing noncompete agreements on a case-by-case basis, the Commission's categorical approach must be buttressed by very compelling evidence. But the evidence does not support a categorical rule. Rather, it demonstrates what experience teaches: that sometimes noncompete agreements have anticompetitive effects, and other times they have procompetitive effects.

## A

The Final Rule treats noncompete agreements as categorical, or *per se*, violations of Section 5.[286] Within the context of the antitrust laws, that is a remarkable thing. The antitrust

---

noncompete agreements are vertical agreements between the supplier of labor—the employee—and the purchaser of labor—the employer.

[284] See, e.g., *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561–64 (11th Cir. 1983) (rejecting application of *per se* rule to employee noncompete agreements and analyzing the particular effects of the agreement under the rule of reason); *Aydin v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983) ("Employee covenants not to compete or interfere with the employer's business after the end of the employment relationship should not be tested under the per se rule."); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 264–69 (7th Cir. 1981); (applying rule of reason to employee noncompete agreements); *United States v. Empire Gas Corp.*, 537 F.2d 296, 308 (8th Cir. 1976) ("The difficulty with the government's position is that there is no showing that any [noncompete agreement] was unreasonable so as to violate the Sherman Act. . . . We agree with the district court's conclusion that the mere existence of a large number of covenants not to compete does not establish a 15 U.S.C. § 1 violation."); *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1082–83 (2d Cir. 1977) (refusing to treat employee noncompete agreements as *per se* Section 1 violations, instead analyzing their particular effects under the rule of reason); *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 843–46 (5th Cir. 1975) (same); *Bradford v. N.Y. Times Co.*, 501 F.2d 51, 59–60 (2d Cir. 1974) (applying rule of reason to noncompete agreement and refusing 'the invitation to classify such a restraint as a per se violation of the Sherman Act"); see also *Snap-On Tools*, 321 F.2d at 836–37 (rejecting FTC enforcement action against noncompete agreement between dealer and supplier on ground that it was not unreasonable in its particular effects).

[285] See *infra* Section I.B.

[286] I recognize that the dichotomy between *per se* rules and the rule of reason arose in the context of Section 1 of the Sherman Act, 15 U.S.C. § 1. And I agree with the majority that Section 5 proscribes more conduct than is proscribed by Sections 1 and 2 of the Sherman Act. Final Rule, 89 Fed. Reg. at 38,348. But that does not mean that when we are dealing with Section 5 we throw out the window more than a century of Sherman Act precedent. Quite the opposite. Courts have consistently linked Section 5 to the rest of the antitrust laws. See, e.g., *Motion Picture Advert. Serv. Co.*, 344 U.S. at 394–95 ("[T]he Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act—to stop in their incipiency acts and practices which, when full blown, would violate those Acts, as well as to condemn as 'unfair method of competition' existing violations of them." (internal citations omitted)); see *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d Cir. 1984) ("Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled."); *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292–93 (4th Cir. 1987) ("[T]he FTC Act functions as a kind of penumbra around the federal antitrust statutes. . . . [T]he scope of the FTC is . . . linked to the antitrust laws."). "When conduct

laws have long distinguished between restraints subject to categorical prohibition—the *per se* rule—and those subject to a case-by-case analysis—the rule of reason.[287] The rule of reason, or restraint-specific approach, "presumptively applies" to every restraint.[288] Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[289] That means that the default antitrust analysis in American law involves a highly individualized inquiry into the nature and effects of the "particular contract or combination."[290] That is precisely the approach that the common law, and a large majority of States, have applied to noncompete agreements for centuries.[291]

There are exceptions to this case-by-case approach. "Some types of restraints … have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*."[292] "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work. . . ."[293] But *per se* treatment is exceedingly rare. "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act."[294] That "considerable experience" must be sufficient for courts to "predict with confidence that [the restraint at issue] would be invalidated in all or almost all instances under the rule of reason"; that is, that the restraint in almost every iteration would be "manifestly anticompetitive" and "lack[ing] any redeeming value."[295] Given the complexity of business relationships and the unique effects those relationships may have in different contexts, courts are "reluctan[t] to adopt *per* se rules with regard to 'restraints . . . where the economic impact of certain restraints is not immediately obvious.'"[296]

"Reluctan[t]" is understating it. Only horizontal restraints—price-fixing and market allocation—are subject to *per se* categorization.[297] Courts once categorically prohibited some

---

does bear the characteristics of recognized antitrust violations . . . the Commission may properly look to cases applying those laws for guidance." *Atlantic Refin. Co. v. FTC*, 381 U.S. 357, 369–70 (1965).

[287] *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018); see also *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 60 (1911) (announcing the rule of reason).

[288] *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

[289] *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 (1977).

[290] *Texaco*, 547 U.S. at 5.

[291] See *supra* Section I.B.

[292] *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

[293] *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

[294] *Topco Assocs., Inc.*, 405 U.S. at 607–08.

[295] *Leegin*, 551 U.S. at 886–87 (cleaned up).

[296] *Khan*, 552 U.S. at 10 (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 458–459).

[297] *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into

vertical agreements too, but the Supreme Court has gotten rid of those precedents.[298] And one court of appeals recently held that even horizontal price-fixing is subject to the rule of reason if the two parties to the restraint were in a dual-distribution relationship.[299] *Per se* treatment in our law is rare, and has gotten substantially rarer over the last thirty years.

The Final Rule charges headlong in the opposite direction by adding a third *per se* rule to American antitrust law: noncompete agreements. It is the only vertical agreement in the bunch. The question, then, is where we acquired the experience sufficient to justify departing so radically from where courts have been taking the rest of antitrust law. The courts have disclaimed sufficient experience to treat noncompete agreements as *per se* illegal.[300] The Commission has very little experience with noncompete agreements.[301] Had it not cooked up some consent orders on the eve of this rulemaking, the Commission would have no experience at all.[302] The States have substantial experience with noncompete agreements. Their experience suggests that noncompete agreements are often fair and procompetitive and should be permitted.[303] The Final Rule reaches precisely the opposite conclusion.

The Commission justifies the Final Rule by relying on academic papers. A handful of economic and sociological studies, it contends, demonstrates that noncompete agreements are universally unfair and anticompetitive.[304] But the evidence on which the Commission relies is nowhere near sufficient to justify this sweeping rule.

## B

### 1

The Final Rule concedes that "some empirical evidence" reveals that noncompete agreements "increase investment in human capital of workers, capital investment, and [research and development] investment."[305] Indeed, "the only study that attempts to identify the causal link between non-competes and worker human capital investment" found that making noncompete

---

the harm it has actually caused."); D. Francis & C. Sprigman, Antitrust: Principals, Cases, and Materials 274 (2d ed. 2024) ("Thus, today, with an asterisk for tying arrangements, no vertical restraints are *per se* illegal.").

[298] See *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911) (categorically prohibiting minimum resale price restraints), *overruled by Leegin*, 551 U.S. at 882, 907; *Albrecht v. Herald Co.*, 390 U.S. 145 (1968) (categorically prohibiting maximum resale price restraints), *overruled by Khan*, 552 U.S. at 7, 18, 22; *United States v. Arnold, Schwinn & Co.*, 338 U.S. 365 (1967) (categorically prohibiting vertical nonprice restraints), *overruled by GTE Sylvania*, 433 U.S. at 58–59.

[299] *United States v. Brewbaker*, 87 F.4th 563, 582–83 (4th Cir. 2023).

[300] See, e.g., *Bradford*, 501 F.2d at 60 ("There is certainly a total absence of federal Sherman Act experience" with noncompete agreements.).

[301] See *supra* Section I.C.

[302] *Ibid.*

[303] See *supra* Section I.B.

[304] Final Rule, 89 Fed. Reg. at 38,379–80, 38,388–89.

[305] *Id*. at 38,422.

agreements unenforceable would substantially decrease companies' investments in employee training.[306] Another study found that noncompete "enforceability increases [research and development] expenditure."[307] These results are unsurprising. Economic theory predicts that, at least in some circumstances, noncompete agreements promote an employer's investment in its employees by mitigating the risk that a rival will ride freely on those investments by luring the employee away before the investing employer can recoup the return on those investments.[308]

Investments in employee training and research and development are neither unfair nor anticompetitive. They are critical to the success of employers, employees, and the general economy. And some noncompete agreements promote both. These findings ought to be fatal to a categorical rule that rests on the proposition that every noncompete agreement is unfair and anticompetitive.

The Commission waves away these procompetitive effects, arguing that other arrangements—namely, nondisclosure agreements (NDAs), intellectual property rights, and invention-assignment agreements—will seamlessly fill the gaps left by the elimination of noncompete agreements.[309] But the Final Rule provides no evidence to support this sweeping conclusion. It merely declares *ipse dixit* that these alternatives will be just as good as noncompete agreements.[310] It can make this sweeping declaration, it reasons, because a few States have banned noncompete agreements and their economies seem to be doing fine.[311] That is a slender reed on which to rest a rule obliterating thirty million contracts. The existence of a few States with noncompete bans does not prove that alternatives can protect all noncompete agreements' potential procompetitive effects. For one thing, only two of the States that purportedly ban noncompete agreements ban them anywhere near to the extent the Commission does in the Final Rule.[312] And, in practice, those two States do not go nearly as far as the Final Rule because, notwithstanding their bans, noncompete agreements remain common and

---

[306] *Id*. at 38,423 (citing Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783, 796–97 (2019)).

[307] *Ibid*. (citing Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Noncompete Agreements* (Nat'l. Bureau of Econ. Rsch., Working Paper No. 31487 2023)).

[308] John McAdams, *Noncompete Agreements: A Review of the Literature*, Fed. Trade Comm'n Bureau of Econ. Rsch. Paper 6 (2019) ("Non-compete agreements are one arrangement that can mitigate the hold-up problem . . . by discouraging worker attrition before the firm has had time to recoup the cost of its upfront investment, and thus permit firms to make investments in its workers that are mutually beneficial and that it otherwise may not decide to do.").

[309] Final Rule, 89 Fed. Reg. at 38,424–33.

[310] *Id*. at 38,424.

[311] *Id*. at 38,424–25.

[312] Barnett & Sichelman, *supra* note 34, at 1011–14 (2020) (identifying California and North Dakota and pointing out that empirical studies have radically oversimplified other state regulatory regimes).

enforceable in some circumstances.[313] Further, this approach fails to account for other factors that drive economic development and innovation in the States. For example, the Commission argues that technology startups have thrived in California notwithstanding its ban on noncompete agreements, "suggesting that employers have less restrictive alternatives for protecting trade secrets."[314] But this argument is just the *post hoc* fallacy. We have no idea what the California economy would look like if it permitted noncompete agreements. And there are too many confounding variables to account for any causation between the "less restrictive alternatives" and the success of Silicon Valley.

Not only does the Commission fail to establish that alternative arrangements will adequately replace noncompete agreements, the Final Rule, in fact, contains evidence that the proposed alternatives may not be adequate replacements for noncompete agreements. The Final Rule cites a number of studies that attempted to isolate noncompete agreements' effects. If alternatives could effectively replicate the benefits of noncompete agreements, these studies should have shown no relationship between noncompete agreements and procompetitive benefits. But, as the Final Rule acknowledges, that is not the case. Studies show that, notwithstanding the purported alternatives, the use of noncompete agreements "increase[s] investment in human capital of workers, capital investment, and [research and development] investment."[315]

There is good reason to believe this evidence and doubt that alternative measures would adequately preserve the procompetitive benefits of noncompete agreements. The proposed alternatives are behavioral. That is, they preclude an employee from engaging in certain behaviors with his or her former employer's rival, but they do not prevent him or her from working for that rival. Noncompete agreements, by contrast, are structural. They prevent former employees with unique insight into a company from joining a competitor in the first place.

The Commission knows full well that structural protections are almost always more effective than behavioral restrictions. When enforcing the antitrust laws, the Commission typically rejects behavioral remedies and insists on more effective structural relief. In 2022, the Commission told Congress that "we now strongly disfavor behavioral remedies and will not hesitate to reject proposed divestitures that cannot fully cure the underlying harm."[316] Indeed, earlier that year, the Commission rejected a proposed behavioral remedy and blocked a vertical

---

[313] Final Rule, 89 Fed. Reg. at 38,466–67 ("[W]orkers from States where non-competes are banned commented that they faced enforcement of non-competes that selected the law of another State," and "Colvin and Shierholz find that 45.1% of workplaces in California use non-competes even though they are unenforceable there.").

[314] Final Rule, 89 Fed. Reg. at 38,396.

[315] *Id*. at 38,422.

[316] Prepared Statement of the Fed. Trade Comm'n Before the United States Senate Committee on the Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights "Oversight of the Enforcement of the Antitrust Laws," 6 (Sept. 20, 2022).

merger.[317] The Commission's preference for structural relief rather than behavioral relief reflects straightforward concerns. Behavioral remedies are difficult to craft; violations are difficult to detect; and the remedies are complicated and difficult to enforce.[318] The meager evidentiary record in the Final Rule does not justify the dismissal of commenters' analogous concerns about the behavioral alternatives to noncompete agreements.[319]

2

The evidentiary record is also far from conclusive on the potential benefits that a ban on noncompete agreements would bring. The Commission's principal justification for the Final Rule is that banning noncompete agreements is likely to increase employees' wages substantially.[320] But this claim is overstated. The Final Rule's chief evidence for this claim is an unpublished study which found that employees' wages rose after restrictions on noncompete-agreement enforceability increased.[321] The study analyzed changes to noncompete-agreement enforceability

---

[317] Statement Regarding Termination of Lockheed Martin Corporation's Attempted Acquisition of Aerojet Rocketdyne Holdings Inc., Fed. Trade Comm'n Press Release (Feb. 15, 2022) (announcing termination of Lockheed/Aerojet transaction); *Lockheed Martin Reports Fourth Quarter And Full Year 2021 Financial Results*, Lockheed Martin News Release (Jan. 25, 2022), https://news.lockheedmartin.com/2022-01-25-Lockheed-Martin-Reports-Fourth-Quarter-and-Full-Year-2021-Financial-Results (describing the FTC's rejection of Lockheed Martin's proposed behavioral remedies).

[318] Joint Letter from Dep't of Just. AAG Jonathan Kanter and Fed. Trade Comm'n Chair Lina Khan to Canada Ministry of Innovation, Science, and Industry, 3 (Mar. 31, 2023) ("Given the difficulties in crafting behavioral remedies that adequately anticipate corporate incentives and reflect dynamic market realities as well as the challenges of enforcing these provisions, behavioral remedies are particularly disfavored by the agencies").

[319] Comment by American Investment Council, FTC-2023-0007-21042, at 20 n.79 ("Even where it is possible to demonstrate improper sharing of confidential information, at that point the genie cannot be put back into the bottle and damages often cannot be reasonable calculated. Noncompete clauses seek to prevent the individual subject to it from being in a position where he or she could intentionally or unintentionally disclose confidential information. This is theoretically similar to the FTC's preference for structural remedies in merger cases. Keeping parties apart polices interaction better."); Comment by HR Policy Association, FTC-2023-0007-20998, at 14 ("In the case of a senior executive who is responsible for overall corporate strategy or product design, it is almost impossible to 'ringfence' the proprietary information that would do competitive harm if that executive immediately joined a direct competitor with no cooling-off period."); Comment by National Association of Manufacturers, FTC-2023-0007-20939, at 4 ("NDAs do not address the reality that it is simply unrealistic to expect that employees will mentally separate the trade secrets they have developed expertise on when they go to a competitor. The current remedies for misappropriation of trade secrets under state laws . . . do not prevent misappropriation of trade secrets, but rather only offer a remedy after the misappropriation has occurred. Noncompete agreements are, therefore, a necessary and important complement to non-disclosure agreements and trade secret litigation for companies attempting to protect their proprietary scientific, technical, and business information.").

[320] Final Rule, 89 Fed. Reg. at 38,474 (citing "an increase in earnings or earnings growth" as the first of the "Benefits of the Rule"); *id.* at 38,460 (noting that "non-competes suppress wages for workers across the labor force" and rejecting an alternative disclosure rule that would not achieve the same results); *id.* at 38,382–87 (section titled, "Non-Competes Suppress Workers' Earnings"); *id.* at 38,410–11 (section titled, "Non-Competes with Senior Executives Suppress Labor Mobility and Earnings").

[321] *Id.* at 38,382 (discussing Matthew S. Johnson, Kurt J. Lavetti & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31929, 2023). The Final

40

that fall well short of the categorical ban the Final Rule imposes. Specifically, the study ranked noncompete-agreement enforceability on a scale from 0.0 to 1.0.[322] The categorical ban that the Final Rule imposes would be a dramatic shift for some States, taking them from near 1.0 to 0.0 based on the study's methodology.[323] This is a far cry from the minor changes that the study examined. Nearly all of the shifts in noncompete enforceability that it considered had "a score change of 0.15 or less," and the changes largely preserved most noncompete enforceability, with seventy-five percent of the sample having a post-change enforceability score greater than 0.65.[324] This study therefore suggests that restrictions narrower than a complete ban could achieve the wage increases the Commission says it wants, while preserving the procompetitive benefits the Commission acknowledges exist. But the Commission nevertheless fires its blunderbuss and bans them all—hardly the sort of "rational" response to this study that the APA requires.

The unpublished study also suffers from a key weakness. Even assuming that noncompete agreements will produce short-run wage increases, it does not necessarily follow that the unenforceability of noncompete agreements will benefit employees in the future. Noncompete agreements help solve the "hold-up" problem. "Hold-up" describes the phenomenon in which a firm may "forgo making certain investments in [its] workforce knowing that [the] employees would be able to . . . quit and appropriate the value of the investment."[325] Noncompete agreements mitigate the hold-up problem "by discouraging worker attrition before the firm has had time to recoup the cost of its upfront investment, and thus permit firms to make investments in its workers that are mutually beneficial and that it otherwise may not decide to do."[326] As of today, employers may have invested in training their employees, secure in the knowledge that a noncompete agreement would prevent these employees from taking their new

---

Rule also invokes a study on the effects of the unenforceability of noncompete agreements for tech workers in Hawaii. See *id*. at 38,382–83 (citing Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (2022)). Whatever the merits of that study, its subject is so entirely idiosyncratic that it cannot plausibly be used as evidence to sustain a ban on every single noncompete agreement in America. The Final Rule further relies on a study of the unenforceability of noncompete agreements for "hourly workers with relatively low earnings" in Oregon. See *id*. at 38,381 (citing Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022)). While this paper is a valuable contribution to the literature, it examines a non-retroactive change affecting a limited population in a limited area, which forms a poor basis for a national rule applying to the whole population. In addition, there are questions about whether the paper's results are confounded by macroeconomic changes from the Great Recession and whether the timing of changes in mobility relative to changes in wages matches the authors' interpretation. See McAdams, *supra* note 308, at 17–18.

[322] See Johnson, Lavetti & Lipsitz, *supra* note 321, at 10.

[323] See *ibid.* ("Florida has the highest NCA Enforceability Score during our time period (which we normalize to 1), and North Dakota has the lowest score (which we normalize to 0).").

[324] *Id.* at 11.

[325] John M. McAdams, *Non-Compete Agreements: A Review of the Literature* 6 (SSRN, Dec. 31, 2019).

[326] *Ibid*; see also Office of Econ. Pol'y, U.S. Dep't of Treasury, Non-compete Contracts: Economic Effects and Policy Implications 7–8 (Mar. 2016).

41

skills to a competitor. But with noncompete agreements no longer enforceable, employers may make fewer similar training investments.[327] That decrease in training may undermine productivity. The Final Rule discusses no empirical literature that examines the effects of noncompete agreements on labor productivity. I am hard pressed to believe that less productive, undertrained employees will be able to command higher wages in the long run than those in whom firms have invested heavily in training.

The Commission's claim that forbidding noncompete agreements will boost innovation is also weak.[328] In support of this claim, the Final Rule cites three unpublished studies linking an increase in patent filings to the unenforceability of noncompete agreements.[329] But patents are not a good measure of innovation. First, many patent filings do not reflect any innovation at all,[330] as the Commission has explained more than once.[331] Indeed, patents sometimes *suppress* innovation rather than promote it.[332] Second, innovation does not always involve patents.[333] Finally, if firms cannot use noncompete agreements to protect their intellectual property, they might use patents instead. This increase in patent filings would lead to a positive association between patents and a ban on noncompete agreements but would tell us nothing about whether firms are innovating any more or less than they were before the ban on noncompete agreements.[334] While the papers on which the Final Rule relies attempted to account for some of the problems with using patents as a proxy for innovation,[335] their success, and the overall link between noncompete agreements and innovation, remains unsettled.

---

[327] The Final Rule discusses the possibility that noncompete agreements may increase only "core" (basic) rather than "advanced" training, because experienced workers might leave the industry due to noncompete agreements, which would increase the need for basic training of new workers. See Final Rule, 89 Fed. Reg. at 38,487. But there does not appear to be any evidence to support whether or not increased training associated with noncompete agreements is core or advanced. The mere possibility that some training is inefficient should not be used to dismiss the increase in an outcome (training) that is generally regarded as positive and as the primary benefit of noncompete agreements.

[328] *Id*. at 38,394.

[329] *Ibid*. (citing Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 21 (SSRN, 2023); Johnson, Lipsitz & Pei, supra note 307; and Emma Rockall & Kate Reinmuth, *Protect or Prevent? Non-Compete Agreements and Innovation* (SSRN, 2023)).

[330] Barnett & Sichelman, *supra* note 34, at 1024.

[331] See, e.g., Fed. Trade Comm'n Statement Concerning Brand Drug Manufacturers' Improper Listing of Patents in the Orange Book (Sep. 14, 2023).

[332] Fed. Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy, at 5 (Oct. 2003) ("[P]oor quality or questionable patent[s] . . . can block competition and harm innovation in several ways.").

[333] See *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 483 (1974) ("[N]o patent is available for a discovery, however useful, novel, and nonobvious, unless it falls within one of the express categories of patentable subject matter of 35 U.S.C. § 101").

[334] See Barnett & Sichelman, *supra* note 34, at 1023–24.

[335] In an attempt to address the fact that patents do not always reflect innovation, some papers assign more weight to arguably higher relevance patents in various ways. See He, *supra* note 329, at 4 (using the value of each patent measured by stock market reactions); Johnson, Lipsitz, & Pei, *supra* note 307, at 5 (assigning more importance to

3

The Final Rule also draws arbitrary lines. By and large, the Final Rule seeks to identify the *average* effects of noncompete agreements. This approach creates two problems. First, nothing in Section 5 forbids agreements that are themselves fair and procompetitive simply because similar agreements in other contexts may be unfair and anticompetitive. By focusing on averages, the Commission is necessarily, and arbitrarily, capturing in its dragnet perfectly fair and procompetitive agreements in order to avoid "administrability concerns" about drawing lines short of a complete ban.[336] Those agreements are outside of our Section 5 authority to proscribe no matter how similarly they look to other agreements that may be unfair or anticompetitive.[337] Second, the Commission's focus on averages elides critical details. There are likely particular industries or employee types for which the procompetitive benefits associated with noncompete agreements cannot be achieved by other means. The Commission notes that one paper estimates "34%–39% increases in capital investment due to increases in noncompete enforceability *at knowledge-intensive firms*."[338] But the Commission estimates an increase of "7.9% *across all sectors*."[339] This wide variation shows that studies that aggregate results from many sectors could miss concentrated effects, including harm, that a blanket ban might have on particular subgroups. For example, commenters argued that a noncompete-agreement ban would deter investment that broadcasters make "in on-air talent for news, sports, weather, and other programming,"[340] which might hurt employees' efforts to build the skills and reputation needed to jump to larger television markets.[341] Even if the broad study cited in the Final Rule[342] proved that a

---

patents that have more forward citations by other patents in order to identify more important patents); Rockall & Reinmuth, *supra* note 329, at 12 (assigning more importance to patents with fewer backward citations). Papers also take different approaches to try to address concerns that noncompete agreement bans merely increase firms' propensity to patent innovations rather than increasing actual innovation. One study examines propensity to patent by replicating the overall results for the medical device and pharmaceutical industries considered in isolation, on the theory that these industries are highly unlikely to have unpatented innovations. Johnson, Lipsitz & Pei, *supra* note 307, at 5. Though this result is intriguing, it is only for two industries in one paper and only reflects the effects on patenting and not other forms of innovation. Another study assumes that product innovations are more likely than process innovations to rely on patents due to greater concerns that competitors could reverse engineer products. Rockall & Reinmuth, *supra* note 329, at 25. They find the ratio of process to product patents does not change with a change in non-compete enforceability, which could suggest a stability of propensity to patent.
[336] Final Rule, 89 Fed. Reg. at 38,458.
[337] See, e.g., *Boise Cascade Corp. v. FTC.*, 637 F.2d 573, 577 (9th Cir. 1980) (reversing the Commission's finding of FTC Act Section 5 liability and declining to enforce its order because "[d]espite these similarities [with conduct previously found to violate Section 5], neither the Commission nor the administrative law judge (ALJ) purported to find that the pricing system here was used with the price-stabilizing purpose and effect [as the prior conduct]").
[338] Final Rule, 89 Fed. Reg. at 38,423 n.746 (emphasis added) (citing Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1, 28–29 (2024)).
[339] *Ibid*. (emphasis added).
[340] Comment by the National Association of Broadcasters, FTC-2023-0007-16268, at 2.
[341] Comment by Block Communications, FTC-2023-0007-21041, at 4–5.
[342] Final Rule, 89 Fed. Reg. at 38,382 (discussing Johnson, Lavetti & Lipsitz, *supra* note 321).

noncompete-agreement ban would increase average employee wages in the long run—and I do not believe that it does—it cannot demonstrate whether the ban would specifically benefit or hurt an extremely narrow group such as on-air broadcast talent.

Moreover, the Final Rule's lone exception—for existing noncompete agreements in which the employee is a senior executive—is likely the most arbitrary aspect of it all. The Commission concedes that noncompete agreements "with senior executives may tend to negatively affect competitive conditions in product and service markets to an even greater degree than [noncompete agreements] with other workers, given the outsized role senior executives play in forming new businesses and setting the strategic direction of firms with respect to innovation."[343] On the Commission's theory, then, the only agreements it leaves in force are more grievous violations of Section 5 than the agreements it nullifies. The Commission exempts them from the Final Rule because of "practical concerns" about unwinding existing agreements, but it concedes that similar concerns apply to other agreements.[344] The Commission's careful consideration of the effects of a particular species of noncompete agreement, while ignoring the potentially unique effects of countless other varieties, demonstrates the Final Rule's overinclusion and arbitrariness.

4

The lack of evidence on noncompete agreements' effects on innovation, wages, productivity, and on the effects of potential alternatives to those agreements, points to a broader problem that infects the Commission's analysis: the economic literature on noncompete agreements is new and still being developed. Indeed, one of our own economists pointed this out just a few years ago, writing that "[f]urther research is needed in several areas" because "the existing empirical literature on non-compete agreements suffers from several important limitations that raise questions as to whether it has successfully estimated the causal effect of such agreements on mobility, wages, entrepreneurship, and innovation."[345] And just a few years before that, one of the scholars on which the Commission heavily relies warned that "the data we have currently is woefully inadequate and more research is needed to reach meaningful conclusions about reforms."[346] The Final Rule does not even cite these contrary views.

---

[343] Final Rule, 89 Fed. Reg. at 38,404; see also *id.* at 38,407 (Noncompete agreements "for senior executives are especially pernicious" because "[s]enior executives are relatively few in number, are bound by [noncompete agreements] at high rates, and have highly specialized knowledge and skills. Therefore, it can be extremely difficult for existing firms and potential new entrants to hire executive talent and to form the most productive matches.").
[344] *Id.* at 38,412.
[345] McAdams, *supra* note 308, at 20.
[346] Norman Bishara & Evan Starr, *The Incomplete Noncompete Picture*, 20 Lewis & Clark L. Rev. 497, 546 (2016).

Most of the papers that the Final Rule relies upon are either unpublished or were published within the last five years.[347] Some are contradictory. For example, the two papers on the only subject that has been examined by more than one group of authors—the effect of noncompete agreements in financial advisory firms—reached opposite conclusions.[348] To be sure, our knowledge of the effects of noncompete agreements has improved in recent years. But we do not have anything close to the full picture of the procompetitive and potentially anticompetitive effects of noncompete agreements. "[W]ithout the full picture of noncompete use within and across firms, better measures of enforceability, worker perceptions, and employer motivations, policymakers are still largely in the dark about what reforms, if any, are needed."[349] Given that this literature is currently the subject of extensive ongoing research, the Commission should not, and I believe cannot, prematurely use it to justify a wide-sweeping policy decision that will foreclose the opportunity to further study the effects of noncompete agreements on the American economy.

The APA "require[s] final rules to 'articulate a . . . rational connection between the facts found and the choices made.'"[350] It is possible that the evidence on which the Commission relies may have justified a modest rule aimed at the specific industries or professions studied in the academic literature. Instead, for reasons known only to the majority, the Commission decided to go for broke and ban every single noncompete agreement it could find. The APA requires that a vast trove of evidence sustain the vast sweep of the Final Rule. The handful of academic papers cited in the Final Rule cannot justify its incredible reach, and relying on them to prohibit noncompete agreements categorically is a "clear error of judgment."[351]

*** 

Because we have neither the authority nor the evidence to sustain the Final Rule, it is unlawful. I respectfully dissent.

---

[347] See, e.g., Johnson, Lavetti & Lipsitz, *supra* note 321.

[348] See Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218–43 (2021); Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives*, 76 J. Finance 2409–45 (2021).

[349] Bishara & Starr, *supra* note 346, at 541.

[350] *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43).

[351] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977).