# EXHIBIT B



UNITED STATES OF AMERICA
# Federal Trade Commission
WASHINGTON, D.C. 20580

Office of Commissioner
Melissa Holyoak

**Dissenting Statement of Commissioner Melissa Holyoak**

**Joined by Commissioner Andrew N. Ferguson**

*In the Matter of the Non-Compete Clause Rule*
Matter Number P201200
June 28, 2024

Article I of the Constitution vests "[a]ll legislative Powers herein granted" in Congress.[1] "[B]y vesting the lawmaking power in the people's elected representatives, the Constitution sought to ensure 'not only that all power [w]ould be derived from the people,' but also 'that those [e]ntrusted with it should be kept in dependence on the people.'"[2] While many lament Congressional gridlock, the lawmaking process was designed to be difficult and to include "many accountability checkpoints."[3] Allowing Congress to divest its legislative power to the Executive Branch bypasses those checkpoints and compromises the integrity of the Constitution's separation of powers.[4] Yet courts tolerate legislative delegations to agencies only to "fill in statutory gaps," and apply various doctrines to keep such limited delegations in check.[5]

The modern administrative state may be accustomed to the ease and breadth of legislative rulemaking,[6] but an agency should not lose sight of these constitutional proscriptions and should, therefore, approach legislative rulemaking with circumspection—lawmaking is an extraordinary power and agency lawmaking tests the delicate balance of separation of powers.[7]

With these important constitutional principles in mind, a threshold question must be answered for the Non-Compete Clause Rule ("Final Rule"): Does the Commission have authority to promulgate

---

[1] U.S. Const. Art. I.
[2] *W. Virginia v. EPA*, 597 U.S. 697, 737-38 (2022) (Gorsuch, J., concurring) (quoting The Federalist No. 37, 227 (J. Madison)).
[3] *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring).
[4] *See W. Virginia*, 597 U.S. at 739 (Gorsuch, J., concurring) ("Permitting Congress to divest its legislative power to the Executive Branch would 'dash [this] whole scheme.'") (quoting *Dep't of Transp.*, 575 U.S. at 61 (Alito, J., concurring)).
[5] *Gundy v. United States*, 139 S. Ct. 2116, 2141 (2019) (Gorsuch, J., dissenting) (explaining that in "policing improper legislative delegations[,]" "hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines").
[6] *See City of Arlington, Tex. v. Fed. Comm. Comm'n.*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting) ("The administrative state 'wields vast power and touches almost every aspect of daily life.'") (quoting *Free Enter. Fund v. PCAOB.*, 561 U.S. 477, 499 (2010)).
[7] *See e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022) (per curiam) ("Administrative agencies are creatures of statute" and "accordingly possess only the authority that Congress has provided.").

legislative rules for unfair methods of competition? I believe the answer is no and therefore I respectfully dissent.

My dissent should not, however, be interpreted to mean that I endorse all non-compete agreements. To the contrary, I would support the Commission's prosecution of anti-competitive non-compete agreements, where the facts and law support such enforcement.[8] That is why I am particularly disappointed that the Commission dedicated the Commission's limited resources to a broad rulemaking that exceeds congressional authorization and will likely not survive legal challenge. Those resources would be better used to identify and prosecute—including in collaboration with States' attorneys general—anticompetitive non-compete agreements using broadly accepted theories of antitrust harm.[9]

Non-compete agreements present complex policy questions. And I am sympathetic to those who feel stuck in a job because a noncompete prevents them from seeking other opportunities. But I am equally sympathetic to the small business owner who invests in her new employees, just to watch the employee walk away to her biggest competitor with valuable training and trade secrets.[10] Relatedly, I fear that banning noncompete agreements will potentially deprive employees of critical training—and impede career progression—because a business is no longer adequately incentivized to invest in its employees.[11] There are costs *and* benefits to noncompete agreements. The reciprocal nature of agreeing to stay with an employer for a period of time in exchange for the employer's investment in training and related services only underscores the inherent difficulty of condemning non-competes generally, rather than on a case-by-case basis.

An illustrative example is *Mitchel v. Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711). Though the Final Rule apparently cites *Mitchel* in support of its sweeping conclusions, in reality *Mitchel* is an example of courts wrestling with the tradeoffs and public policy concerns of enforcing non-compete agreements that "threaten[] a worker's ability to practice a trade."[12] The restraint on trade in *Mitchel*—a baker's promise not to compete for five years—was upheld. The court reasoned that the agreement was limited in time and geographic scope, and "enhancing the marketability of the business itself—and thereby providing incentives to develop such an enterprise—outweighed the temporary and limited loss of competition."[13] *Mitchel* therefore highlights the importance of a case-by-case approach to evaluating noncompete agreements.

---

[8] My concern over the potential harm from non-compete agreements is not an endorsement of the Final Rule's sweeping claims and characterization of the available evidence on the harms of non-compete agreements. *See infra* Section 4.

[9] Some comments submitted in response to the Notice of Proposed Rulemaking describe facts and circumstances that would suggest liability under traditional antitrust theories of harm.

[10] *See, e.g.,* Comment of Am. Intellectual Property Law Ass'n at 3 (even with nondisclosure agreements, trade secrets are difficult to protect because departing employees "often cannot meaningfully perform their new job without using the [former employer's protected information] in some way").

[11] *See, e.g.*, Final Rule at 528, 542.

[12] *Id*. at 5.

[13] *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 689 (1978) (discussing *Mitchel's* reasoning).

Setting aside the policy issues that undermine the case for the rulemaking, as a creature of Congress, the Commission only has the powers granted to it by Congress.[14] While it may fervently wish to resolve the policy debate, "no matter how important, conspicuous, and controversial the issue, … an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress."[15] Here, the Commission's power is wanting.

The Commission asserts that Section 5's authority regarding unfair methods of competition *works together* with Section 6(g) to permit the Commission to promulgate competition rules.[16] But, as further explained below, based on the text and structure of the FTC Act, I am persuaded that a reviewing court would interpret Section 6(g) to authorize only *procedural* or internal operating rules, not substantive legal rules.[17] The Commission thus cannot rely on 6(g) to promulgate competition legislative rules. Further, even assuming, *arguendo*, the Commission has such rulemaking authority, I believe there is no clear congressional authorization under Section 5 of the FTC Act for promulgation of the Final Rule and therefore agree with Commissioner Ferguson's reasons for rejecting the Rule.

## I. BASED ON THE TEXT AND STRUCTURE OF THE FTC ACT, SECTION 5 AND SECTION 6(G) DO NOT AUTHORIZE COMPETITION RULEMAKINGS.

Statutory interpretation begins with the text.[18] And as the Supreme Court has stated, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[19] In my view, the FTC Act's text and structure do not support competition rulemaking authority under Section 5 and Section 6(g).

When Congress created the FTC in 1914, it granted the FTC authority in Section 5 to prevent "unfair methods of competition in commerce."[20] After unsuccessful attempts to use this authority to regulate unfair trade practices, the Commission lobbied for additional authority,[21] and in 1938, Congress amended Section 5 to add "unfair or deceptive acts or practices."[22] Decades later, in 1975, Congress changed "in commerce" to "in or affecting commerce."[23]

---

[14] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").
[15] *FDA & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) (internal citations omitted).
[16] *See* Non-Compete Clause Rule ("Final Rule") at 24 (emphasis added).
[17] *See* Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit,* 75 Admin. L. Rev. 277, 298-99 (2023) (setting forth reasons for interpreting Section 6(g) as conferring the authority to write procedural rather than substantive rules).
[18] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) ("As in all such cases, we begin by analyzing the statutory language, assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.") (internal quotations omitted).
[19] *W. Virginia*, 597 U.S. at 721 (quoting *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989)).
[20] FTC Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 722 (1914).
[21] *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 992 (D.C. Cir. 1973).
[22] 52 Stat. 111 (1938).
[23] 15 U.S.C. § 45(a)(2).

Other than these additions, the unfair methods of competition enforcement powers set forth in Section 5 have remained relatively unchanged since 1914.[24] Section 5, codified at 15 U.S.C. § 45, sets forth a comprehensive adjudication structure where the Commission may: issue and serve a complaint; provide notice and hold a hearing where it receives testimony; permit intervention in the proceedings; provide transcripts of hearings; prepare a report with findings of fact; issue a cease-and-desist order; and modify or set aside such reports or orders.[25] Importantly, however, where a defendant objects to a Section 5 cease and desist order, a reviewing court of appeals must first determine that the order is valid before the FTC can enforce it.[26] The FTC Act's sole discussion of the FTC's "unfair methods of competition" authority is found in Section 5—and nowhere in Section 5 does it mention rulemaking.[27]

Because Section 5's comprehensive adjudication scheme does not address rulemaking, the Commission pulls from another provision of the FTC Act—Section 6(g)—for its source of authority for legislative rulemaking. Section 6(g) in the original Act provides that the Commission may "[f]rom time to time classify corporations and to make rules and regulations for the purpose of carrying out the provisions of the Act."[28]

Section 6(g) thus authorizes rules, but the question is what type of rule? Under the Administrative Procedure Act, there are different kinds of "rules," including legislative rules (implementing statutes with full force and effect of law), interpretative rules (advising the public on how an agency interprets its statutes and rules), guidance or policy documents, or procedural rules (agency processes).[29]

The Commission asserts that Section 6(g) authorizes the FTC to issue legislative rules—but an agency does not have legislative rulemaking authority without "some *clear expression* of congressional intent to confer power to act with the force of law."[30] The Supreme Court instructs that whether Congress delegated to an agency such authority—to promulgate rules carrying the "force of law"—can be demonstrated in a manner of ways, including by "an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."[31] Section 6, however, does not mention notice-and-comment

---

[24] Merrill, *supra* note 17 at 297.
[25] 15 U.S.C. § 45(b).
[26] *Id.* § 45(c) ("To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission.").
[27] 38 Stat. at 717-724.
[28] FTC Act, Pub. L. No. 63-203, § 6, 38 Stat. 717, 722 (1914). Section 6(g) now reads: "From time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g).
[29] *See Am. Min. Cong. v. Mine Safety & Health Admin*., 995 F.2d 1106, 1109 (D.C. Cir. 1993).
[30] Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 489 (2002) (emphasis added) (citing *Bowen*, 488 U.S. at 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) ("The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes.")).
[31] *United States v. Mead Corp*., 533 U.S. 218, 227 (2001). That Section 6(g) refers to "rules and regulations" does not answer whether such rules are legislative or interpretive. *See* Merrill & Watts, *supra* note 30 at 480-81.

rulemaking, adjudication (or some other mechanism for enforcement of Section 6(g) rules), nor anything else clearly indicating that such rules would have the force of law.[32]

While Section 5 includes adjudication, the text and structure of the Act do not support an interpretation that Section 6(g) rules were supposed to be enforced through Section 5 adjudication. Indeed, Section 5's comprehensive adjudication framework does not speak to the enforcement of Commission rules at all. Rather, the adjudication process is "de novo" with "no hint of structuring the adjudication by promulgating pre-existing substantive rules."[33] In other words, Section 5 adjudication involves a fact-intensive inquiry of a *specific* party's unfair method of competition, and nothing in the text suggests it contemplates adjudication for a violation of some existing rule.[34]

The Final Rule asserts that if "Congress may permissibly delegate the authority to determine through adjudication whether a given practice is an unfair method of competition, it may also permit the Commission to do the same through rulemaking."[35] But that inference is mistaken. Legislative rulemaking is, by definition, *creating law*.[36] Adjudication is enforcing *existing law*. The Final Rule goes beyond the Commission's delegated authority to prevent unfair methods of competition through case-by-case adjudication. The Supreme Court's discussion in *Schechter Poultry* illustrates the distinction.[37]

There, the Supreme Court struck down regulations—adopted pursuant to the National Industrial Recovery Act ("NIRA")—which provided for "codes of fair competition" regulating the manner in which chickens were to be sold.[38] The Court held that the NIRA was an "unconstitutional delegation of congressional power" because the law lacked the FTC's legal standards *and* adjudicatory procedures.[39] The Court contrasted NIRA's broad authority to potentially regulate "the vast array of commercial and industrial activities throughout the country" with the FTC's

---

[32] *See* Merrill, *supra* note 17 at 298 & n.138 (finding Section 6(g) to be procedural because Section 6 does not authorize an enforcement action) (citing *Am. Min. Cong.*, 995 F.2d at 1109); *see also* Merrill & Watts, *supra* note 30, at 531-32 & n. 325-26 (legislative rulemaking supported by reference of enforcement) (citing *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953)); *but see Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 678 (D.C. Cir. 1973) (finding Section 6(g) legislative rulemaking could be enforced with Section 5 adjudication).
[33] *See* Merrill, *supra* note 17, at 299.
[34] Because antitrust matters are factually intensive, competition legislative rulemaking is inherently inadequate: "The most important limitation of both rulemaking and per se rules is their inability to capture and reflect variations in the effects of many forms of conduct on the performance of markets." Richard J. Pierce Jr., *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?,* GW Law Faculty Publications & Other Works 1561, at 3 (2021); *see also* Merrill, *supra* note 17, at 308 (arguing against 6(g) competition legislative rulemaking because "[a]ntitrust cases are often fact-intensive, which is one reason why they have been resolved using trial-type procedures ever since the Sherman Act was passed in 1890").
[35] Final Rule at 44; *see* William C. MacLeod, *Regulation Beyond the Rule of Reason*, 30 Geo. Mason L. Rev. 1001, 1072-1076 (2023).
[36] To be clear, as Commissioner Ferguson explains in Section III.A of his dissent, Congress may never delegate its legislative power. Thus, while I describe legislative rulemaking as "creating law," Congress may "delegate no more than the authority to make policies and rules that *implement* its statutes." *Loving v. United States*, 517 U.S. 748, 771 (1996) (emphasis added). Unfortunately, as observed by Justice Thomas, "[t]he Framers' dedication to the separation of powers has been well-documented, if only half-heartedly honored." *Dep't of Transp. V. Ass'n of Am. Railroads*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring).
[37] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532 (1935).
[38] *Id.* at 542.
[39] *Id.*

Section 5 authority to bring cases "in *particular* instances, upon evidence, in the light of *particular* competitive conditions and of what is found to be a *specific* and substantial public interest."[40] The Court further contrasted the Commission's adjudication process (acting as a quasi-judicial body, taking evidence, and making findings of fact in particular circumstances) with the regulatory codes of fair competition ("unfettered" legislative power delegated to the President, which had no procedural requirements or governing standards).[41] Importantly, it was the Commission's case-by-case adjudication procedures that allowed it to escape the nondelegation concerns that defeated the codes of fair competition.[42] But the constitutionally critical "guardrails" *Schechter* identified as limiting the Commission's authority "disappear completely" in competition rulemaking.[43] Adjudication and rulemaking are simply not opposite sides of the same coin as the Final Rule suggests.

The most telling structural reason against 6(g) legislative rulemaking, however, is that Section 5 adjudication itself has no force of law.[44] The Commission's cease-and-desist orders under Section 5 are not self-executing; the orders must instead be enforced by an Article III court.[45] Thus, unlike other agencies tasked with legislative rulemaking, the power to enforce and *interpret* Section 6(g) rules would oddly fall to the courts.[46] It strains credulity to argue that Section 6(g) rulemaking was meant to have the "force of law" based on a separate adjudication framework that has no force of law.

Historical convention also confirms that the FTC lacks competition rulemaking authority. As is well understood by administrative law scholars, "the history of rulemaking during the Progressive and New Deal eras reveals" that Congress followed "a convention for indicating whether an agency had the power to promulgate legislative rules."[47] That convention required a "textual signal" in "a separate provision in the statute attaching 'sanctions' to the violation of rules and regulations

---

[40] *Id.* at 532-33, 539 (emphasis added). The Final Rule makes much of the fact that the Supreme Court held, as in *Schechter*, that Section 5's "unfair method of competition" should be interpreted more broadly than the Sherman Act. *See* Final Rule at 22-23. The question here is not whether unfair methods of competition go beyond traditional antitrust doctrines but rather whether the means of enforcing unfair methods includes legislative rulemaking. While Congress tasked the FTC with preventing unfair methods of competition, the Commission is still limited by the means with which Congress selected to achieve that mandate—"agencies are bound, not only by the ultimate purposes Congress has selected, but the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994).
[41] *Schechter*, 295 U.S. at 533-537.
[42] *See* Jennifer Cascone Fauver, *A Chair With No Legs? Legal Constraints on the Competition Rule-Making Authority of Lina Khan's FTC*, 14 Wm. & Mary Bus. L. Rev. 243, 294 (2023).
[43] *Id.* (citing Maureen K. Ohlhausen & James F. Rill, *Pushing the Limits?*, in RULEMAKING AUTHORITY OF THE US FEDERAL TRADE COMMISSION, 155, 171 (Daniel A. Crane ed., 2022)).
[44] *See* Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain,* 89 Geo. L.J. 833, 890-92 (2001) ("Agency orders that must be brought to courts for enforcement are by their very nature not legally binding on parties outside the agency."). Further, because Section 5 adjudication does not have the "force of law," any Commission determination on that basis should not qualify for *Chevron* deference. *See Mead Corp.*, 533 U.S. at 226-27.
[45] 15 U.S.C. § 45(l); *see* Merrill, *supra* note 17, at 297.
[46] *See* Merrill, *supra* note 17 at 299 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) ("[W]hen granting rulemaking power to agencies, Congress usually intends to give them, too, considerable latitude to interpret the ambiguous rules they issue.")).
[47] *See* Merrill & Watts, *supra* note 30, at 493.

promulgated under a particular rulemaking grant."[48] In other words, "[i]f the statute prescribed a sanction, then the authority to make 'rules and regulations' included the authority to adopt legislative rules that have the force of law. If the statute did not include a sanction, the authority to make 'rules and regulations' encompassed only interpretative or procedural rules."[49] The absence of a sanction here confirms that Congress did not confer legislative rulemaking authority via Section 6(g).

In addition, Section 6(g)'s placement and context in the FTC Act's statutory scheme dissuades a finding that it can be combined with Section 5 for competition legislative rulemaking. Section 6 of the FTC Act, codified at 15 U.S.C. § 46, outlines the "Additional powers of Commission," which are primarily investigatory:

- Investigation of Persons, Partnerships, or Corporations (§ 46(a));
- Reports of Persons, Partnerships, and Corporations (§ 46(b));
- Investigation of Compliance with Antitrust Decrees (§ 46(c));
- Investigations of Violations of Antitrust Statutes (§ 46(d));
- Readjustment of Business of Corporations Violating Antitrust Statutes (§ 46(e));
- Publication of Information; Reports (§ 46(f));
- **Classification of Corporations; Regulations (§ 46(g))**;
- Investigations of Foreign Trade Conditions; Reports (§ 46(h));
- Investigations of Foreign Antitrust Law Violations (§ 46(i));
- Investigative Assistance for Foreign Law Enforcement Agencies (§ 46(j));
- Referral of Evidence for Criminal Proceedings (§ 46(k)); and
- Expenditures for Cooperative Arrangements (§ 46(*l*)).[50]

Whereas Section 5 lays out the Commission's adjudication authority and process regarding unfair methods of competition in great detail, Section 6 focuses on the Commission's secondary authority to investigate and create reports—detailing, for example, the various areas of investigation. Positioned in the middle of that section, Section 6(g) authorizes the Commission to "classify corporations"—and tacked on to that provision the authority to make rules.[51] When considered as part of the overall statutory scheme, scholars agree that the rulemaking authority in this ancillary provision is meant to effectuate the Commission's investigative powers and other procedural rules.[52]

Supreme Court precedent is instructive here. In reviewing a statutory scheme, the Supreme Court is skeptical of broad claims of power that come from "ancillary" provisions. For example, in *MCI*

---

[48] *Id.*
[49] *Id.*
[50] 15 U.S.C. § 46(a)-(l).
[51] 15 U.S.C. § 46(g).
[52] Merrill, *supra* note 17, at 298-99 (setting forth reasons for interpreting Section 6(g) as conferring the authority to write procedural rather than substantive rules); Vartan Shadarevian & Lloyd Lyall, *Modern Antitrust Meets Modern Rulemaking: Evaluating the Potential of FTC Competition Rulemaking*, 72 U. Kan. L. Rev. 389, 403 (2024) ("Section 6(g) was more likely intended to be limited to adopting rules for investigations."). *See* Pierce *supra* note 34, at 9 (concluding that Supreme Court would reject Section 6(g) as authorizing competition legislative rulemaking).

7

*Telecommunications Corp. v. American Telephone & Telegraph Co.*, the Court rejected the FCC's rate regulation, which it argued was authorized by an ancillary provision in its authorizing statute allowing the agency to "modify" rate-filing requirements.[53] The Court found that it was "highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a *subtle device* as permission to 'modify' rate-filing requirements."[54]

The Court in *MCI Telecommunications* dismissed the notion that the FCC's authority to "modify" rate-filings included a wholesale ability to reset rate-filings generally. The Final Rule's interpretation of Section 5 is likely to get dismissed on similar grounds. Section 5 adjudication authorizes complaints against a *specific* person, partnership, or corporation.[55] Competition legislative rulemaking, on the other hand, would allow wholesale regulation of entire industries, giving "the FTC control over the U.S. Gross Domestic Product—worth $18.4 trillion in 2020."[56] In fact, the Final Rule estimates it will cost employers $400-$488 billion over the next ten years.[57]

*Whitman v. American Trucking Associations* is equally instructive.[58] There, the Court considered whether Section 109 of the Clean Air Act (CAA) authorized the EPA to consider implementation costs when setting ambient air quality standards.[59] The Court explained that because Section 109(b)(1) was the "engine that drives nearly all of Title I of the CAA," the "textual commitment of authority to the EPA" to consider costs must be "clear."[60] What is often termed the mousehole canon, the Court reasoned: "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[61]

Similar to Section 109 at issue in *American Trucking*, Section 5 of the FTC Act is the engine that drives the Commission's "unfair methods of competition" authority. Section 5 makes no mention of rulemaking. And Section 6(g) lacks a clear textual commitment authorizing *competition* rulemaking. It is highly unlikely that Congress intended to alter the comprehensive adjudicatory

---

[53] 512 U.S. 218, 231 (1994).
[54] *Id.* (emphasis added).
[55] 15 U.S.C. § 45(a)(2).
[56] Cascone Fauver, *supra* note 41, at 290.
[57] Final Rule at 321.
[58] 531 U.S. 457, 468 (2001).
[59] *Id*.
[60] *Id.*
[61] *Id.* The Court remains skeptical of ancillary provisions providing broad authority. Most recently, in *West Virginia v. EPA*, the Court rejected a broad claim of emissions regulation based on a provision that was designed only as a gap-filler and "used a handful of times" in fifty years. 597 U.S. at 710; *see also Nat'l Fed'n of Indep. Bus. v. Occupational Safety and Health Admin.*, 595 U.S. 109, 119 (2022) (finding it "telling that OSHA, in its half century of existence" had never relied on its claimed authority to adopt "a broad public health regulation of this kind"). While I agree with Commissioner Ferguson's reasons for rejecting the rule under the major questions doctrine as articulated recently in *West Virginia v. EPA*, the Supreme Court cases rejecting authority based on ancillary provisions in the statutory scheme precedes this recent articulation. *See, e.g.*, *MCI Telecomm.*, 512 U.S. 218; *Am. Trucking*, 531 U.S. 457; *Gonzales v. Oregon,* 546 U.S. 243, 267 (2006) (rejecting the "idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation").

powers of Section 5 with an ancillary provision in a separate section covering investigatory powers. The elephant of competition rulemaking simply does not fit in the Section 6(g) mousehole.

## II. THE COMMISSION'S HISTORICAL INTERPRETATION OF SECTION 6(G) SUGGESTS THE FTC LACKS COMPETITION RULEMAKING.

How the Commission initially interpreted the metes and bounds of Section 6(g) confirms the FTC lacks competition rulemaking authority. "A prominent canon of statutory interpretation, well established in 1914 and frequently referenced afterwards, is that the interpretation of a statute by an agency closely contemporaneous with its enactment is entitled to significant weight."[62] For decades after the enactment of the FTC Act in 1914, the Commission interpreted Section 6(g) as "conferring only the power to conduct adjudications and investigations and not as conferring any power to issue legislative rules."[63]

While the first half-century of the Commission's existence reflected a well-understood absence of 6(g) legislative rulemaking, in 1962, the Commission began issuing Trade Regulation Rules (TRRs).[64] The Commission waffled on whether those rules had binding effect and it did not immediately bring any enforcement actions.[65] But after the Commission adopted a legislative rule prescribing cigarette labeling, Congress responded by overturning the rule with the Federal Cigarette Labeling and Advertising Act in 1965.[66] The Commission persisted with promulgating TRRs and its authority was challenged in court. In *National Petroleum Refiners Association v. FTC*, the D.C. Circuit upheld the Commission's authority to promulgate a TRR, specifically, a rule declaring that the failure to post octane rating numbers at gasoline pumps was an unfair method of competition and an unfair or deceptive act or practice.[67] As further discussed below in Section III, scholars question the soundness and viability of that decision.

The Final Rule relies heavily on the Commission's brief history of promulgating TRRs as demonstrating its 6(g) rulemaking authority,[68] but that history is not helpful.[69] Not only did that aggressive rulemaking period diverge from the Commission's first 49 years, that period was also short-lived and met with significant congressional blowback. And the Commission did not promulgate another rule solely related to unfair methods of competition after *National Petroleum*.[70]

---

[62] Merrill, *supra* note 17, at 301; *See also W. Virginia*, 597 U.S. at 747 (Gorsuch, J., concurring) ("A 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight as evidence of the statute's original charge to an agency.") (quoting *United States v. Philbrick*, 120 U.S. 52, 59 (1887)).
[63] Merrill, *supra* note 17, at 301; *see also* Merrill & Watts, supra note 30, at 549-52; *see also* David L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy*, 78 Harv. L. Rev. 921, 925 (1965) (explaining that Commission relied on adjudication proceedings "for the first half-century of its existence").
[64] Merrill & Watts, supra note 30 at 552.
[65] Cascone Fauver, *supra* note 41 at 256-57; Merrill & Watts, supra note 30, at 553.
[66] Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, 79 Stat. 282 (1965); *see* Merrill & Watts, *supra* note 28, at 553-54.
[67] 482 F.2d 672 (D.C. Cir. 1973).
[68] Final Rule at 25-28.
[69] Importantly, the FTC only once promulgated a rule exclusively addressing an unfair method of competition. *See* Cascone Fauver, *supra* note 41, at 258.
[70] *See* Pierce, *supra* note 34, at 6-7.

After *National Petroleum*, and in response to the Commission's perceived overreach, Congress passed the Magnuson-Moss Warranty Act in 1975, which imposed strict requirements for legislative rulemaking regarding unfair or deceptive acts or practices.[71] It also expressly provided that these new procedures were the only means of rulemaking for unfair or deceptive acts and practices.[72] The congressional rebuff did not end there. Because the Commission's aggressive tactics garnered it the nickname the "National Nanny,"[73] Congress refused to provide the Commission funding and shut it down for several days.[74] And, in 1980, Congress once again legislated to further limit the Commission's authority.[75] In fact, "Congressional irritation with the FTC's rulemaking binge was so great that Congress failed to reauthorize the FTC for fourteen years after the 1980 Act."[76]

The Final Rule argues that "[w]ere there any doubt that the 1914 Congress granted the Commission the authority to make rules under section 6(g) to prevent unfair methods of competition, the Congresses of 1975 and 1980 eliminated such doubt by ratifying the D.C. Circuit's decision holding that the Commission has such authority."[77] But the arguments in support are unpersuasive.

*First*, the Final Rule argues that the 1975 Congress considered but rejected the idea of proscribing Section 6(g) legislative rulemaking.[78] But Congress also failed to expressly *adopt* Section 6(g) competition rulemaking.[79] This highlights the problem with attempting to decipher legislative inaction. The Supreme Court has "reasserted in no uncertain terms [its] oft-expressed skepticism toward reading the tea leaves of congressional inaction."[80] That skepticism is well placed here as the 1975 legislative history[81] reveals a mixed bag of views: "some participants in the legislative process assumed the D.C. Circuit had correctly interpreted Section 6(g)" while "others thought it had not."[82]

---

[71] Magnuson-Moss Warranty—Federal Trade Commission Improvements Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).
[72] *Id.*
[73] Cascone Fauver, *supra* note 41, at 260.
[74] *Id.*
[75] Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, 94 Stat. 374, § 1.
[76] Cascone Fauver, *supra* note 41, at 261.
[77] *See* Final Rule at 32.
[78] *Id.* at 30 (quoting 15 U.S.C. 57a(a)(2)).
[79] Merrill, *supra* note 17, at 315 ("The House and the Conference Committee rejected the Commission's entreaty to preserve its rulemaking authority as construed in *National Petroleum Refiners*.").
[80] *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (reasoning that the Court had "no idea whether the Members' failure to act in 1977 was attributable to their belief that the Corps' regulations were correct, or rather to their belief that the courts would eliminate any excesses, or indeed simply to their unwillingness to confront the environmental lobby").
[81] Without citation, Chair Khan claims that my dissent relies on legislative history to "disprove[] that 6(g) confers substantive rulemaking authority." *See* Statement of Chair Khan at 4. Not so. The legislative history here is not used to interpret the statutory text but instead to demonstrate a more narrow point: the legislative history's lack of consensus undermines any suggestion of concerted congressional inaction.
[82] Merrill, *supra* note 17, at 315; *see also* Pierce, *supra* note 41 at 9-10 (finding it doubtful that Congress ratified *National Petroleum*). Justice Scalia recognized that the multiple reasons for legislative inaction make it impossible to attribute acquiescence to legislators' inaction: "The 'complicated check on legislation,' The Federalist No. 62, p. 378 (C. Rossiter ed. 1961), erected by our Constitution creates an inertia that makes it impossible to assert with any

While the Supreme Court has "sometimes relied on congressional acquiescence when there is evidence that Congress considered and rejected the '*precise* issue' presented before the Court," "[a]bsent such *overwhelming evidence* of acquiescence, [the Court is] loath to replace the plain text and original understanding of a statute with an amended agency interpretation."[83] Here, it is simply impossible to determine with any degree of assurance what the congressional inaction regarding competition rulemaking signified. The Final Rule is short of the overwhelming evidence necessary to replace the plain text and original understanding of Section 6(g) and Section 5.

To be sure, whether silence should be given any weight is questionable. As Justice Scalia explained, and later expounded by Justice Thomas, the notion that a court can assume its interpretation is correct due to congressional inaction is based on the "patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant."[84] Justice Thomas highlighted the constitutional dangers of assigning any meaning to silence: "Finally, even if congressional silence could be meaningfully understood as acquiescence, it still falls short of the bicameralism and presentment required by Article I and therefore is not a 'valid way for our elected representatives to express their collective judgment.'"[85]

Thus, even if Congress in 1975 liked *National Petroleum*'s interpretation of Section 6(g), tacit approval is not relevant; instead, a reviewing court here remains tasked with determining what the original meaning of Section 6(g) was when it was enacted in 1914.[86] As demonstrated by the text

---

degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice." *Johnson v. Transportation Agency, Santa Clara Cty.*, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting)).

[83] *Rapanos*, 547 U.S. at 750 (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001)) (emphasis in original).

[84] *Johnson*, 480 U.S. at 671 (Scalia, J., dissenting); *see also Gamble v. United States*, 587 U.S. 678, 723 (2019) (Thomas, J., concurring); Cascone Fauver, supra note 41 at 285 ("Silence from a subsequent legislature should have absolutely no relevance to the meaning the enacting legislature intended.") (quoting Linda D. Jellum, MASTERING LEGISLATION, REGULATION, AND STATUTORY INTERPRETATION 299 (3d ed. 2020)).

[85] *Gamble*, 587 U.S. at 723 (Thomas, J., concurring) (quoting Caleb Nelson, *Stare Decisis and Demonstrably Erroneous Precedents*, 87 Va. L. Rev. 1, 76 (2001)); *cf.* Alan B. Morrison, *The Sounds of Silence: The Irrelevance of Congressional Inaction in Separation of Powers Litigation*, 81 Geo. Wash. L. Rev. 1211, 1221 (2013) ("But the Constitution precludes the Court from drawing any inference from what Congress did not do in response to the President's expansive reading of the statute, any more than it could infer congressional disapproval if one House had passed a resolution condemning the President for misconstruing the law.").

[86] Congressional *inaction* 60 years after enactment of the FTC Act does nothing in determining what the statute meant when enacted. But Congressional *action* in the decades following enactment support the agency's contemporaneous view that it lacked Section 6(g) legislative rulemaking authority. In 1940, Congress passed the Wool Products Labeling Act, ch. 871, § 1, 54 Stat. 1128 (1940), and in 1951, the Fur Products Labeling Act, ch. 298, § 1, 65 Stat. 175 (1951), both of which *granted* legislative rulemaking authority. See 15 U.S.C. § 68d(a) (authorizing rulemaking "as may be necessary and proper for administration and enforcement"); 15 U.S.C. § 69f(b)) (authorizing rulemaking "as may be necessary and proper for purposes of administration and enforcement of this subchapter"). Congress then enacted the Flammable Fabrics Act of 1953, which initially only included general rulemaking authority identical to Section 6(g) of the FTC Act, but in 1967, Congress amended it to add that violation of any rules promulgated under the Act would be "an unfair method of competition" and the Commission had the authority to enjoin violations of such rules. Pub. L. No. 90-189, §§ 4(a), 5(a), 81 Stat. 568, 571 (1967) (codified as amended at 15 U.S.C. §§ 1194(c), 1195(a)). Critically, these legislative actions demonstrate that Congress did not interpret the

11

and structure, when the FTC Act was enacted it did not authorize Section 6(g) legislative rulemaking—Congress's silence in 1975 does not cure that lack of authority.

*Second*, the Final Rule argues that specific legislative provisions in the 1975 and 1980 amendments "confirmed the Commission's authority to make rules under section 6(g)."[87] The text of those provisions, however, does not support any congressional confirmation of legislative rulemaking. The Final Rule first points to Section 18, a new section added to the FTC Act in 1975 that included robust procedures, beyond the requirements of the Administrative Procedure Act, for legislative rulemaking for unfair or deceptive acts of practices.[88] Specifically, the Final Rule relies on Section 18's "savings clause" regarding unfair methods of competition[89]:

> The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title). The preceding sentence shall not affect **any authority** of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.[90]

The first sentence aligns the Commission's rulemaking authority for unfair acts or practices with the heightened requirements of Section 18, and the second sentence clarifies that such limitation does not apply to unfair methods of competition rules. But the second sentence only specifically identifies interpretive rules and policy statements—markedly absent is any mention of *legislative* rulemaking for unfair methods of competition.[91] Moreover, the savings clause says it has no effect on "any" authority of the Commission.[92] So rather than *affirmatively* ratifying the existence of legislative rulemaking for unfair methods of competition, the savings clause merely recognizes that Section 18 had no impact on *whatever* authority may exist—dodging the question of whether *National Petroleum* correctly found legislative rulemaking authority.[93]

Further, the Final Rule's strained reading that Section 18 confirms competition rulemaking also creates the strange situation where Congress would impose heightened requirements for *unfair* acts or practices rulemaking while leaving undisturbed *unfair* methods of competition

---

FTC Act of 1914 to confer legislative rulemaking authority to the Commission. Had Congress thought otherwise, no subsequent grants of authority would have been necessary. *See* Merrill & Watts, *supra* note 30, at 549-50 ("If Congress had granted general legislative rulemaking authority to the FTC in 1914 when it created the Commission, these subsequent grants of legislative rulemaking powers would have been superfluous.").

[87] Final Rule at 30.
[88] *Id.* at 29-30.
[89] *Id.* at 30.
[90] 15 U.S.C. 57a(a)(2) (emphasis added).
[91] This clause was more likely aimed at preserving the Commission's ability to issue Merger Guidelines: "[T]he most important 'rules' employed by the FTC and DOJ in competition matters are the Merger Guidelines, which are general statements of policy, not legislative rules." Merrill, *supra* note 17, at 307.
[92] 15 U.S.C. 57a(a)(2).
[93] Cascone Fauver, *supra* note 41 at 284 (positing that savings clause's use of "any" authority meant "Congress may have been signaling that the issue of legislative rule-making was yet unresolved"); Merrill, *supra* note 17, at 307 ("Clearly, the second sentence [of § 57a(a)(2)] meant to preserve the status quo with respect to the FTC's rulemaking authority in antitrust matters.").

rulemaking.[94] This is particularly peculiar because antitrust matters are factually intensive: "Given that Congress was enamored of hybrid rulemaking procedures in 1975, on the ground that they would allow more intensive probing of fact issues, one would expect it to require the use of such procedures in competition cases if Congress intended to ratify FTC rulemaking authority in competition cases."[95] Unless of course Congress did not believe that the FTC had competition rulemaking authority.

The Final Rule next argues that the 1975 Congress confirmed Section 6(g) legislative rulemaking because Section 18 did not invalidate 6(g) rules that had already been promulgated and Section 18 further permitted promulgation for rules that were substantially completed.[96] These provisions merely reflect Congress's intent to maintain the status quo by preserving specific *rules* (those promulgated or nearly complete), rather than confirming Section 6(g) legislative *rulemaking*.

For these same reasons, the Final Rule's reliance on Section 22 as confirming 6(g) legislative rulemaking[97] falls flat. Section 22 was added in 1980 to provide additional requirements for any rule promulgated by the Commission including, *inter alia*, a regulatory analysis that details the rule's objectives, alternatives to the rule, a cost-benefit analysis, and compliance with applicable laws.[98] The requirements apply to both newly promulgated rules, as well as amendments to existing rules if the amendment would "have an annual effect on the national economy of $100,000,000 or more," "cause a substantial change in the cost or price of goods or services," or "have a significant impact upon persons subject to regulation" and upon consumers.[99]

The Final Rule argues that because Section 22 applies to legislative rules, and because Section 22 defines "rule" to include rules promulgated under Section 18 *and* Section 6(g), Congress "confirmed the Commission's authority to promulgate rules regulating unfair methods of competition."[100] But Section 22 includes no mention of unfair methods of competition. Indeed, Section 22 does not affirmatively confirm *any* legislative rulemaking authority under Section 6(g). That is because Section 22 applies to *previously* enacted 6(g) rules. The 1975 legislation preserved the validity of the Commission's previously enacted 6(g) rules—over 25 rules enacted from 1963 to 1978.[101] Section 22 thus works to ensure that significant amendments to those previously enacted 6(g) rules would also comply with the rigorous regulatory analysis of Section 22.

Accordingly, Congress in 1975 did not expressly ratify *National Petroleum* but affirmed that it was not changing what, if any, authority the Commission may have regarding unfair methods of

---

[94] Final Rule at 29.
[95] Merrill, *supra* note 15, at 308.
[96] Final Rule at 30 ("Congress also made clear that Section 18 'shall not affect the validity of any rule which was promulgated under section 6(g).' And it provided that 'any proposed rule under section 6(g)' with certain components that were 'substantially completed before' section 18's enactment 'may be promulgated in the same manner and with the same validity as such rule could have been promulgated had this section not been enacted.'") (quoting Magnuson-Moss Act, 88 Stat. 2183) (brackets omitted).
[97] Final Rule at 31.
[98] 5 Pub. L. 96-252, 94 Stat. 374 (1980).
[99] *Id.*; *see also* 15 U.S.C. § 57b-3(1).
[100] Final Rule at 31.
[101] *See* Final Rule at 25-28 (listing promulgated 6(g) rules); *see* Magnuson-Moss Act, 88 Stat. 2183 (maintaining validity of previously enacted 6(g) rules).

13

competition rulemaking.[102] The Final Rule's implausible theory is that Congress, five years later in 1980, reversed course and sought to affirmatively answer that question in Section 22 without actually mentioning unfair methods of competition. In *AMG Capital Management, LLC v. FTC*, the Supreme Court rejected similar arguments by the Commission.[103] There, the Supreme Court considered whether Section 13(b) of the FTC Act authorized the Commission to obtain injunctions and recover equitable monetary relief in a single action.[104] But the problem with the Commission's argument was that while 13(b) authorized permanent injunctions, the authority to obtain monetary equitable relief was found in Section 19(b).[105]

Among other arguments, the Commission asserted that courts of appeals had accepted the Commission's interpretation of Section 13(b), which Congress later ratified in amendments to the FTC Act.[106] Those amendments involved changes to Section 13's venue, joinder, and service (unrelated to remedial provisions) provisions, and changes to Section 5 authorizing all remedies including restitution where certain conduct in foreign commerce was involved—yet those amendments said "nothing about the scope of Section 13(b)."[107] The Court observed that: "when 'Congress has not comprehensively revised a statutory scheme but has made only isolated amendments it is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of a court's statutory interpretation.'"[108]

The same is true here. The isolated amendments on which the Final Rule depends—Section 18's savings clause for unfair methods of competition rules and Section 22's reference to 6(g) rules with no mention of unfair methods of competition—do not revise Section 6's or Section 5's statutory scheme. The amendments tell us nothing about the original meaning of Section 6 when enacted in 1914: "When a later statute is offered as 'an expression of how the Congress interpreted a statute passed by another Congress a half century before,' 'such interpretation has very little, if any, significance.'"[109] The text and structure of the FTC Act do not support Section 6(g) legislative rulemaking—and the original meaning is left undisturbed by subsequent, insignificant congressional action.

### III.    THE FINAL RULE'S RELIANCE ON *NATIONAL PETROLEUM* IS MISPLACED.

To support its argument that the FTC Act confers competition rulemaking authority to the Commission, the Final Rule relies heavily on the reasoning found in *National Petroleum Refiners Association v. FTC*.[110] That reliance is misplaced. The court there approached its interpretation of

---

[102] 15 U.S.C. 57a(a)(2).
[103] 593 U.S. 67, 81 (2021).
[104] *Id.* at 70.
[105] *Id.* at 73.
[106] *Id.* at 81.
[107] *Id.* at 82.
[108] *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001)) (brackets and ellipses omitted).
[109] *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (Stevens, J., concurring) (quoting *Rainwater v. United States*, 356 U.S. 590, 593 (1958)) (ellipses omitted); *see also Bilski*, 561 U.S. at 645 (Stevens, J., concurring) (quoting *Diamond v. Diehr*, 450 U.S. 175, 184 (1981)) ("[B]ecause [the suggested reading of the statute at issue] would expand [the statute] to cover a category of processes that have not 'historically been eligible,' 'we should be loathe to conclude that Congress effectively amended [the statute] without saying so clearly.'").
[110] 482 F.2d 672 (D.C. Cir. 1973).

14

Section 6(g) quite differently than a court would approach the issue today, reasoning that courts must interpret statutes "liberally" to construe "broad grants of rule-making authority."[111] But as scholars note, *National Petroleum*'s framing, approach to statutory interpretation, and delegation questions were never adopted by the Supreme Court and fell out of favor decades ago.[112]

Indeed, the D.C. Circuit in *National Petroleum* spent most of its opinion not analyzing the text and structure of Section 6(g) but instead itemizing the salutary benefits of the rulemaking process.[113] And rather than finding a clear expression from Congress authorizing legislative rulemaking, the D.C. Circuit's approach really boils down to—*well, Congress never said the Commission could not make competition rules*.[114] The Final Rule gives short shrift to the text and structure of the FTC Act and blindly follows the D.C. Circuit's holding.[115] Chair Khan criticizes my repudiation of *National Petroleum* and argues that "the rule of law demands that we follow what the law is."[116] But *National Petroleum* is not binding on the other courts of appeals—the *statute* is the law, not a nonbinding judicial opinion. And of particular relevance here, *National Petroleum* is not binding where challenges to the Final Rule are now pending,[117] nor does it reflect how the Supreme Court would likely rule.

Indeed, the same arguments that worked for the Commission in *National Petroleum* went nowhere with the Supreme Court recently in *AMG Capital*.[118] Rejecting the FTC's argument that Section 13(b) provided it authority to recover monetary relief, the Court instead focused on the Act's language and structure.[119]

The Court observed that Section 13(b)'s language refers only to injunctions and does not mention monetary relief; and it further observed that the Section 13(b) injunctive authority was "buried in

---

[111] *Id.* at 680. Indeed, rather than requiring affirmative evidence of a conferral of legislative rulemaking authority, "the court framed the question as whether there was affirmative evidence *not* to confer power to make legislative rules." Merrill, *supra* note 17, at 303 (citing *Nat'l Petroleum Refiners Ass'n*, 482 F.2d. at 673, 691) (emphasis in original).

[112] *See* Pierce *supra* note 34 at 6 (citing Merrill & Watts, supra note 488 at 557-70); *see also* Cascone Fauver, *supra* note 41 at 265-66 (concluding that *National Petroleum*'s "'remarkable' interpretation of the law is unlikely to survive under the Supreme Court's modern jurisprudence"); Kristin Hickman, *The Roberts Court's Structural Incrementalism*, 136 Harv. L. Rev. F. 75, 77 (2022) ("In 1978, renowned administrative law scholar Kenneth Culp Davis described formal separation of powers, rule of law, and nondelegation principles as 'barriers to the development of the administrative process' and the modern administrative state (and judicial review thereof) … [T]he Roberts Court by contrast takes seriously formalist conceptions of separation of powers, rule of law, and nondelegation principles.").

[113] 482 F.2d at 681.

[114] *Id.* at 676 ("But Section 5(b) does not use limiting language suggesting that adjudication alone is the only proper means of elaborating the statutory standard.").

[115] Final Rule at 25, 28-29. For this same reason, the Final Rule's reliance on *United States v. JS & A Grp.*, 716 F.2d 451, 454 (7th Cir. 1983), is also wrong. Without engaging with the text and structure, the Seventh Circuit merely incorporated the National Petroleum's discussion. *Id.* at 454.

[116] Statement of Chair Khan at 3.

[117] *See Ryan, LLC v. Fed. Trade Comm'n*, No. 3:24-cv-986 (N.D. Tex.).

[118] 593 U.S. at 78-82; *see* William C. MacLeod, *Regulating Beyond the Rule of Reason*, 30 Geo. Mason L. Rev. 1001, 1068 (2023) ("In *AMG Capital Management v. FTC*, . . . the FTC used many of the same arguments that had worked in the Court of Appeals for the District of Columbia in 1972 to suggest the Act conferred an unexpressed power. This time, however, the agency was unable to persuade a single Justice.").

[119] 593 U.S. at 75-78.

a lengthy provision that focused upon purely injunctive, not monetary, relief."[120] The FTC Act's "structure" further confirmed to the Court that Section 13(b) did not provide the FTC with the authority to seek monetary relief.[121] Because Section 5(l) and Section 19 "gave district courts the authority to impose limited monetary penalties and to award monetary relief … [Congress] likely did not intend for Section 13(b)'s more cabined 'permanent injunction' language to have similarly broad scope."[122] Writing for a unanimous Supreme Court, Justice Breyer found it unlikely "that Congress, without mentioning the matter, would have granted the Commission authority so readily to circumvent its traditional Section 5 administrative proceedings."[123]

Like the FTC's Section 13(b) argument in *AMG*, Section 6(g) is an ancillary provision in an unrelated section, and it is not likely that Congress, without mention, intended Section 6(g) to disrupt Section 5's comprehensive adjudicatory scheme.

* * *

For these reasons I am persuaded that Section 6(g) and Section 5 do not authorize the Commission to issue the Final Rule.

### IV. EMPIRICAL EVIDENCE DOES NOT SUPPORT THE FINAL RULE'S BROAD REACH.

Beyond the lack of authority to issue the Final Rule, I also do not believe that the economic theory or available empirical evidence justify such a broad rule.

Non-compete clauses, under certain circumstances, can have anticompetitive effects. In particular, they can increase switching costs,[124] reduce labor mobility, and prevent resources from flowing to the use that values them the most. As a consequence, the agreements can undermine the ability for employees to negotiate with both their current and potential employees.[125] This may depress wages[126] or even lead to extended periods of unemployment during the term of the noncompete (or while the employee finds employment not restricted by the clause).[127] Beyond the effect upon

---

[120] *Id.* at 75.
[121] *Id.* at 77.
[122] *Id*.
[123] *Id.* at 78.
[124] Office of Econ. Policy, U.S. Dep't of the Treasury, NON-COMPETE CONTRACTS: ECONOMIC EFFECTS AND POLICY IMPLICATIONS 20 (2016) [hereinafter OEP Non-Compete Report] ("As workers progress through their careers, switching jobs is more difficult in states that stringently enforce non-competes."); *but see* Brian C. Albrecht et al., *Labor Monopsony and Antitrust Enforcement: A Cautionary Tale*, ICLE White Paper No. 2025-05-01, 2 n.7 (May 1, 2024) (*citing and quoting* Jean-Pierre Dubé, Günter J. Hitsch, & Peter E. Rossi, *Do Switching Costs Make Markets Less Competitive?*, 46 J. MARKETING RSRCH. 435, 435 (2009) ("In the simulations, prices are as much as 18% lower with than without switching costs. More important, equilibrium prices do not increase even in the presence of switching costs that are of the same order of magnitude as product price.")).
[125] OEP Non-Compete Report *supra* note 124 at 3 ("Worker bargaining power is reduced after a non-compete is signed…").
[126] *Id.* (explaining that noncompetes can "possibly lead[] to lower wages").
[127] *See* Camila Ringeling et al., *Noncompete Clauses Used in Employment Contracts Comment of the Global Antitrust Institute, Antonin Scalia Law School, George Mason University* 7 (Feb. 7, 2020) [hereinafter GAI Comment]; OEP Non-Compete Report *supra* note 124 at 3 ("Non-competes sometimes induce workers to leave their occupations entirely, foregoing accumulated training and experience in their fields.").

employees, non-compete provisions may also raise the costs of rivals trying to enter or expand within the relevant market.[128]

Noncomplete clauses—like vertical restraints more broadly[129]—can also have procompetitive or welfare enhancing effects. Most notably, noncompete clauses promote innovation because firms using noncompete clauses reduce the risk that their secrets will be transferred to a rival that hires their employees.[130] Employers are also more willing to invest in human capital and to train their employees when they know that they will be the one to benefit from the investment in their employees,[131] at least in part solving the holdup problem.[132] The issue is further complicated because even if non-compete clauses do lower wages, that may lower the marginal cost for the employer, and a lower marginal cost will, in competitive situations, be passed through as lower prices to consumers.[133]

Importantly, and contrary to the Final Rule's assertions, the empirical evidence on non-compete clauses reveals a mixed story.[134] A few studies find that non-compete clauses, in some circumstances, can cause lower wages.[135] Other studies, by contrast, find the opposite or inconclusive results.[136] A recent review of the literature by an FTC economist emphasized the risks of making broad conclusions regarding non-compete clauses:

> Although the literature has made important strides in studying non-competes and their effects on workers, firms, and end consumers, further work is needed. Due to the limited availability of data and a paucity of natural experiments (e.g., law changes) to assess the impact of non-competes, much of the literature relies on cross-sectional comparisons of signers and non-signers, or high-enforceability

---

[128] Matt Marx & Lee Fleming, *Non-compete Agreements: Barriers to Entry … and Exit?* 12 Innovation Pol'y Economy 39, 58 (2012) ("Entry is less likely to occur given non-competes because would-be founders find it more difficult to start companies in the same industry. Moreover, even once founded it is more difficult for nascent ventures to attract talent from companies that use non-competes because they are less able to reliably promise a robust defense against a lawsuit from the former employer."); *see also* GAI Comment *supra* note 127 at 7.

[129] *See, e.g.*, James C. Cooper et al., *Vertical Antitrust Policy as a Problem of Inference*, 23 INT'L J. INDUS. ORG. 639, 658 (2005) ("Most studies find evidence that vertical restraints/vertical integration are procompetitive."); *see also* Daniel P. O'Brien, *The Antitrust Treatment of Vertical Restraints: Beyond the Possibility Theorems*, *in* Report: The Pros and Cons of Vertical Restraints 76 (2008) ("Based on the survey in the previous section, the empirical literature on RPM, ET, vertical integration, and non-linear contracting suggests that these practices have been used to mitigate double marginalization and induce demand increasing activities by retailers. With few exceptions, the literature does not support the view that these practices are used for anticompetitive reasons. This literature supports a fairly strong prior belief that these practices are unlikely to be anti-competitive in most cases.").

[130] *See* GAI Comment *supra* note 127 at 4-5; OEP Non-Compete Report *supra* note 124 at 3, 7.

[131] *See, e.g.*, Paul H. Rubin & Peter Shedd, *Human Capital and Covenants Not to Compete*, 10 J. LEGAL STUD. 93, 93 (1981) (finding "restrictive covenants were and are necessary in some circumstances to lead to efficient amounts of investment in human capital"); OEP Non-Compete Report *supra* note 124 at 3.

[132] GAI Comment *supra* note 127 at 5; *see also* Benjamin Klein, *The Holdup Problem*, *in* THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW (Peter Neman Ed., 1998).

[133] Brian C. Albrecht et al., *Labor Monopsony and Antitrust Enforcement: A Cautionary Tale*, ICLE White Paper No. 2025-05-01 at 20 (May 1, 2024); *id.* at 33 ("This is problematic, because such 'harms' actually benefit consumers in the baseline model. In the extreme example, all of the benefits of a better negotiating position are passed on to consumers, and the firm is more of a direct intermediary trading on behalf of consumers, rather than a monopolistic reseller.").

[134] GAI Comment *supra* note 127 at 9-14.

[135] *Id.*

[136] *Id.*

states and low-enforceability ones. The more credible empirical studies tend to be narrow in scope, focusing on a limited number of specific occupations (e.g., executives) or potentially idiosyncratic policy changes with uncertain and hard-to-quantify generalizability (e.g., banning non-competes for technology workers in Hawaii). There is little evidence on the likely effects of broad prohibitions of non-compete agreements. Further research, perhaps exploiting more recent law changes or new sources of data, is necessary to establish the causal impact such agreements have on market participants.[137]

At a minimum, the empirical evidence suggests that the effects of non-compete clauses are highly context specific. Anticipating the various effects reflected in the literature, existing antitrust law allows for *ex post* review of non-compete agreements on a case-by-case basis.

As a vertical restraint with varied and context-specific effects, the rule of reason would likely apply.[138] Under the rule of reason, "courts . . . conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition. The goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."[139] Based upon the mixed effects from both the theory and the empirics, continued enforcement under the rule of reason seems more appropriate than a wide-sweeping rule that fails to grapple with the economics or the specific context of individual non-compete clauses.

---

[137] *Id.* at 13 (quoting John M. McAdams, *Non-Compete Agreements: A Review of the Literature* at 4 (December 31, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3513639).

[138] *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) ("[T]he per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." (citations omitted)).

[139] *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018) (citations, ellipses, and internal quotation marks omitted).