## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RYAN LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| CHAMBER OF COMMERCE OF THE | § | |
| UNITED STATES OF AMERICA, | § | |
| BUSINESS ROUNDTABLE, TEXAS | § | |
| ASSOCIATION OF BUSINESS, and | § | |
| LONGVIEW CHAMBER OF COMMERCE, | § | Civil Action No. 3:24-CV-00986-E |
| | § | |
| Plaintiff-Intervenors, | § | |
| | § | |
| v. | § | |
| | § | |
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Ryan, LLC's ("Ryan") and Plaintiff-Intervenors the Chamber of Commerce of the United States of America, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce's ("Plaintiff-Intervenors") (referred collectively with Ryan as "Plaintiffs") Opposed Motion for Stay of Effective Date and Preliminary Injunction against the Federal Trade Commission's ("FTC" or the "Commission") "Non-Compete Rule" (sometimes referred to as the "Rule"), 16 C.F.R. § 910.1-.6, which makes most non-compete agreements unenforceable. (ECF Nos. 23 and 46). The Rule's effective date is September 4, 2024. However, the text, structure, and history of the FTC Act reveal that the FTC lacks substantive rulemaking authority with respect to unfair methods of competition under Section 6(g). The Court **GRANTS** the motion for preliminary injunction and postpones the effective date of the Rule as

applied to the Plaintiffs. While this order is preliminary, the Court intends to rule on the ultimate merits of this action on or before August 30, 2024.

## I.  BACKGROUND

### A.  The Federal Trade Commission Act

In 1914, Congress enacted the Federal Trade Commission Act ("the FTC Act" or "the Act") to protect consumers and promote competition:

> A commission is created and established, to be known as the Federal Trade Commission (hereinafter referred to as the Commission), which shall be composed of five Commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate. Not more than three of the Commissioners shall be members of the same political party. The first Commissioners appointed shall continue in office for terms of three, four, five, six, and seven years, respectively, from September 26, 1914, the term of each to be designated by the President, but their successors shall be appointed for terms of seven years, except that any person chosen to fill a vacancy shall be appointed only for the unexpired term of the Commissioner whom he shall succeed: *Provided, however*, That upon the expiration of his term of office a Commissioner shall continue to serve until his successor shall have been appointed and shall have qualified. The President shall choose a chairman from the Commission's membership. No Commissioner shall engage in any other business, vocation, or employment. Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office. A vacancy in the Commission shall not impair the right of the remaining Commissioners to exercise all the powers of the Commission.

15 U.S.C. § 41. Since the Commission's inception, Congress vested it with the power to prevent unfair methods of competition, under Section 5 of the Act. *See* 15 U.S.C. § 45(a)(2).[1] In 1938, Congress expanded the Commission's power under this provision to also prevent unfair deceptive acts or practices. *See* The Wheeler-Lea Act, ch. 49, § 3, 52 Stat. 111 (1938) (current version at 15 U.S.C. § 45(a)). The current Section 5, entitled "[u]nfair methods of competition unlawful; prevention by Commission," states:

> The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4)

---

[1] The Parties refer to 15 U.S.C. § 45 colloquially as "Section 5," as codified, and the Court does the same.

of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, *from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce*.

15 U.S.C. § 45(a)(2) (emphasis added). Section 5 describes the FTC's enforcement powers through administrative proceedings. Specifically, the Section *provides* the FTC will hold a hearing if it believes a party is using unfair methods of competition or unfair or deceptive acts or practices. *See* 15 U.S.C. § 45(b). If the FTC then concludes that a party has engaged in the prohibited conduct, a cease-and-desist order may be issued—subject to penalties if the order is violated. *See* 15 U.S.C. § 45(b), (g), (l). Thus, whether a practice is considered an "unfair method of competition" or an "unfair or deceptive act" is typically decided through case-by-case administrative adjudication. *See generally* 15 U.S.C. § 45.

Next, Section 6 of the Act—which has also been in place since the Commission's inception—entitled "[a]dditional powers" grants the Commission additional powers to support the adjudicatory scheme. *See* 15 U.S.C. § 46.[2] Most of these powers are investigatory or ministerial. *See* 15 U.S.C. § 46. One provision titled "[c]lassification of corporations; regulations," gives the Commission the power to "[f]rom time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). Pertinent here, FTC asserts Section 6(g) empowers the FTC with the authority to make substantive rules related to unfair methods of competition. (ECF No. 82 at 15).

---

[2] The Parties refer to 15 U.S.C. § 46 colloquially as "Section 6," as codified, and the Court does the same.

**B.      The Non-Compete Rule**

This is a dispute over the FTC's rulemaking authority concerning the enforceability of employer/employee non-compete agreements. These agreements are restrictive covenants that prohibit an employee from competing against the employer. *See, e.g., Team Envt'l. Servs., Inc. v. Addison*, 2 F.3d 124, 126 (5th Cir. 1993) (discussing enforceability of non-compete agreement under Louisiana law). Regarding the prevalence of non-compete agreements, the Parties' joint appendix provides:

> [T]he Commission finds that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups, albeit with some differences in the magnitude of the prevalence based on industries and demographics. The Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete.

(*See* ECF No. 149 at 18). States have historically regulated non-competes through caselaw and statute. S*ee, e.g., Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011) ("[R]easonable non[-] compete clauses in contracts pertaining to employment are not considered to be contrary to public policy as constituting an invalid restraint of trade[.] Texas courts have enforced reasonable covenants not to compete dating back at least to 1899."); *see also, e.g.*, TEX. BUS. & COM. CODE § 15.50 (enumerating the criteria for enforceability of covenants not to compete under Texas law); (ECF No. 149 at 439) (discussing that "46 States have statutory provisions or case law that ban or limit the enforceability of non-competes for workers in certain specified occupations."). No federal law broadly addresses the enforceability of non-competes.

In 2018, the FTC began to study non-competes through public hearings and workshops; invitations for public comment; and a review of academic studies. (*See* 89 Fed. Reg. at 38, 343–

44). Three years later, the FTC initiated several investigations into the use of non-competes to determine whether they constitute unfair methods of competition. (*See* 89 Fed. Reg. at 38,343-44).

On January 19, 2023, the FTC proposed the Non-Compete Rule- which "prohibit[ed] employers from entering into non-compete clauses with workers starting on the rule's compliance date, the proposed rule would require employers to rescind existing non-compete clauses no later than the rule's compliance date." Non-Compete Clause Rule, 88 Fed. Reg. 3482-01. On April 23, 2024, the FTC adopted the final Non-Compete Rule. *See* 16 C.F.R. § 910. The Rule provides, in pertinent part:

> Non-compete clause means:
> (1) A term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from:
> > (i) Seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or
> > (ii) Operating a business in the United States after the conclusion of the employment that includes the term or condition.

16 C.F.R. § 910.1. The Rule distinguishes its application to "workers" and "senior executives." *See* 16 C.F.R. § 910.2(a). "Workers" and "senior executives" are defined as follows:

> **Senior executive means** a worker who:
> (1) Was in a policy-making position; and
> (2) Received from a person for the employment:
> (i) Total annual compensation of at least $151,164 in the preceding year; or
> (ii) Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year; or
> (iii) Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete clause.
> [. . . .]
> **Worker means** a natural person who works or who previously worked, whether paid or unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person. The term worker includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.

16 C.F.R. § 910.1 (emphasis added in bold). Based on this distinction between "senior executive" and "worker," the Non-Compete Rule enumerates "[u]nfair methods of competition" as follows:

> (1) Workers other than senior executives. With respect to a worker other than a senior executive, **it is an unfair method of competition for a person**:
>     (i) To enter into or attempt to enter into a non-compete clause;
>     (ii) To enforce or attempt to enforce a non-compete clause; or
>     (iii) To represent that the worker is subject to a non-compete clause.
> (2) Senior executives. **With respect to a senior executive, it is an unfair method of competition for a person:**
>     (i) To enter into or attempt to enter into a non-compete clause;
>     (ii) To enforce or attempt to enforce a non-compete clause entered into after the effective date; or
>     (iii) To represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.

16 C.F.R. § 910.2(a) (emphasis added in bold).

The FTC asserts that- (i) because non-compete clauses are "unfair methods of competition" under Section 5 of the FTC Act, and (ii) pursuant to the authority granted them in Section 6(g), the Commission has the authority to issue the Rule. *See* 15 U.S.C. §§ 45(a)(2), 46(g); *see generally* 16 C.F.R. § 910.1-6.  Subject to the limitations and distinctions above, the Rule essentially provides that it is an unfair method of competition—and therefore a violation of Section 5—for persons to enter or enforce non-compete agreements. The Rule also supersedes state laws that would "permit or authorize" non-compete agreements. *See* 16 C.F.R. § 910.4. [3]

Apart from the exceptions regarding the Rule's application to senior executives discussed above, the Rule also contains other exceptions regarding (i) bona fide sales of businesses; (ii)

---

[3] However, the Rule does not "annul, or exempt any person from complying with any State statute, regulation, order, or interpretation applicable to a non-compete clause, including, but not limited to, State antitrust and consumer protection laws and State common law." 16 C.F.R. § 910.4(a). "[N]o provision of this part shall be construed as altering, limiting, or affecting the authority of a State attorney general or any other regulatory or enforcement agency or entity or the rights of a person to bring a claim or regulatory action arising under any State statute, regulation, order, or interpretation, including, but not limited to, State antitrust and consumer protection laws and State common law." 16 C.F.R. § 910.4(b).

circumstances where a cause of action accrued prior to the effective date; and (iii) circumstances where a person has a good-faith basis to believe that the Rule is inapplicable. *See* 16 C.F.R. § 910.3(a)–(c).

## C. Procedural History

On April 23, 2024, Ryan initiated this lawsuit. (ECF No. 1). On May 1, 2024, Ryan filed its Amended Complaint—the operative complaint on which it proceeds. (*See* ECF No. 22). Ryan asserts the following causes of action against the FTC based on the Administrative Procedure Act ("APA"), which empowers a reviewing court to hold unlawful and set aside certain agency action(s), findings, and conclusions. 5 U.S.C. § 706(2). Specifically, Ryan asserts the FTC's actions were unlawful because (i) the FTC acted without statutory authority; (ii) the Rule is the product of an unconstitutional exercise of power; and (iii) the FTC's acts, findings, and conclusions were arbitrary and capricious. (*See* ECF No. 22 at 21-30). Ryan further asserts a claim under the Declaratory Judgment Act, challenging the Rule as unlawful. (*See* ECF No. 22 at 30-32).

On May 1, 2024, Ryan filed its Motion for Stay of Effective Date and Preliminary Injunction, (ECF No. 23), along with its brief in support, (ECF No. 24), seeking an order staying the effective date of the Rule and preliminarily enjoining the FTC from enforcing the Rule. On May 8, 2024, Plaintiff-Intervenors filed their Motion to Intervene, (ECF No. 32), along with their brief in support, (ECF No. 33). The Court granted the Motion to Intervene on May 9, 2024. (ECF No. 34). On May 10, 2024, Plaintiff-Intervenors filed their Motion for Stay of Effective Date and Preliminary Injunction, (ECF No. 46), along with their brief in support, (ECF No. 47), which support and request relief similar to Ryan's request for injunctive relief. On May 29, 2024, the FTC filed its consolidated response to Plaintiffs' Motions for Stay of Effective Date and

Preliminary Injunction, (ECF No. 81), along with its brief in support, (ECF No. 82). Plaintiffs replied on June 12, 2024. (ECF Nos. 146, 147). Additionally, the Parties filed their joint appendix on June 14, 2024. (ECF No. 149). Thus, Plaintiffs' motions are fully briefed and ripe for determination.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 65(a) provides for the issuance of preliminary injunctions. Fed. R. Civ. P. 65(a). "A preliminary injunction is an 'extraordinary remedy.'" *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *see Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant a preliminary injunction is to be treated as the exception rather than the rule."); *see also Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). In fact, "[i]n some ways, the permanent injunction is less demanding than the preliminary injunction." *Valentine v. Collier*, 978 F.3d 154, 159 (5th Cir. 2020). "It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out" below. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158, 130 S. Ct. 2743, 2757, 177 L. Ed. 2d 461 (2010).

To obtain a preliminary injunction, a movant must establish the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction serves the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v.*

*Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). The same standards apply "to prevent irreparable injury" under the APA. *See* 5 U.S.C. § 705; *Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021).

Further, "[t]he district court has a general discretionary power to stay proceedings before it in the control of its docket and in the interests of justice." *McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982). This power to stay proceedings states:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

Such staying power is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166, 81 L. Ed. 153 (1936). District courts are to "weigh competing interests and maintain an even balance" in deciding whether to issue a stay. *Landis*, 299 U.S. at 255, 57 S. Ct. at 166. "The party seeking the stay 'bears the burden' of showing its need." *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020) (quoting *Clinton v. Jones*, 520 U.S. 681, 708, 117 S. Ct. 1636, 1651, 137 L. Ed. 2d 945 (1997)).

### III.  PRELIMINARY INJUNCTION

Plaintiffs seek an order staying the effective date of the Non-Compete Rule and preliminarily enjoining the FTC from enforcing the Rule—including, but not limited to, through

any ongoing or future administrative action.[4] (*See* ECF Nos. 23, 46). For the reasons enumerated hereunder, the Court will grant a stay and preliminary injunction after finding that (i) Plaintiffs are likely to succeed on the merits; (ii) irreparable harm will result without the issuance of injunctive relief; and (iii) the balance of harms and public interest weigh in favor of granting injunctive relief.

## A.    Likelihood of Success on the Merits

The first element in the preliminary injunction analysis is whether the movant has "shown a substantial likelihood of *ultimately* succeeding on the merits, [] potential procedural hurdles notwithstanding." *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) (citation omitted). "Substantial" likelihood of success on the merits does not mean "certain." *Byrne v. Roemer*, 847 F.2d 1130, 1133 (5th Cir. 1988) (explaining that "the movant need not always show a probability of success on the merits") (quoting *Celestine v. Butler*, 823 F.2d 74, 77 (5th Cir. 1987)); *see Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017) ("Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits before the court may proceed to assess the remaining requirements."). Some likelihood of success can be sufficient to support the issuance of a preliminary injunction. *See Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir. 1980) ("Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief."). But "[m]erely finding that there is more likelihood than 'no chance' is not sufficient to sustain the granting of a preliminary injunction." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.3 (5th Cir. 1979). In the context of agency action, another district court has explained:

---

[4] The "effective date" is defined as 120 days after publication in the Federal Register, which is Sept. 4, 2024. *See* 16 C.F.R. § 910.6.

> Judicial review of agency action "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). The agency must examine relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). The agency must also consider reliance interests of those affected by a contemplated decision and consider less-disruptive policies given those interests. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, ––– U.S. ––––, 140 S. Ct. 1891, 1913–15, 207 L.Ed.2d 353 (2020).

*Texas v. Biden*, 646 F. Supp. 3d 753, 772 (N.D. Tex. 2022), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The Court agrees with the above. To assess the likelihood of success on the merits, the Court "look[s] to the standards provided by the substantive law." *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir. 1990).

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). Plaintiffs aver the FTC's Non-Compete Rule meets all of the above—(i) it exceeds its statutory authority; (ii) it is patently unconstitutional; and (iii) it is arbitrary and capricious.

Ryan contends that it is likely to succeed on the merits because (i) "the text, history, and structure of the FTC Act makes clear" that Section 6(g) does not grant the Commission the statutory authority to issue rules defining unfair methods of competition; (ii) if read as the FTC proposes, Section 6(g) would be an unconstitutional delegation of legislative authority because the FTC Act does not provide an intelligible principle guiding the Commission's exercise of rulemaking authority; and (iii) the Commission is unconstitutionally structured—as it is insulated from the President. (ECF No. 24 at 22–34). Similarly, Plaintiff-Intervenors aver the FTC Act does

not authorize the Rule for two overarching reasons. (*See* ECF No. 47). First, the Rule exceeds the Commission's statutory authority; and second, the Rule is the product of flawed decision-making as it violates the APA. (ECF No. 47 at 17–36).

The FTC responds that Plaintiffs are unlikely to succeed on the merits because: (i) the Commission has statutory authority to promulgate the final rule; (ii) the Commission properly determined that all non-competes are "unfair methods of competition;" (iii) Congress lawfully delegated authority to the Commission to make the Rule; (iv) the Act's removal restrictions are lawful; (v) the Rule is not unlawfully retroactive; and (vi) the Rule is not arbitrary and capricious. (ECF No. 82 at 24–47). The Court first addresses whether the FTC exceeded its statutory authority in implementing the Non-Compete Rule.

1.      *Statutory Authority—Text, Structure, and History of the FTC*

Plaintiffs assert the Commission's claimed statutory authority in promulgating the Rule—Section 6(g) of the FTC Act—does not authorize substantive rulemaking. "The extent of [the FTC's] powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background." *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 674 (D.C. Cir. 1973). "The question to be answered is 'not what the [Commission] thinks it should do but what Congress has said it can do.'" *National Petroleum*, 482 F.2d at 674 (quoting *Civil Aeronautics Bd. v. Delta Air Lines Inc.*, 367 U.S. 316, 322, 81 S. Ct. 1611, 1617, 6 L. Ed. 869 (1961)). "The judiciary remains the final authority with respect to questions of statutory construction and must reject administrative agency actions which exceed the agency's statutory mandate or frustrate congressional intent." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 968 (D.C. Cir. 1985).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721, 142 S. Ct. 2587, 2607 (2022) (quoting *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 1504 103 L. Ed. 2d 891 (1989)). "The appropriate starting point when interpreting any statute is its plain meaning." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005). "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566, 173 L. Ed. 2d 443 (2009) (cleaned up) (quoting *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S. Ct. 2276, 2286, 159 L. Ed. 2d 172 (2004)). "[A] court must look to the intent of the legislature and must construe the statute so as to give effect to that intent." *CenterPoint Energy Hous. Elec. v. Harris Cnty. Toll Rd. Auth.*, 436 F.3d 541, 545 (5th Cir. 2006); *see generally Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *14 (U.S. June 28, 2024) ("The deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA.").

In Section 5 of the FTC Act, Congress vested the Commission with the power to prevent unfair methods of competition:

> The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a)(2). And as stated above, Section 6 gives the FTC the power "to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). Section 5 creates a comprehensive scheme to prevent unfair methods of competition, while Section 6 enumerates additional powers that generally aid in the administration of that adjudication-focused scheme. *See generally* 15 U.S.C. §§ 45, 46. "The [FTC Act] statute gives [the FTC]

express authority 'to make rules and regulations for the purpose of carrying out the provisions of the [FTC] Act." *Hill v. Fed. Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941).

Plaintiffs challenge whether the FTC's rulemaking authority under Section 6(g) encompasses substantive rulemaking, in addition to procedural rulemaking. The FTC asserts Section 6(g) and 15 U.S.C. § 57a empowers it with substantive rulemaking authority. (ECF No. 82 at 18, 25-35).[5] The issue presented is whether the FTC's ability to promulgate rules concerning unfair methods of competition include the authority to create *substantive* rules regarding unfair methods of competition.

The Court starts with the text of Section 6(g) and 15 U.S.C. § 57a. *See Hightower v. Tex. Hosp. Ass'n,* 65 F.3d 443, 448 (5th Cir. 1995) ("When courts interpret statutes, the initial inquiry is the language of the statute itself."). Under Section 6(g) of the FTC Act, the Commission has the power to "classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). By a plain reading, Section 6(g) of the Act does not expressly grant the Commission authority to promulgate substantive rules regarding unfair methods of competition. Next, 15 U.S.C. § 57a empowers the FTC to prescribe "interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce." *See* 15 U.S.C. § 57a. Section 57a limits the FTC's ability to make rules dealing with *unfair or deceptive practices*—not *unfair methods of competition*. 15 U.S.C. § 57a(2).[6] However, 15 U.S.C. § 57a acknowledges the FTC has some rulemaking power "with respect to unfair methods of competition in or affecting commerce." 15 U.S.C. § 57a(2).[7]

---

[5] The Parties refer to 15 U.S.C. § 57a of the FTC Act as "Section 18."
[6] The Court further discusses 15 U.S.C. § 57a hereunder as the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act. *See infra* at Part III. A.
[7] The complete limitation on the FTC's rulemaking authority under 57a(2) states:

Plainly read, the Court concludes the FTC has some authority to promulgate rules to preclude unfair methods of competition. Indeed, the Act says as much by alluding to this power in 15 U.S.C. § 57a. *See* 15 U.S.C. § 57a. However, after reviewing the text, structure, and history of the Act, the Court concludes the FTC lacks the authority to create substantive rules through this method. Section 6(g) is "indeed a 'housekeeping statute,' authorizing what the APA terms 'rules of agency organization procedure or practice' as opposed to 'substantive rules.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 310, 99 S. Ct. 1705, 1722, 60 L. Ed. 2d 208 (1979). Plaintiffs next contend the lack of a statutory penalty for violating rules promulgated under Section 6(g) demonstrates its lack of substantive rulemaking power. (ECF No. 24 at 23–24; ECF No. 47 at 18–19). The Court agrees.

When authorizing legislative rulemaking, Congress also historically prescribes sanctions for violations of the agency's rules—confirming that those rules create substantive obligations for regulated parties.[8] "If the statute prescribed a sanction, then the authority to make 'rules and regulations' included the authority to adopt legislative rules having the force of law . . . [but] [i]f

---

The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title). **The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.**

15 U.S.C. § 57a(2) (emphasis added in bold).

[8] *See, e.g.,* Federal Water Power Act, ch. 285, § 25, 41 Stat. 1063, 1076 (1920) (repealed 1935) (attaching criminal penalties to violations of the Federal Power Commission's rules and regulations); Tea Importation Act, ch. 358, § 6, 29 Stat. 604, 606 (1897) (repealed 1996) (providing for the destruction of impure tea that falls below the standards set by the Secretary of the Treasury if the owner fails to export such tea outside of the United States within six months of the examination); Warehouse Act, ch. 313, pt. C, § 25, 39 Stat. 486, 490 (1916) (codified as amended at 7 U.S.C. § 252(a) (2000)) (providing the Secretary of Agriculture may suspend or revoke any warehouseman's license for any violation of the rules and regulations made under the Act); Grain Standards Act, ch. 313, pt. B, § 7, 39 Stat. 482, 484 (1916) (codified as amended at 7 U.S.C. § 85) (providing for the suspension or revocation of any grain inspector's license for any violation of the rules and regulations made under the Act); Social Security Act Amendments of 1939, ch. 666, § 205(a), 53 Stat. 1360, 1368.

---

the statute did not include a sanction, the authority to make 'rules and regulations' encompassed only interpretive or procedural rules." Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 HARV. L. REV. 467, 493–94 (2002) ("[I]f the statute was silent regarding the legal consequences for failure to conform to regulations, it was understood as granting the agency the power to make only housekeeping rules."). Section 6(g) contains no penalty provision—which indicates a lack of substantive force. *See generally* 15 U.S.C. § 46. In contrast, Section 5 adjudications include a penalty provision. *See* 15 U.S.C. § 45(l)–(m). Thus, the lack of a penalty included with Section 6(g) supports that such provision encompasses only housekeeping rules—not substantive rulemaking power.

Furthermore, viewing the statute as a whole, the location of the alleged substantive rulemaking authority is suspect. First, the initial part of Section 6(g) merely vests the FTC with the power to "[f]rom time to time classify corporations;" the alleged substantive rulemaking power is the latter portion of the statute. 15 U.S.C. § 46(g). If the FTC is correct in its interpretation, then Congress did not choose to place such substantial power in a primary, independent place. *See Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) ("[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." (quoting *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019))). Further, Section 6(g) is the seventh in a list of twelve almost entirely investigative powers. *See* 15 U.S.C. § 46. Last, Section 6(g) fails to mention Section 5 or any other substantive authority from where such substantive rulemaking power would stem. *See* 15 U.S.C. § 46.

Agencies are creatures of Congress—"an agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374, 106 S. Ct. 1890, 1901, 90 L. Ed. 2d 369 (1986). As "[t]he question to be answered is 'not

what the [Commission] thinks it should do but what Congress has said it can do,'" the Court must look to what Congress explicitly gave the FTC the authority to do. *National Petroleum*, 482 F.2d at 674 (quoting *Civil Aeronautics Bd.,* 367 U.S. at 322, 81 S. Ct. at 1617). The Court concludes the structure and the location of Section 6(g) show that Congress did not explicitly give the Commission substantive rulemaking authority under Section 6(g).

The Court next addresses the history of the FTC Act, coupled with the structural amendments added since its inception. Initially, for the first forty-eight years of its existence, the Commission explicitly disclaimed substantive rulemaking authority. *See National Petroleum*, 482 F.2d at 693 ("Our conclusion as to the scope of Section 6(g) is not disturbed by the fact that the agency itself did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently before that time that it lacked such power."). In 1962, the FTC announced for the first time that it was going to rely on Section 6(g) to issue Trade Regulation Rules—rules that would have the force of law. *See* Merrill & Watts, 116 Harv. L. Rev. at 552.

In *National Petroleum*, the plaintiffs challenged the FTC's power to issue such rules. The D.C. Circuit held that Section 6(g) authorized the Commission to promulgate substantive rules: it is "[o]ur belief that 'rules and regulations' in Section 6(g) should be construed to permit the Commission to promulgate binding substantive rules as well as rules of procedure." *National Petroleum*, 482 F.2d at 678. The FTC, thereafter, promulgated several rules based on this rulemaking power under Section 6(g). (*See* ECF No. 149 at 29–32). However, from 1978 until the enactment of the Non-Compete Rule, the Commission did not promulgate a single *substantive* rule under Section 6(g).

Next, the Court addresses subsequent amendments to the FTC Act. During the 90th Congressional session in 1967 and 1968, Congress enacted amendments expressly allowing force

of law rulemaking related to specific subjects. *See, e.g.*, Pub. L. No. 90-189, 81 Stat. 568 (1967). If Section 6(g) had already given the Commission such substantive rulemaking power, these amendments would be superfluous. *See Howard Hughes Co. v. C.I.R.*, 805 F.3d 175, 183 (5th Cir. 2015) ("[T]he rule against superfluities, [] instructs courts to interpret a statute to effectuate all its provisions, so that no part is rendered superfluous.") (quoting *Hibbs,* 542 U.S. at 89, 124 S. Ct. at 2276).

The history of the FTC's empowerments requires further analysis of 15 U.S.C. § 57a—the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act ("Magnuson-Moss Act") in 1975. The Magnuson-Moss Act was implemented "to codify the Commission's authority to make substantive rules for unfair or deceptive acts or practices in or affecting commerce." *Am. Fin. Servs. Ass'n*, 767 F.2d at 967. The Magnuson-Moss Act provides:

> (1) ... [T]he Commission may prescribe—
> (A) interpretive rules and general statements of policy with respect to *unfair or deceptive acts or practices* in or affecting commerce (within the meaning of section 45(a)(1) of this title), and
> (B) rules which define with specificity acts or practices which are *unfair or deceptive acts or practices* in or affecting commerce (within the meaning of section 45(a)(1) of this title).... Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

15 U.S.C. § 57a(a)(1) (emphasis added). The Magnuson-Moss Act requires the FTC to comply with certain procedural requirements before issuing substantive rules on unfair or deceptive acts or practices. *See* 15 U.S.C. § 57a(b).  vested the Commission with the power to promulgate substantive rules regarding *only* unfair or deceptive acts or practices, *not* unfair methods of competition.

Although 15 U.S.C. § 57a mentions the limitations regarding rulemaking in the "unfair or deceptive acts or practices" context "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods

of competition in or affecting commerce," such statutory language is not an affirmative grant of substantive rulemaking authority to the FTC in the "unfair methods of competition" context.

The FTC further argues that its substantive rulemaking authority was again confirmed by the 1980 amendments—the Federal Trade Commission Improvements Act of 1980—as they left Section 6(g) and the language in Section 19 unchanged. Such decision "preserv[ed] the Commission's authority to regulate unfair methods of competition, further ratifying the Commission's authority." (ECF No. 82 at 27). Further, because the 1980 amendments defined "rule" as one promulgated under Section 6 or 18, but excluded non-legislative rules; Congress must have "understood rules issued under Section 6 to include legislative rules prohibiting unfair methods of competition." (ECF No. 82 at 28). Again, the Court rejects such reasoning as a piecemeal attempt to confer rulemaking authority that Congress has not affirmatively granted to the FTC. The role of an administrative agency is to do as told by Congress, not to do what the agency think it should do. *See National Petroleum*, 482 F.2d at 674.

"Agencies do not have unlimited power to accomplish their policy preferences until Congress stops them; they have only the powers that Congress grants through a textual commitment of authority." *See Central Forwarding, Inc. v. ICC*, 698 F.2d 1266, 1272 (5th Cir. 1983) ("[I]f Congress has granted only limited powers to the agency, and the regulation bears little kinship to the rulemaking authority expressed by statute, the validity of the regulation is suspect."). The Court concludes the text and the structure of the FTC Act reveal the FTC lacks substantive rulemaking authority with respect to unfair methods of competition, under Section 6(g). See generally 15 U.S.C. § 46(g); 15 U.S.C. § 57a.  Thus, when considering the text, Section 6(g) specifically, the Court concludes the Commission has exceeded its statutory authority in promulgating the Non-Compete Rule, and thus Plaintiffs are likely to succeed on the merits.

Having determined the FTC exceeded its statutory authority, the Court pretermits further discussion of statutory bases.

2.    *Arbitrary and Capricious*

An administrative agency's actions are constrained by the standard set out in the APA—a court must "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court explains this arbitrary-and-capricious standard as follows:

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

*FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158, 209 L. Ed. 2d 287 (2021); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14, 129 S. Ct. 1800, 1810, 173 L. Ed. 2d 738 (2009)). Generally, an agency rule is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983).

In applying this standard, the Court is limited to "the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50, 103 S. Ct. at 2867. Accordingly, this Court's review is deferential and limited. Although "'we may not provide a reasoned basis for the agency's action that the agency itself has not given,' we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 911 (5th Cir. 2023)

(quoting *State Farm*, 463 U.S. at 43, 103 S. Ct. at 2867). "The Supreme Court has made clear that when it comes to arbitrary-and-capricious review, 'the Government should turn square corners in dealing with the people.'" *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 860 (5th Cir. 2022) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24, 140 S. Ct. 1891, 1909, 207 L. Ed. 2d 353 (2020)). "A decision is arbitrary or capricious only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Wilson v. U.S. Dep't. of Agric.,* 991 F.2d 1211, 1215 (5th Cir. 1993).

Thus, because the FTC is an administrative agency, the Commission's actions are constrained by the APA's arbitrary-and-capricious standard. The Court finds there is a substantial likelihood the Rule is arbitrary and capricious because it is unreasonably overbroad without a reasonable explanation. It imposes a one-size-fits-all approach with no end date, which fails to establish a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S. Ct. at 2867 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 246, 9 L. Ed. 2d 207 (1962)).

On this record, the evidence put forth by the Commission does not warrant the Non-Compete Rule's expansive ban. In enacting the Rule, the Commission relied on a handful of studies that examined the economic effects of various state policies toward non-competes. (*See* ECF No. 149 at 111). However, no state has ever enacted a non-compete rule as broad as the FTC's Non-Compete Rule. Further, the FTC's evidence compares different states' approaches to enforcing non-competes on based on the specific factual situation—completely inapposite from the FTC imposing a categorical ban. (*See* ECF No. 149 at 140-42). As to this latter point, the FTC provides no evidence or reasoned basis. The Commission's lack of evidence as to why they chose to impose such a sweeping prohibition—that prohibits entering or enforcing virtually all non-competes—

instead of targeting specific, harmful non-competes, renders the Rule arbitrary and capricious. *See Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. of Pers. Mgmt.*, 220 F.3d 427, 430 n.2 (5th Cir. 2000) (holding that "failing to give a reasonable explanation for how [an agency] reached its decision" may make an agency's decision arbitrary and capricious under the APA). In sum, the Rule is based on inconsistent and flawed empirical evidence,[9] fails to consider the positive benefits of non-compete agreements, and disregards the substantial body of evidence supporting these agreements.

Second, the FTC insufficiently addressed alternatives to issuing the Rule. "The role of this court is to determine whether the [FTC] provides a sufficient explanation of the alternatives to permit a reasoned choice among the different courses of action." *Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721, 734 (S.D. Tex. 2010), *aff'd*, 435 F. App'x 368 (5th Cir. 2011). However, on this record, the FTC did not sufficiently consider alternatives. (*See generally* ECF No. 149). While considering less disruptive alternatives, the FTC "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Wages & White Lion*, 16 F.4th at 1139 (quoting *Regents*, 591 U.S. at 33, 140 S. Ct. at 1915)). The record shows the Commission did not conduct such analysis, instead offering the conclusion that "case-by-case adjudication of the enforceability of non-competes has an *in terrorem*[10] effect that would significantly undermine the Commission's objective to address non-competes' tendency to negatively affect competitive conditions in a final rule." (ECF No. 149 at 362).

---

[9] While the "APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies," an agency's evidence must be accurate and supported—not perfect. *Prometheus Radio Project*, 592 U.S. at 427, 141 S. Ct. at 1160.

[10] Black's Law Dictionary defines "*in terrorem*" as "[b]y way of threat; as a warning." *In terrorem*, Black's Law Dictionary (11th ed. 2019).

The FTC's "compelling justifications" for its decision to not consider other exceptions or alternatives does not adequately justify the far reach of the Rule. The FTC dismissed any possible alternatives, merely concluding that either the pro-competitive justifications outweighed the harms, or that employers had other avenues to protect their interests. (*See* ECF No. 149 at 356–74) (stating the categorical ban "advances the final rule's objectives to a greater degree than differentiating among workers"). Thus, the Court cannot find the Non-Compete Rule "fall[s] within a zone of reasonableness" and is "reasonably explained." *Emily's List v. FEC*, 581 F.3d 1, 22 n.20 (D.C. Cir. 2009). As such, the Court concludes the Rule is arbitrary and capricious.

The Court concludes Plaintiffs are likely to succeed on the merits that the FTC lacks statutory authority to promulgate the Non-Compete Rule, and that the Rule is arbitrary and capricious. Thus, the Court pretermits discussion of Plaintiffs' remaining causes of action, as they have successfully proven their likelihood of success on the merits based on the reasoning enumerated above.

## B.   Irreparable Harm

To satisfy the second element of the preliminary injunction analysis, Plaintiffs must demonstrate that, if the Court denies the grant of a preliminary injunction, irreparable harm will result. Irreparable harm exists where "there is no adequate remedy at law." *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (cleaned up). In the Fifth Circuit, it is "well-established that an injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, plaintiffs need only show they are "likely to suffer irreparable harm in the absence of preliminary relief."

*Benisek v. Lamone*, 585 U.S. 155, 158, 138 S. Ct. 1942, 1944, 201 L. Ed. 2d 398 (2018) (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. at 374). "[A] showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Janvey*, 647 F.3d at 600.

"When determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts . . . .'" *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). Further, financial losses have been categorized as irreparable injury "where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation,' or 'where the loss threatens the very existence of the movant's business.'" *Texas v. EPA*, 829 F.3d at 434 (internal citations omitted) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (concluding that economic costs may constitute irreparable harm); *see also, e.g.*, *In re NTE Connecticut LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022) ("[W]e have recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.") (cleaned up) (internal quotation omitted).

Ryan avers that, if the Rule takes effect, Ryan's non-competes with present and former principals would be invalidated, Ryan would be barred from entering into new non-competes, and Ryan would have to inform its workers that its non-compete agreements are now invalid. (ECF No. 24 at 34). Ryan asserts the Rule would result in irreparable harm as this will "increase the risk that departing workers may take Ryan's intellectual property and proprietary methods to its competitors"—which cannot be effectively mitigated by trade secret laws and non-disclosure agreements. (ECF No. 24 at 34). Ryan contends the Rule would "announce open season for

poaching of clients and workers." (ECF No. 23 at 35). Ryan claims it would have to expend significant time and resources to counteract the Rule and update all existing agreements. (ECF No. 23 at 35–36).

Similarly, Plaintiff-Intervenors claim the harm from the implementation of the Rule will be immediate and severe. (ECF No. 47 at 36). Plaintiff-Intervenors argue that businesses will not be able to rely on their existing non-competes or enter into new ones. (ECF No. 47 at 36). Plaintiff-Intervenors claim that, on the effective date, "millions of workers and businesses will instantly lose bargained-for contractual protections," forcing employers to expend significant time and costs to counteract the effects. (ECF No. 47 at 36). Plaintiff-Intervenors aver that businesses and workers alike will be unable to "protect investments in specialized training" or able to "avoid free-riding by competitors." (ECF No. 47 at 37).

The FTC's opposing argument is scant:

> Plaintiffs' failure to establish a likelihood of success on the merits is a sufficient basis to deny their motions. *See, e.g.*, *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024). In any event, Plaintiffs also fail to establish that a preliminary injunction is necessary to prevent imminent, irreparable harm. For example, Association Plaintiffs argue that their members face irreparable harm absent a stay or injunction because "[p]arties that currently rely on non[-]competes will be forced to choose between terminating those agreements or risking an enforcement action." Association Mot. 4-5. But it is well established that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 375 (5th Cir. 2023). And this alleged harm is not attributable to the Rule, because the Commission may undertake an enforcement action against those same entities pursuant to Section 5 even without the Rule in place. In any event, any harm that arises from Plaintiffs' own choice to violate the Rule would constitute "self-inflicted" injury, which "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam).

(ECF No. 82 at 48). Simply put, the FTC argues that Plaintiffs fail to establish the necessity of a preliminary injunction to prevent imminent, irreparable harm as neither "mere litigation expense" or "self-inflicted injury" qualify as irreparable. (ECF No. 82 at 48).

Under Fifth Circuit precedent, the "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr.*, 66 F.4th at 597; *see also Louisiana v. Biden*, 55 F.4th at 1034 ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."). It is undisputed that the Rule requires compliance through, at the very least, notice to employees subject to existing non-compete clauses. 16 C.F.R. § 910.2(b). The Rule anticipates such notice as transmitted "on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker." 16 C.F.R. § 910.2.

Taken together, the Court concludes compliance with the Rule would result in financial injury. As the Court concluded above, *supra* § III.A., Plaintiffs are likely to succeed on the merits that the Non-Compete Rule is invalid. "Indeed, complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Wages & White Lion*, 16 F.4th at 1142 (quoting *Texas v. EPA*, 829 F.3d at 433)). The FTC does not contend that Plaintiffs have an avenue to recover costs spent from complying with the Rule. (*See* ECF No. 82 at 48). That is likely because "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion*, 16 F.4th at 1142; s*ee, e.g.*, *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014) (stating there must be a waiver of sovereign immunity to maintain judicial review of federal agencies); *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020); *Whittle v. United States*, 7 F.3d 1259, 1262 (6th Cir. 1993) (sovereign immunity extends to "agencies of the United States as well, which are immune absent a showing of a waiver of sovereign immunity."). In essence, Plaintiffs lack of a "guarantee of

eventual recovery" is another reason that its alleged harm is irreparable. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765, 141 S. Ct. 2485, 2489, 210 L. Ed. 2d 856 (2021).

Given Plaintiffs' nonrecoverable costs of complying with the Rule, bolstered by the FTC's failure to make a developed responsive argument, the Court concludes Plaintiffs have met their burden of showing irreparable harm in the absence of injunctive relief. Thus, Plaintiffs have sufficiently satisfied the second element of the preliminary injunction analysis.

## C.   Balance of Equities and Public Interest

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will serve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762, 173 L. Ed. 2d 550 (2009). Therefore, the Court considers them together. In this assessment, the Court weighs "the competing claims of injury and [ ] consider[s] the effect on each party of the granting or withholding of the requested relief," while also considering the public consequences of granting injunctive relief. *Winter*, 555 U.S. at 24, 129 S. Ct. at 376.

Plaintiffs argue there is "no public interest in the perpetuation of unlawful agency action" and a nationwide preliminary injunction would maintain the status quo, while not harming the FTC whatsoever. (ECF No. 24 at 26; ECF No. 47 at 37). Plaintiffs assert "the risk of error is greater if a preliminary injunction is denied than if it is granted." (ECF No. 24 at 37). The FTC responds that Plaintiffs have conflated their argument: a likelihood of success on the merits—standing alone—is not a sufficient basis for a preliminary injunction, and Plaintiffs "fail to meaningfully address the remaining requirements." (ECF No. 82 at 49). The Commission further avers that

Plaintiffs fail to satisfy the requirements for injunctive relief as they "make no effort to establish that any cost they may incur outweigh the Rule's expected benefits." (ECF No. 82 at 49–50).

On this record, it is evident that if the requested injunctive relief is not granted, the injury to both Plaintiffs and the public interest would be great. Granting the preliminary injunction serves the public interest by maintaining the status quo and preventing the substantial economic impact of the Rule, while simultaneously inflicting no harm on the FTC. *See Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."). Further, the Rule makes unenforceable long-standing contractual agreements that have been judicially recognized as lawful and beneficial to the public interest. *See TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 758 (S.D. Tex. 2009) (holding that Texas has clarified that enforcing "reasonable non-compete agreements is within the public interest."); *see also Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 621 (D.C. 1989) (holding that preliminary injunctions have been sustained even where non-competes limited competition for a period over three years). The Court concludes granting injunctive relief both serves the public interest and tips the balance of harms in favor of Plaintiffs. Accordingly, the Court determines that Plaintiffs have satisfied all prerequisites for a preliminary injunction.

## D.    Scope of the Injunctive Relief

Finally, the Court must ascertain the scope of the injunctive relief. A preliminary injunction is an "extraordinary equitable remedy." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014), *cert. denied*, 579 U.S. 941, 136 S. Ct. 2536, 195 L. Ed. 2d 867 (2016) (citation and internal quotation omitted). As briefed, Ryan and Plaintiff-Intervenors request for the Court

to "enjoin [the FTC's] enforcement [of the Rule] pending a ruling on the merits." (ECF No. 24 at 37; *see* ECF No. 47 at 38). Ryan appears to request nationwide injunctive relief. (ECF No. 24 at 36). The FTC argues that relief should be tailored—that it "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (ECF No. 82 at 50) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979)).

 "[T]he Constitution vests the District Court with 'the judicial Power of the United States.'" *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. Const. art. III, § 1). However, "[a]s is true for all injunctive relief, the scope of the injunction must be justified based on the circumstances." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). "The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano*, 442 U.S. at 702, 99 S. Ct. at 2558 (1979).[11]

Several recent cases involving nationwide relief rely on *Texas v. United States*, in which a divided panel of the Fifth Circuit affirmed nationwide injunctive relief within a preliminary injunction. *See Texas v. United States,* 809 F.3d at 187–88. The issue in *Texas v. United States* involved States' and state officials' challenge to United States' and officials of Department of Homeland Security's (DHS) actions relating to immigration. *Texas v. United States*, 809 F.3d at 146–50. In affirming nationwide relief within a preliminary injunction, the Fifth Circuit explained

> The government claims that the nationwide scope of the injunction is an abuse of discretion and requests that it be confined to Texas or the plaintiff states. But the Constitution requires "an *uniform* Rule of Naturalization";[] Congress has instructed that "the immigration laws of the United States should be enforced vigorously and uniformly";[] and the Supreme Court has described immigration policy as "a comprehensive and *unified* system."[] Partial implementation of DAPA would "detract[ ] from the 'integrated scheme of regulation' created by Congress,"[] and there is a substantial likelihood that a geographically-limited

---

[11] The Court acknowledges that no class action has been raised in this proceeding, as was the case in *Califano*. 442 U.S. at 702, 99 S. Ct. at 2558 ("[T]he fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the *complaining* parties.") (emphasis added).

injunction would be ineffective because DAPA beneficiaries would be free to move among states.

*Texas v. United States*, 809 F.3d at 187–88 (emphasis added in bold) (footnotes omitted). Thereafter, the Fifth Circuit explained that the judicial power of a federal district court "is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d at 188. Thus, apart from (i) the Parties in *Texas v. United States* including several states; (ii) the core issue of the governmental acts involving immigration; and (iii) the Constitution and Congress discussing the requirement for immigration law enforcement to be "uniform," the Fifth Circuit's opinion offers limited guidance on the contours for the "appropriate circumstances" upon which a federal district court may issue a nationwide injunction. *Texas v. United States*, 809 F.3d at 187–88. Thus, the Court declines to view the circumstances of this proceeding as an "appropriate circumstance" that would merit nationwide relief.[12]

Second, the Court has standing and redressability concerns regarding nationwide injunctive relief in this case. Recent case precedent supports limiting injunctive relief to the "plaintiffs" before the Court. In *Braidwood Management, Inc. v. Becerra*, the Fifth Circuit determined a district court abused its discretion in permitting "universal injunctive relief" in an APA action when plaintiffs lacked basis for such an injunction:

> Thus, without any basis to seek universal vacatur of final agency actions taken to enforce the preventive-care mandates, the plaintiffs lack any basis for an injunction of the same breadth. The district court likewise did not explain why, apart from vacatur under the APA, the universal injunction was necessary. We must therefore conclude that it was an abuse of discretion to enter universal injunctive relief after already providing complete relief to the plaintiffs.

---

[12] As discussed hereabove, the Parties agree that the status quo for enforceability of non-competes is varied as 46 states have varied case law and statutory schemes to address non-competes.

*Braidwood Mgmt., Inc. v. Becerra*, No. 23-10326, 2024 WL 3079340, at *17 (5th Cir. June 21, 2024) (footnote omitted). Here, Plaintiffs have offered virtually no briefing (or basis) that would support "universal" or "nationwide" injunctive relief. Additionally, similar to *Braidwood Management, Inc.*, Plaintiffs in this proceeding do not include any governmental units—only private entities. *See* 2024 WL 3079340, at *3 ("The plaintiffs in this case, four individuals and two businesses, take issue with the specific recommendations detailed above."). Plaintiffs have offered no briefing as to how or why nationwide injunctive relief is necessary to provide complete relief to Plaintiffs, at this preliminary stage. *see, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, 114 S. Ct. 2516, 2525, 129 L. Ed. 2d 593 (1994) (discussing limitations of injunctive relief to provide "complete relief" to plaintiffs).

Furthermore, the Plaintiff-Intervenors in this proceeding appear to seek associational standing on behalf of their respective member entities. (ECF No. 37 at 18) ("Plaintiff-Intervenors have associational standing to bring this suit on behalf of their various members."). However, Plaintiff-Intervenors have not briefed associational standing. (*See* ECF No. 47). Plaintiff-Intervenors have directed the Court to neither sufficient evidence of their respective associational member(s) for which they seek standing, nor any of the three elements that must be met regarding associational standing.[13] Without such developed briefing, the Court declines to extend injunctive relief to members of Plaintiff-Intervenors.[14]

---

[13] To demonstrate associational standing, Putative Intervenors must prove three elements: "(1) the association[s'] members would independently meet the Article III standing requirements; (2) the interests the association[s] seek[ ] to protect are germane to the purpose of the organization[s]; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (internal citation omitted); *see Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 938 (N.D. Tex. 2019) (discussing the same).
[14] Neither the FTC nor Ryan briefs associational standing. (*See* ECF Nos. 24; 82; 146).

For those reasons, the Court limits the scope of the injunctive relief herein to named Plaintiff Ryan, LLC and Plaintiff-Intervenors Chamber of Commerce of the United States of America; Business Roundtable; Texas Association of Business; and Longview Chamber of Commerce.[15] The Court shall follow with a separate preliminary injunction order specifying the terms of the injunctive relief.

## IV.  CONCLUSION

For the reasons enumerated above, it is ORDERED that Plaintiffs' and Plaintiff-Intervenors' Motions for Stay of Effective Date and Preliminary Injunction are **GRANTED**, as limited in the Preliminary Injunction Order to follow. (ECF Nos. 23, 46). Thus, the effective date of the Non-Compete Rule is STAYED, and the FTC is hereby ENJOINED from implementing or enforcing the Non-Compete Rule, as limited in the Preliminary Injunction Order to follow. The Court enters the following scheduling order:

**IT IS ORDERED THAT:**

1.  The Court previously granted leave regarding a joint status report on the next steps of the case—with regard to scheduling—on June 25, 2024. In light of the Court's determinations hereabove, the Court herein MODIFIES the deadline for a joint status report to **Tuesday July 9, 2024**. The Court anticipates the joint status report to include deadlines for: (i) the FTC's deadlines to file responsive pleadings; (ii) the Parties amended pleading(s) deadlines, if any; (iii) further filing(s) of the administrative record;[16] and (iv) the Parties' respective briefing on the merits.

2.  With regard to scheduling, the Court intends to enter a merits disposition on this action on or before **August 30, 2024**.

(Signature page follows).

---

[15] The FTC does not contest the standing of Ryan or the Plaintiff-Intervenor entities—the named Parties. (*See* ECF No. 82 at 51).

[16] The Court's understanding is that the relevant portions of the administrative record have been filed. (*See* ECF Nos. 83; 88; 149).

**SO ORDERED:** July 3rd, 2024.

ADA BROWN
UNITED STATES DISTRICT JUDGE