IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| RYAN, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 3:24-cv-986-E |
| FEDERAL TRADE COMMISSION, | |
| Defendant. | |

**RYAN, LLC'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
aho@gibsondunn.com
ekiernan@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone: 817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew G. I. Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*Attorneys for Ryan, LLC*

# TABLE OF CONTENTS

Page(s)

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

BACKGROUND ........................................................................................4

    I.    The FTC Act ......................................................................4

    II.    Non-Compete Agreements ...........................................8

    III.    The Non-Compete Rule .............................................10

    IV.    Ryan, LLC .................................................................12

STATEMENT OF NATURE AND STAGE OF PROCEEDING ...........................13

STATEMENT OF ISSUES AND STANDARD OF REVIEW ..............................13

ARGUMENT ...........................................................................................14

    I.    The Commission Lacks Statutory Authority To Issue The
        Non-Compete Rule..........................................................14

        A.    The Text, Structure, And History Of The FTC Act Make Clear
               That Section 6(g) Does Not Authorize Substantive Rules. ...................15

        B.    The Major Questions Doctrine Confirms The Commission's
               Lack Of Authority. ..................................................19

        C.    The Commission's Counterarguments Are Meritless............................23

    II.    A Grant Of Rulemaking Authority To Define Unfair Methods Of
        Competition Would Violate The Constitution.............................27

    III.    The Rule Is Unlawfully Retroactive. .........................................31

    IV.    The Rule Is Arbitrary And Capricious. ......................................32

        A.    The Commission Did Not Justify A Blanket Ban.................................32

# TABLE OF CONTENTS

Page(s)

B.      The Commission's Cost-Benefit Analysis Is Arbitrary
        And Capricious. ...............................................................................37

V.      The Commission Is Unconstitutionally Insulated From
        The President. ...................................................................................42

VI.     The Proper Remedy Is Vacatur, With Nationwide Effect ..........................43

CONCLUSION ...........................................................................................45

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935).................................................................27, 28, 29

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2485 (2021)......................................................................22

*AMG Cap. Mgmt., LLC v. FTC*,
  593 U.S. 67 (2021).....................................................................16, 18

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023).....................................................................20

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988).........................................................................31

*BP Am., Inc. v. FERC*,
  52 F.4th 204 (5th Cir. 2022) ...........................................................43

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ....................................................13, 44

*Bus. Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011)..................................................35, 36

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) .......................................................4, 44

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024)...................30

*CFTC v. Schor*,
  478 U.S. 833 (1986).....................................................................24, 25

*Chamber of Com. of U.S.A. v. U.S. Dep't of Labor*,
  885 F.3d 360 (5th Cir. 2018) ...........................................................37

*Chamber of Com. v. OSHA*,
  636 F.2d 464 (D.C. Cir. 1980).....................................................17, 18

Page(s)

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979).................................................................................1

*In re Clarke*,
   94 F.4th 502 (5th Cir. 2024) .................................................................44

*Collins v. Mnuchin*,
   938 F.3d 553 (5th Cir. 2019) ................................................................24

*Consumers' Research v. CPSC*,
   91 F.4th 342 (5th Cir. 2024) .................................................................43

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   144 S. Ct. 2440 (2024)...........................................................................44

*Data Mktg. P'ship, LP v. Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) .................................................................44

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ...................................................................8

*Encino Motocars, LLC v. Navarro*,
   579 U.S. 211 (2016)...............................................................................40

*Farmers Union Cent. Exch., Inc. v. FERC*,
   734 F.2d 1486 (D.C. Cir. 1984).............................................................32

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...............................................................................27

*Fox Television Stations, Inc. v. FCC*,
   280 F.3d 1027 (D.C. Cir. 2002).............................................................41

*FTC v. Bunte Bros.*,
   312 U.S. 349 (1941).........................................................................18, 26

*FTC v. Motion Picture Advert. Serv. Co.*,
   344 U.S. 392 (1953)...............................................................................34

*FTC v. R.F. Keppel & Bro., Inc.*,
   291 U.S. 304 (1934)...............................................................................29

Page(s)

*FTC v. Sperry & Hutchinson Co.*,
  405 U.S. 233 (1972)..................................................................28, 34

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ....................................................................28

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) .............................................................37

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)..........................................................................5

*ICC v. Cincinnati, N. O. & T. P. Ry. Co.*,
  167 U.S. 479 (1897)........................................................................20

*Illumina, Inc. v. FTC*,
  88 F.4th 1036 (5th Cir. 2023) .........................................................43

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)........................................................................34

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024)....................................................................14

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ...........................................................34

*Mistretta v. United States*,
  488 U.S. 361 (1989)........................................................................27

*Mitchel v. Reynolds*,
  24 Eng. Rep. 347 (Q.B. 1711) ..........................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
  *State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................32, 33, 35

*Nat. Ass'n of Private Fund Managers v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) .......................................................16

Page(s)

*Nat'l Petroleum Refiners Ass'n v. FTC*,
  482 F.2d 672 (D.C. Cir. 1973) ........................................6, 7, 17, 23

*New State Ice Co. v. Liebmann*,
  285 U.S. 262 (1932) ..............................................................22

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024) ...........................................32, 33, 34, 36

*Paul v. United States*,
  140 S. Ct. 342 (2019) ............................................................28

*Perez Pimentel v. Mukasey*,
  530 F.3d 321 (5th Cir. 2008) .................................................31

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ..............................................................18

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ..............................................................43

*Snap-On Tools Corp. v. FTC*,
  321 F.2d 825 (7th Cir. 1963) .............................................10, 21

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ..........................................................22, 24

*U.S. Fidelity & Guar. Co. v. McKeithen*,
  226 F.3d 412 (5th Cir. 2000) .................................................31

*UARG v. EPA*,
  573 U.S. 302 (2014) ..............................................................20

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .......................................................19, 20, 21

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ..............................................................15

**Constitutional Provisions**

U.S. Const. art. I, § 1 ................................................................27

Page(s)

**Statutes**

5 U.S.C. § 551(4) ...................................................................................................30

5 U.S.C. § 706 ...............................................................................4, 13, 27, 43, 44

15 U.S.C. § 41 ...........................................................................................5, 43

15 U.S.C. § 45 ...........................................................................................5, 15

15 U.S.C. § 45(a)(2) .........................................................................................5

15 U.S.C. § 45(b) .............................................................................................5

15 U.S.C. §45(*l*) .............................................................................................5

15 U.S.C. § 45(l) ............................................................................................16

15 U.S.C. § 45(m) ......................................................................................16, 43

15 U.S.C. § 45(n) ...........................................................................................34

15 U.S.C. § 45a ..........................................................................................8, 19

15 U.S.C. § 46 ...............................................................................................15

15 U.S.C. § 46(a) .............................................................................................5

15 U.S.C. § 46(d) .............................................................................................5

15 U.S.C. § 46(e) .............................................................................................6

15 U.S.C. § 46(f) .............................................................................................6

15 U.S.C. § 46(g) .........................................................................................6, 15

15 U.S.C. § 46(h) .............................................................................................6

15 U.S.C. § 46(j) .............................................................................................6

15 U.S.C. § 46(k) .............................................................................................6

15 U.S.C. § 53(b) ............................................................................................43

Page(s)

15 U.S.C. § 57a(a)(1)(B)......................................................................7, 18, 19

15 U.S.C. § 57a(a)(2)............................................................................8, 19, 25

15 U.S.C § 57a(b) ...........................................................................................7

15 U.S.C § 57a(d) ...........................................................................................7

15 U.S.C. § 57b .............................................................................................26

15 U.S.C. § 57b-3(a)(1) ................................................................................26

15 U.S.C. § 57b(a) ........................................................................................43

15 U.S.C. § 1194(c) ..................................................................................7, 19

15 U.S.C. § 2302 ...........................................................................................19

15 U.S.C. § 2302(b) .........................................................................................7

15 U.S.C. § 2302(d) .........................................................................................7

15 U.S.C. § 2310(a) ..................................................................................7, 19

15 U.S.C. § 2310(b) ..................................................................................7, 19

28 U.S.C. § 2201 ...........................................................................................13

28 U.S.C. § 2202 ...........................................................................................13

An Act to Amend the Flammable Fabrics Act, Pub. L. No. 90-189,
    81. Stat. 568 (1967)...................................................................................7

Federal Trade Commission Act, ch. 311,
    38 Stat. 717 (1914)..................................................................4, 6, 15, 16

Federal Trade Commission Act Amendments of 1938,
    Pub. L. No. 75-447, 52 Stat. 111 ..............................................................5

Ga. Code Ann. § 13-8-50-54.........................................................................22

Magnuson-Moss Warranty-Federal Trade Commission Improvement
    Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975)................................7, 19

Page(s)

Minn. Stat. § 181.988 (2023) ..................................................................22

**Regulatory Materials**

16 C.F.R. § 910.1 ...................................................................................10

16 C.F.R. § 910.2 ..............................................................................10, 11

16 C.F.R. § 910.3 ...................................................................................10

16 C.F.R. § 910.4 ...................................................................................10

16 C.F.R. § 910.6 ...................................................................................11

Federal Trade Commission, Deceptive Advertising and Labeling of
    Previously Used Lubricating Oil, 29 Fed. Reg. 11,650 (Aug. 14,
    1964) ...............................................................................................6

Federal Trade Commission, Misbranding and Deception as to Leather
    Content of Waist Belts, 29 Fed. Reg. 8,166 (June 27, 1964) ............................17

Federal Trade Commission, Non-Compete Clause Rule,
    89 Fed. Reg. 38,342 (May 7, 2024)........................... 1, 6, 11, 20, 21, 22, 23, 24,
    .................................................................... 30, 33, 34, 35, 36, 37, 38, 39, 41, 42

Federal Trade Commission, Policy Statement Regarding the Scope of
    Unfair Methods of Competition Under Section 5 of the Federal
    Trade Commission Act, Commission File No. P221201 (Nov. 10,
    2022) .............................................................................................30

Federal Trade Commission, Power Output Claims for Amplifiers
    Used in Home Entertainment Products,
    39 Fed. Reg. 15,387 (May 3, 1974) ...................................................17

Federal Trade Commission, Proposed Non-Compete Clause Rule, 88
    Fed. Reg. 3,482 (Jan. 19, 2023)............................................21, 38, 39

Dissenting Statement of Commissioner Andrew N. Ferguson, In the
    Matter of the Non-Compete Clause Rule, Matter No. P201200
    (June 28, 2024).................................................................................2

Page(s)

Oral Statement of Commissioner Andrew N. Ferguson,
 https://tinyurl.com/2far6mmb ..........................................................................2, 22

Dissenting Statement of Commissioner Melissa Holyoak, In the
 Matter of the Non-Compete Clause Rule, Matter No. P201200
 (June 28, 2024)...............................................................................................2

Oral Statement of Commissioner Melissa Holyoak,
 https://tinyurl.com/44rw98n6 ..........................................................................2

## Other Authorities

Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L.
 Rev. 625 (1960) .............................................................................................8

David B. Bills & Randy Hodson, *Worker training: A review, critique,
 and extension*, 25 Research in Social Stratification & Mobility, 258
 (2007)............................................................................................................41

Employment Cost Index – December 2023, Bureau of Labor
 Statistics, https://www.bls.gov/news.release/pdf/eci.pdf ...................................38

Epstein Becker & Green, P.C., *50-State Noncompete Survey* (2023),
 https://tinyurl.com/52r2tu65; ...........................................................................8

Annual Report of the Federal Trade Commission (1922) ...................................6, 17

Umit G. Gurun et al., Unlocking Clients: *The Importance of
 Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ.
 1218 (2021)....................................................................................................9

Int'l Franchise Ass'n, *International Franchise Association Statement
 on Final FTC Noncompete Rule* (Apr. 25, 2024),
 https://tinyurl.com/2mzn68b2...........................................................................12

Maysoon Khan, *New York governor vetoes bill that would ban
 noncompete agreements*, Associated Press (Dec. 23, 2023),
 https://tinyurl.com/yne98v45...........................................................................22

Brian M. Malsberger, *Covenants Not to Compete* (13th ed. 2021)..........................8

x

Page(s)

John M. McAdams, FTC, Non-Compete Agreements: A Review of
the Literature (2019) ..........................................................9, 35

Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57
Wake Forest L. Rev. 631 (2022) ..........................................9

Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the
Force of Law: The Original Convention*, 116 Harv. L. Rev. 467
(2002).....................................................................................16

Richard J. Pierce Jr., *Can the Federal Trade Commission Use
Rulemaking to Change Antitrust Law?*, GW Law Faculty
Publications & Other Works 1561 (2021)...........................23

S. 986, 92d Cong. (1971) ..........................................................25

S. Conf. Rep. No. 93-1408 (1974) ...........................................25

S. Rep. No. 93-151 (1973) .......................................................25

S. Rep. No. 96-500 (1979) .......................................................26

Evan P. Starr et al., *Noncompete Agreements in the U.S. Labor Force*,
64 J.L. & Econ. 53 (2021) ...................................................9

Evan P. Starr, James J. Prescott & Norman D. Bishara, Noncompete
Agreements in the U.S. Labor Force, 64 J.L. & Econ. 53 (2021)......................38

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Federal Trade Commission by a 3-2 vote has adopted an economically destabilizing, legally unprecedented rule outlawing the use of nearly all non-compete agreements by every employer, in every industry, across the entire United States ("Non-Compete Rule" or "Rule").[1]  According to the Commission, it has the authority to take this momentous step because a provision of the Federal Trade Commission Act ("FTC Act") that authorizes *procedural* rules supposedly also authorizes a sweeping *substantive* prohibition on "unfair methods of competition"— and because, the Commission maintains, non-competes are nearly always "unfair."

This Court has already rejected both arguments, "conclud[ing] the Commission has exceeded its statutory authority in promulgating the Non-Compete Rule" and that the Rule "is unreasonably overbroad without a reasonable explanation."  ECF 153 at 19, 21.  There is no evidentiary or legal reason for the Court to change course now.  The Court's initial conclusions remain correct.

Despite the Commission's best efforts to pull an elephant out of a mousehole, "the text, structure, and history of the Act" demonstrate that Section 6(g)—the Commission's claimed authority—"is indeed a 'housekeeping statute'" that does not authorize "'substantive rules.'"  ECF 153 at 15 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979)).  The major questions doctrine confirms Congress did not

---

[1] *See* Federal Trade Commission, Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024).

vest the Commission with authority to promulgate a rule declaring that non-compete agreements are categorically unfair and anticompetitive—a determination with seismic consequences affecting tens of millions of workers, millions of employers, and billions of dollars in economic productivity.

Indeed, Congress could not constitutionally have conferred this authority on the Commission with the open-ended language—"unfair methods of competition"—that the Commission points to.   Further, agencies need express statutory authorization to promulgate rules that, like the Non-Compete Rule, retroactively impair vested rights, and the Act contains no authorization at all for retroactive rulemaking, let alone express authorization.   As Commissioner Ferguson summarized in his oral dissent, the Commission does not have "the power to nullify tens of millions of existing contracts; to preempt the laws of forty-six States; to declare categorically unlawful a species of contract that was lawful when the [FTC Act] was adopted in 1914; and to declare those contracts unlawful across the whole country irrespective of their terms, conditions, historical contexts, and competitive effects."[2]

---

[2] Oral Statement of Commissioner Andrew N. Ferguson at 2, https://tinyurl.com/2far6mmb ("Ferguson Oral Statement"); *accord* Oral Statement of Commissioner Melissa Holyoak, https://tinyurl.com/44rw98n6; ECF 152-1 (Dissenting Statement of Commissioner Andrew N. Ferguson, In the Matter of the Non-Compete Clause Rule, Matter No. P201200 (June 28, 2024)); ECF 152-2 (Dissenting Statement of Commissioner Melissa Holyoak, In the Matter of the Non-Compete Clause Rule, Matter No. P201200 (June 28, 2024)).

This Court's conclusion that the Rule is arbitrary and capricious is also correct.  For hundreds of years, employers and employees have had the freedom to negotiate mutually beneficial non-compete agreements.  Reasonably tailored non-competes are permitted by the vast majority of States—including Texas, where Ryan is headquartered—which apply state statutes and a rich body of state common law to determine on a case-by-case basis whether a non-compete is reasonable in duration, geographic scope, and other respects.  The Commission nonetheless imposed a one-size-fits-all rule outlawing nearly all non-compete agreements, declaring them to be *per se* unfair methods of competition in violation of Section 5 of the FTC Act.

That decision is unsupported and unsupportable.  As this Court explained, the Commission "lack[ed] … evidence as to why they chose to impose such a sweeping prohibition—that prohibits entering or enforcing virtually all non-competes—instead of targeting specific, harmful non-competes," and "insufficiently addressed alternatives to the Rule."  ECF 153 at 21-22.  The Commission inconsistently weighed the evidence, made logically incompatible findings, ignored comments pointing out these flaws and more limited alternatives, and greatly exaggerated the Rule's purported benefits while downplaying or ignoring its costs.  Each of those hallmarks of arbitrary and capricious decisionmaking requires vacatur.

Perhaps unsurprisingly, this unlawful Rule has been promulgated by a politically unaccountable "independent" agency that is unconstitutionally insulated from the President's removal powers. The FTC Act restricts the President's authority to remove Commissioners. While perhaps at one point the Commission did not exercise executive power, today it does, so that removal restriction is unconstitutional.

For all these reasons, this immensely disruptive Rule should be vacated. Non-competes have been authorized and actively supervised by the States for centuries—the Commission's attempt to invalidate them nationwide by diktat is flatly unlawful. Under the Administrative Procedure Act ("APA"), the consequence is that "[t]he reviewing court *shall* … set aside" the unlawful agency action. 5 U.S.C. § 706(2) (emphasis added). That remedy—vacatur—means, in turn, that the "'rule may not be applied to anyone.'" *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (citations omitted). That is certainly the proper result here, for a patently illegal rule that increases costs and confusion each day it remains on the books.

## BACKGROUND

### I.   The FTC Act

In 1914 Congress enacted the FTC Act, establishing the Commission as a multimember "independent" agency. *See* FTC Act, ch. 311, 38 Stat. 717 (1914)

(codified as amended at 15 U.S.C. §§ 41 *et seq.*).  The Commission is "composed of five Commissioners … [n]ot more than three of" whom "shall be members of the same political party."  15 U.S.C. § 41.  The President appoints the Commissioners, with the advice and consent of the Senate.  But the President can remove a Commissioner only "for inefficiency, neglect of duty, or malfeasance in office."  *Id.*; *see Humphrey's Executor v. United States*, 295 U.S. 602, 623 (1935).

Since the Commission's inception, Section 5 of the FTC Act has "empowered and directed" it "to prevent" the use of "unfair methods of competition."  15 U.S.C. § 45(a)(2).  In 1938, Congress amended Section 5 to give the Commission the additional power to prevent "unfair or deceptive acts or practices."  Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111-12.

Section 5 of the Act creates a comprehensive scheme for the Commission to prevent unfair methods of competition through case-by-case adjudication.  *See* 15 U.S.C. § 45.  Congress empowered the Commission to hold a hearing and issue a cease-and-desist order if the hearing reveals the respondent is engaging in an unfair method of competition; the Act provides for penalties for violating such an order.  *Id.* § 45(b), (*l*).

Section 6 of the Act grants the Commission ancillary powers to support this adjudicatory framework.  Most of those powers are investigatory.  *See* 15 U.S.C.

§ 46(a)-(d), (h)-(j).   Others are ministerial, such as the powers to make recommendations, *see id.* § 46(e), (k), and publish reports, *see id.* § 46(f).   One provision, Section 6(g), which has been in place since the Commission's inception in 1914, grants the Commission the power to "classify corporations and … to make rules and regulations for the purpose of carrying out the provisions of this subchapter."   *Id.* § 46(g); *see also* 38 Stat. at 722.   The Act does not authorize penalties for violating rules promulgated under Section 6(g).

From 1914 until 1962, the Commission did not invoke Section 6(g) as a grant of substantive rulemaking authority, and, in fact, expressly disclaimed such authority, telling Congress it could not "issue orders, rulings, or regulations unconnected with any proceeding before it."   Annual Report of the Federal Trade Commission 36 (1922); *see Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 & n.27 (D.C. Cir. 1973) (recounting history).   Then, in the 1960s and 1970s, the Commission changed course and promulgated several rules declaring certain actions to be unfair or deceptive acts or practices, citing Section 6(g) as its authority.   89 Fed. Reg. at 38,349-50 & nn.132-157.   Some of these rules, as an afterthought, also declared the same actions to be unfair methods of competition.   *See, e.g.*, Deceptive Advertising and Labeling of Previously Used Lubricating Oil, 29 Fed. Reg. 11,650 (Aug. 14, 1964).

Meanwhile, Congress granted the Commission narrowly tailored rulemaking authority addressing specific subjects.  *See, e.g.*, An Act to Amend the Flammable Fabrics Act, Pub. L. No. 90-189, § 4(a), 81. Stat. 568, 571 (1967) (codified at 15 U.S.C. § 1194(c)).  Although these congressional grants of specific rulemaking authority would have been superfluous if Section 6(g) already granted substantive rulemaking authority, the D.C. Circuit decided in 1973 that Section 6(g) did grant the Commission substantive rulemaking authority.  *See Nat'l Petroleum*, 482 F.2d at 698.

Congress's reaction was swift.  Just two years after *National Petroleum*, Congress enacted the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975), which empowered the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices," 15 U.S.C. § 57a(a)(1)(B), while imposing tight constraints on the way such rules could be adopted, *id.* § 57a(b)-(d).  Congress also empowered the Commission to prescribe rules regarding written warranties, *id.* §§ 2302(b), (d), 2310(a), and declared "fail[ure] to comply with … a rule" promulgated under the Magnuson-Moss Act to be a violation of Section 5, *id.* § 2310(b).  Conspicuously absent, however, was conferral of authority to adopt unfair-method-of-competition rules.  Instead, Congress took a deliberately neutral position on whether Section 6(g) granted that authority, providing that the

7

Magnuson-Moss Act "shall not affect any authority of the Commission" to issue unfair-method-of-competition rules.  *Id.* § 57a(a)(2).

From 1978 until the Non-Compete Rule, the Commission did not promulgate a single rule under Section 6(g).  And throughout that time, Congress continued to grant the Commission other targeted rulemaking powers.  *See, e.g.*, 15 U.S.C. § 45a (rules related to labelling).

## II.    Non-Compete Agreements

For hundreds of years, firms and workers have freely negotiated mutually beneficial agreements for a worker not to compete with an employer's core business during the employment relationship and for a time-limited period after it ends.  The standard governing these agreements was first articulated in *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (Q.B. 1711), which held that "particular" restraints, limited to specific regions, times, or customers, were enforceable just like any other contract.  *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 629-30 (1960).  That general reasonableness test became the standard approach in "both English and American courts," *id.* at 638-39, leading to a rich body of state law and application of the "rule of reason" under federal antitrust law, *see generally* Brian M. Malsberger, *Covenants Not to Compete* (13th ed. 2021); Epstein Becker & Green, P.C., *50-State Noncompete Survey* (2023), https://tinyurl.com/52r2tu65; *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that

covenants not to compete should be examined under the rule of reason.").  Until the Commission issued its Non-Compete Rule, non-compete agreements were legal under federal antitrust law and, when reasonably tailored, the laws of 46 States (including Texas).

That is because workers, firms, and the economy all benefit from reasonable non-compete agreements.  *See* Amended Complaint, ECF 22 at ¶¶ 33-39.  Non-compete agreements promote training by solving a free-rider problem.  *See* John M. McAdams, FTC, Non-Compete Agreements: A Review of the Literature 13 (2019).  By so doing, they can increase workers' earnings.  *See* Evan P. Starr et al., *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 80 (2021).  Non-compete agreements also incentivize R&D investment and facilitate innovation by helping firms protect their intellectual property.  *See* McAdams, *supra*, at 19 (collecting papers).  And in certain industries where client relationships are critical— such as tax consulting—non-compete agreements can reduce prices.  *See* Umit G. Gurun et al., Unlocking Clients: *The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).

Reasonably tailored non-compete agreements are thus a mutually beneficial, negotiated term of employment.  *See* Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57 Wake Forest L. Rev. 631, 677 (2022).  That may be why, until 2022, the Commission had only once claimed a non-compete agreement

was an unfair method of competition—and lost in court.  *See Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963).

## III.    The Non-Compete Rule

On April 23, 2024, a bare majority of the Commission voted to promulgate the Non-Compete Rule.   The Rule declares that "it is an unfair method of competition for a person: (i) To enter into or attempt to enter into a non-compete clause; (ii) To enforce or attempt to enforce a non-compete clause; or (iii) To represent that the worker is subject to a non-compete clause."   16 C.F.R. § 910.2(a)(1).  "Worker" is defined to include anyone "who works or who previously worked, whether paid or unpaid," for anyone else, regardless of employee or independent contractor status.  *Id.* § 910.1.  The Rule also purports to supersede state laws that would "permit or authorize" non-compete agreements.  *Id.* § 910.4.

The Rule permits non-competes only when "entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets." *Id.* § 910.3(a).  The Rule also allows employers to enforce existing non-competes— but not new ones—with "senior executives," defined to include CEOs, presidents, and other senior corporate officers who "control significant aspects of a business entity or common enterprise."  16 C.F.R. §§ 910.1, 910.2(a)(2)(ii).  And causes of action that "accrued prior to the [Rule's] effective date" may be pursued.  *Id.*

§ 910.3(b).  Otherwise, any non-compete agreement with any worker earning any salary in any industry is outlawed, and businesses must send a "clear and conspicuous notice" to any worker currently subject to a non-compete informing him that his "non-compete clause will not be, and cannot legally be, enforced against the worker."  *Id.* § 910.2(b)(1).

In short, the Commission has declared that more than 99% of non-competes across the whole country, in all industries, in all circumstances—without any individualized consideration—"are exploitative and coercive" and must be eradicated.  89 Fed. Reg. at 38,365, 38,442.  The Commission made no finding that non-competes are an unfair method of competition in any particular industry.

By the Commission's own estimates, the Rule massively reworks the American economy.  The Commission estimates—"conservative[ly]"—that the Rule will invalidate the contracts of "approximately 30 million workers."  89 Fed. Reg. at 38,343 & n.34.  And the Commission predicts the economic impact of the Rule will exceed *hundreds of billions* of dollars.  *See, e.g.*, *id.* at 38,467.

The Court stayed the Rule's effective date for Ryan and Plaintiff-Intervenors.  *See* ECF 154.   But for the rest of the nation, the Rule takes effect on September 4, 2024.  16 C.F.R. § 910.6.

## IV.   Ryan, LLC

Ryan is a global tax consulting firm headquartered in Dallas.  It employs over 2,500 people in the United States and serves over 30,000 clients.  Ryan's principals and other workers are sought-after tax experts who frequently join Ryan after years of experience in the tax industry.

Ryan's principals and many of its other workers agree to temporally limited non-compete clauses.  Those covenants are one type of tool used to protect Ryan's confidential information, including Ryan's playbooks for advising clients, which are often developed through a collaborative process that can take years of research and trial and error to perfect.  Ryan's non-competes also prevent departing workers from poaching Ryan's clients and workers.

The Non-Compete Rule will prohibit Ryan from enforcing the vast majority of its non-compete agreements and will force Ryan to inform current and former workers that those agreements no longer apply to them.  That places Ryan's business secrets at serious risk of exposure, and may lead to poaching of Ryan's clients and workers.  And like Ryan, countless other professional-services firms—as well as businesses that own intellectual property, rely on skilled labor, or have generated goodwill in the marketplace with existing and potential customers—will face difficult choices in protecting these legitimate business interests.  *See, e.g.*, Int'l Franchise Ass'n, *International Franchise Association Statement on Final FTC*

*Noncompete Rule* (Apr. 25, 2024), https://tinyurl.com/2mzn68b2 (condemning "the harm [the Rule] will bring to competition and intellectual property").

## STATEMENT OF NATURE AND STAGE OF PROCEEDING

Ryan filed its amended complaint on April 30.  ECF 22.  Ryan's claims arise under the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  On July 3, this Court granted Ryan a preliminary injunction and stayed the Rule's effective date for Ryan.  ECF 153, 154.

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue presented is whether the Non-Compete Rule is unlawful under the APA.  Under the APA, courts "*shall* … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C) (emphasis added).  The APA's mandatory language empowers courts to "'set aside—*i.e.*, formally nullify and revoke—an unlawful agency action'" without "consideration of the various equities at stake."  *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951-52 (5th Cir. 2024) (citation omitted).

13

**ARGUMENT**

This Court should vacate the Non-Compete Rule, which constitutes a flagrant disregard for the statutory and constitutional limits on government power. The text, history, and structure of the FTC Act make clear that Section 6(g)—the Commission's claimed authority—does not grant the Commission the power to issue rules defining unfair methods of competition. Were there any doubt, the major questions doctrine would resolve it. Indeed, if the Commission's reading were correct, Section 6(g) would be an unconstitutional delegation of legislative authority because the FTC Act provides no intelligible principle to guide the exercise of rulemaking authority. Even supposing the Commission could adopt *some* form of non-compete rule, the Rule here is impermissibly retroactive and is an arbitrary, capricious, and wholly unsupportable blanket ban adopted pursuant to a deeply flawed cost-benefit analysis. And to top it all off, the Commission itself is structured in a manner that violates Article II of the Constitution.

## I.   The Commission Lacks Statutory Authority To Issue The Non-Compete Rule.

Under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). The Commission claims authority to adopt the Non-Compete Rule under Section 6(g) of the FTC Act, which says the agency may "[f]rom time to time classify corporations and … make rules

14

and regulations for the purpose of carrying out the provisions of this subchapter."

15 U.S.C. § 46(g).   That language does not grant the substantive rulemaking

authority the Commission claims.

> **A.**   **The Text, Structure, And History Of The FTC Act Make Clear That Section 6(g) Does Not Authorize Substantive Rules.**

As this Court has already concluded, ECF 153 at 19, the FTC Act does not

empower the Commission to promulgate substantive rules defining unfair methods

of competition.

**1.**   "Congress … does not alter the fundamental details of a regulatory scheme

in vague terms or ancillary provisions."   *Whitman v. Am. Trucking Ass'ns*, 531 U.S.

457, 468 (2001).   But that is exactly what the Commission claims Congress did in

the FTC Act.   Section 5 of the Act creates a comprehensive scheme to prevent unfair

methods of competition through case-by-case adjudication.   *See* 15 U.S.C. § 45.

Section 6, in turn, lays out ancillary powers that generally aid in the administration

of that adjudication-focused scheme.   *See id.* § 46.   The Commission's claimed

rulemaking authority is the latter half of the seventh such ancillary power, a

subsection captioned "classifying corporations."   *See* FTC Act, 38 Stat. at 722.   That

location is "suspect," to say the least.   ECF 153 at 16.   And as the Fifth Circuit

recently instructed, even in circumstances where statutory language "at first blush …

seemingly grants the Commission the power" it claims, those words "cannot be

construed in a vacuum"; rather, they "must be read in their context and with a view

to their place in the overall statutory scheme." *Nat. Ass'n of Private Fund Managers v. SEC*, 103 F.4th 1097, 1110-11 (5th Cir. 2024). It is unfathomable that Congress, in one half of one subsection of a provision addressing procedural matters, provided the Commission with the far-reaching power to issue substantive rules categorically condemning economic practices as unfair methods of competition on a nationwide basis. That "reading would allow a small statutory tail to wag a very large dog." *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021).

**2.** The lack of a statutory penalty for violating rules promulgated under Section 6(g) further demonstrates that it "encompasses only housekeeping rules— not substantive rulemaking power." ECF 153 at 16. When the provision was enacted in 1914, it was unheard of for Congress to grant broad legislative rulemaking authority without also enacting a provision providing penalties for violating those rules. *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 549-57 (2002). There is no penalty provision for Section 6(g) rules. By contrast, there is now, and was then, a penalty provision for violating orders that result from Section 5 adjudications. *See* 15 U.S.C. § 45(*l*)-(m); FTC Act, ch. 311 § 5, 38 Stat. at 720.

**3.** The Commission's own understanding of its powers likewise counsels against reading Section 6(g) to grant substantive rulemaking authority. For the first 48 years of its existence, the Commission explicitly disclaimed substantive

rulemaking authority. *See Nat'l Petroleum*, 482 F.2d at 693 & n.27. In fact, less than a decade after the Act's passage, the Commission told Congress that "[o]ne of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it." Annual Report of the Federal Trade Commission 36.

The Commission did not assert the power to promulgate substantive rules under Section 6(g) until 1963. And it last asserted that power in 1978, before exhuming it to adopt the Non-Compete Rule. *See* ECF 153 at 17. Thus, the Commission historically has not understood Section 6(g) to grant substantive rulemaking authority except for a brief 15-year period. Even in that period, the Commission promulgated only rules defining unfair or deceptive acts or practices—most commonly deceptive advertising. *See, e.g.*, 29 Fed. Reg. 8,166 (June 27, 1964) ("Misbranding and Deception as to Leather Content of Waist Belts"); 39 Fed. Reg. 15,387 (May 3, 1974) ("Power Output Claims for Amplifiers Used in Home Entertainment Products"). To be sure, the Commission sometimes added as an afterthought that those unfair or deceptive acts or practices were also an unfair method of competition, but that boilerplate language does not make them unfair-method-of-competition rules "just because the agency says" so. *Chamber of Com. v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980). "Instead, it is the substance of what the agency" did "which is decisive," and none of the rules promulgated under

17

Section 6(g) was substantively directed at unfair methods of competition.  *Id.* (cleaned up).

Before the Non-Compete Rule, the Commission *never* asserted that Section 6(g) allowed it to promulgate a bona fide unfair-method-of-competition rule. This "want of assertion of power by" the Commission, which "presumably would be alert to exercise it," is "significant in determining whether such power was actually conferred."  *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941); *see also AMG Cap. Mgmt*, 593 U.S. at 72 (courts construe the FTC Act in light of "how the Commission's authority (and its interpretation of that authority) has evolved over time").

**4.**  Subsequent amendments to the FTC Act would be wholly superfluous if Section 6(g) granted substantive rulemaking authority. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").  Most importantly, Section 18, which the Magnuson-Moss Act created, authorizes the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a(a)(1)(B).  That would serve no purpose if Section 6(g) already provided substantive rulemaking power.  The Magnuson-Moss Act conspicuously did not grant the Commission the authority to promulgate rules defining unfair methods of competition.  It instead took a

deliberately neutral position on whether the Commission possessed that power by stating that it did "not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition." *Id.* § 57a(a)(2).

The Magnuson-Moss Act also authorizes the Commission to promulgate rules regarding warranties without complying with the procedures of Section 18, *see* Magnuson-Moss §§ 102, 110(a), 88 Stat. at 2186, 2190 (codified at 15 U.S.C. §§ 2302, 2310(a)), and provides that failing to comply with those rules violates Section 5 of the FTC Act, *id.* § 110(b) (codified at 15 U.S.C. § 2310(b)).  Again, under the Commission's view that Section 6(g) already generally authorized substantive rules, this power to promulgate rules regarding warranties is superfluous. Furthermore, both before and after the Magnuson-Moss Act, Congress granted the Commission specific rulemaking authorities that "would be superfluous" if "Section 6(g) had already given the Commission … substantive rulemaking power." ECF 153 at 18; *see* 15 U.S.C. § 1194(c) (enacted in 1967); 15 U.S.C. § 45a (enacted in 1994).

> ### B.   The Major Questions Doctrine Confirms The Commission's Lack Of Authority.

If any doubt remained, it would be resolved by the major questions doctrine. *See West Virginia v. EPA*, 597 U.S. 697, 716 (2022).  That doctrine embodies the "'common sense'" principle that Congress does not delegate massive powers in "'vague terms.'"  *Id.* at 722, 723.  Agencies cannot regulate "a question of deep

economic and political significance" absent "clear" authority from Congress. *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (quotation omitted). Contrary to the Commission's assertion, *see* 89 Fed. Reg. at 38,352-54, whether it has authority to promulgate an unfair-method-of-competition rule banning non-competes is a quintessential major question.

*First*, the major questions doctrine applies when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *West Virginia*, 597 U.S. at 724 (quoting *UARG v. EPA*, 573 U.S. 302, 324 (2014)). That includes newfound rulemaking authority, which must be conferred in a manner that is "open to no misconstruction, but clear and direct," even when the agency has case-by-case enforcement authority. *ICC v. Cincinnati, N. O. & T. P. Ry. Co.*, 167 U.S. 479, 505 (1897); *see West Virginia*, 597 U.S. at 740 (Gorsuch, J., concurring) (discussing *Cincinnati*). That is because the "legislat[ive]" power to ban virtually all non-competes is orders of magnitude broader than the "enforce[ment]" power to enjoin use of a specific non-compete. *Cincinnati*, 167 U.S. at 501.

The Non-Compete Rule is the very first bona fide unfair-method-of-competition rule in the Commission's 110-year history. Other than a brief 15-year interlude ended by enactment of the Magnuson-Moss Act, the Commission has not claimed that Section 6(g) grants it substantive rulemaking authority at all, and

20

instead has proceeded, as Congress intended, on a case-by-case basis. And in that short period the Commission promulgated only unfair-or-deceptive-act-or-practice rules. *See supra* 17-18.

*Second* and similarly, courts regularly invoke the major questions doctrine when an agency seeks to effectuate a "fundamental revision of [a] statute, changing it from one sort of scheme of regulation into an entirely different kind." *West Virginia*, 597 U.S. at 728 (brackets and ellipsis omitted). By transforming the FTC Act's prohibition on unfair methods of competition from an adjudication-centric scheme into a rule-based one, the Commission has fundamentally changed the regulatory scheme.

Likewise, the Non-Compete Rule transforms the FTC Act from a trade regulation statute into a worker-protection statute—indeed the Rule is arguably the most controversial employment regulation in history. But the Commission is not an employment regulator, and its suggestion that it has a history of regulating non-compete agreements is risible. *See* 89 Fed. Reg. at 38,353. Excepting one failed adjudication, *see Snap-On Tools*, 321 F.2d at 837, the Commission had never addressed non-competes until it "rushed out" a handful of consent agreements in the days before the Commission proposed the Rule in a transparent attempt to create a paper trail. *See* 88 Fed. Reg. 3,482, 3,542 (Jan. 19, 2023) (Proposed Non-Compete Clause Rule) (Commissioner Wilson, dissenting).

21

*Third*, this particular unfair-method-of-competition rule indisputably has enormous economic significance. The Commission itself estimates that the Rule will render approximately "30 million" contracts unenforceable, affect "one in five American workers," and have an economic impact in the hundreds of billions of dollars. 89 Fed. Reg. at 38,346, 38,467; *see* Ferguson Oral Statement at 3 ("There is no doubt that the Final Rule presents a major question.").

*Finally*, the Rule "intrudes into an area that is the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). Non-compete agreements have been regulated by the States since the nation's Founding. *See supra* 8-9. And the proper way to regulate them at the state level remains a question of deep political significance vigorously debated today. For example, Minnesota banned non-compete agreements last year, Minn. Stat. § 181.988 (2023), while New York's governor vetoed a similar ban, *see* Maysoon Khan, *New York governor vetoes bill that would ban noncompete agreements*, Associated Press (Dec. 23, 2023), https://tinyurl.com/yne98v45. Other States, such as Georgia, have made non-competes easier to enforce. *See* Ga. Code Ann. §§ 13-8-50-54. If Congress had intended to permit the Commission to terminate those "economic experiments," it would have clearly said so. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *Solid Waste Agency*

*of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-74 (2001) ("*SWANCC*").

### C.   The Commission's Counterarguments Are Meritless.

The Commission's claim of statutory authority to promulgate rules declaring unfair methods of competition relies primarily on *National Petroleum*. *See* 89 Fed. Reg. at 38,350.  That decision was wrong when decided and has not aged well.

The D.C. Circuit based its decision largely on its belief that rulemaking was a superior method of regulation than adjudication, and that interpreting Section 6(g) to grant rulemaking authority was thus necessary to "render the statutory design effective."  482 F.2d at 681-84, 688, 690-91.  As one leading scholar put it, "the method of statutory interpretation that the D.C. Circuit used in *National Petroleum Refiners* has never been embraced by the Supreme Court; it has not been used by any court in decades; and, it is inconsistent with the principles of separation of powers that the Supreme Court has emphasized for decades."  Richard J. Pierce Jr., *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works 1561, at 9 (2021).  Instead of substituting its preferred procedural mechanism for Congress's, the court should have interpreted Section 6(g) in light of its plain language and statutory context.

Perhaps recognizing that Section 6(g) is an awfully slim reed, the Commission also relies on later enactments—the Magnuson-Moss Act and the FTC

Improvements Act.   But those statutes did not ratify substantive rulemaking authority under Section 6(g).   Although the Supreme Court once observed that Congress's revisiting a statute without making "pertinent change" is evidence that a "longstanding administrative interpretation" is correct, *CFTC v. Schor*, 478 U.S. 833, 846 (1986), it has since recognized that "congressional acquiescence" should be recognized "with extreme care" and only if there is "overwhelming evidence of acquiescence." *SWANCC*, 531 U.S. at 160, 169 n.5; *see also Collins v. Mnuchin*, 938 F.3d 553, 572 (5th Cir. 2019).   There is no evidence of any acquiescence, let alone overwhelming evidence.

Even under *Schor*, there has been no ratification.   There was no "longstanding administrative interpretation" allowing unfair-method-of-competition rulemaking for Congress to ratify.   *Schor*, 478 U.S. at 846.   As discussed, the Commission interpreted Section 6(g) to grant no rulemaking authority at all for most of its history; in the brief period before Magnuson-Moss when the Commission asserted authority under Section 6(g), it promulgated only unfair-or-deceptive-act-or-practice rules. The Commission's assertion that the Rule "rests on firm historical footing" is simply false.   89 Fed. Reg. at 38,353.

And even if there were a practice to ratify, Magnuson-Moss made "pertinent change[s]" to the FTC Act that demonstrate the *absence* of ratification—granting the Commission authority to promulgate unfair-or-deceptive-act-or-practice rules, but

24

not unfair-method-of-competition rules. *Schor*, 478 U.S. at 846.  That new statutory authorization *rebuts* the Commission's position that Section 6(g) *already* provided power to issue substantive rules.

Although Magnuson-Moss stated that the Act "shall not affect any authority of the Commission" to issue unfair-method-of-competition rules, 15 U.S.C. § 57a(a)(2), that phrase is neither "an affirmative grant of substantive rulemaking authority" nor a ratification of unfair-method-of-competition rulemaking authority, ECF 153 at 19.  Instead of affirming that Section 6(g) grants authority for unfair-method-of-competition rules, the phrase "shall not affect *any* authority" merely preserves a hypothetical potentiality, demonstrating a congressional decision to dodge the question.

The legislative history supports that understanding.  The Senate bill conferred no rulemaking authority, removing a section from an earlier bill that had granted unfair-or-deceptive-act-or-practice rulemaking authority only.  *See* S. Rep. No. 93-151, at 32 (1973) (discussing S. 986, § 206, 92d Cong. (1971)).  The House bill expressly barred unfair-method-of-competition rules, while granting unfair-or-deceptive-act-or-practice rulemaking authority.  In conference, unfair-or-deceptive-act-or-practice authority was retained—consistent with the House's approach—while the Senate's neutrality was adopted toward unfair competition authority, leaving the 1914 status quo in place.  *See* S. Conf. Rep. No. 93-1408 § 202 (1974).

25

At no point had either the House or the Senate proposed granting authority for unfair competition rules.

The Commission's practice also supports that understanding. Although the Commission now claims that Congress ratified its Section 6(g) authority in 1975, the Commission did not promulgate an unfair-method-of-competition rule under that supposed authority until the Non-Compete Rule. That absence of an "assertion of power" is "significant" evidence that no "such power was actually conferred." *Bunte Bros.*, 312 U.S. at 351-52.

Finally, Congress did not ratify the Commission's purported unfair-method-of-competition rulemaking authority in the FTC Improvements Act either. That statute subjected rules promulgated under Section 6 and Section 18 to enhanced procedural requirements. 15 U.S.C. § 57b-3(a)(1). Setting aside that there was nothing to ratify, the pertinent section applies to amendments to preexisting rules. Referring to Section 6 ensured the enhanced procedures would apply to amendments to unfair-or-deceptive-act-or-practice rules promulgated before Magnuson-Moss. The legislative history supports that understanding: "[S]ection 18 is specifically limited to authority to issue rules to prohibit unfair or deceptive acts or practices. The clear intent of Congress in granting this authority was ... *not to provide new rulemaking authority over antitrust violations*." S. Rep. No. 96-500 at 19 n.6 (1979) (emphasis added).

* * *

In short, Section 6(g) does not grant the Commission substantive rulemaking authority. If there were any doubt, the major questions doctrine resolves it. And the Commission's reliance on later enactments is unavailing, because those later enactments neither granted nor ratified unfair-method-of-competition rulemaking authority. The Non-Compete Rule is therefore "in excess of statutory … authority" and so must be "set aside." 5 U.S.C. § 706(2)(C).

## II. A Grant Of Rulemaking Authority To Define Unfair Methods Of Competition Would Violate The Constitution.

If Section 6(g) did grant the Commission authority to issue substantive unfair-method-of-competition rules, then it would be an unconstitutional delegation of legislative power. This is further reason to reject the Commission's expansive reading of the statute. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("[A]mbiguous statutory language [must] be construed to avoid serious constitutional doubts.").

The Constitution vests "[a]ll [the] legislative Powers" it grants in "Congress." U.S. Const. art. I, § 1. Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Rather, Congress can delegate power to an agency only if it provides an "intelligible principle" by which the agency can exercise that power. *Mistretta v. United States*, 488 U.S. 361, 372

(1989).  More precisely, Congress may authorize agencies only to "fill[] up details and find[] facts." *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *see also Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari).

The FTC Act does not provide an intelligible principle to guide a rulemaking defining unfair methods of competition.   Section 6(g) states only that the Commission can make "rules and regulations for the purpose of carrying out the provisions of this subchapter."  And Section 5, the subchapter's primary substantive provision, prohibits "unfair methods of competition"—a phrase that "does not admit of precise definition," *Schechter*, 295 U.S. at 532, and allows the Commission to "measur[e] a practice against the elusive … standard of fairness," *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).  That sort of subjective, value-laden phrase does not provide an intelligible principle to guide Commission rulemaking.

The Supreme Court's decision in *Schechter* powerfully demonstrates that point.  In *Schechter*, the Court held that the National Industrial Recovery Act unconstitutionally authorized the President to adopt "codes of fair competition." 295 U.S. at 521-23.  The FTC Act was different, the Court explained, precisely because the authority it gave the Commission over "unfair methods of competition" was to be exercised through adjudications, not rulemakings. *Id.* at 533.  The Commission could declare something an unfair method of competition only "in particular

instances" after "formal complaint," "notice and hearing," "findings of fact," and "judicial review." *Id.* The Recovery Act, on the other hand, "dispense[d] with that administrative procedure," authorizing the promulgation of a "legislative code." *Id.* at 533, 539. That "code-making authority … [was] an unconstitutional delegation of legislative power." *Id.* at 542.

The Commission's claimed authority to promulgate rules defining "unfair methods of competition" is virtually identical to the authority to issue "codes of fair competition" held unconstitutional in *Schechter*. The Supreme Court has recognized that both the phrases "fair competition" (in the Recovery Act) and "unfair methods of competition" (in the FTC Act) extend beyond mere "unfair competition." *Schechter*, 295 U.S. at 532 (addressing Recovery Act); *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 310-11 (1934) (addressing FTC Act). Neither "fair competition" nor "unfair methods of competition" provides an intelligible principle to constrain agency decisionmaking.[3]

The Commission's attempt to put some meat on the bones that Congress left bare only reinforces the elusiveness of Section 5's standards. The Commission asserts that "indicia of unfairness include the extent to which the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of

---

[3] Though the Court recognized that "the difference" between the two statutes "lies not only in procedure but in subject matter" too, there is no disputing that the procedural difference was central to its holding. *Schechter*, 295 U.S. at 533-34.

economic power of a similar nature." 89 Fed. Reg. at 38,358.  But stringing together various near-synonymous adjectives does not meaningfully clarify the standard being applied to establish a rule of "general … applicability and future effect," 5 U.S.C. § 551(4).  Indeed, this list of value-laden adjectives is copied verbatim from the Commission's November 2022 Policy Statement Regarding the Scope of Unfair Methods of Competition, which jettisoned the century-old rule of reason and claimed that Section 5 allows the Commission to regulate conduct that "is not facially unfair" according to an indeterminate "sliding scale," as long as the conduct has some "tendency to negatively affect competitive conditions."  Commission File No. P221201 at 9 (Nov. 10, 2022).  Regardless, the fact that the Commission feels the need to provide (illusory) guardrails demonstrates that Congress itself provided none.

At minimum, the Commission's boundless interpretation of the FTC Act urges caution.  "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc) (quotation omitted), *aff'd*, 602 U.S. 406 (2024).  The Court should construe Section 6(g) not to provide authority to promulgate rules defining unfair methods of competition.

### III.   The Rule Is Unlawfully Retroactive.

Even if the Commission had authority to promulgate unfair-method-of-competition rules, the Rule would be impermissibly retroactive.  "Retroactivity is generally disfavored in the law" and poses "severe problems of unfairness because it can upset legitimate expectations and settled transactions."  *U.S. Fidelity & Guar. Co. v. McKeithen*, 226 F.3d 412, 418 (5th Cir. 2000).  Accordingly, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Section 6(g) contains no "express statutory grant" "for retroactive rulemaking."  *Id.* at 209.

The Non-Compete Rule nonetheless acts retroactively by invalidating over 30 million existing contracts.  A regulation has "a retroactive effect when [it] 'takes away or impairs vested rights.'"  *Perez Pimentel v. Mukasey*, 530 F.3d 321, 326 (5th Cir. 2008) (citation omitted).  Employers have vested contractual rights under their non-compete agreements.  In most cases, employers have already performed their half of the bargain—hiring employees, training them, and, in many cases, directly compensating them for and in reliance on their agreement not to compete.  The Rule "takes away" those vested contractual rights.  *Perez*, 530 F.3d at 326.

## IV.    The Rule Is Arbitrary And Capricious.

As this Court has already determined, the Rule is also arbitrary and capricious. ECF 153 at 23.   The Commission's decision to categorically ban non-compete agreements is neither "'reasonable'" nor "'reasonably explained.'" *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (citation omitted).   The numerous instances of unreasoned decisionmaking throughout the Rule indicate that, rather than developing "a rational connection between the facts found and the choice made," the Commission made a choice and then distorted the evidence to find facts to support it. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   For similar reasons, the Commission's blinkered cost-benefit analysis is fatally flawed.

### A.    The Commission Did Not Justify A Blanket Ban.

The Commission's justifications for imposing a nationwide, blanket ban on non-competes do not withstand scrutiny.   At bottom, the Commission justifies the Rule by concluding that non-competes, nearly always and everywhere, are an unfair method of competition.   That conclusion is unreasoned.

*First*, the Commission did not meaningfully consider the alternative of imposing industry-specific bans.   "[A]n agency has a duty to consider responsible alternatives to its chosen policy." *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984).   Many of the Commission's findings were based on studies of particular industries, especially the healthcare and technology sectors.

*See, e.g.*, 89 Fed. Reg. at 38,433 (discussing prices and concentration in the healthcare market); *id.* at 38,382-83, 38,389-90 (discussing the technology industry). Commenters explained that the Commission's evidence did not support banning non-competes in all industries.[4]  The Commission did not even examine whether non-competes are unfair and harmful methods of competition in *all* industries.  *See* 89 Fed. Reg. at 38,457-66.  Nor did it establish a "rational connection" between the industry-specific "facts found" and the economy-wide "choice made."  *State Farm*, 463 U.S. at 43.

*Second*, the Commission "offered no reasoned response" to comments pointing out the flaws of banning non-compete agreements among partners in a business.  *Ohio*, 144 S. Ct. at 2054.  Numerous commenters, including Ryan, explained that partners in businesses such as consulting firms are often core to the business and, therefore, have considerable bargaining power when negotiating non-competes.  *See* Ryan Comment 36.  That consideration supports allowing non-competes for personnel who hold equity in a business.  Instead of engaging with that aspect of the problem, the Commission merely stated that "proposals to except partners, shareholders, and similar groups are likely covered by the sale of business exception if they sell their share of the business upon leaving."  89 Fed. Reg. at

---

[4] *See, e.g.*, Ryan Comment 8-10 (consulting); National Association of Manufacturers Comment, Dkt. FTC-2023-0007-20939 (manufacturing); Small Business Owner Comment, Dkt. FTC-2023-0007-21063 (suggesting that "if statistically valid industry by industry studies suggest a need in some instances for a national rule within the agency's authority," the Commission should "tailor it to industries the study identifies").

38,421.  But at the same time, the Commission made it clear that the Rule bans non-competes that reduce the value of an equity-holding employees' shares.  *Id.* at 38,439. That is an evasion of Ryan's comment, not a "reasoned response" to it.  *Ohio*, 144 S. Ct. at 2044; *see also, e.g.*, *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (failing to respond to "significant points … raised by the public comments" indicates a failure to "consider[] the relevant factors").

*Third*, the Commission did not adequately consider how non-competes affect consumer welfare, a key factor for determining whether they universally are an unfair method of competition.  The FTC Act "was designed to supplement and bolster the Sherman Act and the Clayton Act."  *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394 (1953).  Though the "flexibility" of the phrase "unfair methods of competition" allows the Commission to "consider[] public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws," it does not excuse the Commission from considering the core policies encompassed by the antitrust laws.  *Sperry & Hutchinson Co.*, 405 U.S. at 241, 244; *see also* 15 U.S.C. § 45(n) ("In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence.").

Whether a policy is "harmful to the consumer" or "in the consumer's best interest" is the core consideration under the antitrust laws.  *Leegin Creative Leather*

*Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Especially in an inflationary era, the Commission therefore was required to consider whether and to what extent the Rule will raise consumer prices.  The Commission said it "does not expect that prices will rise because of the rule," 89 Fed. Reg. at 38,467, but that assertion was based on a single study of the healthcare market and directly contradicts the Commission's own finding elsewhere that the projected "increases in workers' earnings may increase consumer prices because of higher firms' costs," *id.* at 38,479. In rushing to minimize the Rule's obvious economic effects, the Commission gave inadequate consideration to this "important aspect of the problem." *State Farm*, 463 U.S. at 43.

*Fourth*, "the Commission relied upon insufficient empirical data" to support its conclusions.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011). Although the Commission did cite some empirical studies, the Commission's own economist recognized that those studies could not determine "the likely effects of broad prohibitions of non-compete agreements."  John M. McAdams, Federal Trade Commission, Non-Compete Agreements: A Review of the Literature at 4 (2019). That analysis recognized that, among other problems with the literature, "the paucity of changes in [non-compete] enforceability" makes it "far from clear whether the estimated effects are likely to extend to other states[,] … industries[,] … or occupations." *Id.* at 11; *see also id.* at 12-13 (discussing flaws with other studies).

Perhaps because of that inconvenient conclusion, the Commission did not cite its own economist's analysis even once, even though it was raised in numerous comments. *See, e.g.*, Ryan Comment 40. It was arbitrary and capricious to base the Rule on these flawed studies, none of which could predict the "economic consequences of [the] rule." *Business Roundtable*, 647 F.3d at 1151.

*Fifth*, the Commission used those flawed empirical studies in an opportunistic, inconsistent manner by discounting studies that undermined the Rule while crediting equally flawed studies that supported it. For example, the Commission credited correlational studies associating non-competes with lower earnings, 89 Fed. Reg. at 38,382, but declined to credit studies finding that the use of non-competes is associated with higher earnings because they are "unlikely to reflect causation," *id.* at 38,383. As Ryan explained in its comment letter, none of the studies measuring the effect of the "enforceability of non-competes" can establish that a prohibition on non-competes caused earnings to increase, because each of them simultaneously measured *twelve* different metrics of enforceability, and those metrics could not be disentangled. *See* Ryan Comment 43. Yet the Commission continued to rely only on its preferred correlational studies without offering a "reasoned response" to Ryan's criticism. *Ohio*, 144 S. Ct. at 2054.

*Finally*, the Commission relied on inconsistent and contradictory reasoning regarding the Rule's effect on information-sharing, a large part of its basis for finding

that non-competes negatively affect competition.  The Commission claimed that eliminating non-competes will increase innovation by eliminating obstacles to information-sharing.  89 Fed. Reg. at 38,409.  But the Commission simultaneously claimed that employers can use "alternatives to non-competes," such as non-disclosure agreements and trade-secret law to prevent information-sharing.  *Id.* at 38,424-26.  The Commission does not explain how both can be true.  If NDAs and trade secret law were sufficient to prevent sharing of valuable information, abolishing non-competes would not increase innovation because employers would simply replace the non-competes with comprehensive NDAs and vigorous (and costly) enforcement of trade secret law.  Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Com. of U.S.A. v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).

### B.   The Commission's Cost-Benefit Analysis Is Arbitrary And Capricious.

An agency's cost-benefit analysis "can render the rule unreasonable if the analysis rests on a serious flaw." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021).  The Commission's cost-benefit analysis here was flawed in virtually every possible way:  the benefits are overstated, the costs the Commission did identify are understated, and a host of other costs are ignored.  A proper cost-benefit analysis would show that the economic costs of banning non-competes far outweigh the benefits.

37

*First*, the Commission exaggerated the Non-Compete Rule's purported benefits.  Citing a single study that relies on a decade-old survey of workers, the Commission concluded that 20% of American workers are bound by non-competes. 89 Fed. Reg. at 38,346 (citing Evan P. Starr, James J. Prescott & Norman D. Bishara, Noncompete Agreements in the U.S. Labor Force, 64 J.L. & Econ. 53 (2021)).  But that study conceded that its "data" may not be "representative."  Starr, Prescott, & Bishara, *supra* at 82-83.  Further, the number of workers who supposedly would benefit from the Rule has fallen, as States have restricted the use of non-competes in the last few years.  *See* 89 Fed. Reg. at 38,465 n.1050.

Moreover, the purported benefit to workers is negligible—except for certain high earners.  The Proposed Rule projected that CEOs and physicians would be among the principal beneficiaries of projected wage gains under the Rule; the Adopting Release obscured and failed to address which workers would experience wage gains from the Final Rule.  *See* 88 Fed. Reg. at 3,523-24.  And the Commission found the Rule would increase wages a paltry 0.86% overall in any event—wages grew more than that in the fourth quarter of 2023 alone.  *See* 89 Fed. Reg. at 38,474; Employment Cost Index – December 2023 at 2, Bureau of Labor Statistics, https://www.bls.gov/news.release/pdf/eci.pdf.  The Commission also conceded that "[i]t is difficult to determine the extent to which [these] earnings represent transfers

versus benefits." 89 Fed. Reg. at 38,475. Yet despite all this, the Commission placed enormous weight on the Rule's negligible wage gains.

The Commission also inflated the supposed benefits to firms. It estimated that despite causing research-and-development spending to fall, the Rule would increase the number of patents. 89 Fed. Reg. at 38,476. But, as the Commission had previously acknowledged, more patents does not necessarily mean more innovation, because patents often cover intellectual property that non-competes would have otherwise helped shield. *See* Ryan Comment 28; *see also* 88 Fed. Reg. at 3,492. The Commission further estimated that the number of new firms would increase. 89 Fed. Reg. at 38,475. But it does not follow that these new firms would prove successful and therefore actually benefit society. *See* SIFMA Amicus Br., ECF 57-2 at 27–28.

*Second*, the Commission ignored several substantial costs to businesses. Firms that use non-competes have structured their hiring, organizational, logistical, and personnel decisions in reliance on the centuries of precedent finding reasonable non-competes valid. To these firms, compliance with the Rule is not as simple as the acknowledged (but understated) costs of rewriting contracts and obtaining legal advice discussed below. Rather, many firms will have to develop whole new policies, agreements, and terms for potentially thousands of employees to protect intellectual property in lieu of non-compete agreements—the Commission entirely failed to

consider these costs.  (Those burdens and costs were a key reason it was important to Ryan to obtain a preliminary injunction and are a central reason now that nationwide vacatur is needed).

Many firms will have to revamp entire business models, especially models centered around selling the services of highly educated and specialized experts.  *See, e.g.*, Managed Funds Ass'n Comment 4–5; Advanced Med. Techs. Ass'n Comment 7-8.  These firms will also face greater hiring, training, and human-resources expenses resulting from increased worker turnover.  *See, e.g.*, Retail Industry Leaders Ass'n Comment 11; Int'l Ctr for L. & Econ. Comment 4.  The Rule does not meaningfully grapple with these imminent business disruptions, which arise from firms' legitimate reliance on the status quo.  *See Encino Motocars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016).

The Commission similarly failed to consider costs the Rule will inflict upon the economy.  Most obviously, the Commission ignored inflation resulting from increased costs of production through reduced training and limited worker access to information.  The Commission also neglected the possibility that firms will outsource jobs to highly industrialized countries where non-competes are legal, including Canada, France, or Japan.  *See* Ryan Comment 53 (citing Association of Corporation Counsel, Multi-Country Survey on Covenants Not to Compete (2018)).

*Third*, the Commission downplayed the costs it did acknowledge.   The Commission admitted that the Rule might cause firms to reduce "human capital investment," for instance, 89 Fed. Reg. at 38,423, but brushed aside this loss with an indifference that reflects how out-of-depth the Commission is in its new-found role of employment regulator.  Workers suffer most from reduced training, since training yields "higher pay, greater likelihood of promotion, and more job security."  David B. Bills & Randy Hodson, *Worker training: A review, critique, and extension*, 25 Research in Social Stratification & Mobility, 258, 292 (2007) (quoted in Ryan Comment 51).  A bipartisan consensus recognizes that employer-provided training has become particularly important today, as employers—through apprenticeship and the like—provide skills and know-how that four-year colleges do not.  *See* Ryan Comment 30-32.  Reduced worker training also harms firms and consumers because better trained workers are more productive, knowledgeable, and innovative.  *See* Ryan Comment 51.  The Rule, then, will harm the very people it purports to help— workers and consumers—and is arbitrary and capricious for this reason and because the Commission ignored substantial evidence and "did not provide an adequate basis for believing the Rule would in fact further" its stated goals.  *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1043-44 (D.C. Cir. 2002).

As another example, though the Commission ignored the fact that firms will need to develop alternative means of protecting intellectual property, it recognized

that firms will have to modify workers' contracts.  The Commission estimated that each firm will need only one hour of a lawyer's time to modify contracts for incoming workers, and four to eight for current workers.  89 Fed. Reg. at 38,482. That is a massive underestimate.  Large companies with thousands of employees have many different documents, including handbooks and severance agreements, that will need to be analyzed for non-competes and any other restrictive covenant that may fall under the Commission's broad "non-compete" definition.  And small businesses may need more attorney time per employee, as they are less likely to consistently use form contracts.  *See* Ryan Comment 47; Retail Industry Leaders Ass'n Comment 25.

The Commission also minimized the Rule's effect on litigation costs.  While the Rule will decrease non-compete litigation, litigation involving other restrictive covenants and trade-secret laws will increase.  Trade secret and non-disclosure litigation are especially costly because enforcement requires discovery into information outside plaintiffs' possession.  The Commission acknowledged this "may be costly," but then claimed—without evidence—that the "decrease in non-compete litigation would likely offset" those costs.  89 Fed. Reg. at 39,469.

## V.   The Commission Is Unconstitutionally Insulated From The President.

Because Article II of the Constitution vests the executive power in the President, "lesser officers" within the Executive Branch "must remain accountable

42

to the President." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).
Accountability is accomplished by the President's "unrestricted removal power." *Id.*
at 215.  The FTC Act restricts that power.  *See* 15 U.S.C. § 41.

Although the Supreme Court upheld the FTC Act in *Humphrey's Executor*, its
decision rested on the premise that "the FTC as it existed in 1935 exercis[ed] 'no
part of the executive power.'"  *Seila Law*, 591 U.S. at 215 (citation omitted).  But
that conclusion "has not withstood the test of time." *Id.* at 216 n.2.  Amendments to
the FTC Act have given the Commission expanded enforcement powers that are
plainly executive in nature.  *See* 15 U.S.C. §§ 45(m), 53(b), 57b(a).  Because
Commissioners' removal protections are therefore unconstitutional even under
*Humphrey's Executor*, the Rule must be vacated so the Commission can consider
anew—with proper presidential oversight—whether to adopt the Rule.[5]

## VI.    The Proper Remedy Is Vacatur, With Nationwide Effect

Under the APA, courts "*shall* … hold unlawful and set aside" agency action
that is "in excess of statutory jurisdiction" or "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law."  5 U.S.C. § 706 (emphasis
added).  This language is mandatory:  The Court is "required" to set aside unlawful
agency actions.  *BP Am., Inc. v. FERC*, 52 F.4th 204, 213 (5th Cir. 2022).  There is

---

[5] The Fifth Circuit recently held that *Humphrey's* continuing force "is for the Supreme Court … to
answer." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023).  Ryan respectfully preserves this
argument for further review.  *See Consumers' Research v. CPSC*, 91 F.4th 342, 346 (5th Cir. 2024).

therefore no need to "consider[] … the various equities at stake before determining whether a party is entitled to vacatur." *Braidwood*, 104 F.4th at 952.

As for the consequence of vacatur, it "'extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to "set aside"—i.e., formally nullify and revoke—an unlawful agency action.'" *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (citation omitted).  It follows that "relief under Section 706 … is not party restricted." *Career Colls.*, 98 F.4th at 255.  Rather, when "plaintiffs prevail on [an] APA challenge, [a] court *must* 'set aside'" the agency action "with nationwide effect." *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) (emphasis added); *see also Braidwood*, 104 F.4th at 951 ("vacatur under § 706(2) [is] a remedy that affects individuals beyond those who are parties to the immediate dispute").

Accordingly, if the Court rules for Ryan on the merits, Fifth Circuit precedent requires the Court to vacate the Rule on a nationwide basis.  *See also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring) ("When a federal court sets aside an agency action, the federal court vacates that order.").  That remedy is essential to spare tens of thousands of American businesses the illegal burdens imposed by the Rule, to bring this litigation to a prompt conclusion, and to avoid a torrent of lawsuits to obtain the relief that to date only Ryan and the plaintiff-intervenors have received.

## CONCLUSION

The Court should declare unlawful, vacate, and set aside the Non-Compete Rule on a nationwide basis.

Respectfully submitted,

Dated:  July 19, 2024

/s/ *Allyson N. Ho*

| | |
|---|---|
| Allyson N. Ho | Eugene Scalia (*pro hac vice*) |
| Texas Bar No. 24033667 | Amir C. Tayrani (*pro hac vice*) |
| Elizabeth A. Kiernan | Andrew G. I. Kilberg (*pro hac vice*) |
| Texas Bar No. 24105666 | Aaron Hauptman (*pro hac vice*) |
| GIBSON, DUNN & CRUTCHER LLP | Joshua R. Zuckerman (*pro hac vice*) |
| 2001 Ross Avenue, Suite 2100 | GIBSON, DUNN & CRUTCHER LLP |
| Dallas, TX 75201 | 1050 Connecticut Avenue, N.W. |
| Telephone: 214.698.3100 | Washington, DC 20036 |
| Facsimile: 214.571.2900 | Telephone: 202.955.8500 |
| aho@gibsondunn.com | Facsimile: 202.467.0539 |
| ekiernan@gibsondunn.com | escalia@gibsondunn.com |
| | atayrani@gibsondunn.com |
| Charles W. Fillmore | akilberg@gibsondunn.com |
| Texas Bar No. 00785861 | ahauptman@gibsondunn.com |
| H. Dustin Fillmore III | jzuckerman@gibsondunn.com |
| Texas Bar No. 06996010 | |
| THE FILLMORE LAW FIRM LLP | |
| 201 Main Street, Suite 700 | |
| Fort Worth, TX 76102 | |
| Telephone: 817.332.2351 | |
| chad@fillmorefirm.com | |
| dusty@fillmorefirm.com | |

*Attorneys for Ryan, LLC*

45

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume requirements of Judge Brown's Scheduling Order, ECF 163, because it contains 9,990 words; and

2.      This document complies with the typeface requirements of Judge Brown's Case Management Procedure II.A because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated:  July 19, 2024                       Respectfully submitted,

*/s/ Allyson N. Ho*
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
aho@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on July 19, 2024, I caused the foregoing motion to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

Dated:  July 19, 2024                    Respectfully submitted,

*/s/ Allyson N. Ho*
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
aho@gibsondunn.com