## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC,<br><br>*Plaintiff,*<br><br>CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, and LONGVIEW CHAMBER OF COMMERCE,<br><br>*Plaintiff-Intervenors,*<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>*Defendant.* | **Case No. 3:24-cv-986-E** |

## PLAINTIFF-INTERVENORS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT........................................................1

BACKGROUND............................................................................5

    A.    Factual Background ..........................................................5

        1.    The Commission's Authority Under The FTC Act..................5

        2.    Existing Regulation of Worker Noncompete Agreements.......7

        3.    The Commission's Noncompete Rulemaking............................9

    B.    Procedural Background ............................................................9

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS..............11

STANDARD OF REVIEW ........................................................11

ARGUMENT .........................................................................12

I.    THE NONCOMPETE RULE EXCEEDS THE COMMISSION'S STATUTORY AUTHORITY ...............................................12

    A.    The Commission Lacks The Authority To Prohibit Unfair Methods Of Competition Through Rulemaking (Count I).................13

        1.    Section 6(g) of the FTC Act does not authorize substantive rulemaking ........................................................................13

        2.    The Commission's counterarguments are meritless ...............20

    B.    The Commission's Classification Of All Noncompetes As "Unfair Methods of Competition" Is Contrary To Section 5 (Counts II and III) ..........................................................................23

    C.    The Commission's Rule Is Unlawfully Retroactive (Count IV).........29

II.    THE NONCOMPETE RULE IS THE PRODUCT OF FLAWED DECISIONMAKING..................................................................30

A.    The Rule's Categorical Ban Is Not Supported By Evidence ............31

B.    The Rule Unjustifiably Brushes Aside Superior Alternatives...........38

C.    The Rule's Cost-Benefit Analysis Is Deeply Flawed .........................40

III.   THE NONCOMPETE RULE SHOULD BE SET ASIDE.................42

A.    The Noncompete Rule Must Be Vacated...............................................42

B.    Plaintiff-Intervenors Are Entitled To Relief For All Of Their Members ................................................................................................44

CONCLUSION.................................................................................................49

# TABLE OF AUTHORITIES

*Page(s)*

CASES:

*1-800 Contacts, Inc.* v. *FTC*,
  1 F.4th 102 (2d Cir. 2021) ...................................................................25

*Alabama Ass'n of Realtors* v. *HHS*,
  594 U.S. 758 (2021) ............................................................................27

*Anatol Zukerman & Charles Krause Reporting, LLC* v. *USPS*,
  64 F.4th 1354 (D.C. Cir. 2023) ..........................................................47

*Association of Am. Physicians & Surgeons, Inc.* v. *Texas Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...............................................44, 45, 47

*Baltimore & O.R. Co.* v. *Aberdeen & Rockfish R. Co.*,
  393 U.S. 87 (1968) ..............................................................................34

*Boise Cascade Corp.* v. *FTC*,
  637 F.2d 573 (9th Cir. 1980) ..............................................................24

*Bowen* v. *Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ............................................................................29

*BP P.L.C.* v. *Mayor & City Council of Baltimore*,
  593 U.S. 230 (2021) ............................................................................21

*Career Colls. & Schs. of Tex.* v. *U.S. Dep't of Ed.*,
  98 F.4th 220 (5th Cir. 2024) ...............................................................43

*Cargill* v. *Garland*,
  57 F.4th 447 (5th Cir. 2023) (en banc) ..............................................42

*Casa de Maryland, Inc.* v. *Wolf*,
  486 F. Supp. 3d 928 (D. Md. 2020) ..............................................45, 49

*Chamber of Commerce* v. *FTC*,
  No. 6:24-cv-148 (E.D. Tex. May 3, 2024) .....................................10, 49

iii

*Chrysler Corp.* v. *Brown,*
    441 U.S. 281 (1979)..................................................................................15

*In re Clarke,*
    94 F.4th 502 (5th Cir. 2024) .................................................................5, 43

*Clinkscales* v. *Chevron U.S.A., Inc.,*
    831 F.2d 1565 (11th Cir. 1987)...............................................................46

*Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.,*
    720 F.2d 1553 (11th Cir. 1983).................................................................8

*Delaware Dept. of Nat. Res. & Env't Control* v. *E.P.A.,*
    785 F.3d 1 (D.C. Cir. 2015) ....................................................................37

*DeSantis* v. *Wackenhut Corp.,*
    793 S.W.2d 670 (Tex. 1990) .....................................................................8

*Massachusetts ex rel. Div. of Marine Fisheries* v. *Gutierrez,*
    594 F. Supp. 2d 127 (D. Mass. 2009) .....................................................34

*E.I. Du Pont de Nemours & Co.* v. *FTC,*
    729 F.2d 128 (2d Cir. 1984) .............................................................23, 24

*Eastern Enters.* v. *Apfel,*
    524 U.S. 498 (1998)...........................................................................29, 30

*FDA* v. *Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024)..................................................................................47

*Franciscan All., Inc.* v. *Becerra,*
    47 F.4th 368 (5th Cir. 2022) ...................................................................42

*Gundy* v. *United States,*
    139 S. Ct. 2116 (2019) .............................................................................29

*Humphrey's Executor* v. *United States,*
    295 U.S. 602 (1935)..................................................................................17

*Hunt* v. *Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977)..................................................................................45

iv

*Impax Labs., Inc.* v. *FTC*,
    994 F.3d 484 (5th Cir. 2021)......................................................................24

*International Ladies' Garment Workers' Union* v. *Donovan*,
    722 F.3d 795 (D.C. Cir. 1983).....................................................................38

*Jama* v. *ICE*,
    543 U.S. 335 (2005).....................................................................................21

*Martin* v. *Hadix*,
    527 U.S. 343 (1999).....................................................................................29

*Metropolitan Life Ins. Co.* v. *Massachusetts*,
    471 U.S. 724 (1985).....................................................................................27

*Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*,
    60 F.4th 956 (5th Cir. 2023) ......................................................................30

*Miles* v. *Apex Marine Corp.*,
    498 U.S. 19 (1990).......................................................................................26

*National Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco,
    Firearms & Explosives*,
    2024 WL 1349307 (N.D. Tex. Mar. 29, 2024) ......................................45, 49

*National Ass'n of Home Builders* v. *EPA*,
    682 F.3d 1032 (D.C. Cir. 2012)...................................................................40

*NFIB* v. *OSHA*,
    595 U.S. 109 (2022)...............................................................................19, 27

*North Tex. Specialty Physicians* v. *FTC*,
    528 F.3d 346 (5th Cir. 2008).......................................................................24

*Northern Spotted Owl* v. *Hodel*,
    716 F. Supp. 479 (W.D. Wash. 1988)..........................................................34

*Pan Am. World Airways, Inc.* v. *United States*,
    371 U.S. 296 (1963).....................................................................................26

*Pierce* v. *Fuller*,
    8 Mass. 223 (1811) .......................................................................................7

v

*Seila Law LLC* v. *CFPB*,
140 S. Ct. 2183 (2020) ...................................................................17

*Snap-On Tools Corp.* v. *FTC*,
321 F.2d 825 (7th Cir. 1963)...........................................................25

*Southwestern Elec. Power Co.* v. *EPA*,
920 F.3d 999 (5th Cir. 2019)...........................................................40

*Speech First, Inc.* v. *Fenves*,
979 F.3d 319 (5th Cir. 2020)........................................................... 46

*Texas* v. *Biden*,
10 F.4th 538 (5th Cir. 2021) ........................................................... 48

*Texas* v. *U.S. Dep't of Transp.*,
2024 WL 1337375 (N.D. Tex. Mar. 27, 2024) ...............................11

*University of Tex. M.D. Anderson Cancer Ctr.* v. *HHS*,
985 F.3d 472 (5th Cir. 2021)...........................................................12

*USFS* v. *Cowpasture River Preservation Assn.*,
590 U.S. 604 (2020)..........................................................................27

*Utility Air Reg. Grp.* v. *EPA*,
573 U.S. 302 (2014)..........................................................................15

*Valentine* v. *Collier*,
993 F.3d 270 (5th Cir. 2021)...........................................................47

*VanDerStok* v. *Garland*,
86 F.4th 179 (5th Cir. 2023) ...........................................................11

*West Virginia* v. *EPA*,
597 U.S. 697 (2022)..............................................................2, 22, 27

*Yakima Valley Cablevision, Inc.* v. *FCC*,
794 F.2d 737 (D.C. Cir. 1986).........................................................38

**STATUTES:**

5 U.S.C. § 706 ...............................................................5, 11, 12, 42

15 U.S.C. § 45 .................................................................................. *passim*

15 U.S.C. § 46 .................................................................................. *passim*

15 U.S.C. § 57a .........................................................................6, 17, 18

15 U.S.C. § 1194(c) ...................................................................................7

28 U.S.C. §§ 2201 *et seq.* .......................................................................11

Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22, 26 .....................................14

Cal. Bus. & Prof. Code § 16600 .............................................................32

Federal Trade Commission Act Amendments of 1994, Pub. L.
    103-312 (1994) ...................................................................................19

Flammable Fabrics Act, amendment, Pub. L. 90-189 (1967) ...........17

FTC Act of 1914, Pub. L. 63-203 (1914) ...............................*passim*

FTC Act, amendments, Pub. L. 75-447 (1938) ........................................6

FTC Improvements Act of 1980, Pub. L. 96-252 (1980)....................21

Longshoremen's and Harbor Workers' Compensation Act, ch.
    509, Pub. L. 69-803, 44 Stat. 1424 (1927).......................................14

Magnuson-Moss Act, Pub. L. 93-637 (1975) ...........................6, 17, 20

Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv)...........................................8

Sherman Act.............................................................................................8

**OTHER AUTHORITIES:**

88 Fed. Reg. 3,482 (Jan. 19, 2023)........................................................36

89 Fed. Reg. 38,342 (May 7, 2024) ................................................*passim*

Balasubramanian, et al., *Locked In? The Enforceability of
    Covenants Not to Compete and the Careers of High-Tech
    Workers*, 57 J. Hum. Res. S349, S351 (2022)...........................32, 33

vii

Can & Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. Entrepreneurship & Pub. Pol. 223 (2022) ..................................................................................33

FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition* (Nov. 2022)..............................................................28

H.R. Rep. 103-138 .............................................................................19

Johnson, Lavetti & Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*, NBER Working Paper Series (2023) ....................................................................................37

Johnson, Lavetti & Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*, SSRN (2021)..........................37

Lavetti, Simon, & White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, SSRN, (2021) ......................................................................................32

Lipsitz & Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022) ...........32

McAdams, *Non-Compete Agreements: A Review of the Literature,* FTC Bureau of Economics Research Paper (2019) .................7

Merrill & Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002)...............................5

Milner, *Defining Unfair Methods of Competition in the Federal Trade Commission Act*, 2023 Wisc. L. Rev. 109, 114 (2023) .....................24

*Report of the Att'y Gen.'s Comm. on Admin. Pro.* 27 (Jan. 22, 1941) ...........................................................................................14

S. Rep. 103-130.................................................................................18

## PRELIMINARY STATEMENT

The Federal Trade Commission's Noncompete Rule is a staggering assertion of regulatory power.  By the Commission's own estimates, the Noncompete Rule will retroactively invalidate more than 30 million existing contracts, imposing massive costs on workers and businesses alike.  If upheld, it would mean that the Commission has power to outlaw common business practices and run roughshod over the considered and varied policies of 50 States.

As the Court correctly recognized at the preliminary-injunction stage, the Rule is unlawful.  The Commission is a "creature[] of Congress" that cannot act "unless and until Congress confers power on it," but Congress has never empowered the Commission to issue binding, substantive regulations outlawing common business practices as "unfair methods of competition." ECF No. 153 (Op.), at 16, 19-20.  On top of that, the Commission flunked the Administrative Procedure Act's requirement that its chosen policy "'be reasonable and reasonably explained,'" because its "expansive ban" on noncompete agreements is not supported by "the evidence put forth by the Commission."  Op. 20-21 (quoting *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Those rulings were correct, and there is no basis for a different conclusion at the summary-judgment stage.  The Court should enter summary judgment in plaintiffs' favor and set aside the Rule.

I.     The Noncompete Rule exceeds the Commission's statutory authority in three separate ways.

First, as the Court has correctly concluded, the Federal Trade Commission Act does not authorize the Commission to issue substantive unfair-competition rules.  For the first time in five decades, the Commission now claims that a seldom-used housekeeping provision of the FTC Act, Section 6(g), empowers it to issue substantive rules declaring business practices unlawful economy-wide.  But "the text, structure, and history of the Act" refute that claim.  Op. 15.  And any doubt about that conclusion is removed by the major-questions doctrine, which requires Congress to "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia* v. *EPA*, 597 U.S. 697, 716 (2022).

Second, even if the Commission had any authority to issue unfair-competition rules, categorically prohibiting *all* worker noncompete agreements as "unfair methods of competition" cannot be squared with the meaning of that phrase in Section 5 of the FTC Act.  Under established law, a

2

business practice is only unfair competition if it produces anticompetitive harm that outweighs any procompetitive benefits. The Commission did not even attempt to make that showing for noncompetes as a class. It instead relied on its radical reinterpretation of Section 5 in a 2022 "Policy Statement," which purported to give a majority of the Commission the authority to condemn conduct as "unfair" without showing any actual harm to consumers or competition. That novel interpretation of Section 5 is wrong on its own terms, upends the States' longstanding role in regulating noncompetes, and violates the major-questions doctrine. And accepting that interpretation would make Section 5 so boundless as to reflect an unconstitutional delegation of legislative power.

Third, the Commission lacks statutory authority to retroactively invalidate millions of existing contracts. Congress must provide clear authority for an agency to issue rules with retroactive consequences. Nothing in the FTC Act or any other statute empowers the Commission to issue regulations that categorically unwind existing contracts.

II.    As the Court correctly recognized, independent of those statutory defects, the Noncompete Rule is a textbook example of arbitrary-and-capricious decisionmaking.

3

First, the Commission offers no evidence to support its categorical nationwide *ban* on noncompetes. To justify that drastic choice, the Commission relies on state-level studies that analyzed the effect of noncompete agreements in particular industries or for employees of certain income levels. None of that evidence lends any support to a total ban on noncompetes, let alone overcomes decades of research and judicial decisions demonstrating that many noncompetes are beneficial.

Second, the Commission unjustifiably dismissed alternatives that would have allowed the Commission to achieve its purported objectives at lower cost. During the notice-and-comment process, commenters proposed targeted changes to the Rule and explained why those changes were superior to a blanket ban. But rather than engage with those arguments, the Commission waved them away, often in a single sentence.

Third, the Commission relied on a flawed cost-benefit analysis to prop up its Rule. The Commission inexplicably refused to measure many benefits of noncompetes that the Rule acknowledged, while crediting purported benefits of a ban that are (at best) highly speculative.

III.    Because the Noncompete Rule is "not in accordance with law" and "arbitrary [and] capricious," the APA requires this Court to "set aside" the

4

Rule. 5 U.S.C. § 706. Under controlling Fifth Circuit precedent, that relief is not party-specific, but has "nationwide effect." *See In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024). At a minimum, plaintiff-intervenors are entitled to permanent relief from the Noncompete Rule for all of their members.

**BACKGROUND**

A.    **Factual Background**

1.    **The Commission's Authority Under The FTC Act**

In the FTC Act of 1914, Congress "declared unlawful" "unfair methods of competition" and created the Commission to enforce that prohibition. The FTC Act reflected two different views in Congress about how the Commission should operate. The House envisioned the Commission as a purely investigative body, which would gather information, produce reports, and make recommendations to the Attorney General for enforcement. Meanwhile, the Senate envisioned the Commission as a separate enforcement agency that would enforce the antitrust laws through case-by-case adjudication. What emerged was a combination of the two: the Senate-proposed enforcement powers became Section 5 of the Act, while the House-proposed investigative powers became Section 6. *See* Ex. A; Merrill & Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002).

Notably, there is no suggestion in the legislative record that anyone in Congress believed the FTC would have substantive rulemaking authority.

In Section 5, Congress authorized the Commission to pursue individual enforcement actions against alleged violators.  15 U.S.C. § 45(a)-(b).  And in Section 6, titled "Additional powers," Congress authorized the Commission to undertake other activities to further its enforcement authority, such as "gather[ing] and compil[ing] information" and "investigat[ing]" violations of the antitrust laws that may be referred to the Attorney General.  *Id.* § 46.  Relevant here, in Subsection (g)—which is titled "Classification of corporations; regulations"—Congress granted the Commission the power to "[f]rom time to time classify corporations and . . . *to make rules and regulations for the purpose of carrying out the provisions of this subchapter*."  *Id.* § 46(g) (emphasis added).

Congress has revisited the FTC Act many times since 1914.  In 1938, Congress amended Section 5 to also prohibit "unfair or deceptive acts or practices."  Pub. L. 75-447, § 3.  In 1975, Congress expressly authorized the Commission to issue binding regulations related to "unfair or deceptive acts and practices," but only after following detailed procedural requirements.  Pub. L. 93-637, § 202 (codified at 15 U.S.C. § 57a).  Congress has also expressly

6

provided the Commission with narrow rulemaking authority over specific topics. *See, e.g.*, 15 U.S.C. § 1194(c) ("violation[s] of such rules . . . shall be an unfair method of competition and an unfair and deceptive act or practice"). Outside of those specific statutes, Congress has not authorized the Commission to issue rules prohibiting "unfair methods of competition."

### 2. Existing Regulation of Worker Noncompete Agreements

By the Commission's own estimates, there are 30 million noncompetes in the United States. *See* FTC, Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024). Reasonable noncompete agreements allow businesses to protect sensitive and confidential information and give employers increased flexibility in compensation. They also benefit employees by incentivizing employers to provide specialized training and development opportunities that would otherwise be unavailable. *See* McAdams, *Non-Compete Agreements: A Review of the Literature,* FTC Bureau of Economics Research Paper 6 (2019).

Noncompetes pre-date the Founding and have been regulated exclusively by the States for centuries. *See, e.g.*, *Pierce* v. *Fuller*, 8 Mass. 223 (1811). States have developed varying approaches to ensuring that noncompetes do not unduly restrict workers. In many States, including Texas, a noncompete agreement will be enforced so long as it is "limited appropriately

as to time, territory, and type of activity." *See, e.g.*, *DeSantis* v. *Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990). Some States have enacted statutes prohibiting certain kinds of noncompetes. *See, e.g.*, Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv) (prohibiting noncompetes that "exceed 12 months"). And although they represent a very small minority, some States—California, Oklahoma, North Dakota, and Minnesota—have enacted legislation treating noncompetes in the employment context as largely unenforceable (though each of those bans is narrower than the Rule).

In stark contrast, no federal law addresses the enforceability of noncompetes. As far as Plaintiffs are aware, no federal court has ever held that a noncompete agreement violated the federal antitrust laws. *Cf. Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1562-1564 (11th Cir. 1983) (explaining that noncompetes have procompetitive benefits). Tellingly, in declaring that noncompete agreements as a class are categorically "unfair methods of competition," the Commission did not cite a single judicial decision holding that a noncompete agreement violated the FTC Act, the Sherman Act, or any other federal statute.

### 3.    The Commission's Noncompete Rulemaking

Despite extensive case law and economic research confirming the benefits of reasonable noncompete agreements, the Commission in January 2023 proposed a broad rule that would ban those agreements nationwide.  The proposed rule prompted swift pushback from businesses, workers, economists, and former governmental officials.  And plaintiff-intervenors and others showed that the Commission lacks authority to issue a competition regulation of any kind or to categorically prohibit noncompete agreements. Compl. ¶¶ 79-81.

On April 23, 2024, the Commission issued its final rule, which changed little from the proposal.  *See* 89 Fed. Reg. 38,502-38,503.  The main substantive change was a carve-out for existing (but not future) noncompetes with "senior executives," defined as workers making over $151,164 who hold a "policy-making position."  *Id.* at 35,502.

### B.    Procedural Background

Shortly after its issuance, Plaintiff Ryan, LLC sued to block the Commission's Noncompete Rule.  The next day, plaintiff-intervenors filed a separate suit in the Eastern District of Texas, alleging that the Noncompete Rule exceeded the Commission's statutory authority and violated the APA's requirement for reasoned decisionmaking.  The district court stayed that case,

9

however, to allow plaintiff-intervenors to intervene in this litigation. According to the court, it made sense to consolidate the two proceedings because "the Fifth Circuit holds that permanent or preliminary relief from agency rulemaking that fails or likely fails the APA's standards is not limited to the named plaintiff but, instead, is vacating or postponing a rule as to all whom it would otherwise bind." Op. 8, *Chamber of Commerce* v. *FTC*, No. 6:24-cv-148 (E.D. Tex. May 3, 2024). This Court granted plaintiff-intervenors' motion to intervene on May 9, 2024. ECF No. 34.

On July 3, this Court issued an order granting motions filed by Ryan and plaintiff-intervenors for a preliminary injunction and an order postponing the Noncompete Rule's effective date under the APA. Op. 1, 9 (citing 5 U.S.C. § 705). The Court held that plaintiffs were likely to succeed in their challenge to the Rule because (i) "the FTC lacks the authority to create substantive rules . . . through Section 6(g)," and (ii) "the evidence put forward by the Commission does not warrant the Non-Compete Rule's expansive ban." Op. 15, 21. And because each of those defects was alone enough to render the Rule unlawful, this Court found it unnecessary to address "Plaintiffs' remaining causes of action." Op. 23. The Court also held that plaintiffs would suffer irreparable harm if they were forced to "comply[] with a putatively

10

invalid regulation," Op. 26 (quoting *Restaurant L. Ctr.* v. *DOL*, 66 F.4th 593, 597 (5th Cir. 2023)), and that "granting injunctive relief [would] serve[] the public interest." Op. 28.

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff-intervenors have moved for summary judgment on their claims, which arise under the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. This Court has stated that it will rule on plaintiffs' motions for summary judgment no later than August 30, 2024, ahead of the Rule's September 4 effective date. ECF No. 156.

## STANDARD OF REVIEW

"In the context of a challenge to agency action under the APA, [s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Texas* v. *U.S. Dep't of Transp.*, 2024 WL 1337375, at *6 (N.D. Tex. Mar. 27, 2024) (citation omitted).

The APA requires that a court "hold unlawful and set aside agency action . . . found to be," among other things, "not in accordance with law." 5 U.S.C. § 706(2). The "core inquiry" in such a challenge is "whether the proposed agency rule is a lawful extension of the statute under which the agency purports to act." *VanDerStok* v. *Garland*, 86 F.4th 179, 188 (5th Cir.

11

2023).  The APA further directs that agency rulemakings be set aside if they are "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  A court's review is "searching and careful," and requires that an agency "examine the relevant data and articulate a satisfactory explanation for its action."  *University of Tex. M.D. Anderson Cancer Ctr.* v. *HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (citations omitted).

ARGUMENT

## I.     THE NONCOMPETE RULE EXCEEDS THE COMMISSION'S STATUTORY AUTHORITY.

The FTC Act does not authorize the Noncompete Rule for three independent reasons.  First, as this Court correctly concluded, no provision of the FTC Act empowers the Commission to issue substantive unfair-competition rules.  The Commission relies on Section 6(g), but that ancillary provision does not authorize the Commission's expansive and unprecedented claim of regulatory power.  Second, Section 5 of the FTC Act cannot be read to allow the Commission to outlaw all noncompete agreements.  The Commission's contrary interpretation is divorced from history and precedent and would mean that Congress unconstitutionally delegated its authority to the Commission.  Third, at a minimum, the FTC Act does not authorize the Commission to retroactively invalidate millions of existing noncompetes.

12

## A.    The Commission Lacks The Authority To Prohibit Unfair Methods Of Competition Through Rulemaking (Count I).

As the Court correctly concluded at the preliminary-injunction stage, Congress has never authorized the Commission to issue substantive regulations respecting unfair methods of competition. That is plain on the face of the FTC Act. And even if the statute were not clear, the major-questions doctrine prevents the Commission from relying on a minor provision of the Act to fundamentally alter the American economy.

### 1.    Section 6(g) of the FTC Act does not authorize substantive rulemaking.

"Agencies do not have unlimited power to accomplish their policy preferences until Congress stops them; they have only the power that Congress grants through a textual commitment of authority." Op. 19. Congress has never provided the Commission with general, freestanding authority to issue regulations that bind the public. Unlike other agencies that Congress has authorized to write substantive rules addressing all matters under their jurisdiction, the Commission was not established as a rulemaking body. Instead, Congress gave it the power to (i) pursue individual enforcement and (ii) investigate potential wrongdoing and publish reports. Although Congress has since vested the Commission with specific rulemaking authority over certain matters, it has never done so for "unfair methods of competition."

a.    The Commission claims to have found general rulemaking authority in a single clause tucked within a provision setting forth its investigative powers.  Section 6(g) authorizes the Commission to "[f]rom time to time classify corporations and . . . *make rules and regulations for the purpose of carrying out the provisions of [the Act]*."  15 U.S.C. § 46(g) (emphasis added).  By its plain text, "Section 6(g) . . . does not expressly grant the Commission authority to promulgate substantive rules."  Op. 14.  And that provision is markedly different from other statutes that for centuries have expressly provided agencies with the power to issue binding substantive rules.  Op. 15; *see, e.g.*, Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22, 26 (authorizing an agency to "establish regulations" that "shall be binding" on private parties).  To authorize legislative rulemaking, Congress also has historically prescribed sanctions for violations of the agency's rules, confirming that those rules create substantive obligations for regulated parties.  *See, e.g.*, Longshoremen's and Harbor Workers' Compensation Act, ch. 509, Pub. L. 69-803, 44 Stat. 1424 (1927); *see also Report of the Att'y Gen.'s Comm. on Admin. Pro.* 27 (Jan. 22, 1941) (AG Report) ("[T]he striking characteristic of the legislation [authorizing] substantive regulations . . . is that it attaches sanctions to compel observance of the regulations."); Merrill & Watts, *supra*,

14

at 494-495.  By contrast, when a rulemaking provision does not indicate that the agency may issue substantive regulations that will bind the public—as is true of Section 6 of the FTC Act—the provision is "simply a grant of authority to the agency to regulate its own affairs."  *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 309 (1979).

The surrounding context confirms that Section 6(g) does not give the Commission substantive rulemaking authority.  *See Utility Air Reg. Grp.* v. *EPA*, 573 U.S. 302, 321 (2014).  Section 6(g) begins with the power to "[f]rom time to time classify corporations."  Congress did not slip in substantive rulemaking authority over all business practices in the American economy after first granting that mundane power.

Moreover, "the location of the alleged substantive rulemaking authority is suspect."  Op. 16.  Section 6(g) is the seventh in a list of twelve lettered subsections setting forth "[a]dditional powers" of the Commission, which largely consist of investigative authorities to request information and produce reports.  Section 6 does not mention Section 5 or any other substantive authority.  And it provides no standards to guide the Commission—like the "public interest" standard that applies to enforcement actions under Section

15

5. 15 U.S.C. § 45(b). All of that makes sense only if Section 6(g) does not confer the power to issue substantive rules.

b.    The FTC Act's history confirms that Section 6(g) does not provide substantive rulemaking authority. Section 6 emerged from an agreement between those in Congress who wanted the FTC to pursue its own enforcement actions (ultimately reflected in Section 5) and those who wanted the FTC to serve as a purely investigative body (reflected in Section 6). *See* pp. 11-12, *supra*. Neither camp even suggested giving the Commission the power to issue substantive rules.

In fact, both during and after the Act's passage, all three Branches expressly stated their view that the Commission *lacked* rulemaking authority. Representative Covington advocated for the FTC Act by arguing that the Commission would "not be exercising power of a legislative nature." Merrill & Watts, *supra*, at 506 (quoting 51 Cong. Rec. 14,932 (1914)). Shortly after the law was passed, the Commission itself wrote to Congress that "[o]ne of the most common mistakes is to suppose that the [Commission] can issue orders, rulings, or regulations unconnected to any proceedings before it." *Id.* (quoting Annual Report of the Federal Trade Commission 36 (1922)). That understanding was echoed by Attorney General Jackson in his Final Report

16

on the APA. *See id.* And in resolving a constitutional challenge to the Commission's structure in 1935, the Supreme Court explained that Section 6 only authorized the Commission to "mak[e] investigations and reports thereon for the information of Congress." *Humphrey's Executor* v. *United States*, 295 U.S. 602, 627-628 (1935); *see Seila Law LLC* v. *CFPB*, 140 S. Ct. 2183, 2200 (2020). The consensus understanding has long been that Section 6(g) does not authorize substantive rules.

      c.    Subsequent amendments to the FTC Act provide further confirmation that Section 6(g) does not grant the Commission general substantive rulemaking authority. First, Congress has enacted a series of targeted amendments to the FTC Act that expressly allow rulemaking related to specific subjects, like product labeling or dangerous items in the marketplace. *See, e.g.*, Pub. L. 90-189, § 4 (1967). "If Section 6(g) had already given the Commission . . . substantive rulemaking power, these amendments would be superfluous." Op. 18.

      Second, in the Magnuson-Moss Act of 1975, Congress granted the Commission rulemaking authority related to "unfair or deceptive acts and practices"—but *not* "unfair methods of competition." 15 U.S.C. § 57a(a); *see* Op. 19 (Magnuson-Moss does not contain "an affirmative grant of substantive

17

rulemaking authority" related to "unfair methods of competition"). Congress also imposed procedural requirements before the Commission could issue any rules under that statute. *See, e.g.*, 15 U.S.C. § 57a(b)(2) (requiring "advance notice" of the proposed rule to a congressional committee). It is implausible that Congress would have expressly granted substantive rulemaking authority subject to procedural hurdles for "unfair and deceptive acts or practices," while implicitly allowing the Commission to make binding "unfair method of competition" rules at will. *See Statement of Commissioner Melissa Holyoak,* In the Matter of the Non-Compete Clause Rule, at 12-13 (Apr. 23, 2024) (Holyoak Dissent) (noting that the Commission's interpretation results in "the strange situation where Congress would impose heightened requirements for *unfair* acts or practices rulemaking while leaving undisturbed *unfair* methods of competition rulemaking").

Third, Congress revisited the Commission's rulemaking authority in 1994, codifying the substantive analysis the agency must undertake when defining "unfair or deceptive acts and practices." *See* Pub. L. 103-312, § 9; S. Rep. 103-130 at 12. Again, Congress gave no indication that it believed the Commission could issue rules defining "unfair methods of competition."

*See* H.R. Rep. 103-138, at 4 (Commission's authority related to "unfair methods of competition is "limited . . . to case-by-case adjudication").

      d.    All of that is enough to reject the Commission's claim of rulemaking authority. Op. 14-20. But any doubt about the meaning of Section 6(g) is resolved by the major-questions doctrine. It is hard to imagine a more major question than whether an agency may assert rulemaking authority to decide what constitutes fair competition throughout "'a significant portion of the American economy'—indeed, nearly the entire economy." *Dissenting Statement of Andrew N. Ferguson*, In the Matter of the Non-Compete Clause Rule 12 (June 28, 2024) (Ferguson Dissent). This case shows how vast that power is: by a vote of 3-2, the Commission has overridden the laws of all 50 States and declared tens of millions of noncompete agreements unenforceable, no matter the ends they serve or what benefits employees bargained for or received. And of course if the Commission may declare that all noncompetes are unfair methods of competition, it may take the same approach to any other business practice. The Commission does not have anything remotely resembling clear congressional authorization to assert powers of such vast "political and economic significance." *Biden*, 55 F.4th at 1033; *see NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022).

If more were needed, the Commission has "claim[ed] to discover" this "unheralded power" in a "long-extant statute." *Biden*, 55 F.4th at 1033. Section 6(g) is tucked away in a corner of the FTC Act that relates to investigative powers, and it includes no reference to any substantive power of the Commission. The Commission understood Section 6(g)'s limited scope for decades, and "explicitly disclaimed substantive rulemaking authority . . . for the first forty-eight years of its existence." Op. 17. To be sure, the Commission experimented with a short-lived effort to issue substantive rules in the 1960s and 1970s. *See* 89 Fed. Reg. 38,349-38,350. But that experiment prompted Congress to clarify the Commission's rulemaking authority through the Magnuson-Moss Act, which conferred such authority *only* for unfair or deceptive acts or practices. Since that time, the Commission has never relied on Section 6(g) as granting substantive rulemaking authority—until now. Op. 17.

> ### 2.     The Commission's counterarguments are meritless.

In opposing preliminary relief, the Commission all but ignored the original meaning of the FTC Act, arguing instead that Congress had supposedly ratified a single D.C. Circuit decision endorsing its claim of

rulemaking authority. ECF No. 82, at 16-17, 21 (citing *National Petroleum Refiners* v. *FTC*, 482 F.2d 672, 674 (D.C. Cir. 1973)).

This Court rightly rejected the Commission's "piecemeal attempt" to cobble together "rulemaking authority that Congress has not affirmatively granted." Op. 19. As the Court explained, neither Magnuson-Moss nor the FTC Improvements Act of 1980 authorizes rulemaking under Section 6(g). Op. 18-19; *see* Holyoak Dissent, at 14 (explaining that "[t]he amendments [to the FTC Act] tell us nothing about the original meaning of Section 6 when enacted in 1914"). And the Commission's claim of authority is undermined by the fact that, "from 1978 until the enactment of the Non-Compete Rule, the Commission did not promulgate a single *substantive* rule under Section 6(g)." Op. 17.

The Commission's ratification argument also misunderstands the law. Courts interpret statutes to ratify judicial interpretations only when there is a "judicial consensus so broad and unquestioned that [courts] must presume Congress knew of and endorsed it." *Jama* v. *ICE*, 543 U.S. 335, 349 (2005). A single court of appeals decision obviously falls short of that standard. *See BP P.L.C.* v. *Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021) ("It seems most unlikely to us that a smattering of lower court opinions could ever

21

represent the sort of 'judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it.'") (quoting *Jama*, 453 U.S. at 349).

The Commission's prior attempts to side-step the major-questions doctrine are also meritless. At the preliminary-relief stage, it argued that the doctrine does not apply to the question whether Section 6(g) authorizes substantive unfair-competition *rules* because the Act elsewhere authorizes individual unfair-competition *enforcement actions*. But there is a massive difference between a blanket ban on conduct that has been lawful for centuries and case-by-case, fact-specific enforcement actions. The Commission acknowledged as much in its briefs, repeatedly invoking the need for a clear, "bright-line rule" regarding noncompete agreements. ECF No. 82, at 34.

The Commission's remaining arguments are equally unavailing. It suggests that the major-questions doctrine is inapplicable because "the Rule is consistent with the Commission's purpose in preventing unfair methods of competition." ECF No. 82, at 23. But the Supreme Court has frequently invoked the doctrine when an agency is acting within its usual field. *See, e.g.*, *West Virginia* v. *EPA*, 597 U.S. 697, 724 (2022) (regulation of air pollutants). And if the Commission could avoid the major-questions doctrine by simply

22

citing its authority over "unfair methods of competition"—even in situations where, as here, the conduct in question has never once been found by a court to violate the FTC Act—the major-questions doctrine would be a dead letter.

### B. The Commission's Classification Of All Noncompetes As "Unfair Methods of Competition" Is Contrary To Section 5 (Counts II and III).

Even if the Commission had authority to make rules governing "unfair methods of competition" under Section 6(g), the Noncompete Rule is still unlawful. It has long been settled that to constitute an "unfair method of competition" under Section 5, the conduct at issue must harm competition more than help it. Some individual noncompete agreements may impose harms that are not outweighed by procompetitive benefits, but plainly not all of them do. The Commission cannot simply declare all noncompetes *per se* unlawful under Section 5. Accordingly, although this Court found it unnecessary to address this argument at the preliminary-injunction stage, it provides an independent reason to set aside the Rule.

1. "It is the function of the court[s] to determine the scope" of the phrase "unfair methods of competition." *E.I. Du Pont de Nemours & Co.* v. *FTC*, 729 F.2d 128, 136 (2d Cir. 1984) (*Ethyl*). To distinguish "anticompetitive" from "legitimate conduct," *id.*, courts have consistently required the

Commission to prove in each case that the challenged conduct (i) produces anticompetitive effects, *see, e.g.*, *North Tex. Specialty Physicians* v. *FTC*, 528 F.3d 346, 362-363 (5th Cir. 2008); *Ethyl*, 729 F.2d at 141; and (ii) is not offset by procompetitive justifications, *see, e.g.*, *Impax Labs., Inc.* v. *FTC*, 994 F.3d 484, 497 (5th Cir. 2021); *Ethyl*, 729 F.2d at 140; *see also* Milner, *Defining Unfair Methods of Competition in the Federal Trade Commission Act*, 2023 Wisc. L. Rev. 109, 114 (explaining that, at the time of the FTC Act's passage, the phrase "unfair methods of competition" was meant to capture "actions that appeared to inflict losses on rivals or impede their entry into a market without any offsetting justification"). Under this settled interpretation of Section 5, in order to show that *all* noncompete agreements constitute "unfair methods of competition," the Commission had to show that *all* noncompete agreements cause competitive harm that is not outweighed by procompetitive benefits.

The Commission did not even try to make that showing. Instead the Commission argued that noncompetes harm competition in the *aggregate*. *See* 89 Fed. Reg. 38,379-38,380. But courts have correctly rejected attempts to establish Section 5 violations by relying on that type of aggregated approach. *See, e.g.*, *Boise Cascade Corp.* v. *FTC*, 637 F.2d 573, 582 (9th Cir. 1980) ("[T]o

24

allow a finding of a Section 5 violation on the theory that the mere widespread use of [a] practice[] makes it [unlawful] would blur the distinction between guilty and innocent commercial conduct."). If some noncompetes harm competition and others do not, only the former are "unfair methods of competition" prohibited by Section 5. *See Snap-On Tools Corp.* v. *FTC*, 321 F.2d 825, 837 (7th Cir. 1963).

The Commission similarly did not attempt to show that the supposed anticompetitive effects of noncompetes are not offset by procompetitive benefits—such as promoting specialized training or protecting businesses' sensitive information. Under Section 5, if the procompetitive benefits of a defendant's conduct outweigh its anticompetitive harm, that conduct is not unfair. *See 1-800 Contacts, Inc.* v. *FTC*, 1 F.4th 102, 114 (2d Cir. 2021). The Commission acknowledged that noncompetes serve many legitimate business interests, but it never attempted to show that those benefits were outweighed by the anticompetitive harms for every noncompete agreement prohibited by its Rule. 89 Fed. Reg. 38,422.

In opposing plaintiffs' request for preliminary relief, the Commission argued that Section 5 gives it the authority to prohibit noncompetes "as a class" because they "tend to" have "anticompetitive effects," regardless of

25

whether the particular agreements covered by the Rule cause "actual anticompetitive harm." ECF No. 82, at 25-26. The implications of that interpretation are staggering: if the Commission is right about the meaning of Section 5, then even without the Rule, it could pursue an enforcement action against any company with any noncompete agreement without proving that the defendants' conduct had any discernible effect on competition—let alone that it caused more harm than good. Nothing in Section 5's prohibition of "*unfair* methods of competition" permits that extraordinary interpretation. *See Pan Am. World Airways, Inc.* v. *United States*, 371 U.S. 296, 307 (1963) (explaining that Section 5 takes its "meaning from the facts of each case"); *see also* Ferguson Dissent, at 17-18.

2.    Again, if there were any doubt about the meaning of Section 5, several settled interpretive principles would resolve it. Courts "assume that Congress is aware of existing law" when it enacts a statute. *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Noncompete agreements date back to the Founding, and there is no indication that Congress in 1914 (or at any time thereafter) intended for the Commission to outlaw a common, well-accepted business practice. Moreover, Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power,"

26

*USFS* v. *Cowpasture River Preservation Assn.*, 590 U.S. 604, 622 (2020)—particularly when it is acting in an area of "traditional state regulation," *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 740 (1985). Here, States have regulated noncompete agreements since the beginning of the Republic, and federal law has had nothing to say on the subject. The Rule now overrides the laws of all 50 States, replacing case-specific or context-dependent judgments with a blunt federal rule.

In addition, as with its reading of Section 6, the Commission's interpretation of Section 5 runs headlong into the major-questions doctrine. By the Commission's lights, the Rule would affect every industry in America based on across-the-board generalizations of what practices a majority of Commissioners believes are "unfair." *See NFIB*, 595 U.S. at 117. And it would allow the agency to substitute its judgment for that of Congress, which has consistently declined to enact noncompete legislation for years, as well as the States, most of which have widely enforced noncompetes. *See West Virginia*, 597 U.S. at 731-732; *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021) (explaining that the major-questions doctrine applies when an agency "intrudes into an area that is the particular domain of state law"). Congress has not authorized any of this, let alone clearly.

27

3.      Finally, under the Commission's interpretation of "unfair methods of competition," Section 5 would unconstitutionally delegate legislative power. Because the Commission cannot show that *all* noncompetes cause unjustified competitive harm, the Rule relies on the Commission's interpretation of "unfair methods of competition" adopted in a 2022 Policy Statement.  *See* 89 Fed. Reg. 38,358.  Breaking with decades of case law interpreting Section 5, that Policy Statement says that the Commission may determine that conduct violates Section 5 any time it (i) is "undertaken by an actor in the marketplace," (ii) is "coercive, exploitative, collusive, abusive, deceptive, [or] predatory," and (iii) "tend[s] to negatively affect competitive conditions" by, for example, "impair[ing] the opportunities" of a competitor.  *Id.*; FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition* 8-9 (Nov. 2022) (Policy Statement).

If those vague requirements are all that is necessary to declare a business practice unlawful, then there are no meaningful guardrails on the Commission's power.  *See* Ferguson Dissent, at 28-32.  Indeed, the Commission goes so far as to claim that it can prohibit any conduct that violates "the spirit of the antitrust laws," so long as that conduct "limit[s] choice" or "impair[s] other market participants."  Policy Statement, at 9-10.

28

Understood that way, Section 5 lacks any "intelligible principle" to guide the Executive's discretion and amounts to an unconstitutional delegation of legislative power. *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019).

### C. The Commission's Rule Is Unlawfully Retroactive (Count IV).

At a minimum, the Commission's attempt to invalidate all existing noncompetes exceeds its authority. "Retroactivity is generally disfavored in the law, in accordance with fundamental notions of justice that have been recognized throughout history." *Eastern Enters.* v. *Apfel*, 524 U.S. 498, 532 (1998) (internal quotations omitted). In light of that core principle, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules." *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Agencies seeking to issue rules with retroactive effect must point to clear congressional authorization to do so. *Id.* And the question whether a regulation "operates retroactively demands a commonsense, functional judgment." *Martin* v. *Hadix*, 527 U.S. 343, 357-358 (1999).

The Commission did not attempt to identify a clear congressional authorization to engage in retroactive rulemaking. The Rule nonetheless voids nearly all existing noncompetes, even if the parties bargained for that

protection in return for valuable consideration. *See* 89 Fed. Reg. 38,439. For instance, a small business that shared vital proprietary information with or provided specialized training to an employee who signed a noncompete could not stop the employee from taking those secrets or training to a competitor. Ex. H, Appx. 66-67. Even assuming Section 6(g) authorizes the Commission to issue unfair-competition regulations, nothing in that provision blesses the Commission's attempt to retroactively unwind private contracts. This Court should avoid the serious questions that arise under the Fifth Amendment when the government imposes retroactive burdens that "deprive citizens of legitimate expectations and upset settled transactions." *Eastern Enters.*, 524 U.S. at 533.

## II.    THE NONCOMPETE RULE IS THE PRODUCT OF FLAWED DECISIONMAKING.

In addition to lacking statutory authority for the Noncompete Rule, the Commission violated the APA in adopting it. "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023). As the Court has already recognized, the Commission fell short of the APA's standard of reasoned decisionmaking in several ways.

30

## A.     The Rule's Categorical Ban Is Not Supported By Evidence.

1.     The Noncompete Rule imposes an "unreasonably overbroad," "one-size-fits-all approach" on businesses throughout the United States. Op. 21.  The Rule broadly defines "non-compete clause" to cover any "term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a work from . . . seeking or accepting work [or] operating a business" in the United States.  89 Fed. Reg. 38,502.  It draws no distinction between employees and independent contractors, and it applies to senior executives making millions per year.  89 Fed. Reg. 38,502.  It may even sweep in some non*disclosure* agreements that the Commission believes may "function" like a noncompete.  89 Fed. Reg. 38,364.  As the result of this categorical ban, no company may grant a researcher access to sensitive information or give a CEO a lucrative compensation package in return for the promise not to take the company's sensitive information to a competitor for a reasonable period of time.

"[T]he evidence on which the Commission relies is nowhere near sufficient to justify this sweeping rule."  Ferguson Dissent, at 37.  To defend its categorical ban, the Commission principally relied on a handful of studies that examined the economic effects of various state policies toward

31

noncompetes.  *See* 89 Fed. Reg. 38,372-38,373.  But as the Court recognized, those studies provide no support for the Commission's nationwide ban.  First, none of the studies shed any light on the wisdom of the Commission's policy because "no state has ever enacted a non-compete rule as broad as the" Noncompete Rule.  Op. 21.  Even California defines noncompetes more narrowly than the Commission.  *Compare* Cal. Bus. & Prof. Code § 16600 (prohibiting contracts that "restrain[]" a person "from engaging in a lawful profession") *with* 89 Fed. Reg. 38,502 (defining noncompetes as any agreement that "functions to prevent" a worker from "seeking or accepting work" or "operating a business").

Second, many of the studies relied on by the Commission focus on the effects of policies that target specific industries or income levels.  *See* 89 Fed. Reg. 38,380-38,390.  For instance, the Commission pointed to:

- A study examining an Oregon law that applied only to hourly workers, *see* Lipsitz & Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022);

- A study examining a Hawaii law that applied only to technology workers, *see* Balasubramanian, et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (2022);

- A study examining the effects of state laws on the earnings of physicians, *see* Lavetti, Simon, & White, *The Impacts of*

32

> *Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020); and
>
> - A study examining the effects of state law on the entrepreneurship of low-wage workers, *see* Can & Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. Entrepreneurship & Pub. Pol. 223 (2022).

But again, the effects of these narrowly targeted policies say nothing about the effects of the Rule. The Commission did not adopt a regulation that applies to only hourly workers, the technology sector, or physicians—it adopted a total ban that applies to low-wage workers and CEOs alike. And nothing in the studies of targeted policies remotely suggests that a categorical ban would be preferable. Evidence supporting the benefits of lower speed limits provides no support for a rule banning cars from the road entirely.

Third, the Commission never explained why it was appropriate to extrapolate findings from studies of particular States to the entire national economy—and the studies themselves warn against doing so. One study extensively cited by the Commission acknowledged the difficulty of drawing general conclusions from its state-specific findings. Balasubramanian, *supra*, at 11-12 (noting that "Hawaii's labor market is geographically isolated, which raises concerns about the potential generalizability of the findings"). Another explained that state-specific analysis of noncompetes "presents both empirical

33

and inferential challenges" because of the limited data available to compare states to one another.  Lipsitz, *supra*, at 163, n.16.  The Commission nonetheless defends its reliance on state-level studies by arguing that they are more reliable than other evidence.  89 Fed. Reg. 38,373.  But even if that were true, the Commission still needs evidence that *actually supports* the policy it adopted—particularly one of such "great consequence" to the national economy. *Massachusetts ex rel. Div. of Marine Fisheries* v. *Gutierrez*, 594 F. Supp. 2d 127, 131 (D. Mass. 2009).

Without any relevant studies, the Commission has no other reasoned basis for imposing a sweeping ban on noncompetes.  The Commission mentions its supposed "experience and expertise in competition matters," 89 Fed. Reg. 38,346, but the Commission had no enforcement record whatsoever related to noncompetes before 2023.  *See* 89 Fed. Reg. 38,353 n.215; Ferguson Dissent, at 31 (discussing "the three enforcement actions the Commission ginned up the day before this rulemaking began").  The Commission's "conclusory assertions of agency 'expertise'" thus cannot justify its Rule. *Northern Spotted Owl* v. *Hodel*, 716 F. Supp. 479 (W.D. Wash. 1988); *see Baltimore & O.R. Co.* v. *Aberdeen & Rockfish R. Co.*, 393 U.S. 87, 92 (1968)

(warning against judicial review becoming "lost in the haze of so-called expertise").

2.    Not only did the Commission provide no affirmative support for its categorical ban, but it also failed to refute the extensive evidence showing that reasonable noncompetes promote competition.  With respect to judicial decisions, as explained above, the Commission has not identified a single case suggesting that a noncompete is an "unfair method of competition" or violates federal antitrust laws.  On the contrary, many judicial decisions rejecting challenges to noncompete agreements have explained their procompetitive benefits. *See* pp. 7-8, *supra*.

The Commission also failed to genuinely grapple with the extensive body of literature finding that reasonable noncompetes benefit the economy.  For example, one study found that the absence of post-employment restrictions led to higher rates of misconduct among financial brokers and higher prices for consumers.  89 Fed. Reg. 38,445.  Another found that noncompetes lead to more efficient allocation of patients among physicians.  89 Fed. Reg. 38,398.  The Commission offered no sound basis for disregarding this evidence.  Instead, it "cherry-picked evidence that conform[ed] to [its] narrative" by emphasizing findings that supported its policy while dismissing findings that

did not.  88 Fed. Reg. 3,482, 3,543 (Jan. 19, 2023) (Commissioner Wilson, dissenting).  Incredibly, the Commission applied this exercise in confirmation bias to the *very same study*:  the Commission repeatedly cited a 2014 survey to support its claim that employers try to use unenforceable noncompetes, but then dismissed other portions of that same study finding that employees offered noncompetes received higher pay and increased training opportunities.  *Compare* 89 Fed. Reg. 38,466 *with* 89 Fed. Reg. 38,430.

3.     At the preliminary-injunction stage, the Commission barely defended its treatment of the evidence, arguing in a single sentence (at 34) that the benefits of eliminating noncompetes are supposedly "linear," making it "reasonable to extrapolate" that a nationwide ban would have the same benefits as more targeted policies.  That reasoning does not hold water.  If, as courts, legislatures, and economists have recognized for centuries, some noncompetes are harmful and some are beneficial, then there is no reason to assume that banning a reasonable noncompete for a CEO would have the same effect as banning noncompetes for low-wage workers.  Yet that is exactly what the Commission assumed throughout the Noncompete Rule.  Here again, one of the Commission's preferred studies was later revised to note the "strong assumption" required for exactly that sort of "extrapolation."  *Compare*

36

Johnson, Lavetti & Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*, NBER Working Paper Series (2023), at 18 n.33 *with* Johnson, Lavetti & Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*, SSRN (2021), at 19.

The Commission also suggested (at 35) that a sweeping ban is appropriate because it offers more "clarity" and makes it easier for the Commission to pursue enforcement actions. That is a dangerous rationale. Federal agencies cannot choose to ban all forms of conduct because they believe an overbroad uniform approach is more convenient than a more limited, targeted one. *Delaware Dept. of Nat. Res. and Env't Control* v. *E.P.A.*, 785 F.3d 1, 17 (D.C. Cir. 2015), as amended, (July 21, 2015) (finding rule arbitrary and capricious where "the only rationale provided for a national rule was a vague desire for uniformity" and where agency "did not address why a more limited rule would not achieve the same outcome"). In any event, it is hard to see how the Commission's vague "functional" test for identifying what may constitute a noncompete could possibly meet any objective other than increasing the Commission's regulatory power over private businesses.

**B.    The Rule Unjustifiably Brushes Aside Superior Alternatives.**

The Commission also flunked the APA's requirement that it adequately explain why it adopted its chosen rule over "obvious and less drastic alternative[s]," *Yakima Valley Cablevision, Inc.* v. *FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986), particularly when those alternatives were "obvious[ly] respons[ive] to the concerns expressed by the" Commission. *International Ladies' Garment Workers' Union* v. *Donovan*, 722 F.3d 795, 817 (D.C. Cir. 1983).

During the notice-and-comment process, many commenters advocated replacing the Rule's categorical ban with a case-by-case approach. That proposal was consistent with state courts' longstanding approach to assessing noncompetes and the economic literature showing that noncompetes are often procompetitive, and it also mapped onto the Commission's own historical practice in enforcing Section 5 violations. But the Commission rejected that alternative, arguing that a case-by-case approach would not allow enforcers to address the use of noncompetes "in the aggregate." 89 Fed. Reg. 38,463. Tellingly, that argument effectively concedes that many agreements would be enforceable under a case-by-case test. 89 Fed. Reg. 38,464. Yet the Commission made no attempt to explain why it was sensible to wipe out

38

potentially millions of agreements that even the Commission does not think would harm competition.

Commenters also proposed a host of other alternatives that would have limited the harmful effects of the Rule.  For example, Plaintiff U.S. Chamber proposed amending the Rule to exclude independent contractors and severance agreements.  *See* U.S. Chamber of Commerce Comment Letter on Non-Compete Clause Rule 44-45 (Apr. 17, 2023).    And healthcare organizations requested exemptions for healthcare professionals, doctors, and senior hospital executives.  *See* Stamford Health Comment Letter on the Non-Compete Clause Rule 5 (Apr. 1, 2023).  Here again, the Commission summarily rejected each of these proposals based on little more than *ipse dixit*—"merely concluding," without any reasoned analysis, "that either the pro-competitive justifications outweighed the harms, or that employers had other avenues to protect their interests."  Op. 23; *see, e.g.*, 89 Fed. Reg. 38,444 (declining to exclude certain "client- or sales-based industries" from the Rule because the "purported justifications [for those exceptions] . . . do not change the Commission's finding").  Particularly given the breadth and staggering impact of the Noncompete Rule, the Commission's casual dismissal of these

reasonable alternatives does not pass muster under the APA. *See Southwestern Elec. Power Co.* v. *EPA*, 920 F.3d 999, 1030 (5th Cir. 2019).

### C. The Rule's Cost-Benefit Analysis Is Deeply Flawed.

"[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *National Ass'n of Home Builders* v. *EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). The Commission's cost-benefit analysis is replete with "serious flaw[s]" on both sides of the ledger.

First, the Commission significantly downplayed the costs of its Rule. The Commission waved away the litigation costs that businesses are certain to incur when relying on trade-secret suits to protect their information, asserting that those costs "are not quantifiable." 89 Fed. Reg. 38,470. And it dismissed the cost of businesses' inability to protect their confidential information, assuming (without evidence or analysis) that firms can rely on other tools like nondisclosure agreements to achieve a similar level of protection, *id.* at 38,494—despite having expressly defined noncompetes broadly enough to sweep in at least some nondisclosure agreements, *id.* at 38,364-38,365. The Commission cannot simultaneously claim that nondisclosure agreements are

a viable tool to offset the costs of the Rule while also adopting a regulation that would invalidate many of them.

The Commission also "fail[ed] to consider the positive benefits of non-compete agreements" outlawed by its Rule.  Op. 22.  The Rule contains passing references to those benefits of noncompetes, including "lower prices" for consumers and increased training opportunities.  But the Commission never accounts for the costs of extinguishing those benefits in any serious way. *See* 89 Fed. Reg. 38,398 (dismissing evidence showing that noncompetes lead to lower prices because "non-competes may also have several countervailing effects that would tend to increase prices"); *id.* at 38,468 (dismissing the benefits of increased training opportunities).

Second, the Commission's assessment of the benefits that would purportedly flow from outlawing all noncompetes was equally flawed.  As discussed above, the supposed benefits the Commission identified came largely from studies examining the economic effects of different State policies, even though no State has ever adopted a policy as restrictive as the Noncompete Rule.  Moreover, those studies are based on methodological flaws that were thoroughly explained to the Commission during the comment period.  *See, e.g.*, Kristina M. L. Acri *et al.*, Comment Letter on Non-Compete

Clause Rule 1-2 (April 19, 2023).  And the studies rely on stale data; even the Commission acknowledged that many of its conclusions were based on datasets that ended in 2009 or 2014.  *See* 89 Fed. Reg. 38,473, 38,475 n.1113. Finally, the Commission failed to appreciate that changes to state law call into question the rationale for a categorical ban in the first place: If current state laws are already weeding out unreasonable noncompetes, there is no benefit to a federal rule that also wipes out reasonable, procompetitive noncompetes.

## III.  The Noncompete Rule Should Be Set Aside.

Because the Noncompete Rule violates the law in numerous respects, it must be "set aside" under the APA.  5 U.S.C. § 706.  At a minimum, even if a more limited remedy were available under the APA, plaintiff-intervenors are entitled to relief preventing the Commission from enforcing the Noncompete Rule against their members.

### A.    The Noncompete Rule Must Be Vacated.

In the Fifth Circuit, "vacatur of an agency action is the default rule." *Cargill* v. *Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406 (2024); *see Chamber of Commerce* v. *SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023).  Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc.* v. *Becerra*, 47 F.4th 368, 374-375 (5th Cir. 2022).  Importantly, vacatur "is not party-

42

restricted": when an agency rule is "set aside" or deemed "invalid," "it may not be applied to anyone." *Career Colls. & Schs. of Tex.* v. *U.S. Dep't of Ed.*, 98 F.4th 220, 255 (5th Cir. 2024) (quoting Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121, 1173 (2020)); *see In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) ("Should plaintiffs prevail on their APA challenge, this court must 'set aside' CFTC's ultra vires rescission action, with nationwide effect."). Accordingly, if the Court holds that the Commission violated the APA in adopting the Noncompete Rule, it must set aside the Rule so that it cannot be applied to anyone.

The Fifth Circuit's recent decision in *Braidwood Mgm't, Inc.* v. *Becerra* is not to the contrary. In fact, the *Braidwood* Court reaffirmed that, in APA cases such as this one, "'a reviewing court *shall*' set aside unlawful agency action" in an order that "has nationwide effect" and "is not party-restricted," rejecting the government's argument that it was "require[d]" to "consider[] the various equities at stake before determining whether a party is entitled to a vacatur." 104 F.4th 930, 951-952 (5th Cir. 2024) (citing *Career Colls.*, 98 F.4th at 255) (footnotes and quotation marks omitted). The Fifth Circuit held that those well-established principles did not apply in *Braidwood* only because the plaintiffs there *had not pursued an APA claim*. *Id.* Because plaintiffs' claims

43

in *this* case all arise under the APA, vacatur is the appropriate remedy under Fifth Circuit law and is not limited to the parties.

### B.    Plaintiff-Intervenors Are Entitled To Relief For All Of Their Members.

Because the Fifth Circuit requires vacatur as the remedy in suits brought under the APA, there is no need to consider whether plaintiff-intervenors have satisfied the traditional requirements for permanent relief. But if the Court reaches that question, plaintiff-intervenors are entitled to a remedy that protects their members from the Commission's unlawful regulation.   First, under foundational principles of associational standing, plaintiff-intervenors have satisfied all of the requirements necessary to seek relief on behalf of their members, so that those members may benefit from any order "setting aside" the Noncompete Rule.  And second, plaintiff-intervenors have satisfied all of the traditional requirements for a permanent injunction.

1.     It is well established that associations can pursue claims on behalf of their members and, when those claims are successful, obtain a remedy that includes their membership.  *See Warth*, 422 U.S. at 515; *Association of Am. Physicians & Surgeons, Inc.* v. *Texas Med. Bd.*, 627 F.3d 547, 550-551 (5th Cir. 2010) (*AAPS*).  Courts thus regularly grant plaintiff-associations relief that extends to their full membership.  *See, e.g.*, *Career Colleges*, 98 F.4th at

44

255; *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2024 WL 1349307, at *6-7, 12 (N.D. Tex. Mar. 29, 2024) (enjoining federal officials from enforcing a rule "against the NRA's members"); *Casa de Maryland, Inc.* v. *Wolf*, 486 F. Supp. 3d 928, 972 (D. Md. 2020) (same).  And on summary judgment in suits like this one—where an association brings suit "solely as the representative of its members," rather than to prevent "injury to itself," *AAPS*, 627 F.3d at 550—an injunction or other remedy protecting the association's members is the only way to afford the plaintiff-association any meaningful remedy.

Plaintiff-intervenors have established associational standing in this case. An association has standing to sue on behalf of its members when (i) it seeks to protect interests that "are germane to the organization's purpose," (ii) its members "have standing to sue in their own right," and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Each of those requirements is readily satisfied here, and the Commission has never contended otherwise.

First, as alleged in their Complaint, plaintiff-intervenors are "committed to protecting the interests of [their] members . . . and regularly

advocate[] for reforms that reduce . . . regulatory burdens." Compl. ¶ 34 (ECF No. 37). And they supported that allegation with detailed declarations about the purpose and mission of each organization. *See* Ex. B, Appx. 7 (Texas Association of Business); Ex. C, Appx. 15, 17 (Longview Chamber of Commerce); Ex. D, Appx. 25-26 (Chamber of Commerce of the United States of America); Ex. G, Appx. 52-53 (Business Roundtable); *see also Speech First, Inc.* v. *Fenves*, 979 F.3d 319, 326, 331 (5th Cir. 2020) (relying on a declaration submitted by the association plaintiff); *Clinkscales* v. *Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987) (explaining that "affidavits appended to appellant's motion for a preliminary injunction were . . . properly before the district court" when it "ruled on the summary judgment motions").

Second, plaintiff-intervenors have demonstrated that their members will suffer concrete harms as a result of the Noncompete Rule. *See* Ex. B, Appx. 8-9; Ex. C, Appx. 16-18; Ex. D, Appx. 27-30; Ex. G, Appx. 53-56; *see also* Ex. E (Highland Landscaping) Appx. 35, 37-39; Ex. F, Appx. 43, 46-48 (Alloy Precision Technologies); Ex. H, Appx. 66-68 (Citadel Enterprise) (declarations from three of plaintiff-intervenor U.S. Chamber's members describing the harms caused by the Noncompete Rule). Accordingly, plaintiff-intervenors' members would have standing to sue in their own right. *See FDA* v. *Alliance*

*for Hippocratic Medicine*, 602 U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements.").

Third, under Fifth Circuit precedent, plaintiff-intervenors' claims for declaratory and injunctive relief do not require the participation of any individual members.  *See AAPS*, 627 F.3d at 552 (explaining that the participation of members was not required "as long as the resolution of the claims benefits the association's members and the claims can be proven by evidence from representative injured members").  And the Commission has never disputed plaintiff-intervenors' standing to challenge the Noncompete Rule on behalf of their members.  *See* Op. 31 n.14.

2.     Plaintiff-intervenors also satisfy the requirements for a permanent injunction.  After establishing success on the merits, plaintiff-intervenors are entitled to a permanent injunction if they can demonstrate "that a failure to grant the injunction will result in irreparable injury[,] that said injury outweighs any damage that the injunction will cause the opposing party[,] and . . . that the injunction will not disserve the public interest." *Valentine* v. *Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *Anatol Zukerman & Charles Krause Reporting, LLC* v. *USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023)

47

(explaining that the defendant's and public's interest merge when "the defendant is the government").

This Court has already explained the irreparable harm that plaintiff-intervenors' members will suffer if forced to comply with the Noncompete Rule. Op. 25-26 (describing plaintiff-intervenors' evidence of harm and discussing the Rule's compliance burdens); *see e.g.*, Ex. D, Appx. 28 ("administrative and labor costs" associated with the Rule and costs of finding new ways to protect "confidential information and workforce investments"); Ex. G, Appx. 56 (costs associated with removing incentives to "invest in specialized or substantial on-the-job training"); Ex. E, Appx. 38 (costs associated with the uncertainty of the Rule including with respect to nondisclosure and nonsolicitation agreements); Ex. F, Appx. 45-47 (value of "secret technologies and proprietary information" and developing "employee training opportunities"). And it explained that the Rule harms the public interest by "mak[ing] unenforceable long-standing contractual agreements that have been judicially recognized as lawful and beneficial." Op. 28. With respect to the public interest, the Fifth Circuit has made clear that the public interest is always harmed by "the perpetuation of unlawful agency action." *Texas* v. *Biden*, 10 F.4th 538, 560 (5th Cir. 2021). Accordingly, if the

48

Noncompete Rule is not vacated, permanent relief is necessary to remedy the harms it will cause.

Because plaintiff-intervenors have established associational standing and have carried their burden to obtain a permanent injunction, that remedy should extend to "each member . . . whose interest the group[s] protect[]." Op. at 5, *Chamber of Commerce*, *supra*; *see, e.g.*, *National Rifle Ass'n of Am.*, 2024 WL 1349307, at *12; *Casa de Maryland*, 486 F. Supp. 3d at 972. For that reason, another district court assessing the very same claims has already rejected the Commission's request to "limit any relief that may issue in this case" to only a subset of plaintiff-intervenors' members, reasoning that such a limitation would be "flatly contrary to case law allowing associational standing." Op. at 5, *Chamber of Commerce*, *supra*. Indeed, the whole purpose of the Noncompete Rule was to prohibit plaintiff-intervenors' members from entering into noncompete agreements. Because those members were the target of the regulation, they should be protected by this Court's remedy.

## CONCLUSION

Plaintiff-intervenors respectfully request that the Court grant their motion for summary judgment and set aside the Noncompete Rule.

49

Dated:  July 19, 2024

Respectfully submitted,

/s/ *Robert L. Sayles*

Jordan L. Von Bokern (D.C. Bar No. 1032962)
Tyler S. Badgley (D.C. Bar No. 1047899)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, D.C.  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
tbadgley@uschamber.com

Liz Dougherty* (D.C. Bar No. 457352)
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Washington, D.C. 20024
202-872-1260
ldougherty@brt.org

* *Pro hac vice* pending

Robert L. Sayles (Texas Bar No. 24049857)
Boyce Holleman (Texas Bar No. 24126727)
BRADLEY ARANT BOULT CUMMINGS LLP
1445 Ross Avenue
Suite 3600
Dallas, TX 75202
Tel: (214) 257-9800
Fax: (214) 939-8787
rsayles@bradley.com
bholleman@bradley.com

Jeffrey B. Wall (Georgia Bar No. 750427)
Judson O. Littleton (D.C. Bar No. 1027310)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com

*Counsel for Plaintiff-Intervenors Chamber of Commerce of the United States of America, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce*

## CERTIFICATE OF WORD COUNT

This Brief In Support of Motion for Summary Judgment complies with the Court's July 11 Order, ECF No. 163, because it contains 9,962 words.

/s/ *Robert L. Sayles*
Robert L. Sayles

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2024, I electronically transmitted the attached document to the Clerk of the Court and all counsel of record using the ECF System for filing and service in accordance with Local Rule 5.1.

/s/ *Robert L. Sayles*
Robert L. Sayles

51