# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC, <br><br> *Plaintiff,* <br><br> CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, and LONGVIEW CHAMBER OF COMMERCE, <br><br> *Plaintiff-Intervenors,* <br><br> v. <br><br> FEDERAL TRADE COMMISSION, <br><br> *Defendant.* | **Case No. 3:24-cv-986-E** |

**APPENDIX (APPX. 1 – APPX. 69) TO PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page*

Exhibit A: Relevant Statutory Provisions .............................................................1

Exhibit B: Declaration of Glenn Hamer, President and Chief Executive
Officer of Plaintiff Texas Association of Business.....................................5

Exhibit C: Declaration of Kelly R. Hall, President/CEO of Plaintiff Longview
Chamber of Commerce...............................................................................13

Exhibit D: Declaration of Glenn Spencer, Senior Vice President of Plaintiff
Chamber of Commerce of the United States of America.......................23

Exhibit E: Declaration of Ian MacLean, President of Highland Landscaping,
LLC...............................................................................................................33

Exhibit F: Declaration of Michael Canty, President and Chief Executive
Officer of Alloy Precision Technologies, Inc. ..........................................41

Exhibit G: Declaration of Elizabeth Dougherty, General Counsel and
Corporate Secretary of Plaintiff Business Roundtable .........................50

Exhibit H: Declaration of Gerald Beeson, Senior Managing Director and
Chief Operating Officer for Citadel Enterprise Americas Services
LLC...............................................................................................................58

# EXHIBIT A

**Appx. 1**

## RELEVANT STATUTORY PROVISIONS

Section 5 of the FTC Act, 15 U.S.C. § 45, provides in relevant part:

(a)     Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade

(1)     Unfair methods of competition in of affecting commerce, and unfair and deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

Section 6 of the FTC Act, 15 U.S.C. § 46, provides in relevant part:

The Commission shall also have the power ---

(a) Investigation of persons, partnerships, or corporations

To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.

(b) Reports of persons, partnerships, and corporations

To require, by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission

**Appx. 2**

within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

(c) Investigation of compliance with antitrust decrees

Whenever a final decree has been entered against any defendant corporation in any suit brought by the United States to prevent and restrain any violation of the antitrust Acts, to make investigation, upon its own initiative, of the manner in which the decree has been or is being carried out, and upon the application of the Attorney General it shall be its duty to make such investigation. It shall transmit to the Attorney General a report embodying its findings and recommendations as a result of any such investigation, and the report shall be made public in the discretion of the Commission.

(d) Investigations of violations of antitrust statutes

Upon the direction of the President or either House of Congress to investigate and report the facts relating to any alleged violations of the antitrust Acts by any corporation.

(e) Readjustment of business of corporations violating antitrust statutes

Upon the application of the Attorney General to investigate and make recommendations for the readjustment of the business of any corporation alleged to be violating the antitrust Acts in order that the corporation may thereafter maintain its organization, management, and conduct of business in accordance with law.

(f) Publication of information; reports

To make public from time to time such portions of the information obtained by it hereunder as are in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use: Provided, That the Commission shall not have any authority to make public any trade secret or any commercial or financial information which is obtained from any person and which is privileged or confidential, except that the Commission may disclose such information (1) to officers and employees of appropriate Federal law enforcement agencies or to any officer or employee of any State law enforcement agency upon the

**Appx. 3**

prior certification of an officer of any such Federal or State law enforcement agency that such information will be maintained in confidence and will be used only for official law enforcement purposes, and (2) to any officer or employee of any foreign law enforcement agency under the same circumstances that making material available to foreign law enforcement agencies is permitted under section 57b-2(b) of this title.

(g) Classification of corporations; regulations

From time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter.

(h) Investigations of foreign trade conditions; reports

To investigate, from time to time, trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants, or traders, or other conditions, may affect the foreign trade of the United States, and to report to Congress thereon, with such recommendations as it deems advisable.

(i) Investigations of foreign antitrust law violations

With respect to the International Antitrust Enforcement Assistance Act of 1994, to conduct investigations of possible violations of foreign antitrust laws (as defined in section 12 of such Act).

…

**Appx. 4**

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

RYAN, LLC,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION,

*Defendant.*

**Case No. 3:24-cv-986-E**

# DECLARATION OF GLENN HAMER, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF PLAINTIFF-INTERVENOR TEXAS ASSOCIATION OF BUSINESS

1

**Appx. 6**

Pursuant to 28 U.S.C. § 1746, I, Glenn Hamer, hereby declare as follows:

1.      I am the President and Chief Executive Officer of the Texas Association of Business ("TAB").  TAB's principal place of business is 316 West 12th Street #200, Austin TX 78701.

2.      I am offering this declaration in support of TAB in the above-captioned case.

3.      TAB is a general business association and state chamber of commerce.  TAB represents member companies, large and small, to advocate for a policy, legal, and regulatory environment that allows them to thrive in business.  TAB has worked alongside business and its chamber partners to represent companies of all sizes and sectors, advocating for policies, including in matters of federal competition and labor law, that help businesses grow and create jobs.

4.      TAB works in a bipartisan manner to deliver solutions to the challenges affecting Texas employers.  TAB's purpose is to champion the best business climate in the world, unleashing the power of free enterprise to enhance lives for generations.  In advancing this purpose, TAB seeks to preserve the ability of employers to enter into noncompete agreements that foster innovation and preserve competition.

2

**Appx. 7**

5.      I am aware that the Federal Trade Commission has now finalized the "Non-compete Clause Rule," Fed. Trade Comm'n, *Non-Compete Clause Rule*, RIN2084-AB74 (Apr. 23, 2024) (the "Rule"), which is the subject of the above-referenced case.  The Rule voids nearly all noncompete agreements and requires employers with existing noncompete agreements to issue notices that noncompete agreements cannot be enforced.

6.      Many Texas employers, including TAB members, have noncompete agreements with their employees and are affected by the Rule.

7.      Employers enter into noncompete agreements for a variety of purposes.  To give a few examples, an employer may enter into noncompete agreements in order to protect (1) sensitive, confidential and propriety information such as intellectual property, technologies or customer lists, (2) investments in employee training and development, or (3) acquired assets against competition from the seller.

8.      By rendering those agreements unlawful, the Rule threatens to have immediate and severe effects on Texas businesses.  Agreements will be rendered unenforceable, even if the member has already given valuable consideration for the agreement.  Employers with similar agreements, such as non-disclosure and non-solicitation agreements, will need to obtain the advice

**Appx. 8**

of counsel about whether those agreements remain enforceable and how they can maintain or modify them to fully protect their confidential and proprietary information. Employers will also have to begin the expensive and time-consuming process of notifying employees that their noncompete agreements cannot be enforced.

9.    If the Rule is not prevented from going into effect, businesses will incur unrecoverable costs to comply with the Rule, including attorney's fees, administrative and labor costs, and litigation expenses from defending against civil enforcement actions. In particular, businesses will need to make changes to their contracting practices in an effort to comply with the Rule, seek the advice of counsel about alternatives to protect their confidential information and workforce investments, and incur administrative and labor costs associated with issuing notices that noncompete agreements cannot be enforced and changing company policies. Other employers may be unwilling to purchase businesses and other assets without a guarantee that the seller will not immediately begin competing against them. And for businesses that opt to continue their current contracting practices, the Rule threatens to subject them to civil enforcement actions.

**Appx. 9**

10.     The Rule also creates uncertainties in industries that depend on noncompete agreements with highly-skilled and knowledgeable employees. As one example, many businesses use noncompete agreements when hiring senior executives.  Senior executives have access to confidential and competitively sensitive information and strategies, which could cause serious harm to businesses if disclosed to a competitor.  The Rule eliminates an important tool that many businesses use to protect their interests when hiring senior executives.

11.     Many employers use noncompete agreements to protect competitively sensitive information, such as trade secrets, customer lists, and pricing strategy and data.  Preventing competitors from unfairly accessing this confidential information by hiring away employees preserves healthy and vibrant competition.  Noncompete agreements provide clearer rules and are easier to enforce than alternatives, such as trade secret lawsuits or non-disclosure and non-solicitation clauses.

12.     If the effective date of the Rule is delayed or the Rule does not go into effect, many businesses would spend less money complying with the Rule. They would also be free to continue using noncompete agreements to protect their confidential proprietary information, invest in employee training and

**Appx. 10**

development without fear that competitors could freeride on their investments, and purchase business assets without concerns about competition from the seller.

**Appx. 11**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 9, 2024 at Austin, Texas.

Glenn Hamer

7

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

RYAN, LLC,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION,

*Defendant.*

Case No. **3:24-cv-986-E**

## DECLARATION OF KELLY R. HALL, PRESIDENT/CEO OF PLAINTIFF-INTERVENOR LONGVIEW CHAMBER OF COMMERCE

**Appx. 14**

Pursuant to 28 U.S.C. § 1746, I, Kelly R. Hall, hereby declare as follows:

1.      I am the President/CEO of the Longview Chamber of Commerce (the "Longview Chamber").  My business address is 410 N Center Street, Longview, TX 75601.

2.      I am offering this declaration in support of the Longview Chamber in the above-captioned case.

3.      The Longview Chamber of Commerce is the leading advocacy organization in Gregg County, Texas, representing the interests of business. Our members include over 1,000 businesses and professional organizations in Gregg County and 11 adjacent counties (the "Longview Trade Area").  Our mission is to engage in and promote projects that have a positive economic impact on the Longview Trade Area, serving our members and their 50,000+ employees.

4.      I have served as President and CEO of the Longview Chamber of Commerce since 2005.  As President and CEO, I develop and oversee the Longview Chamber's initiatives and strategies, oversee the Longview Chamber's overall operations, foster community relationships, and champion economic growth.  Over the years, I have worked to drive the Longview

**Appx. 15**

Chamber's mission forward, solidifying its position as a cornerstone of the Longview Trade Area business community.

5.    The purpose of this declaration is to discuss the impact of the Federal Trade Commission's "Non-compete Clause Rule," Fed. Trade Comm'n, *Non-Compete Clause Rule*, RIN2084-AB74 (Apr. 23, 2024) (the "Rule"), on the Longview Chamber's members. The Longview Chamber joined a coalition comment letter opposing the proposed rule during the notice-and-comment period. See Chamber of Commerce of the United States, "Coalition Comments on FTC Proposed Rule to Ban Noncompetes," https://www.uschamber.com/finance/antitrust/coalition-comments-on-ftc-proposed-rule-to-ban-noncompetes (Apr. 17, 2023).

6.    The Rule voids nearly all noncompete agreements and requires employers with existing noncompete agreements to issue notices that noncompete agreements cannot be enforced.

7.    In response to the FTC's proposed rule, the Longview Chamber surveyed its members about whether and under what circumstances they enter into noncompete agreements with employees. The results of that survey confirmed that many Longview Chamber members reported that they have noncompete agreements with their employees.

3

**Appx. 16**

8. Longview Chamber members routinely enter into noncompete agreements for a variety of purposes. To name a few examples, Longview Chamber members may enter into noncompete agreements in order to protect (1) sensitive, confidential and propriety information such as intellectual property, technologies or customer lists, (2) investments in employee training and development, or (3) acquired assets against competition from the seller.

9. Longview Chamber members enter into noncompete agreements with different groups of employees, including equity recipients, named executive officers, and many categories of their employees. Many of these members also enter into forfeiture-of-compensation clauses. The forfeiture clauses typically apply if a former employee solicits other employees or customers, breaches confidentiality agreements, works for a competitor post-departure, or disparages the company.

10. By rendering those agreements unlawful, the Rule threatens to have immediate and severe effects on many of the Longview Chamber's members. Thousands of members' agreements will be rendered unenforceable, even if the member has already given valuable consideration for the agreement. Members with similar agreements, such as non-disclosure and non-solicitation agreements, will need to obtain the advice of counsel about

4

**Appx. 17**

whether those agreements remain enforceable and how they can maintain or modify them to fully protect their confidential and proprietary information. And members will also have to begin the expensive and time-consuming process of issuing notices to employees that their noncompete agreements cannot be enforced.

11.    If the Rule is not prevented from going into effect, many of the Longview Chamber's members will incur unrecoverable costs to comply with the Rule, including attorney's fees, administrative and labor costs, and litigation expenses from defending against civil enforcement actions.    In particular, many of the Longview Chamber's members will need to make changes to their contracting practices in an effort to comply with the Rule, seek the advice of counsel about alternatives to protect their confidential information and workforce investments, and incur administrative and labor costs associated with issuing notices that noncompete agreements cannot be enforced and changing company policies.  Other Longview Chamber members will be unwilling to purchase businesses and other assets without a guarantee that the seller will not immediately begin competing against them.  And for the Longview Chamber's members that opt to continue their current

5

contracting practices, the Rule threatens to subject them to civil enforcement actions.

12.    The Rule also creates uncertainties in industries that depend on noncompete agreements with highly skilled and knowledgeable employees.  As one example, many of the Longview Chamber's members use noncompete agreements when hiring senior executives.  Senior executives have access to confidential and competitively sensitive information and strategies, which could cause serious harm to businesses if disclosed to a competitor.  The Rule eliminates an important tool that many Longview Chamber members use to protect their interests when hiring senior executives.  In addition, many of the Longview Chamber's healthcare members have noncompete agreements with physicians and other skilled healthcare providers, which enables them to make substantial investments in recruiting and training quality healthcare providers.  The Rule undermines these healthcare members' ability to ensure adequate care for patients in their communities.  Similarly, many technology companies have noncompete agreements with their software engineers and computer scientists.  These highly skilled and highly compensated employees have access to—and may even play a role in developing—crucial confidential and proprietary information, intellectual property, and technologies.   The

6

**Appx. 19**

Rule impairs technology companies' ability to disclose confidential information to these employees without fear that a competitor could access it by hiring away the employee.

13.    Many other members use noncompete agreements to protect competitively sensitive information, such as trade secrets, customer lists, and pricing strategy and data.  Preventing competitors from unfairly accessing this confidential information by hiring away employees preserves healthy and vibrant competition.  Noncompete agreements provide clearer rules and are easier to enforce than alternatives, such as trade secret lawsuits or non-disclosure and non-solicitation clauses.  In addition, many Longview Chamber members reported negotiating mutually agreeable resolutions with employees who were bound by a noncompete agreement but nonetheless wanted to leave to work for a competitor.

14.    The members of the Longview Chamber reported that without the ability to enter into noncompete agreements, they would have to reduce the amount of sensitive information they shared with employees, lower their investments in training new employees, and change their compensation arrangements.

15.    If the effective date of the Rule is delayed or the Rule does not go into effect, many of the Longview Chamber's members would spend less money complying with the Rule.  They would also be free to continue using noncompete agreements to protect their confidential proprietary information, invest in employee training and development without fear that competitors could free-ride on their investments, and purchase business assets without concerns about competition from the seller.

**Appx. 21**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 9, 2024 at 410 N Center St., Longview, TX 75601.

Kelly R. Hall

9

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

RYAN, LLC,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION,

*Defendant.*

**Case No. 3:24-cv-986-E**

**DECLARATION OF GLENN SPENCER, SENIOR VICE PRESIDENT OF PLAINTIFF-INTERVENOR CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**

1

**Appx. 24**

Pursuant to 28 U.S.C. § 1746, I, Glenn Spencer, hereby declare as follows:

1.      I am the Senior Vice President of the Employment Policy Division at the Chamber of Commerce of the United States of America (the "Chamber").   In that capacity, I lead the Chamber's work on labor and employment law.  My business address is 1615 H Street, N.W. Washington, D.C. 20062-2000.

2.      I am offering this declaration in support of the Chamber in the above-captioned case.

3.      The Chamber is the world's largest business federation, directly representing approximately 300,000 members and indirectly representing an underlying membership of more than three million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the United States.  The Chamber routinely advocates in federal courts on matters of federal competition and employment law, including filing lawsuits challenging anti-business laws and regulatory actions.

4.      The Chamber's mission is to advocate for policies that help businesses grow and create jobs in their communities.   In advancing its

2

**Appx. 25**

mission, the Chamber seeks to preserve the ability of its members to freely negotiate agreements that foster innovation and preserve competition.

5.    As part of that purpose, the Chamber engages in public advocacy on legal and policy issues relating to employment and competition.  One issue on which the Chamber has frequently engaged in public advocacy is the Federal Trade Commission's proposed rule broadly prohibiting noncompete agreements.  *See, e.g.*, U.S. Chamber of Commerce, "The FTC's Noncompete Rulemaking is Blatantly Unlawful," https://www.uschamber.com/finance/antitrust/the-ftcs-noncompete-rulemaking-is-blatantly-unlawful (January 5, 2023); Suzanne P. Clark, "The Chamber of Commerce Will Fight the FTC," Wall St. J., https://www.wsj.com/articles/chamber-of-commerce-will-fight-ftc-lina-khan-noncompete-agreements-free-marketsoverregulation-authority-11674410656 (Jan. 22, 2023); Chamber of Commerce, "Coalition Letter to Congress on the FTC's Proposed Rule on Noncompete Agreements," https://www.uschamber.com/finance/antitrust/coalition-comments-on-ftc-proposed-rule-to-ban-noncompetes (Feb. 28, 2023).

6.    I am aware that the Federal Trade Commission has now finalized its "Non-compete Clause Rule," Fed. Trade Comm'n, *Non-Compete Clause*

3

**Appx. 26**

*Rule*, RIN2084-AB74 (Apr. 23, 2024) (the "Rule"), which is the subject of the above-referenced case. The Rule voids nearly all noncompete agreements and requires employers with existing noncompete agreements to issue notices that noncompete agreements cannot be enforced. The Chamber filed a comment letter opposing the proposed rule during the notice-and-comment period. *See* Comment from United States Chamber of Commerce, Comment ID FTC-2023-0007-19345 (Apr. 23, 2023). The Chamber also organized a coalition of trade associations to oppose the proposed rule. *See* Coalition Comments on FTC's Proposed Rule to Ban Noncompetes, https://www.uschamber.com/finance/antitrust/coalition-comments-on-ftc-proposed-rule-to-ban-noncompetes (Apr. 17, 2023).

7.  The Chamber has thousands of members that have noncompete agreements with their employees and are affected by the Rule.

8.  Many Chamber members routinely enter into noncompete agreements for a variety of purposes. To name a few examples, Chamber members may enter into noncompete agreements in order to protect (1) sensitive, confidential and propriety information such as intellectual property, technologies or customer lists; (2) investments in employee training and development; or (3) acquired assets against competition from the seller.

4

**Appx. 27**

9.    By rendering those agreements unlawful, the Rule threatens to have immediate and severe effects on many of the Chamber's members. Millions of members' agreements will be rendered unenforceable, even if the member has already given valuable consideration for the agreement. Members with similar agreements, such as non-disclosure and non-solicitation agreements, will need to obtain the advice of counsel about whether those agreements remain enforceable and how they can maintain or modify them to fully protect their confidential and proprietary information. And members will also have to begin the expensive and time-consuming process of issuing notices to employees that their noncompete agreements cannot be enforced.

10.    If the Rule is not stopped from going into effect, many of the Chamber's members will incur unrecoverable costs to comply with the Rule, including attorney's fees, administrative and labor costs, and litigation expenses from defending against civil enforcement actions. In particular, many of the Chamber's members will need to make changes to their contracting practices in an effort to comply with the Rule, seek the advice of counsel about alternatives to protect their confidential information and workforce investments, and incur administrative and labor costs associated with issuing notices that noncompete agreements cannot be enforced and

**Appx. 28**

changing company policies.  Other Chamber members will be unwilling to purchase businesses and other assets without a guarantee that the seller will not immediately begin competing against them.  And for the Chamber's members that opt to continue their current contracting practices, the Rule threatens to subject them to civil enforcement actions.

11.    The Rule also creates uncertainties in industries that depend on noncompete agreements with highly skilled and knowledgeable employees.  As one example, many of the Chamber's members use noncompete agreements when hiring senior executives.  Senior executives have access to confidential and competitively sensitive information and strategies, which could cause serious harm to businesses if disclosed to a competitor.  The Rule thus eliminates an important tool that many Chamber members use to protect their interests when hiring senior executives.  In addition, many of the Chamber's healthcare members have noncompete agreements with physicians and other skilled healthcare providers, which enables them to make substantial investments in recruiting and training quality healthcare providers.  The Rule undermines these healthcare members' ability to ensure adequate care for patients in their communities.  Similarly, many technology companies have noncompete agreements with their software engineers and computer

**Appx. 29**

scientists. These highly skilled and highly compensated employees have access to—and may even play a role in developing—crucial confidential and proprietary information, intellectual property, and technologies. The Rule accordingly impairs technology companies' ability to disclose confidential information to these employees without fear that a competitor could access it by hiring away the employee.

12. Many other members use noncompete agreements to protect competitively sensitive information, such as trade secrets, customer lists, and pricing strategy and data. Preventing competitors from unfairly accessing this confidential information by hiring away employees preserves healthy and vibrant competition. Noncompete agreements provide clearer rules and are easier to enforce than alternatives such as trade secret lawsuits or non-disclosure and non-solicitation clauses.

13. If the effective date of the Rule is delayed or the Rule does not go into effect, many of the Chamber's members would spend less money complying with the Rule. They would also be free to continue using noncompete agreements to protect their confidential proprietary information, invest in employee training and development without fear that competitors

7

**Appx. 30**

could free-ride on their investments, and purchase business assets without concerns about competition from the seller.

**Appx. 31**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 9, 2024 at U.S. Chamber of Commerce, 1615 H Street, NW, Washington, DC 20062.

Glenn Spencer

9

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

RYAN, LLC,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION,

*Defendant.*

Case No. **3:24-cv-986-E**

## DECLARATION OF IAN MACLEAN, PRESIDENT OF HIGHLAND LANDSCAPING, LLC

**Appx. 34**

Pursuant to 28 U.S.C. § 1746, I, Ian MacLean, hereby declare as follows:

1.    I am the President of Highland Landscaping, LLC.  I make this declaration based on my own personal knowledge.

2.    Highland Landscaping is a landscaping company located in Southlake, Tarrant County, Texas, that provides a variety of landscaping design, renovation, installation, and maintenance services.  Highland Landscaping is a small business that employs roughly 40 to 45 employees as office staff, managers, and landscapers.

3.    Highland Landscaping is a member of the Chamber of Commerce of the United States of America.

4.    Highland Landscaping enters into noncompete agreements with some of its employees.  Specifically, Highland Landscaping has entered into noncompete agreements with many of its office staff and managers.  These agreements generally prevent employees who leave Highland Landscaping from accepting employment with a competitor for a limited period of time (five years) after leaving the company.  Highland Landscaping does not enter into noncompete agreements with its laborers.

5.    Noncompete agreements are important to Highland Landscaping in a number of ways.  For example, such agreements protect Highland

**Appx. 35**

Landscaping's confidential information by preventing competitors (including large national chains) from gaining access to Highland Landscaping's proprietary client databases, processes, marketing strategies, and other highly sensitive information by simply hiring Highland Landscaping's employees.

6.    Highland Landscaping's noncompete agreements also promote investments in the workforce.  In particular, Highland Landscaping is able to expend considerable resources on employee training opportunities while ensuring that competitors will not be able to free-ride on those investments. Highland Landscaping has established an expensive employee-training program, and does not make any profit on employees during their first year with the company.  Without the ability to enter into noncompete agreements, larger competitors would be able to hire Highland Landscaping's employees after Highland Landscaping has incurred the substantial expenses of workforce training, and Highland Landscaping would have less incentive to offer those programs.

7.    Because Highland Landscaping values the benefits of noncompete agreements, Highland Landscaping's employees who have entered into

3

**Appx. 36**

noncompetes receive higher compensation than they would if noncompetes were not available.

8.    I understand that the Federal Trade Commission has adopted a rule that would prohibit Highland Landscaping from entering into virtually any noncompete agreements in the future and require Highland Landscaping to void existing noncompete agreements.  If this rule goes into effect, it will impose significant, direct costs on Highland Landscaping, including by requiring Highland Landscaping to notify employees or former employees who signed noncompete agreements that those agreements are no longer enforceable.

9.    If this noncompete rule goes into effect, Highland Landscaping will be unable to rely on noncompete agreements to protect confidential business information and to promote investments in the workforce.  As a result, the noncompete rule will put Highland Landscaping's confidential information at risk and will decrease incentives for workforce training.  It may also lead to lower compensation for Highland Landscaping's employees, who will no longer be able to receive higher wages in exchange for signing a noncompete agreement.

**Appx. 37**

10.    The noncompete rule creates considerable uncertainty as to whether similar kinds of agreements with employees—such as nondisclosure agreements, liquidated damages provisions, and non-solicitation agreements—are lawful and enforceable going forward.  Because of that uncertainty, Highland Landscaping will likely need to incur substantial costs to obtain legal advice regarding future contracts with employees, and may incur costs associated with defending lawful agreements.

11.    Highland Landscaping cannot rely on alternatives to achieve the benefits of noncompete agreements.  In Highland Landscaping's experience, nondisclosure agreements are difficult to monitor and enforce and trade secret suits do not protect all of Highland Landscaping's sensitive information or investments in workforce training.  Moreover, attempting to enforce a nondisclosure agreement or to establish a trade secret violation requires expensive and time-consuming litigation, a burden that Highland Landscaping will likely be unable to bear.

12.    Highland Landscaping competes with some large national chains that would gain an unfair advantage if they had access to Highland Landscaping's propriety information and relationships in the community.  For

**Appx. 38**

that reason, Highland Landscaping is concerned that the noncompete rule will

harm the company.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 9, 2024 at Southlake, Texas.

Ian MacLean

**Appx. 40**

# EXHIBIT F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

RYAN, LLC,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION,

*Defendant.*

**Case No. 3:24-cv-986-E**

## DECLARATION OF MICHAEL CANTY, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF ALLOY PRECISION TECHNOLOGIES, INC.

1

**Appx. 42**

Pursuant to 28 U.S.C. § 1746, I, Michael Canty, hereby declare as follows:

1.      I am the President and Chief Executive Officer of Alloy Precision Technologies, Inc. ("Alloy").  I make this declaration based on my own personal knowledge, and over 40 years of experience manufacturing and distributing products in the U.S. and competing and selling products both domestically and internationally.

2.      Alloy Precision Technologies is a metal fabrication company located in Mentor, Ohio, that manufacturers bellows and flexible sealing assemblies, precision machining, welding, tubing, and other highly engineered products.  Alloy sells to, among others, the power generation, petrochemical, aerospace, defense, and semiconductor industries.  Alloy employs roughly 100 professionals as salesman, machinists, highly technical engineers and quality personnel, as well as several other types of skilled and unskilled personnel. Alloy develops a wide range of proprietary equipment, processes, and products to compete both domestically and globally.

3.      Alloy is a member of Plaintiff the Chamber of Commerce of the United States of America.

**Appx. 43**

4.      Alloy enters into noncompete agreements with most (though not all) of its employees.  Specifically, Alloy has entered into noncompete agreements with its sales and marketing staff, its professional personnel, and all of those employees in a position to have access to proprietary information, processes, and technologies.  These agreements generally prevent employees who leave Alloy from accepting employment with a competitor for a limited period of time (generally 2 years) after leaving the company.

5.      Noncompete agreements are important to Alloy in a number of ways.  For example, such agreements protect the company's confidential information by preventing larger competitors from gaining access to Alloy's proprietary technology, financial data, and other highly sensitive information by simply hiring its employees.  Alloy has previously been forced to invoke its noncompete agreements where former employees began working for domestic or foreign competitors and had access to Alloy's sensitive pricing data, proprietary processes, customer contract data, and other proprietary information.  In those situations, clear and readily enforceable noncompete agreements prevented competitors from gaining an unfair advantage over Alloy.

**Appx. 44**

6.     Noncompete agreements also protect Alloy from foreign competitors, such as those from China, England, and Germany, who would otherwise be able to hire members of Alloy's workforce and gain access to its secrets and customer base to compete unfairly.  Notably, the Federal Government requires manufacturing companies that sell to the U.S. defense industry (like Alloy) to take steps to protect sensitive information. Noncompete agreements are an important tool to achieve that objective.

7.     Alloy's noncompete agreements also promote investments in the workforce.  In particular, Alloy is able to expend considerable resources on employee training opportunities while ensuring that competitors will not be able to free-ride on those investments.  Without the ability to enter into noncompete agreements, competitors would be able to hire Alloy's employees after the company has incurred the substantial expenses of workforce training (and have in fact tried to do so), and Alloy would have less incentive to offer those programs.

8.     Reflecting the value Alloy places on the benefits of noncompete agreements, its employees who have entered into noncompete agreements often receive higher compensation than they would if noncompete agreements were not available.  In addition, Alloy's ability to protect its proprietary secrets

4

**Appx. 45**

encourages it to hire more U.S. employees instead of shipping those jobs overseas.

9.      I understand that the Federal Trade Commission has adopted a rule that would prohibit Alloy from entering into noncompete agreements in the future and require the company to void nearly all existing noncompete agreements.  If this rule goes into effect, it will create significant risks for and impose direct costs on Alloy.  Alloy's secret technologies and proprietary information would become fair game for domestic and foreign-based competitors:  A competitor would be able to swoop in, offer much higher compensation to encourage employees to join the competitor, then terminate the employees once the competitor has obtained the secret Alloy information. Alloy has in fact witnessed such efforts in the past.  On top of these costs, Alloy would also immediately incur the costs of issuing notices to employees or former employees who signed noncompete agreements, notifying them that those agreements are no longer enforceable.

10.      If this noncompete rule goes into effect, Alloy will be unable to rely on noncompete agreements to protect confidential business information and to promote investments in the workforce.  As a result, the noncompete rule will put Alloy's confidential information at risk and will decrease incentives for

**Appx. 46**

workforce training.  It may also force Alloy to consider moving jobs overseas to reduce its costs since it will no longer be able to protect the information and processes that allow it to compete with foreign and domestic actors.

11.    The noncompete rule also creates considerable uncertainty as to whether similar kinds of agreements with employees—such as non-disclosure agreements, liquidated damages provisions, and non-solicitation agreements—are lawful and enforceable going forward.  Because of that uncertainty, Alloy will likely need to incur substantial costs to obtain legal advice regarding future contracts with employees, and may incur costs associated with defending lawful agreements.

12.    Many of these costs discussed above may be incurred even before the rule goes into effect.  That is because Alloy will need to change its business practices and employment agreements in anticipation of the noncompete rule.  For example, Alloy will not be able to offer higher pay in exchange for an employee's agreement to abide by a noncompete if it is possible that noncompete will become unenforceable in the near future.

13.    Alloy cannot rely on alternatives to achieve the benefits of noncompete agreements.  In Alloy's experience, nondisclosure agreements are difficult to monitor and enforce and trade secret suits do not protect all of the

**Appx. 47**

company's sensitive information or investments in workforce training. Moreover, attempting to enforce a nondisclosure agreement or to establish a trade secret violation requires expensive and time-consuming litigation, a burden that Alloy will likely be unable to bear. Alloy has previously incurred high costs to protect its information through trade secret litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 10, 2024 at Mentor, Ohio.

Michael Canty

8

# EXHIBIT G

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC,<br><br>      *Plaintiff,*<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>      *Defendant.* | **Case No. 3:24-cv-986-E** |

## DECLARATION OF ELIZABETH DOUGHERTY, GENERAL COUNSEL AND CORPORATE SECRETARY OF PLAINTIFF-INTERVENOR BUSINESS ROUNDTABLE

1

**Appx. 51**

Pursuant to 28 U.S.C. § 1746, I, Elizabeth Dougherty, hereby declare as follows:

1.    I am the General Counsel and Corporate Secretary at Business Roundtable.  Business Roundtable is a non-profit association comprised of more than 200 chief executive officers (CEOs) of America's leading companies, representing every sector of the U.S. economy.  Business Roundtable is headquartered in Washington D.C.

2.    I am offering this declaration in support of Business Roundtable in the above-captioned case.

3.    Since 1972, Business Roundtable has worked to promote a thriving U.S. economy that creates economic opportunity for all Americans. Business Roundtable's members work closely with policymakers to advance sound economic policies, including policies related to federal competition and labor law.

4.    To support that work, Business Roundtable engages in public advocacy on legal and policy issues relating to employment and competition. One area of Business Roundtable's advocacy focus has been the Federal Trade Commission's proposed rule broadly prohibiting noncompete agreements. *See*, *e.g.*, Business Roundtable, Comment Letter on Non-Compete Clause

**Appx. 52**

Rule (April 17, 2023), https://www.regulations.gov/comment/FTC-2023-0007-19341.

5.      I am aware that the Federal Trade Commission has now finalized its "Non-compete Clause Rule," Fed. Trade Comm'n, *Non-Compete Clause Rule*, RIN2084-AB74 (Apr. 23, 2024) (the "Rule"), which is the subject of the above-referenced case.  The Rule voids nearly all noncompete agreements and requires employers with existing noncompete agreements to issue notices that noncompete agreements cannot be enforced.

6.      Business Roundtable's members and their companies have many noncompete agreements with employees which are affected by the Rule.

7.      Business Roundtable's members and their companies routinely enter into noncompete agreements for a variety of purposes.  To name a few examples, members' companies may enter into noncompete agreements in order to protect (1) sensitive, confidential and propriety information such as intellectual property, technologies or customer lists, (2) substantial investments in specialized employee training and development, or (3) acquired assets against competition from the seller.

8.      By rendering those agreements unlawful, the Rule threatens to have immediate and severe effects on many Business Roundtable members

3

**Appx. 53**

and their companies.  Nearly all noncompete agreements will be rendered unenforceable, even if valuable consideration has already been given for the agreement.  Other provisions of the rule limit employers ability to use other types of agreements, such as non-disclosure and non-solicitation agreements. Many Business Roundtable members and their companies use these agreements to protect important confidential and proprietary information and, because of the Rule, will need to obtain the advice of counsel about whether those agreements remain enforceable and how they can maintain or modify them to fully protect their confidential and proprietary information. And members and their companies will also have to begin the expensive and time-consuming process of notifying employees that their noncompete agreements cannot be enforced.

9.    If the Rule is not prevented from going into effect, then many of Business Roundtable's members and their companies will incur unrecoverable costs to comply with the Rule, including attorney's fees, administrative and labor costs, and litigation expenses from defending against civil enforcement actions.  In particular, many of Business Roundtable's members and their companies will need to make changes to their contracting practices in an effort to comply with the Rule, seek the advice of counsel about alternatives to

4

protect their confidential information and workforce investments, and incur administrative and labor costs associated with issuing notices that noncompete agreements cannot be enforced and changing company policies. Other Business Roundtable members and their companies will be unwilling to purchase businesses and other assets without a guarantee that the seller will not immediately begin competing against them. And for Business Roundtable members and their companies that opt to continue their current contracting practices, the Rule threatens to subject them to civil enforcement actions.

10. The Rule also creates uncertainties in industries that depend on noncompete agreements with highly skilled and knowledgeable employees. As one example, many of Business Roundtable's members use noncompete agreements when hiring senior executives. Senior executives have access to confidential and competitively sensitive information and strategies, which could cause serious harm to businesses if disclosed to a competitor. The Rule eliminates an important tool that many Business Roundtable members and their companies use to protect their interests when hiring senior executives. In addition, many of Business Roundtable's members have noncompete agreements with employees whose positions require specialized or substantial on-the-job training, such as sales agents. Business Roundtable members and

5

**Appx. 55**

their companies use noncompete agreements to safeguard their substantial investment in providing specialized training.  The Rule removes that safeguard and undermines the incentive for Business Roundtable and its members to invest in specialized or substantial on-the-job training.

11.    Many other Business Roundtable member companies use noncompete agreements to protect competitively sensitive information, such as trade secrets, customer lists, and pricing strategy and data.  Preventing competitors from unfairly accessing this confidential information by hiring away employees preserves healthy and vibrant competition.  Noncompete agreements provide clearer rules and are easier to enforce than alternatives such as trade secret lawsuits or non-disclosure and non-solicitation clauses.

13.    If the effective date of the Rule is delayed or the Rule does not go into effect, many of Business Roundtable's members and their companies would spend less money complying with the Rule.  They would also be free to continue using noncompete agreements to protect their confidential proprietary information, invest in employee training and development without fear that competitors could freeride on their investments, and purchase business assets without concerns about competition from the seller.

**Appx. 56**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 9, 2024 at Washington, D.C.

_____

Elizabeth Dougherty

**Appx. 57**

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

RYAN LLC,

           *Plaintiff,*

  *v.*                                    No. 3:24-cv-986-E

FEDERAL TRADE COMMISSION,

           *Defendant.*

**DECLARATION OF GERALD BEESON,**
**SENIOR MANAGING DIRECTOR AND CHIEF OPERATING OFFICER FOR**
**CITADEL ENTERPRISE AMERICAS SERVICES LLC**

Pursuant to 28 U.S.C. § 1746, I, Gerald Beeson, hereby declare as follows:

1.     I am Senior Managing Director and Chief Operating Officer for Citadel Enterprise Americas Services LLC ("Enterprise").  I have worked for the Citadel Entities for the past 31 years. In my role, I am responsible for the operations of the Enterprise, Citadel Americas Services LLC ("Citadel"), and Citadel Securities Americas Services LLC ("Citadel Securities") employment entities, and all of their affiliates (collectively, the "Citadel Entities").  I make this declaration based on my own personal knowledge.

## The Citadel Entities

2.     ***Citadel.***    Citadel is one of the world's leading alternative investment managers.  It manages capital on behalf of many of the world's preeminent private, public and nonprofit institutions. It seeks the highest and best use of investor capital to deliver market leading results and contribute to broader economic growth.  For over 30 years, Citadel has cultivated a culture of learning and collaboration among some of the most talented and accomplished investment professionals, researchers and engineers in the world.   Its colleagues are empowered to test their ideas and develop commercial solutions that accelerate their growth and drive real impact.  The alternative investment management industry is highly competitive.  Like other

investment management firms, Citadel relies on proprietary and confidential technology and investment strategies, information, and analysis to compete with other firms and to produce returns for its clients.  The significant investments in our proprietary platform have powered Citadel to become recognized as the most profitable hedge fund manager of all time, delivering significant returns to the institutions that have entrusted their capital to us.

3.     ***Citadel Securities.***  Citadel Securities is a next-generation capital markets firm as well as a leading global market maker and proprietary electronic trading firm.  It provides institutional and retail investors with the liquidity they need to trade a broad array of equity and fixed-income products in any market condition.  At Citadel Securities, the brightest minds in finance, science, and technology rely on powerful, advanced analytics and other proprietary and trade secret information and technology to solve the markets' most critical challenges and compete and succeed.  Electronic trading is a highly competitive business, and successful companies like Citadel Securities rely heavily on proprietary and confidential strategies, platforms and related technologies to compete and succeed.  The significant innovation of our proprietary platform has powered Citadel Securities to compete with other market makers to deliver better outcomes for investors and build confidence in the integrity of capital markets around the world.

**Appx. 61**

4.    ***Citadel Enterprise.*** Citadel Enterprise provides various technological, operational, and tactical support services to both Citadel and Citadel Securities. These services may include but are not limited to engineering, legal and compliance advice, investor relations, risk management, human resources, corporate affairs, treasury, and finance.

5.    Over the course of many years, the Citadel Entities have invested significant resources to develop (i) highly confidential investment and trading strategies, algorithms, trading platforms, risk tools, and scores of other highly proprietary and trade secret information and technology, (ii) extremely talented, knowledgeable, well-trained and experienced employees, which together have allowed Citadel and Citadel Securities to become leaders in their respective businesses, and (iii) a valuable set of clients and investors.   The Citadel Entities' proprietary and trade secret information and technology must be kept confidential, and the firms must be incentivized to invest in their employees to ensure that they maintain their competitive advantage and are positioned to continue producing attractive returns for themselves and their clients and investors.   Indeed, if their trade secrets became known in the industry or the skills of their employees diminished, it could have an existential impact on the Citadel Entities ability to succeed.  Although a high number of the Citadel Entities' employees require regular access to certain proprietary and

trade secret information and technology to perform their work, access to specific pieces or kinds of such information and technology is limited to a "need-to-know" basis, and systems are designed to protect and secure the information housed within them.

6.    The Citadel Entities are members of the Chamber of Commerce of the United States of America.

7.    The Citadel Entities employ more than 3000 people in the United States.  These employees include portfolio managers, data analysts, traders, engineers, quantitative developers, and researchers, among others.  The Citadel Entities' employees are typically sophisticated, highly educated and well compensated.  As detailed below, the Citadel Entities invest considerable time and resources in training their employees and developing their capabilities.  By necessity, the firms entrust their employees—as necessary—with access to certain of the Citadel Entities' proprietary and trade secret information and technology to help each of those employees excel in their field.

### Citadel Entities' Use of Non-Compete Agreements

8.    The Citadel Entities negotiate tailored non-compete agreements with most (though not all) of their employees.  Specifically, the Citadel Entities typically enter into non-compete agreements with highly skilled and highly-compensated employees who have access to and knowledge of proprietary and

trade secret information and technology—such as portfolio managers, analysts, technologists, quantitative and other researchers, traders, and other specialists. These non-compete agreements generally provide the Citadel Entities with the option to restrict employees who leave a Citadel Entity from working for a competitor for a specified period of time after leaving the company. During any elected non-compete period the employee receives monthly monetary compensation at or significantly exceeding their base salary. Given the financial costs associated with securing employees' agreement to these provisions, the Citadel Entities enter into and exercise non-compete agreements only when necessary to protect their interests. The Citadel Entities also seek to limit the length of time an employee is subject to a non-compete agreement based on the nature and amount of confidential and proprietary information in the employee's possession. They make these decisions on an employee-by-employee basis.

9. The Citadel Entities' non-compete agreements benefit both the Citadel Entities and the employees. The Citadel Entities make significant investments in developing the skills of individual employees and entrust them with sensitive and proprietary business and client information, which enables them to perform their jobs with a greater degree of efficiency, skill and success, leading to opportunities for significant career growth and compensation. Non-

compete agreements allow the Citadel Entities to protect their investments in employees by ensuring that, during a reasonable period of time following their employment, former employees do not divulge confidential information and proprietary trade secrets to competing firms and do not poach clients or employees. Citadel Entities' employees, in turn, benefit from the sophisticated training and broader access to resources and information that the Citadel Entities are willing and able to provide them *because* of the protection provided by non-compete agreements.

10.    Non-compete agreements structured like those used by the Citadel Entities encourage and appropriately incentivize innovation in the trading and managed-funds industries.  For example, these agreements allow companies like Citadel and Citadel Securities to make investments in efficient and highly confidential trading processes, technologies, and algorithms without fear that departing employees will immediately take the fruits of those investments to competing firms.  Non-compete agreements also allow the Citadel Entities to provide high-level, specialized training and knowledge for individual employees, who in turn can use that training and knowledge to provide clients, including various public and private institutions, with significant returns on their financial investments.

### The Federal Trade Commission's Non-Compete Rule

11.    I understand that the U.S. Federal Trade Commission (FTC) has adopted a rule that would prohibit the Citadel Entities from entering into virtually any non-compete agreement in the future and would further require them to void nearly all existing non-compete agreements with their employees. If this rule goes into effect, it will create considerable risks for—and impose significant direct costs and harm on—the Citadel Entities.

12.    For one, the Citadel Entities will be unable to rely on non-compete agreements to protect their proprietary and trade secret information and technology, their investment into their employees, and their client and investor relationships. As a result, the Citadel Entities' proprietary and trade secret information and technology would immediately become vulnerable to competitors.  For example, a competitor could reduce its training and research and development expenses but offer much higher compensation to entice employees to immediately join the competitor and bring with them the Citadel Entities' proprietary and trade secret information and/or technology.  The competitor could then exploit the employees' knowledge to the detriment of the Citadel Entities.  This would harm employees, too, as the competitor would be free to terminate the employees once it had obtained the secret information.

Unfortunately, given the Citadel Entities' innovation, creativity, and success, they have encountered these types of tactics from their competitors in the past.

13.    The FTC's non-compete rule will also decrease the Citadel Entities' incentives to provide employees with specialized knowledge and training because the Citadel Entities will be unable to ensure that employees will not use that knowledge and training to benefit competitors after leaving.  The rule will also force the Citadel Entities to further restrict access to proprietary and trade secret information and technology, resulting in more compartmentalized work—which hurts individual employee career development along with overall productivity.   This, in turn, may lead to lower returns for the Citadel Entities and their clients and investors (many of which are endowments, research foundations, health care institutions and pension programs), as well as lower compensation for the Citadel Entities' employees.

14.    On top of these harms, the Citadel Entities have paid hundreds of millions of dollars in consideration to employees in exchange for signing their existing non-compete agreements.  The FTC's rule would unfairly deprive the Citadel Entities of the benefit of those bargains.  In addition, the Citadel Entities will be forced to restructure the manner in which they do business and their employees' ability to succeed and ultimately advance their careers will be negatively impacted.

15.     The FTC's noncompete rule also creates considerable uncertainty as to whether similar kinds of agreements with employees—such as non-disclosure agreements, liquidated damages provisions, and non-solicitation agreements—are lawful and enforceable going forward. Because of that uncertainty, the Citadel Entities will likely need to incur substantial costs to obtain legal advice regarding future arrangements with employees, and they may incur costs associated with enforcing lawful agreements.

16.     The Citadel Entities cannot rely on alternatives to achieve the benefits of non-compete agreements. In my decades of experience, I have learned that non-disclosure agreements are difficult to monitor and enforce and trade-secret lawsuits suits are costly and do not protect all of the Citadel Entities' proprietary and trade secret information and technology or investments in workforce training. Moreover, it is often difficult for companies like the Citadel Entities' to even know when their trade secrets have been misappropriated. And attempting to enforce a non-disclosure agreement or to establish a trade secret violation requires expensive and time-consuming litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 19, 2024, at Chicago, Illinois.

_____

Gerald Beeson