# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | |
|---|---|---|
| RYAN LLC, | § | |
| Plaintiff, | § | |
| | § | |
| CHAMBER OF COMMERCE OF | § | |
| THE UNITED STATES OF | § | |
| AMERICA, BUSINESS | § | |
| ROUNDTABLE, TEXAS | § | |
| ASSOCIATION OF BUSINESS, and | § | Civil Action No.: 3:24-CV-00986-E |
| LONGVIEW CHAMBER OF | § | |
| COMMERCE, | § | |
| Plaintiff-Intervenors, | § | |
| | § | |
| v. | § | |
| | § | |
| FEDERAL TRADE COMMISSION, | § | |
| Defendant. | § | |

**PROPOSED BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE FEDERATION OF AMERICAN HOSPITALS AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S AND PLAINTIFF-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT**

Katrina A. Pagonis
*Pro Hac Vice*
HOOPER, LUNDY & BOOKMAN
44 Montgomery Street, Suite 3500
San Francisco, CA 94104
Telephone: (415) 875-8500
Fax: (415) 986-2157
kpagonis@hooperlundy.com

Kelly A. Carroll
*Pro Hac Vice*
HOOPER, LUNDY & BOOKMAN
401 9th Street NW, Suite 550
Washington, DC 20004
Telephone: (202) 580-7712
Fax: (202) 609-8931
kcarroll@hooperlundy.com

Counsel for *Amici Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF THE *AMICI CURIAE* ....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENTS......................4

ARGUMENT ..............................................................................................7

I.    The Commission Failed to Adequately Address the Likelihood of Significant Distortions in Hospital Competition Resulting from the Disparate Treatment of Nonprofit and Taxpaying Hospitals. ........................7

II.   The Commission Failed to Adequately Explain Its Rejection of Alternatives Proposed by *Amici*. ................................................12

III.  Vacatur Is the Proper Remedy to Uniformly Set Aside the Unlawful Non-Compete Rule .........................................................................17

CONCLUSION..........................................................................................22

CERTIFICATE OF COMPLIANCE........................................................23

CERTIFICATE OF SERVICE .................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATS Tree Servs., LLC v. FTC*,
No. 24-1743, 2024 WL 3511630 (E.D. Pa. July 23, 2024) ..................................5

*Bridgeport Hosp. v. Becerra*,
____ F. 4th. ____, No. 22-5249,
2024 WL 3504407 (D.C. Cir. July 23, 2024) ....................................................20

*Chamber of Commerce v. S.E.C.*,
88 F.4th 1115 (5th Cir. 2023) ...........................................................................19

*In re Clarke*,
94 F.4th 502 (5th Cir. 2024) ....................................................................... 18-19

*Data Mktg. P'ship v. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) .............................................................................18

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...........................................................................................16

*Franciscan All., Inc. v. Becerra*,
47 F.4th 368 (5th Cir. 2022) .........................................................................7, 19

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .............................................................................................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................................12, 16

*Ohio v. Environmental Protection Agency*,
144 S. Ct. 2040 (2024) ............................................................................11, 12, 16

*Tex. Ass'n Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ............................................................................19

*Texas Med. Ass'n v. U.S. Dep't Health & Hum. Servs.*,
No. 6:22-CV-450-JDK,
2023 WL 5489028 (E.D. Tex. Aug. 24, 2023)..................................................19

# TABLE OF AUTHORITIES (*con't*)

**Page(s)**

**Cases** (*con't*)

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) ...............................................................16

*Texas v. Cardona*,
   ____ F. Supp. 3d ____, No. 4:23-cv-00604,
   2024 WL 2947022 (N.D. Tex. June 11, 2024) .................................20

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) .........................................................19, 20

**Statutes**

5 U.S.C. § 706(2)(A)...............................................................................18

5 U.S.C. § 706(2)(C)...............................................................................18

15 U.S.C. § 44 .......................................................................................3, 8

Administrative Procedure Act § 706 ......................................................18

Fair Labor Standards Act .......................................................6, 14, 15, 16

Federal Trade Commission Act ..................................................8, 10, 11

Internal Revenue Code § 501(c)(3).....................................................3, 10

**Regulations**

89 Fed. Reg. 38,342 (May 7, 2024) .........................................................2

**Other Authorities**

Am. Hosp. Ass'n,
   Cmt. Ltr. Proposed Non-Compete Clause Rule (Feb. 22, 2023),
   *available at* https://www.regulations.gov/comment/FTC-2023-
   0007-8138 ................................................................2–6, 8, 13–15, 17

## TABLE OF AUTHORITIES (*con't*)

**Page(s)**

**Other Authorities** (*con't*)

Cheryl Miller, *FTC Chair Lina Khan Defends Noncompete Rule, Agency's Assertive Role as Competition Watchdog*, Law.com (Jul. 25, 2024) ....................................................................................................6

Fed'n Am. Hosps.,
Cmt. Ltr. Proposed Non-Compete Clause Rule (Feb. 22, 2023), *available at* https://www.regulations.gov/comment/FTC-2023-0007-21034 ............................................................................. 3–6, 8, 13–14, 17

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* are the American Hospital Association ("AHA") and the Federation of American Hospitals ("FAH") (together, "*Amici*"), national associations representing hospitals and health systems.

The AHA represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations.  Its members are committed to improving the health of the communities that they serve, and to helping ensure that care is available to and affordable for all Americans.  The AHA educates its members on healthcare issues and advocates on their behalf, so that their perspectives are considered in formulating health policy.  One way in which the AHA promotes its members' interests is by participating as amicus curiae in cases with important and far-ranging consequences.

The FAH is the national representative of more than 1,000 leading taxpaying hospitals and health systems throughout the United States.  FAH members provide patients in urban and rural communities with access to high-quality, affordable healthcare.  Its members include teaching and non-teaching, acute, inpatient rehabilitation, behavioral health, and long-term care hospitals.  They provide a wide range of acute, post-acute, emergency, children's, cancer care, and ambulatory services.

Dedicated to a market-based philosophy, the FAH provides representation

and advocacy on behalf of its members to Congress, the executive branch, the judiciary, media, academia, accrediting organizations, and the public. FAH routinely submits comments to the Centers for Medicare & Medicaid Services ("CMS") on Medicare and Medicaid payment and rulemakings and offers guidance to courts regarding Medicare and Medicaid reimbursement principles. FAH member hospitals serve some of our country's most vulnerable communities.

*Amici*, their members, and the healthcare ecosystem would be adversely impacted if the Federal Trade Commission's (the "Commission" or "FTC") rule prohibiting non-compete clauses, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Non-Compete Rule" or "Rule") goes into effect. As the AHA stated in a public comment in response to the Rule, while "[t]he AHA respects the FTC's efforts to address issues of genuine unequal bargaining power between certain employers and certain types of workers . . . the proposed rule would profoundly transform the health care labor market – particularly for physicians and senior hospital executives." *See* AHA, Cmt. Ltr. Proposed Non-Compete Clause Rule (Feb. 22, 2023), at 1–2, *available at* https://www.regulations.gov/comment/FTC-2023-0007-8138 (hereinafter "AHA Cmt."). The Rule "would instantly invalidate millions of dollars of existing contracts, while exacerbating problems of health care labor scarcity, especially for medically underserved areas like rural communities." *Id.* at 2.

Importantly, the FTC does not have the statutory authority to apply its rule to nonprofit entities that are exempt under Section 501(c)(3) of the Internal Revenue Code, including nonprofit hospitals and health systems. *See* 15 U.S.C. § 44. As such, *only* the taxpaying hospital and health-system members of the FAH and AHA would be subject to the requirements of the Non-Compete Rule. This could cause a significant "distortion in the competitive playing field" for hospital labor. FAH, Cmt. Ltr. Proposed Non-Compete Clause Rule (Feb. 22, 2023), at 2, *available at* https://www.regulations.gov/comment/FTC-2023-0007-21034 (hereinafter "FAH Cmt."). Indeed, the Rule's disparate treatment of taxpaying vs. tax-exempt, nonprofit entities could significantly disrupt health care labor markets *regardless of hospital ownership type*. As the AHA explained, "this disequilibrium could reduce the available supply of highly-trained, highly-skilled labor for for-profit hospitals in particular markets, driving up the price for such labor or at least creating serious instability in those markets. Market distortions of this kind would arise in the context of an already-challenging workforce shortage for America's hospitals." AHA Cmt. at 16; *see also* FAH Cmt. at 7 ("The uneven playing field the Noncompete Rule would impose between taxpaying and tax-exempt hospitals is illogical and would create significant, unintended, and anticompetitive distortions.").

In light of these potential consequences, both *Amici* filed public comments

urging the Commission to more narrowly-tailor its Rule, exempting the healthcare industry or, at a minimum, exempting highly-skilled, highly-compensated physicians and the hospitals' executives who have greater bargaining power than lower-skilled, lower-wage workers. *See* AHA Cmt. at 7–17; FAH Cmt. at 6–16. As the AHA concluded: "[T]he proposed regulation errs by seeking to create a one-size-fits all rule for *all* employees across *all* industries, especially because Congress has not granted the FTC the authority to act in such a sweeping manner." AHA Cmt. at 2. For these reasons, *Amici* have an acute interest in the proper resolution of this case.

## INTRODUCTION AND SUMMARY OF ARGUMENTS

This Court's July 3, 2024 opinion got it exactly right. Among other correct conclusions, it properly held that the Non-Compete Rule is "unreasonably overbroad without a reasonable explanation." Mem. Op. at 21, ECF 153. Given the Court's familiarity with these issues and the persuasiveness of its reasoning, *Amici* do not wish to burden the Court by rehashing legal arguments it has already considered. Instead, *Amici* respectfully submit this brief to provide the Court with additional, clear examples showing that the Rule is as arbitrary and capricious as this Court already found it to be. Although this Court may properly decide this case based on its conclusion that the Commission has exceeded its statutory authority (Mem. Op. at 19–20), *Amici* believe that the arbitrary-and-capricious

claims are equally significant. This is particularly so in light of the Eastern District of Pennsylvania's recent order denying a preliminary injunction of the Non-Compete Rule. That court did *not* address an arbitrary-and-capricious claim, nor did it consider the Commission's failure to appropriately grapple with the unique context of the health care labor market. *See ATS Tree Servs., LLC v. FTC*, No. 24-1743, 2024 WL 3511630 (E.D. Pa. July 23, 2024).

The Commission's treatment of the hospital labor market underscores why the Final Rule was not supported by relevant evidence, lacked a reasonable explanation, and did not consider proffered alternatives. Both the AHA and FAH explained to the Commission that the Rule could create significant distortions in the health care labor market because the Commission lacks the statutory authority to apply the rule to nonprofit hospitals. AHA Cmt. at 3–6; FAH Cmt. at 2–6. Because nonprofit and taxpaying hospitals located in the same market compete for the same talent, a rule that applies to only one category of hospitals would have severe and unknown impacts on the price, availability, and overall supply of hospital labor. *Amici* explained that the potential effects of this disparate treatment had not been sufficiently studied, and so the Commission should examine it further before imposing a strict rule on taxpaying hospitals and health systems. AHA Cmt. at 7–17; FAH Cmt. at 8–16. The Commission rejected this measured approach, instead offering a sweeping Final Rule that was neither reasonable nor

rationally explained.

Similarly, both *Amici* explained to the Commission that, if it persisted in issuing a final rule despite a lack of statutory authority, there was a better alternative to its proposed one-size-fits-all rule:  a non-compete ban that exempts highly-skilled, highly compensated workers like physicians and senior executives using the finely drawn, well-established categories in the Fair Labor Standards Act regulations.  AHA Cmt. at 7–16; FAH Cmt. at 8–16.  *Amici* explained that a rule focusing solely on hospital employees who lacked comparable bargaining power— such as nurses, cafeteria workers, hospital translators, orderlies, and others—would achieve the Commission's goals without undermining the competitive benefits of other non-compete agreements.  AHA Cmt. at 1–2; 15–16, 18.  In fact, notwithstanding the position the Commission took in the Final Rule, the Commission Chair herself stated earlier this week that "more often than not" non-compete agreements for senior executives "are actually bargained for."  Cheryl Miller, *FTC Chair Lina Khan Defends Noncompete Rule, Agency's Assertive Role as Competition Watchdog*, Law.com (Jul. 25, 2024), https://www.law.com/therecorder/2024/07/25/ftc-chair-lina-khan-defends-noncompete-rule-agencys-assertive-role-as-competition-watchdog/.  Nevertheless, the Commission dismissed *Amici's* proposed alternative with inadequate explanation, choosing to rely on unverified anecdotes from commenters while

dismissing contrary empirical evidence.

These examples prove that the Court was correct when it held that "[t]he Commission's lack of evidence as to why they chose to impose such a sweeping prohibition—that prohibits entering or enforcing virtually all non-competes— instead of targeting specific, harmful non-competes, renders the Rule arbitrary and capricious."  Mem. Op. at 21–22, ECF 153.  And because the Court was entirely correct in this conclusion, as well as in its determination that the Commission lacked statutory authority to promulgate such a rule in the first place, there is only one appropriate remedy:  vacatur of the Final Rule.  *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").  Accordingly, this Court should set aside the Non-Compete Rule, which will ensure that hospital labor markets are not adversely distorted by the Commission's unlawful, arbitrary and capricious Final Rule.

## ARGUMENT

I.    **The Commission Failed to Adequately Address the Likelihood of Significant Distortions in Hospital Competition Resulting from the Disparate Treatment of Nonprofit and Taxpaying Hospitals.**

The Non-Compete Rule is uniquely disruptive as applied to hospitals and health systems.  The majority of America's hospitals are owned by tax-exempt, nonprofit organizations (58 percent) or State and local governments (19 percent)

that do not qualify as corporations under 15 U.S.C. § 44 and are thus beyond the

Commission's reach under the FTC Act.  JA0677.  Only the remaining 24% of

hospitals are subject to the Commission's jurisdiction and the Non-Compete Rule.

What's more, taxpaying hospitals compete directly with nonprofit hospitals for

employees—***78.8%*** of taxpaying hospitals are located in the same Hospital

Referral Region as a nonprofit hospital.  AHA Cmt. at 16.  As such, the Non-

Compete Rule would only apply to taxpaying hospitals, most of which compete

with nonprofit hospitals for employees.  This disparate treatment will produce an

uneven playing field among hospitals and will likely create significant, unstudied,

and anticompetitive distortions.

 *Amici* explained this reality to the Commission and urged the Commission to

exempt taxpaying hospitals and study the problem before upending hospital labor

markets.  AHA Cmt. at 16–17; FAH Cmt. at 6–7.  The AHA urged the

Commission to heed the Supreme Court's wise admonition that "[a]gencies, like

legislatures, do not generally resolve massive problems in one fell regulatory

swoop. . . .  They instead whittle away at them over time, refining their preferred

approach as circumstances change and as they develop a more nuanced

understanding of how best to proceed."  *Massachusetts v. EPA*, 549 U.S. 497, 524

(2007) (cited in AHA Cmt. at 18).

 But, the Commission ignored that warning.  In so doing, the Commission

identified no studies or data addressing the potential impact of the uneven application of a non-compete rule. The FTC thereby embarked upon an arbitrary and capricious experiment, permitting a majority of hospitals to continue to negotiate non-compete arrangements with their employees while competing with taxpaying hospitals that are subject to the FTC's jurisdiction and the Non-Compete Rule.

The agency's response to comments on this issue were unlawfully inadequate. ***First***, the Commission asserted its general commitment to prohibiting non-competes "to the full extent of its jurisdiction." JA0678. But a desire to assert unprecedented, maximalist regulatory authority does not excuse the failure to study and consider the ramifications. Nor does it permit the agency to disregard or dismiss real-world considerations like the distortion of unique labor markets. An agency may wish to regulate at the outer edges of its power, but doing so may still be arbitrary and capricious, as it is here.

***Second***, the Commission suggested—erroneously—that some unspecified portion of the tax-exempt nonprofit and governmental hospitals "likely fall under the Commission's jurisdiction and the final rule's purview because the Commission's jurisdiction is not coterminous with tax-exempt status." *Id.* This assertion, however, is unsupported by the Commission and judicial precedent cited in the rule. Not a single case cited by the Commission (JA0053–54 nn. 273–278)

involves the assertion of FTC section 5 jurisdiction over a nonprofit hospital (or even a non-hospital section 501(c)(3) tax-exempt, nonprofit entity), and it defies credulity to use this history to conclude that it is likely that any such hospital falls within the Commission's section 5 jurisdiction.  But even if the Commission has authority to regulate "some portion" of nonprofit and governmental hospitals—and it does not[1]—there are thousands of hospitals that it concededly could not reach.  And many of those hospitals compete in the same labor markets as taxpaying hospitals, creating the very risk of distortion that *Amici* identified in their comment letters.  Put another way, it is no answer that the Commission may regulate *some* nonprofit hospitals because, by its own admission, they cannot regulate *all* nonprofits hospitals, and so they still have no answer to the labor market distortions that *Amici* predict.[2]

  ***Third***, the Commission insisted that the continued use of non-compete

---

[1] The Commission's assertion of section 5 regulatory authority over some tax-exempt, nonprofit hospitals demonstrates the breathtaking breadth of its power grab.  The Commission believes that Section 5 of the FTC Act gives it the right to disregard the Internal Revenue Service's assessment of a hospital's nonprofit status if three Commissioners seek to inquire further and assert their own jurisdiction.  *See* JA0052–54.  While *Amici* need not address the merits of this contention here, they reference it to demonstrate how the Commission's Final Rule is even more sweeping than it may appear.  This broad assertion of jurisdiction is yet another instance of the Commission's failure to understand that "[t]he role of an administrative agency is to do as told by Congress, not to do what the agency think it should do."  Mem. Op. at 19, ECF 153.

[2] The same reasoning defeats the Commission's contention that for-profit staffing agencies or physician groups may employ some subset of hospital workers.  JA0677.  That may be true, but for-profit agencies do not employee *all* hospital workers.  As such, nonprofit and taxpaying hospitals will necessarily compete for *some* hospital labor under very different legal regimes, thereby raising the risk of distortion that the Commission failed to adequately address.

agreements by the large market segment that is outside the FTC's jurisdiction might place them "at a self-inflicted disadvantage in their ability to recruit workers." JA0679. This possibility has no evidentiary basis, as the Commission has never studied the impact of prohibiting non-compete arrangements only in a relatively small portion of a particular market. Moreover, contrary to the Commission's suggestion, the existence of state laws regulating non-compete agreements for both taxpaying and tax-exempt hospitals, *id.*, does not sufficiently address the distortive effects of the Non-Compete Rule. Rather than examining the anticipated hospital labor market impacts of the Non-Compete Rule in states with varying rules concerning non-compete arrangements, the Commission simply cited data about the number of hospitals in such states. The Commission's "response did not address the [commenters'] concern so much as sidestep it." *Ohio v. Environmental Protection Agency*, 144 S. Ct. 2040, 2055 (2024). After all, a mere recitation of statistics is not a reasoned response to the precise issue at hand. And if all of this were not enough, these statistics do not suggest that taxpaying and nonprofit hospitals would be on an even playing field in any state. This Court's astute observation that "no state has ever enacted a non-compete rule as broad as the FTC's Non-Compete Rule" is fatal to the Commission's statistics. Mem. Op. at 21, ECF 153.

     ***Finally***, left with the glaring problem that it does not have sufficient

evidence about the disparate impact of its rule and is stubbornly unwilling to study it further, the Commission summarily asserts its "long-time expertise in the healthcare market." JA0680. But a naked assertion of expertise is not a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983). In fact, the Commission's conclusory assertion of "we know best" demonstrates by "its own words and actions" that it was "on notice of the [Amici's] concern" but "failed to address the concern adequately." *Ohio*, 144 S. Ct. at 2056.

*Amici* agree with Plaintiff, Plaintiff-Intervenors, and this Court (Mem. Op. at 21–22, ECF 153) that (1) the Non-Compete Rule is unreasonably overbroad without a reasonable explanation, (2) it is generally not warranted by the evidence put forth by the Commission, and (3) the FTC did not sufficiently consider alternatives in promulgating the Rule. These fatal deficiencies in the Rule would exist even if the Secretary had exempted hospitals and health systems. But they are particularly acute with respect to the FTC's failure to adequately address the consequences of different rules for competitors in the same hospital labor market.

## II.    The Commission Failed to Adequately Explain Its Rejection of Alternatives Proposed by *Amici.*

As this Court has already noted, the Commission was required to consider less disruptive alternatives proposed, and in so doing, "was required to assess whether there were reliance interests, determine whether they were significant, and

weigh any such interests against competing policy concerns." Mem. Op. at 22, ECF 153 (internal citations and quotations omitted). Yet "[t]he record shows the Commission did not conduct such analysis, instead offering the conclusion that 'case-by-case adjudication of the enforceability of non-competes has an *in terrorem* effect that would significantly undermine the Commission's objective to address non-competes' tendency to negatively affect competitive conditions in a final rule.'" *Id.* (citing ECF 149 at 362). Such a justification "does not adequately justify the far reach of the Rule." *Id.* at 23.

This is also true with regard to the alternatives proposed by *Amici* AHA and FAH. In their public comments, *Amici* responded to the Commission's request for comments "on whether it should differentiate between workers rather than adopting a rule that applies uniformly to all workers." JA0773. Both *Amici* advised that it would be appropriate to narrow the Non-Compete Rule as it pertains to the unique features of the healthcare labor market, and in particular, to exempt physicians and senior hospital executives from the Rule. In support of its recommendations, *Amici* provided empirical evidence that:

- ***Non-compete agreements increase the rate of earnings growth for physicians***. There is a large body of empirical literature that finds, without exception, employees earn more with non-compete agreements than without them. AHA Cmt. at 7–8; FAH Cmt. at 8–10. Specific to physicians, an empirical study cited by the Commission in the Proposed Non-Compete Rule (JA0741) found that the "use of non-compete clauses among physicians is associated with greater earnings (by 14%) and greater earnings growth." AHA Cmt. at 8; FAH Cmt. at

8–9.

- ***Non-compete agreements promote continuity and integration of care*** by allowing medical practices to increase investments in patient relationships.  AHA Cmt. at 8–9; FAH Cmt. at 11.

- ***Non-compete agreements protect hospitals' recruitment investments***, especially in rural areas where there are workforce shortages.  AHA Cmt. at 10–11; FAH Cmt. at 16.

- ***Non-compete agreements encourage hospitals to make investments in training their employees***.  AHA Cmt. at 12–13; FAH Cmt. at 11.

- ***Non-compete agreements encourage sharing of proprietary information within hospitals***.  AHA Cmt. at 13–14.

- ***Physicians and senior hospital executives are fundamentally different from other workers*** such that the FTC's concerns regarding unequal bargaining power are not applicable.  AHA Cmt. at 15; FAH Cmt. at 15.

As one way of tailoring the Rule to address these facts, the AHA recommended that the Commission look to other areas of federal law that define and exempt categories of highly skilled and highly compensated workers.  AHA Cmt. at 15–16.  In particular, the AHA suggested that the Commission look to the Fair Labor Standards Act ("FLSA"), which, with its implementing regulations, defines categories of employees exempted from the statute's overtime pay requirements.  As the AHA commented:

> The FLSA generally requires that employees in the United States be paid at least the federal minimum wage for all hours worked and overtime pay at not less than time and one-half the regular rate of pay for all hours worked over 40 hours in a workweek. But, as authorized by statute, Department of Labor regulations contain exemptions from this requirement, including for "learned professionals," "highly

compensated employees," and even employees in the practice of medicine. **These are finely-drawn, well-established legal categories that the Commission can – and should – look to when re-evaluating its rule regarding non-compete agreements.** Relying on these three categories would address the AHA's concerns about invalidating non-compete agreements for physicians and senior executives. But more important for the Commission's ostensible purposes here, several of the FLSA-exemption categories would carve out those with equal bargaining power, while allowing the Commission to exercise any regulatory authority it believes it has towards protecting lower-skilled and lower-wage employees.

AHA Cmt. at 15–16 (citations omitted).

The Commission is well aware of the FLSA and the Department of Labor's ("DOL") implementing regulations—indeed, the Non-Compete Rule draws multiple definitions and standards from the FLSA.  *See*, *e.g.*, JA0643–JA0645 (setting the senior executive compensation threshold in accordance with definitions used in FLSA compliance); JA0646 (using the DOL's FLSA definition of "preceding year" as relevant to the senior executive compensation threshold).  In the Commission's own words, "The Commission recognizes DOL's expertise in determining who qualifies as a highly compensated worker and employers' likely familiarity with DOL regulations.  Given this familiarity, the Commission borrows from DOL's definition of compensation to minimize compliance burdens on employers."  JA0644.

Nonetheless, the Commission rejected, with only a passing reference, the AHA's suggestion that the Non-Compete Rule integrate the FLSA's exemptions to

tailor the Rule more narrowly.  *See* JA0649.  In so doing, the Commission failed to specifically respond to comments urging it to incorporate the FLSA's practice of medicine exemption.  *Id.*  Instead, the Commission summarily concluded that adopting FLSA exemptions "would exempt millions of non-competes that harm competition and workers" without examining the impact of selectively incorporating FLSA exemptions.  JA0649.  The Commissioner's failure to meaningfully engage with these regulatory alternatives itself renders the Non-Compete Rule arbitrary and capricious.  *See Ohio*, 144 S. Ct. at 2054 ("Although commenters posed this concern to EPA during the notice and comment period . . . EPA offered no reasoned response . . . . As a result, the applicants are likely to prevail on their argument that EPA's final rule was not 'reasonably explained,' that the agency failed to supply 'a satisfactory explanation for its action[,]' and that it instead ignored 'an important aspect of the problem' before it.") (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) and *State Farm*, 463 U.S. at 43); *Texas v. Biden*, 10 F. 4th 538, 554 n.4 (5th Cir. 2021) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

In addition, the Commission improperly discounted evidence in the record—including evidence presented by *Amici*—that non-competes *increase* competition and earnings for physicians and improve patient care, rural healthcare access,

medical training, and innovation and development, instead crediting self-serving, anecdotal comments. JA0635. For instance, the Commission discounted the findings of a physician-specific study revealing that non-compete clauses were associated with greater earnings and greater earnings growth (*see* AHA Cmt. at 8, FAH Cmt. at 8–9). The Final Rule gave this study "little weight" because it is correlative, rather than causal, despite acknowledging that the study "partially mitigates this methodological flaw by comparing earnings effects in a high- versus a low-enforceability state." JA0612. It was therefore unreasonable for the Commission to disregard this methodologically rigorous, physician-specific study. It was even more unreasonable to brush aside this legitimate alternative proposal in a single paragraph that relied on broad conclusions about "exploitation and coercion" that come primarily from unverified anecdotes.

In short, the Commission's consideration of the alternatives proposed by *Amici* to tailor the Rule to the unique features of the healthcare system, and its explanation of its decision to reject those alternatives, were unlawfully insufficient.

## III.  Vacatur Is the Proper Remedy to Uniformly Set Aside the Unlawful Non-Compete Rule.

Whether the Court finds the Non-Compete Rule to be in excess of the Commission's statutory authority (as it should), *see* Pl.-Intervenors Br. at 12–30; Pl. Br. Supp. Mot. Summ. J., ECF 167 ("Plaintiff Br.") at 14–31, or the product of flawed decision-making, *see supra*, Sec. I and II, *see also* Pl.-Intervenors Br. at

30–42; Plaintiff Br. at 32–42, the proper remedy is vacatur.  The applicable legal considerations and precedents concerning remedies in a final decision on the merits are different from those that guide the issuance of a preliminary injunction. Having reached a final conclusion that the Non-Compete Rule violates the APA, the Court must "set aside" the unlawful agency action and vacate the Non-Compete Rule in its entirety.  Any party-specific or other limited relief[3] would be inappropriate and disruptive as it would itself create an uneven competitive playing field.

Section 706 of the Administrative Procedure Act expressly provides that a reviewing court "shall . . . set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A), (C).  Accordingly, federal courts instruct that "vacatur is the appropriate remedy[]" for unlawful agency action.  *Data Mktg. P'ship v. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (establishing that vacatur empowers courts to "set aside" unlawful agency action) (citation omitted).  The Fifth Circuit has explicitly held that if plaintiffs prevail on challenging an agency action under the APA, the reviewing court "*must* set aside the [action], with nationwide effect."  *In re Clarke*, 94 F.4th

---

[3] Notably, associational relief would apply unevenly across nearly every industry based on membership in Plaintiff-Intervenor associations, distorting markets, including health care (*see* Sec. I, *supra*).

502, 512 (5th Cir. 2024) (emphasis added); *see also Franciscan All., Inc.*, 47 F.4th at 374–75  ("Vacatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation.") (emphasis added).

Because the Non-Compete Rule was promulgated in excess of statutory authority (Pl.-Intervenors Br. at 12–30; Plaintiff Br. at 14–31), this Court must now vacate the Rule.  Likewise, vacatur is equally necessary if the Court concludes that the Rule is arbitrary and capricious.  As established by the Fifth Circuit, departing from the default rule of vacatur is justifiable *only* in "rare cases" when the Defendant can show that (1) there is a "serious possibility" that the agency will be able to correct the rule's defects on remand and (2) vacating the challenged action would produce "disruptive consequences."  *Chamber of Commerce v. S.E.C.*, 88 F.4th 1115, 1118 (5th Cir. 2023); *see also Tex. Ass'n Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).  "[B]ecause vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary."  *Texas Med. Ass'n v. U.S. Dep't Health & Hum. Servs.*, No. 6:22-CV-450-JDK, 2023 WL 5489028, at *18 (E.D. Tex. Aug. 24, 2023).  The Commission has not, and cannot, show either factor applies here.

*First*, there is no possibility that the agency could correct the Rule's defects on remand.  *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (upholding vacatur where "fundamental substantive defects in the program," meant there was

"no possibility that [the agency] could obviate" defects on remand). The agency cannot fix a rule that it does not have statutory authority to promulgate. *See Bridgeport Hosp. v. Becerra*, ___ F.4th. ___, No. 22-5249, 2024 WL 3504407 (D.C. Cir. July 23, 2024) (holding vacatur is required when "an agency can't 'cure' the fact that it lacks authority to take a certain action"). Even if the Commission has such authority, it cannot show that it would be able to promulgate a ban against non-compete agreements after appropriately analyzing the impact of non-compete rules on specific sectors of the economy, including the healthcare field. *See* Sec. I, II, *supra*; Pl.-Intervenors' Br. at 31–37.

**Second**, this is not a circumstance in which vacatur would cause any disruptive consequences. In fact, because the Court is set to rule on the merits *before* the Rule's effective date of September 4, 2024, JA0571, vacatur would maintain the status quo, and "a vacatur that simply reinstates the longstanding status quo would not cause disruptive consequences." *Texas v. Cardona*, ___ F. Supp. 3d ___, No. 4:23-cv-00604, 2024 WL 2947022 (N.D. Tex. June 11, 2024). Indeed, as the Fifth Circuit has reasoned, "vacatur is a less dramatic remedy" than injunctive relief, as "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas v. United States*, 50 F.4th at 529 (internal quotations omitted).

Whether the Court finds the Rule to be invalid as in excess of the Commission's statutory authority, or as arbitrary and capricious, the APA and controlling Fifth Circuit precedent mandate this Court to vacate the Non-Compete Rule in its entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, the *Amici* respectfully submit that the Court should grant Plaintiffs' and Plaintiff-Intervenors' Motions for Summary Judgment and vacate the Non-Compete Rule.

DATED: July 26, 2024    Respectfully submitted,

           HOOPER, LUNDY & BOOKMAN, P.C.

           */s/ Katrina A. Pagonis*
           Katrina A. Pagonis
           *Pro Hac Vice*
           HOOPER, LUNDY & BOOKMAN
           44 Montgomery Street, Suite 3500
           San Francisco, CA 94104
           Telephone:  (415) 875-8500
           Fax:  (415) 986-2157
           kpagonis@hooperlundy.com

           Kelly A. Carroll
           *Pro Hac Vice*
           HOOPER, LUNDY & BOOKMAN
           401 9th Street NW, Suite 550
           Washington, DC 20004
           Telephone:  (202) 580-7712
           Fax:  (202) 609-8931
           kcarroll@hooperlundy.com

           Counsel for *Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify the foregoing complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, that the foregoing brief contains 4,834 words, including footnotes, and excluding the case caption, table of contents, table of authorities, signature block, and certificates, and that foregoing is typed in 14-point font and the footnotes are typed in 11-point font.

Date: July 26, 2024

*/s/ Katrina A. Pagonis*
Katrina A. Pagonis

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, the foregoing document was electronically filed in this matter with the Clerk of Court, using the ECF system, which sent notification of such filing to all counsel of record.


Date: July 26, 2024

*/s/ Katrina A. Pagonis*
Katrina A. Pagonis
