# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

RYAN, LLC,

      Plaintiff,

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA, *et al.*,

      Plaintiff-Intervenors,

v.

FEDERAL TRADE COMMISSION,

      Defendant.

CASE NO.: 3:24-CV-986-E

## DEFENDANT'S CORRECTED CONSOLIDATED BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF AND PLAINTIFF-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 4

I.     THE FEDERAL TRADE COMMISSION ACT .................................. 4

    A.    The Commission's Directive to Prevent Unfair Methods of
Competition ................................................................................ 4

    B.    The Commission's Statutory Authority ......................................... 6

II.    THE NON-COMPETES RULEMAKING ......................................... 10

    A.    The Proposed Rule ........................................................................ 10

    B.    The Commission's Findings and Public Comments ................................ 12

    C.    The Final Rule ............................................................................... 14

PROCEDURAL HISTORY ............................................................................... 15

LEGAL STANDARD ........................................................................................ 16

ARGUMENT .................................................................................................... 17

I.    THE FTC ACT EXPRESSLY AUTHORIZES THE COMMISSION
TO ISSUE LEGISLATIVE RULES PREVENTING UNFAIR
METHODS OF COMPETITION. ....................................................... 17

    A.    The Statute Expressly Directs the Commission to Prevent Unfair
Methods of Competition Through Rulemaking. ....................................... 17

    B.    The Major Questions Doctrine Does Not Compel a Different
Result. ........................................................................................... 29

II.    THE COMMISSION PROPERLY DESIGNATED NON-
COMPETES, AS A CLASS, AS "UNFAIR METHODS OF
COMPETITION." .............................................................................. 34

III.    THE RULE DOES NOT INTRUDE ON A CORE AREA OF
STATE REGULATION. ...................................................................... 40

IV.    CONGRESS LAWFULLY DELEGATED AUTHORITY TO THE
COMMISSION. ................................................................................... 42

V.      THE RULE IS NOT UNLAWFULLY RETROACTIVE. ............................... 46

VI.     THE RULE IS REASONABLE AND REASONABLY EXPLAINED. ....... 47

VII.    THE FTC ACT'S REMOVAL RESTRICTIONS ARE LAWFUL. ................ 63

VIII.   ANY RELIEF AWARDED BY THIS COURT SHOULD BE
        LIMITED IN ACCORDANCE WITH THE APA AND
        EQUITABLE PRINCIPLES. ................................................................. 63

        A.      Even If the APA Authorized Universal Vacatur, that Remedy Is
                Not Warranted Here. ................................................................. 63

        B.      The Court Should Not Extend Any Injunctive Relief to
                Unidentified Members of Plaintiff-Intervenors. ......................... 68

CONCLUSION ........................................................................................ 79

# TABLE OF AUTHORITIES

## CASES

*10 Ring Precision, Inc. v. Jones,*
    722 F.3d 711 (5th Cir. 2013) ..................................................................... 47

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) .......................................................................... 44, 45

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ................................................................................ 33

*Am. Fin. Servs. Ass'n v. FTC,*
    767 F.2d 957 (D.C. Cir. 1985) ............................................................... 42

*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (1974) ................................................................................ 77

*Am. Power & Light Co. v. SEC,*
    329 U.S. 90 (1946) .................................................................................. 44

*Amin v. Mayorkas,*
    24 F.4th 383 (5th Cir. 2022) ................................................................... 47

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ........................................................ 66, 76, 77

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd. ("AAPS"),*
    627 F.3d 547 (5th Cir. 2010) ............................................................ 73, 75

*Ass'n of Cmty. Organizers for Reform Now v. Fowler,*
    178 F.3d 350 (5th Cir. 1999) ................................................................. 69

*Atl. Refining Co. v. FTC,*
    381 U.S. 357 (1965) ................................................................................ 37

*ATS Tree Services, LLC v. FTC,*
    No. 2:24-cv-01743-KBH, 2024 WL 3511630 (E.D. Pa. July 23, 2024) .............. *passim*

*Biden v. Missouri,*
    595 U.S. 87 (2022) .................................................................................. 32

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ................................................................................... 31

*Boise Cascade Corp. v. FTC*,
    637 F.2d 573 (9th Cir. 1980) ...................................................................... 39

*Bristol Meyers Co.*,
    102 F.T.C. 21 (1983) ...................................................................................... 6

*Califano v. Yamasaki*,
    442 U.S. 672 (1979) ................................................................................ 69, 77

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ......................... 65, 67

*Cascabel Cattle Co., LLC v. U.S.*,
    955 F.3d 445 (5th Cir. 2020) ...................................................................... 23

*Cent. & S.W. Servs., Inc. v. EPA*,
    220 F.3d 683 (5th Cir. 2000) ...................................................................... 65

*Chamber of Commerce v. FTC*,
    6:24-cv-148 (E.D. Tex. Apr. 29, 2024) ................................................... 71, 78

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ..................................................................................... 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ..................................................................................... 17

*City of Arlington v. FCC*,
    668 F.3d 229 (5th Cir. 2012) ...................................................................... 31

*City of Hous. v. FAA*,
    679 F.2d 1184 (5th Cir. 1982) .................................................................... 20

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ................................................................................ 63

*Corley v. U.S.*,
    556 U.S. 303 (2009) .................................................................................... 23

*Delaware Department of Natural Resources and Environmental Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015) ........................................................................ 54

*DHS v. New York,*
   140 S. Ct. 599 (2020) .......................................................................... 66, 67

*Eastern Enterprises v. Apfel,*
   524 U.S. 498 (1998) .................................................................................. 47

*E.I. du Pont de Nemours & Co. v. FTC ("Ethyl"),*
   729 F.2d 128 (2d Cir. 1984) ................................................................. 5, 19

*FCC v. Prometheus Radio Proj.,*
   592 U.S. 414 (2021) .................................................................................. 51

*FDA v. Alliance for Hippocratic Med.,*
   602 U.S. 367 (2024) .............................................................................. 72, 76

*Fed. Power Comm'n v. Hope Nat. Gas Co.,*
   320 U.S. 591 (1944) .................................................................................. 43

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
   129 F.3d 826 (5th Cir. 1997) ................................................................... 71

*FTC v. Beech-Nut Packing Co.,*
   257 U.S. 441 (1922) .................................................................................... 5

*FTC v. Brown Shoe Co.,*
   384 U.S. 316 (1966) ......................................................................4, 5, 43, 44

*FTC v. Ind. Fed'n of Dentists,*
   476 U.S. 447 (1986) .................................................................................. 35

*FTC v. Motion Picture Advert. Serv. Co.,*
   344 U.S. 392 (1953) .........................................................................5, 35, 44

*FTC v. R.F. Keppel & Bro.,*
   291 U.S. 304 (1934) .................................................................................... 4

*FTC v. Raladam Co.,*
   283 U.S. 643 (1931) .............................................................................. 43, 44

*FTC v. Texaco, Inc.,*
   393 U.S. 223 (1968) ....................................................................... 36, 37, 43, 44

*Gill v. Whitford,*
   585 U.S. 48 (2018) .................................................................................... 67

*Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson,*
    559 U.S. 280 (2010) ..................................................................... 28

*Gundy v. United States,*
    588 U.S. 128 (2019) ..................................................................... 42

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ..................................................................... 64

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ..................................................................... 73

*ICC v. Cincinnati N. O. & T. P. Ry. Co.,*
    167 U.S. 479 (1897) ..................................................................... 30

*Illumina, Inc. v. FTC,*
    88 F.4th 1036 (5th Cir. 2023) .................................................... 63

*Impax Lab'ys, Inc. v. FTC,*
    994 F.3d 484 (5th Cir. 2021) ..................................................... 36

*In re POM Wonderful LLC.,*
    No. 9344 (FTC Jan. 10, 2013) ...................................................... 6

*Jama v. ICE,*
    543 U.S. 335 (2005) ..................................................................... 22

*Jones v. U.S.,*
    936 F.3d 318 (5th Cir. 2019) ..................................................... 16

*Jonibach Mgmt. Trust v. Wartburg Enterprises, Inc.,*
    750 F.3d 486 (5th Cir. 2014) ..................................................... 17

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) .............................................................. 66, 67

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994) ..................................................................... 46

*Lefebure v. D'Aquilla,*
    15 F.4th 650 (5th Cir. 2021) ..................................................... 66

*Lorillard v. Pons,*
    434 U.S. 575 (1978) ..................................................................... 19

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021) ........................................................................ 70

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...................................................................................... 42

*Mitchel v. Reynolds*,
    1 P. Wms 181 (Q.B. 1711) ............................................................................ 11

*Mobile Relay Assocs. v. FCC*,
    457 F.3d 1 (D.C. Cir. 2006) ......................................................................... 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................. 47, 51

*Mourning v. Family Publications Servs., Inc.*,
    411 U.S. 356 (1973) ...................................................................................... 18

*N. Pac. Ry. Co. v. U.S.*,
    356 U.S. 1 (1958) ......................................................................................... 48

*N. Tex. Specialty Physicians v. FTC*,
    528 F.3d 346 (5th Cir. 2008) ....................................................................... 36

*N.Y. Cent. Secs. Corp. v. United States*,
    287 U.S. 12 (1932) ........................................................................................ 43

*Nat'l Broad. Co. v. U.S.*,
    319 U.S. 190 (1943) ...................................................................................... 43

*Nat'l Cable & Telecommc'ns Ass'n v. FCC ("National Cable")*,
    567 F.3d 659 (D.C. Cir. 2009) ..................................................................... 46

*Nat'l Petroleum Refiners Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) ........................................................ 7-8, 19, 29

*Natural Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ....................................................................... 36

*NFIB v. DOL*,
    595 U.S. 109 (2022) ...................................................................................... 30

*North Carolina v. FERC*,
    112 F.3d 1175 (D.C. Cir. 1997) ................................................................... 51

*Ochoa-Salgado v. Garland,*
    5 F.4th 615 (5th Cir. 2021) ............................................................................ 66

*Peerless Prods., Inc. v. FTC,*
    284 F.2d 825 (7th Cir. 1960) ......................................................................... 41

*Properties of the Villages, Inc. v. FTC,*
    No. 5:24-cv-00316-TJC-PRL (M.D. Fla. 2024) ....................................... 1, 68

*Portland Cement Ass'n v. Ruckelshaus,*
    486 F.2d 375 (D.C. Cir. 1973) ....................................................................... 55

*Rudisill v. McDonough,*
    601 U.S. 294 (2024) ....................................................................................... 26

*Sears, Roebuck & Co. v. FTC,*
    258 F. 307 (7th Cir. 1919) ............................................................................. 43

*Seila Law, LLC v. CFPB,*
    591 U.S. 197 (2020) ....................................................................................... 29

*Sierra Club v. U.S. Dep't of Interior,*
    990 F.3d 909 (5th Cir. 2021) ......................................................................... 47

*Silva-Trevino v. Holder,*
    742 F.3d 197 (5th Cir. 2014) ......................................................................... 21

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,*
    531 U.S. 159 (2001) ....................................................................................... 22

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) ................................................................................... 64

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ....................................................................................... 70

*Texas Clinical Labs, Inc. v. Sebelius,*
    612 F.3d 771 (5th Cir. 2010) ......................................................................... 47

*Thorpe v. Housing Authority of City of Durham,*
    393 U.S. 268 (1953) ................................................................................. 18, 27

*Trump v. Hawaii,*
    585 U.S 670 (2018). ................................................................................. 66, 68

*United States v. American Tobacco Co.*,
    221 U.S. 106 (1911) ........................................................................................... 11, 41

*United States v. Cooper*,
    750 F.3d 263 (3d Cir. 2014) ............................................................................... 43-44

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ................................................................................................. 5

*United States v. JS&A Grp., Inc.*,
    716 F.2d 451 (7th Cir. 1983) ............................................................................... 8, 29

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ............................................................................................. 27-28

*United States v. Texas*,
    599 U.S. 670 (2023) ....................................................................................... 65, 66, 76

*Viasat, Inc. v. FCC*,
    47 F.4th 769 (D.C. Cir. 2022) ................................................................................ 72

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ................................................................................ 29, 30, 32, 33

*White Buffalo Ventures, LLC v. University of Texas at Austin*,
    420 F.3d 366 (5th Cir. 2005) ................................................................................. 16

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ..................................................................................... 42, 43, 45

*Yakus v. United States*,
    321 U.S. 414 (1944) ................................................................................................ 43

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022) ................................................................................................ 23

## STATUTES

5 U.S.C. § 301 .............................................................................................................. 26

5 U.S.C. § 702 .............................................................................................................. 64

5 U.S.C. § 703 .............................................................................................................. 64

5 U.S.C. § 706 ............................................................................17, 63, 65

15 U.S.C. § 44 ....................................................................................... 69

15 U.S.C. § 45 ................................................................................. *passim*

15 U.S.C. § 46 ................................................................................. *passim*

15 U.S.C. § 53(b) ..................................................................................... 6

15 U.S.C. § 57a .......................................................................... 9, 20, 21, 24

15 U.S.C. § 57b-3 ............................................................................ *passim*

15 U.S.C. § 1194(c) ................................................................................. 24

15 U.S.C. § 2310(a)(1)-(2) ....................................................................... 24

15 U.S.C. § 7607 ..................................................................................... 25

Fla. Stat. Ann. § 501.204(1) ..................................................................... 41

Federal Cigarette Labeling and Advertising Act ,
    Pub. L. No. 89-92, 79 Stat. 282 (1965), *amended*, 15 U.S.C. § 1333 ............................. 7

Federal Trade Commission Act of 1914,
    Pub. L. No. 63-203, 38 Stat. 717, *amended*, 15 U.S.C. §§ 41-58 ............................ *passim*

Federal Trade Commission Improvements Act of 1980,
    Pub. L. No. 96-252, 94 Stat. 374, codified at 15 U.S.C. § 57b-3 ................................. 10

LA Stat. Ann. § 51:1405 ........................................................................... 41

Magnuson-Moss Warranty—Federal Trade Commission Improvement Act,
    Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) ....................................... 8, 9

Miss. Code Ann. § 75-24-5 ........................................................................ 41

N.Y. Gen. Bus. Law § 340 ......................................................................... 41

**RULES**

Fed. R. Civ. P. 23(c)(1)(A) ....................................................................... 77

Fed. R. Civ. P. 56(a) ............................................................................... 16

Fed. R. Civ. P. 65(d) ............................................................................... 72

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

16 C.F.R. pt. 3 ......................................................................................... 6

29 C.F.R. § 910.3(b) ............................................................................... 46

Non-Compete Clause Rule ,
   88 Fed. Reg. 3482 (Jan. 19, 2023) ................................................. 12

Non-Compete Clause Rule,
   89 Fed. Reg. 38,342 (May 7, 2024) ......................................... *passim*

Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps,
   36 Fed. Reg. 23,871 (Dec. 16, 1971)
   *repealed by* 43 Fed. Reg. 43,022 (Sept. 22, 1978) .......................... 7

Promulgation of Trade Regulation Rule,
   40 Fed. Reg. 49,492 (Oct. 22, 1975) ............................................... 9

Promulgation of Trade Regulation Rule,
   40 Fed. Reg. 51,582 (Nov. 5, 1975) ................................................ 9

Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health
   Hazards of Smoking,
   29 Fed. Reg. 8324 (July 2, 1964) .................................................... 7

## LEGISLATIVE MATERIALS

120 Cong. Rec. 40,606, 40,713 (1974) (statement of Sen. Hart) ................................ 8, 24

H.R. Rep. No. 103-138 (1993) ................................................................. 20

S. Conf. Rep. 93-1408 § 202 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7755, 7762 ........... 8

## OTHER AUTHORITIES

*Agency Rules with the Force of Law: The Original Convention*,
   116 Harv. L. Rev. 467 (2002) ...................................................... 25

Grossman, Robert I., Comment Letter on Proposed Rule (Mar. 20, 2023),
   https://perma.cc/7ZY9-FNJ3 ........................................................ 75

Harlan M. Blake, *Employee Agreements Not to Compete*,
73 Harv. L. Rev. 625 (1960) ........................................................................ 10

Individual Commenter, Comment Letter on Proposed Rule (Mar. 6, 2023),
https://perma.cc/ML95-TAVQ ................................................................... 11

John M. McAdams, Non-Compete Agreements: A Review of the Literature (2019) . 56

Johnson, Lavetti & Lipsitz, The Labor Market Effects of Legal Restrictions on
Worker Mobility (Nat'l Bureau of Econ. Rsch.,
Working Paper No. 31929, 2023) .......................................................... 53-54

Jonathan Barnett, Comment Letter on Proposed Rule (May 2, 2023),
https://perma.cc/UR3S-R372 ..................................................................... 60

Policy Statement Regarding the Scope of Unfair Methods of Competition Under
Section 5 of the Federal Trade Commission Act, Comm'n File No. P221202 (Nov.
10, 2022),
https://perma.cc/2G3F-2UW9 ............................................................... 5, 6, 34

Prevent, Century Dictionary and Cyclopedia (1911) ........................................ 18

Small Business Majority, Comment Letter on Proposed Rule (Apr. 19, 2023),
https://perma.cc/E6EJ-E789 ................................................................... 73-74
Small Business Majority et al., Comment Letter on Proposed Rule (Apr. 19, 2023),
https://perma.cc/ZTW2-KCL9 74

## INTRODUCTION

The Federal Trade Commission ("the Commission") is charged by Congress in the Federal Trade Commission Act ("the FTC Act" or "the Act") with preventing unfair methods of competition in or affecting commerce. Congress thus authorized the Commission to "make rules and regulations for the purpose of carrying out" that mandate. 15 U.S.C. § 46(g). The Commission has done just that, by issuing a rule designating most existing non-compete clauses in contracts ("non-competes") to be unenforceable "unfair methods of competition," subject to an exception for certain senior executives, and banning the future use of most non-competes. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ("Rule" or "Final Rule"). Non-competes both by definition and in their proven empirical effects restrict competition in labor, product, and service markets by preventing workers from taking new jobs or starting new businesses.

Plaintiffs, a private company and group of business-interest associations, filed this lawsuit to challenge the Commission's effort to promote fair competition. This Court previously granted Plaintiffs' request for preliminary relief, temporarily enjoining the Commission from enforcing the Rule against Plaintiffs and staying the Rule's effective date as to Plaintiffs. Mem. Op. and Order, ECF No. 153 (July 3, 2024). At the same time, legal challenges to the Rule have continued to percolate through other district courts. *See ATS Tree Services, LLC. v. FTC*, 2:24-cv-01743-KBH (E.D. Pa. 2024); *Properties of the Villages, Inc. v. FTC*, 5:24-cv-00316-TJC-PRL (M.D. Fla. 2024). Recently,

a judge in the U.S. District Court for the Eastern District of Pennsylvania denied a plaintiff's similar request for a preliminary injunction, concluding that the plaintiff was unlikely to succeed on the merits of its claims, many of which are the same as those brought by Plaintiffs here, and had not established irreparable harm from the Rule. *ATS Tree Services, LLC* ("*ATS*"), 2024 WL 3511630 (E.D. Pa. July 23, 2024).

Plaintiffs' burden to establish entitlement to relief on summary judgment is greater than on a motion for preliminary injunction, and this Court's prior opinion does not bind it at this stage. At no point in the history of this litigation have Plaintiffs meaningfully contested that the use of non-competes is an unfair method of competition or that the Commission has authority to regulate non-competes through adjudication. Rather, Plaintiffs' arguments center on whether the Commission can prohibit the use of non-competes through rulemaking. But Congress authorized the Commission in clear language to prevent unfair methods of competition through both adjudication and rulemaking, and the Commission's choice of rulemaking to address the anticompetitive effects of non-competes is both logical and unremarkable. The major questions doctrine is also not implicated here, as the Rule falls squarely within the Commission's delegated authority and expertise. Nor is the Sherman Act's framework applicable, since the FTC Act was designed to supplement the Sherman Act and expressly confers the authority to prevent unfair methods of competition. The FTC Act also provides an intelligible principle by which the Rule can be measured, and the Rule is not unlawfully retroactive because it has only prospective effects. Finally, the

Commission easily satisfies the deferential arbitrary-and-capricious standard given its exhaustive study of non-competes and thorough economic justifications for the Rule.

But even if the Court is inclined to enter judgment for Plaintiffs, it should carefully circumscribe any relief in accordance with the Administrative Procedure Act ("APA") and equitable principles. First, the Court should deny Plaintiffs' request to vacate the Rule in its entirety. Even assuming vacatur is an available remedy under the APA, the use of that remedy is subject to traditional equitable principles. Here, where challenges to the Rule are percolating amongst the lower courts and at least one of those courts already has concluded that the Rule is likely lawful, those equitable principles weigh heavily against issuing any form of universal relief, including vacatur.

Second, should the Court determine injunctive relief is warranted, such relief should be limited to the named parties to whom the Rule applies and any identified members of the U.S. Chamber of Commerce ("Chamber") that have shown harm from the Rule. Importantly, any relief should not extend to hundreds of thousands or millions of other unidentified members of the plaintiff organizations, without any evidence that those members are injured by the Rule, have authorized the organizational plaintiffs to litigate claims on their behalf, or have agreed to be bound by the judgment in this litigation. The Chamber has not shown that it is a bona fide membership organization or that the relief it seeks here will benefit its unknown members; indeed, the Chamber does not establish that all the members on whose behalf it purports to litigate even oppose the Rule, which is particularly significant given public support for the Rule from

3

a wide swath of businesses. Finally, issuing the overbroad relief Plaintiffs request would contravene Article III and equitable principles; violate Rule 65's requirement that injunctive relief be specific and well-defined; give numerous unnamed and unknown entities two bites at the apple; and circumvent the due process protections and established requirements for seeking aggregate or class-wide relief in federal court.

## BACKGROUND

## I.   THE FEDERAL TRADE COMMISSION ACT

Congress established the Commission in 1914 as a bipartisan expert agency. Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717, codified as amended at 15 U.S.C. §§ 41-58. The Commission has two core mandates, set forth in Section 5 of the Act, codified at 15 U.S.C. § 45. The Commission is "empowered and directed" "to prevent": (1) "unfair methods of competition in or affecting commerce," *id.* § 45(a)(2), and (2) "unfair or deceptive acts or practices [("UDAPs")] in or affecting commerce," *id.*

### A. The Commission's Directive to Prevent Unfair Methods of Competition

Section 5's directive to prevent "unfair methods of competition" confers on the Commission "broad powers to declare trade practices unfair." *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320-21 (1966). The initial proposal for the FTC Act used the phrase "unfair competition," which had a recognized common law definition. *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 310-11 (1934). But Congress found that phrase "too narrow," and substituted for it the "broader and more flexible phrase 'unfair *methods of*

4

competition'"—a term that was then new in the law. *Id.* at 311-12 (emphasis added). The Supreme Court has repeatedly recognized that "unfair methods of competition" encompasses "incipien[t]" conduct beyond that which violates the Sherman or Clayton Acts, and that the FTC Act "supplement[s] and bolster[s]" those statutes rather than merely duplicating them. *Brown Shoe*, 384 U.S. at 322; *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953) (same); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 453 (1922) (same).

To fall within Section 5's ambit, conduct must first be a "method of competition" "as opposed to merely a condition of the marketplace … such as high concentration or barriers to entry." Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act at 8, Comm'n File No. P221202 (Nov. 10, 2022), https://perma.cc/2G3F-2UW9. ("Section 5 Policy Statement") (synthesizing caselaw); *see E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2d Cir. 1984) ("*Ethyl*"). The conduct must also be "unfair," meaning it "goes beyond competition on the merits"—*i.e.*, competing by offering a better product, service, or job. Section 5 Policy Statement at 8-9; *see United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing anticompetitive practice from having "a superior product" or "business acumen"). As articulated in nearly a century of caselaw and the Act's legislative history, whether competition goes beyond the merits requires "two key criteria": (1) the conduct is "coercive, exploitative, collusive, abusive, deceptive, predatory" or "otherwise restrictive or exclusionary;" and (2) the conduct

5

"tend[s] to negatively affect competitive conditions," *e.g.*, by tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement at 9 & nn.51, 52 (collecting cases and summarizing history of the Act); *see also* 89 Fed. Reg. at 38,358-59. This "second prong … does not turn on whether the conduct directly caused actual harm in the specific instance at issue," and may be satisfied when conduct tends to harm competitive conditions "in the aggregate along with the conduct of others engaging in the same or similar conduct." 89 Fed. Reg. at 38,358; *see also id.* at nn.288-90.

## B. The Commission's Statutory Authority

The Commission carries out its mandates—preventing unfair methods of competition and UDAPs—through adjudication and rulemaking. Pursuant to Section 5, enforcement actions subject to adjudication before the Commission—including to stop a violation of a rule—are governed by formal procedures and judicially reviewable. 15 U.S.C. § 45(b), (c); 16 C.F.R. pt. 3. These adjudications are precedential and apply to future Commission action.[1] The Commission may also seek injunctive relief in court to halt activity that is unlawful under the Act. 15 U.S.C. § 53(b).

Section 6 of the Act, codified at 15 U.S.C. § 46, contains "additional powers" of the Commission, including significant investigative authority and rulemaking authority pertaining to any provision of the Act. *Id.* Section 6(g) empowers the Commission "to

---

[1] For example, the Commission announced its "competent and reliable scientific evidence" standard in an adjudication decades ago, *Bristol Meyers Co.*, 102 F.T.C. 21, 312, 315 (1983), and has regularly invoked that standard since, *e.g.*, *In re POM Wonderful LLC*, No. 9344, Final Order (FTC Jan. 10, 2013).

make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722; *see also* 15 U.S.C. § 46(g). It also provides the Commission authority to "classify corporations." *Id.*

Before statutory amendments imposed separate, more restrictive procedural requirements for UDAP rulemakings, *see infra*, the Commission used its Section 6(g) authority to promulgate twenty-six rules combatting both unfair methods of competition and UDAPs. *See* 89 Fed. Reg. at 38,349-50. For example, the Commission's "Octane Rule" declared it to be both an unfair method of competition and a UDAP to fail to disclose the minimum octane number on gasoline pumps. Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971), *repealed by* 43 Fed. Reg. 43,022 (Sept. 22, 1978).

Some rules attracted Congressional attention and were displaced by legislation. *See, e.g.*, Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, 79 Stat. 282 (1965) (codified as amended at 15 U.S.C. § 1333) (displacing Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324 (July 2, 1964)). Yet Congress chose not to limit the scope of the Commission's rulemaking authority with respect to unfair methods of competition. Courts of appeals confirmed the Commission's statutory authority to promulgate such rules. The D.C. Circuit held that the Commission "is authorized to promulgate rules defining the meaning of the statutory standards of the illegality [that] the Commission is empowered to prevent," including unfair methods of competition. *Nat'l Petroleum*

7

*Refiners Ass'n v. FTC*, 482 F.2d 672, 698 (D.C. Cir. 1973) ("*National Petroleum*"). The Seventh Circuit later agreed and "incorporate[d] by reference that case's lengthy discussion of the Commission's rulemaking authority under section 6(g)." *U.S. v. JS&A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).

With clear awareness of the D.C. Circuit's decision upholding the Commission's rulemaking authority with respect to both UDAPs and unfair methods of competition in *National Petroleum*, Congress chose to add procedural limits for UDAP rulemakings while expressly preserving the Commission's authority to issue rules governing unfair methods of competition. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) ("1975 Amendments"). The Senate rejected the House's proposal to prohibit the Commission from "prescribing rules with respect to unfair competitive practices." S. Conf. Rep. 93-1408 § 202 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7755, 7762. And the Conference report adopting the final text of the 1975 Amendments made clear that "[t]he conference substitute does not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition …." *Id.* at 7764.

Debate immediately before the Senate vote on the conference report further demonstrated Congress's awareness of *National Petroleum*, with a statement quoting from the decision and noting that, because the 1975 Amendments concerned consumer protection provisions, the new procedural requirements "are limited to unfair or deceptive acts or practices rules." 120 Cong. Rec. 40,606, 40,713 (1974) (statement of

8

Sen. Hart). Debate also made clear that the amendments "are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition" and the Commission may continue to do so "in accordance with the informal rulemaking procedures of [the Administrative Procedure Act]." *Id.*

The 1975 Amendments, which became Section 18 of the Act, codified at 15 U.S.C. § 57a, provide:

> The Commission shall have no authority under [the Act], other than its authority under this section, to prescribe any rule with respect to [UDAPs].... *The preceding sentence shall not affect any authority of the Commission to prescribe rules ... with respect to unfair methods of competition....*

15 U.S.C. § 57a(a)(2) (emphasis added). Congress also amended Section 6(g) to reference Section 18, stating that the Commission may issue rules and regulations "except as provided in [Section 18(a)(2)]." *Id.* § 46(g). Congress noted that its amendments "shall not affect the validity" of any rule the Commission had previously promulgated, and it provided that "[a]ny proposed rule under section 6(g)" that was "substantially completed" at the time of the 1975 Amendments could be promulgated without the new procedures in Section 18. *See* 88 Stat. at 2198. That carve-out allowed the Commission to promulgate several rules in progress, including the "Mail Order Rule" that defined certain conduct as both a UDAP and an unfair method of competition. *See* Promulgation of Trade Regulation Rule, 40 Fed. Reg. 49,492 (Oct. 22, 1975) (regulatory text of Part 435—Mail Order Rule); Promulgation of Trade Regulation Rule, 40 Fed. Reg. 51,582 (Nov. 5, 1975) (statement of basis and purpose

for final rule).

In the Federal Trade Commission Improvements Act of 1980 ("1980 Amendments"), Congress again amended the Act. Pub. L. No. 96-252, 94 Stat. 374. These amendments, codified at 15 U.S.C. § 57b-3, created additional procedural steps for the Commission's UDAP and unfair method of competition rulemakings. Confirming that both Section 6(g) and Section 18(a) provide substantive rulemaking authority, Congress defined "rule" by reference to those sections and exempted from the new procedural requirements "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, [and] practice." 15 U.S.C. § 57b-3(a)(1). Congress also demonstrated its awareness of the scope of rules promulgated under Sections 6(g) and 18(a) by recognizing that amendments to those rules could have "an annual effect on the national economy of" at least $100 million. *Id.* § 57b-3(a)(1)(A).

## II.    THE NON-COMPETES RULEMAKING

### A. The Proposed Rule

Non-competes undermine economic liberty, preventing individuals from moving freely to switch jobs or start their own businesses. For centuries, courts have scrutinized non-competes on a case-by-case basis, recognizing their anticompetitive nature and that they can have pernicious effects. *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 636 (1960) (in *Dyer's Case*, the Court of Common Pleas in 1414 declared it "illegal at common law" to condition a promise on

an agreement "not [to] practice his trade for a period of six months in the plaintiff's town"); *Mitchel v. Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711) (enforcing a non-compete but recognizing that non-competes may threaten "the loss of [the worker's] livelihood, and the subsistence of his family"). As early as 1911, in the formative antitrust case *United States v. American Tobacco Co.*, the Supreme Court held that several tobacco companies violated both section 1 and section 2 of the Sherman Act because of their "constantly recurring" use of non-competes, among other practices. 221 U.S. 106, 181-83 (1911). All States restrict non-competes to some degree, and four States have banned them.

In recent decades, it became clear that non-competes are widespread, proliferating far beyond the boardroom to low-wage and hourly workers without specialized training or access to confidential information. *Id.* at 38,346 (over half of workers covered by non-competes are hourly workers); *see also, e.g.*, Individual Commenter, Comment Letter on Proposed Rule (Mar. 6, 2023), https://perma.cc/ML95-TAVQ (Texan worker explaining: "I couldn't go down the street to another burrito shop because I might bring with me the knowledge of how to roll a tortilla around a mess of rice and beans."). Simultaneously, a robust body of empirical literature studying non-competes emerged as changes in state law provided natural experiments enabling economists to isolate and quantify the harms caused by (not just correlated with) non-competes. 89 Fed. Reg. at 38,382-84. Yet employers continue to use non-competes even in States where they are unlawful. *Id.* at 38,429.

Beginning in 2018, the Commission studied the extent and effects of non-competes through public hearings and workshops, invitations for public comment, and a review of academic studies. *See* 89 Fed. Reg. at 38,343-44. In 2021, the Commission initiated several investigations into the use of non-competes, which resulted in consent decrees settling charges that those agreements were unfair methods of competition under Section 5 and requiring firms to eliminate non-competes for thousands of workers. *Id.* at 38,344. In 2023, the Commission proposed a rule that would require employers to rescind all existing non-competes and prohibit employers from entering into new ones. Non-Compete Clause Rule, 88 Fed. Reg. 3482 (Jan. 19, 2023).

## B. The Commission's Findings and Public Comments

Before adopting the Final Rule, the Commission conducted an exhaustive analysis of the economic literature regarding non-competes and considered the public comments that were filed in response. In its expert judgment, the Commission found that non-competes: (1) are a method of competition as opposed to a condition of the marketplace, 89 Fed. Reg. at 38,374; (2) are by their terms restrictive and exclusionary, *id.*; and (3) tend to negatively affect competition in labor, product, and service markets, *id.* at 38,379-402, 38,406-11. The Commission also found that non-competes with non-senior executives are exploitative and coercive because they are often imposed unilaterally, *id.* at 38,374-79, though that is not always true for senior executives, who often have an opportunity to bargain for, and receive compensation for, non-competes, *id.* at 38,405-06.

12

For labor markets, the evidence showed that non-competes tend to reduce competition by inhibiting efficient matching between workers and employers. *Id.* at 38,379. That is, non-competes reduce labor mobility by limiting the movement of workers between firms. *Id.* at 38,380-81. This suppresses wages, even for workers *not* subject to non-competes, as well as productivity, because workers are not matched to optimal jobs given their skillsets. *Id.* at 38,382-84. For product and service markets, the evidence showed that non-competes inhibit new business formation by preventing workers from leaving their jobs to start competing firms, and by preventing existing businesses from hiring the talented workers they need to compete. *Id.* at 38,388-91. For similar reasons, non-competes inhibit innovation. *Id.* at 38,394-95.

The Commission also found that "the principal harms from non-competes arise from their tendency to negatively affect competitive conditions in the aggregate." *Id.* at 38,463. That is, while "[a] single non-compete with a single worker may not do much to inhibit efficient matching between workers and employers across a labor market or suppress new business formation or innovation (and what effects it does have would be difficult to measure)," "the Commission [found] based on empirical evidence that the use of many non-competes across the labor market does have … aggregate net negative effects," *id.*, for "workers, consumers, [and] businesses." *id.* at 38,460. The Commission found that these negative externalities—stemming from the widespread use of non-competes—may be difficult to redress in individual adjudications

13

concerning noncompete agreements but can be addressed in a rulemaking concerning non-compete agreements as a class. *Id.* at 38,463-64.

The overwhelming public support for the proposed rule reinforced these empirical findings. *See id.* at 38,344 (over 25,000 of the 26,000 comments supported the proposed rule). Thousands of workers explained how non-competes prevent them from taking a better job or starting a competing business, which depresses wages, subjects them to poor working conditions, and reduces the quality and increases the prices of goods or services their employers offer. *Id.* at 38,340-46. Numerous small businesses and small business associations also supported the Rule. 89 Fed. Reg. at 38,491-92. The Commission estimated that prohibiting non-competes would increase new business formation by 2.7% annually and spur innovation, leading to over 100,000 new patents over ten years. 89 Fed. Reg. at 38,433, 38,470. Worker earnings would increase by $400 to $488 billion over ten years, *id.*, and consumer prices would fall, *id.* at 38,478.

## C. The Final Rule

For those reasons, the Commission adopted the Final Rule, which provides that it is an unfair method of competition under Section 5 for employers to enter into non-competes after the Rule's effective date, September 4, 2024. 89 Fed. Reg. at 38,342. The Rule also prohibits employers from enforcing existing non-competes after that date and requires employers to provide notices that those clauses are unenforceable, except with respect to senior executives. *Id.* Existing non-competes with senior executives—which

14

the Rule defines as any worker who makes above $151,164 annually and is in a policy-making position—may remain in effect. *Id.*; *id.* at 38,414.

## PROCEDURAL HISTORY

Plaintiff Ryan, LLC ("Ryan") initiated this suit on April 23, 2024. Compl., ECF No. 1. Ryan then amended its complaint, challenging the Rule on several constitutional and statutory bases under the APA. Am. Compl. ¶¶ 66-97 (May 1, 2024), ECF No. 22. Ryan also moved to stay the effective date of the Rule and for a preliminary injunction. *See* ECF No. 24 ("Ryan Mot.").

On May 9, 2024, the Court granted intervention to four organizations who previously filed suit in the Eastern District of Texas: the U.S. Chamber of Commerce, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce (collectively, "Plaintiff-Intervenors"; collectively with Ryan, "Plaintiffs"). Order, ECF No. 34. Plaintiff-Intervenors challenged the Rule on similar, though not entirely overlapping grounds, Pl.-Intervenors Compl. ¶¶ 87-119, ECF No. 37, and moved for a stay of the Rule's effective date and preliminary injunction, *see* ECF No. 47 ("Pl.-Intervenors Mot.").

The Court granted Ryan and Plaintiff-Intervenors' motions for preliminary relief. Mem. Op. and Order, ECF No. 153 ("Op.") (July 3, 2024). Specifically, the Court enjoined the Commission from "implementation of or enforcement of the Non-Compete Rule" against Ryan and Plaintiff-Intervenors, excluding Plaintiff-Intervenors' members, until "the Court's final adjudication on the merits." Prelim. Inj., ECF No.

15

154 (July 3, 2024). The Court also stayed the effective date of the Rule as to Plaintiffs. *Id.*

Plaintiffs filed their motions for summary judgment on July 19, 2024. Ryan, LLC's Mot. for Summ. J., ECF No. 166; Pl.-Intervenors Mot. for Summ. J., ECF No. 168.

## LEGAL STANDARD

Summary judgment is appropriate on a showing "that there is no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the movant's burden to demonstrate "the absence of a genuine issue of material fact," and entry of summary judgment is required against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. U.S.*, 936 F.3d 318, 321 (5th Cir. 2019).[2] Cross-motions for summary judgment should be "reviewed independently, with evidence and inferences taken in the light most favorable to the nonmoving party." *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 370 (5th Cir. 2005). When a court has previously entered a preliminary injunction, "the findings of fact and conclusions of law" therein "are not binding" and "may be challenged at a later stage of the

---

[2] Unless indicated, internal quotations and citations are omitted throughout.

16

proceedings." *Jonibach Mgmt. Trust v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 491 (5th Cir. 2014).

Under the APA, an agency's decision must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or in excess of statutory authority. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B)-(C). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Court may not "substitute its judgment for that of the agency." *Id.*

## ARGUMENT

### I. THE FTC ACT EXPRESSLY AUTHORIZES THE COMMISSION TO ISSUE LEGISLATIVE RULES PREVENTING UNFAIR METHODS OF COMPETITION.

#### A. The Statute Expressly Directs the Commission to Prevent Unfair Methods of Competition Through Rulemaking.

Far from being solely an "adjudication-focused scheme," Op. 13, the Commission's authority to issue legislative rules prohibiting unfair methods of competition is evident from the plain text of the Act. Section 5 "empower[s] and direct[s]" the Commission to "prevent" the use of unfair methods of competition. 15 U.S.C. § 45(a)(2). Section 6(g) then authorizes the Commission "to make rules and regulations for the purpose of carrying out the provisions of this Act," including in furtherance of the Commission's Section 5 mandate to prevent unfair methods of

17

competition. 38 Stat. at 722; *see also* 15 U.S.C. § 46(g). This plain text reading of the Act is consistent with the Supreme Court's decision in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369 (1973), where the Court made clear that "when the empowering provision of a statute states simply that the agency may 'make … such rules and regulations as may be necessary to carry out the provisions of this Act,' … the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" 411 U.S. 356, 369 (1973) (quoting *Thorpe v. Housing Auth. of City of Durham*, 393 U.S. 268, 280-81 (1953)).

Indeed, this Court acknowledged that the Commission "has some authority to promulgate rules to preclude unfair methods of competition." Op. 15. But there is no textual limitation on the types of "rules and regulations" permitted by Section 6(g), and imposing any limitation on the types of "rules and regulations" the Commission may issue amounts to rewriting the statute to include words never enacted by Congress. *Contra* Ryan Mot. 15; Pl.-Intervenors Mot. 13.

The Commission's power to promulgate rules to prohibit practices in furtherance of Section 5(a) is further confirmed by the Act's directive to the Commission to "prevent" entities subject to its jurisdiction "from using unfair methods of competition," 15 U.S.C. § 45(a)(2). "Prevent" means "to keep from existing or occurring; render impossible." *Prevent,* Century Dictionary and Cyclopedia (1911). Congress's use of the word "prevent" compels the conclusion that Congress empowered the Commission to issue rules regulating unfair methods of competition,

18

since the only way for the Commission to act to *prevent* unfair methods of competition from occurring in the first place would be to prohibit such methods before they occur. Adjudications, by contrast, are inherently retrospective and backward-looking. Reading Section 6(g) to exclude legislative rules would "cabin the [Commission's] power as solely adjudicatory, and therefore reactionary and backward-looking, only arising once unfair methods of competition have already occurred." *ATS*, 2024 WL 3511630, at *14-15. Congress's use of the word "prevent" makes clear that Congress conferred upon the Commission the power "to act prophylactically to stop 'incipient' threats of unfair methods of competition." *Id.* at *15 (quoting *Ethyl*, 729 F.2d at 136).

Congress ratified the Commission's competition rulemaking authority in the 1975 Amendments. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). It is undisputed that Congress enacted the 1975 Amendments against the backdrop of the then-recent decision in *National Petroleum*, which held that Section 6(g) empowers the Commission to issue rules defining unfair methods of competition.[3, 4] 482 F.2d 672; *ATS*, 2024 WL 3511630, at * 16 (Congress "affirmed" holding of *National Petroleum* "implicitly through

---

[3] Ryan argues that *National Petroleum* was wrongly decided. Ryan Mot. 23. Not so. But that is irrelevant to the key point here: The holding of that case provided the basis for the congressional ratification confirming that Section 6(g) extends to rules related to unfair methods of competition.

[4] The Court cited to *National Petroleum* in its preliminary injunction opinion several times. *E.g.,* Op. at 12. The holding of that case—that the FTC has substantive rulemaking authority for unfair methods of competition—confirms that the FTC has statutory authority to issue the Rule.

its ratification of the 1975 Amendments"). Congress rejected a proposal to limit the Commission's competition rulemaking authority and instead opted to add text to the statute that expressly confirmed that authority consistent with the holding of *National Petroleum*, amending the statute to provide that the Commission's UDAP rulemaking authority "shall not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2); *see also supra*, Background I.B; *City of Hous. v. FAA*, 679 F.2d 1184, 1196 (5th Cir. 1982) (demonstrating ratification with "excerpts from the legislative record").[5] In this Court's prior opinion, it stated that Section 18 did not *grant* authority for legislative rules regarding unfair methods of competition. Op. 18-19 (emphasis added). But that misunderstands the Commission's position. The Commission does not contend that Section 18 granted new authority. Rather, the language in Section 18(a)(2) preserving the Commission's authority *ratified* the Commission's *existing* rulemaking authority in Section 6(g).

Plaintiff-Intervenors have no response to this express statutory text, and therefore are unable to explain why Congress would preserve the Commission's unfair method of competition rulemaking authority if, as they claim, Congress never granted such authority. *Cf.* Pl.-Intervenors Mot. 11-12. Ryan dismisses the plain statutory text

---

[5] An errant statement in a preliminary report on amendments adopted nearly twenty years later incorrectly describing the Commission's pre-1975 "unfairness authority" is no basis to question the statutory text and clear indication of Congressional ratification. *Contra* Pl.-Intervenors Mot. 16 (citing H.R. Rep. No. 103-138, at 4 (1993)).

as "merely preserv[ing] a hypothetical potentiality," Ryan Mot. 25, but there was nothing hypothetical about the Commission's power to make rules preventing unfair methods of competition at the time of the 1975 Amendments. By this time, the Commission had promulgated more than a dozen rules defining certain conduct as an unfair method of competition, the D.C. Circuit had squarely held that the Commission had authority to make legislative rules preventing unfair methods of competition, and the Commission was in the midst of promulgating a rule defining certain conduct as an unfair method of competition—a rulemaking that Congress expressly allowed the Commission to complete using Section 6(g). *See, supra*, Background I.B. When Congress expressly preserved the Commission's authority "to prescribe rules … with respect to unfair methods of competition," it was preserving the Commission's widely known and well-settled authority to make legislative rules preventing unfair methods of competition. 15 U.S.C. § 57a(a)(2).

In the 1980 Amendments, Congress again opted not to disturb its grant of competition rulemaking authority in Section 6(g), nor the language in Section 18 preserving that authority. *See Silva-Trevino v. Holder*, 742 F.3d 197, 202-03 (5th Cir. 2014) (Congress "expects" courts to "abide" by construction when "relevant language remained unchanged" and lawmakers had "revisited" issue). The 1980 Amendments added procedural requirements for all Commission rulemakings, not just UDAP rulemakings, defining "rule" as one promulgated under Section 6 or 18 of the Act. 15 U.S.C. § 57b-3(a)(1). While these amendments specifically included Section 6 rules, they

specifically excluded non-legislative rules, which makes sense only if Congress understood rules issued under Section 6 to include legislative rules even after it removed UDAP rulemaking authority from Section 6 in the 1975 Amendments. Thus, the 1980 Amendments again ratified the grant of competition rulemaking authority in Section 6. The 1980 Amendments also recognized that amendments to Commission rules could have "annual effect[s] on the national economy of $100,000,000 or more," indicating Congress's awareness that rules under Section 6 regarding unfair methods of competition might have a substantial economic impact—which makes sense only if those rules might be legislative rules preventing unfair methods of competition. *Id.* § 57b-3(a)(1)(A).

Plaintiffs fail to contend with the plain text of the statute and instead quibble with the standard for congressional ratification. Ryan Mot. 24-25; Pl.-Intervenors Mot. 21-22. But none of the cases Plaintiffs cite changes the analysis. In *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001), the Court considered whether to "overcome the plain text," by reference to Congressional action. *Cf.* Ryan Mot. 24. Here, Congressional ratification confirms the most natural reading of the plain text. And in *Jama v. ICE*, the Court noted a judicial consensus "so broad and unquestioned that we must presume Congress knew of and endorsed it." 543 U.S. 335, 349 (2005); *cf.* Pl.-Intervenors Mot. 21. The Commission does not need the Court to "presume" what Congress knew here because the legislative history expressly discusses *National Petroleum. See, supra*, Background I.B.

22

Plaintiffs' reading of the statute is also "at odds with one of the most basic interpretive canons," because it would render language in Sections 6(g) and 18(a)(2) "inoperative or superfluous." *Corley v. U.S.*, 556 U.S. 303, 314 (2009). Section 6(g) empowers the Commission to make rules "for the purpose of carrying out" the Act "*except* as provided in section [18(a)(2)]," which circumscribes the Commission's rulemaking authority specifically with respect to UDAPs. 15 U.S.C. § 46(g) (emphasis added). This statutory carve-out for rules promulgated under Section 18(a)(2)—which covers the Commission's rulemaking authority specifically for UDAPs—would have no independent significance if Section 6(g) did not otherwise allow the Commission to make legislative rules. *See Cascabel Cattle Co., LLC v. U.S.*, 955 F.3d 445, 451 (5th Cir. 2020). The explicit reservation of rulemaking authority for unfair methods of competition in Section 18(a)(2) would similarly be superfluous if the Commission did not already possess that authority. Plaintiffs' reading of Section 6(g) impermissibly asks the Court not to "give effect" to that reservation. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 699 (2022).

Plaintiffs' view of these same amendments is incompatible with the text of the statute and the unambiguous legislative history. Plaintiffs characterize the 1975 Amendments as *granting* rulemaking authority for UDAPs, but this authority already existed under Section 6(g) and, indeed, the Commission had exercised it for over a decade by promulgating over two dozen legislative rules. *See supra*, Background I.B. Rather, the 1975 amendments *narrowed* the Commission's pre-existing authority to issue

23

UDAP rules by permitting only rules that "define with specificity" such acts and requiring the Commission to satisfy certain procedural requirements beyond those required by the APA. 15 U.S.C. § 57a(a)(1)(B); *see also id.* § 57a(a)(2); *id.* § 57a(b). It is thus no surprise that the 1975 Amendments did not "grant" the Commission rulemaking authority for unfair methods of competition; Congress had already granted the Commission that authority in Section 6(g) and ratified it in the 1975 Amendments. *Contra* Ryan Mot. 25; Pl.-Intervenors Mot. 17-18. And while Plaintiffs contend it is "implausible" that Congress intended there to be different procedural tracks for UDAP and unfair method of competition rulemakings, *e.g.*, Pl.-Intervenors Mot. 19, legislative history confirms that was exactly Congress's intent. *See* 120 Cong. Rec. at 40,713 (discussing "dual approach" to Commission rulemaking and how that "dual approach" would allow Congress to compare rules for unfair methods of competition issued under Section 6(g) with UDAP rules issued under Section 18). In short, the amendments to the FTC Act confirm what the plain text and structure of the statute already make clear: Section 6(g) authorizes the Commission to enforce the prohibition against "unfair methods of competition" through promulgating legislative rules.

It is also irrelevant that Congress routinely directs the Commission to issue rules targeting specific practices that Congress determines violate Section 5. *E.g.*, 15 U.S.C. § 2310(a)(1)-(2) (the Commission "shall prescribe" rules setting forth the minimum requirements for informal warranty dispute resolution procedures); 15 U.S.C. § 1194(c) ("direct[ing]" the Commission to issue rules regarding flammable fabrics). These

24

provisions do not, as Plaintiffs suggest, limit the Commission's rulemaking authority. Ryan Mot. 19; Pl.-Intervenors Mot. 17; Op. 17-18. Instead, they represent explicit directions from Congress to exercise the Commission's authority to prevent specific violations of Section 5. Indeed, even after the 1975 Amendments directing specific procedures for UDAP rulemakings, Congress continued to enact statutes directing the Commission to define specific UDAPs. *E.g.*, 15 U.S.C. § 7607. If these post-1975 Amendments directives targeting specific UDAPs do not render the Commission's general UDAP rulemaking authority in Section 57a superfluous, neither should Congress's directives targeting other violations of Section 5 render the Commission's Section 6(g) rulemaking superfluous.

Lacking any textual basis for their challenge to the Commission's rulemaking authority, Plaintiffs urge this Court to adopt a novel substantive rule of statutory interpretation never recognized by the Supreme Court or the Fifth Circuit. Pursuant to this proposed rule, Plaintiffs urge this Court to presume that Congress would not grant "broad legislative rulemaking authority without also enacting a provision providing penalties for violating those rules." Ryan Mot. 16; Pl.-Intervenors Mot. 14-15 (relying on Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467 (2002)). As an initial matter, this supposed canon is irrelevant because Congress ratified and expressly preserved the Commission's rulemaking authority in 1975. Regardless, this Court should reject Plaintiff's invitation to disregard the plain text of the statute in favor of a purported convention of statutory

interpretation proffered in an academic journal and never recognized by Congress or the Supreme Court. *Cf. Rudisill v. McDonough*, 601 U.S. 294, 315 (2024) (Kavanaugh, J., concurring) (noting that substantive canons require the court to "depart from what the court, absent the canon, would have concluded is the best reading of the statutory text"). As the proponents of this purported convention themselves note, "Congress was not infallibly attentive to the drafting convention in signaling which rulemaking grants are legislative and which are not." Merrill & Watts, 519. Thus, for example, the Communications Act of 1934 "presents an example of a statute in which the inference of legislative intent drawn from the application of the convention should probably be disregarded, given other, contrary evidence of legislative intent." *Id.*

So too here. Reading Section 6(g) in context with the Commission's mandate to *prevent* unfair methods of competition, Congress's intent to authorize legislative rules defining unfair methods of competition is clear. Section 6(g) also bears no textual resemblance to the paradigmatic "housekeeping" statute that Plaintiffs and the Court analogize to in *Chrysler Corp. v. Brown*, 441 U.S. 281, 309-310 (1979). Ryan Mot. 1; Pl.-Intervenors Mot. 14-15; Op. 15. The "housekeeping" statute at issue in *Chrysler* authorized rules by "the head" of any "Executive department" for "the government of his department, the conduct of its employee, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." 441 U.S. at 309 (quoting 5 U.S.C. § 301). In contrast, Section 6(g) provides for rulemaking authority to "carry out the provisions" of the Act without any limitation or

26

reference to specific housekeeping duties.  15 U.S.C. § 46(g); *see also Thorpe*, 393 U.S. 268.

In any event, there is now, and has always been, in the Act a "legal consequence" for violating a rule issued under Section 6(g): the threat of a cease-and-desist order following an enforcement action by the Commission. In 1914, the only way the Commission could enforce any rule was through an administrative adjudication, after which the Commission could issue a cease-and-desist order. There was thus no need for Congress to separately specify the penalty for violating a rule—the Act already specified the penalty that would follow the Commission's sole means of enforcement. The civil penalty provisions in Sections 5(*l*) and 5(m) that the Court mistakenly identified as penalties following adjudication proceedings are irrelevant. Op. 16; *see* 38 Stat. at 720. Those provisions did not exist in 1914, and the Commission has never— then or now—been able to seek or impose civil sanctions in administrative adjudications. Only a federal court can issue those sanctions. *See* 15 U.S.C. §§ 45(*l*), (m).

Plaintiff-Intervenors further argue that Congress's choice to locate the Commission's rulemaking authority in Section 6 rather than in Section 5 is "suspect" and that "context" overrides the plain language of Section 6(g). Pl.-Intervenors Mot. 15-16 (quoting Op. 16). The Supreme Court has long made clear, however, that Sections 5 and 6 are meant to be read together. In *United States v. Morton Salt Co.*, the Court rejected an argument "derive[d] from legislative history" that Congress "divided the duties and powers of the Commission into two separate categories, one in [Section] 6

27

merely re-enacting the old powers of investigation and publicity in antitrust matters," and the other as a "new unfair-competition power, self-contained and sealed off in [Section] 5." 338 U.S. 632, 649 (1950). Rather, the Court held that Section 6 powers could be used in aid of the "duties of the Commission," including duties in Section 5 of the Act. *Id.* at 649-50. That Congress located the Commission's rulemaking authority in the same statutory provision as the authority to "classify corporations" is similarly irrelevant. *Contra* Ryan Mot. 13; Pl.-Intervenors Mot. 15. The "substantive connection, or fit" between classifying corporations and issuing rules and regulations "is not so tight or so self-evident" to "demand" that either phrase be "robbed of its independent and ordinary significance." *Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289 (2010). Plaintiff-Intervenors' argument that Section 6 does not "mention Section 5 or any other substantive authority" is belied by the text of Section 6(g) itself, which permits "rules and regulations" with respect to any provision of the "Act," necessarily including Section 5.

Finally, to the extent the Commission's historical understanding of its rulemaking authority is relevant, *see* Ryan Mot. 16-18; Pl.-Intervenors Mot. 16-17, the Commission's exercise of its competition rulemaking authority under Section 6(g)—not once overturned by a court of appeals as inconsistent with the statutory text—confirms what the text makes clear. *See supra*, Background I.B. That these prior rules were issued during a specific span of years and addressed different topics has no bearing on whether the Commission has substantive rulemaking authority. *See Morton Salt*, 338 U.S. at 647-78

28

("[U]nexercised" powers "are not lost by being allowed to lie dormant."); *contra* Ryan Mot. 17-18; Pl.-Intervenors Mot. 16-17. And, contrary to Plaintiff-Intervenors' suggestion, Pl.-Intervenors Mot. 17, the Supreme Court has not definitively spoken on the scope of the Commission's rulemaking authority. *See Seila Law, LLC v. CFPB*, 591 U.S. 197, 219 n.4 (2020) ("[P]erhaps the FTC possessed broader rulemaking, enforcement, and adjudicatory powers than the *Humphrey's* Court appreciated."). Indeed, the only appellate courts to squarely address the question held that Section 6 authorizes the Commission to promulgate rules regulating unfair methods of competition. *See Nat'l Petroleum*, 482 F.2d 672; *JS&A Grp.*, 716 F.2d at 454.

## B. The Major Questions Doctrine Does Not Compel a Different Result.

Plaintiffs also invoke the major questions doctrine, but it has no application here. Ryan Mot. 19-23; Pl.-Intervenors Mot. 19-20. Congress "directed" the Commission to "prevent" the use of "unfair methods of competition." 15 U.S.C. § 45(a)(2). In the more than hundred years since, the Commission has done just that, both by adjudication and rulemaking. Finding that the use of non-competes is an unfair method of competition thus goes to the heart of the Commission's mandate under the Act and is not a "transformative expansion [of its] regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see also ATS*, 2024 WL 3511630, at *18 ("[B]ecause the [Commission's] Rule falls squarely within its core mandate, and it has previously used its Section 6(g) rulemaking power in similar ways, … the Major Question Doctrine is not applicable.").

Plaintiffs do not contest that the Commission has the authority to bring a Section 5 enforcement action—or, indeed, enforcement actions against every user of non-competes subject to the Commission's jurisdiction—charging that the use of non-competes is an unfair method of competition. It defies logic to argue that an agency unquestionably has the authority to carry out its statutory mandate using its express authority to bring enforcement actions and adjudicate, but not through its equally express authority to issue rules and regulations.[6] Plaintiffs identify no case where a court invalidated an agency's exercise of its rulemaking authority when the agency's authority to carry out the same substantive mandate through adjudications is unquestioned. *See, e.g.*, *West Virginia*, 597 U.S. at 729 (characterizing agency as making a different type of policy judgment based on "expertise … *not* traditionally needed in [the agency's] regulatory development"); *NFIB v. DOL*, 595 U.S. 109, 117-18 (2022) (applying major questions doctrine to rule setting "public health measures" that were "outside of OSHA's sphere of expertise" rather than "workplace safety standards"). The Court's emphasis in these cases has been on whether the agency has expertise in the type of decision being made, not simply whether the topic of regulation bears some relationship to the agency's work more broadly. *Contra* Pl.-Intervenors Mot. 22. Here, Congress

---

[6] The Commission's express authority to issue rules and regulations distinguishes it from *ICC v. Cincinnati N. O. & T. P. Ry. Co.*, 167 U.S. 479 (1897). *Contra* Ryan Mot. 20. In *Cincinnati*, the Court considered whether the Interstate Commerce Commission could set rail rates by regulation, despite no rulemaking authority conferred by statute. 167 U.S. at 500-01. The Court held that such authority could not be "implied" from other statutory provisions. *Id.* at 501. *Cincinnati* thus bears no resemblance to the case at hand, where Section 6(g) clearly states the Commission's authority to "make rules and regulations for the purpose of carrying out the provisions of the Act." 38 Stat. at 722.

directed the Commission to "prevent" unfair methods of competition, and in Sections 5 and 6 of the Act, Congress expressly granted the Commission discretion to decide whether to carry out this mandate by way of adjudication, rulemaking, or both. *See, e.g., City of Arlington v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012) (discussing agency's discretion to proceed via adjudication or rulemaking). The Commission then relied on its expert judgment and empirical evidence to make a judgment in line with its policy and economic expertise—a far cry from "simply citing" its policy authority, as Plaintiff-Intervenors suggest. Pl.-Intervenors Mot. 22.

Ryan errs in contending that the Commission's use of its rulemaking authority represents a "fundamental revision" of the Act, transforming it "from a trade regulation statute into a worker-protection statute." Ryan Mot. 21. Far from transforming the Act, the Rule is consistent with the Commission's mandate to prevent unfair methods of competition. *See supra*, Background II.B. Ryan's misleading framing further ignores the Rule's significant procompetitive benefits, such as the promotion of new business formation. *See supra*, Background II.B. The Commission used its rulemaking authority to prevent unfair methods of competition to limit the use of clauses that expressly ban competition, as Congress explicitly directed it to do. This case is therefore readily distinguishable from *Biden v. Nebraska*, where the Court rejected a reading of the statute that would allow the Secretary to "rewrite" the Education Act by waiving or modifying any provision in case of national emergency. 143 S. Ct. 2355, 2373 (2023).

The Commission's exercise of its competition rulemaking authority bears no resemblance to the challenged regulatory action in *West Virginia v. EPA*, where "the legality of [the agency's] choice was controversial at the time and was never addressed by a court." 597 U.S. at 725. Contrary to that case, where the challenged rule had "no precedent" because it operated differently from the sole prior rule, the Commission's Rule is consistent with its historical use of Section 6(g), including for rules defining certain unfair methods of competition. And, further distinguishing the Rule from the one at issue in *West Virginia*, courts have upheld the Commission's exercise of its competition rulemaking authority. *See supra*, Background I.B.; *ATS*, 2024 WL 3511630, at * 18 ("The FTC's Final Rule is consistent with [the Commission's] past use of Section 6(g)" and "the courts that have reviewed the Commission's rulemaking authority have upheld it.").

There is also no basis for this Court to invalidate an express grant of statutory authority on the grounds that it permits the Commission to take actions that have significant economic effect. *Cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (not applying major questions doctrine despite agency action "go[ing] further than what the Secretary has done in the past"). Congress explicitly and deliberately created the Commission to prevent unfair methods of competition "in or affecting commerce." 15 U.S.C. § 45(a)(2). The Commission is authorized and designed to take actions affecting commerce throughout the national economy with significant economic effect. *See, e.g., id.* § 57b-3(a)(1)(A) (defining "rule" with reference to amendments that could have an

32

"annual effect on the national economy of $100,000,000 or more"). Plaintiffs do not (and cannot) reasonably dispute that the Commission could carry out its statutory mandate to prevent unfair methods of competition by bringing precedential enforcement actions against companies that use non-competes as an unfair method of competition—which would likewise have significant economic effects.

Plaintiff-Intervenors err by attaching significance to state and congressional debate regarding non-competes. *See* Pl.-Intervenors Mot. 27 (citing *Ala. Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 764 (2021)). Congress explicitly directed the Commission to prevent unfair methods of competition. And the States' differing approaches to regulation of non-competes enabled the Commission and economists to measure just how harmful non-competes are. There is likely always preexisting debate on practices the Commission determines are unlawful under Section 5, but that is no reason to negate the Commission's authority to act within its expertise. *See ATS*, 2024 WL 3511630, at * 17 ("[T]he states and federal government have shared jurisdiction in this area, and … the existence of state regulations of non-competes does not preclude the FTC from issuing rules to prevent unfair methods of competition.").

In any event, the Commission has "clear Congressional authorization" to issue rules relating to the Act, including unfair methods of competition, for all the reasons explained *supra*, Section I.A. *See West Virginia*, 597 U.S. at 724.

## II.   THE COMMISSION PROPERLY DESIGNATED NON-COMPETES, AS A CLASS, AS "UNFAIR METHODS OF COMPETITION."

The Commission properly designated non-competes, as a class, as unfair methods of competition. *See ATS*, 2024 WL 3511630, at *16-17 (concluding that the Commission acted within its Section 5 authority in declaring non-competes unfair methods of competition). As explained, whether conduct constitutes an "unfair" method of competition encompasses two "key criteria": (1) the conduct is "coercive, exploitative, collusive, abusive, deceptive, predatory" or "otherwise restrictive or exclusionary"; and (2) the conduct "tend[s] to negatively affect competitive conditions," for example by tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement at 9 (collecting cases); *see also* 89 Fed. Reg. at 38,358-59.

Applying its expertise and based on a thorough study of the economic literature and comment record, the Commission concluded that non-competes as a class meet these criteria because they are facially restrictive and exclusionary, and because they tend to negatively affect competitive conditions in labor, product, and service markets by locking up talent and preventing efficient matching between employers and workers. 89 Fed. Reg. at 38,374-402, 38,406-11. The Commission also found that empirical evidence showed actual, ongoing competitive harms from the use of non-competes due to their prevalence as well as their spillover effects and negative externalities on businesses and workers who do not themselves have non-competes. *Id.* at 38,460-64.

34

With respect to non-senior executives, the Commission additionally found that non-competes are exploitative and coercive. *Id.* at 38,374-79. Finally, the Commission concluded that the proffered justifications for non-competes—including purported procompetitive justifications—did not alter its finding that non-competes are unfair methods of competition. *Id.* at 38,421-34.

Plaintiff-Intervenors do not generally dispute that the Commission is permitted to designate non-competes as an unfair method of competition. Instead, they argue only that, even if non-competes as a class are facially restrictive or exclusionary and tend to reduce competition, the Rule violates Section 5 because, in their view, the Commission is required to conduct a case-by-case inquiry for every non-compete, and some individual non-competes may have procompetitive effects. Pl.-Intervenors Mot. 23-27. Those arguments are wrong.

First, in arguing that the Commission is confined to case-by-case balancing of whether an individual non-compete is anticompetitive, Plaintiff-Intervenors invoke a specific doctrinal framework—a showing that the conduct (1) produces anticompetitive effects that (2) are not offset by procompetitive benefits, *see* Pl.-Intervenors Mot. 23-24—that does not apply here. That is a partial description of the "rule of reason," which applies to some Sherman Act claims. But the FTC Act was specifically enacted to supplement the Sherman Act and the rule of reason, and the Supreme Court has repeatedly affirmed that Section 5 reaches conduct that would not violate the Sherman Act. *Motion Picture Advert.*, 344 U.S. at 394-95; *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447,

35

454 (1986) ("The standard of 'unfairness' under the FTC Act … encompass[es] not only practices that violate the Sherman Act and the other antitrust laws, but also practices that the Commission determines are against public policy for other reasons."). Plaintiff-Intervenors' cases applying the rule of reason to adjudications are thus irrelevant here.[7] As explained above, the Commission need not demonstrate actual anticompetitive harm to establish a violation of the FTC Act—Section 5 reaches "incipien[t] acts" and conduct with a "dangerous tendency … to hinder competition." *FTC v. Texaco, Inc.*, 393 U.S. 223, 224 (1968) (upholding application of Section 5 because of a practice's "*potential* for stifling competition" (emphasis added)). Here, the Commission properly determined that non-competes, as a class, tend to and in fact do have actual current anticompetitive effects in labor, product, and service markets; an additional showing of such effects specific to every individual noncompete the Rule covers is not required.

Even if Plaintiff-Intervenors were correct that the Rule sweeps too broadly because some hypothetical set of non-competes may not constitute unfair methods of competition, that would not provide any basis to enjoin or stay the Rule entirely rather than as applied to that limited set of non-competes. *See Natural Res. Def. Council v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020) (explaining that "a court may invalidate only

---

[7] *See Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021); *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 354-55, 363-70 (5th Cir. 2008).

36

some applications" of a regulation). But Plaintiff-Intervenors make no attempt to show that the non-competes they use fall within that hypothetical set and thus have not demonstrated any entitlement to relief even assuming the correctness of their statutory argument.

Next, Plaintiff-Intervenors assert, without any support, that some non-competes have procompetitive effects such as "promoting specialized training or protecting businesses' sensitive information" and are therefore justified under Section 5. Pl.-Intervenors Mot. 25. But even accepting that premise as true, Plaintiff-Intervenors fail to explain how those examples are "procompetitive" at all. To be procompetitive, conduct must promote *competition*, not merely provide a pecuniary benefit to the party engaged in that conduct. *E.g.*, *Atl. Refining Co. v. FTC*, 381 U.S. 357, 371 (1965) (considering that the contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *Texaco*, 393 U.S. at 230 (following the reasoning of *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"). Plaintiff-Intervenors may find non-competes to be an inexpensive way for employers to trap workers in order to protect their intellectual property, but that does not make non-competes "procompetitive."

In any event, and in stark contrast to Plaintiff-Intervenors' single-sentence assertion regarding the supposed procompetitive effects of non-competes, the

Commission made expert findings of fact based on thirty empirical studies from the past twenty-one years quantifying the harms caused by—not merely correlated with—non-competes. The Commission also conducted its own economic analysis. Its expert conclusion was that all non-competes tend to negatively affect competitive conditions and are unjustified—*i.e.*, that non-competes are anticompetitive, not procompetitive. As their name suggests, non-competes in both purpose and effect are designed to and in fact do limit competition. Plaintiff-Intervenors ignore entirely the substantial body of evidence cited by the Commission regarding the negative effects of non-competes beyond the parties to any particular non-compete in asserting—again, without support—that some unknown class of non-compete agreements have procompetitive effects in unspecified ways.

Plaintiff-Intervenors also fundamentally misunderstand the Commission's assessment of the aggregate effects of non-competes. *See* Pl.-Intervenors Mot. 24-25. The Commission did not find that some non-competes may individually be beneficial and some may individually be harmful—rather, the Commission found that the use of *any* non-compete is an unfair method of competition because non-competes, by definition, hinder competition and impose negative externalities beyond one individual agreement. *See, e.g.*, 89 Fed. Reg. at 38,407, 38,428. For instance, the Commission cited several studies showing how workers who are *not* themselves subject to non-competes nevertheless experience negative effects from others' use of non-competes. *Id.* at 38,383 (citing study showing that "increases in non-compete enforceability in one State have

38

negative impacts on workers' earnings in bordering States"); *id.* (citing study showing that "when the rate of use of non-competes in an industry in a State is higher, wages are lower for workers who do not have non-competes but who work in the same State and industry").[8] The Commission found that the negative externalities from non-competes harm businesses too. *Id.* at 38,493 (non-competes have "negative spillover effects on other small businesses that do not use non-competes").

What is more, the record plainly shows that the Commission *did* find that the anticompetitive effects of non-competes outweigh their purported procompetitive benefits, contrary to what Plaintiff-Intervenors claim. While not required under Section 5, the Commission in fact extensively analyzed the various justifications commonly offered for non-competes and concluded that those justifications—including the ones highlighted by Plaintiff-Intervenors, such as promoting training or protecting sensitive information—did not alter the Commission's conclusion that non-competes are an unfair method of competition. *See* 89 Fed. Reg. at 38,422-434 ("Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the claimed business justifications for non-

---

[8] Plaintiff-Intervenors' citation to *Boise Cascade Corp. v. FTC*, 637 F.2d 573 (9th Cir. 1980), which involved an adjudication, is irrelevant. *Boise Cascade* held that "the mere widespread use" by petitioner of a pricing practice (without any showing that the practice had anticompetitive effects) did not suffice for Section 5 liability—it did not speak to whether the Commission can consider the broad impact of non-competes, and how their use, both individually and in the aggregate, results in significant anticompetitive effects. *See id.* at 582.

competes do not justify the harms from non-competes."). That is because employers always have other viable means to protect their legitimate interests without burdening competition to the degree that non-competes do. *Id.* at 38,421-34. The Commission explained that non-disclosure agreements, patents, and trade secrets law are the appropriate tools to protect employers' legitimate intellectual property interests—not non-competes that categorically cut off competition in an overbroad manner. *Id.* at 38,424-26. It similarly explained that to protect legitimate investments in employee training, employers and workers can negotiate fixed term employment contracts in which they mutually agree to a length of employment tailored to recoup the employer's investment—rather than curtailing *post-employment* competition. *Id.* at 38,424. And it explained that employers can always compete on the merits by offering better jobs than their competitors. *Id.*

Finally, Plaintiff-Intervenors ignore the Commission's mandate to "prevent" unfair methods of competition, 15 U.S.C. § 45(a)(2), including through promulgating "rules and regulations," *id.* § 46(g). That mandate necessarily requires the Commission to take account of the widespread adoption of practices across industry, not just the individual, isolated effects of a single contract.

## III.   THE RULE DOES NOT INTRUDE ON A CORE AREA OF STATE REGULATION.

There is no merit to the argument that non-competes are an "area of 'traditional state regulation'" and therefore the Commission lacked authority to issue the Rule. *See*

Pl.-Intervenors Mot. 26-27. The Rule is a valid exercise of the federal government's well-established and longstanding power in the antitrust area. And as described, non-competes have long been subject to federal antitrust laws and are therefore plainly not the exclusive or traditional domain of States. *See, e.g.*, *Am. Tobacco Co.*, 221 U.S. at 181-83 (scrutinizing non-competes under the Sherman Act over 100 years ago); *ATS*, 2024 WL 3511630, at *17 ("[T]he states and federal government have shared jurisdiction in this area.").

Plaintiff-Intervenors point to the fact that most States have also chosen to regulate non-competes, but it is commonplace for States to address issues that the federal government subsequently or simultaneously chooses to address as well. In the context of the Commission's Section 5 authority to regulate UDAPs, for instance, courts have recognized that the federal government can regulate unfair business practices "even if the activities or industries have been the subject of legislation by a state." *Peerless Prods., Inc. v. FTC*, 284 F.2d 825, 827 (7th Cir. 1960). And antitrust law frequently involves overlapping jurisdiction between state and federal law, as reflected by numerous States' "little FTC Acts." *See, e.g.*, LA Stat. Ann. § 51:1405; Fla. Stat. Ann. § 501.204(1); Miss. Code Ann. § 75-24-5; N.Y. Gen. Bus. Law § 340 *et seq*. The Rule therefore does nothing to significantly alter the balance of federal-state power.

Plaintiff-Intervenors' federalism argument is particularly inapposite here because the Rule does not limit States' ability to further regulate non-competes. *See* 89 Fed. Reg. at 38,454-55 ("State laws that restrict non-competes and do not conflict with the final

41

rule are not preempted."). In other words, the Rule is not intended to "occupy the field

… or to preempt state law in the absence of requirements that are inconsistent with the

rule." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 990 (D.C. Cir. 1985) (upholding FTC

UDAP rule that preempted conflicting state laws). Finally, even if the clear statement

principles that Plaintiff-Intervenors invoke were applicable, the Commission has clear

authorization to issue the Rule, as explained.

## IV.   CONGRESS LAWFULLY DELEGATED AUTHORITY TO THE COMMISSION.

Plaintiffs' nondelegation challenge lacks merit. *See ATS*, 2024 WL 3511630, at

*18-19 (rejecting non-delegation challenge to the Rule). The nondelegation doctrine

requires that Congress articulate "an intelligible principle" to guide the agency. *Whitman*

*v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). That standard is "not demanding."

*Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.). It stems from the

"practical understanding that in our increasingly complex society, replete with ever

changing and more technical problems, Congress simply cannot do its job absent an

ability to delegate power under broad general directives." *Mistretta v. United States*, 488

U.S. 361, 372 (1989). The Supreme Court has only twice found a congressional

delegation of power unconstitutional, and only because "Congress had failed to

articulate any policy or standard" to confine the agency's discretion. *Gundy*, 588 U.S. at

130 (plurality op.).

42

Section 5's directive that the FTC prevent "[u]nfair methods of competition in or affecting commerce," 15 U.S.C. § 45(a)(1), easily meets the intelligible-principle test. For decades, the Supreme Court has approved of Congress's delegation of authority to the Commission to regulate "unfair methods of competition." *See, e.g., Texaco,* 393 U.S. at 225; *Brown Shoe,* 384 U.S. at 320. The Court has described the meaning of the phrase "unfair methods of competition" as "obvious": "[T]he word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors." *FTC v. Raladam Co.,* 283 U.S. 643, 649 (1931); *accord Sears, Roebuck & Co. v. FTC,* 258 F. 307, 311 (7th Cir. 1919) (rejecting nondelegation challenge to the Act). Particularly given this backdrop, the "unfair method of competition" standard is not nearly as sweeping as other, more generalized delegations previously upheld by the Supreme Court, such as the authority to set "fair and equitable" prices, *Yakus v. United States,* 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *Fed. Power Comm'n v. Hope Nat. Gas Co.,* 320 U.S. 591, 600 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" require, *Nat'l Broad. Co. v. U.S.,* 319 U.S. 190, 225-26 (1943); to allow railroad acquisitions in the "public interest," *N.Y. Cent. Secs. Corp. v. United States,* 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health[,]" *Whitman,* 531 U.S. at 472.

Further, in analyzing a nondelegation claim, courts may consider the "purpose" of the statute, its "factual background," and the "statutory context." *United States v.*

43

*Cooper*, 750 F.3d 263, 270 (3d Cir. 2014) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)). Congress enacted the FTC Act "to supplement and bolster" the Sherman and Clayton Acts. *Motion Picture Advert.*, 344 U.S. at 394-95. Specifically, the FTC Act was intended "to stop in their incipiency those methods of competition which fall within the meaning of the word 'unfair.'" *Raladam Co.*, 283 U.S. at 647; *Texaco, Inc.*, 393 U.S. at 225. The Supreme Court has also understood the phrase "unfair methods of competition" to include trade practices that "conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws." *Brown Shoe Co.*, 384 U.S. at 321. Thus, the policies behind those statutes further inform the meaning of "unfair methods of competition."

*A.L.A. Schechter Poultry Corp. v. United States* further underscores the validity of the Act's delegation. 295 U.S. 495 (1935). The Court there contrasted the National Industrial Recovery Act's impermissible delegation to regulate "fair competition" with the permissible delegation in the Act to regulate "unfair methods of competition." *Id.* at 531-36. Even though the latter was also "an expression new in the law" without "precise definition," the Commission could determine what constituted "unfair methods of competition" "in the light of particular competitive conditions and of what is found to be a specific and substantial public interest." *Id.* at 532-33. The Rule does just that.

Plaintiffs' contrary arguments are unpersuasive. *See* Ryan Mot. 29-30; Pl.-Intervenors Mot. 28-29. The *Schechter* Court disclaimed reliance on the Commission's

function as a quasi-judicial body, stating that "the difference between the code plan of the Recovery Act and the scheme of the [FTC] Act lies not only in procedure but in subject matter." *Schechter*, 295 U.S. at 533-34. The Court understood the phrase "fair competition" as having "a much broader range and a new significance" than "unfair methods of competition." *Id.* at 534. Ryan identifies no case supporting its novel theory that a statutory phrase can constitute a lawful delegation in the context of adjudication but an unlawful delegation with respect to rulemaking. In any event, the Court took issue with the Recovery Act because it "dispense[d] with … any administrative procedure" whatsoever in permitting the President to unilaterally approve codes via Executive Order—a far cry from the rigorous administrative procedure, including extensive opportunity for public comment, prescribed by the APA which the Commission followed in promulgating the Rule. *Id.* at 533.

Plaintiffs also contend that the Commission's identification in the Section 5 Policy Statement of specific criteria it will consider when determining whether a method of competition is unfair shows Section 5 lacks an intelligible principle. *See* Ryan Mot. 31-32; Pl.-Intervenors Mot. 28. But agencies frequently elaborate on statutory standards through guidance without raising a nondelegation issue, and the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75.

## V.    THE RULE IS NOT UNLAWFULLY RETROACTIVE.

A regulation operates retroactively where it "alters the *past* legal consequences of past actions." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006). By contrast, agency action "that only upsets expectations based on prior law"—"but has not rendered past actions illegal or otherwise sanctionable"—"is not retroactive." *Nat'l Cable & Telecommc'ns Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) ("*National Cable*").

Under that well-established framework, the Rule is not retroactive, because it does not impose "past legal consequences" for any conduct predating its effective date. Rather, it renders certain existing contractual terms prospectively unenforceable and restricts conduct in the future. Those are commonplace effects of changes in the law. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 n.24 (1994) ("Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct."). The D.C. Circuit's analysis in *National Cable* is on all fours with this case. The regulation challenged there prohibited cable companies from both "enforcing existing exclusivity contracts" and "executing … new ones," finding that such contracts were unfair methods of competition. 567 F.3d at 662. The court explained that the rule was not retroactive, because while it "impaired the future value of past bargains," it did not impose any liability based on those bargains. *Id.* at 670.[9] The same is true for the Rule.

Plaintiff-Intervenors' cursory argument that the Rule implicates the Fifth

---

[9] The Rule preserves an employer's ability to pursue causes of action for non-compete violations that accrued before the effective date. 89 Fed. Reg. at 38,439 (29 C.F.R. § 910.3(b)).

Amendment also lacks merit. *See* Pl.-Intervenors Mot. 30. Their sole authority for that contention, *Eastern Enterprises v. Apfel*, 524 U.S. 498, 534 (1998), involved a statute that imposed "substantial and … far reaching" financial liabilities for events decades in the past, thereby "divesting [the plaintiff] of property long after [it] believed [those] liabilities … to have been settled." The Rule, by contrast, does not divest Plaintiffs of any property, imposes no financial penalties, and has purely prospective effect.

## VI.   THE RULE IS REASONABLE AND REASONABLY EXPLAINED.

Plaintiffs also do not meet their burden at summary judgment to establish that the Rule is arbitrary and capricious. The arbitrary and capricious standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). The court's "task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022). "[A] court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and must "uphold an agency's actions 'if its reasons and policy choices satisfy minimum standards of rationality,'" *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (citation omitted). The reviewing court must begin with "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption." *Texas Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

Based on economic theory, empirical evidence, and qualitative data, the Commission found that non-competes tend to negatively affect competitive conditions. First, as a matter of classical economic theory, "the 'unrestrained interaction of competitive forces' yields a variety of benefits such as lower prices for consumers, better wages and working conditions for workers, and higher quality products." *Id.* at 38,380 (quoting *N. Pac. Ry. Co. v. U.S.* 356 U.S. 1, 4 (1958)). But non-competes "introduce a major friction" to the competitive market, "harm[ing] the competitive process and tend[ing] to negatively affect competitive conditions in labor markets." *Id.*

Second, the Commission relied on quantitative and qualitative evidence to identify seven distinct but interrelated negative effects of non-competes: (1) they suppress labor mobility; (2) they suppress earnings; (3) they reduce job quality; (4) they reduce new business formation; (5) they reduce innovation; (6) they may increase concentration and consumer prices; and (7) they may reduce quality and consumer choice. 89 Fed. Reg. at 38,379-402, 38,404-11.

Available evidence strongly supports these findings. For example, with respect to labor mobility, the Commission reviewed data showing that, "across the board, studies of non-competes and labor mobility find decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within-industry and between-industry mobility." *Id.*

The Commission placed the greatest weight on studies that examine the effects of a change in the law governing non-competes' enforceability, because these studies

48

are the most probative of causation and, conversely, least likely to be affected by confounding variables. *Id.* at 38,372. Thus, in the context of labor mobility, the Commission relied most heavily on a meta-analysis of "all legal changes in the enforceability of non-competes from 1991 to 2014 across the entire labor force" and determined that "substantial decreases in non-compete enforceability cause a significant increase in job-to-job mobility in industries that use non-competes at a high rate." *Id.* at 38,380-81. In the same category of evidence, the Commission also relied on data showing that Hawaii's ban on non-competes for tech workers increased mobility by 12.5% and that Oregon's ban on non-competes for hourly workers increased mobility by 17.3%. *Id.* at 38,381. And the Commission relied on a study of knowledge workers that found that decreases in non-compete enforceability were associated with a substantial increase in mobility of workers, especially for other employers in the same industry. *Id.*

The Commission also considered data comparing a sample of workers who were subject to a non-compete to a sample of those who were not, although it cautioned that such studies "cannot easily differentiate between correlation and causation" and thus placed relatively less weight on them. *Id.* at 38,372. In the context of labor mobility, for instance, the Commission bolstered its finding by citing a study "comparing workers in occupations that use non-competes at a high versus low rate" that projected that a change "from mean enforceability to no enforceability would cause a decrease in employee tenure," *i.e.*, an increase in mobility, of 8.2% "for workers in high-use

49

occupations …, compared with those in low-use occupations." *Id.* at 38,381. A study based on nationally representative data from 11,500 labor force participants determined that "having a non-compete was associated with a 35% decrease in the likelihood that a worker would leave for a competitor," and, moreover, that "the mechanism underlying reduced mobility" was the worker's belief about whether his or her non-compete would be enforced—underscoring the need for clarity. *Id.*

Indeed, across industries and geographic regions, the studies on which the Commission relied "*all* f[ound] that non-competes reduce labor mobility." *Id.* at 38,381 (emphasis added). And these empirical findings were amplified in the stories of thousands of workers who submitted comments "stating that their mobility is or has been restricted by a non-compete," regardless of whether that non-compete is enforceable under State law. *Id.* The Commission relied on similar data to support its findings with respect to earnings, *see id.* at 38,382-87, 38,410-11, job quality, *see id.* at 38,387-88, new business formation, *id.* at 38,389-94, 38,407-10, innovation, *id.* at 38,394-98, concentration and consumer prices, *id.* at 38,398-99, and quality and consumer choice, *id.* at 38,399-401.

Plaintiffs do not satisfy their burden to rebut the presumption of a rational relationship between the evidence on which the Commission relied and its findings. Turning first to Plaintiff-Intervenors' arguments, they begin with the mistaken premise that the Rule is inadequately supported because some of the evidence on which the Commission relies was drawn from a particular industry or geographic area. That does

not undermine the conclusions that the Commission drew from the totality of the evidence—which, as noted, was remarkably consistent across industries and geographic regions. Plaintiff-Intervenors are thus mistaken to consider each data set on which the Commission relied in isolation. *E.g.*, Pl.-Intervenors Mot. 33 (noting that Hawaii is geographically isolated). Rather, that the Commission found consistent effects across hourly workers in Oregon, technology workers in Hawaii, physicians in numerous states, and low-wage workers in numerous states, *see id.* at 32-33, *supports* the generalization of those collective findings.

"An agency need not 'have perfect information before it takes any action,'" *North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir. 1997), and the "APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies," *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 427 (2021). Even in the face of "serious uncertainties," an agency need only "explain the evidence which *is* available, and … offer a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 52 (emphasis added). The Commission readily satisfied that obligation here. For example, because the Rule has not yet taken effect, no external empirical study has had occasion to examine the effects on competition of a nationwide ban on non-competes. But the Commission performed its own economic analysis modeling the effects of a nationwide ban using the best empirical evidence available. 89 Fed. Reg. at 38,466-502.

51

Contrary to Plaintiff-Intervenors' assertion, the Commission did not fail to refute evidence showing that non-competes tend to promote competition. Pl.-Intervenors Mot. 35. Judicial decisions applying the rule of reason to determine whether a particular non-compete violates the Sherman Act are inapposite, for the reasons explained above. *See supra*, Section II. In any event, most of these decisions also predate the most rigorous empirical research on the effects of non-competes, which has emerged in recent years as some jurisdictions have changed their laws and the use of non-competes has proliferated. Plaintiff-Intervenors also cite a study that found that a group of financial advisory firms that voluntarily agreed not to use non-competes, non-disclosure agreements, or non-solicitation agreements experienced higher rates of employee misconduct than firms that did not join the agreement. Pl.-Intervenors Mot. 35. The Commission acknowledged that study, as well as another study that examined the exact same group of financial advisory firms and found the opposite effect, based on a larger sample size. 89 Fed. Reg. at 38,445. And the other study Plaintiff-Intervenors cite did find that "noncompetes lead to more efficient allocation of patients among physicians," Pl.-Intervenors Mot. 35, but it also found that "this comes at the cost of greater concentration and higher consumer prices," 89 Fed. Reg. at 38,398. This study thus *supported* the Commission's finding that non-competes may increase concentration and consumer prices.

There also is nothing anomalous about the Commission's treatment of 2014 survey data. *Contra* Pl.-Intervenors Mot. 36. The Commission credited the survey's

finding that "employers frequently use non-competes even when they are unenforceable under State law." 89 Fed. Reg. at 38,466. That descriptive observation does not require a causal inference. By contrast, the Commission placed little weight on the same survey's finding that notice of non-competes alongside a job offer is "positively correlated with training compared to later notice," both because the finding was merely correlative and not causal, and because the data "[wa]s not salient on the question of whether employers have less restrictive alternatives to protect[] training investments." *Id.* at 38,430. That is, even to the extent the data may have been probative of causation, it addressed only the timing of when a worker was notified that he or she was bound by a non-compete, and not the more relevant distinction of whether the worker was actually bound.

The Commission properly relied on inferences drawn from the available empirical literature as well. For example, it was reasonable for the Commission to extrapolate from more limited studies because those studies' findings were "broadly linear." 89 Fed. Reg. at 38,385; *contra* Pl.-Intervenors Mot. 36. On that score, Plaintiff-Intervenors note that a study on which the Commission relied was later revised to note that, based on a "strong assumption" of linearity, researchers could conclude that a national ban on non-competes would result in an average earnings increase of 3.2% to 14.2% for all workers. Pl.-Intervenors Mot. 36-37. As the researchers expressly found (and as Plaintiffs fail to acknowledge), "this assumption is *not unreasonable*" based on the data. Johnson, Lavetti & Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker*

*Mobility* 18 n. 33 (Nat'l Bureau of Econ. Rsch., Working Paper No. 31929, 2023) (emphasis added).

With respect to the Commission's consideration of alternatives, the Commission thoroughly explained why case-by-case consideration of each non-compete was not a workable alternative to the Rule considering the Commission's findings. *See* 89 Fed. Reg. at 38,462; *contra* Pl.-Intervenors Mot. 37-39. Relatedly, Plaintiff-Intervenors are wrong that the only basis for the Rule's categorical approach is a desire for uniformity or convenience. Pl.-Intervenors Mot. 37. As explained throughout, the Commission did not conclude that "many agreements would be enforceable under a case-by-case test." *Id.* at 38. Rather, non-competes, as a class, are unfair methods of competition. *Delaware Department of Natural Resources and Environmental Control v. EPA* is therefore inapposite. *See* 785 F.3d 1, 17 (D.C. Cir. 2015), *as amended*, (July 21, 2015) (noting that "the only rationale provided for a national rule was a vague desire for uniformity").

The clarity of the Commission's rule also has numerous benefits for industry, workers, and the market. As the Rule explains, "[r]esearch demonstrates that employers maintain non-competes even where they likely cannot enforce them," and "the degree to which non-competes inhibit worker mobility is affected not only by whether a non-compete is actually enforceable but also on whether a worker believes their employer may enforce it." 89 Fed. Reg. at 38,458. Furthermore, a bright-line rule "provide[s] all market participants," including businesses, "greater clarity" than a piecemeal approach. *Id.* at 38,462. Further, case-by-case adjudication is insufficient because "many workers

cannot afford to litigate their non-competes," and an unreasonably broad non-compete may expire before a court can rule on its validity. *Id.* at 38,463. And rulemaking, unlike case-by-case adjudication, addresses "negative externalities" of non-competes "on other workers, other employers, consumers, and the economy." *Id.*

Additionally, the Commission thoroughly justified its decision not to create additional exceptions to the Rule. *See* 89 Fed. Reg. at 38,371 (independent contractors), *id.* at 38,447-51 (healthcare workers); *contra* Pl.-Intervenors Mot. 39.

Ryan's arguments also lack merit. As explained above, the data on which the Commission relied to support its findings was consistent across industry and geographic region. *Contra* Ryan Mot. 32-33.

Ryan also is wrong to fault the Commission for not engaging further with Ryan's comment that partners in businesses such as consulting firms often have considerable bargaining power when negotiating non-competes. Ryan Mot. 33-34. The Commission *agreed* with Ryan that non-competes with senior executives are not always exploitative and coercive. 89 Fed. Reg. at 38,404-06, 38,418. Rather, the Commission found that the use of such non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product, service, and labor markets. *Id.* The bargaining power of consulting firm partners is immaterial to those findings. *See Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973) ("[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern.").

Next, Ryan is mistaken to suggest that the Commission did not adequately consider consumer welfare, including prices. Ryan Mot. 34-35. To the contrary, the Commission observed that the only empirical study *directly* examining price effects of non-competes found that non-competes cause higher consumer prices. 89 Fed. Reg. at 38,398. The Commission similarly observed that additional, less direct but still probative evidence showed that non-competes increase industrial concentration, which in turn tends to raise consumer prices. *Id.* Conversely, the Commission found "*no* empirical evidence that enforceability of non-competes increase[s] prices." *Id.* at 38,479 (emphasis added). And Ryan—which bears the burden of proof on its arbitrary-and-capricious claim—identifies no such evidence here.

Ryan also fails to establish that the data on which the Commission relied was either "insufficient" or "flawed." Ryan Mot. 35-36. For that proposition, Ryan cites a brief 2019 article in which an economist—who was employed by the Commission but wrote in his personal capacity—surveyed then-existing empirical literature on non-competes. *Id.* (citing John M. McAdams, *Non-Compete Agreements: A Review of the Literature* (2019)). McAdams summarized that, "[a]cross the board, the literature finds that non-compete agreements are associated with longer worker tenure and less mobility" and that "papers relying on state policy changes" find that non-competes lead to "lower wages," McAdams at 20—two key findings that support the Rule. He went on to opine that "[f]urther research [wa]s needed" in certain other areas. *Id.* That is immaterial, for two reasons. First, the Commission's findings with respect to labor mobility and wages

alone were sufficient to support its conclusion that non-competes tend to negatively affect competitive conditions. 89 Fed. Reg. at 38,387. Second, the Commission expressly considered this article but found it "generally outdated" because "much of the strongest evidence on the effects of non-competes has been published in recent years," since that 2019 review. *Id.* 38,385.

There also is no basis for Ryan's suggestion that the Commission assigned different weight to correlational studies based on their findings. Ryan Mot. 36. In concluding that non-competes suppress wages, the Commission relied principally on data drawn from the natural experiments that occur when particular jurisdictions change the enforceability of non-competes, *i.e.*, study designs that show causation. 89 Fed. Reg. at 38,382. The Commission merely cited a correlational study that reached the same result as "corroborat[ing] the estimates from other studies that rely on more credible research designs." *Id.* On the other side of the ledger, the Commission noted that the only data suggesting that non-competes might increase wages were based on purely correlational studies. *Id.* at 38,383.

Finally, contrary to Ryan's assertion, there is no contradiction between the Commission's conclusions that the Rule will promote innovation, on the one hand, and that firms can protect their confidential information using less restrictive alternatives such as non-disclosure agreements and trade secret law, on the other hand. Ryan Mot.

37.[10] Ryan overlooks the distinction between proprietary information, which belongs to the business, and general knowledge and skill that belong to the worker, including "experience and understanding of the industry, which may cross-pollinate with the capabilities of [a] new company, cultivating new research which would not otherwise be achieved" and thereby promoting innovation. 89 Fed. Reg. at 38,408. The Commission also noted that firms can use non-disclosure agreements ("NDAs") and trade secret law "in tandem" with other less restrictive alternatives, such as fixed-duration employment contracts. *Id.* at 38,431.

Plaintiffs also challenge the reasonableness of the Commission's cost-benefit analysis, *see* Pl.-Intervenors Mot. 40-42; Ryan Mot. 37-42, but the Act precludes judicial review of "[t]he contents and adequacy of" that regulatory analysis. 15 U.S.C. § 57b-3(c)(1). Although the Act requires the Commission to "issue a final regulatory analysis" for all final rules, it bars "any judicial review" of that analysis. *Id.* § 57b-3(b)(2), (c)(1).

In any event, each of Plaintiff-Intervenors' objections to the cost-benefit analysis lacks merit. With respect to costs, the Commission did not "wave[] away" the possibility that trade secret litigation expenses may increase as a result of the Rule. Pl.-Intervenors Mot. 40. Rather, the Commission carefully considered this concern and recognized that "litigation costs may rise if firms turn to litigation to protect trade secrets and if that litigation is more expensive than enforcing" non-competes. 89 Fed. Reg. 38,484. But

---

[10] Nowhere did the Commission state that the Rule would "eliminat[e] obstacles to information-sharing." Ryan Mot. 37.

the Commission but found "no evidence increased litigation will result in increased costs associated with the final rule," *id.*, and Plaintiffs-Intervenors cite none. The Commission also noted that more recent economic literature tends to show that litigation costs would fall under the rule, not rise. *Id.* n.1169.

And the Commission explained that the Rule does not prevent employers from using "garden-variety NDAs" to safeguard their sensitive business information; it "prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business." *Id.* at 38,426; *contra* Pl.-Intervenors Mot. 40-41.

As explained above, the Commission amply supported its conclusion that the Rule is more likely to decrease prices than to increase them. *Contra* Pl.-Intervenors Mot. 41. And the Commission did not "dismiss[] the benefits of increased training opportunities." *Id.* Rather, it acknowledged that the ten-year net effect on worker training as a result of the Rule could range from a benefit of $32 billion to a cost of $41 billion, depending principally on whether training decreases as a result of more efficient matching between workers and employers, *i.e.*, less training is required to address a skills mismatch ("core training"), or decreased investment in training that builds upon the productivity of workers who may already be experienced in an industry ("advanced training"). 89 Fed. Reg. at 38,479.

With respect to benefits, as discussed above, the Commission drew reasonable conclusions from available data and explained how the data supported those

59

conclusions. *Contra* Pl.-Intervenors Mot. 41. The Commission also thoroughly addressed the study discussed in the comment submitted by professors including Dr. Acri. *Compare* Jonathan Barnett, Comment Letter on Proposed Rule (May 2, 2023), https://perma.cc/UR3S-R372, *with* 89 Fed. Reg. at 38,397-98 & n.583. Plaintiffs offer no support for their assertion that economic analysis of data from 2009 or 2014 is too "stale" to be useful, nor do they offer any basis to conclude that more recent data shows different effects of non-competes. Pl.-Intervenors Mot. 42. Finally, as discussed, the Commission thoroughly explained why the status quo of State-by-State enforcement was inadequate.

Ryan's objections to the Commission's cost-benefit analysis are similarly unpersuasive. First, Ryan posits that the number of workers currently bound by non-competes may be smaller than the Commission assumed. Ryan Mot. 38. Even if that were true, it would affect the magnitude of the Rule's benefits and costs alike but would not necessarily alter the balance between them.

Ryan also is wrong to suggest that high earners will disproportionately benefit from the Rule. Ryan Mot. 38. Rather, the Commission found that the negative correlation between non-competes and earnings is "consistent across dissimilar subsets of the population." 89 Fed. Reg. at 38,385. In any event, a concentration of benefits among high earners likewise would not alter the balance between the Rule's costs and benefits.

Ryan then characterizes as "paltry" an estimated increase in worker earnings of $400-488 billion over ten years. Ryan Mot. 38. This assertion cannot be squared with Ryan's earlier statement that the economic impact of the Rule—"in the hundreds of billions of dollars"—triggers application of the major questions doctrine. *Id.* at 22.

Contrary to Ryan's assertion, *id.* at 39, the Commission expressly accounted for the reality that not all patents reflect increased innovation, prioritizing studies that "take[] into account the quality of patents issued" rather than merely the "number of patents," 89 Fed. Reg. at 38,373. With respect to the possibility that some new businesses created as a result of the Rule may fail, it is always true that not every business succeeds. Moreover, as explained in the Rule, "no empirical evidence shows new businesses fail at a higher rate when (or because) non-competes are less enforceable." *Id.* at 38,494.

Next, Ryan makes a cursory suggestion that firms will need to "revamp entire business models" as a result of the Rule, "especially models centered around selling the services of highly educated and specialized experts." Ryan Mot 40.[11] The Commission reasonably found otherwise. With respect to protecting investments in training, in particular, the Commission noted that, "[i]f an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration," "establish[ing] a term that is long

---

[11] It is worth noting that the legal profession, which falls within this category, has long prohibited the use of non-competes. *See* 89 Fed. Reg at 38,390 & n.532.

enough for the employer to recoup its human capital investment." 89 Fed. Reg. at 38,426. Additionally, employers can "compet[e] on the merits for the worker's labor services through better pay, benefits, or working conditions." *Id.* at 38,430.

Further, as explained above, the Commission adequately accounted for the Rule's likely effects on prices—which are more likely to decrease than increase, contrary to Ryan's invocation of inflation—as well as training and litigation costs. *Contra* Ryan Mot. 40-42.

Finally, the Court's decision to grant preliminary injunctive relief with respect to Plaintiffs' arbitrary-and-capricious claim rested on two misapprehensions. First, it is not true that "no state has ever enacted a non-compete rule as broad as the FTC's." Op. 21. As noted in the Rule, four States have generally prohibited non-competes. 89 Fed. Reg. at 38,424.[12] Second, the Commission did consider employers' reliance interests on existing non-competes, *contra* Op. 22, and determined that, for workers other than senior executives, the "acute, ongoing harms to competition" and to "individual workers" that existing non-competes impose outweigh those reliance interests, except in the case of senior executives, particularly because firms have tools other than non-competes to protect their interests in employee retention and protection of trade secrets or other commercially sensitive information, 89 Fed. Reg. at 38,403-04.

---

[12] To the extent that Plaintiff-Intervenors attempt to distinguish California's ban on the ground that it affects only "lawful profession[s]," they fail to explain why this distinction is significant. Pl.-Intervenors Mot. 32.

## VII.   THE FTC ACT'S REMOVAL RESTRICTIONS ARE LAWFUL.

As Ryan concedes, Ryan Mot. 43 n.5, the Fifth Circuit's recent decision in *Illumina, Inc. v. FTC* forecloses the challenge to the Act's removal restrictions. 88 F.4th 1036, 1047 (5th Cir. 2023) ("[W]hether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer."). Even if that were not the case, this challenge would fail because Ryan has failed to show any harm from the Commissioners' tenure protection. *See Collins v. Yellen*, 141 S. Ct. 1761, 1781 (2021).

## VIII. ANY RELIEF AWARDED BY THIS COURT SHOULD BE LIMITED IN ACCORDANCE WITH THE APA AND EQUITABLE PRINCIPLES.

### A. Even If the APA Authorized Universal Vacatur, that Remedy Is Not Warranted Here.

Even assuming that the APA authorizes vacatur of agency action,[13] the Court should decline, as a matter of equitable discretion, to enter a universal vacatur of the Rule. Text and precedent both make clear that whether to enter vacatur—and the scope of any such relief—is constrained by equitable principles. And those principles limit proper relief to redressing the injuries of the named parties, thus foreclosing universal vacatur in this case.

---

[13] The Commission preserves for further review the argument that the APA's provision for the courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek.

The APA is not properly read to require vacatur—much less universal vacatur—of challenged action, in light of traditional equitable principles generally restricting relief beyond the parties. Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The Supreme Court has recently reinforced this principle of interpretation, instructing that, "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). And the Court explained that even seemingly mandatory statutory language—such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles" governing relief. *Id.* at 1577. "[S]uch an abrupt departure from traditional equity practice" as requiring relief no matter the equities requires "plain[er]" language than that. *Id.*; *see also Hecht Co.*, 321 U.S. at 329 (Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances.").

So too with the APA. As an initial matter, the APA itself provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibition or mandatory injunction," 5 U.S.C. § 703, and explicitly preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702. In light of the traditional equitable principles against which the statute was enacted—and which are explicitly incorporated into the statute—there is no sound reason to conclude

that Congress did not merely authorize but compelled courts to abandon "the bedrock practice of case-by-case judgments with respect to the parties in each case" by adopting the unremarkable "set aside" language in § 706. *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment).

Finally, this construction of the APA—as permitting, but not requiring, universal vacatur—is consistent with Fifth Circuit precedent. The Fifth Circuit has treated universal vacatur as a discretionary equitable remedy, not one that is automatic or compelled in every case. *See Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy … is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024). And the Fifth Circuit has sometimes declined to enter vacatur in favor of a remedy termed "remand without vacatur" when equitable principles so directed. *E.g.*, *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

Plaintiffs offer no analysis of the APA's text or history to justify their reading of the statute as compelling universal vacatur. Instead, they merely cite stray dicta from various Fifth Circuit cases describing vacatur in mandatory terms. Ryan Br. 43-44; Chamber Br. 42-43. But those cases generally did not consider the arguments presented here. It is well established that "a panel's assumption"—here, that the APA permits universal vacatur—"'is not binding if the adverse party did not challenge and [the panel]

65

did not consider' that issue." *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) (collecting cases). This remains true even when the assumption was necessary to the decision, as in the context of subject matter jurisdiction. *See, e.g.*, *Lefebure v. D'Aquilla*, 15 F.4th 650, 657 (5th Cir. 2021). And Plaintiffs' reading of their cited cases is inconsistent with the Fifth Circuit's practice, noted above, of sometimes declining to vacate or directing the district court on remand to consider other equitable remedies. Nor did any of those cases have the benefit of the Supreme Court's recent decision in *McKinney*, which made clear that language such as that in the APA cannot be read to displace traditional equitable principles, as explained above.

Here, under traditional equitable principles, the Court should decline to vacate the Rule in its entirety and instead enter tailored, party-specific relief—either vacatur or an injunction—in the event it determines any of Plaintiffs' claims is meritorious. The problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a nationwide injunction or universal vacatur. *See, e.g.*, *Labrador v. Poe*, 144 S. Ct. 921, 926-28 (2024) (Gorsuch, J., concurring); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 585 U.S. 670, 713 (2018) (Thomas, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). Overbroad remedies "virtually guarantee[] that a rising number of 'high-profile' cases will find their way to [the Supreme] Court." *Labrador*, 144 S. Ct. at 927 (Gorsuch, J., concurring). They "effectively transform[] a limited dispute between a small number of parties … into a far more consequential

referendum on the law's every provision as applied to anyone." *Id.* "What's worse, universal [remedial] practice is almost by design a fast and furious business." *Id.* Moreover, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to … secure a win nationwide." *DHS*, 140 S. Ct. at 601 (Gorsuch, J., concurring). "And the stakes are asymmetric. If a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal," "until either one side gives up or [the Supreme] Court grants certiorari." *Id.* The result of this ahistoric practice, in other words, is "gamesmanship and chaos." *Id.* This Court should "take heed" of these problems and "return to a more piecemeal and deliberative judicial process" that is "truer to the historic limits" of judicial power. *Labrador*, 144 S. Ct. at 927-28 (Gorsuch, J., concurring).

Plaintiffs do not identify any reason why vacatur of the entire Rule is necessary to afford them complete relief in this case, and such an overbroad order would harm the Commission and the public interest. "It is well-established that '[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Cargill*, 57 F.4th at 472 (quoting *Gill v. Whitford*, 585 U.S. 48, 73 (2018)). Thus, Ryan's assertions with respect to the alleged injuries of "tens of thousands of [other] Americans" are misplaced. Ryan Mot. 44. To the extent the Court concludes that any of Plaintiffs' claims are meritorious,

Plaintiffs have cited no reason why party-specific vacatur would not fully redress their purported injuries.

Moreover, universal vacatur is particularly unwarranted here, because another court already has ruled that the Rule is authorized by statute and rejected other constitutional challenges, and a preliminary injunction motion is pending before a third court. *See ATS*, 2024 WL 3511630, at *19; *Properties of the Villages, Inc. v. FTC*, No. 5:24-cv-00316-TJC-PRL (M.D. Fla. July 2, 2024), ECF No. 25. Universal vacatur thus would deprive the *ATS* court's decision of any practical significance and would forestall meaningful review in *Properties of the Villages*. Thus, regardless of this Court's conclusions on the merits, the Court should allow the important legal issues presented here to continue to percolate through the federal courts. *See Hawaii*, 585 U.S. at 713 (Thomas, J., concurring) (noting that universal remedies "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch").

## B. The Court Should Not Extend Any Injunctive Relief to Unidentified Members of Plaintiff-Intervenors.

Plaintiff-Intervenors have identified three businesses purportedly harmed by the Rule that are members of the U.S. Chamber of Commerce. Based on these three businesses, Plaintiff-Intervenors also seek injunctive relief for their entire respective undisclosed memberships, which number in the hundreds of thousands or potentially

millions (as explained below, it is not even clear how many "members" these organizations have). *See* Pl.-Intervenors Mot. 44–49.[14] But none of those additional members are identified in this Court, and nothing indicates that they are aware of this lawsuit, have agreed to be bound by any judgment in this litigation, have authorized the organizational plaintiffs to litigate claims on their behalf, or even oppose the Rule (which in fact benefits and was supported by numerous businesses, including potentially by many of those members). Extending relief to those unidentified members compounds the constitutional and equitable concerns raised above, and poses significant additional equitable and practical problems where the organizations' memberships are ill-defined, vast, and indeed likely in favor of the Rule to some extent, and where another district court has concluded that the Rule is likely lawful. Instead, as this Court observed at the preliminary injunction stage, and consistent with Article III's limits on the judicial power, any injunctive relief should be limited to individual businesses—whether named parties or members of one of the organizational plaintiffs—that this Court concludes have established harm from the Rule. Op. at 29 (discussing *Califano v. Yamasaki*, 442 U.S. 672, 702 (1979) ("[T]he scope of injunctive

---

[14] Plaintiff-Intervenors do not seek to proceed under a theory of organizational standing—that is, based on Article III injury to themselves as organizations. *See Ass'n of Cmty. Organizers for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). They would not have such standing in any event, because "the Commission lacks jurisdiction to prevent section 5 violations by a corporation not organized to carry on business for its own profit or that of its members." 89 Fed. Reg. at 38,357 (explaining the contours of the Commission's jurisdiction under 15 U.S.C. § 44). Based on the record, Plaintiff-Intervenors, which claim tax-exempt non-profit status, have not shown that they are corporations organized to carry on business for their own profit or that of their members, and therefore the Rule does not apply to Plaintiff-Intervenors as employers.

relief is dictated by the extent of the violation established."), and *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) ("As is true for all injunctive relief, the scope of the injunction must be justified based on the circumstances.")).

As a threshold matter, three of the organizational plaintiffs—Business Roundtable, Texas Association of Business ("TAB"), and Longview Chamber of Commerce—lack standing at all to challenge the Rule because they have not identified *any* member with standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). It is well-established that at summary judgment, an organizational plaintiff seeking to litigate on behalf of its membership must "make specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm." *Id.* And "only where *all* the members of the organization are affected by the challenged activity" does the "requirement of naming the affected members" not apply. *Id.* at 498-99. That narrow exception is plainly inapplicable to Business Roundtable, TAB, or the Longview Chamber; the relevant declarations all aver only that "many" of those organizations' members, though certainly not all, have non-compete agreements. *See generally* Pl.-Intervenors Mot., Exs. B, C, G. Because these three plaintiffs lack standing to challenge the Rule, they are not entitled to relief of any kind.

Turning to the Chamber, if the Court determines that it is entitled to relief, that relief should be limited to the businesses who have identified themselves in this lawsuit. To start, the Chamber has not established that it may litigate on behalf of its entire membership because it has not shown that it is a bona fide membership organization.

It has not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor has it explained how its members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997).

To the contrary, the sparse evidence regarding the Chamber's membership confirms the opposite: the Chamber is a diffuse organization with an ill-defined membership, and there is no evidence that those "members" have any substantial ability to control its actions. The Chamber avers that it not only "directly" represents "approximately 300,000 members," but also "indirectly represent[s] an underlying membership of more than three million U.S. businesses." Pl.-Intervenors Mot., Ex. D ¶ 3 ("Chamber Decl."). But it is entirely unclear what it means for the Chamber to "directly" represent some members and to "indirectly" represent millions of others. Thus, on this record, the Chamber's membership is a moving target without a "clearly articulated and understandable … structure." *Friends of the Earth*, 129 F.3d at 829. And not only that, but the Chamber has also maintained the right to keep its membership confidential (even in response to judicial inquiry), further obscuring its membership structure. *See* Notice of Related Cases ¶ 3, *Chamber of Commerce v. FTC*, No. 6:24-cv-148 (E.D. Tex. Apr. 29, 2024), ECF No. 21.

Relatedly, it is unclear whether the Chamber seeks relief on behalf of its direct membership, its indirect membership, or some combination thereof. That ambiguity violates Rule 65's requirement that every injunction "state its terms specifically" and

71

"describe in reasonable detail" the "acts restrained or required." Fed. R. Civ. P. 65(d). To the extent the broader "indirect" membership group consists of unidentified members of unidentified organizations that are in turn members of the Chamber, the Chamber's request to seek relief on behalf of entities "two degrees removed from the party before" the court "seems to run roughshod" over Article III's injury-in-fact requirement. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 399-400 (2024) (Thomas, J., concurring).

Adding to the fact that the Chamber does not state with clarity even the number of members it has, there is no indication in the record of how an entity becomes a Chamber member (whether "directly" or "indirectly"), nor what power those members exercise over the Chamber's decision-making. The declarations submitted on behalf of the Chamber's three members each contain an identical boilerplate assertion that the company "is a member of the Chamber" with nothing more. *See* Pl.-Intervenors Mot., Ex. E ¶ 3 (Highland Landscaping), Ex. F ¶ 3 (Alloy Precision), Ex. H ¶ 6 (Citadel); *accord Viasat, Inc. v. FCC*, 47 F.4th 769, 781-82 (D.C. Cir. 2022) (rejecting theory of associational standing where "[t]wo purported members submitted affidavits, … but neither describe[d] involvement in the Group beyond a bare assertion of membership"). There is also nothing in the record suggesting that the Chamber's members, however defined, have authorized the Chamber to litigate on their behalf or understand they may be bound by an adverse judgment on their claims. In these circumstances, as the Fifth Circuit's commonsense rule articulated in *Friends of the Earth* makes clear, the Chamber

72

may not purport to litigate on behalf of all its many unidentified members.

The Chamber has also not carried its burden to demonstrate that the relief it requests does not "require[] the participation of any individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As the Chamber points out, *see* Pl.-Intervenors Mot. 47, to meet that standard, Fifth Circuit precedent requires an organizational plaintiff seeking to proceed on behalf of its entire membership to prove that "the resolution of the claims benefits the association's members." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010) ("*AAPS*"). But the Chamber has failed to make that showing.

In fact, the record shows that the opposite is true: it is overwhelmingly likely that many of the Chamber's members in fact support and stand to benefit from the Rule going into effect, rather than benefiting from the Chamber's requested relief. As the Commission found, the Rule is projected to result in substantial benefits to American businesses by increasing their access to qualified workers and spurring innovation. That is why, for instance, the Small Business Majority—a "network of more than 85,000 small businesses" and "a representative of America's 33 million small businesses"— joined by other business organizations including local chambers of commerce, and hundreds of small businesses from over forty states, submitted comments in support of the Rule and filed an amicus brief in support of the Commission in this case. *See* Small Business Majority, Comment Letter on Proposed Rule (Apr. 19, 2023), https://perma.cc/E6EJ-E789 (comment from Small Business Majority's CEO and

Founder explaining businesses' support for the Rule) ("Small Business Majority Comment"); Small Business Majority *et al.*, Comment Letter on Proposed Rule (Apr. 19, 2023), https://perma.cc/ZTW2-KCL9 (comment from Small Business Majority joined by small business organizations and hundreds of individual small businesses urging the Commission to adopt the Rule); Amicus Br. of Small Bus. Majority & Prof. Evan Starr, ECF No. 125-1. Given the Chamber's apparently vast membership, the same will be true for many of the businesses it claims to represent.

Reinforcing that conclusion, the Chamber offers that it has only "thousands of members" with non-compete agreements, in other words, a tiny fraction of the more than three million members whose interests it claims to "indirectly" represent. *See* Chamber Decl. ¶ 7. By that token, then, the overwhelming majority—indeed, millions—of the Chamber's members do not use non-competes and would in fact benefit from the "level playing field" that the Rule creates by precluding their competitors from using an anticompetitive business practice. *See* Small Business Majority Comment at 1.

By way of example, the American Hospital Association ("AHA") filed an amicus brief in this case in support of Plaintiffs. Amicus Br. of the Am. Hosp. Ass'n et al., ECF No. 178-1. ("AHA Br."). The AHA "represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations," and purports to "promote[] its members' interests … by participating as amicus curiae" in litigation. AHA Br. at 1. Yet at least one of its members—New York University Langone Health—submitted a comment in

favor of the Rule. *See* Grossman, Robert I., Comment Letter on Proposed Rule (Mar. 20, 2023), https://perma.cc/7ZY9-FNJ3. The odds are overwhelming that, similarly, some of the Chamber's unidentified members do not support the Chamber's position in this litigation and would not benefit from the relief that it seeks; thus, the Chamber may not unilaterally assert claims on their behalf. *See AAPS*, 627 F.3d at 552.

The affidavits from the three Chamber members that have identified themselves in this litigation further confirm that individual participation of the Chamber's members is necessary. Those affidavits show how, even for the Chamber's members who do use non-competes, the Rule affects those members in varying and uncertain ways. To start, one of Chamber's three identified members here, Citadel, does not even appear to be covered by the Rule. *See* Pl.-Intervenors Mot., Ex. H. Citadel's non-compete agreements include a clause requiring Citadel to pay the departing worker "monthly monetary compensation at or significantly exceeding [the worker's] base salary" during the non-compete period. *Id.* ¶ 8. Those are the kinds of "garden leave" agreements that the Rule does not prohibit. *See* 89 Fed. Reg. at 38,366.

Turning to the Chamber's other two identified members—Highland Landscaping and Alloy—they have not shown that their non-competes are even enforceable under state law. Nor has Ryan. None of the declarations submitted by Highland Landscaping, Alloy, or Ryan indicate the geographic scope of their non-competes, nor which state's law governs those agreements. Furthermore, Ryan does not indicate the duration of its non-competes. Without more information, it is

impossible to say how the Rule affects any of these individual businesses because their non-competes may be unenforceable under state and federal law, even without taking the Rule into account. Individual participation of the Chamber's members is required under these circumstances.

Even if it the Chamber could satisfy Article III's requirements to sue on behalf of hundreds of thousands or millions of unnamed businesses, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such a restriction on relief would promote longstanding equitable principles that a party "gets only one bite at the apple," *Alliance*, 602 U.S. at 402 (Thomas, J., concurring), and that the effect of any judgment should be bidirectional, *cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits). The same well-documented practical and equitable problems that apply to requests for universal relief such as vacatur articulated above apply to requests for an injunction that would run to millions of unidentified "members" of a diffuse organizational plaintiff. *See generally id.* at 395-98 (Sutton, C.J., concurring); *supra,* Argument VIII.A.

Finally, the named Plaintiff-Intervenors and the Chamber's three identified members should not be permitted to circumvent the class-action requirements of Rule 23 by seeking relief on behalf of unnamed individuals. *See Alliance*, 602 U.S. at 402 (Thomas, J., concurring); *Texas*, 599 U.S. at 694 (Gorsuch, J., concurring in the judgment). Class actions are the "mechanism for applying a judgment to third parties,"

76

and "Rule 23 carefully lays out the procedures for permitting a district court to bind nonparties to an action." *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring). When a court decides to certify a class—which it must do at "an early practicable time" after the suit is filed, Fed. R. Civ. P. 23(c)(1)(A)—the absent class members will be bound by a favorable or unfavorable judgment, *see Califano*, 442 U.S. at 702. Accordingly, to protect potential class members' due process rights, Rule 23 contains robust requirements for certifying different forms of classes, and, for some classes, requirements for notice to class members and the right to opt out. Discarding those procedures and issuing relief that applies to millions of non-parties who have not authorized the Chamber to litigate claims on their behalf, or have even demonstrated awareness of this lawsuit, may violate those non-parties' rights and ultimately amounts to an inequitable one-way class action. *Cf. Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974) (explaining that the rule against one-way intervention prevents potential parties from "await[ing] developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests"). All of these problems are only compounded by the possibility that some of the Chamber's "members" are simply members of the Chamber's organizational members, attenuating any connection those entities have to the Chamber's decisions in this litigation.

These problems are not merely theoretical. In the separate case filed by Plaintiff-Intervenors challenging this Rule, the named Plaintiff here—Ryan—was revealed to be a member of one of the Plaintiff-Intervenors. *See* Notice of Related Cases ¶ 4, *Chamber*

*of Commerce v. FTC*, No. 6:24-cv-148 (E.D. Tex. Apr. 29, 2024), ECF No. 21. Despite that, the organizational plaintiffs sought to proceed separately, carving out Ryan *post hoc* from their request for relief while maintaining an entitlement to relief on behalf of their millions of other unnamed members. *Id.* ¶ 6. And the largest organizational plaintiff—the Chamber—along with TAB would not even say whether other entities challenging the same Rule in other cases were members at all. *Id.* ¶ 3. In essence, the organizational plaintiffs seek to proceed under conditions that could create the opportunity for multiple bites at the apple by potentially millions of unnamed entities whose claims they seek to advance in this litigation. Thus, if the court is inclined to grant injunctive relief to the organizational plaintiffs, it should reject that approach and instead limit any such relief to the members which have identified themselves here, which the Court determines have shown standing, and which have authorized the Chamber to proceed on their behalf.

Finally, any injunction should be tailored to match only the claims on which Plaintiffs have prevailed. For instance, if Plaintiffs have proven that the Rule is arbitrary and capricious only insofar as it applies to workers with access to confidential information or specialized training, any injunction should cover only those workers. *See supra* at 36-37. Similarly, if any specific provision of the Rule can be severed to address Plaintiff's claims, the Court should leave the rest of the Rule intact. *See* 89 Fed. Reg. at 38,505.

## CONCLUSION

Defendant's motion for summary judgment should be granted, and Plaintiffs' motions for summary judgment should be denied.

Dated: August 5, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

LESLEY R. FARBY
Assistant Branch Director

*/s/ Rachael L. Westmoreland*
RACHAEL L. WESTMORELAND
(GA Bar No. 539498)
TAISA M. GOODNATURE
ARJUN MODY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-1280
E-mail:
rachael.westmoreland@usdoj.gov

## CERTIFICATE OF WORD COUNT

This document complies with the Court's word count requirement, as amended

by the Court's July 11, 2024 Order, ECF No. 163, because it contains 19983 words.

Dated: August 5, 2024          /s/ Rachael L. Westmoreland
                                              RACHAEL L. WESTMORELAND (GA Bar
No. 539498)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-1280
E-mail: rachael.westmoreland@usdoj.gov

## CERTIFICATE OF SERVICE

On August 5, 2024, I electronically filed the above response with the clerk of court for the U.S. District Court, Northern District of Texas. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


*/s/ Rachael L. Westmoreland*

Rachael L. Westmoreland