IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

RYAN, LLC,

　　　　　　　　　　Plaintiff,

　　　　v.

FEDERAL TRADE COMMISSION,

　　　　　　　　　　Defendant.

Civil Action No. 3:24-cv-986-E

## RYAN, LLC'S CONSOLIDATED REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
aho@gibsondunn.com
ekiernan@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone: 817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew G. I. Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*Attorneys for Ryan, LLC*

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................1

PROCEDURAL STATEMENT ................................................................2

ARGUMENT .................................................................................3

   I.     The Commission Lacks Statutory Authority To Issue The Rule. ...............3

     A.    Congress Did Not Grant Unfair-Method-Of-Competition Rulemaking Authority In The FTC Act. .....................................................3

     B.    Congress Did Not Ratify Unfair-Method-Of-Competition Rulemaking Authority. ..........................................................6

     C.    The Major Questions Doctrine Resolves Any Doubt. ............................10

   II.    Unfair-Method-Of-Competition Rulemaking Authority Would Be Unconstitutional. ..........................................................................12

   III.   The Rule Is Unlawfully Retroactive. ...........................................13

   IV.   The Rule Is Arbitrary And Capricious. .........................................13

     A.    The Commission Did Not Justify A Blanket Ban ..................................14

     B.    The Commission's Cost-Benefit Analysis Is Arbitrary And Capricious. ............................................................................17

   V.    The Proper Remedy Is Vacatur, With Nationwide Effect. ........................20

     A.    The APA Requires Nationwide Vacatur. ...........................................20

     B.    The Equities Favor Nationwide Vacatur. ...........................................22

CONCLUSION ................................................................................24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)..........................................................................2, 3, 12

*Ala. Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021)......................................................................11

*Atl. Richfield Co. v. Christian*,
140 S. Ct. 1335 (2020).......................................................................9

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ......................................................................4

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)..........................................................................13

*Braidwood Mgmt., Inc. v. Becerra*,
104 F.4th 930 (5th Cir. 2024) ...........................................2, 20, 21, 22

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011).........................................................16

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .......................................................21, 22

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) (en banc) ............................................21

*Chamber of Commerce v. OSHA*,
636 F.2d 464 (D.C. Cir. 1980)...........................................................7

*In re Clarke*,
94 F.4th 502 (5th Cir. 2024) .............................................................21

*Coastal Conservation Ass'n v. Dep't of Commerce*,
846 F.3d 99 (5th Cir. 2017) ..............................................................15

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
144 S. Ct. 2440 (2024)......................................................................23

## TABLE OF AUTHORITIES
### (*continued*)

<u>Page(s)</u>

*DHS v. New York*,
    140 S. Ct. 599 (2020) ........................................................................................23

*Doleac ex rel. Doleac v. Michalson*,
    264 F.3d 470 (5th Cir. 2001) ............................................................................23

*Farmers Union Cent. Exch., Inc. v. FERC*,
    734 F.2d 1486 (D.C. Cir. 1984)........................................................................14

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..........................................................................................13

*Franciscan All., Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ............................................................................20

*FTC v. R.F. Keppel & Bro., Inc.*,
    291 U.S. 304 (1934)..........................................................................................12

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ..............................................................................17

*ICC v. Cincinnati, N. O. & T. P. Ry. Co.*,
    167 U.S. 479 (1897)..........................................................................................10

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ............................................................................12

*Lorillard v. Pons*,
    434 U.S. 575 (1978)............................................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................14, 15, 17

*Mourning v. Family Publications Serv.*,
    411 U.S. 356 (1973)............................................................................................4

*Nat'l Cable & Telecommc'ns Ass'n v. FCC*,
    567 F.3d 659 (D.C. Cir. 2009)..........................................................................13

## TABLE OF AUTHORITIES
*(continued)*

<u>Page(s)</u>

*Ohio v. EPA,*
 144 S. Ct. 2040 (2024)................................................................13

*Perez Pimentel v. Mukasey,*
 530 F.3d 321 (5th Cir. 2008) ...............................................13

*SEC v. Chenery Corp.,*
 318 U.S. 80 (1943).....................................................................14

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
 531 U.S. 159 (2001).................................................................6

*Tex. Med. Ass'n v. HHS,*
 2024 WL 3633795 (5th Cir. Aug. 2, 2024) .........................21, 22, 23

*Trump v. Hawaii,*
 585 U.S. 670 (2018) ...............................................................23

*UARG v. EPA,*
 573 U.S. 302 (2014).................................................................10

*United States v. Morton Salt Co.,*
 338 U.S. 632 (1950).................................................................9

*West Virginia v. EPA,*
 597 U.S. 697 (2022).........................................................1, 3, 10, 11

### Statutes

5 U.S.C. § 706.............................................................................20

15 U.S.C. § 45(a)(2)...................................................................4

15 U.S.C. § 45(b)........................................................................4

15 U.S.C. § 45(*l*).........................................................................4

15 U.S.C. § 45a...........................................................................5

15 U.S.C. § 57a(a)(1)...............................................................5, 8

## TABLE OF AUTHORITIES
### (*continued*)

Page(s)

15 U.S.C. § 57a(a)(2) ...................................................................................8

15 U.S.C. § 57b-3(c) ..................................................................................17

15 U.S.C. § 1194(c) .....................................................................................5

15 U.S.C. § 7607 ..........................................................................................5

## Regulatory Materials

16 C.F.R. § 910.1 ........................................................................................19

Federal Trade Commission, Non-Compete Clause Rule,
   89 Fed. Reg. 38,342 (May 7, 2024)............................... 11, 15, 16, 18, 19, 20, 22

Minimum Octane Numbers on Gasoline Dispensing Pump, 36 Fed.
   Reg. 23,871 (Dec. 16, 1971)...................................................................7

## Other Authorities

120 Cong. Rec. 40,606 (1974) (statement of Sen. Hart) ...........................8

120 Cong. Rec. 41,386 (1974) (statement of Rep. Broyhill).....................8

Annual Report of the Federal Trade Commission (1922) ..........................3

*Prevent*, Century Dictionary and Cyclopedia (1911) ...............................5

U.S. Census Bureau, *Total Revenue for Management Consulting
   Services, All Establishments, Employer Firms*,
   https://tinyurl.com/56sm4396 ...............................................................15

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Federal Trade Commission's Non-Compete Rule is one of the most consequential and controversial employment rules in history. It invalidates nearly every one of the 30 million non-compete agreements currently in force across the country, will trigger hundreds of billions of dollars in economic repercussions, and overrides the centuries' old common-law approach that nearly all States currently apply to assess non-competes on a case-by-case basis. This Court has already found this brazen power grab unlawful, because it was undertaken without statutory authority and because it was arbitrary and capricious. The Commission has given the Court no reason to change course.

As this Court concluded, the Commission lacks statutory authority to issue unfair-method-of-competition rules. The Commission barely attempts to argue that the FTC Act of 1914 granted it authority to issue rules defining unfair methods of competition. Instead, the Commission primarily contends that Congress ratified its authority in later amendments to the FTC Act. But there was no practice of promulgating unfair-method-of-competition rules to ratify, and those later statutes do not demonstrate that Congress intended to ratify any such authority. The major questions doctrine resolves any doubt: the Rule represents a "transformative expansion in [the Commission's] regulatory authority" and has "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022). Indeed,

1

Congress could not have constitutionally conferred such boundless authority on the Commission. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532-33 (1935).

The Rule is also arbitrary and capricious. The Commission did not justify its decision to impose a sweeping, nationwide ban. Its attempts to salvage its results-oriented reasoning falls flat, alongside its incomplete cost-benefit analysis.

The Commission has thus violated the Administrative Procedure Act ("APA") several times over. As the Fifth Circuit has repeatedly held, the "'default' remedy" for an APA violation is vacatur, with nationwide effect. *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024) (citation omitted). No Fifth Circuit case "require[s] consideration of the various equities at stake before determining whether a party is entitled to vacatur." *Id.* Quite the opposite. *See id.* Even if the equities were considered, however, the Commission has pointed to no good reason for departing from the APA's default remedy. This Court should vacate the Rule nationwide.

## PROCEDURAL STATEMENT

The procedural posture, issues, and standard of review have not changed since Ryan filed its motion. *See* Ryan Br. 13.

# ARGUMENT

## I.    The Commission Lacks Statutory Authority To Issue The Rule.

This Court already held that "the text, structure, and history of the FTC Act reveal that the FTC lacks substantive rulemaking authority with respect to unfair methods of competition under Section 6(g)." ECF 153 at 1.  At summary judgment, the Commission repeats the same arguments this Court previously rejected. *Compare* ECF 82 at 15-25, *with* Opp. 17-33.

### A.    Congress Did Not Grant Unfair-Method-Of-Competition Rulemaking Authority In The FTC Act.

"'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" ECF 153 at 13 (quoting *West Virginia*, 597 U.S. at 721).  Congress does not hide elephants like the power to promulgate unfair-method-of-competition rules in mouseholes like the latter half of the seventh subsection of a section containing otherwise ministerial and investigative powers.  *See* Ryan Br. 15-16.  That alone makes clear that "Section 6(g) is indeed a housekeeping statute."  ECF 153 at 15 (cleaned up).  That conclusion matches the contemporaneous understandings of both the Commission itself, Annual Report of the Federal Trade Commission 36 (1922), and the Supreme Court, *Schechter*, 295 U.S. at 532-33.  The Commission has no explanation for the decades of consensus regarding Section 6(g).

3

As this Court recognized, this conclusion also accords with the early-1900s congressional practice of pairing substantive rulemaking authority with penalties for violating those rules. ECF 153 at 15-16. The Commission complains (at 25-26) that accounting for the lack of penalties is an "invitation to disregard the plain text." Not so. Recognizing Congress's longstanding practice is "a tool for discerning—not departing from—the text's most natural interpretation." *Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring).[1]

The Commission (at 27) alternatively argues that the threat of a cease-and-desist order is the penalty for violating its rules. But the Commission can issue cease-and-desist orders only after a Section 5 *adjudication*, and penalties accrue only for violations of such orders. *See* 15 U.S.C. § 45(b), (*l*). This pairing of penalties with adjudicatory authority confirms the Commission's lack of rulemaking authority.

The Commission fares no better in arguing (at 18-19) that its Section 5 mandate to "prevent" unfair methods of competition contemplates prospective rulemaking authority. "[P]revent[ing]" unfair methods of competition is all the Commission is "empowered and directed" to do. 15 U.S.C. § 45(a)(2). The Commission's adjudicatory authority thus must necessarily "prevent" violations. And for over a century, the Commission has used this authority to issue cease-and-

---

[1] The Commission cites *Mourning v. Family Publications Service*, 411 U.S. 356 (1973), but that case addressed whether a rule promulgated under a provision that undisputedly authorized substantive rules conflicted with another provision of the statute. *Id.* at 362.

desist orders that "'keep [unfair methods of competition] from existing or occurring'" through their threat of monetary penalties and precedential effect.  Opp. 18 (quoting *Prevent*, Century Dictionary and Cyclopedia (1911)).

Finally, the surplusage canon demonstrates that Section 6(g) does not authorize substantive rules.  *See* Ryan Br. 18-19.  Congress has granted the Commission specific, substantive rulemaking authority numerous times since enacting Section 6(g).  *See, e.g.*, 15 U.S.C. § 57a(a)(1) ("the Commission may prescribe … rules which define with specificity … unfair or deceptive acts or practices"); *id.* § 45a ("The Commission … may … issue [Made in America labeling] rules"); *id.* § 1194(c) ("The Commission is authorized and directed to prescribe" flammability rules).  The Commission's claim (at 24-25) that these provisions *only* "direct[]" the Commission to use preexisting rulemaking authority to address particular Section 5 violations cannot be squared with their text.  By contrast, the example the Commission cites, 15 U.S.C. § 7607, says the Commission "shall prescribe rules [regarding contact lenses] pursuant to" its unfair-or-deceptive-acts-or-practices rulemaking authority, which shows that Congress knows how to direct the Commission to exercise already extant authority when it wants to.

### B. Congress Did Not Ratify Unfair-Method-Of-Competition Rulemaking Authority.

The Commission again contends that Congress in the Magnuson-Moss Act and FTC Improvements Act ratified unfair-method-of-competition rulemaking authority. It did not.

The standard for ratification is high: "Absent … overwhelming evidence of acquiescence," courts should not "replace the plain text and original understanding of a statute with an amended agency interpretation." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001). The Commission disputes that standard's applicability (at 22), contending that it does not apply when ratification merely "confirms the most natural reading of the plain text." But that response concedes that, if Ryan is correct about the best interpretation of the FTC Act, the Commission needs "overwhelming evidence" that Congress intended to replace that understanding with an "amended agency interpretation."

Regardless, Congress did not ratify unfair-method-of-competition rulemaking authority under any standard. To begin, there was no practice of issuing unfair-method-of-competition rules for Congress to ratify. *See* Ryan Br. 17-18, 26. The Commission asserts (at 21) that it "had promulgated more than a dozen rules defining certain conduct as an unfair method of competition" by the time Magnuson-Moss was enacted, but it fails to rebut Ryan's explanation that those rules in substance defined unfair or deceptive acts or practices, and merely as an afterthought

asserted that the deceptive practice was also an unfair method of competition. *See* Ryan Br. 17-18.

The Octane Rule at issue in *National Petroleum* is representative. The Commission filled seven pages of the Federal Register discussing how failing to display gasoline's octane rating deceived consumers into purchasing unnecessary higher-octane gasoline and thus was an unfair or deceptive practice. Posting of Minimum Octane Numbers on Gasoline Dispensing Pump, 36 Fed. Reg. 23,871, 23,873-80 (Dec. 16, 1971). With no additional analysis, the Commission also concluded that "failure … to affirmatively disclose the research octane rating of the gasoline … constitutes an unfair method of competition and an unfair trade practice." *Id.* at 23,880. The Octane Rule was in "substance" an unfair-or-deceptive-act-or-practice rule; it was not an unfair-method-of-competition rule "just because the [Commission] says" it was. *Chamber of Commerce v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980).

Even if there were something to ratify, Congress did not do so. The Commission (at 19) cites *Lorillard v. Pons*, which states that ratification might occur "when [Congress] re-enacts a statute without change." 434 U.S. 575, 580 (1978). But Magnuson-Moss did not re-enact the FTC Act "without change." *Id.* It substantively amended the FTC Act by granting the Commission authority to

promulgate unfair-or-deceptive-act-or-practice rules, but not unfair-method-of-competition rules. *See* 15 U.S.C. § 57a(a)(1).

The Commission (at 20) emphasizes the proviso that Magnuson-Moss "shall not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2). But if Congress aimed to ratify existing authority, it would have said Magnuson-Moss "shall not affect *the* authority of the Commission to prescribe unfair-method-of-competition rules." The use of "*any* authority" was a deliberate congressional decision to remain neutral on whether Section 6(g) granted that authority, a question that divided legislators. *Compare* 120 Cong. Rec. 40,606, 40,713 (1974) (statement of Sen. Hart) (suggesting the Commission had unfair-method-of-competition rulemaking authority), *with* 120 Cong. Rec. 41,386, 41,407 (1974) (statement of Rep. Broyhill) (suggesting the Commission did not have "any such authority"). None of the bills in the lead-up to Magnuson-Moss proposed to grant the Commission unfair-method-of-competition rulemaking authority, and the House bill would have *barred* those rules. Ryan Br. 25-26. The statement of one Senator does not enshrine the illogical conclusion that Congress nevertheless ratified open-ended unfair-method-of-competition

rulemaking authority while restricting unfair-or-deceptive-act-or-practice rulemaking authority.[2]

Nor did Congress ratify unfair-method-of-competition rulemaking authority in the FTC Improvements Act of 1980. The Commission has not rebutted Ryan's explanation that the statute defined "Rule" to include rules promulgated under Section 6 to capture amendments to rules promulgated before Magnuson-Moss. Ryan Br. 26.

That this is the first unfair-method-of-competition rule promulgated since Magnuson-Moss and the FTC Improvements Act further confirms that neither enactment ratified unfair-method-of-competition rulemaking authority. *See* Ryan Br. 18. The Commission notes (at 28-29) that the Supreme Court has held that powers "are not lost by being allowed to lie dormant." *United States v. Morton Salt Co.*, 338 U.S. 632, 647 (1950). But the Commission omitted the immediately preceding sentence: "The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist." *Id.*

---

[2] Neither Section 18(a)(2)'s exclusivity provision nor the reference to it added to Section 6(g) indicates Congress ratified unfair-method-of-competition rulemaking authority. *Contra* Opp. 23. Those provisions reflect "a belt and suspenders approach" to ensure that the Commission did not promulgate unfair-or-deceptive-act-or-practice rules under Section 6(g). *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020). Congress did not ratify unfair-method-of-competition rulemaking authority through negative inference.

### C.     The Major Questions Doctrine Resolves Any Doubt.

If any doubt remains, the major questions doctrine resolves it.  The Non-Compete Rule is the first bona fide unfair-method-of-competition rule, and so is a "transformative expansion" of the Commission's rulemaking authority.  *UARG v. EPA*, 573 U.S. 302, 324 (2014); *contra* Opp. 29.

The Commission nevertheless claims (at 30) that no major question is presented because the Commission can "bring a Section 5 enforcement action … charging that the use of non-competes is an unfair method of competition."  But *ICC v. Cincinnati, N. O. & T. P. Ry. Co.* squarely holds that even when an agency has clear case-by-case enforcement authority, its rulemaking authority must be "open to no misconstruction, but clear and direct," because the "legislat[ive]" power to ban virtually all non-competes is orders of magnitude broader than the "enforce[ment]" power to enjoin use of a specific non-compete.  167 U.S. 479, 501, 505 (1897); *see West Virginia*, 597 U.S. at 740 (Gorsuch, J., concurring) (citing *Cincinnati*).  The Commission contends (at 30 n.6) that *Cincinnati* is distinguishable because the ICC had "no rulemaking authority conferred by statute," but that merely begs the question whether the FTC Act confers the relevant authority.[3]

---

[3] Ryan does not concede that the Commission could properly determine that any non-compete is an unfair method of competition.  Likewise, contrary to the Commission's suggestion (at 75-76), Ryan's non-competes are enforceable under applicable state laws.

Regardless, whether the Commission can ban virtually all non-competes is itself a major question, because that action has "vast economic and political significance." *West Virginia*, 597 U.S. at 716; *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). The Commission claims (at 32-33) the Rule is similar to other Commission rules and that Congress recognized the agency could issue rules with effects in excess of $100 million. But the Rule preempts the laws of nearly every State, and the Commission estimated that the Rule's economic effects would be *hundreds of billions* of dollars. 89 Fed. Reg. 38,342, 38,467 (May 7, 2024). The Rule's impact is thus exponentially greater than prior rules governing topics as quotidian as advertising for waist belts and amplifiers in home entertainment systems. *See* Ryan Br. 17.

Finally, the Rule "fundamentally revis[es]" the FTC Act from a trade-regulation statute to a worker-protection statute. *West Virginia*, 597 U.S. at 728. The Commission (at 31) sidesteps this argument on the basis that the Rule supposedly has "procompetitive benefits." The contention that the Commission may intrude into the domain of the Labor Department, National Labor Relations Board, and innumerable state and local agencies if doing so promotes competition is breathtaking. Whether to confer such authority is precisely the type of major question that Congress must answer.

## II.    Unfair-Method-Of-Competition    Rulemaking    Authority    Would    Be Unconstitutional.

If the Commission's Section 6(g) interpretation is correct, the FTC Act unconstitutionally delegates legislative authority.  The phrase "unfair methods of competition"—which the Commission re-interpreted in 2022 to jettison the century-old rule of reason—provides no intelligible principle to guide the Commission's rulemaking, as the capaciousness of the Commission's policy statement demonstrates.  *See* Ryan Br. 27-30; *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022).

*Schechter* proves as much.  As the Commission notes (at 4-5), "unfair methods of competition" is "broader and more flexible" than "unfair competition."  *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 310-11 (1934).  If "unfair methods of competition" is broader than "unfair competition," it must also be broader than "fair competition"—the phrase *Schechter* held was an unconstitutional delegation.  295 U.S. at 532.

The Commission (at 45) accuses Ryan of inventing a "novel theory that a statutory phrase can constitute a lawful delegation in the context of adjudication but an unlawful delegation with respect to rulemaking."  But that is *Schechter*'s holding: delegating the power to adopt "codes of fair competition" is unconstitutional, whereas delegating the power to find "unfair methods of competition … in particular instances, upon evidence, in the light of particular competitive conditions" is constitutional.  295 U.S. at 521-23, 33.

At minimum, the Court should construe any ambiguity "to avoid [the] serious constitutional doubts" presented by the Commission's claimed authority. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

## III.    The Rule Is Unlawfully Retroactive.

The Commission concedes that Section 6(g) lacks the "express statutory grant" required "for retroactive rulemaking." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988). Instead, the Commission (at 46) relies on one out-of-circuit case to argue the Rule is not retroactive because it "only upsets expectations." *Nat'l Cable & Telecommc'ns Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) (quotation omitted). But Fifth Circuit precedent holds that a regulation is retroactive when it "'takes away or impairs vested rights.'" *Perez Pimentel v. Mukasey*, 530 F.3d 321, 326 (5th Cir. 2008) (citation omitted). The Rule impairs businesses' vested contractual rights and thus is impermissibly retroactive.

## IV.    The Rule Is Arbitrary And Capricious.

The Rule is also arbitrary and capricious, as this Court already determined. ECF 153 at 23. The Commission's decision to categorically ban non-competes is neither "'reasonable'" nor "'reasonably explained.'" *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (citation omitted). The Commission's defenses of its fatally flawed reasoning and cost-benefit analysis fail.

### A.    The Commission Did Not Justify A Blanket Ban.

Ryan identified six specific defects in the Commission's justifications for banning virtually all non-competes. Ryan Br. 32-37. The Commission's responses reflect the short shrift it gave comments highlighting flaws in its predetermined decision.

*First*, the Commission neither considered the "responsible alternative" of industry-specific bans, *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984), nor established a "rational connection" between the "facts found" and the nationwide "choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Commission (at 55) now belatedly argues industry-specific data justifies a blanket ban because the data "was consistent across industr[ies]." But the Commission did not offer that justification in adopting the Rule and cannot backfill its reasoning here. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). Regardless, the Commission considered evidence from only a handful of industries—primarily healthcare and technology—and low-wage occupations. Extrapolating from those unique settings to the entire economy is unreasonable. Moreover, even if the Commission's belated justification held water, it would not excuse the Commission's failure to *consider* commenters' suggestion to proceed industry-by-industry. *See Farmers Union*, 734 F.2d at 1511.

*Second*, the Commission offered no reasoned response to Ryan's argument that non-competes should be allowed for equity-holding business partners. The Commission (at 55) dismisses Ryan's comment as not "significant enough" to have required a response, despite the management-consulting industry alone generating over $300 billion of annual revenue. *See* U.S. Census Bureau, *Total Revenue for Management Consulting Services, All Establishments, Employer Firms*, https://tinyurl.com/56sm4396. Nor is it sufficient that the Commission found that "non-competes with senior executives are not always exploitative and coercive." Opp. 55. That argument ignores the Commission's crabbed definition of "senior executives," which excludes many (if not the vast majority of) partners. *See* 89 Fed. Reg. at 38,418-20.

*Third*, the Commission inadequately considered consumer welfare. The Commission's arguments do not reconcile its contradictory findings that "increases in worker earnings from restricting non-competes may increase consumer prices because of higher firms' costs," 89 Fed. Reg. at 38,479, with its conclusion—based on a *single* study of the idiosyncratic healthcare market—that it did "not expect that prices will rise because of the [R]ule," *id.* at 38,467.[4]

---

[4] Ryan is not required to provide "evidence" that the Commission's prediction about prices is wrong. *Contra* Opp. 56. Rather, Ryan need only demonstrate that the Commission failed to adequately consider this "important aspect of the problem," *State Farm*, 463 U.S. at 43, rendering its decision "arbitrary and capricious," *Coastal Conservation Ass'n v. Dep't of Commerce*, 846 F.3d 99, 111 (5th Cir. 2017).

*Fourth*, "the Commission relied upon insufficient empirical data" to support its conclusions. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011). The Commission's economist did not just say that "further research was needed in certain other areas." Opp. 56 (cleaned up). Rather, he explained that the existing research could not determine the effects of a broad prohibition on non-competes, Ryan Br. 35, as this Court also recognized, ECF 153 at 21.

*Fifth*, the Commission discounted correlational studies that undermined the Rule while crediting correlational studies that supported it. The Commission claims (at 57) that the studies it relied on were based on "natural experiments" establishing the causal effects of banning non-competes. But the Commission ignores Ryan's point that those studies do not demonstrate causation, because they simultaneously measured twelve metrics of enforceability, only one of which was whether non-competes are allowed. *See* Ryan Br. 36; Ryan Comment 43.

*Finally*, the Commission inconsistently asserted that the Rule will both foster innovation by promoting information-sharing and that firms can fully guard their confidential information through non-disclosure agreements and trade-secrets law. The Commission now claims that the Rule promotes sharing of "knowledge and skill that belong to the worker" while allowing firms to protect their "proprietary information." Opp. 58 (citing 89 Fed. Reg. at 38,408). But the cited evidence of knowledge-sharing relates to *executives*, whose knowledge is most likely to be

inseparably infused with confidential information, and the Commission offers no evidence that knowledge-sharing—by executives or any other employees—is anything more than a zero-sum game in which any benefits to new companies are offset by harms to existing ones.

### B. The Commission's Cost-Benefit Analysis Is Arbitrary And Capricious.

The Commission's cost-benefit analysis exaggerated benefits and understated and ignored costs. The Commission asserts in passing (at 58) that its cost-benefit analysis is immune from judicial review pursuant to 15 U.S.C. § 57b-3(c)(1). But paragraph (c)(3) explains that paragraph (c)(1) does "not alter the substantive or procedural standards otherwise applicable to judicial review of any action by the Commission," including that agencies rationally connect their rules to evidence. *See State Farm*, 463 U.S. at 43. And courts routinely vacate rules for arbitrary and capricious cost-benefit analyses under the "otherwise applicable" standards of the APA. *Id.*; *see, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021). There are multiple reasons for this Court to do so here.

*First*, the Commission inflated the Rule's benefits. It overestimated the number of workers bound by non-competes and the Rule's benefit to those workers. The Commission does not defend its estimate, instead suggesting that an overestimate "would affect the magnitude of the Rule's benefits and costs alike but would not necessarily alter the balance between them." Opp. 60. But because the

17

Rule inflicts several fixed compliance costs upon large firms, including hiring attorneys to review and rewrite template contracts and developing alternatives to non-competes, the relative benefit of the Rule decreases as the number of purportedly benefiting workers shrinks.

The Commission similarly misstates its own findings about who would benefit from the Rule, claiming now that "high earners" will not "disproportionately benefit." Opp. 60. But the very paragraph of the Adopting Release that the Commission cites states that "college-educated workers … experience relatively larger adverse effects on their earnings from non-compete enforceability." 89 Fed. Reg. at 38,385. And the Commission does not dispute that any increase in earnings for the vast majority of workers is eclipsed by wage gains resulting from a strong economy. *See* Ryan Br. 38.[5]

*Second*, the Commission ignored substantial costs. The Commission failed to consider that human-capital-intensive businesses will have to revamp entire business models and develop whole new policies. As in the Adopting Release, the Commission provides no substantive response to Ryan's observation that firms will have to restructure operations to reduce workers' access to clients and sensitive information and that firms will outsource jobs to countries where non-competes

---

[5] The Commission argues (at 61) that the wage increases would be substantial in the aggregate. That proves Ryan's point: the Commission is forcing an extraordinarily consequential restructuring of national employment law for the primary benefit of highly-compensated workers.

remain legal. *See* Ryan Br. 39-40. The Commission does claim (at 56, 62) that it adequately considered inflationary effects, but the study it relies on "relates only to healthcare markets." 89 Fed. Reg. at 38,398.

*Third*, the Commission downplayed the costs it did acknowledge. The Commission largely ignored firms' reliance interests, notwithstanding its conclusory finding that the benefits of non-competes to workers outweigh these interests. Opp. 62. The Commission also does not dispute that firms will incur the expense of training workers who would depart once their training is complete. The Commission instead suggests (at 59, 61-62) that less training is actually a good thing and that firms can recoup training expenses by "sign[ing] the worker to an employment contract with a fixed duration." The Commission never explains, however, how fixed-duration contracts are consistent with the Rule's prohibition of contractual terms that "function[] to prevent a worker from … accepting work … with a different person." 16 C.F.R. § 910.1.

The Commission also significantly underestimated compliance and litigation costs. *See* Ryan Br. 41-42. The Commission (at 59) offers no response to Ryan's explanation that a few hours of a lawyer's time are insufficient for large firms to analyze and revise their employment contracts. Regarding litigation costs, the Commission now argues (at 59) that "more recent economic literature tends to show that litigation costs would fall under the rule." But the Commission expressly

19

declined to "rely on" the cited study, which was published after the comment period. 89 Fed. Reg. at 38,424 n.757, 38,484 n.1169.  In any event, the study merely showed that trade-secret litigation does not increase following bans on non-competes, which *undermines* the Commission's suggestion that trade-secret law is an adequate replacement for non-competes.  *Id.*

* * *

In short, even if the FTC did have authority to remake the nation's employment markets and override centuries-old practices of 46 States, it could not reasonably do so in a slapdash rulemaking relying on studies of a handful of states and industries conducted largely in the last four years.

## V.    The Proper Remedy Is Vacatur, With Nationwide Effect.

Binding Fifth Circuit precedent holds that "vacatur under § 706 is … the 'default' remedy for unlawful agency action," that it should be granted without "consideration of the various equities at stake," and that it has "nationwide effect." *Braidwood*, 104 F.4th at 952.  Even if equitable considerations are assessed, they favor nationwide vacatur.

### A.    The APA Requires Nationwide Vacatur.

The APA says courts "*shall* … hold unlawful and set aside" unlawful agency action.  5 U.S.C. § 706 (emphasis added).  "Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."  *Franciscan All., Inc. v.*

20

*Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022).  And there is no difference between "vacatur" and "universal vacatur," *contra* Opp. 64—vacatur is inherently "a remedy that affects individuals beyond those who are parties to the immediate dispute." *Braidwood*, 104 F.4th at 951.  It has "nationwide effect," is "not party-restricted," and "affects persons in all judicial districts equally." *Id.*  Fifth Circuit precedent does not "require consideration of the various equities at stake before determining whether a party is entitled to vacatur." *Id.* at 952.

The Commission (at 65) incredibly claims that this controlling precedent is "stray dicta," pointing to the plurality decision in *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc).  *Braidwood* rejected that exact argument, explaining that the *Cargill* plurality reaffirmed that "vacatur … is the default rule" and remanded for consideration of the remedy's scope only "because the parties had not briefed the remedial-scope question." 104 F.4th at 952 n.102.  Multiple other post-*Cargill* decisions confirm that nationwide vacatur is required under the APA.  *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("ultimate relief under Section 706 … is not party-restricted"); *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) ("Should plaintiffs prevail on their APA challenge, this court must 'set aside' CFTC's *ultra vires* rescission action, with nationwide effect.").

The only narrow exception to nationwide vacatur recognized by the Fifth Circuit is "remand without vacatur." *Tex. Med. Ass'n v. HHS*, 2024 WL 3633795, at

*12 (5th Cir. Aug. 2, 2024). But that remedy is to be used "only rarely" when there is "'a serious possibility' that the deficiency can be corrected on remand and that vacatur would have 'disruptive consequences.'" *Id.* (citations omitted). Neither requirement is met here. Because the Commission lacked statutory authority to issue the Rule, its "unlawful agency action" cannot be corrected on remand, and vacatur would merely "'preserve[] the status quo.'" *Id.* (citation omitted).

Accordingly, the Court should order the "default" APA remedy—vacatur with "nationwide effect" and without a balancing of the "various equities." *Braidwood*, 104 F.4th at 951-52.

## B.    The Equities Favor Nationwide Vacatur.

Even if the equities could be considered, the Commission has not carried its burden to demonstrate that the equities override the "'default' remedy" of nationwide vacatur. *Braidwood*, 104 F.4th at 952 (citation omitted).

"The [Commission's] protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards." *Career Colls.*, 98 F.4th at 255. The Commission found that it was "important to provide a readily understandable, *uniform* Federal approach" to non-competes, because a "uniform rule" provides "certainty for both workers and employers." 89 Fed. Reg. at 38,381-82, 38,442 (emphasis added). It is "inconsisten[t]" and inequitable for the

Commission to justify the Rule with the benefits of uniformity yet resist uniform, nationwide relief. *Tex. Med.*, 2024 WL 3633795, at *12.

Furthermore, declining to grant universal relief will inevitably invite a flood of litigation. *See Doleac ex rel. Doleac v. Michalson*, 264 F.3d 470, 474 (5th Cir. 2001) (recognizing that "the interest in judicial economy" bears "on the equities"). That there are already two other challenges to the Rule demonstrates that many suits will follow—other potential litigants among the tens of thousands of affected businesses are waiting to see this case's outcome. Thousands of duplicative suits would massively drain judicial resources.

Against those weighty considerations supporting vacatur, the Commission (at 66-67) offers only generic critiques of universal relief, which have largely been directed at universal *preliminary* relief. *See, e.g.*, *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay); *Trump v. Hawaii*, 585 U.S. 670, 713 (2018) (Thomas, J., concurring). In any event, those critiques cannot displace the text of the APA or "[l]ongstanding precedent." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462-63 (2024) (Kavanaugh, J., concurring).[6]

---

[6] The Rule also is unlawful because the Commission is unconstitutionally structured. Ryan Br. 42-43.

23

## CONCLUSION

The Court should declare unlawful, vacate, and set aside the Non-Compete Rule on a nationwide basis.

Respectfully submitted,

Dated:  August 9, 2024

/s/ *Allyson N. Ho*

Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900
aho@gibsondunn.com
ekiernan@gibsondunn.com

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Telephone: 817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew G. I. Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

*Attorneys for Ryan, LLC*

24

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type volume requirements of Judge Brown's Scheduling Order, ECF 163, because it contains 5,000 words; and

2.     This document complies with the typeface requirements of Judge Brown's Case Management Procedure II.A because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: August 9, 2024                    Respectfully submitted,

*/s/ Allyson N. Ho*
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
aho@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on August 9, 2024, I caused the foregoing brief to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

Dated:  August 9, 2024               Respectfully submitted,

_/s/ Allyson N. Ho_                       
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
214.698.3100
aho@gibsondunn.com