# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC,<br><br>*Plaintiff*,<br><br>CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, and LONGVIEW CHAMBER OF COMMERCE,<br><br>*Plaintiff-Intervenors*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>*Defendant*. | **Case No. 3:24-cv-986-E** |

## PLAINTIFF-INTERVENORS' COMBINED REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO COMMISSION'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

*Page*

INTRODUCTION..................................................................................................1

PROCEDURAL STATEMENT ...........................................................................3

ARGUMENT ........................................................................................................4

I.  THE COMMISSION LACKED STATUTORY AUTHORITY
    TO ADOPT THE RULE.................................................................................4

   A.  Section 6(g) Does Not Authorize Binding
       Competition Regulations..........................................................................4

   B.  Section 5 Does Not Authorize the Commission To Declare
       All Noncompetes Unlawful .....................................................................10

   C.  The FTC Act Does Not Authorize the Commission's
       Retroactive Rulemaking .........................................................................13

II.  THE COMMISSION ENGAGED IN UNREASONED
     DECISIONMAKING....................................................................................14

III.  RELIEF SHOULD NOT BE LIMITED TO THE PARTIES ...........18

   A.  Universal Vacatur Is Required and Appropriate ................................18

   B.  Plaintiff-Intervenors May Seek Relief For All
       Their Members.........................................................................................21

CONCLUSION....................................................................................................26

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*American Alliance for Equal Rights.* v. *Fearless Fund Management, LLC,*
103 F.4th 765 (11th Cir. 2024) ...................................................................21, 22

*Association of American Physicians & Surgeons, Inc.* v. *Texas Medical Board,*
627 F.3d 547 (5th Cir. 2010)..............................................................................23

*Career Colleges & Schools of Texas* v. *U.S. Department of Education,*
98 F.4th 220 (5th Cir. 2024) ...............................................................19, 20, 23

*Chamber of Commerce* v. *FTC,*
2024 WL 1954139 (E.D. Tex. May 3, 2024)....................................................24

*Chamber of Commerce* v. *SEC,*
88 F.4th 1115 (5th Cir. 2023) ..........................................................................20

*FTC* v. *Actavis,*
570 U.S. 136 (2013)............................................................................................11

*FTC* v. *Motion Picture Advertising Service Co.,*
344 U.S. 392 (1953)............................................................................................10

*FTC v. Texaco, Inc.,*
393 U.S. 223 (1968)............................................................................................10

*Hunt* v. *Washington State Apple Advertising Commission,*
432 U.S. 333 (1977)............................................................................................21

*Jama* v. *ICE,*
543 U.S. 335 (2005).............................................................................................4

*Martin* v. *Hadix,*
527 U.S. 343 (1999)............................................................................................13

*Mourning* v. *Family Publications Service, Inc.*,
    411 U.S. 356 (1973) .................................................................................. 7

*National Association of Private Fund Managers* v. *SEC*,
    103 F.4th 1097 (5th Cir. 2024) ............................................. 18, 19, 25

*National Cable & Telecommunications Association* v. *FCC*,
    567 F.3d 659 (D.C. Cir. 2009) ................................................................ 14

*National Council of La Raza* v. *Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ......................................................... 22-23

*Pan American World Airways, Inc.* v. *United States*,
    371 U.S. 296 (1963) ............................................................................... 10

*Perez Pimental* v. *Mukasey*,
    530 F.3d 321 (5th Cir. 2008) ........................................................... 13, 14

*Polk Bros., Inc.* v. *Forest City Enters.*,
    776 F.2d 185 (7th Cir. 1985) ................................................................ 14

*Students for Fair Admissions, Inc.* v. *President and Fellows of*
    *Harvard College*,
    600 U.S. 181 (2023) ............................................................................... 25

*Speech First, Inc.* v. *Fenves*,
    979 F.3d 319 (5th Cir. 2020) ................................................................ 22

*Speech First, Inc.* v. *Shrum*,
    92 F.4th 947 (10th Cir. 2024) .............................................................. 22

*Starbucks Corp.* v. *McKinney*,
    144 S. Ct. 1570 (2024) ........................................................................... 19

*Summers* v. *Earth Island Institute*,
    555 U.S. 488 (2009) ............................................................................... 21

*Texas Medical Association* v. *HHS*,
    2024 WL 3633795 (5th Cir. Aug. 2, 2024) ............................... 19, 20, 21

*Texas* v. *Cardona*,
    2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ....................................... 20

*United States* v. *Morton Salt Co.*,
  338 U.S. 632 (1950)....................................................................8

*Utility Air Regulatory Group.* v. *EPA*,
  573 U.S. 302 (2014)....................................................................8

*Warth* v. *Seldin*,
  422 U.S. 490 (1975)...................................................................24

STATUTES

5 U.S.C. § 706 ................................................................18, 19

15 U.S.C. § 45 .................................................................8, 9

15 U.S.C. § 46 ....................................................................6

15 U.S.C. § 57a ...................................................................5

15 U.S.C. § 57b-3 ................................................................18

15 U.S.C. § 1604 ..................................................................7

FTC Act of 1914, Pub. L. 63-203 (1914) ........................................4, 6

Magnuson-Moss Act, Pub. L. 93-637 (1975) .....................................5, 6

Cal. Bus. & Prof. Code § 16600 ...............................................16

OTHER AUTHORITIES

120 Cong. Rec. 41,407.........................................................4, 5

89 Fed. Reg. 38,342 (May 7, 2024) ........................................*passim*

*Dissenting Statement of Andrew N. Ferguson*, In the Matter of
  the Non-Compete Clause Rule (June 28, 2024) ...........................9, 11

## INTRODUCTION

The Commission claims the power to issue unfair-competition rules that govern the entire national economy.  It has sought to exercise that power to invalidate tens of millions of private agreements.  One would think that, to support that breathtaking assertion of regulatory power, the Commission would identify clear congressional authorization and overwhelming evidence supporting its Rule.  But the Commission does not even attempt that showing. It instead claims (ECF No. 189 (Br.), at 2-3) the Noncompete Rule is a "logical and unremarkable" exercise of authority it has held since 1914, and asks the Court to defer to its self-described "exhaustive study of non-competes and thorough economic justifications" for the Rule.  This Court correctly rejected those arguments at the preliminary-relief stage; it should now put a stop to the Commission's power grab and set the Rule aside.

First, the Commission's argument for rulemaking authority relies principally on its contention that Magnuson-Moss "ratified" its exercise of that authority over a ten-year period.  But the Commission has no answer to the text of Magnuson-Moss, which affirmatively *declines* to recognize any such authority.  The Commission's only arguments based on the original FTC Act's text depend on the wholly implausible theory that Congress buried then-

unheard-of legislative rulemaking authority—supposedly core to the Commission's mission—in the back half of an ancillary statutory provision, but the Commission ignored it for the bulk of its existence. These arguments cannot survive any level of scrutiny, much less that required by the major-questions doctrine.

Second, the Commission identifies no precedent for its effort to condemn *all* noncompetes under Section 5. It instead asks this Court to conclude that, when Congress outlawed "unfair methods of competition," it authorized a majority of Commissioners to deem common business practices categorically "unfair" according to their policy preferences, rather than well-established analysis of a practice's competitive harms *and* benefits. Tellingly, the Commission cannot identify any precedent that, fairly read, supports its novel approach. Again, any doubt that the Commission's unbounded view of its own authority is wrong is removed by the major-questions *and* nondelegation doctrines.

Third, the Commission acknowledges it has no authority to engage in retroactive rulemaking, but claims that the Rule applies only prospectively. Only a governmental agency could describe a regulation that will

2

instantaneously unwind millions of private agreements as "prospective." This Court should reject that fiction.

Fourth, the Commission cannot defend its decisionmaking process. It claims that, because there is no research on a categorical ban on all noncompetes, the Commission permissibly relied on more limited and inapposite data. That is not reasoned decisionmaking; it is contorting the record to support a predetermined outcome.

Recognizing that the Noncompete Rule violates the APA, the Commission spends a substantial portion of its brief urging the Court to disregard Fifth Circuit law requiring that it be vacated. Binding authority—including a case decided just last week—rejects those arguments. Likewise as to injunctive relief, the Court should decline to depart from bedrock associational standing principles warranting relief for all of plaintiff-intervenors' members.

## PROCEDURAL STATEMENT

The procedural posture, issues, and standard of review have not changed. *See* ECF No. 169 (Motion), at 11.

# ARGUMENT

## I.  THE COMMISSION LACKED STATUTORY AUTHORITY TO ADOPT THE RULE.

### A.  Section 6(g) Does Not Authorize Binding Competition Regulations.

1.  Having little to say about the meaning of the 1914 FTC Act, the Commission largely hangs its hat on its argument that the Magnuson-Moss Act of 1975 ratified a single D.C. Circuit opinion and a few Commission rules proscribing both unfair acts and "unfair methods of competition."  As this Court recognized, that argument is wrong many times over.  ECF No. 153 (Op.), at 19.

Attempting to satisfy (or avoid) "the standard for congressional ratification" plaintiffs cited, the Commission asserts (at 22) that "the legislative history [of Magnuson-Moss] expressly discussed *National Petroleum*."  But all that shows is that Congress "knew of" *National Petroleum*—it does nothing to suggest that Congress "endorsed" that decision, *Jama* v. *ICE*, 543 U.S. 335, 349 (2005).  In fact, the legislative record is clear that Members of Congress *disagreed* with *National Petroleum*'s reading of Section 6(g).  *See* 120 Cong. Rec. 41,407 (Rep. Broyhill's statement that he "[d]id not believe that the FTC has" authority "to promulgate rules w[ith] respect to 'unfair methods of competition.'"); *id.* (explaining that, before

Magnuson-Moss's enactment, "there were continuing assertions that the FTC did not possess substantive rulemaking authority").

That is why, as the statute itself confirms, Congress *took no position* on the issue—it provided only that Magnuson-Moss "shall not affect *any authority* of the Commission to prescribe rules … with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2) (emphasis added); *see* Op. 18-19. The Commission's continued insistence that Magnuson-Moss "expressly confirmed" its competition rulemaking authority (at 20) is impossible to square with that text. Had Congress intended to ratify *National Petroleum*'s reading of Section 6(g), it obviously would have referenced "*the* authority of Commission." Instead, Congress punted, referring only to "any" such authority conveyed by the 1914 Act.[1]

Congress's decision not to address competition rulemaking authority in Magnuson-Moss also refutes the Commission's reliance (at 22-23) on the Act's addition of language to Section 6(g) carving out UDAP rulemakings. Congress added that language to ensure that the Commission would not try to evade Magnuson-Moss's new UDAP rulemaking requirements by relying on other

---

[1] The 1980 Act also took no position on Section 6(g) rulemaking authority. *See* Motion 21; Op. 19.

5

provisions of the FTC Act, as the Commission had done during its frolic into rulemaking in the previous decade.

Finally, the Commission offers (at 24) only a half-hearted attempt to explain why, on its view, Congress erected high procedural barriers for UDAP rulemaking while allowing the Commission free rein to issue competition rules. The Commission points to legislative history from one proponent of its view purportedly discussing a "dual approach" to Commission rulemaking. But that descriptive observation (which other Members of Congress rejected) does not explain *why* Congress would have drawn such a distinction, particularly in an era when the Commission would simply tack an unfair-method-of-competition label onto rules defining UDAPs. *See* 89 Fed. Reg. 38,349-38,350.

2.    The Commission likewise can find no support for its legislative rulemaking authority in the original FTC Act. It first contends (at 18) that there is "no textual limitation on the types of 'rules and regulations'" the Commission may issue under Section 6(g). But that argument simply begs the question of what "rules and regulations" Section 6(g) authorized in 1914. 15 U.S.C. § 46. "Agencies do not have unlimited power to accomplish their policy preferences until Congress stops them," Op. 19, so the Commission must offer

some reason to believe that the buried reference to "rules and regulations" in the 1914 Act meant substantive rules that bind the public.

The Commission makes no such showing. It argues (at 18) that an expansive interpretation of that phrase is supported by *Mourning* v. *Family Publications Service, Inc.*, 411 U.S. 356 (1973). But *Mourning* addressed only whether an agency's rule was reasonably related to the statute it administered; it did not consider whether the statute authorized binding regulations in the first place. *Id.* at 371. In fact, contrary to Section 6(g)'s vague reference to rules "for the purpose of carrying out the provisions of this subchapter," the relevant provision in *Mourning* expressly stated that the relevant "regulations" could be enforced against private parties. *See* 15 U.S.C. § 1604 (regulations "may provide for such adjustments and exceptions" for lending transactions "to prevent circumvention or evasion" or "facilitate compliance with" the statute).

The Commission's responses to the textual oddities of its argument are no more convincing. It claims (at 27) that there is nothing remarkable about reading an ancillary provision of Section 6 to authorize substantive rulemaking to enforce Section 5's mandate because "Sections 5 and 6 are meant to read together." True enough, but that only means Section 6's investigative powers

7

are designed to complement Section 5's enforcement power, not that either provision authorizes legislative rulemaking. *See United States* v. *Morton Salt Co.*, 338 U.S. 632, 651 (1950). And the Commission admits (at 28) that it has no explanation for why Congress would have apparently granted such wide-ranging substantive rulemaking authority in the back half of Section 6(g)—a provision authorizing the Commission to "classify corporations." Op. 16. Congress did not locate such momentous legislative rulemaking authority in such an ill-fitting place. *See Utility Air Reg. Grp.* v. *EPA*, 573 U.S. 302, 321 (2014).

The Commission's second textual argument (at 18-19) is that the 1914 Act directed the Commission to "prevent … unfair methods of competition," and "the only way for the Commission to act to prevent unfair methods of competition from occurring in the first place would be to prohibit such methods before they occur." That is a remarkable argument, given that it implies that the Commission has ignored that congressional directive for all but 10 years of its existence. It is also wrong. The Act expressly tells the Commission how it should "prevent" unfair methods of competition that it has "reason to believe" that any person "is using": "[I]t shall issue and serve upon such person … a complaint" and ultimately seek "an order requiring such

person … to cease and desist from using such method of competition." 15 U.S.C. § 45(b).

3.    The major-questions doctrine removes any doubt that the Commission's reading of Section 6 is wrong.  The Commission protests (at 29-30) that doctrine does not apply because the Act authorizes individual unfair-competition enforcement actions.  But there is a massive difference between addressing unfair conduct on a case-by-case, fact-specific basis and issuing a nationwide ban on a common business practice that is lawful in almost all States—which the Commission acknowledged when it declined case-by-case adjudication as an adequate alternative.  *See* 89 Fed. Reg. 38,462-38,463.  The Commission cannot simultaneously argue that enforcement actions are insufficient to achieve its desired policy outcome and that the difference between adjudication and rulemaking is inconsequential.

The Commission also argues (at 32-33) that the Rule's economic significance is irrelevant because Congress authorized enforcement actions with significant economic effect.  But that authority plainly does not amount to a blank check authorizing *all* economically transformative actions, in whatever form.  *See* Ferguson Dissent, 12.

**B.    Section 5 Does Not Authorize the Commission To Declare All Noncompetes Unlawful.**

1.    The Commission contends (at 34) that Section 5 permits it to declare entire categories of business conduct unlawful "as a class," without any individualized showing of actual competitive harm.  The Commission identifies no cases supporting that approach.   Instead, it invokes its own Policy Statement, adopted by a majority of Commissioners months before proposing the Noncompete Rule.  But the cases cited in that Policy Statement undermine the Commission's attempt to ignore the benefits of individual noncompete agreements.  *See, e.g.*, *Pan Am. World Airways, Inc.* v. *United States*, 371 U.S. 296, 307 (1963) (Section 5 takes its "meaning from the facts of each case"); *FTC* v. *Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 296 (1953) (same).

The Commission suggests (at 36) that its class-wide approach is appropriate because it has the authority to target "incipient" violations of the law.  But that authority is relevant only when conduct has a "dangerous tendency … to hinder competition."  Br. 36 (citing *FTC v. Texaco, Inc.*, 393 U.S. 223, 224 (1968)).  The Commission cannot make that showing with respect to *all* noncompetes, when many such agreements have been enforced for centuries without any discernible effect on competition.

10

The Commission argues that it could simply ignore benefits of noncompetes that purportedly do not specifically relate to competition. That is nonsense. Courts have long acknowledged that Section 5 accounts for a range of valid business justifications, including (as relevant to noncompetes) the protection of intellectual property. *See FTC* v. *Actavis*, 570 U.S. 136 (2013) (rejecting Commission's attempt to declare conduct "presumptively unlawful" under Section 5). And the Commission's suggestion (at 37-38) that plaintiffs needed to describe the benefits of noncompetes in more detail ignores the extensive discussion of those benefits throughout the administrative record developed by the Commission. *See* Ferguson Dissent, 37-42.

Finally, the Commission again points to the Act's directive to "prevent" violations (at 40), but never explains—in its brief or at any prior time in the Commission's history—how that language authorizes it to deem common business practices as "unfair" on a class-wide basis without making the well-established Section 5 showing.

2.    The Commission has no real response to plaintiff-intervenors' argument that its entirely unbounded, policy-driven approach to Section 5 implicates the major-questions doctrine. It ignores the economic and political significance of its interpretation, instead pretending (at 33) that no one

11

contests its authority to pursue enforcement actions on the ground that noncompetes are per se unlawful. But plaintiff-intervenors have consistently contested that point, explaining that no court has ever concluded that any noncompete violated Section 5, let alone without an individualized showing that its competitive harms outweighed its benefits.

The Commission's suggestion that the Rule does not infringe on state authority (at 40-42) is also plainly wrong. The Rule will displace centuries of state regulation, none of which has *ever* been as broad as the Rule. At the federal level, by contrast, the best history the Commission can muster is federal decisions "scrutinizing" noncompetes. Br. 41. But meritless suits challenging noncompetes under federal law do not make those agreements the subject of federal regulation. As a result, there has never previously been *any* overlap between federal and state antitrust regulation of noncompetes.

3.    This Rule amply demonstrates the serious non-delegation issue raised by the Commission's interpretation of Section 5. The Commission is claiming that a statute enacted in 1914 authorizes it to declare a longstanding business practice categorically unlawful, despite never once proving that any particular use of that practice harmed competition. And it claims the authority

to define its own standards for making that determination, as it did in the radical Section 5 Policy Statement.

The Commission tries to avoid this problem by citing (at 43-44) a handful of decisions that cabin its authority by requiring it to consider, for example, "present or potential competitors" or the "basic policies" of the federal antitrust laws. But each of those decisions assumed that the Commission would proceed case-by-case and carefully examine the particular facts when evaluating conduct under Section 5. They thus serve as no meaningful constraint on the power that the Commission has now attempted to arrogate to itself to adopt class-wide prohibitions.

## C.    The FTC Act Does Not Authorize the Commission's Retroactive Rulemaking.

The Commission cannot identify statutory authorization to retroactively invalidate millions of existing contracts. So it instead contends (at 46) that the Rule is not retroactive because it "does not impose 'past legal consequences' for any conduct predating its effective date." But that is directly contrary to the "commonsense, functional judgment" necessary to decide "whether a statute operates retroactively." *Martin* v. *Hadix*, 527 U.S. 343, 357-358 (1999). The Commission's acknowledgement (at 46) that the Rule applies to "existing" contracts confirms that it will "upset[] settled expectations." *Perez Pimental*

13

v. *Mukasey*, 530 F.3d 321, 326 (5th Cir. 2008). The Rule accordingly will do far more than "alter only the present situation," *National Cable & Telecomm. Ass'n* v. *FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009): it will make bargained-for agreements worthless.

## II. THE COMMISSION ENGAGED IN UNREASONED DECISIONMAKING.

A.    The Commission points to no evidence measuring the effects of a categorical ban on noncompetes. Instead, it claims that its decision to impose a total ban was supported by "economic theory, empirical evidence, and qualitative data." Br. 48. None of those arguments holds up.

The Commission first nods (at 48) to "classical economic theory," which supposedly demonstrates that any restraint on market choices harms competition. But that argument proves far too much, as it would apply to joint ventures and other agreements that unquestionably promote competition. *See Polk Bros., Inc.* v. *Forest City Enters.*, 776 F.2d 185, 188-90 (7th Cir. 1985).

The Commission then relies on a handful of studies to support its ban, citing these studies' findings regarding "labor mobility" (at 48)—a largely meaningless metric when it comes to assessing noncompetes, which by definition limit worker mobility to some extent. The relevant question that

14

none of these studies addresses is whether a given limit on worker mobility is justified by procompetitive benefits.

In fact, the studies are even narrower than that. They examine the enforceability of noncompetes in particular industries or for workers with lower incomes. For example, among the studies on which the Commission says (at 48) it "placed the greatest weight" are a study on the effect of Hawaii's ban of noncompetes on *high-tech* workers, and a study on the effect of Oregon's ban of noncompetes on *low-wage* workers. *See* Br. 51 (discussing Balasubramanian et al.; Lipsitz & Starr). The Commission simply asserts that those narrower studies support its categorical ban because "no external empirical study has had occasion to examine the effects on competition of a nationwide ban on non-competes." Br. 51. It is hard to imagine a clearer example of an agency's working backward to reach its desired outcome.

The Commission faults plaintiffs (at 50) for evaluating "each data set on which the Commission relied in isolation." But the Commission readily acknowledges that it discounted a range of studies showing noncompetes have benefits, Br. 52 (dismissing study finding that noncompetes decrease misconduct among financial advisors), while cherry-picking findings from

15

others, *id.* (claiming that a study showing both costs and benefits of noncompetes for physicians supported its categorical ban).

B.    The Commission also fails to meaningfully engage with this Court's prior holding that the Noncompete Rule was likely arbitrary and capricious.  First, the Commission ignores the Court's analysis of the evidence, arguing (at 62) that "the Court's decision … rested" on (supposedly incorrect) conclusions that no state had enacted a ban as broad as the Noncompete Rule and the Commission had failed to engage with businesses' reliance interests. That argument misreads this Court's decision, which carefully walked through the defects in the Commission's analysis and its failure to account for evidence that did not support its preordained conclusion.  Op. 20-23.

And the Commission's protests are incorrect anyway.  The Commission's functional test for defining noncompetes (which was adopted expressly to reach beyond traditional noncompetes) *is* in fact broader than any existing state law.  *Compare* Cal. Bus. & Prof. Code § 16600 *with* 89 Fed. Reg. 38,502.  And the Court discussed reliance interests as only one of the many considerations overlooked by the Commission when considering alternatives to its blanket ban on noncompetes.  Op. 22.

16

Second, the Commission spends a single sentence responding to this Court's explanation that it had "insufficiently addressed alternatives" to its nationwide ban.  Br. 54.  And it justifies its decision to impose a nationwide ban instead of a case-by-case approach on the ground that all noncompetes would be unlawful if considered on their own terms.  But that assertion is at odds with an extensive body of law (and even the Rule itself) showing that reasonable noncompetes are beneficial.  Op. 28; *see, e.g.*, 89 Fed. Reg. 38,468, 38,398 (acknowledging that noncompetes can lead to "lower prices" for consumers, "more efficient[]" allocation of patients among physicians, and more "core training" for employees).

C.     The Commission also fails to justify its flawed cost-benefit analysis.  In response to the argument that it "waved away" litigation costs in its rulemaking, the Commission merely reasserts that it found "no evidence" those costs will increase.  Br. 58-59.  But the Commission was presented with evidence about the costs of trade-secret and nondisclosure litigation during the comment period.  *See* ECF No. 149, at 30-32.  And the Commission's ban on noncompetes unquestionably pushes businesses to rely on those inadequate, costlier alternatives.

17

The Commission likewise dismissed the costs of businesses' inability to protect their confidential information, arguing (at 59) that "garden-variety" nondisclosure agreements are still permissible. But the Commission intentionally defined noncompetes in such a way that some nondisclosure agreements may now be unlawful. Businesses are certain to incur costs trying to distinguish between valid and invalid nondisclosure agreements under the Commission's vague test.[2]

To avoid these defects, the Commission suggests (at 58) that its deficient cost-benefit analysis is immune from judicial review. But the statute precluding judicial review only applies to UDAP rules issued "pursuant to [S]ection 57a(e)," and is thus inapplicable here. *See* 15 U.S.C. § 57b-3(c).

## III.  RELIEF SHOULD NOT BE LIMITED TO THE PARTIES.

### A.  Universal Vacatur Is Required and Appropriate.

The Fifth Circuit recently rejected in unequivocal terms the Commission's argument that vacatur is not required: when an agency violates the APA, the court "'shall'—not may—'hold unlawful and set aside' [the] agency action." *Nat'l Ass'n of Priv. Fund Managers* v. *SEC*, 103 F.4th 1097,

---

[2] That the Rule's vagueness causes such confusion is confirmed by the Commission's statement in its brief (at 75) that Citadel's *post*-termination restrictions are not banned by the Rule, citing language authorizing *pre*-termination "garden leave" arrangements.

1114 (5th Cir. 2024) (quoting 5 U.S.C. § 706).  That  "ultimate relief under Section 706 … is not party-restricted."  *Career Colls. & Schs. of Tex.* v. *U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).  And in a decision issued only a week ago, the Fifth Circuit again confirmed that "universal vacatur" is generally "required in this circuit."  *Texas Med. Ass'n* v. *HHS*, 2024 WL 3633795, at *12 (5th Cir. Aug. 2, 2024) (slip op.) (*TMA*).

The Commission nonetheless asks this Court to award a narrower remedy.  First, the Commission argues (at 65) that the Fifth Circuit's vacatur rule is "stray dicta" because that court was never presented with the arguments it raises here.  That was not true before *TMA*, *see Career Colls.*, 98 F.4th at 255, and it certainly is not true after *TMA* rejected the same arguments—based on largely the same concurring opinions—that the Commission raises here.  *See TMA*, 2024 WL 3633795, at *11-12; *see also* Brief for Appellants at 53, *TMA* (5th Cir. July 12, 2023); Reply Brief at 32, *TMA* (5th Cir. Oct. 16, 2023).[3]

Second, the Commission notes (at 65) that the Fifth Circuit has stated that remand without vacatur may sometimes be appropriate.  But departing

---

[3]    The Commission also cites (at 64) *Starbucks Corp.* v. *McKinney*, 144 S. Ct. 1570 (2024), but that case—which predates *TMA*—construed language about an "injunction" in the National Labor Relations Act, not the words "set aside" under the APA.

19

from the "default rule" of vacatur "is justifiable only in 'rare cases' satisfying two conditions":  (1) there is "a 'serious possibility' that the agency will be able to correct the rule's defects on remand," *and* (2) "vacating the challenged action would produce 'disruptive consequences.'"  *Chamber of Commerce* v. *SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023).  Neither condition is present here. The Commission "will not be able to justify its decision to create law that Congress did not pass."  *Texas* v. *Cardona*, 2024 WL 3658767, at *47 (N.D. Tex. Aug. 5, 2024); *see Chamber of Commerce*, 88 F.4th at 1117 ("Remand without vacatur is … inappropriate for agency action suffering from … serious procedural or substantive deficiencies.").  And vacating the Rule before it takes effect will have no disruptive consequences; it will simply "preserve[] the status quo."  *TMA*, 2024 WL 3633795, at *12 (citation omitted).

There is accordingly no need to consider the Commission's arguments (at 66-68) that "traditional equitable principles" support limiting relief to the parties.  In any event, the Fifth Circuit rejected such narrowing for a rule that seeks to "promote 'uniformity and predictability.'"  *TMA*, 2024 WL 3633795, at *12; *see Career Colls.*, 98 F.4th at 255.  Likewise here, the Noncompete Rule repeatedly proclaims the importance of a "uniform, high level of [federal] protection"" that would create "certainty for both workers and employers."  89

20

Fed. Reg. 38,381, 38,442, 38,453.  Because party-specific relief would "thwart the uniformity and predictability" that the Commission deemed important enough to supplant the laws of all 50 States, "universal vacatur" is appropriate even under the Commission's own terms.  *TMA*, 2024 WL 3633795, at *12.

**B.    Plaintiff-Intervenors May Seek Relief For All Their Members.**

Before its summary-judgment brief, the Commission had never previously challenged plaintiff-intervenors' standing.  And for good reason: having adopted a Rule expressly designed to ban every business in the *country* from entering into noncompetes, there is no credible doubt that plaintiff-intervenors satisfy the three-factor test for challenging that Rule on behalf of their members.  *See* Motion 45-47 (quoting *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  But the Commission now asks this Court to create new law imposing novel limits on associational standing that would deprive associations of a meaningful remedy.

First, the Commission argues (at 70) that plaintiff-intervenors other than the U.S. Chamber lack standing because their declarations did not identify members harmed by the Noncompete Rule.  The Commission relies on *Summers* v. *Earth Island Institute*, 555 U.S. 488, 498 (2009), but that environmental-injury case simply held that an association must show "that one

21

or more of [its] members *would* be directly affected" by the challenged action, rather than a mere "statistical probability" that its members would be harmed. *See Am. All. for Equal Rts.* v. *Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (emphasis added). This case presents no such uncertainty; plaintiff-intervenors' sworn declarations asserted that their members *are* harmed in numerous concrete ways by the Rule's ban on noncompetes, including its invalidation of existing noncompetes. Appx. 8, 17, 53. Unsurprisingly, the Commission does not (and cannot) dispute the truth of those assertions, given the Rule's admission that it will affect *thousands* of businesses nationwide. 89 Fed. Reg. 38,346. That is sufficient to demonstrate standing.

If the Commission's argument is simply that plaintiff-intervenors must *name* those members, such a mandatory "identify-by-name" requirement has been repeatedly rejected. *See, e.g.*, *Am. All. For Equal Rts.*, 103 F.4th at 773; *Speech First, Inc.* v. *Shrum*, 92 F.4th 947, 950, 952 (10th Cir. 2024); *see also Speech First, Inc.* v. *Fenves*, 979 F.3d 319, 335-36 (5th Cir. 2020). Naming affected members adds nothing where it is "clear" that "one or more members have been or will be adversely affected" and the defendant "need not know the identity of a particular member to understand and respond to an

22

organization's claim of injury." *Nat'l Council of La Raza* v. *Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

Second, the Commission suggests (at 75-76) that the U.S. Chamber may lack standing because its members' participation is necessary to prove that their noncompete agreements are covered by the Rule and enforceable under state law. The Commission even tries (at 75) to manufacture a dispute about the Rule's coverage to dispute one Chamber member's standing (confirming just how ill-defined the Rule is in the first place, *supra* n.2). But the Commission cannot cite a single case supporting this argument, which ignores that, at a minimum, Article III is readily satisfied by the "immediate increase in regulatory burden" resulting from the overbroad and vague Rule, *Career Colls.*, 98 F.4th at 234, and that participation of individual members is not required when an organization "seeks declaratory and injunctive relief" rather than damages, *Ass'n of Am. Physicians & Surgeons, Inc.* v. *Texas Med. Bd.*, 627 F.3d 547, 551, 553 (5th Cir. 2010) ("*AAPS*").

Finally, the Commission argues (at 70-78) that, even if plaintiffs-intervenors have standing, the Court should limit relief to the members identified in the record. Tellingly, in nearly ten pages of briefing on this issue, the Commission does not identify a *single* case preventing an association-

23

plaintiff from seeking relief for its entire membership.  And the one judge who *has* considered these new arguments—*in this very case* before staying plaintiff-intervenors' claims—explained that the Commission's newfound position is "flatly contrary to case law allowing associational standing and not requiring joinder as a party of each member of an association whose interest the group protects." *Chamber of Commerce* v. *FTC*, 2024 WL 1954139, at *3 (E.D. Tex. May 3, 2024) (citing *AAPS*, 627 F.3d at 552).

The Commission offers nothing to overcome the foundational principle, established almost 50 years ago by the Supreme Court, that an organization demonstrating associational standing can "invoke the court's remedial powers on behalf of its members" and seek a "remedy" that, "if granted, will inure to the benefit of those members of the association actually injured." *Warth* v. *Seldin*, 422 U.S. 490, 511, 515 (1975).  The Commission engages in a lengthy discussion of supposed practical issues with ascertaining membership, the possibility that some individual members might not support plaintiff-intervenors' claims, and the fact that associational standing is different from Rule 23 class actions.  But those arguments would apply to *any* case involving an association plaintiff, thus effectively negating the well-established concept of associational standing.  *See, e.g.*, *Nat'l Ass'n of Priv. Fund Managers*, 103

24

F.4th at 1109.  Notably, the government has raised none of these purported concerns when attempting to invoke *res judicata* against members of an association who filed their own suit after an association pursued claims on their behalf (without naming them).  *See* ECF 106, *Swisher* v. *FDA*, No. 1:22-cv-954 (D.D.C. Feb. 5, 2024).  The Court should reject the Commission's effort to invent them out of whole cloth now to try to prevent plaintiff-intervenors' members from securing relief from the Rule.

Finally, the Commission's baseless suggestions—made in this case for the first time in the decades that the U.S. Chamber has been litigating with the government—that the U.S. Chamber is not "a bona fide membership organization," or that the Court needs to inquire into the Chamber's member lists or procedures to determine whether the Chamber has shown "indicia of membership" (at 70-71) are squarely inconsistent with the Supreme Court's most recent pronouncement on associational standing.  *See Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) (recognizing associational standing of an organization that "has identified members and represents them in good faith").

## CONCLUSION

The Court should grant plaintiff-intervenors' motion for summary judgment and set aside the Noncompete Rule.

Dated:  August 9, 2024

Respectfully submitted,

/s/ *Robert L. Sayles*

Jordan L. Von Bokern (D.C. Bar
No. 1032962)
Tyler S. Badgley (D.C. Bar No.
1047899)
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, D.C.  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
tbadgley@uschamber.com

Robert L. Sayles (Texas Bar No.
24049857)
Boyce Holleman (Texas Bar No.
24126727)
BRADLEY ARANT BOULT
CUMMINGS LLP
1445 Ross Avenue
Suite 3600
Dallas, TX 75202
Tel: (214) 257-9800
Fax: (214) 939-8787
rsayles@bradley.com
bholleman@bradley.com

Liz Dougherty (D.C. Bar No.
457352)
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Washington, D.C. 20024
202-872-1260
ldougherty@brt.org

Jeffrey B. Wall (Georgia Bar No.
750427)
Judson O. Littleton (D.C. Bar No.
1027310)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com

*Counsel for Plaintiff-Intervenors
Chamber of Commerce of the
United States of America, Business
Roundtable, Texas Association of
Business, and Longview Chamber
of Commerce*

27

## CERTIFICATE OF WORD COUNT

This Reply Brief In Support of Plaintiff-Intervenors' Motion for Summary Judgment complies with the Court's July 11 Order, ECF No. 163, because it contains 5,000 words.

/s/ *Robert L. Sayles*
Robert L. Sayles

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically transmitted the attached document to the Clerk of the Court and all counsel of record using the ECF System for filing and service in accordance with Local Rule 5.1.

/s/ *Robert L. Sayles*
Robert L. Sayles