# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| RYAN, LLC,<br><br>    Plaintiff,<br><br>CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>    Plaintiff-Intervenors,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>    Defendant. | CASE NO.: 3:24-CV-986-E |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

PROCEDURAL STATEMENT ................................................................................. 3

ARGUMENT .............................................................................................................. 4

    I.    THE COMMISSION HAS LEGISLATIVE RULEMAKING
        AUTHORITY TO PREVENT UNFAIR METHODS OF
        COMPETITION. ......................................................................................... 4

        A.    The Statute Expressly Directs the Commission to Prevent
            Unfair Methods of Competition Through Rulemaking. ................. 4

        B.    The Major Questions Doctrine Does Not Compel a
            Different Result. ................................................................................ 13

    II.    THE COMMISSION PROPERLY DESIGNATED NON-
        COMPETES, AS A CLASS, "UNFAIR METHODS OF
        COMPETITION." ....................................................................................... 16

    III.    THE RULE DOES NOT INTRUDE ON A CORE AREA OF
        STATE REGULATION. ............................................................................ 19

    IV.    CONGRESS LAWFULLY DELEGATED AUTHORITY TO
        THE COMMISSION. ................................................................................ 20

    V.    THE RULE IS NOT RETROACTIVE. .................................................... 22

    VI.    THE RULE IS REASONABLE AND REASONABLY
        EXPLAINED. .............................................................................................. 23

    VII.    ANY RELIEF SHOULD BE TAILORED. ............................................. 31

        A.    The Court Should Not Vacate the Rule. .......................................... 31

        B.    Any Injunction Should Be Tailored. ................................................ 35

CONCLUSION ........................................................................................................ 41

i

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. U.S.,*
  295 U.S. 495 (1935) ........................................................................... 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) ........................................................... 36

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.,*
  713 F.3d 1187 (9th Cir. 2013) ......................................................... 36

*Atlantic Refining Co. v. FTC,*
  381 U.S. 357 (1965) ........................................................................... 18

*ATS Tree Servs., LLC v. FTC,*
  2024 WL 3511630 (E.D. Pa. July 23, 2024).............................. 8, 32

*Braidwood Management, Inc. v. Becerra,*
  104 F.4th 930 (5th Cir. 2024) .......................................................... 32

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ........................................................................... 40

*Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ............................................................ 32

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ................................ 31

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) ........................................................................... 6

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
  129 F.3d 826 (5th Cir. 1997) ........................................................... 38

*FTC v. Actavis,*
  570 U.S. 136 (2013) ........................................................................... 19

*FTC v. Texaco, Inc.,*
　*Co.*, 393 U.S. 223 (1968) ........................................................................ 18

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
　695 F.3d 330 (5th Cir. 2012) ................................................................. 35

*Gundy v. U.S.,*
　588 U.S. 128 (2019) ................................................................................. 20

*ICC v. Cincinnati,*
　167 U.S. 479 (1897) ................................................................................. 14

*In re Clarke,*
　94 F.4th 502 (5th Cir. 2024) ................................................................. 33

*Jama v. ICE,*
　543 U.S. 335 (2005) ................................................................................. 11

*Landgraf v. USI Film,*
　511 U.S. 244 (1994) ........................................................................... 22, 23

*Mourning v. Family Publ'ns. Serv.,*
　411 U.S. 356 (1973) ........................................................................ 4, 5, 6

*National Cable & Telecommc'ns Ass'n v. FCC,*
　567 F.3d 659 (D.C. Cir. 2009) ............................................................. 22

*Nat'l Petroleum Refiners Ass'n v. FTC,*
　482 F.2d 672 (D.C. Cir. 1973) ............................................................... 8

*NLRB v. Bell Aerospace Co.,*
　416 U.S. 267 (1974) ................................................................................. 13

*O'Reilly v. U.S. Army Corps of Eng'rs,*
　477 F.3d 225 (5th Cir. 2007) ............................................................... 34

*Perez Pimentel v. Mukasey,*
　530 F.3d 321 (5th Cir. 2008) ............................................................... 22

*Polk Brothers v. Forest City Enterprises, Inc.,*
　776 F.2d 185 (7th Cir. 1985) ............................................................... 25

*Properties of the Villages, Inc. v. FTC,*
   No. 5:24-cv-316 (M.D. Fla. Aug. 15, 2024) ................................................ 8

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
   531 U.S. 159 (2001) ...................................................................................... 11

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ...................................................................... 36

*Starbucks Corp. v. McKinney,*
   144 S. Ct. 1570 (2024) ................................................................................. 31

*Students for Fair Admission v. Harvard,*
   600 U.S. 181 (2023) ...................................................................................... 39

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ............................................................................... 35, 36

*Texas Medical Ass'n v. HHS,*
   No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) ......................... 33

*Thorpe v. Hous. Auth.,*
   393 U.S. 268 (1969) ................................................................................... 4, 6

*U.S. v. Am. Tobacco Co.,*
   221 U.S. 106 (1911) ...................................................................................... 20

*U.S. v. JS&A Grp., Inc.,*
   716 F.2d 451 (7th Cir. 1983) ........................................................................ 8

*Viasat, Inc. v. FCC,*
   47 F.4th 769 (D.C. Cir. 2022) ..................................................................... 38

*West Virginia v. EPA,*
   597 U.S. 697 (2002) ...................................................................................... 13

**Statutes**

5 U.S.C. § 702 ................................................................................................... 31

iv

5 U.S.C. § 703 ................................................................................................ 31

5 U.S.C. § 705 ......................................................................................... 32, 35

15 U.S.C. § 57b-3 ..................................................................................... 27, 28

15 U.S.C. § 7607 ............................................................................................ 9

15 U.S.C. § 45 ........................................................................................... 4, 10

15 U.S.C. § 46 ........................................................................................... 4, 10

**Rules**

Federal Rule of Civil Procedure 65(d) .......................................................... 38

**Regulations**

16 C.F.R. § 910.1 .......................................................................................... 24

89 Fed. Reg. 38,342 (May 7, 2024) ..................................................... *passim*

**Other Authorities**

120 Cong. Rec. 40,606, 40,713 (1974) ......................................................... 12

*About Us*, U.S. Chamber of Commerce,
    perma.cc/6SD4-PLX3 ................................................................................ 37

*Any*, Webster's New Collegiate Dictionary 51 (1975) ................................... 9

H.R. Rep. No. 553, Pt. 1 (Apr. 14, 1914) ....................................................... 7

Merrill & Watts, *Agency Rules with the Force of Law*,
    116 Harv. L. Rev. 467 (2002) ................................................................... 10

Section 5 Policy Statement, Comm'n File No. P221202 (Nov. 10, 2022),
    https://perma.cc/2G3F-2UW9 .................................................................. 18

## INTRODUCTION

Congress granted the Federal Trade Commission the power to "make rules and regulations for the purpose of carrying out [the FTC Act]," and "empowered and directed" it to "prevent" businesses "from using unfair methods of competition in or affecting commerce."[1] This statutory language is indistinguishable from provisions the Supreme Court has repeatedly held grant legislative rulemaking authority. The Commission's Rule prohibiting most non-compete agreements is at the core of this congressional mandate. As their very name states, non-compete agreements preclude workers from competing with their former employers. Dozens of economic studies and tens of thousands of public comments confirm that non-competes hinder competition, which raises prices, reduces innovation, and suppresses wages.

First, Plaintiffs' replies attempt to sidestep the text of the FTC Act. They ask the Court to read some words into the statute, cut some words out of the statute, and be the first court to adopt new canons of interpretation. Tellingly, Plaintiffs do not identify a single instance of statutory text that empowered an agency to "make rules and regulations for the purpose of carrying out" that agency's enabling statute yet did not confer legislative rulemaking authority. In contrast, the Supreme Court has recognized that numerous statutes with such language do convey legislative rulemaking authority. The only appellate courts to squarely consider that question as to the FTC Act agreed,

---

[1] This brief adopts the same abbreviations as the Commission's opening brief.

1

and Congress ratified that understanding twice. In recent weeks, two district courts considering challenges to the Commission's Rule have rejected the same statutory argument that Plaintiffs raise, holding that the FTC Act confers legislative rulemaking authority.

Second, the major questions doctrine does not apply because the Commission is exercising its expertise and carrying out the core of its mandate. And even if it did, that would not undermine the Rule because there is a clear textual grant of authority.

Third, Plaintiff-Intervenors do not rebut the Commission's explanation for why it correctly concluded that non-competes as a class are unfair methods of competition. Rather than engage with the Commission's reasoning, findings, and conclusions in this regard, they reiterate their incorrect arguments that the Commission was required to apply an inapposite legal test from the Sherman Act and proceed via case-by-case adjudication.

Fourth, Plaintiffs' grab bag of constitutional claims fails. Under the well-established test for retroactivity, the Rule is not retroactive because it does not penalize past conduct; Plaintiff-Intervenors' contrary position has no limiting principle and would call into question a host of uncontroversial governmental activity. Plaintiffs' non-delegation challenges also lack merit; as the Supreme Court has recognized, "unfair methods of competition" has an "obvious" meaning and is an intelligible principle that constrains the Commission's authority.

Fifth, the Rule survives the APA's deferential standard for arbitrary-and-

2

capricious review. The Commission devoted dozens of pages to considering a range of alternatives to the Rule, including case-by-case litigation and industry-specific exclusions, and explained why they were not viable. Unable to contest that the Rule is supported by the broad consensus of empirical literature, Plaintiffs argue that the literature is not sufficiently well-developed. That is not true, but in any event, an agency action is not arbitrary and capricious when it reasonably relies on available data, even if that data is not perfectly comprehensive. The Commission's regulatory impact analysis is not subject to judicial review, and, regardless, Plaintiffs do not establish that the Commission unreasonably weighed the relative costs and benefits of the Rule.

Finally, if this Court enters judgment for Plaintiffs on any claims, the Court should tailor any accompanying relief to redress injury that the Plaintiffs have shown, consistent with Article III and equitable principles. In particular, a remedy that applied beyond the parties would nullify another court's decision on the same issues presented here and prevent further percolation of those issues in other courts. Plaintiffs have provided no reason for seeking relief that extends beyond the parties or identified businesses in this lawsuit. Likewise, if the Court finds only some portion of the Rule unlawful, it should sever that provision from the portions of the Rule that are lawful.

## PROCEDURAL STATEMENT

The procedural posture, issues, and standard of review have not changed. Comm'n Mot., ECF No. 189, at 15-16.

## ARGUMENT

### I.   THE COMMISSION HAS LEGISLATIVE RULEMAKING AUTHORITY TO PREVENT UNFAIR METHODS OF COMPETITION.

#### A. The Statute Expressly Directs the Commission to Prevent Unfair Methods of Competition Through Rulemaking.

Congress authorized the Commission in express statutory language to issue "rules or regulations for the purposes of carrying out [the FTC] Act," which includes the Commission's mandate to "prevent" businesses from "using unfair methods of competition in or affecting commerce." 15 U.S.C. §§ 46(g), 45; Comm'n Mot. 17-19. The Supreme Court has recognized that such language is an unambiguous statutory grant of legislative rulemaking authority. *Mourning v. Family Publ'ns. Serv.*, 411 U.S. 356, 369 (1973); *Thorpe v. Hous. Auth.*, 393 U.S. 268, 277 (1969). And if the text left any doubt, Congress ratified the Commission's ability to promulgate legislative rules for the purpose of preventing unfair methods of competition twice—in 1975 and 1980—after the Commission had promulgated dozens of legislative "unfair methods of competition" rules and after the D.C. Circuit had held that the Commission had that authority, in a decision that Plaintiff-Intervenors concede Congress "knew of." Pl.-Intervenors Reply 4; Comm'n Mot. 19-22.

**The FTC Act's Text.** Recognizing that the plain text of the statute does not

support their position,[2] Plaintiffs ask this Court to rewrite it. Plaintiffs read in artificial, atextual limits on the Commission's clear grant of competition rulemaking authority in Section 6(g) and read out language in Sections 6(g) and 18a of the Act that further confirms the Commission's authority. Ignoring the text entirely, they rely on novel canons of statutory interpretation while violating recognized canons of interpretation like the canon against surplusage.

1. Beginning with the text of Section 6(g), the Supreme Court's decision in *Mourning* makes clear that broad statutory language empowering an agency to "make … rules and regulations" for the purpose of carrying out its enabling statute confers legislative rulemaking authority. Neither Ryan nor Plaintiff-Intervenors seriously grapple with this basic point. Instead, they claim that the statute at issue in *Mourning* "undisputedly authorized substantive rules." Ryan Reply 4 n.1; *see* Pl.-Intervenors Reply 7. But that proves the Commission's point. The statute in *Mourning* empowered the agency to "make … rules and regulations as may be necessary to carry out the provisions of this Act." 411 U.S. at 369. If that statute "undisputedly authorized substantive rules," as Ryan concedes, then so does Section 6(g), which uses materially identical language.

*Mourning* was not cabined to its facts; it stands for the general principle that "[w]here the empowering provision of a statute" "simply" uses the language above,

---

[2] Plaintiffs erroneously assert (Ryan Reply 1; Plaintiff-Intervenors Reply 4) that the Commission "hangs its hat" on ratification. In fact, the Commission's summary judgment brief begins with a discussion of the FTC Act's text, Comm'n Mot. 17–19, before explaining why congressional ratification confirms that the most natural reading of the text is that Congress granted the Commission substantive rulemaking authority, *id.* 19-22.

there is no question regarding the agency's rulemaking authority. 411 U.S. at 369. And *Mourning* quotes a prior Supreme Court case, *Thorpe*, which articulated the same general rule as applied to a different statute that likewise empowered an agency to "make … rules and regulations as may be necessary to carry out the provisions of" the agency's enabling statute. 393 U.S. at 277. *Thorpe*, which Plaintiffs fail to acknowledge, makes abundantly clear that Plaintiffs' fact-bound characterizations of *Mourning* are wrong, as is their reading of Section 6(g).

On reply, Plaintiffs have almost nothing to say about the text of Section 6(g). They try to minimize its significance by labeling it in conclusory fashion a "housekeeping" or "ancillary" provision, and by pointing to its location within the FTC Act. Ryan Reply 3; Pl.-Intervenors Reply 7-8. But Plaintiffs entirely ignore *Chrysler Corp. v. Brown*, 441 U.S. 281, 309-10 (1979), in which the Supreme Court explained that a "housekeeping" statute is one that expressly limits an agency's rulemaking authority to specific internal administrative matters—not one like Section 6(g) and the statutes in *Mourning* and *Thorpe* that empower an agency to issue rules for the purpose of carrying out its *entire enabling statute*. Comm'n Mot. 26-27. For the same reason, Plaintiff-Intervenors have things backwards when they argue (at 6) that the lack of any textual limit in Section 6(g) somehow "begs the question" of what types of rules Congress authorized the Commission to make. Congress understands what it means to grant an agency the broad power to make "rules and regulations" to effectuate its enabling statute, and it knows how to limit that authority through additional statutory language

when it wants. Congress did not limit that authority here.

The location of the grant of rulemaking authority in the FTC Act does not alter what the text plainly says. Comm'n Mot. 27-28. Plaintiff-Intervenors again ask this Court (at 8) to infer an atextual limit on the Commission's rulemaking authority based on Section 6(g)'s additional language empowering the Commission to classify corporations. But they have no answer to the fact that Section 6(g) empowers the Commission to make rules "for the purpose of carrying out the provisions of [the Act]" as a whole—not for some more narrow purpose, and certainly not limited to classifying corporations (which not even Plaintiffs argue). Comm'n Mot. 28.[3]

In any event, Plaintiffs' argument is self-defeating because the power to "classify corporations" is a substantive power. That language granted the Commission authority to establish classes of corporations that would be required to file annual reports with the FTC. *See, e.g.*, H.R. Rep. No. 553, Pt. 1 (Apr. 14, 1914), at 3. Nothing about the content or location of Section 6(g) suggests that the Commission is limited to making procedural rules.

Furthermore, both appellate courts that have addressed the Commission's competition rulemaking authority, as well as the other district courts that have considered the question, have concluded that the Commission has legislative

---

[3] Neither a 1922 report nor language in *Schechter Poultry*, in which the relevant issue was not squarely presented, changes the plain text of the FTC Act. Comm'n Mot. 28-29.

rulemaking authority. Comm'n Mot. 29; *see Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973); *U.S. v. JS&A Grp., Inc.*, 716 F.2d 451 (7th Cir. 1983); *ATS Tree Servs., LLC v. FTC*, 2024 WL 3511630 (E.D. Pa. July 23, 2024); ECF No. 59 at 14, *Properties of the Villages, Inc. v. FTC*, No. 5:24-cv-316 (M.D. Fla. Aug. 15, 2024) ("Congress conferred … some form of substantive rulemaking authority to the FTC with regard to unfair methods of competition.").[4]

In contrast, Plaintiffs do not cite a single case reading a broad grant of legislative rulemaking authority like the one in Section 6(g) in the cramped fashion that they propose.

2. Plaintiffs' interpretation of the statute also asks this Court to disregard language in Section 18a(a)(2) explicitly preserving the Commission's existing legislative competition rulemaking authority, and language in Section 6(g) indicating that the Commission has legislative rulemaking authority beyond its separately codified UDAP rulemaking authority—in other words, for preventing unfair methods of competition. Comm'n Mot. 23. With respect to Section 18a(a)(2), Plaintiffs' sole response (Ryan Reply 8; Pl.-Intervenors Reply 5) is that Congress's use of "any authority" as opposed to "the authority" means that the operative language has no effect. That interpretation would violate the canon against superfluity. That is, if Congress wanted to "[*take*] *no*

---

[4] The district court in *Properties of the Villages* went on to find that the Rule likely violates the major questions doctrine. Defendants respectfully disagree with that conclusion for the reasons explained by the *ATS* court, 2024 WL 3511630, at *18, and at Comm'n Mot 29-33, and in this brief.

*position* on the issue" of the Commission's legislative rulemaking authority, Pl.-Intervenors Reply 5, it would have said nothing at all. Instead, Congress chose to explicitly preserve authority that was broadly understood to exist at the time and which was confirmed by *National Petroleum*, of which Congress was aware. After all, the word "any" means "one or some indiscriminately of whatever kind"; it does not mean "no" or "none." *Any*, Webster's New Collegiate Dictionary 51 (1975).

As for Section 6(g)'s carveout for UDAP rulemaking, Plaintiff-Intervenors' contention (at 5-6) that Congress simply wanted the Commission not to "evade" the procedures for UDAP rulemaking imposed by the Magnusson-Moss Act also violates the superfluity canon because it leaves unanswered the question of what rulemaking authority Section 6(g) encompasses. Plaintiffs' argument renders the key language in Section 6(g) inoperative.

Ryan's invocation (at 5) of the surplusage canon does not change the plain text of Section 6(g). Comm'n Mot. 24-25. Ryan's cited examples show that Congress wanted the Commission to address particular problems. Contrary to Ryan's proffered explanation for 15 U.S.C. § 7607, that statute simply made clear that Congress wanted the Commission to follow the procedural requirements for UDAP rulemaking in that specific instance, and confirms that Congress sometimes directs the Commission to exercise its existing legislative rulemaking in specific ways.

3. Finally, Ryan concedes (at 4) that no caselaw supports its novel contention that there must be penalties associated with violating a legislative rule. Comm'n Mot.

9

25-26. Ryan also has no response to the acknowledgement of the authors of the law review article on which Ryan relies that Congress did not consistently follow this so-called convention, as exemplified by the Communications Act of 1934. *Id.* at 26. Indeed, the authors of that article further acknowledge that their view cannot be squared with Supreme Court precedent such as *Mourning* and *Thorpe.* Merrill & Watts, *Agency Rules with the Force of Law*, 116 Harv. L. Rev. 467, 534-35 (2002). In any event, even if this principle were to apply, the FTC Act satisfies it, because there are "legal consequences" for violating the Rule—a cease-and-desist order following an enforcement action. Comm'n Mot. 27. In response, Ryan suggests that any such legal consequences must be monetary penalties that automatically attach to a first violation of a rule, but Ryan cites no authority for that assertion.[5] Presumably, Ryan is challenging the Rule because it believes there would be legal consequences for violating it.

**Ratification.** Were there any remaining doubt that the FTC Act means what it says—that the Commission has authority to promulgate "rules and regulations for the purposes of carrying out [the FTC] Act," which includes a mandate to "prevent" businesses "from using unfair methods of competition in or affecting commerce," 15 U.S.C. §§ 45(a)(2), 46(g)—Congress ratified that understanding by leaving the operative text unchanged in the 1975 and 1980 Amendments, with demonstrated awareness of the D.C. Circuit's authoritative understanding of its meaning. *See* Comm'n Mot. 19-22.

---

[5] Not even the authors of the cited article argue that the penalties must be monetary—in their view, the presence of "legal consequences" for violating a rule suggests rulemaking authority. 116 Harv. L. Rev. at 494.

Plaintiffs' counterarguments are unpersuasive. Whatever the standard for congressional ratification, it is satisfied here. *See id.* 6-10, 22. In any event, the Commission has not disputed that "overwhelming evidence of acquiescence" is required "to replace the plain text and original understanding of a statute with an amended agency interpretation." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001). But that maxim has no application here, because the Commission does not seek to replace the plain text or settled understanding at the time of ratification—and, moreover, overwhelming evidence establishes that Congress was aware of that understanding. Indeed, Ryan does not dispute that Congress plainly was aware of the existing understanding of the text and acquiesced in it, and that the Rule is consistent with that confirmed understanding.

Meanwhile, Plaintiff-Intervenors have no meaningful response (at 4) to the Commission's explanation that *Jama v. ICE*, 543 U.S. 335 (2005), is inapposite, because one need not "presume" here that Congress was aware of the D.C. Circuit's decision in *National Petroleum*. As Plaintiff-Intervenors concede, "Congress 'knew of' *National Petroleum*'" when it enacted the 1975 Amendments. Pl.-Intervenor Reply 4; *see* Comm'n Mot. 22. Plaintiff-Intervenors note (at 4-5) that one member of Congress disagreed with the holding of *National Petroleum*, but that only underscores that Congress was aware of the decision.

Unable to dispute that Congress was aware of *National Petroleum*, Ryan next attempts to argue that "there was no practice of issuing unfair-methods-of competition

11

rules for Congress to ratify." Ryan Reply 6. In Ryan's estimation, rules establishing that particular practices were both unfair methods of competition and UDAPs were more concerned with UDAPs than with competition. Once again, the relevant inquiry is whether the practice of addressing unfair methods of competition by rulemaking existed before the 1975 and 1980 Amendments, not whether Ryan agrees with the Commission's determination as to a given practice. *See* Comm'n Mot. 9, 21.

Ryan also does not dispute (at 7) that the 1975 Amendments reenacted Section 6(g) without substantive change. That the Amendments also added other statutory provisions does not change the meaning of Section 6(g). And as the Commission explained, the 1975 Amendments did not grant any rulemaking authority; it narrowed the Commission's UDAP rulemaking authority while leaving the Commission's competition rulemaking authority intact. *See* Comm'n Mot. 23-24.

Similarly, Plaintiff-Intervenors are mistaken to suggest (at 6) that the congressional ratification doctrine requires the Commission to explain why Congress chose to impose different procedural requirements for unfair method of competition rules than for UDAP rules. They cite no authority requiring the Commission to persuade this Court of the wisdom of Congress's approach. In any event, Senator Hart explained: "Because S. 356 primarily concerns consumer protection matters, the procedural requirements in title 2 respecting FTC rulemaking are limited to unfair or deceptive acts or practices rules." 120 Cong. Rec. 40,606, 40,713 (1974) (statement of Sen. Hart). That is, because the Magnuson-Moss Act was generally focused on

12

consumer protection, it made sense for the Act to focus on the procedures applicable to UDAP rulemakings, in contrast to competition rulemakings.

### B. The Major Questions Doctrine Does Not Compel a Different Result.

The major questions doctrine does not apply because the Commission has clear statutory authority to promulgate the Rule, as explained *supra*, Argument I.A. Comm'n Mot. 29-33. Additionally, non-competes in purpose and effect (and in name) prevent individuals from competing in the marketplace and prevent businesses from competing with one another for talent. It is therefore not a "transformative expansion" of the Commission's "authority" to regulate that practice, which lies at the heart of its expertise and its mandate to prevent the use of unfair methods of competition. *West Virginia v. EPA*, 597 U.S. 697, 724 (2002).

The Commission also explained that the choice to proceed via rulemaking as opposed to via precedential adjudication does not present a "major question"; to the contrary, it is black-letter administrative law that agencies have discretion to choose between both in formulating policy. Comm'n Mot. 30; *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). Demonstrating just how radical its position is, Ryan's only response to this, buried in a footnote, is the remarkable assertion that it "does not concede that the Commission could properly determine that *any* non-compete is an

13

unfair method of competition." Ryan Reply 10 n.3 (emphasis added).[6] In other words, Ryan is unwilling to admit that it would be an unfair method of competition for an employer to prevent its workers from working for another business anywhere in the country for ten, twenty, or fifty years after departing. That position fails to grapple with the Commission's thorough demonstration, through the application of precedent and the study of evidence and public comments, that non-competes are an unfair method of competition and have significant actual anti-competitive effects.

Ryan primarily relies (at 10) on a case from the 1800s, *ICC v. Cincinnati*, 167 U.S. 479 (1897), which states that an agency's rulemaking authority must be "clear and direct." That case is relevant only insofar as an agency seeks to infer rulemaking authority from the power to adjudicate. That is not applicable to a statute that expressly empowers the Commission to "make rules and regulations."

Ryan next argues (at 11) that the Rule presents a "major question" simply because it has "vast economic and political significance." But Ryan does not contest that the "significance" of a regulation is far from dispositive in major questions cases, Comm'n Mot. 32, and fails to address that the Commission's statutory mandate directs it to take action "in or affecting commerce" and gives it jurisdiction over industries across the economy (other than those expressly carved out). Nor can Ryan refute that Congress contemplated, in the statutory text, that *amendments* to Commission rules could have

---

[6] Ryan also asks (at 10 n.3) that this Court simply take its word that its non-competes are enforceable, with no evidence or explanation.

effects on the economy that implicate hundreds of millions of dollars, if not more.[7] If Congress expressly authorized the Commission to issue rule amendments with that impact, it is common sense that the Commission has the authority to issue rules with a significant economic impact. Ryan quibbles with the size of the Rule's economic impact compared to other actions the Commission has taken. But there is no legal principle—major questions doctrine or otherwise—suggesting that an agency's clear statutory authority is limited by its "most significant" prior use of that same authority. Limiting the Commission to addressing only rare or inconsequential anti-competitive practices would in fact conflict with Congress's textual directive that the Commission address unfair methods of competition "in or affecting commerce."

Finally, characterizing the Rule as a "worker-protection" regulation does not mean that the Rule does not prevent unfair methods of competition. Comm'n Mot. 31. The Rule promotes competition, as thoroughly explained and as numerous businesses have acknowledged. Non-Compete Clause Rule, 89 Fed. Reg. 38,342, 38,392 (May 7, 2024). And contrary to Ryan's rhetoric, there is nothing "breathtaking" about the fact that the Rule happens to promote competition in the labor market (among other markets). Federal agencies have overlapping jurisdiction; that the Rule benefits workers in addition to businesses and the economy as a whole does not render that Rule unlawful.

---

[7] Ryan mistakenly states (at 5) that the language in 15 U.S.C. § 57b-3(a)(1)(A) refers to rules themselves, when it refers to amendments.

Plaintiff-Intervenors briefly retread (at 9) several of the arguments addressed above, without actually explaining why the Rule violates the major questions doctrine under any formulation. In any event, to address their arguments: first, there is no tension between the Commission's considered choice to use rulemaking, as opposed to case-by-case precedential adjudication, as the most effective tool for addressing the widespread harms of non-competes, explained at 89 Fed. Reg. at 38,462-64, and its point that no "major question" is implicated by that choice. Plus, rulemaking has significant procedural benefits over a party-specific precedential adjudication, as it affords the opportunity for notice and public comment, among the APA's other procedural protections.

Second, Plaintiff-Intervenors assert that the Commission does not have a "blank check authorizing *all* economically transformative actions, in whatever form." The Commission does not claim a "blank check" to do whatever it likes, nor does that remotely describe what it has done in this case. The Commission followed the procedures of the APA to prohibit the use of an anti-competitive practice at the heart of its mandate, based on robust empirical economic findings and a vast comment record that overwhelmingly supported the Rule.

## II. THE COMMISSION PROPERLY DESIGNATED NON-COMPETES, AS A CLASS, "UNFAIR METHODS OF COMPETITION."

Plaintiff-Intervenors rebut none of the Commission's analysis, summarized at Comm'n Mot. 24-25, explaining why non-competes as a class are unfair

16

methods of competition. They do not dispute that non-competes are facially restrictive and exclusionary, and that most non-competes are exploitative. They also do not explain why the Commission was wrong in its findings that non-competes tend to harm competition in labor markets and goods and services markets by precluding the efficient matching of firms and workers and blocking the formation of new competing firms, and that non-competes have actual anti-competitive effects. *See generally* Pl.-Intervenors Reply 10-11 (addressing none of these arguments).

Instead, Plaintiff-Intervenors ask this Court (at 10) to simply take their word that non-competes have had no "discernible effect on competition." They also assert (at 10) that the Commission "cannot make [the] showing" that all non-competes are unfair methods of competition, without contesting any particular finding or conclusion that the Commission made in support of that precise showing. Those conclusory assertions demonstrate that Plaintiff-Intervenors have no substantive rebuttal to the Commission's determination that non-competes as a class are unfair methods of competition.

Crucially, Plaintiff-Intervenors are silent in response to the Commission's explanation regarding the aggregate harms of non-competes. Comm'n Mot. 38-39. The Commission found that all non-competes cut off competition. And although the FTC Act does not require the Commission to establish ongoing actual harms—requiring instead a *tendency* to negatively affect competitive conditions—the Commission found that non-competes do have *actual* negative effects. The overwhelming empirical

17

evidence shows that non-competes cause actual, ongoing harm—with spillover economic effects, including on workers and firms that do not use them. Plaintiff-Intervenors reiterate their mistaken claim (at 10) that the Commission "ignore[d] the benefits of individual non-compete[s]," but the Commission considered the purported justifications for individual non-competes, and it concluded that employers always have viable alternatives to protect their legitimate interests that, unlike non-competes, do not categorically cut off competition. Comm'n Mot. 39.

Furthermore, contrary to Plaintiff-Intervenors' arguments (at 10), the Commission applied well-established principles from Supreme Court and appellate decisions defining unfair methods of competition in issuing its 2022 Section 5 policy statement and in promulgating the Rule. *See* Policy Statement (Nov. 10, 2022), https://perma.cc/2G3F-2UW9.

Plaintiff-Intervenors also double down (at 11) on their argument that a firm could justify its use of an anti-competitive business practice with considerations untethered from competition, such as by showing that the practice benefited the firm economically. The Supreme Court flatly rejected that theory in *FTC v. Texaco Inc.*, 393 U.S. 223, 230 (1968), and *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 371 (1965). *See* Comm'n Mot. 37. Plaintiff-Intervenors have no answer to those cases. Pl.-Intervenors

18

Reply 11.[8]

Finally, Plaintiff-Intervenors vaguely invoke the major questions doctrine once again—with no supporting caselaw—to argue that the Commission misapplied Section 5 principles in this rulemaking. Pl.-Intervenors Reply 11-12. The Commission's rulemaking was not "unbounded" or "policy-driven"—rather, it was constrained by the procedures of the APA and the Commission's Section 5 authority, and it was supported by a vast rulemaking record. And while Plaintiff-Intervenors now belatedly contest the Commission's authority to bring an enforcement action against a firm for non-competes, they do not explain on what basis.

## III.   THE RULE DOES NOT INTRUDE ON A CORE AREA OF STATE REGULATION.

The Rule does not intrude on a core area of state regulation. Comm'n Mot. 40-42. Plaintiff-Intervenors concede that it is commonplace for States to regulate, even extensively, in an area such as antitrust in which they have shared jurisdiction with the federal government.

Plaintiff-Intervenors' only response (at 12) is to mistakenly claim that there has never been overlap between federal and state regulation of non-competes. But as explained, in 1911, before the FTC Act was passed, the Supreme Court recognized that

---

[8] Plaintiff-Intervenors' only citation here is to *FTC v. Actavis*, 570 U.S. 136 (2013), a case that reversed the improper dismissal of an FTC complaint. *Actavis* did not hold that a firm could justify anti-competitive behavior based on reasons unconnected to competition. *Id.* at 141 ("[T]he basic question here is whether" the agreement at issue "can sometimes unreasonably diminish competition in violation of the antitrust laws.").

the use of non-competes could violate federal antitrust law. *U.S. v. Am. Tobacco Co.*, 221 U.S. 106, 181-83 (1911).

## IV.   CONGRESS LAWFULLY DELEGATED AUTHORITY TO THE COMMISSION.

Plaintiffs' non-delegation challenge is meritless. Comm'n Mot. 42-45. The relevant standard, which is "not demanding," is simply whether Congress has articulated "an intelligible principle" to guide the agency. *Gundy v. U.S.*, 588 U.S. 128, 145-46 (2019) (plurality op.). Congress's delegation to the Commission to prevent "unfair methods of competition" plainly satisfies that standard. The Supreme Court has described that phrase's meaning as "obvious," and it is far more specific than numerous others that the Supreme Court has upheld against non-delegation challenges. Comm'n Mot. 43-44.

Plaintiffs do not contest any of the above. Instead, they argue that the Commission's exercise of rulemaking authority here somehow transformed Congress's directive to the Commission to prevent unfair methods of competition from a constitutional delegation to an unconstitutional one. As explained, that novel theory has no basis in the law. Comm'n Mot. 45. In response, Ryan first contends (at 12) that the Commission's 2022 policy statement suggests that there is no intelligible principle guiding the agency. But the policy statement is simply non-binding guidance issued by the Commission summarizing the text and history of the FTC Act, as well as caselaw interpreting that Act, of the sort agencies routinely issue. It does not support Ryan's

claim of an unconstitutional delegation, notwithstanding Plaintiffs' hyperbolic characterization of the statement as "radical." *E.g.*, Pl.-Intervenors' Mot. 13.

Ryan also argues (at 12) that if the phrase "unfair methods of competition" is "broader" than "unfair competition," then it must necessarily be broader than "fair competition"—the phrase in the Recovery Act that the Supreme Court found impermissible in *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495 (1935). That reasoning is flatly contradicted by *Schechter* itself, which held that the "fair competition *of the [Recovery Act] codes*" was "much broader" than the FTC Act's "unfair methods of competition," not the other way around. 295 U.S. at 534 (emphasis added). Unlike "unfair methods of competition" here, "fair competition" under the Recovery Act did not meaningfully constrain the President's ability to unilaterally adopt codes of competition to further the "goal" of "industrial recovery" generally. *Id.* at 536.

Nor does *Schechter* support Ryan's suggestion that a delegation may be permissible in the context of an adjudication but not in the context of APA rulemaking. The Recovery Act at issue in *Schechter* was plagued by procedural defects to be sure, but those defects—*e.g.*, "dispens[ing] with … any administrative procedure" whatsoever— do not bear on the Commission's valid exercise of its rulemaking authority here. *Id.* at 533.

Plaintiff-Intervenors similarly argue (at 12-13) that "the Commission's interpretation of Section 5" raises a non-delegation problem, though they cite no authority for their position. Their contention (at 12) that the Commission "never once

prov[ed] that any particular use" of a non-compete harmed competition is incorrect. The Commission showed that the use of non-competes is always an unfair method of competition—consistent with their purpose and effect to prevent competition, as well as extensive empirical evidence and tens of thousands of comments.

## V.    THE RULE IS NOT RETROACTIVE.

The Rule is not impermissibly retroactive, because it does not impose legal consequences for any conduct predating its effective date. Comm'n Mot. 46-47. To the contrary, the Rule renders certain existing contractual provisions only prospectively unenforceable, while expressly preserving any claims accrued before the Rule's effective date. It is thus precisely analogous to the regulation upheld against a retroactivity challenge in *National Cable & Telecommc'ns Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir. 2009), which rendered existing contracts unenforceable.

In contrast, Ryan and Plaintiff-Intervenors cannot point to a single example of any court striking down a regulation like the Rule on retroactivity grounds. Instead, they read *Perez Pimentel v. Mukasey*, 530 F.3d 321, 326 (5th Cir. 2008), which held that the regulation at issue was not retroactive, for the overbroad proposition that any regulation that "upsets settled expectations" or "impairs" contractual rights is impermissibly retroactive. Ryan Reply 12; Pl.-Intervenors Reply 13-14. That is wrong. As the Supreme Court explained in *Landgraf v. USI Film*, a "statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, … or upsets expectations based in prior law." 511 U.S. 244, 269 (1994).

22

Indeed, "[e]ven uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct." *Id.* at 269 n.4. "Rather," the relevant question is "whether the new provision attaches *new* legal consequences to events completed before its enactment." *Id.* at 269-70 (emphasis added). The Rule does no such thing.[9, 10]

## VI.    THE RULE IS REASONABLE AND REASONABLY EXPLAINED.

The Rule is not arbitrary and capricious. Contrary to Ryan's assertion (at 14), the Commission considered the alternative of limiting the Rule's scope based on industry and explained in detail why that alternative was not viable. *See* 89 Fed. Reg. at 38,442-51; Comm'n Mot. 50-51, 54-55. And the Commission relied in the Rule on the determination that the anti-competitive effects of non-competes are consistent across industries, contrary to Ryan's suggestion (at 14) that this explanation is a post-hoc rationalization. *See, e.g.*, 89 Fed. Reg. at 89,385 ("the finding of [non-competes'] negative effects on earnings is consistent across dissimilar subsets of the population"); Comm'n Mot. 60.

Additionally, the annual revenue of the management-consulting industry (Ryan Reply 15) is irrelevant to the materiality of Ryan's comment regarding the bargaining power of equity-holding business partners. As explained, that comment was immaterial

---

[9] If the Court determines the Rule is retroactive, it should limit any injunction to the portion of the Rule that applies to existing non-competes.

[10] Precedent forecloses Ryan's removal challenge, Comm'n Mot. 63, and Ryan does not argue otherwise, Ryan Reply 23 n.6.

23

because it did not address the basis for the Commission's finding that non-competes with senior executives are unfair methods of competition. *See* Comm'n Mot. 55.

Additionally, Ryan argues for the first time on reply (at 15) that "many (if not the vast majority of) partners" are excluded from the Rule's definition of "senior executives"—namely, workers who earn at least $151,164 annually in a policy-making role, 89 Fed. Reg. at 38,502 (16 C.F.R. § 910.1). The Rule explained that "[p]artners in a business … would … generally qualify as senior executives … , assuming the partners have authority to make policy decisions about the business." 89 Fed. Reg. at 38,418. Ryan offers no support for its contrary claim, which was also forfeited.

With respect to consumer welfare, Ryan does not dispute that "[t]here is *no* empirical evidence that enforceability of non-competes increase[s] prices." 89 Fed. Reg. at 38,479 (emphasis added); *see* Comm'n Mot. 56. To the extent that Ryan challenges (at 15) the robustness of the data on which the Commission relied, an agency is entitled to rely on available data. Comm'n Mot. 51. Moreover, available empirical data in this context is consistent with economic theory—non-competes raise prices by inhibiting efficient matching between employers and workers and by blocking the formation of competing firms that could offer lower prices. 89 Fed. Reg. at 38,380.

Ryan also does not dispute (at 16) that the 2019 literature review that Ryan cites is "'generally outdated' because 'much of the strongest evidence on the effects of non-competes has been published in recent years,' since that 2019 review." Comm'n Mot. 57 (quoting 89 Fed. Reg. at 38,382).

Next, the Commission was consistent in the weight it applied to correlational and causational studies, regardless of the studies' findings. *See id.* That one causational study considered multiple metrics to determine non-compete enforceability does not render the study "correlative," as Ryan mistakenly contends (at 16).

Ryan is wrong to assert (at 17) that "the Commission offers no evidence that knowledge-sharing … is anything more than a zero-sum game in which any benefits to new companies are offset by harms to existing ones." As explained, Comm'n Mot. 58, the Rule allows companies to protect proprietary information while promoting the cross-pollination of workers' skills and ideas to increase innovation. And the Rule cites ample evidence that non-competes decrease innovation by preventing the latter cross-pollination, *i.e.*, that innovation is not, as Ryan suggests, a zero-sum game. *See, e.g.*, 89 Fed. Reg. at 38,388-89, 38,394-98.

Plaintiff-Intervenors similarly do not establish that the Rule is arbitrary and capricious. On reply, they again fail to support their assertion that non-competes are procompetitive, either in theory or in practice. Instead, they gesture (at 14) to joint ventures, citing *Polk Brothers v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985). The Rule does not implicate joint ventures, and *Polk Brothers* is inapposite because it did not address a non-compete agreement and applied a rule-of-reason framework that is inapplicable here. *See* Comm'n Mot. 36.

Plaintiff-Intervenors do not dispute (at 15) that the data on which the Commission relied was both linear and consistent across industry and geographic

region, which allowed the Commission to extrapolate the effects of a nationwide ban. Comm'n Mot. at 50-51, 53-54, 60. Instead, they emphasize that no study has yet examined the effects of a nationwide ban on non-competes. Far from demonstrating "an agency's working backward to reach its desired outcome," Pl.-Intervenor Reply 15, that limitation is always present when an agency implements a new policy. It is impossible to directly measure the real-world effects of a policy that has not yet taken effect. Nevertheless, an agency is entitled to make policy determinations based on the best data available at the time. Comm'n Mot. 51.

Contrary to Plaintiff-Intervenor's protestations (at 15-16), the Commission reasonably placed greater weight on the findings of a study that used a larger sample size than another study that relied on the same data set but used a smaller sample size. Comm'n Mot. 52. Similarly, it is not "cherry-picking," Pl.-Intervenor Reply 15-16, to determine that the disadvantages identified in a study of non-competes among physicians (greater concentration and higher consumer prices) outweighed the study's finding of more efficient allocation of patients across physicians, Comm'n Mot. 52.

On reply, Plaintiff-Intervenors still fail to identify (at 16) any meaningful difference (aside from geographic reach) between the scope of the Rule and the scope of the existing non-compete bans of four States. Comm'n Mot. 62 n.12. Additionally, the Rule thoroughly addressed why proposed alternatives to the Rule were not viable, as well as reliance interests on existing non-competes. *Id.* 54-55, 62.

Plaintiff-Intervenors mistakenly assert (at 17) that the Commission devoted only a sentence to the possibility of case-by-case litigation as an alternative to a categorical ban. The Commission thoughtfully considered that issue in the Rule, which the Commission cited and discussed across two pages of its opening brief. *See* 89 Fed. Reg. at 38,458-59; Comm'n Mot. 54-55. Plaintiff-Intervenors generally do not dispute the merits of that analysis, except to repeat their unsupported contention that some non-competes are beneficial. On that score, contrary to Plaintiff-Intervenors' out-of-context citations (at 17), the Commission did not find in the Rule that any non-competes are more beneficial than harmful.

Next, the FTC Act precludes judicial review of the Commission's cost-benefit regulatory analysis. Comm'n Mot. 58. Plaintiff-Intervenors respond (at 18) by citing an exception to the statute's general bar on judicial review that applies solely to UDAP rulemakings (not here), under which "a court … may set aside such rule if the Commission has failed entirely to prepare a regulatory analysis." 15 U.S.C. § 57b-3(c)(1). By contrast, in competition rulemakings, "[t]he contents and adequacy of [the Commission's] regulatory analysis …, including the adequacy of any procedure involved in such preparation or issuance, shall not be subject to *any* judicial review in any court." *Id.* (emphasis added). Even if the UDAP standard applied, Plaintiffs do not argue that the Commission "failed entirely" to prepare a regulatory analysis; they challenge only the contents of that analysis. Meanwhile, as Ryan observes (at 17), the APA's arbitrary-and-capricious standard is "*otherwise* applicable," 15 U.S.C. § 57b-3(c)(3) (emphasis

27

added), but that means it is not applicable here, given that the FTC Act expressly precludes "any judicial review" of the required regulatory analysis, 15 U.S.C. § 57b-3(c)(1).

In any event, Plaintiffs' challenges to the merits of the Commission's cost-benefit analysis are unpersuasive. The Commission did not "overestimate[] the number of workers bound by non-competes," Ryan Reply 17, nor would any such overestimation affect the balance of the Rule's costs and benefits, *see* Comm'n Mot. 60. Ryan responds that the Rule imposes certain fixed compliance costs on employers, but those costs apply only to employers who use non-competes. Ryan previously argued that the number of workers bound by non-competes may have fallen on a State-by-State basis, *see* Ryan Mot. 38, not an employee-by-employee basis. That is, in States where non-competes are already banned, employers will not incur the fixed compliance costs that Ryan invokes.

Additionally, while the distribution of the Rule's wage-related benefits among workers is irrelevant to the balance of its benefits and costs, *see* Comm'n Mot. 60, the Commission did not find that high earners will benefit disproportionately from the Rule, *contra* Ryan Reply 18.[11] Notably, Ryan acknowledges that the Rule will result in an

---

[11] Ryan omits the cited study's finding that "college-educated workers *and workers in occupations and industries in which non-competes are used at a high rate* experience relatively larger adverse effects on their earnings from non-compete enforceability," although all workers experience adverse effects. 89 Fed. Reg. at 38,385 (emphasis added). With respect to the latter group, more than half of all workers bound by non-competes are hourly workers. *Id.* at 38,346. That belies any assertion that the Rule disproportionately benefits those in the top income and education brackets.

"increase in earnings for the *vast majority* of workers." Ryan Reply 18 (emphasis added).
Ryan's undeveloped and unsupported assertion that these increases will somehow be
"eclipsed by wage gains resulting from a strong economy," *id.*, cannot overcome the
Commission's considered findings that the Rule will benefit the economy as a whole,
not only by raising wages across the board but also by spurring innovation and new
business formation and lowering consumer prices, 89 Fed. Reg. at 38,433, 38,470,
38,478.

The Commission has explained why employers will not need to "revamp entire
business models," as a result of the Rule, Ryan Reply 18, in light of less restrictive
alternatives that the Rule preserves for the protection of investments in human capital
and intellectual property, *see* Comm'n Mot. 61-62. And the Commission thoroughly
analyzed the Rule's effects on the economy as a whole, including prices. *See id.* at 62.

With respect to other costs, Ryan (at 19) does not point to any reliance interests
that the Commission failed to consider. Ryan also does not dispute that it is sometimes
more efficient to hire a worker who already has the skills needed for a particular job
(and who would be unavailable for hire if bound by a non-compete) than to train a
different worker from scratch. *See* Comm'n Mot. 59. And the Rule clearly explained that
fixed-duration employment contracts are consistent with the Rule because "they do not
restrain post-employment conduct." 89 Fed. Reg. at 38,368.

Finally, Ryan asserts (at 19) that some firms' legal counsel may require more time
than the Commission's average estimate. But that average estimate, by definition,

contemplates that some firms will require more time and others less. With respect to litigation costs, Ryan suggests that trade secret law is not an adequate alternative to non-competes because some recent evidence shows that banning non-competes does not result in an increase in trade-secret litigation. Ryan Reply 19-20 (citing 89 Fed. Reg. at 38,424 n.757, 38,484 n.1169). But law's efficacy is not generally measured by the volume of litigation that it generates, and Ryan offers no persuasive reason why it should be here.

Plaintiff-Intervenors' challenges (at 17) to the Rule's cost-benefit analysis are no more persuasive. They fail to undermine the Commission's conclusion that no record evidence indicates that litigation costs will increase as a result of the Rule, considering both the decrease in non-compete litigation and increase (if any) in trade-secret or nondisclosure litigation. *See* Comm'n Mot. 58-59. On that score, Plaintiff-Intervenors contend that the Commission failed to consider relevant evidence presented during the comment period. Pl.-Intervenors Reply 17 (citing ECF No. 149 at 30-32). But the pages they cite, which reproduce portions of the Rule discussing the Commission's statutory authority, have nothing to do with litigation costs.

Finally, the Rule is clear that NDAs do not violate the Rule provided they do not "prevent a worker from seeking or accepting employment or operating a business." 89 Fed. Reg. at 38,426; *contra* Pl.-Intervenor Reply 18. The Rule offers specific guidance on NDAs and provides examples of both permissible and impermissible agreements. 89 Fed. Reg. at 38,365.

## VII.  ANY RELIEF SHOULD BE TAILORED.

### A. The Court Should Not Vacate the Rule.

As explained in the Commission's opening brief, determining the appropriate remedy for any meritorious APA claim requires a fact-specific, equitable analysis. *See* Comm'n Mot. 63-68. The APA expressly provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibition or mandatory injunction," 5 U.S.C. § 703, and preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702. The *en banc* Fifth Circuit confirmed in *Cargill v. Garland* that, if a court concludes that agency action exceeds the agency's statutory authority, the court must then "determine the proper scope of relief" and appropriate form of relief, whether "injunctive, declaratory, or otherwise." 57 F.4th 447, 472 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024). If universal vacatur were the automatic remedy, remand in that case would have been improper. *See id.* Moreover, the Supreme Court recently reinforced in *Starbucks Corp. v. McKinney* that a statute providing that a particular remedy "shall" be granted does not "supplant the traditional equitable principles" governing relief. 144 S. Ct. 1570, 1577 (2024).

Should the Court determine that any of Plaintiffs' claims is meritorious, equitable considerations here call for party-specific relief, whether in the form of an injunction or vacatur. Plaintiffs do not attempt to establish that broader relief is necessary to remedy their alleged injuries. And a nationwide remedy would effectively nullify the judgment of another district court that the Rule is within the scope of the Commission's

31

authority, *see ATS*, 2024 WL 3511630, at *19, in addition to forestalling further percolation of the relevant legal issues in other courts.

On reply, Plaintiffs make no effort to establish that equitable principles call for universal relief here. Instead, they hang their hats on the argument that, if they prevail, Fifth Circuit precedent *requires* the Court to enter relief binding non-parties to this action. That argument does not withstand scrutiny.

The Fifth Circuit expressly recognized in *Braidwood Management, Inc. v. Becerra* that the *Cargill* court remanded the case to district court for briefing on the appropriate scope of any relief under the APA. 104 F.4th 930, 952 n.102 (5th Cir. 2024). As noted, that remand cannot be squared with Plaintiffs' argument that universal relief is necessary whenever a court determines that an agency exceeded its statutory authority. Moreover, *Braidwood*'s discussion of APA relief is dicta, because the court did not grant any APA relief in that action. *See id.* at 952.

Meanwhile, in addressing the scope of relief under 5 U.S.C. § 705, the Fifth Circuit observed in *Career Colleges* that, "[w]hen a reviewing court determines that agency regulations are unlawful, the *ordinary* result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (emphasis added) (citation omitted). "Ordinary," of course, does not mean "mandatory"—as this Court recognized in limiting the scope of Section 705 relief in this action to the Plaintiffs, in light of equitable

32

considerations that apply with even greater force to any final relief the Court may grant. Prelim. Inj. (July 3, 2024), ECF No. 154.

In *Clarke*, the court discussed in the context of a transfer motion the "nationwide" effect of any order vacating an enforcement action against a single international entity, which would affect third parties "in all judicial districts equally." *In re Clarke*, 94 F.4th 502, 507, 512 (5th Cir. 2024). Here, too, the Commission does not dispute that an order preventing enforcement of the Rule against the identified Plaintiffs would bind the Commission beyond this District and would affect the employees bound by Plaintiffs' non-competes regardless of geographic location. *Clarke* does not suggest that this Court should also bar the Commission from enforcing the Rule against entities with no relationship to this lawsuit.

Finally, in *Texas Medical Ass'n v. HHS*, the Fifth Circuit: (1) rejected the argument that the APA does not authorize vacatur; (2) declined to remand without vacatur under the circumstances of that case; and (3) declined to enter party-specific relief under the circumstances of that case. No. 23-40217, 2024 WL 3633795, at *11-12 (5th Cir. Aug. 2, 2024). None of those holdings precludes this Court from entering party-specific relief here. In particular, the *TMA* court concluded that party-specific relief was not appropriate in light of the need for national uniformity and predictability, which were the "*primary* justifications" for the challenged Rule. *Id.* *12 (emphasis added). Here, by contrast, the Commission has identified numerous benefits of the Rule apart from uniformity. *See, e.g.*, Comm'n Mot. 14, 48; *see also infra* Argument VII.B (explaining that

33

the relief Plaintiffs seek here is divisible). And the Commission stated in the Rule that, "although … a national standard is most effective," "[t]he Commission's adoption of the final rule does not hinge on the same restrictions applying to all non-competes, on the final rule applying to all workers, or on joint adoption or operation of each provision." 89 Fed. Reg. at 38,456. *TMA*'s analysis therefore does not control here. Moreover, Plaintiff-Intervenors cannot credibly argue that nationwide uniformity is required here when they seek to return to a State-by-State patchwork approach to non-compete enforceability.

The Commission cited remand without vacatur as one example of a remedy other than universal vacatur that the Fifth Circuit has repeatedly affirmed in APA cases. Comm'n Mot. 65. To the extent this Court determines that the Rule is statutorily authorized but inadequately explained, remand without vacatur would be the correct remedy. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238 (5th Cir. 2007) ("[W]hen an agency decision is not sustainable on the basis of the administrative record, then the matter should be remanded to the agency for further consideration." (internal quotation marks omitted)). But even if the Court concludes that the Rule exceeds statutory authority, party-specific relief would adequately redress any injury to the identified parties here. Comm'n Mot. 66-68.

In sum, this Court can and must make a fact-specific determination with respect to the appropriate remedy for any meritorious claim under the APA, no less than under any other statute. The Commission has explained, and Plaintiffs do not dispute, that

party-specific relief—whether in the form of vacatur or an injunction—is sufficient to remedy any injuries to Plaintiffs. And equitable considerations counsel against broader relief, as this Court recognized in limiting the scope of its preliminary relief under both Rule 65 and 5 U.S.C. § 705. At summary judgment, those equitable considerations counsel even more strongly against extending relief beyond the parties, given that another court has held that the Rule is within the Commission's statutory authority.

### B. Any Injunction Should Be Tailored.

Plaintiff-Intervenors seek to leverage purported injury to three businesses that are members of the Chamber of Commerce into relief for potentially several million unidentified businesses. But Plaintiff-Intervenors lack Article III standing to do so. Comm'n Mot. 68-76. Thus, as this Court recognized in fashioning preliminary injunctive relief, any permanent injunctive relief that it determines is warranted should be limited to any businesses identified in this litigation that have established injury from the Rule.

First, Business Roundtable, TAB, and Longview Chamber all "'fail[] to identify even one individual' member with standing," as required for purposes of associational standing. *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012). *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009), was clear—an organization must "establish[] that at least one identified member" is injured. Plaintiff-Intervenors point (at 21-22) to *Summers*'s discussion of whether standing can be premised on statistical probabilities. But the Court's language there proves the Commission's point: it stated

35

that the "requirement of *naming … members* has never been dispensed with in light of statistical probabilities." *Id.* at 498-99 (emphasis added). Accordingly, courts have rejected the sufficiency of declarations submitted at summary judgment simply asserting that "many" unidentified members of an association are injured, as Business Roundtable, TAB, and Longview Chamber do here. *See Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194-95 (9th Cir. 2013) (finding no standing because "AGC does not identify any affected members by name nor has it submitted declarations by any of its members attesting to harm"). The only Fifth Circuit case that Plaintiff-Intervenors cite in support of their position that there is no naming requirement (contrary to *Summers*'s explicit holding) did not actually address the issue. *See Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020).

For its part, the Chamber has identified three members that claim injury from the Rule. But as explained, the Chamber has not demonstrated that it has an identifiable membership overall, the size and structure of which remain unknown. There are no indicia or details of what it means for a business to be a member of the Chamber, nor how those members—including the members identified here—direct or control the Chamber. And, crucially, there is no indication that the Chamber's members, however defined, support this litigation or would "benefit[]" from the Chamber's requested relief, as required for purposes of associational standing. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). Rather, the opposite is almost certainly true; numerous businesses, including likely many Chamber members,

36

supported the Rule because they recognize that prohibiting an anti-competitive practice will benefit them and benefit the economy as a whole, as the Commission concluded. That is especially true because the Chamber's stated mission is to "advocate[] for policies that help businesses create jobs and grow our economy," *About Us*, U.S. Chamber of Commerce, perma.cc/6SD4-PLX3—and the Rule furthers both of those goals by spurring business formation and innovation. *See, e.g.*, Amicus Br. of Small Business Majority, ECF No. 138. The Chamber does not dispute any of this, which is fatal to its invocation of associational standing.

There is also no "confusion" inherent to the Rule regarding Citadel's garden leave policy, as Plaintiff-Intervenors assert (at 18 n.2). The Rule acknowledges that firms use the term "garden leave" to describe a variety of arrangements. 89 Fed. Reg. at 38,363. Any "confusion" here arises because the Chamber—which bears the burden to establish standing—has not put Citadel's non-compete agreement into the record. Without knowing more about whether those departing employees, while receiving "monthly monetary compensation" from Citadel, remain on payroll, whether they continue to receive benefits, and similar details, the Commission cannot say with certainty whether those agreements are covered. Citadel Decl. ¶ 8, ECF No. 169-1, Ex. H. But that does not render the Rule "vague." Rather, any vagueness stems from attempting to apply the Rule to a vaguely described contract—and more importantly, it means that Citadel has not established injury-in-fact from the Rule. And it only further reinforces the Commission's point that individual participation of the Chamber's

members is necessary. Comm'n Mot. 75-76.

The Chamber also has no answer to the argument that its requested relief—an injunction preventing the Commission from enforcing the Rule against the Chamber's millions of unidentified, secret members—would violate Federal Rule of Civil Procedure 65(d)'s requirement that injunctive relief be "specific[]" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

The Chamber dismisses the above in a single sentence (at 24)—that these arguments "would apply to *any* case involving an association plaintiff, thus effectively negating … associational standing." The government's arguments do not "negat[e]" associational standing; they are drawn from associational standing principles. Caselaw is clear that associations must have a "clearly articulated and understandable membership structure" and that the lawsuit in question must be "within the scope of reasons that [members] joined the organization," which the Chamber has failed to demonstrate. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997). Similarly, courts have held that an organization lacked associational standing where the sole indicia of membership were "affidavits" submitted by a handful of members which fail to "describe[] involvement in the Group beyond a bare assertion of membership," as is true of the declarations submitted here. *Viasat, Inc. v. FCC*, 47 F.4th 769, 781-82 (D.C. Cir. 2022).

The government's arguments would also plainly not apply to "any case involving

38

an associational plaintiff." They would not apply to a bona fide membership organization, that proved it had a clearly articulated and understandable membership structure, explained how its members direct or control the organization, and showed its members would benefit from the requested relief. Not all associational plaintiffs claim to represent an unknown number of unidentified members as the Chamber seeks to do here, and the Chamber's reliance on the slippery-slope fallacy should be rejected.

*Students for Fair Admission v. Harvard*, 600 U.S. 181 (2023) ("*SFFA*"), only reinforces the Commission's point. SFFA had "identifiable members" and is, accordingly, of a definite size—forty-seven individuals. *Id.* at 201. In contrast, the Chamber's declaration demonstrates that its membership is murky and undefined, to the point that it is unclear whether the Chamber's membership runs into the hundreds of thousands or millions of members. Chamber Decl. ¶ 3, ECF No. 169-1. Even on reply, the Chamber does not explain what it means in stating that it has "direct" and "indirect" members. *See id.*

Moreover, the declarations submitted by SFFA in the district court demonstrated that its members—again, fewer than fifty—"had the opportunity to have input and direction on SFFA's case." 600 U.S. at 201. The Chamber has made no such showing; indeed, even the three members that have submitted declarations simply assert, in boilerplate, that they are "members" of the Chamber without explaining what that means. Comm'n Mot. 72.

And the relief that SFFA sought—injunctive relief preventing the use of

39

affirmative action in college admissions at a particular university—was indivisible. That is, it would be nonsensical for a university to adopt a different admissions policy for some SFFA members but not others. In contrast, it would be reasonable and practical to tailor any injunction here to prevent the Commission from enforcing the Rule against the Chamber's identified members that have demonstrated injury from the Rule, and indeed that would make *more* sense than an injunction preventing the Commission from enforcing the Rule against some unknown set of businesses, some of which surely do not want that relief.

Finally, even if the Chamber had associational standing to challenge the Rule, this Court should exercise its equitable discretion and decline to enter the overbroad relief that Plaintiff-Intervenors request, to prevent parties from achieving two bites at the apple, to permit issues to percolate, and to prevent the Chamber from circumventing Rule 23. Comm'n Mot. 76-78. That would accord with the foundational Article III and equitable principle that the "scope of injunctive relief is dictated by the extent of the violation established," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and with this Court's approach at the preliminary injunction stage. Op., ECF No. 153 at 28-29.

Additionally, if any infirmities the Court finds can be cured by severing some part of the Rule, the Court should do so. Comm'n Mot. 78.

## CONCLUSION

Defendant's motion for summary judgment should be granted, and Plaintiffs' motions for summary judgment should be denied.


Dated: August 16, 2024                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney
                                          General

                                          LESLEY R. FARBY
                                          Assistant Branch Director

                                          */s/ Taisa M. Goodnature*
                                          TAISA M. GOODNATURE
                                          (New York Bar No. 5859137)
                                          RACHAEL L. WESTMORELAND
                                          ARJUN MODY
                                          Trial Attorneys
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, NW
                                          Washington, D.C. 20005
                                          Tel: (202) 514-3786
                                          E-mail: Taisa.M.Goodnature@usdoj.gov

## CERTIFICATE OF WORD COUNT

This document complies with the Court's word count requirement, as amended by the Court's July 11, 2024 Order, ECF No. 163, because it contains 9,980 words.


Dated: August 16, 2024          */s/ Taisa M. Goodnature*
                                TAISA M. GOODNATURE
                                (New York Bar No. 5859137)
                                RACHAEL L. WESTMORELAND
                                ARJUN MODY
                                Trial Attorneys
                                U.S. Department of Justice
                                Civil Division, Federal Programs Branch
                                1100 L Street, NW
                                Washington, D.C. 20005
                                Tel: (202) 514-3786
                                E-mail: Taisa.M.Goodnature@usdoj.gov

42

## CERTIFICATE OF SERVICE

On August 16, 2024, I electronically filed the above reply with the clerk of court for the U.S. District Court, Northern District of Texas. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


*/s/ Taisa M. Goodnature*

Taisa M. Goodnature