# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| RYAN, LLC,<br><br>        Plaintiff,<br><br>CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>        Plaintiff-Intervenors,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br><br>        Defendant. | CASE NO.: 3:24-CV-986-E |

## JOINT APPENDIX

<table>
<tr><td>

*/s/ Allyson N. Ho*
Allyson N. Ho
Texas Bar No. 24033667
Elizabeth A. Kiernan
Texas Bar No. 24105666
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel: 214.698.3100
aho@gibsondunn.com

</td><td>

Eugene Scalia (*pro hac vice*)
Amir C. Tayrani (*pro hac vice*)
Andrew G. I. Kilberg (*pro hac vice*)
Aaron Hauptman (*pro hac vice*)
Joshua R. Zuckerman (*pro hac vice*)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: 202.955.8500
escalia@gibsondunn.com
atayrani@gibsondunn.com
akilberg@gibsondunn.com
ahauptman@gibsondunn.com
jzuckerman@gibsondunn.com

</td></tr>
</table>

*Additional Counsel Listed on Following Pages*

Charles W. Fillmore
Texas Bar No. 00785861
H. Dustin Fillmore III
Texas Bar No. 06996010
THE FILLMORE LAW FIRM LLP
201 Main Street, Suite 700
Fort Worth, TX 76102
Tel: 817.332.2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

*Counsel for Plaintiff*

/s/ Robert L. Sayles
Robert L. Sayles (Texas Bar No.
24049857)
Boyce Holleman (Texas Bar No.
24126727)
BRADLEY ARANT BOULT
CUMMINGS LLP
1445 Ross Avenue
Suite 3600
Dallas, TX 75202
Tel: (214) 257-9800
Fax: (214) 939-8787
rsayles@bradley.com
bholleman@bradley.com

Jeffrey B. Wall (Georgia Bar No.
750427)
Judson O. Littleton (D.C. Bar No.
1027310)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.co

Jordan L. Von Bokern (D.C. Bar No.
1032962)
Tyler S. Badgley (D.C. Bar No.
1047899)
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, D.C.  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
tbadgley@uschamber.com

Liz Dougherty (D.C. Bar No. 457352)
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Washington, D.C. 20024
202-872-1260
ldougherty@brt.org

*Counsel for Plaintiff-Intervenors Chamber of Commerce of the United States of America, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

LESLEY R. FARBY
Assistant Branch Director

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
(New York Bar No. 5859137)
RACHAEL L. WESTMORELAND
ARJUN MODY
Trial Attorneys

U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-3786
E-mail:
Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendant*

# TABLE OF CONTENTS

Page(s)

Federal Trade Commission, Non-Compete Clause Rule,
89 Fed. Reg. 38,342 (May 7, 2024) ..................................................................JA001

Federal Trade Commission, Proposed Non-Compete Clause Rule,
88 Fed. Reg. 3,482 (Jan. 19, 2023) ......................................................................JA0166

Federal Trade Commission, Policy Statement Regarding the Scope of
Unfair Methods of Competition Under Section 5 of the Federal Trade
Commission Act, Comm'n File No. P221202 (Nov. 10, 2022).......................JA0231

Harlan M. Blake, Employee Agreements Not to Compete,
73 Harv. L. Rev. 625 (1960) ...............................................................................JA0247

Umit G. Gurun et al., Unlocking Clients: The Importance of Relationships
in the Financial Advisory Industry, 141 J. Fin. Econ. 1218 (2021) ..................JA0314

Johnson, Lavetti & Lipsitz, The Labor Market Effects of
Legal Restrictions on Worker Mobility (Nat'l Bureau of Econ. Rsch.,
Working Paper No. 31929, 2023) ........................................................................JA0340

John M. McAdams, Non-Compete Agreements:
A Review of the Literature (2019) ......................................................................JA0436

Thomas W. Merrill & Kathryn Tongue Watts, Agency Rules with the
Force of Law: The Original Convention,
116 Harv. L. Rev. 467 (2002) .............................................................................JA0460

Evan P. Starr et al., Noncompete Agreements in the U.S. Labor Force,
64 J.L. & Econ. 53 (2021) ....................................................................................JA0586

Kristina M. L. Acri et al. Comment Letter (Apr. 19, 2023)....................................JA0618

Anonymous Small Business Owner Comment Letter (April 19, 2023) ................JA0718

Advanced Medical Technology Association Comment Letter
(March 16, 2023) ...................................................................................................JA0721

Jonathan Barnett Comment Letter (May 2, 2023)...................................................JA0731

Business Roundtable Comment Letter (Apr. 17, 2023)..........................................JA0831

Coalition Comment Letter (Apr. 17, 2023) .............................................................JA0849

Robert I. Grossman Comment Letter (Mar. 20, 2023)............................................JA0858

Individual Commenter Comment Letter (Mar. 6, 2023) .........................................JA0867

International Center for Law & Economics Comment Letter
    (April 19, 2023) ................................................................................................JA0868

Managed Funds Association Comment Letter (April 19, 2023)..............................JA0951

National Association of Manufacturers Comment Letter (April 18, 2023) ..........JA0958

Retail Industry Leaders Association Comment Letter (April 19, 2023) ................JA0969

Ryan LLC Comment Letter (Apr. 19, 2023) ...........................................................JA0997

Small Business Majority Comment Letter (Apr. 19, 2023).....................................JA1052

Small Business Majority et al. Comment Letter (Apr. 19, 2023) ...........................JA1055

Stamford Health Comment Letter (Apr. 1, 2023) ..................................................JA1068

U.S. Chamber Comment Letter (Apr. 17, 2023) ....................................................JA1082

## CERTIFICATE OF SERVICE

On August 16, 2024, I electronically filed the above document with the clerk of court for the U.S. District Court, Northern District of Texas. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ Taisa M. Goodnature

Taisa M. Goodnature

**FEDERAL TRADE COMMISSION**

**16 CFR Parts 910 and 912**

**RIN 3084–AB74**

**Non-Compete Clause Rule**

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** Pursuant to the Federal Trade Commission Act ("FTC Act"), the Federal Trade Commission ("Commission") is issuing the Non-Compete Clause Rule ("the final rule"). The final rule provides that it is an unfair method of competition for persons to, among other things, enter into non-compete clauses ("non-competes") with workers on or after the final rule's effective date. With respect to existing non-competes—*i.e.,* non-competes entered into before the effective date—the final rule adopts a different approach for senior executives than for other workers. For senior executives, existing non-competes can remain in force, while existing non-competes with other workers are not enforceable after the effective date.

**DATES:** The final rule is effective September 4, 2024.

**FOR FURTHER INFORMATION CONTACT:** Benjamin Cady or Karuna Patel, Office of Policy Planning, 202–326–2939 (Cady), 202–326–2510 (Patel), Federal Trade Commission, 600 Pennsylvania Avenue NW, Mail Stop CC–6316, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Summary of the Final Rule's Provisions*

The Commission proposed the Non-Compete Clause Rule on January 19, 2023 pursuant to sections 5 and 6(g) of the FTC Act.[1] Based on the Commission's expertise and after careful review and consideration of the entire rulemaking record—including empirical research on how non-competes affect competition and over 26,000 public comments—the Commission adopts this final rule addressing non-competes.

The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for employers to, *inter alia,* enter into non-compete clauses with workers on or after the final rule's effective date.[2] The Commission thus adopts a comprehensive ban on new non-competes with all workers.

With respect to existing non-competes, *i.e.,* non-competes entered into before the final rule's effective date, the Commission adopts a different approach for senior executives[3] than for other workers. Existing non-competes with senior executives can remain in force; the final rule does not cover such agreements.[4] The final rule allows existing non-competes with senior executives to remain in force because this subset of workers is less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers subject to existing non-competes and because commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives. For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[5] Employers must provide such workers with existing non-competes notice that they are no longer enforceable.[6] To facilitate compliance and minimize burden, the final rule includes model language that satisfies this notice requirement.[7]

The final rule contains separate provisions defining unfair methods of competition for the two subcategories of workers. Specifically, the final rule provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; to enforce or attempt to enforce a non-compete clause; or to represent that the worker is subject to a non-compete clause.[8] The Commission describes the basis for its finding that these practices are unfair methods of competition in Parts IV.B.1 through IV.B.3.

The final rule provides that, with respect to a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; to enforce or attempt to enforce a non-compete clause entered into after the effective date; or to represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.[9] The Commission describes the basis for its finding that these practices are unfair methods of competition in Part IV.C.2.

The final rule defines "non-compete clause" as "a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from (1) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (2) operating a business in the United States after the conclusion of the employment that includes the term or condition." [10] The final rule further provides that, for purposes of the final rule, "term or condition of employment" includes, but is not limited to, a contractual term or workplace policy, whether written or oral.[11] The final rule further defines "employment" as "work for a person." [12]

The final rule defines "worker" as "a natural person who works or who previously worked, whether paid or unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person." [13] The definition further states that the term "worker" includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.[14]

The final rule does not apply to non-competes entered into by a person pursuant to a bona fide sale of a business entity.[15] In addition, the final rule does not apply where a cause of action related to a non-compete accrued prior to the effective date.[16] The final rule further provides that it is not an unfair method of competition to enforce or attempt to enforce a non-compete or to make representations about a non-compete where a person has a good-faith basis to believe that the final rule is inapplicable.[17]

The final rule does not limit or affect enforcement of State laws that restrict non-competes where the State laws do not conflict with the final rule, but it preempts State laws that conflict with the final rule.[18] Furthermore, the final

---

[1] Non-Compete Clause Rule, NPRM, 88 FR 3482 (Jan. 19, 2023) (hereinafter "NPRM").

[2] § 910.2(a)(1)(i) and § 910.2(a)(2)(i).

[3] *See* § 910.1 (defining "senior executive").

[4] *See* Part IV.C.3.

[5] § 910.2(a)(1)(ii).

[6] § 910.2(b)(1).

[7] § 910.2(b)(4).

[8] § 910.2(a)(1).

[9] § 910.2(a)(2).

[10] § 910.1.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] § 910.3(a).

[16] § 910.3(b).

[17] § 910.3(c); *see also* Part V.C.

[18] § 910.4.

JA0001

rule includes a severability clause clarifying the Commission's intent that, if a reviewing court were to hold any part of any provision or application of the final rule invalid or unenforceable—including, for example, an aspect of the terms or conditions defined as non-competes, one or more of the particular restrictions on non-competes, or the standards for or application to one or more category of workers—the remainder of the final rule shall remain in effect.[19] The final rule has an effective date of September 4, 2024.[20]

### B. Context for the Rulemaking

1. Growing Concerns Regarding the Harmful Effects of Non-Competes

The purpose of this rulemaking is to address conduct that harms fair competition. Concern about non-competes dates back centuries, and the evidence of harms has increased substantially in recent years. However, the existing case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets.

The ability of employers[21] to enforce non-competes has always been restricted, based on public policy concerns that courts have recognized for centuries. For example, in *Mitchel* v. *Reynolds* (1711), an English case that provided the foundation for American common law on non-competes,[22] the court noted that workers were vulnerable to exploitation through non-competes and that non-competes threatened a worker's ability to practice a trade and earn a living.[23] These concerns have persisted. Today, non-competes between employers and workers are generally subject to greater scrutiny under State common law than other employment terms "because they are often the product of unequal bargaining power and because the employee is likely to give scant

attention to the hardship he may later suffer through loss of his livelihood."[24] For these reasons, State courts often characterize non-competes as "disfavored."[25]

Furthermore, as "contract[s] . . . in restraint of trade,"[26] non-competes have always been subject to our nation's antitrust laws.[27] As early as 1911, in the formative antitrust case of *United States* v. *American Tobacco Co.*, the Supreme Court held that several tobacco companies violated both section 1 and section 2 of the Sherman Act because of the "constantly recurring" use of non-competes, among other practices.[28]

Concerns about non-competes have increased substantially in recent years in light of empirical research showing that they tend to harm competitive conditions in labor, product, and service markets. Changes in State laws governing non-competes[29] in recent decades have allowed researchers to better isolate the effects of non-competes, giving rise to a body of empirical research documenting these harms. This research has shown that the use of non-competes by employers tends to negatively affect competition in labor markets, suppressing earnings for workers across the labor force—including even workers not subject to non-competes.[30] This research has also shown that non-competes tend to negatively affect competition in product and service markets, suppressing new business formation and innovation.[31]

Alongside this large body of empirical work, news reports revealed that employers subject even middle-income and low-wage workers to non-competes

on a widespread basis.[32] Workers came forward to recount how—by blocking them from taking a better job or starting their own business, and subjecting them to threats and litigation from their employers—non-competes derailed their careers, destroyed their finances, and upended their lives.[33]

Yet despite the mounting empirical and qualitative evidence confirming these harms and the efforts of many States to ban them, non-competes remain prevalent in the U.S. economy. Based on the available evidence, the Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete.[34] The evidence also indicates that employers frequently use non-competes even when they are unenforceable under State law.[35] This suggests that employers may believe workers are unaware of their legal rights; that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights; or that workers are unable to enforce their rights through case-by-case litigation.[36] In addition, the ability of States to regulate non-competes effectively is constrained by employers' use of choice-of-law provisions, significant variation in how courts apply choice-of-law rules in disputes over non-competes, and the increasingly interstate nature of work. As the public comments attest, this patchwork of laws and legal uncertainty has become extremely burdensome for both employers and workers.[37]

As concern about the harmful effects of non-competes increased, the Commission began exploring the potential for Federal rulemaking on non-competes. In 2018 and 2019, the Commission held several hearings on twenty-first century competition and consumer protection issues, including "the use of non-competition agreements

---

[19] § 910.5.

[20] § 910.6.

[21] For ease of reference, the Commission uses the term "employer" in this Supplementary Information to refer to a person for whom a worker works. The text of part 910 does not use the term "employer."

[22] Harlan Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 629–31 (1960).

[23] The *Mitchel* court expressed concern that non-competes threaten "the loss of [the worker's] livelihood, and the subsistence of his family." *Mitchel* v. *Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711). The court likewise emphasized "the great abuses these voluntary restraints" are subject to—for example, "from masters, who are apt to give their apprentices much vexation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves." *Id.*

[24] Restatement (Second) of Contracts sec. 188, cmt. g (1981).

[25] *See, e.g., Navarre Chevrolet, Inc.* v. *Begnaud*, 205 So. 3d 973, 975 (La. Ct. App. 3d 2016); *Eastman Kodak Co.* v. *Carmosino*, 77 A.D.3d 1434, 1435 (N.Y. App. Div. 4th 2010); *Access Organics, Inc.* v. *Hernandez*, 175 P.3d 899, 904 (Mont. 2008); *Bybee* v. *Isaac*, 178 P.3d 616, 621 (Idaho 2008); *Softchoice, Inc.* v. *Schmidt*, 763 NW2d 660, 666 (Minn. Ct. App. 2009).

[26] 15 U.S.C. 1.

[27] *See, e.g., Newburger, Loeb & Co., Inc.* v. *Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[28] 221 U.S. 106, 181–83 (1911).

[29] NPRM at 3494 (describing recent legislative activity at the State level).

[30] *See* Parts IV.B.3.a and IV.C.2.c.ii.

[31] *See* Parts IV.B.3.b and IV.C.2.c.i.

[32] *See, e.g.*, Dave Jamieson, *Jimmy John's Makes Low-Wage Workers Sign 'Oppressive' Noncompete Agreements*, HuffPost, Oct. 13, 2014, *https://www.huffpost.com/entry/jimmy-johns-non-compete_n_5978180*; Spencer Woodman, *Exclusive: Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes*, The Verge, Mar. 26, 2015, *https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-exclusive-noncompete-contracts*.

[33] *See, e.g.*, Conor Dougherty, *How Noncompete Clauses Keep Workers Locked In*, N.Y. Times, May 13, 2017, *https://www.nytimes.com/2017/05/13/business/noncompete-clauses.html*; Lauren Weber, *The Noncompete Clause Gets a Closer Look*, Wall St. J., Jul. 21, 2021, *https://www.wsj.com/articles/the-noncompete-clause-gets-a-closer-look-11626872430*.

[34] *See* Part I.B.2. As described therein, this is likely a conservative estimate.

[35] *See* Part IV.B.2.b.i.

[36] *See id.*

[37] *See* Part IX.C.2.

and the conditions under which their use may be inconsistent with the antitrust laws.'' [38] In January 2020, the Commission held a public workshop on non-competes. The speakers and panelists who participated in the workshop—and the hundreds of public comments the Commission received in response to the workshop—addressed a wide range of issues, including statutory and judicial treatment of non-competes; the economic literature regarding the effects of non-competes; and whether the Commission should initiate a Federal rulemaking on non-competes. [39] The Commission also sought public comment on non-competes as part of an August 2021 solicitation for public comment on contract terms that may harm competition and a December 2021 public workshop on competition in labor markets. [40] The Commission has also addressed non-competes in connection with its merger review work. [41]

In 2021, the Commission initiated investigations into the use of non-competes. In 2023, the Commission secured final consent orders settling charges that certain firms engaged in an unfair method of competition in violation of section 5 because their use of non-competes tended to impede rivals' access to the restricted employees' labor, harming workers, consumers, and competitive conditions. [42]

The Commission also secured a final consent order settling charges that another firm violated section 5 by using non-competes with its employees. [43] The

Commission's complaint alleged the firm's imposition of non-competes took advantage of the unequal bargaining power between the firm and its employees, including low-wage security guard employees, and thus reduced workers' job mobility; limited competition for workers' services; and ultimately deprived workers of higher wages and more favorable working conditions. [44]

Based on the feedback obtained from years of extensive public outreach and fact-gathering, in January 2023, the Commission published a notice of proposed rulemaking (NPRM) concerning non-competes. [45] The proposed rule would have categorically banned employers from using non-competes with all workers and required rescission of all existing non-competes. [46]

In response to the NPRM, the Commission received over 26,000 public comments. [47] The comments reflected a diverse cross-section of the U.S. The Commission received comments from employers and from workers in a wide range of industries and from every State; [48] from small, medium, and large businesses; and from workers with wide-ranging income levels. [49] The Commission also received comments from representatives of different industries through trade and professional groups as well as from

academics and researchers. Federal, State, and local governmental representatives also submitted public comments.

Among these comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes. Among the public commenters were thousands of workers who described how non-competes prevented them from taking a better job or starting a competing business, as well as numerous small businesses who struggled to hire talented workers. Commenters stated that non-competes have suppressed their wages, harmed working conditions, negatively affected their quality of life, reduced the quality of the product or service their company provided, prevented their business from growing and thriving, and created a climate of fear that deters competitive activity. The following examples are illustrative of the comments the Commission received: [50]

• I currently work in sales for an asphalt company in Michigan. The company had me sign a two year non-compete agreement to not work for any other asphalt company within 50 miles if I decide to resign. After two years with the company I have been disheartened at how poorly customers are being treated and how often product quality is sub-par. I would love to start my own business because I see this as an opportunity to provide a better service at a lower cost. However, the non-compete agreement stands in the way even though there are no trade secrets and too many customers in this market. [51]

• [I] signed a non-compete clause for power-washing out of duress. My boss said that if I didn't sign before the end of the week, not to come in the next week. . . . I'd like to start my own business but I would have to find another job and wait 5 years. All I know is power-washing and these business owners all want me to sign a non-compete clause. It's one big circle of wealthy business owners keeping the little man down. Essentially, non-compete clauses limit an employee's opportunity to excel in whatever skill or trade they're familiar with. In the land of the free, we should be free to start a business not limited by greedy business owners. [52]

• In October 2020, I started working as a bartender at a company called [REDACTED] for $10 an hour. On my first day, I

[38] Hearings on Competition and Consumer Protection in the 21st Century, Notice, 83 FR 38307, 38309 (Aug. 6, 2018).

[39] FTC, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (Jan. 9, 2020), *https://www.ftc.gov/news-events/events/2020/01/non-competes-workplace-examining-antitrust-consumer-protection-issues.*

[40] FTC, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021), *https://www.regulations.gov/document/FTC-2021-0036-0022;* FTC, *Making Competition Work: Promoting Competition in Labor Markets* (Dec. 6–7, 2021), *https://www.regulations.gov/docket/FTC-2021-0057/comments.*

[41] *See* NPRM at 3498–99.

[42] FTC, Press Release, *FTC Approves Final Orders Requiring Two Glass Container Manufacturers to Drop Noncompete Restrictions That They Imposed on Workers* (Feb. 23, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-approves-final-orders-requiring-two-glass-container-manufacturers-drop-noncompete-restrictions;* FTC, Press Release, *FTC Approves Final Order Requiring Anchor Glass Container Corp. to Drop Noncompete Restrictions That It Imposed on Workers* (June 2, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-approves-final-order-requiring-anchor-glass-container-corp-drop-noncompete-restrictions-it.*

[43] FTC, Press Release, *FTC Approves Final Order Requiring Michigan-Based Security Companies to*

*Drop Noncompete Restrictions That They Imposed on Workers* (Mar. 8, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-approves-final-order-requiring-michigan-based-security-companies-drop-noncompete-restrictions.*

[44] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.* at 1 (Jan. 4, 2023).

[45] NPRM, *supra* note 1.

[46] *Id.* at 3482–83.

[47] The public comments are available online. *See Regulations.gov,* Non-Compete Clause Rule (NPRM), FTC–2023–0007, *https://www.regulations.gov/docket/FTC-2023-0007/comments.* The Commission cannot quantify the number of individuals or entities represented by the comments. The number of comments undercounts the number of individuals or entities represented by the comments because many comments, including comments from different types of organizations, jointly represent the opinions or interests of many.

[48] This reflects information provided by commenters. Commenters self-identify their State and are not required to include geographic information.

[49] Though most commenters identifying as workers did not provide information regarding their income or compensation levels, many provided information about their particular jobs or industries from which the Commission was able to infer a broad range of income levels based on occupational data from the Bureau of Labor Statistics (''BLS''). BLS wage data for each year can be found at Occupational Employment and Wage Statistics, *Tables Created by BLS, https://www.bls.gov/oes/tables.htm* (hereinafter ''BLS Occupational Employment and Wage Statistics''). The Commission used data from the May 2022 National XLS table, generally for private ownership.

[50] To be clear, the Commission does not rely on any particular individual comment submission for its findings, but rather provides here (and throughout this final rule) examples of comments that were illustrative of themes that spanned many comments. The Commission's findings are based on consideration of the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition.

[51] Individual commenter, FTC–2023–0007–2215. Comment excerpts have been cleaned up for grammar, spelling, and punctuation.

[52] Individual commenter, FTC–2023–0007–12689.

unknowingly signed a 2-year non-compete, slipped between other paperwork while my boss rushed me, and downplayed its importance. . . . At [REDACTED], I was sexually harassed and emotionally abused. I needed money, so I searched for a new job while remaining at [REDACTED] for one year. I was eventually offered a bartending job at a family-owned bar with better wages, conditions, and opportunities. Upon resigning, I was threatened with a non-compete I didn't know existed. Still, I couldn't take it anymore, so believing it was an unenforceable scare tactic, I took the new job, thinking our legal system wouldn't allow a massive company with over 20 locations to sue a young entry-level worker with no degree. In December 2021, I was sued for $30,000 in ''considerable and irreparable damages'' for violating the non-compete. . . .[53]

• I am a physician in a rural underserved area of Appalachia. . . . ''[N]on-compete'' clauses have become ubiquitous in the healthcare industry. With hospital systems merging, providers with aggressive non compete clauses must abandon the community that they serve if they chose to leave their employer. . . . Healthcare providers feel trapped in their current employment situation, leading to significant burnout that can shorten their career longevity. Many are forced to retire early or take a prolonged pause in their career when they have no other recourse to combat their employer.[54]

• I am a practicing physician who signed an employment contract containing a noncompete agreement in 2012, entering into this agreement with an organization that no longer exists. My original employer merged with, and was made subsidiary to, a new organization that is run under religious principles in conflict with my own. . . . I would have never signed such an agreement with my new employer, yet I am bound to this organization under threat of legal coercion. To be clear, the forced compromise of my religious principles does direct harm to me. My only recourse to this coercion is to give up medical practice anywhere covered by my current medical license, which is injurious to the patients in my care, and to myself.[55]

• I am the owner of a small-midsize freight brokerage, and non-competes of large brokerages have time and time again constrained talent from my business. Countless employees of [a] mega brokerage . . . have left and applied for our company and we must turn them away. These are skilled brokers that are serving the market and their clients well due to THEIR skillsets. . . . These non-competes affect not just me but the clients they work with as these skilled brokers are forced out of the entire logistics market for an entire year and possibly a lifetime when they pick up a new career in a different field because of these aggressive non-competes. . . .[56]

• I was laid off from my company in 2008 due to the economy, not to any fault of my own. However, when I was offered a job at another company, my former company threatened them and my offer was rescinded. I was unable to find gainful employment for months, despite opportunities in my field, and had to utilize unemployment when I otherwise would not have needed it. To find work, I ultimately had to switch fields, start part time somewhere, and just continue to work my way up. All of this because I was laid off to no fault of my own.[57]

• I was terminated by a large hospital organization suddenly with a thriving, full Pediatric practice. . . . My lawyer and I believe the non-compete does not apply in my circumstances and that the noncompete is overly broad, restrictive and harmful to the public (my patients). I started seeing my patients mostly gratuitously in their homes so they would not go without the care they wanted and needed . . . The judge awarded the order and I was told I cannot talk to patients on the phone, text patients, zoom visits or provide any pediatric care within my non-compete area. Patients are angry and panicked. I'm worried every day about my patients and how I can continue to care for them. . . . Patients have a right to choose and keep their doctor. The trust built between a patient and his doctor is crucial to keeping a patient healthy. It's not a relationship that can or should be replaced. . . . Patients should always come first and that is not happening.[58]

• When I first graduated veterinary school I signed a noncompete clause that was for 7 years. I tried to negotiate it to a more reasonable time period but the employer wouldn't budge. There weren't many job openings for new graduates at the time and I had student loans to pay back so I signed it. . . . I moved back home to a small town and took a job that required a 10-radial-mile, 2-year noncompete (this is currently considered ''reasonable/standard'' in my industry). Unfortunately since it's a rural area the 10 miles blocked me out of the locations of all other veterinary clinics in the county and I had to commute an hour each way to work in the next metropolitan area. This put a lot of stress on my family since I have young children. Some days I didn't even get to see them when they were awake.[59]

• I work for a large electronic health records company . . . that is known for hiring staff right out of college, myself included. I was impressed with their starting salary and well-advertised benefits, so I was quick to accept their offer. After accepting their offer, I was surprised to receive a contract outlining a strict non-compete agreement . . . I feel disappointed that this information was not made apparent to me prior to my acceptance of the position, and now I feel stuck in a job that I've quickly discovered is not a good long-term fit for me. I am certain that many other recent graduates often find themselves in a similar position— they accept shiny offers from a workplace, not knowing whether the company and position will be the right fit for them, and find themselves trapped by such contracts as mine.[60]

• Non competes are awful. I am being sued right now for going into business on my own in Boston, Massachusetts, by my former employer who says I signed a non-compete in 2003, 20 years ago. . . . I am fighting them in court. Hopefully I will prevail. . . . [The] corporation I worked for is a billion-dollar corporation. And they just keep trying scare tactics to make me back down. They went as far as trying to get a preliminary injunction ordered against me. And the judge refused but I still have to spend $1,000 an hour to defend myself.[61]

• I have been working in the field of multi-media in the DC/Baltimore region since the early 2000s. . . . I was 26 when I first became employed, and at that time a requirement was that I sign a non-compete agreement. . . . This means I can't be an entrepreneur- which kills any opportunities for me to grow something of my own- which could potentially provide jobs for others in the future. So what this non-compete does is basically enables businesses to be small monopolies. I could literally have a new lease on my career if non competes were abolished. As of now, when I think of working someplace else I have to consider changing careers altogether.[62]

• A former employer had me sign a non-compete when I started employment at an internship in college. It was a part-time position of 20 hours of work as an electrical engineer, while I finished university. After university, I worked for this employer another 4 years full time, but then found a better job in another state. It was not a competitor, but a customer of my former employer. My former employer waited till the day after my 4-week notice to tell me that I had signed a non-compete agreement and that it [barred] me from working for any competitor, customer or any potential customer up to 5 years after leaving the company with no geographic limitations. This was effectively the entire semi-conductor industry and put my entire career at risk.[63]

• Non-competes serve little more purpose than to codify and entrench inefficiencies. I have seen this firsthand in the context of a sophisticated management consulting environment where company owners provided ever less support in terms of contributing to projects or even to sales of new business while still feeling secure through agreements that substantially limited anyone from working in the relevant industry for two years on a global basis after leaving. . . . The reality is that there are innumerable retention mechanisms (such as good working conditions, compensation, culture, management, growth trajectory and/ or strategy) that can contribute to loyal employees without the need for non-competes.[64]

The Commission has undertaken careful review of the public comments

---

[53] Individual commenter, FTC–2023–0007–8852.

[54] Individual commenter, FTC–2023–0007–0026.

[55] Individual commenter, FTC–2023–0007–9671.

[56] Individual commenter, FTC–2023–0007–6142.

[57] Individual commenter, FTC–2023–0007–15497.

[58] Individual commenter, FTC–2023–0007–14956.

[59] Individual commenter, FTC–2023–0007–0922.

[60] Individual commenter, FTC–2023–0007–10729.

[61] Individual commenter, FTC–2023–0007–10871.

[62] Individual commenter, FTC–2023–0007–10968.

[63] Individual commenter, FTC–2023–0007–16347.

[64] Individual commenter, FTC–2023–0007–3963.

and the entirety of the rulemaking record. Based on this record and the Commission's experience and expertise in competition matters, the Commission issues this final rule pursuant to its authority under sections 5 and 6(g) of the FTC Act.

## 2. Prevalence of Non-Competes

Based on its own data analysis, studies published by economists, and the comment record, the Commission finds that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups, albeit with some differences in the magnitude of the prevalence based on industries and demographics. The Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete.[65]

As described in Part II.F, the inquiry as to whether conduct is an unfair method of competition under section 5 focuses on the nature and tendency of the conduct, not whether or to what degree the conduct caused actual harm.[66] Although a finding that non-competes are prevalent is not necessary to support the Commission's determination that the use of non-competes by employers is an unfair method of competition, the Commission finds that non-competes are prevalent and in widespread use throughout the economy, which is why researchers have observed such significant negative actual effects from non-competes on competitive conditions in labor markets and markets for products and services.[67]

A 2014 survey of workers finds that 18% of respondents work under a non-compete and 38% of respondents have worked under one at some point in their lives.[68] This study has the broadest and likely the most representative coverage of the U.S. labor force among the prevalence studies discussed here.[69] This study reports robust results contradicting the prior assumptions of some that non-competes were, in most cases, bespoke agreements with

sophisticated and highly-paid workers. It finds that, among workers without a bachelor's degree, 14% of respondents reported working under a non-compete at the time surveyed and 35% reported having worked under one at some point in their lives.[70] For workers earning less than $40,000 per year, 13% of respondents were working under a non-compete and 33% worked under one at some point in their lives.[71] Furthermore, this survey finds that 53% of workers covered by non-competes are hourly workers.[72] The survey suggests that a large share of workers subject to non-competes are relatively low-earning workers. In addition, a survey from the Federal Reserve Board of Governors found that 11.4% of workers have non-competes, including workers with relatively low earnings and low levels of education. The survey finds some degree of geographic heterogeneity, though it finds that large numbers of workers in all regions of the country have non-competes (including 7.0% of workers in States which broadly do not enforce non-competes).[73]

Furthermore, a survey of workers conducted in 2017 estimates that 24.2% of workers are subject to a non-compete.[74] This survey also finds that non-competes are often used together with other restrictive employment agreements, including non-disclosure agreements ("NDAs") and non-recruitment and non-solicitation agreements.[75] A methodological limitation of this survey is that it is a convenience sample of individuals who visited *Payscale.com* during the time period of the survey and is therefore unlikely to be fully representative of the U.S. working population. While weighting based on demographics helps, it does not fully mitigate this concern.

Additionally, a 2017 survey of business establishments with 50 or more employees estimates that 49% of such

establishments use non-competes for at least some of their employees, and 32% of such establishments use non-competes for all of their employees.[76]

Other estimates of non-compete use cover subsets of the U.S. labor force. One 2022 study is based on National Longitudinal Survey of Youth (NLSY) data.[77] The NLSY is an often-used labor survey conducted by the Bureau of Labor Statistics ("BLS") that consists of a nationally representative sample of 8,984 men and women born from 1980–84 and living in the U.S. at the time of the initial survey in 1997; it is a subset of the workforce by age of worker.[78] The 2022 study using NLSY data reports prevalence of non-competes to be 18%, in line with the number estimated based on the 2014 survey of workers directed solely at calculating the prevalence of non-competes.[79]

Non-competes are pervasive across occupations. For example, a survey of independent hair salon owners finds that 30% of hair stylists worked under a non-compete in 2015.[80] A survey of electrical and electronic engineers finds that 43% of respondents signed a non-compete.[81] A different study finds that 45% of physicians worked under a non-compete in 2007.[82] One study published in 2021 finds that 62% of CEOs worked under a non-compete between 1992 and 2014.[83] Another, published in 2023, supports that finding and reflects an upward trend in the use of non-competes among executives—specifically, the proportion of executives working under a non-compete rose from "57% in the early 1990s to 67% in the mid-2010s."[84] The 2014 survey reports industry-specific rates ranging from 9% in the Agriculture and Hunting category to 32% in the

---

[65] This is likely a conservative estimate. Surveys of workers likely underreport the share of workers subject to non-competes, since many workers may not know they are subject to a non-compete. *See, e.g.,* Alexander J.S. Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete Agreements,* Report (Dec. 10, 2019) at 3.

[66] *See infra* note 288 and accompanying text.

[67] *See* Parts IV.A through IV.C (describing this evidence).

[68] Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the US Labor Force,* 64 J. L. & Econ. 53, 53 (2021).

[69] The final survey sample of 11,505 responses represented individuals from nearly every demographic in the labor force. *Id.* at 58.

[70] *Id.* at 63.

[71] *Id.*

[72] Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements,* 68 Mgmt. Sci. 143, 144 (2022) (analyzing data from the Starr, Prescott, & Bishara survey).

[73] Tyler Boesch, Jacob Lockwood, Ryan Nunn, & Mike Zabek, *New Data on Non-Compete Contracts and What They Mean for Workers* (2023), *https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers.*

[74] Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (Jan. 18, 2024), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403.*

[75] *Id.* at 11 (reporting that if a worker has a non-compete, there is a 70%–75% chance that all three restrictive covenants are present).

[76] Colvin & Shierholz, *supra* note 65 at 1.

[77] Donna S. Rothstein & Evan Starr, *Noncompete Agreements, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997,* June 2022 Mthly. Lab. Rev. (2022).

[78] BLS, *NLSY97 Data Overview, https://www.bls.gov/nls/nlsy97.htm.*

[79] Rothstein & Starr, *supra* note 77 at 1.

[80] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?,* 57 J. Hum. Res. 689, 700 (2022).

[81] Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals,* 76 a.m. Socio. Rev. 695, 702 (2011). Calculated as 92.60% who signed a non-compete of the 46.80% who were asked to sign a non-compete.

[82] Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians,* 55 J. Hum. Res. 1025, 1042 (2020).

[83] Omesh Kini, Ryan Williams, & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation,* 34 Rev. Fin. Stud. 4701, 4707 (2021).

[84] Liyan Shi, *Optimal Regulation of Noncompete Contracts,* 91 Econometrica 425, 447 (2023).

Information category.[85] The Balasubramaian et al. survey reports industry-specific rates ranging from 12% in the Arts, Entertainment, and Recreation category to 30% in the Professional, Scientific, and Technical category.[86] The same survey also reports occupation-specific rates ranging from 8% in the Community and Social Services category to 32% in the Computer and Mathematical category.[87]

In addition, commenters presented survey data on the prevalence of non-competes in various occupations and industries. The Commission does not rely on these surveys to support its finding that non-competes are in widespread use throughout the economy. Because the Commission lacked access to a detailed description of the methodology for these surveys (unlike for the surveys described previously), the Commission cannot evaluate how credible their research designs are. However, they generally confirm the Commission's finding that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups.

For example, commenters reported that 33% of practitioners in the applied behavioral analysis field reported being subject to a non-compete,[88] along with 68% of cardiologists,[89] 42% of colorectal surgeons,[90] 72% of members of the American Association of Hip and Knee Surgeons,[91] and 31% of wireless telecommunications retail workers.[92] Other commenters cited a 2019 study finding that 29% of businesses where the average wage is below $13 per hour use non-competes for all their workers.[93]

Several trade organizations included information in their comments about the percentage of their members that use non-competes for at least some of their workers, based on surveys of their membership. For the National Association of Wholesaler-Distributors, this figure was 80%;[94] for the Independent Lubricant Manufacturing Association, 69%;[95] for the Michigan Chamber of Commerce, 73%;[96] for the Gas and Welding Distributors Association, 80%;[97] and for the National Association of Manufacturers, 70%.[98] One industry organization said its survey found that 57% of respondents require workers earning over $150,000 to sign non-competes.[99] A survey by the Authors Guild finds that 19.2% of respondents reported that non-competes prevented them from publishing a similar or competing book.[100] The HR Policy Association stated that 75% of respondents indicated they use non-competes for less than 10% of their workers, and nearly one third indicated they use non-competes for less than 1% of their workers.[101] The association stated that its survey covered 3 million workers and argued that its survey finding less usage of non-competes was more representative than studies cited in the

NPRM.[102] However, the commenter did not provide the data underlying its claims. The Retail Industry Leaders Association stated that a recent survey of its members indicated that, among members that use non-competes, the majority do so with less than 1% of their workforce and an additional quarter use non-competes with less than 10% of their workforce.[103] Additionally, a commenter referenced a survey of small business owners finding that 48% use non-competes for their own business.[104]

Several commenters misrepresented the Commission's finding related to prevalence as based on "a single study from 2021" (Starr, Prescott, and Bishara, 2021), which relied on survey data from 2014. The Commission's finding is not based on a single study. The NLSY study reaches similar conclusions about the prevalence of non-competes across the economy,[105] and the occupation-specific studies indicate that non-competes are pervasive in various occupations.[106] Furthermore, despite its methodological limitations, the data submitted by commenters generally comport with the estimates reported in the academic literature. One commenter stated the respondents to the Starr, Prescott, and Bishara survey were not necessarily representative of the population. The Commission believes that the weighting of the data sufficiently addresses this concern.

Another commenter argued that individuals may misunderstand contracts that they have signed, leading them to mistakenly believe they are bound by a non-compete. The Commission does not find this to be a plausible explanation for the high numbers of workers, businesses, and trade associations that report that non-competes are prevalent.

The Commission appreciates the additional estimates provided by commenters. The comments broadly corroborate the Commission's finding that non-competes are used across the workforce, with some heterogeneity in the magnitude of the prevalence. The

---

[85] Starr, Prescott, & Bishara, *supra* note 68 at 67.

[86] Balasubramanian et al., *supra* note 74 at 47.

[87] *Id.*

[88] Kristopher J. Brown, Stephen R. Flora, & Mary K. Brown, *Noncompete Clauses in Applied Behavior Analysis: A Prevalence and Practice Impact Survey*, 13 Behavioral Analysis Practice 924 (2020) (survey of 610 workers).

[89] Comment of Am. Coll. of Cardiology, FTC–2023–0007–18077, at 2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents or the time period.

[90] William C. Cirocco. *Restrictive Covenants in Physician Contracts: An American Society of Colon and Rectal Surgeons' Survey*, 54 Diseases of the Colon and Rectum 482 (2011). The survey examined 157 colorectal surgeons who had completed their residency in the prior decade.

[91] Comment of Am. Ass'n of Hip and Knee Surgeons, FTC–2023–0007–21076, at 4. The comment said the internal poll was conducted in early 2023, but the comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[92] Comm. Workers of Am. and Nat'l Employment L. Project, *Broken Network: Workers Expose Harms of Wireless Telecom Carriers' Outsourcing to 'Authorized Retailers'* (Feb. 2023), *https://cwa-union.org/sites/default/files/2023-02/20230206_BrokenNetwork.pdf*, at 12. The survey had 204 respondents.

[93] Colvin & Shierholz, *supra* note 65 at 13.

[94] Comment of Nat'l Assoc. of Wholesaler-Distribs., FTC–2023–0007–19347, at 2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[95] Comment of Indep. Lubricant Mfrs. Ass'n, FTC–2023–0007–19445, at 3. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[96] Calculated as 77%*95% (assuming that the 95% reported in their comment applies to the 77% who reported using restrictive covenants). Comment of Mich. Chamber of Com., FTC–2023–0007–20855. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[97] Comment of Gas and Welding Distribs. Ass'n, FTC–2023–0007–20934, at 2–3. The comment did not provide a citation to the survey or the underlying data. The comment said the survey took place after the NPRM was proposed and had 161 respondents.

[98] Comment of Nat'l Ass'n of Mfrs., FTC–2023–0007–20939, at 2 (citing Nat'l Ass'n of Mfrs., Noncompete Survey Data Report, *https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf*). The survey had 150 respondents.

[99] Comment of Soc. for Hum. Res. Mgmt., FTC–2023–0007–20903, at 5 n.2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[100] Comment of The Authors Guild, FTC–2023–0007–20854, at 7. The comment did not provide a citation to the survey or the underlying data, but said it had 630 respondents.

[101] Comment of HR Policy Ass'n, FTC–2023–0007–20998, at 8.

[102] *Id.*

[103] Comment of Retail Indus. Leaders Ass'n, FTC–2023–0007–20989, at 6. The comment did not provide a citation to the survey or the underlying data, including the number of respondents or the time period.

[104] Comment of Sm. Bus. Majority, FTC–2023–0007–21093 (citing Small Business Majority, Opinion Poll: Small Business Owners Support Banning Non-Compete Agreements (Apr. 13, 2013), *https://smallbusinessmajority.org/sites/default/files/research-reports/2023-non-compete-poll-report.pdf*).

[105] *See* Rothstein & Starr, *supra* note 77 and accompanying text.

[106] *See supra* notes 80–87 and accompanying text.

Commission finds that this heterogeneity is insufficient to warrant industry-specific exclusions from coverage under the final rule in part because employers' use of non-competes is prevalent across labor markets and for the reasons discussed in Part V.D regarding requests for exclusions.

## II. Legal Authority

### A. The History of the Commission and Section 5 of the FTC Act

The FTC Act was enacted in 1914.[107] Section 5 of that Act "declared" that "unfair methods of competition in commerce" are "unlawful," and it "empowered and directed" the Commission "to prevent" entities subject to its jurisdiction from "using" such methods.[108] Congress removed certain enumerated industries, activities, or entities—such as banks [109]—from the Commission's jurisdiction but otherwise envisioned a Commission whose purview would cover commerce across the national economy.

The term "'unfair methods of competition' . . . was an expression new in the law" when it first appeared in the FTC Act.[110] Congress purposely introduced this phrase to distinguish the Commission's authority from the definition of "unfair competition" at common law. Because the "meaning which the common law had given to ['unfair competition'] was . . . too narrow," Congress adopted "the broader and more flexible phrase 'unfair methods of competition.' " [111] Using this new phrase also made clear that Congress designed section 5 to extend beyond the reach of other antitrust laws—most notably, the Sherman Act—whose text did not include the term

"unfair methods of competition." [112] In particular, Congress wanted the Commission to apply a standard that would reach conduct not captured by other antitrust laws and the rule of reason, which courts applied when interpreting the Sherman Act, making it "impossible to predict with any certainty" whether courts would condemn the many "practices that seriously interfere with competition." [113] Allowing the Commission to prevent unfair methods of competition would also help the Commission achieve a core purpose of the Act: to stop "trade restraints in their incipiency" before they grew into violations of other antitrust laws.[114]

By design, the new phrase "unfair methods of competition" did "not 'admit of precise definition.' " [115] Congress intentionally gave the Commission flexibility to adapt to changing circumstances.[116] The Supreme Court has affirmed the more inclusive scope of section 5 on numerous occasions [117] and has affirmed the Commission's power under the Act to condemn coercive and otherwise unfair practices that have a tendency to stifle or impair competition.[118] Federal appellate courts have likewise consistently held that the Commission's authority under section 5 extends beyond "the letter" of other antitrust laws.[119]

Congress further expanded the Commission's jurisdiction over time. Congress extended the Commission's authority in 1938 by adding the further

prohibition on "unfair or deceptive acts or practices." [120] And in 1975, Congress amended the phrase "in commerce" in section 5 to "in or affecting commerce," a change that was "specifically designed to expand the Commission's jurisdiction . . . to make it coextensive with the constitutional power of Congress under the Commerce Clause." [121]

Congress gave careful thought to the structure of the FTC as an independent agency entrusted with this considerable responsibility. The Commission would consist of five members, no more than three of whom could be part of the same political party, who would serve for terms of seven years.[122] The Commission would draw on trained expert staff to develop the body of law regarding what constitutes unfair methods of competition (and, later, unfair and deceptive practices),[123] both through acting as "a quasi judicial body" [124] that determines whether conduct is an unfair method of competition in adjudications and through authority to promulgate legislative rules delineating conduct that constitutes an unfair method of competition. Recognizing that the Commission is an expert agency in making such determinations about anticompetitive conduct, courts reviewing Commission determinations as to what practices constitute an unfair method of competition have given the Commission's decisions "great weight." [125]

The FTC Act today reflects a careful balance from Congress. Congress has directed the Commission to proceed

---

[107] Federal Trade Commission Act of 1914, Public Law 63–203, 38 Stat. 717, 719 (hereinafter "FTC Act of 1914").

[108] FTC Act of 1914, 38 Stat. at 719. Section 5 is codified as amended at 15 U.S.C. 45. Congress later amended the term "in commerce" to "in or affecting commerce." The Supreme Court has explained that this amended phrase makes section 5 of the FTC Act "coextensive with the constitutional power of Congress under the Commerce Clause." *United States* v. *Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 n.6 (1975). For simplicity, this statement of basis and purpose often refers to "unfair methods of competition" without the commerce requirement, but the Commission acknowledges that it has power to prevent only such methods that are in or affect commerce as that term is defined in the Act. *See* 15 U.S.C.44.

[109] *See* 15 U.S.C. 45(a)(2).

[110] *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 532 (1935).

[111] *See FTC* v. *R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 310–11 (1934); *see also Schechter Poultry*, 295 U.S. at 532.

[112] *See E.I. du Pont de Nemours* v. *FTC (Ethyl)*, 729 F.2d 128, 136 (2d Cir. 1984) ("'Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled.").

[113] S. Rep. No. 62–1326, at 14 (1913) (hereinafter "Cummins Report"). After analyzing a series of Supreme Court decisions interpreting the Sherman Act—*e.g.*, *Standard Oil Co. of New Jersey* v. *United States*, 221 U.S. 1, 60 (1911)—the Senate committee feared that the rule of reason meant that "in each instance it [would be] for the court to determine whether the established restraint of trade is a due restraint or an undue restraint" and that this made it "imperative to enact additional legislation." Cummins Report at 11–12.

[114] *FTC* v. *Brown Shoe Co.*, 384 U.S. 316, 322 (1966); *see also FTC* v. *Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394–95 (1953).

[115] *R.F. Keppel & Bro.*, 291 U.S. at 312.

[116] *Id.* at 311 n.2.

[117] *See, e.g.*, *id.* at 311; *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 532 (1935); *Brown Shoe Co.*, 384 U.S. at 320–22.

[118] *FTC* v. *Texaco*, 393 U.S. 223, 225–26 (1968) (citing *Atl. Refin. Co.* v. *FTC*, 381 U.S. 357, 376 (1965)).

[119] *Spiegel, Inc.* v. *FTC*, 540 F.2d 287, 292 (7th Cir. 1976) (quoting *FTC* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)); *cf.*, *Chuck's Feed & Seed Co.* v. *Ralston Purina Co.*, 810 F.2d 1289, 1292–93 (4th Cir. 1987).

[120] Federal Trade Commission Act, Public Law 447, 75th Cong., 3d Sess. (March 21, 1938) c. 49; 52 Stat. 111 (1938).

[121] *United States* v. *Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 n.6 (1975). As noted, the Commission's authority does not reach certain enumerated industries or activities—a list that has also grown over time. *See* 15 U.S.C. 45(a)(2); *see also* Part II.E.1. Some of these industries are statutorily prohibited from engaging in unfair or deceptive practices or unfair methods of competition under different laws overseen by other agencies. *See, e.g.*, 49 U.S.C. 41712(a) (allowing the Secretary of Transportation to "decide whether an air carrier, foreign air carrier, or ticket agent" has engaged in such conduct).

[122] 15 U.S.C. 41.

[123] *Id.* (anticipating that the Commission would "build up a comprehensive body of information for the use and advantage of the Government and the business world"); *id.* at 11,092 ("[W]e want trained experts; we want precedents; we want a body of administrative law built up.").

[124] *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 533 (1935).

[125] *FTC* v. *Cement Inst.*, 333 U.S. 683, 720 (1948); *Atl. Ref. Co.* v. *FTC*, 381 U.S. 357, 368 (1965); *FTC* v. *Texaco*, 393 U.S. 223, 226 (1968); *Official Airline Guides, Inc.* v. *FTC*, 630 F.2d 920, 927 (2d. Cir. 1980) (quoting *Cement Inst.*, 333 U.S. at 720); *see also FTC* v. *Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 396 (1953); *FTC* v. *Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

against a broader range of anticompetitive conduct than other antitrust laws like the Sherman and Clayton Acts can reach. On the other hand, Congress has never established a private right of action under section 5,[126] nor has it authorized the Commission to recover civil penalties or other monetary relief from parties who engage in unfair methods of competition.[127] Instead, the Commission may either pursue an adjudication under section 5(b) or seek an injunction in Federal court under section 13(b) against a party that has engaged in an unfair method of competition.[128] As explained below, it may also promulgate rules prohibiting unfair methods of competition. The Commission cannot obtain civil penalties or other monetary relief against parties for using an unfair method of competition, although it can obtain civil penalties in court if a party is ordered to cease and desist from a violation and fails to do so.[129]

*B. The Commission's Authority To Promulgate the Rule*

Alongside section 5, Congress adopted section 6(g) of the Act, in which it authorized the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, which include the Act's prohibition of unfair methods of competition.[130] The plain text of section 5 and section 6(g), taken together, empower the Commission to promulgate rules for the purpose of preventing unfair methods of competition. That includes legislative rules defining certain conduct as an unfair method of competition.

The Commission has exercised its authority under section 6(g) to promulgate legislative rules on many occasions stretching back more than half a century. Between 1963 and 1978,[131]

the Commission relied on section 6(g) to promulgate the following rules: (1) a rule declaring it an unfair method of competition ("UMC") and an unfair or deceptive act or practice ("UDAP") to mislead consumers about the size of sleeping bags by representing that the "cut size" represents the finished size; [132] (2) a rule declaring it a UMC and UDAP to use the word "automatic" or similar words to describe household electric sewing machines; [133] (3) a rule declaring it a UMC and UDAP to misrepresent nonprismatic instruments as prismatic; [134] (4) a rule declaring it a UMC and UDAP to advertise or market dry cell batteries as "leakproof;" [135] (5) a rule declaring it a UMC and UDAP to misrepresent the "cut size" as the finished size of tablecloths and similar products; [136] (6) a rule declaring it a UMC and UDAP to misrepresent that belts are made of leather if they are made of other materials; [137] (7) a rule declaring it a UMC and UDAP to represent used lubricating oil as new; [138] (8) a rule declaring it a UDAP to fail to disclose certain health warnings in cigarette advertising and on cigarette packaging ("Cigarette Rule"); [139] (9) a rule declaring it a UMC and UDAP to fail to disclose certain features of light bulbs on packaging; [140] (10) a rule declaring it a UMC and UDAP to

misrepresent the actual size of the viewable picture area on a TV; [141] (11) a rule declaring a presumption of a violation of section 2(d) and (e) of the amended Clayton Act for certain advertising and promotional practices in the men's and boy's clothing industry; [142] (12) a rule declaring it a UMC and UDAP to fail to make certain disclosures about the handling of glass fiber products and contact with certain products containing glass fiber; [143] (13) a rule declaring it a UMC and UDAP to make certain misrepresentations about transistors in radios; [144] (14) a rule declaring it a UDAP to fail to disclose certain effects about inhaling certain aerosol sprays; [145] (15) a rule declaring it a UMC and UDAP to misrepresent the length or size of extension ladders; [146] (16) a rule declaring it a UDAP to make certain misrepresentations, or fail to disclose certain information, about games of chance; [147] (17) a rule declaring it a UMC and UDAP to mail unsolicited credit cards; [148] (18) a rule declaring it a UMC and UDAP to fail to disclose the minimum octane number on gasoline pumps ("Octane Rule"); [149] (19) a rule declaring it a UMC and UDAP to sell finished articles of clothing without a permanent tag or label disclosing care and maintenance

---

[126] *See, e.g., Holloway* v. *Bristol-Myers Corp.*, 485 F.2d 986, 988–89 (D.C. Cir. 1973); *Liu* v. *Amerco*, 677 F.3d 489, 492 (1st Cir. 2012).

[127] Congress has authorized the FTC to seek civil monetary remedies against parties who engage in unfair or deceptive acts or practices under some circumstances. *See* 15 U.S.C. 45(m); 15 U.S.C. 57b.

[128] *See* 15 U.S.C. 45(b); 15 U.S.C. 53(b).

[129] *See* 15 U.S.C. 45(l).

[130] 15 U.S.C. 46(g).

[131] As explained in more detail later in this Part, Congress added section 18 to the FTC Act in 1975, and that section provides the process the Commission must go through to promulgate rules defining unfair or deceptive acts or practices. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Public Law 93–637, 88 Stat. 2183 (Jan. 4, 1975) (hereinafter "Magnuson-Moss Act"); 15 U.S.C. 57a. Congress provided, however, that "[a]ny proposed rule under section 6(g) . . . with respect to which presentation of data, views, and arguments was substantially completed before" section 18 was enacted "may be

promulgated in the same manner and with the same validity as such rule could have been promulgated had" section 18 "not been enacted." 88 Stat. 2198; 15 U.S.C. 57a note. This list therefore includes a handful of rules promulgated under section 6(g) but after 1975 because those rules were substantially completed before section 18's enactment.

[132] Advertising and Labeling as to Size of Sleeping Bags, 28 FR 10900 (Oct. 11, 1963), *repealed by* 60 FR 65528 (Dec. 20, 1995).

[133] Misuse of "Automatic" or Terms of Similar Import as Descriptive of Household Electric Sewing Machines, 30 FR 8900 (Jul. 15, 1965), *repealed by* 55 FR 23900 (June 13, 1990).

[134] Deception as to Nonprismatic and Partially Prismatic Instruments Being Prismatic Binoculars, 29 FR 7316 (Jun. 5, 1964), *repealed by* 60 FR 65529 (Dec. 20, 1995).

[135] Deceptive Use of "Leakproof," "Guaranteed Leakproof," etc., as Descriptive of Dry Cell Batteries, 29 FR 6535 (May 20, 1964), *repealed by* 62 FR 61225 (Nov. 17, 1997).

[136] Deceptive Advertising and Labeling as to Size of Tablecloths and Related Products, 29 FR 11261 (Aug. 5, 1964), *repealed by* 60 FR 65530 (Dec. 20, 1995).

[137] Misbranding and Deception as to Leather Content of Waist Belts, 29 FR 8166 (Jun. 27, 1964), *repealed by* 61 FR 25560 (May 22, 1996).

[138] Deceptive Advertising and Labeling of Previously Used Lubricating Oil, 29 FR 11650 (Aug. 14, 1964), *repealed by* 61 FR 55095 (Oct. 24, 1996).

[139] Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 FR 8324 (July 2, 1964), *repealed by* 30 FR 9485 (July 29, 1965). As explained in more detail herein, Congress superseded this rule with legislation.

[140] Incandescent Lamp (Light Bulb) Industry, 35 FR 11784 (Jul. 23, 1970), *repealed by* 61 FR 33308 (Jun. 27, 1996).

[141] Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets, 31 FR 3342 (Mar. 3, 1966), *repealed by* 83 FR 50484 (Oct. 9, 2018).

[142] Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 32 FR 15584 (Nov. 9, 1967), *repealed by* 59 FR 8527 (Feb. 23, 1994).

[143] Failure to Disclose that Skin Irritation May Result from Washing or Handling Glass Fiber Curtains and Draperies and Glass Fiber Curtain and Drapery Fabrics, 32 FR 11023 (Jul. 28, 1967), *repealed by* 60 FR 65532 (Dec. 20, 1995).

[144] Deception as to Transistor Count of Radio Receiving Sets, Including Transceivers, 33 FR 8446 (Jun. 7, 1968), *repealed by* 55 FR 25090 (Jun. 20, 1990).

[145] Failure to Disclose the Lethal Effects of Inhaling Quick-Freeze Aerosol Spray Products Used for Frosting Cocktail Glasses, 34 FR 2417 (Feb. 20, 1969), *repealed by* 60 FR 66071 (Dec. 21, 1995).

[146] Deceptive Advertising and Labeling as to Length of Extension Ladders, 34 FR 929 (Jan. 22, 1969), *repealed by* 60 FR 65533 (Dec. 20, 1995).

[147] Games of Chance in the Food Retailing and Gasoline Industries, 34 FR 13302 (Aug. 16, 1969), *repealed by* 61 FR 68143 (Dec. 27, 1996).

[148] Unsolicited Mailing of Credit Cards, 35 FR 4614 (Mar. 17, 1970), *repealed by* 36 FR 45 (Jan. 5, 1971). This rule was rescinded in response to an amendment to the Truth in Lending Act that prohibited similar conduct. *See* Public Law 91–508, 84 Stat. 1126 (1970).

[149] Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 FR 23871 (Dec. 16, 1971), *repealed by* 43 FR 43022 (Sept. 22, 1978). This rule was superseded by the Petroleum Marketing Practices Act, Public Law 95–297, 92 Stat. 333 (June 19, 1978). A similar regulation was promulgated under that law at 16 CFR part 306.

instructions;[150] (20) a rule declaring a UMC and UDAP for a grocery store to offer products for sale at a stated price if those products will not be readily available to consumers ("Unavailability Rule");[151] (21) a rule declaring it a UMC and UDAP for a seller to fail to make certain disclosures in connection with a negative option plan ("Negative Options Rule");[152] (22) a rule declaring it a UDAP for door-to-door sellers to fail to furnish certain information to buyers;[153] (23) a rule declaring it a UMC and UDAP to fail to make certain disclosures about sound power amplification for home entertainment products;[154] (24) a rule declaring it a UDAP for sellers failing to include certain contract provisions preserving claims and defenses in consumer credit contracts ("Holder Rule");[155] (25) a rule declaring it a UMC and UDAP to solicit mail order merchandise from a buyer unless the seller can ship the merchandise within 30 days ("Mail Order Rule");[156] and (26) a rule declaring it a UDAP for a franchisor to fail to furnish a franchisee with certain information.[157]

Some of these rules attracted significant attention. For instance, the Commission began the rulemaking process to require warnings on cigarette packages just one week after the Surgeon General's "landmark report" that determined smoking is a health hazard,[158] and that rule was front-page news.[159] Following a lobbying campaign

by the tobacco industry,[160] Congress supplanted the Commission's regulation with the Cigarette Labeling and Advertising Act but did not disturb the Commission's rulemaking authority.[161] The Unavailability Rule was likewise front-page news upon its release in 1971, and Congress left it intact.[162]

In *National Petroleum Refiners Association* v. *FTC* ("*Petroleum Refiners*"), the D.C. Circuit expressly upheld the Octane Rule as a proper exercise of the Commission's power under section 6(g) to make rules regulating both unfair methods of competition and unfair or deceptive acts or practices.[163] After construing "the words of the statute creating the Commission and delineating its powers," the court held "that under the terms of its governing statute . . . and under Section 6(g) . . . the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent."[164] That interpretation was also "reinforced by the construction courts have given similar provisions in the authorizing statutes of other administrative agencies."[165] The Seventh Circuit later agreed with the D.C. Circuit's decision and "incorporate[d] [it] by reference" when rejecting a challenge to the Mail Order Rule.[166]

Following such rulemakings and the D.C. Circuit's confirmation of the Commission's rulemaking power in *Petroleum Refiners*, Congress in 1975 enacted a new section 18 of the FTC

Act. This new section introduced special procedures, beyond those required under the Administrative Procedure Act, for promulgating rules for unfair or deceptive acts or practices, and it eliminated the Commission's authority to issue such rules under section 6(g).[167] But Congress pointedly chose not to restrict the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g). That choice was deliberate. While considering this legislation, Congress knew that the Commission had promulgated rules regulating unfair methods of competition and that the D.C. Circuit in *Petroleum Refiners* had confirmed the Commission's authority to do so.[168] And Congress expressly considered—but rejected—an amendment to the FTC Act under which "[t]he FTC would have been prohibited from prescribing rules with respect to unfair competitive practices."[169]

Instead, the enacted section 18 confirmed the Commission's authority to make rules under section 6(g). The law expressly preserved "any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce."[170] Congress also made clear that Section 18 "shall not affect the validity of any rule which was promulgated under section 6(g)."[171] And it provided that "[a]ny proposed rule under section 6(g)" with certain components that were "substantially completed before" section 18's enactment "may be promulgated in the same manner and with the same validity as such rule could have been promulgated had this section not been enacted."[172] Among the substantially completed rules at the time was the Mail Order Rule, which proposed to define—and upon promulgation did define—certain conduct as both an unfair method of competition and an unfair or deceptive act or practice.[173] The 1975 legislation thus expressly permitted the Commission to promulgate a rule under section 6(g) that defined an unfair method of competition and evinces Congress's

---

[150] Care Labeling of Textile Wearing Apparel, 36 FR 23883 (Dec. 16, 1971).

[151] Retail Food Store Advertising and Marketing Practices, 36 FR 8777 (May 13, 1971).

[152] Use of Negative Option Plans by Sellers in Commerce, 38 FR 4896 (Feb. 22, 1973).

[153] Cooling-off Period for Door-to-Door Sales, 37 FR 22934 (Oct. 26, 1972).

[154] Power Output Claims for Amplifiers Used in Home Entertainment Products, 39 FR 15387 (May 3, 1974).

[155] Preservation of Consumers' Claims and Defenses, 40 FR 53506 (Nov. 18, 1975).

[156] Mail Order Merchandise, 40 FR 49492 (Oct. 22, 1975) (regulatory text), 40 FR 51582 (Nov. 5, 1975) (statement of basis and purpose). The Mail Order Rule has since been updated to become the Mail, internet, or Telephone Order Merchandise Rule, or MITOR. *See* 79 FR 55619 (Sept. 17, 2014). The updates to the rule were based on the Commission's authority to regulate unfair or deceptive acts or practices.

[157] Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 FR 59614 (Dec. 21, 1978).

[158] Teresa Moran Schwartz & Alice Saker Hrdy, *FTC Rulemaking: Three Bold Initiatives and Their Legal Impact*, 2–3 (Sept. 22, 2004).

[159] *U.S. to Require Health Warning for Cigarettes*, N.Y. Times (June 25, 1964) at 1, 15 (tobacco industry indicating plans to immediately challenge the Commission's authority to issue the regulation), *https://www.nytimes.com/1964/06/25/archives/us-to-require-health-warning-for-cigarettes-trade-commission-orders.html*.

[160] Tobacco Inst., *Tobacco—A Vital U.S. Industry* (1965), *https://acsc.lib.udel.edu/exhibits/show/legislation/cigarette-labeling*.

[161] Public Law 89–92, 79 Stat. 282 (July 27, 1965); *see* 15 U.S.C. 1331 *et seq.*

[162] *FTC Bars Grocery Ads for Unavailable Specials*, N.Y. Times (May 13, 1971) at 1, *https://www.nytimes.com/1971/05/13/archives/f-t-c-bars-grocery-ads-for-unavailable-specials-bars-grocery*; 16 CFR 424.1 and 424.2. The rule was amended after its enactment in 1971 to add an exception and defenses but otherwise remains intact as promulgated. Amendment to Trade Regulation Rule Concerning Retail Food Store Advertising and Marketing Practices, 54 FR 35456–08 (Aug. 28, 1989); *see also* Retail Food Store Advertising and Marketing Practices Rule, 79 FR 70053–01 (Nov. 25, 2014).

[163] *Nat'l Petroleum Refiners Ass'n* v. *FTC*, 482 F.2d 672 (D.C. Cir. 1973).

[164] *Nat'l Petroleum Refiners*, 482 F.2d at 674, 698; *see also Am. Fin. Servs. Ass'n* v. *FTC*, 767 F.2d 957, 967 (D.C. Cir. 1985) (concluding, after extensive review of the legislative history related to the FTC's rulemaking authority originating in 1914 and extending through amendments to the FTC Act in 1980, that "Congress has not at any time withdrawn the broad discretionary authority originally granted the Commission in 1914 to define unfair practices on a flexible, incremental basis.").

[165] *Nat'l Petroleum Refiners*, 482 F.2d at 678.

[166] *United States* v. *JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).

[167] Magnuson-Moss Act, 88 Stat. 2183; *see* 15 U.S.C. 57a.

[168] S. Rep. No. 93–151, at 32 (1973).

[169] H.R. Conf. Rep. No. 93–1606, at 30 (1974).

[170] 15 U.S.C. 57a(a)(2).

[171] Magnuson-Moss Act, 88 Stat. 2183.

[172] Magnuson-Moss Act, 88 Stat. 2183.

[173] *See* Undelivered Mail Order Merchandise and Services, 36 FR 19092 (Sept. 28, 1971) (initial NPRM); 39 FR 9201 (Mar. 8, 1974) (amended NPRM); 40 FR 49492 (Oct. 22, 1975) (final regulatory text).

intent to leave in place the Commission's authority to promulgate such rules under section 6(g). As the Seventh Circuit later put it, "Congress . . . considered the controversy surrounding the Commission's substantive rulemaking power under Section 6(g) to have been settled by the *Octane Rating* case." [174]

Congress again confirmed the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g) when it enacted section 22 of the FTC Act as part of the Federal Trade Commission Improvements Act of 1980.[175] Section 22 imposes certain procedural requirements the Commission must follow when it promulgates any "rule." Section 22(a) defines "rule" as "any rule promulgated by the Commission under section 6 or section 18" while *excluding* from that definition "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." [176] Thus, by its terms, section 22(a) demonstrates the 1980 Congress's understanding that the Commission maintained authority to promulgate rules under section 6 that are not merely "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." [177] Section 22 envisions rules that will have the force of law as legislative rules and defines "rule" based on whether it may "have an annual effect on the national economy of $100,000,000 or more," "cause a substantial change in the cost or price of goods or services," or "have a significant impact upon" persons and consumers.[178] Section 22(b) of the Act similarly contemplates authority to make legislative rules by imposing regulatory analysis obligations on any rules that the Commission promulgates under section 6.[179] The specific obligations in section 22(b), such as the requirement for the Commission to conduct a cost-benefit analysis, assume that section 6(g) authorizes substantive and economically significant rules.

Both the 1975 and 1980 amendments to the FTC Act thus indicate that Congress understood the Commission possessed rulemaking power under section 6(g) and chose to leave that

authority in place.[180] As the Supreme Court has observed, "[t]he long time failure of Congress to alter" a statutory provision, like section 6(g) here, "after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one." [181] That is especially true when, as here, "the matter has been fully brought to the attention of the public and the Congress, the latter has not seen fit to change the statute." [182] Were there any doubt that the 1914 Congress granted the Commission the authority to make rules under section 6(g) to prevent unfair methods of competition, the Congresses of 1975 and 1980 eliminated such doubt by ratifying the D.C. Circuit's decision holding that the Commission has such authority.

### C. Comments and Responses Regarding the Commission's Legal Authority

The Commission received many comments supporting, discussing, or questioning its authority to promulgate the final rule. Numerous commenters supported that the Commission has such authority, including, among others, legal scholars and businesses.[183] In addition, hundreds of small businesses—hailing from 45 States and the District of Columbia—joined a comment by the Small Business Majority supporting the final rule.[184]

Commenters questioning the Commission's authority typically advanced one of three arguments. First, some commenters claimed the FTC Act does not grant the Commission authority to promulgate the rule. Second, some commenters contended that the validity of non-competes is a major question that Congress has not given the Commission the authority to address. And third, some commenters argued that Congress had impermissibly delegated to the Commission authority to promulgate nationwide rules governing methods of competition. A smaller number of comments asserted other, miscellaneous reasons the Commission allegedly lacked authority

to promulgate the rule. The Commission has considered these comments and disagrees for the reasons explained below.

### 1. The Commission's Authority Under the FTC Act

The Commission received numerous comments claiming that it lacks authority under the FTC Act to promulgate rules prohibiting unfair methods of competition. The Commission disagrees. Congress expressly granted the Commission authority to promulgate such rules in the original FTC Act of 1914, Congress enacted legislation in 1975 expressly preserving that authority,[185] and it imposed requirements in 1980 that presumed that authority.

The Commission is not persuaded by commenters' arguments in opposition to its authority. For instance, some commenters argued that Congress's choice to exclude certain industries from the Commission's jurisdiction indicates that Congress did not intend to give the Commission the power to pass rules that affect commerce across the national economy.[186] But Congress expressly "empowered and directed" the Commission to prevent unfair methods of competition throughout the economy,[187] in any activities "in or affecting commerce," subject only to limited exceptions. The final rule will apply only to the extent that the Commission has jurisdiction under the FTC Act. The Act does not limit the Commission's authority to pursue, for example, industry-specific rulemaking. Where Congress wished to limit the scope of the Commission's authority over particular entities or activities, it did so expressly, demonstrating its intent to give the Commission broad enforcement authority over activities in or affecting commerce outside the scope of the enumerated exceptions.[188] That section 22 of the FTC Act requires the Commission to perform a regulatory analysis for amendments to rules based on, *inter alia*, "their annual effect on the

---

[174] *United States* v. *JS & A Grp.,* 716 F.2d 451, 454 (7th Cir. 1983).

[175] Public Law 96–252, 94 Stat. 374 (1980).

[176] *Id.; see* 15 U.S.C. 57b–3(a)(1).

[177] 15 U.S.C. 57b–3(a)(1).

[178] *Id.*

[179] 15 U.S.C. 57b–3(b).

[180] Congress has also amended section 6 since the D.C. Circuit decided *Petroleum Refiners,* but it left section 6(g) untouched. *See* Public Law 109–455, 120 Stat. 3372 (2006).

[181] *Apex Hosiery Co.* v. *Leader,* 310 U.S. 469, 488 (1940).

[182] *Id.* at 489.

[183] *See, e.g.,* Comment of Lev Menand et al., FTC–2023–0007–20871; Comment of Peter Shane et al., FTC–2023–0007–21024; Comment of Yelp, FTC–2023–0007–20974; Comment of Veeva Systems, FTC–2023–0007–18078.

[184] Comment of Sm. Bus. Majority, FTC–2023–0007–21022.

[185] Some commenters argued that the 1975 Magnuson-Moss Act, which created additional procedures the Commission must use to promulgate rules regulating unfair or deceptive acts or practices, implies that the Commission entirely lacks authority to promulgate rules regulating unfair methods of competition. The Commission disagrees with these comments and notes the effect of the 1975 legislation, which preserved the Commission's existing rulemaking authority.

[186] *E.g.,* Comment of Fed'n of Am. Hosps., FTC–2023–0007–21034.

[187] 15 U.S.C. 45(a)(2).

[188] 15 U.S.C. 45(a)(2), (3).

national economy'' confirms the same.[189]

Other commenters argued that the Commission is relying on vague or ancillary provisions for its authority and invoked the familiar refrain that Congress ''does not . . . hide elephants in mouseholes.'' [190] None of the provisions on which the Commission is relying are either vague or ancillary. As explained earlier, preventing unfair methods of competition is at the core of the Commission's mandate, the plain text of the Act gives the Commission rulemaking authority to carry out that mandate, and the Commission has exercised this rulemaking authority before.[191] The D.C. Circuit and Seventh Circuits have upheld that exercise of authority, and Congress preserved this authority in subsequent amendments to the Act following the D.C. Circuit's decision.[192]

Additional commenters cited select legislative history from the 1914 FTC Act to suggest the Commission lacks authority to promulgate rules regulating competition.[193] ''[T]here is no reason to resort to legislative history'' when, as here, the text of the statute speaks plainly.[194] Even if that were not the case, however, the legislative history does not unambiguously compel a different conclusion. Faced with similar arguments to those raised by commenters here, in *National Petroleum Refiners,* the D.C. Circuit conducted an exhaustive review of the 1914 FTC Act and concluded ''the legislative history of section 5 and Section 6(g) is ambiguous'' and ''certainly does not compel the conclusion that the Commission was not meant to exercise the power to make substantive rules with binding effect[.]'' [195] As the D.C. Circuit explained, even individual statements by some Congresspeople that might suggest otherwise,[196] when properly contextualized, ''can be read to

support substantive rule-making of the kind asserted by the'' Commission.[197]

Statements from the enactment of the 1975 Magnuson Moss Act, which added section 18 to the FTC Act, confirm the Commission's authority to promulgate rules under section 6(g). That legislative history reveals Congress in 1975 made a considered decision to reject an effort to overturn the D.C. Circuit's interpretation of the FTC Act and instead confirmed that section 6(g) authorizes the Commission to promulgate legislative rules concerning unfair methods of competition.[198] More importantly, these sorts of individual statements cannot trump the plain text of the Act that Congress passed,[199] which gave the Commission the authority ''to make rules and regulations for the purpose of carrying out the provisions'' of the FTC Act. Indeed, even if the legislative history were to be selectively read to cut against the Commission's authority, the Commission would still conclude that section 6(g) confers authority to promulgate this final rule because the plain text of the statute (including both the original 1914 Act and subsequent enacted amendments to the FTC Act) unambiguously confers that authority.

In short, neither the legislative history of the FTC Act, nor any of the other arguments commenters raised about the Commission's rulemaking authority overcome the plain meaning of the Act or Congress's ratification of the Commission's power to make rules

preventing unfair methods of competition, as discussed in Part II.B.[200]

The Commission acknowledges that individual members of the Commission have, at times, disclaimed the Commission's authority to promulgate rules regulating unfair methods of competition.[201] The statement of an individual Commissioner does not reflect the views of or bind ''[t]he Commission itself,'' which has concluded—just as it did when it issued such rules in the past—that it does possess such authority.[202] In any event, the Commission has reviewed these statements, along with the many comments it received, and does not believe any of the arguments raised in support of that position overcome the plain meaning of the FTC Act provisions.

### 2. Major Questions Doctrine

Many commenters assert that the Commission lacks the authority to adopt the final rule based on the major questions doctrine. That doctrine, as the Supreme Court recently explained in *West Virginia* v. *EPA,* ''teaches that there are extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority.'' [203] In such cases, ''something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims.'' [204] Having considered the factors that the Supreme Court has used to identify major questions, the Commission concludes that the final rule does not implicate the major questions doctrine. And even if that doctrine did apply, the Commission concludes that Congress provided clear authorization for the Commission to promulgate this rule.[205]

---

[189] 15 U.S.C. 57b–3 (outlining requirements of the Commission's rulemaking process for new rules and amendments); *see also* Part II.E (discussing the Commission's jurisdiction).

[190] *Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001); *see, e.g.,* Comment of La. And 12 Other States, FTC–2023–0007–21094.

[191] *See* Part II.B (discussing the Commission's history of using section 6(g) to promulgate rules).

[192] *Id.*

[193] *E.g.,* Comment of Nat'l Ass'n of Mfrs., FTC–2023–0007–20939; Comment of La. And 12 Other States, FTC–2023–0007–21094.

[194] *United States* v. *Gonzales,* 520 U.S. 1, 6 (1997).

[195] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672, 686 (D.C. Cir. 1973).

[196] *Id.* at 704; *see also, e.g.,* Comment from La. and 12 Other States, FTC–2023–0007–21094 (identifying statements and failed bills that, the commenters say, show the Commission was not intended to possess rulemaking authority).

[197] *Nat'l Petroleum Refiners,* 482 F.2d at 709.

[198] For example, while the Senate was considering amendments to the FTC Act, Senator Hart read excerpts of *Nat'l Petroleum Refiners* into the record. *See* 120 Cong. Rec. 40712 (Dec. 18, 1974). These short excerpts included the court acknowledging that it was considering whether the Commission ''is empowered to promulgate substantive rules'' that would ''give greater specificity and clarity to the broad standard of illegality—'unfair methods of competition'. . .— which the agency is empowered to prevent.'' *Id.* (quoting *Nat'l Petroleum Refiners,* 482 F.2d at 673). Senator Hart then explained that the ''procedural requirements . . . respecting FTC rulemaking'' in the bill under consideration ''are limited to unfair or deceptive acts or practices rules.'' *Id.* ''These provisions and limitations,'' he explained, ''are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition.'' *Id.* ''Rules respecting unfair methods of competition,'' Senator Hart said, ''should continue to be prescribed in accordance with'' the APA. *Id.; see also* Comment of Lev Menand et al., FTC–2023–0007–20871 at 3–6 (recounting legislative history that preceded the 1975 amendments to the FTC Act).

[199] *See Barnhart* v. *Sigmon Coal Co.,* 534 U.S. 438, 457 (2002) (''Floor statements from two Senators [who were sponsors of the bill] cannot amend the clear and unambiguous language of a statute.'').

[200] This includes arguments about the legislative intent, structure, or post-enactment history of the 1914 FTC Act.

[201] *See, e.g., Nat'l Petroleum Refiners,* 482 F.2d at 695–96 & n. 32, 38–39; NPRM at 3544 (dissenting statement of Commissioner Wilson).

[202] *Nat'l Petroleum Refiners,* 482 F.2d at 694; *see also* 16 CFR 4.14(c) (''Commission action'' requires ''the affirmative concurrence of a majority of the participating Commissioners'').

[203] *W. Va.* v. *EPA,* 597 U.S. 697, 721 (2022) (cleaned up).

[204] *Id.* at 723 (cleaned up).

[205] The Commission notes that some commenters either implicitly or explicitly focused on the Commission's rulemaking authority, as opposed to the Commission's authority to define non-competes as an unfair method of competition, as a major question. The Commission has already addressed

The agency authority underlying this final rule rests on firm historical footing. There is nothing novel about the Commission's assertion of authority to promulgate legislative rules under section 6(g).[206] As explained in Part II.B, the Commission has used this authority for more than 60 years to promulgate many rules defining unfair methods of competition and/or unfair or deceptive acts or practices.[207] The Commission's use of this power sometimes garnered significant attention, such as when it made national news by requiring cigarette warnings in the immediate wake of the Surgeon General's groundbreaking report on the health effects of smoking.[208] And the Commission's rulemaking authority was long ago "addressed"—and affirmed— "by a court."[209] Moreover, after that high-profile rulemaking and judicial affirmation, Congress considered—and twice reaffirmed—the Commission's authority to issue legislative rules defining unfair methods of competition under section 6(g).[210] Indeed, even when Congress decided to displace the FTC's Cigarette Rule with legislation, it left the Commission's rulemaking authority in place.[211] Likewise, when Congress added procedural steps the Commission must take when promulgating rules concerning unfair or deceptive acts or practices, it expressly allowed the Commission to complete certain ongoing rulemakings, including one that relied on section 6(g) to define an unfair method of competition.[212] This is not a situation where Congress "conspicuously and repeatedly" declined to grant the agency the claimed power.[213]

Nor does the substance of the rule represent any departure from the Commission's past practices. Since its establishment in 1914, the Commission has had the authority to determine whether given practices constitute unfair methods of competition. Rather than trying to define all the many and varied practices that are unfair, Congress empowered the Commission to respond to changing market conditions and to bring specialized expertise to bear when making unfairness determinations.[214] As noted in Part I.B, the Commission has previously secured consent orders premised on the use of non-competes being an unfair method of competition,[215] and there is little question that the Commission has the authority to determine that non-competes are unfair methods of competition through adjudication.[216] Indeed, one commenter who asserted the rule would violate the major questions doctrine expressly agreed that the Commission could determine that a specific non-compete is an unfair method of competition through case-by-case adjudication.[217] The Commission is making the same kind of determination here through rulemaking rather than adjudication.[218] And because the rulemaking process allows all interested parties a chance to weigh in, this process "may actually be fairer to parties than total reliance on case-by-case adjudication."[219] This is thus not a situation where the agency's action would fundamentally change the nature of the regulatory scheme. Determining whether a practice is an "unfair method of competition" under section 5 has been a core task of the Commission for more than a century—and, indeed, goes to the heart of its mandate.

Additionally, non-competes have already been the subject of FTC scrutiny and enforcement actions, so subjecting them to rulemaking is a more incremental—and thus less significant— step than it would be for an agency to wade into an area not currently subject to its enforcement authority. And the present rulemaking is consistent with both Congress's intent for the Commission and the Commission's prior practice. Congress "empowered and directed" the Commission "to prevent persons, partnerships, or corporations" within the Commission's jurisdiction "from using unfair methods of competition in or affecting commerce."[220] Following that directive, the Commission has previously used its section 6(g) authority to promulgate rules that reach industries across the economy. For example, the Mail Order Rule placed restrictions on any sale conducted by mail,[221] and the Negative Option Rule requires certain disclosures for some negative option plans. These rules—promulgated nearly 50 or more years ago—applied across the industries within the FTC's jurisdiction, yet no court has held that they exceeded the Commission's authority.[222] Indeed, the Seventh Circuit upheld the Mail Order Rule as a valid exercise of that authority.[223]

Congress itself recognized that the Commission's authority will sometimes affect firms across the economy. Indeed, addressing unfair methods of competition and unfair and deceptive practices across industries (other than the industries, activities, or entities Congress expressly exempted) is the core of the Commission's mandate—and the Commission has long pursued that mandate through both rulemaking[224] and adjudication.[225] Congress imposed

---

the source of its rulemaking authority, *see* Part II.B. But to be clear, the Commission concludes that neither its rulemaking authority under section 6(g) nor its authority to use that power to define non-competes as an unfair method of competition implicates the major questions doctrine, and that even assuming either did, Congress has provided express statutory authority for both.

[206] *W. Va.* v. *EPA,* 597 U.S. at 725.

[207] *See* Part II.B (discussing the Commission's history of promulgating rules under section 6(g)).

[208] *See* Part II.B (discussing Cigarette Rule and Holder Rule); *see also* "U.S. to Require Health Warning for Cigarettes," N.Y. Times (June 25, 1964) at 1, 15 (historic industry indicating plans to immediately challenge the Commission's authority to issue the regulation).

[209] *W. Va.* v. *EPA,* 597 U.S. at 725; *see* Part II.B (discussing decisions from the D.C. Circuit and Seventh Circuit affirming the Commission's rulemaking power under section 6(g)).

[210] *See* Part II.B (discussing the history and content of sections 18 and 22 of the FTC Act).

[211] *See* Federal Cigarette Labeling and Advertising Act, Public Law 89–92, 79 Stat. 282 (July 27, 1965).

[212] 15 U.S.C. 57a(a)(2); *see* Part II.B (discussing the Mail Order Rule).

[213] *W. Va.* v. *EPA,* 597 U.S. at 724.

[214] *See, e.g., FTC* v. *R.F. Keppel & Bro.,* 291 U.S. 304, 311 n.2, 314 (1934).

[215] In those orders, the party agreed, *inter alia,* to cease and desist from enforcing or attempting to enforce existing non-competes and from entering into or attempting to enter into new ones, and also agreed to provide notice to affected employees that they are no longer subject to a non-compete. *See* Part I.B n.42–44 (citing recent Commission investigations and consent orders involving non-competes).

[216] To the extent that any commenters argued the Commission lacked authority over the entire subject matter of non-compete agreements, the Commission did not see any compelling explanation that an agreement not to compete falls outside the meaning of a "method of competition."

[217] Comment of Int'l Ctr. For L. & Econs., FTC–2023–0007–20753, at 75–76.

[218] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672 at 685 (D.C. Cir. 1973) (recognizing that the Commission may "choose[ ]to elaborate" section 5's "comprehensive statutory standards through rule-making or through case-by-case adjudication").

[219] *Id.* at 681; *see generally* Part IX.C.2 (discussing the value of rulemaking).

[220] 15 U.S.C. 45(a)(2).

[221] *Mail Order Merchandise,* 40 FR 49492 (Oct. 22, 1975); *see* 16 CFR part 435.

[222] *See* Part II.B (listing rules promulgated by the FTC exercising authority under sections 5 and 6(g)).

[223] *United States* v. *JS & A Grp.,* 716 F.2d 451, 454 (7th Cir. 1983).

[224] *See* Part II.B.

[225] The Commission's adjudicatory power, like its rulemaking power, stretches across the national economy. For instance, the Commission has found companies in a variety of industries participated in price-fixing conspiracies that violated section 5 and ordered them to cease and desist from such practices following an adjudication. *See, e.g., Eugene Dietzgen Co.* v. *FTC,* 142 F.2d 321 (7th Cir. 1944) (scientific instruments); *U.S. Maltsters Ass'n* v. *FTC,* 152 F.2d 161 (7th Cir. 1945) (malt manufacturers); *Keasbey & Mattison Co.* v. *FTC,* 159 F.2d 940 (6th Cir. 1947) (asbestos insulation); *Allied Paper Mills* v. *FTC,* 168 F.2d 600 (7th Cir. 1948) (book paper manufacturers); *Bond Crown & Cork. Co.* v. *FTC,* 176 F.2d 974 (4th Cir. 1949) (bottle cap manufacturers). Price-fixing is just one example. The Commission's adjudicatory power also supported a cease-and-desist order concerning a food manufacturer's resale practices more than 100 years ago. *FTC* v. *Beech-Nut Packing,* 257 U.S. 441 (1922). And it supported a cease-and-desist order

Continued

certain requirements in section 22 on any amendment to a Commission rule promulgated under section 6 (or section 18) that would have certain substantial effects on the national economy, the price of goods or services, or regulated entities and consumers.[226] Congress thus anticipated—and intended—that the Commission's rulemaking power carried the potential to affect the economy in considerable ways, and Congress already considered and specified the necessary steps and checks to ensure the Commission's exercise of that power is appropriate. For all these reasons, the final rule does not involve a ''major question'' as the Supreme Court has used that term.

Even if the final rule does present a major question, the final rule passes muster because the FTC Act provides clear authorization for the Commission's action. In cases involving major questions, courts expect Congress to ''speak clearly'' if it wishes to assign the disputed power.[227] Congress did so when it ''declared unlawful'' in the FTC Act ''[u]nfair methods of competition'' and empowered the Commission ''to make rules and regulations for the purpose of carrying out the provisions of th[e] Act.'' [228] Congress ''[i]n large measure'' left ''the task of defining 'unfair methods of competition' . . . to the Commission.'' [229] That is precisely what the Commission has done here, for the reasons elaborated in Part IV. Finally, there is no doubt that the Commission has expertise in the field (competition) it is regulating here.[230] For these reasons, even if the final rule involves a major question, Congress has

clearly delegated to the Commission the authority to address that question.

### 3. Non-Delegation Doctrine

Some commenters also objected that Congress violated the non-delegation doctrine by empowering the Commission to promulgate rules regulating unfair methods of competition. The Commission disagrees. The non-delegation doctrine provides that ''Congress generally cannot delegate its legislative power to another Branch.'' [231] But the Constitution does not ''prevent Congress from obtaining the assistance of its coordinate Branches.'' [232] ''So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'' [233] Applying this rule, the Supreme Court has ''over and over upheld even very broad delegations'' including those directing agencies ''to regulate in 'the public interest,' . . . to set 'fair and equitable' prices and 'just and reasonable' rates,'' and ''to issue whatever air quality standards are 'requisite to protect the public health.' '' [234] ''The Supreme Court has'' also ''explained that the general policy and boundaries of a delegation 'need not be tested in isolation' '' and ''[i]nstead, the statutory language may derive content from the 'purpose of the Act, its factual background and the statutory context in which they appear.' '' [235]

Here, Congress ''declared unlawful'' any ''unfair methods of competition in or affecting commerce'' and ''empowered and directed'' the Commission ''to prevent'' entities within its jurisdiction ''from using unfair methods of competition.'' [236] Congress also instructed the Commission to ''make rules and regulations for the purpose of carrying out the provisions'' of the FTC Act.[237] Congress's stated purpose and policy in section 5 provides the Commission with

an intelligible principle to guide its section 6(g) rulemaking authority.[238]

Were there any doubt, the Supreme Court has laid it to rest in *A.L.A. Schechter Poultry Corp.* v. *United States.*[239] *Schechter Poultry* marked one of two occasions ''in this country's history'' that the Supreme Court ''found a delegation excessive,'' and ''in each case . . . Congress had failed to articulate *any* policy or standard to confine discretion.'' [240] The Court offered the FTC Act, however, as a counterexample of proper Congressional delegation. The Court recognized that the phrase ''unfair methods of competition'' in the FTC Act was ''an expression new in the law'' without ''precise definition,'' but that Congress had empowered the Commission to ''determine[ ] in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest'' whether a method of competition is unfair.[241] The FTC Act stood in contrast, the Court explained, to the National Industrial Recovery Act (''NIRA''), which the Court held included an unconstitutional delegation.[242]

The Commission recognizes that *Schechter Poultry* approved of the FTC Act's adjudicatory process for determining unfair methods of competition without commenting on the Act's rulemaking provision. But the ''unfair method of competition'' authority the Court approvingly cited in *Schechter Poultry* is the same intelligible principle the Commission is applying in this rulemaking. And just as the adjudication process provides for a ''formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate evidence, and for judicial review,'' [243] the APA rulemaking process provides for a public notice of proposed rulemaking, the opportunity to ''submit[t] . . . written data, views, or arguments,'' agency consideration of those comments, and judicial review.[244] If Congress may permissibly delegate the

---

within the past few years enjoining a pharmaceutical company from entering into reverse payment settlement schemes. *Impax Labs., Inc.* v. *FTC,* 994 F.3d 484 (5th Cir. 2021). In the century between, the Commission has found section 5 violations based on false advertising, monopoly maintenance, exclusive dealing, and more in diverse sectors throughout the country.

[226] 15 U.S.C. 57b–3; *see also* Part II.B.

[227] *W. Va.* v. *EPA,* 597 U.S. 697, 716, 723 (2022).

[228] FTC Act of 1914, 38 Stat. at 721–22; *see* 15 U.S.C. 45(a), 46(g); *see also* Part II.A (discussing the Commission's rulemaking authority).

[229] *FTC* v. *Texaco, Inc.,* 393 U.S. 223, 225 (1968).

[230] *Cf. W. Va.* v. *EPA,* 597 U.S. at 729 (noting the Court's view that the EPA had traditionally lacked the expertise needed to develop the rule at issue); *Ala. Ass'n of Realtors* v. *HHS,* 594 U.S. 758, at 764–65 (2021) (questioning the link between the Center for Disease Control and an eviction moratorium); *see also* Part II.A (discussing Congress's creation of the Commission as an expert body); Parts IV.B and IV.C (discussing the rationale for the rule and explaining the negative effects non-competes have on competition). The Commission also notes that through, *inter alia,* the roundtables and enforcement actions described in Part I.B, and through this rulemaking process, it has acquired expertise on non-competes specifically. The Commission further notes that non-competes are, inherently, a method of competition.

[231] *Mistretta* v. *United States,* 488 U.S. 361, 372 (1989).

[232] *Id.*

[233] *Id.* (alteration in original).

[234] *Gundy* v. *United States,* 139 S. Ct. 2116, 2121 (2019) (citing *Nat'l Broadcasting Co.* v. *United States,* 319 U.S. 190, 216 (1943); *N.Y. Cent. Secs. Corp.* v. *United States,* 287 U.S. 12, 24 (1932); *Yakus* v. *United States,* 321 U.S. 414, 422 (1944); *Fed. Power Comm'n* v. *Hope Natural Gas Co.,* 320 U.S. 591 (1944); and *Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001)).

[235] *TOMAC, Taxpayers of Mich. Against Casinos* v. *Norton,* 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting *Am. Power & Light Co.* v. *SEC,* 329 U.S. 90, 104 (1946)).

[236] 15 U.S.C. 45(a)(1)–(2).

[237] 15 U.S.C. 46(g).

[238] As the D.C. Circuit noted in *Nat'l Petroleum Refiners Ass'n* v. *FTC,* ''the Supreme Court has ruled that the powers specified in Section 6 do not stand isolated from the Commission's enforcement and law applying role laid out in Section 5.'' 482 F.2d 672, 677 (D.C. Cir. 1973) (citing *United States* v. *Morton Salt Co.,* 338 U.S. 632 (1950)).

[239] *A.L.A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935).

[240] *Gundy,* 588 U.S. at 2129 (internal quotation omitted); *cf. also Panama Refin. Co.* v. *Ryan,* 293 U.S. 388 (1935) (finding impermissible delegation).

[241] *Schechter Poultry,* 295 U.S. at 532–33.

[242] *Id.* at 529–42.

[243] *Id.* at 533.

[244] 5 U.S.C. 553, 702.

authority to determine through adjudication whether a given practice is an unfair method of competition, it may also permit the Commission to do the same through rulemaking.[245]

For these reasons, the Commission concludes that its authority to promulgate rules regulating unfair methods of competition is not an impermissible delegation of legislative authority.

4. Other Challenges to the Commission's Authority

Finally, a handful of comments raised other, miscellaneous arguments contending that the Commission lacks authority to promulgate the rule. The Commission has reviewed and considered these comments and concludes they do not undercut the Commission's authority to promulgate the final rule.

The Commission received several comments about the Commerce Clause. That clause allows Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes."[246] Consistent with that clause, the FTC Act empowers the Commission to prevent unfair methods of competition "in or affecting commerce," which the Act also defines consistently with the Constitution.[247] One commenter wrote to support the rule and emphasized that non-competes restrict the free flow of interstate commerce. Others argued that the proposed rule would violate the Commerce Clause by regulating local commerce. The Commission has considered these comments and concludes that it may promulgate the final rule consistent with the Commerce Clause. The final rule extends to the full extent of the FTC's jurisdiction, which in turn extends no further than the Commerce Clause permits. As the Supreme Court has explained, the phrase "in or affecting commerce" in section 5 of the FTC Act is "coextensive with the constitutional power of Congress under the Commerce Clause."[248] In this final rule, the Commission finds the use of non-

competes by employers substantially affects commerce as that term is defined in the FTC Act. The final rule is therefore a lawful exercise of Congress's delegated power.[249]

Relatedly, one commenter objected that the rule would violate the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[250] But as just explained, the Constitution grants Congress the power to regulate interstate commerce, and pursuant to that power Congress granted the Commission authority to prevent unfair methods of competition in or affecting commerce. The Commission is not intruding on any power reserved to the States.

Some commenters objected that the rule infringes on the right to contract. One of these commenters acknowledged that the Constitution's Contracts Clause does not apply to the Federal government.[251] Regardless, even assuming the Constitution protects a right to contract that can be asserted against a Federal regulation, that right sounds in substantive due process, and the Commission must offer only a rational basis for the rule.[252] As relevant here, the final rule advances the Commission's congressional mandate to prevent unfair methods of competition and will promote competition and further innovation among its many benefits.[253] There is a rational relationship between regulating non-competes and these legitimate government purposes.

One commenter argued that the proposed rule was unconstitutionally vague. This commenter's objection focused on the proposed provision governing *de facto* non-competes. The Commission is not adopting that proposed language in the final rule. Instead, the Commission has clarified the scope of its definition of non-compete clause. Whether a specific clause falls within the scope of the final rule will necessarily depend on the precise language of the agreement at

issue, but the text of the final rule provides regulated parties with sufficient notice of what the law demands to satisfy any due process vagueness concerns.

*D. Compliance With the Administrative Procedure Act ("APA")*

Some commenters also contended that the Commission has not complied with the Administrative Procedure Act ("APA").[254] At a high level, the APA requires prior public notice, an opportunity to comment, and consideration of those comments before an agency can promulgate a legislative rule.[255] The Commission has engaged in that process, which has led to this final rule and the accompanying explanation. Some comments failed to recognize the NPRM was a preliminary step that did not fossilize the Commission's consideration of arguments or weighing of evidence. Moreover, the APA "limits causes of action under the APA to final agency action."[256] It is this final rule, not the NPRM, that constitutes final agency action. Before adopting this final rule, the Commission reviewed and considered all comments received. In many instances, the Commission has made changes relative to the proposed rule to address concerns that commenters raised. In all cases, however, the Commission has complied with the APA.

*E. The Commission's Jurisdiction Under the FTC Act*

The Commission's jurisdiction derives from the FTC Act. Employers that are outside the Commission's jurisdiction under the FTC Act are not subject to the final rule. The Commission clarifies in the definition of person in § 910.1, that the rule applies only to those within the Commission's jurisdiction. Some commenters sought a more detailed accounting of the

---

[245] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672, 685 (D.C. Cir. 1973); *cf. SEC* v. *Chenery Corp.,* 332 U.S. 194, 202–03 (1947) ("Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.").

[246] U.S. Const. art. I, sec. 8, cl. 3.

[247] 15 U.S.C. 44, 45(a)(1).

[248] *United States* v. *Am. Bldg. Maintenance Indus.,* 422 U.S. 271, 277, n.6 (1975).

[249] *See Nat'l Fed'n of Indep. Bus.* v. *Sebelius,* 567 U.S. 519, 549 (2012) ("Congress's power" under the Commerce Clause "is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others."); *see also* Part I.B.2 (discussing prevalence of non-competes) and Part IX.C.2 (addressing the need for a nationwide regulation prohibiting non-competes).

[250] U.S. Const. amend. X.

[251] *See* U.S. Const. art. I, sec. 10, cl. 1.

[252] *See, e.g., L & H Sanitation, Inc.* v. *Lake City Sanitation, Inc.,* 769 F.2d 517, 522 (8th Cir. 1985).

[253] *See* Parts IV.B and IV.C, Part X.F.6.

[254] This includes, for example, a commenter who argued that the NPRM was not the product of reasoned decision-making, asserting that the Commission had failed to consider key aspects of the rule or misconstrued evidence; commenters who argued that the rule was arbitrary and capricious for failing to consider less restrictive alternatives; commenters who argued that the NPRM failed to consider State policy or that the Commission would be acting arbitrarily by not passing a uniform rule; and commenters who argued that the Commission had failed to consider reliance interests. The Commission has addressed the concerns underlying these comments in other parts of this statement of basis and purpose.

[255] 5 U.S.C. 553; *see also Elec. Priv. Info. Ctr.* v. *DHS,* 653 F.3d 1, 5 (D.C. Cir. 2011) (APA "generally require[s] an agency to publish notice of a proposed rule in the **Federal Register** and to solicit and consider public comments upon its proposal.").

[256] *Trudeau* v. *FTC,* 456 F.3d 178, 188–89 (D.C. Cir. 2006) (internal quotation marks omitted); *see* 5 U.S.C. 704.

Commission's jurisdiction under the FTC Act. The Commission addresses those comments in this section. Comments seeking an exclusion for entities within the Commission's jurisdiction are addressed in Parts V.D.3 and V.D.4.

### 1. Generally

Certain entities that would otherwise be subject to the final rule may fall outside the FTC's jurisdiction under the FTC Act. The FTC Act exempts certain entities or activities from the Commission's enforcement jurisdiction, which otherwise applies to "persons, partnerships, or corporations." [257] For example, the Act exempts "banks" and "persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act." [258] And the Act excludes from its definition of "corporation" any entity that is not "organized to carry on business for its own profit or that of its members." [259] The NPRM explained that, where an employer is exempt from coverage under the FTC Act, the employer would not be subject to the rule.[260] The NPRM also explained State and local government entities—as well as some private entities—may not be subject to the rule when engaging in activity protected by the State action doctrine.[261] Some commenters stated that the Commission should restate, clarify, interpret, or limit the reach of its authority under the FTC Act in the rule.

In response, the Commission explains that the final rule extends to covered persons that are within the Commission's jurisdiction. The Commission does not believe restating or further specifying each jurisdictional limit in the final rule's text is necessary; the FTC Act defines the limits of the Commission's jurisdiction and those limits govern this rule. Moreover, the Commission cannot here provide guidance that applies to every fact and circumstance. Whether an entity falls under the Commission's jurisdiction can be a fact-specific determination. An attempt by the Commission to capture all potential interpretations of the laws governing exclusions from the FTC Act may create confusion rather than clarity. In response to commenters who asked the Commission to affirm that the final rule does not bind agencies that regulate firms outside the Commission's

jurisdiction under the FTC Act, the Commission affirms that the Commission applies the final rule only to entities that are covered by the FTC Act.[262]

A State government agency commenter suggested that the Commission explicitly exempt State and local governments from the rule. The commenter pointed to conflicts-of-interest policies used by some State agencies to preclude former employees from working on related projects or jobs in the private sector, which the commenter stated do not implicate the policy concerns the FTC seeks to address in the rule. The commenter also noted the complexity of when the Commission's jurisdiction might extend to State and local governments. The Commission clarifies in the definition of "person" in § 910.1 that the final rule applies only to a legal entity within the Commission's jurisdiction. The Commission also explains in Part III.E that the definition of "person" is coextensive with the Commission's authority to issue civil investigative demands. Nothing in this rule change changes the extent of the Commission's jurisdiction over State and local governments. The Commission declines to specify all circumstances under which a governmental entity or quasi-governmental entity would or would not be subject to the Commission's jurisdiction and, thus, this final rule. In any event, with respect to the government ethics policies referenced by the commenter, to the extent the commenter is referring to traditional "cooling off" policies that preclude former government employees from working on discrete, specific projects that fell within the scope of their former official governmental position to address ethical concerns, such policies would not meet the definition of "non-compete clause" in § 910.1 because they do not prohibit, penalize or function to prevent a worker from switching jobs or starting a new business.

### 2. Jurisdiction Over Entities Claiming Nonprofit Status Under the FTC Act or the Internal Revenue Code

Commenters from the healthcare industry argued that the Commission should restate, clarify, interpret, or limit the reach of its authority under the FTC Act specifically for the healthcare industry. They pointed to the prevalence of healthcare organizations registered under section 501(c) of the Internal Revenue Code claiming tax-exempt status as nonprofits. Commenters contended that these organizations are categorically outside the Commission's authority under the FTC Act. In fact, under existing law, these organizations are not categorically beyond the Commission's jurisdiction. To dispel this misunderstanding, the Commission summarizes the existing law pertaining to its jurisdiction over non-profits.

#### a. Comments Received

Business and trade industry commenters from the healthcare industry, including, for example, hospitals, physician practices, and surgery centers, focused on whether the Commission has jurisdiction over nonprofit organizations registered under section 501(c)(3) of the Internal Revenue Code in light of the FTC Act's definition of "corporation." Section 501(c)(3) exempts from taxation certain religious, charitable, scientific, educational, and other corporations, "no part of the net earnings of which inure[] to the benefit of any private shareholder or individual." [263] An entity is a "corporation" under the FTC Act only if it is "organized to carry on business for its own profit or that of its members." [264] Several industry commenters argued the Commission does not have jurisdiction over entities that claim tax-exempt status as nonprofits because they are, by definition, not "organized to carry on business for [their] own profit or that of [their] members." The Commission presumes that commenters self-identifying as or referring to "nonprofits," "not-for-profits," or other similar terms without further explanation are referencing entities claiming tax-exempt status under section 501(c)(3) or other provisions of the Internal Revenue Code. Some commenters contended that, to avoid confusion, the rule should state it does

---

[257] 15 U.S.C. 45(a)(2); *see also FTC* v. *AT&T Mobility LLC,* 883 F.3d 848, 853–56 (9th Cir. 2018) (*en banc*).

[258] 15 U.S.C. 45(a)(2).

[259] 15 U.S.C. 44.

[260] NPRM at 3510.

[261] *Id.* (citing *Parker* v. *Brown,* 317 U.S. 341, 350–51 (1943)).

[262] For example, a few community bank commenters expressed concern that because the Federal Deposit Insurance Corporation ("FDIC") can enforce the FTC Act against banks, the rule could be applied by the FDIC to banks. The FTC Act is the Commission's organic statute, and interpretive authority of the FTC Act rests with the Commission. Whether other agencies enforce section 5 or apply the rule to entities under their own jurisdiction is a question for those agencies. At the same time, as discussed in this Part II.E.1, the Commission applies and enforces the rule only to the extent of its jurisdiction.

[263] 26 U.S.C. 501(c)(3). Other, less frequently invoked paragraphs of section 501(c) also identify corporations and organizations that qualify for tax-exempt status. The distinctions between these entities and those claiming tax-exempt status under 501(c)(3) are analyzed under the same standard.

[264] 15 U.S.C. 44.

not apply to entities claiming tax-exempt status as non-profits. At least one commenter stated that the Commission should clarify whether and how the rule would apply to healthcare entities claiming tax-exempt status as nonprofits and then reopen the comment period. One commenter sought clarification on how ownership interest in a for-profit entity or joint venture with a for-profit partner by an entity that claims tax-exempt status as a nonprofit would affect the rule's applicability.

b. The Final Rule

The final rule applies to the full scope of the Commission's jurisdiction. Many of the comments about nonprofits erroneously assume that the FTC's jurisdiction does not capture any entity claiming tax-exempt status as a nonprofit. Given these comments, the Commission summarizes Commission precedent and judicial decisions construing the scope of the Commission's jurisdiction as it relates to entities that claim tax-exempt status as nonprofits and to other entities that may or may not be organized to carry on business for their own profit or the profit of their members.

Congress empowered the Commission to "prevent persons, partnerships, or corporations" from engaging in unfair methods of competition.[265] To fall within the definition of "corporation" under the FTC Act, an entity must be "organized to carry on business for its own profit or that of its members."[266] These FTC Act provisions, taken together, have been interpreted in Commission precedent[267] and judicial decisions[268] to mean that the Commission lacks jurisdiction to prevent section 5 violations by a corporation not organized to carry on business for its own profit or that of its members.

The Commission stresses, however, that both judicial precedent and Commission precedent recognize that not all entities claiming tax-exempt status as nonprofits fall outside the Commission's jurisdiction. As the Eighth Circuit has explained, "Congress took pains in drafting § 4 [15 U.S.C. 44] to authorize the Commission to regulate so-called nonprofit corporations,

associations and all other entities if they are in fact profit-making enterprises."[269] The Commission applies a two-part test to determine whether a corporation is organized for profit and thus within the Commission's jurisdiction. As the Commission has explained, "[t]he not-for-profit jurisdictional exemption under Section 4 requires both that there be an adequate nexus between an organization's activities and its alleged public purposes and that its net proceeds be properly devoted to recognized public, rather than private, interests."[270] Alternatively stated, the Commission looks to both "the source of the income, *i.e.*, to whether the corporation is organized for and actually engaged in business for only charitable purposes, and to the destination of the income, *i.e.*, to whether either the corporation or its members derive a profit."[271] This test reflects the Eighth Circuit's analysis in *Community Blood Bank of Kansas City Area, Inc.* v. *FTC* and "the analogous body of federal law which governs treatment of not-for-profit organizations under the Internal Revenue Code."[272] Under this test, a corporation's "tax-exempt status is certainly one factor to be considered," but that status "does not obviate the relevance of further inquiry into a [corporation's] operations and goals."[273]

Merely claiming tax-exempt status in tax filings is not dispositive. At the same time, if the Internal Revenue Service ("IRS") concludes that an entity does not qualify for tax-exempt status, such a finding would be meaningful to the Commission's analysis of whether the same entity is a corporation under the FTC Act. Administrative proceedings and judicial decisions involving the Commission or the IRS[274] have identified numerous private benefits that, if offered, could render an entity a corporation organized for its own profit or that of its members under the FTC Act, bringing it within the

Commission's jurisdiction. For instance, the Commission has exercised jurisdiction in a section 5 enforcement action over a physician-hospital organization because the organization engaged in business on behalf of for-profit physician members.[275] That organization, which consisted of over 100 private physicians and one non-profit hospital, claimed tax-exempt status as a nonprofit.[276] Similarly, the Commission has exercised jurisdiction over an independent physician association claiming tax-exempt status as a nonprofit. The association consisted of private, independent physicians and private, small group practices.[277] That association was organized for the pecuniary benefit of its for-profit members because it "contract[ed] with payers, on behalf of its [for-profit] physician members, for the provision of physician services for a fee."[278] Under IRS precedent in the context of purportedly tax-exempt nonprofit hospitals and other related entities that partner with for-profit entities, where the purportedly nonprofit entity "has ceded effective control" to a for-profit partner, "conferring impermissible private benefit," the entity loses tax-exempt status.[279] The IRS has also rejected claims of nonprofit tax-exempt status for entities that pay unreasonable compensation, including percentage-based compensation, to founders, board members, their families, or other insiders.[280]

These examples are illustrative. As has been the case for decades, under Commission precedent and judicial

---

[265] 15 U.S.C. 45(a)(2). The Commission focuses on coverage as "corporations" in this section.

[266] 15 U.S.C. 44.

[267] *In the Matter of Coll. Football Ass'n,* 117 F.T.C. 971, 992–999 (1990).

[268] *California Dental Ass'n* v. *FTC,* 526 U.S. 756, 766 (1999); *Cmty. Blood Bank of Kansas City Area, Inc.* v. *FTC,* 405 F.2d 1011, 1016 (8th Cir. 1969); *FTC* v. *Univ. Health, Inc.,* 938 F.2d 1206, 1214 (11th Cir. 1991).

[269] *Blood Bank,* 405 F.2d at 1018; *see also, e.g., FTC* v. *Nat'l Comm'n on Egg Nutrition,* 517 F.2d 485, 488 (7th Cir. 1975).

[270] *Coll. Football Ass'n,* 117 F.T.C. at 998.

[271] *Id.* at 994 (internal quotation and citation omitted).

[272] *Id.* at 994.

[273] *In the Matter of the Am. Med. Assoc.,* 94 F.T.C. 701, 1979 WL 199033, at *221 (FTC Oct. 12, 1979).

[274] The Commission offers examples of decisions from the IRS and Tax Court as examples that the Commission may deem persuasive. Although "[r]ulings of the Internal Revenue Services are not binding upon the Commission," the Commission has recognized that "a determination by another Federal agency that a respondent is or is not organized and operated exclusively for eleemosynary purposes should not be disregarded." *Am. Med. Assoc.,* 1979 WL 199033 at *221.

[275] *In the Matter of Preferred Health Servs., Inc.,* FTC No. 41–0099, 2005 WL 593181, at *1 (Mar. 2, 2005).

[276] *Id.* at *1.

[277] *In the Matter of Boulder Valley Individual Prac. Assoc.,* 149 F.T.C. 1147, 2010 WL 9434809, at *2 (Apr. 2, 2010).

[278] *Boulder Valley,* 2010 WL 9434809, at *2. The Commission has similarly exercised jurisdiction where an entity claiming nonprofit tax-exempt status provides pecuniary benefit to for-profit entities or individuals. *See, e.g., In the Matter of Mem'l Hermann Health Network Providers,* 137 F.T.C. 90, 92 (2004); *Preferred Health,* 2005 WL 593181, at *1–*2; *Advoc. Health Partners,* F.T.C. No. 31–0021, 2007 WL 643035, at *3–*4 (Feb. 7, 2007); *Conn. Chiropractic Ass'n,* F.T.C. No. 71–0074, 2008 WL 625339, at *2 (Mar. 5, 2008); *Am. Med. Ass'n v. FTC,* 638 F.2d 443 (2d Cir. 1980), aff'd, 455 U.S. 676 (1982).

[279] *Redlands Surgical Servs.* v. *Comm'r,* 242 F.3d 904, 904–05 (9th Cir. 2001); *see also St. David's Health Care Sys.* v. *United States,* 349 F.3d 232, 239 (5th Cir. 2003).

[280] *See Fam. Tr. of Mass., Inc.* v. *United States,* 892 F. Supp. 2d 149, 155–156 (D.D.C. 2012); I.R.S. G.C.M. 39,674 (Oct. 23, 1987); *Bubbling Well Church of Universal Love, Inc.* v. *Comm'r,* No. 5717–79X, 1980 WL 4453 (T.C. June 9, 1980) ("[E]xcessive payments made purportedly as compensation constitute benefit inurement in contravention of section 501(c)(3).").

decisions construing the scope of the Commission's jurisdiction, any entity satisfying the two-prong test falls within the Commission's jurisdiction. Such entities would thus be bound by the final rule.[281]

### F. The Legal Standard for Unfair Methods of Competition Under Section 5

In section 5 of the FTC Act, "unfair methods of competition in or affecting commerce" are "declared unlawful."[282] In enacting section 5, Congress intentionally did not mirror either the common law or the text or judicial interpretations of the Sherman Act, but instead adopted this new term.[283] As the Supreme Court has confirmed, this different term reflects a distinct standard.[284] Under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace, and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.

Indicia of unfairness include the extent to which the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature.[285] Indicia of unfairness

may also be present if the conduct is otherwise restrictive or exclusionary, depending on the circumstances, such as the nature of the commercial setting and the current and potential future effects of the conduct.[286] Notably, section 5 does not limit indicia of unfairness to conduct that benefits one or more firms and necessarily disadvantages others. Instead, restrictive and exclusionary conduct may also be unlawful where it benefits specific firms while tending to negatively affect competitive conditions.[287]

The second prong, whether conduct tends to negatively affect competitive conditions, focuses on the nature and tendency of the conduct. It does not turn on whether the conduct directly caused actual harm in the specific instance at issue and therefore does not require a detailed economic analysis or current anticompetitive effects.[288]

Instead, the inquiry examines whether the conduct has a tendency to negatively affect competitive conditions, including by raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing or excluding other market participants, reducing the likelihood of potential or nascent competition, reducing labor mobility, suppressing worker compensation or degrading working conditions for workers. These concerns may arise when the conduct is examined in the aggregate along with the conduct of others engaging in the same or similar conduct.[289] Section 5 does not require a separate showing of market power or market definition.[290] Nor does section 5 import the rule-of-reason analysis applied under other antitrust laws, including in some Sherman Act cases.[291]

The Commission weighs the two elements—indicia of unfairness and tendency to negatively affect competitive conditions—on a sliding scale. Where the indicia of unfairness are clear, conduct may be an unfair method of competition with only a limited showing of a tendency to negatively affect competitive conditions.[292] For example, conduct that is coercive and exploitative evinces facial unfairness and weighs heavily as clear indicia of unfairness.[293] Where indicia of unfairness are less clear, conduct may still violate section 5 where it tends to negatively affect

---

[281] The Commission cannot predict precisely how many entities claiming nonprofit tax-exempt status may be subject to the final rule. The Commission finds that the benefits of the final rule justify implementing it no matter how many nonprofit entities claiming tax-exempt status it ultimately reaches—including under the unlikely assumption that it does not reach any of them.

[282] 15 U.S.C. 45(a)(1).

[283] The Clayton Antitrust Act (38 Stat. 730, ch. 323, Pub. L. 63–212, Oct. 15, 1914) was signed into law weeks after the FTC Act of 1914, 38 Stat. 717.

[284] See FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986); FTC v. Sperry & Hutchinson, 405 U.S. 233, 243–44 (1972); FTC v. Brown Shoe Co., 384 U.S. 316, 321 (1966); FTC v. Motion Picture Advert. Serv., 344 U.S. 392, 394–95 (1953); FTC v. R.F. Keppel & Bro., 291 U.S. 304, 309–10 (1934). While some commenters argued the Commission should apply the rule of reason in this rule, as outlined in Parts II.A, II.B, II.C, and II.F, neither the text of section 5, the Supreme Court and other courts' interpretation of section 5, nor the legislative history support the conclusion that the Commission should apply the rule of reason to determine whether conduct violates section 5 as an unfair method of competition. The Commission outlines the legal standard for finding certain uses of non-competes to be unfair methods of competition in the final rule in this Part II.F.

[285] See e.g., Sperry & Hutchinson Co., 405 U.S. at 243 (holding section 5 reaches conduct shown to exploit consumers, citing R.F. Keppel & Bro., 291 U.S. at 313); Atl. Refin. Co. v. FTC, 381 U.S. 357, 369 (1965) (holding that the "utilization of

economic power in one market to curtail competition in another . . . . bolstered by actual threats and coercive practices" was an unfair method of competition); FTC v. Texaco, 393 U.S. 223, 228–29 (1968) (finding that use of "dominant economic power . . . in a manner which tended to foreclose competition" is an unfair method of competition); E.I. du Pont de Nemours v. FTC (Ethyl), 729 F.2d 128, 137, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive or deceitful" as well as "exclusionary").

[286] See, e.g., Motion Picture Advert. Serv. Co., 344 U.S. at 395–96; Luria Bros. & Co. v. FTC, 389 F.2d 847, 860–61 (3d Cir. 1968). As the Supreme Court has made clear, the inquiry into the nature of the commercial setting does not, however, require market definition or proof of market power. See, e.g., Atl. Refin. Co., 381 U.S. at 371 (finding it "unnecessary to embark upon a full scale economic analysis of competitive effect"). On November 10, 2022, the Commission issued a policy statement describing the key principles of general applicability concerning whether conduct is an unfair method of competition under section 5. FTC, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) (hereinafter "FTC Policy Statement"). The FTC Policy Statement cites a number of cases explaining that section 5 does not require market definition or proof of market power. Id. at 10.

[287] See, e.g., Brown Shoe Co., 384 U.S. at 320 ("Thus the question . . . is whether the Federal Trade Commission can declare it to be an unfair practice for Brown, the second largest manufacturer of shoes in the Nation, to pay a valuable consideration to hundreds of retail shoe purchasers in order to secure a contractual promise from them that they will deal primarily with Brown and will not purchase conflicting lines of shoes from Brown's competitors. We hold that the Commission has power to find, on the record here, such an anticompetitive practice unfair . . . .")

[288] Atl. Refin. Co., 381 U.S. at 371 (It is "unnecessary to embark upon a full scale economic analysis of competitive effect."); Texaco, 393 U.S. at 230 ("It is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); Union Circulation Co. v. FTC, 241 F.2d 652, 657 (2d Cir. 1957) ("The agreements should be struck down if their reasonable tendency, as distinguished from actual past effect, is to injure

or obstruct competition. Under the Federal Trade Commission Act, industry agreements and practices have been enjoined without an actual showing of injury to competition . . . ."). See also Sperry & Hutchinson Co., 405 U.S. at 244 ("[U]nfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws."); Ethyl, 729 F.2d at 138 (finding that evidence of actual harm is not required); In re Coca-Cola Co., 117 F.T.C. 795, 915 n.25 (1994) (rejecting argument that section 5 violation requires showing of "anticompetitive effects").

[289] Motion Picture Advert. Serv. Co., 344 U.S. at 395; Union Circulation Co., 241 F.2d at 658 ("The tendency of the 'no-switching' agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well-established signatory agencies and to the disadvantage of infant organizations.").

[290] Atl. Refin. Co., 381 U.S. at 371; Texaco, 393 U.S. at 230; L.G. Balfour Co. v. FTC, 442 F.2d 1, 19–20 (7th Cir. 1971) (no proof of foreclosure of a relevant market necessary in an exclusive dealing contract case under section 5 (citing Brown Shoe)).

[291] See Part II.A.

[292] See, e.g., Ethyl, 729 F.2d at 137–39; FTC Policy Statement, supra note 286, at 9.

[293] See e.g., Sperry & Hutchinson Co., 405 U.S. at 243; Ethyl, 729 F.2d at 139, 140 (finding that unfair methods of competition include practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); FTC Policy Statement, supra note 286, at 7, 9.

JA0017

competitive conditions, but a stronger showing of such tendency is required.

In many cases the Commission (and courts) have held conduct to constitute an unfair method of competition by pointing to clear indicia of unfairness, including coercive or exploitative conduct, without conducting a detailed economic analysis of its effects. In *Atlantic Refining Co.* v. *FTC* and *FTC* v. *Texaco, Inc.,* the Supreme Court held that the Commission established an unfair method of competition where an oil company used its economic power over its gas stations to coerce them into buying certain tires, batteries, or accessories only from firms that paid the oil company a commission.[294] The Court determined in *Atlantic Refining* that "a full-scale economic analysis of competitive effect" was not required and the Commission needed only to show that the conduct burdened "a not insubstantial portion of commerce."[295] The Court reiterated this standard in *Texaco* holding that, even though the impact was less harmful than the conduct in *Atlantic Refining,* "the anticompetitive tendencies of [the challenged] system are clear, and . . . the Commission was properly fulfilling the task that Congress assigned it in halting this practice in its incipiency."[296] As the Court observed, "[t]he Commission is not required to show that a practice it condemns has totally eliminated competition."[297] In *FTC* v. *R.F. Keppel & Brother, Inc.,* the Supreme Court held that the Commission established an unfair method of competition where a manufacturer exploited the inability of children to protect themselves in the marketplace by marketing inferior goods to them through use of a gambling scheme.[298] The Court considered the extent of the practice and concluded "[the practice] is successful in diverting trade from competitors" without

engaging in a full-scale economic analysis.[299]

In other cases, the Commission (and courts) have held exclusionary or restrictive conduct was an unfair method of competition based on evidence of the conduct's tendency to negatively affect competitive conditions without focusing on the indicia of unfairness, including whether the conduct is coercive or exploitative. But an evidentiary showing or detailed economic analysis that such conduct generated actual anticompetitive effects or would do so in the future still was not required. For example, in *Union Circulation Company* v. *FTC,* the Second Circuit held the Commission established an unfair method of competition where a group of door-to-door subscription solicitation agencies agreed not to hire workers who were previously employed by another signatory agency.[300] The Court looked to whether the "reasonably foreseeable effect" of the agencies' conduct would be to "impair or diminish competition between existing [competitors]" or prevent potential new rivals.[301] In finding the conduct was an unfair method of competition, the court concluded that "[t]he tendency of the . . . agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well established signatory agencies and to the disadvantage of infant organizations."[302] In *FTC* v. *Brown Shoe Co.,* the Supreme Court held that an exclusive dealing arrangement under which the Brown Shoe Company offered shoe retailers "a valuable consideration . . . to secure a contractual promise from them that they will deal primarily with Brown and will not purchase

conflicting lines of shoes from Brown's competitors'' violated section 5 consistent with the Commission's authority "to arrest trade restraints in their incipiency."[303] Of course, evidence of actual adverse effects on competition meets the requirement to show a tendency to negatively affect competitive conditions. For example, in *FTC* v. *Motion Picture Advertising Service Co.,* the Supreme Court held that an exclusive dealing arrangement violated section 5 where there was "substantial evidence" that the contracts "unreasonably restrain competition."[304]

Respondents in unfair method of competition cases sometimes assert purported justifications as an affirmative defense. Some courts have declined to consider justifications altogether. However, where defendants raise justifications as an affirmative defense, the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[305] Additionally, to the extent justifications are asserted, they must be legally cognizable,[306] non-pretextual,[307] and any restriction used to bring about the benefit must be narrowly tailored to limit any adverse impact on competitive conditions.[308]

---

[294] *Atl. Refin. Co.,* 381 U.S. at 369–70; *Texaco,* 393 U.S. at 228–29.

[295] *Atl. Refin. Co.,* 381 U.S. at 371. *See also Texaco,* 393 U.S. at 230 (finding that the practice unfairly burdened competition for a not insignificant volume of commerce); *FTC* v. *R.F. Keppel & Bro.,* 291 U.S. 304, 309 (1934) ("A practice so widespread and so far reaching in its consequences is of public concern if in other respects within the purview of the statute.").

[296] *Texaco,* 393 U.S. at 230 (further noting that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce.").

[297] *Id.* at 230. *See also Shell Oil Co.* v. *FTC,* 360 F.2d 470, 487 (5th Cir. 1966) ("A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord.").

[298] 291 U.S. 304, 313.

[299] 291 U.S. at 308–09.

[300] 241 F.2d 652, 655 (2d Cir. 1957).

[301] *Id.* at 658. Notably, the court also considered facially coercive conduct by which the door-to-door subscription agencies coerced magazine publishers into not doing business with one of their competitors because the competitor hired their former workers. *Id.* at 655–56. The court upheld the Commission's order concluding this conduct was an unfair method of competition under section 5. The court did not conduct any related economic analysis and simply concluded that the "illegal scheme of coercion . . . is clearly unjustified." *Id.*

[302] *Id.* at 658; *see also Nichols* v. *Spencer Intern. Press, Inc.,* 371 F.2d 332, 334 (7th Cir. 1967) ("Granting that the antitrust laws were not enacted for the purpose of preserving freedom in the labor market, nor of regulating employment practices as such, nevertheless it seems clear that agreements among supposed competitors not to employ each other's employees not only restrict freedom to enter into employment relationships, but may also, depending upon the circumstances, impair full and free competition in the supply of a service or commodity to the public.")

[303] *FTC* v. *Brown Shoe Co.,* 384 U.S. 316, 320, 322 (1966).

[304] *FTC* v. *Motion Picture Advert. Serv. Co.,* 344 U.S. 392, 395–96 (1953); *see also L.G. Balfour Co.* v. *FTC,* 442 F.2d 1, 14 (7th Cir. 1971) (holding that a firm's exclusive dealing contracts violated section 5 where such contracts were 'anti-competitive' ").

[305] *Atl. Refin. Co.* v. *FTC,* 381 U.S. 357, 371 (1965) (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *FTC* v. *Texaco,* 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"); *Balfour,* 442 F.2d at 15 (while relevant to consider the advantages of a trade practice on individual companies, this cannot excuse an otherwise illegal business practice). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through section 5.

[306] *See, e.g., FTC* v. *Ind. Fed. Dentists,* 476 U.S. 447, 463 (1986); *Fashion Originators' Guild of Am.* v. *FTC,* 312 U.S. 457, 468 (1941); *FTC* v. *Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 423–24 (1990).

[307] *See, e.g., Ind. Fed'n of Dentists,* 476 U.S. at 464. *See also United States* v. *Microsoft Corp.,* 253 F.3d 35, 62–64, 72, 74, 76–77 (D.C. Cir. 2001); *Eastman Kodak Co.* v. *Image Technical Tech. Svcs,* 504 U.S. 541, 472, 484–85 (1992); *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608–10 (1985).

[308] *NCAA* v. *Alston,* 594 U.S. 69, 100–101 (2021); *Polygram Holding, Inc.* v. *FTC,* 416 F.3d 29, 38

Continued

## III. Section 910.1: Definitions

Section 910.1 sets forth definitions of several terms used in the final rule.

### A. Definition of "Business Entity"

The Commission adopts the definition of "business entity" as proposed.

#### 1. Proposed Definition

The Commission proposed to define "business entity" as "a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary thereof." [309] The term "business entity" was used in two places: (1) in proposed § 910.3, which contained an exception for certain non-competes entered into in the context of a sale of a business by a substantial owner of, or substantial member or substantial partner in, the business entity,[310] and (2) in proposed § 910.1(e), which defined "substantial owner, substantial member, or substantial partner" as an owner, member, or partner holding at least a 25% ownership interest in a business entity.

The Commission explained in the NPRM that it proposed including divisions and subsidiaries in the definition of "business entity" to apply the sale-of-a-business exception where a person is selling a division or subsidiary of a business entity.[311] The Commission stated the primary rationale for the sale-of-business exception—to help protect the value of a business acquired by a buyer—also applies where a person is selling a division or subsidiary of a business entity.[312]

#### 2. Comments Received

Two commenters specifically addressed the definition of business entity. One commenter suggested a new definition using a functional test that the commenter asserted would prevent employers from structuring their businesses as several smaller legal entities in order to fall within the sale-of-a-business exception. Another commenter also suggested that the definition be amended to explicitly include "general partnerships" and trusts.

#### 3. The Final Rule

The Commission adopts the definition of "business entity" as proposed. The

Commission declines to adopt a functional test for the definition of "business entity." As described in greater detail in Part V.A, the sale-of-a-business exception in the final rule does not contain a 25% ownership threshold, so employers will not have an incentive to structure their businesses as several smaller legal entities in order to fall within the sale-of-a-business exception. The Commission also believes replacing the current bright-line definition of "business entity" with a functional test would make it more difficult for workers and employers to know whether a given non-compete is enforceable in the context of the sale of a business. The Commission concludes adding the terms "general partnerships" and "trusts" to the definition is unnecessary, because the phrase "other legal entity" already includes those entity types.

### B. Definition of "Employment"

The Commission proposed to define "employment" as "work for an employer, as the term employer is defined in § 910.1(c)." [313] That provision defined "employer" as "a person, as defined in 15 U.S.C. 57b–1(a)(6) [section 20 of the FTC Act], that hires or contracts with a worker to work for the person." [314] Section 20 defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law." The Commission intended the proposed definition of "employer" to clarify that an employment relationship exists, for purposes of the final rule, regardless of whether an employment relationship exists under another law, such as a Federal or State labor law.[315] The final rule clarifies the definitions to better reflect that intent.

While commenters generally did not address the proposed definition of "employment," many commenters expressed concern that the proposed definition of "employer" would exclude workers hired by one entity to work for another, such as workers hired through a staffing agency. To avoid excluding such workers, and consistent with the Commission's intent to cover workers irrespective of whether they are classified as in an "employer-employee" relationship under other State and Federal laws, the final rule defines "employment" as "work for a person" and makes corresponding changes to the definition of "employer," described in Part III.C. This definition of

"employment" better clarifies that an employment relationship exists, for purposes of the final rule, regardless of whether an employment relationship exists under another law, such as a Federal or State labor law.

### C. Proposed Definition of "Employer"

The Commission proposed to define employer as a "person, as defined in 15 U.S.C. 57b–1(a)(6) [section 20 of the FTC Act], that hires or contracts with a worker to work for the person." [316] Section 20 defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law." [317] The Commission clarified in the NPRM that a person meeting the definition of an employer under proposed § 910.1(c) would be an employer regardless of whether the person meets another legal definition of employer, such as a definition in Federal or State labor law.[318] In response to concerns raised by commenters, the final rule does not adopt a definition of "employer."

#### 1. Comments Received

Several commenters expressed support for the proposed definition of "employer." A few commenters suggested changes to the definition of "employer" to maximize the final rule's coverage and close potential loopholes. Worker and employer advocates noted the proposed definition appeared to exclude certain persons who are commonly understood to be a worker's employer because it assumed that a worker's employer is the same legal entity that hired or contracted with the worker. These commenters contended the proposed definition would not cover arrangements such as when a worker is employed through a contractual relationship with a professional employer organization or staffing agency; under a short-term "loan-out arrangement," during which a worker hired by one employer may work for another employer; under contract with a parent, subsidiary, or affiliate of the business who hired them; or by persons or entities who share common control over the worker's work. A few of these commenters also stated that the proposed definition creates a loophole allowing evasion of the rule through third-party hiring. Most commenters that addressed this issue suggested listing one or more such arrangements in the definition of "employer" to

---

[309] NPRM, proposed § 910.1(a).

[310] *Id.* at 3508.

[311] *Id.* at 3509.

[312] *Id.*

[313] *Id.,* proposed § 910.1(d).

[314] *Id.,* proposed § 910.1(c).

[315] *Id.* at 3510.

[316] *Id.,* proposed § 910.1(c).

[317] 15 U.S.C. 57b–1(a)(6).

[318] NPRM at 3510.

ensure these kinds of arrangements are covered.

One worker advocacy group argued the term "hires or contracts" in the proposed definition of "employer" is in tension with the Commission's stated intent to broadly cover all workers, including externs, interns, and volunteers. This commenter suggested the definition of "employer" incorporate language from the Fair Labor Standards Act ("FLSA") definition of "employ," which includes to "suffer or permit to work."[319] The commenter suggested this language because of its breadth, noting the language originated in State laws designed to reach businesses that use third parties to illegally hire and supervise children.

One industry trade organization argued that, to minimize inconsistencies with the FLSA, the Commission should incorporate the FLSA's definition of "employer."

2. Final Rule

After considering the comments, the Commission has revised the definitions of "non-compete clause" and "worker" as described in Parts III.D and III.G. These revisions make the definition of "employer" unnecessary, so the Commission is not finalizing a definition of "employer."

These revisions clarify that the final rule covers all workers regardless of whether they work for the same person that hired or contracted with them to work. As explained in Part III.D, in the definition of "non-compete clause," the Commission has revised the phrase "contractual term between an employer and a worker" to read "term or condition of employment" and has revised the phrase "after the conclusion of the worker's employment with the employer" to read "after the conclusion of the employment that includes the term or condition." Furthermore, as explained in Part III.G, in the definition of "worker," the Commission has revised the phrase "a natural person who works, whether paid or unpaid, for an employer" to read "a natural person who works or who previously worked, whether paid or unpaid."

The Commission is adopting this more general language, rather than listing the exact kinds of contractual arrangements and entities (*e.g.,* staffing agencies, affiliates, joint employers, etc.) to avoid unnecessary or confusing terminology, evasion of the final rule through complex employment relationships, and the need to specify myriad fact-specific scenarios. The language is designed to capture indirect employment relationships as a general matter without regard to the label used.

*D. Definition of "Non-Compete Clause"*

Based on the comments received, the Commission adopts a slightly modified definition of "non-compete clause" in § 910.1. Section 910.1 defines a "non-compete clause" as a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from (A) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (B) operating a business in the United States after the conclusion of the employment that includes the term or condition. Section 910.1 further provides that, for purposes of the final rule, "term or condition of employment "includes, but is not limited to, a contractual term or workplace policy, whether written or oral." Similar to the proposed rule, the final rule applies to terms and conditions that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends, as well as agreements that penalize or effectively prevent a worker from doing the same.

1. Proposed Definition

The Commission's proposed definition of "non-compete clause" consisted of proposed § 910.1(b)(1) and (b)(2). Proposed § 910.1(b)(1) would have defined "non-compete clause" as "a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer." Proposed § 910.1(b)(2) would have provided that the definition in proposed § 910.1(b)(1) includes "a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer."

The Commission explained that the proposed definition of non-compete clause would be limited to non-competes between employers and workers and would not apply to other types of non-competes, for example, non-competes between two businesses.[320] The Commission further explained the definition would be limited to post-employment restraints (*i.e.,* restrictions on what the worker may do after the conclusion of the worker's employment) and would not apply to concurrent-employment restraints (*i.e.,* restrictions on what the worker may do during the worker's employment).[321]

In the NPRM, the Commission noted that, rather than expressly prohibiting a worker from competing against their employer, some non-competes require workers to pay damages if they compete against their employer. The Commission explained that courts generally view these contractual terms as non-competes and that proposed § 910.1(b)(1) encompassed them.[322]

The Commission also expressed concern that workplace policies—for example, a term in an employee handbook stating that workers are prohibited from working for certain types of firms or in certain fields after their employment ends—could have the same effects as a contractual non-compete even if they are not enforceable, because workers may believe they are bound by the policy. The Commission sought comment on whether the term "non-compete clause" should expressly include a provision in a workplace policy.[323]

The Commission stated that proposed § 910.1(b)(1) was a generally accepted definition of non-compete clause that covers both express non-competes and terms purporting to bind a worker that have the same functional effect as non-competes.[324] The Commission stated that the definition would generally not apply to other types of restrictive employment agreements that do not altogether prevent a worker from seeking or accepting other work or starting a business after their employment ends and do not generally prevent other employers from competing for that worker's labor.[325] At the same time, the Commission expressed concern about unusually restrictive employment agreements that, while not formally triggered by seeking or accepting other work or starting a business after their employment ends, nevertheless restrain such an unusually large scope of activity that they have the same functional effect as non-competes.[326] The Commission noted judicial opinions finding some such

[319] 29 U.S.C. 203(g).

[320] NPRM at 3509.

[321] *Id.*
[322] *Id.*
[323] *Id.* at 3510.
[324] *Id.* at 3509.
[325] *Id.*
[326] *Id.*

restrictive employment agreements to be *de facto* non-competes.[327]

Proposed § 910.1(b)(2) accordingly sought to clarify that the definition in proposed § 910.1(b)(1) includes contractual terms that are *de facto* non-competes because they have the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. It then provided two illustrative, non-exhaustive examples of contractual terms that may be such functional non-competes: (1) an NDA between an employer and a worker written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment with the employer; and (2) a training-repayment agreement ("TRAP") that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred to train the worker.[328]

### 2. Coverage of the Definition

### a. Comments Received

Most of the comments on the definition of "non-compete clause" addressed whether, and under what circumstances, the rule should apply to functional non-competes.[329] Many commenters that generally supported the NPRM agreed the definition of non-compete clause should cover other restrictive employment agreements when they function as non-competes. These commenters argued that, when restraints on labor mobility are banned, companies switch to functionally equivalent restraints. Some commenters asked the Commission to adopt a broader definition of functional non-competes or to expand the rule to ban

additional types of restrictive employment agreements altogether. A few commenters asked the Commission to broaden proposed § 910.1(b)(1) and (2) by replacing the terms "prevent" and "prohibit" with "restrains" and "limits."

In contrast, many commenters who generally opposed the NPRM stated that proposed § 910.1(b)(2) was overinclusive. Many such commenters also asserted the definition was vague and could lead to confusion and significant litigation. Several comments suggested clarifications, such as including additional examples of functional non-competes; creating safe harbors for certain restrictive employment covenants; replacing proposed § 910.1(b)(2) with a standard based on antitrust law's "quick look" test;[330] or revising the provision to focus on the "primary purpose" of a restrictive employment covenant. Several commenters argued the Commission failed to cite evidence that functional non-competes are anti-competitive. Other commenters expressed concern that prohibiting functional non-competes would undermine the rule's intent to permit less restrictive alternatives to non-competes.

At least one commenter argued that proposed § 910.1(b)(2) should be removed because it was redundant, as the proposed definition of non-compete clause in proposed § 910.1(b)(1) already captured any term that prevents an employee from seeking alternative employment, without regard to how the term is labeled. Some commenters who generally supported the NPRM also expressed concern that ambiguity in proposed § 910.1(b)(2) could enable employers to intimidate workers by suggesting that restrictive employment agreements used to evade a final rule are not non-competes under the functional test. Other commenters who generally supported the rule asked for greater specificity in proposed § 910.1(b)(2) to prevent adverse judicial interpretations that could undermine the effectiveness of the rule.

Many commenters addressed issues specific to other types of restrictive employment agreements, including NDAs (also sometimes referred to as confidentiality agreements), TRAPs, non-solicitation agreements, and garden leave and severance agreements.

With respect to NDAs, some commenters stated that the Commission rightly identified overbroad NDAs as a potential method of evasion of the rule

and supported the Commission's recognition of overbroad NDAs as functional non-competes. In contrast, some commenters contended that by covering functional non-competes, the proposed rule would limit their ability to use NDAs. Some commenters argued that providing that overbroad NDAs may be functional non-competes would be inconsistent with the proposed rule's separate preliminary finding that NDAs are less restrictive alternatives to non-competes. Similarly, some commenters contended that a functional test may frustrate employers' ability to use NDAs to protect legitimate trade secrets or to enjoin a former worker employed with a competitor under the Defend Trade Secrets Act of 2016, in part because they would be concerned about potential legal liability. Some commenters contended that the example of an overbroad NDA in proposed § 910.1(b)(2) would discourage the use of NDAs, including the use of narrowly tailored NDAs, and undermine confidence in their enforceability. Some commenters stated that reference to cases, including *Brown* v. *TGS Management Co.*[331] and similar cases, represent outliers that are likely to cause more confusion than clarity.

Other commenters addressed the proposed definition's application to TRAPs, which are agreements in which the worker agrees to pay the employer for purported training expenses if the worker leaves their job before a certain date. Several commenters asked the Commission to ban all forms of TRAPs. These commenters argued that employers are increasingly adopting TRAPs and that abusive TRAPs are pervasive throughout the economy. Some commenters asserted millions of workers are likely bound by TRAPs. Commenters stated TRAPs may impose penalties that are disproportionate to the value of training workers received or require the worker to pay alleged training expenses for on-the-job training. Some commenters contended TRAPs may be even more harmful than non-competes, because while non-competes prohibit or prevent workers from seeking or accepting other work or starting a business after they leave their job, TRAPs can prevent workers from leaving their job for any reason.

Some commenters expressed concern that the example in proposed § 910.1(b)(2)(ii) of a TRAP that was a functional non-compete was too narrow, and that the Commission should not imply that TRAPs with penalties that *are* reasonably related to an employer's training expenses cannot be functional

---

[327] *Wegman* v. *London*, 648 F.2d 1072, 1073 (5th Cir. 1981) (holding that liquidated damages provisions in a partnership agreement were *de facto* non-compete clauses "given the prohibitive magnitudes of liquidated damages they specify"); *Brown* v. *TGS Mgmt. Co., LLC,* 57 Cal. App. 5th 303, 306, 319 (Cal. Ct. App. 2020) (holding that an NDA that defined "confidential information" "so broadly as to prevent [the plaintiff] in perpetuity from doing any work in the securities field" operated as a *de facto* non-compete clause and therefore could not be enforced under California law, which generally prohibits enforcement of non-compete clauses).

[328] NPRM, proposed § 910.1(b)(2).

[329] While the NPRM generally used the term "*de facto* non-competes," the final rule uses the term "functional non-competes." The Commission believes this term more clearly conveys that certain terms are considered non-competes under the final rule where they function to prevent workers from seeking or accepting other work or starting a business after their employment ends.

[330] *See, e.g., Cal. Dental Ass'n* v. *FTC,* 526 U.S. 756, 770–71 (1999).

[331] *See supra* note 327 and accompanying text.

non-competes. One commenter asked the Commission to adopt the standard for TRAPs in the Uniform Restrictive Employment Agreement Act.[332] Another commenter suggested that the Commission ban TRAPs below an income threshold of $75,000. Another commenter asked the Commission to clarify that costs that are inherent in any employer-employee relationship—such as time spent by a supervisor training a new employee how to perform routine business procedures typical for their position or role—should not be considered costs that are "reasonably related to the costs" of training.

At least one commenter urged the Commission to treat as functional non-competes other employment terms similar to TRAPs such as equipment loans, where employers provide employees with a loan to purchase equipment that the worker needs in order to perform their job, and damages provisions containing open-ended costs related to the employee's departure—including hiring and training replacements or vague harms such as reputational damages, loss of good will or lost profits. In contrast, some commenters argued that TRAPs should be excluded from coverage under proposed § 910.1(b)(2) because they are not unfair or anti-competitive.

Regarding non-solicitation agreements—which prohibit a worker from soliciting former clients or customers of the employer—a few commenters expressed concern that overbroad non-solicitation agreements may be permitted because they were not listed in the regulatory text for proposed § 910.1(b)(2) as examples of functional non-competes (although the Commission described them in the preamble to the proposed rule as restrictive employment agreements that may fall within the definition of non-compete clause if they restrain such an unusually large scope of activity that they are *de facto* non-compete clauses).[333] These commenters asked the Commission to revise proposed § 910.1(b)(2) to expressly cover non-solicitation agreements that prohibit workers from doing business with prospective or actual customers to an extent that would effectively preclude them from continuing to work in the same field or that prevent a worker from doing business with their former employer's client where the client solicits the worker directly. Other commenters, however, expressed concern that the proposed rule could

undermine employers' confidence in the enforceability of non-solicitation agreements and asked that the final rule clarify that non-solicitation agreements are generally not prohibited, or exclude them altogether.

Some comments addressed no-hire clauses, which bar former workers from hiring their former colleagues. One employment lawyer stated that these are less restrictive than non-compete clauses. Other commenters stated that no-hire clauses can still limit careers or make it hard for new businesses to find staff. Some commenters expressed concerns with no-business or non-dealing clauses, which bar former workers from doing business with former clients or customers even if the clients or customers sought them out. These commenters stated such agreements limit the options of clients and customers.

Many commenters raised questions about forfeiture-for-competition clauses, which they stated are often a component of deferred compensation arrangements for executives. Commenters stated that deferred compensation plans often include forfeiture clauses, or contingencies on receiving the promised compensation, to incentivize their recipients to act in ways that benefit the employer. These commenters stated that agreements not to compete for a period of time after employment ends are a common feature of forfeiture clauses. Some commenters stated that such forfeiture-for-competition clauses are non-competes and have the same negative effects as non-competes because they are contingent on competition—they require workers to give up bonus pay or other post-employment benefits if they work for a competing employer or start a competing business, and they keep other employers from being able to hire those workers. Other commenters stated forfeiture-for-competition clauses are a common and important component of deferred compensation arrangements for highly compensated employees and senior executives.[334] Other commenters argued the clauses allow workers to choose between receiving the deferred compensation and forfeiting it if they choose to work for a competitor, and thus they are not non-competes. Other commenters urged the Commission to either clarify that forfeiture-for-competition clauses are not non-competes or to carve them out explicitly.

Many commenters also addressed the application of the rule to garden leave agreements. In using the term "garden leave," commenters seemed to be referring to a number of different types of agreements. Some commenters referred to garden leave agreements as those in which, before a worker left their job, they remained employed and received full pay for a specified period of time but their access to co-workers and company facilities was restricted. In contrast, other commenters considered "garden leave" an arrangement to make payments to a worker after their employment concluded. Commenters used different terminology to refer to these kinds of agreements, including severance pay, partial pay, and full pay akin to administrative leave, in exchange for an agreement not to compete. Some commenters argued it is coercive for a worker to sign a non-compete in exchange for severance pay and argued garden leave arrangements are non-competes because they limit a worker's options to work for a competitor. Some commenters asked the Commission to adopt a durational limit for garden leave. At least one commenter also urged the Commission to clarify that an employer cannot unilaterally terminate garden leave.

Other commenters requested clarification that garden leave was not a non-compete on the basis that garden leave does not create a legal obligation on the part of the worker to refrain from competing. Some commenters requested a specific exclusion for garden-leave arrangements. They argued that by forcing employers to pay workers, garden leave would reduce the overuse of non-competes. One talent industry commenter argued that the rule should expressly allow for "fee tails," which require talent agents to pay a portion of future commissions to former employers.

### b. The Final Rule

After considering the comments, the Commission has slightly modified the definition of non-compete clause to clarify its scope. In the final rule, § 910.1 defines "non-compete clause" as a term or condition of employment that either "prohibits" a worker from, "penalizes" a worker for, or "functions to prevent" a worker from (A) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (B) operating a business in the United States after the conclusion of the employment that includes the term or condition.

---

[332] *See* ULC, *Uniform Restrictive Employment Agreement Act* (2021), sec. 14.

[333] NPRM at 3509.

[334] Commenters also provided purported business justifications for forfeiture-for-competition clauses, which are addressed in Part IV.D.2.

Pursuant to the term ''prohibits,'' the definition applies to terms and conditions that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends. Examples of such agreements would be a contractual term between a national sandwich shop chain and its workers stating that, for two years after the worker leaves their job, they cannot work for another sandwich shop within three miles of any of the chain's locations,[335] or a contractual term between a steelmaker and one of its executives prohibiting the executive from working for any competing business anywhere in the world for one year after the end of the executive's employment.[336] The vast majority of existing agreements covered by the final rule fall into this category of agreements that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends.

Pursuant to the term ''penalizes,'' the definition also applies to terms and conditions that require a worker to pay a penalty for seeking or accepting other work or starting a business after their employment ends. One example of such a term is a term providing that, for two years after the worker's employment ends, the worker may not engage in any business within a certain geographic area that competes with the employer unless the worker pays the employer liquidated damages of $50,000.[337] Because such an agreement penalizes the worker for seeking or accepting other work or for starting a business after the worker leaves their job, it would be a non-compete clause under § 910.1. Indeed, where an agreement restricts who a worker can work for or their ability to start a business after they leave their job, State courts generally characterize the agreement as a non-compete, regardless of whether the agreement contains an express

prohibition or requires the worker to pay liquidated damages.[338]

Another example of a term that ''penalizes'' a worker, under § 910.1, is an agreement that extinguishes a person's obligation to provide promised compensation or to pay benefits as a result of a worker seeking or accepting other work or starting a business after they leave their job. One example of such an agreement is a forfeiture-for-competition clause, which, similar to the agreement with liquidated damages described previously, imposes adverse financial consequences on a former employee as a result of the termination of an employment relationship, expressly conditioned on the employee seeking or accepting other work or starting a business after their employment ends. An additional example of a term that ''penalizes'' a worker under § 910.1 is a severance arrangement in which the worker is paid only if they refrain from competing. The Commission also notes that a payment to a prospective competitor to stay out of the market may also violate the antitrust laws even if it is not a non-compete under this rule.[339]

The common thread that makes each of these types of agreements non-compete clauses, whether they ''prohibit'' or ''penalize'' a worker, is that on their face, they are triggered where a worker seeks to work for another person or start a business after they leave their job—*i.e.*, they prohibit or penalize post-employment work for another employer or business. As elaborated in Part IV, such non-competes are inherently restrictive and exclusionary conduct, and they tend to negatively affect competitive conditions in both labor and product and service markets by restricting the mobility of workers and preventing competitors from gaining access to those workers.

Pursuant to the term ''functions to prevent,'' the definition of non-compete clause also applies to terms and conditions that restrain such a large scope of activity that they function to prevent a worker from seeking or accepting other work or starting a new business after their employment ends, although they are not expressly

triggered by these specific undertakings. This prong of the definition does not categorically prohibit other types of restrictive employment agreements, for example, NDAs, TRAPs, and non-solicitation agreements. These types of agreements do not by their terms prohibit a worker from or penalize a worker for seeking or accepting other work or starting a business after they leave their job, and in many instances may not have that functional effect, either. However, the term ''functions to prevent'' clarifies that, if an employer adopts a term or condition that is so broad or onerous that it has the same functional effect as a term or condition prohibiting or penalizing a worker from seeking or accepting other work or starting a business after their employment ends, such a term is a non-compete clause under the final rule.

In response to the comments alleging that covering ''de facto'' or ''functional'' non-competes is overinclusive or vague, the Commission notes that the definition's three prongs—''prohibit,'' ''penalize,'' and ''function to prevent''— are consistent with the current legal landscape governing whether a particular agreement is a non-compete. In addition to generally accepted definitions of non-competes encompassing the ''prohibits'' prong of the definition, terms that ''penalize'' workers for seeking or accepting other work or starting a business after they leave their job (for example, by requiring them to pay liquidated damages) are typically considered non-competes under State law.[340] And the ''functions to prevent'' prong of the definition is likewise consistent with legal decisions holding that restrictive employment agreements other than non-competes may be analyzed under the State law test applicable to non-competes where they function similarly to non-competes.[341] As the First Circuit stated in a recent opinion, ''[O]verly broad nondisclosure agreements, while not specifically prohibiting an employee from entering into competition with the former employer, raise the same policy concerns about restraining competition as noncompete clauses where, as here, they have the effect of preventing the defendant from competing with the plaintiff.''[342] The fact that whether a given restrictive covenant rises to the level of being a functional non-compete will turn on the facts and circumstances

---

[335] This example is based on the agreements described in Jamieson, *supra* note 32. The company agreed to remove the non-competes in 2016 as part of a settlement. Office of the Att'y Gen. of the State of N.Y., Press Release, *A.G. Schneiderman Announces Settlement With Jimmy John's To Stop Including Non-Compete Agreements In Hiring Packets* (June 22, 2016), *https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-settlement-jimmy-johns-stop-including-non-compete.*

[336] This example is based on *AK Steel Corp.* v. *ArcelorMittal USA, LLC,* 55 NE3d 1152, 1156 (Ohio Ct. App. 2016).

[337] This example is based on *Press-A-Dent, Inc.* v. *Weigel,* 849 NE2d 661, 668–70 (Ind. Ct. App. 2006) (holding that the agreement was an unlawful non-compete).

[338] *See, e.g., Wichita Clinic, P.A.* v. *Louis,* 185 P.3d 946, 951 (Kan. Ct. App. 2008); *Grayhawk Homes, Inc.* v. *Addison,* 845 SE2d 356 (Ga. Ct. App. 2020); *Salewski* v. *Pilchuck Veterinary Hosp., Inc.,* 359 P.3d 884 (Wash. Ct. App. 2015).

[339] *See., e.g., Palmer* v. *BRG of Ga., Inc.,* 498 U.S. 46, 49–50 (1990) (''[A]greements between competitors to allocate territories to minimize competition are illegal'' (citing *United States* v. *Topco Assocs., Inc.,* 405 U.S. 596 (1972)); *FTC* v. *Actavis, Inc.,* 570 U.S. 136, 154 (2013) (''payment in return for staying out of the market'' may violate the antitrust laws).

[340] *See supra* note 338 and accompanying text.

[341] *See, e.g., Brown* v. *TGS Mgmt. Co., LLC,* 57 Cal. App. 5th 303, 306, 316–19 (Cal. Ct. App. 2020); *Wegmann* v. *London,* 648 F.2d 1072, 1073 (5th Cir. 1981); *TLS Mgmt. & Mktg. Servs.* v. *Rodriguez-Toledo,* 966 F.3d 46, 59–60 (1st Cir. 2020).

[342] *TLS Mgmt. & Mktg. Servs.,* 966 F.3d at 57.

of particular covenants and the surrounding market context does not render this aspect of the final rule overinclusive or vague. Such covenants would be subject to case-by-case adjudication for whether they constitute an unfair method of competition even in the absence of the final rule.

In response to the comments alleging the Commission failed to cite evidence that functional non-competes harm competition, the Commission disagrees. This final rule is based on a robust evidentiary record that includes significant empirical evidence and thousands of public comments, as well as the Commission's longstanding expertise in evaluating competition issues. Based on this record, the Commission finds that non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets and markets for products and services.[343] In addition, the Commission finds that, with respect to workers other than senior executives, non-competes are exploitative and coercive.[344] The Commission finds that the functional equivalents of non-competes—because they prevent workers from engaging in the same types of activity—are likewise restrictive and exclusionary conduct that tends to negatively affect competitive conditions in a similar way. In response to the commenters who expressed concern that prohibiting functional non-competes would undermine the rule's intent to permit reasonable substitutes, the Commission stresses that, as described throughout this Part III.D, the "functions to prevent" prong of the definition of non-compete clause captures only agreements that function to prevent a worker from seeking or accepting other work or starting a business after they leave their job—not appropriately tailored NDAs or TRAPs that do not have that functional effect.

While many commenters requested the final rule state expressly in the final rule whether various specific restrictive employment agreements satisfy the definition of non-compete clause, the Commission declines to adopt a definition that attempts to capture or carve out every edge case. Rather, the final rule focuses on providing a clear, understandable, and generally applicable definition of non-compete clause that reflects the need for case-by-case consideration of whether certain restrictive covenants rise to the level of being functional non-competes—which is fully consonant

with the legal landscape employers generally face today. The Commission nevertheless here responds to comments regarding the restrictive clauses that commenters contended should be expressly addressed in the final rule.

As noted in this Part III.D, restrictive employment agreements other than non-competes—such as NDAs, non-solicitation agreements, and TRAPs—do not by their terms or necessarily in their effect prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job. For example, a garden-variety NDA in which the worker agrees not to disclose certain confidential information to a competitor would not prevent a worker from seeking work with a competitor or from accepting such work after the worker leaves their job. Put another way, an NDA would not be a non-compete under § 910.1 where the NDA's prohibitions on disclosure do not apply to information that (1) arises from the worker's general training, knowledge, skill or experience, gained on the job or otherwise; or (2) is readily ascertainable to other employers or the general public.[345]

However, NDAs may be non-competes under the "functions to prevent" prong of the definition where they span such a large scope of information that they function to prevent workers from seeking or accepting other work or starting a business after they leave their job. Examples of such an agreement may include an NDA that bars a worker from disclosing, in a future job, any information that is "usable in" or "relates to" the industry in which they work.[346] Such an agreement would effectively prevent the worker from working for another employer in that industry. A second example would be an NDA that bars a worker from disclosing any information or knowledge the worker may obtain during their employment whatsoever, including publicly available information.[347] These agreements are so broadly written that, for practical purposes, they function to prevent a worker from working for another employer in the same field and are therefore non-competes under § 910.1.

Under the final rule's definition of non-compete clause, the same inquiry applies to non-solicitation agreements. Non-solicitation agreements are generally not non-compete clauses under the final rule because, while they restrict who a worker may contact after they leave their job, they do not by their terms or necessarily in their effect prevent a worker from seeking or accepting other work or starting a business. However, non-solicitation agreements can satisfy the definition of non-compete clause in § 910.1 where they function to prevent a worker from seeking or accepting other work or starting a business after their employment ends. Whether a non-solicitation agreement—or a no-hire agreement or a no-business agreement, both of which were referenced by commenters, as discussed previously—meets this threshold is a fact-specific inquiry. The Commission further notes that—like all the restrictive employment agreements described in this Part III.D—non-solicitation agreements, no-hire, and no-business agreements are subject to section 5's prohibition of unfair methods of competition, irrespective of whether they are covered by the final rule.

Depending on the facts and circumstances, a TRAP can also function to prevent a worker from working for another firm or starting a business. For example, one commenter cited a TRAP that required entry-level workers at an IT staffing agency who were earning minimum wage or nothing at all during their training periods to pay over $20,000 if they failed to complete a certain number of billable hours.[348] The commenter also cited a TRAP requiring nurses to work for three years or else repay all they have earned, plus paying the company's "future profits," attorney's fees, and arbitration costs.[349] These types of TRAPs may be functional non-competes because when faced with significant out-of-pocket costs for leaving their employment—dependent on the context of the facts and circumstances—workers may be forced to remain in their current jobs, effectively prevented from seeking or accepting other work or starting a business.

In response to the comments, the Commission declines at this time to either categorically prohibit all TRAPs related to leaving employment, or to exempt such provisions altogether. The Commission agrees with comments raising substantial concerns about the

---

[343] See Parts IV.B and IV.C.
[344] See Part IV.B.2.b.

[345] This example is based on sec. 9 of the Uniform Restrictive Employment Agreement Act, *supra* note 332.
[346] This example is based on *Brown* v. *TGS Mgmt.*, 57 Cal. App. 5th at 316–19 ("Collectively, these overly restrictive provisions [in the NDA at issue] operate as a de facto noncompete provision; they plainly bar Brown in perpetuity from doing any work in the securities field.").
[347] This example is based on *TLS Mgmt. & Mktg. Servs.*, 966 F.3d at 57 (holding that the NDA was unenforceable).

[348] Comment of Jonathan F. Harris, Dalié Jiménez, & Jonathan Glater, FTC–2023–0007–20873 at 4.
[349] *Id.* at 6–7.

potential effects of such agreements on competitive conditions. As noted in the summary of the comments, commenters cited TRAPs that impose penalties disproportionate to the value of training workers received and/or that claimed training expenses for on-the-job training. However, the evidentiary record before the Commission principally relates to non-competes, meaning on the present record the Commission cannot ascertain whether there are any legitimate uses of TRAPs that do not tend to negatively affect competitive conditions. When TRAPs function to prevent a worker from seeking or accepting other work or starting a business after the employment associated with the TRAP, they are non-competes under § 910.1.

The Commission notes that clauses requiring repayment of a bonus when a worker leaves their job would not be non-competes under § 910.1 where they do not penalize or function to prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job. For example, a provision requiring the repayment of a bonus if the worker leaves before a certain period of time would not be a non-compete under § 910.1 where the repayment amount is no more than the bonus that was received, and the agreement is not tied to who the worker can work for, or their ability to start a business, after they leave their job. Similarly, a term or condition under which a worker loses accrued sick leave when their employment ends would not function to prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job.

With respect to garden leave agreements, as noted previously, commenters used the term "garden leave" to refer to a wide variety of agreements. The Commission declines to opine on how the definition of non-compete clause in § 910.1 would apply in every potential factual scenario. However, the Commission notes that an agreement whereby the worker is still employed and receiving the same total annual compensation and benefits on a *pro rata* basis would not be a non-compete clause under the definition,[350] because such an agreement is not a post-

employment restriction. Instead, the worker continues to be employed, even though the worker's job duties or access to colleagues or the workplace may be significantly or entirely curtailed. Furthermore, where a worker does not meet a condition to earn a particular aspect of their expected compensation, like a prerequisite for a bonus, the Commission would still consider the arrangement "garden leave" that is not a non-compete clause under this final rule even if the employer did not pay the bonus or other expected compensation. Similarly, a severance agreement that imposes no restrictions on where the worker may work following the employment associated with the severance agreement is not a non-compete clause under § 910.1, because it does not impose a post-employment restriction.

The Commission declines a commenter's request to replace the term "prevent" with "restrains" or "limits." Commenters generally did not express concern about the term "prevent" and the Commission is concerned that different language could greatly expand the scope of the definition and reduce its clarity.

The Commission also declines to adopt alternative *de facto* tests raised by commenters, such as a version of the "quick look" test. As described in Part II.F, the legal standard under section 5 of the FTC Act is distinct from that of the Sherman Act. The Commission also declines to adopt a test that would consider the primary purpose of a restrictive employment agreement. The Commission believes that it can be difficult to establish an employer's subjective "purpose" in entering into an agreement. In addition, such a test could allow extremely overbroad agreements that dramatically restrict a worker's ability to compete against the employer—and have the negative effects described in Parts IV.B and IV.C—as long as the employer entered into the agreement without the subjective intent to restrict competition.

The Commission agrees with the commenter who stated that proposed § 910.1(b)(2) was redundant because proposed § 910.1(b)(1) was already a functional definition. In the final rule, the Commission has revised the text of the definition of non-compete clause to address confusion among commenters about whether proposed § 910.1(b)(2) clarified the definition or extended it.

In response to the commenters requesting that the Commission clarify the circumstances under which the definition would apply to various other types of restrictive employment agreements, the Commission declines at

this time to enumerate every circumstance that may arise. As noted, a restrictive employment covenant may be a non-compete clause under § 910.1 if it expressly prohibits a worker from, or penalizes a worker for, seeking or accepting other work or starting a business, or if it does not do so expressly but is so broad or onerous in scope that it functionally has the same effect of preventing a worker from doing the same.

### 3. International Application of the Rule

#### a. Comments Received

The Commission received several comments expressing concern about whether the final rule would apply to non-competes that restrict work outside the U.S. In response, the final rule's definition of non-compete clause clarifies that it applies only to work in the U.S. or operating a business in the U.S.

Some commenters raised concerns about the cross-border movement of workers. A research center commenter asserted there is a global shortage of science and technology workers and stated that the final rule's adoption could exacerbate the U.S. shortage by allowing other countries to more easily poach U.S. workers. An academic commenter argued that banning non-competes might deter foreign investors from sending workers to the U.S. if the final rule would invalidate their non-competes.

Some commenters argued that legal systems in the People's Republic of China or other jurisdictions provide insufficient protection for U.S. companies' trade secrets, confidential information, or patent rights, and contended employers need non-competes as *ex ante* protection. These commenters generally say that trade secrets litigation is more challenging in some jurisdictions outside the U.S., for example because of less extensive discovery processes, less frequent use of preliminary injunctions, insufficient remedies, and a lower propensity to prosecute criminal intellectual property cases. An academic commenter argued that some courts may have fewer protections for confidential information compared to the U.S., so a suit concerning only a non-compete is less likely to reveal trade secrets through the course of litigation and thus more effectively prevent technologies from leaking to other governments and protecting U.S. national security interests. However, the comments provided limited evidence on non-competes and trade secret protection outside the U.S., and collectively only

---

[350] The term and practice of "garden leave" appears to have a British origin and is recognized by the Government of the United Kingdom. *See Gov.UK, Handing in your notice, https:// www.gov.uk/handing-in-your-notice/gardening-leave* ("Your employer may ask you not to come into work, or to work at home or another location during your notice period. This is called 'gardening leave'.").

discussed evidence from a few jurisdictions. One commenter noted that legal information and data from some jurisdictions may not be fully accurate because not all court decisions are public.

Two commenters highlighted the domestic semiconductor industry and the CHIPS Act of 2022, arguing the Chinese government seeks to acquire IP related to semiconductors and semiconductor experts with relevant knowledge and information. Those comments expressed concern that a ban on non-competes would damage the semiconductor industry, which relies on skilled workers and trade secrets, by weakening trade secrets protection and disincentivizing investment. Another commenter argued the proposed rule would undermine export controls designed to prevent foreign countries from acquiring U.S. technology and knowledge by allowing workers to move to foreign competitors. One commenter argued the proposed rule conflicts with an October 2022 Bureau of Industry and Security ("BIS") export control rulemaking, stating that the rulemaking limits worker mobility in certain industries from the U.S. to the People's Republic of China. Another commenter suggested the proposed rule would violate the World Trade Organization's Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), which requires that persons "shall have the possibility of preventing information lawfully within their control from being disclosed to, acquired by, or used by others without their consent . . . ."[351] Finally, one commenter argued that by making it more difficult for businesses to protect against international theft of their intellectual property, the rule is at odds with the purposes of the Protecting American Intellectual Property Act of 2022.[352]

Some of these commenters made recommendations for the final rule. A law firm suggested that the final rule prevent evasion by barring employers from selecting the law of non-U.S. jurisdictions to govern employment contracts with U.S.-based workers. A trade association requested that the final rule cover only agreements subject to the law of a U.S. State. An academic commenter suggested revisions to the text of the proposed rule to ensure the final rule applies only within the U.S. The commenter also recommended stating that a non-compete restricting

work outside the U.S. is not a *per se* unfair method of competition and providing guidance on how employers should evaluate international non-competes, using factors such as the business justification for the non-compete and the impact on the worker. The commenter recommended applying the law of the jurisdiction where the worker seeks to be employed.

### b. The Final Rule

In response to commenters' concerns, in this final rule the Commission adopts changes to the definition of "non-compete clause" that expressly limit the definition of non-compete to terms or conditions that prevent workers from seeking or accepting work in the U.S. or operating a business in the U.S. The final rule does not apply to non-competes if they restrict only work outside the U.S. or starting a business outside the U.S.

This revision clarifies for stakeholders the scope of the final rule and confirms it does not prohibit employers from using non-competes that restrict work outside the U.S., in compliance with those jurisdictions' own laws. The Commission understands that, as a commenter noted, some companies operating or competing globally already draft non-competes that comply with the laws of multiple jurisdictions and, thus, amending their non-competes to reflect this application of the final rule would not pose a significant challenge for those entities.

The Commission's revision clarifying the final rule's application to work or starting a business only in the U.S. also addresses the concerns from some commenters about key U.S. workers and technology flowing overseas, because the final rule does not ban non-competes that restrict workers from working or starting a business outside the U.S. It also clarifies that the final rule would not invalidate non-competes entered into by foreign companies with foreign workers unless they restrict a worker's ability to work or start a business inside the U.S. Other questions about the final rule's application to cross-border or non-U.S. employment are also addressed by the Foreign Trade Antitrust Improvements Act, codified at 15 U.S.C. 45(a)(3).

The Commission agrees with the academic commenter that, for non-competes that apply outside the U.S., the law of the relevant jurisdiction should govern any issue other than restricting work or starting a business in the U.S. However, the Commission declines to adopt a balancing test for non-competes restricting a worker's ability to work or start a business

outside the U.S., as a bright-line rule that applies only to work or starting a business in the U.S. is more administrable. In addition, the Commission declines to add language in the final rule stating that it does not apply to overseas employers or to non-competes not subject to U.S. State law. The final rule may apply to overseas employers if the non-compete purports to restrict work or starting a business in the U.S. and the reviewing court applies U.S. law.

The empirical evidence cited in the NPRM focused on the U.S., primarily consisting of studies based on the effects of changes in State laws in the U.S. The comments provided limited evidence on non-competes and trade secret protection outside the U.S., leaving many issues and most jurisdictions unaddressed. The Commission also notes, as one commenter did, that legal information and data from some jurisdictions may not be fully accurate because not all court decisions are public. On the current record, the Commission cannot reach conclusions on whether other jurisdictions have sufficient alternatives to non-competes, the scope of any potential risk, and many of the other issues raised. As a result, the Commission limits application of the final rule to work in the U.S., where the Commission has ample evidence on non-competes' negative effects.

One commenter argued the rule conflicts with BIS's October 2022 export control rulemaking, which restricts the ability of U.S. persons to support development or production at certain semiconductor facilities in the People's Republic of China without a license from BIS.[353] While the revision addresses the commenter's underlying concern about protection of sensitive technology from other governments by not banning non-competes that restrict the movement of workers to and in other jurisdictions, neither the NPRM nor the final rule is inconsistent with the BIS rule. The final rule will not affect BIS's ability to grant or decline to grant a license. With respect to the commenter that suggested the rule would violate TRIPS, the Commission has found that U.S. law provides alternative means of protecting trade secrets,[354] and TRIPS does not require enforcement of non-competes.

With respect to the commenter that stated that the final rule should include

[351] Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, sec. 7, art. 39, para. 2, 33 I.L.M. 81 (as amended Jan. 23, 2017).

[352] 50 U.S.C. 1709.

[353] Implementation of Additional Export Controls: Certain Advanced Computing and Semiconductor Manufacturing Items; Supercomputer and Semiconductor End Use; Entity List Modification, Interim Final Rule, 87 FR 62186 (Oct. 13, 2022).

[354] *See* Part IV.D.2.

a choice-of-law provision to prevent evasion, there is an existing body of law in the U.S. governing choice of law and conflict of laws issues. Accordingly, the Commission declines to add any provisions concerning choice of law or conflict of law to the final rule. Rather, such questions are left to the relevant jurisdiction, whether that is a U.S. State, the Federal government, or another jurisdiction, as determined by applicable law.

### 4. Other Issues Relating to the Definition

#### a. Comments Received

While most commenters focused on the proposed definition's application to functional non-competes or international application, some commenters addressed other issues relating to the proposed definition. Several commenters stated that the definition should cover workplace policies or handbooks, to minimize confusion and make clear that employers are prohibited from including non-competes in workplace policies or handbooks, even if such clauses are unenforceable because they are not formal binding contracts. Some commenters stated that such policies or handbooks can affect a worker's decision to leave their job to work with a competitor or start their own businesses. Others stated the same about oral agreements. One commenter stated that the definition should not cover workplace policies because they apply only during, not after, employment.

A few commenters said the Commission should state explicitly in the definition of "non-compete clause" that restrictions on concurrent employment, such as prohibitions on "moonlighting" with competitors, are excluded. Other commenters urged the Commission to expand the definition to include restraints on concurrent employment because workers often need to take additional jobs during economic downturns, and low-wage workers generally need to take on additional jobs.

An organized labor commenter argued that no-raid agreements, which the commenter described as agreements between labor organizations not to attempt to organize workers already under representation by another union, should be exempted from the definition. An industry trade organization asked the Commission to clarify whether the definition would apply to non-competes in agreements between motor carriers and brokers in the trucking industry. In addition, a few commenters stated that proposed § 910.1(b)(1) was too broad or

potentially ambiguous without pointing to any specific features of the definition.

#### b. The Final Rule

To address the concerns raised by commenters about workplace policies and handbooks, the definition of non-compete clause in § 910.1 uses the phrase "a term or condition of employment" instead of "contractual term." The definition further clarifies that term or condition of employment includes "a contractual term or workplace policy, whether written or oral." The Commission finds that employers have used restrictions in handbooks, workplace policies, or other vehicles that are not formal written contracts to successfully prevent workers from seeking or accepting other employment or starting a new business. The Commission finds, consistent with the views expressed by commenters, that such restrictions in handbooks, workplace policies, or other such vehicles have the same tendency to negatively affect competitive conditions as a formal binding contract term. To provide that such conduct is covered by the definition of non-compete clause, this language clarifies that the definition of non-compete clause is not limited to clauses in written, legally enforceable contracts and applies to all forms a non-compete might take, including workplace policies or handbooks and informal contracts. Given the comments expressing concern about oral representations, the Commission clarifies in the definition of non-compete clause that clauses that purport to bind a worker are covered, whether written or oral, and provides in § 910.2(a)(1) and (2) that it is an unfair method of competition to make representations that a worker is subject to a non-compete. (However, as explained in Part V.C, such representations are not prohibited where the person has a good-faith basis to believe that the final rule is inapplicable.)

The Commission declines to extend the reach of the final rule to restraints on concurrent employment. Although several commenters raised this issue, the evidentiary record before the Commission at this time principally relates to post-employment restraints, not concurrent-employment restraints. The fact that the Commission is not covering concurrent-employment restraints in this final rule does not represent a finding or determination as to whether these terms are beneficial or harmful to competition. The Commission relatedly clarifies that fixed-duration employment contracts, *i.e.,* contracts between employers and

workers whereby a worker agrees to remain employed with an employer for a fixed term and the employer agrees to employ the worker for that period, are not non-compete clauses under the final rule because they do not restrain post-employment conduct.

While the final rule does not extend to restraints on concurrent employment, the Commission has made a technical edit to the definition of non-compete to clarify how it relates to seeking and accepting employment. Proposed § 910.1(b) defined non-compete clause as a contractual term that "prevents the worker from seeking or accepting employment with a person . . . after the conclusion of the worker's employment with the employer." Because, as a technical matter, non-competes can also prevent workers from seeking or accepting future employment with another person before their work for their previous employer has concluded, the Commission has clarified the relevant language to read "that prevents a worker from seeking or accepting work in the United States with a different person *where such work would begin after* the conclusion of the employment that includes the term or condition" and "that prevents a worker from operating a business in the United States *after the conclusion of the employment* that includes the term or condition" (emphases added).

In addition, in response to comments expressing concern about evasion of the rule through third-party hiring,[355] the Commission has revised the phrase "after the conclusion of the worker's employment with the employer" to read "after the conclusion of the employment that includes the term or condition." The Commission recognizes that non-competes can cover workers who are hired by one party but work for another, such as workers hired through staffing agencies. The Commission intends for the final rule to apply to such non-competes, and for this revision to eliminate any ambiguity as to whether such clauses are covered by the definition of non-compete clause in § 910.1.

With respect to the comment about union no-raid agreements, the Commission notes that the definition would apply only to the extent the agreement is a "term or condition of employment" and only if the agreement "prevents a worker from seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or

---

[355] These comments are described in greater detail in Part III.G.

condition'' or ''operating a business in the United States after the conclusion of the employment that includes the term or condition.''[356] The Commission's understanding is that union no-raid agreements are not terms and conditions of employment that prevent workers from seeking or accepting work or operating a business.

With respect to the comment asking whether the definition would apply to non-competes in agreements between motor carriers and brokers in the trucking industry, the Commission notes as a general matter that the definition would not apply to non-competes between businesses, but the Commission declines to opine on specific factual circumstances.

### E. Definition of ''Person''

The proposed rule did not separately define the term ''person.'' Instead, proposed § 910.1(c)—the proposed definition of ''employer''—stated that an employer ''means a person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person.'' The statutory provision cross-referenced in proposed § 910.1(c) is section 20(a)(6) of the FTC Act, which defines ''person'' for purposes of the Commission's authority to issue civil investigative demands. Section 20(a)(6) defines ''person'' as ''any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law.'' No comments were received concerning the use of ''person'' in proposed § 910.1(c).

As explained in Part III.C, the Commission has removed the defined term ''employer'' from the regulatory text of the final rule. However, the regulatory text still uses the term ''person.'' For example, § 910.2(a)(1) prohibits a ''person'' from, among other things, entering into a non-compete clause. As a result, the Commission has adopted a separate definition of the term ''person.'' Section 910.1 defines ''person'' as ''any natural person, partnership, corporation, association, or other legal entity within the Commission's jurisdiction, including any person acting under color or authority of State law.'' This text consists of the proposed definition from section 20(a)(6), plus the phrase ''within the Commission's jurisdiction,'' which clarifies that only persons within the Commission's jurisdiction are subject to the final rule.

### F. Definitions Related to Senior Executives

With respect to existing non-competes, *i.e.,* non-competes entered into before the final rule's effective date, the Commission adopts a different approach for ''senior executives'' than for other workers. Existing non-competes with senior executives can remain in force; the final rule does not cover such agreements.[357] For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[358] The Commission describes its rationale for the final rule's differential treatment of senior executives in Part IV.C.

Section 910.1 defines the term ''senior executive'' as well as related terms. Because the Commission's rationale for the final rule's differential treatment of senior executives provides important context for these definitions, the Commission describes these definitions in Part IV.C.4.

### G. Definition of ''Worker''

#### 1. Proposed Definition

In the NPRM, the Commission proposed to define ''worker'' in proposed § 910.1(f) as ''a natural person who works, whether paid or unpaid, for an employer.''[359] Proposed § 910.1(f) also stated that ''the term [worker] includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer.''[360]

In the NPRM, the Commission explained it intended the term ''worker'' to include not only employees, but also individuals classified as independent contractors, as well as other kinds of workers.[361] The Commission explained that, under proposed § 910.1(f), the term ''worker'' would include any natural person who works, whether paid or unpaid, for an employer, without regard to whether the worker is classified as an ''employee'' under the FLSA or any other statute that draws a distinction between ''employees'' and other types of workers.[362]

The Commission stated in the NPRM that it was concerned that if the rule were to define workers as ''employees'' according to, for example, the FLSA definition, employers may misclassify employees as independent contractors

to evade the rule's requirements.[363] The Commission explained it had no reason to believe non-competes that apply to workers who are treated as independent contractors under the FLSA or interns tend to negatively affect competitive conditions to a lesser degree than non-competes that apply to employees, and that such non-competes may, in fact, be more harmful to competition, given that these other types of workers tend to have shorter working relationships.[364] In addition, the Commission explained that the purported business justifications for applying non-competes to independent contractors would not be different or more cognizable from those related to employees.[365]

Proposed § 910.1(f) also stated the term worker ''does not include a franchisee in the context of a franchisee-franchisor relationship.''[366] The Commission explained that the relationship between a franchisor and franchisee may in some cases be more analogous to the relationship between two businesses than the relationship between an employer and a worker, and that the evidentiary record before the Commission related primarily to non-competes arising solely out of employment.[367] The Commission therefore stated that it believed it would be appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a ''worker'' for purposes of proposed § 910.1(f).[368]

Proposed § 910.1(f) further clarified, however, that the term worker ''includes a natural person who works for the franchisee or franchisor,'' and that ''non-competes between franchisors and franchisees remain subject to [F]ederal antitrust law as well as all other applicable law.''[369] The Commission explained that these laws include State laws that apply to non-competes in the franchise context.[370] The Commission also clarified that it was not proposing to find that non-competes between franchisors and franchisees are beneficial to competition.[371]

#### 2. Comments Received

Several commenters stated that they agreed with the proposed definition of ''worker'' because it applies to all workers without regard to their classification. Many of these

---

[356] § 910.1.

[357] *See* Part IV.C.3.

[358] *See* § 910.2(a)(1)(i).

[359] NPRM, proposed § 910.1(f).

[360] *Id.*

[361] *Id.* at 3511.

[362] *Id.*

[363] *Id.*

[364] *Id.*

[365] *Id.*

[366] *Id.* at 3511, 3520.

[367] *Id.*

[368] *Id.*

[369] *Id.* at 3511.

[370] *Id.*

[371] *Id.*

commenters specifically urged the Commission to adopt a final definition that includes all categories of workers regardless of whether they are classified as employees, including independent contractors, "gig" workers, and others. These commenters pointed to the Commission's preliminary finding that non-competes are widely used across the economy. They cited employers' frequent misclassification of workers as independent contractors, agreeing with concerns raised in the NPRM that, if "worker" excludes independent contractors, employers may misclassify workers as independent contractors to avoid complying with the rule. Many commenters stated that millions of workers are misclassified as independent contractors, including a disproportionate number of women, people of color, and low-income workers. These commenters expressed concern that, if the rule excluded independent contractors from coverage, it would fail to benefit these groups, for whom non-competes may be particularly exploitative and coercive.

On the other hand, several commenters suggested removing bona fide independent contractors and sole proprietors from the definition of "worker." Two industry groups contended that there is a lack of data regarding the prevalence and effects of non-competes among independent contractors as opposed to other kinds of workers and that, as a legal matter, the evidence is insufficient to justify including independent contractors as "workers" under the rule. A few industry organizations also contended that, because they have more control over their work and generally work for more than one employer, independent contractors have greater bargaining power than other workers. One academic commenter suggested that non-competes between employers and independent contractors are more akin to agreements between businesses than agreements between employers and workers. A few of these industry organizations also contended that non-competes are justified because independent contractors provide services outside the scope of their employers' expertise and thus have greater access to sensitive information than other workers. Other industry organizations contended that small businesses employ more independent contractors than their larger rivals. These commenters stated that, to protect small businesses from being impacted disproportionately by the rule, the definition of "worker" should exclude independent contractors. Finally, a few

industry trade organizations and an academic commenter stated that independent contractors should be excluded from coverage under the rule to avoid "free riding," in which a contractor working for one firm can use that firm's assets—like tools or databases—to benefit another firm.

Several commenters suggested changes to the definition of "worker" to maximize the rule's coverage and close potential loopholes. One worker advocacy group noted that, combined with the proposed definition of "employer," the proposed definition of "worker"—a natural person who works "for an employer"—appeared to exclude workers who work for a person other than the person who hired or contracted with them to work. The commenter noted that workers are often employed indirectly—by way of a contractual relationship with a staffing agency, an affiliate of their common-law employer, or some entity other than their common-law employer—and that non-competes are often imposed on workers by the non-hiring party. In order to ensure these workers are covered by the rule, the commenter suggested that the definition of "worker" should also cover a person who works "directly or indirectly" for an employer and that the definition specifically include "a person who works for the employer under an arrangement with a professional employer organization, statutory employer, wholly owned entity of which the person is the sole or principal employee or service provider, loan-out arrangement or similar arrangement."

The same commenter also argued that employers often impose non-competes on workers who own a portion of the business while not applying the same restriction to outside investors who do not work for the company, and that such worker-owner non-competes should be treated as employment-related non-competes. In order to ensure these workers are covered by the rule, the commenter suggested that "worker" should also include "a person who holds direct or indirect equity or other interest in the employer and who provides services to or for the benefit of the employer." Another commenter suggested that, for clarity, "worker" should specifically exclude a "substantial owner, member or partner" as defined in the sale-of-business exception.

Several State attorneys general, local government commenters, academic commenters, and a worker advocacy group warned that categorically excluding franchisees from the definition of "worker" would lead employers to misclassify workers as

franchisees to evade the rule's requirements. Some commenters suggested incorporating the "ABC" test—a common law test designed to determine whether a worker is an employee based on fact-specific conditions—into the definition of "worker" to prevent evasion.[372]

Some commenters requested that the Commission revise the definition of "worker" to exclude or include certain workers from coverage under the rule. These comments are addressed in Part IV.C (comments requesting an exclusion for senior executives) and in Part V.D (comments requesting exclusions for other categories of workers).

### 3. The Final Rule

After considering the comments, the Commission revised the definition of "worker" in three ways to clarify that the term covers all current and former workers, regardless of which entity hired or contracted with them to work, and regardless of a worker's title or status under any other applicable law.

First, the Commission added "or who previously worked" to the basic definition of "worker" as "a natural person who works." This revision is designed to clarify that former workers are considered "workers" under the final rule, such as where an employer is required to notify a former worker that their non-compete is no longer enforceable.[373]

Second, the Commission removed "for an employer" from the definition. This revision is designed to ensure that the final rule covers workers who are hired by one party but work for another, closing the unintended loophole identified by commenters regarding third-party hiring.

Third, the Commission added "without regard to the worker's title or the worker's status under any other State or Federal laws" prior to the list of examples of different categories of workers that the definition covers. This change is designed to make more explicit that the term "worker" includes all workers regardless of their titles, status under other laws, or the details of the contractual relationship with their employer.

The Commission has made two additional changes to the definition for clarity. First, the Commission has revised the phrase "individual classified as an independent contractor" to "independent contractor." Second, the Commission has added "a natural person who works for a franchisee or

---

[372] *See, e.g., Dynamex Operations W. v. Superior Ct.,* 4 Cal. 5th 903, 955–957 (Cal. 2018).

[373] *See* § 910.2(b).

franchisor'' to the non-exclusive list of examples of types of workers that would be covered by the definition. This language is simply moved from elsewhere in the definition. Third, the Commission has removed the sentence reading ''[n]on-competes between franchisors and franchisees would remain subject to Federal antitrust law as well as all other applicable law'' from the definition to avoid the implication that only such non-competes remain subject to Federal antitrust law and other applicable law.

The Commission declines to specify that a ''worker'' includes an owner who provides services to or for the benefit of their business because the definition already encompasses the same.

The Commission is not persuaded by commenters' arguments that independent contractors or sole proprietors are inherently different from other kinds of workers with respect to non-competes, and therefore declines to exclude them from the definition of ''worker.'' Commenters did not present persuasive evidence that non-competes that apply to independent contractors or sole proprietors tend to negatively affect competitive conditions to a lesser degree—or are restrictive, exclusionary, exploitative, or coercive to a lesser degree—than non-competes that apply to other workers. As noted by commenters who supported including independent contractors, non-competes' tendency to negatively affect competitive conditions by restricting workers' ability to change jobs or start businesses is not contingent on whether the worker is an employee or an independent contractor. While some commenters contended that independent contractors have more independence and more access to intellectual property than other workers, commenters did not provide evidence that this is the case. Moreover, even were this to be true, it would not justify an exclusion, because the Commission generally declines to exclude workers based on their access to intellectual capital or their independence for the reasons explained in Part V.D.

Furthermore, whether a worker is an employee or an independent contractor does not impact employers' ability to exploit imbalances of bargaining power or limit employers' ability to use less restrictive alternatives to non-competes to protect their intellectual property. While commenters who supported excluding independent contractors contended that independent contractors have more bargaining power than other workers, this contention is not backed by evidence. While some economists hypothesize that, theoretically,

independent contractors may have more bargaining power vis-à-vis employers than employees do, they do not provide empirical evidence to support that assertion. Furthermore, as described by a report from the Treasury Department that was based on an extensive literature review, independent contractors may have less bargaining power than employees in many respects.[374]

The Commission is also not persuaded that non-competes are necessary to prevent ''free riding'' by independent contractors who use one firm's assets to benefit another. The final rule prohibits agreements that restrain a worker from working after the scope of employment has ended and does not prohibit agreements which prevent a worker from working for two firms simultaneously. In addition, any ''free riding'' may be addressed through less restrictive means, including through agreements prohibiting an independent contractor from using assets provided by one firm to benefit another.

Nor is the Commission persuaded that small businesses will be disproportionately harmed by a rule which prohibits non-competes for independent contractors. Commenters did not provide evidence to support their assertion that small businesses employ more independent contractors than larger ones.

The Commission agrees with the commenters who contended that excluding independent contractors may have the effect of excluding misclassified workers, who may be among the most vulnerable to exploitation and coercion. The recent overview by the U.S. Department of Labor (''DOL'') of the evidence on misclassification led it to conclude that although the prevalence of misclassification of employees as independent contractors is unclear, there is evidence that it is nonetheless ''substantial'' and has a disproportionate effect on workers who are people of color or immigrants because of the disparity in occupations most affected by misclassification, which include jobs in construction, trucking, delivery, home care, agriculture, personal care, ride-hailing services, and janitorial and building services.[375] The Commission also agrees with commenters' contentions that excluding independent contractors from the definition of

''worker'' could increase employers' incentive to misclassify workers as independent contractors. Indeed, misclassification is often motivated by attempts to evade the application of laws.

Because there is no reason to believe non-competes that apply to independent contractors or sole proprietors tend to negatively affect competitive conditions to a lesser degree, or are restrictive, exclusionary, exploitative, or coercive to a lesser degree, than non-competes that apply to employees—and in light of substantial evidence of widespread employee misclassification—the Commission declines to exclude independent contractors from the definition of ''worker.'' For this reason, the Commission also declines to incorporate the ''ABC'' test or other tests designed to differentiate between independent contractors and employees.

## IV. Section 910.2: Unfair Methods of Competition

### A. Introduction

#### 1. Overview of the Commission's Findings and Determinations

In the NPRM, the Commission proposed to categorically ban employers from using non-competes with all workers, including existing agreements. However, the Commission sought comment on whether it should adopt different standards for non-competes with senior executives, and, if so, how it should define senior executives.[376] Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that non-competes with all workers are an unfair method of competition—although its rationale differs with respect to workers who are and are not senior executives.

The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for employers to, *inter alia,* enter into non-competes with workers on or after the final rule's effective date.[377] The Commission thus adopts a comprehensive ban on new non-competes with all workers. With respect to existing non-competes, *i.e.,* non-competes entered into before the final rule's effective date, the Commission adopts a different approach for senior executives[378] than for other workers.

---

[374] U.S. Treasury Dep't, Report, *The State of Labor Market Competition* (Mar. 7, 2022) (hereinafter ''Treasury Labor Market Competition Report'').

[375] Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 FR 1638, 1735 (Jan. 10, 2024).

[376] NPRM at 3519.

[377] *See* § 910.2(a)(1)(i) and § 910.2(a)(2)(i).

[378] *See* § 910.1 (defining ''senior executive'').

Existing non-competes with senior executives can remain in force; the final rule does not cover them.[379] For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[380] Employers must provide such workers with existing non-competes notice that the non-competes will not be enforced after the final rule's effective date.[381]

Specifically, with respect to workers who are not senior executives, the Commission determines that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause; or represent to the worker that the worker is subject to a non-compete clause.[382] The Commission finds that with respect to these workers, these practices are unfair methods of competition in several independent ways:

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets.

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets.

• The use of non-competes is exploitative and coercive conduct that tends to negatively affect competitive conditions in labor markets.

• The use of non-competes is exploitative and coercive conduct that tends to negatively affect competitive conditions in product and service markets.

In contrast, with respect to senior executives, the Commission determines that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause entered into after the effective date; or represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date. The Commission does not find that non-competes with senior executives are exploitative and coercive. With respect to senior executives, the Commission finds that non-competes are unfair methods of competition in two independent ways:

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect

competitive conditions in product and service markets.

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets.

The final rule allows existing non-competes with senior executives to remain in force. Because the harm of these non-competes is principally that they tend to negatively affect competitive conditions (rather than exploiting or coercing the executives themselves), and due to practical concerns with extinguishing existing non-competes for such executives, the final rule prohibits employers only from entering into or enforcing new non-competes with senior executives.

Parts IV.B and IV.C set forth the findings that provide the basis for the Commission's determinations that the foregoing practices are unfair methods of competition under section 5 for these two categories of workers, respectively.[383] In these sections, the Commission also describes and responds to comments regarding the preliminary findings in the NPRM that informed its preliminary determinations related to unfair methods of competition.

### 2. Analytical Framework for Assessing Empirical Evidence

Before turning to the basis for its findings, the Commission describes the analytical framework it has applied in assessing the empirical evidence on non-competes. In the NPRM, the Commission discussed the existing empirical literature on non-competes and its assessment of those studies, including its preliminary view of which studies were more robust and thus should be given more weight.[384] In response, some commenters argued the Commission gave too much weight to certain studies or too little weight to others.[385]

The Commission notes that the methodologies of empirical studies on

the effects of non-competes vary widely. In this final rule, based on the Commission's longstanding expertise assessing empirical evidence relating to the effects of various practices on competition, the Commission gives more weight to studies with methodologies that it finds are more likely to yield accurate, reliable, and precise results. In evaluating studies, the Commission utilized the following five principles that reflect best practices in the economic literature.

First, the Commission gives more weight to studies examining the effects of a change in legal status or a change in the enforceability of non-competes, and less weight to studies that simply compare differences between workers who are subject to non-competes and those who are not. Studies that look at what happens before and after a change in State law that affects the enforceability of non-competes provide a reliable way to study the effects of the change. This is especially true when only the enforceability of non-competes changes, and not other factors affecting firms and workers. If other substantial changes do not also occur around the same time, this study design often allows the researcher to infer that the change caused the effects—since the likelihood that confounding variables are driving the effects or outcomes is minimal.[386]

In contrast, other studies of the use of non-competes compare a sample of workers who are subject to non-competes with a sample of workers who are not subject to non-competes. The shortcoming of these studies is that they cannot easily differentiate between correlation and causation. For example, if such a study shows that workers with non-competes earn more, there could be many confounding reasons for this result. For example, employers may be more likely to enter into non-competes with workers who earn more. In contrast, a study showing that workers' earnings increase or decrease when non-

---

[379] *See* Part IV.C.3.

[380] *See* § 910.2(a)(1)(ii) and § 910.2(a)(1)(iii).

[381] *See* § 910.2(b).

[382] *See* § 910.2(a)(1).

[383] In addition to the findings described in Parts IV.B and C, the Commission finds that the use of non-competes by employers substantially affects commerce as that term is defined in section 5 and burdens a not insubstantial portion of commerce. The findings in Parts IV.B and C apply with respect to senior executives and other workers, whether considered together or respectively. The evidence establishes that non-competes affect labor mobility, workers' earnings, new business formation, and innovation, including empirical evidence specifically identifying cross-border effects with respect to earnings, *see infra* notes 464–468 and accompanying text, and innovation, *see infra* note 563 and accompanying text.

[384] *See* NPRM at 3484–93.

[385] The Commission discusses comments addressing specific studies in Parts IV.B, IV.C, and IV.D.

[386] In Parts IV.B and C, the Commission describes how these "enforceability" studies show that increased enforceability of non-competes results in various harms, such as reduced earnings, new business formation, and innovation. Notably, the available evidence also shows that workers are chilled from engaging in competitive activity even where a non-compete is likely unenforceable—for example, because they are unaware of the law or unable to afford a legal battle against the employer. *See* Part IV.B.3.a.i. The fact that many workers may not adjust their behavior in response to changes in State-level enforceability of non-competes suggests that the final rule could result in even greater effects than those observed in the research, particularly because it would require employers to provide workers with notice that their non-compete is no longer in effect, which would help correct for workers' lack of knowledge of the law. *See* § 910.2(b).

competes are made more or less enforceable provides much stronger evidence regarding the effect of non-competes, in isolation. Researchers studying non-competes are aware of this bias and frequently caution that estimates of the correlation between outcomes and the use of non-competes should not be misinterpreted as causal.[387]

Second, the Commission gives more weight to studies examining the effects of changes in non-compete enforceability and less weight to studies that simply compare economic outcomes between States where non-competes are more enforceable and States where non-competes are less enforceable. This latter category of studies is known as "cross-sectional studies of enforceability." Like studies based on the use of non-competes, these cross-sectional studies of enforceability cannot easily differentiate between correlation and causation. This is because differences between States that are unrelated to non-competes and their enforceability can easily pollute comparisons. For example, non-competes are less enforceable in California than in Mississippi, and the cost of living is higher in California than in Mississippi. However, the difference in the cost of living is likely to be due to underlying differences between the economies and geographies of the two States, rather than being attributable to non-competes. In contrast, studies examining how changes in enforceability of non-competes affect various outcomes—studies that look at what happens within States before and after a change in State law that affects the enforceability of non-competes—allow researchers to infer that the change caused the effects.[388]

Despite having this limitation, the Commission believes that cross-sectional studies of enforceability are still superior to the "use" studies described under the first principle. This is because although comparisons of different States may have unreliable results due to confounding variables—depending on which States are

compared—"use" studies are inherently unreliable due to confounding effects. For example, because employers enter into non-competes more often with highly paid workers, all "use" studies related to worker earnings are inherently unreliable, although studies that utilize data on the use of non-competes but employ a design that plausibly identifies a causal effect may be less unreliable.

Third, the Commission gives more weight to studies assessing changes in the enforceability of non-competes in multiple States. This reduces the possibility that the observed change in economic outcomes was driven by an idiosyncratic factor unique to a particular State. For example, assume State X changed its laws to make non-competes less enforceable, and new business formation subsequently increased compared with other States. However, around the same time it changed its non-compete law, State X also enacted legislation to provide attractive tax incentives to entrepreneurs. It would be difficult to isolate the effect of the change in non-compete law from the effect of the tax law change. For this reason, the Commission gives more weight to studies that analyze the effects of multiple changes in enforceability. For example, if a study shows that, compared with other States that did not change their non-compete laws, new business formation rose not only in State X, but also in several other States that changed their laws to make non-competes less enforceable, the Commission would be more confident inferring that changes in non-compete law caused these effects.

Fourth, the Commission gives more weight to studies that use sophisticated, nuanced measures of enforceability, such as non-binary measures of non-compete enforceability that capture multiple dimensions of non-compete enforceability. This fourth guiding principle ensures accuracy and granularity in the measurement of non-compete enforceability.

A variety of different factors affect the enforceability of non-competes from State to State, including (among others) the permissible geographic scope and duration of non-competes and how high the employer's burden of proof is to establish that a non-compete is enforceable. Given the different factors involved, the overall level of non-compete enforceability from State to State falls along a spectrum; it is not as simple as whether non-competes are enforceable or not. Thus, scales which use binary measures miss nuance between States. This is true for

enforceability overall (e.g., scales which simply assign States to "enforcing" or "non-enforcing" categories) and for elements of enforceability (e.g., scales which assess whether a non-compete is enforceable if a worker is fired with a yes or no answer). While no scale is perfect, scales which allow for multidimensionality and granularity measure non-compete enforceability (and thus the effects that stem from it) with a higher degree of accuracy.[389]

Fifth, the Commission gives more weight to studies in which the outcome studied by the researchers is the same as the outcome the Commission is interested in or is an effective proxy for the outcome the Commission is interested in. It gives less weight to studies that use ineffective proxies. For example, some outcomes are relatively easy to study. There is extensive data on workers' earnings at the State level, so researchers can simply use this data to study how changes in non-compete enforceability affect workers' earnings in a State. Other outcomes, however, may be more challenging to quantify directly, and thus researchers may use proxies for understanding the effect they are studying. For example, there is no single metric that measures innovation in the economy. For this reason, to learn about how non-competes affect innovation, a researcher might study the effect of changes in non-compete enforceability on the number of patents issued in the State as a proxy for innovation. However, proxies can sometimes be ineffective or inapt. For example, a study that analyzes the effect of non-compete enforceability on the number of patents issued is generally a weaker proxy for innovation than a study that also takes into account the quality of patents issued. For this reason, the Commission gives more weight to studies that measure the exact outcome of interest or studies that use effective proxies.

While these five guiding principles are important indicators of the relative strength of empirical studies evaluated by the Commission for the purpose of this final rule, the Commission's assessment of empirical studies was holistic and relied on its economic expertise. In addition to the guiding principles described in this Part IV.A.2, the Commission's holistic, expert assessment of the empirical evidence also included considering characteristics of studies important in any context, such as data quality, statistical precision, and other factors.

---

[387] See, e.g., Starr, Prescott, & Bishara, supra note 68 at 73 ("Our analysis of the relationships between noncompete use and labor market outcomes . . . is best taken as descriptive and should not be interpreted causally."); Johnson & Lipsitz, supra note 80 at 711 ("These regressions [of firm investment on non-compete use] should be interpreted as correlations rather than causation, since the decisions to make these investments and use [non-competes] are made jointly.").

[388] Matthew S. Johnson, Kurt J. Lavetti, & Michael Lipsitz, The Labor Market Effects of Legal Restrictions on Worker Mobility, Nat'l Bureau of Econ. Rsch. 2 (2023) (". . . cross-sectional variation in enforceability might be correlated with other unobserved differences across states.").

[389] Jonathan M. Barnett & Ted Sichelman, The Case for Noncompetes, 87 U. Chi. L. Rev. 953 (2020).

In some instances, the Commission cites studies beyond those discussed in the NPRM. The Commission cites such studies only where they check or confirm analyses discussed in the NPRM, or where the Commission is responding to comments raising them. The Commission's findings do not rest on these studies, however, and they are not necessary to support its findings.

## B. Section 910.2(a)(1): Unfair Methods of Competition—Non-Competes With Workers Other Than Senior Executives

The Commission now turns to the basis for its findings that non-competes with workers other than senior executives are an unfair method of competition. As explained in Part II.F, under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace, and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness, and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.

Non-competes with workers other than senior executives satisfy all the elements of the section 5 inquiry.[390] As described in Part IV.B.2, such non-competes are facially unfair because they are restrictive and exclusionary, and because they are exploitative and coercive. And as described in Part IV.B.3, such non-competes tend to negatively affect competitive conditions in labor markets and markets for products and services. As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused actual harm in a specific instance. Here, the tendency of non-competes to impair competition is obvious from their nature and function. And even if this tendency were not facially obvious, the evidence confirms that non-competes do in fact have a negative effect on competitive conditions.

The Commission finds that the empirical research described in this Part IV.B supports findings related to workers other than senior executives.[391]

## 1. The Commission Finds That Non-Competes Are a Method of Competition, Not a Condition of the Marketplace

With respect to the first element, whether the conduct is a method of competition, the Commission preliminarily found in the NPRM that non-competes are a method of competition under section 5 because they are specific conduct undertaken by an actor in a marketplace, as opposed to merely a condition of the marketplace.[392] No commenters disagreed with this finding, and the Commission reaffirms its preliminary finding that non-competes are a method of competition.

## 2. The Commission Finds That Non-Competes Are Facially Unfair Conduct

The Commission finds that non-competes are facially unfair conduct under section 5 because they are restrictive and exclusionary. The Commission further finds that non-competes are facially unfair under section 5 because they are exploitative and coercive.

### a. Non-Competes Are Restrictive and Exclusionary Conduct

Under section 5, indicia of unfairness may be present where conduct is restrictive or exclusionary, provided that the conduct also tends to negatively affect competitive conditions.[393] In the NPRM, the Commission explained that non-competes are restrictive conduct.[394] No commenters disputed this analysis, and the Commission reaffirms its preliminary finding that non-competes are restrictive.

The restrictive nature of non-competes is evident from their name and function: non-competes restrict competitive activity. They do so by restricting a worker's ability to seek or accept other work or start a business after the worker leaves their job, and by restricting competitors from hiring that worker. Because non-competes facially restrict competitive activity, courts have long held they are restraints of trade and proper subjects for scrutiny under the antitrust laws.[395]

The restrictions that non-competes impose on workers are often substantial. Non-competes can severely restrict a worker's ability to compete against a former employer. For most workers, the most natural alternative employment options are jobs in the same geographic area and in the same field. These are the very jobs that non-competes typically prevent workers from taking. Furthermore, for most workers, the most practical entrepreneurship option is starting a business in the same field. This is the very opportunity that non-competes typically prevent workers from pursuing. Moreover, the record before the Commission reflects that non-competes are often so broad as to force a worker to sit out of the labor market altogether.

In the NPRM, the Commission used the term "restrictive" to encompass both restrictive and exclusionary conduct.[396] In this final rule, in addition to finding that they are restrictive conduct, the Commission separately finds that non-competes are exclusionary conduct because they tend to impair the opportunities of rivals. Where a worker is subject to a non-compete, the ability of a rival firm to hire that worker is impaired. In addition, where many workers in a market are subject to non-competes, the ability of firms to expand into that market, or entrepreneurs to start new businesses in that market, is impaired.

For the foregoing reasons, the Commission finds that the use of non-competes with workers other than senior executives is facially unfair under section 5 because it is conduct that is restrictive or exclusionary.

### b. Non-Competes Are Exploitative and Coercive Conduct

Conduct may violate section 5 where it is exploitative or coercive and tends to negatively affect competitive conditions.[397] Indeed, where conduct is exploitative or coercive, it evidences

---

[390] For the sake of readability, in this Part IV.B, the Commission refers to non-competes with workers other than senior executives as "non-competes."

[391] Some of the studies described in Part IV.B analyze non-competes between employers and workers across the labor force. Other studies analyze non-competes with particular populations of workers. In each of the studies described in Part IV.B, non-competes with workers other than senior executives represented a large enough segment of the sample that the study supports findings related to the effects of non-competes for such workers. Studies that focus primarily on non-competes for senior executives are described in Part IV.C, which explains the Commission's findings related to non-competes with senior executives.

[392] NPRM at 3504.

[393] See Part II.F.

[394] NPRM at 3500.

[395] See, e.g., Am. Tobacco Co., 221 U.S. 106, 181–83 (1911) (holding that several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-competes); Newburger, Loeb & Co., Inc., 563 F.2d 1057, 1082 (2d Cir.) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[396] NPRM at 3500 ("Non-competes also restrict rivals from competing against the employer to attract their workers.").

[397] See Part II.F.

clear indicia of unfairness, and less may be necessary to show a tendency to negatively affect competitive conditions.[398]

In the NPRM, the Commission preliminarily found that non-competes with workers other than senior executives were exploitative and coercive because in imposing them on workers, employers take advantage of their unequal bargaining power.[399] The Commission also preliminarily found that non-competes are exploitative and coercive at the time of the worker's potential departure, because they force a worker to either stay in a job the worker wants to leave or force the worker to bear other significant harms and costs, such as leaving the workforce or their field for a period of time; relocating to a different area; violating the non-compete and facing the risk of expensive and protracted litigation; or attempting to pay the employer to waive the non-compete.[400]

The Commission received an outpouring of comments on the question of whether non-competes were exploitative or coercive. Thousands of workers described non-competes as pernicious forces in their lives that took advantage of their lack of bargaining power and forced them to make choices detrimental to their finances, their careers, and their families. Above all, the predominant themes that emerged from the comments were powerlessness and fear.

Thousands of workers reported feeling powerless to avoid non-competes, either because the worker needed the job or because non-competes were pervasive in the worker's field. Hundreds of workers reported non-competes were unilaterally imposed on them. Workers overwhelmingly reported that they did not bargain over non-competes, did not receive compensation for non-competes, and were not represented by counsel in connection with non-competes, with only rare exceptions.

And hundreds of workers reported that even where they wanted a job with better pay or working conditions, or to strike out on their own, the fear of litigation from a deep-pocketed employer or the fear of being without work prevented them from doing so. Hundreds of workers described how this fear coerced them into remaining in jobs with poor conditions or pay, including dangerous or toxic work environments; into leaving an industry or profession that they invested, trained, studied, or

were experienced in, damaging or derailing their careers; into moving away from their home, uprooting or separating their families; or into enduring long-distance commutes, which made it harder to care for and spend precious time with their loved ones. Many workers described how this fear hung above them even if they thought the non-compete was overbroad and probably unenforceable under State law, because having to defend a lawsuit from an employer for any length of time would devastate their finances.

Based on the entirety of the record, for the following reasons, the Commission finds non-competes with workers other than senior executives are exploitative and coercive because they are unilaterally imposed by a party with superior bargaining power, typically without meaningful negotiation or compensation, and because they trap workers in worse jobs or otherwise force workers to bear significant harms and costs.

i. Non-Competes With Workers Other Than Senior Executives Are Unilaterally Imposed

The Commission finds that employers almost always unilaterally impose non-competes, exploiting their superior bargaining power to impose—without any meaningful negotiation or compensation—significant restrictions on workers' abilities to leave for better jobs or to engage in competitive activity.

The Commission finds that employers have significantly more bargaining power than workers. Most workers, especially workers other than senior executives, depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and put food on the table. The loss of a job or a job opportunity can severely damage workers' finances and is far more likely to have serious financial consequences for a worker than the loss of a worker or a job candidate would have for most employers.

The Treasury Department, in a report based on an extensive literature review, finds that firms generally have considerable labor market power.[401] The report states that concentration in particular industries and locations can increase employers' labor market power.[402] However, the report explains that, even in the absence of concentration, firms have significant labor market power due to a variety of factors.

As the report notes, some of these factors are inherent in the firm-worker relationship. The report states that workers are at an informational disadvantage relative to firms, often not knowing what other workers earn or the competitive wages for their labor.[403] The report states further that workers often have limited or no ability to switch locations and occupations quickly and may lack the financial resources to support themselves while they search for jobs that pay more and better match their skills and abilities.[404] According to the report, these conditions often enable firms to exert market power even in labor markets that are not highly concentrated.[405]

In addition to factors inherent to the employer-worker relationship, the report concludes that firms use a wide range of practices to restrain competition for workers, including sharing wage information and conspiring to fix wages with other firms; agreeing not to hire other firms' workers; and adopting non-competes, mandatory arbitration agreements, and overbroad NDAs.[406] The report also states that practices such as outsourcing and worker misclassification have further diminished workers' market power.[407] Overall, the report finds that employers' labor market power has resulted in a 20% decrease in wages relative to the level in a fully competitive market.[408]

The Commission finds that employers are able to exploit their considerable labor market power—and indeed routinely do so—with respect to non-competes imposed on workers other than senior executives. Employers are repeat players likely to have greater experience and skill at bargaining than individual workers in the context of negotiating employment terms such as non-competes.[409] Research has found that employers present non-competes in standard-form contracts,[410] which workers are unlikely to read,[411] and that

---

[398] *See id.*

[399] NPRM at 3502–04.

[400] *Id.* at 3504.

[401] Treasury Labor Market Competition Report, *supra* note 374 at i–ii.

[402] *Id.* at i.

[403] *Id.*

[404] *Id.*

[405] *Id.*

[406] *Id.*

[407] *Id.* at ii.

[408] *Id.*

[409] *See, e.g., Samuel Stores, Inc.* v. *Abrams,* 108 A. 541, 543 (Conn. 1919); *Sunder Energy, LLC* v. *Jackson,* 305 A.3d 723, 753 (Del. Ct. Chancery 2023).

[410] Starr, Prescott, & Bishara, *supra* note 68 at 72 ("Taken together, the evidence in this section indicates that employers present (or employees receive) noncompete proposals as take-it-or-leave-it propositions.").

[411] *See, e.g.,* Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction,* 96 Harv. L. Rev. 1173 (1983); Russell Korobkin, *Bounded Rationality, Standard-Form Contracts, and*

Continued

workers rarely bargain over non-competes and rarely seek the assistance of counsel in reviewing non-competes.[412] Many workers also lack the legal training or legal knowledge necessary to understand whether a particular non-compete is enforceable or the consequences of entering into a non-compete. The available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws.[413] Research has also found that employers exploit their power over workers by providing them with non-competes after they have accepted the job offer—and in many cases, on or after their first day of work—when the worker's negotiating power is at its weakest, since the worker may have turned down other job offers or left their previous job.[414]

The comment record provides strong support for the Commission's finding that non-competes are coercive and exploitative because they are typically unilaterally imposed by employers on workers other than senior executives. Illustrative examples of the comments the Commission received include the following:

• I am a practicing OB/GYN physician in Shreveport, LA. . . . I was put into a non-negotiable, vague non-compete with NO expiration date. . . . I needed a job. I was in a large amount of debt with accumulating interest during my four years of residency with a minimal salary. Honestly, I could not afford an attorney. So naively I trusted that the people that had been training me for the past 4 years would not take advantage of me in a contract. I did not have the ability to seek advice on "how" to negotiate a contract with my mentors since my mentors were the ones who wrote the contract.[415]

• As [a] physician who recently negotiated a new contract, I support FTC changes to the non-compete rules. . . . All three institutions [I considered working for] had unreasonable and onerous non-competes. Essentially making it impossible to get another job in the entire state of NJ—not just a few mile radius but two thirds of the state. . . . Non-competes are never negotiable even when hiring a lawyer to review and negotiate the contract. Hospitals refused to negotiate on the majority of the contract citing it is [an] across the board provision that cannot be altered.[416]

• I'm a worker that has had to consider whether to take a job that requires signing a no-compete agreement . . . . Several times

in my career, after weeks of interviewing and salary negotiation, I've found myself facing a required no-compete agreement that would drastically limit my future career options and negotiating power. Several times I've accepted these agreements because I had already turned down competing offers and found myself with limited options.[417]

• I'm a project manager at an Interior Design & Home Staging company in Manhattan; we're the largest staging company on the East Coast. After I accepted my job offer and went in to file paperwork, I was very briefly walked through what this non-compete means (the details were not made entirely clear; I believe they left it intentionally murky) and it was buried deep in the new employee rules and regulations packet I needed to read and sign at my onboarding. I personally am very against these agreements because, as mine states, I cannot work with "a competing staging company" or for any of the clients of my current company. Again, we're the largest staging firm on the east coast and have a lot of clients (we do over 100 stagings per year). Essentially, I am completely shut out of working in the industry in NYC as there are only a handful of other staging companies that can pay me a living wage to do so.[418]

• You might say that we might be able to negotiate out of a non-compete in our contract, but that is simply not true. In my hospital, I was already established, owning a house and having kids in school in a spouse in a career when the Hospital came forward and sit on my next contract renewal that I had no choice, but to sign a noncompete. They had me over a barrel. At my next contract negotiation, I try to negotiate out of the noncompete, with less salary or less benefits, and it was a nonstarter. There is zero tolerance for negotiating out of the noncompete.[419]

• At the end of 2018, as a Manager at a small business (150 employees) in a niche technology industry, I was offered shares in our company as we were acquired by a Private Equity firm. . . . I worked with a company-provided attorney on an Employment Agreement. This agreement offered a 6-month severance with a 1-year non-compete period, which I negotiated down to a 6-month non-compete to match the severance period. Later that month, I was sent an additional, previously unseen 120-page Share Agreement that governed how I would vest the shares I had earned. I didn't realize it at the time, but buried toward the end of this document was another non-compete that had a much longer timeframe dictated—1 year from when I no longer held any shares. As it would potentially take up to 6 years for the company to sell again, that meant an incredibly long and indefinite sounding time period. I was given only one business day to review this agreement, and was sent a signature packet the following day. I honestly thought I was signing my

Employment Agreement negotiated with a company attorney, not the share agreement that neither myself nor the attorney had reviewed, and which I had only received the day prior.[420]

• Desperate to obtain an entry level job in the Accounting field in which I am currently obtaining my Associate's degree, I was presented with an offer of employment and a non-compete agreement contract to sign. Because I needed to pay rent, I signed it.[421]

• On the first day of my husband's employment, without prior notice, an extensive 2 year non-compete clause was put in his employment contract and while it was noted within the clause he could seek counsel, when you are in the middle of your first day of work it's not practical. In addition, for most people, if it is your first experience with a non-compete, you likely do not have the funds to pay a $750 per hour lawyer to advise and negotiate on your behalf, nor realize the possible long-term consequences.[422]

Many commenters agreed with the Commission's preliminarily finding that employers generally have considerable labor market power. Even commenters opposing the NPRM did not generally dispute the notion that there is unequal bargaining power between employers and workers. Many workers stated that non-competes are pervasive in their industry, meaning they could not find a job without one. Many commenters stated that high wages or skills do not automatically translate into more bargaining power or sufficiently mitigate the harms from non-competes, especially in concentrated markets or markets where so many employers use non-competes that workers effectively have no choice but to sign them. Commenters also said that underrepresented groups may have even less bargaining power to negotiate non-competes and are less likely to have the resources for litigation, which could have an increased deterrent effect on worker mobility.

Hundreds of commenters stated that workers are rarely, if ever, able to negotiate their non-competes because non-competes are typically presented in a take-it-or-leave-it fashion. These comments spanned both lower-wage workers and workers in high-wage industries.[423] Workers often stated that they were "forced" to sign a non-

*Unconscionability,* 70 U. Chi. L. Rev. 1203, 1217 (2003).

[412] Starr, Prescott, & Bishara, *supra* note 68 at 72.

[413] J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability,* Forthcoming, J. L. Stud. 10–11 (2022).

[414] Marx (2011), *supra* note 81 at 706.

[415] Individual commenter, FTC–2023–0007–4414.

[416] Individual commenter, FTC–2023–0007–10547.

[417] Individual commenter, FTC–2023–0007–12428.

[418] Individual commenter, FTC–2023–0007–12480.

[419] Individual commenter, FTC–2023–0007–14706.

[420] Individual commenter, FTC–2023–0007–2347.

[421] Individual commenter, FTC–2023–0007–2600.

[422] Individual commenter, FTC–2023–0007–5933.

[423] Industries that the Commission considered as higher wage industries included but were not limited to engineers, entertainment (namely on-air talent), entrepreneurs, financial services, dentists, physicians, sales workers, tech industry workers, and veterinarians. Industries were assessed as high wage based on BLS occupational wage data. BLS, *Occupational Employment and Wage Statistics, https://www.bls.gov/oes/tables.htm* (based on the May 2022 National XLS table).

compete. Very few workers said they were able to decline signing a non-compete and still be hired or employed. An employment law firm also agreed with the Commission and stated that non-competes are rarely subject to negotiation.

Confirming the research described in this Part IV.B.2.b.i, many workers—including highly paid and highly skilled workers—stated that they did not receive notice that they would be required to sign a non-compete until after accepting a job offer. Some workers said they were told of the non-compete after accepting the job but before starting work. Many workers who described when they were notified of a non-compete said it was on their first day of work or even later. Many workers stated that they were required to sign their non-compete after a merger or acquisition—*i.e.,* after they were already on the job but there was a change in ownership of the company. For example, a trade organization stated that it is common for the purchaser of a business to impose non-competes on its workers, which may trap workers in an organization different from the one they originally agreed to work for. An employment law firm commented that even highly paid or highly skilled workers do not always receive notice of non-competes with the employment offer.

Many workers also stated that non-competes are often hidden or obscured. Several workers said their non-compete was buried in other paperwork or confusingly worded or vague. Some commenters stated that their employer refused to allow them to have a copy of their non-compete. Many workers said their employers gave them misleading or incorrect information about the terms or enforcement of non-competes. Each of the above categories included not only workers from low-wage industries, but also workers from high-wage industries. While these practices appear to be commonplace, based on the comments, the Commission also notes that even workers who knew about non-competes before accepting the job offer—and who did not report being misled about the non-compete—did not report bargaining or negotiating over it.

Only a small number of workers reported any negotiating over non-competes. For example, a sales worker said they were able to negotiate a non-compete, though that worker still supported the proposed rule. A surgeon group stated hospitals were willing to negotiate over non-competes, but that hospitals use the non-competes as a negotiating tactic to drive down surgeon salaries.

Few workers who submitted comments reported being compensated for signing a non-compete. Among those workers who did report receiving compensation, most still say they considered their non-competes to be exploitative or coercive. For example, some workers said they were laid off and then required to sign a non-compete as a condition for receiving severance. A few workers said their employer had threatened to withhold their commissions and/or pay on departure if they did not sign a non-compete. One worker reported never receiving the compensation associated with a non-compete, because they were terminated two months after signing.

In addition, the Commission finds that employers frequently impose non-competes even when they are unenforceable under State law. An economist suggested that non-competes may be used in States in which they are unenforceable because the employer hopes the State's policy might change, or the employer might be able to forum-shop to apply the law of another jurisdiction more favorable to non-competes. Some commenters stated that firms may remind workers they are subject to a non-compete upon departure even when those non-competes are unenforceable because they hope that workers and competitors will abide by them.

These comments that employers often use unenforceable non-competes are supported by research finding that employers frequently use non-competes even when they are unenforceable under State law.[424] This research suggests that employers may believe workers are unaware of their legal rights, or that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights or the challenges workers face enforcing their rights.

A far smaller number of commenters—a group that included many businesses and trade organizations, and very few workers—argued that non-competes were not exploitative or coercive. An industry organization said non-competes are understandable to a layperson with respect to their geographic scope, time in effect, and industry to which they apply, while an alternative trade secret case would be more complex. But even if workers understand the basic terms of non-competes, that does not alter the Commission's core concern that non-competes are exploitative and coercive because they take advantage of unequal bargaining power between employers

and workers and force workers to stay in jobs they want to leave or otherwise bear significant harms or costs. It also does not alter the Commission's concern that non-competes tend to negatively affect competitive conditions. Moreover, the Commission notes that the available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws.[425] In addition, many commenters stated that non-competes were not disclosed to them before they started their job. Furthermore, the Commission addresses why trade secret law is a less restrictive alternative for protect employers' legitimate interests in Part IV.D.2.

A few commenters stated that unequal bargaining power does not constitute an unfair method of competition. In response, the Commission notes that it does not find that unequal bargaining power itself is an unfair method of competition; rather, unequal bargaining power informs its analysis of exploitation and coercion.

The comment record indicates that while some highly paid workers may seek the assistance of counsel when negotiating non-competes, many do not. Commenters did not present studies or other quantitative evidence that undermines the finding in Starr, Prescott, & Bishara that less than 8% of workers seek assistance of counsel in connection with non-competes.[426] The Commission thus finds that the vast majority of workers lack assistance of counsel in connection with entering non-competes. The Commission believes that its definition of senior executives, discussed in Part IV.C.4, captures those workers who are most likely to seek assistance of counsel. To the extent any other individual workers seek assistance of counsel and/or are able to actually bargain over non-competes sufficient that a given non-compete is not exploitative and coercive, the Commission still finds that such non-competes are unfair methods of competition for the independent reason that they are restrictive and exclusionary conduct that tends to negatively affect competitive conditions.

Overall, the comments provide strong support for the Commission's finding that, with respect to workers other than senior executives, employers almost always unilaterally impose non-competes—exploiting their superior bargaining power to significantly restrict workers' abilities to leave for better jobs or engage in competitive activity.

---

[424] Starr, Prescott, & Bishara, *supra* note 68 at 81.

[425] *See supra* note 413 and accompanying text.

[426] Starr, Prescott, & Bishara, *supra* note 68 at 72.

ii. Non-Competes With Workers Other Than Senior Executives Trap Workers in Jobs or Force Them to Otherwise Bear Significant Harms and Costs

The Commission finds that non-competes are exploitative and coercive because they force workers to either stay in jobs they want to leave or bear other significant harms and costs, such as leaving the workforce or their field for a period of time; relocating out of their area; or violating the non-compete and facing the risk of expensive and protracted litigation. In addition, the Commission finds non-competes exert a powerful *in terrorem* effect: they trap workers in jobs and force them to bear these harms and costs even where workers believe the non-competes are overbroad and unenforceable, due to workers' fear that having to defend a lawsuit from their employer for any length of time would devastate their finances or ruin their professional reputations.

The comment record provides strong support for this finding. Many workers submitted comments supportive of the Commission's preliminary finding that non-competes coerce workers into remaining in their current jobs. Many workers reported staying in their jobs because they feared harm to their careers if they were forced out of their field; feared having to relocate or endure a lengthy commute due to a non-compete; or feared their non-competes would cause them to be unemployed if they left. Several workers reported they were unable to take a specific desired job because of a non-compete. Many workers recounted how non-competes trapped them in jobs with poor working conditions or where they were subject to illegal conduct, including sexual harassment.[427] Some workers said they were subject to particularly broad, even global, non-competes, meaning leaving their field was their only option if they left their current job. These comments spanned both lower-wage workers and workers in high-wage industries.

Illustrative examples of the comments the Commission received include the following:

• I am a journalist who has been forced to move across the country three times, and leave my field entirely for one year, in order to comply with stringent non-compete agreements. . . . In [one] situation, I was stuck working for abusive management who fostered a toxic and abusive workplace, and I had to work there for more than a year until I could find a job in another city entirely because they had threatened to sue me under the non-compete if I left and worked for

another local station. . . . [E]ven if these clauses are unenforceable, as we've all heard before, who can afford the legal representation to go up against a corporation and their lawyers when the lawsuit threat comes? My life would have been very different if I weren't trapped by non-competes at points in my career.[428]

• As a veterinarian I support the elimination of non-compete agreements. In our profession they still are overwhelmingly the normal expectation with contracts. . . . [C]ompanies use the fear of litigation to enforce them. As veterinary medicine very quickly becomes more corporate owned, basically they pit us as a singular employee against large corporations that have substantial means both financially and legally. No reasonable employee wants to take on that battle or even can financially take on that battle. So regardless if the clauses are 'unenforceable' they are enforced via intimidation. . . . When [my] job was a terrible fit and my boss ultimately ended up 'not renewing my contract' I was still left with a noncompete. This basically eliminated my ability to work within a reasonable distance of our home. I ended up commuting an hour and 15 minutes one way for 10 months until my husband, myself, and my very young child were able to move closer to my new job. While it was likely legally unreasonable in nature, I did not have the resources financially to even consider the legal battle that would have had to happen for reconsideration and I desperately needed an income to continue to pay the student debt that comes with being a young doctor. Furthermore I had a baby that needed my focus as well.[429]

• I was fired unjustly 11/2021 for declining the Covid vaccine. My medical and religious exemptions were both denied. In addition to this, I was required by my former employer contract to abide by the two-year 10 mile restrictive covenant. This greatly hindered my ability to find employment, and I was out of work for approximately three months. I could only find part-time work for a fraction of my former salary. Had I not had the noncompete clause, I could have found a full-time job almost immediately.[430]

• Unfortunately, the average dental school graduate has nearly $300,000 in student loan debt, and most new dentists are unable to make their practice-ownership dreams a reality immediately after residency. Thus, we rely on entry-level associate dentist positions to gain experience, pay off debt, and become fiscally/professionally prepared to become practice owners. Much to my dismay, upon interviewing for my first associate dentist position, I quickly realized how non-competes are being used in the dental profession to prevent vulnerable young dentists like myself from taking the next step in our careers. . . . Although dental associate positions come with relatively high compensation, it doesn't make this issue any less problematic.[431]

• My daughter had an inter-state non-compete enforced as a minimum wage

medical scribe. Originally she was working with a medical scribe company in Indiana prior to Covid. Due to COVID and graduating from college she then moved to our home in Oregon. She applied for a medical scribe job in Oregon with a company that did not provide any scribe services in Indiana. But her original scribe company had 1 "office" they were providing scribe services to in Salem, Oregon. My daughter had applied with the local scribe company to provide services but when examined further found that her original scribe company from Indiana was going to enforce a $5000 non-compete buy-out fee on her to provide the services in Salem, Oregon that were within the sphere of restriction for her "new" local scribe opportunity.[432]

Many commenters explained that non-competes forced them to relocate and described the toll the relocation took on their families. Other commenters stated that their families have been forced to live apart, or they had been separated from elderly relatives, due to a non-compete forcing the relocation of one of the family members. Many commenters described how long commutes undertaken to avoid non-competes increased transportation costs and caused the worker to lose precious time with their families.

The comment record bolsters the Commission's finding that employers wield non-competes to coerce and exploit workers into refraining from competitive activity even where non-competes are unenforceable. Many workers explained that they—and others in their industry—abided by non-competes, even where they believed the non-compete was overbroad and likely unenforceable. According to a law firm specializing in executive compensation, even workers who can afford counsel may be unwilling to mount a long and uncertain legal battle to challenge a non-compete. The firm said employers almost always have deeper pockets and more access to counsel than individual workers, making workers more reluctant to litigate. Commenters further stated that employers may be able to deduct litigation costs as a business expense, giving them the wherewithal to enforce their non-competes.

Many workers with non-competes stated that they feared legal action from their employer or enormous legal fees if they left their current job, and most of those workers said they could not afford litigation. Workers also stated that they are reluctant to engage in litigation against an employer because it would harm their reputation in their industry.

Many workers reported being threatened with litigation over a non-

---

[427] These comments are addressed in greater detail in Part IV.B.3.a.iii.

[428] Individual commenter, FTC–2023–0007–0747.
[429] Individual commenter, FTC–2023–0007–2855
[430] Individual commenter, FTC–2023–0007–7561.
[431] Individual commenter, FTC–2023–0007–8858.

[432] Individual commenter, FTC–2023–0007–15249.

compete when they attempted to leave an employer. Some commenters said their non-competes contained additional clauses making litigation more difficult, such as attorneys' fee-shifting provisions or forced arbitration. Other workers feared having to pay financial penalties or feared having their compensation clawed back if their employer claimed they violated the non-compete. Each of the above comment categories included numerous comments from workers in high-wage industries.

Commenters asserted that employers have several advantages in litigation, further increasing the risk of challenging a non-compete. A commenter said even an extremely overbroad non-compete may be enforceable because a court can modify it to reduce its scope or duration. An employment attorney said employers who use overbroad non-competes to stifle competition suffer few if any negative consequences for doing so. The employment attorney further said that most employers do well even in a legal regime that nominally disfavors non-competes, due to the chilling effect of the threat of litigation. One researcher cited in the NPRM stated that non-competes have a powerful chilling effect because State laws generally do not prohibit employers from requiring employees to sign overbroad non-competes. Accordingly, the researcher recommended that non-competes be banned rather than restricted in scope, thereby preventing the possibility of lawsuits (and the threat thereof).

No commenters submitted studies or empirical evidence to contradict or otherwise call into question the research cited in the NPRM finding employers frequently use non-competes even when they are unenforceable under State law. Many commenters said they perceived non-competes to be a tool used to intimidate workers, and others specifically said they had been intimidated when their employers took legal action against other workers who left. These comments spanned workers in both lower-wage and high-wage industries.

The comments reflected that fields with high compensation levels were not immune from coercion and exploitation, and that, to the contrary, specialization can increase employers' ability to coerce and exploit workers. For example, some commenters said highly trained and/or specialized workers face heightened challenges in finding a job that does not violate a non-compete without relocating or become entirely unemployable, given the smaller number of such specialized jobs

available. One commenter said that many workers are compensated highly because they are in a small field or have a niche skillset, meaning non-competes significantly limit their ability to find another job in their field. Some commenters in professions requiring advanced education also submitted comments stating that significant student loan debt decreased their bargaining power or increased the financial risk of attempting to change jobs. An employment law firm stated that highly paid or highly skilled workers in roles that are not limited to a single industry or business, such as finance or human resources, are more likely to be able to find employment in another industry, while those with training and expertise in a particular industry or type of business are at a greater risk of unemployment. Some medical organizations and others pointed out that non-competes can be particularly exploitative and coercive for professions such as physicians that require State licenses, credentials, and insurance, making relocation even more difficult.

A far smaller number of commenters claimed non-competes are not exploitative or coercive and do not trap workers in jobs or force workers to bear significant harms or costs. Several commenters argued that, because non-competes are often not exploitative and coercive at the time of contracting, they are also not exploitative and coercive at the time workers seek to leave their jobs. According to these commenters, to the extent a non-compete is bargained for and fairly compensated, that same non-compete does not become exploitative and coercive at the time of departure. In response, the Commission notes that commenters overwhelmingly reported workers rarely bargain in connection with, or receive compensation for, non-competes,[433] and the mere existence of compensation does not automatically make that compensation fair.

Some business and business association commenters contended that workers with higher earnings can more easily forgo wages to wait out non-competes, and thus do not feel forced to stay in their jobs. These commenters also argued that non-competes for these workers are often tied to equity or severance, which the worker can choose to forego if they want to compete. These comments are contrary to the extensive comment record indicating that even workers with higher earnings cannot afford to forgo compensation and feel forced to stay in jobs they want to leave due to non-competes. To the extent any

such individual workers bargained for or received compensation for a non-compete, the Commission still finds that such non-competes are unfair methods of competition for the independent reason that they are restrictive and exclusionary conduct that tends to negatively affect competitive conditions.

Overall, the comments provide strong support for the Commission's finding that non-competes are exploitative and coercive because they trap workers in jobs or force them to bear significant harms and costs.

For the foregoing reasons, the Commission finds that non-competes with workers other than senior executives are exploitative and coercive and thus facially unfair under section 5.

3. The Commission Finds That Non-Competes Tend To Negatively Affect Competitive Conditions

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes tend to negatively affect competitive conditions in labor markets for the reasons explained in this Part IV.B.3.a. (As explained in Part IV.B.3.b, the Commission further finds that non-competes tend to negatively affect competitive conditions in markets for products and services.)

As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused actual harm in a specific instance. Here, the tendency of non-competes to impair competition is clear from their nature and function. In any event, the evidence confirms that non-competes do in fact have a negative effect on competitive conditions.

The Commission turns now to the significant evidence of harm to competition in labor markets from non-competes, including evidence of suppressed labor mobility, suppressed earnings, and reduced job quality.

a. Non-Competes Tend to Negatively Affect Competitive Conditions in Labor Markets

The Commission finds that non-competes tend to negatively affect competitive conditions in labor markets by inhibiting efficient matching between workers and employers.

Labor markets function by matching workers and employers. In a competitive labor market, workers compete for jobs by offering their skills and time (*i.e.,* their labor services) to

---

[433] *See* Part IV.B.2.b.i.

employers, and employers in turn compete for those labor services by offering better pay, benefits, or other elements of job satisfaction.[434] A worker who is seeking a better job—more pay, better hours, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Prospective employers can compete for the worker's services, and the worker's current employer may also compete by seeking to retain the worker—*e.g.,* by offering a raise, promotion, or other enticement.[435] Ultimately, the worker chooses the job that best meets their objectives, and the employer chooses the worker who best meets theirs. In general, the more jobs and the more workers that are available—*i.e.,* the more competing options the worker and employer each have—the stronger the match will be.

Thus, a key component of a competitive labor market is voluntary labor mobility. Choice—the ability of market participants to satisfy their preferences where possible—facilitates competition. In the labor market, voluntary labor mobility reflects both the choices or preferences of workers and that of rival competitors.

However, non-competes introduce a major friction that tends to impair the competitive functioning of labor markets. Non-competes inhibit the efficient matching between workers and employers via the competitive process because, even if a competing employer offers a better job and the worker wants to accept that better job, the non-compete will prevent the worker from accepting it if the new job is within the scope of the non-compete (or if the worker is unsure or afraid it may be). Meanwhile, the employer who would like to hire the worker is prevented from competing to attract that talent. The result is less competition among employers for the worker's services and less competition among workers for available jobs. Since the worker is prevented from taking many jobs that would otherwise be available, the worker may decide not to look for a job at all. Or the worker may enter the labor market but take a job in which they are less productive, such as when a non-compete forces a worker to leave their field of expertise and training.

In this way, non-competes frustrate competitive processes in labor markets. In competitive markets, the "unrestrained interaction of competitive forces" yields a variety of benefits such

as lower prices for consumers, better wages and working conditions for workers, and higher quality products.[436] In contrast, when "[i]ndividual competitors lose their freedom to compete" in the labor market, the importance of worker preference in setting the level of wages and working conditions is reduced, which is "not consistent with [the] fundamental goal of antitrust law."[437] The restraint imposed by non-competes on the interaction of competing employers and competing workers directly undercuts the functioning of the competitive process in determining wages and working conditions. Accordingly, non-competes facially harm the competitive process and tend to negatively affect competitive conditions in labor markets. Evidence that non-competes have in fact had actual detrimental impacts on outcomes of the competitive process—such as workers' earnings, new business formation, and innovation—demonstrate that non-competes do in fact harm competition.

The Commission notes that the actual effect of any one individual non-compete on the overall level of competition in a particular labor market may be marginal or impossible to discern statistically. However, as explained in Part I.B.2, non-competes are prevalent across the U.S. labor force. The empirical literature and other record evidence discussed in this section reflect that non-competes, in the aggregate, negatively affect competitive conditions in labor markets—resulting in harm not only to workers subject to non-competes and the employers seeking to hire them, but also workers and employers who lack non-competes.

The Commission finds that evidence of the effects of non-competes on workers' labor mobility and earnings is sufficient to support its finding that non-competes tend to negatively affect competitive conditions in labor markets.[438] In addition, the Commission believes that this finding is further bolstered by strong qualitative evidence that non-competes reduce job quality.[439]

The Commission's findings relating to labor mobility and earnings are principally based on the empirical evidence described in Parts IV.B.3.a.i and ii. However, the comments provide strong qualitative evidence that bolsters these findings. Furthermore, the Commission notes that the legal

standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions; empirical evidence of actual harm is not necessary to establish that conduct is an unfair method of competition. In the case of non-competes, however, there is extensive empirical evidence, as well as extensive corroborating public comments, that non-competes negatively affect competitive conditions in labor markets.

#### i. Non-Competes Suppress Labor Mobility

*Evidence of Suppressed Labor Mobility*

The Commission finds that non-competes tend to negatively affect competitive conditions in labor markets by suppressing labor mobility, which inhibits efficient matching between workers and employers. The evidence indicates that non-competes reduce labor mobility. Several empirical studies find that non-competes limit the movement of workers between firms and reduce the pool of labor available to existing employers and potential entrants.[440]

In the NPRM, the Commission described the empirical research on non-competes and labor mobility.[441] The Commission stated that, across the board, studies of non-competes and labor mobility find decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within-industry and between-industry mobility.[442] Based on that body of empirical evidence and its review of the record as a whole following the comment period, the Commission finds that non-competes reduce labor mobility.

Several empirical studies find that non-competes reduce labor mobility. Some of these studies analyze the effects of non-competes on labor mobility across the labor force.

A study by Johnson, Lavetti, and Lipsitz examined the impact on labor mobility of all legal changes in the enforceability of non-competes from 1991 to 2014 across the entire labor force.[443] This study finds that

---

[434] *See* Treasury Labor Market Competition Report at 3–4.

[435] *See id.*

[436] *See N. Pac. Ry. Co.* v. *United States,* 356 U.S. 1, 4 (1958).

[437] *See NCAA* v. *Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 106–07 (1984).

[438] *See* Part IV.B.3.a.i–ii.

[439] *See* Part IV.B.3.a.iii.

[440] As the Commission stated in the NPRM, it does not view reduced labor mobility as a harm in and of itself. *See* NPRM at 3490. Instead, the Commission finds that the empirical evidence showing non-competes reduce labor mobility is powerful evidence that non-competes do indeed restrict labor market competition by inhibiting the movement of workers between firms—and therefore efficient matching between workers and firms.

[441] NPRM at 3489.

[442] *Id.*

[443] Johnson, Lavetti, & Lipsitz, *supra* note 388. This study was updated in 2023. The updated

substantial decreases in non-compete enforceability cause a significant increase in job-to-job mobility in industries that use non-competes at a high rate.[444]

Evan Starr's study comparing workers in occupations that use non-competes at a high versus low rate finds that a State moving from mean enforceability to no enforceability would cause a decrease in employee tenure for workers in high-use occupations of 8.2%, compared with those in low-use occupations. Tenure in this study serves as a proxy for mobility, since tenure is the absence of prior mobility.[445] This use of a proxy means the outcome of interest is not precisely measured, and the study is less robust than those that examine changes in legal enforceability of non-competes. The study's findings are, however, consistent with the other studies finding that non-competes reduce labor mobility.

Starr, Prescott, and Bishara's study of non-compete use likewise finds that having a non-compete was associated with a 35% decrease in the likelihood that a worker would leave for a competitor.[446] While this finding is based on the use of non-competes (and is accordingly given less weight), the authors also survey workers, who report that the cause of their reduced mobility is their non-compete. The study finds that the mechanism underlying reduced mobility is not whether non-competes are legally enforceable or not, but rather, it is the worker's belief about the likelihood that their employer would seek to enforce a non-compete. Workers who did not believe that employers would enforce non-competes in court were more likely to report they would be willing to leave for a competitor.[447] This study thus not only supports the Commission's finding that the use of non-competes impacts labor mobility, but also supports the Commission's finding that non-competes can exert an *in terrorem* effect on labor mobility even where they are unenforceable.[448] This supports the need to ensure that

workers are aware of the prohibition on non-competes.[449]

Other studies analyze how non-competes affect the labor mobility of specific populations of workers. A study by Jessica Jeffers finds that decreases in non-compete enforceability were associated with a substantial increase in departure rates of workers, especially for other employers in the same industry.[450] This study's sample is limited to knowledge workers (*i.e.,* workers whose primary asset is applying their mental skills to tasks), and the study uses a binary—rather than continuous—measure of non-compete enforceability. It does, however, examine several changes in the enforceability of non-competes to generate its results, making it fairly robust.

In addition, two recent studies examined subgroups of the population that were affected by State law changes and find major effects on those populations' labor force mobility. Balasubramanian et al., in 2022, focused on Hawaii's ban of non-competes for high-tech workers and find that the ban increased mobility by 12.5%.[451] Lipsitz and Starr, in 2022, focused on Oregon's ban of non-competes for hourly workers and find that mobility increased by 17.3%.[452]

Comments Pertaining to Labor Mobility Evidence and Commission Responses

The Commission's finding that non-competes suppress labor mobility is principally based on the empirical evidence described in this Part IV.B.3.a.i. However, the comments provide strong qualitative evidence that bolsters this finding.

Many commenters agreed with the Commission's preliminary finding that non-competes suppress labor mobility and stated that this reduction in labor mobility leads to less labor market competition and poorer wages and working conditions.

In response to the NPRM's discussion of this literature, some commenters questioned the adequacy of the studies. For example, one commenter stated that

the available research is either limited to specific sectors of the economy, limited geographically, or limited by small sample sizes. Some commenters claimed the empirical research lacked appropriate counterfactuals.

The Commission acknowledges that some of the studies focus on specific industries or specific geographies, and that the studies vary in the methodologies the authors rely on. These arguments do not undermine the utility of the studies, particularly given that they all find that non-competes reduce labor mobility. Moreover, the Commission finds that each of the studies discussed in this Part IV.B.3.a.i conduct their analyses against appropriate counterfactuals. And while there may be some variation in the magnitude of the effect on mobility among industries, several of the empirical studies find economy-wide effects. That evidence shows that non-competes restrict the movement of workers to a significant degree.

Additionally, the record is replete with examples of commenters who recounted personal stories that accord with the empirical literature. The Commission received comments from several thousand individual workers stating that their mobility is or has been restricted by a non-compete. While some commenters who opposed the proposed rule disputed that non-competes prevent workers from finding other jobs in their industry, the Commission finds the weight of the evidence clearly demonstrates a significant effect on labor mobility.

The Commission further notes that many commenters' submissions substantiated its finding that non-competes can have an *in terrorem* effect on labor mobility even where they would not ultimately be enforceable in court.[453] As many commenters explained, the high costs and complexities of non-compete litigation can have a chilling effect on workers and thus reduce worker mobility regardless of whether a court would enforce the non-compete. For this reason, the very existence of a non-compete is likely to deter workers from switching jobs or starting their own business, even if it would ultimately not be enforced. This supports the Commission's view that not only should non-competes' enforcement be prohibited, it is also important to provide a readily understandable,

version of the study reports results slightly differently than the 2022 version cited in the NPRM, but the analysis and results themselves do not meaningfully change. Accordingly, the update to Johnson, Lavetti, and Lipsitz does not materially affect the Commission's analysis of the study.

[444] *Id.* at 21.

[445] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete,* 72 I.L.R. Rev. 783 (2019). The value is calculated as 8.2% = 0.56/6.46, where 0.56 is the reported impact on tenure and 6.46 is mean tenure in the sample.

[446] Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts,* 36 J. L., Econ., & Org. 633, 652 (2020).

[447] *Id.* at 664.

[448] *See* Part IV.B.2.b.ii.

[449] *See* Part IV.E (describing the final rule's notice requirement).

[450] Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship,* 37 Rev. Fin. Stud. 1 (2024). The 2024 version of Jeffers' paper finds a decline in the departure rate of 7% of the sample mean, and a decline in the within-industry departure rate of 10%.

[451] Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers,* 57 J. Hum. Res. S349, S351 (2022).

[452] Lipsitz & Starr, *supra* note 72 at 157.

[453] *See* Part IV.B.2.b.ii.

uniform Federal approach, and notice to workers of unenforceability.[454]

Some commenters who generally opposed the rule questioned the virtue of labor mobility, arguing that when colleagues leave, remaining workers can experience increased workloads or harm to their employer. However, this comment ignores the benefits that will also accrue from those same firms having more ready access to incoming potential colleagues as well. The Commission also notes that unfair conduct cannot be justified on the basis that it provides the firm undertaking the conduct with pecuniary benefits.[455]

Some commenters argued labor mobility has generally been increasing in the U.S. labor market. Setting aside whether this is true, it is not probative of whether the practice of using non-competes reduces labor mobility or negatively affects labor market competition.

For these reasons, the empirical evidence that non-competes suppress labor mobility supports the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets.

ii. Non-Competes Suppress Workers' Earnings

Evidence of Suppressed Earnings

The Commission finds that non-competes suppress workers' earnings as a result, in part, of decreased labor mobility, supporting the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets. As the NPRM explained, many studies find increased enforceability of non-competes reduces earnings for workers across the labor market generally; for specific types of workers; and even for workers not subject to non-competes.[456] Several major empirical studies of how changes in non-compete enforceability affect workers' earnings show that increased enforceability of non-competes suppresses workers' earnings.

A study conducted by Johnson, Lavetti, and Lipsitz finds that non-competes limit workers' ability to leverage favorable labor markets to receive greater pay.[457] The authors find that when non-competes are more enforceable, workers' earnings are less responsive to low unemployment rates, which workers typically leverage to negotiate pay raises. The authors estimate that a nationwide ban on non-competes would increase average earnings by approximately 3–14%.[458] Of the studies of how non-competes affect earnings, this study has the broadest coverage. It spans the years 1991 to 2014, examines workers across the labor force, and uses all known common law and statutory changes in non-compete enforceability to arrive at its estimates. This study is very robust, as it satisfies all of the principles outlined in Part IV.A.2.

The same study also finds that non-competes increase racial and gender wage gaps by disproportionately suppressing the wages of women and non-White workers. While the study estimates that earnings of White men would increase substantially if a nationwide ban on non-competes is enacted, the comparable earnings increase for workers in other demographic groups would be up to twice as large, depending on the characteristics of the group.[459] The authors estimate that making non-competes unenforceable would close racial and gender wage gaps by meaningful amounts, although the mechanism behind this effect is unclear.[460]

Furthermore, a study conducted by Evan Starr estimates that earnings fall by about 4% where a State shifts its policy from non-enforcement of non-competes to a higher level of enforceability.[461] This study covers a sample which is broadly representative of the entire labor force from 1996 to 2008. Unlike many of the other studies described in this Part IV.B.3, this study does not use a change in enforceability of non-competes to analyze the impact of enforceability. Rather, it examines the differential impact of enforceability on workers in occupations that use non-competes at a high rate versus workers in occupations that use non-competes at a low rate. As described in Part IV.A.2, studies comparing differential usage of non-competes are generally less informative than studies examining changes in enforceability, although in this particular study the comparison between workers in high- and low-use occupations may effectively control for State-level differences between labor markets, lending more credibility to the estimates. More importantly, the Commission notes that the study corroborates the estimates from other studies that rely on more credible research designs, and therefore is appropriately viewed as additional evidence supporting the range of estimated effects on wages across the labor market.

Two additional studies analyze effects of non-competes on earnings for specific populations of workers. A study conducted by Lipsitz and Starr focuses on a natural experiment in Oregon, where non-competes were banned for hourly workers with relatively low earnings. The study estimates that when Oregon stopped enforcing non-competes for hourly workers, their wages increased by 2–3% relative to workers in States that did not experience legal changes. The study also finds a greater effect (4.6%) on workers in occupations that used non-competes at a relatively high rate.[462] The authors additionally find that women's earnings increased at a higher rate, with earnings increases after the non-compete ban of 3.5% for women, versus 1.5% for men.

A study by Balasubramanian et al. focuses on a natural experiment in Hawaii, which banned non-competes for high-tech workers in 2015. The study finds earnings of new hires increased by about 4% after the ban, relative to earnings in other States without bans.[463]

In addition to this research, which shows that increased enforceability of

---

[454] See Part IX.C. See also supra note 386 (explaining that studies assessing changes in enforceability of non-competes likely underestimate the effects of non-competes, given that workers may refrain from seeking or accepting work or starting a business even if the non-compete is likely unenforceable, and explaining the importance of notice to workers).

[455] Atl. Refin. Co. v. FTC, 381 U.S. 357, 371 (1965) (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); FTC v. Texaco, 393 U.S. 223, 230 (1968) (following the same reasoning as Atlantic Refining and finding that the "anticompetitive tendencies of such a system [were] clear"); L.G. Balfour Co. v. FTC, 442 F.2d 1, 15 (7th Cir. 1971) ("While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice."). Justifications that are not cognizable under other antitrust laws are also not cognizable under section 5.

[456] NPRM at 3486–88.

[457] Johnson, Lavetti & Lipsitz, supra note 388 at 37.

[458] Id. at 3. The NPRM reported an increase in average earnings of 3.3–13.9%. Those numbers were taken from an earlier version of the Johnson, Lavetti, and Lipsitz paper. The updated paper finds an increase in average earnings of 3.2–14.2%. The change does not materially affect the paper's findings or the Commission's analysis of the paper.

[459] Id. at 42. The 2023 version of the paper by Johnson, Lavetti, and Lipsitz reports earnings increases of 1.3% for White men, and increases between 1.5–3.2% for workers in other demographic groups, corresponding to a change in non-compete enforceability equal to the difference between the 75th and 25th percentiles. These differences are statistically significant for Black men and non-White, non-Black women.

[460] Id. The 2023 version of the paper reports that the earnings gaps would close by 1.5–3.8% given a change in non-compete enforceability equal to the difference between the 75th and 25th percentiles.

[461] Starr, supra note 445 at 783.

[462] Lipsitz & Starr, supra note 72 at 143.

[463] Balasubramanian et al., supra note 451 at S349.

non-competes reduces workers' earnings across the labor market generally and for specific types of workers, two empirical studies find that increased enforceability of non-competes suppresses earnings even for workers who are *not* subject to non-competes.

The Johnson, Lavetti, and Lipsitz study, in a separate analysis, isolates the impact of a State's enforceability policy on workers not directly affected by that policy to demonstrate that non-competes affect not just the workers subject to non-competes, but the broader labor market as well. The study finds that increases in non-compete enforceability in one State have negative impacts on workers' earnings in bordering States, and that the effects are nearly as large as the effects in the State in which enforceability changed (but taper off as the distance to the bordering State increases).[464] The study estimates that a legal change in one State has an effect on the earnings of workers just across that State's border that is 76% as great as for workers in the State in which the law was changed.[465] In other words, when one State changes its law to be more permissive of non-competes and itself experiences a decrease in workers' earnings of 4%, workers just across the border (*i.e.,* workers who share a labor market)[466] would experience decreased earnings of 3%.[467] The authors conclude that, since the workers across the border are not directly affected by the law change (*i.e.,* contracts that they have signed do not become more or less enforceable), this effect must be due to changes in the local labor market.[468] The researchers based their analysis on where workers worked, rather than their residence, so the results are not tainted by workers

who worked in the State where the law changed but lived across the border.

The second of these studies, a study conducted by Starr, Frake, and Agarwal, analyzed workers without non-competes who worked in States and industries in which non-competes were used at a high rate.[469] The authors find that, when the rate of use of non-competes in an industry in a State is higher, wages are lower for workers who do not have non-competes but who work in the same State and industry. This study also finds that this effect is stronger where non-competes are more enforceable.[470]

The authors show that the reduction in earnings (and in labor mobility) is due to a reduction in the rate of job offers. Individuals in State/industry combinations that use non-competes at a high rate do not receive job offers as frequently as individuals in State/industry combinations in which non-competes are not frequently used.[471] The authors also demonstrate that decreased mobility and earnings are not due to increased job satisfaction (*i.e.,* if workers are more satisfied with their jobs, they may be less likely to change jobs, and more likely to accept lower pay).[472]

Given some methodological limitations of this study, the Commission views it as supporting the other evidence that non-competes have negative spillover effects on earnings for workers without non-competes and reduce labor mobility. Namely, the research design relies on cross-sectional differences in enforceability of non-competes. Although this study also examines the use of non-competes, it does not compare individuals who are bound by non-competes to individuals who are not. Instead, it examines the rate of use across industries and States, and therefore avoids the statistical biases inherent in studies which compare individuals with and without non-competes. The authors also employ tests to increase confidence in the causal interpretation of these results, but they cannot conclusively rule out explanations outside of the scope of their data.

Several additional studies examine the association between non-compete use—rather than enforceability—and earnings. For the reasons described in Part IV.A.2, the Commission finds that these studies are less credible in

measuring how non-competes affect earnings, and accordingly the Commission gives these studies minimal weight.

In one such study, Starr, Prescott, and Bishara examine survey results and find that non-compete use is associated with 6.6% to 11% higher earnings.[473] In another study, using Payscale.com data, Balasubramanian, Starr, and Yamaguchi find that individuals with non-competes (regardless of what other post-contractual restrictions they had) had 2.1–8.2% greater earnings than individuals with no post-contractual restrictions. However, this positive association may be due to non-competes often being bundled with NDAs. The authors find that, compared with individuals subject only to NDAs, non-competes are associated with a 3.0–7.3% *decrease* in earnings, though the authors do not disentangle this effect from the effects of non-solicitation and non-recruitment provisions.[474] Another study, by Lavetti, Simon, and White, finds that use of non-competes among physicians is correlated with greater earnings (by 14%) and greater earnings growth.[475] Finally, Rothstein and Starr find that greater use of non-competes is correlated with higher earnings.[476]

Because these studies merely reflect correlation and are unlikely to reflect causation, the Commission gives them little weight. The NPRM noted that the Lavetti, Simon, and White physician study partially mitigates this methodological flaw by comparing earnings effects in a high- versus a low-enforceability State (Illinois versus California). However, at best, this comparison is a cross-sectional comparison with a minimally small number of States being compared. The study does not consider changes in non-compete enforceability over time. Therefore, it is impossible to disentangle underlying differences in those two States from the effects of non-compete enforceability. The Commission accordingly gives this study, like the other studies reliant on comparisons of populations using non-competes and not using non-competes, little weight, though the shortcoming is slightly mitigated in the case of this study. While this study is specific to physicians, the Commission nonetheless finds that studies employing stronger methodologies (especially studies of

---

[464] The NPRM cited an earlier version of Johnson, Lavetti, and Lipsitz's study that estimated that a legal change in one State would have an effect on the earnings of workers just across that State's border that was 87% as great as for workers in the State in which the law was changed. NPRM at 3488. The data cited in this final rule reflect an updated version of this study.

[465] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 51. Seventy-six percent is calculated as the coefficient on the donor State NCA score ($-.137$) divided by the coefficient on own State NCA score ($-.181$).

[466] See U.S. Econ. Rsch. Serv., Commuting Zones and Labor Market Areas, *https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/*.

[467] The Commission notes that the estimates in the updated version of Johnson, Lavetti, and Lipsitz's study are slightly different, but qualitatively similar to the earlier estimates noted in the NPRM. The results remain statistically significant and do not materially affect the Commission's analysis.

[468] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 30.

[469] Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961 (2019), online ahead of print at *https://pubsonline.informs.org/doi/abs/10.1287/orsc.2018.1252* at 6.

[470] *Id.* at 11.

[471] *Id.* at 10.

[472] *Id.* at 13.

[473] Starr, Prescott, & Bishara *supra* note 68 at 75.

[474] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 40. The percentage range is calculated as $e^{-0.030}-1$ and $e^{-0.076}-1$, respectively.

[475] Lavetti, Simon, & White, *supra* note 82 at 1051. The increase in earnings is calculated as $e^{0.131}-1$.

[476] Rothstein & Starr, *supra* note 77 at 1.

workers positioned similarly in the income distribution [477] and studies which broadly represent the U.S. workforce [478]) provide compelling evidence that non-competes significantly suppress wages.

Comments Pertaining to Suppressed Earnings and Commission Responses

The Commission's finding that non-competes suppress earnings is principally based on the empirical evidence described in this Part IV.B.3.a.ii. However, the comments provide strong qualitative evidence that bolsters this finding.

The Commission received thousands of comments from workers describing how non-competes suppressed their earnings. These commenters spanned a wide variety of industries, hailed from across the U.S., and recounted a common experience: a non-compete prevented them from earning more. Illustrative examples of these comments include the following:

• I worked at a TV station. A corporation owned us and forced me to sign a yearly non-compete in order to remain in my position. After a few years, I was offered a management job with a much bigger title and much more money. . . . However, the corporation that owned us wouldn't even talk about letting me out of the non-compete. They wouldn't even discuss a settlement. They totally refused to allow me to pursue a much higher salary and a much higher position, no matter what was offered. I was forced to choose between staying in my current job, and not being able to improve my job or money, or being unemployed for 6 months.[479]

• I have been subject to a non-compete for 11 years in aggregate as a physician. Because of my non-compete, I am unable to take a position with another organization without having to drive much farther outside of my non-compete stipulated geographic restrictions (which would add to the time that I am away from my family, and costs more in fuel and vehicle maintenance). Because of my non-compete, I haven't had a raise in 6 years, because I can't negotiate with my employer because I have no bargaining position to negotiate from if I don't have options of alternate employment within the restrictions of my non-compete.[480]

• I recently received two job offers with better compensation, but I had my non-compete reviewed by an attorney and learned that it would open myself up to a significant lawsuit and potential fines. I most likely have to sit out a year and either work completely outside my field where I have advanced degrees or not work at all. Since I am the primary breadwinner, this is not financially possible for my family, so I have to stick with

my current employer who has not given me a pay increase in 2 years.[481]

• I am a Certified Nurse Practitioner and signed [a non-compete]. I live in Minnesota and would be required to travel one hour one way in order to fulfill [the] agreement. . . . My employer increased my responsibilities (on-call hours added) without additional pay using vague language in my binding agreement. I would have to hire a lawyer and spend thousands of dollars to file a lawsuit to get the agreement releasing me. . . . My employer took advantage of my binding agreement and did not increase my [Relative Value Unit] rate in 5 years for my or other Nurse Practitioners in our organization.[482]

• I was just starting out in my career when I finally got a part time job in my field of geology. Unfortunately, it didn't last long and I was let go. But because of a non compete agreement I had to sign I couldn't take another job in my field even though I had a good lead on one. Instead I had to take a job as a waitress making less than minimum wage.[483]

• I work for an IT company, low-level employee just above minimum wage, and I had to sign one of these to get the job even though I don't know any knowledge above what someone could learn in 10 or 15 hours on YouTube, yet I still had to sign this which makes it so I can't compete . . . if they offered me better pay.[484]

• I began working for my employer 10 years ago as a very young and inexperienced single mother. I desperately needed a job that could pay more than minimum wage, and I eagerly accepted my position and non-compete status. I have now been working at almost the same rate of pay (as raises are not readily given to us regardless of recessions or cost of living increases)—for a DECADE. My children are approaching college age, and I will absolutely need a higher income to help fund their educations.[485]

• I am in the laboratory medicine field and was laid off from a job as an implementation rep for an instrument vendor. Other companies were the competition, and I was held to a non-compete. This caused me to go from a six figure salary with great benefits back to the hospital making barely 60k as a single mother with twins and no emergency fund saved! I later went into the UV disinfection field and developed a tremendous amount of knowledge regarding minimizing the spread of infections in hospitals (pre-covid). After 5 years, I was laid off and prevented from continuing in this niche field that I had spent so much time developing a skillset and statistics within. I was only given a 2 week severance (along with a reminder of legal action if I worked for the competition). Companies use this as a bully tactic![486]

In addition to receiving thousands of comments recounting personal stories of non-competes stymieing the commenters' ability to get a better-paying job or a raise, many commenters also described how, over the long term, non-competes can lower wages and diminish career prospects for workers forced to sit out of the market or start over in a new field. The Commission also received numerous comments stating that non-competes exacerbate wage gaps based on gender and race, including by decreasing entrepreneurship and wages to a greater extent for women and people of color and by giving firms more power to engage in wage discrimination.[487]

With respect to the empirical literature, numerous commenters agreed that there is a wealth of empirical evidence to support the Commission's preliminary finding that, by inhibiting efficient matching between workers and employers, the use of non-competes is harming workers by suppressing their earnings. In addition to the literature discussed in the NPRM and in this final rule, some commenters pointed to a 2016 report from the Treasury Department that examines the correlation between non-compete enforceability and both earnings and earnings growth at the State level. The Treasury report finds that a one-standard-deviation increase in State-level enforceability of non-competes is correlated with 1.38% to 1.86% lower earnings, which can be found in both lower earnings upon starting a job and lower earnings growth.[488] The Commission agrees with commenters that this provides additional support for the final rule. However, the Commission gives less weight to cross-sectional studies of enforceability, like the 2016 Treasury report, that examine the correlation between non-compete enforceability and earnings growth.[489] The Commission relies more heavily on the studies that find that non-competes suppress earnings based on examining natural experiments.

Some commenters opposing the rule argued that studies of non-compete use, including the studies described in this Part IV.B.3.a.ii, show a positive association between non-compete use and earnings, especially when early notice of non-competes is provided,

[477] Balasubramanian et al., *supra* note 451.

[478] Johnson, Lavetti, & Lipsitz, *supra* note 388.

[479] Individual commenter, FTC–2023–0007–8067.

[480] Individual commenter, FTC–2023–0007–0616.

[481] Individual commenter, FTC–2023–0007–0651.

[482] Individual commenter, FTC–2023–0007–0857. Relative value units are a component of a methodology that calculates earnings for some healthcare workers.

[483] Individual commenter, FTC–2023–0007–11973.

[484] Individual commenter, FTC–2023–0007–11137.

[485] Individual commenter, FTC–2023–0007–7238.

[486] Individual commenter, FTC–2023–0007–2416.

[487] *See also* Part IV.B.3.a.iii (summarizing comments from workers and worker advocates stating that non-competes increase illegal conduct by employers and make it harder for workers to report illegal conduct).

[488] Dept. of the Treasury, *Non-Compete Contracts: Economic Effects and Policy Implications* (March 2016) at 20.

[489] *See* Part IV.A.2.

while others cautioned against interpreting these relationships as causal. The Commission agrees with commenters who caution against a causal interpretation of these studies, which are unable to determine whether non-compete use causes differences in earnings, whether earnings cause differences in non-compete use, or whether a third factor simultaneously determines both, as discussed in Part IV.A.2.

Some commenters opposing the rule stated that the most comprehensive study of the earnings effects of non-competes (the Johnson, Lavetti, and Lipsitz study described in this Part IV.B.3.a.ii) examines only relatively incremental changes in laws governing the enforceability of non-competes (*i.e.,* changes other than full bans), and claimed that this study thus does not shed light on the effects of a full prohibition. In response, the Commission notes that the analysis in Johnson, Lavetti, and Lipsitz finds that the effects of changes in non-compete enforceability are broadly linear. This means the effect of a change in enforceability twice the size of another change results in a change in workers' earnings that is approximately twice as large. As a result, the Commission finds that it would be appropriate to extrapolate from the effects of incremental changes in non-compete laws to the effects of prohibitions, at least in the context of worker earnings.[490] In other words, if incremental changes in enforceability lead to a certain level of earnings effects, it is reasonable to presume—based on the linearity of the relationship between changes in enforceability and workers' earnings—larger changes will lead to larger effects.

That said, in the regulatory impact analysis, the Commission does not extrapolate from the incremental changes observed in these studies with respect to earnings effects.[491] Instead, the Commission follows a conservative approach and assumes that the prohibition in the final rule, even though it is comprehensive, will have the same effects on earnings as the incremental legal changes observed in these studies. Therefore, even if the effects of changes in non-compete enforceability are not linear, the Commission's analysis of the economic impacts of the final rule is not undermined because, if anything, it underestimates the benefits of the rule.

A commenter argued that the Johnson, Lavetti, and Lipsitz dataset is outdated because it examines enforceability between 1991 and 2014. In response, the Commission finds that while the enforceability measures contained in that dataset do not perfectly reflect current enforceability due to changes in State law in the intervening several years, the measures still reflect the impacts of non-compete enforceability on economic outcomes, and likely still have strong predictive power.

Some commenters opposing the rule asserted that the overall competitiveness of U.S. labor markets undermines the argument that workers suffer from non-competes. In response, the Commission notes that a range of factors have weakened competition in labor markets.[492] In any event, the level of competitiveness of a labor market does not justify use of a practice that tends to negatively affect competitive conditions.

Some commenters opposing the rule pointed to academic writings, including a summary of the research by an FTC economist writing in his personal capacity in 2019, stating that there was limited evidence on the effects of such clauses. The Commission finds that these writings are generally outdated and disagrees with them. As the various explanations of the empirical research in Parts IV.B and IV.C illustrate, much of the strongest evidence on the effects of non-competes has been published in recent years. The Commission notes further that Evan Starr, one expert who voiced concerns over the state of the evidence in the past, submitted a comment that was broadly supportive of the interpretation of the evidence in the NPRM and of the proposed rule.[493]

Other comments opposing the rule stated that the heterogeneity of the impact of a non-compete ban on earnings undermined the Commission's preliminary finding regarding the effects of non-competes on earnings. These commenters asked whether the population-wide average effects noted in certain studies apply across the workforce or only to certain individuals (*e.g.,* at certain points in the income distribution), certain professions, or in certain geographies (*e.g.,* where local labor markets tend to be more concentrated). Another commenter argued that if a ban on non-competes drives up earnings for highly skilled

workers, wages might decrease for other categories of workers.[494]

In response to these comments, the Commission finds that, while estimates of the magnitude of the effect of non-competes on earnings vary to some extent across groups of workers, the effects are directionally and qualitatively similar across groups. For example, while Balasubramanian et al. do not report a table with average earnings for workers in their study, workers in the high tech jobs studied tend to be relatively highly paid, and the study finds non-competes suppress these workers' earnings.[495] On the lower end of the earnings spectrum, Lipsitz and Starr report average earnings of $16.41 per hour for workers in their study, which corresponds to annual earnings of approximately $34,133 per year (assuming 2,080 hours worked per year), and their study likewise finds that non-competes suppress the earnings of these workers.[496]

Additionally, Johnson, Lavetti, and Lipsitz's study of workers across the economy shows that, while college-educated workers and workers in occupations and industries in which non-competes are used at a high rate experience relatively larger adverse effects on their earnings from non-compete enforceability, the estimated effect of increased enforceability on other workers is still negative (albeit statistically insignificant in this study).[497] In short, while these studies do not estimate the magnitude of negative effects for every subset of the population, the finding of negative effects on earnings is consistent across dissimilar subsets of the population.

A commenter that opposed the NPRM asserted that a categorical ban could decrease wages for highly paid workers, arguing that such workers could negotiate higher wages in exchange for the non-compete that they would lose with a ban. This speculative assertion is belied by the comment record, which indicates that the highly paid, highly skilled workers who are not senior

---

[490] *See* Figure 3; Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.

[491] *See* Part X.F.5.

[492] See Treasury Labor Market Competition Report at i.

[493] Comment of Evan Starr, FTC–2023–0007–20878.

[494] These commenters were generally referring to higher-wage workers, but not senior executives. Comments that focused on senior executives are addressed in Part IV.C.

[495] Workers in the occupation Computer and Information Research Scientists (SOC code 15–1221) in the private sector had median earnings of $156,620 in 2022, while Software Developers (SOC code 15–1252) in the private sector had median earnings of $127,870 in 2022. BLS, Occupational Employment and Wage Statistics, *https://www.bls.gov/oes/tables.htm.* These private-sector data are from the May 2022 National industry-specific and by ownership XLS table (*see* table labeled ''national_owner_M2022_dl'').

[496] Lipsitz & Starr, *supra* note 72 at 148.

[497] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 57.

executives are also unlikely to negotiate non-competes.[498] It is also belied by empirical evidence that non-competes suppress earnings for highly paid workers.[499]

Similarly, commenters opposing the rule questioned whether earnings effects merely result from firms hiring different types of workers after changes in non-compete enforceability (for example, workers with different levels of experience or education). In response to these comments, the Commission first notes that the studies find adverse impacts across the labor force. Therefore, even if a different mix of types of workers were hired due to non-compete enforceability, the evidence shows workers' wages are suppressed across the labor force when non-competes are more enforceable. Additionally, the Commission notes that the study by Lipsitz and Starr compares the earnings growth of individual workers before and after the legal change in Oregon, showing that earnings growth increased after the non-compete ban. This provides some evidence that the effects observed in the literature are not simply due to substitution, since individual workers' earnings trajectories would not be changed if all the effects were simply due to firms substituting one type of worker for another.[500]

Some commenters opposing the rule asserted that enforceability indices are likely measured with substantial error. These commenters argue that the indices are based on qualitative analyses of State laws and not data on how frequently non-competes are actually enforced or the results of these enforcement cases. The Commission finds the enforceability indices are sufficiently reliable, because they are generated through careful analysis of State law that takes into account variation in legal enforceability along multiple dimensions.[501] Moreover, a 2024 study using enforcement outcome data finds that a non-compete ban in Washington increased earnings, consistent with the studies using enforceability indices.[502]

Some commenters opposing the rule asserted that Hawaii's prohibition of non-competes in the technology industry may not have covered the workers claimed (in particular, omitting workers in the broadcast industry).[503] These commenters also asserted that Hawaii simultaneously banned non-solicitation clauses.

The Commission finds the study of Hawaii's non-compete ban to be informative, despite these limitations. First, any workers omitted from coverage by the statute, but considered as affected in the study, would lead to a phenomenon known as "attenuation bias," which causes estimated effects to underestimate the true impact.[504] Second, the non-solicitation agreements banned by the Hawaii law were non-solicitation of coworker agreements (otherwise known as non-recruitment agreements)—agreements under which workers are barred from recruiting former coworkers, as opposed to non-solicitation of client agreements, under which workers are barred from soliciting former clients. While non-solicitation of coworker agreements may have a marginal impact on workers' earnings (e.g., in situations in which workers only find out about job opportunities via past coworkers), the Commission does not find it likely that they have a major effect on workers' earnings. They may prevent some workers from hearing about some job opportunities, but unlike non-competes, they do not prevent workers from taking those opportunities. And unlike non-solicitation of client agreements, they do not frustrate workers' ability to build up a client base after moving to a new employer. The Commission therefore finds it likely that much of the impact identified in the study of the Hawaii law is due to non-competes. The Commission also notes that the Hawaii study is directionally consistent with the results from other more robust studies that use different methodologies.

Some commenters opposing the rule argued that the impact of Oregon banning non-competes for low-wage workers may have been limited because the law did not affect existing non-competes; because non-competes were already disfavored in Oregon before the law change; and because the law included multiple carve-outs. Commenters also argued the negative effects on earnings found in Oregon may have been confounded by the Great Recession.

The Commission finds that those concerns are not a compelling reason to discard the study. The study carefully examines multiple comparisons of workers within Oregon and across States. The results therefore cannot be explained by a differential response of Oregon to the Great Recession, a differential response of hourly workers to the Great Recession, or even a differential response of hourly workers in Oregon to the Great Recession. The Commission also does not believe that the study is undermined because the law did not affect existing non-competes and included multiple carve-outs, or because non-competes were disfavored in Oregon before the law changed. These factors likely mitigated the magnitude of the law's negative effect on earnings, rather than exaggerating it.

Some commenters opposing the rule argued that Johnson, Lavetti, and Lipsitz[505] claim that "[t]he overall effect of [non-compete] enforceability on earnings is ambiguous," and that this undermines the Commission's preliminary findings. However, these commenters take this quote out of context. The authors were referring to a theoretical model, not to the empirical work in their paper. When economists do empirical research, they often begin by constructing a theoretical model and describing what the theory would predict; they then describe their empirical findings, which may show a different result. The authors described that it is unclear, theoretically, whether non-compete enforceability would increase or decrease earnings. However, the empirical findings of the study were clear: as the authors stated, "We find that increases in [non-compete] enforceability decrease workers' earnings."[506] The fact that the authors described the theoretical results of a hypothesized model as ambiguous does not undermine the fact that their study had clear empirical results.

Some healthcare businesses and trade organizations opposing the rule argued that, without non-competes, physician shortages would increase physicians' wages beyond what the commenters view as fair. The commenters provided no empirical evidence to support these assertions, and the Commission is unaware of any such evidence. Contrary to commenters' claim that the rule would increase physicians' earnings beyond a "fair" level, the weight of the evidence indicates that the final rule

---

[498] *See* Parts IV.B.2.b.i and IV.C.1.

[499] *See, e.g.,* Balasubramanian et al., *supra* note 451.

[500] Lipsitz & Starr, *supra* note 72, Online Appendix at 18.

[501] Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy,* 13 U. Pa. J. Bus. L. 751 (2011); Barnett & Sichelman, *supra* note 389.

[502] Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach* (2024), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674.*

[503] Balasubramanian et al., *supra* note 451.

[504] Attenuation bias occurs when the independent variable (here, whether a worker is covered by the ban) is measured with error.

[505] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2021) at 11; *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.*

[506] *Id.* at 2.

will lead to fairer wages by prohibiting a practice that suppresses workers' earnings by preventing competition; that is, the final rule will simply help ensure that wages are determined via fair competition. The Commission also notes that it received a large number of comments from physicians and other healthcare workers stating that non-competes exacerbate physician shortages.[507]

One commenter opposing the rule criticized the analysis in the Johnson, Lavetti, and Lipsitz study, suggesting that data on where individuals live are not necessarily indicative of where individuals work, and that identified spillover effects may simply be due to cross-border commuters. The Commission disagrees, because, as noted, the study considers whether the workers are subject to enforceable non-competes based on their work location.

A commenter also argued that if the absence of non-competes helped workers, one would expect California, North Dakota, and Oklahoma to have the highest median incomes among all the States. The Commission believes this expectation is inapt. Given the evidence that non-competes suppress workers' earnings, earnings in California, North Dakota, and Oklahoma are likely higher than they would be if non-competes were enforceable, but there is no reason to expect they would necessarily be higher than all other States.

One commenter opposing the rule asserted that the Commission's citation of one study in the NPRM was insufficient to show that non-competes are directly tied to discriminatory behavior by employers, or that non-competes worsen racial or gender wage gaps. The Commission does not rest its finding in this final rule that non-competes tend to negatively affect competitive conditions on findings of increased discriminatory behavior or exacerbation of gender and wage gaps. The Commission merely notes that there are two empirical studies—described under "Evidence of suppressed earnings"—that find that non-competes do, in fact, exacerbate earnings gaps.

One commenter opposing the rule stated that closing racial and gender wage gaps may harm racial minorities and women if their wages were to fall in absolute terms. Another commenter argued that the proposed rule would reduce capital investment and output, which would decrease White male workers' wages. In response, the Commission notes that the study by Johnson, Lavetti, and Lipsitz shows that the impact of a decrease in non-compete enforceability on earnings is positive for workers in each of these groups.

The empirical evidence makes clear that, by restricting a worker's ability to leave their current job to work for a competitor or to start a competing business, non-competes reduce workers' earnings, supporting the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets.

### iii. Non-Competes Reduce Job Quality

In the NPRM, the Commission recognized that non-competes may also negatively affect working conditions, *i.e.,* job quality,[508] although this had not been studied in the empirical literature (likely because it is harder to quantify). Competition in labor markets yields not only higher earnings for workers, but also better working conditions.[509] In a well-functioning labor market, workers who are subject to poor working conditions can offer their labor services to an employer with better working conditions. Such workers can also start businesses, giving them more control over working conditions. Non-competes frustrate this competitive process by restricting a worker's ability to switch jobs or start a business. Furthermore, in a well-functioning labor market, employers compete to retain their workers by improving working conditions. Where workers are locked into a job—because their alternative employment options are restricted—those competitive forces are diminished and working conditions can suffer. The Commission accordingly sought comment on this topic.

In response, thousands of workers with non-competes described how, by frustrating these competitive processes, non-competes prevent them from escaping poor working conditions or demanding better working conditions. Based on the large number of comments the Commission received on this issue and the wide variety of negative and severe impacts commenters described, the Commission finds that, in addition to suppressing earnings, non-competes negatively affect working conditions for a significant number of workers.

The Commission finds that the effects of non-competes on labor mobility and workers' earnings are sufficient, standing alone, to support its finding that non-competes with workers other than senior executives tend to negatively affect competitive conditions

in labor markets. However, the Commission believes its finding that non-competes are an unfair method of competition is further bolstered by this strong qualitative evidence related to non-competes degrading working conditions.

Numerous workers and worker advocacy organizations described how non-competes compel workers to endure jobs with poor working conditions. Illustrative examples of these comments include the following:

• In March 2018, I was fired from a job in local news for refusing to go into an unsafe situation. I'd recently received a letter from a man threatening to kidnap me. When my boss decided he would still send me out alone in the field, I fought him on it, lost, and was terminated. Three weeks later, I found out I was pregnant. Unable to work in my field because of a noncompete enforced even AFTER I was terminated, I had no choice but to apply for WIC and government assistance, and work at a retail job making half my previous salary. I wanted to work. I wanted money to support my child. I wanted money to move closer to home, to escape a domestic violence situation. My noncompete kept me in a horrible spot, and nearly cost me my life.[510]

• I started my first job as a Nurse Practitioner in 2019. All positions I interviewed for required a non-compete. . . . In my case, I work for an employer that is hostile, discriminated against me during pregnancy and maternity leave and has raised his voice at me in meetings. He told me I was lucky to even have a job after becoming pregnant. I learned after starting at the practice that he has shown this pattern before with previous employees. I say this because all of these above-mentioned reasons are why I have the right to want to quit my job and move on. I desperately want to leave and start another job but I can't because of the non compete. I feel like a prisoner to my job. I feel depressed in my work conditions and I feel like I have no way out.[511]

• I'm a barber and violated a non-compete about 6 months ago. . . . I worked for my previous employer for two years in a toxic environment. I told my employer how work was affecting my home life on more than one occasion and she did nothing. . . . How was I to know that I would be working in a toxic environment when I applied? So ultimately, I decided in order to be happy and make a living wage, I'd have no choice but to violate my non-compete. She came after me in no time flat. Now I'm paying legal fees and at risk of going to court and losing my job for 6 more months. . . . [I]f I'm working in poor working conditions, I should be able to work where I please. For two years, my job and employer affected my mental health. I chose to take anti-depressants after things got bad at work, upped my dosage twice as work

---

[507] *See* Part IV.B.3.b.iv for a more detailed summary of these comments.

[508] NPRM at 3504.

[509] Treasury Labor Market Competition Report at i.

[510] Individual commenter, FTC–2023–0007–12813.

[511] Individual commenter, FTC–2023–0007–4989.

became progressively worse and since I've left, I've stopped taking my medication.[512]

• I am a commissioned employee in the mortgage world, and I had a non-compete with my former company in Ohio. Near the end of my time at this company, they merged with another company and put the new company in charge of the sales staff. It was miserable. We started having issues, even with having basic supplies, and it went from just harming me to harming my ability to get business complete, which harms the consumer. I left and I was sued for a three year period. . . . I really do not feel that [non-competes] should be allowed. You are stuck at employers and they can treat you in any manner that they please because they know that they can make your life a living hell if you leave them.[513]

• Like many new graduates in the medical field, I signed on with a company that made numerous empty promises. . . . What I was not prepared for, was the company's strategic increase in facilities in which I was to perform services under this contract. In the short span of 2 years, I did neurophysiological monitoring for 24 facilities . . . . While working conditions fell apart regardless of my requests for adequate sleep following 36 hours straight of working on call at my designated stroke hospital, time for meals or breaks within 18+ hour work days, and a reasonable travel distance within the area the company demanded I relocate to, I was met with threats from HR regarding my non-compete if I were to leave. . . . Working conditions became so intense, I was placed on migraine medications at the recommendations of my doctor and required three separate trips in the ER for medical conditions related to stress, inability to eat or drink while tied within tens of hours long surgeries . . . . Again I was met with threats from HR and now their legal team.[514]

Many commenters stated that non-competes harm working conditions for lower-wage workers. However, there were many commenters in higher-wage jobs who also stated that non-competes harmed their working conditions. For example, numerous physicians explained that they were trapped in jobs with poor working conditions because of non-competes. Many of these physicians described how non-competes accelerate burnout in their profession by making it harder for workers to escape bad working conditions or demand better working conditions. Many commenters recounted how they left poor work environments but non-competes harmed them by forcing them to leave their field, move out of the area where they lived, or spend time and money defending themselves from legal action. Many commenters argued that prohibiting non-competes would increase workers' bargaining power and

in turn incentivize employers to provide better work environments.

Workers in both high-wage and low-wage professions, as well as worker advocacy groups, stated that by diminishing workers' competitive alternatives, non-competes keep workers trapped in jobs where they experience dangerous, abusive, or toxic conditions; discrimination; sexual harassment; and other forms of harassment. These commenters also described how non-competes trap some workers in jobs where their employer commits wage and hour violations, such as wage theft, as employers that use non-competes can insulate themselves from the free and fair functioning of competitive markets and are thus more likely to be able to steal worker wages with impunity. Several commenters said they were unable to receive benefits because a non-compete rendered them unable to switch to a job with better benefits or rendered them unable to leave their job when their employer took their benefits away. A professional membership network for survivors of human trafficking explained that traffickers masquerading as legitimate businesses use non-competes to prevent trafficking victims from leaving.

Some workers and advocacy organizations stated that non-competes increase the potential for harm from retaliation. These commenters stated that restricting a worker's employment opportunities makes it even harder for workers to find new jobs after experiencing retaliation. These commenters argued that this discourages workers from reporting fraud, harassment, discrimination, or labor violations. A labor union commented that, by making it harder for workers to find new jobs, non-competes can deter unionization and chill activities protected by the National Labor Relations Act, including activities to address unsafe, unfair, or unsatisfactory working conditions. According to a trade organization of attorneys, whistleblower protections may come too late for a fired whistleblower who cannot obtain another job because of a non-compete. Several commenters provided survey or case evidence showing that workers who report sexual harassment, wage theft, or poor working conditions are frequently retaliated against, including by being fired.[515] These commenters

stated that, because non-competes make it harder for these workers to find new jobs, non-competes decrease the likelihood that workers report these kinds of harms.

Many workers described how, by limiting their ability to get out of harmful workplace environments, non-competes contributed to stress-related physical and mental health problems. Many commenters, particularly in the healthcare profession, stated that suicide is a major problem in their profession and described non-competes as one of the stressors, because non-competes make it harder to leave jobs with unsustainable demands, leaving workers feeling trapped.

While thousands of commenters described, often in personal terms, how non-competes have negatively affected their working conditions, the Commission received few comments from workers or worker advocates stating that non-competes improved working conditions. The few comments received stated that workers who remain with an employer can be harmed by departing and competing colleagues, via increased workloads or harm to their employer.

Taken together, these comments provide strong qualitative evidence that non-competes degrade working conditions, which supports the Commission's finding that non-competes tend to negatively affect competition in labor markets.

### b. Non-Competes Tend to Negatively Affect Competitive Conditions in Product and Service Markets

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes tend to negatively affect competitive conditions in markets for products and services by inhibiting new business formation and innovation.

New businesses are formed when new firms are founded by entrepreneurs or spun off from existing firms. New business formation increases competition by reducing concentration, bringing new ideas to market, and forcing incumbent firms to respond to new firms' ideas instead of stagnating. New businesses disproportionately create new jobs and are, as a group, more resilient to economic

---

[512] Individual commenter, FTC–2023–0007–3323.

[513] Individual commenter, FTC–2023–0007–3955.

[514] Individual commenter, FTC–2023–0007–1252.

[515] For example, the National Women's Law Center, which operates and administers the TIME'S UP Legal Defense Fund, reported that among individuals who contacted the Fund to request legal assistance related to sexual harassment in the workplace, 72% reported facing retaliation, and, among those, 36% had been fired. Comment of Nat'l

Women's L. Ctr., FTC–2023–0007–20297 at 5 (citing Jasmine Tucker & Jennifer Mondino, *Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund*, 4 (Oct. 2020), *https://nwlc.org/wp-content/uploads/2020/10/NWLC-Intake-Report_FINAL_2020-10-13.pdf*).

downturns.[516] With respect to spinoffs, research shows that spinoffs within the same industry are highly successful relative to other entrepreneurial ventures.[517]

Non-competes, however, tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation in two ways. First, since many new businesses are formed by workers who leave their jobs to start firms in the same industry, non-competes reduce the number of new businesses that are formed in the first place.[518] Second, non-competes deter potential entrepreneurs from starting or spinning off new businesses—and firms from expanding their businesses—by locking up talented workers.[519] Non-competes thus create substantial barriers to potential new entrants into markets and also stymie competitors' ability to grow by making it difficult for those entrants to find skilled workers.

Innovation refers to the process by which new ideas result in new products or services or improvements to existing products or services. Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, and innovation by one firm may also prompt other firms to compete and improve their own products and services. However, non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting innovation.

Non-competes tend to reduce innovation in three ways. First, non-competes prevent workers from starting businesses in which they can pursue innovative new ideas.[520] Second, non-competes inhibit efficient matching between workers and firms.[521] Where workers are less able to match with jobs that maximize their talents, employers' ability to innovate is constrained. Third, and relatedly, non-competes reduce the movement of workers between firms.[522]

This decreases knowledge flow between firms, which limits the cross-pollination of innovative ideas.

As described in Parts IV.B.3.b.i and ii, the Commission finds that the effects of non-competes on new business formation and innovation are sufficient to support its finding that non-competes tend to negatively affect competitive conditions in product and service markets. In addition, as described in Parts IV.B.3.b.iii and iv, the Commission believes this finding is further bolstered by evidence that non-competes increase concentration and consumer prices, as well as evidence that non-competes reduce product quality.

The Commission's findings relating to new business formation and innovation are principally based on the empirical evidence described in Parts IV.B.3.b.i and ii. However, the comments provide strong qualitative evidence that bolsters these findings. Furthermore, the Commission notes that the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions; empirical evidence of actual harm is not necessary to establish that conduct is an unfair method of competition. In the case of non-competes, however, there is extensive empirical evidence, as well as extensive corroborating public comments, that non-competes negatively affect competitive conditions in product and service markets.

### i. Non-Competes Inhibit New Business Formation

#### Evidence of Inhibited New Business Formation

The Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation. The weight of the empirical evidence establishes that when non-competes become more enforceable, the rate of new business formation (*i.e.,* the number of new businesses formed) declines.

Several empirical studies assess the effects of non-competes on the rate of new business formation. A study conducted by Jessica Jeffers examines several State law changes in the technology sector and the professional, scientific, and technical services sector and finds a decline in new firm entry when non-competes become more enforceable. Jeffers finds that as non-competes became more enforceable, the entry rate of new firms decreases substantially.[523] Jeffers' study uses

several changes in non-compete enforceability that are measured in a binary fashion. While this study therefore does not satisfy all the principles outlined in Part IV.A.2, it satisfies most of them and is accordingly quite robust and weighted highly.

Another study, conducted by Matt Marx, examines the impact of several changes in non-compete enforceability between 1991 and 2014 on new business formation, and likewise finds a negative effect of non-competes on new business formation.[524] Marx finds that, when non-competes become more enforceable, men are less likely to found a rival startup after leaving their employer, that women are even less likely to do so (15% less likely than men), and that the difference is statistically significant.[525] This study therefore supports both that non-competes inhibit new business formation and that non-competes tend to have more negative impacts for women than for men. Marx uses several changes in non-compete enforceability measured in a continuous fashion. The study therefore satisfies the principles outlined in Part IV.A.2 and is weighted highly.

In addition, Johnson, Lipsitz, and Pei analyze the extent to which non-compete enforceability affects the rate of firm entry in high-tech industries. They find that an average increase in non-compete enforceability decreases the establishment entry rate by 3.2%.[526] Outside of examining only innovative industries, this study's methodology is otherwise strong, and the study is therefore weighted highly. While this study uses multiple changes in a granular measure of non-compete enforceability, a quite robust methodology, the study is limited to high-tech industries.

In addition, a study conducted by Can and Fossen indicates that decreases in enforceability of non-competes in Utah and Massachusetts increased entrepreneurship among low-wage workers.[527] Can and Fossen examine just two changes in non-compete enforceability, measured in a binary fashion, and the study is therefore given slightly less weight than studies which

[516] *See, e.g., The Importance of Young Firms for Economic Growth,* Policy Brief, Ewing Marion Kauffman Foundation (Sept. 24, 2015).

[517] Aaron K. Chatterji, *Spawned With a Silver Spoon? Entrepreneurial Performance and Innovation in the Medical Device Industry,* 30 Strategic Mgmt. J. 185 (2009).

[518] *See, e.g.,* Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms,* 64 Mgmt. Sci. 552 (2018).

[519] *See, e.g.,* Shi, *supra* note 84.

[520] *See* Part IV.B.3.b.i.

[521] *See* Part IV.B.3.a. While the Commission focuses on the most direct negative effects on competition in product and service markets in this Part IV.B.3.b, inefficient matching between workers and firms may have additional negative effects, including on output.

[522] *See* Part IV.B.3.a.i.

[523] Jeffers, *supra* note 450. The 2024 version of Jeffers' study reports a 7% impact.

[524] Matt Marx, *Employee Non-Compete Agreements, Gender, and Entrepreneurship,* 33 Org. Sci. 1756 (2022).

[525] *Id.* at 1763.

[526] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non-Compete Agreements,* Nat'l. Bur. Of Econ. Rsch. (2023) at 36.

[527] Ege Can and Frank M. Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts,* 11 J. of Entrepreneurship and Pub. Pol. 223 (2022).

**38390** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

examine more changes or use a more granular measure of enforceability. The study corroborates the results of studies using these stronger methodologies.

Furthermore, a study conducted by Benjamin Glasner focused on high-tech industries finds that technology workers increased entrepreneurial activity in Hawaii after non-competes were restricted, but finds no effect on entrepreneurial activity from Oregon's restriction on non-competes with low-wage workers.[528] Similar to the study by Can and Fossen, this study by Glasner uses two changes in non-compete enforceability measured in a binary fashion. Additionally, a study published by Stuart and Sorenson shows that increased enforceability of non-competes decreases the amount by which firm acquisitions and IPOs induce additional local business formation.[529] This study uses cross-sectional variation in non-compete enforceability measured in a binary fashion, and studying the amount by which firm acquisitions and IPOs induce additional local business formation does not cover all entrepreneurship. These studies are thus given more limited weight, but generally are in line with other evidence that non-competes reduce new business formation and innovation.

Additionally, a study conducted by Starr, Balasubramanian, and Sakakibara analyzes the effect of non-compete enforceability on spinouts (*i.e.*, when a firm creates a new business by splitting off part of its existing business). The authors find that, when non-compete enforceability increases by one standard deviation, the rate of spinouts within the same industry decreases by 32.5%—a major decrease in new business formation.[530] Research shows that spinouts within the same industry are highly successful, on average, when compared with typical entrepreneurial ventures.[531] This study uses cross-sectional differences in non-compete

enforceability, measured in a continuous fashion, though it attempts to avoid problems related to the use of cross-sectional differences in non-compete enforceability by using law firms—which likely do not use non-competes due to ethical limits in the legal profession[532]—as a control group. The Commission therefore gives this study somewhat less weight than studies of changes in non-compete enforceability, though the findings corroborate the findings of the studies by Jeffers and Marx.

In addition, a study by Salomé Baslandze shows that non-competes reduce new business formation, finding that greater non-compete enforceability inhibits entry by spinouts founded by former employees of existing firms.[533] Baslandze notes that spinouts tend to innovate more and are relatively higher quality than other new firms. This study examines changes in non-compete enforceability on a continuous measure but assumes that changes over a 19-year period occur smoothly over time instead of identifying exactly when the legal changes were made. While this study uses changes in non-compete enforceability and corroborates the findings of the aforementioned studies on new business formation, the assumption regarding the timing of changes yields an imprecise measure of non-compete enforceability over time. The Commission therefore gives this study somewhat less weight than studies which precisely identify the timing of changes in non-compete enforceability.

Finally, in a 2011 study, Samila and Sorenson find that when non-competes are more enforceable, rates of entrepreneurship, patenting, and employment growth slow. They find that an increase in venture capital funding creates three times as many new firms where non-competes are unenforceable, compared to where non-competes are enforceable.[534] This study

uses cross-sectional variation in non-compete enforceability along two dimensions, both of which are measured in a binary fashion. Due to this measurement, the Commission gives this study less weight, though its results corroborate the findings of the other studies on new business formation.

The Commission gives minimal weight to two additional studies. One of these estimates the job creation rate at startups increased by 7.8% when Michigan increased non-compete enforceability.[535] However, the Commission places less weight on this study than the studies discussed previously because it examines only one legal change in one State and because the change to non-compete enforceability was accompanied by several other simultaneous changes to Michigan's antitrust laws. Thus, it is not possible to isolate the effect of the change in non-compete enforceability standing alone.

The other study finds mixed effects of non-compete enforceability on the entry of businesses into Florida. The study examines a legal change in Florida which made non-competes more enforceable. The authors find larger businesses entered the State more frequently (by 8.5%) but smaller businesses entered less frequently (by 5.6%) following the change.[536] Similarly, Kang and Fleming find that employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change.[537] This study examines a single change in non-compete enforceability. However, the Commission gives this study minimal weight because the study does not examine new business formation specifically; instead, it assesses the number of "business entries," which does not necessarily reflect new business formation because it also captures existing businesses moving to the State.

Additional research analyzes the effects of non-competes on the number of jobs created by new businesses.[538]

---

[528] Benjamin Glasner, *The Effects of Noncompete Agreement Reforms on Business Formation: A Comparison of Hawaii and Oregon*, Econ. Innovation Group White Paper (2023), *https://eig.org/noncompetes-research-note/*.

[529] Toby E. Stuart & Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin. Sci. Q. 175 (2003).

[530] Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 561. 32.5% is calculated as 0.0013/ 0.004, where 0.0013 is the coefficient reported in Table 2, Column 6, and 0.004 is the mean WSO entry rate reported in Table 1 for "nonlaw" firms.

[531] For reviews of the literature, *see, e.g.*, Steven Klepper, *Spinoffs: A Review and Synthesis*, 6 European Mgmt. Rev. 159 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions*, in Handbook of Entrepreneurship Research 81 (2005).

[532] *See* Am. Bar Ass'n, Model Rule 5.6, *https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_5_6_restrictions_on_rights_to_practice/*.

[533] Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth*, Fed. Res. Bank of Atlanta Working Paper No. 2022–10 (2022), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4277191*.

[534] Samila & Sorenson find that a 1% increase in venture capital funding increased the number of new firms by 0.8% when non-competes were enforceable, and by 2.3% when non-competes were not enforceable. Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425, 432 (2011). The values are calculated as $0.8\% = e^{0.00755} - 1$ and $2.3\% = e^{0.00755 + 0.0155} - 1$, respectively.

[535] Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, Fed. Res. Bank of Phila. Working Paper No. 21–26 at 16 (2021).

[536] Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663, 673 (2020).

[537] *Id.* at 674. The value is calculated as 15.8% = $e^{0.1468} - 1$.

[538] In the NPRM, the Commission stated that the evidence relating to the effects of non-competes on job creation was inconclusive. However, in the final rule, the Commission does not make a separate finding that non-competes reduce job creation.

While the research described previously shows that non-competes inhibit the rate of new business formation, this research indicates that even where new businesses are created, these new businesses have fewer workers where non-competes are more enforceable. This evidence suggests that non-competes not only prevent small businesses from being formed, but they also hinder entrepreneurship by tending to reduce the number of employees new firms are able to hire.

In addition to analyzing the rate of firm entry in high-tech industries, Johnson, Lipsitz, and Pei analyzes the number of jobs created at newly founded firms in innovative industries.[539] Using evidence from several State law changes, the authors find that increases in non-compete enforceability lead to a reduction in the number of jobs created at newly founded firms in innovative industries (though not necessarily across all industries or all types of firms) by 7.2%.[540]

A study by Starr, Balasubramanian, and Sakakibara finds that increases in non-compete enforceability decreased average per-firm employment at new firms.[541] In the NPRM, the Commission stated that this study found that several increases in non-compete enforceability were associated with a 1.4% increase in average per-firm employment at new firms.[542] However, upon further review of the study, the Commission interprets this study as finding that increases in non-compete enforceability decreased average per-firm employment at new firms—both for spinouts within the same industry and spinouts into a different industry.[543] For spinouts into a different industry, average per-firm employment at the time of founding decreases by 1.4% due to greater non-compete enforceability. For spinouts into the same industry, average per-firm employment decreases by 0.3%.[544] At seven years after founding, the results are similar: spinouts into a different industry have average per-firm employment that is 1.5% lower due to greater non-compete enforceability, while spinouts into the same industry have per-firm employment that is 0.7% lower.[545] The Commission notes that this study compares States with different levels of enforceability, using law firms as a control group, instead of considering changes in non-compete enforceability. It is therefore given less weight than studies with stronger methodologies.[546]

Comments Pertaining to Inhibited New Business Formation and the Commission's Responses

The Commission's finding that non-competes inhibit new business formation is principally based on the empirical evidence described in this Part IV.B.3.b.i. However, the comments provide strong qualitative evidence that bolsters this finding.

Hundreds of commenters agreed with the Commission's preliminary finding that non-competes reduce new business formation. Illustrative examples of comments the Commission received include the following:

• I am a hairstylist . . . and have been with the company for 11 years. Our work conditions have changed drastically over the years and Covid has really sent us on a sharp decline. It is not the same salon I signed on to work for. That being said, a few coworkers want to open a salon and take some of us with them to bring back the caliber of service we want to give our clients. Our non-compete contracts state that we can't work within 30 miles of this salon. We didn't expect that standards would drop so low and they would raise prices so high that we lost so many clients. . . . We have all had enough of the toxic environment and need to be free of this unfair contract.[547]

• I am a veterinarian that has had to suffer under non-compete clauses my entire career. I have had to sell my home and relocate several times including moving out of State due to non-compete clauses. I'm currently stuck in a [non-compete covering a] 30 mile radius of all 4 practices of a group of hospitals I work for. This basically keeps me from working in an enormous area. I had to sign it due to circumstances out of my control and they took advantage of my situation. I recently tried to start my own business, not related to the type of practice that I have the non-compete clause with, and had to abandon the idea because I couldn't get funding without my current employer releasing me from the contract or by relocating again out of the huge area of non-compete.[548]

• We own a small family practice in urban Wisconsin. I previously was employed by a large healthcare organization and burned out. When I left to star[t] my own business, I was restricted from working close by, by a non-compete. I spent $24,000 [in] legal fees challenging this successfully. . . . Now as a business owner for 5 years, we have the opportunity to hire some physician assistants who have been terminated without cause from my prior employer. I am unable to do so because they also had to sign non-competes. I have seen many disgruntled patients who have delayed care because of this.[549]

• I am aesthetic nurse practitioner wanting to start my own business but I am tied to a 2 year 10 mile non compete. I was basically obligated to sign the non-compete when I needed to reduce my hours to finish my master's degree (that I paid for and they wanted me to get). I feel forced to stay at a job that is not paying me what I am worth.[550]

• I am a licensed social worker with a non-compete which is hindering my employment options. . . . I would like to start my own business as the mental health facility I work for is not supportive of mental health. This rule would be a great benefit for mental health professionals and those seeking quality mental health services.[551]

• As a recently graduated physician, I wanted to start my own practice and become a small business owner. However, I also needed a source of income to start out and wanted to work part time at a local hospital for income and benefits. However, due to a non-compete clause in their contracts, I could not start my own business and practice in the same city if I was to work with them. This hindered my ability to work as much as I wanted (ended up having to work as an independent contractor for significantly less

---

Instead, it cites the research described herein—which relates solely to job creation at newly founded firms—to support its finding that non-competes inhibit new business formation.

[539] Johnson, Lipsitz, and Pei, *supra* note 526 at 36.

[540] *Id.* While this study satisfies each of the other metrics outlined in Part IV.A.2, the sample is restricted to firms in innovative industries, and therefore the outcome of interest is not reflective of the entire population.

[541] Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 552.

[542] NPRM at 3488–89.

[543] While this study satisfies some of the principles for robust design outlined in Part IV.A.2, the Commission notes that average per-firm employment does not precisely correspond to the economic outcome of interest, which is overall employment or job creation.

[544] Calculated as 1.4% − 1.1%, based on the effect for non-within-industry spinouts (1.4%) and the relative impact on within-industry spinouts (−1.1%). *See* Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 561.

[545] Calculated as 1.5% − 0.7%, based on the effect for non-within-industry spinouts (1.5%) and the relative impact on within-industry spinouts (−0.8%). *See id.* at 563.

[546] There are also two studies analyzing how non-competes affect job creation or employment generally. Neither study relates to new business formation specifically. Goudou finds a decreased job creation rate from an increase in non-compete enforceability in Florida. Felicien Goudou, *The Employment Effects of Non-compete Contracts: Job Retention versus Job Creation* (2023), *https://www.jesugogoudou.me/uploads/JMP_Felicien_G.pdf*. This study considers just one change in non-compete enforceability, and is therefore given less weight, though the results corroborate findings in papers which satisfy more of the guideposts in Part IV.A.2. Additionally, the 2023 version of Johnson, Lavetti, & Lipsitz, *supra* note 388, finds that increased non-compete enforceability reduces employment by 1.9%, though they do not estimate the impact on job creation directly. Rather, the authors look only at the closely related metric of changes in overall employment. This study otherwise has a strong methodology, as discussed in Part IV.B.3.a.ii.

[547] Individual commenter, FTC–2023–0007–3299.

[548] Individual commenter, FTC–2023–0007–1448.

[549] Comment of Three Oaks Health, FTC–2023–0007–1397.

[550] Individual commenter, FTC–2023–0007–10157.

[551] Individual commenter, FTC–2023–0007–11922.

shifts per month and no benefits), and made it more difficult to get my business off the ground due to expenses for providing my own benefits. Banning non-compete clauses would significantly help the ability for citizens to pursue starting small businesses or other work to increase their income and prosperity.[552]

• Mr. Z had worked for a company for over 15 years installing windshields in vehicles. He was a lower-level employee making $18.50 an hour and did not learn any trade secrets or confidential information. After years of working for the company the employer refused to raise his wages despite his experience, so he decided to start his own business. Shortly after giving notice and beginning his new endeavor, he received a letter from his previous employer informing him that he was in breach of his non-compete agreement and the employer would enforce it if he continued with his business plan.[553]

• Non-competes have prohibited me from making a living as a fitness and wellness professional to such an extent, that it hurt me economically. I opened up my own business that was different than my previous employer, even though it was different and I told him I was going to focus on a different area in wellness, my previous employer sued me. I ended up having to hire an attorney to defend myself and when it was all said and done, I spent close to 12,000 in fees and penalties.[554]

• Non compete agreements are detrimental to the average worker, preventing them from pursuing better paying job offers or from starting their own business in the same industry. I am directly affected by a non-compete clause I had signed as part of a job acceptance. I am now forming my own business in the same industry as my employer, and cannot do business within a 50-mile radius of my employer. That radius covers the hometown I live in. Even though we are in the same industry, we have very different target markets.[555]

As these comment excerpts reflect, many potential entrepreneurs wrote to the Commission to describe how they wanted to strike out on their own, but a non-compete preventing them from doing so. These comments indicate that non-competes have deprived communities of homegrown businesses—with respect to everything ranging from tech companies, to hair salons, to physician practices, and many more types of firms. This deprives markets of competing firms that can reduce concentration—which in turn has benefits for lowering prices and raising the quality of products and services, and increasing innovation in bringing new ideas to market—as well

as depriving communities of opportunities for new job creation.

Even where entrepreneurs were able to start businesses, they explained how non-competes prevented them from hiring talented workers and made it harder for their nascent businesses to grow and thrive. Many other commenters described personal experiences in which their newly formed businesses were threatened by litigation costs related to non-competes. Other commenters stated that the threat of litigation related to non-competes increases the risk and cost of starting a new business, particularly if that business intends to compete against a large incumbent firm. One commenter stated that incumbent firms can use non-compete litigation as a mechanism to chill startup formation where startups lack the resources to contest a non-compete.

Numerous small businesses and organizations representing small businesses submitted comments expressing support for the proposed rule and describing how it would help small business owners. These commenters contend that categorically prohibiting non-competes will empower small businesses by providing them with new access to critical talent and will drive small business creation as entrepreneurial employees will be free to compete against their former employers. Many small businesses also argued that non-competes can hinder small business formation and can keep small businesses from growing once they are formed. The extensive comments the Commission received from small businesses are also addressed in Part XI.C.

Some small businesses said they spent tens or hundreds of thousands of dollars defending themselves from non-compete lawsuits. A one-person surveying firm said it has to regularly turn down work because of the former employer's threat to sue over a non-compete. A small, five-worker firm said it was sued by a billion-dollar company for violating a non-compete despite the fact that the firm waited out the non-compete period and did not use proprietary information or pursue the former employer's customers; it fears the legal fees will force it out of business. A legal aid organization relayed the story of a client, a self-employed beauty worker who was unable to provide their service during a non-compete lawsuit despite working outside the non-compete geographic radius. The CEO of one small transport and logistics company said a ban would remove a tool used mostly by the largest companies in each industry to maintain

their market dominance, as small competitors cannot match their legal budgets. Further, many workers said they would open their own business if non-competes were banned.

Many small businesses shared their experiences of how non-competes have made hiring more difficult. For example, a small physician practice said non-competes made it difficult to compete with larger practices to attract and retain physicians. A small business and a medical association said small businesses could not afford a lawsuit when hiring workers. An IT startup tried to hire an executive who had retired from a large firm, but the large firm sued the startup to enforce what the startup said was an unenforceable non-compete. According to the startup, because a lawsuit would have cost up to $200,000, it was forced to settle and could not work with numerous potential clients, and its growth was significantly slowed. It stated that it continues to turn away many potential hires to avoid being sued over non-competes.

Other commenters raised additional issues relevant to hiring. According to one technology startup organization, the inability to assemble the right team is a major reason startups fail, and small businesses lose opportunities because they must avoid hiring workers who are subject to even unenforceable non-competes. That organization also said startups currently face legal and time costs from navigating the patchwork and complexity of State non-compete laws, especially when trying to determine if a potential hire's non-compete is enforceable; the time and expense of navigating this landscape will thus often cause the startups to forego that hire. That organization said some non-competes prevent experienced workers from counseling, advising, or investing in startups, and such mentoring can double a startup's survival rate.

Several self-identified entrepreneurs commented that because of their non-competes, they feared not being able to operate, build, or expand their business. Numerous workers reported that they wanted to or planned to start their own business, but their non-compete made them too afraid to do so. A public policy organization referenced the Census Bureau's Annual Business Survey to argue that a majority of business owners and an even higher majority of Black business owners view starting their own business as the best avenue for their ideas, and that non-competes may prevent these potential entrepreneurs' ideas from coming to market.

Several commenters stated that non-competes make it harder for new businesses to hire workers with relevant

---

[552] Individual commenter, FTC–2023–0007–11777.

[553] Comment of NW Workers' Justice Project, FTC–2023–0007–15199 (discussing a client).

[554] Individual commenter, FTC–2023–0007–12904.

[555] Individual commenter, FTC–2023–0007–12697.

experience or industry knowledge. Some commenters argued that non-compete bans, such as in California, have contributed to higher rates of successful start-ups, while new firms in States where non-competes are more enforceable tend to be smaller and are more likely to fail.

In contrast, several commenters opposed to the rule argued that non-competes promote new business formation by protecting small and new firms' investments, knowledge, and workers from appropriation by dominant firms poaching their employees. Commenters also theorized that, while non-competes directly inhibit employee spinoffs, they may encourage businesses to enter the market by enhancing their ability to protect their investments. As described in Part IV.D.2, the Commission finds that firms have viable alternatives for protecting these investments that burden competition to a less significant degree than non-competes. The Commission further notes that these commenters did not provide evidence to support their assertions.

In addition, when assessing how non-competes affect new business formation, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.B.3.b.i can be occurring at the same time. That is, a non-compete might in some instances be protecting a firm's investments in a manner that is productivity-enhancing holding all else equal. But even that same non-compete can—and certainly non-competes in the aggregate do—inhibit new business formation by prohibiting workers from starting new businesses and by locking up talented workers, preventing the worker from efficiently matching with the job that is the highest and best use of their talents. What the empirical evidence shows is that non-competes reduce new business formation, overall and on net, indicating that the tendency of non-competes to inhibit new business formation more than counteracts any tendency of non-competes to promote new business formation.

Other commenters said non-competes protect firms' value and assets for sale in future acquisitions, which they said drives seed capital investment in start-ups. An investment industry organization commented that private-equity financing, particularly for early-stage companies, often includes non-competes and is used to support growth, in turn increasing competition. In response, the Commission notes that these commenters provided no empirical evidence that decreases in non-compete enforceability have affected seed capital investment and private-equity financing. Moreover, the Commission notes that there is no indication that small businesses or early-stage companies in States that have banned or limited non-competes have been unable to obtain financing. To the contrary, California, where non-competes are unenforceable, has a thriving start-up culture.

Other commenters addressed empirical research related to new business formation. Some commenters similarly argued that research on the average quality of employee spinouts due to changes in non-compete enforceability may imply negative effects of the rule (*e.g.,* if prohibiting non-competes decreases average employment or average survival rates of new firms). Some commenters also noted that the Baslandze study finds that weaker non-compete enforceability increases the rate at which spinouts form but result in a lower proportion of high-quality spinouts.[556]

In response to these comments, the Commission notes commenters primarily referenced Starr, Balasubramanian, & Sakakibara[557] to support this view. The findings in this study have been misinterpreted by commenters. This study actually finds that spinouts that form when non-compete enforceability is stricter are *lower* quality (*i.e.,* create fewer jobs), but that the effect is less drastic for spinouts within the same industry versus spinouts into different industries. Coupled with other evidence discussed in Part IV.B.3.b.i, the weight of which points to increased job creation due to the rule, the Commission finds that empirical studies have not established that non-competes lead to higher-quality startups or higher-quality spinouts. The Commission also notes that the result in the Baslandze study regarding the quality of spinouts is theoretical, and the study does not test this theory empirically.

Commenters also argued that non-competes may have different effects on different types of workers—for example, across different industries, occupations, or levels of pay—and that these differences may affect the impacts of non-competes on new business formation. In response, the Commission notes that the studies show negative effects across a range of industries and are directionally consistent, even if they do not provide results for all subgroups.

Commenters asserted that non-competes may affect job creation through several different mechanisms. The Commission agrees and finds that, regardless of the specific mechanism, the weight of the evidence indicates that non-competes inhibit job creation.

Commenters opposing the rule also questioned the usefulness of studies of Michigan's law change, given that existing non-competes remained enforceable under the Michigan law; they state that as a result, it would take longer for effects from the law to be realized. As noted under "Evidence of inhibited new business formation," the Commission gives minimal weight to this study, but for other reasons.

In an ex parte communication entered into the record, the author of the study of the Michigan law change expressed concern over the Commission's interpretation of the study.[558] In particular, he stated that his methodology mitigated concerns that the study's findings of an increase in the job creation rate may be due to decreases in that rate's denominator (total employment). While the Commission does not agree with this assessment,[559] the Commission places less weight on the study for different reasons, as noted.

Some commenters who opposed the rule also addressed the evidence relating to non-competes and job creation, although these commenters generally did not focus on job creation related to new businesses specifically. Some of these commenters asserted that the studies addressed in the NPRM indicated that non-competes are associated with a greater number of jobs available and increased rates of job creation, rather than decreased rates of job creation. Some asserted that the evidence on job creation is mixed and that the issue is understudied. In the NPRM, the Commission stated that the evidence relating to the effects of non-competes on job creation was inconclusive. However, in the final rule,

---

[556] Baslandze, *supra* note 533 at 40.

[557] Starr, Balasubramanian, & Sakakibara, *supra* note 518.

[558] Ex Parte Communication: Email from G. Carlino to E. Wilkins (Jan. 30, 2023), *https://www.ftc.gov/system/files?file=ftc_gov/pdf/P201200NonCompeteNPRMExParteCarlinoRedacted.pdf.*

[559] In particular, the long time period and the difference-in-difference methodology used in the study do not mitigate concerns that decreases in employment due to non-compete enforceability could drive increases in the job creation rate. The concern is not that the findings somehow represent effects on anything other than the average job creation rate (as noted by the author in his ex parte communication), but that a rate is comprised of a numerator and denominator, and effects on either may drive effects on the rate as a whole. This concern is shared by at least two empirical studies of non-competes. *See* Johnson, Lavetti, & Lipsitz *supra* note 388 at 19 and Johnson, Lipsitz, & Pei *supra* note 526 at 19.

the Commission does not make a separate finding that non-competes reduce job creation. Instead, it cites the research described herein—which relates to job creation at newly founded firms—to support its finding that non-competes inhibit new business formation.

ii. Non-Competes Inhibit Innovation

Evidence of Inhibited Innovation

The Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting innovation. Three highly reliable empirical studies find that non-competes reduce innovation.

One such study, a study by Zhaozhao He, finds that the value of patents, relative to the assets of the firm, increases by about 31% when non-compete enforceability decreases.[560] In contrast to some other studies of innovation discussed here, He's study focuses on the value of patents, rather than the mere number of patents. The study does so to mitigate concerns that patenting volume may not represent innovation.[561] The study analyzes the impact of several legal changes to non-compete enforceability, using a binary measure of non-compete enforceability. While this study therefore does not satisfy all the principles outlined in Part IV.A.2, it nonetheless satisfies many of them and contains a reasonably strong methodology.

A second study, by Johnson, Lipsitz, and Pei, finds that increased enforceability of non-competes decreases the rate of "breakthrough" innovations and innovations which make up the most cited patents. This study lends weight to the finding that non-competes harm both the quantity and the quality of innovation.[562] The authors also show that when non-compete enforceability decreases, patenting increases even in industries where most new innovations are patented. These increases imply that the effect is a true increase in innovation, rather than firms substituting between patents and non-competes.

Johnson, Lipsitz, and Pei also show that State-level changes in non-compete policy do not simply reallocate innovative activity across State lines, which would result in no change in innovation at the national level. Instead, they find that decreasing non-compete

enforceability, even in one State, increases innovative activity nationally.[563] Johnson, Lipsitz, and Pei's study uses several legal changes to analyze the impact of enforceability. It also uses several metrics of quality and quantity to mitigate concerns over whether patenting is an accurate reflection of innovation, especially in this context. The study thus satisfies all the principles outlined in Part IV.A.2 and is therefore given substantial weight by the Commission.

A third study, by Rockall and Reinmuth, finds that non-competes have a significant negative impact on innovation. They further find that this effect is not driven solely by the entry of new businesses. Their work suggests a potentially central role for knowledge spillovers, which are hampered when worker mobility is diminished. The study uses many changes to non-compete enforceability quantified on a continuous basis and considers several metrics which represent the quantity and quality of patenting, in order to accurately capture the relationship between non-competes and innovation.[564] Similar to the study by Johnson, Lipsitz, and Pei, this study therefore satisfies all the principles described in Part IV.A.2 and is given substantial weight.

The Commission places the greatest weight on the foregoing three studies, in which factors unrelated to the legal changes at issue are less likely to drive the results. There are additional studies that relate to non-competes and innovation, but the Commission gives them less weight.

A study by Samila and Sorenson finds that venture capital induced less patenting by 6.6 percentage points when non-competes are enforceable.[565] However, the authors note that patenting may or may not reflect the true level of innovation, as firms may use patenting as a substitute for non-competes where they seek to protect sensitive information.[566] Furthermore, this study assesses only the quantity of patents and does not take into account the quality of patents, which would be a better proxy for innovation. For this reason, the Commission gives less weight to this study (although its findings are directionally consistent with the first three studies described herein). This study also uses cross-

sectional variation in non-compete enforceability, which is measured along two dimensions in a binary fashion. In addition, a study by Gerald Carlino examined how patenting activity in Michigan was affected by an increase in non-compete enforceability. The study finds that mechanical patenting increased following the change in the law, but that drug patenting fell, and that the quality of computer patents fell.[567] However, the increase in mechanical patenting appears to have primarily occurred approximately 14 years after non-compete enforceability changed. This suggests that some other mechanism may have led to the increase in patenting activity.[568] Moreover, the study uses a single change in non-compete enforceability to generate its results, and it uses only one measure of innovation outside of patent quantity— quality as measured by patent citations. Finally, this study examines a change to non-compete enforceability which was accompanied by several other changes to Michigan's antitrust laws, making it impossible to identify the effect of the change in non-compete enforceability standing alone. For these reasons, the Commission gives less weight to this study.

A study by Clemens Mueller does not estimate the overall impact of non-compete policy on innovation, but instead focuses on career detours of inventors.[569] Mueller shows that inventors are more likely to take "career detours"—that is, to change industries to avoid the reach of their non-compete—when enforceability of non-competes is stricter. Due to the lower match quality between that inventor and their new industry, the innovative productivity of those inventors suffers after they take career detours. However, the Commission assigns this study less weight because, while its methodology satisfies the principles outlined in Part IV.A.2, the study is only informative of the productivity of individuals taking career detours. It does not address whether innovation in the aggregate increases. Mueller uses several changes in non-compete enforceability to generate results, but those changes are measured in binary—rather than continuous—fashion.

Coombs and Taylor examine the impact of non-compete enforceability on innovation. They find that research

[560] Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 21 (2023), *https://ssrn.com/abstract=3846964.* Thirty one percent is calculated as $e^{0.272} - 1$.

[561] *Id.* at 17.

[562] Johnson, Lipsitz, & Pei, *supra* note 526.

[563] *Id.*

[564] Emma Rockall & Kate Reinmuth, *Protect or Prevent? Non-Compete Agreements and Innovation* (2023), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683.*

[565] Samila & Sorenson, *supra* note 534 at 432. The value is calculated as $6.6\% = e^{0.0208 + 0.0630} - e^{0.0208}.$

[566] *Id.*

[567] Carlino, *supra* note 535 at 40.

[568] *Id.* at 48.

[569] Clemens Mueller, *Non-Compete Agreements and Labor Allocation Across Product Markets,* Proceedings of the EUROFIDAI-ESSEC Paris December Finance Meeting 2023 (2023), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4283878.*

productivity, as measured by the number of products in biotechnology firms' prospectuses, was lower in California than other States, which they suggest implies that California's ban on non-competes hampers research productivity.[570] However, this study is purely cross-sectional, and results may be due to other differences between California and other States; the Commission accordingly places less weight on this study.

Two additional studies address firm strategies related to innovation. However, the Commission gives them little weight because the outcomes studied do not inform how non-competes would affect the overall level of innovation in the economy. The first, by Raffaele Conti, uses two changes in non-compete enforceability (in Texas and Florida), and indicates that firms engage in riskier strategies with respect to research and development ("R&D") when non-compete enforceability is greater.[571] However, this study does not address whether these riskier strategies lead to greater innovation. The second, by Fenglong Xiao, finds that increases in non-compete enforceability led to increases in exploitative innovation (*i.e.,* innovation which stays within the bounds of the innovating firm's existing competences) in the medical device industry.[572] The study finds this increase in exploitative innovation leads to an increase in the rate at which new medical devices are introduced. However, the study also finds that explorative innovation (*i.e.,* innovation which moves outside those bounds) decreased, and explorative innovation is the mode of innovation which the empirical literature has found to be associated with high growth firms.[573] The net impact on innovation from this study is thus unclear. The study examines several changes in non-compete enforceability, measured with a binary indicator of non-compete enforceability.

## Comments Pertaining to Inhibited Innovation and the Commission's Responses

The Commission's finding that non-competes inhibit innovation is principally based on the empirical evidence described in this Part IV.B.3.b.ii. However, the comments provide strong qualitative evidence that bolsters this finding.

Several academics and economic research groups, among other commenters, agreed with the Commission's preliminary finding that non-competes inhibit innovation. Commenters argued that non-competes reduce knowledge flow and collaboration, force workers to leave their field of expertise, and discourage within-industry spinouts that promote innovation. Many commenters stated that banning non-competes would make it easier for workers to pursue innovative ideas and to hire the best talent to help develop those ideas. Illustrative examples of comments the Commission received include the following:

• I am a geneticist at Stanford University, and I am co-founding a biotech startup that aims to discover new cancer immunotherapies. Many of the most talented geneticists, immunologists, cancer biologists, and other scientists with unique and valuable skillsets for drug development are bound by non-competes that prevent them from leaving jobs at big pharma companies to join biotech startups like mine. The result is artificial scarcity in the market for top scientific talent—a phenomenon that precludes healthy competition between industry incumbents and new entrants. Given that much of our country's most cutting-edge translational research happens within biotech startups, and given that many of the most successful drugs on the market originate in biotech startups, non-competes in pharma and biotech prevent the most talented scientists from working on the most innovative science and obstruct the development of new treatments and cures for human disease—leaving our society worse off.[574]

• As a practicing Physician for over thirty years, and one who trained fellows in pain management, who followed many of their students' careers, I was able to see the detriments of unfair Non-Compete clauses in their contracts. Often a physician would take a job, and if it did not work out, the restrictions were so severe, that they would need to move to a new geographic location in order to be employed. . . . Other scenarios exist as well. Where large institutions can block scientific discovery of their research physicians from moving to other institutions which may be better able to support their research, potentially blocking the promotion of scientific discovery.[575]

• I am an engineer in the orthopedic space. I have an idea for a truly innovative foot and ankle plating system that I believe could become the standard of care for fracture fixation and foot deformity correction. It could save 10–15 minutes of operating room time per surgery, which studies show carries a cost of $1000 (times millions of surgeries annually). It does not directly compete with my former employer's product, but I have to wait a year to start engaging surgeons about it because of a very broad non-compete, for a product that does not even compete.[576]

• I currently work as a mid-level technical employee at a company that enforces long (a year or longer) noncompetes. . . . After working for larger companies for a few years after college, many of my friends started their own companies. Some succeeded massively and some didn't but what was common among most of them was that the companies they started were somewhat related to what they were working on before. They either saw a gap in the industry while working for a larger company, or had a bold idea in their domains that they wanted to quit their jobs and try executing it. All this risk taking has in turn resulted in innovation, more competition, and hundreds of jobs. This would not have been possible if these people were under non-compete agreements from their previous employers. In fact, many of my friends who are currently working for companies that have non-competes have personally told me that they want to try a different approach than the current incumbents in their industry, but they simply can't take this risk because of the long non-competes they are under. Note that non-competes are even more consequential for workers of relatively less experience because sitting out for 1 year while only having 3 to 4 years of experience is a lot more detrimental to one's career when compared to an individual with 20 years of experience. Given that younger workers are more willing to take risks and try new ideas, the impact of non-competes on innovation is far worse than many think.[577]

• I am an engineer who has worked on software and hardware in several domains, including the semiconductor industry. I perceive non-competes to not only be detrimental to free trade but also to be detrimental to American innovation and manufacturing. If the United States is serious about supporting the growth of the semiconductor industry in the U.S., it must ensure that semiconductor companies inside the United States truly act to benefit American innovation. . . . The FTC would act prudently to ban such agreements.[578]

• I am a physician. I have worked for public entities for my entire career. I have worked under non-competes for my entire career. The result of these non-compete clauses is that myself and my colleagues keep our imagination and creativity locked away. We see novel applications of pharmaceuticals and medical devices which our leadership

---

[570] Porcher L. Taylor, III, and Joseph E. Coombs, *Non-Competition Agreements and Research Productivity in the Biotechnology Industry,* 26 Frontiers of Entrepreneurship Rsch. 1 (2006).

[571] Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Risky R&D Strategies?,* 35 Strategic Mgmt. J. 1230 (2014).

[572] Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices,* 51 Rsch. Pol'y 1 (2022).

[573] Alessandra Colombelli, Jackie Krafft & Francesco Quatraro, *High-Growth Firms and Technological Knowledge: Do Gazelles Follow Exploration or Exploitation Strategies?,* 23 Indus. And Corp. Change 262 (2014).

[574] Individual commenter, FTC–2023–0007–0198.
[575] Individual commenter, FTC–2023–0007–3885.

[576] Individual commenter, FTC–2023–0007–0760.
[577] Individual commenter, FTC–2023–0007–19807.
[578] Individual commenter, FTC–2023–0007–12872.

**38396**     **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

does not want to pursue, and we are also precluded from pursuing these ideas due to the noncompete. We see new ways to reach people and help people with our unique skill sets, and our noncompete keeps us from being able to reach them. The noncompete allows our employer to own us. They monopolize the talent of their workforce and this deprives the community of the innovation that may stem from the unleashing of the creativity of the physician workforce. I see the direct impact of non-compete clauses. The public has so much to gain by releasing healthcare workers from their noncompete clauses. These talented individuals, once released from their noncompetes, will begin to contribute to their communities with new ideas and innovation that will serve their communities. Many entities have so many reasons to avoid innovation and this stifles the individuals who work for them and oppresses new ideas. Once released from the bureaucracy and burden of non-competes I believe you will see an abundance of community outreach, device innovation and community service from many physicians currently subjugated by their noncompete clauses.[579]

A research organization said a ban on non-competes would increase the value workers realize from creativity and inventiveness, though it also asserted that non-competes can incentivize firms to create and share information. Some workers commented that they had innovative ideas or research that their employer was unwilling to pursue, but the worker could not leave to pursue their ideas elsewhere. A commenter also argued that captive workforces can stifle competition for workers and for clients or patients that leads to innovation. According to several commenters, trapping workers in jobs can also lead to decreased productivity and so-called "quiet quitting."

Some commenters contended that California's ban on non-competes helped Silicon Valley and other industries in California thrive. For example, a public policy organization pointed to industry clusters where studies have identified job hopping, which may otherwise be prohibited by non-competes, as the primary mechanism of knowledge diffusion and argued that restricting non-competes for knowledge workers would improve the U.S.'s competitiveness. Other commenters questioned whether non-competes played a role in Silicon Valley's growth. In response, the Commission notes that it does not attribute California's success in the technology industry to its non-compete laws. The Commission merely notes (in Part IV.D) that the technology industry is highly dependent on protecting trade secrets and that it has thrived in

California despite the inability of employers to enforce non-competes, suggesting that employers have less restrictive alternatives for protecting trade secrets.

Other commenters opposing the rule argued that non-competes may promote innovation by encouraging firms to make productivity-enhancing investments and by decreasing the risk of workers leaving. These commenters stated that non-competes protect firms' investments in workers, R&D, intellectual capital, and innovation. The Commission does not believe that non-competes are needed to protect valuable firm investments. As described in Part IV.D.2, the Commission finds that firms have less restrictive alternatives that protect these investments adequately while burdening competition to a less significant degree.

In addition, when assessing how non-competes affect innovation, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.B.3.b.ii can be occurring at the same time. That is, a non-compete might in some instances be protecting a firm's investments in a manner that is productivity-enhancing holding all else equal. But even that same non-compete can—and certainly non-competes in the aggregate do—inhibit innovation by preventing workers from starting new businesses in which they can pursue innovative ideas; inhibiting efficient matching between workers and firms; and reducing the movement of workers between firms. What the empirical evidence shows is that non-competes reduce innovation, overall and on net, indicating that the tendency of non-competes to inhibit innovation more than counteracts any tendency of non-competes to promote innovation.

The Commission addresses the available evidence on the relationship between non-competes and firm investment in Part IV.D.1.

A business commenter contended that worker mobility does not necessarily improve innovation since the new firm may be unable or unwilling to use the worker's knowledge or ideas, or the new start-up may fail and leave consumers with less innovative products and services. In response, the Commission notes that it is certainly possible that some workers switch jobs to firms that are unable or unwilling to use their knowledge or ideas, or to startups that may fail. However, the fact that the empirical evidence shows that reduced non-compete enforceability increases innovation suggests that these effects are

outweighed by workers who can switch jobs to firms that make better use of their talents, or to startups that thrive and bring innovative new products to market.

Other commenters stated that non-competes promote the sharing of ideas and information within firms and incentivize risk-taking. The Commission is not aware of evidence that non-competes promote the sharing of ideas within firms specifically, but in any event the Commission explains in Part IV.D.2 that trade secrets and NDAs provide less restrictive means than non-competes for protecting confidential information. With respect to risk-taking, the Commission notes that the Conti study finds that firms engage in riskier R&D strategies when non-compete enforceability is greater, but it is not clear whether these riskier R&D strategies translate into increased innovation.

Commenters also argued that non-competes may have different effects on different types of workers—for example, across different industries, occupations, or levels of pay—and that these differences may affect the impacts of non-competes on innovation. In response, the Commission notes that the most methodologically robust studies show negative effects across a range of industries and are directionally consistent, even if they do not provide results for all subgroups.

A research organization argued that non-competes decrease the likelihood that innovative technologies are developed outside the U.S. and that non-competes promote economic growth, competitiveness, and national security. The Commission is not aware of any reliable evidence of the effects of non-competes on whether innovative technologies are developed outside the U.S. However, the weight of the empirical evidence indicates that non-competes reduce the amount of innovation occurring within the U.S.

Some commenters noted that innovation hubs have emerged in States that enforce non-competes. In response, the Commission notes that it does not find that it is impossible for innovation hubs to emerge where non-competes are enforceable. Instead, the Commission finds that, overall, non-competes inhibit innovation.

One commenter performed an empirical exercise in which he correlated Global Innovation Index rankings of innovation clusters with the enforceability of non-competes in each location. The commenter found that only one of the top five clusters bans non-competes, and only three others in the top 100 ban non-competes. The

---

[579] Individual commenter, FTC–2023–0007–2340.

commenter cited the success of Chinese innovation clusters, noting that non-competes are permitted in each of them.[580] The Commission does not find this evidence persuasive. Other differences across countries may explain these results better than policy towards non-competes, which is one factor among many that affect the level of innovation in an economy.

Some commenters argued that the empirical research cited in the NPRM has mixed results. These commenters point to the study by Xiao (2022) showing that non-competes increase exploitative innovation (innovation that incrementally extends firms' existing capabilities), but not explorative innovation (innovation that extends the scope of firms' capabilities). In response, the Commission notes that, within this particular study, the net impact of non-competes on innovation was unclear. But the Commission does not believe the evidence overall is mixed, given that the three empirical studies of the effects of non-competes on innovation that use the most reliable empirical methods all find that non-competes reduce innovation.

Some commenters claimed that two studies cited in the NPRM—the Xiao and Conti studies—had findings that were omitted or misinterpreted: first, the Xiao finding that non-compete enforceability increases the rate of new discoveries of medical devices due to increases in the rate of exploitative innovation but not explorative innovation); and second, the Conti finding that greater non-compete enforceability leads to riskier innovation, which these commenters assert is a positive outcome.[581] In response, the Commission notes that the NPRM described both of these findings and did not omit or misinterpret them.[582] The Commission explains why it gives these studies little weight under "Evidence of inhibited innovation."

A commenter asserted that the He study is insufficient evidence to support a finding, and that the study examines the effects of non-compete enforceability on the value of patents, which the commenter asserts misses other aspects of innovation. In response, the Commission believes that the He study is methodologically robust and that, while no single metric can capture all aspects of innovation, the value of patents is a meaningful proxy. The Commission also notes that the effects

observed in the He study are considerable, as the study finds that the value of patents, relative to the assets of the firm, increases by about 31% when non-compete enforceability decreases. In addition, the Commission notes that the comment record provides substantial qualitative support in line with the empirical findings. Furthermore, additional research, published since the release of the NPRM, helps confirm the Commission's finding regarding the effect of non-competes on innovation. As described under "Evidence of inhibited innovation," this evidence moves beyond assessing the impact of non-competes on the value of patents or the number of patents to identify the quality of new innovation, as well as the mechanisms underlying these effects.

Many commenters referred to a law review article, which was also submitted as a comment itself, that critiques the literature on non-competes and innovation.[583] First, the authors argue that a measure of enforceability used in part of the economic literature is incorrect and that a more recently developed measure is imperfect but better.[584] The Commission agrees with the authors that the more recently developed measure of enforceability, the scale based on Bishara (2011), is stronger than other measures of enforceability due to its granularity. This metric is used in many studies cited in this final rule, including the Johnson, Lipsitz, and Pei study, which largely reinforces the conclusions in the He study, lending weight to the conclusions in these studies that non-competes suppress the overall level of innovation in the economy.

Second, the authors argue that a given non-compete may be governed by the laws of a State other than the State where the worker lives, which undermines the reliability of studies analyzing the effects of non-compete enforceability. The authors argue that cross-border enforcement of non-competes may be a difficult issue to properly address in empirical work and has not been accounted for in the work to date. In response, the Commission notes that if the State law that applied to a given non-compete were totally random—for example, if a non-compete

in Oregon was no more likely to be governed by Oregon's law than any other State's law—we would expect to observe no effects on economic outcomes (such as earnings, innovation, and new business formation) from changes in State law. Instead, the empirical research shows that changes in State law have clear impacts on economic outcomes in particular States. This indicates that enough non-competes within a particular State are subject to that State's law for changes in that State's law to affect economic outcomes in that State.

Third, the authors argue that there is a lack of data on the use of non-competes and that such data are needed to completely assess the effects of non-competes. Although there is not comprehensive data on individual workers' employment agreements, the Commission believes the studies that examine changes in enforceability do so based on sufficient data to be reliable and are otherwise methodologically sound. These studies are also highly probative with respect to the effects of the final rule because what they are examining—how changes in the enforceability of non-competes affect various outcomes—matches closely with what the final rule does. The Commission also notes that there is considerable data regarding the prevalence of non-competes, which it discussed in Part I.B.2.

Fourth, the article argues that some studies of non-competes have small sample sizes, which may lead to measurement error. In response to concerns about small sample sizes, the Commission notes that the most recent studies use a greater breadth of variation in the legal environment surrounding non-competes, overcoming this obstacle. Fifth, the article expresses concern about certain studies that are based on legal changes in Michigan. The Commission takes this critique into account throughout this final rule and notes it when discussing the applicable studies that examine legal changes in Michigan, including under "Evidence of inhibited innovation."

In an ex parte communication included in the public record, the author of one of the studies of innovation stated that studies which examine multiple legal changes may be biased, since affected parties may anticipate the legal change and adjust their behavior prior to the date that the legal change is made. The author stated that examination of the legal change in Michigan was therefore preferable, since it was "inadvertent" and therefore not

---

[580] Comment of Mark Cohen, FTC–2023–0007–12064, at 12–13.

[581] Referring to Xiao, *supra* note 572 and Conti, *supra* note 571.

[582] NPRM at 3492–93.

[583] Barnett & Sichelman, *supra* note 389.

[584] The allegedly flawed measures use binary indicators for enforcement versus non-enforcement, or binary indicators for several facets of enforceability (Stuart and Sorenson, *supra* note 529; Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment,* 27 J. L., Econ., & Org. (2011)), and the more recent measure is more nuanced (Bishara, *supra* note 501).

subject to anticipation effects.[585] The Commission agrees that, in general, anticipation effects can bias the findings of empirical studies. However, empirical work shows that the legal changes used in much of the literature on non-competes are not subject to anticipation effects.[586] This may be because the vast majority are changes based on judicial decisions, rather than statutory changes, as hypothesized by researchers.[587] Moreover, even if anticipation effects occur in studies of non-compete enforceability, that would likely not change the measurable observed benefits of reducing non-compete enforceability, and may indeed lead to underestimation of observed benefits. Underestimation would occur if parties were adjusting their behavior in advance of the change in enforceability in the same direction as the effects observed after the change. This would occur if, for example, firms began to decrease use of non-competes in advance of a decrease in non-compete enforceability, knowing that those non-competes would soon be less enforceable. This ultimately would mean that the actual effects on labor mobility, earnings, new business formation, innovation, and other outcomes could be even greater. Additionally, the legal change in Michigan is subject to other criticism, as discussed under "Evidence of inhibited innovation" and by commenters.

### iii. Non-Competes May Increase Concentration and Consumer Prices

#### Evidence of Increased Concentration and Consumer Prices

As described in Parts IV.B.3.b.i and ii, the Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation and innovation, and have in fact done so. The Commission finds that these effects, standing alone, are sufficient to support its finding that non-competes tend to negatively affect competitive conditions in product and service markets.

However, the Commission notes that there is also evidence that non-competes increase industrial concentration more broadly, which in turn tends to raise consumer prices. The empirical literature on these effects is less developed than the empirical work documenting declines in new business formation and innovation; specifically,

the empirical evidence on consumer prices relates only to healthcare markets (though the evidence on concentration spans all industries in the economy). For this reason, the Commission does not rest its finding that non-competes tend to negatively affect competitive conditions in product and service markets on a finding that non-competes increase concentration and consumer prices. However, there are several reliable studies finding that non-competes increase concentration and/or consumer prices, bolstering the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.

The Commission finds that non-competes reduce new business formation.[588] By doing so, non-competes may increase concentration. Non-competes may also stunt the growth of existing firms that would otherwise better challenge dominant firms, for example, by limiting potential competitors' access to talented workers.[589]

Non-competes may also affect prices in a variety of ways. By suppressing workers' earnings, non-competes decrease firms' costs, which firms may theoretically pass through to consumers in the form of lower prices. However, non-competes may also have several countervailing effects that would tend to increase prices. First, non-competes may increase concentration, which could lead to less competition between firms on price, and therefore higher prices for consumers. Second, by inhibiting efficient matching between workers and firms, non-competes may reduce the productivity of a firm's workforce, which may lead to higher prices. Third, by inhibiting innovation, non-competes may hinder the development of lower-cost products or more efficient manufacturing processes.

One study, by Hausman and Lavetti, focuses on physician markets. The study finds that as the enforceability of non-competes increases, these markets become more concentrated, and prices for consumers for physician services increase. The study finds that while non-competes allow physician practices to allocate clients more efficiently across physicians, this comes at the cost of greater concentration and higher consumer prices. This study examines several changes in non-compete enforceability measured continuously. The authors note that, in theory, if

decreased non-compete enforceability decreases earnings, then the fall in prices may simply be due to pass-through of labor costs. However, empirical research shows that decreased non-compete enforceability increases earnings (as discussed in Part IV.B.3.a.ii). Even if that were not the case, Hausman and Lavetti show that labor cost pass-through cannot explain their findings.[590] This study satisfies all of the principles described in Part IV.A.2, and is accordingly weighted highly by the Commission.

Another study, by Lipsitz and Tremblay, examines all industries in the economy and shows empirically that increased enforceability of non-competes at the State level increases concentration.[591] Lipsitz and Tremblay theorize that non-competes inhibit entrepreneurial ventures that could otherwise enhance competition in goods and service markets. The authors show that the potential for harm is greatest in the industries in which non-competes are likely to be used at the highest rate.[592]

If the general causal link governing the relationship between enforceability of non-competes, concentration, and consumer prices acts similarly to that identified in the study by Hausman and Lavetti, then it is plausible that increases in concentration identified by Lipsitz and Tremblay would lead to higher prices in a broader set of industries than healthcare. Lipsitz and Tremblay use several changes in non-compete enforceability measured in a continuous fashion, but do not measure the impact on consumer prices or welfare. The Commission therefore finds the study's conclusion that non-competes increase concentration highly robust, but the study is not itself direct empirical evidence of a relationship between non-competes and prices.

Two additional studies assess the effects of non-competes on concentration and prices. However, the Commission gives these studies little weight.

A study of physician non-competes by Lavetti, Simon, and White finds that prices charged by physicians with non-competes are similar to those charged by physicians without non-competes.[593]

---

[585] Ex Parte Communication: Email from G. Carlino, *supra* note 558.

[586] Johnson, Lavetti & Lipsitz, *supra* note 388 at 12–14.

[587] *Id.* at 12.

[588] *See* Part IV.B.3.b.i.

[589] *See* Part IV.C.2.c.i (describing a study addressing how non-competes force firms to make inefficiently high buyout payments).

[590] Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am Econ. J. Applied Econ. 278 (2021).

[591] Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* 6 (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864*. Concentration is measured by an employment-based Herfindahl-Hirschman Index (HHI).

[592] *Id.* at 3.

[593] *See* Lavetti, Simon, & White, *supra* note 82.

The Commission gives this study less weight because it merely analyzes differences between workers based on the use of non-competes.[594]

A study by Younge, Tong, and Fleming finds that non-competes contribute to economic concentration because non-compete enforceability increases the rate of mergers and acquisitions.[595] This study uses one change in non-compete enforceability—in Michigan—to generate its results. However, in addition to its use of a single legal change in a single State, the change to non-compete enforceability was accompanied by several other changes to Michigan's antitrust laws, so it is not possible to identify the effect of the change in non-compete enforceability standing alone.

Comments Pertaining to Increased Concentration and Consumer Prices and the Commission's Responses

Several commenters addressed the question of whether non-competes affect concentration and consumer prices. Some commenters asserted that the rule would lower consumer prices by improving matches between employers and workers, increasing productivity. Commenters also argued that locking up talent, particularly in specialized markets, prevents entrepreneurship and new business formation and can thus contribute to increased concentration.

Some commenters opposing the NPRM claimed that banning non-competes could increase concentration. These commenters argued that larger firms could discourage companies from expanding into new and underserved markets by poaching, or threatening to poach, their key employees, leading to increased costs that could force some firms out of business. These commenters also argued that non-competes protect small businesses from dominant consolidators, as high recruitment, retention, and other costs may induce small businesses to sell or larger businesses may hire away their workers. A medical trade organization stated that without non-competes, independent practices might not be able to afford to hire and thus may be unable to grow or compete.[596]

While these commenters theorize that prohibiting non-competes would increase concentration, the Commission

notes that the available evidence indicates that non-competes increase concentration, rather than reducing it. The Commission further notes that these theories are inconsistent with the robust empirical literature finding that non-competes reduce new business formation, as well as with the hundreds of comments from small businesses, including physician practices, recounting how non-competes stymied their ability to enter markets or grow because they make it harder to hire talent.

Several commenters claimed that prohibiting non-competes would increase worker earnings and increase transaction costs related to hiring, which firms would pass through to consumers in the form of higher prices. However, the only study of how non-competes affect prices—the Hausman and Lavetti study—finds that decreased non-compete enforceability *decreases* prices in the healthcare market, rather than increasing them. Moreover, while it is theoretically possible that higher labor costs could be passed on to consumers in the form of higher prices, there are several countervailing effects from prohibiting non-competes that would tend to lower prices. Additionally, empirical research shows that labor cost pass-through cannot explain decreases in prices in healthcare markets associated with non-competes becoming less enforceable.[597]

An insurance company stated that insurance premiums would increase if the rule allows non-profit hospitals to dominate the hospital market and have more leverage in network negotiations. These commenters do not provide any empirical evidence to support this assertion. Moreover, for the reasons described in Part V.D.5, the Commission disagrees that the ability to use non-competes will provide a material competitive advantage to non-profit hospitals. Another commenter stated that if non-competes are prohibited, physicians will leave States with lower market reimbursement rates for those with higher rates, increasing healthcare costs and shortages. Commenters did not cite any empirical evidence that supports this hypothetical assertion that the final rule would increase healthcare costs or shortages due to physicians leaving States with lower reimbursement rates, and the Commission is aware of none. However, the Commission notes that it received many comments from doctors, nurses, and other healthcare professionals

asserting that non-competes worsen healthcare shortages.[598]

Some commenters stated that non-competes may improve access to physicians due to non-compete-led consolidation or more efficient patient-sharing within practices, and that Hausman and Lavetti's study is unable to quantify these benefits. In response, the Commission notes that there is no empirical literature bearing out this theory, and that the commenters overwhelmingly stated that non-competes decrease patients' access to the physicians of their choice, increase healthcare shortages, and negatively affect the quality of health care.[599]

iv. Non-Competes May Reduce Product and Service Quality and Consumer Choice

The negative effects of non-competes on competition may also degrade product and service quality and consumer choice. Competition encourages firms to expand their product offerings and innovate in ways that lead to new and better products and services.[600] However, by inhibiting new business formation, increasing concentration, and reducing innovation, non-competes reduce competitive pressure in product and service markets, which may reduce product quality and consumer choice. In addition, poor working conditions and less optimal matching of workers and firms may lead to reductions in the quality of products and services. For these reasons, non-competes may tend to negatively affect competitive conditions in product and service markets by reducing product quality and consumers' options.

Such effects are less readily quantifiable than the other negative effects of non-competes on product and service markets—*i.e.,* the negative effects on new business formation, innovation, concentration, and consumer prices. It is thus unsurprising that there are not reliable empirical studies of these effects. However, the Commission received an outpouring of public comments on this issue. Hundreds of commenters, primarily from the healthcare field, described how

---

[594] *See* Part IV.A.2 (describing the shortcomings of such studies).

[595] Kenneth A. Younge, Tony W. Tong, & Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence From a Natural Experiment,* 36 Strategic Mgmt. J. 686 (2015).

[596] *See also* Part XI.C.2, which addresses these types of comments in greater detail.

[597] Hausman & Lavetti, *supra* note 590.

[598] These comments are summarized in greater detail in Part IV.B.3.b.iv.

[599] *See* Part IV.B.3.b.iv.

[600] In the NPRM, the Commission noted that innovation and entrepreneurship can, in turn, have positive effects on product quality. *See* NPRM at 3492. The Commission did not make specific findings on the effect of non-competes on consumer choice. However, the Commission discussed the closely related questions of how non-competes affect new business formation, innovation, concentration, and consumer prices. *See id.* at 3490–93.

**38400** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

non-competes reduce product and service quality and consumer choice.

The large number of comments the Commission received on this issue, the wide variety of impacts commenters describe, and the fact that the impacts commenters describe are overwhelmingly negative, indicate that non-competes reduce product quality and consumer choice, further bolstering the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.[601]

The commenters who addressed the effects of non-competes on product quality and consumer choice primarily discussed the healthcare industry. The majority of these comments focused on how non-competes harm patient care. Hundreds of physicians and other commenters in the healthcare industry stated that non-competes negatively affect physicians' ability to provide quality care and limit patient access to care, including emergency care. Many of these commenters stated that non-competes restrict physicians from leaving practices and increase the risk of retaliation if physicians object to the practices' operations, poor care or services, workload demands, or corporate interference with their clinical judgment. Other commenters from the healthcare industry said that, like other industries, non-competes bar competitors from the market and prevent providers from moving to or starting competing firms, thus limiting access to care and patient choice. Physicians and physician organizations said non-competes contribute to burnout and job dissatisfaction, and said burnout negatively impacts patient care.

In addition, physicians and physician organizations stated that, to escape non-competes, physicians often leave the area, and that this severs many physician/patient relationships. These commenters stated that non-competes therefore cause patients to lose the knowledge, trust, and compatibility that comes with long-established relationships. These commenters also said that strong physician/patient relationships and continuity of care improve health outcomes, particularly for complex, chronic conditions or patients who need multiple surgeries. These commenters described how patients who lose their physicians to non-competes either travel long

distances to see that physician, switch physicians, or lose access entirely if no other physicians are available. One physician argued that taking away a patient's ability to choose their provider violates the Patients' Bill of Rights.[602]

One medical society cited a 2022 survey of Louisiana surgeons in which 64.4% of the surgeons believed non-competes force patients to drive long distances to maintain continuity of care, and 76.7% believed they force surgeons to abandon their patients if they seek new employment.[603] This study had a small sample size and thus the Commission gives it limited weight, but the Commission notes that it accords with the many comments the Commission received describing how patients must drive long distances to maintain continuity of care—or are unable to do so, resulting in harms to their health. Illustrative comments on how non-competes affect the quality of patient care include the following:

• As a primary care physician I truly hope to see [the rule] move forward. I recently left my position at one company and for a year commuted an hour to be outside of my non-compete radius. I recently returned to my community and discovered I have more patients than I can count who simply didn't get care for over a year because they didn't want to find a new [primary care physician] but also couldn't make the hour drive to see me at my new location. The commute was annoying for me, but ultimately the only ones truly hurt were patients. Let's stop hurting our patients by restricting their ability to see their physicians.[604]

• My practice has operated since the 1990s in Danville, Kentucky. We are the only cardiology practice that has been present and has worked tirelessly to serve this rural community. The practice was a private practice originally. Unfortunately, just as most cardiac practices throughout the country have had to, our practice had to come under the control of these hospital systems to maintain its viability. . . . The CEO and the administration . . . have squeezed us out and forced us to leave the area with the employment contract non-compete in place. . . . I have spent the last 6 months hugging patients, medical staff, nursing who are stricken by the fact that we are being pushed out. Patients desperately ask me how they can maintain care if they have to travel up to an hour to see their

doctors with this change. They worry how they can pay for the steep gas prices to see their doctors. . . . They are truly concerned for the health of their families. All the while all I can do is tell them that my non-compete does not allow me, their cardiologist for the past decade, to give them any advice on how to maintain their care.[605]

• As a Physician, I had a non compete clause in my contract that extended two counties wide (100 square miles). . . . [W]hen I would not sign a contract amendment regarding pay that was very unfavorable and nebulous I was called in and summarily dismissed 'no cause.' Because of that I had to work out of state and my patients were instantly without a physician. The community did not have enough physicians to be able to care for the patients who now had no medical provider. During COVID this lack of access to healthcare for patients most certainly led to increased unnecessary illness and death. . . . Patients are suffering with access to healthcare, and physician shortages are being exacerbated because every time a physician has to leave because of a non compete clause they start hiring and credentialing all over again and it can take months for them to be able to work again.[606]

• Being a therapist, non-competes are extremely scary when it comes to patient care. Some include date ranges in which we cannot communicate with our patients, some of whom have severe trauma histories or suicidal ideations. If a clinician changes companies but is unable to continue meeting a patient, who is at fault if there is an injury or death? . . . Some non-competes include mileage in which a clinician cannot create their own company or rent out an office within a certain radius—how is this a safe practice? How can clients continue to work on their mental health and desire to stay alive if they have to change clinicians due to a noncompete clause?[607]

• Due to mistreatment and to escape workplace toxicity, one of my colleagues left our practice in compliance to our non-compete conditions, even though they caused great hardship. I, too, wanted to leave, but could not because doing so would have harmed my family's well being. What I witnessed in the aftermath was unconscionable. There was a void in patient care and months later, there still is a void. Not only was this physician required to move quite a distance from the practice, he was forbidden to even inform his patients that he was leaving. The practice in turn, did not inform the patients, and when asked, just informed them that he was no longer with the practice. Consequently, wait times to treat cancers doubled and now have tripled.[608]

• I would like to open a new clinic in my town, but my noncompete would disallow that from happening immediately. Furthermore, I worry that my patients that need medical care wouldn't be able to access it at my current clinic because the providers

---

[601] As described in Parts IV.B.3.b.i and ii, the Commission finds that the effects of non-competes on new business formation and innovation, standing alone, are sufficient to sustain its finding that non-competes tend to negatively affect competitive conditions in product and service markets.

[602] See President's Advisory Commission on Consumer Protection and Quality in the Health Care Industry, *Consumer Bill of Rights and Responsibilities, Executive Summary* (1997), *https://govinfo.library.unt.edu/hcquality/cborr/index.htm.*

[603] See William F. Sherman et al., *The Impact of a Non-Compete Clause on Patient Care and Orthopaedic Surgeons in the State of Louisiana: Afraid of a Little Competition?*, 14 Orthopedic Revs. (Oct. 2022), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9569414/.*

[604] Individual commenter, FTC–2023–0007–19853.

[605] Individual commenter, FTC–2023–0007–4072.

[606] Individual commenter, FTC–2023–0007–4440.

[607] Individual commenter, FTC–2023–0007–4270.

[608] Individual commenter, FTC–2023–0007–2384.

are booked out 6+ months, and if one left that would make those immediately increase to nearly a year, which could potentially cause my patient lasting damage. If I could open my own clinic locally without the constraints of the noncompete, those patients would be able to continue care as necessary with me, and I wouldn't feel stuck with poor management worsening patient care for my patients.[609]

• As a veterinarian, I can personally assure the FTC that such restrictions have caused both death and permanent disability of pets. . . . In nearly every scenario I have heard of, the veterinary business that requires and enforces non-compete clauses is underserving the pet-owning public. This is the current situation for veterinary medicine on a national level. Hospitals are so overwhelmed that they are not accepting new patients, turning away veterinary cases, and imposing extremely long (several months or more) waiting lists for appointments and/or scheduled procedures. If a hospital cannot accommodate the patients who require veterinary care, that hospital is not able to compete with the existing demand for services. . . . Is it fair for pet owners who cannot get their pets in to see a veterinarian (even on emergency situations) to have the veterinary hospitals who refuse to see their pets remove other options for care via non-compete clauses? These clauses are being blatantly abused by certain large veterinary businesses so that these organizations can maintain a pool of potential patients (on waiting lists) to draw from. Unfortunately, many of these dogs and cats die while waiting to be seen. At least in my profession, the non-compete concept has reached an epitome of unethical conduct. In addition, economic growth has been stunted due to self-serving greedy people in power. Please get rid of this horrible clause and lets make sure pets and their owners get what they need, when they need it.[610]

Some hospital associations argued that a study of physician markets[611] shows that non-competes improve patient care. According to these commenters, this research finds that non-competes make in-practice referrals more likely, increasing revenue and wages and providing patients with more integrated and better care. In response, the Commission notes that while the study finds that non-competes make physicians more likely to refer patients to other physicians within their practice—increasing revenue for the practice—it makes no findings on the impact on the quality of patient care. The Commission further notes that pecuniary benefits to a firm cannot justify an unfair method of competition.[612]

Some medical practices argued that within-group referrals allow physicians

to coordinate care plans and simplify logistics, and that non-competes protect the stability of those care teams to patients' benefit. Some industry associations and hospitals argued that non-competes improve patient choice and continuity of care because they stop physicians from leaving a health provider, benefiting patients who cannot follow the provider due to geographic or insurance limitations. One physician association said physicians leaving jobs can be costly to patients, who must transfer records and reevaluate insurance coverage.

The Commission notes that the vast majority of comments from physicians and other stakeholders in the healthcare industry assert that non-competes result in worse patient care. The Commission further notes that the American Medical Association discourages the use of non-competes because they "can disrupt continuity of care, and may limit access to care."[613] In addition, there are alternatives for improving patient choice and quality of care, and for retaining physicians, that burden competition to a much less significant degree than non-competes.

A related issue frequently raised in the comments is the impact non-competes have on healthcare shortages. According to many commenters, non-competes contribute to shortages by preventing physicians from moving to areas where their skills and specialties are needed; forcing physicians out of such areas; or forcing them out of practice entirely due to contractual restrictions or burnout. Such shortages, according to these commenters, decrease access to care, increase wait times, lead to canceled procedures, and decrease the quality of care. Many commenters stated that these effects of non-competes are particularly acute in rural, underserved, and less affluent areas that already have difficulty attracting healthcare professionals. Some commenters argued that provider shortages can, in combination with non-competes, create monopolies.

A smaller number of commenters from the healthcare industry argued that non-competes alleviate healthcare

shortages and prevent hospital or facility closures by keeping physicians from leaving underserved areas and reducing fluctuations in labor costs. Some of these commenters asserted that a ban on non-competes would upend healthcare labor markets, thereby exacerbating healthcare workforce shortages, especially in rural and underserved areas. A medical society argued that non-competes can allow groups to meet contractual obligations to hospitals, as physicians leaving can prevent the group from ensuring safe care. As the Commission notes, there are not reliable empirical studies of these effects, and these commenters do not provide any. However, the Commission notes that the rule will increase labor mobility generally, which makes it easier for firms to hire qualified workers.

Commenters in a variety of industries beyond healthcare markets also provided a wide range of examples of how non-competes diminish the quality of goods and services, including preventing businesses from hiring experienced staff and creating worker shortages. Commenters stated that, where firms in a market use non-competes, it can be difficult for other firms to remain in the market, and consumers thus lose the freedom to choose their providers. Several comments pointed favorably to the American Bar Association's longstanding ban on non-competes for most lawyers to protect clients' freedom to choose their lawyer, in contrast with other highly paid and highly skilled professions such as physicians and their patients or clients.[614]

Commenters from outside the healthcare industry mainly focused on how non-competes increase concentration within industries, which reduces firms' incentive to innovate and results in consumers having fewer choices. Other commenters described how non-competes lock highly talented workers out of their fields or force them into jobs where they are less productive, depriving the marketplace of the products and services they would have developed. Illustrative examples of these comments include the following:

• As a software developer who often works under contracts containing sections stipulating non-compete agreements, I have observed first hand how they can harm the economy by bolstering monopolies, such as in sectors where clientele only have a single choice for meeting their engineering needs. Often, these clients have no other options and are forced to meet whatever arbitrary price point is set by the leading (sole)

---

[609] Individual commenter, FTC–2023–0007–1206.
[610] Individual commenter, FTC–2023–0007–0677.
[611] Lavetti, Simon, & White, *supra* note 82.
[612] *See supra* note 305 and accompanying text.

[613] *See, e.g.,* Comment of Am. Med. Ass'n, FTC–2023–0007–21017, at 4–5 (citing AMA *Code of Medical Ethics* Opinion 11.2.3.1). After the comment period closed, the AMA adopted a policy supporting banning non-competes for physicians in clinical practice who are employed by hospitals, hospital systems, or staffing companies, though not those employed by private practices. This policy change does not have legal effect. Andis Robeznieks, *AMA Backs Effort to Ban Many Physician Noncompete Provisions,* Am. Med. Ass'n (Jun. 13, 2023), *https://www.ama-assn.org/medical-residents/transition-resident-attending/ama-backs-effort-ban-many-physician-noncompete.*

[614] *See* Model Rule 5.6, *supra* note 532.

company, and that company may in turn operate howsoever they choose without feeling the need to adopt reasonable business practices that might exist were there competition.[615]

• As an aspiring tree care professional, non-compete agreements prevent me from switching employers/companies to access better work conditions or opportunities. No tree service company has ever invested in me. I learned to climb and saw while working for Federal agencies (USDA and NPS), and also through self-education and practice on my own. I believe that non-compete agreements have adversely limited competition in the tree service industry. This hurts employees who could do better if they were free to change their place of employment, and it hurts consumers who have fewer tree service providers to choose from.[616]

• I worked in a business supplying technology and materiel considered critical for national defense. I was labeled an expert in the field by my DoD customers and commended multiple times for solving logistical and technical problems with protective equipment during the previous two wars. I lead development contracts from the DoD to advance the state-of-the-art in warfighter protection, which set multiple records for figures of merit within my business, and which our program manager volunteered was the most exciting technology she had ever managed. When my business decided to discontinue that technology and transfer me, my noncompete agreement prevented me from continuing to support the DoD. I was removed from consideration at another firm in the third round of interviews because of my noncompete agreement—again, for a technology my business had decided to not pursue and had transferred me out of. So, instead of having the opportunity to advance my career into management in the service of protecting warfighters, I had to exit that industry and move laterally, into a different industry that cannot value 20 years of my expertise, and which will not further the defense of my country. If the FTC had nationalized a prohibition on noncompete clauses two years ago, this would not have happened, and I would have had the opportunity to advance my career, improve my family's economic fortune, and continue to contribute to our nation's defense.[617]

Overall, the Commission believes that the large number of comments it received on the issue of product quality and consumer choice and the wide variety of overwhelmingly negative impacts commenters describe further bolsters the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.

### 4. Prohibitions in Section 910.2(a)(1)

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission adopts § 910.2(a)(1), which defines unfair methods of competition related to non-competes with respect to workers other than senior executives. Section 910.2(a)(1) provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause; or represent that the worker is subject to a non-compete clause.

Part IV.A sets forth the Commission's determination that the foregoing practices are unfair methods of competition under section 5, and Parts IV.B.1 through IV.B.3 explain the findings that provide the basis for this determination. In this Part IV.B.4, the Commission explains the three prongs of § 910.2(a)(1) and addresses comments on proposed § 910.2(a).[618]

#### a. Entering Into or Attempting To Enter Into (§ 910.2(a)(1)(i))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "enter into or attempt to enter into a non-compete clause with a worker." The Commission adopts this same language in the final rule in § 910.2(a)(1)(i). As a result, the final rule prohibits persons from entering into or attempting to enter into non-competes with workers other than senior executives as of the effective date. (Section 910.2(a)(2)(i) separately prohibits persons from entering into or attempting to enter into non-competes with senior executives as of the effective date.)

A business commenter requested that the Commission remove "attempt to enter into" from § 910.2(a) on the basis that it may encourage workers to sue employers for contractual provisions that have no practical effect on the worker or which are not finalized in any employment agreement. The Commission disagrees that conduct that would be covered by the attempt provision—such as presenting the worker with a non-compete, even if the employer and worker do not ultimately execute the non-compete—has no practical effect on the worker. The Commission is concerned that such attempts to enter into non-competes still have *in terrorem* effects that deter competition. For example, workers presented with non-competes may not realize they are not bound by them. Such workers may therefore refrain from seeking or accepting other work or starting a business, yielding the same tendency of non-competes to negatively affect competitive conditions that motivate this final rule.

The Commission accordingly finalizes the language as proposed.

#### b. Enforcing or Attempting To Enforce (§ 910.2(a)(1)(ii))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "maintain with a worker a non-compete clause." In addition, proposed § 910.2(b)(1) would have provided that, to comply with this prohibition on maintaining a non-compete, an employer that entered into a non-compete with a worker prior to the compliance date must "rescind the non-compete no later than the compliance date."

As elaborated in Part IV.E, the Commission has decided not to finalize a rescission requirement. As a result, the Commission also removes "maintain" from the text of § 910.2(a), to avoid any ambiguity about whether the final rule contains a rescission requirement. Instead of a rescission requirement, the final rule focuses more narrowly on the future enforcement of existing non-competes with workers other than senior executives. It provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enforce or attempt to enforce a non-compete clause. An employer attempts to enforce a non-compete where, for example, it takes steps toward initiating legal action to enforce the non-compete, even if the court does not enter a final order enforcing the non-compete.

For workers other than senior executives, this prohibition on enforcing a non-compete applies to all non-competes, but affects only enforcement or attempted enforcement conduct taken after the effective date of the rule. In so doing, the Commission reduces the burden on employers by eliminating the need to take steps to formally rescind provisions of existing contracts, instead simply requiring that employers refrain from enforcing or attempting to enforce in the future (after the effective date) non-competes that are rendered unenforceable by this provision of the rule.

As explained in Part IV.C, the Commission in the final rule does not prohibit the future enforcement or attempted enforcement of existing non-

---

[615] Individual commenter, FTC–2023–0007–5818.
[616] Individual commenter, FTC–2023–0007–1980.
[617] Individual commenter, FTC–2023–0007–4446.

[618] Several commenters requested changes to proposed § 910.2(a) to provide various exceptions to coverage under the final rule. The Commission addresses these comments in Part V.C.

competes with senior executives. The Commission considered whether to take this approach for workers other than senior executives, but based on the totality of the evidentiary record concludes that such non-competes should not remain in force after the effective date for three main reasons. First, existing non-competes with workers other than senior executives negatively affect competitive conditions to a significant degree, for the same reasons as new non-competes. The Commission believes that non-competes with such workers that were entered into before the effective date implicate the concerns described in Part IV.B.3—relating to the negative effects of non-competes on competitive conditions in labor, product, or service markets—to the same degree as non-competes entered into as of the effective date. Of course, the Commission notes that the empirical evidence quantifying the harms to competition from non-competes by definition relates to existing non-competes.

Second, for workers other than senior executives, existing non-competes not only impose acute, ongoing harms to competition, they also impose such harms on individual workers by restricting them from engaging in competitive activity by seeking or accepting work or starting their own business after their employment ends. As described in Part IV.B.2.b, the Commission received thousands of comments from workers that described non-competes as pernicious forces in their lives that forced them to make choices that were detrimental to their finances, their careers, and their families. These concerns are less present for senior executives, who are far more likely than other workers to have negotiated their non-compete and received compensation in return, thereby mitigating this kind of acute, ongoing harm.

Third, because the Commission finds that non-competes with workers other than senior executives generally are not bargained for and such workers generally do not receive meaningful, if any, compensation for non-competes, the practical considerations that are present with respect to existing non-competes for senior executives (discussed in Part IV.C.3) are far less likely to be present for other workers. For these reasons, the Commission concludes that, consistent with the proposed rule, existing non-competes with workers other than senior executives should not remain in force after the effective date.

Several commenters argued that the Commission should allow all existing non-competes to remain in effect. Some of these commenters argued that the rule would upset bargained-for agreements. Commenters asserted that workers who received benefits in exchange for agreeing to non-competes would receive a windfall if such clauses cannot be maintained and are no longer enforceable. A few of these commenters also argued that invalidating existing non-compete agreements will upset workers' economic interests because they will lose out on enhanced compensation that they have received or expect to receive in exchange for their non-competes. Some commenters contended that invalidating existing non-competes would be especially harmful to workers' interests in non-competes tied to particularly large amounts of compensation, complex compensation arrangements, or unique forms of compensation such as equity grants. Relatedly, some commenters expressed concern that the NPRM did not explain whether employers could recoup benefits already paid in exchange for non-competes. A few commenters suggested that they have given workers confidential and trade secret information in exchange for the worker agreeing to a non-compete that may no longer be enforceable.

The Commission is not persuaded by comments arguing that the rule would upset existing bargained-for agreements. As noted in Part IV.B and Part IV.C, the Commission finds that workers who are not senior executives are unlikely to negotiate non-competes or to receive compensation for them. Moreover, the Commission has also determined that non-competes with senior executives that predate the effective date may be enforced,[619] which will substantially reduce the number of workers with complex compensation arrangements whose non-competes are rendered unenforceable after the effective date.

Other commenters argued that employers relied on the expectation of a non-compete when deciding how much to invest in training their workers or the extent to which they share trade secrets with their workers. In response, the Commission notes that firms that are concerned about retention have tools other than non-competes for retaining workers, including fixed-duration employment contracts (*i.e.,* forgoing at-will employment and instead making a mutual contractual commitment to a period of employment) and providing improved pay and benefits (*i.e.,* competing on the merits to retain the worker's labor services). In addition, while some workers that have received

training may leave a firm for a competitor, firms will also be able to attract highly trained workers *from* competitors, and this increased job-switching will likely lead to more efficient matching between workers and employers overall.[620]

The Commission is not persuaded by commenters who contended that invalidating existing non-competes would disturb employer expectations with respect to sharing trade secrets or other commercially sensitive information. As explained in Part IV.D.2, the Commission finds that employers have adequate alternatives to non-competes to protect these interests, including trade secret law and NDAs, and that these alternatives do not impose the same burden on competition as non-competes. Some commenters contended that employers may not have adequate alternatives in place for existing non-competes and that former workers may not agree to new NDAs. But the Commission finds that it is rare for an employer who entered into a non-compete agreement as a means of protecting trade secrets or commercially sensitive information to have not also entered into an NDA with the worker.[621] This is especially true given that non-competes are generally less enforceable than NDAs.[622] In any event, nothing in the final rule prevents employers from entering new NDAs with workers.

Some commenters contended that invalidating existing non-competes would enable new employers to "free ride" off former employers' investments in training. The Commission addresses comments about "free riding" and training investments in Part IV.D.2.

Several comments argued that a final rule should not invalidate existing non-competes because the economic impact is too unpredictable. These commenters maintained that the number of individual employment contracts that would be invalidated means that the economic impact would be exceptionally widespread, and likely impossible to accurately predict. In response, the Commission notes that it

---

[619] *See* Part IV.C.3.

[620] *See* Part IV.B.3.a.

[621] *See, e.g.,* Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 35 (finding that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and 74.7% of workers with non-competes are subject to all three provisions).

[622] Camilla A. Hrdy & Christopher B. Seaman, *Beyond Trade Secrecy: Confidentiality Agreements that Act Like Noncompetes,* 133 Yale L. J. 669, 676 (2024) ("Courts across jurisdictions routinely give confidentiality agreements 'more favorable treatment' than noncompetes. And confidentiality agreements are not typically subject to the same limitations that are applied to noncompetes. . . . Overall, courts tend to apply a default rule of enforceability.") (internal citations omitted).

has assessed the benefits and costs of the final rule and finds that the final rule has substantial benefits that clearly justify the costs (even in the absence of full monetization).[623]

c. Representing (§ 910.2(a)(1)(iii))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause." The Commission adopts the same language in the final rule. Pursuant to § 910.2(a)(1)(iii), it is an unfair method of competition for an employer to represent that a worker other than a senior executive is subject to a non-compete clause. The "good faith" language remains in the final rule but, for clarity, it has been moved to § 910.3, which contains exceptions to the final rule.[624]

Under this "representation" prong, the final rule prohibits an employer from, among other things, threatening to enforce a non-compete against the worker; advising the worker that, due to a non-compete, they should not pursue a particular job opportunity; or telling the worker that the worker is subject to a non-compete. The Commission believes that this prohibition on representation is important because workers often lack knowledge of whether employers may enforce non-competes.[625] In addition, the evidence indicates that employers frequently use non-competes even when they are unenforceable under State law, suggesting that employers may believe workers are unaware of or unable to vindicate their legal rights.[626] Employers can exploit the fact that many workers lack knowledge of whether non-competes are unenforceable under State law by representing to workers that they are subject to a non-compete when they are not or when the non-compete is unenforceable. Such misrepresentations can have *in terrorem* effects on workers, causing them to refrain from looking for work or taking another job, thereby furthering the adverse effects on competition that the Commission is concerned about.

In addition, threats to litigate against a worker—even where the worker is aware of the Commission's rule and

believes the non-compete is unenforceable—may deter the worker from seeking or accepting work or starting their own business. As explained in Part IV.B.2.b.ii, many commenters—including highly paid workers—explained in their comments that they believed their non-compete was unenforceable, but they nevertheless refrained from seeking or accepting work or starting their own business because they could not afford to litigate against their employer for any length of time. For this reason, the Commission believes it is important for the final rule to prohibit employers not only from enforcing or attempting to enforce non-competes against workers other than senior executives, but also threatening to do so.

A commenter suggested limiting the "representation" prong to instances where the employer has no good-faith basis to believe the non-compete is valid "under local or State law," even if the non-compete is invalid under the final rule. The Commission does not adopt this approach because representing to workers that they are subject to a non-compete, where the rule provides that the non-compete is unenforceable, would mislead the worker and would tend to deter them from competing against the employer by seeking or accepting work or starting a business.

*C. Section 910.2(a)(2): Unfair Methods of Competition—Non-Competes With Senior Executives*

In the NPRM, the Commission proposed to prohibit non-competes—including non-competes entered into before the effective date—with all workers.[627] The Commission preliminarily found that all non-competes, whether with senior executives or other workers, were restrictive conduct that negatively affected competitive conditions.[628] However, while the Commission preliminarily found that non-competes with workers other than senior executives were exploitative and coercive, the Commission stated that this finding did not apply to senior executives.[629] The Commission requested comment on that preliminary finding, as well as on whether non-competes with senior executives should be excluded from the rule or otherwise subject to a different standard. The NPRM did not define the term "senior executive," but sought comment on

potential approaches to defining the term.[630]

In the final rule, the Commission does not find that senior executives—specifically, highly paid workers with the highest levels of authority in an organization—are exploited or coerced in connection with non-competes, and it describes the record on this issue in Part IV.C.1. The Commission does, however, find that non-competes with senior executives are an unfair method of competition, based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that impair competitive conditions in the economy. Specifically, the Commission finds that such non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets and labor markets. Indeed, non-competes with senior executives may tend to negatively affect competitive conditions in product and service markets to an even greater degree than non-competes with other workers, given the outsized role senior executives play in forming new businesses and setting the strategic direction of firms with respect to innovation. The Commission explains the basis for these findings in Part IV.C.2.

Because non-competes with senior executives are not exploitative or coercive, however, this subset of workers is less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers subject to existing non-competes. In addition, commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives. For these reasons, as described in Part IV.C.3, the Commission allows existing non-competes with senior executives to remain in force—unlike existing non-competes with all other workers, which employers may not enforce after the effective date.

In Part IV.C.4, the Commission explains the final rule's definition of "senior executive" and the related definitions it is adopting.[631] The Commission finds that the final rule's definition of "senior executive" appropriately captures the workers that are more likely to have complex compensation packages that present practical challenges to untangle, and who are less likely to be exploited or coerced in connection with their non-competes. To capture this subset of

---

[623] *See* Part X.E.

[624] *See* Part V.C.

[625] *See* Prescott & Starr, *supra* note 413 at 10–11.

[626] *See* Starr, Prescott, & Bishara, *supra* note 68 at 81.

[627] NPRM, proposed § 910.2(a).

[628] *Id.* at 3500.

[629] *Id.* at 3502–04.

[630] *Id.* at 3520.

[631] *See* § 910.1.

workers for whom the Commission decides to leave existing non-competes unaffected, the final rule adopts a definition of senior executive that uses both an earnings test and a job duties test. Specifically, the final rule defines the term "senior executive" to refer to workers earning more than $151,164 who are in a "policy-making position" as defined in the final rule.[632]

Finally, in Part IV.C.5, the Commission explains the regulatory text it is adopting in § 910.2(a)(2), which defines unfair methods of competition related to non-competes with senior executives.

### 1. The Commission Does Not Find That Non-Competes With Senior Executives Are Exploitative or Coercive

The Commission stated in the NPRM that its preliminary finding that non-competes are exploitative and coercive did not apply to senior executives. The Commission stated that non-competes with senior executives are unlikely to be exploitative or coercive at the time of contracting, because senior executives are likely to negotiate the terms of their employment and may often do so with the assistance of counsel.[633] The Commission also stated that such non-competes are unlikely to be exploitative or coercive at the time of the executive's potential departure, because senior executives are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete.[634] The Commission sought comment on whether there are other categories of highly paid or highly skilled workers (*i.e.,* other than senior executives) who are not exploited or coerced in connection with non-competes.[635]

Based on the totality of the record, including the many comments submitted on these questions, the Commission finds that senior executives—specifically, highly paid workers with the highest levels of authority in an organization—are substantially less likely than other workers to be exploited or coerced in connection with non-competes. For these reasons, the Commission does not find that non-competes with senior executives are exploitative or coercive.

There is little empirical evidence on the question of whether non-competes with senior executives are exploitative or coercive. A 2006 study of non-competes with CEOs finds that many of these workers negotiated a severance

period as long or longer than their non-compete period, making it easier to sit out of the market.[636] However, this study was limited to very-high-earning CEOs at large public companies—the average total compensation of the CEOs studied was $1.65 million [637]—so its findings do not necessarily capture the experiences of other senior executives. Many Americans work in positions with "senior executive" classifications. According to BLS, there were almost 3.4 million "top executives" in the U.S. in 2022 at firms under private ownership, and the median income for these workers was $99,240.[638]

The comment record on whether senior executives experience exploitation and coercion in relation to their non-competes is mixed. Many commenters asserted that, because some senior executives negotiate their non-competes with the assistance of expert counsel, they are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete, and thus their non-competes are not exploitative or coercive. Several commenters stated that senior executives frequently negotiate non-competes for valuable consideration and/or typically agree to non-competes only in exchange for compensation. Some senior executives say they were not exploited or coerced in connection with non-competes.[639] Several commenters agreed with the Commission's preliminary finding that senior executives often obtain the assistance of counsel with respect to non-competes. Some commenters stated that to the extent a non-compete is not exploitative or coercive at the time of contracting, it is also not exploitative or coercive at the time of departure. One CEO stated that non-competes should be permissible for senior executives when they are entered into in exchange for severance and when the senior executive leaves voluntarily.

The Commission notes that a relatively small number of self-identified senior executives submitted

comments in their personal capacity. While the Commission did receive some comments from self-identified senior executives suggesting that their non-competes were exploitative and coercive, such comments were far less common than for other workers. However, some senior executives did report experiencing similar issues of exploitation and coercion. Several senior executives said that their non-competes were required and non-negotiable. Multiple senior executives described their own non-competes as "one-sided" in favor of the employer. Some senior executives say they were not given consideration for the non-compete, and even some who said they received consideration still said their non-competes were exploitative and coercive. For example, some senior executives said they: (1) were required to sign a non-compete under threat of losing their job or their earned compensation; (2) were forced into a stock share buyout that included a non-compete; or (3) could obtain long-term compensation only if they signed a non-compete. Two advocacy groups stated that many senior executives may lack power to avoid non-competes and that employers still hold most of the leverage in employment negotiations, even with respect to senior executives. An employment law firm stated that in its experience, it had not seen higher compensation for senior executives and other highly paid workers in jurisdictions where non-competes were allowed, and that employers rarely provide compensation for non-competes. The firm said that senior executives and other highly paid workers are more likely to receive severance payments, but such payments are paid only in some cases. It said that even when paid, the severance payments often do not fully compensate for what a senior executive could have otherwise earned during the non-compete period.

Furthermore, several self-identified senior executives said they felt unable to leave their company because of their non-competes. Many of these commenters said they feared being unemployed. Some senior executives say they feared or could not afford litigation, while two senior executives said that they could not afford to fight non-competes they believed were unenforceable. Several self-identified senior executives, having spent their careers in one industry, said they were forced to sit out of the market for long periods, forgoing earnings and the ability to work. Others reported struggling to find a job and suffering

---

[632] *Id.*

[633] NPRM at 3503.

[634] *Id.* at 3504.

[635] *Id.* at 3503–04.

[636] Stewart J. Schwab & Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?,* 63 Wash. & Lee L. Rev. 231, 256–57 (2006).

[637] *Id.* at 244.

[638] BLS, Occupational Employment and Wage Statistics, *Tables Created by BLS, https:// www.bls.gov/oes.tables.htm.* These data are from the May 2022 National XLS table for Top Executives under private ownership.

[639] For the sake of readability, the Commission refers to the commenters based on how they described themselves. For example, if a commenter said they were a senior executive, the Commission refers to them as a senior executive (rather than as a "self-described senior executive").

financially, including living on Social Security or nearing bankruptcy.

One law firm specializing in executive compensation said many senior executives may have achieved top roles at companies because they have spent decades in the same industry and would struggle to find work with firms other than competitors. Another law firm said senior executives blocked from an industry could lose their long-cultivated reputation in the industry and, as a result, time out of an industry could harm their careers. Worker advocacy organizations and a law firm said senior executives tend to be relatively older and, as older workers are forced out of the job market, they are likely to be losing out on increasingly scarce employment opportunities relative to their younger counterparts. Another advocacy group argued that the Commission did not provide sufficient evidence to support its preliminary finding that non-competes are not exploitative and coercive for senior executives. A few commenters suggested that senior executives from historically marginalized groups may be paid less and have less bargaining power than other senior executives.[640]

Critically, the Commission received an outpouring of comments indicating that highly paid workers who are *not* senior executives (*i.e.,* who are not workers with the highest levels of authority in an organization) are often coerced or exploited via non-competes. The Commission received many comments from workers in relatively higher-wage fields—such as medicine, engineering, finance and insurance, and technology—who stated that employers exploited and coerced them through the use of non-competes.[641] The vast

majority of higher-wage workers who are not senior executives reported that they lacked bargaining power in relation to their employer; did not negotiate their non-compete or receive compensation for it; and/or were not informed of the non-compete until after they received the job offer. Many of these workers stated that their non-compete was hidden or obscured; that their employers misled them about the terms of a non-compete; and/or that the non-compete was confusingly worded or vague. In addition, many high-wage workers recounted how non-competes coerced them into refraining from competing against their employer by forcing them to stay in jobs they wanted to leave or forcing them to leave their profession, move their families far away, and/or commute long distances. And a large share of high-wage workers argued that even where their non-competes were overbroad and likely unenforceable, they were deterred from seeking or accepting other work or starting a business by the threat of a lawsuit from their employer, which they said would be ruinous to their finances and professional reputations.[642] The Commission accordingly finds that higher-wage workers who are not senior executives are often exploited and coerced through employers' use of non-competes.

In addition, the Commission believes it is appropriate to conclude that lower-earning workers, regardless of their job title or function in an organization, are more likely to be exploited or coerced in connection with non-competes. As noted, many workers classified as "top executives" make under $100,000. Commenters did not self-report their income, so the Commission cannot definitively determine that the self-identified senior executives who reported exploitation and coercion are lower-wage senior executives. Because of their incomes, however, lower-wage senior executives are likely subject to many of the same exploitative and coercive factors that affect other workers, such as the inability to afford a non-compete lawsuit, forgo work for a lengthy period, leave the field, or relocate.[643] Comments from some senior executives confirmed that they did not have sufficient bargaining power to negotiate the non-compete or consideration for it, suffered serious financial harm from non-competes, and could not afford to litigate their non-competes. Accordingly, the Commission finds that a mere job title alone is insufficient to confer bargaining power

on a worker, and lower-wage senior executives can be subject to the same exploitation and coercion that other workers face.

However, having considered the comments and the available empirical evidence on this question, the Commission does not find that non-competes with highly paid workers who are also senior executives are likely to be exploitative or coercive. The Commission stresses that it is not affirmatively finding that such non-competes can never be exploitative or coercive. The Commission has simply determined the record before it is insufficient to support such a finding at this time.

## 2. The Use of Non-Competes With Senior Executives is an Unfair Method of Competition Under Section 5

While the Commission does not find that non-competes with senior executives are exploitative and coercive, the Commission determines that these non-competes are nonetheless unfair methods of competition, for the reasons described herein.

To determine whether conduct is an unfair method of competition under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.[644]

Non-competes with senior executives satisfy all the elements of the section 5 inquiry. As described in Part IV.C.2.a, these non-competes are methods of competition. As described in Part IV.C.2.b, these non-competes are facially unfair conduct because they are restrictive and exclusionary. And as described in Part IV.C.2.c, these non-competes tend to negatively affect competitive conditions in product and service markets and in labor markets. Because the Commission finds that non-competes with senior executives are unfair methods of competition, the Commission declines to exclude them from the final rule. However, as described in Part IV.C.3, the final rule allows existing non-competes with senior executives to remain in effect, due to the considerations described therein.

---

[640] One of those commenters cited two *USA Today* articles that examined Federal workforce records for 88 companies in the S&P 100 to assess the number of Asian and Latina women in executive positions. The articles did not include the underlying data used for the evaluation. *See* Jessica Guynn & Jayme Fraser, *Asian Women Are Shut Out of Leadership at America's Top Companies. Our Data Shows Why,* USA Today (Apr. 25, 2022), *https://www.usatoday.com/money/2022/04/25/asian-women-executives-discrimination-us-companies/7308310001/?gnt-cfr=1;* Jessica Guynn & Jayme Fraser, *Only Two Latinas Have Been CEOs at a Fortune 500 Company: Why So Few Hispanics Make It to the Top,* USA Today (Aug. 2, 2022), *https://www.usatoday.com/story/money/2022/08/02/hispanic-latina-business-demographics-executive//?gnt-cfr=1.* These news reports find a disparity in the number of Asian and Latina women in senior executive roles at these companies but make no specific findings on bargaining power. While lack of representation and other factors may impact bargaining power, the Commission believes that these two articles (with no underlying data provided) are insufficient evidence at this time to find exploitation and coercion with respect to this subset of senior executives.

[641] *See* Part IV.B.2.b.i–ii.

[642] *See* Part IV.B.2.b.ii.

[643] *See id.*

[644] *See* Part II.F.

a. The Commission Finds That Non-Competes With Senior Executives are a Method of Competition, Not a Condition of the Marketplace

With respect to the first element—whether conduct is a method of competition—the Commission finds that non-competes with senior executives are a method of competition for the same reasons as non-competes with other workers.[645]

b. Non-Competes With Senior Executives are Facially Unfair Conduct Because They are Restrictive and Exclusionary

In Part IV.B.2.a, the Commission finds that non-competes with workers other than senior executives are facially unfair conduct because they are restrictive and exclusionary. The Commission finds that non-competes with senior executives are facially unfair conduct for the same reasons.

Like non-competes for all other workers, the restrictive nature of non-competes with senior executives is evident from their name and function: non-competes restrict competitive activity. They prevent senior executives from seeking or accepting other work or starting a business after leaving their job. And like non-competes for all other workers, non-competes with senior executives are exclusionary because they impair the opportunities of rivals. Where a worker is subject to a non-compete, the ability of a rival firm to hire that worker is impaired. In addition, where many workers in a market are subject to non-competes, the ability of firms to expand into that market, or entrepreneurs to start new businesses in that market, is impaired. While non-competes may impair the opportunities of rivals in all labor markets, non-competes for senior executives are especially pernicious in this regard. Senior executives are relatively few in number, are bound by non-competes at high rates,[646] and have highly specialized knowledge and skills. Therefore, it can be extremely difficult for existing firms and potential new entrants to hire executive talent and to form the most productive matches.

Because senior executives are often compensated in return for their promise not to compete, some commenters argue that non-competes with senior executives are not unfair methods of competition. However, agreements can present concerns under the antitrust laws even when both parties benefit.

Here, non-competes with senior executives are not unfair methods of competition under section 5 because they are unfair to the individual executive, but because they tend to negatively impact competitive conditions—*i.e.*, harm competition in product and service markets, as well as in labor markets—by imposing serious negative externalities on other workers, rivals, and consumers.[647]

c. Non-Competes With Senior Executives Tend To Negatively Affect Competitive Conditions

The Commission finds non-competes with senior executives tend to negatively affect competitive conditions in product and service markets and in labor markets. As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused actual harm in a specific instance. Here, the tendency of non-competes to impair competition is obvious from their nature and function, as it is for non-competes with workers who are not senior executives. And even if this tendency were not facially obvious, the evidence confirms that non-competes with senior executives do in fact negatively affect competitive conditions.

i. Non-Competes With Senior Executives Tend To Negatively Affect Competitive Conditions in Product and Service Markets

In the NPRM, the Commission stated that non-competes with senior executives may harm competition in product and service markets in unique ways.[648] The Commission stated that non-competes with senior executives may contribute more to negative effects on new business formation and innovation than non-competes with other workers, to the extent that senior executives may be likely to start competing businesses, be hired by potential entrants or competitors, or develop innovative products and services.[649] The Commission also stated that non-competes with senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants.[650] The Commission

preliminarily concluded that, as a result, prohibiting non-competes for senior executives may have relatively greater benefits for consumers than prohibiting non-competes for other workers.[651]

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes with senior executives tend to negatively affect competitive conditions in markets for products and services, inhibiting new business formation and innovation.

Non-Competes With Senior Executives Inhibit New Business Formation and Innovation

In Part IV.B.3.b, the Commission described the extensive empirical evidence indicating that non-competes inhibit new business formation and innovation. The Commission's finding in Part IV.B.3.b that non-competes inhibit new business formation and innovation does not examine non-competes with senior executives specifically. However, the Commission finds that non-competes with senior executives inhibit new business formation and innovation at least as much as non-competes with other workers and likely to a greater extent, given the outsized role of senior executives in forming new businesses, serving on new businesses' executive teams, and setting the strategic direction of businesses with respect to innovation.

Specifically, non-competes with senior executives tend to negatively affect competitive conditions in product and service markets in three ways. First, non-competes with senior executives inhibit new business formation. In Part IV.B.3.b.i, the Commission finds that non-competes with workers other than senior executives inhibit new business formation. The Commission finds that non-competes with senior executives inhibit new business formation as much as non-competes with other workers and likely to a greater extent, due to the important role senior executives play in new business formation.

Senior executives are particularly well-positioned to form new businesses because of their strategic expertise and business acumen; knowledge of multiple facets of their industries; experience making policy decisions for businesses; and ability to secure financing. Senior executives are also often crucial to the formation of startups, because startups often begin by

---

[645] *See* Part IV.B.1.

[646] *See* Part I.B.2 (noting studies estimating that about two-thirds of senior executives work under non-competes).

[647] *See* Part IV.C.2.i–ii (describing the negative effects of non-competes with senior executives on markets for products and services and labor markets).

[648] NPRM at 3502.

[649] *Id.* at 3513.

[650] *Id.*

[651] *Id.*

forming a leadership team, which is often comprised of experienced and knowledgeable executives from elsewhere in the industry.[652] Empirical research shows that when startups hire top management teams from other firms, they are more likely to grow beyond their initial stages [653] and that top managers' experience in an industry allows startups to grow more quickly.[654] Additionally, empirical research finds that startups that hire top management teams with experience are more likely to become successful businesses.[655] Empirical research also finds that, in addition to experience, top management teams that have worked together in the past are more successful than those that have not.[656] For these reasons, non-competes with senior executives not only inhibit new business formation by blocking the executives from forming new businesses; they also prevent other potential founders from forming new businesses, because potential founders are less likely to start new businesses when they are unable to assemble the executive team they need because so many executives in the industry are tied up by non-competes. By inhibiting new business formation, these non-competes deprive product and service markets of beneficial competition from new entrants—competition that in turn tends to benefit consumers through lower prices or better product quality.

Second, non-competes with senior executives inhibit innovation. In Part IV.B.3.b.ii, the Commission finds that non-competes with workers other than senior executives inhibit innovation. The Commission finds that non-competes with senior executives inhibit innovation at least as much as non-competes with other workers and likely to a greater extent, because senior executives play a crucial role in setting the strategic direction of firms with respect to innovation.

Non-competes with senior executives inhibit innovation by impeding efficient matching between workers and firms. As described in Part IV.B.3.a, labor markets function by matching workers and employers. The same is true for senior executives. Executives compete for roles at firms, and firms compete to attract (often highly sought-after) executives; executives choose the role that best meets their objectives, and firms choose the executive who best meets theirs. Non-competes impede this competitive process by blocking executives from pursuing new opportunities (*i.e.,* positions that are within the scope of their non-compete) and by preventing firms from competing to attract their talent. Thus, because non-competes are prevalent, the quality of the matches between executives and firms suffers.

By inhibiting efficient matching between firms and executives, non-competes frustrate the ability of firms to hire executives who can best maximize the firm's capacity for innovation. Senior executives play an important role in advancing innovation at firms.[657] Senior executives are often a fundamental part of the innovative process, guiding the strategic direction of the firm in terms of topics of new research and the depth of new research; determining the allocation of R&D funding; and making the decision to develop (and supervising the development of) new products and services.[658]

Research shows that labor mobility among senior executives may tend to foster innovation. Empirical research finds that executives with shorter job tenures tend to engage in more innovation than those who are longer tenured at firms.[659] In addition, empirical research shows that the strength of executives' external networks—which are likely stronger among executives hired externally—

increase the rate of innovation.[660] Finally, when senior executives are hired by new companies, they bring their experience and understanding of the industry, which may cross-pollinate with the capabilities of the new company, cultivating new research which would not otherwise be achieved.[661] By inhibiting efficient matching between executives and firms, non-competes impede the ability of firms to develop innovative products and services that benefit consumers.

Furthermore, empirical research shows that better matching among executives and firms drives productivity as well as innovation. When firms and executives have a higher quality match, the firm as a whole is more productive.[662] By inhibiting efficient matching between executives and firms, non-competes tend to reduce the productivity of firms.

In theory, firms that seek to hire an executive could just pay the executive's employer (or former employer) to escape the non-compete. However, research by Liyan Shi describes how non-competes with senior executives force firms to make inefficiently high buyout payments. Shi ultimately concludes that "imposing a complete ban on noncompete clauses would be close to implementing the social optimum." [663]

Shi explains that firms and executives jointly create market power by entering into non-competes and excluding rivals from hiring experienced labor in a competitive labor market. The existence of a non-compete forces rivals to make an inefficiently high buyout payment, where the inefficiency arises due to the market power of the incumbent firm created by the non-compete. Rival firms must either make these payments, which therefore lead to deadweight economic loss, or forgo the payment—and, consequently, the ability to hire a talented executive (and perhaps the ability to enter the market at all, for potential new firms).[664] New and small businesses in particular might be unable to afford these buyouts. By calibrating

[652] *See, e.g.,* Leslie Crowe, *How to Hire Your First Leadership Team* (Oct. 24, 2023), *https:// baincapitalventures.com/insight/how-to-hire-your-first-leadership-team-as-a-startup-founder/.*

[653] Bradley Hendricks, Travis Howell, & Christopher Bingham, *How Much Do Top Management Teams Matter in Founder-Led Firms?,* 40 Strategic Mgmt. J. 959 (2019).

[654] Yasemin Y. Kor, *Experience-Based Top Management Team Competence and Sustained Growth,* 14 Org. Sci. 707 (2003).

[655] Agnieszka Kurczewska & Michał Mackiewicz, *Are Jacks-of-All-Trades Successful Entrepreneurs? Revisiting Lazear's Theory of Entrepreneurship,* 15 Baltic J. of Mgmt. 411 (2020).

[656] Kathleen M. Eisenhardt, *Top Management Teams and the Performance of Entrepreneurial Firms,* 40 Small Bus. Econ. 805 (2013).

[657] *See, e.g.,* Jean-Philippe Deschamps, *Innovation Leaders: How Senior Executives Stimulate, Steer and Sustain Innovation* (John Wiley & Sons, 2009); Jean-Philippe Deschamps & Beebe Nelson, *Innovation Governance: How Top Management Organizes and Mobilizes For Innovation* (John Wiley & Sons, 2014).

[658] Christopher Kurzhals, Lorenz Graf-Vlachy, & Andreas König, *Strategic Leadership and Technological Innovation: A Comprehensive Review and Research Agenda,* 28 Corp. Governance: An Int'l Review 437 (2020); Pascal Back & Andreas Bausch, *Not If, But How CEOs Affect Product Innovation: A Systematic Review and Research Agenda,* 16 Int'l J. of Innovation and Tech. Mgmt. 1930001 (2019); Vassilis Papadakis & Dimitris Bourantas, *The Chief Executive Officer as Corporate Champion of Technological Innovation: An Empirical Investigation,* 10 Tech. Analysis & Strategic Mgmt. 89 (1998) (finding that CEO characteristics significantly influence technological innovation, and that the influence is particularly powerful for new product introductions).

[659] Vincent L. Barker III & George C. Mueller, *CEO Characteristics and Firm R&D Spending,* 48 Mgmt. Sci. 782 (2002).

[660] Qing Cao, Zeki Simsek, & Hongping Zhang, *Modelling the Joint Impact of the CEO and the TMT on Organizational Ambidexterity,* 47 J. of Mgmt. Stud. 1272 (2010); Olubunmi Faleye, Tunde Kovacs, & Anand Venkateswaran, *Do Better-Connected CEOs Innovate More?,* 49 J. of Fin. And Quant. Analysis 1201 (2014).

[661] *See, e.g.,* Orly Lobel, *Talent Wants to Be Free* (Yale Univ. Press, 2013).

[662] Yihui Pan, *The Determinants and Impact of Executive-Firm Matches,* 63 Mgmt. Sci. 185 (2017); Matthew Ma, Jing Pan, & Xue Wang, *An Examination of Firm-Manager Match Quality in the Executive Labor Market* (2021), *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=3067808.*

[663] Shi, *supra* note 84 at 427.

[664] *Id.*

this theoretical model to data on executive non-competes and executive compensation, the study shows that banning non-competes would result in nearly optimal social welfare gains.

Shi notes that such a mechanism could be tempered by the ability of a labor market to provide viable alternative workers for new or competing businesses. However, when a particular type of labor is somewhat scarce, when on-the-job experience matters significantly, or when frictions prevent workers from moving to new jobs—all of which tend to be the case for senior executives—there is no way for the market to fill the gap created by non-competes.

Some of the evidence in this study arises from analysis of non-compete use coupled with non-compete enforceability. Other evidence in the study, including the finding that a ban on non-competes is close to optimal, relies not on use at the individual level, but on prevalence of non-competes across a labor market. The latter approach does not rely, therefore, on comparing individuals with and without non-competes, and is therefore not subject to the estimation bias that leads the Commission to give less weight to evidence based on the use of non-competes.

*Relevant Comments and Commission Responses*

Many commenters stated that non-competes with senior executives reduce new business formation and innovation, confirming the Commission's findings. Several senior executives recounted personal experiences in which a non-compete prevented them from starting a business. A tech executive stated that they knew many tech executives who would have left their roles to start within-industry spinoffs if not for their non-competes. A senior executive stated that they had planned to start a small business that would not have harmed the former employer but had signed a non-compete that prevented them from doing so. A former executive stated that they were sued after starting a new business despite confirming with the CEO of their former employer that doing so would not violate the non-compete. Another senior executive said their non-compete prevented them from taking a job at a smaller, more innovative company in their industry. Some commenters warned that permitting non-competes for senior executives would reinforce dominant positions for industry incumbents who can foreclose new entrants from access to critical talent and expertise. An advocate for startups stated that small businesses

significantly benefit from mentorship from experienced founders, which can be inhibited by non-competes.

Other commenters argued that the Commission should exclude senior executives from coverage under the final rule because doing so would benefit competition in product and service markets. These commenters generally stated that non-competes may promote innovation by encouraging firms to make productivity-enhancing investments, such as investments in developing trade secrets. The Commission does not believe that non-competes are needed to protect valuable firm investments. As discussed in Part IV.D, the Commission finds that employers have less restrictive alternatives for protecting valuable investments and that these alternatives are available for senior executives as well as for other workers.

In addition, when assessing how non-competes with senior executives affect competition in product and service markets, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.C.2.c.i can be occurring at the same time. That is, a non-compete with a senior executive might in some instances be protecting a firm's investments in a manner that is productivity-enhancing, holding all else equal. At the same time, however, that same non-compete may restrict the executive's ability to start a new business after leaving the firm. And even that same non-compete can—and certainly non-competes in the aggregate do—prevent the most efficient match between senior executives and the firms that can make the highest and best use of their talents, and decrease knowledge flow between firms, which limits the cross-pollination of innovative ideas. What the empirical evidence shows is that overall, *i.e.*, in net effect, non-competes reduce new business formation and innovation,[665] indicating that the tendency of non-competes to inhibit new business formation and innovation more than counteracts any effect of non-competes on promoting new business formation and innovation by protecting a firm's investments.

A commenter—referencing the Shi study—argued that banning buyout clauses in non-competes would enhance economic efficiency relative to banning non-competes altogether. Other commenters, including Shi, the author of the study, disagreed with this

claim.[666] In response to these comments, the Commission finds that prohibiting buyout clauses would not enhance efficiency relative to prohibiting non-competes altogether. The Commission does not believe prohibiting buyout clauses would address the tendency of non-competes for senior executives to negatively affect competitive conditions, because it would mean that fewer executives could escape their non-competes, reducing labor mobility and efficient matching between executives and firms even further.

Some commenters disputed the Commission's legal rationale for prohibiting non-competes with senior executives. One comment stated that the NPRM did not cite any case law where a non-compete for a senior executive violated antitrust law and argued that there is no widespread case law to support a *per se* ban. In response, the Commission notes that it is determining that non-competes are an unfair method of competition under section 5, not a *per se* violation of the Sherman Act. For the reasons described in this Part IV.C.2, the Commission finds that non-competes are restrictive and exclusionary and that, based on the totality of the evidence, they tend to negatively affect competitive conditions at least as much as non-competes with other workers, and likely even more so, given the outsize role of senior executives in new business formation and innovation. For these reasons, the Commission finds that these non-competes are an unfair method of competition under section 5.

Another commenter stated that the NPRM did not satisfy the standard for finding a tendency to negatively affect competitive conditions for senior executives as set forth in the Commission's section 5 Policy Statement.[667] The commenter stated that a *per se* ban on non-competes considers neither the size, power, or purpose of the firm nor how non-competes interact with individual markets. The commenter argued that the evidence cannot justify an economy-wide ban.

The Commission finds that non-competes for senior executives are an unfair method of competition under section 5 for all the reasons described in this Part IV.C.2. The Commission states the applicable legal standard under section 5 in Part II.F, which is consistent with the standard set forth in the Policy Statement. As noted in Part

---

[665] *See* Part IV.B.3.b.i–ii.

[666] Comment of Liyan Shi, FTC–2023–0007–19810.

[667] *See* FTC Policy Statement, *supra* note 286.

II.F, the Commission need not make a separate showing of market power or market definition. Nor must the Commission show that the conduct directly caused actual harm in the specific instance at issue. Instead, the inquiry under section 5 focuses on the nature and tendency of the conduct. Moreover, as noted in Part II.F, the Commission may consider the aggregate effect of conduct as well. The language in the Policy Statement stating that the size, power, and purpose of the respondent may be relevant is not limiting, but instead provides guidance regarding factors the Commission may consider in evaluating potentially unfair methods of competition. This guidance may be especially relevant in individual cases and less so in section 5 rulemakings. Finally, as described in Part II.F, a finding that conduct is an unfair method of competition does not require definition of a market or consideration of individual markets. Moreover, as described in Part V.D, the Commission considered and finds no basis for excluding particular industries or workers.

ii. Non-Competes With Senior Executives Tend to Negatively Affect Competitive Conditions in Labor Markets

The effects of non-competes with senior executives on product and service markets are the primary reason why the Commission finds that non-competes with senior executives are an unfair method of competition. However, non-competes also tend to negatively affect competitive conditions in labor markets.

Non-Competes With Senior Executives Suppress Labor Mobility and Earnings

In Part IV.B.3.a, the Commission describes extensive empirical evidence that non-competes reduce labor mobility and worker earnings. The Commission's finding in Part IV.B.3.a that non-competes suppress labor mobility and earnings does not examine non-competes with senior executives specifically. However, the evidence cited by the Commission is also probative with respect to non-competes with senior executives.

Non-competes reduce labor mobility for senior executives for the same reasons they reduce labor mobility for other workers—they directly restrict workers from seeking or accepting other work or starting a business after they leave their job. In Part IV.B.3.a.i, the Commission cites empirical evidence that non-competes reduce labor mobility. This evidence shows that non-competes reduce labor mobility for all

subgroups of workers that have been studied, including inventors, high-tech workers, low-wage workers, and workers across the labor force. The impact of non-competes on labor mobility is direct, since non-competes directly prohibit certain types of mobility. Therefore, the Commission finds the non-competes restrict the labor mobility of senior executives as well.

This finding is supported by Mark Garmaise's study of the relationship between non-compete enforceability and the labor mobility and earnings of executives.[668] Garmaise finds that stricter non-compete enforceability reduces within-industry executive mobility by 47% and across-industry executive mobility by 25%. The study, which is limited to senior executives, uses multiple legal changes in non-compete enforceability, measured along multiple dimensions in a binary fashion. The Shi study qualitatively confirms these results—that executives experience greater labor mobility in the absence of non-competes.[669] However, that study examines use, and not just enforceability, of non-competes, so the Commission gives it less weight.

Furthermore, by inhibiting efficient matching between executives and firms—through a similar mechanism as for all other workers [670]—non-competes reduce executives' earnings. Like non-competes for other workers, non-competes block senior executives from switching to a job in which they would be better paid. And by doing so, non-competes decrease opportunities (and earnings) for senior executives who are not subject to non-competes—as well as for workers who are not senior executives, but who would otherwise move into one of those roles.

As described in Part IV.B.3.a.ii, the empirical research indicates that non-competes suppress wages for a wide range of subgroups of workers across the spectrum of income and job function, including workers who are not subject to non-competes. Importantly, an empirical study that does focus on senior executives finds that non-competes suppress earnings of senior executives. The Garmaise study finds that decreased enforceability of non-competes increases executives' earnings by 12.7%.[671] Garmaise also finds that decreased enforceability of non-competes increases earnings growth for CEOs by 8.2%. Since much of the

increase in earnings is attributable to an increase in earnings growth (as opposed to earnings at the start of the employment relationship), Garmaise hypothesizes that earnings increase because CEOs are more likely to invest in their own human capital when they have no non-compete.[672] However, Garmaise also notes that while non-competes may offer benefits to firms which use them, there may be negative impacts across the labor markets in which they are used.[673] This is the only study of executive earnings that does not examine the use of non-competes: it examines multiple legal changes in non-compete enforceability, measured along multiple dimensions (though in a binary fashion).

As noted in Part IV.C.1, many senior executives negotiate valuable consideration for non-competes. However, the evidence suggests that non-competes still have a net negative effect on senior executives' earnings, because the suppression of earnings through reduced labor market competition more than cancels out the compensation that some of these executives individually receive for their non-competes.

A second study, by Kini, Williams, and Yin,[674] simultaneously estimates the impact of non-compete enforceability and non-compete use on earnings and finds a positive correlation. The Commission gives this study less weight because it analyzes the use of non-competes. As described in Part IV.A.2, such studies cannot easily differentiate between correlation and causation. Kini, Williams, and Yin use an enforceability measure to generate their estimates, but do not estimate models that omit use of non-competes, meaning that the Commission does not interpret the findings as representing a causal relationship.

Relevant Comments and Commission Responses

Many commenters addressed negative effects of non-competes with senior executives on competition in labor markets. Non-competes, these commenters stated, can negatively affect a senior executive's career when they leave their field or sit out of the workforce for a period, causing their skills and knowledge (particularly in fast-paced fields) to stagnate and affecting their reputations. Like other workers, some senior executives said their non-compete limited their options and earnings in their specialized field.

---

[668] Garmaise, *supra* note 584.

[669] Shi, *supra* note 84.

[670] *See* Part IV.B.3.a.

[671] Garmaise, *supra* note 584 at 403. The reduction in earnings is calculated as $e^{-1.3575 \ast 0.1} - 1$, where $-1.3575$ is taken from Table 4.

[672] *Id.* at 402.

[673] *Id.* at 379.

[674] Kini, Williams, & Yin, *supra* note 83.

Other commenters argued the Commission should exclude senior executives from the rule because they earn more compensation, including higher wages, for non-competes than they would gain under the final rule. Many of these commenters argued that because senior executives have bargaining power, any findings on decreased wages would not apply to them. Some employers stated they compensated their senior executives for non-competes. Some industry organizations stated that some additional compensation and bonuses might not be offered if non-competes are banned. One business stated the compensation it pays executives takes their non-competes into account. Another business stated it provides severance benefits in exchange for non-competes that fully compensate the executive for the duration of the non-compete.

In response to these comments, the Commission notes the Garmaise study indicates that non-competes have a net negative effect on earnings for senior executives in the aggregate because they suppress competition, even if individual senior executives receive some amount of compensation for their personal non-compete. Garmaise's analysis accounts for any compensation the executive receives for the non-compete.

An industry trade organization stated that non-competes create job opportunities for executives and other highly skilled workers, rather than restricting them, because, without non-competes to protect confidential information, employers will often be reluctant to expand their executive teams. The Commission notes this assertion is unsupported by empirical evidence, and the Commission finds that firms have less restrictive alternatives for protecting confidential information.[675]

An investment industry organization stated that the Commission cannot assume senior executives will be equally or more effective at new firms compared to their old firms. In response, the Commission notes that voluntary labor mobility—for senior executives and all workers—typically reflects a mutually beneficial outcome. To the extent a firm is willing to pay more to attract a particular worker to come work for them, it is typically because the firm places a higher value on the worker's productivity than the worker's current employer. In addition, the Commission notes that many commenters stated that non-competes often force senior executives to sit out

of the workforce, causing them to lose valuable knowledge and skills. In general, senior executives are more likely to be effective when they can remain in the industry in which they have experience and expertise, rather than starting over in a new industry because of a non-compete.

An industry trade organization stated that the Commission's assertion that wages are reduced across the labor market is inconsistent with the NPRM's preliminary finding that non-competes are not coercive or exploitative for senior executives, because when more issues are left for negotiation, the job market is increasingly competitive, as workers can differentiate themselves through their terms and tailor their terms to each employer. The Commission does not believe these findings are in tension. Agreements do not need to be exploitative or coercive to inhibit efficient matching between workers and firms or to negatively affect competitive conditions. Furthermore, the Commission believes that executives have many other ways to differentiate themselves other than based on non-compete terms.

One commenter argued that the findings in the Kini, Williams, and Yin study should not be interpreted as representing a causal relationship. Upon further consideration, the Commission agrees with this comment and does not interpret this study causally, as described in this Part IV.C.2.c.ii.

For these reasons, the Commission finds that non-competes with senior executives are an unfair method of competition. As a result, the Commission declines to exclude senior executives from the final rule altogether.

### 3. The Final Rule Allows Existing Non-Competes With Senior Executives To Remain in Effect

The final rule prohibits employers from, among other things, entering into or enforcing new non-competes with senior executives—*i.e.,* non-competes entered into on or after the effective date.[676] However, the Commission decides to allow existing non-competes with senior executives—*i.e.,* non-competes entered into before the effective date—to remain in effect. The Commission describes the basis for this determination in this Part IV.C.3.

The Commission believes the evidence could provide a basis for prohibiting employers from enforcing existing non-competes with senior executives, as the final rule does for all other workers, given the tendency of such agreements to negatively affect

competitive conditions.[677] However, the Commission has decided to allow existing non-competes for senior executives to remain in effect, based on two practical considerations that are far more likely to be present for senior executives than other workers. First, as described in Part IV.C.1, senior executives are substantially less likely than other workers to be exploited or coerced in connection with non-competes. As a result, this subset of workers is substantially less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers with existing non-competes (even if senior executive's existing non-competes are still harming competitive conditions in the economy overall). Second, commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives, as described in this Part IV.C.3.[678]

Numerous businesses and trade associations argued that, if the final rule were to invalidate existing non-competes for senior executives, that would present practical challenges for employers, because many such non-competes were exchanged for substantial consideration. According to commenters, consideration exchanged for non-competes includes long-term incentive plans, bonuses, stock awards, options, or severance payments, among other arrangements.

Some commenters were concerned about a potential windfall for workers. They argued that if the non-compete portion of the contract were rescinded or otherwise invalidated, the worker may be left with any benefits already received in exchange for the non-compete, such as equity or bonuses, and could also compete. An industry association stated that some of its members' workers have already received thousands or hundreds of thousands of dollars in additional compensation alongside non-competes, though it was unclear what each worker received. Some business associations said businesses do not have a clear way to recover those payments or benefits. A commenter asked whether a worker who forfeited equity for competing could get the equity back or if executives who were compensated by their new

---

[675] *See* Part IV.D.2.

[676] § 910.2(a)(2).

[677] *See* Part IV.C.2

[678] Because the Commission proposed to require employers to rescind existing non-competes—*see* NPRM, proposed § 910.2(b)(1)—many of these comments addressed the proposed rescission requirement specifically. Comments that pertain only to the issue of rescission, and that do not apply to whether existing non-competes for senior executives may remain in effect generally, are addressed in Part IV.E.

employers for the non-compete would be paid twice.

The Commission views the problem as more complex than these commenters suggest. First, the empirical evidence and comments illustrate that in many cases, non-competes are currently trapping workers, including senior executives, in their jobs, meaning the employer is getting not only the benefit of trapping that individual worker, but also the benefit of non-competition.[679] In such circumstances, employers may have already received part or all of the benefit they sought from entering a non-compete, though the value would be difficult if not impossible to quantitatively assess. Moreover, it is impracticable for the Commission to untangle whether, to the extent some workers received compensation that was denominated consideration for a non-compete, that non-compete simultaneously suppressed other compensation to the worker such as wages. For example, some commenters who described negotiating their non-competes stated the employer used it as a tactic to drive down wages.

In addition, most workers subject to a non-compete are subject to other restrictive covenants,[680] both mitigating any purported harm and complicating any quantitative valuation of a non-compete.

The Commission also notes that, to the extent equity was provided as consideration, owning a share in the prior employer may induce workers not to risk lowering the value of that equity by competing. However, the concern about workers seeking already-forfeited compensation is misplaced, as the final rule will not impact workers who forfeited compensation for competing under a then-valid non-compete.

Overall, however, where an employer has provided meaningful consideration in exchange for a non-compete, the comments indicate that being unable to enforce that non-compete may complicate that exchange in a way that would be difficult to value and untangle. These difficult practical assessments indicate that the final rule should contain a limited, easily administrable exception for existing non-competes with senior executives, who are considerably more likely than other workers to have negotiated non-competes and received substantial consideration in return.

In addition, an employment attorney suggested that employers may suspend any mid-stream benefits and terminate unvested options and stock and cancel bonuses. One commenter suggested employers may seek refunds from workers, which could create uncertainty. Similarly, an industry association said senior workers who signed a non-compete as part of a severance agreement might see their severance payments taken away, as employers would need to decide whether to continue paying despite the elimination of non-competes or, to the extent they legally can, attempt to renegotiate any outstanding severance agreements. Finally, a business said executives in the middle of their contracts might need to renegotiate those contracts. The Commission shares these concerns about the practicalities of untangling non-competes that are more likely to have been bargained for. Senior executives who engaged in a fair bargaining process may have obtained significant consideration and planned accordingly, as have their employers. While employers' ability to stop payments or claw back consideration is uncertain, any efforts to do so could be disruptive.

Other commenters stated that they believed rescission could result in litigation against workers. An employment lawyer said litigation was difficult to predict but that there could be litigation seeking declarations from courts on how the rule impacts existing contracts. A group of commenters stated that rescinding or invalidating agreements would lead to increased litigation against workers who received the benefit of the bargain but were no longer bound by a non-compete in exchange, and that such litigation would seek to nullify severance agreements, employment agreements, clawback agreements, and others.

One business said the NPRM was silent on how to address specially taxed arrangements, but the business did not provide additional details on any such arrangements. A law firm said workers who received consideration in a prior year would have paid taxes on it and would now need to amend their prior tax return to get a refund if they have to pay back that consideration, while employers might have to amend their return to reflect the loss of a deduction. That law firm also said some executives and other workers use and plan for non-competes to reduce their "golden parachute" tax burden.

Finally, an accountant explained that valuations of senior executive non-competes are conducted during many merger and acquisition transactions.

Similarly, an industry association said acquisition prices may include the value of non-competes that ensure the buyer retains certain talent, so if non-competes were rescinded or invalidated the buyer would lose the value of what they paid for with no way to recoup the costs. The commenter stated that the bargained-for value of such sales may decrease if existing senior executive non-competes cannot be enforced. The exemption for existing non-competes addresses this concern. Moreover, this concern does not exist for future transactions in any event, since they would not account for non-competes that have been banned.

In response to the foregoing comments, the Commission finds it plausible that rendering existing non-competes with senior executives enforceable could create some of these practical implementation challenges. The Commission accordingly elects to exclude existing non-competes with senior executives from the rule, reducing the burden of implementation of the final rule.

The Commission also understands that some of these practical concerns could arise for workers other than senior executives if they received substantial consideration in exchange for a non-compete. However, the evidence indicates that any such agreements with workers other than senior executives are very rare, and that such workers are more likely to experience exploitation and coercion in connection with non-competes. Therefore, allowing only existing non-competes with senior executives to remain in force will significantly reduce these practical concerns for employers. In contrast, a wider exemption for all existing agreements would leave in place a large number of non-competes that tend to harm competitive conditions, including a large number of exploitative and coercive non-competes for which no meaningful consideration was received.

Some commenters suggested the Commission exempt from the final rule non-competes in exchange for which the worker received consideration. One business asked for an exception to the final rule for paid non-competes, asserting that such an exception would allow workers to receive guaranteed payments while accessing information and training and would allow workers to start their own businesses after the non-compete period. Another business recommended allowing non-competes that provide severance equal to a worker's salary for the non-compete period. An employment attorney suggested an exception from the rule for non-competes that are part of a severance agreement or where the

---

[679] *See* Part IV.B.2.b.

[680] *See* Balasubramanian, Starr, & Yamaguchi, *supra* note 74 (finding that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or non-recruitment agreement, and 74.7% of workers with non-competes are also subject to all three other types of provisions).

worker receives a paid non-compete period or garden leave, which the attorney says do not align with the Commission's concerns about non-competes and represent a balanced trade-off.

The Commission declines to adopt an exception for non-competes in exchange for which the worker received consideration (whether under an existing or future non-compete). The fact that a worker received compensation for a non-compete does not mean the worker received fair compensation, *i.e.,* compensation commensurate with earnings that would be received in a competitive labor market. In addition, such an exception would raise significant administrability concerns. For example, a rule that exempts non-competes exchanged for "substantial consideration" or "meaningful consideration" would not provide sufficient clarity to employers and workers to avoid significant compliance costs and litigation risks. Requiring a brighter-line specific amount (or standard) of compensation would be unlikely to appropriately capture highly fact-specific, varying financial circumstances of workers and firms. Moreover, it would be difficult to prevent employers from suppressing compensation or benefits along other dimensions (*e.g.,* a requirement for severance equal to the worker's salary during the non-compete period as one commenter suggested could lead to the salary being suppressed). The Commission also notes, however, that while it is not adopting a blanket exemption from the final rule for non-competes in exchange for which the worker received consideration, it is satisfying this request to some extent by adopting an exemption for existing non-competes for senior executives, which are the non-competes most likely to have been exchanged for consideration.

Finally, the Commission concludes that allowing existing non-competes for senior executives to remain in effect is appropriate despite the significant negative effects of such non-competes on competition described in Part IV.C.2. The Commission took into consideration that non-competes with senior executives are less likely to be causing ongoing harm to individuals by preventing them from seeking or accepting other work or starting their own business, because such non-competes were likely to have been negotiated or exchanged for consideration. In addition, the negative effects of these non-competes on competitive conditions will subside over time as these non-competes expire.

## 4. Defining Senior Executives

As noted earlier, the Commission did not define the term "senior executive" in the NPRM. Instead, the Commission requested comment on how the term should be defined.[681] In this final rule, the Commission adopts a definition of "senior executive" to isolate the workers who are least likely to have experienced exploitation and coercion and most likely to have bargained for meaningful compensation for their non-compete. Workers for whom exploitation and coercion concerns are likely most relevant and who are unlikely to have bargained for or received meaningful consideration for a non-compete—namely, lower-earning workers, and relatively higher paid or highly skilled workers who lack policy-making authority in an organization—do not fall within this final definition.

This definition is relevant because, as explained in Part IV.C.2, the basis for the Commission's findings that non-competes with senior executives are unfair methods of competition differs in some ways from the evidence and rationales underpinning its findings that non-competes with other workers are unfair methods of competition. Furthermore, as explained in Part IV.C.3, the final rule allows existing non-competes with senior executives to remain in force, while prohibiting employers from enforcing existing non-competes with other workers after the effective date.

The Commission defines "senior executives" based on an earnings test and a job duties test. In general, the term "senior executives" refers to workers earning more than $151,164 [682] who are in a "policy-making position" as defined in the final rule. The Commission adopted this definition after considering the many comments on who senior executives are and how to define them. Notably, the Commission concluded that, unlike highly paid senior executives, highly paid workers other than senior executives and lower-wage workers with senior executive titles as a formal matter likely experience exploitation and coercion and are unlikely to have engaged in bargaining in connection with non-competes, much like lower-wage workers.[683] In other words, the Commission finds that the only group of workers that is likely to have bargained for meaningful compensation in exchange for their non-compete is

senior executives who are both highly paid and, as a functional matter, exercise the highest levels of authority in an organization.[684] The Commission estimates that approximately 0.75% of workers are such senior executives.[685]

### a. Definition of "Senior Executive"

The NPRM requested comment on how to define senior executives while providing sufficient clarity to employers and workers.[686] The NPRM stated that there is no generally accepted legal definition of "senior executive" and that the term is challenging to define given the variety of organizational structures used by employers.[687] The NPRM raised the possibility of looking to existing Securities and Exchange Commission ("SEC") definitions; adopting a definition closely based on a definition in an existing Federal regulation; adopting a new definition; defining the category according to a worker's earnings; using some combination of these approaches; or using a different approach.[688] Commenters proposed a wide variety of definitions, largely focused on two types: an exception based on a worker's job duties or title, and an exception based on a compensation threshold. Upon review of the full record, the Commission determines that a test that combines both of these criteria best captures the subset of workers who are likely to have bargained for meaningful compensation in exchange for their non-compete in a readily administrable manner.

### i. The Need for a Two-Part Test

Many commenters suggested combining a compensation threshold with a job duties test. For example, one business supported excepting workers who met a combination of tests based on a compensation threshold, FLSA exemption status, and access to trade secrets. A law firm suggested the final rule should account for both pay, exempting only low-wage hourly workers, and job duties in determining an exception. One commenter suggested defining "senior executive" based on total compensation, job title, and job duties. Though the Commission does not adopt these specific duties and wage combinations, the Commission agrees that a combined approach is necessary.

The Commission has determined that the definition of "senior executive" should include both a compensation threshold and job duties test, similar to

---

[681] NPRM at 3520.

[682] This threshold is based on the 85th percentile of earnings of full-time salaried workers nationally. *See* Part IV.C.4.b.

[683] *See* Part IV.C.1.

[684] *See id.*

[685] *See* Part X.F.11.

[686] NPRM at 3520.

[687] *Id.*

[688] *Id.*

the DOL regulations that define and delimit the FLSA's exemption for executive employees.[689] The key advantage of a compensation threshold, as one industry organization commenter stated, is that compensation thresholds are objective and easily understood by all stakeholders—yielding significant administrability benefits. However, since not all workers above any given compensation threshold are senior executives, a job duties test is also needed to identify senior executives.

The two-part test isolates the workers most likely to have bargaining power to negotiate meaningful consideration for a non-compete and least likely to experience exploitation and coercion in connection with non-competes. A compensation threshold ensures that stakeholders do not need to spend time assessing the job duties of workers below the threshold—minimizing the amount of detailed analysis stakeholders must undertake. A compensation threshold also helps ensure that workers who work in positions with "senior executive" classifications but likely lack meaningful bargaining power due to their relatively low incomes and who likely did not receive meaningful consideration for a non-compete are excluded from the definition. The job duties test ensures that the definition identifies the individuals most likely to have bespoke, negotiated agreements—those with the highest level of authority over the organization—while also ensuring that high-earning workers who are not senior executives, who likely experience exploitation and coercion from non-competes and do not generally bargain over them, are not captured by the definition.[690]

Clarity from a compensation threshold is essential, as without clarity workers and employers would often be uncertain about a non-compete's enforceability (absent adjudication), and such uncertainty often fosters *in terrorem* effects.[691] For example, an attorney commenter stated that an exception for executive, management, and professional employees and those with access to trade secrets would inherently lack clarity. A lack of clarity could also facilitate evasion by employers, as one law firm commented.

While there may be some workers other than senior executives as defined here who may have bargained for consideration for a non-compete, the benefits to workers and employers of a clear and administrable definition outweigh the risk that some bargained-for non-competes are invalidated. In Part IV, the Commission finds even bargained-for non-competes tend to negatively affect competitive conditions. The Commission finds that the need to avoid an overinclusive exception that increases those harms to competitive conditions outweighs the risk that in rare instances private parties with non-competes other than with senior executives may need to restructure their employment agreements to utilize less restrictive alternatives that burden competition to a lesser degree.

Many commenters sought an exception for senior executives and/or highly paid and highly skilled workers based on justifications such as access to trade secrets or confidential information, rather than compensation thresholds. Some argued that compensation thresholds do not align with or allow individualized assessments of which workers meet a given justification such as access to confidential information. One law firm commented that a bright-line compensation threshold would eliminate non-competes for lower wage workers while allowing non-competes for what the commenter viewed as legitimate business purposes. Some commenters opposed an exception for senior executives because they believed "senior executive" would be too difficult to define. In Part V.D.2, the Commission explains why it is not adopting an exception for workers based on their access to trade secrets and other intellectual property. Further, in the Commission's view, eliminating the need for individualized assessments for most workers is the primary advantage of a compensation threshold, not a drawback (although the Commission declines to adopt a compensation threshold alone for reasons stated previously and in Part V.D.1). However, the evidence indicates that an exception for existing senior executive non-competes is appropriate, which the Commission defines here.

Commenters, both those supporting and opposing the rule, pointed out several issues with compensation thresholds standing alone. Some commenters were concerned a compensation threshold would exclude some workers, such as many physicians, from the final rule's benefits based on their income level. Two commenters said an exception would penalize the advancement of workers near a threshold and those workers may have to choose between higher wages or being free from a non-compete.

Including the job duties tests alongside the compensation threshold mitigates the risk of such cliff effects, assuming they exist (which is far from clear).

Some commenters asserted a threshold would need to be updated for inflation, while one law firm commented that frequent updates would make the final rule more difficult to understand and implement. Commenters also pointed out the need to explain when the threshold would be measured. While adjusting for inflation could be important to ensure the final rule continues serving its intended function if the compensation threshold governed a total exemption from the rule (as these commenters assume), it is unnecessary to the final rule because the exception adopted applies only to existing non-competes (*i.e.*, it has only one-time application). The Commission explains in Part IV.C.4.b its reasons for declining to adopt a locality adjustment.

ii. The Final Rule's Definition of "Senior Executive"

Based on the considerations described in Part IV.C.4.a.i, the Commission adopts a two-pronged definition of "senior executive" in § 910.1. Under § 910.1, a senior executive is a worker who was in a policy-making position and who received from a person for the employment:

• Total annual compensation of at least $151,164 in the preceding year (under paragraph (2)(i)); or

• Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year (under paragraph (2)(ii)); or

• Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete (under paragraph (2)(iii)).

Paragraph (2)(ii) applies to workers who were in a policy-making position during only part of the preceding year, which includes workers who were hired or who left a business entity within the preceding year as well as workers who were promoted to or demoted from a policy-making position in the preceding year. Paragraph (2)(iii) ensures that the exception applies to senior executives who departed from the employer more than one year before the effective date but are still subject to a non-compete (*e.g.*, a worker who left more than a year ago and has a non-compete term of 18 months). To account for those senior executives, paragraph (2)(iii) considers total annual compensation in the year preceding their departure.

[689] The FLSA is the Federal statute establishing minimum wage, overtime, recordkeeping, and youth employment standards. *See* 29 U.S.C. 201 *et seq.*
[690] *See* Part IV.C.1.
[691] *See* Part IX.C.

To clarify the definition's compensation threshold, the final rule includes definitions of "total annual compensation" and "preceding year." To clarify the job duties test, the final rule includes definitions of "policy-making position" as well as two additional terms that are in the definition of "policy-making position": "officer" and "policy-making authority." These definitions are described in Parts IV.C.4.b and IV.C.4.c.

b. Defining the Compensation Threshold

Pursuant to § 910.1, the senior executive exception applies only to workers who received total annual compensation of at least $151,164 from a person for employment in a policy-making position in the most relevant preceding year. Section 910.1 further defines "total annual compensation" and "preceding year," respectively. This threshold is based on the 85th percentile of earnings of full-time salaried workers nationally.[692]

The Commission draws this line between more highly paid and less highly paid workers based on its assessment of which workers are more likely to experience exploitation and coercion and less likely to have engaged in bargaining in connection with non-competes and the need to implement a two-part test. As commenters noted, there is no single compensation threshold above which zero workers will have been coerced and exploited and below which zero workers will have been uncompensated for the non-compete that binds them. Based on the Commission's expertise and after careful review of the rulemaking record, including relevant data, the empirical research, and the public comments, the Commission concludes $151,164 in total annual compensation reflects a compensation threshold under which workers are likely to experience such exploitation and coercion and are less likely to have bargained for their non-competes, while providing employers a readily administrable line. With this line, market participants can easily know that workers below the line cannot be subject to non-competes, minimizing both *in terrorem* effects and eliminating the administrative burden of conducting a job duties test for those workers.

The Commission looked to several sources and suggestions from the comments in selecting a threshold. Numerous commenters suggested the Commission should look to the FLSA, and some specifically recommended the FLSA regulations' threshold for highly compensated employees.[693] DOL sets the compensation threshold for highly compensated employees in its overtime regulations under the FLSA based on earnings of full-time salaried workers. Since January 2020, based on a regulation adopted in 2019, that threshold is $107,432 and reflects the 80th percentile of full-time salaried workers nationally using combined 2018 and 2019 data.[694] In September 2023, DOL proposed raising that threshold to the 85th percentile of full-time salaried workers nationally and, *inter alia*, updating the amount to reflect more current earnings data. For 2023, the 85th percentile of full-time salaried workers nationally is $151,164.[695] The Commission recognizes DOL's expertise in determining who qualifies as a highly compensated worker and employers' likely familiarity with DOL regulations. Given this familiarity, the Commission borrows from DOL's definition of compensation to minimize compliance burdens on employers.

Another Federal regulatory threshold for high wage workers noted by commenters also aligns with the 85th percentile of full-time salaried workers nationally in 2023 or approximately $150,000. In the retirement context, the IRS sets a threshold for highly compensated employees at $150,000 for 2023 and $155,000 for 2024.[696] Additionally, the District of Columbia bans non-competes for workers making less than $150,000.[697]

The Commission analyzed occupational wage data to identify a threshold that would capture more highly paid senior executives, who are likely to have bespoke, negotiated non-competes. BLS's most recent wage data indicates that workers in the "chief executive" category have a median wage of $209,810.[698] Thus, most "chief executives," most if not all of whom would meet the duties component of the two-part test in this final rule, earn well above the $151,164 compensation threshold, ensuring that the threshold is likely not underinclusive. The Commission notes that some very high-wage occupations have a median wage above $151,164, including: physicians; surgeons; computer and information systems managers; and dentists.[699] To qualify for the exemptions, these workers would have to also meet the job duties portion of the senior executive test, which is appropriate because the Commission finds that workers in these professions are often subject to coercion and exploitation and rarely have bespoke, negotiated non-competes.

The Commission also considered a lower wage threshold of approximately $100,000, which would be closer in range to the DOL highly compensated employee threshold of $107,432 that DOL adopted in 2019. According to 2022 BLS data, the median wage for "top executives" in the U.S. is $99,240.[700] Workers in the "top executive" category include "chief executives," but also include officials with less authority like "general and operations managers." The latter have an annual median wage of $97,030 with their earnings at the 75th percentile being $154,440.[701] The Commission believes that a significant number of general and operations managers (some of whom may be in a policy-making position) likely do not have bespoke, negotiated non-competes. For example, a vice president of operations of a local retail chain with only a few locations would likely be in this category. The same vice president—unlike the vice president of a multinational

---

[692] BLS, Labor Force Statistics from the Current Population Survey, *https://www.bls.gov/cps/// nonhourly-workers.htm* (based on the data from the table "Annual average 2023").

[693] However, at the time of commenting the highly compensated employee threshold was $107,432 and the Department had not proposed a new threshold.

[694] 29 CFR 541.601; *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, NPRM, 88 FR 62152, 62157 (Sept. 8, 2023) (hereinafter "2023 FLSA NPRM").

[695] *See* Bur. Of Labor Stats., Research Series on Percentiles of Usual Weekly Earnings of Nonhourly Full-Time Workers, at *https://www.bls.gov/cps/ research/nonhourly/earnings-nonhourly-workers.htm* (based on the table "Annual average 2023"); 2023 FLSA NPRM at 62153. The DOL proposed a threshold at $143,998, the 85th percentile of full-time salaried workers at the time the 2023 FLSA NPRM was proposed. When the highly compensated employee test was originally created in 2004, its $100,000 threshold exceeded the annual earnings of 93.7% of salaried workers. *Id.* at 62159.

[696] IRS, *Definitions,* (Aug. 29, 2023) (Highly Compensated Employees), *https://www.irs.gov/ retirement-plans/plan-participant-employee/ definitions;* IRS, *COLA Increases for Dollar Limitations on Benefits and Contributions,* (updated Nov. 7, 2023), *https://www.irs.gov/retirement-plans/cola-increases-for-dollar-limitations-on-benefits-and-contributions.*

[697] DC Code sec. 32–581.02(a)(1) (effective Oct. 1, 2022) (where the employee's compensation is less than $150,000, or less than $250,000 if the

employee is a medical specialist, employers may not require or request that the employee sign an agreement or comply with a workplace policy that includes a non-compete).

[698] BLS Occupational Employment and Wage Statistics, *supra* note 49. These data are from the May 2022 National XLS table for Chief Executives under private ownership.

[699] *See id.* These data are from the May 2022 National XLS table for private ownership.

[700] *Id.* These data are from the May 2022 National XLS table for Top Executives under private ownership.

[701] *Id.* These data are from the May 2022 National XLS table for General and Operations Managers under private ownership.

corporation—is unlikely to possess the same bargaining power or to have a bespoke, negotiated employment agreement. Moreover, to the extent an individual's total compensation is under $151,164, in the unlikely event the individual received consideration for their non-compete, such consideration is unlikely to represent a significant part of their compensation.

Similarly, the Commission believes a $107,432 (or thereabouts) threshold would be overinclusive and individuals who likely do not have bespoke, negotiated non-competes—and who were likely to be exploited and coerced—could meet the threshold test. The $107,432 threshold was adopted based on earnings in 2018 and 2019. Adjusting for inflation, $107,432 in June 2019 is the equivalent of $130,158 in February 2024. Moreover, as noted previously, BLS data reflect that chief executives generally earn significantly more than $130,158. In contrast, occupations with a median wage below $151,164 but above $107,432 include: advertising, marketing, promotions, public relations, purchasing, and sales managers; financial managers; software developers; physician assistants; optometrists; nurse practitioners; and pharmacists.[702] These are occupations that the comment record reflects often experience coercion and exploitation with respect to non-competes and rarely have negotiated or compensated non-competes. A civic organization commenter also argued that the DOL regulations' "highly compensated employee" definition's $107,432 threshold was close to the median wage in some industries and areas and cited several cases that it said demonstrate that adopting this threshold would exclude workers who are vulnerable to exploitation and coercion.

Accordingly, the Commission adopts a threshold of $151,164. This threshold, combined with the duties test, reflects highly compensated individuals who are most likely to have the bespoke, complex non-competes that the Commission elects to leave undisturbed, and who the Commission finds are less likely to experience coercion and exploitation. This threshold also has significant administrability benefits, as it is calculated in accord with definitions used in FLSA compliance, with which employers are generally familiar. This alignment will yield efficiency benefits that reduce compliance burdens on employers.

After careful review, the Commission decided not to choose a threshold higher or lower in part because as the compensation threshold in the rule increased, fewer small businesses and firms in areas with lower wages and costs of living would have senior executives with non-competes who would qualify for the exception as compared to larger businesses. Similarly, the lower a threshold is, the more workers who live in areas with higher wages and costs of living would fall above the threshold.[703]

The Commission also declines to adopt a locality adjustment. Some commenters said that a uniform national threshold could lead to geographic disparities because of the different cost of living and average incomes in different areas. Geographic disparities are difficult to resolve, as disparities often exist not just between States, but, for example, between urban and rural areas within a State. The Commission considered this factor in selecting the $151,164 threshold compared to other options. Tailoring a compensation threshold to every locality or even State or region would be burdensome and generate significant confusion for workers and employers. The Commission finds that the importance of a uniform threshold to avoid confusion and for administrability outweighs the drawbacks of any geographic disparities, particularly in light of comments from employers stating that the existing patchwork of State laws is burdensome to navigate. The Commission notes that neither DOL nor IRS have adopted thresholds for highly compensated individuals that vary geographically. Given the rise in remote work, applying geographic variation to employers and workers would also prove burdensome. Moreover, total annual compensation under § 910.1 includes traditional bonuses or compensation a senior executive might receive, such as a bonus tied to performance that is paid pursuant to any prior contract, agreement, or promise. The rule also allows for the entire amount of such bonuses to be credited to total annual compensation, thus, increasing the likelihood of capturing highly compensated policy-making individuals across the nation.

The Commission estimates that approximately 92% of workers will fall below this compensation threshold, ensuring that existing non-competes will be unenforceable for the vast majority of workers most likely to experience exploitation and coercion in connection with non-competes.[704] The Commission also estimates that approximately 0.75% of workers are likely to be considered senior executives.[705] The compensation threshold reflects the Commission's finding that non-competes are very rarely bargained for, and to the extent they are, below $151,164 such bargaining is almost non-existent and consideration for a non-compete, if any, is likely to be relatively small. Pairing the compensation threshold with the duties test will also minimize compliance costs, as employers and the Commission will not need to conduct job duties tests for those workers whose compensation fall below the threshold.

i. Definition of "Total Annual Compensation"

Section 910.1 provides that "total annual compensation" is based on the worker's earnings over the preceding year. It is based on DOL's regulation defining "total annual compensation" for highly compensated employees in 29 CFR 541.601(b)(1) and matches DOL's determination of what types of compensation can count towards total annual compensation for highly compensated employees.

Section 910.1, like DOL's definition, states that total annual compensation may include salary, commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during that 52-week period. Nondiscretionary bonuses and compensation includes compensation paid pursuant to any prior contract, agreement, or promise, including performance bonuses the terms of which the worker knows and can expect.[706] The definition further states that total annual compensation does not include board, lodging and other facilities as defined in 29 CFR 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other similar fringe benefits. Section 541.606 is part of DOL's regulations concerning salary requirements for employees employed in a bona fide executive, administrative, or professional capacity, and applies to

[702] Id.

[703] See also 2023 FLSA NPRM at 62176.
[704] See Steven Ruggles, Sarah Flood, Matthew Sobek, Daniel Backman, Annie Chen, Grace Cooper,

Stephanie Richards, Renae Rodgers, & Megan Schouweiler. IPUMS USA: Version 15.0 [dataset]. Minneapolis, MN: IPUMS, 2024. https://doi.org/10.18128/D010.V15.0 (American Community Survey 2022 data, adjusted to 2023 dollars and excluding government and non-profit workers).

[705] See Part X.F.11.

[706] 29 CFR 778.211(c); see also U.S. DOL, Fact Sheet #56C: Bonuses under the Fair Labor Standards Act (FLSA) (Dec. 2019), https://www.dol.gov/agencies/whd/fact-sheets/56c-bonuses.

highly compensated employees.[707] That regulation cross-references DOL's regulations on wage payments under the FLSA in 29 CFR part 531, including the term "other facilities" defined in 29 CFR 531.32.

This regulatory text makes one modification to the DOL approach to correspond to the final rule's purposes and the non-compete context. Based on comments received, the Commission decided not to adopt DOL's base salary requirement for highly compensated employees in its definition of compensation, which serves a different purpose than the definition adopted here. The 2019 DOL regulation requires that a portion of the worker's total annual compensation must be paid on a salary or fee basis in order to qualify as a highly compensated employee, to ensure that the worker receives at least a base salary and to guard against potential abuses.[708] In contrast, the exception in § 910.2(a)(2) applies only to senior executives. The Commission understands that compensation for senior executives can be structured in many different ways. A law firm commented that senior executive compensation can be particularly complex, as base salary may be 20% or less of a senior executive's annual pay, and much of their pay is variable and does not vest until the end of the year. One comment said some CEOs receive only a $1 salary and receive the rest of their compensation in other forms. The definition of total annual compensation in the final rule is designed to allow for different forms of nondiscretionary compensation without requiring employers to pay a particular amount as salary.

### ii. Definition of "Preceding Year"

The definitions of "senior executive" and "total annual compensation" in § 910.1 use the term "preceding year." To provide clarity and facilitate compliance, the Commission defines the term "preceding year" in § 910.1 as a person's choice among the following time periods: the most recent 52-week year, the most recent calendar year, the most recent fiscal year, or the most recent anniversary of hire year. The term "preceding year" is drawn from DOL's FLSA regulations in 29 CFR 541.601(b)(4), which states that "[t]he employer may utilize any 52-week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year. If the employer does not identify some other year period in advance, the calendar year will apply." Here, the Commission similarly gives employers flexibility to minimize compliance costs, as many employers may have compensation more readily available based on the last calendar year, their fiscal year, or the anniversary of a worker's hire as part of tax and other reporting requirements.

### iii. Other Proposed Compensation Thresholds

In seeking to exempt senior executives and highly paid workers from the rule altogether, commenters suggested several possible wage-related thresholds, including specific dollar thresholds (e.g., $100,000) not tied to any existing metric or standard; whether the worker is an hourly worker; annual compensation at or above some multiple of the Federal poverty level or minimum wage, as in New Hampshire, Maine, and Rhode Island statutes; State average wages or ten times the local median wage; and $330,000, the IRS annual compensation limit for 401(k) retirement contributions.[709]

As explained in Part V.D, the Commission declines to exempt workers from the rule altogether based on their earnings. With respect to defining the workers whose *existing* non-competes the Commission exempts, the Commission also declines to use these thresholds or standards. For the reasons described in this Part IV.C.4.b, the Commission believes the compensation threshold it is adopting—in combination with the job duties test it is adopting—most effectively isolates the workers (namely, senior executives) who are likely to bargain with employers and receive compensation for their non-competes and who are unlikely to be exploited or coerced in connection with non-competes. While thresholds based on State lines or metrics would reflect differences in wages and costs of living among States, they would not reflect differences between, for example, urban and rural areas within a State and could generate confusion where the threshold varies between States, in addition to increasing compliance burdens by requiring employers to assess which State adjustment applies—a particularly challenging task in increasingly cross-border and remote work environments. Using the local median wage would generate too much unpredictability for employers and workers and would face the same administrability and confusion challenges to an even higher degree. In contrast, a uniform national compensation threshold as part of the test provides clarity that reduces the risks of *in terrorem* effects and increases ease of compliance. Finally, the $330,000 threshold is an annual compensation limit, while the IRS has a different test to identify highly compensated employees. A $330,000 threshold would be too high for employers in areas with lower average incomes and costs of living and would likely exclude from the definition many senior executives who bargained for their non-compete in exchange for consideration.

One business recommended an exception for individuals in the top 10% income tier at their respective employers to exempt workers at start-ups that might not be able to compensate their workers at a high level but whose workers may still be exposed to trade secrets. Another proposed using Internal Revenue Code section 414(q), defining highly compensated employee as the highest paid 1% or 250 employees in the corporation. A percentage threshold, however, has significant practical issues including workers entering and exiting, earnings changes, and factoring in independent contractors, workers at subsidiaries, or workers at parent companies. It would also lead to disparities between large and small firms, as large firms could use non-competes for far more workers than could small firms.

Other commenters pointed to State laws setting a compensation threshold to support excluding highly paid workers from the final rule or suggested the Commission look to those States as an example. A public policy organization that supported a categorical ban said any threshold should be at least higher than $100,000, citing research on Washington's non-compete reforms that indicated that employers did not value non-competes up to that threshold.[710] The compensation threshold the

---

[707] 29 CFR 541.601(a)(1) ("[A]n employee with total annual compensation of at least $107,432 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee as identified in subparts B, C or D of this part.").

[708] 29 CFR 541.601(b)(1); Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 FR 22122, 22175 (Apr. 23, 2004) ("This change will ensure that highly compensated employees will receive at least the same base salary throughout the year as required for exempt employees under the standard tests, while still allowing highly compensated employees to receive additional income in the form of commissions and nondiscretionary bonuses.").

[709] IRS, *COLA Increases for Dollar Limitations on Benefits and Contributions,* (updated Nov. 7, 2023), *https://www.irs.gov/retirement-plans/cola-increases-for-dollar-limitations-on-benefits-and-contributions;* Treas. Reg. sec. 1.401(a)(17)–1.

[710] Hiraiwa, Lipsitz & Starr, *supra* note 502.

Commission is adopting is higher than this amount.

c. Defining the Job Duties Component

i. Definitions of ''Officer,'' ''Policy-Making Authority,'' and ''Policy-Making Position''

In NPRM, the Commission suggested that the final rule's definition of senior executive could be based on SEC Rule 3b–7.[711] The Commission did not receive comments specifically addressing this option, but the Commission carefully considered arguments for and against job duties or job title distinctions as well as numerous comments on potential job duties tests, alone or in combination with compensation thresholds, before determining that a modified version of SEC Rule 3b–7's job duties requirements would best meet the exception's goals. The duties test adopted by the Commission is precise and more tailored than the other definitions proposed by commenters[712] and minimizes the risk that workers who likely experienced exploitation and coercion are included in the definition of senior executive. The test focuses primarily on job duties, rather than solely on job titles, because businesses do not all use the same job titles, and a job title might not reflect the worker's actual level of authority in an organization, which is a key indicator of whether a worker is likely to face exploitation and coercion or to have bargained in connection with non-competes.

Section 910.1 defines ''policy-making position'' as a business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority, or any other natural person who has policy-making authority for the business entity similar to an officer with policy-making authority. The definition of ''policy-making position'' further states that an officer of a subsidiary or affiliate of a business entity that is part of a common enterprise who has policy-making authority for the common enterprise may be deemed to have a policy-making position for the business entity for purposes of this paragraph. Finally, the definition of ''policy-making position'' states that a natural person who does not have policy-making authority over a common enterprise may not be deemed to have a policy-making position even if the person has policy-making authority over a subsidiary or affiliate of a business

entity that is part of the common enterprise.

Section 910.1 also defines terms used in the definition of ''policy-making position.'' Section 910.1 defines ''officer'' as a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any natural person routinely performing corresponding functions with respect to any business entity whether incorporated or unincorporated. To account for differences in the way business entities may use and define job titles, the definition includes workers in equivalent roles. By incorporating this definition of ''officer,'' ''senior executive'' applies to workers at the highest levels of a business entity.

This definition is nearly verbatim of the SEC definition of ''officer'' in 17 CFR 240.3b–2. That term ''officer'' is used in SEC Rule 3b–7.[713] To maintain consistency with the SEC regulations by ensuring that ''officer'' has the same meaning, and to utilize the SEC's expertise in this area, the Commission adopts the SEC's definition of ''officer.''

Section 910.1 defines ''policy-making authority'' as final authority to make policy decisions that control significant aspects of a business entity or a common enterprise. The definition further states that policy-making authority does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise.

Accordingly, for a worker to be a senior executive, in addition to meeting the compensation threshold, the worker must be at the level of a president, chief executive officer or the equivalent, officer (defined in § 910.1), or in a position that has similar authority to a president or officer. Further, an officer or other qualifying person must have policy-making authority. Presidents, chief executive officers, and their equivalents are presumed to be senior

executives (i.e., employers do not need to consider the further element of ''policy-making authority''). The term ''chief executive officer or the equivalent'' was added to the definition of ''policy-making position'' to increase clarity on who was included and to reflect the wider range of businesses with various structures that are subject to the final rule (as compared to SEC Rule 3b–7). The definition of ''policy-making position'' includes workers with equivalent authority because job titles and specific duties may vary between companies. This ensures that the term ''senior executive'' is broad enough to cover more than just a president or chief executive officer, especially for larger companies, as others may have final policy-making authority over significant aspects of a business entity.

For example, many executives in what is often called the ''C-suite'' will likely be senior executives if they are making decisions that have a significant impact on the business, such as important policies that affect most or all of the business. Partners in a business, such as physician partners of an independent physician practice, would also generally qualify as senior executives under the duties prong, assuming the partners have authority to make policy decisions about the business. The Commission notes that such partners would also likely fall under the sale of business exception in § 910.3 if the partner leaves the practice and sells their shares of the practice. In contrast, a physician who works within a hospital system but does not have policymaking authority over the organization as a whole would not qualify.

The Commission changed some aspects of SEC Rule 3b–7 to fit the context of this rulemaking. First, because § 910.2(a)(2) will extend to non-public companies, unlike SEC regulations, the final rule's definition of ''policy-making position'' does not include the phrase ''any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance)'' in the definition of ''executive officer.''[714] The Commission believes that in the context of this final rule, in which the definition is relevant to a broader array of entities than public companies, that phrase would encompass workers who, despite their titles, are among those who are likely to be coerced or exploited by non-competes. For example, this aspect of the definition can be too easily applied to managers of small departments, who the Commission finds

[713] 17 CFR 240.3b–7 (''The term executive officer, when used with reference to a registrant, means its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant.''); 17 CFR 240.3b–2 (''The term officer means a president, vice president, secretary, treasury or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated.'').

[714] 17 CFR 240.3b–7.

are unlikely to have bargained for their non-competes. At the same time, a manager who does in fact have policy-making authority would meet the definition of "officer" in § 910.1 and thus be included in the definition of senior executives (if the manager also meets the compensation threshold). Similarly, depending on the organization, a vice president may have final policy-making authority over significant aspects of a business entity. The adapted definition is based on functional job duties rather than formal job titles.

Second, SEC Rule 3b–7 uses the term "policy making function" as part of its definition of the types of job duties that could classify a person as an "executive officer." [715] While the term "policy making function" is undefined in SEC Rule 3b–7 and other SEC regulations, the Commission believes that defining the term "policy-making authority" in § 910.1 would provide greater clarity and facilitate compliance with the final rule. The final rule applies to a wider range of business entities than SEC rules, and the Commission seeks to minimize the need to consult with counsel about the meaning of this term. The Commission is also concerned that if the term is left undefined, employers could, inadvertently or otherwise, label too many workers who have any involvement in the employer's policy making as senior executives, especially workers without bargaining power.

In defining this term, the Commission seeks to broadly align with the SEC's definition of "executive officer" while focusing on senior executives in a wider variety of entities, who are less likely to experience exploitation and coercion. As explained in Part IV.C.4.b with respect to the compensation threshold, there is no job duties test that will exclude every worker who experiences exploitation and coercion with respect to non-competes while including every worker who does not. Building on the SEC definition provides firms and workers with a more administrable definition that isolates workers at the most senior level of an organization.

To ensure that the final rule's job duties test for senior executives broadly aligns with the SEC definition, the Commission looked to case law interpreting that SEC definition. Few courts have interpreted SEC Rule 3b–7's "policy making function" language, though some courts view it as an officer test. [716] In the most in-depth discussion,

the U.S. District Court for DC considered a defendant who was a member of a corporate body that discussed important policy decisions and made recommendations to the CEO, and supervised and had "substantial influence" over a major aspect of the company's business. However, the court held that only the CEO, and not the defendant, had authority to make company policy and ultimate decisions on significant issues. [717] The court conducted a fact-intensive analysis of the defendant's duties and held that the defendant did not have the authority to make policy. The court also held that the term did not include individuals solely "involved in discussing company strategy and policy." [718]

The Commission finds this case law instructive and thus defines "policy-making authority" in the final rule as "final authority to make policy decisions that control significant aspects of a business entity and does not include authority limited to advising or exerting influence over such policy decisions." Adding this definition provides stakeholders with additional clarity as to what type of authority meets the definition of "senior executive" and prevents overbroad application of the definition. It expressly does not include workers who merely advise on or influence policy, as a wide range of workers in an organization can advise on or influence policy without being a senior executive.

In order to ensure that lower-level workers, whom the Commission finds likely experience exploitation and coercion, are not included in the definition of senior executive, policy-making authority is assessed based on the business as a whole, not a particular office, department, or other sublevel. It considers the authority a worker has to make policy decisions that control a significant aspect of a business entity without needing a higher-level worker's approval. For example, if the head of a marketing division in a manufacturing firm only makes policy decisions for the marketing division, and those decisions do not control significant aspects of the

business (which would likely be decisions that impact the business outside the marketing division), that worker would not be considered a senior executive. Similarly, in the medical context, neither the head of a hospital's surgery practice nor a physician who runs an internal medical practice that is part of a hospital system would be senior executives, assuming they are decision-makers only for their particular division. The definition is limited to the workers with sufficient pay and authority such that they are more likely to have meaningful bargaining power and actually negotiated their own non-competes.

For the same reason, the Commission added language to the definitions of "policy-making authority" and "policy-making position" to exclude from the definition of "senior executives" workers with policy-making authority over only a subsidiary or affiliate of a common enterprise who do not have policy-making authority over the common enterprise. One commenter argued that the proposed definition of "business entity" would allow firms to divide themselves into separate entities to evade the final rule. In addition to sharing this concern, the Commission is concerned that executives of subsidiaries or affiliates of a common enterprise [719] could rely on their final authority to make policy decisions for only that subsidiary or affiliate to classify the head of each office as a senior executive even though that individual only has authority over one component of a coordinated common enterprise. Rather, the worker must have policy-making authority with respect to the common enterprise as a whole, not just a segment of it, to be a senior executive. Workers who head a subsidiary or affiliate of a common enterprise are similar to department heads; the senior executives controlling the entire common enterprise control those individual subsidiaries and affiliates. As the Commission has explained, the Commission finds that department heads and other highly paid non-senior executives do not have sufficient bargaining power to avoid exploitation and coercion and are unlikely to have bargained in connection with non-competes. The job duties test identifies the workers with the highest levels of authority in an organization, *i.e.*, the workers most likely to have bargaining power and a bespoke, negotiated agreement, and a

---

[715] *Id.*

[716] *See, e.g., SEC* v. *Enters. Solutions,* 142 F. Supp. 2d 561, 570, 574 (S.D.N.Y. 2001) (finding that a so-called consultant's role was "sufficiently

similar to the duties of an officer or director of the company that his involvement, along with his history of criminal and regulatory violations, ought to have been disclosed" where the consultant controlled the company, including hiring the CEO, arranging loans from companies controlled by the consultant, negotiating acquisitions, and putting his daughter on the board in his place); *In re Weeks,* SEC Release No. 8313 at *9 (Oct. 23, 2003) (finding a consultant was *de facto* in charge of the company while the officers and directors were figureheads who lacked authority and influence over the company).

[717] *SEC* v. *Prince,* 942 F. Supp. 2d 108, 133–36 (D.D.C. 2013).

[718] *Id.* at 136.

[719] *FTC* v. *WV Universal Mgmt., LLC,* 877 F.3d 1234, 1240 (11th Cir. 2017) ("[C]ourts have justly imposed joint and several liability where a common enterprise exists").

common enterprise is effectively a single organization. Such workers may have a senior executive job title, but they are unlikely to meet the job duties test.

To be considered a "common enterprise" for the purposes of defining policy-making authority and policy-making position, the Commission looks beyond legal corporate entities to whether there is a common enterprise of "integrated business entities."[720] This means that the various components of the common enterprise have, for example, one or more of the following characteristics: maintain officers, directors, and workers in common; operate under common control; share offices; commingle funds; and share advertising and marketing.[721] Therefore, the definitions of policy-making authority and policy-making position include provisions whose purpose is to exclude those executives of a subsidiary or affiliate of a common enterprise from being considered senior executives. For example, if a business operates in several States and its operations in each State are organized as their own corporation, assuming these businesses and the parent company meet the criteria for a common enterprise, the head of each State corporation would not be a senior executive. Rather, only the senior executives of the parent company (or whichever company is making policy decisions for the common enterprise) could qualify as senior executives for purposes of this final rule, because they are the workers with the highest level of authority in the organization and most likely to have bargaining power and a bespoke, negotiated agreement. However, a worker could qualify as a senior executive even if they were an executive of one or more subsidiaries or affiliates of the common enterprise, so long as that senior executive exercised policy-making authority over the common enterprise in its entirety. These

provisions are consistent with the approach taken elsewhere in this final rule to focus on real-world implications and authority rather than formal titles, labels, or designations. This exclusion from the definitions of "policy-making authority" and "policy-making position" applies only to common enterprises; for subsidiaries or affiliates that are not part of a common enterprise, a worker could qualify as a senior executive if they have policy-making authority over that subsidiary or affiliate and meet all of the requirements.

The Commission has also substituted "business entity" in the definitions of "officer" and "policy-making position" where SEC Rule 3b–7 uses the word "registrant" and 17 CFR 240.3b–2 uses "organization," because "registrant" has a specific meaning in the SEC context that is inapplicable to the wider array of business entities covered by this final rule and because "business entity" is defined in § 910.1 and is used throughout this final rule. The Commission substituted "natural person" where SEC Rule 3b–7 and 17 CFR 240.3b–2 use "person" because "person" is separately defined for purposes of this final rule in § 910.1.

### ii. Other Proposed Job Duties Tests

#### The FLSA

Numerous commenters suggested basing a job duties test on the categories of occupations that are exempt from requirements under the FLSA. Some commenters suggested using only some of the exemptions such as executive employees,[722] administrative employees, learned or creative professionals, or workers in the practice of medicine.[723] DOL's regulations also set a salary threshold at not less than $684 per week ($35,568 annually),[724] though other commenters suggested using a higher compensation threshold.

One civic organization opposed applying any FLSA exemptions, stating that the FLSA provides numerous exemptions that do not relate to any non-compete policy considerations, and an exception or more lenient standards for FLSA-exempt workers would not solve the problems caused by non-competes. It opposed using the FLSA's executive, administrative, or professional exemptions, arguing that updates to the FLSA's salary threshold

are often delayed and outdated, often falling below the poverty threshold, and the duties test serves as a loophole for wage and hour protections.

Commenters offered several reasons for adopting the FLSA exemptions: these categories are already well-established in Federal law; nonexempt workers under the FLSA tend not to have access to trade secrets or be able to take an employer's goodwill and are thus less likely to harm the employer; the exemptions would capture both wage and job duties tests; some States use a similar standard to the FLSA in their non-compete statutes; and the exemptions would ban non-competes for low-skilled workers for whom there are insufficient justifications for non-competes. An employment attorney also pushed back on the NPRM's concerns that the FLSA exemptions could enable misclassification,[725] asserting that misclassification under the FLSA is unlawful and penalized, and thus usually inadvertent.

The Commission does not adopt the FLSA exemptions for purposes of this final rule because it would exempt millions of non-competes that harm competition and workers. For example, the FLSA exempts most highly paid and highly skilled workers,[726] who the Commission finds experience exploitation and coercion (except where those workers are also senior executives).[727] The Commission also adopts brighter-line rules than the FLSA to ease compliance burdens and address *in terrorem* effects that result from uncertainty about whether a non-compete is unenforceable.[728] Although the Commission does not believe that the FLSA job duties tests are appropriate for this final rule, it does view the FLSA wage threshold methodology for "highly compensated employees" as a useful benchmark.[729]

### Trade Secret and Confidential Information Exceptions

Numerous commenters urged the Commission not to ban non-competes for workers who have access to trade secrets and confidential information, often noting this justification is commonly used for highly paid and highly skilled workers, including senior executives. One comment expressly stated that this exception should apply regardless of earnings, though many

---

[720] See *FTC* v. *E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636–37 (6th Cir. 2014).

[721] See *id.* (" 'If the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness. Courts generally find that a common enterprise exists 'if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing.' ") (quoting *FTC* v. *Wash. Data. Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012)). In assessing a common enterprise, "no one factor is controlling," and "federal courts routinely consider a variety of factors." *FTC* v. *Wyndham Worldwide Corp.*, No. CIV.A. 13–1887 ES, 2014 WL 2812049, at *7 (D.N.J. Jun. 23, 2014); *see also Del. Watch Co.* v. *FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (" '[T]he pattern and frame-work of the whole enterprise must be taken into consideration.' ")

[722] See 29 CFR 541.100(a).

[723] See DOL, Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA) (revised Sept. 2019), *https://www.dol.gov/agencies/whd/fact-sheets/17a-overtime*.

[724] *Id.*

[725] See NPRM at 3511.

[726] See 2023 FLSA NPRM at 62190 (estimating that 36.4 million salaried, white-collar employees currently qualify as FLSA-exempt executive, administrative, or professional employees).

[727] See Part IV.C.1.

[728] See Part IX.C.

[729] See Part IV.C.4.b.

others did not mention compensation thresholds. One business suggested a bright-line rule for the types of confidential business information that can be protected by a non-compete based on existing State statutes, to increase certainty about what is allowed. Commenters suggested exceptions based on a variety of job types they viewed as more likely to be exposed to trade secrets and confidential information, including all highly skilled workers; key scientific, technical, R&D, or sales workers; or workers with highly detailed knowledge of business and marketing plans. The Commission explains why it is not adopting exceptions based on access to trade secrets or other intellectual property in Parts V.D.1 and V.D.2.

Additional Proposed Job Duties and Job Title Tests

The Commission carefully considered several other proposed tests. The NPRM stated that the Commission could base the definition of senior executive on SEC Regulation S–K's definition of senior executives.[730] Commenters did not discuss this potential option. The Commission is not adopting this approach because it bears little relation to the likelihood that a senior executive bargained for a non-compete, and because it would designate roughly seven individuals per company as "senior executives" regardless of their compensation level or the size of the company, meaning it would not apply equally among employers or workers.[731] For example, a ten-person company could potentially use non-competes for most of its workforce irrespective of whether they are senior executives, whereas a company with ten thousand employees would be limited to the same number.[732]

One commenter proposed adopting a definition similar to the tax code provision on "golden parachute payments."[733] Several commenters drafted their own definition of senior executive based on job duties, titles, or ownership status, such as C-suite

executives and their immediate subordinates, partners and equity holders, managers, workers involved in strategic decision-making, and more.

The Commission carefully considered each proposed definition and how it would operate in practice before selecting the two-part test. Elements of some of these proposals, such as strategy development or decision-making, are also similar to the job duties test the Commission is finalizing. The Commission believes that definitions based on job titles alone would be inadequate because, as one industry association commented, employers define job titles differently, and a title might not accurately reflect a worker's job duties. The other definitions proposed by commenters, such as the provision on golden parachute payments, would generally require a more fact-intensive analysis than the job duties test the Commission is adopting. Market participants would need to conduct the analysis for more workers, including workers who are exploited and coerced by non-competes. A more fact-intensive analysis would require more resources for litigation and is thus likely to have *in terrorem* effects for lower-wage workers.[734] Moreover, many of these proposals would exempt more workers than the Commission's definition, such as managers, even though workers in such roles and occupations are often coerced and exploited by non-competes.

As explained in this Part, the Commission pairs a relatively easy-to-apply job duties test with a compensation threshold to maximize administrability and clarity while identifying those senior executives most likely to have bargained for non-competes. In addition, proposals to except partners, shareholders, and similar groups are likely covered by the sale of business exception if they sell their share of the business upon leaving.

5. Prohibitions in Section 910.2(a)(2)

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission adopts § 910.2(a)(2), which defines unfair methods of competition related to non-competes with respect to senior executives. Section 910.2(a)(2) provides that, with respect to a senior executive, it is an unfair method of competition for a person: (i) to enter into or attempt to enter into a non-compete clause; (ii) to enforce or attempt to enforce a non-compete clause

entered into after the effective date; or (iii) to represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date. Part IV.A.1 sets forth the Commission's determination that the foregoing practices are unfair methods of competition under section 5, and Part IV.C.2 explains the findings that provide the basis for this determination.

Section 910.2(a)(2) uses similar language as § 910.2(a)(1); however, there are two key differences. First, the prohibition in § 910.2(a)(2)(ii) on enforcing or attempting to enforce a non-compete applies only to non-competes entered into after the effective date. Second, the prohibition in § 910.2(a)(2)(iii) on representing that a senior executive is subject to a non-compete applies only where the non-compete was entered into after the effective date. Sections 910.2(a)(2)(ii) and (iii) include this language because, for the reasons described in Part IV.C.3, the Commission has determined not to prohibit existing non-competes with senior executives—*i.e.*, non-competes entered into before the effective date—from remaining in effect.

Otherwise, the explanation of the three prongs of § 910.2(a)(1) in Part IV.B.4—relating to issues such as, for example, what "attempt to enter into" and "attempt to enforce" mean, and what conduct the "representation" prong applies to—is applicable to the corresponding language in § 910.2(a)(2). The good-faith exception in § 910.3 is also applicable to the relevant prohibitions with respect to senior executives and is explained in Part V.C.

*D. Claimed Justifications for Non-Competes Do Not Alter the Commission's Finding That Non-Competes Are an Unfair Method of Competition*

For the reasons described in Parts IV.B and IV.C, the Commission determines that certain practices related to non-competes are unfair methods of competition under section 5. In this Part IV.D, the Commission finds the claimed justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition.

As noted in Part II.F, some courts have declined to consider justifications altogether and the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question

---

[730] *See* NPRM at 3520 (citing 17 CFR 229.402(a)(3)).

[731] *See* 17 CFR 229.402(a)(3).

[732] Additionally, while the reporting obligations of public companies may provide them with an incentive to avoid generating a profusion of "senior executives," privately held companies would not face a similar constraint and could potentially avoid any "per-company" limitations through corporate restructuring.

[733] This provision determines who is an "officer" "on the basis of all the facts and circumstances in the particular case (such as the source of the individual's authority, the term for which the individual is elected or appointed, and the nature and extent of the individual's duties) . . . ." Treas. Reg. sec. 1.280G–1, Q/A–18.

[734] *See* Part IX.C.

is not cognizable as a justification.[735] However, where defendants raise justifications as an affirmative defense, they must be legally cognizable,[736] and non-pretextual,[737] and any restriction used to bring about the benefit must be narrowly tailored to limit any adverse impact on competitive conditions.[738]

In the NPRM, the Commission considered the commonly cited business justifications for non-competes and preliminarily found they did not alter the Commission's determination that non-competes are an unfair method of competition.[739] The Commission has reviewed and considered the comments on its analysis of the justifications for non-competes. For two reasons, the claimed justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition. First, employers have more narrowly tailored alternatives to non-competes for protecting valuable investments that tend to negatively affect competitive conditions to a lesser degree. Second, the asserted benefits from the claimed business justifications from non-competes do not justify the considerable harm from non-competes.

### 1. Claimed Business Justifications for Non-Competes and Empirical Evidence

Claimed business justifications for non-competes relate to increasing employers' incentives to make productive investments, such as investments in worker human capital (worker training), client and customer attraction and retention, or in creating or sharing trade secrets or other confidential information with workers. According to these asserted justifications, without non-competes, employment relationships are subject to an investment hold-up problem. Investment hold-up would occur where an employer—faced with the possibility that a worker may depart after receiving some sort of valuable investment or obtaining valuable information—opts not to make that investment in the first place, thereby decreasing the firm's productivity and overall social welfare. For example, according to this claimed justification, an employer may be more reticent to make capital investments or invest in workers' human capital by training its workers if it knows the worker may depart for or may establish a competing firm. Similarly, commenters argued that employers may decrease investments or experience harm if a worker takes a trade secret or other confidential information to a competitor.

Courts have cited these justifications when upholding non-competes under State common law and in cases challenging non-competes under the Sherman Act.[740] However, courts have not considered non-competes' aggregate harms, and neither legislatures nor courts have had occasion to consider these justifications in the context of section 5. The Commission has considered them and found them unavailing in cases in which it has successfully obtained consent decrees against non-competes alleged to be an unfair method of competition in violation of section 5.[741]

There is some empirical evidence that non-competes increase investment in human capital of workers, capital investment, and R&D investment. However, the Commission also finds that there are alternatives that burden competition to a lesser degree,[742] and, in any event, these claimed benefits do not justify the harms from non-competes.[743]

As explained in the NPRM, a study by Evan Starr finds that moving from mean non-compete enforceability to no non-compete enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-competes at a high rate (relative to a control group of occupations that use non-competes at a low rate).[744] The study further finds that changes in training are primarily due to changes in firm-sponsored, rather than employee-sponsored, training.[745]

Firm-sponsored training is the type of investment in human capital that non-competes are often theorized to protect, as the firm may be unwilling to make an unprotected investment. However, the study does not distinguish between core training, *i.e.,* training required to perform job duties, and advanced training, *i.e.,* training with potential to increase productivity beyond the baseline requirements for job performance. When non-competes are more enforceable, workers may receive additional core training rather than advanced training, but this may actually reflect a reduction in efficiency. When non-competes are more enforceable, labor mobility decreases and workers may also move to new industries to avoid potentially triggering non-compete clause violations (as discussed in Part IV.B.2.b.ii), both of which make experienced workers less often available for hire. Firms therefore may need to train workers at a greater rate because they will hire inexperienced workers who require more core training. On the other hand, advanced training can be associated with productivity gains, and firms using non-competes may increase rates of advanced training for experienced workers because non-competes increase the likelihood that firms receive a return on the training investment. The study does not distinguish between these types of training, and thus leaves unclear whether the observed increases in training reflect productivity gains or losses (or neither in net).

Additionally, the Starr study uses data on the use of non-competes, comparing high- and low-use occupations, rather than changes in enforceability; however, the study does not examine differences between individuals who are bound by non-

---

[735] *Atl. Refin. Co.,* 381 U.S. at 371 (considering that defendant's distribution contracts at issue ''may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers'' and holding that the ''Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves''); *FTC* v. *Texaco,* 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the ''anticompetitive tendencies of such system [were] clear''); *L.G. Balfour Co.* v. *FTC,* 442 F.2d 1, 15 (7th Cir. 1971) (''While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice.''). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through section 5.

[736] See, e.g., *FTC* v. *Ind. Fed'n of Dentists,* 476 U.S. 447, 463 (1986); *Fashion Originators' Guild of Am.* v. *FTC,* 312 U.S. 457, 467–68 (1941); *FTC* v. *Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 423–24 (1990).

[737] *See, e.g., Ind. Fed'n of Dentists,* 476 U.S. at 464. *See also United States* v. *Microsoft Corp.,* 253 F.3d 34, 64, 74 (D.C. Cir. 2001); *Eastman Kodak Co.* v. *Image Tech. Svcs.,* 504 U.S. 451, 484–85 (1992); *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608–10 (1985).

[738] *NCAA* v. *Alston,* 594 U.S. 69, 99–104 (2021); *Polygram Holding, Inc.* v. *FTC,* 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines, sec. 3.36b. *See also Union Circulation Co.* v. *FTC,* 241 F.2d 652, 658 (2d Cir. 1957) (''The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices.'').

[739] NPRM at 3504–08.

[740] *See, e.g., United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir. 1898); *Polk Bros., Inc.* v. *Forest City Enters.,* 776 F.2d 185, 189 (7th Cir. 1985).

[741] *See* FTC, *In the Matter of O–I Glass, Inc and In the Matter of Ardagh Group S.A., Ardagh Glass Inc., and Ardagh Glass Packaging Inc.,* Analysis of Agreements Containing Consent Order to Aid Public Comment, FTC File No. 2210182 (Jan. 4, 2023) at 6–7; FTC, *In the Matter of Prudential Security, Inc., et al.,* Analysis of Agreement Containing Consent Order to Aid Public Comment, FTC File No. 2210026 (Jan. 4, 2023) at 7; FTC, *In the Matter of Anchor Glass Container Corp. et al.,* FTC File No. 2210182 Analysis of Agreement Containing Consent Order to Aid Public Comment (Mar. 15, 2023) at 6.

[742] *See* Part IV.D.2.

[743] *See* Part IV.D.3.

[744] Starr, *supra* note 445 at 796–97.

[745] *Id.* at 797.

competes and individuals who are not. This study is the only study that attempts to identify the causal link between non-competes and worker human capital investment, and the Commission gives it some weight, though not as much weight as it would receive if it examined changes in non-compete enforceability. The Commission also weights it less highly because it does not distinguish between core and advanced training.

The second study, by Jessica Jeffers, finds knowledge-intensive firms invest substantially less in capital equipment following decreases in the enforceability of non-competes, though the effect is much more muted (and statistically insignificant) when considering all industries.[746] While firms may invest in capital equipment for many different reasons, Jeffers examines this outcome (as opposed to labor-focused outcomes) to avoid looking at R&D expenditure as a whole, which is in large part composed of labor expenses. This allows the study to isolate the effects of non-compete enforceability on investment from other effects of non-competes, such as reduced worker earnings.

Jeffers finds that there are likely two mechanisms driving these effects: first, that firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (*i.e.,* the return on investment in capital equipment is greater when workers are more highly trained); and second, that non-competes reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[747] Jeffers does not find any impact of non-compete enforceability on R&D expenditure (intangible investment). The sample in this study's examination of capital investment is limited to incumbent firms, and the study also finds decreases in new firm entry due to increases in non-compete enforceability. The study therefore does not offer clear insights into the overall net effect on capital investment (which includes investment by incumbent firms as well as investment by entering firms). Additionally, the Commission notes that if Jeffers' hypothesis—that firms increase investment in capital because of decreased competition—is correct, then this increased capital investment

may not necessarily reflect increased economic efficiency. Jeffers uses multiple changes in non-compete enforceability, measured in a binary fashion, and the Commission therefore gives this study substantial weight, but less weight than studies which additionally measure enforceability in a non-binary fashion.

Two studies published after the release of the NPRM also assess the effects of non-competes on firm investments. A study by Johnson, Lipsitz, and Pei revisits the form of the regressions used by Jeffers. The authors find that greater non-compete enforceability increases R&D expenditure.[748] This is consistent with the NPRM's preliminary finding, and the finding of the Jeffers study, that there is evidence that non-competes increase employee human capital investment and other forms of investment. The Commission gives this study substantial weight because it examines multiple changes in non-compete enforceability measured in a non-binary fashion.

Similarly, a study by Liyan Shi examines the relationship between non-compete enforceability, the use of non-competes among executives, and firm investment.[749] Shi finds that intangible capital (expenditure on R&D) is positively associated with use of non-competes, especially in States that enforce non-competes more strictly. However, Shi finds that—unlike in the Jeffers study—physical capital expenditure has no relationship with the use of non-competes, even in high enforceability States. The Commission notes that this evidence pertains specifically to non-competes with highly paid senior executives: the executives in Shi's study earned $770,000 in cash compensation, on average. The Commission also notes that this evidence arises from analysis of non-compete use coupled with non-compete enforceability. The Commission therefore gives less weight to these empirical findings.

As the NPRM described, there are also two studies examining the impact of non-compete use (as opposed to non-compete enforceability) on investment. However, these studies simply compare differences between samples of workers that do and do not use non-competes, a methodology the Commission gives less weight to.[750] The first is a study by Starr, Prescott, and Bishara using their 2014 survey of non-compete use. They find no statistically significant

association with either training or the sharing of trade secrets (after inclusion of control variables) but do not examine other investment outcomes.[751] The second study, by Johnson and Lipsitz, examines investment in the hair salon industry. That study finds that firms that use non-competes train their employees at a higher rate and invest in customer attraction through the use of digital coupons (on so-called "deal sites") to attract customers at a higher rate, both by 11 percentage points.[752]

As the Commission stated in the NPRM, it gives these two studies (the 2021 Starr, Prescott, and Bishara studies and the 2021 Johnson and Lipsitz studies) minimal weight, because they do not necessarily represent causal relationships, a point recognized by the authors of both of these studies.[753] Similar to other studies of non-compete use—as opposed to changes in non-compete enforceability—these studies are less reliable because the use of non-competes and the decision to invest may be jointly determined by other characteristics of the firms, labor markets, or product markets.[754]

One additional study, by Younge and Marx, finds that the value of publicly traded firms increased by 9% due to an increase in non-compete enforceability.[755] As the Commission noted in the NPRM, the authors attribute this increase to the value of retaining employees, which comes with the negative effects to parties other than the firm (employees, competitors, and consumers) described in Parts IV.B and IV.C. As the NPRM stated, if the benefits to the firm arise primarily from reductions in labor costs, then the increase in the value of firms is in part a transfer from workers to firms and is therefore not necessarily a benefit of non-competes. However, the authors do not explore the extent to which increases in firm value arise from decreases in labor costs. The authors additionally note that since the time frame used in the study is short, "there may be deleterious effects of non-competes in the long run" which are absent in their findings.[756] This study

---

[746] Jeffers, *supra* note 450 at 28. Jeffers reports 34%–39% increases in capital investment due to increases in non-compete enforceability at knowledge-intensive firms in the 2024 version of the study, and the Commission calculates increases of 7.9% across all sectors (see Part X.F.9.a.i).

[747] *Id.* at 29.

[748] Johnson, Lipsitz, and Pei, *supra* note 526.

[749] Shi, *supra* note 84.

[750] *See* Part IV.A.2.

[751] Starr, Prescott, & Bishara, *supra* note 68 at 76.

[752] Johnson & Lipsitz, *supra* note 80 at 711.

[753] Starr, Prescott, & Bishara, *supra* note 68 at 73; Johnson & Lipsitz, *supra* note 80 at 711.

[754] *See* Part IV.A.2 (describing the analytical framework the Commission is applying to weigh the empirical studies, including why it assigns greater weight to studies assessing changes in non-compete enforceability than to studies of non-compete use).

[755] Kenneth A. Younge & Matt Marx, *The Value of Employee Retention: Evidence from a Natural Experiment,* 25 J. Econ. & Mgmt. Strategy 652 (2016).

[756] *Id.* at 674.

does not address the effects of non-competes on firm investments specifically.

As the Commission stated in the NPRM, it is unaware of any evidence of a relationship between the enforceability of non-competes and the rate at which companies invest in creating or sharing trade secrets.[757] Similarly, the Commission is unaware of any evidence non-competes reduce trade secret misappropriation or the loss of other types of confidential information, difficult areas for researchers to study given the lack of reliable data on firms' trade secrets and confidential information.[758] As explained in Part IV.D.2, even assuming non-competes do reduce misappropriation or information loss, the Commission finds that there are alternatives to protect these investments that burden competition to a lesser degree.

2. Employers Have Alternatives to Non-Competes for Protecting Valuable Investments

a. The Proposed Rule

In the NPRM, the Commission preliminarily found that employers have alternatives to non-competes for protecting valuable investments.[759] The Commission stated that these alternatives may not be as protective as employers would like, but they reasonably accomplish the same purposes as non-competes while burdening competition to a less significant degree.[760]

The Commission stated that trade secret law—a form of intellectual property law that protects confidential business information—already provides significant legal protections for an employer's trade secrets.[761] The Commission also stated that employers that seek to protect valuable investments are able to enter into NDAs with their workers. NDAs, which are also commonly known as confidentiality agreements, are contracts in which a party agrees not to disclose

or use information designated as confidential.[762] The Commission further stated that, if an employer wants to prevent a worker from leaving right after receiving valuable investment in their human capital, the employer can sign the worker to an employment contract with a fixed duration.[763] In addition, the Commission stated that employers that wish to retain their workers can also pay their workers more, offer them better hours or better working conditions, or otherwise improve the conditions of their employment—*i.e.,* compete to retain their labor services.[764]

The Commission also noted that in three States—California, North Dakota, and Oklahoma—employers generally cannot enforce non-competes, so they must protect their investments using one or more of these less restrictive alternatives.[765] The Commission stated that the economic success in these three States of industries that are highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-competes for protecting valuable investments.[766]

b. The Commission's Final Findings

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the asserted business justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition. Employers have alternatives to non-competes for protecting valuable investments that burden competition to a less significant degree. Rather than restraining a broad scope of beneficial competitive activity—by barring workers altogether from leaving work with the employer or starting a business and by barring competing employers and businesses from hiring those workers—these alternatives are much more narrowly tailored to limit impacts on competitive conditions.

For the protection of trade secrets and other confidential information, these alternatives include enforcement of intellectual property rights under trade secret and patent law, NDAs, and invention assignment agreements.

Employers also have alternative mechanisms to protect their investments in worker human capital, including fixed duration contracts, and competing on the merits to retain workers by providing better pay and working conditions.

The experiences of certain States in banning non-competes bolster this conclusion. Non-competes have been void in California, North Dakota, and Oklahoma since the 1800s.[767] In these three States, employers generally cannot enforce non-competes, so they must protect their investments using one or more less restrictive alternatives. There is no evidence that employers in these States have been unable to protect their investments (whether in human capital, physical capital, intangible assets, or otherwise) or have been disincentivized from making them to any discernible degree. Rather, in each of these States, industries that depend on highly trained workers and trade secrets and other confidential information have flourished. California, for example, is home to four of the world's ten largest companies by market capitalization, and it also maintains a vibrant startup culture.[768] Technology firms are highly dependent on highly-trained and skilled workers as well as protecting trade secrets and other confidential information—and, since the 1980s, California has become the epicenter of the global technology sector, even though employers cannot enforce non-competes.[769] Indeed, researchers have posited that high-tech clusters in California may have been aided by increased labor mobility due to the unenforceability of non-competes.[770] In

[757] Recent evidence suggests that trade secret litigation does not increase following bans on non-competes. Brad N. Greenwood, Bruce Kobayashi, Evan Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation* (2024), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4771171.* The Commission does not rely on this study to support the findings described in this Part IV.D.

[758] *See, e.g.,* David S. Levine & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act,* 53 Wake Forest L. Rev. 106, 120–22 (2018).

[759] NPRM at 3505–07.

[760] *Id.*

[761] *Id.* at 3505–06.

[762] *Id.* at 3506–07.

[763] *Id.* at 3507.

[764] *Id.*

[765] Since the NPRM was issued, Minnesota has become the fourth State to make non-competes unenforceable. *See* Minn. Stat. Ann. sec. 181.988 (effective July 1, 2023).

[766] NPRM at 3507.

[767] Non-competes have been void in California since 1872, in North Dakota since 1865, and in Oklahoma since 1890. *See* Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Non-Compete Clauses,* 74 N.Y.U. L. Rev. 575, 616 (1999) (California); *Werlinger* v. *Mut. Serv. Casualty Ins. Co.,* 496 NW2d 26, 30 (N.D. 1993) (North Dakota); Brandon Kemp, *Noncompetes in Oklahoma Mergers and Acquisitions,* 88 Okla. Bar J. 128 (2017) (Oklahoma). Minnesota also recently prohibited non-competes, through a law that took effect in July 2023. *See* Minn. Stat. sec. 181.988. However, Minnesota's experience is too new to draw conclusions about the ability of industries that depend on trade secrets to thrive where non-competes are unenforceable.

[768] Josh Dylan, *What Is Market Cap In Stocks?,* Nasdaq.com (Aug, 12, 2022), *https://www.nasdaq.com/articles/what-is-market-cap-in-stocks;* Ewing Marion Kauffman Found., *State Entrepreneurship Rankings, https://www.../public_affairs//02/25/_foundation_state_entrepreneurship_rankings.html.*

[769] *See, e.g.,* Gilson, *supra* note 767 at 594–95.

[770] *See, e.g., id.* at 585–86, 590–97; Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster,* 88 Rev. Econ. & Statistics 472, 477 (2006).

North Dakota and Oklahoma, the energy industry has thrived, and firms in the energy industry depend on highly-trained workers as well as the ability to protect trade secrets and other confidential information.

The Commission finds that the economic success in these three States of industries that are highly dependent on highly trained workers, trade secrets, and other confidential information illustrates that non-competes are not necessary to protect employers' legitimate interests in trained workers or securing their intellectual property and confidential information. These alternatives are available to employers and viable both with respect to senior executives and to workers other than senior executives. The Commission addresses these alternatives in this Part IV.D.2.b and summarizes and responds to the comments on these alternatives in Part IV.D.2.c.

i. Trade Secret Law

The Commission finds that trade secret law provides employers with a viable, well-established means of protecting investments in trade secrets, without the need to resort to the use of non-competes with their attendant harms to competition. Trade secret law is a form of intellectual property law that is specifically focused on providing employers with the ability to protect their investments in trade secrets.[771]

Forty-seven States and DC have adopted the Uniform Trade Secrets Act ("UTSA").[772] The UTSA provides a civil cause of action for trade secret misappropriation, which refers to disclosure or use of a trade secret by a former employee without express or implied consent.[773] The UTSA also provides for injunctive and monetary relief, including compensatory damages, punitive damages, and attorney's fees.[774]

In addition, in 2016, Congress enacted the Defend Trade Secrets Act of 2016 ("DTSA"), which established a civil cause of action under Federal law for trade secret misappropriation.[775] The DTSA brought the rights of trade secret owners "into alignment with those long

enjoyed by owners of other forms of intellectual property, including copyrights, patents, and trademarks."[776] Similar to State laws modeled on the UTSA, the DTSA authorizes civil remedies for trade secret misappropriation, including injunctive relief, damages (including punitive damages), and attorney's fees.[777] The DTSA also authorizes a court, in "extraordinary circumstances," to issue civil ex parte orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action."[778] There is thus a clear Federal statutory protection that specifically governs protection of trade secrets.

Trade secret theft is also a Federal crime. The Economic Espionage Act of 1996 ("EEA") makes it a Federal crime to steal a trade secret for either (1) the benefit of a foreign entity ("economic espionage") or (2) the economic benefit of anyone other than the owner ("theft of trade secrets").[779] The EEA authorizes substantial criminal fines and penalties for these crimes.[780] The EEA further authorizes criminal or civil forfeiture, including of "any property constituting or derived from any proceeds obtained directly or indirectly as a result of" an EEA offense.[781] The EEA also requires offenders to pay restitution to victims of trade secret theft.[782]

Under the UTSA, DTSA, and EEA, the term "trade secret" is defined expansively and includes a wide range of confidential information.[783] The

viability of trade secret law as a means for redressing trade secret theft is illustrated by the fact that firms regularly bring claims under trade secret law. A recent analysis by the legal analytics firm Lex Machina finds that 1,156 trade secret lawsuits were filed in Federal court in 2022.[784] In addition, an analysis by the law firm Morrison Foerster finds that 1,103 trade secret cases were filed in State courts in 2019.[785] The number of cases filed in State court has held steady since 2015, when 1,161 cases were filed.[786] The fact that a considerable number of trade secret lawsuits are filed in Federal and State courts—over 2,200 cases per year—and the fact that this number has held relatively steady for several years suggests that many employers themselves view trade secret law as a viable means of obtaining redress for trade secret theft.

The use of trade secret law burdens competition to a lesser degree than the use of non-competes. Trade secret law provides firms with a viable means of redressing trade secret misappropriation—and deterring trade secret misappropriation by workers—without blocking beneficial competitive activity, such as workers switching to jobs in which they can be more productive or starting their own businesses.

ii. NDAs

NDAs provide employers with another well-established, viable means for protecting valuable investments.[787]

---

[771] Brian T. Yeh, *Protection of Trade Secrets: Overview of Current Law and Legislation*, Cong. Rsch. Serv. 4 (Apr. 22, 2016) (Report R43714), *https://sgp.fas.org/crs/secrecy/R43714.pdf*.

[772] *See* Levine & Seaman, *supra* note 758 at 113. The three States that have not adopted the UTSA offer protection to trade secrets under a different statute or under common law. Yeh, *supra* note 771 at 6 n.37.

[773] Uniform Trade Secrets Act with 1985 Amendments (Feb. 11, 1986) at sec. 1(2).

[774] *Id.* at secs. 2–4.

[775] Defend Trade Secrets Act of 2016, Public Law 114–153, 130 Stat. 376, 379 (2016).

[776] U.S. Senate, Report to Accompany S. 1890, the Defend Trade Secrets Act of 2016, S. Rep. No. 114–220 at 3 (2016).

[777] 18 U.S.C. 1836(b)(3).

[778] 18 U.S.C. 1836(b)(2).

[779] 18 U.S.C. 1831 (economic espionage); 18 U.S.C. 1832 (theft of trade secrets).

[780] 18 U.S.C. 1831 through 1832.

[781] 18 U.S.C. 1834, 2323.

[782] 18 U.S.C. 1834, 2323.

[783] The UTSA generally defines a "trade secret" as information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use and (2) is the subject of reasonable efforts to maintain its secrecy. UTSA, *supra* note 773 at sec. 1(4). The DTSA and EEA use a similar definition. 18 U.S.C. 1839(3). The Supreme Court has held that "some novelty" is required for information to be a trade secret, because "that which does not possess novelty is usually known." *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U.S. 470, 476 (1974). As the high court of one State noted in applying a State statute based on the UTSA, "business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures." *U.S. West Commc'ns, Inc.* v. *Off. of Consumer Advoc.,* 498 NW2d 711, 714 (Iowa 1993). *See also Confold Pac., Inc.* v. *Polaris Indus., Inc.,* 433 F.3d 952, 959 (7th Cir. 2006) ("A trade secret is really just a piece of information

(such as a customer list, or a method of production, or a secret formula for a soft drink) that the holder tries to keep secret by executing confidentiality agreements with employees and others and by hiding the information from outsiders by means of fences, safes, encryption, and other means of concealment, so that the only way the secret can be unmasked is by a breach of contract or a tort.").

[784] Gloria Huang, *Lex Machina Releases its 2023 Trade Secret Litigation Report*, Lex Machina (Jul. 13, 2023), https://.com/blog/lex-machina-releases-its-2023-trade-secret-litigation-report/.

[785] Kenneth A. Kuwayti & John R. Lanham, Morrison Foerster, Client Alert, *Happy Anniversary, DTSA: The Defend Trade Secrets Act at Five* (May 25, 2021), *https://www.mofo.com///210525-defend-trade-secrets-act-dtsa.*

[786] *Id.* at n.5.

[787] The Commission uses the term "NDA" to refer to contractual provisions that are designed to protect trade secrets or other business information that has economic value. Employers may also seek to use NDAs to protect other kinds of information, such as information about discrimination, harassment, sexual assault, corporate wrongdoing, or information that may disparage the company or its executives or employees. These types of NDAs have been widely criticized for, among other things, their pernicious effects on workers. *See, e.g.,* Rachel S. Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining In Non-Disclosure Agreements,* UC-Hastings Research Paper 2–6 (Jan. 2022), *https://papers.ssrn.com/sol3/.?abstract_=.*

NDAs are contracts in which a party agrees not to disclose and/or use information designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract.[788] Employers regularly use NDAs to protect trade secrets and other confidential business information. Researchers estimate that between 33% and 57% of U.S. workers are subject to at least one NDA.[789] One study finds that 95.6% of workers with non-competes are also subject to an NDA; 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement; and 74.7% of workers with non-competes are subject to all three provisions.[790] In most States, NDAs are more enforceable than non-competes.[791] While some commenters argued that NDAs would not be an adequate alternative to non-competes because of the NPRM's proposed functional definition of ''non-compete clause,'' the final rule will not prevent employers from adopting garden-variety NDAs; rather, it prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business.[792]

Appropriately tailored NDAs burden competition to a lesser degree than non-competes. Such NDAs may prevent workers from disclosing or using certain information, but they generally do not prevent workers from seeking or accepting other work, or starting their own business, after their employment ends. As the Tenth Circuit has stated, workers subject to NDAs, unlike workers subject to non-competes, ''remain free to work for whomever they wish, wherever they wish, and at whatever they wish,'' subject only to the terms that prohibit them from disclosing or using certain information.[793]

iii. Other Means of Protecting Valuable Investments

The Commission finds that employers have additional well-established means of protecting valuable investments in addition to trade secret law and NDAs.

For the protection of trade secrets and other confidential information, the Commission finds that these additional means include patent law and invention assignment agreements. Patent law provides inventors with the right, for a certain period of time, to exclude others from making, using, offering for sale, or selling an invention or importing it into the U.S.[794] During the period when patent protection is effective, patents grant the patent holder these exclusive rights, while other firms may use trade secrets if they are independently developed, reverse-engineered, or inadvertently disclosed.[795] In some cases, however, firms may choose to keep their invention a trade secret rather than seeking a patent because patent protection only lasts a certain number of years, after which the invention becomes part of the public domain.[796] Where a technology, process, design, or formula is able to meet the rigorous standards for patentability, patent law provides companies with a less restrictive alternative than non-competes for protecting it.[797]

Employers can further protect their property interests in these forms of intellectual property through appropriately tailored invention assignment agreements. These are agreements that give the employer certain rights to inventions created by the employee during their employment with a firm.[798] Like patent law, this tool, when appropriately tailored, provides employers with additional protection for some of their most valuable intellectual property interests.

With respect to investments in worker human capital, the Commission finds that these less restrictive alternatives include fixed duration contracts and competing on the merits to retain workers. If an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration. An employer can establish a term that is long enough for the employer to recoup its human capital investment, without restricting who the worker can work for, or their ability to start a business, after their employment ends. In doing so, the employer makes

a commitment to the worker and vice versa.

Finally, instead of using non-competes to lock in workers, the Commission finds that employers that wish to retain their workers can also compete on the merits for the worker's labor services—*i.e.*, they can provide a better job than competing employers by paying their workers more, offering them better hours or better working conditions, or otherwise improving the conditions or desirability of their employment. These are all viable tools for protecting human capital investments and other investments an employer may make that do not rely on suppressing competition.

c. Comments and Responses to Comments

Many commenters agreed with the Commission's preliminary finding that employers have less restrictive alternatives to non-competes. These commenters asserted that trade secret law, combined with NDAs, creates a powerful deterrent to post-employment disclosures of trade secrets and confidential information, and that these tools adequately protect valuable investments in the absence of non-competes. The Commission agrees with these commenters. Other commenters asserted that the alternatives to non-competes identified in the NPRM are inadequate for protecting employer investments. The Commission summarizes and responds to the comments it received on less restrictive alternatives in this Part IV.D.2.c.

i. Comments and Responses to Comments on Trade Secrets and Other Confidential Information

Several commenters who generally supported the proposed rule stated that trade secret law and NDAs offer meaningful enforcement advantages to employers compared with non-competes. A few commenters stated that, unlike non-competes, trade secret law and NDAs are broadly enforceable in all fifty States. A few commenters stated that, while monetary penalties for breaching non-competes are ordinarily difficult to obtain, employers can obtain substantial monetary recovery for trade secret law and NDA violations. The Commission agrees with these comments.

Several commenters stated that the scope of trade secret law is limited in various respects. Several commenters stated, for example, that customer lists, pricing, and bid development information are typically excluded from the definition of ''trade secret'' under the DTSA and the law of many States.

---

[788] *See* Chris Montville, *Reforming the Law of Proprietary Information*, 56 Duke L.J. 1159, 1168 (2007).

[789] Arnow-Richman, *supra* note 787 at 2–3.

[790] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 44. The value 97.5% is calculated as (1 − 0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete (see Table 1 on page 36), and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete, regardless of what other post-employment restrictions they have.

[791] Montville, *supra* note 788 at 1179–83.

[792] See Part III.D.2.b.

[793] *MAI Basic Four, Inc.* v. *Basis, Inc.*, 880 F.2d 286, 288 (10th Cir. 1989).

[794] 35 U.S.C. 271.

[795] Yeh, *supra* note 771 at 3–4.

[796] *Id.* at 4–5. *See also United States* v. *Dubilier Condenser Corp.*, 289 U.S. 178, 186 (1933) (rather than seeking a patent, an inventor ''may keep his invention secret and reap its fruits indefinitely.'').

[797] Yeh, *supra* note 771 at 4–5.

[798] *See, e.g.*, *Milliken & Co.* v. *Morin*, 731 SE2d 288, 294–95 (S.C. 2012); *Revere Transducers, Inc.* v. *Deere & Co.*, 595 NW2d 751, 759–60 (Iowa 1999); *Ingersoll-Rand Co.* v. *Ciavatta*, 542 A.2d 879, 886–87 (N.J. 1988).

In response to these comments, the Commission notes that customer information may be classified as trade secrets under certain circumstances, such as when the information is not generally known or not otherwise easy to obtain and when a firm has taken measures to protect the confidentiality of the information.[799] Employers may also use NDAs to protect such information. NDAs broadly protect all information defined as confidential, regardless of whether such information constitutes a "trade secret" under State or Federal law.[800]

Some commenters argued that other tools under intellectual property law, such as patent and trademark law, are inadequate to protect employers' investments. These commenters misinterpret the Commission's findings. The Commission did not find in the NPRM, nor does it find in this final rule, that patent law standing alone or trademark law standing alone provide employers benefits equal to the benefits they may reap from an unfair method of competition, namely the use of non-competes. Rather, the Commission finds that patent law can be used, together with the other tools the Commission cites, including NDAs and fixed-term employment contracts, to protect legitimate investments in intellectual property and worker human capital investment and therefore that these tools, taken together, are viable alternatives to non-competes.

A number of commenters stated that there are enforceability disadvantages to trade secret law and NDAs compared to non-competes. Several commenters stated that trade secret law and NDAs are inadequate to protect employer investments prophylactically because employers can enforce them only after the trade secrets or other confidential information have already been disclosed. These commenters stated that trade secrets and confidential information can be highly valuable, and its value could be destroyed as soon as a worker discloses such information to a competing employer. Additionally, some commenters argued that trade secret law and NDAs are inadequate to protect employers' investments because enforcement outcomes for trade secrets and NDAs are less predictable and certain than with non-competes. Some comments suggested that this purported clarity of non-competes benefits workers, arguing that non-competes offer bright lines workers can follow to ensure against unintended violations. Other commenters assert that non-competes themselves are not necessarily effective as a prophylactic remedy, because it is often unclear whether a particular non-compete is enforceable, and non-competes are difficult to enforce in many jurisdictions. A few commenters stated that prophylactic remedies are already available under trade secret law in almost half of U.S. States where the doctrine of inevitable disclosure is recognized, while other commenters were concerned that not all States recognize the doctrine. Other commenters argued the inevitable disclosure doctrine may be worse for workers, and one commenter argued that the final rule would increase the use of the inevitable disclosure doctrine and thus reduce worker mobility.

Some commenters stated that prophylactic remedies are necessary to adequately protect trade secrets and confidential information because workers can exploit their former employers' trade secrets and confidential information without ever disclosing the information themselves, thus leaving aggrieved employers with no recourse under trade secret law or an NDA. Specifically, these commenters argued that when workers take new roles, they will inevitably use their knowledge of former employers' confidential information. For example, where a worker has experience with attempts and failures to develop new ideas or products with a former employer, they will likely use this knowledge to prevent a new employer from making similar mistakes, thus free riding off the former employer's development efforts, costs, and time. A commenter argued that preventing non-competes from restricting this type of misappropriation would discourage investment and harm innovation in the long run.

The Commission believes that what some commenters describe as the "prophylactic" benefits of non-competes—that an employer can block a worker from taking another job, without respect to any alleged misconduct—is also the source of their overbreadth because it enables employers to restrict competition in both labor markets and product and service markets, as detailed in Parts IV.B and IV.C. That employers prefer to wield non-competes as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition. The Commission also disagrees that banning non-competes would discourage investment and would harm innovation in the long run. As discussed in Part IV.B.3.b.ii, the Commission finds that the weight of the evidence indicates that non-competes reduce innovation by preventing workers from starting businesses in which they can pursue innovative new ideas; inhibiting efficient matching between workers and firms (making it less likely that workers match with firms that can maximize their talent and productivity); and decreasing the cross-pollination of ideas.

Additionally, the Commission notes that non-compete agreements themselves cannot be said to provide ironclad "prophylactic" protections against disclosure of trade secrets and other confidential information. As other commenters point out, in the absence of this rule, it is often unclear whether and to what extent a specific non-compete is enforceable, and they are difficult to enforce in many jurisdictions. Moreover, non-competes do not prevent the worker from disclosing trade secrets or confidential information after the end of the non-compete period or outside of the clause's geographic restriction. The Commission also notes that, as a few commenters stated, prophylactic remedies are already available under trade secret law in almost half of U.S. States where the doctrine of inevitable disclosure is recognized.[801]

Several commenters argued that detecting and proving violations of NDAs and trade secret law is more

---

[799] See U.S. West Commc'ns, Inc. v. Off. of Consumer Advoc., 498 NW2d 711, 714 (Iowa 1993) ("business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs . . ."); Guy Carpenter & Co. v. Provenzale, 334 F.3d 459, 467 (5th Cir. 2003) ("A customer list may be a trade secret, but not all customer lists are trade secrets under Texas law. The broader rule of trade secrets, that they must be secret, applies to customer lists"); Home Paramount Pest Control Cos. v. FMC Corporation/Agricultural Prods. Group, 107 F. Supp. 2d 684, 692 (D. Md. 2000) ("There is no question that a customer list can constitute a trade secret."); Liebert Corp. v. Mazur, 827 NE2d 909, 922 (2005) ("[W]hether customer lists are trade secrets depends on the facts of each case.").

[800] See, e.g., Tendeka, Inc. v. Glover, No. CIV.A. H–13–1764, 2015 WL 2212601 at *14 (S.D. Tex. May 11, 2015).

[801] In some States, under the "inevitable disclosure doctrine," courts may enjoin a worker from working for a competitor of the worker's employer where it is "inevitable" the worker will disclose trade secrets in the performance of the worker's job duties. See, e.g., PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269, 1272 (7th Cir. 1995). The inevitable disclosure doctrine is controversial. Several States have declined to adopt it altogether, citing the doctrine's harsh effects on worker mobility. See Bayer Corp. v. Roche Molecular Sys., Inc., 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999); LeJeune v. Coin Acceptors, Inc., 849 A.2d 451, 470– 71 (Md. 2004). Other States have required employers to meet high evidentiary burdens related to inevitability, irreparable harm, and bad faith before issuing an injunction pursuant to the doctrine. See generally Eleanore R. Godfrey, Inevitable Disclosure of Trade Secrets: Employee Mobility v. Employer Rights, 3. J. High Tech. L. 161 (2004).

difficult than for non-competes, and that enforcement is accordingly more expensive, because it is more difficult to detect and obtain evidence of the disclosure or use of confidential information than it is to determine that a former worker has moved to a competitor. Some commenters asserted that trade secret litigation is expensive because the cases are fact-intensive and involve litigating multiple challenging issues. Some commenters argued that as a result, the proposed rule conflicted with Congressional intent underlying the DTSA. A few commenters similarly argued that breaches of non-solicitation agreements are difficult to detect and can be enforced only after the solicitation has occurred. While the Commission recognizes that trade secrets litigation and NDA and non-solicitation enforcement may be more costly than non-compete enforcement in some instances, the Commission is not persuaded that higher costs associated with alternative tools make those tools inadequate. The comments do not establish that pursuing remedies through trade secrets litigation or NDA enforcement are prohibitively expensive. In any event, the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[802] While employers may find that protecting trade secrets and confidential information or customer relationships by using non-competes to restrict worker mobility, regardless of whether that worker would misappropriate confidential information or solicit customers, is easier for them, the Commission finds that same overbreadth of non-competes imposes significant negative externalities on workers, consumers, businesses, and competition as a whole.[803] This overbreadth that employers benefit from wielding is what causes the harms from non-competes relative to more narrowly-tailored alternatives.

Some commenters contended that higher burdens for establishing violations of trade secret and IP laws will harm employer incentives to share trade secrets with workers and to invest in valuable skills training. The Commission is not persuaded that higher evidentiary burdens render trade secret law and NDAs inadequate for protecting employers' valuable investments. Heightened standards are a valuable mechanism to filter out overbroad restrictions on beneficial competitive activity. The comment

record is replete with examples of workers bound by non-competes who lacked knowledge of trade secrets or whose employment with a competitor never threatened their previous employer's investments. To the extent trade secret law and NDAs require higher evidentiary showings, that makes these alternatives more tailored tools for protecting employers' valuable investments without unduly restricting a worker from engaging in competitive activity.

Some commenters argued that, without non-competes, employers would limit access to valuable trade secrets within the workplace because trade secret law requires employers to show reasonable efforts to maintain the secrecy of an alleged trade secret to prove a violation, and that reduced rates of intrafirm trade secrets sharing will ultimately harm innovation as well as workers. In response, the Commission notes that the empirical evidence indicates otherwise: when non-competes are more enforceable, the overall level of innovation decreases.[804] Furthermore, these comments seem to overstate the burden of reasonable efforts to keep information secret. Under the DTSA, courts have found that employers meet this requirement by sharing information at issue only among workers bound by NDAs or maintaining such information in password-protected digital spaces.[805] Accordingly, assertions that employers will need to take extraordinary precautions to maintain secrecy over trade secrets and confidential information are inconsistent with standards courts typically recognize for determining whether reasonable efforts were taken to keep such information confidential. The Commission is not persuaded that requirements in trade secret law to show reasonable efforts to maintain secrecy will deter intrafirm information sharing, or otherwise make alternative tools inadequate.

Several commenters argued that the Commission should not find that employers have adequate alternatives to protecting their valuable investments because there is a lack of empirical evidence specifically showing that trade secret law and NDAs are effective for the purpose of protecting trade secrets and confidential information. In response, the Commission notes that trade secret law is a body of law that is specifically designed to protect the

interests being asserted; employers consistently bring cases under this body of law; and a preference among firms for a blunter instrument for protecting trade secrets and confidential information cannot justify an unfair method of competition that imposes significant negative externalities on workers, other firms, consumers, and the economy.[806] An industry trade organization commenter stated that neither fixed-duration employment contracts nor improved pay, benefits, or working conditions specifically protect against the disclosure of confidential information. In response, the Commission notes that firms can protect against the disclosure of confidential information using trade secret law and NDAs, and, where applicable, patent law and invention assignment agreements. And in response to these commenters, the Commission notes that companies in California, North Dakota, and Oklahoma have been able to protect their trade secrets and other confidential information adequately using tools other than non-competes since the late nineteenth century. Industries that are highly dependent on trade secrets and other confidential information have flourished in those States even though non-competes have been unenforceable.

A few commenters disputed the NPRM's contention that the rate at which employers pursue trade secrets litigation is evidence of the viability of trade secret law as a means for redressing trade secret theft or protecting confidential information, in part because those employers were not necessarily relying exclusively on trade secret law. The Commission does not assert that these data, alone, conclusively establish trade secret law is a perfect vehicle for redressing trade secret theft. Rather, the data show trade secret litigation is more than a mere theoretical possibility—it is an avenue many companies choose to redress trade secret theft and indeed it is the body of law designed and developed for this very purpose. Accordingly, the Commission believes that the fact that many companies bring claims under the well-established body of State and Federal law on trade secrets is relevant evidence that trade secret law provides a viable means for redressing trade secret theft.

Some commenters suggested a higher volume of trade secrets litigation in California may reflect a higher rate of trade secret disclosure due to the State's policy against enforcing non-competes. However, these commenters did not

---

[802] *See supra* note 305 and accompanying text.
[803] *See* Parts IV.B and IV.C.

[804] *See* Part IV.B.3.b.ii.
[805] *See e.g., In re Adegoke,* 632 B.R. 154, 167 (Bankr. N.D. Ill. 2021); *Houser* v. *Feldman,* 569 F. Supp. 3d 216, 230 n.7 (E.D. Pa. 2021); *AvidAir Helicopter Supply, Inc.* v. *Rolls-Royce Corp.,* 663 F.3d 966, 974 (8th Cir. 2011).

[806] *See* Parts IV.B and IV.C (describing the negative externalities from non-competes).

provide evidence to support this hypothesis. The Commission also notes industries in California that depend on protecting trade secrets have thrived despite the inability to enforce non-competes; indeed, the State is the capital of the global technology industry. Therefore, regardless of whether there is a higher rate of trade secret litigation in California, the less restrictive alternatives identified in this Part IV.D have provided sufficient protection to enable these companies to grow, thrive, and innovate. Furthermore, the rate of trade secret litigation in California may result from factors unique to California's economy, such as California's high concentration of technology companies relative to other States. As such, the Commission does not believe there is credible evidence to suggest trade secrets are disclosed at a higher rate in California than in other jurisdictions.[807]

Many commenters agreed with the Commission's preliminary conclusion that the economic success in California, North Dakota, and Oklahoma of industries highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-competes for protecting valuable investments. In contrast, a few commenters argued that the Commission mischaracterized California's non-compete ban because they claim that California permits non-competes to protect trade secrets, citing dicta from the 1965 California Supreme Court case *Muggill* v. *Reuben H. Donnelley Corp.*[808] However, the Commission is unaware of any cases in which a California court has actually upheld a non-compete agreement under California law based on the dicta in this opinion, and commenters do not point to any.[809] To the contrary, California courts have consistently refused to enforce non-competes even where employers alleged they were needed to protect trade secrets.[810]

Another commenter argued that California's experience does not necessarily demonstrate anything about the effect of banning non-competes because California employers impose non-competes at rates comparable to

other States. In response, the Commission notes that while Starr, Prescott, and Bishara state that workers are covered by non-competes at "roughly the same rate" in States where non-competes are unenforceable and enforceable,[811] when the authors control for employee characteristics to compare "observationally equivalent employees," they find that non-competes are less common (by 4–5 percentage points) in nonenforcing States compared to States that permit vigorous enforcement of non-competes.[812] Additionally, California, North Dakota, and Oklahoma are still distinct from other States because employers may not actually enforce non-competes, even if employers in those States continue to enter into them.

A commenter argued that the Commission misattributes California's success in the technology industry and North Dakota's and Oklahoma's success in the energy industry to their non-compete laws, rather than the presence of top universities and venture capital firms in the State (in the case of California) or of abundant natural resources in the State (in the case of North Dakota and Oklahoma). The Commission believes that this commenter mischaracterizes its analysis. The Commission does not attribute California's success in the technology industry and North Dakota's and Oklahoma's success in the energy industry to their non-compete laws. The Commission merely notes that these industries are highly dependent on protecting trade secrets and having highly trained workers, and that these industries have thrived in these States despite the inability of employers to enforce non-competes.

One commenter argued that there are no alternatives that adequately protect employers' legitimate interests because other restrictive employment agreements do not sweep as broadly as non-competes. In this Part IV.D, the Commission concludes that less restrictive alternatives such as trade secret law, IP law, and NDAs are adequate to protect trade secrets and other confidential information even where they do not sweep as broadly as non-competes. Indeed, the Commission believes that non-competes are overbroad with respect to protecting trade secrets and other confidential information, because they enable employers to restrict a wide swath of beneficial competitive activity without respect to any alleged misconduct. That employers prefer to wield non-competes

as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition.

ii. Comments and Responses to Comments on Human and Physical Capital Investment

Several commenters addressed the evidence concerning the effects of non-competes on human capital investment and other investment. Several commenters asserted that, even if non-competes increased human capital investment, they still left workers worse off because they suppressed workers' mobility and wages overall. Workers and worker advocates also argued that workers lose the value of their skills and human capital investment when non-competes force them to sit out of the workforce, and non-competes can decrease their incentive to engage in human capital investment since they cannot capitalize on their skills and knowledge. These commenters stated that many workers, particularly highly skilled workers, have had some form of education prior to working for their employer, diminishing any potential need for non-competes to protect the employers' human capital investment. For example, many physicians pointed out that they had to go through medical school, residency, internships, and/or fellowships—significant investments that they made, not their employers.

Some commenters questioned the link between increased human capital investment and non-compete enforcement, arguing that employer human capital investment will still be provided without non-competes. Other commenters also stated that prohibiting non-competes would make it easier for firms to hire trained workers, because it would be easier for them to switch jobs. More generally, one advocacy organization said that employers frequently make investments that do not work out and should not place the risk of that investment onto their workers. A commenter who discussed physician non-competes argued that investment-based justifications for non-competes overestimate the value added by employers while failing to recognize the value physicians bring to employers.

Some businesses and trade organizations argued that employers invest significant time and money into training workers who lack the specific skills needed for the job. These commenters stated that, without non-competes, employers risk the worker taking that investment to a competitor. Some commenters state that this risk is

---

[807] *See* NPRM at 3507.

[808] 62 Cal. 2d 239, 242 (Cal. 1965).

[809] *See generally* David R. Trossen, Edwards *and Covenants Not to Compete in California: Leave Well Enough Alone*, 24 Berkeley Tech. L.J. 539, 546 (2009).

[810] *See, e.g., D'sa* v. *Playhut, Inc.*, 102 Cal. Rptr. 2nd 495, 497–501 (Cal. Ct. App. 2nd 2000); *Dowell* v. *Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 11 (Cal. Ct. App. 2nd 2009); *Arthur J. Gallagher & Co.* v. *Lang*, 2014 WL 2195062 (N.D. Cal. May 23, 2014) at *4 n.3.

[811] Starr, Prescott & Bishara, *supra* note 68 at 81.

[812] *Id.* at 68.

greatest in underserved areas and when there are worker shortages. Several commenters said that employment restrictions such as non-competes incentivize businesses to pay for credentials, training, and advanced education that low-wage and other workers would be unable to afford on their own, facilitating upward mobility. For highly educated workers, such as physicians, some employers said they need non-competes to protect payments for continuing education as well as mentorships and on the job training. Businesses and their advocates asserted that in some industries, many new employees are unprofitable for a significant period, requiring up-front investment and training from employers who want to recoup that investment.

In response, the Commission notes that, as described in Part IV.D.2.b.iii, firms have less restrictive alternatives for protecting human capital investments, including fixed-duration contracts and competing on the merits for the worker's labor services through better pay, benefits, or working conditions. Through these means, employers can retain workers without restricting who they can work for, or their ability to start a business, after their employment ends. The Commission also notes that these commenters often inaccurately describe the increased labor mobility afforded by the final rule as a one-way street. While it will be easier under the final rule for workers to switch jobs and work for a competitor, it will also be easier for firms to hire talented workers, since those workers are not subject to non-competes. In general, firms will benefit from access to a wider pool of labor, because the rule eliminates the friction non-competes impose on the free functioning of competition in labor markets. Whether this will be a net benefit to a particular firm, or not, will depend on the firm's ability to compete for workers on the merits to attract and retain talent.

A group of healthcare policy researchers stated that the investment justifications offered by corporate owners of physician practices are misleading since the true value of the investment in the practice is the book of business and referrals. These researchers suggested that non-competes are used to circumvent laws that prohibit payment for physician referrals. The Commission notes that this comment aligns with a statement by researcher Kurt Lavetti at the Commission's 2020 forum on non-competes. Lavetti stated that patient referrals are a valuable asset, but buying or selling those referrals is illegal, so

non-competes are a secondary method of protecting that asset.[813]

Commenters also stated that non-competes protect investments other than in human capital, capital expenditures, and R&D, including recruiting and hiring, providing client and customer service, facilities, marketing, and technology, among others. The Commission is unaware of any empirical evidence showing that non-competes increase these types of investments, and commenters did not provide any. In general, however, firms can protect investments in trade secrets and confidential information, and investments in workers, through the less restrictive alternatives described in Part IV.D.2.b.

Two trade organizations stated that prohibiting non-competes could cause businesses to lose staff, and that losing staff could cause them to reduce investments that may be based on staffing assumptions. These commenters did not provide empirical evidence to support these arguments. The Commission also notes that firms would not necessarily lose workers because of the final rule. As described previously, some firms may lose workers because it will be easier for workers to leave for better opportunities, while some firms may gain workers by attracting workers from other firms. Additionally, firms can retain workers by competing on the merits for their labor services—*i.e.,* by offering better jobs than their competitors.

Commenters asserted that Starr, Prescott, and Bishara[814] found that notice of non-competes alongside a job offer is positively correlated with training compared to later notice. In response, the Commission notes that the evidence is a correlation between early notice and training, not a causal finding, so the Commission gives it minimal weight. In addition, regardless of whether there is an increase in training where notice of non-competes is provided along with the job offer instead of later on, this data is not salient on the question of whether employers have less restrictive alternatives to protecting training investments.

A few commenters stated non-competes protect against the ''disclosure'' of general trade knowledge and skills, while the less restrictive alternatives cited in the NPRM do not.

Relatedly, some commenters argued prohibiting non-competes and broadly enabling workers to take general trade knowledge and skills to competitors will mean that their new employers will free ride off investments the former employers made in their human capital, which will discourage future investment in human capital. The Commission does not believe preventing workers from using their general trade knowledge and skills, including their gains in trade knowledge and skills through experience with a particular employer, is a legally cognizable or legitimate justification for non-competes. Under State common law, preventing a worker from using their general knowledge and skills with another employer is not a legitimate interest that can justify a non-compete.[815] Indeed, there is a general principle in the law of restrictive employment agreements—and trade secret law as well—that these tools cannot be used to prevent workers from using their general trade knowledge and skills.[816] The Commission does not view the inability to prevent disclosure or use of general skills and knowledge as a shortcoming of trade secret law and NDAs; instead, it considers the use of general skills and knowledge as beneficial competitive activity. Moreover, the Commission notes that sectoral job training strategies can be a tool for employers and workers to access worker training that is transferrable across employers.[817]

One commenter asserted trade secret law and NDAs are inadequate to protect employers' goodwill, while another commenter asserted these tools are inadequate to protect investments in relationships with clients. Regarding whether trade secret law and NDAs are adequate to protect employers' client relationships, the Commission interprets this to refer to employers' concern that a client will follow a worker to a competitor. The Commission believes that employers have alternatives for protecting these investments, including fixed-duration contracts (in the case of goodwill), NDAs (in the case of client lists), and competing on the merits to retain workers and/or clients. Firms can seek to protect client relationships by offering superior service and value— through the free and fair functioning of competition. These more narrowly

---

[813] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements,* Remarks at the FTC Workshop on Non-Competes in the Workplace, at 145–46 (Jan. 9, 2020), at *https://www.ftc.gov//files// _events/1556256/non-compete-workshop-transcript-full.pdf.*

[814] Starr, Prescott & Bishara, *supra* note 68 at 53.

[815] *See* NPRM at 3495 n.162.

[816] *See* Montville, *supra* note 788 at 1161.

[817] *See, e.g.,* Mayu Takeuchi & Joseph Parilla, *Federal Investments in Sector-Based Training Can Boost Workers' Upward Mobility,* Brookings Inst. (Dec. 7, 2023), *https://www.brookings.edu/articles/ federal-investments-in-sector-based-training-can-boost-workers-upward-mobility/.*

tailored alternatives reasonably protect the applicable interest while burdening competition to a lesser degree because they do not restrict the worker's ability to seek or accept work or start a business after their employment ends. Therefore, while trade secret law and NDAs may not protect goodwill or client relationships, the Commission finds that employers have adequate alternative tools to protect these interests. Furthermore, the Commission notes the final rule does not restrict employers from using trade secret law and NDAs in tandem—along with other alternatives—to protect their investments, and comments maintaining that employers lack adequate alternatives to non-competes because the commenter views just one of these mechanisms as inadequate are unpersuasive.

A commenter argued the final rule may implicate the ability of Federal contractors to provide letters of commitment, which are often required by government agencies and require contractors to identify key personnel who will work on an awarded contract, sometimes for years in the future. In response, the Commission notes that contractors have alternatives to non-competes to retain key personnel, including by using fixed-term employment contracts or providing the key personnel a better job than competitors.

A commenter stated that fixed-duration employment contracts are not necessarily effective at protecting human capital investments because employers may not know at the time of hiring when they will be providing training to a worker. This commenter also stated that improving the pay, benefits, and working conditions of workers is not necessarily an effective means for protecting human capital investments. In response, the Commission notes employers may enter into fixed-duration employment contracts with their workers at any time, not just at the outset of the employment relationship. It further notes competing to retain a trained worker will not work in every instance, but it is an important option available to employers and the provision of training can itself be a competitive differentiator for an employer.

A commenter also asserted California has the highest cost of living and, if this is attributable to the absence of non-competes, the proposed rule could risk increasing the cost of living nationwide. The commenter did not provide evidence to support the existence of an inverse relationship between non-compete enforceability and cost of

living, and the Commission is aware of no such evidence. The Commission thus does not believe that there is a basis to conclude the final rule would increase the cost of living nationwide.

### iii. Comments Regarding Alternatives to Non-Competes for Senior Executives

Commenters offered the same justifications for non-competes with senior executives: that they increase employers' incentive to make productive investments. However, many commenters argued senior executives are more likely than other workers to have knowledge of trade secrets and other competitively sensitive information or to have customer relationships and thus non-competes for senior executives are necessary, and other tools such as trade secret law and NDAs are not viable alternatives.

In response, the Commission finds that these tools—trade secret law, NDAs, patents, and invention assignment agreements—provide viable means of protecting valuable investments against disclosure by senior executives, just as they do for all other workers. Commenters do not identify any reasons why senior executives are uniquely situated with respect to these less restrictive alternatives—*i.e.,* why trade secret law or NDAs may not adequately protect firm investments from disclosure by senior executives specifically—and the Commission is not aware of any such reasons.

Some commenters argued non-competes with executives and high-wage workers promote competition because they encourage innovation in businesses by providing investors with more confidence that executives will not share trade secrets with competitors, decreasing competition. An industry organization asserted that non-competes allow executives to share ideas and business decisions with other workers within the business and collaborate to make strategic decisions. A commenter stated that an executive leaving to start a competing product could also delay the timeline for both the former employer's product and the competing product. As noted previously, the Commission does not believe there is reliable empirical data on the relationship between non-competes and disclosure of confidential information, but employers have alternatives to protect such information. Further, the empirical evidence shows non-competes overall inhibit innovation on the output side; therefore, to the extent any of these effects are occurring, they are more than

outweighed by the negative effects of non-competes on innovation.[818]

According to some commenters, an executive moving to a competitor could unfairly advantage the competitor and irreparably harm the former employer. In response, the Commission notes that there is nothing inherently unfair about an executive moving to a competitor, particularly if this results from competition on the merits (such as the competitor paying more or otherwise making a more attractive offer). If companies seek to retain their executives, they have other means for doing so—such as increasing the executives' compensation or entering fixed-duration contracts—that do not impose significant negative externalities on other workers and on consumers, as non-competes do.[819]

Some commenters also said senior executives may have more client, business partner, and customer relationships than other employees and may contribute substantially to a firm's goodwill. The Commission believes that employers have alternatives for protecting goodwill and client/customer relationships. For example, if a firm wants to keep a worker from departing and taking goodwill or clients or customers with them, it can enter a fixed-duration contract with the worker, otherwise seek to retain the worker through competition on the merits, or seek to retain the client/customer through competition on the merits.

An accountant with experience analyzing executive non-competes for business valuations said such valuations are calculated based on the potential harm if the executive violated the non-compete. In addition, some commenters argued non-competes for senior executives and other important workers increase the value of firms in mergers and acquisitions because they ensure such valuable workers stay after the sale. An investment industry organization said investors seek to ensure the right workers who know the business stay and run the newly acquired business. In addition, that organization said some institutional investors may require contracts retaining key workers.

In response, the Commission notes that valuation of senior executive non-competes in such contexts is part of the reason the Commission is allowing such existing senior executive non-competes to remain in force.[820] In future

---

[818] *See* Part IV.B.3.b.ii.

[819] *See* Part IV.C.2 (describing the negative externalities of non-competes for senior executives).

[820] *See* Part IV.C.3.

transactions, businesses and investors have other methods of incentivizing senior executives and other workers to remain, including fixed duration contracts and competing to retain workers on the merits, and thereby enhancing the value of firms and transactions—methods that do not impose such significant externalities on other workers and consumers.

Some industry organizations said non-competes increase employer investment in management and leadership training for executives. An investment industry organization said non-competes allow senior executives to access training and experience for their own benefit and the benefit of investors in the firm. In response, the Commission notes that employers have alternative mechanisms to protect their investments in worker training, including fixed-duration contracts and improved compensation.

Some commenters argued that non-competes may improve executive performance, as some executives have non-competes tied to deferred compensation and other future benefits, which encourages long-term value creation by incentivizing executives to focus on long-term rather than short-term gains. A law firm said that forfeiture-for-competition clauses are an important component of deferred compensation agreements, and deferred compensation incentivizes long-term value-building and penalizes, via reduction or forfeiture, harm to the business, which the commenter said includes working for a competitor. The commenter claimed that if forfeiture-for-competition clauses are banned, firms would shift some of the deferred compensation to more short-term awards, which would in turn increase risk-taking and decrease overall wealth accumulation. The commenter cited a review by the Federal Reserve after the 2008 financial crisis which found that deferred compensation can mitigate executive risk-taking activities.[821] It also cited other Federal agencies and court decisions recognizing the value of deferred compensation to mitigate risk. Separately, the firm argued that without forfeiture-for-competition clauses, an executive who moves to a competitor will compete less against their former employer so as not to devalue their equity award, thus degrading competition. Commenters also

contended that State courts have recognized forfeiture-for-competition clauses to be reasonable and that some State statutes governing non-competes carve them out.

In response, the Commission recognizes that many existing deferred compensation contracts may have been negotiated to include non-competes or forfeiture-for-competition clauses that may not be easily separated, and the final rule allows existing senior executive non-competes to remain in force.[822] However, the Commission is not persuaded that non-competes are necessary for future deferred compensation agreements. The Federal Reserve study on the value of deferred compensation does not mention non-competes or forfeiture-for-competition clauses. While the study states that clawback provisions may discourage specific types of behavior, it notes that they do not affect most risk-related decisions.[823] The commenter did not explain why non-competes are necessary for deferred compensation to reduce risk-taking or how post-employment competition could impact performance while at the firm. The commenter also did not explain why firms would forgo the benefits of deferred compensation even without a forfeiture-for-competition clause. The commenter separately argued that an executive who moves to a competitor will be conflicted and compete less against their former employer so as not to devalue their equity award. The comment framed this as an anticompetitive problem akin to interlocking directorates under the Clayton Act, as it could increase collusion (though the commenter provided no support for this argument). The commenter did not, however, explain why an executive would move to a competitor if doing so would devalue their own equity. The Commission also does not believe that the solution to this type of anticompetitive behavior, even if it were to occur, is to further restrict competition by blocking the executive from moving to the competitor in the first place.

Some commenters argued that forfeiture-for-competition clauses, which are sometimes attached to deferred compensation arrangements, were also justified. Some commenters contended that workers subject to forfeiture-for-competition clauses who choose to work for a competitor are likely to be compensated by the

competitor for whom they will be working. Separately, a law firm and an investment industry organization stated that it would be unfair for companies to continue making deferred compensation or other payments to former workers who now work for a competitor if forfeiture-for-competition clauses were banned. A law firm also stated that forfeiture-for-competition clauses allow senior executives to retire without losing their deferred compensation, which in turn clears a path for younger workers to move up, while protecting senior executives' retirement benefits. In response, the Commission notes that pre-existing agreements for senior executives are not banned under the final rule.[824] The Commission also sees no reason why deferred compensation, including for retiring workers, cannot be used without forfeiture-for-competition clauses.

Some commenters stated that the study by Kini, Williams, and Yin, discussed in the NPRM with respect to senior executive earnings,[825] finds that CEOs with non-competes are more frequently forced to resign their position. Commenters note that Kini, Williams, and Yin also find that CEO contracts more closely align the incentives of executives (with respect to stock prices and risk taking) with shareholders when the executives have non-competes or when those non-competes are more enforceable. In response, the Commission notes that, as indicated by commenters, this study examines the use of non-competes in conjunction with their enforceability. The Commission therefore finds that the results may not reflect a causal relationship. For example, the use of non-competes and the propensity of the board to force an executive to resign may be jointly determined by the strength of the relationship or the trust between management and the board, rather than the use of non-competes causing forced turnover. The Commission also notes that—as shown in the study—there are other methods by which boards may encourage executives to perform, such as by structuring financial incentives to encourage or discourage risk taking, according to the preferences of the board. Boards can also fire poorly performing executives even without non-competes.

One commenter said that a ban on non-competes may encourage U.S. companies to relocate their executive teams outside the U.S. in order to continue using non-competes. The

---

[821] *See* Bd. of Govs. of the Fed. Reserve Sys., *Incentive Compensation Practices: A Report on the Horizontal Review of Practices at Large Banking Organizations* (Oct. 2011), *https:// www.federalreserve.gov/publications/other-reports/incentive-compensation-practices-report-201110.pdf.*

[822] *See* Part IV.C.3.

[823] Federal Reserve Report on Incentive Compensation Practices, *supra* note 821 at 16–17.

[824] *See* § 910.2(a)(2).

[825] *See* Kini, Williams, & Yin, *supra* note 83.

commenter did not provide specific evidence to support this assertion. The Commission believes that firms' decisions on where to locate their executive teams are likely influenced by a multitude of factors other than whether the firm may or may not use non-competes.

3. The Asserted Benefits From These Justifications Do Not Justify the Harms From Non-Competes

a. The Commission's Final Findings

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the claimed business justifications for non-competes do not justify the harms from non-competes—for either senior executives or for workers other than senior executives, whether considered together or separately—because the evidence indicates that increasing enforceability of non-competes has a net negative impact along a variety of measures. Whether the benefits from a practice outweigh the harms is not necessarily an element of section 5,[826] but, in any event, the benefits from the justifications cited in Part IV.D.1 clearly do not justify the harms from non-competes.

Not all the harms from non-competes are readily susceptible to monetization.[827] However, even the quantifiable harms from non-competes are substantial and clearly not justified by the purported benefits. Non-competes cause considerable harm to competition in labor markets and product and service markets. Non-competes obstruct competition in labor markets because they inhibit optimal matches from being made between employers and workers across the labor force through the process of competition on the merits for labor services. The available evidence indicates that increased enforceability of non-competes substantially suppresses workers' earnings, on average, across the labor force generally and for specific types of workers.[828]

In addition to the evidence showing that non-competes reduce earnings for workers across the labor force, there is also evidence that non-competes reduce earnings specifically for workers who

are not subject to non-competes.[829] These workers are harmed by non-competes, because their wages are depressed, but they do not necessarily benefit from any purported incentives for increased human capital investment that non-competes may provide. Overall, these harms to labor markets are significant. The Commission estimates the final rule will increase workers' total earnings by an estimated $400 billion to $488 billion over ten years, at the ten-year present discounted value.[830]

The available evidence also indicates non-competes negatively affect competition in product and service markets. The weight of the evidence indicates non-competes have a negative impact on new business formation and innovation.[831] There is evidence that non-competes increase consumer prices and concentration in the health care sector.[832] There is also evidence non-competes foreclose the ability of competitors to access talent.[833] While available data do not allow for precise quantification of some of these effects, they are nonetheless substantial: the Commission estimates that the rule will reduce spending on physician services over ten years by $74–194 billion in present discounted value, will result in thousands to tens of thousands of additional patents per year, and will increase in the rate of new firm formation by 2.7%.[834]

In the Commission's view, the asserted benefits from non-competes do not justify their harms. Even if the businesses using non-competes benefit, pecuniary benefits to the party undertaking the unfair method of competition are not a sufficient justification under section 5.[835] As described in Part IV.D.1, the most commonly cited justifications for non-competes are that they increase employers' incentive to make productive investments in, for example, trade secrets, customer lists, and human and physical capital investment. There is some evidence that non-competes increase human and physical capital investment, as noted previously.[836] However, the empirical literature does not show the extent to which human capital investment and other investment benefits from non-competes accrue to any party besides the employer, and to

the extent it addresses this issue it suggests otherwise. For example, in theory, if increased human capital investment from non-competes benefited workers, they would likely have higher earnings when non-competes are more readily available to firms (i.e., when legal enforceability of non-competes increases). However, as explained in Parts IV.B.3.a.ii and IV.C.2.c.ii, the empirical evidence indicates that, on net, greater enforceability of non-competes reduces workers' earnings. Likewise, in theory, if increased human capital investment increased innovation that redounds to the benefit of the economy and society as a whole, one would expect to see legal enforceability of non-competes yield such benefits, but as elaborated in Part IV, the empirical evidence on innovation effects indicates the opposite.

Moreover, the Commission is also not aware of any evidence that these potential benefits of non-competes lead to reduced prices. Indeed, the only empirical study of the effects of non-competes on consumer prices—in the health care sector—finds increased prices as the enforceability of non-competes increases.[837] That study, which finds that non-compete enforceability increased physician pay, also finds that labor cost pass-through is not driving price decreases.[838]

Furthermore, there is no evidence that, in the three States in which non-competes are generally void, the inability to enforce non-competes has materially harmed employers, consumers, innovation (or economic conditions more generally), or workers. As a result, the Commission finds that the asserted benefits from non-competes do not justify the harms they cause.

The Commission finds that the harms from non-competes are clearly not justified by the purported benefits, regardless of whether one considers senior executives or workers other than senior executives together or separately. In this Part IV.D.3, the Commission explains why, for workers overall, the asserted benefits from non-competes do not justify the harms they cause. This is at least as true for senior executives as for other workers. As described in Part IV.C.2.c.i, non-competes with senior executives tend to negatively affect competitive conditions in product and service markets at least as much as non-competes with other workers—and likely to a greater extent—given the outsized role of senior executives in forming new businesses, serving on new

---

[826] See Part II.F (stating that the inquiry as to whether conduct tends to negatively affect competitive conditions focuses on the nature and tendency of the conduct and does not require a detailed economic analysis).

[827] See, e.g., Parts IV.B.3.a.iii and IV.B.3.b.iv.

[828] See Part IV.B.3.a.ii; Part IV.C.2.c.ii.

[829] See Part IV.B.3.a.ii.

[830] See Part X.F.6.

[831] See Part IV.B.3.b.i–ii; Part IV.C.2.c.i.

[832] See Part IV.B.3.b.iii.

[833] See Part IV.C.2.c.i.

[834] See Part X.F.6.

[835] See Part II.F.

[836] See Part IV.D.1.

[837] See Part IV.B.3.b.iii.

[838] See Hausman & Lavetti, *supra* note 590 at 278.

businesses' executive teams, and setting the strategic direction of businesses with respect to innovation. At the same time, firms have the same less restrictive alternatives available for senior executives as they do for other workers, as described in Part IV.D.2.c.iii. For these reasons, whether one considers non-competes with senior executives or non-competes with other workers, the claimed business justifications for non-competes do not justify the harms from non-competes.

b. Responses to Comments

Commenters focused on the question of whether employers have adequate alternatives to non-competes and the analysis of costs and benefits of the proposed rule in the preliminary regulatory impact analysis, rather than the balancing analysis discussed in this Part IV.D.3 specifically. These comments are addressed in Part IV.D.2 and in Part X, respectively.

*E. Section 910.2(b): Notice Requirement for Existing Non-Competes*

The Commission proposed to require employers to rescind (*i.e.*, legally modify) existing non-competes and provide notice to inform workers that they are no longer bound by existing non-competes.[839] Based on comments, the Commission is not adopting a rescission requirement in the final rule. Rather than require employers to legally modify existing non-competes, the final rule prohibits employers from enforcing existing non-competes with workers other than senior executives after the compliance date.

The final rule adopts the notice requirement—for workers who are not senior executives—with minor revisions to facilitate compliance and to improve the likelihood of workers being meaningfully informed. The revisions include an option for employers to make the notice more accessible to workers who speak a language other than English. The final rule also simplifies compliance and ensures that workers have prompt notice that their non-competes are no longer in force by requiring employers to provide notice by the effective date, rather than 45 days thereafter.

1. The Proposed Rule

Proposed § 910.2(b)(1) would have required employers to rescind existing non-competes with all workers. Proposed § 910.2(b)(2) would have required employers that rescinded non-competes to provide notice to the affected workers that their non-compete

is no longer in effect and may not be enforced.

As proposed, § 910.2(b)(2) had three subparagraphs that imposed various requirements related to the notice. Proposed § 910.2(b)(2)(i) stated that an employer that rescinds a non-compete pursuant to § 910.2(b)(1) must provide notice in an individualized communication to the worker that the worker's non-compete is no longer in effect and may not be enforced. The Commission stated in the NPRM that an employer could not satisfy the notice requirement by, for example, posting a notice at the employer's workplace.[840] Proposed § 910.2(b)(2)(i) also stated that the employer must provide the notice in writing on paper or in a digital format such as an email or text message within 45 days of rescinding the non-compete.

Proposed § 910.2(b)(2)(ii) stated that the employer must provide the notice to both current workers and former workers when the employer has the former worker's contact information readily available. To ease the burden of compliance, proposed § 910.2(b)(2)(iii) provided model language that would satisfy the notice requirement. Proposed § 910.2(b)(2)(iii) and § 910.2(b)(3) provided a safe harbor for employers using the model language, while also permitting an employer to use different language, provided that the language communicates to the worker that the worker's non-compete is no longer in effect and may not be enforced.[841]

In the NPRM, the Commission stated that the purpose of the proposed notice requirement was to ensure that workers are informed that their existing non-competes are no longer in effect. The Commission cited evidence indicating that many workers are not aware of the applicable law governing non-competes or their rights under those laws, and stated that it was therefore concerned that, absent a notice requirement, workers may not know that their non-competes are no longer enforceable as of the effective date.[842]

2. The Final Rule

a. The Final Rule Does Not Require Rescission (Legal Modification) of Existing Non-Competes

The Commission has eliminated the proposed rule's requirement that employers rescind (*i.e.*, legally modify) existing non-competes. The Commission believes the proposed rescission requirement would have imposed unnecessary burdens on employers, as other aspects of the final rule provide

less burdensome means of ensuring that workers other than senior executives will not be bound or chilled from competitive activity by non-competes after the effective date. Under § 910.2(a)(1)(ii), it is an unfair method of competition for a person to enforce or attempt to enforce a non-compete (except where, under § 910.3 the person has a good-faith basis to believe that the final rule is inapplicable). Further, under § 910.2(b)(1), the person who entered into the non-compete must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete clause is no longer in effect and will not be, and cannot legally be, enforced against the worker. These provisions are sufficient to achieve the purposes of the proposed rescission requirement without requiring any affirmative conduct beyond the notice requirement.

The Commission has also eliminated the proposed rescission requirement in response to comments expressing confusion about the requirement and concern about its practical implications. Some comments interpreted the proposed rescission requirement to mean that the worker and employer must be returned to their original positions (*i.e.*, on the day they entered into the non-compete) and presumed to not have entered into it or that it mandated wholly new contracts to replace any existing agreements that contained non-competes. Some commenters objected to what they considered the high compliance costs of rescinding and revising every employment contract with a non-compete. Some businesses said their contracts with senior executives and potentially other workers would be unwound by a rescission requirement. Other commenters said that if the Commission promulgated the proposed rescission requirement, it would be disregarding the role non-competes played in the overall value of the exchange for an employment contract. An industry association said rescission would require assessment of each contract's severability under relevant State law, and the answers would vary widely.

The Commission does not intend for the final rule to have such effect and has omitted the rescission requirement proposed in the NPRM. The Commission also adopts § 910.3(b), which provides an exception for causes of action that accrued before the effective date, to be clear that the final rule does not render any existing non-competes unenforceable or invalid from the date of their origin. Instead, it is an unfair method of competition to enforce

---

[839] *See* NPRM, proposed § 910.2(b).

[840] *Id.* at 3513.
[841] *Id.* at 3514.
[842] *Id.* at 3513.

certain non-competes beginning on the effective date. Actions taken before the effective date—for example, enforcing an existing non-compete or making representations related to an existing non-compete—are not unfair methods of competition under the final rule. As noted elsewhere, the Commission also exempts from the rule future enforcement of existing non-competes with senior executives.

Commenters also argued that a rescission requirement would be impermissibly retroactive, present due process concerns, and/or constitute an impermissible taking under the Fifth Amendment. The Commission responds to these comments in Part V.B.

Numerous commenters opposed the proposed rescission requirement based on perceived challenges presented by proposed § 910.1(b)(2), which addressed *de facto* non-competes, and its purported ambiguity with respect to which contractual terms employers would be required to rescind. The Commission has removed the rescission requirement for the reasons described in this Part IV.E.2.a and has also revised the proposed rule's language concerning *de facto* non-competes to clarify the scope of the definition.

**b. The Final Rule's Notice Requirement**

While the final rule does not require rescission (*i.e.,* legal modification) of existing non-competes, the final rule does prohibit enforcement of existing non-competes after the effective date and requires the person who entered into the non-compete with the worker to provide clear and conspicuous notice to the worker, by the effective date, that the worker's non-compete will not be, and cannot legally be, enforced against the worker.[843] The notice must identify the person who entered into the non-compete with the worker and must be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.[844]

Several commenters emphasized the importance of notice, especially for former workers who may be actively refraining from competitive activity (in compliance with a non-compete), and who may continue to do so if they are not informed that their non-compete is no longer in effect. One commenter highlighted the importance of notice, because a non-compete may be coercive regardless of its enforceability. Many commenters emphasized the need for clear and concise language in the notices, including in languages other than English. One commenter asked the Commission to use concrete, lay-friendly terms to help reduce workers' fears of being sued. A commenter that recommended notice in languages other than English suggested that such a requirement apply to medium and large businesses with a threshold percentage of workers (such as 10%) who primarily speak a language other than English.

Commenters also suggested changes in notice procedures to improve the chances of workers receiving and understanding the notice. One commenter stated that text messages should not qualify as a primary means of individual notice because they are too casual, may be automatically deleted, and the sender may not be identifiable. However, in this commenter's view, text messages could be a secondary form of notice. Some commenters suggested that in addition to individual notice, the final rule should require an employer to post a copy of the notice in the workplace and/or online.

A number of commenters asserted that the requirement for employers to provide notice to former workers when "the employer has the worker's contact information readily available" was confusing or burdensome. A commenter stated that employers do not update former employees' contact information, so such information is likely incomplete and might be inaccurate. One commenter asserted that a requirement to provide notice within 45 days of the effective date is too difficult for small businesses. Another commenter suggested that the final rule should require contacting only former workers who left the firm two years or less before the effective date, unless the non-compete has elapsed.[845] Some commenters expressed concern that former workers might not be notified under the "readily available" standard. A commenter stated that, to avoid confusion and evasion, employers should be required to send notice to

former workers at the worker's last known home address, email address, or cell phone number. Commenters also contended that the meaning of "individualized communication" was not clear or that compliance with it would be too difficult or burdensome.

The Commission finalizes the proposed rule's notice requirement largely as proposed, with minor revisions to facilitate compliance, reduce burdens on employers, and improve accessibility for non-English speakers.[846] The final rule also requires covered businesses to provide notice by the effective date, rather than 45 days thereafter, to simplify the final rule and to secure its benefits for competition in labor markets and product and service markets as soon as practicable.

The Commission finalizes a notice requirement because the available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws, or are unable to enforce their rights—and are chilled from engaging in competitive activity as a result. The evidence shows that even when employers impose non-competes that are unenforceable under State law, many workers believe they are bound by them (or are otherwise unable to enforce their rights to be free of non-competes).[847] As a result, the Commission finds that even after the final rule is in effect, absent a clear notice requirement, many workers may be unaware that, because of the final rule, their employer cannot enforce a non-compete and that the Commission has the authority to take action against employers who violate the final rule. Accordingly, absent notice, these workers may continue to be chilled from switching jobs or starting their own business. This would tend to negatively affect competitive conditions in the

[843] § 910.2(b)(1).

[844] This language mirrors language in other Federal regulations. *See, e.g.,* 17 CFR 9.11 (notice of disciplinary action must be made personally by mail at the person's last known address or last known email address); 29 CFR 38.79 (written notice must be sent to a "complainant's last known address, email address (or another known method of contacting the complainant in writing)"); 16 CFR 318.5 (providing for written notification at an individual's last known address, or email if the individual chooses that option).

[845] Under the final rule, notice is only required for existing non-competes, *i.e.,* those that have not elapsed.

[846] The Commission notes that this required notice is a routine disclosure of valuable, factual information to workers that does not implicate the First Amendment. *See Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249–53 (2010) (citing *Zauderer* v. *Off. of Disciplinary Counsel,* 471 U.S. 626, 651 (1985)). As described in this Part IV.E, the Commission adopts this notice requirement to ensure workers do not wrongly believe they remain bound by unenforceable non-competes after the rule goes into effect. The Commission's conclusion that such notice is necessary to achieve the full benefits of the final rule is based on its expertise and on empirical evidence supporting the Commission's finding of an *in terrorem* effect related to non-competes.

[847] *See* Prescott & Starr, *supra* note 413; *see also* Part IV.B.2.b.ii (describing the Commission's finding that non-competes are exploitative and coercive where they trap workers in jobs or force them to bear significant harms or costs, even where workers believe the non-compete is unenforceable).

same manner as if non-competes were in full force and effect.

A notice requirement helps address this concern by informing individual workers, to the extent possible, that after the effective date the employer will not enforce any non-compete against the worker. The Commission believes that prompt and clear notice to workers other than senior executives that non-competes are no longer enforceable is essential to furthering the purposes of the final rule—to allow workers to seek or accept another job or to leave to start and run a business, and to allow other employers to compete freely for workers. Indeed, the Commission has refined the model language to make it shorter and clearer than the proposed model language.

While the proposed rule would have required employers to provide the notice no later than 45 days after the compliance date, the final rule requires notice no later than the effective date (*i.e.*, no later than 120 days after the final rule is published in the **Federal Register**). The Commission believes that it is practicable and reasonable for employers to provide the notice by the effective date. The Commission has designed the notice requirement to make compliance as easy as possible for employers. The final rule provides safe harbor model language that satisfies the notice requirement;[848] gives employers several options for providing the notice—on paper, by mail, by email, or by text;[849] and exempts employers from the notice requirement where the employer has no record of a street address, email address, or mobile telephone number for the worker.[850]

In addition, while the model language in the proposed rule used the phrase "the non-compete clause in your contract is no longer in effect,"[851] the model language in the final rule uses the phrase "[EMPLOYER NAME] will not enforce any non-compete clause against you."[852] Because this language does not identify the recipient as having a non-compete, the employer does not need to determine which of its workers have non-competes; instead, it can simply send a mass communication such as a mass email to current and former workers.

Furthermore, requiring notice by the effective date simplifies the final rule and allows its benefits to begin sooner. In response to commenters that contended that they need more time to

provide workers notice, the Commission believes that providing notice should not be time-consuming, even for small businesses, particularly given that the final rule provides model language, allows use of the worker's last known contact information for notice, allows digital notice, and, (unlike in the proposed rule) categorically exempts an employer who has no such information from the notice requirement. Moreover, as described in Part IV.B.2.b.ii, non-competes trap workers in jobs or force them to bear other significant harms or costs—even where workers believe the non-compete is unenforceable. Given the limited burdens associated with providing notice only to workers whose last known contact information is on file and employers' option to simply copy and paste the safe harbor model notice, as well as the known and currently ongoing acute harms of non-competes (including their *in terrorem* effects) and the importance of workers knowing as soon as possible that their non-compete is unenforceable, the Commission declines to extend the time to provide notice.[853] The Commission finds that 120 days is more than adequate for employers to complete this task.

In response to comments expressing concern that the NPRM's "individualized communication" requirement was unclear or burdensome, the Commission has removed that language. Instead, the final rule ensures each worker will receive notice while specifying several permissible methods for providing the notice, which furthers compliance certainty while giving employers a range of options and an efficient means of complying. By allowing a number of formats for such communications, including digital formats, employers are more likely to be able to contact workers rapidly, individually, and have flexibility to do so at low cost. Accordingly, § 910.2(b)(2) of the final rule allows for notice by text message, by email, as well as paper notice by hand or by mail to the worker's last known street address. The final rule gives employers flexibility to choose among these methods. In responses to the concerns expressed by the commenter about text messages, the Commission believes that text messages should be a permissible method for providing the notice because they are widely used, delivered quickly, low-cost for employers, and an effective means of communication for workers who do not have email accounts.

In response to comments contending that notice to former workers is too burdensome or difficult, the Commission believes that providing notice to former workers is critical because former workers may be refraining from competitive activity because they believe they are subject to a non-compete. The Commission disagrees that providing notice to former workers will be burdensome. The Commission believes that most employers have contact information for former workers who may be subject to non-competes.[854] And under the final rule, in those rare cases in which an employer has no record of a street address, email address, mobile telephone number, or other method of contacting the worker or former worker, § 910.2(b)(3) exempts the employer from the final rule's notice requirement with respect to the worker. Furthermore, by specifying the circumstances under which notice may not be provided, this exemption also addresses concerns expressed by some commenters that ambiguity in the proposed rule's "readily available" standard for notifying former workers would lead to fewer former workers being notified.

In response to comments contending that notice to former workers is too burdensome or difficult, the Commission believes that providing notice to former workers is critical because former workers may be refraining from competitive activity because they believe they are subject to a non-compete. In light of the comments about the proposed "readily available" contact information standard, the Commission in this final rule does not adopt that language and instead requires that the notice must be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker. The Commission agrees with commenters that stated that most employers have such contact information for both present and former workers. For those rare cases in which

---

[848] § 910.2(b)(4)–(5).

[849] § 910.2(b)(2)(ii).

[850] § 910.2(b)(3).

[851] NPRM, proposed § 910.2(b)(2)(iii).

[852] § 910.2(b)(4).

[853] The Commission addresses the effective date in Part VIII.

[854] Employers have many record-keeping requirements under State and Federal laws under which they may retain the contact information described in § 910.2(b)(2)(ii). *See, e.g.*, IRS, Circular E, Employer's Tax Guide, Pub. 15, 8 (2024) ("Keep all records of employment taxes for at least 4 years," including addresses of employees and recipients and forms with addresses.); USCIS, Handbook for Employers M–274, Sec. 10.0, Retaining Form I–9 (requiring retention of I–9 form, which includes employees' addresses, email addresses, and telephone numbers).

an employer has no record of a street address, email address, mobile telephone number, or other method of contacting the worker or former worker, § 910.2(b)(3) exempts the employer from the final rule's notice requirement.

The Commission agrees with comments that notices in other languages spoken by workers would help achieve the goal of informing workers that their non-competes are no longer enforceable and help employers to comply with the final rule. However, to avoid imposing a burden of translation on employers, § 910.2(b)(6) makes it optional to provide notices in languages other than English. The Commission encourages employers to provide this notice to workers who speak languages other than English. To facilitate the provision of notices in other languages, the final rule provides a model notice in English and links to translations of other languages that are commonly spoken in U.S. homes, including Spanish, Chinese, Arabic, Vietnamese, Tagalog, and Korean.[855]

## V. Section 910.3: Exceptions

### A. Section 910.3(a): Exception for Persons Selling a Business Entity

In the NPRM, the Commission proposed an exception for certain non-competes between the seller and the buyer of a business that applied only to a substantial owner, member, or partner, defined as an owner, member, or partner with at least 25% ownership interest in the business entity being sold. Based on comments, the Commission adopts an exception for the bona fide sale of a business without requiring that the seller have at least a 25% ownership interest.

#### 1. The Proposed Rule

Proposed § 910.3 allowed non-competes where the restricted party is "a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or . . . selling all or substantially all of a business entity's operating assets," and is also "a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete."[856] The Commission proposed to define "substantial owner, substantial member, and substantial partner" as "an owner, member, or partner holding at least a 25 percent ownership interest in a business entity."[857] The text of proposed § 910.3 stated that non-competes allowed under the proposed exception would remain subject to Federal antitrust law and all other applicable law.

The Commission stated in the NPRM that its proposal to exempt from the rule non-competes between the seller and the buyer of a business did not reflect a finding that such non-competes are beneficial to competition.[858] Rather, the Commission explained that such non-competes may implicate unique interests and have unique effects, and the evidentiary record did not permit the Commission to thoroughly assess the full implications of restricting their enforceability.[859] The Commission noted that because all States permit non-competes between the seller and the buyer of a business to some degree, and because the laws that apply to these types of non-competes have seen fewer changes recently than the laws applicable to non-competes that arise solely out of employment, there have not been natural experiments allowing researchers to assess this type of non-compete's effect on competition.[860]

#### 2. Comments Received

A few commenters suggested eliminating the proposed exception. These commenters contended that non-competes between the seller and the buyer of a business may still be exploitative and coercive, particularly in the case of small business owners in transactions with larger, better-resourced corporations. However, most commenters who addressed the issue supported an exception that would allow certain non-competes between the seller and the buyer of a business. These commenters agreed with the NPRM that State common law generally applies less-intensive scrutiny to non-competes ancillary to the sale of a business and that every State statute banning non-competes has an exception which allows some or all non-competes between the seller and the buyer of a business. Most of the commenters who supported some form of exception for non-competes between the seller and the buyer of a business contended that they are necessary to protect the value of the sale by ensuring the effective transfer of the business's goodwill. According to these commenters, a buyer will be less willing to pay for a business if they cannot obtain assurance that they will be protected from future competition by the seller, and so a failure to cover related non-competes may chill acquisitions. Commenters stated that sellers of a business have more bargaining power than workers do and generally receive a portion of the sales price, making exploitation and coercion less likely. They also noted that non-competes between the seller and the buyer of a business remain subject to State limitations on scope, duration, and reasonableness.

Some commenters supported the proposed 25% ownership threshold. However, most commenters who otherwise supported the exception stated that the proposed 25% ownership threshold is too high. They argued that the 25% threshold does not account for the reality of most transactions, in which owners with less than 25% interest in a business may have significant goodwill and receive significant proceeds from a sale. Some commenters focused on the tax costs of the threshold, pointing to IRS provisions that currently allow taxpayers to deduct from their taxable income the portion of the sales price made in exchange for non-competes. Others argued that the 25% threshold would disincentivize equity-based consideration. To avoid these harms, these commenters suggested a variety of other thresholds, including the 5% ownership threshold used in SEC regulations.[861] Some commenters contended that the Commission failed to provide evidence justifying the proposed 25% ownership threshold. Others questioned the effectiveness of ownership as a proxy for goodwill or the likelihood of exploitation and coercion. As examples, these commenters pointed to passive investors who may have significant ownership stakes in a business but none of its goodwill, and owners whose interests may be purchased for less than fair market value or who are excluded from sales negotiations.

A few commenters argued that the proposed 25% ownership threshold would preempt the laws of California and other States which ban non-competes except in the sale of a business, none of which require that the seller have a substantial ownership stake. They pointed to cases in which California courts applied the exception and allowed enforcement of non-competes against shareholders holding as little as a 3% ownership interest. In light of these statutes, some of these commenters urged the Commission to adopt an exception for

---

[855] *See* Sandy Dietrich & Erik Hernandez, Census Bureau, *Nearly 68 Million People Spoke a Language Other Than English at Home in 2019* (Dec. 6, 2022) at Table 1, *https://www.census.gov/library/stories/2022/12/languages-we-speak-in-united-states.html.*

[856] NPRM, proposed § 910.3.

[857] *Id.,* proposed § 910.1(e).

[858] *Id.* at 3515.

[859] *Id.* at 3514–15.

[860] *Id.*

[861] *See, e.g.,* 17 CFR 240.13d–1 (requiring reporting by beneficial owners holding more than 5% interest in an equity security).

agreements that involve the sale of a business or equity in a company without a threshold ownership requirement.

Some commenters urged the Commission to adopt a case-by-case assessment of business sales based on State law, such as a "totality of the circumstances" or "reasonableness" test. Others proposed replacing the ownership-based exception with an exception for founders, key workers with IP access, and/or those with goodwill. At least one commenter asked the Commission to use a bright-line rule rather than a functional or definitional test that would require adjudication and interpretation by courts.

Some commenters presented empirical evidence to justify a lower ownership threshold. A few commenters pointed to data suggesting that more than 96% of CEOs of the 3,000 largest publicly traded companies own less than 25% of their company. One commenter pointed to data suggesting that the average duration of a startup's life from fundraising to acquisition is 6.1 years, arguing that it is unlikely for venture-capital backed businesses to operate and grow for that period of time without accepting funding that dilutes founders' and key employees' equity stake in the business. Other commenters supporting a lower threshold provided anecdotal evidence that businesses cede large shares to financial backers, resulting in many owner-operators holding significantly less than a 25% share in their business.

Finally, some commenters focused on eliminating potential loopholes to the proposed exception. Some commenters expressed concern that employers may set up sham transactions with wholly owned subsidiaries in order to impose non-competes that would otherwise be prohibited under the rule, urging the Commission to clarify that the exception applies only to bona fide transfers to an independent third party. Some commenters contended that firms may use "springing" non-competes (in which a worker must agree at the time of hiring to a non-compete in the event of some future sale) and repurchase rights, mandatory stock redemption programs, or similar stock-transfer schemes (pursuant to which a worker may be required to sell their shares if a certain event occurs) to impose non-competes on their workers which would otherwise be prohibited. They urged the Commission to address those instances specifically, including by defining the exception by the percentage of total equity value received in liquid proceeds at the time of the relevant transaction.

## 3. The Final Rule

The Commission adopts a sale of business exception for substantially the same reasons articulated in the NPRM. However, in response to comments concerning the ownership percentage threshold, the Commission modifies § 910.3(a) so that it no longer includes the proposed requirement that the restricted party be "a substantial owner of, or substantial member or substantial partner in, the business entity" to fall under the exception. The Commission otherwise adopts this provision largely as proposed. To address commenters' concerns that employers will use sham transactions, stock-transfer schemes or other mechanisms designed to evade the rule, § 910.3(a) requires that, to fall under the exemption, a non-compete must be entered into pursuant to a bona fide sale.

The Commission reiterates that § 910.3(a) does not reflect a finding that non-competes between the seller and the buyer of a business are beneficial to competition or that they are not restrictive and exclusionary or exploitative and coercive. Indeed, the Commission acknowledges that some non-competes between the seller and buyer of a business may be exploitative and coercive due to an imbalance in bargaining power and/or may tend to harm competitive conditions. However, commenters did not present empirical research on the prevalence of non-competes between the seller and the buyer of a business or on the aggregate economic effects of applying additional legal restrictions to non-competes between the seller and buyer of a business. The Commission's decision to adopt § 910.3(a) reflects the view of the Commission and most commenters that, compared to non-competes arising solely out of an employment relationship, non-competes between the sellers and buyers of businesses may implicate unique interests and have unique effects that this rulemaking record does not address.[862]

The proposed requirement that an excepted non-compete bind only a "substantial" owner, member or partner of the business entity being sold was designed to allow those non-competes between the seller and the buyer of a business which are critical to effectively transfer goodwill while prohibiting those which are more likely to be exploitative and coercive due to an imbalance of bargaining power between the seller and the buyer. However, commenters persuasively argued that the proposed 25% ownership threshold

was too high because it failed to reflect the relatively low ownership interest held by many owners, members, and partners with significant goodwill in their business. The Commission declines to maintain the "substantial" interest requirement with a lower percentage threshold for the same reason.

The Commission also declines to adopt a threshold of $1 million, $250,000, or some other dollar limit on the proceeds received by the seller. On the current record, these thresholds were not sufficiently correlated to sellers' goodwill or bargaining power for a broadly generalizable approach. The Commission declines to adopt a "totality of the circumstances" or "reasonableness" test in the text of § 910.3(a) because they would provide little meaningful guidance to buyers and sellers and would be difficult to administer. For the same reasons, the Commission declines to replace the ownership-based exception with an exception for founders, key workers, workers with access to intellectual property, and/or workers with goodwill. Furthermore, non-competes allowed under the exception will continue to be governed by State law, which generally requires a showing that a non-compete is necessary to protect the value of the business being sold, as well as Federal antitrust law.[863]

Finally, the Commission agrees with commenters' concerns about the risks that firms may abuse the exception through sham transactions with wholly owned subsidiaries, "springing" non-competes, repurchase rights, mandatory stock redemption programs, or similar evasion schemes. The Commission adds the term "bona fide" and makes changes clarifying that any excepted non-compete must be made "pursuant to a bona fide sale" to ensure that such schemes are prohibited under the rule. A bona fide sale is one made in good faith as opposed to, for example, a transaction whose sole purpose is to evade the final rule.[864] In general, the Commission considers a bona fide sale to be one that is made between two

---

[862] See NPRM at 3514–15.

[863] See, e.g., U.S. v. Addyston Pipe & Steel Co., 85 F. 271, 281 (6th Cir. 1898) ("For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements [inter alia] by the seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold . . . . Before such agreements are upheld, however, the court must find that the restraints attempted thereby are reasonably necessary . . . to the enjoyment by the buyer of the property, good will, or interest in the partnership bought. . . .").

[864] Black's Law Dictionary defines bona fide as "[m]ade in good faith; without fraud or deceit," and "[s]incere; genuine." (11th ed. 2019).

independent parties at arm's length, and in which the seller has a reasonable opportunity to negotiate the terms of the sale. So-called "springing" non-competes and non-competes arising out of repurchase rights or mandatory stock redemption programs are not entered into pursuant to a bona fide sale because, in each case, the worker has no good will that they are exchanging for the non-compete or knowledge of or ability to negotiate the terms or conditions of the sale at the time of contracting. Similarly, sham transactions between wholly owned subsidiaries are not bona fide sales because they are not made between two independent parties.

The Commission declines to specifically delineate each kind of sales transaction which is not a bona fide sale under the exception to avoid the appearance that any arrangement not listed is allowed under the exception. Courts have effectively identified and prohibited such schemes pursuant to State statutes prohibiting non-competes.[865] In addition, non-competes allowed under the sale-of-business exception remain subject to Federal and State antitrust laws, including section 5 of the FTC Act.

### B. Section 910.3(b): Exception for Existing Causes of Action

Proposed § 910.2(a) would have prohibited employers from maintaining an existing non-compete with a worker. The proposed rule also would have required employers to rescind existing non-competes.[866] Commenters argued that any invalidation or rescission required of existing non-competes would be impermissibly retroactive, present due process concerns, and/or constitute an impermissible taking under the Fifth Amendment.

As described in Part IV.C.5, the Commission adopts a modified § 910.2(a) under which existing non-competes for workers who are not senior executives are no longer enforceable. The Commission adds an exception in § 910.3(b) in response to comments raising concerns related to retroactivity. Section 910.3(b) specifies that the final rule does not apply if a cause of action related to a non-compete provision accrued prior to the effective date. This

includes, for example, where an employer alleges that a worker accepted employment in breach of a non-compete if the alleged breach occurred prior to the effective date. This provision responds to concerns that the final rule would apply retroactively by extinguishing or impairing vested rights acquired under existing law prior to the effective date.[867] In this Part V.B, the Commission addresses commenters' arguments regarding retroactivity, due process, and impermissible taking under the Fifth Amendment.

#### 1. Retroactivity

A number of commenters asserted that applying the final rule to prohibit the enforcement of existing non-competes would render the final rule impermissibly retroactive. The Commission disagrees. A rule "does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the [rule's] enactment, or upsets expectations based in prior law."[868] Rather, courts have explained that an "administrative . . . rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed."[869] "A rule that 'alter[s]' the past legal consequences of 'past action' is retroactive," while a rule that "'alter[s] only the 'future effect' of past actions, in contrast, is not."[870] Agency action "that only upsets expectations based on prior law is not retroactive."[871]

The final rule is not impermissibly retroactive because it does not impose any legal consequences on conduct predating the effective date. The Commission is not creating any new obligations, imposing any new duties, or

attaching any new disabilities for past conduct.[872] And to minimize concerns about retroactivity, the Commission adopts § 910.3(b), which states that the final rule does not apply where a cause of action related to a non-compete accrues before the effective date. The notice requirement in § 910.2(b) likewise does not render the final rule impermissibly retroactive because that requirement merely requires notice that non-competes that exist after the effective date will not be enforced in the future with respect to workers other than senior executives. No penalties attach to persons who entered non-competes before the effective date.

This final rule is analogous to the FCC rulemaking upheld in *National Cable & Telecommunications Ass'n* v. *FCC*. There, the agency promulgated a rule that "forbade cable operators not only from entering into new exclusivity contracts, but also from enforcing old ones."[873] The court upheld the rule against a retroactivity challenge because the FCC had "impaired the future value of past bargains but ha[d] not rendered past actions illegal or otherwise sanctionable."[874] This final rule does the same with existing non-competes. The final rule does not render it illegal or otherwise sanctionable for parties to have entered into non-competes before the effective date; it merely provides that persons cannot enforce or attempt to enforce such agreements with workers other than senior executives or represent to such workers that they are bound by an enforceable non-compete after the effective date. It is thus not impermissibly retroactive.

In *National Cable,* the court also considered whether the agency had "balance[d] the harmful 'secondary retroactivity' of upsetting prior expectations or existing investments against the benefits of applying [its] rules to those preexisting interests."[875] While commenters did not frame their objection as one of "secondary retroactivity," some did object that the final rule would upset the benefits of pre-existing bargains. As in *National Cable,* however, the Commission has "expressly consider[ed] the relative benefits and burdens of applying its rule

---

[865] *See, e.g., Bosley Med. Grp.* v. *Abramson,* 161 Cal. App. 3d 284, 291 (Cal. Ct. App. 1984) (refusing to enforce non-compete imposed on physician under agreement requiring physician to purchase 9% of stock at hiring and resell to corporation upon termination because agreement "was devised to permit plaintiffs to accomplish that which the law otherwise prohibited: an agreement to prevent defendant from leaving plaintiff medical group and opening a competing practice").

[866] *See* proposed § 910.2(b)(1).

[867] As discussed in Part V.B.1, courts have explained that an "administrative . . . rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed." *Regents of the Univ. of Cal.* v. *Burwell,* 155 F. Supp. 3d 31, 44 (D.D.C. 2016) (alteration in original) (quoting *Nat'l Min. Ass'n* v. *DOL,* 292 F.3d 849, 859 (D.C. Cir. 2002)). But a regulation is *not* retroactive simply because it "impair[s] the future value of past bargains" if it does not also "render[ ] past actions illegal or otherwise sanctionable." *Nat'l Cable & Telecomms. Ass'n* v. *FCC,* 567 F.3d 659, 670 (D.C. Cir. 2009).

[868] *Landgraf* v. *USI Film Prods.,* 511 U.S. 244, 269 (1994).

[869] *Burwell,* 155 F. Supp. 3d at 44 (alteration in original) (quoting *Nat'l Min. Ass'n,* 292 F.3d at 859).

[870] *Id.* (alterations in original) (quoting *Ne. Hosp. Corp.* v. *Sebelius,* 657 F.3d 1, 14 (D.C. Cir. 2011)).

[871] *Nat'l Cable,* 567 F.3d at 670 (internal quotation omitted) (quoting *Mobile Relay Assocs.* v. *FCC,* 457 F.3d 1, 11 (D.C. Cir. 2006)).

[872] For instance, the D.C. Circuit found that agency action impermissibly attached a "new disability" when a Department of Interior rule made mine operators ineligible for a surface mining permit based on "pre-rule violations." *Nat'l Min. Ass'n* v. *U.S. DOI,* 177 F.3d 1, 8 (D.C. Cir. 1999). Here, the final rule imposes no penalties or other disabilities on persons who entered into non-competes before the effective date.

[873] *Nat'l Cable,* 567 F.3d at 661.

[874] *Id.* at 670.

[875] *Id.* at 670.

to existing contracts.'' [876] This consideration led the Commission to adopt the various exceptions described in the final rule, including the decision not to apply the final rule to non-competes entered into with senior executives before the effective date. As explained in Part IV.B, however, the Commission has determined that, for workers other than senior executives, there are substantial benefits to applying the rule to prohibit the future enforcement of non-competes entered into before the effective date. These benefits include the anticipated increase in worker earnings, new business formation, and innovation.[877] Additionally, the Commission finds such agreements are generally coercive and exploitative, so prohibiting their future enforcement is also a benefit.[878]

In the Commission's view, these significant benefits justify any burdens of applying the final rule to the future enforcement of pre-existing agreements with workers other than senior executives. Having balanced the burdens and benefits of so applying the final rule, the Commission has satisfied its obligation to consider the secondary retroactivity effects of the final rule. Moreover, the Commission notes that non-competes were already subject to case-by-case adjudication under section 5.[879] Employers were thus already responsible, even before the final rule, for ensuring their non-competes are not unfair methods of competition.

### 2. Takings

The Commission also disagrees with commenters who contended that applying the final rule to non-competes entered into before the effective date would violate the Fifth Amendment by effecting a taking without due compensation. Some comments interpreted the proposed rescission requirement to mean that the worker and employer must be returned to their original positions (*i.e.,* on the day they entered into the non-compete) and presumed to not have entered the agreement, or that the rule would mandate wholly new contracts to replace any existing agreements that contained non-competes. The Commission does not intend the final rule to have such effect and has omitted the rescission requirement proposed in the NPRM. The Commission also adopts § 910.3(b), which provides an exception for causes of action that accrued before the effective date, to clarify that the final

rule is purely prospective. The final rule does not render any existing non-competes unenforceable or invalid from the date of their origin. Instead, under the final rule, it is an unfair method of competition to enforce certain non-competes beginning on the effective date. Action taken before the effective date to enforce an existing non-compete or representations made before the effective date related to an existing non-compete are not an unfair method of competition under the final rule. The final rule does not effectuate a taking.

The Takings Clause provides that ''private property'' shall not ''be taken for public use, without just compensation.'' [880] When, as here, ''the government, rather than appropriating private property for itself or a third party, imposes regulations that restrict an owner's ability to use his own property,'' courts consider whether the regulation ''goes too far'' and constitutes a ''regulatory taking.'' [881] Consistent with the Supreme Court's decision in *Penn Central Transportation Co.* v. *City of New York* (''*Penn Central*''), this is necessarily an ''ad hoc, factual inquir[y]'' and focuses on three factors: ''the economic impact of the regulation on the claimant''; ''the extent to which the regulation has interfered with distinct investment-backed expectations''; and ''the character of the governmental action.'' [882] ''[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.'' [883] As a general matter, ''the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.'' [884]

Under the *Penn Central* test, the final rule does not effect a taking as a matter of law. First, the economic impact of the regulation on employers with existing non-competes with workers who are not senior executives is insufficient to constitute a taking.[885] The Commission has found that such agreements are rarely the product of bargaining, and that little to nothing is offered in

exchange for them. And research has confirmed that for many such agreements, employers do not value the ability to enforce the agreements.[886] The final rule also includes provisions that allow employers and workers to ''moderate and mitigate the economic impact'' of the final rule.[887] The Commission has made clear that employers may continue to use reasonable NDAs and trade secrets law to protect their interests, including customer goodwill.[888] In fact, one study finds that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and 74.7% of workers with non-competes are subject to all three provisions.[889] And in cases where non-competes with workers other than senior executives were tied to benefits like cash or equity, the Commission has provided time for those agreements to be renegotiated if necessary.[890] For senior executives, the Commission allows existing agreements to continue to be enforced.

The character of the governmental action here also counsels against viewing the final rule as a taking. ''A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.'' [891] There is no physical invasion here, and the final rule is promulgated under the Commission's authority to identify and prohibit unfair methods of competition.[892] Among other economic benefits described in Part IV.B, the Commission finds economy-wide benefits, including increases in new business formation and innovation. The Commission also finds that the final rule will increase earnings for workers by preventing enforcement of agreements that suppress their earnings. Moreover, non-competes have long been subject to government regulation, including not only section 5 of the FTC Act, but also State common

---

[876] *Id.* at 671.
[877] *See* Part IV.B.
[878] *See* Part IV.B.2.b.
[879] Part I.B.1.

[880] U.S. Const. amend. V.
[881] *Cedar Point Nursery* v. *Hassid,* 594 U.S. 139, 148 (2021).
[882] *Penn Cent. Transp. Co.* v. *City of N.Y.,* 438 U.S. 104 (1978).
[883] *Lingle* v. *Chevron U.S.A. Inc.,* 544 U.S. 528, 540 (2005).
[884] *Connolly* v. *Pension Ben. Guar. Corp.,* 475 U.S. 211, 224 (1986); *see also Nat'l Min. Ass'n* v. *Babbitt,* 172 F.3d 906, 917 (D.C. Cir. 1999) (applying *Connolly* to a Takings challenge to an administrative rule).
[885] *Murr* v. *Wis.,* 582 U.S. 383, 405 (2017); *see also Connolly,* 475 U.S. at 225.

[886] *See* Hiraiwa, Lipsitz, & Starr (2023) (showing that firms do not value the ability to enforce non-competes for workers earning up to $100,000 per year and potentially more).
[887] *Connolly,* 475 U.S. at 225–26.
[888] *See* Part IV.D.2.
[889] Balasubramanian, Starr, & Yamaguchi, supra note 74 at 35.
[890] *See* § 910.6.
[891] *Penn Cent. Transp. Co.* v. *City of N.Y.,* 438 U.S. 104, 124 (1978) (internal citation omitted).
[892] *See* 15 U.S.C. 45(a); *see also* Parts IV.B and C (the Commission's findings outlining the public benefits of the final rule and the public harm from the use of non-competes).

law, State enactments, and other Federal antitrust laws.

Finally, the final rule does not upset investment-backed expectations to the extent necessary to constitute a taking. Even in States that prohibit some or all non-competes, employers make many investments in workers that they would continue to make regardless of their ability to use non-competes, such as training, or that would be protected by other mechanisms, such as reasonable NDAs, trade secret law, and/or fixed term contracts. In other words, non-competes are not a prerequisite to employers' productivity and output, in large part because (as described in Part IV.D) employers have reasonable alternatives to protecting the investments they make. The Commission has also lessened the economic burden of the final rule by creating an exception for situations where a cause of action accrued before the effective date.[893] Furthermore, States and the Federal government have regulated and considered further regulating non-competes for years, and the Commission issued the NPRM more than 18 months before the effective date—and began exploring whether to regulate non-compete agreements more than five years ago.[894] There has thus been ample notice that non-competes may become unenforceable by rule,[895] and prior to this rule non-competes were already subject to case-by-case adjudication under section 5. For all these reasons, the Commission does not believe the final rule constitutes a taking.

### 3. Due Process

Similarly, the Commission disagrees with commenters who argued that applying the final rule to existing non-competes would present due process concerns. Assuming that these due process concerns are independent of other constitutional concerns like the alleged retroactive application of the final rule,[896] which are addressed in Parts V.B.1 and V.B.2, the Commission disagrees that there is any due process infirmity. Due process requires the government, at a minimum, to provide notice and an opportunity to be heard before depriving any person of

property.[897] By issuing the NPRM and engaging in notice-and-comment rulemaking, the Commission has provided sufficient due process. And on top of the notice-and-comment process, there will be further process in an administrative adjudication or in court before any person is found to have violated the rule.

### C. Section 910.3(c): Good Faith Exception

The Commission adds an exception in § 910.3(c) in an abundance of caution to ensure the final rule does not infringe on activity that is protected by the First Amendment[898] and to improve clarity in § 910.2(a). The exception states: "It is not an unfair method of competition to enforce or attempt to enforce a non-compete clause or to make representations about a non-compete clause where a person has a good-faith basis to believe that this part 910 is inapplicable." A similar "good-faith basis" clause was in proposed § 910.2(a).

As described in Parts IV.B.4 and IV.C.5, the final rule includes a prohibition on enforcing or attempting to enforce non-competes in both § 910.2(a)(1) and (2). Under the *Noerr-Pennington* doctrine, filing a lawsuit—even if the suit may tend to restrict competition and is ultimately unsuccessful—is typically protected under the First Amendment right to petition and immune from antitrust scrutiny.[899] However, courts have recognized that where a lawsuit is a "sham," *i.e.,* objectively baseless and subjectively designed solely to prevent competition, it is not protected.[900] For a non-compete covered by the final rule, enforcing or attempting to enforce the non-compete would likely be considered a "sham" lawsuit. Accordingly, such a lawsuit would not enjoy protection under the First Amendment. Section 910.3(b) ensures, however, that if a circumstance arises under which an employer's enforcement of or attempt to enforce a non-compete

is protected by the First Amendment, the final rule does not run afoul of it.

As explained in Parts IV.B.4 and IV.C.5, the Commission adopts a prohibition on "representing" that a worker is subject to a non-compete in §§ 910.2(a)(1)(iii) and 910.2(a)(2)(iii). In § 910.3(c), the Commission incorporates a "good-faith" exception that applies to the prohibition on "representing" the worker is subject to a non-compete. Taken together, these provisions of the final rule prohibit an employer from representing to a worker that the worker is subject to a non-compete unless the employer has a good-faith basis to believe the worker is subject to an enforceable non-compete.

The Supreme Court has held "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."[901] Accordingly, "[t]he government may ban forms of communication more likely to deceive the public than to inform it, . . . or commercial speech related to illegal activity."[902] The final rule does not cover protected speech because it prohibits only misrepresentations about whether a non-compete covered by the rule is enforceable. The good-faith exception in § 910.3(b) ensures, however, that the final rule does not run afoul of the First Amendment if a circumstance arises under which an employer's representation that a worker is subject to a non-compete is protected by that Amendment.

In the NPRM, the Commission stated that an employer would have no good faith basis to believe that a worker is subject to an enforceable non-compete "where the validity of the rule . . . has been adjudicated and upheld." Some commenters stated that legal challenges to the final rule will create uncertainty and unpredictability related to compliance. The Commission believes the foregoing statement in the NPRM would contribute to this confusion and does not adopt it in this final rule. The Commission clarifies that the absence of a judicial ruling on the validity of the final rule does not create a good-faith basis for non-compliance. If the rule is in effect, employers must comply.

### D. Requests To Expand Final Rule Coverage or To Provide an Exception From Coverage Under the Final Rule

In the NPRM, the Commission preliminarily concluded that applying the rule uniformly to all employers and workers would advance the proposed

---

[893] *See* § 910.3(b).

[894] *See* Part I.B.

[895] *Connolly* v. *Pension Ben. Guar. Corp.,* 475 U.S. 211, 226 (1986).

[896] Commenters invoking a due process concern outside the retroactivity context provided little contextual detail on the precise substance of the concern, nor did they explain what further process would be due before the Commission could promulgate the rule.

[897] *See, e.g., N. Am. Butterfly Ass'n* v. *Wolf,* 977 F.3d 1244, 1265 (D.C. Cir. 2020) (citing *Mathews* v. *Eldridge,* 424 U.S. 319, 333–34 (1976)).

[898] The Commission adopts § 910.3(b)(3) out of an abundance of caution and does not believe that any of the requirements in the final rule run afoul of the First Amendment because the Commission finds that the use of certain existing non-competes is an unlawful unfair method of competition.

[899] *See E.R.R. Presidents' Conference* v. *Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am.* v. *Pennington,* 381 U.S. 657 (1965).

[900] *Pro. Real Est. Invs., Inc.* v. *Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 (1993).

[901] *Cent. Hudson Gas & Elec.* v. *Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980).

[902] *Id.* at 563–64.

rule's objectives to a greater degree than differentiating among workers on the basis of industry or occupation, earnings, another factor, or some combination of factors, and that it would better ensure workers are aware of their rights under the rule.[903] The Commission sought comment on this topic, including what specific parameters or thresholds, if any, should apply in a rule differentiating among workers.[904]

The vast majority of commenters supported the Commission's proposal to ban non-competes categorically for all workers.[905] Commenters from a broad spectrum of job types and industries stated that non-competes harm competition in a way that hurts workers and employers.

Commenters also supported the rule with perspectives specific to particular industries. In response to the Commission's request for comment on the issue, some commenters argued that the Commission should further expand the rule to cover non-competes between franchisors and franchisees.

Other commenters argued the Commission should differentiate among workers and employers along different parameters. They stated that workers with higher earnings, higher skills, specific job titles, or access to specific types of information should be excluded. Some stated that particular industries should be excluded wholesale, including all workers in an industry regardless of their job duties, while some stated that only certain workers in particular industries should be excluded.

In adopting the final rule, the Commission considered each request for exclusion from or expansion of coverage under the final rule and concludes that the use of covered non-competes is an unfair method of competition. The Commission also concludes that applying the final rule as adopted in part 910 to the full extent of the Commission's jurisdiction with respect to covered workers advances the final rule's objectives to a greater degree than differentiating among workers. In response to, *inter alia,* comments regarding the potential costs and difficulties that may result from

invalidating existing non-competes for certain senior executives, however, the final rule differentiates between senior executives and other workers by allowing existing non-competes for senior executives to remain in force. The final rule adopts a uniform rule categorically banning new non-competes for all workers. The Commission substantiates its finding that the use of non-competes with workers is an unfair method of competition in Parts IV.B and IV.C.

In this Part V.D, the Commission addresses comments related to differentiation or exclusion of certain workers, employers, or industries. Comments related to expanding or limiting the definition of worker or employer are addressed in Parts III.C and III.G. Comments related to the Commission's jurisdiction and exclusions from the Commission's jurisdiction in the FTC Act are addressed in Part II.E. Comments related to the prevalence of non-competes within and across industries are addressed in Part I.B.2.

Overall, the Commission is committed to stopping unlawful conduct related to the use of certain non-competes to the full extent of its authority and jurisdiction. The Commission finds every use of a non-compete covered by the final rule to be an unfair method of competition under section 5 of the FTC Act for the reasons in Parts IV.B and IV.C. The use of an unfair method of competition cannot be justified on the basis that it provides a firm with pecuniary benefits.[906] To the extent commenters argue for an exception based on this justification, the Commission declines to create any exception on that basis. Moreover, a uniform rule carries significant benefits, which many commenters who otherwise opposed the NPRM acknowledged.[907] Among those benefits is the certainty for both workers and employers from a uniform rule, which also lessens the likelihood of litigation over uncertain applications. Exceptions for certain industries or types of workers would likely increase uncertainty and litigation costs, as parties would dispute whether a specific business falls within an industry-wide exception. Most importantly, exceptions would fail to

remedy the tendency of non-competes to negatively affect competitive conditions in the excepted industries or for excepted types of workers and would likely have *in terrorem* effects.

### 1. Differentiation by Worker Compensation or Skills

Many commenters sought an exception for highly paid or highly skilled workers, often alongside requests for an exception for senior executives, while many others asked the Commission to keep these workers within the scope of the final rule. Commenters seeking an exception argued that highly paid and highly skilled workers in particular did not experience exploitation and coercion and were more likely to have access to confidential information or client or customer relationships, along with the other justifications for non-competes discussed in Part IV.D. Commenters' specific arguments on the evidence concerning highly paid or highly skilled workers are considered in the relevant subsections of Part IV.B. Many commenters proposed using a compensation threshold to differentiate highly paid workers and senior executives, discussed in IV.C.4.b. Other commenters suggested an exception based on the FLSA exemptions or the worker's level of access to confidential information, discussed in Parts IV.C.4. and V.D.2.

The Commission finds that non-competes have a tendency to negatively affect competitive conditions in labor markets and product and service markets, including non-competes binding highly paid and highly skilled workers. The evidence shows that, among the other effects described in Part IV.B, non-competes for highly paid and highly skilled workers suppress wages for these workers,[908] restrict competitors' access to highly skilled workers,[909] and restrict entrepreneurship.[910] Notably, as described in Parts IV.B.2 and IV.C.1, the Commission concludes that non-competes for highly paid or highly skilled workers who are not senior executives are generally exploitative and coercive. The Commission finds that highly paid and highly skilled workers who are not senior executives only rarely negotiate meaningful consideration in exchange for a non-compete. As the Commission finds, the overwhelming response from commenters, particularly workers, was that non-competes are exploitative and

---

[903] NPRM at 3518. The NPRM's proposed definition of "worker" excluded franchisees in the context of franchisee-franchisor relationships. *Id.* at 3520. The NPRM also proposed an exception for certain non-competes between the seller and the buyer of a business.

[904] NPRM at 3519.

[905] The Commission received over 26,000 public comments from a wide range of stakeholders. Among these comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes.

[906] *See, e.g., Atl. Refin. Co.* v. *FTC,* 381 U.S. 357, 371 (1965) ("Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves."); *see also* Part II.F.

[907] *See* Part IX.C.

[908] *See* Part IV.B.3.a.ii.

[909] *See* Part IV.C.2.c.i.

[910] *See* Part IV.B.3.b.i.

coercive for many workers in highly paid professions other than senior executives.[911] While there may be highly paid or highly skilled workers who do not meet the definition of ''senior executive'' and who are not exploited or coerced, including workers above the definition's total compensation threshold, the Commission explains in Part IV.C.4 why a compensation threshold is necessary—but not sufficient—for purposes of defining senior executives whose existing non-competes may remain in force under the final rule. Further, the Commission finds that employers have sufficient alternatives to non-competes for highly paid and highly skilled workers.[912] The Commission also explains why it is not exempting all non-competes that were exchanged for consideration in Part IV.C.3. Accordingly, the final rule does not include any workers other than highly paid senior executives in the exception from the ban on enforcing existing non-competes. To ensure that only workers for whom there is insufficient evidence of exploitation and coercion are included in the exception, the final rule narrowly defines senior executive in § 910.1.[913]

### 2. Differentiation by Worker Access to Information

Some commenters suggested excluding workers with access to trade secrets, confidential business information, or other intellectual capital. Commenters contended these workers are uniquely situated because of their access to valuable employer information. Many commenters responded to these arguments and disagreed with them. Some commenters stated that employers overstate the proportion of workers who have access to such information. Commenters also stated that employers exaggerate the amount or quality of information that should be appropriately considered a trade secret, confidential business information, or other intellectual capital, and therefore exaggerate the purported cost to the firm of not being able to use non-competes. Commenters also stated that employers have alternatives to non-competes that generate less harm to competition, to workers, to the economy, and to rival firms, including NDAs and fixed-term employment contracts.

The Commission declines to adopt an exclusion based on workers' access to

trade secrets, confidential business information, or other intellectual capital because it finds such an exclusion would be unnecessary, unjustified, unworkable, and prone to evasion. The Commission finds the use of non-competes to be an unfair method of competition and addresses claimed justifications related to trade secrets, confidential business information, or other intellectual capital in Part IV.D. The Commission finds that protecting trade secrets, confidential information, and other intellectual capital is an insufficient justification for non-competes because employers have less restrictive alternatives for protecting such information. Moreover, if the Commission were to exempt workers with access to confidential information, employers could argue that most or all workers fall under the exception, requiring workers to engage in complex and fact-specific litigation over the protected status of the underlying information. As explained in Part IX.C, such case-by-case adjudication of the enforceability of non-competes has an *in terrorem* effect that would significantly undermine the Commission's objective to address non-competes' tendency to negatively affect competitive conditions in a final rule.

### 3. Differentiation by Industry Other Than Healthcare

Some businesses and organizations argued that specific industries should be exempt from the final rule. The Commission carefully considered these comments and declines to adopt any industry-based exceptions. The Commission notes that while some commenters characterized purported justifications for an exclusion from the final rule as unique to a particular industry, the purported justifications were in fact the same as those addressed in Part IV.D, namely, the need to protect investments in labor, trade secrets, confidential business information, or other intellectual capital. The Commission addresses those arguments in full in Part IV.D, but in this Part V.C.3 further discusses examples of comments seeking industry-based exceptions.

#### a. Client- and Sales-Based Industries

Some commenters in client- or sales-based industries, including real estate and insurance, argued they are unique and should be excluded from any rule. A real estate commenter argued that job switching by real estate employees is similar to the sale of a business where the goodwill and book of business generated by the departing employee must remain with the business. A

timeshare industry commenter claimed the industry had unique features justifying the use of non-competes with highly paid workers, such as the cost of marketing and cultivation of relationships to bring in and maintain customers as well as the need to protect proprietary targets and strategies for resort development, due in part to the limited number of available resort contracts. A commenter representing insurance marketing organizations (IMOs), which serve as facilitators between insurance carriers, agents, and consumers similarly argued for an exclusion, citing client goodwill, purported trade secrets in sales methods, sales leads, unique compensation structures, and company analyses, and consumer harm from potential agent misconduct if the agent moves to a new IMO and changes the consumer's policy. Some businesses stated that non-competes rarely impact a worker's ability to find other work in their industry, sometimes because the new employer ''buys out'' the non-compete.

The majority of commenters from the real estate and insurance industry workers and small, independent insurance agencies, supported a comprehensive ban. These comments painted a picture consistent with the Commission's findings in Part IV.B regarding indicia of unfairness, including facial unfairness, and the tendency of non-competes to negatively affect competitive conditions in the labor and product and service markets. A worker from the real estate industry stated that non-competes are standard in the industry for all workers, regardless of their position in a company. Commenters stated that they were asked to sign after starting their job, with one worker stating that they faced the option of either signing the non-compete or leaving and losing future commissions for work they had done. Workers noted that they were terminated without cause and still required to comply with a non-compete, and that they had no bargaining power for promotion or wage increases. The following examples are illustrative of the comments the Commission received:

- As an aspiring entrepreneur in the real estate space, I am in a relatively small market where one company dominates. I recently ended my employment with them. They use non-competes to restrict competition and trap employees. The abolition of non-competes is paramount as small towns/cities grow. . . .[914]
- I signed a non-compete after working at a Real Estate Brokerage for several months. I

---

[911] *See* Part IV.B.2.b.

[912] *See* Part IV.D.2.

[913] For a more detailed discussion of proposed § 910.1(i), *see* Part IV.C.4.a.

[914] Individual commenter, FTC–2023–0007–10710.

was told I had to sign it or I would not be paid on the transactions I had pending. The non-compete was so overreaching—there was no geographical scope, the penalty was more than prohibitive. I was told that no one really enforces them or attempts to. I signed it, collected my outstanding pay and left the company within 90 days. Fast forward 4 years, I have been defending myself in litigation over this non-compete for over 3 years. Unable to afford qualified representation.[915]

• I am a business owner and have had 40 independent contractors under my business at my peak. They were all under non-compete, and if I could go back, I would eliminate the non-compete. It doesn't help the employee or contractor, and it doesn't help the business either. It spurs an unhealthy work environment. Clogs up the judicial system with frivolous cases where they try and scare people from earning a living. . . . I 100% support this ban, and it should go into effect immediately.[916]

Commenters stated that non-competes are standard in the insurance industry and that the industry is facing significant consolidation, fueled in part by private equity firms. These commenters argued that workers in the insurance industry are prohibited from seeking jobs with higher pay and better benefits in their specialty. Commenters stated that they were not able to negotiate better conditions at their current job and that employers can change the employment terms at will, so workers face reduced commissions and pay while still being held to a non-compete. Commenters stated that insurance agents are highly trained and specialized, and non-competes force them to leave their specialty and start over in a new specialty for less pay. Commenters also argued that non-competes thwart consumer choice because insurance agents create relationships with their customers, and customers lose the ability to choose the same agent if the agent is bound by a non-compete. Commenters also noted that standard employment agreements in the insurance industry require workers to pay their own costs to defend against noncompete litigation even if the worker is successful in the challenge such that even if a worker does not violate the terms of a noncompete, or the noncompete is not enforceable, workers who change jobs or start a new agency are often faced with significant legal bills. Commenters noted that although independent licensing agents are meant to be able to contract with multiple insurance companies, they are heavily restricted by non-competes, creating regional monopolies. The

following examples are illustrative of the comments the Commission received:

• As a captive "Independent Contractor" for a large insurance company, this rule would be a lifeline should I decide to pursue an independent agent opportunity. The insurance company I represent, has gradually cut commissions over the past few years . . . that makes it extremely uncompetitive compared to peers. There is absolutely no reason why I should be held prisoner and not be able to pursue far more favorable, and beneficial opportunities, for both myself and my family.[917]

• Ideally I would like to start my own insurance agency but am currently prevented from doing so due to a non-compete clause. We are already somewhat limited in employment opportunities here in rural West Texas . . . . I'm finding it difficult to find a path to provide for my family during the two year period [of the non-compete], and therefore am considering scrapping the new business idea and remaining at my current job. . . . In a sense, I feel trapped at my current job, and ultimately I feel hobbled from achieving my full potential as a future small business owner.[918]

The Commission declines to adopt an exclusion for client- or sales-based industries such as real estate and insurance. The use of non-competes is an unfair method of competition and the purported justifications raised by commenters do not change the Commission's finding. The Commission also notes that, to the extent commenters seeking an exception are referencing different restrictive covenants, including some garden variety non-solicitation agreements, which do not prohibit or function to prevent a worker from switching jobs or starting a new business as described in Part III.D, the final rule does not apply to them. Thus, the Commission focuses on commenters' purported need for an exclusion based on non-competes alone.

In response to commenters arguing that information and techniques related to sales, including strategy on developing business, is confidential or proprietary and that workers' ability to move to another job or start a business would thus harm them, the Commission notes that any specific information or truly proprietary techniques can be protected by much less restrictive alternatives, such as trade secret law and NDAs. For example, proprietary targets and strategies for timeshares or unique compensation structures or company analyses cited by IMOs can be otherwise protected. Moreover, companies can compete on the merits to retain their customers by offering better

products and services. Requiring workers to leave the industry or the workforce is an overbroad restriction that tends to negatively affect—and actually harms—competition with attendant harm to workers and rivals, as outlined in Part IV.B.

With respect to commenter arguments that non-competes are needed to protect specialization related to particular products and skills related to sales, as the Commission finds in Part IV.D, preventing workers from using their general trade knowledge and skills, including their gains in the same through experience with a particular employer, is not a legally cognizable justification for non-competes. That a real estate, insurance, or any other sales agent inherently learns skills and gains knowledge in the performance of their job, becoming a more effective salesperson over time, is not itself a cognizable justification for preventing the worker from re-entering the labor market as a worker or business owner. Employers' efforts to use non-competes to prevent workers from using general trade knowledge and skills is an unfair method of competition under section 5 because it is an attempt to avoid competition on the merits.[919] To the extent employers seek to protect legitimate investments in training, the Commission finds employers have less restrictive alternatives, including fixed duration contracts and better pay or other terms and conditions of employment to retain the worker. Finally, the Commission notes that because all covered employers can no longer maintain or enforce non-competes with workers who are not senior executives, employers may also have a larger pool of trained and experienced workers to hire from.

The Commission disagrees with commenters arguing that a worker leaving a sales position is akin to the sale of a business. Unlike the seller of a business, a worker is in an unequal bargaining position and does not receive compensation when leaving the firm. The fact that a worker generates goodwill for an employer is not a cognizable justification for non-competes. First, it not clear that the employer would lose goodwill associated with their business if a particular worker leaves. Moreover, commenters do not specify the extent to which their legitimate investment in the worker—separate from employing the

---

[915] Individual commenter, FTC–2023–0007–5502.

[916] Individual commenter, FTC–2023–0007–6782.

[917] Individual commenter, FTC–2023–0007–10919.

[918] Individual commenter, FTC–2023–0007–19441.

[919] *See Nat'l Soc'y of Prof. Engrs.* v. *United States,* 435 U.S. 679 (1978) (confirming that limiting competition, even if based on the specific advantages of doing so because of the particular nature of an industry, is not a cognizable justification).

worker to use their general skills and knowledge to successfully perform the job—generates such goodwill. To the extent employers do seek to protect investments in goodwill, the employer has less restrictive alternatives to attract and retain workers and customers or clients.

b. Industries With Apprenticeships or Other Required Training

Some commenters representing industries with apprenticeships or that require training as a part of employment, such as real estate appraisers, plumbers, and veterinarians, argued their industry should be excluded from the final rule. These commenters contended that a significant investment is needed to make workers productive in their industries and that they need to use non-competes to protect that investment. Each commenter cited an apprenticeship or training period during which they are not able to bill or must bill a lower amount for a worker's labor.

Worker commenters from these industries stated that non-competes leave them unable to launch or progress in their career because non-competes tie them to their first employer. Some appraiser commenters noted that, while their share of the appraisal fee rises to some extent after completing their apprenticeship, they cannot negotiate higher shares of the fee or other better working conditions because of non-competes. A union commenter representing plumbers noted that plumbers with non-competes are not able to accept better offers of employment, with better pay and benefits, including union positions. Other worker commenters mentioned geographic overbreadth and excessively long non-competes of two years. Many veterinarian commenters supported the proposed rule, stating that non-competes artificially held down their compensation and did not allow them to start new practices in areas where the need for more veterinary services is great, with some commenters stating that this contributed to consolidation.

The Commission declines to exclude industries, such as real estate appraisal, plumbing, and veterinary medicine, in which an industry must purportedly invest in significant training or apprenticeship of workers before the employer considers them to be productive. The Commission finds that these employers have less restrictive alternatives—namely fixed duration contracts—to protect their investment in worker training. A return on investment in the training does not require that the worker be unable to work for a period

after leaving employment. Moreover, employers stand to benefit from the final rule through having access to a broader labor supply—including incoming experienced workers—with fewer frictions in matching with the best worker for the job.

c. Financial Services

Some commenters representing financial services companies opposed the rule, arguing non-competes are necessary for the industry and their industry is unique because non-competes have been used for decades, while numerous firms have entered the market, workers are mobile, and there is no evidence of blocked or curbed entry, lack of access to talent, lower innovation, or other negative impacts in that market. These commenters mention that mobility and access to talent is possible because new employers often ''buy out'' a worker's non-compete to hire a worker who may be otherwise bound by a non-compete. Several commenters also contend that non-competes are especially vital to firms that focus on securities or commodities trading because disclosure of commercially sensitive information to competitors can be extremely damaging to their former employers' profitability.

Commenters identified three studies which they contend suggest that non-competes improve worker productivity. First, commenters identified two studies on the Broker Protocol, an agreement among financial advisory firms which ostensibly limited the use of NDAs, non-solicitation agreements, and non-competes simultaneously. One study by Gurun, Stoffman, and Yonker finds that firms that joined the Protocol experienced higher rates of employee misconduct and earned increased fees.[920] The other study, by Clifford and Gerken, finds that firms which joined the Protocol invested more heavily in licensure and experienced fewer customer complaints.[921] Commenters noted that these two studies have conflicting findings on advisor misconduct. The authors themselves discuss these findings, with each criticizing the approach of the other. One commenter stated that, from a technical standpoint, the Clifford and Gerken study has a superior approach due to its substantially larger sample size and its analysis of the assumptions

underlying the methodologies used in both studies. A third study—a study of the mutual fund industry by Cici, Hendriock, and Kempf—finds that mutual fund managers increase their firms' revenue when non-competes are more enforceable by investing in higher performing funds, attracting new clients, and increasing revenue from fees.[922] This study uses three changes in non-compete enforceability, measured in a binary fashion.

A commenter representing a large group of public equity investors supported the rule, stating that a comprehensive ban would create an inclusive labor market, which is integral to long-term corporate value and a dynamic, innovative, and equitable economy. Financial services worker commenters also supported the rule, citing to their failure to be paid for their skills over time, the threat of litigation in seeking new employment, and the overbroad nature of non-competes in the industry. The following example is illustrative of the comments the Commission received:

• I am a female finance professional with strong qualifications and experience. I am subject to an extremely long and comprehensive non compete contract which I was induced to sign at a young age. I have been offered many positions at other firms who would be more willing to provide me with leadership opportunities and a path to further advancement, but I am unable to consider them and I am essentially trapped at my firm. . . .[923]

The Commission declines to exclude financial services companies over which it has jurisdiction from the final rule. The Commission finds in Part IV.C that non-competes are restrictive, exclusionary, and also exploitative and coercive for higher wage and highly skilled workers, including workers in finance. The Commission also finds in Part IV.B and IV.C that non-competes tend to negatively affect competitive conditions in labor market through reduced labor mobility and in the product and services market through reduced innovation and new business formation. Evidence that new employers sometimes buy out non-competes also suggests that such clauses harm competition by raising the cost to compete and creating deadweight economic loss for the new employer.[924]

The empirical evidence provided by commenters arguing for differentiation

---

[920] Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry,* 141 J. of Fin. Econ. 1218–43 (2021).

[921] Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives,* 76 J. of Fin. 2409–45 (2021).

[922] Gjergji Cici, Mario Hendriock, & Alexander Kempf, *The Impact of Labor Mobility Restrictions on Managerial Actions: Evidence from the Mutual Fund Industry,* 122 J. of Banking & Fin. 105994 (2021).

[923] Individual commenter, FTC–2023–0007–0953.

[924] *See* Part IV.C.2.c.i.

for the finance industry does not support their claims. The Commission finds that it is difficult to weigh the evidence in the two studies of the Broker Protocol because they reach conflicting results, though the Commission agrees that the technical approach in the Clifford and Gerken study is superior due to its larger sample size. More importantly, both studies primarily concerned non-solicitation agreements, and do not isolate any effects of non-competes. So even if the studies did not reach conflicting results, the Commission believes they still would yield little reliable information about the effects of non-competes specifically. With respect to the study of the mutual fund industry, the Commission notes that under section 5, firms may not justify unfair methods of competition based on pecuniary benefit to themselves.[925] The study does not establish that there were societal benefits from the attraction of new clients or the increased fee revenue—just that the firms benefited. Therefore, this study does not establish a business justification that the Commission considers cognizable under section 5.

d. On-Air Talent

Some commenters opposing the rule stated that investment in on-air talent would be considerably reduced without non-competes. Commenters argued that on-air talent becomes well-known because of employers' investment and reputation and that employers must be able to use non-competes to protect this investment. The Commission also received a number of comments from and on behalf of on-air talent. Those commenters stated that non-competes are ubiquitous for on-air talent, that they are often localized geographically, that they suppress compensation, and that they force workers seeking a better match to move out of their localities. The following example is illustrative of the comments the Commission received:

• I am a professional broadcast journalist subject to a non-compete agreement with every employment contract I have ever signed, which is the industry standard. I understand the need for contractual agreements with on-air talent and some off-air talent, but non-compete agreements have historically offered nothing to employees besides restricting where they work, and how much money they are able to earn . . . [while] knowing that employees would have to completely relocate if they wanted to seek or accept another opportunity.[926]

The Commission declines to exclude on-air talent from the final rule. The Commission finds the use of non-compete agreements is an unfair method of competition as outlined in Part IV.B, and commenters do not provide evidence that a purported reduction in investment in on-air talent would be so great as to overcome that finding. Specifically, the success of on-air talent is a combination of the employer's investment and the talent of the worker, both of which benefit the employer. As noted in Part IV.D, other less restrictive alternatives, including fixed duration contracts and competing on the merits to retain the talent, allow employers to make a return on their own investments. Moreover, as stated in Part II.F, firms may not justify unfair methods of competition based on pecuniary benefit to themselves. Employers in this context do not establish that there are societal benefits from their investment in on-air talent, but only that the firms benefited.

e. Construction

A commenter representing companies who provide skilled workers in construction stated that the Commission should exclude the industry from the rule because non-competes are necessary to the industry's success. The commenter states that non-competes are necessary for investment in innovation and productivity in the industry. The comment cites to three studies. Two of the studies find a general reduction in productivity in construction and conclude, *inter alia,* further study is warranted to better understand the trend—Goolsbee and Syverson[927] and Huang, Chapman, and Burty ("NIST study"[928]). The third study is a McKinsey & Company report published in 2020 predicting innovation in the construction industry in the coming years.[929]

The evidence cited by this commenter is exclusively about broad trends in productivity in the industry, and what may impact those trends. None of the studies explicitly examines non-competes, and they do not support inferences on the effects of non-competes in this particular industry. Indeed, the Commission finds that the final rule addresses issues raised by the commenter. For example, the commenter notes that productivity in the industry has been declining for years. Notably, this downward trend exists with non-competes in use in the industry. The Commission notes that, under its analysis of the effect of the final rule, productivity will benefit because the final rule frees up labor and allows for greater innovation. The NIST study raises "skilled labor availability" as the very first factor that affects productivity. The Commission finds in Part IV that non-competes suppress labor mobility and the Commission believes the final rule will result in firms having access to workers who are a better, more productive fit. The McKinsey & Company report notes that changes in the industry will require adaptation by firms. The Commission believes the final rule will facilitate this adaptation by sharing non-confidential know-how across firms through increased mobility of workers. The rule may also help mitigate, and certainly will not exacerbate, concerns over increased concentration in the industry raised in the McKinsey & Company report, as the Commission finds that non-competes inhibit new business formation in Part IV.B.3.b.i. Moreover, the Commission believes non-competes may increase concentration, as discussed in Part IV.B.3.b.iii.

Additionally, the Commission finds that less restrictive alternatives, including appropriately tailored NDAs and non-solicitation agreements, are sufficient to address disclosure of confidential information and concerns related to client business. With respect to concerns that the construction industry as a whole is suffering from under-investment in capital and that the final rule may further disincentivize capital investment, as the Commission finds in Part IV.B.3.b.i, non-competes inhibit new business formation. The increase in new business formation from the final rule will bring new capital to bear in the industry. The Commission addresses the empirical literature and comments related to capital investment in detail Part IV.D.1. The Commission notes here that it is not clear any purported capital investment associated with non-competes is entirely beneficial because it may be the result of firms over-investing in capital because they do not face competition on the merits. Even if there is some net decrease in capital investment due to the final rule, commenters provide no reason to believe it would be a material amount.

[925] *Id.*

[926] Individual commenter, FTC–2023–0007–12779.

[927] Austan Goolsbee & Chad Syverson, *The Strange and Awful Path of Productivity in the U.S. Construction Sector* (NBER Working Paper 30845, Jan. 2023).

[928] Allison L. Huang, Robert E. Chapman, & David Burty, *Metrics and Tools for Measuring Construction Productivity: Technical and Empirical Considerations,* Nat'l Inst. of Standards and Tech., Bldg. and Fire Rsch. Lab., NIST Special Publication 110 (September 2009).

[929] McKinsey & Co., *The Next Normal in Construction: How Disruption is Reshaping the World's Largest Ecosystem* (June 2020).

4. Exclusion for Covered Market Participants That Have Competitors Outside the FTC's Jurisdiction

The Commission explained in the NPRM that some entities that would otherwise be employers may not be subject to the final rule to the extent they are exempted from coverage under the FTC Act.[930] As described in Part II.E.1, the Act exempts, *inter alia,* ''banks,'' ''persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act of 1921''[931] as well as an entity that is not ''organized to carry on business for its own profit or that of its members.''[932] A few business and trade organization commenters argued the Commission should rescind the proposal or should not promulgate the rule because limits on the Commission's jurisdiction mean that the rule will distort competitive conditions where coverage by the final rule may not be universal. These commenters identified industries where employers excluded from the Commission's jurisdiction compete with covered persons, including livestock and meatpacking industries, and areas where government or private employers subject to the State action doctrine compete with covered employers. They contended that excluded employers will be able to use non-competes while their covered competitors are legally prohibited from doing so, advantaging excluded employers.

The Commission declines to rescind the proposal or otherwise refrain from promulgating a rule simply because the rule would not cover firms outside the Commission's jurisdiction. As an initial matter, jurisdictional limits are not unique to the Commission. All agencies have limits on their jurisdiction—many of which do not neatly map to all competitors in a particular market. Moreover, as explained in Parts IV and X, the final rule will have substantial benefits notwithstanding the FTC Act's jurisdictional limits, including increases in worker earnings, new firm formation, competition, innovation, and a decrease in health care prices (and potentially other prices). Furthermore, the Commission finds the risk of material disparate impact in markets where some but not all employers are covered by the final rule is minimal and, in any event, the final rule's overall benefits justify any such potential impact. As commenters acknowledged, excluded employers already compete with covered employers in the same markets.

That is, coverage under the FTC Act—whether an employer is subject to the FTC Act and enforcement by the FTC—differs across a range of topics and long predates this final rule, which does not materially alter the status quo in that respect. Moreover, even in the absence of the rule, firms within the jurisdiction of the FTC Act are already subject to potential FTC enforcement against unfair methods of competition, including against non-competes, while firms outside the FTC's jurisdiction are not. The final rule does not alter that basic landscape.

At least one financial services industry commenter stated that national banks are outside of the Commission's jurisdiction and argued the final rule should exclude bank holding companies, subsidiaries, and other affiliates of Federally regulated banks to avoid disparate treatment of workers employed by different affiliates within the same organization, and because those entities are already heavily regulated. The Commission declines to exclude bank holding companies, subsidiaries, and other affiliates of Federally regulated banks that fall within the Commission's jurisdiction. While these institutions may be highly regulated, and depending on the corporate structure non-competes may be allowed for some workers but not others, the Commission finds that neither factor justifies excluding them from the final rule. If Federally regulated banks are concerned about disparate treatment of workers employed by their own different affiliates, they have the option to stop using non-competes across all their affiliates.

A corporation wholly owned by an Indian tribe asserted that the Commission should exclude Indian tribes and their wholly owned business entities from the definition of ''employer.'' The commenter asserted that the FTC Act does not explicitly grant jurisdiction over Indian tribes and their corporate arms. The commenter further argued that critical tribal revenue will be lost if tribal businesses' ability to retain skilled workers is impacted. The Commission declines to categorically exclude tribes or tribal businesses from coverage under the final rule. The FTC Act is a law of general applicability that applies to Indians, Indian Tribes, and tribal businesses.[933] The Commission

recognizes, however, that in some instances these entities may be organized in such a way that they are outside the Commission's jurisdiction.[934] Whether a given Tribe or tribal business is a corporation within the FTC Act will be a fact-dependent inquiry. The Commission is aware of no evidence suggesting the final rule would disproportionately impact tribes or tribal businesses.[935]

5. Coverage of Healthcare Industry

Many commenters representing healthcare organizations and industry trade associations stated the Commission should exclude some or all of the healthcare industry from the rule because they believe it is uniquely situated in various ways. The Commission declines to adopt an exception specifically for the healthcare industry. The Commission is not persuaded that the healthcare industry is uniquely situated in a way that justifies an exemption from the final rule. The Commission finds use of non-competes to be an unfair method of competition that tends to negatively affect labor and product and services markets, including in this vital industry; the Commission also specifically finds that non-competes increase healthcare costs. Moreover, the Commission is unconvinced that prohibiting the use of non-competes in the healthcare industry will have the claimed negative effects.

a. Comments Received

Many business and trade industry commenters from the healthcare industry seeking an exception,

[930] NPRM at 3510.

[931] *Id.* (citing 15 U.S.C. 45(a)(2)).

[932] *Id.* (citing 15 U.S.C. 44).

[933] *See Fed. Power Comm'n* v. *Tuscarora Indian Nation,* 362 U.S. 99, 116–17 (1960) (examining case law supporting the conclusion that ''a general statute in terms applying to all persons includes Indians and their property interests''); *FTC* v. *AMG*

*Servs., Inc.,* No. 2:12–CV–00536–GMN, 2013 WL 7870795, at *16–*21 (D. Nev. July 16, 2013), *report and recommendation adopted,* No. 2:12–CV–00536–GMN, 2014 WL 910302 (D. Nev. Mar. 7, 2014) (discussing the FTC Act's applicability to Indian Tribes and tribal businesses).

[934] *See, e.g., AMG Servs.,* 2013 WL 7870795, at *22 (finding genuine dispute of material fact barring summary judgment on question of whether tribal chartered corporations were corporations under the FTC Act).

[935] The commenter also asked the Commission to engage Indian tribes about the proposed rule, citing Executive Order 13175. However, the Commission notes that Executive Order 13175, which requires consultation with Indian Tribes before promulgating certain rules, does not apply to independent regulatory agencies such as the Commission. E.O. No. 13175, 65 FR 67249 (Nov. 6, 2000) (stating that the term ''agency,'' which governs the applicability of the executive order, excludes agencies ''considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5)''); 44 U.S.C. 3502(5) (listing the Commission as an ''independent regulatory agency''). The Commission did, however, provide extensive opportunities for public input from any and all stakeholders, including a 120-day comment period (extended from 90 days) and a public forum held on February 16, 2023, that provided an opportunity to directly share experiences with non-competes.

including, for example, hospitals, physician practices, and surgery centers, focused on whether the Commission has jurisdiction to regulate nonprofit entities registered under section 501(c) of the Internal Revenue Code. The Commission addresses its jurisdiction in Part II.E and considers comments related to requests for an industry-based exclusion for all or part of the healthcare industry in this section. As stated in Part II.E, entities claiming tax exempt status as nonprofits are not categorically beyond the Commission's jurisdiction, but the Commission recognizes that not all entities in the healthcare industry fall under its jurisdiction.

Based on the assumption that entities claiming tax-exempt status as nonprofits and publicly owned healthcare organizations would be exempt, many industry commenters contended that for-profit healthcare organizations must be also exempted from the rule as a matter of equal treatment. Commenters cited data from the American Hospital Association (AHA) indicating that as many as 58% of all U.S. hospital systems claim tax-exempt status as nonprofits, 24% are for-profit hospitals, and 19% are State and local government hospitals. One commenter cited AHA data indicating that 78.8% of for-profit hospitals are located in the same Hospital Referral Region (HRR) as at least one entity that claims tax-exempt status as a nonprofit. Many commenters argued that for-profit entities and entities that claim nonprofit status compete for patients, physician and non-physician staff, and market share. These commenters contended that a rule covering only for-profit healthcare entities will distort the market in favor of entities claiming tax-exempt status as nonprofits, which would continue using non-competes. One commenter identifying as an entity claiming nonprofit tax-exempt status argued that such entities need to rely on non-competes to compete with for-profit competitors because, unlike for-profit health systems, they invest significantly in specialized training and mentorship, and offer a guaranteed minimum salary to recent graduates.

Some commenters contended that favoring entities claiming tax-exempt status as nonprofits would have negative effects. Some commenters argued that disparate coverage under the rule may exacerbate consolidation in the healthcare industry by advantaging entities that claim tax-exempt status as nonprofits. They stated that increased consolidation would reduce the available supply of skilled labor for for-profit hospitals, increasing labor costs and contributing to higher prices paid

by patients. Commenters noted a trend in physicians increasingly leaving private practice to work at large hospital groups claiming tax-exempt status as nonprofits, which, they contended, may continue to lock those physicians up using non-competes. Industry commenters also argued that insurance premiums will rise more than they would absent the rule because of the greater market power and resulting leverage of entities that claim tax-exempt status as nonprofits in provider network negotiations. One manufacturing industry association commenter argued that the burden of rising premiums will be passed on to manufacturers who provide health insurance to their employees.

Commenters also argued that a rule covering for-profit healthcare providers would cause independent, physician-owned practices, and small community practices to suffer a competitive disadvantage compared to larger entities that claim tax-exempt status as nonprofits and public hospital groups, reducing the number of these practices and interrupting continuity of care for their patients. Commenters stated that such practices will suffer these consequences acutely in States or localities that are particularly saturated with entities that claim tax-exempt status as nonprofits or exempt State or local hospitals, and cited New York and Mississippi as examples. A commenter claimed that public hospitals regulated by the Commission will incur losses because of their reduced ability to hire and retain physicians that perform profitable procedures. One commenter cited a 1996 Commission study to contend that, all else equal, hospitals that claim tax-exempt status as nonprofits set higher prices when they have more market power. A business commenter contended that, given what they considered a large-scale exemption of certain physician employers from the Commission's jurisdiction, the States are more appropriate regulators of non-competes between physicians and employers. Other commenters claimed that the Commission must further study the consequences of differential treatment.

Conversely, many commenters vociferously opposed exempting entities that claim tax-exempt status as nonprofits from coverage under the final rule. Several commenters contended that, in practice, many entities that claim tax-exempt status as nonprofits are in fact "organized to carry on business for [their] own profit or that of [their] members" such that they are "corporations" under the FTC Act. These commenters cited reports by

investigative journalists to contend that some hospitals claiming tax-exempt status as nonprofits have excess revenue and operate like for-profit entities. A few commenters stated that consolidation in the healthcare industry is largely driven by entities that claim tax-exempt status as nonprofits as opposed to their for-profit competitors, which are sometimes forced to consolidate to compete with the larger hospital groups that claim tax-exempt status as nonprofits. Commenters also contended that many hospitals claiming tax-exempt status as nonprofits use self-serving interpretations of the IRS's "community benefit" standard to fulfill requirements for tax exemption, suggesting that the best way to address unfairness and consolidation in the healthcare industry is to strictly enforce the IRS's standards and to remove the tax-exempt status of organizations that do not comply. An academic commenter argued that the distinction between for-profit hospitals and nonprofit hospitals has become less clear over time, and that the Commission should presumptively treat hospitals claiming nonprofit tax-exempt status as operating for profit unless they can establish that they fall outside of the Commission's jurisdiction.

The Commission also received many comments about coverage of the health care sector generally under the rule. Some commenters urged the Commission to ensure that health care workers, including doctors and physicians, were covered by the final rule. Several commenters stated that eliminating non-competes would allow doctors wishing to change jobs to stay in the same geographic area, fostering patient choice and improving continuity of care. Other commenters urged the Commission to create an exception for health care workers. Some argued that the evidence does not support the Commission's conclusion that non-competes depress earnings in health care. Other reasons commenters cited in support of an exception included concerns about continuity and quality of care for patients, the increased costs for employers of health care workers, physicians' negotiating power with their employers, and the effect on incentives for employers to train their health care workers.[936]

Thousands of healthcare workers submitted comments supporting a ban on non-competes. Worker commenters

---

[936] Some commenters also contended that the health care industry should be exempt from the rule because many health care providers fall outside of the Commission's jurisdiction. The Commission summarizes and responds to those commenters in Part II.E.2.

did not always identify whether they were working at for-profit organizations, entities that claim tax-exempt status as nonprofits, or State or local healthcare organizations, but each category was represented in the comments. These commenters detailed the negative effects of non-competes on their families, their mental health, their financial health, and their career advancement, as elaborated in Part IV.B.2.b.ii. Specifically, healthcare workers commented that because non-competes prohibited them from switching jobs or starting their own businesses, they had to stay at jobs with unsafe and hostile working conditions, to take jobs with long commutes, to relocate their families, to give up training opportunities, and to abandon patients who wanted to continue seeing them. Illustrative comments are highlighted in Parts I and IV.

Additionally, commenters stated the hardship patients have suffered because of non-competes when, for example, their physician was required to move out of their area to work for a different employer. The Commission highlights some of these comments in Part IV.B.2.b.ii and includes two further illustrative comments here:

• As a patient, non compete clauses are affecting mine and my [family's] ability to receive medical care. Our pediatrician left a practice and we aren't able to be informed where they are going. When we find out, it is an hour away [because] of the non compete. And when we look for other [doctors] closer they aren't accepting new patients. So for an entire year we are driving 2 [hours] round trip to see our pediatrician until they can move back to a local medical group. The non compete clause is not just affecting the life of the [doctor], but is also impacting many of us who rely on their services.[937]

• As a family physician this has caused much grief and obstructs my desire to work and provide care for underserved populations. I am a NHSC scholarship recipient and due to non compete clauses was unable to continue working in the town I served due to its rurality. This created a maternity desert in the region I served. Now in a more metropolitan area, there has been an exodus of physicians in the area due to non compete clauses that has caused worsening access to primary care, specialty services, including behavioral health and substance use disorder treatment.[938]

A number of physician group commenters stated that nonprofit healthcare organizations regularly impose non-competes on physicians, and that the impact of the rule would be limited if nonprofits are not required to

comply. Some physician group commenters urged the Commission to work with other agencies to fill in gaps in applying the rule based on the Commission's jurisdiction, citing the importance of banning non-competes as widely as possible because of the harms they impose on physicians and patients irrespective of employer status. Specifically, commenters suggested that the Commission use its antitrust and referral authority to aggressively monitor nonprofit organizations for antitrust violations, to collaborate with other Federal agencies, including the IRS, and to provide incentives and guidance to States, which can enact measures to ensure that a prohibition on non-competes is implemented comprehensively. One commenter also noted that a ban would bring scrutiny to non-competes and would likely intensify pressure to eliminate them. A few commenters also contended that entities claiming tax-exempt status as nonprofits are subject to the Commission's jurisdiction as "persons" under the FTC Act.

**b. The Final Rule**

After carefully considering commenters' arguments, the Commission declines to exempt for-profit healthcare employers or to exempt the healthcare industry altogether.

First, as described in Part IV, the Commission finds that certain uses of non-competes are an unfair method of competition. The use of unfair methods of competition cannot be justified on the basis that it provides a firm with pecuniary benefits to help them compete with other firms that use similar tactics.[939] In this case, for-profit and other covered entities have urged the Commission to allow them to continue to employ an unfair method of competition (*i.e.,* use non-competes) because some competitors are not prohibited from doing so as they are beyond the Commission's jurisdiction. The Commission is committed to stopping unlawful conduct to the full extent of its jurisdiction. For example, the Commission would not refrain from seeking to enjoin unlawful price fixing by a for-profit within its jurisdiction because entities outside its jurisdiction

under the FTC Act would not be subject to the same FTC action.

Second, the Commission disagrees with commenters' contention that all hospitals and healthcare entities claiming tax-exempt status as nonprofits necessarily fall outside the Commission's jurisdiction and, thus, the final rule's purview. As explained in Part II.E.2, a corporation's "tax-exempt status is certainly one factor to be considered," but that status is not coterminous with the FTC's jurisdiction and therefore "does not obviate the relevance of further inquiry into a [corporation's] operations and goals."[940] Accordingly, as noted by commenters, entities that claim tax-exempt nonprofit status may in fact fall under the Commission's jurisdiction. Similarly, whether the final rule would apply to quasi-public entities or certain private entities that partner with States or localities, such as hospitals affiliated with or run in collaboration with States or localities, depends on whether the particular entity or action is an act of the State itself under the State action doctrine, which is a well-established, fact-specific inquiry.[941] Thus, some portion of the 58% of hospitals that claim tax-exempt status as nonprofits and the 19% of hospitals that are identified as State or local government hospitals in the data cited by AHA likely fall under the Commission's jurisdiction and the final rule's purview. Further, many States have banned non-competes for a variety of healthcare professionals in both for-profit and nonprofits entities by statute.[942] Even if

[937] Individual commenter, FTC–2023–0007–10085.

[938] Individual commenter, FTC–2023–0007–0924.

[939] *See Atl. Refin. Co.* v. *FTC,* 381 U.S. 357, 371 (1965) ("Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves.").

[940] *In the Matter of the Am. Med. Assoc.,* 94 F.T.C. 701, 1979 WL 199033 (FTC Oct. 12, 1979).

[941] *In the Matter of Ky. Household Goods Carriers Ass'n, Inc.,* 139 F.T.C. 404, 405 (2005) ("The Supreme Court has made clear that the state action doctrine only applies when (1) the challenged restraint is clearly articulated and affirmatively expressed as state policy, and (2) the policy is actively supervised by the State itself.") (citation and alterations omitted); *see also id.* at 410–13 (applying test); *Elec. Inspectors, Inc.* v. *Vill. of East Hills,* 320 F.3d 110, 117–19 (2d Cir. 2003).

[942] Colo. Rev. Stat. sec. 8–2–113(5)(a) (Colorado statute banning non-competes for physicians); D.C. Code sec. 32–581.01 (D.C. statute banning non-competes for medical specialists earning less than $250,000, compared to $150,000 for other workers); Fla. Stat. sec. 542.336 (Florida statute banning non-competes for physician specialists in certain circumstances); Ind. Code Ann. secs. 25–22.5–5.5–2 and 2.5(b) (Indiana statute banning non-competes for primary care physicians and restricting non-competes for other physicians); Iowa Code sec. 135Q.2(3)(a) (banning non-competes for health care employment agency workers who provide nursing services); Ky. Rev. Stat. sec. 216.724(1)(a) (Kentucky statute banning non-competes for temporary direct care staff of health care services agencies); N.M. Stat. Ann. secs. 24–1I–1 and 2 (New Mexico statute banning non-competes for several types of health care practitioners); S.D. Codified Laws secs. 53–9–11.1–11.2 (South Dakota statute banning non-

Continued

the final rule's coverage extends only to hospitals that do not identify as tax-exempt non-profits based on AHA data, as explained in Part IV.A.1, the Commission finds every use of covered non-competes to be an unfair method of competition and concludes that the evidence supports the Commission's decision to promulgate this final rule, which covers the healthcare industry to the full extent of the Commission's authority.

Relatedly, in response to commenters' concern that large numbers of healthcare workers will not benefit from the final rule because they work for entities that the final rule does not cover, the Commission notes many workers at hospitals, including those that claims tax-exempt status as a nonprofit or government-owned hospital, contract with or otherwise work for a for-profit entity, such as a staffing agency or physician group. Although some of these individuals may work at an excluded hospital, the final rule applies to their employer—the staffing agency or for-profit physician group—because it is covered by the final rule.

The Commission disagrees with commenters stating the ability to use non-competes will provide a material competitive advantage to entities claiming tax-exempt status as nonprofit or publicly owned entities that are beyond the Commission's jurisdiction. To the contrary, those entities outside FTC jurisdiction that continue to deploy non-competes may be at a self-inflicted disadvantage in their ability to recruit workers, even if they derive some short-term benefit from trapping current workers in their employment. Furthermore, commenters' concern that for-profit healthcare entities will be at a competitive disadvantage is based on the false premise that entities outside the jurisdiction of the FTC will not be otherwise regulated or scrutinized with respect to the use of non-competes. States currently regulate non-competes by statute, regulation, and common law. According to the AHA data cited by commenters, over 12% (398/3,113) of nonprofit hospitals and 13% of government hospitals (187/1,409) are in States that ban non-competes for all employers. In any event, even if true, arguments that for-profit and other covered entities could suffer competitive harm by not being able to employ an unfair method of competition would not change the Commission's

competes for several types of healthcare practitioners); Tex. Bus. & Com. Code secs. 15.50–.52 (Texas statute restricting the use of non-competes for physicians).

finding that use of certain non-competes is an unfair method of competition, as further discussed in Part IV.

While the Commission shares commenters' concerns about consolidation in healthcare, it disagrees with commenters' contention that the purported competitive disadvantage to for-profit entities stemming from the final rule would exacerbate this problem. As some commenters stated, the Commission notes that hospitals claiming tax-exempt status as nonprofits are under increasing public scrutiny. Public and private studies and reports reveal that some such hospitals are operating to maximize profits, paying multi-million-dollar salaries to executives, deploying aggressive collection tactics with low-income patients, and spending less on community benefits than they receive in tax exemptions.[943] Economic studies by FTC staff demonstrate that these hospitals can and do exercise market power and raise prices similar to for-profit hospitals.[944] Thus, as courts have

[943] See, e.g., Press Release, Office of U.S. Sen. Chuck Grassley, *Bipartisan Senators Probe Potential Abuse Of Tax-Exempt Status By Nonprofit Hospitals* (Aug. 9, 2023), *https://www.grassley.senate.gov/news/news-releases/bipartisan-senators-probe-potential-abuse-of-tax-exempt-status-by-nonprofit-hospitals*; Request for Information Regarding Medical Payment Products, 88 FR 44281 (July 12, 2023); U.S. Gov't Accountability Off., Testimony Before the Subcommittee on Oversight, Committee on Ways and Means, House of Representatives, *Tax Administration: IRS Oversight of Hospital's Tax-Exempt Status*, GAO–23–106777 (Apr. 26, 2023), *https://www.gao.gov/assets/gao-23-106777.pdf*; *Pottstown Sch. Dist.* v. *Montgomery Cnty. Bd. of Assessment Appeals*, 289 A.3d 1142 (Pa. Commw. Ct. 2023) (holding that for-profit hospitals purchased by nonprofit claiming tax exempt status under Federal law do not qualify under State law for nonprofit tax exemption); *Phoenixville Hosp., LLC* v. *Cnty. of Chester Bd. of Assessment Appeals*, 293 A.3d 1248 (Pa. Commw. Ct. 2023); *Brandywine Hosp., LLC* v. *Cnty. of Chester Bd. of Assessment Appeals*, 291 A.3d 467 (Pa. Commw. Ct. 2023); *Jennersville Hosp., LLC* v. *Cnty of Chester Bd. of Assessment Appeals*, 293 A.3d 1248 (Pa. Commw. Ct. 2023); The Daily, *How Nonprofit Hospitals Put Profits Over Patients* (Jan. 5, 2023), *https://www.nytimes.com/2023/01/25/podcasts/the-daily/nonprofit-hospitals-investigation.html*; Gov't Accountability Off., *Tax Administration: Opportunities Exist to Improve Oversight of Hospitals' Tax-Exempt Status*, GAO–20–679 (Sept. 17, 2020), *https://www.gao.gov/products/gao-20-679*; Danielle Ofri, *Why Are Nonprofit Hospitals So Highly Profitable?*, N.Y. Times, Feb. 20, 2020, *https://www.nytimes.com/2020/02/20/opinion/nonprofit-hospitals.html*; Maya Miller & Beena Raghavendran, *Thousands of Poor Patients Face Lawsuits From Nonprofit Hospitals That Trap Them in Debt*, ProPublica (Sept. 13, 2019), *https://www.propublica.org/article/thousands-of-poor-patients-face-lawsuits-from-nonprofit-hospitals-that-trap-them-in-debt*.

[944] See, e.g., Michael G. Vita & Seth Sacher, *The Competitive Effects of Not-For-Profit Hospital Mergers: A Case Study*, 49 J. Indus. Econ. 63 (2001), *http://onlinelibrary.wiley.com/doi/10.1111/1467-6451.00138/epdf* (finding substantial price

recognized, the tax-exempt status as nonprofits of merging hospitals does not mitigate the potential for harm to competitive conditions.[945]

Commenters provide no empirical evidence, and the Commission is unaware of any such evidence, to support the theory that prohibiting non-competes would increase consolidation or raise prices. To the contrary, as elaborated in Parts IV.B.3.a and IV.B.3.b, the empirical literature suggests, and the Commission finds, that the final rule will increase competition and efficiency in healthcare markets, as workers at for-profit healthcare entities will be able to spin off new practices or work for different employers where their productivity is greater. This is true even if the Commission does not reach some portion of healthcare entities. While the Commission's prior research may indicate, as one commenter suggested, that nonprofit hospitals set higher prices when they have more market power, the Commission finds that the final rule is not likely to increase healthcare prices

increases resulting from a merger of nonprofit, community-based hospitals, and determining that mergers involving nonprofit hospitals are a legitimate focus of antitrust concern); Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction*, 18 Int'l J. Econ. Bus. 65, 79 (2011), *http://www.tandfonline.com/doi/full/10.1080/1357151676.2011.542956* (finding evidence of post-merger price increases ranging from 28%–44%, and concluding that "[o]ur results demonstrate that nonprofit hospitals may still raise price quite substantially after they merge. This suggests that mergers involving nonprofit hospitals should perhaps attract as much antitrust scrutiny as other hospital mergers.").

[945] See, e.g., FTC v. OSF Healthcare Sys., 852 F. Supp. 2d 1069, 1081 (N.D. Ill. 2012) ("[T]he evidence in this case reflects that nonprofit hospitals do seek to maximize the reimbursement rates they receive."); FTC v. ProMedica, No. 3:11 CV 47, 2011 WL 1219281 at *22 (N.D. Ohio Mar. 29, 2011) (finding that a nonprofit hospital entity "exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans."); United States v. Rockford Mem'l Corp., 898 F.2d 1278, 1284–87 (7th Cir. 1990) (rejecting the contention that nonprofit hospitals would not seek to maximize profits for exercising their market power); FTC v. Univ. Health, Inc., 938 F.2d 1206, 1213–14 (11th Cir. 1991) ("[T]he district court's assumption that University Health, as a nonprofit entity, would not act anticompetitively was improper."); Hospital Corp. of America v. FTC, 807 F.2d 1381, 1390–91 (7th Cir. 1986) (rejecting the contention that nonprofit hospitals would not engage in anticompetitive behavior). See also FTC & Dep't of Jusitce, *Improving Health Care: A Dose of Competition* 29–33 (2004), *https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf* (discussing the significance of nonprofit status in hospital merger cases, and concluding that the best available empirical evidence indicates that nonprofit hospitals exploit market power when given the opportunity and that "the profit/nonprofit status of the merging hospitals should not be considered a factor in predicting whether a hospital merger is likely to be anticompetitive").

through this same mechanism because it is unlikely to lead to significant increases in healthcare nonprofits' market share, if at all.

Moreover, the Commission has other tools to address consolidation in healthcare markets and is committed to using them. The Clayton Act grants the Commission authority to enforce compliance with, *inter alia*, section 7 of the Clayton Act. The Clayton Act does not include any carveout for entities that are nonprofit or otherwise do not operate for profit—and the FTC's jurisdictional limit based on the definition of "corporation" in the FTC Act does not apply in this context.[946] Accordingly, the Commission has authority under the Clayton Act to review and challenge mergers and acquisitions involving healthcare entities or hospitals regardless of nonprofit status.[947] Thus, even if the jurisdictional limitations of the final rule were to somehow incentivize some hospitals and other healthcare entities claiming non-profit status to consolidate, the Commission will continue to scrutinize those mergers and work with State partners to vigorously defend competition.[948] For the same reason, the Commission disagrees with commenters who contended that the effects of consolidation and staffing shortages will be worse in areas highly saturated with nonprofits claiming tax-exempt status.

Finally, the Commission disagrees with commenters that stated the Commission must further study the final rule's effect on healthcare workers and entities. The Commission has specific, long-time expertise in the healthcare market as anticompetitive mergers and conduct in healthcare markets have long been a focus of FTC law enforcement, research, and advocacy.[949] This work

includes economic analyses of the effects of mergers involving nonprofit hospitals and studies of the impacts of hospital mergers.[950] Accordingly, given this expertise and the extensive record in the rulemaking, the Commission finds it has sufficient understanding of healthcare markets and that the evidence supports the final rule's application to the healthcare industry.

### 6. Coverage of Franchisors Vis-à-Vis Franchisees

#### a. The Proposed Rule

The Commission proposed to exclude franchisees from the definition of "worker" and requested comment on whether and to what extent the rule should cover non-competes between franchisors and franchisees ("franchisor/franchisee non-competes").[951] The Commission explained that it proposed to exclude franchisees from the definition of "worker" because, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker.[952] The Commission also noted that the evidentiary record relates primarily to non-competes that arise out of employment. However, the Commission stated that, in some cases, franchisor/franchisee non-competes may present concerns under section 5 similar to the concerns presented by non-competes between employers and workers and sought comment on coverage of franchisor/franchisee non-competes.[953]

#### b. Comments Received

Many commenters requested that the final rule cover franchisor/franchisee

non-competes. Numerous commenters contended the franchisee-franchisor relationship is closer to a relationship between a worker and an employer than a relationship between businesses. These commenters argued that franchisees are often individual business owners who, like workers, lack bargaining power to negotiate over non-competes. One commenter stated that the Commission acknowledged in the Franchise Rule that franchisees generally lack bargaining power.[954] Several commenters, including industry commenters representing franchisees, argued that franchisees tend to suffer even greater power imbalances than workers because many risk significant personal assets to start their franchises. According to these commenters, this risk places acute strain on franchisees' bargaining leverage when negotiating to renew franchise agreements because, if they choose to reject a new agreement, they not only lose the opportunity to continue working in the same field due to their non-compete, but also the value of their investment.

Commenters seeking coverage of franchisor/franchisee non-competes also stated that these non-competes do not protect legitimate interests because franchisors generally do not entrust franchisees with trade secrets or details about their broader commercial strategy. These commenters stated that, even if franchisees do receive such information, franchisors have less restrictive alternatives for protecting it, including NDAs and trade secret law. Some commenters also stated that non-competes have anticompetitive effects because franchisors may degrade the quality of inputs or raise input prices without fearing that their existing franchisees will leave for a competitor.

Many franchisee commenters also stated their desire to compete after exiting their franchise relationships. Franchisees also stated that their non-competes harm their negotiating position in bargaining over franchise renewal terms. These franchisees stated that franchisors can impose higher royalty rates or other less favorable terms over time as the franchisees feel powerless to refuse or make effective counteroffers, due to their non-competes. Many franchisees asserted that their non-competes are overbroad because they restrain individual owners' spouses and other close relatives from competing in the same industry. Some franchisees stated that their non-competes include penalties for choosing

---

[946] 15 U.S.C. 18; 15 U.S.C. 45; *Univ. Health, Inc.,* 938 F.2d at 1214–16.

[947] *Id.*

[948] *See, e.g., In the Matter of RWJ Barnabas Health and Saint Peters Healthcare Sys.,* Docket No. 9409 (Jun. 2, 2022) (complaint); *FTC v. Advoc. Health Care,* No. 15 C 11473, 2017 WL 1022015, at *1 (N.D. Ill. Mar. 16, 2017); *FTC v. Penn State Hershey Med. Ctr.,* 838 F.3d 327, 332 (3d Cir. 2016).

[949] *See, e.g.,* FTC, *Competition in the Health Care Marketplace, https://www.ftc.gov/tips-advice/ competition-guidance/industry-guidance/health-care;* FTC, *Overview of FTC Actions in Health Care Services and Products* (2022), *https://www.ftc.gov/ system/files/ftc_gov/pdf/2022.04.08 %20Overview%20Healthcare%20 %28final%29.pdf;* Joseph Farrell et al., *Economics at the FTC: Retrospective Merger Analysis with a Focus on Hospitals,* 35 Rev. Indus. Org. 369 (2009), *http://link.springer.com/content/pdf/ 10.1007%2Fs11151-009-9231-2.pdf;* FTC, *Examining Health Care Competition* (Mar. 20–21, 2014), *https://www.ftc.gov/news-events/ calendar/2014/03/examining-health-care- competition;* FTC & Dep't of Justice, *Examining*

*Health Care Competition* (Feb. 24–25, 2015), *https://www.ftc.gov/news-events/events-calendar/ 2015/02/examining-health-care-competition; Improving Health Care: A Dose of Competition, supra* note 945.

[950] *See, e.g.,* FTC, *FTC Policy Perspectives on Certificates of Public Advantage* (Aug. 15, 2022), *www.ftc.gov/copa;* FTC, *Physician Group and Healthcare Facility Merger Study* (ongoing, initiated Jan. 2020), *https://www.ftc.gov/enforcement/ competition-matters/2021/04/physician-group- healthcare-facility-merger-study;* Christopher Garmon, *The Accuracy of Hospital Merger Screening Methods,* 48 RAND J. of Econ. 1068 (2017), *https://www.ftc.gov/system/files/ documents/reports/accuracy-hospital-merger- screening-methods/rwp_326.pdf;* Joseph Farrell, et al., *Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets,* 39 Rev. Indus. Org. 271 (2011), *http:// link.springer.com/content/pdf/10.1007%2Fs11151- 011-9320-x.pdf;* Devesh Raval, Ted Rosenbaum, & Steve Tenn, *A Semiparametric Discrete Choice Model: An Application to Hospital Mergers,* 55 Econ. Inquiry 1919 (2017).

[951] NPRM at 3511, 3520.

[952] *Id.* at 3511.

[953] *Id.* at 3520.

[954] Trade Regulation Rule on Franchising and Business Opportunity Ventures, 43 FR 59614, 59625 (Dec. 21, 1978).

not to renew their contracts even if they do not compete.

Other commenters, primarily franchisors and trade organizations, stated that franchisor/franchisee non-competes should be excluded from the final rule. Many of these commenters argued that franchisor/franchisee non-competes are more similar to restrictive covenants between businesses than non-competes between employers and workers. Some of these commenters argued that franchisor/franchisee non-competes are more justified than non-competes in the employment context because, unlike employment relationships, entering into a franchise agreement is completely voluntary. Some commenters argued that, unlike non-competes in the employment context, franchisor/franchisee non-competes are only entered into by individuals with access to substantial capital and who therefore always have the option of starting their own businesses.

Many of these commenters argued that prohibiting non-competes for franchisees would threaten to severely disrupt or destroy the franchise business model, and that this would harm franchisors and franchisees alike, as franchising offers a unique opportunity for working people to become entrepreneurs with established brands. Commenters asserted non-competes are critical to the franchise business model because they offer both franchisors and franchisees confidence that existing franchisees will likely stay with a brand and refrain from using a franchise's trade secrets to unfairly compete against the franchisor. Commenters also asserted that franchisees are often exposed to proprietary information through training manuals and operational support and that non-competes help protect this information. In addition, commenters contended franchisor/franchisee non-competes protect investments made by other franchisees and maintain a franchise's goodwill.

Commenters supporting the exclusion of franchisor/franchisee non-competes from the final rule also asserted that the Commission lacked an evidentiary basis for covering such non-competes. These commenters also claimed no State has prohibited non-competes for franchisees, and the Commission would therefore lack data from natural experiments to justify extending a final rule to the franchise context.

### c. The Final Rule

The Commission continues to believe that, as many commenters attested, franchisor/franchisee non-competes

may in some cases present concerns under section 5 similar to the concerns presented by non-competes between employers and workers. The comments from franchisors, franchisees, and others provide the Commission with further information about non-competes in the context of the franchisor/franchisee relationship, but the evidentiary record before the Commission continues to relate primarily to non-competes that arise out of employment. Accordingly, the final rule does not cover franchisor/franchisee non-competes. Non-competes used in the context of franchisor/franchisee relationships remain subject to State common law and Federal and State antitrust laws, including section 5 of the FTC Act.

## VI. Section 910.4: Relation to State Laws and Preservation of State Authority and Private Rights of Action

In proposed § 910.4, the Commission addressed State laws and preemption. Based on comments, the Commission adopts a modified provision clarifying and explaining that States may continue to enforce laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than the final rule.[955]

### A. The Proposed Rule

The NPRM contained an express preemption provision, proposed § 910.4, that explained the proposed rule preempted State laws inconsistent with the rule and did not preempt State laws that offer greater protection than the rule. The NPRM explained that when a State law offers greater protection than the rule, employers would be able to comply with both the NPRM and the State law. Thus, the proposed rule would have established a regulatory floor, but not a ceiling. The NPRM provided two hypothetical examples, one of a State law that would be inconsistent with, and therefore preempted by, proposed § 910.2(a) and one that would not because it satisfied the savings clause by offering greater protection and was not inconsistent with proposed part 910.[956]

### B. Authority for Preemption

Numerous commenters supported the preemption of inconsistent State laws. Some commenters asserted the Commission lacks the legal authority to preempt State laws, including State common law, on non-competes because Congress allegedly did not confer the

necessary authority to the Commission or because of federalism principles. They argued there must be clear Congressional intent to preempt State laws relating to non-competes.[957] Numerous commenters asserted the Commission lacks clear authority from Congress to preempt State laws on non-competes, arguing the FTC's statutory authority neither expressly nor impliedly authorizes preemption of non-competes. Commenters made similar points based on cases about the preemptive force of the Commission's UDAP regulations. For example, one commenter asserted the FTC may not have the authority to preempt less restrictive State laws, citing *American Optometric Association* v. *FTC*, in which the court noted the need for congressional authorization for the Commission to preempt an entire field of State laws that arise from the State's police powers.[958]

The Commission finds it has the authority to promulgate regulations that preempt inconsistent State laws under section 6(g), together with section 5, of the FTC Act. Even without an express preemption provision, Federal statutes and regulations preempt conflicting State laws. Under the Supreme Court's conflict preemption doctrine, a Federal statute or regulation impliedly preempts State laws when it is impossible for the regulated parties to comply with both the Federal and the State law, or when a State law is an obstacle to achieving the full purposes and objectives of the Federal law.[959] "Federal regulations have no less pre-emptive effect than Federal statutes." [960] Indeed, even commenters who questioned the FTC's authority to preempt State laws agreed that if a Federal agency promulgates a rule pursuant to its Congressionally conferred authority, the rule preempts conflicting State laws.

As discussed in Parts II.A, II.B, and II.C, the Commission has the authority to promulgate this final rule. Accordingly, the final rule preempts conflicting State laws. To provide a clear explanation of the Commission's intent and the scope of preemption effected by the final rule, the final rule includes an express preemption

---

[955] State statutes, regulations, orders, or interpretations, including State common law, are referred to as "State laws" for ease of reference.

[956] NPRM at 3515.

[957] Comments on the Commission's authority to promulgate this final rule, separate from the issue of preemption of State law, are summarized in Part II.

[958] *Am. Optometric Ass'n* v. *FTC*, 626 F.2d 896, 910 (1980).

[959] *See, e.g., Federal Preemption: A Legal Primer,* Cong. Rsch. Serv., 23 (May 18, 2023) (Report R45825), *https://crsreports.congress.gov/product/pdf/R/R45825/3.*

[960] *Fid. Fed. Sav. & Loan Ass'n* v. *de la Cuesta,* 458 U.S. 141, 153 (1982).

provision at § 910.4.[961] As discussed in Part VI.D, the Commission has modified proposed § 910.4 to make clear that even when the scope of non-compete prohibitions under a State law is less than that of the final rule, State authorities and persons may enforce the State law by, for example, bringing actions against non-competes that are illegal under the State law.

## C. The Benefits of Preemption

Numerous commenters stated that variations in State laws chill worker mobility and expressed support for a uniform Federal standard. Some commenters explained that a preemption clause could bring clarity to the law's effect.

The U.S. Department of Justice commented that, due to the patchwork of State laws, a worker may be free to switch jobs in one jurisdiction but subject to a non-compete in another, creating uncertainty as to the non-compete's enforceability for both firms and workers.[962] In another commenter's view, the variation in State non-compete laws creates competitive disadvantages for companies in States that ban such clauses, necessitating a Federal ban.

Another commenter pointed out that most States have not passed statutes that ban or restrict non-competes, and that existing statutes cover different categories of workers and different wage levels, making it difficult for workers to know whether employers can enforce a particular non-compete. The commenter stated that variations in the legal authority of State attorneys general to take action on the public's behalf also limit the effectiveness of State restrictions on non-competes. A number of commenters explained that the difficulties arising from variations in State non-compete laws are exacerbated by the increase in remote and hybrid work, and workers who travel to work across State lines. Accordingly, many commenters favored a uniform Federal standard that would promote certainty for employers and workers. Even some commenters who generally opposed banning non-competes favored preemption to eliminate the patchwork of State laws that makes it difficult for workers to know the applicable law and encourages forum shopping by employers who want to bring suits in sympathetic jurisdictions.

Other commenters opposed preemption, asserting that State legislatures and courts are best situated to address non-competes and that the States have historically regulated this area. They contended States should be allowed to continue adjusting the scope of restrictions on non-competes including applicability to different types of workers, time span, and geographic scope.

The Commission finds that preemption of State laws, including State common law, that conflict with the final rule best mitigates the negative effects of the patchwork of State laws, including chilling worker mobility and undercutting competitive conditions in labor and product and services markets.[963] Preempting this patchwork with a Federal floor is particularly important given the increase in work across State lines, and remote and hybrid work, since the COVID–19 pandemic.

Moreover, as discussed in Part IX.C, preemption furthers a primary goal of the final rule: to provide a uniform, high level of protection for competition that is easy for both employers and workers to understand and makes it less likely that employers will subject workers to illegal non-competes or forum shop. Indeed, some commenters who otherwise opposed the proposed ban on non-competes regarded the patchwork itself burdensome to employers as well as workers and noted the rule would reduce burden by eliminating uncertainty and confusion caused by State law variations.[964] As described in Part IX.C, the Commission has determined that declining to issue this final rule and continuing to rely solely on State laws and case-by-case adjudication would be less effective than issuing a clear national standard. The Commission concludes, however, that supplementing the final rule with additional State authority and resources, so long as the State laws are not inconsistent with the final rule, will assist in protecting both workers and competition.

## D. The Extent of Preemption

Some commenters strongly supported the NPRM but expressed concern that the preemption provision as proposed could undermine States' efforts to curb non-competes and would thereby undercut the final rule's effectiveness. These commenters stated that under one interpretation, proposed § 910.4 could preempt State laws that prohibit non-competes for workers earning less than a specified income because the law as a whole may not be deemed to provide greater protection than the final rule. In their view, such an interpretation would not further the final rule's goals, because States with income-based restrictions on non-competes rather than complete bans may offer covered workers protections against non-competes that the FTC's proposed rule would not provide, such as State enforcement, private rights of action, and certain financial penalties.[965]

These commenters also asserted that in many cases, State agencies and residents could be better positioned to respond to unlawful non-compete use specific to a particular State, but they would be unable to do so and dependent on the Commission if their laws were fully preempted. To enable concurrent enforcement of State laws that restrict the use of non-competes, thereby increasing the enforcement resources devoted to the issue, they recommended a "savings clause" that would exempt from preemption State laws that provide workers with protections substantially similar to or greater than those afforded by the

---

[961] Many FTC regulations, including regulations promulgated under section 6(g) of the FTC Act, include provisions addressing State laws and preemption. *See, e.g.,* Funeral Rule, 16 CFR 453.9 (exempting from preemption State laws that "afford an *overall* level of protection that is *as great as, or greater than,* the protection afforded by" the FTC's Rule) (emphasis added); Concerning Cooling Off Period for Sales Made at Homes or at Certain Other Locations, 16 CFR 429.2(b) (exempting laws and ordinances that provide "a right to cancel a door-to-door sale that is *substantially the same or greater* than that provided in this part") (emphasis added); Business Opportunity Rule, 16 CFR 437.9(b) ("The FTC does not intend to preempt the business opportunity sales practices laws of any [S]tate or local government, except to the extent of any conflict with this part. A law is not in conflict with this Rule if it affords prospective purchasers *equal or greater protection*[.]") (emphasis added); Mail, internet, or Telephone Order Merchandise Rule, 16 CFR 435.3(b) ("This part does supersede those provisions of any State law, municipal ordinance, or other local regulation which are inconsistent with this part to the extent that those provisions do not provide a buyer with rights which are *equal to or greater* than those rights granted a buyer by this part.") (emphasis added); Franchise Rule, 16 CFR 436.10(b) ("The FTC does not intend to preempt the franchise practices laws of any [S]tate or local government, except to the extent of any inconsistency with part 436. A law is not inconsistent with part 436 if it affords prospective franchisees *equal or greater protection*[.]") (emphasis added); Labeling and Restrictions of Home Insulation, 16 CFR 460.24(b) (preemption of "State and local laws and regulations that are inconsistent with, or frustrate the purposes of this regulation"). *See also* Part II.B.

[962] Comment of Dep't of Justice Antitrust Div., FTC–2023–0007–20872 at 7.

[963] *See* Part IX.C.

[964] *See, e.g.,* Comment of Mech. Contractors Ass'n of Am., FTC–2023–0007–18218 (although opposed to the proposed rule, MCCA's position supports a single Federal rule and some level of preemption).

[965] *See* Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043, at 14–15 ("jurisdictions like Colorado, Illinois, Washington, and the District of Columbia have passed laws that ban non-competes for workers making under a specified income threshold and also include remedies provisions that authorize [S]tate agencies and residents to enforce the law"); *id.* at 9–11 (discussing State enforcement, private action, and damages in several State non-compete laws).

rule.[966] They also recommended that the rule not preempt State antitrust and consumer protection laws that may protect workers against non-competes and other restrictive employment arrangements as those laws can provide another enforcement avenue for State agencies and residents.

Another commenter recommended including a narrow reverse preemption provision so that relevant State laws in States that enact the Uniform Restrictive Employment Agreement Act[967] would not be preempted.[968] The comment asserted that by doing so, a final rule would preserve a role for the States and encourage their cooperation with the Commission, and also provide greater protections for employees than the proposed rule provided in several ways, such as allowing for greater enforcement and including classes of employers that the final rule would not cover.[969] The uniform law would ban non-competes for workers earning at or below the State's annual mean wage and would allow non-competes for those earning more, but apply limits and require disclosures for any non-compete.

Based on comments, the Commission has modified the final rule's preemption provision to clarify and explain that State laws that restrict non-competes and do not conflict with the final rule are not preempted. Section 910.4 also expressly references State common law, antitrust law, and consumer protection law, so that the intended scope of preemption is clear. State common law is expressly referenced because many States do not have a general non-compete statute, and the common law varies considerably.

Section 910.4(b) reflects the Commission's intent that States may continue to enforce in parallel laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than that of the final rule. That is, State laws cannot authorize non-competes that are prohibited under this final rule, but States may, for example, continue to pursue enforcement actions under their laws prohibiting non-competes even if the State laws prohibit a narrower subset of non-competes than this rule prohibits.

Accordingly, § 910.4(a) states that the final rule will not be construed to annul, or exempt any person from complying with, any State statute, regulation, order, or interpretation applicable to a non-compete, including, but not limited to, State antitrust and consumer protection laws and State common law. Rather, the final rule supersedes such laws to the extent, and only to the extent, that such laws would otherwise permit or authorize a person to engage in conduct that is an unfair method of competition under § 910.2(a) or conflict with the notice requirement in § 910.2(b).[970] These revisions provide that when States have restricted non-competes and their laws do not conflict with the final rule, employers must adhere to both provisions, and workers are protected by both provisions (including State restrictions and penalties that exceed those in Federal law).

For example, § 910.4 makes clear that the final rule does not preempt State law enforcement where a State bans non-competes only for workers earning below a certain amount and thus has a ban that is narrower than the final rule. Thus, if a State's law bars non-competes only for workers who earn less than $150,000 per year, the final rule and the law are different in scope of protection but not directly inconsistent. The State may continue to enforce its ban for workers earning less than $150,000, but all non-competes covered by the final rule, regardless of a worker's earnings, remain an unfair method of competition under the final rule and are therefore unlawful.

In response to concerns raised by commenters and to further bolster the consistent use of State laws, the Commission expressly recognizes State authority and the existence of private rights of action arising under State laws that restrict non-competes or bar unfair methods of competition. This is set forth in § 910.4, now titled ''Relation to State laws and preservation of State authority and private rights of action,'' and is detailed in § 910.4(b). That section provides that unless a State law conflicts with the final rule and is superseded as described in § 910.4(a), part 910 does not limit or affect the authority of State attorneys general and other State agencies or the rights of a person to bring a claim or regulatory action arising under State laws, including State antitrust and consumer protection laws and State common law. Section 910.4(b) also explains that

persons retain the right to bring a claim or regulatory action under State laws unless the laws conflict with the final rule and have been superseded as described in § 910.4(a).

These modifications are consistent with many commenters' recommendations and recognize State-based enforcement as a potent force that supplements Federal enforcement. In addition, the modifications, particularly those that explain § 910.4 does not exempt any person from complying with State laws, are intended to curb the use of preemption as a defense against State restrictions of non-competes.[971] Under the final rule, States may continue to play a critical role in restricting the use of non-competes. In contrast to the FTC Act, which cannot be enforced by private persons or State authorities,[972] the non-compete laws of numerous States provide for such enforcement.[973] Non-competes that are outside the FTC's jurisdiction or otherwise outside the scope of the final rule may be covered by State non-compete laws.[974] State penalties can be substantial and may be particularly important as a deterrent.

The modifications also reflect the Commission's long history of working in concert with States and encouraging concurrent enforcement of State laws to pursue common goals. While the Commission recognizes this will leave some variation in the enforcement exposure covered persons face among States, that variation will be greatly reduced by the final rule, which sets a

---

[966] Another comment recommended a similar formulation, which would exempt from preemption State laws that offer workers protection that is equal to or greater than the protection provided by the final rule. This commenter asserted that this formulation would allow existing State law to stand.

[967] See Uniform Restrictive Employment Agreement Act, *supra* note 332 at sec. 5, sec. 8.

[968] See Comment of ULC, FTC–2023–0007–20940.

[969] See also Part II.E (discussing comments on the Commission's jurisdiction under the FTC Act).

[970] The effect of part 910 is limited to non-competes. It would not broadly preempt other uses of State antitrust and consumer protection law.

[971] See, e.g., Sprietsma v. Mercury Marine, 537 U.S. 51, 62–70 (2002) (finding Federal Boat Safety Act did not relieve defendant from liability for State common law tort claim because it did not expressly nor impliedly preempt State common law).

[972] See, e.g., FTC, A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority App. A (May 2021), https://www.ftc.gov/about-ftc/mission/ enforcement-authority; Holloway v. Bristol-Myers Corp., 485 F.2d 986, 997 (D.C. Cir. 1973).

[973] Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043 at 7 (''jurisdictions like Colorado, Illinois, Washington, and the District of Columbia have passed laws that ban non-competes for workers making under a specified income threshold and also include remedies provisions that authorize state agencies and residents to enforce the law''). See also 2023 Cal. Legis. Serv. Ch. 157 (S.B. 699) West (adding Cal. Bus. & Prof. Code sec. 16600.5, Sept. 1, 2023) (providing for a private right of action in regard to California's non-compete statute).

[974] See Part II.E (discussing the Commission's jurisdiction under the FTC Act). See, e.g., Cal. Bus. & Prof. Code secs. 16600–16602 (broad coverage); Minn. Stat. Ann. sec. 181.988, subdiv. 1 (b) ('''Employer' means any individual, partnership, association, corporation, business, trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee.'').

floor that applies nationally.[975] As it has done in the past, the Commission will "share the field" with States and partner with them in the battle against abusive non-competes.[976] As set out in Part IX.C, the Commission considered and rejected the alternative of relying on existing State laws alone. Consistent with that determination, the Commission declines to adopt the suggestion from a comment that relevant State laws in States that enact the Uniform Restrictive Employment Agreement Act not be preempted.

## VII. Section 910.5: Severability

The Commission stated in the NPRM that it may adopt a severability clause [977] and it received a comment stating the Commission should adopt such a clause to protect the rights and securities of workers if one part of the rule or one category of workers were invalidated. The Commission adds § 910.5, together with this section, to clarify the Commission's intent.[978]

Section 910.5 states that if any provision of the final rule is held to be invalid or unenforceable either facially, or as applied to any person or circumstance, or stayed pending further agency action, such invalidity shall not affect the application of the provision to other persons or circumstances or the validity or application of other provisions. Section 910.5 also states that if any provision or application of the final rule is held to be invalid or unenforceable, the provision or application shall be severable from the final rule and shall not affect the remainder thereof. This provision confirms the Commission's intent that the remainder of the final rule remain in effect in the event that a reviewing court stays or invalidates any provision, any part of any provision, or any application of the rule—including, for example, an aspect of the terms and conditions defined as non-competes, one or more of the particular restrictions on non-competes, or the standards for or application to one or more categories of workers.

The Commission finds that each of the provisions, parts of the provisions, and applications of the final rule operate independently and that the evidence and findings supporting each provision, part of each provision, and application of each provision stand independent of one another. In this final rule, the Commission determines that certain conduct is an unfair method of competition in Part IV.B and Part IV.C and differentiates between senior executives and workers who are not senior executives with respect to existing non-competes. The final rule distinguishes between the two in both the final rule's operation and in the bases for adopting the final rule. The difference in restrictions among different workers, and the distinct bases for adopting the restrictions, is described in detail in Parts IV.B and IV.C. The Commission also estimates the effect of excluding senior executives entirely from the rule in Part X.F.11 and finds that the benefits of covering only those workers who are not senior executives justify the costs.

The Commission promulgates each provision, part of each provision, and application of each provision as a valid exercise of its legal authority. Were any provision, part of any provision, or any application of any provision of the final rule stayed or held inapplicable to a particular category of workers, to particular conduct, or to particular circumstances, the Commission intends the remaining elements or applications of the final rule to prohibit a non-compete between covered persons and covered workers as an unfair method of competition.

In Parts IV.B and IV.C, the Commission finds that the use of non-competes is an unlawful unfair method of competition under section 5 of the FTC Act because it is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in several independent ways. In support of its finding that the use of non-competes is an unlawful unfair method of competition for workers who are not senior executives, the Commission additionally finds that the use of non-competes is exploitative and coercive in Part IV.B.2.b.

The Commission relies principally on empirical evidence regarding the effects of changes in non-compete enforceability, both when finding in Part IV.B.3.a and Part IV.C.2.c.ii that the use of non-competes tends to negatively affect competitive conditions in labor markets, and when finding in Part IV.B.3.b and Part IV.C.2.c.i that the use of non-competes tends to negatively affect competitive conditions in product

and service markets. The Commission further analyzes and quantifies these effects in Part X.F.6, including sensitivity analyses that compare the estimated effects of smaller changes in enforceability and larger changes in enforceability.

Based on this empirical evidence and analysis, the Commission believes that more limited application of the rule—which might result were a court to render the final rule inapplicable in some way—may be equivalent to smaller changes in the enforceability of non-competes in the empirical literature. As described in Part IV.B.3.a and IV.B.3.b, smaller changes in enforceability change the magnitude, but not the directional nature, of the labor market and product and service market effects.[979] Accordingly, consistent with the findings related to the use of certain non-competes being an unfair method of competition in Part IV, the empirical evidence on the use of non-competes, the regulatory impact analysis in Part X, and its expertise, the Commission finds that any smaller reduction in enforceability resulting from circumstances in which a court stays or invalidates some application of the final rule would not impair the function of the remaining parts of the final rule nor would it undermine the justification or necessity for the final rule as applied to other persons, conduct, or circumstances. The Commission intends for any remaining application of the final rule to be in force because it is committed to stopping any and all unlawful conduct related to the use of certain non-competes and the Commission finds every use of a non-compete covered by the final rule to be an unlawful unfair method of competition under section 5 of the FTC Act.[980]

In Part X, the Commission conducts a regulatory impact analysis for the final rule as applied to all workers, as applied to all workers other than senior executives, and as applied to senior executives. The Commission finds that the asserted benefits of the use of non-competes do not justify the harms from the use of non-competes for any category of workers. The Commission's findings and differential analysis demonstrate that the asserted benefits from the use of non-competes do not justify the harms from the use of non-competes for higher- or lower-wage earners, including, for example, lower-wage workers defined as workers whose total annual compensation is less than $151,164.

---

[975] The Commission has taken this position in previous regulations. *See, e.g.,* Part 429—Cooling-Off Period for Door-to-Door Sales, 37 FR 22934 (Oct. 26, 1972).

[976] For a previous example, *see* Trade Regulation Rule; Funeral Industry Practices, 47 FR 42260, 42287 (Sept 24, 1982) (noting the purpose of the rule's provision addressing relation of the rule to State law is "to encourage [F]ederal-[S]tate cooperation by permitting appropriate [S]tate agencies to enforce their own [S]tate laws that are equal to or more stringent than the trade regulation rule").

[977] NPRM at 3518–19 & n.429.

[978] In the NPRM, proposed § 910.5 addressed the compliance date.

[979] *See also* Part X.F.6.

[980] *See* NPRM at 3518–19.

For instance, if, for any reason, a reviewing court were to stay or invalidate the final rule as applied to senior executives, the Commission would intend for the remainder of the final rule to apply to all workers other than senior executives. Likewise, if a reviewing court were to stay or invalidate the final rule as applied to workers other than senior executives, the Commission would intend for the remainder of the final rule to apply to senior executives. Additionally, if a reviewing court were to stay or invalidate the final rule as applied to some other subset of workers, the Commission would intend for the remainder of the final rule to apply to all but those workers. So, for example, if a reviewing court were to stay or invalidate the final rule as applied to workers other than lower-wage workers—defined as workers whose total annual compensation is less than $151,164—the Commission would intend for the remainder of the final rule to apply to those workers, and further notes the evidentiary record demonstrates that application of the rule to those remaining workers would be beneficial and achieve lawful objectives. In the same way, if a reviewing court were to stay or invalidate the provision of the final rule regarding enforcing an existing non-compete or the notice requirement, the Commission would intend for the remainder of the final rule to apply. As described in Part IX.C, although the Commission concludes that a national standard is most effective, a number of States currently apply different standards to different workers and States also apply a myriad of legal standards to non-competes generally. Accordingly, were a reviewing court to stay or invalidate a particular application of the final rule, a covered person could simply comply with the provisions, parts of provisions, or applications of the final rule that remain in effect.

The Commission's adoption of the final rule does not hinge on the same restrictions applying to all non-competes, on the final rule applying to all workers, or on joint adoption or operation of each provision. Accordingly, the Commission considers each of the provisions adopted in the final rule to be severable, both within each provision and from other provisions in part 910. In the event of a stay or invalidation of any provision, any part of any provision, or of any provision as it applies to certain conduct or workers, the Commission's intent is to otherwise preserve and enforce the final rule to the fullest possible extent.

## VIII. Section 910.6: Effective Date

The Commission adopts a uniform effective date of 120 days after publication of the final rule in the **Federal Register**. The final rule will go into effect, and compliance with the final rule will be required, on that date. Based on comments urging the Commission to reduce the compliance period from the 180-day period proposed in the NPRM so that the benefits of the final rule may be obtained as soon as possible, the Commission's findings that the use of non-competes is exploitative and coercive for the vast majority of workers, and modifications in the final rule that reduce covered entities' compliance burden, the Commission modifies the date that compliance with the final rule is required from 180 days to 120 days after publication in the **Federal Register**.

### A. The Proposed Rule

In the NPRM the Commission proposed a compliance date of 180 days after publication of the final rule in the **Federal Register**. The Commission stated that, during the compliance period, employers would need to: (1) assess whether to implement replacements for existing non-competes (such as NDAs), draft those covenants, and then negotiate and enter into those covenants with the relevant workers; (2) remove any non-competes from employment contracts that they provide to new workers; and (3) rescind, no later than the date that compliance is required, any non-competes that it entered into prior to the compliance date.[981] The Commission preliminarily found that 180 days would be enough time for employers to accomplish all of these tasks.[982] The NPRM would have also required employers to provide the notice specified in proposed § 910.2(b)(2) within 45 days of rescinding the non-compete.[983]

The Commission also stated that it proposed to establish an effective date of 60 days after the final rule is published in the **Federal Register** even though compliance would not be required for 180 days.

[981] *Id.* at 3483, 3515–16. In the NPRM and herein, the Commission refers to the period between the publication of the final rule and the date on which compliance with the final rule is required as the ''compliance period.'' *See id.* at 3515.

[982] *Id.* at 3516.

[983] *Id.* (addressing compliance with proposed § 910.2(b)(2)).

### B. Comments Received

Many worker commenters urged the Commission to act as quickly as possible to bring the final rule into force, citing the current acute, ongoing harms to their earnings, mobility, quality of life, and other significant impacts and noting the final rule's potential for immediate relief if their non-compete was no longer in force. Representatives of many local governments from different States contended that the negative effects of non-competes and the anticipated benefits of the proposed rule justified allowing the Commission's rule to go into effect as soon as possible. Other commenters supported the compliance date as proposed or favored other measures to obtain the anticipated benefits of the final rule as soon as practicable. Another commenter contended that the 180-day compliance period was sufficient to allow businesses to ensure compliance and suggested that the Commission move the effective date back to the day or the day after the final rule is published.[984]

Several commenters suggested the Commission adopt a longer compliance period of one year, 18 months, or two years. These commenters generally stated that businesses need more time to adjust their compensation packages, contracting practices, and employee policies to comply with the rule and to protect their intellectual property. At least one commenter also argued the Commission should adopt a two-year compliance period to allow courts sufficient time to hear and resolve challenges to the final rule. One commenter asserted that the compliance period would be especially burdensome for smaller business. Another industry commenter argued application of the rule should be phased in over time.

### C. The Final Rule

The Commission adopts a 120-day compliance period. As outlined in Parts IV.B and IV.C, based on both voluminous comments from the public as well as a significant body of empirical evidence, the Commission finds that the use of non-competes is coercive and exploitative for the vast majority of workers across different earnings levels and occupations and that for all workers it tends to negatively affect competitive conditions in labor markets and also tends to negatively affect competitive conditions in product and service markets—and that such actual harms are in fact currently ongoing. The Commission adopts a 120-

[984] The comment did not consider the limitations on the effective date imposed by the CRA.

day compliance period to stop these unfair methods of competition as soon as practicable. The Commission finds that a 120-day period appropriately balances the interests at hand.

The Commission has taken several steps in the final rule to make compliance as simple as possible for employers. These steps make it practicable and reasonable to require compliance within 120 days. The final rule allows regulated entities to enforce existing non-competes with senior executives, who commenters contended are most likely to have complex compensation arrangements that include non-competes. Accordingly, there is no need for a lengthy compliance period, as the most complex existing arrangements are left in place. The Commission also eliminated the rescission requirement for all workers. Under the final rule, employers will not need to rescind (*i.e.,* legally modify) existing non-competes for any workers; rather, employers will simply be prohibited from enforcing them after the effective date of the final rule and will be required to provide the notice in § 910.2(b)(1).[985] While employers are required to provide notice to workers with existing non-competes who are not senior executives, under § 910.2(b), the final rule provides model safe harbor language that satisfies the notice requirement.[986] The final rule gives employers several options for providing the notice—on paper, by mail, by email, or by text.[987] And employers are exempt from the notice requirement where the employer has no record of a street address, email address, or mobile telephone number for the worker.[988] Furthermore, as explained in Part IV.E, the Commission has simplified the notice requirement to facilitate employers' ability to comply by simply sending a mass communication such as a mass email to current and former workers.

Starting on the effective date of the final rule, employers will be prohibited from entering into new non-competes barred by this final rule and from enforcing non-competes that the employer entered into prior to that date with workers other than senior executives. Prior to the effective date employers will need to identify each of their workers with existing non-compete agreements and can assess which, if any, are senior executives and determine if they wish to maintain those

non-competes. Employers will also need to assess and revise, if necessary, any employment policies or handbooks that purport to bind workers even after the effective date.

To the extent they have confidential business information, trade secrets, or other investments to protect with respect to a particular worker, employers will be able to assess their options to lawfully protect that information. However, new protections will be unnecessary in many cases, because, for example, 95.6% of workers subject to non-competes are already subject to an NDA.[989] In the rare case where compensation might be tied to a non-compete that is not with a senior executive, the employer and worker can determine whether to amend their original employment agreement. The Commission concludes that the 120-day compliance period gives employers more than sufficient time to complete these tasks. For example, firms routinely complete entire onboarding processes for new employees in much shorter timeframes than 120 days.

The Commission also finds that the 120-day compliance period gives small businesses enough time to comply with the final rule. Although small businesses may have limited staff and funds compared to larger firms, they also have fewer workers, and the exclusion for existing non-competes for senior executives will relieve the compliance burden altogether for those small firms that use non-competes only with those workers. Moreover, the steps the Commission has taken to reduce the compliance burden of § 910.2(b) will further simplify and streamline compliance for small businesses.

The Commission has also determined it is not necessary to extend the compliance period to give courts time to adjudicate pending non-compete litigation because, as described in Part V.C.3, the Commission has adopted § 910.3(b), which provides that the final rule does not apply where a cause of action related to a non-compete arose prior to the effective date. The Commission also finds that a longer compliance period is not needed to hear and resolve challenges to the final rule, especially given the ability of a challenger to seek a preliminary injunction.

In sum, the Commission finds that due to modifications reducing covered entities' burden to comply with the final rule, a compliance period of 120 days is sufficient to comply with the final rule. Given these changes the longer

compliance period proposed in the NPRM is no longer warranted and would allow the use of certain non-competes that are an unfair method of competition—and their related harms and costs—to continue for longer than necessary. The substantial benefits to competition and to workers of the final rule taking effect as soon as possible outweigh any concerns about potential difficulties in meeting an earlier compliance date.

The Commission also adopts a 120-day effective date. The Commission concludes that it would ease the burden of implementation and reduce possible confusion by having a uniform date for when the final rule goes into effect and when compliance under the final rule is required. A 120-day effective date complies with the requirements of the Congressional Review Act that a "major rule" may not take effect fewer than 60 days after the rule is published in the **Federal Register**.

## IX. Alternative Policy Options Considered

The Commission proposed to ban non-competes categorically, with a limited exception for non-competes entered into by a person who is selling a business entity. In the NPRM, the Commission discussed and sought comment on potential alternatives to the proposed categorical ban, including discrete alternatives that would implement a rebuttable presumption of unlawfulness or apply different standards to different categories of workers.[990] The Commission also sought comment on whether a rule should apply a different standard to senior executives and, whether, in lieu of the proposed rule, the Commission should adopt a disclosure rule or reporting rule.[991] The Commission sought comment on all aspects of potential alternatives, including whether the Commission should adopt one of the identified alternatives or some other alternative instead of the proposed rule.[992] The Commission also sought comment on the extent to which a uniform Federal standard for non-competes would promote certainty for employers and workers.[993]

The Commission received many comments on these questions, as well as on the question of whether the Commission should issue a Federal standard for non-competes or continue relying on existing law and case-by-case litigation to address harms from non-

---

[985] *See* Part IV.E (describing why the Commission is not finalizing a rescission requirement).

[986] § 910.2(b)(4) and (5).

[987] § 910.2(b)(2)(ii).

[988] § 910.2(b)(3).

[989] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 44.

[990] NPRM at 3516.

[991] *Id.* at 3519–21.

[992] *Id.* at 3521.

[993] *Id.* at 3497.

competes. In this section, the Commission discusses the comments received regarding these alternatives and the reasons it has decided not to adopt them. This Part IX addresses these comments but does not address alternatives related to the design of specific regulatory provisions, which are discussed in the Part addressing the relevant provision.

*A. Categorical Ban vs. Rebuttable Presumption*

1. The Rebuttable Presumption Alternative Generally

While preliminarily finding that a categorical ban would best achieve the proposed rule's objectives, the Commission nevertheless sought comment on the alternative of a rebuttable presumption, under which it would be presumptively unlawful for an employer to use a non-compete, but a non-compete would be permitted if the employer could meet a certain evidentiary burden or standard.[994] The Commission also sought feedback on the form any rebuttable presumption should take.[995]

Most commenters that addressed this issue, including those both supporting and opposing the proposed rule, discouraged the Commission from including a rebuttable presumption in the final rule. These commenters contended that a rebuttable presumption would add complexity and uncertainty to the rule.

Supporters of the proposed rule asserted that a rebuttable presumption would undermine the rule's effectiveness, failing to deter employers from imposing non-competes while making litigation too uncertain and costly for most workers to pursue. Some of these commenters contended that a rebuttable presumption would also do little to reduce the chilling effects of non-competes. They argued that employers would continue to impose non-competes that are unlikely to survive a rebuttable presumption.

Many commenters critical of the proposed rule opposed a rebuttable presumption for essentially the same reasons they opposed the rule in general. They contended that, in States where non-competes are generally enforceable, a rebuttable presumption would inappropriately shift the burden of proof from workers to employers. Many of these commenters specifically opposed a rebuttable presumption that would use a test similar to antitrust law's "quick look" analysis, contending

that the Commission's analysis of empirical research on non-competes cannot substitute for the lengthy experience courts usually have with a particular restraint before giving it quick-look treatment. A few commenters contended that a rebuttable presumption would increase litigation and raise employers' compliance costs by complicating the determination of whether a given non-compete is likely valid, requiring more lawyer involvement in drafting clauses and more reliance on courts to determine a non-compete's validity.

A few commenters supported a rebuttable presumption, arguing the Commission's proposed ban on non-competes was too blunt an instrument. Some also contended that a rebuttable presumption would offer a more flexible approach akin to the majority of State law approaches. At least one commenter stated a rebuttable presumption would make the final rule more likely to survive judicial review. A few commenters stated a rebuttable presumption would provide more protections than most State laws by allowing only non-competes that the commenter contended are not unfair to the worker, such as where highly paid workers agree to narrow non-competes in exchange for bargained-for consideration. One commenter argued a rebuttable presumption would enable the Commission to accrue more experience adjudicating non-competes and assessing their impact on competition.

Commenters advocating for a rebuttable presumption generally preferred a test focusing on one or more factors, including: the non-compete's geographic scope and duration; the presence and amount of any liquidated damages or penalty provision; whether the clause is narrowly tailored to prevent competition with actual competitors; the restrained worker's duties and income; and the availability of less restrictive alternatives. A few commenters supported a "preponderance" (as opposed to a "clear and convincing") standard to permit as many non-competes as possible but acknowledged that such a rule may be so similar to the existing common law as to be redundant.

After carefully reviewing and considering the comments, the Commission concludes that a rule implementing a rebuttable presumption is not preferable to the final rule as adopted. Based on the Commission's expertise, including careful review and consideration of the entire rulemaking record, the Commission finds that a rebuttable presumption would be less

effective than the final rule for achieving the Commission's stated goals. A rebuttable presumption also presents administrability concerns that the final rule does not.

Overall, the comments reinforced the Commission's concerns that a rebuttable presumption would foster substantial uncertainty about the validity of a given non-compete and would do little to reduce the *in terrorem* effects of non-competes. Research demonstrates that employers maintain non-competes even where they likely cannot enforce them,[996] that many workers are not aware of the applicable law governing non-competes or their rights under those laws,[997] and that the degree to which non-competes inhibit worker mobility is affected not only by whether a non-compete is actually enforceable but also on whether a worker believes their employer may enforce it.[998] Accordingly, the Commission concludes that a rule implementing a rebuttable presumption would be inadequate to reduce the prevalence of non-competes, their chilling effect on worker mobility, or their tendency to negatively affect competitive conditions. Relatedly, the Commission believes a rebuttable presumption would increase litigation costs for workers and employers relative to the final rule as adopted.

The Commission also believes that, in important respects, a rebuttable presumption for non-competes is inconsistent with the Commission's findings in this final rule. As discussed in greater detail in Part IX.C, a rule that provides for case-by-case, individualized assessment of non-competes is unlikely to address the negative effects of non-competes on competition in the aggregate. In addition, by focusing on considerations specific to the worker and the employer, a rebuttable presumption is unlikely to address the external effects of non-competes (*i.e.,* the effects on persons other than the parties to the non-compete), including their negative effects on the earnings of workers who are not covered by non-competes.

The Commission recognizes there may be some benefits to a rebuttable presumption relative to the status quo. Because it puts the burden of proof on employers, a rebuttable resumption would be stricter than the current law in States where non-competes are allowed, and research suggests even a small decrease in enforceability would increase worker mobility, raise wages,

---

[994] *Id.* at 3517.

[995] *Id.* at 3517–19.

[996] *See* Part IV.B.2.b.

[997] *See* Prescott & Starr, *supra* note 413.

[998] Starr, Prescott, & Bishara, *supra* note 68 at 633, 652, 664.

and promote innovation.[999] But the categorical ban adopted in the final rule would have greater benefits in these respects without the drawbacks explained in this Part IX.A.1.

#### 2. Discrete Alternatives Related to Rebuttable Presumptions

In the NPRM, the Commission also sought comment on four discrete alternatives to the proposed rule: Alternative #1 (categorical ban below some threshold, rebuttable presumption above); Alternative #2 (categorical ban below some threshold, no requirements above); Alternative #3 (rebuttable presumption for all workers); and Alternative #4 (rebuttable presumption below some threshold, no requirements above).[1000]

As explained in Part IX.A.1, the Commission finds a rebuttable presumption would be ineffective in addressing the harms to competitive conditions caused by non-competes. For the same reasons, the Commission declines to adopt Alternatives #1, #3, and #4, all of which contemplated a rebuttable presumption for some or all workers.

While the vast majority of commenters supported the Commission's proposal to ban non-competes categorically for all workers, a number of commenters suggested that the Commission permit non-competes with senior executives (or other highly skilled or highly paid workers) and other workers. The Commission addresses these comments in Part IV.C and V.D.1, where it finds that such non-competes tend to negatively affect competitive conditions in labor markets and in product and service markets, and that non-competes are also exploitative and coercive for workers other than senior executives. For these reasons, the Commission declines to adopt Alternative #2, which contemplated imposing no requirements on workers above a certain wage or other threshold.

#### B. Other Discrete Alternatives

#### 1. Disclosure Rule

In the NPRM, the Commission sought comment on the potential alternative of adopting disclosure requirements related to non-competes.[1001] The Commission explained that the rule

could, for example, require an employer to disclose to a worker prior to making an employment offer that the worker will be subject to a non-compete and/or to explain the terms of the non-compete and how the worker would be affected by signing it.[1002] The Commission noted that a 2021 study by Starr, Prescott, and Bishara finds that disclosure of non-competes to workers prior to the acceptance of a job offer was associated with increased earnings, rates of training, and job satisfaction.[1003] The authors of the study, however, cautioned that their analysis "should not be interpreted causally," a point the Commission noted in explaining why it gave minimal weight to the study.[1004] The Commission preliminarily concluded in the NPRM that a disclosure requirement would not achieve the objectives of the proposed rule.[1005]

In general, commenters stated they agreed with the Commission's preliminary view that, while there may be some benefits to a disclosure rule, it would not achieve the objectives of the rule. Workers and worker advocacy groups stated that non-competes are often presented to workers on their first day on the job, or after they accept an employment offer. Although these commenters generally supported a comprehensive ban, they noted that if the Commission did not pursue a ban, a disclosure requirement may help improve workers' awareness of non-competes before accepting an offer. On the other hand, these commenters contended that a disclosure rule would do little to reduce the prevalence of non-competes, because workers have little choice but to accept non-competes, which are typically presented as "take-it-or-leave-it" terms and are ubiquitous in many fields.

Many trade organizations, advocacy groups, and academics who were generally supportive of the rule stated that a disclosure rule would fail to mitigate the competitive harms caused by non-competes in the aggregate. While acknowledging a disclosure rule may ameliorate some problems related to worker awareness of non-competes, these commenters contended that non-competes are unfair and coercive because employees generally lack adequate bargaining power to refuse to sign or bargain over non-competes even when they are presented at the time of

an employment offer, and that a disclosure rule would therefore not have the effect of making non-competes less unfair or coercive. A few commenters opposed a disclosure rule generally but urged the Commission to adopt a disclosure requirement for any non-competes permitted by the final rule, including for any non-competes entered into by a person who is selling a business.

On the other hand, some trade organizations, advocacy groups, and businesses that generally opposed the rule advocated for the Commission to adopt a disclosure rule in lieu of the proposed categorical ban. These commenters contended that a disclosure rule would substantially mitigate the unfairness of non-competes that are entered into without adequate notice to the worker without drastically altering the legal status quo, thereby maintaining the protections for trade secrets, training expenditures, and intellectual property they contend that non-competes provide. They stated that eight States and the District of Columbia have statutory notice requirements for non-competes.

Most of the commenters who supported a disclosure rule also argued that rather than demonstrating that non-competes tend to negatively affect competitive conditions, the available evidence merely demonstrates opportunistic behavior by employers (such as presenting non-competes only after prospective workers have taken hard-to-reverse steps towards accepting employment) and workers (such as seeking to be excused from a non-compete after recognizing its impact on future job prospects). These commenters asserted that a disclosure rule would be better suited to address these types of opportunistic behaviors than a categorical ban.

Some commenters based their support for a disclosure rule on their contention that workers have sufficient bargaining power to negotiate over non-competes when they are provided with notice of them. One such commenter pointed to the cited research by Starr, Prescott, and Bishara finding that disclosure of non-competes to workers prior to acceptance of a job offer may increase earnings, increase rates of training, and increase job satisfaction.[1006] The commenter also referenced the study's finding that of those workers who did not attempt to negotiate a non-compete, 52% reported that they thought the terms were reasonable and 41% reported that they assumed the terms to be non-

---

[999] Johnson, Lavetti, & Lipsitz, *supra* note 388 (decreasing enforceability increases worker mobility and earnings); Johnson, Lipsitz, & Pei, *supra* note 526 at 2–5 (enforceability negatively impacts patent quantity and quality).

[1000] NPRM at 3519.

[1001] *Id.* at 3521 n.446 (noting certain provisions in the Commission's Franchise Rule (16 CFR part 436), such as § 436.5(i) and (q), require non-competes to be disclosed to a franchisee).

[1002] *Id.* at 3521.

[1003] *Id.*, citing Starr, Prescott, & Bishara, *supra* note 68 at 75.

[1004] *Id.* at 3487, citing Starr, Prescott, & Bishara, *supra* note 68 at 73.

[1005] *Id.* at 3521.

[1006] Starr, Prescott, & Bishara, *supra* note 68 at 75.

negotiable.[1007] The commenter contended that a disclosure rule would decrease the number of workers who assumed non-competes were non-negotiable.

A few commenters contended a disclosure rule may be more likely to withstand judicial review because the Commission could promulgate a disclosure rule in this context under its UDAP authority pursuant to the Magnuson-Moss Act. In addition, a few commenters requested the Commission adopt timing rules for when the disclosure must be provided, such as by requiring that employers disclose a non-compete in the job advertisement, at the time of the job offer, or at least five business days prior to the worker's deadline to sign an employment agreement.

The Commission declines to adopt a disclosure rule.[1008] The Commission finds that merely ensuring workers are informed about non-competes would not address the negative externalities non-competes impose on workers, rivals, and consumers. As described in Part IV.B.3.a.ii, non-competes suppress wages for workers across the labor force, including workers who are not subject to non-competes. Ensuring that a worker who enters into a non-compete is informed about the non-compete does not address the harm to these other workers. In addition, it does not address the ways in which non-competes harm consumers and the economy through reduced new business formation and innovation, described in Part IV.B.3.b. In other words, non-competes have negative spillover effects on workers, consumers, businesses, and the economy that disclosure cannot remediate.

The Commission also finds that a disclosure requirement would not be as effective as a categorical ban in addressing the exploitation and coercion of workers through non-competes. As described in Part IV.B.2.b.i, there is a significant imbalance in bargaining power between employers and most workers, which is particularly acute in the context of negotiating employment terms such as non-competes. And, as many comments from workers and worker advocacy groups attest, non-competes are often included in standard-form contracts and offered on a take-it-or-leave-it basis.[1009]

As a result, workers have limited practical ability to negotiate non-competes even if they are notified of such clauses prior to accepting their employment offer. Indeed, as described in Part IV.B.2.b.i, the comment record reflects that very few workers (other than senior executives) bargain over their non-competes—whether the worker knew about the non-compete before the job offer and understood its terms, or not.

The Commission gives the findings of the Starr, Prescott, and Bishara study on the impacts of disclosure little weight because the study reflects only correlation, not causation, with respect to the effects of a disclosure rule (similar to the "use" studies the Commission gives little weight to, as described in Part IV.A.2). The study merely compares a set of workers whose firms disclosed the non-compete and workers whose firms did not, and any correlation may thus be attributable to confounding factors. This comparison—similar to comparisons of workers with and without non-competes—may be polluted by differences between firms that opt to disclose non-competes and those that do not, or differences between workers who are the beneficiaries of disclosure versus those who are not.[1010] For example, it is possible that firms that disclose non-competes are also more responsible employers in general that tend to pay their workers more, train their workers more, and have more satisfied workers. The Commission therefore does not find that this evidence represents a causal relationship between the disclosure of non-competes and earnings and other outcomes. Moreover, the weight of the evidence discussed in Parts IV.B and IV.C finding increased earnings, new business formation, and innovation from the final rule significantly surpass the potential effects of disclosing non-competes.

One commenter stated that the Starr, Prescott, and Bishara study suggests that a disclosure rule would decrease the number of workers who assume a non-compete with which they are presented is non-negotiable. The study suggests that the potential effects of a disclosure rule in this respect would be, at best, limited.[1011] For the reasons described in this Part IX.B.1, the Commission is skeptical that a disclosure requirement

would meaningfully increase the share of workers who actually bargain over non-competes.

A disclosure rule may address some deceptive or misleading practices in connection with non-competes. However, considering that a disclosure rule is not likely to significantly reduce the negative competitive impacts of non-competes on labor markets and on product and service markets, this benefit is significantly outweighed by the limitations of a disclosure rule.[1012]

The Commission further concludes that a disclosure rule is not necessary for non-competes in the context of sales of a business entity. As described in Part V.A, persons selling a business entity tend to have bargaining power in the context of the transaction, and the Commission is unaware of evidence that deceptive and misleading practices in connection with non-competes (such as waiting to disclose a non-compete until after the job offer) are common with respect to business sales.

## 2. Reporting Rule

In the NPRM, the Commission sought comment on a reporting rule as a potential alternative to the proposed rule.[1013] The Commission stated that it could require employers to report certain information to the Commission relating to their use of non-competes; for example, employers that use non-competes could be required to submit a copy of the non-compete to the Commission.[1014] As the Commission explained, a reporting rule might enable the Commission to monitor the use of non-competes and could potentially discourage employers from using non-competes that are not clearly justified under existing law.[1015]

The Commission stated in the NPRM that it did not believe a reporting rule would achieve the objectives of the proposed rule. The Commission stated that merely requiring employers to report their non-competes to the Commission would not meaningfully reduce the prevalence of non-competes and would therefore fail to reduce the negative effects non-competes have on competitive conditions in labor markets and product and service markets.[1016] At the same time, the Commission stated that a reporting rule would impose

---

[1007] *Id.* at 72.

[1008] The Commission notes that the Franchise Rule requires franchisors to disclose any non-compete that franchisees must impose on managers. 16 CFR 436.5(o)(3). These non-competes are prohibited by the final rule. *See* Parts III.D and V.D.6.

[1009] *See* Part IV.B.2.b.i.

[1010] Indeed, the authors of this study note that "unobservables may more plausibly account for these estimates." *See* Starr, Prescott, & Bishara, *supra* note 68 at 77 n.35.

[1011] *Id.* at 72. The study finds that 38% of workers asked to sign a non-compete before accepting a job offer assumed they could not negotiate, versus 48% of workers asked after accepting a job offer.

[1012] The Commission considered whether a disclosure rule would be appropriate for senior executives, but concludes that it is not because it would fail to address many of the ways in which non-competes are restrictive and exclusionary and tend to negatively affect competitive conditions.

[1013] *Id.* at 3521.

[1014] *Id.*

[1015] *Id.*

[1016] *Id.*

significant and recurring compliance costs on employers.[1017]

Most commenters addressing this topic agreed with the Commission's preliminary view that a reporting rule would not achieve the goals of the proposed rule. At least one business opposed any reporting requirement due to the cost of compliance and to avoid exposing any confidential information contained in employment agreements. At the same time, some commenters stated that a reporting rule may assist enforcement and provide quantitative data sets to measure compliance, while recognizing that such benefits would lose significance if the Commission were to adopt the proposed rule. One commenter suggested that, to improve the effectiveness of any reporting rule, any such rule should include a provision stating that any non-competes which were not properly disclosed to State and Federal authorities are null and void.

The Commission declines to adopt a reporting rule. A reporting rule would impose recurring compliance costs on employers, compared with the proposed rule, which largely imposes one-time costs. At the same time, a reporting rule would be inadequate to address the negative effects of non-competes on competitive conditions in labor markets and product and service markets, or the Commission's concerns about exploitation and coercion through the use of non-competes, since it would allow for the continued use of non-competes.

### 3. Limitations on Scope and Duration

In addition to those alternatives listed in the NPRM, a few commenters suggested adopting an alternative rule that allows non-competes but sets a limitation on their geographic scope and/or duration. Some commenters suggested a geographic limit of five, ten, or thirty miles and/or a temporal limit of six months or one, two, or three years, while others suggested a fact-specific requirement that the geographic scope or duration of a non-compete be "reasonable." Many of these commenters cited State laws that take a similar approach.

A few commenters opposed this alternative. One worker advocacy group argued that any bright-line limit may end up serving as a default, encouraging employers to impose non-competes of the maximum allowable scope or duration even if that limit is longer or broader than they otherwise would have imposed. At least one academic commenter argued that setting geographic scope or duration limitations on non-competes is unlikely to have a substantial impact, pointing to the continued prevalence of overly broad non-competes despite State laws designed to set upper limits on geographic scope and duration.

The Commission declines to adopt a standard providing that the geographic scope or duration of non-competes must be "reasonable." The Commission is concerned a reasonableness standard would foster significant uncertainty among workers and businesses about the enforceability of non-competes, for the same reasons a rebuttable presumption would. In addition, as described in Part II.C.1 of the NPRM, all States where non-competes are enforceable currently apply a reasonableness standard, so a Federal reasonableness standard would not mitigate the negative effects of non-competes that are presently occurring.

The Commission also declines to adopt the alternative of imposing limits on the scope and duration of non-competes. Such a rule would be insufficient to address the negative effects of non-competes on competitive conditions in labor markets or products and services markets. Although a non-compete that lasts for a shorter duration or within a smaller geographic area curtails job mobility for the individual worker it binds to a lesser degree, it nonetheless curtails the worker's job mobility and the ability of competing employers to recruit and access talent. Non-competes limited in duration and scope still tend to inhibit efficient matching between workers and employers, with spillover effects on new business formation and innovation through the mechanisms described in Parts IV.B and IV.C. Furthermore, limitations on the scope and duration of non-competes would not address the spillover effects from non-competes on other workers and consumers. In short, even if a non-compete applies only to a relatively delimited location or time period, it still—by design—cuts off free and fair competition in labor and product and service markets.

In addition, most of the commenters who stated that they were exploited and coerced by non-competes did not do so on the basis that the non-compete was overbroad in scope or duration. Instead, most of the commenters who described the terms of their non-competes described limits on scope and duration that were within the bounds of what is typically permissible under State law.[1018] Some of these commenters even stated expressly that they were subject to the non-compete that was standard or typical in their field. Even these commenters, however, explained how they were exploited and coerced in connection with non-competes because the non-compete was unilaterally imposed and because the non-compete trapped them in worse jobs or forced them to bear significant harms or costs. For these reasons, the Commission declines to adopt bright-line limits on the scope and duration of non-competes.

### 4. Compensation Requirement

Some commenters requested that the Commission adopt an alternative that would permit non-competes so long as the worker is compensated. Some commenters pointed to Massachusetts and Oregon law governing non-competes under which, for certain workers, non-competes may be enforced if, *inter alia*, they include a minimum level of compensation or consideration to the worker separate from compensation for employment.[1019]

The Commission declines to adopt a rule requiring compensation for non-competes. First, such a rule would not address the harms to competitive conditions that non-competes cause, which result in harm to other workers, to rivals of employers, and to consumers. The Commission finds in Parts IV.B.3.a.ii and IV.C.2.c.ii. that non-competes harm workers other than the workers who sign them, by reducing the number of job opportunities and thereby inhibiting efficient matching for all workers. The Commission further finds in Parts IV.B.3.b and IV.C.2.c.i that non-competes inhibit new business formation and innovation, which affects consumers. Therefore, even if a worker were fully compensated for a non-compete, the fact of that compensation would not redress these negative externalities. Second, this alternative would be ineffective or significantly less effective because of the *in terrorem* effect of non-competes, which the Commission finds to be grounded in empirical evidence and supported by the comment record described in Part IV.B.2.b. Third, such a rule would be difficult to administer and potentially easy to evade, as employers could suppress other wages or job quality while labeling some compensation as attributable to the non-compete.

### 5. Combination of Different Alternatives

Some commenters suggested the possibility of combining two or more of the alternatives discussed in this Part IX

---

[1017] *Id.*

[1018] *See* Part IV.B.2.b.

[1019] Mass. Gen. Laws Ann. ch. 149, sec. 24L; Or. Rev. Stat. Ann. sec. 653.295.

in place of a categorical ban. While a combination of these regulations or limitations might modulate some of the ways in which non-competes are exploitative and coercive, they would not be as effective as a comprehensive ban. In particular, a combination approach would lack the clarity of a comprehensive ban and thus would not be as effective as a categorical ban in addressing the exploitation and coercion of workers through non-competes. Moreover, as noted previously, the alternatives discussed would do little to address the tendency of non-competes to negatively affect competitive conditions and to cause spillover effects on other workers and on consumers. Accordingly, a combination of these alternative regulations or limitations would fail to remedy the aggregate and spillover effects of non-competes and thus would not achieve the Commission's stated goals.

### C. The No-Action Alternative: Reliance on Existing Legal Frameworks Instead of a Clear National Standard

The Commission sought comment on whether a Federal standard for non-competes would promote certainty for employers and workers.[1020] The Commission finds that a clear national standard for non-competes will more effectively address non-competes' tendency to negatively affect competitive conditions than case-by-case adjudication or relying on existing law alone. The Commission also finds that declining to adopt the final rule, and instead relying on case-by-case adjudication or existing law alone, would not address the exploitation and coercion of workers through non-competes.

#### 1. Comments Received

Many commenters expressed support for the NPRM because they viewed current laws as insufficient to protect all workers, rivals, or consumers, regardless of where they are located, from the negative effects of non-competes on competitive conditions in labor markets and markets for products and services. Numerous workers, businesses, and other commenters said the patchwork of State laws and confusion about those laws, particularly reasonableness tests, makes it difficult for workers and businesses to understand the law and in turn contributes to the use of unenforceable or overbroad non-competes and chills worker mobility. Several commenters also said that case-by-case adjudication and reasonableness

tests make it difficult for parties to predict outcomes, which in turn raises litigation costs. Even some organizations opposed to the proposed rule or who supported a different policy believed that a Federal rule could be beneficial, such as to businesses operating in multiple jurisdictions.

In addition, according to commenters, case-by-case adjudication under State law cannot address the harms caused by non-competes through their use in the aggregate. Some commenters also asserted that the patchwork of State laws is complicated by remote and hybrid workers. Others argued that State laws are skewed in favor of employers or leave workers vulnerable to unreasonable agreements. Some argued that many workers, businesses, non-competes, and labor markets cross State lines, demonstrating the need for one standard. Several State Attorneys General also said that numerous complications arise when localities span more than one State and those States have different laws on non-competes; workers become confused and enforcement of non-competes can have spillover effects in another State.[1021]

In contrast, many commenters stated that case-by-case adjudication is preferable to a Federal rule because it allows individual facts to be considered. In addition, many commenters argued that existing State legislative and judicial decisions are sufficient to impose limitations on non-competes while recognizing legitimate business interests. Commenters also argued that States should be allowed to continue their natural experiments with non-competes; that non-competes historically have been and should remain an issue of State law; and that States are best suited to make policy judgments for their citizens.

Some commenters argued that unenforceable or overly broad non-competes are not a problem because courts can strike down or reform them. Some employers asserted that they specifically, or employers more generally, did not enter into unenforceable non-competes. Other commenters argued that employers did not use choice of law clauses to evade State laws, stating the clauses are the products of arms-length bargaining and provide certainty and predictability.

#### 2. Responses to Comments and the Commission's Findings

##### a. The Value of Rulemaking

The Commission has the authority to make rules and regulations to carry out

the FTC Act's prohibition on unfair methods of competition under sections 5 and 6(g) of the FTC Act as described in Parts II.A through II.C, and the Supreme Court has stated that agencies generally have discretion to choose between rulemaking and adjudication.[1022] Based on the empirical evidence, the comments, and the Commission's expertise, the Commission finds that rulemaking is the appropriate method of addressing non-competes.

The prevalence of non-competes across the economy, described in Part I.B.2, and the scale of the harms they cause, described in Parts IV.B and IV.C, show that it is more efficient to address the harms to competition from non-competes via rulemaking compared to case-by-case adjudication. As the D.C. Circuit stated in ruling that the Commission had the authority to promulgate unfair methods of competition rules, "the availability of substantive rule-making gives an agency an invaluable resource-saving flexibility in carrying out its task of regulating parties subject to its statutory mandate." [1023] The Commission estimates that there are 2.92 million firms using non-competes in the U.S.[1024] Adjudicating individual cases against even just one-tenth of 1% of these employers would be slow, inefficient, and costly for the Commission, employers, and workers. Rulemaking provides notice of the application of section 5 to non-competes in a clearer and more accessible way than piecemeal litigation and avoids compliance delays.[1025] The final rule will provide all market participants greater clarity about their obligations under section 5 of the FTC Act, facilitating compliance. Additionally,

---

[1020] NPRM at 3497.

[1021] Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043 at 11.

[1022] *SEC* v. *Chenery Corp.,* 332 U.S. 194, 203 (1947); *NLRB* v. *Bell Aerospace Co. Div. of Textron, Inc.,* 416 U.S. 267, 293 (1974); Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023).

[1023] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672, 681–82 (D.C. Cir. 1973); *see also id.* at 690 (stating that "the historic case-by-case purely adjudicatory method of elaborating the Section 5 standard and applying it to discrete business practices has not only produced considerable uncertainty" but has also spawned lengthy litigation).

[1024] *See* Part X.F.6 (estimating that 49.4% of the 5.91 million firms in the U.S. use non-competes).

[1025] *See* Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023); *Nat'l Petroleum Refiners,* 482 F.2d at 690 ("[W]hen delay in agency proceedings is minimized by using rules, those violating the statutory standard lose an opportunity to turn litigation into a profitable and lengthy game of postponing the effect of the rule on their current practice. As a result, substantive rules will protect the companies which willingly comply with the law against what amounts to the unfair competition of those who would profit from delayed enforcement as to them.") (citation omitted).

the final rule will simplify enforcement proceedings by streamlining the proof required.[1026]

In addition, the principal harms from non-competes arise from their tendency to negatively affect competitive conditions in the aggregate. A single non-compete with a single worker may not do much to inhibit efficient matching between workers and employers across a labor market or suppress new business formation or innovation (and what effects it does have would be difficult to measure), but the Commission finds based on empirical evidence that the use of many non-competes across the labor market does have these aggregate net negative effects.[1027] For this reason, rulemaking is preferable to individual litigation for addressing the negative effects of non-competes. Past Commission experience has also illustrated that case-by-case enforcement, education, and other enforcement mechanisms are not always sufficient to stop widespread harms.[1028] A Federal rulemaking is the most efficient method to address the scale of harm to competitive conditions in labor, product, and service markets caused by non-competes.

Finally, "utilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticism, advice and data that is ordinarily less likely to be forthcoming in adjudication." [1029] Rulemaking is particularly beneficial when, as here, "a vast amount of data had to be compiled and analyzed, and the Commission, armed with these data, had to weigh the conflicting policies." [1030] Rulemaking also allows for more fulsome engagement from the public by providing for public comment on a complete regulatory scheme. The Commission greatly benefited from the submitted comments.

### b. Case-by-Case Litigation Alone Cannot Address the Negative Effects of Non-Competes on Competition

The Commission finds that case-by-case litigation alone is insufficient to address the harms to competition from non-competes due to the cost of litigation, which deters many workers from challenging non-competes, and the limited resources of public enforcement agencies. In addition, individual litigation is not well-suited to redress the negative externalities non-competes impose on other workers, other employers, consumers, and the economy from their use in the aggregate.

Many commenters addressed the shortcomings of individual litigation as a means for addressing the harms of non-competes. Numerous commenters noted that litigation is costly and many workers cannot afford to litigate their non-competes.[1031] Many commenters, including workers, entrepreneurs, and employment attorneys, shared examples of five-figure and six-figure litigation costs related to non-compete lawsuits. Numerous commenters reported that the fear of litigation costs induced them to refrain from seeking or accepting other work or starting a business, even though they thought the non-compete was likely unenforceable. Many other commenters stated that they complied with a non-compete after they were threatened with enforcement, even though they were unsure about the non-compete's enforceability. One study finds that 53% of workers subject to non-competes are hourly workers,[1032] who are particularly unlikely to be able to afford a court challenge.

Commenters also noted some non-competes include liquidated damages clauses or fee-shifting provisions requiring the worker to pay the employer's attorney and other costs if the employer wins, further increasing the costs (and risks) of challenging a non-compete. In addition, commenters stated that litigation is time-consuming and could take as long or longer than the non-compete period. For example, one commenter shared a decision in the commenter's own case where the appellate court found the non-compete violated public policy by leaving an area with only one surgeon in a specialty—but reached that decision only after the two-year non-compete had already run its course.[1033] Commenters also said

workers who sued their employer could experience reputational harm and difficulty finding work going forward.

Litigation can be even riskier if a court might reform a non-compete, which leaves the worker subject to some restrictions even if the initial non-compete was impermissibly broad. Several commenters cited a *Harvard Law Review* article that discusses the consequences of allowing courts to sever or reform overbroad non-competes:

> For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable.[1034]

If there is no penalty for drafting overbroad non-competes (as is true in most States),[1035] employers have little incentive to draft non-competes narrowly, particularly if a court is likely to revise it rather than strike it down, or if a worker is unlikely to be able to litigate at all. An employment attorney commented it is particularly difficult to advise workers about whether their specific non-compete is enforceable when it is possible a court may modify the underlying non-compete.

Case-by-case litigation under other antitrust laws alone is also insufficient to address the harms from non-competes. Non-competes restrain trade and therefore are subject to the Sherman Act.[1036] While private litigants may bring private causes of action to enforce the Sherman Act,[1037] the Commission views private litigation under the Sherman Act as an ineffectual response in the context of non-competes based on the history of cases by private litigants arising under that Act, as explained in the NPRM.[1038] For an individual litigant, proving harm to competition in the relevant geographic and product markets is a resource-intensive task that

[1026] *See Nat'l Petroleum Refiners,* 482 F.2d at 690 ("With the issues in Section 5 proceedings reduced by the existence of a rule delineating what is a violation of the statute or what presumptions the Commission proposes to rely upon, proceedings will be speeded up.").

[1027] *See* Part IV.B.3.a–b.

[1028] *See, e.g.,* Combating Auto Retail Scams Trade Regulation Rule, 89 FR 590, 600 (Jan. 4, 2024) (stating that rulemaking was necessary because certain unfair and deceptive acts and practices had persisted despite more than a decade of Federal and State enforcement, education, and other action in the motor vehicle dealer marketplace).

[1029] *Nat'l Petroleum Refiners,* 482 F.2d at 683 (citations omitted); *see also* Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023).

[1030] *Nat'l Petroleum Refiners,* 482 F.2d at 683 (citations omitted).

[1031] *See also* Part IV.B.2.b.ii (describing exploitative and coercive effects of the risk and cost of being subject to a non-compete suit).

[1032] Lipsitz & Starr, *supra* note 72 at 144 (analyzing data from the Starr, Prescott, & Bishara survey).

[1033] *Graham* v. *Cirocco,* 69 P.3d 194, 200 (Kan. App. 2003).

[1034] Blake, *supra* note 22 at 682–83 (noting that this may not be applicable if the worker has bargaining power and it may be inefficient to tailor non-competes to each worker, and recommending that courts only sever when they determine the employer acted fairly).

[1035] *See* NPRM at 3495.

[1036] *See* Part I.B.1.

[1037] *See* 15 U.S.C. 15.

[1038] NPRM at 3496.

typically requires expert testimony.[1039] This makes an already expensive proposition even less palatable for most workers and further tips the risk-versus-reward calculus away from litigation. In addition, to succeed on a Sherman Act claim, a plaintiff must show harm to competition as a whole, not just to themselves. It may be difficult or impossible for a worker to establish that their individual non-compete—or a single firm's use of a non-compete—adversely affected competition in a labor market or product/service market sufficiently to violate the Sherman Act.[1040] Section 5, on the other hand, is more inclusive than the Sherman Act.[1041] As outlined in Part II.F, section 5 requires a showing of indicia of unfairness and a tendency to negatively affect competitive conditions. It does not require a separate showing of market power or market definition—nor does it require proof of harm to competition by each non-compete.[1042]

Case-by-case litigation by public enforcers, such as the Commission or State attorneys general, is a potential alternative or supplement to private litigation under other antitrust laws. But the ability of public enforcers to engage in effective case-by-case litigation related to non-competes, absent a rule, is limited.

As cited in Parts I.B. and II.C.2, the FTC has previously secured consent orders premised on the use of non-competes being an unfair method of competition under section 5, and the Commission has the authority to determine that non-competes are unfair methods of competition through adjudication. However, FTC resource constraints limit the potential effectiveness of enforcement of section 5 on a purely case-by-case basis. The Commission is an independent agency that works to promote fair and open markets and protect the entire American public from unfair and deceptive business practices. The Commission has fewer than 1,500 employees for its entire body of work related to this mission,[1043] which includes investigating, challenging, and litigating anticompetitive mergers and conduct;

processing and reviewing merger filings; and investigating and challenging a wide range of consumer protection issues.[1044]

Similarly, several State Attorneys General commented that the multifactor common law approaches to non-compete law result in piecemeal decisions that do not address the non-compete problem in a uniform manner.[1045] These State Attorneys General also noted that some State enforcement agencies lack straightforward authority to enforce existing common law protections related to non-competes and argued that the challenges associated with common law enforcement underscore the need for a Federal rule.[1046] And the resource limitations to pursue non-competes comprehensively through enforcement limit States equally—if not more.

The Commission estimates that there are approximately 30 million individual non-competes in the U.S.[1047] In contrast to the large volume of non-competes, the resources of public enforcement agencies are limited. Public enforcers must balance competing demands for resources and priorities when they bring public enforcement actions. Public enforcers cannot conceivably investigate the specific details of every non-compete or initiate litigation concerning more than a small fraction of unlawful non-competes. A Federal rule provides clarity to market participants, engages all stakeholders in the development of the rule, and more effectively ceases an unfair method of competition.

The significant limitations on the ability of private and public litigants to challenge unlawful non-competes have practical implications. Courts cannot strike down an unenforceable non-compete that they never had the opportunity to review. Moreover, as detailed in Part IV.B.2.b, non-compete restrictions may still have significant *in terrorem* effects when workers are uncertain about the enforceability of their non-competes or lack the ability to challenge their use.

Furthermore, case-by-case litigation is insufficient to address negative externalities from non-competes (*i.e.*, harms non-competes cause to persons other than the parties to the non-compete). As described in Parts IV.B and IV.C, non-competes impose significant negative externalities on other workers, other firms, consumers, and the economy. Individual non-

compete cases are not well-suited for redressing these harms. For example, while the precise reasonability test for non-competes differs from State to State, the test typically considers the business interest asserted by the employer; the harm to the worker; and the injury to the public from the loss of the worker's services.[1048] This test does not generally account for the harms experienced by other workers, other firms, consumers, and the economy resulting from the negative effects of non-competes on competition.

Furthermore, because the significant harms of non-competes result from their aggregate use, they are unlikely to be captured by an assessment of an individual worker's non-compete or an individual firm's use of non-competes. This is true regardless of whether those non-competes are challenged under State non-compete laws or under other antitrust laws. It is likewise true regardless of whether non-competes are challenged by private litigants or public enforcers. Accordingly, the Commission finds that case-by-case litigation alone is insufficient to address the negative externalities of non-competes.

The Commission, by contrast, is well-positioned to evaluate non-competes holistically. The Commission is an expert agency and has used its expertise to assess the weight of the empirical evidence and comment record to evaluate the aggregate effects of non-competes. The Commission here implements a clear national standard through notice-and-comment rulemaking to protect competition, based on the evidence that the use of non-competes in the aggregate negatively affects competition and harms workers and consumers.

For all these reasons, the Commission finds that case-by-case litigation is not a viable alternative to the final rule.[1049]

---

[1039] *See, e.g., U.S. Healthcare, Inc.* v. *Healthsource, Inc.,* 986 F.2d 589, 599 (1st Cir. 1993) ("In practice, the frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify.").

[1040] *See* NPRM at 3496–97 (discussing non-compete cases that have been brought under the antitrust laws).

[1041] *See* Part II.A.

[1042] *See* Part II.F.

[1043] FTC, *Congressional Budget Justification—Fiscal Year 2025,* at 8 (2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/fy25-cbj.pdf.*

[1044] *Id.*

[1045] Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043 at 7.

[1046] *Id.*

[1047] *See* Part I.B.2.

[1048] *See* NPRM at 3494–95.

[1049] A few commenters suggested that the Commission could create guidelines instead of a rule to explain what factors the agency would look at in an enforcement action. By definition, however, a guidance document would "not have the force and effect of law." *Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 97 (2015) (quoting *Shalala* v. *Guernsey Mem'l Hosp.,* 514 U.S. 87, 99 (1995)). Guidelines would not bind employers or courts and would not provide workers with the same clarity about the enforceability of their non-competes. Moreover, case-by-case litigation itself is not suited to address the negative externalities of non-competes, a concern the issuance of guidelines would not address. The Commission finds that the issuance of guidelines is not a viable alternative to the final rule for the same reasons that it finds that the no-action alternative generally is not a viable alternative to the final rule.

## c. State Law Alone Cannot Address the Negative Effects of Non-Competes on Competition

The Commission appreciates that States have enacted legislation in recent years to ban or restrict non-competes and ameliorate their negative effects.[1050] The Commission has long recognized the value of concurrent enforcement of Federal and State law and believes States have an important role to play in restricting the use of non-competes. Indeed, in this final rule, the Commission has revised § 910.4 to ensure that States may continue to enforce laws that restrict non-competes and do not conflict with the final rule. However, the Commission believes that reliance on State law alone is insufficient to address the negative effects of non-competes on competition. The practical ability of States to address the harms to their residents from non-competes is limited by various factors, including employers' use of choice-of-law, forum-selection, and arbitration clauses; significant confusion among both employers and workers resulting from the patchwork of State law, which chills workers from engaging in competitive activity even where non-competes are likely unenforceable under State law and also increases employers' compliance costs, particularly given the increase in interstate remote work; spillover effects from other States' laws; and incentives for States to adopt permissive non-compete policies.

Many States have adopted statutory restrictions or compete bans on non-competes. Four States—California, Minnesota, North Dakota, and Oklahoma—have adopted statutes rendering non-competes void for nearly all workers.[1051] The majority of the remaining 46 States have statutory provisions or case law that ban or limit the enforceability of non-competes for workers in certain specified occupations.[1052] The general language of the test for whether a non-compete is reasonable is fairly consistent from State to State.[1053] However, the specifics of the application of the standard differ

from State to State. For example, States vary in how narrowly or broadly they define legitimate business interests and the extent to which courts are permitted to modify an unenforceable non-compete. States also differ with respect to statutory restrictions on non-competes.[1054] As a result, among the 46 States where non-competes may be enforced, variation exists with respect to the enforceability of non-competes.[1055]

State law also differs with respect to the steps courts take when they conclude that a non-compete is unenforceable as drafted. As noted in the NPRM, the majority of States have adopted the "reformation" or "equitable reform" doctrines, which allow courts to revise the text of an unenforceable non-compete to make it enforceable.[1056]

Because the enforceability of non-competes and courts' positions with respect to unenforceable non-competes vary from State to State, the question of which State's law applies in a legal dispute can determine the outcome of a non-compete case. Non-competes often contain choice-of-law provisions designating a particular State's law for resolution of any future dispute.[1057] Furthermore, some non-competes include forum-selection provisions specifying the court and location where a dispute may be heard.[1058] The default rule under conflict-of-laws principles is that the court honors the parties' choice of law, meaning that the burden is typically on the worker—the vast majority of whom the Commission finds are exploited and coerced when entering into a non-compete—to negotiate for the law of a different forum to apply.[1059]

There is significant variation, however, in how courts apply choice of law rules in disputes over non-competes.[1060] As a result, it can be difficult for employers and workers to predict how disputes over choice of law

(and, in turn, the enforceability of the non-compete) will be resolved.[1061] Several commenters agreed that a Federal rule would alleviate these problems.

Choice of law provisions may also mean that workers lose their own State's protections. For example, workers from States where non-competes are banned commented that they faced enforcement of non-competes that selected the law of another State. This raises the concern that choice of law clauses can be used to evade State bans or restrictions by forum shopping.[1062] As two scholars note, when "the parties or issues involved have connections to multiple jurisdictions," the law "confounds lawyers and commentators because of its complexity and unpredictability."[1063]

Employers may also impose arbitration clauses, which require that legal disputes with the employer—including disputes related to non-competes—be resolved through binding arbitration rather than in court.[1064] Where such clauses are valid, the Federal Arbitration Act requires that courts enforce them.[1065] Choice of law, forum selection, and arbitration clauses create opportunities for employers to forum-shop in ways that undermine any given State's ability to effectively regulate non-competes.

Numerous workers, businesses, and other commenters said the patchwork of State laws and confusion about those laws makes it difficult for workers and businesses to understand whether a particular non-compete would be enforceable. The lack of a clear national standard, and resulting confusion,

---

[1050] *See* NPRM at 3494 (summarizing recent State non-compete legislation).

[1051] *See* Cal. Bus. & Prof. Code sec. 16600; N.D. Cent. Code sec. 9–08–06; Okla. Stat. Ann. tit. 15, sec. 219A. Minnesota banned non-competes signed on or after July 1, 2023, after the comment period closed. Minn. Stat. Ann. sec. 181.988.

[1052] In most States, those limits apply to just one or two occupations (most commonly, physicians). *See* Beck Reed Riden LLP, *Employee Noncompetes: A State-by-State Survey* (Feb. 19, 2024), *https://beckreedriden.com/wp-content/uploads/2024/02/BRR-Noncompetes-20240219-50-State-Noncompete-Survey-Chart.pdf* [hereinafter "Beck Reed Chart"].

[1053] *See* NPRM at 3494–95.

[1054] *See, e.g.,* Beck Reed Riden Chart, *supra* note 1052.

[1055] NPRM at 3495.

[1056] *Id.*

[1057] Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective,* 31 Comp. Lab. & Pol'y J. 389, 396–402 (2010).

[1058] *Id.* at 402–04.

[1059] *Id.* at 397 ("In general, courts defer to choice of law clauses because they are presumed to represent the express intention of the parties."). *Cf.* Cal. Lab. Code sec. 925(a) (stating that employers shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would either (1) require the employee to adjudicate outside of California a claim arising in California or (2) deprive the employee of the substantive protection of California law with respect to a controversy arising in California).

[1060] Lester & Ryan, *supra* note 1057 at 394–95.

[1061] *Id.* at 395 ("The state of the law is perhaps characterized more by inconsistency than anything else, so much so that commentators lament the 'disarray' and 'mish-mash' of the law, and criticize courts for their 'post-hoc rationalizing of intuitions' or their use of a 'hodgepodge of factors, often with insignificant explanation of how they decide what weight to give each.'") (internal citations omitted).

[1062] *See generally* Timothy P. Glynn, *Interjurisdictional Competition in Enforcing Non-Compete Agreements: Regulatory Risk Management and the Race to the Bottom,* 65 Wash. & Lee L. Rev. 1381, 1386 (2008) (noting "judicial attempts to preempt other courts from disregarding the parties' choice of law"). Some States have attempted to defend against this by enacting statutes banning selection of a different State's law for a non-compete. *See* Minn. Stat. Ann. sec. 181.988(3)(a) (Minnesota); Cal. Lab. Code sec. 925 (California); Colo. Rev. Stat. sec. 8–2–113(6) (Colorado); Mass. Gen. Laws ch. 149, sec. 24L(e) (Massachusetts); La. Rev. Stats. 23:921(2) (Louisiana). Many of these statutes are relatively recent, however, and it remains to be seen how effective they will be.

[1063] Lester & Ryan, *supra* note 1057 at 389.

[1064] *See, e.g.,* Alexander J.S. Colvin, Econ. Pol'y Inst., Report, *The Growing Use of Mandatory Arbitration* (Apr. 6, 2018).

[1065] *See, e.g., Nitro-Lift Techs.* v. *Howard,* 568 U.S. 17, 20–22 (2012).

contributes to non-competes being used in jurisdictions where they are unenforceable. Starr, Prescott, and Bishara find that employers frequently use non-competes even when they are unenforceable under State law.[1066] Similarly, Colvin and Shierholz find that 45.1% of workplaces in California use non-competes even though they are unenforceable there.[1067] Anecdotally, an economist commented that the Commission's *Prudential Security* case, in which the employer continued using non-competes after they were held unenforceable by a court, was an example of employers enforcing unenforceable non-competes.[1068]

While the Commission has no doubt that many employers aim to ensure their contracts comply with applicable law, the empirical evidence indicates that at least some employers are using unenforceable non-competes, and some workers are turning down jobs where their non-competes are likely unenforceable. Some commenters referenced Starr, Prescott, and Bishara's finding that workers frequently cite non-competes as a factor in turning down job offers in both States that enforce non-competes and in those that do not.[1069] The study also finds that workers are more likely to report that they would be willing to leave for a competitor when they did not believe their employer would attempt to enforce a non-compete in court.[1070] The study suggests that whether a worker's non-compete is enforceable may matter less than whether the employer is willing to try to enforce it.[1071] The Commission notes that this study does not necessarily indicate a causal relationship, but it does indicate that for many workers, the *in terrorem* effect of non-competes may outweigh any State protections.

Furthermore, the ability of States to address harms to their residents from non-competes is limited by spillover effects from other States. The economies of States are closely interconnected. Therefore, even where a State adopts a law that strictly regulates non-competes, such a law can be undermined by permissive non-compete laws in a nearby State.[1072]

Finally, several comments argued that State regulation of non-competes should continue by quoting Justice Brandeis's dissent in *New State Ice Co.* v. *Leibmann:* "[i]t is one of the happy incidents of the [F]ederal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." [1073] The Commission disagrees that further laboratory testing by States is needed. States have been experimenting with non-compete regulation for more than a century, with laws ranging from full bans to notice requirements, compensation thresholds, bans for specific professions, reasonableness tests, and more.[1074] Past State experimentation and legal changes yielded a considerable body of empirical research, which as described in Parts IV.B and IV.C, demonstrates that non-competes negatively affect competitive conditions in labor markets and in product and service markets. This evidence supports the Commission's finding that non-competes are an unfair method of competition.

Individual States' non-compete policies can cause spillover effects that negatively affect competitive conditions in other States. Individual States' non-compete policies can also affect the operation of legal regimes in other States. Choice of law provisions cause confusion for workers even in States where non-competes are unenforceable. There are incentives for some States to adopt extremely permissive non-compete policies to attract employers that favor non-competes, and potentially even to enable employers to "export" those permissive policies to other States through choice-of-law provisions.[1075] In short, States are interconnected with respect to non-competes. Without a uniform standard through the final rule, States are forced to balance the benefit to their residents of laws regulating non-competes against the fear that some employers may shift jobs to States where non-competes are more enforceable. One benefit of the

Commission's rulemaking is it resolves this problem. The rulemaking record shows banning non-competes will improve competitive conditions in all States and will benefit workers in all States.

# X. Regulatory Analysis

## A. Introduction

The Commission has examined the economic impacts of the final rule as required by section 22 of the FTC Act (15 U.S.C. 57b–3). Section 22 directs the Commission to issue a final regulatory analysis that analyzes the projected benefits and any adverse economic effects and any other effects of the final rule. The final regulatory analysis must also summarize and assess any significant issues raised by comments submitted during the public comment period in response to the preliminary regulatory analysis.[1076]

## B. Preliminary Analysis

Pursuant to section 22 of the FTC Act, the Commission issued a preliminary regulatory analysis of its proposed rule.[1077] The preliminary regulatory analysis contained (1) a concise description of the need for, and objectives of, the proposed rule; (2) a description of any reasonable alternatives to the proposed rule that may accomplish the stated objective of the final rule in a manner consistent with applicable law; and (3) for the proposed rule and for each of the alternatives described, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects.[1078]

In the preliminary regulatory analysis, the Commission described the anticipated effects of the proposed rule and quantified the benefits and costs to the extent possible. For each benefit or cost quantified, the analysis identified the data sources relied upon and, where relevant, the quantitative assumptions made. The preliminary analysis measured the benefits and costs of the proposed rule against a baseline in which the Commission did not promulgate a rule regarding non-competes and included in the scope of the analysis the broadest set of economic actors possible. Several of the benefits and costs were quantifiable, but not monetizable—especially with respect to differentiating between transfers, benefits, and costs. The Commission preliminarily found that others were not quantifiable. The

---

[1066] Starr, Prescott, & Bishara, *supra* note 68 at 53, 81.

[1067] Colvin & Shierholz, *supra* note 65 at 5–6.

[1068] *See* FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.,* Matter No. 211 0026 at 1, 5–7 (Dec. 28, 2022).

[1069] Starr, Prescott, & Bishara, *supra* note 68 at 633, 663.

[1070] *Id.* at 633, 652, 664.

[1071] *Id.*

[1072] *See, e.g.,* Johnson, Lavetti, & Lipsitz, *supra* note 388 (finding that increases in non-compete enforceability in one State have negative impacts on

workers' earnings in bordering States, and that the effects are nearly as large as the effects in the State in which enforceability changed, but taper off as the distance to the bordering State increases).

[1073] *New State Ice Co.* v. *Leibmann,* 285 U.S. 262, 311 (1932) (Brandeis, dissenting).

[1074] *See* Beck Reed Riden Chart, *supra* note 1052.

[1075] *See, e.g.,* Glynn, *supra* note 1062 at 1385–86 (stating that "because employers typically are the first movers in [non-compete] litigation, they often can litigate in a hospitable judicial forum," and noting a rise in interjurisdictional disputes related to non-compete enforcement and "judicial attempts to preempt other courts from disregarding the parties' choice of law").

[1076] 15 U.S.C. 57b–3(b)(2)(C), (E).

[1077] NPRM at 3521–31.

[1078] *See* 15 U.S.C. 57b–3(b)(1)(A) through (C).

preliminary analysis discussed any bases for uncertainty in the estimates.

The Commission preliminarily found substantial positive effects of the proposed rule: an increase in workers' earnings by $250–$296 billion annually (with some portion representing an economic transfer from firms to workers); an increase in new firm formation and competition; a reduction in health care prices (and prices in other markets may also fall); and an increase in innovation. The Commission noted that several of these benefits overlap (*e.g.,* increases in competition may fully or in part drive decreases in prices and increases in innovation). The Commission also preliminarily found some costs of the proposed rule. Direct compliance and contract updating would result in $1.02 to $1.77 billion in one-time costs, and firm investment in human capital and capital assets would fall.

The Commission preliminarily concluded that the substantial labor market and product and service market benefits of the proposed rule would exceed the costs. Furthermore, the Commission preliminarily found the benefits would persist over a substantially longer time horizon than most costs of compliance and contract updating.

### C. Public Comments on the Preliminary Regulatory Impact Analysis

Based on the comments received, the final regulatory analysis reflects greater quantification where possible and includes sensitivity analyses to reflect different assumptions, including assumptions commenters suggested. The final regulatory analysis concludes, consistent with the preliminary analysis, that the benefits of the final rule justify the costs.

Some commenters urged the Commission to quantify the costs and benefits to a greater degree. In the final analysis, the Commission incorporates greater quantification where possible. That some effects cannot be quantified or monetized does not, however, undermine the Commission's conclusion that the benefits justify the costs.

Some commenters focused on the methodology used to estimate earnings effects in the preliminary analysis, stating that extrapolating estimated effects on earnings based on linear predictions may result in incorrect estimates. These commenters stated that linear predictions might be particularly unreliable outside the range observed in the data. While as a general matter, linear extrapolation may not be appropriate in all circumstances,

especially in the absence of data supporting such an approach, the Commission notes the linear effect of non-compete enforceability on earnings was statistically tested in the economic literature.[1079]

Nevertheless, to test and confirm the robustness of the conclusions drawn in the preliminary analysis from the linear approach, in this final analysis, the Commission uses several estimation approaches. For its primary analysis, the Commission adopts an approach that does not rely on extrapolation. Specifically, the Commission assumes that the historical average change[1080] in non-compete enforceability observed at the State level represents the total change in enforceability that results from the rule. This approach is hereafter referred to as the "average enforceability change approach." It likely underestimates the effects of the rule because the State-level changes that would occur under the rule (which adopts a near comprehensive ban) would be substantially larger than the changes observed historically. The Commission also conducted sensitivity analyses with two other approaches— described further in Parts X.C and X.F.6.a—that use linear extrapolation to scale up the effects estimated in the literature to estimate the effects of the final rule (*i.e.,* a near comprehensive ban).

Some commenters alleged the proposed rule would increase inflation. Some commenters also stated the proposed rule would harm shareholders by decreasing corporate profits. In response, the Commission notes that the regulatory analysis attempts to quantify and monetize real costs and benefits of the final rule as opposed to nominal costs and benefits. Therefore, net benefits are benefits that represent increased economic efficiency resulting from the final rule rather than increases in the dollar value of output that may be due to inflation. Additionally, earnings increases are due, at least in part, to increased economic efficiency, which would likely lower prices. Accordingly, the Commission does not expect that prices will rise because of the rule. Indeed, empirical evidence shows that in physician clinics, prices fall with decreased non-compete

enforceability.[1081] Similarly, while the effect of the final rule on corporate profits is unclear,[1082] the Commission's analysis is focused on overall gains or losses in economic surplus—*i.e.,* the net benefits to society, not to individual corporations.

Some commenters stated that certain costs may be missing from the preliminary analysis, including costs related to worker misconduct and litigation over the validity of the final rule. The Commission finds no evidence or compelling arguments directly linking non-competes to worker misconduct and therefore does not consider such costs.[1083] Costs related to litigation over the validity of the rule are outside the scope of the regulatory analysis under section 22, which is concerned with costs and benefits should the final rule be implemented.

Some commenters stated the rule may have beneficial tax ramifications for businesses and workers with non-competes that are no longer enforceable, including based on changes in amortization schedules. In response, the Commission notes that any tax savings under the final rule represent transfers from the government to firms that previously used non-competes. Significantly, the Commission is allowing existing non-competes with senior executives, who may be most likely to have non-competes with tax implications, to remain in effect. This will mitigate the need for tax-related administrative work. In response to comments on the tax ramifications of clawed back pay, the final rule does not encourage or require firms to "claw back" compensation and given the exclusion for senior executives' existing non-competes in the final rule, situations in which a firm would be in a position to consider clawing back pay are likely to be extremely limited, if any.

Some commenters stated workers may be harmed if firms claw back workers' earnings, if workers lose long-term incentive payments, retention bonuses, and severance payments, or if workers must pay for training out of pocket in response to the rule. First, in Parts IV.B.3.a.iii and X.F.6.a, the Commission finds earnings increases overall associated with decreases in non-compete enforceability. With respect to existing non-competes, non-competes

[1079] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.

[1080] In other words, taking all changes in non-compete enforceability between 1991 and 2014 (the range studied in the relevant literature) into account, the Commission considers a change whose magnitude is equal to the average of the magnitudes of all those changes. *See* Johnson, Lavetti, & Lipsitz, *supra* note 388 for more details.

[1081] Hausman & Lavetti, *supra* note 590.

[1082] The evidence in the empirical literature is mixed. Younge & Marx (*supra* note 755) find an increase in firm value when non-competes became enforceable in Michigan. Hiraiwa, Lipsitz, & Starr (*supra* note 502) find no effect on firm value when non-competes were prohibited for the majority of workers in Washington.

[1083] *See* Part V.D.3.

**38468** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

with senior executives, which are most likely to be structured with incentive payments, bonuses, and severance, may remain in effect under the final rule. To the extent any other existing non-competes with such structures are not excluded from the final rule, as noted in Parts III.D and IV.D, deferred compensation and other structured payments generally have many material contingencies other than a non-compete, which means incentive payments and retention bonuses will continue to retain value for the employer. Going forward, under the final rule, agreements for deferred compensation and other structured payments may be permissible as long as they do not fall within the definition of non-compete clause in § 910.1. With respect to payments for training, the Commission notes evidence that worker-sponsored training is unaffected by legal enforceability of non-competes,[1084] and it is therefore unlikely that workers will incur costs related to training as a result of the final rule.

Some commenters disagreed with the Commission's use of patenting activity as a proxy for innovation in the preliminary analysis, stating that the value of innovation may not be captured in patenting, in part because employers may use patents as a substitute for non-competes. First, the Commission agrees that innovation likely has value above and beyond patenting. That patenting does not capture the full value of innovation is not a basis for dismissing its value as a proxy altogether. Second, while it is theoretically possible firms may substitute from the use of non-competes to the use of patents to protect intellectual property, the empirical literature shows increases in innovation do not follow from the simple substitution of protections between non-competes and patents. Specifically, the empirical literature confirms the innovations prompted by decreased non-compete enforceability are qualitatively valuable, and—examining the relationship between non-compete enforceability and patenting for drugs and medical devices, where patenting is ubiquitous [1085]—it shows the patents reflect true net increases in innovation (as opposed to substitutions). One commenter stated there can be difficulty ascertaining the value of patenting. The Commission finds that there are several estimates of the private value of a patent (*e.g.*, the value to the patenting firm) in the literature, but no estimates of the social value of a patent, as further

discussed in Part X.F.6.b. The Commission therefore stops short of monetizing this benefit. The final analysis addresses effects on innovation in greater detail in Part X.F.6.b.

Some commenters asserted the research related to investment in human capital does not distinguish between two different types of training: core training, *i.e.*, training required to perform job duties, and advanced training, *i.e.*, training with potential to increase productivity beyond the baseline requirements for job performance.[1086] Commenters stated that when non-competes are more enforceable, workers may receive additional core training rather than advanced training. In other words, when non-competes are more enforceable, labor mobility decreases and workers may also move to new industries to avoid potentially triggering non-compete clause violations (as discussed in Part IV.B.3.b.ii), both of which make experienced workers less often available for hire. Firms therefore may need to train workers at a greater rate because they will hire inexperienced workers who require more core training. Research finding increases in training associated with increases in non-compete enforceability therefore may not imply increases in advanced training—*i.e.*, the kind of training that increases productivity of workers already able to perform job duties, with net benefits for society as a whole. In response, the Commission agrees that decreases in training under the final rule may represent decreases in core, rather than advanced, training. It is not possible to discern whether the observed effects on training in the literature represent core versus advanced training because evidence that would facilitate such an analysis does not exist. Importantly, a decrease in core training would be economically beneficial because it would reflect a more efficient use of the labor force. Therefore, to the extent a decrease in training reflects a change in core training, this would be a net benefit of the final rule—not a cost. On the other hand, to the extent a decrease in training is due to a change in advanced training, this would represent a net cost of the final rule. The Commission further discusses investment in human capital in Part X.F.7.a.

Some commenters stated that costs associated with rescinding existing non-competes and updating contractual practices may be greater than estimated

in the NPRM and attributed the greater cost to the need for high-cost outside counsel. In response, the Commission finds it likely that many firms will not need to use costly outside counsel (or indeed, any counsel) to comply with the final rule. This is especially true since the final rule allows non-competes for senior executives to remain in effect, since it does not require rescission of any existing contracts, and since it provides a model safe harbor notice for other workers and makes other adjustments to simplify the notice process. In response to commenters stating that firms will need more time to implement than estimated in the NPRM, the Commission conducts an updated analysis in Part X.F.7.b. The Commission notes that the model language provided in the final rule and allowing employers to use the last known address, mail or electronic, will significantly simplify the notice process for employers. Additionally, the Commission performs two sensitivity analyses in Part X.F.7.b. The first assumes an attorney's time is more costly—it replaces the primary estimate of the average hourly productivity of an attorney ($134.62 per hour, based on BLS earnings data) with an estimated rate of the cost of outside counsel who is a tenth-year attorney ($483 per hour).[1087] The second makes different assumptions about the time spent by employers related to existing non-competes that will be no longer be enforceable and updating contractual practices. Finally, the Commission clarifies the definition of "non-compete clause" in Part III.D to reduce confusion and give employers and workers a clearer understanding of what is prohibited. This, in turn, will reduce compliance costs and potential litigation costs over what constitutes a non-compete.

One commenter from the retail industry claimed the cost of implementing the proposed rule could

---

[1084] Starr, *supra* note 445.

[1085] See Part IV.B.3.b.ii, discussing Johnson, Lipsitz, & Pei, *supra* note 526.

[1086] Commenters used the words "requisite" and "discretionary" in lieu of "core" and "advanced," respectively.

[1087] This estimate is drawn from the Fitzpatrick Matrix, which is a fee schedule used by many U.S. courts for determining the reasonable hourly rates in the District of Columbia for attorneys' fee awards under Federal fee-shifting statutes. It is used here as a proxy for market rates for litigation counsel in the Washington, DC area, which likely represent the high end of rates for litigation counsel in the U.S. The estimate is therefore adjusted to reflect a national rate by multiplying by the ratio of the hourly wage of attorneys nationwide to the hourly wage of attorneys in the Washington, DC metro area, based on BLS Occupational Employment and Wage Statistics data. The Commission conservatively uses the rates of a tenth-year attorney—a much more experienced attorney than is likely to be needed (and indeed no attorney at all may be needed). *See* Fitzpatrick Matrix, *https://www.justice.gov/usao-dc/page/file/1504361/dl?inline*. *See* BLS Occupational Employment and Wage Statistics, *https://www.bls.gov/oes/data.htm*.

be $100,000 to $200,000 per firm but did not support this assertion with any evidence. The Commission disagrees with this assertion, which does not align with its careful estimates based on empirical evidence and significant expertise presented in Part X.F.7.b.ii. The Commission's estimates also acknowledge and account for potentially heterogeneous costs across firms.

Some commenters stated that employers would need to spend substantial resources to litigate trade secret disputes and violations of post-employment restrictions other than non-competes. One commenter stated that the cost of a trade secret case may range from $550,000 to $7.4 million, depending on the monetary value of the trade secret claim. The Commission analyzes costs of litigation in Part X.F.7.c. The Commission agrees with commenters that trade secret litigation, and litigation over post-employment restrictions other than non-competes, may be costly. However, the Commission notes that no evidence exists to support the hypothesis that litigation on these fronts will increase because of the final rule. Indeed, recent evidence suggests that trade secret litigation does not increase following bans on non-competes.[1088] Moreover, the final rule, with its clear and bright-line standard (as compared to the current patchwork of State laws), would likely decrease litigation attempting to enforce non-competes, including litigation initiated by former employers against workers who start their own business or who find a new employer. While the Commission does not have evidence on the frequency of these different types of litigation, it expects the decrease in non-compete litigation would likely offset potential increases in other litigation.

Positing that firms will be reluctant to share trade secrets with workers under the rule, some commenters also stated that the costs of lessened sharing of trade secrets should be taken into account. Since no data exists on the effect of non-competes on the monetary value of shared trade secrets, the Commission does not quantify or monetize this effect. Moreover, there is no evidence that employers will lessen the extent to which they share trade

secrets under the final rule, much less that any change would be material. As detailed in Part IV.D, employers have less restrictive alternatives to non-competes that mitigate these concerns.

Some commenters reference the Starr, Balasubramanian, and Sakakibara study[1089] and the Commission's interpretation of it in the NPRM to assert that firms founded because of the rule may be of lower quality than existing firms in terms of average employment and survival rates, and adjustments should be made to the Commission's analysis to account for these differences. Upon further review, the Commission interprets the authors' findings to show that within-industry spinouts resulting from lessened non-compete enforceability tend to be lower quality than non-within industry spinouts resulting from lessened non-compete enforceability. However, both types of spinouts are better, on average, than spinouts that form under stricter non-compete enforceability. The study's results therefore suggest that, if anything, the Commission underestimates the final rule's benefits from new business formation, because the estimates do not adjust for quality.

Some commenters asserted that, because of the positive effects of the proposed rule on labor mobility, firms may face greater costs associated with turnover (especially firms that currently use non-competes) due to the cost of finding a replacement, the cost of training a replacement, and the cost of lost productivity. Based on Pivateau (2011),[1090] one commenter estimated that turnover costs 25% of the annual salary of a worker. Some commenters also argued that some firms may face decreased costs of turnover, because more plentiful availability of labor can reduce the cost of hiring. The Commission finds that there may be distributional effects of increased turnover—benefits for firms that face a lower cost of hiring and costs for firms losing workers who had been bound by non-competes—and assesses the same in Part X.F.9.c.

Some commenters offered additional empirical evidence not discussed in the NPRM that was not specific to the proposed regulatory analysis. The Commission responds to those comments in Part IV.

## D. Summary of Changes to the Regulatory Analysis

In the final regulatory analysis presented in Part X.F, the Commission updates its analyses based on the parameters of the final rule, comments received, supporting empirical evidence raised by commenters, changes in the status quo regarding regulation of non-competes, and reanalysis of evidence presented in the NPRM.[1091] This includes the Commission's attempt to quantify and monetize, to the extent feasible, all costs and benefits of the final rule, as well as transfers and distributional effects. The Commission additionally analyzes hypothetical scenarios to assess what otherwise unmonetized benefits and costs would lead to a final rule that is net beneficial. Finally, the Commission elects to include an analysis of an alternative the Commission considered, namely an analysis of fully excluding senior executives.[1092]

Under the final rule, existing non-competes with senior executives may remain in effect. While this change likely affects some costs and benefits associated with the final rule temporarily, the Commission does not specifically quantify or monetize those effects. The effect on persistent costs and benefits would be temporary, as senior executives will eventually move out of their jobs and retire or move into new jobs, to which the final rule will apply. The Commission notes throughout its analysis, however, how different estimates may be affected by this differential treatment of senior executives even if it cannot quantify the precise effect.

## E. Summary of Benefits and Costs

The Commission considered several effects of the final rule on economic outcomes: earnings, innovation, entrepreneurship, distributional effects on workers, investment in human capital, capital investment, legal and administrative costs, prices, labor mobility and turnover, and litigation costs.

The Commission describes the primary estimates of benefits, transfers, costs, and distributional effects associated with each of these outcomes in Table 1. Table 1 also reports whether the outcome for each effect is quantifiable or monetizable and

---

[1088] Greenwood, Kobayashi & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

[1089] Starr, Balasubramanian, & Sakakibara, *supra* note 518.

[1090] Griffin Toronjo Pivateau, *Preserving Human Capital: Using the Noncompete Agreement to Achieve Competitive Advantage*, 4 J. Bus. Entrepreneurship & L. 319 (2010).

[1091] As described in detail in this Part X, the Commission's final analysis, including its quantification and monetization of effects, therefore is not precisely the same as its preliminary analysis.

[1092] The Commission is not required to analyze costs and benefits of regulatory alternatives in its final regulatory analysis. *See* 15 U.S.C. 57b–3(b)(2)(B).

discusses important nuance or uncertainty.

TABLE 1

| Category | Extent of characterization | Description of estimate | Discussion |
|---|---|---|---|
| Earnings | Quantified | The estimated ten-year present discounted value of increased worker earnings is $400–$488 billion. Effect on earnings partially represents a transfer and partially represents a benefit of the final rule. | The extent to which the estimated increase in worker earnings represents a benefit versus a transfer is unclear, though there is evidence to suggest that a substantial portion is a benefit. |
| Innovation | Quantified | Annual count of new patents estimated to rise by 3,111–5,337 in the first year, rising to 31,110–53,372 in the tenth year. Annual spending on R&D estimated to fall by $0-$47 billion. Effect on innovation represents a benefit of the final rule. | Estimates of the societal value of innovation are not available. The two effects on innovation together represent a benefit because more output (amount of innovation) is produced with less input (R&D spending). |
| Prices | Partially Quantified | The estimated ten-year present discounted value of decreases in spending on physician and clinical services is $74-$194 billion. Prices in other sectors may decrease as well but are not quantified. The effect on prices partially represents a transfer and partially represents a benefit of the final rule. | Price changes encompass transfers (from firms to consumers) and benefits (since price changes are likely due to increased competition); however, the exact split is not clear. Increased competition may also increase consumer quantity, choice, and quality. Prices outside of physician and clinical services may fall due to changes in competition because of new entrants; however, the literature has not quantified this effect. |
| Investment in Human Capital | Monetized | The estimated ten-year present discounted value of the net effect of the final rule on investment in human capital ranges from a benefit of $32 billion to a cost of $41 billion. The effect on investment in human capital may represent a cost or benefit of the final rule. | The range in estimates reflects uncertainty over whether decreased investment in human capital under the final rule reflects reductions in advanced investment (which the firms opt into to increase productivity) or core investment (which is no longer necessary if more experienced workers are hired) and uncertainty over the workers for whom investment in human capital (all workers or workers in occupations which use non-competes at a high rate) is affected. |
| Legal and Administrative Costs | Monetized | One-time legal and administrative costs are estimated to total $2.1–$3.7 billion. Legal and administrative costs represent a cost of the final rule. | |
| Litigation Effects | Not quantified or monetized | The final rule may increase or decrease litigation costs. Effects on litigation costs may represent a cost or benefit of the final rule. | Estimates of the effect of the final rule on total litigation costs are not quantifiable. Litigation costs may rise or fall depending on firms' subsequent use of other contractual provisions and trade secret law and how the costs of such litigation compare to the cost of non-compete litigation, as well as the decreased uncertainty associated with a bright-line rule on non-competes. |

TABLE 1—Continued

| Category | Extent of characterization | Description of estimate | Discussion |
|---|---|---|---|
| Firm Expansion and Formation ..... | Quantified ...................................... | The final rule is estimated to increase new firm formation by 2.7–3.2% and decrease capital investment at incumbent firms by 0–7.9%. These effects represent a shift in productive capacity from incumbent firms to new firms. The overall effect on firm expansion and formation represents a distributional effect of the final rule. | New firm formation is generally a benefit, but may also crowd out incumbent firms and is therefore not a pure benefit. Decreased capital investment at incumbent firms may be counterbalanced by increased capital investment at new firms or rebalancing across industries, and therefore may or may not be a cost in net. |
| Distributional Effects on Workers .. | Not quantified or monetized ......... | The rule may reduce the gender and racial earnings gap, may disproportionately encourage entrepreneurship among women, and may mitigate legal uncertainty for workers, especially relatively low-paid workers. The differential effect on different groups of workers represents a distributional effect of the final rule. | |
| Labor Mobility ................................ | Partially Monetized ...................... | Some firms may save on turnover costs (due to easier hiring as more potential workers are available), while some firms may have greater turnover costs (due to lost workers newly free from non-competes). The latter is estimated to be no more than $131 per worker with a non-compete, while estimates are not available to monetize the former. While it is unclear whether labor mobility costs represent a net cost or benefit of the final rule, they likely represent a distributional effect (costing firms which use non-competes and helping firms which do not) of the final rule. | The estimate of the increase in turnover costs for firms using non-competes is an upper bound, since it encompasses effects on investment in workers' human capital, hiring workers, and lost productivity of workers, all of which are expected to diminish under the final rule. |

**Note:** Present values are calculated using discount rates of 2%, 3%, and 7%.

The Commission finds that, even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs. While data limitations make it challenging to monetize all the expected effects of the final rule, the Commission believes it has quantified the effects of the final rule likely to be the most significant in magnitude, and thus, potentially drive whether and the extent to which the final rule is net beneficial. This includes both benefits and costs. Based on those quantifications, the Commission is able to make conservative assumptions, based on its expertise, under which the final rule would be net beneficial. In this context, by conservative assumption, the Commission means that it is presuming the benefits it quantifies to be relatively low in value for purposes of this analysis, *i.e.,* lower than it believes is likely the case. With respect to costs, the Commission assumes costs are on the higher end of the estimated range, which is higher than the Commission believes is likely to be the case. Through this analysis, provided in detail in Part X.F.10, the Commission further bolsters its finding that the benefits of the final rule justify the costs.[1093]

Specifically, the Commission finds that even if only 5.5% of the estimated $400–$488 billion increase in worker

---

[1093] The Commission notes that it does not believe there is a likely scenario in which firm exit and lost capital investment, especially when balanced against firm entry and gained capital investment at new firms, would change this outcome. Firm exit and lost capital investment, which are not quantified and are discussed as distributional effects in Part X.F.9, would not, for example, result in costs large enough to overcome the break-even analyses (even if, for example, the value of earnings representing productivity increases or the social value of patents had to be marginally higher) or the finding that the benefits justify the costs.

earnings represents increased productivity resulting from improved, more productive matches between workers and employers, the benefits will outweigh the costs. In Part X.F.6.a, the Commission explains that the economic literature does not provide a way to separate increased productivity from the total effect on earnings (*i.e.,* transfers versus benefits in the regulatory impact analysis sense). However, the Commission finds that based on the literature, some part of the increase in worker earnings represents increased productivity and believes that 5.5%, and likely more, represents increased productivity. Similarly, even presuming that no part of the effect on earnings is a benefit (as opposed to a transfer), the Commission finds that if the social value of a patent were at least $297,144, then the monetizable benefits will exceed monetized costs. Notably, the literature finds that the average private value of a patent may be as high

JA0130

as $32,459,680, again making this assumption regarding the social value of a patent quite conservative. Finally, even presuming none of the earnings are benefits (rather than transfers) and that the social value of a patent is zero (an implausibly low estimate), if all the lost investment in human capital is core, the monetized benefits would also exceed monetized costs. Notably, in conducting these analyses, in each instance, the Commission further makes the very conservative assumption that monetizable benefits other than the benefit being analyzed are zero. That is, the Commission assumes that patents have no social value and that no reduced investment in human capital is core when considering how much of earnings must represent increased productivity in order for the monetized benefits to exceed the monetized costs. This break-even analysis shows that while data limitations making it challenging to monetize all of the expected benefits of the rule, the Commission finds that the final rule can be shown to be net beneficial even under very conservative assumptions.

### F. Final Regulatory Analysis

#### 1. Background

As discussed in Part IV.B.3.a, non-competes inhibit worker mobility, creating worse matches between workers and firms and decreasing workers' productivity and therefore their earnings. Non-competes also prevent firms from hiring talented and experienced workers; inhibit new business formation; and reduce the flow of innovative workers between firms, harming innovation. The final rule increases competition in labor markets by allowing workers to move more freely between jobs and increases competition in product and service markets by ensuring that firms are able to hire appropriate workers, that workers are able to create new entrepreneurial ventures, and that worker flow between firms enhances innovation.

#### 2. Economic Rationale for the Final Rule

The final rule addresses two primary economic problems. First, non-competes tend to harm competitive conditions in labor markets. Non-competes increase barriers to voluntary labor mobility and prevent firms from competing for workers' services, thus creating frictions and obstructing the functioning of labor markets. These frictions inhibit the formation of optimal and efficient matches in the labor market, resulting in diminished worker and firm productivity and in lower wages.

The second economic problem is that non-competes tend to harm competitive conditions in product and service markets. Non-competes create a barrier to new business formation and entrepreneurial growth, which negatively affects consumers by lessening competition in product and service markets. Non-competes also make it difficult for competitors to hire talented workers, which reduces these competitors' ability to effectively compete in the marketplace. Additionally, non-competes impede innovation by preventing the churn [1094] of innovative workers between firms, limiting the spread and recombination of novel ideas, which may negatively affect technological growth rates.

#### 3. Purpose of the Final Rule

The final rule provides that, with respect to a worker other than a senior executive, it is an unfair method of competition—and thus a violation of section 5 of the FTC Act—for a person to enter into or attempt to enter into a non-compete; enforce or attempt to enforce a non-compete; or represent that the worker is subject to a non-compete. [1095] The final rule also provides that, with respect to senior executives, it is an unfair method of competition—and thus a violation of section 5 of the FTC Act—for a person to enter into or attempt to enter into a non-compete; enforce or attempt to enforce a non-compete entered into after the effective date; or represent that the worker is subject to a non-compete, where the non-compete was entered into after the effective date. [1096]

#### 4. Baseline Conditions

##### a. Estimate of the Affected Workforce

As described in Part II.E, some workers may not be subject to the final rule to the extent they are employed by an entity or in a capacity that is exempted from coverage under the FTC Act. The Commission estimates the fraction of the workforce who would be covered under the final rule (the "coverage rate") by applying conservative assumptions to individual-level data on the characteristics of the workforce from the American Community Survey (ACS) for 2017 to 2021. [1097] Residents of four States (California, Minnesota, North Dakota, and Oklahoma) are excluded from the sample used for the computation, since these States already generally do not enforce non-compete agreements.

To estimate the coverage rate, workers are classified according to three criteria: (1) whether the individual is identified as working for the government; (2) whether the individual is identified as working for a non-profit organization; and (3) whether the individual works in an industry or in a capacity that is likely to be outside the jurisdiction of the FTC Act. Government employment consists of employment with local, State, and Federal governments, in addition to individuals on active duty in the U.S. Armed Forces or Commissioned Corps. Nonprofit status is self-reported by survey respondents. Industries are defined based on the North American Industry Classification System (NAICS).

Such a classification of workers is necessarily imperfect as the FTC's jurisdiction does not exclude all workers that may be identified in the data as government employees or map directly into the data on non-profit status or the NAICS classifications that are available within the ACS. For example, the FTC Act is likely to exempt some firms that are classified as non-profits but not others, as described in Part II.E. Also, in some instances, only a subset of a given NAICS category (and not the entire category) appeared likely to fall outside the jurisdiction of the FTC Act. When ambiguity arose, the Commission was overinclusive in excluding workers. For example, the Commission classified all nonprofits as outside the coverage of the final rule for the purposes of estimating the coverage rate. Moreover, in estimating the coverage rate, the Commission excluded entire industries in calculating the coverage rate when some subset of that industry appeared to be outside the Commission's jurisdiction. This over-inclusiveness has the effect of underestimating the coverage rate of the final rule, and thus the overall net effect of the final rule will be conservative.

Using data from the ACS and the assumptions detailed in Part X.F.4, the Commission estimates that the final rule is likely to cover 80% of the private U.S. workforce.

##### b. Non-Compete Enforceability

For regulatory analyses, the effects of the final rule are measured against a baseline representing conditions that would exist in the absence of the rule. The extent of the final rule's costs and benefits depends on the degree to which it will change the enforceability of non-competes relative to what it would be in the baseline. Currently, non-competes are broadly prohibited in four States:

---

[1094] Churn in this context means turnover that is neither job creation nor job destruction—essentially the movement of workers among jobs.

[1095] *See* § 910.2(a)(1).

[1096] *See* § 910.2(a)(2).

[1097] The preliminary analysis in the NPRM did not estimate or apply a coverage rate based on jurisdiction.

JA0131

California, North Dakota, Oklahoma, and Minnesota. In some other States, non-competes are prohibited for some, but not all, workers. For non-competes that are not prohibited expressly by statute, some version of a reasonableness test is used under State law to determine whether a given non-compete is enforceable or not. These reasonableness tests examine whether the restraint is greater than needed to protect an employer's purported business interest. Non-competes can also be found unreasonable where the employer's need for the non-compete is outweighed by the hardship to the worker or the likely injury to the public. Because these cases arise in the context of individual litigation, courts focus the "likely injury to the public" inquiry on the loss of the individual worker's services and not on the aggregate effects of non-competes on competition in the relevant market or overall in the economy.[1098]

Researchers have used various scoring systems to capture the enforceability of non-competes State by State over time. As described in Part IV.A.2, the Commission gives greatest weight to studies that measure enforceability granularly (*i.e.*, not using a binary score but, for example, an integer scale) and along various dimensions (*e.g.*, the employer's burden of proof in non-compete litigation and the extent to which courts are permitted to modify unenforceable non-competes to make them enforceable). The scoring system which fits these criteria best[1099] has been used to study the effect of non-compete enforceability on several economic outcomes. This score, which varies across States and across years, measures non-compete enforceability along a scale which runs from zero to one.[1100] A score of zero indicates enforceability equal to that of the State which enforces non-competes least (North Dakota). A score of one indicates enforceability equal to that of the State which enforces non-competes most readily (Florida). The final analysis relies on this score heavily as a granular and reliable scoring system that allows

the Commission to consider the effect of non-compete enforceability on several economic outcomes. The studies that use this score form much of the basis for the final regulatory analysis.

5. Estimating the Effect of the Rule on a State-Level Enforceability Metric

In the absence of the rule, the average State enforceability score—in States that do not broadly prohibit them—when measured on a scale of 0 (lowest enforceability) to 1 (highest enforceability), is 0.78. The final rule will result in State-level enforceability of non-competes falling from its level in the absence of the rule to zero (*i.e.*, an average decrease of 0.78, excluding States that broadly prohibit non-competes).[1101] Using data on scores from 1991 to 2014, researchers report that the average magnitude of a change in the score (*i.e.*, the size of the change, regardless of whether it was a score increase or decrease) from year to year was 0.081.[1102] In other words, when a State's score changed from one year to the next, the average magnitude of that change was 0.081, on a scale of zero to one. Since the decrease that will result from the final rule is significantly larger than the average decrease considered in the literature (0.78 v. 0.081), the Commission considered different methods for the preliminary estimate in this final analysis. Consistent with the NPRM, this final analysis could attempt to scale up, or extrapolate, estimated effects to account for this larger decrease. As discussed in Part X.C, some commenters criticized this approach, stating that it may result in

unreliable estimates absent evidence that the economic effects the Commission is attempting to measure would scale up linearly.

The Commission notes in X.C that empirical studies show a linear extrapolation is appropriate for measuring earnings effects.[1103] However, similar evidence supporting the use of linear extrapolation is not available for all economic outcomes the Commission is measuring in this final analysis. To maintain consistent reporting across economic outcomes and to avoid extrapolation, the final analysis considers the effect of a change equal to 0.081 when possible.[1104] That is, for the purposes of the final analysis, the Commission conservatively assumes the projected effects on economic outcomes due to the final rule are equal to the effects the economic literature associates with an average magnitude change in the non-compete enforceability score from year to year. The economic literature reports enforceability changes as simply increases or decreases in some studies,[1105] and the magnitude of those legal changes in this final analysis is assumed to mirror the average magnitude change of 0.081. The Commission makes these assumptions to avoid the possibility of inadvertently inflating the effects of changes in the enforceability score. The final rule will result in greater changes in enforceability than the changes examined in empirical studies. There is a possibility that the magnitude of change for particular economic outcomes will not be the same in response to every reduction in enforceability. For example, it is possible that for some economic outcomes, as enforceability gets closer to zero, the changes in the outcome being measured will be lower with each change in enforceability.

At the same time, the Commission notes that this may result in underestimating benefits of the final rule—the average magnitude change of 0.081 is much smaller than the average 0.78 change it would take for enforceability to reflect the final rule. To reflect this possibility, the final analysis includes sensitivity analyses which extrapolate beyond an average magnitude change. In these sensitivity

---

[1098] *See* NPRM at 3493–97 (describing the law governing non-competes at the time the NPRM was published). Minnesota prohibited non-competes after the publication of the NPRM. *See* Minn. Stat. Ann. sec. 181.988.

[1099] Bishara, *supra* note 501 at 751.

[1100] Different researchers have rescaled this score in different ways (*e.g.*, from zero to 470, or scaled such that the mean score is zero and the standard deviation of the score is one). The Commission uses the scaling from zero to one because that is the way it is used in the majority of the studies which are relied on in the final analysis, as well as for easy interpretability and consistency across the final analysis.

[1101] Calculated using data from 2009, the most recent year with publicly available data, and rescaled to a zero to one scale. *See* Starr, *supra* note 445.

[1102] Changes of zero (*i.e.*, years in which the score in a given State was the same as the prior year) were excluded from this calculation. The Commission notes that the study which reports this average (Johnson, Lipsitz, & Pei, *supra* note 526) was released after publication of the NPRM. The Commission also notes that the data underlying this calculation were used in other studies discussed in the NPRM; Johnson, Lipsitz, & Pei report the average score in the most accessible fashion and is therefore used here. The average they report is the average change in the analysis sample they select, which is chosen for analytical reasons to ensure accuracy of their estimates. Use of the underlying data to re-calculate the average score or use of scores provided by other researchers would not change the overall outcomes, conditional on sample selection. Moreover, the Commission reports the estimates resulting from a full extrapolation in this final analysis, which does not use this average score change in its sensitivity analysis, and is the method used in the NPRM. As noted, the Commission believes that the full extrapolation method is a valid, but potentially less precise method. Accordingly, the use of this score supplements—but is not necessary to support—the Commission's ultimate finding that the benefits to the final rule justify the costs.

[1103] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.

[1104] When considering studies which do not report the relationship between non-compete enforceability and economic outcomes based on a numeric score, the Commission is unable to scale the effect to reflect the average magnitude change of 0.081.

[1105] *See, e.g.*, Jeffers, *supra* note 450.

analyses, the estimated effects from the empirical literature are scaled up on a State-by-State basis (rather than taking the average) to account for the estimated size of the decrease in each State's score. The Commission notes that linear extrapolation provides a robust estimate of earnings changes based on the empirical literature, but for consistency, the Commission reports effects based on the average magnitude change as its primary analysis.

### 6. Benefits of the Rule

The Commission finds several benefits attributable to the final rule, as reflected in part by the effects of the rule on earnings and prices, and all the effects on output and innovation, as summarized in Table 1 in Part X.E.

#### a. Earnings

The Commission finds labor markets will function more efficiently under the final rule, which will lead to an increase in earnings or earnings growth. Specifically, in this regulatory analysis, the Commission finds that the estimated ten-year present discounted value of increased worker earnings is $400–$488 billion. The final rule will result in additional earnings stemming from improvements in allocative efficiency due to more productive matching between businesses, which are economic benefits. In other words, the increase in worker mobility will allow employers to hire workers who are a better, more productive fit with the positions they are seeking to fill, which in turn will increase productivity overall. A portion of the additional earnings are transfers from firms to workers resulting from more plentiful employment options outside the firm,[1106] as workers who are not bound by non-competes will be in a different bargaining position with their employer. To the extent other better opportunities with different employers exist for a given worker, their current employers will now be competing with those other employers and may increase worker compensation to keep those workers. The Commission finds that the economic literature does not provide a way to separate the total effect on workers' earnings into transfers and benefits.

The increase in worker earnings resulting from the final rule is calculated as follows:

*Increase in worker earnings = (% Increase in Earnings caused by the change in enforceability of non-competes) * (Total Affected Earnings)*

The primary approach in this analysis is to estimate the percentage increase in earnings assuming that the effect of the final rule will be the same as the effect of an average magnitude change in non-compete enforceability, as discussed in Part X.F.5. The Commission estimates the percentage increase in workers' earnings to be 0.86%.[1107] The Commission estimates total affected annual earnings to be $6.2 trillion (in 2023 dollars).[1108]

Multiplying the percentage effect (0.86%) by overall affected annual earnings ($6.2 trillion) results in an annual earnings effect of $53 billion. The ten-year effect on earnings, discounted separately by 2%, 3%, and 7%, is reported in the first row of Table 2.[1109]

This primary approach requires no extrapolation (*i.e.,* it does not scale the effect on economic outcomes to account for the fact that the effect of the rule on enforceability scores will be greater than the changes studied in the economic

literature). However, it may understate the increase in workers' earnings resulting from the final rule. Thus, the Commission conducts two sensitivity analyses to assess how the estimated effect of the rule would change if effects are extrapolated to represent changes in enforceability scores greater than those examined in the literature.

The first sensitivity analysis, hereafter referred to as the ''full extrapolation'' approach, calculates the effect on worker earnings in an identical fashion to the primary analysis but relies on an estimate of the percentage increase in worker earnings which extrapolates to the effect of a complete prohibition on the use of non-competes. This results in an effect on worker earnings equal to 3.2% (instead of 0.86% in the primary analysis).[1110] For this estimate, total affected earnings are equal to $7.3 trillion in 2023 dollars.[1111] The estimated effect on earnings across the workforce for this first sensitivity analysis is therefore given by the percentage effect on earnings (3.2%) multiplied by the total annual wages in the U.S. for the affected population ($7.3 trillion). This results in an annual

---

[1106] By transfers, the Commission refers to ''a gain for one group and an equal-dollar-value loss for another group.'' *See* Off. of Mgmt. & Budget, *Circular A–4* (Nov. 9, 2023), 57, *https:// www.whitehouse.gov/wp-content/uploads/2023/11/ CircularA-4.pdf.*

[1107] Calculated as $-\left(e^{-0.107*0.081}-1\right)$, where $-0.107$ is the estimated coefficient of earnings on non-compete enforceability score in Johnson, Lavetti, & Lipsitz (*supra* note 388), and 0.081 represents the size of an average magnitude change calculated in Johnson, Lipsitz, & Pei (*supra* note 526) which scales the effect to represent the effect of an average sized change in the non-compete enforceability score.

[1108] This figure represents total annual earnings in the U.S. in the most recent year with data available (2022), adjusted to 2023 dollars: see *https://data.bls.gov/cew/apps/table_maker/v4/ table_maker.htm#type=0&year=2022&qtr=A& own=5&ind=10&supp=0.* Earnings from California, North Dakota, Oklahoma, and Minnesota (States which broadly do not enforce non-competes) are subtracted out, since enforceability in those States will be broadly unaffected by the rule. The estimate is additionally adjusted to account for the proportion of the workforce the Commission estimates are currently covered by the Commission's jurisdiction (80%), as discussed in Part X.F.4.a. Numerically, $6.2 trillion is calculated as ($9.1 trillion − $1.6 trillion) * 80% = $6.0 trillion, adjusted to $6.2 trillion to adjust to 2023 dollars. $9.1 trillion is total private earnings in 2022 in the U.S. (the most recent year with data available), and $1.6 trillion is total private earnings in 2022 in CA, ND, OK, and MN.

[1109] For illustrative purposes, State-specific estimates are displayed in Appendix Table A.1. In this table, the estimated number of covered workers is calculated as 80% * (total employed population in the State); the estimated increase in total earnings is calculated as 0.86% * (estimated total covered earnings), where estimated total covered earnings is calculated as (estimated number of covered workers) * (average annual earnings); and the estimated increase in average earnings is calculated as 0.86% * (average annual earnings). Total employed population and average annual earnings are taken from the Census Bureau Quarterly Census of Employment and Wages for 2022 (see *https://www.bls.gov/cew/data.htm*).

[1110] The percentage effect, 3.2%, is reported by Johnson, Lavetti, & Lipsitz (*supra* note 388) as the lower end of a range of possible effects of a ban on non-competes, relative to non-compete enforceability in 2014. The estimate is constructed by calculating the change in the enforceability score in each State which would bring that State's score to zero (representing no enforceability of non-competes) and scaling the estimated effect on worker earnings by that amount. The Commission uses the low end of the reported range in order to exercise caution against extrapolation, since the estimate uses an out-of-sample approximation: the changes in most States necessary to arrive at a score of zero are greater than the changes examined in the study (though this approximation is consistent with the results of a test in Johnson, Lavetti, and Lipsitz which shows that the effect of enforceability on earnings is roughly linear: namely, a change in enforceability that is twice as large results in a change in earnings that is twice as large). The Commission also notes that the estimated range is based on enforceability in 2014. Since then, some changes in State law have made non-competes more difficult to enforce for subsets of their workforces so that a prohibition on non-competes today is likely to have a slightly lesser effect than a prohibition would have had in 2014.

[1111] This estimate differs from total affected earnings for the primary analysis because the estimate of 3.2% takes into account enforceability in California, North Dakota, and Oklahoma. Earnings in those States is therefore added back into total affected earnings. However, earnings in Minnesota are still omitted, since the prohibition in Minnesota was enacted after the conclusion of the study period in Johnson, Lavetti, and Lipsitz (2023): see Minn. Stat. sec. 181.988. Total annual earnings in the U.S. for the affected population excluding MN are calculated as ($9.1 trillion − $0.2 trillion) * 80%, adjusted to adjust to 2023 dollars. $9.1 trillion is earnings for all workers in the US in 2022 (the most recent year with available data) and $0.2 trillion is earnings for workers in MN. *See https:// data.bls.gov/cew/apps/table_maker/v4/table_ maker.htm#type=0&year=2022&qtr=A& own=5&ind=10&supp=0.*

estimated earnings gain of $234 billion.[1112] The ten-year effect, discounted at 2%, 3%, and 7%, is displayed in the second row of Table 2.

The second sensitivity analysis, hereafter referred to as the "partial extrapolation" approach, uses the same formula as the other two analyses (% effect on earnings * total affected earnings) but is more conservative in its estimate of the percent effect on earnings than the full extrapolation estimate. The full extrapolation approach assumes that enforceability scores fall to zero. The partial extrapolation approach instead assumes that enforceability scores fall to the minimum observed enforceability score ignoring scores in States that broadly

prohibit non-competes (a more moderate extrapolation). The minimum observed enforceability score excluding States that broadly prohibit non-competes is 0.53 (on a scale of zero to one), which is the enforceability score in New York.[1113] This analysis calculates the change in each State's score that would bring it to 0.53, and scales the effect on worker earnings estimated in the empirical literature by that amount.[1114] For example, West Virginia's enforceability score is 0.59. To change to New York's enforceability score would imply a decrease in West Virginia's score of 0.06 (calculated as 0.59—0.53). This implies a percent effect on earnings in West Virginia of 0.64%.[1115]

Total affected earnings in each State are calculated by multiplying total earnings in that State (adjusted to 2023 dollars) by the estimated percentage of covered workers (80%). For example, in West Virginia, total earnings are estimated to be $0.24 trillion.[1116]

Next, the percent increase in earnings in each State is multiplied by total affected earnings in that State. In West Virginia, this results in an earnings increase of 0.64% * $0.24 trillion = $152 million. Finally, the earnings increases are added across States. The overall estimated effect is an annual increase in earnings of $161 billion. The ten-year effect, discounted at 2%, 3%, and 7%, is displayed in the third row of Table 2.

TABLE 2

| | Estimated ten-year increase in earnings ($ billions), assuming: | | |
| --- | --- | --- | --- |
| | 2% Discount rate | 3% Discount rate | 7% Discount rate |
| Primary estimate (average enforceability change) | $488 | $468 | $400 |
| Estimate (full extrapolation) | 2,148 | 2,060 | 1,762 |
| Estimate (partial extrapolation) | 1,488 | 1,427 | 1,221 |

The estimated effects on earnings in Table 2 are based on estimates of the percentage change in earnings from a study in the empirical literature that aligns with the metrics outlined in Part IV.A.2. Another study in the literature estimates earnings effects using a comparison between workers in occupations that use non-competes at a high rate versus a low rate.[1117] After adjusting the finding from that study to the average magnitude enforceability change, the estimated effect on worker earnings is 0.5%,[1118] or $31 billion annually.[1119]

The Commission notes that, as discussed in Part X.E, earnings of senior executives who continue to work under

non-competes are included in the calculations in this Part X.F.6.a. If the Commission were able to identify those senior executives, their omission from the calculations would decrease the earnings effect of the final rule, since the earnings effect for those senior executives (and others, because of spillovers) would be pushed further into the future, causing steeper discounting. However, while senior executives are paid relatively highly, there are relatively few of them: for example, based on BLS data on earnings by occupation, Chief Executives' earnings comprise just 0.5% of all earnings.[1120] Therefore, the impact on the earnings calculations of omitting or pushing

forward the earnings of senior executives who would continue to work under a non-compete is limited.

Discussion of Transfers Versus Benefits

It is difficult to determine the extent to which the earnings effects represent transfers versus benefits. Transfers, in this context, refer to "a gain for one group and an equal-dollar-value loss for another group."[1121] Such transfers do not represent a net benefit or cost to the economy as a whole for purposes of regulatory impact analysis.

To the extent a prohibition on non-competes leads to greater competition in the labor market and a more efficient allocation of labor by allowing workers to sort into their most productive

---

[1112] This estimate is comparable to the estimate of $250 billion per year reported in the NPRM. *See* NPRM at 3523. The estimate in the NPRM was based on earnings in 2020 (as opposed to 2022 in this final regulatory analysis), included earnings in Minnesota (which has since passed a bill prohibition non-competes), and did not adjust for the estimate of the affected workforce discussed in Part X.F.4.a.

[1113] Enforceability score data come from Starr (2019), which reports scores for 2009 (the most recent data available). Scores are adjusted to a scale of zero to one.

[1114] In particular, for each State, the Commission calculates the percentage effect on earnings as $e^{0.107 \cdot \Delta \text{Enf}} - 1$, where $\Delta \text{Enf}$ is equal to the enforceability score in that State minus the lowest observed enforceability score, excluding CA, ND, OK, and MN (0.53).

[1115] Calculated as $-(e^{-0.107 \cdot 0.064} - 1)$, where $-0.107$ is the estimated coefficient of earnings on

non-compete enforceability score in Johnson, Lavetti, & Lipsitz (*supra* note 388), and 0.064 represents the scaling factor due to West Virginia's score change.

[1116] Calculated as $0.29 trillion * 80%, where $0.29 trillion is earnings in WV in 2022 (the most recent year with data available) adjusted to 2023 dollars. See *https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0*.

[1117] For further discussion of this study, see the discussion in Part IV.B.3.a.ii of Starr, *supra* note 445.

[1118] The change in enforceability which generates the estimate in Starr (*supra* note 445) is a one standard deviation change, as measured using non-compete enforceability scores for all 50 States and the District of Columbia in 1991, which is a change on a scale of zero to one of approximately 0.17, calculated as 1/[1.60 − (− 4.23)]. Scaling the estimate, a change equal to 0.081 would result in

an earnings effect of 0.5%, calculated as $e^{(0.0099 \cdot 0.081/0.172)} - 1$.

[1119] Calculated as $6.2 trillion * 0.5%.

[1120] Calculated as (199,240 * 246,440)/(147,886,000 * 61,900), where 199,240 and 147,886,000 are employment for Chief Executives and All Workers, respectively, and 246,440 and 61,900 are dollar earnings for Chief Executives and All Workers, respectively, in 2022. See Occupation Employment and Wage Statistics, BLS, *https://www.bls.gov/oes/tables.htm*. The Commission notes that Chief Executives are used as an illustrative example, and are an imperfect proxy for senior executives: some Chief Executives (as classified by BLS) may not be senior executives under the final rule, and some senior executives under the rule may not be Chief Executives.

[1121] Off. of Mgmt. & Budget, *Circular A–4* (Nov. 9, 2023) at 57.

matches with firms (including new firms that may be formed), then the resulting earnings increases may reflect higher productivity and so represent a net benefit to the economy. However, some increases in earnings when non-competes are prohibited may simply represent a transfer of income from firms to workers (or, if firms pass labor costs on to consumers, from workers to workers).

Several pieces of evidence support the Commission's finding that at least part of the increase in earnings represents a social benefit or net benefit to the economy, rather than just a transfer. As described in Part IV.B.3.a.ii, two studies have sought to estimate the external effect of non-compete use or enforceability: that is, the effect of use or enforceability on individuals other than those directly affected by non-compete use or enforceability.

One study directly estimates the external effect of a change in non-compete enforceability.[1122] While use of non-competes is not observed in the study, the effects of changes in a State's laws are assessed on outcomes in a neighboring State. Since the enforceability of the contracts of workers in neighboring States are not affected by these law changes, the effect must represent a change related to the labor market which workers in both States share. The estimate suggests that workers in the neighboring State experience effects on their earnings that are 76% as large as workers in the State in which enforceability changed.[1123] In other words, two workers who share a labor market would experience nearly the same increase in their earnings from a prohibition on non-competes, even if the prohibition only affects one worker. While the study does not directly estimate the differential effects by use, the effects on workers unaffected by a change in enforceability may be similar to the effects on workers not bound by non-competes.

A second study demonstrates that when the use of non-competes by employers increases, wages decrease for workers who do not have non-competes but who work in the same State and industry. This study also finds that this effect is stronger where non-competes are more enforceable.[1124] Since the affected workers are not bound by non-competes themselves, the differential in earnings likely does not completely represent a transfer resulting from a

change in bargaining power between a worker bound by a non-compete and their employer.

Overall, these studies suggest there are market-level dynamics governing the relationship between earnings and the enforceability of non-competes: specifically, restrictions on the enforceability of non-competes affect competition in labor markets by alleviating frictions and allowing for more productive matching. Changes in enforceability or use of non-competes have spillover effects on the earnings of those workers who should not be directly affected because they do not have non-competes or they work in nearby labor markets that did not experience changes in enforceability. If non-competes simply changed the relative bargaining power of workers and firms, without affecting market frictions or competition, then these patterns are less likely to be observed. Additionally, new business formation when non-competes are less enforceable (see Part IV.B.3.b.i for a discussion of the evidence) may create new productive opportunities for workers.

Due to the uncertainty related to earnings as transfers versus benefits, the Commission analyzes various scenarios that allocate the percent of the earnings effect to a benefit at different levels in Part X.F.10. This does not represent a finding that no part or only a small part of the effect on earnings is a benefit; rather, it is to ensure that the total estimated effect of the final rule is robust for the purposes of the regulatory impact analysis to the possibility that a small percentage of the effect on earnings represents a net benefit.[1125]

b. Innovation

The Commission finds that an additional benefit of the rule would be to increase the annual count of new patents by 3,111–5,337 in the first year, rising to 31,110–53,372 in the tenth year. By alleviating barriers to knowledge-sharing that inhibit innovation, and by allowing workers greater opportunity to form innovative new businesses, the final rule will increase innovation. Studies have sought to directly quantify this effect, primarily focused on patenting activity. The Commission therefore considers the effect on patenting in support of its

findings related to innovation. Lacking an estimate of the social value of a patent, the Commission does not monetize this benefit. The Commission also finds that the rule will reduce expenditure on R&D by $0 to $47 billion per year. In light of the increase in overall innovation, this reduction is a cost savings for firms, but may not reflect a market-level effect because it does not measure potential expenditure on R&D by new firms formed as a result of the final rule. The change in patenting due to the rule for each year is calculated as follows:

*Increase in # of Patents = (% Increase in Patenting) * (Total # of Affected Patents)*

The Commission estimates the percentage increase in patenting to average 10.9%–18.7% annually over a ten-year period,[1126] which is the percentage effect on patenting of an average magnitude change in non-compete enforceability, as discussed in Part X.F.5. The Commission assumes that the full effect on patenting phases in over the course of a ten-year period, resulting in an effect of 2.0%–3.4% in the first year, increasing to 19.8%–34.0% by the tenth year.[1127] The total number of affected patents in each year is 156,976.[1128]

The results of the analysis, for the top and bottom end of the reported range of percentage increases in patenting, are displayed in Table 3.

As a sensitivity analysis, mirroring the analysis in Part X.F.6.a, the Commission assumes that enforceability scores in each State will fall to the lowest observed score among States which do not broadly prohibit non-competes. The Commission calculates the percentage change in patenting in each State by extrapolating the

---

[1122] Johnson, Lavetti, & Lipsitz, *supra* note 388.

[1123] *Id.* (note: a new version of this paper, posted in 2023 after the NPRM was published, revised this estimate slightly).

[1124] Starr, Frake, & Agarwal, *supra* note 469.

---

[1125] The Commission notes that Part IV.B.3.a.ii does not measure or consider whether earnings are transfers or benefits because to the extent that the earnings that are transfers represent firms' ability to suppress earnings using an unfair method of competition, the transfer of such earnings from firms to workers through the use of non-competes still reflect the tendency of non-competes to negatively affect competitive conditions in the labor market.

---

[1126] These values represent the range reported in Johnson, Lipsitz, & Pei, *supra* note 526, considering both raw patent counts and patent counts weighted by a measure of their quality: the number of citations received in the five years after the patent is granted. The findings by Johnson, Lipsitz, & Pei are qualitatively confirmed in the literature, with similar estimates generated by He (*supra* note 560)—a study discussed in the NPRM—and Rockall & Reinmuth (*supra* note 564).

[1127] This analysis assumes that the effect on patenting increases by an identical amount each year (2.0–3.4%), ensuring that the overall average annual change is equal to that reported in Johnson, Lipsitz, & Pei (*supra* note 526).

[1128] This is the number of granted utility patents, which are patents for new or improved innovation and are the types of patents studied by Johnson, Lipsitz, & Pei (*Id.*). The figure comes from 2020, which is the most recent data available from the U.S. Patent and Trademark Office. It excludes States in which non-competes are not enforceable (California, Oklahoma, North Dakota, and Minnesota). Data available at *https://www.uspto.gov/web/offices/ac/ido/oeip/taf/st_co_20.htm.*

percentage increase in patenting to reflect the size of the change in that State's enforceability score. For example, as noted in Part X.F.6.a, West Virginia's score would fall from 0.59 to 0.53 as a result of this analysis. The percentage change in patenting in West Virginia would therefore average 9.0%–16.6%,[1129] resulting in an increase of 1.9%–3.6% in the first year, rising to 19.2%–35.6% by the tenth year.

The annual State-specific percentage changes are multiplied by the number of annual patents granted in each State.[1130] Finally, the changes in patenting across States are combined across States for a national estimate. The results are reported in Table 3. As States have broadly decreased legal enforceability of non-competes in recent years, the changes necessary to move to lower enforceability are likely overestimated in this sensitivity analysis. This causes the values estimated by this method to likely overestimate the true extent of the benefit.

TABLE 3

| Year relative to publication of the rule | Estimated annual count of additional patents using low estimate of innovation effect | Estimated annual count of additional patents using high estimate of innovation effect | Estimated annual count of additional patents using low estimate of innovation effect and extrapolation approach | Estimated annual count of additional patents using high estimate of innovation effect and extrapolation approach |
|---|---|---|---|---|
| 1 | 3,111 | 5,337 | 8,927 | 19,306 |
| 2 | 6,222 | 10,674 | 17,853 | 38,611 |
| 3 | 9,333 | 16,012 | 26,780 | 57,917 |
| 4 | 12,444 | 21,349 | 35,706 | 77,222 |
| 5 | 15,555 | 26,686 | 44,633 | 96,528 |
| 6 | 18,666 | 32,023 | 53,560 | 115,833 |
| 7 | 21,777 | 37,360 | 62,486 | 135,139 |
| 8 | 24,888 | 42,697 | 71,413 | 154,444 |
| 9 | 27,999 | 48,035 | 80,339 | 173,750 |
| 10 | 31,110 | 53,372 | 89,266 | 193,055 |

The Commission is not aware of estimates that assess the overall social value of a patent and therefore the Commission does not monetize the estimated effects on innovative output. Estimates of the effect of a patent on a firm's value in the stock market exist in the empirical literature,[1131] as do estimates of the sale value of a patent at auction.[1132] However, those estimates do not include the effects on follow-on innovation, consumers (who may benefit from more innovative products), competitors, or the rents that are shared with workers, and instead reflect solely the private effect of a patent to the relevant firms.

The Commission notes that patent counts may not perfectly proxy for innovation. However, by using citation-weighted patents, as well as other measures of quality, the study by Johnson, Lipsitz, and Pei shows that patent quality, not just patent quantity, increase when non-competes become less enforceable.[1133] Similarly, the study by He shows that the value of patents also increases when non-competes become less enforceable.[1134]

The second effect of the final rule associated with innovation is a possible change in spending on R&D. The change in R&D spending due to the final rule is calculated as follows:

Reduction in R&D Spending = (% Reduction in Spending) * (Total Affected Spending)

The Commission estimates that the percentage reduction in spending is 0–8.1%, with the broad range reflecting disagreement in the empirical literature.[1135] Total affected spending is $575 billion (in 2023 dollars). Multiplying the percentage effect by total affected spending, the overall annual effect is a reduction of $0-$47 billion in R&D spending in 2023 dollars.

The Commission notes that, in light of the increases in innovation identified in this Part X.F.6.b, reductions in R&D spending represent a cost savings for firms. Put differently, reductions in R&D spending may cause commensurate reductions in innovative output. Insofar as reductions in R&D spending resulting from the rule could have countervailing effects on innovation, the estimated increase in innovative output represents the net effect, which would otherwise be even larger, if R&D spending were held constant.

Notably, empirical estimates of R&D spending are based on observed changes among incumbent firms and therefore may not reflect market-level effects. Decreased investment at the firm level (the level of estimation in the studies that report effects of enforceability on R&D spending) does not necessarily mean that investment would decrease at the market level, since new firms entering the market may contribute additional R&D spending not captured in the referenced studies. For these reasons, the Commission stops short of classifying the effect on R&D spending as a benefit of the final rule.

The Commission notes that, as discussed in Part X.E, the estimated effects on innovation do not take into account that some senior executives

[1129] Calculated as $e^{(1.43*0.06)} - 1$ and $e^{(2.56*0.06)} - 1$, where 1.43 and 2.56 represent the coefficients reported in Johnson, Lipsitz, & Pei (*Id.*) as the lower and upper bounds of the reported coefficient range, and 0.06 is the decline in the enforceability score in West Virginia.

[1130] Data available at *https://www.uspto.gov/web/offices/ac/ido/oeip/taf/st_co_20.htm*.

[1131] Leonid Kogan, Dimitris Papanikolaou, Amit Seru, & Noah Stoffman, *Technological Innovation, Resource Allocation, and Growth*, 132 The Quarterly J. of Econ. 665 (2017).

[1132] Ariel Pakes, *Patents as Options: Some Estimates of the Value of Holding European Patent Stocks*, 54 Econometrica 755 (1986).

[1133] Johnson, Lipsitz, & Pei, *supra* note 526.

[1134] He, *supra* note 560.

[1135] Johnson, Lipsitz & Pei (*supra* note 526) find a negative effect on R&D spending of 8.1% due to an average magnitude change in non-compete enforceability, while Jeffers (*supra* note 450) finds no economically or statistically significant effect on R&D spending.

[1136] Total U.S. R&D spending was estimated by the NSF in 2019, the most recent available year with finalized estimates, excluding nonprofits, higher education, and nonfederal and Federal government. Nat'l Ctr. for Sci. and Engrg. Stats., *New Data on U.S. R&D: Summary Statistics from the 2019–20 Edition of National Patterns of R&D Resources* (Dec. 27, 2021), *https://ncses.nsf.gov/pubs/nsf22314*; Nat'l Ctr. for Sci. and Engrg. Stats., *U.S. R&D Increased by $51 Billion in 2020 to $717 Billion; Estimate for 2021 Indicates Further Increase to $792 Billion* (Jan. 4, 2023), *https://ncses.nsf.gov/pubs/nsf23320*. Note that the data are not broken out by State, and therefore the final analysis cannot exclude CA, ND, OK, and MN.

may continue to work under non-competes under the rule. The Commission is unable to separate the effects of senior executives' non-competes from other workers' non-competes on innovation. Some effects estimated in this Part X.F.6.b may occur further in the future than assumed in this analysis, based on the extent of continued use of non-competes for senior executives.

Overall, the Commission finds that the final rule will significantly increase innovation. Furthermore, the increase in innovation may be accompanied by a decrease in spending on R&D that would, thus, be a cost saving to firms.

c. Prices

The Commission finds that consumer prices may fall under the final rule because of increased competition. The only empirical study of this effect concerns physician practice prices. Based on this study, the Commission estimates the ten-year present value reduction in spending for physician and clinical services from the decrease in prices is \$74–\$194 billion. The Commission finds some of the price effects may represent transfers from firms to consumers and some may represent benefits due to increased economic efficiency. Some of the benefits may overlap with benefits otherwise categorized, such as benefits related to innovation.

The decrease in prices for physician services because of the final rule is calculated as follows:

*Decrease in Prices = (% Decrease in Prices) * (Total Affected Spending)*

The Commission estimates the percentage decrease in prices for physician services to be 3.5%.[1137] Total spending on physician and clinical services was \$801 billion in 2023 dollars, excluding States that broadly do not enforce non-competes.[1138] The Commission separately multiplies spending by 35%, 61.9%, and 75% (estimates of the proportion of hospitals covered by the Commission's jurisdiction as a proxy for total physician and clinical services spending covered by the Commission's jurisdiction) to arrive at total affected spending.[1139] The ten-year sum of discounted spending decreases for these analyses are presented in Table 4.

As a sensitivity analysis, mirroring the analysis in Part X.F.6.a, the Commission assumes that enforceability scores in each State will fall to the lowest observed score among States which do not broadly prohibit non-competes. The Commission calculates the percentage change in prices in each State by extrapolating the percentage decrease in prices to reflect the size of the change in that State's enforceability score. As noted in Part X.F.6.a, West Virginia's score would fall from 0.59 to 0.53 as a result of this analysis. The percentage decrease in prices in West Virginia would therefore be 2.5%.[1140] This percentage decrease is multiplied by State-specific physician spending, adjusted by the relevant multiplier to account for the Commission's jurisdiction, and summed over States.

The ten-year present discounted value of the spending decreases estimated by this analysis are presented in Table 4.

TABLE 4

| | Assumed percent of physicians covered (%) | Estimated spending reduction over ten years (billions of dollars) assuming: | | |
|---|---|---|---|---|
| | | 2% Discount rate | 3% Discount rate | 7% Discount rate |
| Primary estimate (average magnitude enforceability change) ........................ | 35 | \$90 | \$87 | \$74 |
| | 61.9 | 160 | 153 | 131 |
| | 75 | 194 | 186 | 159 |
| Sensitivity analysis (partial extrapolation approach) ........................................ | 35 | 257 | 247 | 211 |
| | 61.9 | 455 | 437 | 373 |
| | 75 | 552 | 529 | 459 |

Several effects of the final rule, including changes in capital investment, new firm formation, and innovation, may possibly filter through to consumer prices. Prices, therefore, may act as a summary metric for the effects on consumers. The Commission notes, however, that prices are an imperfect measure for the effect on consumers. For example, increased innovation catalyzed by the final rule could result in quality increases in products, which might increase prices (all else equal), but nevertheless, consumers may be better off. New firm formation may result in a broader set of product offerings, even if prices are unaffected. Finally, some portion of this effect may represent a transfer from physician practices to consumers. For all these reasons, as well as to avoid double-counting (since prices may reflect changes in innovation, investment, market structure, wages, and other outcomes that are measured elsewhere), the Commission considers evidence on prices to be corroborating evidence, rather than a unique cost or benefit, though some portion of the total effect likely represents a standalone benefit of the rule. The Commission also notes increased competition brought about by the final rule will likely increase

[1137] 3.5% is calculated as $-(e^{(0.427 * 0.081)} - 1)$, where 0.427 is the coefficient relating non-compete enforceability and physician prices in Hausman & Lavetti (*supra* note 590), and 0.081 represents the average magnitude non-compete enforceability score, as described in Part X.F.5.

[1138] See *https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/National HealthAccountsStateHealthAccountsProvider*. Spending in 2020, the most recent year with available data, was \$679 billion, which is \$801 billion adjusted to 2023 dollars. CA, ND, OK, and MN are omitted.

[1139] In the absence of data on the percentage of physician practices that are non-profit, the Commission uses a range of three different assumptions on the share of covered hospitals. In the first two scenarios, the Commission assumes that the set of covered hospitals is all hospitals that are not non-profit. The first scenario uses 2020 data from the American Hospital Association indicating that 65% of hospitals report that they are non-profits (based on data available at *https://www.ahadata.com/aha-dataquery*). The second scenario uses 2017–2021 data from the American Community Survey indicating that 38.1% of hospital employment is at non-profits (see *https://www.washingtonpost.com/business/2023/05/12/force-behind-americas-fast-growing-nonprofit-sector-more*). Finally, consistent with the Commission's findings in Part V.D.4, the percentages of firms that report themselves as nonprofit in the data, which reflects registered tax-exempt status under IRS regulations, does not equate to the Commission's jurisdiction. It is likely the Commission may have jurisdiction over some hospitals and other healthcare organizations identified as nonprofits. Therefore, the third scenario assumes that 75% are covered.

[1140] Calculated as $e^{(0.427 * 0.06)} - 1$, where 0.427 is the coefficient reported in Hausman and Lavetti (*supra* note 590), and 0.06 is the decline in the enforceability score in West Virginia.

consumer quantity, choice, and quality. These effects are not quantified in the literature.

To draw inferences to other industries, the Commission notes that if the relationship between non-compete enforceability and prices observed in healthcare markets holds in other industries, then under the final rule prices would likely decrease, and product and service quality would likely increase. Insofar as such effects may be driven by increases in competition, as discussed in Part IV.B.3.b.iii, *e.g.*, because of new firm formation, it is likely output would also increase. However, the evidence in the literature addresses only healthcare markets and therefore the Commission cannot say with certainty that similar price effects would be present for other products and services.

In many settings, it is possible that increases in worker earnings from restricting non-competes may increase consumer prices because of higher firms' costs.[1141] There is no empirical evidence that enforceability of non-competes increase prices due to increased labor costs. Additionally, greater wages for workers freed from non-competes may result from better worker-firm matching, which could simultaneously increase wages and increase productivity, leading to lower prices.

The Commission notes that, as discussed in Part X.E, the estimates of the effect of the rule on prices do not separately account for the effect of senior executives who may continue to have non-competes under the rule. The Commission is unable to monetize or quantify these effects separately because there is no accounting in the applicable literature of why, nor to which groups of workers, the observed price effects occur. If such non-competes have a large impact, some of the effects estimated in this section may occur further in the future than described in this Part X.F.6.c.

### 7. Costs of the Final Rule

The Commission finds costs associated with the final rule, including legal and administrative costs, and possibly costs related to investment in human capital and litigation, as summarized in Table 1 in Part X.E. The Commission notes the final analysis includes effects on investment in human capital and litigation costs in this Part X.F.7 discussing costs

associated with the final rule, though it is not clear whether effects associated with investment in human capital are costs or benefits, and it is not clear whether litigation costs would rise or fall under the final rule.

#### a. Investment in Human Capital

The Commission estimates the ten-year present discounted value of the net effect of the final rule on investment in human capital (*i.e.,* worker training) ranges from a benefit of $32 billion to a cost of $41 billion. The Commission notes that this wide range represents substantial uncertainty in the interpretation of the estimates that exist in the economic literature. The estimates contained in this Part X.F.7.a are separated along lines created by that uncertainty.

There are two primary sources of uncertainty. The first pertains to the extent to which lost investment in human capital is "core" versus "advanced." As discussed in Part IV.B.3.b.ii, when non-competes are enforceable, fewer workers will be available due to decreased labor mobility, including workers who would be a good skills match for a particular job, as well as workers moving to new industries to avoid triggering a potential non-compete clause violation. This may require retraining of workers forced into a new field that would not otherwise be necessary for an experienced worker within the same industry. The departure of experienced workers from the industry also means firms will be required to invest in the human capital of inexperienced workers who replace them. This type of investment in training to address a skills mismatch—which is referred to as the "core" training scenario—contrasts with what is referred to as the "advanced" training scenario, which is investment in training that builds upon the productivity of workers who may already be experienced in an industry. Insofar as reductions in investment in human capital due to the final rule represent reductions in core investment, the rule will save firms money and will additionally not require workers to forgo time spent producing goods and services to train. Therefore, such reductions would represent a benefit of the final rule. However, insofar as reductions in investment in human capital from the final rule represent reductions in advanced investment, there may be productivity losses for workers. The estimates in the literature do not allow the Commission to distinguish between the types of forgone human capital investment in the final analysis. This final analysis therefore

separately estimates the effects assuming lost investment in human capital is core and assuming it is advanced.

The second source of uncertainty pertains to the specific estimates of the effect of non-compete enforceability on investment of human capital. Starr (2019) estimates the differential effect of non-compete enforceability on training in occupations which use non-competes at a high rate versus those that use non-competes at a low rate but does not estimate the absolute effect on investment across the workforce. Therefore, this final analysis separately estimates the effects on training under two different assumptions—that the increase in training due to greater non-compete enforceability affects all workers, or only workers in high-use occupations—to demonstrate how this uncertainty affects the estimates.[1142]

The Commission notes that some of the estimates described in this Part X.F.7 may overlap with estimates reported in other sections of the regulatory analysis. For example, if decreased enforceability of non-competes decreases investment in workers' human capital, and this decreased investment would be reflected in lower wages for workers, then the estimate of the wage increase resulting from the final rule will already account for the extent to which decreased investment decreases wages. That is, if investment were held constant, the earnings increase associated with the final rule may be even larger.

#### i. Estimates Assuming Lost Investment in Human Capital Is Core Training

The first set of estimates assumes that all lost training is core. This results in estimated effects of the final rule that represent upper bounds on the benefits associated with the final rule's effect on investment in human capital. In these scenarios, the final rule will allow firms to hire experienced workers instead of needing to provide costly training to workers new to the industry or a position. The change in investment in core training brought about by the rule is calculated as follows:

*Effect of Decreased Investment in Core Training = Additional Output of*

---

[1141] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through,* 54 J. Money, Credit & Banking 7 (2022).

[1142] Whether this assumption yields an overestimate or underestimate depends on what happens to training of workers in occupations with a low-rate of non-competes use when the enforceability of non-competes changes. If the effect of a change in non-compete enforceability on workers in occupations that use non-competes at a low rate is small, this assumption yields an overestimate of the overall effect on training. If the effect on those workers is large, it results in an underestimate.

*Workers Resulting From Less Time Spent Training + Reduced Direct Outlays on Training*

Additional Output of Workers Resulting From Less Time Spent Training

The first component is additional output of workers resulting from less time spent on otherwise unnecessary training if they were better matched with firm and industry. The change in the output of workers from less time spent training because of the final rule is calculated as follows:

*Additional Output of Workers Resulting From Less Time Spent Training = (Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers) * (Average Hours Spent Training Per Worker) * (Average Hourly Output of Workers)*

The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1143] The percentage point decrease in trained workers is estimated to be 0.4.[1144] Average hours spent training per worker is estimated to be 85 hours per year.[1145]

Average hourly output of workers is estimated to be $60.77.[1146]

The total additional output due to forgone training time is therefore calculated as $1.9 billion per year when all workers are assumed to be affected, or $0.8 billion per year when only workers in high-use occupations are assumed to be affected.

Reduced Direct Outlays on Human Capital Investment

The second component of the economic effect calculated in the final analysis is reduced direct outlays on human capital investment—or the out-of-pocket cost to firms for training. The change in direct outlays on human capital investment resulting from the rule is calculated as follows:

*Reduced Direct Outlays = [(Total Direct Outlays)/(# of Workers Receiving Training)] * [(Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers)]*

Total direct outlays on human capital investment are estimated to be $105 billion in 2023 dollars.[1147] The estimated number of workers receiving training is 23.5 million workers.[1148] The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1149] The

percentage point decrease in trained workers is estimated to be 0.4.[1150]

This calculation results in annual cost savings of $1.6 billion, assuming the training rates of workers in all occupations are affected and $0.7 billion assuming the training rates of workers only in high-use occupations are affected. The ten-year present value effects of the final rule on investment in human capital, assuming that lost investment is core investment, discounted at 2%, 3%, and 7% and separately assuming effects on workers in all occupations versus just workers in occupations that use non-competes at a high rate, are presented in the first two rows of Table 5.

ii. Estimates Assuming Lost Investment in Human Capital Is Advanced Training

The second set of estimates of the effects on human capital investment in the final analysis assumes all training is advanced. The Commission begins with the same approach (calculated in Part X.F.7.a.i) to estimate the direct gain in output of workers and reduced direct outlays from foregone advanced human capital investment because such investment is costly for firms and results in decreased time spent on productive activities by workers, regardless of whether the investment is core or advanced. The major difference is that the Commission nets out an additional component which represents lost long-term productivity of workers caused by lost investment in their human capital. The Commission nets out this additional component based on the assumption that advanced human capital investment results in some increased long-term productivity in workers (because it assumes that firms would not otherwise make such a costly investment). This results in estimated effects of the final rule that represent upper bounds on the costs associated with changes in investment in human capital. Therefore, the estimated effect of the rule on advanced human capital investment is calculated as follows:

*Effect of Decreased Investment in Advanced Training = Additional Output of Workers Resulting from Less Time Spent Training + Reduced Direct Outlays on Training − Lost Output Resulting from Foregone Advanced Training*

The first two components—additional output of workers due to less time spent training and reduced direct outlays on training—are calculated in Part X.F.7.a.i. The lost output of workers due to lost investment in their human

---

[1143] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr, *supra* note 445; see *https://www.bls.gov/oes/tables.htm*. The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. The Commission notes that these estimates include public employment, as data on occupation-specific employment at the State level are not available by firm ownership. Occupation-specific employment data are necessary to split workers into low- and high-use occupations. Workers including those estimated to be bound by non-competes and those who are not are included in this estimate, since the empirical estimate of the increase in training reflects a sample representative of the full workforce, not just those bound by non-competes.

[1144] The coefficient reported by Starr (*supra* note 445), 0.77%, corresponds to a one standard deviation increase on Starr's scale, and represents the percentage point effect on the percentage of workers trained (rather than the amount of training they receive). Rescaling to a scale of zero to one, a one standard deviation increase is equal to a change in the enforceability measure of 0.17. Since estimates for earnings and innovation use a mean enforceability change of 0.081 on a scale of zero to one, the coefficient in Starr is rescaled to 0.77 * (0.081/0.17) = 0.364%, which represents the change in the fraction of covered workers receiving training due to an average magnitude change of 0.081.

[1145] 85 hours per year is calculated as 5.7 weeks per year * 20.1 hours per week * 73.9%, where 73.9% is the percentage of training that is firm-sponsored (the type of training likely to be affected by the final rule). These three estimates (5.7 weeks per year, 20.1 hours per week, and 73.9% of training being firm sponsored) are estimated in

Harley J. Frazis & James R. Spletzer, *Worker Training: What We've Learned from the NLSY79*, 128 Monthly Lab. Rev. 48 (2005).

[1146] The Commission assumes that the average hourly output of workers is twice their average earnings and estimates average earnings to be $30.38 per hour, which is the average hourly earnings for workers in training ages 22–64 currently holding one job in the Survey of Income and Program Participation for all waves from 1996 to 2008. The dollar value is adjusted to 2023 dollars.

[1147] 2022 Training Industry Report, Training Magazine (Nov. 2022) at 17.

[1148] Calculated as 15.8% * 148.9 million, where 15.8% is the percentage of workers who receive training, according to Frazis & Spletzer *supra* note 1145 at 48. 148.9 million is the estimated number of workers in the U.S. in May 2022 according to *https://www.bls.gov/oes/tables.htm*. Note that all workers are included in this estimate (not just workers in States which enforce non-competes) because the estimate of training expenditures also covers all workers.

[1149] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr (*supra* note 445) (*see https://www.bls.gov/oes/tables.htm*). The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. *See supra* note 1143.

[1150] As discussed in Part X.F.7.a.i.

capital due to the rule in each year is calculated as follows:

*Lost Output from Lost Investment in Human Capital = (Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers) * (Average Hourly Output of Workers) * (Average Hours Worked per Year) * (% Productivity Loss)*

The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1151] The percentage point decrease in trained workers is estimated to be 0.4.[1152] Average hourly output of workers is estimated to be $60.77.[1153] The average number of hours worked per year is 1,784.[1154] The Commission assumes the percent productivity loss to be 6.4%.[1155]

In the first year, this yields a total estimate of lost output from lost investment in human capital of $1.5 billion or $0.7 billion (under the separate assumptions of all workers being affected and only high-use occupation workers being affected). Since the returns to advanced training persist to some extent over time, in the second year, returns to advanced training from the first year are assumed to depreciate by 20%,[1156] and the calculation is redone according to the depreciated return to advanced training. In the third year, training from the first year again depreciates, and so on until the tenth year (the end of the horizon considered).

Additionally, in the second year, a new round of advanced training is forgone. An additional $1.5 billion or $0.7 billion in lost output is therefore incurred in the second year under the final rule, and the depreciation calculations are again repeated for the new round of advanced training until year ten. New rounds of advanced training are forgone in each year through the tenth. Lost output from lost advanced training in the tenth year is therefore the sum of a depreciated return to training from each of the prior nine years plus lost output from lost training in the tenth year itself.

To arrive at estimates of overall lost productivity due to lost advanced training, lost productivity in each year (separately due to lost training in each prior year) is added together. Finally, lost productivity due to lost advanced training is subtracted from the two components calculated in Part X.F.7.a.i (additional output of workers from less time spent training and reduced direct outlays). The ten-year discounted effects of the final rule on investment in human capital, assuming lost investment is advanced training investment, discounted at 2%, 3%, and 7%, and separately assuming workers in all occupations versus just workers in occupations that use non-competes at a high rate, are presented in the last two rows of Table 5.

TABLE 5

|  | 2% Discount rate | 3% Discount rate | 7% Discount rate |
|---|---|---|---|
| Estimated discounted ten-year effect assuming lost training is core and workers in all occupations are affected | $32 | $31 | $27 |
| Estimated discounted ten-year effect assuming lost training is core and workers in high-use occupations are affected | 14 | 14 | 12 |
| Estimated discounted ten-year effect assuming lost training is advanced and workers in all occupations are affected | −41 | −39 | −31 |
| Estimated discounted ten-year effect assuming lost training is advanced and workers in high-use occupations are affected | −19 | −17 | −14 |

**Note:** All values in billions of 2023 dollars. Negative values represent net cost estimates, while positive values represent net benefit estimates.

As discussed in Part X.E, the Commission notes that the estimates in this Part X.F do not account for senior executives who continue to work under non-competes under the rule. If the effects on training are due to effects on such senior executives, then the effects discussed herein would occur further into the future than discussed.

**b. Legal and Administrative Costs Related to Compliance**

The Commission finds that firms with existing non-competes will have related legal and administrative compliance costs as a result of the final rule. The Commission quantifies and monetizes these costs and conducts related sensitivity analyses.

**i. Legal Costs**

The Commission finds one-time legal costs related to firms' compliance with the final rule are estimated to total $2.1-$3.7 billion. The Commission estimates two main components of legal costs: (1) updating existing employment agreements or terms to ensure new hire employment terms comply with the final rule; and (2) advising employers about potential operational or contractual changes for workers who will no longer have enforceable non-competes. The latter includes determination of workers whose non-competes are no longer enforceable

[1151] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May, 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr (*Id.*) (see *https://www.bls.gov/oes/tables.htm*). The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. *See supra* note 1143.

[1152] As discussed in Part X.F.7.a.i.

[1153] The Commission assumes that the average hourly output of workers is twice their average

earnings and estimates average earnings to be $30.38 per hour, which is the average hourly earnings for workers in training ages 22–64 currently holding one job in the Survey of Income and Program Participation for all waves from 1996 to 2008. The dollar value is adjusted to November 2023 dollars using *https://www.bls.gov/data/inflation_calculator.htm*.

[1154] See *https://fred.stlouisfed.org/release/tables?rid=50&eid=6462#snid=6449*, which reports average weekly hours and overtime of all employees on private nonfarm payrolls by industry sector, seasonally adjusted. The reported value, 34.3, is multiplied by 52 to get annual hours worked.

[1155] This figure is the midpoint of two estimates in the literature: Harley Frazis & Mark A.

Loewenstein, *Reexamining the Returns to Training: Functional Form, Magnitude, and Interpretation,* 40 J. Hum. Res. 453 (2005) [3.7%] and Gueorgui Kambourov, Iourii Manovskii, & Miana Plesca, *Occupational Mobility and the Returns to Training,* 53 Can. J. of Econ. 174 (2020) [9.1%].

[1156] There is no perfect estimate of the rate of human capital depreciation in the economic literature. Studies typically make assumptions they deem reasonable to estimate this rate, with 20% representing neither the low end nor the high end of the range of such assumptions. *See, e.g.,* Rita Almeida & Pedro Carneiro, *The Return to Firm Investments in Human Capital,* 16 Lab. Econs. 97 (2009), who assume that the human capital depreciation rate may range from 5% to 100%.

under the rule, as opposed to those that fall under the exemption for senior executives.

For the first component, firms must consider what changes to their contractual practices are needed to ensure that incoming workers are not offered or subject to non-competes and what revisions to human resources materials and manuals are needed to ensure they are not misused on a forward-going basis. Firms may respond by removing specific non-compete language from standard contracts and human resources (H.R.) materials and manuals used for future employees. The second component involves strategic decisions and changes in response to the final rule. For example, firms may adjust other contractual provisions such as NDAs. This legal work is not mandated or required by the rule; it would be undertaken only by the subset of firms and workers for whom firms conclude that such alternatives would be desirable. Additionally, such adjustments are likely unnecessary for senior executives whose non-competes continue to be enforceable under the rule. Therefore, this component additionally involves identifying senior executives whose existing non-competes are unaffected. For any such legal work, firms may use in-house counsel or outside counsel.

Legal costs are therefore calculated as follows:

*Legal Costs = Modify Standard Contract Language/H.R. Materials and Manuals Costs + Revise Contractual Practices Costs*

One component of the legal cost will be due to the modification of standard contracts to remove prohibited language regarding non-competes which is calculated as follows:

*Modify Standard Contract Language/ H.R. Materials and Manuals = (Average Hours Necessary for Modification) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates that, on average, modifying standard contract language and H.R. materials and manuals would take the equivalent of one hour of a lawyer's time.[1157] The estimated cost per hour is $134.62 in 2023 dollars,[1158] and the number of

affected businesses is 3.4 million.[1159] This results in a total one-time modification cost of $457 million.

Another component of legal costs relates to any firm-level revision to their contractual practices, including identification of senior executives, which is calculated as follows:

*Revise Contractual Practices Costs = (Average Hours Necessary to Update Contractual Practices) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates the average firm employs the equivalent of four to eight hours of a lawyer's time to update its contractual practices and determine which employees may fall under the final rule's exemption.[1160] The Commission estimates the cost of a lawyer's time to be $134.62 as discussed in this Part X.F.7.b.i. The number of affected businesses is estimated to be 2.9 million.[1161]

---

*lawyers.htm.* As in Part X.F.7.a, the Commission doubles this number to reflect the lost productivity of the worker.

[1159] Calculated as 6.88 million * 0.494. Here, 6.88 million is the number of establishments in the U.S. (excluding California, North Dakota, Oklahoma, and Minnesota, where non-competes are broadly unenforceable) in 2021 (the most recent year with data available): see *https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html.* This value is multiplied by 49.4%, the percentage of firms using non-competes in the U.S. according to Colvin & Shierholz (*supra* note 65).

[1160] The Commission emphasizes that this is an average to underscore there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those that use non-competes only with workers who do not have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect sensitive information, may opt to do nothing. There is evidence indicating firms that use non-competes are already using other types of restrictive employment provisions: Balasubramanian et al. (2024) find that 95.6% of workers with non-competes are also subject to an NDA, 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and that 74.7% of workers with non-competes are also subject to all three other types of provisions. See Balasubramanian, Starr, & Yamaguchi (*supra* note 74). Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract. The estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-competes opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-competes with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 days of an attorney's time, this would result in the estimate of 4–8 hours on average.

[1161] Calculated as 5.91 million * 0.494. Here, 5.91 million is the number of firms in the U.S. (excluding California, North Dakota, Oklahoma, and Minnesota, where non-competes are broadly unenforceable) in 2021 (the most recent year with data available): *see https://www.census.gov/data/*

Under the assumption that the average firm that uses a non-compete employs the equivalent of four to eight hours of a lawyer's time, the total one-time expenditure on revising contractual practices would range from $1.6 billion (assuming four hours are necessary) to $3.1 billion (assuming eight hours are necessary).

Some commenters indicated that some firms may use outside counsel, which is more costly to firms, to remove non-competes from contracts of incoming workers and to update contractual practices. While commenters did not provide data to support this assertion, as a sensitivity analysis, the Commission replaces the estimate of the hourly earnings of a lawyer with an estimate of the cost of outside counsel ($483 per hour), conservatively overestimating costs by using the estimated rate of a tenth-year lawyer.[1162] Under this sensitivity analysis, the Commission estimates the total cost of ensuring that incoming workers' contracts do not contain non-competes would be $1.6 billion and the cost of updating contractual practices would be $5.6–$11.3 billion. Some commenters stated that the hourly cost of lawyers' time may be even greater than the value assumed in the sensitivity analysis ($483 per hour). The Commission finds that the sensitivity analysis assuming a rate of $438 per hour provides a reasonable estimate of the costs under the assumption that outside counsel would be used, and that higher rates (*e.g.,* $749 per hour, as stated by one commenter) are unreasonably high, especially as an average across many firms.

The Commission believes the exclusion of existing non-competes with senior executives could result in lower net legal costs than the Commission's estimate. First, for senior executives who currently work under a non-compete, firms will have a longer time period during which they may update

---

*tables/2021/econ/susb/2021-susb-annual.html.* This value is multiplied by 49.4%, the percentage of firms using non-competes in the U.S. according to Colvin & Shierholz (*supra* note 65). The Commission notes that this analysis assumes that decisions regarding protection of sensitive information and contract updating are made at the firm (a collection of establishments under shared ownership and operational control), rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. This explains the difference between the number of businesses used here (2.9 million) versus the number used to calculate the cost of contract revision (3.4 million).

[1162] This estimate is drawn from the Fitzpatrick Matrix. *See supra* note 1087 and accompanying text. Note that the Commission does not double this number to reflect productivity, since the cost of outside counsel's time likely already reflects the productivity of that worker.

---

[1157] This process would likely be straightforward for most firms (*i.e.,* simply not using non-competes or removing one section from a boilerplate contract). There may be firms for which it is more difficult and requires more time. This analysis uses an average time spent of one hour, which conservatively represents the *average* time spent to do so, and accounts for variation across firms.

[1158] According to BLS, the median wage for a lawyer was $65.26 per hour in 2022, or $67.31 in 2023 dollars. See *https://www.bls.gov/ooh/legal/*

contractual practices. For example, for a senior executive who does not change jobs for 5 years after the compliance date of the final rule, the firm will have 5 years to determine how it wants to update contractual practices for an incoming senior executive who replaces the current one. Delaying costs in this way reduces their economic effect due to discounting. Additionally, if a senior executive remains in their job for over ten years, then the cost of updating contractual practices would fall outside the scope of the Commission's estimates altogether.

At the same time, when the final rule goes into effect, firms will need to identify senior executives whose existing non-competes are not covered by the final rule in order to determine which contractual practices they may need to update immediately. The Commission does not include a separate legal cost for identifying senior executives and estimates the range of attorney time for revising contractual practices under the final rule, which encompasses identifying senior executives, to be the same as the estimate for the proposed rule—4 to 8 hours. This is in part because the strategic considerations involved in revision of contractual practices will likely include such identification. Moreover, the Commission believes the identification of such workers will not be difficult or time consuming. Firms can use the compensation threshold to rule out the vast majority of workers from the exemption and the definition of senior executive in § 910.1 includes clear duties to determine whether any executives who meet the compensation threshold are senior executives under the final rule. It also provides that the CEO and/or president of a firm is a senior executive without the need to conduct any duties analysis.

Another reason the Commission does not add to its estimate of 4 to 8 hours to account for identification of senior executives is that excluding existing non-competes with senior executives would otherwise decrease this estimate, likely to a greater degree than the cost of identifying senior executives. As noted, a significant amount of time spent by attorneys as estimated in the NPRM was intended to account for revising contractual practices for more complex agreements. Commenters noted that employment terms with senior executives are often individualized so that attorney and firm time would be spent on their agreements regardless of whether a non-compete may be included. Since firms use non-competes

for senior executives at a high rate,[1163] revising contractual practices for senior executives may constitute a significant portion of the overall estimate of the cost of revising contractual practices, and given their exclusion, the Commission finds that the cost estimate for revising contractual practices likely represents an overestimate overall. The Commission does not, however, reduce its final cost estimates to account for this change. As noted in Part X.D, this final analysis generally does not account for the temporal difference in coverage of non-competes for senior executives. The same is true here and, to be consistent across the estimates in this final regulatory analysis, the Commission does not estimate a reduction in legal cost but notes potential bases for differences in estimates where relevant.

Overall, the Commission acknowledges that there may be substantial heterogeneity in the costs for individual firms; however, these numbers may be overestimates. For firms whose costs of removing non-competes for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with the costs of updating contractual practices.

ii. Administrative Costs for Notification Requirement

The Commission finds the total one-time costs for implementing the notification requirement are estimated to be $94 million. These costs relate to the provision of notice to workers other than senior executives as required by § 910.2(b). Notably, firms may use the model notice language provided by the Commission, and the form of this model notice enables firms to choose to send the notice to workers regardless of whether they have non-competes as described in Part IV.E. The notice provision cost is calculated as follows:

Notice Provision Cost = Digital Notice Provision Cost + Mailed Notice Provision Costs

The first component, digital notice provision costs, are calculated as follows:

Digital Notice Provision Costs = (Average Hours Necessary to Compose and Send Notice) * (Cost per Hour) * (# of Affected Businesses)

The Commission estimates that 20 minutes (⅓ of one hour) are necessary for a human resources specialist to compose and send this notice in a digital format to all of a firm's workers

who are not senior executives [1164] and applicable former workers, on average.[1165] The cost per hour is estimated to be $63.70.[1166] The estimated number of affected businesses is 3.4 million.[1167] The digital notice provision cost is therefore estimated to be $72 million.

Businesses may not have digital contact information for some workers. The cost of mailed notice provision would include the cost of postage and the cost of a human resource professional's time. Mailed notice provision costs are therefore calculated as follows:

Cost of Mailed Notice Provision = Number of Workers with Non-competes Receiving Physical Notice * (Cost of One Printed Page + Mailing Cost + Cost of Human Resource Professional's Time)

The number of workers with non-competes receiving physical notice is the total number of covered workers (101.1 million; see Part X.F.7.a.i) times the percentage of workers who have non-competes (18.1%) times the percentage of workers who require mailed notice (assumed to be 66% of workers [1168]), for a total of 12.3 million workers. The Commission notes that the percentage of workers who require mailed notice is likely a substantial overestimate, since it is estimated based on the percentage of individuals who receive health information digitally. The Commission believes employers are more likely to have digital means of providing the notice to their current workers especially, but also to their

---

[1164] The Commission notes that identification of such workers is accounted for in revision of contract costs calculated in Part X.F.7.b.i.

[1165] See, e.g., the supporting statement for the Notice of Rescission of Coverage and Disclosure Requirements under the Affordable Care Act (CMS–10330/OMB Control No. 0938–1094) at 5, which estimates time spent customizing and sending similar notice. Available at https://www.reginfo.gov/public/do/DownloadDocument?objectID=119319401.

[1166] According to BLS, the median wage for a human resources specialist was $30.88 per hour in 2022, which is equivalent to $31.85 in November 2023 dollars, updated for inflation using https://www.bls.gov/data/inflation_calculator.htm. See https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm. As in Part X.F.7.a, the Commission doubles this number to reflect the lost productivity of the worker.

[1167] As calculated in Part X.F.7.b.i., the Commission conservatively assumes that each establishment—a physical location of a business—must engage in its own communication, and that each establishment has digital contact information for at least one worker, and will therefore engage in digital notice provision.

[1168] See infra note 1165 (CMS Supporting Statement assumes 66% of workers require mailed notice from their health insurance companies).

former workers. The Commission adopts this estimate as an upper bound.

The cost per worker is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. The overall cost of mailed notice provision is therefore estimated to be $22 million. The total cost of the notice provision is therefore $94 million.

Commenters stated that it may take two hours of a legal professional's time to provide notice. The Commission finds this estimated time to be a substantial overestimate and reiterates that this analysis incorporates a legal professional's time necessary to identify senior executives and to strategize updates to firm contractual practices into its estimate of legal costs in X.F.7.b.i. The model notice language alleviates the need for a legal professional's time and the Commission finds it unreasonable to assume such a notice would need to actually be sent by a legal professional. While firms may opt to use original language drafted by an attorney to notify workers, the Commission notes that the model language satisfies the notification requirement and therefore does not include the cost of original language as a regulatory cost estimate in the final analysis. However, under these assumptions, the cost of providing the notice is estimated at $5.2 billion.

The Commission notes that communication is conducted at the establishment level and time costs do not vary based on the number of existing senior executives with non-competes that the final rule does not cover. While establishments with only senior executives with non-competes would not incur any notification costs because the final rule does not cover existing non-competes with senior executives, without an estimate of the percentage of firms for which this is true, the Commission conservatively assumes that all establishments estimated to use non-competes engage in this notification.

Legal and administrative costs are summarized in Table 6. The Commission notes that, since all costs are assumed to be borne in the first year, there is no discounting applied and therefore only one estimate for each analysis is presented.

TABLE 6

|  | $ billions |
| --- | --- |
| **Cost of modifying standard contract language/H.R. materials and manuals** | |
| Primary ............................................................................................................................................................................................. | $0.5 |
| Sensitivity analysis (outside counsel cost of $483) ........................................................................................................................... | 1.6 |
| **Cost of reviewing and revising contractual practices** | |
| Primary, four hours ............................................................................................................................................................................ | 1.6 |
| Primary, eight hours .......................................................................................................................................................................... | 3.1 |
| Sensitivity analysis (four hours, outside counsel cost of $483) ....................................................................................................... | 5.6 |
| Sensitivity analysis (eight hours, outside counsel cost of $483) ..................................................................................................... | 11.3 |
| **Administrative Costs for Notification Requirement** | |
| Primary ............................................................................................................................................................................................. | 0.09 |

c. Litigation Effects

Theoretically, under the final rule, certain litigation costs may fall. Litigation related to non-competes may decrease because the final rule creates bright line rules, reducing uncertainty about the enforceability of non-competes. On the other hand, litigation costs may rise if firms turn to litigation to protect trade secrets and if litigation is more expensive than enforcing (or threatening to enforce) non-competes, and/or if firms elect to litigate over what constitutes a non-compete.

The Commission finds there are plausible but directionally opposite theoretical outcomes for the different types of litigation that may be affected by the final rule. In fact, some recent evidence suggests trade secret litigation falls as a result of bans on non-competes taking effect.[1169] The Commission finds

no evidence increased litigation will result in increased costs associated with the final rule. The Commission cannot quantify or monetize the overall effect as a cost or benefit, but estimates the magnitude of any change would be sufficiently small as to be immaterial to the Commission's assessment of whether the benefits of the rule justify its costs.

8. Transfers

As discussed in Part X.F.6.a, some portion of the earnings effect associated with the final rule represents a transfer: while workers may earn more with greater productivity resulting from the rule, some of their earnings increase may result from enhanced bargaining power, which constitutes a transfer from firms to workers.

Similarly, some portion of the price effects associated with the final rule represents a transfer: while consumers may achieve greater surplus with increased competition, the price decrease itself is partially a transfer from firms to consumers.

9. Distributional Effects

The Commission finds several distributional effects associated with the final rule, including those associated with firm expansion and formation, distributional effects on workers, and labor mobility, as summarized in Table 1 in Part X.E.

a. Firm Expansion and Formation

When non-competes are prohibited, new firms may enter the market but incumbent firms may opt to invest less in capital, leaving the overall effect on total capital investment unclear. Similarly, while new firms may enter the market, it is theoretically possible that incumbent firms may exit the market without the ability to use non-competes (though no evidence of this

---

[1169] Greenwood, Kobayashi, & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion

that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

effect exists) or contract. Research finds that decreased non-compete enforceability increases new firm formation by 2.7% and may have no effect on capital investment or may decrease capital investment at incumbent firms by up to 7.9%. To the extent there may be a decrease in capital investment at incumbent firms as a result of the final rule, it may represent a shift in productive capacity from incumbent firms to new firms. As discussed in Part IV.D, another purported justification for non-competes is that they allow firms to protect trade secrets, which in theory might allow firms to share those trade secrets more freely with workers, and so improve productivity. However, no empirical evidence substantiates this claim or would allow quantification or monetization of this effect.

Empirical evidence has studied parts, but not all, of the contrasting effects on capital investment and new firm formation. Studies have examined effects of non-competes on capital investment by large, publicly traded firms, who are likely incumbents.[1170] However, no study examines the effect of capital investment economy-wide, nor does any study specifically examine capital investment for new firms. Similarly, studies have examined new firm formation, but no studies look at firm exit among incumbents.

It is thus not possible to measure the benefit and costs of the full economy-wide effects on firm expansion and formation. The calculations that may be performed using available data will necessarily omit components of the tradeoff. The final analysis therefore quantifies the effects that the literature has examined but does not monetize those effects.

### i. Capital Investment

Research finds that capital investment for incumbent firms at the firm level may decrease under the final rule for the economy as a whole, though effects for high-tech industries may be positive, negative, or close to zero. The Commission notes that the capital investment discussed in this Part X.F.9 relates to tangible capital, does not reflect capital investment by newly-formed firms, and is distinct from R&D spending, which is discussed in Part X.F.6.b.

One estimate of the overall effect of non-compete enforceability on capital investment by incumbent firms, which some commenters pointed to, is estimated with substantial uncertainty

and is statistically indistinguishable from zero (*i.e.,* statistically insignificant): a decline in capital investment of 7.9% for the average incumbent publicly-traded firm.[1171] Another study finds no effect on capital investment, but includes the use of non-competes in its estimating procedure, leading to concerns that the finding does not support a causal interpretation, as explained in Part IV.A.2.[1172]

The Commission notes two additional estimates specific to high-tech or knowledge firms: a decline in capital investment among incumbent publicly-traded firms of 34%–39% (an estimate which corresponds to the estimate of a decline of 7.9% when all publicly traded firms are examined),[1173] and an increase in capital investment of 3.1% for the average publicly-traded high-tech firm (an estimate that is statistically insignificant).[1174] The Commission notes the study finding an increase in capital investment of 3.1% uses a more granular measure of non-compete enforceability than the study finding a decrease of 34%–39%, and the Commission therefore gives it more weight.[1175]

The Commission reiterates that any change in investment at the firm level does not necessarily mean investment would change at the market level, since increased firm entry may also increase the employed capital stock and investment in that capital stock, which may offset any possible decreases in investment for incumbent firms. These potential positive offsetting effects are not captured in the estimates herein.

### ii. New Firm Formation

Research finds that new firm formation increases by 2.7% across the economy due to decreases in non-compete enforceability.[1176] The

Commission also notes an estimate specific to high-tech industries: that decreases in non-compete enforceability led to a 3.2% increase in the establishment entry rate.[1177]

The benefits associated with new firm entry may include added surplus for consumers (*e.g.,* from increased competition) or workers (from expanded labor demand). However, the Commission is unable to quantify those beneficial effects, though some may be captured by the effect on prices discussed in Part X.F.6.c. Nor is it able to quantify whether existing firms might exit or contract in response to this new firm entry (*i.e.,* whether the new firms' output would be wholly additive or crowd out some amount of existing firms' output). New firm entry may also drive some of the innovative effects of the final rule if new firms are engaging in substantial innovation.

Overall, the Commission finds that the rule will likely result in a 2.7% increase in new firm formation and is unable to quantify the net effects of this on the productive capacity of the economy. Benefits from new firm entry and possible costs from decreased capital investment may offset each other but the degree to which this happens is not quantifiable. The effect of the final rule on firm expansion and formation likely results in productive capacity shifting from incumbent firms to new firms. Consistent with findings in Part IV.B.3.b.iii, productive capacity shifting from incumbent to new firms may decrease concentration, possibly contributing to decreases in prices, as discussed in Part X.F.6.c.

---

[1170] Jeffers, *supra* note 450; Johnson, Lipsitz, & Pei, *supra* note 526.

[1171] The increase, 7.9%, is calculated as 0.00317/0.04, where 0.00317 is the reported coefficient (Table 4, Panel A, Column 1), and 0.04 is the mean investment per million dollars of assets ratio, across all firms (Table 2, Panel C). Due to statistical uncertainty, the estimate cannot rule out (with 95% confidence) values ranging from a *gain* in capital investment equal to 6.7% to a *loss* in capital investment equal to 22.5% for the average firm. See Jeffers, *supra* note 450.

[1172] Shi, *supra* note 84.

[1173] Jeffers, *supra* note 450. The estimate pertains to firms in Technology and Professional, Scientific, and Technical Services.

[1174] Johnson, Lipsitz, & Pei, *supra* note 526. The estimate pertains to firms classified as high-technology by the National Science Foundation: see *https://nsf.gov/statistics/seind14/index.cfm/chapter-8/tt08-a.htm.*

[1175] The two studies are otherwise identical in the extent to which they satisfy the criteria for assessing empirical research laid out in Part IV.A.2.

[1176] Jeffers (*supra* note 450) does not report an effect for the economy as a whole. However, Jeffers reports coefficients of −0.103 for the effect of

increased non-compete enforceability on firms founded per million people in knowledge-sector industries and 0.008 for non-knowledge sector industries, with respective sample sizes of 78,273 and 190,665 (Table 9, Panel A, Columns 1 and 2). Using the sample sizes as weights, the Commission estimates a weighted average of these coefficients of −0.024. Applying this estimate to the average number of firms founded per million people (Table 2, Panel B) results in an estimated increase in new firm formation of 2.7%. The Commission did not calculate the effect for the economy as a whole in the NPRM. The NPRM reported that increases in non-compete enforceability decreased new firm entry by "0.06 firms per million people (against a mean of 0.38) for firms in the knowledge sector," NPRM at 3526, which was consistent with the version of the Jeffers study cited in the NPRM. The final rule cites the updated version of the Jeffers study, published in 2024. The Commission notes that estimation of the uncertainty in the combined estimate requires information on the covariance of the estimated coefficients, which is not reported in Jeffers' study. See Jeffers, *supra* note 450.

[1177] Johnson, Lipsitz, & Pei, *supra* note 526. The estimate pertains to firms classified as high-technology by the National Science Foundation: see *https://nsf.gov/statistics/seind14/index.cfm/chapter-8/tt08-a.htm.*

### b. Distributional Effects on Workers

The Commission finds that the final rule may reduce gender and racial earnings gaps, may especially encourage entrepreneurship among women, and may mitigate legal uncertainty for workers, especially relatively low-paid workers.

Specifically, the Commission finds gender and racial wage gaps may close significantly under a nationwide prohibition on non-competes, according to economic estimates.[1178] Another estimate indicates that the negative effect of non-compete enforceability on within-industry entrepreneurship is significantly greater for women than men.[1179]

The Commission finds the rule may be especially helpful for relatively low-paid workers, for whom access to legal services may be prohibitively expensive. Workers generally may not be willing to file lawsuits against deep-pocketed employers to challenge their non-competes, even if they predict a high probability of success. The Commission finds that the bright-line prohibition in the final rule, which the Commission could enforce, may mitigate uncertainty for workers.[1180]

### c. Labor Mobility

The Commission finds the overall effect of the final rule on turnover costs due to increased labor mobility is ambiguous and represents a distributional effect of the rule. The Commission finds turnover costs for firms seeking new workers may fall with a greater availability of experienced labor. For firms losing workers newly freed from non-competes, the Commission estimates the effect of the final rule to be $131 per worker with a non-compete. The Commission therefore finds the effect on turnover costs represents a distributional effect of the final rule because it costs firms that use non-competes to constrain workers and benefits firms that do not.

To calculate the potential $131 increase in turnover costs for workers whose non-competes are no longer enforceable after the rule, this final analysis calculates:

*Additional Turnover Cost per Worker with a Non-compete = (Baseline Turnover Rate) \* (% Increase in Turnover) \* (Rate of Use of Non-competes in Affected Industries) \* (Overall Earnings of Affected Workers) \* (Cost of Turnover as % of Earnings)/(Number of Workers in*

### Affected Industries with Non-competes)

The Commission estimates the baseline turnover rate, *i.e.,* the turnover rate in the status quo, to be 47% annually.[1181] The estimated percent increase in turnover from the final rule is 1.0%.[1182] The estimated rate of use of non-competes in affected industries is 23.9%.[1183] Estimated overall earnings of affected workers is $5.25 trillion.[1184] The estimated cost of turnover as a percentage of earnings is 25%.[1185] Finally, the estimated number of workers in affected industries with non-competes is 11.8 million.[1186]

The annual estimated increase in turnover costs per worker with a non-compete is $131.

The Commission notes the actual costs of turnover to businesses may be substantially lower under the final rule than this estimate reflects. This is because the specific components of turnover costs—finding a replacement, training, and productivity—are likely to be affected by the final rule. An increased availability of experienced workers results when non-competes no longer constrain those workers, and finding replacements will be less costly to firms. Additionally, training should not be counted in the costs of turnover presented in this Part X.F.9.c, since it is separately accounted for in Part X.F.7.a, but is nevertheless included in the 25% estimate used to arrive at the estimate of $131 per worker with a non-compete, since there is no reliable way to remove training costs from that estimate; it is thus double-counted. Finally, because the Commission finds increased labor mobility will likely increase worker

productivity due to better matching between workers and firms, the cost of lost productivity will be lower. The cost of lost productivity will also be lessened because the pool of workers available to firms may be more talented or experienced, since such workers would no longer be bound by non-competes (relative to new entrants to the workforce, who are not experienced and also are not bound by non-competes). This would allow firms to recruit workers who are more likely to be highly productive upon entry at a new job.

The Commission reiterates its finding that the costs of turnover for many firms may diminish due to a more plentiful supply of available labor. Without estimates of the effect of the final rule on the cost of recruiting a worker, the net effect of the final rule on turnover costs is not quantified.

### 10. Break-Even Analysis

The Commission believes it has quantified the effects of the final rule that are likely to be the most significant in magnitude, but data limitations make it challenging to monetize all the expected effects of the final rule, *i.e.,* to numerically estimate the impact of particular effects on the economy as a whole. Most of the estimated costs of the final rule are monetized in Part X.F.7. However, the Commission is unable to monetize the estimated benefits of the final rule without additional assumptions. Two of the major benefits—innovation and earnings—are quantified but they are not monetized because a particular parameter or data point that would allow the Commission to estimate their effect in dollars is unavailable. For earnings, this parameter is an estimate of the percentage of the effect on earnings that represents a benefit versus a transfer.[1187] For innovation, this parameter is an estimate of the social value of a patent. Making an assumption about these parameters allows the Commission to monetize the benefits associated with the effect on earnings and innovation. A break-even analysis based on such assumptions confirms the Commission's finding that the benefits of the rule clearly justify the costs.

The analysis in this Part X.F.10 calculates the sum of the monetizable costs of the rule, separately under the assumption that lost investment in human capital is core training (in which case monetizable costs are direct

---

[1178] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 38.

[1179] Marx (2022), *supra* note 524 at 8.

[1180] NPRM at 3531.

[1181] Based on annual worker mobility rates (separations divided by employment) in 2022 as calculated using the Job Openings and Labor Turnover Survey, conducted by BLS.

[1182] Calculated as $-e[(^{-0.241+0.112)\*0.081}-1)$, where $-0.241+0.112$ represents the estimated effect in Johnson, Lavetti, and Lipsitz (*supra* note 388) on workers in high use industries. The corresponding estimate for other industries is statistically indistinguishable from zero and those industries are therefore omitted from calculations. The multiplier 0.081 is the average magnitude change in non-compete enforceability, as discussed in Part X.F.5.

[1183] Calculated as the average usage rate in high-use industries in Starr, Prescott & Bishara (*supra* note 68).

[1184] Based on data from BLS for industries classified as high-use in Starr, Prescott & Bishara (*supra* note 68), excluding CA, ND, OK, and MN.

[1185] See Pivateau, *supra* note 1090.

[1186] Calculated as 49.4 million \* 23.9%. 49.4 million is equal to 0.8 \* 61.8 million, where 0.8 is the coverage rate (see Part X.F.4.a) and 61.8 million is the number of workers in high-use industries (*https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables*). 23.9% is the average usage rate in high-use industries in Starr, Prescott, & Bishara (*supra* note 68).

[1187] Though the estimated effect on earnings is presented in dollars, the Commission considers this value to be quantified, but not monetized, since some part of the estimate may represent a transfer and not a benefit.

compliance costs and the cost of updating contractual practices), and under the assumption that lost investment in human capital is advanced training (in which case monetizable costs are the net cost of lost productivity from decreased human capital investment, direct compliance costs, and the cost of updating contractual practices). The analysis conservatively assumes that training for all workers is affected (versus just those in high-use occupations, as described in Part X.F.7.a).

If the Commission assumes the decrease in human capital investment is a decrease in core training, the final rule results in net benefits without monetizing or counting any positive effects on the economy from earnings or innovation. The savings or benefit to the economy from reduced core training would be greater than the combined monetized costs of the final rule in X.F.7.b. In other words, even if the benefit to the economy from earnings and innovation were assumed to be zero (an implausible and extremely conservative assumption), the final rule would be net beneficial under the assumption that estimates of reduced training reflect better matching of workers and firms and therefore a reduced need to provide workers with core training.

Under the assumption that lost human capital investment is advanced, the Commission calculates values of the social value of a patent and the benefit percentage of the earnings effect that would fully offset the net monetizable costs of the final rule.

### a. Estimate of Net Benefit Assuming Lost Human Capital Investment Is Core Training

Under the assumption that lost human capital investment is core, the sum of the present discounted value of direct compliance costs and the cost of contractual updating (the monetizable costs of the rule), using a 3% discount rate, is $3.7 billion. In this case, the final rule is net beneficial even ignoring the benefits associated with innovation and earnings. This is because the net monetized cost ($3.7 billion) is less than the monetized benefit associated with investment in human capital ($31 billion or $13.9 billion, when all occupations are assumed to be affected versus just high-use occupations, respectively). The net monetizable benefit of the final rule—even ignoring benefits associated with innovation and earnings—is therefore $27.3 billion or $10.2 billion, respectively.

### b. Estimate of Net Benefit Assuming Lost Human Capital Investment Is Advanced Training

In this Part X.F.10.b, the Commission calculates the net monetizable costs and benefits of the final rule assuming that lost human capital investment is advanced training, and under varying assumptions about the values of the two monetization parameters identified (the social value of a patent and the percentage of the earnings effect that represents a benefit). Then, the Commission calculates break-even points: values for the monetization parameters which would fully offset the net monetizable costs of the final rule.

Break even points are calculated by finding the values of the social value of a patent and the benefit percent of the earnings increase such that:

*(Net Costs Associated with Investment in Human Capital) + (Direct Compliance Costs) + (Costs of Updating Contracts) = (Earnings Increase) * (Benefit % of Earnings Increase) + (Patent Increase) * (Social Value of Patent)*

As calculated in Part X.F.7, assuming a 3% discount rate, the net cost associated with investment in human capital is $39.0 billion.[1188] Direct compliance costs plus the cost of updating contracts are estimated to be $3.7 billion.[1189] Net monetizable costs therefore total $42.7 billion.

The estimated earnings increase of the final rule over ten years, discounted at 3% is $468 billion. The estimated effect of the rule on innovation (using the low end of the primary estimate) ranges from an additional 3,111 patents per year to 31,110 patents per year, increasing as time goes on.[1190]

The Commission presents estimates that demonstrate break-even points by making an assumption for the value of one of the two monetization parameters, and calculating the value of the other which implies equal monetized costs and benefits. Based on estimates of the private value of a patent, the Commission separately assumes that the social value of a patent is $94,886, $234,399, $5,865,833, or $32,459,680.[1191] In addition to spanning

---

[1188] Note that this calculation considers the net cost of lost investment in human capital (*i.e.,* the cost of lost productivity, minus the savings on direct outlays and gained output due to less time spent training). The Commission reiterates that this calculation assumes that lost human capital investment is advanced, rather than core.

[1189] This calculation assumes that updating contractual practices takes, on average, eight hours per firm.

[1190] The estimates presented here conservatively assume zero effect on R&D spending.

[1191] The Commission points out that the economic literature has not explored the *social*

a wide range of possible valuations, these values all represent the private value of a patent to certain actors (*e.g.,* the purchaser or seller of a patent, or shareholders of a patenting company). These values do not account for innovative spillovers (*e.g.,* follow-on innovation) or product market spillovers to competitors (who may lose business to innovating firms), and therefore do not necessarily represent the social value of a patent. However, they serve as benchmarks against which to assess the breakeven points of the analysis of the final rule.

No studies have assessed what percentage of the earnings effect of non-compete enforceability is a benefit versus a transfer. The Commission separately assumes that the percentage is equal to 0%, 5%, 10%, and 25%.

The computed breakeven points are reported in Table 7, under the assumption that lost investment in human capital is advanced. Panel A reports necessary benefit percentages, under each of the four assumed social values of a patent, that would cause the rule to result in zero net monetized benefit. A reported value of 0% indicates that the assumed value of a patent itself covers the net monetized costs of the final rule. Panel B reports the necessary social value of a patent, under each of the four assumed benefit percentages, that would cause the rule to result in zero net monetized benefit. A reported value of $0 indicates that the benefits associated with earnings cover the net monetized costs of the final rule on their own.

### TABLE 7

| Assumed social value of a patent | Necessary benefit percentage on earnings |
|---|---|
| **Panel A** | |
| $94,886 .......................... | 5.5 |
| $234,399 ........................ | 1.7 |
| $5,865,833 .................... | 0.0 |

---

value of a patent, but has explored the *private* value of a patent, with highly varied conclusions (all reported here adjusted to 2023 dollars). Serrano estimates the average value of a patent (in terms of its sale price at auction) to be between $234,399 and $289,022. Pakes estimates the average value of a patent (in terms of stock market reactions to announcements) to be $5,865,833. Kogan et al. estimate the average value of a patent (also in terms of stock market reactions to announcements) to be $32,459,680. Outside of the academic literature, a Richardson Oliver Insights report notes that the average sale price of U.S. issued patents on a brokered market was $94,886. *See* Carlos J. Serrano, *Estimating the Gains from Trade in the Market for Patent Rights,* 59 Int'l Econ. Rev. 1877 (2018); Pakes, *supra* note 1132; Kogan, et al., *supra* note 1131; Richardson Oliver Insights Report (2022): *https://www.roipatents.com/secondary-market-report.*

### TABLE 7—Continued

| Assumed social value of a patent | Necessary benefit percentage on earnings |
|---|---|
| $32,459,680 ..................... | 0.0 |

| Assumed benefit percentage on earnings | Necessary patent value |
|---|---|

**Panel B**

| | |
|---|---|
| 0% ..................................... | $297,144 |
| 5% ..................................... | 134,202 |
| 10% ................................... | 0 |
| 25% ................................... | 0 |

Panel A shows that, even assuming a value of patenting ($94,886) that is substantially lower than the estimates in the economic literature, only 5.5% of the earnings effect must be an economic benefit (as opposed to a transfer) for the benefits associated with innovation and earnings to outweigh the monetized costs of the rule. Panel B shows that, even if no part of the earnings effect of the final rule reflects an economic benefit (which the Commission finds to be unlikely, in light of the evidence discussed in Part IV.B.3.a.ii), the social value of a patent would need to be only $297,144 in order to cover the monetized costs of the rule—well within the range of (private) values of a patent found in the literature.

The Commission additionally notes that Table 7 omits other benefits of the rule. The estimated benefits do not include the benefits arising from decreased consumer prices or increased workforce output. The estimates also omit possible changes in litigation costs associated with the rule. The Commission finds it likely that the omitted benefits substantially exceed the omitted costs, and additionally reiterates that the estimated values in Table 7 assume that lost investment in human capital is fully advanced. Therefore, the Commission views the values reported in Table 7 as conservative estimates of the breakeven points of the rule under those scenarios.

### 11. Analysis of Alternative Related to Senior Executives

The Commission elects to provide an analysis of the effects of an alternative with more limited coverage. Specifically, the Commission provides an analysis of a rule that would cover—and therefore ban—non-competes with all workers except senior executives. As compared to the final rule, under this alternative, it would not be an unfair method of competition to enter into non-competes with senior executives after the effective date. The Commission finds that excluding all non-competes

with senior executives from coverage under the rule (as opposed to the final rule, which excludes only existing non-competes with senior executives) would diminish both costs and benefits, but would still result in substantial benefits on net.

#### a. Analysis of Lost Benefits and Costs if Senior Executives Are Excluded

Several costs and benefits may be affected if senior executives are excluded from coverage by the final rule. The Commission now discusses each of those costs and benefits relative to the final rule.

The Commission finds that some benefits related to labor market competition and workers' earnings would be lost if senior executives were entirely excluded from the final rule. This is especially true because those workers have high earnings, meaning that a given percentage increase in their earnings yields a greater overall effect compared with relatively lower earning individuals. However, those workers make up a small portion of the workforce—approximately 0.75% of the workforce, based on data from the American Community Survey.[1192] The overall change in the earnings benefit is therefore limited, but would exceed senior executives' share of the workforce. Support for this finding is discussed in Part IV.C. Garmaise (2011) finds that earnings of senior executives are negatively affected by non-competes. Countervailing evidence exists, but it is based on evaluation of the use of non-competes, which the Commission gives less weight.[1193] The Commission notes the definition of senior executive used in Garmaise (2011) does not map perfectly to the definition of senior executives in this final rule, though there is likely substantial overlap.

The Commission is unable to quantify the lost benefits related to innovation if senior executives were excluded from coverage under the final rule but finds their exclusion would diminish the innovation benefits of the final rule. Senior executives are involved in determination of the strategic path of the firm and its execution, which likely has a substantial effect on innovation.

The Commission cannot quantify what percentage of the innovation effect is due to senior executives versus other workers, though it is likely shared by both groups.

The Commission finds that benefits related to consumer prices would fall significantly if senior executives were excluded from coverage. By increasing competition, increases in new firm formation and increased ability to hire talented workers may be key drivers of the effect of the final rule on consumer prices. As discussed in Part IV.C, senior executives have the knowledge and skills necessary to found new firms, or to be key members of other firms. Therefore, if senior executives are excluded from the final rule, some benefits associated with new firm foundation and innovation would be lost, though the exact proportion cannot be estimated. The Commission notes that benefits associated with lower prices through increased competition might also be lost but cannot be quantified.

Turning to costs, the Commission finds that costs associated with investment in human capital may fall if senior executives were excluded from the rule. The productivity of senior executives may benefit from investment in their human capital.[1194] The precise monetary contribution of investment in senior executives' human capital to the productivity of firms has not been estimated, nor has the empirical literature separately assessed the effect of non-competes on human capital investment for senior executives. If senior executives benefit from advanced, rather than core, training investment (as described in Part X.F.7.a), their exclusion will reduce costs. Because senior executives are a small part of the workforce and must be highly skilled, locking them up with non-competes could theoretically mean that firms would need to invest in relatively more core training for senior executives if they were excluded from the final rule.

The Commission finds that the direct costs of compliance with the final rule may be partially affected if senior executives were categorically excluded. The final rule allows employers to enforce existing non-competes for senior executives, so there are no notice and re-negotiation costs for senior executives. However, in this scenario, costs associated with ensuring incoming

---

[1192] In particular, 0.75% represents the percentage of employed individuals from 2017–21 ages 22–64, excluding residents of CA, ND, OK, and MN, and excluding workers reporting working for non-profits or the government, whose earnings are above the inflation-adjusted threshold and who are coded as having occupation "Top Executive." The Commission notes that this estimate may not exactly match the definition in the final rule but the Commission believes that this provides a reasonable estimate.

[1193] See Part IV.A.2 (explaining the Commission's concerns with these types of studies).

[1194] Solomon Akrofi, *Evaluating the Effects of Executive Learning and Development on Organisational Performance: Implications for Developing Senior Manager and Executive Capabilities,* 20 Int'l. J. of Training and Dev. 177 (2016).

senior executives' contracts do not have non-competes would be substantially reduced. Because senior executives' contracts are generally more complex than other workers' contracts, this reduction may be relatively large, even though there are relatively few senior executives in the workforce (approximately 0.75%). With respect to the costs of updating contractual practices, commenters noted the costs of updating senior executives' contracts may be greater than for other workers because of the complexity of their contracts. Therefore, excluding senior executives categorically might reduce costs associated with updating contractual practices substantially. At the same time, senior executives' contracts may already be bespoke and individualized to such an extent that removing a non-compete would not considerably raise the costs associated with revising contractual practices. Moreover, these contracts may be even more likely than other workers to already include NDAs and other similar provisions.

Finally, the Commission finds exclusion of senior executives may reduce litigation costs from the final rule, though the overall effect is unclear. Senior executives are highly likely to have access to sensitive business information. To the extent costs associated with trade secret litigation or litigation over other restrictive covenants increase under the final rule, though no evidence supports this possibility, then exclusion of senior executives may substantially reduce these costs. Litigation related to whether a worker meets the definition of a senior executive may also increase if senior executives are categorically excluded.

Overall, excluding senior executives from the final rule would substantially reduce the benefits of the rule—especially those associated with new firm formation, innovation, and prices—but would also likely reduce costs, especially those associated with investment in human capital and updating contractual practices. The Commission finds that the benefits of a rule excluding senior executives would justify the costs of such a rule.

b. Analysis of Benefits and Costs to Workers Other Than Senior Executives

Now, the Commission turns to an analysis of the benefits and costs that remain if senior executives are excluded from the rule.

The Commission finds there would be substantial benefits to labor market competition and workers' earnings even if senior executives were categorically excluded. The evidence on earnings

discussed in Part IV.B.3.a.ii does not exclude senior executives, but based on the percentage of the population that represents senior executives, the evidence largely pertains to workers other than senior executives. Therefore, while studies focused on senior executives (largely) do not apply, studies of the entire workforce mostly reflect the effects of non-competes on other workers. In addition to the broader evidence on earnings discussed in Part IV.B.3.a.ii, one study analyzes a population exclusively comprised of hourly workers, nearly all of whom are highly likely not to be senior executives, supporting the finding that even with senior executives excluded from a rule, there would be substantial benefits to labor market competition and workers' earnings.[1195]

The Commission is unable to quantify to what extent the estimated effects on innovation are driven by senior executives versus other workers, but still finds that a final rule excluding these senior executives would result in substantial benefits to innovation. First, there is evidence that productivity of inventors decreases when they take career detours because of non-competes.[1196] Second, insofar as effects on innovation are driven by increased idea recombination, having access to those ideas (which innovators actively engaged in R&D must) implies that moving to new firms would increase innovation. Empirical studies have not quantified the size of these effects relative to the overall effect of banning non-competes for workers including senior executives on innovation, however.

The Commission finds that a rule excluding senior executives would still yield substantial benefits with respect to consumer prices. Many entrepreneurs were not formerly senior executives, meaning that encouraging entrepreneurship among workers who are not senior executives by prohibiting non-competes will yield more business formation. That business formation increases competition, which may lead to lower prices. Additionally, firms will not be foreclosed access to talent (which is likely important across the spectrum of workers, though evidence only specifically exists for senior executives), which may also lead to lower prices. In the absence of empirical evidence demonstrating which workers' non-competes affect consumer prices, the Commission cannot estimate how much of the effect is due to coverage of which workers.

The Commission finds that a rule excluding senior executives would result in decreased levels of investment in workers' human capital. The empirical literature has not separately assessed the effect of non-competes on investment in human capital for senior executives versus other workers, though the study finding that training decreases with greater non-compete enforceability includes both workers who are and are not senior executives. The Commission therefore believes that some or much of any cost or benefit of the rule from changing investment in human capital would pertain to workers who are not senior executives. However, the Commission notes that, as discussed in Part X.F.7.a, if lost training under the rule is lost "core" (as opposed to "advanced") training, then the final rule will cause a cost *savings* for firms, which will have greater access to experienced workers and will therefore spend less on "core" training.

The Commission finds that the direct costs of compliance with the final rule may be partially diminished if senior executives were excluded. First, the Commission reiterates that notice is not required for senior executives under the final rule. Therefore, that component of the direct costs of compliance would not be affected. However, even with those senior executives excluded, costs associated with ensuring incoming workers' contracts do not have non-competes would still be present. Insofar as senior executives' contracts may be more complex than other workers' contracts, this cost may be substantially diminished, however. Similarly, with respect to the costs of updating contractual practices, as noted by commenters, these costs may be substantially greater for the contracts of senior executives due to the complexity of their contracts and the sensitivity of the information they possess. Therefore, while some costs associated with updating contractual practices would survive if senior executives were excluded, their exclusion may reduce costs associated with the rule disproportionately to their (relatively low) share of the workforce.

Finally, some litigation costs may still be present if senior executives are excluded. Litigation costs associated with non-competes would still likely fall for workers other than senior executives due to the bright-line coverage in the rule. Costs associated with litigation other than non-compete litigation may rise if firms turn to those methods, though no evidence suggests they will.

Overall, a rule that excludes senior executives will likely result in

---

[1195] Lipsitz & Starr, *supra* note 72.

[1196] Mueller, *supra* note 569.

substantial benefits, as well as some costs. While the Commission largely cannot quantify the extent to which benefits and costs would fall if senior executives were excluded from coverage under the rule, the Commission finds that the benefits quantified and monetized elsewhere in this impact analysis would likely be diminished relative to the final rule as adopted, especially those associated with innovation and prices, but costs would also be diminished, especially those associated with investment in human capital and updating contractual practices. The Commission finds that, even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs, which remains true even if senior executives were excluded from coverage.

## XI. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to provide an Initial Regulatory Flexibility Analysis ("IRFA") and Final Regulatory Flexibility Analysis ("FRFA") of any final rule subject to notice-and-comment requirements, unless the agency head certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities.[1197] In the NPRM, the Commission provided an IRFA, stated its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered.[1198] In addition to publishing the NPRM in the **Federal Register**, the Commission announced the proposed rule through press and other releases,[1199] as well as through other outreach including hosting a public forum on the proposed rule[1200] and attending the U.S. Small Business Administration Office of Advocacy's ("SBA Advocacy") roundtable on the proposed rule with small entities,[1201] in keeping with the Commission's history of small business guidance and outreach.[1202]

The Commission thereafter received over 26,000 public comments, many of which identified themselves as being from small businesses, industry associations that represent small businesses, and workers at small businesses.[1203] The Commission greatly appreciates and thoroughly considered the feedback it received from such stakeholders in developing the final rule. The Commission made changes from the proposed rule in response to such feedback and will continue to engage with small business stakeholders to facilitate implementation of the final rule. Further, the Commission is publishing compliance material to assist small entities in complying with the final rule.

Specifically, based on the Commission's expertise and after careful review and consideration of the entire rulemaking record—including empirical research on how non-competes affect competition and over 26,000 public comments—the Commission adopts this final rule, including with changes relative to the proposal to reduce compliance burdens on small business and other entities. For example, the Commission allows existing non-competes with senior executives to remain in force,[1204] amends the safe harbor notice requirement to ease compliance,[1205] removes the requirement to rescind existing non-competes, and removes the ownership threshold from the sale of business exception.[1206] In light of the comments, the Commission has carefully considered whether to certify that the final rule will not have a significant impact on a substantial number of small entities. The Commission continues to believe the final rule's impact will not be substantial in the case of most small entities, and in many cases the final rule will likely have a positive impact on small businesses. However, the Commission cannot fully quantify the impact the final rule will have on such entities. Therefore, in the interest of thoroughness and an abundance of caution, the Commission has prepared the following FRFA with this final rule.

Although small entities across all industrial classes—*i.e.*, all NAICS codes—would likely be affected, the estimated impact on each entity would be relatively small. The Small Business Administration ("SBA") states that, as a rule of thumb, the impact of a rule could be significant if the cost of the rule (a) eliminates more than 10% of the businesses' profits; (b) exceeds 1% of the gross revenues of the entities in a particular sector; or (c) exceeds 5% of the labor costs of the entities in the sector.[1207] As calculated in Part XI.F, the Commission estimates that legal and administrative costs would result in costs on average of $712.45 to $1,250.93 for single-establishment firms with 10 workers.[1208] These costs would exceed the SBA's recommended thresholds for significant impact only if the average profit of regulated entities with 10 workers is $7,125 to $12,509, average revenue is $71,245 to $125,093, or average labor costs are $14,249 to $25,019, respectively. Furthermore, while there are additional nonmonetizable costs associated with the final rule, there are also nonmonetizable benefits which would at least partially offset those costs, as explained in Part X.F.6.

### A. Reasons for the Rule

The Commission describes the reasons for the final rule in Parts IV.B and IV.C.

### B. Statement of Objectives and Legal Basis

The Commission describes the objectives and legal basis for the final rule in Part IV.B and IV.C and the legal authority for the final rule in Part II.

---

[1197] 5 U.S.C. 603–605.

[1198] NPRM at 3531.

[1199] FTC, Press Release, *FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition* (Jan. 5, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.*

[1200] FTC, FTC Forum Examining Proposed Rule to Ban Noncompete Clauses (Feb. 16, 2023), *https://www.ftc.gov/news-events/events/2023/02/ftc-forum-examining-proposed-rule-ban-noncompete-clauses.*

[1201] Commission staff attended the February 28, 2023, roundtable. *See also* Comment from SBA Off. of Advocacy, FTC–2023–0007–21110 at 2.

[1202] Each year since FY2002, the Small Business Administration (SBA) Office of the National Ombudsman has rated the Federal Trade Commission an "A" on its small business compliance assistance work. *See, e.g.,* SBA Office of the Nat'l Ombudsman, 2021 Annual Report to Congress at 47.

[1203] The Commission received over 26,000 comment submissions in response to its NPRM. *See Regulations.gov, Non-Compete Clause Rule* (Jan. 9, 2023), *https://www.regulations.gov/document/FTC-2023-0007-0001.* To facilitate public access, 20,697 such comments have been posted publicly at *www.regulations.gov. Id.* (noting posted comments). Posted comment counts reflect the number of comments that the agency has posted to *Regulations.gov* to be publicly viewable. Agencies may redact or withhold certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. Gen. Servs. Admin., *Regulations.gov* Frequently Asked Questions, *https://regulations.gov/faq.*

[1204] *See* Part IV.C.3.

[1205] *See* Part IV.E.

[1206] *See* Part V.A.

[1207] SBA, *A Guide for Government Agencies: How to Comply With the Regulatory Flexibility Act,* at 19 (Aug. 2017) *https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/a-guide-for-government-agencies-how-to-comply-with-the-regulatory-flexibility-act/* (hereinafter "RFA Compliance Guide").

[1208] Ten workers is chosen as an illustrative example. For this example, the Commission calculates the cost of notification based on 10 workers and applies legal costs consistent with the average per establishment cost calculated in X.F.7.

*C. Issues Raised by Comments, the Commission's Assessment and Response, and Any Changes Made as a Result*

1. Comments [1209] on Benefits to Small Businesses and the Commission's Findings [1210]

a. Comments

Numerous small businesses and small business owners generally supported the proposed rule and shared two primary reasons, among others, that the rule may uniquely benefit small business owners. First, because non-competes are expressly designed to prevent workers from starting new businesses within the industry and geographic market that worker is experienced in, commenters said non-competes prevent new business formation and threaten new small businesses. Thus, consistent with the empirical evidence,[1211] commenters said a ban on non-competes will drive small business creation as entrepreneurial employees will be free to compete against their former employers. Second, commenters said non-competes harm small businesses by preventing them from hiring experienced workers. The Commission considered all comments related to small businesses and addresses many of them in Parts IV.B and IV.C and throughout this document.

Many comments from small businesses align with the findings in Part IV.B.3.b.i, namely that non-competes inhibit new business formation. A vast majority of such new businesses will be small businesses. For example, Kang and Fleming find that when Florida made non-competes more enforceable, larger businesses entered the State and increased employment while small businesses entered less

frequently, and employment for them did not change.[1212] An economist stated the NPRM's findings show that non-competes harm small business formation and that firms struggle to hire and grow in States that are more likely to enforce non-competes. Another commenter identified an additional study showing that Hawaii's ban on non-competes in the technology industry increased the number of technology startups.[1213]

Some commenters cited the Small Business Majority's polling data on non-competes. The survey finds that 67% of small businesses that currently use non-competes support the proposed ban [1214] and 46% of small business owners have been subject to a non-compete that prevented them from starting or expanding their own businesses.[1215] Additionally, 35% of small business respondents reported that they have been prevented from hiring an employee because of a non-compete.[1216] The survey also finds that of the 312 small businesses that responded, 59% expressed agreement that NDAs could likely protect confidential information or trade secrets as effectively as a non-compete.[1217] The online survey had a small sample size of 312 small business owners and decision-makers, and had a margin of error of +/−6%.[1218] An economist commented that these survey findings provide specific evidence underlying the mechanisms identified in the empirical studies finding that non-competes decrease new business formation and prevent new firms from hiring and growing. While the survey has too small of a sample size to be fully representative of small businesses, the survey illustrates that non-competes have prevented or delayed small businesses from starting or expanding.

Small businesses stated non-competes hindered their small business, including through costly lawsuits from former employers. Many commenters said non-competes were preventing them from starting a business.[1219] One technology startup organization cited the thousands of startups formed by alumni of five leading tech companies as well as key within-industry spinoffs in the

aerospace industry and suggested the number of spinoffs could be greater with a nationwide ban on non-competes. The commenter stated that even delays in founding a startup slow innovation. The commenter looked at the employment history of these aerospace startup founders and stated that, while it could not determine whether they had non-competes, their work history suggested they were not constrained in the labor market.

Many small businesses commented that non-competes prevented them from hiring the right talent and harmed their businesses, often because small businesses could not afford a lawsuit or even the legal costs of determining whether a non-compete with a perspective employee was unenforceable.[1220] A technology startup organization stated that startups are much more likely to survive with experienced counselors and mentors.[1221] A policy organization stated that non-competes favor established and large companies, because they can use non-compete litigation strategically to chill movement of experienced executives to startups and smaller firms that lack the resources to contest the non-competes in court. The policy organization also stated workers with non-competes often go to an established competitor that has the resources to protect them in case of a suit rather than a small firm, meaning small firms are disadvantaged in hiring. Similarly, a law firm commenter stated that small firms are less able to compensate new hires who have forfeiture-for-competition clauses compared to larger firms.

Commenters made several other arguments in favor of the rule covering small businesses. Several commenters pointed out that small businesses have not struggled to thrive in States where non-competes have long been prohibited, including California, Oklahoma, and North Dakota. A startup organization agreed with data cited in the NPRM indicating non-competes disproportionately reduce entrepreneurship for women, and argued that disproportionate financial challenges for women mean women entrepreneurs have fewer resources to withstand other harms from non-competes, including lack of access to talent.[1222] A law firm stated that a small business exception to the rule would lead to an inefficient "cliff" effect, where small businesses who previously fell within the exception would need to

---

[1209] The U.S. SBA publishes a Table of Small Business Size Standards based on the North American Industry Classification System (NAICS), determining the maximum number of employees or annual receipts allowed for a concern and its affiliates to be considered small. 13 CFR 121.201; *see also* Small Bus. Admin., *Table of Size Standards, https://www.sba.gov/document/support-table-size-standards.* Because commenters did not provide their NAICS number or annual receipts, and many did not provide the number of workers, the Commission is unable to determine whether each individual commenter meets the SBA's definition of a small business. Instead, for purposes of considering comments from small businesses, the Commission relies on the commenter's self-description of being a small business or start-up.

[1210] This section captures comments related to the potential benefits of the final rule for small businesses. These comments do not directly address the IRFA. Comments on the IRFA are captured in Part XI.G. Many comments and issues concerning small businesses are also discussed in Part IV.B.3.b.i.

[1211] *See* Part IV.B.3.b.i.

[1212] Kang & Fleming, *supra* note 536.

[1213] *See* Glasner, *supra* note 528.

[1214] Sm. Bus. Majority, Opinion Poll, *Small Business Owners Support Banning Non-Compete Agreements* 2 (Apr. 13, 2023). The survey also finds that 51% of small businesses that do not use non-competes support the proposed ban.

[1215] *Id.*

[1216] *Id.*

[1217] *Id.* at 3 (finding that 24% strongly agreed and 35% somewhat agreed).

[1218] *Id.* at 2.

[1219] *See* Part IV.B.3.b.i (summarizing these comments).

[1220] *Id.*

[1221] *Id.*

[1222] *See also* Marx (2022), *supra* note 519.

rescind their existing non-competes after surpassing a threshold. Finally, and importantly, numerous workers at small businesses reported substantial harms from non-competes consistent with the harms cited in Part IV.B.2 and IV.B.3.a, just as workers for large employers did.

b. Responses to Comments

As the Commission explained in Parts IV.B.3.b and IV.C.2.c, the weight of the empirical evidence supports the conclusion that non-competes inhibit new business formation and foreclose small and other businesses from accessing the talent they need to grow and succeed. Most new businesses are small, and non-competes are expressly designed to prevent workers from starting new businesses in the fields they know best. The Commission appreciates the small businesses and entrepreneurs who shared their experiences in the comments. These comments and the many comments discussed in Parts IV.B.2 and IV.B.3 from small businesses align with and bolster the empirical evidence. The comments illustrate the real-world impacts of non-competes on entrepreneurs and would-be entrepreneurs, both before and after formation of a business. Moreover, the labor market effects—including reducing labor mobility and artificially suppressing wages and job quality—are not different or mitigated when a worker works for a small business rather than a large one. Studies finding harm from non-competes examined both large and small businesses, and the Commission believes that small businesses' use of non-competes causes the same harms set forth in Parts IV.B and IV.C, including harm to other small businesses.

Based on these and other comments, the Commission believes that many small businesses are blocked from hiring workers that could help their business grow and have fewer resources than larger businesses to evaluate the risk of hiring a worker subject to a non-compete, to pay to "release" a worker they want to hire from a non-compete, such as a forfeiture-for-competition clause, and defend themselves from a non-compete suit.

In response to the comments on small business successes in States where non-competes are banned, the Commission notes that it recognizes that there are many successful small businesses in States that ban non-competes, but is not aware of any empirical evidence considering success rates of small businesses based on enforceability of non-competes.

In response to the comment discussing startups in the aerospace industry, the Commission notes that the conclusions of the commenter align with the empirical evidence that the most successful startups are within-industry spinoffs.[1223] However, the Commission notes that according to the data presented in the comment, some of the founders the comment described as being unrestrained in the labor market have significant gaps in their work history, though the Commission cannot determine the cause of any gaps.

As explained in Part IV.C, the Commission adopts a partial exception in § 910.2(a)(2) for senior executives under which their existing non-competes—non-competes entered into before the effective date—are not covered by the final rule. Employers cannot, however, enter into new non-competes with senior executives as of the effective date. The evidence and comments describing the importance of freeing senior executives from non-competes with respect to founding and supporting new and small businesses contributed to the Commission's decision to ban future non-competes for senior executives instead of excepting senior executives entirely from the final rule. The Commission is aware that existing non-competes with senior executives will reduce some of the benefits for new and small businesses as fewer senior executives will be free to join or found those businesses beginning on September 4, 2024. However, senior executives are a small, narrowly defined group, meaning there will still be numerous experienced workers freed from non-competes that can found or support small businesses, and senior executive non-competes will eventually become phased out. In addition, the Commission expects small businesses to receive the other anticipated benefits of the final rule.

2. Comments Arguing the Rule Will Harm Small Businesses and the Commission's Findings[1224]

a. Comments

Some small businesses and industry groups stated they believe a ban on non-competes would harm small businesses. Several commenters requested an exception for small businesses or certain types of small businesses, such as independent medical practices. The Commission addresses these comments in this Part XI.C.2 and addresses direct potential costs in Part XI.E. The Commission appreciates the small businesses and entrepreneurs who shared their experiences in the comments.

Commenters raised concerns that eliminating non-competes for all businesses would allow larger businesses and incumbents to easily hire away talent from smaller competitors and startups. Other small businesses said they had been harmed in the past by former workers competing against them, including by recruiting clients and other workers, or by large competitors hiring their workers. Similarly, some industry associations and small businesses said non-competes protect independent businesses, including medical practices, from dominant consolidators, as high recruitment, retention, and other costs may induce small businesses to sell their business to consolidators. Relatedly, some healthcare organizations argued a ban that does not cover nonprofit hospitals and health systems would provide those large nonprofits with an unfair advantage over independent medical practices.

Some small businesses offered the same justifications as other businesses for using non-competes but emphasized the heightened potential damage to smaller businesses less able to bear costs, including being forced to close or sell.[1225] Many of these comments asserted that small businesses relying on legitimate trade secrets would be especially harmed if a worker took that information to a competitor or new business, particularly because they would be least equipped to detect theft or retain sophisticated legal counsel to litigate potential trade secrets or NDA claims, thus reducing investment and innovation.[1226] A law firm argued that trade secrets litigation often costs millions, and few attorneys are willing to work on contingency, so startups would struggle to litigate against larger well-financed firms, especially as large firms can drive costs up to force the startup out of the litigation. SBA Advocacy asserted that if competitive information is not protected, some small businesses could face a serious risk of loss or potential closure and could not afford alternative means of protection.

One industry organization stated more generally that protecting information is a high priority for emerging growth companies. Some small businesses

---

[1223] See Part IV.B.3.b.i.

[1224] This section captures comments that do not directly address the IRFA but that are related to the potential costs of the final rule for small businesses. Comments directly addressing the IRFA are captured in Part XI.G. Many comments concerning small businesses are also discussed in Part IV.B.3.b.i.

[1225] See, e.g., SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1226] Id.

stated if non-competes are banned, they might silo workers and information to limit the potential harm from a worker leaving for a larger competitor and would harm the business. One business stated that while banning non-competes might allow more market entrants, those new entrants will be more likely to fail without the protection of non-competes for worker retention and confidential information. Some business associations stated small business owners often rely on independent contractors and sole proprietors such as marketers to build their businesses and share proprietary information with them (meaning contractors may have access to information from multiple competitors) and covering such groups under the rule would harm their growth.

Small businesses also stated they use non-competes to protect investments, including in training, to prevent workers from taking clients or customers, and to increase retention and stability. For example, some small businesses shared that they started using non-competes after workers they had trained extensively went to a larger competitor or started their own business. One small business organization stated the proposed requirement to relate ''costs incurred'' to TRAPs would be harder for small businesses who are more likely to train on the job. A physician practice stated a partner leaving for a hospital would destabilize and increase costs for the practice, but a non-compete that is bought out helps practices afford those extra costs or otherwise prevents destabilization.

Commenters provided additional reasons small businesses use non-competes. A business stated that they could not afford to pay workers as much as larger businesses, so will be unable to find workers. A small business association stated that banning non-competes would exacerbate the labor shortage for small businesses by decreasing investment in training, when there are already insufficient qualified applicants. A commenter stated that the NPRM did not provide any examples of small businesses using non-competes in an unfair way. SBA Advocacy also stated that some small business employment contracts compensate workers for non-competes. One business stated small businesses may not be able to afford to fight larger businesses using borderline *de facto* non-competes.

A banking association stated new businesses that cannot protect their business would be less able to attract capital than more established businesses, while a community bank similarly said it may be unable to lend to small businesses that cannot protect their workers, customers, and proprietary information with non-competes. A small business stated that NDAs and non-solicitation clauses were too difficult to enforce, as it was told by judges that in order to win a non-solicitation suit against a former worker who purportedly took clients, the business would need to subpoena its own former clients to testify, which would damage the business's reputation.

A physician said they were able to start an independent practice while complying with a non-compete and hire others in compliance with their non-competes. One small business said they were able to work out solutions when hiring a worker subject to a non-compete to avoid violating it.

SBA Advocacy relayed the concern of one 8(a) [1227] small business that feared if entities in the 8(a) business development program cannot control their talent, the money the Federal government has spent helping these companies would be wasted. Accordingly, SBA Advocacy asserted that the proposed rule conflicted with the Congressional law creating the 8(a) program.[1228]

A small Federal contractor stated that larger companies could poach workers who are skilled and/or who are already cleared by the government to work on projects from small businesses, potentially putting them out of business, and would damage contractors' ability to provide stability to the agencies.

Some commenters expressed concern that the proposed 25% threshold [1229] for the sale of business exception would cause small businesses to lose value when acquired because owners and key workers are critical contributors to the business and non-competes are intangible assets, making buyers less likely to buy. Some commenters requesting a small business exception suggested various definitions of ''small business,'' including based on the number of employees.

Finally, SBA Advocacy encouraged the Commission to adopt an approach addressing the different concerns of small entities and consider, analyze, and tailor alternatives to the size and type of entity to minimize adverse impacts to small entities.[1230] It stated that a categorical ban was inappropriate given the range of industries and nature of economic impacts.[1231] One business requested an exception for highly paid workers at small businesses, to create a predictable bright-line rule while leveling the playing field for small businesses. An industry association asked for an exception for newly formed businesses to encourage capital formation among start-up entities.

**b. Responses to Comments**

First and foremost, the Commission finds, based on its expertise, the empirical evidence, and the record before it, that non-competes tend to negatively affect competitive conditions in both labor and product and service markets, including by inhibiting new business formation.[1232] The Commission is not aware of any empirical research on existing firm closures—including small business closures—being correlated with decreased non-compete enforceability. The Commission is also not aware of empirical research on specific business closure patterns. Rather, the empirical evidence shows that non-competes overall increase new business formation and decrease concentration, indicating that the final rule will likely increase the overall number of small businesses. The Commission is focused on the aggregate effects of non-competes on competitive conditions and here considers the overall effect on small businesses. While an individual small business may benefit from prohibiting one of its workers from joining a competitor or from keeping a competitor from entering the market, non-competes have a substantial net negative aggregate impact on competitive conditions in both labor markets and product and services markets, including negative spillover effects on other small businesses that do not use non-competes.[1233]

The Commission has assessed the evidence on protection of trade secrets and proprietary information in Part IV.D and finds that businesses have sufficient, less restrictive alternatives to protect such information. These options, such as NDAs, protection under trade secrets law, and importantly, competing

---

[1227] Sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10) and 637(a)) authorize the SBA to establish a business development program, which is known as the 8(a) Business Development program. The 8(a) program is a robust nine-year program created to help firms owned and controlled by socially and economically disadvantaged individuals. SBA, *8(a) Business Development Program* (last updated Jan. 25, 2024), *https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.*

[1228] SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1229] NPRM, proposed § 910.1(e).

[1230] SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1231] *Id.*

[1232] *See* Parts IV.B and IV.C.

[1233] *See id.*

on the merits to retain workers, are also accessible to small businesses. On the latter, small businesses have potentially distinct options from larger firms because of their greater ability to be flexible and responsive to their workers' preferences. Moreover, the Commission notes that no evidence exists to support the hypothesis that trade secret litigation will increase after the final rule takes effect. Recent evidence suggests trade secret litigation does not increase following bans on non-competes.[1234] With a bright-line rule banning non-competes, small businesses, like other business, will not face or have to undertake litigation related to non-competes, which may partially offset other litigation costs if firms do substitute other litigation. In fact, the purported dynamic where small firms are outspent and outmatched by large firms that drive up the cost of trade secrets litigation, is the exact dynamic many small businesses face when sued over a non-compete, which can also force small businesses to close.[1235] While the Commission does not have data on the frequency of each type of litigation or how often it forces small businesses to close, these comments indicate that this alleged legal threat is already present in a different form. Moreover, the overbreadth of non-competes that employers cite as the source of their benefits for reducing litigation costs is also the source of the negative effects of non-competes on competitive conditions, and pecuniary benefits to a firm engaged in an anticompetitive practice are not a cognizable justification for an anticompetitive practice.[1236]

Additionally, the Commission is unaware of any evidence that small businesses in States where non-competes are less enforceable are more likely to experience trade secret misappropriation, or evidence that small businesses are at a distinct disadvantage in these States. Finally, the Commission notes that despite claims that using non-competes to protect trade secrets supports innovation, the empirical evidence shows increased enforceability of non-competes on net in the aggregate harms innovation. Again, the Commission

considers the overall effect on all business, including small businesses, and finds that the final rule will not reduce innovation by small business.

In response to the comments that businesses would limit sharing confidential information with their workers or that a small business's inability to protect confidential information would cause new businesses to fail, the Commission notes that use of less restrictive alternatives, including, for example, NDAs, fixed term contracts, and worker retention policies, would allow small businesses to maintain the same or near same level of protection for the confidential information they might share and want to protect. Accordingly, to the extent it is productive for a small business to protect such information or share it with a worker, the firm would adopt these alternatives and be able to continue to operate with the same or similar use of confidential information. Moreover, the Commission is not aware of any empirical evidence supporting the conclusion that firms would share less confidential information or be less able to protect it. In fact, the evidence shows that both within-industry and non-within industry spinouts are better quality, on average, when non-competes are less enforceable, which reinforces the conclusion that small businesses do not rely on non-competes to thrive.[1237] Indeed, no empirical evidence shows new businesses fail at a higher rate when (or because) non-competes are less enforceable. To the extent some businesses may choose to limit information sharing (as some individual comments suggest), the Commission concludes that the benefits of the final rule with respect to earnings, new business formation, and innovation justify any limited resulting negative effect.

In Parts IV.D.1 and X.F.7.a, the Commission examines the evidence on human capital investment and other investment and finds uncertainty regarding whether the effects on training and other investment will be benefits or costs under the final rule. The Commission distinguishes between core training and advanced training, finding that businesses may be able to spend less on core training under the final rule to the extent businesses are able to better match workers with their needs. The Commission similarly finds that new business formation under the final rule could result in an increase in overall capital investment or serve to offset any decreased capital investment in incumbent firms. As noted in

comments from small businesses, non-competes limit their ability to hire experienced, productive workers. While it may be true in some cases that large businesses will be able to "poach" workers from smaller business, smaller businesses would also be better able to hire talent from large (or other) businesses under the final rule. In fact, theoretically, the final rule would be more beneficial to smaller businesses because they would no longer be hamstrung by the threat of non-compete litigation by large firms when hiring experienced workers from those firms. To the extent large firms can afford to pay out a worker non-compete or to litigate or threaten litigation to secure talent they want from a small firm, a ban on non-competes will better level the playing field between small and large firms competing for talent. While as stated by one commenter, some small businesses may be successful if there are able to use non-competes, the empirical evidence supports the conclusion that new business formation will increase overall under the final rule, and the Commission is not aware of any evidence of small business closure patterns. Businesses also have other alternatives to retain workers.[1238] Finally, the empirical evidence demonstrates ways in which non-competes advantage large businesses against smaller ones.[1239]

In response to comments that argued non-competes were needed to promote stability and worker retention, the Commission notes there is no evidence that stability and worker retention are economically productive in and of themselves. The overall evidence on the harms from non-competes demonstrates that retention of workers through non-competes has considerable costs to both labor markets and product and service markets. Importantly, businesses also have other, less restrictive alternatives— that do not tend to negatively affect competitive conditions—to retain workers as discussed in this Part and in Part IV.D.2. In response to the comment that small businesses will be less likely to afford retaining workers than large businesses that can pay more, the Commission notes that increases in innovation are likely to make small businesses more productive and successful, allowing them to better compete with their larger competitors. Moreover, the Commission notes that, in addition to those retention alternatives, many workers commented that their non-competes prevented them from seeking jobs with better working

---

[1234] Greenwood, Kobayashi, & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

[1235] *See* Parts IV.D and X.F.7.c.

[1236] *See* Part II.F.

[1237] *See* Part X.F.9.a.

[1238] *See* Part IV.D.2.

[1239] *See* Part IV.B.3.b.

conditions, shorter commutes, more flexible hours, or more career advancement opportunities, among others.[1240] Small businesses have ways to compete for workers beyond wages alone.

Many of the comments from small businesses, as well as from other commenters, appear to confuse non-competes with other types of agreements, such as non-solicitation agreements or NDAs, and argue that non-competes are needed to prevent former workers from taking the employer's customers or clients or disclosing confidential information. The final rule does not ban non-solicitation clauses unless they meet the definition of non-compete clause.[1241] While one commenter argued that non-solicitation clauses may be more difficult to enforce than non-competes, the Commission weighs the cost of this potential increased difficulty against the harms from non-competes and finds that any marginal benefit compared to a non-solicitation clause does not justify the costs of non-competes. And as explained previously, pecuniary benefits to a firm from an anticompetitive practice are not a cognizable defense.[1242]

In response to comments that small businesses are more reliant on independent contractors and without non-competes independent contractors might have access to confidential information for multiple competitors, the Commission first notes that the final rule does not prohibit agreements preventing a worker from working for two firms simultaneously.[1243] Many alternatives to non-competes allow businesses working with independent contracts to protect their confidential information, including maintaining security of confidential information as well as NDAs and other such agreements, as described in Part IV.D. There is no evidence that independent contractors are more likely to use or share confidential business information and, in fact, they are likely to be working under an agreement detailing their responsibilities and to be more familiar with ways to assure clients that any confidential business information shared with them will remain confidential.

In response to comments that banks might decrease lending without non-competes, the Commission notes that there is no indication that small businesses in States that have banned or

limited non-competes have been unable to obtain financing and commenters provide no related evidence. Again, small businesses will have less restrictive alternatives as a means of protecting confidential information. Moreover, with respect to new business formation, workers seeking to start their own businesses will be able to reassure banks that their business will not face the threat of litigation or a court enjoining them from continuing with their business because of a non-compete.

In response to SBA Advocacy's comment on compensation for non-competes, the Commission considered this issue in Part IV.C. and decided to allow existing non-competes with senior executives, which the Commission finds are most likely to have involved consideration, to remain in force.

In response to the comment on the 8(a) business development program, the Commission notes that there are likely program participants in States where non-competes are banned or partially banned and, thus, are not able to use non-competes. Moreover, the program aims to help firms owned and controlled by socially and economically disadvantaged individuals with various supports and assistance to improve their success in securing government contracts. There is no basis to believe such assistance hinges on these small businesses being able to use non-competes with their workers. Like other firms, program participants have viable, less restrictive alternatives that do not tend to negatively affect competitive conditions. The evidence presented in this Part shows that on the whole, small businesses—including 8(a) participants—are expected to benefit from the ban on non-competes by, for example, having a larger pool of talent from which to hire workers.

In response to the comment that large businesses may use borderline *de facto* non-competes, the Commission notes that it provides greater clarity on the definition of non-compete clause in Part III.D, which the Commission believes will reduce both confusion and evasion. To the extent the commenter is raising the possibility that such other restrictive employment terms may tend to negatively affect competitive conditions, the Commission notes that section 5 and the other antitrust laws apply to those terms and govern whether such terms might be unlawful.

In response to comments on the proposed sale of business threshold, as explained in Part V.A, the Commission is eliminating the 25% threshold, meaning more small businesses will be able to utilize non-competes for more

owners when they are selling their business. While individual businesses might see decreased value in a sale from being unable to use non-competes for workers, any decrease is justified by the net aggregate benefits of freeing labor markets and product and service markets from non-competes. Again, pecuniary benefits to a firm engaged in an anticompetitive practice is not a cognizable defense.[1244]

In response to the proposed definitions of "small business," first, as explained in Part X.H, the Commission declines to create an exception for small businesses. Second, the SBA already defines "small business" based on size standards set forth in 13 CFR 121.201, and agencies are prohibited from deviating from this definition without following the procedures set out in 13 CFR 121.903.[1245]

In response to the comments arguing that the Commission's jurisdiction does not extend to tax-exempt nonprofit hospitals and healthcare organizations and that the final rule would, thus, give large nonprofits an unfair advantage over small practices, the Commission addresses this question in Parts II.E.2 and V.D.4. In response to the comment on difficulties in using TRAPs under the proposed rule, the Commission notes the final rule does not ban TRAPs, but covers terms and conditions of employment that meet the definition of non-compete clause as delineated in § 910.1 and described in Part III.D.

The commenter asserting that the final rule would exacerbate a labor shortage for small businesses did not provide evidence to support this claim. The Commission, however, finds that a ban on non-competes will increase labor mobility and enable skilled workers who are currently trapped by non-competes to work for others in the industry.

Finally, the Commission notes that numerous workers at small businesses have shared how non-competes have harmed them.

The Commission has carefully considered all of SBA Advocacy's and other stakeholders' comments, including those requesting a small business exception. The Commission has made the following changes, which the Commission believes will benefit small entities: adding an exception for existing senior executive non-competes; amending the notice requirement to ease compliance; and eliminating the sale of

---

[1240] *See* Part IV.B.3.a.iii.
[1241] *See* Part III.D.
[1242] *See* Part II.F.
[1243] *See* Part III.D.

[1244] *See* Part II.F.
[1245] RFA Compliance Guide, *supra* note 1207 at 14. One business suggested that the SBA definition is prone to confusion and litigation but did not provide any additional information to explain why or how.

business ownership threshold. The Commission believes that the final rule will benefit small businesses overall. The Commission notes that no State has exempted small businesses from any State statutes regulating non-competes.[1246] There is no empirical evidence that a small business exception is necessary or appropriate. Further, the evidence indicating that a ban on non-competes will benefit the economy accounts for non-competes used by both large and small businesses. In sum, the evidence indicates the final rule will, in the aggregate, benefit both small businesses and workers who work for small businesses—not to mention the consumers who in turn benefit. More small businesses are expected to enter the market, and the final rule will remove barriers to their growth.

*D. Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result*

The Commission received and carefully reviewed the comment from the SBA.[1247] The issues raised by the SBA and the Commission's responses are included in Parts XI.C and XI.F.

*E. Description and Estimated Number of Small Entities to Which the Rule Will Apply*

The final rule will impact all small businesses, across all industry classes, that use non-competes. It may also impact some small businesses that do not use non-competes but are impacted by other businesses' use of non-competes. The Commission does not expect that there are classes of businesses which will face disproportionate impacts from the final rule.

For the vast majority of industries, there is no nationwide granular data regarding the percentage of firms that use non-competes, which would facilitate calculating the number of small entities in a given industry using non-competes. Because of this data limitation and given the relatively stable percentage of firms using non-competes across the size distribution,[1248] the

Commission estimates the total number of small firms across all industries in the U.S. economy. The Commission then calculates the number of firms estimated to use non-competes by applying an estimate of the percentage of firms using non-competes to that total. Using the size standards set by the SBA,[1249] the Commission calculates that there are 5.25 million small firms and 5.48 million small establishments in the U.S.[1250] Assuming that 49.4% of firms or establishments use non-competes,[1251] an estimated 2.59 million small firms, comprising 2.71 million small establishments, would be affected by the final rule. These calculations—the counts of businesses and the percentage of businesses that use non-competes— are based on small businesses with employees, since sole proprietorships are unlikely to use non-competes. Since the estimate cannot account for differential use of non-competes across industries, these firms span all industries and various sizes below the standards set in the SBA's size standards.

The Commission sought comments on all aspects of the IRFA, including the description and estimated number of small entities to which the rule would apply. A business association claimed the IRFA estimated the number of small businesses solely based on one incomplete study, the Colvin and Shierholz study, which it argued counted only firms with no union members who said all employees signed

non-competes, risking significantly undercounting the number of impacted businesses. This comment misreads the study. The cited statement explained that when tabulating the share of businesses where all employees sign non-competes, the study counted only firms with no union members as it did not have information on whether union members signed non-competes.[1252] That does not mean that only firms with no union members where all employees signed non-competes were included in the study. In fact, the study divided its results between the share of workplaces where all employees and only some employees were subject to non-competes.[1253] The comment cites to only one component of the study results. Moreover, the study states that anecdotal evidence indicates it is rare for unions to agree to non-competes,[1254] and comments the Commission received align with that anecdotal evidence.

*F. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

To comply with the final rule, small entities must do three things. First, to comply with §§ 910.2(a)(1)(i) and 910.2(a)(2)(i), which state it is an unfair method of competition to enter into a non-compete with a worker, small entities can no longer enter into new non-competes with incoming workers, including senior executives. This may include revising human resources materials and manuals and template or form contracts to ensure they are not misused on a forward-going basis, and making strategic decisions regarding workers' employment terms. Second, to comply with § 910.2(a)(1)(ii) and (iii), small entities cannot enforce (or make misrepresentations about) existing non-competes for workers other than senior executives after the effective date. That is, businesses must refrain from suing or threatening to sue workers other than senior executives regarding a non-compete after the effective date; but formal contract rescission is not required. Third, businesses must provide notice to workers other than senior executives that the worker's non-compete will not be enforced against the worker. The Commission provides a safe harbor notice that must be provided only to workers with known contact information. These foregoing steps entail some potential legal and administrative costs.

As calculated in Parts X.D.1.a and X.D.2.a, the Commission estimates the legal and administrative costs would

---

[1246] *See generally* Beck Reed Riden Chart, *supra* note 1052. In 2023, Maryland increased its non-compete compensation threshold to $19.88 per hour and set a slightly lower threshold for small employers at $19.20 per hour. Md. Lab. & Empl. Code sec. 3–716.

[1247] SBA Off. of Advocacy, FTC–2023–0007– 21110.

[1248] *See* Colvin & Shierholz, *supra* note 65 at 5. The Commission emphasizes that, since smaller firms generally use non-competes at a lower rate, based on the numbers reported in Table 1, the estimate of the number of affected small entities is likely larger than is true in practice.

[1249] *See* Small Bus. Admin., *Table of Size Standards, https://www.sba.gov/document/support- table-size-standards.*

[1250] The Commission uses the latest data available from the Census Bureau's Statistics of U.S. Businesses database, available based on firm revenue and firm size. Census Bureau, *Statistics of U.S. Businesses (SUSB)* (last revised Nov. 17, 2023), *https://www.census.gov/programs-surveys/ susb.html.* Values are deflated to current dollars using *https://www.bls.gov/data/inflation_ calculator.htm.* As used in this analysis, per the Census Bureau, ''a firm is a business organization consisting of one or more domestic establishments in the same geographic area and industry that were specified under common ownership or control.'' On the other hand, ''an establishment is a single physical location at which business is conducted or services or industrial operations are performed.'' *See* Census Bureau, *Glossary, https:// www.census.gov/programs-surveys/susb/about/ glossary.html.* The number of small firms calculated here has decreased compared to the IRFA based on the updated Census Bureau data and SBA size standards.

[1251] *See* Colvin & Shierholz, *supra* note 65. The Commission notes that the estimated percentage of firms which use non-competes is based on a survey of businesses with employees. In addition, the Small Business Majority's recent survey of small businesses finds that 48% of respondents use non-competes. Sm. Bus. Majority Opinion Poll, supra note 1214. The Commission does not find that this survey has a sufficiently representative sample size to be considered definitive but notes that it aligns with the Colvin & Shierholz estimate.

[1252] *See* Colvin & Shierholz, *supra* note 65.

[1253] *See generally id.*

[1254] *Id.*

total $538.48 to $1,076.96 for each small firm, plus an additional $155.85 for each establishment owned by that firm, plus an additional $1.81 per worker. A single-establishment firm with 10 workers, for example, would bear estimated costs of $712.45 to $1,250.93.[1255] Only a small portion of the average cost estimated for each small firm—$155.85 per establishment, plus $1.81 per worker—is required under the rule. The remainder of the estimated cost is attributable to legal costs which firms may (but are not required to) undertake to revise their contractual practices. The FRFA assumes that the value of human resource professionals' times and legal professionals' time is equal to twice their average wages, which results in updated estimates.[1256] In an abundance of caution, the Commission has erred on the side of overestimating costs.

As described in greater detail in Part X.F.7.a, the Commission also finds that firm investment in human capital may increase or decrease under the final rule, depending on the type of training affected. Given the evidence available, the Commission is unable to fully monetize the estimates of firm investment in human capital. It concludes, however, that even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs.

### 1. Legal Costs

To ensure that incoming workers' contracts do not include non-competes and that they fully comply with the final rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete). For many firms, this process would likely be straightforward (*i.e.*, simply not using non-competes or removing one section from a boilerplate contract). Other firms may have more complex agreements or choose to use more time. The Commission assumes that, on average, ensuring that contracts for incoming workers do not have non-competes would take the equivalent of one hour of a lawyer's time (valued at

$134.62),[1257] resulting in a total cost of $134.62*2.71 million = $364.8 million. There may be substantial heterogeneity in the costs for individual firms; however, the Commission believes this number is conservative. For firms whose costs of removing non-competes for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with the costs of updating contractual practices, described in Part X.F.7.b.

For each establishment of each firm, estimated direct compliance costs total $21.23 + $134.62 = $155.85, plus $1.81 per worker with a non-compete.

Some business commenters have indicated that they may add or expand the scope of NDAs or other contractual provisions. This legal work is not mandated or required by the rule; it would be undertaken only by the subset of firms and workers for whom firms conclude that such alternatives would be desirable. Additionally, such adjustments are likely unnecessary for senior executives whose non-competes continue to be enforceable under the final rule. Therefore, this component additionally involves identifying senior executives whose existing non-competes are unaffected. For any such legal work, firms may use in-house counsel or outside counsel. To do so, firms may use in-house counsel or outside counsel to revise current contracts or enter into new, different contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to revise their contractual practices when they can no longer use non-competes, and commenters did not provide evidence on costs. However, there is evidence indicating that firms that use non-competes are already using other types of restrictive employment provisions. Balasubramanian et al. find that 95.6% of workers with non-competes are also subject to an NDA, 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and that 74.7% of workers with non-competes are also subject to all three other types of provisions.[1258] Firms that are already using multiple

restrictive covenants may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-competes,[1259] the Commission assumes that the average firm employs the equivalent of four to eight hours of a lawyer's time to revise its contractual practices.[1260] The Commission emphasizes that this is an average to underline the fact that there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those that use non-competes only with workers who do not have access to sensitive information, or those that are already using other types of restrictive employment provisions to protect sensitive information, may opt to make no changes. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract.[1261] The estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-competes opt to make no changes to their contractual practices (for example, because their workers are among the 97.5% of workers that already have other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-competes with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 working days of an attorney's time, this would result in the estimate of 4–8 hours on average.

The Commission further emphasizes this estimate is an average across all employers that would be covered by the final rule. There is likely substantial heterogeneity in the amount of time firms would use to revise contractual practices; very large firms that use non-competes extensively would likely incur greater costs.

Under the assumption that the average firm that uses a non-compete employs the equivalent of four to eight hours of a lawyer's time, this analysis calculates the total expenditure on updating contractual practices to range from $134.62*4*2.59 million = $1.4 billion to $134.62*8*2.59 million = $2.8 billion. Note that this assumes decisions regarding protection of sensitive information and contract updating are

---

[1255] "Ten workers" is chosen as an illustrative example.

[1256] See Part X.F.7.b for a detailed description of the calculation and assumptions. The Commission notes that a typographical error in the IRFA resulted in the Commission reporting preliminary figures that were substantially larger than the comparable calculations in the preliminary section 22 analysis, which accounts for some of the differential between the preliminarily reported figures in the IRFA and the final estimates here.

[1257] BLS, *Occupational Outlook Handbook, Lawyers* (last modified Sept. 6, 2023), *https://www.bls.gov/ooh/legal/lawyers.htm* (updated for inflation to 2023 dollars and based on updated BLS data). Assumed lost productivity is twice the median wage.

[1258] Balasubramanian, Starr, & Yamaguchi, *supra* note 74. The value 97.5% is calculated as (1–0.6%/ 24.2%), where 0.6% represents the proportion of workers with only a non-compete, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete, regardless of what other post-employment restrictions they have.

[1259] Colvin & Shierholz, *supra* note 65 at 1.

[1260] Part X.F.7.b.i.

[1261] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-competes. Commenters did not provide additional information or data that could be used to update these estimates.

made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm.

For each affected small business, the estimated cost of updating contractual practices is $134.62*4 = $538.48 to $134.62*8 = $1,076.96.

## 2. Administrative Costs for Notification Requirements

To reduce compliance costs and increase compliance certainty, § 910.2(b)(5) provides that an employer complies with the notice requirement in § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(4). Furthermore, § 910.2(b)(4) includes model language that constitutes notice to the worker that the worker's non-compete is no longer in effect. The Commission estimates that composing and sending this message in a digital format to all of a firm's workers and applicable former workers for whom digital contact information is available would take 20 minutes of a human resources specialist's time.[1262] According to BLS, the median wage for a human resources specialist was $31.85 per hour in 2023.[1263] The cost of compliance for currently employed workers with digital contact information available is therefore ($31.85*2)/3 = $21.23 per establishment. As estimated in Part XI.E, there are 2.59 million small firms, comprising 2.71 million small establishments, in the U.S. that use non-competes.[1264] Conservatively assuming that each establishment must engage in its own communication (*i.e.*, that a firm's headquarters does not have the ability to send a company-wide email, for example), this means that the total direct compliance cost for workers who are already employed and for whom digital contact information is available is $21.23*2.71 million = $57.5 million.

Each small firm must additionally mail notice to workers with non-competes for whom a physical address is available, but digital contact information is not. The cost per notice is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. Given an estimated count of affected workers with non-

competes at small businesses of 584,843,[1265] the overall cost of mailed notice provision is therefore estimated to be $1.1 million.

## G. Comments and Responses to Comments on the IRFA

The IRFA explained the Commission's preliminary assessment of the direct compliance costs for employers, both for rescinding non-competes for workers who are already employed as well as the costs of an attorney to ensure contracts for incoming workers do not have non-competes.[1266] The IRFA also explained the Commission's assessment of the costs of updating contractual practices, if the employer seeks to do so, by expanding the scope of other contractual provisions to protect trade secrets and other valuable investments.[1267] The Commission sought comment on all aspects of the IRFA.[1268]

In support of the proposed rule, one employment law firm said there are no significant recurring compliance costs to the final rule that would create an undue burden for small employers compared to larger employers. The Commission agrees. The final rule is designed to require only a one-time action and no recurring compliance requirements in order to minimize compliance costs for employers. A technology startup organization said the rule would save small businesses significant legal costs from the complex legal analysis currently necessary when trying to hire a worker subject to a non-compete, particularly when trying to assess the patchwork of State laws, "reasonableness" tests, and choice-of-law issues, which startups have few resources to pay.

Some commenters raised concerns about the preliminary assessment of direct compliance costs, primarily concerning unsubstantiated costs of consulting with counsel. Some commenters said small businesses would need to consult with outside counsel to ensure they properly comply with the final rule, though they did not explain why. Another business

association said most small businesses do not have the organizational development required to issue the notice and would need to hire outside counsel. A group of industry associations said the estimated costs of $317.68 to $563.84 were not realistic and did not reflect the cost of discussions with outside counsel on its existing agreements and contracts and its contract negotiation practices, but the comment did not provide information to support a different estimate. Some commenters argued that small businesses lacking internal counsel or employment lawyers on retainer would face substantial unplanned expenses when seeking outside counsel on whether other restrictive covenants violated the proposed *de facto* non-compete provision. These commenters did not provide cost estimates.

First, in response to the proposed rule's Preliminary Regulatory Impact Analysis, commenters discussed that the estimated compliance costs and costs of contractual updating may underestimate true costs for the broader business community and provided alternative estimates of the time employers might spend complying with the rule and updating contractual practices, as well as the charged rates of outside counsel. These comments are addressed in the sensitivity analyses presented in Part X.F.7. The Commission has also updated the estimated legal costs in this Part. Commenters also argued that small businesses would face greater costs associated with the use of outside counsel but did not quantify those costs for small businesses. Again, the Commission provides a sensitivity analysis reflecting the cost of experienced outside counsel for all firms in Part X.F.7.b.i. Moreover, as the Commission notes, the estimate reflects significant heterogeneity, so that it is likely that some firms will simply be able to remove the paper or electronic copy of the non-compete from their website or workplace manual—requiring no attorney time—while others, like the commenter, may spend more time consulting with counsel.

Second, in response to these and other comments and as explained in Part III.D, the definition of non-compete clause has been revised to reduce confusion and give employers and workers a clearer understanding of what is prohibited, which will in turn reduce compliance costs. Third, the FRFA includes updated compliance costs to reflect any remaining need to assess contracts under § 910.2(a). Fourth, the Commission has made the notice

---

[1262] *See* Part X.F.7.

[1263] *See* BLS, *Occupational Outlook Handbook, Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm* (last modified Sept. 6, 2023) (updated for inflation to 2023 dollars).

[1264] The dataset is available at Census Bureau, *2021 SUSB Annual Data Tables by Establishment Industry,* Industry (Feb. 2022) (last revised Sept. 15, 2023), *https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html.*

[1265] Estimated as 80% * 18.1% * 66% * (33,271,644−27,151,987), where 80% is the percentage of covered workers (see Part X.F.4.a), 18.1% is the estimated percentage of workers with non-competes (see Starr, Prescott, & Bishara, *supra* note 68), 67% is the assumed percent of workers without digital contact information, and 6,119,657 = 33,271,644−27,151,987 is the count of workers at small businesses (see *https://advocacy.sba.gov/wp-content/uploads/2023/11/2023-Small-Business-Economic-Profile-US.pdf*).

[1266] *See* NPRM at 3532.

[1267] *See id.* at 3532–33.

[1268] *See id.* at 3531.

requirement as simple as possible by providing model language for the notice in § 910.2(b)(4) and a safe harbor allowing employers to use a last known address and an exception for employers who do not have a workers' contact information. Employers can provide the notice by hand or through the mail, email, or a text message,[1269] and employers are not required to provide notice if they have no method of contacting a worker by paper or digital format.[1270] An employer is required only to notify workers that existing non-competes are no longer in effect and refrain from including non-competes in future contracts. This process is designed to be as easy as possible for employers. Employers should rarely need to seek outside legal assistance for complying with the notice requirement, and commenters do not provide an explanation of why legal assistance would be a necessary part of this process, though the cost of any such legal assistance (to identify senior executives for whom notice is not required) is accounted for in Part XI.F.1. Finally, the Commission will provide guidance materials for small entities to explain how to comply with the final rule.

The estimated compliance costs do not directly include any costs or savings from the senior executive exception, because the number of workers the exception might apply to is such a small portion of workers overall that any effect is *de minimis*. At an individual firm level, small businesses might not be impacted by the exception (if no workers earn above the total compensation threshold). Others might face increased compliance costs if they choose to use the exception and need to evaluate whether a worker meets the definition of senior executive (as accounted for in Part XI.F.1). However, the total compensation threshold included in the final rule's definition of "senior executive" is designed to ensure that employers and workers do not need to conduct a job duties assessment for every worker, only workers making above the threshold. In addition, in many cases it may be clear that a worker does or does not meet the test for whether a worker is a "senior executive" without a detailed assessment. For example, CEOs and Presidents are presumed to be in a policy-making position under § 910.1 and will not be otherwise subject to a job duties test, while highly paid workers in a non-executive role such as many physicians will not. Other small

businesses might see decreased or eliminated direct and indirect compliance costs if they can maintain existing senior executive non-competes.

Many commenters also stated there are other indirect costs. SBA Advocacy suggested that the IRFA did not account for additional potential costs, including the costs of services, including higher legal fees to protect information, potential increased training, hiring and retention costs, and process changes.[1271] Similarly, a business association argued small businesses could face additional costs for finding alternatives to protect assets and to alter hiring, training, and retention processes. Some business associations argued that the cost of updating contractual practices would be higher because businesses would need to consult counsel, and many small businesses may be unable to afford to do so. A business organization stated that the Commission should consider the costs from a small business diminishing in value to potential buyers because it cannot record the value of its non-competes.

Another business organization said costs to small businesses are not limited to updating contractual agreements, mentioning the use of non-competes to protect assets and investments. A law firm suggested that trade secrets litigation often costs unspecified millions in attorney and expert fees and investigations costs. A business association commented that the rule would likely trigger additional litigation costs for trade secret protection and satisfying standards for injunctive relief, as well as unspecified additional costs related to lost business relationships and ideas. The business association cited an article from the biotech industry as saying a ban will force biotech companies to find other ways to protect themselves, likely through increased trade secret litigation, and recognizing that non-competes are critical to startups in the industry.

Two comments requested that the Commission publish a supplemental IRFA to account for the rule's potential impact.

The Commission notes that agencies are generally not required to consider indirect costs, though it is considered a best practice.[1272] While commenters

raised categories of indirect costs that may be implicated (and it is not clear exactly what potential costs may fit into those categories), commenters did not provide any data or information that could enable the Commission to estimate any indirect costs. Some of these costs are also attenuated and speculative. Many of these concerns are also addressed in Parts IV.D and XI.C. The commenters also misunderstand the calculations in the IRFA and RIA; the estimates are an average across employers using non-competes, and there is likely to be substantial heterogeneity. The calculations account for the assumption that some firms may spend more than this amount. In response to comments on hiring costs, some firms may save on hiring costs from easier hiring, while others might have increased turnover costs.[1273] Businesses also have other options to compete on the merits besides raising wages, as many commenters indicated they sought jobs with better hours, more flexible schedules, shorter commutes, career opportunities, and other benefits.[1274] Businesses will be better able to hire workers experienced in their field who require less training than workers new to an industry.[1275]

Even if commenters' unsupported assertions that trade secret litigation and NDA enforcement may be more costly for businesses, including small businesses, are correct, such costs are justified by the benefits of the rule and in any event pecuniary benefits to a firm from an anticompetitive practice are not a cognizable justification.[1276] The Commission estimates that the final rule may increase or decrease overall litigation costs, and there is no evidence in the literature to allow the Commission to quantify those costs or benefits.[1277]

The comment citing an article on the biotech industry overstates the article's statements. The article said the existing increase in trade secrets litigation was likely to continue if the rule were adopted, did not cite any evidence for this prediction other than that non-competes are often used to protect trade secrets, and noted that companies may also use NDAs or restrict access to sensitive information.[1278] The article

---

[1269] § 910.2(b)(2).

[1270] § 910.2(b)(3).

[1271] SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1272] *Mid-Tex Elec. Co-op., Inc.* v. *FERC,* 773 F.2d 327, 342 (D.C. Cir. 1985) ("[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities[,]" and the court inferred that "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any

stratum of the national economy."); *see also* RFA Compliance Guide, *supra* note 1207 at 22–23, 64–68.

[1273] *See* Part X.F.9.

[1274] *See* Part XI.C.2.b.

[1275] *See* Part X.F.7.a.

[1276] *See* Parts IV.D.3, X.F.5–6, II.F.

[1277] *See* Part X.F.7.c.

[1278] Rosemary Scott, *FTC's Non-Compete Law Could Propel Rise in Trade Secrets Lawsuits,*
Continued

did not say that non-competes are critical to biotech startups.[1279]

The commenter asking the Commission to consider small business valuation changes did not provide any potential estimates of such a cost, nor did the commenter demonstrate that such costs exist. It is unclear whether this commenter was referring to the value of non-competes for owners or for workers, but some such non-competes may fall within the exceptions for existing senior executive non-competes or for owners in a sale of business.[1280] To the extent there are any remaining non-competes that increase the value of a business in a sale, the Commission finds that any marginal decrease is justified by the substantial overall benefits of the rule.

In response to the requests for a supplemental IRFA, one is not required by law, and this FRFA responds to all comments on the IRFA. A supplemental IRFA would not provide the public with additional relevant information that the IRFA did not.

*H. Discussion of Significant Alternatives*

The RFA requires that agencies include a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.[1281] Statutory examples of "significant alternatives" include different requirements or timetables that take into account the resources available to small entities; the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; the use of performance rather than design standards; and an exemption from coverage of the rule, or any part thereof, for small entities.[1282]

In Part IX, the Commission discusses significant alternatives to the final rule. Part IX also includes an assessment determining that each of the significant alternatives would not accomplish the objectives of the final rule. The Commission did incorporate some of the alternatives proposed in the NPRM and

in comments into the final rule, namely the exception for existing senior executive non-competes, simplifying notice requirements, eliminating rescission requirements, and eliminating the 25% threshold for the sale of business exception. In addition, the Commission's analysis of benefits and costs in Part X includes an assessment of the benefits and costs of excluding senior executives. The Commission notes that it has designed the final rule to minimize compliance costs for all businesses and that the final rule does not include any reporting requirements. As stated in Part X.F.7.b, the Commission estimates that direct compliance costs and the costs of updating contractual practices would result in costs of $538.48 to $1,076.96 for each firm. As previously noted, the Commission does not believe the final rule imposes a significant economic impact on a substantial number of small entities. The Commission has also described how the final rule will benefit and increase the number of small businesses.

After careful consideration, the Commission is not creating an exception for small entities or different regulatory requirements for small entities. The final rule provides that for workers other than senior executives, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete, enforce or attempt to enforce a non-compete, or represent that the worker is subject to a non-compete.[1283] For senior executives, the final rule provides that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete, enforce or attempt to enforce a non-compete entered into after the effective date, or represent that the worker is subject to a non-compete, where the non-compete was entered into after the effective date.[1284] Based on the available evidence, the Commission does not believe that the analysis in Parts IV.B and IV.C is fundamentally different for non-competes that are imposed by small entities. For this reason, the Commission is not creating an exception for small entities or different regulatory requirements for small entities.

The Commission is not delaying the effective date of the final for small entities. Under § 910.6, the final rule is effective 120 days after publication in the **Federal Register** on September 4, 2024. One small business asked that the final rule's effective date be delayed for two years to give the business time to

silo its intellectual property and implement safeguards to protect its information. In the Commission's view, the rule's effective date of September 4, 2024 will afford small entities a sufficient period of time to comply with the final rule, and commenters have not provided evidence that more time is necessary.[1285]

## XII. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 ("PRA"),[1286] Federal agencies must obtain approval from the Office of Management and Budget ("OMB") for each collection of information they conduct or sponsor. The term "collection of information" includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.[1287] Under the PRA, the Commission may not conduct or sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.[1288]

*A. The Proposed Rule*

In the NPRM, the Commission stated that it believed the proposed rule would contain a disclosure requirement that would constitute a collection of information requiring OMB approval under the PRA. The Commission stated that this disclosure requirement was proposed § 910.2(b)(2), which would have required employers to provide notice to a worker with an existing non-compete—*i.e.*, a non-compete that was entered into prior to the effective date— that the non-compete is no longer in effect and may not be enforced against the worker.[1289] Conservatively assuming that each establishment must engage in its own communication—*i.e.*, a firm's headquarters does not have the ability to send a company-wide email, for example—the Commission estimated that covered employers would incur an estimated labor cost burden of 1,310,747 hours to comply with this requirement (3,932,240 establishments × 20 minutes). The Commission estimated the associated labor cost for notifying affected workers who are already employed is $9.98 × 7.96 million × 0.494 = $39,243,755.[1290]

The Commission stated that the proposed rule would impose only *de minimis* capital and non-labor costs.

---

BioSpace (Feb. 8, 2023), *https://www.biospace.com/article/ftc-s-non-compete-law-could-propel-rise-in-trade-secrets-lawsuits-/*.

[1279] *Id.*

[1280] *See* § 910.3.

[1281] 5 U.S.C. 604(a)(6).

[1282] *See* 5 U.S.C. 603(c)(1)–(4).

[1283] *See* § 910.2(a)(1).

[1284] *See* § 910.2(a)(2).

[1285] *See* Part VIII.

[1286] 44 U.S.C. 3501 *et seq.*

[1287] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).

[1288] 44 U.S.C. 3506(c)(1)(B); 5 CFR 1320.5(a)(3).

[1289] NPRM at 3533.

[1290] *Id.* at 3534.

The Commission anticipated that covered employers would already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the proposed rule would require a one-time disclosure to some workers subject to a rescinded non-compete, the Commission anticipated that this one-time disclosure would not require substantial investments in new systems or other non-labor costs. The Commission noted that, moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.[1291]

The Commission sought comment on all aspects of its PRA analysis, including (1) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information would have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of these information collections on respondents.

*B. Comments Received*

No commenters specifically addressed the PRA analysis in the NPRM. However, the Commission received extensive comments on its Preliminary Regulatory Impact Analysis and Initial Regulatory Flexibility Act Analysis, and many of these commenters addressed the Commission's estimates related to the cost of compliance. These comments are summarized in Parts X (the Commission's Final Regulatory Analysis) and XI (the Commission's Final Regulatory Flexibility Act Analysis). The Commission also received comments on the proposed notice requirement itself. These comments are summarized in Part IV.E.

*C. Final PRA Analysis*

The Commission finalizes the proposed rule's notice requirement largely as proposed, with some adjustments to further ease compliance. In the final rule, § 910.2(a)(1)(ii) prohibits employers from enforcing existing non-competes—*i.e.,* non-competes entered into prior to the effective date—with respect to workers other than senior executives. Section 910.2(b)(1) as finalized states further that for each existing non-compete that it is an unfair method of competition to enforce or attempt to

enforce under § 910.2(a)(1)(ii)—*i.e.,* non-competes entered into with workers other than senior executives—the person who entered into the non-compete with the worker must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete will not be, and cannot legally be, enforced against the worker.

Pursuant to § 910.2(b)(2), the notice must (i) identify the person who entered into the non-compete with the worker and (ii) be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.

Section 910.2(b)(3) provides an exception to the notice requirement in § 910.2(b)(1) where the person that would otherwise be required to provide the notice has no record of a street address, email address, or mobile telephone number.

Section 910.2(b)(4) provides model language that employers may use to comply with the notice requirement. Section 910.2(b)(5) states that an employer presumptively complies with the notice requirement in § 910.2(b)(1) where the employer provides a notice to the worker pursuant to § 910.2(b)(4). And § 910.2(b)(6) allows but does not require employers, in addition to providing the required notice in English, to provide the notice in another language (or languages). Section 910.2(b)(6) also permits employers to use any Commission-provided translation of the model language in § 910.2(b)(4).

The notice requirement has changed in two important respects from the proposed rule. First, employers are no longer required to provide the notice to senior executives with existing non-competes. Second, as long as employers provide the notice in English, they are permitted to provide the notice in a language other than English. However, neither of these changes significantly affects the burden of complying with the notice. Senior executives are only 0.75% of workers, so the cost savings to employers of not needing to provide the notice to senior executives are minimal. No employer is required to provide the notice in a different language, so the rule does not require employers to incur any compliance costs for doing so.

The Commission estimates that composing and sending the notice in a digital format to workers for whom digital contact information is available

would take 20 minutes of a human resources specialist's time. According to BLS, the median wage for a human resources specialist in 2022 was $31.85 per hour in 2023 dollars.[1292] The cost of compliance for currently employed workers is therefore ($31.85*2)/3=$21.23 per establishment.[1293] According to the Census Bureau's Statistics of U.S. Businesses database, in 2021 (the most recent year for which data are available), there were 5.91 million firms and 6.88 million establishments in the U.S.[1294] The Commission estimates the percentage of firms using non-competes in the U.S. at 49.4%.[1295] The Commission conservatively assumes that each establishment must engage in its own communication—*i.e.,* that a firm's headquarters does not have the ability to send a company-wide email, for example. This yields an estimated 3,397,545 covered establishments which would incur an estimated labor cost burden of 1,132,515 hours to comply with this requirement (3,397,545 establishments × 20 minutes). The Commission estimates the associated labor cost for notifying affected workers who are already employed and for whom digital contact information is available is $21.23 × 6.88 million × 0.494 = $72,141,201.

Businesses may not have digital contact information for workers. The number of workers with non-competes who must therefore receive physical notice is the total number of covered workers (101.1 million; see Part X.F.7.a.i) times the percentage of workers who have non-competes (18.1%) times the percentage of workers who require mailed notice (assumed to be 66% of workers[1296]), for a total of 12.1 million workers. The Commission notes that the percentage of workers who require mailed notice is likely a substantial overestimate, since it is estimated based on the percentage of individuals who receive health information digitally. The Commission believes that employers are more likely to have digital means of providing the notice to their current workers

---

[1291] *Id.*

[1292] BLS, *Occupational Outlook Handbook: Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.* The value in 2022 was $30.88, which was updated to 2023 dollars.

[1293] The lost productivity of workers is assumed to be twice the median wage. *See* Part X.F.7.b.ii.

[1294] Census Bureau, *2021 SUSB Annual Data Tables by Establishment Industry* (December 2023), *https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html.*

[1295] *See* Colvin & Shierholz, *supra* note 65 at 4.

[1296] *See supra* note 1165 (CMS Supporting Statement assumes 66% of workers require mailed notice from their health insurance companies).

especially, but also to their former workers. The Commission conservatively adopts this estimate as an upper bound. The cost of mailed notice provision includes some capital costs (the cost of postage and mailing materials) and the cost of a human resource professional's time. The cost per worker is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus the cost of one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. The overall cost of mailed notice provision is therefore estimated to be $22 million.

As the Commission stated in the proposed rule, the Commission anticipates that covered employers already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the final rule requires a one-time disclosure to some workers, the Commission anticipates this one-time disclosure will not require substantial investments in new systems or other non-labor costs. Moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.

### XIII. Other Matters

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this final rule as a ''major rule,'' as defined by 5 U.S.C. 804(2).

### List of Subjects in 16 CFR Part 910

Antitrust.

■ For the reasons set forth above, and under the authority of Sections 5 and 6(g) of the Federal Trade Commission Act, the Federal Trade Commission adds subchapter J, consisting of parts 910 and 912, to chapter I in title 16 of the Code of Federal Regulations to read as follows:

**Subchapter J—Rules Concerning Unfair Methods of Competition**

### PART 910—NON-COMPETE CLAUSES

### PART 912—[RESERVED]

### PART 910—NON-COMPETE CLAUSES

Sec.
910.1.   Definitions.
910.2.   Unfair methods of competition.
910.3.   Exceptions.
910.4.   Relation to State laws and preservation of State authority and private rights of action.
910.5.   Severability.
910.6.   Effective date.

**Authority:** 15 U.S.C. 45 and 46(g).

### PART 910—NON-COMPETE CLAUSES

#### § 910.1   Definitions.

As used in this part:
*Business entity* means a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary thereof.
*Employment* means work for a person.
*Non-compete clause* means:
(1) A term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from:
(i) Seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or
(ii) Operating a business in the United States after the conclusion of the employment that includes the term or condition.
(2) For the purposes of this part, term or condition of employment includes, but is not limited to, a contractual term or workplace policy, whether written or oral.
*Officer* means a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any natural person routinely performing corresponding functions with respect to any business entity whether incorporated or unincorporated.
*Person* means any natural person, partnership, corporation, association, or other legal entity within the Commission's jurisdiction, including any person acting under color or authority of State law.
*Policy-making authority* means final authority to make policy decisions that control significant aspects of a business entity or common enterprise and does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise.
*Policy-making position* means a business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority, or any other natural person who has policy-making authority for the business entity similar to an officer with policy-making authority. An officer of a subsidiary or affiliate of a business entity that is part of a common enterprise who has policy-making authority for the common enterprise may be deemed to have a policy-making position for purposes of this paragraph. A natural person who does not have policy-making authority over a common enterprise may not be deemed to have a policy-making position even if the person has policy-making authority over a subsidiary or affiliate of a business entity that is part of the common enterprise.
*Preceding year* means a person's choice among the following time periods: the most recent 52-week year, the most recent calendar year, the most recent fiscal year, or the most recent anniversary of hire year.
*Senior executive* means a worker who:
(1) Was in a policy-making position; and
(2) Received from a person for the employment:
(i) Total annual compensation of at least $151,164 in the preceding year; or
(ii) Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year; or
(iii) Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete clause.
*Total annual compensation* is based on the worker's earnings over the preceding year. Total annual compensation may include salary, commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during that 52-week period. Total annual compensation does not include board, lodging and other facilities as defined in 29 CFR 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other similar fringe benefits.
*Worker* means a natural person who works or who previously worked, whether paid or unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person. The term worker includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.

#### § 910.2   Unfair methods of competition.

(a) *Unfair methods of competition*—(1) *Workers other than senior executives.* With respect to a worker other than a senior executive, it is an unfair method of competition for a person:
(i) To enter into or attempt to enter into a non-compete clause;

(ii) To enforce or attempt to enforce a non-compete clause; or

(iii) To represent that the worker is subject to a non-compete clause.

(2) *Senior executives.* With respect to a senior executive, it is an unfair method of competition for a person:

(i) To enter into or attempt to enter into a non-compete clause;

(ii) To enforce or attempt to enforce a non-compete clause entered into after the effective date; or

(iii) To represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.

(b) *Notice requirement for existing non-compete clauses*—(1) *Notice required.* For each existing non-compete clause that it is an unfair method of competition to enforce or attempt to enforce under paragraph (a)(1)(ii) of this section, the person who entered into the non-compete clause with the worker must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete clause will not be, and cannot legally be, enforced against the worker.

(2) *Form of notice.* The notice to the worker required by paragraph (b)(1) of this section must:

(i) Identify the person who entered into the non-compete clause with the worker;

(ii) Be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.

(3) *Exception.* If a person that is required to provide notice under paragraph (b)(1) of this section has no record of a street address, email address, or mobile telephone number, such person is exempt from the notice requirement in paragraph (b)(1) of this section with respect to such worker.

(4) *Model language.* For purposes of paragraph (b)(1) of this section, the following model language constitutes notice to the worker that the worker's non-compete clause cannot legally be enforced and will not be enforced against the worker.

**BILLING CODE 6750-01-P**

**Figure 1 to Paragraph (b)(4)—Model Language**

A new rule enforced by the Federal Trade Commission makes it unlawful for us to enforce a non-compete clause. As of [DATE EMPLOYER CHOOSES BUT NO LATER THAN EFFECTIVE DATE OF THE FINAL RULE], [EMPLOYER NAME] will not enforce any non-compete clause against you. This means that as of [DATE EMPLOYER CHOOSES BUT NO LATER THAN EFFECTIVE DATE OF THE FINAL RULE]:

- You may seek or accept a job with any company or any person—even if they compete with [EMPLOYER NAME].

- You may run your own business—even if it competes with [EMPLOYER NAME].

- You may compete with [EMPLOYER NAME] following your employment with [EMPLOYER NAME].

The FTC's new rule does not affect any other terms or conditions of your employment. For more information about the rule, visit [*link to final rule landing page*]. Complete and accurate translations of the notice in certain languages other than English, including Spanish, Chinese, Arabic, Vietnamese, Tagalog, and Korean, are available at [URL on FTC's website].

---

BILLING CODE 6750-01-C

(5) *Safe harbor.* A person complies with the requirement in paragraph (b)(1) of this section if the person provides notice to a worker pursuant to paragraph (b)(4) of this section.

(6) *Optional notice in additional languages.* In addition to providing the notice required in paragraph (b)(1) of this section in English, a person is permitted to provide such notice in a language (or in languages) other than English or to include internet links to translations in additional languages. If providing optional notice under this paragraph (b)(6), a person may use any Commission-provided translation of the model language in paragraph (b)(4) of this section.

§ 910.3  Exceptions.

(a) *Bona fide sales of business.* The requirements of this part shall not apply to a non-compete clause that is entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets.

(b) *Existing causes of action.* The requirements of this part do not apply where a cause of action related to a non-compete clause accrued prior to the effective date.

(c) *Good faith.* It is not an unfair method of competition to enforce or attempt to enforce a non-compete clause or to make representations about a non-compete clause where a person has a good-faith basis to believe that this part is inapplicable.

§ 910.4  Relation to State laws and preservation of State authority and private rights of action.

(a) This part will not be construed to annul, or exempt any person from complying with any State statute,

regulation, order, or interpretation applicable to a non-compete clause, including, but not limited to, State antitrust and consumer protection laws and State common law, except that this part supersedes such laws to the extent, and only to the extent, that such laws would otherwise permit or authorize a person to engage in conduct that is an unfair method of competition under § 910.2(a) or conflict with the notice requirement in § 910.2(b).

(b) Except with respect to laws superseded under paragraph (a) of this section, no provision of this part shall be construed as altering, limiting, or affecting the authority of a State attorney general or any other regulatory or enforcement agency or entity or the rights of a person to bring a claim or regulatory action arising under any State statute, regulation, order, or interpretation, including, but not limited to, State antitrust and consumer protection laws and State common law.

### § 910.5 Severability.

If any provision of this part is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision shall be construed so as to continue to give the maximum effect to the provision permitted by law and such invalidity shall not affect the application of the provision to other persons or circumstances or the validity or application of other provisions. If any provision or application of this part is held to be invalid or unenforceable, the provision or application shall be severable from this part and shall not affect the remainder thereof.

### § 910.6 Effective date.

This part is effective September 4, 2024.

## PART 912—[RESERVED]

By direction of the Commission, Commissioners Holyoak and Ferguson dissenting.

**April J. Tabor,**

*Secretary.*

**Note:** The following appendix will not appear in the Code of Federal Regulations.

APPENDIX A—TABLE A.1

| State | Estimated number of covered workers | Estimated increase in total annual worker earnings | Estimated increase in average annual worker earnings |
|---|---|---|---|
| Alabama | 1,620,882 | $822,829,396 | $508 |
| Alaska | 251,167 | 145,317,588 | 579 |
| Arizona | 2,460,342 | 1,410,771,964 | 573 |
| Arkansas | 999,178 | 478,239,544 | 479 |
| California | .................. | .................. | .................. |
| Colorado | 2,251,980 | 1,484,772,427 | 659 |
| Connecticut | 1,314,029 | 945,571,637 | 720 |
| Delaware | 367,291 | 220,637,013 | 601 |
| District of Columbia | 598,990 | 604,415,889 | 1,009 |
| Florida | 7,486,582 | 4,229,047,004 | 565 |
| Georgia | 3,764,270 | 2,188,893,667 | 581 |
| Hawaii | 495,988 | 270,123,206 | 545 |
| Idaho | 656,688 | 315,487,683 | 480 |
| Illinois | 4,735,066 | 3,051,620,266 | 644 |
| Indiana | 2,490,735 | 1,280,797,352 | 514 |
| Iowa | 1,229,598 | 624,937,405 | 508 |
| Kansas | 1,112,654 | 553,683,941 | 498 |
| Kentucky | 1,536,365 | 759,416,081 | 494 |
| Louisiana | 1,492,474 | 747,953,455 | 501 |
| Maine | 501,216 | 258,101,666 | 515 |
| Maryland | 2,112,817 | 1,378,702,305 | 653 |
| Massachusetts | 2,876,506 | 2,288,111,777 | 795 |
| Michigan | 3,440,754 | 1,946,978,052 | 566 |
| Minnesota | .................. | .................. | .................. |
| Mississippi | 916,362 | 384,971,511 | 420 |
| Missouri | 2,256,955 | 1,184,012,673 | 525 |
| Montana | 396,982 | 191,696,465 | 483 |
| Nebraska | 787,174 | 399,373,568 | 507 |
| Nevada | 1,177,510 | 646,371,090 | 549 |
| New Hampshire | 536,516 | 343,360,391 | 640 |
| New Jersey | 3,307,696 | 2,301,979,408 | 696 |
| New Mexico | 666,290 | 326,156,344 | 490 |
| New York | 7,411,689 | 5,879,334,118 | 793 |
| North Carolina | 3,759,643 | 2,105,343,963 | 560 |
| North Dakota | .................. | .................. | .................. |
| Ohio | 4,314,090 | 2,330,837,261 | 540 |
| Oklahoma | .................. | .................. | .................. |
| Oregon | 1,560,619 | 916,694,759 | 587 |
| Pennsylvania | 4,690,586 | 2,795,472,689 | 596 |
| Rhode Island | 385,074 | 220,004,925 | 571 |
| South Carolina | 1,745,274 | 858,798,497 | 492 |
| South Dakota | 354,502 | 169,742,169 | 479 |
| Tennessee | 2,526,310 | 1,389,744,066 | 550 |
| Texas | 10,599,295 | 6,535,957,999 | 617 |
| Utah | 1,320,994 | 715,807,809 | 542 |
| Vermont | 241,017 | 127,248,043 | 528 |
| Virginia | 3,166,902 | 1,995,480,948 | 630 |

APPENDIX A—TABLE A.1—Continued

| State | Estimated number of covered workers | Estimated increase in total annual worker earnings | Estimated increase in average annual worker earnings |
|---|---|---|---|
| Washington | 2,809,814 | 2,090,953,114 | 744 |
| West Virginia | 539,026 | 253,817,680 | 471 |
| Wisconsin | 2,301,874 | 1,207,149,373 | 524 |
| Wyoming | 217,787 | 108,650,236 | 499 |
| Full US, excluding CA, ND, OK, MN | 101,785,552 | 53,291,058,349 | 524 |

**Note:** The estimated number of covered workers is calculated as 80% * (total employed population in the state); the estimated increase in total earnings is calculated as 0.86% * (estimated total covered earnings), where estimated total covered earnings is calculated as (estimated number of covered workers) * (average annual earnings); and the estimated increase in average earnings is calculated as 0.86% * (average annual earnings). Total employed population and average annual earnings are taken from the U.S. Census Bureau Quarterly Census of Employment and Wages for 2022 (see *https://www.bls.gov/cew/data.htm*). National totals may not equal the sum of state-specific estimates due to rounding.

[FR Doc. 2024–09171 Filed 4–30–24; 8:45 am]
**BILLING CODE 6750–01–P**

## FEDERAL TRADE COMMISSION

### 16 CFR Part 910

RIN 3084–AB74

### Non-Compete Clause Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** Pursuant to Sections 5 and 6(g) of the Federal Trade Commission Act, the Federal Trade Commission ("Commission") is proposing the Non-Compete Clause Rule. The proposed rule would, among other things, provide that it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; to maintain with a worker a non-compete clause; or, under certain circumstances, to represent to a worker that the worker is subject to a non-compete clause.

**DATES:** Comments must be received on or before March 20, 2023.

**ADDRESSES:** Interested parties may file a comment online or on paper by following the instructions in the Request for Comment part of the **SUPPLEMENTARY INFORMATION** section below. Write "Non-Compete Clause Rulemaking, Matter No. P201200" on your comment, and file your comment online at *https://www.regulations.gov,* by following the instructions on the web-based form. If you prefer to file your comment on paper, mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex C), Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Shannon Lane (202–876–5651), Attorney, Office of Policy Planning, Federal Trade Commission.

**SUPPLEMENTARY INFORMATION:**

## I. Overview of the Proposed Rule

A non-compete clause is a contractual term between an employer and a worker that typically blocks the worker from working for a competing employer, or starting a competing business, within a certain geographic area and period of time after the worker's employment ends. Non-compete clauses limit competition by their express terms. As a result, non-compete clauses have always been considered proper subjects for scrutiny under the nation's antitrust laws.[1] In addition, non-compete clauses

between employers and workers are traditionally subject to more exacting review under state common law than other contractual terms, due, in part, to concerns about unequal bargaining power between employers and workers and the fact that non-compete clauses limit a worker's ability to practice their trade.[2]

In recent decades, important research has shed light on how the use of non-compete clauses by employers affects competition. Changes in state laws governing non-compete clauses have provided several natural experiments that have allowed researchers to study the impact of non-compete clauses on competition. This research has shown the use of non-compete clauses by employers has negatively affected competition in labor markets, resulting in reduced wages for workers across the labor force—including workers not bound by non-compete clauses.[3] This research has also shown that, by suppressing labor mobility, non-compete clauses have negatively affected competition in product and service markets in several ways.[4]

In this rulemaking, the Commission seeks to ensure competition policy is aligned with the current economic evidence about the consequences of non-compete clauses. In the Commission's view, the existing legal frameworks governing non-compete clauses—formed decades ago, without the benefit of this evidence—allow serious anticompetitive harm to labor, product, and service markets to go unchecked.

Section 5 of the Federal Trade Commission Act ("FTC Act") declares "unfair methods of competition" to be unlawful.[5] Section 5 further directs the Commission "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce." [6] Section 6(g) of the FTC Act authorizes the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, including the Act's

prohibition of unfair methods of competition.[7]

Pursuant to Sections 5 and 6(g) of the FTC Act, the Commission proposes the Non-Compete Clause Rule. The proposed rule would provide it is an unfair method of competition—and therefore a violation of Section 5—for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or, under certain circumstances, represent to a worker that the worker is subject to a non-compete clause.[8]

The proposed rule would define the term "non-compete clause" as a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.[9] The proposed rule would also clarify that whether a contractual provision is a non-compete clause would depend not on what the provision is called, but how the provision functions. As the Commission explains below, the definition of non-compete clause would generally not include other types of restrictive employment covenants—such as non-disclosure agreements ("NDAs") and client or customer non-solicitation agreements—because these covenants generally do not prevent a worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. However, under the proposed definition of "non-compete clause," such covenants would be considered non-compete clauses where they are so unusually broad in scope that they function as such.[10]

The proposed rule would define "employer" as a person—as the term "person" is defined in 15 U.S.C. 57b–1(a)(6)—that hires or contracts with a worker to work for the person.[11] The proposed rule would define "worker" as a natural person who works, whether paid or unpaid, for an employer. The proposed rule would clarify that the term "worker" includes an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who

---

[1] *See, e.g., U.S.* v. *Am. Tobacco Co.,* 221 U.S. 106, 181–83 (1911) (holding several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly

recurring" use of non-compete clauses); *Newburger, Loeb & Co., Inc.* v. *Gross,* 563 F.2d 1057, 1082 (2d Cir. 1977) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[2] *See infra* Part II.C.

[3] *See infra* Part II.B.1.

[4] *See infra* Part II.B.2.

[5] 15 U.S.C. 45(a)(1).

[6] 15 U.S.C. 45(a)(2).

[7] 15 U.S.C. 46(g).

[8] *See* proposed § 910.2(a). For ease of reference, this NPRM employs the term "use of non-compete clauses" as a shorthand to refer to the conduct that the proposed rule would provide is an unfair method of competition.

[9] *See* proposed § 910.1(b)(1).

[10] *See infra* Part V (in the section-by-section analysis for proposed § 910.1(b)).

[11] *See* proposed § 910.1(c).

**JA0166**

provides a service to a client or customer.[12]

In addition to prohibiting employers from entering into non-compete clauses with workers starting on the rule's compliance date, the proposed rule would require employers to rescind existing non-compete clauses no later than the rule's compliance date.[13] The proposed rule would also require an employer rescinding a non-compete clause to provide notice to the worker that the worker's non-compete clause is no longer in effect.[14] To facilitate compliance, the proposed rule would (1) include model language that would satisfy this notice requirement[15] and (2) establish a safe harbor whereby an employer would satisfy the rule's requirement to rescind existing non-compete clauses where it provides the worker with a notice that complies with this notice requirement.[16]

The proposed rule would include a limited exception for non-compete clauses between the seller and buyer of a business.[17] This exception would only be available where the party restricted by the non-compete clause is an owner, member, or partner holding at least a 25% ownership interest in a business entity.[18] The proposed regulatory text would clarify that non-compete clauses covered by this exception would remain subject to federal antitrust law as well as all other applicable law.

The proposed rule would establish an effective date of 60 days, and a compliance date of 180 days, after publication of a final rule in the **Federal Register**.[19]

In this notice of proposed rulemaking ("NPRM"), the Commission describes and seeks comment on several alternatives to the proposed rule, including whether non-compete clauses between employers and senior executives should be subject to a different standard than non-compete clauses with other workers.[20] The Commission also assesses the benefits and costs of the proposed rule, the impact of the proposed rule on small businesses, and compliance costs related to the proposed rule's notice requirement.[21]

The Commission seeks comment on all aspects of this NPRM. Comments

must be received on or before March 20, 2023.[22]

## II. Factual Background

### A. What are non-compete clauses?

A non-compete clause is a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.[23] A typical non-compete clause blocks the worker from working for a competing employer, or starting a competing business, within a certain geographic area and period of time after their employment ends. A non-compete clause may be part of the worker's employment contract or may be contained in a standalone contract. Employers and workers may enter into non-compete clauses at the start of, during, or at the end of a worker's employment.

If a worker violates a non-compete clause, the employer may sue the worker for breach of contract. An employer may be able to obtain a preliminary injunction ordering the worker, for the duration of the lawsuit, to stop the conduct that allegedly violates the non-compete clause. If the employer wins the lawsuit, the employer may be able to obtain a permanent injunction ordering the worker to stop the conduct that violates the non-compete clause; a payment of monetary damages from the worker; or both.[24] Where workers are subject to arbitration clauses,[25] the employer may seek to enforce the non-compete clause through arbitration.

The below examples of non-compete clauses from recent news reports, legal settlements, and court opinions are illustrative.

• A contractual term between a security guard firm and its security guards requiring that, for two years following the conclusion of the security guards' employment with the firm, the security guard may not "[a]ccept employment with or be employed by" a competing business "within a one hundred (100) mile radius" of the security guard's primary jobsite with the firm and stating that the security guards may not "[a]ssist, aid or in any manner whatsoever help any firm, corporation, partnership or other business to compete with" the firm. The non-compete clause also contains a "liquidated damages" clause requiring the security guard to pay the firm $100,000 as a penalty for any conduct that contravenes the agreement.[26]

• A contractual term between a glass container manufacturing company and its workers typically requiring that, for two years following the conclusion of the worker's employment with the company, the worker may not directly or indirectly "perform or provide the same or substantially similar services" to those the worker performed for the company to any business in the U.S., Canada, or Mexico that is "involved with or that supports the sale, design, development, manufacture, or production of glass containers" in competition with the company.[27]

• A contractual term between a sandwich shop chain and its workers stating that, for two years after the worker leaves their job, the worker may not perform services for "any business which derives more than ten percent (10%) of its revenue from selling submarine, hero-type, deli-style, pita and/or wrapped or rolled sandwiches" located within three miles of any of the chain's more than 2,000 locations in the United States.[28]

• A contractual term between a steelmaker and one of its executives prohibiting the executive from working for "any business engaged directly or indirectly in competition with" the steelmaker anywhere in the world for

[12] See proposed § 910.1(f).

[13] See proposed § 910.2(b)(1).

[14] See proposed § 910.2(b)(2)(A).

[15] See proposed § 910.2(b)(2)(C).

[16] See proposed § 910.2(b)(3).

[17] See proposed § 910.3.

[18] See proposed §§ 910.3 and 910.1(e).

[19] See proposed § 910.5.

[20] See infra Part VI.

[21] See infra Parts VII–IX.

[22] Pursuant to Section 22(d)(4) of the FTC Act, 15 U.S.C. 57b–3(d)(4), this NPRM was not included in the Commission's Spring 2022 Regulatory Agenda because the Commission first considered it after the publication deadline for the Regulatory Agenda.

[23] See proposed § 910.1(b). The term "non-compete clause" has also been used describe agreements between one or more business not to compete against one another, see, e.g., Lumber Liquidators, Inc. v. Cabinets To Go, LLC, 415 F. Supp. 3d 703, 709 (E.D. Va. 2009), as well as kinds of moonlighting during a worker's employment, see, e.g., In the Matter of the Investigation by Barbara D. Underwood, Att'y Gen. of the State of N.Y. of WeWork Companies, Inc., Assurance of Discontinuance No. 18–101 (Sept. 18, 2018) at Exhibit B. As underscored above, however, this proposed rule focuses only on post-employment restraints that employers impose on workers.

[24] Donald J. Aspelund & Joan E. Beckner, Employee Noncompetition Law § 8:2, § 8:22 (Aug. 2021).

[25] See, e.g., Alexander J.S. Colvin, Econ. Pol'y Inst., Report, The Growing Use of Mandatory Arbitration (Apr. 6, 2018).

[26] Fed. Trade Comm'n, Complaint, In re Prudential Sec., Inc. et al., Matter No. 221 0026 at ¶ 12–¶ 13 (December 28, 2022).

[27] Fed. Trade Comm'n, Complaint, In re Ardagh Group S.A. et al., Matter No. 211 0182 at ¶ 9 (December 28, 2022).

[28] Dave Jamieson, Jimmy John's Makes Low-Wage Workers Sign 'Oppressive' Noncompete Agreements, HuffPost (Oct. 13, 2014). The company agreed to remove the non-compete clause in 2016 as part of a settlement. Office of the State of N.Y., Press Release, A.G. Schneiderman Announces Settlement With Jimmy John's To Stop Including Non-Compete Agreements In Hiring Packets (June 22, 2016).

**3484** **Federal Register** / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules

one year following the termination of the executive's employment.[29]

• A contractual term between an office supply company and one of its sales representatives stating that, for two years after the sales representative's last day of employment, the sales representative is prohibited from "engag[ing] directly or indirectly, either personally or as an employee, associate, partner, or otherwise, or by means of any corporation or other legal entity, or otherwise, in any business in competition with Employer," within a 100-mile radius of the sales representative's employment location.[30]

• A contractual term between a nationwide payday lender and its workers stating that, for one year after the worker leaves their job, they are prohibited from performing any "consumer lending services or money transmission services" for any entity that provides such services, or to "sell products or services that are competitive with or similar to the products or services of the Company," within a 15-mile radius of any of the payday lender's 1,000 locations in the United States.[31]

• A contractual term between an online retailer and its warehouse workers prohibiting the workers, for 18 months after leaving their job, from "directly or indirectly . . . engag[ing] or support[ing] the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by" the retailer—or that is "intended to be sold, offered, or otherwise provided by [the retailer] in the future"—that the worker "worked on or supported" or about which the worker obtained or received confidential information.[32]

• A contractual term between a medical services firm and an ophthalmologist stating that, for two years after the termination of the ophthalmologist's employment with the firm, the ophthalmologist shall not engage in the practice of medicine in

two Idaho counties unless the ophthalmologist pays the firm a "practice fee" of either $250,000 or $500,000, depending on when the ophthalmologist's employment ends.[33]

In addition to non-compete clauses, other types of contractual provisions restrict what a worker may do after they leave their job. These other types of provisions include, among others:

• Non-disclosure agreements (NDAs)—also known as "confidentiality agreements"—which prohibit the worker from disclosing or using certain information;

• Client or customer non-solicitation agreements, which prohibit the worker from soliciting former clients or customers of the employer (referred to in this NPRM as "non-solicitation agreements"); [34]

• No-business agreements, which prohibit the worker from doing business with former clients or customers of the employer, whether or not solicited by the worker;

• No-recruit agreements, which prohibit the worker from recruiting or hiring the employer's workers;

• Liquidated damages provisions, which require the worker to pay the employer a sum of money if the worker engages in certain conduct; and

• Training-repayment agreements (TRAs), a type of liquidated damages provision in which the worker agrees to pay the employer for the worker's training expenses if the worker leaves their job before a certain date.[35]

These other types of restrictive employment covenants can sometimes be so broad in scope that they serve as *de facto* non-compete clauses.[36]

In addition to restricting what workers may do after they leave their jobs, employers have also entered into agreements with other employers in which they agree not to compete for one another's workers. These include no-poach agreements, in which employers agree not to solicit or hire one another's workers, and wage-fixing agreements, in

which employers agree to limit wages or salaries (or other terms of compensation).[37]

The Commission seeks comment on its description in this Part II.A of non-compete clauses. The Commission also encourages workers, employers, and other members of the public to submit comments describing their experiences with non-compete clauses.

*B. Evidence Relating to the Effects of Non-Compete Clauses on Competition*

Non-compete clauses have presented challenging legal issues for centuries.[38] But only in the last two decades has empirical evidence emerged to help regulators and the general public understand how non-compete clauses affect competition in labor markets and product and service markets.

In the early 2000s, researchers began to shed new light on the impacts of non-compete clauses on innovation and productivity. As this new body of research was evolving, news reports revealed non-compete clauses were being imposed even on low-wage workers.[39] These reports surprised many observers, who had assumed only highly skilled workers were subject to non-compete clauses.[40] Researchers responded by applying the tools of economic research to better understand how employers were using non-compete clauses and how they were affecting competition.

1. Labor Markets

The empirical research on how non-compete clauses affect competition shows that the use of non-compete clauses in the aggregate is interfering with competitive conditions in labor markets.

Labor markets function by matching workers and employers. Workers offer their skills and time to employers. In return, employers offer pay, benefits, and job satisfaction.[41] In a well-functioning labor market, a worker who is seeking a better job—more pay, better hours, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Employers who have positions available compete for the worker's services. The worker's

---

[29] *AK Steel Corp.* v. *ArcelorMittal USA, LLC,* 55 N.E.3d 1152, 1156 (Ohio Ct. App. 2016).

[30] *Osborne* v. *Brown & Saenger, Inc.,* 904 N.W.2d 34, 36 (N.D. 2017).

[31] *People of the State of Ill.* v. *Check Into Cash of Ill., LLC,* Complaint, 2017–CH–14224 (Ill. Circuit Ct. Oct. 25, 2017), ¶ 29, ¶ 70, *https://illinoisattorneygeneral.gov/pressroom/2017_10/Check_Into_Cash-Complaint.pdf.*

[32] Spencer Woodman, Exclusive: *Amazon makes even temporary warehouse workers sign 18-month non-compete clauses,* The Verge (Mar. 26, 2015). The company removed the non-compete clause following the media coverage. Josh Lowensohn, *Amazon does an about-face on controversial warehouse worker non-compete contracts,* The Verge (Mar. 27, 2015).

[33] *Intermountain Eye & Laser Ctrs. P.L.L.C.* v. *Miller,* 127 P.3d 121, 123 (Idaho 2005).

[34] The term "non-solicitation agreement" can also refer to a type of agreement between employers not to solicit one another's employees. In this NPRM, however, the term refers only to contractual provisions between employers and workers prohibiting the worker from soliciting clients or customers of the employer.

[35] *See, e.g.,* Norman D. Bishara, Kenneth J. Martin, and Randall S. Thomas, *An Empirical Analysis of Non-Competition Clauses and Other Restrictive Post-Employment Covenants,* 68 Vand. L. Rev. 1, 13 (2015); Uniform Law Comm'n, *Uniform Restrictive Employment Agreement Act,* Draft For Approval (2021) at § 2.

[36] *See, e.g., Wegmann* v. *London,* 648 F.2d 1072, 1073 (5th Cir. 1981); *Brown* v. *TGS Mgmt. Co., LLC,* 57 Cal. App. 5th 303, 306, 319 (Cal. Ct. App. 2020).

[37] Fed. Trade Comm'n & U.S. Dep't of Justice Antitrust Division, Antitrust Guidance for Human Resource Professionals (Oct. 2016) at 3.

[38] *See infra* Part II.C.

[39] *See, e.g.,* Jamieson, *supra* note 28.

[40] *See, e.g.,* Alan B. Krueger & Eric A. Posner, The Hamilton Project, Policy Proposal 2018–05, *A Proposal for Protecting Low-Income Workers from Monopsony and Collusion* (February 2018) at 7.

[41] *See, e.g.,* Dep't of the Treasury, Report, *The State of Labor Market Competition* (March 7, 2022) at 3.

current employer may also compete with these prospective workers by seeking to retain the worker—for example, by offering to raise the worker's pay or promote the worker. Ultimately, the worker chooses the job that best meets their objectives. In general, the more jobs available—*i.e.*, the more options the worker has—the stronger the match the worker will find.

Just as employers compete for workers in a well-functioning labor market, workers compete for jobs. An employer who needs a worker will make it known that the employer has a position available. Workers who learn of the opening will apply for the job. From among the workers who apply, the employer will choose the worker that best meets the employer's needs—in general, the worker most likely to be the most productive. In general, the more workers who are available—*i.e.*, the more options the employer has—the stronger the match the employer will find.

Through these processes—employers competing for workers, workers competing for jobs, and employers and workers matching with one another—competition in the labor market leads to higher earnings for workers, greater productivity for employers, and better economic conditions.

In a perfectly competitive labor market, if a job that a worker would prefer more—for example, because it has higher pay or is in a better location—were to become available, the worker could switch to it quickly and easily. Due to this ease of switching, in a perfectly competitive labor market, workers would easily match to the optimal job for them. If a worker were to find themselves in a job where the combination of their happiness and productivity is less than in some other job, they would simply switch jobs, making themselves better off.

However, this perfectly competitive labor market exists only in theory. In practice, labor markets deviate substantially from perfect competition. Non-compete clauses, in particular, impair competition in labor markets by restricting a worker's ability to change jobs. If a worker is bound by a non-compete clause, and the worker wants a better job, the non-compete clause will prevent the worker from accepting a new job that is within the scope of the non-compete clause. These are often the most natural alternative employment options for a worker: jobs in the same geographic area and in the worker's field of expertise. For example, a non-compete clause might prevent a nurse in Cleveland from working in the health care field in Northeast Ohio, or a

software engineer in Orlando from working for another technology company in Central Florida. The result is less competition among employers for the worker's services and less competition among workers for available jobs. Since the worker is prevented from taking these jobs, the worker may decide not to enter the labor market at all. Or the worker may enter the labor market but take a job in which they are less productive, such as a job outside their field.

Non-compete clauses affect competition in labor markets through their use in the aggregate. The effect of an individual worker's non-compete clause on competition in a particular labor market may be marginal or may be impossible to discern statistically. However, the use of a large number of non-compete clauses across a labor market markedly affects the opportunities of all workers in that market, not just those with non-compete clauses. By making it more difficult for many workers in a labor market to switch to new jobs, non-compete clauses inhibit optimal matches from being made between employers and workers across the labor force. As a result, where non-compete clauses are prevalent in a market, workers are more likely to remain in jobs that are less optimal with respect to the worker's ability to maximize their productive capacity. This materially reduces wages for workers—not only for workers who are subject to non-compete clauses, but for other workers in a labor market as well, since jobs that would otherwise be better matches for an unconstrained worker are filled by workers subject to non-compete clauses.

### a. Estimates of Non-Compete Clause Use

Based on the available evidence, the Commission estimates that approximately one in five American workers—or approximately 30 million workers—is bound by a non-compete clause.

A 2014 survey of workers by Evan Starr, JJ Prescott, and Norman Bishara, which resulted in 11,505 responses, found 18% of respondents work under a non-compete clause and 38% of respondents have worked under one at some point in their lives.[42] Among the

studies of non-compete clause use discussed here, this study has the broadest and likely the most representative coverage of the U.S. labor force.[43] Starr, Prescott, and Bishara also found that, among workers without a bachelor's degree, 14% of respondents reported working under a non-compete clause at the time surveyed and 35% reported having worked under one at some point in their lives.[44] For workers earning less than $40,000 per year, 13% of respondents work under a non-compete clause and 33% worked under one at some point in their lives.[45] Furthermore, this survey shows 53% of workers who are covered by non-compete clauses are hourly workers.[46]

Starr, Prescott, and Bishara also found, in states where non-compete clauses are unenforceable, workers are covered by non-compete clauses at approximately the same rate as workers in other states.[47] This suggests employers maintain non-compete clauses even where they likely cannot enforce them.

Other estimates of non-compete clause use cover subsets of the U.S. labor force. One study, a 2021 study by Rothstein and Starr, is based on National Longitudinal Survey of Youth (NLSY) data.[48] The NLSY consists of a nationally representative sample of 8,984 men and women born from 1980–84 and living in the United States at the time of the initial survey in 1997.[49] The survey is an often-used labor survey conducted by the Bureau of Labor Statistics, rather than a one-off survey

---

[42] Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 53 (2021). A survey of workers conducted in 2017 by *Payscale.com* reached similar results. This survey estimated that 24.2% of workers are subject to a non-compete clause. Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Bundling Employment Restrictions and Value Appropriation from Employees* 35 (2022), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403*. This survey also

found that non-compete clauses are often used together with other restrictive employment covenants, including non-disclosure, non-recruitment, and non-solicitation covenants. *Id.* at 17 (reporting that respondents that had a non-compete clause reported having all three of the other restrictive employment covenants 74.7% of the time). However, a key limitation of the *Payscale.com* survey is that it is a convenience sample of individuals who visited *Payscale.com* during the time period of the survey and is therefore unlikely to be fully representative of the U.S. working population. *Id.* at 13. While weighting based on demographics helps, it does not fully mitigate this concern.

[43] The final survey sample contained 11,505 responses, representing individuals from nearly every demographic in the labor force. *Id.* at 58.

[44] *Id.* at 63.

[45] *Id.*

[46] Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2021) (analyzing data from the Starr, Prescott, & Bishara survey).

[47] Starr, Prescott, & Bishara, *supra* note 42 at 81.

[48] Donna S. Rothstein & Evan Starr, *Mobility Restrictions, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997* (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3974897*.

[49] U.S. Bureau of Labor Statistics, *NLSY97 Data Overview, https://www.bls.gov/nls/nlsy97.htm.*

**3486** **Federal Register** / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules

directed solely at calculating the prevalence of non-compete clauses. Using this data, Rothstein and Starr estimate the prevalence of non-compete clauses to be 18%, which is comparable to the number estimated by Starr, Prescott, and Bishara.[50]

Finally, four occupations have been studied individually: executives, physicians, hair stylists, and electrical and electronics engineers. Both Shi (2021) and Kini et al. (2021) estimate prevalence of non-compete clauses for executives. Shi (2021) finds the proportion of executives working under a non-compete clause rose from ''57% in the early 1990s to 67% in the mid-2010s.'' [51] Kini et al. (2021) find that 62% of CEOs worked under a non-compete clause between 1992 and 2014.[52] Lavetti et al. (2020) find 45% of physicians worked under a non-compete clause in 2007.[53] In a survey of independent hair salon owners, Johnson and Lipsitz (2021) find 30% of hair stylists worked under a non-compete clause in 2015.[54] Finally, in a survey of electrical and electronic engineers, Marx (2011) finds that 43% of respondents signed a non-compete clause.[55]

Some observers have stated that the use of non-compete clauses by employers appears to have increased over time.[56] However, there is no consistent data available on the prevalence of non-compete clauses over time.

While many workers are bound by non-compete clauses, many workers do not know whether their non-compete clause is legally enforceable or not. As part of their 2014 survey, Starr et al.

asked surveyed individuals ''Are noncompetes enforceable in your state?'' Of the respondents, 37% indicated that they did not know whether or not their non-compete clause was enforceable.[57] Additionally, 11% of individuals were misinformed: they believed that non-compete clauses were enforceable in their state when they were not, or they believed that non-compete clauses were not enforceable when they were.[58]

Starr et al. also find that only 10.1% of workers with non-compete clauses report bargaining over it.[59] Additionally, only 7.9% report consulting a lawyer, and only 11.4% of respondents thought that they still would have been hired if they had refused to sign the non-compete clause.[60] Marx finds that only 30.5% of electrical engineers who signed non-compete clauses were asked to sign prior to accepting their job offer, and 47% of non-compete clause signers were asked to sign on or after their first day of work.[61]

b. Earnings—Effects on Workers Across the Labor Force

By inhibiting optimal matches from being made between employers and workers across the labor force, non-compete clauses reduce the earnings of workers. Several studies have found that increased enforceability of non-compete clauses reduces workers' earnings across the labor market generally and for specific types of workers.

Each of the studies described below analyzes the effects of non-compete clause enforceability on earnings. While different studies have defined enforceability of non-compete clauses in slightly different ways, each uses enforceability as a proxy for the chance that a given non-compete clause will be enforced.[62]

These studies use ''natural experiments'' resulting from changes in state law to assess how changes in the enforceability of non-compete clauses affect workers' earnings. The use of a natural experiment allows for the

inference of causal effects, since the likelihood that other variables are driving the outcomes is minimal.

First, a study conducted by Matthew Johnson, Kurt Lavetti, and Michael Lipsitz finds that decreasing non-compete clause enforceability from the approximate enforceability level of the fifth-strictest state to that of the fifth-most-lax state would increase workers' earnings by 3–4%.[63] Johnson, Lavetti, and Lipsitz also estimate that a nationwide ban on non-compete clauses would increase average earnings by 3.3–13.9%.[64] The authors also find that non-compete clauses limit the ability of workers to leverage favorable labor markets to receive greater pay: when non-compete clauses are more enforceable, workers' earnings are less responsive to low unemployment rates (which workers may typically leverage to negotiate pay raises).[65]

The second study of the effects of non-compete clause enforceability on earnings, conducted by Evan Starr, estimates that if a state that does not enforce non-compete clauses shifted its policy to that of the state with an average level of enforceability, earnings would fall by about 4%.[66] Unlike many of the other studies described here, this study does not use a change in enforceability of non-compete clauses to analyze the impact of enforceability. Rather, it examines the differential impact of enforceability on workers in occupations which use non-compete clauses at a high rate versus workers in occupations which use non-compete clauses at a low rate. While the Commission believes that this research design may be less informative with respect to the proposed rule than designs which examine changes in enforceability, the study's estimated effects are in line with the rest of the literature.

The third study, conducted by Michael Lipsitz and Evan Starr, estimates that when Oregon stopped enforcing non-compete clauses for workers who are paid hourly, their wages increased by 2–3%, relative to workers in states which did not experience legal changes. The study also found a greater effect (4.6%) on workers

[50] Rothstein & Starr, *supra* note 48 at 7.

[51] Liyan Shi, *Optimal Regulation of Noncompete Contracts* 27 (2022), https://static1.squarespace.com/static/59e19b282278e7ca5b9ff84f/t/626658ffb73adb2959bd4371/1650874624095/noncompete_shi.pdf.

[52] Omesh Kini, Ryan Williams, & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation*, 34 Rev. Fin. Stud. 4701, 4707 (2021).

[53] Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020).

[54] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?*, 57 J. Hum. Res. 689, 700 (2022).

[55] Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Socio. Rev. 695, 702 (2011). Calculated as 92.60% who signed a non-compete clause of the 46.80% who were asked to sign a non-compete clause.

[56] *See, e.g.,* Rachel Arnow-Richman, *Cubewrap Contracts and Worker Mobility: The Dilution of Employee Bargaining Power via Standard Form Noncompetes*, 2006 Mich. St. L. Rev. 963, 981 n.59; John W. Lettieri, American Enterprise Institute, Policy Brief, *A Better Bargain: How Noncompete Reform Can Benefit Workers and Boost Economic Dynamism* (December 2020) at 2.

[57] J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability* 10 (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3873638.

[58] *Id.* at 11.

[59] Starr, Prescott, & Bishara, *supra* note 42, at 72.

[60] *Id.*

[61] Marx (2011), *supra* note 55 at 706. Forty-seven percent is calculated as the sum of 24.43% and 22.86%, the respective percentage of requests that were made on the first day or after the first day at the company.

[62] All the studies described below rely on twelve concepts of enforceability based on Malsberger's ''Non-Compete Clauses: A State-by-State Survey'' and Kini et al. supplemented with data from Beck, Reed, and Riden LLP's state-by-state survey of non-compete clauses.

[63] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2 (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.

[64] *Id.*

[65] *Id.* at 36.

[66] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. Rev. 783, 799 (2019).

in occupations that used non-compete clauses at a relatively high rate.[67]

The fourth study, conducted by Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr, found that when Hawaii stopped enforcing non-compete clauses for high-tech workers, earnings of new hires increased by about 4%.[68]

The fifth and sixth studies both show that enforceable non-compete clauses reduce earnings for executives. One study, by Mark Garmaise, finds that decreased enforceability of non-compete clauses increases executives' earnings by 12.7%.[69] Another study, by Omesh Kini, Ryan Williams, and David Yin, finds that decreased enforceability of non-compete clauses led to lower earnings for CEOs when use of non-compete clauses is held constant. However, the study also finds use of non-compete clauses decreases when non-compete clause enforceability decreases. When that relationship is taken into account, decreased enforceability results in greater earnings for CEOs. For example, if the state which enforces non-compete clauses most strictly (Florida) hypothetically moved to a policy of non-enforcement, then a CEO who had a non-compete clause prior to the policy change would experience an estimated 11.4% increase in their earnings, assuming their non-compete clause was dropped.[70]

Among the studies listed above, Johnson, Lavetti, and Lipsitz likely have the broadest coverage. The study spans the years 1991 to 2014, examines workers across the labor force, and uses all known common law and statutory changes in non-compete clause enforceability to arrive at its estimates. The study by Starr also covers the entire labor force, from 1996 to 2008. However, the Starr study is only able to compare effects for occupations that use non-compete clauses at a high rate to those that use them at a low rate. The next two studies cover just one legal

change, and only a subset of the labor force: hourly workers in Oregon, in the case of Lipsitz and Starr, and high-tech workers in Hawaii, in the case of Balasubramanian et al. Finally, while the studies conducted by Garmaise and Kini et al. examine multiple legal changes, they focus solely on executives.

One limitation of studies of enforceability alone—*i.e.,* studies which do not consider the use of non-compete clauses—is that it is difficult to disentangle the effects of increased enforceability on workers who are subject to non-compete clauses and workers who are not subject to non-compete clauses. In other words, since effects are observed across the labor force (or some subset of it), they include both effects on workers with and without non-compete clauses. However, due to the research cited in the next subsection—indicating non-compete clauses reduce earnings for workers who are *not* subject to non-compete clauses—the Commission believes it is reasonable to conclude based on contextual evidence that the labor-force-wide effects described in the studies above include effects on both workers with and without non-compete clauses.

Three additional studies examine the association between non-compete clause use—rather than enforceability—and earnings. Using the 2014 survey described in Part II.B.1.a, Starr et al. find that the use of non-compete clauses is associated with 6.6% higher earnings in the model including the most control variables among those they observe.[71] Using the *Payscale.com* data, Balasubramanian et al. find that while non-compete clause use is associated with 2.1–8.2% greater earnings (compared with individuals with no post-contractual restrictions), this positive association is due to non-compete clauses often being bundled with non-disclosure agreements. Compared with individuals only using non-disclosure agreements, use of non-compete clauses is associated with a 3.0–7.3% *decrease* in earnings, though the authors do not disentangle this effect from the effects of use of non-solicitation and non-recruitment provisions.[72] Finally, Lavetti et al. find that use of non-compete clauses among physicians is associated with greater earnings (by 14%) and greater earnings growth.[73] (The Commission notes, however, this study does not consider

how changes in non-compete clause enforceability affect physicians' earnings. As described below in the cost-benefit analysis for the proposed rule, the Commission estimates the proposed rule may increase physicians' earnings, though the study does not allow for a precise calculation.[74])

However, the Commission does not believe that studies examining the association between non-compete clause use—rather than enforceability—and earnings are sufficiently probative of the effects of non-compete clauses on earnings. The Commission's concern is that non-compete clause use and earnings may both be determined by one or more confounding factors. It may be the case, for example, that employers who rely most on trade secrets both pay more and use non-compete clauses at a high rate (which would not necessarily be captured by the control variables observed in studies of non-compete clause use). This means these studies do not necessarily inform how restricting the use of non-compete clauses through a rule would impact earnings. This methodological limitation contrasts with studies examining enforceability of non-compete clauses, in which changes in enforceability are "natural experiments" that allow for the inference of causal effects, since the likelihood that other variables are driving the outcomes is minimal. A "natural experiment" refers to some kind of change in the real world that allows researchers to study the impact of the change on an outcome. In a natural experiment, the change is effectively random, uninfluenced by other factors which could have simultaneously affected the outcome. In such situations, it is therefore most likely the change itself caused any impact that is observed on the outcomes.

The belief that studies of non-compete clause use do not reflect causal estimates is shared by the authors of at least one of the studies of non-compete clause use. As noted in Starr et al., "Our analysis of the relationships between noncompete use and labor market outcomes . . . is best taken as descriptive and should not be interpreted causally."[75] As a result, the Commission gives these studies minimal weight. The study of physicians conducted by Lavetti et al. partially mitigates this concern by comparing earnings effects in high-versus low-enforceability states, though this analysis compares only California and Illinois, meaning that it is

---

[67] Lipsitz & Starr, *supra* note 46 at 143.

[68] Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Non-Compete Clauses and the Careers of High-Tech Workers,* 57 J. Hum. Res. S349, S349 (2022).

[69] Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment,* 27 J.L., Econ., & Org. 376, 403 (2011). The reduction in earnings is calculated as $e^{-1.3575*0.1} - 1$, where $-1.3575$ is taken from Table 4.

[70] Kini, Williams, & Yin, *supra* note 52 at 4731. The 11.4% increase is calculated as $e^X - 1$, where X is calculated as 9 times the coefficient on CEO Noncompete × HQ Enforce (0.047), where 9 is the enforceability index in Florida, plus the coefficient on CEO Noncompete ($-0.144$), plus 9 times the coefficient on HQ Enforce ($-0.043$).

[71] Starr, Prescott, & Bishara, *supra* note 42 at 75.

[72] Balasubramanian, Starr, & Yamaguchi, *supra* note 42 at 40. The percentage range is calculated as $e^{-0.030} - 1$ and $e^{-0.076} - 1$, respectively.

[73] Lavetti, Simon, & White, *supra* note 53 at 1051. The increase in earnings is calculated as $e^{0.131} - 1$.

[74] *See infra* Part VII.B.1.a.ii.

[75] Starr, Prescott, & Bishara, *supra* note 42 at 73.

impossible to disentangle underlying differences in those two states from the effects of non-compete clause enforceability.

c. Earnings—Effects on Workers Not Covered by Non-Compete Clauses

As described above, non-compete clauses negatively affect competition in labor markets, thereby inhibiting optimal matches from being made between employers and workers across the labor force. As a result, non-compete clauses reduce earnings not only for workers who are subject to non-compete clauses, but also for workers who are not subject to non-compete clauses.

Two studies show non-compete clauses reduce earnings for workers who are not subject to non-compete clauses. The first study, a 2019 study of the external effects of non-compete clauses conducted by Evan Starr, Justin Frake, and Rajshree Agarwal, analyzed workers without non-compete clauses who worked in states and industries in which non-compete clauses were used at a high rate.[76] They find that, when the use of non-compete clauses in a given state and industry combination increases by 10%, the earnings of workers who do not have non-compete clauses, but who work in that same state and industry, go down by about 6.12% more when that state has an average enforceability level, compared with a state which does not enforce non-compete clauses.[77] In effect, this study finds when the use of non-compete clauses by employers increases, that drives down wages for workers who do not have non-compete clauses but who work in the same state and industry. This study also finds this effect is stronger where non-compete clauses are more enforceable.

The Commission notes that, similar to some of the studies described above, this study relies on use of non-compete clauses, as well as cross-sectional differences in enforceability of non-compete clauses, to arrive at their conclusions. While this approach calls into question the causal relationship outlined in the study, the authors employ tests to increase confidence in the causal interpretation; however, the tests rely on what data the authors have available, and therefore cannot rule out explanations outside of the scope of their data. This study also analyzes the effect of non-compete clause use for certain workers on workers in a different firm, meaning that factors

simultaneously driving non-compete clause use and outcomes within a certain firm will not break the causal chain identified in the study.

Starr, Frake, and Agarwal show the reduction in earnings (and mobility, discussed below) is due to a reduction in the rate of the arrival of job offers. Individuals in state/industry combinations which use non-compete clauses at a high rate do not receive job offers as frequently as individuals in state/industry combinations where non-compete clauses are not frequently used.[78] The authors also demonstrate decreased mobility and earnings are *not* due to increased job satisfaction (*i.e.*, if workers are more satisfied with their jobs, they may be less likely to change jobs, and more likely to accept lower pay).[79] Finally, they show that decreased mobility and earnings are not because workers are searching for jobs less frequently, suggesting that job openings and firm behavior matter more to the underlying mechanism.[80]

The second study, conducted by Johnson, Lavetti, and Lipsitz, isolates the impact of a state's enforceability policy on workers not directly affected by that policy to demonstrate non-compete clauses affect not just the workers subject to those non-compete clauses, but the broader labor market as well. In particular, the study finds that increases in non-compete clause enforceability in one state have negative impacts on workers' earnings in bordering states, and the effects are nearly as large as the effects in the state in which enforceability changed. Johnson, Lavetti, and Lipsitz estimate that the impact on earnings of a law change in one state on workers just across that state's border is 87% as great as for workers in the state in which the law was changed (the effect tapers off as the distance to the bordering state increases).[81] When a law change in one state decreases workers' earnings in that state by 4%, that would therefore mean that workers just across the border (*i.e.*, workers who share a commuting zone—a delineation of a local economy[82]—but who live in another state) would experience decreased earnings of 3.5%. The authors conclude that, since the workers across the border are not

*directly* affected by the law change (*i.e.*, contracts that they have signed do not become more or less enforceable), this effect must be due to changes in the local labor market.[83]

d. Earnings—Distributional Effects

There is evidence that non-compete clauses increase racial and gender wage gaps by disproportionately reducing the wages of women and non-white workers. This may be, for example, because firms use the monopsony power which results from use of non-compete clauses as a means by which to wage discriminate. The study by Johnson, Lavetti, and Lipsitz finds that while earnings of white men would increase by about 3.2% if a state's enforceability moved from the fifth-strictest to the fifth most lax, the comparable earnings increase for workers in other demographic groups would be 3.7–7.7%, depending on the characteristics of the group (though it is not clear from the study whether or not the differences are statistically significant).[84] The authors estimate that banning non-compete clauses nationwide would close racial and gender wage gaps by 3.6–9.1%.[85]

e. Job Creation

While non-compete clauses may theoretically incentivize firms to create jobs by increasing the value associated with any given worker covered by a non-compete clause, the evidence is inconclusive. One study, by Gerald Carlino, estimates the job creation rate at startups increased by 7.8% when Michigan increased non-compete clause enforceability.[86] However, the job creation rate calculated in this study is the ratio of jobs created by startups to overall employment in the state: therefore, the job creation rate at startups may rise either because the number of jobs created by startups rose, or because employment overall fell. The study does not investigate which of these two factors drives the increase in the job creation rate at startups.

Another study finds that several increases in non-compete clause enforceability were associated with a 1.4% increase in average per-firm employment at new firms (though not necessarily total employment).[87] In this

---

[76] Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961, 6 (2019).

[77] *Id.* at 11.

[78] *Id.* at 10.

[79] *Id.* at 13.

[80] *Id.*

[81] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 51. Eighty seven percent is calculated as the coefficient on the donor state NCA score (−.181) divided by the coefficient on own state NCA score (−.207).

[82] See U.S. Econ. Rsch. Serv., Commuting Zones and Labor Market Areas, *https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/*.

[83] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 30.

[84] *Id.* at 38.

[85] *Id.*

[86] Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment* at 16 (Fed. Reserve Bank of Phila. Working Paper 21–26, 2021).

[87] Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation,*

study, the authors attribute the increase in average employment to a change in the composition of newly founded firms. The increases in non-compete clause enforceability prevented the entry of relatively small startups which would otherwise have existed. Therefore, the firms which entered in spite of increases in non-compete clause enforceability had more workers on average: this increased the average job creation rate at new firms, because the average entering firm was relatively larger. However, if the mechanism identified by the authors is correct, increases in enforceability generate fewer total jobs, because the same number of large firms may enter (regardless of non-compete clause enforceability), but fewer small firms enter.

A similar mechanism may explain the results in both studies above. If that is indeed the case, then an increase in average per-firm employment among startups is not a positive effect of non-compete clause enforceability: instead, it could actually represent a negative effect, since non-compete clauses prevent small firms from existing in the first place, and overall job creation may decrease. The Commission therefore believes, with respect to job creation rates, the evidence is inconclusive.

## 2. Product and Service Markets

In addition to analyzing how non-compete clauses affect competition in labor markets, researchers have also analyzed whether non-compete clauses affect competition in markets for products and services. The available evidence indicates the use of non-compete clauses interferes with competitive conditions in product and service markets as well.

The adverse effects of non-compete clauses on product and service markets likely result from reduced voluntary labor mobility. Non-compete clauses directly impede voluntary labor mobility by restricting workers subject to non-compete clauses from moving to new jobs covered by their non-compete clause. Since non-compete clauses prevent some job openings from occurring (by keeping workers in their jobs), they also prevent workers who are not subject to non-compete clauses from finding new jobs (since the new jobs are already occupied by workers with non-compete clauses).

Influenced by Ronald Gilson's research positing that high-tech clusters in California may have been aided by increased labor mobility because non-compete clauses are generally unenforceable in that state,[88] many studies have examined how non-compete clauses affect labor mobility. Even literature primarily focused on other outcomes has examined labor mobility as a secondary outcome. Across the board, all studies have found decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within- and between-industry mobility. We briefly describe each of these studies in turn.

A 2006 study conducted by Fallick, Fleischman, and Rebitzer supported Gilson's hypothesis by showing that labor mobility in information technology industries in metropolitan statistical areas (MSAs) in California was 56% higher than in comparison MSAs outside California. They note, however, the estimates may not be fully (or at all) attributable to non-compete clause enforceability. Although the Commission therefore does not find this particular study to be sufficiently probative of the relationship between non-compete clauses and labor mobility, its qualitative findings are in line with the rest of the literature.[89]

To estimate the impacts of non-compete clause enforceability in a fashion that may more plausibly attribute causality to the relationship, in 2009, Marx, Strumsky, and Fleming examined the impact on labor mobility of Michigan's switch to enforcing non-compete clauses. They found that Michigan's increase in enforceability led to an 8.1% decline in the mobility of inventors.[90]

In 2011, Mark Garmaise examined how a suite of changes in non-compete clause enforceability affected labor mobility. Garmaise found executives made within-industry job changes 47% more often, between-industry job changes 25% more often (though this result was not statistically significant), and any job change 35% more often when non-compete clauses were less enforceable.[91]

A 2019 study by Jessica Jeffers uses several legal changes to analyze the impact of non-compete clauses on workers' mobility, finding that decreases in non-compete clause enforceability were associated with an 8.6% increase in departure rates of workers, and a 15.4% increase in within-industry departure rates of workers.[92]

Evan Starr's 2019 study comparing workers in occupations which use non-compete clauses at a high versus low rate found that a state moving from mean enforceability to no enforceability would cause a decrease in employee tenure for workers in high-use occupations of 8.2%, compared with those in low-use occupations. Here, tenure serves as a proxy for mobility, since tenure is the absence of prior mobility.[93]

Returning to an examination of executives, Liyan Shi's 2020 paper qualitatively confirmed Garmaise's results, showing that executives with enforceable non-compete clauses were 1.8 percentage points less likely to separate from their employers, compared with executives without enforceable non-compete clauses.[94]

Starr, Prescott, and Bishara's 2020 study found that having a non-compete clause was associated with a 35% decrease in the likelihood a worker would leave for a competitor.[95] However, they also found enforceability does not impact this prediction, in contrast with prior studies. Digging deeper into the mechanism, they find that what matters is the worker's belief about the likelihood their employer would seek to enforce a non-compete clause in court. Workers who did not believe employers would enforce non-compete clauses in court were more likely to report they would be willing to leave for a competitor.[96] This result confirms the need to ensure that workers are aware of the proposed rule, though it suffers from the same limitations as do previously discussed studies of the impacts of non-compete clause use, rather than enforceability: that studies of use are not causally interpretable, since they may conflate the effects of factors which cause use for the effects of use itself.

Two recent studies examined subgroups of the population affected by

---

[88] Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Non-Compete Clauses,* 74 N.Y.U. L. Rev. 575 (1999).

[89] Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster,* 88 Rev. Econ. & Statistics 472, 477 (2006).

[90] Matt Marx, Deborah Strumsky, & Lee Fleming, *Mobility, Skills, and the Michigan Non-Compete Experiment,* 55 Mgmt. Sci. 875, 884 (2009).

[91] Garmaise, *supra* note 69 at 398.

[92] Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 22 (2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393.*

[93] Starr, *supra* note 66 at 798. The value is calculated as 8.2% = 0.56/6.46, where 0.56 is the reported impact on tenure and 6.46 is mean tenure in the sample.

[94] Shi, *supra* note 51 at 26.

[95] Evan Starr, J.J. Prescott, & Norm Bishara, *The Behavioral Effects of (Unenforceable) Contracts,* 36 J.L., Econ., & Org. 633, 652 (2020).

[96] *Id.* at 664.

---

*Growth, and Survival of New Firms,* 64 Mgmt. Sci. 552, 561 (2018).

state law changes. Balasubramanian et al., in 2022, focused on high-tech workers whose non-compete clauses were banned in Hawaii, and Lipsitz and Starr, in 2022, focused on hourly workers whose non-compete clauses were banned in Oregon. The former found that the ban increased mobility by 12.5% in the high-tech sector,[97] while the latter found that mobility of hourly workers increased by 17.3%.[98]

Finally, a 2022 study by Johnson, Lavetti, and Lipsitz examined the impact on labor mobility of all legal changes after 1991 across the entire labor force. They found moving from the enforceability level of the fifth strictest state to that of the fifth most lax state causes a 6.0% increase in job-to-job mobility in industries using non-compete clauses at a high rate.[99] Furthermore, they found when a state changes its non-compete clause enforceability in that fashion, workers in neighboring states experience 4.8% increases in mobility as measured by job separations, and 3.9% increases as measured by hiring rates, though neither result was statistically significant.[100]

As described below in Part IV.A.1.a.ii, the Commission does not view reduced labor mobility from non-compete clauses—in and of itself—as evidence non-compete clauses negatively affect competition in product and service markets. Instead, reduced labor mobility is best understood as the primary driver of effects in product and service markets that the Commission is concerned about. These effects are described below.

### a. Consumer Prices and Concentration

There is evidence that non-compete clauses increase consumer prices and concentration in the health care sector. There is also evidence non-compete clauses increase industrial concentration more broadly. Non-compete clauses may have these effects by inhibiting entrepreneurial ventures (which could otherwise enhance competition in goods and service markets) or by foreclosing competitors' access to talented workers.

One study, by Naomi Hausman and Kurt Lavetti, finds increased concentration, as measured by the Herfindahl-Hirschman Index (HHI), at the firm level [101] and increased final

goods prices [102] as the enforceability of non-compete clauses increases. Hausman and Lavetti's study focuses on physician markets, showing that while non-compete clauses allow physician practices to allocate clients more efficiently across physicians, this comes at the cost of greater concentration and prices for consumers. Generally, greater concentration may or may not lead to greater prices in all situations and may arise for reasons which simultaneously cause higher prices (indicating, therefore, a noncausal relationship between concentration and prices). In this case, the authors claim that researching the direct link between changes in law governing non-compete clauses and changes in concentration allows them to identify a causal chain starting with greater enforceability of non-compete clauses, which leads to greater concentration, and higher consumer prices.

While there is no additional direct evidence on the link between non-compete clauses and consumer prices, another study, by Michael Lipsitz and Mark Tremblay, shows increased enforceability of non-compete clauses at the state level increases concentration, as measured by an employment-based HHI.[103] Lipsitz and Tremblay theorize non-compete clauses inhibit entrepreneurial ventures which could otherwise enhance competition in goods and service markets, and show that the potential for harm is greatest in exactly those industries in which non-compete clauses are likely to be used at the highest rate.[104] If the general causal link governing the relationship between enforceability of non-compete clauses, concentration, and consumer prices acts similarly to that identified in the study by Hausman and Lavetti, then it is plausible that increases in concentration identified by Lipsitz and Tremblay would lead to higher prices in a broader set of industries.

In many settings, it is also theoretically plausible that increases in worker earnings from restricting non-compete clauses may increase consumer prices by raising firms' costs (though there is countervailing evidence,

especially in goods manufacturing [105]). However, we are not aware of empirical evidence that this occurs, and there are also countervailing forces—such as the impacts on concentration described above and positive impacts on innovation [106]—that would tend to decrease consumer prices. Additionally, the greater wages observed for workers where non-compete clauses are less enforceable may be due to better worker-firm matching, which could simultaneously increase wages and increase productivity, which could lead to lower prices.

In addition, the only study of how non-compete clauses affect prices—the Hausman and Lavetti study described above—finds decreased non-compete clause enforceability decreases prices in the healthcare market, rather than increasing them. The study notes that, in theory, changes in non-compete clause enforceability could impact physicians' earnings, which could subsequently pass through to prices in healthcare markets. However, the authors show that, where prices decrease due to decreased non-compete clause enforceability, labor cost pass-through is not driving price decreases. As the authors note, if price decreases associated with non-compete clause enforceability decreases were due to pass-through of decreases in physicians' earnings, then the most labor-intensive procedures would likely experience the greatest price decreases when enforceability decreases. However, they find the opposite: there is little to no effect on prices for the most labor-intensive procedures, in contrast with procedures which use relatively less labor. As the authors explain, this shows that decreases in healthcare prices associated with decreases in non-compete clause enforceability are not due to pass-through of lower labor costs.[107]

### b. Foreclosing Competitors' Ability To Access Talent

There is evidence that non-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—

---

[97] Balasubramanian et al., *supra* note 68 at S351.

[98] Lipsitz & Starr, *supra* note 46 at 157.

[99] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 21.

[100] *Id.* at 76.

[101] Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 a.m. Econ. J. Applied Econ. 258, 284 (2021). Note that Hausman and Lavetti find decreased HHI at the establishment

level (where an establishment is a physical location, and a firm is a company which may own multiple establishments). For the purposes of consumer outcomes such as a price or product quality, the relevant measure of concentration is at the firm level, since firms are unlikely to compete against themselves on price or quality.

[102] *Id.* at 280.

[103] Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* 6 (2021), *https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=3975864.*

[104] *Id.* at 3.

[105] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through*, 54 J. Money, Credit & Banking 7 (2022).

[106] *See infra* Part II.B.2.d.

[107] Hausman & Lavetti, *supra* note 101 at 278.

and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses.

Liyan Shi studies this effect in a 2022 paper. This paper finds non-compete clauses are used to ensure that potential new employers of executives make a buyout payment to the executive's current employer.[108] Such a mechanism could be tempered by the ability of a labor market to provide viable alternative workers for new or competing businesses. However, when a particular type of labor is somewhat scarce, when on-the-job experience matters significantly, or when frictions prevent workers from moving to new jobs, there is no way for the market to fill the gap created by non-compete clauses. By studying CEOs, who are difficult to replace and relatively scarce, Shi's paper shows that non-compete clauses foreclose the ability of competitors to access talent by effectively forcing them to make inefficiently high buyout payments. Shi ultimately concludes that ''imposing a complete ban on noncompete clauses would be close to implementing the social optimum.'' [109]

### c. New Business Formation

The weight of the evidence indicates non-compete clauses likely have a negative impact on new business formation. Three studies show that non-compete clauses and increased enforceability of non-compete clauses reduce entrepreneurship, new business formation, or both. A fourth study also finds that non-compete clauses reduce the rate at which men and women found new startups, though the result is not statistically significant for men. A fifth study finds mixed effects which likely support the theory that non-compete clauses reduce new business formation, and a sixth study finds no effect.

New business formation may refer to entrepreneurs creating new businesses from scratch or to businesses being spun off from existing businesses. New business formation increases competition first by bringing new ideas to market, and second, by forcing incumbent firms to respond to new firms' ideas instead of stagnating. New businesses disproportionately create new jobs and are, as a group, more resilient to economic downturns.[110]

Recent evidence that new business formation is trending downward has led to concerns that productivity and technological innovation are not as strong as they would have been had new business formation remained at higher levels.[111] Non-compete clauses restrain new business formation by preventing workers subject to non-compete clauses from starting their own businesses. In addition, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.

Three studies show that non-compete clauses and increased enforceability of non-compete clauses reduce entrepreneurship and new business formation. First, Sampsa Samila and Olav Sorenson, in a 2011 study, examined the differential impacts of venture capital on business formation, patenting, and employment growth. They found when non-compete clauses are more enforceable, rates of entrepreneurship, patenting, and employment growth slow. They find that a 1% increase in venture capital funding increased the number of new firms by 0.8% when non-compete clauses were enforceable, and by 2.3% when non-compete clauses were not enforceable.[112] Similarly, a 1% increase in the rate of venture capital funding increased employment by 0.6% when non-compete clauses were enforceable, versus 2.5% where non-compete clauses were not enforceable.[113]

The second study, conducted by Jessica Jeffers in 2019, uses several state law changes to observe a decline in new firm entry when non-compete clauses are more enforceable. When non-compete clause enforceability is made stricter (based on the relatively meaningful changes examined in her study), the entry rate of new firms decreased by 10% in the technology sector and the professional, scientific, and technical services sector.[114]

The third study, conducted by Evan Starr, Natarajan Balasubramanian, and Mariko Sakakibara in 2018, finds that the rate of within-industry spinouts (WSOs) decreases by 0.13 percentage points (against a mean of 0.4%) when non-compete clause enforceability

increases by one standard deviation.[115] The study's measured impact on the entry rate of non-WSOs (*i.e.,* spinoffs into other industries) is statistically indistinguishable from zero (0.07 percentage point increase associated with a one standard deviation increase in enforceability).[116] WSOs have been shown to be highly successful, on average, when compared with typical entrepreneurial ventures.[117] By reducing intra-industry spinoff activity, non-compete clauses prevent entrepreneurial activity that is likely to be highly successful.

The fourth study, published by Matt Marx in 2021, examines the impact of several changes in non-compete clause enforceability between 1991 and 2014.[118] Marx finds that, when non-compete clauses are more enforceable, men are 46% less likely to found a rival startup after leaving their employer (though this result is statistically insignificant), that women are 69% less likely to do so, and that the difference in the effect of non-compete clause enforceability on founding rates between men and women *is* statistically significant.[119] This study therefore supports both the theory that non-compete clauses inhibit new business formation and that non-compete clauses tend to have more negative impacts for women than for men.

A fifth study finds mixed effects of non-compete clause enforceability on the entry of businesses into the State of Florida. Hyo Kang and Lee Fleming, in a 2020 study, examine a legal change in Florida which made non-compete clauses more enforceable. This study finds that larger businesses entered the state more frequently (by 8.5%), but smaller businesses entered less frequently (by 5.6%) following the change.[120] Similarly, Kang and Fleming found that employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change.[121]

---

[108] Shi, *supra* note 51.

[109] *Id.* at 35.

[110] *See, e.g., The Importance of Young Firms for Economic Growth,* Policy Brief, Ewing Marion Kauffman Foundation (Sept. 24, 2015).

[111] *See, e.g.,* Cong. Budget Off., *Federal Policies in Response to Declining Entrepreneurship* (December 2020).

[112] Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth,* 57 Mgmt. Sci. 425, 432 (2011). The values are calculated as $0.8\% = e^{0.00755} - 1$ and $2.3\% = e^{0.00755 + 0.0155} - 1$, respectively.

[113] *Id.* at 433. The values are calculated as $0.6\% = e^{0.00562} - 1$ and $2.3\% = e^{0.00562 + 0.0192} - 1$, respectively.

[114] Jeffers, *supra* note 92 at 32.

[115] Starr, Balasubramanian, & Sakakibara, *supra* note 87 at 561.

[116] *Id.* at 561.

[117] For reviews of the literature, *see, e.g.,* Steven Klepper, *Spinoffs: A Review and Synthesis,* 6 European Mgmt. Rev. 159–71 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions,* in Handbook of Entrepreneurship Research (2005) 81–96.

[118] Matt Marx, *Employee Non-compete Agreements, Gender, and Entrepreneurship,* Org. Sci. (Online ahead of print) (2021).

[119] *Id.* at 9.

[120] Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study,* 29 J. Econ. & Mgmt. Strategy 663, 673 (2020).

[121] *Id.* at 674. The value is calculated as $15.8\% = e^{0.1468} - 1$.

**3492** **Federal Register** / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules

In the Commission's view, however, the results of this study do not necessarily show how non-compete clauses affect new business formation. This study does not examine new business formation specifically; instead, it assesses the number of "business entries" into the state. As the authors acknowledge, many of these business entries are not new businesses being formed in Florida (*i.e.,* startups), but existing businesses that are moving to the state.[122] Because startups are almost never large businesses, the authors' finding that larger businesses entered the state more frequently is much more likely to reflect businesses moving to the state, rather than new businesses being formed in the state. (While a business's relocation to Florida may benefit Florida, it is not net beneficial from a national perspective, since the business is simply moving from somewhere else.) The authors' finding that increased non-compete clause enforceability decreased the entry of smaller businesses is more likely to reflect an effect of non-compete clause enforceability on new business formation, since smaller businesses are relatively more likely than larger businesses to be startups.

A sixth study finds no effect of non-compete clauses on new business formation. A 2021 study by Gerald Carlino analyzes the impact of a legal change in Michigan that allowed the courts to enforce non-compete clauses. This study finds no significant impact on new business formation.[123]

### d. Innovation

The weight of the evidence indicates non-compete clauses decrease innovation. Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, or may promote competition because successful new products and services force competing firms to improve their own products and services. Non-compete clauses affect innovation by reducing the movement of workers between firms, which decreases knowledge flow between firms. Non-compete clauses also prevent workers from starting businesses in which they can pursue innovative new ideas.

One study shows increased enforceability of non-compete clauses decreases the value of patenting, using a variety of legal changes. Another study shows that increased non-compete clause enforceability decreases the rate at which venture capital funding increases patenting. Finally, using a legal change in Michigan which increased enforceability, one study shows there were mixed effects on patenting in terms of both quantity and quality, but mechanical patenting (a large part of patenting in Michigan) increased.

The first study, a 2021 study by Zhaozhao He, finds the value of patents, relative to the assets of the firm, increase by about 31% when non-compete clause enforceability decreases.[124] In contrast to the other two studies of innovation, the study uses the value of patents, rather than the number of patents, to mitigate concerns that patenting activity may not represent innovation, but rather substitutions of protections (in other words, that when non-compete clauses are made less enforceable, firms may use patents instead of non-compete clauses to seek to protect sensitive information).[125] The study also analyzes the impact of several legal changes to non-compete clause enforceability, which means that the results may be most broadly applicable.

The second study, by Samila and Sorensen, found that, when non-compete clauses are enforceable, venture capital induced less patenting, by 6.6 percentage points.[126] However, as explained above, the authors note patenting may or may not reflect the true level of innovation, as firms may use patenting as a substitute for non-compete clauses where they seek to protect sensitive information.[127] The final study of innovation, a 2021 study by Gerald Carlino, examined how patenting activity in Michigan was affected by an increase in non-compete enforceability. The study finds that mechanical patenting increased following the law change, but drug patenting fell, and the quality of computer patents fell (as measured by citations).[128] The increase in mechanical patenting appears to have primarily occurred approximately 14 years after non-compete clause enforceability changed, however, suggesting some other mechanism may have led to the increase in patenting activity.[129] We place relatively greater weight on studies focused on multiple legal changes to non-compete clause

enforceability (such as the above referenced study by He), in which factors unrelated to the legal changes at issue are less likely to drive the results. The Carlino study also does not discuss whether patenting activity is an appropriate measure of innovation, though the other two studies suggest that it may be an unreliable measure at best. The study by Samila and Sorensen examines the enforceability of non-compete clauses across all states but does not consider changes in enforceability: they are therefore unable to rule out that their results could be due to underlying differences in the states rather than non-compete clause enforceability.

The Commission therefore places greatest weight on the study by He, which suggests innovation is largely harmed by non-compete clause enforceability. Though the results from Carlino countervail this finding, those results are subject to criticism (as is the corroborating evidence found in Samila and Sorensen).

Two additional studies address firm strategies related to innovation. The first, by Raffaele Conti, uses two changes in non-compete clause enforceability (in Texas and Florida), and indicates that firms engage in riskier strategies with respect to research and development when non-compete clause enforceability is greater.[130] Riskier research and development strategies lead to more breakthrough innovations, but also lead to more failures, leaving the net impact unclear. The paper does not quantify the total impact on innovation.

The second, by Fenglong Xiao, found increases in non-compete clause enforceability led to increases in exploitative innovation (*i.e.,* innovation which stays within the bounds of the innovating firm's existing competences), and decreases in exploratory innovation (*i.e.,* innovation which moves outside those bounds) in medical devices.[131] Overall, this leads to an increase in the quantity of innovation as measured by the introduction of new medical devices. This increase in quantity, however, is the net result of an increase in exploitative innovation and a decrease in explorative innovation, where the latter is the mode of innovation which the empirical

---

[122] *Id.* at 668.

[123] Carlino, *supra* note 86 at 36.

[124] Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 21 (2021), *https://ssrn.com/abstract=3846964.* Thirty one percent is calculated as $e^{0.272} - 1$.

[125] *Id.* at 17.

[126] Samila & Sorenson, *supra* note 112 at 432. The value is calculated as $6.6\% = e^{0.0208 + 0.0630} - e^{0.0208}$.

[127] *Id.*

[128] Carlino, *supra* note 86 at 40.

[129] *Id.* at 48.

[130] Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Riskier R&D Strategies?*, 35 Strategic Mgmt. J. 1230 (2014).

[131] Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices,* 51 Rsch. Pol'y 1 (2022).

literature has found to be associated with high growth firms.[132]

While these two additional studies bring nuance to the changes in the types of innovation pursued by firms when non-compete clause enforceability changes, neither undermines the weight of the evidence described above: that increased non-compete clause enforceability broadly diminishes the rate of innovation.

### e. Training and Other Investment

There is evidence that non-compete clauses increase employee training and other forms of investment. Four studies have examined investment outcomes: two examine the effects of non-compete clause enforceability on investment (both of which find positive impacts on investment), while two examine the relationship between non-compete clause use and investment (only one of which finds positive impacts on investment).

Of the two studies that examine the effects of non-compete clause enforceability on investment, one looks at employee training, and one looks at firm capital expenditures (*e.g.,* investment in physical assets, such as machines). The first study, a 2020 study by Evan Starr, finds that moving from mean non-compete clause enforceability to no non-compete clause enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-compete clauses at a high rate (relative to a control group of occupations that use non-compete clauses at a low rate).[133] The study further finds changes in training are primarily due to changes in firm-sponsored, rather than employee-sponsored, training.[134] Firm-sponsored training is the type of training non-compete clauses are often theorized to protect, as the firm may be unwilling to make an unprotected investment.

The second study, a 2021 study by Jessica Jeffers, finds knowledge-intensive firms invest 32% less in capital equipment following decreases in the enforceability of non-compete clauses.[135] While firms may invest in capital equipment for many different reasons, Jeffers examines this outcome (as opposed to labor-focused outcomes) to avoid looking at research and development expenditure as a whole, which is in large part composed of labor

expenses. This allows the study to isolate the effects of non-compete clause enforceability on investment from other effects of non-compete clauses, such as reduced worker earnings. Jeffers finds that there are likely two mechanisms driving these effects: first, that firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (*i.e.,* the return on investment in capital equipment is greater when workers are more highly trained); and second, that non-compete clauses reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[136]

The first study that examines the impact of non-compete clause use on investment is a 2021 study by Starr et. al. using their 2014 survey of non-compete clause use. They find no statistically significant impact on either training or the sharing of trade secrets (after inclusion of control variables) but cannot examine other investment outcomes.[137] The second study, a 2021 study by Johnson and Lipsitz, examines investment in the hair salon industry. It finds that firms that use non-compete clauses train their employees at a higher rate and invest in customer attraction through the use of digital coupons (on so-called "deal sites") to attract customers at a higher rate, both by 11 percentage points.[138] However, the authors of both studies caution that these results do not necessarily represent a causal relationship.[139] In each study, the use of non-compete clauses and the decision to invest may be jointly determined by other characteristics of the firms, labor markets, or product markets. For this reason, the Commission places relatively minimal weight on these studies in terms of how they inform the relationship between the proposed rule and future potential firm investment.

Overall, the additional incentive to invest (in assets like physical capital, human capital, or customer attraction, or in the sharing of trade secrets and confidential commercial information) is the primary justification for use of non-compete clauses. Any investment which is lost due to the inability of firms to use non-compete clauses would likely represent the greatest cost of the proposed rule. Indeed, one study, by Kenneth Younge and Matt Marx, finds

that the value of publicly traded firms increased by 9% due to an increase in non-compete clause enforceability.[140] However, they attribute this increase to the value of retaining employees, which comes with the negative effects to parties other than the firm (employees, competitors, and consumers) described in this Part II.B. In particular, if benefits to the firm arise primarily from reductions in labor costs, then the increase in the value of firms is in part a transfer from workers to firms, and is therefore not necessarily a procompetitive benefit of non-compete clauses. However, the authors do not explore the extent to which increases in firm value arise from decreases in labor costs. The authors additionally note that since the time frame used in the study is short, "there may be deleterious effects of non-competes in the long run" which are absent in their findings.[141]

The Commission requests comment on all aspects of its description, in this Part II.B, of the empirical evidence relating to non-compete clauses and their effects on competition. In particular, the Commission seeks submissions of additional data that could inform the Commission's understanding of these effects.

### C. Current Law Governing Non-Compete Clauses

The states have always placed a variety of restrictions on the ability of employers to enforce non-compete clauses. These restrictions are based on public policy concerns American courts—and English courts before them—have recognized for centuries. For example, in the English opinion *Mitchel* v. *Reynolds* (1711), which provided the foundation for the American common law on non-compete clauses,[142] the court expressed concerns that workers were vulnerable to exploitation under non-compete clauses and these clauses threatened workers' ability to practice their trades and earn a living.[143]

Today, while the enforceability of non-compete clauses varies between

---

[132] Alessandra Colombelli, Jackie Krafft & Francesco Quatraro, *High-Growth Firms and Technical Knowledge: Do Gazelles Follow Exploration or Exploitation Strategies?,* 23.1 Industrial and Corporate Change 262 (2014).

[133] Starr, *supra* note 66 at 796–97.

[134] *Id.* at 797.

[135] Jeffers, *supra* note 92 at 28.

[136] *Id.* at 29.

[137] Starr, Prescott, & Bishara, *supra* note 42 at 76.

[138] Johnson & Lipsitz, *supra* note 54 at 711.

[139] Starr, Prescott, & Bishara, *supra* note 42 at 73; Johnson & Lipsitz, *supra* note 54 at 711.

[140] Kenneth A. Younge & Matt Marx, *The value of employee retention: evidence from a natural experiment,* 25 J. Econ. & Mgmt. Strategy 652 (2016).

[141] *Id.* at 674.

[142] Harlan Blake, *Employment Agreements Not to Compete,* 73 Harv. L. Rev. 625, 630–31 (1960).

[143] *Mitchel* v. *Reynolds,* 1 P. Wms. 181, 190 (Q.B. 1711) (expressing concern that non-compete clauses threaten "the loss of [the worker's] livelihood, and the subsistence of his family," and also "the great abuses these voluntary restraints are liable to," for example, "from masters, who are apt to give their apprentices much vexation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves.").

states, all fifty states restrict non-compete clauses between employers and workers to some degree.[144] Non-compete clauses between employers and workers are generally subject to greater scrutiny under state common law than other employment terms, due to "the employee's disadvantageous bargaining position at the time of contracting and hardship at the time of enforcement." [145] For these reasons, state courts often characterize non-compete clauses as "disfavored." [146]

In addition to state common law, non-compete clauses have always been considered proper subjects for scrutiny under the nation's antitrust laws.[147]

1. State Law on Non-Compete Clauses

The question of whether or under what conditions an employer can enforce a particular non-compete clause depends on the applicable state law. Three states—California, North Dakota, and Oklahoma—have adopted statutes rendering non-compete clauses void for nearly all workers.[148] Among the 47 states where non-compete clauses may be enforced under certain circumstances, 11 states and the District

of Columbia have enacted statutes making non-compete clauses void or unenforceable—or have banned employers from entering into non-compete clauses—based on the worker's earnings or a similar factor.[149] In addition, the majority of these 47 states have statutory provisions that ban or limit the enforceability of non-compete clauses for workers in certain specified occupations. In most states, those limits apply to just one or two occupations (most commonly, physicians).[150]

States have been particularly active in restricting non-compete clauses in recent years. Of the twelve state statutes restricting non-compete clauses based on a worker's earnings or a similar factor (including the DC statute), eleven were enacted in the past ten years.[151] States have also recently passed legislation limiting the use of non-compete clauses for certain occupations.[152] Other recent state legislation has imposed additional requirements on employers that use non-compete clauses. For example, Oregon, Maine, Massachusetts, New Hampshire, and Washington have enacted laws requiring employers to provide prior notice that a non-compete clause will be required as a condition of employment.[153] Massachusetts and Oregon have enacted "garden leave" provisions, which require employers to compensate workers during the post-employment period in which the workers are bound by the non-compete clause.[154] Washington limited the permissible duration of non-compete clauses to 18 months,[155] and Massachusetts and Oregon limited it to one year.[156]

For workers not covered by these statutory restrictions, the question of whether or under what conditions a non-compete clause may be enforced against them depends on state common law.

In the 47 states where at least some non-compete clauses may be enforced, courts use a reasonableness inquiry to determine whether to enforce a non-compete clause, in addition to whatever statutory limits they are bound to apply. While the precise language of the test differs from state to state, states typically use a test similar to the test in the Restatement (Second) of Contracts:

A promise to refrain from competition that imposes a restraint that is ancillary

---

[144] Cynthia Estlund, *Between Rights and Contract: Arbitration Agreements and Non-Compete Covenants as a Hybrid Form of Employment Law,* 155 U. Pa. L. Rev. 379, 391 (2006).

[145] *Id. See also* Restatement (Second) of Contracts sec. 188, cmt. g (1981) ("Postemployment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.").

[146] *See, e.g., Navarre Chevrolet, Inc.* v. *Begnaud,* 205 So. 3d 973, 975 (La. Ct. App. 3d 2016); *Eastman Kodak Co.* v. *Carmosino,* 77 A.D.3d 1434, 1435 (N.Y. App. Div. 4th 2010); *Access Organics, Inc.* v. *Hernandez,* 175 P.3d 899, 904 (Mont. 2008); *Bybee* v. *Isaac,* 178 P.3d 616, 621 (Idaho 2008); *Softchoice, Inc.* v. *Schmidt,* 763 NW2d 660, 666 (Minn. Ct. App. 2009).

[147] *See, e.g., Am. Tobacco Co.,* 221 U.S. at 181–83 (holding several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-compete clauses); *Newburger, Loeb & Co., Inc.,* 563 F.2d at 1082 ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[148] *See* Cal. Bus. & Prof. Code sec. 16600; N.D. Cent. Code sec. 9–08–06; Okla. Stat. Ann. tit. 15, sec. 219A. While California law permits non-compete clauses if they are necessary to protect an employer's trade secrets, *see Muggill* v. *Reuben H. Donnelley Corp.,* 62 Cal. 2d 239, 242 (Cal. 1965), the scope of this exception is unclear. In a recent case, the California Supreme Court declined to address the issue. *Edwards* v. *Arthur Andersen LLP,* 189 P.3d 285, 289 n.4 (Cal. 2008).

[149] Colorado, Colo Rev. Stat. Ann. sec. 8–2–113(2)(a)–(b), as amended by H.B. 22–1317 (effective Aug. 10, 2022) (non-compete clauses are void except where they apply to a "highly compensated worker," currently defined as a worker earning at least $101,250 annually, *see* Colo. Code Regs. sec. 1103–14:1.2); District of Columbia, DC Code sec. 32–581.02(a)(1) (effective Oct. 1, 2022) (where the employee's compensation is less than $150,000, or less than $250,000 if the employee is a medical specialist, employers may not require or request that the employee sign an agreement or comply with a workplace policy that includes a non-compete clause); Illinois, 820 Ill. Comp. Stat. 90/10(a) (effective Jan. 1, 2017) (no employer shall enter into a non-compete clause unless the worker's actual or expected earnings exceed $75,000/year); Maine, Me. Rev. Stat. Ann. tit. 26, sec. 599–A(3) (effective Sep. 19, 2019) (an employer may not require or permit an employee earning wages at or below 400% of the federal poverty level to enter into a non-compete clause with the employer); Maryland, Md. Code Ann., Lab. & Empl. sec. 3–716(a)(1)(i) (effective Oct. 1, 2019) (non-compete clauses are void where an employee earns equal to or less than $15 per hour or $31,200 per year); Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(c) (effective Jan. 14, 2021) (non-compete clauses shall not be enforceable against workers classified as nonexempt under the Fair Labor Standards Act ("FLSA")); Nevada, Nev. Rev. Stat. sec. 613.195(3) (effective Oct. 1, 2021) (non-compete clauses may not apply to hourly workers); New Hampshire, N.H. Rev. Stat. Ann. sec. 275:70-a(II) (effective Sept. 8, 2019) (employers shall not require a worker who earns an hourly rate less than or equal to 200% of the federal minimum wage to enter into a non-compete clause, and non-compete clauses with such workers are void and unenforceable); Oregon, Or. Rev. Stat. sec. 653.295(1)(e) (effective Jan. 1, 2022) (non-compete clauses are void and unenforceable except where the worker's annualized gross salary and commissions at the time of the worker's termination exceed $100,533); Rhode Island, R.I. Gen Laws sec. 28–59–3(a)(1) (effective Jan. 15, 2020) (non-compete clauses shall not be enforceable against workers classified as nonexempt under the FLSA); Virginia, Va. Code Ann. sec. 40.1–28.7:8 (effective July 1, 2020) (no employer shall enter into, enforce, or threaten to enforce a non-compete clause with an employee whose average weekly earnings are less than the Commonwealth's average weekly wage); Washington, Wash. Rev. Code Ann. sec. 49.62.020(1)(b) and 49.62.030(1) (effective Jan. 1, 2020) (non-compete clause is void and unenforceable unless worker's annualized earnings exceed $100,000 for employees and $250,000 for independent contractors, to be adjusted for inflation).

[150] *See* Russell Beck, Beck Reed Riden LLP, *Employee Noncompetes: A State-by-State Survey* (August 17, 2022), [hereinafter "Beck Reed Riden Chart").

[151] *See supra* note 149.

[152] *See, e.g.,* Connecticut, Conn. Gen. Stat. Ann. sec. 20–681 (effective June 26, 2019) (home health care workers); Florida, Fla. Stat. Ann. sec. 542.336 (effective June 25, 2019) (certain physicians in certain counties); Hawaii, Haw. Rev. Stat. sec. 480–4(d) (effective July 1, 2015) (technology workers); Indiana, Ind. Code sec. 25–22.5–5.5–2 (effective July 1, 2020) (physicians); Utah, Utah Code Ann. sec. 34–51–201 (effective May 18, 2018) (broadcasting employees).

[153] Oregon, Or. Rev. Stat. sec. 653.295(1)(a)(A) (effective Jan. 1, 2008); Maine, Me. Rev. Stat. Ann. tit. 26, sec. 599–A(4) (effective Sep. 19, 2019); Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(b)(i) (effective Jan. 14, 2021); New Hampshire, N.H. Rev. Stat. Ann. sec. 275:70 (effective July 28, 2014); Washington, Wash. Rev. Code Ann. sec. 49.62.020(1)(a)(1) (effective Jan. 1, 2020).

[154] Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(b)(vii) (effective Jan. 14, 2021); Oregon, Or. Rev. Stat. sec. 653.295(7) (effective Jan. 1, 2022).

[155] Washington, Wash. Rev. Code Ann. sec. 49.62.020(2) (effective Jan. 1, 2020).

[156] Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(b)(iv) (effective Jan. 14, 2021); Oregon, Or. Rev. Stat. sec. 653.295(3) (effective Jan. 1, 2022).

to an otherwise valid transaction or relationship is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.[157]

The first basis on which a non-compete clause can be found unreasonable is where the restraint is greater than needed to protect the employer's legitimate interest. Nearly all states recognize the protection of an employer's trade secrets as a legitimate interest.[158] Some states also recognize an interest in protecting confidential information that is not a trade secret.[159] Some states also recognize an interest in protecting the employer's investment in training, although many of these states define the interest as protecting specialized training.[160] A few states recognize an interest in preventing an worker who provides "unique" services from working for a competitor.[161] Courts do not recognize protection from ordinary competition as a legitimate business interest.[162]

If the employer can demonstrate a legitimate interest, the employer must then show the non-compete clause is tailored to that interest. This analysis typically considers whether the non-compete clause prohibits a greater scope of activity than necessary to protect the employer's legitimate interests;[163] covers a geographic area more extensive than necessary to protect those interests;[164] or lasts longer than needed to protect those interests.[165]

The second basis under which a non-compete clause can be found unreasonable is where the employer's need for the non-compete clause is outweighed by the hardship to the worker and the likely injury to the public. When assessing the "hardship to the worker" prong, courts typically consider whether the non-compete clause would be unreasonable in light of the worker's personal circumstances. For example, courts have invalidated non-compete clauses where they would destroy a worker's sole means of support.[166]

When assessing the "likely injury to the public" prong, the factor most frequently considered by courts is whether enforcing the non-compete clause against the worker would deprive the community of essential goods and services.[167] Because these cases arise in the context of individual litigation, courts focus the "likely injury to the public" inquiry on the loss of the individual worker's services and not on the aggregate effects of non-compete clauses on competition in the relevant market.

State law also differs with respect to the steps courts take when they conclude that a non-compete clause is unenforceable as drafted. The majority of states have adopted the "reformation" or "equitable reform" doctrine, which allows courts to revise the text of an unenforceable non-compete clause to make it enforceable.[168] Some states have adopted the "blue pencil" doctrine, under which courts may remove any defective provisions and may enforce the non-compete clause if the remaining provisions constitute a valid non-compete clause.[169] A few states have adopted the "red pencil" doctrine, under which courts declare an entire non-compete clause void if one or more of its provisions are found to be defective.[170]

As noted above, the general language of the test for whether a non-compete clause is reasonable is fairly consistent from state to state. However, the specifics of non-compete clause law differ from state to state. For example, states vary in how narrowly or broadly they define legitimate interests for using a non-compete clause and the extent to which courts are permitted to modify an unenforceable non-compete clause to render it enforceable. As a result, among the 47 states where non-compete clauses may be enforced, variation exists with respect to the enforceability of non-compete clauses.[171]

Because the enforceability of non-compete clauses varies from state to state, the question of which state's law applies in a legal dispute between an employer and a worker can determine the outcome of the case. Non-compete clauses often contain choice-of-law provisions designating a particular state's law for resolution of any future dispute.[172] Some non-compete clauses include forum-selection provisions specifying the court and location where any dispute will be heard.[173] The default rule under conflict-of-laws principles is that the court honors the parties' choice of law, meaning the burden is typically on the worker to argue that the law of a different forum should apply.[174]

In addition, there is significant variation in how courts apply choice of law rules in disputes over non-compete clauses.[175] As a result, it can be difficult for employers and workers to predict how disputes over choice of law will be resolved.[176] Additionally—aside from the question of which state's law should apply—employers and workers may be uncertain about whether the non-compete clause is enforceable under the state's law. Furthermore, state non-compete law may change; as described above in Part II.C.1, there have been many changes in state non-compete law in recent years. The result is that employers and workers may face considerable uncertainty as to whether

[157] Restatement (Second) of Contracts sec. 188 (1981).

[158] *See, e.g., Reed, Roberts Assocs.* v. *Strauman,* 40 N.Y.2d 303, 308–09 (N.Y. 1976); *see* Beck Reed Riden Chart, *supra* note 150 (listing each state's approach).

[159] *See, e.g., Proudfoot Consulting Co.* v. *Gordon,* 576 F.3d 1223, 1233–34 (11th Cir. 2009); *see* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[160] *See, e.g., IDMWORKS LLC* v. *Pophaly,* 192 F. Supp. 3d 1335, 1342 (S.D. Fla. 2016); *see* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[161] *See, e.g., Ticor Title Ins.* v. *Cohen,* 173 F.3d 63, 70 (2d Cir. 1999); *see* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[162] *See, e.g., Valley Med. Specialists* v. *Farber,* 982 P.2d 1277, 1281 (Ariz. 1999).

[163] *See, e.g., Diversified Hum. Res. Grp., Inc.* v. *Levinson-Polakoff,* 752 SW2d 8, 11 (Tex. Ct. App. 1988).

[164] *See, e.g., Orkin Exterm. Co., Inc.* v. *Girardeau,* 301 So. 2d 38, 39 (Fla. Ct. App. 1st 1974).

[165] *See, e.g., Jorgensen* v. *Coppedge,* 181 P.3d 450, 454 (Idaho 2008).

[166] *See, e.g., Chavers* v. *Copy Prods. Co. of Mobile,* 519 So. 2d 942, 945 (Ala. 1988).

[167] *See, e.g., Dick* v. *Geist,* 693 P.2d 1133, 1136–37 (Idaho Ct. App. 1985).

[168] *See, e.g., Butler* v. *Arrow Mirror & Glass, Inc.,* 51 SW3d 787, 794 (Tex. Ct. App. 2001). *See also* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[169] *See, e.g., Compass Bank* v. *Hartley,* 430 F. Supp. 2d 973, 980 (D. Ariz. 2006). *See also* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[170] *See, e.g., Hassler* v. *Circle C Res.,* 505 P.3d 169, 178 (Wyo. 2022). *See also* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[171] Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Non-Compete Clauses, Trends, and Implications for Employee Mobility Policy,* 13 U. Pa. J. Bus. L. 751, 778–79 (2011).

[172] Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective,* 31 Comp. Lab. & Pol'y J. 389, 396–402 (2010).

[173] *Id.* at 402–04.

[174] Lester & Ryan, *supra* note 172 at 394. *Cf.* Cal. Lab. Code § 925(a) (stating that employers shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would either (1) require the employee to adjudicate outside of California a claim arising in California or (2) deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

[175] *Id.*

[176] *Id.* at 394–95 ("The state of the law is perhaps characterized more by inconsistency than anything else, so much so that commentators lament the 'disarray' and 'mish-mash' of the law, and criticize courts for their 'post-hoc rationalizing of intuitions' or their use of a 'hodgepodge of factors, often with insignificant explanation of how they decide what weight to give each.'") (internal citations omitted).

a particular non-compete clause may be enforced.

Workers may also be subject to arbitration clauses, which require that legal disputes with the employer—including disputes related to non-compete clauses—be resolved through binding arbitration rather than in court. Where such clauses are valid, the Federal Arbitration Act requires that courts enforce them.[177]

Most state courts apply different rules to non-compete clauses when they are entered into between the seller and buyer of a business, compared with non-compete clauses that arise solely out of the employment relationship.[178] The three states in which non-compete clauses are void in nearly all instances—California, North Dakota, and Oklahoma—permit enforcement when non-compete clauses are entered into between the seller and buyer of a business.[179] In most of the other states, non-compete clauses between the seller and buyer of a business are either exempted from the state's non-compete clause statute, subject to a more lenient test under the statute, or subject to more lenient standard under the state's case law.[180] Courts cite several different reasons for why they accord different treatment to non-compete clauses between the seller and buyer of a business. These reasons include the relatively equal bargaining power of both parties in the context of a business sale, relative to the employer-worker context, where there is more likely to be unequal bargaining power; the need to protect the buyer's right to the goodwill for which it has paid; and the fact that the proceeds from the sale will ensure that the seller of the business will not experience undue hardship.[181]

### 2. Non-Compete Clauses and Antitrust Law

Non-compete clauses are ''contract[s] . . . in restraint of trade.'' Therefore,

they are subject to Section 1 of the Sherman Act.[182] The Commission has identified 17 cases in cases in which private plaintiffs or the federal government have challenged a non-compete clause between an employer and a worker under either Section 1 or an analogous provision in a state antitrust statute.[183] (Three of these 17 cases concerned non-compete clauses between the seller and buyer of a business,[184] and two of these 17 cases were brought under state antitrust statutes.[185])

In two of these 17 cases, the parties challenging the non-compete clause were successful to some degree. In the early antitrust case of *United States* v. *American Tobacco Co.*, the Supreme Court held that several tobacco companies violated both Section 1 and Section 2 of the Sherman Act because of the collective effect of six of the companies' practices, one of which was the ''constantly recurring'' use of non-compete clauses.[186] This is the only case the Commission has identified in which a court analyzed the collective, rather than isolated, use of non-compete clauses.

More recently, a federal district court denied a motion to dismiss a plaintiff's

claim that a non-compete clause between a concierge medicine firm and physicians violated Section 1. The court held that while the reasonableness of the non-compete clause ultimately would be a factual determination, the plaintiff stated a valid claim under Section 1 where it alleged the firm ''includes post-contract non-compete clauses with an unreasonably large liquidated damage provision in its employment contracts,'' in addition to other practices.[187]

In the other 15 Sherman Act cases, the challenge to the individual non-compete clause was unsuccessful. These claims failed for three main reasons. First, in several of these cases, the parties challenging the non-compete clause argued solely that the non-compete clause they were challenging should be *per se* unlawful under Section 1. Courts rejected these arguments, reasoning that non-compete clauses may serve legitimate business interests in some instances[188] and that courts have had insufficient experience with non-compete clauses to warrant a *per se* categorization under Section 1.[189]

The second main reason these challenges have been unsuccessful is that, in the vast majority of these 15 cases, the party challenging the non-compete clause did not allege the non-compete clause adversely affected competition, which is an essential element of a Section 1 claim in rule of reason cases.[190] In only one case did the plaintiff appear to allege facts related to anticompetitive effect beyond the effect on the person bound by the non-compete clause. In that case, the court dismissed the plaintiff's claim because the plaintiff did not sufficiently allege ''the amount of competition foreclosed by defendant.''[191]

Third, courts have also rejected challenges to non-compete clauses based on reasoning that a corporation is not capable of conspiring with its employees as a matter of law.[192]

Plaintiffs have also challenged non-compete clauses between employers and workers under Section 2 of the Sherman Act, which prohibits monopolization or attempted monopolization.[193] The Commission is not aware of a case in which a Section 2 claim relating to an

---

[177] *See, e.g., Nitro-Lift Techs.* v. *Howard*, 568 U.S. 17, 21–22 (2012).

[178] Based on a review of the state cases in Malsberger (2017), *supra* note 62 and Fenwick & West LLC, *Summary of Non-Compete Clauses: A Global Perspective, https://assets.fenwick.com/ legacy/FenwickDocuments/RS_Summary-of-Covenants.pdf.*

[179] Cal. Bus. & Prof. Code sec. 16601; N.D. Cent. Code sec. 9–08–06; Okla. Stat. Ann. tit. 15, sec. 218.

[180] *See, e.g.,* Colo. Rev. Stat. Ann. sec. 8–2–113(3)(c) (statutory exemption); Ga. Code Ann. sec. 13–8–57(d) (more lenient statutory test); *Jiffy Lube Int'l, Inc.* v. *Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993) (more lenient standard under case law).

[181] *See, e.g., Woodward* v. *Cadillac Overall Supply Co.*, 240 NW 2d 710, 715 (Mich. 1976) (bargaining power); *Bybee*, 178 P.3d at 622 (Idaho 2008) (goodwill); *Centorr-Vacuum Indus., Inc.* v. *Lavoie*, 609 A.2d 1213, 1215 (N.H. 1992) (undue hardship).

[182] *See, e.g., Newburger, Loeb & Co., Inc.*, 563 F.2d at 1082.

[183] *U.S.* v. *Am. Tobacco Co.*, 221 U.S. 106 (1911); *Alders* v. *AFA Corp. of Fla.*, 353 F. Supp. 654 (S.D. Fla. 1973) (non-compete clause between seller and buyer of a business); *Bradford* v. *N.Y. Times Co.*, 501 F.2d 51 (2d Cir. 1974); *Golden* v. *Kentile Floors, Inc.*, 512 F.2d 838 (5th Cir. 1975); *U.S.* v. *Empire Gas Corp.*, 537 F.2d 296 (8th Cir. 1976); *Newburger, Loeb & Co., Inc.* v. *Gross*, 563 F.2d 1057 (2d Cir. 1977); *Lektro-Vend Corp.* v. *Vendo Co.*, 660 F.2d 255 (7th Cir. 1981) (non-compete clause between seller and buyer of a business); *Aydin Corp.* v. *Loral Corp.*, 718 F.2d 897 (9th Cir. 1983); *Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.*, 720 F.2d 1553 (11th Cir. 1983); *Caremark Homecare, Inc.* v. *New England Critical Care, Inc.*, 700 F. Supp. 1033 (D. Minn. 1988); *GTE Data Servs., Inc.* v. *Elec. Data Sys. Corp.*, 717 F. Supp. 1487 (M.D. Fla. 1989); *DeSantis* v. *Wackenhut Corp.*, 793 SW2d 670 (Tex. 1990) (state antitrust law case); *Borg-Warner Protective Servs. Corp.* v. *Guardsmark, Inc.*, 946 F. Supp. 495 (E.D. Ky. 1996); *Caudill* v. *Lancaster Bingo Co., Inc.*, 2005 WL 2738930 (S.D. Ohio Oct. 24, 2005); *Dallas South Mill, Inc.* v. *Kaolin Mushroom Farms, Inc.*, 2007 WL 9712116 (N.D. Tex. Feb. 23, 2007)); *Cole* v. *Champion Enters., Inc.*, 496 F. Supp. 2d 613 (M.D.N.C. 2007) (non-compete clause between seller and buyer of a business) (state antitrust law case); *Signature MD, Inc.* v. *MDVIP, Inc.*, 2015 WL 3988959 (C.D. Cal. Apr. 21, 2015). There are also several opinions addressing whether non-compete clauses between businesses violate Section 1. Courts generally apply a less restrictive legal standard to non-compete clauses between businesses. *See, e.g., Lumber Liquidators, Inc.*, 415 F. Supp. 3d at 715–16.

[184] *Alders*, 353 F. Supp. 654; *Lektro-Vend*, 660 F.2d 255; *Cole*, 496 F. Supp. 2d 613.

[185] *DeSantis*, 793 SW2d 670; *Cole*, 496 F. Supp. 2d 613.

[186] *Am. Tobacco Co.*, 221 U.S. at 181–83. Section 2 of the Sherman Act, 15 U.S.C. 2, prohibits monopolization or attempted monopolization.

[187] *Signature MD, Inc.*, 2015 WL 3988959 at *7.

[188] *See, e.g., Lektro-Vend*, 660 F.2d at 265.

[189] *See, e.g., Aydin*, 718 F.2d at 900.

[190] *See, e.g., Ohio* v. *Am. Express Co.*, — U.S.— , 138 S. Ct. 2274, 2284 (2018).

[191] *GTE Data Servs.*, 717 F. Supp. at 1492.

[192] *See, e.g., Borg-Warner*, 946 F. Supp. 499; *Dallas South Mill*, 2007 WL 9712116 at *3.

[193] 15 U.S.C. 2. *See, e.g., BRFHH Shreveport, LLC.* v. *Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 616–26 (W.D. La. 2016).

employer's use of a non-compete clause has been successful.

## 3. Federal and State Enforcement Activity Related to Non-Compete Clauses

In recent years, state attorneys general in Illinois, New York, and Washington have sued companies for unlawfully using non-compete clauses. As of January 2020, state attorneys general have publicly announced settlements with seven companies regarding the use of non-compete clauses.[194] In February 2022, the Antitrust Division filed a statement of interest in a state non-compete clause case brought by private plaintiffs.[195]

The Antitrust Division and the Commission have also taken steps in recent years to address other types of contractual provisions that restrict competition in labor markets. The Antitrust Division has brought civil enforcement actions under Section 1 against several technology companies for entering into no-poach agreements with competitors. These enforcement actions ended with consent judgments against the companies.[196] In addition, the Antitrust Division has brought criminal charges for wage-fixing and no-poach agreements against companies and individuals.[197] The Commission too has brought civil enforcement actions against companies related to competition for employment, which ended in consent judgments against the

companies.[198] In addition, the attorney general of the State of Washington has entered into settlement agreements with over 200 companies in which the companies have agreed to stop using no-poach clauses.[199]

The Commission seeks comment on all aspects of its description, in this Part II.C, of the law currently governing non-compete clauses. The Commission specifically seeks comment on the extent to which employers use choice-of-law provisions to evade the laws of states where non-compete clauses are relatively less enforceable. The Commission also seeks comment on the extent to which a uniform federal standard for non-compete clauses would promote certainty for employers and workers.

## D. The Commission's Work on Non-Compete Clauses

This rulemaking represents the culmination of several years of activity by the Commission related to non-compete clauses and their effects on competition. This activity has included extensive public outreach and fact-gathering related to non-compete clauses, other restrictive employment covenants that may harm competition, and competition in labor markets generally. The Commission has also analyzed non-compete clauses in connection with its enforcement, research, and merger review work.

The Commission first began focusing on non-compete clauses in the mid-2010s, as a growing body of empirical research raised concerns about the anticompetitive effects of non-compete clauses. In 2018 and 2019, the Commission held several "Hearings on Competition and Consumer Protection in the 21st Century."[200] The Commission invited public comment on a wide range of topics, including "the use of non-competition agreements and the conditions under which their use may be inconsistent with the antitrust laws."[201] Participants addressed non-compete clauses at two of the hearings.[202]

Also in 2019, the Open Markets Institute, 19 labor and public interest organizations, and 46 individual advocates and scholars petitioned the Commission to initiate a rulemaking to prohibit non-compete clauses.[203]

As evidence mounted regarding the anticompetitive effects of non-compete clauses, the Commission's focus on this issue increased. On January 9, 2020, the Commission held a public workshop on non-compete clauses. At the workshop, speakers and panelists addressed topics including statutory and judicial treatment of non-compete clauses; the Commission's authority to address non-compete clauses; the economic literature regarding the effects of non-compete clauses; and whether the Commission should initiate a rulemaking on non-compete clauses.[204] In connection with the workshop, the Commission sought public comment on a wide range of topics related to a potential rulemaking on non-compete clauses. The Commission received 328 comments addressing these topics from researchers, advocates for workers, employers, trade associations, attorneys, members of Congress, state and local officials, unions, other organizations, and individual members of the public.[205]

In addition, on August 5, 2021, the Commission issued a solicitation for public comment on contract terms that may harm competition, including "non-compete clauses that prevent workers from seeking employment with other firms." The Commission received 280 comments on this solicitation from a wide range of stakeholders.[206] On December 6–7, 2021, the Commission and the Antitrust Division held a workshop entitled "Making Competition Work: Promoting Competition in Labor Markets." The Commission sought

---

[194] See Public Comments of 19 State Attorneys General in Response to the Federal Trade Commission's January 9, 2020 Workshop on Non-Compete Clauses in the Workplace at 6 n.23 (listing the settlements).

[195] Statement of Interest of the United States, *Beck* v. *Pickert Med. Grp.,* No. CV21–02092 (Nev. Dist. Ct. Feb. 25, 2022).

[196] See Antitrust Guidance for Human Resource Professionals, *supra* note 37 at 3–4 (citing cases).

[197] *U.S.* v. *Neeraj Jindal and John Rodgers,* No. 4:20–cr–358–ALM–KPJ (E.D. Tex. Dec. 9, 2020); *U.S.* v. *Surgical Care Affiliates, LLC and SCAI Holdings, LLC,* No. 3:21–cr–011–L (N.D. Tex. Jan. 5, 2021); *U.S.* v. *Ryan Hee and VDA OC, LLC,* formerly ADVANTAGE ON CALL, LLC, No. 2:21–cr–00098–RFB–BNW (D. Nev. Mar. 26, 2021); *U.S.* v. *DaVita, Inc. and Kent Thiry,* No. 21–cr–00229–RBJ (D. Colo. Nov. 3, 2021); *U.S.* v. *Patel, et al.,* 3:21–cr–220–VHB–RAR (D. Conn. Dec. 15, 2021); *U.S.* v. *Manahe, et al.,* 2:22–cr–00013–JAW (D. Me. Jan. 27, 2022). The defendants in the *Jindal* case were found not guilty of the wage-fixing charge, and the defendants in the *DaVita* cases were found not guilty of all charges. *Jindal,* Jury Verdict (E.D. Tex. Apr. 14, 2022); *DaVita,* Verdict (D. Colo. Apr. 15, 2022). However, both courts found that the conduct alleged in the indictment properly fell within the confines of the *per se* rule. *Jindal,* Memorandum Opinion and Order, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) at *4–*8; *DaVita,* Order Denying Defendants' Motion to Dismiss, 2022 WL 266759 (D. Colo. Jan. 28, 2022) at *4–*8. The court in *Manahe* likewise recently denied a motion to dismiss, holding the indictment charged a recognized form of per se illegal conduct. 2022 WL 3161781, at **7, 9 (D. Me. Aug. 8, 2022).

[198] See Antitrust Guidance for Human Resource Professionals, *supra* note 37 at 4 (citing cases).

[199] Office of the Att'y Gen. of the State of Wash., Press Release, *AG Report: Ferguson's Initiative Ends No-Poach Practices Nationally at 237 Corporate Franchise Chains* (June 16, 2020).

[200] Fed. Trade Comm'n, *Hearings on Competition and Consumer Protection in the 21st Century, https://www.ftc.gov/enforcement-policy/hearings-competition-consumer-protection.*

[201] Fed. Trade Comm'n, Notice, *Hearings on Competition and Consumer Protection in the 21st Century,* 83 FR 38307, 38309 (Aug. 6, 2018).

[202] Fed. Trade Comm'n, Transcript, *Competition and Consumer Protection in the 21st Century* (Oct. 16, 2018), *https://www.ftc.gov/system/files/*

documents/public_events/1413712/ftc_hearings_session_3_transcript_day_2_10-16-18_1.pdf; Fed. Trade Comm'n, Transcript, *Competition and Consumer Protection in the 21st Century* (June 12, 2019), *https://www.ftc.gov/system/files/documents/public_events/1519667/ftc_hearings_session_14_transcript_6-12-19_0.pdf.*

[203] Open Markets Inst. et al., *Petition for Rulemaking to Prohibit Worker Non-Compete Clauses* (March 20, 2019).

[204] Fed. Trade Comm'n, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, https://www.ftc.gov/news-events/events/2020/01/non-compete-clauses-workplace-examining-antitrust-consumer-protection-issues.*

[205] Fed. Trade Comm'n, Docket FTC–2019–0093, *Workshop on Non-Compete Clauses Used in Employment Contracts, https://www.regulations.gov/document/FTC-2019-0093-0001/comment.*

[206] Fed. Trade Comm'n, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021), *https://www.regulations.gov/document/FTC-2021-0036-0022.*

comment from the public in connection with this event and received 27 comments.[207]

As it has developed this proposed rule, the Commission has closely considered the views expressed at these forums and the public comments it has received through these engagement efforts. The comments have informed the Commission's understanding of the evidence regarding the effects of non-compete clauses; the law currently governing non-compete clauses; and the options for how the Commission may seek to restrict the unfair use of non-compete clauses through rulemaking, among other topics.

The Commission has also focused on non-compete clauses in connection with its enforcement, merger review, and research work. With respect to enforcement, in 2021, the Commission initiated investigations into the use of non-compete clauses by manufacturers of glass containers used for food and beverage packaging. On December 28, 2022, the Commission accepted, subject to final approval, consent agreements with two manufacturers in the industry.[208] The glass container industry is highly concentrated and is characterized by substantial barriers to entry and expansion. Among these barriers, it is difficult to identify and employ personnel with skills and experience in glass container manufacturing.[209]

The complaints allege the manufacturers required employees across a variety of positions—including employees who work with the glass plants' furnaces and forming equipment and in other glass production, engineering, and quality assurance roles—to enter into non-compete clauses. The complaints allege this conduct has a tendency or likelihood to impede rivals' access to the restricted employees' labor, to limit workers' mobility, and thus to harm workers, consumers, competition, and the competitive process. As such, the complaints allege each company has engaged in an unfair method of competition in violation of Section 5 of the FTC Act.[210] The proposed consent orders would prohibit each manufacturer from "entering or attempting to enter, maintaining or attempting to maintain, or enforcing or attempting to enforce a Non-Compete Restriction with an Employee, or communicating to an Employee or a prospective or current employer of that Employee that the Employee is subject to a Non-Compete Restriction." [211]

In 2021, the Commission also initiated investigations into the use of non-compete clauses in the security guard services industry. On December 28, 2022, the Commission accepted, subject to final approval, a consent agreement with Prudential Security, Inc., Prudential Command Inc., and the firms' co-owners (collectively "Prudential Respondents"). Prudential Security, Inc. and Prudential Command Inc. provided security guard services to clients in several states.

The Commission's complaint alleges the Prudential Respondents' use of non-compete clauses is an unfair method of competition under Section 5 because it is restrictive, coercive, and exploitative and negatively affects competitive conditions.[212] The complaint further alleges the Prudential Respondents' imposition of non-compete clauses took advantage of the unequal bargaining power between Prudential Respondents and their employees, particularly low-wage security guard employees, and thus reduced workers' job mobility, limited competition for workers' services, and ultimately deprived workers of higher wages and more favorable working conditions.[213] Under the terms of the proposed order, Prudential Respondents—including any companies the co-owners may control in the future—must cease and desist from entering, maintaining, enforcing, or attempting to enforce any non-compete clause.[214]

These consent orders have been placed on the public record for 30 days in order to receive comments from interested persons. After 30 days, the Commission will again review the consent agreements and the comments received and will decide whether it should make the proposed orders final or take other appropriate action.[215]

In addition, as part of a 2020 settlement with the Commission, three national rent-to-own companies agreed to refrain from enforcing non-compete clauses that were entered into in connection with reciprocal purchase agreements.[216]

With respect to merger review, on August 11, 2015, the Commission approved a final order settling charges that Zimmer Holdings, Inc.'s acquisition of Biomet, Inc. would have eliminated competition between the companies in the markets for certain orthopedic medical products. Among other things, the order requires Zimmer to "remove any impediments or incentives" that may deter workers from accepting employment with the divested businesses, including non-compete clauses.[217]

On November 10, 2021, the Commission approved a final order settling charges that 7-Eleven's acquisition of Marathon Petroleum Corporation's Speedway subsidiary violated federal antitrust laws. Among other things, the order prohibits 7-Eleven from enforcing any non-compete clauses against any franchisees or employees working at or doing business with the divested assets.[218]

On January 10, 2022, the Commission approved a final order settling charges that dialysis service provider DaVita, Inc.'s acquisition of University of Utah Health's dialysis clinics would reduce competition in vital outpatient dialysis services in the Provo, Utah market. As part of the order, DaVita was required to remove certain non-compete clauses and prohibited from enforcing or entering into non-compete clauses with certain parties.[219] And on August 9, 2022, the Commission issued a final consent order in which ARKO Corp. and its subsidiary GPM agreed to roll back a sweeping non-compete clause they

[207] Fed. Trade Comm'n, Docket FTC–2021–0057, *Making Competition Work: Promoting Competition in Labor Markets, https://www.regulations.gov/docket/FTC-2021-0057/comments.*

[208] Fed. Trade Comm'n, Decision and Order, *In re O–I Glass, Inc. et al,* Matter No. 211 0182 (December 28, 2022); Fed. Trade Comm'n, Decision and Order, *In re Ardagh Group S.A. et al,* Matter No. 211 0182 (December 28, 2022).

[209] Fed. Trade Comm'n, Analysis of Agreements Containing Consent Order to Aid Public Comment, *In re O–I Glass Inc. et al., In re Ardagh Group S.A. et al,* Matter No. 211 0182 (December 28, 2022) at 2.

[210] *Id.* at 1–2.

[211] *Id.* at 7.

[212] Fed. Trade Comm'n, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.,* Matter No. 211 0026 at 1, 5–7 (December 28, 2022).

[213] *Id.* at 1.

[214] *Id.*

[215] *Id.* at 1–2; Glass Container Analysis to Aid Public Comment, *supra* note 209 at 1.

[216] Fed. Trade Comm'n, Press Release, *Rent-to-Own Operators Settle Charges that They Restrained Competition through Reciprocal Purchase Agreements* (Feb. 21, 2020), *https://www.ftc.gov/news-events/news/press-releases/2020/02/rent-own-operators-settle-charges-they-restrained-competition-through-reciprocal-purchase-agreements.*

[217] Fed. Trade Comm'n, *In the Matter of Zimmer Holdings, Inc. et al.,* No. C–4534, Decision and Order (Aug. 11, 2015), *https://www.ftc.gov/system/files/documents/cases/150820zimmerdo.pdf.*

[218] Fed. Trade Comm'n, Press Release, *FTC Approves Final Order Requiring Divestitures of Hundreds of Retail Gas and Diesel Fuel Stations Owned by 7-Eleven, Inc.* (Nov. 10, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/11/ftc-approves-final-order-requiring-divestitures-hundreds-retail-gas-diesel-fuel-stations-owned-7.*

[219] Fed. Trade Comm'n, *In the Matter of Davita Inc. and Total Renal Care, Inc.,* No. C–4752, Decision and Order (Jan. 10, 2022) at 12–14, *https://www.ftc.gov/system/files/documents/cases/211_0056_c4752_davita_utah_health_order.pdf.*

imposed on a company to which they sold 60 gas stations.[220]

With respect to research, in September 2021, the Commission issued a study analyzing acquisitions by five large technology companies that were not reported to the Commission and the U.S. Department of Justice under the Hart-Scott-Rodino Act.[221] The study found 76.7% of transactions included non-compete clauses for founders and key employees of the acquired entities. The study also found that higher-value transactions were more likely to use non-compete clauses.[222] The study does not explain why the companies used non-compete clauses or analyze the effects of these particular non-compete clauses on competition.

The Commission seeks comment on its description, in this Part II.D, of the Commission's work on non-compete clauses prior to this NPRM.

### III. Legal Authority

Section 5 of the FTC Act declares "unfair methods of competition" to be unlawful.[223] Section 5 further directs the Commission "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce." [224] Section 6(g) of the FTC Act authorizes the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, including the Act's prohibition of unfair methods of competition.[225] Taken together, Sections 5 and 6(g) provide the Commission with the authority to issue regulations declaring practices to be unfair methods of competition.[226]

Courts have made clear Section 5's prohibition of unfair methods of competition encompasses all practices that violate either the Sherman or Clayton Acts.[227] However, courts have long held the scope of Section 5 is not confined to the conduct that is prohibited under the Sherman Act, Clayton Act, or common law.[228] Section 5 reaches incipient violations of the antitrust laws—conduct that, if left unrestrained, would grow into an antitrust violation in the foreseeable future.[229] Additionally, Section 5 reaches conduct that, while not prohibited by the Sherman or Clayton Acts, violates the spirit or policies underlying those statutes.[230]

### IV. The Commission's Preliminary Determination That Non-Compete Clauses Are an Unfair Method of Competition

The Commission preliminarily determines it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause.[231] This preliminary determination is the basis for this proposed rule, which would provide that each of these practices is an unfair method of competition under Section 5.[232] This Part IV sets forth a series of preliminary findings that provide the basis for this preliminary determination. The Commission's preliminary determination and each of these preliminary findings are subject to further consideration in light of the comments received and the Commission's additional analysis. The Commission seeks comment on all aspects of this Part IV.[233]

### A. Non-Compete Clauses Are an Unfair Method of Competition Under Section 5

#### 1. Non-Compete Clauses Are Unfair

Courts have held conduct is an "unfair method of competition" under Section 5 where the conduct is facially unfair. In *Atlantic Refining Co.* v. *FTC* and *FTC* v. *Texaco, Inc.,* the Court held the Commission established an unfair method of competition where an oil company used its economic power over its gas stations to coerce them into buying certain tires, batteries, or accessories only from firms that paid the oil company a commission.[234] In *Texaco,* the Court held the conduct was an unfair method of competition even though Texaco's conduct was not overtly coercive, reasoning that Texaco's conduct was "inherently coercive" because its "dominant economic power was used in a manner which tended to foreclose competition." [235] In *FTC* v. *R.F. Keppel & Bro.,* the Court held the Commission established an unfair method of competition where a manufacturer exploited the inability of children to protect themselves in the marketplace by marketing inferior goods to them through use of a gambling scheme.[236] In *E.I. du Pont de Nemours & Co.* v. *FTC (Ethyl),* the U.S. Court of Appeals for the Second Circuit reaffirmed that coercive conduct is quintessentially covered by Section 5's prohibition of unfair methods of competition.[237]

The Court has also held that, for coercive conduct to constitute unfair

---

[220] Fed. Trade Comm'n, Press Release, *FTC Approves Final Order Restoring Competitive Markets for Gasoline and Diesel in Michigan and Ohio* (Aug. 9, 2022), *https://www.ftc.gov/news-events/news-press-releases/2022/08/ftc-approves-final-order-restoring-competitive-markets-gasoline-diesel-michigan-ohio.*

[221] Fed. Trade Comm'n, *Non-HSR Reported Acquisitions by Select Technology Platforms, 2010–2019: An FTC Study* (September 2021) at 1.

[222] *Id.* at 21–22. The table states that the figure is 77.3%. The reason for this discrepancy is not clear.

[223] 15 U.S.C. 45(a)(1).

[224] 15 U.S.C. 45(a)(2).

[225] 15 U.S.C. 46(g).

[226] *Nat'l Petroleum Refiners Ass'n* v. *Fed. Trade Comm'n,* 482 F.2d 672, 697–98 (D.C. Cir. 1973).

[227] *See, e.g., Fed. Trade Comm'n* v. *Cement Inst.,* 333 U.S. 683, 693 (1948) (holding practices that violate the Sherman Act are unfair methods of competition); *Fashion Originators' Guild of Am.* v. *Fed. Trade Comm'n,* 312 U.S. 457, 464 (1941) (holding practices that violate the Clayton Act are unfair methods of competition).

[228] *See, e.g., Fed. Trade Comm'n* v. *Motion Picture Advert. Serv. Co.,* 344 U.S. 392, 394–95 (1953) ("The 'Unfair methods of competition', which are condemned by [Section] 5(a) of the [FTC] Act, are not confined to those that were illegal at common law or that were condemned by the Sherman Act. Congress advisedly left the concept flexible to be defined with particularity by the myriad of cases from the field of business.") (internal citations omitted).

[229] *See, e.g., Cement Inst.,* 333 U.S. at 708 ("A major purpose of [the FTC] Act was to enable the Commission to restrain practices as 'unfair' which, although not yet having grown into Sherman Act dimensions would most likely do so if left unrestrained."); *Fashion Originators' Guild,* 312 U.S. at 466; *Triangle Conduit & Cable Co.* v. *Fed. Trade Comm'n,* 168 F.2d 175, 176 (7th Cir. 1948).

[230] *See, e.g., Fashion Originators' Guild,* 312 U.S. at 463 (stating that "[i]f the purpose and practice of the combination of garment manufacturers and their affiliates runs counter to the public policy declared in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it as an unfair method of competition"); *E.I. du Pont de Nemours & Co.* v. *Fed. Trade Comm'n (Ethyl),* 729 F.2d 128, 136–37 (2d Cir. 1984) (finding that the Commission may bar "conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit"). On November 10, 2022, the Commission issued a policy statement describing the key principles of general applicability concerning whether conduct is an unfair method of competition under Section 5. Fed. Trade Comm'n, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022).

[231] For ease of reference, this Part IV employs the term "use of non-compete clauses" as a shorthand to refer to this conduct.

[232] *See* proposed § 910.2(a).

[233] The Commission intends for this Part IV to satisfy the requirements in Section 22 of the FTC Act that, in an NPRM, the Commission issue a preliminary regulatory analysis that contains "a concise statement of the need for, and the objectives of, the proposed rule." 15 U.S.C. 57b–3.

[234] *Atl. Refin. Co.,* 381 U.S. at 369–70; *Texaco, Inc.,* 393 U.S. at 228–29.

[235] 393 U.S. 223 at 228–29 (1968). *See also Shell Oil Co.* v. *Fed. Trade Comm'n,* 360 F.2d 470, 487 (5th Cir. 1966) ("A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord.").

[236] 291 U.S. 304, 313 (1934).

[237] 729 F.2d 128, 140 (2d Cir. 1984) ("In short, in the absence of proof of a violation of the antitrust laws or evidence of collusive, coercive, predatory, or exclusionary conduct, business practices are not 'unfair' in violation of § 5 unless those practices either have an anticompetitive purpose or cannot be supported by an independent legitimate reason.").

method of competition, it must burden commerce. In *Atlantic Refining,* the Court determined "a full-scale economic analysis of competitive effect" was not required; due to the nature of the conduct at issue, the Commission merely needed to show the conduct burdened "a not insubstantial portion of commerce." [238]

In the cases described above, courts condemned conduct under Section 5 based on the facial unfairness of the conduct. In other cases, however, courts have condemned restrictive or exclusionary conduct under Section 5 based not on the facial unfairness of the conduct, but on the impact of the conduct on competition. For example, in *FTC* v. *Motion Picture Advertising Service Co.,* the Court held an exclusive dealing arrangement violated Section 5 where there was "substantial evidence" the contracts "unreasonably restrain competition." [239] Similarly, in *L.G. Balfour Co.* v. *FTC,* the U.S. Court of Appeals for the Seventh Circuit held a firm's exclusive dealing contracts violated Section 5 where such contracts were "anti-competitive." [240] As the U.S. Court of Appeals for the Sixth Circuit stated in *Hastings Manufacturing Co.* v. *FTC,* the Section 5 jurisprudence has established that "acts [that are] not in themselves illegal or criminal, or even immoral, may, when repeated and continued and their impact upon commerce is fully revealed, constitute an unfair method of competition within the scope of the Commission's authority to regulate and forbid." [241]

For the reasons described below, the Commission preliminarily finds the use by employers of non-compete clauses is an "unfair" method of competition under Section 5. The Commission's preliminary findings differ based on whether the worker is a senior executive. For workers who are not senior executives, the Commission preliminarily finds the use by employers of non-compete clauses is "unfair" under Section 5 in three independent ways. First, non-compete clauses are restrictive conduct that negatively affects competitive conditions. Second, non-compete clauses are exploitative and coercive at the time of contracting while burdening

a not insignificant volume of commerce. Third, non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer while burdening a not insignificant volume of commerce.

For workers who are senior executives, the Commission preliminarily finds the use by employers of non-compete clauses is "unfair" under Section 5 because such non-compete clauses are restrictive conduct that negatively affects competitive conditions. As described below in Part IV.A.1.a.ii, the Commission preliminarily concludes non-compete clauses for senior executives may harm competition in product markets in unique ways. The second and third preliminary findings described above—that non-compete clauses are exploitative and coercive at the time of contracting and at the time of a worker's potential departure—do not apply to workers who are senior executives. [242]

The Commission seeks comment on whether this different unfairness analysis should apply to other highly paid or highly skilled workers who are not senior executives. Furthermore, in Part VI.C below, the Commission seeks comment on how this category of workers—whether "senior executives" or a broader category of highly paid or highly skilled workers—should be defined, and whether different regulatory standards should apply to this category of workers.

The Commission seeks comment on its preliminary finding that non-compete clauses are an "unfair" method of competition under Section 5.

### a. Non-Compete Clauses Are Restrictive Conduct That Negatively Affects Competitive Conditions

First, the Commission preliminarily finds non-compete clauses are an "unfair" method of competition under Section 5 because they are restrictive conduct that negatively affects competitive conditions.

As noted above, courts have condemned restrictive or exclusionary conduct under Section 5 based not on the facial unfairness of the conduct, but on the impact of the conduct on competition. [243] Non-compete clauses are restrictive conduct. By their express

terms, non-compete clauses restrict a worker's ability to work for a competitor of the employer—for example, by accepting a job with a competitor or starting a business that would compete against the employer. Non-compete clauses also restrict rivals from competing against the employer to attract their workers. Because non-compete clauses facially restrain competition in the labor market, courts have long held they are restraints of trade and proper subjects for scrutiny under the antitrust laws. [244] Furthermore, as described in detail in this NPRM, there is considerable empirical evidence showing non-compete clauses negatively affect competition in labor markets and product and service markets. [245] This evidence is summarized below.

i. Non-Compete Clauses Negatively Affect Competitive Conditions in Labor Markets

As described in greater detail above in Part II.B.1, non-compete clauses negatively affect competitive conditions in labor markets by obstructing the sorting of workers and employers into the strongest possible matches. Labor markets function by matching workers and employers. In a well-functioning labor market, a worker who is seeking a better job—more pay, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Employers who have positions available compete for the worker's services. The worker's current employer may also compete with these prospective employers by seeking to retain the worker—for example, by offering to raise the worker's pay or promote the worker. Ultimately, the worker chooses the job that best meets their objectives. In general, the more jobs available—*i.e.,* the more options the worker has—the greater the possibility the worker will find a strong match.

Just as employers compete for workers in a well-functioning labor market,

---

[238] 381 U.S. at 370–71. *See also Texaco, Inc.,* 393 U.S. at 230 (finding that the practice unfairly burdened competition for a not insignificant volume of commerce); *R.F. Keppel & Bro.,* 291 U.S. at 309 ("A practice so widespread and so far reaching in its consequences is of public concern if in other respects within the purview of the statute.").

[239] 344 U.S. 392, 395–96 (1953).

[240] 442 F.2d 1, 14 (7th Cir. 1971).

[241] 153 F.2d 253, 257 (6th Cir. 1946).

[242] As described below in Part VII.B.1.a.iv, the Commission estimates that, when non-compete clauses are more enforceable, CEO earnings are reduced. This may result from the negative effects on competitive conditions that non-compete clauses have on labor markets (discussed in greater detail below in Part IV.A.1.a.i) rather than from exploitation or coercion.

[243] *See supra* Part IV.A.1.

[244] *See, e.g., Am. Tobacco Co.,* 221 U.S. at 181–83 (holding several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-compete clauses); *Newburger, Loeb & Co., Inc.,* 563 F.2d at 1082 ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.")

[245] *See supra* Part II.B.

**JA0184**

workers compete for jobs. In general, the more workers who are available—*i.e.,* the more options the employer has—the stronger the match the employer will find. Through these processes—employers competing for workers, workers competing for jobs, and employers and workers matching with one another—competition in the labor market leads to higher earnings for workers, greater productivity for employers, and better economic conditions.

In a perfectly competitive labor market, if a job that a worker would prefer more—for example, because it has higher pay or is in a better location—were to become available, the worker could switch to it quickly and easily. However, this perfectly competitive labor market exists only in theory. In practice, labor markets substantially deviate from perfect competition. Non-compete clauses, in particular, impair competition in labor markets by restricting a worker's ability to change jobs. If a worker is bound by a non-compete clause, and the worker wants a better job, the non-compete clause will prevent the worker from accepting a new job within the scope of the non-compete clause. These will often be the most natural alternative employment options for a worker: jobs in the same geographic area and in the worker's field of expertise. The result is less competition among employers for the worker's services. Since the worker is prevented from taking these jobs, the worker may decide not to enter the labor market at all, or the worker may enter the labor market but take a job outside of their field of expertise in which they are less productive.

Non-compete clauses affect competition in labor markets through their use in the aggregate. The effect of an individual worker's non-compete clause on competition in a particular labor market may be marginal or may be impossible to discern statistically. However, the use of a large number of non-compete clauses across a labor market demonstrably affects the opportunities of all workers in that market. By making it more difficult for many workers in a labor market to switch to new jobs, non-compete clauses inhibit optimal matches from being made between employers and workers across the labor force. As a result, where non-compete clauses are prevalent in a market, workers are more likely to remain in jobs that are less optimal with respect to the worker's ability to maximize their productive capacity. This materially reduces wages for workers—not only for workers who are subject to non-compete clauses, but

other workers in a labor market as well, since jobs that would otherwise be better matches for an unconstrained worker are filled by workers subject to non-compete clauses.

The Section 5 analysis as to whether conduct negatively affects competitive conditions does not require a showing that the conduct caused actual harm.[246] However, whether conduct causes actual harm can be relevant to whether it is an unfair method of competition.[247] There is significant empirical evidence that non-compete clauses cause actual harm to competition in labor markets, and that these harms are substantial.

As described above in Part II.B.1.a, the Commission estimates at least one in five American workers—or approximately 30 million workers—is bound by a non-compete clause. The proliferation of non-compete clauses is restraining competition in labor markets to such a degree that it is materially impacting workers' earnings—both across the labor force in general, and also specifically for workers who are not subject to non-compete clauses. The available evidence indicates increased enforceability of non-compete clauses substantially reduces workers' earnings, on average, across the labor market generally or for specific types of workers.[248] The Commission estimates the proposed rule, which would prohibit employers from using non-compete clauses, would increase workers' total earnings by $250 to $296 billion per year.[249]

In addition to the evidence showing non-compete clauses reduce earnings for workers across the labor force, there is also evidence non-compete clauses reduce earnings specifically for workers who are *not* subject to non-compete clauses.[250] One study finds when the use of non-compete clauses by employers increases, that drives down

---

[246] *See Fed. Trade Comm'n* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244 (1972) (explaining that "unfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"); *In re Coca-Cola Co.,* 117 F.T.C. 795, 915 (FTC 1994) (rejecting argument that Section 5 violation requires showing "anticompetitive effects").

[247] *See Ethyl,* 729 F.2d at 138 (evidence of actual harm can be "a relevant factor in determining whether the challenged conduct is unfair").

[248] *See supra* Part II.B.1. While there is evidence that increased enforceability of non-compete clauses increases the rate of earnings growth for physicians, Lavetti, Simon, & White, *supra* note 53 at 1051, the Commission estimates that the proposed rule may increase physicians' earnings, although the study does not allow for a precise calculation. *See infra* Part VII.B.1.a.ii.

[249] *See infra* Part VII.B.1 (describing the Commission's assessment of the benefits of the proposed rule).

[250] *See supra* Part II.B.1.c.

wages for workers who do not have non-compete clauses but who work in the same state and industry. This study also finds this effect is stronger where non-compete clauses are more enforceable. This study shows the reduction in earnings (and also reduced labor mobility) is due to a reduction in the rate of the arrival of job offers.[251] Another study finds similarly that changes in non-compete clause enforceability in one state have negative impacts on workers' earnings in bordering states and that the effects are nearly as large as the effects in the state in which enforceability changed (though the effect tapers off as the distance to the bordering state increases).[252] The authors conclude that, since the workers across the border are not directly affected by the law change—because contracts that they have signed do not become more or less enforceable—this effect must be due to changes in the local labor market.[253]

The Commission preliminarily concludes non-compete clauses negatively affect competitive conditions in labor markets regardless of the worker's income or job function. Whether a worker is a senior executive or a security guard, non-compete clauses block the worker from switching to a job in which they would be better paid and more productive—restricting that worker's opportunities as well as the opportunities of other workers in the relevant labor market. The available data do not allow the Commission to estimate earnings effects for every occupation. However, the evidentiary record indicates non-compete clauses depress wages for a wide range of subgroups of workers across the spectrum of income and job function. The Commission therefore estimates the proposed rule would increase earnings for workers in all of the subgroups of the labor force for which sufficient data is available.[254]

The Commission seeks comment on its preliminary finding that non-compete clauses negatively affect competitive conditions in labor markets.

### ii. Non-Compete Clauses Negatively Affect Competitive Conditions In Markets For Products and Services

The adverse effects of non-compete clauses on product and service markets largely result from reduced labor mobility. Several studies show the use of non-compete clauses by employers

---

[251] Starr, Frake, & Agarwal, *supra* note 76 at 4.

[252] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 51.

[253] *Id.* at 30.

[254] *See infra* Part VII.B.1.a.

reduces labor mobility. All of these studies have found decreased rates of labor mobility, as measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within- and between-industry mobility.[255] The Commission does not view reduced labor mobility from non-compete clauses—in and of itself—as evidence that non-compete clauses negatively affect competition in product and service markets. Instead, reduced labor mobility is best understood as the primary driver of the effects in product and service markets the Commission is concerned about.

Reduced labor mobility from non-compete clauses negatively affects competitive conditions in product and service markets in several respects. First, there is evidence non-compete clauses increase consumer prices and concentration in the health care sector. There is also evidence non-compete clauses increase industrial concentration more broadly. Non-compete clauses may have these effects by inhibiting entrepreneurial ventures (which could otherwise enhance competition in goods and service markets) or by foreclosing competitors' access to talented workers.[256]

Second, non-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses. There is evidence of this mechanism in the market for CEOs.[257]

Third, the weight of the evidence indicates non-compete clauses have a negative impact on new business formation. New business formation increases competition first by bringing new ideas to market, and second, by forcing incumbent firms to respond to new firms' ideas instead of stagnating. Non-compete clauses restrain new business formation by preventing workers subject to non-compete clauses from starting their own businesses. In addition, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.[258]

Fourth, the weight of the evidence indicates non-compete clauses decrease innovation. Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, or may promote competition because successful new products and services force competing firms to improve their own products and services. Non-compete clauses affect innovation by reducing the movement of workers between firms, which decreases knowledge flow between firms. Non-compete clauses also prevent workers from starting businesses in which they can pursue innovative new ideas.[259]

As noted above in Part II.B.2.e, there is also evidence non-compete clauses increase employee training and other forms of investment. The Commission considers this evidence below in Part IV.B as part of its analysis of the justifications for non-compete clauses.

The Commission believes non-compete clauses for senior executives may harm competition in product markets in unique ways, to the extent that senior executives may be likely to start competing businesses, be hired by potential entrants or competitors, or lead the development of innovative products and services. Non-compete clauses for senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants. As a result, prohibiting non-compete clauses for senior executives may have relatively greater benefits for consumers than prohibiting non-compete clauses for other workers. The Commission seeks comment on this analysis as well as whether this reasoning may apply to highly paid and highly skilled workers who are not senior executives.

The Commission seeks comment on its preliminary finding that non-compete clauses negatively affect competitive conditions in markets for products and services.

### b. Non-Compete Clauses Are Exploitative and Coercive at the Time of Contracting

The Commission preliminarily finds non-compete clauses for workers other than senior executives are exploitative and coercive because they take advantage of unequal bargaining power between employers and workers at the time the employer and worker enter into the non-compete clause.

As noted above, courts have held conduct that is exploitative and coercive can violate Section 5 where it burdens a not insignificant volume of commerce.[260] Courts have long recognized bargaining power between employers and workers is unequal and, as a result, workers are vulnerable to exploitation and coercion through the use of non-compete clauses at the time of contracting. Courts have expressed this concern since at least the early eighteenth century. In the foundational English case *Mitchel* v. *Reynolds*, the court cited "the great abuses these voluntary restraints are liable to . . . from masters, who are apt to give their apprentices much vexation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves." [261] As another court stated, more recently:

The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. . . . Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training.[262]

Indeed, courts have cited the imbalance of bargaining power between workers and employers as a central reason for imposing stricter scrutiny on non-compete clauses between employers and workers than on non-compete clauses between businesses or between the seller and buyer of a business.[263]

The imbalance of bargaining power between employers and workers results from several factors. Many of these

---

[255] *See supra* Part II.B.2.

[256] *See supra* Part II.B.2.a.

[257] *See supra* Part II.B.2.b.

[258] *See supra* Part II.B.2.c.

[259] *See supra* Part II.B.2.d.

[260] *See supra* Part IV.A.1.

[261] 1 P. Wms. at 190.

[262] *Arthur Murray Dance Studios of Cleveland* v. *Witter,* 105 NE2d 685, 703–04 (Ohio Ct. Com. Pl. 1952). *See also* Restatement (Second) of Contracts (1981) sec. 188 cmt. g ("Postemployment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.").

[263] *See, e.g., Alexander & Alexander, Inc.* v. *Danahy,* 488 NE2d 22, 29 (Mass. App. Ct. 1986); *Diephol* v. *Rutledge,* 659 NE 989, 991 (Ill. Ct. App. 1995); *Palmetto Mortuary Transp., Inc.* v. *Knight Sys., Inc.,* 818 SE2d 724, 731 (S.C. 2018).

factors relate to the nature of the employer-worker relationship in the United States generally. Most workers depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and keep food on the table. For these workers, particularly the many workers who live paycheck to paycheck, loss of a job or a job opportunity can severely damage their finances.[264] For these reasons, the loss of a job or an employment opportunity is far more likely to have serious financial consequences for a worker than the loss of a worker or a job candidate would have for most employers. In addition, employers generally have considerable labor market power, due to factors such as concentration and the difficulty of searching for a job.[265] The considerable labor market power of employers has significantly diminished the bargaining power of U.S. workers.[266]

Several additional factors contribute to the imbalance of bargaining power between employers and workers generally. These include the decline in union membership, which forces more workers to negotiate with their employers individually;[267] increased reliance by employers on various forms of outsourcing, which allows employers to fill persistent vacancies without having to raise wages or improve conditions for incumbent workers;[268] and the proliferation of no-poaching agreements, which limit the mobility of workers and, as a result, their bargaining power.[269]

While the employer-worker relationship is defined by an imbalance of bargaining power generally, the imbalance of bargaining power is particularly acute in the context of negotiating employment terms such as

non-compete clauses, for several reasons. First, as courts have long recognized, employers are repeat players who are likely to have greater experience and skill at bargaining, in the context of negotiating employment terms, than individual workers.[270] Second, and relatedly, workers are not likely to seek the assistance of counsel in reviewing employment terms,[271] while employers are more likely to seek the assistance of counsel in drafting them.

Third, research indicates consumers exhibit cognitive biases in the way they consider contractual terms,[272] and the same may be true of workers. Consumers rarely read standard-form contracts.[273] Consumers also tend to focus their attention on a few salient terms of the transaction, such as price and quantity, and tend to disregard other terms, particularly terms that are relatively obscure.[274] Consumers are particularly likely to disregard contingent terms—terms concerning scenarios that may or may not come to pass—or to be unable to assess what the impact of those terms may be.[275] Consumers also tend to disregard onerous terms or terms that involve difficult trade-offs, such as giving up legal rights or future opportunities.[276] Workers likely display similar cognitive biases in the way they consider employment terms. These reasons explain why the imbalance of bargaining power between workers and employers is particularly high in the context of negotiating employment terms such as non-compete clauses.

There is considerable evidence employers are exploiting this imbalance of bargaining power through the use of non-compete clauses. Non-compete clauses are typically standard-form

contracts,[277] which, as noted above, workers are not likely to read. The evidence shows workers rarely bargain over non-compete clauses[278] and rarely seek the assistance of counsel in reviewing non-compete clauses.[279] Furthermore, research indicates that, in states where non-compete clauses are unenforceable, workers are covered by non-compete clauses at roughly the same rate as workers in other states,[280] suggesting that employers may believe workers are unaware of their legal rights, or that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights. In addition, there is evidence employers often provide workers with non-compete clauses after they have accepted the job offer—in some cases, on or after their first day of work—when the worker's negotiating power is at its weakest, since the worker may have turned down other job offers or left their previous job.[281]

Because there is a considerable imbalance of bargaining power between workers and employers in the context of negotiating employment terms, and because employers take advantage of this imbalance of bargaining power through the use of non-compete clauses, the Commission preliminarily finds non-compete clauses are exploitative and coercive at the time of contracting.

As noted above, for coercive conduct to constitute unfair method of competition, it must also burden a not insignificant volume of commerce. The Commission preliminarily finds non-compete clauses burden a not insignificant volume of commerce due to their negative effects on competitive conditions in labor markets and product and service markets, which are described above.[282]

This preliminary finding does not apply to workers who are senior executives. Non-compete clauses for senior executives are unlikely to be exploitative or coercive at the time of contracting, because senior executives are likely to negotiate the terms of their employment and may often do so with the assistance of counsel. The Commission seeks comment on whether there are other categories of highly paid or highly skilled workers (*i.e.,* other

---

[264] *See, e.g.,* Jennie E. Brand, *The Far-Reaching Impact of Job Loss and Unemployment,* 41 Ann. Rev. of Socio. 359 (2015); CareerBuilder, *Living Paycheck to Paycheck is a Way of Life for Majority of U.S. Workers, According to New CareerBuilder Survey* (Aug. 24, 2017), *https://press.careerbuilder.com/2017-08-24-Living-Paycheck-to-Paycheck-is-a-Way-of-Life-for-Majority-of-U-S-Workers-According-to-New-CareerBuilder-Survey* (reporting that 78% of American workers live paycheck to paycheck); Jeff Ostrowski, Bankrate, *Survey: Fewer than 4 in 10 Americans could pay a surprise $1,000 bill from savings* (Jan. 11, 2021), *https://www.bankrate.com/banking/savings/financial-security-january-2021/.*

[265] Treasury Labor Market Competition Report, *supra* note 41 at i–ii.

[266] *Id.* at ii ("As this report highlights, a careful review of the credible academic studies places the decrease in wages at roughly 20 percent relative to the level in a fully competitive market").

[267] *See, e.g.,* Alan Krueger, *Luncheon Address: Reflections on Dwindling Worker Bargaining Power and Monetary Policy* at 272 (Aug. 24, 2018), *https://www.kansascityfed.org/Jackson%20Hole/documents/6984/Lunch_JH2018.pdf.*

[268] *Id.*

[269] *Id.* at 273.

[270] *See, e.g., Samuel Stores, Inc.* v. *Abrams,* 108 A. 541, 543 (Conn. 1919).

[271] In one survey, only 7.9% of workers with non-compete clauses reported consulting a lawyer in connection with the non-compete clause. Starr, Prescott, & Bishara, *supra* note 42, at 72.

[272] *See, e.g.,* Arnow-Richman (2006), *supra* note 56 at 981; Russell Korobkin, *Bounded Rationality, Standard Form Contracts, and Unconscionability,* 70 U. Chi. L. Rev. 1203, 1206 (2003); Robert Hillman & Jeffrey Rachlinski, *Standard-Form Contracting in the Electronic Age,* 77 N.Y.U. L. Rev. 429, 450–54 (2002).

[273] Korobkin, *supra* note 272 at 1206.

[274] Arnow-Richman (2006), *supra* note 56 at 981; Hillman & Rachlinksi, *supra* note 272 at 452.

[275] *See, e.g.,* Estlund, *supra* note 144 at 413 (2006). *See also* Fed. Trade Comm'n, *Credit Practices Rule,* 49 FR 7740, 7744 (Mar. 1, 1984) (noting that consumers tend disregard contingent provisions and concentrate their search on factors such as interest rates and payment terms).

[276] Arnow-Richman (2006), *supra* note 56 at 981; Korobkin, *supra* note 272 at 1203–31.

[277] Starr, Prescott, & Bishara, *supra* note 42 at 72 ("Taken together, the evidence in this section indicates that employers present (or employees receive) noncompete proposals as take-it-or-leave-it propositions.").

[278] *Id.*

[279] *Id.*

[280] *Id.* at 81.

[281] Marx (2011), *supra* note 55 at 706.

[282] *See supra* Part IV.A.1.a.i–ii.

than senior executives) to whom this preliminary finding should not apply.

The Commission seeks comment on all aspects of its preliminary finding that non-compete clauses are exploitative and coercive at the time of contracting.

### c. Non-Compete Clauses Are Exploitative and Coercive at the Time of The Worker's Potential Departure From the Employer

The Commission preliminarily finds non-compete clauses for workers other than senior executives are exploitative and coercive at the time of the worker's potential departure from the employer, because they force a worker to either stay in a job they want to leave or choose an alternative that likely impacts their livelihood.

For most workers who want to leave their jobs, the most natural employment options will be work in the same field and in the same geographic area. However, where a worker is bound by a non-compete clause, the worker's employment options are significantly limited. A worker who is subject to a non-compete clause, and who wants to leave their job, faces an undesirable choice that will likely affect their livelihood: either move out of the area; leave the workforce for a period of time; leave their field for period of time; pay the employer a sum of money to waive the non-compete clause; or violate the non-compete clause and risk a lawsuit from the employer. By forcing a worker who wants to leave their job to either stay in their job or take an action that will likely negatively affect their livelihood, non-compete clauses coerce workers into remaining in their current jobs. Courts have long expressed concern about this coercive effect of non-compete clauses—that non-compete clauses may threaten a worker's livelihood if they leave their job.[283]

Workers have an inalienable right to quit their jobs.[284] The Supreme Court has described this "right to change employers" as a critical "defense against oppressive hours, pay, working conditions, or treatment."[285] Strictly speaking, non-compete clauses do not prevent workers from quitting their jobs. However, non-compete clauses "burden the ability to quit, and with it the ability to demand better wages and working conditions and to resist oppressive conditions in the current job."[286] Non-

compete clauses burden the ability to quit by forcing workers to either remain in their current job or, as described above, take an action—such as leaving the labor force for a period of time or taking a job in a different field—that would likely affect their livelihood. For this reason, the Commission finds non-compete clauses are exploitative and coercive at the time of the worker's potential departure.

As noted above, for coercive conduct to constitute unfair method of competition, it must also burden a not insignificant volume of commerce. The Commission preliminarily finds non-compete clauses burden a not insignificant volume of commerce due to their negative effects on competitive conditions in labor markets and product and service markets, which are described above.[287]

This preliminary finding does not apply to workers who are senior executives. Non-compete clauses for senior executives are unlikely to be exploitative or coercive at the time of the executive's departure. Because many senior executives negotiate their non-compete clauses with the assistance of expert counsel, they are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete clause.[288] The Commission seeks comment on whether there are other categories of highly paid or highly skilled workers (*i.e.*, other than senior executives) to whom this preliminary finding should not apply.

The Commission seeks comment on all aspects of its preliminary finding that non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer.

### 2. Non-Compete Clauses Are a Method of Competition

For conduct to be an "unfair method of competition" under Section 5, it must be both "unfair" and a "method of competition." In *Ethyl,* the court distinguished between a "condition" of a marketplace, such as an oligopolistic market structure, and a "method" of competition, which it described as "specific conduct which promotes" an anticompetitive result.[289] When an

employer uses a non-compete clause, it undertakes conduct in a marketplace. This conduct implicates competition; indeed, it has demonstrable effects on competition in both labor markets and markets for products and services.[290] For these reasons, the Commission preliminarily finds non-compete clauses are a method of competition under Section 5. The Commission seeks comment on this preliminary finding.

### *B. The Justifications for Non-Compete Clauses Do Not Alter the Commission's Preliminary Determination*

For the reasons described above in Part IV.A, the Commission preliminarily determines non-compete clauses are an unfair method of competition under Section 5. In this Part IV.B, the Commission preliminarily finds the justifications for non-compete clauses do not alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition.

The circumstances under which a business justification can overcome a finding that conduct is an unfair method of competition are narrow. In *Fashion Originators' Guild of America* v. *FTC,* the Court held that, in light of "the purpose and object of this combination, its potential power, its tendency to monopoly, [and] the coercion it could and did practice upon a rival method of competition," the Commission did not err by refusing to hear evidence related to justifications, "for the reasonableness of the methods pursued by the combination to accomplish its unlawful object is no more material than would be the reasonableness of the prices fixed by unlawful combination."[291] In *Atlantic Refining,* the Court similarly held the Commission did not err by refusing to consider "evidence of economic justification for the program," because, while the arrangements at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers . . . the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves."[292]

Similarly, in *L.G. Balfour Co.,* the Commission challenged as an unfair method of competition the use of exclusive dealing contracts by a firm that manufactured and sold jewelry and other items bearing the insignia of fraternities and high schools. The firm argued the contracts were justified, in

---

[283] *See, e.g., Mitchel,* 1 P. Wms. at 190 (citing "the mischief which may arise from [non-compete clauses] . . . to the party, by the loss of his livelihood").

[284] *Bailey* v. *Alabama,* 219 U.S. 219, 242 (1911).

[285] *Pollock* v. *Williams,* 322 U.S. 4, 17–18 (1944).

[286] *See* Estlund, *supra* note 144 at 407.

[287] *See supra* Part IV.A.1.a.i–ii.

[288] *See, e.g.,* Stewart J. Schwab & Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?,* 63 Wash. & Lee L. Rev. 231, 256–57 (2006) (noting that 84% of CEO employment contracts that included both a non-compete clause and a severance payment have a severance payment that is equal to or greater than the length of the non-competition period).

[289] 729 F.2d at 139.

[290] *See supra* Part II.B.

[291] 312 U.S. at 467–68.

[292] 381 U.S. at 371.

part because the fraternities and schools benefitted from uniformity in the design and workmanship of the items. The court reasoned ''[w]hile it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice.'' [293] The court found the exclusive contracts were not justified, because the fraternities and schools had other means for accomplishing the goal of maintaining high quality for their jewelry and because the firm did not establish that its competitors could not satisfy its customers' needs.[294]

In this Part IV.B, the Commission considers the commonly cited business justifications for non-compete clauses but preliminarily finds they do not alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition, for two reasons. First, employers have alternatives to non-compete clauses that reasonably achieve the same purposes while burdening competition to a less significant degree. Second, the asserted benefits from these commonly cited justifications do not outweigh the considerable harm from non-compete clauses.

### 1. Commonly Cited Justifications for Non-Compete Clauses

The most cited justifications for non-compete clauses are that they increase employers' incentive to make productive investments, including in worker training, client attraction, or in creating or sharing trade secrets with workers. According to these justifications, without non-compete clauses, employment relationships are subject to an investment hold-up problem. Investment hold-up occurs where an employer—faced with the possibility a worker may depart after receiving some sort of valuable investment—opts not to make that investment in the first place, thereby decreasing the firm's productivity and overall social welfare. For example, according to these justifications, an employer may be more reticent to invest in trade secrets or other confidential information; to share this information with its workers; or to train its workers if it knows the worker may depart for or may establish a competing firm. Courts have cited these justifications when upholding non-compete clauses under state common law or antitrust law.[295]

As described above in Part II.B.2.e, there is evidence non-compete clauses increase worker training and capital investment (*e.g.,* investment in physical assets, such as machines). Non-compete clauses may increase an employer's incentive to train their workers or invest in capital equipment because workers bound by non-compete clauses are less likely to leave their jobs for competitors. The author of the study assessing effects on capital investment finds there are likely two mechanisms driving these effects. First, firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (*i.e.,* the return on investment in capital equipment is greater when workers are more highly trained). Second, non-compete clauses reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[296]

The Commission is not aware of any evidence of a relationship between the enforceability of non-compete clauses and the rate at which companies make other types of productive investments, such as investments in creating or sharing trade secrets. Similarly, the Commission is not aware of any evidence non-compete clauses reduce trade secret misappropriation or the loss of other types of confidential information. The Commission's understanding is there is little reliable empirical data on trade secret theft and firm investment in trade secrets in general, and no reliable data on how non-compete clauses affect these practices. The Commission understands these are difficult areas for researchers to study, due to, for example, the lack of a governmental registration requirement for trade secrets and the unwillingness of firms to disclose information about their practices related to trade secrets.[297]

The Commission is also not aware of any evidence that increased investment due to non-compete clauses leads to reduced prices for consumers. Indeed, the only empirical study of the effects of non-compete clauses on consumer prices—in the health care sector—finds increased final goods prices as the enforceability of non-compete clauses increases.[298]

### 2. Employers Have Alternatives to Non-Compete Clauses for Protecting Valuable Investments

There are two reasons why the business justifications for non-compete clauses do not alter the Commission's preliminary determination non-compete clauses are an unfair method of competition. The first is employers have alternatives to non-compete clauses for protecting valuable investments. These alternatives may not be as protective as employers would like, but they reasonably accomplish the same purposes as non-compete clauses while burdening competition to a less significant degree.

As noted above, the most commonly cited justifications for non-compete clauses are that they increase an employer's incentive to make productive investments—such as investing in trade secrets or other confidential information, sharing this information with its workers, or training its workers—because employers may be more likely to make such investments if they know workers are not going to depart for or establish a competing firm. However, non-compete clauses restrict considerably more activity than necessary to achieve these benefits. Rather than restraining a broad scope of beneficial competitive activity—by barring workers altogether from leaving work with the employer for a competitor and starting a business that would compete with the employer—employers have alternatives for protecting valuable investments that are much more narrowly tailored to limit impacts on competitive conditions. These alternatives restrict a considerably smaller scope of beneficial competitive activity than non-compete clauses because—while they may restrict an employee's ability to use or disclose certain information—they generally do not prevent workers from working for a competitor or starting their own business altogether.[299]

#### a. Trade Secret Law

Trade secret law provides employers with an alternative means of protecting their investments in trade secrets. Trade secret law is a form of intellectual property law that protects confidential

---

[293] 442 F.2d at 15, *citing Motion Picture Advert. Serv. Co.,* 344 U.S. 392.

[294] *Id.* at 14–15.

[295] *See, e.g., U.S.* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir. 1898); *Polk Bros., Inc.* v.

*Forest City Enters.,* 776 F.2d 185, 189 (7th Cir. 1985).

[296] Jeffers, *supra* note 92 at 29.

[297] *See, e.g.,* David S. Levine & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act,* 53 Wake Forest L. Rev. 105, 120–22 (2018).

[298] *See supra* Part II.B.2.a.

[299] *See, e.g., MAI Basic Four, Inc.* v. *Basis, Inc.,* 880 F.2d 286, 287–88 (10th Cir. 1989) (stating that workers subject to NDAs—unlike workers subject to non-compete clauses—''remain free to work for whomever they wish, wherever they wish, and at whatever they wish,'' subject only to the terms that prohibit them from disclosing or using certain information.'').

business information.[300] It also serves as an alternative to the patent system, "granting proprietary rights to particular technologies, processes, designs, or formulae that may not be able to satisfy the rigorous standards for patentability." [301] Even where information meets standards for patentability, companies may choose to rely on trade secret law and not obtain a patent, because they wish to keep information out of the public domain.[302]

Trade secret law has developed significantly in recent decades. Prior to the late 1970s, trade secret law across the states was inconsistent, leading to significant uncertainty regarding the scope of trade secret protections and the appropriate remedies for misappropriation.[303] Recognizing the need for more uniform laws, the American Bar Association approved the Uniform Trade Secrets Act ("UTSA") in 1979.[304] Forty-seven states and the District of Columbia have adopted the UTSA.[305] The three states that have not adopted the UTSA offer protection to trade secrets under a different statute or under common law.[306]

The UTSA provides a civil cause of action for trade secret misappropriation, which refers to disclosure or use of a trade secret by a former employee without express or implied consent.[307] The UTSA also provides for injunctive and monetary relief, including compensatory damages, punitive damages, and attorney's fees.[308] In some states, under the "inevitable disclosure doctrine," courts may enjoin a worker from working for a competitor of the worker's employer where it is inevitable the worker will disclose trade secrets in the performance of the worker's job duties.[309] The inevitable disclosure doctrine is highly controversial. Several states have declined to adopt it altogether, citing the doctrine's harsh effects on worker mobility.[310] Other states have required employers to meet

high evidentiary burdens related to inevitability, irreparable harm, and bad faith before issuing an injunction pursuant to the doctrine.[311]

In addition, in 2016, Congress enacted the Defend Trade Secrets Act of 2016 ("DTSA"), which established a civil cause of action under federal law for trade secret misappropriation.[312] The DTSA brought the rights of trade secret owners "into alignment with those long enjoyed by owners of other forms of intellectual property, including copyrights, patents, and trademarks." [313] Similar to state laws modeled on the UTSA, the DTSA authorizes civil remedies for trade secret misappropriation, including injunctive relief, damages (including punitive damages), and attorney's fees.[314] The DTSA also authorizes a court, in "extraordinary circumstances," to issue civil *ex parte* orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action." [315]

Furthermore, trade secret theft is a federal crime. The Economic Espionage Act of 1996 ("EEA") makes it a federal crime to steal a trade secret for either (1) the benefit of a foreign entity ("economic espionage") or (2) the economic benefit of anyone other than the owner ("theft of trade secrets").[316] The EEA authorizes substantial criminal fines and penalties for these crimes.[317] The EEA further authorizes criminal or civil forfeiture, including of "any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of" an EEA offense.[318] The EEA also requires offenders to pay restitution to victims of trade secret theft.[319]

Under these laws, the term "trade secret" is defined expansively and includes a wide range of confidential information. The UTSA generally defines a "trade secret" as information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use and (2) is the subject of reasonable efforts to

maintain its secrecy.[320] The DTSA and EEA use a similar definition.[321] The Supreme Court has held "some novelty" is required for information to be a trade secret, because "that which does not possess novelty is usually known." [322] Overall, the definition of "trade secret" covers a wide range of information employers seek to protect from disclosure. As the high court of one state noted, "[t]here is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret." [323]

The viability of trade secret law as a means for redressing trade secret theft is illustrated by the fact that firms regularly bring claims under trade secret law. A recent analysis by the legal analytics firm Lex Machina finds 1,382 trade secret lawsuits were filed in federal court in 2021.[324] Perhaps due to the enactment of the DTSA, the number of cases filed increased 30% from 2015 to 2017—from 1,075 to 1,396 cases—and has remained steady ever since.[325] In addition, an analysis by the law firm Morrison Foerster finds 1,103 trade secret cases were filed in state courts in 2019.[326] The number of cases filed in state court has held steady since 2015, when 1,161 cases were filed.[327] The fact that a considerable number of trade secret lawsuits are filed in federal and state court—approximately 2,500 cases per year—and the fact that this number has held steady for several years suggests employers view trade secret law as a viable means of obtaining redress for trade secret theft.

In sum, intellectual property law already provides significant legal protections for an employer's trade secrets. Trade secret law may not be as protective as some firms might like, but overall, it provides employers with a viable means of protecting their investments in trade secrets.

b. Non-Disclosure Agreements

Employers that seek to protect valuable investments also have the

[300] Brian T. Yeh, Protection of Trade Secrets: Overview of Current Law and Legislation, Cong. Rsch. Serv. Report R43714 (April 22, 2016) at 4.

[301] *Id.*

[302] *Id.* at 4–5.

[303] Uniform Trade Secrets Act With 1985 Amendments (Feb. 11, 1986), Prefatory Note at 1.

[304] *Id.* Prefatory Note at 3.

[305] *See* Levine & Seaman, *supra* note 297 at 113.

[306] Yeh, *supra* note 300 at 6 n.37.

[307] UTSA, *supra* note 303 at sec. 1(2).

[308] *Id.* at secs. 2–4.

[309] *See, e.g., PepsiCo, Inc.* v. *Redmond*, 54 F.3d 1262 (7th Cir. 1995) (affirming the district court's order enjoining an employee from assuming his responsibilities at a competing employer for six months).

[310] *See Bayer Corp.* v. *Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999); *LeJeune* v. *Coin Acceptors, Inc.*, 849 A.2d 451, 471 (Md. 2004).

[311] *See, e.g.,* Eleanore R. Godfrey, *Inevitable Disclosure of Trade Secrets: Employee Mobility* v. *Employer Rights,* 3 J. High Tech. L. 161 (2004).

[312] Defend Trade Secrets Act of 2016, Public Law 114–153, 130 Stat. 376 (May 11, 2016).

[313] U.S. Senate, Report to Accompany S. 1890, the Defend Trade Secrets Act of 2016, S. Rept. 114–220 at 3.

[314] 18 U.S.C. 1836(b)(3).

[315] 18 U.S.C. 1836(b)(2).

[316] 18 U.S.C. 1831 (economic espionage); 18 U.S.C. 1832 (theft of trade secrets).

[317] 18 U.S.C. 1831–1832.

[318] 18 U.S.C. 1834, 2323.

[319] 18 U.S.C. 1834, 2323.

[320] UTSA, *supra* note 303 at sec. 1(4).

[321] 18 U.S.C. 1839(3).

[322] *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U.S. 470, 476 (1974).

[323] *U.S. West Commc'ns, Inc.* v. *Off. of Consumer Advoc.,* 498 NW2d 711, 714 (Iowa 1993). *See also Confold Pac., Inc.* v. *Polaris Indus., Inc.,* 433 F.3d 952 (7th Cir. 2006) (Posner, J.).

[324] Lex Machina, Infographic, *Trade Secret Litigation Report 2021, https://lexmachina.com/resources/infographic-trade-secret-report/.*

[325] Kenneth A. Kuwayti, John R. Lanham, & Candice F. Heinze, Morrison Foerster, Client Alert, *Happy Anniversary, DTSA: The Defend Trade Secrets Act at Five* (May 25, 2021).

[326] *Id.*

[327] *Id.*

ability to enter into NDAs with their workers.[328] NDAs, which are also commonly known as confidentiality agreements, are contracts in which a party agrees not to disclose information the contract designates as confidential. NDAs may also prohibit workers from using information that is designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract.

Employers regularly use NDAs to protect trade secrets and other confidential business information. Researchers estimate between 33% and 57% of U.S. workers are subject to at least one NDA.[329] In most states, NDAs are more enforceable than non-compete clauses.[330]

The widespread use of NDAs by firms has raised concerns that NDAs may inhibit innovation and worker mobility.[331] Scholars have also raised concerns that overbroad NDAs can function as *de facto* non-compete clauses.[332] However, the protection of trade secrets and other limited confidential business information is widely recognized as a legitimate use of NDAs.[333]

NDAs that are unusually broad in scope may function as *de facto* non-compete clauses, hence falling within the scope of the proposed rule.[334] However, appropriately tailored NDAs, which would fall outside the scope of the proposed rule,[335] burden competition to a lesser degree than non-compete clauses. Such NDAs may prevent workers from disclosing or

using certain information, but they generally do not prevent workers from working for a competitor or starting their own business altogether. As the U.S. Court of Appeals for the Tenth Circuit has stated, workers subject to NDAs—unlike workers subject to non-compete clauses—''remain free to work for whomever they wish, wherever they wish, and at whatever they wish,'' subject only to the terms that prohibit them from disclosing or using certain information.[336]

c. Other Means of Protecting Valuable Investments

In addition to trade secret law and NDAs, employers have additional means of protecting valuable investments. For example, if an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration. An employer can establish a term of employment long enough for the employer to recoup its training investment without restricting a worker's ability to compete with the employer after the worker's employment ends. Employers that wish to retain their workers can also pay the worker more, offer them better hours or better working conditions, or otherwise improve the conditions of their employment. These are all viable alternatives for protecting training investments, and other investments an employer may make, that do not restrict a worker's ability to work for a competitor of the employer or a rival's ability to compete against the worker's employer to attract the worker.

Proponents of non-compete clauses sometimes assert that, without non-compete clauses, firms will be unable to protect their trade secrets or other valuable investments. However, there are three states in which non-compete clauses are generally unavailable to employers today: California, North Dakota, and Oklahoma. In these three states, employers generally cannot enforce non-compete clauses, so they must protect their investments using one or more of the alternatives described above. The experiences of these states suggest the alternatives described above are fundamentally viable for protecting valuable firm investments.

Non-compete clauses have been void in California since 1872, in North Dakota since 1877, and in Oklahoma since 1890.[337] California is a state where

large companies have succeeded—it is home to four of the world's ten largest companies by market capitalization—and it also maintains a vibrant startup culture.[338] Since the 1980s, California has become the global center of the technology sector, and technology firms are highly dependent on protecting trade secrets and other confidential information.[339] (Indeed, researchers have posited that high-tech clusters in California may have been aided by increased labor mobility due to the unenforceability of non-compete clauses.[340]) In North Dakota and Oklahoma, the energy industry has thrived, and firms in the energy industry depend on the ability to protect trade secrets and other confidential information.

The economic success in these three states of industries highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-compete clauses for protecting valuable investments. Relative to non-compete clauses, these alternatives are more narrowly tailored to limit impacts on competitive conditions.

The Commission seeks comment on its preliminary finding that employers have reasonable alternatives to non-compete clauses for protecting their investments.

3. The Asserted Benefits From These Justifications Do Not Outweigh the Harms From Non-Compete Clauses

The second reason why the commonly cited business justifications for non-compete clauses do not alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition is that, overall, the asserted benefits from these justifications do not outweigh the harms from non-compete clauses.

As described above, the Commission preliminarily finds that, for some workers, non-compete clauses are exploitative and coercive because they take advantage of unequal bargaining power between employers and workers at the time of contracting.[341] The

---

[328] In this NPRM, we use the term ''NDA'' to refer to contractual provisions that are designed to protect trade secrets or other business information that has economic value. Employers may also seek to use NDAs to protect other kinds of information, such as information about discrimination, harassment, sexual assault, corporate wrongdoing, or information that may disparage the company or its executives or employees. These types of NDAs have been widely criticized for, among other things, their pernicious effects on workers. *See, e.g.,* Rachel Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining In Non-Disclosure Agreements,* UC-Hastings Research Paper Forthcoming at 2–6 (January 2022), *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=4022812.*

[329] *Id.*

[330] *See* Chris Montville, *Reforming the Law of Proprietary Information,* 56 Duke L.J. 1159, 1179–83 (2007).

[331] *See* Rex N. Alley, *Business Information and Non-Disclosure Agreements: A Public Policy Framework,* 116 Nw. L. Rev. 817, 832 (2022).

[332] *See, e.g.,* Arnow-Richman et al., *supra* note 328 at 5. *See also Brown,* 57 Cal. App. 5th at 319.

[333] *See* Montville, *supra* note 330 at 1179–83.

[334] *See* proposed § 910.1(b)(2) (describing the functional test for whether a contractual term is a non-compete clause) and *infra* Part V (in the section-by-section analysis for proposed § 910.1(b)).

[335] *Id.*

[336] *MAI Basic Four, Inc.,* 880 F.2d at 287–88.

[337] Gilson, *supra* note 88 at 616 (California); *Werlinger v. Mutual Service Casualty Ins. Co.,* 496

N.W.2d 26, 30 (N.D. 1993) (North Dakota); Brandon Kemp, *Noncompetes in Oklahoma Mergers and Acquisitions,* 88 Okla. Bar J. 128 (Jan. 21, 2017) (Oklahoma).

[338] Josh Dylan, *What Is Market Cap In Stocks?, Nasdaq.com* (Aug. 12, 2022); Ewing Marion Kauffman Found., *State Entrepreneurship Rankings, https://www.realclearpublicaffairs.com/ public_affairs/2019/02/25/kauffman_foundation_ state_entrepreneurship_rankings.html.*

[339] *See, e.g.,* Gilson, *supra* note 88 at 594–95.

[340] *Id.;* Fallick, Fleischman, & Rebitzer, *supra* note 89.

[341] *See supra* Part IV.A.1.b.

Commission also preliminarily finds that, for some workers, non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer because they force a worker to either stay in a job they want to leave or choose an alternative that likely impacts their livelihood.[342] For these workers, for whom non-competes are facially unfair, the justifications for non-compete clauses must overcome a high bar to alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition.[343]

In addition, non-compete clauses cause considerable harm to competition in labor markets and product and service markets. There is evidence non-compete clauses harm both workers and consumers. Non-compete clauses obstruct competition in labor markets because they inhibit optimal matches from being made between employers and workers across the labor force. The available evidence indicates increased enforceability of non-compete clauses substantially reduces workers' earnings, on average, across the labor force generally and for specific types of workers.[344]

In addition to the evidence showing non-compete clauses reduce earnings for workers across the labor force, there is also evidence non-compete clauses reduce earnings specifically for workers who are not subject to non-compete clauses.[345] These workers are harmed by non-compete clauses, because their wages are depressed, but they do not necessarily benefit from any incentives for increased training that non-compete clauses may provide.

Overall, these harms to workers are significant. The Commission estimates that the proposed rule, which would prohibit employers from using non-compete clauses, would increase workers' total earnings by $250 to $296 billion per year.[346]

The available evidence also indicates non-compete clauses negatively affect competition in product and service markets. There is evidence non-compete clauses increase consumer prices and concentration in the health care sector.[347] There is also evidence non-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete

clauses if they want to hire them.[348] The weight of the evidence also indicates non-compete clauses have a negative impact on new business formation and innovation.[349] These harms are significant. For example, with respect to consumer prices in the health care sector alone, the Commission estimates health spending would decrease by $148 billion annually due to the proposed rule.[350]

In the Commission's preliminary view, the asserted benefits from non-compete clauses do not outweigh these harms. In short, while there is considerable evidence non-compete clauses harm both workers and consumers, the evidence that non-compete clauses benefit workers or consumers is scant.

As described above, the most common justification for non-compete clauses is they increase employers' incentive to make productive investments in, for example, trade secrets, customer lists, worker training, and capital investment. There is evidence non-compete clauses increase employee training and capital investment, as noted above.[351] However, the considerable harms to workers and consumers are not outweighed because an employer has some marginally greater ability to protect trade secrets, customer lists, and other firm investments, or because the worker is receiving increased training, or because the firm has increased capital investments. If they were, workers would have higher earnings when non-compete clauses are more readily available to firms (*i.e.,* when legal enforceability of non-compete clauses increases) or prices for consumers would be lower. However, the empirical economic literature shows workers generally have lower, not higher, earnings when non-compete clause enforceability increases.

Moreover, the Commission is also not aware of any evidence these potential benefits of non-compete clauses lead to reduced prices for consumers. Indeed, the only empirical study of the effects of non-compete clauses on consumer prices—in the health care sector—finds increased final goods prices as the enforceability of non-compete clauses increases.[352] Furthermore, the Commission is not aware of any evidence non-compete clauses reduce trade secret misappropriation or the loss of other types of confidential information. The Commission's

understanding is there is little reliable empirical data on trade secret theft and firm investment in trade secrets in general, and no reliable data on how non-compete clauses affect these practices. The Commission is also not aware of evidence that, in the three states in which non-compete clauses are generally void, the inability to enforce non-compete clauses has materially harmed workers or consumers in those states.

As a result, the Commission preliminarily finds the asserted benefits from non-compete clauses do not outweigh the harms. The Commission seeks comment on this preliminary finding.

**V. Section-by-Section Analysis**

The Commission is proposing to create a new Subchapter J in Chapter 16 of the Code of Federal Regulations. Subchapter J would be titled "Rules Concerning Unfair Methods of Competition." Within Subchapter J, the Commission is proposing to create 16 CFR part 910—the Non-Compete Clause Rule.[353] The Commission describes each section of the proposed rule below.

*Section 910.1    Definitions*

Proposed § 910.1 would contain definitions of terms that would be used in the Rule.

1(a) Business Entity

Proposed § 910.1(a) would define the term business entity. This term would be used in proposed § 910.3, which would contain an exception for certain non-compete clauses. Under the exception, the Rule would not apply to a non-compete clause entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets, when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause. The proposed rule would also use the term business entity in proposed § 910.1(e), which would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity.

Proposed § 910.1(a) would define the term business entity as a partnership, corporation, association, limited

[342] *See supra* Part IV.A.1.c.

[343] *See, e.g., Fashion Originators' Guild,* 312 U.S. at 467–68; *Atl. Refining Co.,* 381 U.S. at 371.

[344] *See supra* Part II.B.1.b.

[345] *See supra* Part II.B.1.c.

[346] *See infra* Part VII.B.1.a.

[347] *See supra* Part II.B.2.a.

[348] *See supra* Part II.B.2.b.

[349] *See supra* Part II.B.2.c–d.

[350] *See infra* Part VII.B.2.c.

[351] *See supra* Part II.B.2.e.

[352] *See supra* Part II.B.2.a.

[353] For ease of reference, this Part V refers to proposed 16 CFR part 910 as "the Rule."

liability company, or other legal entity, or a division or subsidiary thereof. The Commission is proposing to include divisions and subsidiaries in the definition because it believes the exception in proposed § 910.3 should apply where a person is selling a division or subsidiary of a business entity. The primary rationale for the sale-of-a-business exception in proposed § 910.3—that the exception may help to protect the value of a business acquired by a buyer—would also apply where a person is selling a division or subsidiary of a business entity. Applying the sale-of-a-business exception where a person is selling a division or subsidiary of a business entity would also be consistent with many state laws that exempt non-compete clauses from certain requirements when they are between the seller and buyer of a business, including a division or subsidiary of the business.[354]

The Commission seeks comment on proposed § 910.1(a).

### 1(b) Non-Compete Clause

Proposed § 910.1(b)(1) would define non-compete clause as a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. The Commission believes this is a generally accepted definition of the term non-compete clause.

Proposed § 910.1(b)(1) would limit the coverage of the Rule to non-compete clauses between employers and workers. The Rule would not apply to other types of non-compete clauses—for example, non-compete clauses between two businesses, where neither is a worker pursuant to the Rule's definition of "worker."[355] While such non-compete clauses would not be covered by the Rule, they would still be subject to federal antitrust law and all other applicable law.

Furthermore, pursuant to proposed § 910.1(b)(1), the Rule would apply only to post-employment restraints—i.e., restrictions on what the worker may do after the conclusion of the worker's employment with the employer. The Rule would not apply to concurrent-employment restraints—i.e., restrictions on what the worker may do during the worker's employment.

Some non-compete clauses do not use language that expressly prohibits a worker from competing against their employer, but instead effect the same restriction by requiring workers to pay damages if they compete against their employer. State courts generally view these contractual terms as non-compete clauses.[356] These contractual terms would also be non-compete clauses under proposed § 910.1(b)(1), because they prevent a worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer (unless the damages specified in the contract are paid).

Proposed § 910.1(b)(2) would clarify the definition of non-compete clause in proposed § 910.1(b)(1) by explaining that whether a contractual term is a non-compete clause for purposes of the Rule would depend on a functional test. In other words, whether a contractual term is a non-compete clause would depend not on what the term is called, but how the term functions.

In addition to non-compete clauses, employers and workers enter into many other types of covenants that restrict what a worker may do after the worker leaves their job, including, among others, NDAs; non-solicitation agreements; and TRAs.[357] The definition of non-compete clause would generally not include these types of covenants, because these covenants generally do not prevent a worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer. These other types of covenants may affect the way a worker competes with their former employer after the worker leaves their job. However, they do not generally prevent a worker from competing with their former employer altogether; and they do not generally prevent other employers from competing for that worker's labor. For example, if a worker leaves their job with their employer and goes to work for a competitor, an NDA the worker signed with their employer may prevent the worker from disclosing certain information to the competitor. However, a standard NDA would not prevent the worker from seeking or accepting work with the competitor.

The Commission is concerned, however, that some employers may seek to evade the requirements of the Rule by implementing restrictive employment covenants other than non-compete clauses that restrain such an unusually large scope of activity that they are de facto non-compete clauses. Under proposed § 910.1(b)(2), such functional equivalents would be non-compete clauses for purposes of the Rule, whether drafted for purposes of evasion or not.

Courts have taken this approach when analyzing whether a contractual term is a non-compete clause under state law. For example, in Brown v. TGS Mgmt. Co., LLC, a California state court held an NDA that defined confidential information "so broadly as to prevent [the plaintiff] from ever working again in securities trading" operated as a de facto non-compete clause and therefore could not be enforced under California law, which generally prohibits enforcement of non-compete clauses. The NDA in this case restrained a far broader scope of activity than a typical NDA. For example, it defined "confidential information" as any information that is "usable in" or "relates to" the securities industry. As a result, the court concluded it effectively prevented the worker from working in the securities industry after his employment ended and was therefore a de facto non-compete clause.[358] Similarly, in Wegmann v. London, the U.S. Court of Appeals for the Fifth Circuit concluded liquidated damages provisions in a partnership agreement were de facto non-compete clauses "given the prohibitive magnitudes of liquidated damages they specify."[359]

The purpose of § 910.1(b)(2) is to clarify that, if an employer implements a restrictive covenant not called a "non-compete clause" but so unusually broad in scope it functions as such, the covenant would be within the definition of non-compete clause in proposed § 910.1(b)(1). Proposed § 910.1(b)(2) would state that the term non-compete clause includes a contractual term that is a de facto non-compete clause because it has the effect of prohibiting the worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer.

Proposed § 910.1(b)(2) would also provide two examples of contractual terms that may be de facto non-compete clauses. The first example, based on Brown v. TGS Mgmt. Co., LLC, would be a non-disclosure agreement between an employer and a worker written so broadly it effectively precludes the worker from working in the same field

---

[354] See, e.g., Cal. Bus. & Prof. Code sec. 16601; Mass. Gen. Laws Ann. ch. 149, sec. 24L (definition of "noncompetition agreement"); R.I. Gen. Laws sec. 28–59–2(8)(iii).

[355] See proposed § 910.1(f).

[356] See, e.g., Wichita Clinic, P.A. v. Louis, 185 P.3d 946, 951 (Kan. Ct. App. 2008); Intermountain Eye & Laser Ctrs., 127 P.3d 121, 127 (Idaho 2005); BDO Seidman v. Hirshberg, 712 NE2d 1220, 1222–23 (N.Y. 1999).

[357] See supra Part II.A.

[358] 57 Cal. App. 5th 303, 306, 316–319 (Cal. Ct. App. 2020).

[359] 648 F.2d 1072, 1073 (5th Cir. 1981).

after the conclusion of the worker's employment with the employer. The second example, based on *Wegmann* v. *London,* would be a covenant between an employer and a worker that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred for training the worker.

The Commission stresses this list of examples would be a non-exclusive list. Restrictive covenants other than NDAs and TRAs may also constitute *de facto* non-compete clauses, depending on the facts. In addition, NDAs and TRAs may constitute *de facto* non-compete clauses under factual scenarios other than the scenarios outlined in these examples.

The Commission seeks comment on proposed § 910.1(b)(1) and (2). In addition, the Commission is concerned that workplace policies similar to non-compete clauses—such as a term in an employee handbook stating workers are prohibited from working for competitors after their employment ends—could potentially have negative effects similar to non-compete clauses if workers believe they are binding, even if they do not impose a contractual obligation. Therefore, the Commission also seeks comment on whether non-compete clause should be defined not only as a "contractual term" between an employer and a worker, but also as a provision in a workplace policy.[360]

### 1(c) Employer

The Rule would apply only to non-compete clauses between employers and workers.[361] Proposed § 910.1(c) would define employer as a person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person. 15 U.S.C. 57b–1(a)(6) defines person as any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of state law. Thus, proposed § 910.1(c) would effectively define employer as any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of state law, that hires or contracts with a worker to work for the person.

A person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person would be an employer under proposed § 910.1(c) regardless of whether the

person meets another legal definition of employer, such as a definition in federal or state labor law.

Some entities that would otherwise be employers may not be subject to the Rule to the extent they are exempted from coverage under the FTC Act. These entities include certain banks, savings and loan institutions, federal credit unions, common carriers, air carriers and foreign air carriers, and persons subject to the Packers and Stockyards Act of 1921,[362] as well as an entity that is not "organized to carry on business for its own profit or that of its members."[363] Where an employer is exempt from coverage under the FTC Act, the employer would not be subject to the Rule.

Furthermore, state and local government entities—as well as some private entities—may not be subject to the Rule when engaging in action protected by the state action doctrine. States are subject to the antitrust laws.[364] However, under the state action doctrine, federal statutes do not limit the sovereign states' autonomous authority over their own officers, agents, and policies in the absence of clear congressional intent to do so.[365] The key question is whether the conduct at issue is "compelled by direction of the state acting as a sovereign."[366] The state action doctrine may also be invoked by private entities in certain limited scenarios—specifically, where (1) the challenged restraint is clearly articulated as and affirmatively expressed as state policy, and (2) the policy is actively supervised by the state itself.[367] Thus, some entities that would otherwise be employers under proposed § 910.1(c) may not be subject to the Rule when engaging in action protected by the state action doctrine. Where private entities are involved, this would likely require a highly fact-specific inquiry.

The Commission seeks comment on proposed § 910.1(c).

### 1(d) Employment

The proposed rule would define the term non-compete clause as a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.

Proposed § 910.1(d) would define employment as work for an employer, as the term employer is defined in § 910.1(c). This proposed definition would clarify that an employment relationship exists, for purposes of the Rule, regardless of whether an employment relationship exists under another law, such as a federal or state labor law. The Commission seeks comment on proposed § 910.1(d).

### 1(e) Substantial Owner, Substantial Member, and Substantial Partner

The proposed rule would use the terms substantial owner, substantial member, and substantial partner in proposed § 910.3, which would exempt certain non-compete clauses from coverage under the Rule. This exception would only be available where the party restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity. Limiting the exception to substantial owners, substantial members, and substantial partners would ensure the exception is only available where the seller's stake in the business is large enough that a non-compete clause may be necessary to protect the value of the business acquired by the buyer.

Proposed § 910.1(e) would define substantial owner, substantial member, and substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity. The Commission is proposing a threshold of 25% ownership interest because the Commission believes the exception should be available where, for example, a few entrepreneurs sharing ownership interest in a startup sell their firm. In such a scenario, a non-compete clause may be necessary to protect the value of the business acquired by the buyer. For this reason, a threshold of, for example, 51% may be too high.

However, the Commission believes the exception should not be available where the ownership interest in question is so small the transfer of ownership interest would not be necessary to protect the value of the business acquired by the buyer. For example, the exception should not be available where a worker with a small amount of company stock sells that stock back to the company as part of a stock redemption agreement when the worker's employment ends. The Commission believes a 25% threshold strikes the appropriate balance between a threshold that may be too high (and would exclude many scenarios in which a non-compete clause may be necessary to protect the value of the business acquired by the buyer) and a threshold

---

[360] *See, e.g.,* D.C. Code sec. 32–581.01(15).

[361] *See* proposed § 910.1(b)(1).

[362] 15 U.S.C. 45(a)(2).

[363] 15 U.S.C. 44.

[364] *Goldfarb* v. *Va. State Bar,* 421 U.S. 773, 791–92 (1975).

[365] *Parker* v. *Brown,* 317 U.S. 341, 350–51 (1943) (construing the Sherman Act).

[366] *Goldfarb,* 421 U.S. at 791.

[367] *Cal. Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980).

that may be too low (and would allow the exception to apply more broadly than is needed to protect such an interest).

Instead of establishing a threshold, the Rule could simply use the terms substantial owner, substantial member, and substantial partner in proposed § 910.3 and leave the interpretation of those terms to case-by-case adjudication. However, if the Rule does not define a threshold, sellers of businesses may be unsure whether or not they are substantial owners, substantial members, and substantial partners under proposed § 910.3. Defining a threshold would provide greater clarity to the public and facilitate compliance with the Rule.

The Commission seeks comment on proposed § 910.1(e).

1(f) Worker

The Rule would apply only to non-compete clauses between employers and workers.[368] Proposed § 910.1(f) would define worker as a natural person who works, whether paid or unpaid, for an employer. Proposed § 910.1(f) would further state the term worker includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer.

As this definition states, the term worker would include not only employees, but also individuals classified as independent contractors, as well as other kinds of workers. Under proposed § 910.1(f), the term worker would include any natural person who works, whether paid or unpaid, for an employer, without regard to whether the worker is classified as an "employee" under the Fair Labor Standards Act (FLSA) or any other statute that draws a distinction between "employees" and other types of workers. Thus, gig economy workers such as rideshare drivers would be considered workers for purposes of proposed § 910.1(f).

The Commission is concerned that, if the Rule were to define workers as "employees" according to, for example, the FLSA definition, employers may misclassify employees as independent contractors to evade the Rule's requirements. Furthermore, the Commission has no reason to believe non-compete clauses that apply to workers such as independent contractors or interns negatively affect competitive conditions to a lesser degree than non-compete clauses that apply to employees. Such non-compete

clauses may, in fact, be more harmful to competition, given that these other types of workers tend to have shorter employment relationships. In addition, the Commission does not believe employers have stronger business justifications for applying non-compete clauses to independent contractors than they would to employees.

Proposed § 910.1(f) would also state the term worker does not include a franchisee in the context of a franchisee-franchisor relationship. The Commission believes that, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker. In addition, the evidentiary record before the Commission relates primarily to non-compete clauses that arise solely out of employment. The Commission has surveyed the available evidence relating to non-compete clauses and is not aware of research on the effects of applying additional legal restrictions to non-compete clauses between franchisors and franchisees. Therefore, the Commission believes it would be appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a worker for purposes of proposed § 910.1(f).

Proposed § 910.1(f) would further clarify, however, the term worker includes a natural person who works for the franchisee or franchisor. In addition, proposed § 910.1(f) would clarify non-compete clauses between franchisors and franchisees would remain subject to federal antitrust law as well as all other applicable law. These laws include state laws that apply to non-compete clauses in the franchise context. The Commission is not proposing to find that non-compete clauses between franchisors and franchisees are beneficial to competition.

The Commission seeks comment on proposed § 910.1(f).

*Section 910.2 Unfair Methods of Competition*

2(a) Unfair Methods of Competition

Proposed § 910.2(a) would state it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause. In effect, proposed § 910.2(a) would categorically ban employers from using non-compete clauses, because—as

of the compliance date—employers would be prohibited from maintaining pre-existing non-compete clauses and entering into new non-compete clauses.[369]

Part IV above explains the legal basis for the Commission's preliminary determination that the practices listed in proposed § 910.2(a) are unfair methods of competition. This section-by-section analysis for proposed § 910.2(a) describes how each of the three prongs of proposed § 910.2(a) would function and explains why the Commission is proposing a categorical ban on non-compete clauses.

How Proposed § 910.2(a) Would Function

Proposed § 910.2(a) would prohibit an employer from entering into or attempting to enter into a non-compete clause with a worker and maintaining with a worker a non-compete clause. Proposed § 910.2(a) would use both the term "enter into" and the term "maintain" to make clear it is an unfair method of competition for an employer to either (1) enter into or attempt to enter into new non-compete clauses as of the Rule's compliance date or (2) maintain pre-existing non-compete clauses as of the compliance date. The Commission believes non-compete clauses entered into before the compliance date implicate the concerns described above in Part IV to the same degree as non-compete clauses entered into as of the compliance date.[370] As a result, the Commission believes it would be appropriate to require employers to rescind non-compete clauses entered into before the compliance date, as well as to refrain from entering into or attempting to enter into new non-compete clauses starting on the compliance date.

Furthermore, requiring employers to rescind existing non-compete clauses would not impose significant compliance costs, due to the safe harbor in proposed § 910.2(b)(3). Under this safe harbor, an employer could comply with the requirement to rescind existing non-compete clauses by providing notice to the affected workers. In addition, proposed § 910.2(b)(2)(C) would further reduce compliance costs by providing language that would presumptively meet this notice requirement.

---

[368] *See* proposed § 910.1(b)(1).

[369] However, employers could still use non-compete clauses where they qualify for the exception in proposed § 910.3 for non-compete clauses between the seller and buyer of a business.

[370] *See supra* Part IV (describing the reasons for the Commission's preliminary determination that non-compete clauses between employers and workers are an unfair method of competition).

Proposed § 910.2(a) would prohibit an employer from attempting to enter into a non-compete clause with a worker. An employer attempts to enter a non-compete clause with a worker where, for example, the employer provides the worker with the non-compete clause, but the worker does not sign it. The Commission is concerned that attempting to enter into a non-compete clause with a worker would have *in terrorem* effects because, in this situation, the worker may still believe they are subject to a non-compete clause even if they did not sign it. For example, the worker may not recall whether they signed the non-compete clause or may not realize they are not bound by the non-compete clause unless they signed it.

Proposed § 910.2(a) would also prohibit an employer from representing to a worker that the worker is covered by a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause. Workers often lack knowledge of whether employers may enforce non-compete clauses.[371] In addition, the available evidence indicates that, in states where non-compete clause are void, workers are subject to non-compete clauses at approximately the same rate as workers in other states, suggesting that employers may believe workers are unaware of their legal rights.[372] Because many workers lack knowledge of whether their employer may enforce a non-compete clause under state law, they may also be unaware of any final rule issued by the Commission prohibiting employers from entering into or maintaining non-compete clauses. Employers may seek to exploit this lack of awareness by representing to workers that they are subject to a non-compete clause when they are not. This would likely have an *in terrorem* effect on workers, causing them to refrain from looking for work or taking another job, thereby furthering the adverse effects on competition motivating this proposed rule. As a result, the Commission believes it is appropriate for the Rule to prohibit employers from representing to workers that they are covered by a non-compete clause.

In addition, workers—particularly low-income workers—may lack resources to litigate against their employers. As a result, mere threats to enforce a non-compete clause may deter workers from looking for work with a competitor or starting their own business, which would result in the anticompetitive effects described above in Part IV.A.

Under this "representation" prong of proposed § 910.2(a), an employer would be prohibited from, among other things, threatening to enforce a non-compete clause against a worker; advising a worker that, due to a non-compete clause, they should not pursue a particular job opportunity; or simply telling the worker that the worker is covered by a non-compete clause. However, under proposed § 910.2(a), this prohibition on representation would only apply where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause. Proposed § 910.2(a) includes this "no good faith basis" exception to ensure the representation prong is consistent with the First Amendment. The Supreme Court has held "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."[373] Accordingly, "[t]he government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity."[374] A rule that prohibits an employer from representing to a worker that the worker is subject to a non-compete clause—where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause—would meet this test because, under such circumstances, an employer would be making a false claim and asserting an illegal restraint on worker activity. An employer would have no good faith basis to believe that a worker is subject to an enforceable non-compete clause where non-compete clauses are not enforceable in the relevant state or where the validity of the Rule—which would prohibit employers from maintaining or entering into non-compete clauses—has been adjudicated and upheld.

Proposed § 910.2(a) would not apply retroactively. An employer would not violate proposed § 910.2(a) where—prior to the compliance date—it entered into or attempted to enter into a non-compete clause with a worker; maintained with a worker a non-compete clause; or represented to a worker that the worker is subject to a non-compete clause. Instead, proposed § 910.2(a) would require employers to refrain from these practices starting on the compliance date.

Why the Commission Is Proposing a Categorical Ban on Non-Compete Clauses

Except for certain non-compete clauses between the seller and buyer of a business,[375] the proposed rule would categorically ban employers from using non-compete clauses with workers. The proposed rule would prohibit an employer from using a non-compete clause with any of its workers, without regard to the worker's earnings or job function.

The Commission is proposing a categorical ban on non-compete clauses because, fundamentally, non-compete clauses obstruct labor market competition through a similar mechanism for all workers. Non-compete clauses block workers in a labor market from switching to jobs in which they would be better paid and more productive. This harms workers who are subject to non-compete clauses. This also harms other workers in the labor market, since jobs that may be better matches for those workers are filled by workers who are unable to leave their jobs due to non-compete clauses.[376] And this harms other firms and potential entrants into the market, who have a more limited pool of workers from which to hire. Regardless of a worker's income or job status, non-compete clauses block workers from switching to jobs in which they would be better paid and more productive—restricting the opportunities of all workers in that labor market.

The available data do not allow the Commission to estimate earnings effects for every occupation. However, the evidentiary record indicates non-compete clauses depress wages for a wide range of subgroups of workers across the spectrum of income and job function—from hourly workers to highly paid, highly skilled workers such as executives. The Commission therefore estimates the proposed rule would increase earnings for workers in all of the subgroups of the labor force for which sufficient data is available.[377] Excluding these workers from the proposed rule would deny these workers the benefits of higher earnings through increased competition in the market for their labor.

The Commission recognizes there are compelling reasons for banning non-compete clauses that apply more strongly to lower-wage workers. Non-

---

[371] *See* Prescott & Starr, *supra* note 57 at 10–11.

[372] *See* Starr, Prescott, & Bishara, *supra* note 42 at 81.

[373] *Cent. Hudson Gas & Elec.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).

[374] *Id.* at 563–64.

[375] *See* proposed § 910.3.

[376] *See supra* Part II.B.1.

[377] *See infra* Part VII.B.1.a.

JA0196

compete clauses for lower-wage workers—such as sandwich shop workers, warehouse workers, or security guards [378]—may be more likely than non-compete clauses for higher-wage workers to be exploitative and coercive at the time of contracting and at the time of the worker's potential departure from the employer. [379] In addition, the most commonly cited justifications for non-compete clauses appear particularly weak when applied to relatively lower-wage workers, to the extent such workers are less likely to have access to trade secrets or confidential information. [380]

The Commission believes there are also compelling reasons for banning non-compete clauses that apply more strongly to highly paid or highly skilled workers such as senior executives. As described above, the weight of the available evidence indicates non-compete clauses negatively affect new business formation, innovation, and the ability of competitors to hire skilled workers. [381] Non-compete clauses for highly paid or highly skilled workers such as senior executives may be contributing more to these harms than non-compete clauses for some other workers, to the extent such workers may be likely to start competing businesses, be hired by potential entrants or competitors, or develop innovative products and services. Non-compete clauses for highly paid or highly skilled workers such as senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants. As a result, prohibiting non-compete clauses for highly paid or highly skilled workers such as senior executives may have relatively greater benefits for consumers than prohibiting non-compete clauses for other workers.

For these reasons, the Commission preliminarily believes a categorical ban on non-compete clauses would best achieve the objective of the proposed rule, which is to remedy the adverse effects of non-compete clauses on competition in labor markets and product and service markets. However, the Commission also believes several alternatives to a categorical ban may also accomplish the objectives of the proposed rule to some degree, including different standards for senior

executives. These alternatives are described in detail in Part VI.

The Commission seeks comment on proposed § 910.2(a).

### 2(b) Existing Non-Compete Clauses

Proposed § 910.2(b) would clarify employers' obligations, and impose additional requirements, related to non-compete clauses entered into by the employer prior to the compliance date ("existing non-compete clauses").

### 2(b)(1) Rescission Requirement

Proposed § 910.2(b)(1) would state that, to comply with proposed § 910.2(a)—which states it is an unfair method of competition for an employer to maintain with a worker a non-compete clause—an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date. The reasons why the Commission is proposing this rescission requirement are described above in the section-by-section analysis for proposed § 910.2(a).

The requirements in § 910.2(b)(1)–(3) do not apply where a worker's obligation not to compete elapsed prior to the compliance date. This is because the requirements in § 910.2(b)(1)–(3) derive from § 910.2(a), which establishes it is an unfair method of competition to maintain with a worker a non-compete clause. An employer does not maintain with a worker a non-compete clause, in violation of the Rule, where the obligation not to compete elapsed prior to the compliance date. For example, if a worker left their job in 2019 and was subject to a two-year obligation not to compete, that obligation would have elapsed in 2021, and the employer would not violate the Rule by failing to rescind the non-compete clause.

The Commission seeks comment on proposed § 910.2(b)(1).

### 2(b)(2) Notice Requirement

Proposed § 910.2(b)(2) would require that the employer provide notice to a worker that the worker's non-compete clause has been rescinded. Proposed § 910.2(b)(2) would have three subparagraphs that would impose various requirements related to the notice.

First, proposed § 910.2(b)(2)(A) would state that an employer that rescinds a non-compete clause pursuant to § 910.2(b)(1) must provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. Proposed § 910.2(b)(2)(A) would contain a notice requirement because the

Commission believes the available evidence indicates that many workers are not aware of the applicable law governing non-compete clauses or their rights under those laws. [382] As a result, if the Commission were to issue a final Non-Compete Clause Rule, many workers who had entered into non-compete clauses may be unaware that, due to the Rule, their employer is no longer permitted to maintain the non-compete clause. As a result, these workers may continue to refrain from leaving their job to work for a competitor or start their own business. This would negatively affect competitive conditions in the same manner the Commission is concerned about. [383] A notice requirement would help address this concern by ensuring workers are informed that their non-compete clause is no longer in effect and may not be enforced against them.

Proposed § 910.2(b)(2)(A) would state further that the employer must provide the notice to the worker in an individualized communication. As such, an employer could not satisfy the notice requirement by, for example, posting a notice at the employer's workplace that workers' non-compete clauses are no longer in effect. Proposed § 910.2(b)(2)(A) would also state that the employer must provide the notice on paper or in a digital format such as, for example, an email or text message. As such, a notice communicated orally would not meet the notice requirement. Allowing employers to provide the notice in a digital format would also reduce compliance costs for employers. Proposed § 910.2(b)(2)(A) would also require the employer to provide the notice to the worker within 45 days of rescinding the non-compete clause.

Second, proposed § 910.2(b)(2)(B) would state that the employer must provide the notice to a worker who currently works for the employer. The Commission believes that most employers have contact information available for their current workers and can use this contact information to provide the notice.

Proposed § 910.2(b)(2)(B) would also state that the employer must provide the notice to a worker who formerly worked for the employer, provided that the employer has the worker's contact information readily available. Providing the notice to former workers may be even more vital than providing the notice to current workers because former workers may be refraining actively from competitive activity because they believe they are subject to

---

[378] *See supra* Part II.A (listing illustrative examples of non-compete clauses).

[379] *See infra* Part IV.A.1.b–c.

[380] *See supra* Part IV.B (describing the most commonly cited justifications for non-compete clauses).

[381] *See supra* Part II.B.2.b–d.

[382] *See* Prescott & Starr, *supra* note 57 at 10–11.

[383] *See supra* Part IV.A.1.a.

a non-compete clause. However, employers may not have contact information readily available for all former workers. Proposed § 910.2(b)(2)(B) would therefore require employers to provide the notice to former workers only where the employer has the worker's contact information readily available. The Commission believes that this requirement would strike the appropriate balance between providing notice to affected workers and minimizing compliance costs for employers.

Third, proposed § 910.2(b)(2)(C) would provide model language that would satisfy the requirement in proposed § 910.2(b)(2)(A) that the employer "provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker." The model language is designed to communicate the relevant information in a simple and straightforward manner. Proposed § 910.2(b)(2)(C) would also clarify that an employer may also use language that is different from the model language, provided that the language communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. Proposed § 910.2(b)(2)(C) would reduce compliance costs and increase compliance certainty for employers by providing employers with model language they could use, while simultaneously providing employers with the flexibility to use other language that would communicate the required information.

The Commission seeks comment on proposed § 910.2(b)(2)(A)–(C).

2(b)(3) Safe Harbor

Proposed § 910.2(b)(3) would contain a safe harbor for compliance with the rescission requirement in proposed § 910.2(b)(1). Proposed § 910.2(b)(3) would state that an employer complies with the rescission requirement described in § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(2). Consequently, to comply with the rescission requirement for purposes of the Rule, an employer could simply send a notice to a worker that is compliant with proposed § 910.2(b)(2). An employer that does so would not need to take any other steps to comply with the rescission requirement in proposed § 910.2(b)(1). The Commission believes that this safe harbor would strike an appropriate balance between ensuring that workers receive adequate notice of their rights under the Non-

Compete Clause Rule and minimizing compliance costs for employers.

The Commission seeks comment on proposed § 910.2(b)(3).

*Section 910.3    Exception*

Proposed § 910.3 would exempt certain non-compete clauses between the seller and buyer of a business from coverage under the Rule. Proposed § 910.3 would state that the requirements of the Rule shall not apply to a non-compete clause that is entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets, when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause. Proposed § 910.3 would also clarify that non-compete clauses covered by this exception would remain subject to federal antitrust law as well as all other applicable law.

The exception in proposed § 910.3 would apply only in a narrow set of circumstances. The Rule, as a whole, would only apply to non-compete clauses between employers and workers.[384] As a result, the exception in proposed § 910.3 would apply only where the party restricted by the non-compete clause is a worker (for example, where the seller of a business is going to work for the acquiring business). Where the person restricted by the non-compete clause is not a worker, the Rule would not apply as an initial matter.

The Commission is proposing the exception in § 910.3 because non-compete clauses between the seller and buyer of a business may be unique in certain respects from non-compete clauses arising solely out of employment. Specifically, non-compete clauses between the seller and buyer of a business may be distinct from non-compete clauses that arise solely out of employment because they may help protect the value of the business acquired by the buyer.

This view is consistent with the law of the majority of the states, under which non-compete clauses between the seller and buyer of a business are treated differently from non-compete clauses arising solely out of employment. For example, while non-compete clauses are generally void in California, North Dakota, and Oklahoma, each of these three states exempts non-compete

clauses between the seller and buyer of a business from this general rule.[385] In the majority of the 47 states that enforce non-compete clauses under some circumstances, non-compete clauses between sellers and buyers of businesses are reviewed under a more lenient standard than non-compete clauses that arise solely out of employment.[386] A frequently cited reason for this difference in treatment is that such non-compete clauses implicate an additional interest relative to non-compete clauses that arise solely out of employment: they protect the value of the business acquired by the buyer.[387] If non-compete clauses between the seller and buyer of a business help protect the value of the business acquired by the buyer, restricting these types of non-compete clauses could potentially affect business acquisitions, including the incentives of various market actors to start, sell, or buy businesses.

The Commission further notes that the evidentiary record described above in Part II.B relates primarily to non-compete clauses that arise solely out of employment. Unlike non-compete clauses that arise solely out of employment, there has been little empirical research on the prevalence of non-compete clauses between the seller and buyer of a business. The Commission is also not aware of empirical research on the economic effects of applying additional legal restrictions to these types of non-compete clauses. In part, this is because all states permit non-compete clauses between buyers and sellers of businesses to some degree, and because the laws that apply to these types of non-compete clauses have seen fewer changes recently than the laws that apply to non-compete clauses that arise solely out of employment. As a result, there have been few natural experiments that allow researchers to assess how restricting these types of non-compete clauses may affect competition, including any effects on business acquisitions.

For these reasons, the Commission believes it may be appropriate to exempt non-compete clauses between the seller

---

[384] *See* proposed § 910.1(b).

[385] Cal. Bus. & Prof. Code sec. 16601; N.D. Cent. Code sec. 9–08–06(1); Okla. Stat. Ann. tit. 15, secs. 218 (sale of a business) and 219 (dissolution of a partnership).

[386] *See, e.g.,* Fla. Stat. Ann. sec. 542.335(1)(d); *Hess Newmark Owens Wolf, Inc.* v. *Owens,* 415 F.3d 630, 634 (7th Cir. 2005); *Jiffy Lube Int'l, Inc.* v. *Weiss Bros., Inc.,* 834 F. Supp. 683, 691 (D.N.J. 1993).

[387] *See, e.g., Strategix, Ltd.* v. *Infocrossing West, Inc.,* 142 Cal. App. 4th 1068, 1072–73 (Cal. Ct. App. 4th 2006); *Reed Mill & Lumber Co.,* 165 P.3d at 736; *Bybee,* 178 P.3d at 622.

and buyer of a business from coverage under the Rule. Proposed § 910.3 would clarify, however, that these non-compete clauses would remain subject to federal antitrust law and all other applicable law, including state law requiring non-compete clauses to be tailored to protect a legitimate business interest and to be limited in duration, geographic area, and the scope of activity prohibited.

Exempting non-compete clauses between the seller and buyer of a business from coverage under the Rule would not represent a finding that such non-compete clauses are beneficial to competition. It would simply reflect the Commission's view that it would be appropriate to tailor the Rule to non-compete clauses that arise solely out of employment—given that non-compete clauses between the seller and buyer of a business may implicate unique interests and have unique effects, and that the evidentiary record does not permit the Commission to assess these potential effects as thoroughly as the potential effects of restricting non-compete clauses that arise solely out of employment.

The exception in proposed § 910.3 would only apply where the seller of the business is a substantial owner of, or substantial member or substantial partner in, the business at the time the person enters into the non-compete clause. Proposed § 910.1(e) would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity. The exception would therefore not allow non-compete clauses to be applied to a business's workers in connection with the sale of a business, where those workers are not substantial owners, members, or partners. The reasons for this proposed 25% threshold are described above in the section-by-section analysis for proposed § 910.1(e).

The Commission seeks comment on proposed § 910.3.

### Section 910.4    Relation to State Laws

The Supremacy Clause of the U.S. Constitution provides that the Constitution, and the laws of the United States made pursuant to the Constitution, "shall be the supreme Law of the Land." [388] Hence, federal law preempts any state law that conflicts with the exercise of federal power. [389]

Such conflict preemption occurs either "where it is impossible for a private party to comply with both state and federal law" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [390] Congressional intent to preempt state law can be expressed in the statutory language itself (express preemption) or implied in the structure and purpose of federal law (implied preemption). [391] Federal regulations "have no less preemptive effect than federal statutes," [392] and agencies themselves, implementing federal statutes, can expressly preempt conflicting state laws and regulations. [393]

In some instances, a federal law may fully preempt contrary state laws. In others, federal law may impliedly or expressly respect the continuing and concurrent exercise of state power, thus setting a regulatory "floor" but not a "ceiling." [394] The Commission notes that "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." [395]

The proposed rule would contain an express preemption provision. Proposed § 910.4 would provide that the Rule shall supersede any state statute, regulation, order, or interpretation to the extent that such statute, regulation, order, or interpretation is inconsistent with the Rule. [396] Proposed § 910.4 would further provide that a state statute, regulation, order, or interpretation is not inconsistent with the provisions of the Rule if the protection such statute, regulation, order, or interpretation affords any worker is greater than the protection provided under the Rule.

This preemption provision would reflect the Commission's intent that the Non-Compete Clause Rule establish a regulatory floor, not a ceiling. Under the proposed preemption provision, state laws that are inconsistent with the Rule would be preempted. One example would be a state law providing that an employer may enforce a non-compete clause against a worker where the non-compete clause is tailored to a legitimate business interest and

reasonably limited in duration, geographic area, and scope of activity prohibited. Such a law would be inconsistent with proposed § 910.2(a), which would state that it is an unfair method of competition—and therefore a violation of Section 5 of the FTC Act—for an employer to enter into, attempt to enter into, or maintain a non-compete clause with a worker. Under proposed § 910.4, proposed § 910.2(a) would preempt the contrary state law to the extent that it conflicts with proposed § 910.2(a).

However, under the second sentence of proposed § 910.4, a state law would not conflict with the provisions of the Rule if the state law afforded greater protection to the worker than the protection provided under the Rule. For example, as noted above, proposed § 910.3 would exempt certain non-compete clauses between the seller and buyer of a business from coverage under the Rule. If a state were to prohibit employers from entering into, attempting to enter into, or maintaining all non-compete clauses—including non-compete clauses between the seller and buyer of a business—an employer could comply with both the state law and the Rule by not entering into, attempting to enter into, or maintaining non-compete clauses between the seller and buyer of a business.

The Commission seeks comment on proposed § 910.4.

### Section 910.5    Compliance Date

The proposed rule would establish a separate effective date and compliance date. Under proposed § 910.5, the proposed rule's effective date would be the date that is 60 days after the final rule is published in the **Federal Register**. The proposed rule's compliance date would be the date that is 180 days after the final rule is published in the **Federal Register**. In this NPRM, the Commission refers to the 180-day period between the publication of the final rule and the compliance date as the "compliance period."

*Compliance With § 910.2(a).* The Commission expects that employers would need to undertake the following two types of tasks during the compliance period to be prepared to comply with § 910.2(a) starting on the compliance date. First, starting on the compliance date, employers would be prohibited from maintaining existing non-compete clauses (*i.e.,* non-compete clauses that the employer entered into with a worker prior to the compliance

---

[388] U.S. Const. art. VI, cl. 2.

[389] *Fid. Fed. Sav. & Loan Ass'n* v. *de la Cuesta,* 458 U.S. 141, 153 (1982) (citing roots in the Supremacy Clause); *McCulloch* v. *Md.,* U.S. Supreme Court, 4 Wheat 159 (1819) (citing the Supremacy Clause and the Necessary and Proper Clause (Article I, Section 8, clause 18)).

[390] *Crosby* v. *Nat'l Foreign Trade Council,* 530 U.S. 363, 372–73 (2000).

[391] *Cipollone* v. *Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992); *Jones* v. *Rath Packing Co.,* 430 U.S. 519, 525 (1977).

[392] *Fid. Fed. Sav. & Loan Ass'n,* 458 U.S. at 153.

[393] *Id.; see also* v. *Shimer,* 367 U.S. 374, 383 (1961).

[394] *See, e.g., Oneok, Inc.* v. *Learjet, Inc.,* 575 U.S. 373, 384–85 (2015).

[395] *Cal.* v. *ARC Am. Corp.,* 490 U.S. 93, 102 (1989).

[396] In this Part V, we refer to state statutes, regulations, orders, or interpretations as "state laws" for ease of reference.

date).[397] As a result, during the compliance period, an employer would need to assess whether to implement replacements for existing non-compete clauses, such as NDAs; draft those covenants; and then negotiate and enter into those covenants with the relevant workers. Second, an employer would be prohibited from entering into new non-compete clauses starting on the compliance date.[398] As a result, during the compliance period, employers would need to, for example, remove any non-compete clauses from employment contracts that they provide to new workers. The Commission believes that 180 days—or approximately six months—would be enough time for employers to accomplish each of these two tasks.

*Compliance With § 910.2(b)(1)–(3).* To comply with § 910.2(b)(1)–(3) starting on the compliance date, an employer would be required to rescind, no later than the compliance date, any non-compete clauses that it entered into prior to the compliance date.[399] Where an employer rescinds a non-compete clause, the employer would be required to provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.[400] This notice may be provided in a digital format, such as an email or text message.[401] The Rule would require the employer to provide the notice to the worker within 45 days of rescinding the non-compete clause.[402] Employers would be required to provide the notice to current workers, as well as former workers where the employer has the former worker's contact information readily available.[403] To reduce compliance costs, the Rule would provide model language that employers may use for the notice.[404] However, employers would have the flexibility to use language other than the model language, provided that it communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.[405] The Rule would also provide a safe harbor that would allow an employer to comply with the Rule's rescission requirement by providing a compliant notice.[406] The Commission believes that this would significantly reduce compliance costs.

The Commission believes that the 180-day compliance period would provide employers with sufficient time to prepare to rescind existing non-compete clauses no later than the compliance date.

The Commission is proposing an effective date of 60 days after publication of the final rule in the **Federal Register** because it expects that the final rule would likely be a major rule under the Congressional Review Act (CRA). Under the CRA, a ''major rule'' may not take effect fewer than 60 days after the rule is published in the **Federal Register**.[407] The CRA further states that a rule is a ''major rule'' if it has an annual effect on the economy of $100 million or more.[408] The Commission believes that the impacts of the proposed rule, if finalized, would be large enough that the final rule would be a major rule under the CRA.[409]

The Commission seeks comment on proposed § 910.5.

## VI. Alternatives to the Proposed Rule

In this Part VI, the Commission describes alternatives to the proposed rule.[410] This Part VI addresses the alternatives related to the rule's fundamental design. These alternatives flow from two key questions: (1) whether the rule would impose a categorical ban on non-compete clauses or a rebuttable presumption of unlawfulness, and (2) whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers. The different permutations of the answers to each of these questions yield the different alternatives for the rule's fundamental design.

This Part VI does not generally address alternatives related to the design of specific regulatory provisions. For example, proposed § 910.1(e) defines a substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity. In a final rule, the Commission could set this standard at a

different percentage level—for example, 50% or 10%. The Commission seeks comment on these types of granular questions not in this Part VI, but in the section-by-section analysis for the relevant provision in Part V above.

### A. Two Key Dimensions of Alternatives

In Part IV above, the Commission preliminarily finds that the use of non-compete clauses by employers is an ''unfair'' method of competition under Section 5. For workers who are not senior executives, the Commission preliminarily finds that non-compete clauses are ''unfair'' under Section 5 in three independent ways. First, the use by employers of non-compete clauses is restrictive conduct that negatively affects competitive conditions. Second, non-compete clauses are exploitative and coercive at the time of contracting while burdening a not insignificant volume of commerce. Third, non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer while burdening a not insignificant volume of commerce.[411]

For workers who are senior executives, the Commission preliminarily finds that the use by employers of non-compete clauses is ''unfair'' under Section 5 because such non-compete clauses are restrictive conduct that negatively affects competitive conditions. Indeed, as described above in Part IV.A.1.a.ii, the Commission preliminarily believes that non-compete clauses for senior executives may harm competition in product markets in unique ways. (The second and third preliminary findings described above—that non-compete clauses are exploitative and coercive at the time of contracting and at the time of a worker's potential departure—do not apply to senior executives.) In Part IV, the Commission seeks comment on whether this different unfairness analysis should also apply to highly paid or highly skilled workers who are not senior executives.

The objective of the proposed rule is to remedy these adverse effects from the use of non-compete clauses. The proposed rule would seek to accomplish this objective by prohibiting an employer from entering into or attempting to enter into a non-compete clause with a worker; maintaining with a worker a non-compete clause; and, under certain circumstances,

---

[397] *See* proposed § 910.2(a).

[398] *Id.*

[399] *See* proposed § 910.2(b)(1).

[400] *See* proposed § 910.2(b)(2)(A)–(C).

[401] *See* proposed § 910.2(b)(2)(A).

[402] *Id.*

[403] *Id.*

[404] *See* proposed § 910.2(b)(2)(C).

[405] *Id.*

[406] *See* proposed § 910.2(b)(3).

[407] 5 U.S.C. 801(a)(3)(A).

[408] 5 U.S.C. 804(2).

[409] *See infra* Part VII (analyzing the costs and benefits of the proposed rule).

[410] The Commission intends for this Part VI to satisfy the requirements in Section 22 of the FTC Act that, in an NPRM, the Commission issue a preliminary regulatory analysis that shall contain ''a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule in a manner consistent with applicable law'' and ''a preliminary analysis of the effectiveness of the proposed rule and each alternative in meeting the stated objectives of the proposed rule.'' 15 U.S.C. 57b–3(b)(1)(B)–(C).

[411] *See supra* Part IV.A.1. The Commission also preliminarily finds that non-compete clauses are a ''method of competition.'' *See supra* Part IV.A.2.

*Federal Register* / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules 3517

representing to a worker that the worker is subject to a non-compete clause.[412]

The proposed rule would ban non-compete clauses categorically, with a limited exception for certain non-compete clauses between the seller and buyer of a business.[413] In Part V, the Commission explains why it is proposing a categorical ban on non-compete clauses.[414]

There are two key dimensions of alternatives related to the rule's fundamental design. First, instead of a categorical ban, the Commission could adopt a rebuttable presumption of unlawfulness. Under this approach, it would be presumptively unlawful for an employer to use a non-compete clause, but the use of a non-compete clause would be permitted if the employer could meet a certain evidentiary burden, based on a standard that would be articulated in the rule. Second, instead of applying to all workers uniformly, the Rule could include exemptions or different standards for different categories of workers. These exemptions or different standards could be based on a worker's job functions, earnings, another factor, or some combination of factors.

## 1. Categorical Ban vs. Rebuttable Presumption

The Commission could adopt a rebuttable presumption of unlawfulness instead of a categorical ban. Under this approach, it would be presumptively unlawful for an employer to use a non-compete clause. However, the use of a non-compete clause would be permitted if the employer could meet a certain evidentiary burden, based on a standard that would be articulated in the rule. The rationale behind this approach would be that prohibiting employers from using non-compete clauses is an appropriate default rule in light of the adverse effects on competition from their use in the aggregate; however, there may be specific sets of facts under which their use may be justified, so it would be appropriate to permit employers to use them in those cases.

Conceptually, the rebuttable presumption approach would be similar to "quick look" analysis under antitrust law. In antitrust cases, most restraints are analyzed under the rule of reason, which entails an intensive, fact-specific assessment of market power and market structure to determine a restraint's actual effect on competition.[415] However, where "the great likelihood of anticompetitive effects can be easily ascertained," a court may also adopt a truncated, or "quick look," rule of reason analysis.[416] Courts apply quick look analysis where, "based upon economic learning and the experience of the market, it is obvious that a restraint of trade likely impairs competition." [417] In such cases, "the restraint is presumed unlawful and, in order to avoid liability, the defendant must either identify some reason the restraint is unlikely to harm consumers or identify some competitive benefit that plausibly offsets the apparent or anticipated harm." [418] A rebuttable presumption in the Rule would mirror this approach. Non-compete clauses would be presumed unlawful, based on the "economic learning and experience of the market" summarized in Part IV above, but the use of a non-compete clause would be permitted if the employer could make a showing that satisfies a certain standard.

The rebuttable presumption approach would also be similar in many respects to the current common law governing non-compete clauses. In most states, non-compete clauses are disfavored, but are permitted if an employer can identify a legitimate business interest and if the non-compete clause is reasonable with respect to geographic area, duration, and the scope of activity prohibited.[419] Similarly, under the rebuttable presumption approach, non-compete clauses would be presumptively unlawful but would be permitted under certain circumstances.

One important question related to the rebuttable presumption approach is what the test for rebutting the presumption should be. The Commission preliminarily believes that, if it were to adopt a rebuttable presumption in a final rule, it would adopt a test that is more restrictive than the current common-law standard. Otherwise, the Rule would be no more restrictive than current law, and the objective of the Rule—to remedy the adverse effects to competition from employers' use of non-compete clause—would not be achieved.

One option would be a test derived from the quick look test. For example, the rule could allow an employer to rebut the presumption where the employer "shows by clear and convincing evidence that the non-compete clause is unlikely to harm competition in labor markets or product or service markets, or identifies some competitive benefit that plausibly outweighs the apparent or anticipated harm." Alternatively, the test could focus exclusively on either of these two prongs: unlikeliness of harm to competition, or presence of a competitive benefit that plausibly outweighs the apparent or anticipated harm to competition. A term other than "clear and convincing evidence," such as "preponderance of the evidence," could also be used.

Another option would be a test that piggybacks on state law. For example, the rule could allow an employer to rebut the presumption where the employer "shows by clear and convincing evidence that a non-compete clause is necessary to protect a legitimate business interest." This would be a higher standard than the current common law test because it would require an employer to show not only that it has a "legitimate business interest" under state law, but that it cannot protect this interest in another way—for example, through the use of an NDA. The test could also use the term "reasonably necessary" instead of "necessary," or a term other than "clear and convincing evidence, such as "preponderance of the evidence." The Commission could also establish what "legitimate business interests" could justify a non-compete clause and which could not.

The Commission preliminarily believes the categorical ban in the proposed rule would advance the proposed rule's objectives to a greater degree than the rebuttable presumption approach. The Commission is concerned that the rebuttable presumption approach could foster confusion among employers and workers because the question of whether an employer may use a non-compete clause would depend on an abstract legal test rather than a bright-line rule. Under a categorical ban, it would be clear non-compete clauses are prohibited. In contrast, under the rebuttable presumption approach, it may be difficult for both employers and workers to know whether a particular non-compete clause meets the abstract legal test articulated in the rule. For example, it may be difficult for an employer or worker to know whether a particular non-compete clause is

---

[412] *See* proposed § 910.2(a). For ease of reference, this Part VI employs the term "use of non-compete clauses" to refer to the specific conduct that the proposed rule would prohibit.

[413] *See* proposed § 910.3. As described in Part V (in the section-by-section analysis for proposed § 910.1(c)), the proposed rule would also not apply to employers to the extent they are exempt under Section 5(a)(2) of the FTC Act, and the proposed rule may not apply under certain circumstances due to the state action doctrine.

[414] *See supra* Part V, in the section-by-section analysis for proposed § 910.2(a).

[415] *See, e.g., Am. Express Co.,* 138 S. Ct. at 2284.

[416] *See, e.g., Calif. Dental Ass'n* v. *Fed. Trade Comm'n,* 526 U.S. 756, 770 (1999).

[417] *Polygram Holding, Inc.* v. *Fed. Trade Comm'n,* 416 F.3d 29, 36 (D.C. Cir. 2005).

[418] *Id.*

[419] *See supra* Part II.C.1.

"unlikely to harm competition in labor markets or product or service markets," whether "there is some competitive benefit that plausibly outweighs the apparent or anticipated harm," or whether a non-compete clause is "necessary" to protect a legitimate business interest. Furthermore, because only the Commission can enforce a rule issued under Section 6(g)—and therefore clarity for employers—would be slow in coming.

However, the rebuttable presumption could also have some advantages over a categorical ban. If there were to be specific factual scenarios, unanticipated by the Commission, in which a particular non-compete clause did not implicate the anticompetitive concerns the Commission is concerned about, the rebuttable presumption would allow the clause to be used.

The Commission seeks comment on whether it should adopt a rebuttable presumption instead of a categorical ban and what the test for rebutting the presumption should be.

2. Uniform Rule vs. Differentiation

In addition to establishing a categorical ban on non-compete clauses, the proposed rule would apply uniformly to all workers. Employers covered by the rule—*i.e.,* employers other than those exempt from coverage under the FTC Act [420]—would be prohibited from using a non-compete clause with a worker, except in limited scenarios where the non-compete clause is between the seller and buyer of a business.[421]

Rather than applying a rule uniformly to all workers, the Commission could apply different rules to different categories of workers based on a worker's job function, occupation, earnings, another factor, or some combination of factors. For example, the rule could ban non-compete clauses for workers generally, but could apply a rebuttable presumption to non-compete clauses for workers whose earnings are above a certain threshold (or could exempt such workers altogether).

This Part VI uses the term "more-lenient standards" to refer to the more relaxed regulatory standards that would apply to certain categories of workers—such as the workers above the earnings threshold in the example above—under this approach. This Part VI also uses the term "more-stringent standards" to refer to the stricter standards that would

apply to certain categories of workers, such as the workers below the earnings threshold in the second example above.

As described above in Part II.C.1, the recent non-compete clause statutes many states have enacted have generally differentiated among categories of workers. Most of these states have restricted non-compete clauses only for workers below a threshold based on the worker's earnings or a similar factor, such as whether the worker is non-exempt under the FLSA or whether the worker is an hourly worker.[422]

There are three main ways a rule could differentiate among workers. First, a rule could apply different standards to workers based on the workers' job functions or occupations. For example, a rule could apply more-lenient standards to non-compete clauses for senior executives or could exempt them from coverage altogether.

Second, a rule could apply different standards to workers based on some combination of job functions/occupations and a worker's earnings. For example, the rule could apply more-lenient standards to workers who qualify for the FLSA exemptions for "executives" and "learned professionals." [423] Workers who qualify for these FLSA exemptions (which exempt the worker from minimum-wage and overtime-pay rules) if they earn above a certain amount and perform certain types of job duties.[424] Another potential alternative could be to apply more-lenient standards to a worker who qualifies for any FLSA exemption.[425]

Third, like the recent state statutes described above, a rule could apply different standards based on the worker's earnings. An earnings threshold could be relatively high (as in, *e.g.,* the State of Washington, where a non-compete clause is void unless the worker's annual earnings exceed $100,000 for employees and $250,000 for independent contractors); in the middle (as in, *e.g.,* Virginia, where employers may not enter into, enforce, or threaten to enforce a non-compete clause with a worker whose average weekly earnings are less than the Commonwealth's average weekly wage); or relatively low (as in, *e.g.,* Maryland, where non-compete clauses are void

where a worker earns equal to or less than $15 per hour or $31,200 per year).[426] The Commission also believes if it were to adopt a threshold based on earnings, it would be appropriate to index the earnings level to inflation, to ensure as well as possible that the threshold continues to correspond to the Commission's justification for it.

A rule could also differentiate among workers based on a different factor, or based on some combination of factors.

The Commission preliminarily concludes applying the rule uniformly to all workers would advance the proposed rule's objectives to a greater degree than differentiating among workers. As described in Part V above, non-compete clauses obstruct labor market competition in a similar way for all workers, regardless of a worker's income or job status.[427] Whether a labor market includes high earners or low-wage workers, non-compete clauses block workers in that market from switching to jobs in which they would be better paid and more productive—restricting the opportunities of all workers in that labor market. The Commission estimates the proposed rule would increase earnings for workers across the labor force, as well as for workers in all of the subgroups of the labor force for which sufficient data are available—from hourly workers to highly paid, highly skilled workers such as executives.[428] Excluding these workers from the proposed rule would deny these workers the benefits of higher earnings through increased competition in the market for their labor.

The Commission also preliminarily concludes a rule that applies uniformly to all workers would better ensure workers are aware of their rights under the rule. For example, the Commission believes employers generally know whether a particular worker is exempt under the FLSA, but many workers may not know this themselves. Therefore, if the Rule were to prohibit non-compete clauses with FLSA non-exempt workers, and an employer were to enter into a non-compete clause with an FLSA non-exempt worker in violation of the Rule, the worker may not know whether the non-compete clause is valid.

If the Commission were to adopt a final rule differentiating among categories of workers, it may also adopt a severability clause indicating the Commission intends for the standards to

---

[420] *See supra* Part V, in the section-by-section analysis for proposed § 910.1(c), for additional discussion of this issue.

[421] *See* proposed § 910.3.

[422] *See supra* Part II.C.1.

[423] *See* 29 CFR 541.100; 29 CFR 541.200.

[424] *See* Dep't of Labor, *Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA)* (Sept. 2019).

[425] *See* Dep't of Labor, *Handy Reference Guide to the Fair Labor Standards Act,* entry under Exemptions, *https://www.dol.gov/agencies/whd/compliance-assistance/handy-reference-guide-flsa#8.*

[426] *See supra* note 149 and accompanying text.

[427] *See supra* Part V (in the section-by-section analysis for proposed § 910.2(a)).

[428] *See infra* Part VII.B.1.a.

be severable.[429] If a regulatory provision is severable, and one part of the provision is invalidated by a court, the court may allow the other parts of the provision to remain in effect.[430] When analyzing whether a provision is severable, courts consider both (a) the agency's intent and (b) whether severing the invalid parts of the provision would impair the function of the remaining parts.[431] Including a severability clause would clarify the Commission's intent that, if a court were to invalidate the standards for one category of workers, the other standards would remain in effect. The Commission also believes if it were to adopt a final rule differentiating between categories of workers, and a court were to strike down the rules for one category, that would not impair the function of the remaining provisions. If every worker falls into only one category, and one or more (but not all) of the standards were to be invalidated, an employer could simply comply with the standards that remain in effect.

The Commission seeks comment on whether it should differentiate between workers rather than adopting a rule that applies uniformly to all workers. In addition, the Commission seeks comment on what the specific threshold(s) should be.

*B. Discrete Alternatives*

As described above, there are two key dimensions of alternatives related to the fundamental design of the rule. The first is whether the rule should impose a categorical ban on non-compete clauses or a rebuttable presumption of unlawfulness. The second is whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers, using one or more thresholds based on a worker's job functions, earnings, some other factor, or some combination of factors. The different permutations of the answers to each of these questions yield the different alternatives for the rule's fundamental design. As a result, the number of potential alternatives to the proposed rule is nearly limitless. However, for the purpose of focusing public comment, this Part VI.B describes four discrete alternatives to the proposed rule. The Commission preliminarily believes each of these alternatives may further the objectives of the proposed rule, to some degree.

For each of the alternatives described below, the Commission could adopt a variety of different thresholds. As described above in Part VI.A.2, a threshold could be based on job functions, the worker's occupation, earnings, some other factor, or some combination of factors. A threshold could be set relatively high, relatively low, or in the middle.

1. Alternative #1: Categorical Ban Below Threshold, Rebuttable Presumption Above

Under Alternative #1, the rule would categorically ban the use of non-compete clauses for some workers and apply a rebuttable presumption of unlawfulness to non-compete clauses for the other workers. For example, the rule could ban non-compete clauses generally, but apply a rebuttable presumption to workers who qualify for the FLSA exemptions for executives or learned professionals.[432] Or the rule could ban non-compete clauses but apply a rebuttable presumption to workers who earn more than $100,000 per year.

The Commission is not proposing this approach due to the preliminary concerns, described above in Parts VI.A.1 and VI.A.2, about the rebuttable presumption approach and about differentiating among categories of workers. However, the Commission seeks comment on this alternative.

2. Alternative #2: Categorical Ban Below Threshold, No Requirements Above

Under Alternative #2, the rule would categorically ban the use of non-compete clauses for some workers and not apply any requirements to the other workers. In effect, the other workers would simply be exempt from coverage under the rule. This approach would be similar to the recent non-compete clause statutes many states have enacted.[433] For example, like the recent State of Washington statute, the rule could prohibit the use of non-compete clauses for employees earning $100,000 or less per year and independent contractors earning less than $250,000 or less per year. Or, like the recent Massachusetts and Rhode Island statutes, the rule could prohibit the use of non-compete clauses for workers who are non-exempt under the FLSA.

The Commission is not proposing this approach due to its preliminary concerns, described above in Part VI.A.2, about differentiating among categories of workers. However, the

Commission seeks comment on this alternative.

3. Alternative #3: Rebuttable Presumption for All Workers

Under Alternative #3, the rule would apply a rebuttable presumption of unlawfulness to non-compete clauses for all workers. This approach would be similar to the proposed rule in that it would apply uniformly to all U.S. workers. However, instead of a categorical ban, the rule would apply a rebuttable presumption. The Commission is not proposing this approach due to its preliminary concerns with the rebuttable presumption approach, which are described above in Part VI.A.1. However, the Commission seeks comment on this alternative.

4. Alternative #4: Rebuttable Presumption Below Threshold, No Requirements Above

Under Alternative #4, the rule would apply a rebuttable presumption of unlawfulness to non-compete clauses for some workers and not apply any requirements to the other workers. This approach would be similar to Alternative #2, except that, instead of categorically banning non-compete clauses for workers below the threshold, the rule would apply a rebuttable presumption. The Commission is not proposing this approach due to the preliminary concerns, described above in Parts VI.A.1 and VI.A.2, about the rebuttable presumption approach and about differentiating among categories of workers. However, the Commission seeks comment on this alternative.

The Commission seeks comment on each of these alternatives described in this Part VI.B, including whether the alternative would advance the objectives of the proposed rule to a greater or lesser degree than the proposed rule, and how the Commission should design the rule if it were to adopt the alternative.

*C. Different Standards for Senior Executives*

In addition to seeking comment generally on whether the rule should apply uniformly to all workers or differentiate between categories of workers,[434] the Commission seeks comment specifically on whether it should adopt different standards for non-compete clauses with senior executives.[435]

---

[429] The Commission may adopt a severability clause even if it did not apply different standards to the different categories of workers.

[430] *See, e.g., Davis Cnty. Solid Waste Mgmt.* v. *EPA,* 108 F.3d 1454, 1459 (D.C. Cir. 1997).

[431] *Id.* at 1460.

[432] *See supra* note 423–424 and accompanying text.

[433] *See supra* note 149.

[434] *See supra* Part VI.A.2.

[435] The Commission could also define senior executives as a separate category, but apply the
Continued

**3520** **Federal Register** / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules

The proposed rule would categorically ban non-compete clauses for all workers, including senior executives. However, the Commission recognizes non-compete clauses for senior executives may present distinct concerns. As described in Part IV, the Commission preliminarily finds that, like non-compete clauses for other workers, non-compete clauses for senior executives negatively affect competitive conditions in labor markets.[436] The Commission also preliminarily finds non-compete clauses for senior executives negatively affect competitive conditions in product and service markets, and they may do so in unique ways.[437] However, unlike non-compete clauses for other workers, the Commission does not preliminarily find non-compete clauses for senior executives are exploitative and coercive at the time of contracting or at the time of the worker's potential departure.[438]

Given that non-compete clauses for senior executives may present distinct concerns, the Commission is interested in the public's views about whether different standards for senior executives would be appropriate. For example, the Commission could adopt a categorical ban on non-compete clauses for workers in general, but apply a rebuttable presumption of unlawfulness for senior executives or exempt senior executives altogether.

The Commission seeks comment on how, if the Commission were to adopt different standards for senior executives, this category of workers should be defined. The Commission is not aware of a generally accepted legal definition of "senior executive." This term may be challenging to define, given the variety of organizational structures used by employers. The Commission could cross-reference a definition in an existing federal regulation, such as the definition of "named executive officer" in Securities and Exchange Commission (SEC) Regulation S–K[439] or the definition of "executive officers" in SEC Rule 3b–7;[440] adopt a definition closely based on a definition in an existing federal regulation; adopt a new definition; define the category according to a worker's earnings; use some combination of these approaches; or use a different approach. The Commission seeks comment on what definition would draw the appropriate line—with

respect to which workers should be covered by the different standards—while providing sufficient clarity to employers and workers.

In addition, the Commission seeks comment on whether these different standards should also be applied to other highly paid or highly skilled workers who are not senior executives, including specifically how such a category should be defined.

### D. Coverage of Non-Compete Clauses Between Franchisors and Franchisees

The proposed rule would state the term "worker" does not include a franchisee in the context of a franchisee-franchisor relationship.[441] As a result, the proposed rule would not cover non-compete clauses between franchisors and franchisees.[442] As described above in Part V, the Commission believes that, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker. In addition, the evidentiary record before the Commission relates primarily to non-compete clauses that arise solely out of employment; the Commission has surveyed the available evidence relating to non-compete clauses and is not aware of research on the effects of applying additional legal restrictions to non-compete clauses between franchisors and franchisees. Therefore, the Commission believes it is appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a "worker" for purposes of proposed § 910.1(f).[443] (Proposed § 910.1(f) would explain, however, the term "worker" includes a natural person who works for the franchisee or franchisor, and non-compete clauses between franchisors and franchisees would remain subject to federal antitrust law as well as all other applicable law.)

While the Commission is not currently proposing to cover franchisor/franchisee non-compete clauses for these reasons, the Commission recognizes that, in some cases, these non-compete clauses may present concerns under Section 5 similar to the concerns presented by non-compete clauses between employers and workers. Many franchise agreements may contain non-compete clauses.[444] By

restricting a franchisee's ability to start a new business, franchisor/franchisee non-compete clauses could potentially stifle new business formation and innovation, reduce the earnings of franchisees, and have other negative effects on competitive conditions similar to non-compete clauses between employers and workers. Franchisor/franchisee non-compete clauses could also potentially be exploitative and coercive in some cases, such as where there is an imbalance of bargaining power between the parties. While the relationship between franchisors and franchisees may, in some cases, be more analogous to a business-to-business relationship, many franchisees lack bargaining power in the context of their relationship with franchisors and may be susceptible to exploitation and coercion through the use of non-compete clauses.[445]

For these reasons, the Commission seeks comment on whether the Rule should cover franchisor/franchisee non-compete clauses and why. The Commission also seeks comment on whether, if the Rule were to cover franchisor/franchisee non-compete clauses, they should be categorically banned or subject to a rebuttable presumption of unlawfulness (and if the latter, what the standard for rebutting the presumption should be). The Commission further seeks comment on whether, if the rule were to cover franchisor/franchisee non-compete clauses, the rule should apply uniformly to all such non-compete clauses or whether certain categories of franchisor/franchisee non-compete clauses should be exempted or subject to different standards. The Commission encourages commenters to submit data or other evidence that could inform the Commission's consideration of this issue.

### E. Other Alternatives

This Part VI.E describes two alternatives the Commission believes would likely not further the objectives of the proposed rule. However, this assessment is preliminary. Based on the public comments and the Commission's

---

same standards to senior executives as to other workers.

[436] *See supra* Part IV.A.1.a.i.

[437] *See supra* Part IV.A.1.a.ii.

[438] *See supra* Part IV.A.1.b–c.

[439] 17 CFR 229.402(a)(3).

[440] 17 CFR 203.501(f).

[441] *See* proposed § 910.1(f).

[442] For ease of reference, this Part VI refers to these types of non-compete clauses as "franchisor/franchisee non-compete clauses."

[443] *See supra* Part V (in the section-by-section analysis for proposed § 910.1(f)).

[444] *See, e.g.,* Brian Callaci, Sergio Pinto, Marshall Steinbaum, & Matthew Walsh, *Vertical Restraints*

*and Labor Markets in Franchised Industries* (July 6, 2022), *https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=4155571* (finding that, in a sample of 530 franchising contracts, various types of vertical restraints were prevalent, while not specifically addressing non-compete clauses). The Commission has also frequently encountered non-compete clauses in franchise agreements. *See supra* Part II.D (describing consent orders that restricted a franchisor's ability to enforce non-compete clauses).

[445] *See, e.g.,* Brian Callaci & Sandeep Vaheesan, *Antitrust Remedies for Fissured Work,* Cornell L. Rev. (forthcoming), *https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=4076274 at 21–22.*

additional analysis, the Commission could potentially decide to adopt one or both of the alternatives described below in a final rule instead of, or in addition to, the proposed rule or one of the alternatives described above. The Commission seeks comment on each of the two alternatives described in this Part VI.E, as well as whether there are other alternatives not described in Part VI that the Commission should consider.

### 1. Disclosure Rule

The Commission could potentially adopt disclosure requirements related to non-compete clauses.[446] For example, research suggests many workers often do not find out about non-compete clauses until after they have accepted an employment offer.[447] This concern could be addressed by requiring an employer to disclose to a worker, before making the employment offer, that the worker will be subject to a non-compete clause. The employer could also potentially be required to explain the terms of the non-compete clause and how the worker would be affected by signing the non-compete clause.

While there is evidence disclosure of non-compete clauses to workers prior to acceptance of a job offer may increase earnings, increase rates of training, and increase job satisfaction for that worker,[448] the Commission does not believe this alternative would achieve the objectives of the proposed rule. Merely ensuring workers are informed about non-compete clauses would not address one of the Commission's central concerns: that, in the aggregate, they are negatively affecting competitive conditions in labor markets—including impacts on workers who are not bound by non-compete clauses—and in markets for products and services. Moreover, the benefits of a disclosure rule may be limited due to the differential in bargaining power between many workers and their employers, which would hamper those workers' ability to negotiate for better employment terms.[449]

### 2. Reporting Rule

The Commission could also potentially require employers to report certain information to the Commission relating to their use of non-compete clauses. For example, employers that use non-compete clauses could be

required to submit a copy of the non-compete clause to the Commission. This would enable the Commission to monitor the use of non-compete clauses. It would also potentially discourage employers from using non-compete clauses where they are clearly not justified under existing law.

However, the Commission does not believe a reporting rule would achieve the objectives of the proposed rule. Merely requiring employers to submit their non-compete clauses to the Commission may not meaningfully reduce the prevalence of non-compete clauses. As a result, it may not remedy the extent to which non-compete clauses adversely affect competitive conditions in labor markets and product and service markets. A reporting rule would also impose significant and recurring compliance costs on employers.

The Commission seeks comment on all aspects of this Part VI, including whether the Commission should adopt one of the alternatives described above, or a different alternative, instead of the proposed rule.

## VII. Analysis of Benefits and Costs of the Proposed Rule and Alternatives

The proposed rule would provide it is an unfair method of competition—and thus a violation of Section 5 of the FTC Act—for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause.[450] The proposed rule is targeted at increasing competition in labor markets by allowing workers to move more freely between jobs and increasing competition in product markets by ensuring firms are able to hire talented workers and workers are able to found entrepreneurial ventures.

The proposed rule is intended to alleviate two primary competitive problems. First, non-compete clauses anticompetitively interfere in the functioning of labor markets without generating compensating benefits. Non-compete clauses prevent firms from competing for workers' services and increase barriers to voluntary labor mobility, obstructing the smooth functioning of labor markets, resulting in lower wages and diminished worker and firm productivity.

The second competitive problem is non-compete clauses create negative

spillovers in labor markets and in product and service markets. In labor markets, non-compete clauses negatively impact workers who are not themselves bound by non-compete clauses by preventing the opening of vacancies and thereby creating mismatches between labor and firms. In product and service markets, non-compete clauses prevent entrepreneurial growth, which negatively impacts consumers by reducing competition in those markets. Non-compete clauses also foreclose competitors' ability to access labor market talent, negatively affecting those competitors' ability to effectively compete in the marketplace. Additionally, non-compete clauses impede innovation, which may negatively impact technological growth rates.

Section 22 of the FTC Act requires the Commission to issue a preliminary regulatory analysis when publishing a proposed rule that would declare a practice to be an unfair method of competition under Section 5 of the FTC Act.[451] The preliminary regulatory analysis must contain (1) a concise description of the need for, and objectives of, the proposed rule; (2) a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule in a manner consistent with applicable law; and (3) for the proposed rule, and for each of the alternatives described in the analysis, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects.[452]

In the preliminary analysis below, we describe the anticipated impacts of the rule as proposed. Where possible, we quantify the benefits and costs. If a benefit or cost is quantified, we indicate the sources of the data relied upon. If an assumption is needed, the text makes clear which quantities are being assumed. We measure the benefits and costs of the rule against a baseline in which no rule regarding non-compete clauses has been promulgated by the Commission. The Commission solicits comments from the public to improve the assumptions used in this preliminary analysis before promulgation of any final rule.

This preliminary analysis attempts to include in its scope the broadest set of economic actors possible. The Commission invites submission of information pertaining to additional economic actors who would be affected by the proposed rule. Several of the benefits and costs described in this

---

[446] The Commission's Franchise Rule requires non-compete clauses to be disclosed to a franchisee. 16 CFR 436(i); 436(q).

[447] Marx (2011), *supra* note 55 at 706.

[448] Starr, Prescott, and Bishara, *supra* note 42 at 75.

[449] *See supra* Part IV.A.1.b.

[450] *See* proposed § 910.2(a).

[451] 15 U.S.C. 57b–3.

[452] 15 U.S.C. 57b–3(b)(1)(A)–(C).

JA0205

analysis are either quantifiable, but not monetizable (especially with respect to separation between transfers, benefits, and costs), or not quantifiable at all. The Commission therefore also invites submission of information which could be applied to quantify or monetize estimates contained in the analysis.

For some of the economic effects of non-compete clauses, conflicting evidence exists in the academic literature. We classify these effects under both benefits and costs, and discuss divergences in the evidence, as well as relative strengths and weaknesses of the evidence.

The Commission seeks comment on all aspects of the preliminary analysis presented in this Part VII as well as submissions of additional data that could inform the Commission's analysis of the benefits, any adverse economic effects, and any other effects of the proposed rule.

*A. Overview of the Effects of the Proposed Rule*

In this preliminary regulatory analysis, we have quantified and monetized those costs and benefits for which we are able and described all other costs and benefits. The Commission finds substantial benefits of the proposed rule: workers' earnings would likely increase by $250–$296 billion annually (though some portion of this represents an economic transfer from firms to workers), new firm formation and competition would increase, health care prices would fall (and prices in other markets may fall), and innovation would increase, though several of these benefits overlap (*e.g.,* increases in competition may fully or in part drive decreases in prices and increases in innovation). The Commission also finds some costs of the proposed rule: direct compliance and contract updating would result in $1.02 to $1.77 billion in one-time costs, and firm investment in worker training and capital assets would fall.

The nature of the estimates, however, creates substantial difficulty in calculating a bottom-line present value of the net benefit to the economy of the proposed rule. The Commission believes the substantial labor and product market benefits of the proposed rule would exceed the costs, and additionally would persist over a substantially longer time horizon than some of the one-time costs of compliance and contract updating. However, we do not present here an estimate of the net benefit, as it would necessarily omit major components of both costs and benefits. In particular, the numbers reported above are not

comparable in order to estimate the net benefit of the rule: as noted, some portion of the earnings increase estimate represents transfers rather than benefits; several benefits and costs are unmonetized in this analysis; and several of the annualized benefits and costs (including the portion of the earnings increase attributable to benefit) may persist indefinitely, as compared with the one-time compliance and contract updating costs.

*B. Estimated Benefits of the Proposed Rule*

In this Part VII.B, we describe the beneficial impacts of the proposed rule; provide preliminary quantitative, monetized estimates where possible; and describe benefits we can only assess qualitatively. We enumerate benefits in two broad categories (further divided into subcategories): benefits related to labor markets and benefits related to goods and service markets.

Overall, the Commission estimates worker earnings would increase by $250–$296 billion annually as a result of the proposed rule. While the Commission believes some of this increase represents an economic benefit, some portion of this increase likely represents a transfer of income from firms to workers, or from consumers to workers if firms pass labor costs on to consumers. The Commission also finds, however, that the proposed rule would increase the rate of new firm formation, the rate of innovation, and the extent of competition in product and service markets, which may lead to lower prices for consumers, though the sizes of these effects are not quantifiable based on the estimates in the economic literature (except in the case of healthcare).

1. Benefits Related to Labor Markets

By preventing workers from changing employers or embarking upon entrepreneurial ventures, non-compete clauses prevent beneficial labor market competition in two primary ways. First, non-compete clauses prevent workers from leaving their job for higher-paying jobs, or from leveraging such an offer to increase their earnings at their current employer. Second, non-compete clauses reduce voluntary churn in labor markets. While churn is not necessarily beneficial in and of itself, voluntary churn allows workers (who would otherwise be bound by non-compete clauses) and firms to sort into the best possible matches and opens vacancies, which allow workers who are not necessarily bound by non-compete clauses to find better matches. Both mechanisms exhibit, at least in part, as earnings losses for workers when non-

compete clauses enforceability increases; however, the extent to which earnings gains associated with the proposed rule represent benefits versus transfers may depend on the mechanism. We describe in which cases we are and are not able to categorize, quantify, and monetize these estimates below.

a. Earnings

The primary impact of the proposed rule is an increase in earnings or earnings growth for workers, and more efficient functioning of labor markets. A full analysis of this benefit would seek to quantify the entire range of heterogeneity in the effect of the proposed rule on earnings. In other words, for any given worker, the likely impact on that worker's earnings is based on whether that worker has a non-compete clause, whether non-compete clauses are broadly used in their occupation/industry/local area, how much that worker earns, that worker's demographics, and much more. While some studies have sought to quantify heterogeneous impacts of non-compete clauses and their enforceability on subgroups of workers, this accounting is limited to fairly small sectors of the population. For this reason, we focus primarily on estimates of average effects across the American labor force, though we provide details on what heterogeneity has been analyzed below.

The study containing the most direct estimate of the increase in workers' earnings given a prohibition on non-compete clauses finds that earnings would increase across the labor force by an average of 3.3–13.9%.[453] For several reasons, we primarily focus on the low end of this range: in addition to generating the most conservative estimate, this range represents an out-of-sample approximation and is furthermore based on enforceability in 2014. Since then, some states have passed legislation causing non-compete clauses to be more difficult to enforce for subsets of their workforces, therefore causing a prohibition on non-compete clauses today to have a slightly lesser effect than a prohibition would have had in 2014.[454] Using total annual wage earnings in the United States for private employers in 2020 (the most recent year with finalized numbers) as a baseline,[455] we estimate a total annual earnings

---

[453] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 2.

[454] *See supra* Part II.C.1.

[455] National annual earnings are taken from Bureau of Labor Statistics, *Employment and Wages Data Viewer* (last visited Dec. 9, 2022), *https:// data.bls.gov/cew/apps/data_views/data_ views.htm#tab=Tables.*

JA0206

increase of $250.05 billion. We also report the total annual earnings increase that is associated with other levels of the percentage increase in earnings that fall within the range reported in the study in Table 1, in addition to 10-year discounted earnings increases using both 3% and 7% discount rates.

TABLE 1

| Percentage increase in earnings (%) | Total annual earnings increase ($ billion) | Total 10-year earnings increase, 3% discount rate ($ billion) | Total 10-year earnings increase, 7% discount rate ($ billion) |
|---|---|---|---|
| 3.3 | 250.05 | 2,132.97 | 1,756.24 |
| 5.0 | 378.86 | 3,231.78 | 2,660.98 |
| 7.0 | 530.41 | 4,524.49 | 3,725.37 |
| 9.0 | 681.95 | 5,817.20 | 4,789.76 |
| 11.0 | 833.50 | 7,109.91 | 5,854.15 |
| 13.0 | 985.04 | 8,402.63 | 6,918.54 |
| 13.9 | 1,053.24 | 8,984.35 | 7,397.51 |

Another study estimates decreased non-compete clause enforceability would increase earnings by approximately 1%. This study uses, as a control group, occupations which use non-compete clauses at a low rate: the estimate therefore represents the differential effect on occupations which use non-compete clauses at a *high* rate, relative to the control group. While the study does estimate the separate impact of non-compete clause enforceability for each group, there is no way to disentangle this effect from state-specific effects (*e.g.,* that California does not typically enforce non-compete clauses, and also differs from other states in many ways).[456] Since workers in occupations which use non-compete clauses at a low rate may also be affected by changes in non-compete clause enforceability, the reported increase in earnings likely underestimates the impact on the entire labor force. The change in enforceability which generates this estimate is a one standard deviation change, as measured using non-compete clause enforceability scores[457] for all 50 states and the District of Columbia in 1991. Applying the 1% earnings effect estimate to each state (based on the scores in 2009), we calculate that each state moving to non-enforceability (as would be the case under the proposed rule) would result in an overall annual earnings increase of $295.9 billion.[458]

The Commission's preliminary finding is therefore the proposed rule would increase workers' earnings workforce-wide by $250–$296 billion annually. We discuss in Part VII.B.1.b the extent to which the Commission believes this increase represents a benefit of the proposed rule versus a transfer.

Four broad classes of workers merit specific attention, as researchers have generated empirical estimates of the effects of non-compete clause enforceability based specifically on those sectors. These classes are (a) high-tech workers; (b) physicians; (c) workers paid on an hourly basis; and (d) CEOs. We clarify that the effects we present on each of these specific classes of workers are contained within the broader estimates presented above: that is, the estimates above contain each of these classes of workers, plus the rest of the labor force. The specific estimates for each class of workers are therefore presented to indicate the range of effects observed in the labor market and to illustrate the scope of empirical work that has been performed on the topic.

i. High-Tech Workers

One study examines the impact of non-compete clause enforceability on high-tech workers in Hawaii.[459] That study includes estimates for the entirety of the high-tech work force, as well as for newly hired workers. Since the ban in Hawaii did not void previously signed non-compete clauses, while the proposed rule would, we use the estimate for newly hired workers. This is because that estimate reflects the effects on those workers who were subject to a regime with no non-compete clause enforceability. Extrapolating from the estimates for Hawaii to the average impact on high-tech workers in each state, a prohibition such as the one in this proposed rule would increase earnings of high-tech workers in the average state by 4.8%.[460] Caution is recommended in interpreting this extrapolation, however, since results from one sector within one state may not necessarily inform outcomes that would occur in the rest of the country.

ii. Physicians

One study reports the effects of non-compete clause use and enforceability on the earnings growth of physicians.[461]

Due to the limitations of the study design, the main estimate concerns the impact of non-compete clause use on earnings growth, rather than the level of earnings.[462] However, assuming physicians begin at an identical level of earnings, a physician with a non-compete clause would have an estimated 89% earnings growth over a ten-year period, versus an estimated 36% for a physician without a non-compete clause. In other words, the physician with a non-compete clause would have earnings approximately

[456] Starr, *supra* note 66 at 792–93.

[457] Non-compete clause enforceability scores, used for this estimate as well as several others, are calculated using various methods based on legal descriptions provided in various editions of ''Non-Compete Clauses: A State-by-State Survey'' by Brian M. Malsberger.

[458] The total earnings increase is calculated as the sum over all states of:

$$(e^{0.0099*(\text{State's Enforceability Score}-\text{Lowest State Enforceability Score})}-1)*(\text{Total Annual Wages of the State})$$

This calculation assumes that all workers benefit from the increase in earnings, as opposed to calculating the benefits to those in high-use occupations versus those in low-use occupations. The benefit of this approach is that it yields a total predicted earnings increase for the economy as a whole, rather than a comparison between different types of workers. However, it is likely an overestimate for workers in low-use occupations, and an underestimate for those in high-use occupations.

[459] Balasubramanian et al., *supra* note 68 at S349.

[460] The increase in earnings in each state is calculated as

$$e^{0.0441*(\text{State's Enforceability Score}-\text{Lowest State Enforceability Score})/(\text{Hawaii's Enforceability Score}-\text{Lowest State's Enforceability Score})}-1,$$ where 0.0441 represents the impact of Hawaii's prohibition on log earnings for newly hired high-tech workers (Table 2, Panel A, Column 5).

[461] Lavetti, Simon, & White, *supra* note 53 at 1025.

[462] In Table 4 of the study, the table which reports earnings effects, the authors include a ''job-match'' fixed effect, which rules out several alternate explanations for the authors' findings but leaves the authors unable to estimate the base effect of having a non-compete clause on earnings.

39% greater than the physician without.[463]

This estimate, however, is based solely on non-compete clause use, and does not consider the impact of enforceability changing. Use of non-compete clauses is likely determined by several characteristics of an employer (*e.g.,* the value of trade secrets or client attraction, productivity gains associated with training, nearness of potential competitors), some of which may also cause changes in earnings levels or earnings growth. Taking the separate effect of non-compete clause enforceability into account, it is possible that the estimated effect on earnings growth would differ from the estimates reported above.

The combined effect of enforceability and use on earnings growth may separately be estimated using another model in the same study.[464] We note that the authors state this model presents only ''suggestive evidence.'' Furthermore, while this model does estimate the effect of non-compete clause use on physicians' earnings (in contrast to that reported above, which only examines earnings growth), as well as the interaction between use and enforceability, it does not report the baseline effect of non-compete clause enforceability, independent of use.[465] Using those estimates, nonetheless, allows for estimation of the impact of simultaneously removing non-compete clause enforceability and non-compete clause use on earnings at various levels of experience (omitting the baseline effect of enforceability, which is not reported). For a physician with 10 years of experience in the state which enforces non-compete clauses most readily, the estimates suggest a prohibition on non-compete clauses and removing that physician's non-compete clause would lead to a 12.7% increase in earnings, in contrast with the results of the model reported above.[466] For the identical situation for a physician with just 1 year of experience, the increase in earnings would be 37.4%. We emphasize, however, that if the baseline effect of enforceability (which the authors are unable to estimate) is large,

it could qualitatively change the effect on earnings of a simultaneous change in enforceability and use that we report.

### iii. Workers Paid on an Hourly Basis

One study analyzed how Oregon's 2008 prohibition on non-compete clauses for hourly workers impacted their wages.[467] The study estimates Oregon's prohibition increased hourly workers' earnings by 2.3%, with twice the effect (4.6%) on workers in occupations which use non-compete clauses at a relatively high rate.[468] Extrapolating from the estimates for Oregon to the average impact on hourly workers in each state, a prohibition such as the one in this proposed rule would increase earnings of hourly workers in the average state by 2.3%.[469] Caution is recommended in interpreting this extrapolation, however, since results from one segment of the workforce within one state may not necessarily inform outcomes that would occur in the rest of the country.

### iv. CEOs

One estimate of the impact of non-compete clause enforceability finds that moving from full enforceability of non-compete clauses to a prohibition would increase earnings growth by 8.2% and the level of earnings by 12.7% for CEOs.[470] Again ignoring heterogeneity and implementing a linear extrapolation using 2009 enforceability scores, the average CEO would experience a 9.4% increase in earnings due to the prohibition in the proposed rule.[471]

Another study simultaneously examines the effect of *use* of a non-compete clause and the enforceability thereof.[472] This study finds that decreased enforceability of non-compete clauses led to lower earnings for CEOs when use of non-compete clauses is held constant. However, this study also finds that, when non-compete clause enforceability decreases (as it would

under the proposed rule), non-compete clause use does not stay constant; it decreases.[473] As a result, the Commission believes the appropriate way to extrapolate based on the findings of this study is to take into account both the impact of non-compete clause enforceability decreasing and the effect of non-compete clause use decreasing.

When this relationship is taken into account, decreases in non-compete clause enforceability (as would occur under the proposed rule) result in greater earnings for CEOs. The study estimates an increase in enforceability of 1 on a 0 to 12 scale increases CEO noncompete use by 10.2 percentage points in their sample: therefore, a prohibition on non-compete clauses would affect CEOs' earnings via the effect the study attributes to enforceability alone, as well as by changing the use of non-compete clauses by CEOs, which has its own effect on earnings, according to the study.[474]

Assuming a baseline level of enforceability, it is possible to use the estimates from this study to calculate the impact on CEOs' earnings of simultaneously decreasing enforceability and non-compete clause use to zero (which would mirror the effect of the proposed rule). At the highest level of enforceability (9; Florida from 1997–2014), setting enforceability to zero and eliminating non-compete clauses from contracts would increase CEOs' earnings by 11.4%, based on this study. From a lower baseline level of enforceability (for example, 3, as in New York from 1992 to 2014), setting enforceability to zero and eliminating non-compete clauses from contracts would increase earnings by 14.1%.[475]

Based on the results of these two studies, the Commission therefore believes total compensation for CEOs would increase by 9.4% as a result of the proposed rule. This estimate is based on the first study discussed: while the results from the second study are qualitatively similar, the extent to which its results can be extrapolated are murkier due to the reliance on the secondary estimate of how non-compete clause use changes with non-compete clause enforceability. Ultimately, this finding is in accordance with findings

---

[463] Calculated as 1.89/1.36 − 1 = 39%.

[464] The estimates are presented in Table 6, Column 2.

[465] In Table 6 of the study, the authors use local market fixed effects: again, these fixed effects are necessary to rule out alternate explanations for their findings, but prevent estimation of the baseline impact of non-compete clause enforceability on earnings.

[466] The increase in earnings are calculated as $e^B − 1$, where B is the sum of each of the coefficients on NCA, NCA*Log Exp, Bishara Score*NCA, Bishara Score*NCA*Log Exp, each multiplied by the relevant variable.

[467] Lipsitz & Starr, *supra* note 46 at 143.

[468] *Id.* at Table 3, columns 3 and 4, respectively; percent changes are calculated as $e^b − 1$, where b is the relevant reported coefficient.

[469] The increase in earnings in each state is calculated as

$e^{(0.023*(\text{State's Enforceability Score} - \text{Lowest State Enforceability Score})/(\text{Oregon's Enforceability Score} - \text{Lowest State's Enforceability Score}))} − 1$, where 0.023 represents the impact of Oregon's prohibition on log earnings for hourly workers (Table 3, Column 3).

[470] Garmaise, *supra* note 69 at 376–425. We assume the average level of in-state competition for the estimate of the effect on the level of earnings, as reported in Table 1.

[471] We first calculate the difference between each state's score and the lowest score (which represents a full prohibition) after normalizing scores to a 0 to 1 scale. Then, we find the average of that difference (0.742) and multiply by the estimated change of 12.7% to arrive at 9.4%.

[472] Kini, Williams, & Yin, *supra* note 52 at 4701.

[473] The study estimates that an increase in enforceability of 1 on a 0 to 12 scale increases CEO noncompete use by 10.2 percentage points in their sample. *Id.* at 4718.

[474] *Id.*

[475] The estimated impact of an increase in enforceability on CEOs with non-compete clauses is calculated as the effect of the sum of the coefficients on CEO noncompete × HQ Enforce and HQ enforce (*i.e.,* $0.4\% = e^{(0.047 - 0.043)} − 1$).

**JA0208**

in other segments of the labor force. Similar to typical workers, non-compete clauses prevent employers from competing for the labor of CEOs, including by offering better remuneration. Therefore, CEOs, like other workers, are locked into jobs in ways that prevent them from taking advantage of positive changes in labor market conditions.

### b. Discussion of Transfers Versus Benefits

It is difficult to determine the extent to which the earnings effects discussed above represent transfers versus benefits. In the context of this analysis, transfers refer to ''monetary payments from one group to another that do not affect total resources available to society.'' [476] In other words, transfers do not represent a net benefit or cost to the economy as a whole.

Broad increases in earnings when non-compete clauses are prohibited may simply represent a transfer of income from firms to workers (or, if firms pass labor costs on to consumers, from consumers to workers). There may, however, be a related benefit if the earnings increase of workers is related to market power or efficiency in the labor market. In other words, if a prohibition on non-compete clauses leads to a more efficient allocation of labor in the market, perhaps due to a rebalancing of power between workers and employers which decreases monopsony power, then the resulting earnings increases may represent a net benefit to the economy.

Additionally, if earnings increases are due to higher quality matching which results from increased labor market churn, then increased pay reflects a benefit to the economy, since workers' higher pay reflects higher productivity.

Several pieces of evidence support the idea that at least part of the increase in earnings represents a social benefit, rather than just a transfer. As described above in Part II.B.1.c, two studies have sought to estimate the external impact of non-compete clause use or enforceability: that is, the effect of use or enforceability on individuals other than those directly affected by use or enforceability.

First, one study demonstrates when the use of non-compete clauses by employers increases, that decreases wages for workers who do not have non-compete clauses but who work in the same state and industry. This study also finds this effect is stronger where non-compete clauses are more

enforceable.[477] Since the affected workers are not bound by non-compete clauses themselves, the differential in earnings does not completely represent a transfer due to a change in bargaining power between a worker bound by a non-compete clause and their employer, though available data does not allow for an estimate of the magnitude of transfers versus the total increase in economic benefit.

A second study directly estimates the external impact of a change in non-compete clause enforceability.[478] While use of non-compete clauses is not observed in the study, the impacts of changes in a state's laws are assessed on outcomes in a neighboring state. Since the enforceability of the contracts of workers in neighboring states are not affected by these law changes, the effect must represent a change related to the labor market, which workers in both states share. The estimate suggests workers in the neighboring state experience impacts on their earnings that are 87% as large as workers in the state in which enforceability changed.[479] In other words, two workers who share a labor market would experience nearly the same increase in their earnings due to a prohibition on non-compete clauses, even if the prohibition only impacts one worker. While the study does not directly estimate the differential effects by use, the effects on workers unaffected by a change in enforceability may be similar to the effects on workers not bound by non-compete clauses.

Overall, these two studies suggest there are market-level dynamics governing the relationship between earnings and the enforceability of non-compete clauses: that restrictions on the enforceability of non-compete clauses impact competition in labor markets by alleviating frictions and allowing for more productive matching. Changes in enforceability or use of non-compete clauses affect earnings of workers who do not have non-compete clauses or who work in local labor markets near, but not in, locations which experience changes in enforceability. If non-compete clauses simply changed the relative bargaining power of workers and firms, without affecting market frictions or competition, then these patterns would not be observed.

With a full accounting of all other costs and benefits, one could perform a ''sensitivity analysis'' to estimate how

much the percentage of earnings increases that represent benefits, rather than transfers, would affect the net impact of the proposed rule. However, as discussed, we are unable to fully monetize, or even quantify, several costs and benefits associated with the proposed rule. We present, instead, a partial sensitivity analysis which answers the question: for a given level of costs, what percentage of the earnings increases would offset those costs? The costs may be interpreted as the overall *net* cost of the rule, excluding benefits associated with earnings increases: that is, the costs listed in the table are the direct compliance and contract updating costs, plus the nonquantifiable and nonmonetizable costs, minus all benefits, excluding benefits associated with earnings increases.

The estimates are presented in Table 2. In order to present the most conservative estimates possible, we assume the earnings increase represents the lowest end of the range we estimate from the empirical literature ($250.05 billion). We discount annually at the rate of 7% (which is more conservative than a 3% discount rate, given that the costs are more front-loaded than the benefits due to the upfront compliance costs and costs of contract updating), and assume that annualized benefits and costs persist for 10 years. The first estimate, for zero or negative net cost, demonstrates that, if the non-earnings-related benefits of the proposed rule outweigh the total costs of the proposed rule, then the costs are already offset, and no portion of the earnings increase must be a benefit. The next estimate for costs is the midpoint of the estimates presented for direct compliance and contract updating costs, as estimated in Part VII.C: if the costs of the proposed rule (excluding direct compliance and contract updating costs) exactly offset the benefits (excluding earnings-related benefits), then if 0.08% of the earnings increases are benefits, they would exactly offset the estimated $1.394 billion costs of direct compliance and contract updating (where that estimate is the midpoint of the estimated range). While the Commission does not have detailed or complete enough quantifiable and monetizable estimates to determine whether net costs are positive or negative, the rest of Table 2 presents estimates for the portion of the earnings increase which would offset net costs greater than $1.394 billion, should they exist.

---

[476] Off. of Mgmt. & Budget, *Circular A–4* (Sept. 17, 2003) at 38.

[477] Starr, Frake, & Agarwal, *supra* note 76 at 961–80.

[478] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 26.

[479] Calculated as $-0.181/-0.207 = 87\%$. Coefficients taken from *id.* at Table 6, Column 2.

TABLE 2

| Net cost estimate ($ million) | Portion of earnings increase that offsets the cost estimate (%) |
|---|---|
| 0 or Negative .................. | 0.00 |
| 1,394 ................................ | 0.08 |
| 5,000 ................................ | 0.28 |
| 10,000 .............................. | 0.57 |
| 15,000 .............................. | 0.85 |
| 20,000 .............................. | 1.14 |
| 25,000 .............................. | 1.42 |
| 30,000 .............................. | 1.71 |
| 35,000 .............................. | 1.99 |
| 40,000 .............................. | 2.28 |
| 45,000 .............................. | 2.56 |
| 50,000 .............................. | 2.85 |

## 2. Benefits Related to Product and Service Markets

There is evidence the proposed rule would positively impact the markets for products and services in multiple ways. Studies show that new firm formation would rise under a prohibition on non-compete clauses, for two primary reasons: first, workers would be free to form spin-offs which compete with their employers, contributing to increased competition and growth. Second, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.

Another possible benefit of the proposed rule related to markets for products and services is that worker flows across employers contribute to knowledge sharing, resulting in increased levels of innovation.

We note that, to the extent productivity increases of firms may be shared with workers, some of the benefits outlined in this Part VII.B.2 may overlap with the earnings estimates outlined above in Part VII.B.1.a. Similarly, to the extent harms to incumbent firms (due to, *e.g.,* increased competition) may negatively impact workers, those would also be reflected in the earnings estimates.

### a. Increased Firm Formation and Competition

Intra-industry employee spinoffs (*i.e.,* firms formed by entrepreneurs who previously worked for a firm against which they now compete—also known as within-industry spinouts or WSOs) have been shown to be highly successful, on average, when compared with typical entrepreneurial ventures.[480] Non-compete clauses typically reduce the prevalence of intra-industry spinoffs, and therefore prevent entrepreneurial activity that is likely to be highly successful. One estimate implies that a one-standard-deviation increase in non-compete clause enforceability decreases the rate of WSOs by 0.13 percentage points (against a mean of 0.4%).[481] The proposed prohibition, by extrapolation, would result in an overall increase in the rate of WSOs by 0.56 percentage points, which would more than double the rate of WSOs. We note this is a linear approximation and cannot account for heterogeneous effects of enforceability across states, nor can it account for nonlinearities in the impact of enforceability (as neither analysis is reported in the study).

The study also estimates the impact on the entry rate of non-WSOs (*i.e.,* spinoffs into other industries), and calculates a coefficient statistically indistinguishable from zero (0.07 percentage point increase associated with a one standard deviation increase in enforceability).[482]

Another study similarly estimates the impacts of non-compete clause enforceability on departures of employees to found new firms, as well as on all new firm entry.[483] These outcomes differ slightly from the ones previously reported: for employee departures to found new firms, the target industry of the employee spinoff is not reported (so the effect encompasses both within-industry and out-of-industry spinoffs). The latter outcome encompasses all new firm entry, not just spinoffs. There are pros and cons of this approach, relative to studying only spinoffs. On the one hand, it examines an outcome less likely to be directly impacted by non-compete clauses. On the other hand, if firms are encouraged to enter when non-compete clauses are more easily enforceable (due to, *e.g.,* greater projected protection of knowledge assets), then this approach will likely identify effects that may appear only weakly when looking just at spinoffs.

For each outcome, the estimated effect of an increase in non-compete clause enforceability (which is, in this study, measured by a collection of discrete legal changes) is negative: an increase in non-compete clause enforceability decreases the rate at which employees leave to become founders of firms by 0.78 percentage points, against a mean in the sample of 5% (though the result is statistically indistinguishable from zero),[484] and decreases the rate of new firm entry by 0.06 firms per million people (against a mean of 0.38) for firms in the knowledge sector, compared with firms in other sectors (for which there is no statistically significant effect). Due to the design of the study, the change in legal enforceability is not quantified, and therefore no extrapolation is possible to the country as a whole.

Three more estimates related to firm entry exist in the literature. One examines the differential impacts of venture capital ("VC") funding on firm entry: it finds a 1% increase in VC funding increases business formation by 2.3% when non-compete clauses are not enforceable, and by 0.8% when non-compete clauses are enforceable.[485] Another study examined the extent to which a legal enforceability increase in Michigan affected firm entry, and found that, among all sectors, there was no change in the entry rate of new firms (none of the estimated coefficients were statistically significant).[486] Among high-tech firms, the increase in enforceability was associated with a 40.3% increase in entry when compared with states that did not enforce non-compete clauses. However, the study also notes that, compared with its neighbors, or using a statistical technique to match Michigan's trend in firm entry (synthetic control method), the estimated effect was statistically indistinguishable from zero. Finally, a study examining the effect of an increase in enforceability in Florida found small firm (fewer than 50 employees) entry fell by 5.6%, while large firm (greater than 1,000 employees) entry increased by 8.5%. Similarly, employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change .[487] The net effect was a 4.4% increase in concentration, as measured by a Herfindahl-Hirschman Index, due to the overall increase in the size of

---

European Mgmt. Rev. 159–71 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions,* in Handbook of Entrepreneurship Research (2005) 81–96.

[481] Starr, Balasubramanian, & Sakakibara, *supra* note 87 at 561.

[482] *Id.* at 561.

[483] Jeffers (2019), *supra* note 92 at 1.

[484] The estimated effect is statistically significant at the 10% level, and nearly doubles to 0.014, when attention is focused on firms which employ at least 40% of workers in the state in which their headquarters resides. This is important because it ensures that a greater portion of the workforce is subject to the local non-compete clause policy regime: a broadly dispersed company has workers subject to many different legal policies surrounding non-compete clauses, and it is therefore not surprising that the estimate is unable to distinguish a large impact of the policy changes.

[485] Samila & Sorenson, *supra* note 112 at 425–38.

[486] Carlino, *supra* note 86.

[487] Kang & Fleming, *supra* note 120 at 674.

---

[480] For reviews of the literature, *see, e.g.,* Steven Klepper, *Spinoffs: A Review and Synthesis,* 6

JA0210

firms. It is important to note that firm entry, in this study, is not necessarily new business formation. Indeed, the authors describe many business entries into Florida as existing businesses which are seeking to move or establish new franchises. The observed effects may therefore be due to relocations across state lines, which would likely not occur under the proposed rule.

For the previously mentioned three sets of estimates, it is again difficult to extrapolate to a population-wide measure of impact, since the "size" of the enforceability change is not quantified.

In Part II.B.2.c above, the Commission states the weight of the evidence demonstrates new firm formation would increase under the proposed rule; however, the Commission is unable to extrapolate from the studies which examine this outcome in order to quantify or monetize the effect.

b. Innovation

Scholars have posited that a lack of non-compete clause enforceability led Silicon Valley to become a hub of technological innovation. One paper theorizes that, as workers freely flowed between knowledge firms, those workers shared ideas and generated innovations greater than what a fixed set of workers, not interacting with outside workers, could have generated.[488] Studies have shown labor mobility is greater when non-compete clauses are more difficult to enforce.[489] However, those same studies did not directly show innovation is aided by the free flow of knowledge workers.

If non-compete clauses inhibit innovation by creating barriers to knowledge-sharing, then a prohibition on non-compete clauses, by alleviating those barriers, would increase innovation. Studies have sought to directly quantify this effect, primarily focused on patenting activity.

One study examined the impact of non-compete clause enforceability on venture capital's relationship with innovation. The study found that, when non-compete clauses are enforceable, venture capital induced less patenting, by 6.6 percentage points.[490] Two other studies directly focused on the relationship between non-compete clause enforceability and patenting. One, examining seven changes in non-compete clause enforceability, finds a 26.6% decline in the value of patents (as

measured by changes in stock prices surrounding the date a patent is granted) associated with increases in non-compete clause enforceability.[491] The other, examining the impact of a legal change in enforceability in Michigan, finds an increase in non-compete clause enforceability leads to an increase in the number of patents per 10,000 residents of 0.054 (against a mean of 2.20 in Michigan prior to the legal change).[492] There is no clear reason for this discrepancy in findings. It may be due to the setting being studied: the study finding a 26.6% decline in patent value considers several legal changes in non-compete clause enforceability, rather than just using one (as in the Michigan study) or relying on cross-sectional differences (as in the study of venture capital).

While the Commission believes the strongest evidence (due to the robustness of the findings across several legal changes) indicates innovation would likely increase under the proposed rule, as described above in Part II.B.2.d, the Commission is unable to extrapolate from the relevant studies to quantify or monetize this benefit.

c. Prices

Several of the effects discussed above, as well as costs of the proposed rule on products and service markets, may possibly filter through to consumer prices. Prices, therefore, may act as a summary metric for the impacts on consumers. We note this metric is highly imperfect: for example, increased innovation due to the proposed rule could cause quality increases in products, which drives prices up. Consumers may be better off, even though prices increased. For this reason, as well as to avoid double-counting (since prices may take into account changes in innovation, investment, market structure, wages, and other outcomes), we consider evidence on prices to be corroborating evidence, rather than a unique cost or benefit on its own.

One study estimates the impact of non-compete clause enforceability on consumer prices in the market for physician services.[493] The study estimates moving from the lowest observed non-compete clause enforceability score to the highest would increase prices by 53.3%. Extrapolating to the effect of the proposed prohibition nationwide (using 2009 enforceability scores), and applying percentage price decreases to

state-level physician spending,[494] we estimate health spending would decrease by $148.0 billion annually. We note, again, this is a large (linear) extrapolation from the estimate provided in the study. Furthermore, this amount is partially a transfer from physician practices to consumers, and additionally, we reiterate this estimate likely encompasses some of the prior estimates (*i.e.*, those regarding new firm formation or innovation), and we therefore do not count it as a standalone benefit of the proposed rule.

With respect to other industries, if the relationship between non-compete clause enforceability and prices observed in healthcare markets holds, the Commission believes prices would decrease, product and service quality would increase, or both under the proposed rule. Insofar as such effects may be driven by increases in competition (see Part VII.B.2.a), it is likely output would also increase. However, the evidence in the economic literature is solely based on healthcare markets (which do comprise a large portion of spending in the United States, but are far from all consumer spending), and while there is evidence that there are relationships between non-compete clause enforceability and concentration, innovation, new firm formation, and other product market outcomes, the Commission cannot say with certainty similar effects would be present for other products and services.

In many settings, it is theoretically plausible increases in worker earnings from restricting non-compete clauses may increase consumer prices by raising firms' costs (though there is countervailing evidence, especially in goods manufacturing).[495] We note an absence of empirical evidence that this mechanism persists in practice, as well as countervailing forces, such as the impacts on concentration described above and positive impacts on innovation (see Part II.B.2.d). Additionally, greater wages for workers freed from non-compete clauses may be due to better worker-firm matching, which could simultaneously increase wages and increase productivity, which

---

[488] Gilson, *supra* note 88.

[489] See, *e.g.*, Fallick, Fleischman, & Rebitzer, *supra* note 89 at 472–81; Johnson, Lavetti, & Lipsitz, *supra* note 42.

[490] Samila & Sorenson, *supra* note 112 at 432.

[491] He, *supra* note 124 at 22.

[492] Carlino, *supra* note 86 at 40.

[493] Hausman & Lavetti, *supra* note 101 at 258.

[494] The latest available numbers are from 2014. *See* Ctrs. for Medicare & Medicaid Servs., *National Health Expenditure Data, Health Expenditures by State of Provider*, 1980–2014 (last visited Dec. 9, 2022), *https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccounts StateHealthAccountsProvider*. We use physician and clinical spending in 2014 by state of provider.

[495] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through*, 54 J. Money, Credit & Banking 7 (2022).

could lead to lower prices. Finally, as described in Part II.B.2.a, increases in healthcare prices are not due to pass-through of greater labor costs.

## C. Estimated Costs of the Proposed Rule

In this Part VII.C, we describe the costs associated with the proposed rule; provide preliminary quantitative, monetized estimates where possible; and describe costs we can only assess qualitatively. We welcome public comment regarding the scope of the costs outlined in this Part VII.C, especially with respect to direct compliance costs and the costs of updating contractual practices.

The Commission estimates firms' direct compliance costs and the costs of firms updating their contractual practices would total $1.02 to $1.77 billion. The Commission also finds worker training and firm investment in capital assets would likely decrease under the proposed rule. Finally, the Commission finds inconclusive evidence that the job creation rate would diminish under the proposed rule. Given the evidence available, the Commission is unable to monetize the estimates of worker training, firm investment in capital assets, and job creation, however.

### 1. Direct Compliance Costs

In order to comply with the proposed rule, firms must remove non-compete clauses from workers' contracts in two ways. First, to comply with proposed § 910.2(a), which states it is an unfair method of competition to maintain with a worker a non-compete clause, firms would need to no longer include non-compete clauses in the contracts of incoming workers, which may include revising existing employment contracts. Second, to comply with proposed § 910.2(b)(1) and (2), firms would need to rescind existing non-compete clauses no later than the compliance date and provide notice to workers that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

In order to reduce compliance costs and increase compliance certainty, proposed § 910.2(b)(3) would provide that an employer complies with the rescission requirement in proposed § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(2). Furthermore, proposed § 910.2(b)(2)(C) includes model language which may be provided to the worker in order to inform the worker that their non-compete clause is no longer in effect. We estimate composing and sending this message in a digital format to all of a firm's workers and applicable former

workers would take 20 minutes of a human resources specialist's time. According to the Bureau of Labor Statistics, the median wage for a human resources specialist was $29.95 per hour in 2021.[496] The cost of compliance for currently employed workers is therefore $29.95/3=$9.98 per firm. According to the U.S. Census Bureau's Statistics of U.S. Businesses database, in 2019 (the most recent year with data available), there were 6.10 million firms and 7.96 million establishments in the United States.[497] We estimate the percentage of firms using non-compete clauses in the U.S. at 49.4%. This estimate is based on Colvin and Shierholz's 2017 survey of business establishments. Colvin and Shierholz estimate 49% of establishments of more than 50 employees use non-compete clauses for at least some of their employees, and 32% of establishments use non-compete clauses for all of their employees.[498]

Conservatively assuming each establishment must engage in its own communication (*i.e.*, that a firm's headquarters does not have the ability to send a company-wide email, for example), this means the total direct compliance cost for rescinding existing non-compete clauses and providing notice is $9.98*7.96 million*0.494=$39.25 million.

To ensure incoming workers' contracts do not include non-compete clauses and they fully comply with the proposed rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete clause). For many firms, this process would likely be straightforward (*i.e.*, simply not using non-compete clauses or removing one section from a boilerplate contract). For other firms, it may be more difficult and require more time. We assume that, on average, ensuring contracts for incoming workers do not have non-compete clauses would take the equivalent of one hour of a lawyer's time (valued at $61.54),[499] resulting in a total cost of $61.54*7.96 million*0.494=$241.96 million. We acknowledge there may be substantial heterogeneity in the costs for individual

firms; however, we believe this number is conservative. For firms whose costs of removing non-compete clauses for incoming workers is greater, the work of ensuring contracts comply with the law would overlap substantially with the costs of updating contractual practices, described in the next section.

### 2. Costs of Updating Contractual Practices

Firms may seek to update their contractual practices by expanding the scope of non-disclosure agreements (NDAs) or other contractual provisions to ensure they are expansive enough to protect trade secrets and other valuable investments. To do so, firms may use in-house counsel or outside counsel to examine and amend current contracts or enter into new contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to update their contractual practices when they can no longer use non-compete clauses. However, there is evidence indicating firms that use non-compete clauses are already using other types of restrictive employment provisions. Firms may be doing so because, among other things, they are uncertain whether a non-compete clause will be enforceable, or because they desire the additional protections NDAs and other types of restrictive employment provisions can offer. Balasubramanian et al. find that 97.5% of workers with non-compete clauses are also subject to a non-solicitation agreement, non-disclosure agreement, or a non-recruitment agreement, and 74.7% of workers with non-compete clauses are also subject to all three other types of provisions.[500] Firms that are already using multiple layers of protection may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-compete clauses,[501] we assume the average firm employs the equivalent of four to eight hours of a lawyer's time to update their contractual practices. We emphasize this is an average to underline the fact that there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those which use non-compete clauses only with workers who do not

---

[496] *See* Bureau of Lab. Stats., *Occupational Outlook Handbook, Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.*

[497] The dataset is available at U.S. Census Bureau, *2019 SUSB Annual Data Tables by Establishment Industry, https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html* (last visited Dec. 9, 2022).

[498] Alexander J.S. Colvin & Heidi Shierholz, Econ. Pol'y Inst., *Noncompete Agreements* (2019) at 1.

[499] Bureau of Lab. Stats., *Occupational Outlook Handbook: Lawyers, https://www.bls.gov/ooh/legal/lawyers.htm.*

[500] Balasubramanian, Starr, & Yamaguchi, supra note 40 at 35. We calculate 97.5% as (1−0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete clause, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete clause, regardless of what other post-employment restrictions they have.

[501] Colvin & Shierholz, *supra* note 498 at 1.

JA0212

have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect sensitive information, may opt to do nothing. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract.[502] Our estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-compete clauses opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-compete clauses with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 hours of an attorney's time, this would result in the estimate of 4–8 hours on average reported above.

We further emphasize this estimate is an average across all employers that would be covered by the rule. There is likely substantial heterogeneity in the amount of time firms would use to update contractual practices; very large firms that use non-compete clauses extensively would likely incur greater costs.

Under the assumption the average firm that uses a non-compete clause employs the equivalent of four to eight hours of a lawyer's time, we calculate the total expenditure on updating contractual practices to range from $61.54*4*49.4%*6,102,412=$742.07 million to $61.54*8*49.4%*6,102,412=$1.48 billion. Note that we assume decisions regarding protection of sensitive information and contract updating are made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. The Commission seeks comment on this estimate.

### 3. Firm Investment

Non-compete clauses may impact investments made by firms in multiple ways.[503] First, a firm may anticipate a greater return on investment in a worker with a non-compete clause—since the worker is unable to take the skills they attain to a competitor—and may therefore provide greater levels of training. Second, since non-compete clauses increase worker training, firms may increase investment that complements human capital when they are able to use non-compete clauses. Third, non-compete clauses decrease competition, which increases returns on investment at the firm level, inducing additional investment at the firm level. This increased investment at the firm level does not necessarily mean, however, investment would increase at the market level, since decreased competition may also decrease output, decreasing employed capital stock and investment in that capital stock.

Once again, the costs described in this section may overlap with estimates reported in preceding sections. For example, if increased enforceability of non-compete clauses increases training of workers, and increased training results in higher wages for workers, then the estimate of the wage decrease when enforceability increases already takes into account the extent to which increased training increases wages. That is, if training were held constant, the earnings increase associated with the proposed rule would likely be even larger.

With respect to worker training, one study finds that an increase in the non-compete clause enforceability index of one standard deviation (across states) results in an increase in the number of workers who reported receiving training of 14.7% for workers in occupations which use non-compete clauses at a high rate, relative to those in which non-compete clauses are used at a low rate.[504] Extending this estimate to the U.S. workforce implies that, on average, 3.1% fewer workers would receive training in a given year, as a result of the proposed rule.[505]

An estimate of the impact of non-compete clause enforceability on firm investment in capital assets implies that an increase in enforceability leads to an increase in firms' net investment to asset ratio of 1.3 percentage points (against a mean of 3.5%). The magnitude of the enforceability increase which is associated with this change is not quantified according to the scale above, however, so it is not possible to extend this estimate to the population. Additionally, the estimate is constructed at the firm level, and it is not possible to extrapolate the estimate to the market level, given potential changes in the composition of the market associated with changes in non-compete clause enforceability.

The proposed rule may also impact the extent to which trade secrets are shared with workers. Non-compete clauses are commonly justified as a means by which firms are able to protect trade secrets, which may allow those trade secrets to be shared more freely with workers, positively impacting productivity. However, to the best of our knowledge, there is no available evidence on this topic which would allow us to quantify or monetize the cost, or identify whether it exists in practice.

### 4. Job Creation Rates

While non-compete clauses may, in theory, incentivize firms to create jobs by increasing the value associated with any given worker covered by a non-compete clause, the evidence is inconclusive. One estimate indicates the job creation rate at startups increased by 7.8% when Michigan increased non-compete clause enforceability.[506] However, the job creation rate calculated in this study is the ratio of jobs created by startups to overall employment in the state: therefore, the job creation rate at startups may rise either because the number of jobs created by startups rose, or because employment overall fell. The study does not investigate which of these two factors drives the increase in the job creation rate at startups.

Another study finds that several increases in non-compete clause enforceability were associated with a 1.4% increase in average employment at new firms.[507] However, the authors attribute the increase in average employment to a change in the composition of newly founded firms. The increases in enforceability prevented the entry of relatively small startups which would otherwise have existed. The remaining firms which entered were therefore larger on average: this increases the average job creation

---

[502] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-compete clauses.

[503] For more discussion, see Jeffers (2019), *supra* note 92; Starr (2019), *supra* note 66 at 783–817.

[504] Starr (2019), *supra* note 66 at 796. Estimates are taken from Table 4, Column 4.

[505] The total training decrease is calculated as the weighted average (where weights are equal to employment in 2020, the latest year available, taken from *https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm*) over all states of:

$$(e^{-0.0077*(\text{State's Enforceability Score}-\text{Lowest State Enforceability Score})}-1)$$

This calculation assumes that all workers are subject to the decrease in training, as opposed to calculating the decrease to those in high-use occupations versus those in low-use occupations. The benefit of this approach is that it yields a total predicted training decrease for the economy as a whole, rather than a comparison between different types of workers. However, it is likely an overestimate for workers in low-use occupations, and an underestimate for those in high-use occupations. It is the same methodology used to calculate earnings increases in Part VII.B.1.a for the estimate drawn from the same study.

[506] Carlino, *supra* note 86 at 16.

[507] Starr, Balasubramanian, & Sakakibara, *supra* note 87 at 561.

rate at new firms, because the average entering firm is relatively larger. However, in terms of total jobs created, it means that increases in enforceability generate fewer total jobs, if the mechanism identified by the authors is correct. A similar mechanism may explain the results in both studies above. If that is indeed the case, then an increased job creation rate among startups is not a cost of the proposed rule. Instead, it could actually be a benefit (albeit unquantifiable), since non-compete clauses prevent small firms from existing in the first place. The Commission therefore believes that, with respect to job creation rates, the evidence is inconclusive: it is unclear whether the negative results have causes which are actually benign, or even positive.

### 5. Litigation Costs

The proposed rule would likely reduce litigation costs associated with non-compete clauses, since there would be little to no uncertainty that the vast majority of those clauses are prohibited. However, it is also possible that costs associated with trade secret claims or other post-employment restrictions, such as non-disclosure agreements or non-solicitation agreements, would increase. The Commission is not aware of any evidence indicating the magnitude of the change in litigation costs associated with any of these claims, and it is therefore not clear whether the net impact on litigation costs would be a benefit or a cost of the proposed rule. The Commission seeks comment on the impact the rule would have on litigation costs.

### D. Discussion of Alternatives

In Part VI of this NPRM, the Commission describes several alternatives to the proposed rule. Here, we discuss the extent to which implementation of each of these alternatives would change the analysis of benefits and costs presented above.

We treat Alternatives 1 and 3 first. Under Alternative 1, the rule would categorically ban the use of non-compete clauses for some workers and apply a rebuttable presumption of unlawfulness to non-compete clauses for other workers. For example, the rule could ban non-compete clauses generally, but apply the rebuttable presumption to workers who qualify for the FLSA exemptions for executives or learned professionals.[508] Or the rule could ban non-compete clauses but apply the rebuttable presumption to

workers who earn more than $100,000 per year. Under Alternative 3, non-compete clauses for all workers would be subject to a rebuttable presumption of illegality.

There are two primary ways in which a rebuttable presumption of illegality, rather than a prohibition, could affect the benefits and costs associated with the proposed rule. First, a rebuttable presumption may decrease costs associated with the proposed rule by allowing employers to use non-compete clauses in situations in which the true benefits of non-compete clauses exceed the costs. In other words, the non-compete clauses which survive a rebuttable presumption may contribute to economic efficiency to the extent a court is able to identify efficiency-enhancing non-compete clauses.

Second, a rebuttable presumption could increase costs by forcing cases involving non-compete clauses to be litigated more frequently, since the line defining a permissible non-compete clause would be less bright. Additionally, there may be situations in which the presumption would likely hold (*i.e.*, a given non-compete clause is likely prohibited under the presumption), but which are not fought by workers, fearing they might lose the case. In such cases, any costs and benefits associated with non-compete clauses (such as those outlined in the preceding sections) would accrue to the economy.

The two impacts of a change from a prohibition to a rebuttable presumption would likely be more drastic for workers above the threshold (for whom the presumption would be rebuttable under Alternative 1), as compared with those additional workers for whom the presumption would be rebuttable under Alternative 3. For the latter set of workers, there are fewer plausible cases in which the presumption would be rebutted, since higher-paid workers typically have access to greater levels of sensitive information. This means there is a smaller efficiency gain to be had from allowing non-compete clauses which could plausibly rebut the presumption; however, it also means there would likely be fewer litigated cases since there would be fewer marginal non-compete clauses. Therefore, the effect of moving from the proposed rule to Alternative 1 is likely more substantial than the effect of moving from Alternative 1 to Alternative 3.

The effects of Alternatives 2 and 4 may be analyzed similarly. Under Alternative 2, the rule would categorically ban the use of non-compete clauses for some workers and

not apply any requirements to other workers. For example, like the recent State of Washington statute, the rule could prohibit the use of non-compete clauses for employees earning $100,000 or less per year and independent contractors earning less than $250,000 or less per year. Or, like the recent Massachusetts and Rhode Island statutes, the rule could prohibit the use of non-compete clauses for workers who are non-exempt under the FLSA.[509] Under Alternative 4, the rule would apply a rebuttable presumption of unlawfulness to non-compete clauses for some workers and not apply any requirements to other workers. Workers above the threshold are most likely to be those workers for whom firm investment and training are valuable, but they are also often uniquely positioned to found new firms, since they hold knowledge gained by working in their industry. Therefore, a large portion of the benefits associated with the proposed rule would be lost if workers above the threshold were not covered; however, a large portion of the costs would also be lost, since the need to restructure contracts to protect sensitive information would no longer be present for those workers, and firms would continue to train and invest in those workers in the same way they currently do. Additionally, the earnings effects for relatively lower-wage workers appear to be less, based on empirical work, though the legal changes analyzed were not perfectly comparable. This could indicate, again, there are more substantial benefits to be had from prohibiting non-compete clauses for workers above the threshold based on harms to labor markets, compared with workers below the threshold.

The alternative under which the rule would use a different standard for senior executives, discussed in Part VI.C, would yield similar effects to the analyses discussed above. If a rebuttable presumption were applied to senior executives, if there are some non-compete clauses that are efficient, and if courts are able to appropriately identify efficient non-compete clauses, then some non-compete clauses would likely be used (and may survive challenges) which are indeed efficient. On the other hand, costs associated with legal challenges would likely increase due to an increased frequency of legal challenges associated with a less bright line. If no requirement is applied to senior executives, then a large portion of the benefit of the proposed rule, as it applies to senior executives, would be lost: benefits associated with increased

---

[508] *See supra* notes 423–424 and accompanying text.

[509] *See supra* Part VI.B.2.

product market competition and benefits associated with increased labor market competition. The costs of restructuring contracts, however, would be lost, as well.

Another alternative, discussed in Part VI.D, concerns whether non-compete clauses between a franchisor and a franchisee would be covered by the proposed rule. As noted in Part VI.D, evidence concerning the impact of prohibiting non-compete clauses between franchisors and franchisees does not exist. The Commission is therefore unable to estimate the extent to which the costs and benefits which would result from the proposed rule covering those parties would be similar to those resulting from prohibiting worker non-compete clauses.

### E. Other Major Effects

There are two substantial equity concerns associated with the proposed rule which are not captured above. The first relates to the economic outcomes of women and racial and ethnic minorities. Non-compete clauses may affect women and racial and ethnic minorities more negatively than other workers. For example, firms may use the monopsony power which results from use of non-compete clauses as a means by which to wage discriminate, or women (who may exhibit greater risk aversion, in practice [510]) may be more reluctant to start businesses when non-compete clauses are enforceable. One estimate indicates that gender and racial wage gaps would close by 3.6–9.1% under a nationwide prohibition on non-compete clauses.[511] Another estimate indicates the negative impact of non-compete clause enforceability on within-industry entrepreneurship is 15% greater for women than for men.[512]

The second equity concern related to non-compete clauses is that workers may not be willing to file lawsuits against deep-pocketed employers to challenge their non-compete clauses, even if they predict a high probability of success. The proposed rule would substantially mitigate this concern by enacting a bright-line prohibition, which the Commission could enforce. This would mitigate uncertainty for workers and would be especially helpful for relatively low-paid workers,

for whom access to legal services may be prohibitively expensive.

### VIII. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to either provide an Initial Regulatory Flexibility Analysis (IRFA) with a proposed rule or certify that the proposed rule would not have a significant impact on a substantial number of small entities.[513] The Commission does not expect the proposed rule, if adopted, would have a significant impact on a substantial number of small entities.

Although small entities across all industrial classes—*i.e.,* all North American Industry Classification System (NAICS) codes—would be affected, the estimated impact on each entity would be relatively small. The Small Business Administration (SBA) states that, as a rule of thumb, the impact of a proposed rule could be significant if the cost of the proposed rule (a) eliminates more than 10% of the businesses' profits; (b) exceeds 1% of the gross revenues of the entities in a particular sector, or (c) exceeds 5% of the labor costs of the entities in the sector.[514] As calculated in Part VIII.D, the Commission estimates direct compliance costs and the costs of updating contractual practices would result in costs of $317.68 to $563.84 for single-establishment firms. These costs would only exceed these sample limits if the average profit of regulated entities is $3,177 to $5,638, average revenue is $31,768 to $56,384, or average labor costs are $6,353 to $11,276, respectively. Furthermore, while there are additional nonmonetizable costs associated with the proposed rule, there are also nonmonetizable benefits which would at least partially offset those costs, as explained above in Part VII.

Although the Commission certifies under the RFA that the proposed rule would not have a significant impact on a substantial number of small entities, and hereby provides notice of that certification to the SBA, the Commission has determined it is appropriate to publish an IRFA in order to describe the impact of the proposed rule on small entities. The Commission seeks comment on all aspects of the IRFA in this Part VIII.

### A. Reasons for the Proposed Rule

The Commission describes the reasons for the proposed rule above in Part IV.

### B. Statement of Objectives and Legal Basis

The Commission describes the objectives and legal basis for the proposed rule above in Part IV and the legal authority for the rule above in Part III.

### C. Description and Estimated Number of Small Entities to Which the Rule Would Apply

The proposed rule would impact all small businesses, across all industry classes, that use non-compete clauses. The Commission does not expect there are classes of businesses that would face disproportionate impacts from the proposed rule.

For the vast majority of industries, there is no granular data regarding the percentage of firms that use non-compete clauses (which could then be used to calculate the number of small entities in that industry using non-compete clauses). Due to this data limitation and given the relatively stable percentage of firms using non-compete clauses across the size distribution,[515] we estimate the total number of small firms across all industries in the U.S. economy. We then calculate the number of firms estimated to use non-compete clauses by applying an estimate of the percentage of firms using non-compete clauses to that total. Using the size standards set by the SBA,[516] we calculate that there are 5.95 million small firms and 6.24 million small establishments in the U.S.[517] Assuming

[510] *See, e.g.,* Catherine C. Eckel & Philip J. Grossman, *Men, Women and Risk Aversion: Experimental Evidence, Handbook of Experimental Economics Results* 1 (2008) 1061–073 and Gary Charness & Uri Gneezy, *Strong Evidence For Gender Differences in Risk Taking,* 83 J. Econ. Behavior & Org. 50–58 (2012).

[511] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 38.

[512] Marx (2021), *supra* note 118 at 8.

[513] 5 U.S.C. 603–605.

[514] Small Bus. Admin., *A Guide for Government Agencies: How to Comply With the Regulatory Flexibility Act* (August 2017) (hereinafter RFA Compliance Guide) at 19.

[515] *See* Colvin & Shierholz, *supra* note 498 at 5. We emphasize that, since smaller firms generally use non-compete clauses at a lower rate, based on the numbers reported in Table 1, our estimate of the number of affected small entities is likely larger than is true in practice.

[516] See Small Bus. Admin., *Table of Size Standards, https://www.sba.gov/document/support-table-size-standards.*

[517] We use the latest data available from the U.S. Census Bureau's Statistics of U.S. Businesses database, available based on firm revenue and firm size. U.S. Census Bureau, *Statistics of U.S. Businesses (SUSB), https://www.census.gov/programs-surveys/susb.html* (last visited Dec. 9, 2022). We deflate to current dollars using Historical Table 10.1. Off. of Mgmt. & Budget, *Historical Tables, https://www.whitehouse.gov/omb/budget/historical-tables/* (last visited Dec. 9, 2022). As used in this analysis, per the U.S. Census Bureau, "a firm is a business organization consisting of one or more domestic establishments in the same geographic area and industry that were specified under common ownership or control." On the other hand, "an establishment is a single physical location at which business is conducted or services or industrial operations are performed." *See* U.S. Census Bureau, *Glossary, https://www.census.gov/programs-surveys/susb/about/glossary.html.*

49.4% of firms or establishments use non-compete clauses,[518] we estimate 2.94 million small firms, comprising 3.08 million small establishments, would be affected by the proposed rule. Since our estimate spans differential use of non-compete clauses across industries (in the absence of more detailed data), these firms span all industries and various sizes below the standards set in the SBA's size standards.

*D. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

As calculated in Parts VIII.D.1 and VIII.D.2, the Commission estimates the direct compliance costs and the costs of updating contractual practices would total $246.16 to $492.32 for each small firm, plus an additional $71.52 for each establishment owned by that firm. A single-establishment firm, for example, would bear estimated costs of $317.68 to $563.84, for example.

As described in greater detail in Part VII.C.3, the Commission also finds worker training and firm investment in capital assets would likely decrease under the proposed rule. Finally, as described in greater detail in Part VII.C.4, the Commission finds mixed evidence that the job creation rate would diminish under the proposed rule. Given the evidence available, the Commission is unable to monetize the estimates of worker training, firm investment in capital assets, and job creation, however.

1. Direct Compliance Costs

In order to comply with the proposed rule, small entities must remove non-compete clauses from workers' contracts in two ways. First, to comply with proposed § 910.2(a), which states it is an unfair method of competition to maintain with a worker a non-compete clause, small entities would need to no longer include non-compete clauses in the contracts of incoming workers, which may include revising existing employment contracts. Second, to comply with proposed § 910.2(b)(1) and (2), small entities would need to rescind existing non-compete clauses no later than the compliance date and provide notice to workers that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

In order to reduce compliance costs and increase compliance certainty, proposed § 910.2(b)(3) would provide that an employer complies with the rescission requirement in proposed § 910.2(b)(1) where it provides notice to

a worker pursuant to § 910.2(b)(2). Furthermore, proposed § 910.2(b)(2)(C) includes model language which may be provided to the worker in order to inform the worker that their non-compete clause is no longer in effect. We estimate composing and sending this message in a digital format to all of a firm's workers and applicable former workers would take 20 minutes of a human resources specialist's time. According to the Bureau of Labor Statistics, the median wage for a human resources specialist was $29.95 per hour in 2021.[519] The cost of compliance for currently employed workers is therefore $29.95/3=$9.98 per firm. As calculated in Part VIII.C, we estimate there are 2.94 million small firms, comprising 3.08 million small establishments, in the United States which use non-compete clauses.[520] Conservatively assuming that each establishment must engage in its own communication (*i.e.,* a firm's headquarters does not have the ability to send a company-wide email, for example), this means the total direct compliance cost for workers who are already employed is $9.98*3.08 million=$30.74 million.

To ensure incoming workers' contracts do not include non-compete clauses and they fully comply with the proposed rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete clause). For many firms, this process would likely be straightforward (*i.e.,* simply not using non-compete clauses or removing one section from a boilerplate contract). For other firms, it may be more difficult and require more time. We assume that, on average, ensuring contracts for incoming workers do not have non-compete clauses would take the equivalent of one hour of a lawyer's time (valued at $61.54),[521] resulting in a total cost of $61.54*3.08 million=$189.54 million. We acknowledge there may be substantial heterogeneity in the costs for individual firms; however, we believe this number is conservative. For firms whose costs of removing non-compete clauses for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with

the costs of updating contractual practices, described in the next section.

For each establishment of each firm, we estimate direct compliance costs would total $9.98+$61.54=$71.52.

2. Costs of Updating Contractual Practices

Firms may seek to update their contractual practices by expanding the scope of non-disclosure agreements (NDAs) or other contractual provisions to ensure they are expansive enough to protect trade secrets and other valuable investments. To do so, firms may use in-house counsel or outside counsel to examine and amend current contracts or enter into new contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to update their contractual practices when they can no longer use non-compete clauses. However, there is evidence indicating firms that use non-compete clauses are already using other types of restrictive employment provisions. Firms may be doing so because, among other things, they are uncertain whether a non-compete clause will be enforceable, or because they desire the additional protections NDAs and other types of restrictive employment provisions can offer. Balasubramanian et al. find that 97.5% of workers with non-compete clauses are also subject to a non-solicitation agreement, non-disclosure agreement, or a non-recruitment agreement, and 74.7% of workers with non-compete clauses are also subject to all three other types of provisions.[522] Firms already using multiple layers of protection may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-compete clauses,[523] we assume the average firm employs the equivalent of four to eight hours of a lawyer's time to update their contractual practices. We emphasize this is an average to underline the likelihood of large differences in the extent to which firms update their contractual practices. Many firms, including those which use non-compete clauses only with workers who do not have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect

---

[518] See Colvin & Shierholz, *supra* note 498 at 1.

[519] See U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook, Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.*

[520] The dataset is available at U.S. Census Bureau, *2019 SUSB Annual Data Tables by Establishment Industry, https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html,* (last visited Dec. 9, 2022).

[521] U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook, Lawyers, https://www.bls.gov/ooh/legal/lawyers.htm.*

[522] Balasubramanian, Starr, & Yamaguchi, supra note 40 at 35. We calculate 97.5% as (1−0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete clause, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete clause, regardless of what other post-employment restrictions they have.

[523] Colvin & Shierholz, *supra* note 498 at 1.

sensitive information, may opt to do nothing. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract.[524] Our estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-compete clauses opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-compete clauses with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 days of an attorney's time, this would result in the estimate of 4–8 hours on average reported above.

We further emphasize this estimate is an average across all employers that would be covered by the rule. There is likely substantial heterogeneity in the amount of time firms would use to update contractual practices; very large firms that use non-compete clauses extensively would likely incur greater costs.

Under the assumption the average firm that uses a non-compete clause employs the equivalent of four to eight hours of a lawyer's time, we calculate the total expenditure on updating contractual practices to range from $61.54*4*2.94 million=$723.7 million to $61.54*8*2.94 million=$1.45 billion. Note that we assume decisions regarding protection of sensitive information and contract updating are made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. The Commission seeks comment on this estimate.

For each firm, we estimate the cost of updating contractual practices would be $61.54*4=$246.16 to $61.54*8=$492.32.

*E. Identification of Duplicative, Overlapping, or Conflicting Federal Rules*

The Commission is not aware of any duplicative, overlapping, or conflicting federal rules. As described above in Part II.C.1, the enforceability of a non-compete clause currently depends on state law. Non-compete clauses are also subject to federal antitrust law. However, the Commission is not aware of any federal regulations that would duplicate, overlap, or conflict with the proposed rule.

*F. Discussion of Significant Alternatives*

In Part VI above, the Commission discusses significant alternatives to the proposed rule. Part VI also includes a preliminary assessment of whether each of the significant alternatives would accomplish the objectives of the proposed rule. In addition, the Commission's analysis of benefits and costs in Part VII includes an assessment of the benefits and costs of various alternatives.[525]

The Commission is not proposing an exemption for small entities or different regulatory requirements for small entities. The proposed rule would provide it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or, under certain circumstances, to represent to a worker that the worker is subject to a non-compete clause.[526] For the reasons described above in Part IV, the Commission is proposing to provide these practices are an unfair method of competition under Section 5. Based on the available evidence, the Commission does not believe the analysis in Part IV above is fundamentally different for non-compete clauses imposed by small entities. For this reason, the Commission is not proposing an exemption for small entities or different regulatory requirements for small entities. The Commission seeks comment on whether it should propose a small entity exemption or different requirements for small entities, including whether non-compete clauses used by small entities are less likely to have the anticompetitive effects described in Part IV.A above, and whether employers that are small entities are less likely than other employers to have alternatives available for protecting their investments, as described in Part IV.B above.

The Commission is also not proposing a delayed compliance date for small entities. Under proposed § 910.5, compliance with the proposed rule would be required as of the proposed compliance date, which would be 180 days after publication of the final rule in the **Federal Register**.[527] In the Commission's preliminary view, this proposed compliance period would afford small entities a sufficient period of time to comply with the proposed rule.[528] The Commission seeks comment on whether this is the case.

## IX. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA),[529] federal agencies must obtain approval from the Office of Management and Budget (OMB) for each collection of information they conduct or sponsor. The term ''collection of information'' includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.[530] Under the PRA, the Commission may not conduct or sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.[531]

The Commission believes the proposed rule would contain a disclosure requirement that would constitute a collection of information requiring OMB approval under the PRA. Proposed § 910.2(a) would state it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or, under certain circumstances, represent to a worker that the worker is subject to a non-compete clause. Proposed § 910.2(b)(1) would state that, to comply with § 910.2(a), an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date.

Proposed § 910.2(b)(2)—the provision that would contain the disclosure requirement that would require OMB approval—would require employers to provide a notice to workers in certain circumstances. Specifically, proposed § 910.2(b)(2)(A) would require an employer that rescinds a non-compete clause pursuant to § 910.2(b)(1) to provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. Proposed § 910.2(b)(2)(A) would also state the employer must provide the notice to the worker in an individualized communication and the employer must provide the notice on paper or in a digital format such as, for example, an email or text message. Proposed § 910.2(b)(2)(B) would state the employer must provide the notice to a

---

[524] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-compete clauses.

[525] *See supra* Part VII.D.
[526] *See* proposed § 910.2(a).
[527] *See* proposed § 910.5.

[528] *See supra* Part V, in the section-by-section analysis for proposed § 910.5.
[529] 44 U.S.C. 3501 *et seq.*
[530] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).
[531] 44 U.S.C. 3506(c)(1)(B); 5 CFR 1320.5(a)(3).

worker who currently works for the employer. Proposed § 910.2(b)(2)(B) would also state that the employer must also provide the notice to a worker who formerly worked for the employer, provided the employer has the worker's contact information readily available. Finally, proposed § 910.2(b)(2)(C) would provide model language that would satisfy the notice requirement. Proposed § 910.2(b)(2)(C) would also state that an employer may also use different language, provided the notice communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

The Commission estimates composing and sending this message in a digital format to all workers would take 20 minutes of a human resources specialist's time. According to the Bureau of Labor Statistics, the median wage for a human resources specialist in 2021 was $29.95 per hour.[532] The cost of compliance for currently employed workers is therefore $29.95/3 = $9.98 per firm. According to the U.S. Census Bureau's Statistics of U.S. Businesses database, in 2019 (the most recent year for which data are available), there were 6.10 million firms and 7.96 million establishments in the United States.[533] The Commission estimates the percentage of firms using non-compete clauses in the United States at 49.4%.[534] This yields an estimated 3,932,240 covered establishments. Conservatively assuming that each establishment must engage in its own communication—*i.e.,* a firm's headquarters does not have the ability to send a company-wide email, for example—this means covered employers would incur an estimated labor cost burden of 1,310,747 hours to comply with this requirement (3,932,240 establishments × 20 minutes). The Commission estimates the associated labor cost for notifying affected workers who are already employed is $9.98 × 7.96 million × 0.494 = $39,243,755.

The proposed rule would impose only *de minimis* capital and non-labor costs. The Commission anticipates covered employers already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the proposed rule would require a one-time disclosure to some workers subject to a rescinded non-compete clause, the Commission anticipates this one-time disclosure would not require substantial investments in new systems or other non-labor costs. Moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.

The Commission invites comments on: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information would have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of these information collections on respondents. The Commission seeks comment on all aspects of this Part IX.

Comments on the proposed reporting requirements subject to Paperwork Reduction Act review by OMB should additionally be submitted to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function. The *reginfo.gov* web link is a United States Government website operated by OMB and the General Services Administration (GSA). Under PRA requirements, OMB's Office of Information and Regulatory Affairs (OIRA) reviews federal information collections.

## X. Request for Comment

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before March 20, 2023. Write "Non-Compete Clause Rulemaking, Matter No. P201200" on your comment. Your comment—including your name and your state—will be placed on the public record of this proceeding, including the *https://www.regulations.gov* website.

Because of the public health emergency in response to the COVID–19 outbreak and the agency's heightened security screening, postal mail addressed to the Commission will be subject to delay. We strongly encourage you to submit your comments online through the *https://www.regulations.gov* website. To ensure the Commission considers your online comment, please follow the instructions on the web-based form.

If you file your comment on paper, write "Non-Compete Clause Rulemaking, Matter No. P201200" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex C), Washington, DC 20580.

Because your comment will be placed on the publicly accessible website at *https://www.regulations.gov,* you are solely responsible for making sure your comment does not include any sensitive or confidential information. In particular, your comment should not include any sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number, or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also solely responsible for making sure your comment does not include any sensitive health information, such as medical records or other individually identifiable health information. In addition, your comment should not include any "trade secret or any commercial or financial information which . . . is privileged or confidential"—as provided by 15 U.S.C. 46(f) and 16 CFR 4.10(a)(2)—including, in particular, competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Comments containing material for which confidential treatment is requested must be filed in paper form, must be clearly labeled "Confidential," and must comply with 16 CFR 4.9(c). In particular, the written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. Your comment will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your comment has been posted publicly at *https://www.regulations.gov*—as legally required by 16 CFR 4.9(b)—we cannot redact or remove your comment, unless you submit a confidentiality request that meets the requirements for such treatment under FTC Rule 4.9(c) and the General Counsel grants that request.

Visit the Commission's website, *www.ftc.gov,* to read this NPRM and the fact sheet describing it. The FTC Act and other laws the Commission administers permit the collection of

---

[532] U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook: Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.*

[533] U.S. Census Bureau, 2019 SUSB Annual Data Tables by Establishment Industry (February 2022), *https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html* (last visited Dec. 9, 2022).

[534] *See* Colvin & Shierholz, *supra* note 498 at 4.

JA0218

public comments to consider and use in this proceeding as appropriate. The Commission will consider all timely and responsive public comments that it receives on or before March 20, 2023. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, see *https://www.ftc.gov/site-information/ privacy-policy.*

## XI. Communications by Outside Parties to Commissioners or Their Advisors

Written communications and summaries or transcripts of oral communications respecting the merits of this proceeding, from any outside party to any Commissioner or Commissioner's advisor, will be placed on the public record, per 16 CFR 1.26(b)(5).

## List of Subjects in 16 CFR Part 910 Antitrust

■ For the reasons set forth above, the Federal Trade Commission proposes to add a new subchapter J, consisting of part 910, to chapter I in title 16 of the Code of Federal Regulations to read as follows:

**Subchapter J—Rules Concerning Unfair Methods of Competition**

## PART 910—NON–COMPETE CLAUSES

Sec.
910.1.   Definitions.
910.2.   Unfair methods of competition.
910.3.   Exception.
910.4.   Relation to State laws.
910.5.   Compliance date.

**Authority:** 15 U.S.C. 45 and 46(g).

### § 910.1   Definitions.

(a) *Business entity* means a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary thereof.

(b) *Non-compete clause,* as used in this part:

(1) *Mea*ns a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.

(2) The term non-compete clause includes a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. For example, the following types of contractual terms, among others, may be *de facto* non-compete clauses:

(i) A non-disclosure agreement between an employer and a worker that is written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment with the employer.

(ii) A contractual term between an employer and a worker that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred for training the worker.

(c) *Employer* means a person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person.

(d) *Employment* means work for an employer, as the term employer is defined in paragraph (c) of this section.

(e) *Substantial owner, substantial member,* and *substantial partner* mean an owner, member, or partner holding at least a 25 percent ownership interest in a business entity.

(f) *Worker* means a natural person who works, whether paid or unpaid, for an employer. The term includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer. The term worker does not include a franchisee in the context of a franchisee-franchisor relationship; however, the term worker includes a natural person who works for the franchisee or franchisor. Non-compete clauses between franchisors and franchisees would remain subject to Federal antitrust law as well as all other applicable law.

### § 910.2   Unfair methods of competition.

(a) *Unfair methods of competition.* It is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause.

(b) *Existing non-compete clauses.*

(1) *Rescission requirement.* To comply with paragraph (a) of this section, which states that it is an unfair method of competition for an employer to maintain with a worker a non-compete clause, an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date.

(2) *Notice requirement.*

(i) An employer that rescinds a non-compete clause pursuant to paragraph (b)(1) of this section must provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. The employer must provide the notice to the worker in an individualized communication. The employer must provide the notice on paper or in a digital format such as, for example, an email or text message. The employer must provide the notice to the worker within 45 days of rescinding the non-compete clause.

(ii) The employer must provide the notice to a worker who currently works for the employer. The employer must also provide the notice to a worker who formerly worked for the employer, provided that the employer has the worker's contact information readily available.

(iii) The following model language constitutes notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker, for purposes of paragraph (b)(2)(i) of this section. An employer may also use different language, provided that the notice communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

**Figure 1 to Paragraph (b)(2)(iii)—Model Language**

BILLING CODE 6750–01–P

---

A new rule enforced by the Federal Trade Commission makes it unlawful for us to maintain a non-compete clause in your employment contract. As of [DATE 180 DAYS AFTER DATE OF PUBLICATION OF THE FINAL RULE], the non-compete clause in your contract is no longer in effect. This means that once you stop working for [EMPLOYER NAME]:

- You may seek or accept a job with any company or any person—even if they compete with [EMPLOYER NAME].

- You may run your own business—even if it competes with [EMPLOYER NAME].

- You may compete with [EMPLOYER NAME] at any time following your employment with [EMPLOYER NAME].

The FTC's new rule does not affect any other terms of your employment contract.

For more information about the rule, visit [*link to final rule landing page*].

---

BILLING CODE 6750–01–C

(3) *Safe harbor.* An employer complies with the rescission requirement in paragraph (b)(1) of this section where it provides notice to a worker pursuant to paragraph (b)(2) of this section.

### § 910.3  Exception.

The requirements of this part 910 shall not apply to a non-compete clause that is entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets, when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause. Non-compete clauses covered by this exception would remain subject to Federal antitrust law as well as all other applicable law.

### § 910.4  Relation to State laws.

This part 910 shall supersede any State statute, regulation, order, or interpretation to the extent that such statute, regulation, order, or interpretation is inconsistent with this part 910. A State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part 910 if the protection such statute, regulation, order, or interpretation affords any worker is greater than the protection provided under this part 910.

### § 910.5  Compliance date.

Compliance with this part 910 is required as of [DATE 180 DAYS AFTER DATE OF PUBLICATION OF THE FINAL RULE].

By direction of the Commission, Commissioner Wilson dissenting.

**April J. Tabor,**

*Secretary.*

**Note:** the following statements will not appear in the Code of Federal Regulations.

**Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya**

Today the Federal Trade Commission is proposing a rule that would prohibit businesses from using noncompete clauses in contracts with workers. Noncompete clauses generally restrict a company's workers from working for—or launching—a competitor for a period of time even after they have stopped working for that company. Researchers estimate that about one in five American workers is bound by a noncompete clause.

By design, noncompetes often close off a worker's most natural alternative employment options: jobs in the same geographic area and professional field. These restrictions can undermine core economic liberties, burdening Americans' ability to freely switch jobs.[1]

[1] *Pollock* v. *Williams,* 322 U.S. 4, 17–18 (1944) (describing the "right to change employers" as a critical "defense against oppressive hours, pay, working conditions, or treatment").

JA0220

**Federal Register** / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules 3537

A recent Commission action illustrates the real-life stakes: Prudential, a security company in Michigan, enforced noncompetes against its workers, including security guards earning near-minimum wage.[2] These noncompetes included a $100,000 liquidated damages clause. On multiple occasions, Prudential sued former employees who left for competitors offering higher wages. In one case, Prudential successfully pressured a competitor to fire one of those new hires. Media reports document countless other instances in which Americans who wish to change jobs—be it to pursue a better opportunity, to escape harassment, or to express disagreement with new workplace policies—are trapped in place by noncompete clauses.

Notably, the aggregate economic impact of noncompete clauses goes beyond any individual worker. Initiatives by several states to limit the use of noncompetes has given researchers the opportunity to closely study their effects. The Notice of Proposed Rulemaking (NPRM) published today carefully reviews the empirical evidence available to date and highlights several key findings.[3]

First, noncompete clauses reduce competition in labor markets, suppressing earnings and opportunity even for workers who are not directly subject to a noncompete. When workers subject to noncompete clauses are blocked from switching to jobs in which they would be better paid and more productive, unconstrained workers in that labor market are simultaneously denied the opportunity to replace them. This collective decline in job mobility means fewer job offers and an overall drop in wages, as firms have less incentive to compete for workers by offering higher pay, better benefits, greater say over scheduling, or more favorable conditions. The FTC estimates that the proposed ban on noncompetes would increase workers' total earnings by close to $300 billion per year.[4]

Second, the existing evidence indicates that noncompete clauses reduce innovation and competition in product and service markets. Studies show that locking workers in place reduces innovation, likely by decreasing the flow of information and knowledge among firms. By preventing workers from starting their own businesses and limiting the pool of talent available for startups to hire, noncompetes also limit entrepreneurship and new business formation. This in turn reduces product quality while raising prices. Indeed, existing evidence from the health care sector suggests that the proposed ban would decrease consumer prices, potentially to the tune of $150 billion a year.[5]

A recent Commission action shows how depriving new businesses of access to skilled workers can thwart competition. In the highly concentrated glass manufacturing sector, incumbent firms imposed noncompetes on thousands of employees. These noncompetes locked up highly specialized workers, tending to impede the entry and expansion of rivals by depriving them of access to qualified employees.[6]

The empirical evidence available to date, coupled with the Commission's years of work on noncompetes, forms the basis for the proposed rule.[7] The

proposal determines that employers' use of noncompetes is an unfair method of competition under Section 5 of the FTC Act. It recognizes that noncompetes may be unlawful in different contexts for different reasons; for example, employers' use of noncompetes to bind low-wage workers may be coercive and unfair in ways that the use of noncompetes to bind senior executives is not. Still, the proposal concludes that, in the aggregate, employers' use of noncompetes undermines competition across markets in ways that are harmful to workers and consumers and warrant a prohibition.

The proposed rule also draws on key lessons learned from state efforts to limit or ban the use of noncompetes. For example, research shows that some employers continue to use noncompetes even in states that have declared them null and void. As a result, workers in states where noncompetes are unenforceable are about as likely to have one in their contract as workers in other states.[8] In practice this causes confusion and uncertainty for workers about whether they are bound by an enforceable noncompete, which can dissuade them from seeking or accepting another job. To address this, the proposed rule would both prohibit employers from representing to workers

---

[2] Complaint, *In re Prudential Security, Inc.,* File No. 221–0026 (Jan. 4, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/2210026prudentialsecuritycomplaint.pdf; see* Press Release, Fed. Trade Comm'n, FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers (Jan. 4, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.*

[3] Notice of Proposed Rulemaking for Non-Compete Clause Rule ("NPRM"), Part II.B (Jan. 5, 2023).

[4] *See* NPRM Part VII.B.1 (describing the Commission's assessment of the benefits of the proposed rule).

[5] Drawing from a study on the financial industry, Commissioner Wilson suggests that suspending noncompetes here caused higher prices and more employee misconduct. *See* Umit G. Gurun, Noah Stoffman & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry,* 141 J. Fin. Econ. 1218 (2021). Notably, under the proposed rule, firms will still have contractual methods to protect their client lists, unlike the firms observed in this study, which were prohibited from using non-solicitation agreements in addition to noncompete clauses. Furthermore, the change in the financial industry may have curtailed beneficial entrepreneurship, since it only covered mobility of workers between firms, and therefore continued to permit some noncompete clauses which could prevent workers from starting their own businesses.

[6] Complaint, *In re O–I Glass, Inc.,* File No. 211–0182 (Jan. 4, 2023), *https://www.ftc.gov/system/files/ftc_gov/pdf/211oiglasscomplaint.pdf;* Complaint, *In re Ardagh Group S.A.,* File No. 211–0182 (Jan. 4, 2023), *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghcomplaint.pdf; see* Press Release, Fed. Trade Comm'n, FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers (Jan. 4, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.*

[7] The Commission has conducted extensive public outreach relating to noncompete clauses. *See, e.g.,* Fed. Trade Comm'n, *Hearings on Competition and Consumer Protection in the 21st Century, https://www.ftc.gov/enforcement-policy/hearings-competition-consumer-protection* (including discussion of noncompete agreements during the Oct. 15–17, 2018 and June 12, 2019 hearings, and inviting public comment on topics

including "the use of non-competition agreements and the conditions under which their use may be inconsistent with the antitrust laws"); Fed. Trade Comm'n, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (Jan. 9, 2020), *https://www.ftc.gov/news-events/events/2020/01/non-competes-workplace-examining-antitrust-consumer-protection-issues;* Fed. Trade Comm'n, *Making Competition Work: Promoting Competition in Labor Markets* (Dec. 6–7, 2021), *https://www.ftc.gov/news-events/events/2021/12/making-competition-work-promoting-competition-labor-markets;* Fed. Trade Comm'n, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021), *https://www.regulations.gov/document/FTC-2021-0036-0022.* The FTC has also focused on noncompete clauses in connection with its merger review work. *See* Press Release, Fed. Trade Comm'n, FTC Approves Final Order Restoring Competitive Markets for Gasoline and Diesel in Michigan and Ohio (Aug. 9, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-approves-final-order-restoring-competitive-markets-gasoline-diesel-michigan-ohio;* Press Release, Fed. Trade Comm'n, FTC Approves Final Order Imposing Strict Limits on Future Mergers by Dialysis Service Provider DaVita, Inc. (Jan. 12, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/01/ftc-approves-final-order-imposing-strict-limits-future-mergers-dialysis-service-provider-davita-inc;* Press Release, Fed. Trade Comm'n, FTC Approves Final Order Requiring Divestitures of Hundreds of Retail Gas and Diesel Fuel Stations Owned by 7-Eleven, Inc. (Nov. 10, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/11/ftc-approves-final-order-requiring-divestitures-hundreds-retail-gas-diesel-fuel-stations-owned-7.*

[8] Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force,* 64 J.L. & Econ. 53, 81 (2021).

that they are covered by a noncompete clause and require them to actively notify workers presently covered that these clauses are now void and cannot be enforced.

Action by federal enforcers is particularly appropriate here given that the harms from noncompetes flow across state lines. Many labor markets are spread across more than one state, and product markets are typically multistate as well, so the use of noncompetes in one state can harm workers and consumers in others. Moreover, employers may seek to circumvent state laws restricting noncompetes through the use of choice-of-law provisions and forum selection clauses, so that one state's lenient approach to noncompetes may have spillover effects into other states.[9]

The Federal Trade Commission is particularly well suited to this task. Congress designed the FTC to be an expert administrative agency that could enforce the prohibition against unfair methods of competition through rulemaking as well as through case-by-case adjudication. Although the Commission has primarily pursued antitrust enforcement through adjudication, rulemaking can deliver several benefits—including greater legal clarity and predictability, greater administrability and efficiency of enforcement, and greater public participation and airing of a maximally broad range of viewpoints and criticisms.[10]

Several factors seem to make noncompetes especially ripe for enforcement through rulemaking rather than adjudication, including the magnitude and scope of the apparent harms. Private litigation in this area may also be limited, given that there is no private right of action under Section 5 of the FTC Act—and that arbitration clauses and class action waivers in employment contracts often can functionally preclude lawsuits by workers.

Moreover, the FTC has notable expertise in this area. The Commission began deepening its work on noncompetes under Chairman Joseph Simons four years ago. Since then, the agency has held multiple workshops and sought and received public comments on three separate occasions. Our staff have closely studied the available economic research and reviewed hundreds of comments from employers, advocates, trade associations, members of Congress, state and local officials, unions, and workers.

In her dissent, Commissioner Wilson questions the Commission's authority to engage in "unfair methods of competition" rulemaking.[11] But the rulemaking authority we are exercising today is firmly rooted in the text and structure of the FTC Act and supported both by judicial precedent interpreting the scope of the law as well as further statutory language from the 1970s.[12]

Commissioner Wilson also suggests that the Commission's authority for the NPRM will be challenged under the major questions doctrine, which the Supreme Court recently applied in *West Virginia* v. *EPA*. Here, however, the FTC is operating under clear statutory authority. Identifying and addressing unfair methods of competition is central to the mandate that Congress gave the Commission in the text of our authorizing statute. Indeed, a greater threat to the "vesting of federal legislative power in Congress" would be for this Commission to repudiate or ignore Congress's clear direction to the Commission to consider rules to address unfair methods of competition.[13]

This proposal is the first step in the FTC's rulemaking process. It identifies several potential alternative rules, including those that would cover only a subset of workers or that would apply different legal standards to different categories of workers. Receiving input from a broad set of market participants, including those who have experienced firsthand the effects of noncompete clauses, will be critical to our efforts. I urge members of the public to review our proposal and submit comments.

A few topics are especially worthy of close consideration. First, should the rule apply different standards to noncompetes that cover senior executives or other highly paid workers? As the NPRM notes, these workers may be less vulnerable to coercion, but restraining them through noncompetes may still harm competition—for example, by making it harder and more expensive for potential entrants to recruit individuals for leadership positions. I am keen for input on this question, including on how any such category of workers should be defined and what standards should be applied. For example, if the Commission were to adopt a "rebuttable presumption" of illegality for noncompetes affecting these workers, what showing should be required to overcome the presumption?

Second, should the rule cover noncompetes between franchisors and franchisees? The current proposal does not cover noncompetes used by franchisors to restrict franchisees, but we recognize that in some cases they may raise concerns that are analogous to those raised by noncompetes between employers and workers. We welcome the public's views on this topic, as well as data or other evidence that could inform our consideration of this issue.

Third, what tools other than noncompetes might employers use to

---

[9] Non-compete clauses often contain choice-of-law provisions designating a particular state's law for resolution of any future disputes. *See* Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective*, 31 Comp. Lab. & Pol'y J. 389, 396–402 (2010). Some non-compete clauses include forum selection clauses, which specify the court and location where any dispute will be heard. *Id.* at 402–04. When contracting with workers in states with relatively stringent non-compete laws, companies may include choice-of-law and forum-selection provisions that designate jurisdictions with less stringent non-compete laws. The default rule under conflict-of-laws principles is that the court honors the parties' choice of law, meaning that the burden is on the worker to argue that the law of a different forum should apply. *Id.* at 394.

[10] *See, e.g.*, Rohit Chopra & Lina Khan, *The Case for "Unfair Methods of Competition" Rulemaking*, 87 U. Chi. L. Rev. 357 (2020); *Nat'l Petroleum Refiners Ass'n* v. *FTC*, 482 F.2d 672, 683 (D.C. Cir. 1973) (noting that "utilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticism, advice and data that is ordinarily less likely to be forthcoming in adjudication").

[11] Commissioner Wilson argues that our enforcement actions are in direct tension with a Seventh Circuit decision, *Snap-On Tools Corp.* v. *FTC*, 321 F.2d 825 (7th Cir. 1963). *Snap-On Tools* is distinguishable on several fronts, including the fact that it concerned noncompetes used in the business-to-business context, not those used by an employer to restrict its workers. Additionally, while the majority stated that it is "not prepared to say that [the termination restriction] is a per se violation of the antitrust laws," *id.* at 837, the Commission did not argue for a per se rule and so the issue was not litigated. *Id.* at 830–31; *id.* at 839 (Hastings, C.J., dissenting). Notably, the question before the Seventh Circuit was *not* whether the noncompete clause itself constituted an unfair method of competition. The Commission had held that the termination restriction provision was unlawful because it was used as an enforcement mechanism to ensure compliance with the other provisions. *Id.* at 836–37. Thus, once the court found that the other restrictive provisions in the agreement were lawful, it also held that the clause restricting competition upon termination did not violate the FTC Act. *Id.* at 837.

[12] The plain text of the FTC Act clearly authorizes the Commission to issue rules. Specifically, Section 6(g) enables the agency to "make rules and regulations for the purpose of carrying out the provisions" of the law. Several other provisions support the conclusion that Section 6(g) confers substantive rulemaking authority. For instance, Section 18 explicitly preserves "any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." The D.C. Circuit endorsed this plain reading of 6(g) in *Petroleum Refiners*, 482 F.2d at 698, when it considered and rejected an argument that Section 6(g) only authorized the FTC to promulgate procedural or interpretive rules. *Petroleum Refiners* is the only case that directly addresses the FTC's Section 6(g) rulemaking authority. This holding—that the FTC may "promulgate rules defining the meaning of the statutory standards of the illegality [the agency was] empowered to prevent," *id.* at 698—represents the current state of the law.

[13] *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2617 (2022) (Gorsuch, J., concurring).

protect valuable investments, and how sufficient are these alternatives? The proposal identifies several potential mechanisms that employers may use—including trade secrets law and confidentiality agreements—and we preliminarily find that these alternatives reasonably achieve the goal of protecting investments without unduly burdening competition. We welcome feedback on the Commission's preliminary analysis of this issue.

I am deeply grateful to staff in the Office of Policy Planning, the Bureau of Competition, the Bureau of Economics, and the Office of General Counsel for their careful and thorough work on this proposal. I am also grateful to the many scholars, advocates, and journalists whose work in recent years has shed light on the proliferation of noncompetes and the resulting harms that can manifest.

While the NPRM is just the first step toward a final rule, it marks the Commission's commitment to exercising the full set of tools and authorities that Congress gave us and to ensuring that our work is protecting all Americans. I look forward to working closely with my colleagues to continue this critical effort.

## Statement of Commissioner Slaughter Joined by Commissioner Alvaro M. Bedoya

One of the great privileges of working at the Federal Trade Commission is the opportunity—and responsibility—we have to help real people in their everyday lives. We offer that help not only when we challenge massive mergers but also when we tackle the myriad smaller ways in which people are denied agency and autonomy. When we fight fraud, manipulative business opportunities, anticompetitive schemes, and bogus fees, we help restore meaningful choice and dignity to consumers and workers. These principles are the bedrock of a democratic society, but too often they are denied to Americans who are not rich and powerful. Addressing the scourge of noncompete clauses that restrict the job mobility of workers advances our mission by ensuring that workers have the chance to compete to earn a fair wage and family-supporting benefits.

I am therefore pleased to support the Commission's Notice of Proposed Rulemaking ("NPRM") on the Noncompete Clause Rule under Sections 5 and 6(g) of the Federal Trade Commission Act. I am grateful to the cross-agency team who worked on this NPRM and thank them for their hard work and collaborative drafting process.

I also want to thank the civil-society organizations and academics who filed a petition with the FTC in 2019 calling for a rulemaking to address noncompetes in employment contracts.[1] This petition increased the awareness of and knowledge about the issue not only within the agency but also with the public more broadly. That heightened focus was on display in the FTC's noncompete workshop in January 2020.[2] As I did at that workshop, I again thank the labor community for engaging with the competition community to tackle the pocketbook issues that sit at the intersection of labor and antitrust law and that have profound effects on workers.[3] Several years of activity by the Commission related to noncompete clauses in employment contracts have culminated in this NPRM, which is another milestone in our effort to more thoroughly incorporate labor competition and effects on workers into our antitrust law analyses.

I write separately to emphasize two points. First, noncompete clauses, and the restrictions they place on workers regarding their future employment or business creation, are deeply troubling. Based on the research discussed in the NPRM, they have serious ramifications for individual workers and labor competition broadly, as well as for consumers. Although sometimes referred to as noncompete "agreements," they rarely represent actual agreements. Instead, they are often imposed on workers with no ability to bargain as a condition of employment. Even when noncompetes have been ruled unenforceable by courts or outlawed by legislation, firms continue to use them, as was alleged in a recent case the FTC settled over noncompetes imposed on minimum wage-earning security guards.[4]

Workers restrained by noncompetes are unable to pursue certain job opportunities and are therefore deprived of higher wages and more favorable working conditions and benefits. Similarly, businesses that need to hire workers are inhibited from attracting and hiring noncompete-restrained workers through better working conditions, pay, and benefits.[5] Even more alarming is the evidence that shows noncompetes reduce earnings for workers not individually bound by them.[6] Studies also show reduced entrepreneurship, new-business formation, or both when workers are inhibited by noncompetes.[7] Finally, American consumers can suffer from noncompete clauses through paying higher prices for lower-quality goods and services.[8] For all these reasons, it is clear that it is more than appropriate for the FTC to use our rulemaking authority under Sections 5 and 6(g) to address noncompete clauses in employment contracts.

Second, I strongly encourage the public to share their lived experiences and perspectives with the Commission. I have heard personally about how noncompete clauses can strike fear into workers and make them anxious about their livelihoods. These stories come from a variety of different industries and

[1] Open Markets Inst. et al., Petition for Rulemaking to Prohibit Worker Non-Compete Clauses (March 20, 2019), *https://static1.squarespace.com/static/5e449c8c3ef68d752f3e70dc/t/5eaa04862ff52116d1dd04c1/1588200595775/Petition-for-Rulemaking-to-Prohibit-Worker-Non-Compete-Clauses.pdf*.

[2] Fed. Trade Comm'n, Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, *https://www.ftc.gov/news-events/events/2020/01/non-compete-clauses-workplace-examining-antitrust-consumer-protection-issues*.

[3] *Remarks of FTC Commissioner Rebecca Kelly Slaughter*, New Decade, New Resolve to Protect and Promote Competitive Markets for Workers, FTC Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020), *https://www.ftc.gov/system/files/documents/public_statements/1561475/slaughter_-_noncompete_clauses_workshop_remarks_1-9-20.pdf*.

[4] In the Matter of Prudential Security, Inc., a corporation; Prudential Command Inc., a corporation; Greg Wier, a natural person; and Matthew Keywell, FTC Matter/File Number

2210026 (January 4, 2023), Complaint ¶ 22, *https://www.ftc.gov/legal-library/browse/cases-proceedings/2210026-prudential-security-et-al-matter;* Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya In the Matters of Prudential Security, O–I Glass Inc., and Ardagh Group S.A, January 4, 2023, *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-joined-commissioners-slaughter-bedoya-matters-prudential-security-o-i*.

[5] Notice of Proposed Rulemaking, Non-Compete Clause Rule, Part II.B.1.

[6] *See* Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, The Labor Market Effects of Legal Restrictions on Worker Mobility 2 (2020), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381;* Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961, 6 (2019).

[7] *See* Sampsa Samila & Olav Sorenson, Noncompete Covenants: Incentives to Innovate or Impediments to Growth, 57 Mgmt. Sci. 425, 432 (2011); Jessica Jeffers, The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship 22 (2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393;* Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms, 64 Mgmt. Sci. 552, 561 (2018).

[8] *See* Naomi Hausman & Kurt Lavetti, Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes, 13 am. Econ. J. Applied Econ. 258, 284 (2021); Michael Lipsitz & Mark Tremblay, Noncompete Agreements and the Welfare of Consumers 6 (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864*.

professions, from fast-food workers to family physicians.[9] Public input from individuals who are or who have been bound by noncompetes and from firms that use them is a critically important step in the rulemaking process, and it will help the Commission weigh the proposed broad ban on noncompete clauses as well as the alternative approaches discussed in the NPRM. I look forward to working with my fellow Commissioners to achieve a just outcome that promotes fair competition.

## Dissenting Statement of Commissioner Christine S. Wilson

Today, the Commission announced a notice of proposed rulemaking ("NPRM") for a Non-Compete Clause Rule. "The proposed rule would provide that it is an unfair method of competition—and therefore a violation of Section 5—for an employer to enter into or attempt to enter into a non-compete clause with a worker; [or to] maintain with a worker a non-compete clause . . ." [1] For the many reasons described below, on the current record, I do not support initiating the proposed rulemaking and consequently dissent.

The proposed Non-Compete Clause Rule represents a radical departure from hundreds of years of legal precedent that employs a fact-specific inquiry into whether a non-compete clause is unreasonable in duration and scope, given the business justification for the restriction. The Commission undertakes this radical departure despite what appears at this time to be a lack of clear evidence to support the proposed rule. What little enforcement experience the agency has with employee non-compete provisions is very recent (within the last week) and fails to demonstrate harm to consumers and competition. Lacking enforcement experience, the Commission turns to academic literature—but the current record shows that studies in this area are scant, contain mixed results, and provide insufficient support for the scope of the proposed rule. And one study illustrates clearly, in the financial services sector, the negative unintended consequences of suspending non-compete provisions, including higher fees and broker misconduct. The suspension of non-competes across all industry sectors in the U.S. undoubtedly will impose a

much larger raft of unintended consequences.

Setting aside the substance of the rule, the Commission's competition rulemaking authority itself certainly will be challenged. The NPRM is vulnerable to meritorious challenges that (1) the Commission lacks authority to engage in "unfair methods of competition" rulemaking, (2) the major questions doctrine addressed in *West Virginia* v. *EPA* applies, and the Commission lacks clear Congressional authorization to undertake this initiative; and (3) assuming the agency does possess the authority to engage in this rulemaking, it is an impermissible delegation of legislative authority under the non-delegation doctrine, particularly because the Commission has replaced the consumer welfare standard with one of multiple goals. In short, today's proposed rule will lead to protracted litigation in which the Commission is unlikely to prevail.

The NPRM invites public comment on both a sweeping ban on non-competes and various alternatives pursuant to the Administrative Procedure Act, not the Magnuson-Moss Act. Stakeholders should note that this solicitation for public comment is likely the only opportunity they will have to provide input not just on the proposed ban, but also on the proposed alternatives. For this reason, I encourage all interested parties to respond fully to all parts of the NPRM's solicitation of public comments.

## Non-Compete Clauses Merit Fact-Specific Inquiry

Based on the current record, non-compete clauses constitute an inappropriate subject for rulemaking. The competitive effects of a non-compete agreement depend heavily on the context of the agreement, including the business justification that prompted its adoption. But don't take my word for it—the need for fact-specific inquiry aligns with hundreds of years of precedent. When assessing the legality of challenged non-compete agreements, state and federal courts (and English courts before them) have examined the duration and scope of non-compete clauses, as well as the asserted business justifications, to determine whether non-compete clauses are unreasonable and therefore unenforceable.[2]

The NPRM itself acknowledges, at least implicitly, the relevance of the circumstances surrounding adoption of

non-compete clauses. For example, the NPRM proposes an exception to the ban on non-compete clauses for provisions associated with the sale of a business, acknowledging that these non-compete clauses help protect the value of the business acquired by the buyer.[3] Recognizing that senior executives typically negotiate many facets of their employment agreements, the NPRM distinguishes situations in which senior executives are subject to non-compete provisions.[4] And to stave off potential legal challenges, the NPRM proposes more carefully tailored alternatives to a sweeping ban on non-compete clauses that instead would vary by employee category.

Despite the importance of context and the need for fact-specific inquiries, the Commission instead applies the approach of the newly issued Section 5 Policy Statement[5] to propose a near-complete ban on the use of non-compete clauses. Pursuant to this approach, the Commission invokes nefarious-sounding adjectives—here, "exploitive and coercive"—and replaces the evaluation of actual or likely competitive effects with an unsubstantiated conclusion about the "tendency" for the conduct to generate negative consequences by "affecting consumers, workers or other market participants."[6]

Using the approach of the Section 5 Policy Statement that enables the majority summarily to condemn conduct it finds distasteful, the Commission today proposes a rule that prohibits conduct 47 states have chosen

---

[9] *See People of the State of Ill.* v. *Jimmy John's Enters., LLC, No. 2016-CH-07746 (Cook County Cir. Ct. filed June 8, 2016); See also Kurt Lavetti, Carol Simon, & William D. White, The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians, 55 J. Hum. Res. 1025, 1042 (2020).*

[1] Notice of Proposed Rulemaking for Non-Compete Clause Rule ("NPRM") Part I (Jan. 5, 2023).

[2] *See, e.g., United States* v. *Addyston Pipe & Steel Co., 85 F. 271, 281 (6th Cir. 1898) (Taft, J.), aff'd in relevant part, 175 U.S. 211 (1899); Mitchel* v. *Reynolds, 1 P. Wms. 181 (1711).*

[3] NPRM Part V, Section 910.3.

[4] Accordingly, the Commission seeks comments on whether senior executives should be treated differently from the proposed ban on non-compete clauses. *See* NPRM Parts IV.A.1.b, IV.A.1.c. In a similar vein, recent consent agreements issued for public comment that prohibit the use of non-compete agreements in the glass container industry do not prohibit non-compete clauses for senior executives and employees involved in research and development. *See* O-I Glass, Inc., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182o-iglassdraftorderappxa.pdf* (Jan. 4, 2023) (Decision and Order Appendix A); Ardagh Glass Group S.A., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghdraftorderappxa.pdf* (Jan. 4, 2023) (Decision and Order Appendix A); Christine S. Wilson, Comm'r, Fed. Trade Comm'n, Dissenting Statement regarding In the Matter of O-I Glass, Inc. and In the Matter of Ardagh Group S.A. (Jan. 4, 2023), *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/dissenting-statement-commissioner-christine-s-wilson-regarding-matters-o-i-glass-inc-ardagh-group-sa.*

[5] Fed. Trade Comm'n, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/p221202sec5enforcementpolicystatement_002.pdf.*

[6] *Id.* at 9.

*Federal Register* / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules    **3541**

to allow.[7] Similarly, the Commission's proposed rule bans conduct that courts have found to be legal,[8] a concern the Commission dismisses with a claim that the Section 5 prohibition on ''unfair methods of competition'' extends beyond the antitrust laws. But the majority's conclusions and today's proposed rule forbid conduct previously found lawful under Section 5 of the FTC Act. Specifically, applying FTC Act Section 5, the Seventh Circuit found that ''[r]estrictive [non-compete] clauses . . . are legal unless they are unreasonable as to time or geographic scope[.]''[9] In other words, the Seventh Circuit found that a fact-specific inquiry is required under Section 5.

The NPRM announced today conflicts not only with the Seventh Circuit's holding, but also with several hundred years of precedent. With all due respect to the majority, I am dubious that three unelected technocrats[10] have somehow hit upon the right way to think about non-competes, and that all the preceding legal minds to examine this issue have gotten it wrong. The current rulemaking record does not convince me otherwise.

*I. Non-Compete Agreements—the First Application of the Section 5 Policy Statement*

The proposed Non-Compete Clause Rule ''would provide that it is an unfair method of competition—and therefore a violation of Section 5—for an employer to enter into or attempt to enter into a non-compete clause with a worker; [or] to maintain with a worker a non-compete clause . . .''[11] The proposed ban on non-compete clauses is based only on alleged violations of Section 5 of the FTC Act; it is not premised on the illegality of non-compete clauses under the Sherman or Clayton Acts.

When the Commission issued the Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (''Policy Statement'') in November 2022, I warned that the approach described by the Policy Statement would enable the Commission majority to condemn conduct it disfavors, even when that conduct repeatedly has been found lawful.[12] I predicted that the approach to Section 5 enforcement contained in the Policy Statement would facilitate expansive enforcement, often without requiring evidence of anticompetitive effects. And I cautioned that subjects of investigations would not be able to defend their conduct because procompetitive justifications would not be credited. The Non-Compete Clause Rule NPRM provides a graphic illustration of these concerns.

*A. The NPRM's Determination That Non-Compete Clauses Are Unfair*

The NPRM states that there are 3 *independent* ways for classifying non-compete clauses as an ''unfair'' method of competition.[13] In November, I objected to the enforcement approach described in the Section 5 Policy Statement—specifically, permitting the Commission majority to condemn conduct merely by selecting and assigning to disfavored conduct one or more adjectives from a nefarious-sounding list.[14] Here, two of the three explanations the Commission provides for concluding that non-compete clauses are unfair rely on invocation of the adjectives ''exploitive and coercive.''[15] The third explanation for the illegality of non-compete clauses demonstrates how little evidence the majority requires to conclude that conduct causes harm.

According to the NPRM, ''non-compete clauses are exploitive and coercive at the time of contracting.''[16] The NPRM explains that the ''clauses for workers other than senior executives are exploitive and coercive because they take advantage of unequal bargaining power[.]''[17] The business community will be surprised to learn that ''unequal bargaining power'' can lead to a conclusion that any negotiated outcome may be condemned as ''exploitive and coercive,'' which then can be parlayed into a finding that the conduct violates Section 5. Indeed, this assertion is particularly troubling not merely because it presages an approach that is literally limitless, but also because the imbalance of bargaining power, as in this setting, arises wholly apart from any conduct by the business.[18] The reader may note that the NPRM cites legal decisions to support the assignment of adjectives. Yet, a careful reading of the courts' discussions of the imbalance of bargaining power between employers and employees reveals that while the imbalance may provide a reason to scrutinize non-compete clauses, it is not used to condemn or invalidate them.[19] Remarkably, in each case cited in footnote 253 of the NPRM, the court found the non-compete clauses to be enforceable.

Next, the NPRM finds that ''non-compete clauses are exploitive and coercive at the time of the worker's potential departure from the employer[.]''[20] The NPRM reaches this conclusion regardless of whether the clauses are enforced. This conclusion is

---

[7] NPRM Part II.C.1. Further, the NPRM explains ''[s]tates have been particularly active in restricting non-compete clauses in recent years.'' *Id.* The Commission's rulemaking will end states' varying approaches to address non-compete agreements. The Commission's preemption of states' approaches is premature to the extent that the Commission admits that it does not know where to draw lines regarding the treatment of non-compete provisions (*i.e.*, the Commission seeks comments on alternatives to the proposed ban based on earnings levels, job classifications, or presumptions). The Commission ignores the advice of Justice Brandeis and instead proposes to end states' experimentation to determine the optimal treatment of non-compete clauses. *See New State Ice Co.* v. *Liebmann*, 285 U.S. 262, 311 (1932) (''To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.'').

[8] *See United States* v. *Empire Gas Corp.*, 537 F.2d 296, 307–08 (8th Cir. 1976); *Lektro-Vend Corp.* v. *Vendo Co.*, 660 F.2d 255, 267 (7th Cir. 1981); *Newburger, Loeb & Co., Inc.* v. *Gross*, 563 F.2d 1057, 1081–83 (2d Cir. 1977); *Bradford* v. *New York Times Co.*, 501 F.2d 51, 57–59 (2d Cir. 1974).

[9] *Snap-On Tools Corp.* v. *Fed. Trade Comm'n*, 321 F.2d 825, 837 (7th Cir. 1963).

[10] This characterization is not an insult, but a fact. I, too, am an unelected technocrat.

[11] NPRM Part I.

[12] *See* Christine I. Wilson, Comm'r, Fed. Trade Comm'n, Dissenting Statement Regarding the ''Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act'' (Nov. 10, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyWilsonDissentStmt.pdf*.

[13] NPRM Part IV.A.1.

[14] *See* Wilson, *supra* note 12.

[15] The Policy Statement claimed that determinations of unfairness would be based on a sliding scale. Here, the NPRM identifies independent ways to determine that non-compete clauses are unfair; no sliding scale is applied.

[16] NPRM Part IV.A.1.b The NPRM explains that this conclusion does not apply to senior executives and also seeks comment on whether there is a broader category of highly paid or highly skilled employees for whom the conclusion is inappropriate. *Id.*

[17] *Id.*

[18] According to the NPRM, unequal bargaining power arises because employees depend on job income to pay bills, job searches entail significant transaction costs, the prevalence of unions has declined, employers outsource firm functions, employers have more experience negotiating because they have multiple employees, employees typically do not hire lawyers to negotiate agreements, and employees may not focus on the terms of their contracts. *Id.*

[19] *See Alexander & Alexander, Inc.* v. *Danahy*, 488 NE2d 22, 29 (Mass. App. Ct. 1986) (finding injunction to enforce non-compete agreement proper); *Diepholz* v. *Rutledge*, 659 NE 989, 991 (Ill. Ct. App. 1995) (finding non-compete agreement enforceable, but also finding no violation of terms of non-compete agreement); *Palmetto Mortuary Transp., Inc.* v. *Knight Sys., Inc.*, 818 SE2d 724, 731 (S.C. 2018) (finding non-compete agreement enforceable).

[20] NPRM Part IV.A.1.c. Again, the NPRM explains that this conclusion does not apply to senior executives and also invites comments on whether there is a broader category of highly paid or highly skilled employees for whom the conclusion is inappropriate. *Id.*

contrary to legal precedent, which requires enforcement of non-compete provisions before finding harm.[21]

Finally, the NPRM finds that "non-compete clauses are restrictive conduct that negatively affects competitive conditions." [22] Although this basis for concluding that non-compete provisions are unfair does not rely solely on the selection of one adjective, here, the NPRM demonstrates how little evidence the majority requires before finding that conduct is unfair pursuant to the Section 5 Policy Statement.

Until yesterday, the Commission had announced no cases (and therefore had no experience and no evidence) to conclude that non-compete clauses harm competition in labor markets. In fact, the only litigated FTC case challenging a non-compete clause found that a non-compete provision covering franchise dealers did *not* violate Section 5 of the FTC Act.[23] Notably, the NPRM omits any reference to this case. The Commission has accepted settlements regarding non-compete clauses in contracts between businesses,[24] but the majority itself has distinguished those cases from non-compete clauses in labor contracts.[25] And in those B2B cases, the non-compete clauses were associated with the sale of a business, a situation that falls within the narrow exception to the ban provided in the proposed Non-Compete Clause Rule.

Just yesterday, though, the Commission rushed out the announcement of three consent agreements that resolve allegations that non-compete provisions constitute an unfair method of competition.[26] The first consent involves security guard services, and the other two involve the manufacturing of glass containers. These consents undoubtedly were designed to support assertions that the FTC now has experience with non-compete agreements in employee contracts. But even a cursory read of the complaints reveals the diaphanous nature of this "experience."

Remarkably, none of these cases provides evidence showing the anticompetitive effects of non-compete clauses beyond the conclusory allegations in the complaints. The complaints in the glass container industry assert that non-compete provisions may prevent entry or expansion by competitors, but contain no allegations regarding firms that have tried unsuccessfully to obtain personnel with industry-specific skills and experience.[27] Regarding the effects on employees, the complaints make no allegations that the non-compete clauses were enforced by respondents [28] and the Analysis to Aid Public Comment accompanying the consent agreements points only to studies not tied to the glass container industry. These cases provide no evidence that the non-compete provisions limited competition for employees with industry-specific expertise, thereby lowering wages or impacting job quality. Similarly, in the case against Prudential Security, Inc.,[29] the complaint alleges that individual former employees were limited in their ability to work for other firms in the security guard industry,[30] but contain no allegations that the firm's non-compete provisions had market effects on wages or effects in a properly defined market for security guard services.

The NPRM also asserts FTC experience with non-compete provisions by pointing to Commission merger consent agreements that restrict the use of non-compete agreements. The complaints in those cases did not allege harm from non-compete clauses and the provisions in the consent agreements were included to ensure that the buyers of divestiture assets could obtain employees familiar with the assets and necessary for the success of the divestitures at issue.

Finally, the NPRM claims Commission experience with non-compete agreements to support the Non-Compete Clause Rule from a Commission workshop in January 2020.[31] But the NPRM fails to reflect the variety of views expressed during that workshop, including testimony that the economic literature is "[s]till far from reaching a scientific standard for concluding [that non-compete agreements] are bad for overall welfare . . . Also [we] don't yet fully understand the distribution of effects on workers . . . Welfare tradeoffs are likely context-specific, and may be heterogeneous." [32]

Indeed, the NPRM ignores that testimony and instead focuses on economic literature that purportedly demonstrates that non-compete clauses are unfair because they negatively affect competitive conditions. But an objective review of that literature reveals a mixed bag. For example, the first study described in the NPRM [33] finds that "decreasing non-compete clause enforceability from the approximate enforceability level of the fifth-strictest state to that of the fifth-most-lax state would increase workers' earnings by 3–4%." Yet, this study also finds that these effects vary strongly across different groups of individuals. For example, the authors find that "enforceability has little to no effect on earnings for non-college educated workers" and instead find that enforceability primarily impacts college-educated workers. Similarly, it finds that strict non-compete clause enforceability has very different effects for different demographic groups: it has little to no effect on men, and much

---

[21] *See, e.g., O'Regan v. Arbitration Forums, Inc.,* 121 F.3d 1060, 1065–66 (7th Cir. 1997) ("to apply antitrust laws to restrictive employment covenants, there must be some attempted enforcement of an arguably overbroad portion of the covenant in order for there to be a federal antitrust violation."); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 267 (7th Cir.1981) ("a section 1 violation requires proof that the defendant knowingly enforced the arguably overbroad section of the ancillary noncompetition covenant").

[22] NPRM Part IV.A.1.a.

[23] *See Snap-On Tools Corp. v. Fed. Trade Comm'n,* 321 F.2d at 837.

[24] *See* ARKO Corp., FTC File No. 211–0187, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110087C4773ArkoExpressComplaint.pdf* (Aug. 5, 2022); DTE Energy Co., FTC File No. 191–0068, *https://www.ftc.gov/system/files/documents/cases/191_0068_c-4691_dte-enbridge_complaint.pdf.* (Dec. 13, 2019).

[25] *See* Lina M. Khan, Chair, Fed. Trade Comm'n, Joined by Rebecca Kelly Slaughter and Alvaro M. Bedoya, Comm'rs, Fed. Trade Comm'n, Statement regarding In the Matter of ARKO Corp./Express Stop, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110187GPMExpressKhanStatement.pdf* (June 10, 2022) (distinguishing non-compete clauses in labor contracts and effects on workers from non-compete clause in merger agreement where both parties remain in market).

[26] On December 28, 2022, the Commission voted to accept for public comment three consent agreements involving non-compete agreements. For two of those matters, the Commission vote occurred less than a week after the Commission received the papers. *See* Ardagh Glass Group S.A., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghacco.pdf* (Jan. 4, 2023) (Agreement Containing Consent Order (signatures dated Dec. 21, 2022)).

[27] *See* O–I Glass, Inc., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/211082o-iglasscomplaint.pdf* (Jan. 4, 2023) (complaint ¶¶ 6, 8); Ardagh Glass Group S.A., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghcomplaint.pdf* (Jan. 4, 2023) (complaint ¶¶ 6, 8).

[28] *See* Wilson, Dissenting Statement regarding In the Matter of O–I Glass, Inc. and In the Matter of Ardagh Glass Group S.A., *supra* note 4.

[29] Prudential Security, Inc., File No. 221–0026, *https://www.ftc.gov/system/files/ftc_gov/pdf/2210026prudentialsecuritycomplaint.pdf* (Dec. 28, 2022) (consent agreement accepted for public comment).

[30] *Id.* (complaint at ¶¶ 23, 25).

[31] Fed. Trade Comm'n, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, https://www.ftc.gov/news-events/events/2020/01/non-compete-clauses-workplace-examining-antitrust-consumer-protection-issues.*

[32] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements,* Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020), *https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete=workshop-slides.pdf.*

[33] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2, *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381* (2020).

JA0226

larger effects on women and Black men and women. The NPRM interprets these differential effects as facts in favor of the Non-Compete Clause Rule, as it would diminish race and gender wage gaps, but there is no corresponding discussion of the Rule's effect on the wage gap based on education. An alternative interpretation of these findings is that the scientific literature is still muddled as to who is helped and who is harmed by non-compete clauses, and that it would be better for the Commission to tailor a rule to those settings where a scientific consensus exists.

Similarly, the NPRM often bases its conclusions about the effects of non-compete clauses on limited support. For example, the NPRM contends that increased enforceability of non-compete clauses increases consumer prices. Yet, under the current record, this conclusion is based on only one study in healthcare markets and another study that considers the relationship between non-compete clauses and concentration.[34] The NPRM does not provide a basis to conclude that findings with respect to the market for physicians and healthcare are generalizable, instead acknowledging that no comparable evidence exists for other markets.[35] Also, the study that considers the effects of non-compete clauses on concentration does not draw conclusions about prices; the NPRM's conclusion that non-compete provisions lead to higher prices requires assumptions about a relationship between concentration and prices. Moreover, the NPRM omits studies showing that reducing the enforceability of non-compete restrictions leads to higher prices for consumers. A study by Gurun, Stoffman, and Yonker finds that an agreement not to enforce post-employment restrictions among financial advisory firms that were members of the Broker Protocol led brokers to depart their firms, and consumers to follow their brokers, at high rates. The study found, however, that clients of firms in the Broker Protocol paid higher fees and experienced higher levels of broker misconduct.[36] In other words, suspending non-competes resulted in higher prices and a decrease in the quality of service provided. These unintended consequences illustrate the inevitably far-reaching and unintended consequences that today's NPRM will

visit upon employees, employers, competition, and the economy.

## B. The NPRM's Treatment of Business Justifications

The NPRM explains that "the additional incentive to invest (in assets like physical capital, human capital, or customer attraction, or in the sharing of trade secrets and confidential commercial information) is the primary justification for use of non-compete clauses." [37]

It acknowledges that "there is evidence that non-compete clauses increase employee training and other forms of investment," [38] and describes two studies demonstrating that increased non-compete clause enforceability increased firm-provided training and investment.[39] It also describes studies that examine non-compete clause use and investment.[40] Despite the studies, the NPRM concludes, "the evidence that non-compete clauses benefit workers or consumers is scant." [41] In other words, the NPRM treats asymmetrically the evidence of harms (mixed evidence given great credence) and benefits (robust evidence given no credence). These early examples of cherry-picking evidence that conforms to the narrative provide little confidence in the integrity of the rulemaking process or the ultimate outcome.

Implicitly, though, the NPRM credits some business justifications for non-compete provisions. It excludes from the ban those non-compete clauses associated with the sale of a business, implicitly acknowledging that these non-compete clauses are necessary to

protect the goodwill of the transferred business. Also, the NPRM likely credits business justifications when it seeks comment on whether senior executives should be covered by the rule. Nonetheless, on its face, the NPRM expressly discounts business justifications and makes no effort to distinguish and determine circumstances where investment incentives are important.

The NPRM also discounts procompetitive business justifications by asserting that trade secret law, non-disclosure agreements, and other mechanisms can be used to protect firm investments. While the NPRM explains that these mechanisms may protect investments, the existing record provides no evidence that these mechanisms are effective substitutes for non-compete agreements.[42] The NPRM cites no instances where these mechanisms have been used effectively in lieu of non-compete clauses, even though natural experiments exist and could be studied (*e.g.*, when states have changed the enforceability of non-compete clauses). "[M]erely identifying alternative mechanisms to solve a potential employee investment problem does not provide . . . guidance as to which mechanism achieves the objective at the lowest social cost." [43] Moreover, the NPRM's observation that firms successfully operate in states where non-compete clauses are not enforceable is unpersuasive; the NPRM offers no meaningful cross-state comparisons and the observation does not show that firms and competition are equally or even more successful in those states than in states where non-compete clauses are permissible.

## II. The Proposed Non-Compete Clause Rule Will Trigger Numerous and Likely Successful Legal Challenges Regarding the Commission's Authority To Issue the Rule

This section describes the numerous, and meritorious, legal challenges that undoubtedly will be launched against the Non-Compete Clause Rule. Defending these challenges will entail lengthy litigation that will consume

---

[34] NPRM Part II.B.2.a.

[35] NPRM Part VII.B.2.c.

[36] Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).

[37] NPRM Part II.B.2.e.

[38] *Id.*

[39] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. Rev. 783, 799 (2019) (moving from mean non-compete enforceability to no non-compete clause enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-compete clauses at a high rate); Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 22 (2019), *https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=3040393 (knowledge-intensive firms invest 32% less in capital equipment following decreases in the enforceability of non-compete clauses).*

[40] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?*, 57 J. Hum. Res. 689, 700 (2022) (finding firms that use non-compete clauses in hair salon industry train employees at 11% higher rate and increase investment in particular customer-attraction device by 11%); Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 53 (2021) (finding no statistically significant impact on training and trade secrets from use of non-compete clauses, but unable to examine other types of investments).

[41] NPRM Part IV.B.3.

[42] There is a limited literature regarding the efficacy of trade secret protection and non-disclosure agreements. *See* Ius Gong & I.P.L. Png, *Trade Secrets Law and Inventory Efficiency: Empirical Evidence from U.S. Manufacturing, https://ssrn.com/abstract=2102304* (July 8, 2012) (investigating effects of operational know-how information spillovers under various levels of enforcement of trade secret law).

[43] Camila Ringeling, Joshua D. Wright, et. al, Noncompete Clauses Used in Employment Contracts, Comment of the Global Antitrust Institute 6 (Feb. 7, 2020), *https://papers.ssrn.com/ sol3/papers.cfm?abstract_id=3534374.*

substantial staff resources. I anticipate that the Rule will not withstand these challenges, so the Commission majority essentially is directing staff to embark on a demanding and futile effort. In the face of finite and scarce resources, this NPRM is hardly the best use of FTC bandwidth.

There are numerous paths for opponents to challenge the Commission's authority to promulgate the Non-Compete Clause Rule. First, I question whether the FTC Act provides authority for competition rulemaking. The NPRM states that the Commission proposes the Non-Compete Clause Rule pursuant to Sections 5 and 6(g) of the FTC Act. Section 6(g) of the FTC Act authorizes the Commission to "make rules and regulations for the purpose of carrying out the provisions of the subchapter" where Section 6(g) otherwise provides that the Commission may "from time to time classify corporations." [44] Section 6(g) was believed to provide authority only for the Commission to adopt the Commission's procedural rules. For decades, consistent with the statements in the FTC Act's legislative history, Commission leadership testified before Congress that the Commission lacked substantive competition rulemaking authority.[45]

Ignoring this history, the Commission embarked on a substantive rulemaking binge in the 1960s and 1970s.[46] The vast majority of these substantive rules pertained to consumer protection issues. Only one substantive rule was grounded solely in competition;[47] that rule was not enforced and subsequently was withdrawn.[48] Another substantive rule was grounded in both competition and consumer protection principles, and prompted a federal court challenge. There, the D.C. Circuit in 1973 held in *National Petroleum Refiners*[49] that the FTC did have the power to promulgate substantive rules.

Two years later, however, Congress enacted the Magnuson-Moss Act,[50] which required substantive consumer protection rules to be promulgated with heightened procedural safeguards under a new Section 18 of the FTC Act. Notably, the Magnuson-Moss Act expressly excluded rulemaking for unfair methods of competition from Section 18. FTC Chairman Miles Kirkpatrick (1970–73) explained that it was not clear whether Congress in the Magnuson-Moss Act sought to clarify existing rulemaking authority or to grant substantive rulemaking authority to the FTC for the first time.[51] If the latter, then the FTC only has substantive *consumer protection* rulemaking power, and lacks the authority to engage in substantive *competition* rulemaking. This uncertainty about the language of the statute will be a starting point for

challenges of the Non-Compete Clause Rule.

Second, the Commission's authority for the Rule likely will be challenged under the major questions doctrine, which the Supreme Court recently applied in *West Virginia* v. *EPA*.[52] Under the major questions doctrine, "where a statute . . . confers authority upon an administrative agency," a court asks "whether Congress in fact meant to confer the power the agency has asserted."[53] The Supreme Court explained in *West Virginia* v. *EPA* that an agency's exercise of statutory authority involved a major question where the "history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."[54]

Challengers will ask a court to determine whether today's NPRM constitutes a major question. Using Justice Gorsuch's concurrence as a guide, agency action will trigger the application of the major questions doctrine if the agency claims, among other things, the power to (1) resolve a matter of great political significance, (2) regulate a significant portion of the American economy, or (3) intrude in an area that is the particular domain of state law.[55] First, the regulation of non-compete clauses is a question of political significance; Congress has considered and rejected bills significantly limiting or banning non-competes on numerous occasions,[56] a strong indication that the Commission is trying to "work around" the legislative process to resolve a question of political significance.[57] Second, the Rule proposes to regulate a significant portion of the American economy through a ban on non-competes. According to the NPRM, the "Commission estimates that approximately one in five American workers—or approximately 30 million workers—is bound by a non-compete clause.[58] Thus, the Non-Compete Clause Rule indisputably will negate millions of private contractual agreements and impact employer/employee relationships in a wide variety of

---

[44] 15 U.S.C. 46(g). Section 6 of the FTC Act provides

§46. Additional powers of Commission
The Commission shall also have power . . .
(g) Classification of corporations; regulations
From time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter.

[45] *See Nat'l Petroleum Ref'rs Ass'n* v. *FTC,* 482 F.2d 672, 696 nn. 38, 39 (D.C. Cir. 1973). *See also* Noah Joshua Phillips, *Against Antitrust Regulation,* American Enterprise Institute Report 3, *https://www.aei.org/research-products/report/against-antitrust-regulation/* (Oct. 13, 2022) ("[T]he Conference Committee [considering legislation that created the Federal Trade Commission] was between two bills, neither of which contemplated substantive rulemaking. . . . The legislative history does not demonstrate congressional intent to give the FTC substantive rulemaking power: The House considered and rejected it, the Senate never proposed it, and neither the Conference Committee's report nor the final debates mentioned it."); 51 Cong. Rec. 12916 (1914), reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 4368 (Earl W. Kintner ed., 1982) statement of Sen. Cummins) ("[I]f we were to attempt to go further in this act and to give the commission the authority to prescribe a code of rules governing the conduct of the business men of this country for the future, we would clash with the principle that we can not confer upon the commission in that respect legislative authority; but we have not made any such attempt as that, and no one proposes any attempt of that sort."); *id.* at 14932, reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 4734 (Earl W. Kintner ed., 1982) (statement of Rep. Covington) ("The Federal trade commission will have no power to prescribe the methods of

competition to be used in the future. In issuing orders it will not be exercising power of a legislative nature . . . the function of the Federal trade commission will be to determine whether an existing method of competition is unfair, and, it is finds it to be unfair, to order the discontinuance of its use. In doing this it will exercise power of a judicial nature."); *id.* at 13317, reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 4675 (Earl W. Kintner ed., 1982) (statement of Sen Walsh) ("We are not going to give to the trade commission the general power to regulate and prescribe rules under which the business of this country shall in the future be conducted; we propose simply to give it the power to denounce as unlawful a particular practice that is pursued by that business.").

[46] *See* Timothy J. Muris & Howard Beales, III, The Limits of Unfairness Under the Federal Trade Commission Act 13 (1991).

[47] FTC Men's and Boy's Tailored Clothing Rule, 16 CFR 412 (1968).

[48] Notice of Rule Repeal, 59 FR 8527 (1994).

[49] *Nat'l Petroleum Ref'rs Ass'n* v. *FTC,* 482 F.2d 672 (D.C. Cir. 1973).

[50] Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Public Law 93–637, 88 Stat. 2183 (1975).

[51] *See* Miles W. Kirkpatrick, *FTC Rulemaking in Historical Perspective* 48 Antitrust L.J. 1561, 1561 (1979) ("One of the most important aspects of the Magnuson-Moss Act was its granting, or confirmation, depending upon your reading of the law at that time, of the FTC's rulemaking powers.").

[52] *West Virginia* v. *EPA,* 142 S. Ct. 2587 (2022).

[53] *Id.* at 2608.

[54] *Id.*

[55] *Id.* at 2600–01 (Gorsuch, J. concurring).

[56] Russell Beck, *A Brief History of Noncompete Regulation,* Fair Competition Law (Oct. 11, 2021), *https://faircompetitionlaw.com/2021/10/11/a-brief-history-of-noncompete-regulation/.*

[57] *West Virginia* v. *EPA,* 142 S.Ct. at 2600 (Gorsuch, J. concurring).

[58] NPRM Part II.B.1.a.

industries across the United States. Third, regulation of non-compete agreements has been the particular domain of state law. As the NPRM explains, 47 states permit non-competes in some capacity, while three states have chosen to prohibit them entirely, and state legislatures have been active in this area recently.[59]

If a court were to conclude that the Non-Compete Clause Rule is a major question, the FTC would be required to identify clear Congressional authorization to impose a regulation banning non-compete clauses. Yet, as discussed above, that clear authorization is unavailable. The language in Section 6(b) is far from clear, and largely discusses the Commission's classification of corporations. I do not believe that Congress gave the FTC authority to enact substantive rules related to any provision of the FTC Act using this "oblique" and unclear language. In addition, the decision by Congress to omit unfair methods of *competition* rulemaking in the Magnuson-Moss Act, which immediately followed the decision in *National Petroleum Refiners,* is additional evidence that Congress has not clearly authorized the FTC to make competition rules that may have significant political or economic consequences. Moreover, Congress did not remove the known ambiguity when it enacted the FTC Improvements Act of 1980.[60]

Third, the authority for the Non-Compete Clause Rule may be challenged under the non-delegation doctrine. The doctrine is based on the principle that Congress cannot delegate its legislative power to another branch of government, including independent agencies.[61]

Since the 1920s, the Supreme Court has found that Congress has not made an improper delegation of legislative power so long as Congress has set out "an intelligible principle to which the person or body authorized to fix [rules] is directed to conform."[62] Applying this principle in *Schechter Poultry,*[63] the Supreme Court approved Congressional authorization for the FTC to prohibit unfair methods of competition, relying on the Commission's administrative enforcement proceedings where the Commission acts as "a quasi judicial body" and that "[p]rovision was made for formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate evidence, and for judicial review . . ."[64] The Court simultaneously found that provisions of the National Industrial Recovery Act to issue "codes of fair competition" were *improper* delegations of legislative power, distinguishing the impermissibly broad fair competition codes from the FTC Act's approach to address unfair methods of competition that are "determined in particular instances, upon evidence, in light of particular competitive conditions[.]"[65]

Notably, the Commission's proposed ban on non-compete clauses abandons the Commission's procedures that led the Supreme Court in *Schechter Poultry* to find that the Commission's enforcement of "unfair methods of competition" does not constitute an improper delegation of legislative power. In addition, to the extent that the Commission's Section 5 Policy Statement (which provides the basis for determining that non-compete clauses are an unfair method of competition) abandons the consumer welfare standard to pursue multiple goals, including protecting labor, the Commission's action more closely resembles the National Industrial Recovery Act codes that also sought to implement multiple goals under the guise of codes of fair competition.

### III. Comments Are Encouraged

The NPRM invites public comment on many issues. I strongly encourage the submission of comments from all interested stakeholders. After all, unlike rulemaking for consumer protection

rules under the Magnuson-Moss process, this is likely the only opportunity for public input before the Commission issues a final rule. For this reason, it is important for commenters to address the proposed alternatives to the near-complete ban on non-compete provisions. To the extent that the NPRM proposes alternatives to the current proposed rule, if the Commission were subsequently to adopt one of the alternatives, which would be a logical outgrowth of the current proposed rulemaking,[66] there would be no further opportunity for public comment. Moreover, the Commission believes that if it were to adopt alternatives that differentiate among categories of workers, the various rule provisions would be severable if a court were to invalidate one provision. Consequently, it is important for the public to address each of the alternatives proposed in the NPRM because the comment period on the proposed rule is the only opportunity for public input on those alternatives.

In addition to the issues for which the NPRM invites comments, I encourage stakeholders to address the following points:

• The NPRM references some academic studies regarding non-competes. What other academic literature addresses the issues in the NPRM, including the procompetitive justifications for non-compete provisions?

• The NPRM describes papers that exploit natural experiments to estimate the effects of enforcing non-compete clauses. While this approach ensures that the estimates are internally valid, it reflects the causal effects of non-compete agreements only in the contexts within which they are estimated. What should the Commission consider to understand whether and when these estimates are externally valid? How can the Commission know that the estimates calculated from the contexts of the literature are representative of the contexts outside of the literature?

• The NPRM draws conclusions based on "the weight of the literature," but the literature on the effects of non-compete agreements is limited, contains mixed results, and is sometimes industry-specific. Which conclusions in the NPRM are supported by the weight

[59] *Id.* Part II.C.1.

[60] *See* H.R. Rep. No. 96–917, 96th Cong., 2d sess. 29–30 (1980), reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 5862 (Earl W. Kintner ed., 1982) (conference report on FTC Improvements Act of 1980 explaining that when adopting a restriction on standards and certification rulemaking brought as an unfair or deceptive act or practice, conferees were not taking a position on the Commission's authority to issue a trade regulation rule defining 'unfair methods of competition' pursuant to section 6(g). ''The substitute leaves unaffected whatever authority the Commission might have under any other provision of the FTC Act to issue rules with respect to 'unfair methods of competition.' '').

[61] Five Supreme Court justices have expressed interest in reconsidering the Court's prior thinking on the doctrine, which increases the risk that a challenge may be successful. *See Gundy* v. *United States,* 139 S. Ct. 2116, 2131 (2019) (Alito, J. concurring) (stating with respect to the nondelegation doctrine that ''[i]f a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort''); *id.* at 2131 (Gorsuch, J., dissenting, joined by Chief Justice Roberts and Justice Thomas) (expressing desire to ''revisit'' the Court's approach

to the nondelegation doctrine); *Paul* v. *United States,* 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J, respecting the denial of certiorari); Amy Coney Barrett, *Suspension and Delegation,* 99 Cornell L. Rev. 251, 318 (2014).

[62] *J.W. Hampton, Jr., & Co.* v. *United States,* 276 U.S. 394, 409 (1928).

[63] *A.L.A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935).

[64] *Id.* at 533.

[65] *Id.*

[66] *See Owner-Operator Indep. Drivers Ass'n* v. *Fed. Motor Carrier Safety Admin.,* 494 F.3d 188, 210 (D.C. Cir. 2007); *see also Agape Church, Inc.* v. *FCC,* 738 F.3d 397, 412 (2013) (holding that FCC ''sunset'' rule was a logical outgrowth when proposed rule gave public notice that a viability rule was in danger of being phased out, i.e., a sunset provision).

of the literature? Which conclusions in the NPRM contradict the weight of the literature? Which conclusions in the NPRM require additional evidence before they can be considered substantiated?

• Where the evidence provided in the NPRM is limited, is the evidence sufficient to support either the proposed ban on non-compete clauses or the proffered alternative approaches to the proposed ban?

• What are the benefits and drawbacks of the currently proposed ban compared to the proposed alternative rule that would find a presumption of unlawfulness, including the role of procompetitive justifications in rebutting a presumption?

[FR Doc. 2023–00414 Filed 1–18–23; 8:45 am]

**BILLING CODE 6750–01–P**

### Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act Commission File No. P221202

### November 10, 2022

Section 5 of the Federal Trade Commission Act (FTC Act) prohibits "unfair methods of competition in or affecting commerce."[1] On July 1, 2021, the Federal Trade Commission (FTC) rescinded its 2015 Statement of Enforcement Principles Regarding "Unfair Methods of Competition" under Section 5 of the FTC Act.[2] This statement supersedes all prior FTC policy statements and advisory guidance on the scope and meaning of unfair methods of competition under Section 5 of the FTC Act.

### I.    Introduction

Pursuant to the FTC's analysis of the decided cases and prior enforcement actions, this policy statement describes the key principles of general applicability concerning whether conduct is an unfair method of competition. Consistent with the Supreme Court's interpretation of the FTC Act in at least twelve decisions, this statement makes clear that Section 5 reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions.[3]

---

[1] Pub. L. No. 63-203, 38 Stat. 717; 15 U.S.C. § 45(a)(1).

[2] Fed. Trade Comm'n, Statement of the Commission on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act (July 9, 2021), https://www.ftc.gov/legal-library/browse/statement-commission-withdrawal-statement-enforcement-principles-regarding-unfair-methods.

[3] *See, e.g. Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (holding that "[t]he standard of "unfairness" under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws"); *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242 (1972) (holding that "the Commission has broad powers to declare trade practices unfair."); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 262 (1968) (holding that "[i]n large measure the task of defining "unfair methods of competition" was left to the [FTC]. . . and that the legislative history shows that Congress concluded that the best check on unfair competition would be [a practical and expert administrative body] . . . [that applies] the rule enacted by Congress to particular business situations"); *Fed. Trade Comm'n v. Brown Shoe*, 384 U.S. 316, 321 (1966) (holding that the FTC "has broad powers to declare trade practices unfair[,] particularly . . . with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts"); *Atlantic Refining Co. v. Fed. Trade Comm'n*, 381 U.S. 357, 369 (1965) (holding that all that is necessary is to discover conduct that runs counter to the public policy declared in the Act. . ." and that "there are many unfair methods of competition that do not assume the proportions of antitrust violations"); *Fed. Trade Comm'n v. Colgate-Palmolive et al.*, 380 U.S. 377, 384-85 (1965) (noting that the proscriptions in section 5 are flexible); *PAN AM v. United States*, 371 U.S. 296, 306 -308 (1963) ("[Section 5] was designed to bolster and strengthen antitrust enforcement[,] and the definitions are not limited to precise practices that can readily be catalogued. They take their meaning from the facts of each case and the impact of particular practices on competition and monopoly"); *Fed. Trade Comm'n v. Nat'l Lead Co.*, 352 U.S. 419, 428-29 (1957) (affirming past rulings finding that the commission is clothed with "wide discretion in. . . [bringing] an end to the unfair practices found to exist[;]. . . [is] 'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed[;] . . . has wide latitude for

This statement is intended to assist the public, business community, and antitrust practitioners by laying out the key general principles that apply to whether business practices constitute unfair methods of competition under Section 5 of the FTC Act. In considering whether conduct, either in a specific instance or as a category, constitutes an unfair method of competition, the Commission will directly consult applicable law. This statement does not pertain to any other statutory provision within the FTC's jurisdiction.[4]

## II.    Background and Legislative History of Section 5 of the FTC Act

### A.    The text, structure, and legislative history of Section 5 show that its mandate extends beyond the Sherman and Clayton Acts and reaches unfair conduct with a tendency to negatively affect competitive conditions

As the Commission explained in its July 2021 withdrawal of the previous policy statement, the text, structure, and history of Section 5 reaches more broadly than the antitrust laws.[5] Congress passed the FTC Act to push back against the judiciary's adoption and use of the open-ended rule of reason for analyzing Sherman Act claims,[6] which it feared would deliver inconsistent and unpredictable results and "substitute the court in the place of Congress."[7]

---

judgment and[;]. . . [that] to attain the objectives Congress envisioned, [the FTC] cannot be required to confine its road block to the narrow lane the transgressor has traveled"); *American Airlines, Inc. v. North American Airlines, Inc*., 351 U.S. 79, 85 (1956) (finding that "[u]nfair or deceptive practices or unfair methods of competition". . . are broader concepts than the common-law idea of unfair competition"); *Fed. Trade Comm'n v. Motion Picture Advertising Service Co*., 344 U.S. 392, 394-95 (1953) (noting that "Congress advisedly left the concept [of unfair methods of competition] flexible . . . [and] designed it to supplement and bolster the Sherman Act and the Clayton Act[,] [so as] to stop . . . acts and practices [in their incipiency] which, when full blown, would violate those Acts[,]. . . as well as to condemn as "unfair methods of competition" existing violations of them"); *Fed. Trade Comm'n v. Cement Institute*, 333 U.S. 683, 708 (1948) (holding that conduct that falls short of violating the Sherman Act may violate Section 5); *Fed. Trade Comm'n v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 310 (1934) (finding that unfair methods of competition not limited to those "which are forbidden at common law or which are likely to grow into violations of the Sherman Act").

[4] This statement does not address the Commission's authority to prevent unfair or deceptive acts or practices in 15 U.S.C. §§ 45(a),(n). This statement is limited to the scope of standalone unfair methods of competition Section 5 violations. Such standalone unfair methods of competition Section 5 claims may be brought under one or more of the theories set forth in this policy statement and combined with claims under other parts of the FTC Act or other statutes enforced by the Commission as warranted.
This statement does not address the language of 15 U.S.C. § 45(b), which states that the Commission will act when it has reason to believe such action is in the public interest. *See generally Hills Bros. v. Fed. Trade Comm'n*, 9 F.2d 481, 483–84 (9th Cir. 1926) ("the interest of the public, like the question whether the commission has reason to believe that any person, partnership, or corporation has been or is using any unfair method of competition in commerce, is committed to the discretion of the commission, is to be determined by the commission before proceedings are instituted, and is not thereafter a subject of controversy either before the commission or before the court, except in so far as the question of public interest is necessarily involved in the merits of the case, and, if the commission finds that the method of competition in question is prohibited by the act, no other or further finding on the question of public interest is required."); *see also Parke, Austin & Lipscomb, Inc., et al. v. Fed. Trade Comm'n*, 142 F.2d 437, 441 (2d Cir. 1944).

[5] Statement of Commission, *supra* note 2.

[6] *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 60 (1911).

[7] S. Rep. No. 62-1326, at 10 (1913) ("Cummins Report"). Senator Francis Newlands, one of the chief sponsors of the bill that became the FTC Act, expressed concern that *Standard Oil* left antitrust regulation "to the varying judgments of different courts." 47 Cong. Rec. 1225 (1911). After analyzing a series of Supreme Court decisions

Congress therefore determined it would "establish[ ] a commission for the better administration of the law and to aid in its enforcement."[8] This led to the creation of the FTC in 1914 and to the enactment of a prohibition of "unfair methods of competition," a new standard in federal competition law.[9]

In enacting Section 5, Congress's aim was to create a new prohibition broader than, and different from, the Sherman and Clayton Acts. Congress purposely introduced the phrase, "unfair methods of competition," in the FTC Act to distinguish the FTC's authority from the definition of "unfair competition" at common law.[10] It also made clear that Section 5 was designed to extend beyond the reach of the antitrust laws.[11] Concluding that a static definition would soon become outdated,[12] Congress wanted to give the Commission flexibility to adapt to changing circumstances.[13]

The key function of the FTC in applying its mandate to combat unfair methods of competition, according to Congress, would be to identify *unfair* forms of competition.[14] The legislative record demonstrates that Congress enacted Section 5 to protect against various types of unfair or oppressive conduct in the marketplace.[15] During debates over the meaning of unfair

---

interpreting the Sherman Act, a Senate committee feared that the rule of reason resulted in a situation where, "in each instance it [would be] for the court to determine whether the established restraint of trade is a due restraint or an undue restraint." Cummins Report, at 10. It lamented that the rule of reason had made it "impossible to predict with any certainty" whether courts would condemn the many "practices that seriously interfere with competition" and found it inconceivable that "the courts . . . be permitted to test each restraint of trade by the economic standard which the individual members of the court may happen to approve." *Id.* at 10, 12. The committee believed this would result in a loss of confidence by the public in the courts and eventually lead to a "repudiat[ion] [of] the fundamental principles of representative government." *Id.* at 11.

[8] *Id.* at 12.

[9] Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717 (codified as amended at 15 U.S.C. § 41–58). *See* 51 CONG. REC. 12146 (1914) (statement of Sen. Hollis) ("The Sherman Act is adequate for the abolition of monopoly; it is, however, but imperfectly adequate for the regulation of competition. The present Congress is charged with the duty of supplying the defect in the law").

[10] *See* 51 CONG. REC. 12936 (1914) (statement of Sen. Reed) ("It is my opinion that if we employ the term "unfair competition" as it is employed in this bill, without adding anything to it, the courts will adopt as the meaning of Congress that meaning which has been affixed to the term by all of the law dictionaries and by a great many legal authorities."). *See also* 51 CONG. REC. 12814 (1914) (statement of Sen. George Sutherland).

[11] *See E.I. du Pont de Nemours v. Fed. Trade Comm'n* (*Ethyl*), 729 F.2d 128, 136 (2d Cir. 1984) ("Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled") (citing H.R. REP. NO. 63-1142, at 19 (1914) (Conf. Rep.)); 51 CONG. REC. 11236 (1914) (statement of Sen. Cummins) (stating that the purpose of Section 5 was "to make some things punishable, to prevent some things, that cannot be punished or prevented under the antitrust law").

[12] H.R. REP. NO. 63-1142, at 19.

[13] *See id.* at 18–19.

[14] *Id.* at 19.

[15] *Id.* at 2 (declaring "unfair and oppressive competition to be unlawful"); S. REP. NO. 63-597, at 17 (1914) (citing a previous version of the bill, S. 2941, which would allow the commission to revoke the registration of any corporation using "materially unfair or oppressive methods of competition"); 51 CONG. REC. 8861 (1914) (statement of Rep. Hinebaugh) (seeking to prevent "unfair or oppressive competition" and proceeding to list examples); *id.* at 8979 (statement of Rep. Murdock) (seeking to protect to protect "smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals"); *id.* at 13117 (statement of Sen. Reed) ("intended to reach unfair, dishonest, crooked, oppressive, coercive acts. It is not intended to cover mere mistakes").

methods of competition, members of Congress had no difficulty identifying concrete examples.[16] One congressman noted that when it comes to unfair methods of competition, "[t]here is that in the common sense of fairness and right dealing which indicates plainly the distinction between close bargaining and oppression."[17] Both the House and Senate also expressed a common understanding that unfair methods of competition encompassed conduct that tended to undermine "competitive conditions" in the marketplace.[18]

Congress evinced a clear aim that "unfair methods of competition" need not require a showing of current anticompetitive harm or anticompetitive intent in every case. First, the legislative history is replete with statements to the effect that Congress wanted the FTC to stop monopolies in their "incipiency."[19] Requiring the FTC to show current anticompetitive effects,

---

[16] For instance, a Senate report referenced practices "such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition." S. REP. NO. 63-597, at 13. In considering what conduct should be prohibited, the House distinguished between "artificial bases" of monopolistic power and "natural bases." *See* H.R. REP. NO. 63-533, at 23–25. The House viewed artificial bases of monopolistic power to include, for instance, the acceptance of rates or terms of service from common carriers not granted to other shippers; price discrimination not justified by differences in cost or distribution; procuring the secrets of competitors by bribery or any illegal means; procuring conduct on the part of employees of competitors inconsistent with their duties to their employers; making oppressive exclusive contracts; the maintenance of secret subsidiaries or secretly controlled agencies held out as independent; the destruction or material lessening of competition through the use of interlocking directorates; and the charging of exorbitant prices where the seller has a substantial monopoly. *Id.* Natural bases included control of natural resources, transportation facilities, financial resources, or any other economic condition inherent in the character of the industry, such as patent rights. *Id. See also* 51 CONG. REC. 11084–86 (1914) (statement of Sen. Newlands) (discussing jurisprudence on unfair competition); *id.* at 14928-14931 (statement of Rep. Covington) (discussing jurisprudence on unfair competition); *id.* at 11108 (statement of Sen. Newlands) (providing specific examples of unfair competition, such as local price cutting and organizing "bogus independent concerns . . . for the purpose of entering the field of the adversary and cutting prices with a view to his destruction[,]" among other things); *id.* at 11230 (statement of Sen. Robinson) (providing examples of unfair competition).

[17] 51 CONG. REC. 8979 (statement of Sen. Murdock).

[18] *See* S. REP. NO. 1326, at 3–4 (stating that "Congress should maintain the policy established by the anti-trust law" to "'maintain[ ] competitive conditions," and that "every possible effort to create and preserve competitive conditions should be made"); *id.* at 2, 3-4, 11, & 13; S. REP. NO. 63-597, at 10 ("a commission is a necessary adjunct to the preservation of competition and to the practical enforcement of the law"); H.R. Rep. No. 63-533, at 2 (1914) (reported by Rep. Covington) ("The administration idea and the idea of business men generally, is for the preservation of proper competitive conditions in our great interstate commerce."). The FTC Act's legislative history makes it clear that Congress intended the statute to protect a broad array of market participants including workers and rival businesses. *See* 51 CONG. REC. 13312 (1914) (statement of Sen. Reed) ("it is not required to show restraint of trade or monopoly, but that the acts complained of hinder the business of another, or prohibit another from engaging in business, or restrain trade"); *id.* (statement of Sen. White) ("one of the main objects of this legislation is to prevent a rival in business from using unfair competition to drive his competitor out of business and to prevent this before the business is destroyed"); 51 CONG. REC. 8979 (1914) (statement of Rep. Murdock) (purpose of new Commission "is to protect the smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals"). The goals of "protecting consumers against the high prices and [guarding] the interests of employees" were expressed by the House. *See* H.R. REP. NO. 533, 63d Cong., 2d Sess. 14 (1914) (quoting from the Preliminary Report of the Industrial Commission, submitted to Congress in 1900). *See also* 51 CONG. REC. 8854 (1914) (statement of Rep. Morgan) (among goals of Section 5 "to secure labor the highest wage, the largest amount of employment under the most favorable conditions and circumstances").

[19] H.R. REP. NO. 63-1142, at 19 ("[t]he most certain way to stop monopoly at the threshold is to prevent unfair competition"); 51 CONG. REC. 13118) (1914) (statement of Sen. Reed) ("the same class of conspiracies exactly as the Sherman Antitrust Act deals with, except that we propose to strike those acts in their incipiency instead of after

4

which are typically seen only after the monopoly has passed the "embryonic" stage, would undercut Congress's hope to prohibit unfair business practices prior to, or near, monopoly power.[20] In addition, many of the practices listed by Congress as patently unfair do not automatically carry with them measurable effects.[21] Second, in considering and rejecting a definition of "unfair methods of competition" that would have required a showing of intent, legislators noted that such a requirement would inappropriately restrict the new provision to the metes and bounds of the antitrust laws and place an undue burden on the Commission in proving its cases.[22]

Congress struck an intentional balance when it enacted the FTC Act. It allowed the Commission to proceed against a broader range of anticompetitive conduct than can be reached under the Clayton and Sherman Acts, but it did not establish a private right of action under Section 5, and it limited the preclusive effects of the FTC's enforcement actions in private antitrust cases under the Sherman and Clayton Acts.[23]

---

they have been actually worked out into a complete system of monopoly or restraint of trade"); *id.* at 14941 (statement of Rep. Stevens) (noting that section five "[would] give to this commission the power of preventing in their conception and in their beginning some of these unfair processes in competition which have been the chief source of monopoly"); *id.* at 12030 (statement of Sen. Newlands) (remarking that a commission would "check monopoly in the embryo"); *id.* at 11455 (statement of Sen. Cummins) (stating that the new law would "seize the offender before his ravages have gone to the length necessary in order to bring him within the law that we already have"); *id.* at 11087 (statement of Sen. Newlands) (citing the Cummins Report, which anticipated that a commission "could be vastly more effectual than through the courts alone, which in most cases will take no cognizance of violations of the law for months or years after the violation occurred, and when the difficulty of awarding reparation for the wrong is almost insurmountable").

[20] 51 CONG. REC. 13118 (statement of Sen. Reed) (declaring that Congress intended "to do something that will strike a death blow to monopoly. . . to arrest it in its infancy . . . [and] to strike those acts in their incipiency instead of after they have been actually worked out into a complete system of monopoly or restraint of trade."); *id.* at 14927 (statement of Rep. Covington) ("the best and most, effective way to deal with the various practices of unfair or destructive competition which, if permitted to go on unchecked and uncontrolled, become potential for restraint of trade or monopoly"); *id.* at 14929 (statement of Rep. Covington) ("We are seeking . . . to deal, with those practices of unfair trade in their incipient stages which if left untrammeled and uncontrolled become the acts which constitute in their culmination restraint of trade and monopoly and the groundwork of the trusts which have menaced us industrially").

[21] 51 CONG. REC. 12217 (statement of Sen. Newlands) ("all you would have to prove would be an unfair method whose tendency was to stifle competition."); 51 CONG. REC. 13312 (statement of Sen. White) (stating that "one of the main objects of this legislation is to prevent a rival in business using unfair competition to drive his competitor out of business and to prevent this before the business is destroyed" and that "the unfair acts and practices had to have the effect to destroy or unreasonably hinder the business of another would neutralize this useful feature of the enactment"); 51 CONG. REC. 13311 (statement of Sen. Cummins) ("if the effect is to restrain trade or to create a monopoly[,] we have a complete and perfect prohibition in the antitrust law"); 51 CONG. REC. 13312 (1914) (statement of Sen. Reed) ("it is not required to show restraint of trade or monopoly, but that the acts complained of hinder the business of another, or prohibit another from engaging in business, or restrain trade"); 51 CONG. REC. 8979 (statement of Rep. Murdock) (purpose of new Commission "is to protect the smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals.").

[22] 51 CONG. REC. 13311 (1914) (statement of Sen. Cummins) ("[t]here can be unfair competition in which the public is interested without any intent as described in the amendment"); *id.* ("[i]f the effect is to restrain trade or to create a monopoly we have a complete and perfect prohibition in the antitrust law"); *id.* at 13312 (statement of Sen. White) ("but we will have to carry the additional burden of proving the specific intent . . . [t]he proof of the specific intent with which an act was done is, as all lawyers know difficult to make").

[23] Treble damages are not available under the FTC Act. Civil penalties and Section 19's monetary remedies are limited to unfair and deceptive acts or practices. *See* 15 U.S.C. § 45(m)(1)(A); 15 U.S.C. § 57b. A finding that

The Supreme Court has affirmed this same broad view of the scope of Section 5 on numerous occasions.[24] It has condemned coercive and otherwise facially unfair practices that have a tendency to stifle or impair competition.[25] The federal circuit courts have likewise consistently held that the FTC's authority extends not only to "the letter," but also to "the spirit" of the antitrust laws.[26]

## B.    Congress created the FTC as an expert body charged with elucidating the meaning of Section 5

Congress was careful and deliberate when it created the FTC, an independent agency. The five Commissioners would serve for terms of seven years, which would "give them an opportunity to acquire the expertness" needed to determine what constitutes an unfair method of competition.[27] The Commission would provide guidance to the business community on the legality of business practices (including by issuing advisory opinions),[28] serve as an aid to the courts,[29] and act as an enforcer against unfair methods of competition.[30] Congress gave the Commission powers to conduct quasi-judicial hearings,[31] directly seek injunctive relief in federal court,[32] pursue investigations, prepare reports, and make rules.[33] To balance the Commission's powers, Congress created checks to ensure that the FTC would be accountable to it[34] and that the

---

conduct is an unfair method of competition under Section 5 is not given collateral estoppel effect in subsequent private antitrust actions. *Holloway v. Bristol-Myers Corp*., 485 F.2d 986 (D.C. Cir. 1973) (holding that private litigants cannot sue for violations of the FTC Act). *See also* 51 CONG. REC. 13115 (1914) (statement of Sen. Newlands) ("I do not believe in the principle, of assessing threefold damages."); *id*. at 11317 (statement of Sen. McCumber) (moving to strike treble damages provision).

[24] *See supra*, note 3.

[25] *Texaco*, 393 U.S. at 225–26 (citing *Atlantic Refining Co.,* 381 U.S. at 376).

[26] *Ethyl*, 729 F.2d at 136–37 (citing *Sperry & Hutchinson*, 405 U.S. at 239); *Grand Union Co. v. Fed. Trade Comm'n,* 300 F.2d 92, 98–99 (2d Cir. 1962). *Cf.*, *Chuck's Feed & Seed Co. v. Ralston Purina Co*., 810 F.2d 1289, 1292–93 (4th Cir. 1987) (describing Section 5 "as a kind of penumbra around the federal antitrust statutes").

[27] S. REP. NO. 63-597 at 11. *See also id*. at 11 (anticipating that the Commission would "build up a comprehensive body of information for the use and advantage of the Government and the business world"); *id*. at 22 ("we want trained experts; we want precedents; we want a body of administrative law built up.").

[28] *See id*. at 6–7 (citing an address by President Wilson, stating that "the business men of the country . . . desire the advice, the definite guidance and information which can be supplied by an administrative body."); *id*. at 10 (anticipating that the Commission would "aid the business public.").

[29] *See* H.R. REP. NO. 63-533, at 8 (anticipating that the commission would use its investigatory powers in "aid of the courts.").

[30] S. REP. NO. 63-597, at 10 (anticipating that the Commission would have "sufficient power ancillary to the Department of Justice to aid materially and practically in the enforcement of the Sherman law and to aid the business public as well, and, incidentally, to build up a comprehensive body of information for the use and advantage of the Government and the business world"). *See also* H.R. REP. NO. 63-533, at 9.

[31] 15 U.S.C. § 45(b) (providing for adjudicatory hearings).

[32] 15 U.S.C. § 53(b).

[33] *Id*. § 46(a),(b) (authorizing the Commission to investigate corporations and require reports); *id*. § 46(g) (authorizing the Commission to "make rules and regulations for the purpose of carrying out the provisions of this subchapter"); *Nat'l Petroleum Refiners Ass'n v. Fed. Trade Comm'n*, 482 F.2d 672, 673 (D.C. Cir. 1973) (holding that "the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent").

[34] *See, e.g*., 15 U.S.C. § 46(d),(f),(h) (requiring reports to Congress); *Id*. § 57a(f)(7) (requiring annual reports to Congress); *Id*. § 57b-2(d)(1)(A) (providing for disclosure of protected information to Congress). Congress also holds

FTC's decisions would be reviewable by federal courts of appeal.[35] In the ensuing years, Congress has conducted vigorous oversight of the FTC and the courts have not hesitated to review Commission decisions.[36]

Congress intended for the FTC to be entitled to deference from the courts as an independent, expert agency.[37] Over the years, courts have consistently held that FTC determinations as to what practices constitute an unfair method of competition deserve "great weight,"[38] recognizing that the Commission is an expert agency, rather than "a carbon copy of the Department of Justice."[39]

Even when courts have rejected the Commission's factual conclusions, they have consistently reaffirmed the scope of its Section 5 authority.[40] For example, *Ethyl*, *Boise*, and *OAG* cited prior decisions of the Supreme Court that affirm the distinctive scope of Section 5,[41] but ultimately found that the particular facts at issue lacked evidence of unfairness, either "some indicia of oppressiveness"[42] or some evidence that the conduct tended to negatively affect the market.[43] All three appellate decisions reiterated the well-accepted principle that the Commission "is not confined to [the] letter" of the antitrust laws, and that "[i]t may bar incipient violations of

---

the FTC accountable though the budgetary, appointment, and oversight processes, and through numerous statutory enactments and amendments relating to the FTC's powers over the course of the hundred-plus years since the passage of the Federal Trade Commission Act.

[35] 15 U.S.C. § 45(b). Respondents in adjudicative proceedings may receive judicial review of the Commission's decision in their circuit of residence or any circuit where they committed the conduct underlying the alleged violation: an unusually expansive form of judicial oversight. *See, e.g.,* J. Thomas Rosch Commissioner, Fed. Trade Comm'n, Three Questions About Part Three: Administrative Proceedings at the FTC, Remarks Before the American Bar Association Section of Antitrust Law Fall Forum, Washington, D.C. 18 (Nov. 8, 2012), https://www.ftc.gov/sites/default/files/documents/public_statements/three-questions-about-part-three-administrative-proceedings-ftc/121108fallforum.pdf.

[36] *See* William E. Kovacic, *The Federal Trade Commission and Congressional Oversight of Antitrust Enforcement*, 17 Tulsa L.J. 587, 623–27 (1982). *See also Ethyl*, 729 F.2d at 137; *Boise Cascade Corp. v. Fed. Trade Comm'n*, 637 F.2d 573, 581–82 (9th Cir. 1980); *Official Airline Guides, Inc. v. Fed. Trade Comm'n (OAG)*, 630 F.2d 920, 927 (2d Cir. 1980).

[37] S. Rep. No. 63-597 at 11, 22.

[38] *OAG*, 630 F.2d at 927 (quoting *Cement Inst*itute, 333 U.S. at 720); *Atlantic Refining Co.*, 381 U.S. at 368; *Fed. Trade Comm'n v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934). *See also Ind. Fed'n of Dentists*, 476 U.S. at 455; *Texaco*, 393 U.S. at 226; *Motion Picture Advert. Serv. Co.*, 344 U.S. at 396.

[39] *Fed. Trade Comm'n v. Dean Foods Co*., 384 U.S. 597, 618–19 (1966) (Fortas, J., dissenting). *See also* 51 Cong. Rec. 12146 (statement of Sen. Henry Hollis) (observing that the DOJ would be able to focus on "the great task of prosecuting suits for the dissolution of monopolies, leaving to the trade commission the important service of policing competition, so as to protect small business men, keep an open field for new enterprise, and prevent the development of trusts").

[40] *See, e.g., Ethyl*, 729 F.2d at 128; *Boise*, 637 F.2d at 573; *OAG*, 630 F.2d at 920.

[41] *Boise*, 637 F.2d at 581; *Ethyl*, 729 F.2d at 136–37; *OAG*, 630 F.2d at 927.

[42] *Ethyl*, 729 F.2d at 139 (holding that "before business conduct in an oligopolistic industry may be labelled "unfair" within the meaning of § 5 a minimum standard demands that, absent a tacit agreement, at least some indicia of oppressiveness must exist"); *OAG*, 630 F.2d at 927–28 (finding that the monopolist had "no purpose to restrain competition or to enhance or expand his monopoly, and [did] not act coercively").

[43] *Boise*, 637 F.2d at 581 (finding that "without proof of anticompetitive effects" it could not assume that there was a "deliberate restraint on competition"). *Boise*'s applicability to cases outside the realm of delivered pricing is limited – the court's decision was driven by the Commission's inconsistent position on delivered pricing practices in prior statements, its shifting litigation strategy, and the Commission's failure to meets its own standard. *Id*. at 575–77, 582.

those statutes."[44] They also agreed that Section 5 reaches "conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit,"[45] and further recognized the importance of deference to the Commission where it acts against conduct that is unfair.[46]

## III.    Unfair Methods of Competition

Relying on the text, structure, legislative history of Section 5, precedent, and the FTC's experience applying the law, this statement describes the most significant general principles concerning whether conduct is an unfair method of competition under Section 5 of the FTC Act.[47]

### 1.    The conduct must be a method of competition

Conduct must be a "method of competition" to violate Section 5. A method of competition is conduct undertaken by an actor in the marketplace—as opposed to merely a condition of the marketplace, not of the respondent's making, such as high concentration or barriers to entry.[48] The conduct must implicate competition, but the relationship can be indirect. For example, misuse of regulatory processes that can create or exploit impediments to competition (such as those related to licensing, patents, or standard setting) constitutes a method of competition.[49] Conversely, violations of generally applicable laws by themselves, such as environmental or tax laws, that merely give an actor a cost advantage would be unlikely to constitute a method of competition.

### 2.    That is unfair

The method of competition must be unfair, meaning that the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business acumen, truthful marketing and advertising practices,

---

[44] *Ethyl,* 729 F.2d at 136. *See also Boise,* 637 F.2d at 581.

[45] *Ethyl,* 729 F.2d at 136–37.

[46] *Ind. Fed'n Dentists*, 476 U.S. at 454.

[47] Whether the conduct violates accepted norms of unfairness derived from external standards expressed in statutes, common law, and regulations outside of the federal antitrust laws may also be relevant to whether the conduct is an unfair method competition. *See Ind. Fed'n of Dentists*, 476 U.S. at 454 ("The standard of "unfairness" under the FTC Act …encompass[es] not only practices that violate the Sherman Act and the other antitrust laws. . . but also practices that the Commission determines are against public policy for other reasons."). *See also Sperry & Hutchinson*, 405 U.S. at 244; *Motion Picture Advertising Co.,* 344 U.S. at 395; *R.F. Keppel & Bro.*, 291 U.S. at 313. This framework will not be used to analyze matters that constitute a violation of the letter of the antitrust laws.

[48] *See Ethyl*, 729 F.2d at 139.

[49] Statement of the Federal Trade Commission Regarding Google's Search Practices, In the Matter of Google, Inc., FTC File No. 111-0163 (Jan. 3, 2013), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-federal-trade-commission-regarding-googles-search-practices-matter-google-inc; Statement of the Federal Trade Commission In the Matter of Robert Bosch GmbH, FTC. File No. 121-0081 (Apr. 24. 2013); Analysis of Proposed Consent Decree to Aid in Public Comment: In the Matter of Negotiated Data Solutions, LLC, FTC File No. 051-0094 (Jan. 23, 2008); *In re Dell Computer Corp*., 121 F.T.C. 616 (1996) (consent order). *Cf.*, *Walker Process Eqpt., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965) (fraud on the patent office may constitute antitrust violation).

investment in research and development that leads to innovative outputs, or attracting employees and workers through the offering of better employment terms. [50]

There are two key criteria to consider when evaluating whether conduct goes beyond competition on the merits. First, the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature. [51] It may also be otherwise restrictive or exclusionary, depending on the circumstances, as discussed below. Second, the conduct must tend to negatively affect competitive conditions. [52] This may include, for example, conduct that tends to foreclose or impair the opportunities of market participants, reduce competition between rivals, limit choice, or otherwise harm consumers.

These two principles are weighed according to a sliding scale. Where the indicia of unfairness are clear, less may be necessary to show a tendency to negatively affect competitive conditions. [53] Even when conduct is not facially unfair, it may violate Section 5. [54] In these circumstances, more information about the nature of the commercial setting may be necessary to determine whether there is a tendency to negatively affect competitive conditions. The size, power, and purpose of the respondent may be relevant, as are the current and potential future effects of the conduct.

The second principle addresses the tendency of the conduct to negatively affect competitive conditions—whether by affecting consumers, workers, or other market participants. In crafting Section 5, Congress recognized that unfair methods of competition may take myriad forms and hence that different types of evidence can demonstrate a tendency to interfere with competitive conditions. Because the Section 5 analysis is purposely focused on incipient threats to competitive conditions, [55] this inquiry does not turn to whether the conduct directly caused

---

[50] *See generally U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) *(*distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *U.S. v. Alum. Co. of America,* 148 F.2d 416, 430 (2d Cir. 1945) (distinguishing conduct based on "superior skill, foresight and industry.").

[51] *See e.g., Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers, citing *R.F. Keppel & Bro.*, 291 U.S. at 313); *Atlantic Refining Co.*, 381 U.S. at 369 (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices")*; Texaco*, 393 U.S. at 228-29 (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition")*; Ethyl, 729 F.2d* at 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary").

[52] *See, e.g.,* S. REP. NO. 1326, at 3–4 (1913) (stating that "Congress should maintain the policy established by the anti-trust law" to "'maintain[ ] competitive conditions," and that "every possible effort to create and preserve competitive conditions should be made"). *Id.* at 2, 3-4, 11, & 13; *see also* H.R. Rep. No. 63-533, at 2 (1914) (reported by Rep. Covington) (The administration idea and the idea of business men generally, is for the preservation of proper competitive conditions in our great interstate commerce").

[53] *Ethyl*, 729 F.2d at 137-39.

[54] *Hastings Mfg. Co. v. Fed. Trade Comm'n*, 153 F.2d 253, 257 (6th Cir. 1946).

[55] *See generally supra* notes 11 & 18. *See also Fashion Originators' Guild Am. v. Fed. Trade Comm'n (FOGA)*, 312 U.S. 457, 466 (1941) (holding that it was not determinative that petitioners had not yet "achieved a complete monopoly"; rather it was "sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition").

*actual* harm in the specific instance at issue.[56] Instead, the second part of the principle examines whether the respondent's conduct has a tendency to generate negative consequences; for instance, raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing other market participants, or reducing the likelihood of potential or nascent competition. These consequences may arise when the conduct is examined in the aggregate along with the conduct of others engaging in the same or similar conduct,[57] or when the conduct is examined as part of the cumulative effect of a variety of different practices by the respondent.[58] Moreover, Section 5 does not require a separate showing of market power or market definition when the evidence indicates that such conduct tends to negatively affect competitive conditions.[59] Given the distinctive goals of Section 5, the inquiry will not focus on the "rule of reason" inquiries more common in cases under the Sherman Act, but will instead focus on stopping unfair methods of competition in their incipiency based on their tendency to harm competitive conditions.

## IV.    Potential Cognizable Justifications

In the event that conduct *prima facie* constitutes an unfair method of competition, liability normally ensues under Section 5 absent additional evidence. There is limited caselaw on what, if any, justifications may be cognizable in a standalone Section 5 unfair methods of competition case, and some courts have declined to consider justifications altogether.[60] In instances where a party chooses to assert justifications as an affirmative defense, the FTC can

---

[56] *See Sperry & Hutchinson*, 405 U.S. at 244 (explaining that "unfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"); *Ethyl*, 729 F.2d at 138 (finding that evidence of actual harm can be "a relevant factor in determining whether the challenged conduct is unfair" but is not required); *Boise*, 637 F.2d at 581-82. *In re Coca-Cola Co.*, 117 F.T.C. 795, 915 (1994) (rejecting argument that Section 5 violation requires showing "anticompetitive effects"). *See also supra* notes 19-21 and accompanying text (explaining that a showing of an actual anticompetitive injury is unnecessary to prove a violation of Section 5 because that section was designed to stop in their incipiency acts and practices that could lead to violations of the Sherman and Clayton Acts).

[57] *Motion Picture Advertising*, 344 U.S. at 395.

[58] Consent Order, Statement in Support of Consent, *In the Matter of Intel Corp.*, File No. 061-0247 (Dkt. 9341) (July 28, 2010); *The Vons Co.*, FTC Complaints and Order, 1987-1993 Transfer Binder, Trade Reg. Rep. (CCH) ¶ 23,200 (Aug. 7, 1992).

[59] *Atlantic Refining Co.*, 381 U.S. at 371 ("unnecessary to embark upon a full scale economic analysis of competitive effects."); *Texaco*, 393 U.S. at 230 (holding that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); *L.G. Balfour Co. v. Fed. Trade Comm'n*, 442 F.2d 1, 19-20 (7th Cir. 1971) (No proof of foreclosure necessary in an exclusive dealing contract case under Section 5 (citing *Brown Shoe*).

[60] *Atlantic Refining Co.*, 381 U.S. at 371 (considering the defendant's argument that the distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and nonetheless holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *Texaco*, 393 U.S. at 230 (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"); *Balfour*, 442 F.2d at 15 (while relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through Section 5.

draw on the Commission's long experience evaluating asserted justifications when enforcing Section 5, as well as its review of decided cases and past enforcement actions.[61]

First, it would be contrary to the text, meaning, and case law of Section 5 to justify facially unfair conduct on the grounds that the conduct provides the respondent with some pecuniary benefits.[62] At the same time, some practices may impact competitive conditions in a manner that both harms and benefits market participants other than the party; at times, the harms and benefits may redound to the same participants, and at times they may be disparately distributed – that is, a practice may harm some market participants while simultaneously providing legitimate benefits to others.

If parties in these cases choose to assert a justification, the subsequent inquiry would not be a net efficiencies test or a numerical cost-benefit analysis. The unfair methods of competition framework explicitly contemplates a variety of non-quantifiable harms, and justifications and purported benefits may be unquantifiable as well. The nature of the harm is highly relevant to the inquiry; the more facially unfair and injurious the harm, the less likely it is to be overcome by a countervailing justification of any kind.[63] In addition, whether harmed parties share in the purported benefits of the practice may be relevant to the inquiry.

Some well-established limitations on what defenses are permissible in an antitrust case apply in the Section 5 context as well. It is the party's burden to show that the asserted justification for the conduct is legally cognizable,[64] non-pretextual,[65] and that any restriction used to bring about the benefit is narrowly tailored to limit any adverse impact on competitive

---

[61] *See supra* § II (B) (discussing Congressional intent to create an expert Commission entitled to deference for its determinations).

[62] *Supra* note 51.

[63] *See FOGA*, 312 U.S. at 467-68 (finding the Commission did not need to hear evidence of justifications where "[t]he purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts").

[64] *See, e.g. Ind. Fed. Dentists*, 476 U.S. at 463 (making clear that justifications that run directly counter to the "basic policy of the Sherman Act," in this instance, limiting consumer access to relevant information because "an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise, and even dangerous, choices" are not cognizable); *id.* at 464 (affirming Commission's finding that there was insufficient evidence that the restraint conferred the claimed benefit at all). *See also Fed. Trade Comm'n v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423-24 (1990); *NCAA v. Board of Regents*, 468 U.S. 85, 113-15 (1984); *United States v. Addyston Pipe Steel Co.* 85 F. 271 (6th Cir. 1898), *aff'd* 175 U.S. 211 (1899).

[65] Pretextual justifications include those that are not set forth in documents prior to, or contemporaneous with, the introduction of the conduct, or not plausibly based on the known facts. *See, e.g. Ind. Fed'n of Dentists*, 476 U.S. at 464 (affirming the Commission's finding that there was insufficient evidence that the restraint conferred the claimed benefit at all). *See also United States v. Microsoft Corp.*, 253 F.3d 35, 62-64, 72, 74, 76-77 (D.C. Cir. 2001); *Eastman Kodak Co. v. Image Technical Tech. Svcs*, 504 U.S. 541, 472, 484-85 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-10 (1985); *Texas Specialty Physicians v. Fed. Trade Comm'n*, 528 F.3d 346, 368-70 (5th Cir. 2008); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196-97 (3d Cir. 2005). *See also* Fed. Trade Comm'n & U.S. Dep't of Justice, Antitrust Guidelines for Collaboration Among Competitors §3.36a (2000) (2000 Collaboration Guidelines) ("Efficiency claims are not considered if they are vague or speculative or otherwise cannot be verified by reasonable means").

conditions.[66] In addition, the asserted benefits must not be outside the market where the harm occurs.[67] Finally, it is the party's burden to show that, given all the circumstances, the asserted benefits outweigh the harm and are of the kind that courts have recognized as cognizable in standalone Section 5 cases.[68]

## V.    Historical Examples of Unfair Methods of Competition

For the purpose of providing further guidance, the FTC lists here a non-exclusive set of examples and citations of past decisions and consent decrees based on Section 5, and, where applicable, other antitrust laws, focusing on conduct that constitutes an incipient violation of the antitrust laws or that violates the spirit of the antitrust laws. These illustrative examples are drawn from case law and from FTC experience.

A non-exclusive set of examples of conduct that have been found to violate Section 5 include:

- Practices deemed to violate Sections 1 and 2 of the Sherman Act or the provisions of the Clayton Act, as amended (the antitrust laws).[69]

- Conduct deemed to be an incipient violation of the antitrust laws. Incipient violations include conduct by respondents who have not gained full-fledged monopoly or market power, or by conduct that has the tendency to ripen into violations of the antitrust laws.[70] Past examples of such use of Section 5 of the FTC Act include:

  - invitations to collude,[71]

---

[66] *NCAA v. Alston*, 141 S. Ct. 2141, 2162-64 (2021); *Polygram Holding, Inc. v. Fed. Trade Comm'n*, 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines § 3.36b.

[67] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370-71 (1963); 2000 Collaboration Guidelines § 3.36a.

[68] At all times, the burden of persuasion would remain with the Commission in administrative proceedings pursuant to 5 U.S.C. §556(d).

[69] *Motion Picture Advertising*, 344 U.S. at 395 (conduct fell "within the prohibitions of the Sherman Act and is therefore an unfair method of competition within the meaning of s. 5(a)."); *Cement Institute*, 333 U.S. at 683; *FOGA,* 312 U.S. at 463; *Fed. Trade Comm'n v. Pacific States Paper Trade Ass'n*, 273 U.S. 52 (1926).

[70] *FOGA*, 312 U.S. at 466 (FTC may challenge combinations "not merely in their fruition, but also in their incipiency combinations which could lead to . . .trade restraints and practices deemed undesirable"); *Motion Picture Advertising*, 344 U.S. at 394-95 ("[i]t is also clear that the Federal Trade Commission Act was designed to supplement and bolster the Sherman and the Clayton Act. . . to stop in their incipiency acts and practices which, when full blown, would violate those Acts."); *Cement Institute*, 333 U.S. at 708; *Triangle Conduit & Cable Co. v. Fed. Trade Comm'n*, 168 F.2d 175, 181 (7th Cir. 1948).

[71] The Commission has challenged both public and private invitations to collude as unfair methods of competition. This type of conduct, if consummated would constitute a per se violation of the antitrust laws. Invitations to collude, even if unaccepted, represent both an incipient violation as well as a violation of the spirit of the antitrust laws within the meaning of the 2022 Section 5 policy statement. Under either theory, an invitation to collude constitutes an unfair method of competition under Section 5. *In Re Quality Trailer Products Corp.,* 115 F.T.C. 944 (1992) (consent); *In re Valassis Communs.*, Dkt. C-4160, 2006 FTC LEXIS 25 (2006) (consent); *In re A.E. Clevite*, 116 F.T.C. 389 (1993) (consent); *In re YKK (USA)*, 108 F.T.C. 628 (1993) (consent); *In re Precision Moulding Co.*, 122 F.T.C. 104 (1996) (consent); *In re Stone Container Corp.*, 125 F.T.C. 853 (1998) (consent); *In re U-Haul Int'l, Inc.*, File No. 081-0157, 6 (2010) (consent); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F.Supp. 2d 1343,

- o  mergers, acquisitions, or joint ventures that have the tendency to ripen into violations of the antitrust laws,[72]

- o  a series of mergers, acquisitions, or joint ventures that tend to bring about the harms that the antitrust laws were designed to prevent, but individually may not have violated the antitrust laws,[73] and

- o  loyalty rebates, tying, bundling, and exclusive dealing arrangements that have the tendency to ripen into violations of the antitrust laws by virtue of industry conditions and the respondent's position within the industry.[74]

- Conduct that violates the spirit of the antitrust laws. This includes conduct that tends to cause potential harm similar to an antitrust violation, but that may or may not be covered by the literal language of the antitrust laws or that may or may not fall into a "gap" in those laws.[75] As such, the analysis may depart from prior precedent based on the provisions of the Sherman and Clayton Acts. Examples of such violations, to the extent not covered by the antitrust laws, include:

- o  practices that facilitate tacit coordination,[76]

- o  parallel exclusionary conduct that may cause aggregate harm,[77]

---

1369-70 (N.D. Ga. 2017), *aff'd sub. Nom.*, *Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 827 (2019). Depending on the circumstances, an invitation to collude may also constitute attempted monopolization under Section 2 of the Sherman Act, *United States v. American Airlines*, 743 F.2d 1114 (5th Cir. 1984), or wire fraud, *United States v. Ames Sintering*, 927 F.2d 232 (6th Cir. 1990).

Under appropriate circumstances, the Commission will refer evidence of per se illegal cartel agreements to the Department of Justice for criminal prosecution. *See* Commission Statement Regarding Criminal Referral and Partnership Process, File No. P094207 (Nov. 18, 2021),

https://www.ftc.gov/system/files/documents/public_statements/1598439/commission_statement_regarding_criminal_referrals_and_partnership_process_updated_p094207.pdf.

[72] *Yamaha Motor Co. v. Fed. Trade Comm'n*, 657 F.2d 971 (8th Cir. 1981), *cert. denied*, 456 U.S. 915 (1982).

[73] *Vons*, 1987-1993 Transfer Binder ¶ 23,200. Such series of acquisitions or related conduct may also constitute an unfair method competition as a violation of the spirit of the antitrust laws. *See infra* note 83 and cases cited therein.

[74] *Luria Bros. v. Fed. Trade Comm'n*, 389 F.2d 847, 864 (3d Cir. 1968), *cert. denied*, 393 U.S. 829 (1968).

[75] Remarks of Jon Leibowitz, Comm'r, Fed. Trade Comm'n, "Tales from the Crypt" Episodes '08 and '09: The Return of Section 5 ("Unfair Methods of Competition in Commerce are Hereby Declared Unlawful"), Section 5 Workshop, at 4 (Oct. 17, 2008), https://www.ftc.gov/sites/default/files/documents/public_events/section-5-ftc-act-competition-statute/jleibowitz.pdf ("Simply put, consumers can still suffer plenty of harm for reasons not encompassed by the Sherman Act as it is currently enforced in the federal courts.").

[76] *Cement Institute*, 333 U.S. at 709-21 (multiple basing point pricing system contributed to unlawful coordinated pricing); Analysis to Aid Public Comment, *In re BMG Music et. al*, 65 Fed. Reg. 31,319 (2000), Docket No. C-3973 (2000) (Decision & Order) (distributors of pre-recorded music, acting in parallel but without agreement, impose identical coercive limits on retailer advertising of discounts). *See generally* William E. Kovacic, *Antitrust Policy and Horizontal Collusion in the 21st Century*, 9 LOY. CONSUMER L. REV. 97, 107 (1997) ("[T]he FTC remains perhaps the best vehicle for articulating standards designed to discourage anticompetitive coordination among competitors.").

[77] *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 897 (2007) (holding that the extent of adoption of resale price maintenance across the industry is relevant to legality); *Motion Picture Advertising*, 344 U.S. at 395

- o  conduct by a respondent that is undertaken with other acts and practices that cumulatively may tend to undermine competitive conditions in the market,[78]

- o  fraudulent and inequitable practices that undermine the standard-setting process or that interfere with the Patent Office's full examination of patent applications,[79]

- o  price discrimination claims such as knowingly inducing and receiving disproportionate promotional allowances against buyers not covered by Clayton Act,[80]

- o  de facto tying, bundling, exclusive dealing, or loyalty rebates that use market power in one market to entrench that power or impede competition in the same or a related market,[81]

- o  a series of mergers or acquisitions that tend to bring about the harms that the antitrust laws were designed to prevent, but individually may not have violated the antitrust laws,[82]

- o  mergers or acquisitions of a potential or nascent competitor that may tend to lessen current or future competition,[83]

---

("respondent and the three other major companies have foreclosed to competitors 75 percent of all available outlets."); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 309, 314 (1949) (taking into account extent of industry use of similar practices). *See also* C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 YALE L.J. 1182, 1243-45 (2012) ("parallel exclusion is a suitable subject for FTC enforcement under Section 5 of the FTC Act.").

[78] Intel Consent Order at 9341; *Vons*, 1987-1993 Transfer Binder ¶ 23,200.

[79] U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY § 6 (2017); *In re American Cyanamid Co.*, 72 F.T.C. 623, 684-85, *aff'd sub nom*, *Charles Pfizer & Co.*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920 (1969) (actual or attempted enforcement of patents obtained by inequitable conduct falling short of fraud).

[80] *Alterman Foods v. Fed. Trade Comm'n*, 497 F.2d 993 (5th Cir. 1974); *Colonial Stores v. Fed. Trade Comm'n*, 450 F.2d 733 (5th Cir. 1971); R.H. *Macy & Co. v. Fed. Trade Comm'n*, 326 F.2d 445 (2d Cir. 1964); *American News Co. v. Fed. Trade Comm'n*, 300 F.2d 104 (2d Cir. 1962); *Grand Union Co. v. Fed. Trade Comm'n*, 300 F.2d 92 (2d Cir. 1962); *In re Foremost-McKesson, Inc.*, 109 F.T.C. 127 (1987).

[81] *Atlantic Refining Co.*, 381 U.S. at 357; *Texaco, Inc.*, 393 U.S. at 223; *Shell Oil Co. v. Fed. Trade Comm'n*, 360 F.2d 470 (5th Cir. 1966); *Brown Shoe*, 384 U.S. at 316.

[82] *The Vons Cos.*, 1987-1993 Transfer Binder ¶ 23,200. Section 5 has also been used to challenge individual transactions that do not meet the technical requirements of Section 7. *In re Beatrice Foods*, 67 F.T.C. 473 (1965), supplemented, 68 F.T.C. 1003 (1965), modified, 71 F.T.C. 797 (1967); *In re Dean Foods, Co.*, 70 F.T.C. 1146 (1966); *In re Foremost Dairies, Inc.*, 60 F.T.C. 944 (1962).

[83] *See, e.g., Fed. Trade Comm'n v. Facebook*, 581 F.Supp. 3d 34 (D.D.C. 2022) (denying motion to dismiss challenging acquisition of WhatsApp and Instagram); Analysis of Agreement Containing Consent Orders to Aid Public Comment, In the Matter of Novartis AG, File No. 141-0141 (consent decree requiring divestiture in transaction eliminating future competition in oncology compounds); Analysis of Agreement Containing Consent Orders to Aid Public Comment, *In the Matter of Össur Americas Holdings, Inc*., File No. 191-0177 (consent decree requiring divestiture in transaction eliminating future competition in myoelectric elbows). *See also Fed. Trade Comm'n v. Procter & Gamble Co.*, 386 U.S. 568 (1967) (barring acquisition of leading firm where acquirer was most likely potential entrant). *See generally* PHILIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 701at p. 200 (4th ed. 2015) (acquisition of "an

- o  using market power in one market to gain a competitive advantage in an adjacent market by, for example, utilizing technological incompatibilities to negatively impact competition in adjacent markets,[84]

- o  conduct resulting in direct evidence of harm, or likely harm to competition, that does not rely upon market definition,[85]

- o  interlocking directors and officers of competing firms not covered by the literal language of the Clayton Act,[86]

- o  commercial bribery and corporate espionage that tends to create or maintain market power,[87]

- o  false or deceptive advertising or marketing which tends to create or maintain market power,[88] or

---

actual or likely potential competitor is properly classified, for it tends to augment or reinforce the monopoly by means other than competition on the merits."); C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. PA. L. REV. 1879 (2020).

[84] *Eastman Kodak*, 504 U.S. at 451; *Newcal Industries v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978); *LePage's v. 3M Co.*, 324 F.3d 141 (3d Cir. 2003) (en banc).

[85] *Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (finding of sustained effects legally sufficient even in absence of elaborate market analysis); *Toy's "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (finding "sufficient proof of anticompetitive effects [such] that no more elaborate market analysis was necessary"). *Cf.*, *Fed. Trade Comm'n v. Staples, Inc.*, 970 F.Supp. 1066, 1075-6 (D.D.C. 1997) (relying in part on direct evidence that pricing for key products from office superstores lower where three such stores exist in same metropolitan area and higher where only one or two such stores present).

[86] *Perpetual Federal Savings & Loan*, 90 F.T.C. 608 (1977) (complaint dismissed due to subsequent legislation). *Cf.*, *TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) (noting automatic nature of liability under Clayton §8 when prerequisites of statute established).

[87] *See* Policy Statement of the Federal Trade Commission on Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products (2022), at 6 n. 27 ("The Commission has a long history of addressing commercial bribery and will continue to do so."), https://www.ftc.gov/legal-library/browse/policy-statement-federal-trade-commission-rebates-fees-exchange-excluding-lower-cost-drug-products; See Hon. Garland S. Ferguson, Jr., Chairman, Fed. Trade Comm'n, Commercial Bribery: An Address to the Conf. on Com. Bribery to the Am. Standards Council and the Better Bus. Bureau of N.Y. (Oct. 17, 1930) (explaining the Commission's focus on commercial bribery as an unfair method of competition even before it gained authority under the Robinson-Patman Act); *see also* Donald S. Clark, Sec'y, Fed. Trade Comm'n, Remarks Regarding The Robinson-Patman Act: Annual Update, Before the Robinson Patman Act Comm., Section of Antitrust Law, 46th Annual Spring Meeting (Apr. 2, 1998), *See e.g.*, *In re Lockheed Corp.*, 92 F.T.C. 968 (1978) (commercial bribery).

[88] *In re Coleco Industries*, 111 F.T.C. 651 (1989) (consent decree barring claims of product availability unless actually available or company has reasonable basis for such claim); *In re Xerox Corp.*, 86 F.T.C. 364 (1975) (repeated publicizing release date of new products with knowledge that products would not be available by that date); Analysis of Proposed Consent Order to Aid Public Comment: *In the Matter of Intel Corp.*, Dkt No. 9341 at 5-6 (describing acts of deception in Commission complaint). *Cf, Microsoft*, 253 F.3d at 76-77 (acts of deception relating to compatibility of Microsoft version of Java with competing software applications as unlawful monopoly maintenance under the Sherman Act). *See generally* Maurice E. Stucke, *When a Monopolist Deceives*, 76 ANTITRUST L.J. 823 (2010). *See also* DANIEL A. CRANE, THE INSTITUTIONAL STRUCTURE OF ANTITRUST ENFORCEMENT 138 (2011) (The Commission is on strongest ground when challenging market power created by fraud or deception).

  o discriminatory refusals to deal which tend to create or maintain market power.[89]

## VI. The Path Forward

The FTC is committed to faithfully discharging its statutory obligations, including through enforcing and administering the prohibition against "unfair methods of competition" on a standalone basis, as laid out in Section 5 of the FTC Act, or in conjunction with its other statutory authorities.

---

[89] *Aspen*, 472 U.S. at 610-11 (affirming antitrust liability for termination of joint venture where no legitimate business justification present for such conduct); *Eastman Kodak*, 504 U.S. at 483-85 (denying summary judgment where defendant manufacturer of copiers refused to deal with third party service providers); *In re Grand Caillou Packing Co.*, 65 F.T.C. 799 (1964), *aff'd in part and rev'd in part sub nom.*, *LaPeyre v. Fed. Trade Comm'n*, 366 F.2d 117 (5th Cir. 1966) (violation of Section 5 for monopoly manufacturer of shrimp peeling machines to lease machines at substantially different rates in different regions of the US); Analysis of Proposed Consent Order to Aid Public Comment: In the Matter of Intel Corp., Dkt No. 9341 at 4 (describing alleged threates of refusal to deal with customers who purchased non-Intel CPUs). *See generally* Brett Frischmann & Spencer Weber Waller, *Revitalizing Essential Facilities*, 75 ANTITRUST L.J. 1 (2008).

JA0246

VOLUME 73          FEBRUARY 1960          NUMBER 4

# HARVARD LAW REVIEW

## EMPLOYEE AGREEMENTS NOT TO COMPETE †

*Harlan M. Blake* *

*Beginning with a historical discussion of the judicial treatment accorded to covenants in which an employee agrees not to compete with his employer after termination of employment, the author examines their present status and analyzes the factors which enter into their enforceability. In light of this analysis, Professor Blake suggests counseling and drafting techniques which may enable the employer to be more effectively protected against former employees' utilization of confidential information and customer relationships acquired during the period of employment.*

MANY of the employees of American business are parties to covenants not to compete with their former employers after termination of employment.[1] Such undertakings are most often ob-

---

† This article stems from a paper presented before the Antitrust Section of the American Bar Association at its August 1959 meeting. The author wishes to thank Professor Milton Handler, Chairman of the Committee on Information and Education of the Section, for stimulating his interest in the topic. Mr. Richard Young, a second-year student in the Minnesota Law School, rendered valuable research assistance.

* Professor of Law, The University of Minnesota. B.A., Chicago, 1946, M.A., 1947, J.D., 1954.

[1] The type of agreement under discussion is fairly accurately described by the cumbersome phrase "agreement, ancillary to an employment contract, not to compete with the employer after termination of employment." Even this is not quite complete, however. For example, it does not include "agency" or franchise agreements entered into between local retailers and manufacturers, in which the owner of the outlet, much like a branch manager in an integrated operation, undertakes not to compete. Such agreements are usually treated in much the same way as employment contracts. Nor does it clearly encompass agreements not to solicit customers or to assign future inventions, which are treated like agreements not to compete even though they are different in important respects.

Postemployment restraints may be found either in a covenant in the actual contract of employment or in a separate contract for which the supporting consideration is at least in part the continuing employment. No important distinction arises from this difference.

625

tained from technical, sales, and managerial personnel who have access to confidential business information or develop close relationships with customers. A covenant typically provides that the employee shall not work for a competitor or set up a competitive business for himself for a specified period of time in a designated geographical area.[2]

Covenants of this type comprise one of the traditional common-law "restraints of trade" and present problems which have kept them before the courts for more than five hundred years.[3] Their treatment at the hands of the courts has reflected the evolution of industrial technology and business methods, as well as the ebb and

---

[2] There do not seem to have been any studies of the use of such covenants by employers, although some data is available on the use of related employee agreements to assign future inventions. See sources cited note 214 *infra*. Especially in recent years the number of cases has been very great. See Annots., 41 A.L.R.2d 15 (1955); 43 A.L.R.2d 94 (1955), for an extensive list of cases, grouped by jurisdiction and in terms of the duration and geographic extent of the restriction. These annotations represent the only work done on this topic in the United States during the last thirty years, other than general discussion in the contracts treatises, 6 CORBIN, CONTRACTS § 1394 (1951); 5 WILLISTON, CONTRACTS § 1643 (rev. ed. 1937), and a number of law-review case notes. For earlier studies which include discussion of employee covenants, see, *e.g.*, Carpenter, *Validity of Contracts Not To Compete*, 76 U. PA. L. REV. 244 (1928); Kales, *Contracts To Refrain From Doing Business or From Entering or Carrying on an Occupation*, 31 HARV. L. REV. 193 (1917). The English sources are set out in note 21 *infra*, and statutes affecting the problem of enforceability of employee restraints in several states appear in note 78 *infra*.

[3] See pp. 631–32 *infra*. The traditional common-law restraints are now commonly classified into two groups: (1) restraints "ancillary" to valid underlying contracts, including, in addition to employment agreements, contracts for the sale of a business or professional practice, partnership agreements, assignments of patent rights, leases of property for business purposes, and, more recently, employee-retirement agreements; (2) restraints not "ancillary" to valid underlying contracts, but typically undertaken to divide territory or markets, limit production, pool profits, fix prices, or buy out potential competitors. "Nonancillary" arrangements did not come to be commonly regarded as subject to the traditional "restraint of trade" doctrines either in the United States or England until the nineteenth century. The earliest known direct-restraint case was decided in 1798, Smith v. Scott, 4 Paton 17 (H.L. 1798) (Scot.); the first American case was Pierce v. Fuller, 8 Mass. 223 (1811). The present classification became an accepted part of law with Judge Taft's celebrated opinion in United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 282–83 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899). The "nonancillary" cases are discussed, and Taft's analysis criticized, in Peppin, *Price-Fixing Agreements Under the Sherman Anti-Trust Law*, 28 CALIF. L. REV. 667, 676–77 n.220 (1940). See also HANDLER, ANTITRUST IN PERSPECTIVE 9–13 (1957); Packer, Book Review, 67 YALE L.J. 1141 (1958); DEWEY, MONOPOLY IN ECONOMICS AND LAW 109–38 (1959). The distinction is adopted in RESTATEMENT, CONTRACTS § 515(e) (1932).

flow of such social values as freedom of contract, personal economic freedom, and business ethics. But the fundamental interests which come into conflict have not basically changed.

From the point of view of the employer, postemployment restraints are regarded as perhaps the only effective method of preventing unscrupulous competitors or employees from appropriating valuable trade information and customer relationships for their own benefit. Without the protection afforded by such covenants, it is argued, businessmen could not afford to stimulate research and improvement of business methods to a desirably high level, nor could they achieve the degree of freedom of communication within a company that is necessary for efficient operation.

The opposite view is that postemployment restraints reduce both the economic mobility of employees and their personal freedom to follow their own interests. These restraints also diminish competition by intimidating potential competitors and by slowing down the dissemination of ideas, processes, and methods. They unfairly weaken the individual employee's bargaining position vis-à-vis his employer and, from the social point of view, clog the market's channeling of manpower to employments in which its productivity is greatest.

Recently there has been evidence of new interest on the part of employers and their counsel in the subject of employee restraints. There are several reasons. The employment market — especially for highly trained technical, engineering, and research personnel, but for many other classes of employees as well — has been very competitive. Personnel offices report that hard-to-get, qualified men are refusing to agree to the impairment of mobility that such covenants entail, or are demanding other concessions because of them.[4] Furthermore, alert counsel have noted an increasing tendency on the part of courts to refuse to enforce the restraints in terms as broad as those in which they have been drawn.[5] As a result, many lawyers are reexamining the procedures and forms employed by their clients. Will they stand up in court in an important case? If the restraint is overly broad, will

---

[4] Assertions of fact regarding the increasing use of covenants and their "typical" form are based on opinions of lawyers, including house counsel, and businessmen with whom the problem has been discussed, and on the author's informal analysis of the numbers and types of covenants litigated.

[5] See p. 681 *infra.*

a court pare the covenant down to reasonable scope and enforce it in an appropriate case, or will it be declared completely unenforceable? If validity is doubtful, how can procedures and forms be modified to enhance their effectiveness? Is the protection afforded to the employer by such covenants worth the cost and difficulty of "tightening up"?

The history of common-law restraints retains some interest also for students of the antitrust laws.[6] The Sherman Act makes illegal "every contract, combination . . . or conspiracy, in restraint of trade or commerce . . . ."[7] In the first decades after the act's passage, the common-law "restraint of trade" doctrine was regarded as a major guide to determining the meaning of this broad language. Even today when, paradoxically, the Sherman Act is apparently never called into play against this traditional type of contract in restraint of trade,[8] its history may cast some light on the continuing debate between proponents of the "per se" doctrines and those advocating extension of the "rule of reason."

---

[6] See secondary authorities cited note 3 *supra*.

[7] 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1958).

[8] When the required effect on commerce is present, unreasonable postemployment restraints would seem clearly to violate the Sherman Act, with the usual consequences, including possible action by the attorney general and treble-damage liability to the injured party. The legislative history and subsequent judicial discussion of the Sherman Act seem clearly to indicate that its purpose was certainly not less than to make illegal those restraints which had been unenforceable at common law. See ATT'Y GEN. NAT'L COMM. ANTITRUST REP. 5–12 (1955). However, the Antitrust Division has in all likelihood never turned its attention to such agreements, and no treble-damage actions have been discovered among the reported thousands of cases. Virtually all were suits brought by employers seeking injunctive relief or damages, or both. Occasionally a declaratory judgment is sought by a covenantor but in only one case that has been found was there combined a claim of damages to the employee resulting from his unemployability; there is no indication that treble damages were sought. The matter apparently never came to trial. Herskovitz v. Todd Co., 85 N.Y.S.2d 707 (Sup. Ct. 1949).

The *in pari delicto* doctrine would seem not to bar the employee's suit, for he is clearly one of the class sought to be protected by the statute. Furthermore, presumably the employer is solely responsible for its execution in illegal form. See generally 6 CORBIN, CONTRACTS §§ 1536–41 (1951). The explanation is undoubtedly in part the relative improbability of success of such an action, particularly since the standard of validity is so flexible, pp. 648–49 *infra*, and in view of common judicial skepticism regarding treble damages generally. See Loevinger, *Private Action — The Strongest Pillar of Antitrust*, 3 ANTITRUST BULL. 167–70 (1958). Furthermore, monetary damage would normally be difficult to show, particularly in light of the limitation imposed by the requirements of making reasonable efforts to mitigate. RESTATEMENT, CONTRACTS § 336 (1932); 5 CORBIN, CONTRACTS § 1039 (1951).

## I. Mitchel v. Reynolds and the Early Cases

For 250 years the most cited case on common-law restraints of trade has been *Mitchel v. Reynolds.*[9] In that opinion Parker, C. J., later Earl of Macclesfield, thoroughly reviewed the early cases in search of a unifying principle to guide judicial decision in all subsequent cases in which an effort was made to enforce a covenant not to compete. The covenant in dispute in that case was not incident to an employment agreement but accompanied the transfer of a business. In assigning to the plaintiff the lease of a bake shop, the assignor, a journeyman baker, gave a bond that he would not practice his baker's art in the parish for the term of the lease. He violated the agreement. In the action on the bond, he pleaded that the bond was illegal as a restraint of trade because it interfered with the practice of his craft. Lord Macclesfield noted that there was a presumption that all restraints of trade are invalid, but held that it had been overcome. "[A] special consideration being set forth in the condition, which shews it was reasonable for the parties to enter into it, the same is good . . . . [A] man may, upon a valuable consideration, by his own consent, and for his own profit, give over his trade, and part with it to another . . . ."[10] The court pointed out that the presumption of invalidity stems from the "mischief" which the restraints may cause, first, in the possible loss of the covenantor's means of earning a livelihood and, second, in the loss to society of the services of a useful member. The court also noted that such covenants may be used by corporations as a means of monopolization. But to refuse to enforce reasonable restraints accompanying the transfer of a business would result in unnecessary hardship or loss to a craftsman ready to retire but forced to continue in trade or to sell out at a lower price because no one would risk the purchase of his business without the protection of an enforceable covenant not to compete.

The opinion noted, however, that the effects may be different in the case of covenants in employment agreements, for they are subject to "great abuses . . . from masters, who are apt to give their apprentices much vexation on this account, and to use many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come up to set

---

[9] 1 P. Wms. 181, 24 Eng. Rep. 347 (Q.B. 1711).

[10] *Id.* at 182, 186, 24 Eng. Rep. at 348, 349.

up for themselves." [11]  The inference is clear that the burden of showing a just reason for the restraint might be greater in these cases.

To this sound method of analysis, Lord Macclesfield then added an elaboration, drawing a distinction — first enunciated by Lord Coke [12] — between "particular" and "general" restraints. A "general" restraint is an employment restriction which extends throughout the kingdom or, perhaps, indefinitely in time. A "particular" (or "partial") restraint is more limited in area or applied only to certain "persons," presumably clientele of the business involved. A partial restraint, such as that before the court, is upheld if there is "good and adequate consideration" to support the promise and circumstances set forth which make it appear to the court to be a "just and honest contract." [13]  No general restraints could be held valid, however, because it would never be reasonable to keep a man from practicing his trade where this would be "of no benefit to either party" and thus "only oppressive." [14]  This must be true "in all cases of general restraint throughout *England*; for what does it signify to a tradesman in *London*, what another does at *Newcastle*?" [15]  Thus the notion of a general restraint appears to have been only an application of the rule of reason to the conditions of England in 1711, when it was not possible to conceive of competition in a nationwide market. In this respect, Macclesfield seems to have attempted to dispose of Lord Coke's precedent in much the same manner that Mr. Chief Justice White, two hundred years later, accommodated previous holdings involving price-fixing agreements into his formulation of the "rule of reason" in interpreting the Sherman Act. [16]

*Mitchel v. Reynolds* is a remarkable opinion for its method of balancing the social utility of certain types of restraints against their possible undesirable effects upon the covenantor and the public, and for its formulation of a rule of reason. There is very

---

[11] *Id.* at 190, 24 Eng. Rep. at 350.

[12] Rogers v. Parrey, 2 Bulst. 136, 80 Eng. Rep. 1012 (K.B. 1613).

[13] Mitchel v. Reynolds, 1 P. Wms. 181, 186, 197, 24 Eng. Rep. 347, 349, 352 (Q.B. 1711). The court rejected the distinction suggested in the older cases between a restraint undertaken in a bond and other promissory obligations, ruling that there is no policy that competent parties might not settle in advance the "*quantum* of damages." *Id.* at 194, 24 Eng. Rep. at 352.

[14] *Id.* at 182, 24 Eng. Rep. at 348.

[15] *Id.* at 190–91, 24 Eng. Rep. at 350.

[16] Standard Oil Co. v. United States, 221 U.S. 1 (1911); see HANDLER, ANTI-TRUST IN PERSPECTIVE 8 (1957).

little in the modern approach to the problem for which a basis cannot be found in Macclesfield's opinion. But the opinion also contained seeds of difficulty. First, it firmly wed into a "unitary" restraint-of-trade doctrine several not very closely related subjects, including, besides postemployment restrictions, sales of good will, restrictions incident to the transfer of property interests, and what are now called nonancillary restraints, such as price-fixing or division-of-territory agreements. The marriage certainly did not help the orderly development of legal doctrines to deal with the different problems. Second, its ingenious elaboration of the general-partial distinction attracted so much attention from later judges that the doctrine persisted long after Macclesfield's logic in advancing it would have required its abandonment. Finally, the "reasonableness" test was related to the consideration doctrine in such a way that when later decisions made it clear that adequacy of consideration was not to be investigated, many judges thought the reasonableness test had been abandoned as well. This misunderstanding set the stage for several decades of bad decisions in England at the end of the nineteenth century.[17] However, Lord Macclesfield should not bear all the blame for trying to subsume too many diverse problems under a single legal formulation. Earlier cases had begun the process of trying to create a unitary law of restraints of trade by citing approvingly cases dealing with the late medieval apprentice system in decisions dealing with transfers of property interests.[18] *Mitchel v. Reynolds* simply completed the marriage instead of performing the divorce which was needed.

The early cases discussed in *Mitchel v. Reynolds* fall into two distinct groups both in point of time and, it is submitted, in subject. The first four cases, starting with the celebrated *Dyer's Case* [19] in 1414, extend through the sixteenth century. In each the court declared the restraint before it void with no consideration of the reasonableness of its scope. These are the cases always cited in support of the proposition that originally the common

---

[17] See p. 640 *infra*.

[18] The first appears to be Broad v. Jollyfe, Cro. Jac. 596, 79 Eng. Rep. 509 (K.B. 1620), although Lord Coke's reported comments in Rogers v. Parrey, 2 Bulst. 136, 80 Eng. Rep. 1012 (K.B. 1613), indicate that he would not examine the underlying facts of a restraint. Letwin attributes to Coke "invention" of the idea that the common law opposed all monopolies. Letwin, *The English Common Law Concerning Monopolies*, 21 U. Chi. L. Rev. 355, 356 (1954).

[19] Y.B. Mich. 2 Hen. 5, f. 5, pl. 26 (C.P. 1414).

law regarded all restraints as departures from the principle of economic freedom and therefore void. The second group of cases,[20] decided in the seventeenth century, distinguished between general and partial restraints and, in some instances, seemed to engage to a limited extent in the balancing of interests which characterizes *Mitchel v. Reynolds*. The cases in this second group involve restraints incident to the sale or transfer of a business interest.

What has not been noted with sufficient clarity is that all four of the early cases probably involved restraints undertaken by apprentices or journeymen. They appear to be cases of "unethical" masters attempting to prolong the traditional period of subservience of an apprentice or journeyman and to interfere with his traditional rights to enter the guilds as a craftsman, in violation of guild custom. If the early cases represent, in fact, the courts' attempt to assist the guilds and legislative bodies in shoring up the crumbling values of the medieval economic system, they cannot fairly be described as indicative of an attitude of economic liberalism. Thus, the usual statement of the early common law of restraints appears to require revision. It would seem more nearly correct to say that restraints incident to the transfer of business interests have always been held valid if reasonably tailored to the scope of the transaction; only restraints of future employment were originally held invalid without regard to the scope of the restriction, and this was so because they involved circumventions of the customary rules of apprenticeship.[21]

During the period in which the early group of cases was decided the craft guilds were the dominant vehicles of economic activity.[22]

---

[20] Rogers v. Parrey, 2 Bulst. 136, 80 Eng. Rep. 1012 (K.B. 1613); Broad v. Jollyfe, Cro. Jac. 596, 79 Eng. Rep. 509 (K.B. 1620); Bragge v. Stanner, Palm. 172, 81 Eng. Rep. 1031 (K.B. 1621); Prugnell v. Gosse, Aleyn 67, 82 Eng. Rep. 919 (K.B. 1648); Ferby v. Arrosmyth, 2 Keb. 377, 84 Eng. Rep. 236 (K.B. 1668); Anonymous, March 77, 82 Eng. Rep. 419 (C.P. 1640); Barrow v. Wood, March 191, 82 Eng. Rep. 470 (C.P. 1642).

[21] This distinction is perhaps implicit in Parsons' analysis of the early cases. See 2 PARSONS, CONTRACTS *748–51. The best textual treatment of the early cases, but with little analysis, is SANDERSON, RESTRAINT OF TRADE 7–20 (1926). See also, *e.g.*, POLLOCK, PRINCIPLES OF CONTRACT 326–31 (13th ed. 1950); MATTHEWS & ADLER, RESTRAINT OF TRADE (2d ed. 1907).

[22] The sources for the following material are 2 ASHLEY, ENGLISH ECONOMIC HISTORY 66–189 (4th ed. 1906); CHEYNEY, INDUSTRIAL AND SOCIAL HISTORY OF ENGLAND 116–52 (rev. ed. 1920); 1 LIPSON, ECONOMIC HISTORY OF ENGLAND 238–390 (5th ed. 1929). See also 8 HOLDSWORTH, HISTORY OF ENGLISH LAW 56–62 (2d ed. 1937). See generally GROSS, THE GILD MERCHANT (1890); KRAMER, THE

A craft guild comprised three classes of members — masters, journeymen, and apprentices. The apprenticeship system provided the master craftsman with his small labor force and was, in addition, a system of technical training through which young men were introduced into the skills and societal "mysteries" of a trade. The obligations and duties of both master and apprentice were defined by a contract — the indenture — whose terms varied from place to place and guild to guild, but were largely customary, or, during long periods, substantially defined by statute. In 1563, the Statute of Apprentices [23] made a seven-year apprentice period mandatory, but long before its enactment this period had been required by most of the guilds. A corollary of the long period of training, in which wages as such were either nonexistent or nominal, was that at its end the apprentice was to be free as a journeyman to practice his trade for hire wherever he chose until he could gain entry to the inner circle of craftsmen. Typically, he became a master craftsman in the town in which he had served his apprenticeship.

Occasional enterprising craftsmen would break or try to break from the traditional pattern and expand their activities, either by taking in extra apprentices or by seeking to bind their helpers to a longer period of apprenticeship. Lipson reports that "the number of apprentices which a master might employ developed in the fifteenth and sixteenth centuries into a subject of burning controversy." [24] Some guilds in effect extended the period of apprenticeship by requiring the apprentice to continue to serve his master for a year or more after the term of apprenticeship. During this era, the number of journeymen seeking to become craftsmen increased rapidly in many guilds and villages. The established craftsmen often sought to protect their position through an imaginative variety of restrictions. Often journeymen who had served their apprenticeship in other cities were excluded from the local guild. Examinations in the "mysteries" were made more

---

ENGLISH CRAFT GILDS (1927); UNWIN, THE GILDS AND COMPANIES OF LONDON (3d ed. 1938); DUNLOP & DENMAN, ENGLISH APPRENTICESHIP AND CHILD LABOUR (1912); ENGLISH GILDS (T. Smith ed. 1870). Interesting documents useful in understanding the era, including a typical apprenticeship indenture and examples of municipal regulations of the entry into trades, are reproduced in BLAND, BROWN & TAWNEY, ENGLISH ECONOMIC HISTORY — SELECT DOCUMENTS (3d imp. 1919). See also HANDLER, CASES ON TRADE REGULATION 18–32 (2d ed. 1951).

[23] 5 Eliz. 1, ch. 4, discussed in 2 ASHLEY, *op. cit. supra* note 22, at 94–95.

[24] 1 LIPSON, *op. cit. supra* note 22, at 285.

JA0255

difficult. Fees accompanying entrance into the guild were increased. Most important for our purposes, occasional "unethical" masters extracted obligations from their apprentices and journeymen which made it difficult or impossible for them to become full-fledged members of the guild upon expiration of their traditional term.

The guild system, however, was much more than a form of economic organization. Its regulations embodied "a whole social system" sanctioned "by the force of public opinion and the pressure of moral and social conventions."[25] It was deeply involved in religion and morality. Until the sixteenth century, when the decay of the guilds was well advanced, such incursions upon the traditional rules of apprenticeship were regarded by the populace and by the "ethical" masters — in all likelihood the senior members of most of the guilds — as morally wrong and subversive of custom and order. Many of the numerous statutes and ordinances of the period represent attempts to inhibit the erosion of the traditional practices. The Statute of Apprentices climaxed these endeavors. But most revealing is an Act for Avoiding of Exactions Taken Upon Apprentices, adopted a few years earlier, in 1536.[26] The act recited that masters had "by cautil and subtil means compassed and practiced to defraud and delude" in requiring apprentices as their term of service expired to undertake not to set up shop nor carry out their occupation "as freemen" without their master's assent. The statute made it illegal to "compel or cause any apprentice or journeyman, by oath or bond . . . that he, after his apprenticeship or term expired, shall not set up or keep any shop" nor take any money or property "for or concerning his or their freedom or occupation . . . ." The statute was not cited in any of the contemporary cases but its indication of the temper of the times sheds light on their significance.

Two of the early group of cases, decided in the latter part of the sixteenth century, clearly involved obligations obtained from apprentices. In an anonymous case[27] decided by the Court of Queen's Bench in 1578, the defendant had bound himself as a mercer's apprentice to a master in Nottingham, giving bond not to employ the craft within four years. After breach of the covenant,

---

[25] *Id.* at 296.

[26] 28 Hen. 8, ch. 5, reproduced in BLAND, BROWN & TAWNEY, *op. cit. supra* note 22, at 284–86.

[27] Moore K.B. 115, 72 Eng. Rep. 477 (Q.B. 1578).

the master brought an action of debt on the obligation, but the court held that it was not maintainable. The one-sentence report contains no discussion, and it is not entirely clear whether the restraint was to run after the end of the apprenticeship period or from the date of first employment. Twenty-four years later the Queen's Bench provided a somewhat more extensive discussion in *Colgate v. Bacheler.*[28] The defendant's son obligated himself to pay the plaintiff twenty pounds if he "either as apprentice, or servant, or for himself as master, or otherwise, use the trade of an haberdasher within the county of *Kent*, cities of *Canterbury*, or *Rochester*" [29] before a certain date. The court specifically noted the restraint was not a broad one but ruled that it was unlawful to restrain the practice of a trade "at any time, or at any place . . . ." The court reasoned that "for as well as he may restrain him for one time, or one place, he may restrain him for longer times, and more places, which is against the benefit of the Common-wealth . . . . [F]or he ought not to be abridged of his Trade, and Living." [30] This is the first enunciation in the known decisions of a "policy" reason for invalidating a restraint.

The case of the Blacksmiths of South-Mims,[31] a decision by the Court of Common Pleas in 1587, cannot be definitely identified as involving an apprentice. The obligor under a bond not to compete is identified only as "another black-smith." His obligation restrained him from practicing his craft in South-Mims without limit as to time, and might possibly have been given incident to a transfer of wares or a shop. However, when the obligee brought action on the bond after violation of the covenant, the local justices of the peace were persuaded to throw the suitor in jail. Although the 1536 statute was not cited in the report and indeed may have been lost sight of in the fifty-year interim, it seems likely that the severity of the justices' reaction is best explained by the same feeling that manifested itself in the statute. The court freed the plaintiff, on a writ of habeas corpus, for want of jurisdiction in the justices of the peace, but decided that the bond was "void, because it was against the law."

Each of these three cases cited *Dyer's Case,*[32] decided more than

---

[28] Cro. Eliz. 872, 78 Eng. Rep. 1097 (Q.B. 1602).
[29] *Ibid.*
[30] *Ibid.*
[31] 2 Leo. 210, 74 Eng. Rep. 485 (C.P. 1587).
[32] Y.B. Mich. 2 Hen. 5, f. 5, pl. 26 (C.P. 1414).

150 years earlier, but none discussed it. *Dyer's Case* is the first known case dealing with restrictions on the practice of a craft. The report is indeed sketchy. A writ of debt had been brought upon an obligation undertaken by the defendant, a dyer, who pleaded that, according to the "indenture" which he had undertaken, the obligation was to lose its force if he did not practice his trade for a period of six months in the plaintiff's town. He asserted that he had satisfied this requirement. Judge Hull then interposed his celebrated observation that the defendant might have demurred because the condition was illegal at common law and "per Dieu si le plaintiff fuit icy il irra al prison, tanque il ust fait fyne au Roye." [33] Although the language may not necessarily indicate quite the degree of indignation which one might think,[34] this was a powerful dictum, as the repeated later citations of it demonstrate. However, the plaintiff's lawyer was allowed to proceed and issue was joined. Subsequent proceedings in the case are unreported.

No facts as to the underlying transaction are known. However, there is some evidence that John Dyer, too, was an apprentice or journeyman who had been oppressed by a grasping master. Judge Hull's indignation is more easily explained by this hypothesis than if Dyer were a master who had freely sold his business. Furthermore, the restraint is of too short a duration, six months, to give a buyer much protection against a well-established tradesman's later decision to open a new shop. Even so brief a restraint, however, might discourage an impecunious and unventuresome journeyman from exercising his customary right to set up shop for himself. It is entirely possible, of course, that the bond may have been undertaken under totally different circumstances — perhaps, as Lord Macclesfield hypothesizes in *Mitchel v. Reynolds*, an owner had been victimized when despondent, "having just met with a great loss . . . ." [35] Again, however, the short duration of the restraint reduces the credibility of these hypotheses. Why would an enemy, creditor, or competitor settle for a restraint of so short a duration as to be commercially valueless?

These are the only known cases in which a restraint has been

---

[33] "By God, if the plaintiff were here he would go to prison until he paid a fine to the King."

[34] Pollock comments that such outbursts are not uncommon in the early rolls. POLLOCK, PRINCIPLES OF CONTRACT 328 n.19 (13th ed. 1950).

[35] 1 P. Wms. at 193, 24 Eng. Rep. at 351.

held void without regard to geographical scope, duration, or reasonableness in terms of the underlying facts. If, as seems likely, these cases represent reactions by the judges against erosions in the customs of the guilds by aggressive craftsmen, they have a significance almost the reverse of that usually attributed to them. They show judicial support of the customary concepts of "fair" commercial activity of the late medieval period rather than precocious premonitions of economic *laissez faire*. It was the "unethical" master craftsman, seeking to increase his scale of operations and making use of contracts to alter customary practices, who was moving in the direction of modern enterprise capitalism.

## II. THE DEVELOPMENT AFTER MITCHEL V. REYNOLDS

If there indeed existed, as the foregoing analysis suggests, a quite different approach by the courts to restraints incident to transfers of business interests from that made to those restraints impinging on the customs of the apprenticeship system, the distinctions — with their relevance to the changed industrial scene — were lost sight of for a period after *Mitchel v. Reynolds*, partly because of the way in which the opinion in that case reinforced the unitary approach to the restraint doctrine.

*Mitchel v. Reynolds* is even more clearly the starting place for the modern law of restraints in employment contracts than for other classes of restraints. *Dyer's Case* and its three successors were decided in the context of a social and economic system just entering into the long and difficult transition to entrepreneurial capitalism. As the transition was being completed in the late eighteenth and nineteenth centuries, the concepts of economic liberalism and the primacy of contractual obligation were developing deep roots in legal and economic thought.[36] In this intellectual environment, contractual postemployment restraints presented a philosophic dilemma which was not troublesome before the era in which freedom of contract was so highly regarded. Macclesfield's concern had been that a man might be deprived of his sustenance and society of his services, not that he was limited in his economic mobility. Nor were freedom-of-contract concepts of particular concern in that opinion; on the contrary, its author clearly felt that inequality of bargaining power might be a determinative consideration. But in the nineteenth century courts

---

[36] See pp. 640–41 *infra.*

*HARVARD LAW REVIEW* [Vol. 73:625

saw the problem differently. For them the question was how to balance freedom of the market against freedom of contract when an employee entered into a contract limiting his economic mobility.

Industrial and technological changes, of course, had diminished the harshness of many such restraints. By the early nineteenth century the last vestiges of the apprentice system were disappearing.[37] Long apprenticeships no longer served as barriers to shifting from one field of employment to another. Factory labor was characterized by specialization; a skill or special training might be acquired in a year, or month, or week. Men had become more mobile geographically; to leave one's town no longer involved the economic risks and actual physical dangers of an earlier period. Local roots were less strong; hostility to strangers less a factor. On the other hand, operations were larger, personal relationships between master and servant were less important, and the employee was more completely dependent on his vocation for his livelihood than ever before. In short, the industrial revolution had set the stage for the development of a modern approach to the problem.

During the late eighteenth and nineteenth centuries a flood of cases reached the English courts.[38] With the breakdown of the customary norms and procedures of the apprenticeship system, contractual provisions to take their place had become more common. Employers wanted to protect themselves from future competition by employees, or at least from loss of customers or trade secrets to them. Employee restraints offered such protection in some degree. For their part, employees were willing or had no better alternative than to restrict their future freedom of action in order to obtain present employment and such training and experience as came with it. The fact that litigated cases were numerous is good evidence that such restraints had become a commonplace feature of employment contracts.

Until the end of the nineteenth century both English and Ameri-

---

[37] The long-dormant Statute of Apprentices was at last formally repealed in 1814. 54 Geo. 3, ch. 96.

[38] The texts cited in note 21 *supra* contain discussions of the English cases during this period, as do MOLLER, VOLUNTARY COVENANTS IN RESTRAINT OF TRADE (1925); HEDGES, RESTRAINT OF TRADE (1932); GARE, COVENANTS IN RESTRAINT OF TRADE (1935). No attempt will be made here to duplicate that coverage other than to indicate the most important events in the exposition and refinement of the rule of reason announced in *Mitchel v. Reynolds.* See also the excellent history of the English development in Davies v. Davies, 36 Ch. D. 359 (C.A. 1887).

JA0260

can courts regarded *Mitchel v. Reynolds* as the fundamental authority to be applied in employee-restraint cases. Indeed, cases which failed to cite it are difficult to find. Although a few courts and commentators adopted a strictly mechanical interpretation of the case,[39] most understood its method. The central problem was to formulate the "reasonableness" test in more specific terms and to give it content by deciding its application in the individual cases. Applying a rule of reason in restraint-of-trade cases brought about two results. First, as technology advanced, the general-partial distinction became meaningless, and thus unreasonable, and was narrowly applied and finally abandoned. Further, as the special considerations which are of decisive importance in employee restraints were considered in a number of cases, the law relating to such restraints became specialized and tended to break away from the broader doctrine. The nineteenth century cases reflected this evolution.

The first careful reformulation of the "reasonableness" test came in an English case decided in 1831. In *Horner v. Graves*,[40] Tindal, C.J., clarified *Mitchel v. Reynolds* by ruling that the element of reasonableness was not limited to the consideration stated in the contract but extended to all facts relevant to "whether the restraint is such only as to afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public." [41] The court held that a restraint upon a dentist's assistant not to practice dentistry within 100 miles of his employer's town while the latter was practicing was unreasonably broad. The personal nature of the service made it impossible that so wide an area could

---

[39] The earliest American cases and commentators were particularly narrow in their interpretation of the rule of *Mitchel v. Reynolds*. For example, Mr. Justice Story's influential treatise on equity jurisprudence contained this statement:

> [T]he known and established distinction is between such bargains and contracts as are in general restraint of trade and such as are in restraint of it only as to particular places or persons. The latter, if founded upon a good and valuable consideration, are valid. The former are universally prohibited.

1 STORY, EQUITY JURISPRUDENCE § 407 (14th ed. 1918). A more misleading paraphrase of *Mitchel v. Reynolds* could hardly be devised; given "good and valuable" consideration, the determination of validity was made purely mechanical. No remnant of the "reasonableness" criterion nor room for distinguishing among types of restraints remained, nor did the logic of the general-particular dichotomy appear.

The mechanical view in the English cases is exemplified by Ward v. Byrne, 5 M. & W. 548, 151 Eng. Rep. 232 (Ex. 1839); Hinde v. Gray, 1 Man. & G. 195, 133 Eng. Rep. 302 (C.P. 1840).

[40] 7 Bing. 735, 131 Eng. Rep. 284 (C.P. 1831).

[41] *Id.* at 743, 131 Eng. Rep. at 287.

ever be occupied beneficially by the employer. Tindal also took the opportunity to note that the distinction between general and particular restraints in *Mitchel v. Reynolds* was not intended as a universal rule. The court's function was to determine "what is a reasonable restraint with reference to the particular case." [42] Although the case still followed the precedent of *Mitchel v. Reynolds* in looking to the adequacy of the consideration for the restraining covenant, in every other respect it is perfectly modern in method and reasoning and, it is submitted, correct in its interpretation and application of *Mitchel v. Reynolds*.

In 1853, the Court of Queen's Bench reversed the traditional rule that all restraints of trade are prima facie invalid by holding that the burden was on the covenantor to show that the covenant was unreasonable.[43] This view, doubtless rooted in strong freedom-of-contract views, prevailed in England until 1913 and is in part responsible for the fact that during the latter part of the nineteenth century in England virtually all such covenants, in employment contracts or elsewhere, were upheld. Another factor was the apparent confusion as to the meaning of the reversal in *Hitchcock v. Coker* [44] of the rule that adequacy of consideration must be examined. Some judges apparently interpreted this ruling to mean that the reasonableness of the scope of a restraint was no longer to be examined, even though the author of the opinion was the same Tindal, C.J., whose exposition of the reasonableness doctrine in *Horner v. Graves* was so notable. Probably the most important factor, however, was the currency of the general philosophic position exemplified by a pronouncement made by Jessel, M.R., in an influential case [45] involving an alleged restraint of trade in connection with an assignment of patent rights:

> It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore,

---

[42] *Ibid.*

[43] Tallis v. Tallis, 1 El. & B. 391, 118 Eng. Rep. 482 (Q.B. 1853). This reversal of the rule of *Mitchel v. Reynolds* was in turn discarded, and the old rule reinstated. See Attwood v. Lamont, [1920] 3 K.B. 571, 588–89 (C.A.).

[44] 6 Ad. & E. 438, 112 Eng. Rep. 167 (Ex. 1837).

[45] Printing & Numerical Registering Co. v. Sampson, L.R. 19 Eq. 462 (1875).

you have this paramount public policy to consider — that you are not lightly to interfere with this freedom of contract.[46]

In spite of the insistence of the law judges, particularly, that the precedent of *Mitchel v. Reynolds* required that all nationwide restraints be held invalid,[47] this position could not survive in the face of the combined forces of the reasonableness approach and the commanding respect accorded to the terms of contracts. In at least two cases in which the facts were very favorable, equity judges upheld "general" restraints.[48] However, there appear to be no English cases, either in law or in equity, prior to *Rousillon v. Rousillon*[49] in which a restraint without spatial limitations in an employment contract was held enforceable.

In that case the nephew of the owners of a champagne distribution firm had agreed, while working for them as a clerk and representative in England and in other countries, not to represent another champagne house for two years after leaving their employ. Shortly thereafter his employers gave up their retail business and no longer required his services. He thereupon set himself up as a retail wine merchant and apparently annoyed his uncles by holding himself out as from a city in Champagne when in fact he had no establishment there. Justice Fry asserted boldly that there had never been an absolute rule that an unlimited restraint was void and that if reasonable protection of the covenantee required specific enforcement of the restraint beyond national boundaries, this would be done.[50]

The opinion does not explain why any protection should have been extended to the plaintiffs after they had abandoned their retail trade in England. In equity one might expect that a restriction would no longer be enforced after the reason for it had ceased to exist. Fortunately, the proposition that if a restraint was reasonable in scope at the time it was entered into changed circumstances should not defeat its enforcement has never gained wide acceptance in American courts. In the *Rousillon* case the absoluteness of freedom of contract had reached its high point. For

---

[46] *Id.* at 465.

[47] Ward v. Byrne, 5 M. & W. 548, 151 Eng. Rep. 232 (Ex. 1839); Hinde v. Gray, 1 Man. & G. 195, 133 Eng. Rep. 302 (C.P. 1840).

[48] Whittaker v. Howe, 3 Beav. 383, 49 Eng. Rep. 150 (Ch. 1841); Leather Cloth Co. v. Lorsont, L.R. 9 Eq. 345 (1869). *But cf.* Allsopp v. Wheatcroft, L.R. 15 Eq. 59 (1872).

[49] 14 Ch. D. 351 (1880).

[50] *Id.* at 366–69.

more than thirty years thereafter all restraints of trade, including postemployment restrictions, were examined with a presumption of validity if their scope was roughly coterminous with the area of the covenantee's business activity.

In the celebrated decision of the House of Lords in *Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co.*,[51] any lingering doubts about the validity of "general" restraints were finally resolved by the consensus of the Lords that a restraint no wider than reasonably necessary to protect the interests of the covenantee and not against the public interest should be upheld. Although the case involved a sale of a vast munitions business and a worldwide covenant not to compete, the court's rejection of the mechanical general-partial distinction clearly extended to employee restraints as well. However, in addition to its ruling that technological developments had made the old distinction outmoded, the case contained a warning that the extreme freedom-of-contract position exemplified by the *Rousillon* case might not long survive. Lord Macnaghten noted, as had Lord Macclesfield 183 years earlier, that "different considerations must apply in cases of apprenticeship . . . . A man is bound an apprentice because he wishes to learn a trade and to practice it . . . . [T]here is obviously more freedom of contract between buyer and seller than between master and servant or between an employer and a person seeking employment."[52] Nonetheless, for twenty years after this pronouncement, English courts continued to employ a rigorous freedom-of-contract approach to all restraint cases. The reasonableness test was always employed, but the values it embodied during the era were such that almost any restraint no larger than the market in which the covenantee did business was held suitable.[53]

But the dicta of *Mitchel v. Reynolds* and the *Nordenfelt* case were finally brought to fruition in two decisions of the House of Lords which today form the heart of the English law of employee

---

[51] [1894] A.C. 535, *affirming* [1893] 1 Ch. 630 (C.A. 1892).

[52] [1894] A.C. at 566.

[53] Matthews and Adler analyzed thirty-three cases decided during this period. Of these, in only seven were the restraints found to be unreasonable. Five found unreasonable were postemployment restraints; two were nonancillary restraints; none were invalidated in cases in which a business interest had been transferred. Thus there is some indication that even in this period some weight was occasionally given to the different nature of employee restraints. MATTHEWS & ADLER, *op. cit. supra* note 21, at 198–215.

restraints. In *Mason v. Provident Clothing & Supply Co.*[54] and *Herbert Morris, Ltd. v. Saxelby*,[55] the Lords took note of changing values with respect to employer-employee relationships and undertook a thorough reexamination and reformulation of principles. These cases together established first, that the rule of reason required different measures to be applied in employee-restraint cases; second, that the employer must affirmatively show that the restraint sought to be enforced is no broader than needed for his reasonable protection; third, that the restraint must be reasonable, taking into account the interests of the employee as well as the employer; and finally, that a restraint could not be justified if its only purpose is to protect the employer from future competition, as such; in this respect postemployment restraints differ from those agreed to in connection with purchases of good will, for example.[56]

Thus, throughout the period since *Mitchel v. Reynolds*, and probably before, English courts almost uniformly adhered to a rule of reason with respect to employee restraints. Most courts recognized that the general-partial distinction was derived from application of the principle to a particular situation, and as technology advanced the distinction diminished in vigor and was finally abandoned. The rule of reason during the period derived much of its content from the predominant importance accorded freedom-of-contract ideas. Only in the House of Lords was an imbalance consistently noted and finally definitively redressed. Henceforth application of the rule of reason would put the courts in a more active role in protecting the employee from undue burdens. Macclesfield's methods and insights of two hundred years earlier had at last been fully understood and adapted to modern conditions.

The development of the law of postemployment restraints in America parallels the nineteenth-century English pattern, but with two characteristic differences. First, the courts had to struggle with the general-partial distinction in the context of state as well as national boundaries. Second, in the application of the reasonableness test, almost from the beginning more emphasis was

---

[54] [1913] A.C. 724.
[55] [1916] 1 A.C. 688.
[56] This summarizes the excellent synthesis contained in the opinion of Younger, L.J., in Attwood v. Lamont, [1920] 3 K.B. 571, 580 (C.A.).

placed on protecting the employee from overly heavy burdens and less on the conclusiveness of contractual terms.

The earliest cases, following the lead of American commentators,[57] provided an inauspicious start. In two New York cases it was stated that restraints extending over the entire state were void without regard to the circumstances.[58] But by 1866, in a case involving a restraint upon an employee, the high court of Pennsylvania, distinguishing the "sale of handicraft" from the sale of property, noted that an equity court should "regard the hardship of the bargain, and the prejudice to the public" and refused injunctive relief without reference to mechanical rules.[59]

In 1874, in *Oregon Steam Nav. Co. v. Winsor*,[60] the Supreme Court upheld a covenant, given in connection with the sale of a steamship, not to compete in the state of California. The Court noted that "in this country especially, where State lines interpose such a slight barrier to social and business intercourse . . . . cases may arise in which it would involve too narrow a view of the subject to condemn as invalid a contract not to carry on a particular business within a particular State." [61] Shortly thereafter, New York reversed its position,[62] Massachusetts also announced a rule of reason,[63] and Rhode Island, appropriately enough, became the first state to reject the relevance of state boundaries in a case involving an employee restraint.[64] The Rhode Island court also noted that the reasonableness of a restraint depended on "the nature and circumstances of the transaction" and could be expected to be quite different in the case of a restraint upon a "mere servant." In sum, within fifty years after the first American restraint-of-trade case, the "reasonableness" criterion was firmly established, and the Supreme Court and the most influential state courts had laid the groundwork for abandoning the mechanical general-partial distinction.[65]

---

[57] See, *e.g.*, note 39 *supra*.

[58] Lawrence v. Kidder, 10 Barb. 641 (N.Y. Sup. Ct. 1851); Dunlop v. Gregory, 10 N.Y. 241 (1851) (dictum).

[59] Keeler v. Taylor, 53 Pa. 467, 470 (1866).

[60] 87 U.S. (20 Wall.) 64 (1874).

[61] *Id.* at 67.

[62] Diamond Match Co. v. Roeber, 106 N.Y. 473, 13 N.E. 419 (1887).

[63] Morse Twist Drill & Mach. Co. v. Morse, 103 Mass. 73 (1869).

[64] Herreshoff v. Boutineau, 17 R.I. 3, 7, 19 Atl. 712, 713 (1890) (dictum).

[65] [T]he true test, in considering the legality of a condition of covenant in restraint of trade, is not whether the restraint covers the whole State or Nation, but it is whether the restraint is *reasonable* . . . . The latest decisions of the United States Supreme Court, the Court of Chancery in England, the Court

In at least one case, an American court had explored the special problems of employee restraints earlier and more thoroughly than any English court, with interesting results. Shortly after Justice Fry had decided the *Rousillon* case in strong freedom-of-contract terms, a New Jersey court, in *Mandeville v. Harman*,[66] was making a quite different appraisal. A well-established physician, having employed an assistant, renewed his contract, inserting a condition that the employee not engage in the practice of medicine or surgery in Newark at any later time. Shortly after the renewed contract expired, the defendant opened up an office in Newark, the reason for his termination with the plaintiff not appearing. Injunctive relief was denied. The court reasoned that although a restraint for the whole period of one's life might be reasonable in the case of the sale of good will, it was much longer than was necessary to protect the complainant on these facts. Most interesting is the court's analysis that "professional skill, experience and reputation are things which cannot be bought or sold." [67] If a physician seeks to sell his practice, all the purchaser can get is "immunity from competition with him." [68] Thus, inferentially, the risk of loss of clientele to his assistant was not sufficient to justify contractual protection; the only important effect was to prevent competition. Incomplete though this analysis is, and in spite of the debatable outcome of the case,[69] no earlier opinion, American or English, had gone as far in recognizing the essential dilemma of employee restraints and in discerning the differences which were soon to cause the development of the law concerning them to split off and go its own way.

Thus, by the end of the nineteenth century, courts in both England and the United States had fully accepted the method of decision on which modern refinements were to develop. This ap-

---

of Appeals of New York, and the Supreme Court of Rhode Island . . . are decisive of this subject . . . .

Eaton, *On Contracts in Restraint of Trade*, 4 HARV. L. REV. 128, 136–37 (1890). The author does not draw a distinction, also supportable in the American cases, between the application of the rule of reason in employee and other restraint cases. The early American cases are more exhaustively collected, and discussed, in Kerr, *Contracts in Restraint of Trade*, 22 AM. L. REV. 873 (1888).

[66] 42 N.J. Eq. 185, 7 Atl. 37 (Ch. 1886).

[67] *Id.* at 193, 7 Atl. at 40.

[68] *Id.* at 194, 7 Atl. at 41.

[69] Few later cases have followed the court's logic to the same conclusion in restraint on doctors' assistants. See Dodd, *Contracts Not To Practice Medicine*, 23 B.U.L. REV. 305 (1943); Annot., 58 A.L.R. 156 (1929).

proach, the rule of reason, once properly understood, inevitably led to the elimination of the artificial distinction which had grown from too literal a reading of *Mitchel v. Reynolds*. By the early years of the present century the reasonableness approach had also laid the groundwork for the divorce of the law of employee restraints from its rather unnatural marriage with the doctrines governing restraints of other types.

## III. The Recent Developments — Some General Considerations

Today the courts are in almost universal agreement that the restraint-of-trade doctrine is not unitary.[70] Decisions involving one type of restraint may have very little persuasive effect in a dispute involving another type.[71] The basic reasons recognized in *Mitchel v. Reynolds* have been formulated in much greater detail in the recent cases.

The considerations are these. A transfer of good will cannot be effectively accomplished without an enforceable agreement by the transferor not to act so as unreasonably to diminish the value of that which he is selling. The same is true in regard to any other property interest of which exclusive use is part of the value. The restraint on the transferor in such a case necessarily runs concurrently with the use of the property by the covenantee. Thus, such a restriction is analogous to a performer's contract for an exclusive appearance or a famed designer's agreement not to lend his name and talent to the design of a competing product. Indeed, some courts have thought that an employee restraint

---

[70] This development has not been without opposition. Although Professor Williston recognized that courts were less disposed to sustain employee restraints than others, he asserted that "the distinction . . . seems unadvisable as a positive rule of law." 3 WILLISTON, CONTRACTS § 1643 (1920). In a later edition, although still doubting the desirability of the distinction, he reported that "there is a tendency in the United States to follow the English courts in differentiating between contracts in restraint of trade and contracts in restraint of employment." 5 WILLISTON, CONTRACTS § 1643 (rev. ed. 1937). Professor Carpenter supported the distinction. Carpenter, *supra* note 2, at 267. Professor Corbin does not refer to the dispute. The *Restatement* recognizes differing tests of "reasonableness." RESTATEMENT, CONTRACTS § 515, comment *b* (1932).

[71] This is not to say that courts do not cite cases dealing with other classes of restraints in support of general propositions. See cases cited in Annot., 43 A.L.R.2d 94, 111 (1955). However, employee-restraint cases are not decided in terms of general propositions, but, as is universally agreed, on their individual facts. A factual analogy based on cases other than those involving employee restraints would not be particularly persuasive.

should be enforced only if the employee's services are unique.[72] This is a natural confusion that arises from the analogy with restraints incident to sales. The essential purpose of the post-employment restraint is quite different, however. Its objective is not to prevent the competitive use of the unique personal quali-ties of the employee — either during or after the employment — but to prevent competitive use, for a time, of information or re-lationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment. Unlike a restraint accompanying a sale of good will, an employee restraint is not necessary for the employer to get the full value of the thing being acquired — in this case, the employee's current services. The promise not to act in certain ways after terminating employ-ment is something additional which the employer may or may not feel to be important and worth bargaining and paying for, de-pending on the circumstances. A sale of good will implies some obligation to deliver the thing sold by refraining from competi-tion,[73] just as an employment contract implies some obligation not to impair the value of the services rendered by competitive activity during the period of employment.[74] But no such com-mitment not to compete after employment can be implied from an ordinary employment contract. Thus, courts properly should, and do, look more critically to the circumstances of the origin of postemployment restraints than to the circumstances of other classes of restraints.

Making this investigation, they find that the parties to an em-

---

[72] The most dignified statement of this view was in Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708 (1923). The New York courts no longer require uniqueness, Foster v. White, 248 App. Div. 451, 290 N.Y. Supp. 394 (1936), *aff'd*, 273 N.Y. 596, 7 N.E.2d 710 (1937), if they ever did, although the criterion occasionally reappears, not as a requirement but as one of the alternative reasons for enforcing a restraint. See, *e.g.*, Bristol Insulation Co. v. Cuomo, 137 N.Y.S.2d 46, 47 (Sup. Ct. 1954). See also 3 DET. L. REV. 38, 41 (1932). The error of the analysis is not often repeated, however, and is occasionally specifically noted and avoided. Sarco Co. v. Gulliver, 3 N.J. Misc. 641, 129 Atl. 399 (Ch. 1925), *aff'd*, 99 N.J. Eq. 432, 131 Atl. 923 (Ct. Err. & App. 1926); Briggs v. Butler, 140 Ohio St. 499, 510-11, 45 N.E.2d 757, 763 (1942).

[73] There are differences among courts concerning how extensive a restraint should be implied. *Compare* Hall Mfg. Co. v. Western Steel & Iron Works, 227 Fed. 588 (7th Cir. 1915), *with* Saunders v. Piggly-Wiggly Corp., 30 F.2d 385 (6th Cir. 1924).

[74] This duty will be implied from general agency principles. RESTATEMENT (SECOND), AGENCY § 393 (1958). This article is not concerned with either express or implied contractual obligations not to compete during the period of actual con-tinuing employment.

ployee covenant are often of unequal bargaining power and, thus, that there is less likelihood that the covenant was actually bargained for. They may find that the employee has improvidently given up his only valuable economic asset, specialized proficiency arising from experience or training. On the other hand, a seller of property is more likely to have other sources of income or, in any event, income from the capital arising from the sale. Finally, they find that an employee covenant has an inevitable tendency to reduce an employee's mobility and bargaining power during his employment. Because of these differences,[75] courts are more likely to declare an employee covenant invalid as unreasonable, or, in giving injunctive relief, they are more likely to require that an employer settle for less thoroughgoing protection than that accorded a transferee of a property interest.[76]

The formulation of the test of the validity of postemployment restraints most often cited in recent cases is that of the *Restatement of Contracts*.[77] A covenant restraining an employee from competing with his former employer on termination of employment is valid if it is reasonable in view of the circumstances of the particular case.[78] A restraint is reasonable only if it (1) is no

---

[75] These possible differences are discussed in many recent cases, notably Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543 (1944); Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 45–46, 105 N.E.2d 685, 704 (C.P. 1952).

[76] Originally, as was noted in the foregoing discussion, *Mitchel v. Reynolds* announced that the burden of proof to show the validity of the restraint was on the employer. In Tallis v. Tallis, 1 El. & B. 391, 118 Eng. Rep. 482 (Q.B. 1853), this presumption was reversed, but in Mason v. Provident Clothing & Supply Co., [1913] A.C. 724, the House of Lords reversed that holding and returned to the older rule. See Attwood v. Lamont, [1920] 3 K.B. 571, 588–89 (C.A.).

The vast majority of American jurisdictions place the burden on the proponent of the restraint. But Vermont, at least, seems to have adopted the other rule. Dyar Sales & Mach. Co. v. Bleiler, 106 Vt. 425, 175 Atl. 27 (1934). The employer, having a fuller "picture" of the company's interests and needs than any employee, should be in a much better position to show that a restraint is no more burdensome than needed to protect the employer's legitimate interest. The employee, on the other hand, would find it difficult to show that the restraint is unreasonable.

[77] RESTATEMENT, CONTRACTS §§ 513–15 (1932).

[78] In several states, covenants by the employee not to carry on a similar business or solicit old customers are controlled by statute. North Dakota, Louisiana, and Oklahoma declare void all contracts which restrain an employee from carrying on any profession, trade, or business. N.D. REV. CODE § 9–0806 (1943), Olson v. Swendiman, 62 N.D. 649, 244 N.W. 870 (1932); LA. REV. STAT. § 23:921 (1950), Baton Rouge Cigarette Serv., Inc. v. Bloomenstiel, 88 So. 2d 742 (La. Ct. App. 1956); OKLA. STAT. tit. 15, § 217 (1951), E. S. Miller Labs., Inc. v. Griffin, 200 Okla. 398, 194 P.2d 877 (1948). Alabama limits an employee's undertaking not to compete to the area of a specific city or county for as long as the employer carries on business there. ALA. CODE tit. 9, §§ 22, 23 (1940), Shelton v. Shelton, 238 Ala.

greater than is required for the protection of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.[79]

Like rules of reason generally, this formulation is so general as to throw little light on specific detailed problems. Furthermore, it is artificial — even inaccurate — in its description of the deliberation which actually takes place. For example, the permissible limits of employer protection cannot be defined without simultaneous attention to the correlative interests of the employee; nor can such a balancing of employer and employee interests proceed without reference to the public interest in workable employer-employee relationships, on the one hand, and in individual economic freedom, on the other. Thus, some courts have reformulated the first branch of the test to state that a restraint is reasonable only if it is no greater than is required for the protection of the employer *in some legitimate interest*.[80] With this formulation, they find greater freedom to engage in a balancing of all the factors which they consider relevant. However, having completed the analysis of the extent of a protectible interest, courts usually find

---

489, 192 So. 55 (1939). California declares void all employee restraints of this nature. CAL. BUS. & PROF. CODE § 16600, Morris v. Harris, 127 Cal. App. 2d 476, 274 P.2d 22 (Dist. Ct. App. 1954). However, the statute has been construed to allow a covenant by the employee not to solicit the customers of the employer for a reasonable time. Gordon v. Landau, 49 Cal. 2d 690, 321 P.2d 456 (1958). Florida limits employee restraints to those "within a reasonably limited time and area . . . so long as such employer continues to carry on a like business therein." FLA. STAT. § 542.12 (1957), Atlas Travel Serv., Inc. v. Morelly, 98 So. 2d 816 (Fla. Dist. Ct. App. 1957). However, a majority of the Florida Supreme Court seemingly ignored the statute in a per curiam opinion affirming a lower court's refusal to enforce an apparently reasonable employee covenant. United Loan Corp. v. Weddle, 77 So. 2d 629 (Fla. 1955). Michigan allows an employee covenant not to carry on a similar business only when the employee has had access to route lists of the employer. In such situations, a covenant not to do business for ninety days in the territory covered by the route is allowed. MICH. COMP. LAWS §§ 445.761, .766 (1948), Wedin v. Atherholt, 298 Mich. 142, 298 N.W. 483 (1941). South Dakota declares void all employee covenants except when both parties are in a profession licensed by the state. In such cases, a covenant not to carry on a similar business for ten years within twenty-five miles of the former employer is permitted. S.D. CODE § 10.0706 (1939).

[79] This is an adaptation of the *Restatement*'s more general formulation to post-employment restraints, typical of those found in the cases. See Annot., 43 A.L.R.2d 94, 144 (1955). It is somewhat broader and more general than the *Restatement* in its formulation of the "injury to the public" test. The *Restatement* limits injury to the public to tendency or purpose to create a monopoly, to control prices, or to limit production. RESTATEMENT, CONTRACTS § 515 (1932).

[80] See, *e.g.*, Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 28, 105 N.E.2d 685, 691 (C.P. 1952).

the relevant considerations exhausted; the other branches of the *Restatement* formulation are seldom, as separate considerations, given much attention. This does not mean that the interests of the employee and the public are necessarily slighted, but only that "undue hardship" to the employee and "injury" to the public are measured against the urgency of the employer's claim to protection, rather than against some extrinsic standard. This is only to say that courts treat the problem as a normal exercise of judgment, while the *Restatement* formulation has a check-list conceptualism about it. In addition, although the "undue hardship" limitation might open the way for consideration of the personal circumstances of the restrained employee — his financial circumstances or other factors unrelated to the employment relationship — such considerations are not often treated in opinions. It seems reasonably clear that they should not be, except, perhaps, under most extraordinary circumstances.

Although the current formulation may be inelegant, its thrust is clear. Every postemployment restraint, for whatever reason imposed, has inevitable effects which in some degree oppose commonly shared community values. In view of our feeling that a man should not be able to barter away his personal freedom, even this small degree of servitude is distasteful. It is particularly distasteful if there is no effective bargaining between the parties — as in the situation in which the employer knows that everyone else in the industry insists on the covenant too, or when the employment officers have no authority to change the provisions of the employment contract form. The values offended are more social or political than economic. However, there are important economic considerations as well. Anything that impedes an employee's freedom of access to a job in which his productivity (and wages) would be higher, involves a cost in terms of the economy's welfare.

Balanced against these considerations are the needs of efficient business organization. When a business grows past the one-man size, important business information must be entrusted to an employee; as the business grows still larger such information must be entrusted to many more. Optimum division of labor and specialization cannot take place unless confidential business information relating to technology, processes, plans, development activity, customers, and the like, is entrusted to appropriate employees. The optimum amount of "entrusting" probably will not occur

JA0272

unless the risk of loss to the employer through breach of the trust can be held to a minimum.

What most recent cases require to enforce a restraining covenant, although not stating the requirement in these terms, is that the employer show special circumstances which make it unfair for him to bear all the risk of placing the employee in a position in which a later breach of confidence might be costly. Only in this way can the employer justify a covenant which in effect shifts the burden of an important business risk to an employee.

Before examining the cases to see what these special circumstances may be, it is worthwhile to suggest one further note of theory. As a risk-distributing device the restraint on future employment is neither particularly efficient nor fair. First, it is not efficient because the cost (inconvenience) to the employees as a group bears no relation to the risk of injury; most employees burdened with such restrictions represent at any given moment no substantial risk, because most of the time neither their knowledge nor their personal contacts could actually result in damage to the employer. A restraint tailored to protect against circumstances when maximum damage could be done will necessarily "over-protect" most of the time. Second, the device is unfair in that its burdens are borne equally by honest and loyal employees and by those who are neither. A perfectly fair and efficient device would force any employee guilty of a breach of loyalty to reimburse the employer at once in the exact amount of any loss caused by the breach. No burden would be borne by any other employees. In theory, this is the exact result achieved by the usual action for damages. In practice, as will be noted later, it is clear that such a remedy is far from adequate.

## IV. PROTECTIBLE EMPLOYER INTERESTS

Whether an interest is ultimately protectible, in the sense that its presence will support an injunction to enforce a restraining covenant, depends in part on how burdensome a restraint is needed to protect it. However, some general observations can be made about the kinds of business interests which may be protected by suitably limited restraints.

First, a clarifying exclusion can be made. Even when job specialization and simplification have been carried to an advanced stage, many types of employment require a period of orientation or on-the-job training. During this period the employee's wage

or salary is likely to be somewhat greater than the current value of his services. The cost of the training represents an investment by the employer in the employee — one which he hopes to recapture, with an appropriate return, from the enhanced productivity of the employee's future services. However, the employer cannot be sure that the employee will stay on so that the investment will be rewarded, since contracts for personal services are not usually specifically enforced.[81] Thus the employer may feel justified in seeking to make it more difficult for the employee to leave — particularly to go into competitive employment — by any effective device at hand. A covenant against postemployment competition may have the desired effect. Furthermore, a plausible public-policy argument is available: Unless some enforceable commitment or effective deterrent is possible, employers will not be justified in making the optimum outlay on employee-training programs; even an employee eager for training will be unable to commit himself firmly enough to warrant the undertaking. This argument is a close counterpart of the strongest reason for enforcement of covenants not to compete in connection with the sale of a business: Only if the covenant is enforceable can the vendor effectively transfer, and be paid for, the good will which he has developed.[82]

These arguments have not proven sufficiently persuasive. It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee. The fact that they were acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant,[83] even though the on-the-job training has been extensive and costly.[84] In the absence of special circumstances the risk of future competition from the employee falls upon the employer and cannot be shifted, even though the possible damage is greatly increased by experience gained in the course of the employment.[85]

---

[81] RESTATEMENT, CONTRACTS § 379 (1932).

[82] This is the argument, it will be remembered, which constituted the central rationale of the decision in *Mitchel v. Reynolds*. See p. 629 *supra*.

[83] See, *e.g.*, Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405 (1954); Dunfey Realty Co. v. Enwright, 101 N.H. 195, 138 A.2d 80 (1957); Herbert Morris, Ltd. v. Saxelby, [1916] 1 A.C. 688.

[84] Club Aluminum Co. v. Young, 263 Mass. 223, 160 N.E. 804 (1928).

[85] Although the foregoing principles can and should be stated squarely, the fact

This basic postulate is limited in its effectiveness by the inherent difficulty, on any set of facts, of drawing a line between training in the general skills and knowledge of the trade, and training which imparts information pertaining especially to the employer's business. This difficulty is the central problem of employee restraints. What special facts must exist in the employment relation to overcome the presumption against limiting postemployment competition? How broad a restriction on an employee's freedom do such special circumstances make permissible?

It should not be surprising that the business interests important enough to support an employee restraint are those which would have some degree of legal protection even in the absence of a contract. In order to enforce a restraint, the employee must present a substantial risk either to the employer's relationships with his customers or with respect to confidential business information. These will be seen to be closely related to the traditional "customer list" and "trade secret" doctrines of the law of unfair competition. However, postemployment restraints may in some cases legitimately extend protection somewhat beyond the special circumstances which those doctrines encompass, particularly in the area of customer relationships.

### A. *Customer Relationships*

In almost all commercial enterprises, except in the few cases in which the market approaches the ideal of perfect competition, contact with customers or clientele is a particularly sensitive aspect of the business. In smaller concerns, or even in large businesses with a relatively small clientele, sales and customer service are typically handled largely by the proprietor or one or more

---

is that in almost any case an employer can point to some information imparted which pertains exclusively to the company. If the court determines that this is sufficient to qualify as something over and above normal training in the general skills of the trade, it may then take into account the total "investment" the employer has made in the training process, as well as the experience and background which the employee brings to the job, in determining the reasonableness of the restraint. See cases cited in Annot., 43 A.L.R.2d 94, 203–04 (1955). This may appear to be an artificial process of decision, and perhaps it is. Yet it may be the only way to reconcile the courts' general agreement on the principle with the obvious fact that some weight is given to the overall balance between the employer's contribution and the employee's when the case is otherwise a close one. Any artificiality may be a reasonable price to pay to retain vigor in the principle that merely equipping an employee to be a potentially more dangerous competitor is not in itself enough to support a restraint.

of the partners or trusted officers, depending upon the form of business organization. In most businesses, however, as the size of the operation increases, selling and servicing activities must be at least in part decentralized and entrusted to employees whose financial interest in the business is limited to their compensation. The employer's sole or major contact with buyers is through these agents and the success or failure of the firm depends in part on their effectiveness. Although the employee's job may be limited to servicing an existing customer route or list, or dealing with those who come to the employer's place of business or do business by mail or telephone, in many cases he is expected to bring in new business. In any of these situations, the possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own. Businessmen have very probably spent as much time worrying about this risk, and seeking legal techniques of reducing it, as they have for any other business problem. The protection available from traditional common-law doctrines has been very limited, reflecting in part the fact that balancing the employer's and the employee's claims in these circumstances is not easy.

The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property. Certainly, the argument goes, the employee should have no equity in the custom which the business had developed before he was employed. Similarly, under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal. This is what he is being paid to do. When he leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cash-box.

The employee's viewpoint is that if by fair means he can persuade those with whom he has dealt that keeping his services outweighs the reasons for staying put, his claim to the relationship is

JA0276

superior to that of the employer. He urges that his duty as an employee to preserve customer relationships for the benefit of the employer terminates with the employment. Freedom to use business contacts for one's own benefit should not be impaired by restraints which have the effect of inhibiting competition.

In the difficult process of balancing these considerations, the courts have given more weight to the arguments of the former employee.[86] They have generally agreed that, in the absence of an express contract, he may not be restrained from competing with his former employer nor from soliciting his customers. However, at least two classes of possible exceptions have been recognized in addition, of course, to the ordinary duty not to misrepresent or mislead the customer about the change of circumstances. First, the employee may not use a secret list of customers prepared by the former employer, nor any other confidential information about the customer obtained by virtue of the former employment; this exception is almost uniformly recognized and the doctrines have been applied and refined in a multitude of cases. In addition, some courts recognize a fiduciary duty extending beyond that of the ordinary employee for an individual, such as an officer of a corporation, who was in a position of special trust.

To be protected, however, a customer list must be more than a listing of firms or individuals which could be compiled from directories or other generally available sources. Only when it represents a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it, will appropriation and use in competition by the former employee be enjoined. However, in many jurisdictions a former employee cannot be prevented from using a list, prepared after leaving the employment, which is based on his own experience or made up from memory.

The customer-list doctrine and the "memory" exception have been extensively criticized, commentators making the entirely

---

[86] The following brief discussion of the legal doctrines applied in cases dealing with employee solicitation of the customers of a former employer, in the absence of express contractual restraints, relies upon, and may be supplemented by, the detailed discussion and cases cited in 2 CALLMANN, UNFAIR COMPETITION AND TRADE-MARKS 834–49 (2d ed. 1950) [hereinafter cited as CALLMANN]; ELLIS, TRADE SECRETS § 72 (1953) [herinafter cited as ELLIS]; 1 NIMS, UNFAIR COMPETITION AND TRADE MARKS § 157 (4th ed. 1947) [hereinafter cited as NIMS]; RESTATEMENT, TORTS §§ 708, 711–12 (1938); Annot., 126 A.L.R. 758 (1940); Notes, 34 ILL. L. REV. 365 (1939); 8 J.B.A. KAN. 285 (1939); 1 SYRACUSE L. REV. 110 (1949); 22 VA. L. REV. 359 (1936); 21 VA. L. REV. 330 (1935).

*HARVARD LAW REVIEW* [Vol. 73:625

reasonable observation that the length of an employee's memory seems irrelevant to what is or is not fair postemployment activity.[87] Yet the distinction has survived, indeed remained vigorous, over a long period. This is some evidence that it is helpful to courts and probably approximates good sense in most cases. The explanation seems to be that the "memory" rule of thumb, in application, allows the former employee to solicit those customers whom he has played some personal role in obtaining or retaining for the former employer, giving him the benefit of a rather wide margin of doubt. Insofar as the employee has need of a written list to refresh his memory, it can be fairly assumed that he played no significant role in developing or maintaining the relationship. Thus, the customer-list doctrine may be interpreted as a judicial judgment to intervene, absent a special contract provision or other special circumstances, only when it is entirely clear that the employee has had no significant relationships with the customer. As will be noted, this approach to balancing the competing "claims" of the employer and employee is becoming of increasing importance in the employee-restraint cases.

In addition to policy reasons for thus severely limiting the employer's claim to his clientele, there is reluctance on the part of courts to extend the substantive scope of protection to circumstances for which effective remedies may be impossible to devise. Damages are necessarily highly speculative, for if the customer is willing to go with the former employee there is some reason to assume that he might not have continued the old relationship much longer in any event. As for equitable relief, it is difficult to think of a more easily frustrated order than an injunction against solicitation. It is certainly not desirable to order the former employee not to transact business with the customer even if the customer comes to him without solicitation;[88] yet if two parties who have had regular business dealings desire to make an arrangement, how the overtures were carried out — including

---

[87] *E.g.*, 2 CALLMANN, 844–45; McClain, *Injunctive Relief Against Employees Using Confidential Information*, 23 KY. L.J. 248, 259 (1935). The exception does not protect an employee when he acts under a carefully worked out plan which includes "stealing" the former employer's clientele built up through great effort and expense, *cf.* Reid v. Mass Co., 155 Cal. App. 2d 293, 318 P.2d 54 (Dist. Ct. App. 1957), or when there have been activities which involve grossly unfair competition of other kinds.

[88] Courts usually refuse to issue so broad an order, at least when nothing more is shown than competition by a former employee. Kramer, *Protection of Customer Lists in California*, 23 CALIF. L. REV. 399, 404 (1935), and cases cited therein.

whether a solicitation was made — will seldom be known to outsiders. Furthermore, the former employer is not likely to maintain happy relations with a customer who learns that a court order has been obtained which prevents him from receiving an offer from an old business friend.[89]

For these reasons the employer is apt to regard his interests as inadequately protected by traditional legal remedies, and his arguments are not without merit. An enforceable employee covenant not to compete remedies this deficiency, and with a vengeance. In at least three different ways such covenants may provide protection beyond that which would otherwise be available. First, they may deter the employee from leaving his employment and thus from finding himself in a position to compete for customers; second, if the former employee violates the covenant, he may be ordered out of the business entirely, rather than subjected only to the less effective order not to solicit; finally, an effective covenant may in some cases not only protect against solicitation of all the employer's actual customers but also guarantee his exclusive access to potential customers in the restricted area, rather than protect only against the misuse of customer lists.[90]

Courts in most jurisdictions have held that an employer has a sufficient interest in retaining his present customers to support an employee covenant whenever the employee's relationship with customers is such that there is a substantial risk that he may be able to divert all or part of their business.[91] This is the so-called "customer contact" basis.[92]

---

[89] Covenants not to solicit customers, which are commonly used, are really a narrow form of the type of postemployment restraint under discussion, and their enforceability is determined according to the principles being discussed. See generally Hines, *Employees' Covenants Not To Solicit Former Patrons*, 20 CALIF. L. REV. 607 (1932). It should be noted that such a restraint is subject to most of the same practical enforcement problems as relief granted on grounds of unfair competition in the absence of a contract. However, if enforceable, it does increase the class of customers access to which will be protected beyond the coverage of the customer-list doctrine. This discrepancy has been criticized. Hannigan, *The Implied Obligation of an Employee*, 77 U. PA. L. REV. 970, 980 (1929).

[90] The third result will be shown to be less likely today than at an earlier date. Courts now tend not to enforce area restrictions in many situations when the area contains many potential customers who have not been solicited or serviced by the employee. Text accompanying note 180 *infra.*

[91] A useful catalogue of cases by jurisdiction under headings of types of employment will be found in Annot., 41 A.L.R.2d 15, 92–102 (1955). The listing is essentially repeated in Annot., 43 A.L.R.2d 94, 164–75 (1955).

[92] An interesting discussion of this "theory" and its limitations will be found in Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 47–53, 105

This approach in its purest form is exemplified by a recent Utah decision.[93]  Allen, a registered pharmacist, had been hired to manage a drug store being built in an outlying section of Salt Lake City.  The employment contract contained a covenant that in the event of termination for any reason he would not "directly or indirectly compete, as an employee or principal in the operation of a drug store or pharmacy within a radius of two miles . . . for a period of five years thereafter." [94]  His activity was largely responsible for building up a good business within a short time, but at the end of a year he was fired to make room for a son of one of the directors of the company.  He sought a declaratory judgment as to the validity of the covenant.  The nature of the business was not such as to give rise to any trade secrets; the court specifically noted that "all prescriptions are prepared in conformance with specifications listed in United States Pharmacopoeia and National Formulary.  No methods of buying, displaying or the selling of merchandise were obtained by the plaintiff from the defendant." [95]  However, the restraint was held valid in its full scope, the court reasoning that in hiring plaintiff the pharmacy company was "purchasing the good will which might accrue to the business by reason of plaintiff's personal attributes. . . . In order to retain it after plaintiff's termination, a covenant was necessary which would prohibit him from drawing away all his close friends, but the defendant's customers, to another nearby drug store." [96]

The "customer contact" basis posits a substantial risk of loss of clientele to an employee because of the nature of his work.  Whether the risk will be sufficiently great to warrant a restriction, and how broad a restriction will be permitted, depends upon the extent to which the employee is likely to be identified in the cus-

N.E.2d 685, 705–09 (C.P. 1952), which is discussed at pp. 666–67 *infra*. See also Kelite Prods. v. Brandt, 206 Ore. 636, 294 P.2d 320 (1956), which reproduces a substantial section of the record in which the defendant, on cross-examination, explains his view that "if a man has a good product they are pretty apt to follow the man." *Id.* at 645, 294 P.2d at 324. (All italicized in original.) Defendant was engaged in the "highly competitive" business of selling industrial cleaning and maintenance compounds.

[93] Allen v. Rose Park Pharmacy, 120 Utah 608, 237 P.2d 823 (1951); *accord,* Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 12 A.2d 780 (1940). Compare Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 108 Atl. 541 (1919); Nesko Corp. v. Fontaine, 19 Conn. Supp. 160, 110 A.2d 631 (C.P. 1954).

[94] 120 Utah at 610, 237 P.2d at 824.

[95] *Id.* at 614–15, 237 P.2d at 826.

[96] *Id.* at 617, 237 P.2d at 827.

tomer's mind with the product or service being sold.[97] The most important factors seem to be (1) the frequency of the employee's contacts with customers and whether they are the employer's only relationships with those customers, (2) the locale of the contact, and (3) perhaps most important, the nature of the functions performed by the employee.

(1) *Frequency.* — The frequency of the employee's dealings with the customer is obviously important as a limiting factor. If contacts are infrequent and irregular, there may be no sufficient risk to the employer to support any degree of restraint.[98] When the commodity being sold is such that there are apt to be no "repeat" sales, such as residential real estate, or if sales are normally highly infrequent, as is true with major household appliances, a restraint may not be justifiable. The same is true when the nature of a service is such that it is required only very occasionally or at irregular intervals.[99]

Frequency of contact may also control or affect the permissible period of the restraint. Paradoxically, if the contact is less frequent, a longer period of restraint may be reasonable. Here the controlling idea is that the employer should be given a reasonable period of time in which to overcome the former employee's personal hold over the client, usually by putting another man on the job.[100] The employer's new representative should be given a reasonable opportunity to demonstrate to the customer that he will perform satisfactorily and to establish a working relationship. Thus, the less frequent the contacts, other factors being equal, the longer the period needed by the new employee.

Even though the employee's dealings with the customer are very frequent, they may not be given much weight in situations in which other contacts between the employer and the customer are

---

[97] See Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 47–53, 105 N.E.2d 685, 705–09 (C.P. 1952).

[98] *E.g.*, Harry Livingston, Inc. v. Macher, 30 Del. Ch. 94, 54 A.2d 169 (Ch. 1947); Crowell v. Woodruff, 245 S.W.2d 447 (Ky. 1951); Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 246 N.W. 567 (1933). *But see* Erikson v. Hawley, 12 F.2d 491 (D.C. Cir. 1926).

[99] Bowler v. Lovegrove, [1921] 1 Ch. 642; see Northwest Side Lumber Co. v. Layton, 239 Ill. App. 82 (1925); Tawney v. Mutual Sys., Inc., 186 Md. 508, 47 A.2d 372 (1946). *But see* Interstate Fin. Corp. v. Wood, 69 F. Supp. 278 (E.D. Ill. 1946).

[100] See Tawney v. Mutual Sys., Inc., *supra* note 99; Deuerling v. City Baking Co., 155 Md. 280, 141 Atl. 542 (1928); Allen v. Rose Park Pharmacy, 120 Utah 608, 237 P.2d 823 (1951); Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N.W.2d 585 (1955).

important, particularly when there are other relationships with senior officers or employees.[101]

(2) *Locale.* — Even when the employee is the primary contact man, if the transactions take place under circumstances in which the employee is not the only link with the product, the customer is less likely to direct his loyalty primarily to the employee. Transactions which take place at the employer's place of business may involve less risk to the employer than do those which take place exclusively at the customer's home or business establishment. Thus, in most cases in which there are repeated visits to the customer's home, such as when it is part of a milk, laundry, or other route, some degree of restraint is supportable.[102] On the other hand, equally frequent contacts of much the same quality when a customer regularly visits a store or office are less likely, of themselves, to be sufficient.[103]

The locale of contact may also influence the permissible scope of the restraint. When a regular customers' route has been developed, courts are increasingly insisting that the restraint be limited to the route itself.[104] If a salesman has an assigned territory in which he solicits business and services customers, a restraint will seldom be upheld if it extends beyond the limits of the territory actually served.[105] On the other hand, if the point of contact is the employer's place of business, courts are faced with the problem whether to limit the restraint to solicitation of actual customers of the employer, or to permit the restraint to be effective throughout the geographical area from which custom is drawn. The answer to the question will usually be determined by other factors, such as the nature of the product and whether the product is sold to the general public or to business concerns.

---

[101] See, *e.g.*, Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 47–52, 105 N.E.2d 685, 705–08 (C.P. 1952); Lantieri Beauty Salon, Inc. v. Yale, 169 Misc. 547, 7 N.Y.S.2d 984 (Sup. Ct. 1938).

[102] The "route" cases are numberless. See Annot., 43 A.L.R.2d 94, 316–21 (1955). For an important limitation on the general rule that appropriate restraints against soliciting routes are enforceable, see pp. 663–64 *infra*.

[103] See cases cited note 101 *supra*. *But see* Shirk v. Loftis Bros., 148 Ga. 500, 97 S.E. 66 (1918).

[104] See, *e.g.*, Denny v. Roth, 296 S.W.2d 944 (Tex. Civ. App. 1956); *cf.* Meyer v. Wineburgh, 110 F. Supp. 957 (D.D.C. 1953); Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

[105] See R. L. Guttridge, Inc. v. Wean, 8 N.J. Super. 450, 73 A.2d 284 (Ch. 1950); Delmar Studios v. Kinsey, 233 S.C. 313, 104 S.E.2d 338 (1958); Spinks v. Riebold, 310 S.W.2d 668 (Tex. Civ. App. 1958). *But see* Renwood Food Prods., Inc., v. Schaefer, 240 Mo. App. 939, 223 S.W.2d 144 (1949).

Where the general public makes up the clientele, it is often impossible to devise a restraint other than in terms of the geographic area of the normal market.[106]

(*3*) *Nature of the Employee's Activity.* — The quality of customer contacts, perhaps the most important factor, depends primarily upon the nature of the product or service involved and the degree of authority and responsibility given the employee.[107] At opposite extremes, the door-to-door salesman of a simple consumer's good may be contrasted with the executive salesman of automated installations, or, dealing in services, an account executive in an advertising agency. The risk to the employer reaches a maximum in situations in which the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction.[108]

The role the employee plays is apt to be related to another factor of importance. When the customer relationship calls for a high degree of executive skill, the employee is apt to occupy a relatively senior position in the company. Being a part of — or in close contact with — the higher echelons of management, he is usually in a position to bargain as an individual about the terms of his employment. It is more likely that any restraint he undertakes is tailored to the circumstances and bargained for, and thus less subject to skeptical review as a contract of adhesion.[109] Furthermore, a restraint applicable to such an individual is less likely to be based solely on his relationships with customers, because he is also apt to have access to confidential business information. Interestingly, however, there has been very little litigation concerning employment restraints on members of high-level management of large corporations.[110] Covenants undertaken by

---

[106] The problems presented by a restraint of this nature are discussed at pp. 679–81 *infra.*

[107] *Compare* Chemical Fireproofing Corp. v. Krouse, 155 F.2d 422 (D.C. Cir. 1946) (relief denied), *with* Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1947) (relief granted).

[108] See, *e.g.,* May v. Young, 125 Conn. 1, 2 A.2d 385 (1938) (production engineer); Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957) (accountant); Haysler v. Buttersfield, 240 Mo. App. 733, 218 S.W.2d 129 (1949) (placement counsellor); Spinks v. Riebold, 310 S.W.2d 668 (Tex. Civ. App. 1958) (salesman of highly specialized equipment).

[109] The relative bargaining power of the employer and employee is stressed in many cases both upholding and denying the validity of covenants. See note 161 *infra.*

[110] For instances of such litigation, see Wahlgren v. Bausch & Lomb Optical Co., 68 F.2d 660 (7th Cir.), *cert. denied,* 292 U.S. 639 (1934); Heinz v. Na-

"middle management" employees — branch managers, sales managers, and the like — are very apt to be upheld if the employee's position places him in contact with customers.[111] Restraints upon professional employees, such as associates or technical assistants of lawyers,[112] doctors,[113] architects,[114] accountants,[115] and dentists,[116] are also generally upheld when the customer relationships are substantial.[117] When the clientele being served is scattered throughout the country — as is often the case when customer contacts are at the executive level — courts are willing to enforce very broad territorial restraints,[118] although as will subsequently

---

tional Bank of Commerce, 237 Fed. 942 (8th Cir. 1916); Gilford Motor Co. v. Horne, [1933] Ch. 935. It should be noted that, except for the English case, none of the foregoing cases involved straight employment restraints of the usual sort.

[111] See, *e.g.*, Stokes v. Moore, 262 Ala. 59, 77 So. 2d 331 (1955); Fatzinger v. DeLong, 10 Pa. D. & C.2d 53 (C.P. 1956); Ofsowitz v. Askin Stores, Inc., 306 S.W.2d 923 (Tex. Civ. App. 1957); Phillips v. Seiberling Rubber Co., 278 S.W.2d 293 (Tex. Civ. App. 1954); Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N.W.2d 585 (1955).

[112] See Toulmin v. Becker, 69 Ohio L. Abs. 109, 124 N.E.2d 778 (Ct. App. 1954). American lawyers apparently do not use such covenants extensively, or at least do not take them to court. There are many cases involving English solicitors' clerks, in all of which, except the most recent, Dickson v. Jones, [1939] 3 All E.R. 182 (Ch.), the restraint seems to have been upheld. In the latter case the court noted that some protection is "almost always necessary" in cases involving solicitors, but found the restraint too broad in area in view of its unlimited duration.

[113] See Dodd, *Contracts Not To Practice Medicine*, 23 B.U.L. REV. 305 (1943). More recent cases include Millet v. Slocum, 4 App. Div. 2d 528, 167 N.Y.S.2d 136 (1957) (dictum); Keen v. Schneider, 202 Misc. 298, 114 N.Y.S.2d 126 (Sup. Ct.), *aff'd*, 280 App. Div. 954, 116 N.Y.S.2d 494 (1952). In Foltz v. Struxness, 169 Kan. 714, 215 P.2d 133 (1950), a one-hundred mile radial restraint was severed and enforced as to the city in which the employing physician practiced. In cases involving the other branches of the healing professions courts are more strict. See Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377 (1945) (veterinary); Rudolph Bros. v. Greulick, 21 N.Y.S.2d 971 (Sup. Ct. 1940) (optometrist).

[114] See Continental Paper Grading Co. v. Howard T. Fisher & Associates, 3 Ill. App. 2d 118, 120 N.E.2d 577 (1954).

[115] See Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957); Racine v. Bender, 141 Wash. 606, 252 Pac. 115 (1927).

[116] See cases cited in Annot., 43 A.L.R.2d 94, 165 (1955).

[117] In Skyland Broadcasting Corp. v. Hamby, 2 Ohio Op. 2d 426, 141 N.E.2d 783 (C.P. 1957), a covenant undertaken by a "disk jockey" was upheld when he tried to move to a competing radio station, the court reasoning that the employer had made a considerable investment in obtaining clientele by "building up" the employee as a "personality."

[118] See Wark v. Ervin Press Corp., 48 F.2d 152 (7th Cir. 1931); *In re* International Match Corp., 20 F. Supp. 420 (S.D.N.Y. 1937); Basic Food Sales Corp. v. Moyer, 55 F. Supp. 449 (W.D. Pa. 1944); Toulmin v. Becker, 69 Ohio L. Abs. 109, 124 N.E.2d 778 (Ct. App. 1954). Most of the employee cases in which a

**JA0284**

be shown, there is increasing evidence of disfavor of geographical restrictions when sufficient protection may be available from a covenant not to solicit former customers.[119]

The mere fact of frequent customer contact is not enough to provide a basis for an enforceable covenant when the circumstances of the contact are such that the risk to the employer is low, such as when the employee is engaged in the collection of bills or delinquent customer accounts,[120] or is working under the close supervision of the employer or a senior employee, as is often the case with office workers,[121] clerks in retail stores,[122] auto mechanics,[123] repairmen,[124] and the like. Nor are the normal friendships and contacts one may have socially in the community a sufficient support for a restraint, even though these may include customers or potential customers of the employer.[125]

The foregoing threefold breakdown of factors affecting the degree of risk is not, of course, exhaustive. Other facts in a case may be controlling; for example, the inconvenience of following the employee to a new place of business may be great,[126] or the employer's product or service may be unique.[127]

Thus far the discussion has assumed that the presence of a substantial risk of losing customers to an employee is itself an adequate basis for a reasonably designed restraint. A substantial majority of the cases support this position. However, there is an important limitation to this general rule. When an employee,

---

nationwide restraint has been enforced, however, have involved trade secrets of a technical nature. See cases cited in Annot., 43 A.L.R.2d 94, 275–77 (1955).

[119] See discussion at p. 690 *infra*; Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 108 Atl. 541 (1919) (dictum); *cf.* New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940); Tawney v. Mutual Sys., Inc., 186 Md. 508, 47 A.2d 372 (1946). *But see* John Roane, Inc. v. Tweed, 33 Del. Ch. 4, 89 A.2d 548 (Sup. Ct. 1952).

[120] See Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543 (1944); Interstate Tea Co. v. Alt, 271 N.Y. 76, 2 N.E.2d 51 (1936).

[121] See cases cited in Annot., 43 A.L.R.2d 94, 170–71 (1955).

[122] See cases cited *id.* at 174.

[123] See Ridley v. Krout, 63 Wyo. 252, 180 P.2d 124 (1947).

[124] See cases cited in Annot., 43 A.L.R.2d 94, 172 (1955).

[125] See Ridley v. Krout, 63 Wyo. 252, 180 P.2d 124 (1947). *But cf.* Allen v. Rose Park Pharmacy, 120 Utah 608, 237 P.2d 823 (1951).

[126] This point was made and carefully explored by Judge Hoover in Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 49, 105 N.E.2d 685, 706 (C.P. 1952).

[127] See, *e.g.*, Byers v. Trans-Pecos Abstract Co., 18 S.W.2d 1096 (Tex. Civ. App. 1929). It appears that a public utility would seldom be able to claim a customer-relationship basis for an employee covenant not to compete.

*HARVARD LAW REVIEW* [Vol. 73:625

usually a salesman or route service man, actually brings customers with him when he takes employment, courts are reluctant to prevent his soliciting them when he departs, regardless of the existence of a covenant not to compete.[128] Furthermore, a few older cases and a larger number of more recent decisions appear to be extending this idea by investigating the nature of the employer's claim to the custom served by the employee.

For example, in *Love v. Miami Laundry Co.*, [129] the employer had what would seem to be a very strong case. The three employees against whom relief was sought had been route servicemen and the employer's only contact with the customers, whom the employees visited regularly at their homes for over two years. It does not appear that the employees had brought clients or experience when they came to the job. The covenant did not extend over an area but only to actual customers of the laundry. The injunction sought was even narrower, viz., relief against solicitation of customers on the routes which defendants had actually serviced. After a rehearing and over a vigorous dissent the court refused injunctive relief, although it did not hold the covenant void. The court reasoned that "friendships and confidence [gained] amongst customers" are attributable to an employee's "God-given, or self-cultivated, ingratiating personality" [130] in which the employer has no property interest. Neither did the laundry obtain any "special property right" in the customer. The court noted that in many jurisdictions covenants based on such an interest have been enforced but argued that those courts did

---

[128] See M. & S. Drapers v. Reynolds, [1957] 1 Weekly L.R. 9 (C.A. 1956); Fleisig v. Kossoff, 85 N.Y.S.2d 449 (Sup. Ct. 1948), *aff'd*, 275 App. Div. 909, 90 N.Y.S.2d 273 (1949). *But see* Tawney v. Mutual Sys., Inc., 186 Md. 508, 47 A.2d 372 (1946).

[129] 118 Fla. 137, 160 So. 32 (1934); *accord*, J. Schaeffer, Inc. v. Hoppen, 127 Fla. 703, 173 So. 900 (1937). Since the *Love* case, Florida has enacted a statute permitting employee covenants "within a reasonably limited time and area . . . so long as [the] . . . employer continues to carry on a like business therein." FLA. STAT. § 542.12 (1957). However, in United Loan Corp. v. Weddle, 77 So. 2d 629 (Fla. 1955), decided after the new statute was passed, the Florida Supreme Court affirmed in a per curiam opinion a lower court's refusal to enforce a seemingly reasonable employee restraint. A more recent lower-court decision cited the strong dissent in the *Weddle* case and granted an injunction enforcing an employee restraint. Atlas Travel Serv., Inc., v. Morelly, 98 So. 2d 816 (Fla. Dist. Ct. App. 1957). Thus the status of the *Love* case as Florida law is highly uncertain. The case is included, however, primarily as an excellent example of the judicial attitude under discussion which is increasingly evident in recent decisions.

[130] 118 Fla. at 147–48, 160 So. at 36.

not give adequate attention to the employee's interests and to the fact that employee covenants are not bargained for between equals.

Further limitations of the customer-relationship basis for restraints are found in two more recent decisions. *Welcome Wagon, Inc. v. Morris* [131] is the latest reported episode in the history of the Welcome Wagon organization.[132] The company enters into contracts with women in communities throughout the country under which they arrange with local merchants to sponsor welcoming visits to the homes of newcomers into the community, newly married couples, and others. The welcomer brings greetings, small gifts, and advertising messages from the sponsors, who hope in this way to win future patronage. The sponsors pay Welcome Wagon a fee based on the number of visits made. The hostess gets a percentage, but no salary or guaranteed minimum amount. In addition to recruiting sponsors and making the visits, the hostess takes care of all other local arrangements and pays expenses, except that in some instances the organization arranges with a local auto dealer to provide a car which bears the organization's name. As its history shows, Welcome Wagon stands in great need of protection of its customer contacts, for the temptation is great for the local merchants and hostess to save the fifty per cent or more of fees which the organization takes under the contract. Furthermore, the organization apparently has no contact with its local sponsors other than through the local hostess. Yet when Nancy Morris violated her contract's covenant not to compete and actually enlisted former Welcome Wagon sponsors in her community in a new enterprise of a similar nature, Welcome Wagon was denied relief. The Court of Appeals found the restraint's five-year duration "entirely too long" and the geographic coverage — the city itself and, in separate clauses, any other places where the plaintiff "is then engaged" or "has been or has signified his intention to be engaged" in the service — too broad. The court found "no deep trade secrets and no highly confiden-

---

[131] 224 F.2d 693 (4th Cir. 1955).

[132] Previous Welcome Wagon attempts to enforce covenants substantially similar to that in the present case met with mixed results. *Compare* Briggs v. Butler, 140 Ohio St. 499, 45 N.E.2d 757 (1942), *and* Briggs v. Glover, 167 Misc. 306, 3 N.Y.S.2d 979 (Sup. Ct. 1938), *with* Briggs v. Boston, 15 F. Supp. 763 (N.D. Iowa 1936). A case contemporaneous with the *Morris* case was successful in the Indiana appellate court. Welcome Wagon, Inc. v. Haschert, 125 Ind. App. 503, 127 N.E.2d 103 (1955).

tial information," and by implication rejected any customer-contact basis for relief. Plaintiff requested that the covenant be reduced in scope by severance, but this also was denied.

In *Arthur Murray Dance Studios, Inc. v. Witter*,[133] the famous dancing master's organization suffered a reversal in its attempt to police the covenants not to compete which it requires of the instructors in its local establishments.[134] In an opinion already widely cited both for its result and its wit, the court rejected Murray's claim that the instruction it provided in the master's technique and methods provided sufficient basis for a restraint limited to professional dancing in the immediate area. The court also found the facts inappropriate for relief on the grounds of risk of loss of clientele. Although the opinion minimized the risk of injury in this respect, the court could hardly have failed to be aware that the personal following of individual instructors among their students is one of the major assets of such a school, and, indeed, doubtless the primary reason for the vigorous efforts by Murray to devise binding restraints and bring violators to court.

It is perhaps significant that in both the *Welcome Wagon* and *Arthur Murray* situations the employer's chief contributions to the enterprise appear to have been its name, some standardized procedures, and a very limited investment in entrepreneurial services. In each case the success or failure of the local venture depended to an unusual extent on the personal qualities of the employees. Even though the risk of diversion of the employer's clientele was substantial — in the *Welcome Wagon* case an accomplished fact — this alone was not considered a sufficient ground for even a comparatively modest limitation on the employee's future activities. Somewhat comparable circumstances were present in recent cases in which narrow covenants were refused enforcement against a salesman for an advertising agency,[135] a driver-solicitor for an equipment-rental service,[136] a real-estate and insurance salesman in a small community,[137] a salesman of barber- and beauty-shop

---

[133] 62 Ohio L. Abs. 17, 105 N.E.2d 685 (C.P. 1952).

[134] Other efforts are represented by Murray v. Cooper, 268 App. Div. 411, 51 N.Y.S.2d 935 (1944), *aff'd*, 294 N.Y. 658, 60 N.E.2d 387 (1945) (relief denied); Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (1951) (relief allowed).

[135] Davis-Robertson Agency v. Duke, 119 F. Supp. 931 (E.D. Va. 1953).

[136] Thomas v. Coastal Industrial Servs., Inc., 214 Ga. 832, 108 S.E.2d 328 (1959).

[137] Dunfey Realty Co. v. Enwright, 101 N.H. 195, 138 A.2d 80 (1957).

equipment,[138] and a retail ice-cream salesman.[139]  It is submitted
that these cases are indicative of a growing tendency on the part
of courts not only to require a showing of substantial risk of losing
clientele to the former employee, but also to balance the con-
flicting claims of the employer and employee to the customers in
question.  Where the employer's role in securing or retaining custo-
mers is limited in relation to the employee's, it appears to be in-
creasingly likely that no protectible interest sufficient to support
a restraining covenant will be recognized.

### B. Confidential Business Information

Although a commanding majority of the litigated employee-re-
straint cases represent attempts, usually by proprietors of small
businesses, to preserve their clientele, many companies are pri-
marily interested in restrictive covenants as a means of prevent-
ing valuable business information obtained by employees from
being used by a competitor.  The archetype of this class of protect-
ible interests is the "trade secret," traditionally a "plan or process,
tool, mechanism, or compound, known only to its owner and those
of his employees to whom it is necessary to confide it." [140]  These
business artifacts have been dignified with the label of "property"
and are protected against disclosure or misuse during or after
employment — or, indeed, whether or not the miscreant was ever
an employee — for as long as they retain their confidential na-
ture.[141]

The concept of the trade secret, however, has its roots in an era
when business technology was less complex and dynamic than it
is today.  The formula of a patent medicine or a secret process was
often the cornerstone of a business whose methods and product
remained unchanged for decades.  But the acceleration of the
rate of growth of the economy, characterized by vastly broader
markets and an avalanche of new products, has produced entirely
new forms of business behavior.  Firms are increasingly produc-
ing a larger number of products.  Competition increasingly takes
the form of rivalry among producers of products which are dif-

---

[138] Saul v. Thalis, 156 F. Supp. 408 (D.D.C. 1957).

[139] Kleinwaks v. Shiner, 10 Pa. D. & C.2d 419 (C.P. 1957).

[140] National Tube Co. v. Eastern Tube Co., 13–23 Ohio C.C. Dec. 468, 470
(1902), aff'd, 69 Ohio St. 560, 70 N.E. 1127 (1903) ; see RESTATEMENT, TORTS § 757,
comment b (1939). See generally ELLIS §§ 1–16.

[141] See, e.g., 1 NIMS § 141; ELLIS § 6 and cases cited therein; Note, 23 COLUM.
L. REV. 164 (1923).

ferentiated in large part by highly advertised brand names. A premium is placed on fast-moving industrial research resulting in new products, or in new designs or models of old products. In the intense rivalry for consumers' favor, beating competitors to market with something new or different increasingly characterizes successful competition. The new product of the research or design departments must be tested for quality and for consumer acceptability, trade marks and legal problems must be taken care of, packaging created, advertising campaigns planned and executed, salesmen briefed, and innumerable intermediate problems solved — often against the pressure of time. Not infrequently, the success of the venture depends on keeping information about it out of the hands of competitors. Acknowledging that legal protection of such confidential business matters might be appropriate, how were the courts to apply the once simple "trade secret" test to the complex facts of modern business methods? In modern laboratories, design centers, and planning conferences, where do trade secrets begin and the employee's intellectual tools of the trade end?

Mr. Justice Holmes had provided some conceptual clarification by noting that "the word property as applied to . . . trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be." [142] At least where employees are concerned, most courts now treat the problem as one of breach of trust or confidence.[143] This formulation makes it conceptually less difficult to afford protection to confidential information of a transient nature, such as a plan for an advertising campaign, for example, but it does not provide an easy answer to the underlying question: Under what conditions and with respect to what kinds of information does a duty not to disclose arise? There can be no betrayal of confidence unless there is a confidence to betray and it is known to be a confidence.[144]

---

[142] E.I. du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102 (1917).

[143] This approach leaves to unfair-competition doctrines the problem of an outsider's appropriation of valuable business confidences. 2 CALLMANN 859–63.

[144] National Starch Prods., Inc. v. Polymer Indus., Inc., 273 App. Div. 732, 79 N.Y.S.2d 357 (1948).

Although the confidential-relation approach allows courts great freedom to examine all the circumstances of the case and flexibility in deciding when to accord protection, it has obvious limitations. Clearly, the boundaries of the protection cannot be stated with exactitude, so that in all but the clearest cases it is difficult to predict with certainty whether protection will be extended. In theory this problem can be solved without a restraint on future employment. The employer and employee can reach an agreement that information specifically described will not be used or divulged during or after the term of employment except for the benefit of the employer. The continuing employment will suffice as consideration,[145] and reducing the matter to contract will usually persuade a court that the information merits protection.[146] However, such contracts present practical difficulties. It is often impossible to spell out in advance in specific terms the confidential information for which protection will be desired, particularly when it may be of a transient nature. Describing it in general terms usually does not solve the problem of what is intended by the employer and understood by the employee to be included. Furthermore, the important thing to the employer is not having a cause of action in case of a breach of confidence, but preventing the violation from occurring. An injunction not to disclose can seldom undo or effectively prevent the doing of the real damage. Even in the

---

[145] There has been extensive debate over whether employment terminable at will could provide consideration for employee obligations of this nature or, perhaps more accurately, whether equity will enforce an obligation incident to a contract when the contract as a whole might not be specifically enforceable against the employer. This problem extends to covenants not to compete as well as to all the related types of undertakings in employment contracts. Although the question is occasionally discussed in the opinions, the almost universally accepted view now is that any substantial performance by the employer (*i.e.*, actual employment of the employee for any substantial period) makes the restraint enforceable against the employee. See 5 CORBIN, CONTRACTS § 1210 (1951); Note, *The Enforcibility of a Promise Not To Compete After an Employment at Will*, 29 COLUM. L. REV. 347 (1929).

[146] Indeed, if there is no serious question that the information attains the dignity of a "trade secret," the contract will be merely declarative of a preexisting right — the contract only "strengthens" the right to relief. Consolidated Boiler Corp. v. Bogue Elec. Co., 141 N.J. Eq. 550, 566–67, 58 A.2d 759, 769–70 (Ch. 1948); L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431 (Sup. Ct. 1948); Todd Protectograph Co. v. Hirchberg, 100 Misc. 418, 165 N.Y. Supp. 906 (Sup. Ct. 1917). The contract is said to serve "as evidence of the confidential nature of the disclosure, thereby negating any inference of publication." Note, 42 COLUM. L. REV. 317, 318 (1942). But it will not preclude a court's examination into whether the information ultimately deserves protection. 2 CALLMANN 806–08.

best of good faith, a former technical or "creative" employee working for a competitor, or in business for himself in the same or a related field, can hardly prevent his knowledge of his former employer's confidential methods or data from showing up in his work.[147] And utmost good faith cannot always be expected. Thus, from the employer's point of view a more effective preventive is badly needed.

The public-interest question cannot be decisively answered, either. There is doubtless considerable social benefit in having the best "know-how" disseminated among competitors. Against this must be balanced some clear disadvantages. If valuable information cannot be effectively protected for at least a minimum period of time, part of the advantage of a vigorous program of research and development is lost. Research expenditures will not be carried to the optimum level. Furthermore, attempts to minimize the risk in other ways are very likely to result in reduction of intracompany exchange of ideas which may be important to effective research and coordination of operations. Finally, the creative employee may find his opportunities to develop in his technical specialty inhibited by such "security" barriers within the company.

The most effective protective device is an enforceable postemployment covenant not to compete. For reasons of the nature indicated, courts have more uniformly upheld covenants founded on protection of confidential business information than those based solely on protecting customer relationships. Indeed, to a considerable extent, the protection extended to customer relationships is an offshoot of the protection of confidential information. For example, many jurisdictions give preferred protection to customer lists or routes on the ground that they are trade secrets.[148] Information regarding the special needs and characteristics of company customers may be protected as confidential information even by courts reluctant to go so far as to base protection on the

---

[147] This point was forcefully made in Eastman Kodak Co. v. Powers Film Prods., Inc., 189 App. Div. 556, 561–62, 179 N.Y. Supp. 325, 330 (1919):

> [I]f he is permitted to enter this employ, injunctive relief in form against the imparting of such special knowledge is more than likely to prove inefficient. The mere rendition of the service along the lines of his training would almost necessarily impart such knowledge to some degree. . . . [Defendant] cannot be loyal both to his promise to his former employer and to his new obligations to the defendant company.

[148] New York is an outstanding example. See Note, *Protection of Customer Lists in New York*, 1 SYRACUSE L. REV. 110 (1949). See also cases cited in Annot., 43 A.L.R.2d 94, 191–93 (1955).

employee-customer relationship standing alone.[149]  The line is so difficult to draw that employers' petitions for injunctive relief to protect customer relationships seldom fail to try to persuade the court that the employee has had access to confidential information regarding the customers or other facts of the business as well.

A recitation in general terms in an employee covenant that the employer is divulging trade secrets and confidential information to the employee does not prove that such facts were actually present to a sufficient degree to warrant enforcement of the restraint; however, it does inform the court that the employee knew that the employer regarded at least some aspects of his work as involving confidential information when he accepted the restraint.[150] Whether the facts will in fact be found sufficient appears to depend primarily on two factors: the nature of the information, including how it came into being, and the efforts of the employer to keep it confidential.  Thus the analysis in the employee-restraint cases is not significantly different from that undertaken in cases involving trade secrets in the absence of a contract or in cases dealing with covenants not to disclose trade secrets.

*(1) The Nature of the Information.* — When the process or method is not unique or significantly different from those in use generally in the trade or industry, it will not serve as an adequate basis for a restraint.[151]  But when a business is new or unusual, even its fairly routine methods may be worthy of protection, especially when the employer has established the new endeavor at considerable risk of financial loss.[152]  In most cases, however, the most significant factor is whether the method, technique, or "know-how" has been developed by the employer through a considerable investment of time, effort, or money.[153]  It is clearly not

---

[149] See, *e.g.,* Todd Protectograph Co. v. Hirchberg, 100 Misc. 418, 165 N.Y. Supp. 906 (Sup. Ct. 1917).

[150] In this respect the recitation in a covenant not to compete seems to be no different from the comparable recitation in a covenant not to disclose trade secrets. It may have evidentiary value as to the parties' understanding when the covenant was made. See note 146 *supra.*

[151] See generally Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 138 N.E. 485 (1923); Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387, 67 Atl. 339 (Ct. Err. & App. 1907). More recent decisions include Roy v. Bolduc, 140 Me. 103, 34 A.2d 479 (1943); Harry Livingston, Inc. v. Macher, 30 Del. Ch. 94, 54 A.2d 169 (Ch. 1947); Molina v. Barany, 56 N.Y.S.2d 124 (Sup. Ct. 1945).

[152] Thomas W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295 (1926).

[153] See Kelite Corp. v. Khem Chems., Inc., 162 F. Supp. 332 (N.D. Ill. 1958); Lee v. Samburn, 94 U.S.P.Q. 153, 154 (Cal. Super. Ct. 1952); Eastman Kodak Co.

necessary that the methods be previously unknown or narrowly limited in use.[154] The fact that a successful product is being produced by a method well-known in another context, but previously unused for the product in question, is sufficient.[155] A trade secret can arise from combining elements widely used in the trade into a new combination or sequence.[156] The fact that a particular company is using a formula or process, even though the formula or process may be generally known in the trade, may itself be a protectible trade secret.

The problem with regard to scientific and technical information is especially difficult, because the more nearly information with business value approaches "pure science" the more persuasive the claim becomes that it is part of the public domain and thus properly regarded as part of the intellectual equipment of the employee as a research scientist or engineer rather than information pertaining especially to the employer's business.[157] It seems likely that this question will arise in an increasing number of cases.

Relatively unexplored as yet is the problem raised by "creative" ideas developed by personnel in nonscientific departments. It seems reasonable to assume that plans and ideas expressed in marketing strategies or advertising campaigns, for example, may provide a sufficient basis for some form of postemployment restraint.[158] Because of the highly ephemeral nature of such confidential information, however, a reasonably proportioned restraint will in most cases be quite short in duration.

v. Powers Film Prods., Inc., 189 App. Div. 556, 179 N.Y. Supp. 325 (1919); ELLIS § 14. *Contra*, 2 CALLMANN 799.

[154] Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J. Eq. 99, 46 A.2d 201 (Ct. Err. & App. 1946); see 2 CALLMANN 803–15.

[155] See *id.* at 797–802.

[156] *Ibid.*

[157] Previously unknown natural phenomena are not patentable; neither can they be protected as trade secrets, though they be discovered at great expense by privately employed scientists, because of the public policy against restricting access to such knowledge, by analogy with the policy limiting patentability. See generally 2 CALLMANN 797–802.

[158] See Thomas W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295 (1926). Trade secrets have to some extent been recognized in what Callmann designates "internal business facts," whose claim to protection derives not from an independent commercial value but from the fact that their being known to competitors would destroy all or part of their value. 2 CALLMANN 802–03. For example, if the timing of the launching of a new product or advertising program were known to a business rival, he might be able to adopt countervailing tactics.

JA0294

A number of cases go to very extreme lengths in extending protection to business confidences of a rather routine nature. Considerable authority can be found for enforcing a restraint when little more appears than the information necessarily known to a person such as a branch manager of a small retail outlet about retailing methods, sources of supply, customers' credit standing, income and expense data, and the like.[159] Although particular business data of a company are in one sense unique to the company and are typically not widely publicized, it is submitted that information representing the normal accretion of day-to-day routines, as contrasted with the valuable product of special creative endeavors, should seldom, of itself, be sufficient to support an employee restraint. Trivial differences in methods and processes are not recognized as trade secrets;[160] surely knowledge of the ordinary routines of a particular business should not, of itself, support a restriction on an employee's mobility. Exceptions should perhaps be recognized when the covenantor is at a sufficiently senior level in management to warrant imposition of a fiduciary duty higher than that of the ordinary employee.[161]

*(2) Employer Efforts to Keep Information Confidential.* — Business information voluntarily made available to one not in a confidential relation with the employer and not under a contractual obligation of secrecy usually loses its claim to legal protection.[162] However, an implied term of all employment contracts is

---

[159] Many of the cases in which restraints against managers of retail stores are enforced rely in part on this type of information. Annot., 43 A.L.R.2d 94, 168–70 (1955); see, *e.g.*, Park v. Essa Tex Corp., 315 S.W.2d 197 (Tex. Civ. App. 1958).

[160] See Victor Chem. Works v. Iliff, 299 Ill. 532, 132 N.E. 806 (1921); ELLIS § 15. Callmann urges that information that the employer purchases from a particular supplier or on certain terms should be a trade secret. 2 CALLMANN § 803. At least for the enforcement of employee restraints, it is suggested that the better-reasoned cases make a distinction between situations in which such internal information is fairly routine and situations involving unusual circumstances in which the availability of supplies, for example, is a matter of special importance. *Compare* Schreyer v. Casco Prods. Corp., 97 F. Supp. 159 (D. Conn. 1951), *with* Richard M. Krause, Inc. v. Gardner, 99 N.Y.S.2d 592 (Sup. Ct. 1950).

[161] This factor will have a high correlation with whether the covenant was in fact negotiated and bargained for, a factor which is regarded as highly persuasive. See United Loan Corp. v. Weddle, 77 So. 2d 629 (Fla. 1955) (dissenting opinion); Sonatone Corp. v. Baldwin, 227 N.C. 387, 42 S.E.2d 352 (1947).

[162] See 2 CALLMANN 806–08. And when the purpose of informing the employee about the employer's "secret" method or process is to enable him to use it as a sales argument, thus divulging it, no trade secret exists sufficient to support a restraint. Gates-McDonald Co. v. McQuilkin, 33 Ohio L. Abs. 481, 34 N.E.2d 443 (Ct. App. 1941).

that the employee will not divulge or use any information which
he knows is confidential during or after employment; thus an
employer's giving access to such information to employees who
have occasion to use it does not destroy its confidential nature.[163]
However, if the confidential nature of the information is to be the
basis for restricting the freedom of an employee, the employer
should be required to show that he has taken reasonable measures
to protect its secrecy.[164] The most persuasive proof possible that
information is worthy of legal protection is that the employer has
taken every feasible step to protect it himself. This would re-
quire that disclosure be limited insofar as practicable even among
employees. At a minimum, procedures should be shown which
advise employees of the importance the employer attaches to the
confidential nature of certain projects or classes of information.[165]
Demonstration of a carefully administered program of intracom-
pany security can hardly fail to be persuasive when an employee
restraint is sought to be enforced on this basis. However, courts
have not yet commonly required so extensive a showing.

## V. Scope of Restraint and the Problem of Severability

Even though the employer can show legitimate interests in the
protection of clientele or confidential information, the employee
restraint will not be enforced if under all the circumstances the
restraining covenant is unduly restrictive of the employee's free-
dom. This is the traditional formulation.[166] But perhaps at the
present time it is more nearly correct to say that the restraint will
not be enforced if the specific competitive activity complained of
is not unreasonable. This distinction is necessary because of the
practice of most American courts of ignoring the reasonableness
of the terms of the covenant as an abstract matter and concentrat-
ing on the reasonableness of what the former employee is actually
doing in breach of his agreement. If in balancing the equities the

---

[163] The doctrine of "limited publication" is discussed at 2 CALLMANN 812–13.
See also L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431 (Sup. Ct. 1948).

[164] *E.g.,* Excelsior Steel Furnace Co. v. Williamson Heater Co., 269 Fed. 614
(6th Cir. 1921); Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs.
17, 53–56, 105 N.E.2d 685, 709–11 (C.P. 1952); RESTATEMENT, TORTS § 757, com-
ment *b — secrecy* (1939).

[165] See O. Hommel Co. v. Fink, 115 W. Va. 686, 177 S.E. 619 (1934). No duty
not to disclose exists if the employee could not reasonably be expected to know that
the employer regards the information as confidential. *Cf.* 1 NIMS § 150.

[166] See pp. 648–49 *supra.*

:24-cv-00986-E     Document 210     Filed 08/16/24     Page 303 of 1133     Pagel

court decides that his activity would fall within the scope of a reasonable prohibition, it is apt to make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it.[167]

The traditional dimensions of a restraint have been those of duration and geographic area. The "activity" dimension was not an issue in the earliest cases; a trade was a trade, set apart by separate guilds and the institution of apprenticeship, and there was no ambiguity in a promise not to "exercise the trade of a baker" or "enter into competition." But division of labor and specialization now make it of the utmost importance that a restraint define carefully the activities in which the employee is not to engage. Thus, in the modern cases the "time" dimension remains critical, but the "activity" restraint is, in many cases, replacing the "area" restraint. Restraints mainly concerned with protecting confidential information are likely to be inadequate if they contain any geographic limitation;[168] markets and competition are increasingly national, even international, in scope. And restraints centered on customer protection are increasingly being limited to actual customers of the employer.[169] Thus, geographic dimensions are not as favored as they once were.

A restraint is usually said to be reasonable, with reference to each of the three dimensions, only if its scope is necessary in its full extent to protect a legitimate interest of the employer.[170] However, it seems more accurate to say that a restraint is reasonable only if, taken as a whole, its dimensions are proportioned in relation to each other so as to keep the burden on the employee down to the minimum consistent with reasonable protection to the employer's legitimate interests. Thus, for example, whether a restraint's duration is reasonable may well turn on the scope of the limitation on activity, and which combination of the two is suitable, if any, will depend upon the facts of the particular employment relationship.

*(1) Activity Restrictions.* — Whether the prohibition of future activity is no broader than necessary to protect the employer

---

[167] See, *e.g.*, Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1957) (dictum); Kelite Prods., Inc. v. Brandt, 206 Ore. 636, 294 P.2d 320 (1956). See also note 193 *infra*.

[168] National Starch Prods., Inc. v. Polymer Indus., Inc., 273 App. Div. 732, 79 N.Y.S.2d 357 (1948) (dictum).

[169] See cases cited note 104 *supra*.

[170] See Annot., 43 A.L.R.2d 94, 144–45 (1955).

depends upon the job the employee has held. Particularly in restraints to be entered into by highly skilled or specialized technical, creative, or managerial personnel, and when the employer is a large company with highly diversified activities, the reasonableness of this dimension of the restraint is likely to be carefully scrutinized.[171] An employee who has a considerable personal investment in education and training for specialized work may be badly hurt by any restraint which would require him to deviate substantially from a normal path of professional or vocational development. Yet the employer obtains no effective protection if the restraint does not provide a commercially significant leeway in time in which it can bring to fruition the confidential projects about which the employee has information. To balance these equities in a covenant which must usually be standardized to some degree, requires skillful and carefully considered drafting. For example, it would almost never seem reasonable for a large chemical manufacturer active in every field of industrial chemistry to attempt to restrain an industrial chemist from working for any competitor for even a relatively short period, for such a covenant would bar the chemist from virtually all activity. This kind of problem can be minimized, although not always entirely avoided, by confining the restraint to future work in the particular department or special activity of the present employment. Many of the same considerations are applicable to sales personnel who have specialized in products of a relatively technical nature, and to other service and managerial personnel.

When the primary purpose is protection of clientele, the very large or highly specialized company is again presented with special problems. If the company sells nationally, even an activity

---

[171] *E.g.*, Hydraulic Press Mfg. Co. v. Lake Erie Eng'r Corp., 132 F.2d 403 (2d Cir. 1942) (mechanical engineer); Kaumagraph Co. v. Stampagraph Co., 197 App. Div. 66, 188 N.Y. Supp. 678 (1921), *aff'd*, 235 N.Y. 1, 138 N.E. 485 (1923) (design-production expert); Herbert Morris, Ltd. v. Saxelby, [1916] 1 A.C. 688 (engineer and draftsman). In O. Hommel Co. v. Fink, 115 W. Va. 686, 177 S.E. 619 (1934), the court makes the important distinction between a skill sufficiently unspecialized that the restrained employee can turn elsewhere, if need be, and one learned before the relationship with the present employer or one on which the employee's livelihood depends. There are some cases, however, in which the highly specialized, technical employee has been successfully restrained because of his possession of confidential information. See, *e.g.*, Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J. Eq. 99, 46 A.2d 201 (Ct. Err. & App. 1946) (plant engineer); Eastman Kodak Co. v. Powers Film Prods., 189 App. Div. 556, 179 N.Y. Supp. 325 (1919) (photographic technical specialist); Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1957) (design and production engineer).

restraint in terms of soliciting the company's customers is likely to close off so large a percentage of the total market as to require the employee to shift fields completely.[172] This may present no very important problem when the commodity being sold is simple and the employee loses little by being required to shift his selling activities to a different line of products. However, when the selling is specialized or complex, it may be necessary to limit the restriction as narrowly as possible to particular products or to the individual customers which the employee regularly serviced.[173] When the employee's selling is confined to a particular region or route the problem is simplified. A restraint against soliciting along the route or in the region serviced by the employee does not bar the employee from continuing to practice his specialty and — other requirements being satisfied — will be upheld.[174]

*(2) Time restrictions.* — In determining whether a restraint extends for a longer period of time than necessary to protect the employer, the court must determine how much time is needed for the risk of injury to be reasonably moderated. When the restraint is for the purpose of protecting customer relationships, its duration is reasonable only if it is no longer than necessary for the employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers.[175] If a restraint on this ground is justifiable at all, it seems that a period of several months would usually be reasonable. If the selling or servicing relationship is relatively complex, a longer period may be called for. Courts seldom criticize restraints of six months or a year on the grounds of duration as such, and even longer restraints are often enforced. When the selling relationship is important but still simple, as when consumers' goods are being sold by house-to-house calls over a route, a

---

[172] Unless the covenant specifically indicates the intent was otherwise, a restraint against solicitation of customers should be limited to customers at the time of termination. See Arkansas Dailies, Inc. v. Dan, 36 Tenn. App. 663, 675, 260 S.W.2d 200, 205 (1953) (dictum).

[173] See, *e.g.*, Interstate Tea Co. v. Alt, 271 N.Y. 76, 2 N.E.2d 51 (1936); Molina v. Barany, 56 N.Y.S.2d 124 (Sup. Ct. 1945).

[174] *E.g.*, Sonotone Corp. v. Ellis, 2 N.J. Super. 419, 64 A.2d 255 (Ch.), *aff'd*, 4 N.J. Super. 331, 67 A.2d 186 (App. Div. 1949); Pilgrim Coat, Apron & Linen Serv., Inc. v. Krzywulak, 141 N.J. Eq. 212, 56 A.2d 584 (Ch. 1948); Arkansas Dailies, Inc. v. Dan, 36 Tenn. App. 663, 676, 260 S.W.2d 200, 205 (1953); Annot., 41 A.L.R.2d 15, 127–30 (1955). See also Note, *Protection of Customer Lists in New York*, 1 SYRACUSE L. REV. 110, 115–16 (1949).

[175] See cases cited note 100 *supra*; Eureka Laundry Co. v. Long, 146 Wis. 205, 131 N.W. 412 (1911).

very short period, however, might provide adequate protection.[176]

The permissible duration of a restraint when confidential information is being protected presents a more difficult problem. Traditionally, a covenant not to divulge a trade secret was enforceable against the promisor for as long as the secrecy remained, at least when the secret had been reduced to writing or practice.[177] An obligation not to disclose a relatively definite secret of the traditional kind does not necessarily materially impair an employee's opportunities for related employment. But with trade secrets now being defined broadly in terms of a fiduciary obligation, a general prohibition against divulging trade secrets or other confidences is much less narrow and specific, and, therefore, much more limiting of employment opportunities. Thus, it may be argued that a covenant in general terms not to disclose trade secrets should be treated in much the same way as a covenant not to compete.[178]

In any event, the presence of trade secrets or confidential information as a basis for a covenant not to compete does not justify a restraint of indefinite duration. In view of what may be a very onerous burden on the employee, reasonable protection to the employer in light of the facts of the case may be a much shorter time than the full life of the secret. On the other hand, when the confidential information known by the employee will lose its business significance in a short period of time, that period sets the outside limit for the effective duration of the restraint, in the absence of other supporting bases.[179]

---

[176] See Deuerling v. City Baking Co., 155 Md. 280, 141 Atl. 542 (1928).

[177] 2 CALLMANN 816.

[178] In Guth v. Minnesota Mining & Mfg. Co., 72 F.2d 385 (7th Cir. 1934), *cert. denied*, 294 U.S. 711 (1935), the court properly recognized that a covenant to assign future inventions as limited the employee's opportunities for competitive employment as a research man that it should be treated as a covenant not to compete. See the cases cited in COSTA, INVENTING IN EMPLOYMENT 112–31 (1953). In most cases the fact that an applicant is encumbered by a general covenant not to disclose trade secrets or confidential information will be at least as great a deterrent to a potential employer as an agreement to assign inventions, which can be effective as to new inventions only within narrow limits. See *id.* at 121–25. A distinction can be made, however; the duty not to divulge trade secrets exists in the absence of a contract, and, therefore, the employee's mobility is no more limited by a covenant not to disclose than by the existence of that duty in the absence of a covenant. Nims implies that a covenant not to disclose is generally treated like a covenant not to compete. 1 NIMS § 150, at 425.

[179] In Arkansas Dailies, Inc. v. Dan, 36 Tenn. App. 663, 676, 260 S.W.2d 200, 205 (1953), for example, the court determined the appropriate duration of the relief by determining when, on the average, contracts would have been renewed with

*(3) Area restrictions.* — Most confidential business information worthy of any protection at all is appropriately protectible without geographic limitation, because once an employee has divulged a trade secret in any location the likelihood that it will become public knowledge available to immediate competitors is greatly increased. Information, unlike customers, is highly mobile. Thus restraints limited to a geographic area are typically associated with sales activities. Whether they are reasonable is measured by the location and nature of the employer's clientele.

If the employer's product or service is purveyed primarily at his place of business, the geographic area from which the bulk of his custom is drawn may be the only practicable way to define an effective restraint. Particularly when the area is populous and the product is one which is sold to the general public, however, enforcing such a restraint gives the employer a great deal more protection than he is entitled to under any theory of protectible interests.[180] He is necessarily protected not only in his actual trade but from competition by the employee with respect to a vast pool of merely potential customers. In cases involving traveling salesmen, most courts refuse to enforce restraints extending to areas in which the employer has no customers currently, but only potential customers.[181] These facts, added to the generalization that the employee's hold over the customer tends to be at a minimum when he works at the employer's place of business,[182] lead to the conclusion that under these circumstances area restraints are likely to be held invalid, or enforced only in narrower terms after severance.[183] The potential-customer population of the area and

---

subscriber-clients; with the renewals the value of defendant's confidential information regarding terms of the contract would lose much of its value. Usually, however, the determination of reasonableness of duration is a judgment, not based on very specific facts, of when the risk to the employer will be reasonably diminished, having regard to the burden placed on the employee.

[180] This fact has been repeatedly recognized, usually in connection with enforcing a geographic restraint only as to actual customers or a narrower area than that spelled out in the restraint. See, *e.g.,* Tawney v. Mutual Sys., 186 Md. 508, 47 A.2d 372 (1946); Menter Co. v. Brock, 147 Minn. 407, 180 N.W. 553 (1920).

[181] Cases cited in Annot., 43 A.L.R.2d 94, 181-82 (1955). *But cf.* New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940), as an example of an exception sometimes made when the employee has reason to know that the employer may be planning to expand activities into a new area. See also Annot., 43 A.L.R.2d 94, 182-85 (1955). These cases cannot be supported in terms of any customer-relationship interest.

[182] See p. 660 *supra.*

[183] See pp. 681-84 *infra.*

the number of existing competitors are properly taken into consideration.[184]

An employee who deals with customers throughout the nation or in a large territory is usually selling to business clients or servicing them. Thus, in any geographic area there will be only a relatively limited number of actual or potential customers, all or most of whom he is apt to have solicited. Several types of restriction are possible in these cases. The restriction might be drafted (1) to extend to the entire area in which the employer has or solicits customers, regardless of the particular employee's activities, (2) to extend to the area in which the employee was active during the course of his employment, (3) to prohibit only solicitation of actual customers of the employer, or (4) to prohibit solicitation only of those customers with whom the employee has dealt. Other variations are possible, but these groupings include most of the cases. It will be noted that the first two are area restrictions while the last two might be considered as activity restrictions. Although some modern cases have allowed restraints as broad as the area of the employer's business activity,[185] the general rule is that the restraint may not extend beyond the area in which the employee was active.[186] In an increasing number of cases, however, injunctions have been issued only against solicitation of the former employer's actual customers or, even more narrowly, of customers with whom the employee has dealt.[187] This is one of the facts which supports the point made earlier that activity prohibitions are increasingly more important than area restrictions. Whether these distinctions make any significant difference, of course, de-

---

[184] Cases cited note 180 *supra*. See also Blackstock, *Covenants in Restraint of Trade in Contracts of Employment Terminable on Notice*, 66 S.A.L.J. 139, 148 (1949); Cowan, *Covenants Not To Compete After Termination of Employment*, 5 PEABODY L. REV. 79, 86 (1941).

[185] *E.g.*, Basic Foods Sales Corp. v. Moyer, 55 F. Supp. 449 (W.D. Pa. 1944); see New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940); Annot., 43 A.L.R.2d 94, 306–12 (1955). In O. Hommel Co. v. Fink, 115 W. Va. 686, 177 S.E. 619 (1934), the restraint, which covered a broad geographical area, was cut down to cover the territory in which the employer did business, rather than the smaller area in which defendant had actually serviced customers.

[186] Cases cited in Annot., 43 A.L.R.2d 94, 175–76 (1955). More recent cases include Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 626, 636, 136 A.2d 838, 843, 848 (1957); Delmar Studios v. Kinsey, 233 S.C. 313, 104 S.E.2d 338 (1958); Spinks v. Riebold, 310 S.W.2d 668 (Tex. Civ. App. 1958).

[187] Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957); Denny v. Roth, 296 S.W.2d 944 (Tex. Civ. App. 1957).

pends on the nature of the employer's business and how thoroughly selling activities have covered the area. Insofar as the employee has not had contacts with potential customers in the region, enforcing a geographic restraint inevitably involves restraint of competition without justification by the customer-contact theory of protectible interests.

Thus, it is submitted that in all but very unusual cases, any restraint which is limited only geographically is not justifiable in terms of the modern theory of employee restraints. Courts appear to be moving towards this view.

*(4) Severance.* — The general contract doctrine of severance has important consequences in the field of employee restraints. In the first employee case after *Mitchel v. Reynolds*, the court issued an order only after applying the "blue pencil" to a restraint too broad in area.[188] The prohibition covered a certain area around the employer's shop or any other shop the employer "shall think proper to remove to." Because the employer might move anywhere, the restraint was said to be "general" and thus invalid as written. The court struck the second clause and issued an injunction covering the area around plaintiff's then place of business. In the *Nordenfelt* case,[189] the prohibition extended not only to carrying on an ammunition business but also "any business competing or liable to compete in any way with that for the time being carried on by the company . . . ." The Court of Appeals, severing the broader restraint, enforced the narrower in the first known application of severance to an "activity" restriction. None of the older cases, however, applied severance to the time dimension, presumably because draftsmen had not felt inclined to draft that term of the covenant in such a way that severance could be effected by mechanical striking out with the judicial blue pencil.

Although the blue-pencil theory of severability is still occasionally advanced as a reason for not enforcing a restraint drafted too broadly,[190] most courts either issue an injunction which is regarded as reasonable, even though narrower than the terms of the restrain-

---

[188] Chesman v. Nainby, 2 Str. 739, 93 Eng. Rep. 819 (K.B. 1726).

[189] Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co., [1894] A.C. 535, 536.

[190] See Interstate Fin. Corp. v. Wood, 69 F. Supp. 278 (E.D. Ill. 1946); Vendo Co. v. Long, 213 Ga. 774, 102 S.E.2d 173 (1958).

ing covenant,[191] or refuse enforcement altogether even though the restraint might be mechanically cut down.[192]

Courts and writers have engaged in hot debate over whether severance should ever be applied to an employee restraint.[193] The argument against doing so is persuasive. For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold

---

[191] *E.g.*, Denny v. Roth, 296 S.W.2d 944 (Tex. Civ. App. 1957).

[192] *E.g.*, Welcome Wagon, Inc. v. Morris, 224 F.2d 693 (4th Cir. 1955); cases cited note 195 *infra.*

[193] See generally 6 CORBIN, CONTRACTS §§ 1390, 1394 (1951); 5 WILLISTON, CONTRACTS §§ 1659–60 (rev. ed. 1937). Section 518 of the *Restatement of Contracts* limits severability to restraints "divisible in terms" and refuses severability to reasonable segments of divisible restraints only when "the entire agreement is part of a plan to obtain a monopoly." No distinction is made in this respect between employee restraints and those ancillary to property transfers. Thus the *Restatement* rejects the rule of Mason v. Provident Clothing & Supply Co., [1913] A.C. 724, that in employee-restraint cases grammatical severability should not be recognized when the covenant as a whole is "deliberately framed in unreasonably wide terms" or the unreasonable excess is more than "trivial" or "technical." Professors Corbin and Williston both concluded that the *Restatement* erred in refusing enforcement to "indivisible" restraints unduly broad in terms when reasonable relief could be granted. Williston & Corbin, *On the Doctrine of Beit v. Beit*, 23 CONN. B.J. 40 (1949) (commenting on a Connecticut sale-of-property case, Beit v. Beit, 135 Conn. 195, 63 A.2d 161 (1948)). Neither scholar, unfortunately, discussed the question of whether the rule of the *Mason* case is preferable in employee-restraint cases. Williston, believing that employee restraints should not be distinguished from others, note 70 *supra*, would doubtless have rejected the *Mason* rule.

Many, perhaps most, American courts now follow Williston and Corbin in refusing to accept the *Restatement* position. They tend freely to reform restraints which are indivisible in terms. See cases cited note 167 *supra*. In addition, courts are increasingly subscribing to, or at least acting in accordance with, the *Mason* rule in distinguishing employee-restraint cases. See, *e.g.*, Welcome Wagon, Inc. v. Morris, 224 F.2d 693 (4th Cir. 1955); Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N.W.2d 585 (1955) (dictum); Thomas v. Coastal Industrial Servs., Inc., 214 Ga. 832, 108 S.E.2d 328 (1959). Nesko Corp. v. Fontaine, 19 Conn. Supp. 160, 166, 110 A.2d 631, 635 (C.P. 1954), is particularly interesting in that although it might have achieved its result, denial of severance, by following the modified blue-pencil approach of the Connecticut Supreme Court in Beit v. Beit, *supra*, it instead specifically adopted the English view and refused enforcement because in employee cases employers must not be permitted to "seek unnecessary and inequitable restraint or be unduly harsh on an employee."

On the extensive but not very illuminating law-review discussion of this problem, see, in addition to articles cited note 2 *supra*, 28 COLUM. L. REV. 81 (1928); 5 DUKE B.J. 115 (1956); 40 HARV. L. REV. 326 (1926); 54 MICH. L. REV. 416 (1956); 17 MINN. L. REV. 86 (1932). The English view is carefully explained in Farwell, *Covenants in Restraint of Trade as Between Employer and Employee*, 44 L.Q. REV. 66 (1928).

numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too.

Although this argument is impressive, it has certain limitations. First, it assumes that all employment contracts are contracts of adhesion, the burdens of which fall entirely on the employee by virtue of his lesser bargaining power. Although this may often be the case,[104] much of the current interest in reviewing employee restraints is a result of the unwillingness of hard-to-get, qualified technical workers and salesmen to sign such broad restrictions on their future mobility. Thus, at least when the employment market is highly competitive, the employer may indirectly bear much of the burden of the restraint himself in the form of the higher costs of less well-qualified personnel. Thus, it should not be assumed that intelligent employers will necessarily take unseemly advantage of the courts' willingness to sever.

The other major limitation has to do with the fact that in all but the smallest businesses it is administratively impossible to tailor each covenant to the particular requirements of an individual employee, to say nothing of revising the covenant with each change of the employee's responsibilities. A comparatively few forms must serve for large numbers of employees in quite different circumstances. Employees themselves may often be suspicious and resentful of unequal treatment. Thus, even when the employer acts in complete good faith, it may happen that in the situation that gets to court the restraint is somewhat more burdensome than would be necessary in the case of the violating party. Yet an injunction may be clearly appropriate.

The general approach to resolving the dilemma seems clear. If the court is persuaded that the employer's policy and practice with respect to employee restraints generally is fair and designed only to protect legitimate interests, the court should tailor the covenant to provide such protection with a minimum burden to the employee. When it seems likely that the employer exacts the restriction for whatever advantage he can get from limiting the employees' mobility and bargaining power, or that he has not accorded employees' interests sufficient weight in devising and administering the restraints, severance should be denied. Courts

---

[104] See p. 661 *supra.*

should not aid and abet a grasping or negligent employer by re-forming an unreasonably restrictive agreement.[195]

When severance seems necessary if a restraint is to be enforced, the employer should bear the burden of showing either that the terms of the covenant were actually negotiated with the individual employee or that the employer's policy and practice with regard to such restraints generally has been devised with reasonable regard to avoiding undue burdens on employees. The employer is in a better position to show the facts in this regard than is the employee.

## VI. CIRCUMSTANCES OF THE EMPLOYEE

Most of the important factors relating to the circumstances of the employee have already been considered. As noted, it is impossible to discuss the boundaries of employers' legitimate interests without considering at the same time the position of the employee. However, in any particular case there may be unusual facts relating to the employee which will be given special weight. It may be useful to bring those factors together here.

(*1*) *Factors having to do with the employment.* — If the employee brings to the job when he enters it extensive experience,[196] long and costly professional or vocational education or training,[197] wide acquaintance and good standing in a community,[198] or a high degree of specialized proficiency for any other reason, courts are apt to require a higher urgency of interest on the employer's part to support a restraint. This result seems entirely appropriate, for the loss to the individual and the economic loss to society are

---

[195] See, e.g., Sonotone Corp. v. Baldwin, 227 N.C. 387, 42 S.E.2d 352 (1947) (dictum); Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377 (1945); cf. Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405 (1954).

[196] See, e.g., Saul v. Thalis, 156 F. Supp. 408 (D.D.C. 1957); Kaumagraph Co. v. Stampagraph Co., 197 App. Div. 66, 188 N.Y. Supp. 678 (1921), aff'd, 235 N.Y. 1, 138 N.E. 485 (1923).

[197] See, e.g., Hydraulic Press Mfg. Co. v. Lake Erie Eng'r Corp., 132 F.2d 403 (2d Cir. 1942); Herreshoff v. Boutineau, 17 R.I. 3, 19 Atl. 712 (1890). But see, e.g., Eastman Kodak Co. v. Powers Film Prods., Inc., 189 App. Div. 556, 179 N.Y. Supp. 325 (1919); Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1957). Note also that the nearly uniform enforcement of restraints against doctors, note 113 supra, and other professional people, limits the force of this argument. Perhaps it is usually the case that people of extensive education are put in positions of special confidence in terms of trade secrets or customers, thus bringing the two principles into frequent conflict.

[198] See, e.g., Crowell v. Woodruff, 245 S.W.2d 447 (Ky. Ct. App. 1951); Ridley v. Krout, 63 Wyo. 252, 275, 180 P.2d 124, 131 (1947); Standard Oil Co. v. Bertelsen, 186 Minn. 483, 243 N.W. 701 (1932).

both greatest when a highly trained and specialized person is prevented from employing his special abilities. When such a person has been working for the employer for only a short period,[199] or when the employer's contribution to the enterprise is considered relatively insubstantial,[200] the courts are unlikely to find a sufficient interest to support a restraining covenant. This was noted particularly in the customer-contact cases.

Although not included in any of the formulations, another factor often mentioned in opinions, and perhaps more often an unmentioned consideration, is the circumstance of the termination of employment. Most covenants provide that they shall have effect no matter how the termination comes about; yet in some cases it is clear that this factor is taken into account.[201] Indeed, if the discharge is clearly inequitable, the employer may be denied enforcement, on general equitable principles, of an otherwise reasonable restraint.[202] On the other hand, if the employee leaves because he has been hired by a competitor as a part of a plan to divert customers or trade secrets, or if he is in a conspiracy with other employees to appropriate business values, injunctive relief may issue even when, under other circumstances, the employer's interest might be regarded as insufficient to support a restraint.[203]

(*2*) *Factors outside the employment relationship.* — In the *Restatement of Contracts* formulation, a basis for adjudging a re-

---

[199] See 6 CORBIN, CONTRACTS § 1394, at 523–25 (1951). Particularly when the employment is terminated by the employer, courts may be receptive to the argument that the employer should not be able to limit the employee's future activity after only a nominal period of employment. Although inadequacy of consideration cannot be raised, as such, this factor may still affect the scope of the equitable remedy. 6 CORBIN, CONTRACTS § 1395 (1951). In any event, it seems clear that an employer can jeopardize his right to enforcement of the restraint by terminating employment under questionable circumstances. See notes 201 & 202 *infra*. And although when the employer's business is sold the restraining covenants, which may be an important asset, are assignable, Comment, 19 U. CHI. L. REV. 97 (1951), the new employer may have a handicap to overcome in his enforcement efforts. Compare Crowell v. Woodruff, *supra* note 198; Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

[200] See discussion at pp. 666–67 *supra*.

[201] Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 195 N.E. 747 (1935); Weiss v. Levine, 134 N.J. Eq. 1, 34 A.2d 237 (Ch. 1943); Dictograph Prods., Inc. v. Morris, 54 N.Y.S.2d 211 (Sup. Ct. 1945); Lantieri Beauty Salon, Inc. v. Yale, 169 Misc. 547, 7 N.Y.S.2d 984 (Sup. Ct. 1938).

[202] The "clean hands" doctrine or a related equitable consideration of course may bar a covenantee. See RESTATEMENT, CONTRACTS § 367 (1932). See also 5 OHIO ST. L.J. 263, 267 & nn.29–32 (1939). Where the employer purposefully cuts wages to force the employee out, relief may be denied. Smith Baking Co. v. Behrens, 125 Neb. 718, 251 N.W. 826 (1933).

[203] Breed v. National Credit Ass'n, 211 Ga. 635, 88 S.E.2d 15 (1955).

straint of trade unreasonable is that it "imposes undue hardship upon the person restricted." [204] The comments are silent on the point, but the illustrations are limited to cases in which the hardship consists of an unreasonable limitation on future employment opportunities, taking into account only the professional or vocational status of the covenantor. However, in a small number of cases the opinions have explicitly taken into account accidental or personal factors, such as the employee's family situation, or his length of residence in a community, or the difficulty of getting a job during depression years. [205] Although such facts may occasionally be appealing, it should be kept in mind that invalidating an otherwise reasonable restraint on such grounds may jeopardize a conscientiously developed program which redounds to the benefit, generally, of employer and employees.

## VII. "Injury to Society"

For many decades the rule for all covenants not to compete was stated in terms of their being reasonable if they were no broader in scope than was necessary to protect the covenantee, and if they caused no substantial injury to society. [206] As applied to employee restraints, any consideration of the employee's interests had to be smuggled in under the second clause. [207] Today, although this formulation is still occasionally repeated, the recognized method of decision is that of balancing the employer's claims to protection against the burden on the employee. Once the judgment is made, almost never does a court proceed to consider possible injury to society as a separate matter.

This is not surprising, for the balancing process engaged in will almost always result in maximizing the social values as well as

---

[204] Restatement, Contracts § 515(b) (1932).

[205] See, *e.g.*, several depression cases in which the effect of the covenant could not be reconciled with general economic conditions. *E.g.*, Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 195 N.E. 747 (1935); Lantieri Beauty Salon, Inc., v. Yale, 169 Misc. 547, 7 N.Y.S.2d 984 (Sup. Ct. 1938). When there is no apparent feasible alternative for the defendant other than to leave his home community, a court may be swayed. Standard Oil Co. v. Bertelsen, 186 Minn. 483, 243 N.W. 701 (1932); Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543 (1944); see Herbert Morris, Ltd. v. Saxelby, [1916] 1 A.C. 688, 706. Other personal factors are occasionally mentioned. *E.g.*, Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 246 N.W. 567 (1933) (physical handicap).

[206] See, *e.g.*, the statement in Eureka Laundry Co. v. Long, 146 Wis. 205, 209-10, 131 N.W. 412, 413 (1911).

[207] See p. 642 *supra.*

those of the parties. For example, the social cost of preventing an employee from going to a job at which he would be more productive is theoretically equal, given an efficient market, with the economic loss to the individual. One situation in which social cost might be different from private cost exists when the restraint is being used, either by the employer alone or in a bilateral arrangement with his employees, to monopolize the business in a specific community. This possibility is recognized both in the *Restatement* [208] and in occasional cases in which it appears to be relevant.[209]

## VIII. CONCLUSION

Speaking generally and excluding those jurisdictions with special statutory provisions,[210] a lawyer today can advise a client that effective restraints can be devised for employees working in positions of confidence either by virtue of access to valuable confidential information or of special relationships with clientele to whom the employer has a preponderant claim. Whether a particular covenant will in fact stand up in court depends not only on the lawyer's skill in drafting but, more important, on the employer's demonstrable good faith. First, the employer should be in a position to persuade a court that the motivating reason for the covenant is not to establish a hold upon the employee or to gain a bargaining advantage over him by inhibiting his freedom of movement but rather to protect legitimate business interests which are the product of substantial effort or investment by the employer. Second, and closely related, the employer should be able to show that it has made every effort to keep the burden upon the employee as small as possible consistent with reasonable protection of such interests. This involves a number of considerations: (1) The undertakings should be obtained only from those classes of employees whose positions are such that their future activities present a reasonably high probability of substantial damage. (2) When feasible, the covenant should be tailored to fit the circumstances of the individual employee; where this is not possible,

---

[208] A restraint is unreasonable if it "tends to create, or has for its purpose to create, a monopoly, or to control prices or to limit production artificially . . . ." RESTATEMENT, CONTRACTS § 515(c) (1932).

[209] *E.g.*, Wilson v. Gamble, 180 Miss. 499, 177 So. 363 (1937); Parisian Live Dyers & Cleaners v. Springfield, 275 S.W. 1098 (Tex. Civ. App. 1925), in both of which the court considered whether enforcing the restraint would tend to create a monopoly and rejected the defense.

[210] See note 78 *supra*.

reasonable classifications of employees should be devised and the covenant tailored so that the burden on each class is held to a minimum. (3) The program should be administered in a flexible manner. For example, the employer should be willing to grant waivers of the restraint in many cases. It should not be unwilling to renegotiate the terms of a covenant with an employee when conditions change if this can be done on the facts of the individual case without loss of reasonable protection and without disruption of personnel relations. (4) In some cases, the employer may even wish to consider making financial arrangements to moderate the burden on the employee. For example, one progressive company undertakes, as a part of the agreement, to pay its technical personnel full salary and its sales personnel half salary during any time when a restraint results in a bona fide loss of suitable employment. This should be a highly persuasive demonstration to any court that a restraint is not being used for primarily oppressive purposes.

In sum, the most persuasive evidence that the employer's interests are deserving of protection is that he has himself devoted substantial effort and undertaken expense to put into effect a system reasonably adapted to protect his interests with as little burden as possible upon his employees. Even in the absence of such facts, of course, many jurisdictions remain liberal in their granting of injunctive relief. However, any employer who may have occasion to enforce a restraint outside of the state in which the employment takes place must assume that the most exacting standards may be applied to the covenant in a critical case.[211] Even a clause in the contract in which the parties purport to specify that the law of a particular state be applied is unlikely to be given effect.[212] Thus, most large companies are required to adopt cove-

---

[211] The resolution which will be made of the conflict-of-laws question which arises when an effort is made to enforce a multistate restraint outside the jurisdiction in which the employment took place is not easily predictable. Some courts will apply the law of the state where the covenant was made and the employment performed. John Roane, Inc. v. Tweed, 33 Del. Ch. 4, 89 A.2d 548 (Sup. Ct. 1952). Others refuse to enforce foreign restraints which violate the public policy of the forum. Super Maid Cook-Ware Corp. v. Hamil, 50 F.2d 830 (5th Cir. 1931) (dictum); Davis v. Jointless Fire Brick Co., 300 Fed. 1 (9th Cir. 1924); May v. Mulligan, 36 F. Supp. 596 (W.D. Mich. 1939), aff'd, 117 F.2d 259 (6th Cir. 1940), *cert. denied*, 312 U.S. 691 (1941); *cf.* Paulsen & Sovern, *"Public Policy" in the Conflict of Laws*, 56 Colum. L. Rev. 969, 1006 (1956). The moral for the draftsman is that generally when a multistate restraint is required, it should satisfy the requirements of reasonableness of the most exacting state included within the terms of the restraint.

[212] Davis v. Jointless Fire Brick Co., *supra* note 211; Super Maid Cook-Ware Corp. v. Hamil, *supra* note 211.

nants and procedures which will satisfy the most rigorous scrutiny.

In a field of law in which the broad criterion of reasonableness gives a court great freedom, it is of the utmost importance to bring to the court's attention full information concerning the confidential nature of the relationship and the reasonableness of the employer's procedures. Also, it is important to show that the employee knew that his position was regarded as one of confidence; otherwise it is difficult to argue a breach of duty.[213] An excellent way to accomplish both objectives is to include in the form of agreement thorough, although usually necessarily generalized, recitations of the kinds of confidential information or customer relationships which the employer must make available to employees of this classification. Also, the agreement may be the best way to place before the court information regarding the fairness and flexibility of the company's procedures. These matters can and should be carefully outlined either in preambles or in the actual text of the covenant. If in practice restraints are often waived, it may be advisable to consider spelling out in the contract the considerations taken into account and the procedure for securing waiver. Why the scope of the restrictions as to activity, area, or time is needed may also be appropriately recited. Similarly, a recitation that the employee has skills and abilities to do other types of work, or that he is willing to move to another community if the restraint so requires, may possibly be noticed by a court and seems unlikely to do harm.

For certain classes of employees it may be desirable to include covenants other than a straight covenant not to compete. For example, a technical employee may be asked to agree to inform the employer of and to assign future inventions based on confidential information to which the employee has had access.[214] Such an agreement to assign tends to reduce an employee's future employability and its reasonableness is therefore examined in the same manner as an outright postemployment restraint.[215] However, it may be regarded as valid, if appropriately limited, even though the basic covenant is refused enforcement. Also, a separate undertaking not to divulge confidential information may be called for. Some courts regard such an agreement as enforceable as long as

[213] For the possible value of such a recitation, see Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (1951).

[214] Covenants to assign inventions are a complex problem in themselves. See COSTA, INVENTING IN EMPLOYMENT 112–31 (1953); Knoth, *Assignment of Future Inventions*, 27 CHI.-KENT L. REV. 295 (1949).

[215] See note 178 *supra*.

the information in question remains confidential; thus, such a clause may retain vitality long after the others have by their terms expired.[216] Such a covenant is often supplemented by an agreement to return to the employer any confidential documents or other material in the possession of the employee at the termination of employment. Finally, depending on the client's circumstances, it may be advisable to include a separate covenant not to solicit customers. In states such as California a covenant of this sort might be respected even though the employment restraint would be denied enforcement.[217] In states favoring the blue-pencil approach, such a clause may preserve some protection when an area restraint is considered to be unreasonably broad.[218]

However, there is a substantial tactical risk involved in deciding to make use of supplementary covenants. The presence of separate covenants not to disclose trade secrets and not to solicit customers may serve as an invitation to a court to deny enforcement to the more burdensome covenant not to compete and to rely, instead, on one or more of the less stringent remedies. In a recent Pennsylvania case,[219] for example, a one-year restraint extending 100 miles around Philadelphia was denied enforcement against door-to-door salesmen whom the employer had provided with confidential routes, the court relying on the separate covenants not to solicit customers whom the employee had been serving and not to divulge confidential customer information.[220] In some cases, the employer's circumstances may be such that an all-or-nothing approach is preferable, for example, when the nature of important confidential information is such that there would be no practical way to police whether or not a former employee is violating the covenant, or even an injunction against disclosure, while engaged in his own competing business or working for a competitor. Here there would be little or nothing to gain from a covenant not to disclose, yet it might tempt a court to deny effective relief on the grounds that an order not to disclose would

---

[216] See p. 678 *supra*.

[217] See note 78 *supra*.

[218] See note 190 *supra*.

[219] Morgan's Home Equip. 'Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

[220] In this case the restraint was clearly too broad geographically. However, had the circumstances of the litigation made it appropriate, in the absence of the supplementary clauses, the court, which has not been reluctant to reform restraints, see Plunkett Chem. Co. v. Reeve, 373 Pa. 513, 95 A.2d 925 (1953), might have kept them out of the business entirely in Philadelphia. It should be noted, however, that no broader protection than that granted could be supported on the basis of the customer-contact theory, which the court appears to follow.

suffice. Perhaps the risk of supplementary covenants can be somewhat moderated by having them as separate documents.

There are no magic words or phrases in drafting employee covenants. It is still probably advisable to draw the covenant so that both activity and geographic-area descriptions are mechanically severable.[221] There are perhaps a few clauses which can do no harm and may do some good. For example, an agreement between the parties that the law of the state of employment is intended to apply is unlikely to be given any effect by a court which feels strongly that the "public policy" of the state of the forum demands that enforcement be denied,[222] but the clause may be given some weight by other courts.[223] Similarly, an agreement that the obligation of the employee is to be assignable in the event of a sale of the company may aid a court in reaching that result at a later date.[224] Courts occasionally note clauses in which the parties agree that a violation will constitute irreparable injury envisaging injunctive relief, even though there is a further arrangement for the deposit of a bond to be forfeited in case of breach.[225]

From an objective point of view, the employee covenant not to compete is an inefficient and often unfair device for allocating the burden of certain business risks. Yet in certain circumstances such covenants are necessary, largely because other legal remedies, although theoretically available, are relatively ineffective in practice. There have been many cases of gross misuse of such covenants in the past, in part because of the failure of many courts to engage in a discriminating analysis of their impact before enforcing them. There is evidence that this attitude is rapidly changing. This fact, added to an increasing awareness by employers that such covenants are not always costless, should bring about a considerable tightening up of practices with respect to them. This result can hardly fail to be beneficial to all concerned.

---

[221] A good example of a geographically severable covenant is found in Welcome Wagon, Inc., v. Haschert, 125 Ind. App. 503, 127 N.E.2d 103 (1955). No example has been found of comparable draftsmanship as to the time element, although some day a draftsman may summon up the courage to try "for six months plus six months plus . . . for a total of . . . years."

[222] See note 211 *supra*.

[223] See John Roane, Inc. v. Tweed, 33 Del. Ch. 4, 89 A.2d 548 (Sup. Ct. 1952).

[224] See Comment, *Assignability of Employees' Covenants Not To Compete*, 19 U. Chi. L. Rev. 97 (1951).

[225] See clause used by Arthur Murray's organization. Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (1951). Compare Stokes v. Moore, 262 Ala. 59, 77 So. 2d 331 (1955).

Journal of Financial Economics 141 (2021) 1218–1243

Contents lists available at ScienceDirect

# Journal of Financial Economics

journal homepage: www.elsevier.com/locate/jfec



# Unlocking clients: The importance of relationships in the financial advisory industry☆



Umit G. Gurun [a], Noah Stoffman [b], Scott E. Yonker [c,*]

[a] School of Management, University of Texas at Dallas, Richardson, TX 75080, United States
[b] Department of Finance, Kelley School of Business, Indiana University, 1309 East Tenth Street, Bloomington, IN 47405, United States
[c] Dyson School of Applied Economics and Management, Cornell SC Johnson College of Business, Cornell University, Ithaca, NY, 14853, United States

## ARTICLE INFO

Article history:
Received 26 September 2019
Revised 21 July 2020
Accepted 28 July 2020
Available online 4 May 2021

JEL classification:
G5
G24
G23
J41
J42
K31

Keywords:
Financial adviser
Relationships
Trust
Clients
Flows
Noncompete agreement
Broker protocol
Misconduct

## ABSTRACT

We investigate the importance of client relationships in the financial advisory industry. We exploit firm-level variation in adoption of the Broker Protocol, which enabled clients to follow their advisers to member firms without fear of litigation. We show that advisers' ability to maintain client relationships is a significant predictor of their employment decisions; that about 40% of client assets follow advisers when they move; and that once clients are "unlocked," firms become less willing to fire advisers for misconduct. Firms that unlock their clients subsequently experience higher levels of misconduct and increase their fees, calling into question whether clients are better off.

© 2021 Elsevier B.V. All rights reserved.

---

☆ We thank Jawad Addoum, Brian Broughman, Ben Charoenwong, Lauren Cohen, Mark Egan, Zoran Ivkovich, Matthew S. Johnson, Andrew Karolyi, Naveen Khanna, Alan Kwan, Kurt Lavetti, Benjamin Loos, David Ng, Chris Parsons, Andy Puckett, Amiyatosh Purnanandam, Jonathan Reuter, Matthew Serfling, Amit Seru, Merih Sevilir, and Jagadeesh Sivadasan as well as seminar participants at the 9th Conference on Professional Asset Management at Erasmus University, Cornell University, the European Finance Association Conference, FIRS, FTC Micro Conference, Indiana University, North Carolina State University, the Mitsui Finance Symposium at the University of Michigan, the University of Houston, the University of Tennessee Smokey Mountain Finance Conference, and the Western Finance Association Annual Conference for helpful comments.
* Corresponding author.
E-mail addresses: umit.gurun@utdallas.edu (U.G. Gurun), nstoffma@indiana.edu (N. Stoffman), sey8@cornell.edu (S.E. Yonker).

https://doi.org/10.1016/j.jfineco.2021.04.026
0304-405X/© 2021 Elsevier B.V. All rights reserved.

## 1. Introduction

Financial advisers in the United States manage $28 trillion of assets for their clients. The relationships between these advisers—numbering over 760,000 in our data—and their millions of clients are critical for supporting the economic activity generated by these investments. Trust is inherent in these relationships, although the literature has yet to distinguish between whom clients trust (Gennaioli et al., 2015; Gurun et al., 2018; Kostovetsky, 2016). Is it the advisory firm that creates advertisements and develops a brand name that prompts clients to walk into a branch? Or

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243

is it the adviser who develops an intimate financial counseling relationship with the client? From the client's perspective, choosing an adviser or advisory firm is no different from choosing a lawyer or a surgeon. Some clients care more about the adviser than the firm, or the surgeon than the hospital, or the lawyer than the law firm. In these industries, where asymmetric information abounds and the potential for client harm is large, the ability to foster personal relationships with clients has important implications for employees, firms, clients, and ultimately, the industry's competitive landscape.

If clients trust their advisers more than their advisory firms, then advisers will have considerable power within their firms, since it is their relationships with clients that constitute the firm's primary asset (Lavetti et al., 2019). Without constraints on their mobility, advisers can move to a competing firm, perhaps taking many of their clients with them and essentially walking out the door with the firm's assets.

To reduce this power imbalance, firms often use noncompete agreements (NCAs) to legally constrain their employees' mobility.[1] In the presence of the trust relationship, however, these agreements not only restrict the adviser's mobility, but to some extent also lock in clients to the firm where their adviser is employed.[2]

In this paper, we investigate the importance of client relationships in the financial advisory industry. We show empirically that these relationships guide adviser employment decisions, that a large portion of client assets follow advisers when they move, and that firms' decisions to discipline advisers are influenced by their amount of control over these relationships. We then study how the power dynamic between firms and their employees induced by these relationships affects clients, firms, and the structure of the financial advisory industry more generally. We conclude that the effects are far-reaching, impacting the prevalence of adviser misconduct, fee rates, and industry competition.

To assess the importance of client relationships in the financial advisory industry, we need a source of variation in their transferability between firms. For this we rely on the 2004 creation of the Protocol for Broker Recruiting (hereafter, "the protocol") by three major brokerage firms, with the encouragement of the Financial Industry Regulatory Authority (FINRA). The stated purpose of the agreement was to "further clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives between firms," although it was also seen as a way to reduce the litigation expenses that had historically been regularly incurred when an adviser would switch firms.[3] The protocol established a set of rules

governing adviser departures. Specifically, it allowed an adviser to take client lists and contact information to their new employer without fear of legal action—effectively unlocking clients from firms.

Importantly for the purposes of our identification strategy, the shield from litigation provided by the protocol applies only when both the previous and new employers are signatories to the protocol. Moreover, the protocol agreement was not restricted to its original signatories; since its inception, over 1500 financial firms have joined in a staggered fashion, and very few have exited.

We combine complete records of all firms joining and leaving the protocol with detailed information on all registered brokers and investment adviser representatives to construct a staggered panel of firm entry into, and exit from, the broker protocol. We then exploit within-firm time series variation in the transferability of client relationships induced by variation in membership in the protocol. Together, these data provide us with a very rich setting in which to study the importance of client relationships in the financial advisory industry.

We begin our empirical analysis by assessing the importance of client relationships to advisers. Typically, advisers are compensated as a percentage of their annual "production," defined as the commissions and fees generated from the clients they service, and this compensation rate can vary across investment advisers. The ability to take clients when moving to another firm is therefore important to adviser compensation, so protocol entry should affect advisers' employment decisions. We find that while the entry into the protocol is not associated with a significant change in the overall likelihood of an adviser's departure, there is a substantial shift in the firms that advisers move to. Specifically, the probability of leaving for another firm in the protocol increases by approximately 50%. This effect is offset by a decline in the probability of going to a nonprotocol firm. These results provide strong evidence that the transferability of client relationships is indeed a major factor in adviser employment decisions.

If clients trust advisers, then when advisers change firms their clients should follow, inducing a "relationship-based flow." This particular flow mechanism is distinct from those previously studied, such as flows due to past performance (Lynch and Musto, 2003; Huang et al., 2007), expense ratios (Sirri and Tufano, 1998; Bergstresser et al., 2009) or brokers' incentives (Christoffersen et al., 2013). Available data does not allow direct observation of each adviser's book of business, but we do observe each firm's assets under management (AUM) each year, and are therefore able to relate changes in this value to adviser moves. We show that an adviser leaving one protocol member firm to join another brings substantially more assets than if he were to join a firm that is outside the protocol. Our lower bound estimates suggest that, unconstrained, the average adviser takes about 40% of her clients when she changes firms. This value has not been previously estimated in the literature, and could be of interest to market participants, especially in the context of litigation. The estimated elasticity using changes in number of accounts instead of AUM is nearly identical.

---

[1] We refer to non-compete agreements, but include also non-solicit agreements, which allow employees to move to competing firms, but not to solicit former clients to move their business. NCAs are also known as non-compete clauses, or covenants not to compete.

[2] Throughout the paper, we use the term "advisers" to refer to both registered investment advisers and registered representatives employed at broker-dealers, who may or may not also be registered investment advisers.

[3] The complete text of the 1,200-word agreement is available at http://www.thebrokerprotocol.com/index.php/authors/read-the-protocol.

U.G. Gurun, N. Stoffman and S.E. Yonker
Journal of Financial Economics 141 (2021) 1218–1243

From a revealed preference perspective, evidence of relationship-based flows suggests that relaxing constraints on the transferability client relationships—what we term "unlocking clients"—makes both advisers and clients better off. However, as noted above, asymmetric information permeates the financial advisory industry, so there is a potential for advisers to take advantage of their clients. Putting clients in unsuitable or high-fee products, shirking by neglecting their advisory duties, or moving clients to higher fee firms are just a few ways that advisers could exploit their clients' trust. Unlocking clients can also weaken firm governance: it tips the balance of power from firms to advisers, which could make firms laxer with respect to punishing advisers when they engage in misconduct to prevent a decline in assets.[4]

We therefore test whether firms are less likely to discipline their advisers following protocol adoption and whether this leads to increased adviser misconduct at member firms. We find that following protocol adoption, firms become more reluctant to fire advisers after they engage in bad behavior. For the sample of advisers working at large firms, engaging in misconduct increases the probability of being fired by about 23%, but that this discipline is effectively undone when firms join the protocol. We also find that protocol adoption is associated with an increase in the propensity to engage in misconduct by about 40%. Together, these findings support the notion that firms are indeed reluctant to fire employees once they have entered the protocol for fear of losing the assets of those advisers' clients and that this leads to a higher incidence of misbehavior by advisers.

We next estimate the dynamics of fees following protocol adoption. Firms may increase fees to compensate for the possibility of losing assets to adviser departures or because they realize that the trust underlying relationship-based flows can be easily exploited. Alternatively, firms can decrease their fees to attract new clients to compensate for the loss of AUM that follows adviser departures. For a small sample of brokerage firms, we find that firms do not significantly change their fees in the first year of protocol membership, but in the second year fees go up by about 13% from pre-adoption levels. After three years, fees remain about 18% higher than pre-adoption fee levels. These findings, along with those on higher misconduct rates, call into question whether unlocking clients makes them better off.

What is the effect of unlocking clients on firms? If all firms charged the same fees for identical products, then advisers moving within the protocol member firms should just be a zero sum game. Therefore, to answer this question, we need to think about which firms should gain from joining and which should lose. Prior to the protocol, legal settlements between the former and new employer were the norm when advisers moved clients between firms. The new employer would pay the former some percentage of the adviser's annual production. The large brokerage houses that initiated the protocol along with those that

joined in the early years likely anticipated that the agreement would lead to zero net flows, and reduced legal costs. They likely did not anticipate the growth of the protocol to include smaller firms. For these firms, the protocol was an opportunity. The status quo legal settlement process made it extremely difficult for small firms to poach employees from larger firms since they did not have the resources to settle up. Protocol adoption made poaching from large firms "free." With this in mind, we analyze firm outcomes by splitting the sample between large and small firms.

Our empirical findings are largely consistent with these arguments. Adoption of the broker protocol matters much more for smaller firms. Smaller firms see abnormal adviser growth from within the industry of about 8.5% in the year they join the protocol. This is driven by poaching advisers from other member firms. Substantial growth only lasts during the first two years, suggesting that small firms strategically join the protocol to poach advisers and grow their client base. Large firms, by contrast, see no net growth in the number of advisers upon adoption of the protocol, but the long-term effects of protocol adoption for these firms is a decline in advisers. We see similar patterns when investigating the impact of unlocking clients on revenue. For small firms, revenue increases by about 27% upon adoption of the protocol and remains persistently higher. Large firms, however, see a temporary increase of about 7% in the first year, which fades away by the second year. These results indicate that if clients were fully unlocked from firms, the financial advisory industry would become less concentrated, allowing small firms to compete with larger firms.

Tempering the benefit of increased competition, we also find that misconduct rates at small firms increase by more than at larger firms following protocol adoption and remain persistently high. An advisers with a large client base at a small firm will wield much more power than at a large firm since her book of business constitutes a larger percentage of firm assets at the small firm. In a sense "relationship assets" in small firms are much more concentrated, making them less willing to discipline large advisers.[5]

Our findings contribute to the literature that explores incentives and behavior of financial advisers, who play an influential role in determining their clients' asset choices (Mullainathan et al., 2012; Foerster et al., 2017), despite a failure to deliver tangible benefits (Bergstresser et al., 2009; Chalmers and Reuter, 2020). We extend this literature by highlighting the fundamental importance of the relationships between advisers and their clients in this industry. Charoenwong et al. (2017), Dimmock et al. (2018) and Egan et al. (2019) study misconduct in this industry, whereas Clifford and Gerken (2019) investigate the effect of the broker protocol on investment in human capital. We show that significant adviser power can lead to higher fees, laxer firm governance, and increased adviser misconduct.

---

[4] A recent literature has found that rates of adviser misconduct are persistent within firms, suggesting that some advisory firms do a poor job of disciplining misconduct (Egan et al., 2019).

[5] This idea is similar to Israelsen and Yonker (2017), who show that firms with concentrated human capital experience large declines in firm value when "key" employees depart.

**JA0316**

U.G. Gurun, N. Stoffman and S.E. Yonker    Journal of Financial Economics 141 (2021) 1218–1243

Our findings are also related to the growing literature on the importance of trust in the financial advisory industry (Gennaioli et al., 2015; Gurun et al., 2018; Germann et al., 2018; Kostovetsky, 2016). We provide the first estimate of the percentage of assets an adviser can expect to take when switching firms, which is direct evidence of the importance of trust-based relationships between clients and advisers. Unlike Gurun et al. (2018), who show the impact on asset flows from clients losing trust in regulators, we show that client trust in advisers—rather than advisory firms—shapes asset flows in the financial advisory market. From this perspective, our study complements Kostovetsky (2016), who studies mutual fund flows around management-company ownership changes, finding evidence that clients also place trust in firms.

Finally, our paper is related to the broad literature in labor economics on the use of NCAs in various industries and how it affects human capital mobility. Starr et al. (2018) find that 18% of employees report being bound by non-compete agreements—including 20% of employees with less than a high school education—while 38% of employees report having signed a non-compete agreement at some point in the past.[6] Studies have generally found that NCAs are an impediment to this mobility (Stuart and Sorenson, 2003; Marx et al., 2009; Marx, 2011), and therefore can affect the growth of both industries and geographic regions (Rosegrant and Lampe, 1992; Saxenian, 1996; Franco and Filson, 2006; Klepper, 2002; Klepper and Sleeper, 2005). With the exception of Lavetti et al. (2019), who use a survey of physicians in five states, this literature has relied on state-level variation in enforcement of NCAs. We contribute to this literature by providing the first large-scale evidence of the effects of NCAs on labor mobility and bargaining power using firm-level variation in NCAs. In contrast to previous studies, our design allows us to control for geographic differences in local labor market conditions that could be correlated with NCA enforcement.

## 2. Empirical methodology

We are interested in estimating the importance of client relationships in the financial advisory industry. To do this, we need variation in advisers' ability to move clients when they switch firms. For this purpose, we construct a staggered panel of firm entry and exit into the broker protocol, which relaxed the enforcement of NCAs for advisers moving within member firms, allowing clients to freely follow their advisers to some firms, but not others.

Importantly, there are very few barriers to protocol membership. Firms entering the protocol must only file a joinder agreement and notify the Securities Industry and Financial Markets Association (SIFMA) of their entry. Leaving is also easy, requiring only written notification ten days prior to exit. This ease of entry and exit alleviates the concern that certain types of firms are systematically excluded

and that characteristics of those excluded firms could drive our findings.

One challenge to estimating causal effects using the broker protocol as our source of variation is that firms are likely to join the protocol strategically. Indeed, our results show that this is likely the case. In the analysis that follows, we show that adviser turnover increases significantly in the year a firm joins the protocol, and remains high in the year following protocol membership, but then converges to pre-membership levels, suggesting that firms enter the protocol to poach advisers (see Fig. 2). In the Internet Appendix, we identify characteristics that predict a firm's decision to join the protocol, namely firm size, past growth, being a registered investment adviser (RIA), and the amount of competition among local advisers (Table IA.1).

We must therefore consider two potential sources of endogeneity: omitted factors and reverse causality. First we consider omitted factors that predict protocol membership but cannot be included in the model; these could be be static or time-varying at the level of the firm, branch, or local labor market. We address this concern in three ways. First, we include firm-branch fixed effects in our adviser-level regressions, which allows us to control for any time-invariant, firm- and branch-level omitted variables that could drive protocol adoption. Second, we include county-year fixed effects to remove the effect of any time series trends that could be due to changing local economic conditions or the increasing number of firms entering the protocol across geographies, for example. The inclusion of these fixed effects rules out the possibility that either static or time-varying omitted variables at the local level influence our estimates. Third, while we control for observable firm and branch characteristics that could vary through time, this cannot account for time-varying *omitted* firm and branch characteristics that could drive protocol entry. For example, a firm can adopt a more aggressive corporate strategy that includes aggressive recruiting. This strategy could simultaneously affect many firm-level policies, as well as leading to the firm's decision to join the protocol. Such changes in firm policies would be correlated with protocol adoption, but are not a result of protocol adoption. We deal with this by exploiting several facts: (i) protocol adoption is a firm-level decision that applies to all firm branches regardless of their location, (ii) many firms have branches in different states, and (iii) there is substantial heterogeneity in the level of enforcement of NCAs by state. Therefore, looking within a firm, protocol entry should have stronger effects on branches located in states that have stronger NCA enforcement. Throughout the analysis we test this hypothesis.

The second possible source of endogeneity is reverse causality. When regressing adviser turnover on protocol membership, for example, it is difficult to determine whether firms join the protocol because they seek to poach advisers, or whether joining the protocol causes turnover to increase. We argue that while this source of endogeneity is certainly present at the firm level, firm entry into the protocol acts as an exogenous positive shock to the transferability of client relationships, essentially transforming what were once firm-specific assets to general assets

---

[6] Greenhouse (2014) provides examples of non-compete agreements in a surprising range of jobs, including summer camp counselors, event planners, and yoga instructors. In 2016, the sandwich chain Jimmy Johns agreed to stop requiring NCAs with its employees as part of a settlement with the New York attorney general's office.

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243

that advisers can take with them if they leave. This is especially true for advisers at large firms. We therefore conduct all of our analysis both with the full sample of observations as well as a subset of advisers who work for large firms, with the assumption that advisers at large firms do not likely influence the decisions of management to join the broker protocol.

## 3. Data and sample construction

In this section, we discuss the four main data sources utilized in the study and how we use them to construct the adviser-level and firm-level data sets used in our analysis.

### 3.1. Financial adviser data

Data on financial advisers are extracted from FINRA's web server, which provides consolidated data from its BrokerCheck web site and the Security and Exchange Commission's Investment Adviser Public Disclosure (IAPD) web site. These data include information on all registered representatives (brokers) and investment adviser representatives (investment advisers). Following Egan et al. (2019), we refer to these two groups collectively as "financial advisers." Data extracted from this source include the histories of broker and investment adviser registrations with firms, locations of employment, customer complaints and dispute resolutions, and industry examinations. The data are similar to that used in the main analysis of Egan et al. (2019), but also include advisers working for registered investment advisers that are not also broker-dealers.

### 3.2. Registered investment adviser data

Data on registered investment advisory firms are from Part 1A of SEC Form ADV, the Uniform Application for Investment Advisor Registration, which we obtained through a series of Freedom of Information Act (FOIA) requests. The SEC granted us all electronic filings made since the electronic filing mandate began in 2001, through the first quarter of 2017. These data include detailed information about investment advisory firms, including their owners, their clients, and any criminal behavior. Importantly, investment advisory firms are required to update their filings annually, including assets under management (AUM). Using these data, we follow Gurun et al. (2018) in constructing an advisory firm-year panel data set.

### 3.3. Broker-dealer data

Broker-dealers are identified using Form BD, which is filed by all registered broker-dealers. The data were obtained through a FOIA request to the SEC and are augmented with additional information from the SEC's web site listing active broker-dealers by month, dating back to 2007.[7]

### 3.4. Broker protocol data

Entry and exit dates to the broker protocol are collected from a web site maintained by the law firm Carlile, Patchen, and Murphy, LLP.[8] The site includes a directory of all firms that have ever entered the broker protocol, and provides legal names of firms, their dates of entry and exit, and contact information. We match these firms to FINRA's unique firm-level CRD identifier by matching legal names of these entities to those in the SEC and FINRA databases. This matching is extremely precise because the protocol web site uses legal names of firms.

As of the end of 2016, there were 1515 unique firms that had joined the broker protocol. Of these, we are able to identify the CRD for 1325 firms, or 87.5% of the initial sample. Most firms that we are unable to match appear to be banks or trusts and are therefore not included in the adviser data. Of the matched firms, 1166 (88.0%) had at least one adviser employed in the year prior to joining the protocol. (The remainder are firms that were established and joined the protocol prior to commencing operations or having any registered advisers.)

Table 1 reports firm entry and exit by year into the protocol. The table shows that by December 2016, only 39 of the 1166 firms that had entered the protocol had subsequently left. Entry by number of firms peaked at 214 in the aftermath of the financial crisis, in 2009. Looking at the number of advisers added to the protocol, the two highest years were 2004 and 2009, each with over 57,000 advisers joining. The table also shows that in the early years of the protocol entry was dominated by large broker-dealers, but that smaller registered investment advisers have made up the majority of entrants since 2010. For example, the average firm joining in 2004 had 14,323 advisers, while at the end of our sample period this number had declined to just 32.

Our analysis uses only the period of 2007 onward because of a possible survivorship bias present in our data prior to 2007, which we discuss in detail below. The table shows that our sample includes 99% of the staggered firm entries, 100% of the exits, and 207,791 advisers that were employed when their firms joined the protocol, which is 72% of the population.

Fig. 1 shows the percentage of firms and advisers in the protocol by year. Panel A of the figure shows that protocol membership by firm has steadily increased over the period. By the end of 2016, 6.3% of firms with more than one adviser were party to the protocol. These rates are slightly higher for broker-dealer firms than for non-broker-dealer firms. Turning to the number of financial advisers employed at firms in the protocol, Panel B of the figure shows that by the end of 2016, 38.9% of advisers were employed by firms in the protocol. A much larger proportion of advisers employed by broker-dealers than those employed by non-broker-dealers were covered (43.3% vs. 12.6%).

---

[7] www.sec.gov/help/foiadocsbdfoiahtm.html.

[8] www.thebrokerprotocol.com.

JA0318

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243

**Table 1**
Entry and exit in the broker protocol.

The table shows the number of firms and advisers that entered or exited the broker protocol each year. The number of advisers is the total number of advisers registered with the firm as of the end of the calendar year prior to the entry or exit year. The table also reports the percentage of entering or exiting firms that are registered broker dealers and the percentage of advisers who work for registered broker dealers. Also reported are the total number of entries/exits ("Total") and the total number covered for our sample period ("Sample total"), as well as the percentage of the total covered by our sample, which begins in 2007.

| Year | Entry | | | | | Exit | | | | |
|------|-------|--|--|--|--|------|--|--|--|--|
| | Number | | | % BD | | Number | | | % BD | |
| | Firms | Advisers | Adv./ Firm | Firms | Advisers | Firms | Advisers | Adv./ Firm | Firms | Advisers |
| 2004 | 4 | 57,290 | 14,323 | 100 | 100 | | | | | |
| 2005 | 1 | 432 | 432 | 100 | 100 | | | | | |
| 2006 | 10 | 23,178 | 2318 | 90 | 100 | | | | | |
| 2007 | 18 | 17,968 | 998 | 67 | 97 | | | | | |
| 2008 | 71 | 26,769 | 377 | 46 | 100 | | | | | |
| 2009 | 214 | 57,596 | 269 | 44 | 99 | | | | | |
| 2010 | 135 | 15,196 | 113 | 29 | 96 | 3 | 133 | 44 | 0 | 0 |
| 2011 | 119 | 12,530 | 105 | 27 | 98 | 5 | 48 | 10 | 20 | 35 |
| 2012 | 110 | 11,127 | 101 | 23 | 84 | 9 | 1302 | 145 | 22 | 41 |
| 2013 | 91 | 6632 | 73 | 14 | 91 | 5 | 447 | 89 | 40 | 91 |
| 2014 | 134 | 43,659 | 326 | 17 | 98 | 5 | 70 | 14 | 0 | 0 |
| 2015 | 124 | 11,932 | 96 | 20 | 96 | 7 | 283 | 40 | 29 | 86 |
| 2016 | 135 | 4382 | 32 | 15 | 84 | 5 | 28 | 6 | 0 | 0 |
| Total | 1166 | 288,691 | | 28.39 | 97.80 | 39 | 2311 | | 18 | 52 |
| Sample | 1151 | 207,791 | | 27.54 | 96.94 | 39 | 2311 | | 18 | 52 |
| % total | 99 | 72 | | | | 100 | 100 | | | |

## 3.5. Additional data sources

We obtain data on fee-based assets and fee revenue for a subset of large broker-dealers from *InvestmentNews'* B-D Data Center.[9] These data, which cover approximately 75 broker-dealers per year from 2004 to 2016, are compiled from annual surveys of independent broker-dealers. We obtain annual data on revenue for broker-dealers from Audit Analytics' Broker-Dealer Financial and Operational Combined Uniform Single (FOCUS) Report, which collects data from SEC Form X-17A-5 filings, and contains information on the financial and operating conditions of broker-dealers. We summarize these data in Tables IA.7 and IA.8 of the Internet Appendix, respectively. We also construct a measure of state-level NCA enforceability, "Absence of NCA enforcement," based on data presented in Table 1 of Stuart and Sorenson (2003).

## 3.6. Sample construction

We construct a data set covering advisers beginning in 2003, but show in the Appendix that the data are free of survivorship bias concerns only beginning in August 2007. Our main tests using these data are therefore conducted with annual panel data from the end of 2007 until the end of 2016. This final survivorship-bias-free sample includes 5,902,522 employee-year observations. We run robustness tests using all available data back to the beginning in 2003, but acknowledge that a possible survivorship bias exists in this extended sample.

Summary statistics for the adviser panel are displayed in Panel A of Table 2. Also shown are the subsamples based on whether the adviser is employed by a firm that is a member of the protocol during the year or not. The table shows that, for 33% of the employee-year observations, advisers work for firms in the protocol. Most financial advisers work for broker-dealers (97%). The average financial adviser has 12 years of experience and advisers at firms in the protocol have about three more years of experience, on average, than advisers at firms not in the protocol. The unconditional probability of an adviser leaving for another firm during the year is 0.092. We decompose adviser movements by whether their destination firm is a protocol member. Not surprisingly, the majority of moves are to nonprotocol firms (79%), since there are many more of them.

We construct a misconduct indicator variable following Egan et al. (2019). During our sample, advisers engage in misconduct 0.5% of the time, which is slightly less than the 0.6% reported in Table 1 of Egan et al. (2019). Advisers employed by protocol member firms appear to be about 75% more likely to engage in misconduct. We also calculate "Past misconduct," which indicates if an adviser has ever engaged in misconduct in the past. Its average is 6.8%, matching the 7% reported by Egan et al. (2019). More generally, our summary statistics closely match those of Egan et al. (2019).

We construct a firm-level sample by collapsing the adviser-level data each year. This gives us 133,519 firm-year observations from 2007 until 2016, for about 13,350 firms per year. In 4% of the firm-years, firms are members of the broker protocol and in 31% firms are broker-dealers. The average firm has 59 advisers, but this distribution is highly skewed with a median of only four. Moreover, broker protocol members have many more advisers than firms that are not members. Within industry turnover, defined as the average of the percentage of advisers leaving the firm for other firms and the percentage of advisers joining the

---

[9] http://www.investmentnews.com.

JA0319

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243



**Fig. 1.** Percentage of firms and advisers in the protocol by year. The figure shows the percentage of financial firms that are members of the broker protocol (Panel A) and advisers who are employed by members of the broker protocol (Panel B) by year for all firms that employ at least two financial advisers between 2004 and 2016. These percentages are also decomposed into firms (employers) that are not broker-dealers and firms that are broker-dealers. The survivorship-bias-free sample begins in August of 2007. Advisers who retire prior to August 2007 are missing from the sample.

firm from other firms, is about 6.5% for the average firm, and is predominately driven by turnover with firms that are not in the protocol. At least one misconduct event occurs at firms at a rate of nearly 8% per year and, as previously noted, it is much less frequent among nonprotocol firms.

Our asset flow tests are limited to firms that are registered investment advisers with the SEC. The RIA sample indicator reveals that firms in about 33.7% (44,995 firm-years) of the firm-years also file Form ADV and report AUM. The average firm has $2.2 billion in AUM and 1625 client accounts, but the median AUM is much smaller at $236 million and 450 client accounts. Firms in the protocol manage roughly twice as many assets as those that are not. The average asset and account growth rates are around 7%.

JA0320

U.G. Gurun, N. Stoffman and S.E. Yonker                                                      Journal of Financial Economics 141 (2021) 1218–1243

**Table 2**

Summary statistics.

The table displays summary statistics for variables used in the analysis. Reported in Panel A are summary statistics for the survivorship-bias-free adviser-level panel of advisers who work for employers that employ at least two financial advisers, which includes 5,902,522 adviser-year observations from the end of 2007 through the end of 2016. Reported in Panel B are summary statistics for the firm-level panel of all firms that employee at least two financial advisers, which includes 133,519 firm-year observations from the end of 2007 through the end of 2016. All variables are defined in Tables A.1 and A.2 of the Appendix. Also reported are means of the sample split by whether the employer (adviser-panel) or the firm is a member of the broker protocol at the end of the calendar year and the significance levels of univariate t-tests testing the differences in these means. t-statistics are computed using robust standard errors, clustered by firm. Significance levels are denoted by c, b, and a, which correspond to 10%, 5%, and 1% levels, respectively. Data on AUM is available only for firms that register as investment advisers with the SEC. For about 37% of the firm-year observations, the firm is registered as an investment adviser.

| | Mean | Median | St. dev. | 1st per. | 99th per. | Not in protocol mean | In protocol mean |
|---|---|---|---|---|---|---|---|
| _Panel A: Adviser level_ | | | | | | | |
| firm in protocol | 0.328 | 0.000 | 0.469 | 0.000 | 1.000 | 0.000 | 1.000 |
| Years experience | 12.070 | 10.000 | 9.653 | 0.000 | 40.000 | 10.979 | 14.306[a] |
| Log (years experience) | 2.206 | 2.398 | 0.970 | 0.000 | 3.714 | 2.110 | 2.402[a] |
| Registered investment adviser | 0.390 | 0.000 | 0.488 | 0.000 | 1.000 | 0.284 | 0.608[a] |
| Registered representative | 0.994 | 1.000 | 0.079 | 1.000 | 1.000 | 0.991 | 0.999[a] |
| Gen. sec. rep. (7) | 0.669 | 1.000 | 0.470 | 0.000 | 1.000 | 0.584 | 0.846[a] |
| Inv. co. prod. rep. (6) | 0.378 | 0.000 | 0.485 | 0.000 | 1.000 | 0.459 | 0.213[a] |
| Gen. sec. principal (24) | 0.139 | 0.000 | 0.346 | 0.000 | 1.000 | 0.139 | 0.138 |
| Number of other qual. | 0.469 | 0.000 | 0.860 | 0.000 | 4.000 | 0.393 | 0.625[a] |
| Past misconduct | 0.068 | 0.000 | 0.251 | 0.000 | 1.000 | 0.055 | 0.095[a] |
| Absence of NCA enforcement | 0.200 | 0.000 | 0.400 | 0.000 | 1.000 | 0.190 | 0.220[b] |
| Leave for another firm (%) | 9.221 | 0.000 | 28.933 | 0.000 | 100.000 | 9.116 | 9.438 |
| Leave to a protocol firm (%) | 3.444 | 0.000 | 18.236 | 0.000 | 100.000 | 1.878 | 6.654[a] |
| Leave to a nonprotocol firm (%) | 5.777 | 0.000 | 23.331 | 0.000 | 100.000 | 7.237 | 2.783[a] |
| Forced turnover (%) | 2.968 | 0.000 | 16.969 | 0.000 | 100.000 | 3.329 | 2.227[a] |
| Misconduct indicator | 0.005 | 0.000 | 0.070 | 0.000 | 0.000 | 0.004 | 0.007[a] |
| Broker-dealer indicator | 0.970 | 1.000 | 0.170 | 0.000 | 1.000 | 0.958 | 0.996[a] |
| _Panel B: Firm level_ | | | | | | | |
| Firm in protocol | 0.040 | 0.000 | 0.195 | 0.000 | 1.000 | 0.000 | 1.000 |
| Number of advisers | 60.097 | 4.000 | 670.821 | 1.000 | 877.000 | 42.499 | 485.065[a] |
| Log (number of advisers) | 1.810 | 1.386 | 1.358 | 0.000 | 6.777 | 1.761 | 2.996[a] |
| Within industry turnover | 6.534 | 0.000 | 12.444 | 0.000 | 60.000 | 6.411 | 9.508[a] |
| Turnover with firms in protocol | 0.967 | 0.000 | 2.985 | 0.000 | 16.667 | 0.875 | 3.201[a] |
| Turnover with firms not in protocol | 5.567 | 0.000 | 11.353 | 0.000 | 52.632 | 5.536 | 6.307[a] |
| %Δ in advisers | 3.947 | 0.000 | 24.916 | −50.000 | 100.000 | 3.825 | 6.875[a] |
| %Δ in advisers outside industry | 1.178 | 0.000 | 16.096 | −50.000 | 57.143 | 1.196 | 0.745 [b] |
| %Δ in advisers within industry | 2.769 | 0.000 | 17.841 | −50.000 | 78.495 | 2.629 | 6.131[a] |
| %Δ in advisers with protocol firms | 0.626 | 0.000 | 5.350 | −14.286 | 33.333 | 0.524 | 3.082[a] |
| %Δ in advisers with firms not in protocol | 2.143 | 0.000 | 16.505 | −50.000 | 66.667 | 2.105 | 3.049[a] |
| % advisers join from outside the industry | 6.088 | 0.000 | 15.159 | 0.000 | 66.667 | 6.110 | 5.540[a] |
| % advisers join from within industry | 7.919 | 0.000 | 18.421 | 0.000 | 100.000 | 7.726 | 12.574[a] |
| % advisers join from protocol firms | 1.280 | 0.000 | 5.098 | 0.000 | 33.333 | 1.137 | 4.742[a] |
| % advisers leave to go outside the industry | 4.910 | 0.000 | 10.642 | 0.000 | 50.000 | 4.914 | 4.796 |
| % advisers leave within industry | 5.150 | 0.000 | 11.380 | 0.000 | 50.000 | 5.096 | 6.442[a] |
| % advisers leave for protocol firms | 0.654 | 0.000 | 2.479 | 0.000 | 14.286 | 0.613 | 1.660[a] |
| Misconduct dummy | 0.077 | 0.000 | 0.267 | 0.000 | 1.000 | 0.068 | 0.306[a] |
| Broker dealer indicator | 0.311 | 0.000 | 0.463 | 0.000 | 1.000 | 0.310 | 0.347[b] |
| RIA indicator | 0.337 | 0.000 | 0.473 | 0.000 | 1.000 | 0.334 | 0.516[a] |
| AUM ($ millions) | 2,217.889 | 236.219 | 8,784.918 | 11.736 | 68,754.900 | 3,729.877 | 7,601.002 |
| Log (AUM) | 5.761 | 5.465 | 1.690 | 2.463 | 11.113 | 5.727 | 6.295[a] |
| ΔLog (AUM) | 0.074 | 0.082 | 0.312 | −1.180 | 1.276 | 0.069 | 0.143[a] |
| Number of accounts (thousands) | 1.625 | 0.000 | 4.763 | 0.002 | 34.323 | 20.750 | 27.199 |
| Log (Accts) | −0.942 | −0.799 | 1.815 | −6.215 | 3.825 | −1.028 | 0.391[a] |
| ΔLog (Accts) | 0.070 | 0.041 | 0.371 | −1.345 | 1.609 | 0.066 | 0.124[a] |

## 4. Results

In the following sections, we test the importance of client relationships in the financial advisory industry. We begin with advisers by testing whether unlocking clients affects their employment decisions (Section 4.1). Next we focus on clients by asking, when unlocked, what percentage of client assets follow their advisers when ad-

visers switch firms (Section 4.2). For firms, we estimate how unlocking clients affects their willingness to discipline advisers for bad behavior since unlocking clients transfers bargaining power to advisers (Section 4.3). We then test whether laxer monitoring by firms leads to increased financial misconduct (Section 4.4). The dynamics of fees after firms unlock their clients are then explored (Section 4.5). Finally, we ask which firms are the winners

U.G. Gurun, N. Stoffman and S.E. Yonker
Journal of Financial Economics 141 (2021) 1218–1243

and losers from unlocking clients, and what are the implications for the industry (Section 4.6).

### 4.1. Adviser employment decisions

We begin by estimating the effect of unlocking clients on advisers' decisions to move to another firm ("turnover").

#### 4.1.1. Adviser-level analysis

We estimate the following linear probability model using our annual adviser-employer matched panel from 2007 through 2016:

$$\text{Turnover}_{j,i,c,t+1} = \alpha_{i,c} + \gamma_{c,t} + \beta_p(\text{Firm in protocol})_{j,i,t}$$
$$+ \Gamma'\text{Controls}_{i,t} + \epsilon_{j,i,t}, \quad (1)$$

where $\text{Turnover}_{j,i,c,t+1}$ is an indicator that is one if individual $j$'s employment at firm $i$ in a branch located in county $c$ ends during year $t + 1$. (Firm in the protocol)$_{i,t}$ is an indicator variable that is one if firm $i$ is in the broker protocol by the end of year $t$, and $\alpha_{i,c}$ and $\gamma_{c,t}$ are branch (firm-county) and county-year fixed effects, respectively. Control variables include the log of the number of advisers employed at firm $i$ at the end of year $t$, the log of the number of years of experience of adviser $j$ by the end of year $t$, and a series of dummy variables indicating the exams/qualifications of the financial advisers, which follow the definitions used in Egan et al. (2019).[10] The variable of interest is "Firm in protocol." If unlocking clients increases the propensity of advisers to leave their firms, then the estimate of $\beta_p$ should be significantly positive.

We estimate regression (1) using three alternative definitions of turnover. First, we use "Leave for another firm," an indicator variable that is one if an adviser leaves one firm and joins another. We further decompose this variable into two categories: whether the firm that the adviser joins is a member of the protocol or not, creating the indicator variables "Leave to a protocol firm" and "Leave to a nonprotocol firm."

Since all advisers in a firm are treated simultaneously, our empirical design could have what Abadie et al. (2017) call an "assignment" problem. We address this by clustering standard errors by firm throughout the analysis.[11] Sampling problems are not an issue in our study since the "sample" includes the population of financial advisers.

Panel A of Table 3 shows the regression results for these three turnover variables. In column 1, the estimate of $\beta_p$ is indistinguishable from zero, indicating that unlocking clients does not increase advisers' propensity to switch firms. However, the evidence in columns 2 and 3 shows that unlocking clients redirects advisers toward other protocol firms and away from nonprotocol firms. The estimate of $\beta_p$ in column 2 is 1.81, indicating that once advisers'

firms join the protocol, those advisers are 1.8% more likely to leave for another protocol firm. The unconditional probability of leaving to join a firm in the protocol is 3.5%, so the economic magnitude of this effect is substantial, increasing the probability by over 50%. The estimate in column 3 indicates that the probability that advisers leave to join nonprotocol firms following their firm joining the protocol declines by about 2.0%. These results are consistent with adviser-client relationships affecting advisers' employment decisions.[12]

To further the argument of causality, in columns 4 through 7 of the table we test whether the effects of unlocking clients due to the relaxation of NCAs are stronger in branches that are located in states that enforce NCAs. To do this, we estimate regression (1) separately for advisers working at branches located in states that enforce NCAs and for those working in states that do not. We then test whether $\beta_p$ is larger in magnitude for the sample of advisers working in states that enforce NCAs. If advisers are aware of the state-level enforceability of these agreements, then the protocol should have more of an effect on turnover in states that enforce NCAs. Of course, broker protocol can still influence adviser mobility in states where NCAs are not influenced if advisers are unaware of the strength of enforceability in their states.

The coefficient estimates indicate that the effects of the protocol are stronger in states that actually enforce NCAs. The estimates of $\beta_p$ in column 4 are roughly twice the size of those in column 5 and theses differences are significantly different from zero at the 10% level. Similarly, the decrease in the probability of advisers leaving for firms that are not in the protocol following protocol membership is larger in magnitude for advisers working in states that enforce NCAs. The estimate of $\beta_p$ is −2.14 in column 6 of Panel A, while the coefficient in column 7 is −1.52. This difference is significant at the 10% level.

Panel B shows the results when the sample is restricted to advisers who work for large firms (those with 100 advisers or more). The sample averages about 590 of these firms per year, which is about the 96th percentile of firm size. These results are less susceptible to reverse causality since individual advisers are less likely to be able to influence their firms' decisions to join the protocol. The results confirm that unlocking clients affects adviser employment decisions.

#### 4.1.2. Firm-level analysis

We next estimate the dynamics of firm-level turnover and adviser growth following unlocking clients. To ensure that our findings are not driven by outliers, all dependent variables are winsorized at the 1st and 99th percentiles. Specifically, we estimate:

$$\text{Turnover/Growth}_{i,t}$$
$$= \alpha_i + \gamma_t + \beta_{p,0}(\text{Firm joins protocol})_{i,t}$$
$$+ \beta_{p,1}(\text{Firm joins protocol})_{i,t-1}$$

---

[10] One exception is that we include a dummy variable, "investment adviser," that indicates whether the adviser is currently registered as an investment adviser. Egan et al. (2019), instead use data on exams passed to infer registration as an investment adviser.

[11] Two-way clustering by firm and year is not appropriate, since we only have nine years of data. Standard advice is that there should be at least 50 clusters to make clustering the standard errors appropriate.

[12] Table IA.3 in the Internet Appendix shows the effect of the inclusion of various fixed effects in our model. Branch fixed effects explain the most variation and have largest effect on the magnitude of the estimates of $\beta_p$.

U.G. Gurun, N. Stoffman and S.E. Yonker

*Journal of Financial Economics 141 (2021) 1218–1243*

**Table 3**

Adviser turnover.

The table displays regression results from linear probability models estimated using OLS (Eq. (1) in the text) of various turnover measures in the next year on "Firm in protocol," which is an indicator variable that is one if the financial adviser is employed by a firm that is a member of the broker protocol as of the end of the calendar year. The table reports the results using two samples. In Panel A, the analysis uses the entire adviser-level sample described in Panel A of Table 2. In Panel B, the sample is restricted to employees who are employed by firms with at least 100 advisers. Only coefficient estimates on "Firm in protocol" are displayed in Panel B, but the same control variables used in Panel A are included in the models. The dependent variable in column 1 is "Leave for another firm," which is an indicator variable that is one if the adviser who departs in year $t + 1$ joins another firm by August of 2017 (the time of download for our data). We further decompose this variables by whether the firm that the adviser joins is a member of the protocol or not, creating the indicator variables "Leave for a protocol firm" and "Leave for a nonprotocol firm." Columns 4 through 7 show regression results for subsamples of advisers split by state-level NCA enforcement. We categorize state-level enforcement of NCAs based on the variable "Absence of NCA enforcement," which is a dummy variable that indicates that the state where the adviser works does not enforce non-compete agreements. This variable is based on Table 1 of Stuart and Sorenson (2003) and used in Samila and Sorenson (2011). We categorize states that do not enforce NCAs as those where "Absence of NCA enforcement"=1 and those that do enforce NCAs as states where "Absence of NCA enforcement"=0. All models include firm-county and county-year fixed effects. County is based on the primary branch where the adviser works. $t$-statistics are computed using robust standard errors (reported in parentheses), clustered by firm. Using the same robust standard error estimation we also report $\hat{\beta}_{p,\text{yes}} - \hat{\beta}_{p,\text{no}}$ and the associated standard errors. Significance levels are denoted by c, b, and a, which correspond to 10%, 5%, and 1% levels, respectively.

| Sample | Leave for another firm | Leave for a protocol firm | Leave for a nonprotocol firm | Leave for a protocol firm | Leave for a protocol firm | Leave for a nonprotocol firm | Leave for a nonprotocol firm |
|---|---|---|---|---|---|---|---|
| | | | | State enforces NCAs? | | | |
| | Full | Full | Full | Yes | No | Yes | No |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| *Panel A: All advisers* | | | | | | | |
| Firm in protocol | −0.183 | 1.812[a] | −1.995[a] | 2.023[a] | 1.062[c] | −2.135[a] | −1.523[a] |
| | (0.885) | (0.592) | (0.502) | (0.636) | (0.596) | (0.537) | (0.489) |
| Log (number of advisers) | 3.359[c] | 2.204 | 1.155 | 1.957 | 3.360 | 1.139 | 1.231[c] |
| | (1.896) | (1.673) | (0.882) | (1.583) | (2.132) | (0.996) | (0.667) |
| Log (years experience) | −1.628[a] | −0.569[a] | −1.059[a] | −0.545[a] | −0.668[a] | −1.056[a] | −1.070[a] |
| | (0.201) | (0.125) | (0.114) | (0.119) | (0.152) | (0.115) | (0.126) |
| Investment adviser | 0.253 | 0.819[b] | −0.566[a] | 0.720[a] | 1.178[b] | −0.504[a] | −0.817[a] |
| | (0.361) | (0.320) | (0.129) | (0.264) | (0.546) | (0.138) | (0.159) |
| Gen. sec. rep. (7) | 3.300[a] | 1.392[a] | 1.907[a] | 1.290[a] | 1.819[a] | 1.895[a] | 1.963[a] |
| | (0.215) | (0.137) | (0.160) | (0.107) | (0.292) | (0.163) | (0.209) |
| Inv. co. prod. rep. (6) | −0.251 | −0.096 | −0.155 | 0.016 | −0.472 | −0.133 | −0.246 |
| | (0.323) | (0.210) | (0.193) | (0.163) | (0.372) | (0.208) | (0.177) |
| Gen. sec. principal (24) | −0.675[b] | −0.399[b] | −0.276[b] | −0.361[b] | −0.567[b] | −0.259[b] | −0.348[b] |
| | (0.268) | (0.200) | (0.123) | (0.180) | (0.289) | (0.125) | (0.155) |
| Number of other qual. | 0.227[a] | 0.119[c] | 0.108[a] | 0.119[c] | 0.126 | 0.100[b] | 0.141[a] |
| | (0.084) | (0.064) | (0.039) | (0.062) | (0.078) | (0.041) | (0.046) |
| County-Year FE | Y | Y | Y | Y | Y | Y | Y |
| Firm-county FE | Y | Y | Y | Y | Y | Y | Y |
| Mean of the dep. var. | 9.169 | 3.482 | 5.687 | 3.441 | 3.863 | 5.790 | 5.349 |
| Adj-$R^2$ | 0.10 | 0.11 | 0.09 | 0.11 | 0.12 | 0.09 | 0.10 |
| Observations | 5,891,188 | 5,891,188 | 5,891,188 | 4,712,699 | 1,178,489 | 4,712,699 | 1,178,489 |
| $\hat{\beta}_{p,\text{yes}} - \hat{\beta}_{p,\text{no}}$ | | | | 0.961[c] | | −0.612[c] | |
| | | | | (0.534) | | (0.369) | |
| *Panel B: Sample advisers working at firms with at least 100 advisers* | | | | | | | |
| Firm in protocol | 0.007 | 1.740[a] | −1.733[a] | 1.972[a] | 0.892 | −1.873[a] | −1.256[b] |
| | (0.947) | (0.664) | (0.543) | (0.707) | (0.695) | (0.585) | (0.499) |
| Controls | Y | Y | Y | Y | Y | Y | Y |
| County-year FE | Y | Y | Y | Y | Y | Y | Y |
| Firm-county FE | Y | Y | Y | Y | Y | Y | Y |
| Mean of the dep. var. | 8.996 | 3.673 | 5.323 | 3.584 | 4.063 | 5.407 | 5.010 |
| Adj-$R^2$ | 0.10 | 0.11 | 0.09 | 0.11 | 0.12 | 0.08 | 0.09 |
| Observations | 5,221,183 | 5,221,183 | 5,221,183 | 4,180,975 | 1,040,208 | 4,180,975 | 1,040,208 |
| $\hat{\beta}_{p,\text{yes}} - \hat{\beta}_{p,\text{no}}$ | | | | 1.080[c] | | −0.617 | |
| | | | | (0.608) | | (0.395) | |

$$+ \beta_{p,2}(\text{Firm joins protocol})_{i,t-2}$$
$$+ \beta_{p,>2}(\text{Firm joins protocol})_{i,<t-2}$$
$$+ \Gamma'\text{Controls}_{i,t-1} + \epsilon_{i,t}, \qquad (2)$$

where $\alpha_i$ and $\gamma_t$ are firm and year fixed effects and (Firm joins protocol)$_{i,t}$ is an indicator variable that is one if firm $i$ joins the broker protocol in year $t$. Therefore, $\beta_{p,s}$

estimates the change in turnover $s$ periods after protocol adoption relative to the firm's average turnover prior to joining the broker protocol. For instance, $\beta_{p,0}$ captures abnormal turnover in the first year of membership. The parameter $\beta_{p,>2}$ captures the average abnormal turnover after three or more years of protocol membership. The lagged log number of advisers is included to control for firm size.

JA0323

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243



**Panel A**



**Panel B**

**Fig. 2.** Adviser turnover: Firm-level dynamics. The figure plots the coefficient estimates and their 10% confidence intervals of the $\beta_{p,t}$'s from Eq. (2), which is a linear probability model with firm and year fixed effects, that regresses various measures of turnover on lags of "Join protocol." Therefore, the coefficient estimates on these indicator variables measure the changes in turnover relative to average turnover prior to a firm joining the broker protocol. The analysis uses the entire firm-level sample described in Panel B of Table 2. The dependent variables are within-industry turnover (Panel A), turnover with firms in the protocol and turnover with firms not in the protocol (Panel B), %Δ in advisers within industry (Panel C), and %Δ in advisers with protocol firms and %Δ in advisers with nonprotocol firms (Panel D), where definitions follow those in Table A.2. Confidence intervals are computed using robust standard errors, clustered by firm.

The estimates of the $\beta_{p,s}$'s from the regressions are plotted in Fig. 2.[13] In addition, adviser growth is decomposed into % join and % leave. The endogenous entry of firms into the protocol is evident in the figures. In Panels A and C, we see that within industry turnover and adviser growth spike in the year that a firm joins the protocol, but subsequently reverts to levels observed prior to membership. Panels B and D show that it is the turnover

---

[13] Coefficient estimates and their standard errors are displayed in the Internet Appendix in Table IA.2.

JA0324

U.G. Gurun, N. Stoffman and S.E. Yonker    *Journal of Financial Economics 141 (2021) 1218–1243*



**Panel C**



**Panel D**

**Fig. 2.** Continued

with other firms in the protocol that drives this the first year spike, consistent with firms entering the protocol to poach advisers. Also consistent with this is that there is no initial effect on turnover with firms that are not protocol members. Abnormal turnover and adviser growth with protocol firms remains abnormally high for the first years of membership. Turnover with nonprotocol firms does not decline abnormally until the second year of membership, but it remains persistently low thereafter. Adviser growth with nonprotocol firms remains flat through the entire period.

### 4.2. Relationship-based flows

The results from the previous section are consistent with advisers placing importance on the client relationship. While unlocking clients does not increase adviser propensity to change firms, it does affect the firms that advisers move to. This suggests that clients move with advisers when they switch firms. In this section, we formally test whether clients follow advisers. Finding positive evidence of these relationship-based flows would be consistent with some clients valuing their relationships with advisers more than with their advisory firms.

To test this, we estimate the following fixed effects OLS regression model:

$$\Delta \log(\text{AUM})_{i,t}$$
$$= \alpha_i + \gamma_t + \beta_{n,o}(\%\Delta \text{ in adv. outside industry})_{i,t}$$
$$+ \beta_{n,n}(\%\Delta \text{ in adv. within industry})_{i,t}$$
$$+ \beta_{n,p}(\%\Delta \text{ in adv. with protocol firms})_{i,t}$$

**JA0325**

U.G. Gurun, N. Stoffman and S.E. Yonker                                                                 Journal of Financial Economics 141 (2021) 1218–1243

$$+ \beta_{p,o} \text{Protocol}_{i,t} \times (\%\Delta \text{ in adv. outside industry})_{i,t}$$
$$+ \beta_{p,n} \text{Protocol}_{i,t} \times (\%\Delta \text{ in adv. within industry})_{i,t}$$
$$+ \beta_{p,p} \text{Protocol}_{i,t} \times (\%\Delta \text{ in adv. with protocol firms})_{i,t}$$
$$+ \beta_p (\text{Firm in protocol})_{i,t} + \Gamma' \text{Controls}_{i,t-1} + \epsilon_{i,t}, \quad (3)$$

where $\Delta\log(\text{AUM})_{i,t}$ is the change in the log of AUM of firm $i$ during year $t$, (Firm in protocol)$_{i,t}$ is an indicator variable if firm $i$ is a member of the broker protocol by the end of year $t$, and $\alpha_i$ and $\gamma_t$ are firm and year fixed effects, respectively.

The %$\Delta$ in adv. variables are various decompositions of the percentage change in the number of advisers at firm $i$ during year $t$. "%$\Delta$ in adv. within industry" is the percentage change in advisers to and from other firms in our sample. Therefore, it is the difference between advisers joining from other firms and advisers leaving for other firms, regardless of whether those firms are protocol members. "%$\Delta$ in adv. outside industry" is the percentage change in advisers entering or leaving our sample. This includes the difference between advisers who enter our sample for the first time and those that leave the profession (i.e., they never show up in our data again) and also the difference between advisers joining after being unemployed for at least a year and those leaving and being unemployed for at least a year. These two components sum to the total percentage change in advisers at the firm during the year, so %$\Delta$ in adv.$_{i,t}$=%$\Delta$ in adv. outside industry$_{i,t}$+%$\Delta$ in adv. within industry$_{i,t}$, where the scaling factor in all measures is the number of advisers at the end of year $t-1$. We separate these components because we hypothesize that advisers moving to or from other firms in the industry are more likely to move assets with them than are rookie advisers, or those who leave the industry. This leads to the prediction that $\beta_{n,n} > \beta_{n,o}$.

Finally, "%$\Delta$ in adv. within industry" can be decomposed into advisers moving between protocol- and non-protocol firms. "%$\Delta$ in adv. with protocol firms" is the difference between the percentage of advisers joining from protocol member firms and those leaving for protocol member firms. As before, the scaling factor is the total number of advisers at the end of year $t-1$. Constructing our variables this way allows us to test for differences in the elasticities of AUM to advisers for those joining from or leaving for protocol and nonprotocol firms.

In regression (3), the coefficients $\beta_{n,o}$, $\beta_{n,n}$, and $\beta_{n,n} + \beta_{n,p}$ capture the elasticities of AUM for nonprotocol firms with respect to outside industry advisers, nonprotocol advisers, and protocol advisers, respectively. The coefficients $\beta_{p,o}$, $\beta_{p,n}$, and $\beta_{p,p}$ capture the incremental effect on those elasticities due to firms being in the protocol.

Recall that in order for financial advisers to move assets from one firm to another without legal repercussions, both firms must be members of the protocol. Therefore, our main hypothesis is that changes in AUM should be most sensitive to the changes in advisers at protocol firms moving to and from other protocol firms, or $\beta_{p,p} > 0$. In addition, there is no reason to believe that the change in AUM should be any more sensitive to changes in nonprotocol advisers or changes in advisers from outside the indus-

try if the firm is a protocol member, implying that $\beta_{p,o} = 0$ and $\beta_{p,n} = 0$.

We estimate various forms of regression (3) using a firm-level annual panel data set constructed from electronic filings of Form ADV, as described in Section 3.2. In Table 2, we showed that this sample covers roughly 34% of firm-year observations in the sample. This decline in sample size is due to the fact that not all firms that employ financial advisory firms are RIAs, which are required to make regular filings with the SEC.

Table 4 shows the results of our tests. In column 1, we include only the "%$\Delta$ in advisers" as our variable of interest in order to test the general contemporaneous relationship between changes in AUM and changes in advisers. The coefficient estimate is 0.107, which implies that a 1% increase in the number of financial advisers at the average firm is associated with about a 10.7 basis point increase in AUM. In column 2, we decompose the change in advisers between outside and inside the industry changes and further decompose inside industry changes into changes with protocol members and non-members. The estimates show that changes within the industry are associated with much larger changes in AUM. A 1% increase in advisers leaving the industry is associated with about a 4 bps decrease in AUM. The same change in advisers leaving for nonprotocol (protocol) firms within the industry leads to a decrease of about 14 (27) bps. Not only do the estimates show that larger changes in AUM are associated with within industry changes in advisers, but they also show that advisers leaving for protocol firms take roughly double the amount of assets with them relative to advisers leaving for firms outside the protocol. This difference is statistically significant.

In column 3, we estimate the full version of Eq. (3). Consistent with our hypotheses, we find that $\beta_{p,p} = 0.185 > 0$ and we fail to reject the hypotheses that $\beta_{p,o} = 0$ and $\beta_{p,n} = 0$. These findings indicate that changes in AUM are particularly sensitive to changes in advisers with protocol members, especially when the firm itself is a protocol member. Our estimate of the change in AUM for a 1% increase in the number of advisers leaving a protocol firm for firms in the protocol is $14.3 + 12.4 + 3.9 + 6.9 + 18.5 = 56.0$ bps. In other words, an adviser leaving a protocol member firm for another protocol member firm takes, on average, clients with assets worth about half of the average assets of the firm's existing advisers. It is possible that some of this outflow is due to factors other than advisers taking clients with them, but the 18.5 bps due to protocol-to-protocol firm turnover likely represents a lower bound of the size of the effect, as there is no reason to believe that assets would fall by more for firms in the protocol than those outside it when their advisers leave for protocol firms, other than that between protocol members clients are unlocked.

The regressions estimated in columns 4 through 6 use the change in the natural log of the number of accounts managed by the RIA. While the number of accounts is different from the number of clients, Form ADV does not report continuous values for client counts and the number of accounts is a better predictor of the number of clients than is AUM. The estimates using accounts tell a similar story to those using AUM. The only difference is that our

U.G. Gurun, N. Stoffman and S.E. Yonker
Journal of Financial Economics 141 (2021) 1218–1243

**Table 4**

Relationship-based flows.

Panel A of the table displays regression results from fixed effect OLS regressions (Eq. (3) in the text) of changes in log (AUM) (columns 1 to 3) and changes in log(number of accounts) (columns 4 to 6) on contemporaneous changes in the percentage of advisers employed by the firm (%∆ in advisers) in column 1. In column 2, we decompose the percentage change in managers, by whether they are leaving or joining from outside the industry (%∆ in advisers outside industry) or within the industry (%∆ in advisers within industry), which includes moves to both protocol and nonprotocol firms. We add an additional variable that captures the incremental effect of the protocol, the percentage change in advisers to and from other firms that are members of the broker protocol (%∆ in advisers with protocol firms). In column 3, we interact these measures of percentage changes in advisers with "Firm in protocol," which is an indicator variable that is one if the firm is a member of the broker protocol as of the end of the previous calendar year. The analysis in Panel B follows the same pattern, but decomposes each % net change by including separate variables for the percentage of advisers joining and leaving firms. The analysis uses the firm-year observations from the sample described in Panel B of Table 2, which consists of Registered Investment Advisers with the SEC (about 37% of the sample). All continuous variables are winsorized at the 1st and 99th percentiles to remove the effects of outliers. All models include firm and year fixed effects. t-statistics are computed using robust standard errors (reported in parentheses), clustered by firm. Significance levels are denoted by c, b, and a, which correspond to 10%, 5%, and 1% levels, respectively.

| Dependent variable: | ∆log(AUM) | | | ∆log(Accts) | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| *Panel A* | | | | | | |
| %∆ in advisers | 0.107[a] | | | 0.125[a] | | |
| | (0.007) | | | (0.009) | | |
| %∆ in advisers outside industry | | 0.037[a] | 0.040[a] | | 0.059[a] | 0.059[a] |
| | | (0.009) | (0.010) | (0.012) | | (0.013) |
| %∆ in advisers within industry | | 0.145[a] | 0.143[a] | | 0.159[a] | 0.155[a] |
| | | (0.011) | (0.011) | | (0.014) | (0.014) |
| %∆ in advisers with protocol firms | | 0.151[a] | 0.124[a] | | 0.161[a] | 0.143[a] |
| | | (0.029) | (0.030) | | (0.039) | (0.041) |
| Firm in protocol | | | 0.039[a] | | | 0.063[a] |
| | | | (0.014) | | | (0.018) |
| Firm in protocol × | | | | | | |
| %∆ outside industry | | | –0.070 | | | –0.006 |
| | | | (0.043) | | | (0.066) |
| %∆ in advisers within industry | | | 0.069 | | | 0.118[c] |
| | | | (0.056) | | | (0.067) |
| %∆ in advisers with protocol firms | | | 0.185[c] | | | 0.060 |
| | | | (0.112) | | | (0.132) |
| Lagged log(AUM) / log(Acct) | –0.254[a] | –0.253[a] | –0.254[a] | –0.306[a] | –0.305[a] | –0.306[a] |
| | (0.007) | (0.007) | (0.007) | (0.011) | (0.011) | (0.011) |
| Year FE | Y | Y | Y | Y | Y | Y |
| Firm FE | Y | Y | Y | Y | Y | Y |
| Adj-$R^2$ | 0.38 | 0.39 | 0.39 | 0.25 | 0.25 | 0.25 |
| Observations | 43,980 | 43,980 | 43,974 | 43,980 | 43,980 | 43,974 |
| *Panel B* | | | | | | |
| % advisers join | 0.085[a] | | | 0.113[a] | | |
| | (0.008) | | | (0.010) | | |
| % advisers leave | –0.196[a] | | | –0.173[a] | | |
| | (0.014) | | | (0.017) | | |
| % advisers join from outside the industry | | 0.027[b] | 0.030[a] | | 0.049[a] | 0.049[a] |
| | | (0.010) | (0.011) | | (0.014) | (0.014) |
| % advisers join from within industry | | 0.107[a] | 0.104[a] | | 0.141[a] | 0.136[a] |
| | | (0.013) | (0.013) | | (0.016) | (0.016) |
| % advisers join from protocol firms | | 0.183[a] | 0.169[a] | | 0.175[a] | 0.169[a] |
| | | (0.031) | (0.031) | | (0.043) | (0.044) |
| % advisers leave to go outside the industry | | –0.095[a] | –0.096[a] | | –0.102[a] | –0.104[a] |
| | | (0.018) | (0.019) | | (0.022) | (0.023) |
| % advisers leave within industry | | –0.274[a] | –0.270[a] | | –0.224[a] | –0.220[a] |
| | | (0.020) | (0.021) | | (0.026) | (0.027) |
| % advisers leave for protocol firms | | –0.175[b] | –0.110 | | –0.185[b] | –0.120 |
| | | (0.072) | (0.073) | | (0.093) | (0.096) |
| Firm in protocol | | | 0.049[a] | | | 0.064[a] |
| | | | (0.016) | | | (0.021) |
| Firm in protocol × | | | | | | |
| % advisers join from outside the industry | | | –0.066 | | | 0.032 |
| | | | (0.049) | | | (0.077) |
| % advisers join from within industry | | | 0.089 | | | 0.143[b] |
| | | | (0.059) | | | (0.069) |
| % advisers join from protocol firms | | | 0.028 | | | –0.051 |
| | | | (0.036) | | | (0.050) |

(continued on next page)

JA0327

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243

**Table 4** (continued)

| Dependent variable: | $\Delta\log(\text{AUM})$ | | | $\Delta\log(\text{Accts})$ | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| % advisers leave to go outside the industry | | | 0.057 | | | 0.101 |
| | | | (0.091) | | | (0.111) |
| % advisers leave within industry | | | −0.079 | | | −0.099 |
| | | | (0.089) | | | (0.142) |
| % advisers leave for protocol firms | | | −0.393[b] | | | −0.403[c] |
| | | | (0.161) | | | (0.218) |
| Lagged log(AUM) / log(Acct) | −0.254[a] | −0.253[a] | −0.254[a] | −0.306[a] | −0.305[a] | −0.306[a] |
| | (0.007) | (0.007) | (0.007) | (0.011) | (0.011) | (0.011) |
| Year FE | Y | Y | Y | Y | Y | Y |
| Firm FE | Y | Y | Y | Y | Y | Y |
| Adj-$R^2$ | 0.38 | 0.39 | 0.39 | 0.25 | 0.25 | 0.25 |
| Observations | 43,980 | 43,980 | 43,974 | 43,980 | 43,980 | 43,974 |

test of the coefficient of interest, $\beta_{p,p}$, is not statistically different from zero. AUM fluctuates both with investment performance and flows, while the number of accounts depends only on flows. Indeed, these values in our sample have a correlation of only 0.41. Given this, the fact that our results are consistent across these measures adds to our confidence that we are capturing the common component that drives both, namely client flows.

In Panel B of the table, we decompose each of our measures of the percentage change in advisers into the percentage of advisers joining and leaving, and run regressions analogous to those in Panel A. We do this because we suspect that coefficient estimates on advisers leaving their firms will be much more precise since the average adviser's book of business at their current firm is likely more reflective of their actual book than at the firm to which they move.[14]

The estimates in Panel B show that this is indeed the case. For the most part, the estimates on the coefficients on the "% advisers leave" variables support our main hypotheses. The estimate of $\beta_{p,p}$ using AUM in column 3 is −0.39 and in column 6, using the number of accounts, it is −0.40. Both are similar and statistically different from zero. The coefficient estimates indicate that a 1% increase in advisers leaving for protocol firms from a protocol firm will lead to a decrease in AUM of 80 bps (= −26.9 − 11 + 4.9 − 7.9 − 39.1) and a decrease in the number of accounts of 77 bps (= −21.9 − 11.7 + 6.7 − 9.8 − 39.9). Of these decreases, we can safely say that half are due to advisers taking clients with them when they switch firms.

In summary, we estimate that when advisers move, that they take about 40% of their book of business with them. This supports the notion that a substantial portion of clients place trust in their advisers over the trust they have in their advisory firms. This has implications for the power dynamic between firms and advisers.

---

[14] Suppose an adviser works at a firm with $100 million in AUM that has ten advisers. On average, each adviser manages $10 million. If the adviser leaves, taking $5 million with her to a new firm, then we would estimate that a 10% decrease in advisers leads to a 5% decrease in AUM. If the adviser joins a firm with the same AUM/adviser ratio, then we would get a similar estimate on our coefficient "% advisers join," but if the new firm has a greater (smaller) AUM/adviser ratio the coefficient will be smaller (greater), thereby introducing noise to our estimates.

### 4.3. Disciplining advisers

In the previous section, we showed that unlocking clients leads to a substantial number of clients following their advisers when they switch firms. We therefore ask whether this makes firms reluctant to fire advisers, even when the advisers engage in bad behavior. Egan et al., 2019), p. 235 find a large presence of repeat offenders among financial advisers and conclude that "this result implies that neither market forces nor regulators fully prevent such advisers from providing services in the future." In other words, clients are ineffective at disciplining "bad" advisers through asset transfers. This is likely drisxsven by information asymmetries. One way firms can mitigate this market imperfection is by disciplining advisers themselves. To test whether unlocking clients reduces firms' incentives to do so, we modify regression (1) to include an indicator variable that is one if the adviser engages in misconduct during year $t$ ("Misconduct"), and the interaction of "Misconduct" with whether the firm is a member of the protocol. Our dependent variable is forced turnover, which is defined as turnover in which the adviser is subsequently unemployed for at least 90 days, on the assumption that few individuals would choose to be unemployed for that long. Formally, we estimate:

$$\begin{aligned}
\text{Turnover}_{j,i,c,t+1} &= \alpha_{i,c} + \gamma_{c,t} + \beta_m(\text{Misconduct})_{j,t} \\
&+ \beta_p(\text{Firm in protocol})_{j,i,t} \\
&+ \beta_{p,m}(\text{Firm in protocol})_{j,i,t} \times (\text{Misconduct})_{j,t} \\
&+ \Gamma'\text{Controls}_{i,t} + \epsilon_{j,i,t},
\end{aligned} \tag{4}$$

where definitions of all variables follow those previously described. $\beta_m$ measures turnover sensitivity to misconduct, which should be positive, at least in egregious cases of misconduct. $\beta_p$ measures the difference in turnover propensity for firms once they join the protocol. If firms fear relationship-based outflows, then they may be more reluctant to fire advisers following protocol entry, implying that this coefficient could be negative. $\beta_{p,m}$ captures the difference in turnover sensitivity to misconduct attributable to firms being protocol members.

The results are presented in Table 5 for the full sample and the sample of advisers who work for firms with at least 100 advisers. Following the earlier adviser-level anal-

U.G. Gurun, N. Stoffman and S.E. Yonker *Journal of Financial Economics 141 (2021) 1218–1243*

**Table 5**

Turnover sensitivity to misconduct.

The table displays regression results from linear probability models estimated using OLS (Eq. (4) in the text) of forced turnover in the next year on "Misconduct," which is an indicator variable if the adviser engaged in misconduct, as defined by Egan et al. (2019), during the year; "Firm in protocol," which is an indicator variable that is one if the financial adviser is employed by a firm that is member of the broker protocol as of the end of the calendar year; and the interaction of the two. The dependent variable is an indicator variable that is one if the adviser joins another firm after 90 days of being unemployed. The table reports the results using two large samples and two subsamples of each. In columns 1 through 3, the analysis uses the entire adviser-level sample described in Panel A of Table 2. In columns 4 through 6, the results are reported for the sample of advisers employed by firms with at least 100 advisers. Each of these samples is split by state-level NCA enforcement using the variable "Absence of NCA enforcement," as outlined in Table 3. All models include firm-county and county-year fixed effects. $t$-statistics are computed using robust standard errors (reported in parentheses), clustered by firm. Using the same robust standard error estimation we also report $\hat{\beta}_{p \times m, yes} - \hat{\beta}_{p \times m, no}$ (the difference between the coefficient estimates on the interaction term of "Firm in the protocol" and "Misconduct" between the "yes" and "no" samples.) and the associated standard errors. Significance levels are denoted by c, b, and a, which correspond to 10%, 5%, and 1% levels, respectively.

| Sample | Full sample | | | $\geq$ 100 advisers | | |
|---|---|---|---|---|---|---|
| | State enforces NCAs? | | | State enforces NCAs? | | |
| | All | Yes | No | All | Yes | No |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Misconduct | 0.458[b] | 0.585[a] | -0.009 | 0.640[a] | 0.746[a] | 0.274 |
| | (0.183) | (0.187) | (0.397) | (0.211) | (0.206) | (0.460) |
| Firm in protocol | -0.324[c] | -0.296[c] | -0.422[c] | -0.240 | -0.195 | -0.401 |
| | (0.176) | (0.174) | (0.246) | (0.175) | (0.170) | (0.252) |
| Firm in protocol × Misconduct | -0.544[b] | -0.793[a] | 0.304 | -0.677[b] | -0.899[a] | 0.052 |
| | (0.241) | (0.247) | (0.532) | (0.263) | (0.262) | (0.583) |
| Log (number of advisers) | 0.396 | 0.342 | 0.644[a] | 0.087 | -0.006 | 0.528[c] |
| | (0.327) | (0.369) | (0.239) | (0.381) | (0.425) | (0.313) |
| Log (years experience) | -0.699[a] | -0.672[a] | -0.806[a] | -0.748[a] | -0.715[a] | -0.880[a] |
| | (0.078) | (0.078) | (0.090) | (0.083) | (0.084) | (0.095) |
| Investment adviser | -0.929[a] | -0.878[a] | -1.136[a] | -0.865[a] | -0.819[a] | -1.059[a] |
| | (0.092) | (0.095) | (0.116) | (0.097) | (0.099) | (0.121) |
| Gen. sec. rep. (7) | 0.180[c] | 0.107 | 0.484[a] | 0.017 | -0.052 | 0.307[b] |
| | (0.103) | (0.108) | (0.124) | (0.111) | (0.116) | (0.134) |
| Inv. co. prod. rep. (6) | -0.529[a] | -0.524[a] | -0.549[a] | -0.654[a] | -0.641[a] | -0.701[a] |
| | (0.160) | (0.170) | (0.146) | (0.178) | (0.188) | (0.164) |
| Gen. sec. principal (24) | 0.205[b] | 0.213[b] | 0.162 | 0.328[a] | 0.322[a] | 0.339[b] |
| | (0.100) | (0.097) | (0.130) | (0.112) | (0.108) | (0.151) |
| Number of other qual. | -0.014 | -0.032 | 0.064[c] | -0.008 | -0.026 | 0.070[c] |
| | (0.029) | (0.030) | (0.035) | (0.033) | (0.034) | (0.039) |
| Mean of the dep. var. | 2.97 | 3.00 | 2.82 | 2.78 | 2.82 | 2.64 |
| County-Year FE | Y | Y | Y | Y | Y | Y |
| Firm-county FE | Y | Y | Y | Y | Y | Y |
| Adj-$R^2$ | 0.03 | 0.03 | 0.03 | 0.02 | 0.02 | 0.02 |
| Observations | 5,891,188 | 4,712,699 | 1,178,489 | 5,221,183 | 4,180,975 | 1,040,208 |
| $\hat{\beta}_{p \times m, yes} - \hat{\beta}_{p \times m, no}$ | | | -1.097[b] | | | -0.951 |
| | | | (0.559) | | | (0.599) |

ysis on turnover, both of these samples are further split by state-level NCA enforcement, and we test whether protocol membership has a larger impact on turnover sensitivity to misconduct in states that enforce NCAs.

The results from the full sample (column 1), indicate that engaging in misconduct increases the probability of being fired by 46 bps, which is about a 15% increase in the unconditional probability of forced turnover. In the same sample, being a member of the protocol essentially undoes this discipline. The estimate of $\beta_{p,m}$ is $-0.54$ and is significant at the 5% significance level.

Splitting the sample between advisers who work in states that do and do not enforce NCAs (columns 2 and 3), we find that advisers who work in states that enforce NCAs are more likely to be fired for engaging in misconduct, but advisers at firms that relax the enforcement of NCAs by being members of the protocol are not more likely to be fired for engaging in misconduct. This suggests that both state-

level enforcement of NCAs and firm-level enforcement are important to the balance of power between firms and advisers. In the sample of advisers who work in states that do not enforce NCAs, we find that engaging in misconduct does not increase the probability of being fired irrespective of whether the advisers' firm is a protocol member or not.

Focusing on the sample of advisers working for firms with at least 100 advisers, we find similar results. In general, these results are consistent with firms being more reluctant to fire employees once they unlock clients for fear of losing AUM.

### 4.4. Misconduct

Since firms are less likely to discipline their advisers for misconduct, it is natural to ask whether this affects the propensity of advisers to engage in misconduct. We therefore test whether adviser misconduct in-

JA0329

**Table 6**

Adviser misconduct.

The table displays regression results from linear probability models estimated using OLS of a measure of adviser misconduct on "Firm in protocol." The analysis uses the adviser-level data described in Panel A of Table 2 and the dependent variable is "Misconduct" multiplied by 100. "Misconduct" is an indicator variable that is one if the adviser engaged in misconduct during the year, as defined by Egan et al. (2019). The results are reported for two different fixed effect models for the full sample and the samples financial advisers working for firms with at least 100 advisers. The models estimated in columns 1 and 2 include county-year and firm-county fixed effects and those in columns 3 and 4 include county-year and financial adviser fixed effects. t-statistics are computed using robust standard errors (reported in parentheses), clustered by firm. Significance levels are denoted by c, b, and a, which correspond to 10%, 5%, and 1% levels, respectively.

| Sample | All (1) | ≥ 100 advisers (2) | All (3) | ≥ 100 advisers (4) |
|---|---|---|---|---|
| Firm in protocol | 0.104 | 0.131[c] | 0.148[b] | 0.195[a] |
| | (0.070) | (0.078) | (0.059) | (0.068) |
| Past misconduct | 1.313[a] | 1.197[a] | | |
| | (0.068) | (0.077) | | |
| Log (number of advisers) | 0.037 | 0.064 | –0.131[a] | –0.157[a] |
| | (0.047) | (0.061) | (0.011) | (0.019) |
| Log (years experience) | 0.133[a] | 0.131[a] | 0.365[a] | 0.396[a] |
| | (0.013) | (0.014) | (0.049) | (0.056) |
| Investment adviser | 0.344[a] | 0.351[a] | –0.048 | –0.019 |
| | (0.033) | (0.035) | (0.031) | (0.030) |
| Gen. sec. rep. (7) | 0.107[a] | 0.082[a] | 0.194[a] | 0.176[a] |
| | (0.023) | (0.026) | (0.043) | (0.047) |
| Inv. co. prod. rep. (6) | 0.029 | 0.010 | 0.062 | 0.006 |
| | (0.019) | (0.019) | (0.099) | (0.107) |
| Gen. sec. principal (24) | –0.035[c] | –0.080[a] | 0.097[a] | 0.095[b] |
| | (0.018) | (0.019) | (0.036) | (0.041) |
| Number of other qual. | 0.013[c] | 0.011 | –0.069[a] | –0.081[a] |
| | (0.007) | (0.007) | (0.016) | (0.016) |
| County-Year FE | Y | Y | Y | Y |
| Firm-county FE | Y | Y | N | N |
| Adviser FE | N | N | Y | Y |
| Mean of the dep. var. | 0.494 | 0.472 | 0.494 | 0.472 |
| Adj-$R^2$ | 0.03 | 0.03 | 0.05 | 0.04 |
| Observations | 5,862,497 | 5,197,696 | 5,706,560 | 5,043,769 |

creases once firms unlock clients by joining the protocol. We regress "Misconduct," an indicator variable described in Section 4.3, on "Firm in protocol," controls, and two different specifications of fixed effects. In the first specification, we include firm-county and county-year fixed effects. Egan et al. (2019) show that advisers' past misconduct is a strong predictor of future misconduct, so we add "Past misconduct" as a control in these regressions. In the second specification, we include adviser fixed effects, instead of firm-county. Adviser fixed effects could be important to include to control for any time-invariant, unobservable, individual characteristics of managers.

The results of these tests are presented in Table 6. In columns 1 and 2 of the table, which uses the model with firm-county and county-year fixed effects, the coefficient estimates on "Firm in protocol" are both positive, but only significantly statistically different from zero in the sample of advisers working for large firms (t-statistics of 1.5 and 1.7). Once adviser fixed effects are included in the model, the coefficient estimates on "Firm in protocol" become both statistically and economically significant. The estimate in column 4, which is calculated using the sample of advisers working for employers with at least 100 advisers, indicates that the probability that an adviser engages in misconduct increases by 20 bps once his employer joins the protocol. Compared to an unconditional probability of misconduct of 47 bps, this is an increase in likelihood of

over 40%. We confirm the robustness of our results to various subsamples as well as extending the sample period back to 2003; these results are presented in Table IA.6 of the Internet Appendix. In all models that include adviser fixed effects, our inferences are unchanged.[15]

### 4.5. Fee rates

In this section, we investigate the dynamics of advisory fees following protocol adoption. Firms can increase their fees to compensate for the increased probability of relationship-based outflows or because they seek to exploit relationship-based inflows. Alternatively, firms can lower fees to attract relationship-based inflows from advisers seeking lower rates for their clients.

A broker-dealer can generate revenue from two main sources, commissions and fees. Because a commission-

---

[15] Clifford and Gerken (2019) investigate the relationship between advisers receiving customer complaints and broker protocol membership and find a weak negative relationship (10% significance level). Unlike the misconduct measure of Egan et al. (2019), their measure includes complaints that were dismissed, withdrawn, or are still pending. Since we are interested in adviser malfeasance we do not include disclosures where the adviser is exonerated. In untabulated tests, we find no significant relationship between protocol membership and total customer complaints, but weak evidence that frivolous customer complaints decrease with protocol membership.

JA0330

U.G. Gurun, N. Stoffman and S.E. Yonker

*Journal of Financial Economics 141 (2021) 1218–1243*



**Fig. 3.** Fee rates. The figure plots the coefficient estimates and their 10% confidence intervals of the $\beta_{p,t}$'s from Eq. (2), which is a linear regression model with firm and year fixed effects, that regresses "fee rates" on lags of "Join protocol." Therefore, the coefficient estimates on these indicator variables measure the changes in fees rates relative to their average prior to a firm joining the broker protocol. The analysis uses the sample of firms covered by the *InvestmentNews* annual independent B-D surveys from 2004 to 2016 with complete data as outlined in Section 3.5 of the text. The dependent variable is "Fee rate," which is the fee revenues divided by the fee-based AUM. Confidence intervals are computed using robust standard errors, clustered by firm.

based broker derives his income from selling particular investment products (such as mutual funds), a potential conflict of interest can arise between brokerages and their clients. For instance, Mullainathan et al. (2012) find that some advisers in the United States steer investors from well-diversified portfolios to high-fee mutual funds. Such opportunistic behavior has also been found in other financial products (Anagol et al., 2017) and other countries (Bhattacharya et al., 2012; Hackethal et al., 2012). A brokerage fee, on the other hand, is a flat rate that customers pay brokers to manage money regardless of the type of investment the client has in her portfolio. This flat rate is generally expressed as a percentage of AUM.

To test our hypotheses, we use broker-dealer revenue breakdown information from the B-D Data Center maintained on the *InvestmentNews* web site. As discussed in Section 3.5, our data set covers 2004 to 2016 and contains approximately 75 large broker-dealers per year. For each of these firms, we observe both the total revenue and fee revenue, as well as the total assets under management that generated the fees. From these, we calculate the "Fee rate", i.e., Fee rate = Fee revenues / Fee-based AUM. Table IA.7 in the Internet Appendix displays summary statistics of this sample. It shows that it is composed of large broker-dealers and the average fee rate is 1.0%.

We calculate how firms adjust their fee rates in response to unlocking clients by estimating Eq. (2) with fee rate as the dependent variable. The model includes firm and year fixed effects, so the coefficients on the $\beta_p$'s capture the abnormal changes in the fee rate since prior to protocol adoption. Fig. 3 plots the coefficients' estimates on

the $\beta_p$'s and their 10% confidence intervals. It shows that in the year of protocol adoption fee rates do not increase significantly. However, in the second year rates increase about 14 bps and by year three they increase another 4 bps to 18 bps, where they remain significantly higher. Compared to the average fee rate of 100 basis points, the increase is not only statistically significant, but also economically large. These results suggest that unlocking clients led to higher fees, at least at large broker-dealers.

### 4.6. Winners and losers to unlocking clients

We next investigate the effect of unlocking clients on firms. If all firms within the protocol charge the same fees for identical products, then advisers moving from firm to firm is zero sum game. In fact, this was likely the expectation of the originators and early adopters of the protocol: that net relationship flows with other large brokerages would be small, but that litigation costs would decline. As time went on, however, small firms began joining the protocol, as we show in Table 1. These firms stood to gain from the protocol because it protected them from prohibitively large settlement payouts that they would have had to make if they poached advisers from larger firms in the absence of the agreement. We therefore suspect that small firms are the ultimate beneficiaries of unlocking clients.

We split the sample between small (fewer than 100 advisers) and large (100 or more advisers) firms and explore the firm-level dynamics around protocol adoption on adviser growth, revenue, and misconduct. To do this, we es-

JA0331

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243



**Panel A**



**Panel B**

**Fig. 4.** Firm-level outcomes by firm size. The figure plots the coefficient estimates and their 10% confidence intervals of the $\beta_{p,t}$'s from Eq. (2), similar to Figs. 2 and 3 for samples of small (less than 100 advisers) and large firms (100 or more advisers). The dependent variables are within industry turnover (Panel A), the natural log of total revenue (Panel B), and a firm level misconduct dummy (Panel C), where definitions follow those in Table A.2. The analysis and Panels A and C uses the entire firm-level sample described in Panel B of Table 2, split by firm size. The analysis in Panel B uses the sample of broker-dealers covered by the FOCUS data, as described in Section 3.5 and summarized in Table IA.8 in the Internet Appendix. Confidence intervals are computed using robust standard errors, clustered by firm.

timate Eq. (2) with these alternative dependent variables. Fig. 4 plots the coefficient estimates and their 10% confidence bounds. The data on revenue is from FOCUS reports and is only available for broker-dealers. These data are described in Section 3.5 and summary statistics are provided in Table IA.8 in the Internet Appendix.

In Panel A, the dependent variable is "%$\Delta$ in advisers within industry." The figure shows that small firms

saw massive growth in the first two years following protocol adoption. In the first year, small firms, on average, grew their advisory teams through poaching by over 8%. During the second year of protocol membership, they grew another 3%. In subsequent years, their growth was almost 2% above pre-adoption levels, but not significantly different from zero. Large firms, on the other hand, saw no abnormal growth in the initial years of proto-

JA0332

U.G. Gurun, N. Stoffman and S.E. Yonker

*Journal of Financial Economics 141 (2021) 1218–1243*



**Panel C**

**Fig. 4.** Continued

col adoption and by the fourth year these firms began to shrink.

Estimates of changes in revenue, displayed in Panel B, tell a similar story. Small firms saw dramatic increases in revenue following protocol adoption. In the first year of protocol adoption, the revenue of small firms increased by 27%, on average, and this increase remained fairly steady over time. Large firms saw a more muted response. Revenue increased by only 7% in the first year.

In Panel C we also see that the prevalence of misconduct spikes among small firms after unlocking clients, but not among large firms. This may not be surprising. For small firms, each adviser's relationships represent a larger proportion of the firms' total assets. In other words, the relationship assets are much more concentrated for small firms. Therefore, losing one adviser is much more costly to a small firm than a large firm. This makes small firms less likely to discipline advisers for bad behavior, similar to the idea of key human capital put forth by Israelsen and Yonker (2017).[16]

Together, these results suggest that if all clients were unlocked in the industry, small firms would be the beneficiaries, although it is not clear whether this is good or bad for clients.

## 5. Robustness

### 5.1. Subsample analysis

To check the robustness of the results, we replicate all adviser-level results (Tables 3, 5, and 6) for three different subsamples. The results are displayed in the Internet Appendix in Tables IA.4, IA.5, and IA.6, respectively.

First, we limit the sample to advisers who are brokers. Several studies of financial advisers (i.e. Egan et al. (2019); Clifford and Gerken (2019)) exclude those who are investment advisers, but not brokers from their samples. To ensure that our results are not driven by these advisers, we exclude them. In general, the main results are unchanged. This is not that surprising since the majority of financial advisers are registered brokers.

Next, we estimate our results for the subsample of advisers who work for only one firm. When advisers are registered with multiple firms simultaneously, a choice must be made about which firm is the main employer. Again, we do our best by basing our choice on the initial registration date, but other choices could be made. The main results do not materially change when limiting the analysis to this sample.

Finally, we reproduce the results for the extended sample from 2003 to 2016, acknowledging that this sample could have a survivorship bias. This bias is particularly important for analysis including forced turnover and misconduct, since advisers who are either fired or engage in misconduct are likely to disappear from the sample. Indeed, both the turnover sensitivity to misconduct and misconduct results are weaker in this sample. However, the results on turnover are in line with the main analysis.

### 5.2. Binary choice models

As an alternative to the linear probability models used to estimate the results displayed in Tables 3, 5, and 6, we estimate our results using binary choice models, but leave the results untabulated.[17] Because maximum likelihood es-

---

[16] In unreported results, we confirm that unlocking clients leads to laxer discipline among small firms by replicating the analysis in Table 5 for the sample of firms with fewer than 100 advisers.

[17] These results are available upon request.

U.G. Gurun, N. Stoffman and S.E. Yonker                                                    Journal of Financial Economics 141 (2021) 1218–1243



**Fig. 5.** Protocol withdrawal and adviser exits. The figure plots the percentage of 2017 annual turnover occurring each business day of the year for Morgan Stanley (blue) and UBS Financial Services (orange). On October 24, 2017, Morgan Stanley submitted a letter indicating that it would like to withdrawal from the broker protocol. UBS followed suit on November 20, 2017. It takes ten days for the withdrawal to take effect. Therefore, the last days that Morgan Stanley and UBS Financial Services were members of the broker protocol were November 2, 2017 and November 30, 2017, respectively. Those dates are indicated on the graph above. (For interpretation of the references to color in this figure legend, the reader is referred to the web version of this article.)

timation of nonlinear binary choice models has computational difficulties when the number of fixed effects is large, we first estimate our results using both probit models and linear probability models omitting fixed effects from the models. We find that both models give consistent results across all of our results.

Stammann et al. (2016) develop a package in R, called "bife," that can handle one dimension of high-dimensionality fixed effects. They call their estimator a "bias-corrected logit estimator." We reestimate the results using this estimator, which allows us to include branch fixed effects in our specifications. Since we cannot also include county-year fixed effects, we include yearly fixed effects to absorb general economic conditions. All specifications include the control variables included in our baseline models. Again, we find that all of our earlier results hold. Finally, we include adviser fixed effects in the misconduct regressions analogous to those in Table 6, column 3. We find that the coefficient on "Firm in the protocol" is positive, but not statistically different from zero (*p*-value= 0.23). We conclude that our results are robust to estimation using binary choice models.

### 5.3. Out-of-sample evidence: protocol withdrawals and adviser exits

As an out-of-sample test of the impact of unlocking clients on adviser turnover decisions, we take advantage of two recent events that followed our initial data collection. In October and November of 2017, two major financial advisory firms exited the broker protocol. To withdraw from the broker protocol firms, must submit a letter of their intent, but the actual withdrawal does not become effective for ten business days. We therefore examine whether an abnormal percentage of advisers leave these firms during the nine-day window after the withdrawal submission, but prior to the withdrawal taking effect.

Fig. 5 plots the percentage of 2017 annual turnover occurring each business day of the year (daily number of advisers leaving the firm scaled by total number advisers leaving the firm during 2017) for Morgan Stanley and UBS Financial Services. Morgan Stanley submitted its withdrawal notice on October 24, 2017 and UBS followed suit on November 20, 2017. Because of the ten-day grace period, the last days that Morgan Stanley and UBS Finan-

JA0334

U.G. Gurun, N. Stoffman and S.E. Yonker
Journal of Financial Economics 141 (2021) 1218–1243

cial Services were members of the broker protocol were November 2, 2017 and November 30, 2017, respectively. These dates are indicated in Fig. 5. The average percentage of annual turnover per day is 0.39% (=1/257) during 2017. On the final days that Morgan Stanley and UBS were members of the protocol, they experienced 5.73% and 9.92%, respectively, of their daily attrition for the entire year. That is, on November 2, 62 advisers left Morgan Stanley and on November 30, 94 advisers left UBS. While we do not conduct formal statistical tests, note that the standard deviation of daily turnover for Morgan Stanley and UBS in 2017 was 0.48% and 0.73%, respectively. This indicates that exits were over ten standard deviations from the mean for both brokerages on their last days in the broker protocol and in both cases they were the maximum for the year. It is also worth noting that, of those advisers who left either Morgan Stanley or UBS on those dates, only two (1.3%) joined firms that were not members of the broker protocol.

## 6. Conclusion

We demonstrate the importance of client relationships in the financial advisory industry. Our evidence shows that these relationships are critical for clients, advisers, and their firms. They drive advisers' employment decisions: advisers are much more likely to move to firms to which they can freely transfer their clients. Clients value their relationships with their advisers, and follow them to new firms. When unconstrained, advisers move about 40% of client assets with them when they switch firms. These relationships are also important to firms, which become less willing to discipline their advisers for misconduct, for fear of experiencing relationship-based outflows.

An important question is what would be the implication if all clients in the industry were unlocked. How would this affect advisers, clients, firms, and the industry? While we cannot provide a definitive answer, our results give us some clues.

We believe that advisers would stand to gain the most, since they would effectively gain control of a portion of the revenue-generating assets of firms. Unfortunately, we do not observe adviser preferences or wages, but, by revealed preference, advisers would not voluntarily move to another firm unless it makes them better off. Increases in adviser welfare could come through higher wages, better product offerings to clients, or more favorable working conditions.

What about clients? Again, by revealed preference, we suspect that clients believe that they would be better off. After all, why else would they follow their advisers? However, two of our empirical findings question whether that's really the case. First, we find that the lax monitoring of firms induced by unlocking clients leads to a greater incidence of adviser misconduct. Second, we show that following protocol entry, firms raise their fees permanently by about 18 bps, albeit for a small sample of large broker-dealers. Again, our assessment is limited by data. We do not observe the actual products into which clients are allocated, nor do we observe the relevance of clients' allocations to their goals and objectives. The finding that misconduct increases following protocol adoption is somewhat informative, since, as Egan et al. (2019) report, 21% of client complaints are related to the suitability of their investments.

We conclude that unlocking clients would likely benefit small firms over large. We show that protocol adoption affected small firms dramatically more than large firms. It enabled small firms to freely poach advisers from large firms and to gain clients' assets. Essentially, a policy of unlocking clients would level the playing field among firms. A blanket policy could alter the competitive landscape within the industry.

Some legislators in Washington have also expressed concern that NCAs are used by firms to suppress the wages of lower level employees.[18] Theory suggests that employee compensation should be greater in the absence of NCAs because of the creditable threat of employees moving to competitors. While we cannot directly observe compensation data, our results suggest that the relaxation of NCA enforcement leads to a significant increase in the bargaining power of financial advisers. Future research could explore more directly the effects of NCAs on compensation in other industries.

## Appendix

### A.1. Verifying the survivorship-bias-free sample

We use historical brokerage and investment adviser registration dates for advisers to construct a survivorship-bias-free adviser-firm-year panel data set. Data from the SEC's IAPD web site provides historical beginning and ending investment adviser registration dates, while FINRA's BrokerCheck web site provides beginning and ending registered representative (broker) registration dates. Financial advisers can be dually registered, or registered only as a broker or investment adviser. When constructing the employment spells, we use the union of dates spanned by broker and investment registrations to determine the dates of employment of dually registered financial advisers with their firms.

We downloaded these data in July 2017, after an update to FINRA's web site Terms of Use explicitly provided permission for researchers to download the data for academic purposes.[19] The FINRA web site states that it maintains information on the web site for brokers who have been registered within the last ten years, or possibly longer,[20] indicating that we can have confidence that our sample is free of possible survivorship bias beginning in 2007.

To verify this, we calculate the last year that each financial adviser is included in the data. Panel A of Fig. A.1 shows the distribution of these final years. Almost none of the advisers file their final deregistration prior to 2007, which is ten years prior to when we collected the data.[21] It therefore appears that FINRA deletes entire adviser histories from the publicly available data once they have

---

[18] See, for example, https://www.c-span.org/video/?c4796572/sen-van-hollen-questions-ftc-chair-joseph-simons.

[19] See item 5 of FINRA BrokerCheck Terms of Use, modified July 17, 2017.

[20] See www.finra.org/investors/about-brokercheck.

[21] The figure does not include 2017. About 68% of advisers in the sample are still registered in 2017.

JA0335

U.G. Gurun, N. Stoffman and S.E. Yonker *Journal of Financial Economics 141 (2021) 1218–1243*



Distribution of advisers' final years

*Panel A*

Distribution of advisers' final months

*Panel B*

**Fig. A.1.** Distribution of advisers' final years and months. Panel A of the figure displays the distribution of the advisers' final years of registration for data extracted from the BrokerCheck and IAPD web sites in July of 2017 for the years 2003 to 2017. The year 2017 is not included in the graph, but accounts for 68% of the observations. Panel B shows the distribution of final months for 2007 and for the years 2003–2016, excluding 2007.

been de-registered for ten years. Panel B provides additional support for this claim by comparing the distribution of an adviser's final month of registration in 2007 to all other years. The typical distribution is fairly even across all months, although there's an uptick in December. But, in 2007 the sample is completely different: there are almost no final de-registrations until July in that year, which is precisely ten years before we downloaded the data.

In light of this evidence, we conclude that our data are free of survivorship bias only during the period beginning in August, 2007.

### A.2. Additional information on sample construction

One complication in constructing the employee-employer matched data set is that the data provide registration dates, rather than actual employment dates. An adviser could, for example, de-register but stay with

a firm in a nonadvisory role. This is unlikely to be much of an issue, however, because the cost of maintaining registration is low relative to the potential benefits, so even if financial advisers move into different roles, they will most likely keep their registrations active. Nevertheless, we assume that an adviser is continually employed with a firm if his registration ends but then begins again at the same firm within 365 days, provided that the adviser has not registered with another firm during the intervening period. We also remove registrations lasting less than two weeks.

A second complication is that many financial advisers are registered simultaneously with multiple firms. In our sample, 91.9% of advisers-year observations are from advisers registered with one firm, while the corresponding numbers for those registered at two firms is 7.7%. The remaining 0.4% of observations represents advisers simultaneously registered at more than two firms. In cases of mul-

**JA0336**

U.G. Gurun, N. Stoffman and S.E. Yonker                                                    Journal of Financial Economics 141 (2021) 1218–1243

tiple employment, we assume that the primary employer is the firm with which the adviser has been registered the longest. We provide evidence of robustness to this assumption by showing that our main results hold when focusing only on observations for advisers who work for a single employer.

Finally, we limit our sample to firms with at least two advisers located within the United States, since we are interested in the effects of non-compete agreements.

### A.3. Variable definitions

**Table A.1**
Adviser-level variable definitions.

| Adviser-level variables | Definition | Source |
|---|---|---|
| Firm in protocol | An indicator variable that is one if any of the adviser's employers are members of the protocol as of the end of the calendar year. | Broker protocol web site, IAPD, BrokerCheck |
| Log (number of advisers) | Log of the total number of advisers employed by the adviser's primary employer at the end of the calendar year. | IAPD, BrokerCheck |
| Log (years experience) | Log of the number of years since the adviser is first registered as a financial adviser at any firm. | IAPD, BrokerCheck |
| Investment adviser | An indicator variable that is one if the adviser is registered as an investment adviser during the year. | IAPD |
| Sec. agent st. law (63) | An indicator variable that is one if the adviser passed the Series 63 exam by the end of the year. | IAPD, BrokerCheck |
| Gen. sec. rep. (7) | An indicator variable that is one if the adviser passed the Series 7 exam by the end of the year. | IAPD, BrokerCheck |
| Inv. co. prod. rep. (6) | An indicator variable that is one if the adviser passed the Series 6 exam by the end of the year. | IAPD, BrokerCheck |
| Gen. sec. principal (24) | An indicator variable that is one if the adviser passed the Series 24 exam by the end of the year. | IAPD, BrokerCheck |
| Number of other qual. | The number of exams passed other than Series 6, 7, 24, 63, 65, or 66 by the end of the year. | IAPD, BrokerCheck |
| Past misconduct | An indicator variable that is one if the adviser has a misconduct record as of the previous year, where misconduct is defined according to Egan et al. (2019). | IAPD, BrokerCheck |
| Absence of NCA enforcement | An indicator variable that is one if the state where the adviser works does not enforce non-compete agreements. | Table 1 of Stuart and Sorenson (2003); Samila and Sorenson (2011). |
| Leave for another firm | An indicator variable that is one if the adviser leaves his/her firm during the year and subsequently joins another firm in the data. | IAPD, BrokerCheck |
| Leave for a protocol firm | An indicator variable that is one if the adviser leaves his/her firm during the year and subsequently joins a firm that is a member of the protocol. | Broker protocol web site, IAPD, BrokerCheck |
| Adviser-level variables | Definition | Source |
| Leave for a nonprotocol firm | An indicator variable that is one if the adviser leaves his/her firm during the year and subsequently joins a firm that is not a member of the protocol. | Broker protocol web site, IAPD, BrokerCheck |
| Forced turnover | An indicator variable that is one if "Leave for another firm" is one and the number of days before joining another firm is greater than 90. | IAPD, BrokerCheck |
| Misconduct indicator | Following Egan et al. (2019), this is an indicator variable that is one if any of the following disclosures appear for an adviser during the year: Customer Dispute—Settled; Employment Separation After Allegations; Regulatory—Final; Criminal—Final Disposition; Customer Dispute—Award/Judgment; or Civil—Final. These six types of disclosure are selected from a total of 23 categories. | IAPD, BrokerCheck |
| Broker-dealer indicator | An indicator variable that is one if the adviser's primary employer is a registered broker-dealer. | Form BD, IAPD, BrokerCheck |
| Primary employer | Employer who has employed the adviser the longest. | IAPD, BrokerCheck |

JA0337

U.G. Gurun, N. Stoffman and S.E. Yonker                                                Journal of Financial Economics 141 (2021) 1218–1243

**Table A.2**
Firm-level variable definitions.

| Firm-level variables | Definition | Source |
|---|---|---|
| Firm in protocol | An indicator variable that is one if any of the firm is a member of the protocol as of the end of the calendar year. | Broker protocol web site |
| Log (number of advisers) | Log of the total number of advisers employed by the firm at the end of the calendar year. | IAPD, BrokerCheck |
| Within industry turnover | The average of the percentage of the firm's advisers leaving for other firms and the percentage of the firm's advisers joining from other firms, where percentages are calculated based on the number of advisers at the firm at the end of the previous calendar year. | IAPD, BrokerCheck |
| Turnover with firms in protocol | The average of the percentage of the firm's advisers leaving for firms in the protocol and the percentage of the firm's advisers joining from firms in the protocol, where percentages are calculated based on the number of advisers at the firm at the end of the previous calendar year. | IAPD, BrokerCheck |
| Turnover with firms not in protocol | The average of the percentage of the firm's advisers leaving for firms not in the protocol and the percentage of the firm's advisers joining from firms not in the protocol, where percentages are calculated based on the number of advisers at the firm at the end of the previous calendar year. | IAPD, BrokerCheck |
| $\%\Delta$ in advisers | The percent change in the total number of advisers at the firm. | IAPD, BrokerCheck |
| $\%\Delta$ in advisers outside industry | The difference in the percentage of rookie advisers hired by the firm (registering for the first time) and the percentage of the firm's advisers leaving the industry (deregistering for the last time), where percentages are scaled by the total number of advisers at the firm at the end of the previous calendar year. | IAPD, BrokerCheck |
| $\%\Delta$ in advisers within industry | The difference in the percentage of advisers hired from other firms within the industry by the firm and the percentage of the firm's advisers leaving for other firms in the industry, where percentages are scaled by the total number of advisers at the firm at the end of the previous calendar year. | IAPD, BrokerCheck |
| $\%\Delta$ in advisers with protocol firms | The difference in the percentage of advisers hired from protocol member firms and the percentage of the firm's advisers leaving for protocol member firms, where percentages are scaled by the total number of advisers at the firm at the end of the previous calendar year. | Broker protocol web site, IAPD, BrokerCheck |
| Misconduct dummy | An indicator variable that is equal to one if any of the firm's advisers engaged in misconduct, as defined by the "Misconduct indicator," during the calendar year. | IAPD, BrokerCheck |
| Broker dealer indicator | An indicator variable that is one if firm is a registered broker-dealer. | Form BD, IAPD, BrokerCheck |
| RIA indicator | An indicator variable that is on if the firm is a registered investment adviser. | SEC Form ADV, IAPD, BrokerCheck |
| $\Delta$Log (AUM) | Change in the log of total assets under management from the end of the previous fiscal year to the end of the current fiscal year. | SEC Form ADV, Part 1a, Item 3F2c |
| Log (AUM) | Log of total assets under management at the end of the fiscal year. | SEC Form ADV, Part 1a, Item 3F2c |
| $\Delta$Log (Accts) | Change in the log of total number of accounts from the end of the previous fiscal year to the end of the current fiscal year. | SEC Form ADV, Part 1a, Item 3F2f |
| Log (Accts) | Log of total number of accounts at the end of the fiscal year. | SEC Form ADV, Part 1a, Item 3F2f |
| Fee rate | Fee revenues / fee-based AUM | B-D Data Center maintained on the *InvestmentNews* web site |
| Log (Revenue) | Log of total revenue end of the fiscal year. | Audit Analytics item "pe_ended_rev" |

# References

Abadie, A., Athey, S., Imbens, G.W., Wooldridge, J., 2017. When Should You Adjust Standard Errors for Clustering? NBER working paper.

Anagol, S., Cole, S., Sarkar, S., 2017. Understanding the advice of commissions-motivated agents: evidence from the indian life insurance market. Rev. Econ. Stat. 99, 1–15.

Bergstresser, D., Chalmers, J.M.R., Tufano, P., 2009. Assessing the costs and benefits of brokers in the mutual fund industry. Rev. Financ. Stud. 22, 4129–4156.

Bhattacharya, U., Hackethal, A., Kaesler, S., Loos, B., Meyer, S., 2012. Is unbiased financial advice to retail investors sufficient? Answers from a large field study. Rev. Financ. Stud. 25, 975–1032.

Chalmers, J., Reuter, J., 2020. Is conflicted investment advice better than no advice? J. Financ. Econ. 138, 366–387.

Charoenwong, B., Kwan, A., Umar, T., 2017. Who Should Regulate Investment Advisers? SSRN working paper 2899883.

Christoffersen, S.E., Evans, R., Musto, D.K., 2013. What do consumers' fund flows maximize? Evidence from their brokers' incentives. J. Finance 68, 201–235.

Clifford, C., Gerken, W., 2019. Investment in Human Capital and Labor Mobility: Evidence From a Shock to Property Rights. SSRN working paper 3064204.

Dimmock, S.G., Gerken, W.C., Graham, N.P., 2018. Is fraud contagious? Coworker influence on misconduct by financial advisors. J. Finance 73, 1417–1450.

Egan, M., Matvos, G., Seru, A., 2019. The market for financial adviser misconduct. J. Polit. Economy 127, 233–295.

Foerster, S., Linnainmaa, J.T., Melzer, B.T., Previtero, A., 2017. Retail financial advice: does one size fit all? J. Finance 72, 1441–1482.

Franco, A.M., Filson, D., 2006. Spin-outs: knowledge diffusion through employee mobility. RAND J. Econ. 37, 841–860.

Gennaioli, N., Shleifer, A., Vishny, R., 2015. Money doctors. J. Finance 70, 91–114.

Germann, M., Loos, B., Weber, M., 2018. Trust and Delegated Investing: A Money Doctors Experiment. SSRN working paper 3187189.

**JA0338**

U.G. Gurun, N. Stoffman and S.E. Yonker

Journal of Financial Economics 141 (2021) 1218–1243

Greenhouse, S., 2014. Noncompete Clauses Increasingly Pop up in Array of Jobs. New York TimesSection B, p. 1.

Gurun, U.G., Stoffman, N., Yonker, S.E., 2018. Trust busting: the effect of fraud on investor behavior. Rev. Financ. Stud. 31, 1341–1376.

Hackethal, A., Inderst, R., Meyer, S., 2012. Trading on Advice. SSRN working paper 1701777.

Huang, J., Wei, K.D., Yan, H., 2007. Participation costs and the sensitivity of fund flows to past performance. J. Finance 62, 1273–1311.

Israelsen, R.D., Yonker, S.E., 2017. Key human capital. J. Financ. Quant. Anal. 52, 175–214.

Klepper, S., 2002. The capabilities of new firms and the evolution of the U.S. automobile industry. Ind. Corp. Change 11, 645–666.

Klepper, S., Sleeper, S., 2005. Entry by spinoffs. Manage. Sci. 51, 1291–1306.

Kostovetsky, L., 2016. Whom do you trust?: investor-advisor relationships and mutual fund flows. Rev. Financ. Stud. 29, 898–936.

Lavetti, K., Simon, C., White, W.D., 2019. The impacts of restricting mobility of skilled service workers: evidence from physicians. J. Hum. Resour. 55, 1025–1067.

Lynch, A.W., Musto, D.K., 2003. How investors interpret past fund returns. J. Finance 58 (5), 2033–2058.

Marx, M., 2011. The firm strikes back: non-compete agreements and the mobility of technical professionals. Am. Sociol. Rev. 76, 695–712.

Marx, M., Strumsky, D., Fleming, L., 2009. Mobility, skills, and the Michigan non-compete experiment. Manage. Sci. 55, 875–889.

Mullainathan, S., Noeth, M., Schoar, A., 2012. The Market for Financial Advice: An Audit Study. NBER working paper.

Rosegrant, S., Lampe, D.R., 1992. Route 128: Lessons from Boston's High-Tech Community. Basic Books, Inc..

Samila, S., Sorenson, O., 2011. Noncompete covenants: incentives to innovate or impediments to growth. Manage. Sci. 57, 425–438.

Saxenian, A., 1996. Regional advantage. Harvard University Press.

Sirri, E.R., Tufano, P., 1998. Costly search and mutual fund flows. J. Finance 53, 1589–1622.

Stammann, A., Heiss, F., Mc Fadden, D., 2016. Estimating fixed effects logit models with large panel data.

Starr, E., Prescott, J., Bishara, N., 2018. Noncompetes in the US Labor Force. SSRN working paper 2625714.

Stuart, T.E., Sorenson, O., 2003. Liquidity events and the geographic distribution of entrepreneurial activity. Adm. Sci. Q. 48, 175–201.

**JA0339**

NBER WORKING PAPER SERIES

THE LABOR MARKET EFFECTS OF LEGAL RESTRICTIONS ON WORKER MOBILITY

Matthew S. Johnson
Kurt J. Lavetti
Michael Lipsitz

Working Paper 31929
http://www.nber.org/papers/w31929

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
December 2023

We thank Kevin Lang, Eric Posner, and Johannes Schmieder for their helpful comments, as well as audience members at Miami University, Carolina Region Empirical Economics Day, the Annual Meeting of the Society of Labor Economists, UC Davis, University of Hawaii, Duke University, Ohio State University, the Russell Sage Foundation Non-Standard Work Meeting, Haverford College, the Federal Trade Commission, the Department of Justice, the Department of the Treasury, and the Bureau of Labor Statistics. We thank Anna Stansbury for providing us data on occupational leave shares, Evan Starr for helpful feedback and assistance with data on court filings, and Lars Vilhuber for help with the QWI data. We thank Tristan Baker, Richard Braun, Florencia Fernandez, and Katie Heath for invaluable research assistance. This work has been supported by Grant # 1811-10425 from the Russell Sage Foundation and the W.K. Kellogg Foundation. The views expressed in this article are those of the authors and do not necessarily reflect those of either Foundation, or of the Federal Trade Commission or any individual commissioner. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2023 by Matthew S. Johnson, Kurt J. Lavetti, and Michael Lipsitz. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

JA0340

The Labor Market Effects of Legal Restrictions on Worker Mobility
Matthew S. Johnson, Kurt J. Lavetti, and Michael Lipsitz
NBER Working Paper No. 31929
December 2023
JEL No. J08,J31,J38,J61

## ABSTRACT

We analyze how the legal enforceability of noncompete agreements (NCAs) affects labor markets. Using newly-constructed panel data, we find that higher NCA enforceability diminishes workers' earnings and job mobility, with larger effects among workers most likely to sign NCAs. These effects are far-reaching: changes in enforceability impose externalities on workers across state borders, suggesting that enforceability broadly affects labor market dynamism. We provide evidence that NCA enforceability primarily affects wages through its effect on workers' outside options; moreover, workers facing high enforceability are unable to leverage tight labor markets to increase earnings. We motivate these findings by embedding NCA enforceability in a search model with bargaining. Finally, higher NCA enforceability exacerbates gender and racial earnings gaps.

Matthew S. Johnson
Sanford School of Public Policy
Duke University
Box #90312
Durham, NC 27708
and NBER
matthew.johnson@duke.edu

Michael Lipsitz
Federal Trade Commission
mlipsitz@ftc.gov

Kurt J. Lavetti
Department of Economics
The Ohio State University
1945 N. High St.
Arps Hall 433
Columbus, OH 43210
and NBER
Lavetti.1@osu.edu

# 1   Introduction

By several metrics, the U.S. labor market failed to produce economic gains for the majority of workers in the four decades prior to 2020. Average real hourly earnings changed little[1] and the share of income accruing to labor declined from 65 percent in the late 1940s to 63 percent in 2000, before accelerating downward to 58 percent in 2016.[2] Various forces have been posited to underlie these trends, including the decline of labor unions (Farber et al., 2018), the rise of superstar firms (Autor et al., 2017), and the rise of domestic outsourcing (Weil, 2014; Goldschmidt and Schmieder, 2017).

Another potential explanation that has received increasing attention is firms' use of postemployment restrictions, the most salient of which are noncompete agreements (NCAs). NCAs contractually limit a worker's ability to enter into a professional position in competition with his or her employer in the event of a job separation. NCAs are common: Starr et al. (2021) find that approximately 18% of workers in 2014 were bound by NCAs, whereas Colvin and Shierholz (2019) found this range to be between 28 and 47 percent in 2019.[3] The legal *enforceability* of NCAs—that is, the terms under which an employer can enforce one—is determined by state employment law. Making NCAs easier to enforce may hinder earnings growth by limiting workers' ability to seek higher-paying jobs or to negotiate higher earnings at their current job. At the same time, others contend that enforceable NCAs can *increase* earnings by making firms more willing to invest in training, knowledge creation, and other portable assets that raise workers' productivity (Rubin and Shedd, 1981; Starr, 2019).

Though the enforceability of NCAs has received increasing scrutiny from policymakers at state and national levels,[4] there remains an incomplete understanding of the labor market effects of NCAs, primarily due to three factors. The first is a lack of comprehensive panel data on NCA enforceability. Researchers have, to date, relied largely on either cross-sectional measures of states' enforceability or case studies of

---

[1]Desilver, Drew, "For Most U.S. Workers, Real Wages Have Barely Budged in Decades," *Pew Research Center*, August 7, 2018.

[2]President's Council of Economic Advisors Issue Brief "Labor Market Monopsony: Trends, Consequences, and Policy Responses" October 2016.

[3]Specifically, 15% of the workers in Starr et al. (2021)'s representative sample reported being bound by NCAs, and another 29.7% were unsure if they were bound by NCAs. Starr et al. (2021) report a level of 18.1% based on a multiple imputation methodology. The range reported by Colvin and Shierholz (2019) represents an imputation based on a survey of business establishments and a broad range of assumptions on the percentage of workers within those establishments bound by NCAs.

[4]The Workforce Mobility Act of 2018 (US Senate Bill 2782, introduced by Chris Murphy) states "No employer shall enter into, enforce, or threaten to enforce a covenant not to compete with any employee of such employer" (`https://www.congress.gov/bill/115th-congress/senate-bill/2782/text?r=6.`). The Freedom to Compete Act of 2019 (US Senate Bill 124, introduced by Marco Rubio) has similar language (`https://www.congress.gov/bill/116th-congress/senate-bill/124/all-info`). In January 2023, the Federal Trade Commission issued a Notice of Proposed Rulemaking which would prohibit NCAs, with limited exceptions, across the economy.

a single state or a handful of states with law changes affecting specific segments of the workforce. This approach has drawbacks: cross-sectional variation in enforceability might be correlated with other unobserved differences across states, and small samples of targeted law changes may not generalize to the population. Second, prior work, which we describe below, has found seemingly conflicting evidence regarding the earnings effect of NCA *use* versus *enforceability*, creating challenges for interpreting the effects of NCAs on worker outcomes. Finally, the literature has not yet thoroughly identified the mechanisms through which enforceable NCAs affect labor markets. Without a clear understanding of *why* NCA enforceability affects workers, it is difficult to generalize empirical evidence to, for example, predict how various proposals to change enforceability might affect the functioning of labor markets.

We present comprehensive evidence on the effect of NCA enforceability on workers' earnings and job mobility. We begin by constructing a new panel dataset to use within-state changes in NCA laws to identify the overall labor market effects of NCA enforceability, including spillover effects within local labor markets. We then provide evidence for a key mechanism through which NCA enforceability affects earnings—namely, its effect on workers' outside options and costs of job mobility. Finally, we show that the earnings effect of NCA enforceability exhibits economically meaningful heterogeneity across demographic groups, contributing a new insight into the determinants of earnings inequality in the United States.

We guide our empirical analysis with a model, based on the search model of Bagger et al. (2014), of how changes in NCA enforceability affect workers' earnings. We show that the effect of increasing NCA enforceability on overall earnings can be decomposed into two terms. The first term relates to the difference in earnings between workers who are and are not bound by enforceable NCAs; the sign of this term is ambiguous due to the offsetting ways that an enforceable NCA raises a worker's earnings (via faster human capital accumulation) and lowers it (via reduced job mobility). The second term reflects the spillover effect of stricter enforceability on the earnings of workers not bound by NCAs. We show that this term is unambiguously negative under the assumption that strict NCA enforceability reduces the job offer arrival rate for all workers. We provide empirical evidence to support this assumption.

To identify the causal effects of NCA enforceability, we created a new dataset with annual measures of NCA enforceability for each of the 50 US states and the District of Columbia from 1991 to 2014. This dataset includes both judicial and legislative decisions that change state-level NCA enforceability, coded to match the criteria developed by leading legal scholars to quantify enforceability. The vast majority of these law changes (90.4%) occur due to judicial decisions via court rulings. An important component of the judicial process is *stare decisis*, or the doctrine of precedent. A consequence is that judges are more constrained than legislators in allowing economic or political trends to affect decisions, a fact that is useful for our research design. We combine our enforceability dataset with earnings and mobility outcomes from a

range of datasets including the Current Population Survey, Job to Job Flows, and the Quarterly Workforce Indicators, all from the US Census Bureau, as well as the Job Openings and Labor Turnover Survey from the Bureau of Labor Statistics.

We find that increases in NCA enforceability decrease workers' earnings and mobility. Moving from the 25th to the 75th percentile in enforceability is associated with an approximately 2% decrease in the average worker's earnings. The earnings effects are almost entirely driven by declines in implied hourly wages. The effect is even stronger among occupations, industries, and demographic groups in which NCAs are used more frequently (according to Starr et al. (2021)). We also find that NCA enforceability reduces worker mobility, particularly among groups where NCAs are used more frequently. An out-of-sample extrapolation implies that rendering NCAs unenforceable nationwide would increase average earnings among *all* workers by 3.2% to 14.2%. The midpoint of this interval (8.7%) is roughly equal to the estimated effects of very large increases in employer consolidation on affected workers' earnings (Prager and Schmitt, 2019); it is also approximately equal to the estimated earnings premium that accrues to workers who enter occupations with government-mandated licensing, and roughly half the size of the earnings premium associated with membership in a labor union.

To interpret this overall negative earnings effect, we then conduct an empirical test to isolate the spillover effects of NCA enforceability on workers who are not themselves bound by NCAs. We show that these spillovers are negative—as predicted by our model—and are economically meaningful. Focusing on local labor markets that are divided by a state border, we show that a change in NCA enforceability in one state indirectly affects the earnings and mobility of workers located in an adjoining state. This finding suggests that the treatment effects of NCA enforceability impact a larger population than the relatively small share of workers bound by NCAs, and the magnitudes suggest that spillovers account for a meaningful share of the overall earnings effects of enforceability.

We then conduct two empirical tests of our proposed mechanism that strict NCA enforceability reduces earnings through its effect on workers' job offer arrival rates. First, we test for heterogeneity in the earnings effect using two separate proxies for the extent to which changes in state-level NCA enforceability affect workers' outside options. Strict NCA enforceability has an especially negative earnings effect in industries in which workers are less likely to move jobs across state lines (as measured in the Job-to-Job flows dataset), and in occupations in which workers have lower cross-occupational mobility (as measured by Schubert et al. (2021)). That is, strict NCA enforceability reduces earnings the most when it has the largest impact on workers' outside options.

The second test of our proposed mechanism revisits prior research that considers how tight labor markets enable workers to increase their earnings. We embed NCA enforceability in an empirical model, first used by Beaudry and DiNardo (1991), that

considers how a worker's current earnings depend on prior labor market conditions. Previous research has found that workers' current earnings are strongly correlated with the most favorable labor market conditions over their current job spell. This relationship is consistent with the extra job offers workers might receive in tight labor markets enabling them to either negotiate a higher wage with their current employer (Beaudry and DiNardo, 1991) or find a job with higher match quality (Hagedorn and Manovskii, 2013). We find that this relationship continues to hold but only in states where NCAs are relatively unenforceable. In contrast, strict NCA enforceability ties workers' earnings to labor market conditions at the start of their job spell, rather than to the most favorable conditions they have experienced since then. This finding implies that strict NCA enforceability erodes workers' ability to leverage tight labor markets to achieve higher earnings, consistent with the hypothesis that NCAs "undermine workers' prospects for moving up the income ladder" (Krueger, 2017).

Finally, we document economically meaningful heterogeneity in the earnings effect of NCA enforceability across demographic groups. Given gender differences in willingness to commute (Le Barbanchon et al., 2019), geographically-restrictive NCAs (or state-level enforceability changes) may have larger effects on womens' outside options than on mens'. Prior work also suggests women tend to be less willing to violate the terms of their NCA than are men (Marx, 2022). Similar evidence suggests that state-level NCA enforceability changes may disproportionately affect the outside options of Black workers, due to racial differences in the propensity to move in response to economic opportunities (Sprung-Keyser et al., 2022). Consistent with this evidence, we find that stricter NCA enforceability reduces earnings for female and for non-white workers by twice as much as for white male workers. Using a standard earnings decomposition, our estimates imply that the 75-25 differential in NCA enforceability accounts for 1.5-3.8% of the earnings gaps between white men and other demographic groups.

**Relationship to the Literature:** Our findings most directly contribute to a growing literature on the earnings effects of NCA enforceability. Prior work examining case studies of individual bans on NCAs—including an Oregon ban on NCAs for hourly workers (Lipsitz and Starr, 2021) and a Hawaii ban on NCAs for tech workers (Balasubramanian et al., 2022)—has found that these bans led to higher earnings.[5] Two papers have studied what happens to executives' earnings when NCAs are easier to enforce, with mixed results: Garmaise (2011) uses three NCA law changes and finds that earnings decrease, while Kini et al. (2019) uses a broader set of law changes and interprets their findings as implying that earnings increase. Studies using cross-sectional variation in NCA enforceability have similarly reached mixed results: Starr (2019) finds that earnings are lower in states with higher NCA enforcement, whereas (Lavetti et al., 2018) finds the opposite relationship for doctors.

---

[5] An exception is Young (2021), who finds that a ban on NCAs in Austria for low-wage workers had limited effects on earnings.

We make several contributions to this literature. Our paper is the first to provide comprehensive panel-based evidence of the earnings effects of enforceability changes for all states and all labor market sectors, using what legal scholars believe is the most accurate measure of NCA enforceability to date (Barnett and Sichelman, 2020). Second, we provide the first panel-based evidence that NCA enforceability has spillover effects onto workers unaffected by legal changes, and that these spillovers account for a meaningful share of the overall earnings effects of NCA enforceability.[6] Finally, we connect our empirical analyses to a job ladder model of the labor market, which provides testable mechanisms through which NCA enforceability affects earnings— namely, by reducing workers' offer arrival rates. The connection to the model aids the interpretation of our empirical findings and provides insight into the types of workers whose earnings would be most affected by proposed policy discussions to make NCAs more or less easily enforceable. We further elaborate on these contributions in Section 8.

We also complement the vibrant literature that considers other economic effects of NCA enforceability, including on entrepreneurship and investment (Jeffers, 2018), employee spinoffs (Starr et al., 2018; Marx, 2022), startup performance (Ewens and Marx, 2018), worker mobility (Marx et al., 2009), and innovation (Johnson et al., 2023).

Our findings also contribute to broader and growing work on employer monopsony power and workers' outside options. Recent work has examined sources of monopsony power, including the role of search frictions (Manning, 2013; Berger et al., 2023; Jarosch et al., 2019), and local employer concentration (Azar et al. (2017), Benmelech et al. (2022), Prager and Schmitt (2019), Berger et al. (2022)). Our results imply that strict NCA enforceability effectively endows employers with a degree of monopsony power, by affecting workers' outside options, even in the absence of explicit changes in employer concentration, which we interpret through a lens of search frictions. In this spirit, our theoretical assumption (and empirical finding) that enforceable NCAs reduce earnings by reducing the value of workers' outside options complements other work showing the importance of outside options on earnings (Caldwell and Danieli, 2018; Schubert et al., 2021). One benefit of our study is that changes in NCA enforceability isolate changes in labor market competition, whereas other factors that might affect labor market power (such as mergers) also directly affect product market competition, though NCAs may have ramifications in product markets as well (Lipsitz and Tremblay, 2021; Johnson et al., 2023).

Finally, our findings provide new insight into a longstanding debate in law and economics regarding freedom of contracting (see, e.g., Bernstein (2008) for an overview).

---

[6]Starr et al. (2019) also test for spillovers from enforceable NCAs. Our findings complement theirs by 1) focusing on enforceability (rather than on *use* of enforceable NCAs), 2) using within-state variation in enforceability (rather than cross-sectional variation across states), and 3) using a border county design to isolate spillovers from other potential omitted variables that may jointly affect wages and enforceability.

Appealing to the Coase theorem, advocates of the freedom to contract suggest that freely-bargained-for NCAs must increase match surplus, which may be split between workers and employers. Evidence that NCAs are not freely bargained-for (e.g., because employers present them after the beginning of the employment relationship (Marx, 2011), or because workers are unaware of their existence Starr et al. (2021)), already reveals one shortcoming of this argument. Our paper reveals another: enforceable NCAs impose substantial negative externalities on other workers.

# 2    Conceptual Framework

In this section, we provide a concise overview of NCAs and the role of legal enforceability, and then present a brief conceptual framework (based on a model which is fully described in Appendix A) to guide our empirical analysis.

An NCA prevents a worker from moving to a job at a competing firm. The exact terms of an NCA are contract-specific, and they typically depend on the nature of competition. For example, in a nontradeable industry in which client lists are important for production, an NCA might dictate that the worker cannot move to another job in the same industry and within a specified geographic radius (e.g. within 25 miles, or within the same state). In an industry in which trade secrets are essential for firms to retain a competitive edge, the NCA might dictate that the worker cannot depart for another employer in the same industry anywhere in the country. More generally, the dimensions of employment mobility that an NCA might restrict could be some combination of geographic, temporal, occupational, or industrial.

While in theory any employment contract could include an NCA, the likelihood that an NCA would be upheld in court depends on the conditions under which a court would rule an NCA to be enforceable—that is, the legal enforceability.

Our focus in this paper is on the effects of NCA *enforceability*, as opposed to NCA *use*. One reason for this focus is data limitations: to our knowledge, there do not exist long panel data for a representative sample of workers on the use of NCAs in the US. A more fundamental reason is that restricting attention to *use* would miss at least two important ways that the legal enforceability of NCAs might affect the labor market.

First, changes in the enforceability of NCAs likely impact both the incidence of NCA use (the extensive margin) and the bindingness of NCAs already signed (the intensive margin). On the extensive margin, cross-sectional studies have found that states with higher NCA enforceability have a larger share of physicians (Lavetti et al., 2018), CEOs (Kini et al., 2019), managers (Shi, 2023), and hair stylists (Johnson and Lipsitz, 2019) that sign NCAs.[7] On the intensive margin, a change in enforceability could alter the effect of an NCA for workers who have already signed one. Though

---

[7]This evidence is not unanimous, however: Starr et al. (2021) find essentially no difference in NCA use by states' enforceability in a representative sample of US workers.

NCAs are used in states in which they are unenforceable (Lavetti et al., 2018; Starr et al., 2021), employers are in a better position to leverage a worker's NCA when enforceability is easier.[8] Higher NCA enforceability could also lead employers already using NCAs to write broader and more restrictive NCAs.

Second, as we will discuss, changes in NCA enforceability could have spillover effects on earnings beyond the set of workers that sign NCAs.

To provide a theoretical foundation for how NCA enforceability affects earnings, we extend a job search model of the labor market developed in Bagger et al. (2014) by allowing workers to have NCAs, and by varying levels of NCA enforceability. Briefly, Bagger et al. (2014) is a job ladder model in which workers match with firms of varying productivities, and they subsequently have the opportunity to take higher-paying jobs or leverage outside offers for pay increases. Worker pay also depends on human capital accumulation. The Bagger et al. (2014) model provides a natural foundation for our purpose, as its focus on the role of human capital accumulation versus job mobility highlights two competing channels through which enforceable NCAs could affect earnings.[9]

We briefly summarize here the insights from the model that guide our empirical analysis. We formally present the extended model in Appendix A.

Let $\bar{w}$ denote average earnings, $\theta$ denote NCA enforceability, and $\gamma$ denote the fraction of workers bound by NCAs. As we derive in Appendix A, the effect of a change in NCA enforceability on average earnings is the sum of two terms:

$$\frac{d\bar{w}}{d\theta} = \gamma(\bar{w}^C - \bar{w}^F) + (1 - \theta\gamma)\frac{d\bar{w}^F}{d\theta} \tag{1}$$

Here, $\bar{w}^C$ and $\bar{w}^F$ denote the average earnings of the subset of constrained workers bound by an NCA and unconstrained workers not bound by one, respectively.

The first term reflects the difference in average earnings between workers bound and not bound by NCAs, scaled by the proportion of workers bound by NCAs. The sign of this difference is indeterminate. On the one hand, workers with NCAs might

---

[8]This argument holds even if a worker is not fully informed about the enforceability of the NCA she has signed. As long as employers *are* informed, and there is some probability that workers can learn, then employers will know the NCA has less bite in expectation when it is not legally enforceable. Put another away, a worker may get a signal of the NCA enforceability regime when she informs her employer of an outside offer she has received: for example, if enforceability is weak, the employer is unlikely to contend it, whereas if enforceability is strict the employer might saliently inform the worker of the legal environment.

[9]We use the term "human capital accumulation" to reflect a range of investments that firms could make in workers. This could include general human capital training (Rubin and Shedd, 1981), but also the sharing of trade secrets or client lists. All of these investments raise a worker's productivity, but they come with different (from the firm's perspective) costs. For example, general training is costly at the time of investment, whereas sharing a client list is only costly in expectation (if a worker takes the list to a competitor). Of course, some forms of investment in workers will be unaffected by NCA enforceability, such as training a worker needs to perform her job. Our focus is on investment in "portable" assets a worker can take with them in the event of a job separation.

experience faster human capital accumulation or require a compensating earnings differential for lost future mobility, both of which could make this term positive. On the other hand, workers with NCAs are unable to climb the job ladder to higher-productivity firms or to leverage outside offers for pay increases, both of which make this term negative. This indeterminacy ultimately makes the effect of NCA enforceability on earnings an empirical question. We provide this empirical evidence in Section 4.

The second term reflects the effect of increased NCA enforceability on the earnings of unconstrained workers not bound by NCAs, scaled by the proportion of workers not bound by enforceable NCAs. We show that this term is strictly negative. This negative spillover effect arises because of a key assumption that we make: higher NCA enforceability reduces the arrival rate of new job offers for all workers.[10] A slower offer arrival rate dampens a key element of earnings growth, namely workers' ability to climb the job ladder and leverage outside offers with their current employer.[11] We provide evidence for the validity of this assumption and estimate the spillover effects of NCA enforceability in Section 5.

While the overall earnings effect of enforceability is indeterminate, the mechanism that drags down earnings, for constrained and free workers alike, is the slowed arrival rate of job offers. We generate two testable predictions to assess the explanatory power of this mechanism. First, the earnings effect of enforceability will be more negative for workers whose outside options enforceability affects the most. This relationship arises because such workers will experience a particularly large slowdown of offer arrival rates (but the human capital accumulation of bound workers will not change). Second, strict NCA enforceability will prevent workers from taking advantage of tight labor markets to move to better matches or to negotiate for higher earnings. We test both of these predictions in Section 6.

---

[10]One reason this might happen is that higher NCA enforceability could decrease the number of searching firms, for example by depressing new firm entry (Starr et al., 2018; Jeffers, 2018). Additionally, the use of enforceable NCAs by some firms can increase recruitment costs for all firms: if firms cannot directly observe whether a job applicant is currently bound by an NCA, this can slow down the recruiting process on average and decrease the value of posting vacancies (Starr et al., 2019; Goudou, 2022).

[11]An alternative mechanism that could give rise to negative spillovers is if firms using enforceable NCAs pay lower wages, and this leads other firms to be able to also pay lower wages by worsening their workers' outside option (Beaudry et al., 2012). However, it is unlikely that this mechanism could fully explain our results, given our evidence (presented in Section 5) that higher NCA enforceability leads firms to post fewer vacancies, which is hard to rationalize under the Beaudry et al. (2012) framework. In addition, there is no clear empirical consensus that workers who *sign* an NCA earn lower wages: some studies find positive correlations between wages and NCA use (Lavetti et al., 2018; Starr et al., 2021).

# 3   Data

## 3.1   State-Level NCA Enforceability

The cornerstone of our paper is a state-level panel dataset with annual measures of states' NCA enforceability. The enforcement of NCAs is governed by employment law, which is determined at the state level. As described by Bishara (2010), NCA laws vary widely across states, and over time within states, in subtle but meaningful ways. For example, there is substantial variation in what is considered a "reasonable" contract, or what is considered a protectable business interest that justifies an NCA. The various aspects that govern the enforceability of NCAs change through case law and, more rarely, through statutes passed by state legislators.

We draw from authoritative legal experts to create an index of each state's legal enforceability of NCAs for each year from 1991 through 2014. Our main primary sources are Bishara (2010), who adopts careful legal analysis to quantify enforceability along a meaningful scale, and a series of legal treatises that Bishara draws from titled "Covenants Not to Compete: A State by State Survey," updated periodically by Malsberger, a leading legal expert on the topic (Malsberger, 2023). Bishara (via Malsberger) identifies seven quantifiable dimensions governing the extent to which an NCA is enforceable. For example, one dimension (Q3a) indicates the extent to which employers are legally required to compensate workers who sign NCAs at the beginning of a job spell. Another dimension (Q8) reflects whether the NCA is enforceable when the employer terminates the employee who signed the NCA (as opposed to a voluntary separation). Table C.1 lists each of the dimensions. Bishara (2010) developed a theoretically-grounded approach to quantify states' treatment of each dimension on an integer scale from 0 (unenforceable) to 10 (easily enforceable). To create an overall enforceability index, Bishara proposed a weighted sum of these seven dimensions, and he chose weights designed to reflect the relative importance of each law component, based on his opinion as a subject expert. Using these rules, Bishara (2010) quantified each dimension and an overall index for each state for the years 1991 and 2009.

We use these legal texts to create a panel version of each state's enforceability from 1991–2014 as follows. We obtained Bishara's internal notes that provide explanations of the legal aspects behind each of his coding decisions.[12] We hired law students to familiarize themselves with the quantification system by going through the Malsberger texts and Bishara's notes for the 1991 enforceability scores. The law students then attempted to use the Malsberger texts to match Bishara's 2009 scores for all of the legal components in every state. After calibrating their own scoring of 2009 with Bishara's, they quantified the changes in enforceability between 1991 and 2009 using the Malsberger texts, imposing Bishara's 1991 and 2009 scores as endpoints. They then extended the panel to 2014. See Section C.1 for a more detailed discussion of

---

[12]We thank Norm Bishara for generously sharing this dataset with us.

the methods, procedures, and principles we used to construct this database.

Once the seven dimensions of enforceability were coded, we constructed a composite *NCA Enforceability Score* for each state-year from 1991-2014 using the same weights for each of the seven dimensions proposed by Bishara (2010).[13]

Differences in how states interpret these dimensions have led to substantial differences in the *NCA Enforceability Score* across states. At the extreme ends of this spectrum, Florida Statute 542.335 explicitly allows the use of NCAs as long as a legitimate business interest is being protected, the agreement is in writing, and the agreement is reasonable in time, area, and line of business.[14] The law allows for a large variety of protectable interests (such as trade secrets, training, and client relationships), permits the beginning of employment or continued employment to act as "consideration" (i.e., compensation) for an NCA, allows the courts to modify NCAs to make them enforceable, and renders NCAs enforceable even when an employer terminates an employee. At the other end of the spectrum, North Dakota Century Code 9-08-06 explicitly bans all NCAs in employment contracts.[15] Quantifying these statutes, Florida has the highest NCA Enforceability Score during our time period (which we normalize to 1), and North Dakota has the lowest score (which we normalize to 0).

Furthermore, law changes have led to sizable changes in the NCA Enforceability Score *within* states over time. Law changes can occur through either statutory provisions (by the state legislature) or through precedent-setting court decisions. Over 90% of the law changes during our sample period arise from court decisions. Each of these involves an instance in which an employer or worker filed a dispute over an NCA, and in deciding whether the NCA was enforceable the judge overruled legal precedent. Consider, for example, a state Superior Court case in Pennsylvania: Insulation Corporation of America v. Brobston (1995). The case concerned an employee of an insulation sales company who had signed an NCA. After being terminated for poor performance, he was hired by a competitor of his original employer, in alleged violation of the NCA. While the NCA in question was ultimately not enforced, the court's decision set new precedent that NCAs may generally be enforced following employer termination: "...the circumstances under which the employment relationship is terminated are an important factor to consider in assessing... the reasonableness of

---

[13]In some state-years, there is no legal precedent for a particular dimension of the enforceability index. Following Bishara (2010), we code these values as missing. The composite NCA enforceability index is a weighted average of scores on each of the seven legal dimensions. When the score for one of the dimensions is missing, we omit it from the calculation of that weighted average, as in Bishara (2010). Though we defer to Bishara (2010) that this is the appropriate way to treat missing values, there are other sensible approaches. In Section C.2, we show that missingness is ultimately quite rare, and we show that our main estimates are insensitive to how we treat missing values.

[14]Florida Statute 542.335. Full text available at `http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0500-0599/0542/Sections/0542.335.html`

[15]North Dakota Century Code 9-08-06. Full text available at `https://www.legis.nd.gov/cencode/t09c08.pdf`

enforcing the restrictive covenant."[16] Future cases cited this precedent in adjudicating matters concerning employee termination: for example, in *All-Pak, Inc., v. Johnston* the court wrote that "We emphasized [in Brobston]...that the reasonableness of enforcing such a restriction is determined on a case by case basis. Thus, the mere termination of an employee would not serve to bar the employer's right to injunctive relief."[17] That is, *Brobston* set a precedent that NCAs *could* be enforceable even if the employee was terminated. *Insulation Corp. of America v. Brobston* therefore resulted in the component of the NCA Enforceability Score specific to treatment following employer termination (Q8) to change from 4 (out of 10) to 7 in Pennsylvania; the resulting change in Pennsylvania's overall NCA Enforceability Score was equal to roughly a third of a standard deviation in the distribution across our sample period.

Table 1 summarizes differences in levels of NCA enforceability across the country and within states over time, between 1991 and 2014. With the exception of the numbers of law changes, states, index increases, and index decreases, the descriptive statistics in Table 1 are weighted to reflect population demographics by matching the scores from each state-year to corresponding observations in the CPS ASEC and using the relevant weights provided by the Census Bureau.

There are 73 within-state NCA law changes over our sample period, and these are dispersed roughly evenly across the Northeast, Midwest, South, and West regions. The average law change results in a change in the magnitude of the NCA Enforceability Score that is about 6.4% of the average score over this period, and the within-state standard deviation in enforceability is equal to roughly 12% of the overall standard deviation. Figure B.1 displays this variation visually. Panel A is a histogram of the level of NCA enforceability across all states over our sample period 1991–2014. Panel B is a histogram of the magnitude (in absolute value) of NCA law changes over this same sample period. Ninety-five percent of law changes result in a score change of 0.15 or less; 0.15 is roughly the difference between the 25th (0.66) and 75th (0.81) percentiles of the NCA score distribution (in levels) over our sample period.

Figure 1 shows the timing of NCA law change events. Changes were relatively evenly dispersed throughout the study time period. There are a few more enforceability increases than decreases, though both are well-represented. Figure 2 shows the CPS ASEC sample-weighted mean NCA Enforceability Score across states over the sample period. NCA enforceability has been generally flat or increasing over time, with an especially steep increase during the mid to late 1990s.

---

[16]Insulation Corp. of America v. Brobston, 667 A.2d 729, 446 Pa. Superior Ct. 520, 446 Pa. Super. 520 (Super. Ct. 1995).

[17]All-Pak, Inc. v. Johnston, 694 A.2d 347 (1997).

### 3.1.1   Are NCA Law Changes Predictable?

If changes in NCA enforceability were correlated with underlying legal, economic, political, or social trends, this could reflect a potential source of endogeneity that would make it challenging to use these changes to isolate the effects of enforceability on earnings. For example, changes to enforceability might be preceded by an increasingly litigious business climate that could itself be caused by changing labor market conditions.

A priori, there are good reasons to expect this concern to be minimal. In most cases, the judicial decisions that change legal precedent are initiated by a case that is idiosyncratic to a particular occupation, industry, or employment relationship; however, the consequences of these decisions affect the state's labor law more broadly. Relative to legislators, judges are less influenced by stakeholder pressure that could sway their decision-making because of the doctrine of *stare decisis*.[18] Furthermore, evidence overwhelmingly suggests that judges do not base their decisions purely on policy preferences, but rather on a wide range of motivations (Epstein and Knight, 2013), implying that judges' decisions to break from precedent in an NCA case are unlikely to be related to underlying trends in the labor market.

Nonetheless, we use two approaches to empirically test this possibility more thoroughly. First, we test whether NCA law changes are preceded by a spike in court cases involving NCA litigation. Second, we test whether states' political, social, and economic characteristics predict NCA law changes.

As our first approach, we test whether changing litigiousness predicts NCA law changes. Following Hiraiwa et al. (2023) and Marx (2022), we use data from Courthouse News Service to identify instances of a filed dispute over an NCA in a US court. As in Hiraiwa et al. (2023), we collect all filings containing the strings "noncompetition," "non-competition," "not to compete," "noncompete," "restrictive covenant," or "postemployment restraint."[19] The data begin in 2002, and we collapse to the state-year level, tabulating counts of cases.[20]

For each state that experiences an NCA law change, we consider the window of time starting five years prior to the law change,[21] and we use state-year observations with no legal change during the same window as the controls for that state. We refer to a treatment state and its matched controls as a "block." We use a stacked

---

[18] For a discussion of stare decisis, see Knight and Epstein (1996).

[19] We omit cases including the term "sale," which often refers to NCAs ancillary to the sale of a business, as these cases are typically handled differently than standard employee NCAs under state law

[20] From 2002–2014, there were roughly 700 court filings about NCAs per year. Compare this number to the roughly 2.5 NCA law changes due to court decisions that occur per year during that same period. That is, roughly 0.38% of court filings result in a decision in which the judge overturned precedent. Interestingly, this proportion is quite similar to the proportion (0.5%) of Supreme Court decisions in which the Court reversed its own Constitutional precedent (Schultz, 2022).

[21] We obtain qualitatively similar results if we choose different time windows.

event study (focusing only on the pre-period) to test whether NCA law changes are preceded by a spike in case counts. Formally, we use a Poisson pseudo-maximum likelihood model (due to the dependent variable being count data) to estimate:

$$Y_{s,b,t} = \sum_{\tau=0}^{5} \alpha_\tau I_{s,b}^\tau + \mu_{s,b} + \rho_{b,t} + \varepsilon_{s,b,t}$$

where $Y_{s,b,t}$ is the count of cases in state $s$ at time $t$, observed in estimation block $b$; $\alpha_\tau$ is the event-time coefficient of interest on $I_{s,b}^\tau$, which is an indicator for whether a legal change occurred $\tau$ years after the observation time $t$ in state $s$; $\mu_{s,b}$ are fixed state-by-block effects; and $\rho_{b,t}$ are fixed block-by-time effects. $\varepsilon_{s,b,t}$ is the error term. The estimation blocks ($b$) correspond to sub-experiments in the stacked difference-in-difference design (Cengiz et al., 2019; Deshpande and Li, 2019); see Section 4.2.2 for more details.

We present the $\hat\alpha_\tau$ coefficient estimates in Appendix Figure B.2. There is no positive trend in cases prior to legal changes. This alleviates concerns that NCA law changes are due to an increased trend toward conflict or toward legal interest in NCAs, which may itself be due to changing labor market or business conditions.

As our second approach, we use a variety of data sources to test whether other changes in political, social, or economic characteristics predict NCA law changes. These include the University of Kentucky Center for Poverty Research's National Welfare Data (University of Kentucky Center for Poverty Research, 2018) on population, workers compensation beneficiaries, an indicator for whether the state governor is a member of Democratic party, the share of state house and senate representatives (respectively) in the Democratic party, minimum wage, and the number of Medicaid beneficiaries. We also use the database constructed in Caughey and Warshaw (2018) to obtain measures of policy liberalism (liberalism in the state as reflected by government policy) and mass liberalism (liberalism in the state as reflected by responses of individuals to policy questions), both of which are measured separately on social and economic dimensions. From this dataset, we also obtain the percentage of voters who identify as Democrats. For more details on the construction of these measures, see Caughey and Warshaw (2018). Next, we gather data on the ideologies of state legislatures from McCarty and Shor (2015), including the State House and State Senate ideology scores, in aggregate as well as separately by Democrats and Republicans. Finally, we include data on union membership from Hirsch and Macpherson (2019).

Table 2 presents the results from a regression in which the dependent variable is a state's annual NCA enforceability, and the independent variables are each of the 20 characteristics noted above (lagged by one year), as well as state and Census division by year fixed effects (we use these same fixed effects in our subsequent analysis). Out of 20 variables, the vast majority have coefficients that are both economically and statistically insignificant. Only two of these 20 variables are statistically significant at the 10% level (the minimum wage and the State Senate Democrats ideology score),

13

and only the minimum wage is significant at the 5% level. A joint F test on the statistical significance of these predictors is insignificant at the 10% level ($p = 0.197$).[22] Furthermore, the partial $R^2$ of the model, after residualizing on division by year and state fixed effects, is 0.114, implying that these predictors collectively explain only 11% of the variance in within-state changes to NCA policy. Thus, these results provide supportive evidence that NCA law changes are not strongly determined by underlying economic, political, or social trends. In subsequent analysis, we provide further corroborating evidence by showing that earnings do not differentially change in years *prior* to an NCA law change.

## 3.2   Data on Earnings and Mobility

We gather data on earnings, employment, mobility, and other labor market outcomes from four sources: the Current Population Survey (CPS) Annual Social and Economic Supplement, the Job-to-Job Mobility dataset, the Quarterly Workforce Indicators (QWI) dataset, and the CPS Occupational Mobility and Job Tenure Supplement (JTS). We describe each of these datasets, and how they fit into our analysis, in turn.

First, we gather individual-level data on earnings and employment from the CPS ASEC (otherwise known as the March Supplement).[23] The ASEC is a CPS supplement collected each March that contains information about the wage and salary income of respondents. The CPS also includes respondents' demographic and geographic information.[24] We restrict the ASEC sample to include individuals who reported having worked for a private-sector employer (not self-employed) in the year prior to being surveyed. We include the years 1991 to 2014, restrict to individuals who were between the ages of 18 and 64 at the time they were surveyed, and remove observations for which earnings or hours variables have been topcoded. The resulting ASEC dataset contains approximately 1.5 million observations, 1.2 million of which represent full-time workers. We deflate earnings and wages in the ASEC using the Consumer Price Index. We match NCA enforceability measures by state and year.

Second, we use the Job-to-Job Flows (J2J) dataset from the U.S. Census Bureau to examine the effect of enforceability on job mobility. Derived from the Longitudinal-

---

[22]It is not surprising that two out of twenty predictors are statistically significant. The probability of finding two or more significant predictors (at the 10% level) out of twenty, conditional on each of the predictors having zero true effect and each being independent (which is surely not true in practice, but provides an adequate benchmark) is approximately $0.88$ $(1 - 0.90^{20})$.

[23]Sarah Flood, Miriam King, Renae Rodgers, Steven Ruggles, and J. Robert Warren. Integrated Public Use Microdata Series, Current Population Survey: Version 6.0 [dataset]. Minneapolis, MN: IPUMS, 2018. `https://doi.org/10.18128/D030.V6.0`

[24]While the ASEC is relatively small compared with, for example, the American Communities Survey (ACS), its existence precedes our earliest data on NCA enforceability (whereas the ACS does not). We are therefore able to leverage all changes in NCA enforceability from 1991-2014. Our results are quite similar if we instead use the ACS. We corroborate our estimates using the universe of earnings data (the QWI).

JA0355

Employer Household Dynamics dataset,[25] these data contain aggregate job flows between cells defined by combinations of age, sex, quarter, origin job state, destination job state, origin employer industry, and destination employer industry. We aggregate these data to the level of the state-industry-year, and we create multiple measures of job mobility that could potentially be affected by NCA enforceability: (1): the *total count* of job-to-job separations; (2): the count of job-to-job separations in which the separating worker's destination job is in a *different* industry or (3): *the same* industry, respectively, than his or her origin job; and (4): the count of job-to-job separations in which the separating worker's destination job is in a *different* state or (5): *the same* state, respectively, than his or her origin job.

Third, we use the Quarterly Workforce Indicators (QWI) dataset from the Census Bureau. Like the J2J, the QWI is a public use file that aggregates data from the LEHD, and it contains data on earnings, as well as numbers of hires and separations, at the county-quarter level for the near-universe of private workers, stratified by sex and age group. We use the QWI both to complement the CPS in our estimation of the earnings effects of NCA enforceability, and also to investigate spillovers from enforceability. One drawback with the QWI for our purposes is that the QWI is not a balanced panel over our sample period, as some states did not begin reporting the necessary data until the late 1990s or later. For this reason, we are left with only 44 legal changes (instead of the universe of 73 legal changes) when using the QWI.

Fourth, in our investigation of the mechanism underlying the relationship between enforceability and earnings, we use data from the CPS Occupational Mobility and Job Tenure Supplement (JTS) over the years 1996 to 2014. The JTS is conducted biannually in either January or February. Among other things, it includes questions about the respondent's history of employment, such as "How long have you been working [for your present employer]?"[26] We use responses to this question to calculate the year that the worker began his or her job spell, which allows us to match individuals to the enforceability score at the time of hire. Our outcome variable of interest is weekly earnings, and we use additional variables as controls. We merge in annual national unemployment rates between 1947 and 2014 from the Bureau of Labor Statistics website for the analysis, which we describe in Section 6.

---

[25]U.S. Census Bureau. (2019). Job-to-Job Flows Data (2000-2019). Washington, DC: U.S. Census Bureau, Longitudinal-Employer Household Dynamics Program, accessed on April 7, 2020 at https://lehd.ces.census.gov/data/#j2j. Version R2019Q1.

[26]Note that "for your present employer" may alternatively be "for company name from basic CPS/as a self-employed person/at your main job." See http://www.nber.org/cps/cpsjan2016.pdf.

# 4 The Effect of NCA Enforceability on Workers' Earnings and Mobility

In this section, we examine the effect of NCA enforceability on earnings and mobility. We then consider whether these effects are more pronounced among workers who are most likely to have signed an NCA, and we then show that our estimates are stable to numerous robustness checks and sensitivity analyses.

## 4.1 Main Results on Earnings and Mobility

We use a difference-in-difference design to estimate the effects of NCA enforceability on earnings, leveraging intra-state variation in NCA enforceability over time. Our basic regression model is

$$Y_{ist} = \beta * Enforceability_{st} + X_{it}\gamma + \rho_s + \delta_{d(s)t} + \varepsilon_{ist}, \tag{2}$$

where $Y_{ist}$ is the outcome of interest, $Enforceability_{st}$ is a state's annual composite NCA enforceability score across the 7 dimensions described in Section 3, $X_{it}$ is a vector of individual-level controls, $\rho_s$ is a fixed effect for each state, and $\delta_{d(s)t}$ is a fixed effect for each Census division by year.[27] The coefficient of interest, $\beta$, is identified from changes in earnings in states that change their NCA enforceability, relative to other states in the same Census division over the same period. Standard errors are clustered by state. A key identifying assumption is $E(Enforceability_{st}\varepsilon_{ist}|\rho_s, \delta_{d(s)t}) = 0$: conditional on state and division-year effects, changes in enforceability are uncorrelated with the error term. The evidence in Section 3.1.1 supports this assumption.

We report results in Table 3. Columns 1-4 use data from the ASEC, restricted to full-time workers between the ages of 18 and 64 who reported working for wage and salary income at a private employer the prior year.[28] The coefficient in Column 1 implies that an enforceability increase equal to 10% of the observed variation in our sample period leads to a 1.2 percent decline in earnings ($exp(-0.118 * 0.1) - 1, p = 0.002$). As another way to convey the magnitude of this estimate, consider that the 25th and 75th percentiles of *Enforceability* observed in our sample are 0.66 and 0.81, respectively. Moving from the 25th to the 75th percentile in *Enforceability* thus leads to a 1.7 percent average decline in annual earnings ($exp(-0.1175 * 0.15) - 1 = 0.017$). Adding fixed effects for broad occupation codes in Column 2 diminishes the point estimate slightly but improves its precision ($p < 0.001$).

A negative effect of *Enforceability* on annual earnings could reflect either a decline in hours worked or a decline in workers' implied hourly wage. In Column 3, the

---

[27]There are 9 Census divisions that partition the United States. We include division-year fixed effects to account for potential time-varying shocks to different areas of the country.

[28]All results are very similar if we include part-time workers.

dependent variable is instead the log of a worker's reported weekly hours:[29] While the point estimate is negative, it is relatively small and statistically insignificant ($p = 0.24$). In Column 4 the dependent variable is the individual's implied log hourly wage (calculated as annual earnings divided by fifty-two times usual weekly hours). The estimated coefficient is nearly identical to the coefficient on annual earnings.

Finally, in Column 5, we corroborate the estimates in Columns 1–4 that used the CPS ASEC sample by using data from the QWI. We run essentially the same regression specification as Column 1, except that we are able to include fixed effects for each county (rather than state)[30] and each division-year-quarter (rather than division-year). We weight the regression by county-level employment. The estimated coefficient is slightly larger than that in Column 1 and statistically significant.

Figure 3 visually illustrates the joint distribution of NCA enforceability and log annual earnings using binned semiparametric scatterplots. The dots in each graph depict the conditional mean log annual earnings for bins of NCA enforceability levels, controlling for the same variables included in Column 2 of Table 3 (state fixed effects, Census division-by-year effects, 1-digit occupation effects, and individual demographic controls). The conditional means are constructed using the semiparametric partial linear regression approach developed in Cattaneo et al. (2023).

Panel (a) shows the full joint distribution for all states and years. Panel (b) excludes California and North Dakota to visually focus on the states and years that provide nearly all of the identifying variation in our estimates. Both figures depict a clear negative relationship between enforceability and earnings. Using the test developed in Cattaneo et al. (2023), we fail to reject the hypothesis that the relationship between log earnings and NCA enforceability is linear in the full distribution (p=0.992). This test reinforces the choice of a linear regression specification in Equation 2.

In Appendix Table B.1 we report estimates from the same models shown in Table 3, but in each model we include the additional political and economic controls described in Section 3.1.1. The point estimates are slightly attenuated but similar with these controls: the coefficients in the ASEC log earnings and log wage models are -0.087 and -0.085, respectively ($p < 0.01$ in each model) and the coefficient in the QWI log average earnings model is -0.121 ($p < 0.01$).

It is instructive to benchmark our results against the estimated earnings effects of other labor market characteristics or institutions. One particularly instructive comparison is the effect of explicit employer concentration on earnings: Prager and Schmitt (2019) find that large changes in employer concentration, caused by local hospital mergers, caused a 6.5 percent decline in earnings among the most affected workers. As two comparable institutions, the household income premium associated with membership in a labor union is an estimated 15-20 log points (Farber et al.,

---

[29]We include part-time workers in this regression to avoid selecting the sample based on the dependent variable.

[30]The estimate is essentially unchanged if we instead use state fixed effects.

2018); the income premium for workers in an occupation that requires a government-issued occupational license is estimated to be 7.5% Gittleman et al. (2018).[31]  To derive a comparable effect of NCA enforceability, we can extrapolate our estimates to consider what would happen to earnings under a national policy that rendered all NCAs unenforceable.  We generate predicted earnings for each individual in the 2014 ASEC sample using coefficients from Column 1 of Table 3, for two different levels of NCA score: first, the NCA score observed in 2014 in that individual's state, and second, at the lowest observed NCA enforceability level (0).  These predictions imply that average earnings among *all* workers would likely increase by 3.2% to 14.2% nationally if NCAs were made unenforceable.[32]  The midpoint of this interval (8.7%) is similar to the effect of a large change in employer concentration, roughly one-half the household premium from labor union membership, and comparable to the premium attained by workers in occupations with government-mandated licenses.[33]

Our NCA Enforceability Score pools seven dimensions of NCA enforceability, but these dimensions might differ in their earnings effects.  In Appendix Table B.2, we reestimate the effect of changes in NCA law on earnings in a specification analogous to Column 1 of Table 3, but focusing on each individual component of the composite NCA score separately.  The first seven rows represent separate regressions identical to Equation 2, except that $Enforceability_{st}$ is replaced with each respective element of the NCA score described in Table C.1.[34]  With two exceptions (which are both insignificant at the 10% level), the estimated effect of each score is negative; among those that are negative, the coefficients are significant at the 5% level for three components.  Two of the dimensions yielding the largest negative earnings effect are those requiring consideration (i.e. compensation), both at the outset of employment (Q3a)

---

[31]Estimates of the earnings premium associated with occupational licensing vary widely: for example, Redbird (2017) finds no earnings premium using a 30-year comprehensive panel of licensing laws.

[32]Specifically, let $X_i$ be the vector of the values of all variables (including fixed effects), except for NCA enforceability score, that are present in the regression in Column 1 of Table 3 for each individual, $i$, in 2014. Let $\gamma$ be the vector of respective coefficients estimated in the same regression, and let $\beta_{Low}$ and $\beta_{High}$ be the bounds of the 95% confidence interval for the coefficient on $Enforceability_i$, the NCA Enforceability Score for individual $i$'s state of residence in 2014. Then, if $\hat{Y}_{i,1,j} = \gamma X_i + \beta_j Enforceability_i$ represents predicted earnings for individual $i$ for $j \in \{Low, High\}$, and $\hat{Y}_{i,2} = \gamma X_i$ represents predicted earnings for individual $i$ when $Enforceability_i = 0$, we report the averages of $[\hat{Y}_{i,2} - \hat{Y}_{i,1,j}]/\hat{Y}_{i,1,j}$.

[33]This prediction of the effect of a national ban on NCAs requires a strong assumption of linearity, since such a ban would lead the average worker to experience an NCA score change far outside the distribution of identifying variation underlying our regressions in Table 3. However, the roughly linear relationship between earnings and NCA enforceability illustrated in Figure 3 suggests that this assumption is not unreasonable.

[34]Estimating a model with each component of the score separately likely introduces some omitted variable bias, as elements of the score are correlated with each other. However, including all individual components of the score in the same regression causes the sample size to shrink significantly due to missingness in some of the components (where missingness indicates that the question has not been legally settled). That model, however, generates coefficients qualitatively similar to those shown in Table B.2.

and after employment has already begun (Q3bc), consistent with evidence in Starr (2019). No single dimension drives our results, and the dimensions with the largest effects are consistent with what one might expect based on theory and prior results.

### 4.1.1   Effects of Enforceability on Job Mobility

While the main focus of our analysis is the earnings effect of NCA enforceability, we also estimate its effect on worker mobility. This analysis is useful because it serves as validation that the variation in enforceability is capturing what NCAs are designed to do—restrict workers' mobility.

Table 4 presents estimates based on job-to-job flows data from the J2J dataset. We measure the number of job-to-job changes at the state-year-quarter-sex-age group-industry level. We then estimate a Poisson pseudo-maximum likelihood model with the following specification:

$$\mathbb{E}\left[J_{stia}\right] = \exp\left[\beta * NCA_{st} + \lambda * High\ Ind_i \times NCA_{st} + \gamma X_{ia} + \theta_{si} + \phi_{d(s)ti} + \varepsilon_{stia}\right]$$

where $J_{stia}$ is the count of job-to-job changes[35] in state $s$, quarter $t$, origin industry $i$, and demographic group (age and sex) cell $a$. $NCA_{st}$ is the NCA enforceability score, and $High\ Ind_i \times NCA_{st}$ is an interaction between industries with high rates of NCA use (as measured in Starr et al. (2021): see Section 4.3.2 for more detail), and the NCA enforceability score. $X_{ia}$ contains indicator variables for male workers and each of the age bins in the J2J data.[36] $\theta_{si}$ is a fixed state by origin industry effect, and $\phi_{d(s)it}$ is a fixed census division by origin industry by quarter-year effect.

In Column 1 we estimate the effect of the origin state NCA enforceability score on the overall number of job-to-job changes and find a small and statistically insignificant effect. However, in Column 2 we interact NCA enforceability with an indicator for whether the origin job was in a high NCA-use industry, and find that NCA enforceability substantially reduces job-to-job separations in high-use industries. The coefficient on $High\ Ind_i \times NCA_{st}$ is negative (-0.241) and highly significant ($p < .01$). The estimate implies that moving from the 25th to the 75th percentile of NCA enforceability decreases the number of job-to-job changes by 3.7% in high-use industries.

In Columns 3 through 6 we test whether NCA enforceability affects not just the *level*, but also the *direction* of job mobility, based on two forms of restrictions often used in NCA contracts. In Columns 3 and 4 we test for effects on job-to-job transi-

---

[35]Following Johnson et al. (2023), we use job change counts, instead of rates, as our dependent variable. We do this because NCA enforceability also affects the denominator of the rate—employment—which makes interpretation difficult. In untabulated results, we find that a regression of log employment on NCA enforceability (using QWI data in a specification identical to Column 5 of Table 3, using baseline employment as weights) yields a coefficient of -0.13 ($p = 0.047$), corresponding to a 1.9% decrease in employment when moving from the 25th to the 75th percentile of enforceability.

[36]These are age ranges 14-18, 19-21, 22-24, 25-34, 35-44, 45-54, and 55-64.

tions that occur across (Col. 3) and within (Col. 4) the origin job industry. Focusing on high-use industries, we find no statistically significant impact of NCA enforceability on across-industry job transitions, but we find a large and significant negative effect on transitions within-industry in high-use industries. Specifically, we estimate that moving from the 25th to the 75th percentile of NCA enforceability decreases the number of within-industry job changes by 5.9% in high-use industries. This evidence is consistent with Marx (2011) and Mueller (2022), who find that technical professionals and inventors bound by NCAs or subject to stricter NCA enforceability take "career detours" to different industries and occupations to avoid potential lawsuits.

In Columns 5 and 6 we test for effects on job-to-job transitions that occur across (Col. 5) and within (Col. 6) the state of the origin job. We again find no statistically significant impact of NCA enforceability in high-use industries on across-state job transitions, but we find a large and significant negative effect on transitions within the origin state in high-use industries. We estimate that moving from the 25th to the 75th percentile of NCA enforceability decreases the number of within-state job changes by 4.1% in high-use industries. This evidence is consistent with the fact that the restrictions in many NCAs are geography-specific, so are more likely to affect the rates of in-state moves.

This evidence illustrates that our measures of NCA enforceability influence mobility decisions: exactly what NCAs are designed to do. The results also motivate our investigation into one mechanism through which NCA enforceability affects earnings, which we describe in Section 6.

## 4.2    Dynamic Effects on Earnings and Robustness to Heterogeneous Treatment Effects

We use a distributed lag model to check whether earnings exhibit differential pretrends in the years prior to an NCA law change, and how earnings evolve in the subsequent years after a law change. We corroborate this analysis with an event study model centered around a state's first NCA law change, which also addresses potential bias from heterogeneous treatment effects that might affect our baseline estimates.

### 4.2.1    Distributed Lag Estimates on Earnings

Two potential concerns with the estimates from difference-in-difference specifications are 1) the plausibility of the parallel trends assumption that treatment and control states would counterfactually follow common trends in the absence of a law change in the treated state, and 2) whether the regression estimates reported in Table 3 mask dynamic treatment effects that change over time.

To address these concerns, we complement our difference-in-difference estimates with a distributed lag model, which allows us to assess the dynamic effects of an

NCA law change in the years immediately before and after the change takes place. A distributed lag model is similar to an event study model: Schmidheiny and Siegloch (2020) show that a distributed lag model with leads and lags is in fact numerically identical to an event study model with binned endpoints.

We estimate the distributed lag regression in first differences, similar to the approach used by Fuest et al. (2018)[37] using the QWI sample, which is based on the universe of jobs in the U.S.. In this specification, the unit of observation is a county $c(s)$, demographic group $g$ (defined as combinations of sex and age), and quarter $t$. The model we estimate using QWI data is:

$$\ln w_{c(s),g,t} - \ln w_{c(s),g,t-1} = \sum_{k=-3}^{k=5} \beta_k [Enforceability_{s,t-k} - Enforceability_{s,t-k-1}]$$
$$+ \Omega_g + \gamma X_{s,t} + \delta_{d(s),t} + \varepsilon_{c(s),g,t}.$$

The dependent variable, $\ln w_{c(s),g,t}$, is the natural logarithm of average earnings in the relevant bin. $\Omega_g$ contains indicator variables for worker sex and each age bin. $X_{s,t}$ includes the same state-level political, economic, and social measures described in Section 4.1. $\delta_{d(s),t}$ is a fixed Census division-by-year-quarter effect. We weight observations by employment and cluster standard errors by state.

As illustrated by Schmidheiny and Siegloch (2020), because the distributed lag model measures treatment effect changes, to obtain event study estimates we calculate the cumulative sum of the distributed lag coefficients away from the normalized year, $j = -1$.

We report the results from this model in Panel A of Figure 4. The figure depicts two noteworthy features. First, there is little evidence of a pre-trend in earnings, supporting the assumptions (and the evidence in Section 3.1.1) that NCA law changes were conditionally exogenous to underlying economic trends and to underlying changes in the frequency of litigation or the use of NCAs which could simultaneously impact earnings. Second, earnings begin to decline in the first year following the law change, and the effects grow in magnitude until year three, becoming statistically significant by year two.[38]

---

[37]Our setting is similar to that in Fuest et al. (2018), who estimate the effects of corporate tax changes on earnings. They consider tax changes across municipalities that occur at staggered times, can occur multiple times in one municipality over the panel, and are of different magnitudes, all of which is also true in our setting.

[38]The gradual increase in the earnings effect could be due to delays in knowledge about law changes, frictions in adjusting contracting terms, or grandfathering of contractual provisions, among other factors. The earnings effect growing over time is also consistent with our proposed mechanism that higher enforceability leaves workers less able to benefit from outside job offers to improve their earnings—a mechanism we test for in Section 6—which is an effect that would compound over time. Lipsitz and Starr (2021) and Young (2021), who study the effects of NCA bans in the state of Oregon and in Austria, respectively, both also find that the earnings effects of NCA bans grew over time.

21

JA0362

#### 4.2.2   Stacked Event Study

While the distributed lag model reported in Panel A of Figure 4 corroborates our
baseline two-way fixed effects (TWFE) model, recent research has illustrated that
both of these approaches can be biased in the presence of heterogeneous treatment
effects. Our empirical design leverages differential timing in changes across states to a
continuous treatment that can change multiple times over the sample period. Several
recent papers have highlighted that staggered timing of changes can cause TWFE
to be biased because of comparisons where states that experience early law changes
serve as controls for states with later law changes (Goodman-Bacon, 2018)). While
alternative estimators have been proposed to overcome this bias for a binary treatment
(e.g., Callaway and Sant'Anna (2021)), continuous variation in treatment can create
additional complications that are the subject of ongoing research (De Chaisemartin
and D'Haultfoeuille, 2022b).

To address these concerns, we draw inspiration from recent work and conduct a
stacked event-study around a state's first law change during our sample period. The
stacked design has been used in other recent applied settings (Cengiz et al., 2019;
Deshpande and Li, 2019), and De Chaisemartin and D'Haultfoeuille (2022a) show
that the treatment effect of a unit's first change can be estimated without bias. We
identify the subset of NCA law changes that satisfy the following criteria: 1) they are
a state's first law change during the sample period, 2) they occur at least 4 years after
the start of the QWI sample period (which varies by state since states entered QWI
in different years), 3) they occur at least 5 years before the end of the sample period
(2014), and 4) they are not followed by subsequent countervailing law changes.

We use the 11 states that never experienced a law change during our sample period
(never changers) as the set of eligible control states. For each treatment state, we
create a panel dataset for that treatment and its control states, comprising the three
years prior and five years following the treatment state's law change. We consider
two sets of control states for each treatment state: 1) all 11 never changer states,
and 2) the subset of never changers in the same Census region.[39] Two treatment
states satisfy requirements (1) to (4) above but lack a control state in their Census
region with QWI data in the pre-period; these two treatment states get dropped from
the specification restricting to control states in the same region. Overall, the sample
restrictions leave us with 10 law changes (14% of the 73 total changes) when we
require controls to be in the same region, and 12 law changes when we allow control
states to be out-of-region. Thus, a tradeoff with this specification is that, while it

---

[39]This model is different than our baseline that compares treated states to control states in the
same Census division. The reason is that in this model there are only 11 eligible controls control
states, leaving an overly sparse set of control states if we required they be in the same Census
division (of which there are 9). We present estimates that do and do not require control states to
be in the Census *region* (of which there are four) to balance the tradeoff between accounting for
geographic-specific shocks that could matter for wages, while also ensuring we have a large enough
comparison group.

helps us overcome the potential biases associated with TWFE, it is not guaranteed that the estimates we obtain will represent a population-level average.

We then stack these individual panel datasets (estimation blocks) and estimate the difference in outcomes between treated and control states in each year relative to the law change. We estimate the following regression equation:

$$\ln w_{c,b,g,t} = \sum_{\tau=-4}^{\tau=6} \alpha_\tau I^\tau_{s(c),b} \times \text{Score Change}_{s(c),b} + \mu_{c,b} + \rho_{r(c),b,t} + \Omega_g + \gamma X_{s,t} + \varepsilon_{c,b,g,t} \quad (3)$$

where $\ln w_{c,b,g,t}$ is log average earnings of group $g$ in county $c$ in estimation block $b$ in year $t$. $I^\tau_{s(c),b}$ is equal to 1 if year $t$ is $\tau$ years relative to state $s(c)$'s first NCA law change (where state $s(c)$ contains county $c$), and Score Change$_{s(c),b}$ is equal to the magnitude of the law change that defines block $b$—i.e., the NCA score from that first law change (and is therefore zero for all control states). $\mu_{c,b}$ is a fixed county–block effect, $\rho_{r(c),b,t}$ a fixed block–region–year effect, where $r(c)$ is the Census region containing county $c$ (or simply block–year when not requiring that controls be in the same Census region). As in the distributed lag model, $\Omega_g$ contains indicators for sex and age categories and $X_{s,t}$ contains state-level political, economic, and social variables. Following Cengiz et al. (2019), we cluster standard errors by state–block. We weight observations by employment.

Panel B of Figure 4 graphically displays the estimates of the $\alpha_\tau$ coefficients from two versions of Equation 3 that do and do not require that control states be in the same Census region. In both specifications, the pre-period coefficients have some noise but are close to (and statistically indistinguishable from) zero. As with the distributed lag model, the coefficients grow for several years following the law change, and are statistically significant in both specifications after year three. The coefficient magnitudes are quite similar across the two models. Using a stacked difference-in-difference (as opposed to a two-way fixed effects) model,[40] we estimate an overall earnings effect of $-0.246$ ($p < .01$), as reported in Column 1 of Table B.3.[41] This magnitude is quite a bit larger than the baseline TWFE coefficient of -0.137 using the QWI data (Table 3), though the estimates are not directly comparable since they are estimated on a different set of law changes and over a different time horizon.

Another advantage of the stacked model is that we can estimate separate treatment effects for each individual law change. This exercise is useful because, for example, it enables us to check whether our estimates are driven by one or two law

---

[40]This regression model is:

$$\ln w_{c,b,g,t} = \beta \times \text{Enforceability}_{s(c),b,t} + \mu_{c,b} + \rho_{b,r(c),t} + \Omega_g + \varepsilon_{c,b,g,t} \quad (4)$$

[41]For this table, we report results from the specification that requires that control states be in the same Census region and that does not condition on the additional state-year level variables in $X_{s,t}$ in Equation 3.

changes, or whether the earnings effect of enforceability is negative in a broad range of states. Figure B.3 reports point estimates and 95% confidence intervals on *Enforceability* from different regressions that each estimate the stacked diff-in-diff model analogous to Equation 4, separately for each of the 10 treatment states in the estimation sample. The point estimates are negative for 8 of the 10 states, implying that our estimated earnings effects are not driven by a few outliers, but rather are broadly represented in a range of states.

### 4.2.3   Long-Panel Event Study

While our stacked model in Section 4.2.2 addresses the potential sources of bias common to difference-in-difference models with staggered treatment timing, an additional complication in our setting is the non-absorbing nature of NCA policies: states have the ability to change NCA enforceability multiple times, such as reversing or enhancing previously changed laws. We address this issue by employing a long-panel event study design, in which the event in each treated state is simply the change in NCA enforceability between the beginning and end of the panel. To do so, we include the years 1991-1993 and 2012-2014 (the first and last three years in our panel) for each state, and we calculate the change in the NCA enforceability score over this time period.[42] We use the CPS ASEC data for this analysis, since many states only started reporting data to QWI after 1993.

Figure B.4 displays results. As in the stacked event studies and the distributed lag model, there is no evidence of a trend in earnings that is different for treated versus untreated states. Earnings are substantially lower (higher) in states that experienced NCA enforceability increases (decreases) in the intervening years, with coefficients that are significantly different than zero and of essentially identical magnitude to our estimates in Panels A and B of Figure 4.

This result provides evidence that our results are not being driven by peculiarities of the methods we employ, as well as demonstrating that the effects of NCA enforceability changes appear to persist in the long run.

## 4.3   Assessing Robustness of Our Estimates to a Range of Concerns

### 4.3.1   Interpreting Estimates from a Continuous Treatment Variable

Recent research reveals that difference-in-difference estimates can be challenging to interpret when the treatment variable is continuous (Callaway et al., 2021). In light of this concern, we can use our stacked event study model to assess whether our

---

[42]For states in which there were enforceability changes in the first three years or in the last three years, we omit the odd year out (and keep the two identical years). There were no states with multiple changes in either of those periods.

estimated earnings effects are driven by the scaling of our enforceability variable or by particular types of law changes. We report results in Table B.3. Column 1 reports the overall estimated earnings effect from the stacked difference-in-difference model. In Column 2 we replace the continuous NCA score with a signed indicator variable that is equal to 1 in the years following a positive law change, to -1 following a negative change, and to 0 otherwise. This model yields a coefficient of -0.018 ($p < 0.01$). To interpret this coefficient, consider that the average NCA law change in this estimation sample resulted in an absolute change in the enforceability index of 0.077; together, these imply an effect size of NCA enforceability of $-0.018/0.077 = -0.234$), similar to the effect size we directly estimate with the continuous variable.

We then estimate if the *direction* of the law change matters. In Columns 3 and 4 we separately estimate the effects of positive and negative enforceability changes, using the same signed indicator variable in place of the continuous enforceability measure. We obtain an estimate of $-0.018$ in each model ($p = 0.019$ and $p = 0.012$, respectively). The symmetric effects illustrate that our estimated earnings effects are general to both increases and decreases in enforceability.

Finally, in Columns 5 and 6 we estimate separate effects for small and large NCA law changes, as defined by whether the treatment state's NCA score change (in absolute value) is below or above the median. The average small change leads the mean treated state's NCA score to change by 0.039 in absolute value, and the estimated earnings effect (using the signed indicator variable for treatment) is $-0.017$ ($p = 0.008$). The average large change leads the mean treated state's score to change by 0.121 in absolute value, and the estimated earnings effect is $-0.024$ ($p = .026$). These differences suggest that the scale of our enforceability measure has economic content: the magnitude of NCA law changes, and not just the sign of the change, affects wages.

These estimates show that the earnings effects are not driven by a particular direction or magnitude of law change.

### 4.3.2  Heterogeneous Earnings Effects Based on Prevalence of NCA Use

In this section, we examine heterogeneity in the effect of enforceability by prevalence of NCA use. This exercise serves two useful purposes. First, it serves as a test of the robustness of the results reported in Section 4.1. If we find that enforceability has larger earnings effects among groups less likely to be bound by NCAs, it might raise questions about the research design. Second, this exercise offers a closer sense of the impact that changes in NCA enforceability will have on the earnings of groups more likely to be exposed to NCAs.

While we do not observe whether individual workers have or have not signed an NCA, Starr et al. (2021) report several sources of heterogeneity in NCA use by worker characteristics. We focus on three sources: workers' education, occupation, and industry. First, Starr et al. (2021) find that workers with a Bachelor's degree

25

or higher are significantly more likely to sign NCAs than workers without a college degree. Second, Starr et al. (2021) find heterogeneity in use across 22 occupation categories and 19 industry categories. We use the occupation and industry in which an individual reports working to the CPS to classify workers as working in *High or Low NCA Use Occupations* and *High or Low NCA Use Industries*.[43] We replicate our main difference-in-difference specification, Equation 2, except that we now add an interaction term of *Enforceability* with an indicator for *College Educated Worker*, *High NCA Use Occupation*, or *High NCA Use Industry* (as well as an indicator for the respective main effects).

Table 5 reports these heterogeneity estimates. Column 1 reports the baseline average effect on earnings, corresponding to Column 1 in Table 3. Column 2 includes an interaction of NCA Enforceability Score with an indicator for whether a worker has a college degree (*College Educated Worker*). The main effect on *NCA Enforceability Score* is close to zero and statistically insignificant, implying that enforceability has little to no effect on earnings for non-college-educated workers. On the other hand, the interaction term ($-0.138, p < .01$) implies that enforceability has a much stronger effect on the earnings of college-educated workers. The sum of the main effect on *NCA Enforceability Score* and the interaction effect implies that going from the 25th to 75th percentile of enforceability leads to a 2.6% decrease in earnings for college-educated workers ($exp((-0.038 - 0.138) * 0.15) - 1 = -0.026, p < .01$), an earnings effect that is over 50 percent larger than the earnings effect for the whole population implied by Column 1 of Table 3.

Column 3 reports heterogeneity by occupational use of NCAs. The estimates imply that going from the 25th to 75th percentile of enforceability leads to a 2.1% decrease in earnings in high-use occupations ($exp((-0.085 - 0.059) * 0.15) - 1 = -0.021, p < 0.01$); the effect for low-use occupations is about 60% as large ($p = 0.02$), and the difference is statistically significant ($p < 0.01$). Finally, Column 4 reports heterogeneity by industries' use of NCAs. Going from the 25th to 75th percentile of enforceability leads to a 2.4% decrease in earnings in high-use industries ($p < 0.01$); the effect for low-use industries is roughly 60% as large ($p < 0.01$), and the difference is statistically significant ($p < 0.01$).

In Column 5, we simultaneously estimate the heterogeneous impacts of NCA enforceability along these three categories. The coefficients on the interactions of NCA Score with *High Use Occupation* and *High Use Industry* attenuate, but remain neg-

---

[43] We define Low NCA Use Occupations as Farm, Fish and Forestry; Legal Occupations; Grounds Maintenance; Food Preparation and Serving; Construction; Extraction; Transport and Materials Moving; Office Support; and Community and Social Services, and High NCA Use Occupations as all others. Low NCA Use Industries are Agriculture and Hunting; Accommodation and Food Services; Arts, Entertainment, and Recreation; Construction; Real Estate; Transportation and Warehousing; Retail Trade; Other Services; and Management of Companies. These occupations and industries represent those with NCA use below or above the national average, according to Figures 5 and 6 in Starr et al. (2021).

ative and significant. The interaction of NCA Score with *College Educated* changes little and remains statistically significant.[44]

### 4.3.3  Accounting for Potentially Endogeneous NCA Law Changes

Considering that the vast majority of NCA law changes arise from court decisions rather than statutory changes; that economic, social, political, and legal factors do not collectively predict changes in NCA enforceability (Table 2 and Figure B.2); and that there is no evidence of pre-trends in the distributed lag and event study models, it is exceedingly unlikely that NCA law changes are endogenous to omitted variables that could contaminate our estimates. Still, we can conduct some additional analyses to further address this concern.

Even though the majority of NCA law changes arise through court decisions, one might worry that the few changes arising from statutory changes might be endogenous to underlying trends in ways that could bias our results. We directly address this concern in Panel A of Table B.4, where we re-estimate our baseline TWFE model but exclude the 8 states that ever experience a statutory NCA law change. The estimated coefficient on *NCA Enforceability Score* is similar to our baseline estimates in Table 3; the standard errors (unsurprisingly) increase in size, though the estimates remain statistically significant.

While judicial decisions are less prone to endogeneity than are statutory changes from legislative action, there is some evidence that judges' decision-making can be swayed by external forces like business interests, particularly for judges that are elected rather than appointed (Katz, 2018). To ensure that our results are not driven by confounding influences on elected judges, we obtained data on how judges are selected across states from Bannon (2018). We recreate our main TWFE analyses a) excluding the 6 states that have partisan judicial elections (i.e., judges are selected via election and the judge's political party is listed on the ballot) and b) excluding the 21 states in which judges are elected (whether or not the elections are partisan). We report results in Panels B and C of Table B.4, respectively. If anything, our point estimates are *larger* in magnitude with these restricted samples (they become substantially more imprecise in Panel C, which is to be expected since we are eliminating over 40% of the states in our sample). Since judicial elections are a key mechanism through which political or economic preferences of voters might affect judicial decisions, this evidence provides further reassurance against this potential form of endogeneity.

---

[44]Since college-educated workers tend to get paid more than those without a college degree, this stability of the *College Educated* estimate is consistent with the evidence in Starr et al. (2021) that NCA use is increasing in workers' annual earnings.

### 4.3.4   Robustness to Construction of NCA Enforceability Index

Though our construction of the NCA Enforceability index reflects the reasoning and judgment of leading legal scholars, a natural question is whether some of the decisions that go into this index affect our results. Two such decisions are how we treat missing values of individual enforceability components and the weights we give to each individual component in constructing the aggregate index. In Appendices C.2 and C.3, we show that our estimates are insensitive to alternative approaches to both of these decisions.

## 5   Spillover Effects of NCA Enforceability on Earnings

The results in Section 4 demonstrate that NCA enforceability has a negative effect on overall earnings. How do these estimates relate to our model? As described in Section 2 (and shown in Equation 13 in Appendix A), the effect of enforceability on average earnings is a weighted sum of two terms: 1) the average difference in earnings between workers that are and are not bound by NCAs and 2) the spillover effect of enforceability on earnings of workers not bound by NCAs. Theoretically, this second term is unambiguously negative: strict NCA enforceability will decrease the earnings of workers not bound by NCAs. This effect arises due to the assumption that strict enforceability slows down the job offer arrival rate for workers who are not constrained by NCAs, reducing their ability to leverage outside offers and climb the job ladder. In this section, we discuss existing evidence supporting this assumption and provide new evidence to corroborate it. We then show that enforceability does have spillover effects that are present and economically meaningful. Finally, we provide a brief discussion of what our results can say about the first term in Equation 13, the difference in average earnings between constrained and free workers, which our model suggests is indeterminate.

### 5.1   Effects of Enforceability on Job Vacancies

Our model predicts that NCA enforceability reduces earnings of workers not bound by NCAs under the assumption that NCAs cause offer arrival rates to fall for all employed workers in a labor market, not just those bound by NCAs. Prior work supports this assumption. Using survey data, Starr et al. (2019) find a large and significant negative effect of the interaction of incidence of NCA use in a state-industry cell and NCA enforceability on job offers received in either the prior year or over the course of their job spell—even among workers who are not bound by NCAs. Similarly, Goudou (2022) finds a decreased job-finding rate in industries with greater NCA incidence,

28

consistent with his model that enforceable NCAs make job vacancies more difficult for firms to fill.[45]

We provide additional corroborating evidence for the prediction that NCAs reduce offer arrival rates using data on job vacancy posting rates. Vacancy rates measure the existence of potential jobs both for workers bound by NCAs and those who are not (and, arguably, more so for those who are not, since those bound by NCAs are unable to take certain jobs) (Bagger et al., 2022). Our primary proxy for offer arrival rates is the number of unemployed people per job opening, a metric used by the Bureau of Labor Statistics that reflects how tight or slack the labor market is. A higher ratio indicates that it would take longer for a worker to receive a job offer, on average. We additionally consider the number of job openings to demonstrate that changes in the ratio are not solely driven by changes in the number of unemployed people. Both of these measures are available at the state–year level starting in 2001 from the Job Openings and Labor Turnover Survey (JOLTS) conducted by the BLS.[46]

In Table 6, we present estimates of the impact of NCA enforceability on these measures of job offer arrival rates. Formally, we estimate an analog of Equation 2 at the state-time level, with no individual controls, and with $t$ representing a month-year. Column 1 shows that stricter NCA enforceability leads to increases in the count of unemployed individuals per job opening: going from the 25th to the 75th percentile of enforceability leads to a reduction in that rate of 0.27 ($p = 0.094$), or 10.7% relative to a mean of 2.51. In other words, when enforceability is stricter, the number of individuals vying for any given vacancy increases. Column 2 shows that, while statistically insignificant, this effect is driven, at least in part, by changes in the count of job openings: going from the 25th to the 75th percentile of enforceability leads to a reduction in job openings of 3.4%.

These results, taken together with the existing literature, corroborate the assumption that NCA enforceability reduces offer arrival rates to workers in the labor market, especially for those who are not bound by NCAs.

## 5.2    Estimating Spillover Effects of NCA Enforceability

Having provided empirical support for our model's assumption that NCA enforceability affects offer arrival rates for all workers, we now turn to the implication of this assumption: that changes to NCA enforceability have spillover effects on the earnings of workers not bound by NCAs.

To test this prediction, we examine whether changes in NCA enforceability in

---

[45]Other factors, however, could push this relationship the other way: in theory, NCAs could encourage recruitment by providing more flexible contracting structures. See Potter et al. (2022) for the implications that follow from that assumption.

[46]We use monthly data aggregated across industries (total nonfarm) at the state level, seasonally adjusted. The BLS does not report data at a more granular level. See https://www.bls.gov/jlt/data.htm

a "donor" state affect workers who share a local labor market with that state but work in a different state. Our goal is to directly assess the extent of spillovers onto workers not directly affected by a change in NCA enforceability. Consider the St. Louis metro area, which includes counties in Missouri but also several counties across the state border in Illinois. If Illinois experiences an NCA law change, does it affect the earnings of workers employed on the Missouri side of the St. Louis metro area? And vice versa if Missouri experiences a law change?

We measure local labor markets as commuting zones, which are clusters of counties that have strong commuting ties and have been used in many prior studies as measures of local labor markets (e.g., Autor et al. (2013)). We identify commuting zones that straddle state borders: these commuting zones are local labor markets that include business establishments in two states and are therefore subject to two different NCA enforcement regimes. We remove 8 commuting zones that contain counties in more than 2 states to ensure clarity in defining the donor state. These restrictions leave us with a set of 137 commuting zones and 742 counties in them. In our main analysis, we focus on the 545 counties in these commuting zones that themselves lie directly on state borders; with this restriction, we avoid counties such as Los Angeles County, which shares a commuting zone with counties in Arizona but is nearly 200 miles driving distance from anywhere in Arizona.

We employ data from the QWI, which, as described in Section 3, includes quarterly earnings and employment flows at the county level, separated by various firm characteristics and worker demographics. Each observation in the dataset represents a unique year, quarter, county, sex, and age group cell.

To test for spillovers, we use an analog of the difference-in-difference model corresponding to Equation 2 to estimate the impact of a change in NCA enforceability across a state border, among workers employed in a commuting zone that straddles the state border. The outcome variable is the log of average quarterly earnings within each cell for all private sector employees. We estimate the model:

$$Y_{ctga} = \phi_0 + \phi_1 * Enforce_{ct} + \phi_2 * BorderEnforce_{ct}$$
$$+ \phi_3 * Female_g + \psi_a + \zeta_c + \Omega_{d(c)t} + \varepsilon_{ctga}, \tag{5}$$

where $c$ indexes county, $t$ indexes year-quarter, $g$ indexes sex, $a$ indexes age group, and $d(c)$ indexes the Census division in which county $c$ is located. $\psi_a$ and $\zeta_c$ are fixed age group and county effects, respectively. $\Omega_{d(c)t}$ is a Census division by year-quarter fixed effect. The primary coefficient of interest is $\phi_2$, which is an estimate of the spillover effect on workers in county $c$ of enforceability in the state that borders the commuting zone in which county $c$ is located. $\phi_1$ estimates the direct effect of enforceability in a worker's own state, analogous to our estimates thus far. We cluster standard errors two ways by state and commuting zone.

30

We report results in Table 7. Column 1 verifies that the direct relationship between (own) state NCA scores and earnings holds in this restricted sample. The coefficient on *Own State NCA Score* is -0.160 and statistically significant ($p < 0.01$). This magnitude is slightly larger than the main estimates reported in Table 3. Column 2 includes the *Donor State NCA Score*. In this model the direct effect of *Own State NCA Score* increases slightly to -0.181, $p < 0.01$, while the coefficient on *Donor State NCA Score* reveals evidence of meaningful spillover effects: the coefficient is -0.137 ($p = 0.059$), which equals 76% of the own state effect.

In the next section we conduct several tests to evaluate the reliability and clarify the interpretation of these spillover estimates.

## 5.3    Assessing the Interpretation of Spillover Estimates

We conduct three tests to corroborate the interpretation that the estimates in Table 7 reflect spillover effects of NCA enforceability across state borders. First, we test whether the magnitude of spillover effects varies in proportion to the relative sizes of the labor forces on each side of a bisected commuting zone. Second, we estimate heterogeneity in the magnitude of spillover effects by distance from state borders. Finally, we consider whether alternative mechanisms can explain our spillover results.

We first examine heterogeneity in spillover effects among border counties. Intuitively, in a commuting zone bisected by a state border, the magnitude of a spillover effect from a donor state's law change should be smaller if the donor state comprises a small share of total employment in the commuting zone. Conversely, if the donor state is the primary location of employers in the commuting zone, a change in NCA enforceability in the donor state should create a larger change in job offer arrival rates (and thus earnings) across the border in the neighboring state.

Column 3 of Table 7 shows our estimates of this heterogeneity. Along with their main effects, we include interactions of the 'own state' and 'donor state' NCA Scores with the share of the commuting zone labor force that is employed on the 'own state' side of the border. Since the unit of observation in this regression is at the county-demographic group-quarter level, we calculate these shares at the demographic group (age-sex combinations) level.[47] The results show that spillover effects are heterogeneous in a manner consistent with the logic above. The main effect of *Donor State NCA Score*, representing the spillover effect in a county that comprises zero percent of its CZ's employment (and thus where the donor state comprises essentially all of the CZ's total employment), is negative (-.167, $p = 0.032$). However, the spillover effect is substantially smaller in counties that account for a large share of employment in their commuting zone. In the extreme case in which a county contains 100% of commuting zone employment, the estimated spillover effect is close to zero (-0.009 =

---

[47]We also include the main effect of this ratio but do not report its coefficient in the table.

-0.167 + 0.157) and statistically insignificant ($p = 0.891$).[48]

Our main estimates of spillover effects consider earnings in adjacent pairs of counties bisected by state borders. Our second test of the interpretability of these estimates relies on the intuition that the magnitude of spillovers should attenuate with distance to the state border; if they did not one might worry our spillover estimates are driven by a spurious correlation. In Table B.6 we present three supplemental estimates from samples that include (1) interior counties that are neither in commuting zones that straddle state borders nor on state borders; (2) the subset of these interior counties that lie at least 50 miles from any state border; and (3) the subset that lie at least 100 miles from a border. We assign to each county a 'Donor State NCA Score' that corresponds to the state geographically closest to that county.[49] Reassuringly, the point estimate on *Nearest Neighboring State's NCA Score* is substantially attenuated in each of these three subsamples, with coefficients -0.059, -0.027, and -0.036, respectively.[50] None of the coefficients are statistically significant.

As a third test, we examine whether spillover effects of NCA enforceability could be driven by alternative mechanisms that we have not considered. We have argued theoretically (and shown empirically in Section 5.1) that strict NCA enforceability slows job offer arrival rates, and that this is the mechanism that underlies negative spillover effects on earnings. However, other explanations are possible. For example, workers may decide to find a job across state lines if their own state increases NCA enforceability. Such behavior would cause an outward shift in labor supply in border states, causing the market-clearing wage to decline. We find no evidence, however, that such worker behavior can explain the spillover effects on earnings. In Table B.7, we present estimates of the spillover effects of enforceability on workers' *mobility*. The structure mimics Table 7, except that our dependent variables are the log quarterly

---

[48]Unlike the analysis with the QWI dataset that we reported in Table 3 and Figure 4, we leave the regressions in Table 7 unweighted. We do this for two reasons. First, we weight the prior QWI analysis by employment to estimate an average treatment effect for the US population; because the sample in Table 7 is limited to border counties, weighting serves no such purpose. Second, spillover effects (as we show) are more pronounced in counties with a small share of employment. Therefore, an estimate that weights observations by employment would likely reveal little to no average impact of Donor State NCA Score. We report a weighted version of Table 7 in Table B.5, which indeed shows an attenuated average effect. However, Column 3 reveals that the heterogeneity based on employment shares in the CZ in Column 3 persists in the weighted specification, as expected.

[49]Specifically, we calculate the distance between county centroids. If the centroid of a county in a different state is less than $m$ miles from the centroid of the focal county, we exclude that focal county from the relevant regression. We assign Donor state NCA scores by finding the county in a different state whose centroid is closest to the focal county's centroid, and using that donor state's NCA score. Note that this approach to assign Donor state NCA scores is slightly different from the approach used in the results reported in Table 7, where we assigned the cross-border state's NCA score to be a focal county's Donor score. These two approaches to assigning Donor Score are often identical, but they diverge in a handful of cases; this discrepancy drives the slight divergence in estimates of coefficient of the *Donor State Score* reported in Table B.6 and Table 7.

[50]At the same time, however, the point estimate on *Own State NCA Score* reveals that the direct effect of own-state NCA score remains stable across these various geographic restrictions.

number of hires and separations from QWI in Columns 1 to 3 and 4 to 6, respectively. Across all six columns, enforceability in a worker's *own* state has a negative effect—of roughly similar magnitude—on hires and separations, corroborating the mobility results we found in Section 4.1.1 using the J2J dataset. The spillover effects (reported in Columns 2 and 5) are imprecisely estimated, though they are negative and of a magnitude that is 53-66% smaller than the direct effect.[51] Thus, there is no evidence that workers move across state lines in response to an NCA law change in their own state; if anything, these estimates suggest that strict NCA enforceability *reduces* cross-border mobility.

Collectively, these results on earnings and mobility provide evidence that NCA enforceability reduces earnings and labor market churn, even across state borders. Though we cannot observe which workers sign NCAs, these results suggest that NCA use has external effects on workers and firms that do not use them, consistent with the theoretical considerations discussed in Section 2.

## 5.4   Interpreting Enforceability Effects in the Presence of Spillovers

The spillover effects reported above have two important implications for interpreting our estimates of the overall earnings effect of NCA enforceability.

The first implication is theoretical. As described in Section 2, the overall effect of enforceability on average earnings depends not just on spillovers, but also on a second term: the average difference in earnings between constrained workers bound by an enforceable NCA and unconstrained workers not bound by one. This term can be positive or negative and is what makes the overall effect on average earnings indeterminate. We are not able to directly estimate this term in this paper; nevertheless, the spillover results allow us to provide some perspective on it.

We first note that, even if a panel dataset on NCA use existed (which, to our knowledge, does not), it is not obvious that the causal effect of signing an NCA is straightforward to identify. The decision by workers and firms to use NCAs is likely to be correlated with many unobserved worker and firm characteristics, such as intangible capital and opportunities for investments, causing endogenous selection into employment contracts with NCAs (Starr et al., 2021). This endogeneity makes it challenging to estimate the causal effect of signing an NCA on earnings. Some prior correlational studies indicate that workers who are bound by NCAs have 5–6% higher earnings than observationally similar workers not bound by one (Starr et al., 2021; Starr and Rothstein, 2022). However, these comparisons likely suffer from omitted variable bias; Balasubramanian et al. (2023) estimate a *negative* effect of signing an NCA on earnings when accounting for plausible selection effects.

---

[51]Additionally, Columns 3 and 6 document an identical pattern of heterogeneity to that observed on earnings: an NCA law change in a donor state has a larger effect on mobility in a focal county among counties comprising a small portion of the commuting zone's total employment, compared to counties comprising a large share.

That said, our results can provide some perspective on the magnitude of this term. As shown in Table 7, the spillover effect of NCA enforceability in a border state is roughly three-quarters of the magnitude of the direct effect in a worker's focal state, our empirical analog of $\frac{d\bar{w}}{d\theta}$ from Equation 1. If our estimate of spillovers is a perfect empirical analog of $\frac{d\bar{w}^F}{d\theta}$, this comparison suggests that $\bar{w}^C - \bar{w}^F$ is *negative* (that is, earnings for workers bound by NCAs are less than earnings for workers without NCAs). On the other hand, if our spillovers analysis underestimates $\frac{d\bar{w}^F}{d\theta}$ (for example, if "true" local labor markets are smaller than Commuting Zones), then our results still leave open the possibility that $\bar{w}^C - \bar{w}^F$ is positive. Regardless, this comparison indicates that, whatever the sign of $\bar{w}^C - \bar{w}^F$, a meaningful share of the overall earnings effect of NCA enforceability is borne by workers not actually bound by NCAs.

The second implication is econometric. Our primary estimating equation (Equation 2) relies on the stable unit treatment value assumption (SUTVA): that control units—states not experiencing legal changes—do not have counterfactual earnings trajectories that are affected by treated units (states experiencing law changes). However, our spillover estimates indicate that this assumption is violated for some control units—namely, counties in control states that are located near the border of a treated state. Since the direction of contamination is the same as the direction of the main effect, this suggests that our primary specification, which includes these contaminated counties, may underestimate the earnings effect of enforceability. We examine this concern in Table B.8, which replicates Column 5 of Table 3, but restricts the sample to counties progressively further away from a state border. Excluding counties near state borders increases the magnitude of the coefficient, though the estimates also become noisier due to the decrease in the number of counties included in the sample.

# 6  Does NCA Enforceability Reduce Earnings By Worsening the Value of Outside Options?

According to our model, the key channel through which NCA enforceability lowers earnings is by slowing down the arrival rate of new job offers. For constrained workers, NCAs explicitly prevent workers from considering outside job offers that compete with their current employer. For unconstrained workers not bound by an NCA, Corollary A.6 demonstrates that this slowdown occurs if high enforceability leads employers to post fewer vacancies (as shown in Section 5.1). Fewer job offers mean that workers have less ability to use improvements in outside options to negotiate for higher earnings and to climb the job ladder (that is, find better-paying jobs).

In this section, we use two approaches to test whether this "outside options" channel explains the negative earnings effect of NCA enforceability. First, we show that the earnings effect of changes in NCA enforceability is largest for those workers whose outside options are most affected by changes in enforceability in their state.

Second, we show that NCA enforceability disrupts workers' ability to take advantage of tight labor markets to raise earnings.

## 6.1   Heterogeneous Earnings Effects Based on Workers' Outside Options

As demonstrated in the second part of Corollary A.6, if strict NCA enforceability reduces earnings by preventing workers from leveraging outside options, then changes in enforceability will have a larger effect on the earnings of workers whose set of outside options is most affected by NCA enforceability.

We consider two margins that could govern the impact of enforceability on workers' outside options: the likelihood that a worker can move across state lines, or switch occupations. The ease with which a worker can move across state lines could directly affect the outside option bite of NCA enforceability among both constrained and unconstrained workers. Because NCAs often restrict movement within a local geographic area, all else equal an NCA eliminates a smaller share of outside options for workers who are more mobile across state lines. If higher state-level NCA enforceability slows down in-state job offer arrival rates, this has less of a bite for unconstrained workers who are more mobile across state lines. Similarly, NCAs often restrict within-occupation mobility (Marx, 2011; Johnson and Lipsitz, 2019). For workers who are outwardly occupationally mobile, such limitations will be less restrictive, since a smaller portion of potential job offers are limited by the use of enforceable NCAs.

We measure variation in cross-state mobility at the industry level using the J2J data (described above in Section 4.1.1). J2J includes a variable equal to the share of job-to-job changes that are across state lines at the state-industry-year (where industry corresponds to 2-digit NAICS code). We collapse this measure to the industry level by averaging across all states for the years 2000—2006.[52] This process gives us a measure of the share of job changes that are across state lines for each 2-digit NAICS industry. One complication for our purposes is that (as shown in Table 4) the share of job changes across state lines is potentially endogenous to NCA enforceability. To partially address this issue, in some specifications we also control for each industry's incidence of NCA *use* as used in Section 4.3.2.

We measure variation in cross-occupational mobility at the occupation level using data from Schubert et al. (2021). Schubert et al. (2021) use data from 16 million resumes compiled by Burning Glass Technologies over the period 2002–2018 to construct the "occupational leave share:"[53] the share of job transitions in which a worker

---

[52]We choose this time-window to avoid any confounding effects from the 2007–2009 Great Recession.

[53]We are incredibly grateful to the authors, who directly provided us with the dataset on each occupation's share of job changes that are to a different occupation.

switches occupations, at the 6-digit SOC occupation level.[54]

We first consider heterogeneity in the earnings effects of NCA enforceability across industries, based on the share of job changes in each industry that are across state lines (the "cross-state leave share"). Panel (a) of Figure 5 displays this relationship graphically. The figure is a scatterplot in which the unit of observation is a 2-digit NAICS industry: on the vertical axis is the earnings effect of NCA enforceability in that industry,[55] and on the horizontal axis is the industry's share of job changes across state lines. The relationship is positive, meaning that the earnings effect of enforceability is attenuated when workers can more easily move across state lines. Column 1 of Table B.9 displays corresponding regression results:[56] a one standard deviation increase in the share of an industry's job changes that are across state lines attenuates enforceability's negative effect on earnings by 0.050 log points ($p = 0.052$), or roughly half of the main effect. Column 2 shows that this estimate is robust to also interacting NCA enforceability with each industry's NCA incidence.

We next consider heterogeneity in the earnings effect across occupations, based on the "occupational leave share." Panel (b) of Figure 5 displays a scatterplot in which the unit of observation is a 6-digit SOC occupation: on the vertical axis is the earnings effect of NCA enforceability in that occupation,[57] and on the horizontal axis is the occupation's share of job changes in which the worker switches occupations. The relationship is positive, which again demonstrates that the earnings of workers whose outside options are less affected by NCAs are less affected by enforceability. Column 3 of Table B.9 displays corresponding regression results:[58] a one SD increase in the share of an occupation's job changes that are to a different occupation attenuates enforceability's negative effect on earnings by 0.011 log points ($p < .01$), or roughly 17% of the main effect. Column 4 shows that this estimate is robust to also interacting NCA enforceability with each occupation's NCA incidence.

These analyses show remarkably consistent evidence that strict NCA enforceability has the largest effect on the earnings of workers whose outside options are most

---

[54]In theory, this measure could also be endogenous to NCA enforceability, for example if workers bound by NCAs are more likely to switch occupations to escape their NCA (Marx, 2011). Unfortunately, the occupational leave share measure is only measured nationally, so we cannot construct it for the state of California (like we did for industry-level cross-state job transitions.)

[55]Using the QWI dataset, we separately regress earnings on NCA enforceability for each industry, and we save the coefficient from each regression. In each regression, we include fixed effects for state, sex, age group, and year–quarter–region, and we weight observations by employment.

[56]Here, we run a single regression with an interaction term. We also normalize the "cross-state leave share" to be mean 0 and standard deviation 1 for interpretability.

[57]Using the CPS ASEC (which is required since it includes information on workers' occupations), we separately regress earnings on NCA enforceability for each occupation, and we save the coefficient from each regression. In each regression we include fixed effects for state, year–region, and we include basic demographic controls. For this plot, we restrict attention to occupations with at least 5,000 observations in our sample period, comprising roughly the most common 100 occupations.

[58]Here, we run a single regression with an interaction term. We also normalize the "cross-occupation leave share" to be mean 0 and standard deviation 1 for interpretability.

36

plausibly impacted by the use and stringency of NCAs in their state.

## 6.2 NCA Enforceability Reduces Workers' Ability to Leverage Tight Labor Markets

The results in the prior section corroborate our model's implication that strict NCA enforceability reduces earnings by slowing down workers' arrival rate of outside offers, thus interrupting an important channel of workers' overall earnings growth (Bagger et al., 2014). In this section, we consider a second way that NCA enforceability might interrupt this channel of earnings growth: by reducing workers' ability to take advantage of tight labor markets to raise their earnings.

We embed NCA enforceability in an empirical model, first used by Beaudry and DiNardo (1991), that considers how a worker's current earnings depend on prior labor market conditions. Beaudry and DiNardo (1991) (hereafter, BDN) consider a model in which firms insure workers against negative productivity shocks using implicit contracts. Their model implies that improvements in labor market conditions enable workers to bargain for higher earnings that persist through their job spell—but only if their mobility is costless (that is, they can easily switch jobs). In this case, because the worker can threaten to quit if her outside option improves, improvements in labor market conditions compel employers to raise wages. If, instead, workers' mobility is costly, they cannot credibly threaten to leave, and improvements in labor market conditions will not translate into higher earnings.

BDN develop a simple empirical test of their model. If mobility is costless, a worker's current earnings will be correlated with the most favorable labor market conditions over the course of her current job spell; if mobility is costly, her earnings will be correlated with the initial market conditions at the start of the spell. BDN find strong evidence consistent with costless mobility: the effect of the most favorable labor market conditions over a worker's job spell (measured as the minimum unemployment rate over the spell) exceeds and washes out any effect of the unemployment rate at the time of hire (predicted by an implicit contracts model with costly mobility) or the contemporaneous unemployment rate (predicted by a spot market).[59]

More recently, Hagedorn and Manovskii (2013) (hereafter, HM) propose a different explanation for why current earnings could be tied to prior labor market conditions. HM model workers' earnings as set in spot markets (in contrast with Beaudry and DiNardo (1991)). However prior labor market conditions still affect a worker's current earnings through their effect on a worker's current match quality. In favorable labor markets, workers receive many job offers and are able to climb the job ladder, enabling workers to choose a job with a higher match quality. HM show that their model rationalizes the same reduced form relationship between current earnings and

---

[59]Other papers in this literature have replicated this baseline result, using different datasets and time periods (e.g., Molloy et al., 2016; Schmieder and Von Wachter, 2010).

history of unemployment rates, but they provide evidence to suggest their model better explains this relationship than BDN.

While BDN and HM provide differing reasons for why prior labor market conditions matter for current earnings, they both illustrate ways that strict NCA enforceability attenuates workers' ability to take advantage of tight labor markets. By slowing down the arrival rate of job offers that workers might otherwise expect, strict NCA enforceability interrupts both channels through which tight labor markets translate to higher earnings, by preventing them from climbing the job ladder (in the spirit of HM) and by diminishing the *threat* of climbing the job ladder (in the spirit of BDN). Both of these mechanisms are important elements of earnings growth in the search model of Bagger et al. (2014).

To test this idea, we revisit the empirical model used by BDN and HM that relates a worker's earnings to prior labor market conditions. We hypothesize that when NCAs are more easily enforceable, a worker's current earnings will be less correlated with the most favorable market conditions during her job spell—and more correlated with initial labor market conditions—relative to workers in states where NCAs are less enforceable.

We begin by replicating the baseline analysis of BDN using the CPS JTS,[60] and limiting our analysis to full-time, private sector workers, for the years 1996-2014 (compared to BDN, who used the years 1976 to 1984).[61] We estimate the model:

$$\ln w_{(i,t+j,t)} = \Omega_1 X_{i,t+j} + \Omega_2 C(t,j) + \rho_{s(i,t)} + \delta_{d(i,t)t} + \varepsilon_{i,t+j}, \tag{6}$$

where $w_{(i,t+j,t)}$ is the earnings of individual $i$ at time $t + j$ who began her job spell at time $t$. $X_{i,t+j}$ is a vector of individual level characteristics. Following BDN, in $X_{i,t+j}$ we include race, Hispanic status, sex, marital status, age, age squared, tenure, tenure squared, education, and industry dummies. $C(t,j)$ is a vector of unemployment rates which, depending on the model, include *Initial UR* (the unemployment rate at the beginning of the individual's job spell) and/or *Minimum UR* (the lowest unemployment rate between the beginning of the job spell and the time of measurement of earnings). Following BDN, we use annual national unemployment rates from the Bureau of Labor Statistics. $\rho_{s(i,t)}$ is a fixed effect for the state in which worker $i$ lives in year $t$. $\delta_{d(i,t)t}$ is a fixed census division by year effect.[62]

This model departs in some ways from the BDN specification. First, we do not include Metropolitan Statistical Area (MSA) fixed effects: doing so decreases our sample size by approximately 25% (due to individuals whose MSA has been omitted

---

[60]Hagedorn and Manovskii (2013) use a similar specification to Beaudry and DiNardo (1991), though they use the National Longitudinal Survey of Youth rather than the CPS.

[61]We omit years prior to 1996 due to a lack of data availability: though BDN use CPS data collected prior to 1996, the dataset we employ (the CPS JTS) has only been collected since 1996.

[62]BDN do not use state fixed effects; we include them to harmonize this model with our benchmark earnings models and to only use within-state variation in enforceability.

from public use extracts of CPS supplements). In their stead, we use dummy variables for metropolitan area status (as used in Equation 2). Second, we do not consider the contemporaneous unemployment rate, which is collinear with $\delta_{d(i,t)t}$. Each of these adjustments ultimately has little impact on our estimates.[63]

We report these results in Table 8. Columns 1–3 replicate the Beaudry and Di-Nardo (1991) main results for our sample period. In Column 1 we include only the unemployment rate at the time of hire (*Initial UR*): our estimated coefficient has a smaller magnitude than that estimated in BDN (ours: -0.008; BDN: -0.030), but it is negative and statistically significant ($p < 0.01$). Column 2 uses, instead, the minimum unemployment rate over the course of the worker's job spell (*Minimum UR*); we find a negative and statistically significant effect. Column 3 mimics the main finding of BDN: including both *Initial UR* and *Minimum UR* attenuates the coefficient on *Initial UR* close to zero but leaves the coefficient on *Minimum UR* negative and significant ($p < 0.01$). In other words, on average, prior experience with tight labor markets leads to higher current earnings—consistent with either a model of implicit contracts with costless mobility (Beaudry and DiNardo, 1991) or a model in which match quality matters for earnings (Hagedorn and Manovskii, 2013).

To test the hypothesis that NCA enforceability shuts down the ability of workers to leverage strong labor markets (via either improvements in bargaining position or moves to stronger matches), we estimate the model:

$$\ln w_{(i,t+j,t,s)} = \Omega_1 X_{i,t+j} + \Omega_2 C(t,j) + \Omega_3 Enf_{t,s} + \Omega_4 C(t,j) * Enf_{t,s} + \varepsilon_{i,t+j}, \quad (7)$$

where $Enf_{t,s}$ is the NCA enforceability score in state $s$ at time $t$, the beginning of the worker's job spell. This model allows the effect of labor market conditions to vary with the strength of NCA enforceability at the time the worker was hired. If NCA enforceability affects the cost of mobility in an implicit contracts environment, or if NCA enforceability prevents workers from attaining better match quality, we expect two effects. First, we expect the coefficient on $Enf_{t,s} \times$ *Minimum UR* to be positive, indicating that employees have *less* ability to leverage favorable labor markets over the course of their job spell when NCA enforceability is high. Second, we expect the coefficient on $Enf_{t,s} \times$ *Initial UR* to be *negative*, indicating that earnings are *more* responsive to labor market conditions at the time of hire when NCA enforceability is high.

We report the results in Columns 4 and 5. Column 4 mirrors Column 3, but includes an additional control: NCA enforceability at the employee's time of hire

---

[63]Inclusion of MSA fixed effects (unreported) has little effect on our estimates. Our estimates are also robust to excluding Census division-by-year fixed effects, and to using state-level unemployment rates in lieu of national unemployment rates, which allows us to include contemporaneous unemployment rates in our regressions (since they are not collinear with division-year fixed effects). We choose to use national rates to follow BDN, and also because state-level unemployment rates could in theory be an outcome of NCA enforceability policies.

($Enf_{t,s}$). Encouragingly, the coefficients on *Initial UR* and *Minimum UR* do not change, indicating that NCA enforceability is not acting as a de facto proxy for one of the unemployment rates.

In Column 5, we include the interactions demonstrating the change in the cost of mobility. First, consider the main effects of *Initial UR* and *Minimum UR*, which indicate the effect of initial and most favorable labor market conditions, respectively, for a state with the lowest NCA enforceability. These coefficients mirror, and amplify, the findings from BDN and HM: a higher initial unemployment rate for a worker in a low-enforcing state does not reduce her earnings today—if anything it leads to *higher* earnings—whereas the main effect of *Minimum UR* indicates that a worker's earnings today are strongly responsive to her most favorable labor market condition over her tenure. In other words, earnings in a state with low NCA enforceability are *even more* aligned with an implicit contracts model of costless mobility, or alternatively reflect a *greater* ability of workers to find high-quality matches, relative to the overall population.

Next, consider the two interaction terms, indicating the differential effects of these conditions for a worker in the highest enforcing state. The coefficient on $Enf_{t,s} \times$ *Initial UR* ($-0.017$; $p < 0.01$) shows that a higher unemployment rate at the time of hire affects current earnings much more negatively when NCAs are more enforceable. The coefficient on the other interaction term, $Enf_{t,s} \times$ *Minimum UR* ($0.020$; $p < 0.05$), shows that the most favorable labor market condition over job tenure has a much more muted effect on current earnings for workers in states with higher enforceability. Combining the main effect on *Minimum UR* with this interaction term reveals that the most favorable labor market condition over the course of tenure has essentially no effect on the earnings of a worker in a state with the highest observed enforceability ($-0.028 + 0.020 = -0.008, p = .19$).

These results provide even more evidence to support the theory that strict NCA enforceability reduces earnings by limiting workers' outside options. The increased rate of job offers that workers can expect in tight labor markets can have long-lasting positive effects on their earnings, either by increasing their bargaining power or by enabling them to switch to better matches. The estimates in Table 8, however, show that this effect is effectively shut down when NCAs are strictly enforced.

# 7   Heterogeneity in NCA Enforceability's Earnings Effect by Sex and Race

We have shown that strict NCA enforceability has a particularly detrimental earnings effect in industries and occupations in which state-level NCA enforceability has the largest effect on workers' outside options. Extending this logic suggests that the earnings effect of NCA enforceability may differ across demographic groups. For

example, it is plausible that NCA enforceability has a larger effect on women's outside options than men's. Women tend to be less willing than women to commute far distances for their job (Le Barbanchon et al., 2019; Caldwell and Danieli, 2018), and married women are less likely to relocate in response to labor market opportunities than are married men (Jayachandran et al., 2023), both of which could be due to imbalanced household gender norms. Women are also less willing (and able) to violate NCAs than are men (Marx, 2022). These differences would imply that geographically-restrictive NCAs (or state-level enforceability changes) would have a larger effect on women's outside options than on men's. Similar differences could arise for racial minorities relative to White individuals: Black individuals are less likely to migrate far away from their hometown, and they are less likely to migrate in response to earnings increases elsewhere (Sprung-Keyser et al., 2022). Together with our model, these differences predict that NCA enforceability will cause greater earnings penalties for historically disfavored workers.

Figure 6 displays results from two regressions that add demographic group indicators, alone and interacted with NCA Score, to the regression reported in Column 1 of Table 3.[64] (Table B.10 reports the underlying regression estimates.) The coefficients reported in the Figure are on the interaction of the relevant group indicator with the *NCA Enforceability Score*, and they represent the impact of NCA enforceability on the earnings of individuals in that group. We report coefficients from two models: our main estimate and a second model that includes interactions between the *NCA Enforceability Score* and indicators for college-educated, high-NCA-use occupations, and high-NCA-use industries, alone and interacted with *NCA Enforceability Score*, in order to account for the fact that workers in different demographic groups may hold different jobs and have different education levels, on average.

The figure reveals meaningful heterogeneity in the earnings effect across demographic groups. In the baseline model the estimates are negative and statistically significant for all demographic groups; however, the magnitudes of earnings effects for Black men and other female minority workers are 94% and 145% larger, respectively, than the effect for White men.[65] A test of equality of the earnings effects across all six groups is strongly rejected ($p < 0.001$). These differences persist in the regression specification with additional controls—the test of equality in coefficients yields a p-value below 0.001.[66]

---

[64]We make two additional modifications to the regression specification. First, we remove the restriction that workers must be working full-time to avoid selecting the sample on an outcome that is known to differ across men and women, though the results do not meaningfully change if we reimpose the full-time restriction. Second, we include more detailed (interacted) demographic categories in the model.

[65]The p-values of pairwise comparisons reported in Figure 6 are Bonferroni-corrected to account for five pairwise comparisons.

[66]We note that our results do not accord with a model in which the penalties faced by non-White workers and women are additive; this pattern has been observed in other work on racial and gender earnings gaps (Paul et al., 2022).

These results suggest that strict NCA enforceability not only reduces earnings *on average*, but it also exacerbates existing disparities across demographic groups. In Column 2 of Appendix Table B.10 we show that these coefficients imply that moving from the 25th to 75th percentile of the NCA Score distribution would decrease average earnings of white men by approximately 1.3%, vs. decreases ranging from 1.5% to 3.2% for the other demographic groups. Together with the estimates in Column 1, these results imply that if a state that enforces NCAs at the 75th percentile of the distribution were to switch to enforcing NCAs at the 25th percentile of the distribution, the earnings gap between white men and each other demographic group would close by 1.5% for nonblack, nonwhite men, 1.9% for black women, 2.3% for white women, 3.6% for black men, and 3.8% for nonblack, nonwhite women.

Of course, we cannot say conclusively that the disparate impacts of NCA enforceability by sex and race arise from differential impacts on outside options. Still, these results do provide further (albeit indirect) evidence that our model has explanatory power for understanding the mechanism through which strict NCA enforceability reduces earnings. A promising avenue for future research would be to more comprehensively examine the ways in which NCAs differentially impact workers of different demographic groups.

# 8    Comparison to Prior Studies: How Generalizable Are the Earnings Effects of NCA Enforceability?

Ours is not the first paper to consider the earnings effect of NCAs and NCA enforceability. Prior work on this topic has considered the effects of NCA use and/or enforceability for specific subsets of workers or subsets of law changes. Relative to this important work, our paper provides the first estimates of earnings effects of NCA enforceability for a broad, representative sample of the US labor force using all law changes over a 24-year period. We also connect our empirical analysis to a theoretical model, which both helps interpret the reduced form effect of NCA enforceability on earnings and implies sources of heterogeneity in those effects. Collectively, these features of our paper allow us to revisit these prior studies, some of which find facially contrasting results.

First, our paper helps make sense of seemingly conflicting findings on the effects of NCA *use* versus NCA *enforceability*. Prior work tends to find that NCA use has either no association or a positive association with earnings (Balasubramanian et al., 2023; Lavetti et al., 2018; Starr and Rothstein, 2022; Starr et al., 2021). In contrast, studies of enforceability of NCAs (including ours) tend to find negative impacts on earnings

(Lipsitz and Starr, 2021; Balasubramanian et al., 2022; Garmaise, 2011).[67] Our paper rationalizes these disparate findings. Our model shows that the effect of increasing enforceability on earnings is the sum of two terms: the difference in earnings between workers who do and do not sign enforceable NCAs (which we show can be positive or negative), and the spillover effect on non-signers (which we show theoretically and empirically is unambiguously negative).[68] Thus, our model provides an explanation for why there could be positive/null earnings effects of use and negative earnings effects of enforceability.[69]

Second, our paper can help rationalize heterogeneity in the estimated earnings impacts of NCA enforceability among existing studies. For example, Lipsitz and Starr (2021) find a 2-3% earnings effect of a ban on NCAs for low-wage workers in Oregon, while Balasubramanian et al. (2022) find a 4-5% earnings impact of a ban on NCAs for high-tech workers in Hawaii. Our model suggests that the differences in the magnitudes of these effects could be due to disparities in the outside options of workers in these different segments of the labor force. In Section 6.1, we find that workers whose outside options are most impacted by NCA enforceability (for example, because NCAs typically cover specific locations, occupations, or industries) are those whose earnings are most affected by changes in enforceability. There is evidence that low-wage workers are more mobile across industries than are high-wage workers, perhaps due to differences in the industry-specificity of human capital.[70] By comparison, high-tech workers may have skills that are more industry-specific, meaning their outside options would be more affected by NCA use and enforceability.[71] At a more extreme tail of the labor market, Garmaise (2011) estimates that CEOs at large publicly-traded US firms have 8.2% lower earnings growth under stricter NCA enforceability. This especially large earnings effect is consistent with CEOs having

---

[67]An exception is (Young, 2021), who finds that an NCA ban in Austria for low-wage workers had a limited effect on earnings.

[68]This insight is particularly useful for interpreting the results from Kini et al. (2019), who estimate the interaction effect of NCA enforceability and NCA use on CEO earnings. They find a *positive* effect of this interaction term (suggesting CEOs with enforceable NCAs get an earnings premium) but a *negative* effect on the main effect of enforceability, which is consistent with negative spillovers. See Table 7, Column 1 of that paper.

[69]Another potential explanation for these differences is that the correlation between NCA use and earnings may not reflect a causal effect, since factors such as access to proprietary knowledge may simultaneously contribute to the use of NCAs and higher earnings. See Starr and Rothstein (2022) for a deeper discussion of this point.

[70]Figure 1 of Lipsitz and Starr (2021) shows that workers in lower earnings brackets are much more likely to change industries than are workers in higher brackets.

[71]At the same time, high-tech workers might be more mobile across state lines than the typical worker, enabling them to escape increases in NCA enforceability in their origin state, which could explain why the 4–5% earnings increase from the Hawaii ban from Balasubramanian et al. (2022) is smaller than our implied overall earnings increase from a nationwide NCA ban (8.7%). Indeed, in the J2J data, the share of job changes that are across state lines in NAICS code 51 (which contains several high-tech industries based on Balasubramanian et al. (2022)'s definition) is 20%, compared to 15% across all other sectors.

substantially lower outside-occupation mobility than other occupations (which the data from Schubert et al. (2021) shows is the case).

Finally, our paper offers the most comprehensive understanding of the labor market effects of NCA enforceability to date. We show that the effect on earnings is negative for a wide range of states (as displayed in Figure B.3), implying that the negative effects in prior case studies are not aberrations. At the same time, we show substantial heterogeneity in the earnings effects across industries and occupations—something not feasible to estimate in a single case study. These analyses can inform which groups are likely to be most affected by ongoing policy discussions to restrict or ban NCAs. Finally, we offer (and provide evidence for) a theoretical channel through which NCA enforceability affects earnings; this extends prior work that has, for example, referenced the role of worker mobility but has been unable to explicitly test why lower mobility would translate to lower earnings.

# 9   Conclusion

Using newly-assembled panel data on state-level NCA enforceability, we show that stricter NCA enforceability leads to a decline in workers' earnings and mobility. The earnings effect of NCA enforceability extends across legal jurisdictions, illustrating that NCA enforceability has far-reaching consequences on labor market outcomes that likely extend far beyond the subset of workers that actually sign NCAs. Multiple sources of evidence indicate that strict enforceability reduces earnings by dampening workers' outside options, shutting down a primary way that workers can otherwise attain higher pay over the course of their careers. Finally, strict enforceability has an especially negative effect on the earnings of women and racial minorities and thus exacerbates existing disparities in the labor market.

Our results also inform a longstanding debate regarding freedom of contract. An argument frequently cited in this debate is that workers would not sign NCAs if they were made worse off by doing so. Evidence that workers sign NCAs either unwittingly or after they have any chance to bargain over them (Marx, 2011) already casts doubt on this argument. Our findings that NCAs create negative *market-level* externalities provide a further challenge to this argument.

Our findings suggest several avenues for future research. An important question is how incomplete markets interact with workers' willingness to sign NCAs: for example, liquidity-constrained workers might sign NCAs that are damaging to their lifetime earnings if they are unable to alternatively accept an initial earnings cut to pay for training or other human capital investment; in this case, NCA enforceability might exacerbate inequality between high- and low-wealth individuals. The earnings effects of NCA enforceability might also interact with unionization and other labor market institutions. Finally, given our findings that strict NCA enforceability reduces the extent to which strong labor markets translate into higher earnings, it is possible

44

that increases in NCA enforceability (or in NCA use) have contributed to the decline in the labor share of income over the past several decades.

# References

Arnold, D. (2019). Mergers and acquisitions, local labor market concentration, and worker outcomes. *Local Labor Market Concentration, and Worker Outcomes (October 27, 2019)*.

Autor, D., D. Dorn, and G. Hanson (2013). The china syndrome: Local labor market effects of import competition in the united states. *American Economic Review 103*(6), 2121–68.

Autor, D. H., D. Dorn, L. F. Katz, C. Patterson, and J. Van Reenen (2017). The fall of the labor share and the rise of superstar firms.

Azar, J., I. Marinescu, and M. I. Steinbaum (2017). Labor market concentration.

Bagger, J., F. Fontaine, M. Galenianos, and I. Trapeznikova (2022). Vacancies, employment outcomes and firm growth: Evidence from denmark. *Labour Economics 75*, 102103.

Bagger, J., F. Fontaine, F. Postel-Vinay, and J.-M. Robin (2014). Tenure, experience, human capital, and wages: A tractable equilibrium search model of wage dynamics. *American Economic Review 104*(6), 1551–96.

Balasubramanian, N., J. W. Chang, M. Sakakibara, J. Sivadasan, and E. Starr (2022). Locked in? the enforceability of covenants not to compete and the careers of high-tech workers. *Journal of Human Resources 57*(S), S349–S396.

Balasubramanian, N., E. Starr, and S. Yamaguchi (2023). Employment restrictions on resource transferability and value appropriation from employees. *Available at SSRN 3814403*.

Bannon, A. (2018). Choosing state judges: A plan for reform. *Brennan Center For Justice at NYU School of Law*.

Barnett, J. M. and T. Sichelman (2020). The case for noncompetes. *The University of Chicago Law Review 87*(4), 953–1050.

Barrett, C. B. and M. R. Carter (2010). The power and pitfalls of experiments in development economics: Some non-random reflections. *Applied Economic Perspectives and Policy 32*(4), 515–548.

Barth, E. and H. Dale-Olsen (2009). Monopsonistic discrimination, worker turnover, and the gender wage gap. *Labour Economics 16*(5), 589–597.

Beaudry, P. and J. DiNardo (1991). The effect of implicit contracts on the movement of wages over the business cycle: Evidence from micro data. *Journal of Political Economy*, 665–688.

Beaudry, P., D. A. Green, and B. Sand (2012). Does industrial composition matter for wages? a test of search and bargaining theory. *Econometrica 80*(3), 1063–1104.

Belenzon, S. and M. Schankerman (2013). Spreading the word: Geography, policy, and knowledge spillovers. *Review of Economics and Statistics 95*(3), 884–903.

Benmelech, E., N. K. Bergman, and H. Kim (2022). Strong employers and weak employees: How does employer concentration affect wages? *Journal of Human Resources 57*(S), S200–S250.

Berger, D., K. Herkenhoff, and S. Mongey (2022). Labor market power. *American Economic Review 112*(4), 1147–1193.

Berger, D. W., K. F. Herkenhoff, A. R. Kostøl, and S. Mongey (2023). An anatomy of monopsony: Search frictions, amenities and bargaining in concentrated markets. Technical report, National Bureau of Economic Research.

Bernstein, D. E. (2008). Freedom of contract. *Liberty of Contract, in Encyclopedia of the Supreme Court of the United States (David S. Tanenhaus*, 08–51.

Bertrand, M. (2011). New perspectives on gender. In *Handbook of labor economics*, Volume 4, pp. 1543–1590. Elsevier.

Bishara, N. D. (2010). Fifty ways to leave your employer: Relative enforcement of covenants

**JA0386**

not to compete, trends, and implications for employee mobility policy. *U. Pa. J. Bus. L. 13*, 751.

Black, S. E. and E. Brainerd (2004). Importing equality? the impact of globalization on gender discrimination. *ILR Review 57*(4), 540–559.

Black, S. E. and P. E. Strahan (2001). The division of spoils: rent-sharing and discrimination in a regulated industry. *American Economic Review 91*(4), 814–831.

Bleakley, H. and J. Lin (2012). Thick-market effects and churning in the labor market: Evidence from us cities. *Journal of urban economics 72*(2-3), 87–103.

Caldwell, S. and O. Danieli (2018). Outside options in the labor market. *Unpublished manuscript*.

Caldwell, S. and N. Harmon (2019). Outside options, bargaining, and wages: Evidence from coworker networks. *Unpublished manuscript, Univ. Copenhagen*.

Callaway, B., A. Goodman-Bacon, and P. H. Sant'Anna (2021). Difference-in-differences with a continuous treatment. *arXiv preprint arXiv:2107.02637*.

Callaway, B. and P. H. Sant'Anna (2021). Difference-in-differences with multiple time periods. *Journal of Econometrics 225*(2), 200–230.

Card, D., A. R. Cardoso, and P. Kline (2015). Bargaining, sorting, and the gender wage gap: Quantifying the impact of firms on the relative pay of women. *The Quarterly Journal of Economics 131*(2), 633–686.

Cattaneo, M. D., R. K. Crump, M. H. Farrell, and Y. Feng (2023). On binscatter. *arXiv preprint arXiv:1902.09608*.

Caughey, D. and C. Warshaw (2018). Policy preferences and policy change: Dynamic responsiveness in the american states, 1936–2014. *American Political Science Review 112*(2), 249–266.

Cengiz, D., A. Dube, A. Lindner, and B. Zipperer (2019). The effect of minimum wages on low-wage jobs. *The Quarterly Journal of Economics 134*(3), 1405–1454.

Colvin, A. J. and H. Shierholz (2019). Noncompete agreements: Ubiquitous, harmful to wages and to competition, and part of a growing trend of employers requiring workers to sign away their rights. *Economic Policy Institute*.

De Chaisemartin, C. and X. D'Haultfoeuille (2022a). Difference-in-differences estimators of intertemporal treatment effects. Technical report, National Bureau of Economic Research.

De Chaisemartin, C. and X. D'Haultfoeuille (2022b). Two-way fixed effects and differences-in-differences with heterogeneous treatment effects: A survey. Technical report, National Bureau of Economic Research.

Deshpande, M. and Y. Li (2019). Who is screened out? application costs and the targeting of disability programs. *American Economic Journal: Economic Policy 11*(4), 213–48.

Diamond, P. A. (1982). Wage determination and efficiency in search equilibrium. *The Review of Economic Studies 49*(2), 217–227.

Epstein, L. and J. Knight (2013). Reconsidering judicial preferences. *Annual Review of Political Science 16*, 11–31.

Ewens, M. and M. Marx (2018). Founder replacement and startup performance. *The Review of Financial Studies 31*(4), 1532–1565.

Exley, C. L. and J. B. Kessler (2019). The gender gap in self-promotion.

Farber, H. S., D. Herbst, I. Kuziemko, and S. Naidu (2018). Unions and inequality over the twentieth century: New evidence from survey data. Technical report, National Bureau of Economic Research.

Fortin, N. M., T. Lemieux, and N. Lloyd (2021). Labor market institutions and the distribution of wages: The role of spillover effects. *Journal of Labor Economics 39*(S2), S369–S412.

Fuest, C., A. Peichl, and S. Siegloch (2018). Do higher corporate taxes reduce wages? micro evidence from germany. *American Economic Review 108*(2), 393–418.

Gan, L. and Q. Li (2016). Efficiency of thin and thick markets. *Journal of econometrics 192*(1), 40–54.

JA0387

Garmaise, M. J. (2011). Ties that truly bind: Noncompetition agreements, executive compensation, and firm investment. *The Journal of Law, Economics, and Organization 27*(2), 376–425.

Gittleman, M., M. A. Klee, and M. M. Kleiner (2018). Analyzing the labor market outcomes of occupational licensing. *Industrial Relations: A Journal of Economy and Society 57*(1), 57–100.

Goldschmidt, D. and J. F. Schmieder (2017). The rise of domestic outsourcing and the evolution of the german wage structure. *The Quarterly Journal of Economics 132*(3), 1165–1217.

Goodman-Bacon, A. (2018). Difference-in-differences with variation in treatment timing. *Unpublished*.

Goudou, F. (2022). The employment effects of non-compete contracts: Job creation versus job retention. *Available at SSRN 4231219*.

Greenwald, B. C. (1986). Adverse selection in the labour market. *The Review of Economic Studies 53*(3), 325–347.

Grossman, S. J. and O. D. Hart (1986). The costs and benefits of ownership: A theory of vertical and lateral integration. *The Journal of Political Economy*, 691–719.

Hagedorn, M. and I. Manovskii (2013). Job selection and wages over the business cycle. *American Economic Review 103*(2), 771–803.

Haltiwanger, J., H. Hyatt, and E. McEntarfer (2018). Who moves up the job ladder? *Journal of Labor Economics 36*(S1), S301–S336.

Haltiwanger, J. C., H. R. Hyatt, L. B. Kahn, and E. McEntarfer (2018). Cyclical job ladders by firm size and firm wage. *American Economic Journal: Macroeconomics 10*(2), 52–85.

Hamory, J., E. Miguel, M. Walker, M. Kremer, and S. Baird (2020). Twenty year economic impacts of deworming. *Working Paper*.

Hardaway, A. B. (2015). The paradox of the right to contract: Noncompete agreements as thirteenth amendment violations. *Seattle UL Rev. 39*, 957.

Hausman, N. and K. Lavetti (2017). Physician concentration and negotiated prices: Evidence from state law changes.

Hernandez, M., D. R. Avery, S. D. Volpone, and C. R. Kaiser (2018). Bargaining while black: The role of race in salary negotiations. *Journal of Applied Psychology*.

Hiraiwa, T., M. Lipsitz, and E. Starr (2023). Do firms value court enforceability of non-compete agreements? a revealed preference approach. *Available at SSRN 4364674*.

Hirsch, B. and D. Macpherson (2019). Union membership and coverage database from the cps.

Jarosch, G., J. S. Nimczik, and I. Sorkin (2019). Granular search, market structure, and wages. Technical report, National Bureau of Economic Research.

Jayachandran, S., L. Nassal, M. Notowidigdo, M. Paul, H. Sarsons, and E. Sundberg (2023). Moving to opportunity, together.

Jeffers, J. S. (2018). The impact of restricting labor mobility on corporate investment and entrepreneurship. *Unpublished*.

Johnson, M. S. and M. Lipsitz (2019). Why are low-wage workers signing noncompete agreements? *Unpublished*.

Johnson, M. S., M. Lipsitz, and A. Pei (2023). Innovation and the enforceability of non-compete agreements. Technical report, National Bureau of Economic Research.

Katz, A. (2018). The chamber in the chambers: The making of a big-business judicial money machine. *DePaul Law Review 67*.

Kini, O., R. Williams, and S. Yin (2023). Ceo non-compete agreements, job risk, and compensation. *Available at SSRN 3170804*.

Kline, P., N. Petkova, H. Williams, and O. Zidar (2019). Who profits from patents? rent-sharing at innovative firms. *The Quarterly Journal of Economics 134*(3), 1343–1404.

Knight, J. and L. Epstein (1996). The norm of stare decisis. *American Journal of Political Science 40*(4).

Krueger, A. B. (2017). The rigged labor market. *Milken Institute Review*.

Lamadon, T., M. Mogstad, and B. Setzler (2022). Imperfect competition, compensating differentials, and rent sharing in the us labor market. *American Economic Review 112*(1), 169–212.

Lavetti, K., C. Simon, and W. D. White (2018). The impacts of restricting mobility of skilled service workers: Evidence from physicians. *Unpublished*.

Le Barbanchon, T., R. Rathelot, and A. Roulet (2019). Gender differences in job search: Trading off commute against wage. *Available at SSRN 3467750*.

Leibbrandt, A. and J. A. List (2014). Do women avoid salary negotiations? evidence from a large-scale natural field experiment. *Management Science 61*(9), 2016–2024.

Lipsitz, M. and E. Starr (2021). Low-wage workers and the enforceability of non-compete agreements. *Management Science, Forthcoming*.

Lipsitz, M. and M. J. Tremblay (2021). Noncompete agreements and the welfare of consumers. *Available at SSRN 3975864*.

Liu, K. (2019). Wage risk and the value of job mobility in early employment careers. *Journal of Labor Economics 37*(1), 139–185.

Malsberger, B. M. (1991-2023). *Covenants Not to Compete: A State-by-State Survey* (1st through 13th ed.). Arlington, VA: BNA Books.

Manning, A. (2013). *Monopsony in motion: Imperfect competition in labor markets*. Princeton University Press.

Marx, M. (2011). The firm strikes back: non-compete agreements and the mobility of technical professionals. *American Sociological Review 76*(5), 695–712.

Marx, M. (2022). Employee non-compete agreements, gender, and entrepreneurship. *Organization Science 33*(5), 1756–1772.

Marx, M., J. Singh, and L. Fleming (2015). Regional disadvantage? employee non-compete agreements and brain drain. *Research Policy 44*(2), 394–404.

Marx, M., D. Strumsky, and L. Fleming (2009). Mobility, skills, and the michigan non-compete experiment. *Management Science 55*(6), 875–889.

McCarty, N. and B. Shor (2015). Measuring american legislatures aggregate data, v4.0.

Miguel, E. and M. Kremer (2004). Worms: Identifying impacts on education and health in the presence of treatment externalities. *Econometrica 72*(1), 159–217.

Molloy, R., R. Trezzi, C. L. Smith, and A. Wozniak (2016). Understanding declining fluidity in the us labor market. *Brookings Papers on Economic Activity 2016*(1), 183–259.

Mueller, C. (2022). How reduced labor mobility can lead to inefficient reallocation of human capital. Technical report, mimeo.

Paul, M., K. Zaw, and W. Darity (2022). Returns in the labor market: A nuanced view of penalties at the intersection of race and gender in the us. *Feminist Economics 28*(2), 1–31.

Potter, T., B. Hobijn, and A. Kurmann (2022). On the inefficiency of non-competes in low-wage labor markets. Federal Reserve Bank of San Francisco.

Prager, E. and M. Schmitt (2019). Employer consolidation and wages: Evidence from hospitals. *Washington Center for Equitable Growth Working Paper*.

Redbird, B. (2017). The new closed shop? the economic and structural effects of occupational licensure. *American Sociological Review 82*(3), 600–624.

Robinson, J. (1933). *The economics of imperfect competition*. London: MacMillian.

Rosen, S. (1986). The theory of equalizing differences. *Handbook of Labor Economics 1*, 641—692.

Rubin, P. H. and P. Shedd (1981). Human capital and covenants not to compete. *The Journal of Legal Studies 10*(1), 93–110.

Schmidheiny, K. and S. Siegloch (2020). On event studies and distributed-lags in two-way fixed effects models: Identification, equivalence, and generalization. *ZEW-Centre for European Economic Research Discussion Paper* (20-017).

Schmieder, J. F. and T. Von Wachter (2010). Does wage persistence matter for employment fluctuations? evidence from displaced workers. *American Economic Journal: Applied Economics 2*(3), 1–21.

Schubert, G., A. Stansbury, and B. Taska (2021). Employer concentration and outside options. *Available at SSRN 3599454*.

Schultz, D. (2022). *Constitutional Precedent in US Supreme Court Reasoning*. Edward Elgar Publishing.

Shi, L. (2023). Optimal regulation of noncompete contracts. *Econometrica 91*(2), 425–463.

Shi, S. (2009). Directed search for equilibrium wage–tenure contracts. *Econometrica 77*(2), 561–584.

Sprung-Keyser, B., N. Hendren, S. Porter, et al. (2022). *The radius of economic opportunity: Evidence from migration and local labor markets*.

Starr, E. (2019). Consider this: Training, wages, and the enforceability of covenants not to compete. *ILR Review 72*(4), 783–817.

Starr, E., N. Balasubramanian, and M. Sakakibara (2018). Screening spinouts? how non-compete enforceability affects the creation, growth, and survival of new firms. *Management Science 64*(2), 552–572.

Starr, E., J. Frake, and R. Agarwal (2019). Mobility constraint externalities. *Organization Science 30*(5), 961–980.

Starr, E., J. J. Prescott, and N. Bishara (2021). Noncompetes in the us labor force. *Journal of Law and Economics, Forthcoming*.

Starr, E. and D. Rothstein (2022). Noncompete agreements, bargaining, and wages: evidence from the national longitudinal survey of youth 1997. *BLS Monthly Labor Review*.

Topel, R. H. and M. P. Ward (1992). Job mobility and the careers of young men. *The Quarterly Journal of Economics 107*(2), 439–479.

University of Kentucky Center for Poverty Research (2018). Ukcpr national welfare data, 1980-2017.

Weil, D. (2014). *The fissured workplace*. Harvard University Press.

Williamson, O. E. (1975). Markets and hierarchies. *New York 2630*.

Young, S. G. (2021). Noncompete clauses, job mobility, and job quality: Evidence from a low-earning noncompete ban in austria. *Job Mobility, and Job Quality: Evidence from a Low-Earning Noncompete Ban in Austria (July 5, 2021)*.

JA0390

# 10 Tables and Figures

Table 1: Descriptive Statistics on NCA Law Changes, 1991-2014

| Region | Northeast | Midwest | South | West | Total |
|---|---|---|---|---|---|
| Average Index | 0.75 | 0.79 | 0.76 | 0.40 | 0.69 |
| Standard Deviation of Index | 0.10 | 0.12 | 0.13 | 0.35 | 0.25 |
| Maximum Index | 0.97 | 0.97 | 1.00 | 0.91 | 1.00 |
| Minimum Index | 0.63 | 0.00 | 0.47 | 0.07 | 0.00 |
| Number of Law Changes | 15 | 19 | 23 | 16 | 73 |
| Number of States in Region | 9 | 12 | 17 | 13 | 51 |
| Number of Index Increases | 11 | 14 | 13 | 9 | 47 |
| Number of Index Decreases | 4 | 5 | 10 | 7 | 26 |
| Average Magnitude Positive Index Change | 0.03 | 0.05 | 0.08 | 0.05 | 0.05 |
| Maximum Positive Index Change | 0.15 | 0.11 | 0.24 | 0.19 | 0.24 |
| Average Magnitude Negative Index Change | -0.05 | -0.03 | -0.04 | -0.02 | -0.04 |
| Maximum Negative Index Change | -0.06 | -0.06 | -0.17 | -0.09 | -0.17 |
| Between-State Standard Deviation | 0.09 | 0.25 | 0.12 | 0.22 | 0.18 |
| Within-State Standard Deviation | 0.03 | 0.03 | 0.04 | 0.03 | 0.03 |

Notes: Statistics in the table represent data from 1991–2014, and the unit of observation is a state-year. The minimum and maximum of the NCA Score are normalized to 0 and 1, respectively. With the exception of the numbers of law changes, states, index increases, and index decreases, the descriptive statistics in Table 1 are weighted to reflect population demographics by matching the scores from each state-year to corresponding observations in the CPS ASEC and using the relevant weights provided by the Census Bureau

Figure 1: Timing of NCA law changes from 1991 through 2014



Figure 2: Average NCA Enforceability Score from 1991 to 2014



Notes: The series in this figure represents the population-weighted average NCA Score in the US in each year.

Table 2: Can Economic and Political Factors Explain Changes in NCA Enforceability?

| Dependent Variable: | NCA Enforceability | |
|---|---|---|
| Population (100,000s) | −0.00 | (0.00) |
| Unemployment Rate | 0.00 | (0.00) |
| Number of Workers Compensation Beneficiaries | −0.00 | (0.00) |
| Democratic Party Governor | −0.01 | (0.00) |
| % of State House from Democratic Party | 0.03 | (0.06) |
| % of State Senate from Democratic Party | 0.05 | (0.03) |
| State Minimum Wage | −0.01* | (0.01) |
| Number of Medicaid Beneficiaries (100,000s) | 0.00 | (0.00) |
| Social Policy Liberalism Score | −0.01 | (0.02) |
| Economic Policy Liberalism Score | −0.02 | (0.01) |
| Social Mass Liberalism Score | 0.00 | (0.02) |
| Economic Mass Liberalism Score | 0.04 | (0.04) |
| Democratic Party ID Count | −0.07 | (0.31) |
| State House Ideology Score | −0.00 | (0.01) |
| State Senate Ideology Score | 0.01 | (0.01) |
| House Democrats Ideology Score | −0.05 | (0.04) |
| House Republicans Ideology Score | 0.02 | (0.05) |
| Senate Democrats Ideology Score | −0.04** | (0.02) |
| Senate Republicans Ideology Score | −0.00 | (0.02) |
| Union Membership | −0.00 | (0.00) |
| N | 829 | |
| $R^2$ | 0.114 | |
| F-Test p-Value | 0.197 | |

Notes: Models also include state and year fixed effects. Reported $R^2$ calculated after residualizing on state and year fixed effects. Standard errors reported in parentheses are clustered by state.
*** p<0.01, ** p<0.05, * p<0.1

JA0393

Table 3: The Effect of NCA Enforceability on Earnings

|  | Log Earnings | | Log Hours | Log Wage | Log Average Earnings |
|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) |
| NCA Enforceability Score | -0.118*** | -0.107*** | -0.021 | -0.106*** | -0.137*** |
|  | (0.036) | (0.028) | (0.017) | (0.027) | (0.034) |
| Observations | 1216726 | 1216726 | 1545874 | 1216726 | 3548827 |
| $R^2$ | 0.275 | 0.357 | 0.132 | 0.346 | 0.941 |
| Geographic FE | State | State | State | State | County |
| Time FE | Div x Year | Div x Year | Div x Year | Div x Year | Div x Quarter |
| Occupation FE | N | Y | Y | Y | N |
| Sample | ASEC | ASEC | ASEC | ASEC | QWI |

ASEC samples use years from 1991-2014 and include individuals between ages 18-64 who reported working for wage and salary income at a private employer. All ASEC regressions include controls for male, white, Hispanic, age, age squared, whether the individual did not complete college, and indicators for the metropolitan city center status of where the individual lives. Column (5) includes controls for male, age group, and county fixed effects. The dependent variable in Column (4), log hourly wage, is calculated as the log of total annual earnings and salary income last year divided by (usual weekly hours last year times 52). Columns (1), (2), and (4) include full-time workers only, while Column (3) includes part-time workers to avoid selection on the dependent variable.

SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

53

Figure 3: The Relationship between NCA Enforceability and Earnings:
Binned Scatterplots



(a) Full Joint Distribution                (b) Joint Distribution Excluding CA & ND

Figures are binned scatterplots depicting the conditional joint distribution of NCA enforceability
and log annual earnings, controlling for the same variables included in Column 2 of Table 3 (fixed
state effects, census division-by-year effects, 1-digit occupation effects, age, age-squared, and
indicators for white, Hispanic, male, less than college education, and metro area status.)
Conditional means are constructed using the semiparametric partial linear regression approach
developed in Cattaneo et al. (2023). Panel (a) includes all states and years, panel (b) excludes
California and North Dakota to visually focus on the main sources of identifying variation that we
use for estimation.

Table 4: The Effects of NCA Enforceability on Job Mobility

|  | All J2J Separations | | Across Ind. | Within Ind. | Across State | Within State |
|---|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) | (6) |
| NCA Enforceability Score | 0.064 | 0.112 | 0.102 | 0.121 | -0.008 | 0.130 |
|  | (0.114) | (0.108) | (0.127) | (0.089) | (0.070) | (0.120) |
| High NCA Use Ind × NCA Score |  | -0.241*** | -0.122 | -0.380*** | -0.058 | -0.270** |
|  |  | (0.085) | (0.089) | (0.109) | (0.126) | (0.110) |
| Observations | 652024 | 652024 | 651664 | 619283 | 638444 | 650404 |
| Mean Dep Var | 1,421.69 | 1,421.69 | 794.65 | 627.60 | 165.38 | 1,256.38 |

Estimates are Poisson pseudo-likelihood coefficients from a model using LEHD Job-to-Job flows data from 1991-2014. Each observation is a state-sex-age group-quarter-industry cell. All regressions include controls for sex, age group, and fixed state-by-origin-industry effects and census-division-by-origin-industry-by-year-by-quarter effects. Regressions are weighted by employment, and standard errors are clustered by state. ***P<.01, **P<.05, *P<.1.

JA0396

Figure 4: Dynamic Effects of NCA Enforceability Changes on Earnings from Two Different Models



(a) Distributed Lag Model



(b) Stacked Event Study

The graphs plot two estimates of the dynamic effects of NCA law changes on earnings, from a distributed lag model (Panel A), and a stacked event study model (Panel B). Both regressions use data from QWI. See Section 4.2.1 for the regression equations and further details. The coefficients represent the effect of an NCA law change that occurred $j$ years ago ($j \in \{-4, 5\}$) on log earnings. The coefficient representing one year prior to law change is normalized to zero. In Panel A, the dependent variable is the yearly change in the log average earnings in a county-group; in Panel B the dependent variable is the log average earnings in a county-group. Standard errors are clustered by state.

JA0397

Table 5: Heterogeneous Effects of NCA Enforceability on Earnings by Education, Occupation, and Industry

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| NCA Enforceability Score | -0.118*** | -0.038 | -0.085** | -0.097*** | -0.033 |
|  | (0.036) | (0.040) | (0.035) | (0.035) | (0.038) |
| College Educated Worker | 0.415*** | 0.510*** | 0.376*** | 0.391*** | 0.442*** |
|  | (0.013) | (0.020) | (0.012) | (0.010) | (0.014) |
| College Educated Worker × NCA Score |  | -0.138*** |  |  | -0.118*** |
|  |  | (0.030) |  |  | (0.022) |
| High NCA Use Occ × NCA Score |  |  | -0.059*** |  | -0.015* |
|  |  |  | (0.014) |  | (0.008) |
| High NCA Use Occ |  |  | 0.254*** |  | 0.194*** |
|  |  |  | (0.007) |  | (0.005) |
| High NCA Use Ind × NCA Score |  |  |  | -0.065*** | -0.035*** |
|  |  |  |  | (0.013) | (0.010) |
| High NCA Use Ind |  |  |  | 0.267*** | 0.219*** |
|  |  |  |  | (0.008) | (0.007) |
| Observations | 1216726 | 1216726 | 1216726 | 1216726 | 1216726 |
| $R^2$ | 0.275 | 0.275 | 0.290 | 0.292 | 0.304 |

The sample in all columns is the CPS ASEC from 1991-2014 and includes individuals between ages 18-64 who reported working for wage and salary income at a private employer the prior year. All regressions include fixed effects for state, fixed effects for Census region by year, and individual controls for male, white, Hispanic, age, age squared, whether the individual did not complete college, and indicators for the metropolitan city center status of where the individual lives. In Columns (3) and (4), High NCA Use Occupations are occupations with NCA use greater than the national average, as tabulated by Starr et al. (2021).
SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

**JA0398**

Table 6: The Effects of NCA Enforceability on Job Openings

|  | Unemployed People Per Job Opening (1) | Job Openings (2) |
|---|---|---|
| NCA Enforceability Score | 1.783* | -0.225 |
|  | (1.045) | (0.233) |
| Observations | 8568 | 8568 |
| $R^2$ | 0.922 | 0.9308 |
| Estimation Methodology | OLS | Poisson |

Estimates are OLS or Poisson pseudo-likelihood coefficients from a model using BLS JOLTS data from 2001-2014. Each observation is a state-year-month cell. All regressions include fixed state and census-division-by-year-by-month effects. Regressions are weighted by employment, and standard errors are clustered by state. ***P<.01, **P<.05, *P<.1.

Table 7: The External Effects of NCA Enforceability on Earnings

|  | (1) | (2) | (3) |
|---|---|---|---|
| Own State NCA Score | -0.160*** | -0.181*** | -0.161** |
|  | (0.058) | (0.066) | (0.069) |
| Donor State NCA Score |  | -0.137* | -0.167** |
|  |  | (0.071) | (0.075) |
| Own Cty Emp/CZ Emp × Own State NCA Score |  |  | -0.110 |
|  |  |  | (0.150) |
| Own Cty Emp/CZ Emp × Donor State NCA Score |  |  | 0.157*** |
|  |  |  | (0.054) |
| Observations | 615191 | 615191 | 613762 |
| $R^2$ | 0.899 | 0.899 | 0.902 |

The dependent variable is log earnings. The sample is the QWI from 1991-2014 restricted to counties directly on state borders in commuting zones that straddle a state border. An observation is a county-sex-age group-quarter. All regressions include controls for sex, age group, as well as division by year by quarter and county fixed effects. Own Cty Emp/CZ Emp is the ratio of sex- and age-group-specific employment in own county divided by sex- and age-group-specific employment in the entire commuting zone. Standard errors are clustered by own state in Column (1), and two-way clustered by own state and commuting zone in columns (2) and (3). ***P<.01, **P<.05, *P<.1

JA0399

Figure 5: NCA Enforceability Has a Larger Effect on Earnings When it Has a Bigger Impact on Workers' Outside options



(a) Industry-level cross-state mobility [QWI]



(b) Occupation-level cross-occupation mobility [CPS]

Each figure is a scatterplot relating the earnings effect of NCA enforceability against the "bite" of enforceability on workers' outside options, using two dimensions of this "bite." In Panel (a), a unit of observation is a 2-digit NAICS industry: on the vertical axis is the earnings effect of NCA enforceability in that industry (estimated using the QWI dataset) and on the horizontal axis is the share of job transitions in that industry that are across state lines (measuring using the J2J dataset). In Panel (b), a unit of observation is a 6-digit SOC occupation: on the vertical axis is the earnings effect of NCA enforceability in that occupation (estimated using the CPS ASEC dataset) and on the horizontal axis is the share of job transitions in that occupation that to different occuaptions (based on data from Schubert et al. (2021)). See Section 6.1 for details.

JA0400

Table 8: NCA Enforceability Changes How Workers and Employers Negotiate Implicit Contracts

|  | Log Earnings | | | | |
|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) |
| Initial UR | -0.008*** | | -0.002 | -0.002 | 0.010** |
|  | (0.002) | | (0.003) | (0.003) | (0.004) |
| Minimum UR | | -0.017*** | -0.014*** | -0.014*** | -0.028*** |
|  | | (0.003) | (0.005) | (0.005) | (0.006) |
| Initial NCA Score | | | | -0.013 | -0.033 |
|  | | | | (0.059) | (0.074) |
| Init. NCA Score × Init. UR | | | | | -0.017*** |
|  | | | | | (0.006) |
| Init. NCA Score × Min. UR | | | | | 0.020** |
|  | | | | | (0.009) |
| No. Obs. | 76350 | 76350 | 76350 | 76350 | 76350 |
| $R^2$ | 0.364 | 0.364 | 0.364 | 0.364 | 0.364 |

The dependent variable is log weekly earnings. All regressions include state, Census division by year, and industry fixed effects, as well as controls for quadratics in age and tenure, and indicators for high school or less, black, Hispanic, married, union member, metro center status, and female.
SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

JA0401

Figure 6: Heterogeneous Effects of NCA Enforceability on Earnings by Race and Sex



The figure depicts coefficients from two regressions of earnings on NCA Score, interacted with demographic groups. The first regression builds on Column 1 of Table 3, adding indicators for each demographic group, as well as interactions of those indicators with NCA Score (the coefficients on which are depicted in the figure, along with 90% confidence intervals). The second regression adds controls for college education, high-NCA-use occupation, and high-NCA-use industry, and each of these controls interacted with NCA Score. The values in brackets report Bonferroni-corrected p-values for the *difference* between each coefficient and the coefficient for white males, with the main estimates in the first row and the estimates including extra controls in the second row.

JA0402

# A   Formalization of Theory

This appendix considers an augmentation of the model of Bagger et al. (2014). Bagger et al. (2014)'s baseline model of workers' earnings growth over their career uses a search and matching framework with human capital accumulation and on-the-job search. We consider a modification in which some workers sign NCAs with a firm, preventing their job mobility while employed by that firm. We consider channels linking earnings and NCAs posited in Section 2, and derive conditions under which those channels would lead to the expected relationships in the model.

## A.1   Summary of Bagger et al. (2014)

First, we introduce and summarize the model of Bagger et al. (2014). In that model, unemployed and employed workers match with prospective employers at rates $\lambda_0$ and $\lambda_1$, respectively. Workers produce according to their human capital: a worker with human capital level $h_t$ produces, in log terms, $y_t = p + h_t$, where $p$ is the productivity of the firm, drawn from exogenous distribution $F(p)$. Workers are paid according to a piece rate: their earnings are (again, in log terms) $w_t = r + p + h_t$, where $R = e^r \leq 1$ is the piece rate. The logged piece rate, $r$, is actually negative, meaning that it represents the amount of productivity that is "returned" to the employer. When exponentiated, the piece rate, $R$, therefore represents the *share* of productivity that is "returned" to the employer.

When unemployed workers match with a new employer, their earnings are determined by setting the piece rate such that the worker receives a share, $\beta$, of the value of their match above and beyond the value of unemployment, which is assumed to be the value of matching with the least productive firm type, $p_{min}$. Employed workers who contact new employers may leave their current job (if the new employer is able to offer more attractive contract terms) or may leverage an outside offer to receive an earnings increase (if the incumbent employer is able to offer more attractive contract terms), in either case receiving a share, $\beta$, of the match-specific rents above and beyond their relevant threat point. Workers also exogenously separate from their employers at rate $\delta \in [0, 1]$ (and immediately rematch at rate $\kappa \in [0, 1]$), and leave the labor force altogether at exogenous rate $\mu \in [0, 1]$. The discount rate is $\rho$.

We selected this model as a baseline due to the harmony between the drivers of earnings growth in the model and the channels through which NCAs could affect earnings that we discussed in Section 2. In the baseline model, workers' earnings growth occurs because of growth in their human capital, $h_t$, and their ability to search for higher-paying jobs. These two mechanisms for earnings growth match well to potential roles for NCAs. First, NCAs are typically justified as a solution to a hold-up problem, where firms are not willing to invest in workers' human (or other) capital (e.g., training, imparting trade secrets, client lists, etc.) for fear that the

worker will depart the firm and therefore deny the firm its return on investment.[72] Therefore, an NCA in this model should cause $h_t$ to grow at a greater rate, as the firm is more willing to invest in the worker. Second, NCAs prevent workers from changing jobs or threatening to change jobs, meaning that workers will not be able to increase earnings by moving to a firm offering higher earnings, or by leveraging an outside offer to increase their earnings at their current firm. The tradeoff between these two competing mechanisms will partially determine the difference in the rates of earnings growth with and without an NCA for the worker.

## A.2 Modifications to Bagger et al. (2014)

We hypothesize that NCAs and NCA enforceability impact labor markets through three primary channels: first, via the offer arrival rates, second, via human capital accumulation, and third, via the ability of constrained workers to change jobs (and, similarly, to use the threat of changing jobs in earnings bargaining). We model NCA enforceability as an exogenous parameter, $\theta$, which may be viewed as the probability that a randomly selected NCA will be enforced (therefore, $\theta \in [0, 1]$).

The first modification we make is that workers with enforceable NCAs are unable to change jobs. We let workers sign NCAs with exogenous probability $\gamma$ when they commence their first employment relationship, which are enforceable with probability $\theta$. The offer arrival rate of new jobs for employed workers with NCAs is zero, or $\lambda_1^C = 0$, where $C$ indicates that the worker is *constrained* by an enforceable NCA.[73] This modification means that if a worker has an enforceable NCA, they will continue to work for the same employer unless they experience an exogenous separation.[74] Though assuming that NCAs strictly prohibit job changing is a simplification (because, for example, workers may be able to buy out of NCAs or can move to firms in different industries or geographic locations), this assumption substantially improves tractability and does not change the predictions of the model, assuming the friction to job switching is great enough. We could instead model NCAs as introducing a cost

---

[72]One reason that enforceable NCAs might raise investment is due to incomplete markets: namely, that liquidity-constrained workers cannot "pay" for general human capital training in the form of lower initial earnings, but they *can* sign an NCA. See (Rubin and Shedd, 1981) for more discussion on this topic.

[73]The superscript $C$ and $F$ will be used frequently to differentiate functions and parameters that differ between signers (constrained workers) and non-signers (free workers).

[74]We make two additional modifications related to this one. First, we assume that, after an exogenous separation, a worker who had previously signed an NCA will continue to work in a job with an NCA. This assumption significantly increases tractability by limiting flows between the two types of jobs. One way to view this assumption is that workers work in industries that use NCAs or in industries that do not; this could occur due to the value of accumulated industry-specific human capital. The second assumption is that workers may immediately find new work upon an exogenous separation with their employer. This assumption also increases tractability of the model. Furthermore, we view it as reasonable: roughly half of states do not enforce NCAs when employees are fired, leaving such workers able to find other jobs quickly in the event of an involuntary separation.

on job switching. In the limit, if the cost is steep enough to limit job changes, this is identical to assuming that the worker is unable to change jobs.

The second modification we make is assuming that the offer arrival rate for workers without NCAs is lower when NCA enforceability is stricter ($\theta$ is larger). One plausible foundation for this assumption is that, when enforceability is nonexistent, firms can be sure that a worker to whom they offer a job will be unencumbered by an NCA. However, when enforceability is strict, firms may worry that they will ultimately have to pay high costs to buy workers out of their NCA (see, e.g., Shi (2023)) or that the worker ultimately will not be able to work for the offering firm. This higher expected cost or greater uncertainty effectively raises the recruitment cost to the firm, reducing the rate at which firms are willing to make offers (see Starr et al. (2019)). Whether or not this foundation is exactly accurate, the relationship between NCA enforceability and job posting is empirically testable: indeed, we find in Section 5 that NCA enforceability causes lower rates of *vacancy posting* (which, notably, does not simply affect workers bound by NCAs) and higher ratios of unemployed workers to vacancies. These results directly underpin this modification to the model.

Specifically, we allow the offer arrival rate for employed workers without enforceable NCAs (workers who are *free* to move), $\lambda_1^F$, to vary with $\theta$. We assume that $\frac{d\lambda_1^F(\theta)}{d\theta} < 0$: the more strictly NCAs are enforced in the labor market, the less often workers will be contacted on-the-job.

The final modification we make is to assume that workers with enforceable NCAs accumulate human capital at a faster rate. In Bagger et al. (2014), accumulation of human capital, $h_t$, is stochastic, with the deterministic component of workers' human capital at time $t$ represented by $g(t)$. Here, we define $g^C(t)$ and $g^F(t)$ to be the deterministic component of, respectively, a constrained and free worker's human capital at time $t$. Since human capital evolves faster for those with NCAs, if $g^C(t-1) = g^F(t-1)$, then $g^C(t) > g^F(t)$. This assumption is a natural implication of the argument that NCAs solve a hold-up problem. Firms might be unwilling to invest in human capital of workers who can freely leave, because they do not expect to recoup the returns on their investment. NCAs, by ensuring that workers cannot freely leave, incentivize firms to invest in workers, causing workers' human capital to develop more rapidly.[75]

Under these modifications, we now generate multiple predictions which relate directly to the empirical work found in this paper.

---

[75]Rubin and Shedd (1981) formalize this argument in a model of incomplete markets, in which liquidity-constrained workers cannot "pay" for general skills training in the form of lower initial earnings, so signing NCAs is an alternative way to facilitate such training that would not otherwise occur.

## A.3    Effects of Enforceability on Average Earnings

First, we examine what happens to average earnings when NCAs become more easily enforceable (that is, when enforceability becomes "stricter"). Earnings depend on human capital (which develops more rapidly for workers with enforceable NCAs) and on mobility (which is is lower when NCAs are more easily enforceable). This tension generates the ambiguous effect of (enforceable) NCAs on earnings.

Since we do not observe NCA use, our empirical investigation focuses on average earnings (across enforceable NCA signers and non-signers). For notational simplicity, we define $\bar{w}_t^k \equiv E[w_{i,t}|j(i) = k]$ for $k \in \{C, F\}$, where $j(i)$ denotes whether worker $i$ is constrained by an enforceable NCA or free to change jobs. These values represent average earnings, at time $t$, for the two respective types of workers. Thus, the average earnings in period $t$, which we denote $\bar{w}_t$, is given by $\bar{w}_t = \theta\gamma\bar{w}_t^C + (1-\theta\gamma)\bar{w}_t^F$.[76] The value $\theta\gamma$ is the probability that the worker is bound by an enforceable NCA (the product of the probability of having an NCA, $\gamma$, and the probability that it is enforceable, $\theta$).

The quantity we are therefore interested in computing is $\frac{d\bar{w}}{d\theta}$: the change in average earnings which results from a change in NCA enforceability. Omission of the subscript, $t$, indicates that we are interested in the derivative of average earnings in steady state. Taking the derivative and rearranging, this quantity has three components:

$$\frac{d\bar{w}}{d\theta} = \gamma(\bar{w}^C - \bar{w}^F) + \theta\gamma\frac{d\bar{w}^C}{d\theta} + (1-\theta\gamma)\frac{d\bar{w}^F}{d\theta} \qquad (8)$$

We consider each component in turn.

### A.3.1    Difference in Average Earnings

We begin with $\gamma(\bar{w}^C - \bar{w}^F)$. Intuitively, this term captures the additional weight put on earnings of workers subject to enforceable NCAs in overall average earnings. As $\theta$ rises, more workers are subject to enforceable NCAs, and the overall average is pushed closer to average earnings for constrained workers, $\bar{w}^C$.

As in Bagger et al. (2014), with our modifications, the earnings of worker $i$ at any time $t$ is given by $w_{i,t} = \alpha_i + g^{j(i)}(t) + \varepsilon_{i,t} + p_{i,t} + r$, where $\alpha_i$ is a worker heterogeneity parameter, $g^{j(i)}(t)$ is the deterministic component of human capital accumulation of the worker, and $\varepsilon_{i,t}$ is a stochastic worker human capital shock. Firm productivity, $p_{i,t}$ (where $i$ represents the worker and $t$ represents time), and $r$ (the piece rate of the worker) round out earnings.

In order to calculate the difference in earnings across workers with and without enforceable NCAs, we compare the individual components of earnings. By assump-

---

[76]Note that flow balance into and out of unemployment implies that an identical proportion of $C$ and $F$ type workers are employed in steady state, and we therefore may omit that proportion in calculation of average earnings.

tion, $\varepsilon$ is distributed identically across workers and across time, and $\alpha$ is distributed identically across workers, so in expectation, there are no differences in $\varepsilon$ or $\alpha$ for workers with and without enforceable NCAs.

By assumption, human capital evolves at a higher rate for those with enforceable NCAs: if $g^C(t-1) = g^F(t-1)$, then $g^C(t) > g^F(t)$.

What is left to compare are firm productivities and the piece rates of workers. Workers with NCAs will face a worse (i.e., first order stochastically dominated) distribution of firm productivities because they are unable to search for higher-paying jobs—*i.e.* they are unable to climb the job ladder. In fact, since they are immobile and exit occurs independently of firm productivity, the distribution of productivities at firms at which NCA-constrained workers are employed (denoted by $L^C(p)$) is exactly equal to the exogenous productivity distribution for a worker entering employment: $L^C(p) = F(p)$.[77]

The steady state distribution for those who do not have enforceable NCAs is derived in Bagger et al. (2014) (equation A15): $L^F(p) = \frac{(\mu+\delta)F(p)}{\mu+\delta+\lambda_1(\theta)\bar{F}(p)}$, where $\bar{F}(p) = 1 - F(p)$. Since workers only move *up* the job ladder, $L^F(p)$ first-order stochastically dominates $L^C(p)$, regardless of the value of $\theta$. Note that, since $\lambda_1'(\theta) < 0$ by assumption, as enforceability becomes stricter, the distribution of firm productivities shifts leftwards (i.e., $\frac{dL^F(p)}{d\theta} \geq 0 \; \forall p$).

Finally, we turn to piece rates. Piece rates for workers without enforceable NCAs evolve identically to those in the baseline model of Bagger et al. (2014). However, the piece rate for enforceable NCA signers does not evolve over time: lacking the ability to change the piece rate by leveraging outside offers or engaging in job-to-job mobility, the piece rate for a worker with an NCA is determined at the advent of their job spell.

In Bagger et al. (2014), the piece rate ($r$) is a function of the most recent firm from which the worker was able to, or would have been able to, extract all available surplus (by virtue of having a high enough competing offer)[78]:

$$r = -\int_{q_{i,t}}^{p_{i,t}} \phi(x,\theta)dx$$

---

[77]We note that an alternate modeling assumption would be that NCAs directly affect the productivity distribution of firms. For example, strict NCA enforceability could directly reduce productivity, as might be suggested by work showing that firms are less innovative when NCAs are more enforceable (Johnson et al., 2023). One concern might be that this assumption generates dynamics in *average* wages that are similar to the effects of enforceability on average earnings that we present in Section 4, making it hard to disentangle whether our proposed mechanism or this alternative assumption drives these empirical results. However, this alternative assumption cannot explain other results, such as those in Sections 5 and 6.2 that show heterogeneous earnings effects, which *can* be explained by our own modeling assumptions.

[78]Note that the piece rate is negative: earnings are given by $w_t = r + p + h_t$, where $p + h_t$ is the marginal product of the worker ($p$ is the firm's productivity and $h_t$ is the worker's productivity due to human capital accumulation). Therefore, the piece rate $r$ represents the share of the worker's productivity that is allocated to the firm.

where $\phi(x,\theta) = (1-\beta)\frac{\rho+\delta+\mu+\lambda_1(\theta)\bar{F}(x)}{\rho+\delta+\mu+\lambda_1(\theta)\beta\bar{F}(x)}$, $\bar{F}(x) = 1 - F(x)$ is the exogenous distribution of firm productivities from which workers draw upon matching with a firm, and $q_{i,t}$ represents the productivity of the last firm from which the worker was able to extract all surplus, by virtue of leveraging a competing offer (see Equation 6 in Bagger et al. (2014) for details on the derivation of this equation). The greater is $q_{i,t}$, the greater the worker's earnings will be. If $q_{i,t} = p_{i,t}$, then the worker was able to extract all surplus from their current firm and therefore $r = 0$: they return none of the full value of productivity to the employer.

In the case of an enforceable NCA signer, the last "job" from which the worker was able to extract all surplus was unemployment, since workers cannot leverage outside options or job hop. The piece rate of signers is therefore determined by the worker having outside option $p_{min}$ (the lowest productivity a firm can have), since by assumption, the value of unemployment is equal to the value of employment in the least productive firm. Simplifying (since $\lambda_1^C = 0$ for signers by assumption), the piece rate of NCA signers will be:

$$r = -\int_{p_{min}}^{p_{i,t}} \phi(x,\theta)dx$$
$$= -\int_{p_{min}}^{p_{i,t}} (1-\beta)\frac{\rho+\delta+\mu+\lambda_1^C\bar{F}(x)}{\rho+\delta+\mu+\lambda_1^C\beta\bar{F}(x)}dx \qquad = -(p_{i,t}-p_{min})(1-\beta)$$

The earnings processes of signers of enforceable NCAs versus nonsigners are therefore given by:

$$\text{Nonsigners: } w_{i,t}^F = \alpha_i + g^F(t) + \varepsilon_{i,t} + p_{i,t} - \int_{q_{i,t}}^{p_{i,t}} \phi(x,\theta)dx$$
$$\text{Signers: } w_{i,t}^C = \alpha_i + g^C(t) + \varepsilon_{i,t} + p_{i,t} - (p_{i,t}-p_{min})(1-\beta) \qquad (9)$$

We now compare *expected* earnings for workers with and without an NCA. First, we examine workers new to the workforce:

**Proposition A.1.** *In steady state, workers signing enforceable NCAs will receive higher initial earnings in expectation than workers not signing NCAs: for $i$ that transition from unemployment to work in period $t$, $E_{i,t-1}[w_{i,t}|j(i) = C] > E_{i,t-1}[w_{i,t}|j(i) = F]$.*

*Proof.* In the first period in which workers match, the firm productivity distributions are identical (since workers have not had a chance to switch jobs). In expectation, $\alpha_i$ and $\varepsilon_{i,t}$ are identical for those with and without NCAs. By assumption, $E_{t-1}[g^C(t)] > E_{t-1}[g^F(t)]$, so the proposition is proven if

$$E_{i,t}[(p_{i,t}-p_{min})(1-\beta)] < E_{i,t}\left[\int_{p_{min}}^{p_{i,t}} \phi(x,\theta)dx\right],$$

67

**JA0408**

since the worker initially bargains with outside option $p_{min}$.

Rewriting the left hand side, we must show that

$$E_{i,t}\left[\int_{p_{min}}^{p_{i,t}}(1-\beta)dx\right] < E_{i,t}\left[\int_{p_{min}}^{p_{i,t}}\phi(x,\theta)dx\right],$$

which is true since $\phi(x,\theta) > (1-\beta) > 0$, regardless of the value of $\theta$. $\qquad\square$

The proof of this proposition highlights two reasons for greater (initial) pay with enforceable NCAs: first, a greater accumulation of human capital leading to greater productivity, and second, the compensating differential associated with NCAs (which is embedded in $\phi(x,\theta)$). Workers who initially match with NCAs are compensated to some extent for their limited future mobility.

However, as workers remain at their jobs longer, three things happen: first, workers with enforceable NCAs accumulate more human capital. Second, workers without enforceable NCAs climb the job ladder, moving to jobs with greater firm productivities, $p_{i,t}$. Third, when workers without enforceable NCAs leverage outside offers, they negotiate better piece rates, $r$. The first increases earnings by more for those who sign enforceable NCAs, while the latter two increase earnings by more for those who do not sign enforceable NCAs. The overall comparison, then, is indeterminate: if human capital grows more quickly than mobile workers climb the job ladder and negotiate better piece rates, workers with NCAs will have earnings that grow more quickly than those without, and vice versa. We summarize in Proposition A.2, but first introduce the condition used in the proposition. The condition states that the growth rate of human capital is lower than the growth rate of the lost ability of the worker to bargain for higher earnings. Ultimately, the goal of the proposition is to show that there is a direct tradeoff between human capital growth and job mobility which governs earnings dynamics.

**Condition 1.**

$$E_t[(g^C(t+1) - g^C(t)) - (g^F(t+1) - g^F(t))]$$
$$< \left(\int_{q_{j,t}}^{p_{j,t}}\int_{p_{j,t-1}}^{p}\phi(x,\theta)dxdF(p)\right)$$
$$+ \left(\int_{p_{j,t}}^{p_{max}}p - p_{j,t} - \left(\int_{p_{j,t}}^{p}\phi(x,\theta)dx - \int_{q_{j,t}}^{p_{j,t}}\phi(x,\theta)dx\right)dF(p)\right)$$

**Proposition A.2.** *Suppose worker $i$ has an enforceable NCA and worker $k$ does not. Conditional on remaining employed and experiencing identical shocks in period $t$ (i.e., $\varepsilon_{i,t} = \varepsilon_{k,t}$), in steady state, expected earnings growth is faster for $k$ than for $i$ under Condition 1: i.e., $E_t[w_{i,t+1}] - w_{i,t} < E_t[w_{k,t+1}] - w_{k,t}$ whenever Condition 1 holds, and $E_t[w_{i_t+1}] - w_{i,t} > E_t[w_{k,t+1}] - w_{k,t}$ when it does not.*

*Proof.* The condition is a (reversible) algebraic simplification of the inequality $E_t[w_{i_{t+1}}] - w_{i,t} < E_t[w_{k,t+1}] - w_{k,t}$. The left hand side may be rewritten as:

$$E_t[\alpha_i + \varepsilon_{i,t+1} + g^C(t+1) + p_{i,t+1} - (1-\beta)(p_{i,t+1} - p_{min})] - [\alpha_i + \varepsilon_{i,t} + g^C(t) + p_{i,t} - (1-\beta)(p_{i,t} - p_{min})]$$

Since $p_{i,t} = p_{i,t+1}$ for $i$, who has an NCA, this reduces to $E_t[g^C(t+1) - g^C(t) + \varepsilon_{i,t+1} - \varepsilon_{i,t}]$. The right hand side may be rewritten as

$$E_t[\alpha_k + \varepsilon_{k,t+1} + g^F(t+1) + p_{k,t+1} - \int_{q_{k,t+1}}^{p_{k,t+1}} \phi(x,\theta)dx] - [\alpha_k + \varepsilon_{k,t} + g^F(t) + p_{k,t} - \int_{q_{k,t}}^{p_{k,t}} \phi(x,\theta)dx]$$

$$= E_t[g^F(t+1) - g^F(t) + \varepsilon_{k,t+1} - \varepsilon_{k,t}]$$
$$- \left[ \int_{q_{k,t}}^{p_{k,t}} \left( \int_p^{p_{k,t}} \phi(x,\theta)dx - \int_{q_{k,t}}^{p_{k,t}} \phi(x,\theta)dx \right) dF(p) \right]$$
$$+ \left[ \int_{p_{k,t}}^{p_{max}} p - p_{k,t} - \left( \int_{p_{k,t}}^{p} \phi(x,\theta)dx - \int_{q_{k,t}}^{p_{k,t}} \phi(x,\theta)dx \right) dF(p) \right]$$

$$= E_t[g^F(t+1) - g^F(t) + \varepsilon_{k,t+1} - \varepsilon_{k,t}]$$
$$+ \left( \int_{q_{k,t}}^{p_{k,t}} \int_{q_{k,t}}^{p} \phi(x,\theta)dxdF(p) \right)$$
$$+ \left[ \int_{p_{k,t}}^{p_{max}} p - p_{k,t} - \left( \int_{p_{k,t}}^{p} \phi(x,\theta)dx - \int_{q_{k,t}}^{p_{k,t}} \phi(x,\theta)dx \right) dF(p) \right]$$

We expand the expectation by using the fact that the lowest productivity level a worker will be able to leverage to achieve an increase in earnings is $q_{k,t}$. If the worker contacts a new employer whose productivity is less than $q_{k,t}$, productivity will not change and the worker will not renegotiate the piece rate. If the worker contacts a new employer with productivity between $q_{k,t}$ and $p_{k,t}$, they will remain employed at productivity $p_{k,t}$ but will renegotiate the piece rate. Finally, if the worker contacts a new employer with productivity above $p_{k,t}$, the worker will change jobs, changing both productivity and the piece rate.

Combination of the reduced right and left hand sides yields the condition stated in the proposition. □

Proposition A.2 simplifies the condition under which workers have larger earnings growth with NCAs versus without. An alternative way of interpreting this proposition is that, when the inequality condition holds, workers without NCAs will see earnings increases relative to workers with NCAs.

Averaging over workers in the population, Propositions A.1 and A.2 immediately generates an indeterminacy with respect to the overall rank ordering of average earnings. When Condition 1 does not hold, average *initial* earnings are greater for workers with enforceable NCAs and earnings growth is faster for workers with enforceable

NCAs, meaning that average earnings for workers with enforceable NCAs are greater than for those without. However, when Condition 1 holds, greater earnings growth for workers without enforceable NCAs may overtake greater initial earnings for workers with enforceable NCAs, leading to the possibility that average earnings are greater for workers without enforceable NCAs.

**Corollary A.3.** *Condition 1 is necessary, but not sufficient, for $\bar{w}_t^F > \bar{w}_t^C$.*

### A.3.2   Effects on Average Earnings for Constrained and Free Workers

The impact of $\theta$ on $\bar{w}_t^C$ is straightforward:

**Proposition A.4.** $\frac{d\bar{w}_t^C}{d\theta} = 0$

*Proof.* Using Equation 9:

$$\frac{d\bar{w}_t^C}{d\theta} = \frac{d}{d\theta}\left[E[\alpha_i + g^C(t) + \varepsilon_{i,t} + p_{i,t} - (p_{i,t} - p_{min})(1-\beta)]\right]$$

Since the distribution of $p_{i,t}$, $L^C(p)$, is independent of $\theta$ (since it is always equal to $F(p)$), and since $\frac{dE[\alpha_i]}{d\theta} = \frac{dE[\varepsilon_{i,t}]}{d\theta} = \frac{dE[g^C(t)]}{d\theta} = 0$, the proposition is shown. □

The impact of $\theta$ on $\bar{w}_t^F$ is less straightforward. In Bagger et al. (2014), the value function for a given worker is given by $V(r, h_t, p)$, and the value function of an unemployed worker (who does not have a piece rate, $r$, or a productivity, $p$) is given by $V_0(h_t)$. It is straightforward to write $V_0(h_t)$ recursively, using the transition probabilities given in Bagger et al. (2014), as:

$$V_0(h_t) = w_u + \frac{\lambda_0}{1+\rho}\int_{p_{min}}^{p_{max}} E_t[V(r_0, h_{t+1}, x)]dF(x) + \frac{1-\lambda_0}{1+\rho}V_0(h_t), \qquad (10)$$

where $w_u$ represents the flow value of unemployment.

We index workers such that workers $i \in [0, u]$ are unemployed, and workers $i \in [u, 1]$ are employed. Let average earnings in period $t$ for workers who do not have enforceable NCAs be given by $\bar{w}_t^F = \int_{i=u}^1 w_{i,t}di$, and let $\bar{w}$ represent average earnings in steady state. Then:

**Proposition A.5.** *In steady state, average earnings are increasing in the arrival rate of offers to employed workers. Formally, $\frac{d\bar{w}}{d\lambda_1} > 0$.*

*Proof.* Consider the generic value functions for employed and unemployed workers, $V(r, h_t, p)$ and $V_0(h_t)$. Integrating each across workers and summing the two expressions yields

$$\int_0^u V(0, h_{i,t})di + \int_u^1 V(r_i, h_{i,t}, p_i)di,$$

70

where variables indexed by $i$ represent worker $i$'s human capital, piece rate, or the productivity of their matched firm, respectively.

Using the recursive definition of $V(r, h_t, p)$ given by Equation 5 in Bagger et al. (2014), as well as the recursive definition of $V_0(h_t)$ given in Equation 10, and simplifying (making use of the fact that, in steady state, the distribution of $h$ is identical across time periods), this expression may be written as:

$$\frac{1+\rho}{\rho}\left(\int_{i=0}^{u} V(0, h_{i,t})di + \int_{i=u}^{1} V(r_i, h_{i,t}, p_i)di\right) = \int_{i=0}^{u} w_u di + \int_{i=u}^{1} w_{i,t}di$$

This expression is intuitive: the sum of the per-period value accrued by workers in the model is given by the sum of payments to unemployed workers and payments to employed workers. Taking derivatives of both sides with respect to $\lambda_1$, and exchanging the order of differentiation and integration (since $u$ is not a function of $\lambda_1$, as shown in Bagger et al. (2014)), we generate the following expression for $\frac{d\bar{w}}{d\lambda_1}$:

$$\frac{d\bar{w}_t}{d\lambda_1} = \int_{i=0}^{u} \frac{dV(0, h_{i,t})}{d\lambda_1}di + \int_{i=u}^{1} \frac{dV(r_i, h_{i,t}, p_i)}{d\lambda_1}di \tag{11}$$

It therefore suffices to show that the right hand side is positive.

The first term may be rewritten to simplify the proof of this fact. First, we substitute for $V(r_0, h_t + 1, x)$ using Equation (3) in Bagger et al. (2014) into Equation 10:

$$V_0(h_t) = w_u + \frac{\lambda_0}{1+\rho}\int_{p_{min}}^{p_{max}} (1-\beta)V_0(h_t) + \beta E_t[V(0, h_{t+1}, x)]dF(x) + \frac{1-\lambda_0}{1+\rho}V_0(h_t),$$

Next, we solve for $V_0(h_t)$:

$$V_0(h_t) = \frac{1+\rho}{\rho + \lambda_0\beta}w_u + \frac{\lambda_0\beta}{1+\rho}\int_{p_{min}}^{p_{max}} E_t\left[V(0, h_{t+1}, x)\right]dF(x)$$

Therefore, for worker $i$:

$$\frac{dV(0, h_{i,t})}{d\lambda_1} = \frac{\lambda_0\beta}{1+\rho}\int_{p_{min}}^{p_{max}} E_t[\frac{dV(0, h_{t+1}, x)}{d\lambda_1}]dF(x) \tag{12}$$

Moving to the second term of the right hand side of Equation 11, Equation (2), the unnumbered equation which follows (2), and Equation (3) from Bagger et al. (2014) show that each $V(r_i, h_{i,t}, p_i)$ may be rewritten as either:

$$(1-\beta)E_t[V(0, h_{t+1}, p')] + \beta E_t[V(0, h_{t+1}, p)]$$

or

$$(1 - \beta)V_0(h_t) + \beta E_t[V(0, h_{t+1}, p)]$$

Therefore, given these expressions and Equation 12, the proposition is proven if $\frac{dV(0,h_t,p)}{d\lambda_1} > 0$, $\forall h_t, p$.

This fact is straightforward. Consider Equation (5) in Bagger et al. (2014), the recursive definition of $V(r, h_t, p)$. Since $r = 0$ in the case we are considering, an increase in $\lambda_1$ simply increases the probability that the worker moves to a higher quality firm to get paid more (the third line of Equation (5)) or stays at their current firm but negotiates better earnings (the fourth line), and decreases the probability that the worker stays at their current firm. Therefore, the result is shown.    □

Since $\frac{d\bar{w}^F}{d\theta} = \frac{d\bar{w}^F}{d\lambda_1} \cdot \frac{d\lambda_1}{d\theta}$, and since $\frac{d\lambda_1}{d\theta} < 0$ by assumption, we immediately get the following results:

**Corollary A.6.** $\frac{d\bar{w}^F}{d\theta} < 0$ $and$ $\frac{d\left[\frac{d\bar{w}^F}{d\theta}\right]}{d\left[\frac{d\lambda_1}{d\theta}\right]} > 0$

The first result says that earnings for free workers are decreasing in NCA enforceability. The second result says that the relationship between NCA enforceability and earnings for free workers is steeper when NCA enforceability has a greater (negative) impact on the arrival rate of offers.

### A.3.3   Overall Effect on Average Earnings

We now return to the overall effect of $\theta$ on average earnings, $\frac{d\bar{W}}{d\theta}$. First, we may reduce Equation 8 using Proposition A.4:

$$\frac{d\bar{w}}{d\theta} = \gamma(\bar{w}^C - \bar{w}^F) + (1 - \theta\gamma)\frac{d\bar{w}^F}{d\theta} \tag{13}$$

Due to the indeterminacy in the sign of $\bar{w}^C - \bar{w}^F$, the sign of the overall expression is also indeterminate. If $\bar{w}^C - \bar{w}^F < 0$, then by A.6, $\frac{d\bar{w}}{d\theta} < 0$. If $\bar{w}^C - \bar{w}^F > 0$, then $\frac{d\bar{w}}{d\theta}$ may be positive or negative.

## A.4   Empirical Implications of Theoretical Results

Overall, our empirical results are able to address several of the model's implications.

First, our results in Section 4 resolve the indeterminacy of the sign of $\frac{d\bar{w}}{d\theta}$.

Second, our results in Section 5 test the model's prediction that $\frac{d\bar{w}^F}{d\theta} < 0$ (the first half of Corollary A.6).

Third, in Section 6, we test the second half of Corollary A.6: that stricter NCA enforceability will have a more negative effect on earnings when enforceability has a larger impact on a worker's offer arrival rate. We test this corollary two ways. In Section 6.1, we directly test this prediction by estimating whether the earnings

72

effect of NCA enforceability are heterogeneous depending on the degree to which workers' offer arrival rates would be affected by NCA enforceability. In Section 6.2, we indirectly test this prediction by estimating whether strict NCA enforceability attenuates the degree to which strong labor market conditions translate into higher earnings over the course of a worker's job spell.

# B    Appendix Figures & Tables

JA0415

Figure B.1: The Distribution in NCA Scores Across states, 1991–2014 (in Levels and Changes)

(a) NCA score levels



(b) NCA score changes



*Notes.* Panel (a) is a histogram of the NCA enforceability score in levels, at the state-year level over our sample period 1991–2014. Panel (b) is a histogram of the size (in absolute value) of score changes over this same sample period.

JA0416

Figure B.2: Do NCA Court Filings Increase Prior to Legal Changes?



Notes: This figure presents the pre-period of a stacked difference-in-difference design, where the coefficients (vertical axis) represent the net impact of being in the state which has a future legal change versus states which do not.

Table B.1: The Effect of NCA Enforceability on Earnings:
Robustness to Political & Economic Controls

| | Log Earnings | | Log Hours | Log Wage | Log Average Earnings |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| NCA Enforceability Score | -0.095*** | -0.087*** | -0.025* | -0.085*** | -0.121*** |
| | (0.031) | (0.023) | (0.013) | (0.022) | (0.030) |
| Observations | 1184797 | 1184797 | 1506230 | 1184797 | 3459572 |
| $R^2$ | 0.275 | 0.357 | 0.132 | 0.346 | 0.941 |
| Geographic FE | State | State | State | State | County |
| Time FE | Div x Year | Div x Year | Div x Year | Div x Year | Div x Quarter |
| Occupation FE | N | Y | Y | Y | N |
| Sample | ASEC | ASEC | ASEC | ASEC | QWI |

This table replicates Table 3, but additionally controls for all variables introduced in Table 2 except ideology variables and variables that are themselves directly related to labor market outcomes (unemployment, Medicaid enrollment, and union membership). SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

JA0418

Table B.2: The Effect of NCA Enforceability on Earnings, by Component of NCA Score

| | | |
|---|---|---|
| Q1: State Statute | -0.029 | (0.025) |
| Q2: Protectable Interest | -0.051** | (0.025) |
| Q3: Plaintiff Burden of Proof | 0.033 | (0.031) |
| Q3a: Consideration, Start of Employment | -0.051*** | (0.013) |
| Q3b/c: Consideration, Continued Employment | -0.029** | (0.012) |
| Q4: Judicial Modification | -0.023 | (0.016) |
| Q8: Enforceable if Employer Terminates | 0.001 | (0.035) |
| NCA Score without Question 1 | -0.117*** | (0.037) |
| Observations | 1216726 | |

Each of the first seven rows represents a separate regression (corresponding to Column 1 of Table 3) in which the variable $Enforceability_{st}$ in Equation 2 has been replaced with each component of the NCA Enforceability Score separately. The coefficient on the score component is reported, alongside SEs clustered by state in parentheses. The final row uses as an independent variable a modified NCA Enforceability Score that omits the score for Q1 (whether there exists a state statute that governs NCA enforceability) in the calculation, but is otherwise equivalent to the NCA Enforceability Score used in the main analysis.

***P<.01, **P<.05, *P<.1

JA0419

Table B.3: The Effect of NCA Enforceability on Earnings: Heterogeneity by Magnitude, Direction, and Source of Law Changes (Stacked Design)

| | (1) Baseline | (2) Extensive | (3) + change | (4) - change | (5) small change | (6) big change |
|---|---|---|---|---|---|---|
| NCA score | -0.246*** | | | | | |
| | (0.070) | | | | | |
| Has NCA change (signed) | | -0.018*** | -0.018** | -0.018** | -0.017*** | -0.024** |
| | | (0.005) | (0.008) | (0.007) | (0.006) | (0.010) |
| Observations | 5,698,274 | 5,698,274 | 3,971,622 | 1,726,652 | 2,854,985 | 2,843,289 |
| $R^2$ | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.95 |
| Mean NCA score change | | 0.077 | 0.095 | 0.045 | 0.039 | 0.121 |

Each column reports the main regression coefficient from the stacked diff-in-diff model in Equation 3, with various modifications described in the table footer.
SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

Figure B.3: Estimated Effect of NCA Enforceability on Earnings, from Separate Stacked Diff-in-diff Models for Each Focal State



Notes: This figure presents the point estimate and 95% confidence interval from separate stacked difference-in-difference models estimated separately for each "focal" treatment state in the estimation sample for the stacked event study model described in Section 4.2.2.

JA0421

Figure B.4: Long-Panel Event Study



The sample includes the years 1991-1993 and 2012-2014 for each state, dropping "odd year out" observations for each state (for states for which there were enforceability changes in the first three years or in the last three years). The estimating equation includes controls for sex, age, age squared, level of education, race, Hispanic status, and whether or not the respondent lives in a metropolitan area, as well as state and Census division-by-year fixed effects. Coefficient estimates and 95% confidence intervals pictured (normalized to coefficient estimate for 1993).

JA0422

Table B.4: The Effect of NCA Enforceability on Earnings: Excluding States in which NCA Law Changes Could in Theory be Endogenous

|  | (1) Log Earnings | (2) | (3) Log Hours | (4) Log Wage | (5) Log Average Earnings |
|---|---|---|---|---|---|
| **Panel A**: Drop States with a Legislative NCA Law Change | | | | | |
| NCA Enforceability Score | -0.136** | -0.120*** | -0.013 | -0.122*** | -0.109 |
|  | (0.056) | (0.044) | (0.027) | (0.042) | (0.071) |
| Observations | 1055609 | 1055609 | 1346663 | 1055609 | 2926080 |
| $R^2$ | 0.278 | 0.362 | 0.134 | 0.350 | 0.942 |
| **Panel B**: Drop States with Partisan Judicial Elections | | | | | |
| NCA Enforceability Score | -0.135*** | -0.121*** | -0.041*** | -0.122*** | -0.156*** |
|  | (0.043) | (0.033) | (0.013) | (0.033) | (0.039) |
| Observations | 989854 | 989854 | 1262128 | 989854 | 2696241 |
| $R^2$ | 0.272 | 0.356 | 0.130 | 0.345 | 0.941 |
| **Panel C**: Drop States with Judicial Elections (Partisan or Non-Partisan) | | | | | |
| NCA Enforceability Score | -0.128 | -0.122 | -0.038* | -0.117 | -0.113 |
|  | (0.095) | (0.078) | (0.019) | (0.077) | (0.090) |
| Observations | 699036 | 699036 | 890737 | 699036 | 1531774 |
| $R^2$ | 0.272 | 0.359 | 0.128 | 0.348 | 0.942 |
| Geographic FE | State | State | State | State | County |
| Time FE | Div x Year | Div x Year | Div x Year | Div x Year | Div x Year-Quarter |
| Occupation FE | N | Y | Y | Y | N |
| Sample | ASEC | ASEC | ASEC | ASEC | QWI |

This table replicates Table 3, but with different sample restrictions in each panel. Panel A drops the 8 states that ever experience a legislative NCA enforceability change. Panel B drops the 6 states in which judges are selected via partisan election. Panel C drops the 21 states in which judges are selected via election (partisan or non-partisan)

SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

JA0423

Table B.5: The External Effects of NCA Enforceability on Earnings (Weighted by Employment)

|  | (1) | (2) | (3) |
|---|---|---|---|
| Own State NCA Score | -0.067* | -0.067* | -0.057 |
|  | (0.035) | (0.036) | (0.047) |
| Donor State NCA Score |  | -0.002 | -0.109 |
|  |  | (0.056) | (0.067) |
| Own Cty Emp/CZ Emp × Own State NCA Score |  |  | -0.054 |
|  |  |  | (0.091) |
| Own Cty Emp/CZ Emp × Donor State NCA Score |  |  | 0.263** |
|  |  |  | (0.110) |
| Observations | 613762 | 613762 | 613762 |
| $R^2$ | 0.944 | 0.944 | 0.944 |

The dependent variable is log earnings. The sample is the QWI from 1991-2014 and includes individuals between ages 19-64. All regressions include controls for male, age group, as well as division by year by quarter and county fixed effects. Own Cty Emp/CZ Emp is the ratio of sex- and age-group-specific employment in own county divided by sex- and age-group-specific employment in the entire commuting zone. Each regression is weighted by cell-specific employment. Standard errors are clustered by own state in Column (1), and two-way clustered by own state and commuting zone in columns (2) and (3). ***P<.01, **P<.05, *P<.1

JA0424

Table B.6: The External Effects of NCA Enforceability on Earnings on Counties Far from State Borders

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Own State NCA Score | -0.184*** | -0.182*** | -0.147*** | -0.073 |
|  | (0.061) | (0.060) | (0.053) | (0.181) |
| Nearest Neighboring State's NCA Score | -0.152** | -0.059 | -0.027 | 0.036 |
|  | (0.060) | (0.061) | (0.059) | (0.092) |
| Observations | 615191 | 2015843 | 1595005 | 545732 |
| $R^2$ | 0.899 | 0.889 | 0.887 | 0.874 |
| Border Sample | Y | N | N | N |
| Distance to Nearest State Restriction | None | None | 50 miles | 100 miles |

The dependent variable is log earnings. The sample is the QWI from 1991-2014 and includes individuals between ages 19-64. Column 1 uses the sample from Table 7, while Columns 2, 3, and 4 use counties that are neither on state borders nor members of border-straddling commuting zones. Columns 3 and 4 further restrict by the distance from the focal county's centroid to the nearest county centroid in a different state. All regressions include controls for male, age group, as well as division by year by quarter and county fixed effects. Standard errors are clustered by own state. ***P<.01, **P<.05, *P<.1

JA0425

Table B.7: The External Effects of NCA Enforceability on Mobility:
Hires and Separations

| | Hires | | | Separations | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Own State NCA Score | -0.277** | -0.292** | -0.221 | -0.256* | -0.275* | -0.189 |
| | (0.129) | (0.141) | (0.159) | (0.152) | (0.162) | (0.182) |
| Donor State NCA Score | | -0.099 | -0.171 | | -0.129 | -0.198 |
| | | (0.143) | (0.166) | | (0.145) | (0.169) |
| Own Cty Emp/CZ Emp × Own State NCA Score | | | -0.429 | | | -0.518 |
| | | | (0.533) | | | (0.570) |
| Own Cty Emp/CZ Emp × Donor State NCA Score | | | 0.396** | | | 0.396** |
| | | | (0.169) | | | (0.165) |
| Observations | 603965 | 603965 | 603108 | 604160 | 604160 | 603300 |
| $R^2$ | 0.951 | 0.951 | 0.952 | 0.950 | 0.950 | 0.951 |
| Sample | Border | Border | Border | Border | Border | Border |

The sample is the QWI from 1991-2014 and includes individuals between ages 19-64. All regressions include controls for male, age group, as well as division by year by quarter and county fixed effects. Standard errors are clustered by own state in columns (1) and (4), and two-way clustered by own state and commuting zone in columns (2), (3), (5), and (6). ***P<.01, **P<.05, *P<.1

Table B.8: The Effect of NCA Enforceability on Earnings as Potentially Contaminated Control Groups Are Removed

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Own State NCA Score | -0.137*** | -0.159*** | -0.293*** | -0.603*** |
| | (0.034) | (0.033) | (0.073) | (0.194) |
| Observations | 3548827 | 1860301 | 1078739 | 602968 |
| $R^2$ | 0.941 | 0.941 | 0.941 | 0.941 |
| Sample Restriction | No restriction | Distance > 50 miles | Distance > 75 miles | Distance > 100 miles |

The sample is the QWI from 1991-2014 and includes individuals between ages 19-64. All regressions include controls for male, age group, as well as division by year by quarter and county fixed effects, and are identical to Column 5 of Table 3 with different samples. Columns (2), (3), and (4) include only counties whose centroids are at least the specified distance away from the nearest county centroid in a different state. Standard errors are clustered by state. ***P<.01, **P<.05, *P<.1

Table B.9: Heterogeneous Earnings Effects Based on the "Bite" of NCA Enforceability on Workers' Outside Options

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Dependent variable: | Log (Average Quarterly Earnings) | | Log (Weekly Earnings) | |
| Sample: | QWI | | CPS | |
| NCA Enforceability Score | -0.091** | -0.109** | -0.088* | -0.065 |
| | (0.027) | (0.030) | (0.043) | (0.042) |
| NCA Enforceability Score × Industry's State leave share [US] | 0.050+ | 0.043+ | | |
| | (0.025) | (0.021) | | |
| NCA Enforceability Score × Occupation's occupational leave share | | | 0.011** | 0.011** |
| | | | (0.003) | (0.003) |
| High NCA Use Industry=1 × NCA Enforceability Score | | 0.049 | | |
| | | (0.046) | | |
| High NCA Use Occ=1 × NCA Enforceability Score | | | | -0.044** |
| | | | | (0.016) |
| Observations | 1075767 | 1075767 | 739219 | 739219 |

Each column contains coefficients from a pooled regression across industries or occupations, comparable to Equation 2. Columns (1) - (2) interact NCA Enforceability with the industry's state leave share (defined as the share of job-to-job changes in that industry from 2001–2006 in which the worker moved across state lines) using J2J data. Columns (3) and (4) use occupational leave share (defined as the share of job changes in an occupation in which the worker moved to a different occupation), calculated using data from Schubert et al. (2021)).

**P<.01, *P<.05, +P<.1

JA0427

Table B.10: Heterogeneous Effects of NCA Enforceability on Earnings by Race and Sex

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| NCA Score | -0.131*** | | | |
| | (0.049) | | | |
| Female & White | -0.469*** | -0.418*** | -0.424*** | -0.417*** |
| | (0.011) | (0.025) | (0.025) | (0.025) |
| Female & Black | -0.572*** | -0.521*** | -0.528*** | -0.515*** |
| | (0.011) | (0.025) | (0.024) | (0.029) |
| Male & Black | -0.339*** | -0.281*** | -0.283*** | -0.272*** |
| | (0.008) | (0.016) | (0.017) | (0.015) |
| Female & Not Black or White | -0.502*** | -0.427*** | -0.441*** | -0.439*** |
| | (0.019) | (0.015) | (0.013) | (0.015) |
| Male & Not Black or White | -0.146*** | -0.133*** | -0.144*** | -0.142*** |
| | (0.010) | (0.016) | (0.015) | (0.014) |
| White Male × NCA Score | | -0.087* | -0.029 | -0.067 |
| | | (0.050) | (0.056) | (0.050) |
| Female & White × NCA Score | | -0.161*** | -0.094* | -0.135** |
| | | (0.058) | (0.056) | (0.055) |
| Female & Black × NCA Score | | -0.160*** | -0.092* | -0.148*** |
| | | (0.054) | (0.052) | (0.053) |
| Male & Black × NCA Score | | -0.170*** | -0.109* | -0.129** |
| | | (0.052) | (0.059) | (0.051) |
| Female & Not Black or White × NCA Score | | -0.214*** | -0.136*** | -0.194*** |
| | | (0.047) | (0.048) | (0.045) |
| Male & Not Black or White × NCA Score | | -0.102** | -0.027 | -0.080* |
| | | (0.048) | (0.048) | (0.045) |
| College Educated Worker × NCA Score | | | -0.110*** | |
| | | | (0.025) | |
| High NCA Use Occ × NCA Score | | | | -0.037*** |
| | | | | (0.012) |
| Observations | 1537454 | 1537454 | 1537454 | 1537454 |
| $R^2$ | 0.275 | 0.275 | 0.276 | 0.289 |

The dependent variable is log weekly earnings. The sample in all columns is the CPS ASEC from 1991-2014 and includes individuals between ages 18-64 who reported working for wage and salary income at a private employer the prior year. All regressions include fixed effects for state, fixed effects for Census division by year, fixed effects for broad occupational class, and individual controls for male, white, Hispanic, age, age squared, whether the individual completed college, and indicators for the metropolitan city center status of where the individual lives. In Column (4), High NCA Use Occupations are occupations with NCA use greater than the national average, as tabulated by Starr et al. (2021). A separate indicator for High NCA Use Occupation is included in those regressions. SEs clustered by state in parentheses. ***P<.01, **P<.05, *P<.1

# C  Appendix: Creating our Database of Noncompete Laws

## C.1  Law Database Construction Procedures and Principles

The state-year level NCA database that we constructed for this paper was guided by the method developed in Bishara (2010) for quantifying the enforceability of state NCA laws on seven dimensions. These seven dimensions are themselves defined by the organization system used in a series of legal reference books by Brian Malsberger titled "Covenants Not to Compete: A State-by-State Survey." There are currently fourteen editions of this reference book, published respectively in 1991 (1st), 1996 (2nd), 2002 (3rd), 2004 (4th), 2006 (5th), 2008 (6th), 2010 (7th), 2012 (8th), 2013 (9th), 2015 (10th), 2017 (11th), 2018 (12th), 2021 (13th), 2022 Edition (Ebook). There are additionally several supplemental editions of the Malsberger text that update new information between these editions. The supplements include: 1999 Cumulative Supplement, 2003 Supplement, 2005 Supplement, 2009 Supplement, and 2016 Supplement.

The Malsberger series is organized around 12 guiding legal questions, in addition to 11 sub-components of these questions. For each of these 23 components in each state, the series describes the current state of the law, including detailed descriptions of relevant case decisions or statues, and discussion of how the law has changed, including which cases were precedential. In constructing a method to quantify the enforceability of NCAs, Bishara (2010) chose seven of these questions and sub-components to be used in an enforceability index. Bishara's quantification method also includes his expert opinion on weights that should be used for each of these seven elements to construct a weighted index that reflects the relative legal importance of the components. The rationales behind the choices of these weights is discussed in Bishara (2010). The weighted index is designed to measure cardinal differences in laws, as opposed to an ordinal ranking of states.

Table C.1 shows the seven components and weights used to construct the enforceability index, along with a few benchmark enforceability scores for each legal component.

Bishara (2010) uses these questions, along with the Malsberger series, to develop two cross-sectional measures of the enforceability index, for every state in 1991 and 2009. Accompanying the paper, Professor Bishara also shared with us a document that contains his internal notes that helped guide the decision-making process behind the assignment of the scores. These internal notes provide important context for decisions about scores that do not perfectly align with the approximate benchmarks shown in Table C.1.

In the construction of our panel measures of NCA enforceability, our guiding principle was to treat the expert opinion expressed in Bishara (2010), and the ac-

Table C.1: Bishara (2011) Rating of the Restrictiveness of Non-Compete Agreements

| Question # | Question | Criteria | Question Weight |
|---|---|---|---|
| Q1 | Is there a state statute that governs the enforceability of covenants not to compete? | 10 = Yes, favors strong enforcement<br>5 = Yes or no, in either case neutral on enforcement<br>0 = Yes, statute that disfavors enforcement | 10 |
| Q2 | What is an employer's protectable interest and how is that defined? | 10 = Broadly defined protectable interest<br>5 = Balanced approach to protectable interest.<br>0 = Strictly defined, limiting the protectable interest of the employer | 10 |
| Q3 | What must the plaintiff be able to show to prove the existence of an enforceable covenant not to compete? | 10 = Weak burden of proof on plaintiff (employer)<br>5 = Balanced burden of proof on plaintiff<br>0 = Strong burden of proof on plaintiff | 5 |
| Q3a | Does the signing of a covenant not to compete at the inception of the employment relationship provide sufficient consideration to support the covenant? | 10 = Yes, start of employment always sufficient to support any CNC<br>5 = Sometimes sufficient to support CNC<br>0 = Never sufficient as consideration to support CNC | 5 |
| Q3b/c | Will a change in the terms and conditions of employment provide sufficient consideration to support a covenant not to compete entered into after the employment relationship has begun? Will continued employment provide sufficient consideration to support a covenant not to compete entered into after the employment relationship has begun? | 10 = Continued employment always sufficient to support any CNC<br>5 = Only change in terms sufficient to support CNC<br>0 = Neither continued employment nor change in terms sufficient to support CNC | 5 |
| Q4 | If the restrictions in the covenant not to compete are unenforceable because they are overbroad, are the courts permitted to modify the covenant to make the restrictions more narrow and to make the covenant enforceable? If so, under what circumstances will the courts allow reduction and what form of reduction will the courts permit? | 10 = Judicial modification allowed, broad circumstances and restrictions to maximum enforcement allowed<br>5 = Blue pencil allowed, balanced circumstances and restrictions to middle ground of allowed enforcement<br>0 = Blue pencil or modification not allowed | 10 |
| Q8 | If the employer terminates the employment relationship, is the covenant enforceable? | 10 = Enforceable if employer terminates<br>5 = Enforceable in some circumstances<br>0 = Not enforceable if employer terminates | 10 |

Source: Bishara (2010). Notes: The questions in the table correspond to the NCA law components used in the IV estimates throughout the paper. In the paper and tables, we refer to Q1 as the 'Statutory Index', to Q2 as the 'Protectable Interest Index', to Q3 as the 'Burden of Proof Index', to Q3a as 'Consideration Index Inception', to Q3b and Q3c together as 'Consideration Index Post-Inception', to Q4 as 'Blue Pencil Index', and to Q8 as 'Employer Termination Index'. In the raw data, the laws are scaled in each state-year from 0 to 10, as indicated by this table. In the estimations, each component is rescaled to range from 0 to 1, where 0 is the least restrictive observation in the data and 1 is the most.

89

JA0430

companying replication materials, as truth, and to find the timing of law changes between 1991 and 2009 that align with the cross-sectional measures and reflect as closely as possible the decision-making process used by Bishara in the construction of the cross-sectional measures.

Operationally, we implemented this database construction process by hiring two third-year law student research assistants (one at Ohio State University and one at Duke University) to make the decisions about the timing and magnitude of law changes. The research assistants were first trained by reading Bishara (2010), reading the relevant components of Malsberger (1991), and going through the notes from Prof. Bishara to understand how different scores were assigned in 1991. The law students then attempted to blindly match Bishara's scores in 2009 for each of the seven law components for all states. They were told which of the components were scored correctly and iterated the calibration process until there was a match with the Bishara 2009 index. The students then went through all of the editions of Malsberger between 1991 and 2009 and coded the timing of changes in enforceability for each of the components in each year. The same RAs then extended the index forward beyond 2009 using subsequent editions of Malsberger. The RAs did not interact directly with each other and were hired in series such that independent revisions and refinements to the database were made over time.

After these two law students completed the raw state-question-year enforceability scores, we hired a third law student at Duke to go over the index completely and construct an accompanying file that includes citations to each case or statute that generated each of the law changes in the database, citations to the locations in the Malsberger series that describe each change, and write brief overviews of the legal substance of each change.

Using the raw component scores, we constructed a weighted average NCA enforceability index using the same quantification system developed in Bishara (2010). In this system, the index score is calculated by taking the weighted total score in each state-year. This quantification system sometimes yields missing values for particular components of the NCA enforceability index in certain state-years. Missing values exist when a state has never had a court case or written a legislative statute that codified a particular dimension of NCA law. In constructing the weighted average enforceability index, Bishara (2010) adjusts for missing components by calculating the weighted sum of non-missing components and scaling the total upwards by the maximum possible score (550) divided by the maximum achievable score given the missing values in a state-year. Since our primary guiding principle is to follow the approach developed in Bishara (2010), we do the same.

One nominal (but important) way that we deviate from Bishara is that we normalize the scale of the index by dividing all scores by the maximum observed score in any state-year. This results in an index that ranges from 0 to 1 and has an interpretation as the range of the observed policy space.

## C.2    Sensitivity of Results to Treatment of Missing Values

A natural concern is whether our estimated earnings effects of NCA enforceability hinge on the treatment of missing values in the Bishara NCA enforceability index. Here we discuss the sensitivity of our approach to decisions about the treatment of missing values.

Of the 8,568 component-state-year law measures in our sample period (51 states*24 years*7 components), 900 (10.5%) are missing. Given that our empirical models use within-state variation, the NCA components that are always missing in a state do not meaningfully contribute to our identifying variation. Of the 900 missing values, 744 (83%) fall into this category of being always missing for all years in the corresponding states. The remaining 156 missing values (1.8%) change from being missing to non-missing over time, which typically means that a new case was decided in which a judge opined on the issue the index is measuring.

We also consider alternative ways one might treat missing values. One alternative approach is to replace missing values with their future non-missing values. This approach might be reasonable if judicial decisions that go from missing to non-missing reflect cases in which a judge's decision reflected reasoning that was implicitly known by legal experts but not yet codified in the law. Redefining the index in this way causes switches to/from missing to become static values, so they no longer contribute to identification. We reconstruct the NCA index using this different assumption and rerun the main results, which are presented in Table C.2.

Table C.2: Robustness to Changes in Assumption about Missing NCA Index Components

|  | Log Earnings (1) | (2) | Log Hours (3) | Log Wage (4) | Log Average Earnings (5) |
|---|---|---|---|---|---|
| Baseline Estimates | -0.118*** | -0.107*** | -0.021 | -0.106*** | -0.137*** |
|  | (0.036) | (0.028) | (0.017) | (0.027) | (0.034) |
| Alternative NCA Enforceability Score | -0.108*** | -0.095*** | -0.023 | -0.095*** | -0.135*** |
|  | (0.037) | (0.029) | (0.018) | (0.028) | (0.034) |
| Observations | 1216726 | 1216726 | 1545874 | 1216726 | 3548827 |
| $R^2$ | 0.275 | 0.357 | 0.132 | 0.346 | 0.941 |
| Geographic FE | State | State | State | State | County |
| Time FE | Div x Year | Div x Year | Div x Year | Div x Year | Div x Quarter |
| Occupation FE | N | Y | Y | Y | N |
| Sample | ASEC | ASEC | ASEC | ASEC | QWI |

The point estimates are slightly attenuated under this alternative assumption, but the qualitative patterns (and 95% confidence intervals) all overlap with our baseline estimates.

## C.3   Sensitivity of Results to Weights Used in Enforceability Index

The weights used to construct the enforceability index were chosen by Professor Bishara to reflect the legal importance of each dimension in determining whether an NCA was enforceable. Bishara notes that "Because this data includes an element of assigning weights to influence the ranking based on the importance of the question to the dependent variable of strength of enforcement, the data can easily be utilized to highlight other outcomes by adjusting the emphasis and rationale for the weight factors" (Bishara, 2010).

We assess the sensitivity of our main results from Table 3 to choices of alternative weights. To do this, we sequentially increased or decreased the weight of each NCA law component by 50%, recalculated the weighted average index, and used the reweighted index to rerun the main earnings, hours, and wage models. As shown below in Table C.3, the main estimates are not very sensitive to these changes in weights. In both the log earnings and log wage models the largest deviation of any coefficient is 11% of the baseline estimate. In all cases, the estimates remain statistically significant.

A second approach we take to gauge the sensitivity of our estimate to the choice of weights is to use the weights from Starr (2019), which uses a confirmatory factor analysis model to infer the weights that optimize model fit. We reconstruct the weighted average NCA index using Starr (2019) statistical weights and again find estimates that are quite similar to our baseline results, as shown in Table C.4.

Table C.3: Robustness to Changes in NCA Index Weights

|  | Log Earnings | | Log Hours | Log Wage |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| Baseline Estimates | -0.118*** | -0.107*** | -0.021 | -0.106*** |
|  | (0.036) | (0.028) | (0.017) | (0.027) |
| Increase Q1 Weight 50% | -0.115*** | -0.105*** | -0.023 | -0.103*** |
|  | (0.036) | (0.028) | (0.017) | (0.028) |
| Increase Q2 Weight 50% | -0.117*** | -0.105*** | -0.019 | -0.103*** |
|  | (0.035) | (0.027) | (0.017) | (0.027) |
| Increase Q3 Weight 50% | -0.116*** | -0.106*** | -0.021 | -0.105*** |
|  | (0.038) | (0.029) | (0.018) | (0.029) |
| Increase Q3a Weight 50% | -0.125*** | -0.113*** | -0.021 | -0.112*** |
|  | (0.036) | (0.028) | (0.018) | (0.027) |
| Increase Q3bc Weight 50% | -0.118*** | -0.106*** | -0.018 | -0.106*** |
|  | (0.035) | (0.027) | (0.018) | (0.027) |
| Increase Q4 Weight 50% | -0.105*** | -0.094*** | -0.018 | -0.094*** |
|  | (0.035) | (0.026) | (0.014) | (0.026) |
| Increase Q8 Weight 50% | -0.116*** | -0.110*** | -0.023 | -0.108*** |
|  | (0.037) | (0.027) | (0.017) | (0.027) |
| Decrease Q1 Weight 50% | -0.119*** | -0.107*** | -0.018 | -0.108*** |
|  | (0.036) | (0.028) | (0.017) | (0.027) |
| Decrease Q2 Weight 50% | -0.111*** | -0.104*** | -0.022 | -0.104*** |
|  | (0.036) | (0.027) | (0.017) | (0.027) |
| Decrease Q3 Weight 50% | -0.117*** | -0.106*** | -0.020 | -0.104*** |
|  | (0.035) | (0.026) | (0.016) | (0.026) |
| Decrease Q3a Weight 50% | -0.108*** | -0.099*** | -0.020 | -0.098*** |
|  | (0.035) | (0.027) | (0.017) | (0.027) |
| Decrease Q3bc Weight 50% | -0.110*** | -0.102*** | -0.023 | -0.100*** |
|  | (0.036) | (0.027) | (0.016) | (0.027) |
| Decrease Q4 Weight 50% | -0.124*** | -0.114*** | -0.022 | -0.112*** |
|  | (0.038) | (0.030) | (0.020) | (0.031) |
| Decrease Q8 Weight 50% | -0.117*** | -0.101*** | -0.018 | -0.101*** |
|  | (0.036) | (0.028) | (0.017) | (0.028) |
| Observations | 1216726 | 1216726 | 1545874 | 1216726 |

JA0434

Table C.4: Robustness to Changes in NCA Index Weights

|  | Log Earnings | | Log Hours | Log Wage |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| Baseline Estimates | -0.118*** | -0.107*** | -0.021 | -0.106*** |
|  | (0.036) | (0.028) | (0.017) | (0.027) |
| NCA Index using Weights from Starr (2019) | -0.130*** | -0.116*** | -0.015 | -0.115*** |
|  | (0.038) | (0.032) | (0.021) | (0.032) |
| Observations | 1216726 | 1216726 | 1545874 | 1216726 |

# Non-Compete Agreements: A Review of the Literature

John M. McAdams[1]
Federal Trade Commission

December 31, 2019

## Abstract

Non-compete agreements (NCAs) are employment contracts that limit the post-employment options of workers. On the one hand, they potentially solve an investment hold-up problem, allowing firms to make mutually beneficial investments in workers. On the other hand, the agreements potentially erode workers' future bargaining position by limiting their outside options. In this paper, we review the economic literature on non-compete agreements in the U.S.

**Keywords**: Non-compete agreements, worker mobility, training, investment holdup

**JEL codes**: J2, J6, K3, L4, M5

---

[1] Email: jmcadams@ftc.gov. The views expressed in this article are those of the author and do not necessarily reflect those of the Federal Trade Commission or any individual commissioner. I would like to thank Dan Hosken, Dave Schmidt, and Brett Wendling for helpful comments. All errors are my own.

1

Electronic copy available at: https://ssrn.com/abstract=3513639

# I.    Introduction

Non-compete agreements (NCAs) are employment contracts that limit the ability of an employee to join or start a competing firm after a job separation.  The past decade has seen burgeoning interest from academics, policymakers, and the media over non-compete agreements—partly due to concern over whether labor markets have been becoming less competitive, and partly due to several high-profile examples of non-competes involving low-skilled occupations such as sandwich makers, dog walkers, and warehouse workers.[2]

This interest has spurred several state enforcement actions and legislative proposals to limit the perceived harm that non-competes cause.[3]  For example, Oregon, Massachusetts, and Washington have passed laws in recent years rendering non-competes unenforceable against low-wage workers.  As their very name might suggest, non-compete agreements have also drawn the attention of competition authorities.  For instance, the Chairman of the Federal Trade Commission has stated the agency is considering issuing a rule to limit the use of non-compete agreements.[4]  This is part of a broader push by the U.S. competition agencies to address competition issues in labor markets.[5]  Alongside the increased attention from policymakers and legislators has been a flurry of economic research into non-compete agreements and their effects on labor and product markets.  Reviewing this economic literature is the purpose of this paper.

States vary considerably in their legal enforcement of non-compete agreements between employers and workers.[6]  Several states do not enforce non-competes at all, or do not enforce them for certain classes of workers.[7]  Most states, though, will enforce non-compete agreements to a certain extent.  The relative strictness of a state's enforceability regime depends on a number of dimensions.  This includes whether the agreements can be enforced for both voluntary and involuntary separations, or only voluntary ones; whether employers must provide additional consideration beyond the job itself to the employee for signing the agreement; whether the firm has a sufficient "protectable interest" to motivate the use of a non-compete; and how the state courts treat agreements that contain provisions which are invalid according to state law.[8]  For

---

[2] On the latter point, see Jamieson, Dave, "Jimmy John's Makes Low-Wage Workers Sign `Oppressive' Noncompete Agreements," *Huffington Post* (Oct. 13, 2014); Jamieson, Dave, "Doggy Day Care Chain Makes Pet Sitters Sign Noncompetes To Protect 'Trade Secrets'," *Huffington Post* (Nov. 24, 2014); and Woodman, Spencer, "Amazon makes even temporary warehouse workers sign 18-month non-competes," *The Verge* (Mar. 26, 2015).

[3] See Johnson and Lipsitz (2018) for a discussion of some recent legislative proposals.  President Obama, in 2016, also issued a "State Call to Action on Non-Compete Agreements" making several proposals.

[4] Parts, Spencer, "Simons: Non-Compete Rulemaking May Come Soon," *Global Competition Review* (May 8, 2019).

[5] Remaly, Ben, and Kaela Coote-Stemmermann, "FTC Considers Workers in Deal Reviews," *Global Competition Review* (Oct. 4, 2018).

[6] States themselves do not "enforce" non-compete agreements directly; it is private employers who do.  We follow the economic literature in using the terms "enforce" and "enforceability" to reflect whether a state would uphold a non-compete if an employer attempted to enforce one through the courts.

[7] California and North Dakota do not enforce non-competes at all.  Other states do not enforce them for specific groups such as technology workers (Hawaii), low-wage workers (Oregon and Washington), and health care workers (various states).  Within the legal sector, non-competes are generally not enforceable in any state.

[8] A non-compete agreement which contains an invalid provision can be nullified completely ("red-pencil doctrine"), the invalid provision can be deleted while keeping the rest of the agreement intact ("blue-pencil doctrine"), or the

2

Electronic copy available at: https://ssrn.com/abstract=3513639

convenience, researchers often combine the various dimensions of enforceability into a single index.  California and North Dakota, two states that do not enforce NCAs, show the lowest levels of enforceability, while Florida and Connecticut display the highest.[9]

Data on non-compete use in the U.S. are sparse.  The government surveys that are standard in the study of U.S. labor markets do not ask about non-compete use.  Researchers have conducted four surveys of non-compete use in the U.S., one of which is national in scope and covers a broad range of occupations, and three of which cover specific occupations.  These surveys are the basis of many studies within the literature.  The national survey finds that 18% of workers in the U.S. were bound by an NCA as of 2014, and 38% had signed one at some point during their career (Starr, Prescott, and Bishara ["SPB"] 2019b).  Moreover, the incidence of non-competes is generally higher in technical and high-skilled occupations and industries.  The other three surveys find a sizeable incidence of non-compete agreements among specific occupations, as discussed below.

Curiously, the existing research consistently finds that non-compete use is common across states regardless of how enforceable the agreements are.  In fact, non-competes are only somewhat less common in states where they are completely unenforceable as compared to states with stricter enforceability.  The previously mentioned national survey finds that 18% of workers across the U.S. are bound by non-competes, compared to 19% in California and North Dakota—two states where NCAs are unenforceable (SPB 2019b).  Two surveys of individual occupations show a similar pattern.[10]

There are several potential explanations for why firms offer non-competes, and why workers accept them.  Non-competes potentially solve a "holdup" problem for certain types of investment (e.g., training, information sharing), allowing firms to make mutually beneficial investments in their workforce.  Non-competes also allow firms to reduce recruitment and training costs by lowering turnover, and firms may offer a wage premium to compensate signers.  Nevertheless, non-competes restrict workers' employment options *ex post*.  Thus, workers may experience lower mobility, less competition for their services, and a worse bargaining position vis-à-vis their current employer.

The presence of non-compete agreements also has implications for innovation and entrepreneurship.  By limiting the flow of workers to competitors, non-compete agreements simultaneously increase the returns to research and development (R&D) at incumbents while reducing knowledge transfer to new or existing competitors, with the net effect on innovation being ambiguous.  The trade-off is analogous to that of patent protection, with stricter protections encouraging investment but temporarily limiting competition.  NCAs may also tend to diminish entrepreneurship, as they limit the ability of workers to start competing firms.  In theory, this

---

invalid provisions can be rewritten so as to render them valid ("equitable reform" or "reformation").  Bishara (2011) is a thorough summary of state statutes and case law on the various dimensions of enforceability.
[9] See, for example, Figure 1 in Balasubramanian et al. (2018).
[10] Johnson and Lipsitz (2018) report that 31% of physicians in California have signed an NCA (vs. 45% nationally). Garmaise (2011) finds that 58% of firms in California have their executives sign NCAs (vs. 70% nationally).

3

Electronic copy available at: https://ssrn.com/abstract=3513639

reduction in firm entry could reduce competition in product markets and further reduce competition over wages, though direct evidence does not exist.

There is relatively little research into why non-compete agreements appear in markets for low-skilled workers. Its incidence among low-wage and low-skill workers tends to be lower than among the more affluent or skilled, but still non-trivial: SPB (2019b) report that 12% of individuals earning less than $20,000 per year were covered by a non-compete, compared to 21% of those earning $60-80,000. There are several possible theories. First, turnover tends to be higher in low-wage occupations,[11] and non-competes will tend to limit turnover either by inducing longer tenure or by screening out more mobile individuals. Second, if poorer households tend to be credit constrained, they may have difficulty funding certain types of training themselves that would otherwise be profitable to undertake. Non-competes potentially offer a mechanism through which firms can fund the cost. Third, low-wage workers are more likely than average to be bound by the minimum wage, and firms can extract additional surplus from workers when the minimum wage limits the ability of wages to do so.[12] Further research is necessary to understand why firms offer low-skilled workers non-competes and why those workers sign them.

Although the literature has made important strides in studying non-competes and their effects on workers, firms, and end consumers, further work is needed. Due to the limited availability of data and a paucity of natural experiments (e.g., law changes) to assess the impact of non-competes, much of the literature relies on cross-sectional comparisons of signers and non-signers, or high-enforceability states and low-enforceability ones. The more credible empirical studies tend to be narrow in scope, focusing on a limited number of specific occupations (e.g., executives) or potentially idiosyncratic policy changes with uncertain and hard-to-quantify generalizability (e.g., banning non-competes for technology workers in Hawaii). There is little evidence on the likely effects of broad prohibitions of non-compete agreements. Further research, perhaps exploiting more recent law changes or new sources of data, is necessary to establish the causal impact such agreements have on market participants.

The remainder of the paper is organized as follows. Section II outlines the theory behind non-compete use and Section III reviews the data and evidence. Section IV concludes.

## II.    Theory

This section discusses several channels through which non-compete agreements affect labor and product markets, many of which are not necessarily mutually exclusive. The focus is on highlighting the potential mechanisms through which the agreements operate rather than offering a detailed exposition or critique of the theories. Section III reviews the empirical evidence and suggests which channels receive more support from the data.

---

[11] Farber (1999), Choi and Fernández-Blanco (2017).
[12] Johnson and Lipsitz (2018).

4

Electronic copy available at: https://ssrn.com/abstract=3513639

**JA0439**

## A.  Effects in the Labor Market

Non-compete agreements potentially offer a solution to a key problem that would otherwise limit investments in the employer-employee relationship, but at the same time may introduce frictions in the labor market, change the bargaining positions of workers and employers, and reduce (ex post) competition over wages.  Before discussing the theory specific to non-compete agreements, we briefly overview the theory of worker-firm bargaining in order to frame the discussion.

In the simple, benchmark model of the labor market with perfect competition and no frictions, firms pay workers a wage equal to the full value they contribute to the firm, known as their value of marginal product (Borjas 2013).[13]  A worker's value of marginal product incorporates their education, skills, training, and other attributes that contribute to productivity.

Deviating from perfect competition yields the possibility that a given worker-firm pair yields positive rents that the two can bargain over in a Nash-type bargaining game (Cahuc, Postel-Vinay, and Robin 2006).  In a Nash bargaining model, equilibrium wages will be determined by the bargaining power and outside options of each party to the negotiation.  A worker's outside options could include outside wage offers generated from on-the-job search, expected wage offers from job search during unemployment, or non-market activities.  A worker with generous outside wage offers, for example, will have greater negotiating leverage and hence will tend to receive higher wages than a worker with less generous offers.[14]  Similarly, a firm's outside options could include recruiting and training a replacement employee, leaving a job opening vacant, or filling a vacancy using an employee from elsewhere in the firm.  A firm facing high recruiting and training costs will have less leverage and hence will have to pay higher wages in equilibrium.

### 1.  Lock-in

One potential effect of non-compete agreements is to alter the bargaining positions of workers and firms.  Balasubramanian et al. (2018) model how non-competes narrow the outside options and reduce the bargaining power of workers who sign them.  The consequence will be lower worker mobility and longer tenure, as well as a flat or declining wage profile over the life of a job, all else equal.  Balasubramanian et al. (2018) refer to this effect as "lock in".

The possibility of lock-in raises the question as to why a worker would sign a non-compete to begin with if the firm was expected to use it during future negotiations to extract a higher share of the match surplus.  It is possible that workers either heavily discount the future (myopia), do not understand the implications of the clauses to begin with, or are offered sufficient additional compensation so that they are willing to accept the non-compete.

---

[13] Our discussion throughout generally focuses on wages, but a similar logic applies to non-wage compensation or workplace amenities.

[14] In a structural model estimated using French data, Cahuc, Postel-Vinay, and Robin (2006) find that inter-firm wage competition is a much more important determinant of the worker's share than the worker's bargaining power, especially for lower skilled workers.

Electronic copy available at: https://ssrn.com/abstract=3513639

2. *Mitigating holdup*

Employees are free to leave their employer at any time.  Cognizant of this mobility, firms may forgo making certain investments in their workforce knowing that employees would be able to subsequently quit and appropriate the value of the investment.  This is an example of a "hold-up" problem (Rubin and Shedd 1981; Grossman and Hart 1986).  Common examples of investments likely to be subject to hold-up in the present context include non-tangible assets such as training, information (trade secrets or production processes), and client lists.[15]

Non-compete agreements are one arrangement that can mitigate the hold-up problem.[16]  They do this by discouraging worker attrition before the firm has had time to recoup the cost of its upfront investment, and thus permit firms to make investments in its workers that are mutually beneficial and that it otherwise may not decide to do (Rubin and Shedd 1981).  As the employee-employer relationship becomes more valuable, firms will tend to pass on some portion of the higher profits in the form of higher wages, assuming firms do not possess all the bargaining power in the relationship.[17]  Thus, to the extent that non-compete agreements mitigate holdup, we should expect to see wages rise over a worker's tenure, all else equal.

The lock-in and holdup mitigation channels are not mutually exclusive.  If the data suggest that wages are flat or fall over a worker's tenure, though, that suggests that the lock-in channel tends to dominate.  Similarly, if wages tend to rise, that suggests that holdup mitigation tends to be the dominant mechanism.

While mitigating holdup will tend to increase wages, it generates ambiguous implications for worker tenure and mobility, depending on the relative increase in worker productivity at the incumbent firm as compared to at firms that are outside the scope of the non-compete (Balasubramanian et al. 2018).  To the extent that mobility does decline as a result of increases in investment facilitated by non-competes, it is because the worker's current job has become *more* attractive relative to alternatives, unlike with lock-in.  Thus, unlike declines in wages, declines in worker mobility are not necessarily informative about whether non-compete clauses are harmful.

Garmaise (2011) argues that non-competes have potentially offsetting effects on investments in training.  Reducing holdup tends to increase the incentive for firm-sponsored training.  But limiting an employee's outside options of employment will tend to decrease their incentive to

---

[15] In Becker's (1962) seminal model, firms may find it profitable to make investments in human capital that increases worker productivity at their specific firm ("firm-specific" training), but will generally not sponsor training that raises productivity at other firms.  Firm-specific training is unlikely to be subject to a hold-up problem because it is by definition not valuable at other firms.

[16] Alternatively, workers could pay firms *ex ante* a portion of the value of the investment, or could post a bond that would be forfeited if the worker were to leave.

[17] Existing studies are consistent with firms sharing rents to some extent with employees in both union and non-union settings (Blanchflower, Oswald, and Sanfey 1996; Van Reenen 1996).  Cahuc, Postel-Vinay, and Robin (2006), however, find that low-wage workers have little to no bargaining power in their study of the French labor market.  Evidence on the returns to firm-specific human capital (tenure)—a market with one buyer and one seller—is also consistent with firms and workers splitting rents (Topel 1991; Altonji and Williams 2005).  Outside of a bargaining framework, it is common to see compensation schemes designed around splitting rents (e.g., profit sharing, performance bonuses).

6

**JA0441**

Electronic copy available at: https://ssrn.com/abstract=3513639

invest in portable (general) skills. Thus, the net impact on human capital accumulation is theoretically ambiguous.

### 3. Labor market frictions

Both mechanisms above (increased returns to tenure and lock-in) are consistent with a decline in worker mobility among individuals who have signed non-compete agreements. A reduction in worker mobility will tend to increase recruitment costs for all firms as the pool of potential applicants for a given posting will shrink. This type of friction can have important implications for wages and productivity. Worker mobility is an important source of wage growth for younger workers, with job changes accounting for approximately a third of early career wage growth (Topel and Ward 1992). In matching models of labor markets, increases in frictions such as recruitment costs will lead to a reduction in average match quality and hence lower aggregate productivity (Jovanovic 1979, 2015).

The presence of non-compete agreements in labor markets may also increase recruitment costs if there is uncertainty regarding whether a potential hire has signed one. Many workers are unsure whether or not they have signed a non-compete. One national survey reports that 30% of respondents did not know whether they had signed one (SPB 2019b). Firms, fearing litigation over hiring a worker bound by a non-compete, may need to expend resources to learn whether potential hires had signed a non-compete with their prior employer.

At the same time, by reducing worker mobility, non-compete agreements reduce turnover costs for the firms that use them. They may also reduce turnover through a screening mechanism: workers who are more likely to leave a job after a short stay will tend to select out of applying for jobs where non-competes are a requirement.

Provided that the firm's benefit from reducing turnover exceeds the cost imposed on the worker, the cost savings will be passed on to workers via higher wages. In perfectly competitive labor markets, workers will capture the entirety of the savings (Johnson and Lipsitz 2017). The premium paid to workers to accept workplace disamenities such as a non-compete agreement is commonly referred to as a compensating differential (Rosen 1974).

Non-compete agreements offer an option for firms to capture a greater portion of the surplus generated from their match with workers in the presence of downward rigidity in wages, such as in the presence of a minimum wage (Johnson and Lipsitz 2017).[18] When a firm cannot adjust total compensation through wages, they may instead adjust along non-wage dimensions such as firm-sponsored training (Schumann 2017), employer-provided health insurance (Marks 2011), or pension coverage (Simon and Kaestner 2004). Johnson and Lipsitz (2017) argue that offering or requiring non-compete agreements is yet another way for firms to adjust compensation (downward, as they impose costs on workers) and capture a larger share of the match surplus.

---

[18] Minimum wage laws are one example of downward rigidity, but firms may have a number of rationales for not reducing wages below a certain threshold: incentive provision in an efficiency wage model (Shapiro and Stiglitz 1984), concern over fairness (Akerlof and Yellen 1990), or to encourage employee cooperation (Fehr and Falk 1999).

Electronic copy available at: https://ssrn.com/abstract=3513639

Non-compete agreements can be seen as a non-wage attribute of a job that provide a benefit to firms (in the form of lower turnover costs) while imposing a cost on workers (reduced mobility), with the result being a transfer in the match surplus from workers to firms. In the context of minimum wage laws, firms are able to pay what are effectively sub-minimum wages. While this reduces the utility of inframarginal workers, it also expands the set of workers for which it is profitable for firms to hire. This expansion in employment will attenuate the disemployment effects of minimum wage laws. Johnson and Lipsitz (2017) propose this as one rationale for why non-compete agreements are observed in low-skilled labor markets, where minimum wage laws are more likely to be binding.

### 4. Reduced firm entry and competition for workers

Not only can non-compete agreements prevent workers from joining competing firms, but they can also prevent workers from founding new firms. If fewer new firms are formed, or if startups are hobbled by a dearth of qualified employees, then demand for workers in industries with a high incidence of non-compete agreements will be lower than otherwise. This mechanism will tend to reduce the wage competition for workers by reducing the frequency and attractiveness of outside offers.

### B. Effects in Product Markets

By limiting mobility, non-compete agreements potentially tie up potential entrepreneurs, increase expected litigation costs over non-competes, and raise hiring costs for employed talent. These factors suggest that non-competes have the potential to reduce firm entry. Lower firm entry could dampen competition and product variety in product markets.

The implications of non-competes for innovation are ambiguous. On the one hand, greater worker mobility may lead to knowledge spillovers that spread information to other firms, enhancing their productivity. Gilson (1999) attributes the success of Silicon Valley, with its large concentration of innovative technology firms, to the unenforceability of non-competes in California and concomitant cross-pollination of ideas from a mobile workforce. On the other hand, firms may be reluctant to invest in risky R&D when departing workers can transfer proprietary information to competitors. By restricting the outflow of workers with non-competes, incumbent firms are in a better position to capture the returns to risky R&D investments. When it comes to innovation, the trade-offs involved are analogous to those in patent protection, with stricter protections encouraging investment but temporarily limiting competition.

8

Electronic copy available at: https://ssrn.com/abstract=3513639

## III.    Evidence

We first outline the data used in the literature, as well as some general features and limitations of the empirical models used to assess the effects of non-competes.  Then, we turn to the empirical findings of the literature.

### A.  Data

The standard surveys used in studying U.S. labor markets (e.g., Current Population Survey, American Community Survey, and National Longitudinal Surveys) do not ask about non-compete agreements.  Thus, the literature on non-competes relies on four surveys administered by academics to quantify their incidence, as well as to study their impact.  One survey is national in scope and covers multiple industries and occupations, and the other three focus on individual industries or occupations.  Separately, several papers combine state-level measures of non-compete enforceability with data on various worker and firm outcomes from more traditional government surveys.

The 2014 National Noncompete Survey Project surveyed 11,505 individuals on the use of non-compete agreements and other information using an online survey administered by the survey firm Qualtrics (Prescott et al. 2016; SPB 2019b).  The survey collected data from individuals employed in the private sector or for a public healthcare organization, and covered all states, occupations, and (private) industries.  Of those in the target sample who began taking the survey, 29% completed it and survived a number of quality checks implemented by the authors.  The authors discuss several potential concerns over the validity of their survey instrument—to be included, an individual must participate in online surveys, have responded to the offer to take the survey, and have completed it.  If the decision to respond to the survey is somehow correlated with non-compete use, then that could introduce bias into empirical work based on the survey.

The National Noncompete Survey finds that 18% of workers in the U.S. were bound by an NCA as of 2014, and 38% had signed one at some point during their career (SPB 2019b).  Moreover, NCAs are prevalent across a number of industries, occupations, and skill levels, though they are more common among technical and high-skill occupations and industries.  For example, non-competes are most prevalent in architecture and engineering (36%), computer and math-related jobs (35%), and management (30%).  Nevertheless, they also appear with some frequency in grounds maintenance (11%), food preparation and service (11%), and construction and extraction (12%).[19]  Non-compete incidence tends to be increasing with educational attainment as well, with holders of professional (39%) and master's degrees (29%) having the highest incidence, while high school graduates (13%) and those with some college (12-14%) have the lowest.[20]

Other surveys focus on specific occupations or industries.  Garmaise (2011) and Kini, Williams, and Yin (2019) collect information on non-compete use among executives at public companies from public filings with the Securities and Exchange Commission (SEC) (e.g., 10-Ks and 10-

---

[19] SPB (2019b), Figure 5.
[20] SPB (2019b), Figure 3.

9

Electronic copy available at: https://ssrn.com/abstract=3513639

Qs).  Many firms disclose whether their top executives have signed a non-compete in their SEC filings.  This information is then combined with data on executive compensation from Standard & Poor's ExecuComp database.  ExecuComp is a frequently studied database that tracks details on the compensation for the five highest paid executives of large public companies.  Garmaise (2011) finds that about 70% of large, publically traded firms have their top executives sign non-compete agreements over the 1992 to 2004 period.  Since some firms may require a non-compete but not disclose that fact publically, this figure is likely a lower bound.  Kini, Williams, and Yin (2019) find that 26% of CEOs in their data covering 1992 to 2014 have executed non-compete clauses.[21]

Johnson and Lipsitz (2017) survey non-compete use among hair salons using an e-mail survey conducted in 2015 through a national hair stylist professional trade group, the Professional Beauty Association.  A total of 218 salon owners responded with information on non-compete use, training, hiring practices, compensation, and other characteristics of the business.  The authors estimate that the response rate to the survey was 31%, conditional on an individual having opened the e-mail survey.  Among respondents, 30% of salon owners said they had their most recent hire sign a non-compete, and 39% said they had at least one hire in the past sign one.

Lavetti, Simon, and White (2018) implemented a survey on non-compete use among primary care physicians using web-based and mailed surveys.  A total of 1,976 physicians across five states (California, Texas, Illinois, Georgia, and Pennsylvania) responded to the 2007 survey, which had a response rate of 70%.  Beyond non-compete use, the survey elicited information on compensation and physician and firm characteristics.  They estimate that about 45% of primary care physicians in group practices are bound by a non-compete agreement.

A number of other papers combine a state-level measure of enforceability with worker and firm outcomes from government surveys or data sources in order to compare high vs. low enforceability regimes.  For example, Balasubramanian et al. (2018) derive data on worker mobility and wages from the Longitudinal Employer-Household Dynamics survey and the Current Population Survey.  Several studies (e.g., Marx, Strumsky, and Fleming 2009; Conti 2014) use public data on patent filings in order to measure R&D and the mobility of inventors.  These papers do not observe whether or not a given worker has signed an NCA, or whether a given firm offers NCAs to its workers.  As such, they do not offer estimates of the incidence of non-compete use.

### B.  Empirical Approaches Used in the Literature

There are three general approaches in the literature to assess the effects of non-compete agreements.  Some papers follow multiple approaches.

The first is to use state policy changes in enforceability, such as changes in state statutes or changes in judicial interpretations of state statutes.  Papers following this approach include Marx,

---

[21] 42% of CEOs in their sample have reported signing an employment contract, of which 62% have an NCA.  This latter figure grew from 46% in 1992-93 to 63% in 2013-14, which demonstrates the growing use of NCAs among executives.

10

Electronic copy available at: https://ssrn.com/abstract=3513639

Strumsky, and Fleming (2009), Garmaise (2011), Carlino (2017), Balasubramanian et al. (2018), and Johnson, Lavetti, and Lipsitz (2019), among others.  Exploiting policy changes can be a credible way of assessing the impact of state laws and regulations.

In the literature on non-competes, though, there is a paucity of changes in enforceability, with papers often relying on one or a handful of policy changes, such as Hawaii's ban on non-competes for tech workers or Michigan's reversal of its prohibition.[22]  The dearth of policy changes raises two problems: assessing external validity and quantifying the uncertainty regarding estimated effects.  While the studies exploiting state policy changes are well executed, it is far from clear whether the estimated effects are likely to extend to other states (with, e.g., a different composition of firms for workers to switch to), industries (with, e.g., different opportunities for training), or occupations.  Non-compete incidence varies markedly across industry and occupation, which suggests that the underlying determinants of use do as well.  Although research directly examining heterogeneity in effects across different groups is sparse, Fallick, Fleischman, and Rebitzer (2006) do find that non-competes matter only for tech workers and not other occupations.  Regarding quantifying the uncertainty of any estimated effects, under certain conditions, estimating standard errors in the presence of a small number of treated units can lead to important biases when using clustered standard errors, as is common in this literature.[23]  Thus, extra care should be taken in interpreting the precision and statistical significance of estimates.

Even when such policy changes are available to the researcher, the possibility that non-competes have external effects on non-signers complicates evaluating the effects of changes in non-compete enforcement.  Several papers provide evidence of such spillover effects (Starr, Frake, and Agarwal *forthcoming*; Johnson, Lavetti, and Lipsitz 2019).  For example, Johnson, Lavetti, and Lipsitz (2019) show that changes in NCA enforceability can affect workers in areas across the border from states changing their non-compete policy.  In such a setting, estimating the impact of changes in enforceability using a difference-in-differences model is complicated by the fact that outcomes in control states may be affected by the changes in policy of contiguous (treated) states, and treated states may be affected by changes in policy of other adjacent (treated) states.  It is not obvious exactly what parameter is identified by such a model.

The second approach evaluates the impact of having a high incidence of non-compete agreements in a state with high enforceability in a difference-in-differences (or triple differences) framework.  These studies do not exploit policy changes over time (as above), but rather use within-state groups as controls, such as industries with a low-incidence of non-compete agreements.  Thus, differences across states in worker outcomes between high and low enforceability are compared for high incidence industries and low incidence industries.  Practically, the use of within-state control groups allows the inclusion of state fixed effects to

---

[22] Johnson, Lavetti, and Lipsitz (2019) is an exception, which exploits 70 changes in an enforceability index over the 1991 to 2014 period.

[23] See, e.g., Imbens and Kolesár (2016) and MacKinnon and Webb (2018).  Lipsitz and Starr (2019) is the only paper using a small number of policy changes (one, in its case) that addresses this issue.  They find that p-values are—in some specifications and samples—substantially higher when correcting standard errors to account for the small number of treated units.

11

**JA0446**

Electronic copy available at: https://ssrn.com/abstract=3513639

control for any unobserved factors that are common to both low and high incidence industries within a state (e.g., cost of living, broad labor market conditions). Examples include Starr (2019), Balasubramanian et al. (2018), Starr, Balasubramanian, and Sakakibara (2017), and Starr, Frake, and Agarwal (2018).

There are several limitations to this second, difference-in-differences approach. First, the types of industries that have low and high incidences of non-competes are markedly different. Non-compete agreements tend to be more prevalent in higher skilled and technical industries such as information technology (IT) and engineering.[24] Any state-level laws or economic factors that affect low-skill workers differently than high-skill workers could potentially bias the models' estimates, to the extent that such laws or factors are correlated with enforceability. For example, state minimum wage laws tend to raise the wages of low-skilled workers more than high-skilled workers.[25] If states that set higher minimum wages tend to have weaker or stronger non-compete enforceability, state fixed effects would be of no use and the estimated impact of non-compete use would be biased.

Another limitation in this second approach is that the underlying variation in non-compete use is poorly understood. It is not clear why—within low- or non-enforcing states—NCAs are common in some industries but not others.[26] Moreover, it is not clear why the *same* industry has a low incidence in some states but high incidence in other states.[27] Without a firm understanding of what drives non-compete use, it is impossible to ascertain whether the necessary exclusion restriction holds and hence whether a difference-in-differences model produces unbiased estimates of the impact of non-compete incidence and enforceability.

The third approach compares labor market outcomes of signers with non-signers after conditioning out the observable characteristics of each group in a regression framework. Some examples include Johnson and Lipsitz (2017), Lavetti, Simon, and White (2018), and Starr et al. (2019). By comparing signers to non-signers, this approach is able to estimate the effect of treatment on the treated. The other two only estimate an intent to treat effect, which does not isolate the effect on signers themselves without information on the change in incidence due to treatment (which none of the studies attempt to estimate).[28]

An important limitation of this approach is the possibility of selection on unobservable worker and firm characteristics that is correlated with NCA use. A general concern with evaluating worker compensation, including arrangements that include non-compete clauses, is that workers are likely to select into jobs that offer a compensation scheme that best meets the preferences and abilities of that worker (Lazear and Shaw 2007). For example, if workers who are most likely to benefit from on-the-job training tend to select into jobs which offer more training, then

---

[24] SPB (2019b), Marx, Strumsky, and Fleming (2009).

[25] In Johnson and Lipsitz's (2017) model, non-compete use is predicted to be higher in areas where the minimum wage is more likely to be binding, implying that NCAs and minimum wage laws would be correlated.

[26] This fact is not lost on the authors themselves. Starr, Frake, and Agarwal (2018) write that "we have little understanding why the incidence varies in non-enforcing states, given that such provisions are unenforceable".

[27] See Figure 1 in Starr, Frake, and Agarwal (2018), which shows incidence by state and industry. This means that a given industry acts as a treated unit in some states but a control in others.

[28] Angrist and Pischke (2009), pp. 158-164. This assumes there are no externalities to the presence of NCAs.

12

Electronic copy available at: https://ssrn.com/abstract=3513639

comparing workers who have signed non-competes to those who have not will tend to overstate their impact on training. Similarly, if workers who select into jobs with strong training opportunities tend to be more productive in general (positive selection), then comparing signers with non-signers would tend to overstate the effect of non-competes on worker outcomes. Firms may also select into states based on state characteristics, such as state taxes, unionization levels, worker productivity, or environmental regulations, which could potentially be correlated with non-compete enforceability.

Beyond selection, it is possible that unobservable features of compensation are correlated with non-compete use. For instance, technology-based startups may tend to offer a higher portion of compensation in stock options (due to cash flow constraints) and also tend to rely more heavily on proprietary information and production processes (and hence require NCAs of their employees). Evaluating the effect of NCAs on wages alone could potentially under- or over-state the impact on total compensation.

To address these two limitations, the literature incorporates controls for worker and firm characteristics in order to reduce any confounding influence of selection. For example, SPB (2019b) control for worker characteristics (gender, education, age, hours and weeks worked, number of past employers), firm characteristics (size, multi-state status), characteristics of employment (other post-employment covenants such as non-disclosure agreements, compensation features such as the presence of health insurance, a retirement plan, etc.), and state-level factors (unemployment, size of labor force). A number of papers also incorporate a test due to Oster (2017) which quantifies how important selection on unobservables would have to be in order to reverse the sign of the coefficient on the policy variable of interest.[29] They generally find that selection on unobservables would have to be "implausibly" strong to reverse their findings.

### C.  *Effects in the Labor Market*

Studies of the labor market effects of non-compete agreements have examined a number of outcomes, with particular focus on investments in non-tangible assets (e.g., worker training), worker mobility, and wages.

### 1.  *Investments in non-tangible assets (training, information, and client lists)*

Non-compete agreements offer an opportunity for firms to invest in various non-tangible assets that might otherwise be subject to holdup. The most common investments analyzed in the literature are training (investments in human capital), sharing information with workers, and sharing client lists with workers. The bulk of the empirical literature finds that workers signing non-compete agreements, or workers who reside in areas with a higher incidence of NCAs, receive more training, more access to information, and more access to client lists. Nevertheless, there is some variation in this finding depending on the type of non-compete and occupation. Garmaise (2011) argues that non-competes have potentially offsetting effects on investments in training: they increase the incentive for firm-sponsored training but decrease that of self-

---

[29] Starr, Prescott, and Bishara (2019a), SPB (2019b), Starr (2019), Starr, Frake, and Agarwal (*forthcoming*).

Electronic copy available at: https://ssrn.com/abstract=3513639

sponsored training. The overall impact on human capital accumulation, then, is theoretically ambiguous. Using a credible source of variation—changes in state policy in Florida, Louisiana, and Texas—he finds wage effects among top executives of public companies that are consistent with workers in higher enforceability states tending to receive more firm-sponsored training. Notably, though, he finds that the decline in (self-sponsored) general training is even greater, leading to lower levels of overall human capital investment (and hence wages). Note, though, that he does not directly analyze data on worker training, but rather infers the effects of NCAs on training from its effects on compensation.

The remaining studies rely on comparing non-compete signers with non-signers, or comparing outcomes in high enforceability states to low enforceability states, while attempting to control for selection using observable characteristics of individuals. Starr (2019) estimates that moving a state from non-enforcement to average enforcement would increase the incidence of worker training by 18%. NCAs also allow firms to train employees sooner in the employment relationship. Uncertainty regarding an employee's tenure will tend to lead firms to delay investing in costly training as they screen employees for those who will quit soon, but the presence of enforceable non-competes allows firms to reduce this uncertainty and move up training opportunities (Starr 2019). Among hair stylists, Johnson and Lipsitz (2017) find that NCA use is associated with a 14% higher likelihood of firms providing on-the-job training. Starr et al. (2019) find that the timing of when a worker receives an NCA matters: although they find no overall effect of NCA use on training, workers receiving early notice (prior to accepting a job) are 11% more likely to have received training.

Like investments in human capital, client lists and information are "mobile" in the sense that they are attached to the worker rather than the firm, and workers may exploit such investments once they quit. Surveying primary care physicians within group practices, Lavetti, Simon, and White (2018) find that physicians receive more patient referrals when they have signed a non-compete agreement. Starr et al. (2019) find, however, that timing once again matters: workers receiving early notice of an NCA are more likely to have firms share information with them, while those receiving late notification are substantially less likely.

Gurun, Stoffman, and Yonker (2019) study non-compete clauses in the financial advisory industry. The relationships that financial advisers form with clients may allow financial advisers to take clients with them when moving firms or founding a new firm. Such behavior may attenuate firms' incentives to, for instance, engage in marketing activities that would build its employed advisers' portfolio of clients. To address this issue, many firms in the industry require non-compete agreements. Gurun, Stoffman, and Yonker (2019) find that relaxing the enforceability of non-compete agreements leads to important shifts in the assets under management at financial advisory firms, consistent with financial advisers bringing clients with them when switching firms.

## 2. Worker mobility and labor market frictions

By limiting the post-employment options of workers who sign them while also potentially increasing the returns to sticking with a given employer, non-compete agreements are predicted to increase worker tenure and decrease job switching.

14

Electronic copy available at: https://ssrn.com/abstract=3513639

The empirical evidence consistently bears this out, including the studies using state policy changes to identify the effects of interest. For American workers generally, Johnson, Lavetti, and Lipsitz (2019) find that moving from a policy of NCA unenforceability to the highest enforceability observed across U.S. states in their sample is predicted to reduce the month-to-month probability of workers changing employers by 26.1%.[30] Similarly, for low wage (hourly) workers, Lipsitz and Starr (2019) show that Oregon's ban on enforcing non-competes led to an increase in transitions across employers of 12.2 to 18.3%.

Studies of individual industries and occupations also find that higher NCA enforceability is associated with lower worker mobility. Inventors in Michigan were 8.1% less likely to switch jobs after Michigan strengthened its enforcement of non-compete agreements in the mid-1980s, with even lower switching rates among those with firm-specific and technological expertise (Marx, Strumsky, and Fleming 2009). Hawaii's ban on NCAs for technology workers led to an 11% increase in mobility, relative to comparable workers in other states, in years subsequent to the ban (Balasubramanian et al. 2018). Top executives were substantially (47%) less likely to change jobs within industries as non-competes became more strictly enforced, and their tenure increased by 16% (Garmaise 2011).

CEO turnover is more responsive to a firm stock performance when the firm's CEO has a signed non-compete agreement (Kini, Williams, and Yin 2019). This is consistent with firms being reluctant to fire executives for lackluster performance if their CEO is able to join a competitor. Financial advisers are substantially more likely to switch firms when non-competes are not enforced against them (Gurun, Stoffman, and Yonker 2019). However, Gurun, Stoffman, and Yonker (2019) find that a reduction in the enforcement of non-competes leads to an increase in misconduct among financial advisers, which is consistent with firms being reluctant to discipline employees who can take assets (clients) with them when they switch jobs.

The more correlational studies in the literature also conclude that non-competes tend to lengthen employee tenure. Nationwide, workers in average-enforcing states have had 8% fewer jobs than similar workers in non-enforcing states (Balasubramanian et al. 2018). Workers in states with a higher incidence of non-competes tend to have longer tenure, and that the effect of incidence is even higher in states with stronger enforceability. Starr, Frake, and Agarwal (*forthcoming*) find that a 10 percentage point increase in the incidence of NCA use is associated with an 0.8 year increase in tenure in average- vs. non-enforcing states (a 12% increase over the mean). IT workers in Silicon Valley and elsewhere in California exhibit higher rates of mobility compared to comparable workers in other states, though this pattern appears to be unique to IT and does not extend to other industries within California (Fallick, Fleischman, and Rebitzer 2006).

Not only do non-compete agreements affect the mobility of workers who sign them, but some evidence suggests they also affect the mobility of those who have *not* signed one by increasing uncertainty in the hiring process. Starr, Frake, and Agarwal (*forthcoming*) show that, among workers who have not signed a non-compete agreement, higher incidences of non-competes tend to reduce job offers in high enforceability states more than low enforceability states (i.e., the

---

[30] This estimate is only marginally statistically significant, however. Their sample covers uses CPS data over the 1991 to 2014 period.

15

Electronic copy available at: https://ssrn.com/abstract=3513639

interaction between incidence and enforceability is negative in the regression model).[31]  Their model predicts that a 10 percentage point increase in the incidence of non-competes is associated with a 21% lower rate of job offers over the previous year, in average enforceability states relative to non-enforcing states.  This finding suggests that the prevalence of non-competes in certain industries could potentially increase frictions in the labor market, generally, not just among those who have signed the agreements.  The importance of the externality will depend on how costly it is for firms to discover whether potential hires are bound by a non-compete.[32]  Since this paper relies on cross-sectional comparisons of states at different levels of incidence and enforceability, though, rather than (say) an exogenous policy shock, the results should be interpreted with some caution.

Although much of the focus in the literature is on how non-competes introduce frictions in the labor market, one study suggests they may reduce one friction of particular importance to low-wage workers.  Johnson and Lipsitz (2017) find that non-competes mitigate the disemployment effects of the minimum wage by allowing firms to pay what is essentially a sub-minimum wage (reducing the wedge between reservation wages and a binding minimum wage).  They replicate Dube, Lester, and Reich's (2016) study and find that minimum wage laws have no effect on employment in states with relatively strong enforcement of non-competes, but have negative effects on employment in states which do not enforce non-competes.  This finding suggests that non-competes may serve to reduce an important friction in the labor market for low-wage workers.  Nevertheless, the fact that non-compete use does not appear to vary considerably across states with different levels of enforceability, as several surveys find, suggests that it may not be the presence of non-competes themselves that are tempering the impact of the minimum wage, but rather other unobservables that are simply correlated with enforceability.  If this is true, then it is not clear how important a role that non-competes are playing.

3.  *Firm entry*

The evidence on non-compete enforceability and firm entry is mixed.  Using Michigan's (lone) law change, Carlino (2017) finds that an increase in enforceability had no impact on the number of firm startups, and had a small (but statistically insignificant) increase in the rate of job creation by startups.

The remainder of the literature, relying more heavily on cross-sectional comparisons, finds that non-compete enforceability is associated with less entry.

Stuart and Sorenson (2003) study "liquidity events" (initial public offerings and acquisitions), which provide an influx of liquid assets to senior employees.  They show that these events generally increase the rate of new firm foundings in the biotech industry, but that non-compete enforceability attenuates this effect, likely because potential entrepreneurs are prevented from starting competitor firms by non-compete agreements.

---

[31] Curiously, though, within states of average or below average enforceability, workers in high incidence industries are more likely to generate job offers than those in low incidence ones.
[32] In the case of executives, the information is likely to be relatively easy to come by.  For instance, Garmaise (2009) gleans it from public 10-K filings.

16

Electronic copy available at: https://ssrn.com/abstract=3513639

Samila and Sorenson (2011) study the differential response of states with high and low enforceability regimes to shocks to venture capital availability. They find that states with less strict NCA enforceability respond to such shocks with higher levels of firm startups and employment. These responses are consistent with non-competes inhibiting new firm creation more, on net, than they encourage investments in human capital or knowledge.

Starr, Balasubramanian, and Sakakibara (2017) provide evidence that higher enforceability is associated with fewer spin-off firms within the same industry as their predecessor.[33] Nevertheless, those spin-offs that do appear are (on average) larger, faster growing, and have a higher likelihood of surviving the initial years. They argue that this is because non-compete agreements introduce expected litigation costs for spin-offs, and these costs dissuade less profitable and smaller firms from ever forming. As with Carlino (2017), this is consistent with greater enforceability leading to startups that are more durable.

### 4. Wages

There are several channels through which NCAs can affect wages, including increasing investments in human and other non-tangible forms of capital, and reducing wage competition by improving the bargaining position of employers and reducing entry of competitors. The empirical evidence on which channel tends to dominate is mixed.

Using state policy changes, Johnson, Lavetti, and Lipsitz (2019) and Lipsitz and Starr (2019) find that increasing enforceability leads to lower wages. For U.S. workers generally, Johnson, Lavetti, and Lipsitz (2019) estimate that moving from NCAs being unenforceable to the highest level of enforceability observed in their sample would lead to an 8.9% drop in average wages. Since only a fraction of workers actually sign non-competes, the effect of strengthening enforceability will be quite a bit higher on those bound by one. Using the 18% incidence estimate from SPB (2019b) and assuming away spillovers on non-signers, a back-of-the-envelope calculation suggests average wage effects on non-compete signers of nearly 50% (0.89/0.18)! These wage effects only appear among (relatively) more educated workers, though: they find no effect of increasing enforceability on workers with less than a college education.

Lipsitz and Starr (2019) estimate that Oregon's ban on non-competes in 2008 led to a 2.2 to 3.1% increase in average wages for low wage (hourly) workers relative to several control groups. Moreover, they find no wage effects for workers with less than a high school degree. However, the timing of Oregon's law banning non-competes is unfortunate from an inferential point-of-view as it coincides with the onset of the Great Recession, the most severe recession since the Great Depression and one which had significant consequences for labor markets. This raises the possibility that the paper's estimated effects are confounded by macroeconomic factors that—similar to NCAs—also influence wage growth and worker mobility, as well as by the differential policy responses by states.[34] Indeed, in Lipsitz and Starr (2019), the mobility of workers in

---

[33] They define industry according to the four-digit NAICS code.
[34] Research on regional recessions finds that the timing of recessions (both the onset and recovery) differs across states (Hamilton and Owyang 2012). This includes states in the same Census region or division, which are used as

17

Electronic copy available at: https://ssrn.com/abstract=3513639

Oregon increased (relative to control states) soon after the ban took force in 2008, but average wages did not increase until a full three years post-ban (in 2011). Actual (or threatened) worker mobility is an important channel through which we expect workers to achieve wage growth in Oregon after its ban on non-competes. The fact that Oregon saw an increase in mobility without an increase in average wages raises the possibility that there are confounding factors at play.

Three studies that also exploit state policy changes but concentrate on individual occupations yield mixed findings. Garmaise (2011) provides evidence that increases in non-compete enforceability from state policy changes led to 8.2% lower growth in the compensation of top executives (25% of the mean growth rate). Kini, Williams, and Yin (2019), on the other hand, show that higher enforceability is associated with higher initial compensation among CEOs who have signed non-competes, consistent with the existence of compensating differentials. They find that a one-standard-deviation increase in their enforceability index is associated with an 11.7% increase in the total initial compensation of CEOs bound by NCAs in their sample. Balasubramanian et al. (2018) show that wages rose among new tech hires by 4.2% after Hawaii eliminated the enforceability of non-compete agreements for technology workers.

Several other, more correlational studies find that NCA signers earn higher wages, consistent with non-competes mitigating holdup. Starr et al. (2019) show that workers bound by non-competes earn 7% higher wages compared with comparable unbound workers. Lavetti, Simon, and White (2018) find that wage growth among primary care physicians in group practices is sharply higher among those having signed a non-compete compared with those who have not, which they attribute to greater within-group patient referrals. They estimate that physicians who sign non-competes experience earnings growth that is eight percentage points higher in each year of the first four years as compared to non-signers, and that their earnings are cumulatively 35 percentage points higher after 10 years.

The particulars of the negotiation process appear to matter. Although Starr et al. (2019) find that NCA signers tend to earn more, the wage premium appears among those who received early notification of the non-compete. Those receiving early notice (about two thirds of the sample) receive 10% higher wages than comparable individuals do, while those receiving late notice (about one third of the sample) receive no wage premium.

Other studies find evidence that workers who sign non-competes tend to earn less and experience lower wage growth over their tenure. Starr (2019) finds that wages are lower among workers, generally, in high enforcement states; in particular, moving from non-enforcement to average enforcement is predicted to lower wages by 4%. Balasubramanian et al. (2018), in a similar setup and using the same data, show that tech workers are predicted to receive average wages that are 2.0-2.8% lower in average vs. non-enforcing states. They also show that wages in

---

control groups in some of the difference-in-differences specifications, and (plausibly) states with a pre-2008 trend in wages or mobility similar to Oregon's, which are used in the synthetic control approach. States also varied in their policy responses to the Great Recession, including changing the maximum duration and generosity of unemployment insurance as well as state minimum wage policy. Lipsitz and Starr (2019) do control for changes in state minimum wages.

Electronic copy available at: https://ssrn.com/abstract=3513639

average enforcing states tend to be lower even early in the employment relationship (at quarter four of the current job spell).

### D. Effects in Product Markets

Less firm entry as a result of a higher incidence of non-compete agreements, as discussed above, is suggestive of the fact that competition in product markets may also be attenuated, though no paper has directly studied the link. Given the importance of non-competes in more technical occupations and industries (Marx, Strumsky, and Fleming 2009; SPB 2019b), the impact may tend to be more acute in technical and scientific industries.

A number of papers, though, do consider the implications of non-competes for innovation. Innovation is often measured, somewhat crudely, using data on patent applications. Although patents do not capture every type of innovation in the economy, they have the advantage of being readily measurable as well as available across a number of different industries. Patents are typically assigned a particular geography based on the address of the inventor or inventors, which appears on the application. Patent activity is common enough that it can be analyzed at the state- or even Metropolitan Statistical Area-level.

Samila and Sorenson (2011), in addition to entrepreneurship and employment, also study the impact of venture capital shocks on innovation. They find that states with less enforceability tend to have more new patents. Together, these responses are consistent with non-competes inhibiting new firm creation and innovation more, on net, than they encourage investments in human capital or knowledge.

Several papers find that stricter non-compete enforceability leads to more innovation, consistent with their reducing information spillovers to competitors. Carlino's (2017) evaluation of Michigan's accidental increase in enforceability finds an increase in the number of mechanical patents in Michigan (the most important patent class in the state), though declines in several smaller patent types. The lower mobility among inventors documented by Marx, Strumsky, and Fleming (2009) was likely an important factor in limiting information transfer among Michigan firms. Conti (2014) finds that firms in states with stronger non-compete enforceability tend to pursue riskier R&D projects than firms in states with weaker enforcement.

Little work has been done on whether any cost changes due to the presence or absence of non-competes are ultimately passed on to end consumers. There are two exceptions. Hausman and Lavetti (2019) argue that the use of non-competes can increase the cost structure of physician practices, and that these costs are ultimately passed on to consumers. They document that a 10% increase in their enforceability index is associated with a 4.3% increase in average commercial prices for physician services. Gurun, Stoffman, and Yonker (2019) find that eliminating the enforcement of non-competes among a group of financial advisory firms led to higher fees for end consumers. They argue that a lack of enforceable non-competes increases the cost of worker attrition (as advisers are able to bring clients with them), which is then passed on to consumers.

Electronic copy available at: https://ssrn.com/abstract=3513639

## IV.    Conclusion

Although suggestive, the existing empirical literature on non-compete agreements suffers from several important limitations that raise questions as to whether it has successfully estimated the causal effect of such agreements on mobility, wages, entrepreneurship, and innovation.  Due to the limited availability of data and a shortage of natural experiments to assess the impact of non-competes, much of the literature relies on cross-sectional comparisons of signers and non-signers, or high-enforceability states and low-enforceability ones.

Nevertheless, the literature offers some tentative findings.  Across the board, the literature finds that non-compete agreements are associated with longer worker tenure and less mobility. The findings for other outcomes, however, are mixed.  The papers relying on state policy changes for identification find that non-competes lead to more firm-sponsored training among top public executives (Garmaise 2011) but lower wages generally (Johnson, Lavetti, and Lipsitz (2019) and for technology workers specifically (Balasubramanian et al. 2018).  Estimates for executives at public companies are mixed (Garmaise 2011; Kini, Williams, and Yin 2019). Studies relying on cross-sectional comparisons tend to find that non-competes are associated with more training and information sharing, as well as higher wages in some instances.[35]  Regarding firm entry and innovation, the only paper using state law changes (Carlino 2017) finds no discernable effect of a state law that changed non-compete enforceability.

Further research is needed in several areas.  First, the determinants of why workers sign non-competes and why firms offer them is not well understood.  Second, it is puzzling why non-compete incidence is only weakly correlated with state enforceability.  Third, there are only a handful of studies of specific industries and occupations (physicians, tech workers, and hair stylists).  Given the wide variation across jobs in the potential for investments and the possibility of lock-in, further work would help shed light on where non-competes are likely to increase or decrease efficiency and welfare.  Fourth, exploiting further changes in policy or enforcement would be useful in sharpening the empirics used in this literature, which relies somewhat more heavily on cross-sectional comparisons of non-compete signers with non-signers and high-incidence states with low-incidence ones.  These changes could consist of state law changes, increases in enforcement action (as has occurred recently in Washington and Illinois), or changes in firm or franchise use of non-compete agreements.  Fifth, little work has been done to study how non-compete agreements affect end consumers.

---

[35] The sign and magnitude of the effect on wages does vary in the studies based on occupation and characteristics of the negotiation (e.g., early vs. late notice).

20

Electronic copy available at: https://ssrn.com/abstract=3513639

# References

Angrist, Joshua D., and Jörn-Steffen Pischke, 2009, *Mostly Harmless Econometrics: An Empiricist's Companion*, Princeton University Press (Princeton, NJ).

Angrist, Joshua D., and Jörn-Steffen Pischke, 2010, "The Credibility Revolution in Empirical Economics: How Better Research Design is Taking the Con out of Econometrics," *Journal of Economic Perspectives* 24(2): 3–30.

Angrist, Joshua D., and Alan B. Krueger, 1999, "Empirical Strategies in Labor Economics," *Handbook of Labor Economics* Vol 3A (eds. Orley C. Ashenfelter and David Card): 1277-1366.

Akerlof, George A., and Janet L. Yellen, 1990, "The Fair Wage-Effort Hypothesis and Unemployment," *Quarterly Journal of Economics* 105(2): 255-283.

Altonji, Joseph G., Nicolas Williams, 2005, "Do Wages Rise with Job Seniority - A Reassessment," *Industrial & Labor Relations Review* 58(3): 370-397.

Balasubramanian, Natarajan, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr, 2018, "Locked In?  The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers," U.S. Census Bureau, Center for Economic Studies Paper #CES-WP-17-09.

Becker, Gary S., 1962, "Investment in Human Capital: A Theoretical Analysis," *Journal of Political Economy* 70(5, Part 2): 9-49)

Bishara, Norman, 2011, "Fifty Ways to Leave Your Employer: Relative Enforcement of Noncompete Agreements, Trends, and Implications for Employee Mobility Policy," *University of Pennsylvania Journal of Business Law* 13(3): 751-795.

Blanchflower, David G., Andrew J. Oswald, and Peter Sanfey, 1996, "Wages, Profits and Rent-Sharing," *Quarterly Journal of Economics* 111(1):  227–251.

Borjas, George J., 2013, *Labor Economics* (Sixth Edition), McGraw-Hill (New York, NY).

Cahuc, Pierre, Fabien Postel-Vinay, and Jean-Marc Robin, 2006, "Wage Bargaining with On-the-Job Search: Theory and Evidence," *Econometrica* 74(2): 323–364.

Carlino, Gerald, 2017, ""Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment," Federal Reserve Bank of Philadelphia Working Paper #17-30.

Choi, Sekyu, & Fernández-Blanco, Javier, 2017, "A Note on U.S. Worker Turnover," *Oxford Bulletin of Economics and Statistics* 79(2): 276-289.

JA0456

Electronic copy available at: https://ssrn.com/abstract=3513639

Conti, Raffaele, 2014, "Do Non-competition Agreements Lead Firms to Pursue Risky R&D Projects?," *Strategic Management Journal* 35(8): 1230–1248.

Dehejia, Rajeev H., and Sadek Wahba, 2002, "Propensity Score-Matching Methods for Nonexperimental Causal Studies," *Review of Economics and Statistics* 84(1): 151-161.

Dube, A., T. W. Lester, and M. Reich, 2016, "Minimum Wage Shocks, Employment Flows, and Labor Market Frictions," *Journal of Labor Economics* 34(3): 663-704.

Fallick, Bruce, Charles A. Fleischman, and James B. Rebitzer, 2006, "Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster," *Review of Economics and Statistics* 88(3): 472-481.

Farber, Henry S., 1999, "Mobility and Stability: The Dynamics of Job Change in Labor Markets," *Handbook of Labor Economics* 3: 2439–2483.

Fehr, E., and A. Falk, 1999, "Wage Rigidity in a Competitive Incomplete Contract Market," *Journal of Political Economy* 107(1): 106-134.

Garmaise, Mark J., 2011, "Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment," *Journal of Law, Economics, and Organization* 27(2): 376-425.

Gilson, R., 1999, "The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete," *New York University Law Review* 74:575–629.

Grossman, Sanford J. and Oliver D. Hart, 1986, "The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration," *Journal of Political Economy* 94(4): 691-719.

Gurun, Umit G., Noah Stoffman, and Scott E. Yonker, 2019, "Unlocking Clients: Non-compete Agreements in the Financial Advisory Industry," Working Paper.

Hamilton, James D., and Michael T. Owyang, 2012, "The Propagation of Regional Recessions," *Review of Economics and Statistics* 94(4): 935–947.

Hausman, Naomi, and Kurt Lavetti, 2019, "Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes," Working Paper.

Imbens, Guido W., and Michal Kolesár, 2016 "Robust Standard Errors in Small Samples: Some Practical Advice," *Review of Economics and Statistics* 98(4), 701–712.

Johnson, Matthew S., Kurt Lavetti, and Michael Lipsitz, 2019, "The Labor Market Effects of Legal Restrictions on Worker Mobility," Working Paper.

**JA0457**

Electronic copy available at: https://ssrn.com/abstract=3513639

Johnson, Matthew S., and Michael Lipsitz, 2017, "Why are Low-Wage Workers Signing Noncompete Agreements?," Working Paper.

Jovanovic, Boyan, 1979, "Job Matching and the Theory of Turnover," *Journal of Political Economy* 87(5): 972–990.

Jovanovic, Boyan, 2015, "Matching, Turnover, and Unemployment," *Journal of Political Economy* 92(1): 108–122.

Kini, Omesh, Ryan Williams, and Sirui Yin, 2019, "CEO Non-Compete Agreements, Job Risk, and Compensation," Working Paper.

Lavetti, Kurt, Carol Simon, and William D. White, 2018, The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians," Working Paper.

Lazear, Edward P., and Kathryn L. Shaw, 2007, "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives* 21(4): 91-114.

Lipsitz, Michael, and Evan Starr, 2019, "Low-Wage Workers and the Enforceability of Non-Compete Agreements," Working Paper.

Marks, Mindy S., 2011, "Minimum wages, employer-provided health insurance, and the nondiscrimination law," *Industrial Relations* 50(2): 241-262.

Marx, Matt, Deborah Strumsky, and Lee Fleming, 2009, "Mobility, Skills, and the Michigan Non-Compete Experiment," *Management Science* 55(6): 875-889.

MacKinnon, James G., and Matthew D. Webb, 2018, "The Wild Bootstrap for Few (Treated) Clusters," *Econometrics Journal* 21(2): 114-135.

Malsberger, Brian M., Samuel M. Brock, Arnold H. Pedowitz, American Bar Association, et al., 2012, *Covenants Not to Compete: A State-by-State Survey*, Bloomberg BNA.

Oster, Emily, 2017, "Unobservable Selection and Coefficient Stability: Theory and Evidence," *Journal of Business and Economic Statistics*.

Rosen, Sherwin, 1974, "Hedonic Prices and Implicit Markets," *Journal of Political Economy* 82(1): 34-55.

Rubin, Paul H., and Peter Shedd, 1981, "Human Capital and Covenants Not to Compete," *Journal of Legal Studies* 10(1): 93-110.

Samila, Sampsa, and Olav Sorenson, 2011, "Noncompete Covenants: Incentives to Innovate or Impediments to Growth," *Management Science* 57(3): 425-438.

Electronic copy available at: https://ssrn.com/abstract=3513639

Schumann, Mathias, 2017, "The Effects of Minimum Wages on Firm-Financed Apprenticeship Training," *Labour Economics* 47: 163-181.

Shapiro, Carl, and Joseph E. Stiglitz, 1984, "Equilibrium Unemployment as a Worker Discipline Device," *American Economic Review* 74(3): 433-444.

Simon, Kosali I., and Robert Kaestner, 2004, "Do Minimum Wages Affect Non-Wage Job Attributes? Evidence on Fringe Benefits," *Industrial & Labor Relations Review* 58(1): 52-70.

Stuart, Toby E., and Olav Sorenson, 2003, "Liquidity Events and the Geographic Distribution of Entrepreneurial Activity," *Administrative Science Quarterly* 48(2): 175-201.

Starr, Evan, 2019, "Consider This: Wages, Training, and the Enforceability of Convenants Not to Compete," *Industrial & Labor Relations Review*.

Starr, Evan, Natarajan Balasubramanian, Mariko Sakakibara, 2017, "Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms," *Management Science* 64(2): 552-572.

Starr, Evan, Justin Frake, and Rajshree Agarwal, *forthcoming*, "Mobility Constraint Externalities," *Organization Science*.

Starr, Evan, J.J. Prescott, and Norman Bishara, 2019a, Noncompetes and Employee Mobility," Working Paper.

Starr, Evan, J.J. Prescott, and Norman Bishara, 2019b, Noncompetes in the U.S. Labor Force," Working Paper.

Topel, Robert, 1991, "Specific Capital, Mobility, and Wages: Wages Rise with Job Seniority," *Journal of Political Economy* 99(1): 145-176.

Topel, Robert, and Michael Ward, 1992, "Job Mobility and the Careers of Young Men," *Quarterly Journal of Economics* 107(2): 439–479.

Van Reenen, John, 1996, "The Creation and Capture of Rents: Wages and Innovation in a Panel of U.K. Companies," *Quarterly Journal of Economics* 111(1): 195-226.

**JA0459**

Electronic copy available at: https://ssrn.com/abstract=3513639

VOLUME 116　　　　DECEMBER 2002　　　　NUMBER 2

# HARVARD LAW REVIEW

## ARTICLES

## AGENCY RULES WITH THE FORCE OF LAW:
## THE ORIGINAL CONVENTION

*Thomas W. Merrill and Kathryn Tongue Watts*

### TABLE OF CONTENTS

INTRODUCTION................................................................................................................. 470

I. WHY THE MEANING OF RULEMAKING GRANTS MATTERS ................................................. 476

II. TEXTUALIST INTERPRETATION OF FACIALLY AMBIGUOUS RULEMAKING GRANTS ...... 481

    A. *Language* .................................................................................................................. 482

    B. *Structure* .................................................................................................................. 483

    C. *Canons of Interpretation* ........................................................................................ 487

        1. The Rule of Lenity ............................................................................................ 487

        2. Nondelegation Canons ...................................................................................... 488

        3. The *Petroleum Refiners* Canon ........................................................................ 492

III. THE CONVENTION CREATED............................................................................................ 493

    A. *Early History: The Diversity of Rulemaking Grants* ...................................... 495

    B. *The Importance of* Eaton *and* Grimaud............................................................ 499

    C. *The Convention Emerges* ........................................................................................ 503

        1. Progressive-Era Rulemaking Grants ............................................................... 504

        2. New Deal-Era Rulemaking Grants .................................................................. 509

    D. *The Office of Legislative Counsel* ......................................................................... 520

    E. *The Administrative Procedure Act* ........................................................................ 523

    F. *Why a Convention?* ................................................................................................. 526

IV. THE CONVENTION IGNORED ........................................................................................... 528

    A. *Rulemaking Grants in the Supreme Court, 1943–1979* ................................... 529

        1. *National Broadcasting* (1943) and *American Trucking* (1953) ...................... 529

        2. *Storer Broadcasting* (1956) and *Texaco* (1964) ............................................. 532

        3. *Thorpe* (1969) and *Mourning* (1973) .............................................................. 534

        4. *Gilbert* (1976) and *Chrysler* (1979) ............................................................... 537

    B. *Why the Convention Was Ignored* ....................................................................... 540

V. THE CONVENTION ERASED ................................................................................. 545

   A. *Commentators Advocate Expanded Use of Rulemaking* ................................ 546

   B. *The FTC, FDA, and NLRB Exercise Legislative Rulemaking Powers* ......... 549

      1. The FTC .................................................................................................... 549

         (a) The FTC's Regulatory Practices from 1914 to 1962 ........................ 551

         (b) The FTC Turns to Legislative Rulemaking ..................................... 552

         (c) *National Petroleum Refiners Association* ..................................... 554

      2. The FDA .................................................................................................... 557

         (a) The Debate over the FDA's Rulemaking Powers Under Section 701(a) ........... 558

         (b) *Pharmaceutical Manufacturers* ..................................................... 562

      3. The NLRB ................................................................................................. 565

VI. TAX EXCEPTIONALISM ................................................................................... 570

   A. *Section 7805(a) of the Internal Revenue Code* ........................................... 571

   B. *The Supreme Court Confirms That Section 7805(a) Is Interpretive* .............. 573

   C. *Why the Tax World Thinks Section 7805(a) Is Interpretive* ........................ 574

VII. WHAT THE CONVENTION MEANS TODAY ..................................................... 576

   A. *The Role of the Convention in Statute-Specific Determinations of Legislative Intent* ..................................................................................... 577

   B. *The Case for a Canon* ................................................................................ 578

   C. *Choosing a Canon* ..................................................................................... 581

      1. *The Queen and Crescent Case* Canon ..................................................... 581

      2. The Convention as Canon ......................................................................... 582

      3. The *Petroleum Refiners* Canon ............................................................... 586

   D. *The* Chevron *Paradox* ............................................................................... 587

CONCLUSION ......................................................................................................... 590

# AGENCY RULES WITH THE FORCE OF LAW:
# THE ORIGINAL CONVENTION

*Thomas W. Merrill*[*] *and Kathryn Tongue Watts*[**]

*The Supreme Court recently held in* United States v. Mead Corp. *that agency interpretations should receive* Chevron *deference only when Congress has delegated power to the agency to make rules with the force of law and the agency has rendered its interpretation in the exercise of that power. The first step of this inquiry is difficult to apply to interpretations adopted through rulemaking, because often rulemaking grants authorize the agency to make "such rules and regulations as are necessary to carry out the provisions of this chapter" or words to that effect, without specifying whether "rules and regulations" encompasses rules that have the force of law, or includes only procedural and interpretive rules.* Mead *therefore requires that courts decipher the meaning of facially ambiguous rulemaking grants. This Article argues that throughout most of the Progressive and New Deal eras, Congress followed a convention for signaling when an otherwise ambiguous rulemaking grant was intended to confer delegated authority to make rules with the force of law. Under this convention, rulemaking grants coupled with a statutory provision imposing sanctions on those who violate the rules were understood to authorize rules with the force of law; rulemaking grants not coupled with any provision for sanctions were understood to authorize only interpretive and procedural rules. Although this understanding can be detected in the Administrative Procedure Act of 1946 (APA), the Supreme Court's decisions construing rulemaking grants after the adoption of the APA betray no awareness of the convention. In the 1970s and early 1980s, the D.C. Circuit and Second Circuit, in an effort to encourage greater use of rulemaking, adopted in place of the convention a presumption that facially ambiguous rulemaking grants always authorize rules with the force of law. As a result, courts held that some agencies, such as the FTC, FDA, and NLRB, had legislative rulemaking powers that Congress almost certainly had not intended. Because the Supreme Court has never endorsed the presumption of the D.C. and Second Circuits, it is not constrained in the aftermath of* Mead *from drawing upon the original convention in discerning whether Congress intended to delegate power to make rules with the force of law. Strong arguments exist in favor of adopting the convention as a general canon for interpreting facially ambiguous rulemaking grants. Compared to the current approach that treats all rulemaking grants as presumptively authorizing legislative rules, the convention is generally more faithful to congressional intent and to constitutional values associated with the nondelegation doctrine. These advantages, however, must be weighed against the fact that adopting such a canon at this late date would almost certainly upset reliance interests, most prominently in the FDA context.*

---

[*] John Paul Stevens Professor of Law, Northwestern University.

[**] J.D., Northwestern University, 2001. The authors would like to thank Carl Auerbach, Robert Blakey, Charlotte Crane, William Jordan, Brian Leiter, Liz Magill, Richard Merrill, John Manning, Larry Sager, Jim Speta, Henry Smith, Peter Strauss, and Jay Tidmarsh for helpful comments and other input, and would like to thank the participants in workshops at Columbia, Notre Dame and Texas Law Schools and at a D.C. Circuit judges' luncheon for stimulating discussions on earlier drafts.

## INTRODUCTION

Whether Congress has delegated to particular agencies the authority to make rules with the force of law has been, until very recently, a question of little interest in the administrative law community. Controversies simmered in the 1960s and 1970s over whether the Federal Trade Commission (FTC), the Food and Drug Administration (FDA), and the National Labor Relations Board (NLRB) had power to engage in legislative rulemaking. But these debates are now largely forgotten. An unarticulated assumption took hold sometime after the 1970s that virtually every agency is free to make policy in any mode it chooses, including legislative rules, interpretive rules, policy statements, or adjudication. Administrative lawyers have come to believe that an agency's intent in promulgating a rule, not Congress's intent in delegating power to the agency, determines whether an agency's action has the force of law.

This assumption may soon change. The Supreme Court's recent decisions in *Christensen v. Harris County*[1] and *United States v. Mead Corp.*[2] thrust the question whether agencies have been delegated authority to act with the force of law to the forefront of the most contested issue in administrative law: the scope of the *Chevron* doctrine, which directs courts to accept reasonable agency interpretations of ambiguous statutes.[3] *Christensen* and *Mead* hold that *Chevron*'s high level of deference applies only to agency interpretations that have the "force of law."[4] Moreover, *Mead* makes clear that agencies act with the force of law only if Congress intended to delegate authority to them to so act.[5] To decide whether *Chevron* deference is appropriate, reviewing courts will therefore have to focus on the intended scope of Congress's authorization.

Unfortunately, *Mead* provides incomplete guidance about how courts should undertake this inquiry. One problem is that both *Christensen* and *Mead* involved agency action considerably more informal than either legislative rulemaking or formal adjudication, both of which unquestionably have the force of law.[6] *Christensen* involved an opinion letter written by the head of the Wage and Hour Division of the Department of Labor. *Mead* considered a letter ruling issued by the Customs Service indicating what tariff would be applied to a particular importation of goods. The Court held in both contexts that these actions did not have the force of law, and hence that *Chevron* did

---

[1] 529 U.S. 576 (2000).

[2] 533 U.S. 218 (2001).

[3] *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).

[4] *Christensen*, 529 U.S. at 587; *Mead*, 533 U.S. at 226–27.

[5] *Mead*, 533 U.S. at 226–27.

[6] *See id.* at 230.

not apply.[7] But the factors that *Mead*, the more fully considered decision, discussed as being relevant to whether tariff classification letters have the force of law are not likely to provide much help in the rulemaking or formal adjudication context.

With respect to rulemaking, which is the focus of this Article, the central difficulty going forward is that nearly all agency rulemaking grants are facially ambiguous concerning whether the agency is authorized to make rules with the force of law. Statutes typically give agencies the power "to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this title,"[8] or "to make such rules and regulations . . . as may be necessary in the administration of this Act."[9] The phrase "rules and regulations" in these statutes could refer to legislative rules — that is, rules that have legally binding effect on the general public — or it could refer to interpretive rules that do not have such binding effect.[10] If "rules and regulations" refers to the former type of rule, then Congress has delegated power to the agency to act with the force of law, and under *Mead* the agency would be eligible for *Chevron* deference. However, if "rules and regulations" refers to the latter type of rule, then *Mead*'s threshold inquiry presumably would not be satisfied, and the agency would not be eligible for *Chevron* deference.[11]

---

[7] *See id.* at 226–27; *Christensen*, 529 U.S. at 587.

[8] Securities Act of 1933, ch. 38, § 19(a), 48 Stat. 74, 85 (codified as amended at 15 U.S.C. § 77s(a) (2000)); *see also* Communications Act of 1934, ch. 652, § 4(i), 48 Stat. 1064, 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)) (authorizing the FCC to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions"); Natural Gas Act, ch. 556, § 16, 52 Stat. 821, 830 (1938) (codified as amended at 15 U.S.C. § 717o) (giving the Federal Power Commission the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act"); Securities Exchange Act of 1934, ch. 404, § 23(a), 48 Stat. 881, 901 (codified as amended at 15 U.S.C. § 78w(a)(1)) ("The Commission and the Federal Reserve Board shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this title . . . ."). According to one report, by January 1, 1935, more than 190 federal statutes included rulemaking grants that gave agencies power to "make any and all regulations 'to carry out the purposes of the Act.'" *Report of the Special Committee on Administrative Law*, 61 ANN. REP. A.B.A. 720, 778 (1936).

[9] Longshoremen's and Harbor Workers' Compensation Act, ch. 509, § 39(a), 44 Stat. 1424, 1442 (1927) (codified as amended at 33 U.S.C. § 939(a) (2000)); *see also* Motor Carrier Act, 1935, ch. 498, § 204(a)(6), 49 Stat. 543, 546 (repealed 1983) (providing that the Interstate Commerce Commission (ICC) has the power "to administer, execute, and enforce all provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration"); Wool Products Labeling Act of 1939, ch. 871, § 6(a), 54 Stat. 1128, 1131 (1940) (codified at 15 U.S.C. § 68d(a)) (authorizing the FTC to make rules and regulations "as may be necessary and proper for administration and enforcement").

[10] For the definition of "legislative" rules (and other classifications of rules), *see infra* Part I, pp. 476–77.

[11] *Mead*, 533 U.S. at 232 (indicating that interpretive rules "enjoy no *Chevron* status as a class").

Although the language of most rulemaking grants is facially ambiguous, we argue in this Article that these grants were not ambiguous during the formative years of the modern administrative state — up to and beyond the enactment of the Administrative Procedure Act (APA) in 1946. Throughout the Progressive and New Deal eras, Congress followed a drafting convention that signaled to agencies whether particular rulemaking grants conferred authority to make rules with the force of law as opposed to mere housekeeping rules. That convention was simple and easy to apply in most cases: If Congress specified in the statute that a violation of agency rules would subject the offending party to some sanction — for example, a civil or criminal penalty; loss of a permit, license, or benefits; or other adverse legal consequences — then the grant conferred power to make rules with the force of law. Conversely, if Congress made no provision for sanctions for rule violations, the grant authorized only procedural or interpretive rules. Congress followed this convention from the second decade of the twentieth century through the enactment of the APA, and it can be discerned in statutes enacted as recently as 1967.[12]

The most remarkable aspect of this drafting convention is that modern administrative lawyers are not aware of its existence. How could a convention that Congress consistently followed during the formative years of the administrative state simply disappear from legal consciousness? The explanation, we suggest, lies in the fact that during the time the convention was developed and followed by Congress, no appellate court rendered a decision that required it to determine whether Congress had conferred authority on an agency to make rules with the force of law. In administrative law, as in other areas of American law, legal knowledge is transmitted through the study of appellate opinions. With no opinion to flag the issue, questions about the meaning of ambiguous rulemaking grants were ignored in post-World War II treatises and instructional materials devoted to administrative law. As a result, knowledge of the convention died out. When, in subsequent years, the Supreme Court occasionally encountered cases that implicated the meaning of such rulemaking grants, none of the parties alerted the Court to the existence of the convention, even if it would have been in their interests to do so — presumably because their lawyers did not know about it.

The collective amnesia about the drafting convention eventually had important consequences. In the 1960s, courts and commentators began to urge an expanded use of rulemaking by agencies and a reduced emphasis on adjudication. Eventually, two influential federal

---

[12] *See* Flammable Fabrics Act, amendment, Pub. L. No. 90-189, § 4(a), 81 Stat. 568, 571 (1967) (codified as amended at 15 U.S.C. § 1194(c)), discussed *infra* note 426.

appellate judges who strongly favored greater use of rulemaking — Judges J. Skelly Wright of the D.C. Circuit and Henry Friendly of the Second Circuit — authored important opinions construing facially ambiguous rulemaking grants to the FTC and FDA as authorizing legislative rulemaking.[13]  These holdings were inconsistent with what Congress had intended, as measured by the convention.  Although some commentators expressed unease about allowing the FTC and FDA to engage in legislative rulemaking under their general rulemaking grants,[14] neither Congress nor the Supreme Court attempted to reverse these decisions.

Soon, the assumption took hold that facially ambiguous rulemaking grants always include the authority to adopt rules having the force of law.  In 1991, for example, the Supreme Court upheld a legislative rule promulgated by the NLRB pursuant to its general rulemaking grant under the National Labor Relations Act.[15]  Although the case involved the first broad-scale exercise of legislative rulemaking by the NLRB since its creation in 1935,[16] no Justice questioned whether the agency had the authority to promulgate such a rule.[17]  Similarly, the Supreme Court's *Chevron* decision treated as legally binding a rule adopted by the Environmental Protection Agency (EPA) pursuant to its general rulemaking powers under the Clean Air Act.[18]  The *Chevron* Court never questioned whether the Act's facially ambiguous rulemaking grant authorized the agency to promulgate a legislative rule.[19]

This history is highly relevant to whether agencies have authority to act with the force of law.  *Christensen* and *Mead* appear to contemplate that courts will engage in a statute-by-statute determination of

---

[13] *See* Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 693 (D.C. Cir. 1973) (Wright, J.); Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 888 (2d Cir. 1981) (Friendly, J.); *see also* Nat'l Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 694–98 (2d Cir. 1975) (anticipating the holding in *Pharmaceutical Manufacturers*).

[14] *See* Bernie R. Burrus & Harry Teter, *Antitrust: Rulemaking v. Adjudication in the FTC*, 54 GEO. L.J. 1106 (1966); Richard A. Merrill, *FDA and the Effects of Substantive Rules*, 35 FOOD DRUG COSM. L.J. 270, 273–75 (1980).

[15] Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 609–610 (1991) (holding that section 6 of the Act, which gives the NLRB the power "to make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions" of the Act, was adequate to authorize the rule).

[16] *See generally* Mark H. Grunewald, *The NLRB's First Rulemaking: An Exercise in Pragmatism*, 41 DUKE L.J. 274 (1991) (evaluating the importance of the NLRB's first significant exercise in legislative rulemaking).

[17] *See American Hospital Ass'n,* 499 U.S. at 609–10 (stating without further explanation that the general rulemaking grant was "unquestionably sufficient to authorize the rule at issue" in the absence of specific limiting provisions).

[18] Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 866 (1984); *see also* 42 U.S.C. § 7601(a)(1) (2000) ("The Administrator is authorized to prescribe such regulations . . . as are necessary to carry out his functions under this chapter.").

[19] Indeed, the Court did not even cite the EPA's general rulemaking provision as authority in its opinion.

whether agencies can exercise such authority. For any statute enacted before the revisionist Wright-Friendly view took hold, the convention in most cases provides the key to unlocking Congress's delegatory intent. The convention is obviously less reliable as a guide to congressional intent for statutes enacted after Wright and Friendly wrote their opinions, since the background understanding against which Congress acts has arguably shifted. Nevertheless, courts may wish to consider adopting the convention as a general canon for determining the presumptive meaning of facially ambiguous rulemaking grants. The ultimate objective of *Chevron*, as interpreted in *Mead*, appears to be to develop a set of signals by which Congress can indicate when agencies, rather than courts, are to serve as the primary interpreters of federal statutes. From this perspective, the original convention for distinguishing between legislative and housekeeping grants — whether Congress prescribed some sanction for rule violations — not only has the imprimatur of history, but would also serve as a clear rule for Congress, agencies, courts, and regulated entities to follow in determining whether the critical delegation occurred. Perhaps most importantly, such a canon — by identifying an unambiguous signal from Congress of its intent to delegate power to act with the force of law — would reinforce an important nondelegation principle: executive branch agents have no inherent authority to act with the force of law and instead possess such power only when it has been deliberately given to them by the people's representatives in Congress.[20]

This Article is divided into seven Parts. Part I begins by describing two reasons why it is important to know whether facially ambiguous rulemaking grants confer power to adopt rules with the force of law. First, legislative rules are subject to special procedural obligations,[21] known as notice-and-comment procedures. To determine whether an agency has promulgated a legislative rule and hence must follow these procedures, we need to know whether Congress has delegated authority to the agency to issue rules that have the force of law. Second, and more urgently, the Supreme Court in its recent *Christensen* and *Mead* decisions has confined the scope of the *Chevron* doctrine to agency interpretations that have the force of law. To implement the *Mead* doctrine, it is necessary to determine when particular rulemaking grants confer authority to make rules with the force of law.

---

[20] *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952) (stating that the President's authority to seize control of steel mills "must stem either from an act of Congress or from the Constitution itself"). For a thorough, but quite dated, discussion of historical sources relating to the existence of inherent presidential power to act with the force of law, see JAMES HART, THE ORDINANCE MAKING POWERS OF THE PRESIDENT OF THE UNITED STATES 110–19 (1925).

[21] *See* Administrative Procedure Act, 5 U.S.C. § 553 (2000).

Anticipating that some interpreters will want to know whether it is possible to ascertain Congress's delegatory intent without recourse to legislative history, Part II canvasses the chief textualist approaches to interpreting facially ambiguous rulemaking grants. We conclude that the meaning of such grants will often remain inconclusive if interpreters examine them through a purely textualist lens, without any reference to history.

Part III turns to history and shows how Congress in the first half of the twentieth century relied on a convention for distinguishing between legislative and nonlegislative rulemaking grants. This convention emerged in the wake of two Supreme Court decisions, *United States v. Eaton*[22] and *United States v. Grimaud*,[23] that considered whether Congress could delegate to administrative agencies the authority to impose criminal penalties for violations of agency regulations. In answering this question, the Court focused on whether Congress had adopted legislation specifically authorizing criminal sanctions for rule violations,[24] and thus provided a point of reference for differentiating between legislative and housekeeping grants. After *Grimaud*, Congress repeatedly deployed the device of including or omitting sanctions for rule violations in a statute as a way of signaling whether an agency had received legislative rulemaking authority. We show that numerous important regulatory statutes enacted in the Progressive and New Deal eras followed this pattern, and that the convention can be discerned in the text and legislative history of the APA.

Despite the fact that legislative actors adhered to the convention through the adoption of the APA, Supreme Court decisions touching on rulemaking grants in the subsequent decades betrayed no awareness of the convention. As we recount in Part IV, the outcomes of the Court's decisions through the 1960s were, with one exception, consistent with the convention.[25] Nevertheless, the Court's general failure to attend to the distinction between grants of legislative authority and grants of housekeeping authority increasingly caused lower courts and commentators to view agency intent, rather than congressional intent, as the key factor in identifying legislative rules.

As support for agency rulemaking grew in the 1960s, advocates inside and outside certain agencies began to urge that facially ambiguous rulemaking grants that had been long regarded as authorizing only housekeeping rules provide a basis for legislative rulemaking. As chronicled in Part V, these efforts eventually led to the successful exer-

---

[22]  144 U.S. 677 (1892).

[23]  220 U.S. 506 (1911).

[24]  *See Eaton*, 144 U.S. at 677; *Grimaud*, 220 U.S. at 517.

[25]  The exception is *Thorpe v. Housing Authority*, 393 U.S. 268 (1969), discussed *infra* notes 342–354 and accompanying text.

cise of general legislative rulemaking powers by three federal agencies that had not previously wielded such powers: the FTC, FDA, and NLRB.[26]  Opinions by Judges Wright and Friendly sanctioning the exercise of general legislative rulemaking authority by the FTC and the FDA in effect established a presumption that facially ambiguous rulemaking grants confer legislative rulemaking authority.

Part VI describes one vestige of administrative practice that deviates from the Wright-Friendly presumption: the tax world, which adheres to the view that the Treasury Department's general rulemaking grant authorizes only interpretive rules.  This view, however, rests on the distinction between general and specific grants of rulemaking authority rather than on whether Congress attached legal sanctions to rule violations.  Thus, even the tax world deviates from the original congressional understanding as reflected in the convention.

Finally, Part VII considers how courts should use this history in determining whether Congress has delegated power to agencies to make rules having the force of law, the inquiry that *Christensen* and *Mead* require.  We consider how Congress, agencies, and courts might use the convention either as a key to understanding legislative intent on a statute-by-statute basis, or as a canon of presumptive congressional intent that overcomes *Mead*'s greatest weakness — its failure to provide a clear rule for identifying the scope of the *Chevron* doctrine.

## I. Why the Meaning of Rulemaking Grants Matters

Agency rules come in several types.[27]  A basic distinction is between "legislative" rules and "nonlegislative" rules.[28]  Legislative rules

---

[26] The FDA's story is somewhat different from those of the FTC and the NLRB: although the agency's general rulemaking grant does not confer legislative rulemaking powers, according to the convention the FDA does have legislative rulemaking powers under several *specific* rulemaking grants. *See infra* section V.B.2, pp. 557–65.

[27] For an overview of the different kinds of rules that agencies can make under the APA regime, see 1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.3 (3d ed. 1994); Michael Asimow, *Nonlegislative Rulemaking and Regulatory Reform*, 1985 DUKE L.J. 381, 383–88 (distinguishing legislative from nonlegislative agency rules, describing the difficulty of distinguishing them in practice, and describing the functions of nonlegislative rules); William T. Mayton, *A Concept of a Rule and the "Substantial Impact" Test in Rulemaking*, 33 EMORY L. REV. 889, 895–910 (1984) (describing the rulemaking process and several proposed conditions for the creation of agency rules); Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules*, 52 ADMIN. L. REV. 547, 549–54 (2000) (describing the differences between legislative rules and interpretive rules under the APA in terms of their effects and the procedures used to make them); Peter L. Strauss, *The Rulemaking Continuum*, 41 DUKE L.J. 1463, 1466–68 (1992) (outlining four kinds of rulemaking activity under the APA: "formal rulemaking," which has stringent procedural requirements, and "informal rulemaking," which has less stringent procedural requirements (both of which result in rules with the force of law); "publication rulemaking," which includes statements of policy and interpretive statements; and other "rules" of "lesser dignity" such as guidance documents and press releases).

[28] *See* Asimow, *supra* note 27, at 383.

are those that have the force and effect of law. From the perspective of agency personnel, regulated parties, and courts, these rules have a status akin to that of a statute.[29] Nonlegislative rules do not have the force and effect of law; rather, they are simply statements about what an agency intends to do in the future.

Another distinction is between "substantive" rules and "procedural" rules. Substantive rules regulate the primary behavior of parties outside the walls of the issuing agency — addressing how much pollution they can emit, what they must disclose in proxy statements, and so forth.[30] The most important type of substantive rules are legislative substantive rules, which regulate primary behavior with the force of law. Such rules are typically referred to as either "legislative rules" or "substantive rules" for short; we will refer to them throughout this Article as "legislative rules." Substantive rules can also be nonlegislative in nature. "Interpretive rules" are nonbinding substantive rules that advise the public about how an agency interprets a particular statute or legislative rule that it administers.[31] "Policy statements" are nonbinding substantive rules that advise the public about how the agency intends to exercise some discretionary power that it has.[32] Procedural rules, in contrast to substantive rules, govern what happens inside an agency — how it is organized, how it conducts hearings, and so forth. Like substantive rules, these too can be either legislative or nonlegislative in character.[33] This Article will not consider procedural rules in detail.

The distinction between legislative rules (that is, substantive legislative rules) and other types of rules is important in administrative law for several reasons.[34] First, the APA generally requires agencies to en-

---

[29] *See* ATTORNEY GENERAL'S COMM. ON ADMIN. PROCEDURE, ADMINISTRATIVE PROCEDURE IN GOVERNMENT AGENCIES, S. DOC. NO. 77-8, at 100 (1st Sess. 1941) [hereinafter FINAL REPORT] (distinguishing "legally binding regulations" that receive statutory force from "interpretive regulations," under which the "statutes themselves and not the interpretations remain in theory the sole criterion of what the law authorizes"). We realize that to say that a legislative rule has a status akin to a statute begs the question of what qualities distinguish a statute. We have more to say about this in Part III, *infra* pp. 493–528, where we unpack the historical convention for differentiating between legislative and nonlegislative rulemaking grants.

[30] *See* U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 30 n.3 (1947).

[31] *See id.; see also* Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quoting and discussing U.S. DEP'T OF JUSTICE, *supra* note 30, at 30 n.3).

[32] *See* U.S. DEP'T OF JUSTICE, *supra* note 30, at 30 n.3.

[33] *See* Joseph v. U.S. Civil Serv. Comm'n, 554 F.2d 1140, 1153 n.24 (D.C. Cir. 1977); 1 DAVIS & PIERCE, *supra* note 27, § 6.6, at 252–54.

[34] In addition to the two reasons discussed in the text, three others deserve mention. First, because legislative rules are legally binding, in an enforcement action the agency need only show that a party violated the rule to prove it acted illegally; in contrast, if the agency invokes an interpretive rule, it is the statute itself, not the rule, that is controlling. Thus a legislative rule can ease an agency's burden of proof and narrow the issues to be litigated. *See* JERRY L. MASHAW ET

gage in notice-and-comment rulemaking before developing legislative rules, but not before making procedural rules, interpretive rules, or policy statements.[35]   In identifying legislative rules for the purposes of APA notice-and-comment requirements, recent appellate decisions have held that two conditions must be satisfied: "Congress has delegated legislative power to the agency and . . . the agency intended to exercise that power in promulgating the rule."[36]   In practice, the decisions that apply this two-part test focus almost exclusively on the second part — whether the agency intended to make a rule that has the force and effect of law.[37]   As far as we are aware, the first part — whether Congress has delegated power to the agency to make rules that have the force of law — has never been the focus of any appellate opinion considering whether a particular rule is legislative and hence subject to the procedural requirements of § 553.

The judicial indifference to the first half of the test is puzzling. With rare exceptions, nearly all of the rulemaking grants adopted by Congress in the twentieth century do not specify whether they authorize legislative rules, procedural rules, interpretive rules, or policy statements.   Instead, they simply speak of "rules and regulations" and leave it at that.[38]   Examining the bare language of these statutes, therefore, courts cannot tell whether Congress "has delegated legislative power to the agency."[39]   By focusing only on agency intent in determining whether a rule is legislative for § 553 purposes, then, courts implicitly assume that facially ambiguous rulemaking grants confer the

---

AL., ADMINISTRATIVE LAW: THE AMERICAN PUBLIC LAW SYSTEM 448 (4th ed. 1998).   Second, under some statutes a legislative rule, unlike an interpretive rule, is not open to judicial review in an enforcement action.   *See, e.g.*, 42 U.S.C. § 7607(b)(1) (2000) (providing that petitions for judicial review of a rule made pursuant to certain sections of the Clean Air Act must be filed within sixty days of the rule's promulgation).   Third, legislative rules are more likely than interpretive rules to be subject to judicial review before an agency brings an enforcement action.   *See* 1 DAVIS & PIERCE, *supra* note 27, § 6.2, at 228; Peter L. Strauss, *Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for an Essential Element*, 53 ADMIN. L. REV. 803, 817–22 (2001).

[35]   *See* 5 U.S.C. § 553(b)–(c) (2000).

[36]   *American Mining Congress*, 995 F.2d at 1109; *see also* Am. Postal Workers Union v. U.S. Postal Serv., 707 F.2d 548, 558 (D.C. Cir. 1983) ("A rule can be legislative only if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue."); *cf. Joseph*, 554 F.2d at 1153 n.24 (noting that whether a rule is legislative depends on "the authority and intent with which [it is] issued").

[37]   For example, in *American Mining Congress*, after stating the two-part test, the court devoted the balance of its opinion to discussing a variety of circumstances that indicate agency intent to make rules with the force of law.   *See American Mining Congress*, 995 F.2d at 1109–13.

[38]   *See infra* section III.C, pp. 503–19 (describing grants of rulemaking authority in numerous twentieth-century statutes).

[39]   *American Mining Congress*, 995 F.2d. at 1109.

JA0471

power to make legislative rules. Later in the Article, we explain the origins of this unstated presumption and question its validity.[40]

A second reason that the distinction between legislative and other types of rulemaking is important concerns the standard that courts apply in reviewing agency interpretations of their statutory authority. The issue here is whether courts will review agency interpretations of statutes under the highly deferential *Chevron* test,[41] or the multifactor *Skidmore* standard,[42] or whether they will instead determine the meaning of the statute de novo.[43] The Supreme Court recently held in *Christensen v. Harris County*[44] and *United States v. Mead Corp.*[45] that *Chevron* applies only to agency interpretations that have the "force of law."[46] Agency interpretations that do not have the force of law receive only whatever deference is due under the *Skidmore* standard.[47] In elaborating the "force of law" criterion, the Court in *Mead* adopted a two-part test similar to that used to distinguish between legislative and nonlegislative rules in the APA rulemaking-requirements context: "We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."[48]

In applying the two-part *Mead* test, lower courts may do what they have done in the APA cases: ignore the first part and concentrate solely on the second. But this response is unlikely. The Court in *Mead* made clear that *Chevron* deference is grounded in a congressional intent to delegate primary interpretive authority to the agency. Its opinion referred throughout to congressional intent, expectations, contempla-

---

[40] *See infra* Part V, pp. 544–70.

[41] *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–44 (1984) (holding that courts must defer to an agency's interpretation of an ambiguous statute if the interpretation is reasonable).

[42] *See* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (requiring courts to consider agency interpretations of ambiguous statutes, to assess these interpretations against a variety of contextual factors, and to defer to such interpretations to the extent that they are persuasive).

[43] For a general discussion of these three standards of review and their respective domains, see Thomas W. Merrill & Kristin E. Hickman, Chevron's *Domain*, 89 GEO. L.J. 833, 852–63 (2001).

[44] 529 U.S. 576 (2000).

[45] 533 U.S. 218 (2001).

[46] *See id.* at 226–27; *Christensen*, 529 U.S. at 587. Neither *Mead* nor *Christensen* explained why courts should give more deference to decisions that have the force of law and less deference to decisions that do not. For a discussion of some reasons supporting this proposition, see Merrill & Hickman, *supra* note 43, at 874–82.

[47] *See Mead*, 533 U.S. at 234–35.

[48] *Id.* at 226–27; *see also id.* at 237 (holding that *Skidmore* rather than *Chevron* applies "where statutory circumstances indicate no intent to delegate general authority to make rules with force of law, or where such authority was not invoked").

tions, thoughts, and objectives.[49]  The Court also discussed a number of factors that led it to conclude that Congress had not delegated authority to the Customs Service to act with the force of law when it authorized the agency to issue tariff classification rulings.  Specifically, the Court considered whether Congress required the agency to engage in relatively formal procedures before acting, whether Congress authorized the agency to adopt rules or precedents that generalize beyond a single case, and whether Congress authorized the agency to prescribe legal norms that apply uniformly throughout its jurisdiction.[50]  The Court conspicuously framed each of these factors in terms of congressional rather than agency intent.

If courts take seriously the relevance of Congress's intent to give an agency's rules the force of law, and heed the passages in *Mead* that appear to say that the inquiry into congressional intent should proceed by looking to all conceivably relevant factors, the result in most cases will be highly unpredictable.  The central problem, again, is that Congress typically authorizes agencies to adopt "rules and regulations," but does not specifically say "legislative" rules and regulations.[51]  And without any direction in the legislative text, the all-things-considered *Mead* framework provides little guidance to lower courts, agencies, and regulated parties about how to discern congressional intent in any given set of circumstances.  Thus, it is likely to sow confusion among lower courts, inhibit agency planning, and generate additional legal costs.  It is also likely to undermine congressional control over the allocation of interpretive authority, for while Congress can be explicit in new legislation, an unpredictable framework makes it difficult to determine how courts will construe existing legislation.[52]  Given the dif-

---

[49] *See id.* at 229–34.

[50] *See id.*

[51] *Mead* also creates problems in determining whether agencies should receive *Chevron* deference for interpretations embodied in procedural rules. Procedural rules, like substantive legislative rules, can have the force of law. *See* 1 DAVIS & PIERCE, *supra* note 27, § 6.6, at 252–54 (noting that procedural rules are sometimes legislative and sometimes merely guidelines). Moreover, there is little doubt that when Congress enacts a facially ambiguous grant of authority to an agency to adopt "rules and regulations," it intends at the very least to include in this grant the authority to make procedural rules. Thus, procedural rules will often satisfy *Mead*'s basic requirement for *Chevron* deference — a delegation of authority from Congress to act with the force of law. *Cf.* Merrill & Hickman, *supra* note 43, at 905–06. On the other hand, *Mead* places considerable emphasis on whether Congress has required that an agency follow notice-and-comment procedures in issuing a rule, *see Mead*, 533 U.S. at 230–31, and the APA specifically exempts procedural rules from notice-and-comment procedures, *see* 5 U.S.C. § 553(b) (2000). Thus, one of the signals of congressional intent to make rules legally binding emphasized by *Mead* — the requirement of notice-and-comment procedures — is irrelevant. The Supreme Court recently reserved judgment on the degree of deference owed to a particular procedural rule. *See* Edelman v. Lynchburg Coll., 122 S. Ct. 1145, 1150 (2002).

[52] *See* Thomas W. Merrill, *The* Mead *Doctrine: Rules and Standards, Meta-Rules and Meta-Standards*, 54 ADMIN. L. REV. 807, 819–26 (2002).

ficulty in determining actual congressional intent, "some version of constructive — or perhaps more frankly said, fictional — intent must operate in judicial efforts to delineate the scope of *Chevron*."[53]   The need to attribute some intent to Congress, in turn, raises the question whether there is any background principle that courts can apply in a manner that is reasonably faithful to Congress's actual intent and that simultaneously resolves disputes over the nature of delegated authority in a reasonably predictable manner.

## II. Textualist Interpretation of Facially Ambiguous Rulemaking Grants

What does Congress mean when it gives agencies the power to make such "rules and regulations" as may be necessary to implement or administer an act?  In Part III, we discuss how Congress historically followed a convention to signal its intent to grant either legislative rulemaking authority or merely housekeeping authority.[54]   Once we understand this convention, we can discern Congress's probable intent in most instances.  But to confirm the existence of this convention we must examine the legislative histories of numerous statutes.  Using legislative history to resolve questions of statutory interpretation is controversial.  Some interpreters, such as Justice Scalia, have insisted that questions of statutory interpretation should be resolved solely in terms of the objective meaning of a statute rather than by reference to Congress's subjective intentions.[55]   Such "textualist" interpreters look to the language of a statute, its structure, and canons of interpretation in resolving statutory meaning, but ordinarily avoid legislative history, such as committee reports and floor debates.[56]   However, a survey of the techniques of interpretation typically deployed by textualists sug-

---

[53] David J. Barron & Elena Kagan, Chevron's *Nondelegation Doctrine*, 2001 SUP. CT. REV. 201, 203; *see also* Russell L. Weaver, *The Emperor Has No Clothes:* Christensen, Mead *and Dual Deference Standards*, 54 ADMIN. L. REV. 173, 186–87 (2002) ("Because Congress never explicitly states that a particular agency is given the power to interpret with the 'force of law,' the Court must focus on 'implicit' manifestations of intent if the 'force of law' standard is to be workable.").

[54] *See infra* pp. 493–528. By "housekeeping authority" we mean the authority to promulgate nonlegislative substantive rules (interpretive rules and policy statements) and procedural rules.

[55] *See* Antonin Scalia, *Common Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in* A MATTER OF INTERPRETATION 29–37 (Amy Gutmann ed., 1997) (arguing that "legislative history should not be used as an authoritative indication of a statute's meaning").

[56] *See id.* at 17–18, 23–37; *see also* Daniel A. Farber & Philip P. Frickey, *Legislative Intent and Public Choice*, 74 VA. L. REV. 423, 453–457 (1988); John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 COLUM. L. REV. 673, 675–76 (1997); Thomas W. Merrill, *Textualism and the Future of the* Chevron *Doctrine*, 72 WASH. U. L.Q. 351, 352 (1994). *See generally* William N. Eskridge, Jr., *The New Textualism*, 37 UCLA L. REV. 621 (1990) (describing the "new textualism" of Justice Scalia and Judge Easterbrook).

gests that these tools cannot clearly resolve the meaning of ambiguous rulemaking grants in most instances.

### A. *Language*

All interpreters regard a statute's language as the most important datum in statutory interpretation.[57]   And indeed, sometimes the language of a rulemaking grant expressly specifies whether the grant includes the authority to adopt legally binding rules.  For example, a few statutes state that the rules promulgated by an agency shall have "the force and effect of law."[58]   Other rulemaking grants unambiguously limit their reach to procedural rules, providing, for example, that an agency has the power to issue "suitable *procedural* regulations to carry out the provisions" of an act.[59]

More often, however, the language used in rulemaking grants is ambiguous, stating only that an agency has the power to make "rules and regulations as may be necessary to carry out the provisions of this title,"[60] or "to make such rules and regulations . . . as may be necessary in the administration of this Act."[61]   It is possible that the varying language used in different grants could be given different meanings.  For example, a grant that gives power to an agency to "enforce" an act or a provision of an act might be construed as authorizing legislative rules, whereas grants that speak only of "administering" an act might not.[62]

---

[57] Even those interpreters who formulate the inquiry in terms of ascertaining legislative purpose or intent routinely "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." Sec. Indus. Ass'n v. Bd. of Governors, 468 U.S. 137, 149 (1984) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)); *see also* Eskridge, *supra* note 56, at 621 (stating that "[t]he statute's text is the most important consideration in statutory interpretation").

[58] *E.g.*, Agricultural Adjustment Act, ch. 25, § 10(c), 48 Stat. 31, 37 (1933) (codified as amended at 7 U.S.C. § 610(c) (2000)).

[59] 42 U.S.C. § 2000e-12(a) (2000) (emphasis added); *see also* Interstate Commerce Act, ch. 104, § 17, 24 Stat. 379 (1887) (repealed 1978) ("Said Commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it . . . .").

[60] *E.g.*, Securities Act of 1933, ch. 38, § 19(a), 48 Stat. 74, 85 (codified as amended at 15 U.S.C. § 77s(a) (2000)); *see also* Natural Gas Act, ch. 556, § 16, 52 Stat. 821, 830 (1938) (codified as amended at 15 U.S.C. § 717o) (giving the Federal Power Commission the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act").

[61] *E.g.*, Longshoremen's and Harbor Workers' Compensation Act, ch. 509, § 39(a), 44 Stat. 1424, 1442 (1927) (codified as amended at 33 U.S.C. § 939(a) (2000)); *see also* Motor Carrier Act, 1935, ch. 498, § 204(a)(6), 49 Stat. 543, 546 (repealed 1983) (providing that the ICC has the power "[t]o administer, execute, and enforce all other provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations and procedure for such administration").

[62] This possibility is suggested in passing in *American Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953): "We cannot agree with appellants' contention that the rule-making authority

Or, rulemaking grants might be differentiated on the ground that a grant that authorizes an agency to "carry out" the provisions of an act[63] is more legislative in tone than a grant that gives an agency the power to make rules for the "administration" of an act[64] or to promulgate rules "as may be necessary in the execution of its functions."[65]

Briefs filed with the Supreme Court have occasionally made arguments of this nature.[66] But only rarely have courts suggested that different verbal formulations signify the conveyance of different types of powers.[67] In the end, whether any particular formulation is "legislative" or "interpretive" remains debatable. For example, it has been argued that a conferral of authority "to enforce" the provisions of an act is both a signal that legislative rulemaking authority has been given and a signal that the agency possesses only interpretive rulemaking authority.[68] Given the general language used in most rulemaking grants, it is not ordinarily possible simply by analyzing the text to determine whether such grants confer legislative as opposed to procedural and interpretive powers.

## B. Structure

The overall structure of statutes provides another important consideration that meets with approval from textualist interpreters. As Justice Scalia has stated, a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme."[69] Structural arguments usually focus on the internal structure of a single

---

... merely concerns agency procedures and is solely administrative. It ignores the distinct reference in the section to enforcement."

[63] *See* statutes cited *supra* note 60.

[64] *See* statutes cited *supra* note 61.

[65] Communications Act of 1934, ch. 652, § 4(i), 48 Stat. 1064, 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions.").

[66] For example, in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973), the petitioner argued that a rulemaking grant to carry out "the purpose" of an act was broader than a grant to carry out "the provisions" of an act. *See* Brief for Petitioner at 24, *Mourning*, 411 U.S. 356 (1973) (No. 71-829). Similarly, in *American Trucking*, the appellants argued that the power the Motor Carrier Act gave to the ICC to "prescribe rules, regulations, and procedure for such administration" of the Act was specifically limited to rules and regulations for "administration." Appellants' Petition for Rehearing at 10–12, E. Motor Express, Inc., v. United States, 344 U.S. 298 (1953) (No. 35).

[67] Nor are we aware of any evidence from legislative history that Congress has ever placed any significance on these divergences in verbal formulations.

[68] *Compare American Trucking*, 344 U.S. at 311 (stating that the power of "enforcement" suggests a legislative grant), *with* Brief for Petitioner, *supra* note 66, at 23–24 (arguing that the power of "enforcement" suggests an interpretive grant).

[69] United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988); *see also* Eskridge, *supra* note 56, at 660–63 (noting a rise in the use of structural arguments by the Supreme Court).

act, but occasionally such arguments also consider the relationship between the act under consideration and related statutes.[70]

Important clues about the meaning of a rulemaking grant can sometimes be gleaned from its placement in an act. One potential indicator of meaning is the grant's location in the administrative or organizational sections of an act.[71] For example, the general rulemaking grant in the Social Security Act of 1935 appears in Title XI, the "General Provisions" title, which contains statutory definitions, a severability clause, and the short title of the Act.[72] A general rulemaking grant in the Communications Act of 1934 also appears in the "General Provisions" title of the Act, which contains organizational provisions relating to the Federal Communications Commission (FCC) and its divisions, as well as statutory definitions.[73] Similarly, the general rulemaking grant in the Internal Revenue Code appears in Subtitle F, which pertains to "Procedure and Administration."[74] The placement of each of these grants may signal that the grant pertains to housekeeping matters only and hence does not authorize legislative rules.

In contrast, the placement of other rulemaking grants suggests that they authorize legislative rules. The most compelling example is a statute that includes both general and more specific rulemaking grants that overlap. For instance, a statute may contain both a general rulemaking grant that authorizes the promulgation of all rules and regulations necessary to carry out the administration of "this subchapter," and one or more narrower rulemaking grants that authorize rules necessary to carry out "this section."[75] The Securities Exchange Act of 1934, the Internal Revenue Code, and the Clean Water Act, among

---

[70] *See, e.g.*, FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 148–49 (2000) (reviewing numerous statutes other than the Federal Food, Drug, and Cosmetic Act in determining that the FDA does not have authority to regulate tobacco products).

[71] *See, e.g.*, Federal Food, Drug, and Cosmetic Act, ch. 675, § 701(a), 52 Stat. 1040, 1055 (1938) (codified as amended at 21 U.S.C. § 371(a) (2000)); Civil Aeronautics Act of 1938, ch. 601, § 205, 52 Stat. 973, 984; Social Security Act, ch. 531, § 1102, 49 Stat. 620, 647 (1935) (codified as amended at 42 U.S.C. § 1302 (2000)); Communications Act of 1934, ch. 652, § 4(i), 48 Stat. 1064, 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)); Packers and Stockyards Act, 1921, ch. 64, § 407, 42 Stat. 159, 169 (codified as amended at 7 U.S.C. § 228 (2000)).

[72] Social Security Act, § 1102, 49 Stat. at 647.

[73] Communications Act of 1934, § 4(i), 48 Stat. at 1068.

[74] I.R.C. § 7805 (2000).

[75] *See, e.g.*, Securities Act of 1933, ch. 38, §§ 19–20, 48 Stat. 74, 85–86 (codified as amended at 15 U.S.C. §§ 77s–77t (2000)) (giving the SEC general rulemaking powers in section 19(a) of the Act and then providing in section 20 that the SEC may institute proceedings against any person who violates "any rule or regulation" promulgated by the SEC under the authority of the Act); Natural Gas Act, ch. 556, §§ 16, 20–21, 52 Stat. 830, 832–33 (1938) (codified as amended at 15 U.S.C. §§ 717o, 717s–717t) (giving the Federal Power Commission general rulemaking powers in section 16 and then providing in sections 20 and 21 for enforcement of the Commission's rules and regulations).

other statutes, fit this pattern.[76] Although both the general grant and the specific grants are often ambiguous on their face, given the overlap it is reasonable to argue that the general grant confers only housekeeping powers, while the narrower grants confer legislative powers. After all, if both the general grant and the specific grants conferred the same type of power (either legislative or housekeeping), then the statute would include a significant redundancy.[77] By construing the general grant to confer the more generally available housekeeping powers — the power to issue procedural or interpretive rules — and construing the specific grants to confer the more jealously guarded power — the power to issue legislative rules — the redundancy disappears.[78]

The structural argument based on overlapping rulemaking grants is not necessarily decisive, however. One problem is that interpretive rulemaking (and perhaps procedural rulemaking as well) has long been viewed as an "inherent" power of all executive institutions.[79] Whether this power is inherent or not, in 1874 Congress granted to the heads of

---

[76] With respect to the Securities Exchange Act, see 15 U.S.C. § 78w, which grants general rulemaking authority to the SEC; *id.* § 78m, which grants authority to make rules regulating periodical reports of registered securities; and *id.* § 78n, which grants authority to make rules regulating proxies. With respect to the Internal Revenue Code, see I.R.C. § 7805(a) (2000), which grants general rulemaking authority; and *id.* § 1502, which grants rulemaking authority dealing with consolidated returns of affiliated corporations. For the Clean Water Act, see *infra* notes 632–635 and accompanying text.

[77] *See* Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995) (stating that the "Court will avoid a reading which renders some words altogether redundant" (citing *United States v. Menasche*, 348 U.S. 528, 538–539 (1955))).

[78] For judicial decisions recognizing this point in the regulatory context, see *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 408 (1999) (Thomas, J., concurring in part and dissenting in part) (arguing that the majority's construction of a general rulemaking grant in the Communications Act to extend to new authority conferred on the FCC by the Telecommunications Act of 1996 renders specific grants of rulemaking authority in the latter Act redundant); and *In re Permanent Surface Mining Regulation Litigation*, 653 F.2d 514, 524 (D.C. Cir. 1981) (considering but rejecting the same argument in the context of the general rulemaking grant in the Surface Mining Control and Reclamation Act of 1977). For commentary recognizing the point in connection with the Internal Revenue Code, see Ellsworth C. Alvord, *Treasury Regulations and the Wilshire Oil Case*, 40 COLUM. L. REV. 252, 257 (1940) (arguing that "some difference was intended by Congress" or else it would not have granted the Treasury both specific and general rulemaking powers); and Stanley S. Surrey, *The Scope and Effect of Treasury Regulations Under the Income, Estate, and Gift Taxes*, 88 U. PA. L. REV. 556, 558 (1940) (contending that rules issued under specific rulemaking grants must be construed to possess different attributes than rules issued under the general rulemaking grant, because otherwise "the careful particularization of Congress in these other sections would be without meaning").

[79] *See* Kenneth Culp Davis, *Administrative Rules — Interpretative, Legislative, and Retroactive*, 57 YALE L.J. 919, 930 (1948) (stating that "the power to issue interpretative regulations is commonly inherent or implied"); Frederic P. Lee, *Legislative and Interpretive Regulations*, 29 GEO. L.J. 1, 24 (1940) ("[T]he power of an administrative officer or agency to prescribe interpretive regulations is not necessarily a delegated power. The authority to exercise such power need not be found in an Act of Congress."); John B. Olverson, Jr., Note, *Legislation by Administrative Agencies*, 29 GEO. L.J. 637, 640 (1941) ("In the mere interpretation of a statute, the administrative agency need not be empowered by such statute to make regulations.").

executive departments general authority to adopt rules governing their employees and affairs.[80] This "Housekeeping Act," which is codified at 5 U.S.C. § 301, provides that: "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."[81] Because executive agencies have long possessed these powers, one could argue that it would be redundant for Congress to give such agencies an additional general grant of power authorizing *only* interpretive and procedural rules. Therefore, to avoid redundancy between the Housekeeping Act and the agency's statute, the general rulemaking grant in the statute should be treated as legislative.

The matter is more complicated still. Section 301's housekeeping grant applies only to the heads of executive departments and military departments, not independent administrative agencies.[82] As a result, it might not be redundant for Congress to give independent agencies such as the FTC, FCC, and NLRB general grants of power to adopt housekeeping rules. Such grants could simply be viewed as substitutes for the housekeeping grant already given to department heads.[83]

---

[80] *See* REV. STAT. § 161 (1873–1874).

[81] 5 U.S.C. § 301 (2000). The Housekeeping Act consolidated into one place various housekeeping powers that had been conferred on department heads in prior acts. *See, e.g.*, Act of July 27, 1789, ch. 4, §§ 1–2, 1 Stat. 28, 29 (giving the Secretary for the Department of Foreign Affairs power over all the records, books, and papers of his office and giving the Secretary the power to "perform and execute such duties" as the President shall entrust to him); Act of Aug. 7, 1789, ch. 7, § 2, 1 Stat. 49, 50 (giving the Secretary of the Department of War power over its records, books, and papers); Act of April 30, 1798, ch. 35, §§ 2–3, 2 Stat. 553, 554 (giving the Secretary of the Navy possession and charge of all books, records, and documents pertaining to the Department of the Navy). Notes presented to Congress by the commissioners who drafted the revised statutes explained the purpose of section 161 as follows:

> This section is suggested by section 8 of the act of 22 June, 1870, which reads as follows: "That the Attorney General is hereby empowered to make all necessary rules and regulations for the government of said Department of Justice, and for the management and distribution of its business." Substantially the same power seems to be conferred, though in vague and uncertain language, by the earlier acts organizing the other Departments. The commissioners have thought it advantageous that the power should be stated in terms, and be conferred alike on all the Secretaries.

1 REVISION OF THE UNITED STATES STATUTES AS DRAFTED BY THE COMMISSIONERS APPOINTED FOR THAT PURPOSE 80 (1872) (citation omitted). Thus, although the language used in REV. STAT. § 161 conferred what could be viewed as very broad procedural rulemaking powers on department heads, the commissioners' notes indicate that they were not attempting to enlarge the powers granted by earlier acts.

[82] *See* 5 U.S.C. § 301; *see also id.* § 101 (defining the term "executive department").

[83] However, if Congress intended general rulemaking grants to independent agencies, such as the FTC and the NLRB, merely to be substitutes for section 301's housekeeping grant, one would expect that Congress would not give general rulemaking grants to executive departments (since section 301's housekeeping grant already covers executive officers). But this is not the case, as Congress has frequently given executive department heads both general and specific rulemaking

Thus, structural arguments about overlapping grants do not definitively resolve the meaning of facially ambiguous rulemaking grants, at least not in all cases.

## C. *Canons of Interpretation*

Canons of interpretation are another tool accepted by most textualists. Three types of canons in particular are potentially relevant in determining the meaning of ambiguous rulemaking grants: the rule of lenity, nondelegation canons, and what this Article will call the *Petroleum Refiners* canon.

*I. The Rule of Lenity.* — The rule of lenity requires courts to construe ambiguous statutes imposing criminal liability narrowly to provide fair notice to potential offenders and to constrain the discretion of prosecutors and courts.[84] Thus, where violation of an agency rule would expose persons to criminal sanctions, the rule of lenity provides a rationale for construing an ambiguous rulemaking grant as authorizing only interpretive rules. This application of the rule of lenity is particularly relevant where Congress has prescribed criminal sanctions for violating legislative agency rules and has given the agency multiple rulemaking grants, some of which are ambiguous. A potential offender would know that violating some agency rules could give rise to criminal sanctions but would not be able to tell whether rules promulgated pursuant to an ambiguous rulemaking grant are included in that category.

Of course, this canon applies only where rule violations are criminally punishable. Courts do not ordinarily apply the rule of lenity to statutes that impose only civil sanctions.[85] The Supreme Court has also curtailed the rule of lenity in recent years, and there is some question whether it applies at all in the context of judicial review of administrative regulations.[86]

---

grants in statutes. *See, e.g.*, Act of June 17, 1902, ch. 1093, § 10, 32 Stat. 388, 390 (giving the Secretary of the Interior general rulemaking powers); Act of June 28, 1934, ch. 865, § 2, 48 Stat. 1269, 1270 (same). This fact would seem to counter any argument that general rulemaking grants should be viewed as mere substitutes for section 301.

[84] *See generally* Patricia G. Chapman, *Has the* Chevron *Doctrine Run out of Gas? Senza Ripieni Use of* Chevron *Deference or the Rule of Lenity*, 19 MISS. C. L. REV. 115, 142–43 (1998) (explaining that the "rule of lenity requires a reviewing court to prefer a narrow (as opposed to a generous) reading of an ambiguous penal or punitive statute, allowing penalties only if the language of the statute is clear or if legislative intent to punish the prohibited actions can be unmistakably ascertained").

[85] *See* United States v. Thompson/Ctr. Arms Co., 504 U.S. 505, 518–19 n.10 (1992).

[86] *See* Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or., 515 U.S. 687, 704 n.18 (1995) (applying *Chevron* rather than the rule of lenity in reviewing an agency regulation that could give rise to criminal sanctions, and stating "[w]e have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement").

2. *Nondelegation Canons.* — Canons based on the nondelegation doctrine[87] are also potentially relevant in interpreting the meaning of ambiguous rulemaking grants.[88]   Courts have never vigorously enforced the original nondelegation principle — that Congress may not delegate powers that are "strictly and exclusively legislative."[89]   Congressional delegations of significant discretionary powers, including rulemaking powers, began in the First Congress and have been a feature of our government ever since.[90]   Nevertheless, courts have employed the nondelegation doctrine as a canon of statutory construction.[91]

One familiar nondelegation principle provides that a congressional delegation of authority to an agency must contain an "intelligible principle" to guide and constrain the agency's behavior.[92]   Courts could invoke the intelligible principle requirement as support for interpreting ambiguous rulemaking grants narrowly, on the ground that such grants fail to provide meaningful guidance to agencies about which sorts of rules are permitted.   Thus, Stanley Surrey, a prominent tax

---

[87] The nondelegation doctrine is based on Article I, Section 1 of the Constitution, which vests "all legislative Powers herein granted . . . in a Congress of the United States." U.S. CONST. art. I, § 1.

[88] *See generally* Cass R. Sunstein, *Nondelegation Canons*, 67 U. CHI. L. REV. 315 (2000) (arguing that nondelegation canons act as rules of construction that prevent agencies from making decisions on their own without authorization from Congress).

[89] Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 42–43 (1825). As Chief Justice Marshall admitted in *Wayman*, the line between those "important subjects" that must be entirely regulated by the legislature itself and those lesser subjects that might be delegated to others was not drawn exactly. *Id.* at 43; *see* James Hart, *The Exercise of Rulemaking Power*, in THE PRESIDENT'S COMM. ON ADMIN. MGMT., REPORT OF THE COMMITTEE WITH STUDIES OF ADMINISTRATIVE MANAGEMENT IN THE FEDERAL GOVERNMENT 311, 322 (1937) (noting a "general trend over many years in the direction of an increase in the number of rules and regulations issued by various Federal agencies in pursuance of delegated authority"); *see also* Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892) ("There are many things upon which wise and useful legislation must depend which cannot be known to the law making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."); 1 FRANK J. GOODNOW, COMPARATIVE ADMINISTRATIVE LAW 27–28 (1893) ("No legislature, however wise or far-seeing, can, with due regard for the interests of the people, which differ with the locality and change with the passage of time, regulate all the matters that need the regulation of administrative law.").

[90] *See* United States v. Grimaud, 220 U.S. 506, 517 (1911) ("From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations — not for the government of their departments, but for administering the laws which did govern.").

[91] *See* Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (ruling that courts should construe statutes to avoid open-ended delegations of legislative power); *see* Sunstein, *supra* note 88, at 316 (arguing that "certain canons of construction operate as nondelegation principles").

[92] This requirement, rooted in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928), is still occasionally litigated. *See, e.g.*, Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472–76 (2001) (holding that Congress had articulated an "intelligible principle" when it granted the EPA the power to promulgate national ambient air quality standards).

scholar, once suggested that the grant of authority to the Treasury Department to adopt rules "needful . . . for the enforcement" of the Internal Revenue Code does not constitute a delegation of legislative rulemaking power, because such a sweeping grant lacks an intelligible principle.[93]

The intelligible principle argument, however, overlooks the fact that the content of an agency's legislative rulemaking will be constrained not only by the grant of rulemaking authority, but also by limitations in the relevant act's substantive provisions. The existence of this additional constraint on agency discretion, together with the Court's extreme reluctance to second-guess Congress regarding the degree of guidance that agencies should receive, probably means that any argument about ambiguous rulemaking grants based on the intelligible principle requirement would fail.[94]

Another nondelegation principle that is perhaps more helpful in interpreting ambiguous rulemaking grants is that an agency may not bind the public with the force of law unless Congress has delegated it the power to do so.[95] In our system of separation of powers, it has always been assumed that the President, members of the executive branch, and federal administrative agencies have no inherent power to make law.[96] By the late nineteenth century, courts had recognized a corollary to this principle: administrative agencies cannot make legislative rules absent a delegation of this power from Congress.[97]

---

[93] *See* Surrey, *supra* note 78, at 557–58. For more discussion of Surrey's arguments, see *infra* pp. 574–75.

[94] The Court has found the requisite intelligible principle lacking in only two statutes. *See* A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529–42 (1935); Pan. Ref. Co. v. Ryan, 293 U.S. 388, 414–20 (1935).

[95] *See* Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979) ("The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes."); 1 DAVIS & PIERCE, *supra* note 27, § 6.3, at 234 ("[A]n agency has the power to issue binding legislative rules only if and to the extent Congress has authorized it to do so.").

[96] *See supra* note 20 and accompanying text.

[97] *See, e.g.*, FRANK J. GOODNOW, THE PRINCIPLES OF THE ADMINISTRATIVE LAW OF THE UNITED STATES 326–27 (1905) ("[T]he general rule in this country is that the administrative authorities possess only the delegated ordinance power — that is, they may issue ordinances only where the power to issue such ordinances has been expressly given to them by the legislature."); Morris M. Cohn, *To What Extent Have Rules and Regulations of the Federal Departments the Force of Law*, 41 AM. L. REV. 343, 345 (1907) ("It has been held that heads of departments have no right, in the absence of statute, to make regulations upon a subject, so as to bind third persons.").

The understanding that a clear delegation is necessary before agencies can bind the public may be related to the rule, first set forth in the nineteenth century, that a municipality cannot act

One historically significant manifestation of this understanding is *Interstate Commerce Commission v. Cincinnati, New Orleans, & Texas Pacific Railway Co.*,[98] the now largely-forgotten *Queen and Crescent Case*,[99] in which the Supreme Court held that the Interstate Commerce Commission (ICC) had no power to prescribe future railroad rates.[100] The Interstate Commerce Act of 1887[101] unquestionably gave the ICC the power to determine whether current rates were reasonable.[102] But the Act contained only a narrow grant of procedural rulemaking authority.[103] The Court held that the power to adjudicate whether rates were reasonable could not be construed to imply the power to set future rates by rule,[104] because delegations of power to bind the public with the force of law are "never to be implied."[105] The Court noted that whether Congress had given the ICC the power to set future rates had "been most strenuously and earnestly debated" by the parties,[106] and concluded that because the question was debatable, the Act had to be construed as not implying that power.[107]

---

unless authorized to do so by the state of which it is a part. John F. Dillon explained the rule, which became known as "Dillon's Rule," as follows:

> It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation, — not simply convenient, but indispensable.

1 JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 89, at 145 (4th ed. 1890).

[98] 167 U.S. 479 (1897).

[99] The *Queen and Crescent Case*, evidently referring to the nicknames of Cincinnati and New Orleans, two principal cities that the railroad served, was the name that some contemporary commentators gave the case. *See, e.g.,* ERNST FREUND, ADMINISTRATIVE POWERS OVER PERSONS AND PROPERTY 148 (1928).

[100] *See The Queen and Crescent Case,* 167 U.S. at 506.

[101] Ch. 104, 24 Stat. 379 (repealed 1978).

[102] *See The Queen and Crescent Case,* 167 U.S. at 505–07.

[103] *See* Interstate Commerce Act, § 17, 24 Stat. at 386 ("Said Commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it . . . .").

[104] *See The Queen and Crescent Case,* 167 U.S. at 509.

[105] *Id.* at 494.

[106] *Id.*

[107] *See id.* at 509. Two other prominent nondelegation decisions of this era also emphasized the importance of an express delegation of power to act with the force of law. In *Marshall Field & Co. v. Clark,* 143 U.S. 649 (1892), the Supreme Court upheld a delegation of power to the President to suspend certain portions of the Tariff Act of 1890. *See id.* at 680–94. The Court emphasized that one important factor in reaching this result was that Congress, not the President, had fixed the standard and declared that the President should ascertain when that standard had been met. *See id.* at 692–93. Similarly, in *Buttfield v. Stranahan,* 192 U.S. 470 (1904), the Court upheld the Secretary of the Treasury's power to set standards for imported tea. *Id.* at 496. The Court again stressed that it was Congress, not the Secretary, that had declared it unlawful to import any tea falling below the Secretary's standards. *See id.* An Attorney General's opinion pub-

The *Queen and Crescent Case* suggests a nondelegation canon in the form of an "express statement" rule: all grants of rulemaking authority confer only housekeeping powers, unless Congress expressly confers the power to make legislative rules.[108] Such a rule, if consistently followed, would eliminate any disputes about the extent of ambiguous rulemaking grants. Unless Congress states in the text of the grant that agency rules will have the "force of law," or includes other words to that effect, the grant authorizes only interpretive and procedural rules. But the *Queen and Crescent Case* is the only time the Court suggested such an express statement rule.[109] For whatever reason, the *Queen and Crescent Case* and its maxim that legislative rulemaking power is "never to be implied" were soon forgotten.[110]

A similar but less draconian canon would insist not on an express statement, but only on some clear expression of congressional intent to confer power to act with the force of law. A number of decisions, including some of fairly recent vintage, contain language consistent with this proposition.[111] The difference between a "clear intent" rule and the ordinary rule that statutes should be given the meaning that Congress more likely than not intended is rather hazy. Presumably, under a clear intent rule, something more than a preponderance of the evidence is required to find a delegation of power.[112] Under the clear intent version of the canon, courts would construe ambiguous rulemaking grants to authorize only nonlegislative rules unless the ordinary tools of statutory interpretation — including, of course, the language

---

lished in 1904 read these decisions as resting on the proposition that only Congress can declare what action has the force of law:

> In [*Marshall Field*] it was specifically declared [by Congress] that the free importation of certain articles *should be suspended* upon a certain contingency, to be ascertained by the President; in [*Stranahan*], that it *should be unlawful* to import any merchandise or tea below the standards directed to be fixed by the Secretary of the Treasury.

25 OFFICIAL OPINIONS OF THE ATTORNEYS-GENERAL OF THE UNITED STATES 249, 254 (John L. Lott & James A. Finch eds., 1906).

[108] An "express statement" rule would require an affirmative statement in the text of the statute. In contrast, what this Article calls a "clear intent" rule would merely require a clear manifestation of legislative intent in view of the totality of the statutory context. *See* Merrill & Hickman, *supra* note 43, at 888. On the nature of clear statement rules more generally, including both express statement and clear intent rules, see William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 VAND. L. REV. 593 (1992).

[109] Perhaps the case owes its singularity to the fact that Congress soon overruled the specific result by giving the ICC power to prescribe future rates. *See infra* note 150 and accompanying text.

[110] A LEXIS search reveals that the *Queen and Crescent Case* has been cited by the Supreme Court only three times since 1933.

[111] *See* cases cited *supra* note 95. This Article argues that the Court's decisions in *United States v. Eaton*, 144 U.S. 677 (1892) and *United States v. Grimaud*, 220 U.S. 506 (1911), rest implicitly on such a clear intent canon. *See infra* section II.B, pp. 499–503.

[112] *See* Gary Lawson, *Proving the Law*, 86 NW. U. L. REV. 859, 890–91 (1992).

and structure of the act — clearly reveal that Congress intended to confer legislative rulemaking authority.[113]

    *3. The* Petroleum Refiners *Canon.* — A third potentially relevant canon lacks the pedigree of either the rule of lenity or the nondelegation doctrine. For want of a better term, this Article calls it the *Petroleum Refiners* canon, after the leading federal appellate opinion that adopted this approach.[114] The *Petroleum Refiners* canon provides that ambiguous grants of rulemaking authority should be construed to give agencies the broadest possible powers, so that they will have flexibility in determining how to effectuate their statutory mandates. In contrast to the nondelegation canons, this canon derives not from fundamental principles of separation of powers but from pragmatic considerations, including the convenience of allowing agencies to make legislative rules on all matters properly within their jurisdiction. The *Petroleum Refiners* canon thus bears an affinity with the Supreme Court's pronouncement in *SEC v. Chenery Corp.*[115] that agencies should be free to choose between rulemaking and adjudication in determining how to formulate policy.[116] *Chenery* itself presented no question about the meaning of an ambiguous rulemaking grant.[117] Nevertheless, the *Chenery* doctrine is often invoked for the more general proposition that agencies should have discretion to choose the format in which they articulate policy. In this more general sense, the doctrine provides analogical support for the *Petroleum Refiners* canon.

    While the Supreme Court has acknowledged the importance of construing rulemaking grants liberally so as not to "undermine the flexibility sought in vesting broad rulemaking authority in an administrative agency,"[118] it has never explicitly endorsed the *Petroleum Refiners* canon. As we shall see, however, two prominent federal courts of appeals have construed ambiguous rulemaking grants as conferring legislative rulemaking authority, and these opinions can be read as embracing the *Petroleum Refiners* canon.[119] In effect, these courts have adopted the exact opposite of the *Queen and Crescent Case*

---

[113] Section 558(b) of the APA, which provides that "[a] sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law," 5 U.S.C. § 558(b) (2000), supports such a canon. *See also infra* pp. 525–26 (discussing the significance of § 558(b) in light of the convention discussed in Part III).

[114] Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672 (D.C. Cir. 1973); *see also* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877 (2d Cir. 1981). These decisions are discussed *infra* pp. 554–57, 562–65.

[115] 332 U.S. 194 (1947).

[116] *Id.* at 202–03.

[117] *See id.* at 201–02.

[118] Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356, 372 (1973); *see also* Am. Trucking Ass'ns v. United States, 344 U.S. 298, 309–10 (1953) (suggesting that rulemaking grants should be interpreted broadly because Congress cannot anticipate "every evil sought to be corrected").

[119] *See infra* pp. 554–57, 562–65.

canon: ambiguous grants confer legislative rulemaking power unless Congress has expressly limited the grant to interpretive or procedural rulemaking.

\* \* \*

In sum, given their ambiguous language, the uncertain implications of structural arguments, and the unavailability of conflicting canons, the meaning of ambiguous rulemaking grants is often debatable if they are examined through a purely textual lens. This Article, therefore, turns to a consideration of what history teaches about the meaning of such grants.

## III. THE CONVENTION CREATED

Although grants of authority allowing agencies to adopt "rules and regulations" appear to be facially ambiguous concerning whether they authorize rules having the force of law, the history of rulemaking during the Progressive and New Deal eras reveals that key participants in the legislative process did not regard such grants as ambiguous. Starting around World War I, Congress began following a convention for indicating whether an agency had the power to promulgate legislative rules. Under this convention, the requisite textual signal was provided by the inclusion of a separate provision in the statute attaching "sanctions" to the violation of rules and regulations promulgated under a particular rulemaking grant. If the statute prescribed a sanction, then the authority to make "rules and regulations" included the authority to adopt legislative rules having the force of law. If the statute did not include a sanction, the authority to make "rules and regulations" encompassed only interpretive or procedural rules.

The "sanctions" took various forms.[120] The clearest case, of course, was when Congress imposed criminal or monetary civil penalties on

---

[120] During the relevant time period, the required legal consequences were generally referred to as "sanctions," but the concept of a "sanction" was given a meaning broader than criminal or civil monetary penalties. This understanding accords with the APA, adopted in 1946, which defined "sanction" as follows:

"[S]anction" includes the whole or a part of an agency —
(1) prohibition, requirement, limitation, or other condition affecting the freedom of any person;
(2) withholding of relief;
(3) imposition of any form of penalty or fine;
(4) destruction, taking, seizure, or withholding of property;
(5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;
(6) requirement, revocation, or suspension of a license; or
(7) taking other compulsory or restrictive action.
Ch. 324, § 2, 60 Stat. 237, 238 (1946) (codified as amended at 5 U.S.C. § 551 (2000)).

persons who violated an agency's regulations.[121]  On other occasions, however, the sanctions might take the form of the forfeiture or destruction of property,[122] the revocation of licenses,[123] or the denial of benefits.[124]  In contrast, if the statute was silent regarding the legal consequences for failure to conform to regulations, it was understood as granting the agency the power to make only housekeeping rules.[125]

This convention can be seen as resting on two propositions that participants in the legal system widely shared in the first half of the twentieth century.  The first is that "law" means roughly what John Austin defined it to mean: general commands backed by the threat of sanctions.[126]  In other words, law — as distinguished from moral norms or principles of justice — is a directive enforced by the infliction of punishment or the imposition of other material sanctions by the state.[127]  The second proposition is that only the legislature, as opposed to the executive and the judiciary, has the power to determine when directives will be given the force of law.  This principle, of course, is

---

[121] *See, e.g.,* Federal Water Power Act, ch. 285, § 25, 41 Stat. 1063, 1076 (1920) (repealed 1935) (attaching criminal penalties to violations of the Federal Power Commission's rules and regulations).

[122] *See, e.g.,* Tea Importation Act, ch. 358, § 6, 29 Stat. 604, 606 (1897) (repealed 1996) (providing for the destruction of impure tea that falls below the standards set by the Secretary of the Treasury if the owner fails to export such tea outside of the United States within six months of the examination).

[123] *See, e.g.,* Warehouse Act, ch. 313, pt. C, § 25, 39 Stat. 486, 490 (1916) (codified as amended at 7 U.S.C. § 252(a) (2000)) (providing that the Secretary of Agriculture may suspend or revoke any warehouseman's license for any violation of the rules and regulations made under the Act); Grain Standards Act, ch. 313, pt. B, § 7, 39 Stat. 482, 484 (1916) (codified as amended at 7 U.S.C. § 85) (providing for the suspension or revocation of any grain inspector's license for any violation of the rules and regulations made under the Act).

[124] *See, e.g.,* Social Security Act Amendments of 1939, ch. 666, § 205(a), 53 Stat. 1360, 1368.

[125] *See, e.g.,* Federal Trade Commission Act, ch. 311, § 6(g), 38 Stat. 717, 722 (1914) (codified as amended at 15 U.S.C. § 46(g) (2000)) (declaring that the FTC has the power "to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act" but providing no sanctions for the violation of those rules and regulations).

[126] *See* JOHN AUSTIN, THE PROVINCE OF JURISPRUDENCE DETERMINED 13–15 (Prometheus ed. 2000) (1832).

[127] As one authority put it:

> A rule of conduct which lacks a means of enforcement is not an expression of the will so much as of the mere wish of the state; and such a rule, if not enforceable by legal processes, should not even be graced with the title of a law of imperfect obligation.

HART, *supra* note 20, at 28.  On the continuity between Austin's command theory and the tenets of the Langdellian legal formalism of the late nineteenth and early twentieth centuries, see ANTHONY J. SEBOK, LEGAL POSITIVISM IN AMERICAN JURISPRUDENCE 83–104 (1998).  Up until the middle of the twentieth century, jurisprudential writings demonstrate a continuing emphasis on the importance of sanctions in identifying those directives that can be said to have the force of law.  *See, e.g.,* EDWIN W. PATTERSON, AN INTRODUCTION TO JURISPRUDENCE 119–26 (2d ed. 1946).  Only later did conceptions of law as having obligatory force without regard to sanctions gain currency.  *See* H.L.A. HART, THE CONCEPT OF LAW 86–88 (1st ed. 1961) (discussing the "internal aspect of rules," which leads to obedience to law without regard to sanctions being imposed for noncompliance).

the version of the nondelegation doctrine that underlies the *Queen and Crescent Case*: agencies have no inherent authority to act with the force of law and can exercise such power only if Congress has delegated it to them.[128]

Combined, the first and second propositions produce the convention: First, under the Constitution, only Congress has the authority to specify when an agency can act with the force of law (the nondelegation proposition). Second, agencies act with the force of law only when their rules are backed by sanctions (the Austinian proposition). Consequently, Congress can indicate whether agencies have the authority to act with the force of law by specifying whether the rules they promulgate will be backed by sanctions.

The convention did not emerge full-blown at any one moment. Rather, it gradually developed around the second decade of the twentieth century as Congress created new administrative entities and considered what kind of rulemaking authority to give them. Moreover, as we shall see, the convention was never explicitly memorialized in an authoritative text, such as a statute, a legislative drafting guide, or a prominent judicial decision. It remained part of the unwritten "common law" of legislative drafting in the first half of the twentieth century. Accordingly, the only way to establish the existence of the convention is to examine a significant number of regulatory statutes and their associated legislative histories, supplemented by contemporary writings by knowledgeable participants in the legislative and administrative processes.[129]

## A. *Early History: The Diversity of Rulemaking Grants*

Although it was originally thought that Congress could not delegate powers that were "strictly and exclusively legislative,"[130] congressional grants of rulemaking power actually began in the first session of Congress. The twenty-fourth statute enacted in 1789 provided that the

---

[128] *See supra* pp. 490–91.

[129] A note about our method of identifying facially ambiguous rulemaking grants is appropriate at this juncture. We began by identifying and analyzing numerous nineteenth- and early twentieth-century regulatory statutes, which we located through a variety of sources, including case law, legal articles and books about rulemaking, and by scanning the United States Code's Popular Name Table, which lists acts and the years in which they were enacted. We next identified those regulatory statutes that include facially ambiguous rulemaking grants and sought to determine whether there was any authority discussing whether these grants conferred legislative or merely housekeeping powers.

We did not systematically attempt to identify facially ambiguous rulemaking grants in statutes passed after the New Deal era; they undoubtedly number in the thousands. We did, however, encounter a number of these grants in the course of our research and we mention them in the Article when relevant.

[130] Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 42–43 (1825); *see also* Field v. Clark, 143 U.S. 649, 692 (1892).

United States government would continue to pay previously granted pensions for one year "under such regulations as the President of the United States may direct."[131]  Similarly, a statute passed in the second session of the first Congress prohibited unlicensed trade with American Indian tribes, instructed the executive department to issue licenses to individuals engaged in trade with Indians, and provided that the licenses were to be "governed in all things touching the said trade and intercourse, by such rules and regulations as the President shall prescribe."[132]

From 1789 through most of the nineteenth century, delegations of rulemaking power generally ran to the President.[133]  Occasionally, however, such grants ran to other officers.  For example, in 1813 Congress passed a tax assessment and collection act that gave the Secretary of the Treasury the power to "establish regulations suitable and necessary for carrying this act into effect."[134]  Notably, the statute expressly stated that these regulations "shall be binding on each assessor in the performance of the duties enjoined by or under this act."[135]  About the same time, Congress passed an act involving taxation of foreign commerce in which it declared that "the Secretary of the Treasury shall give such directions to the collectors, and prescribe such rules and forms to be observed by them, as may appear to him proper for attaining the objects of this act."[136]

Whereas early rulemaking grants were largely confined to military, foreign affairs, tax, and internal government matters, Congress in the late nineteenth century began to legislate over a wider range of activities, including the control and disposition of federal lands and the regulation of interstate commerce.  Practical realities necessitated that the officers administering these statutes adopt implementing regula-

---

[131] Act of Sept. 29, 1789, ch. 24, 1 Stat. 95, 95.

[132] Act of July 22, 1790, ch. 33, 1 Stat. 137, 137.

[133] For a thorough study of the early delegations of administrative rulemaking power, see JOHN PRESTON COMER, LEGISLATIVE FUNCTIONS OF NATIONAL ADMINISTRATIVE AUTHORITIES 50 (1927).  Comer divides the history of rulemaking into four periods: (1) 1789–1824; (2) 1825–1860; (3) 1861–1890; and (4) 1891–1926.  He reports that:

> [T]he legislature was inclined to share the burden of legislation with the Executive often during the first period; that this practice continued to some extent during the second; that Congress was liberal in delegating discretion during the third period; and that during the fourth period the practice was generally established.  Furthermore, . . . although the President received a major portion of all delegated legislation during the first three periods, a division of labor was appearing in the administrative branch of the government and the basis for practically all legislative powers exercised at the present time by the major departments was being laid.

*Id.* at 51.

[134] Act of July 22, 1813, ch. 16, § 4, 3 Stat. 22, 26.

[135] *Id.*

[136] Act of Feb. 10, 1820, ch. 11, § 14, 3 Stat. 541, 543.

JA0489

tions.[137]   Not surprisingly, therefore, Congress became increasingly willing to transfer rulemaking authority to the agencies it was creating.[138]

Some of the statutes enacted by Congress expressly indicated that the regulations promulgated under their authority would have the "force of law."[139]  In 1871, for example, Congress passed an act involving the safety of vessels that gave a supervising board the power to "establish all necessary rules and regulations required to carry out in the most effective manner the provisions of this act for the safety of life, which rules and regulations, when approved by the Secretary of the Treasury, shall have the force of law."[140]  Similarly, in 1870, Congress passed an internal revenue act that gave the Secretary of the Treasury the power to make "all needful rules and regulations, not inconsistent with law, to be observed in the execution of this act, which shall have the force and effect of law."[141]

Other statutes did not explicitly state that agency rules and regulations would have the force of law, but their context implied this conclusion.  In the Timber and Stone Act of 1878,[142] for example, Congress authorized citizens in western states and territories to cut timber on public land.  Section 1 of the Act authorized the Secretary of the Interior to prescribe rules and regulations "for the protection of the tim-

---

[137] *See* Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892) ("There are many things upon which wise and useful legislation must depend which cannot be known to the law making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation." (quoting *Commonwealth ex rel. McClain v. Locke*, 72 Pa. 491, 499 (1873)) (internal quotation marks omitted)). *See generally* 1 FRANK J. GOODNOW, COMPARATIVE ADMINISTRATIVE LAW 27–28 (1897) ("The needs of the government make it necessary that many details in the law be fixed less permanently than by statute. No legislature, however wise or far-seeing, can, with due regard for the interests of the people, which differ with the locality and change with the passage of time, regulate all the matters that need the regulation of administrative law.").

[138] *See* COMER, *supra* note 133, at 51.

[139] Congress's use of the "force of law" language during these years may have been influenced by court decisions holding that internal governmental regulations, navy regulations, and military regulations made pursuant to acts of Congress had the "force of law." *See, e.g.*, Gratiot v. United States, 45 U.S. (4 How.) 80, 117 (1846) (holding that the army regulations at issue had the "force of law"); *see also Ex Parte* Reed, 100 U.S. 13, 22 (1879) (extending the holding of *Gratiot* to navy regulations); *In re* Major William Smith, 23 Ct. Cl. 452, 459 (1888) (holding that army regulations may have the "force of law"); BRUCE WYMAN, THE PRINCIPLES OF THE ADMINISTRATIVE LAW GOVERNING THE RELATIONS OF PUBLIC OFFICERS 285 (1903) (stating that regulations dealing with administration within the executive branch are "usually summed up in the ordinary decision by the statement that these regulations have the force of law"); *cf.* United States v. Ormsbee, 74 F. 207, 210 (E.D. Wis. 1896) (holding that regulations made by the Secretary of War involving access to water on the government's land had the "force of law" when Congress expressly prohibited any use of the water "unless approved and authorized by the secretary of war").

[140] Act of Feb. 28, 1871, ch. 100, § 23, 16 Stat. 440, 449. The Supreme Court in 1908 pointed to the "force of law" language in this statute in holding that regulations promulgated under the Act were entitled to the force and effect of law. *See* La Bourgogne, 210 U.S. 95, 132 (1908).

[141] Act of July 14, 1870, ch. 255, § 34, 16 Stat. 256, 271.

[142] Ch. 150, 20 Stat. 88.

ber and of the undergrowth growing upon such lands, and for other purposes."[143]  Section 3 specified that any person violating the provisions of the Act or any rules and regulations made under it would face potential criminal charges, imprisonment, and a fine of up to $500.[144] Consequently, even though Congress never expressly declared that the rules and regulations would have the "force and effect of law," the unmistakable effect of the Act was to give the Secretary of the Interior the authority to bind persons with the force of law.

The Tea Importation Act of 1897,[145] which sought to regulate the quality of tea imported into the United States, provides another example of Congress implicitly endowing agency rules with the force of law. Section 3 of the Act gave the Secretary of the Treasury the power to establish uniform standards for tea purity, quality, and fitness.[146]  Section 5 provided that any tea falling below the uniform standards set by the Secretary could not be released from the customs house unless it met those standards upon reexamination.[147]  In other words, Congress conditioned the right to import tea on compliance with the Secretary of the Treasury's regulations, effectively giving these regulations the force of law.[148]

By contrast, other statutes, exemplified by the landmark Interstate Commerce Act of 1887 (ICA),[149] included rulemaking grants that were expressly limited to matters of agency procedure and organization. Section 17 of the ICA gave the ICC the general power to "make or amend such general rules or orders *as may be requisite for the order and regulation of proceedings before it,* including forms of notices and the service thereof, which shall conform, as nearly as may be, to those in use in the courts of the United States."[150]

---

[143] *Id.* § 1, 20 Stat. at 88.

[144] *Id.* § 3, 20 Stat. at 89.

[145] Ch. 358, 29 Stat. 604 (repealed 1996).

[146] *Id.* § 3, 29 Stat. at 605. This delegation of legislative rulemaking power to the Secretary of the Treasury to determine tea standards was challenged in *Buttfield v. Stranahan,* 192 U.S. 470 (1904), but the Supreme Court upheld the statute, concluding that Congress fixed "a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute." *Id.* at 495.

[147] Tea Importation Act of 1897, § 5, 29 Stat. at 606.

[148] In contrast, section 10 of the Act gave the Secretary of the Treasury general rulemaking powers, authorizing him to "enforce the provisions of this Act by appropriate regulations." *Id.* § 10, 29 Stat. at 607. The Act was silent as to the effect of the regulations promulgated under this section.

[149] Ch. 104, 24 Stat. 379 (repealed 1978).

[150] *Id.* § 17, 24 Stat. at 386 (emphasis added). In 1889, Congress added a provision to the Act that gave the ICC the power "to execute and enforce the provisions of this act." Amendments to the Interstate Commerce Act, ch. 382, § 3, 25 Stat. 855, 858 (1889). This added provision made no mention of executing and enforcing the Act through rules and regulations; it simply gave the ICC the power "to execute and enforce" the Act. *Id.* In 1906 the ICA was amended by the Hepburn Act to give the ICC specific power to establish maximum rates by rule. *See* Hepburn Act, ch.

## B. The Importance of *Eaton* and *Grimaud*

The increased use of rulemaking toward the end of the nineteenth century gave rise to two Supreme Court decisions that provided the impetus for a more uniform understanding about the proper form of rulemaking grants. No question was presented in either case about the meaning of a facially ambiguous rulemaking grant. Rather, the issue before the Court in both cases was one of authority: whether the federal government could impose criminal sanctions upon an individual for violating rules of conduct set forth in a regulation adopted by an agency pursuant to delegated authority. The Court's eventual answer focused on whether Congress had expressly provided by statute that those who violate a rule of conduct set forth in a regulation can be criminally punished. This response suggested a logical way of differentiating between delegations of legislative and nonlegislative authority. By specifically providing for the imposition of sanctions for the violation of a given regulation, Congress resolved any question of authority and also sent an unambiguous signal of its intent that the resulting rules have the force of law.

In *United States v. Eaton*,[151] the Court considered whether a wholesale oleomargarine dealer could be held criminally liable for failing to conform to a regulation, promulgated under the Oleomargarine Act, that required such dealers to keep books of receipts and disposals and to make returns to the Commissioner of Internal Revenue. Section 20 of the Act authorized the Commissioner to make "all needful regulations" for carrying out the Act's provisions.[152] The government argued that the prosecution was justified by section 18 of the Act, which made it a criminal offense for any manufacturer or distributor of oleomargarine to fail to do anything "required by law in the carrying on or conducting of his business."[153] The government urged that the regulation adopted by the Commissioner under section 20 created

---

3591, § 4, 34 Stat. 584, 589 (1906). This provision of the Hepburn Act overruled the holding in the *Queen and Crescent Case*, 167 U.S. 479 (1897), described *supra* pp. 490–91. *See* ROBERT E. CUSHMAN, THE INDEPENDENT REGULATORY COMMISSIONS 70–74 (1941). The grant was further broadened in the Transportation Act of 1920, ch. 91, 41 Stat. 456, to permit the ICC to prescribe specific rates or maximum and minimum rates. *See id.* § 418, 41 Stat. at 484–85. Neither amendment, however, changed the provision in the original Act limiting the general rulemaking grant to rules of procedure.

[151] 144 U.S. 677 (1892). The case involved a prosecution under the Oleomargarine Act, a statute designed to protect the dairy industry from competition from oleomargarine. *See* Geoffrey P. Miller, *Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine*, 77 CAL. L. REV. 83 (1989).

[152] *Eaton*, 144 U.S. at 685.

[153] *Id.* at 686.

duties that were "required by law," and hence fell within the terms of the general prohibition of section 18.[154]

The Court rejected this contention. Relying on a blend of nondelegation and lenity precepts, the Court stated that the prosecution violated the principle that "a sufficient statutory authority should exist for declaring any act or omission a criminal offence."[155] Although Congress had made it a criminal offense to neglect to do a thing "required by law," Congress had not expressly made it a criminal offense to neglect to do a thing required only by a regulation.[156] The Court did not hold that Congress could never make it a crime to violate a regulation adopted by an agency. It did suggest, however, that if such a delegation of legislative authority were ever to be permitted, Congress would have to speak "distinctly" in criminalizing failures to abide by agency regulations.[157]

*Eaton* established one thing that Congress could not do: it could not delegate to an agency the authority to issue regulations backed by criminal penalties without explicitly identifying the regulations that, if violated, would give rise to such penalties. It was unclear, however, whether the decision stood for the broader principle that it was impermissible to impose any type of legal consequence, criminal or civil, for the violation of a regulation that lacked the proper delegation of authority from Congress.[158] The answer would depend on whether subsequent courts read *Eaton* as being grounded primarily in the doctrine of lenity, and hence limited to criminal sanctions, or whether they read it as being grounded in broader principles of nondelegation.

For nearly two decades, it remained uncertain whether Congress could delegate authority to an agency to adopt regulations that would give rise to criminal sanctions.[159] The Court finally resolved the ques-

---

[154] *Id.*

[155] *Id.* at 688.

[156] *Id.*

[157] *See id.*

[158] At least one case decided in the early twentieth century applied *Eaton* outside the criminal context. *See* Van Lear v. Eisele, 126 F. 823, 828 (E.D. Ark. 1903) ("It is true, in the case at bar the rules do not make the acts of a physician not registered a criminal offense; still, so far as the complainant is concerned, the statute is highly penal, for it deprives him of a valuable right — the right to practice the profession, which, under the laws of the state where he seeks to exercise this right, he is permitted to do.").

[159] In 1897, the Court reaffirmed *Eaton* but distinguished the case before it in finding the regulation valid and upholding the prosecution. *See In re* Kollock, 165 U.S. 526, 533 (1897). On the question whether Congress could make violations of regulations criminal offenses with a sufficiently clear delegation, the lower courts were divided. *Compare* Dastervignes v. United States, 122 F. 30, 33–35 (9th Cir. 1903) (holding that violation of an administrative regulation *can* constitute a criminal offense), United States v. Rizzinelli, 182 F. 675, 678, 684 (D. Idaho 1910) (same), United States v. Moody, 164 F. 269, 271 (W.D. Mich. 1908) (same), United States v. Ormsbee, 74 F. 207, 208–09 (E.D. Wis. 1896) (same), *and* United States v. Breen, 40 F. 402, 403–04 (E.D. La. 1889) (same), *with* United States v. Matthews, 146 F. 306, 310 (E.D. Wash. 1906) (holding that a broad

tion in the 1911 case of *United States v. Grimaud*.[160]  The defendants were criminally charged with grazing sheep on a forest reservation without a permit.[161]  The Secretary of Agriculture had promulgated the permit requirement under authority given by the Forests Reserve Act to "make such rules and regulations and establish such service as will insure the objects of such reservation[s]."[162]  The Act further provided that "any violation of the provisions of this Act *or such rules and regulations* shall be punished as is provided for [in section 5388 of the Revised Statutes]."[163]

The defendants argued that Congress could never delegate to an executive agency the power to adopt rules and regulations punishable by criminal sanctions.  The Supreme Court disagreed.  In contrast to *Eaton*, which had rested on a blend of nondelegation and lenity reasoning, the Court in *Grimaud* framed its analysis exclusively in terms of whether the delegation was permissible.  The Court read the history of the nondelegation doctrine to mean that:

> [W]hen Congress [has] legislated and indicated its will, it [can] give to those who were to act under such general provisions "power to fill up the details" by the establishment of administrative rules and regulations, the violation of which [can] be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress or measured by the injury done.[164]

*Eaton* was readily distinguished because that case had ruled that "while a violation of the regulations might have been punished as an offense if Congress had so enacted, it had, in fact, made no such provision so far as concerned the particular charge then under consideration."[165]  The present case was entirely different: "[T]he very thing which was omitted in the Oleomargarine Act has been distinctly done in the Forest Reserve Act, which, in terms, provides that 'any violation of the provisions of this act or such rules and regulations of the Secretary shall be punished . . . .'"[166]

*Grimaud* thus established what Congress could do: it could delegate power to an agency to adopt regulations subject to criminal penalties,

---

criminalization of any violations of regulations to be set by the Secretary of the Interior represented an invalid delegation of legislative authority), *and* United States v. Blasingame, 116 F. 654, 654 (S.D. Cal. 1900) (same).

[160] 220 U.S. 506 (1911).

[161] *Id.* at 509–10.

[162] *Id.* at 515 (quoting Act of 1897, ch. 2, 30 Stat. 11, 35) (internal quotation marks omitted).

[163] Act of 1897, 30 Stat. at 35 (emphasis added).

[164] *Grimaud*, 220 U.S. at 517.

[165] *Id.* at 519.

[166] *Id.*

provided that Congress itself legislated the penalties.[167]  Moreover, because criminal sanctions are the most severe type of sanction for violating an agency regulation, there was little doubt after *Grimaud* that Congress could provide other types of sanctions for violating agency regulations as well.  In other words, *Grimaud* established that Congress can delegate authority to agencies to promulgate regulations that have a variety of legal consequences — as long as Congress itself spells out by statute what those consequences are.

Neither *Eaton* nor *Grimaud* spoke directly to the question of how facially ambiguous rulemaking grants should be interpreted.[168]  Nevertheless, the decisions established points of reference that Congress could use in signaling whether particular grants authorized rules and regulations having the force of law.  If Congress specifically provided that the violation of a regulation would result in the imposition of sanctions, such as criminal penalties, then the rule would have the force of law (*Grimaud*).  If Congress did not so provide, an agency could not enforce the rule with criminal penalties (*Eaton*), and it was doubtful whether it could be enforced with any type of civil sanction.[169]  Both cases assumed that the place to look for determining whether a regulation has the force of law is the statute that delegated rulemaking power to the agency.  This understanding, of course, was consistent with the version of the nondelegation principle underlying the *Queen and Crescent Case*, which the Court decided during the same era:[170] executive officers and agencies can act with the force of law only if Congress has delegated to them the power to do so.

After *Grimaud*, cases involving administrative rules and regulations appeared before the Court on occasion.  Some of these decisions recognized the distinction between legislative and nonlegislative rules, and they reflected the understanding that legislative rules are those that impose legal consequences on persons who violate them.[171]  More

---

[167] *See, e.g.,* McKinley v. United States, 249 U.S. 397 (1919) (upholding the constitutionality of convictions for violating regulations that the Secretary of War issued under delegated authority in which Congress prescribed the sanctions for rule violations).

[168] Significantly, however, in a case decided shortly after *Grimaud*, the Court dismissed out of hand the contention that either the Housekeeping Act, 5 U.S.C. § 301 (2000), or a general rulemaking grant given to the Commissioner of the General Land Office could serve as the source of a legislative rule.  *See* United States v. George, 228 U.S. 14 (1913).  Quoting these provisions in a footnote, the Court observed: "It will be seen that they confer administrative power only. . . . [A]nd certainly, under the guise of regulation legislation cannot be exercised." *Id.* at 20.

[169] One scholar explained the significance of both cases as follows: "[T]he court will not *presume* the intended policy of allowing the commission or delegate to inflict a penalty or create a new crime in any case; therefore the authority to do that must at least be clearly expressed in the statute." John B. Cheadle, *The Delegation of Legislative Functions*, 27 YALE L.J. 892, 918 (1918).

[170] *See supra* notes 99–109 and accompanying text.

[171] *See* AT&T v. United States, 299 U.S. 232 (1936) (holding that an FCC accounting rule had binding effect because Congress had delegated legislative rulemaking authority to the agency, and

than thirty years elapsed, however, before the Court decided a case implicating the authority of an agency to promulgate legislative rules based on a facially ambiguous rulemaking grant.[172]  Congress, in the meantime, entered a period of unprecedented activity in terms of the delegation of rulemaking authority to administrative agencies.

## C. The Convention Emerges

After *Eaton* and *Grimaud*, the structure of rulemaking grants in regulatory legislation assumed a much more uniform pattern.  Express references to regulations having the "force of law," which were not infrequent in the nineteenth century,[173] became relatively rare, as did express qualifications limiting regulations to matters of procedure.  Instead, "rules and regulations" became the standard refrain, but now Congress sometimes coupled the grant of authority to adopt rules and regulations with a specific provision imposing sanctions on rule violators, and sometimes it did not.  The legislative histories of these statutes, to the extent they clarify the intended meanings of these grants, indicate that knowledgeable participants in the legislative process understood the presence or absence of a provision establishing a sanction for rule violations as the key variable differentiating legislative rulemaking grants from housekeeping ones.  The convention that emerged, however, was most likely familiar only to staff attorneys working for Congress and for the agencies that Congress created.  There is no evidence that knowledge of the convention extended to most members of Congress themselves, to the courts, or — at least during the early years of this formative period — to the commentators who began making note of the growing importance of rulemaking.[174]

---

the FCC had promulgated the rule within the scope of that authority); Ariz. Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 376–78 (1932) (holding that the ICC had no power to impose a sanction on a party for conduct that is "in direct conformity with the Commission's own prior valid legislative pronouncement"); Standard Computing Scale Co. v. Farrell, 249 U.S. 571, 574 (1919) (describing legislative regulations as those that "prescribe a course of action to be enforced by the power of the State").  Most notably, in *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407 (1942), the Court discussed at some length the nature of rules that have the force of law.  The specific holding was that such rules, when issued by the FCC, are subject to pre-enforcement judicial review under the Urgent Deficiencies Act.  *Id.* at 417.  The Court did not reach the issue of authority because the Communications Act of 1934 included a specific grant of authority to make the rules in question.  *Id.* at 416.

[172] *See* Nat'l Broad. Co. v. United States, 319 U.S. 190 (1943), discussed *infra* pp. 529–32.

[173] *See supra* notes 139–141 and accompanying text.

[174] As rulemaking became increasingly common, commentaries began to catalog different kinds of rules and regulations and their legal effects.  *See, e.g.*, COMER, *supra* note 133; FREUND, *supra* note 99, at 211–23; John A. Fairlie, *Administrative Legislation*, 18 MICH. L. REV. 181 (1920); Fred T. Field, *The Legal Force and Effect of Treasury Interpretation, in* THE FEDERAL INCOME TAX 91 (Robert Murray Haig ed., 1921).  These commentators initiated the process of dividing rules into categories similar to those commonly employed today (for example, legislative or substantive, procedural, interpretive).  But they had little or nothing to say about how agencies and courts

*1. Progressive-Era Rulemaking Grants.* — Not long after *Grimaud*, Congress enacted a statute with a facially ambiguous rulemaking grant that will play a large role in our story: the Federal Trade Commission Act of 1914 (FTCA).[175] The Act created the FTC to serve as both an adjudicatory and an investigative body. Section 5 set forth the FTC's quasi-judicial adjudicatory functions, including its power to file complaints, hold hearings, determine whether violations of the FTCA had occurred or were occurring, and issue cease and desist orders.[176] Section 6 set forth the investigative powers of the FTC, including its power to demand reports from corporations and to publish information deemed to be in the public interest.[177]

The FTCA contained only one reference to rules and regulations: section 6(g) provided that the FTC had the power "[f]rom time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act."[178] The statute included no sanction for violations of such rules and regulations. In contrast, the Act empowered the FTC to bring suit to prevent violations of the Act[179] and set forth remedies for violations of the FTC's cease-and-desist orders.[180] The failure to provide any sanction for the violation of rules adopted under section 6(g), along with the placement of

---

should distinguish between grants of legislative authority and grants of merely procedural and interpretive authority. Particularly striking in this regard are Comer's rather hapless comments:

> [T]he terms of investment of rule-making power are not always so coupled with the law, or the subdivisions thereof, that the enforcing officer can readily see what his real power is. Thus, the general law of 1789, which gives to the heads of departments the power to prescribe rules and regulations not inconsistent with law, may or may not bestow upon the Secretary of the Treasury the authority to make rules and regulations for carrying out the provisions of the current income-tax law. A similar power bestowed specifically upon the Secretary of the Navy may or may not enable him to issue binding regulations for enforcing a particular policy entrusted to his care. A blank delegation of such power for enforcing the Packers Act may not give the Secretary of the Agriculture authority to promulgate rules for putting into effect specific provisions of that Act. . . . The officer must make the first guess and let the court determine whether such source is the correct one for effectuating the particular policy in question.

COMER, *supra* note 133, at 133–34. Comer, a political scientist at Williams College, evidently drew his knowledge of rulemaking primarily from documentary sources, including, of course, appellate opinions. Since these sources contained no reflection of the convention as of the time he wrote (1927), it is not surprising that he regarded the meaning of facially ambiguous rulemaking grants as essentially a mystery.

[175] Ch. 311, 38 Stat. 717.

[176] *Id.* § 5, 38 Stat. at 719–21 (codified as amended at 15 U.S.C. § 45 (2000)).

[177] *Id.* § 6, 38 Stat. at 721–22 (codified as amended at 15 U.S.C. § 46).

[178] *Id.* § 6(g), 38 Stat. at 722.

[179] Congress empowered the FTC only to prevent violations of the Act, not of the rules and regulations promulgated under it. Section 5 declared the use of "unfair methods of competition in commerce" to be unlawful and gave the FTC the power to prevent violations. *Id.* § 5, 38 Stat. at 719.

[180] Section 5 empowered the FTC to bring suit to enforce its cease and desist orders whenever any person failed to comply. *Id.* § 5, 38 Stat. at 719–20.

the rulemaking grant in section 6, which conferred the FTC's investigative powers, clearly suggests that Congress intended the rulemaking grant to serve as an adjunct to the FTC's investigative duties, regarding which Congress had not given the agency the authority to act with the force of law.

The legislative history of the Act supports the conclusion that the FTC's rulemaking grant did not confer legislative rulemaking authority.[181] Section 6(g)'s general rulemaking grant originated in the House Bill of 1914,[182] which conferred only investigative powers on the FTC, such as the power to require reports from corporations and to classify corporations.[183] In contrast, the bill that passed the Senate granted adjudicative and investigative powers[184] but included no rulemaking provision at all.[185] As a consequence, when the Conference Committee met, the only rulemaking provision under consideration was the one included in the House bill. Under established practices for reconciling bills in conference, the Committee could not have granted the FTC legislative rulemaking powers, because neither bill granted the agency such authority.[186]

Statements made during floor debates after the Conference Committee incorporated the rulemaking provision into the bill confirm that Congress did not intend section 6(g) to confer legislative authority. In response to questions about the scope of the FTC's powers, Representative Covington, a member of the Conference Committee, distinguished the powers given to the FTC from those delegated to the ICC under the Hepburn Act, which had given the ICC the power to prescribe future rates.[187] Covington stated that the "Federal Trade Com-

---

[181] *See* Burrus & Teter, *supra* note 14, at 1124 ("The legislative history of the Federal Trade Commission Act compels the conclusion that Congress had no intention to confer any 'legislative' rulemaking power upon the Commission."); Glen E. Weston, *Deceptive Advertising and the Federal Trade Commission: Decline of Caveat Emptor*, 24 FED. B.J. 548, 570 (1964) ("There is simply no indication in the legislative history of intent to confer any such power and plenty of evidence of an intent not to empower the FTC to make 'legislative' rules.").

[182] *See* S. DOC. NO. 63-573, at 15 (2d Sess. 1914) (comparing the House, Senate, and Conference versions of the bill).

[183] *See id* at 11.

[184] *See id.* at 7–9, 10–13.

[185] *See id.* at 15.

[186] *See* LORY BRENEMAN, SENATE MANUAL CONTAINING THE STANDING RULES, ORDERS, LAWS, AND RESOLUTIONS AFFECTING THE BUSINESS OF THE UNITED STATES SENATE, S. DOC. NO. 106-1, § 28.2, at 51 (1999) ("Conferees shall not insert in their report matter not committed to them by either House, nor shall they strike from the bill matter agreed to by both Houses.").

[187] Hepburn Act, ch. 3591, § 4, 34 Stat. 584, 589 (1906). Representative Covington also stated:
[T]here is no analogy between the power of the Interstate Commerce Commission under the Hepburn Act and the power of the Federal trade commission in regard to unfair competition. There is, however, a perfect analogy between the former power of the Interstate Commerce Commission under the Cullom Act and the power of the Federal trade commission. Under the Cullom Act the Interstate Commerce Commission had the

mission will have no power to prescribe the methods of competition to be used in the future."[188]   In addition, he explained that the FTC, unlike the ICC, "will not be exercising power of a legislative nature" in issuing its orders.[189]

In subsequent years, the courts, Congress, the agency, and knowledgeable commentators all shared the understanding that section 6(g) did not confer legislative rulemaking power on the FTC. In a leading separation of powers decision, *Humphrey's Executor v. United States*,[190] the Supreme Court surveyed the powers of the FTC and concluded that it exercised only "quasi-legislative" and "quasi-judicial" functions. The principal "quasi-legislative" power the Court identified under section 6 was "making investigations and reports [on unfair forms of competition] for the information of Congress."[191] The Court did not mention the rulemaking grant in section 6(g), presumably because the litigants in the case — and the Court itself — assumed that this provision did not confer any power on the FTC to make legislative rules.

Similarly, the FTC described its own rulemaking power as excluding the authority to issue legally binding rules. In its 1922 *Annual Report*, for example, the FTC complained of the frequent confusion that existed over the extent of its authority:

> One of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it. It is frequently asked to do this, not only in a broad general way, but also to issue warnings to concerns alleged to be using unfair practices. . . . It is hoped, in time, to bring about a thorough understanding of the fact that the commission can not and will not function by any method not authorized in its organic act, whereby complete investigation, careful consideration, and, in short, due process of law and full respect for the moral and legal rights of both parties to controversies are assured.[192]

---

power only to determine whether an existing rate was unreasonable, and, if it so found, to order the railroad to cease and desist from charging that rate. The Federal trade commission will have precisely similar power in regard to an existing method of competition.

51 CONG. REC. 14,932 (1914).

[188] *Id.*

[189] *Id.*

[190] 295 U.S. 602 (1935).

[191] *Id.* at 628.

[192] ANNUAL REPORT OF THE FEDERAL TRADE COMMISSION 36 (1922). Subsequent annual reports also support the conclusion that section 6(g) was confined to supplementing the FTC's investigative powers. *See* ANNUAL REPORT OF THE FEDERAL TRADE COMMISSION 81 (1925) (pointing to investigatory powers, under section 6, as the main basis for the work carried out by the economic division, which investigates general business conditions); *see also* George Rublee, *The Original Plan and Early History of the Federal Trade Commission*, 11 PROC. ACAD.

Lastly, the *Final Report* of the Attorney General's Committee on Administrative Procedure of 1941 reflects the same understanding.[193] The report, which was instrumental in leading to the APA, noted that "[r]elatively few of the administrative agencies studied by the Committee lack power to prescribe regulations for the control of activities which are subject to their authority."[194] But one of the agencies that the *Final Report* pointed to as lacking legislative rulemaking powers was the FTC.[195] Similarly, a monograph on the FTC prepared by the Attorney General's Committee on Administrative Procedure concluded that rules issued by the FTC should be called "advisory interpretations" rather than "rules," because "[n]othing in the statutes administered by the Commission makes any provision for the promulgation of rules applicable to whole industries."[196]

The Packers and Stockyards Act of 1921,[197] which regulated the meat packing industry, provides further evidence of the emergence of the drafting convention. The original House committee bill did not require either packers or stockyard operators to comply with any rules or regulations promulgated under the Act, nor did it include any general rulemaking grant.[198] By contrast, the Senate committee bill included a general rulemaking grant that unquestionably conferred legislative rulemaking authority. The bill declared that it was the "duty" of every packer and operator to comply with the Secretary's regulations and that conduct contrary to such regulations was "unlawful."[199] The bill also set forth the procedures for ordering a packer or operator to cease and desist from violating a regulation.[200]

During Senate floor debate, the provision of the Senate bill requiring that packers and stockyard operators comply with rules and regulations generated much discussion. Senator Stanfield criticized the provision, arguing that it gave the agency power to "practically enact a law under which the packer will become a criminal."[201] Similarly, Senator Wadsworth expressed concern that the agency might "issue[] a

---

POL. SCI. 666, 671 (1926). For Rublee, a drafter of the FTCA and one of the agency's first Commissioners, it was "perfectly clear" that the FTC had no authority to give advance advice about the legality of business practices, and he did not even mention the rulemaking grant. *Id.*

[193] *See* FINAL REPORT, *supra* note 29, at 98 n.19.

[194] *Id.* at 98.

[195] *Id.* at 98 n.18. The Final Report stated that section 6(g) of the FTCA conferred only procedural rulemaking powers on the FTC. *Id.* at 98 n.19.

[196] THE ATTORNEY GENERAL'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH NO. 6, THE FEDERAL TRADE COMMISSION 67 (1939).

[197] Ch. 64, 42 Stat. 159.

[198] *See* 61 CONG. REC. 2495–99 (1921) (summarizing the differences between the House and Senate committee bills).

[199] *See id.* at 2710 (reprinting sections 12(g) and 15 of S. 659, 67th Cong. (1921)).

[200] *See id.* (reprinting sections 20 and 21 of S. 659, 67th Cong. (1921)).

[201] *Id.* at 2493.

rule or regulation which imposes an almost impossible condition of affairs upon a man engaged in one of these businesses."[202]  Senator Norris defended the rulemaking provision, stating:

> I am one who has always looked with a jealous eye upon the granting of power to convict any man or establish a criminal offense for the violation of a rule or regulation that is not set out in the statute; but we can not set out here — no living man could set out here — every rule and every regulation that will be necessary to properly care for this big business.[203]

In the end, the bill that Congress passed into law reflected something of a compromise between the House and Senate views.  The Act had four titles.  Title I provided general definitions, Title II set forth the statutory provisions regulating packers, Title III regulated stockyards, and Title IV included the general provisions of the Act.[204]  Title III subjected stockyard operators to penalties for violations of the rules and regulations promulgated by the Secretary under a specific rulemaking grant included in that title.[205]  Title II, however, did not include a specific rulemaking grant with respect to the packers.  In addition, Congress included a general rulemaking grant in Title IV, but no penalties were attached to this grant.[206]  There is little doubt that the rulemaking grant in Title III was understood to confer power to adopt legislative rules.  To be sure, the conferees deleted any reference to stockyard operators having a "duty" to comply with regulations or to violations of regulations being "unlawful."  But the rulemaking grant in Title III was coupled with a provision imposing criminal sanctions for rule violations,[207] and was clearly understood to confer legislative rulemaking authority.

The critical question is what the members of the House and Senate understood the general rulemaking grant in Title IV to mean.  This grant, unlike the one contained in Title III, contained no provision for sanctions for rule violations.  Remarks by Senator Kenyon on the Senate floor explaining the compromise bill[208] indicate that Congress un-

---

[202] *Id.* at 2494.

[203] *Id.* at 2493.

[204] Packers and Stockyards Act, 1921, ch. 64, 42 Stat. 159.

[205] Section 306(a) required stockyard owners to file schedules of their rates with the Secretary, and section 306(b) gave the Secretary the power to prescribe the form, manner, and detail of the schedules. *See id.* § 306(a), (b), 42 Stat. at 164 (codified at 7 U.S.C. § 207 (2000)).

[206] *Id.* § 407, 42 Stat. at 169 (codified as amended at 7 U.S.C. § 228).

[207] The Secretary's rules regarding the schedules were given legislative effect by Congress in section 306(h), which provided that "[w]hoever willfully fails to comply with the provisions of this section or of any regulations or order of the Secretary made thereunder shall on conviction be fined not more than $1,000, or imprisoned not more than one year, or both." *Id.* § 306(a), (b), (h), 42 Stat. at 164–65 (codified at 7 U.S.C. § 207).

[208] *See* 61 CONG. REC. 4642 (1921) (noting "three amendments [including amendment 17, which provided that the Secretary may make rules and regulations] adopted by the Senate were

JA0501

derstood the ambiguous grant in Title IV to authorize only procedural rules. He noted that this grant "gave the Secretary of Agriculture the right to establish rules and regulations *of procedure*," and characterized the provision as "not an especially important amendment."[209] The legislative history of the Packers and Stockyards Act thus offers an example of a grant coupled with sanctions understood to confer legislative power, combined with a grant lacking any provision for sanctions understood to authorize only housekeeping-type rules.

Congress also appeared to follow the convention when enacting subsequent statutes that created new agencies and delegated rulemaking power to them.[210] One prominent example is the Longshoremen's and Harbor Workers' Compensation Act of 1927.[211] As enacted, the Act included a general rulemaking grant[212] but made no provision for sanctions for rules adopted under the grant. The *Final Report* of the Attorney General's Committee of 1941 confirms that the statute did not confer legislative rulemaking power: it noted that the United States Employees' Compensation Commission, the administrative agency initially charged with implementing the Act, was one of the "[r]elatively few" agencies that lacked the power to prescribe regulations having the force and effect of law.[213]

   *2. New Deal-Era Rulemaking Grants.* — With the advent of the New Deal, Congress increased the pace at which it created new agen-

---

retained in conference. On the remaining Senate amendments the Senate conferees were compelled to accede to the insistence of the House conferees").

[209] *Id.* at 4643 (emphasis added).

[210] For example, the Federal Water Power Act, passed in 1920, is consistent with the convention. *See* Federal Water Power Act, ch. 285, 41 Stat. 1063 (1920). Section 4(h) of the Act gave the Federal Power Commission general rulemaking powers, authorizing it to "perform any and all acts, to make such rules and regulations, and to issue such orders not inconsistent with this Act as may be necessary and proper for the purpose of carrying out the provisions of this Act." *Id.* § 4(h), 41 Stat. at 1067. Section 25 of the Act provided criminal penalties for violations of the Commission's rules and regulations, and section 26 granted the Attorney General the power to institute proceedings for the revocation of licenses whenever any licensee violated the rules or regulations of the Commission. *Id.* §§ 25–26, 41 Stat. at 1076.

[211] Ch. 509, 44 Stat. 1424.

[212] Section 39 provided: "Except as otherwise specifically provided, the United States Employees' Compensation Commission shall administer the provisions of this Act, and for such purpose the commission is authorized . . . to make such rules and regulations . . . as may be necessary in the administration of this Act." *Id.* § 39, 44 Stat. at 1442. The current version of the Act is substantially the same, except that the rulemaking grant runs to the Secretary of Labor. *See* 33 U.S.C. § 939(a) (2000).

[213] *See* FINAL REPORT, *supra* note 29, at 98 n.18. The Act was amended in 1958 to give the Secretary of Labor power to issue safety regulations. *See* Longshoremen's and Harbor Workers' Compensation Act amendment, Pub. L. No. 85-742, § 41(a), 72 Stat. 835, 835 (1958) (codified as amended at 33 U.S.C. § 941(a) (2000)). The amended Act specifically made the violation of these regulations — unlike regulations issued under the original Act — an offense punishable by criminal fines. *Id.* § 41(f), 72 Stat. at 836 (codified as amended at 33 U.S.C. § 941(f)). Under the convention, therefore, the safety regulations were clearly legislative.

cies.  There is no evidence, however, of any change in the convention for differentiating between legislative and housekeeping grants.  For example, the Securities Act of 1933,[214] the Securities Exchange Act of 1934,[215] and the Motor Carrier Act of 1935[216] all contained facially ambiguous general rulemaking grants.  In each case, these statutes also included provisions giving teeth to the rules promulgated under the acts — such as criminal penalties or fines — and empowered the agencies charged with administering the statutes to bring suit to enforce their rules and regulations.  These statutes have always been regarded as conferring legislative rulemaking authority.[217]

---

[214] Ch. 38, 48 Stat. 74.  Section 19(a) of the 1933 Act gave the SEC broad general rulemaking powers by authorizing it "from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this title."  *Id.* § 19(a), 48 Stat. at 85 (codified as amended at 15 U.S.C. § 77s(a) (2000)).  Congress gave teeth to the rules and regulations promulgated by the SEC through two statutory sections.  First, section 20(b) gave the SEC the power to bring an action in any district court to enjoin acts or practices that constitute or will constitute a violation of the provisions of the Act, or any rule or regulations prescribed under the Act.  *Id.* § 20(b), 48 Stat. at 86 (codified as amended at 15 U.S.C. § 77t).  Second, section 24 provided that "[a]ny person who willfully violates any of the provisions of this title, or the rules and regulations promulgated by the Commission under authority thereof . . . shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both."  *Id.* § 24, 48 Stat. at 87 (codified as amended at 15 U.S.C. § 77x).  According to the convention, these two statutory provisions indicate Congress's intent to give the SEC the authority to bind persons outside the agency with the force of law.

[215] Ch. 404, 48 Stat. 881.  Section 23(a) provided that "[t]he Commission and the Federal Reserve Board shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this title."  *Id.* § 23(a), 48 Stat. at 901 (codified as amended at 15 U.S.C. § 78w(a)(1)).  According to the convention, Congress indicated its intent to give legislative effect to these rules and regulations through two statutory provisions.  First, section 21(e) gave the SEC the power to bring an action seeking to enjoin the violation of any rule or regulation promulgated under the Act.  *Id.* § 21(e), 48 Stat. at 900 (codified as amended at 15 U.S.C. 78u).  Second, section 32 set forth penalties for violations of any rules or regulations promulgated by the SEC.  *Id.* § 32, 48 Stat. at 904–05 (codified as amended at 15 U.S.C. § 78ff).

[216] Ch. 498, 49 Stat. 543 (repealed 1983).  Although the ICC was not given general rulemaking powers in the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887) (repealed 1978), section 204(a)(6) of the Motor Carrier Act gave the ICC general legislative rulemaking powers over motor carriers.  *See* Motor Carrier Act, 1935, § 204(a)(6), 49 Stat. at 546.  Section 204(a)(6) provided that the ICC has the power "[t]o administer, execute, and enforce all other provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration."  *Id.*  Congress indicated its intent to give these rules and regulations legislative effect in sections 222(a) and (b).  *See id.* § 222(a), 49 Stat. at 564 ("Any person knowingly and willfully violating any provision of this part, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense."); *id.* § 222(b), 49 Stat. at 564 ("If any motor carrier or broker operates in violation of . . . any rule, regulation, requirement, or order . . . the Commission or its duly authorized agent may apply to the district court of the United States for any district where such motor carrier or broker operates, for the enforcement of such provision of this part, or of such rule, regulation, requirement, order, term, or condition.").

[217] *See* FINAL REPORT, *supra* note 29, at 98–99.

The National Labor Relations Act (NLRA) of 1935,[218] by contrast, contained a facially ambiguous general rulemaking grant but lacked any textual signal indicating Congress's intent to attach legislative effect to such rules. Section 6(a) provided: "[t]he Board shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act."[219] However, the Act did not give the NLRB the power to enjoin or prosecute violations of the rules promulgated under this grant, nor did it provide any statutory penalties for nonconformance with the NLRB's rules and regulations. According to the convention, these omissions indicate that Congress did not intend to grant legislative rulemaking powers to the NLRB.

The legislative history of the NLRA substantiates this conclusion. Upon consideration of different versions of the bill, one Senator made a proposal to limit the NLRB's rulemaking powers under what became section 6(a) to such *"reasonable* rules and regulations as may be necessary to carry out the provisions of this Act."[220] However, the proposal was rejected because, according to a Senate memorandum, "[i]n no case do the rules have the force of law in the sense that criminal penalties or fines accrue for their violation, and it seems sufficient that the rules prescribed must be 'necessary to carry out the provisions' of the act."[221] The *Final Report* of the Attorney General's Committee of 1941 confirms this legislative history: it notes that the NLRB's "power to 'make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this chapter' has been assumed to extend only to matters of procedure."[222]

Perhaps the strongest evidence of the continued operation of the convention during the New Deal years appears in statutes that contain multiple rulemaking grants. Several important New Deal measures, including the Social Security Act of 1935,[223] the Walsh-Healey Act of

---

[218] Ch. 372, 49 Stat. 449. For a further discussion of the general rulemaking grant included in the NLRA and of its legislative history, see *infra* section V.B.3, pp. 565–67.

[219] National Labor Relations Act, § 6(a), 49 Stat. at 452 (codified as amended at 29 U.S.C. § 156 (2000)).

[220] S. 2926, 73rd Cong. § 7 (1934), *reprinted in* 1 LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, 1935, at 1090 (1949) (emphasis added).

[221] *See* COMPARISON OF S. 2926 (73D CONGRESS) AND S. 1958 (74TH CONGRESS) 24 (Comm. Print 1935), *reprinted in* 1 LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, 1935, *supra* note 220, at 1349. The Senate memorandum further noted that the insertion of the word "reasonable" could only result in confusion and would not make any change of substance. *Id.* at 1350.

[222] *See* FINAL REPORT, *supra* note 29, at 98 n.18 (citation omitted).

[223] Ch. 531, 49 Stat. 620.

JA0504

1936,[224] and the Food, Drug, and Cosmetic Act of 1938,[225] share this trait.

As originally adopted in 1935, the Social Security Act contained both a general grant of rulemaking power and several more specific rulemaking grants.[226] Congress specified no legal consequences for violations of rules promulgated under the general grant. It was understood that this provision did not authorize legislative rules.[227] In contrast, the Act did attach sanctions to rules and regulations promulgated under specific rulemaking grants included in the statute,[228] and under the convention these would authorize legislative rules.[229]

The Walsh-Healey Act, which Congress enacted to regulate federal government contracts, also contained both a general rulemaking grant and specific, narrower rulemaking grants.[230] The Act gave the Secretary of Labor the "authority from time to time to make, amend, and

---

[224] Ch. 881, 49 Stat. 2036.

[225] Ch. 675, 52 Stat. 1040.

[226] *See* Social Security Act, § 1102, 49 Stat. at 647 (setting forth, in Title XI concerning the "general provisions" of the Act, a grant giving the Secretary of the Treasury, the Secretary of Labor, and the Social Security Board the power to make rules and regulations "necessary to the efficient administration of the functions with which each is charged under this Act").

[227] *See* FINAL REPORT, *supra* note 29, at 98 nn.18–19 (listing the Social Security Board as an example of an agency that was given the power to act via case-by-case adjudication but was "not given power to elaborate the law they apply by adopting general regulations").

[228] For example, section 808 of Title VIII, which dealt with taxes with respect to employees, gave the Commissioner of Internal Revenue the power to "make and publish rules and regulations for the enforcement of this title." Social Security Act § 808, 49 Stat. at 638. Section 810(a) gave teeth to the rules and regulations promulgated under section 808 by subjecting anyone who:

> [B]uys, sells, offers for sale, uses, transfers, takes or gives in exchange, or pledges or gives in pledge, except as authorized in this title or in *regulations made pursuant thereto,* any stamp, coupon, ticket, book, or other device, prescribed by the Commissioner of Internal Revenue under section 807 for the collection or payment of any tax imposed by this title, shall be fined not more than $1,000 or imprisoned for not more than six months, or both.

*Id.* § 810(a), 49 Stat. at 638 (emphasis added).

[229] In 1939, Congress adopted extensive amendments to the Social Security Act, including a new rulemaking grant. The new grant gave the Social Security Board "full power and authority to make rules and regulations." The rulemaking grant was facially ambiguous regarding whether it granted legislative, or merely interpretive, rulemaking authority. One provision of the amendments, however, mandated that when the Social Security Board denied a claimant benefits for failing "to submit proof in conformity with any regulation" issued under the general rulemaking grant, the court reviewing the denial of benefits "shall review only the question of conformity with such regulations and the validity of such regulations." Social Security Act Amendments of 1939, ch. 666, § 205(g), 53 Stat. 1360, 1370. In other words, the regulations, provided they were consistent with the Act, were to have legislative effect in determining eligibility for benefits. Because the statute specifically provided that a violation of a regulation could result in a sanction — denial of benefits — the new rulemaking grant authorized legislative rules under the convention.

[230] Walsh-Healey Act, ch. 881, 49 Stat. 2036 (1936); *see, e.g., id.* § 4, 49 Stat. at 2038 (codified as amended at 41 U.S.C. § 38 (2000)) (granting the Secretary of Labor the authority to "administer the provisions of this Act . . . and to prescribe rules and regulations with respect thereto"); *id.* § 1(b), 49 Stat. at 2036 (codified as amended at 41 U.S.C. § 35) (stating that the Secretary of Labor will determine the minimum wage).

rescind such rules and regulations as may be necessary to carry out the provisions of this Act."[231]   The Act provided no sanctions for violations of the rules promulgated under this general grant.  By contrast, rules and regulations issued pursuant to section 6, which authorized the Secretary to make rules setting reasonable "exemptions" from the minimum rate and maximum hour provisions of the Act,[232] are legislative according to the convention, because such exemptions necessarily would affect the conduct of contractors by exempting them from the Act's requirements.

Support for this conclusion appears in a monograph on the Act prepared in 1939 for the Attorney General's Committee on Administrative Procedure, which summarized the significance of the differing treatment of rules and regulations promulgated under sections 4 and 6 as follows:

> The rules and regulations made by the Secretary under section 6 have vitality because they affect the nature of the performance required of a contractor.  For the rules and regulations under section 4, however, *no sanction* is provided; they have no dispositive effect, except in so far as they operate as controls upon the Division itself; as administrative interpretations of the statute they may be given respectful judicial consideration if the interpretations be contested in court actions, but they are not binding as acts of subordinate legislation having the force and effect of law.[233]

The Federal Food, Drug, and Cosmetic Act (FDCA)[234] similarly attached varying legal consequences to different rules and regulations based upon the source of rulemaking authority within the Act.  The FDCA repealed the Pure Food Act of 1906,[235] which did not confer legislative rulemaking authority over standards of identity for food or tolerances for poison residues in food.[236]   Because a primary goal of the 1938 Act was to give greater powers to the Secretary of Agricul-

---

[231] *Id.* § 4, 49 Stat. at 2038.

[232] *Id.* § 6, 49 Stat. at 2038–39 (codified at 41 U.S.C. § 40).

[233] ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH 1, THE WALSH-HEALEY ACT, at 68 (1939) (emphasis added).

[234] Ch. 675, 52 Stat. 1040 (1938).

[235] Ch. 3915, 34 Stat. 768 (repealed 1938).  The 1906 Act did include a general rulemaking grant, which provided that "the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor shall make uniform rules and regulations for carrying out the provisions of this Act." *Id.* § 3, 34 Stat. at 768–69.  This grant was understood to authorize only interpretive or procedural rules. *See* Lee, *supra* note 79, at 9 (noting that the 1906 Act did not contain any specific authorization for the promulgation of legislative regulations and did not make observance of the regulations promulgated under the act compulsory).

[236] *See* Wesley E. Forte, *The GMP Regulations and the Proper Scope of FDA Rulemaking Authority*, 56 GEO. L.J. 688, 691 (1968).

ture,[237] Congress included important rulemaking provisions in the FDCA.[238]

The key rulemaking provisions appear in section 701, which has been described as "schizophrenic" because of the mixed rulemaking provisions included within it.[239] Section 701(a) granted general rule-making power to the Secretary, stating that the Secretary could "promulgate regulations for the efficient enforcement of this Act."[240] Then sections 701(e), (f), and (g) set forth detailed procedures, including procedures for public hearings and judicial review of regulations, that the Secretary was required to follow when promulgating regulations under certain enumerated, specific rulemaking grants.[241] Notably, section 701(e) does not refer to section 701(a), and therefore rules promulgated under section 701(a) are not subject to section 701(e)'s procedural safeguards.

Under the convention, the specific rulemaking provisions that were subject to the procedural safeguards of sections 701(e), (f) and (g) conferred *legislative* rulemaking authority.[242] For example, section 401 gave the Secretary the power to promulgate regulations fixing standards of identity for food.[243] Those regulations are given legislative effect by various sections that expressly make violations of section 401 regulations unlawful and subject to criminal penalties.[244]

---

[237] *See* Lee, *supra* note 79, at 18 (noting that "attempts to change over from a system of interpretive regulations to legislative regulations embodying definitions and standards of identity for all foods" were a part of the push for new comprehensive food and drug legislation).

[238] Congress initially charged the Secretary of Agriculture with administering the FDCA. This power was transferred to the Federal Security Administrator in 1940, and later to the Secretary of Health, Education, and Welfare (HEW). The Secretary of HEW delegated his powers under the Act to the FDA, which is a unit of HEW. *See* 1 JAMES T. O'REILLY, FOOD AND DRUG ADMINISTRATION § 2:02 (1992) (explaining that Congress never created the FDA but that HEW instead delegated its powers under the FDCA to the FDA).

[239] Forte, *supra* note 236, at 693.

[240] Federal Food, Drug, and Cosmetic Act, ch. 675, § 701(a), 52 Stat. 1040, 1055 (1938) (codified at 21 U.S.C. § 371(a) (2000)).

[241] *Id.* § 701(e)–(g), 52 Stat. at 1055–56 (codified as amended at 21 U.S.C. § 371(e)–(g)).

[242] *Cf.* Robert H. Becker, *Thoughts for Food*, 28 FOOD DRUG COSM. L.J. 679, 685 (1973) ("For those areas in which the FDA is specifically authorized to promulgate substantive rules or regulations having the force and effect of law, e.g., food standards regulations, Section 701(e) provides that any person who is adversely affected may file objections and request a public hearing on those objections.").

[243] *See* Federal Food, Drug, and Cosmetic Act, § 401, 52 Stat. at 1046 (codified as amended at 21 U.S.C. § 341).

[244] The following provisions gave section 401 regulations legislative effect: (1) section 403(g), 52 Stat. at 1047 (codified as amended at 21 U.S.C. § 343(g)), which declared that a food shall be deemed "misbranded" if it failed to conform to any standard of identity promulgated under section 401; (2) section 301(a), 52 Stat. at 1042 (codified as amended at 21 U.S.C. § 331(a)), which made it unlawful to introduce into interstate commerce any "misbranded" food; (3) section 303(a), 52 Stat. at 1043 (codified as amended at 21 U.S.C. § 333(a)), which provided criminal penalties for introducing any "misbranded" food into interstate commerce; and (4) section 304, 52 Stat. at 1044–

In contrast to the regulations subjected to the procedural safeguards of section 701(e), nothing in the Act indicated that a regulation issued under the authority of section 701(a) would subject the violator to any sanction, penalty, or other legal consequence. This silence suggests Congress's intent to *withhold* legislative rulemaking powers under that section.[245]

Legislative history supports this conclusion. During debate on the Act, Congress divided sharply over whether to give the Secretary the power to promulgate definitions, standards, and regulations having the force and effect of law.[246] Congress ultimately granted specific legislative rulemaking powers to the Secretary only after intense debate about what procedural safeguards the Act should employ to constrain those powers.[247] In contrast to the serious attention Congress gave to the procedural safeguards set forth in sections 701(e), (f), and (g), the general rulemaking grant of section 701(a) passed almost unnoticed.[248] As one scholar writing in 1968 pointed out, the lack of attention paid to section 701(a), coupled with the absence of procedural safeguards attached to section 701(a) rulemaking, carry great significance because

---

45 (codified as amended at 21 U.S.C. § 334), which subjected any food that was "misbranded" to seizure and condemnation.

    A similar analysis applies to the other rulemaking grants covered by section 701(e). For example, the following provisions gave section 403(j) regulations legislative effect: (1) section 403(j), 52 Stat. at 1046 (codified as amended at 21 U.S.C. § 343(j)), which declared that food that "purports to be or is represented for special dietary uses" shall be deemed "misbranded" if its label fails to "bear[] such information concerning its vitamin, mineral and other dietary properties as the Secretary [prescribes] by regulations"; (2) section 301(a), 52 Stat. at 1042 (codified as amended at 21 U.S.C. § 331(a)), which made it unlawful to introduce into interstate commerce any "misbranded food"; (3) section 303, 52 Stat. at 1043 (codified as amended at 21 U.S.C. § 333), which provided criminal penalties for introducing any "misbranded" food into interstate commerce; and (4) section 304, 52 Stat. at 1044–45 (codified as amended at 21 U.S.C. § 334), which subjected any misbranded food to seizure and condemnation. Similarly, the following statutory provisions gave section 406(b) regulations legislative effect: (1) section 406(b), 52 Stat. at 1049 (repealed 1960), which provided that "[t]he Secretary shall promulgate regulations providing for the listing of coaltar colors which are harmless and suitable for use in food and for the certification of batches of such colors"; (2) section 301(i), 52 Stat. at 1042 (codified as amended at 21 U.S.C. § 331(i)), which prohibited the unauthorized use of any mark, stamp, tag, or label authorized or required by the 406(b) regulations; and (3) section 303, 52 Stat. at 1043 (codified as amended at § 333), which provided criminal penalties for violating any of the provisions of section 301, including its prohibition of the unauthorized use of any marks, stamps, tags, or labels authorized or required by section 406(b) regulations.

[245] *See* Forte, *supra* note 236, at 693 n.29 (noting that there is no specific provision providing that a violation of section 701(a) is a violation of the Act and concluding that this omission is "probably due to the fact that Congress intended § 701(a) to authorize interpretive, not substantive, regulations").

[246] *See id.* at 692 (noting that serious questions were raised in Congress about both the advisability of authorizing legislative rulemaking and the procedural safeguards necessary to prevent arbitrary rules).

[247] *See id.* at 692–94.

[248] *See id.* at 693.

"[i]t seems inconceivable that Congress, after five years of debate on the procedural limitations to be placed on the promulgation of some substantive regulations, would authorize the issuance of other regulations having the force and effect of law without debate and without any procedural safeguards."[249]

Statements in Senate and House reports confirm that Congress did not intend section 701(a) to grant legislative rulemaking authority. A House Report, for example, described section 701 as follows:

> Section 701 relates generally to regulations. In the case of regulations, the violation of which constitutes an offense, it is required that appropriate notice of a public hearing be given and that adequate time shall be given after the promulgation of a regulation before it becomes effective. . . .

> Section 701(e), (f), and (g) of the committee amendment set forth the procedure governing the formulation and judicial review of certain regulations to be issued by the Secretary. . . .

> Such regulations are not merely interpretive. They have the force and effect of law and must be observed. Their violation may result in the imposition of criminal penalties, or in the confiscation of the goods involved if shipped in interstate commerce, or in their exclusion from the country if imported.[250]

This report indicates that key participants in the legislative process understood that by attaching sanctions to violations of certain rules and regulations, they elevated those regulations to legislative status. Given the understanding that these rules were legislative, Congress felt it necessary to attach important procedural safeguards to their issuance. No one urged the need to attach safeguards to rules promulgated under section 701(a), because those rules would carry only interpretive effect.

Overall, the text, structure, and legislative history of statutes Congress enacted through the end of the New Deal show a remarkably consistent adherence to the convention's framework for distinguishing between legislative and housekeeping grants. The key was not whether the rulemaking grant was general or specific. Members of Congress referred to the presence or absence of sanctions as the basis for distinguishing between legislative and housekeeping grants on sev-

---

[249] *Id.* at 694; *see also* Becker, *supra* note 242, at 681–82 ("In light of this history of express and specific safeguards governing the authority to issue the substantive regulations authorized by the statute, it seems strange to suggest that the same statute was also intended to authorize the issuance of other unspecified regulations having the force and effect of law, whose violation could also result in the imposition of criminal penalties, without any provision for hearings and with judicial review essentially limited to whether the Agency action is arbitrary or capricious."); Merrill S. Thompson, *FDA — They Mean Well, But . . .*, 28 FOOD DRUG COSM. L.J. 205, 209 (1973) ("It simply doesn't make sense that Congress would bother with 701(e) if it intended to give the Commissioner such powers under 701(a).").

[250] H.R. REP. NO. 75-2139, at 9–10 (1938).

eral occasions when debating rulemaking grants[251] but did not refer to the generality of rulemaking grants as a basis for making such distinctions. In fact, Congress occasionally adopted very general rulemaking grants and attached sanctions to violations of rules issued under them in the *same section of an act*, thereby signaling that the rules promulgated under the grant would be treated as binding.[252]

Despite the strength of the evidence supporting the existence of the convention, there is at least one rulemaking grant from the New Deal era in which the convention does not seem to capture congressional intent: the general rulemaking grant found in Title I of the Communications Act of 1934.[253] The problem stems from the mixture of regulatory schemes that Congress borrowed from other acts in putting together the Communications Act.[254] Title I, which copied many of its provisions from the ICA, sets forth the Act's general organizational provision. Section 4(i) of Title I contains a general rulemaking grant providing that the FCC "may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act as may be necessary in the execution of its functions."[255] Title II governs common carriers. Title III, which regulates broadcasting, borrowed many of its provisions from the Radio Act of 1927,[256] including

---

[251] *See* COMPARISON OF S. 2926 (73D CONGRESS) AND S. 1958 (74TH CONGRESS), *supra* note 221, at 1319, 1349 ("In no case [S. 2926 or S. 1958] do the rules have the force of law in the sense that criminal penalties or fines accrue for their violation. . . ."); *see also* H.R. REP. NO. 75-2139, at 9–10 (1938) (containing FDCA legislative history).

[252] For example, the Taylor Grazing Act of 1934, ch. 865, 48 Stat. 1269, included in section 2 a general rulemaking grant and also specified the sanctions for violating rules promulgated under it:
> The Secretary of Interior shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of the foregoing section, and he shall *make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this Act* and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range; . . . *and any willful violation of the provisions of this Act or of such rules and regulations thereunder after actual notice thereof shall be punishable by a fine of not more than $500.*

*Id.* § 2, 48 Stat. at 1270 (codified at 43 U.S.C. § 315a (2000)) (emphasis added).

[253] Ch. 652, 48 Stat. 1064.

[254] *See* Glen O. Robinson, *The Federal Communications Act: An Essay on Origins and Regulatory Purpose, in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, at 3, 5 (Max D. Paglin ed., 1989) ("To be sure the provisions borrowed from the Interstate Commerce Act were specifically reworded to apply specially to communications carriers, but they are largely transplants from another regulatory regime all the same."); *see also* S. REP. NO. 73-781 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra,* at 711, 711–12 (explaining that the Communications Act borrows and rearranges provisions of the ICA and the Radio Act of 1927).

[255] Communications Act, ch. 652, § 4(i), 48 Stat. at 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)).

[256] Ch. 169, 44 Stat. 1162.

several specific rulemaking grants.[257] Title IV includes the Act's procedural and administrative provisions. Finally, Title V contains the Act's penal provisions. One provision of Title V, section 502, sets forth a general provision subjecting any person who violates any rule or regulation issued under the Act to criminal penalties.[258]

If we apply the convention to the Communications Act, the omnibus provision of criminal sanctions for rule violations in section 502 has the effect of transforming all rulemaking grants in the Act — including the grant in section 4(i) — into grants of legislative rulemaking authority. Given the structure and history of the Act, however, it is doubtful that this is what Congress intended. Section 4(i) was based on section 17 of the ICA,[259] which granted only procedural rulemaking powers. In addition, section 4(i) appears in Title I amid provisions relating to the general administrative organization of the FCC — far away from the penal provisions in section 502 of Title V.[260] Finally, section 4(i) was part of the original draft bill and passed through the

---

[257] *See, e.g.*, Communications Act, § 303(f), 48 Stat. at 1082 (codified as amended at 47 U.S.C. § 303(f)) (giving the FCC power to "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act"); *id.* § 303(i), 48 Stat. at 1082 ((codified at 47 U.S.C. § 303(i)) giving the FCC the "authority to make special regulations applicable to radio stations engaged in chain broadcasting"); *id.* § 303(j), 48 Stat. at 1082 (codified at 47 U.S.C. § 303(j)) (granting the FCC the power to "make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable"). In 1937, Title III of the Communications Act was amended to add a provision authorizing the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions not inconsistent with law, as may be necessary to carry out the provisions of this Act." Amendments to the Communications Act of 1934, ch. 229, § 6(b), 50 Stat. 189, 191 (1937) (adding section 303(r)). All of these various rulemaking grants included within Title III were given legislative effect by section 312(a), which provided for license revocation if any licensee violated any of the Commission's regulations. Communications Act, § 312, 48 Stat. at 1086–87 (codified as amended at 47 U.S.C. § 312(a)).

[258] Section 502, which was part of the 1934 Act, subjects any person "who willfully and knowingly violates any rule, regulation, restriction, or condition" imposed by the FCC under the authority of the Communications Act to a fine of up to $500 for each day during which such offense occurs. Communications Act, § 502, 48 Stat. at 1100–01 (codified at 47 U.S.C. § 502).

[259] A comparison of the language used in section 17 of the ICA with sections 4(h) through (j) of the Communications Act shows that section 4(i) was based upon section 17 of the ICA. *Compare* Communications Act, § 4(i), 48 Stat. at 1068 (codified as amended at 47 U.S.C. § 154(i)) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions."), *with* Interstate Commerce Act, ch. 104, § 17, 24 Stat. 379, 385–86 (1887) (repealed 1978) ("Said Commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it, including forms of notices and the service thereof, which shall conform, as nearly as may be to those in use in the courts of the United States.").

[260] Section 502, 48 Stat. at 1100, borrowed language from section 32 of the Radio Act of 1927. *See* Radio Act of 1927 ch. 169, § 32, 44 Stat. 1162, 1173 (repealed 1934); *see also* S. REP. NO. 73-781 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 711, 721 (explaining that section 502, which provides penalties for violations of rules and regulations of the FCC, is "copied from section 32 of the Radio Act").

legislative process without comment or change.[261]   It was not even
deemed significant enough to warrant a summary in the Senate,
House, or Conference Committee reports.[262]   It is most unlikely that
this provision would have been entirely uncontroversial if it had been
understood as conferring general legislative rulemaking authority on
the FCC.[263]

The Communications Act suggests that Congress was not infallibly
attentive to the drafting convention in signaling which rulemaking
grants are legislative and which are not.   The most likely explanation
for this oversight, in the case of section 4(i) of the Communications
Act, is that the general rulemaking grant drew so little attention, and
was physically placed in the statute at such a great distance from sec-
tion 502, that no one noticed section 502 was written in such a way
that it literally applied to section 4(i).   Had someone noticed the inter-
action between section 4(i) and section 502, we suspect that section 502
would have been revised to make clear that the penal provision
reached only those rules issued under specific rulemaking grants in-
cluded in the Communications Act, such as those rulemaking provi-
sions borrowed from the Radio Act and placed in Title III.   But ap-
parently no one noticed.   The Communications Act thus presents an
example of a statute in which the inference of legislative intent drawn
from the application of the convention should probably be disregarded,
given other, contrary evidence of legislative intent.[264]

---

[261] *Compare Hearings on S. 2910 Before the Senate Comm. on Interstate Commerce*, 73d Cong.
4 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934,
*supra* note 254, at 123, 126 (reprinting original proposed bill), *with* Communications Act, § 4(i), 48
Stat. at 1068 (text of statute as enacted).

[262] *See* H.R. REP. NO. 73-1918, at 45–46 (1934), *reprinted in* A LEGISLATIVE HISTORY OF
THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 733, 777–78; H.R. REP. NO. 73-1850,
at 4–5 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF
1934, *supra* note 254, at 723, 726–27; S. REP. NO. 73-781, at 3 (1934), *reprinted in* A
LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 711, 713.

[263] As enacted in 1934, Title II (pertaining to common carriers) did not contain a general rule-
making grant. Thus, if section 4(i) had been understood to confer legislative rulemaking authority
regarding all of the FCC's functions, this provision would have significantly expanded the
agency's authority over interstate telephone and telegraph carriers. *See infra* note 264. Although
they have not framed their discussion in terms of the convention, the courts have been uncomfort-
able with a broad reading of section 4(i). *See, e.g.*, California v. FCC, 905 F.2d 1217, 1240 n.35
(9th Cir. 1990); AT&T Co. v. FCC, 487 F.2d 865, 876–78 (2d Cir. 1973). The question whether
section 4(i) authorizes legislative rules was briefed in *AT&T Corp. v. Iowa Utilities Board*, 525
U.S. 366 (1999), but was not mentioned in any of the opinions. *Compare* Brief for California at 46
n.21, *Iowa Utilities Board* 525 U.S. 366 (1999) (Nos. 97-826, 97-829, 97-830, 97-831, 97-1075, 97-
1087, 97-1099, 97-1141) (arguing that section 4(i) is not a grant of legislative authority), *with* Brief
for FCC at 19 n.5, FCC v. Iowa Utilities Bd. (No. 97-831) (arguing that Congress gave the FCC
expansive general rulemaking powers and pointing to the codified version of section 4(i) as a
source of those rulemaking powers).

[264] In 1938, Congress amended section 201 of Title II of the Communications Act to add a gen-
eral grant of authority to "prescribe such rules and regulations as may be necessary in the public

## D. *The Office of Legislative Counsel*

One notable institutional development took place at approximately the same time Congress began systematically following the convention: the creation of the Office of Legislative Counsel in both the Senate and the House.[265]  The offices began as a pilot project organized by Columbia Law School in 1916 but became permanent two years later.[266] According to Frederic P. Lee, one of the lawyers who served in both the House and Senate offices in their early days,[267] the offices were

---

interest to carry out the provisions of this Act." Amendments to the Communications Act, ch. 296, 52 Stat. 588, 588 (1938) (codified at 47 U.S.C. § 201(b)). Although the language of this additional rulemaking grant appears to be very broad, the legislative history suggests that its intended scope was narrowly confined to matters concerning the furnishing of reports of positions of ships at sea. One senator explained during debate on the Senate floor that the amendment "relates only to information which comes from vessels at sea as to their location." 83 CONG. REC. 6291 (1938) (statement of Sen. White); *see also* S. REP. NO. 75-1652, at 3 (1938) (noting that the amendment allows free reporting services regarding ships at sea, but that it subjects this free service "to rules, regulations, and limitations which the Commission finds desirable in the public interest"). Nonetheless, in *Iowa Utilities Board*, the Supreme Court held that section 201(b) constitutes a general grant of legislative rulemaking authority that extends to all of the FCC's jurisdiction over common carriers. *Iowa Utilities Board*, 525 U.S. at 377–78. Justice Scalia's opinion for the Court contained no discussion of the history of section 201(b), which suggests a far narrower purpose for that grant.

Whether *Iowa Utilities Board* was correct about section 201(b) if we view the matter through the lens of the convention is a closer call than the question whether section 4(i) should be regarded as a grant of legislative rulemaking authority. Obviously, the omnibus penal provision in section 502 also applies to section 201(b), making section 201(b) presumptively legislative under the convention. And section 201(b), unlike section 4(i), is not in a separate title of the Act dealing with definitions and administrative provisions, nor was it borrowed from another statute that conferred only procedural authority. The correct analysis here probably turns on whether one is willing to credit the sort of legislative history that appears in committee reports and floor statements that bear on legislative purpose (a large topic beyond the scope of this Article). If one is willing to credit such materials, then the presumptive conclusion about section 201(b) drawn from the convention should probably be overcome by evidence that Congress intended this grant to apply only to locational signals from vessels at sea. If one is not willing to credit this kind of evidence, but only the inferences that can be drawn from the text of statutes (which of course is Justice Scalia's general position, *see* Scalia, *supra* note 55, at 29–37), then the presumptive conclusion based on the convention should probably stand and the Court was correct in *Iowa Utilities Board* to conclude that section 201(b) confers general legislative authority over all matters within the FCC's jurisdiction under Title II.

[265] For background, see GEORGE B. GALLOWAY, THE LEGISLATIVE PROCESS IN CONGRESS 409 (1953); KENNETH KOFMEHL, PROFESSIONAL STAFFS OF CONGRESS 183–200 (1962); and Frederic P. Lee, *The Office of the Legislative Counsel*, 29 COLUM. L. REV. 381 (1929). For an interesting case study that discusses the continuing importance of this office, see Victoria F. Nourse & Jane S. Schacter, *The Politics of Legislative Drafting: A Congressional Case Study*, 77 N.Y.U. L. REV. 575, 588–90 (2002).

[266] *See* Lee, *supra* note 265, at 385–86.

[267] Lee served as Assistant Legislative Counsel to the U.S. House of Representatives from 1919 to 1923 and as Legislative Counsel to the U.S. Senate from 1923 to 1930. *See* Lee, *supra* note 79, at 1 n.*. Later he served as Special Counsel to the Secretary of Agriculture. *Id.* Both the House and Senate Offices of Legislative Counsel in these years were small and were staffed by attorneys with extensive experience. *See* GALLOWAY, *supra* note 265, at 409 (noting that the principal at-

strictly nonpartisan and professional.[268]  Their functions included pro-
viding legal research to members of Congress, reviewing and com-
menting on proposed legislation, and most importantly, drafting
bills.[269]  In drafting legislation, the lawyers in the offices paid particu-
lar attention to problems of constitutionality, administrability, and ju-
dicial review.  As Lee recounted:

> In all matters of drafting, knowledge of constitutional and administrative
> law is invaluable. . . . [M]ost of the complex legislative problems today in-
> volve extensive executive machinery for enforcement and administration.
> In the legislative provision for this machinery there must be met the many
> administrative and constitutional law problems involved in the form in
> which executive action may properly express itself and in the judicial re-
> view of such action.[270]

We are not aware of any direct evidence about the kind of advice
the Offices of Legislative Counsel provided to members of Congress
concerning how to signal whether a statute authorized legislative
rulemaking.  But one very powerful piece of circumstantial evidence
exists.  Lee published another article in the *Georgetown Law Journal* in
1940 detailing how to distinguish between legislative and interpretive
regulations.[271]  In this article, Lee used the term "substantive" to de-
scribe two types of rules: "legislative" regulations, which prescribe
what the law shall be and have the force and effect of law; and "inter-
pretive" regulations, which merely construe a statute and do not have
the force and effect of law.[272]  According to Lee, whether a "substan-
tive" regulation is "legislative" or "interpretive" depends upon the
grant of rulemaking authority in the statute, and in particular, whether
Congress specified some sanction for violation of the rules.[273]  As Lee

---

torney in the House Office served for thirty years, from 1919 to 1949); Harry W. Jones, *Bill-
Drafting Services in Congress and the State Legislatures*, 65 HARV. L. REV. 441, 444 (1952) (stat-
ing that in 1951 there were ten lawyers on the House side and eleven lawyers on the Senate side).
The website of the House Office of Legislative Counsel observes that the "Office has traditionally
been career-oriented, with unusually low turnover among the legal staff." *See* http://legcoun.
house.gov/about.html (last modified July 16, 2002).

[268] Lee, *supra* note 265, at 397–98.

[269] *See generally id.* at 388–97 (describing the Senate office's many functions).

[270] *Id.* at 391.

[271] Lee, *supra* note 79.

[272] *Id.* at 2.

[273] *Id.* at 3. Lee further explains:
> The clear situations involving legislative regulations are those where non-conformity to
> the regulations results in criminal penalties or civil penalties or penalty taxes; or where
> non-compliance may result in exclusion of goods from importation or exportation, or in
> their forfeiture; or where non-compliance may result in denial, suspension or revocation
> of permits or other privileges or in denial of subsidy or benefit payments; where taxes
> are directed to be computed on the basis of such regulations; or where Congress author-
> izes regulations prescribing tolerances, variations, or exemptions relaxing a statutory
> rule. In addition Congress may in the statute declare specifically that the regulations
> shall have the force and effect of law. More often a statute granting authority to make

explained, if the "power to prescribe a substantive regulation is delegated by statute, but *no sanctions* are imposed by statute for failure to conform to the regulation, then it is interpretive."[274]  Only if the statute provides legal sanctions for violations of the regulations do those regulations have the force and effect of law.[275]

The implications of Lee's *Georgetown* article are considerable.  His comments about how one identifies a grant of legislative, as opposed to interpretive, rulemaking authority exactly track the convention we have described.  This understanding almost certainly reflects his extensive tenure as an attorney in the House and Senate Offices of Legislative Counsel — a tenure that coincided with the period during which Congress routinely observed the convention.  Since the members of Congress frequently called upon the attorneys in the Offices of Legislative Counsel for assistance in drafting statutes to create administrative agencies and to confer powers on them,[276] and since the attorneys sought to implement faithfully the wishes of their superiors,[277] one can only conclude that the convention described by Lee was the device used by the attorneys in these offices to signal the intentions of Congress.[278]

Lee's views about how to distinguish between legislative and interpretive grants of rulemaking authority are generally consistent with

---

> regulations attaches none of these sanctions to the regulations, is silent as to their force and effect, and is intended to cover only interpretive regulations or regulations affecting internal departmental functions.  Particularly is this so of the usual broad grants that authorize "such regulations as may be necessary to carry out the provisions of this Act" or which are similarly phrased, sometimes with the additional requirement that the regulations be "not inconsistent with law."

*Id.* at 19–21 (footnotes omitted).

[274] *Id.* at 3 (emphasis added).

[275] *Id.* at 21.

[276] *See supra* notes 269–270 and accompanying text.

[277] *See* Lee, *supra* note 265, at 398.

[278] In one instance, we have direct evidence that a senior attorney in the Office of Legislative Counsel played a role in formulating the language defining an important rulemaking power. Lee's superior in the House Office of Legislative Counsel from 1919 to 1923 was Middleton Beaman, who would continue to serve as the first legislative draftsman in the House Office until 1949.  *See* GALLOWAY, *supra* note 265, at 409.  James Landis, who was closely involved in the drafting of the Securities Act of 1933, reported that Beaman suggested (and Congress accepted) changes to the wording of the section of the Act that imposes sanctions on persons who violate rules promulgated by the SEC.  *See* James M. Landis, *The Legislative History of the Securities Act of 1933*, 28 GEO. WASH. L. REV. 29, 36–38 (1959).  Beaman appears fully to have shared Lee's views about the importance of paying close attention to provisions of bills defining agency powers.  As he wrote in an early article:

> Of course I do not mean that a statute should leave nothing to administrative discretion, for it may well be that the most effective administrative device is to create an administrative board to make rules and regulations; but what I wish to make clear is that the administrative machinery, whatever it may be, whether court procedure, penalty provisions, or what not, must be carefully worked out.

Middleton Beaman, *Bill Drafting*, 7 LAW LIBR. J. 64, 68 (1914).

other legal commentary in the New Deal period, up to and beyond the enactment of the APA.[279]  For example, in a monograph written in the early 1950s, Frank Cooper of Michigan Law School enumerated those circumstances in which congressional intent to authorize legislative rulemaking was clear: where "the statute specifically declares that the regulations shall have the force and effect of law"; where "the statute provides penalties that will result from noncompliance with the regulations"; where the statute makes "noncompliance with the regulations a ground for revocation of permits or licenses"; or where the statute authorizes "regulations which will relax a statutory rule otherwise applicable."[280]  Cooper further noted that many statutes contain general rulemaking grants that are facially ambiguous regarding whether they authorize legislative or interpretive rulemaking.  In such cases, he wrote, "the courts usually treat the regulation on the same basis as in cases where there can be no doubt but that the regulation is merely interpretative."[281]

## E. The Administrative Procedure Act

If the prevailing understanding was that agencies could make rules with the force of law only if Congress had provided by statute some sanction for violations of those rules, one would expect to find this understanding reflected in the language and legislative history of the APA.  Insofar as legislative history is concerned, such evidence abounds in the work of the Attorney General's Committee on Administrative Procedure, a blue-ribbon committee appointed by President Roosevelt in the late 1930s to undertake a comprehensive survey of administrative agencies and their procedures.[282]  The committee pro-

---

[279] *See* sources cited *infra* note 281. A notable exception to this generalization is tax scholarship. As described more fully in section VI.C *infra*, pp. 574–75, tax specialists writing around the same time as Lee opined that the relevant distinction was between general and specific grants of rulemaking authority. *See infra* notes 604–612 and accompanying text.

[280] FRANK E. COOPER, ADMINISTRATIVE AGENCIES AND THE COURTS 277–78 (1951).

[281] *Id.* at 278–79; *see also* HART, *supra* note 20, at 173 ("Congress can delegate a power of regulation for defined purposes and provide for the punishment of violations of the resulting ordinances, . . . [but] it must be made clear by Congress that the violation of the particular type of ordinance in question is meant to be punished."); Hans J. Morgenthau, *Implied Regulatory Powers in Administrative Law*, 28 IOWA L. REV. 575, 582 (1943) (noting that whereas "legislative regulations lay down the law and have the force and effect of law, deriving from a specific delegation of power and supported by statutory sanctions, interpretative regulations only construe the statute and have no more the force and effect of law than the interpretation of a private individual"); Olverson, *supra* note 79, at 640 ("If the statute provides that nonconformance to the regulation will result in the imposition of legal sanctions specified by Congress, the regulation is legislative and has the force and effect of the statute itself.  A regulation is said to be interpretive if the power to issue it is delegated by statute, but the statute does not impose legal sanctions for failure to conform to the regulation.").

[282] *See* Clark Byse, *In Memoriam: Walter Gellhorn: Administrative Law Scholar, Teacher, Reformer*, 96 COLUM. L. REV. 589, 590–91 (1996).  For a detailed history of the APA, see George B.

duced twenty-seven monographs that described the decisionmaking processes of various agencies and a summary report entitled *Administrative Procedure in Government Agencies*,[283] better known as the committee's *Final Report*.[284] Both the monographs and the *Final Report*, which are considered "classics of administrative law scholarship" and which laid the intellectual groundwork for the drafting of the APA,[285] contain statements that confirm the existence of the convention. The *Final Report*, for example, distinguishes between interpretive and legislative regulations by focusing on whether the statute imposes sanctions to compel observance of the regulations.[286] It explains that the "statutes themselves and not the regulations remain in theory the sole criterion of what the law authorizes or compels and what it forbids."[287] Specifically, the *Final Report* describes legislative regulations as follows:

> Many statutes contain provisions which become fully operative only after exercise of an agency's rule-making function. Sometimes the enjoyment of a privilege is made conditional upon regulations, as, for example, where Congress permits the importation of an article "upon such rules and regulations as the Secretary of the Treasury may prescribe," or allows utilization of public forests in accord with regulations to be laid down by administrative officers. Sometimes the extent of an affirmative duty is to be fixed by regulations, as, for example, where employers are commanded to pay wages not less than those prescribed in administrative regulations. Sometimes a prohibition is made precise by regulations, as, for example, where the sale of dangerous drugs is forbidden and the determination of what drugs are dangerous is left to administrative rules. In such instances the striking characteristic of the legislation is that *it attaches sanctions to compel observance of the regulations*, by imposing penalties upon or withholding benefits from those who disregard their terms.[288]

---

Shepherd, *Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics*, 90 NW. U. L. REV. 1557 (1996).

[283] FINAL REPORT, *supra* note 29.

[284] Peter L. Strauss, *Changing Times: The APA at Fifty*, 63 U. CHI. L. REV. 1389, 1389–90 (1996).

[285] *Id.*

[286] FINAL REPORT, *supra* note 29, at 27.

[287] *Id.* at 100.

[288] *Id.* at 27 (emphasis added). The Final Report listed the NLRB, the FTC, the Social Security Board, and the United States Employees' Compensation Commission (the agency originally authorized to enforce the Longshoremen's and Harbor Workers' Compensation Act) as agencies that lack the power to adopt legislative rules and regulations. *Id.* at 98 n.18. The inclusion of the Social Security Board in the list fails to account for the 1939 amendments to the Social Security Act. *See supra* notes 228–229 and accompanying text. According to one of the monographs published by the Attorney General's Committee on Administrative Procedure, in 1940 the Social Security Board was in the process of developing a comprehensive set of regulations to implement the Act. *See* ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH NO. 16, SOCIAL SECURITY BOARD 54 (1940).

The *Final Report*'s description makes it clear that legislative rules can be the product of a broad, general rulemaking grant, such as a grant to make "such rules and regulations as the Secretary of the Treasury may prescribe."[289]  The key, according to the *Final Report*, is not the general or specific nature of the rulemaking grant, but rather whether Congress attached sanctions in the statute to compel observance of the regulations.

In addition to the *Final Report*, at least two of the monographs prepared by the Attorney General's Committee recognize that facially ambiguous rulemaking grants sometimes confer authority to make only interpretive rules.[290]  For example, the monograph on the Walsh-Healey Act explains that rules issued by the Secretary of Labor under the Act's general rulemaking grant to "make, amend, and rescind such rules and regulations as may be necessary" are not binding because "no sanction is provided."[291]

Insofar as the text of the APA itself is concerned, the convention is less easy to discern.  We would submit, however, that the influence of the convention appears in the seldom noticed section 558(b), which provides: "A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law."[292]  Note the close association between "sanction" and "substantive rule," and the clear command that neither can be imposed by an agency unless Congress has authorized it to do so by law.  Although section 558(b) does not expressly codify the convention — that an agency may not issue legislative rules unless Congress has provided sanctions for rule violations — the effect of the provision is the same.  Legislative rules were and are widely understood to be those that, when violated, give rise to adverse legal consequences — in other words, "sanctions" as that term is broadly defined by the APA.[293]

---

[289] FINAL REPORT, *supra* note 29, at 27 (internal quotation marks omitted).

[290] *See* ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, *supra* note 233, at 68; ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, *supra* note 196, at 66–67.  In preparing the monographs, the Committee conducted extensive interviews, attended hearings and other administrative proceedings, examined agency files, and received comments and input from agencies' staffs on preliminary drafts.

[291] ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, *supra* note 233, at 66–67.  Other monographs, however, make no mention of the convention when they discuss the meaning of general rulemaking grants. *See, e.g.*, 1 ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH NO. 22, ADMINISTRATION OF INTERNAL REVENUE LAWS: BUREAU OF INTERNAL REVENUE, BOARD OF TAX APPEALS, PROCESSING TAX BOARD OF REVIEW 143 (1940) ("The word 'enforcement' has been broadly construed to permit substantive or interpretive, as well as procedural regulations.").

[292] 5 U.S.C. § 558(b) (2000).

[293] The APA's broad definition of "sanction" includes not only the imposition of a penalty or fine, the forfeiture of property, the assessment of damages, or the loss of a license, but also any other "compulsory or restrictive action" by an agency.  5 U.S.C. § 551(10) (quoted in full *supra* note 120).

Thus, what section 558(b) means, in the words of the Senate Report, is that "agencies may not impose sanctions which have not been specifically or generally provided for them to impose."[294]   Once we understand the convention, we can read the APA in a new light and understand that it, too, presupposes that agencies can make rules with the force of law only if Congress has legislated statutory sanctions for rule violations.

### F.  Why a Convention?

Only rarely in the Progressive and New Deal years did Congress state expressly that agencies were authorized to issue rules with the force of law or were limited to issuing advisory interpretations and procedural rules.  Instead, Congress repeatedly enacted legislation ambiguously authorizing agencies to issue "rules and regulations" and relied on a signaling device for indicating whether a grant was legislative: grants to make rules backed by sanctions authorized legislative rulemaking, whereas grants to make rules not backed by sanctions authorized only procedural or interpretive rulemaking.

As best we can tell, agencies consistently respected the convention during these years.  Of course, adjudication dominated administrative law for the first six decades of the twentieth century, with rulemaking assuming central importance only in the 1970s and afterward.[295]   Nevertheless, it is no accident that agencies operating under broadly worded rulemaking grants that, under the convention, conferred only nonlegislative rulemaking authority — including the FDA, NLRB, FTC, and United States Employees' Compensation Commission — made no attempt during these years to adopt legislative rules.[296]   In contrast, the FCC, SEC, Federal Power Commission, and ICC (with respect to specific rulemaking grants added to the ICA by amend-

---

[294] SENATE COMM. ON THE JUDICIARY, ADMINISTRATIVE PROCEDURE ACT LEGISLATIVE HISTORY, H.R. REP. NO. 79–1980 (1946), *in* S. DOC. NO. 79-248, at 235, 274 (1946); *see also* U.S. DEP'T OF JUSTICE, *supra* note 30, at 88 (explaining that the purpose of § 558(b) is to "assure that agencies will not appropriate to themselves powers Congress has not intended them to exercise").

[295] *See* CORNELIUS M. KERWIN, RULEMAKING: HOW GOVERNMENT AGENCIES WRITE LAW AND MAKE POLICY 11–15 (2d ed. 1999) (describing extensive rulemaking prior to the 1970s, but attributing to the 1970s a "fundamental change" in the ascendancy of rulemaking); Antonin Scalia, *Back to the Basics: Making Law Without Making Rules*, REGULATION, July/Aug. 1981, at 25.

[296] *See* David L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy*, 78 HARV. L. REV. 921, 943, 960–61 (1965) (noting that agencies such as the NLRB and FTC do not engage in legislative rulemaking, perhaps because their authorizing statutes are ambiguous); *see also supra* notes 175–196 and accompanying text (discussing the FTC); *supra* notes 218–222 and accompanying text (discussing the NLRB).

JA0519

ments) all had occasion to issue legislative rules.[297]  Each agency in this latter group operated under broadly worded rulemaking grants that, under the convention, conferred legislative rulemaking authority.

Why did Congress use this convention to signal that it was conferring legislative rulemaking authority, rather than straightforwardly announcing that it was authorizing the agency to make "legislative" rules or rules with the "force of law"?  We can only speculate about the answer.  One possibility is economy in drafting.  If Congress had explicitly authorized an agency to promulgate legislative rules, then the question immediately would have arisen: what sort of sanction attaches to persons who violate these rules?  *Eaton* and *Grimaud* (and later the APA) could be read to say that Congress also must specify the sanctions.[298]  So perhaps Congress thought it more economical to proceed immediately to the specification of the sanctions, which would by implication also convey the information that the rules would be legislative.

Another, more plausible possibility is that use of the convention would have been less likely to trigger political opposition than an explicit statement of authority to adopt rules with the force of law.  An express delegation of legislative authority would in effect wave a red flag and alert opponents of the legislation.  They could tap into deep-seated unease over the idea of delegating legislative rulemaking powers to a body of unelected administrators and could use this unease to rally opposition to the measure.  We have already seen examples of this phenomenon in the legislative histories of the Packers and Stockyards Act[299] and the FDCA.[300]  Later, we will see another example in the history of the Internal Revenue statutes.[301]  So we know the potential existed for opponents of particular bills to use the delegation of legislative rulemaking authority as a focal point of opposition.

Use of the convention obviously could not eliminate all such controversy about the delegation of legislative rulemaking authority.  But at least it allowed regulatory statutes to confer legislative powers without using the inflammatory words "legislative" or "force of law," and hence it reduced somewhat the opportunities for opponents to raise this issue.  This was especially true if the bill placed the sanctions at some distance from the grant of authority to adopt "rules and regulations."  Such "acoustical separation" would further reduce the chances

---

[297] *See, e.g.,* United States v. O'Hagan, 521 U.S. 642, 650–51, 666–77 (1997) (discussing SEC legislative rules); *infra* pp. 529–34 (discussing FCC, ICC, and Federal Power Commission legislative rules).

[298] *See supra* notes 151–170 and accompanying text.

[299] *See supra* pp. 507–08.

[300] *See supra* notes 246–249 and accompanying text.

[301] *See infra* notes 588–596 and accompanying text.

that a casual reader of the bill would notice that Congress was endowing the agency with legislative rulemaking power, even though knowledgeable insiders reading through the bill would grasp this implication immediately.[302]

## IV. THE CONVENTION IGNORED

Given the secondary importance of rulemaking during the first six decades of the twentieth century, it is perhaps not surprising that more than thirty years passed after *United States v. Grimaud*[303] before the Supreme Court heard a case that potentially presented the question whether Congress had authorized an agency to make rules having the force of law under a facially ambiguous rulemaking grant.[304] Nor is it surprising that another ten years passed before the Court confronted a similar case again.[305] All in all, we have identified eight principal cases decided between 1943 and 1979 that potentially presented the Court with a question about an agency's authority to make legislative rules.[306] These cases involved disparate issues under disparate statutes and were rendered too infrequently to generate anything that could be described as a jurisprudence of rulemaking. In fact, the most striking aspect of the eight decisions, taken as a whole, is the absence of any recognizable theory regarding when grants of rulemaking authority confer lawmaking power and when they do not.

---

[302] We postpone to Part VII the normative issues associated with whether Congress should be required to delegate legislative rulemaking powers through an express statement, as opposed to using a convention that signals its clear intent to do so.

[303] 220 U.S. 506 (1911), discussed *supra* pp. 501–03.

[304] The first major case after *Grimaud* to address this issue was *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943).

[305] The next major case to address this issue was *American Trucking Ass'ns v. United States*, 344 U.S. 298 (1953).

[306] The eight cases are *National Broadcasting*, 319 U.S. 190 (1943); *American Trucking*, 344 U.S. 298 (1953); *United States v. Storer Broadcasting Co.*, 351 U.S. 192 (1956); *Federal Power Commission v. Texaco Inc.*, 377 U.S. 33 (1964); *Thorpe v. Housing Authority*, 393 U.S. 268 (1969); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973); *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976); and *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979). In addition to these eight cases, the Supreme Court heard other cases in which the same or similar issues lurked in the background. *See, e.g.*, United States v. S.W. Cable Co., 392 U.S. 157, 178 (1968) (upholding the FCC's authority to regulate cable television systems based in part on the general rulemaking grant in section 303(r) of the Communications Act); E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 132, 136 (1977) (upholding the EPA's authority to issue industrywide regulations limiting discharges by existing plants and citing section 501(a) of the Federal Water Pollution Control Act, which gives the EPA power to make "such regulations as are necessary to carry out" its functions); FCC v. Nat'l Citizens Comm. for Broad., 436 U.S. 775, 793 (1978) (holding that the general rulemaking grant found in section 303(r) of the Communications Act of 1934 "supplies a statutory basis for the Commission to issue regulations codifying its view of the public-interest licensing standard").

JA0521

In retrospect, only one of the eight decisions generated an outcome inconsistent with the convention,[307] and in that case, the party challenging the rule did not raise the question whether the agency had been delegated the power to act with the force of law.[308] But any congruity between the convention and judicial outcomes during these years owes nothing to the Court's deliberative processes. Not one of the cases discussed or even acknowledged the convention introduced in Part III. Cumulatively, the only conclusion one can draw from reading the opinions is that the Justices — and the lawyers appearing before them — had no knowledge of the convention. This ignorance was to have fateful consequences. The Court's failure to offer any coherent basis for distinguishing between legislative and nonlegislative rulemaking grants created the opportunity for later courts and commentators to read the Court's opinions selectively to support the proposition that facially ambiguous rulemaking grants always confer legislative powers.

### A. Rulemaking Grants in the Supreme Court, 1943–1979

In an effort to compress our presentation, we divide the eight cases into four groups of two cases each. Within each group, the cases relate chronologically, present similar underlying issues, and reflect similar styles of reasoning in the way those issues are resolved.

*1.* National Broadcasting *(1943) and* American Trucking *(1953).* — The first two cases, *National Broadcasting Co. v. United States*[309] and *American Trucking Ass'ns v. United States*,[310] are separated by a full decade but present similar issues. *National Broadcasting* arose under the Communications Act of 1934[311] and *American Trucking* under the Motor Carrier Act.[312] Broadly speaking, the issue in each case was whether the agency had authority to promulgate a legislative rule on a subject regarding which Congress had not delegated specific regulatory authority. *National Broadcasting* asked whether the FCC could adopt "chain broadcasting" rules regulating contractual relationships between networks and affiliated broadcasting stations.[313] The granting of a broadcasting license was conditioned upon a station's following these rules.[314] *American Trucking* asked whether the ICC could adopt regulations governing the practices of companies that leased

---

[307] *See* Thorpe v. Hous. Auth., 386 U.S. 670 (1967)
[308] *See infra* notes 342–354 and accompanying text.
[309] 319 U.S. 190 (1943).
[310] 344 U.S. 298 (1953).
[311] Ch. 652, 48 Stat. 1064.
[312] Ch. 498, 49 Stat. 543 (1935).
[313] *National Broadcasting*, 319 U.S. at 196, 209–10.
[314] *See id.* at 196.

trucks to licensed motor carriers.[315] The granting of operating licenses was conditioned upon a carrier's following these rules.[316]

In both cases, the Court upheld the challenged regulations, citing multiple congressional rulemaking grants, including both specific and generic grants. In *National Broadcasting*, the Court relied on three rulemaking grants found in Title III of the Communications Act, one general and two relatively specific, each of which was facially ambiguous concerning whether it authorized rules with the force of law.[317] In *American Trucking*, the Court relied on two grants, one general and one specific, both of which were facially ambiguous in the same sense.[318]

The Court upheld the regulations in both cases without specifying which rulemaking grants endowed the regulations with the force of law. It is not surprising that the Court proceeded in this manner. The challenger in each case claimed that the agency was acting beyond the scope of its regulatory jurisdiction.[319] In neither case did the challenger maintain that the agency lacked the power to adopt regulations having the force of law. Thus the Court probably felt no compulsion to discuss which statutory provisions supported legislative rulemaking.

Had the parties raised the question of the agencies' power to adopt legislative rules, and had the Court resolved the question in light of the drafting convention, the agencies' authority would have been sustained in both cases. With respect to the FCC's regulation of chain broadcasting, section 312(a) of the Communications Act provided for the revocation of licenses based on violations of the FCC's regulations,[320]

---

[315] *See American Trucking*, 344 U.S. at 300–02.

[316] *See id.* at 302.

[317] These were section 303(g), which provided that the FCC shall "generally encourage the larger and more effective use of radio in the public interest"; section 303(i), which gave the FCC "authority to make special regulations applicable to radio stations engaged in chain broadcasting"; and section 303(r) (added by section 6(b) of the 1937 amendments to the Communications Act), which empowered the FCC to adopt "such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act." Communications Act of 1934, ch. 652, § 303(g), (i), 48 Stat. 1064, 1082 (codified as amended at 47 U.S.C. § 303(g), (i) (2000)); Amendments to the Communications Act of 1934, ch. 229, § 6(b), 50 Stat. 189, 191 (1937), *quoted in National Broadcasting*, 319 U.S. at 217.

[318] These were section 212(b), which permitted transfers of motor carrier certificates and permits "pursuant to such rules and regulations as the Commission may prescribe," and section 204(a)(6), which gave the ICC the power "[t]o administer, execute, and enforce all provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration." *American Trucking*, 344 U.S. at 311 (alteration in original) (quoting Motor Carrier Act, 1935, ch. 498, §§ 204(b)(6), 212(b), 49 Stat. 543, 546, 555) (repealed 1983) (internal quotation marks omitted).

[319] *See National Broadcasting*, 319 U.S. at 209; *American Trucking*, 344 U.S. at 309.

[320] Communications Act, § 312(a), 48 Stat. at 1086–87 (codified as amended at 47 U.S.C. § 312(a)). For a discussion of this rulemaking grant, see *supra* note 257.

and section 502 made the violation of "any rule, regulation, restriction, or condition" imposed by the agency under authority of Title III of the Act a criminal offense.[321]   Thus, both the specific and the general rulemaking grants cited in *National Broadcasting* as authority for the FCC rule enabled legislative rulemaking, according to the convention. With respect to the ICC's leasing regulation, section 222(a) of the Motor Carrier Act provided for statutory fines for violations of the ICC's regulations, and section 222(b) gave the ICC the power to bring suit when any regulations were violated.[322]   Under the convention, these provisions signaled Congress's intent to give legislative effect to rules and regulations that the ICC promulgated under the Act.

The significance of *National Broadcasting* and *American Trucking* for the future lay not in what the Court said, but in what it did not say: the opinions demonstrated an apparent indifference to the question of the sources of the agencies' authority as legislative rulemakers.[323]   Nowhere in his opinion for the Court in *National Broadcasting* did Justice Frankfurter attend to the distinction between grants of legislative and nonlegislative rulemaking powers.[324]   Instead, the Court implicitly assumed that the Communications Act's rulemaking grants conferred the power to make legislative rules.  Justice Reed's majority opinion in *American Trucking* quickly rejected the contention that the general rulemaking grant in the Motor Carrier Act "merely concerns agency procedures and is solely administrative."[325]   He stated that the reference to "enforcement" in the general grant refuted this conten-

---

[321] *Id.* § 502, 48 Stat. at 1100–01 (codified as amended at 47 U.S.C. § 502).  For a further discussion of this statutory provision, see *supra* note 258 and accompanying text.

[322] *See* Motor Carrier Act, 1935, § 222(a)–(b), 49 Stat. at 564.

[323] The failure of the Supreme Court to address the source of legislative rulemaking authority enabled future courts and commentators to fill the gap with new theories about the meaning of statutory grants.  For example, in his influential treatise, Kenneth Culp Davis read *National Broadcasting* to mean that a legislative rule "may rest upon an implied or an unclear grant of power" because the Court had sustained the FCC's rules even though the power to issue regulations governing the contractual relationships between networks and affiliates was not *specifically* conferred by the Communications Act.  1 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 5.03, at 299 n.2 (1st ed. 1958).  Davis thus saw *National Broadcasting* as running contrary to the older view, associated with *Eaton* and *Grimaud*, that the authority to issue binding rules must be specifically or explicitly delegated. *Id.*

[324] *See National Broadcasting*, 319 U.S. at 209–26 (reasoning that the FCC's regulations were within its authority under the Communications Act).  As will be discussed *infra* section V.B.2.(b), this silence proved to be significant when Judge Friendly later asserted that *National Broadcasting* supported the view that general grants of rulemaking authority confer the power to make legislative rules. *See* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 880 (2d Cir. 1981) ("The Supreme Court's decision in *National Broadcasting Co. v. United States*, which in retrospect seems to have inaugurated the modern approach, was not universally so recognized at the time, since the Court there relied in part on more specific grants of rulemaking power and the regulations at issue in that case, although legislative in effect, were clothed in the garb of procedural rules." (citations omitted)).

[325] Am. Trucking Ass'ns v. United States, 344 U.S. 298, 311 (1953).

tion.[326]  In any event, he ultimately declined to identify the precise source of authority for the rule, suggesting that it was sufficient to show that the agency was pursuing a problem within the general area that Congress had charged it with regulating.[327]

2.  Storer Broadcasting *(1956) and* Texaco *(1964).* — The next two cases, *United States v. Storer Broadcasting Co.*[328] and *Federal Power Commission v. Texaco Inc.*,[329] presented a different issue.  *Storer Broadcasting* also arose under the Communications Act; *Texaco* arose under the Natural Gas Act.[330]  Both cases presented the question whether an agency could promulgate rules concerning issues that normally require adjudicatory hearings.  *Storer Broadcasting* posed the question whether the FCC could provide by rule that it would deny future applications for television broadcasting licenses if the applicant already had an interest in five or more stations.[331]  *Texaco* posed the question whether the Federal Power Commission could by rule adopt pricing provisions for natural gas supply contracts and provide that it would automatically reject any contract containing inconsistent provisions.[332]

In *Storer Broadcasting*, as in *National Broadcasting*, the FCC cited multiple grants of rulemaking authority to support its rules restricting multiple ownership, each of which was facially ambiguous.[333]  In *Texaco*, only one rulemaking grant supported the Federal Power Commission: section 16 of the Natural Gas Act, which gave the Commission authority to prescribe such regulations "as it may find necessary or appropriate to carry out the provisions of this Act."[334]  This provision was facially ambiguous in the same sense.

The thrust of the challenge in each case was not that the agency lacked power to make rules with the force of law, but that the structure of each act required that the issue in question be resolved through

---

[326] *Id.*

[327] *See id.* at 311–13.

[328] 351 U.S. 192 (1956).

[329] 377 U.S. 33 (1964).

[330] Ch. 556, 52 Stat. 821 (1938).

[331] *See Storer Broadcasting*, 351 U.S. at 193–94 & n.1.

[332] *See Texaco*, 377 U.S. at 34–35.

[333] Sections 303(f) and (r) of the Communications Act potentially supported the rules. Communications Act of 1934, ch. 652, § 303(f), 48 Stat. 1064, 1082 (codified as amended at 47 U.S.C. § 303(f) (2000)) (authorizing the FCC to make "regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions" of the Act); Amendments to the Communications Act of 1934, ch. 229, § 6(b), 50 Stat. 189, 191 (1937) (adding section 303(r) to the Act and giving the FCC the power to make "rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out" the chapter); *see Storer Broadcasting*, 351 U.S. at 201 & n.9 (quoting 47 U.S.C. § 303, the codification of the provisions).

[334] *See Texaco*, 377 U.S. at 41 (quoting Natural Gas Act, ch. 556, § 16, 52 Stat. 821, 830 (1938)).

case-by-case adjudication.[335]  The Supreme Court rejected the argument in both cases, holding that the statutory requirement of a hearing did not preclude the agencies from "particularizing statutory standards through the rulemaking process" and from rejecting without a hearing those who failed either to meet the regulation or to show why they were entitled to a waiver of the rule.[336]

Given that the challengers in both cases objected to the rules as interfering with individual hearing rights, it is not surprising that the Court spent little time considering whether the agency had authority to promulgate rules having the force of law.  The Court concerned itself only with the question whether the rules were within the scope of the agencies' authority, not with whether the rules were legislative.  In *Storer Broadcasting*, Justice Reed's opinion for the Court concluded that the FCC's multiple ownership rules, although not specifically authorized by statute, were sufficiently related to the purpose of the Communications Act and therefore within the scope of sections 4(i) and 303(r), which authorized rules "not inconsistent with the Act or law."[337]  In *Texaco*, Justice Douglas's majority opinion similarly concluded that the Federal Power Commission's general rulemaking grant provided "ample" authority for rules that imposed conditions on individual applications because the rules were within the substantive bounds of the Natural Gas Act.[338]

Had the Court addressed the question whether the agencies had authority to adopt legislative rules, and had it resolved the question in light of the drafting convention, then once again the Court would have upheld the agencies' authority in both cases.  In the Communications Act, addressed in *Storer Broadcasting*, section 4(i) probably does not support legislative rulemaking authority.[339]  But section 303(r) appears to carry legislative effect under the convention for the same reasons discussed in connection with *National Broadcasting* — rules promulgated under this grant are enforced by license revocations and criminal sanctions.[340]  The Federal Power Commission's general rulemaking grant in *Texaco* would have been construed as conferring legislative rulemaking authority under the convention, because the Natural Gas

---

[335] *See Storer Broadcasting*, 351 U.S. at 200; *Texaco*, 377 U.S. at 37, 39.

[336] *Texaco*, 377 U.S. at 39; *see also Storer Broadcasting*, 351 U.S. at 202–03.

[337] *Storer Broadcasting*, 351 U.S. at 203–04.

[338] *Texaco*, 377 U.S. at 41.

[339] *See supra* notes 255–264 and accompanying text (discussing how section 4(i) should probably be viewed as merely a housekeeping grant).

[340] *See supra* pp. 530–31 (describing the legal sanctions attached to rule violations); *supra* note 257 (describing various rulemaking provisions of the Act, including section 303(r), and their effects under the convention).

Act authorized the Commission to bring suit against those who violate its regulations and to subject them to a fine.[341]

The significance of *Storer Broadcasting* and *Texaco* does not lie in any holding by the Court about the meaning of facially ambiguous rulemaking grants. Rather, the cases are important largely because they encouraged the use of rulemaking by agencies in an effort to streamline the regulatory process and, more subtly, because they compounded the impression, inaugurated by *National Broadcasting* and *American Trucking*, that the question whether Congress has delegated to an agency the authority to make rules with the force of law is of little interest or significance to courts.

3. Thorpe *(1969) and* Mourning *(1973).* — The next two cases mark a departure from the Court's prior decisions in that, for the first time, the Court expressly considered whether particular rules adopted by agencies had the force of law. In *Thorpe v. Housing Authority*,[342] a tenant in a federally assisted housing project argued that a circular issued by the Department of Housing and Urban Development (HUD) entitled her to notice and an opportunity to respond prior to eviction by a local housing authority.[343] In *Mourning v. Family Publication Services, Inc.*,[344] a company selling magazine subscriptions challenged a Federal Reserve Board regulation, promulgated under the Truth in Lending Act, that broadly defined consumer credit transactions to include any transaction payable in four or more installments.[345]

The disposition of the two cases abounds with irony from the perspective of the drafting convention. In *Thorpe*, the local housing authority did not argue that HUD lacked the authority to issue legally binding regulations on the subject of eviction procedures.[346] Instead, it argued that HUD had intended the circular to be only advisory; the

---

[341] *See* Natural Gas Act, ch. 556, § 20(a), 52 Stat. 821, 832 (1938) (codified as amended at 15 U.S.C. § 717s (2000)) (empowering the Commission to bring suit); *id.* § 21(b), 52 Stat. at 833 (codified as amended at 15 U.S.C. § 717t) (setting statutory fines for rule violations).

[342] 393 U.S. 268 (1969).

[343] *See id.* at 269–70. When the case first came before the Court, the tenant challenged the state procedures authorizing eviction without notice on constitutional grounds. *See* Thorpe v. Hous. Auth., 386 U.S. 670, 671 (1967). After HUD issued the circular, and before the Court resolved the merits of the claim, the Court vacated and remanded for reconsideration in light of the circular. *See id.* at 673–74. The North Carolina Supreme Court then held that the circular did not apply retroactively to evictions instituted before it was promulgated. *See Thorpe*, 393 U.S. at 273–74. The Court probably viewed the second *Thorpe* decision, relying on the HUD circular rather than on due process, *see id.* at 283–84, as an exercise in avoiding a difficult constitutional question. Years later, the Court held that the eviction of a public housing tenant without notice violated due process. *See* Greene v. Lindsey, 456 U.S. 444, 456 (1982).

[344] 411 U.S. 356 (1973).

[345] *See id.* at 358, 361–62.

[346] *See* Brief for Respondent at 26, *Thorpe*, 393 U.S. 268 (1969) (No. 1003) (acknowledging that HUD had general rulemaking powers and arguing only that HUD could not adopt rules inconsistent with the statute).

authority alternatively argued that if the Court ruled that the circular was intended to be mandatory, it could not be applied retroactively to pending eviction proceedings.[347] In an opinion by Chief Justice Warren, the Court held that the circular was mandatory[348] and thus was a legislative rule. The Court did not explain why the facially ambiguous grant of rulemaking authority found in section 8 of the Housing Act of 1937[349] was a grant of legislative authority, other than to observe in a footnote that "[s]uch broad rule-making powers have been granted to numerous other federal administrative bodies in substantially the same language."[350] The passage that immediately follows, and a passage later in the opinion, intimated that the only constraint on the agency was whether the rules were consistent with the general purposes of the Act.[351] Having established that the circular had the force of law, the Court then rejected the housing authority's argument that applying the circular to evictions already in process would constitute impermissible retroactive rulemaking.[352]

Had the local housing authority challenged HUD's authority to issue rules with the force of law, and had the Court resolved that challenge in accordance with the convention, the housing authority would have prevailed. No statutory sanctions attached to the general rulemaking grant under the Housing Act, and consequently under the convention Congress had not intended to give HUD authority to make

---

[347] See Thorpe, 393 U.S. at 275, 281; see also id. at 278–79 (noting that the housing authority made a constitutional argument as a third alternative).

[348] See id. at 275–76.

[349] Ch. 896, § 8, 50 Stat. 888, 891 (allowing HUD to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act").

[350] Thorpe, 393 U.S. at 277 n.28. The Court cited three other rulemaking grants in support of this observation. See id. It cited a grant to the now-defunct Civil Aeronautics Board, which probably was not a legislative grant under the convention, see 49 U.S.C. § 1324(a) (1964) (endowing the Board with the power to make regulations but specifying no sanctions for violations of those regulations); the general grant contained in the Social Security Act, see Social Security Amendments of 1939, ch. 666, § 205(a), 53 Stat. 1360, 1368 (which was a legislative grant under the convention, see supra note 124 and pp. 493–94); and the grant in section 16 of the Natural Gas Act, see Natural Gas Act, ch. 556, §§ 16, 21(b), 52 Stat. 821, 830 (1938) (codified as amended at 15 U.S.C. § 717t (2000)) (which was also a legislative grant under the convention, see supra pp. 530–32). The author of the footnote was obviously unaware of the signaling device that we argue Congress had used in indicating which grants were legislative and which were nonlegislative.

[351] In the passage immediately following, the Court addressed and rejected the local housing authority's contention that the circular, if understood to be a mandatory rule, was inconsistent with the statutory purpose of vesting in local housing authorities maximum responsibility for administering public housing programs. See Thorpe, 393 U.S. at 277–78. Later in the opinion, the Court observed that the circular was "reasonably related to the purposes of the enabling legislation under which it was promulgated," id. at 280–81, which the Court said included providing "a decent home and suitable living environment to every American family," id. at 281 (quoting Housing Act of 1949, ch. 338, § 2, 63 Stat. 413, 413) (internal quotation marks omitted).

[352] See id. at 281–83.

rules with legislative effect.[353]  *Thorpe* thus represented the first Supreme Court case to reach a result contrary to what would have been required by the convention, although whether the Court's decision can be characterized as a holding on this issue is doubtful, since the parties did not brief the precise issue, and the Court gave only a vague, perfunctory explanation for the outcome in a footnote.[354]

In contrast, the parties' briefs in *Mourning* did raise the question whether the facially ambiguous grant of rulemaking under the Truth in Lending Act[355] authorized the Federal Reserve Board to make rules having the force of law.[356]  In doing so, however, the parties did not discuss the convention.  Following *Thorpe*, the Court ignored this threshold issue, focusing instead on the scope of the agency's rulemaking authority.  As the Court framed the issue:

> Where the empowering provision of a statute states simply that the agency may "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."[357]

The Court held that the Federal Reserve Board's four-installment rule fell within the scope of the agency's authority and was reasonably related to the statute's purpose.[358]

Had the Court sought to resolve the question whether the Federal Reserve Board's rules had the force of law under the convention, it would have concluded that they did.  Section 112 of the Truth in Lending Act provided for fines up to $5000 and imprisonment for per-

---

[353] *See* United States Housing Act of 1937, ch. 896, § 8, 50 Stat. 888, 891.  Even if Congress had given HUD the authority to render legislative rules, there is no indication the agency intended that the circular would function as a legislative rule.  Unlike most legislative rules, it was not promulgated in accordance with notice-and-comment procedures.  *See* 5 U.S.C. § 553(b) (2000).  *But see id.* § 553(a) (exempting rules related to "grants" — including perhaps HUD grants to local housing authorities — from notice-and-comment requirements).  Also, the agency did not publish the circular in the Federal Register.  *See* Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993) (noting that legislative rules are usually published in the Federal Register).

[354] *See, e.g.,* Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (noting that if a prior precedent does not "squarely" address an issue, the Court is "free to address [it] on the merits" at a later date); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952) (stating that an issue not "raised in briefs or argument or discussed in the opinion of the Court" cannot be taken as "a binding precedent on [the] point"); Webster v. Fall, 266 U.S. 507, 511 (1925) (stating that issues that merely "lurk in the record" and are not brought to the Court's attention should not "be considered as having been so decided as to constitute precedents").

[355] Pub. L. No. 90-321, § 105, 82 Stat. 146, 148 (1968) (codified at 15 U.S.C. § 1604 (2000)) ("The Board shall prescribe regulations to carry out the purposes of this title.").

[356] *See, e.g.,* Brief for Petitioner at 20–31, Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356 (1973) (No. 71-829).

[357] *Mourning*, 411 U.S. at 369 (alteration in original) (footnote omitted) (quoting *Thorpe*, 393 U.S. at 280–81).

[358] *See id.* at 376–77.

sons who failed to disclose information required by any regulation issued under the Act.[359] In addition, the Act expressly gave the Board's regulations the force of law by providing that "[a]ny reference to any requirement imposed under this title or any provision thereof includes reference to the regulations of the Board under this title or the provision thereof in question."[360] Because of these statutory provisions, the regulation at issue in *Mourning* — unlike the circular in *Thorpe* — was legislative according to the convention.

In Supreme Court litigation, *Thorpe* and *Mourning* represent the low-water mark in terms of attention to congressional delegations of power to agencies to act with the force of law. Neither the housing authority in *Thorpe* nor the consumer in *Mourning* referred to the convention, even though it would have been in their interests to do so. For its part, the Court focused solely on whether an agency's regulations fell within the general scope of its jurisdiction, as conferred by the act, ignoring entirely the question whether Congress has delegated authority to the agency to act with the force of law.

*4.* Gilbert *(1976) and* Chrysler *(1979).* — In the latter half of the 1970s, a reaction set in. In both *General Electric Co. v. Gilbert*[361] and *Chrysler Corp. v. Brown*,[362] the Supreme Court held that particular agency pronouncements did *not* have the force of law, and for that reason were not valid legislative regulations.[363] In other words, the very issue ignored in *Thorpe* and *Mourning* suddenly returned to the fore. In neither case, however, did the Court point to the absence of congressionally mandated sanctions as the reason for denying these pronouncements the force of law. Thus, although the Court affirmed the importance of delegated authority to act with the force of law, it did not acknowledge the device Congress had employed for signaling an intention to delegate such authority.

*Gilbert* involved the claim that General Electric's employee disability plan violated Title VII of the Civil Rights Act of 1964 by excluding disability based on pregnancy.[364] One issue concerned the weight to be given to guidelines issued by the Equal Employment Opportunity Commission (EEOC) declaring that employers should apply disability benefits to pregnancy on the same terms and conditions as benefits applied to other temporary disabilities.[365] The Court noted that "Congress, in enacting Title VII, did not confer upon the EEOC authority

---

[359] Truth in Lending Act, § 112, 82 Stat. at 151 (codified at 15 U.S.C. § 1611).
[360] *Id.* § 103, 82 Stat. at 147 (codified as amended at 15 U.S.C. § 1602).
[361] 429 U.S. 125 (1976).
[362] 441 U.S. 281 (1979).
[363] *See Gilbert*, 429 U.S. at 141; *Chrysler*, 441 U.S. at 306.
[364] *Gilbert*, 429 U.S. at 127–28.
[365] *Id.* at 140–41.

to promulgate rules or regulations pursuant to that Title."[366] The Court specifically contrasted EEOC guidelines with "regulations which Congress has declared shall have the force of law" or "regulations which under the enabling statute may themselves supply the basis for imposition of liability."[367] Because the EEOC guidelines did not have the force of law, the Court concluded that it would follow them only to the extent that their reasoning was persuasive.[368]

The words the Court used to distinguish the guidelines from a legislative regulation — "Congress has declared," "force of law," "themselves supply the basis for imposition of liability" — suggest that the Court was on the cusp of uncovering the logic of the convention. But the Court betrayed no awareness of the device Congress had used in signaling that agency regulations have the force of law. To be sure, such knowledge was unnecessary in *Gilbert*, because the rulemaking grant to the EEOC empowered the agency only to issue "suitable *procedural* regulations to carry out the provisions" of this subsection.[369] Thus, the Court easily reached the right result — that Congress had not delegated to the EEOC the power to act with the force of law — without the need for recourse to the convention to unlock the meaning of a facially ambiguous rulemaking grant.

In *Chrysler*, a complicated "reverse-Freedom of Information Act" case, the Court considered whether regulations promulgated by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), which required government contractors to furnish reports about their affirmative action programs, had the force of law.[370] The Court held that the OFCCP's regulations were not reasonably related to a grant of power given by Congress and therefore could not be treated as legislative.[371]

---

[366] *Id.* at 141.

[367] *Id.*

[368] In other words, the guideline was entitled to *Skidmore* deference, not *Chevron* deference. *See id.* at 141–42; *see also* United States v. Mead Corp., 533 U.S. 218, 234–35 (2001) (noting that *Chevron* did not eliminate *Skidmore* deference, under which an administrative ruling is afforded "respect proportional to its 'power to persuade'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

[369] 42 U.S.C. § 2000e-12(a) (2000) (emphasis added). In contrast, the EEOC does have legislative rulemaking authority under the Americans with Disabilities Act. *See* 42 U.S.C. §§ 12,116–12,117 (2000).

[370] *See* Chrysler Corp. v. Brown, 441 U.S. 281, 286–87 (1979). A reverse-Freedom of Information Act (FOIA) suit is an action to enjoin the government from disclosing information — under FOIA — that a party has submitted to the government. The Court in *Chrysler* held that FOIA did not authorize such suits, but discussed whether such an action might be permitted under 18 U.S.C. § 1905, a criminal statute that prohibits agencies from disclosing information "not authorized by law." 18 U.S.C. § 1905 (2000); *see Chrysler*, 441 U.S. at 294–95. This in turn presented the question whether the OFCCP regulations, which required disclosure of contractor reports about affirmative action compliance, were binding legislative regulations. *Id.* at 295.

[371] *See Chrysler*, 441 U.S. at 303–09.

One possible source of legal authority for the OFCCP regulations considered by the Court was 5 U.S.C. § 301, the "Housekeeping Act."[372]  This act gives each head of an executive department general power to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."[373]  The grant is facially ambiguous, because it does not specify whether the "regulations" to which it refers include legislative rules, or merely procedural and interpretive rules.  The Court resolved the ambiguity by analyzing the language and history of § 301, concluding that it authorized only "rules of agency organization, procedure or practice," as opposed to legislative rules.[374]  Application of the framework of the convention would have yielded the same conclusion with less effort, because § 301 does not contain any sanction for violating the rules promulgated under its authority.  But the Court did not mention the convention.

*Gilbert* and *Chrysler* are especially revealing because then-Justice William Rehnquist wrote both opinions.  In contrast to the authors of the other decisions we have considered, Justice Rehnquist was, at least at this time, highly sympathetic to the nondelegation doctrine.[375]  This explains his endorsement of the proposition, as stated in *Chrysler*, that "[t]he legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes."[376]  Yet even Justice Rehnquist, with his sensitivity to the nondelegation doctrine, was unable to discern the convention.  By 1979, as far as Supreme Court Justices and Supreme Court litigants were concerned, the convention had disappeared.

---

[372] *See id.* at 308–12.

[373] 5 U.S.C. § 301 (2000).

[374] *Chrysler*, 441 U.S. at 310.  For a discussion of the history of the Housekeeping Act, see *supra* pp. 485–86.

[375] Shortly after *Gilbert* and *Chrysler*, then-Justice Rehnquist authored two widely discussed minority opinions suggesting that aspects of the Occupational Health and Safety Act were unconstitutional on nondelegation grounds. *See* Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 543–44 (1981) (Rehnquist, J., dissenting); Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 675–76 (1980) (Rehnquist, J., concurring).  More recently, as Chief Justice, he appears to have lost interest in the issue.  For example, he joined the Court's opinions rejecting nondelegation challenges in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001); and *Mistretta v. United States*, 488 U.S. 361 (1989).

[376] *Chrysler*, 441 U.S. at 302.

## B. Why the Convention Was Ignored

After a half-century of legislation in which Congress employed the convention to signal whether rulemaking grants authorized legislative rules or housekeeping rules, why did the convention never surface in Supreme Court litigation? The most obvious explanation — and in the end the only satisfactory one — is that no party in any of these cases ever described the convention in its briefs.[377] The Court is not omniscient and largely depends on the parties for information about the relevant law that applies to the many controversies it must resolve. If the parties fail to mention a source of law, the Court cannot be expected to discover it on its own.

It is possible, of course, that one or more Justices might have known about the convention from their own legal experiences. Many Justices of this period had congressional and executive experience. Justices Black, Vinson, Burton, and Minton had served in the Senate; Justices Reed, Jackson, and Clark had served in high level positions in the Department of Justice, and Justice Douglas had been Chairman of the SEC. But the convention functioned at a level of detail below that with which these individuals ordinarily would have been involved in their legislative and administrative capacities. Thus, it is not surprising that they would not have known about the convention, or if they once had known about it, that they would forget about it years later when presented with briefs in which it was not mentioned.

Justice Felix Frankfurter is the most difficult to account for, since he taught administrative law at Harvard before being appointed to the Court and was familiar with *Eaton* and *Grimaud*.[378] But Frankfurter was more an intellectual mentor to other administrative law scholars

---

[377] If any party in these cases had intended to describe the convention, one would expect at a minimum to find some reference to *United States v. Grimaud*, 220 U.S. 506 (1911). In only one of the eight cases, however, did the parties make any reference to *Grimaud* in their briefs, and they did not do so to make the point that congressional sanctions for rule violations mark a grant of rulemaking as legislative. *Compare* Brief for Intervenor-Appellee Teamsters Union at 50, Am. Trucking Ass'ns v. United States, 344 U.S. 298 (1953) (No. 26) ("The grant of a broad scope of rule-making authority, to fill the gaps of regulation, is a customary technique well established since *United States v. Grimaud*."), *with* Brief of Appellants at 31–32, *American Trucking*, 344 U.S. 298 (1953) (No. 26) (distinguishing *Grimaud* on the ground that the statute in that case expressly delegated to the Secretary the power to control public lands, whereas the Motor Carrier Act did not expressly give the ICC the power to regulate motor carrier leasing practices).

[378] *See* Singer v. United States, 323 U.S. 338, 351 (1945) (Frankfurter, J., dissenting) ("It is only when Congress in advance prescribes criminal sanctions for violations of authorized rules that violations of such rules can be punished as crimes. It is this far-reaching distinction which, it was pointed out in the *Grimaud* case, put on one side the doctrine of the *Eaton* case, where violation of rules and regulations was not made criminal, and on the other side legislation such as that enforced in the *Grimaud* case where Congress specifically provided that 'any violation of the provisions of this act or such rules or regulations* [of the Secretary of Agriculture] *shall be punished.'"* (alteration in original) (quoting *United States v. Grimaud*, 220 U.S. at 515)).

and practitioners than a serious scholar of the subject himself.[379] His casebook on administrative law, a jumble of material with little commentary, makes no mention of the convention.[380] Nor does he allude to it in his other administrative law writings, most of which take the form of essays or introductions to other scholars' work.[381]

That the Justices were unfamiliar with the convention, however, only pushes the inquiry back one step: why did the parties fail to discuss it in their briefs? With respect to the first four cases in our survey, it is clear why the industry lawyers did not allude to the convention: the convention represented a losing argument for them. Their clients were anxious to secure a ruling holding particular regulations invalid, but in each case the convention indicated that the relevant agencies (the FCC, ICC, and Federal Power Commission) *did* have the authority to issue regulations having the force of law. Consequently, the industry lawyers concentrated on other arguments.

It is less clear why the government lawyers representing the agencies in these cases did not discuss the convention. Of course, their primary task was to defend the regulations against the attacks leveled by the industry lawyers, and achieving this goal did not require any reliance on the convention. But the government would have gained at least a psychological advantage by demonstrating that Congress clearly intended to delegate legislative rulemaking authority to the agencies in question. Perhaps the omission stems in part from the fact that the agencies are represented in the Supreme Court by lawyers in the Solicitor General's office. These lawyers specialize in appellate advocacy and derive most of their knowledge from studying Supreme Court opinions. Generally, they do not have a deep understanding of the law that surrounds the agencies they represent. Because the convention had never appeared in an appellate opinion and existed only in the "common law" of agency authority as understood by lawyers in Congress and the agencies, the Solicitor General's lawyers perhaps were not aware of it.

With respect to the lawyers who came of age after World War II, there is a more basic explanation for the lack of awareness of the convention. Administrative law scholarship in this period was dominated by scholars who were veterans of government service during the New Deal era. As a general rule, these scholars downplayed the importance of limits on agency powers, instead emphasizing the pragmatic case for

---

[379] *See* WILLIAM C. CHASE, THE AMERICAN LAW SCHOOL AND THE RISE OF ADMINISTRATIVE GOVERNMENT 137–39 (1982).

[380] *See* FELIX FRANKFURTER & J. FORRESTER DAVISON, CASES AND OTHER MATERIALS ON ADMINISTRATIVE LAW (1st ed. 1932).

[381] *See, e.g.,* Felix Frankfurter, *Introduction*, 18 IOWA L. REV. 129 (1933); Felix Frankfurter, *The Task of Administrative Law*, 75 U. PA. L. REV. 614 (1927).

broad delegation of powers to administrative agencies and the impor-
tance of adapting administrative procedure to a judicial model of deci-
sionmaking.[382]   It is thus no coincidence that the early writings of
these scholars contain little discussion of rulemaking (in contrast to ad-
judication) and no discussion of how to determine whether an agency
has been granted legislative rulemaking authority.[383]   Nor is it a coin-
cidence that the instructional materials produced by members of this
group after the New Deal devoted little coverage to rulemaking, and
none at all to the interpretation of facially ambiguous delegations of
rulemaking authority.[384]   For this generation of scholars, the question
of how agencies obtain the power to issue rules that have the force and
effect of statutes was an awkward and potentially destabilizing one for
the federal administrative state.   Since no prominent appellate opinion
dealt with the issue, these scholars evidently felt no obligation to ex-
plore the question in their instructional materials.[385]   As best we can
tell, no lawyer who attended law school after World War II would
have learned about the convention from even the most assiduous study
of the classroom materials in use during this period.

   In any event, by the time we get to *Thorpe* and *Mourning*, consid-
erations of legal relevance and litigational advantage cannot explain
the failure of the parties to alert the Court to the convention.   The only
plausible explanation is collective ignorance.   In *Thorpe*, the conven-
tion provided a winning argument for the housing authority, but the
authority did not mention it.   It is possible that the lawyers for the

---

[382] *See* CHASE, *supra* note 379, at 136–50; G. EDWARD WHITE, THE CONSTITUTION AND
THE NEW DEAL 94–127 (2000).

[383] *See, e.g.*, WALTER GELLHORN, FEDERAL ADMINISTRATIVE PROCEEDINGS (1941) (con-
taining no index entries to regulations, rules, or rulemaking despite the author's experience as re-
search director of the Attorney General's Committee on Administrative Procedure); JAMES M.
LANDIS, THE ADMINISTRATIVE PROCESS (1938) (attempting to justify agencies on the ground
of their neutral expertise but containing no index entries to regulations, rules, or rulemaking); *see
also* JOHN DICKINSON, ADMINISTRATIVE JUSTICE AND THE SUPREMACY OF LAW IN THE
UNITED STATES 15 n.25 (1927) (noting that "[t]he subject of administrative regulations lies out-
side the scope of this book").

[384] *See* WALTER GELLHORN, ADMINISTRATIVE LAW: CASES AND COMMENTS (1st ed.
1940; 2d ed. 1947); WALTER GELLHORN & CLARK BYSE, ADMINISTRATIVE LAW: CASES AND
COMMENTS (1954); LOUIS L. JAFFE, ADMINISTRATIVE LAW: CASES AND MATERIALS (1953);
KENNETH C. SEARS, CASES AND MATERIALS ON ADMINISTRATIVE LAW (1938).   Professor
Davis, whom we have previously cited, devoted much more attention in his early work to rule-
making and to the distinction between legislative and interpretive rules.   *See* KENNETH CULP
DAVIS, ADMINISTRATIVE LAW §§ 54–55 (1951); 1 DAVIS, *supra* note 323, § 5.03; Davis, *supra*
note 79, at 928–34.   Although he cited some of the materials we discuss in this Article that recog-
nize the convention, he did not explicitly describe the convention in any of his work; indeed, he
did not seriously consider the possibility that the scope of an agency's power could be determined
from examining the terms of its organic legislation.

[385] In administrative law, as elsewhere in the law school curriculum, instructional materials
tend to emphasize appellate opinions to the exclusion of virtually everything else.   *See* CHASE,
*supra* note 379, at 117–24.

housing authority made a deliberate decision to concentrate solely on other arguments such as retroactivity. We learn from the Court's opinion that the authority had already begun complying with the circular,[386] and thus perhaps its only interest in continuing the litigation was to avoid an award of attorneys' fees. Still, it is unlikely that the authority's lawyers would have waived a winning argument had they been aware of its existence.

*Mourning* is even more revealing. The petitioner in *Mourning* — who supported the Federal Reserve Board's four-installment rule — devoted several pages of her brief to the issue of the Board's authority to promulgate legislative rules under the Truth in Lending Act's facially ambiguous rulemaking grant.[387] The petitioner set forth numerous arguments explaining why the grant authorized legislative rules. This presentation was thoroughly researched, but it included no mention of Congress's convention.[388]    Given the petitioner's detailed analysis of the Board's general rulemaking grant, it is fair to assume that she would have relied upon the convention if she had been aware of it. Petitioner's failure to raise the convention thus suggests that the convention had disappeared from the consciousness of Supreme Court litigators by the time *Mourning* was argued and decided in 1973.

The final two cases confirm that knowledge of the convention was lost to the circle of lawyers who argue cases before the Supreme Court. In *Gilbert*, petitioner General Electric and supporting amici had every incentive to show that the EEOC's guidelines did not have the force of law. Granted, the express language of the general rulemaking grant made it possible to do so without resort to the convention. Still, had the lawyers known of the convention, one would expect some mention

---

[386] Thorpe v. Hous. Auth., 393 U.S. 268, 283 (1969).

[387] *See* Brief for Petitioner at 21–27, Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356 (1973) (No. 71-829).

[388] The petitioner argued that Supreme Court precedent established that general rulemaking grants arguably confer legislative powers even where several specific rulemaking grants are also included in the Act. *Id.* at 22–23. Relying on *Thorpe*, the petitioner claimed that "[t]he fact that the Act contains substantive provisions and authorizes the Board to issue interpretive regulations does not necessarily negate the grant of legislative rule making power to carry out the Act's more broadly phrased statement of purpose." *Id.* at 22. The petitioner acknowledged that the general rulemaking grant given to the Secretary of the Treasury under the Internal Revenue Code (IRC) was understood to authorize only interpretive rules. *Id.* at 23–24. However, the petitioner distinguished the Board's general rulemaking grant under the Truth in Lending Act from the grant included in the IRC on the ground that the Truth in Lending grant authorizes rules "to carry out *the purposes*" of the Act. *Id.* at 23 (emphasis added) (quoting 15 U.S.C. § 1604 (2000)) (internal quotation marks omitted). This language, the petitioner argued, was broader than the statutory language used in the IRC, which merely gives the power to issue rules "for the enforcement of this title." *Id.* (quoting 26 U.S.C. § 7805(a) (2000)) (internal quotation marks omitted). Finally, the petitioner supported her contention that the Board's general rulemaking grant authorizes legislative rules by pointing to section 1602(g) of the Truth in Lending Act, which gives Board regulations the same legal force as statutory provisions. *Id.* at 24 (citing 15 U.S.C. § 1602(g)).

of it. Yet the briefs' arguments only focus on the language of the rulemaking grant, never once referring to the convention.[389] Similarly, in *Chrysler*, the petitioner was anxious to demonstrate that 5 U.S.C. § 301 authorized only procedural and not legislative rules. Although the history of the rulemaking grant suggests it was, as its colloquial name indicates, only a housekeeping grant, one would expect some reference to the convention to confirm the point. The briefs, however, contained an exposition of the history of the particular grant but did not mention the convention.[390]

It is tempting to attribute this collective silence about the convention to changes in legal beliefs and values, such as a decline in belief in the Austinian conception of law as commands backed by sanctions[391] or a diminished allegiance to the nondelegation doctrine. But it is not clear that any such explanation holds water. The decision in *Thorpe* is as "Austinian" in its understanding of law as anything found in the opinions of the late nineteenth century. Once the Court deemed the HUD circular to have the force of law, it regarded the circular as having a direct preemptive effect on the state law of eviction and on the leases between housing authorities and their tenants. And although the early decisions in our series authored by New Dealers like Justices Frankfurter, Reed, and Douglas may conceivably reflect a latent hostility toward the nondelegation doctrine, this cannot be said of the last two decisions in our series, authored by then-Justice Rehnquist. *Gilbert* and *Chrysler*, in fact, reflect the first steps in a short-lived effort by Justice Rehnquist to *revive* the nondelegation doctrine.[392] Even Judge J. Skelly Wright, author of the leading appellate opinion that conferred legislative rulemaking power in the absence of conventional sanctions, purported to be an enthusiast of the nondelegation doctrine, going so far as to publish an article urging its re-

---

[389] *See* Brief of Westinghouse Electric Corporation as Amicus Curiae in Support of the Position of General Electric Company at 27–28, Gen. Elec. Co. v. Gilbert, 429 U.S. 125 (1976) (No. 74-1589) (arguing that Congress inserted the word "procedural" into the general rulemaking grant to exclude legislative rules from the EEOC's powers); *see also* Brief Amici Curiae of Owens-Illinois, Inc. & The Sherwin Williams Co. at 10–11, *Gilbert*, 429 U.S. 125 (1976) (No. 74-1589) (contending that the "EEOC was granted only *procedural, not substantive,* rulemaking authority, a clear indication of Congress' intent to allow EEOC substantially less rulemaking authority than most other administrative agencies").

[390] *See* Brief of Petitioner Chrysler Corporation at 48–51, Chrysler Corp. v. Brown, 441 U.S. 281 (1979) (No. 77-922) (arguing that 5 U.S.C. § 301 is merely a housekeeping statute that enables "agencies to carry out routine administrative tasks and to promulgate regulations for the conduct of their day-to-day operations"); *see also* Brief for the Respondents at 49, *Chrysler*, 441 U.S. 281 (1979) (No. 77-922) (same).

[391] *See* AUSTIN, *supra* note 126, at 13–15.

[392] *See supra* note 375 and accompanying text.

JA0537

vival.[393]   Thus, there would appear to be no correlation between support for the nondelegation doctrine and receptivity to, or even acknowledgement of, the convention.

In the end, the most parsimonious explanation for the fact that the Supreme Court ignored the convention is simple ignorance.   The proximate cause of the Court's ignorance was the ignorance of the lawyers who appeared before it.   The lawyers remained ignorant because, due to accidents of timing, no case presenting an opportunity for the Court to recognize the convention arose when the convention was most familiar to lawyers serving in Congress and the agencies. Suppose that the FTC or the NLRB had sought to engage in legislative rulemaking in the 1940s, and these actions had been challenged in litigation reaching the Supreme Court or even the courts of appeals. The upshot almost certainly would have been an appellate opinion explaining why the facially ambiguous rulemaking grants that Congress gave to these agencies did not include the power to make rules with the force of law.   But this did not happen.   And it did not happen, ironically enough, primarily because it was *so clear* to the staff attorneys at the FTC and the NLRB that their agencies lacked statutory authority to make such rules.   Because lawyers tend to learn the law from reading appellate opinions,[394] and the convention never appeared in the Supreme Court opinions about rulemaking that accumulated in the years after the New Deal, the possibility of recovering knowledge of the convention slipped away.

## V. THE CONVENTION ERASED

The Supreme Court's failure to attend to the distinction between grants of legislative and housekeeping rulemaking — and the American practice of distilling knowledge of public law from Supreme Court opinions — set the stage for the de facto erasure of the convention by the courts of appeals.   As agencies and commentators began to perceive the advantages of rulemaking over adjudication, they began to rely on the language in several of the Court's opinions (including *National Broadcasting, American Trucking, Storer Broadcasting, Texaco, Thorpe,* and *Mourning*) as support for the proposition that agencies previously thought not to have legislative rulemaking authority in fact had enjoyed such power from their inception.   The understanding that eventually emerged was exactly the opposite of the *Queen and Cres-*

---

[393] *See* J. Skelly Wright, *Beyond Discretionary Justice,* 81 YALE L.J. 575, 582 (1972) (arguing that Congress should not be able "to vote itself out of business.  There must be some limit on the extent to which Congress can transfer its own powers to other bodies without guidance as to how these powers should be exercised.").

[394] *See supra* note 385.

*cent Case* express-statement canon: ambiguous grants of rulemaking authority are presumed to confer legislative rulemaking power unless Congress expressly indicates that the grant is limited to procedural or interpretive rules.

### A. Commentators Advocate Expanded Use of Rulemaking

Beginning in the late 1950s and early 1960s, administrative law commentators began to call for increased use of rulemaking. The case for rulemaking rested on two somewhat disparate sets of concerns — fairness and efficacy. Some commentators emphasized the greater fairness of rules relative to adjudication. Making policy through adjudication can lead to inconsistent outcomes and frustrates expectations when policy changes retroactively.[395] Making policy through rulemaking is much more likely to result in standards that apply prospectively, providing clear notice of the law's requirements to all concerned.[396] Other commentators championed rulemaking as a means of making agencies more effective regulators.[397] For example, some argued that rulemaking allows agencies to promulgate blanket prohibitions against certain industrywide practices.[398]

These somewhat conflicting aspirations — constraining agency discretion and expanding agency power — convinced numerous scholars and lawyers to join the call for more rulemaking. Warren E. Baker, the general counsel of the FCC, wrote a pioneering article in 1957 that embraced both themes. He argued that "rule-making is a sounder way of proceeding than the case-by-case method or general declarations of policy."[399] He pointed to *Storer Broadcasting* as "a perfect example" of how agencies could set policy through rulemaking.[400] He contended

---

[395] *See, e.g.*, KENNETH CULP DAVIS, DISCRETIONARY JUSTICE 66 (Illini Books ed. 1971) (1969) (arguing that the retroactive feature of adjudication may "be sufficiently unfair that good administrators ought to try to avoid it").

[396] *See generally* Shapiro, *supra* note 296, at 929–42 ("[A] rule declared in a regulation is more likely than a rule declared in adjudication to be limited in application to determining the legal status of future conduct . . . ."); *see also* DAVIS, *supra* note 395, at 66 ("[P]rospective rules often should be preferred to retroactive law-making through adjudication.").

[397] *See, e.g.*, Peter Barton Hutt, *Philosophy of Regulation Under the Federal Food, Drug and Cosmetic Act*, 28 FOOD DRUG COSM. L.J. 177, 183 (1973) (arguing that rulemaking allows the FDA to "induce widespread compliance" more effectively); Richard A. Wegman, *Cigarettes and Health: A Legal Analysis*, 51 CORNELL L.Q. 678, 749–51 (1966) (arguing that FTC rulemaking could effectively address the dangers of smoking because the "rulemaking approach assures that the entire industry will feel the weight of the FTC sanction at the same time").

[398] *See* Shapiro, *supra* note 296, at 935 (noting the FTC's view that "when a practice is widespread in an industry, a rulemaking proceeding operates evenhandedly to bar that practice on the part of all, while an order directed only to one permits his competitors to gain an unfair advantage").

[399] Warren E. Baker, *Policy by Rule or Ad Hoc Approach — Which Should It Be?*, 22 LAW & CONTEMP. PROBS. 658, 671 (1957).

[400] *See id.* at 670.

JA0539

that rulemaking, by setting clear, across-the-board standards, serves as a more effective means of establishing policy than the manifold, time-consuming suits required by adjudication.[401]   In addition, he noted that rulemaking avoids the harsh consequences inherent in the retroactive application of agency policy set case-by-case through adjudication.[402]

Two prominent public figures, James Landis and Judge Henry Friendly, soon added their voices to the call for increased agency rulemaking.   In 1960, Landis wrote his influential *Report on Regulatory Agencies to the President-Elect*, in which he contended, "A prime criticism of the regulatory agencies is their failure to develop broad policies in the areas subject to their jurisdiction."[403]   Landis suggested that, rather than rely solely on adjudication, agencies should use rulemaking to set forward-looking policy.[404]   Similarly, in a book published in 1962, Judge Friendly explained that a major source of dissatisfaction with the federal administrative agencies stemmed from their "failure to develop standards sufficiently definite to permit decisions to be fairly predictable and the reasons for them to be understood."[405]   Although Judge Friendly devoted most of his book to the contention that agencies should develop more detailed adjudicative standards, he also urged that the case-by-case adjudication method "should be supplemented by much greater use of two other devices — policy statements and rulemaking."[406]

Professor Kenneth Culp Davis soon threw his formidable energies into promoting greater use of rulemaking.   In his 1969 book *Discretionary Justice*, Davis proclaimed rulemaking to be "one of the greatest inventions of modern government."[407]   He concluded that rulemaking is generally superior to adjudication because of its prospective nature and because it allows interested parties to participate in the development of the rule.[408]   Davis urged all policymakers to "push administra-

---

[401] *Id.* at 664.

[402] *Id.* at 662–63.

[403] JAMES M. LANDIS, REPORT ON REGULATORY AGENCIES TO THE PRESIDENT-ELECT 22 (1960). *See generally* Carl McFarland, *Landis' Report: The Voice of One Crying in the Wilderness*, 47 VA. L. REV. 373, 434–36 (1961) (analyzing Landis's report and discussing Landis's suggestion that other methods of policy planning, such as rulemaking, should be used by agencies in addition to adjudication). *But cf.* LANDIS, *supra* note 383 (New Deal-era work by same author that largely ignores rulemaking).

[404] LANDIS, *supra* note 383, at 18 (noting that "[p]olicy also emanates from rule-making where forward-planning is more possible").

[405] HENRY J. FRIENDLY, THE FEDERAL ADMINISTRATIVE AGENCIES 5–6 (1962).

[406] *Id.* at 145. In 1965, Louis L. Jaffe, an administrative law professor at Harvard, agreed with Judge Friendly, noting that "agencies should do more to formulate policies and guides." LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 49 (1965).

[407] DAVIS, *supra* note 395, at 65.

[408] *Id.* at 66.

tors toward earlier and more diligent use of the rule-making power,"[409] and asserted that "[t]he typical failure in our system that is correctible is not legislative delegation of broad discretionary power with vague standards; it is the procrastination of administrators in resorting to the rule-making power to replace vagueness with clarity."[410]

Davis acknowledged that some agencies may lack statutory power to issue legislative rules with the force of law.[411] He argued, however, that this was not a justification for failure to issue rules, because even agencies lacking legislative rulemaking powers could issue interpretive rules.[412] Davis approvingly pointed to the FTC as an example of an agency that lacked legislative rulemaking powers but that had nevertheless engaged in valuable interpretive rulemaking.[413]

Soon, numerous scholars joined Davis, Landis, and Judge Friendly in cheerleading for rulemaking.[414] *Storer Broadcasting*, *Texaco*, *Mourning*, and *Thorpe* were all cited in support of this advocacy.[415] For example, one scholar writing in 1965 relied on *Texaco* to argue in support of legislative rulemaking by the FTC.[416] Similarly, Professor Ralph F. Fuchs noted that *Texaco* and *Storer Broadcasting* were "likely to provide a new impetus" to rulemaking.[417] Fuchs predicted in

---

[409] *Id.* at 57.

[410] *Id.* at 56–57 (emphasis omitted).

[411] *Id.* at 220.

[412] *Id.* at 68, 220.

[413] *Id.* at 74–77.

[414] *See, e.g.*, Merton C. Bernstein, *The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act*, 79 YALE L.J. 571, 622 (1970) (contending that the NLRB should try rulemaking to "reinvigorate agencies now settled into dull, time-consuming, and relatively unproductive adjudicatory routines"); McFarland, *supra* note 403, at 433 (arguing for rulemaking as an alternative to setting policy through adjudication); Carl S. Silverman, *The Case for the National Labor Relations Board's Use of Rulemaking in Asserting Jurisdiction*, 25 LAB. L.J. 607 (1974) (contending that the NLRB should use rulemaking when deciding whether to assert jurisdiction).

[415] *See, e.g.*, Peter Barton Hutt, *Impact of Recent Court Decisions on the Future of FDA Regulations: An Impromptu Response to the Remarks of the Speakers*, 28 FOOD DRUG COSM. L.J. 707, 712 (1973) [hereinafter Hutt, *Impact of Recent Court Decisions*] (arguing that the debate over the FDA's general rulemaking grant, "although delightful for academic discussions and conferences," would turn out to be one of the "great red herrings of all time" because of cases like *Thorpe* and *Mourning*, which had upheld rulemaking based on general grants); *cf.* Ralph F. Fuchs, *Agency Development of Policy Through Rule-Making*, 59 NW. U. L. REV. 781, 788–89 (1965) (viewing *Storer Broadcasting* and *Texaco* as providing agencies encouragement to settle policy questions through regulation); Glen O. Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform*, 118 U. PA. L. REV. 485, 488–89 (1970) (discussing how *Storer* and *Texaco* invited agencies to use their largely neglected rulemaking powers).

[416] Wesley E. Forte, *The Food and Drug Administration, the Federal Trade Commission and the Deceptive Packaging of Foods*, 40 N.Y.U. L. REV. 860, 886 n.125 (1965) (citing *Texaco* as "the most authoritative source" for the FTC having "the basic authority necessary for . . . specific rulemaking activies").

[417] Fuchs, *supra* note 415, at 788–89.

1965 that, given the momentum these decisions provided, battles over agency powers to issue legislative rules based solely on general rule-making grants had "probably just begun."[418]

### B. The FTC, FDA, and NLRB Exercise Legislative Rulemaking Powers

Professor Fuchs's prediction soon proved correct. As the advocacy of rulemaking mounted in the 1960s, a number of agencies decided to test the limits of their rulemaking powers. The payoff was substantial. When the dust settled, three major agencies — the FTC, FDA, and NLRB — had acquired legislative rulemaking powers that Congress had not originally granted to them.

*1. The FTC.* — Consistent with the understanding that the FTCA did not confer any legislative rulemaking powers on the FTC, the agency made no attempt to promulgate rules with the force of law during the early decades of its existence.[419] Later amendments to the Act, if anything, only underscored the limited nature of the agency's rulemaking powers.[420] Congress expressly conferred legislative rulemaking authority on the FTC under several amendatory statutes, including the Wool Products Labeling Act[421] and the Fur Products Labeling Act.[422] If Congress had granted general legislative rulemaking author-

---

[418] *Id.* at 806.

[419] *See* Shapiro, *supra* note 296, at 925 (noting that in the first half of this century, the FTC relied on adjudicatory proceedings rather than regulations to control unfair practices).

[420] A House Report issued in 1957 highlighted the limited nature of the FTC's rulemaking powers:

> The Federal Trade Commission, through its trade practice conference procedure, has promulgated rules with respect to the labeling and advertising of rayon, acetate, linen, and silk which move in interstate commerce. *These rules, as such, do not have the force and effect of law but are rather advisory interpretations* as to what may constitute unfair methods of competition and unfair and deceptive acts or practices in commerce, under the Federal Trade Commission Act. These rules, insofar as they go, have worked reasonably well, but their chief handicap is the limited jurisdiction of the Commission under its organic statute.

H.R. REP. NO. 85-986, at 2 n.1 (1957) (emphasis added).

[421] Ch. 871, § 6(a), 54 Stat. 1128, 1131 (1940) (codified as amended at 15 U.S.C. § 68d(a) (2000)) (authorizing the FTC to make rules and regulations "as may be necessary and proper for administration and enforcement"). Congress gave the rules promulgated under this general rulemaking grant legislative effect through various statutory provisions. For example, section 3 provided that the introduction into commerce of any wool product that was misbranded within the meaning of the Act or of the *rules or regulations* promulgated by the FTC was unlawful, *id.* § 3, 54 Stat. at 1129 (codified at 15 U.S.C. § 68h), and section 10 subjected any person who willfully violated section 3 to criminal penalties, *id.* § 10, 54 Stat. at 1133 (codified at 15 U.S.C. § 69f(b)).

[422] Ch. 298, § 8(b), 65 Stat. 175, 180 (1951) (codified at 15 U.S.C. § 69f(b)) (authorizing the FTC to promulgate rules and regulations "as may be necessary and proper for purposes of administration and enforcement of this Act"). Various statutory provisions gave legislative effect to the rules and regulations promulgated under this general grant. For example, section 3(a) made it unlawful to introduce into commerce any fur product that is misbranded within the meaning of the Act or of "the rules and regulations prescribed under Section 8(b)," *id.* § 3(a), 65 Stat. at 176 (codified at

ity to the FTC in 1914 when it created the Commission, these subsequent grants of legislative rulemaking powers would have been superfluous.[423]

The history of the Flammable Fabrics Act of 1953[424] confirms most strikingly that Congress did not grant the FTC legislative rulemaking powers under the original FTCA. The Flammable Fabrics Act included a general rulemaking grant that authorized the FTC to "prescribe such rules and regulations as may be necessary and proper for purposes of administration and enforcement of this Act."[425] Congress wrote this grant in language similar to the general grant included in section 6(g) of the FTCA. Both stood alone, lacking any statutory sanctions to put teeth into the regulations. In 1967, however, Congress amended the Flammable Fabrics Act[426] by adding the following language to the rulemaking provision: "The violation of such rules and regulations shall be unlawful and shall be an unfair method of competition . . . under the Federal Trade Commission Act."[427] Congress also gave the FTC the authority to enjoin any violations of the rules and regulations promulgated under the Act.[428] These amendments confirm that the rulemaking grant in the 1953 Act (which was identical to the grant in section 6(g)) did not confer legislative rulemaking powers. More important, they also show that, as late as 1967, when Congress wanted to signal that a particular rulemaking grant conferred legislative rulemaking authority, it added a provision imposing legal sanctions for rule violations.

---

15 U.S.C. § 69a), and section 11(a) subjected any person who violated section 3 to criminal penalties, *id.* § 11(a), 65 Stat. at 181 (codified at 15 U.S.C. § 69i).

[423] *See* Burrus & Teter, *supra* note 14, at 1124–25; *see also* Carl A. Auerbach, *The Federal Trade Commission: Internal Organization and Procedure*, 48 MINN. L. REV. 383, 458 (1964) (noting that criminal penalties attach to the violation of regulations that the FTC promulgated under the Wool Products Labeling Act and the Fur Products Labeling Act and arguing that Congress should amend the FTCA "to give the Commission the power to issue substantive rules and regulations for the violation of which criminal and civil penalties should attach").

[424] Ch. 164, 67 Stat. 111 (1953).

[425] *Id.* § 5(c), 67 Stat. at 113 (codified as amended at 15 U.S.C. § 1194(c) (2000)).

[426] Flammable Fabrics Act, amendment, Pub. L. No. 90-189, § 4(a), 81 Stat. 568, 571 (1967) (codified as amended at 15 U.S.C. § 1194(c)) (amending section 5(c) of the Act). The House Report explained that one purpose of the amendment was to "make the Flammable Fabrics Act more flexible by permitting flammability standards and other regulations to be issued under rulemaking procedures rather than having them fixed by law as is now the case." H.R. REP. NO. 90-972, at 6 (1967). This comment explicitly suggests that the House in 1967 did not believe that the general grant included in the original Act authorized the FTC to promulgate legislative regulations.

[427] Flammable Fabrics Act, amendment, § 4(a), 81 Stat. at 571.

[428] *Id.* § 5(a), 81 Stat. at 571 (codified at 15 U.S.C. § 1195(a)) (amending section 6(a) of the 1953 Act by inserting "or rule or regulation prescribed under section 5(c)" immediately after "section 3").

(a) *The FTC's Regulatory Practices from 1914 to 1962.* — Because Congress chose not to grant the FTC legislative rulemaking powers, for the first half-century of its existence the agency relied mainly on three methods of making policy. Case-by-case adjudication served as the primary enforcement tool.[429] Under the FTCA, the FTC possessed the power to issue a complaint, set a hearing, and decide whether to issue a cease and desist order requiring the respondent to stop any activities found to be unfair commercial practices or unfair methods of competition.[430] However, the shortcomings of adjudication as a method of setting policy soon became apparent. Adjudication failed to achieve widespread compliance, reaching only individual violators and specific acts rather than industrywide practices.[431]

Soon after Congress established the FTC, the agency developed Trade Practice Conferences to help overcome the shortcomings of adjudication[432] and to identify practices that violated the laws administered by the FTC.[433] The procedure worked as follows: a specific industry, a consumer group, or the FTC would initiate a conference about a certain industry; proposed rules would be developed at the conference; the FTC would hold a public hearing on the proposed rules and then issue a Trade Practice Conference Rule (TPCR).[434] TPCRs were not regarded as legally binding.[435] Rather, the FTC relied on voluntary compliance by industry members.[436] If the FTC initiated suit based on a violation, the complaint would "charge [the

---

[429] *See* Wegman, *supra* note 397, at 730 (noting that "[t]he cease and desist procedure is the usual route by which the FTC takes action against unfair commercial practices").

[430] *See* Forte, *supra* note 416, at 887–88.

[431] *See* Wegman, *supra* note 397, at 740 (concluding that adjudication "was not adequate to deal with certain industry-wide practices, since repeated adjudications involving identical facts not only were extremely cumbersome, but resulted in considerable unfairness to all parties concerned").

[432] *See* Weston, *supra* note 181, at 566–67 (noting that the FTC had used Trade Practice Conference Rules since about 1919).

[433] The FTC explained the purpose of the Trade Practice Conference procedure as follows:
[T]o encourage widespread observance of the law by enlisting the cooperation of members of industries and informing them more fully of the requirements of the law, so that wherever consistently possible the Commission may avoid the need for adversary proceedings against persons who, through misunderstanding or carelessness, may violate the law unintentionally.
Federal Trade Commission — Policies, 12 Fed. Reg. 5811 (Aug. 29, 1947).

[434] Forte, *supra* note 416, at 880.

[435] *See* Auerbach, *supra* note 423, at 452 (explaining that trade practice rules "do not, themselves, have the force of law").

[436] *See* Note, *Voluntary Compliance: An Adjunct to the Mandatory Processes*, 38 IND. L.J. 377, 386 (1962) (noting that TPC is a voluntary procedure whose purpose is "to eliminate and prevent, on a voluntary and industrywide basis . . . illegal practices and acts . . . violative of laws administered by the FTC").

party with] violation of the statutory provision on which the rules are premised, and . . . not . . . violation of the trade practice rule."[437]

In 1955, the FTC added a third form of policymaking to its tool bag: Guides.[438] Like TPCRs, Guides did not have the force of law.[439] The Guides program consisted essentially of interpretive rules spelling out the FTC's understanding of the requirements of the FTCA.[440] For example, the FTC issued Cigarette Advertising Guides in 1955 to summarize its view that it was unlawful to represent that cigarette smoking presents no health risks or to make references to that effect.[441]

*(b) The FTC Turns to Legislative Rulemaking.* — After nearly a half-century of setting policy through adjudication, TPCRs, and Guides, in 1962 the FTC decided to institute a new procedure — Trade Regulation Rules (TRRs). Although the legal impact of TRRs was initially unclear,[442] it soon became apparent that the FTC did, in fact, intend to treat TRRs as legislative regulations.

The FTC cautiously tested political support for its new legislative rulemaking experiment by issuing several TRRs that dealt with fairly trivial matters.[443] None of these early rules stirred much contro-

---

[437] FTC Trade Practice Conference Rules, 20 Fed. Reg. 3061 (May 6, 1955).

[438] *See generally* Auerbach, *supra* note 423, at 452–53 (explaining that the Guides program began in 1955 and that by October 31, 1962, the FTC had issued nine Guides).

[439] *See* Note, *supra* note 436, at 394.

[440] *See* Weston, *supra* note 181, at 567; *see also* Note, *supra* note 436, at 397 (noting that the "primary compliance tool in connection with the guides program has been education").

[441] *See* Note, *supra* note 436, at 396.

[442] *See* Burrus and Teter, *supra* note 14, at 1119–20 (noting that the question still remained in 1966 concerning "whether the rules possess[ed] the force and effect of law or simply present[ed] a prima facie case which may be rebutted"); *see also* Auerbach, *supra* note 423, at 455, 457 (arguing that "[a] trade regulation rule will not have the force and effect of law, in the sense that a violator of the rule will become subject to a penalty for its violation" but also noting that Commissioner MacIntyre contemplated the use of "substantive rule making power"). Auerbach's article was an outgrowth of his report to the Committee on Internal Organization and Procedure of the Administrative Conference. He argued in favor of a legislative amendment to give the FTC the power to issue legislative rules and regulations for the violation of which criminal penalties would attach. *Id.* at 458. He noted that the Commission staff was at that time divided on the desirability of legislation. The Director of the FTC's Bureau of Industry Guidance opposed legislation imposing penalties, but the Bureau of Deceptive Practices supported legislation authorizing rules enforceable by penalties. *Id.*

[443] *See* Note, *FTC Substantive Rulemaking: An Evaluation of Past Practice and Proposed Legislation*, 48 N.Y.U. L. REV. 135, 143 (1973) (stating that "[t]he FTC's initial ventures into the area of rulemaking were marked by caution, reflecting not only the problems of adjustment to a new form of regulation, but also, perhaps, concern over its power to proceed and sensitivity to possible political ramifications. The Commission began with minor regulation of advertising and labeling in small businesses . . . ."). For example, in 1963 the agency promulgated a rule requiring that sleeping bags be marked with the size of the finished product rather than the dimensions of the material used in making the bags. 16 C.F.R. § 400 (1964). Similarly, a 1965 TRR declared that the practice of describing household electric sewing machines as "automatic," "fully automatic," or

versy.[444]  The actual effect of the rules was unclear because the FTC
did not immediately attempt to bring any enforcement actions based
on them.[445]

However, in 1964, the FTC adopted its first major, controversial
TRR, which dealt with unfair and deceptive practices in advertising
and labeling cigarettes.[446]  Perhaps anticipating opposition, the FTC
included a lengthy discussion in the rule's statement of basis and pur-
pose justifying the agency's use of legislative rulemaking.[447]  The FTC
cited Judge Friendly and other critics of the administrative process
who had urged agencies to engage in more rulemaking.[448]  It relied on
*National Broadcasting*, *Storer Broadcasting*, and *Texaco* to support its
claim that it possessed the power to promulgate the cigarette rule.[449]
The agency also pointed to the general rulemaking grant in section 6(g)
of the FTCA as a source of authority to issue binding rules.  Finally, it
argued that even if section 6(g) were not in the Act, the TRRs would
not be ultra vires: "It is implicit in the basic purpose and design of the
Trade Commission Act as a whole, to establish an administrative
agency for the prevention of unfair trade practices, that the Commis-
sion should not be confined to quasijudicial proceedings."[450]

The FTC was correct in anticipating an adverse reaction to the
cigarette rule and a challenge to its authority to promulgate it.  The
tobacco industry mounted a full-scale offensive against the TRR[451]
and persuaded Congress to enact a weak labeling bill as a substitute
for the strong restrictions contained in the FTC cigarette rule.[452]  The

---

"automatic zig-zag sewing machine[s]" violated section 5 of the FTCA.  *See* 16 C.F.R. § 401
(1966).

[444] *See* Note, *supra* note 443, at 143 (stating that the FTC's earliest legislative "rules were rela-
tively trivial, dealing with uncomplicated facts and business practices that were easy to isolate
and rectify").

[445] *See* Burrus and Teter, *supra* note 14, at 1120 n.69.

[446] 16 C.F.R. pt. 408 (1966).

[447] FTC Rules and Regulations: Commercial Practices, 29 Fed. Reg. 8324 (July 2, 1964).  The
FTC tried to claim that the Cigarette Rule was not "legislative in the sense of adding new sub-
stantive rights or obligations." *Id.*  Some scholars believed that the FTC's characterization of the
rule as nonlegislative was correct.  For example, Kenneth Culp Davis argued in his book *Discre-
tionary Justice* that the FTC's Cigarette Rule was merely interpretive. *See* DAVIS, *supra* note 395,
at 74–75.  Davis cited the Cigarette Rule as a good example of a valuable interpretive rule, and he
noted that "Congress had not delegated to [the FTC] a separate power to make substantive rules."
*Id.* at 74.

[448] 29 Fed. Reg. 8324, 8368 n.139 (1964).

[449] *Id.* at 8373 n.157.

[450] *Id.* at 8369.

[451] *See* Wegman, *supra* note 397, at 725 (stating that the promulgation of the TRR "jolted the
tobacco industry").  *See generally* A. LEE FRITSCHLER, SMOKING AND POLITICS 74 (3d ed.
1983) (noting that the cigarette industry was "determined to prove that the FTC had no authority
to write such rules").

[452] Wegman, *supra* note 397, at 726.

resulting Federal Cigarette Labeling and Advertising Act[453] required all cigarette packages to be accompanied by a statement that said: "Cigarette Smoking May Be Hazardous To Your Health."[454] When signed into law in 1965, it overrode the FTC's rule, thereby nullifying the FTC's first major TRR.[455]

After its ill-fated attempt to regulate the cigarette industry, the FTC again resorted to promulgating fairly minor, uncontroversial TRRs.[456] Late in the 1960s, however, criticism of the FTC for failing to act more aggressively in enforcing the FTCA rose to a new pitch.[457] Especially significant in this regard was *The Nader Report on the Federal Trade Commission*,[458] which pointed to the cigarette-advertising rule as an example of how the FTC could act to protect consumers, "if properly directed and motivated."[459]

*(c)* National Petroleum Refiners Association. — Prompted by these criticisms, the FTC once again aggressively tested the limits of its TRR procedure in the late 1960s and early 1970s.[460] The agency's pursuit of legislative rulemaking, in turn, led to closer scrutiny concerning whether the FTC in fact possessed legislative authority to is-

---

[453] Pub. L. No. 89-92, 79 Stat. 282 (1965).

[454] *Id.* § 4, 79 Stat. at 283.

[455] Congress also overrode other early TRRs by legislation. A TRR relating to the shipment of unordered merchandise was superseded by provisions in the Postal Reorganization Act. *See* Unordered Merchandise, 35 Fed. Reg. 10,116 (June 18, 1970) (setting forth 16 C.F.R. § 427, which was superseded by 39 U.S.C. § 3009 (2000)). In addition, the Truth in Lending Act overrode a TRR relating to the unsolicited mailing of credit cards. *See* Unsolicited Mailing of Credit Cards, 35 Fed. Reg. 4614 (Mar. 16, 1970) (adopting the credit card regulation that was superseded by 15 U.S.C. §§ 1642–1644 (2000)). Congress's willingness to override the FTC's first attempts at legislative rulemaking may suggest that Congress rejected the validity of the FTC's use of TRRs.

[456] *See* Note, *supra* note 443, at 144 (noting that after its experience with the cigarette rule, the FTC "reverted to earlier policies of caution, and several years of relatively minor rulemaking"); *see, e.g.,* Incandescent Lamp (Light Bulb) Industry, 16 C.F.R. § 409 (1971) (providing that failure to disclose certain information about light bulbs, including the average laboratory life expressed in hours and the light output expressed in average initial lumens, is a violation of the FTCA); Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 16 C.F.R. § 412 (1968) (declaring that certain advertising practices relating to men's and boys' tailored clothing constitute violations of the FTCA).

[457] *See* FRITSCHLER, *supra* note 451, at 75 (reporting that two very critical studies of the FTC appeared in the late 1960s, one written for the American Bar Association and the other by a group of law students working for Ralph Nader).

[458] EDWARD F. COX, ROBERT C. FELLMETH & JOHN E. SCHULZ, THE NADER REPORT ON THE FEDERAL TRADE COMMISSION (1969).

[459] *Id.* at 77. The period from the late 1960s to the early 1980s was the high-water mark of "capture theory," which depicted administrative agencies as the captives of big business; commentators promoted a variety of procedural innovations as cures. *See generally* Thomas W. Merrill, *Capture Theory and the Courts: 1967–1983*, 72 CHI.-KENT L. REV. 1039 (1997).

[460] *See generally* WILLIAM F. WEST, ADMINISTRATIVE RULEMAKING: POLITICS AND PROCESSES 120 (1985) (noting that the Nader Report was instrumental in pushing the FTC to rely more heavily on its rulemaking powers).

sue such rules.[461]  It also resulted in court challenges.  The first case, decided in 1968, challenged a TRR based in part on the theory that the FTC lacked the statutory authority to promulgate legislative rules.[462]  However, the U.S. District Court for the District of Columbia ducked the issue on ripeness grounds.[463]

The National Petroleum Refiners Association brought the next challenge, asserting that the FTC lacked the authority to promulgate a TRR requiring the posting of octane ratings on gasoline pumps.[464] This time the U.S. District Court for the District of Columbia addressed the issue of the FTC's rulemaking authority head on.  After thoroughly canvassing the history of the FTCA and its amendments, the court held that the FTC lacked any general authority to issue rules with the force of law.[465]

The district court's decision created an uproar[466] and nearly brought the FTC's legislative rulemaking to a halt.[467]  In response, Congress began debating legislation that would confer legislative rulemaking authority on the FTC.  Meanwhile, the government appealed the district court's decision to the U.S. Court of Appeals for the D.C. Circuit.  This appeal placed the FTC in the awkward position of having to argue to the D.C. Circuit that it was *clear* that the agency possessed legislative powers while simultaneously arguing to Congress that the FTC's rulemaking powers were sufficiently *ambiguous* to warrant congressional clarification.[468]

Before Congress could act, the D.C. Circuit weighed in, holding that section 6(g) conferred full legislative rulemaking authority on the FTC.[469]  Judge J. Skelly Wright's opinion for the unanimous panel,

---

[461] *Compare* Wegman, *supra* note 397, at 749 (concluding that the FTC did have the power to control conduct prospectively through legislative rulemaking of general applicability), *with* Auerbach, *supra* note 423, at 457–58 (concluding that the FTC did not have legislative rulemaking authority).

[462] *See* Bristol-Myers Co. v. FTC, 284 F. Supp. 745 (D.D.C. 1968).

[463] *Id.* at 748.

[464] *See* Nat'l Petroleum Refiners Ass'n v. FTC, 340 F. Supp. 1343, 1346–47 (D.D.C. 1972) (holding that the general rulemaking grant in the FTCA gave the FTC authority to make rules in connection with its housekeeping chores and investigative responsibilities but did not authorize legislative rulemaking).

[465] *See id.* at 1350.

[466] *See* Note, *supra* note 443, at 142 (criticizing the district court's decision and arguing that there were "serious weaknesses" in the court's analysis).

[467] *See* WEST, *supra* note 460, at 121.

[468] One lawyer, who served as General Counsel to the FTC during this time, recalled that he was busy "either arguing that the Commission had the power to promulgate rules or taking alternative steps, but, of course, maintaining the consistent argument that Congress should clarify the matter once and for all and set down the manner in which the Commission could promulgate Trade Regulation Rules."  Ronald M. Dietrich, *Business and Trade Practices*, 28 FOOD DRUG COSM. L.J. 700, 701 (1973).

[469] Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 674 (D.C. Cir. 1973).

JA0548

joined by Chief Judge David Bazelon and Judge Spottswood Robinson, is a remarkable legal document. Judge Wright commenced with the usual disclaimers, observing that the FTC "is a creation of Congress, not a creation of judges' contemporary notions of what is wise policy. The extent of its powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background."[470] "As always," he continued, "we must begin with the words of the statute creating the Commission and delineating its powers."[471]

There followed a discussion of section 5 of the FTCA, which authorizes the FTC to adjudicate complaints and issue cease and desist orders. Judge Wright rejected the industry's claim that this section was the exclusive source of the FTC's authority to act with the force of law.[472] There was no language in section 5 indicating that it was exclusive, Judge Wright observed.[473] And of course there was section 6(g), which expressly gave the FTC general authority to "make rules and regulations for the purpose of carrying out" various provisions of the Act, including section 5.[474] Read together, Judge Wright explained, the two provisions suggest that the FTC could issue legislative rules that would then be applied and enforced in adjudications brought pursuant to section 5.[475]

Judge Wright then shifted gears, noting that this reading "is reinforced by the construction courts have given similar provisions in the authorizing statutes of other administrative agencies."[476] There followed a skillful exposition and selective quotation from *National Broadcasting*, *Storer Broadcasting*, *Texaco*, *American Trucking*, and *Mourning*, which he read as supporting his claim that the FTC should be allowed to promulgate binding legislative rules.[477] Not surprisingly, Judge Wright's opinion reflected no recognition of a central difference between the rulemaking grants given to the agencies in these cases and the FTC's general rulemaking grant: namely, that the rulemaking grants in those cases, unlike Section 6(g), were coupled with statutory provisions imposing sanctions for rule violations.

The legislative history of the FTCA, as we have seen, provides significant evidence that Congress did not intend to grant legislative rulemaking authority to the FTC.[478] Judge Wright nevertheless pro-

---

[470] *Id.* at 674.
[471] *Id.*
[472] *Id.* at 674–77.
[473] *Id.* at 675.
[474] *Id.* at 676.
[475] *Id.*
[476] *Id.* at 678.
[477] *Id.* at 680.
[478] For a discussion of this legislative history, see *supra* section III.C.1, pp. 504–09.

nounced this history to be "ambiguous" regarding the meaning of Section 6(g),[479] and then relegated the details to an appendix for the especially diligent reader to consult.[480]   Such ambiguity, he said, was not enough to overcome "the plain language of Section 6(g)," which, "read in light of the broad, clearly agreed-upon concerns that motivated passage of the Trade Commission Act, confirms the framers' intent to allow exercise of the power claimed here."[481]   In the end, Judge Wright adopted what amounted to a new canon: unless the legislative history reveals a clear intent to the contrary, courts should resolve any uncertainty about the scope of an agency's rulemaking authority in favor of finding a delegation of the full measure of power to the agency.

The immediate significance of *Petroleum Refiners* was short-lived. Congress soon mooted the issue by adopting the Federal Trade Improvement Act of 1975,[482] which expressly conferred legislative rulemaking powers on the FTC, subject to certain legislative and procedural limitations.[483]   But the importance of Judge Wright's opinion went far beyond its impact on the FTC's rulemaking powers.   His self-confident tone and masterful blending of Supreme Court precedents provided the roadmap for a more general erasure of the convention and invited other agencies, including the FDA, to assert generalized legislative rulemaking powers that Congress had not expressly granted.[484]

   *2. The FDA.* — The FDA's rulemaking story is both similar to and different from that of the FTC.   Much like the FTCA, the FDCA[485] included a facially ambiguous rulemaking grant that did not confer legislative rulemaking authority under the convention.[486]   Unlike the FTCA, however, the FDCA also included several *specific* rulemaking grants that did authorize legislative rulemaking under the convention.[487]   The drawback to these specific rulemaking grants, from the

---

[479] *Petroleum Refiners*, 482 F.2d at 686.

[480] *See id.* at 698.

[481] *Id.* at 686.

[482] Pub. L. No. 93-637, 88 Stat. 2183.

[483] *Id.* § 202, 88 Stat. at 2193–98 (codified as amended at 15 U.S.C. § 57a (2000)).

[484] Although *Petroleum Refiners* is the best-known decision of the D.C. Circuit broadly proclaiming that courts should presume congressional grants of general rulemaking powers to confer legislative rulemaking authority, it was followed by other, lesser-known decisions to the same effect. *See, e.g., In re* Permanent Surface Mining Regulation Litig., 653 F.2d 514, 523–25 (D.C. Cir. 1981) (en banc) (relying in part on *Mourning* and *Petroleum Refiners* to conclude that the general rulemaking grant in the Surface Mining Control and Reclamation Act confers legislative rulemaking powers); Citizens to Save Spencer County v. EPA, 600 F.2d 844, 873–74 (D.C. Cir. 1979) (holding that section 301(a)(1) of the Clean Air Act, which gives the EPA general rulemaking authority, authorizes the agency to adopt legislative rules imposing preconstruction review requirements).

[485] Ch. 675, 52 Stat. 1040 (1938).

[486] For a discussion of the FDA's general rulemaking grant and evidence that Congress intended it to be merely nonlegislative in nature, see *supra* section III.C.2, pp. 509–19.

[487] *See supra* note 244.

perspective of the agency, was that they required the agency to use formal rulemaking procedures when promulgating rules. Consistent with this understanding, for thirty years after the adoption of the FDCA the agency made no effort to use section 701(a) to promulgate legislative rules. Rather, it set policy through case-by-case adjudication, interpretive rulemaking, and legislative rulemaking under its specific rulemaking grants. Beginning in the 1960s and 1970s, however, the FDA — primarily in an effort to free itself from the formal procedural constraints that attached to the FDCA's specific rulemaking grants under section 701(e) — began to assert that section 701(a) authorized it to issue legislative rules using only informal notice-and-comment rulemaking procedures.[488]

*(a) The Debate over the FDA's Rulemaking Powers Under Section 701(a).* — The FDA's "belated discovery" of general rulemaking powers in section 701(a) stemmed largely from the entrepreneurial efforts of Peter Barton Hutt during his tenure as the FDA's chief counsel.[489] In a paper presented to the Food and Drug Law Institute in 1972, Hutt expounded the theory that the FDCA should be viewed as a "constitution" that gave the FDA broad authority to implement "a set of fundamental objectives."[490] Specifically, he argued that the Act gave the FDA power to do anything not excepted or withheld by the Act,[491] and he cited the general rulemaking clause in section 701(a) to support his conclusion that the Act "provide[d] ample legal authority" for the FDA to adopt procedures for the enforcement of FDCA requirements.[492]

Hutt's theory sparked a debate over the FDA's rulemaking authority[493] and drew strong criticism from industry attorneys.[494] For example, one attorney argued that "[i]t is for some a weird and dissonant note to hear that in the sensitive area of congressionally delegated authority, a well-motivated administrative agency can legally do what it alone deems desirable unless Congress has *in advance* specifically *prohibited* it."[495] Similarly, in a paper delivered at an FDA-sponsored

---

[488] *See* 1 JAMES T. O'REILLY, FOOD AND DRUG ADMINISTRATION § 4:02 (1979) ("The Food and Drug Administration grew during the late 1960s and the 1970s from a law enforcement agency which brought deterrent actions against violators, into a more paper-bound generator of rules and regulations.").

[489] *See id.*

[490] Hutt, *supra* note 397, at 178–79.

[491] *See id.* at 179. *See generally* 1 O'REILLY, *supra* note 488, § 4:03 n.33.

[492] Hutt, *supra* note 397, at 185.

[493] *See generally* 1 O'REILLY, *supra* note 488, § 4:02.

[494] *See, e.g.,* H. Thomas Austern, *Philosophy of Regulation: A Reply to Mr. Hutt,* 28 FOOD DRUG COSM. L.J. 189, 191 (1973) (describing Hutt's approach as "delegation running riot" (quoting Justice Cardozo)); Thompson, *supra* note 249, at 206–08 (arguing that Hutt "ignor[ed] the law as written by Congress").

[495] Austern, *supra* note 494, at 190–91.

conference on food labeling in 1973, another attorney criticized Hutt's view that the FDA could use section 701(a) to evade the procedural restrictions imposed by section 701(e) rulemaking proceedings.[496]

The debate surrounding the FDA's decision to use section 701(a) to expand its rulemaking powers reached the courts in the early 1970s.[497] The first major cases to touch on the issue were four related 1973 Supreme Court decisions usually referred to as the *Hynson Quartet*.[498] These cases assumed without discussion that the FDA had authority to issue legislative regulations under section 701(a). For example, in *Weinberger v. Hynson, Westcott & Dunning, Inc.*,[499] the Court upheld certain FDA regulations issued under section 701(a) — regulations setting forth standards and procedures pertaining to drug approval[500] — without considering the antecedent question whether section 701(a) granted the agency authority to issue the regulations.[501] None of Justice Douglas's opinions for the Court in the four cases squarely addressed the meaning of section 701(a), nor did they advert to the distinction among legislative and other types of rules. The Court's inattention to this issue is unsurprising in light of the parties' briefs, which addressed section 701(a) and the distinction between legislative and nonlegislative rules only in passing.[502]

Lawyers and scholars immediately began debating the significance of the *Hynson Quartet*, especially in conjunction with Judge Wright's opinion in *Petroleum Refiners*, decided the same year.[503] Some scholars, including Professor Kenneth Culp Davis, argued that the *Hynson Quartet* did not definitively resolve the scope of section 701(a), because

---

[496] *See* Thompson, *supra* note 249, at 207–12 (suggesting that this FDA action was "designed to circumvent and emasculate 701(e) and thereby to substitute the agency's judgment for the will of Congress").

[497] An earlier case, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 138, 147 (1967), arguably addressed the issue in dicta, describing FDA rules issued under the authority of section 701(a) as "self-operative" rules "that must be followed by an entire industry."

[498] USV Pharm. Corp. v. Weinberger, 412 U.S. 655 (1973); Weinberger v. Bentex Pharms., Inc., 412 U.S. 645 (1973); Ciba Corp. v. Weinberger, 412 U.S. 640 (1973); Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609 (1973).

[499] 412 U.S. 609 (1973).

[500] *See id.* at 612–18.

[501] *Id.* at 617–18 (asserting without discussion that the Commissioner was acting pursuant to his section 701(a) authority in issuing the regulations).

[502] *See* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 881 (2d Cir. 1981) (noting that the parties' discussion of section 701(a) and the legislative-interpretive distinction in the briefs of the *Hynson Quartet* was "meagre").

[503] *See, e.g.*, Becker, *supra* note 242, at 685 (concluding that the language in *Petroleum Refiners* indicates that a case involving section 701(a) of the FDCA might be decided the same way); *see also* Hutt, *Impact of Recent Court Decisions*, *supra* note 415, at 711–12 (contending that the Court "by its actions . . . made it quite clear as to its views on Section 701(a)"); Peter Barton Hutt, *Views on Supreme Court/FDA Decisions*, 28 FOOD DRUG COSM. L.J. 662, 663–66 (1973) [hereinafter Hutt, *Views on Supreme Court*] (explaining the decisions of the *Hynson Quartet* and their impact on the scope of the FDA's administrative authority).

the rules at issue "rested only in part on Section 701(a) and because the Court did not address itself to the question whether Section 701(a) was sufficient support for the rules."[504]   Others argued that the *Hynson Quartet* had definitively resolved the questions surrounding the meaning of section 701(a).[505]   In particular, Hutt contended that the *Hynson Quartet* invited the FDA to promulgate legislative rules under section 701(a).[506]   Hutt also pointed to *Petroleum Refiners* as a sign that the FDA would prevail in court if it attempted to use section 701(a) as a source of legislative rulemaking power.[507]

Hutt's prediction came true in *National Nutritional Foods Ass'n v. Weinberger*,[508] a Second Circuit case decided in 1975 by a panel composed of Judges Mansfield, Waterman, and Lumbard.[509]   The case involved an action brought by manufacturers and distributors of vitamins challenging FDA regulations promulgated under the authority of section 701(a); the regulations declared vitamins A and D in high doses to be "prescription drugs" within the meaning of section 503(b)(1) of the FDCA.[510]   The vitamin manufacturers and distributors alleged, inter alia, that the FDA had no authority to issue regulations having the force of law other than those promulgated under the formal rulemaking procedures of section 701(e).[511]   Writing for the court, Judge Mansfield concluded that section 701(a) did in fact authorize the FDA to

---

[504] 1 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 6:8, at 478 (2d ed. 1978).

[505] *See, e.g.*, 1 O'REILLY, *supra* note 488, § 4:02 ("From the standpoint of administrative powers, the 1973 Supreme Court cases resolved long-standing questions about the scope of § 701(a) and about the FDA's inherent authority to impose legislative rules on the drug industry."); *see also* Pharm. Mfrs. Ass'n v. FDA, 484 F. Supp. 1179, 1182 (D. Del. 1980) (citing cases from the *Hynson Quartet* for the proposition that section 701(a) "authorizes the Secretary to promulgate binding, substantive regulations").

[506] *See* Hutt, *Views on Supreme Court*, *supra* note 503, at 664 (noting that the Court's decisions permit the FDA to "issue regulations for the efficient and effective enforcement of the Food, Drug and Cosmetic Act [that] have *substantive* effect").

[507] *See* Hutt, *Impact of Recent Court Decisions*, *supra* note 415, at 717. Should a court strike down the FDA's legislative rulemaking powers under section 701(a), Hutt suggested (no doubt facetiously): "We will take all of our new regulations and deposit them with the Federal Trade Commission. Since they have jurisdiction over labeling as well as advertising, we will simply ask the FTC to repromulgate them." *Id.*

[508] 512 F.2d 688 (2d Cir. 1975).

[509] Although all three judges agreed that the FDA had legislative rulemaking authority under section 701(a), *see id.* at 695–98, Judge Lumbard wrote a concurring opinion arguing that in cases in which an agency engages in legislative rulemaking under a general rulemaking authorization, the courts should interpret the phrase "arbitrary, capricious, [or] an abuse of discretion" in the APA in such a way as to ensure that especially rigorous judicial review of agency action is provided, *id.* at 705 (Lumbard, J., concurring) (quoting 5 U.S.C. § 706(2)(A) (2000)) (alteration in original).

[510] *See Weinberger*, 512 F.2d at 691.

[511] *See id.* at 694.

promulgate binding regulations without complying with the procedural safeguards set forth in section 701(e).[512]

In reaching this conclusion, Judge Mansfield relied on three factors. First, he noted that while courts had once demanded proof of a specific delegation of legislative authority to an agency purporting to issue legislative rules, modern courts "have learned from experience to accept a general delegation as sufficient in certain areas of expertise."[513] Second, he observed that "over the last decade rule-making has been increasingly substituted for adjudication as a regulatory technique, with the support and encouragement of courts" in cases such as *Petroleum Refiners*.[514] Third, he concluded that any "doubts . . . regarding the FDA's power under § 701(a) to promulgate binding regulations were dispelled" by the Supreme Court's decisions in the *Hynson Quartet*.[515]

One factor that did not significantly influence the Second Circuit's holding in *Nutritional Foods* was the legislative history of the FDCA, which, as we have seen, provides strong evidence that Congress intended to grant legislative rulemaking authority to the FDA *only* pursuant to specific rulemaking grants.[516] Judge Mansfield made just one brief reference to the legislative history in his opinion, observing that the court's attention had not been directed to anything in the legislative history of sections 701(a) or (e) that militated against the court's decision.[517]

After *Nutritional Foods*, many courts treated the issue of the FDA's legislative rulemaking authority under section 701(a) as settled.[518] But, perhaps because of the court's failure to address the crucial legislative history — and because of the possibility of Supreme Court review in some future case — other interested observers, including both scholars and FDA officials, did not view the issue as completely re-

---

[512] *See id.* at 695–98.

[513] *Id.* at 696.

[514] *Id.* at 698.

[515] *Id.* at 696.

[516] *See supra* section III.C.2, p. 515–16.

[517] *Weinberger*, 512 F.2d at 698. Although the discussion of section 701(a)'s legislative history was cursory in the parties' briefs, the appellant did in fact devote a few pages of its brief to the issue of section 701(a) and its legislative history. *See* Brief for Plaintiffs-Appellants at 39–43, *Weinberger*, 512 F.2d 688 (2d Cir. 1975) (No. 74-1738).

[518] *See, e.g.*, Nat'l Nutritional Foods v. Califano, 603 F.2d 327, 333 (2d Cir. 1979) ("Appellants do not, indeed cannot, challenge that the FDA has power under § 701(a) to issue legislative rules to implement § 403(a)."); Nat'l Confectioners Ass'n v. Califano, 569 F.2d 690, 695 (D.C. Cir. 1978) (acknowledging the authority of the FDA under section 701(a) to impose mandatory source coding and recordkeeping requirements on confectioners); United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 246–48 (2d Cir. 1977) (reading section 701(a) as authorizing binding regulations); Cosmetic, Toiletry & Fragrance Ass'n v. Minnesota, 440 F. Supp. 1216, 1221 (D. Minn. 1977) (recognizing the FDA's authority to promulgate "substantive regulations" that are "reviewable only under the arbitrary and capricious standard").

solved. Dialogue continued into the early 1980s about the FDA's rulemaking powers and the courts' apparent transformation of section 701(a).[519]

*(b) Pharmaceutical Manufacturers.* — The debate over section 701(a) culminated in 1981 when the Second Circuit decided yet another case involving the FDA's powers. Congress had passed various amendments to the FDCA in 1962, including an amendment that deemed a drug adulterated if its packaging, processing, holding, or manufacturing failed to conform to "current good manufacturing practice" (CGMP).[520] The amendment did not give the FDA the power to promulgate CGMPs through rulemaking. Rather, the legislative history indicates that Congress expected the FDA to rely on its existing powers under section 701(a) when implementing the statutory provisions dealing with CGMPs.[521]

This legislative history does not necessarily demonstrate, however, that Congress thought section 701(a) authorized *legislative* rules. The original Senate bill would have allowed the FDA to adopt CGMPs only as interpretive rules.[522] The Kennedy Administration objected, arguing that this proposal would invite "endless de novo litigation on the question what constitutes good manufacturing practice each time there is an enforcement action under the new quality control mechanism."[523] The administration proposed that CGMP rules be issued as binding regulations under the formal rulemaking procedures of section 701(e), and the House bill reflected this approach.[524] But the Senate committee balked at the prospect of requiring formal rulemaking and proposed a third approach: that the FDA be authorized to adopt regulations under the authority of section 701(a). Significantly, however, in accepting the section 701(a) approach, neither the Senate committee report nor the floor debate in either chamber characterized section 701(a) as authorizing legislative regulations. Instead, the effect of such regulations was deliberately left ambiguous. As Representative Schenk stated in the House:

> I favor the approach adopted by the Senate under which this determination is made pursuant to section 701(a) of the act. This procedure permits

---

[519] *See, e.g.,* Peter Barton Hutt, *Food and Drug Regulation in Transition,* 35 FOOD DRUG COSM. L.J. 283, 294 (1980) (implying that Congress need not act in order to legitimize courts' decisions regarding the FDA); Merrill, *supra* note 14, at 273–75 (discussing the plausibility of a nonlegislative interpretation of section 701(a) and describing the courts' transformation of section 701(a) into a legislative rulemaking grant as "puzzling").

[520] Drug Amendments of 1962, Pub. L. No. 87-781, § 101, 76 Stat. 780, 781 (codified at 21 U.S.C. § 351(a) (2000)).

[521] *Id.* at 882–84.

[522] S. REP. NO. 1744, pt. 2, at 9 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2884, 2890.

[523] *Id.* at 3–4.

[524] H.R. REP. NO. 2464, at 2 (1962).

> the Secretary to issue such regulations as he desires and their scope and effect will be the same as that of other regulations issued under such general authority. This procedure is more flexible. Numerous regulations have been issued under this section and they have been the subject of consideration and application in the courts in actions arising under the various provisions of the act not now subject to formal rulemaking procedures.[525]

In other words, Congress effectively punted on the legal status of CGMP rules, leaving the issue to be resolved by the courts.

The Second Circuit obliged in *National Association of Pharmaceutical Manufacturers v. FDA*.[526] The plaintiffs challenged various CGMPs adopted by notice-and-comment rulemaking conducted under section 701(a), on the ground that this provision authorized only interpretive, not legislative, rules.[527] In support, they mustered an exhaustive review of the legislative history of the 1938 Act and the FDA's historical interpretation of this grant as encompassing only interpretive and procedural rules.[528]

In a lengthy opinion by Judge Friendly, the Second Circuit again upheld the power of the FDA to issue legislative rules pursuant to section 701(a). Judge Friendly admitted at the outset that "[i]n the interest of historical accuracy, it should be noted that at one time it was widely understood that generalized grants of rulemaking authority conferred power only to make rules of a procedural or an interpretative nature, and not binding substantive regulations, for which a specific delegation was thought necessary."[529] However, reading the language of section 701(a) "with the eyes of 1980," Judge Friendly concluded that this section did in fact give the FDA the power to issue both "substantive as well as procedural" regulations.[530]

Judge Friendly based this conclusion primarily on arguments drawn from precedent. He began by reviewing numerous non-FDA cases involving facially ambiguous rulemaking grants, including *National Broadcasting*, *American Trucking*, and *Petroleum Refiners*.[531] He read these decisions to stand for the proposition that general rulemaking provisions are ordinarily understood "to endow agencies with power to issue binding rules and regulations."[532] Notably, Judge

---

[525] 108 CONG. REC. 21,057 (Sept. 27, 1962) (remarks of Rep. Schenck); *see also* S. REP. NO. 1744, pt. 2, at 4 (1962); 108 CONG. REC. 17,365 (Aug. 23, 1962) (remarks of Sen. Eastland) ("As in the case of other regulations, the courts in the final analysis will pass upon the scope and effect of such regulations.").

[526] 637 F.2d 877 (2d Cir. 1981).

[527] *Id.* at 879, 884.

[528] *See id.* at 882–86.

[529] *Id.* at 880.

[530] *Id.* at 879.

[531] *Id.* at 880.

[532] *Id.*

Friendly discussed these cases at length even though the parties had cited only one, *American Trucking*, in their briefs.[533]  Judge Friendly's invocation of non-FDA cases not briefed by the parties suggests that he aspired to build on Judge Wright's *Petroleum Refiners* opinion and develop a canon of interpretation regarding general rulemaking grants with applications beyond FDA cases.  Judge Friendly also relied on the Supreme Court's decisions in *Abbott Laboratories* and the *Hynson Quartet* as well as the Second Circuit's earlier decision in *Nutritional Foods*,[534] describing these FDA cases as "formidable authority to the effect that § 701(a) itself is a grant of power to issue binding regulations."[535]

Only after considering these precedents did Judge Friendly turn to the legislative history of the FDCA.  He acknowledged that "if the 1962 Congress had made the detailed examination of the legislative history and contemporary understanding of the 1938 Act, which plaintiffs' counsel have now made at long last, it might well have concluded that § 701(a) in fact very likely was not intended to confer power to issue binding substantive rules."[536]  But it was not clear, he continued, whether the Congress that passed the CGMP amendments in 1962 was familiar with the 1938 history.[537]  In any event, the belated excavation of the legislative history, Judge Friendly asserted, was insufficient to overcome the force of stare decisis created by the Supreme Court's decisions construing ambiguous rulemaking grants to confer legislative powers; nor should that history invalidate more specific rulings such as *Nutritional Foods*.[538]

Given Judge Friendly's acknowledgement that the ruling conflicted with the original understanding of section 701(a), his decision constituted an even more dramatic reversal of the *Queen and Crescent Case* canon than did Judge Wright's opinion in *Petroleum Refiners*.  Judge Wright had suggested that facially ambiguous rulemaking grants should be presumed to confer legislative rulemaking power unless clear evidence to the contrary existed in the legislative history.[539]  Judge Friendly appeared to say that facially ambiguous rulemaking grants should be construed to confer legislative rulemaking power,

---

[533] *See* Pet. for Reh'g with Suggestion for Reh'g En Banc 7–9, *Pharmaceutical Manufacturers*, 637 F.2d 877 (2d Cir. 1981) (No. 80-6090) ("[W]e respectfully request that Rehearing and Reargument be granted herein in view of the fact that the Court's decision was (erroneously we believe) based upon cases which the parties did not cite to this Court . . . .").

[534] *Pharmaceutical Manufacturers*, 637 F.2d at 880–82.

[535] *Id.* at 880.

[536] *Id.* at 885 (citation omitted).

[537] *Id.* at 887.

[538] *See id.* at 888.

[539] *See* Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 689–90 (D.C. Cir. 1973).  For a full discussion of the case, see *supra* pp. 554–57.

even in the face of clear evidence to the contrary in the legislative history. In effect, *Pharmaceutical Manufacturers* adopted what we have called the *Petroleum Refiners* canon in full-blown form as an express statement rule: all rulemaking grants are conclusively presumed to confer legislative rulemaking authority unless Congress expressly indicates in the text of the statute that the grant is limited to procedural and interpretive rules.

*3. The NLRB.* — Much like the FDA and the FTC, the NLRB claimed no general rulemaking powers in its early years, in keeping with the understanding that the NLRA did not grant the NLRB legislative rulemaking powers.[540] From its creation in 1935 through the early 1970s, the NLRB formulated policy exclusively through adjudication.

Beginning in the 1960s and continuing through the 1980s, numerous scholars urged the NLRB to turn to rulemaking to formulate its policy.[541] Most of the arguments advanced by these proponents focused on the utility of rulemaking, which assertedly yielded greater precision, certainty, uniformity, and longevity than did adjudication.[542]

Only a few scholars attended to the threshold issue of whether the NLRB in fact had legislative rulemaking power.[543] In the face of the legislative history indicating that Congress had not given the NLRB such authority when creating it in 1935, these scholars pointed to an amendment to section 6(a) of the NLRA added by the Taft-Hartley Act in 1947.[544] As amended, the rulemaking grant read: "The Board shall have authority from time to time to make, amend, and rescind, *in the manner prescribed by the Administrative Procedure Act,* such rules and regulations as may be necessary to carry out the provisions of this

---

[540] For a discussion of why the NLRB's general rulemaking grant is nonlegislative, see *supra* section III.C.2, p. 511.

[541] *See, e.g.,* Bernstein, *supra* note 414, at 620–22; Samuel Estreicher, *Policy Oscillation at the Labor Board: A Plea for Rulemaking,* 37 ADMIN. L. REV. 163 (1985); Cornelius J. Peck, *A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making,* 117 U. PA. L. REV. 254 (1968) [hereinafter Peck, *Critique*]; Cornelius J. Peck, *The Atrophied Rule-Making Powers of the National Labor Relations Board,* 70 YALE L.J. 729 (1961) [hereinafter Peck, *Atrophied Rule-Making*]; Silverman, *supra* note 414, at 607; *cf.* Note, *NLRB Rulemaking: Political Reality Versus Procedural Fairness,* 89 YALE L.J. 982 (1980) (summarizing the controversy and arguing that congressional consideration of mandatory NLRB rulemaking must balance procedural fairness against the NLRB's desire to minimize congressional and judicial intervention in its policies).

[542] *See, e.g.,* Charles J. Morris, *The NLRB in the Dog House — Can an Old Board Learn New Tricks?,* 24 SAN DIEGO L. REV. 9, 27–42 (1987) (describing eleven benefits of rulemaking); Peck, *Critique, supra* note 541, at 272–75.

[543] *See, e.g.,* Fuchs, *supra* note 415, at 798; Peck, *Critique, supra* note 541, at 260–61; *see also* Peck, *Atrophied Rule-Making, supra* note 541, at 732–33.

[544] Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136.

Act."[545] These scholars argued that the addition of the reference to the APA, which prescribed the manner of adopting only legislative rules, would be meaningless unless it also referred to the adoption of legislative rules.[546] Thus, the 1947 amendment was said to embody Congress's understanding that section 6(a) conferred legislative rulemaking authority on the NLRB.[547]

This argument fails, however, for two reasons. First, it ignores the fact that the APA *does* impose certain procedural requirements on the manner of adopting procedural and interpretive rules. Section 3(a)(2) of the APA requires that "the nature and requirements of all formal or informal procedures" be published in the Federal Register; section 3(a)(3) requires the same for "statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public."[548] Thus, the added reference to the APA would *not* be meaningless when applied to procedural and interpretive rules adopted under the authority of section 6(a).[549] Second, the argument ignores that an anti-labor, Republican-led Congress passed the Taft-Hartley Act in order to address "what many viewed as a tendency by the NLRB toward overzealous regulation of employer conduct through its unfair labor practice jurisdiction."[550] It is implausible that Congress would have chosen to grant the NLRB expanded rulemaking powers in 1947 given that the primary objective of the Taft-Hartley Act was to rein in the NLRB.

---

[545] *Id.* sec. 101, § 6, 61 Stat. at 140 (emphasis added to show language added by the 1947 amendment to the original section, National Labor Relations Act, ch. 372, § 6, 49 Stat. 449, 452 (1935) (codified as amended at 29 U.S.C. § 156 (2000))).

[546] Section 4(a) of the APA exempts "interpretative rules, general statements of policy, rules of agency organization, procedure, or practice" from notice-and-comment requirements; section 4(c) requires advance publication of "substantive" rules only. Administrative Procedure Act, ch. 324, § 4, 60 Stat. 237, 239 (1946) (codified as amended at 5 U.S.C. § 552(a) (2000)).

[547] *See* Fuchs, *supra* note 415, at 798; Peck, *Atrophied Rule-Making, supra* note 541, at 732–33.

[548] Administrative Procedure Act, § 3, 60 Stat. at 238 (codified as amended at 5 U.S.C. § 552(a)).

[549] Title VII of the Civil Rights Act of 1964 contains a rulemaking grant that is *expressly* limited to procedural rules; this grant also provides that "[r]egulations issued under this section shall be in conformity with the standards and limitations of" the APA. 42 U.S.C. § 2000e-12(a) (2000). Thus, Congress in 1964 evidently saw no incongruity in authorizing an agency to make rules exempt from notice-and-comment requirements under, but in conformity with, the APA. *See* Edelman v. Lynchburg College, 122 S. Ct. 1145, 1150 n.7 (2002) (noting both the conformity requirement and the exemption).

[550] ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW 5 (1976). Gorman explains:
> The years after 1935 witnessed a dramatic increase in union membership, greater use of the strike, and a post-war proliferation of work-assignment disputes between unions, secondary boycotts, mass picketing, and some corruption and undemocratic practices in internal union affairs . . . . Congressional reaction become manifest in a number of post-war labor bills and finally in the enactment of the Taft-Hartley Act in 1947, reaffirmed over a veto by President Truman.

*Id.*

Later, Congress joined scholars in pressuring the NLRB to resort to rulemaking. In 1977, the House adopted a bill called the Labor Reform Act,[551] which would have required the NLRB to promulgate rules with specified purposes, such as defining appropriate bargaining units and expediting elections. The Act did not clarify or seek to change the language of the NLRB's general grant of rulemaking powers found in section 6(a); rather, it sought to encourage the agency to use its preexisting section 6(a) rulemaking powers, which the drafters implicitly assumed to include legislative rulemaking. For example, the bill provided that the NLRB "shall, to the fullest extent practicable, exercise its authority under [its general rulemaking grant in section 6(a)] to promulgate rules declaring certain units to be appropriate for the purposes of collective bargaining."[552] Although the Senate defeated the bill after six cloture attempts,[553] the effort served as an important barometer of the pressure exerted at the time to force the NLRB to resort to rulemaking.[554]

The judiciary represented a final source of pressure on the NLRB to resort to rulemaking. Most prominently, Judge Friendly authored numerous opinions urging the NLRB to use its rulemaking powers to issue legislative rules.[555] Perhaps the most influential judicial stimulus to use legislative rulemaking, however, came in 1969 when the Supreme Court decided *NLRB v. Wyman-Gordon Co.*[556] *Wyman-Gordon* began as an NLRB adjudication in which the NLRB enforced its so-called *Excelsior Underwear* rule, which required employers to furnish unions with the names and addresses of employees eligible to vote in bargaining elections.[557] The rule originated in *Excelsior Underwear*,[558] a prior adjudication in which the NLRB had announced the rule but limited its operation to future cases.[559]

The employer in *Wyman-Gordon* challenged the *Excelsior Underwear* rule on the ground that the NLRB had in effect engaged in rulemaking without complying with the procedures required by the

---

[551] Labor Reform Act of 1977, H.R. 8410, 95th Cong. (1977); *see also* H.R. REP. NO. 95-637, at 5–6 (1977).

[552] H.R. 8410, *supra* note 551, § 3.

[553] Note, *supra* note 541, at 987 n.30.

[554] Unlike the Federal Trade Improvement Act (FTIA), *see supra* note 482 and accompanying text, the failed Labor Reform Act does not provide indirect evidence that the NLRB was regarded as lacking legislative rulemaking powers. Unlike the FTIA, it did not grant the Board new powers, but merely urged the NLRB to use its preexisting section 6 powers.

[555] *See, e.g.*, NLRB v. Penn Cork & Closures, Inc., 376 F.2d 52, 57 (2d Cir. 1967); NLRB v. Majestic Weaving Co., 355 F.2d 854, 859–61 (2d Cir. 1966); NLRB v. Lorben Corp., 345 F.2d 346, 349 (2d Cir. 1965) (Friendly, J., dissenting).

[556] 394 U.S. 759 (1969).

[557] *See id.* at 761–62.

[558] Excelsior Underwear Inc., 156 N.L.R.B. 1236 (1966).

[559] *Id.* at 1240 n.5.

APA.[560]  This challenge produced a deeply split Supreme Court deci-
sion.[561]  Ultimately, seven members of the Court upheld the applica-
tion of the *Excelsior Underwear* requirement in *Wyman-Gordon*.[562]
However, six Justices strongly criticized the NLRB for not adopting its
*Excelsior Underwear* rule by notice-and-comment rulemaking.[563]  Not
surprisingly, some commentators heralded *Wyman-Gordon* as recogniz-
ing that the NLRB possessed legislative rulemaking powers.[564]

Immediately after *Wyman-Gordon*, the NLRB gave in to the pleas
for rulemaking and promulgated a minor jurisdictional rule declaring
that it would assert jurisdiction in proceedings involving private, non-
profit colleges and universities with gross annual revenues of one mil-
lion dollars or more.[565]  Two additional narrow jurisdictional rules
soon followed.[566]  Although each of these rules was couched in proce-
dural terms, they carried legislative effect in that they announced how
the NLRB would exercise its enforcement authority in the future.

Then the Supreme Court decided *NLRB v. Bell Aerospace Co.*[567]
Reversing a Second Circuit decision authored by Judge Friendly that
had directed the NLRB to engage in rulemaking,[568] the Court reaf-
firmed in strong terms the NLRB's discretion to announce new princi-
ples through adjudication.[569]  The agency happily reverted to its old

---

[560] *See Wyman-Gordon*, 394 U.S. at 762. The NLRB explained that it decided to use adjudica-
tion rather than rulemaking because it viewed rulemaking as "too rigid and inflexible for most of
the problems with which it is concerned." Brief for the National Labor Relations Board 14–15,
*Wyman-Gordon*, 394 U.S. 759 (1969) (No. 463).

[561] Justice Fortas wrote a plurality opinion in which Chief Justice Warren and Justices Stewart
and White joined. Justice Black wrote an opinion concurring in the result, in which Justices
Brennan and Marshall joined, and Justices Douglas and Harlan each wrote a dissenting opinion.
*Wyman-Gordon*, 394 U.S. 759 (1969).

[562] The seven votes derived from Justice Fortas's plurality opinion plus Justice Black's concur-
ring opinion. *See id.* at 766; *id.* at 769 (Black, J., concurring).

[563] The six votes derived from Justice Fortas's plurality opinion plus Justice Douglas's and Jus-
tice Harlan's separate dissenting opinions. *See id.* at 764–65; *id.* 775–76; *id.* 780–81. The NLRB
argued that even if its *Excelsior* requirement did represent a rule rather than an order, this was at
most a *procedural* rule — not a legislative one — and thus was exempt from the notice-and-
comment requirements of the APA. *See* Brief for the National Labor Relations Board, *supra* note
560, at 30–31.

[564] *See, e.g.*, Bernstein, *supra* note 414, at 604 ("*Wyman-Gordon* suggests that rule making —
instead of adjudication — may be required in some circumstances.").

[565] Jurisdictional Standards, Colleges and Universities, 35 Fed. Reg. 18,370 (Dec. 3, 1970) (codi-
fied at 29 C.F.R. § 103.1 (2001)).

[566] One rule provided that the NLRB would assert jurisdiction in proceedings involving sym-
phony orchestras with gross annual revenues of not less than one million dollars, Jurisdictional
Standards, Symphony Orchestras, 38 Fed. Reg. 6177 (Mar. 7, 1973) (codified at 29 C.F.R. § 103.2
(2001)); the other stated that the NLRB would not assert jurisdiction in any proceeding involving
the horseracing and dogracing industries, Jurisdictional Standards, Horseracing and Dogracing
Industries, 38 Fed. Reg. 9507 (Apr. 17, 1973) (codified at 29 C.F.R. § 103.3 (2001)).

[567] 416 U.S. 267 (1974).

[568] Bell Aerospace Co. v. NLRB, 475 F.2d 485, 495–97 (2d Cir. 1973).

[569] *Bell Aerospace*, 416 U.S. at 290–95.

practice of using adjudication to announce new principles and standards.[570]

In 1987, however, the NLRB decided once again to test the scope of its rulemaking powers. The result was the NLRB's first broad-scale legislative rule, which specified the employee bargaining units it would find appropriate in various kinds of health care facilities and hospitals.[571]  In the Notice of Proposed Rulemaking, the NLRB explained that its authority to promulgate the rule derived from the general rulemaking grant in section 6 of the NLRA.[572]  The agency also noted that for years members of Congress, the courts, and scholars had urged it to engage in rulemaking.[573]

The American Hospital Association challenged the validity of the NLRB's rule on three grounds: that section 9(b) of the NLRA requires the NLRB to make bargaining unit determinations "in each case" and therefore precludes the board from using rules to define bargaining units; that the rule violated a congressional admonition to the NLRB to avoid the undue proliferation of bargaining units in the health care industry; and that the rule was arbitrary and capricious.[574]  The Association did not raise the more fundamental question whether the NLRB possessed legislative rulemaking authority in the first place. Rather, the parties, the Seventh Circuit, and the Supreme Court all assumed that Congress had given the NLRB the power to promulgate legislative rules.[575]  Writing for the Seventh Circuit, Judge Posner remarked that "there is broad although not unanimous agreement in the legal community, which we and other courts have remarked approvingly, that the exercise of the Board's dormant substantive rulemaking power is long overdue."[576]  Similarly, Justice Stevens, writing for the Supreme Court, noted in one perfunctory sentence that the general rulemaking grant given to the NLRB "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act," which limitation the Court did not find.[577]

---

[570] *See* Grunewald, *supra* note 16, at 274–76.

[571] *See* Appropriate Bargaining Units in the Health Care Industry, 52 Fed. Reg. 25,142, 25,149 (July 2, 1987) (codified at 29 C.F.R. § 103.30 (2001)).

[572] *Id.* at 25,144.

[573] *Id.* at 25,144–45.

[574] Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 608–09 (1991).  The court rejected all three arguments and upheld the validity of the rule. *Id.*

[575] *See* Am. Hosp. Ass'n v. NLRB, 899 F.2d 651, 655 (7th Cir. 1990) ("The industry does not argue that the [general rulemaking] power is confined to nonsubstantive matters or has atrophied from disuse . . . ."); *see also American Hospital*, 499 U.S. at 609–10; Grunewald, *supra* note 16, at 294–95 (noting that the authority of the NLRB to engage in rulemaking is "not in doubt" because of section 6 of the NLRA).

[576] *American Hospital*, 899 F.2d at 655.

[577] *American Hospital*, 499 U.S. at 610.

JA0562

The willingness of the parties in *American Hospital* to accept that the NLRB had been delegated legislative rulemaking powers most likely stemmed from two sources. First, the pathbreaking opinions of Judges Wright and Friendly that had treated ambiguous rulemaking grants as presumptively authorizing legislative rules had by then been on the books for a decade or more.[578]  Second, although *Wyman-Gordon* did not expressly consider the NLRB's rulemaking powers under section 6(a), the opinions in that case, as well as the Court's treatment of the rulemaking versus adjudication issue in *Bell Aerospace*, implicitly suggested that the NLRB possessed legislative rulemaking powers. Thus, by the time the Court decided *American Hospital* in 1991, counsel for the Association no doubt concluded it was not worth the effort to challenge the NLRB's exercise of legislative rulemaking powers.  As a consequence, the courts, guided as usual by the submissions of the parties, apparently did not perceive any issue of authority either.

## VI. TAX EXCEPTIONALISM

Although the successful assumption of legislative rulemaking powers by the FTC, FDA, and NLRB would appear to reflect a complete triumph of the view that facially ambiguous rulemaking grants confer legislative power, at least one important vestige of the earlier understanding remains.  The tax world continues to adhere to the notion that the facially ambiguous general rulemaking grant in section 7805(a) of the Internal Revenue Code (IRC) confers only interpretive, not legislative, rulemaking authority.[579]

---

[578] *See supra* pp. 554–57, 562–65.

[579] *See generally* MICHAEL I. SALTZMAN, IRS PRACTICE AND PROCEDURE ¶ 3.02[4][a]–[b] (2d ed. 1991) (explaining that regulations issued pursuant to a specific authorization in particular sections of the IRC are "legislative or substantive" and that those issued under the IRC's general grant of rulemaking authority are "interpretative"); Ellen P. Aprill, *Muffled* Chevron: *Judicial Review of Tax Regulations*, 3 FLA. TAX REV. 51, 56–57 (1996) ("Regulations promulgated under the general authority of section 7805(a) are considered interpretive, and regulations promulgated pursuant to a grant of authority under a particular code section are considered legislative." (footnote omitted)); Linda Galler, *Emerging Standards for Judicial Review of IRS Revenue Rulings*, 72 B.U. L. REV. 841, 849 n.53 (1992) ("It has generally been assumed that Treasury regulations adopted pursuant to I.R.C. § 7805(a) are interpretive, while Treasury regulations adopted pursuant to specific delegations of rulemaking authority are legislative."); *see also* John F. Coverdale, *Court Review of Tax Regulations and Revenue Rulings in the* Chevron *Era*, 64 GEO. WASH. L. REV. 35, 69–70 (1995) (citing and summarizing authorities in support of the distinction between general authority regulations and specific authority regulations and the deference given to each type).

**JA0563**

## A. *Section 7805(a) of the Internal Revenue Code*

Section 7805(a) of the IRC grants the Secretary of the Treasury the power to "prescribe all needful rules and regulations for the enforcement" of the tax laws.[580]  This general grant of rulemaking authority appears to have originated in section 1005 of the Revenue Act of 1917,[581] which gave the Commissioner of Revenue the power to promulgate, with the approval of the Secretary of the Treasury, "all needful rules and regulations for the enforcement of the provisions of this Act."[582]  Congress did not attach any statutory sanctions to violations of the regulations promulgated under this general grant.  In contrast, sections 1001 and 1002 of the 1917 Act included specific grants of authority for the Commissioner to regulate returns,[583] and section 1004 attached penalties to the failure to make any returns required by regulation.[584]  Under the convention described in Part III of this Article, therefore, the general grant conferred only interpretive power upon the Commissioner, while the specific grants conferred legislative power. The Revenue Act of 1918[585] and the Revenue Act of 1921[586] included the same combination of general and specific rulemaking grants, using similar language.[587]

When Congress sought to include the usual mixture of rulemaking grants in the Revenue Act of 1924, debate and confusion arose over whether a general grant of rulemaking authority would give the Commissioner the power to promulgate binding regulations.  In particular, Representative Deal expressed concern that the general rulemaking grant would give the Commissioner too much power.[588]  During debates on the House floor, Representative Deal argued:

> These regulations of the Internal Revenue Department have the force of law and subject the taxpayer to a prison penalty if he violates them.  It is nothing more or less than law.  I believe Congress should write the law and not leave it to the Internal Revenue Department. . . . These regulations are binding on the taxpayer and not upon the revenue department. It can change the rules from year to year, month to month, week to week,

---

[580] I.R.C. § 7805(a) (2000).

[581] Ch. 63, 40 Stat. 300.

[582] *Id.* § 1005, 40 Stat. at 326.

[583] *Id.* §§ 1001–1002, 40 Stat. at 325.

[584] *Id.* § 1004, 40 Stat. at 325–26.

[585] Ch. 18, 40 Stat. 1057 (1919).

[586] Ch. 136, 42 Stat. 227, 309.

[587] *See* Revenue Act of 1918, § 1308, 40 Stat. at 1143; Revenue Act of 1921, §§ 1302–1303, 42 Stat. at 309. Like the Revenue Act of 1917, the 1918 Act did not attach any statutory sanctions to violations of the rules and regulations promulgated under the general rulemaking grant. Yet penalties were provided in the 1918 Act for violations of rules and regulations promulgated under specific rulemaking grants. Like the 1917 and 1918 Revenue Acts, the 1921 Act attached statutory sanctions only to rules and regulations promulgated under certain specific rulemaking grants.

[588] 65 CONG. REC. 3333–34 (1924).

and every morning before breakfast if they feel like doing it. The tax-payer has no redress and they never know what the law is.[589]

To remedy this perceived threat to the taxpayer, Deal proposed an amendment providing that regulations issued under the general grant "shall not enlarge or modify any of the provisions of this act and of any other law, and all such rules and regulations and all amendments thereto shall be annually reported to Congress."[590] The House ulti-mately agreed to Deal's proposed amendment, but the Senate declined to modify the general rulemaking grant.[591] Senator Smoot noted dur-ing floor debate that the modification was unnecessary because "[n]o officer of the Government can make any rule or any regulation in vio-lation of the law itself with any binding force."[592]

When the Conference Committee reconciled the differences be-tween the House and Senate versions of the general grant, the Senate version won out, and Deal's proposed amendment was rejected.[593] But Deal did not give up. In 1925 and again in 1927, he persisted with his arguments against the general rulemaking grant.[594] In par-ticular, he continued to advance his contention that citizens could po-tentially face criminal punishment for violating any of the Treasury Department's rules or regulations.[595] Yet each year, Deal failed to per-suade a congressional majority that the general rulemaking grant given to the Commissioner was problematic. Although we can only speculate about why Deal's arguments lacked majority support, the

---

[589] *Id.* at 3333.

[590] *Id.* at 3334.

[591] 65 CONG. REC. 7141 (1924).

[592] *Id.* at 7140.

[593] Revenue Act of 1924, H.R. 6715, § 1001, 68th Cong.

[594] *See* 67 CONG. REC. 1146–47 (1925); 69 CONG. REC. 438–43 (1927).

[595] Mr. Deal's arguments consumed several pages of the Congressional Record. One of his more forceful arguments was the following:

> Twenty thousand three hundred and eleven laws enacted by four separate units in the Internal Revenue Department, without concert of action, coordination of effort, or re-sponsibility, these appointees of the Executive, who can not be reached by the votes of the people, are secretly making laws at will, laws not to be published, laws that can be changed in an hour. Under this condition or plan or system, this department has as-sumed to increase taxes, exempt from taxes, write law, unwrite law, apply the laws of Congress, or ignore the laws of Congress accordingly to the whims, fancies, enmities, or favoritisms of somebody in the Internal Revenue Department, unknown to and un-reachable by the voters of the United States. Do not understand me, Mr. Chairman, to reflect, or intend to reflect, upon the Secretary of the Treasury, or the efficient honest employees in this service. I am not. It is the system that I criticize, a system that invites corruption, injustice, oppression, destruction. A vicious system unworthy of any civi-lized nation. It is the duty of Congress to wipe out the system, and *this may be done in part by withholding the blanket grant of power to the Commissioner of Internal Revenue to make rules and regulations.*

69 CONG. REC. 440 (1927) (emphasis added).

answer may be that many of the key players understood that the general grant conferred only interpretive authority.[596]

When the IRC was enacted in 1939 and subsequently amended in 1954, Congress continued to attach statutory sanctions solely to rules and regulations promulgated under specific rulemaking grants. Under the convention's framework, this absence of sanctions leads to the conclusion that the rules and regulations promulgated under section 7805(a)'s general rulemaking grant are interpretive, which is in fact the common understanding today among tax lawyers.

## B. *The Supreme Court Confirms That Section 7805(a) Is Interpretive*

Notwithstanding the gradual repudiation of the convention outside the tax world, the revisionism of Judges Wright and Friendly is unlikely to spread to the IRC. One reason for this resistance is that, in contrast to what happened in the regulatory context, the Supreme Court has endorsed the outcome dictated by the convention in decisions explicating the meaning of section 7805(a) of the IRC. For example, in *Rowan Cos. v. United States*,[597] the Court noted that "the Commissioner interpreted Congress' definition [of the word 'wages'] only under his general authority to 'prescribe all needful rules.' 26 U.S.C. § 7805(a)."[598] Because the regulation was merely interpretive, the Court held that it deserved "less deference than a regulation issued under a specific grant of authority."[599] Similarly, in *United States v. Vogel Fertilizer Co.*,[600] the Court considered a regulation, issued by the Commissioner under section 7805(a), which interpreted the statutory term "brother-sister controlled group."[601] The Court again observed that because the Commissioner had issued the regulation under his general rulemaking grant, the interpretation was entitled to "less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision."[602]

*Vogel Fertilizer* and *Rowan* confirm that in the tax world — in contrast to other administrative realms — a facially ambiguous general

---

[596] The House and Senate Offices of Legislative Counsel, which were fully institutionalized by this time, were especially active in consulting with the leadership on revenue bills. *See* KOFMEHL, *supra* note 265, at 183. If, as we have speculated, *see supra* pp. 520–23, the attorneys in these offices played a critical role in implementing the convention, then this may explain why the leadership saw no merit in Deal's amendments.

[597] 452 U.S. 247 (1981).

[598] *Id.* at 253.

[599] *Id.*

[600] 455 U.S. 16 (1982).

[601] *Id.* at 24.

[602] *Id.* (quoting *Rowan*, 452 U.S. at 253) (internal quotation marks omitted).

rulemaking grant authorizes only interpretive, not legislative, rules.[603]
Because the Supreme Court has endorsed that view, it will probably
remain secure, unless and until Congress amends the Code.

### C. Why the Tax World Thinks Section 7805(a) Is Interpretive

When we trace the history of the understanding that section 7805(a)
authorizes only interpretive rules, we uncover an anomaly that seems,
at first, to cut against the convention. This anomaly made its first ap-
pearance in a series of articles written in the 1940s by several eminent
tax scholars.[604] They include Erwin Griswold, who later became Dean
of Harvard Law School and Solicitor General of the United States,
and Stanley Surrey, who has been called "the most influential tax theo-
rist of his generation."[605] These authors did not focus on the absence
of sanctions for violations of section 7805(a) as the reason for constru-
ing the grant to authorize only interpretive rules.[606] Instead, they ar-
gued that the relevant distinction was between general and specific
grants of rulemaking authority. General grants were said to authorize
only interpretive rules, whereas specific grants authorized legislative
rules.[607] Surrey buttressed this contention with two arguments: first,
the specific rulemaking grants in the IRC would be redundant if the
general grant were construed to give the agency general legislative
rulemaking authority;[608] and second, the delegation of a general grant

---

[603] *See* Lomont v. O'Neill, 285 F.3d 9, 16 (D.C. Cir. 2002) (stating that section 7805(a) "is noth-
ing more than a general grant of interpretative rulemaking power"); *see also* Michael Asimow,
*Public Participation in the Adoption of Temporary Tax Regulations*, 44 TAX LAW. 343, 358 &
nn.75–76 (1991) (citing *Rowan* and *Vogel Fertilizer* for the proposition that the tax world contin-
ues to adhere to the view that rules adopted pursuant to the Treasury's general rulemaking grant
are interpretive in nature).

[604] *See* Surrey, *supra* note 78, at 558 (arguing that revenue acts do not "support a delegation of
legislative power"); *see also* Alvord, *supra* note 78, at 256–61 (stating that for the great majority of
Treasury regulations, the Commissioner has no legislative authority); Erwin N. Griswold, *A
Summary of the Regulations Problem*, 54 HARV. L. REV. 398, 400–01 (1941) (explaining that inter-
pretive regulations differ from legislative regulations, but only as a matter of degree); *cf.* Cover-
dale, *supra* note 579, at 69 (reporting that Surrey noted as early as 1940 that the general rulemak-
ing grant given to the Treasury was not sufficient to delegate legislative powers).

[605] Coverdale, *supra* note 579, at 69.

[606] The distinction between interpretive and legislative rules caught Surrey's and other tax
scholars' attention due to debate over the "reenactment doctrine," which was well entrenched by
the 1940s. This doctrine provided that when an agency interprets a statutory provision, the ad-
ministrative construction is automatically given the force of law when Congress later reenacts the
legislative language that the administrative rule construes. In arguing against the reenactment
doctrine, Surrey pointed to the fact that most Treasury regulations were merely interpretive be-
cause they were promulgated under the IRC's general rulemaking grant. *See* Surrey, *supra* note
78, at 557–58.

[607] *Id.* For a discussion of the distinction between general and specific grants, as compared
with the conventional "sanctions" test, see *supra* section II.A, pp. 482–83.

[608] *See* Surrey, *supra* note 78, at 558 (contending that rules issued under specific rulemaking
grants should be taken to possess different attributes than rules issued under the general rulemak-

of legislative rulemaking authority would raise serious constitutional questions under the nondelegation doctrine, because the general grant lacks an intelligible principle to guide agencies in making rules.[609]

As we have seen, the distinction between general and specific grants of authority was not the basis for distinguishing between legislative and nonlegislative rulemaking grants under the drafting convention. Indeed, many New Deal-era statutes, including the Natural Gas Act, the Securities Acts, the Communications Act, and the Taylor Grazing Act,[610] contain very broad rulemaking grants that nevertheless have always been understood to authorize legislative rules. We have also seen that the reasons that tax scholars cite in support of the general/specific distinction — the structural argument about redundancy and the invocation of the intelligible principle canon — remain open to question.[611]

We can only conjecture about how Surrey and other tax scholars came to adopt an explanation for the interpretive nature of section 7805(a) that is inconsistent with the logic of the convention. Part of the explanation may be that no appellate opinion or other written source has described the convention. Surrey had worked in the Treasury Department and was undoubtedly familiar with the received understanding that section 7805(a) authorizes only interpretive rules. He sought an explanation for this assumption that fit the facts of the tax world, and came up with the general/specific distinction. Since there was no judicial opinion or other written source that contradicted this explanation, and Surrey's arguments were at least superficially plausible, his explanation became the conventional wisdom of the tax world.[612]

---

ing grants because "otherwise the careful particularization of Congress in these other sections would be without meaning"); *see also* Alvord, *supra* note 78, at 257 (arguing that "some difference was intended by Congress," or it would not have granted the Treasury both specific and general rulemaking power).

[609] *See* Surrey, *supra* note 78, at 557–58 ("The standard of 'needful . . . for the enforcement' of a revenue act would hardly seem adequate . . . to support a delegation of legislative power." (quoting I.R.C. § 62 (Cur. Serv. 1939))).

[610] See *supra* note 252 for a discussion of the Taylor Grazing Act.

[611] *See supra* section II.C pp. 487–93.

[612] 1 DAVIS, *supra* note 323, § 5.03, at 300, 313 (citing Surrey, *supra* note 78, and noting that section 7805(a) of the IRC constituted "something less than a delegation of power to issue rules which would be binding upon the courts"); KENNETH CULP DAVIS, ADMINISTRATIVE LAW OF THE SEVENTIES § 5.03-3, at 157 (1976) (citing Griswold, *supra* note 604, and noting that "[t]he dominant understanding among tax lawyers was once that tax regulations were legislative when made pursuant to a specific statutory provision authorizing regulations, but interpretative when made under the broad words of 26 USCS § 7805(a)"). Because of the influential role that Davis's treatises played in the administrative law world, his attention to the tax scholars' writings and to the interpretive nature of the Treasury's general rulemaking grant may have ensured the perpetuation of that understanding in the tax world.

## VII. WHAT THE CONVENTION MEANS TODAY

Our purpose in looking backward to uncover the historical understanding of facially ambiguous rulemaking grants is, ultimately, to advance understanding of administrative authority in ways that are relevant to ongoing controversies. As recounted in Part I, there are two contexts today in which it is critical to determine whether Congress has delegated power to an agency to make rules with the force of law. One of these contexts is when courts consider whether agencies must comply with the procedural requirements for promulgating legislative rules under the APA. The other is when courts decide whether to apply *Chevron*'s strong deference doctrine. This latter issue, in particular, is a matter of continuing debate within the Supreme Court. Eight Justices agreed in *United States v. Mead Corp.*[613] that *Chevron* rests on congressional intent, and that the requisite intent is to delegate authority to an agency to make rules that have the force of law. But the Court was much more divided the previous Term in *Christensen v. Harris County.*[614] Recent post-*Mead* decisions suggest that the division in *Christensen* may be more indicative of the lack of consensus among the Justices than what the united front in *Mead* might imply.[615]

---

[613] 533 U.S. 218 (2001). The lone dissenter was Justice Scalia. *Id.* at 239 (Scalia, J., dissenting).

[614] 529 U.S. 576 (2000).

[615] In *Barnhart v. Walton*, 122 S. Ct. 1265 (2002), Justice Breyer's opinion for the Court recited factors similar to those mentioned in *Skidmore* in support of the proposition "that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Id.* at 1272; *see also id.* at 1269–72. This echoing of *Skidmore* suggests that Justice Breyer may continue to adhere to his view, set forth in *Christensen*, 529 U.S. at 596–97 (Breyer, J., dissenting), that *Chevron* is simply a special case of *Skidmore* deference. *But see Barnhart*, 122 S. Ct. at 1274 (Scalia, J., concurring in part and concurring in the judgment) (noting that one of the factor relied upon by Justice Breyer — whether the agency interpretation is "longstanding" — is an "anachronism" after *Chevron*, and criticizing the majority for failing to explain why certain agency interpretations were sufficiently authoritative under *Mead* to qualify for *Chevron* deference). In *Edelman v. Lynchburg College*, 122 S. Ct. 1145, 1150 (2002), the Court declined to resolve whether an interpretation set forth in an EEOC procedural rule warranted *Chevron* deference. The reason that Justice Souter's majority opinion gave for avoiding the question was that the agency interpretation was "the position we would adopt even if there were no formal rule and we were interpreting the statute from scratch." *Id.* This language seems disturbingly inconsistent with the delegated lawmaking rationale of *Chevron*, which directs courts to uphold reasonable agency interpretations even if they conflict with the interpretation the court would adopt on its own. Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, 467 U.S. 837, 843 n.11 (1984). As other Justices suggested in concurring opinions, *Edelman* also calls into question the Court's apparent reaffirmation of the delegated lawmaking rationale in *Mead*. *See Edelman*, 122 S. Ct. at 1153 (Thomas, J., concurring) (urging acceptance of the agency interpretation because "the EEOC possessed the authority to promulgate this procedural regulation, and . . . the regulation is reasonable, not proscribed by the statute, and issued in conformity with the APA"); *id.* at 1154–55 (O'Connor, J., joined by Scalia, J., concurring in the judgment) (arguing that the EEOC regulation was entitled to *Chevron* deference because the agency had been delegated authority to adopt procedural regulations, and the regulation had been re-promulgated using formal notice-and-comment procedures).

## A. *The Role of the Convention in Statute-Specific Determinations of Legislative Intent*

*Mead* appears to contemplate that courts will seek to determine on a statute-by-statute basis whether Congress has delegated power to agencies to make rules with the force of law.[616]  The convention we have described would seem at a minimum to be an important datum in undertaking this kind of ad hoc inquiry into congressional intent. The fact that during the formative years of the administrative state Congress followed a convention in signaling whether it was giving agencies the authority to make rules having the force of law is important contextual information in understanding the meaning of facially ambiguous rulemaking grants adopted both during the New Deal and afterwards.

With respect to rulemaking grants that predate the 1960s, we would go further.  We are aware of no Supreme Court decision, prior to *Thorpe* in 1968, that is inconsistent with the convention; nor are we aware of any evidence that Congress had stopped following the convention.  To be sure, there is little evidence that the typical member of Congress was aware of the convention, and some members — such as Representative Deal — clearly were not.  Thus, we are not suggesting that Congress in any sense collectively intended that courts follow the convention.  But there is substantial circumstantial evidence that staff attorneys, in drafting individual statutes, used the convention as a signaling mechanism to agencies and other informed observers.  Consequently, even if the convention was unknown to most legislators themselves, it may nonetheless provide a reliable guide to the type of rulemaking authority that Congress had in fact agreed was appropriate under each particular statute.  Even if courts consider other evidence of congressional intent, such as the structure of a statute or canons of interpretation, the convention is a sufficiently reliable indicator of congressional intent that it should ordinarily outweigh these other factors.

After the Wright and Friendly decisions of the 1970s and 1980s, matters became more complicated.  The convention by that time was completely unknown to administrative lawyers, and Judges Wright and Friendly arguably succeeded in transforming the background understanding against which Congress legislated.  After Judge Friendly's 1981 decision conferring general legislative rulemaking authority on

---

[616] *See* Barron & Kagan, *supra* note 53, at 225–34 (discussing *Mead*'s statute-specific approach, but arguing that under a proper reading *Mead* imposes more structure on a court's deference inquiry than critics suggest).  *But see* Merrill, *supra* note 52, at 813–19 (characterizing *Mead* as adopting an open-ended standard of uncertain content).

the FDA,[617] an attorney from the Office of Legislative Counsel would likely have told a member of Congress that the courts would treat a similarly worded grant as authorizing rules having the force of law.[618] Still, we are aware of no evidence suggesting that Congress ever repudiated the convention or acquiesced in the Wright-Friendly view. Even today, when Congress includes a rulemaking grant in a statute, the legislation frequently specifies whether or not sanctions attach to violations of an agency's rules and regulations.[619]  In a statute-by-statute assessment of the legislative intent of statutes enacted after 1980, however, the convention undoubtedly becomes a more problematic guide.

## B. *The Case for a Canon*

An alternative to *Mead*'s statute-by-statute approach to ascertaining legislative intent would be the adoption of a canon that would serve as an aid to identifying congressional intent.[620]  We assume that

---

[617] *See* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 889 (2d Cir. 1981).

[618] As confirmation of this, consider the views published by the Administrative Conference of the United States on the subject in the early 1980s:

> Though only a minority of statutes contain ... forthright instructions to make rules, most regulatory agencies have no difficulty in pointing to statutory language authorizing them to make "such rules and regulations as may be necessary to carry out the provisions of the Act." Such an authorization clearly enables an agency to promulgate procedural, organizational or other "housekeeping" rules, and it also clearly enables an agency to issue non-binding guidelines or interpretations of its statutory authority. These powers are now quite accepted and may even be deemed within an agency's "inherent" authority. *Whether such language permits an agency to issue binding regulatory prescriptions is less clear, but recent decisions of the U.S. Supreme Court and the Court of Appeals for the D.C. Circuit indicate judicial willingness to find legislative authority in such language.*

OFFICE OF THE CHAIRMAN, ADMIN. CONFERENCE OF THE U.S., A GUIDE TO FEDERAL AGENCY RULEMAKING 74–75 (1983) (emphasis added); *see also* Asimow, *supra* note 27, at 395 (citing *Nutritional Foods* and *Petroleum Refiners* to support the proposition that "under the prevailing view, at least in the federal courts, general rulemaking provisions empower an agency to make either interpretative or legislative rules").

[619] *See, e.g.,* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, §§ 106–107, 104 Stat. 327, 336–37 (codified at 42 U.S.C. §§ 12,116–12,117 (2000)) (declaring that the remedies set forth in specific sections of the Civil Rights Act of 1976 shall apply to violations of regulations promulgated under the general rulemaking grant included in Title I of the ADA); Petroleum Marketing Practices Act, Pub. L. No. 95-297, § 203(e), 92 Stat. 322, 337 (1978) (codified at 15 U.S.C. § 2823 (2000)) (making it unlawful for any person to violate a rule prescribed under section 202(d) of the Act); Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, § 17, 84 Stat. 1590, 1606 (codified at 29 U.S.C. § 666 (2000)) (setting forth penalties for an employer's violation of the rules or regulations prescribed under the Act).

[620] Barron and Kagan, *supra* note 53, also recognize the need for a canon or "background rule" that would serve as a presumptive guide to congressional intent. The canon they suggest is based on whether "the official Congress named in the relevant delegation" has "personally assumed responsibility for the decision prior to issuance." *Id.* at 235. One of the problems with this proposal is that most agencies have legal authority to subdelegate functions to subordinate officials. Most prominently, in the Reorganization Act of 1949, Congress delegated standing authority to the

such a canon would serve only as a presumption and would be rebuttable based on other evidence from the text, structure, and history of the statute in question. But structuring the inquiry under such a canon would offer several advantages over an ad hoc consideration of legislative intent.[621]

The first and most important reason for adopting a general canon would be to facilitate communication between Congress and the courts.[622] *Christensen* and *Mead* make clear that Congress has the ultimate authority to turn *Chevron* deference on and off. Congress can do this either by delegating power to an agency to act with the force of law with respect to a particular issue (*Chevron* on) or by not delegating such power to the agency (*Chevron* off). But Congress can exercise this authority only if it knows what to say in a statute to delegate such power.[623] If a canon provides a general presumption, then Congress will generally know what it must do to confer primary interpretive authority on an agency. Conversely, if acting with the force of law is identified under an ad hoc inquiry, as *Mead* suggests, then Congress will not know if it has succeeded in designating an agency (or the courts) as the primary interpreter until after the issue is litigated. Adopting a canon thus could help to preserve and protect the role of Congress, which the Court has identified as the very foundation of the *Chevron* doctrine.

A possible objection to this argument is that Congress could, in the future, specify whether it has given agencies the authority to make interpretations that have the force of law. Congress could simply include — or not include — language in a given statute that agency rules will have "the force and effect of law." This suggestion, however, overlooks the problem of what happens under thousands of existing rulemaking grants. Congress has neither the time nor the institutional capacity to

---

President to issue reorganization plans that provide for "the authorization of any officer to delegate any of his functions." Reorganization Act of 1949, ch. 226, § 3, 63 Stat. 203, 203. Thus, Congress's naming of an official as the decision maker in an agency's organic act is only a default rule, making it a problematic guide to congressional intent if the default has been changed. Also, the Barron and Kagan proposal only provides an answer to the question whether *Chevron* deference applies to any particular agency interpretation; it does not address the broader issue of how to interpret facially ambiguous rulemaking grants.

[621] The following discussion draws on Merrill, *supra* note 52.

[622] *See* William N. Eskridge, Jr. & Philip P. Frickey, *The Supreme Court, 1993 Term— Foreword: Law as Equilibrium*, 108 HARV. L. REV. 26, 66 (1994).

[623] *Cf.* Finley v. United States, 490 U.S. 545, 556 (1989) ("What is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts."). For recognition of this point in the context of *Chevron*, see Bernard W. Bell, *Using Statutory Interpretation To Improve the Legislative Process: Can It Be Done in the Post-Chevron Era?*, 13 J.L. & POL. 105 (1997); and Jonathan T. Molot, *The Judicial Perspective in the Administrative State: Reconciling Modern Doctrines of Deference with the Judiciary's Structural Role*, 53 STAN. L. REV. 1 (2000).

review and amend existing legislation to ensure that it has allocated interpretive authority properly. If the Court were to adopt a general canon about which kinds of delegations should sustain *Chevron* deference, Congress and affected agencies and interest groups would be better able to predict how courts will interpret existing delegations. In this way, the relevant parties would be in a better position to know which statutes should be targeted for revision.

A second reason to adopt a general canon is to facilitate agency planning. Agencies regard *Chevron* deference as a good thing, and they understandably want courts to accept their legal interpretations so that they can fulfill their statutory obligations as they see fit. Yet agencies must make a significant investment in administrative procedures to obtain the *Chevron* payoff. In the vocabulary of *Christensen* and *Mead*, agencies must take whatever procedural steps are necessary to demonstrate that they intend to exercise authority to make rules with the force of law. In the context of rulemaking, this ordinarily means committing considerable time and resources to notice-and-comment procedures.[624] The ability to know, in advance, whether such an investment will pay off would be tremendously helpful to agencies.

A third reason to adopt such a canon is to facilitate control of the lower federal courts by the Supreme Court. A canon would function like a presumptive rule, and rules are generally better than broad standards for exercising control over subordinate actors in a hierarchy.[625] In the federal judicial system, the problem of control is exacerbated by the fact that the Supreme Court can review only a limited number of cases each year.[626] If the Court had the capacity to review every court of appeals decision, it could define the scope of the *Chevron* doctrine by engaging in a statute-by-statue analysis. But given its limited resources, the Court might better control the behavior of lower courts by adopting a presumptive rule.

Finally, a general canon would allow lawyers to provide more accurate advice to clients about the probable outcome of litigation than

---

[624] For a discussion of the heavy administrative costs of what used to be called "informal" rulemaking, see Harold J. Krent, *Reviewing Agency Action for Inconsistency with Prior Rules and Regulations*, 72 CHI.-KENT L. REV. 1187 (1997); Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 DUKE L.J. 1385 (1992); and Richard J. Pierce, Jr., *Seven Ways To Deossify Agency Rulemaking*, 47 ADMIN. L. REV. 59 (1995).

[625] *See* Russell B. Korobkin, *Behavioral Analysis and Legal Form: Rules vs. Standards Revisited*, 79 OR. L. REV. 23, 37–38 (2000).

[626] *See* Peter L. Strauss, *One Hundred Fifty Cases Per Year: Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action*, 87 COLUM. L. REV. 1093, 1118–29 (1987).

JA0573

would a more flexible standard.[627]  Similarly, when such litigation occurs, arguments about the proper application of a rule will generally require less effort to develop than arguments about the proper application of a standard.  Adopting a general canon would therefore reduce legal costs.

### C.  Choosing a Canon

The discussion in Parts II and III suggests three candidates for a canon that could be used to interpret facially ambiguous rulemaking grants.  First, the canon implicit in the *Queen and Crescent Case* would provide that rulemaking grants are presumed to authorize only procedural and interpretive rules unless Congress expressly states otherwise.  Second, the convention we describe in Part III would provide that rulemaking grants are presumed to authorize the imposition of rules with the force of law either when Congress states so expressly or when it provides for sanctions for rule violations.  Third, the *Petroleum Refiners* canon — the approach endorsed by Judges Wright and Friendly — would provide that rulemaking grants are always presumed to authorize legislative rules unless Congress clearly intends (or, in the Friendly version, expressly states) otherwise.  We assess these three candidates against three criteria: how well they respect the constitutional principle that only Congress can delegate authority to agencies to act with the force of law; how well they track probable congressional intent concerning the powers that agencies can exercise; and the disruption to reliance interests entailed by the transition from the current regime to the proposed canon.

*1.  The* Queen and Crescent Case *Canon. —* The *Queen and Crescent Case* express-statement canon has one great virtue: it would robustly enforce the principle that agencies have no inherent authority to act with the force of law unless Congress delegates that authority to them.  Under this canon, agencies could engage in legislative rulemaking if and only if Congress has expressly authorized them to make rules with "the force and effect of law" or the equivalent.  With the benefit of hindsight, the Court might have been well advised to generalize such an express-statement rule from the *Queen and Crescent Case*.  The nondelegation principle would have been secured; Congress, agencies, and the courts would have had a very clear signaling device for determining when authority to make legislative rules had been conferred; and no major reliance interests would have been frus-

---

[627] *See* FREDERICK SCHAUER, PLAYING BY THE RULES 145–49 (1991); *cf.* Louis Kaplow, *Rules Versus Standards: An Economic Analysis*, 42 DUKE L.J. 557, 579–84 (1992) (arguing that rules are more efficient than standards if fewer resources can be expended in determining the content of the law ex ante rather than ex post).

trated, since nearly all major delegations of such authority occurred after the *Queen and Crescent Case*.

But the Court did not generalize such an express-statement rule from the *Queen and Crescent Case*. Instead, it held in *Grimaud* that Congress could make it a criminal offense to violate an administrative regulation, as long as Congress itself legislated the sanction.[628] This decision presupposed that Congress was not required to confer legislative rulemaking authority through an express statement, but it could do so by clear implication. Relying on this ruling, Congress proceeded over the next half-century to enact thousands of rulemaking grants in which it conferred authority to make legislative rules by clear implication; that is, by prescribing sanctions for violations of "rules and regulations." To adopt an express-statement rule now would massively frustrate congressional intent, as manifested in these many enactments. It would be paradoxical to vindicate the principle of legislative supremacy with a rule that would undermine congressional intent on such a vast scale. Effectively, an express-statement rule would be the undoing of the administrative state. These costs are surely too great for the *Queen and Crescent Case* express-statement canon to tempt the Supreme Court today.

*2. The Convention as Canon.* — The convention we describe in Part III has a much stronger claim to being a viable canon for ascertaining presumptive delegatory intent. The convention would not vindicate the nondelegation principle with the same vigor as the *Queen and Crescent Case* canon, but Congress would still be required to confer the necessary authority by clear implication, most commonly by legislating sanctions for rule violations. In other words, some affirmative legislative act would be required — either the express conferral of legislative power or the express adoption of sanctions for rule violations — before the transfer of authority would be deemed to have occurred.

The convention would also harmonize much better with actual congressional intent. As we have shown, Congress followed the convention quite faithfully until about 1960, while it was adopting most of the regulatory statutes that serve as the foundation for the modern administrative state. We are less sure about what has happened since then, and in particular what has happened since 1981, when Judge Friendly's opinion in *Pharmaceutical Manufacturers* endorsed the *Petroleum Refiners* canon.[629] However, we are unaware of any evidence showing that Congress has relied on the *Petroleum Refiners* canon in drafting modern regulatory statutes.

---

[628] United States v. Grimaud, 220 U.S. 506 (1911); *see supra* pp. 501–02.
[629] *See supra* pp. 563–64.

The big question is how disruptive it would be to existing reliance interests to adopt the convention as a canon at this late date. For the past twenty years, any administrative agency that obtained a legal opinion on the subject would have been advised that a facially ambiguous rulemaking grant would likely be held to confer legislative rulemaking authority. It is unclear how many legislative regulations have been promulgated on this understanding, under statutes that the convention would deem not to authorize such regulations. We cannot even begin to provide a complete accounting, given the thousands of federal statutes containing tens of thousands of rulemaking grants, large and small. A systematic review of these rulemaking grants would pose a Herculean task. All we can offer are some observations drawn from the more historically significant examples of facially ambiguous rulemaking grants and from the controversies we have surveyed in this Article.

First, it appears that the vast majority of administrative agencies that need legislative rulemaking authority do in fact have such authority under the convention. Among the agencies we have reviewed, this includes the FCC, the SEC, the Federal Power Commission (now the Federal Energy Regulatory Commission), the Social Security Administration, the EPA (as to most functions), the IRS (through multiple individual grants), and the Federal Reserve Board (under the Truth in Lending Act). Other agencies that did not originally have legislative rulemaking authority have acquired it through statutory amendments; these include the FTC, the ICC (now the Surface Transportation Board), and the Department of Labor (under the Longshoremen's and Harbor Workers' Compensation Act).

Second, those agencies that lack legislative rulemaking authority under the convention have often been reluctant to engage in legislative rulemaking even when told that they could do so. This describes the NLRB, which, notwithstanding repeated prodding to engage in legislative rulemaking, has continually reverted to a system that relies exclusively on adjudication. It also describes the IRS, insofar as the general rulemaking grant in section 7805(a) is concerned.

Beyond these two categories of agencies are those agencies that lack general legislative rulemaking power under the convention but that have relied on decisions by the courts of appeals authorizing them to use nonlegislative rulemaking grants as sources of legislative rulemaking. The FDA is the most prominent agency in this category and is likely the agency that would be most severely affected by the adoption of the convention as a canon. Yet even here the convention would not necessarily result in the invalidation of all existing FDA regulations issued under the authority of section 701(a). We assume that some of these rules could have been adopted under specific rulemaking grants covered by section 701(e), which requires the use of formal rulemaking procedures. Any challenge to these rules for failure to

comply with the procedural requirements of section 701(e) would likely now be barred as untimely. Thus, with respect to these rules, the primary consequence of adopting the convention would be to deny the FDA *Chevron* deference for interpretations embodied in these rules.[630] Courts, however, would likely regard other FDA rules, such as the Current Good Manufacturing Practice rules, as interpretive rather than legislative.[631] These rules would not only lose *Chevron* deference, but they would also be open to challenge in individual enforcement proceedings.

Other agencies undoubtedly also lack general legislative rulemaking authority, although they may benefit from a greater number of specific grants of authority than does the FDA. The Clean Water Act (CWA), for example, grants general rulemaking authority to the EPA in section 501(a).[632] The CWA nowhere prescribes any sanctions for violations of rules issued under the authority of this grant. As a result, under the convention this provision is not a source of legislative rulemaking authority. However, the CWA also contains numerous specific rulemaking grants permitting the EPA to establish a variety of particular practices and standards.[633] Violations of these regulations are punishable by a variety of civil and criminal penalties and are enforced by other sanctions such as permit denials; thus the regulations authorize legislative rules under the convention. Still, these specific rulemaking grants are not exhaustive, and occasionally circumstances arise in which the EPA's authority to promulgate legislative rules under one of these specific provisions is unclear.[634] Lower courts have occasionally invoked section 501(a) as a source of legislative rulemaking authority in such cases,[635] but this avenue would be foreclosed under the convention.

---

[630] This is because the rules would violate the second step in the *Mead* test: whether the rules were adopted pursuant to a grant of authority to act with the force of law. *See* United States v. Mead Corp., 533 U.S. 218, 227 (2001). The rules *could* have been adopted pursuant to such a grant, but in fact were adopted pursuant to section 701(a), which authorizes only interpretive rules.

[631] *See supra* p. 562.

[632] 33 U.S.C. § 1361(a) (2000).

[633] *See id.* § 1314(e) (addressing best management practices for point sources of pollution); *id.* § 1316 (addressing standards of performance for new sources of pollution); *id.* § 1317(a) (addressing effluent standards for toxic pollutants); *id.* § 1317(b) (addressing pretreatment standards for waste discharged into public sewer systems).

[634] The most prominent of these issues has been whether the EPA has the authority to issue legislative regulations establishing effluent limitations for categories of pollution sources under section 301 of the Clean Water Act. Resolving a circuit split, the Supreme Court held in *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977), that section 301 authorized such rules (although the Court, in support of this construction of section 301, also made passing reference to section 501(a)), *id.* at 126–36.

[635] *See, e.g.*, Pronsolino v. Nastri, 291 F.3d 1123, 1131 (9th Cir. 2002) (relying on section 501(a) as a source of the EPA's authority to make rules with the force of law imposing total maximum

Similarly, HUD lacks general legislative rulemaking power under the convention (at least as far as the United States Housing Act of 1937[636] and Fair Housing Act of 1968[637] are concerned). Congress gave HUD a generalized rulemaking grant in the chapter of the United States Code that establishes HUD and describes its administrative powers.[638] However, no sanctions are attached to give any teeth to the rules HUD might make under this grant. Similarly, the Fair Housing Act includes a general rulemaking grant, giving the Secretary of HUD the power to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this subchapter."[639] Again, no sanctions back these rules. Nevertheless, HUD also enjoys numerous narrower rulemaking grants tied to particular sections of the acts it administers, many of which confer power to make legislative rules.[640] Still, there may be circumstances, analogous to the eviction procedures considered in *Thorpe*, in which none of the specific legislative rulemaking grants applies, and it would therefore be convenient to issue legislative rules under one of the agency's general rulemaking grants.[641] Application of the convention would prohibit the agency from invoking its general rulemaking grants in this way.

---

daily load limits on a river not polluted by any point sources, and hence finding that the agency interpretation merited *Chevron* deference under *Mead*); E.I. du Pont de Nemours & Co. v. Train, 541 F.2d 1018, 1027 (4th Cir. 1976), *aff'd on other grounds*, 430 U.S. at 126–36 (relying on section 501(a) as source of agency authority to issue legislative regulations establishing effluent limitations for categories of sources under section 301 of the Act); *cf.* Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 988 (D.C. Cir. 1997) (holding that the EPA had authority to issue a binding Guidance document under section 118 of the Clean Water Act, and hence that it was not necessary to consider whether such a Guidance could be issued under the authority of section 501(a)).

[636] Ch. 896, 50 Stat. 888 (codified as amended in scattered sections of 42 U.S.C.).

[637] 42 U.S.C. §§ 3601–3631 (2000).

[638] *See id.* § 3535(d) (giving the Secretary of HUD the power to "make such rules and regulations as may be necessary to carry out his functions, powers, and duties").

[639] *Id.* § 3614a. The Act also gives the Secretary the authority to prescribe the rights of appeal from the decisions of administrative law judges, *see id.* § 3608(c), and the power to issue "such regulations as may be necessary to carry out the provisions" of the section dealing with fair housing initiative programs, *see id.* § 3616a(f).

[640] *See, e.g., id.* § 1437c(b) (giving the Secretary the power to prescribe regulations that fix the maximum contribution available for low-income housing; *id.* § 1437s(e) (giving the Secretary the power to prescribe, through regulations, terms and conditions for homeownership or resident management).

[641] The general rulemaking grant included in section 8 of the Housing Act of 1937 — upon which the Supreme Court relied in *Thorpe* to conclude that HUD possessed legislative rulemaking powers, *see* Thorpe v. Hous. Auth., 393 U.S. 268, 277 (1969) — was omitted from the general revision of the Act in 1974. *See* 42 U.S.C. §§ 1406c to 1411a, Codification Note (2000) ("Section 1408, act Sept. 1, 1937, ch. 896, § 8, 50 Stat. 891, authorized promulgation of rules and regulations by the Authority, prior to the general revision of the United States Housing Act of 1937 by Pub. L. 93-383, Title II, § 201(a), Aug. 22, 1974, 88 Stat. 653."). Despite this omission, some courts continued to cite *Thorpe* for the proposition that HUD has broad powers to issue binding rules. *See, e.g.,* Hess v. Ward, 497 F. Supp. 786, 798 (E.D. Pa. 1980).

Whatever the merits of adopting the convention as a presumptive guide to congressional intent, no significant precedential barrier prevents the Supreme Court from adopting such a canon. Nearly all of the Court's decisions that recognized specific rules to be legislative are consistent with the convention. The principal exceptions — *Thorpe,* the *Hynson* Quartet, and *American Hospital* — are cases in which the parties did not brief the question whether the agency had authority to act with the force of law. These decisions cannot, therefore, be characterized as holdings binding on the Court as a matter of stare decisis.[642] Perhaps more importantly, none of the reasoning in the Court's cases is inconsistent with the convention. The statements in *National Broadcasting, American Trucking, Storer Broadcasting, Texaco,* and *Mourning* regarding the importance of liberally construing grants of rulemaking authority are all unexceptional, because the rulemaking grants in those cases did in fact authorize legislative rules under the convention. And the holdings in *Petroleum Refiners* and *Pharmaceutical Manufacturers* — no matter how important to the formation of general legal attitudes since 1980 — are decisions of inferior courts not binding on the Supreme Court.

  *3. The* Petroleum Refiners *Canon.* — The third possible canon presents the mirror image of the virtues and vices of the *Queen and Crescent Case* as a canon. The *Petroleum Refiners* canon does the least to further the nondelegation principle that agencies may act with the force of law only pursuant to a specific delegation from Congress. This canon requires no unambiguous affirmative step to effectuate a delegation of legislative rulemaking authority. Courts would construe ambiguous references to rulemaking as transferring legislative authority, placing the burden on Congress to achieve a different outcome. Congress would still be able to restrict the agencies' ability to make rules with the force of law, but only by denying the agency all rulemaking authority or by clearly limiting rulemaking grants to procedural and interpretive rules. Such a strong presumption in favor of delegation seems like an inadequate level of protection for a principle that serves as a cornerstone of our system of separation of powers.

  Use of the *Petroleum Refiners* canon would also do considerable violence to actual congressional intent. Not only would the FTC, the FDA, and the NLRB receive legislative rulemaking authority under grants not intended to confer such powers, but so would the IRS and the Labor Department under statutes like the Longshoremen's and Harbor Workers' Protection Act.

  The affirmative case for the *Petroleum Refiners* canon is that it would not disturb any reliance interests grounded in existing legisla-

---

[642] *See* cases cited *supra* note 354.

tive rules, since the canon would legitimate all known legislative rules. In particular, we would not have to worry about the fate of the FDA's Current Good Manufacturing Practice rules and other rules adopted pursuant to section 701(a) and intended by the agency to be legislative rules.

Whether the plight of the FDA and other possible reliance issues are sufficiently troubling to warrant embracing the *Petroleum Refiners* canon in light of its other shortcomings is a matter of opinion. Our judgment is that the advantages of the convention in terms of respecting nondelegation values and achieving fidelity to congressional intent are sufficiently great, and the systemic costs of adopting the convention as a canon sufficiently confined, that the convention represents the best candidate for a general canon of presumptive delegatory intent.

### D. The Chevron Paradox

There is one final wrinkle that may prove to be an insuperable barrier to resurrecting the convention as a guide to the meaning of facially ambiguous rulemaking grants. The Court has, not surprisingly, treated *Chevron* as the lodestar situation in which *Chevron* deference is warranted.[643] However, it turns out that the rule at issue in *Chevron* did not have the force of law under the convention, and hence under *Mead* should not have been afforded *Chevron* deference. This outcome is likely to give the Court significant pause before endorsing the convention as a presumptive guide to congressional intent.

*Chevron* involved an EPA interpretation of the term "stationary source" as used in the 1977 Clean Air Act Amendments, applicable to states out of compliance with national ambient air quality standards.[644] The EPA adopted this interpretation in a rulemaking proceeding conducted under the authority of the general rulemaking grant in the Clean Air Act, which was facially ambiguous regarding whether it authorized rules with the force of law.[645] The agency used notice-and-comment procedures in adopting the rule.[646] However, the state-

---

[643] *See, e.g.*, United States v. Mead Corp., 533 U.S. 218, 237 n.18 (2001) (observing that "*Chevron* itself is a good example showing when *Chevron* deference is warranted").

[644] *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 840 (1984).

[645] *See* 42 U.S.C. § 7601(a) (2000).

[646] *See* Requirements for Preparation, Adoption and Submittal of Implementation Plans and Approval and Promulgation of Implementation Plans, 46 Fed. Reg. 50,766 (Oct. 14, 1981). The fact that the agency employed notice-and-comment procedures is not, in itself, a sufficient basis to conclude that the rules were legislative. *Mead* indicates that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure" such as notice and comment. *Mead*, 533 U.S. at 230. But Congress did not direct the EPA to use notice-and-comment procedures under its general rulemaking grant. The decision to do so was the EPA's alone, and unilateral action by an agency

ment of basis and purposes did not clearly indicate whether the agency regarded the rule as legislative or interpretive.[647]

The general rulemaking grant upon which the EPA relied in issuing the stationary-source rule was enacted as part of the 1963 amendments to the Clean Air Act.[648] The original Clean Air Act, adopted in 1955, was little more than a grant-in-aid program designed to stimulate cooperative federalism.[649] In 1963, as part of a general revision of the Act, Congress added a rulemaking grant authorizing the Secretary of HEW (later the Administrator of the EPA) to "prescribe such regulations as are necessary to carry out his functions under this Act."[650] Congress did not prescribe statutory sanctions for violations of the regulations issued under this grant. Under the convention, the absence of sanctions meant that Congress did not intend to allow the regulations issued under the Act to bind persons outside of the agency with the force of law.

The legislative history of the 1963 amendments also lacks any clear expression of congressional understanding that regulations issued under the general rulemaking grant would be legally binding. During debates on the 1963 amendments, a proposal was advanced in the House to add the word "procedural" to the general rulemaking provision, so that the amendments would only authorize the power to "prescribe such procedural regulations."[651] Representative Taft, who offered the amendment, explained that he did not believe it was the intention of the House to authorize regulations that would have the force of law, and he argued that it should be made clear that the general rulemaking provision was intended to refer only to procedural regulations.[652] The amendment passed the House; however, the Conference Committee did not agree to insert the word "procedural" into the grant. Although the Conference Report stated that the word "procedural" was eliminated "as being too restrictive upon the authority

---

cannot establish the required delegation of power *from Congress*. For further discussion of this aspect of *Mead*, see Merrill, *supra* note 52, at 814–15.

[647] Requirements for Preparation, Adoption and Submittal of Implementation Plans and Approval and Promulgation of Implementation Plans, 46 Fed. Reg. 50,766, 50,770 (Oct. 14, 1981). Some aspects of the EPA's discussion suggest that the rule was interpretive. For example, the agency said that it would not require states to follow the definition in their implementation plans, but only that it would not disapprove plans that followed the definition. *Id.* at 50,769. Other aspects suggest that the agency intended the rule to be legislative. For instance, the EPA construed the rule as being subject to pre-enforcement review in the D.C. Circuit, *id.* at 50,770, which is generally a characteristic of legislative rules, see *supra* note 34.

[648] *See* Pub. L. No. 88-206, 77 Stat. 392 (1963).

[649] *See* ch. 360, 69 Stat. 322 (1955).

[650] Pub. L. No. 88-206, § 8(a), 77 Stat. at 400 (codified as amended at 42 U.S.C. § 7601 (2000)).

[651] *See* 109 CONG. REC. 13,291 (July 24, 1963) (statement of Rep. Taft).

[652] *See id.*

which the Secretary needs to carry out the act,"[653] it did not explain whether the Conference Committee understood the general grant to authorize legislative rulemaking.

Representative Taft raised concerns on the House floor about the deletion of the word "procedural" from the Conference Committee bill.[654] However, other House members assured him that the general rulemaking provision included in the Act was a limited one. Representative Roberts explained that despite the elimination of the word "procedural," he felt the Conference bill sufficiently addressed Representative Taft's concerns because "the power of the Secretary is very adequately tied down in this bill as to what he can do and as to what kind of information he must act upon, and the extent of the data upon which he may proceed."[655] Representative Rogers similarly assured Representative Taft that the rulemaking grant was narrow, stating that there was "no rulemaking power for abatement" included in the bill.[656]

In the end, when Congress passed the bill without Representative Taft's proposed qualification on the general rulemaking grant, the House understood the rulemaking grant to be fairly limited. But it was not clear just how limited the rulemaking grant really was.[657] Given that the legislative history is at best ambiguous, the general rulemaking grant would not be viewed as legislative under a canon adopting the presumption that only rulemaking grants providing sanctions for violations reflect a congressional delegation of authority to make rules with the force of law.

In 1990, Congress thoroughly overhauled the Clean Air Act and amended the statute to include sanctions for violations of rules issued under the general rulemaking grant.[658] Post-1990, therefore, the Act's general rulemaking grant clearly qualifies as a source of legislative rulemaking authority under the convention.[659] But the EPA adopted

---

[653] CONF. REP. NO. 88-1003 (1963), *reprinted in* 1963 U.S.C.C.A.N. 1260, 1285.

[654] *See* 109 CONG. REC. 23,962–63 (Dec. 10, 1963) (statement of Rep. Taft).

[655] *Id.* at 23,963 (statement of Rep. Roberts).

[656] *Id.* (statement of Rep. Rogers).

[657] Representative Taft asked the House members whether they understood the general rule-making grant to authorize only procedural as opposed to substantive rules, but he never received a clear answer to this question. *See id.* (statement of Rep. Taft).

[658] *See* An Act to Amend the Clean Air Act, Pub. L. No. 101-549, 104 Stat. 2399, 2676–77 (1990) (codified as amended at 42 U.S.C. § 7413(b)(2)–(d)(1)(B) (2000)). As amended, the Clean Air Act authorizes the EPA to commence a civil action or assess a civil or administrative penalty of up to $25,000 per day of violation against any person who violates "a requirement or prohibition of any rule . . . issued . . . under this chapter." *Id.* (similar language in both provisions). In contrast, the law in effect in 1981, when the EPA adopted the stationary-source rule reviewed in *Chevron*, authorized the EPA to commence a civil action or assess a civil administrative penalty only for violation of select provisions of the Act or state implementation plans. *See* 42 U.S.C. § 7413(a)(1), (a)(3), (a)(5), (c)(1) (1982).

[659] The sanctions added to the Act, however, apply only to violations of "rules," and do not mention "regulations." *See* 42 U.S.C. § 7413 (b)(2)–(d)(1)(B). This word choice is potentially sig-

the rule at issue in *Chevron* under the 1977 version of the Act — well before Congress amended the general rulemaking grant to give the EPA general authority to issue legislative rules implementing the Clean Air Act. This situation presents the ultimate paradox: *Christensen* and *Mead* hold that *Chevron*'s strong doctrine of deference applies only where agencies have been delegated authority to make rules with the force of law. Yet the agency that *Chevron* held to be entitled to this strong deference did not, according to the convention, have authority to make rules having the force of law until many years after *Chevron* was decided — at least not with respect to the particular rule considered in *Chevron*.

In principle, this paradox should not really matter. The important propositions for which *Chevron* stands — that Congress often impliedly intends that an agency rather than the courts be the primary interpreter of gaps and ambiguities in a statute, and that in such cases, courts are to accept reasonable agency interpretations of the statute — remain unaffected even if *Chevron* incorrectly determined that Congress had implied such a delegation in the particular provision at issue. Only much later, in *Mead*, did the Court specify that the key question is whether Congress has delegated to the agency the authority to make rules with the force of law. *Chevron* did not fully anticipate this development, and it contains no holding concerning whether Congress had given the EPA authority to make rules with the force of law. Indeed, the Court in *Chevron* did not even cite the rulemaking grant under which the EPA issued its interpretation. Still, whether the Court would ever be willing to endorse the convention as the key to ascertaining the meaning of facially ambiguous rulemaking grants, when the convention generates this kind of internal dissonance in the Court's case law, remains very much to be seen.

## CONCLUSION

Our story is about legislative supremacy and the signals Congress uses in its exercise. In the abstract, all agree that agencies have no inherent authority to act with the force of law.[660] Agencies can issue edicts that have the effect of statutes only if Congress delegates to them the authority to do so. But what happens if Congress speaks ambiguously in delegating authority to an agency, referring to "rules and regulations" without specifying whether this means rules and

---

nificant because the general rulemaking grant authorizes "regulations," not "rules." If Congress had intended regulations issued under the general rulemaking grant to be enforced via the added sanctions in § 7413, one would think that it would have applied the sanctions to "regulations" as well as "rules."

[660] *See* authorities cited *supra* notes 95 and 97.

regulations with the force of law, or merely procedural and interpretive rules and regulations?

For a long time, Congress used one set of signals to indicate the meaning of such facially ambiguous grants. Most members of Congress were probably blissfully unaware of these signals. But the signals functioned well enough that the attorneys drafting the legislation and advising agency officials about the scope of their authority could do their jobs.

The signals were not, however, made sufficiently explicit that appellate lawyers or courts had easy access to them. Because of the vagaries of litigation, no Supreme Court decision enshrined the signals in an authoritative opinion. When times changed, other actors — agency critics, a new generation of agency lawyers, and judges and their law clerks — interpreted the signals differently. Because there was no controlling legal authority to stop them, these actors in effect engineered a major transfer of delegated power beyond anything that Congress contemplated. While courts continue to incant the principle that agencies have no inherent authority to act with the force of law, in practice courts have enabled every agency with a general grant of rulemaking authority to decide in its discretion whether to act with the force of law.

Another debate has recently emerged concerning which institution in the administrative state is to exercise primary authority in the interpretation of law. The Supreme Court has decided that this question is also a matter of legislative supremacy and that Congress is entitled to signal whether an agency can exercise primary interpretive authority in a given instance.[661] In an effort to describe in general terms which signal will be examined to answer this question, the Court has said that the threshold question is whether Congress has delegated authority to the agency to make rules with the force of law.[662] Thus, by a quirk of fate, the Supreme Court has come around to the question it never answered during the formative years of the administrative state: what language must Congress use to indicate that an agency has been given power to make rules with the force of law?

The Court will soon have to decide whether ambiguous rulemaking grants should be interpreted in accordance with the original set of signals or in accordance with the revisionist understanding that such grants always confer authority to act with the force of law unless Congress specifically limits the grant. We have argued that it is important that the question of delegatory intent be resolved by a presumptive rule, rather than ad hoc. Regarding the choice of a presumptive rule,

---

[661] *See* United States v. Mead Corp., 533 U.S. 218, 229 (2001).
[662] *See id.* at 231–32.

the forces of inertia favor the revisionist understanding. We believe, however, that the original convention for deciphering the meaning of facially ambiguous rulemaking grants, if adopted now as a canon of interpretation, would achieve a better integration of constitutional values and practical realities, of our present and our past.

# Noncompete Agreements in the US Labor Force

Evan P. Starr    *University of Maryland*

J.J. Prescott    *University of Michigan*

Norman D. Bishara    *University of Michigan*

## Abstract

Using nationally representative survey data on 11,505 labor force participants, we examine the use and implementation of noncompete agreements and the employee outcomes associated with these provisions. Approximately 18 percent of labor force participants are bound by noncompetes, with 38 percent having agreed to at least one in the past. Noncompetes are more likely to be found in high-skill, high-paying jobs, but they are also common in low-skill, low-paying jobs and in states where noncompetes are unenforceable. Only 10 percent of employees negotiate over their noncompetes, and about one-third of employees are presented with noncompetes after having already accepted job offers. Early-notice noncompetes are associated with better employee outcomes, while employees who agree to late-notice noncompetes are comparatively worse off. Regardless of noncompete timing, however, wages are relatively lower where noncompetes are easier to enforce. We discuss these findings in light of competing theories of the economic value of noncompetes.

## 1. Introduction

Noncompete agreements (often referred to as noncompetes) are postemployment restrictions that prohibit departing employees from joining or starting a competing enterprise, typically within time and geographic boundaries (for examples, see Figures OE1, OE2, and OE3 in the Online Appendix). Noncompetes have long faced significant legal hostility because of their often blunt prohibition

Results from early versions of this paper are discussed in the US Treasury report on noncompete agreements (US Department of the Treasury 2016) and the subsequent White House report (White House 2016). We thank various units at the University of Michigan for supporting our data collection efforts, including the Law School, the Ross School of Business, Rackham School of Graduate Studies, the Department of Economics, and the Michigan Institute for Teaching and Research in Economics. We are also grateful for financial support from Ewing Marion Kauffman Foundation grant 20151449. Alex Aggen, Russell Beck, Zev Eigen, Alan Hyde, Pauline Kim, Kurt Lavetti, Orly Lobel, W. Bentley MacLeod, Martin Malin, Matt Marx, Sarah Prescott, Margo Schlanger, Stewart Schwab, Jeffrey Smith,

[*Journal of Law and Economics*, vol. 64 (February 2021)]
© 2021 by The University of Chicago. All rights reserved. 0022-2186/2021/6401-0003$10.00

JA0586

on employee mobility (Blake 1960), but they are nevertheless regularly enforced in the United States.[1] Spurred by anecdotes of unpaid interns and minimum-wage sandwich makers signing noncompetes, policy makers in recent years have proposed dozens of legal reforms, including banning noncompetes for some or all employees and regulating the noncompete-contracting process.[2] Yet relatively little is known about the use of noncompete agreements by employers because employee-level noncompete data are scarce (see generally Bishara and Starr 2016).[3] In this study, we use nationally representative data from a survey of 11,505 labor force participants to answer three empirical questions: What fraction and which types of employees enter into noncompetes? What is the nature of the noncompete contracting process? And how are noncompetes related to labor market outcomes, like training, wages, and job satisfaction?

Our empirical analysis is motivated by theoretical work in law and economics that considers the costs and benefits of employment contracts that limit an employee's future mobility. The traditional economics perspective has two key tenets. First, because of the inalienability of human capital (Hart and Moore 1994), employers will be reluctant to invest in developing valuable information or specialized training—given that employees may be unable to compensate employers in advance for access to such information and training (Barron, Berger, and Black 1999; Acemoglu and Pischke 1999)—if employees can easily convey the value of any such investments to a competitor simply by taking a new job. Enforceable noncompetes solve this holdup problem by prohibiting departures to competitors, which encourages employers to make these fragile but important productivity-enhancing investments (Rubin and Shedd 1981; Posner, Triantis, and Triantis 2004; Meccheri 2009). The second tenet is that employees will not agree to a noncompete unless an employer adequately compensates them (Calla-

Isaac Sorkin, Kelsey Starr, and Matt Wiswall made helpful contributions to our survey project. We are particularly grateful to Charlie Brown and Rachel Arnow-Richman for valuable comments on early versions of the survey. We also thank our excellent research assistants (Justin Frake, Benjamin King, Daniel Halim, Xiaoying Xie, Linfeng Li, Mehdi Shakiba, and Emily Bowersox) and Olav Sorenson, Jim Hines, William Hubbard, Ted Sichelman, Scott Stern, Ben Klemens, Alison Morantz, and numerous seminar and conference participants for useful suggestions on previous drafts. All mistakes are our own.

[1] All but a few US states enforce noncompetes (though to varying degrees) as long as they are protecting legitimate business interests—such as trade secrets, client lists, or specialized training (Malsberger, Brock, and Pedowitz 2012)—without unduly harming the employee or the public. See Online Appendix OC for more on the enforceability of noncompetes.

[2] For a recent summary of noncompete policy proposals, see Fair Competition Law, The Changing Landscape of Trade Secrets Laws and Noncompete Laws around the Country (https://www.faircompetitionlaw.com/changing-landscape-of-trade-secrets-laws-and-noncompete-laws/).

[3] Available noncompete data cover executives (Bishara, Martin, and Thomas 2012) and engineers (Marx 2011). There are also two recent papers about the use of noncompetes among physicians (Lavetti, Simon, and White 2020) and hair salon employees (Johnson and Lipsitz, forthcoming). A large literature studies the enforceability of noncompetes but does not use data on noncompete use. See, for example, Balasubramanian et al. (2020), Marx, Strumsky, and Fleming (2009), Stuart and Sorenson (2003), Samila and Sorenson (2011), Starr (2019), Starr, Balasubramanian, and Sakakibara (2018), Conti (2014), Marx, Singh, and Fleming (2015), and Younge, Tong, and Fleming (2015).

han 1985; Friedman 1991), either up front or through higher future wage growth representing part of the return on the employer's marginal investment.[4]

In contrast, a more critical perspective recognizes that while noncompetes might solve certain incentive problems, they can also serve anticompetitive ends, including limiting wage growth by restraining labor market competition from product market competitors, retarding product market competition by reducing information flows to competitors, and preempting future competition from departing employees (Krueger and Posner 2018; Marx 2018). Employers might even deploy noncompetes when they are entirely unenforceable (because they are not relying on enforceability to align incentives), hoping instead that the *in terrorem* effects of the contract will hold employees to their (unenforceable) promises (Sullivan 2009; Starr, Prescott, and Bishara 2020; Blake 1960). This view also challenges the notion that employees will be adequately compensated for entering into a noncompete: for example, employers may impose a noncompete requirement only after an applicant has accepted an employment offer, which they often do on the first day of the job, when the employee's bargaining power is much diminished (Arnow-Richman 2006).

These contrasting views deliver different predictions about the incidence of noncompetes, the noncompete contracting process, and how noncompetes relate to labor market outcomes. (Table 1 summarizes the predictions and findings.) The more benign view tells us that noncompetes should be confined to occupations and industries that require specialized training or access to valuable information, should exist only in states that enforce noncompetes (because enforceability addresses the holdup problem), should involve negotiation, and should correlate with better outcomes for employees (for example, more training and higher wages), especially in enforcing states. The critical view contends that noncompetes should be common even among employees without access to trade secrets and in nonenforcing states, should follow a contracting process that involves little negotiation or transparency, and should be associated with worse labor market outcomes. In what follows, we describe our data and examine these competing predictions.

## 2. Data

Our data come from a large-scale survey that we developed and administered in 2014 to a panel of verified respondents.[5] The sample population is labor force participants ages 18 to 75 who are employed in the private sector or in a public health-care system or who are unemployed. The final sample contains 11,505 re-

---

[4] There is also the view that noncompetes—a species of within-industry mobility friction—will not matter as long as skills and information are fungible across industries and moving costs are low (Sykuta 2014).

[5] We provide a focused discussion of our survey data here with more details in Online Appendix OF. An even more extensive account of our data can be found in Prescott, Bishara, and Starr (2016), which describes our investigation into sample selection issues, hand coding of occupations and industries, weighting methods, and imputation procedures.

Table 1

Perspectives on Noncompetes, Predictions, and Findings

| | Main Arguments | Use | Contracting Process | Labor Market Outcomes |
|---|---|---|---|---|
| Traditional economic perspective | Employers use noncompetes to solve a holdup problem and protect employer interests, including trade secrets and client information, which creates incentives for efficient investment; employees agree not to compete only when doing so makes them better off, either through an up-front compensating differential or through increased growth in wages over time | Noncompetes should be confined to employees in occupations and industries that involve trade secrets, access to client lists, or other valuable information or that require specialized industry-specific training; noncompetes should also be confined to states that enforce them | Noncompetes should be negotiated agreements that maximize joint employee-employer surplus and make both parties better off; alternatively, a compensating differential should be a part of the initial job offer, which would render costly negotiation unnecessary | Conditional on an employee's job duties, employees who agree to noncompetes should receive more training or valuable information relevant to their employment; employees should earn higher wages as they capture some of the joint surplus created by noncompetes; because they capture some of the surplus on average, employees with noncompetes should be more satisfied with their jobs |
| Critical perspective | Noncompetes reduce labor market competition from product market competitors and future product market competition from departing employees; employers can also deploy noncompetes at inopportune times to reduce an applicant's or employee's bargaining power | Noncompetes should be common for all sorts of employees, regardless of access to confidential information, whenever employers can use noncompetes to limit competition in labor or product markets; noncompetes should be found where they are unenforceable if an employee's behavior is affected by noncompetes without regard to the prospect of enforcement | If employers are in a position to impose noncompetes on applicants and employees, noncompetes should rarely be negotiated, and employees should rarely seek outside advice since their options are few; employers may opt for late notice for noncompetes, which reduces employee bargaining power | Employees may not necessarily see any increase in training or information access since noncompetes may not be deployed to resolve incentive or holdup issues; employees may also suffer in terms of lower wages and reduced job satisfaction if noncompetes are able to limit competition in labor markets |

56

JA0589

| Findings | Noncompetes are more common for employees in technical jobs and industries and employees who have access to valuable, confidential information; however, noncompetes are relatively common in all occupations and industries and bind many employees without access to trade secrets or client information; noncompetes are also common in states that do not enforce them | Employees rarely negotiate over noncompetes and are rarely promised anything in exchange for agreeing to one; about one-third of noncompetes are requested by employers after an employee has accepted a job offer (without a change in job title or responsibilities); few individuals receive outside advice during the contracting process | Noncompetes are associated with more training, greater access to information, and higher wages and job satisfaction when the noncompete is presented along with the job offer; if a noncompete is presented after the acceptance of a job offer, employees experience no wage or training benefits on average, and they report being less satisfied in their jobs; higher wages appear to be largest in early tenure for employees receiving early notice, while lower job satisfaction appears early in tenure for employees bound by late-notice noncompetes; training associated with noncompetes increases with the enforceability of the noncompete, but wages fall |

57

spondents drawn from all states, industries, occupations, and other demographic categories. We use an online survey instrument to collect the data, which offers several compelling research-related benefits, such as the ability to ask technical questions in intuitive ways, easy access to millions of Americans who are comfortable responding to Internet surveys, and significantly lower costs (and thus larger sample sizes). Yet surveying people online also comes with several important challenges, such as ensuring respondents' reliability and representativeness, addressing item nonresponse, and even calculating the response rate.[6]

With regard to respondent representativeness, we built quotas into the surveying procedure to ensure our unweighted sample would be representative on key demographics. We also created ex post weights using iterative proportional fitting ("raking") to match the marginal distributions of many important variables in the 2014 American Community Survey (ACS).[7] Table 2 presents unweighted and weighted comparisons of our sample and data from the ACS. Our unweighted sample is higher earning, better educated, and more female than the population, but weighting appropriately virtually eliminates these differences. Unfortunately, weighting does not account for any nonrandom selection into our sample on the basis of unobservables.[8] With respect to data quality, we verify the reliability of respondents' answers in several ways. In addition to examining long-answer and free-form survey responses directly,[9] we also carefully cleaned our raw data, identifying and removing repeat survey takers and excluding observations with intentionally noncompliant answers, among many other exhaustive measures that we took to address inconsistent and low-quality survey submissions (see Online Appendix OF).[10]

---

[6] We vetted online panel providers by signing up as survey takers with many of these survey firms ourselves. Typically, after we completed an intake questionnaire, a representative called us a few days later and asked us questions to confirm the information we had submitted. In later discussions with various online panel providers, we learned that these companies drop applicants who give invalid phone numbers or who are not able to confirm their intake information.

[7] We considered a number of weighting schemes. See Prescott, Bishara, and Starr (2016, tables 16–17) for more details.

[8] As for item nonresponse, if only respondents with an ax to grind about noncompetes finish the survey, we may find that noncompetes are associated with negative outcomes. To address this concern, we asked respondents at the end of the survey to indicate why they participated in the exercise with an option that read "I wanted to share my experiences with noncompetes." In our robustness checks, we drop these individuals and confirm that our results are robust to their exclusion.

[9] In Table OF1, we reproduce the self-reported job titles, occupational duties, and industries from 15 randomly selected respondents. The entries illustrate how seriously respondents took the survey. The respondent-provided job descriptions are quite detailed, as are the industry descriptions. We examined all of the survey data comprehensively by reviewing every one of the 11,505 free-form job titles, job duties, and industries by hand in the process of creating occupation and industry codes. It is clear to us that the vast majority of these respondents took care to write thoughtful responses to the survey questions.

[10] The final step of our cleaning process was the design and use of a flagging algorithm, which analyzes within-survey responses for internal inconsistencies. The flagging algorithm flags up to 21 possible inconsistencies, including, for example, whether the respondent reports that the particular establishment or office at which he or she works is larger in terms of employee numbers than the employer's entire organization, whether there were missing responses, and others (for the full list, see Prescott, Bishara, and Starr 2016, table 7). Only 1.8 percent of the final sample was flagged two or more times, and 82.2 percent received no flags.

Table 2
Comparison of Surveys' Demographic Characteristics: Weighted and Unweighted Samples

|  | Our Survey | | American Community Survey | Difference | |
| --- | --- | --- | --- | --- | --- |
|  | Unweighted | Weighted |  | Unweighted | Weighted |
| Age (years) | 41.98 | 40.33 | 40.55 | 1.43** | −.22 |
|  | (13.23) | (13.63) | (13.64) | (.16) | (.27) |
| Annual income ($1,000s) | 49.06 | 44.00 | 46.68 | 2.38** | −2.68 |
|  | (42.03) | (47.38) | (55.62) | (.77) | (1.75) |
| Work > 40 hours/week | .70 | .71 | .72 | −.02** | −.01 |
|  | (.46) | (.45) | (.45) | (.00) | (.01) |
| Highest degree < bachelor's | .48 | .69 | .70 | −.22** | −.01 |
|  | (.50) | (.46) | (.46) | (.01) | (.02) |
| Highest degree = bachelor's | .37 | .21 | .20 | .16** | .01 |
|  | (.48) | (.41) | (.40) | (.01) | (.01) |
| Highest degree > bachelor's | .16 | .10 | .10 | .06** | .00 |
|  | (.36) | (.30) | (.30) | (.00) | (.01) |
| Male | .47 | .53 | .53 | −.07** | −.00 |
|  | (.50) | (.50) | (.50) | (.01) | (.01) |

Note. The weighted data use raking weights, as described in Section 2 and in Prescott, Bishara, and Starr (2016). Standard deviations (survey data) and robust standard errors (differences) clustered at the state level are in parentheses.
** $p < .01$.

Respondents' willingness to take and complete our survey is comparable to other surveys in the noncompete literature, although response rates are difficult to define and calculate in this setting because panel providers continuously send invitations to a superset of potential respondents—not all of whom are in our population of interest—until they receive a prespecified number of complete surveys. We can drop those who are not in our population of interest if they begin the survey (about 40 percent; see Prescott, Bishara, and Starr 2016, table 2), but we do not know and cannot determine whether those who receive an invitation but never start the survey are in our population of interest.[11] Given this limitation, the true response rate lies between two extremes: the final sample size over the number who started the survey in our population of interest (23 percent) and the final sample size over the total number of survey invitations (2 percent).[12]

[11] The quotas we used to ensure representativeness exacerbate this problem because as the survey stays in the field and quotas begin to bind, respondents who would otherwise qualify for the survey become newly ineligible. Toward the end of the surveying period, when most quotas are full, the online survey company might send out thousands of e-mail invitations when only a handful of respondents satisfy the remaining criteria. In addition, our survey was marketed as a work experiences survey, and online survey respondents skew toward being out of the labor force (see Prescott, Bishara, and Starr 2016, table 12), so it is likely that many who did not respond to the survey invitation were not in our population of interest.

[12] These numbers, while seemingly on the low side, are in line with and likely better than response rates to random-digit-dialing surveys, which were around 6 percent in 2018 (Kennedy and Hartig 2019). To compare the rates, we calculate response rates for other surveys in this literature; see Table OB1. Moreover, in light of our arguably low response rate, it is important to recall that a low response rate is not problematic per se. Rather, bias results only when the reasons for nonparticipation are correlated with unobservables and outcomes of interest.

### 3. The Use of Noncompetes

To identify employees bound by noncompetes, our survey instrument first defines a noncompete agreement (explicitly distinguishing it from a nondisclosure agreement, a common confusion) and asks respondents whether they have ever heard of such provisions (75.2 percent report yes). Our survey then asks those who indicate some familiarity with noncompetes whether they have ever agreed to one at some point in their career (25 percent overall, 42 percent of those who are aware of them) and, if they answer yes, whether they are currently bound by one. For our 11,505 respondents, the unweighted distribution of those with a noncompete is 15.2 percent yes, 55.1 percent no, and 29.7 percent maybe, where the maybe category includes those who have never heard of a noncompete (24.8 percent), do not know if they have one (2.2 percent), do not want to say (.23 percent), and cannot remember (2.5 percent).[13]

A key challenge in calculating the incidence of noncompetes is that many in the maybe category may be bound by a noncompete. In fact, of those in our data who report having ever entered into a noncompete agreement, 8.8 percent also acknowledge having unknowingly signed at least one such provision that they discovered only at some later date. We address this uncertainty in two ways. First, we treat the maybes as their own category, which allows us to interpret the proportion of respondents answering yes as a lower bound on the incidence of noncompetes and the proportion of respondents answering either yes or maybe as an upper bound. Second, because the overall effect of a noncompete is averaged across those who are and who are not aware of their noncompete status, we use multiple-imputation methods (King et al. 2001) to predict which respondents in the maybe category have a noncompete.[14]

Overall, our weighted estimates indicate that 38.1 percent of US labor force participants have agreed to a noncompete at some point in their lives and that 18.1 percent, or roughly 28 million individuals,[15] currently work under one.[16] Table 3 shows the distribution of temporal and geographic restrictions of non-

---

[13] The unweighted distribution for whether an individual has entered into a noncompete at some point in the past in our full sample is 31.5 percent yes, 41.5 percent no, and 27 percent maybe. Among individuals who answer yes or no to the question about whether they entered into a noncompete, almost all report being confident in their answer, that is, either completely (74.2 percent) or fairly (23 percent) sure.

[14] We provide a more in-depth discussion in Prescott, Bishara, and Starr (2016, sec. 2F). To calculate our standard errors properly, we impute noncompete status among the maybe category 25 times. We then estimate our statistical models on each of the 25 different but complete data sets and use Rubin's rules to combine the resulting point estimates and correct the standard errors to reflect the variation in the imputed values (see Section OF5 in the Online Appendix for details). The benefits of multiple-imputation methods are that they allow us to create an overall estimate of the use of noncompetes that accounts for the uncertainty surrounding the maybe group.

[15] The Bureau of Labor Statistics puts the US labor force at 156 million in July 2014 (US Department of Labor 2014, p. 4).

[16] The unweighted multiple-imputation estimates signal that relatively few maybes are likely to have noncompetes in fact. We calculate that 19.9 percent of individuals (including 16 percent of the maybe respondents) are bound by a noncompete in 2014. These numbers are similar to estimates from smaller but more recent surveys: Krueger and Posner (2018), using a similar online survey methodology of 795 respondents in 2017, find a 15.5 percent incidence rate, while a 2017 survey in Utah of 2,000 employees reports an 18 percent incidence rate (Cicero 2017).

Table 3

**Temporal and Geographic Scope
of Noncompetes**

| Scope | Percentage |
|---|---|
| Term duration: | |
| $\leq 1$ Year | 30.9 |
| $>1$ Year to $\leq 2$ years | 15.0 |
| $>2$ Years | 33.8 |
| Do not know | 20.3 |
| Geographic limit of prohibition: | |
| Radius (miles) | 7.3 |
| City | 5.9 |
| County | 6.1 |
| Metropolitan statistical area | 6.0 |
| Within the state | 13.9 |
| Entire United States | 15.4 |
| No limit | 23.1 |
| Other | 3.3 |
| Do not know | 19.0 |

**Note.** The sample includes the 1,747 individuals
bound by noncompetes and uses sample weights.

competes in the United States: most noncompetes have a duration of 2 years or less, while the geographic scope is frequently the state or the entire country (or there is no geographic limitation), though about 20 percent of individuals with noncompetes are uncertain as to the precise terms. Table 4 provides means—overall and by noncompete status—of important variables in our sample. Table 5 and our figures document variation in noncompete use by a range of employee and employer characteristics, with additional calculations available in Figures OA1–OA5 in the Online Appendix. The figures report the results of both our bounding approach and our multiple-imputation strategy.[17] We also examine multinomial logit and linear probability models of employee noncompete status. We briefly describe variation in noncompete use by demographic characteristics before focusing our discussion on the empirical findings that are most relevant to the theoretical and policy debates over noncompetes.

The incidence of noncompetes differs widely across types of employees and employers. Table 5 shows that noncompetes are more than twice as common among employees of for-profit employers than they are among those working for private nonprofits. Men are slightly more likely than women to have entered into a noncompete at some point and to be currently bound by one. Noncompetes are also a bit more frequent among the young (see also Figure 1) and in areas with greater product market competition (Figure 2). Finally, while noncompetes are more routine among those with higher levels of education (Figure 3) and among those with greater annual earnings (Figure 4) or receiving a salary (Table 5),

---

[17] The size of the bars in Figures 1–8 and OA1–OA5 indicates the size of the maybe category. The lower end of the bar represents the lower bound on the incidence of noncompetes, the upper end represents the upper bound on incidence, and the dot marks the multiple-imputation estimate.

Table 4
Weighted Sample Means by Noncompete Status

| Variable | Full Sample | Bound by Noncompete | | | Change Relative to No Group | |
|---|---|---|---|---|---|---|
| | | No | Maybe | Yes | Maybe | Yes |
| Labor market outcomes: | | | | | | |
| Log hourly wage | 2.88 | 2.92 | 2.70 | 3.24 | −.23** | .31** |
| Employer shares info | .55 | .57 | .50 | .59 | −.06** | .02 |
| Training last year | .50 | .52 | .44 | .64 | −.08** | .12** |
| Satisfied in job | .68 | .69 | .65 | .70 | −.04+ | .01 |
| Demographics: | | | | | | |
| Paid hourly | .68 | .65 | .81 | .45 | .16** | −.20** |
| Paid by salary | .28 | .31 | .16 | .49 | −.15** | .18** |
| Paid by commission | .03 | .03 | .02 | .04 | −.01* | .02 |
| Paid by other means | .01 | .01 | .01 | .01 | −.00 | −.00 |
| Age (years) | 40.28 | 42.33 | 37.54 | 40.22 | −4.79** | −2.11** |
| Hours worked per week | 37.59 | 37.92 | 35.87 | 41.27 | −2.05** | 3.34** |
| Weeks worked per year | 47.81 | 48.31 | 46.96 | 48.33 | −1.35** | .02 |
| Male | .53 | .56 | .47 | .58 | −.08** | .03 |
| Private for-profit employer | .90 | .90 | .87 | .96 | −.03** | .06** |
| Private nonprofit employer | .06 | .07 | .07 | .02 | .01 | −.05** |
| Public health system employer | .04 | .03 | .05 | .02 | .02** | −.01* |
| Highest level of education: | | | | | | |
| <Bachelor's degree | .69 | .65 | .81 | .48 | .17** | −.17** |
| Bachelor's degree | .21 | .24 | .14 | .33 | −.10** | .09** |
| >Bachelor's degree | .10 | .12 | .05 | .19 | −.07** | .08** |
| Log state unemployment rate at hire | 1.90 | 1.88 | 1.92 | 1.89 | .04** | .01 |
| Log labor force size in state at hire | 15.35 | 15.33 | 15.35 | 15.41 | .02 | .07** |
| Log establishments in county-industry | 6.47 | 6.47 | 6.40 | 6.68 | −.07 | .21* |
| Employer size: | | | | | | |
| <25 Employees | .23 | .25 | .23 | .15 | −.02+ | −.10** |
| 25–100 Employees | .16 | .16 | .16 | .15 | −.00 | −.00 |
| 101–250 Employees | .09 | .10 | .09 | .10 | −.01 | .00 |
| 251–500 Employees | .07 | .08 | .06 | .09 | −.01 | .02+ |
| 501–1,000 Employees | .07 | .07 | .07 | .07 | .01 | .00 |
| 1,001–2,500 Employees | .07 | .06 | .07 | .07 | .01 | .01 |
| 2,501–5,000 Employees | .07 | .06 | .08 | .08 | .02* | .02* |
| >5,000 Employees | .24 | .23 | .24 | .29 | .01 | .06** |
| Multiunit employer | .63 | .61 | .62 | .73 | .00 | .12** |
| Other postemployment restrictive covenants: | | | | | | |
| Nondisclosure | .36 | .30 | .30 | .75 | −.00 | .44** |
| Nonpoaching | .04 | .02 | .02 | .18 | −.00 | .15** |
| Nonsolicitation | .12 | .08 | .09 | .35 | .01 | .27** |
| Arbitration | .08 | .06 | .05 | .19 | −.01 | .13** |
| Intellectual property assignment | .09 | .08 | .05 | .28 | −.03** | .20** |
| N | 11,505 | 6,344 [55.1] | 3,414 [29.7] | 1,747 [15.1] | | |

Note. Values in brackets are percentages of the unweighted sample; 83.5 percent of the maybe category indicates never having heard of a noncompete. Robust standard errors are clustered at the state level when testing differences between categories.
+ $p < .1$.
* $p < .05$.
** $p < .01$.

JA0595

Table 5

**Noncompete Status by Employee Characteristics**

| Characteristic | Currently Bound | Ever Bound |
|---|---|---|
| Employer class: | | |
|   Private for-profit | 19.0 | 38.8 |
|   Private nonprofit | 9.8 | 28.6 |
|   Public health care | 12.4 | 37.8 |
| Gender: | | |
|   Female | 17.3 | 36.3 |
|   Male | 18.8 | 39.7 |
| Age: | | |
|   Under 40 | 20.6 | 38.7 |
|   40 or Older | 15.6 | 37.5 |
| Highest level of education: | | |
|   <Bachelor's degree | 14.3 | 34.7 |
|   Bachelor's degree | 25.0 | 43.8 |
|   >Bachelor's degree | 30.0 | 49.0 |
| Compensation type: | | |
|   Hourly | 14.0 | 33.7 |
|   Salary | 27.5 | 47.7 |
|   Other | 23.6 | 45.9 |
| Annual earnings: | | |
|   <$40,000 | 13.3 | 33.0 |
|   ≥$40,000 | 25.2 | 45.6 |
| Confidential information: | | |
|   Works directly with clients | 14.9 | 35.6 |
|   Has access to client information | 16.0 | 36.2 |
|   Has access to trade secrets | 32.6 | 54.9 |
|   Client work and client information | 14.8 | 31.3 |
|   Client work and trade secrets | 35.8 | 53.4 |
|   Client information and trade secrets | 34.4 | 58.3 |
|   All confidential options | 35.3 | 56.2 |
|   None | 7.8 | 26.9 |
| Employer size: | | |
|   <25 Employees | 11.6 | 33.6 |
|   25–100 Employees | 17.7 | 36.5 |
|   101–250 Employees | 19.1 | 40.6 |
|   251–500 Employees | 22.3 | 40.9 |
|   501–1,000 Employees | 16.8 | 39.1 |
|   1,001–2,500 Employees | 21.2 | 42.3 |
|   2,501–5,000 Employees | 21.0 | 44.2 |
|   >5,000 Employees | 21.5 | 38.3 |
| Overall | 18.1 | 38.1 |

**Note.** Statistics are percentages from the multiple-imputation approach. All estimates are weighted.

**JA0596**

they are still prevalent among less educated and lower-earning employees. For example, among those without a bachelor's degree, 34.7 percent of our respondents report having entered into a noncompete at some point in their lives, while 14.3 percent report currently working under one. Similarly, of those earning less than $40,000 per year, 13.3 percent are currently subject to a noncompete, with 33 percent reporting that they have acquiesced to one at some point. Table 6 confirms that these patterns hold in a multivariate framework. Importantly, Figures 1–4 and Table 4 also demonstrate that a disproportionate share of the maybe category are low earning with lower levels of education.[18]

Consistent with the traditional case for noncompetes, the provisions are more frequent in certain high-skilled occupations and industries, though they are still common in most other occupations (Figure 5) and industries (Figure 6).[19] Per Figure 5, the occupations in which noncompetes are found most frequently are architecture and engineering and computer and mathematical vocations. Farm, fishing, and forestry positions have the lowest incidence of noncompetes.[20] With respect to industries, Figure 6 shows that noncompetes are most common in information, mining and extraction, and professional and scientific services. Noncompetes are found least frequently in agriculture and hunting and the accommodation and food services industries.[21] Relatedly, the incidence of noncompetes is much higher among those who report possessing some type of trade secret or valuable information. Figure 7 breaks down noncompete incidence by type of legitimate business interest.[22] Those who work with trade secrets are most likely to be bound by a noncompete (33–36 percent), while those who only work with clients or who have client-specific information are roughly half as likely to have a noncompete (15–16 percent).

[18] For example, among those who report having less than a bachelor's degree, nearly 45 percent indicate that they do not know whether they have agreed to noncompete in the past, compared with approximately 20 percent of respondents with at least a bachelor's degree.

[19] We use two methods to identify the use of noncompetes across occupations and industries: First, we calculate the proportion of respondents who report being subject to a noncompete in a given occupation or industry. Second, we ask individuals to project how common noncompetes are in their occupation and industry, and then we aggregate those estimates into a single occupation- or industry-specific number. The idea behind using projected estimates as a way of estimating the incidence of noncompetes is that employees' knowledge of their occupation and industry as a whole captures more information than their personal situation. See Rothschild and Wolfers (2013) for an example of this method in a voting context.

[20] Two indicia of the quality of our survey data are that legal occupations have the second-lowest incidence level (10 percent) and that employees in these occupations are most likely to know whether they are bound by a noncompete. These facts are reassuring because one would expect that lawyers and legal support staff would be among the most careful readers of contracts and because the practice of law is the only occupation in which noncompetes are unenforceable in all states (Starr, Balasubramanian, and Sakakibara 2018).

[21] With respect to the joint occupation-industry incidence distribution, Figure OA5 shows that the use of noncompetes is highest for technical occupations (computer, mathematical, engineering, architecture) in the manufacturing and information industries. Note that in Figure OA5 we analyze only occupation-industry cells for which there are at least 15 individuals in the sample in order to ensure that the results are representative.

[22] We define legitimate business interests as trade secrets, relationships with clients, and client information, such as contacts or marketing databases.

Noncompete Agreements                                                    65



**Figure 1.** Incidence of noncompetes by age



**Figure 2.** Incidence of noncompetes by number of employers in county-industry



**Figure 3.** Incidence of noncompetes by education level



**Figure 4.** Incidence of noncompetes by employee annual earnings

**JA0599**



**Figure 5.** Incidence of noncompetes by occupation



**Figure 6.** Incidence of noncompetes by industry



**Figure 7.** Incidence of noncompetes by legitimate business interest

Finally, we find very little difference in the (unconditional) incidence of non-competes between states that will and will not enforce these provisions (Figure 8). This is true even among single-location employers, where we find that the un-conditional use of noncompetes in nonenforcing states is only slightly lower than in states that enforce noncompete agreements most zealously (14 percent versus 16.5 percent). By comparison, multivariate results in Table 6 indicate that, when comparing two observationally equivalent employees, noncompetes appear to be somewhat more common (4–5 percentage points) in the most vigorous enforcing states relative to nonenforcing states. The difference between the unconditional and conditional models suggests some geographic selection into the use of non-competes based on employees' and employers' observable characteristics.

To provide some aggregate understanding across all of these employee and employer characteristics, our simple multivariate model predicts that a salaried employee with a college degree earning $100,000 per year with access to the em-ployer's trade secrets in a private for-profit firm has a 44 percent likelihood of be-ing a party to a noncompete. As a point of comparison, an employee paid by the hour without a bachelor's degree in a private for-profit firm earning $50,000 per year and without access to the employer's trade secrets has a 13 percent chance of being bound by a noncompete.



**Figure 8.** Incidence of noncompetes by enforceability

## 4. Negotiation and the Contracting Process

Table 7 presents descriptive statistics regarding the noncompete contracting process, including the extent of negotiation over noncompetes, when employers initially present noncompetes to applicants or employees, and whether employees consult with others before assenting to such a provision. A total of 61 percent of individuals with a noncompete first learn they will be asked to agree not to compete before accepting their job offers, while approximately 30 percent first learn they will be asked to agree only after they have already accepted their offers (not including those offered a promotion or change in responsibilities). This late notice appears to matter to employees. In a follow-up question to those who received late notice, 26 percent report that if they had known about their employer's noncompete plans earlier, they would have reconsidered accepting the offer.

Table 7 also shows that only 10 percent of employees report attempting to negotiate over the terms of their noncompete or asking for additional compensation or benefits in exchange for agreeing to such an employment condition. However, we find that the timing of noncompete notice is correlated with whether an individual makes an effort to bargain: employees with early-notice noncompetes are nearly twice as likely to negotiate over their noncompete as employees with late-notice noncompetes (11.6 percent versus 6 percent).[23] When presented with a noncompete, most respondents report just reading and signing it,

---

[23] By contrast, 31 percent of those asked to agree to a noncompete before a promotion or raise report negotiating over the noncompete, which suggests that such circumstances allow employees a more favorable bargaining position.

Table 6

**Determinants of Noncompete Status**

| | Multinomial Logit | | | OLS: Noncompete |
|---|---|---|---|---|
| | Maybe | No | Yes | |
| Log hourly wage | −.037* | .006 | .031** | .029** |
| | (.017) | (.018) | (.011) | (.010) |
| Private nonprofit employer | .042 | .039 | −.081** | −.071** |
| | (.033) | (.033) | (.014) | (.015) |
| Public health system employer | .087* | −.034 | −.053* | −.054* |
| | (.042) | (.036) | (.022) | (.025) |
| Works directly with clients | −.058** | .004 | .053** | .044** |
| | (.020) | (.023) | (.008) | (.009) |
| Has access to client information | −.121** | .055 | .066** | .055** |
| | (.038) | (.041) | (.018) | (.018) |
| Has access to trade secrets | −.178** | .021 | .157** | .161** |
| | (.024) | (.028) | (.018) | (.021) |
| Client work and client information | −.193** | .132** | .061** | .051** |
| | (.027) | (.031) | (.013) | (.014) |
| Client work and trade secrets | −.217** | −.013 | .230** | .227** |
| | (.042) | (.046) | (.049) | (.056) |
| Client information and trade secrets | −.194** | .016 | .178** | .191** |
| | (.031) | (.029) | (.022) | (.026) |
| All confidential options | −.240** | .039 | .201** | .209** |
| | (.027) | (.026) | (.015) | (.017) |
| Enforceability quintile: | | | | |
| 1st Quintile | −.109** | .068** | .041** | .046** |
| | (.026) | (.018) | (.013) | (.015) |
| 2nd Quintile | −.100** | .073** | .027* | .033* |
| | (.021) | (.019) | (.012) | (.013) |
| 3rd Quintile | −.136** | .074** | .062** | .066** |
| | (.026) | (.025) | (.019) | (.022) |
| 4th Quintile | −.118** | .084** | .035* | .039* |
| | (.021) | (.024) | (.017) | (.018) |
| 5th Quintile | −.111** | .064** | .047** | .052** |
| | (.026) | (.017) | (.015) | (.017) |
| Employers in last 5 years: | | | | |
| 2 Employers | −.026 | .027 | −.002 | −.000 |
| | (.021) | (.022) | (.011) | (.011) |
| 3–4 Employers | .010 | −.014 | .004 | .004 |
| | (.020) | (.029) | (.018) | (.017) |
| >4 Employers | .048* | −.056* | .008 | .007 |
| | (.022) | (.023) | (.018) | (.019) |
| Employment: | | | | |
| 1–2 Years | .064+ | −.014 | −.050 | −.047 |
| | (.039) | (.042) | (.032) | (.029) |
| 2–4 Years | .038 | .015 | −.053* | −.048+ |
| | (.040) | (.036) | (.027) | (.026) |
| 4–10 Years | .056 | −.027 | −.029 | −.024 |
| | (.035) | (.035) | (.028) | (.026) |
| >10 Years | .122* | −.095+ | −.028 | −.009 |
| | (.062) | (.051) | (.037) | (.038) |
| Indefinite | .059+ | −.015 | −.044+ | −.038+ |
| | (.032) | (.035) | (.025) | (.022) |
| Paid by salary | −.049** | .015 | .034* | .040* |
| | (.018) | (.017) | (.015) | (.016) |

70

**JA0603**

Table 6 (*Continued*)

| | Multinomial Logit | | | OLS: Noncompete |
|---|---|---|---|---|
| | Maybe | No | Yes | |
| Paid by commission | −.116** | −.006 | .121** | .111* |
| | (.042) | (.042) | (.041) | (.044) |
| Paid by other means | −.012 | −.018 | .030 | .018 |
| | (.062) | (.065) | (.044) | (.036) |
| Age | −.005** | .005** | −.000 | −.000 |
| | (.000) | (.000) | (.000) | (.000) |
| Hours worked per week | .000 | −.001 | .001 | .001 |
| | (.001) | (.001) | (.000) | (.000) |
| Weeks worked per year | −.003* | .002+ | .000 | .000 |
| | (.001) | (.001) | (.001) | (.001) |
| Male | −.024 | .047** | −.023* | −.021* |
| | (.015) | (.016) | (.011) | (.010) |
| Highest degree = bachelor's | −.108** | .076** | .032** | .041** |
| | (.017) | (.019) | (.010) | (.012) |
| Highest degree > bachelor's | −.119** | .085** | .033* | .051** |
| | (.029) | (.029) | (.014) | (.018) |
| Log state unemployment rate at hire | .001 | −.023 | .022 | .020 |
| | (.027) | (.024) | (.016) | (.016) |
| Log labor-force size in state at hire | −.008 | .005 | .003 | .002 |
| | (.010) | (.009) | (.007) | (.007) |
| Multiunit employer | −.033 | .000 | .032** | .034** |
| | (.022) | (.027) | (.011) | (.012) |
| Employer size: | | | | |
| 25–100 Employees | .016 | −.046* | .031+ | .022 |
| | (.018) | (.024) | (.016) | (.016) |
| 101–250 Employees | .017 | −.038 | .022 | .016 |
| | (.027) | (.025) | (.017) | (.018) |
| 251–500 Employees | −.003 | −.035 | .038* | .033 |
| | (.032) | (.031) | (.019) | (.020) |
| 501–1,000 Employees | .059+ | −.076* | .017 | .010 |
| | (.033) | (.038) | (.025) | (.027) |
| 1,001–2,500 Employees | .054 | −.078+ | .024+ | .018 |
| | (.047) | (.046) | (.013) | (.015) |
| 2,501–5,000 Employees | .088** | −.106** | .019 | .013 |
| | (.028) | (.027) | (.018) | (.019) |
| >5,000 Employees | .046+ | −.078** | .032+ | .025 |
| | (.026) | (.027) | (.017) | (.017) |
| Log establishments in county-industry | .006 | −.007 | .001 | .002 |
| | (.005) | (.005) | (.003) | (.003) |
| Mean $R^2$ | | | | .139 |

*Note.* The multinomial logit results indicate the marginal increase in the probability of being in the maybe, no, or yes categories from a unit increase in the variable; the values in each row add to 0 because increases in the probability of being in one category are offset by lower chances of being in another. The ordinary least squares (OLS) results are from a linear probability model in which the dependent variable is an indicator for having agreed to a noncompete versus answering maybe or no to the noncompete-status survey question. The omitted enforceability group is the set of nonenforcing states (North Dakota and California), and the measure of enforceability is from Starr (2019). All regressions include occupation and industry fixed effects. Robust standard errors clustered at the state level are in parentheses. $N = 11,462$.

+ $p < .1$.
* $p < .05$.
** $p < .01$.

JA0604

The Journal of LAW & ECONOMICS

Table 7
The Noncompete Contracting Process

|  | Distribution (%) | Negotiate (%) |
|---|---|---|
| When did you first learn you would be asked to sign a noncompete? | | |
| Before accepting job offer | 60.8 | 11.6 |
| After accepting job offer | 29.3 | 6.3 |
| Before promotion or raise | 2.2 | 30.8 |
| Other or cannot remember | 7.7 | 6.5 |
| What did you do when asked to sign? [a] | | |
| Signed without reading | 6.7 | 7.9 |
| Read quickly and signed | 31.2 | 7.1 |
| Read slowly and signed | 56.4 | 11.6 |
| Consulted with friends and/or family | 10.4 | 30.8 |
| Consulted a lawyer | 7.9 | 48.6 |
| Overall | | 10.1 |

[a] Respondents could select multiple responses.

with a nontrivial fraction not even reading it. According to our data, consultation with friends, family, or a lawyer is relatively uncommon, but obtaining advice is strongly associated with attempting to negotiate.[24]

In Table OB2, we report the reasons individuals cite for not attempting to negotiate over the terms of their noncompetes (by the timing of notice). The top reasons for forgoing the opportunity to negotiate include that the terms were reasonable (52 percent) and the assumption that noncompetes were not negotiable (41 percent). Roughly 20 percent of employees fear creating tension with their employers or simply being fired if they try to negotiate.[25] In terms of heterogeneity by timing, those asked to agree not to compete after they have already accepted their offer are 9 percentage points less likely to report that they felt the terms were reasonable (46 percent versus 55 percent) and are also 10 percentage points more likely to assume they could not negotiate (48 percent versus 38 percent). In unreported tabulations, we also explore respondents' beliefs about the consequences of refusing to agree to a noncompete. We asked respondents with noncompetes, "Would you still have been hired if you refused to sign the noncompete?" Only 11.4 percent answered affirmatively, 61.6 percent believed they would not, and 27 percent did not know. Taken together, the evidence in this section indicates that employers present (or employees receive) noncompete proposals as take-it-or-leave-it propositions.

[24] In unreported results, we also find that negotiation is twice as likely for those with a bachelor's degree relative to those without (13 percent versus 6.2 percent) and that men are more likely to report negotiating than women (13 percent versus 4.5 percent). In addition, negotiation appears to be uncorrelated with enforceability—even after controlling for a host of characteristics such as employer size and employee age, gender, industry, occupation, and education.

[25] For example, in an open answer to a survey question, one respondent wrote, "i needed the job [expletive], i wasn't trying to make any waves on the first day."

## 5. Labor Market Outcomes

The traditional and critical perspectives on noncompetes offer different predictions about the extent to which employees with noncompetes should receive training and valuable information in their employment as well as whether employees who agree not to compete will be better off on the whole. In this section, we examine the conditional relationships between noncompetes and labor market outcomes. Given that contrasting views on noncompetes also highlight the role of late notice (as possibly eroding employee bargaining power),[26] the enforceability of noncompetes (as key to resolving the holdup problem), and effects over tenure (as perhaps reflecting an up-front compensating differential), we also explore heterogeneity along these dimensions.

### 5.1. Empirical Approach

We begin by acknowledging that our analysis of the relationships between noncompete use and labor market outcomes (and the heterogeneity of those relationships across various contracting and legal dimensions) is best taken as descriptive and should not be interpreted causally. Use of noncompetes and the moderator variables we examine are endogenous.[27] Accordingly, any associations we observe may be at least partially due to reverse causation or selection on unobservables. To ease some concerns about this important limitation, we use several approaches to assess the sensitivity of our empirical results, including inspecting the robustness of our findings to the inclusion of a rich set of controls in our regression analysis, testing for selection on unobservables,[28] and asking respondents directly about their experiences with noncompetes.

Our investigation focuses on four critical employee outcomes: wages, training,

---

[26] We provide summary statistics by early and late notice in Table OB3.

[27] We considered two possibilities for suitable instruments for noncompete status: differences in the enforcement regime and the projected incidence of noncompetes by others in the same occupation and industry. Both approaches yield implausible estimates (see Online Appendix OD).

[28] Oster (2019) describes the key aspects of the test: If the $R^2$-statistic rises substantially as additional control variables are added and the estimate of the coefficient of interest remains stable, then there is less residual variation available to explain away a statistically significant estimate. If, however, the $R^2$-value changes very little or the coefficient falls dramatically as controls are added to the model, then we should be less confident in the magnitude and direction of the estimate under review. The test for selection bias in Oster (2019) delivers one parameter, $\delta$, which indicates how powerful selection on unobservables would have to be, relative to the selection that occurs with respect to observables, to push the point estimate in question to 0. A value of $\delta = 1$ implies that selection on unobservables would have to be as important as selection on observables to fully account for an estimated nonzero coefficient, while a value of $\delta > 1$ indicates that selection on unobservables would need to be even greater than selection on observables. To carry out the selection-bias test, we set the maximum $R^2$-value 30 percent higher than the $R^2$-value in our fully saturated model, as Oster recommends. We also examine the reported $\delta$ terms by making comparisons between a model with no controls and one with advanced controls and between a model with basic controls (including state and occupation-industry fixed effects) and the advanced-controls model. We set the test's $\delta$-statistic equal to 1 as a natural cutoff to assess the stability of our results.

access to valuable employer information, and job satisfaction. Our main empirical specification takes the form

$$Y_{iojs} = \beta_0 + \beta_1 \text{Noncompete}_i + \gamma X_{ij} + \omega_{o,j} + \alpha_s + \varepsilon_{iojs}. \qquad (1)$$

The variable Noncompete$_i$ indicates whether the individual is bound by a noncompete. We study those who affirmatively report a current noncompete (yes), grouping maybe respondents with no respondents (and revisiting the robustness of our findings to this choice in our sensitivity analysis). The term $Y_{iojs}$ refers variously to employment-related outcomes as reported by employee $i$ in occupation $o$, industry $j$, and state $s$. We represent industry-occupation (using North American Industry Classification System [NAICS] two-digit codes and Standard Occupational Classification [SOC] two-digit codes) fixed effects and state fixed effects with $\omega_{o,j}$ and $\alpha_s$, respectively. In later models, we disaggregate our noncompete indicator to account for when the employee first learns about the employer's noncompete requirement (early and late notice), with individuals who do not have noncompetes serving as the comparison group; we also examine models in which we interact Noncompete$_i$ with a state-level noncompete enforceability measure and with length of tenure.[29]

Controls are given by $X_{ij}$, which we divide into basic and advanced groups in our analysis to gauge the sensitivity of our results to potentially confounding variables. Basic controls include demographic characteristics,[30] while the advanced controls address more noncompete-specific concerns.[31] These advanced controls likely include some that are endogenous, which potentially obscures any causal mechanisms linking the use of noncompetes and employee outcomes. Neverthe-

---

[29] We cluster our standard errors by state, tracking the level at which noncompetes are enforced (Moulton 1990).

[30] The controls are indicators for employee type (hourly, salaried, commission), gender, and education; employer size; employer's multiunit status; linear measures of an employee's hours worked per week, weeks worked per year, and their interaction; a third-degree polynomial in employee age; the logged number of employers in the county-industry cell; and the logged unemployment rate and labor force size in the state and year in which the employer hired the respondent (Beaudry and DiNardo 1991). When necessary, logged variables take a log of the value plus 1.

[31] Because noncompetes and other postemployment restrictive covenants (nondisclosure agreements, nonsolicitation provisions, and similar devices) frequently occur together (see Table 4), we disentangle and isolate any relationship between noncompetes and outcomes by controlling for these related provisions. If the use of postemployment provisions generally correlates with employer or employee quality or sophistication, controlling for them also accounts for any residual determinant not addressed by our other controls. In addition, we include controls for poaching rates to and from the employer and in the industry generally to address employer heterogeneity in quality and employee mobility patterns (for example, some employers are more likely to have their employees poached by competitors and so may be more likely to use noncompetes and may also pay different wages). We also control for other human resources (HR) benefits, such as whether the employer offers a retirement plan, health insurance, paid vacation days, sick leave, and life insurance. The inclusion of these HR-type benefits reduces the sample size from 11,462 to 11,010. Excluding these variables produces results that are nearly identical to our reported coefficients in terms of statistical significance and magnitude. See Tables OB4–OB7. Individuals with special access to sensitive information or who are predictable flight risks may also be more likely to have both noncompetes and higher earnings, so we control for the number of employers the employee has had in the last 5 years (a baseline measure of mobility) and the types of confidential information the employee possesses (for example, access to trade secrets or client information).

less, because we do not have reliably exogenous variation in the use of noncompetes to examine, it is informative to explore whether any noncompete-related patterns we observe survive when we condition on these potentially associated employment terms and conditions.[32]

### 5.2. Results

Table 8 reports the relationships we find between noncompete status and our four employment outcomes: logged hourly wages and separate indicators for whether the respondent agrees or strongly agrees that their employer shares all job-related information with them, whether they received training in the last year, and whether they agree or strongly agree that they are satisfied with their employment. Our baseline results with our basic controls show that noncompete agreements are associated with positive differentials in wages and training. However, including our advanced controls reduces the training differential to near 0 and causes the wages differential to fall from nearly 11 percent to 6.6 percent.[33] These results imply that certain advanced controls are strongly correlated with the use of noncompetes and these outcomes.

Table 8 also demonstrates that our mainly insignificant baseline results are driven by heterogeneous associations that run in opposite directions, depending on when an employee receives notice of the noncompete. With regard to those who learn of their noncompete before they accept their job offers, our most saturated model indicates that these employees have 9.7 percent ($e^{.093}$) higher earnings, are 4.3 percentage points more likely to have information shared with them (a 7.8 percent increase relative to the sample average), are 5.5 percentage points more likely to have received training in the last year (an 11 percent increase), and are 4.5 percentage points more likely to be satisfied in their jobs (a 6.6 percent increase) relative to employees without a noncompete. In contrast, those presented with a noncompete after they accept an offer (excluding those furnished with a noncompete following a promotion or a change in responsibilities) appear to receive no observable boost in wages or training, are 13.4 percentage points less likely to have had information shared with them (a 24 percent reduction), and are 8.5 percentage points less likely to be satisfied in their employment (a 12.5 percent reduction). In all specifications but one,[34] within-model tests confirm

---

[32] In Tables OB4–OB7, we add our advanced controls sequentially so we can more precisely understand which, if any, shift our estimated noncompete coefficients.

[33] As expected, given the large coefficient swings across these two models, the selection tests for the model with advanced controls confirm that we ought to be worried about selection on unobservables explaining our results. For example, when our model of logged hourly wages with advanced controls is compared with an otherwise equivalent model with no controls, the $\delta$ term is .497, which implies that selection on unobservables would need to be only half as important as selection on observables to explain away our estimated coefficient on noncompete status.

[34] As we show in Table OB4, the lack of statistical significance on the before-after difference in the association between noncompete status and logged hourly wages occurs only when we control for HR benefits.

Table 8
Labor Market Outcomes

| | Log Hourly Wage | | Employer Shares Info | | Training Last Year | | Satisfied in Job | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Baseline: | | | | | | | | |
| Noncompete | .109** | .066** | .031 | −.020 | .077** | .006 | .015 | .006 |
| | (.026) | (.023) | (.030) | (.025) | (.019) | (.019) | (.019) | (.017) |
| | [1.033] | [.497] | [1.361] | [.715] | [1.180] | [.104] | [1.463] | [1.399] |
| | | {.216} | | {.302} | | {.048} | | {.829} |
| $R^2$ | .503 | .541 | .100 | .146 | .160 | .199 | .099 | .149 |
| Timing of notice: | | | | | | | | |
| Before accepting job | .143** | .093** | .101** | .043+ | .131** | .055* | .060** | .045* |
| | (.033) | (.031) | (.026) | (.024) | (.024) | (.025) | (.020) | (.020) |
| | [1.220] | [.638] | [4.067] | [1.254] | [1.954] | [.920] | [4.120] | [3.846] |
| | | {.275} | | {.518} | | {.406} | | {1.972} |
| After accepting job | .057 | .024 | −.093+ | −.134** | .017 | −.058 | −.090* | −.085* |
| | (.042) | (.037) | (.050) | (.039) | (.035) | (.039) | (.036) | (.035) |
| | [.759] | [.316] | [11.830] | [8.474] | [.089] | [1.112] | [7.862] | [9.004] |
| | | {.151} | | {3.097} | | {.480} | | {6.978} |
| With promotion | .202* | .136 | .039 | .011 | −.060 | −.125 | .070 | .051 |
| | (.090) | (.086) | (.089) | (.104) | (.097) | (.113) | (.067) | (.071) |
| | [1.226] | [.741] | [.653] | [.307] | [.637] | [2.221] | [1.375] | [2.385] |
| | | {.269} | | {.186} | | {.850} | | {9.855} |
| $p$-Value: $\beta_{\text{Before}} = \beta_{\text{After}}$ | .062 | .127 | .000 | .000 | .014 | .021 | .000 | .000 |
| $R^2$ | .503 | .541 | .104 | .150 | .162 | .201 | .102 | .151 |
| $N$ | 11,462 | 11,010 | 11,462 | 11,010 | 11,462 | 11,010 | 11,462 | 11,010 |
| Advanced controls | No | Yes | No | Yes | No | Yes | No | Yes |

Note. The baseline specification examines the aggregate association of having a noncompete with employee outcomes; respondents who are coded as answering no include those who have never heard of a noncompete or are unaware if they have signed one. Results for does not remember are not reported. Results by the timing of notice allow the direction and magnitude of any association to vary; respondents not bound by a noncompete are the omitted category. Results of selection tests relative to a model with no controls are in square brackets, and results of selection tests between the models with basic and advanced controls are in curly braces. Selection test statistics are calculated with the Stata command psacalc, using as the maximum $R^2$-value 30 percent more than the $R^2$-value from the model that includes both basic and advanced controls. All regressions include basic controls. Standard errors clustered at the state level are in parentheses.

+ $p < .1$.
* $p < .05$.
** $p < .01$.

JA0609

that those who learn of their noncompete from their prospective employer before they accept an offer do statistically significantly better (in terms of compensation, training, access to information, and satisfaction) than those who learn of and acquiesce to their noncompete only after they accept an employment offer.[35]

Given the limitations implicit in the cross-sectional nature of our data, we also study employees' beliefs about what they were promised by and what they received from their employers for agreeing to their noncompete, as a way to independently—although only tentatively—corroborate the notice-timing differentials that we present in Table 8. The results, which we record in Table OB8, document that employees are rarely promised anything by their employers for agreeing to a noncompete, and, in fact, most of our survey respondents report having received nothing in exchange for their willingness to be bound by one. Moreover, as in Table 8, our findings indicate that employees who enter into late-notice noncompetes are relatively less likely to be promised and less likely to receive anything in exchange for their commitment not to compete.[36]

### 5.3. Sensitivity Analyses

To probe the robustness of the relationships we observe between noncompete status and employee outcomes, we investigate the consequences for our findings of treating the maybe scenarios as a separate contracting category and using multiple imputation to reassign members of the maybe group. Both approaches yield very similar results with respect to our notice-timing analysis, though the generally positive association that we estimate in our baseline regression in Table 8 between noncompetes and wages largely disappears when we use multiple imputation (see Tables OB9 and OB10). We also rerun our analysis without incorporating sample weights and find that none of our results are sensitive to weighting (see Table OB11). In Table OB12, we drop respondents who indicate that they took the survey to discuss their experiences with noncompetes. Our timing results remain robust to this exclusion, though again the average main effect of having a noncompete on wages mostly evaporates (as in the multiple-imputation analysis). Finally, in Table OB13, we examine a related set of subjective employee outcomes, including perceived job security, the employer's commitment to upgrading the employee's skills, and whether the employee would consider return-

---

[35] The selection tests for the statistically significant results for the late-notice category all indicate $\delta > 1$, while the results in the early-notice category are somewhat less robust (except in the satisfaction specification). For example, our results regarding hourly wages for the early-notice group do appear rather sensitive to our advanced controls ($\delta = .275$), which signifies that unobservables may more plausibly account for these estimates.

[36] The precise questions are "Which of the following benefits did your employer promise you [beyond employment alone], either explicitly or implicitly, in exchange for signing the noncompete?" and "Regardless of what your employer did or did not promise, which of the following tangible benefits do you believe you have received because you signed a noncompete?" The survey instrument captures objective outcome measures before it asks these more subjective questions so as not to contaminate the objective measures.



**Figure 9.** Marginal effect of noncompetes over tenure

ing to the employer if he or she were ever to leave. The results of this analysis are broadly consistent with our earlier findings.[37]

### 5.4. Heterogeneity by Tenure and Noncompete Enforceability

In Figure 9, we study whether notice-timing differentials vary by tenure, cognizant that interpreting results later in tenure is troublesome given that tenure is endogenous to noncompete status (Starr, Prescott, and Bishara 2020). Within each tenure bin, we rerun our timing specification and report the coefficient and the 90 percent confidence intervals on our early- and late-notice coefficients relative to the baseline outcome for individuals without a noncompete. Early notice is associated with positive compensating earnings differentials early in tenure (Figure 9A) and with higher (but imprecisely estimated) probabilities of receiving training. We also observe negative job satisfaction and information access differentials within the first 5 years for those who agree to their noncompete after accepting an offer of employment (relative to those without noncompetes).

Given the importance of enforceability for theories justifying noncompetes as a solution to the employer's investment holdup problem, and given that previous

---

[37] Individuals who become aware of their noncompete up front are more likely to report that their employer is committed to upgrading their skills relative to those who receive late notice. We also find that those who receive late notice are less likely (than someone without a noncompete) to consider returning to their employer. Late notice is always associated with statistically significantly worse outcomes relative to early notice.

Table 9

**Labor Market Outcomes: Heterogeneity by Noncompete Enforceability**

| | Log Hourly Wage | | Employer Shares Info | | Training Last Year | | Satisfied in Job | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Baseline: | | | | | | | | |
| Enforceability | −.014+ | | .004 | | −.002 | | .006 | |
| | (.007) | | (.006) | | (.006) | | (.005) | |
| Noncompete | .106** | .063* | .030 | −.020 | .081** | .010 | .008 | .004 |
| | (.027) | (.024) | (.028) | (.025) | (.020) | (.020) | (.017) | (.018) |
| Enforceability × Noncompete | −.025* | −.017+ | .004 | .001 | .021* | .020** | −.014 | −.011 |
| | (.010) | (.009) | (.024) | (.021) | (.008) | (.008) | (.012) | (.009) |
| $R^2$ | .491 | .541 | .089 | .146 | .151 | .199 | .0908 | .149 |
| Timing of notice: | | | | | | | | |
| Enforceability | −.013+ | | .004 | | −.001 | | .006 | |
| | (.007) | | (.006) | | (.006) | | (.005) | |
| Before Accepting Job | .139** | .085** | .100** | .044+ | .137** | .061* | .055** | .042* |
| | (.032) | (.032) | (.026) | (.024) | (.026) | (.026) | (.020) | (.021) |
| After Accepting Job | .051 | .021 | −.093* | −.132** | .020 | −.057 | −.098** | −.087* |
| | (.041) | (.038) | (.046) | (.039) | (.036) | (.039) | (.033) | (.033) |
| Enforceability × Before Accepting Job | −.032* | −.027* | .006 | .003 | .025* | .025* | −.009 | −.006 |
| | (.012) | (.011) | (.016) | (.015) | (.010) | (.009) | (.009) | (.008) |
| Enforceability × After Accepting Job | −.039* | −.030* | .024 | .015 | .008 | −.000 | −.033 | −.027 |
| | (.016) | (.014) | (.046) | (.037) | (.017) | (.016) | (.025) | (.019) |
| $R^2$ | .492 | .542 | .093 | .150 | .154 | .201 | .093 | .152 |
| $N$ | 11,462 | 11,010 | 11,462 | 11,010 | 11,462 | 11,010 | 11,462 | 11,010 |
| State fixed effects | No | Yes | No | Yes | No | Yes | No | Yes |
| Advanced controls | No | Yes | No | Yes | No | Yes | No | Yes |

Note. The baseline specification examines the main association of having a noncompete with employee outcomes and the moderating role of enforceability; respondents who are coded as answering no include those who have never heard of a noncompete or are otherwise unaware if they have signed one. Results by the timing of notice allow the association of having a noncompete and enforceability to vary; respondents not bound by a noncompete are the omitted category. The enforceability measure is from Starr (2019), modifying the initial measure of Bishara (2011). All regressions include basic controls. Standard errors clustered at the state level are in parentheses.

+ $p < .1$.
* $p < .05$.
** $p < .01$.

empirical work on noncompetes has relied heavily on state-level enforceability,[38] we also estimate models examining the differential relationship of noncompetes in states where such provisions are relatively more or less enforceable.[39] In Table 9, we report estimates with and without state fixed effects (which, when included, subsume the main effect of enforceability). Consistent with prior research examining enforceability and wages but inconsistent with our main effect of noncompetes, we find that noncompetes in higher-enforceability regimes are associated with relatively lower earnings (Balasubramanian et al. 2020; Garmaise 2011). We also discover that noncompetes in states that are more likely to enforce them are associated with more training, as in Starr (2019). The negative effects on wages appear invariant to the timing of noncompete notice. By contrast, the relative training benefits we observe in column 6 accrue primarily to those who receive early notice of a noncompete.

## 6. Discussion and Conclusion

Motivated by renewed and widespread legislative interest in noncompetes and the longstanding debate over their value, our study brings new data and several new findings to the academic and policy conversations about noncompetes and related provisions that regulate employee behavior after termination: How common is such contracting? What does it look like in practice, and what types of employees are bound to what kinds of employers? How does it relate to employee outcomes? In this section, we consider how the evidence we uncover with respect to the incidence of noncompetes, contracting, and associated labor market success comports with predictions from the traditional and more critical perspectives on noncompetes.

Several of the facts we document are consistent with the traditional economic perspective, which views the noncompete as an efficient contracting device. For instance, our findings that noncompetes are more common in relatively technical jobs and among employees with access to trade secrets aligns with the hypothesis that noncompetes can be effective at protecting valuable information and training, thereby encouraging efficient investments by employers. Moreover, our evidence that employees with early notice of a noncompete are compensated—with higher wages, more training, more information, and greater job satisfaction—is compatible with theories that identify noncompetes as a solution to a holdup problem (Rubin and Shedd 1981; Acemoglu and Pischke 1999).[40] Our result that employees with early-notice noncompetes have higher wages earlier in tenure is also consistent with an up-front compensating differential (Callahan 1985).

---

[38] We discuss the enforceability of noncompetes and measures from a recent study in Online Appendix OC.

[39] We use the enforceability measure developed in Starr (2019), which is denominated in standard deviations from a mean enforcement score of 0, and we modify our main timing specification by adding enforceability and its interaction with noncompete status as regressors.

[40] The fact that this noncompete-associated boost in training appears to come earlier in tenure implies that employers may use noncompetes to differentiate "stayers" from "leavers" (Loewenstein and Spletzer 1997).

But the frequency of noncompetes among low-wage employees without access to trade secrets and the lack of negotiation in the contracting process hint at more anticompetitive rationales for the use of noncompetes by employers. We observe, for instance, that late-notice noncompetes are not associated with any additional compensation or training but instead appear to be linked to lower job satisfaction. Heterogeneous associations by enforceability further challenge the traditional economic perspective. The ability to enforce noncompetes should encourage more frequent noncompete use, more investment, and higher wages, but employers use noncompetes virtually as often in states where such restrictions are clearly unenforceable. Furthermore, while greater enforceability is associated with more training for individuals with early-notice noncompetes, the wage premium for agreeing to a noncompete also diminishes with enforceability, regardless of timing. This pattern is consistent with enforceability creating incentives for employers to invest in their bound employees, but it is at odds with the idea that employees should likewise benefit from agreeing to such a provision.[41] Importantly, these enforceability-specific findings with respect to wages and training align with prior work studying the effects of the enforceability of noncompetes (Starr 2019; Balasubramanian et al. 2020).[42]

Our empirical work answers several questions about the use of noncompetes, the contracting process, and labor market associations, but unresolved endogeneity concerns related to noncompete status and timing raise significant questions about how best to interpret our results. For example, we are unable to rule out the possibility that some unobservable association explains our outcome results—such as unobservably "good" employers using early-notice noncompetes and unobservably "bad" employers using late-notice noncompetes. Some of our findings also beg important questions. For instance, if indeed employers can use late-notice noncompetes to avoid compensating employees for giving up their right to compete in the future (and somehow employees do not anticipate this tactic), then why do we not see every employer springing noncompetes on new employees? Potential explanations include the possibilities that late notice may produce low morale and lower productivity in some contexts and that, if suing to enforce a noncompete is a realistic possibility, judges may look down on any employer giving late notice. We search for determinants of noncompete timing in Table OB14 but find few predictive relationships.

There are several additional limitations to our work that we hope future research will address. First, given the lack of information on the use of noncompetes (and related provisions) across the labor force and the possibility that our online survey approach may not generate data truly representative of the pop-

---

[41] This training finding is also consistent with the idea that employers may use early-notice noncompetes when they may need to convince a judge of an agreement's reasonableness.

[42] While we designed our research to assess the discrepancies between the two main perspectives on noncompetes, we can also rule out the possibility that employers are using noncompetes as a way to sort between committed and uncommitted employees. Figure OA1 shows that employees are no more likely to accept a noncompete if they plan to stay indefinitely versus just a few years, and Figure OA2 similarly finds that noncompetes are only slightly more common when an individual has had many employers in the last 5 years.

ulation, efforts to collect longitudinal survey data on noncompete contracting, which could allow for the study of employees' and employers' outcomes over time, are sorely needed.[43] Relatedly, our finding that lower-earning employees are less likely to know whether they are bound by a noncompete raises some uncertainty about our incidence results, and employer-level survey data or a sample of contracts could help resolve this ambiguity.

These remaining questions notwithstanding, we make several important contributions to our collective understanding of postemployment contractual restrictions and to the related body of work on transparency (Card et al. 2012; Harris 2018) and labor market frictions (Naidu 2010). Most concretely, we build on several occupation-specific studies (Marx 2011; Schwab and Thomas 2006) to document that noncompetes extend to every corner of the labor market. We also empirically characterize the typically take-it-or-leave-it contracting process surrounding noncompetes and provide correlational evidence that noncompetes are not uniformly associated with better (or worse) employee outcomes—depending on the timing of notice in the contracting process and a noncompete's enforceability. Overall, the story about noncompetes that emerges from our data is complex and nuanced, reflecting both of the literature's dominant perspectives.

## References

Acemoglu, Daron, and Jörn-Steffen Pischke. 1999. The Structure of Wages and Investment in General Training. *Journal of Political Economy* 107:539–72.

Arrow-Richman, Rachel. 2006. Cubewrap Contracts and Worker Mobility: The Dilution of Employee Bargaining Power via Standard Form Noncompetes. *Michigan State Law Review,* pp. 963–92.

Balasubramanian, Natarajan, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr. 2020. Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers. *Journal of Human Resources,* 1218–9931R1, pp. 1–52.

Barron, John M., Mark C. Berger, and Dan A. Black. 1999. Do Workers Pay for On-the-Job Training? *Journal of Human Resources* 34:235–52.

Beaudry, Paul, and John DiNardo. 1991. The Effect of Implicit Contracts on the Movement of Wages over the Business Cycle: Evidence from Micro Data. *Journal of Political Economy* 99:665–88.

Bishara, Norman D. 2011. Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy. *University of Pennsylvania Journal of Business Law* 13:751–95.

Bishara, Norman D., Kenneth J. Martin, and Randall S. Thomas. 2015. An Empirical Analysis of Noncompetition Clauses and Other Restrictive Postemployment Covenants. *Vanderbilt Law Review* 68:1–51.

Bishara, Norman D., and Evan Starr. 2016. The Incomplete Noncompete Picture. *Lewis and Clark Law Review* 20:497–546.

---

[43] Data sets that already collect longitudinal data on employee mobility and entrepreneurship, such as the National Longitudinal Survey of Youth and the Panel Study of Income Dynamics, would be well suited to undertake this task. Websites such as Glassdoor.com and Indeed.com could also add a question about noncompetes to their intake surveys and report the answers to interested job seekers to reduce the information asymmetry regarding the use of noncompetes.

Blake, Harlan M. 1960. Employee Agreements Not to Compete. *Harvard Law Review* 73: 625–91.

Callahan, Maureen B. 1985. Post-employment Restraint Agreements: A Reassessment. *University of Chicago Law Review* 52:703–28.

Card, David, Alexandre Mas, Enrico Moretti, and Emmanuel Saez. 2012. Inequality at Work: The Effect of Peer Salaries on Job Satisfaction. *American Economic Review* 102:2981–3003.

Cicero. 2017. Utah Noncompete Agreement Research. http://issuu.com/saltlakechamber/docs/utah_non-compete_agreement_research.

Conti, Raffaele. 2014. Do Non-competition Agreements Lead Firms to Pursue Risky R&D Projects? *Strategic Management Journal* 35:1230–48.

Friedman, David. 1991. Non-competition Agreements: Some Alternative Explanations. Working paper. University of Chicago Law School, Chicago.

Garmaise, Mark J. 2011. Ties That Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment. *Journal of Law, Economics, and Organization* 27:376–425.

Harris, Benjamin. 2018. *Information Is Power: Fostering Labor Market Competition through Transparent Wages*. Policy Proposal No. 2018-06. Washington, DC: Hamilton Project.

Hart, Oliver, and John Moore. 1994. A Theory of Debt Based on the Inalienability of Human Capital. *Quarterly Journal of Economics* 109:841–79.

Johnson, Matthew S., and Michael Lipsitz. Forthcoming. Why Are Low-Wage Workers Signing Noncompete Agreements? *Journal of Human Resources*.

Kennedy, Courtney, and Hannah Hartig. 2019. Response Rates in Telephone Surveys Have Resumed Their Decline. PewResearch.org, February 27.

King, Gary, James Honaker, Anne Joseph, and Kenneth Scheve. 2001. Analyzing Incomplete Political Science Data: An Alternative Algorithm for Multiple Imputation. *American Political Science Review* 95:49–69.

Krueger, Alan B., and Eric A. Posner. 2018. *A Proposal for Protecting Low-Income Workers from Monopsony and Collusion*. Policy Proposal No. 2018-05. Washington, DC: Hamilton Project.

Lavetti, Kurt, Carol Simon, and William D. White. 2020. The Impacts of Restricting Mobility of Skilled Workers: Evidence from Physicians. *Journal of Human Resources* 55: 1025–67.

Loewenstein, Mark A., and James R. Spletzer. 1997. Delayed Formal On-the-Job Training. *Industrial and Labor Relations Review* 51:82–99.

Malsberger, Brian M., David J. Carr, Arnold H. Pedowitz, and Eric Akira Tate. 2012. 8th ed. *Covenants Not to Compete: A State-by-State Survey*. Arlington, VA: Bloomberg BNA.

Marx, Matt. 2011. The Firm Strikes Back: Non-compete Agreements and the Mobility of Technical Professionals. *American Sociological Review* 76:695–712.

———. 2018. *Reforming Non-competes to Support Workers*. Policy Proposal No. 2018-04. Washington, DC: Hamilton Project.

Marx, Matt, Jasjit Singh, and Lee Fleming. 2015. Regional Disadvantage? Employee Non-compete Agreements and Brain Drain. *Research Policy* 44:394–404.

Marx, Matt, Deborah Strumsky, and Lee Fleming. 2009. Mobility, Skills, and the Michigan Non-compete Experiment. *Management Science* 55:875–89.

Meccheri, Nicola. 2009. A Note on Noncompetes, Bargaining, and Training by Firms. *Economics Letters* 102:198–200.

**JA0616**

84                        The Journal of LAW & ECONOMICS

Moulton, Brent R. 1990. An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables on Micro Units. *Review of Economics and Statistics* 72:334–38.

Naidu, Suresh. 2010. Recruitment Restrictions and Labor Markets: Evidence from the Postbellum U.S. South. *Journal of Labor Economics* 28:413–45.

Oster, Emily. 2019. Unobservable Selection and Coefficient Stability: Theory and Evidence. *Journal of Business and Economic Statistics* 37:187–204.

Posner, Eric A., George G. Triantis, and Alexander J. Triantis. 2004. Investing in Human Capital: The Efficiency of Covenants Not to Compete. Law and Econ Research Paper No. 01-08. University of Virginia, School of Law, Charlottesville.

Prescott, J.J., Norman D. Bishara, and Evan Starr. 2016. Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project. *Michigan State Law Review*, pp. 369–464.

Rothschild, David, and Justin Wolfers. 2013. Forecasting Elections: Voter Intentions versus Expectations. Working paper. Microsoft Research and Applied Statistics Center, New York.

Rubin, Paul H., and Peter Shedd. 1981. Human Capital and Covenants Not to Compete. *Journal of Legal Studies* 10:93–110.

Samila, Sampsa, and Olav Sorenson. 2011. Noncompete Covenants: Incentives to Innovate or Impediments to Growth. *Management Science* 57:425–38.

Schwab, Stewart J., and Randall S. Thomas. 2006. An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For? *Washington and Lee Law Review* 63:231–70.

Starr, Evan. 2019. Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete. *ILR Review* 72:783–817.

Starr, Evan, Natarajan Balasubramanian, and Mariko Sakakibara. 2018. Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms. *Management Science* 64:552–72.

Starr, Evan, J.J. Prescott, and Norman Bishara. 2020. The Behavioral Effects of (Unenforceable) Contracts. *Journal of Law, Economics, and Organization* 36:633–87.

Stuart, Toby E., and Olav Sorenson. 2003. Liquidity Events and the Geographic Distribution of Entrepreneurial Activity. *Administrative Science Quarterly* 48:175–201.

Sullivan, Charles A. 2009. The Puzzling Persistence of Unenforceable Contract Terms. *Ohio State Law Journal* 70:1127–77.

Sykuta, Michael. 2014. The Economics of Jimmy John's "Freaky" Non-compete Clause. MichaelSykuta.com, October 17.

US Department of Labor. 2014. Bureau of Labor Statistics. The Employment Situation—July 2014. US Department of Labor, Washington, DC. https://www.bls.gov/news.release/archives/empsit_08012014.pdf.

US Department of the Treasury. 2016. Office of Economic Policy. *Non-compete Contracts: Economic Effects and Policy Implications.* March. Washington, DC: US Department of the Treasury.

White House. 2016. *Non-compete Agreements: Analysis of the Usage, Potential Issues, and State Responses.* Washington, DC: White House.

Younge, Kenneth A., Tony W. Tong, and Lee Fleming. 2015. How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence from a Natural Experiment. *Strategic Management Journal* 36:686–708.

April 19, 2023

The Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

Dear Commissioners:

We are law professors, economists, and business school professors who have written extensively in the field of innovation and law. We would like to submit an important article regarding noncompetes by two of us, Jonathan Barnett & Ted Sichelman, *The Case for Noncompetes*, 86 THE UNIVERSITY OF CHICAGO LAW REVIEW 953 (2020), for review by the FTC.

This article, which presents the most comprehensive review to our knowledge of empirical evidence concerning the economic effects of noncompetes, addresses – and contradicts – many of the claims made by the FTC in support of its recent proposed rule to effectively ban noncompetes nationwide. In this regard, it offers a viewpoint quite different from the vast majority of academics invited to speak at the FTC's January 9, 2020 workshop on the issue, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues*, as well as the academic research cited by the FTC in favor of its proposed rulemaking.

Specifically, the article contributes a new perspective to the current policy debate over non-competition covenants and other contractual restrictions on employee mobility in technology sectors. As the FTC is aware, scholars have widely argued that innovation thrives in jurisdictions that prohibit noncompetes. This argument focuses on the rise of Silicon Valley as a technology hub, where noncompetes were allegedly not enforced, and the ostensible decline of Boston's Route 128 area, where noncompetes were allegedly enforced. In related work, other scholars have conducted empirical studies purporting to show that noncompetes produce significant economic costs and dampen innovation and startup creation. Based on these scholarly views, several states have recently enacted, and more are seriously debating, statutes that limit or prohibit noncompetes. Similarly, several U.S. Senators proposed legislation that would essentially ban noncompetes nationwide. And now, the FTC seeks a nationwide ban via its proposed rulemaking.

This article makes three original and notable contributions that the FTC should seriously consider. First, it shows that neither theory nor empirics supports the economic arguments commonly made in favor of prohibiting noncompetes. As a matter of theory, conventional wisdom emphasizes that noncompetes impede the circulation of intellectual capital and depress wages, but typically overlooking that noncompetes encourage firms to cultivate employees' human capital and invest in innovative activity. As a matter of empirics, the article contests the widely accepted view that Silicon Valley surpassed Boston because of supposed differences in noncompete enforcement, which tend to be exaggerated. A careful examination of the evidence shows that the Boston area has remained a significant innovation center and that technological and other economic factors explain Silicon Valley's exceptional trajectory. Second, the article identifies serious factual and methodological deficiencies in several widely-cited empirical studies, which cast substantial doubt on those studies' findings and policy implications. Notably, these studies misread and misunderstand state law and enforcement patterns related to noncompetes. Third, based an

exhaustive review of the evidence, the article proposes an original error-cost framework to analyze noncompetes, which provides an economic rationale for the common law's centuries-old reasonableness standard in determining whether to enforce a non-compete.

Unfortunately, even though the FTC is well-aware of Prof. Barnett's and Sichelman's work, they have not been invited to the FTC's workshops on noncompetes, nor were they consulted for the recent round of rulemaking, nor was their research mentioned in the 216-page Notice of Proposed Rulemaking that sets forth the FTC's proposed Non-Compete Clause Rule. In the interests of making public policy on the basis of all available evidence and scholarship, we believe that the FTC's current consideration of noncompetes would be enriched by their research, and we hope the FTC will read their work carefully and contact them to discuss it.

In short, it is critical in our view that the FTC independently assess the validity of the studies it is relying upon so heavily for its proposed rulemaking before taking any actions based on those studies' claims.

Sincerely,

Kristina M. L. Acri
*John L. Knight Chair of Economics*
The Colorado College

Jonathan Barnett
*Professor of Law*
University of Southern California

The Honorable Ronald A. Cass
*Dean Emeritus*
Boston University School of Law
*Former Vice-Chairman and Commissioner*
United States International Trade Commission

Kenneth G. Elzinga
*Robert C. Taylor Professor of Economics*
University of Virginia

Richard A. Epstein
*Laurence A. Tisch Professor of Law*
New York University School of Law
*Peter and Kirsten Bedford Senior Fellow*
Hoover Institution, Stanford University
*James Parker Hall Distinguished Service Professor of Law Emeritus*
University of Chicago Law School

Harold Furchtgott-Roth
Furchtgott-Roth Economic Enterprises
*Senior Fellow*
Hudson Institute

**JA0619**

Bowman Heiden
*Visiting Professor*
University of California, Berkeley

Keith N. Hylton
*William Fairfield Warren Distinguished Professor*
Boston University School of Law

Benjamin Klein
*Professor Emeritus of Economics*
University of California – Los Angeles

Thomas A. Lambert
*Wall Family Chair in Corporate Law and Governance*
University of Missouri School of Law

Adam Mossoff
*Professor of Law*
Antonin Scalia Law School
George Mason University

Kristen Osenga
*Austin E. Owen Research Scholar & Professor of Law*
University of Richmond School of Law

Ted M. Sichelman
*Judith Keep Professor of Law*
University of San Diego

John M. Yun
*Associate Professor of Law*
Antonin Scalia Law School
George Mason University

**JA0620**

# The Case for Noncompetes

*Jonathan M. Barnett† & Ted Sichelman††*

*Scholars and other commentators widely assert that enforcement of contractual and other limitations on labor mobility deters innovation. Based on this view, federal and state legislators have taken, and continue to consider, actions to limit the enforcement of covenants not to compete in employment agreements. These actions would discard the centuries-old reasonableness standard that governs the enforcement of these provisions, often termed "noncompetes," in all but four states (notably, California). We argue that this zero-enforcement position lacks a sound basis in theory or empirics. As a matter of theory, it overlooks the complex effects of contractual limitations on labor mobility in innovation markets. While it is frequently asserted that noncompetes may impede knowledge spillovers that foster innovation, it is frequently overlooked that noncompetes may encourage firms to invest in cultivating intellectual and human capital. As a matter of empirics, we show that two commonly referenced bodies of evidence fail to support zero enforcement. First, we revisit the conventional account of the rise of Silicon Valley and the purported fall*

† Torrey H. Webb Professor, University of Southern California, Gould School of Law.
†† Professor of Law, University of San Diego School of Law.
We thank Shyam Balganesh, Norman Bishara, Michael Burstein, Richard Castanon, Bryan Choi, Victor Fleischer, Lee Fleming, Ronald Gilson, John Goldberg, Robert Gomulkiewicz, Charles Tait Graves, Michael Guttentag, Ryan Holte, Justin Hughes, David Levine, Orly Lobel, Greg Mandel, Karl Mannheim, Matt Marx, Adam Mossoff, Natasha Nayak, Ruth Okediji, David Orozco, Eric Posner, Greg Reilly, Michael Risch, Ben Sachs, David Schwartz, Joseph Singer, Henry Smith, Kathy Spier, Matt Stephenson, James Stern, Olav Sorenson, Evan Starr, David Taylor, Saurabh Vishnubhakat, Polk Wagner, and Stephen Yelderman, as well as attendees at the 2015 Works in Progress in Intellectual Property Conference, the 2017 Conference of the American Law and Economics Association, and workshops at Harvard Law School, University of Pennsylvania Law School, Loyola Law School, Los Angeles, the Center for Law and the Social Sciences at the University of Southern California School of Law, and the University of San Diego School of Law for their helpful discussions and comments on prior versions of this paper. We also thank Carolyn Ginno, Matthew Arnold, Anna Ayar, Vanand Baroni, Haley Dumas, Ryan Foley, David Javidzad, Rachel Stariha, and Millicent Whitemore for their valuable research assistance.

954      *The University of Chicago Law Review*      [87:953

*of the Boston area as innovation centers, showing that this divergence cannot suitably be explained by differences in state law regarding noncompetes. Second, we show that widely cited empirical studies fail to support a causal relationship between noncompetes, reduced labor mobility, and reduced innovation. Given these theoretical and empirical complexities, we propose an error-cost approach that provides an economic rationale for the common law's reasonableness approach toward contractual constraints on the circulation of human capital.*

Introduction ................................................................................................ 955
I.  Old and New Views: From Agnosticism to Abolitionism ..................... 967
    A.  Foundations: Becker and Marshall ............................................ 967
        1.  Becker: Human capital as an economic asset ..................... 968
        2.  Marshall: Industrial districts and agglomeration economies ... 968
    B.  The Old View: Restricting Labor Mobility Is Good and Bad for Innovation ................................................................................. 969
        1.  The credible commitment problem. ..................................... 969
        2.  The noncompete solution ..................................................... 971
        3.  A weak objection to noncompetes ....................................... 972
        4.  A better objection to noncompetes. ..................................... 973
        5.  Evaluation. ........................................................................... 974
    C.  The New View: Restricting Labor Mobility is Bad for Innovation ................................................................................. 975
        1.  Background: Saxenian and Gilson. ...................................... 975
        2.  An initial critique ................................................................ 976
        3.  The empirical challenge ....................................................... 977
II. The Evidence Against Noncompetes: A Close Look ........................... 978
    A.  Reasons to Doubt the Standard Account of the Rise of Silicon Valley .............................................................................. 978
        1.  Did California courts really never enforce noncompetes? ... 980
        2.  Substitutes for noncompetes. ............................................... 986
        3.  Was Massachusetts's noncompete and trade secret law significantly different from California's? .............................. 992
        4.  Did weak enforcement of noncompetes really cause the Valley to rise? .................................................................... 997
        5.  Did Massachusetts really decline? ..................................... 1006
    B.  Empirical Studies: Noncompetes, Mobility, and Innovation ......... 1009
        1.  Nonexperimental studies. ................................................. 1010
        2.  Experimental studies ......................................................... 1027
        3.  Evaluation. ......................................................................... 1029
III. Making Noncompete Policy Under Uncertainty ............................... 1030
    A.  Policy Continuum ........................................................................ 1031
    B.   The "Free Contracting" Baseline ............................................... 1032
    C.  Is There Really a Collective Action Problem? ............................. 1033
    D.  Why Employers Decline to Use Noncompetes .............................. 1036
        1.  Variation in use of noncompetes across employee types ......... 1039

    2.  Variation in the use of noncompetes across industry types..... 1040

  E.  Error Costs and Noncompete Policy................................................ 1042

Conclusion .......................................................................................... 1045

Appendix ............................................................................................. 1047

## Introduction

On February 23, 2017, two titans of Silicon Valley went to war in federal court: Google filed a lawsuit against Uber, accusing it of using intellectual property allegedly stolen by one of the lead engineers on Waymo, Google's self-driving automotive subsidiary.[1] Specifically, Google alleged that Anthony Levandowski had misappropriated Google's intellectual property before departing (along with other Google engineers) to found Otto, a self-driving car startup subsequently acquired by Uber for $680 million.[2] The legal basis for Google's lawsuit against Uber and Levandowski consisted of a medley of federal trade secret, patent infringement, and state trade secret and unfair competition claims.[3] Given the high economic stakes, commentators speculated that if Google prevailed, the ultimate damages could exceed a billion dollars.[4] While the litigation was pending, the trial judge ordered Levandowski to stop working on projects involving the technology that had been allegedly misappropriated.[5] Although Google and Uber settled the dispute shortly after trial proceedings commenced for a mere $245 million, an arbitration panel subsequently found against Levandowski (who was fired by Uber[6]) and, on an interim basis, awarded Google $127 million in damages, for which Uber may be financially responsible under indemnification obligations to its former employee.[7]

---

[1]   Complaint, *Waymo LLC v Uber Technologies, Inc*, No 3:17-cv-00939, *2–5 (ND Cal filed Feb 23, 2017) (available on Westlaw at 2017 WL 726994) (Waymo Complaint) (stating various causes of action against Uber relating to alleged actions by a former Waymo employee in connection with his departure from Waymo to Uber's self-driving car project).

[2]   See id at *3–4 (describing evidence showing that Levandowski, former Waymo engineer, misappropriated information from Waymo upon departure from company).

[3]   Id at *2, 16, 19, 21, 27 (stating trade secret, patent infringement, and unfair competition causes of action).

[4]   See Aarian Marshall, *Google's Robocar Lawsuit Could Kill Uber's Future and Send Execs to Prison* (Wired, Feb 28, 2017), archived at https://perma.cc/SH8J-ZQ2H.

[5]   Joe Mullin, *Judge's Order Bars Uber Engineer from Lidar Work, Demands Return of Stolen Files* (Ars Technica, May 15, 2017), archived at https://perma.cc/B7KC-ZD46; Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, *Waymo LLC v Uber Technologies, Inc*, No 3:17-cv-00939, *23 (ND Cal filed May 11, 2017).

[6]   Aarian Marshall, *Uber Fired Its Robocar Guru, but Its Legal Fight with Google Goes On* (Wired, May 30, 2017), archived at https://perma.cc/YZ3K-78TV.

[7]   Uber Technologies, Inc, *Form S-1 Registration Statement* F-72, F-82 (SEC filed Apr 11, 2019), archived at https://perma.cc/Z2JE-NZBQ.

The Google-Uber litigation, and the rich suite of legal and economic instruments deployed to restrain the departure of a prized employee, is a notable counterexample to the now-standard account of unrestrained employee movement in Silicon Valley, the world's preeminent innovation cluster. That account emphasizes the ease with which technical and managerial talent, and the intellectual capital embodied in that talent, circulates among competitors, resulting in knowledge spillovers that redound to the collective benefit of the innovation ecosystem. This free-flowing movement of human capital is widely attributed to cultural norms, organizational practices, and, especially among legal scholars, California's refusal to enforce a contractual clause known as a "covenant not to compete" (or "noncompete").[8]

A noncompete typically limits a former employee's ability to work for competitors in a certain industry and a certain geographic area for a certain period of time. In contemporary scholarly and policy discussions of innovation policy, the noncompete has recently become a surprising focal point. Specifically, the literature has widely adopted the view initially espoused by Professor Ronald Gilson—albeit in a much more qualified form—that California's general refusal to enforce noncompetes in significant part explains the exceptional growth of Silicon Valley since the early 1980s while Massachusetts's willingness to enforce noncompetes spurred the purported decline of the Route 128 area around Boston.[9] Following this view, California has enjoyed a healthy

---

8    On cultural norms and organizational practices, see AnnaLee Saxenian, *Regional Advantage: Culture and Competition in Silicon Valley and Route 128* 1–9, 32–34, 44–45, 50–56 (Harvard 1996) (arguing that Silicon Valley's comparative advantage compared to Route 128 derived from its "network-based" system that promotes collective learning through informal collaboration within and between firms, as compared to Route 128's hierarchical system based on centralized and vertically integrated corporate entities). On noncompetes, see Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 NYU L Rev 575, 602–09 (1999) (arguing that differences in the enforceability of noncompetes contributed significantly to the ascendance of Silicon Valley over Route 128 by promoting the circulation of human and intellectual capital among competing firms).

9    For the original statement of this view, see Gilson, 74 NYU L Rev at 602–09 (cited in note 8). In the legal literature, representative contributions that have adopted and expanded upon Gilson's insight include: Orly Lobel, *Talent Wants to Be Free: Why We Should Learn to Love Leaks, Raids and Free Riding* 67–70 (Yale 2013) (arguing that California's refusal to enforce noncompetes at least partly accounts for its ascendance over Route 128 and attributing this hypothesis to Ronald Gilson); Orly Lobel, *The New Cognitive Property: Human Capital Law and the Reach of Intellectual Property*, 93 Tex L Rev 789, 825–26 (2015) (likening noncompetes to "a thick cluster of property rights that rigidifies the market and reduces the ability to move forward"); Viva R. Moffat, *Making Non-Competes Unenforceable*, 54 Ariz L Rev 939, 979–80 (2013) (arguing for a uniform rule of nonenforceability on the ground that noncompetes skew the balance in intellectual property policy

circulation of human capital, while Massachusetts has been deprived of the "agglomeration economies" that promote robust innovation clusters.[10] The result in California is a virtuous circle of accelerated innovation that led to the rise of Silicon Valley; the result in Massachusetts is a sad story of a Silicon Valley that could have been but wasn't.

The recent surge of interest in noncompetes is a welcome extension of innovation policy analysis. Noncompetes, and the broader universe of contractual and economic restraints on labor mobility, are a critical but overlooked tool in promoting robust innovation ecosystems. Scholarly discussions of innovation policy typically focus on the extent to which intellectual property rights such as patents or copyrights regulate the flow of informational assets. But this misses a key component of any innovation environment—namely, the flow of intellectual capital embedded in the human beings that innovate and commercialize new products and services. In the business world, firms are keenly aware of the value of human capital and use contractual and economic instruments to avoid losing their most valuable personnel to competitors. Based on a survey of 11,500 participants, a recent study found that an estimated 18 percent of all US workers (roughly, 30 million people), and approximately one-third of workers in professional, scientific, and technical occupations, are subject to noncompetes.[11] The extent to which the law should enforce these contractual instruments is a matter of fundamental importance.

---

between protecting R&D incentives and the public domain); Viva R. Moffat, *The Wrong Tool for the Job: The IP Problem with Non-Competition Agreements*, 52 Wm & Mary L Rev 873, 911–20 (2010) (arguing that noncompetes are a poor tool for protecting IP rights). In the economics literature, see Sampsa Samila and Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt Sci 425, 436 (2011) (arguing that empirical evidence supports relaxing enforcement of noncompetes to accelerate labor mobility and stimulate entrepreneurship). In an important variant on this line of argument, Professor Alan Hyde agrees that labor mobility lies behind the success of Silicon Valley but attributes this difference principally to California firms' reluctance to bring trade secret claims against former employees and California courts' resistance to grant such claims, rather than differences in the treatment of noncompetes. See Alan Hyde, *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market* 32–40 (M.E. Sharpe 2003).

[10]    Gilson, 74 NYU L Rev at 576, 606–07 (cited in note 8).

[11]    See J.J. Prescott, Norman D. Bishara, and Evan Starr, *Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project*, 2016 Mich St L Rev 369, 461; Evan Starr, J.J. Prescott, and Norman Bishara, *Noncompetes in the U.S. Labor Force* *16–19 (University of Michigan Law and Economics Research Paper, Aug 2019), archived at https://perma.cc/ZXU6-NAGU.

In recent years, a growing number of scholars and policymakers have adopted a simple answer to this question: *never*.[12] Following this view—popularized by the slogan, "talent wants to be free"—the free circulation of human capital always, or usually, promotes innovation. As such, any constraints "imposed" by employers reflect either overreaching or economic irrationality.[13] As a matter of policy, this view recommends that all states adopt California's purported zero-tolerance regime—a change that would undo the common-law "reasonableness" standard currently used by forty-six states to adjudge the enforceability of noncompetes.[14] (The current exceptions are California, North Dakota, and Oklahoma, which bar noncompete enforcement against individuals in most circumstances;[15] recently, Hawaii barred noncompetes for "technology business[es]."[16]) To be clear, even under the long-standing common law doctrine (dating from an English precedent in 1711[17]), noncompete clauses are enforceable only if they set forth "reasonable" temporal, geographic, and scope-of-industry limitations.[18] For the "talent wants to be free" school of

---

[12]    See note 13 (noting scholars and policymakers adopting this view); Part I.C (same).

[13]    For representative sources that express this view, see Lobel, *Talent Wants to Be Free* at 27–41, 201 (cited in note 9) (arguing that legal constraints, such as noncompetes, that impede labor mobility discourage innovation by hindering employee creativity and blocking interfirm flows of intellectual capital); Yochai Benkler, *Law, Innovation and Collaboration in Networked Economy and Society*, 13 Ann Rev L & Soc Sci 231, 235 (2017) (arguing that noncompetes are incompatible with a "network view," rather than an "atomistic view," of innovation, and citing empirical evidence that innovation thrives in network relationships with high rates of knowledge flow); Lobel, *Talent Wants to Be Free* at 64 (cited in note 9) (arguing that firms that advocate for noncompete enforcement "would likely benefit from the very movement they are attempting to limit"); Moffat, 52 Wm & Mary L Rev at 893–97 (cited in note 9) ("[N]oncompetes are at odds with both the fair bargaining process and efficiency underpinnings of the freedom of contract rationale."); id at 898–99 (arguing that the "IP justification" for noncompetes is insufficient and advocating a policy of zero enforcement); Alan Hyde, *Should Noncompetes Be Enforced?*, 33 Regulation 6, 9 (Winter 2010–11) (stating that losing an employee means gaining access to a new information network, rather than losing an information asset). Ronald Gilson expresses a similar view, although he clarifies that the positive welfare effects he attributes to California's refusal to enforce noncompetes may be limited to that particular state at a particular point in time in its economic trajectory. See Gilson, 74 NYU L Rev at 619–20, 627–29 (cited in note 8).

[14]    For a review of state laws on noncompetes, see generally J. Gregory Grisham, *Beyond the Red-Blue Divide: An Overview of Current Trends in State Non-Compete Law*, 18 Federalist Society Rev 42 (June 19, 2017), archived at https://perma.cc/33Q7-N9JF.

[15]    Cal Bus & Prof Code § 16600; ND Cent Code § 9-08-06; 15 Okla Stat § 217.

[16]    Hawaii Rev Stat Ann § 480-4(d).

[17]    *Mitchel v Reynolds*, 24 Eng Rep 347, 347 (KB 1711) (stating that a "bond or promise to restrain oneself from trading in a particular place, if made upon a reasonable consideration, is good").

[18]    See id at 348 (drawing distinction between restraints "not to exercise a trade throughout the kingdom," which are deemed to be void, and restraints that are "limited to

*The Case for Noncompetes*

thought, it seems that no limitation on the movement of talent can ever be deemed reasonable.

These academic views now play a prominent part in ongoing policy debates and press coverage concerning proposed laws that would limit, or bar, the enforcement of noncompetes.[19] On March 7, 2019, a bipartisan group of six Democratic and Republican US senators sent a joint letter to the Government Accountability Office requesting that it investigate the impact of noncompetes "on workers and on the economy as a whole."[20] Citing academic research that "California's ban on non-compete agreements has been a prime factor in the state's growing economy," three Democratic US senators introduced legislation in April 2018 to impose a ban on noncompetes nationwide, which was re-introduced by

---

a particular place," which may be deemed reasonable). For more detailed discussion of the reasonableness standard, see Part II.A.3.b.

[19]    Reflecting unusual interest in the intricacies of employment contracts, *The New York Times*, *The Wall Street Journal*, *Forbes*, *Fortune*, *The Boston Globe*, and other media outlets have run stories and op-eds on the use of noncompete clauses and legislative proposals to ban these clauses. See, for example, Orly Lobel, *Companies Compete but Won't Let Their Workers Do the Same* (NY Times, May 4, 2017), archived at https://perma.cc/LG33-EUTV (discussing states' differences in enforcing noncompetes, federal proposals to limit noncompetes, and the harmful effects of noncompetes on employees); Steven Greenhouse, *Noncompete Clauses Increasingly Pop Up in Array of Jobs* (NY Times, June 8, 2014), archived at https://perma.cc/P575-QQCX (discussing proposed legislation in Massachusetts limiting enforcement of noncompetes); Neil Irwin, *When the Guy Making Your Sandwich Has a Noncompete Clause* (NY Times, Oct 14, 2014), archived at https://perma.cc/FQ4X-FNKB (discussing the economic, legal, and moral issues raised by noncompetes); Ruth Simon and Angus Loten, *Litigation over Noncompete Clauses Is Rising* (Wall St J, Aug 14, 2013), online at https://www.wsj.com/articles/litigation-over-non compete-clauses-is-rising-does-entrepreneurship-suffer-1376520622 (visited Feb 17, 2020) (Perma archive unavailable) (discussing increasing litigation over, and prevalence of, noncompete agreements); Joann S. Lublin, *Companies Loosen the Handcuffs on Non-Competes* (Wall St J, Aug 12, 2013), online at https://www.wsj.com/articles/companies-loosen-the-handcuffs-on-noncompetes-1376320350 (visited Feb 11, 2020) (Perma archive unavailable) (discussing cases in which employers declined to strictly enforce noncompetes when executives departed for other large corporations); Eric Goldman, *Why Congress Should Restrict Employee Non-Compete Clauses* (Forbes, June 30, 2015), archived at https://perma.cc/52G4-KTLD (supporting federal legislation to limit enforcement of noncompetes); Claire Zillman, *Are Noncompete Agreements Hurting Tech Innovation?* (Fortune, July 1, 2015), archived at https://perma.cc/2YRK-95G4 (discussing differing views on enforceability of noncompetes, their impact on innovation, and proposed state legislation to limit enforceability); John McEleney, *Noncompetes Hurt Workers and Their Employers* (Boston Globe, June 28, 2015), online at https://www.bostonglobe.com/opinion/2015/06/27/onshape-ceo-john-mceleney-noncompetes-hurt-workers-and-their-employers/6NbXbI5jhZpl5wyvc28FSI/story.html (visited Feb 3, 2020) (Perma archive unavailable) (CEO of Massachusetts-based company arguing that noncompetes should "go away altogether").

[20]    Senator Christopher Murphy, et al, Letter to the Honorable Gene Dodaro, Comptroller General, US Government Accountability Office *1 (Mar 7, 2019), archived at https://perma.cc/W38U-2YRR.

two Democratic and Republican US senators in October 2019.[21]
Like these US senators, advocates for strict limitations on, or out-
right bans of, noncompetes explicitly refer to selected empirical
studies in arguing that these reforms would facilitate labor mo-
bility and promote innovation.[22] A leading academic opponent of
noncompetes has written: "[T]he research suggests that noncom-
petes should be banned for all employees, regardless of skill, in-
dustry or wage; they simply do more harm than good."[23] In 2018,
the influential *Economist* magazine endorsed an only slightly
more qualified position, arguing that noncompetes should be en-
forced only in narrow circumstances and similarly referring to ac-
ademic research to support this position.[24]

A sizeable number of state legislatures have derived similar
conclusions. Since 2014, the legislatures of thirty-seven states
have formally considered laws that would affect the enforceability
of noncompetes in employment agreements.[25] Of those proposed

---

[21]   On the April 2018 proposed legislation, see Office of Senator Ron Wyden, Press
Release, *Wyden, Murphy, Warren Introduce Bill to Ban Unnecessary and Harmful Non-
Compete Agreements* (Apr 26, 2018), archived at https://perma.cc/6N2T-V6N2 ("The new
legislation would prohibit the use of non-compete agreements. . . . Many believe that
California's ban on non-compete agreements has been a prime factor in the state's growing
economy."); Workforce Mobility Act of 2018, S 2782, 115th Cong, 2d Sess (Apr 26, 2018).
On the October 2019 proposed legislation, see Office of Senator Todd Young, Press Release,
*Young and Murphy Introduce Bill to Limit Non-Compete Agreements, Protect Workers* (Oct
17, 2019), archived at https://perma.cc/PFU9-6GWW ("Research indicates that workers
trapped by non-competes are less mobile, which results in firms having difficulty hiring
workers with the right set of skills."); Workforce Mobility Act of 2019, S 2614, 116th Cong,
1st Sess (Oct 27, 2019).

[22]   See, for example, Lobel, *Companies Compete but Won't Let Their Workers* (cited in
note 19). Lori Ehrlich, a Massachusetts representative who introduced a bill to preclude
most noncompete enforcement, believes noncompetes have an "overall impact of stifling
innovation" and cites academic studies on her website. Lori A. Ehrlich, *Fact Sheet: H. 2366*
(2018), archived at https://perma.cc/6XJR-9ZY8 (discussing a "recent peer-reviewed aca-
demic paper" which shows that nearly one in five employees are bound by a noncompete).
See also Zillman, *Are Noncompete Agreements Hurting Tech Innovation?* (cited in note 19).

[23]   Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19).

[24]   *Restrain the Restraints: The Case Against Non-compete Clauses* (The Economist,
May 19, 2018), online at https://www.economist.com/leaders/2018/05/19/the-case-against
-non-compete-clauses (visited Feb 11, 2020) (Perma archive unavailable) (supporting a re-
quirement for employers to demonstrate genuine harm in noncompete litigation, as well
as arguing that noncompetes should be enforced only if they apply for a short time and
they are negotiated before an employee accepts a job offer).

[25]   These states are Alabama, Arkansas, California, Colorado, Connecticut,
Delaware, Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Michigan,
Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New
York, Ohio, Pennsylvania, New Jersey, North Dakota, Oregon, Rhode Island, South
Dakota, Texas, Utah, Vermont, Washington, and West Virginia. This includes all legisla-
tures in which a member has formally proposed a law affecting noncompetes, whether
generally or in specific industries, since 2014, based on a search of legislative proposals in
the Westlaw and LexisNexis databases. See also Appendix.

bills, all but six proposed to limit enforceability (up to and including outright bans). In twenty-one states, these debates have translated into action. This includes Massachusetts, which in 2018 enacted a statute prohibiting noncompetes for certain categories of employees[26] and, in most other cases, imposes notice obligations on employers.[27] The Appendix shows all statutory changes to state noncompete laws during 2014–2019. Nineteen changes reduced enforceability and six enhanced it (although one was repealed two years later and the other was offset by other provisions that limited enforceability). In enacting its ban on noncompetes in the technology industry, Hawaii specifically referenced academic studies that purportedly supported this policy action as being conducive to innovation.[28] Additionally, in California, some courts have recently adopted expansive understandings of the state's statutory limitation on enforcing noncompetes against individuals, applying it to other contractual obligations that have long been thought to lie outside the purview of the statute.[29] In

[26]    The statute primarily captures workers who are "nonexempt under the Fair Labor Standards Act," Mass Gen Laws Ann, ch 149, § 24L, which generally targets salaried workers employed on a fixed hourly basis and most likely would not target managerial and other professional employees. See US Department of Labor Wage and Hour Division, *Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA)* (July 2008), archived at https://perma.cc/7VDP-MURT. However, there may be ambiguities in certain cases. For further discussion, see Stephen T. Melnick, Chris Kaczmarek, and Melissa L. McDonagh, *Frequently Asked Questions About the New Massachusetts Noncompetition Agreement Act* (Littler, Sept 5, 2018), archived at https://perma.cc/ER4R-PMZZ.

[27]    Mass Gen Laws Ann, ch 149, § 24L. The statute also requires that a noncompete "must be no broader than necessary to protect . . . legitimate business interests of the employer" and must have a reasonable geographic, temporal, and industry scope, see id; however, this language simply restates Massachusetts courts' holdings on this point. For further discussion, see notes 150–51 and accompanying text. Note further that the effect of the Massachusetts statute is qualified in two respects: (i) the law does not apply to a noncompete provision in an employer-employee separation agreement (if there is a seven-day period during which the employee can rescind acceptance), and (ii) Massachusetts simultaneously codified the "inevitable disclosure" doctrine, which entitles employers to seek injunctions against departing employees in the case of "threatened misappropriation," Massachusetts Trade Secrets Act, Mass HR 4868, § 19, 190th Sess (July 31, 2018). For further discussion, see note 130 and accompanying text.

[28]    The legislature stated: "[A]cademic studies have concluded that embracing employee mobility is a superior strategy for nurturing an innovation-based economy." Robert B. Milligan, *Hawaii Bans Non-Compete and Non-Solicit Agreements with Technology Workers* (Seyfarth Shaw, July 6, 2015), archived at https://perma.cc/TTQ3-Y9G9.

[29]    These decisions purport to apply the California Supreme Court's 2008 decision in *Edwards v Arthur Andersen LLP*, 189 P3d 285 (Cal 2008). See, for example, *Barker v Insight Global LLC*, 2019 WL 176260, *3 (ND Cal) (allowing claim that a nonsolicitation clause was illegal under California's noncompete ban to go forward); *AMN Healthcare, Inc v Aya Healthcare Services, Inc*, 28 Cal App 5th 923, 935–37 (2018) (holding that a firm could not enforce a nonsolicitation clause against a former recruiter employed by the firm, on the grounds that doing so would violate California's ban on noncompetes); *Golden v*

2018, a California lower court even applied the statutory limitation to prevent businesses from entering into exclusivity agreements between themselves, which had been traditionally the purview of California's antitrust provisions, not its statutory prohibition against noncompetes.[30] While the appellate court reversed this ruling, it is nonetheless indicative of an increasingly dogmatic approach against the enforcement of noncompetes or other contractual provisions deemed to have a comparable effect.[31]

The vigorous political debate and ongoing legislative activity relating to noncompetes encompasses a variety of policy concerns, including efficiency-related economic concerns as well as noneconomic concerns involving personal autonomy and distributive justice.[32] In markets for highly skilled technical and managerial labor (as distinguished from lower-income and lower-skilled occupations, which has been the focus of some of the proposed legislative bans[33]), the debate on both sides has principally relied on economic arguments. The toolkit of law-and-economics analysis is well suited to provide a balanced analysis of efficiency-related arguments for and against proposed policy shifts with respect to

---

*California Emergency Physicians Medical Group*, 896 F3d 1018, 1024–26 (9th Cir 2018) (refusing to uphold a litigation settlement agreement in which a physician-plaintiff agreed not to work at any facility that is owned, managed, or contracted by the medical group that had formerly employed the physician, but without imposing any other restrictions on the physician's pursuit of other employment opportunities). Note that the *Barker* and *AMN Healthcare* decisions depart from long-standing California precedent upholding the enforceability of postemployment nonsolicitation covenants subject to a reasonableness standard, see *Loral Corp v Moyes*, 174 Cal App 3d 268, 278–79 (1985).

30   See *Beckman Coulter, Inc v Quidel Corp*, 2018 WL 9943513, *1–2 (Cal Super).

31   See *Quidel Corp v Superior Court of San Diego County*, 39 Cal App 5th 530, 533, 535–36, 544–45 (2019) (reversing lower court's ruling based on *Edwards* invalidating the exclusivity agreement, and holding that *Edwards* does not extend beyond the employment context).

32   For a critique of noncompetes on distributional grounds, with an emphasis on the lack of meaningful negotiation on the part of the employee, see Rachel S. Arnow-Richman, *Bargaining for Loyalty in the Information Age: A Reconsideration of the Role of Substantive Fairness in Enforcing Employee Noncompetes*, 80 Or L Rev 1163, 1214–15 (2001). See also Christopher T. Wonnell, *The Contractual Disempowerment of Employees*, 46 Stan L Rev 87, 106 (1993). Because our Article focuses on the effects of noncompetes on technological innovation, we generally ignore the distributional (and autonomy-related) effects of noncompetes, though our intention is not to diminish their importance in the overall policy-making calculus.

33   See, for example, Office of Senator Marco Rubio, Press Release, *Rubio Introduces Bill to Protect Low-Wage Workers from Non-Compete Agreements* (Jan 15, 2019), archived at https://perma.cc/JM6P-QPS3 (describing a bill proposed by US Senator Marco Rubio to ban noncompetes nationwide for employees who are eligible for protection under federal overtime eligibility laws).

noncompetes that apply to technical and managerial personnel in technology markets.

In this Article, we undertake that task. Specifically, we look closely and broadly at the economic arguments, both theoretical and empirical, that have been advanced in support of the "talent wants to be free" view. While the details are complex and nuanced, our conclusion is simple and modest. Neither economic theory nor empirical evidence provides compelling support to abandon the common law's centuries-old reasonableness standard. Contractual restraints on labor mobility in technology markets raise complex trade-offs between employers' training and R&D incentives (generally favored by noncompetes) and employee mobility (generally disfavored by noncompetes).[34] While the latter is important for innovation, so is the former, and case-specific application of the reasonableness standard arguably offers the best, albeit imperfect, mechanism for balancing those competing considerations.

The now-popular view that innovation always or usually does best when human capital circulates freely relies heavily on a single historical example: the divergence in economic fortunes of Silicon Valley in California and Route 128 in Massachusetts and the different cultural norms and noncompete enforcement policies attributed to each innovation cluster. The results are surprising. Contrary to the standard account, we show that there is little compelling ground to attribute Silicon Valley's ascendance over Route 128 in the late 1980s and early 1990s to differences in the enforceability of noncompetes.[35]

There are multiple reasons. First, during Silicon Valley's ascendance, California's policy against noncompetes was clouded by several important exceptions. Second, California firms could significantly mimic noncompetes through trade secret and patent infringement litigation, long-term contracts, deferred compensation, and other mechanisms. Third, it is not clear that Massachusetts law substantially restrained employee turnover as an *effective* matter. Contemporary accounts of Route 128 in the heyday of the minicomputer industry in the 1970s and 1980s describe the same type of job hopping and spin-off formation associated with Silicon Valley. Fourth, Silicon Valley's rise over Route 128 most likely stemmed far more from technological and

---

[34] A potential negative secondary effect of noncompetes is to depress employee creativity and effort. We address this concern below in Part I.B.3.

[35] See Part II.A.

economic fundamentals associated with the "PC revolution," ra-
ther than fine distinctions in noncompete enforcement. Lastly,
Route 128's decline was relatively short lived, and it has re-
mained a significant innovation center, especially in the life sci-
ences and certain information technology markets.

Our original and comprehensive reexamination of the Silicon
Valley / Route 128 narrative raises doubts concerning the widely
accepted causal sequence running from prohibiting noncompetes
to increased employee mobility to increased innovation. These
doubts are intensified by a close analysis of recent empirical stud-
ies that are regularly cited as evidence that noncompetes impede
innovation. Contrary to the characterization of these studies in
much of the policy commentary by academics and governmental
agencies,[36] these studies suffer from significant methodological
limitations, deliver statistically weak results, and do not provide
compelling support for the view that banning noncompetes pro-
motes innovation.

A fully informed policy position concerning noncompetes
must reflect the uncertain state of our empirical understanding
of the effects of these agreements in innovation markets. That is,
it must reflect the fact that available evidence can neither support
nor rebut any systematically adverse relationship between non-
competes and innovation outcomes in general. Only this meas-
ured conclusion, rather than the strongly "abolitionist" position
that scholars and policymakers have increasingly advanced, is
consistent with theoretical analysis that identifies the counter-
vailing efficiency effects of noncompetes and other constraints on
employee mobility. The free movement of talent implies efficiency

---

[36]   See, for example, Lobel, *Talent Wants to Be Free* at 67–72 (cited in note 9) (describ-
ing empirical studies that purportedly have confirmed Gilson's hypothesis attributing the
rise of Silicon Valley in part to California's refusal to enforce noncompetes); The White
House, *Non-Compete Agreements: Analysis of the Usage, Potential Issues, and State Re-
sponses* *2, 5–7 (May 2016), archived at https://perma.cc/CR5Y-V8JX (discussing empirical
studies measuring the prevalence and economic effects of noncompetes on employee mo-
bility and start-up formation); US Department of the Treasury, Office of Economic Policy,
*Non-compete Contracts: Economic Effects and Policy Implications* *11–13, 18–23, 26 (Mar
2016), archived at https://perma.cc/V383-QXM7 (reviewing research on use and effects of
noncompetes and concluding that economic justifications for noncompetes have weak sup-
port); Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19) (same);
Lobel, 93 Tex L Rev at 827, 839–42 (cited in note 9) (describing empirical studies suggest-
ing that noncompetes reduce employee mobility, depress employee effort, and reduce in-
novation); Benkler, 13 Ann Rev L & Soc Sci at 235 (cited in note 13) (describing empirical
research purporting to show that enforcing noncompetes depresses employee mobility, re-
duces knowledge spillovers, and undermines innovation); Hyde, 33 Regulation at 9 (cited
in note 13) ("Study after study shows how much more productive firms will be if they can
hire, free of lawsuits, someone who worked at a rival.").

gains from knowledge sharing and accelerated "*n*-mover" innovation. However, a blanket prohibition of noncompetes implies efficiency losses from uncompensated transfers of intellectual capital to competitors—which, far from being mere efficiency-neutral transfers, may discourage *first*-mover innovation and employee training, which may depress the development of human intellectual capital in the first instance.

Complex problems deserve complex solutions. Contrary to what is hastily becoming conventional wisdom, which is in turn being converted into concrete policy actions, there is no one-size-fits-all solution to this trade-off as a matter of economic analysis. Based on available evidence, there is no reason to believe that the efficiency gains from freely circulating human capital systematically outweigh the efficiency losses from uncompensated uses of intellectual capital. Rather, the net efficiency effect of noncompetes in any particular market depends on the interaction between multiple factors that vary across industries, firms, and types of employees. Even if California's zero-enforcement policy has been *locally* optimal (or at least, sufficiently workable) from an efficiency perspective, it may be suited to a particular type of innovation economy at a particular time—an important but neglected qualification that Gilson made when he originally attributed Silicon Valley's success to California's refusal to enforce noncompetes.[37] At the same time, we emphasize that neither theory nor empirics support an unqualified freedom-of-contract approach that enforces noncompetes in all circumstances absent evidence of fraud or coercion. Rather, we explicitly recognize the uncertainty involved in assessing the net efficiency effects of noncompetes. Using the error-cost approach developed in antitrust analysis and jurisprudence,[38] we embed that uncertainty in our policy analysis, concluding that the common law's reasonableness standard remains the best available instrument to reflect, albeit imperfectly, the trade-off between efficiency gains and losses inherent to limitations on employee mobility in innovation markets.

---

[37]  See Gilson, 74 NYU L Rev at 627–29 (cited in note 8).

[38]  For the leading sources, see Frank H. Easterbrook, *Workable Antitrust Policy*, 84 Mich L Rev 1696, 1711 (1986) ("We want to hold to a minimum the sum of the costs of harmful activity wrongly condoned and useful activity wrongly condemned (or discouraged)."); Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex L Rev 1, 16 (1984) ("[W]e should prefer the error of tolerating questionable conduct, which imposes losses over a part of the range of output, to the error of condemning beneficial conduct, which imposes losses over the whole range of output.").

In sum, our Article makes three important contributions to the literature. First, it exhaustively reviews the widespread contention that noncompetes thwart innovation.[39] Our detailed analysis shows that neither theory nor empirics supports the economic arguments commonly wielded in favor of prohibiting noncompetes.[40] As a matter of theory, conventional wisdom emphasizes that noncompetes impede the circulation of intellectual capital while overlooking that noncompetes may encourage firms to cultivate employees' human capital.[41] As a matter of empirics, we contest the widely accepted view that Silicon Valley surpassed Boston because of supposed differences in noncompete enforcement, which tend to be exaggerated.[42] A careful examination of the evidence shows that the Boston area has remained a significant innovation center and that technological and economic factors better explain Silicon Valley's exceptional trajectory.[43] Second, we uncover serious factual and other deficiencies in several widely cited empirical studies, which cast substantial doubt on those studies' findings and policy implications.[44] Third, based on our exhaustive review of the available evidence, we propose an original error-cost framework to analyze noncompetes, which provides a robust economic rationale for the common law's reasonableness standard.[45]

The Article proceeds as follows. Part I describes the noncompete debate and, in particular, contrasts newly ascendant views favoring the free circulation of human capital with older views that recognize that reasonable contractual limitations on employee mobility may promote social welfare. Part II reexamines the standard narrative of the rise of Silicon Valley and the decline of Route 128, looking closely at multiple factors that may account for Silicon Valley's exceptional success as an innovation center. Additionally, we review more recent empirical studies on the relationship between noncompetes, employee movement, and innovation. Part III revisits the range of policy options with respect to noncompetes, using an error-cost approach that has not been previously applied to the enforcement of noncompetes. We briefly conclude.

---

[39]  See Parts I and II.
[40]  See Part II.
[41]  See Part III.
[42]  See Part II.A.
[43]  See Part II.A.
[44]  See Part II.B.
[45]  See Part III.

## I. Old and New Views: From Agnosticism to Abolitionism

In this Part, we review two key stages in the intellectual history of the current debate over noncompetes and other restraints on employee mobility, and situate that debate within a larger body of economic thought relating to the economics of human capital. First, we review an earlier generation of law-and-economics scholarship, which identified the social costs and gains attributable to noncompetes and generally adopted an agnostic position concerning these restraints as a general matter. These scholars were therefore sympathetic to the common law's reasonableness standard, which upholds or invalidates noncompetes on a case-specific basis. Second, we review a more recent school of thought that takes the strong view that the social costs associated with noncompetes typically or almost always outweigh the social gains, and therefore supports ending noncompete enforcement following California's example.

### A. Foundations: Becker and Marshall

Economically informed analysis of noncompetes and other restraints on labor mobility in innovation markets stands at the intersection of two foundational bodies of economic thought: Gary Becker's breakthrough work on the economics of human capital and Alfred Marshall's classic writings on the agglomeration economies that derive from the interchange of intellectual capital. Contemporary discussions of the legal treatment of noncompetes has relied (sometimes implicitly) almost entirely on the work of Marshall, which is a key reference point in the literature on innovation policy, while devoting little attention to the insights of Becker, widely recognized as *the* foundational work in the modern field of labor economics.[46] We review both contributions briefly below and will then integrate these classic insights from innovation policy and labor policy scholarship throughout our analysis of noncompetes and other constraints on the mobility of human capital.

---

[46]   On the importance of Becker's work, see generally Yoram Weiss, *Gary Becker on Human Capital*, 81 J Demographic Econ 27 (2015).

1. Becker: Human capital as an economic asset.

Nobel Prize–winning economist Gary Becker effectively founded the economic analysis of human capital with the publication of his landmark work, *Human Capital*, in 1962.[47] Becker showed that economic analysis could be applied to the acquisition and cultivation of human capital, whether through education, training, or other mechanisms. From an economic point of view, human capital acquisition involves the use of scarce resources to maximize net expected value, as with any other costly activity. In implementing this analysis, Becker drew a key distinction between *general* and *firm-specific* human capital assets.[48] General human capital refers to technical, managerial, and other skills and knowledge that have value across a broad pool of firms or industries.[49] Firm-specific human capital refers to the narrower set of technical, managerial, and other skills and knowledge that have value (or have greater value) only at a particular firm.[50] The scholarly literature that has followed Becker's work has identified an intermediate form of human capital that is specific to an industry—namely, skills and knowledge that have value within an industry but not more generally.[51] As discussed below, these different types of human capital give rise to different implications when analyzing the efficiency effects of noncompetes and other limitations on employee mobility.

2. Marshall: Industrial districts and agglomeration economies.

In the innovation context, economic analysis of noncompetes and other limitations on employee mobility often makes reference to the concept of "industrial districts," originated by Alfred Marshall in his landmark treatise, *Principles of Economics*, first

---

[47] See generally Gary S. Becker, *Human Capital: A Theoretical and Empirical Analysis, with Special Reference to Education* (Chicago 3d ed 1993). Subsequent notes refer to this edition, unless otherwise indicated. This is an updated edition of Gary S. Becker, *Human Capital: A Theoretical and Empirical Analysis, with Special Reference to Education* (National Bureau of Economic Research 1964). Some of the ideas were initially set forth in Gary S. Becker, *Investment in Human Capital: A Theoretical Analysis*, 70 J Pol Econ 9 (1962).

[48] See Becker, *Human Capital* at 33–51 (cited in note 47).

[49] See id at 33–34.

[50] See id at 40.

[51] See, for example, Derek Neal, *Industry-Specific Human Capital: Evidence from Displaced Workers*, 13 J Labor Econ 653, 653 (1995) (identifying categories of skills that are "specific to firms in a given industry or sector of the economy" and therefore do not fall into the existing categories of firm-specific or general human capital).

published in 1890.[52] In a short passage in that work, Marshall proposed that certain industries benefit collectively from a free-flowing exchange of ideas, even if an individual firm may periodically suffer the loss of some portion of its investment in developing an innovation.[53] In Marshall's famous words: "The mysteries of the trade become no mysteries; but are as it were in the air."[54] The movement of R&D personnel among firms is one of the key mechanisms by which the "mysteries of the trade" are disseminated and, according to Marshall, promote the general long-term welfare of all members of that innovation community. This line of reasoning is the basis for an extensive literature on the "agglomeration economies" that arise in innovation clusters in which geographically proximate firms and other entities draw from a free-flowing pool of human and intellectual capital assets to mutual advantage.[55]

## B. The Old View: Restricting Labor Mobility Is Good and Bad for Innovation

The recent wave of academic interest in noncompetes is predated by scholars who had examined the efficiency of noncompete clauses and, explicitly or by implication, other restraints on employee mobility. Generally speaking, that view identifies both efficiency gains and losses that in general could arise from the use of noncompetes in innovation markets. Without an empirical methodology by which to quantify those potentially offsetting effects, that literature largely concluded that the net efficiency of noncompetes is indeterminate as a general matter.

### 1.   The credible commitment problem.

Earlier scholars observed that human capital markets suffer from what economists call a credible commitment problem. Specifically, potential employees cannot provide adequate assurance to employers who are reluctant to invest in cultivating the human capital of employees who can simply move to another employer,

---

[52]   Alfred Marshall, *Principles of Economics* 169 (Palgrave MacMillan 8th ed 1920).
[53]   Id at 225.
[54]   Id.
[55]   See Rainer vom Hofe and Ke Chen, *Whither or Not Industrial Cluster: Conclusions or Confusions?*, 4 Indust Geographer 2, 4–8 (2006) (reviewing the literature on "agglomeration economies").

thereby conferring an advantage on a competitor.[56] When an employee leaves, the employer potentially suffers three costs: (i) it loses its training investment, which may involve a combination of firm-specific and general human capital; (ii) the employee may transmit proprietary information to a competitor; and (iii) the firm must incur costs to recruit and train a substitute employee, which again involves the transmission of firm-specific and general human capital.[57]

Without the ability to block employees from moving to a competitor, and without a sufficient up-front payment from employee to employer to cover the employer's expected costs in the event of the employee's departure, an employer faces two choices. Setting aside the possibility of various substitutes for deterring employee movement (most notably, deferred compensation arrangements and long-term employment contracts), the employer can (i) decline to hire the employee or (ii) hire the employee but underinvest in training (especially training that involves the cultivation of general human capital that has positive postemployment value) and the development and transmission of proprietary, often innovative, information.[58] These concerns account for apprenticeship systems that predate modern intellectual property regimes: limiting the apprentice's ability to switch employers enabled the master to internalize the gains from the intellectual capital transferred to the apprentice.[59] Or, put differently, limiting the apprentice's ability to switch employers enabled the apprentice to credibly commit against expropriating the employer's investment in the apprentice's human capital.

  [56]   See Paul H. Rubin and Peter Shedd, *Human Capital and Covenants Not to Compete*, 10 J Legal Stud 93, 99–102 (1981) (arguing that employers will reduce investment in employee training absent noncompetes); Edmund W. Kitch, *The Law and Economics of Rights in Valuable Information*, 9 J Legal Stud 683, 685 (1980) (asserting that, absent noncompetes, poaching employers will free ride on training investments by existing employers, who will in turn decline to make those investments); Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv L Rev 625, 647 (1960) (contending that the objective of postemployment restraints is "to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment").

  [57]   See note 56 and accompanying text.

  [58]   See Kitch, 9 J Legal Stud at 685 (cited in note 56).

  [59]   See Rubin and Shedd, 10 J Legal Stud at 93–99 (cited in note 56) (arguing that covenants not to compete do not, as earlier scholars assumed, necessarily reflect an exercise of monopoly power by employers).

### 2. The noncompete solution.

Just like the apprentice contract, the noncompete clause can result in joint efficiency gains by enabling employment transactions (and associated knowledge transfers) that otherwise would not take place. This is beneficial not only for the employer but the employee and the industry as a whole. This point is overlooked in recent discussions of noncompetes that tend to emphasize how these clauses block employment opportunities and suppress innovation.[60] However, it is important not to overlook the possibility that the *absence* of noncompetes can block certain *other* employment opportunities. Assuming the prospective employee is financially constrained and cannot post a sufficient "bond" against expropriating the employer's training investment or R&D assets, an otherwise efficient employment transaction—and the associated cultivation of human capital—may not move forward. In that case, both employer and prospective employee are made worse off.

Even if the absence of noncompetes does not entirely block the employment relationship, it may distort the employer's behavior during the term of employment and, as a result, sometimes disadvantage both the firm and the employee. At least three distortions are possible. First, the inability to enforce noncompetes may induce an employer to modify the internal allocation of team personnel so as to mitigate informational leakage from employee departures. For instance, Apple is famous for its secrecy practices and separate teams that work on different projects so as to minimize information transfer between them.[61] Second, the firm may skew the allocation of training resources toward the cultivation of firm-specific human capital so as to maximize the employee's value in the internal labor market but minimize the employee's value in the external labor market.[62] Third, the firm may underinvest in R&D by reallocating resources to activities in which it is not generating informational assets that an employee can transmit to another employer. In a world in which noncompetes are enforceable at some reasonable cost and high probability, these distortions are mitigated and the firm can allocate resources more efficiently among the available set of innovation and non innovation activities.

---

[60]   See note 9 and accompanying text.

[61]   See Adam Lashinsky, *This Is How Apple Keeps the Secrets* (Fortune, Jan 18, 2012), online at https://fortune.com/2012/01/18/the-secrets-apple-keeps (visited Feb 3, 2020) (Perma archive unavailable).

[62]   See Nicola Meccheri, *A Note on Non-competes, Bargaining and Training by Firms,* 102 Econ Letters 198, 200 (2009).

### 3. A weak objection to noncompetes.

Some commentators argue that noncompetes may discourage employees from cultivating their human capital (or, specifically, general or industry-specific human capital)—which in turn may depress employees' effort or creative output—due to the limited ability to access postemployment opportunities.[63] This objection is not especially persuasive. Discouraging employees from acquiring human capital would appear to be inconsistent with rational profit maximization. Put affirmatively, any employer has an incentive to reward employees who enhance their firm-specific human capital (or some value-maximizing combination of firm-specific, industry-specific, and general human capital) and can therefore make a greater contribution to firm value. While there are inherent measurement and verification difficulties in assessing employees' relative contributions in a team environment,[64] firms clearly use a variety of compensation systems to at least approximately reward employee performance, including promotion, monetary bonuses, and more tailored compensation mechanisms.[65] This is unsurprising: in a competitive market, any firm that includes noncompete clauses in its employment package has a rational self-interest in adopting incentive structures that correct for any underperformance effects that could arise as a result.[66] Market forces reward firms who do so successfully and discipline those who do not.

---

[63]   See On Amir and Orly Lobel, *Driving Performance: A Growth Theory of Noncompete Law*, 16 Stan Tech L Rev 833, 846 (2013) ("An employee who knows their market opportunities are significantly reduced due to an enforceable noncompete restriction will be less driven to perform well and to invest in his own human capital."); Mark Garmaise, *Ties That Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J L Econ & Org 376, 413–14 (2011) (setting forth model in which noncompete enforcement can induce employers to invest in managers' human capital but reduce managers' incentives to do so, in which case the manager's human capital may be lower relative to a zero-enforcement regime).

[64]   For the classic treatment, see Armen A. Alchian and Harold Demsetz, *Production, Information Costs, and Economic Organization*, 62 Am Econ Rev 777, 779 (1972) (discussing the difficulties of determining each individual's contribution when observing a team's output).

[65]   See Robert P. Merges, *The Law and Economics of Employee Inventions*, 13 Harv J L & Tech 1, 38–41 (1999) (discussing the "intra-firm appropriability environment" fostered by employee reward mechanisms).

[66]   Below, we criticize experimental studies that purport to confirm the depressing effects of noncompetes on the cultivation of human capital by noting that they fail to adequately account for the large menu of employee incentive mechanisms used in the actual market. See note 305 and accompanying text.

4.    A better objection to noncompetes.

It is certainly the case that enforcing noncompetes limits to some extent the mobility of R&D personnel, which may impede the agglomeration economies that arise from the regular dissemination of knowledge within an industry. To be clear, however, it is not precise to say (as is often said) that a noncompete "binds" an employee to a firm; rather, a noncompete requires that the employee or (more typically) a third party pay a fee demanded by the employer to obtain a waiver of the noncompete.[67] Payments exchanged for waiver of a noncompete are mere wealth transfers without efficiency consequences from a short-term static perspective. Precisely understood, a noncompete is simply a mechanism by which resource-constrained employees can credibly commit to indirectly compensate their employer for training and knowledge leakage costs in the event employees depart for a competitor.[68] The employee's commitment is made credible by providing the employer with a contractual right that can be "sold" to the employee's next employer.

This is not to say that there is no circumstance in which noncompetes can frustrate the efficiency gains associated with the circulation of human capital from one firm to another. First, even when an employer permits an employee otherwise under a noncompete to move to a new firm, the transaction costs of negotiating and executing a waiver of the noncompete generate static costs that would not be incurred if noncompetes were wholly unenforceable. Of course, like all contracting costs, such costs are tolerable when the social gains from contracting (here, for a noncompete) outweigh these costs.

---

[67]    For example, in 2005, Nortel paid Motorola $11.5 million to release its chief operating officer from a noncompete agreement. See Robert McMillan, *Nortel Appoints Ex-Motorola Exec as Operations Chief* (Network World, Jan 19, 2006), archived at https://perma.cc/B4MJ-YTFC.

[68]    Noncompetes may also relieve an employer from having to increase existing employees' compensation to match alternative employment opportunities, given the departure costs imposed by the noncompete. For a theoretical model reaching this result, see Natarajan Balasubramanian, et al, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers* *9–11 (Ross School of Business Working Paper No 1339, Jan 2017), archived at https://perma.cc/3SBZ-UJD8. It should be noted, however, that available evidence is generally inconsistent with this model. The most comprehensive empirical study finds that employees who sign noncompetes earn 6.6 percent *more* on average than employees who do not sign noncompetes (controlling for various other factors), although this wage differential is limited to employees who are presented with a noncompete prior to accepting a job offer. See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *28 (cited in note 11).

Second, when the costs of negotiating and executing the waiver of a noncompete are sufficiently great so as to impede employee turnover, this may generate long-term dynamic efficiency losses to the extent that slowing down employee turnover impedes the transmission of intellectual capital that benefits the industry as a whole. These dynamic efficiency costs present a potential collective action problem because these costs may not be fully internalized by an individual firm in a given industry when that firm makes a decision whether to adopt and enforce a noncompete for a particular employee.

### 5. Evaluation.

The welfare effects of noncompete agreements can now be summarized. On the one hand, noncompetes support employers' incentives to invest in employees' human capital and R&D projects that would otherwise be subject to expropriation by departing employees. On the other hand, noncompetes raise the transaction costs involved in the circulation of human capital, which may impede the innovation process in the industry as a whole. Given these offsetting effects, earlier scholars generally concluded that economic analysis does not support a definitive position against or in favor of enforcing noncompetes in all circumstances.[69] If noncompetes enable firms to secure gains from training and R&D investments, then barring noncompetes may reduce the common pool of technological knowledge that is available for circulation through employee movement. A ban on noncompetes would yield a net social gain over time only if the disincentive effects arising from uncompensated human capital transfers were exceeded by the agglomeration economies and other benefits associated with the unimpeded circulation of human capital. Without empirical evidence in any particular case, this analytical framework is agnostic in general with respect to the net long-term efficiency of those restraints. However, it does recognize a meaningful range of circumstances in which enforcing noncompetes could make firms and employees better off by resolving the credible commitment problem that might preclude or distort employment relationships.

---

[69]   See note 56 and accompanying text.

C.   The New View: Restricting Labor Mobility is Bad for Innovation

The traditional approach is intellectually modest in taking the view that enforcing noncompetes *may* have a net positive effect on innovation. By contrast, the new view on noncompetes tends to take the bolder view that enforcing noncompetes usually, if not always, discourages innovation by slowing down the flow of intellectual capital and impeding the agglomeration economies and similar benefits that fuel the innovation process. This new view consists of a two-part logical sequence. In step one, it claims that barring noncompetes accelerates employee movement. Stated precisely, this assertion reflects the assumption that noncompetes increase the transaction costs of human capital movements. In step two, the new view makes the stronger assertion that increased circulation of R&D personnel promotes innovation by facilitating knowledge spillovers that benefit the industry as a whole. The normative implication is simple and clear: the law should decline to enforce noncompetes in all circumstances.

1.   Background: Saxenian and Gilson.

The new view relies on the work of AnnaLee Saxenian, a sociologist, and Ronald Gilson, a law professor, both of whom apply the Marshallian concept of agglomeration economies to interpret a key episode in the history of US technology markets. Both Saxenian and Gilson contrasted Silicon Valley with Boston's Route 128 area to argue that institutional mechanisms—cultural norms and organizational forms in Saxenian's analysis[70] and a legal ban on noncompetes in Gilson's analysis[71]—that promote employee mobility can promote innovation by facilitating the flow of intellectual capital among competitors. Both authors identify these institutional differences as key factors in accounting for Silicon Valley's rise over Route 128 as the country's leading innovation center starting in the late 1980s.

More specifically, Gilson argued that California's ban on noncompetes represented a solution to a collective-action problem. While no firm individually would agree *not* to adopt a noncompete and thereby expose its human and intellectual capital to competitors, it may be in *all* firms' collective long-term interest to refrain from adopting noncompetes and thereby enjoy the resulting flow

---

[70]   See Saxenian, *Regional Advantage* at 1–9, 29–30, 59–60 (cited in note 8).
[71]   See Gilson, 74 NYU L Rev at 578–79, 602–09 (cited in note 8).

of knowledge spillovers.[72] By implication, Massachusetts firms were caught in a collectively irrational equilibrium in which all firms imposed noncompetes and could not enjoy the collective gains that would result from a more fluid circulation of human capital. Gilson cautioned that this explanation may be specific to Silicon Valley and would not necessarily generalize to other contexts.[73] Nonetheless, a significant body of commentary by legal scholars and economists has endorsed this proposition in stronger formulations and has made largely unqualified policy assertions that enforcing noncompetes and other restraints on employee mobility depresses innovation.[74] For these scholars, California's approach should be the rule, not the exception.

### 2.  An initial critique.

The new view on noncompetes reflects a coherent and straightforward application of the standard collective-action problem in economic analysis. However, it is incomplete in significant respects. Specifically, the new view makes little effort to address the efficiency losses inherent to a legal regime in which a voluntary restraint on the mobility of talent is removed from the table of contracting options. Earlier analysis of noncompetes had recognized that an efficiency loss would arise in any circumstance in which an employee could not credibly commit against expropriating the employer's human capital investment and R&D assets. The employer would respond by distorting the terms of employment to limit its training investments or the employees' exposure to R&D assets or by declining to enter into an employment relationship at all.

---

72  See id at 596.
73  See id at 629.
74  See Lobel, *Talent Wants to Be Free* at 67–72 (cited in note 9) (arguing that empirical evidence supports California's "zero tolerance" policy for noncompetes); Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19) (same); Benkler, 13 Ann Rev L & Soc Sci at 235 (cited in note 13) (arguing that empirical evidence suggests that contractual and other legal constraints on employee mobility undermine innovation); Hyde, 33 Regulation at 10–11 (cited in note 13) (arguing that balance of evidence supports adopting California's policy of zero enforcement toward noncompetes); Moffat, 54 Ariz L Rev at 965 (cited in note 9) (advocating for a zero-enforcement policy toward noncompetes); Moffat, 52 Wm & Mary L Rev at 918–21 (cited in note 9) (same).

A recent economic model formulated by Professor James Rauch shows that this loss can extend well beyond just one employment transaction.[75] Consider a sequence of transactions consisting of (i) an initial employment transaction involving a parent firm and an individual employee, followed by (ii) a series of spin-off transactions involving employees who depart from the parent firm to form or join a spin-off firm, and then depart from the spin-off to form a new entity, and so forth. Noncompetes may raise the transaction costs relating to, and even frustrate, some portion, or even all, of the potential spin-off transactions. That is the focus of the "talent wants to be free" literature. However, it is important not to ignore the possibility that the inability to enforce a noncompete may preclude the initial hire by restoring the credible commitment problem, in which case the subsequent stream of spin-off transactions could be stunted or blocked entirely.[76] Moreover, if noncompetes are not enforceable, even a certain portion of the set of spin-offs may face the same credible commitment dilemma and may be wholly precluded or move forward under distorted terms.[77] If that is the case, then compared to a regime in which noncompetes are enforced, talent may be freer but it could well be worse off.

### 3.  The empirical challenge.

As a theoretical matter, the new view on noncompetes, and the accompanying policy arguments in favor of a total or near-total ban, provide no reason to arbitrarily value the social costs attributable to noncompetes—primarily, potentially reduced circulation of intellectual capital (the focus of Marshall's analysis)—more heavily than the social gains—primarily, potentially increased investment in employee training and R&D (the focus of Becker's analysis). Given this uncertainty, we can only make progress toward assessing the relative intellectual strength of the new view based on empirical inquiry. Commentary by scholars and policymakers in favor of a ban on noncompetes often asserts that empirical data shows that noncompetes depress innovation.[78]

---

[75]  See James Rauch, *Dynastic Entrepreneurship, Entry, and Non-Compete Enforcement* *1–2, 19 (National Bureau of Economic Research Working Paper No 21067, Apr 2015), archived at https://perma.cc/TP8G-3372.

[76]  See id at *1–2, 9–11 (showing formally that the efficiency of noncompetes depends in part on a trade-off between these two countervailing effects on the parent firm and spin-off firms).

[77]  See id at *10.

[78]  See note 36.

In the next Part, we look closely at that body of evidence, finding that nearly all of these studies are badly flawed and, even so, common characterizations of their findings often dramatically overstate the policy conclusions that the data can reasonably support.

## II. The Evidence Against Noncompetes: A Close Look

In this Part, we undertake the most comprehensive examination to date of the two principal bodies of empirical evidence that are commonly referenced in support of the "talent wants to be free" school of thought. First, we review in detail the explanation provided by Saxenian and in particular, Gilson, to account for Silicon Valley's dramatic rise over Route 128 as the world's leading innovation center. We find significant reason to doubt that this fundamental shift in economic trajectories can be traced back to relatively fine differences in the enforceability of noncompetes between California and Massachusetts. Second, we review some of the most highly cited empirical studies that purport to show a three-step causal link between bans on noncompetes, increased employee turnover, and increased innovation. This exercise identifies important methodological and other limitations that cast serious doubt on the policy positions for which those studies have been cited.

### A. Reasons to Doubt the Standard Account of the Rise of Silicon Valley

As of the mid-1970s, Silicon Valley and Route 128 were both viewed as key centers for innovation in the electronics industry, but with different strengths.[79] Silicon Valley excelled in semiconductor chips while Route 128 excelled in minicomputers, a category situated between the supercomputer (or mainframe) segment dominated by IBM and the nascent "microcomputer" (in today's terms, PC) segment pioneered by Apple.[80] Starting in the

---

[79]  See Willem Hulsink, Dick Manuel, and Harry Bouwman, *Clustering in ICT*, in Willem Hulsink and Hans Dons, eds, *Pathways to High-Tech Valleys and Research Triangles: Innovative Entrepreneurship, Knowledge Transfer and Cluster Formation in Europe and the United States* 53, 53–55 (Springer 2008) (stating that Route 128 predated the Silicon Valley technology cluster, which started growing in the 1950s and 1960s and overtook Route 128 in the 1970s); Nancy S. Dorfman, *Route 128: The Development of a Regional High Technology Economy*, 12 Rsrch Pol 299, 300, 313 (1983) (observing that, as of the late 1970s, the Boston area and Silicon Valley had the same number of high-tech employees while the greater San Francisco Bay Area had "about 30 percent more").

[80]  See Hulsink, Manuel, and Bouwman, *Clustering in ICT* at 59 (cited in note 79) (describing how the "minicomputer manufacturers of Route 128 quickly lost ground to the manufacturers of the fast-emerging PCs and workstations in Silicon Valley").

early 1980s, Silicon Valley overtook Route 128 and secured its place as the world's preeminent information technology center. Saxenian attributes the ascendance of Silicon Valley, and the decline of Route 128, to differences in industrial organization and cultural norms.[81] The West Coast environment was characterized by a constant flow of technical personnel among a network of loosely connected firms, which spawned spin-offs that accelerated the innovation process. This structure was supported by industry norms that promoted information sharing and employee mobility.

By contrast, the East Coast environment was characterized by a small number of vertically integrated firms and exhibited little employee turnover. This structure was purportedly supported by industry norms that promoted loyalty to a single employer and discouraged information sharing. Building on Saxenian's narrative, Gilson argued that the free flow of human capital could be attributed in part to California's refusal to enforce noncompetes, while Massachusetts's insistence on enforcing noncompetes may have stagnated the flow of human capital, resulting in a slowdown in innovation.[82] Put together, Saxenian and Gilson's work identifies certain informal and formal institutional characteristics that purportedly set Route 128 on a path to decline, while sending Silicon Valley on an upward trajectory.

Both Saxenian's and Gilson's accounts of the rise of Silicon Valley and decline of Route 128 have been widely adopted in the academic literature.[83] In the discussion below, we identify several considerations that cast doubt on this now-standard account. These include: (i) there were several exceptions (and other legal causes of action) that substantially qualified California's "ban" on noncompetes during this period; (ii) firms could substantially mimic the effect of a noncompete through compensation and other mechanisms; (iii) it is not clear that differences in Massachusetts law on noncompetes and trade secrets resulted in substantial differences in employee mobility as a practical matter; (iv) there are fundamental technological and economic factors that more plausibly account for Silicon Valley's ascendance; and (v) Route 128 has continued to exhibit robust innovative performance.

---

[81]    See Saxenian, *Regional Advantage* at 1–9 (cited in note 8).

[82]    See Gilson, 74 NYU L Rev at 602–09 (cited in note 8).

[83]    As of February 19, 2020, Google Scholar estimates that Saxenian's leading contribution in the area, the book-length *Regional Advantage*, has been cited more than 13,200 times and Gilson's 1999 NYU article on Silicon Valley and Route 128 has been cited more than 900 times. See also note 9 (listing several scholarly publications that refer to and rely on Saxenian's or Gilson's work).

1.  Did California courts really never enforce noncompetes?

Scholars have not adequately questioned whether California courts in actuality declined to enforce noncompetes during the period in which Silicon Valley overtook Route 128. That seems to be the case based on the California statute, which declares void "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind."[84] Given that blanket prohibition, however, it is curious that California firms often insert noncompete clauses in executive employment agreements. Two studies that focus on adoption rates of noncompetes in executive employment agreements at large publicly traded firms find these clauses in 58–62 percent of agreements with firms headquartered in California, as compared to rates of 70–84 percent at the same types of firms headquartered in other states (which generally enforce noncompetes subject to the reasonableness standard).[85] Even more surprisingly, a broader study involving all types of employees finds that the incidence of noncompetes in California (19 percent) is approximately the same as observed in states that enforce noncompetes.[86]

This discrepancy between law and practice might be attributed to the possibility that technical personnel are unaware

---

[84]  Cal Bus & Prof Code § 16600.

[85]  Specifically, from a sample of 874 CEO employment contracts at S&P 1500 firms executed during 1996–2010, Norman Bishara, Kenneth Martin, and Randall Thomas found that California firms include noncompetes at a rate of 62 percent (compared to 84 percent for firms in other states). See Norman D. Bishara, Kenneth J. Martin, and Randall S. Thomas, *An Empirical Analysis of Noncompetition Clauses and Other Restrictive Postemployment Covenants*, 68 Vand L Rev 1, 34 (2015). Garmaise finds that, in a sample of large, publicly traded firms, approximately 70 percent of firms used noncompetes, including 58 percent of California-based firms. Garmaise, 27 J L Econ & Org at 396 (cited in note 63). Garmaise does not specifically identify the rate of noncompete adoption among firms located in the forty-eight enforcing states, although it would be expected that that rate would be somewhat higher than the 70 percent rate reported for the full sample of all firms in all states. See id.

[86]  See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *19 (cited in note 11). We note two additional points concerning the methodology and findings of the Starr, Prescott, and Bishara study. On methodology, we note that the paper carefully distinguishes in its survey methodology between noncompetes and other related provisions such as nondisclosure or nonsolicitation covenants. This is important because it provides confidence that the findings relate specifically to noncompetes rather than other related provisions in employment agreements. See id at *3–4. On substance, we note that the authors do not find any meaningful change in the incidence of noncompetes in comparing "multi-unit" firms, which have operations in California and other states, and "single-unit" firms, which operate only in California. See id at *19. This is a noteworthy result because it might have been expected that large national firms in particular might include noncompete clauses as a "default" provision in their employment agreements since they mostly operate in states that uphold noncompetes under the common-law reasonableness standard.

of California law and firms include a noncompete clause as an *in terrorem* device to be used against departing employees. That explanation assumes that these personnel do not consult legal advisors, particularly a potential new employer's legal counsel, or review publicly available information about a basic point of law. Alternatively, one might argue that, because knowledgeable employees understand that noncompetes are generally *not* enforceable in California, it is not worth the transaction costs of negotiating with an employer to remove these clauses. At a minimum, it is worth inquiring whether the standard understanding of California law is entirely precise during the period in which Silicon Valley overtook Route 128.

In fact, it is not. Writing in 1989, a treatise on trade secrets law observed: "Despite the clear language of" California's statute, "the California courts do not regard all covenants not to compete . . . invalid *per se*."[87] Specifically, there were at least five important circumstances in which California employers could have had some expectation of being able to enforce a noncompete during the period in which Silicon Valley overtook Route 128. While it remains the case that California courts did not *generally* enforce noncompetes against individuals during this period, it is incorrect to assume that a sufficiently motivated employer would *never* rationally invest resources in enforcing (and therefore could never credibly threaten to seek) enforcement of a noncompete against a departing employee.

    *a) Narrow restraints.* In 1987, the Ninth Circuit held that noncompetes were enforceable under California law if the noncompete narrowly restrained postemployment opportunities, as distinguished from a general restraint that barred entry into an entire profession.[88] From the 1970s through the 2000s, litigants that pursued variants of the narrow restraint exception achieved

---

[87]  See Melvin F. Jager, *Trade Secrets Law* § 13.01[2] (1989).

[88]  *Campbell v Board of Trustees of Leland Stanford Junior University*, 817 F2d 499, 502 (9th Cir 1987) (citing California law for the proposition that the statutory ban on non-competes precludes only contractual restraints on entering an "entire business, trade or profession," as distinguished from "only a small or limited part of the business, trade or profession"), quoting *Boughton v Socony Mobil Oil Co*, 231 Cal App 2d 188, 192 (1964). The court purported to apply state law precedent, as set forth in *Boughton*, 231 Cal App 2d at 192, which in turn relied on *King v Gerold*, 240 P2d 710 (Cal App 1952). An earlier Ninth Circuit decision had upheld a clause in a collective bargaining agreement involving the partial forfeiture of certain pension and profit-sharing benefits in the event a retired employee took employment with another firm in the same industry. The court's decision relied on the view that California law does not prohibit an alleged restraint on employee mobility that is "limited in nature and furthers sound public policies." See *Smith v CMTA-IAM Pension Trust*, 654 F2d 650, 660 (9th Cir 1981).

mixed results, sometimes achieving success in (mostly) federal courts but usually not faring well in California state courts.[89] In 1997 and 1999, the Ninth Circuit again applied the exception to uphold a noncompete covenant.[90] Only in 2008, well after Silicon Valley had established its place as the world's technology center, did the California Supreme Court resolve this uncertainty by rejecting the narrow restraint exception.[91]

  *b) Sale of a business.*  Based on a statutory exception,[92] both federal and state courts typically enforced (and continue to enforce) noncompetes executed in connection with the sale of a business. The exception applies to noncompetes entered into by majority target shareholders and possibly other target employees with smaller equity interests.[93] This exception provides some of the legal logic behind the now-popular "acqui-hire" transactional structure, in which a large firm acquires a start-up firm primarily for purposes of retaining the services of its founders and senior managerial and technical personnel. Without a commitment from key personnel that they will remain with or at least not compete with the acquirer for some reasonable period of time, the transaction is not viable. This partially explains why exempting business

---

[89]  For cases recognizing the exception, see *Centeno v Roseville Community Hospital*, 107 Cal App 3d 62, 68–71 (1979); *Latona v Aetna US Healthcare Inc*, 82 F Supp 2d 1089, 1094 (CD Cal 1999); *Cin-Med Associates, Inc v Hemocue, Inc*, 2001 WL 1117562, *3–4 (CD Cal). In *Scott v Snelling & Snelling, Inc*, 732 F Supp 1034, 1042–43 (ND Cal 1990), the court recognized that "California courts may, in some circumstances apply a 'rule of reason' to only partial restrictions on competition" but declined to apply it in the case of a noncompete that imposed postemployment geographic and temporal restrictions. For cases rejecting the exception, see *Golden State Linen Service, Inc v Vidalin*, 69 Cal App 3d 1, 13 (1977); *Liberty Mutual Insurance Co v Arthur J. Gallagher & Co*, 1994 WL 715613, *3 (ND Cal); *Arrowhead Financial Group, Inc v Welty*, 2002 WL 31661269, *6–7 (Cal App); *Jan Marini Skin Research, Inc v Allure Cosmetic USA, Inc*, 2007 WL 1508686, *16 (Cal App); *Thompson v Impaxx, Inc*, 113 Cal App 4th 1425, 1430–31 (2003).

[90]  *General Commercial Packaging, Inc v TPS Package Engineering, Inc*, 126 F3d 1131, 1132–33 (9th Cir 1997) (enforcing a one-year noncompete between a contractor and subcontractor with respect to the contractor's clients); *International Business Machines Corp v Bajorek*, 191 F3d 1033, 1040–41 (9th Cir 1999) (holding that noncompete obligation in stock option agreement did not violate the California statutory ban on noncompetes).

[91]  *Edwards v Arthur Andersen LLP*, 189 P3d 285, 293 (Cal 2008).

[92]  Cal Bus & Prof Code § 16601.

[93]  It is not clear how large that equity interest must be. Rulings have been mixed. See *Hilb, Rogal & Hamilton Insurance Services of Orange County, Inc v Robb*, 33 Cal App 4th 1812, 1816, 1822–25 (1995) (in connection with the merger of an insurance company, upholding a noncompete with an employee of the merged company, who had held a 35 percent ownership interest in the merged company, on ground that a sufficient transfer of goodwill had taken place); *Vacco Industries, Inc v Van Den Berg*, 5 Cal App 4th 34, 48–49 (1992) (finding that a 3 percent interest, which was the ninth largest shareholder interest, in conjunction with an officer position, constituted a substantial shareholder).

acquisitions from noncompete enforcement limitations, which is the rule even in California, is likely to be, and is widely viewed as, efficient.

   *c) Protection of trade secrets.*  Since a California Supreme Court decision in 1958,[94] California law has recognized that the statutory bar against noncompetes does not extend to certain postemployment restrictions—most typically, nondisclosure and nonsolicitation covenants—that are enforced for the purpose of protecting an employer's trade secrets or confidential information.[95] Since the 1980s, California courts have periodically applied the trade secret exception to enforce nonsolicitation and nondisclosure obligations (and, in one recent case, even a noncompete clause "construed to bar only the use of confidential source code, software, or techniques"[96]) that were found to be narrowly tailored to protect a trade secret.[97]

---

   [94]  *Gordon v Landau*, 321 P2d 456, 459 (Cal 1958) (upholding a nonsolicitation clause because "it did not prevent defendant from" engaging in the same or similar business as his former employer).

   [95]  See Jager, *Trade Secrets Law* § 13:4 at 13-13 (cited in note 87) (observing that California courts sometimes enforce noncompetes to protect trade secrets or other confidential information). For cases stating this principle, see *Muggill v Reuben H. Donnelley Corp*, 398 P2d 147, 149 (Cal 1965) (stating that § 16600 invalidates noncompete provisions "unless they are necessary to protect the employer's trade secrets"); *Gordon Termite Control v Terrones*, 84 Cal App 3d 176, 178 (1978) (stating that § 16600 "has been construed by the Supreme Court as invalidating contracts not to compete, except where their enforcement is necessary to protect the trade secrets of an employer"); *Loral Corp v Moyes*, 174 Cal App 3d 268, 276 (1985) (stating that § 16600 "does not invalidate an employee's agreement not to disclose his former employer's . . . trade secrets"); *Moss Adams Co v Shilling*, 179 Cal App 3d 124, 130 (1986); *American Paper & Packaging Products, Inc v Kirgan*, 183 Cal App 3d 1318, 1322 (1986) (Section 16600 invalidates noncompetes "unless their enforcement is necessary to protect an employer's confidential information or trade secrets"); *Scott*, 732 F Supp at 1043 (recognizing a judicially created exception to § 16600 to the extent necessary to protect trade secrets).

   [96]  *Richmond Technologies, Inc v Aumtech Business Solutions*, 2011 WL 2607158, *18–19 (ND Cal) (finding the nonsolicitation clause and noninterference clauses "are likely to be found unenforceable" because they "are more broadly drafted than necessary to protect . . . trade secrets," but a noncompete clause and related clause barring the use of confidential information are "likely enforceable as necessary to protect . . . trade secrets").

   [97]  See *Hollingsworth Solderless Terminal Co v Turley*, 622 F2d 1324, 1338 (9th Cir 1980) (vacating and remanding the lower court's invalidation of a postemployment covenants involving nondisclosure of customer lists and nonsolicitation of a former employer's customers); *John F. Matull & Associates, Inc v Cloutier*, 194 Cal App 3d 1049, 1054–55 (1987) (upholding a nonsolicitation obligation); *Morlife, Inc v Perry*, 56 Cal App 4th 1514 (1997) (affirming a nonsolicitation covenant against former employees); *Asset Marketing Systems, Inc v Gagnon*, 542 F3d 748, 758 (9th Cir 2008) (observing that "non-competition agreements are unenforceable [under California law] unless necessary to protect an employer's trade secret"); *Lindzy v Q-Railing USA Co*, 2013 WL 4437164, *6 (Cal App) (finding a nondisclosure clause and a nonsolicitation clause valid).

In 2008, the Supreme Court of California specifically declined to affirm or reject the trade secret exception.[98] A recent federal court opinion summarizes the current state of California law on this point: "Although California courts have consistently 'condemned' agreements that place restraints on the pursuit of a business or profession . . . 'an equally lengthy line of cases has consistently held former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer.'"[99] Simply put: Section 16600 does not preclude an employer from preventing a departing employee via injunctive relief from joining a new employer by enforcing nondisclosure, nonsolicitation, or other similar postemployment obligations when doing so promotes the employer's interest in protecting its trade secrets.

   *d) ERISA.* A California employer can avoid the statutory ban on noncompetes by embedding the noncompete in a deferred compensation or severance pay arrangement governed by the Employee Retirement Income Security Act of 1974[100] (ERISA). These clauses operate as a forfeiture mechanism that conditions entitlement to certain benefits under the plan upon compliance with the noncompete obligation. As observed in practitioner commentary, this exception typically arises in litigation concerning deferred benefit plans for highly compensated executives.[101] In 1981 and 1987, the Ninth Circuit held that ERISA preempts state law, specifically including noncompete restrictions.[102] California state courts have adopted the same position.[103] This enforcement strategy is limited only by the ERISA requirement that a noncompete

---

[98] *Edwards*, 189 P3d at 289 n 4.

[99] *Richmond Technologies*, 2011 WL 2607158 at *18 (internal brackets omitted), citing *Edwards*, 189 P3d at 290–91 and *Retirement Group v Galante*, 176 Cal App 4th 1226, 1237 (2009).

[100] Pub L No 93-406, 88 Stat 829, codified as amended in various sections of Title 26 and Title 29.

[101] See Amy L. Blaisdell and Wendy S. Menghini, *Pulling Tricks Out of a Top Hat: Preemption of Non-Compete Laws Applicable to "Top Hat" Plans* *1 (DRI: The Voice of the Defense Bar, Dec 29, 2010), archived at https://perma.cc/4SYD-PEAV.

[102] See *Clark v Lauren Young Tire Center Profit Sharing Trust*, 816 F2d 480, 481 (9th Cir 1987) (involving a noncompete under Oregon law); *Lojek v Thomas*, 716 F2d 675, 678, 679–80 (9th Cir 1983) (involving a noncompete under Idaho law). Gilson cites a 1965 California Supreme Court decision that invalidated this type of forfeiture provision in a retirement plan. See Gilson, 74 NYU L Rev at 607 n 100 (cited in note 8), citing *Muggill*, 398 P2d at 149. However, *Muggill* would not appear to survive the Ninth Circuit's interpretation of ERISA, which was enacted in 1974.

[103] See, for example, *Weinfurther v Source Services Corp Employees Profit Sharing Plan and Trust*, 759 F Supp 599, 602 (ND Cal 1991).

forfeiture clause cannot be applied to deprive the employee of benefits accrued after ten years of service.[104]

*e) Choice-of-forum clauses.* California courts will not enforce a noncompete entered into under the law of another state that generally enforces noncompetes. However, prior to 2017, if an employer and former employee were subject to the jurisdiction of an out-of-state court that enforces noncompetes, and the decision was final in that state before any decision in a parallel California action, then a noncompete agreement was typically enforceable within California. In general, the two key factors at issue in such situations were whether (1) the agreement selected another state's courts as the forum for disputes; and (2) whether the employee is now a California resident employed by a California employer. Although California courts will generally not enforce an out-of-state choice-of-law clause, especially if the defendant-employee is a California resident employed by a California firm,[105] prior to 2017, they often respected an out-of-state choice-of-forum clause, even if the other state potentially applied its own law.[106] In practice, this meant that California employees employed by a firm with corporate headquarters out of state—or out-of-state employees moving to California—could be subject to enforceable noncompete restrictions under a properly drafted agreement prior to 2017.[107]

---

[104] 29 USC § 1053(a)(2)(A).

[105] See *Application Group, Inc v Hunter Group, Inc*, 61 Cal App 4th 881, 894–905 (1998).

[106] Compare *Davis v Advanced Care Technologies, Inc*, 2007 WL 2288298, *4–9 (ED Cal) (finding California law applicable to the case despite a Connecticut choice-of-law provision because California had a materially greater interest; the employee was a California resident, the former employer was based in Connecticut, and the new employer was a California-based employer), with *Universal Operations Risk Management, LLC v Global Rescue LLC*, 2012 WL 2792444, *6–7 (ND Cal) (enforcing a forum selection clause despite the strong possibility that the forum state would uphold the covenant not to compete).

[107] See, for example, *Meyer v Howmedica Osteonics Corp*, 2015 WL 728631, *11–12 (SD Cal) (ordering a transfer of forum to New Jersey consistent with the forum selection clause, when there was also a choice of law provision for New Jersey law), citing *Swenson v T–Mobile USA, Inc*, 415 F Supp 2d 1101 (SD Cal 2006) (dismissing a California declaratory relief action in the presence of forum selection clause when the previous action was pending out-of-state); *Universal Operations Risk Management, LLC*, 2012 WL 2792444 at *6–7; *Advanced Bionics Corp v Medtronic, Inc*, 59 P3d 231, 232–34 (Cal 2002) (vacating a lower court's issuance of a temporary restraining order that had blocked the former employer from pursuing a noncompete action it had filed out of state); *Biosense Webster, Inc v Superior Court*, 135 Cal App 4th 827, 830 (2006) (extending the holding of *Advanced Bionics* to circumstances in which no previous action had been filed out of state); *Google, Inc v Microsoft Corp*, 415 F Supp 2d 1018, 1021–22, 1026 (ND Cal 2005) (staying noncompete proceedings pending those in Washington in order to prevent forum shopping). But see *Manchester v Arista Records, Inc*, 1981 US Dist LEXIS 18642, *13–17 (CD Cal) (upholding a choice-of-forum clause in a case involving Cal Labor Code § 2855, which limits

2.  Substitutes for noncompetes.

In addition to the five exceptions described above, California firms could elect (and still can elect) from a large menu of substitute legal and economic instruments to deter employee mobility. To illustrate these alternatives concretely, we can return to the case involving the former Google engineer who took a new position with Uber. As noted previously, the employee had been involved in developing Google's autonomous driving technologies.[108] Under California law, Google would appear to be powerless to prevent the employee from working for Uber. Even assuming that Google cannot wield a noncompete covenant, however, Google has several other credible legal threats at its disposal. Given the existence of these additional legal instruments, any *marginal* preclusive effect that can be reasonably attributed to noncompetes appears to be significantly attenuated, and would need to at least be accounted for in any empirical analysis comparing the differential effects of noncompetes on innovation between California and out-of-state firms.

*a) Patents.*  A firm may use patents to protect against knowledge leakage resulting from employee movement. Although a patent may not cover tacit knowledge per se, it may cover a product or method incorporating that tacit knowledge. Assuming the firm can bear the anticipated enforcement costs, the expropriation risk posed by a departing employee would then be limited to informational assets that fall outside the firm's patent portfolio. A patenting strategy makes any departing employee less attractive to competitors, which implies that the employee will receive fewer or lower offers from other firms and is less likely to leave the current employer. Hence, even in a jurisdiction that is hostile to noncompetes, there may be significant patent-based obstacles that discourage employee movement. Consistent with these expectations, a 2009 empirical study found a deterrent effect on labor mobility in the US semiconductor industry proportional to a firm's propensity to bring patent infringement suits.[109] Another study finds that, while the likelihood of an acquisition increases when a target's employees are subject to noncompetes, that effect weakens in the case of targets that hold strong patent

---

personal service employment contracts to a term of seven years, because the court determined that § 2855 did not apply to the contracts at issue).

    [108]  See notes 1 and 4.

    [109]  See Rajshree Agarwal, Martin Ganco, and Rosemarie H. Ziedonis, *Reputations for Toughness in Patent Enforcement: Implications for Knowledge Spillovers via Inventor Mobility*, 30 Strategic Mgmt J 1349, 1366–67 (2009).

portfolios, suggesting that patents substitute in part for noncompetes as a device for protecting against knowledge leakage after consummation of the acquisition.[110]

   *b) Breach of contract.*  If the employee had signed a nondisclosure agreement (NDA) and then took a position with a competing enterprise, Google could potentially bring (or threaten to bring) a breach of contract claim against the employee. As noted earlier, there is no plausible legal challenge under § 16600 to the enforcement of an NDA so long as it is sufficiently tailored to promote the employer's interest in protecting its trade secrets.[111] The credibility of Google's threat to sue to enforce an NDA would depend on the negotiated scope of the definition of "confidential information" in the NDA and the ease with which Google could demonstrate that the employee had actually breached the NDA's confidentiality provisions at his or her new position. In certain jurisdictions, courts are willing to enforce NDAs that encompass information that would not otherwise qualify as a trade secret;[112] in other jurisdictions (including California), Google may be required to show that enforcement of the NDA targets only nonpublic information that would be protected under trade secret law.[113]

   Alternatively, Google could bring (or threaten to bring) a breach-of-contract claim if it had entered into a long-term employment contract or a shorter-term employment contract with periodic renewal at the employer's option. (The former option may be unattractive to both employers and employees because it locks each party into a potentially unwanted long-term commitment that is difficult to mitigate even through the most carefully

---

[110] See Kenneth A. Younge, Tony W. Tong, and Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence from a Natural Experiment*, 36 Strategic Mgmt J 686, 691–92 (2015).

[111] See Part II.A.1.c.

[112] See Richard F. Dole Jr, *The Contract Exception to the Uniform Trade Secrets Act and Its Implications for the Federal Defend Trade Secrets Act*, 34 Santa Clara High Tech L J 362, 377 n 80 (2018) (observing that courts in some jurisdictions will enforce NDAs that encompass information that would not qualify as a trade secret, subject to a reasonableness standard); Bishara, Martin, and Thomas, 68 Vand L Rev at 21–23 (cited in note 85) (stating that courts will sometimes enforce an NDA that applies to information that might not otherwise be protected under trade secret law, so long as the NDA is limited in time).

[113] See, for example, *Richmond Technologies*, 2011 WL 2607158 at *19 (noting that a "clause prohibiting use of confidential information is likely enforceable to the extent that the claimed information is protectable as a trade secret"). On this point with respect to California law in particular, see Charles T. Graves, *Nonpublic Information and California Tort Law: A Proposal for Harmonizing California's Employee Mobility and Intellectual Property Regimes Under the Uniform Trade Secrets Act*, 2006 UCLA J L & Tech 1, 37–43.

crafted provisions for early separation under certain circumstances.) In yet another variation, Google could bring a tortious interference with contract claim against Uber, on the ground that Uber was aware of the long-term contract to which the departing engineer was then bound.[114]

    *c) Invention assignment agreements.* In the technology industries, it is typical for employees to enter into invention assignment agreements, under which an employee agrees in advance that all "inventions" (as defined in the governing agreement) developed by the employee during the course of his or her employment are deemed to belong to the employer.[115] Under such an agreement, Google could bring a claim against the departing employee if the employee is using an "invention" that the employee made while employed by Google. As long as Google's claim could at least survive a motion to dismiss, it could credibly threaten to impose significant discovery and other litigation costs on the employee-defendant (or, more typically, the new employer who may have agreed to indemnify the employee-defendant). In a widely followed litigation over ownership of the "Bratz" line of dolls, involving Mattel (as plaintiff), Mattel's former employee (as codefendant), and a smaller toy manufacturer (as codefendant), an invention assignment agreement provided the basis for several years of protracted litigation that burdened the defendant with substantial legal fees.[116]

    Alternatively, Google and its former employee may have entered into an invention assignment agreement with a "trailer" clause, which would grant Google ownership over any inventions that the former employee developed within a certain amount of time following termination.[117] That too may limit the employee's attractiveness to any potential outside employer. The doctrine of assignor estoppel can have a similar effect in a departing employee scenario. Under that doctrine, some courts have held that

---

    [114] In the actual litigation between Google and Uber, this would not have been a feasible claim because Google and the departing employee were apparently not parties to a long-term contract.

    [115] See Victoria Lee and Mark Lehberg, *Employee Proprietary Information and Inventions Assignment Agreements: What They Do, and What Could Happen Without Them* (DLA Piper, 2018), archived at https://perma.cc/J5QD-3FXX.

    [116] See *Mattel, Inc v MGA Entertainment, Inc*, 616 F3d 904, 909 (9th Cir 2010) (observing that Mattel's ownership interest in the Bratz line of dolls "turns on the interpretation of Bryant's [the former employee's] 1999 employment agreement," which included an invention assignment clause). For a summary of the litigation, see *Barbie and Bratz: The Feud Continues* (WIPO Magazine, Aug 2011), archived at https://perma.cc/6RM2-W45Y.

    [117] For discussion, see Merges, 13 Harv J L & Tech at 52–53 (cited in note 65).

not only is the employee precluded from arguing against the validity of a patent that the employee assigned to the former employer, but also any new employer of the employee is similarly precluded from doing so. The practical consequence: if the old employer brings a patent infringement suit against the new employer, the latter may be unable to argue in defense that the underlying patent is invalid. Like a trailer clause, this expansive understanding of the assignor estoppel doctrine may limit the attractiveness of an employee to any potential new employer.[118]

*d) Trade secret misappropriation.* Google could (and did) bring a trade secret misappropriation claim against the employee and Uber as the new employer, alleging that the employee or Uber had used or disclosed trade secrets belonging to Google.[119] In certain states (although not California today), even absent evidence of use or disclosure, Google could seek an injunction to prevent its former employee from joining Uber if the court found that the employee would *inevitably disclose* the employer's trade secrets in his new position.[120] Trade secret litigation in a departing employee scenario is not an uncommon occurrence in Silicon Valley. Intel, Broadcom, Cisco, Apple, and other Silicon Valley companies have been involved in prominent trade secret disputes involving former employees.[121] Depending on the credibility of any

---

[118] See Mark A. Lemley, *Rethinking Assignor Estoppel*, 54 Houston L Rev 513, 537 (2016) ("[T]he doctrine of assignor estoppel serves effectively as a partial noncompete agreement, preventing inventors from starting new companies or moving to competitors in many circumstances and at least raising the costs of doing so.").

[119] Waymo Complaint at *2–5 (cited in note 1).

[120] Based on a survey of twenty-four states (current as of 2012), courts in only a handful of states explicitly reject the doctrine while the remainder either explicitly recognize the doctrine or, more commonly, apply it occasionally. See Ryan M. Wiesner, *A State-by-State Analysis of Inevitable Disclosure: A Need for Uniformity and a Workable Standard*, 16 Marq Intell Prop L Rev 211, 217–28 (2012). See also M. Claire Flowers, *Facing the Inevitable: The Inevitable Disclosure Doctrine and the Defend Trade Secrets Act of 2016*, 75 Wash & Lee L Rev 2207, 2223 (2018) (finding that not all states bar application of inevitable disclosure doctrine entirely; only those in the Eighth Circuit, California, Kentucky, Louisiana, Maryland, and Massachusetts expressly refused to adopt the doctrine). During the period in which Silicon Valley overtook Route 128 as a technology center, it was uncertain whether a California court could issue injunctive relief under the inevitable disclosure doctrine. See Part II.A.3.

[121] These headline disputes include: Cisco's lawsuit against Arista, a company founded by departing Cisco employees, see Rachael King, *Cisco's Feud with Former Star Executive Turns Personal—and Costly* (Wall St J, Aug 17, 2017), online at https://www.wsj.com/articles/ciscos-feud-with-former-star-executive-turns-personaland-costly -1502980362 (visited Feb 17, 2020) (Perma archive unavailable); Intel's suit against Broadcom involving the departure of former Intel employees, see Karen Alexander, *Intel, Broadcom Settle Suit over Trade Secrets* (LA Times, Nov 22, 2000), archived at https://perma.cc/MQ9J-KEZA; and Apple's suit against Steve Jobs and Next, see Andrew Pollack, *Steven Jobs Settles Suit Filed by Apple* (NY Times, Jan 18, 1986), archived at

such legal threat, and the potential injunction, damages, and litigation costs to which the employee and future employer could be exposed,[122] Google may be able to dissuade Uber from hiring its employee. This effectively occurred in the Google-Uber litigation: first, Levandowski was barred by court order from working on certain projects at Uber; and, second, Uber fired Levandowski in connection with Google's litigation and related allegations of trade-secret theft.[123] Effectively, this approaches the result that would have been achieved if Google had been able to enforce a noncompete covenant against a departing employee.

Aside from these clearly legal mechanisms, Google and Uber might enter into a mutual "no-hire" (also known as antipoaching) agreement. Beginning in 2005, Apple, Google, and other Silicon Valley–based companies reportedly entered into unwritten "no-hire" agreements to protect their trade secrets and to suppress wage competition among one another.[124] Although these arrangements were ultimately dissolved following a settlement with the Department of Justice for alleged antitrust violations,[125] they illustrate how firms that are precluded from using noncompetes

---

https://perma.cc/5LRN-VK4T. For discussion of other trade secret suits involving departing employees, see Everett M. Rogers and Judith K. Larsen, *Silicon Valley Fever: Growth of High-Technology Culture* 91–94 (Basic Books 1984).

[122] Gilson argues that trade secrecy claims are difficult to win (outside of blatant misappropriation) and, as a result, are not typically effective substitutes for noncompetes. Gilson, 74 NYU L Rev at 597–601 (cited in note 8). We feel this understates certain practical and legal realities. Although trade secrecy claims are certainly not as strong as an absolute bar on postemployment opportunities at competitors, they have considerable legal and *in terrorem* force (as Gilson acknowledges to some extent, see id at 600), especially given that, at least during 1984–2002, California law enabled courts to award relief in trade secret cases even in cases of merely "threatened" (rather than actual) misappropriation. See notes 132–34 and accompanying text. For similar views on the potency of California trade secret suits in certain circumstances, see Michael Risch, *Comments on Trade Secret Sharing in High Velocity Labor Markets*, 12 Empl Rts & Empl Pol J 339, 340–42 (2009) (arguing that California trade secret law provides a potent remedy in cases involving the misappropriation of "core" informational assets).

[123] Mullin, *Judge's Order Bars Uber Engineer from Lidar Work* (cited in note 5); Marshall, *Uber Fired Its Robocar Guru* (cited in note 6).

[124] See Lobel, 93 Tex L Rev at 831–35 (cited in note 9) (describing antipoaching cartels entered into by leading Silicon Valley technology firms); Jeff Elder, *Silicon Valley Companies Agree to Pay $415 Million to Settle Wage Case* (Wall St J, Jan 15, 2015), online at https://www.wsj.com/articles/silicon-valley-companies-agree-to-pay-415-million-to-settle-wage-case-1421363288 (visited Feb 17, 2020) (Perma archive unavailable) (describing settlement of class-action antitrust lawsuit against major technology companies alleging "antipoaching" agreements).

[125] US Department of Justice, Press Release, *Justice Department Requires Six High Tech Companies to Stop Entering into Anticompetitive Employee Solicitation Agreements: Settlement Preserves Competition for High-Tech Employees* (Sept 24, 2010), archived at https://perma.cc/RYG6-VEE5.

may have strong incentives to use other mechanisms to dampen labor mobility.

 *e) Economic alternatives to noncompetes.*  Even in the absence of any alternative legal instrument, employers have another potent mechanism by which to discourage employee movement: they can use deferred compensation mechanisms to encourage employees to remain with the firm.[126] There are multiple methods. Employers can set the vesting schedules of deferred equity compensation (often a substantial portion of an employee's compensation at high-tech firms) so that departing employees suffer an implicit financial penalty by departing prior to the date on which all their options to acquire stock in the company have been triggered. Cisco, a Silicon Valley incumbent and repeat acquirer of startups, typically requires that a target's employees waive vesting rights (in the target's stock) that accelerate upon an acquisition and adopt a new graduated vesting schedule (in Cisco's stock), precisely in order to deter departures by the target's key employees for a certain period of time following the acquisition.[127] Alternatively, an acquisition agreement can skew the division of deal consideration such that a small portion is allocated to the up-front purchase price and the remainder is allocated to a future postacquisition date, contingent on the founders and certain other employees remaining with the acquiror postclosing for a certain period of time.[128] In yet another variation, a recent empirical study shows that S&P 500 firms often pay severance to California-based executives in discretionary installments following separation (as contrasted with lump-sum amounts that the same firms usually pay to non-California-based executives immediately upon separation), subject to compliance

---

[126]  See Richard A. Booth, *Give Me Equity or Give Me Death—the Role of Competition and Compensation in Building Silicon Valley*, 1 Entrepreneurial Bus L J 265, 271 (2006) (arguing that deferred equity compensation is used as a replacement for noncompete agreements for purposes of retaining employees). For empirical evidence that stock options promote employee retention, see Paul Oyer and Scott Schaefer, *Why Do Some Firms Give Stock Options to All Employees?: An Empirical Examination of Alternative Theories*, 76 J Fin Econ 99, 109–10, 131–32 (2005) (based on data on firms' stock option grants to middle managers, finding that this practice is primarily used for purposes of retaining employees and "sorting" between higher- and lower-quality employees).

[127]  See David Mayer and Martin Kenney, *Economic Action Does Not Take Place in a Vacuum: Understanding Cisco's Acquisition and Development Strategy*, 11 Indust & Innovation 299, 312 (2004).

[128]  See Marita A. Makinen, David B. Haber, and Anthony W. Raymundo, *Acqui-Hires for Growth: Planning for Success* *35 (Lowenstein Sandler PC, 2012), archived at https://perma.cc/5XBD-2Q76 (noting that certain acquisitions allocate more than 40 percent of the deal consideration to "incentive pool payments" and "equity grant roll overs . . . contingent on key employees staying with the buyer post-closing").

with noncompete provisions in the executives' employment agreements that are not directly enforceable through breach-of-contract suits.[129]

### 3. Was Massachusetts's noncompete and trade secret law significantly different from California's?

The traditional narrative relies on a significant difference in legal treatment between Massachusetts and California with respect to the enforcement of noncompetes and related doctrines that impact employee mobility. Below we look more carefully at comparative differences between Massachusetts and California law in the enforcement of noncompetes and trade secret law. We do not discern any meaningful differences with respect to trade secret claims. Although we do not contest that there were material differences in the enforceability of noncompetes between the two states during the historical period in question, the comparison is more nuanced than commonly explained, especially taking into account the above-noted exceptions to California's oft-described "ban" on noncompetes.

*a) Trade secrets; inevitable disclosure.*  In general, there are few substantial differences in the trade secret doctrines followed by California and Massachusetts courts.[130] Where there are fine differences, these do not necessarily support the conventional expectation that Massachusetts provides stronger trade secret protections. To illustrate these tendencies, we look more closely at the inevitable disclosure doctrine and its evolution in California and Massachusetts during the period in which Silicon Valley rose to preeminence. Under this doctrine, a court can enjoin an individual from working for a new employer on the ground that the individual will inevitably disclose trade secrets belonging to the former employer.[131] This represents a plaintiff-favorable extension of trade secret law, which typically requires that the plaintiff show that the defendant has actually used or disclosed the trade secret after having misappropriated it.

---

[129] See Sarath Sanga, *Incomplete Contracts: An Empirical Approach*, 34 J L Econ & Org 650, 654, 670–77 (2018) (using a data sample consisting of 852 executive contracts disclosed in SEC filings during 1996–2016 by 75 S&P 500 firms that had employees in California and at least one state other than California).

[130] See Gilson, 74 NYU L Rev at 602 (cited in note 8) (stating that "[t]he scope of protection provided by trade secret law in California and Massachusetts appears to be roughly the same"). See also Robert G. Bone, *A New Look at Trade Secret Law: Doctrine in Search of Justification*, 86 Cal L Rev 241, 247 (1998) ("Although trade secret doctrine varies from state to state, the general rules are substantially similar in all jurisdictions.").

[131] See Flowers, 75 Wash & Lee L Rev at 2217 (cited in note 120).

As of the late 1970s and early 1980s, we are not aware of any indication in California or Massachusetts case or statutory law that either jurisdiction had explicitly recognized or rejected the inevitable disclosure doctrine or any equivalent under trade secret law. In 1984, however, it was California—not Massachusetts—that signaled openness to the inevitable disclosure doctrine by adopting the Uniform Trade Secrets Act (UTSA), which became effective the following year. California's version of the UTSA, the California Uniform Trade Secrets Act (CUTSA), follows the language of the model statute and provides that a plaintiff can obtain injunctive relief under trade secret law if the court finds there is "threatened misappropriation."[132] Those two words mattered: in 1996, AMD, a leading California semiconductor manufacturer, successfully relied on the inevitable disclosure doctrine to secure a preliminary injunction preventing more than twelve of its former employees from taking certain positions at their new employer, Hyundai.[133] Given the language in the CUTSA, and the outcome in the AMD-Hyundai litigation, it can be understood why a Silicon Valley practitioner observed in 1997 that it was unclear whether the inevitable disclosure remedy was available under California law.[134]

In 1998, the author of a leading treatise on trade secret law observed that California law authorized courts generally to intervene to protect against "threatened harm" and concluded: "California has never rejected the fundamental idea that underlies the [inevitable disclosure] doctrine."[135] In 1999, a California intermediate appellate court even explicitly adopted the doctrine (although it ruled against the trade secret claimant and the court's opinion was subsequently "depublished" by the California Supreme Court).[136] Commentators observed that the court's opinion reflected the actual law on the ground in some California

---

[132] Cal Civ Code § 3426.2.

[133] See Benjamin A. Emmert, *Keeping Confidence with Former Employees: California Court Apply the Inevitable Disclosure Doctrine to California Trade Secret Law*, 40 Santa Clara L Rev 1171, 1192–95. The case subsequently settled. See *AMD, Hyundai Unit Settle Trade-Secrets Case* (LA Times, Nov 19, 1996), archived at https://perma.cc/45XY-GMP8.

[134] Terrence P. McMahon, Gary E. Weiss, and Sean A. Lincoln, *Inevitable Disclosure: Not So Sure in the West*, Natl L J C35–36 (May 12, 1997).

[135] James Pooley, *When It Comes to Trade Secrets and Employee Mobility, a Little Inevitable Disclosure Is Not Such a Bad Thing*, The Recorder 41 (Nov 1998).

[136] See generally *Electro Optical Industries, Inc v White*, 90 Cal Rptr 2d 680 (Cal App 1999), ordered not to be officially published, 2000 Cal LEXIS 3536 (Cal). Specifically, the Court of Appeal stated: "Although no California court has yet adopted it, the inevitable disclosure rule is rooted in common sense and calls for a fact specific inquiry. We adopt the rule here." 90 Cal Rptr 2d at 684.

lower courts: "The . . . decision now makes explicit what many trade secret practitioners have known for years: California courts will grant narrowly tailored injunctions in appropriate circumstances to prevent a former employee from performing certain tasks for a new employer to minimize the threat to a former employer's trade secrets."[137]

In the immediately ensuing years, the case law shifted in a more defendant-friendly direction, as several federal district courts applying California law[138]—and, in 2002, a California intermediate appellate court—rejected the inevitable disclosure remedy,[139] specifically distinguishing in the latter case between "inevitable disclosure" and the "threatened misappropriation" language in the CUTSA.[140] Nonetheless, a contemporary observer wrote that it remained uncertain whether a California court might apply the inevitable disclosure doctrine, given that the 2002 case was a ruling by an intermediate appellate court.[141] Reflecting this lingering uncertainty, a California court in 2008 recognized the continuing possibility of bringing a trade secret claim based on the "threatened misappropriation" language in the CUTSA.[142] Although it is almost certain today that the inevitable disclosure doctrine is no longer viable in California in view of *Edwards v Arthur Andersen LLP*,[143] during the ascendance of Silicon Valley in the 1980s, 1990s, and early 2000s, this was not the case.

During approximately the same period, the development of the law in Massachusetts concerning the inevitable disclosure

---

[137] Gary E. Weiss and Sean A. Lincoln, *Accepting the Inevitable: The California Court of Appeal Has Finally Adopted the Doctrine of Inevitable Disclosure* (Supplement to the Recorder, Feb 2000).

[138] *GlobeSpan, Inc v O'Neill*, 151 F Supp 2d 1229, 1229 (CD Cal 2001); *Danjaq, LLC v Sony Corp*, 1999 WL 317629, *1 n 1 (CD Cal); *Computer Sciences Corp v Computer Associates International, Inc*, 1999 WL 675446, *5 (CD Cal); *Bayer Corp v Roche Molecular Systems, Inc*, 72 F Supp 2d 1111, 1119–20 (ND Cal 1999).

[139] *Whyte v Schlage Lock Co*, 101 Cal App 4th 1443, 1462–64 (2002).

[140] See id.

[141] See Hyde, *Working in Silicon Valley* at 33–35 (cited in note 9).

[142] See *Central Valley General Hospital v Smith*, 162 Cal App 4th 501, 524–26 (2008) (stating that the rejection of the inevitable disclosure doctrine in *Whyte* does not imply rejection of trade secret claims based on threatened misappropriation, given that the California code explicitly recognizes such claims).

[143] 189 P3d 285 (Cal 2008). Reflecting the post-*Edwards* approach toward noncompetes and employee mobility more generally, a California court in 2009 awarded attorneys' fees as sanctions against a party that sought an injunction based on the inevitable disclosure doctrine (together with other evidence of bad faith). See *FLIR Systems, Inc v Parrish*, 174 Cal App 4th 1270, 1273–74, 1277 (2009). For further discussion, see Charles T. Graves, *Is There an Empirical Basis for Predictions of Inevitable Disclosure?*, 18 Wake Forest J Bus & Intell Prop L 190, 194–96 (2018).

*The Case for Noncompetes*

doctrine followed a remarkably similar trajectory, with the only potential difference being that Massachusetts common law provided an even weaker basis for asserting the inevitable disclosure doctrine. Given that Massachusetts (unlike California) had not adopted the UTSA and therefore required that a trade secret claimant show actual use or disclosure by the defendant, there was arguably no basis under Massachusetts common law to issue injunctive relief under a theory of inevitable disclosure. In 1995, a federal district court (applying Massachusetts law) found that it was "inevitable" that a software developer would use his former employer's information in his new position; however, the case involved a noncompete agreement and therefore it was not necessary for the court to address the inevitable disclosure doctrine.[144] In 2002, a federal district court did address the doctrine directly and rejected it, stating: "Massachusetts law provides no basis for an injunction without a showing of actual disclosure."[145] As of 2003, a commentator summed up the state of the law by observing that "no Massachusetts appellate court has ruled on the viability of the inevitable disclosure doctrine, and the few Massachusetts trial court decisions dealing with the doctrine have been decidedly lukewarm about it."[146]

Consistent with our general view stated at the outset of this discussion, with respect to the inevitable disclosure doctrine, it was actually California that was more protective of trade secret holders. Any current differences can be dated either to 2008, the year of the *Edwards v Arthur Andersen LLP* decision (insofar as it signaled California courts' likely rejection of any effort by plaintiffs to seek injunctive relief under the inevitable disclosure doctrine), or 2018, when the Massachusetts legislature adopted its version of the UTSA. This gave rise to the same uncertainty that arose following California's adoption of the UTSA in 1984. Following the model statute, the Massachusetts version refers to "threatened misappropriation,"[147] which could provide a basis for Massachusetts courts to adopt the inevitable disclosure doctrine, although they may adopt California courts' now-prevailing understanding that the "threatened misappropriation" language does

---

[144] *Marcam Corp v Orchard*, 885 F Supp 294, 296–97 (D Mass 1995).

[145] *Safety-Kleen Systems, Inc v McGinn*, 233 F Supp 2d 121, 124 (D Mass 2002).

[146] See Laurence H. Reece III, *Employee Noncompetition Agreements: Recent Developments and Trends*, 88 Mass L Rev 24, 36 (2003).

[147] Massachusetts Trade Secrets Act, Mass HR 4868, § 19 (cited in note 27) (providing that "threatened misappropriation may be enjoined upon principles of equity, including but not limited to consideration of prior party conduct and circumstances of potential use").

not imply endorsement of the inevitable disclosure doctrine.[148] While that particular point remains unresolved today, it is notable that practitioners have commented that acceptance by Massachusetts courts of the inevitable disclosure doctrine would run counter to those courts' historical tendency to reject or at least resist application of the doctrine.[149]

*b) Noncompetes.* During the time in which Silicon Valley overtook Route 128, and continuing through the present, it is certainly the case that Massachusetts law, as compared to California law, provided employers with a higher level of confidence in the enforceability of noncompetes. But the differences should not be exaggerated nor should it be assumed that Massachusetts employers have had unfettered ability to enforce noncompetes without constraint. Like almost all states, Massachusetts applies the common-law reasonableness standard. This standard limits the enforceable scope of a noncompete by duration, scope and geography, provided in all cases that the noncompete is deemed necessary to protect the employer's legitimate business interests.[150] For this purpose, Massachusetts courts have defined the employer's legitimate interest narrowly. In a trilogy of cases decided in 1974, the Massachusetts Supreme Court emphasized that noncompetes were enforceable only to the extent required to protect the employer's goodwill, trade secrets, or confidential information.[151] Massachusetts courts apparently took these constraints seriously: writing in 1991, a leading practitioner of trade secret law observed that "Massachusetts courts have often refused to enforce non-competition agreements on the ground that no trade secrets or confidential business information were involved" and that "[i]n

---

[148] For discussion, see Yekaterina Reyzis, *One Step Away from Uniform: Taking a Closer Look at Massachusetts' New Trade Secrets Law* (JDSupra, Nov 21, 2018), archived at https://perma.cc/M472-MVPY.

[149] See id (noting that Massachusetts courts "have long held that the inevitable disclosure doctrine hurts employer mobility and competition"); Andrew T. O'Connor, *New Massachusetts Trade Secret Laws Effective October 1, 2018* (In-House, Sept 12, 2018), archived at https://perma.cc/834P-GUAN (noting that Massachusetts courts "were considered to have effectively rejected (or at least discredited) the 'inevitable disclosure' doctrine").

[150] *Alexander & Alexander, Inc v Danahy*, 488 NE2d 22, 29–30 (Mass App 1986); *New England Canteen Service, Inc v Ashley*, 363 NE2d 526, 528 (Mass 1977); *Analogic Corp v Data Translation, Inc*, 358 NE2d 804, 807 (Mass 1976); *Marine Contractors Co, Inc v Hurley*, 310 NE2d 915, 920–21 (Mass 1974).

[151] See *All Stainless Inc v Colby*, 308 NE2d 481, 485–86 (Mass 1974); *Marine Contractors Co*, 310 NE2d at 920; *National Hearing Aid Centers, Inc v Avers*, 311 NE2d 573, 576–77 (Mass App 1974).

numerous cases, Massachusetts courts have cut back restrictions to make them reasonable."[152]

Other obstacles stood in the way of a Massachusetts employer who sought to enforce a noncompete. Since 1968, Massachusetts courts have recognized the material change doctrine, which bars enforcement of noncompetes if the employee's position and salary changed significantly since starting employment.[153] In 1979 and 1982, the Massachusetts courts extended the reasonableness standard to employment contracts that required employees to forfeit certain deferred compensation upon termination, on the ground that these provisions implicitly operated as noncompetes.[154] Additionally, Massachusetts courts have held that noncompete agreements are to be construed strictly in favor of the employee and, relatedly, have declined to enforce noncompetes if the contractual language has been deemed to be excessively ambiguous.[155] Contrary to the standard narrative, Massachusetts courts during the decline of Route 128 were far from enthusiastic about noncompetes and applied the common-law reasonableness standard to limit their enforceability.

### 4.  Did weak enforcement of noncompetes really cause the Valley to rise?

The standard narrative correctly observes that Massachusetts was an early pioneer of technological innovation. Ironically, the Boston area essentially originated what is now viewed as the Silicon Valley model consisting of a strong academic research complex coupled with a robust venture capital community and substantial movement of human capital among academia, startups, and large firms. In 1946, a Boston firm (the American

---

[152] Laurence H. Reece III, *Employee Non-Competition Agreements and Related Restrictive Covenants: A Review and Analysis of Massachusetts Law*, 76 Mass L Rev 2, 11–12 (1991), citing *National Hearing Aid Centers*, 311 NE2d at 576–77 (denying injunctive relief on ground that employee had not used any confidential information belonging to the employer); *Richmond Brothers, Inc v Westinghouse Broadcasting Co, Inc*, 256 NE2d 304, 305–06 (Mass 1970) (declining to enforce noncompete on ground that employee's success was not attributable to employer's trade secrets or confidential information).

[153] *F.A. Bartlett Tree Expert Co v Barrington*, 233 NE2d 756, 758 (Mass 1968).

[154] *Kroeger v Stop & Shop Companies, Inc*, 432 NE2d 566, 568, 571–72 (Mass App 1982); *Cheney v Automatic Sprinkler Corp of America*, 385 NE2d 961, 965 & n 7 (Mass 1979).

[155] See, for example, *Lanier Services, Inc v Ricci*, 192 F3d 1, 4–5 (1st Cir 1999) (finding that the term, "facilities management services," was ambiguous as a matter of law, interpreting the phrase against the former employer as the drafting party, and declining to enforce the noncompete). For discussion of additional cases during 1999–2002, see Reece, 88 Mass L Rev at 26 (cited in note 146).

Research and Development Corporation, or ARD) established the first major successful venture capital enterprise.[156] Supported by federal defense funding and local VC investors, MIT and Harvard University labs spawned hundreds of spin-offs throughout the 1960s and 1970s.[157] Those spin-offs included firms that later pioneered the "minicomputer"[158] market such as Digital Equipment Corporation (DEC) (founded in 1957 as a MIT startup with funding from ARD), Wang (founded by a Harvard physicist in the 1950s), Data General (founded in 1968 by ex-DEC engineers), and Prime (founded in 1972 by engineers from Honeywell).[159]

Contrary to Saxenian's account of cultural norms, Paul Ceruzzi describes the most important Route 128 firm, DEC, as having been characterized by a nonhierarchical engineer-driven culture that dispensed with the formalities and bureaucracy of incumbents such as IBM.[160] Certainly, as DEC and other large Route 128 firms grew, they tended to adopt vertically integrated structures.[161] But it would be inaccurate to describe the Route 128 environment in its heyday as a monolithic industry consisting of

---

[156] Saxenian, *Regional Advantage* at 15 (cited in note 8).

[157] See id at 16–17; Martin Kenney and Urs von Burg, *Technology, Entrepreneurship and Path Dependence: Industrial Clustering in Silicon Valley and Route 128*, 8 Indust & Corp Change 67, 85–87 (1999); Edward B. Roberts, *A Basic Study of Innovators; How to Keep and Capitalize on Their Talents*, 11 Rsrch Mgmt 249, 254–55 (1968).

[158] The minicomputer refers to a class of computing devices that delivered computing power at a significantly reduced cost (and physical size) relative to the mainframe market (dominated by IBM). Advances in miniaturization and the development of the microprocessor yielded the "microcomputer" (equivalent to the modern PC), which delivered substantial computer power with a small physical "footprint," thereby rendering obsolete the minicomputer category. For discussion, see Paul E. Ceruzzi, *A History of Modern Computing* 124–26 (MIT 2d ed 2003).

[159] See id at 127 (noting that DEC was founded in 1957 by former MIT researchers with funding from ARD); id at 195 (stating that Data General was founded in 1968 by three former DEC engineers); Saxenian, *Regional Advantage* at 18–19 (cited in note 8) (noting that in 1951, An Wang, a scientist at Harvard, founded Wang Laboratories; in 1957, three scientists left Lincoln Labs to found DEC; in 1968, Edson DeCastro left DEC to found Data General; in 1972, William Poduska left Honeywell to found Prime); Kenney and von Burg, 8 Indust & Corp Change at 85–86 (cited in note 157) (noting that in 1957, Kenneth Olsen, a former MIT researcher, founded DEC with a capital investment from ARD); Lynn E. Browne and Steven Sass, *The Transition from a Mill-Based to a Knowledge-Based Economy: New England, 1940–2000*, in Peter Temin, ed, *Engines of Enterprise: An Economic History of New England* 211–12 (Harvard 2000).

[160] See Ceruzzi, *A History of Modern Computing* at 138 (cited in note 158) ("DEC represented everything that was liberating about computers, while IBM, with its dress code and above all its punched card, represented everything that had gone wrong.").

[161] See Kenney and von Burg, 8 Indust & Corp Change at 86–87 (cited in note 157) (stating that many minicomputer pioneers in the Route 128 area integrated vertically in order to reduce turnaround time and protect chip designs); Sarah Kuhn, *Computer Manufacturing in New England: Structure, Location and Labor in a Growing Industry* 29–33 (Joint Center for Urban Studies of MIT and Harvard University 1982).

a handful of vertically integrated incumbents. Although DEC and three other Route 128 firms (plus IBM) dominated the minicomputer segment in the late 1970s and early 1980s,[162] observers and studies systematically documented that those firms spawned a continuing flow of small-firm spin-offs.[163] An interview-based study of twenty-two Massachusetts-based computer firms between 1965 and 1975 found that half of the firms' products "were the result of direct technology transfer from previous employers and another quarter indirect transfer."[164] A study of patent coauthoring patterns found similarly that Boston innovators were regularly involved in information exchange networks that were comparable in robustness (but not size) to those in Silicon Valley.[165] In a manner akin to accounts of Silicon Valley, qualitative histories observe that Route 128 spin-offs could procure necessary inputs from a disaggregated network of small- to medium-size component producers and suppliers, assemblers, and distributors.[166] A history of the period concludes: "[C]ompanies spinning

---

[162] See Nancy S. Dorfman, *Massachusetts' High Technology Boom in Perspective: An Investigation of Its Dimensions, Causes and of the Role of New Firms* 2–4 (MIT Center for Policy Alternatives 1982).

[163] See Michael H. Best, *The New Competitive Advantage: The Renewal of American Industry* 129–30 (Oxford 2001) (describing "genealogies" of firm spin-offs from entrepreneurial "parent" firms in various technology segments of the Route 128 area); Susan Rosegrant and David R. Lampe, *Route 128: Lessons from Boston's High-Tech Community* 153–57 (Basic Books 1992); Dorfman, 12 Rsrch Pol at 310–11 (cited in note 79) (noting that DEC, the leading technology firm in the Boston area, had spawned multiple spin-offs, and that most new technology firms in the Boston area were founded by former employees of other firms or research laboratories); Elaine Romanelli, *New Venture Strategies in the Minicomputer Industry*, 30 Cal Mgmt Rev 160, 167 (1987) (observing that, during the 1960s and 1970s, almost sixty new minicomputer firms were formed, principally by engineers who had worked for DEC and other major minicomputer manufacturers); Roberts, 11 Rsrch Mgmt at 252 (cited in note 157) (observing that thirty-nine companies had been formed during the 1960s by forty-four former employees of one Boston area electronics firm).

[164] See Dorfman, 12 Rsrch Pol at 310, 316 n 40 (cited in note 79) (describing a 1977 study by the MIT Center for Policy Alternatives).

[165] See Lee Fleming, et al, *Why the Valley Went First: Agglomeration and Emergence in Regional Inventor Networks* *29–30 (working paper, Feb 2003), archived at https://perma.cc/4MA2-KZ5U.

[166] See Franz Tödtling, *Regional Networks of High-Technology Firms—The Case of the Greater Boston Region*, 14 Technovation 323, 330 (1994) (describing regional network in Boston area comprising electronics, component and software firms, some of which act as "suppliers or subcontractors to the [large] minicomputer firms"); AnnaLee Saxenian, *In Search of Power: The Organization of Business Interests in Silicon Valley and Route 128*, 18 Econ & Society 25, 45 (1989) (stating that "research laboratories and firms producing components and services for each other co-located, and cross-fertilizations between the academic world, the federal government and local industry fuelled an ongoing expansion of technologically innovative activity in the [Route 128] region"); Dorfman, 12 Rsrch Pol at 306 (cited in note 79) (stating that the Boston area provides technology firms with access to a network of parts and components suppliers, "all particularly critical to new

off from other companies were at the very heart of the monumental growth that the Route 128 area experienced from the 1960s through the 1980s."[167]

On the West Coast, Silicon Valley pioneered innovations in the semiconductor field and, by the late 1970s, was the recognized leader.[168] Historical accounts of Silicon Valley's semiconductor industry typically attribute its origins to the departure in 1957 of leading engineers from Shockley Transistors to form Fairchild Semiconductor, which generated a sequence of leading semiconductor firms.[169] Semiconductor chips are a critical component in a wide array of computing and electronics products and operated as a launching pad for Silicon Valley to achieve dominance in information technology more generally.[170] Even after lower-cost Japanese producers in the 1980s undermined the local memory chip production industry, Silicon Valley adapted by shifting resources to the design and development of customized chips[171] and developing strengths in hardware and software markets. By contrast, the Massachusetts minicomputer industry did not recover as quickly from the entry of lower-cost workstations and personal computers.[172] Massachusetts had bet on the wrong horse and was unable to recover the lead.

Unlike the legal literature, the economic history and business management literature shows no consensus view as to the factors that best explain why Silicon Valley overtook Route 128 as an information technology center. Starting with Gilson, the legal literature has focused on the explanation advocated by Saxenian, who

---

start-ups that are developing prototypes and to manufacturers of customized equipment for small markets").

[167] See Rosegrant and Lampe, *Route 128* at 154 (cited in note 163).

[168] See Kenney and von Burg, 8 Indust & Corp Change at 68, 80–85 (cited in note 157).

[169] See Ceruzzi, *A History of Modern Computing* at 198 (cited in note 158).

[170] See Kenney and von Burg, 8 Indust & Corp Change at 78 (cited in note 157) ("In the postwar electronics industry, transistors and then integrated circuits were an enabling technology for nearly every important electronic innovation.").

[171] See AnnaLee Saxenian, *Regional Networks and the Resurgence of Silicon Valley*, 33 Cal Mgmt Rev 89, 89–95 (1990) (describing how firms that specialize in the design of customized chips and outsource production enabled Silicon Valley to recover after Japanese firms entered the general-purpose semiconductor markets).

[172] See Ceruzzi, *A History of Modern Computing* at 304–06 (cited in note 158) (describing how minicomputer companies based in the Boston area failed to adapt to the PC revolution); Kenney and von Burg, 8 Indust & Corp Change at 87 (cited in note 157) (stating that the minicomputer industry could not compete with "workstations" that offered comparable computing power at a substantially lower price); Richard N. Langlois, *Organizing the Electronic Century*, in Giovanni Dosi and Louis Galambos, eds, *The Third Industrial Revolution in Global Business* 119, 155 (Cambridge 2013) (same).

attributed this development to cultural norms and vertically integrated structures that constrained the flow of intellectual capital.[173] However, the business management and economic history literature is far less monolithic and identifies other salient reasons why Silicon Valley may have overtaken Massachusetts. Most commonly, these scholars identify factors such as the draw of warm weather, luck (in particular, Shockley Transistors' choice to locate in the Bay Area, which then gave rise to the Fairchild spin-off),[174] and, most compellingly, the fact that Silicon Valley had achieved leadership in a general-purpose technology (namely, the microprocessor pioneered by Intel in the 1970s) that could be applied to a wide variety of industrial, business, and consumer markets.[175] By contrast, the leading Massachusetts firms in the late 1970s and early 1980s had focused on developing specialized minicomputer and other technologies targeted for technical and industrial users.[176] Hence, once-pioneering Massachusetts firms such as DEC tended to focus on technologies that would service existing markets for technical and industrial users, rather than developing innovations—such as the personal computer—that would open up new and much larger markets in the corporate, small business, and home segments.[177]

This is not to say that East Coast firms were innovation laggards as compared to their West Coast counterparts. After all, it was IBM, headquartered in New York State, that in 1981 launched the personal computer, which precipitated the movement from closed "end-to-end" hardware systems to modular

---

[173] See note 8.

[174] In the words of Intel's cofounder: "[L]uck played a role in nearly every component of this story of semiconductors and the birth of Silicon Valley." See Gordon Moore and Kevin Davis, *Learning the Silicon Valley Way*, in Timothy Bresnahan and Alfonso Gambardella, eds, *Building High-Tech Clusters: Silicon Valley and Beyond* 7, 36 (Cambridge 2004).

[175] See Kenney and von Burg, 8 Indust & Corp Change at 80 (cited in note 157) (noting that "the semiconductor found a far greater variety of applications than did the minicomputer" and "the semiconductor was important because it made so many other products possible").

[176] See id (noting that Route 128 specialized in the minicomputer, which was a finished product, rather than a component that could be used to assemble other products); Dorfman, *Massachusetts' High Technology Boom in Perspective* at 2–4 (cited in note 162).

[177] See Kenney and von Burg, 8 Indust & Corp Change at 87 (cited in note 157) (noting the common observation that Route 128 firms such as DEC failed to appreciate the threat posed by workstations and microcomputers, the precursors to the desktop personal computer); Ceruzzi, *A History of Modern Computing* at 243–45 (cited in note 158) (noting DEC's choice to focus on high-performance and larger computers rather than smaller and less expensive personal computers).

"plug-and-play" hardware systems as the standard product architecture in the computing market.[178] That East Coast innovation in turn led to the aforementioned decline of DEC, Wang, and other leading Massachusetts minicomputer firms that operated under closed models in which customers purchased all components from a single firm.[179] IBM's success is attributable in part to its then-novel decision to outsource design and production of many of the PC's components—most notably, the operating system (to Microsoft) and the microprocessor (to Intel)—as well as its inadvertent commoditization of the PC's hardware.[180] But these were strategies that could have been taken by a firm like DEC, which had previously made pioneering contributions to computing technology. In fact, DEC attempted to do just that. In 1988, IBM and DEC collaborated to establish the Open Software Foundation, an effort to develop OS/2, a nonproprietary operating system intended to challenge Microsoft's Windows system.[181] Similarly, some of DEC's Route 128 peers responded (albeit, somewhat belatedly) to the decline of the minicomputer by adopting alternative organizational structures.[182] Moreover, two Route 128 firms launched the first commercially successful spreadsheet applications (Visicalc, released in 1979, and Lotus 1-2-3, released in 1984),[183] which are recognized as key factors in the widespread adoption of the Mac and PC, respectively.[184] Hence, there does not seem to be any compelling reason to attribute the decline of DEC and other leading Massachusetts firms substantially to cultural norms or vertically integrated forms of industrial organization.

A similar observation complicates Gilson's argument that Massachusetts's willingness to enforce noncompetes suppressed labor mobility, which hindered the region's innovative performance. Critically, this argument fails to contemplate that

---

[178] See Langlois, *Organizing the Electronic Century* at 153–54 (cited in note 172).

[179] See Best, *The New Competitive Advantage* at 122 (cited in note 163) (observing that dominant Route 128 firms such as DEC and Wang offered "closed architecture" systems). See also Kenney and von Burg, 8 Indust & Corp Change at 87 (cited in note 157) (noting that Wang had dismissed the commercial importance of personal computers).

[180] See Ceruzzi, *A History of Modern Computing* at 277–78 (cited in note 158); Kenney and von Burg, 8 Indust & Corp Change at 96 (cited in note 157).

[181] See Glenn Rifkin and George Harrar, *The Ultimate Entrepreneur: The Story of Ken Olsen and Digital Equipment Corporation* chs 24–25 (Contemporary Books 1988); John Steffens, *Newgames: Strategic Competition in the PC Revolution* 183–84, 222–23 (Pergamon 1994).

[182] See Tödtling, 14 Technovation at 332 (cited in note 166).

[183] See M. Mitchell Waldrop, *The Origins of Personal Computing*, 285 Scientific Am 84, 90 (Dec 2001).

[184] See James A. Sena, *The PC Evolution and Diaspora*, CrossTalk 23 (Mar/Apr 2012); Langlois, *Organizing the Electronic Century* at 152 (cited in note 172).

Route 128 firms could have chosen *not* to request or enforce noncompetes if competitive pressures in the labor market drove them to do so. Gilson argues that collective-action pressures precluded that possibility.[185] But there is compelling evidence that Route 128 firms sometimes, if not *typically*, elected to forgo adoption and enforcement of noncompetes. Contemporary accounts in the early 1980s observed that Route 128 was characterized by frequent spin-offs,[186] talented engineers often left their employees to form start-ups, and large incumbents were typically parents of multiple spin-off firms.[187] One observer records that Route 128 firms tolerated or even welcomed the movement of technical personnel because they "value[d] the knowledge they obtain[ed] by hiring employees from other firms more than they fear[ed] the loss of proprietary information,"[188] and that entrepreneurs often conceived of ideas "in the lab of an employer."[189] That same observer noted that "[n]ew and expanding firms hire[d] their 'know how' by bidding experienced employees away from competing firms."[190]

These accounts make no mention of the use of noncompetes to restrain employee turnover. Rather, firms attempted to retain valued employees by offering superior terms and more interesting work[191]—something that would have been unnecessary if noncompetes were legally potent. The lesson seems clear: when technical

---

[185]  See Gilson, 74 NYU L Rev at 596 (cited in note 8).

[186]  See David A. Garvin, *Spin-Offs and the New Firm Formation Process*, 25 Cal Mgmt Rev 3, 3 (1983) (observing that, as of the early 1980s, in both Silicon Valley and Route 128, new firms are continuously being formed through "spin-offs" founded by "individuals leaving an existing firm in the same industry").

[187]  See Rosegrant and Lampe, *Route 128* at 29, 153–57 (cited in note 163); Dorfman, *Massachusetts' High Technology Boom in Perspective* at 69 (cited in note 162). Professor Sarah Kuhn observes as follows: (i) "[s]ome firms prefer to hire away employees of other computer manufacturing firms," Kuhn, *Computer Manufacturing in New England* at 72 (cited in note 161); (ii) Route 128 has "an unusually high turnover rate among its technical employees, see id at 124–25, and (iii) Route 128 firms provided survey responses indicating heavy reliance on hiring employees from competitors, see id at 125. Similarly, Nancy Dorfman remarks that the Route 128 area is characterized by a start-up entrepreneurial culture in which firms bid away experienced employees from competitors. See Dorfman, 12 Rsrch Pol at 308 (cited in note 79). She further observed that "scientists repeatedly leave their employers to commercialize and market new products whose concepts they helped to develop in the laboratory of a former employer" and it is a "challenge to find new enterprises whose founders did not come from an academic laboratory or another high tech firm." See id at 310.

[188]  See Dorfman, *Massachusetts' High Technology Boom in Perspective* at 9 (cited in note 162).

[189]  See id at 69.

[190]  See Dorfman, 12 Rsrch Pol at 308 (cited in note 79).

[191]  See Kuhn, *Computer Manufacturing in New England* at 125 (cited in note 161).

talent is scarce and market demand for that talent is high, bargaining leverage shifts to employees and differences in the enforceability of noncompetes make little practical difference. Any employer who sought to enforce a noncompete would be punished in the labor market.[192]

To be certain, there is no comprehensive quantitative evidence on noncompete usage and enforcement during this historical period. However, in more recent times—notably, after California substantially ratcheted up its aversion to noncompetes in 2008 in *Edwards*—Massachusetts and California have exhibited similar rates of employee noncompete usage, even among wholly in-state firms, according to the most comprehensive survey conducted to date.[193] Thus, it seems unlikely that during the historical period in question—when Massachusetts and California noncompete law were more similar than today—that the rate of noncompete usage and enforcement between the two states substantially differed.

There may be an additional material factor behind Silicon Valley's ascendance, which existing scholarship has overlooked. In 1979, the Department of Labor modified the "prudence rule" to permit pension fund trustees to invest in venture capital.[194] Based on this signal from federal regulators, state pension fund trustees took the view that it would be consistent with their fiduciary obligations to invest an appropriate portion of a fund's assets in venture capital and other high-risk "alternative" investments.[195] This change triggered a dramatic inflow of capital into VC investments

---

[192] Of course, monopsonistic labor markets exist, and assuming the predicate conditions for firm coordination in this context are satisfied—small number of employers with large market share, comparable employment positions, observable compensation, and a credible mechanism to punish defections—employers can credibly impose and enforce noncompetes. For discussion, see *Todd v Exxon Corp*, 275 F3d 191, 201–02, 207–14 (2d Cir 2001). However, we have no reason to believe that these challenging conditions were satisfied in the labor markets for highly skilled technical workers in the Route 128 area during this historical period, especially given evidence that this area was characterized by frequent spin-offs during this period. See notes 163–67 and accompanying text.

[193] Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *45 fig 8 (cited in note 11).

[194] Department of Labor, Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule, 44 Fed Reg 37221–22 (1979), amending 29 CFR § 2550.404a-1.

[195] See Paul A. Gompers and Josh Lerner, *What Drives Venture Capital Fundraising?* 155 (Brookings Institution 1998).

and, by the late 1980s, the emergence of pension funds as the single largest investor class in VC funds.[196] Presumably, the same is true of California pension funds' increase in VC investment at approximately the same time, given that CalPERS, the principal California state pension fund, followed the lead of the Department of Labor and directed assets toward venture capital funds, formally establishing an Alternative Investment Management program for this purpose in 1990.[197] Like other state pension funds (including Massachusetts), California state pension funds exhibit a significant in-state bias in their investments in VC and private equity funds.[198] VC funds in turn exhibit an in-state bias in the selection of portfolio firms.[199] The much larger size of the California pension system, combined with the in-state biases of California state pension fund managers and California VC principals, implies that Silicon Valley startups likely had access to a much larger pool of capital than Boston-based startups.[200]

---

[196] See id at 155–56, 163–66 (observing that change in the Department of Labor's "prudent man rule" led to investment in venture capital funds by pension funds, which became the primary source of capital for these funds).

[197] See *CalPERS Private Equity Investments Infuse Billions into California Businesses; Portfolio Is Positioned to Capitalize on Buying Opportunities* (Business Wire, Oct 17, 2003), archived at https://perma.cc/4C74-L6R5 (noting the establishment by CalPERS of Alternative Investment Management Program in 1990 as a vehicle for investing in private equity).

[198] See Yael V. Hochberg and Joshua D. Rauh, *Local Overweighting and Underperformance: Evidence from Limited Partner Private Equity Investments*, 26 Rev Fin Stud 403, 414–25 (2013).

[199] See Adam Lichtenstein, *Home-State Investment Bias in Venture Capital Funds*, 62 Fin Analysts J 22, 23–24 (2006). For further evidence that venture capital funds favor investments in geographically proximate regions, see Claudia B. Schoonhoven and Kathleen M. Eisenhardt, *Regions as Industrial Incubators*, in Edwin S. Mills and John F. McDonald, eds, *Sources of Metropolitan Growth* 210, 244–45 (Transaction 2012).

[200] Although data is not available from the time period in question, to get a sense of the sums involved, consider that, during 2007–2014, CalPERS has held between 8.5 percent and 13.5 percent of its private equity investments in California-based firms. In 2014, it held $31.5 billion of private equity investments, of which 11.5 percent was invested in California-based firms. See CalPERS, *CALPERS Comprehensive Annual Financial Report* *52, 100 (FY 2014); CalPERS, *CALPERS Comprehensive Annual Financial Report* *92 (FY 2010); California State Controller's Office, *CALPERS Comprehensive Annual Financial Report* *83 (FY 2009); CalPERS, *CALPERS Comprehensive Annual Financial Report* *86, 89 (FY 2008). Private equity includes VC investments as well as other investments in firms that are not publicly traded. The Massachusetts Pension Reserves Investment Trust Fund, which manages private equity investments on behalf of the Massachusetts state pension system, reported that, as of June 2014, it held $6.9 billion in investments in private equity, of which $1.4 billion was invested in venture capital. See Massachusetts Pension Reserves Investment Trust Fund, *Comprehensive Annual Financial Report* *35 (2014). The report does not disclose what portion of those funds were allocated to Massachusetts-based investment funds, although it does indicate that 27 percent of its private equity investments were made outside the US. See id at *84. Hence, it is extremely

5. Did Massachusetts really decline?

The traditional narrative relies both on the rise of Silicon Valley as a center of innovation in the electronics industry and the decline of Route 128. While it is correct that Silicon Valley has achieved a uniquely preeminent position, this narrative overstates both Massachusetts's relative historical prominence as a technology center and its relative retreat from that position in more recent decades.

While Route 128 was an historical pioneer in the IT industry since World War II, the period during which it was clearly a dominant center was a short period limited to the height of the minicomputer market during the late 1970s and early 1980s.[201] Even during that time, there was no single, overwhelmingly dominant innovation center akin to Silicon Valley's place today. Relative to the Boston area's important, but less than preeminent, position as of the early 1980s, it does not appear to have suffered a permanent decline in innovative performance since the collapse of the minicomputer industry.[202] Rather, the Boston area has recovered its place as a leading regional innovation center, even if it no longer rivals Silicon Valley in the IT market. Multiple innovation metrics provide suggestive evidence in support of this view. During 1985–2013, the Bay Area held and expanded its lead in the volume of VC investments while the New England region consistently occupied the second- or third-place position.[203] From 1987 through 2011, Massachusetts maintained consistently high levels of business-funded R&D intensity (defined as R&D funded by businesses as a percentage of "gross state product") in a range of approximately 3–4 percent, outperforming California in all years but one.[204] From 1997 through 2016, California and Massachusetts

---

unlikely that Massachusetts pension fund managers invested more capital in Massachusetts-based VC firms, as compared to CalPERS's investments in California-based VC firms.

[201] See Best, *The New Competitive Advantage* at 120 (cited in note 163).

[202] See id at 126–27.

[203] National Venture Capital Association, *Yearbook* *35–37 fig 3.08–09 (Thomson Reuters, 2015), archived at https://perma.cc/Y5G3-6DJA.

[204] Authors' calculations, based on (i) data on state-level R&D expenditures extracted on an alternating year basis from the National Center for Science and Engineering Statistics, *Industrial Research and Development Information System* (National Science Foundation, July 2011), archived at https://perma.cc/82ZP-4YS2, and (ii) data on "gross state product" available from the Bureau of Economic Analysis, *Comprehensive Revision of Gross State Product, 1977–2002, and Accelerated GSP Estimates for 2003* (US Department of Commerce, Dec 15, 2004), archived at https://perma.cc/28C3-RCTV. With respect to item (i), we excluded federal R&D expenditures in order to avoid reflecting any federal subsidies that might understate regional markets' ability to sustain innovation.

have appeared every year among the top three states in terms of business-performed R&D intensity (defined as R&D performed by businesses as a percentage of "private-industry output").[205] After the San Francisco area, the Boston area is the second-most popular location in the US that companies select for their primary R&D center (selected by 230 firms as of 2011, compared to 380 firms for San Francisco).[206]

The Boston area has preserved or regained a significant presence in biotechnology and the life sciences, computer systems design, telecommunications equipment, data storage, technical instruments, and industry-oriented software tools.[207] In fact, the success of the Boston area as a technology cluster since the collapse of the minicomputer industry has now lasted longer than the period during which DEC and its peers were dominant.[208] Notwithstanding Massachusetts's formal tolerance of noncompetes, multiple leading firms in various information technology sectors have spawned a steady flow of new firms providing complementary products and services.[209] In the life sciences (including biotechnology) and medical devices sector in particular, the Boston area is especially prominent (in 2015, biotech firms based in New England raised approximately $10.6 billion from outside investors, while biotech firms based in the San Francisco Bay Area raised approximately $6.5 billion).[210] Trade and scholarly commentary typically situates the Boston area among a triplet of

---

[205] National Center for Science and Engineering Statistics, *Industrial Research and Development Information System* (cited in note 204).

[206] Raymond Wolfe and Brandon Shackelford, *2011 Data Show U.S. Business R&D Highly Concentrated by State and Metropolitan Location* (National Science Foundation, Aug 2014), archived at https://perma.cc/NJC9-TAJU.

[207] See Best, *The New Competitive Advantage* at 126, 127–48, 154, 157 (cited in note 163) (describing "resurgence" of Route 128 area as the local technology industry transitioned from vertically integrated to an "open system . . . model of industrial organization"); Michael Best, Albert Paquin, and Hao Xie, *Discovering Regional Competitive Advantage: Massachusetts High-Tech*, 2 Bus & Econ Hist On-Line 1, 2, 7–21 (2004), archived at https://perma.cc/C6X4-7HAN (describing "resurgence" of the Boston area as an innovation center in the 1990s and providing extensive data showing that the Boston area continues to excel in its historical strengths in complex systems software and engineering); Jason S. Wood, *A Comparison of the Enforceability of Covenants Not To Compete and Recent Economic Histories of Four High-Technology Regions*, 5 Va J L & Tech 14, ¶ 38 (2000) (noting that, contrary to "Gilson's dark portrait of Massachusetts' lack of knowledge spillover effects, the greater Boston area, including Route 128, has recovered nicely from the dark days of the 1980s and early 1990s, and has been a leader in the technology revolution of the mid and late-1990s").

[208] See Best, *The New Competitive Advantage* at 121 (cited in note 163).

[209] See id at 129–30.

[210] See *Beyond Borders 2016: Biotech Financing* *15 (Ernst & Young, 2016), archived at https://perma.cc/C3SS-4CZZ.

leading biotechnology clusters along with the Bay Area and San Diego,[211] in some cases ranking it as the leader among those three locations.[212] As of 2015, the Massachusetts Biotechnology Council stated that Massachusetts employed more personnel in biotechnology R&D than any other state and an MIT report found that, on a per capita basis, Massachusetts received significantly more funding ($351 per capita) from the National Institutes of Health than California ($88 per capita).[213] During 2012–2014, San Francisco firms received each quarter approximately 30–50 percent of funding in the national life sciences industry, while Boston firms received each quarter approximately 20–40 percent of funding.[214]

On a state-to-state level comparison, it may be surprising to learn that Massachusetts and California do not materially differ by multiple measures of innovative health. The State Technology and Science Index, which ranks states' innovation capacities by various objective measures, has ranked Massachusetts in first place since the index was inaugurated in 2002 and through its latest release in 2018.[215] In 2018, California ranked fourth, after having held fourth, third, and third places in 2016, 2014, and 2012, respectively.[216] According to the State New Economy Index, both California and Massachusetts are among the country's leading states on multiple innovation measures (reflecting data as of the years 2012 through 2016), including:

(i)    industry-funded R&D as a percentage of total state GDP (CA: 2.5 percent (ranked third); MA: 2.1 percent (ranked fourth));

211    See Shiri M. Breznitz and William P. Anderson, *Boston Metropolitan Area Biotechnology Cluster*, 28 Can J Regional Sci 249, 249 (2005) (noting that Boston, San Diego, and the San Francisco Bay Area "account for a disproportionately high share of total employment and investment" in the US biotechnology industry); Toby Stuart and Olav Sorenson, *The Geography of Opportunity: Spatial Heterogeneity in Founding Rates and the Performance of Biotechnology Firms*, 32 Rsrch Pol 229, 236–37, 249 (2003) (showing that for the period 1983–1995, the Boston area, Southern California, and Northern California exhibited the largest number of new biotechnology firms).

212    *Clusterluck: Boston's Biotech Hub Is Surviving the Challenge from Silicon Valley* (The Economist, Jan 16, 2016), online at https://www.economist.com/business/2016/01/16/clusterluck (visited Feb 17, 2020) (Perma archive unavailable).

213    See id.

214    See *Biotech Funding Surges* *6 fig 13 (PricewaterhouseCoopers, Feb 2015), archived at https://perma.cc/23MW-BQEK.

215    *Massachusetts: State Technology and Science Index* (Milken Institute, 2018), archived at https://perma.cc/WYZ4-AVL6.

216    See *2018 State Technology and Science Index: State Overall Ranking* (Milken Institute, 2018), archived at https://perma.cc/7Z7D-EQX5.

    (ii)  patents awarded to companies per one thousand private-sector workers (CA: 14.6 (ranked thirteenth); MA: 15.7 (ranked ninth));

    (iii)  venture capital invested as a percentage of state GDP (CA: 1.28 percent (ranked first); MA: 1.27 percent (ranked second)); and

    (iv)  employment in high-technology industries as a percentage of total private-sector employment (CA: 6.8 percent (ranked fifth); MA: 7.9 percent (ranked first)).[217]

## B.  Empirical Studies: Noncompetes, Mobility, and Innovation

Even if the Silicon Valley / Route 128 narrative were more robust, it would be imprudent to base any policy conclusions on a single historical example. While Japan was once widely viewed as a model of a successful innovation economy, a regime characterized by lifetime job security and oligopolistic market structures would hardly be viewed today as an attractive innovation ecosystem.[218] Recently, empirical and experimental researchers have sought to move beyond the Silicon Valley example and, in doing so, have produced a sizeable body of studies concerning the effect of noncompetes on labor mobility and, in some cases, innovation. Unlike the literature that relies on the Silicon Valley / Route 128 narrative, these studies usefully apply formal methods to a broad sample of state jurisdictions, seeking to exploit interstate differences, or intrastate changes in, the legal treatment of noncompetes to identify the effects of such differences and changes on employee turnover and certain innovation indicators.

These studies fall into two categories. The larger category addresses only or principally whether noncompetes (or specifically, the enforceability of noncompetes) reduce labor mobility. In a companion paper, we review these studies comprehensively and provide a detailed discussion of the contributions and limitations of the most widely cited studies.[219] In that review, we describe significant methodological limitations and identify factual errors

---

[217] *The 2017 State New Economy Index* *10, 44, 47, 50 (Information Technology & Innovation Foundation, Nov 2017), archived at https://perma.cc/B8R7-CXAV.

[218] On the folly of these once-popular views, see Brink Lindsey and Aaron Lukas, *Revisiting the "Revisionists": The Rise and Fall of the Japanese Economic Model* (Cato Institute, July 31, 1998), archived at https://perma.cc/3GZN-SDGH.

[219] See Jonathan M. Barnett and Ted Sichelman, *Revisiting Labor Mobility in Innovation Markets* *12–29 (USC Gould School of Law Center for Law and Social Science Research Paper Series No CLASS16-13, May 26, 2016), archived at https://perma.cc/V2T9-6UGC.

concerning important points of state law. These shortcomings cast serious doubt on these studies' claims purporting to show a broad causal relationship between the enforcement of noncompetes and reduced labor mobility. For purposes of the review below, however, we will accept as given the findings of this first category of studies—that is, we will assume that the enforceability of noncompetes has some significant incremental effect on labor mobility. This assumption will enable us to focus our review below on a second and smaller group of studies that address the more fundamental question whether the enforceability of noncompetes has a detrimental effect on innovation.

### 1. Nonexperimental studies.

Several empirical studies have sought to test for a relationship between noncompetes, employee mobility, and innovation. Here, we address in detail four of the studies that scholars and policymakers have most heavily cited and relied upon. First, a 2003 study by Professors Toby Stuart and Olav Sorenson (the "Stuart and Sorenson study") examined biotechnology startups founded in the wake of an initial public offering (IPO) or acquisition of a previous company, finding a significant inverse relationship between in-state noncompete enforceability and overall startup formation. Specifically, in the absence of state-level fixed effects, the authors find that "states with weak non-compete regimes realize 217 percent higher founding rates than those that enforce non-compete covenants."[220] Additionally, taking account for state-fixed effects, Stuart and Sorenson find that the median IPO "occurring in . . . a weak enforcement state increases the founding rate [of new biotech firms] . . . by 26 percent."[221] Second, a 2011 study by Professor Mark Garmaise (the "Garmaise study") found that stronger noncompete enforceability, interacted with a measure of in-state competition, tends to suppress R&D spending and that increased enforceability reduces capital investment per

---

Our analysis in that paper focuses on the most widely cited studies, which include: Matt Marx, Jasjit Singh, and Lee Fleming, *Regional Disadvantage? Employee Non-compete Agreements and Brain Drain*, 44 Rsrch Pol 394 (2015); Garmaise, 27 J L Econ & Org 376 (cited in note 63); Matt Marx, Deborah Strumsky, and Lee Fleming, *Mobility, Skills, and the Michigan Non-compete Experiment*, 55 Mgmt Sci 875 (2009); Bruce Fallick, Charles A. Fleischman, and James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rev Econ & Stat 472 (2006).

[220] See Toby Stuart and Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin Sci Q 175, 193 (2003).

[221] Id at 195.

employee.[222] Third, a 2011 study by Professors Sampsa Samila and Olav Sorenson (the "Samila and Sorenson study") found that states that enforce noncompetes dampen the effects of venture capital investment on firm formation and patenting rates.[223] Based on these findings, Samila and Sorenson conclude that the enforceability of noncompetes "significantly impedes entrepreneurship and employment growth."[224] Fourth, a 2015 study by Professors Matt Marx, Jasjit Singh, and Lee Fleming (the "Marx et al. study") found a "brain drain" of inventors from Michigan to states that do not enforce noncompetes after 1985, the year in which Michigan law restored the enforceability of noncompetes.[225] Moreover, the Marx et al. study found that this effect was strongest for more highly skilled inventors.[226] We now address substantial limitations and, in some cases, outright flaws of these studies. Although we do not have space to address every study examining the relationship between noncompetes and innovation, our critique applies to the vast majority of lesser-cited studies on the issue.

    *a) Improper characterization of how strongly states enforce noncompetes.* First, all four of these studies, as well as many other studies, oversimplify and largely misjudge the variation in the strength of state-by-state enforcement of noncompetes. Specifically, these studies classify strength of enforcement either (1) in a binary fashion as "enforcing" or "non-enforcing" states, developed from the study by Stuart and Sorenson; or (2) according to a twelve-factor scale developed by Garmaise.[227]

    Specifically, Stuart and Sorenson classify each state as "non-enforcing" or "enforcing."[228] They identify six states that, during the period 1985–1996, purportedly "preclude[d] the enforcement of *all* noncompete agreements" and five states that "only enforce[d] non-compete covenants under very specific circumstances."[229] These eleven states are considered nonenforcing.[230] In

---

[222] See Garmaise, 27 J L Econ & Org at 408–10 (cited in note 63).

[223] See Samila and Sorenson, 57 Mgmt Sci at 432, 436 (cited in note 9).

[224] See id at 425.

[225] See Marx, Singh, and Fleming, 44 Rsrch Pol at 397 (cited in note 219).

[226] See id at 402. Inventive skill is measured by the number of citations to an inventor's patents.

[227] See Garmaise, 27 J L Econ & Org at 421–22 (cited in note 63); Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

[228] Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

[229] Id (emphasis added).

[230] Id.

contrast, they identify twenty-six enforcing states that purportedly placed "*no* restrictions" on the enforcement of noncompetes, as well as thirteen other nonenforcing states that followed a "reasonable[ness]" approach or enforced noncompetes limited in time or space.[231] The Samila and Sorenson study as well as the Marx et al. study both rely on Stuart and Sorenson's classification system for their analyses.[232]

This binary approach is inherently inaccurate—all states enforce some noncompete provisions and no states enforce all noncompete provisions. Other than California, North Dakota, and Oklahoma (until 1989), all states during that time period essentially adopted a reasonableness approach to the enforcement of noncompetes, subject to variation in application.[233]

Even if one were to draw an arbitrary line between states, it would result in at most two nonenforcing states during this time period. Consistent with both Professor Norman Bishara's comprehensive state-by-state review[234] and our own independent review, we find that during the relevant time periods, other than California and North Dakota, none of the purported nonenforcing states in the Stuart and Sorenson study—namely, Alaska, Connecticut, Michigan, Minnesota, Montana, Nevada, Oklahoma, Washington, and West Virginia—can plausibly be classified in this manner.

It appears that Stuart and Sorenson primarily examined the language of specific state statutes as reproduced in the 1996 edition of the Malsberger treatise on state enforcement of covenants not to compete,[235] without carefully reviewing the descriptions of actual case law in the same treatise. Critically, any state's effective noncompete regime cannot be accurately described without taking into account *both* applicable statutes and judicial interpretation of those statutes. Montana is a case in point. Apparently on the basis of the Montana statute voiding "contracts in restraint

---

[231] Id (emphasis added).

[232] Samila and Sorenson, 57 Mgmt Sci at 430 (cited in note 9); Marx, Singh, and Fleming, 44 Rsrch Pol at 396 n 2 (cited in note 219).

[233] See Brian Malsberger, *Covenants Not to Compete: A State-by-State Survey* xxv (BNA Books 2004) ("Malsberger 2004"); Brian Malsberger, *Covenants Not to Compete: A State-by-State Survey* xxiii (BNA Books 1996) ("Malsberger 1996"); Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy*, 13 U Pa J Bus L 751, 757 (2011) ("While the majority of states provide some enforcement of noncompete agreements . . . there are only two extreme outliers in terms of restrictions on any noncompete enforceability: California and North Dakota.").

[234] See Bishara, 13 U Pa J Bus L at 767, 771–81, 786–87 (cited in note 233).

[235] See Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

of trade,"[236] which has common origins with California's statute, Stuart and Sorenson classify it as a state that "precludes the enforcement of *all* noncompete agreements."[237] Yet, the Malsberger treatise expressly states that "[d]espite subsection 703, Montana courts have upheld restrictive covenants in employment contracts" under a general reasonableness standard.[238]

For states without statutes, Stuart and Sorenson's summary of the Malsberger treatise is also inaccurate. Our detailed review of the treatise, including cases cited therein, shows that all of their study's supposed nonenforcing states lacking statutes—Alaska, Connecticut, Minnesota, and Washington—are misclassified.[239] Again, these states essentially enforce noncompetes under a reasonableness standard. Indeed, Bishara—completely contrary to Stuart and Sorenson—classifies Connecticut and Washington as the fourth and eighth *strongest* enforcing states in 1991, respectively.[240]

In response to an earlier draft of this Article, Sorenson ran robustness checks to the main estimates in the initial study with Stuart using the Bishara measure of enforceability as well as a separate binary coding scheme in which North Dakota and California are the only nonenforcing states.[241] In these revised models, the results are substantially similar to, and in some cases stronger than, Stuart and Sorenson's initial results.[242]

We are heartened by the fact that Sorenson—unlike Marx et al. or Garmaise—chose to revise his study's initial model to take into account our criticisms. However, even these new results are subject to substantial limitations. First, the major result—that the states with weak noncompete enforcement regimes experience higher absolute founding rates than states with strong regimes that abstract away from state fixed effects—is not determinative because other regional factors may correlate between

---

[236]  Mont Code Ann §§ 28-2-703 to -704.

[237]  See Stuart and Sorenson, 48 Admin Sci Q at 190 (emphasis added) (cited in note 220).

[238]  See Malsberger 1996 at 674–75 (cited in note 233). See also *Dobbins, DeGuire & Tucker, PC v Rutherford, MacDonald & Olson*, 708 P2d 577, 580 (Mont 1985) (adopting a three-part reasonableness test to determine whether to enforce a noncompete).

[239]  Specifically, we reviewed Malsberger 1996 at 98–99, 192–94, 604–05, 1136 (cited in note 233).

[240]  See Bishara, 13 U Pa J Bus L at 786–87 (cited in note 233) (reviewing Richey and Malsberger's 1991 treatise on noncompete covenants).

[241]  See E-mail from Olav Sorenson to Ted Sichelman (Oct 19, 2016) (on file with authors).

[242]  See id.

the weak regime and the level of new firm foundings in the region.[243] Second, for the models that take into account state fixed effects by examining new firm foundings following IPOs and acquisitions, the effects with the greatest magnitude are centered in California.[244] This may reflect the fact that California operates in a unique environment not applicable to other states. Third, even though weak enforcement states other than California showed significant declines in new firm foundings following IPOs and interindustry acquisitions, this does not account for the quality of the new firms.[245] As we note below, a more recent study by Starr and others finds that firms founded in strong enforcement states are of higher quality than those in weak enforcement states.[246] Fourth, even the Bishara scale faces significant methodological limitations and has not been independently verified.[247]

The Garmaise study replaces the oversimplified binary approach of Stuart and Sorenson with a graduated twelve-point scale that assigns equal weight (one or zero) to the answers (yes or no) to twelve questions based on those in a later version of the Malsberger treatise[248] regarding the strength and scope of noncompete law in various states.[249] While this is an improvement, this scale is still problematic because there is no legitimate legal or other basis to *equally* weight each of the twelve factors. Comparing two of the factors as an example, it is arguably much more important how a plaintiff must prove the existence of an enforceable covenant not to compete than what counts as sufficient postemployment consideration in considering the strength of a state's noncompete regime.

There are other problems with the Garmaise scale.[250] Garmaise's initial factor—whether the state has a statute bearing on the enforceability of noncompetes (as opposed to mere common law)—does not strike us as indicative one way or the other as to whether the state more strongly enforces noncompete law.[251] Although some very strict states (for example, California and North Dakota)

---

[243]  See Stuart and Sorenson, 48 Admin Sci Q at 193–94 (cited in note 220) ("[A] number of omitted regional factors might correlate with both the weak non-compete enforcement dummy and the level of entrepreneurial activity in the region.").

[244]  See Sorenson E-mail (cited in note 241).

[245]  See note 312 and accompanying text.

[246]  See id.

[247]  See note 296 and accompanying text.

[248]  See Malsberger 2004 at xvii–xviii (cited in note 233).

[249]  See Garmaise, 27 J L Econ & Org at 420–22 (cited in note 63).

[250]  See id.

[251]  See id.

have adopted statutes, so have some states following the flexible, common law reasonableness standard (for example, North Carolina and Ohio).

Next, arbitrary thresholds—such as whether a state has upheld a statewide three-year restriction versus only a two-year one—are not particularly meaningful in the overall scheme of noncompete enforcement. The Malsberger treatise does not of course catalog all the noncompete opinions in a given state—thus, Garmaise could not even answer correctly whether "3-year statewide restrictions have [ever] been upheld" in a particular state.[252] For instance, the applicable Malsberger treatise lists no cases in Wisconsin in which a three-year statewide noncompete was upheld;[253] rather, the treatise cites only a case in Wisconsin for which a three-year noncompete was found unreasonable.[254] But, contrary to Garmaise's scoring, Wisconsin courts in fact had upheld a six-year noncompete and suggested that a three-year noncompete would be reasonable.[255]

Last, for perhaps the most important question—"What is an employer's protectable interest and how is it defined?"—instead of examining the full range of protectable interests, Garmaise curiously focuses on whether an "employer can prevent the employee from future independent dealings with all the firm's customers, not merely with the customers with whom the employee had direct contact."[256] Besides omitting important protectable interests—such as trade secrets, training and development, and ordinary competition—customer relationships are not the type of interest that would typically be of great concern to the top executives at the large, publicly traded firms examined in Garmaise's study. Rather, customer relationships and list restrictions—at least at a large public firm—are more likely to apply to sales personnel, who have direct relationships with the firm's customers, but these personnel were not examined by Garmaise. Variation

---

[252] Id at 422. See Malsberger 2004 at 3332–37 (cited in note 233).

[253] See Malsberger 2004 at 3332–37 (cited in note 233).

[254] See id at 3336, citing *Mutual Service Casualty Insurance Co v Brass*, 625 NW2d 648 (Wis App 2001).

[255] See *Reiman Associates, Inc v R/A Advertising, Inc*, 306 NW2d 292, 296 (Wis App 1981) (upholding a six-year noncompete as reasonable); *Fullerton Lumber Co v Torborg*, 70 NW2d 585, 589–92 (Wis 1955) (remanding for determination of the extent of time as to which a noncompete covenant is reasonable, and suggesting that a minimum period of three years would be supported by the evidence).

[256] See Garmaise, 27 J L Econ & Org at 421 (cited in note 63).

among states in a factor not relevant to the examined class of employees may of course—like Stuart and Sorenson's scale—produce spurious results.

Ultimately, the ideal metric for evaluating a state's noncompete regime is the probability that a typical employee move that *would* be allowed in a hypothetical nonenforcing state *would not* be allowed in any given state. Although it is clearly impossible to achieve such accuracy, neither Stuart and Sorenson nor Garmaise provide sufficient verification for the legitimacy of their indices, such as an empirical analysis of actual cases. Such untested and rough assessments do not make for valid studies.[257]

This concern is confirmed by examining the correlations between the available enforcement scales. The correlation between the Stuart and Sorenson binary scale and the Garmaise twelve-point scale is only 0.43. Bishara constructs an alternate scale[258]—using seven of the twelve questions in the 1991 Richey and Malsberger treatise and the 2009 Malsberger treatise[259]—which, although it raises similar issues as the Garmaise scale, in our opinion is somewhat more likely to be accurate because it uses a graduated scale (unlike Stuart and Sorenson) and differentially weights different factors in the scale (unlike Garmaise). The correlation between the Bishara and Garmaise scales is 0.66, and the correlation between the Bishara and Stuart and Sorenson scales is 0.42.[260]

We recognize that some type of quantitative ranking is a necessary precondition to undertake systematic analysis of the economic effects of noncompete laws. However, given the clear errors in categorization and relatively low correlations among different scales, we are doubtful that the results of studies using the Stuart

---

[257] Garmaise additionally examines individual changes in law in three states by using time-series estimations, see Garmaise, 27 J L Econ & Org at 390–93 (cited in note 63), the limitations of which we address in Barnett and Sichelman, *Revisiting Labor Mobility in Innovation Markets* at *24, Part 3.2.7 (cited in note 219).

[258] See Bishara, 13 U Pa J Bus L at 771, 786–87 (cited in note 233). For an alternate scale modeled on the Bishara scale, see Evan Starr, Natarajan Balasubramanian, and Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt Sci 552, 558 (2018). The Starr and Bishara scales are correlated at 0.94; hence, we ignore the Starr scale.

[259] See Brian Malsberger, *Covenants Not to Compete: A State-by-State Survey* xvii–xviii (BNA Books 2009) ("Malsberger 2009"); P. Jerome Richey and Brian M. Malsberger, *Covenants Not to Compete: A State-by-State Survey* xvi–xvii (BNA 1991).

[260] We thank Norman Bishara for providing the data underlying his scale.

and Sorenson[261] or Garmaise[262] scales to measure the effects of noncompetes on labor mobility can be properly relied upon for empirical study.[263]

A better approach to construct an enforcement scale in our view would be to undertake a comprehensive assessment of the actual extent and conditions in which courts enforce (or not) noncompetes. A large number of actual cases should be randomly selected in each state across a time period of interest. The assessment would identify the outcome in the case along with key factors in each case, including occupation, at-will vs. contract employee, employer- vs. employee-driven termination, industry, term of the noncompete, geographic scope of the noncompete, and other key circumstances, such as whether trade secrets, sale of a business, dissolution of a partnership, choice of law or forum, and substantial employee training were present. Multivariate, logistic regressions could then be constructed to compare how different factors affect outcomes across states. These results could then be substituted, where appropriate, for factors like those in Bishara to construct more accurate scales.

*b) Failure to properly reflect cross-border enforcement of noncompetes.* Garmaise and Marx et al. include cross-state border job changes in their datasets.[264] The Marx et al. study focuses on the supposed "brain drain" from Michigan to "non-enforcing" states following its decision to enforce noncompetes.[265] Such cross-border moves are complex from a legal perspective, because, as

---

[261] Studies that rely on the Stuart and Sorenson scale include: Kenneth A. Younge and Matt Marx, *The Value of Employee Retention: Evidence from a Natural Experiment*, 25 J Econ & Mgmt Strategy 652, 658–70 (2016); Younge, Tong, and Fleming, 36 Strategic Mgmt J at 692 (cited in note 110).

[262] Studies that rely on the Garmaise scale include: I.P.L. Png and Sampsa Samila, *Trade Secrets Law and Mobility: Evidence from "Inevitable Disclosure"* *20 appx 2 (working paper, Feb 14, 2015), archived at https://perma.cc/MH8D-VWYS; Raffaele Conti, *Do Non-competition Agreements Lead Firms to Pursue Risky R&D Projects?*, 35 Strategic Mgmt J 1230, 1234–35 (2014); Bill Francis, et al, *When Finding a New Job Is Not Easy: The Influence of the State Law of Non-Competition Agreements on the Characteristics of M&As* *9 (working paper, Dec 2007), archived at https://perma.cc/U7JW-3V7A; Sharon Belenzon and Mark Schankerman, *Spreading the Word: Geography, Policy, and Knowledge Spillovers*, 95 Rev Econ & Stat 884, 895 (2013).

[263] Even Sorenson's revised results are subject to substantial qualifications. See notes 241–47 and accompanying text. Nor, as far we know, have these revised results been published in any form.

[264] See Marx, Singh, and Fleming, 44 Rsrch Pol at 394–95 (cited in note 219); Garmaise, 27 J L Econ & Org at 396–97 (cited in note 63).

[265] See Marx, Singh, and Fleming, 44 Rsrch Pol at 394 (cited in note 219).

Garmaise properly notes, the law of the state of the former employer will sometimes apply and, in other instances, the law of the state of the new employer will apply.[266]

Marx et al., however, overlook this complexity and erroneously assume that nonenforcing states *always* apply their own law so as to void a noncompete agreement that falls under the law of another state.[267] Even assuming that Marx et al.'s list of ten "nonenforcing" states is correct—which it is not, as we discussed above—the only nonenforcing states that generally refuse to enforce out-of-state noncompetes on public policy grounds are California and North Dakota.[268] Yet, even California does not always void out-of-state noncompete agreements. California courts sometimes transfer cases to another state or stay proceedings so those in another state can proceed, particularly when the employment agreement selects that other state's law and courts.[269]

Furthermore, and perhaps more importantly, all states—including California—will generally enforce a *prior* judgment of another state that afforded the parties a full and fair opportunity to litigate the matter. Thus, if an employee is subject to jurisdiction in the state of the former employer, which often will be the case, then the former employer can sue the employee in its home state. If the employee is not subject to an exclusive choice-of-forum clause, the employee may then sue for a declaratory judgment in

---

[266] The law of the state of the former employer may either be the state in which the employee was located or some other state, to the extent the employer uses a choice-of-law provision specifying the law of a different state (for example, its state of incorporation or headquarters). See Garmaise, 27 J L Econ & Org at 390 n 9 (cited in note 63); Gillian Lester and Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective*, 31 Comp Labor L & Pol J 389, 396–97 (2009) (discussing the situation in which the choice-of-law clauses select the employer's place of incorporation).

[267] See Marx, Singh, and Fleming, 44 Rsrch Pol at 395, 403 (cited in note 219).

[268] We use the 1996 Malsberger treatise to make this determination, see Malsberger 1996 at 102, 136–37, 156–57, 201–02, 618, 684, 719, 857–58, 907, 1147, 1160 (cited in note 233) (citing various cases), as the 2015 Marx, Singh, and Fleming study relies on the same treatise to classify state enforcement regimes. See Marx, Singh, and Fleming, 44 Rsrch Pol at 396 n 2 (cited in note 219), citing Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220) (relying on the 1996 Malsberger treatise for data on states that do not enforce noncompetes).

[269] California substantially restricted the situations in which it will enforce out-of-state noncompetes starting in 2017, but during the time periods in question of these studies, California courts were sometimes amenable to enforcing, directly or indirectly, out-of-state noncompetes. See notes 105–06 and accompanying text.

the state of the new employer. Although there are important nuances, essentially, whichever court enforces judgment first will typically bind the employee.[270]

The simplification of these doctrinal complexities in the Marx et al. study renders that study's key assumption—namely, that nonenforcing states always apply their own law—flawed, and thus confounds its causal identification strategy. As we explain below, given the small number of annual employee moves out of Michigan to nonenforcing states measured in the Marx et al. study, this flaw could lead to substantial overestimates of the measured effects of noncompetes.

The Garmaise study also suffers from difficulties relating to the treatment of out-of-state moves. Specifically, Garmaise includes within his analysis out-of-state moves, and, unlike the Marx et al. study, assumes for simplicity that these moves are always governed by the law of the state of the *former* employer.[271] Because Garmaise's dataset contains only a little over six hundred within-industry transfers (out-of-industry transfers would generally not be governed by noncompetes), it is essential to know what percentage of those transfers were out-of-state (and Garmaise does not disclose as much). If the percentage is large, then some results in the Garmaise study may not be accurate.

    *c) No data on actual usage of noncompete agreements by state.*    Even if one believes these studies accurately categorize strength of enforcement, no study—other than Garmaise's—provides any measure of the actual usage of noncompete agreements within their sample set or how often employers actually enforce noncompetes. Available evidence suggests widely varying use of noncompete agreements among various executive and technical employee groups,[272] and while there is new evidence regarding

[270] See Lester and Ryan, 31 Comp Labor L & Pol J at 405–20 (cited in note 266); Timothy P. Glynn, *Interjurisdictional Competition in Enforcing Noncompetition Agreements: Regulatory Risk Management and the Race to the Bottom*, 65 Wash & Lee L Rev 1381, 1385–86, 1418–28 (2008).

[271] See Garmaise, 27 J L Econ & Org at 396 n 15 (cited in note 63).

[272] Based on a sample of top-level executives, Garmaise finds a roughly 70 percent usage rate, see Garmaise, 27 J L Econ & Org at 396 (cited in note 63). Based on a sample of CEOs at S&P 1500 companies, Bishara, Martin, and Thomas, 68 Vand L Rev at 2 (cited in note 85), find an 80 percent rate. Based on a sample of founders of VC-backed firms, Professors Steven Kaplan and Per Strömberg find a roughly 70 percent rate. Steven N. Kaplan and Per Strömberg, *Financial Contracting Theory Meets the Real World: An Empirical Analysis of Venture Capital Contracts*, 70 Rev Econ Stud 281, 289 (2003). An IEEE study of engineers reports a 47 percent rate. See Matt Marx, *The Firm Strikes Back: Noncompete Agreements and the Mobility of Technical Professionals*, 76 Am Sociological Rev 695, 702 (2011). A 2015 study finds lower usage rates, reporting about 30 percent for managers and about 35 percent in the engineering, computer, and mathematical fields, see

noncompete usage (which we discuss below),[273] there is no evidence to our knowledge of the rate of enforcement across states. This inability to differentiate firm-level usage and enforcement behavior among states introduces the possibility that the observed variation in mobility is not the result of differing state-level enforcement regimes but rather unobserved variation of firm-level usage and enforcement of noncompete agreements and substitutes for noncompetes, such as trade secret actions.[274] If firms in different states substantially vary in their propensity to use and enforce noncompetes and noncompete substitutes, and this variance is not highly correlated with enforcement strength, regressing on enforcement indices may yield spurious results.

Relatedly, none of these studies attempted to control for the variation in state-level enforceability, much less usage and enforcement of noncompete substitutes, such as patents, trade secrets, stock options, long-term contracts, invention assignments, and the like, which we described earlier.[275] This omission alone can substantially confound any possible causal link between results and noncompete enforceability, usage, and enforcement.[276]

*d) Measurement errors are exacerbated by small data sets.* The previous criticisms are especially salient for the Marx et al. study (as well as a previous study performed by Marx and others in 2009) given the relatively small incremental decrease in absolute terms in labor mobility in Michigan identified in the 2009 and 2015 Marx et al. studies. The 2009 Marx et al. study considers 98,468 inventors and 27,478 inventor moves within Michigan

---

Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *43 fig 4 (cited in note 11). These differences are arguably explained by the different datasets—the studies by Kaplan and Strömberg; Garmaise; and Bishara, Martin, and Thomas focus on the most sophisticated companies, while Starr, Prescott, and Bishara's findings are likely more reflective of firms as a whole. Additionally, Garmaise and Bishara, Martin, and Thomas focus on top-level executives.

[273] See Part III.C.

[274] See Robert W. Gomulkiewicz, *Leaky Covenants-Not-to-Compete as the Legal Infrastructure for Innovation*, 49 UC Davis L Rev 251, 256–57, 277–80 (2015) (arguing that Washington technology firms rarely enforce noncompetes); Risch, 12 Empl Rts & Empl Pol J at 346 (cited in note 122) (acknowledging Gilson's theory that trade secret actions might be substitutes for noncompete actions for firms).

[275] See Part II.A.2. Although some of these instruments fall under federal law, there remains effective variation in state-level enforcement of these instruments due to differing applications of the law at a regional level. See, for example, Mark A. Lemley, *Where to File Your Patent Case*, 38 AIPLA Q J 1, 28–37 (2010).

[276] See Part II.A.2 (noting that any empirical study examining the marginal effects of noncompetes would need to take into account these substitute mechanisms).

over the period 1963–2006.[277] Labor mobility actually increased following the enactment of the Michigan Antitrust Reform Act[278] (MARA) over the full time period from 7.18 percent to 8.98 percent, whereas in other nonenforcing states there was a larger increase, from 7.95 percent to 10.80 percent.[279]

While the Marx et al. studies never report these differences in absolute numbers, they are easy to calculate. Specifically, the difference of in-state mobility in Michigan versus nonenforcing states in absolute terms was roughly 1 percent, equating to an absolute difference of about 100–200 moves per year purportedly lost within Michigan due to the enforcement of noncompetes. For inventors moving out of Michigan, the numbers are much lower—the purported difference of inventors moving out of Michigan to nonenforcing states pre- and post-MARA is in the range of merely twenty to twenty-five inventor moves per year. Given the very small number of job changes upon which the results of these studies are premised, the potentially negating effects of the shortcomings identified above cannot be easily dismissed.[280]

  *e) Unique problems of the Michigan studies.* The 2009 and 2015 Marx et al. studies[281] have attracted particular attention because they exploit an apparently exogenous change to the legal treatment of noncompetes in a particular jurisdiction, which therefore provides an opportunity to study the effect of noncompete enforceability on inventor mobility and, potentially, innovation. As noted earlier, the legal change was effected by enactment of MARA, which restored the enforceability of noncompetes under Michigan law.

---

[277] See Marx, Strumsky, and Fleming, 55 Mgmt Sci at 880 (cited in note 219). The 2015 Marx, Singh, and Fleming study examines the period 1975–2005. See Marx, Singh, and Fleming, 44 Rsrch Pol at 396 (cited in note 219).

[278] Michigan Antitrust Reform Act § 4a (1987), codified at Mich Comp Laws § 445.774a.

[279] See Marx, Strumsky, and Fleming, 55 Mgmt Sci at 884 (cited in note 219).

[280] Moreover, the Marx et al. studies track the mobility of employees to any firm, rather than mobility to competing firms. No state enforces noncompetes that purport to proscribe employment at *non*competing firms. Thus, in order to isolate the effects of noncompetes, it is essential to track labor mobility solely among competing firms. In empirical terms, an employee who makes an out-of-industry move to a noncompeting firm is, contrary to the implicit assumption of the Marx et al. study, not effectively subject to a noncompete restriction, and hence should not be classified within a "treatment" group. Thus, the number of inventor "moves" of interest to these studies is even lower than the numbers we calculate in the text.

[281] Marx, Singh, and Fleming, 44 Rsrch Pol 394 (cited in note 219); Marx, Strumsky, and Fleming, 55 Mgmt Sci 875 (cited in note 219).

The striking results of the Marx studies—a state restores the enforceability of dormant noncompete provisions, inventor mobility slows down, and inventors flee the jurisdiction for states without enforceable noncompetes (essentially, California)—are commonly cited, including in federal government reports,[282] to support the view that noncompetes are unwise public policy for jurisdictions that seek to cultivate the next Silicon Valley.

However, beyond the serious shortcomings we have already described in these studies, the Marx et al. studies make an erroneous assumption that wholly undermines their identification methodology and hence, their results. Specifically, both the 2009 and 2015 studies assume that, following Michigan's regime change in 1985, preexisting noncompete provisions automatically became enforceable.[283] *This is not the case*. The study authors appear to overlook that MARA included a savings clause providing that the statute repealed by MARA would "remain in force for the purpose" of enforcing any liability under the repealed act.[284] Consistent with this saving clause, Michigan courts declined to enforce noncompetes that were entered into prior to MARA.[285]

In other words, *no* existing employee with noncompete clauses in employment agreements governed by Michigan law became bound by those clauses following MARA. Rather, any employer seeking to bind an existing employee would need to have that employee sign a new agreement or affirmatively assent to a prior agreement, which would generally result in employers incurring transaction costs and possibly providing additional compensation. As a result, one would expect that the number of employees in Michigan actually subject to enforceable noncompetes

---

[282] See, for example, Office of Economic Policy, *Non-compete Contracts* at *18 (cited in note 36); White House, *Non-Compete Agreements* at *7 (cited in note 36). While relying on the Marx et al. "Michigan" studies to support the view that noncompetes depress "labor market dynamism," the White House report did mention that "other authors dispute these findings." White House, *Non-Compete Agreements* at *7 (cited in note 36). This is most likely a somewhat oblique reference to our companion paper on noncompetes. See generally Barnett and Sichelman, *Revisiting Labor Mobility* (cited in note 219).

[283] For instance, the Marx et al. 2015 study states: "Given that the repeal of Public Act No. 05 merely removed the ban and did not stipulate any governing timeframe, all such contracts [i.e., preexisting noncompetes] would have become immediately enforceable." Marx, Singh, and Fleming, 44 Rsrch Pol at 396 (cited in note 219).

[284] Michigan Antitrust Reform Act § 18 (1985), codified at Mich Comp Laws § 445.788. For a detailed description of the history leading up to the passage of MARA, see *Bristol Window and Door, Inc v Hoogenstyn*, 650 NW2d 670, 673–79 (Mich App 2002).

[285] See, for example, *Compton v Joseph Lepak, DDS, PC*, 397 NW2d 311, 316 (Mich App 1986) ("When an agreement or contract is entered into in violation of the statute, repeal of that statute does not make the agreement valid because the Legislature cannot validate a contract which never had a legal existence.").

would be quite low for a considerable period following MARA's passage.

During this transition period, one cannot legitimately consider all Michigan inventors as being subject to enforceable noncompetes—a critical assumption in both papers. The true regime change (that is, taking into account both nominal and effective changes to noncompete enforceability) most likely took considerable time to impact contracting behavior in the market. As a result, the number of inventors who were immediately affected by MARA was small (which impacts the statistical force of the studies' results),[286] and a sizable portion of the studies' results are unlikely to be causally linked to the legal change effected by MARA.

Yet, the 2009 Marx et al. study finds the exact *opposite* of the effects one would expect from a gradual adoption of noncompetes after the enactment of the MARA statute, stating that "the effect of the policy reversal remained strong for several years and then weakened, both in terms of the magnitude and statistical significance of the coefficient on the interaction variable."[287] Thus, it is extremely likely in our view that factors unrelated to the change in noncompete law in Michigan explain the results, if they are at all correct, of the 2009 study. At a bare minimum, the factual misunderstanding of the *non*retroactive effect of the MARA change casts great doubt on the reliability of using the Marx et al. studies as a basis for substantive policy recommendations.

*f) Correlation, not causality.* Even if the results in these studies were somehow correct, none of these studies can show causation between noncompete enforcement and their findings of reduced innovation (as indicated by various proxy measures). Other than the Marx et al. study, they are all cross-sectional regressions and cannot rule out omitted variables to explain the observed variation. Additionally, Stuart and Sorenson's major finding (including, as noted earlier, Sorenson's revised major finding) abstracts away from state-level fixed effects, and they properly note that they "must interpret this result cautiously, as a number of omitted regional factors might correlate with both the weak non-compete enforcement dummy and the level of entrepreneurial activity in the region."[288] Stuart and Sorenson's models that take account of state-level fixed effects do not account for unique

---

[286] For further discussion, see Barnett and Sichelman, *Revisiting Labor Mobility* at *22 (cited in note 219).

[287] See Marx, Strumsky, and Fleming, 55 Mgmt Sci at 883 (cited in note 219).

[288] See Stuart and Sorenson, 48 Admin Sci Q at 194 (cited in note 220).

within-state, regional omitted variables that may explain the observed patterns, plus are subject to a number of additional limitations.[289] The Samila and Sorenson study is subject to similar limitations, as well as another endogeneity concern. Specifically, this study uses the number of patents to measure innovative output, but patenting is in part a substitute for noncompete enforcement.[290] Thus, finding increased patenting in states with weak nonenforcement, such as California, is not necessarily meaningful. The Marx et al. study, despite the fact that it examines a seemingly exogenous shock to Michigan law, also suffers from causality concerns because—as explained in the previous Section—the regime change did not apply retroactively.

Aside from causality, some of the studies use rough proxies for innovative activity. Stuart and Sorenson merely examine the relationship of noncompetes to the absolute number of spin-offs following IPOs and acquisitions. Studies on patent value have indicated that a small number of high-quality innovations disproportionately account for the total value of all innovations; in other words, not all innovations—and, hence, not all innovative companies—are created equally.[291] Thus, it is not surprising that a more recent study finds that, while noncompetes may depress the absolute number of same-industry spin-offs, increased enforcement is associated with the founding of higher quality firms, particularly ones that began and continued with more employees and survived for longer periods.[292] Relatedly, another recent study finds that, while noncompetes reduce employee mobility and depress certain indicators of entrepreneurship, increased enforceability is associated with an increase in capital investment at existing "knowledge-intensive" firms,[293] suggesting that noncompetes sometimes support investment incentives consistent with theoretical expectations.

---

[289]  See notes 241–47 and accompanying text.

[290]  Samila and Sorenson, 57 Mgmt Sci at 430 (cited in note 9). As noted previously, Agarwal and coauthors found that aggressive patent litigation by US semiconductor firms discourages labor mobility (presumably, because potential new employers fear litigation and elect not to hire from those firms). See note 109 and accompanying text.

[291]  See John R. Allison, et al, *Valuable Patents*, 92 Georgetown L J 435, 448–65 (2004).

[292]  See Starr, Balasubramanian, and Sakakibara, 64 Mgmt Sci at 567 (cited in note 258). Although this Starr study does not compare the total innovative activity of the startups in nonenforcing and enforcing states, a smaller number of highly innovative startups in enforcing states could outweigh the innovative activity of a larger number of less innovative startups in nonenforcing states.

[293]  See Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* *3–5, 20–21 (working paper, Jan 3, 2018), archived at https://perma.cc/9EQX-GDTU.

*g) Why the limitations of these studies likely affect the validity of their results.* To be certain, the limitations we have discussed above do not mandate that the results in these studies are incorrect. It may be the case that some studies suffer from ordinary measurement error, which would underestimate the size of the effects found in those studies, or the errors we have identified are too minor to plausibly change these studies' results. However, there are strong reasons to doubt that the limitations described above are ordinary measurement errors or essentially trivial, implying that they *are* likely to alter these studies' results—either their size or significance, or even the direction and nature of the effects measured.

First, and perhaps most importantly, the Stuart and Sorenson scale misclassifies eight of ten states as "nonenforcing" but does not misclassify any of the "enforcing" states.[294] Such misclassification is not random, but rather is a one-way systemic error. Stuart and Sorenson's misclassification of "enforcing" and "nonenforcing" states lies at the heart of the empirical instruments in the Marx et al. studies used to measure worker mobility and the potential effects on innovative activity.[295]

Although Garmaise's scale appears to suffer more from random error than systemic error—because in our view, there is no scale, even Bishara's scale,[296] that has been definitively validated—it may be the case that Garmaise's results are subject to the same limitations as the Marx et al. studies. So while the results set forth in the Garmaise study and the Marx et al. studies may be statistically significant, they are not necessarily *meaningful* when determining the role noncompetes play in suppressing innovative activity.

Second, the failure to properly take account of the nonretroactivity of Michigan's change in law via MARA also casts considerable doubt on the reliability of the differences-in-differences methodology employed by the Marx et al. studies. Specifically, it confounds these studies' claims to causal identification, because the only Michigan employees not entering entirely new jobs subject to enforceable noncompetes post-MARA were those selected by their employers for "treatment," in other words, the signing of a noncompete provision. Such selection would not be random, but instead would turn on factors such as whether the employee was

---

294  See Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).
295  See Marx, Singh, and Fleming, 44 Rsrch Pol at 396 n 2, 396–97 (cited in note 219); Marx, Strumsky, and Fleming, 55 Mgmt Sci at 880 (cited in note 219).
296  See Bishara, 13 U Pa J Bus L at 786–87 (cited in note 233).

at-will, had knowledge of company trade secrets, was highly skilled, and the like.

Third, the failure of the Garmaise study and the Marx et al. studies to properly take account of cross-border moves, as we note above, may systematically overestimate the effects of noncompetes on labor mobility because in some situations these moves would have been governed by a contrary set of laws than assumed in the empirical approaches in these studies.

Fourth, even if these studies' findings are nominally correct, because of various implicit assumptions about the law and external factors that are certainly or very likely inaccurate, one cannot casually attribute decreases in labor mobility wholly to noncompete enforcement trends. For instance, one or more of these studies wrongly assumes that noncompetes govern moves outside of an industry, that firm-level usage and enforcement of noncompetes is constant across states, that high-level executives' mobility would be prone to court decisions regarding the role of customer lists, and that nonretroactive changes in certain laws were exogenous "shocks."

In sum, of the four major nonexperimental studies examining the effects of noncompetes on innovation that we reviewed in detail, all suffer from multiple infirmities. In our view, these infirmities cast substantial doubt on the validity of the findings in these studies. In other words, there is a strong possibility that these errors would reduce the size of the effects in these studies, result in opposite effects, or potentially eliminate statistically significant effects entirely. Although Sorenson's revision of his earlier study nominally confirmed his earlier results, it remains subject to substantial limitations.[297] As such, none of these studies can be relied upon for a general assessment of the role noncompetes play in the innovative process.

All of the additional studies we could locate that find a negative effect on innovation from noncompetes appear to suffer from one or more of these limitations.[298] Given the theoretical reasons to doubt that noncompetes always have a negative effect on innovation, we believe that there is little to no empirical evidence that noncompetes necessarily retard innovation.[299] Rather, as explained later in the Article, noncompetes will sometimes hinder and sometimes foster innovative activity depending on a variety of contextual circumstances.

---

[297]  See notes 241–47 and accompanying text.

[298]  See notes 261–62 (listing studies relying on flawed scales).

[299]  See Barnett and Sichelman, *Revisiting Labor Mobility* at *29 (cited in note 219).

2. Experimental studies.

Professors On Amir and Orly Lobel conducted an experimental study that found that participants in simulated noncompete treatment groups exerted less effort and made more errors than a restriction-free control group.[300] The study's experimental design abstracts away from the limitations of the empirical studies but introduces its own concerns that cast serious doubt on its applicability to any actual technology environment.

In the experimental setup, participants are informed that they will potentially complete two rounds of a given task. Each participant is paid $0.50 for the completion of each task plus a potential bonus. However, individuals in the "full noncompete" group are told they cannot participate in the second round. Individuals in the "partial noncompete" group are told they will receive 20 percent less payment in the second round. Individuals in the "no noncompete" group are given no restrictions. Participants either perform a creative, word association task or an effort-based, matrix addition task. Each participant performs only the first round.[301] Amir and Lobel find a large negative effect on completing the first round of tasks in the full noncompete group, but not the partial noncompete group, for both the creative and effort-based tasks. Additionally, they find a significantly larger error rate on the effort-based task for the full and partial noncompete group.

Based on this experimental result, Amir and Lobel conclude that "[o]ur behavioral experiment demonstrates that certain postemployment contractual restrictions may negatively impact motivation and performance, as evidenced by the greater rates at which individuals abandon tasks."[302] Although we agree that noncompetes may provide some incentives for employees to underinvest in their own human capital, Amir and Lobel's experimental setup does not take into account important real-world mechanisms to offset these effects.

First, as we discussed earlier, one of the major reasons for the use of noncompetes is to provide incentives for firms to invest in the human capital of their employees.[303] Consistent with that theoretical expectation, a study by Starr finds that stronger noncompete enforcement regimes are associated with increased

---

[300]  See Amir and Lobel, 16 Stan Tech L Rev at 866 (cited in note 63).
[301]  See id at 852–53, 870–74.
[302]  Id at 863.
[303]  See Part I.B.2.

employee training.[304] Amir and Lobel's setup does not allow for any firm-sponsored training.

Second, the flat payment scheme of $0.50 per task plus a bonus in Amir and Lobel abstracts away from the numerous other performance incentive mechanisms we discussed above—such as vesting options, deferred compensation, and the simple ability for star employees to renegotiate—that are present in a typical employment situation.[305]

Third, contrary to Amir and Lobel's setup, a noncompete agreement *never* means that there is no second round of performance. Employees are engaged in a repeat-play game with employers, who rationally reward high-performing employees and penalize low-performing employees. Simultaneously, employees are engaged in a repeat-play game with potential outside employers. Given the discipline imposed by the common-law reasonableness constraint and competitive labor markets, noncompetes are always limited in duration, geography, and industry scope. As a result, employees may port their industry-specific skills to competitors after a certain amount of time and may port their non-industry-specific skills to noncompetitors at any time. Even during the term of a noncompete, an employee can move to any firm that is willing to pay the price demanded by the existing employer to waive the noncompete.

These three reasons are likely to substantially dampen, if not eliminate, any incentives that noncompetes might otherwise create for employees to underinvest in their own human capital. Indeed, a more recent experimental study performed a similar experiment but found that those in the noncompete group exerted no less effort than those in the control group.[306] Using a more realistic setup, this experiment paid the noncompete group more to compensate for any disincentives created in the noncompete treatment—which is precisely what would be expected to occur in any rational employer-employee bargaining situation.

---

[304] See Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indust & Labor Rel Rev 783, 785, 814 (2019).

[305] See Norman D. Bishara and Evan Starr, *The Incomplete Non-compete Picture*, 20 Lewis & Clark L Rev 497, 522–23 (2015).

[306] See Guido Bünstorf, et al, *Win Shift Lose Stay—An Experimental Test of Non-Compete Clauses* *18–19 (Max Planck Institute for Research on Collective Goods Preprint No 2013/17, Sept 2013), archived at https://perma.cc/K2NM-4L4V.

### 3. Evaluation.

In current policy discussions concerning noncompetes, it is common to find statements referring to empirical studies "showing" that noncompetes depress inventor mobility and, as a result, reduce innovation in general. This interpretation is simply not supported by a close examination of the methodologies and substance of the empirical studies upon which these statements typically rely.[307] Even assuming without further examination that noncompetes have some appreciable marginal effect on inventor mobility—a proposition as to which there is considerable doubt[308]—there is no compelling basis to conclude that any such effect results in reduced innovation compared to a legal environment in which noncompetes had no legal force.

The most recent empirical research on the effects of noncompetes provides even more ground to doubt the conventional characterization of the evidence. That research has reached more nuanced results that are consistent with the older law-and-economics analysis that, as discussed earlier, had emphasized how noncompetes have the potential both to impede employee mobility *and* enhance firms' incentives to invest in cultivating employee capital.[309] In particular, these recent studies have found that the ability to enforce noncompetes can increase incentives at medical practices to make intrafirm client referrals (and thereby increase overall returns),[310] increase capital investment at knowledge-intensive firms while reducing the entry of new firms,[311] and result in the establishment of fewer but higher quality spin-offs from parent firms.[312] Another study finds that legal limitations on

---

[307] For a similar view, see Bishara and Starr, 20 Lewis & Clark L Rev at 498–502, 534–40 (cited in note 305) (finding that existing empirical literature suffers from methodological imperfections and cannot currently support policy actions to impose limitations or outright bans on the use of noncompetes).

[308] See Barnett and Sichelman, *Revisiting Labor Mobility* at *29 (cited in note 219) (stating that, due to methodological and other shortcomings, no existing empirical study can "be relied upon for a general assessment of the role noncompetes play in restricting labor mobility").

[309] See Part I.B.

[310] See Kurt Lavetti, Carol Simon, and William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians* *21, 34 (working paper, June 2018), archived at https://perma.cc/4CU3-LZE5. Specifically, the authors find that practices that used noncompetes for physicians enjoyed greater overall returns, even controlling for physician quality and other potentially relevant factors, which the authors attribute to stronger incentives to invest in advertising and making intrafirm client referrals (given the reduced risk of losing clients in the event of a physician departure).

[311] See Jeffers, *The Impact of Restricting Labor Mobility* at *22–23 (cited in note 293).

[312] See Starr, Balasubramanian, and Sakakibara, 64 Mgmt Sci at 563 (cited in note 258).

worker mobility can increase investment at firms that rely on higher-skill workers.[313] While we do not separately review these more recent studies, it would not be surprising if the empirical literature on noncompetes ultimately established that they result in a mixed bag of welfare effects that vary across firms and industries. That would be fully consistent with theoretical expectations that noncompetes can both promote and dampen overall innovation, and it is therefore indeterminate as to which effect will dominate in any particular case.

### III. Making Noncompete Policy Under Uncertainty

The substantial theoretical and empirical literature on noncompetes (and, by implication, other restraints on employee mobility in innovation markets) appears to arrive at a dead end. Even if it were conceded that noncompetes have some marginal effect on labor mobility, neither the canonical Silicon Valley / Route 128 narrative nor the empirical literature provides support for then drawing an adverse connection between noncompetes and innovation outcomes in general. As a practical matter, however, the law cannot be neutral: it must take *some* position on whether noncompetes should be enforced. In this Part, we offer some tentative conclusions concerning the appropriate legal treatment of noncompetes, applying the error-cost approach from antitrust law that explicitly embeds uncertainty into policy analysis and the adjudicative process.[314]

In the course of this exercise, we identify certain variables that may impact the use and efficiency effects of noncompetes across different industries, firms, and even employee types. While this analysis is preliminary, it conforms to evidence on the rates of use of noncompetes, which suggests that markets tailor the use of noncompetes across employee categories, rather than chronically overusing them as assumed in the collective-action problem that drives Gilson's and the follow-on literature's laudatory characterization of California's noncompete policy. Given that this critical assumption appears to have a limited scope of application as an empirical matter, and in light of the material uncertainties that we identified in the empirical studies that are routinely cited

---

[313] See Ali Sanati, *How Does Labor Mobility Affect Corporate Leverage and Investment?* *3–4 (working paper, Mar 2018), archived at https://perma.cc/NU6M-6DNR.

[314] For the leading statements of this approach in the antitrust literature, see note 38.

in support of precluding noncompetes more broadly (and, by implication, other constraints on employee mobility),[315] we ultimately conclude that the reasonableness standard, applied on a case-specific basis through common law adjudication, is likely the best approach of all.

## A.  Policy Continuum

Throughout our discussion, we keep in mind three categories of policy options. As shown in the graphic below, these options can be located on a continuum extending from full enforcement (Option I), which we call the "per se legal" option, to zero enforcement (Option III), which we call the "per se illegal" option. Note that Option II, which corresponds to the common law's reasonableness standard, encompasses in practical terms a range of more and less stringent variants, which push the option closer toward the full- or zero-enforcement poles of the policy continuum. In practical terms, this intermediate range could encompass a number of different principles under which courts could adjudicate the enforceability of a particular noncompete provision and, in doing so, reflect the complex policy trade-off implicated by the enforcement of these provisions. To take just one example, a state may elect to enforce noncompetes subject to a reasonableness limitation but apply that limitation so that noncompetes are enforced only when the plaintiff shows that the noncompete promoted either the protection of trade secrets or the recovery of a training investment.[316] Such an approach would tend to push the law closer toward zero enforcement (at least in the case of noncompetes that do not generate any offsetting social advantage in the form of increased R&D or training incentives). Alternatively, a state may elect to enforce noncompetes subject to a "blue pencil" rule, according to which a court can "rescue" an otherwise invalid noncompete clause by restricting its durational, geographic or industry scope so that it falls within the boundaries of what the court determines to be reasonable.[317] Such an approach would tend to push the law closer toward full enforcement.

---

[315]  See Part II.B.

[316]  For example, New York courts will enforce a noncompete if it "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v Hirshberg*, 712 NE2d 1220, 1223 (NY 1999).

[317]  See, for example, *Coates v Heat Wagons, Inc*, 942 NE2d 905, 914–15 (Ind App 2011) (endorsing the blue pencil doctrine).

FIGURE 1: POLICY CONTINUUM OF NONCOMPETE ENFORCEMENT



## B. The "Free Contracting" Baseline

From an economic point of view, a noncompete is a voluntary transaction involving a human capital asset being exchanged for some form of monetary or other compensation. As such, any efficiency analysis must start from the free contracting baseline—that is, the well-established view that voluntary exchanges result in mutual welfare gains for the contracting parties, absent evidence of market failure, such as fraud, coercion, or information asymmetries. Those private welfare gains represent social welfare gains so long as the parties' exchange transaction does not generate negative third-party externalities. The presumptive efficiency of voluntary exchange transactions accounts for the common law's traditional indifference to the substantive fairness of contracts; rather, courts generally determine enforceability based on whether an agreement meets certain formal procedural criteria.[318] While there are limited exceptions to this principle (for example, the unconscionability doctrine, although courts rarely accept it as a defense[319]), it holds true across contract law as a general matter.[320]

From this starting point, the per se legal option is the default policy approach, and California's refusal to enforce the noncompete clause demands justification from an efficiency or other perspective. In fact, based on the free contracting benchmark, even

---

[318] See Alan Schwartz and Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 Yale L J 541, 546, 556 (2003) (arguing that "efficiency is the only institutionally feasible and normatively attractive goal for a contract law that regulates deals between firms"); id at 555 (rejecting the "externality objection" to restricting commercial contract law to the pursuit of welfare-maximization, on the ground that "most commercial contracts affect only the parties to them").

[319] See Colleen McCullough, *Unconscionability as a Coherent Legal Concept*, 164 U Pa L Rev 779, 785–87 (2016).

[320] See Schwartz and Scott, 113 Yale L J at 555 (cited in note 318) (noting that contract law rarely creates "systematic distributional benefits for particular classes of parties").

the reasonableness principle used by the common law to assess the enforceability of noncompetes is suspect. Ignoring circumstances involving fraud, coercion, information asymmetries, or similar market defects, any economic justification for even qualified enforcement of noncompete clauses—let alone a blanket refusal to enforce—must identify significant third-party externalities that are not reflected in the terms of the noncompete clause and the broader employment agreement of which it is typically a part. Efficiency-based arguments for California's aversion toward enforcing noncompetes therefore rely on the reduction in knowledge spillovers, and collective reduction in innovative vigor in general, that would potentially result if noncompetes were enforced. This was precisely the basis for Gilson's characterization of California's refusal to enforce noncompetes as an efficient legal solution to a collective-action problem.

As we have discussed in detail, it is not clear that this theory has a sound basis in fact. Specifically, the extent to which noncompetes *actually* impede efficient human capital transfers and associated knowledge spillovers is empirically contestable and depends on the transaction costs involved in negotiating waivers of noncompetes, the extent to which noncompetes are actually enforced, and the availability of alternative mechanisms to regulate human capital flows. At a minimum, however, it is at least reasonable to assume that noncompetes impose *some* incremental transaction-cost burden relative to a zero-enforcement regime and thereby may have some incremental adverse effect on impeding the agglomeration economies and similar benefits that can promote innovation activity. Additionally, noneconomic considerations of personal autonomy and distributive justice that play an important role in real-world policy debates over noncompetes strongly disfavor a rule of per se legality. Consequently, we set aside per se legal as a policy option and consider the remaining possibilities that efficiency would be maximized by treating noncompetes as either (i) per se illegal (Option III) or (ii) conditionally legal subject to the reasonableness standard (Option II).

## C.  Is There Really a Collective Action Problem?

Any argument in favor of zero enforcement must rest on Gilson's justification for California's general refusal to enforce the noncompete clause (the closest real-world approximation of the per se illegal policy option), taking note that Gilson himself cautioned against reflexive application of the California model to all

states and industries.[321] Recall that this argument supposes a world in which all (or at least most) firms would be better off if noncompetes were deemed unenforceable. Without coordination, it is in each firm's individual interest to include a noncompete clause (since it would otherwise unilaterally forfeit human capital assets to its competitors), which ultimately operates to all firms' collective detriment by impeding the flow of human capital and the innovation process in general. Under those assumptions, abolishing noncompetes saves firms from this collectively irrational outcome, which in turn enhances knowledge spillovers, fosters agglomeration economies, and accelerates innovation in the industry as a whole.

This line of argument relies heavily on a single assumption: namely, that when the law enforces noncompetes, firms widely, if not universally, adopt noncompetes, resulting in socially excessive constraints on the circulation of human capital. That is a theoretically plausible but empirically untested assumption, especially given the fact that almost all empirical studies compare mobility and innovation outcomes as a function of noncompete enforceability rather than use. Fortunately, recent empirical work has supplied data that can provide some insight into actual use of noncompetes in real-world technology markets.

Available data on the actual use of noncompetes in employment agreements demonstrate significant variation across different subsets of the labor market. As noted previously, two studies that survey CEOs and other top-level executives find usage rates ranging from 70–84 percent.[322] Another study finds comparable usage rates among venture capital-backed firms: in a sample of 213 venture capital investments in 119 firms during 1987–1999, founders were subject to noncompetes in 70.4 percent (or 73.5 percent excluding California firms) of total investments.[323] Those figures are compatible with the assumption that underlies the efficiency argument against noncompetes: without legal intervention, markets tend toward high, and potentially excessive, use of noncompetes. However, a survey study of engineers in the information technology industry report a lower rate of almost 47 percent.[324] A recent and much larger study by Professor

---

[321] See Gilson, 74 NYU L Rev at 629 (cited in note 8).

[322] See note 85 and accompanying text.

[323] Kaplan and Strömberg, 70 Rev Fin Stud at 289 (cited in note 272).

[324] See Marx, 76 Am Sociological Rev at 702 (cited in note 272). The sample consisted of 1,029 technical personnel (all members of the Institute of Electrical and Electronics Engineers) from a variety of industries.

Evan Starr and colleagues that surveys 11,505 workers across a broader range of industries finds even lower usage rates, reporting usage rates ranging from 31–36 percent in engineering positions, computer and mathematical positions, information industries, and professional and scientific industries.[325] The Starr et al. study further finds significant variation based on the relevant business interest that the employer may have in a noncompete with respect to a particular employee. For example, about one-third of employees subject to noncompetes work with trade secrets, as compared to about 15 percent of employees who only "work with clients or who have client-specific information."[326]

These data have been cited by scholars and policymakers who argue that significant numbers of employees are encumbered by these provisions.[327] One scholar claims that employees are now stuck in a "thicket" and that "[n]oncompete agreements are now required in almost every industry and position."[328] We interpret the data differently. The variation in reported usage rates across occupational and industry categories raises serious doubt as to whether it is reasonable to assume that, when noncompetes are enforceable, employers blindly use them in all circumstances. Consider the finding above that approximately one-third of technical personnel are subject to noncompetes. While that is a significant percentage, it means that approximately *two-thirds* of that work force is *not* subject to any such constraint. Even the high usage rates among top-level executives imply that about *one-third* of the relevant labor pool did not agree to a noncompete. Additionally, it is important to keep in mind that *effective* use of noncompetes almost certainly falls well below *nominal* use. A recent study finds that, in the state of Washington, which enforces noncompetes subject to the reasonableness standard, technology firms cultivate a reputation for nonenforcement[329]—meaning, that the actual use of noncompetes is far less common than the nominal use of noncompetes. That finding is consistent with prior reports (as discussed earlier) that firms in the Route 128 area widely tolerated employee departures and spin-offs during the

---

[325] See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *43–44 (cited in note 11).

[326] See id at *19.

[327] See, for example, Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19); White House, *Non-Compete Agreements* at *5–7 (cited in note 36); Office of Economic Policy, *Non-compete Contracts* at *11–13 (cited in note 36).

[328] Lobel, 93 Tex L Rev at 791 (cited in note 9).

[329] See Gomulkiewicz, 49 UC Davis L Rev at 256–57, 277–80 (cited in note 274).

economic heyday (and, presumably, competitive market for technical talent) of the 1970s and 1980s, even though Massachusetts law nominally tolerated enforcement subject to the reasonableness standard.[330] Rather than being driven toward widespread use of noncompetes to constrain the outflow of human capital to competitors, actual market behavior shows that firms sometimes or usually *decline* to use or enforce noncompetes.

D.   Why Employers Decline to Use Noncompetes

   Significant variation in the use and enforcement of noncompetes does not favor the thesis that markets are prone to suffer from a collective-action problem resulting in inefficient overuse of noncompetes. Rather, it is more consistent with a standard competitive market model in which employers bid for managerial and technical talent by offering different packages of price and nonprice terms. Under competitive conditions, firms seek to attract the most highly valued labor by offering different types of employment agreements, some with and some without noncompetes.

   It is entirely plausible that an employer may prefer to offer an employment package without a noncompete. The reason is simple: noncompetes are costly to employers and will not always be worth the price. Prospective employees anticipate that noncompetes will limit postemployment opportunities, which means that employees may be unable to access more lucrative outside employment options during the term of the noncompete and, as a result, will have reduced capacity to renegotiate the terms of employment with the employer in the future. The prospective employee may further anticipate that, given a limited set of outside employment options, the employer could hold up the employee and unilaterally degrade the terms of employment.[331] Based on these expectations, the prospective employee will demand either compensation up-front or, more plausibly, credible assurance that the firm will allocate internal rewards for strong performance that mimic the rewards that would be allocated in the external

---

[330]  See notes 186–90 and accompanying text.

[331]  See Margaret M. Blair, *Firm-Specific Human Capital and Theories of the Firm*, in Margaret M. Blair and Mark J. Roe, eds, *Employees and Corporate Governance* 58, 64–65, 72 (Brookings Institution 1999). Professor Oliver Williamson, the originator of the hold-up concept in the institutional economics literature, makes the same observation but argues that repeat-play forces would typically dissuade employers from engaging in this behavior. See Oliver E. Williamson, *Economic Institutions of Capitalism* 248–49, 259–60 (Free Press 1985).

labor market.[332] If the employer is unwilling to pay the required up-front compensation, cannot credibly commit to reward employees' relative contributions to the firms' team product, or has other mechanisms by which to regulate human capital outflow or protect against knowledge leakage in the event of an employee departure, then, in any of those cases, it may decline to "purchase" a noncompete obligation from the employee.

The "talent wants to be free" school implicitly assumes a world in which employers unilaterally impose or dictate noncompetes and therefore the law must intervene. But that implausibly assumes that employers always or typically are price-setters in the labor market. In most markets, that would typically not be the case and, in technology markets in particular, the very opposite is more likely given the widespread observations that, in many technology market segments, skilled technical labor is scarce and employers bid aggressively to recruit them.[333] Absent market power, we should therefore expect to observe variation in the mix of postemployment constraints as employers compete over a limited talent pool.

More specifically, any such variation in the use of noncompetes will reflect different values placed by employers and employees on two variables:

(i)  $G_f$: the *firm*'s net expected future gains from employee training and knowledge internalization attributable to a noncompete; and

(ii)  $G_e$: the *employee*'s net expected future gains from postemployment opportunities at competitors within the typical duration of a noncompete.[334]

The value of $G_f$ and $G_e$ impacts the firm's and the employee's respective negotiating positions: as the value of $G_f$ rises, the firm

---

[332] See Blair, *Firm-Specific Human Capital* at 66, 72–73 (cited in note 331). As Blair notes, the latter solution is more plausible because full up-front compensation would induce shirking on the part of the employee. See id at 62, 73. Note that assurance of an internal compensation system would be credible only if an employer entered into a contractual commitment to do so or, in the absence of a contract, pledged reputational capital to support any such assurance.

[333] For a review of the evidence, see National Science Board, *Revisiting the STEM Workforce* *9 (Feb 4, 2015), archived at https://perma.cc/S9GE-S5WA.

[334] In some situations, the employee may prefer a noncompete because gains to the employee's human capital from training—which could not occur absent a financing commitment—outweigh anticipated losses from foreclosing potential postemployment opportunities. See Rubin and Shedd, 10 J Legal Stud at 96–97 (cited in note 56). Indeed, a recent study finds that noncompetes are associated with a 5.5 percent increase in the likelihood

is willing to pay a higher price for a noncompete; as the value of $G_e$ rises, the employee will demand a higher price for agreeing to a noncompete. The interaction between these two variables influences the likelihood that any given employer-employee negotiation is likely to yield a noncompete. As the value of $G_f$ rises in value relative to $G_e$, we would expect to see greater adoption of noncompetes since employers value the noncompete highly and employees are willing to "sell" it at a low price; as that ratio is reversed, we would expect to see the opposite outcome. When the values of $G_f$ and $G_e$ are both high (or low), results are likely to be mixed.

We recognize that this model is inherently stylized and, in particular, is vulnerable to the objection that employers and employees in real-world contracting environments do not engage in customized negotiation—rather, employers sometimes include noncompetes in a "take-it-or-leave-it" employment package that does not facilitate term-specific negotiation.[335] This is especially so if the employer demands a noncompete not in the original employment agreement or terms, but only after the employee begins work.[336]

While some evidence supports the view that, in certain market segments, noncompete clauses are not typically negotiated,[337] it should not be automatically concluded that rational negotiation models have no descriptive force in this setting or, equivalently, that employers are free to "impose" noncompetes without paying any price for doing so. First, in the case of top-level executives, the full negotiation assumption almost always holds true as these

---

of receiving training on the job. Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *3 (cited in note 11). In order to address the strongest argument made against noncompetes, we nevertheless assume here that there is a net cost to the employee from agreeing to the noncompete.

[335] See White House, *Non-Compete Agreements* at *9–10 (cited in note 36); Office of Economic Policy, *Non-compete Contracts* at *12–13, 24 (cited in note 36); Marx, 76 Am Sociological Rev at 696 (cited in note 272).

[336] See, for example, Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *52 (cited in note 11) (indicating that only 6.3 percent of survey respondents who reported being asked to sign a noncompete after accepting their job offers attempted to negotiate the noncompete's terms, while this percentage was nearly twice as high for those who had received the noncompete before accepting their job offers).

[337] See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *21 (cited in note 11) (finding that only 10 percent of noncompete signers attempt to negotiate the noncompete); Marx, 76 Am Sociological Rev at 706 tbl 4 (cited in note 272) (finding that 31 percent of surveyed employees received the noncompete request with the job offer, 22 percent received the request after the offer was accepted but prior to the start of work, 24 percent received the request on the first day of work, and 23 percent sometime after the starting work).

agreements are typically entered into with the advice of highly sophisticated counsel specialized in executive compensation matters.[338] Second, in the case of lower-level technical and managerial talent who may well not have the opportunity to negotiate customized terms of employment, the competitive model still has descriptive force even in the absence of transaction-specific negotiation over noncompetes, so long as at least some portion of the market observes employer behavior and disseminates information concerning the terms of employment.[339] Assuming competitive market conditions, that monitoring function may be filled by other employers who have a rational incentive to monitor the use or enforcement of noncompetes by competitors and offer prospective employees an employment package without such restrictions or a demonstrated enforcement record that tolerates employee departures notwithstanding a noncompete.

### 1.  Variation in use of noncompetes across employee types.

While further theoretical refinement and empirical inquiry is warranted, this competitive bidding model anticipates the variation observed in available data on the use of noncompetes among executive and technical personnel populations. In particular, it explains the significantly higher usage of noncompetes among top-level executives as compared to lower-level technical personnel. The most comprehensive empirical study on the use of noncompetes finds a correlation between income (which often correlates with higher-skilled occupations) and the incidence of noncompetes. More specifically, that study finds that, whereas 37 percent of employees earning over $100,000 a year are subject

---

[338]  Statement made based on one of the authors' personal experiences as a practicing transactional attorney.

[339]  For the original version of this argument, made in the debate over the efficiency of contracts of adhesion, see Alan Schwartz and Louis L. Wilde, *Intervening in Markets on the Basis of Imperfect Information: A Legal and Economic Analysis*, 127 U Pa L Rev 630, 637–38 (1979) (arguing that the presence of consumers who engage in "moderate search" can protect consumers who engage in no search from "overreaching firms"). For an application to related debates in copyright-related settings, see Frank H. Easterbrook, *Contract and Copyright*, 42 Houston L Rev 953, 969–70 (2005). As Judge Easterbrook observes, the fact that a particular attribute of a product or service is not routinely negotiated on a transaction-specific basis does not imply that that attribute is being dictated by the supplier. Rather, that question is more profitably analyzed by asking whether the supplier possesses sufficient market power to be in a position to dictate any such term. Nonetheless we recognize that, in the noncompete context, this argument is predicated on the assumption that information is being disseminated in the market concerning a specific employer's noncompete policy, which we recognize may vary from case to case.

to a noncompete, this is only true of 14 percent of employees earning up to $40,000.[340] These findings conform to the expectations of rational bargaining between employers and employees. In the case of a higher-level executive, the employer most likely assigns a high value to $G_f$—that is, the firm prioritizes internalizing the valuable knowledge assets to which a top-level executive would be exposed and is therefore typically prepared to pay a substantial price for obtaining that concession from the employee. By contrast, a lower-level employee may not have comparable exposure to the highest-value knowledge assets, in which case the firm assigns a low value to $G_f$ and is typically willing to forego the noncompete (or, what is functionally equivalent, foregoes enforcement even if a noncompete clause appears in the employment package).

2. Variation in the use of noncompetes across industry types.

The competitive bidding model not only anticipates variation in the use and enforcement of noncompetes across employee types, but also across industries. Using this framework, we can roughly anticipate the expected use of noncompetes in different industry types (a research path that may prove fruitful in future empirical inquiries). Industries that exhibit some or all of the following characteristics are less likely to adopt noncompetes: (i) low capital requirements; (ii) short product development times; (iii) rapid product obsolescence; (iv) strong intellectual property protection (including patents, copyrights, and trade secrets); (v) robust complementary assets (such as strong marketing or manufacturing capabilities); and (vi) high levels of industry-specific product interoperability.[341]

Under those conditions, the employer assigns a low value to $G_f$. A firm in industries with these characteristics is less likely to prioritize maintaining control over its knowledge assets because those assets are not particularly costly to develop, even successful

---

[340] See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *17–18 (cited in note 11).

[341] In industries involving high levels of interoperability, presumably there is substantial information sharing among firms, which is either protected by patents and other forms of intellectual property rights or not at all, at least within the circle of relevant competitors. Either way the gains from internalizing R&D via noncompetes are reduced in this situation. Additionally, interoperability implies that training results in industry-specific capital, which makes the value of intra-industry postemployment opportunities more valuable for employees. Thus, on balance, industries characterized by high levels of interoperability will, all other factors equal, typically fall into this category.

products have short lifetimes, and, in some cases, the product is embedded in a portfolio of IP assets and/or supported by complementary production and distribution assets that are difficult to replicate. For the same reason, employees in this setting are likely to place a high value on $G_e$. In a fast-paced market segment characterized by short product-development times and rapid product obsolescence, employees are likely to demand a high price for accepting noncompetes due to the expectation that a current employer's project is likely to conclude rapidly, in which case the employee may be compelled to seek employment elsewhere. Employment contracts in that type of industry are less likely to include a noncompete clause, and if they do, employers are unlikely to enforce them vigorously given the potential adverse consequences in the ability to recruit talent in the future. The software industry, particularly the Internet-based sector, tends to fit this mold.

Noncompetes are more likely to be selected in markets that exhibit the opposite characteristics. In the biopharmaceutical sector, capital requirements are enormous (approaching or exceeding $1 billion in the case of an FDA-approved drug[342]), product development is long (about ten years on average), product obsolescence is slow, and interoperability is minimal. Given those considerations, the employer is likely to place a high value on internalizing the gains from its R&D investment and therefore should be willing to pay a relatively high price for achieving that objective through restrictions on departing employees. Moreover, the potential costs to a biopharmaceutical employee from a noncompete are presumably lower than in the software industry given longer product development cycles, which—in view of the importance of project-specific knowledge to biopharmaceutical development—tend to ensure longer employee tenures and diminish the number of potential opportunities at competing firms. Consistent with this expectation, empirical evidence shows low levels of employee movement in the Canadian biotechnology industry as compared to the free flow of human capital associated with the semiconductor and other IT industries in Silicon Valley.[343] This observed

---

[342] See Joseph A. DiMasi, Ronald W. Hansen, and Henry G. Grabowski, *The Price of Innovation: New Estimates of Drug Development Costs*, 22 J Health Econ 151, 180–81 (2003). The development cost estimate includes the costs of failed projects previously funded by the pharmaceutical firm. See id.

[343] See Hugh P. Gunz, Martin G. Evans, and R. Michael Jalland, *Career Boundaries in a "Boundaryless" World*, in Maury A. Peiperl, et al, eds, *Career Frontiers: New Conceptions of Working Lives* 24–53 (Oxford 2000).

pattern in human capital flows may be in part a function of institutional design: empirical evidence shows that California biotechnology firms issue stock options with long vesting periods and employees of those firms hold large percentages of firm equity,[344] suggesting that, even when firms operate in a jurisdiction in which noncompetes are unenforceable, they adopt alternative tools to constrain the outflow of human capital.

E.    Error Costs and Noncompete Policy

Economically informed policymaking on noncompetes, and other constraints on employee mobility in innovation markets, must recognize the fundamental uncertainty that attends the selection of any particular point on the policy continuum ranging from full enforcement (equivalent to Option I) to zero enforcement (equivalent to Option III). This is akin to the concept of error cost that occupies a central place in antitrust law and policy: the policymaker recognizes the inevitability of erroneous decisions in general and then selects a legal standard that minimizes the sum of error costs less the administrative costs of implementing any particular standard.[345] Hence, antitrust law reserves per se illegal standards, which have low administrative costs, for practices that usually, or almost always, are expected to result in net social harms (principally, horizontal price-fixing), while retaining rule of reason standards, which have high administrative costs, for practices that do not usually result in net social harms (for example, below-cost predatory pricing).[346] In the case of noncompetes, each option on the policy continuum raises the risks of both under- and over-enforcement relative to the socially optimal level of noncompete enforcement that would be costlessly and perfectly implemented by a hypothetical omniscient regulator. In the case of a per se legal policy (Option I), the market is immune from the risk of underuse of noncompetes but may be exposed to overuse, resulting in suppressed knowledge spillovers and a slowdown in innovation, not to mention concerns regarding personal autonomy and distributive justice. In the case of a per se illegal policy (Option III), the market is immune to the risk of overuse of noncompetes but may be exposed to underuse, resulting in reduced employer incentives to invest in employee training and certain types

---

[344] See Julia Porter Liebeskind, *Ownership, Incentives, and Control in New Biotechnology Firms*, in Margaret M. Blair and Thomas A. Kochan, eds, *The New Relationship: Human Capital in the American Corporation* 299, 306 (Brookings Institution 2000).

[345] See note 38 (listing the leading sources).

[346] See Easterbrook, 63 Tex L Rev at 3 (cited in note 38).

of R&D projects. The intermediate range of policy options (Option II), which correspond to the real-world variants of the common-law reasonableness standard, result in some mix of aggregate overuse or underuse of noncompetes relative to the social optimum.

It is important to appreciate that the error-cost approach contemplates that courts and other policymakers may make mistakes with respect to any individual enforcement action, but, in the aggregate, courts and other policymakers will maximize net social gains over time relative to any other enforcement methodology, taking into account legal transaction costs. Following this long-term net-welfare-maximization standard, the efficient legal regime with respect to noncompetes maximizes over time (i) the gains generated by net-welfare-increasing noncompetes, less (ii) the losses generated by net-welfare-decreasing noncompetes, less (iii) the legal transaction costs incurred to distinguish between "good" and "bad" noncompetes. The selection of any option on the noncompete policy continuum inherently involves the task of distinguishing between net-welfare-increasing and net-welfare-decreasing noncompetes, subject to some positive administrative cost and taking into account some positive probability that any legal rule will sometimes make errors in individual cases in distinguishing between good and bad noncompetes. Options I (per se legal) and III (per se illegal) both have the advantage of low administrative costs as compared to Option II (some version of the reasonableness standard), but take extreme views with respect to the likely distribution of good and bad noncompetes and therefore run the risk of significant error costs in the form of overuse or underuse of noncompetes. Option I ("per se legal") is predicated on the view that noncompetes are always or typically efficient market choices, in which case it is not worthwhile to incur the administrative costs of case-specific adjunction and occasional erroneous enforcement of a "bad" noncompete would be immaterial in the long term. Option III (per se illegal) takes the opposite view with respect to each parameter, except that it agrees that it is not worthwhile to incur the administrative costs of case-specific adjudication. By contrast, Option II takes the intermediate position that the distribution of "good" and "bad" noncompetes may vary sufficiently across industries, employee populations and even individual transactions, so that it is worthwhile to incur the administrative costs required to engage in case-specific adjudication and thereby reduce erroneous enforcement and invalidation

of noncompete clauses. This option is also best in our view for taking account of personal autonomy and distributive justice concerns, which vary depending on the specific circumstances of the employer, employee, and industry.

The earlier generation of law-and-economics scholarship had essentially expressed agnosticism as to the appropriate policy options, on the reasonable ground that available evidence did not provide any firm ground on which to make a choice.[347] Today, we are in a position to take an incrementally firmer view on the efficient legal treatment of noncompetes, grounded in the accumulated body of theoretical and empirical analysis of noncompetes, as well as the larger literature on human capital and agglomeration economies.

An error-cost approach to noncompete policy favors the pliable reasonableness standard set forth several centuries ago in *Mitchel v Reynolds*.[348] While it carries a higher administrative-cost burden compared to Options I and III, the range of more and less generous reasonableness standards encompassed by Option II exhibits a close fit with our best theoretical and empirical understanding—which is to say, our self-acknowledged limited understanding—of the complex efficiency trade-offs involved in enforcing noncompete clauses in any particular case. Moreover, we note that courts' application of the common-law reasonableness standard may not be especially costly given that that inquiry has historically been limited to a defined set of factors, usually limited to duration, geography, and industry scope.[349] Relatedly, we note that the administrative costs under Option III (per se illegality) may in practice be appreciably greater than zero insofar as an absolute ban on noncompetes may lead parties to challenge legal arrangements that arguably mimic the effect of noncompetes but serve legitimate economic functions. This contingency has already been realized in California, where a lower court recently applied the statutory prohibition of noncompetes to an exclusivity clause in a business-to-business agreement, which has never been considered to fall within the purview of that statute.[350]

In sum, the reasonableness limitations that the common law places on the durational, geographic, and industry scope of noncompete obligations may be interpreted as an indirect instrument

---

[347] See Part I.B.5.
[348] 24 Eng Rep 347, 347 (KB 1711).
[349] See note 150 and accompanying text.
[350] See notes 29–30 and accompanying text.

for limiting error costs under conditions of uncertainty with respect to the socially optimal enforcement policy in the case of any particular noncompete. By tolerating noncompetes subject to fairly strict limitations on duration, geographic reach, and industry scope, courts may effectively minimize the expected error costs inherent to the enforcement or nonenforcement of the total population of noncompetes over time, as compared to a regime in which noncompetes were either flatly enforced or prohibited in all cases without qualification. Additionally, if and when evidence concerning the net welfare effects of noncompetes achieves greater certainty, a reasonableness approach provides policymakers with latitude to adjust the permitted scope of noncompetes, an option that is unavailable under either the full-enforcement or zero-enforcement options. While the extreme poles of the policy continuum largely eliminate administrative costs, each is likely to result in significantly higher error costs over time absent extreme and, based on a close reading of the empirical evidence, factually unjustified assumptions with respect to the likely distribution of efficient and inefficient noncompetes in the marketplace.

## Conclusion

Much of current scholarly and policy commentary asserts, often with little qualification, that prohibiting enforcement of noncompetes and other contractual limitations on employee mobility promotes innovation. As one scholar has stated: "[T]here remain no persuasive arguments in favor of enforcing [noncompete] agreements."[351] Based on these types of unqualified statements in the scholarly literature, US senators have proposed—and multiple state legislatures have already taken or are actively considering—actions to substantially limit or even prohibit noncompetes.[352]

We respectfully dissent. The case against noncompetes is typically illustrated by reference to the standard narrative of the rise of Silicon Valley and the decline of Route 128. A close review shows that this historical episode is substantially more complex than has been commonly understood. Technological and economic fundamentals, rather than fine differences in state contract law, most likely account for each region's different innovation trajectories—which, in the medium to long term, has been positive in

---

[351] See Moffat, 52 Wm & Mary L Rev at 879 (cited in note 9).
[352] See notes 19–28 and accompanying text.

both cases.[353] The most widely cited empirical studies of a broader sample of jurisdictions suffer from material limitations and, contrary to repeated characterizations in the policy debate, do not provide compelling support for the view that noncompetes inhibit innovation.[354] Moreover, more recent empirical work has uncovered evidence supporting theoretical claims that noncompetes sometimes induce firms to invest in cultivating employees' human capital.[355]

The current state of our empirical understanding thus continues to track the most refined theoretical analysis of the complex economics of human capital markets, which suggests that the net efficiency effects of noncompetes—and other constraints on employee mobility—in innovation markets will vary across industry types, employee types, and other market parameters.[356] Some market segments may benefit from a high incidence of noncompetes, while others may suffer. Contrary to the direction of recent scholarship, popular commentary, and policy activity, there is little certainty concerning the net efficiency effects of noncompetes in general and reasonable grounds to believe they have a net positive effect in certain innovation environments. If that is the case, then, from an economic point of view, the common law's admittedly uncertain reasonableness standard likely represents the best available approach for balancing the complex trade-offs raised by noncompetes and other constraints on the mobility of human capital in innovation markets.

---

[353] See Part II.A.
[354] See Part II.B.
[355] See notes 310–13 and accompanying text.
[356] See Part II.B.3.

APPENDIX

Changes to State Laws Affecting Noncompetes (2014–2019)[357]

| State (Year) | Change | Reduces Enforceability? |
|---|---|---|
| Delaware (2014) | Bars noncompetes for home inspector trainees. | Y |
| New Hampshire (2014) | Employee must agree to noncompete prior to start of employment. | Y |
| Arkansas (2015) | Specifically authorizes noncompetes in certain circumstances. | N |
| Hawaii (2015) | Prohibits enforcement of non-competes by "technology businesses." | Y |
| Alabama (2016) | Specifically authorizes noncompetes in certain circumstances. | N |
| Connecticut (2016) | Limits enforceable geographic scope and duration of noncompetes involving physicians. | Y |
| Idaho (2016) (repealed 2018) | Specifically authorizes noncompetes in certain circumstances. | N |
| Illinois (2016) | Bars noncompetes for "low-wage" employees. | Y |
| Oregon (2016) | Maximum term of noncompete limited to eighteen months. | Y |
| Utah (2016) | Maximum term of noncompete limited to twelve months. | Y |

[357] Note that this Table does not cover judicial decisions that may have effectively changed an individual state's treatment of noncompetes. Relevant statutes (with the exception of the 2018 Idaho and Utah amendments) are as follows (corresponding to states listed above from top to bottom): 28 Del Code Ann § 4109; NH Rev Stat Ann § 275:70; Ark Code Ann § 4-75-101 (2015); Hawaii Rev Stat Ann § 480-4; Ala Code § 8-1-190; Conn Gen Stat § 20-14p; Idaho Code § 44-2704(6); 820 ILCS 90/10; Or Rev Stat § 653.295; Utah Code Ann § 34-51-201; Cal Labor Code § 925; Nev Rev Stat § 613.195; Colo Rev Stat § 8-2-113; Neb Rev Stat § 87-404(2); Mass Gen Laws Ann ch 149, § 24L; Washington Substitute HB 1450, Washington House of Representatives, 66th Regular Legislative Sess (Mar 12, 2019); Connecticut Bill No 7424, Connecticut General Assembly, Jan Sess (2019); 26 Me Rev Stat Ann § 599-A(1); Md Labor & Empl Code Ann § 3-716 (as amended); NH Rev Stat Ann § 275-70-a (as amended); North Dakota HB 1351, North Dakota Legislative Assembly, 66th Sess (Jan 9, 2019), codified as amended at ND Cent Code § 9-08-06; RI Gen Laws § 28-58-1 et seq.

| State (Year) | Change | Reduces Enforceability? |
|---|---|---|
| California (2017) | Limits ability of employers to require employees to litigate disputes outside of California or under the laws of another state. | Y |
| Nevada (2017) | Limits noncompetes to terms that are "no greater than is required for the protection of the employer." Authorizes courts to reform noncompetes that are unreasonable. | Y, N[358] |
| Colorado (2018) | Bars noncompetes for physicians. | Y |
| Idaho (2018) | Repeals Idaho 2016 statute relating to noncompetes. | Y |
| Nebraska (2018) | Provides that arbitrator or court may "reform" noncompete provisions in a franchise agreement. | N[359] |
| Utah (2018) | Curtails enforcement of noncompetes in the broadcasting industry. | Y |
| Massachusetts (2018) | Prohibits noncompetes for employees subject to the Fair Labor Standards Act and all other employees terminated without cause. | Y[360] |

[358] While the limitations on the enforceability of noncompetes would appear to moderately reduce enforceability relative to the existing reasonableness standard, the specific authorization of courts to reform noncompetes that have excessive duration, scope, or other unreasonable terms tends to enhance enforceability.

[359] This change increases enforceability because it specifically authorizes a court to "blue pencil" a noncompete provision if it is found to be unreasonable in its existing form, rather than ruling the provision to be unenforceable in its entirety.

[360] Note that, while the Massachusetts statute reduced the enforceability of noncompetes in certain cases, it also codified the inevitable disclosure doctrine (which Massachusetts courts have historically resisted), which enables employers to partially mimic the effect of a noncompete. See note 149 and accompanying text.

| State (Year) | Change | Reduces Enforceability? |
|---|---|---|
| Washington (2019) | Imposes high salary and compensation minimums on employees and contractors who may be subject to noncompetes; sets presumptive eighteen-month limit on term; requires agreement at time of acceptance of employment or additional compensation; requires additional payment to employees terminated without cause. | Y |
| Connecticut (2019) | Bars noncompetes in home health services industry. | Y |
| Maine (2019) | Bars noncompetes for certain lower-wage workers and, in all cases, requires that employers disclose noncompete prior to offer of employment. | Y |
| Maryland (2019) | Bars noncompetes for certain lower-wage workers. | Y |
| New Hampshire (2019) | Bars noncompetes for certain lower-wage workers. | Y |
| North Dakota (2019) | Clarifies that "goodwill sale" exception to ban on noncompetes can extend to firm's partners, members, or shareholders. | N |
| Rhode Island (2019) | Bars noncompetes for certain lower-wage workers, employees subject to the Fair Labor Standards Act, students, and workers age eighteen or younger. | Y |

April 19, 2023

**<u>Via Public Comment Portal</u>**

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue NW
Suite CC-5610 (Annex C)
Washington, DC 20580

**Re: Non-Compete Clause Rulemaking, Matter No. P201200**

Dear Federal Trade Commission,

I am the owner of a small company that manufactures a wide range of refractory products and custom designed precast shapes. "Refractories" are commercial furnace linings. A major aspect of our industry is innovation: creating more effective products (both in performance and cost) year-after-year. As a result, my company must place considerable resources not only in researching and developing innovative refractory technologies but also in training and trusting employees with the company's intellectual property, trade secrets, and other confidential information. The refractory industry is complex; my business must employ highly skilled individuals and compensate those employees accordingly. The proposed regulation banning non-compete clauses, essentially, in their entirety will have catastrophic effects for industries like mine.

The Commission publicizes its primary mission in promulgating this rule as "protecting competition and protecting consumers." Nonsense. A blanket ban on non-compete clauses such as is proposed in my industry eliminates all but the largest firms, and punishes consumers with fewer product choices and prices jacked up by oligopolistic profits. That is the rule's effect; that must be the rule's purpose.

The ability effectively and safely to line iron and steel furnaces requires complex technology. That means I must innovate ANNUALLY to stay in business and effectively compete. That ability for small firms like mine to innovate new products annually and drive competition with larger firms necessitates the ability to attract (and retain) the most skilled employees to design, learn and execute this technology best, and to protect that new technology for a reasonable period once my skilled hires are trained.

The proposed rule obviously devastates precisely those the antitrust laws are supposed to protect. It eliminates the protection noncompetes afford against confiscatory pricing and employee poaching that harms both the market and the consumers. It guarantees small firms like mine cannot protect against big firms raiding our talent and poaching our ideas, thus reducing the refractory market to a few big firms and foreign firms from countries that, unlike the FTC, understand the need to protect their own technology and the value of poaching ours. It ensures that the remaining oligarchs can jack up profits and disregard consumer choice.

In the refractory industry and others like it, the effect of the proposed rule will be a concentrated market with less competition among large, favored firms while consumers and little guys like me

lose out. Does that lower consumer prices? No. It creates big guy profit taking. Does that ensure I can do the annual innovation necessary to serve customer needs, remain in business and continue to employ my employees? No. It ensures my ruin. Do these deliberate consequences meet FTC enabling legislation aims? No. They do just the opposite.

Does a blanket ban on non-compete clauses across all industries and all employees serve any legitimate purpose? No. The rule's premise—that non-compete provisions prey on minimum wage employees' ability to change jobs—is transparent nonsense. It guarantees low wages and higher unemployment. The rule's deliberate impact guarantees fewer employment choices and ensures downward pressure on wages the remaining big guys get to pay their employees.

Does it protect employee mobility from overreaching? No. The bulk of jurisdictions in the country that allow non-competes expressly or by implication require employers like me to show a protectable interest in the job—i.e., to show why what we are seeking to protect has a unique value that justifies the restriction, and every jurisdiction limits the market and time within which the restriction applies based on what is necessary to protect that interest.  The best case is that those who suggest otherwise are innocently misinformed.

Is this rule even a lawful exercise of agency authority?  No. Commissioner Wilson aptly outlined in her Dissenting Statement the numerous challenges the FTC faces in promulgating and enforcing this blanket ban on non-compete clauses: "(1) the Commission lacks authority to engage in 'unfair methods of competition' rulemaking, (2) the major questions doctrine addressed in *West Virginia v. EPA* applies, and the Commission lacks clear Congressional authorization to undertake this initiative; and (3) assuming the agency does possess the authority to engage in this rulemaking, it is an impermissible delegation of legislative authority under the non-delegation doctrine, particularly because the Commission has replaced the consumer welfare standard with one of multiple goals."

There is simply no legitimate purpose for the FTC to reach beyond its congressionally authorized role and regulate matters that are already being adequately addressed by state legislatures and the courts. The deliberate results this rule will produce sends a clear  message to firms like mine in industries like mine that only judicial action—and long-term political action—will restore constitutional and statutory rights the rule takes from most of those the FTC regulates to give advantage to favored big guys. We hope this rulemaking process will restore reason.

My firm and those like it offer good well-paying jobs to Americans in places where they often are hard to come by. I am sure the Commission shares my belief in the value of preserving firms like mine. I am confident a reasoned review of this rule's terms as compared to the FTC Act, the Administrative Procedures Act and the Constitution will cast this rule aside. There really is no other lawful option.

We all know that legitimately trying to protect minimum wage worker mobility has nothing to do with a blanket rule that will wreck high tech high skilled industries like mine. If the FTC insists on having a rule outside its expertise and likely to be struck down as exceeding agency authority, I suggest two things. Without them, it is impossible to know whether you even need a rule to achieve the stated aims, and if so, what that rule should say.

First, know what you are talking about; commission independent real world studies that are both widespread and detailed to specific industries. Such a study will help determine the impact of what is proposed before just flinging something onto the page. I am willing to bet the FTC could not identify the effect of its proposed rule on the refractory industry or others like it—for instance, could the FTC identify what percentage of workers in the refractory industry are minimum wage, what percentage of workers in the refractory industry are subject to a noncompete, and the different effects of the proposed rule on different types of workers across different industries. You have to do the work before you make the rule. Unless the injurious consequences to my industry were intended, the FTC clearly undertook no discernible effort to address them in the current rule's operation before proposing it.

Second, fix ONLY what is broke; if statistically valid industry by industry studies suggest a need in some instances for a national rule within the agency's authority, tailor it to industries the study identifies (if the study identifies any, perhaps low skill minimum wage jobs with quantifiable mobility barriers directly the result of overreaching noncompetes) and regulate the specific aspects of particular features (e.g., with temporal and geographic limits) that have withstood legislative muster in numerous state legislatures (and have been well-defined through decades of adjudication in state courts or federal courts sitting in diversity).

If the **true** aim is to protect competition and customers, first get the result of fact-specific inquiries in place before drafting, rather than politics-driven assumptions, and then confine the rule to the fact specific issues those inquiries identify rather than a mindless blanket national ban. Only that will ensure a final determination worthy of this great agency and effective for legitimate regulatory aims. I respectfully ask the Commissioners to conduct such a review, and to take appropriate action rejecting this rule without further waste of taxpayer dollars so that the courts will not be obligated to do so.

Very truly yours,


A Concerned Citizen (and Refractory-Business Owner)

**AdvaMed**
Advanced Medical Technology Association

March 16, 2023

**By Electronic Submission to https://www.regulations.gov/**

Ms. April Tabor
Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue NW, Suite
CC-5610 (Annex C)
Washington, DC 20580

**Re:  Non-Compete Clause Rulemaking, Matter No. P201200**

Dear Ms. Tabor:

The Advanced Medical Technology Association ("AdvaMed") appreciates this opportunity to submit the below comments in response to the Federal Trade Commission's ("FTC") Non-Compete Clause Rule Notice of Proposed Rulemaking ("NPRM"), published at 88 Fed. Reg. 3482 (January 19, 2023).

The FTC's proposed rule would significantly impede medical technology innovation and reduce competition, resulting in diminished quality and increased cost of healthcare available to patients.  Any rule must take a more nuanced approach to regulating non-compete agreements to ensure patient health, innovation, and competition are not unintentionally sacrificed.[1]

**I.     AdvaMed and the Medical Technology Industry**

     **A.     Who We Are**

AdvaMed is a trade association that represents the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information

---

[1] AdvaMed notes there is a question as to whether the FTC has authority to issue this proposed rule.  The FTC asserts authority for the proposed rule under Section 5 of the Federal Trade Commission Act, however, as a threshold matter, the following legal questions must be addressed: (1) whether the FTC has authority to engage in "unfair methods of competition" rulemaking, (2) whether the FTC has clear Congressional authority to conduct rulemaking on a "major question" that will impact the entire economy *(see West Virginia v. EPA*, 142 S. Ct. 2587 (2022)), and (3) to the extent Congress granted such authority, whether that grant was an impermissible delegation of legislative authority.



Matter No. P201200
March 16, 2023

systems. Together, our members develop and manufacture much of the lifesaving and life-enhancing healthcare technology purchased annually in the United States and globally. These include technologies, devices, equipment, diagnostic tests, and health information systems that help patients stay healthier longer; recover more quickly after treatment; and enable clinicians to detect disease earlier and treat patients as effectively and efficiently as possible, transforming healthcare.

Our members range from the largest to the smallest medical technology producers and include hundreds of small companies with fewer than 20 employees. They are committed to the development of new technologies and services that allow patients to lead longer, healthier, and more productive lives. As a result:

- Since 1980, five years have been added to the U.S. life expectancy attributed to advancements in medical technology;[2]

- Developments in medical technologies have dramatically reduced the number of patient-days spent in hospitals;[3] and

- Medical technology advancements have dramatically reduced disability rates, and dramatically increased disability-free life expectancy.[4]

At the same time, innovation and advancements in medical technology result in dramatically reduced healthcare costs.

### B.    Patient Health and Medical Technology Innovation

The role of medical technology innovation in improving patient health is well-known. As stated in a report requested by the Food and Drug Administration and prepared by the National Academy of Sciences, Institute of Medicine ("NAS Report"):

> Pain, suffering, and death from disease still plague patients worldwide. Even where solutions exist, many are suboptimal, and there is much room for improvement. Fortunately, the US economic system has created incentives and

---

[2] National Center for Health Statistics. "Health, United States, 2014: With Special Feature on Adults Aged 55-64." Hyattsville, MD. May 2015.

[3] Between 1980 and 2010, there was a 60% decrease in patient hospital days as a result of developments in medical technologies. National Center for Health Statistics. "Health, United States, 2014: With Special Feature on Adults Aged 55-64." Hyattsville, MD. May 2015.

[4] Disability rates declined by 25 percent from 1982 to 2000, and disability-free life expectancy has increased over time. National Center for Health Statistics. "Health, United States, 2014: With Special Feature on Adults Aged 55-64." Hyattsville, MD. May 2015.



resources to promote and reward innovation. . . . That has created a medical device (also called medical technology) innovation ecosystem in which ideas can become realities that can affect health care.[5]

The medical device innovation ecosystem has multiple components:

- **'Fuelers'—**venture capitalists, investors, and public markets that support the process and invest in the innovators.

- **Innovation catalysts—**small startups, large companies, incubators, and other entrepreneurs that invent the technology or take a concept through to commercialization.

- **Regulators—**the Food and Drug Administration (FDA), the Centers for Medicare and Medicaid Services (CMS), third-party payers, and professional societies (which play a substantial role in patients' access to new technologies).

- **Consumers—**patients, physicians, and hospitals.[6]

All these entities play an important role in the development and advancement of medical technologies. For example, practicing physicians often consult during the development of medical technology, where they share real-time feedback on how a device could be improved, communicating their essential knowledge from diagnosing and/or treating patients while company representatives share their essential knowledge of the technology with the physicians to ensure the best products are reaching patients.

As a result of the innovation ecosystem, the U.S. medical technology industry is responsible for a highly disproportionate share of medical advances globally.[7] Yet, this "medical technology innovation ecosystem is fragile and extremely sensitive to changes in the cost of innovation, which is substantial. . . .The system is already under immense economic pressure."[8] The fragility of the innovation ecosystem results from several factors, including (1) the short product device life cycle, in which products are replaced by new or improved products on average every two

---

[5] National Library of Medicine, National Center for Biotechnology Information, Public Health Effectiveness of the FDA 510(k) Clearance Process: Balancing Patient Safety and Innovation: Workshop Report at 17, available at https://nap.nationalacademies.org/download/12960.

[6] *Id.* at 18.

[7] The United States is ranked first in various measures of healthcare innovation. *See, e.g.,* 2020 FREOPP World Index of Healthcare Innovation, ranking the United States first in Science & Technology Healthcare Innovation with a score of 75.14, well above second-place ranked Netherlands (49.97). Available at https://freopp.org/wihi2020-505b1b60bce6.

[8] NAS Report at 21.



Matter No. P201200
March 16, 2023

years;[9] and (2) the process from concept to product launch is extremely expensive.[10]  Numerous additional obstacles can stifle ideas and cost-saving improvements in healthcare from successfully reaching the market to help patients, including funding challenges, particularly for small companies; insurers' resistance to cover new treatments; and the complexity of the regulatory process.  Robust competition in medical technology innovation is critical to the continued, rapid, and often dramatic advancements in healthcare made by medical technology companies.  Indeed, innovation, not price, is the primary driver of competition in the medical technology industry.[11]

Another factor contributing to the delicate nature of medical technology innovation is the vital role of small companies in that process.  As the NAS Report observed:

> The survival of small companies is critical for delivering innovation to patients. . . . Most of the ideas that really change the practice of medicine come from small companies or individual inventors.  Department of Commerce statistics show that in 2002, 3,725 of the 6,007 US medical device firms being regulated by FDA had fewer than 20 employees, and only 150 had more than 500 employees.[12]

For these and other reasons, the continued ability of medical device companies of any size to make rapid, significant, and sometimes transformational advances in healthcare technology depends upon their continued substantial investments in innovation, research, and development, *as well as* their ability to protect and recoup their investments in these activities and their employees through fair competition.  Protecting the value of their intellectual property, trade secrets, and other confidential business information via non-compete agreements is critical to achieving these goals and essential to fair competition in this innovation-driven industry.  That is, non-compete agreements safeguard innovation and competition within the medical technology industry.

---

[9] *Id.* at 20.  Invention, development, and commercialization of new medical technologies is a lengthy, complex, labor-intensive process, however, the life cycle for similar replacement products is typically much shorter such that protecting an innovator's initial investment in creating new technologies is paramount.

[10] *Id.*

[11] Deloitte Center for Health Solutions, Medical Leaders Prioritize Technology and Consumers (2020), at 4 (available at https://www2.deloitte.com/us/en/insights/industry/life-sciences/medtech-industry-survey.html)

[12] NAS Report at 18.



Matter No. P201200
March 16, 2023

## II.   The FTC's Proposed Rule Would Harm Innovation, Investment, and Competition to the Detriment of Patients

The FTC suggests that non-compete agreements harm competition, however, within the medical technology industry, innovation and investment drive competition and prohibiting non-compete agreements harms innovation and investment.  Trade secrets, intellectual property, proprietary, and other confidential business information (collectively "confidential business information") reflecting and/or utilizing companies' innovation, research, development, and inventions are the lifeblood of the medical technology industry.  The risks posed to the medical technology industry by an employee/consultant joining a competitor and taking with them high-value confidential business information are profound.

Former employees are a major, if not the primary, source of misappropriation of medical technology confidential business information.[13]  Where a former employee is employed by a competitor in the same capacity as their former job, it is often impossible for that former employee in such circumstances to do the work expected of them in their new job *without* using the non-public, proprietary, and valuable knowledge they gained in their former job.  Once they join the new company and begin work, the harm to the former employer is often inevitable and difficult to detect by the employee's former employer.

In order for the medical technology industry to continue delivering lifesaving/life-enhancing technologies to patients, companies must be able to freely share their confidential business information during the design, development, and commercialization processes without fear that the employees and consultants critical to these initiatives will walk out the door and take the information to a competitor.  This free sharing of information and ideas is critical to fostering the collaboration needed to invent new technologies and timely deliver them to patients.  Non-compete agreements allow innovator companies to protect their knowledge assets from knowledge spillovers, limiting the risk their confidential business information will be obtained and misappropriated by competitors.

The FTC proposes that Nondisclosure Agreements ("NDAs") and federal and state trade secret laws are sufficient to protect confidential business information, however, NDAs and/or trade secret laws alone cannot adequately protect the medical technology industry from the risk and harm of trade secret misappropriation.  For example, given the short innovation cycle in the medical technology industry, an innovator would be unlikely to learn about the misappropriation of its trade secrets until after the competitor releases its new competing product, resulting in substantial marketplace loss to the innovator that cannot be recouped through any available

---

[13] After an eight-week trial, a Texas state court jury recently returned a verdict finding that more than a dozen former employees, including the company's former Executive Vice President, conspired to steal company trade secrets to benefit a rival company and owed their former employer millions in damages and legal fees.  *DNOW LP vs. Toby Eoff et al.*, case number 22-DCV-294327, in the 434th District Court of Fort Bend County, Texas.



Matter No. P201200
March 16, 2023

legal remedy. NDAs also do not protect against unintentional disclosure of negative knowledge[14] or confidential business information when an employee is conducting research and development for their new employer. Even if individuals do not directly disclose negative knowledge, it is impossible to prevent employees from using information already in their head, and it is similarly impossible for the employees themselves to ignore negative knowledge or other confidential business information that they have already acquired.

Numerous courts have recognized that money damages cannot adequately compensate a manufacturer for the actual and future damages resulting from misappropriation of confidential business information in the form of "loss of goodwill, loss of competitive advantage, and loss of research incentives."[15] Courts have also correctly recognized that the "loss of trade secrets cannot be measured in money damages" because a "trade secret once lost is, of course, lost forever," and the fact that a single trade secret may be disclosed to a new employer is enough to cause irreparable harm.[16]

The FTC's proposed rule would likely result in reducing competition in the medical technology industry because the majority of the industry could not afford millions of dollars in litigation costs or the loss of their entire investment in research and development, significantly curtailing advancements in lifesaving medical technologies available to patients. A 2019 report from the American Intellectual Property Law Association estimated the median cost to litigate a trade secret case was $4.1 million where the financial risk was between $10 million and $25 million. In fact, the same report estimated that where the financial risk was less than $1 million, litigating

---

[14] Negative knowledge is experientially acquired knowledge of what does not work or what paths to avoid. In the medical technology industry, negative knowledge can include information grounded in years of research and development but quickly acquired by employees/consultants entering the technology development process at any point.

[15] *See, e.g., Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 27 (6th Cir. 2011) (absent a preliminary injunction, plaintiff would suffer irreparable injury such as loss of goodwill, loss of competitive advantage, and loss of research incentives, arising from the misappropriation of its brake-pad formulations); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 118 (3d Cir. 2010) (former employer would suffer irreparable harm absent injunctive relief because the disclosure of its trade secrets by a former employer to a new employer would put the former employer at a competitive disadvantage that a legal remedy could not redress); *Par Pharm., Inc. v. Quva Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019) (former employer demonstrated a reasonable likelihood that its trade secrets had been misappropriated by its former employee, and absent injunctive relief it would suffer irreparable harm).

[16] *See, e.g., See, e.g., N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (a loss of trade secrets constitutes irreparable injury that cannot be measured in damages because once a trade secret is lost, it is lost forever); *FMC Corp. v. Varco Int'l*, Inc., 677 F.2d 500, 503 (5th Cir. 1982) (the fact that a single trade secret may be disclosed to a new employer is enough to cause irreparable harm); *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 509 (2d Cir. 2005) (plaintiff will suffer irreparable harm where the ex-employee had shared misappropriated trade secret with his new employer, including the loss of the advantage of being a pioneer in the field); *Fres-co Sys. USA v. Hawkins*, 690 F. App'x 72, 73 (3d Cir. 2017) (affirming finding of likelihood of irreparable harm and entry of injunction where former employee in possession of trade secrets was hired by competitor for same job, in the same industry, and in the same geographic area).



JA0726

Matter No. P201200
March 16, 2023

trade secret misappropriation would cost even more than the financial risk itself.[17]  This is a considerable burden for a company of any size to bear, but particularly threatening to the small- and medium-sized enterprises that make up the majority of medical technology innovators in the United States.

There are various examples of how reasonable non-compete agreements are appropriately used in the medical technology industry to protect critical confidential business information.  For example, employees working on ongoing research and development prior to a company filing for patent rights hold confidential business information at a critical juncture of invention protection.  If one of these employees moves to a competitor and uses technology developed/learned at the original employer, then questions can be created as to inventorship as well as scope of information in the "public domain" – both of which would impair the patent rights of the original employer.  Likewise, a nefarious foreign company need only set up shop next to an innovator company and hire away a few key employees to gain access to the innovator company's confidential business information through intentional/unintentional disclosures by the former employees, undermining the survival of the innovator company and all its remaining workers.  Without non-compete agreements, medical technology companies would likely be forced to limit the number of people involved in the research and development process because they would not be able to otherwise protect their intellectual property, stifling the collaboration and diversity of thought necessary for ideas to come to life and reach patients.

Similarly, medical technology companies devote tremendous resources training sales consultants who, in turn, train and develop close working relationships with physicians/surgeons, acquiring specialized knowledge of the companies' products and the medical procedures for which the products are used.  This training and communication with physicians/surgeons are necessary because medical technologies often have unique settings and technical controls that must be used properly to ensure safe and effective care of patients.  For instance, sales representatives may assist the clinical/operating room team to ensure that the appropriate range of necessary devices and accessories are available during a procedure, especially when dealing with medical technology that involves multiple devices and/or accessories. Non-compete agreements allow the medical technology industry to invest in this expensive, sophisticated training without fear that a competitor can simply hire that same sales consultant to sell similar products used in the same procedures with the same physician(s), thereby free riding on the previous employer's training investment.  Without non-compete agreements, medical technology companies may be forced to limit the number of people with access to this training to protect their investments in new technologies, resulting in fewer sales consultants available to provide sophisticated operating room training.

---

[17] *See* American Intellectual Property Law Association, Report of the Economic Survey (2019), available at https://www.ipwatchdog.com/wp-content/uploads/2021/08/AIPLA-Report-of-the-Economic-Survey-Relevant-Excerpts.pdf



Matter No. P201200
March 16, 2023

Likewise, as discussed earlier, physicians play an important role in the medical technology innovation ecosystem, often consulting during the development of medical technology.[18]  During that process, it is important that inventors are able to communicate freely with the consulting physicians while protecting their confidential business information, and non-compete agreements are an essential tool for doing so.  Consulting physicians are typically compensated for their time and experience and, in exchange, agree not to consult with competing innovators while having no restrictions on their practice of medicine.

Additionally, as part of the medical technology industry's mission to bring lifesaving/life-enhancing technologies to patients, mergers and acquisitions ("M&A") (as well as venture capital and private equity) play a key role.  Medical technology startups are critical to innovation but often require the capability and financial backing of other organizations to advance their transformative technologies, which requires performing clinical studies, obtaining regulatory approvals, and commercializing their inventions to ultimately reach a broad patient population in need.  Non-competes are necessary tools in M&A/investment agreements and are commonly bargained for – the skills and knowledge of a startup's founder(s) and workforce are essential to the value of its technology such that the founder(s) and workforce can demand a high price for their innovation *and* subsequent wages.  The FTC's proposed rule disrupts this freedom to contract by introducing an unnecessary threat to the buyer/investor of losing the value of their investment.  For example, if key leaders have the immediate freedom to establish competing companies or engineers swiftly depart to work on competing technologies, the substantial value of the target company is lost, disincentivizing innovation because innovators will not be able to trust that they can obtain the investments necessary through M&A to ultimately bring their technologies to market.  A complete ban on non-compete agreements would have a widespread impact on M&A and the ability to obtain capital in the United States, likely resulting in the majority of medical technology companies (smaller companies) never bringing their products to market, reducing competition and depriving patients of lifesaving/life-enhancing technologies.

Ultimately, NDAs and trade secret laws are ineffective tools for preventing the misappropriation of confidential business information and protecting the medical technology industry's significant investments in innovation and talent.[19]  Additionally, the FTC's proposed rule brings even more uncertainty to innovators' ability to protect their confidential business information and investments by seeking to ban NDAs and other "covenants" that the FTC deems "function as"

---

[18] *See supra* at 3.

[19] The FTC mentions fixed-term contracts as another available alternative to protect valuable investments (NPRM at 99-100), but these contracts do nothing to protect confidential business information once the contract ends and the employee/contractor is no longer working for the employer innovator.  Fixed-term contracts are also arguably more restrictive to employees because they bind employees to a particular job for a specified period of time, prohibiting employees from freely (at will) seeking employment anywhere (not just competitors) during the entire duration of the contract.



Matter No. P201200
March 16, 2023

non-compete agreements, calling these agreements *de facto* non-competes,[20] as well as threatening to preempt longstanding existing trade secret laws.  Likewise, retroactively invalidating legal non-compete agreements also jeopardizes an extraordinary amount of lifesaving/life-enhancing technologies.  For the medical technology industry, preventing the misappropriation of confidential business information and protecting the industry's investments in innovation and talent are essential for ensuring patient access to the best medical technology possible.  The FTC's overly broad and nebulous ban on non-compete and "*de facto* non-compete" agreements prevents the industry's ability to do so.  In fact, the FTC's suggestion that non-compete agreements harm competition does not apply to the medical technology industry where innovation/investment drive competition and prohibiting non-compete agreements harms innovation/investment.

## III.    The FTC's Proposed Alternatives / Carve-Outs Do Not Protect Innovation and Patient Health

In putting forward various alternative proposals allowing for non-compete agreements to be used in certain circumstances, it appears the FTC is acknowledging that non-compete agreements have value.  The FTC's alternative proposals, however, do not protect innovation and patient health.  Any rule should take a tailored approach and consider what confidential business information is appropriate to protect through a reasonably construed non-compete restriction. For example, in the medical technology industry, salaries alone do not dictate who has confidential business information that, if misappropriated, would derail innovation to the detriment of patient health.  Salaries also often vary based on geography and size of a company.

Similarly, the FTC's carve-out permitting non-compete agreements for the sale of a business shows there is value in non-compete agreements, but limiting this exception to individuals owning a 25% share of the company being purchased is not founded in the realities of the market – i.e. no individual, even a founder, typically owns 25% of a target company by the time it is being acquired.  Private equity firms, for example, often own large percentages of start-up companies in exchange for providing the capital needed to bring their transformative technologies to market.  The FTC's rejection of non-compete protections in these contexts will limit innovation and stifle much needed investments in research and development of medical technologies in the United States.

---

[20] NPRM at 108-110.



advamed.org  ::  @AdvaMedUpdate  ::  AdvaMed

**9**

**JA0729**

Matter No. P201200
March 16, 2023

## IV.    Conclusion

The FTC's proposed rule to ban reasonable, appropriately used non-compete agreements takes away the only reliable mechanism for medical technology innovators to protect their confidential business information and investments in innovation and talent such that they can continue bringing lifesaving/life-enhancing technologies to patients as quickly and effectively as possible. Any rule must take a more nuanced approach to regulating non-compete agreements and recognize that certain confidential business information needs to be protected – anything less jeopardizes patient health, innovation, and competition.

*                    *                    *

Thank you in advance for your consideration of AdvaMed's comments to the FTC's proposed rule. Please do not hesitate to contact AdvaMed at (202) 783-8700 or Ida Nassar, Vice President, Assistant General Counsel, Compliance & Ethics (inassar@advamed.org) with any questions.

Sincerely,

/s/
Christopher L. White
Chief Operating Officer and General Counsel
Advanced Medical Technology Association (AdvaMed)



April 19, 2023

The Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

Dear Commissioners:

We are law professors, economists, and business school professors who have written extensively in the field of innovation and law. We would like to submit an important article regarding noncompetes by two of us, Jonathan Barnett & Ted Sichelman, *The Case for Noncompetes*, 86 THE UNIVERSITY OF CHICAGO LAW REVIEW 953 (2020), for review by the FTC.

This article, which presents the most comprehensive review to our knowledge of empirical evidence concerning the economic effects of noncompetes, addresses – and contradicts – many of the claims made by the FTC in support of its recent proposed rule to effectively ban noncompetes nationwide. In this regard, it offers a viewpoint quite different from the vast majority of academics invited to speak at the FTC's January 9, 2020 workshop on the issue, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues*, as well as the academic research cited by the FTC in favor of its proposed rulemaking.

Specifically, the article contributes a new perspective to the current policy debate over non-competition covenants and other contractual restrictions on employee mobility in technology sectors. As the FTC is aware, scholars have widely argued that innovation thrives in jurisdictions that prohibit noncompetes. This argument focuses on the rise of Silicon Valley as a technology hub, where noncompetes were allegedly not enforced, and the ostensible decline of Boston's Route 128 area, where noncompetes were allegedly enforced. In related work, other scholars have conducted empirical studies purporting to show that noncompetes produce significant economic costs and dampen innovation and startup creation. Based on these scholarly views, several states have recently enacted, and more are seriously debating, statutes that limit or prohibit noncompetes. Similarly, several U.S. Senators proposed legislation that would essentially ban noncompetes nationwide. And now, the FTC seeks a nationwide ban via its proposed rulemaking.

This article makes three original and notable contributions that the FTC should seriously consider. First, it shows that neither theory nor empirics supports the economic arguments commonly made in favor of prohibiting noncompetes. As a matter of theory, conventional wisdom emphasizes that noncompetes impede the circulation of intellectual capital and depress wages, but typically overlooking that noncompetes encourage firms to cultivate employees' human capital and invest in innovative activity. As a matter of empirics, the article contests the widely accepted view that Silicon Valley surpassed Boston because of supposed differences in noncompete enforcement, which tend to be exaggerated. A careful examination of the evidence shows that the Boston area has remained a significant innovation center and that technological and other economic factors explain Silicon Valley's exceptional trajectory. Second, the article identifies serious factual and methodological deficiencies in several widely-cited empirical studies, which cast substantial doubt on those studies' findings and policy implications. Notably, these studies misread and misunderstand state law and enforcement patterns related to noncompetes. Third, based an

JA0731

exhaustive review of the evidence, the article proposes an original error-cost framework to analyze noncompetes, which provides an economic rationale for the common law's centuries-old reasonableness standard in determining whether to enforce a non-compete.

Unfortunately, even though the FTC is well-aware of Prof. Barnett's and Sichelman's work, they have not been invited to the FTC's workshops on noncompetes, nor were they consulted for the recent round of rulemaking, nor was their research mentioned in the 216-page Notice of Proposed Rulemaking that sets forth the FTC's proposed Non-Compete Clause Rule. In the interests of making public policy on the basis of all available evidence and scholarship, we believe that the FTC's current consideration of noncompetes would be enriched by their research, and we hope the FTC will read their work carefully and contact them to discuss it.

In short, it is critical in our view that the FTC independently assess the validity of the studies it is relying upon so heavily for its proposed rulemaking before taking any actions based on those studies' claims.

Sincerely,

Kristina M. L. Acri
*John L. Knight Chair of Economics*
The Colorado College

Jonathan Barnett
*Professor of Law*
University of Southern California

The Honorable Ronald A. Cass
*Dean Emeritus*
Boston University School of Law
*Former Vice-Chairman and Commissioner*
United States International Trade Commission

Kenneth G. Elzinga
*Robert C. Taylor Professor of Economics*
University of Virginia

Richard A. Epstein
*Laurence A. Tisch Professor of Law*
New York University School of Law
*Peter and Kirsten Bedford Senior Fellow*
Hoover Institution, Stanford University
*James Parker Hall Distinguished Service Professor of Law Emeritus*
University of Chicago Law School

Harold Furchtgott-Roth
Furchtgott-Roth Economic Enterprises
*Senior Fellow*
Hudson Institute

**JA0732**

Bowman Heiden
*Visiting Professor*
University of California, Berkeley

Keith N. Hylton
*William Fairfield Warren Distinguished Professor*
Boston University School of Law

Benjamin Klein
*Professor Emeritus of Economics*
University of California – Los Angeles

Thomas A. Lambert
*Wall Family Chair in Corporate Law and Governance*
University of Missouri School of Law

Adam Mossoff
*Professor of Law*
Antonin Scalia Law School
George Mason University

Kristen Osenga
*Austin E. Owen Research Scholar & Professor of Law*
University of Richmond School of Law

Ted M. Sichelman
*Judith Keep Professor of Law*
University of San Diego

John M. Yun
*Associate Professor of Law*
Antonin Scalia Law School
George Mason University

**JA0733**

# The Case for Noncompetes

*Jonathan M. Barnett† & Ted Sichelman††*

*Scholars and other commentators widely assert that enforcement of contractual and other limitations on labor mobility deters innovation. Based on this view, federal and state legislators have taken, and continue to consider, actions to limit the enforcement of covenants not to compete in employment agreements. These actions would discard the centuries-old reasonableness standard that governs the enforcement of these provisions, often termed "noncompetes," in all but four states (notably, California). We argue that this zero-enforcement position lacks a sound basis in theory or empirics. As a matter of theory, it overlooks the complex effects of contractual limitations on labor mobility in innovation markets. While it is frequently asserted that noncompetes may impede knowledge spillovers that foster innovation, it is frequently overlooked that noncompetes may encourage firms to invest in cultivating intellectual and human capital. As a matter of empirics, we show that two commonly referenced bodies of evidence fail to support zero enforcement. First, we revisit the conventional account of the rise of Silicon Valley and the purported fall*

† Torrey H. Webb Professor, University of Southern California, Gould School of Law.
†† Professor of Law, University of San Diego School of Law.
We thank Shyam Balganesh, Norman Bishara, Michael Burstein, Richard Castanon, Bryan Choi, Victor Fleischer, Lee Fleming, Ronald Gilson, John Goldberg, Robert Gomulkiewicz, Charles Tait Graves, Michael Guttentag, Ryan Holte, Justin Hughes, David Levine, Orly Lobel, Greg Mandel, Karl Mannheim, Matt Marx, Adam Mossoff, Natasha Nayak, Ruth Okediji, David Orozco, Eric Posner, Greg Reilly, Michael Risch, Ben Sachs, David Schwartz, Joseph Singer, Henry Smith, Kathy Spier, Matt Stephenson, James Stern, Olav Sorenson, Evan Starr, David Taylor, Saurabh Vishnubhakat, Polk Wagner, and Stephen Yelderman, as well as attendees at the 2015 Works in Progress in Intellectual Property Conference, the 2017 Conference of the American Law and Economics Association, and workshops at Harvard Law School, University of Pennsylvania Law School, Loyola Law School, Los Angeles, the Center for Law and the Social Sciences at the University of Southern California School of Law, and the University of San Diego School of Law for their helpful discussions and comments on prior versions of this paper. We also thank Carolyn Ginno, Matthew Arnold, Anna Ayar, Vanand Baroni, Haley Dumas, Ryan Foley, David Javidzad, Rachel Stariha, and Millicent Whitemore for their valuable research assistance.

JA0734

954    *The University of Chicago Law Review*    [87:953

*of the Boston area as innovation centers, showing that this divergence cannot suitably be explained by differences in state law regarding noncompetes. Second, we show that widely cited empirical studies fail to support a causal relationship between noncompetes, reduced labor mobility, and reduced innovation. Given these theoretical and empirical complexities, we propose an error-cost approach that provides an economic rationale for the common law's reasonableness approach toward contractual constraints on the circulation of human capital.*

INTRODUCTION ............................................................................................. 955

I.   OLD AND NEW VIEWS: FROM AGNOSTICISM TO ABOLITIONISM ...................... 967
     A.   Foundations: Becker and Marshall ............................................. 967
          1.   Becker: Human capital as an economic asset ........................... 968
          2.   Marshall: Industrial districts and agglomeration economies. ... 968
     B.   The Old View: Restricting Labor Mobility Is Good and Bad for
          Innovation ................................................................................ 969
          1.   The credible commitment problem. .......................................... 969
          2.   The noncompete solution. ......................................................... 971
          3.   A weak objection to noncompetes. ........................................... 972
          4.   A better objection to noncompetes. .......................................... 973
          5.   Evaluation. ................................................................................ 974
     C.   The New View: Restricting Labor Mobility is Bad for
          Innovation ................................................................................ 975
          1.   Background: Saxenian and Gilson. .......................................... 975
          2.   An initial critique ..................................................................... 976
          3.   The empirical challenge. ........................................................... 977

II.  THE EVIDENCE AGAINST NONCOMPETES: A CLOSE LOOK ............................ 978
     A.   Reasons to Doubt the Standard Account of the Rise of
          Silicon Valley ........................................................................... 978
          1.   Did California courts really never enforce noncompetes? .......... 980
          2.   Substitutes for noncompetes. ................................................... 986
          3.   Was Massachusetts's noncompete and trade secret law
               significantly different from California's? .................................. 992
          4.   Did weak enforcement of noncompetes really cause the
               Valley to rise? .......................................................................... 997
          5.   Did Massachusetts really decline? ........................................... 1006
     B.   Empirical Studies: Noncompetes, Mobility, and Innovation ......... 1009
          1.   Nonexperimental studies. ........................................................ 1010
          2.   Experimental studies. ............................................................... 1027
          3.   Evaluation. ................................................................................ 1029

III. MAKING NONCOMPETE POLICY UNDER UNCERTAINTY ............................... 1030
     A.   Policy Continuum ....................................................................... 1031
     B.   The "Free Contracting" Baseline ................................................ 1032
     C.   Is There Really a Collective Action Problem? .............................. 1033
     D.   Why Employers Decline to Use Noncompetes .............................. 1036
          1.   Variation in use of noncompetes across employee types. ......... 1039

    2. Variation in the use of noncompetes across industry types..... 1040

  E. Error Costs and Noncompete Policy................................................ 1042

CONCLUSION ............................................................................................... 1045

APPENDIX ...................................................................................................... 1047

## INTRODUCTION

On February 23, 2017, two titans of Silicon Valley went to war in federal court: Google filed a lawsuit against Uber, accusing it of using intellectual property allegedly stolen by one of the lead engineers on Waymo, Google's self-driving automotive subsidiary.[1] Specifically, Google alleged that Anthony Levandowski had misappropriated Google's intellectual property before departing (along with other Google engineers) to found Otto, a self-driving car startup subsequently acquired by Uber for $680 million.[2] The legal basis for Google's lawsuit against Uber and Levandowski consisted of a medley of federal trade secret, patent infringement, and state trade secret and unfair competition claims.[3] Given the high economic stakes, commentators speculated that if Google prevailed, the ultimate damages could exceed a billion dollars.[4] While the litigation was pending, the trial judge ordered Levandowski to stop working on projects involving the technology that had been allegedly misappropriated.[5] Although Google and Uber settled the dispute shortly after trial proceedings commenced for a mere $245 million, an arbitration panel subsequently found against Levandowski (who was fired by Uber[6]) and, on an interim basis, awarded Google $127 million in damages, for which Uber may be financially responsible under indemnification obligations to its former employee.[7]

---

[1] Complaint, *Waymo LLC v Uber Technologies, Inc*, No 3:17-cv-00939, *2–5 (ND Cal filed Feb 23, 2017) (available on Westlaw at 2017 WL 726994) (Waymo Complaint) (stating various causes of action against Uber relating to alleged actions by a former Waymo employee in connection with his departure from Waymo to Uber's self-driving car project).

[2] See id at *3–4 (describing evidence showing that Levandowski, former Waymo engineer, misappropriated information from Waymo upon departure from company).

[3] Id at *2, 16, 19, 21, 27 (stating trade secret, patent infringement, and unfair competition causes of action).

[4] See Aarian Marshall, *Google's Robocar Lawsuit Could Kill Uber's Future and Send Execs to Prison* (Wired, Feb 28, 2017), archived at https://perma.cc/SH8J-ZQ2H.

[5] Joe Mullin, *Judge's Order Bars Uber Engineer from Lidar Work, Demands Return of Stolen Files* (Ars Technica, May 15, 2017), archived at https://perma.cc/B7KC-ZD46; Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, *Waymo LLC v Uber Technologies, Inc*, No 3:17-cv-00939, *23 (ND Cal filed May 11, 2017).

[6] Aarian Marshall, *Uber Fired Its Robocar Guru, but Its Legal Fight with Google Goes On* (Wired, May 30, 2017), archived at https://perma.cc/YZ3K-78TV.

[7] Uber Technologies, Inc, *Form S-1 Registration Statement* F-72, F-82 (SEC filed Apr 11, 2019), archived at https://perma.cc/Z2JE-NZBQ.

The Google-Uber litigation, and the rich suite of legal and economic instruments deployed to restrain the departure of a prized employee, is a notable counterexample to the now-standard account of unrestrained employee movement in Silicon Valley, the world's preeminent innovation cluster. That account emphasizes the ease with which technical and managerial talent, and the intellectual capital embodied in that talent, circulates among competitors, resulting in knowledge spillovers that redound to the collective benefit of the innovation ecosystem. This free-flowing movement of human capital is widely attributed to cultural norms, organizational practices, and, especially among legal scholars, California's refusal to enforce a contractual clause known as a "covenant not to compete" (or "noncompete").[8]

A noncompete typically limits a former employee's ability to work for competitors in a certain industry and a certain geographic area for a certain period of time. In contemporary scholarly and policy discussions of innovation policy, the noncompete has recently become a surprising focal point. Specifically, the literature has widely adopted the view initially espoused by Professor Ronald Gilson—albeit in a much more qualified form—that California's general refusal to enforce noncompetes in significant part explains the exceptional growth of Silicon Valley since the early 1980s while Massachusetts's willingness to enforce noncompetes spurred the purported decline of the Route 128 area around Boston.[9] Following this view, California has enjoyed a healthy

---

[8]    On cultural norms and organizational practices, see AnnaLee Saxenian, *Regional Advantage: Culture and Competition in Silicon Valley and Route 128* 1–9, 32–34, 44–45, 50–56 (Harvard 1996) (arguing that Silicon Valley's comparative advantage compared to Route 128 derived from its "network-based" system that promotes collective learning through informal collaboration within and between firms, as compared to Route 128's hierarchical system based on centralized and vertically integrated corporate entities). On noncompetes, see Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 NYU L Rev 575, 602–09 (1999) (arguing that differences in the enforceability of noncompetes contributed significantly to the ascendance of Silicon Valley over Route 128 by promoting the circulation of human and intellectual capital among competing firms).

[9]    For the original statement of this view, see Gilson, 74 NYU L Rev at 602–09 (cited in note 8). In the legal literature, representative contributions that have adopted and expanded upon Gilson's insight include: Orly Lobel, *Talent Wants to Be Free: Why We Should Learn to Love Leaks, Raids and Free Riding* 67–70 (Yale 2013) (arguing that California's refusal to enforce noncompetes at least partly accounts for its ascendance over Route 128 and attributing this hypothesis to Ronald Gilson); Orly Lobel, *The New Cognitive Property: Human Capital Law and the Reach of Intellectual Property*, 93 Tex L Rev 789, 825–26 (2015) (likening noncompetes to "a thick cluster of property rights that rigidifies the market and reduces the ability to move forward"); Viva R. Moffat, *Making Non-Competes Unenforceable*, 54 Ariz L Rev 939, 979–80 (2013) (arguing for a uniform rule of nonenforceability on the ground that noncompetes skew the balance in intellectual property policy

circulation of human capital, while Massachusetts has been deprived of the "agglomeration economies" that promote robust innovation clusters.[10] The result in California is a virtuous circle of accelerated innovation that led to the rise of Silicon Valley; the result in Massachusetts is a sad story of a Silicon Valley that could have been but wasn't.

The recent surge of interest in noncompetes is a welcome extension of innovation policy analysis. Noncompetes, and the broader universe of contractual and economic restraints on labor mobility, are a critical but overlooked tool in promoting robust innovation ecosystems. Scholarly discussions of innovation policy typically focus on the extent to which intellectual property rights such as patents or copyrights regulate the flow of informational assets. But this misses a key component of any innovation environment—namely, the flow of intellectual capital embedded in the human beings that innovate and commercialize new products and services. In the business world, firms are keenly aware of the value of human capital and use contractual and economic instruments to avoid losing their most valuable personnel to competitors. Based on a survey of 11,500 participants, a recent study found that an estimated 18 percent of all US workers (roughly, 30 million people), and approximately one-third of workers in professional, scientific, and technical occupations, are subject to noncompetes.[11] The extent to which the law should enforce these contractual instruments is a matter of fundamental importance.

---

between protecting R&D incentives and the public domain); Viva R. Moffat, *The Wrong Tool for the Job: The IP Problem with Non-Competition Agreements*, 52 Wm & Mary L Rev 873, 911–20 (2010) (arguing that noncompetes are a poor tool for protecting IP rights). In the economics literature, see Sampsa Samila and Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt Sci 425, 436 (2011) (arguing that empirical evidence supports relaxing enforcement of noncompetes to accelerate labor mobility and stimulate entrepreneurship). In an important variant on this line of argument, Professor Alan Hyde agrees that labor mobility lies behind the success of Silicon Valley but attributes this difference principally to California firms' reluctance to bring trade secret claims against former employees and California courts' resistance to grant such claims, rather than differences in the treatment of noncompetes. See Alan Hyde, *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market* 32–40 (M.E. Sharpe 2003).

10    Gilson, 74 NYU L Rev at 576, 606–07 (cited in note 8).

11    See J.J. Prescott, Norman D. Bishara, and Evan Starr, *Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project*, 2016 Mich St L Rev 369, 461; Evan Starr, J.J. Prescott, and Norman Bishara, *Noncompetes in the U.S. Labor Force* *16–19 (University of Michigan Law and Economics Research Paper, Aug 2019), archived at https://perma.cc/ZXU6-NAGU.

In recent years, a growing number of scholars and policymakers have adopted a simple answer to this question: *never*.[12] Following this view—popularized by the slogan, "talent wants to be free"—the free circulation of human capital always, or usually, promotes innovation. As such, any constraints "imposed" by employers reflect either overreaching or economic irrationality.[13] As a matter of policy, this view recommends that all states adopt California's purported zero-tolerance regime—a change that would undo the common-law "reasonableness" standard currently used by forty-six states to adjudge the enforceability of noncompetes.[14] (The current exceptions are California, North Dakota, and Oklahoma, which bar noncompete enforcement against individuals in most circumstances;[15] recently, Hawaii barred noncompetes for "technology business[es]."[16]) To be clear, even under the long-standing common law doctrine (dating from an English precedent in 1711[17]), noncompete clauses are enforceable only if they set forth "reasonable" temporal, geographic, and scope-of-industry limitations.[18] For the "talent wants to be free" school of

---

[12]   See note 13 (noting scholars and policymakers adopting this view); Part I.C (same).

[13]   For representative sources that express this view, see Lobel, *Talent Wants to Be Free* at 27–41, 201 (cited in note 9) (arguing that legal constraints, such as noncompetes, that impede labor mobility discourage innovation by hindering employee creativity and blocking interfirm flows of intellectual capital); Yochai Benkler, *Law, Innovation and Collaboration in Networked Economy and Society*, 13 Ann Rev L & Soc Sci 231, 235 (2017) (arguing that noncompetes are incompatible with a "network view," rather than an "atomistic view," of innovation, and citing empirical evidence that innovation thrives in network relationships with high rates of knowledge flow); Lobel, *Talent Wants to Be Free* at 64 (cited in note 9) (arguing that firms that advocate for noncompete enforcement "would likely benefit from the very movement they are attempting to limit"); Moffat, 52 Wm & Mary L Rev at 893–97 (cited in note 9) ("[N]oncompetes are at odds with both the fair bargaining process and efficiency underpinnings of the freedom of contract rationale."); id at 898–99 (arguing that the "IP justification" for noncompetes is insufficient and advocating a policy of zero enforcement); Alan Hyde, *Should Noncompetes Be Enforced?*, 33 Regulation 6, 9 (Winter 2010–11) (stating that losing an employee means gaining access to a new information network, rather than losing an information asset). Ronald Gilson expresses a similar view, although he clarifies that the positive welfare effects he attributes to California's refusal to enforce noncompetes may be limited to that particular state at a particular point in its economic trajectory. See Gilson, 74 NYU L Rev at 619–20, 627–29 (cited in note 8).

[14]   For a review of state laws on noncompetes, see generally J. Gregory Grisham, *Beyond the Red-Blue Divide: An Overview of Current Trends in State Non-Compete Law*, 18 Federalist Society Rev 42 (June 19, 2017), archived at https://perma.cc/33Q7-N9JF.

[15]   Cal Bus & Prof Code § 16600; ND Cent Code § 9-08-06; 15 Okla Stat § 217.

[16]   Hawaii Rev Stat Ann § 480-4(d).

[17]   *Mitchel v Reynolds*, 24 Eng Rep 347, 347 (KB 1711) (stating that a "bond or promise to restrain oneself from trading in a particular place, if made upon a reasonable consideration, is good").

[18]   See id at 348 (drawing distinction between restraints "not to exercise a trade throughout the kingdom," which are deemed to be void, and restraints that are "limited to

thought, it seems that no limitation on the movement of talent can ever be deemed reasonable.

These academic views now play a prominent part in ongoing policy debates and press coverage concerning proposed laws that would limit, or bar, the enforcement of noncompetes.[19] On March 7, 2019, a bipartisan group of six Democratic and Republican US senators sent a joint letter to the Government Accountability Office requesting that it investigate the impact of noncompetes "on workers and on the economy as a whole."[20] Citing academic research that "California's ban on non-compete agreements has been a prime factor in the state's growing economy," three Democratic US senators introduced legislation in April 2018 to impose a ban on noncompetes nationwide, which was re-introduced by

---

a particular place," which may be deemed reasonable). For more detailed discussion of the reasonableness standard, see Part II.A.3.b.

[19]    Reflecting unusual interest in the intricacies of employment contracts, *The New York Times*, *The Wall Street Journal*, *Forbes*, *Fortune*, *The Boston Globe*, and other media outlets have run stories and op-eds on the use of noncompete clauses and legislative proposals to ban these clauses. See, for example, Orly Lobel, *Companies Compete but Won't Let Their Workers Do the Same* (NY Times, May 4, 2017), archived at https://perma.cc/LG33-EUTV (discussing states' differences in enforcing noncompetes, federal proposals to limit noncompetes, and the harmful effects of noncompetes on employees); Steven Greenhouse, *Noncompete Clauses Increasingly Pop Up in Array of Jobs* (NY Times, June 8, 2014), archived at https://perma.cc/P575-QQCX (discussing proposed legislation in Massachusetts limiting enforcement of noncompetes); Neil Irwin, *When the Guy Making Your Sandwich Has a Noncompete Clause* (NY Times, Oct 14, 2014), archived at https://perma.cc/FQ4X-FNKB (discussing the economic, legal, and moral issues raised by noncompetes); Ruth Simon and Angus Loten, *Litigation over Noncompete Clauses Is Rising* (Wall St J, Aug 14, 2013), online at https://www.wsj.com/articles/litigation-over-non compete-clauses-is-rising-does-entrepreneurship-suffer-1376520622 (visited Feb 17, 2020) (Perma archive unavailable) (discussing increasing litigation over, and prevalence of, noncompete agreements); Joann S. Lublin, *Companies Loosen the Handcuffs on Non-Competes* (Wall St J, Aug 12, 2013), online at https://www.wsj.com/articles/companies-loosen-the-handcuffs-on-noncompetes-1376320350 (visited Feb 11, 2020) (Perma archive unavailable) (discussing cases in which employers declined to strictly enforce noncompetes when executives departed for other large corporations); Eric Goldman, *Why Congress Should Restrict Employee Non-Compete Clauses* (Forbes, June 30, 2015), archived at https://perma.cc/52G4-KTLD (supporting federal legislation to limit enforcement of noncompetes); Claire Zillman, *Are Noncompete Agreements Hurting Tech Innovation?* (Fortune, July 1, 2015), archived at https://perma.cc/2YRK-95G4 (discussing differing views on enforceability of noncompetes, their impact on innovation, and proposed state legislation to limit enforceability); John McEleney, *Noncompetes Hurt Workers and Their Employers* (Boston Globe, June 28, 2015), online at https://www.bostonglobe.com/opinion/2015/06/27/onshape-ceo-john-mceleney-noncompetes-hurt-workers-and-their-employers/6NbXbI5jhZpl5wyvc28FSI/story.html (visited Feb 3, 2020) (Perma archive unavailable) (CEO of Massachusetts-based company arguing that noncompetes should "go away altogether").

[20]    Senator Christopher Murphy, et al, Letter to the Honorable Gene Dodaro, Comptroller General, US Government Accountability Office *1 (Mar 7, 2019), archived at https://perma.cc/W38U-2YRR.

two Democratic and Republican US senators in October 2019.[21] Like these US senators, advocates for strict limitations on, or outright bans of, noncompetes explicitly refer to selected empirical studies in arguing that these reforms would facilitate labor mobility and promote innovation.[22] A leading academic opponent of noncompetes has written: "[T]he research suggests that noncompetes should be banned for all employees, regardless of skill, industry or wage; they simply do more harm than good."[23] In 2018, the influential *Economist* magazine endorsed an only slightly more qualified position, arguing that noncompetes should be enforced only in narrow circumstances and similarly referring to academic research to support this position.[24]

A sizeable number of state legislatures have derived similar conclusions. Since 2014, the legislatures of thirty-seven states have formally considered laws that would affect the enforceability of noncompetes in employment agreements.[25] Of those proposed

---

[21]    On the April 2018 proposed legislation, see Office of Senator Ron Wyden, Press Release, *Wyden, Murphy, Warren Introduce Bill to Ban Unnecessary and Harmful Non-Compete Agreements* (Apr 26, 2018), archived at https://perma.cc/6N2T-V6N2 ("The new legislation would prohibit the use of non-compete agreements. . . . Many believe that California's ban on non-compete agreements has been a prime factor in the state's growing economy."); Workforce Mobility Act of 2018, S 2782, 115th Cong, 2d Sess (Apr 26, 2018). On the October 2019 proposed legislation, see Office of Senator Todd Young, Press Release, *Young and Murphy Introduce Bill to Limit Non-Compete Agreements, Protect Workers* (Oct 17, 2019), archived at https://perma.cc/PFU9-6GWW ("Research indicates that workers trapped by non-competes are less mobile, which results in firms having difficulty hiring workers with the right set of skills."); Workforce Mobility Act of 2019, S 2614, 116th Cong, 1st Sess (Oct 27, 2019).

[22]    See, for example, Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19). Lori Ehrlich, a Massachusetts representative who introduced a bill to preclude most noncompete enforcement, believes noncompetes have an "overall impact of stifling innovation" and cites academic studies on her website. Lori A. Ehrlich, *Fact Sheet: H. 2366* (2018), archived at https://perma.cc/6XJR-9ZY8 (discussing a "recent peer-reviewed academic paper" which shows that nearly one in five employees are bound by a noncompete). See also Zillman, *Are Noncompete Agreements Hurting Tech Innovation?* (cited in note 19).

[23]    Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19).

[24]    *Restrain the Restraints: The Case Against Non-compete Clauses* (The Economist, May 19, 2018), online at https://www.economist.com/leaders/2018/05/19/the-case-against-non-compete-clauses (visited Feb 11, 2020) (Perma archive unavailable) (supporting a requirement for employers to demonstrate genuine harm in noncompete litigation, as well as arguing that noncompetes should be enforced only if they apply for a short time and they are negotiated before an employee accepts a job offer).

[25]    These states are Alabama, Arkansas, California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New York, Ohio, Pennsylvania, New Jersey, North Dakota, Oregon, Rhode Island, South Dakota, Texas, Utah, Vermont, Washington, and West Virginia. This includes all legislatures in which a member has formally proposed a law affecting noncompetes, whether generally or in specific industries, since 2014, based on a search of legislative proposals in the Westlaw and LexisNexis databases. See also Appendix.

bills, all but six proposed to limit enforceability (up to and including outright bans). In twenty-one states, these debates have translated into action. This includes Massachusetts, which in 2018 enacted a statute prohibiting noncompetes for certain categories of employees[26] and, in most other cases, imposes notice obligations on employers.[27] The Appendix shows all statutory changes to state noncompete laws during 2014–2019. Nineteen changes reduced enforceability and six enhanced it (although one was repealed two years later and the other was offset by other provisions that limited enforceability). In enacting its ban on noncompetes in the technology industry, Hawaii specifically referenced academic studies that purportedly supported this policy action as being conducive to innovation.[28] Additionally, in California, some courts have recently adopted expansive understandings of the state's statutory limitation on enforcing noncompetes against individuals, applying it to other contractual obligations that have long been thought to lie outside the purview of the statute.[29] In

---

[26]   The statute primarily captures workers who are "nonexempt under the Fair Labor Standards Act," Mass Gen Laws Ann, ch 149, § 24L, which generally targets salaried workers employed on a fixed hourly basis and most likely would not target managerial and other professional employees. See US Department of Labor Wage and Hour Division, *Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA)* (July 2008), archived at https://perma.cc/7VDP-MURT. However, there may be ambiguities in certain cases. For further discussion, see Stephen T. Melnick, Chris Kaczmarek, and Melissa L. McDonagh, *Frequently Asked Questions About the New Massachusetts Noncompetition Agreement Act* (Littler, Sept 5, 2018), archived at https://perma.cc/ER4R-PMZZ.

[27]   Mass Gen Laws Ann, ch 149, § 24L. The statute also requires that a noncompete "must be no broader than necessary to protect . . . legitimate business interests of the employer" and must have a reasonable geographic, temporal, and industry scope, see id; however, this language simply restates Massachusetts courts' holdings on this point. For further discussion, see notes 150–51 and accompanying text. Note further that the effect of the Massachusetts statute is qualified in two respects: (i) the law does not apply to a noncompete provision in an employer-employee separation agreement (if there is a seven-day period during which the employee can rescind acceptance), and (ii) Massachusetts simultaneously codified the "inevitable disclosure" doctrine, which entitles employers to seek injunctions against departing employees in the case of "threatened misappropriation," Massachusetts Trade Secrets Act, Mass HR 4868, § 19, 190th Sess (July 31, 2018). For further discussion, see note 130 and accompanying text.

[28]   The legislature stated: "[A]cademic studies have concluded that embracing employee mobility is a superior strategy for nurturing an innovation-based economy." Robert B. Milligan, *Hawaii Bans Non-Compete and Non-Solicit Agreements with Technology Workers* (Seyfarth Shaw, July 6, 2015), archived at https://perma.cc/TTQ3-Y9G9.

[29]   These decisions purport to apply the California Supreme Court's 2008 decision in *Edwards v Arthur Andersen LLP*, 189 P3d 285 (Cal 2008). See, for example, *Barker v Insight Global LLC*, 2019 WL 176260, *3 (ND Cal) (allowing claim that a nonsolicitation clause was illegal under California's noncompete ban to go forward); *AMN Healthcare, Inc v Aya Healthcare Services, Inc*, 28 Cal App 5th 923, 935–37 (2018) (holding that a firm could not enforce a nonsolicitation clause against a former recruiter employed by the firm, on the grounds that doing so would violate California's ban on noncompetes); *Golden v*

2018, a California lower court even applied the statutory limitation to prevent businesses from entering into exclusivity agreements between themselves, which had been traditionally the purview of California's antitrust provisions, not its statutory prohibition against noncompetes.[30] While the appellate court reversed this ruling, it is nonetheless indicative of an increasingly dogmatic approach against the enforcement of noncompetes or other contractual provisions deemed to have a comparable effect.[31]

The vigorous political debate and ongoing legislative activity relating to noncompetes encompasses a variety of policy concerns, including efficiency-related economic concerns as well as noneconomic concerns involving personal autonomy and distributive justice.[32] In markets for highly skilled technical and managerial labor (as distinguished from lower-income and lower-skilled occupations, which has been the focus of some of the proposed legislative bans[33]), the debate on both sides has principally relied on economic arguments. The toolkit of law-and-economics analysis is well suited to provide a balanced analysis of efficiency-related arguments for and against proposed policy shifts with respect to

---

*California Emergency Physicians Medical Group*, 896 F3d 1018, 1024–26 (9th Cir 2018) (refusing to uphold a litigation settlement agreement in which a physician-plaintiff agreed not to work at any facility that is owned, managed, or contracted by the medical group that had formerly employed the physician, but without imposing any other restrictions on the physician's pursuit of other employment opportunities). Note that the *Barker* and *AMN Healthcare* decisions depart from long-standing California precedent upholding the enforceability of postemployment nonsolicitation covenants subject to a reasonableness standard, see *Loral Corp v Moyes*, 174 Cal App 3d 268, 278–79 (1985).

30  See *Beckman Coulter, Inc v Quidel Corp*, 2018 WL 9943513, *1–2 (Cal Super).

31  See *Quidel Corp v Superior Court of San Diego County*, 39 Cal App 5th 530, 535–36, 544–45 (2019) (reversing lower court's ruling based on *Edwards* invalidating the exclusivity agreement, and holding that *Edwards* does not extend beyond the employment context).

32  For a critique of noncompetes on distributional grounds, with an emphasis on the lack of meaningful negotiation on the part of the employee, see Rachel S. Arnow-Richman, *Bargaining for Loyalty in the Information Age: A Reconsideration of the Role of Substantive Fairness in Enforcing Employee Noncompetes*, 80 Or L Rev 1163, 1214–15 (2001). See also Christopher T. Wonnell, *The Contractual Disempowerment of Employees*, 46 Stan L Rev 87, 106 (1993). Because our Article focuses on the effects of noncompetes on technological innovation, we generally ignore the distributional (and autonomy-related) effects of noncompetes, though our intention is not to diminish their importance in the overall policy-making calculus.

33  See, for example, Office of Senator Marco Rubio, Press Release, *Rubio Introduces Bill to Protect Low-Wage Workers from Non-Compete Agreements* (Jan 15, 2019), archived at https://perma.cc/JM6P-QPS3 (describing a bill proposed by US Senator Marco Rubio to ban noncompetes nationwide for employees who are eligible for protection under federal overtime eligibility laws).

noncompetes that apply to technical and managerial personnel in technology markets.

In this Article, we undertake that task. Specifically, we look closely and broadly at the economic arguments, both theoretical and empirical, that have been advanced in support of the "talent wants to be free" view. While the details are complex and nuanced, our conclusion is simple and modest. Neither economic theory nor empirical evidence provides compelling support to abandon the common law's centuries-old reasonableness standard. Contractual restraints on labor mobility in technology markets raise complex trade-offs between employers' training and R&D incentives (generally favored by noncompetes) and employee mobility (generally disfavored by noncompetes).[34] While the latter is important for innovation, so is the former, and case-specific application of the reasonableness standard arguably offers the best, albeit imperfect, mechanism for balancing those competing considerations.

The now-popular view that innovation always or usually does best when human capital circulates freely relies heavily on a single historical example: the divergence in economic fortunes of Silicon Valley in California and Route 128 in Massachusetts and the different cultural norms and noncompete enforcement policies attributed to each innovation cluster. The results are surprising. Contrary to the standard account, we show that there is little compelling ground to attribute Silicon Valley's ascendance over Route 128 in the late 1980s and early 1990s to differences in the enforceability of noncompetes.[35]

There are multiple reasons. First, during Silicon Valley's ascendance, California's policy against noncompetes was clouded by several important exceptions. Second, California firms could significantly mimic noncompetes through trade secret and patent infringement litigation, long-term contracts, deferred compensation, and other mechanisms. Third, it is not clear that Massachusetts law substantially restrained employee turnover as an *effective* matter. Contemporary accounts of Route 128 in the heyday of the minicomputer industry in the 1970s and 1980s describe the same type of job hopping and spin-off formation associated with Silicon Valley. Fourth, Silicon Valley's rise over Route 128 most likely stemmed far more from technological and

---

[34] A potential negative secondary effect of noncompetes is to depress employee creativity and effort. We address this concern below in Part I.B.3.

[35] See Part II.A.

economic fundamentals associated with the "PC revolution," rather than fine distinctions in noncompete enforcement. Lastly, Route 128's decline was relatively short lived, and it has remained a significant innovation center, especially in the life sciences and certain information technology markets.

Our original and comprehensive reexamination of the Silicon Valley / Route 128 narrative raises doubts concerning the widely accepted causal sequence running from prohibiting noncompetes to increased employee mobility to increased innovation. These doubts are intensified by a close analysis of recent empirical studies that are regularly cited as evidence that noncompetes impede innovation. Contrary to the characterization of these studies in much of the policy commentary by academics and governmental agencies,[36] these studies suffer from significant methodological limitations, deliver statistically weak results, and do not provide compelling support for the view that banning noncompetes promotes innovation.

A fully informed policy position concerning noncompetes must reflect the uncertain state of our empirical understanding of the effects of these agreements in innovation markets. That is, it must reflect the fact that available evidence can neither support nor rebut any systematically adverse relationship between noncompetes and innovation outcomes in general. Only this measured conclusion, rather than the strongly "abolitionist" position that scholars and policymakers have increasingly advanced, is consistent with theoretical analysis that identifies the countervailing efficiency effects of noncompetes and other constraints on employee mobility. The free movement of talent implies efficiency

---

[36]    See, for example, Lobel, *Talent Wants to Be Free* at 67–72 (cited in note 9) (describing empirical studies that purportedly have confirmed Gilson's hypothesis attributing the rise of Silicon Valley in part to California's refusal to enforce noncompetes); The White House, *Non-Compete Agreements: Analysis of the Usage, Potential Issues, and State Responses* *2, 5–7 (May 2016), archived at https://perma.cc/CR5Y-V8JX (discussing empirical studies measuring the prevalence and economic effects of noncompetes on employee mobility and start-up formation); US Department of the Treasury, Office of Economic Policy, *Non-compete Contracts: Economic Effects and Policy Implications* *11–13, 18–23, 26 (Mar 2016), archived at https://perma.cc/V383-QXM7 (reviewing research on use and effects of noncompetes and concluding that economic justifications for noncompetes have weak support); Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19) (same); Lobel, 93 Tex L Rev at 827, 839–42 (cited in note 9) (describing empirical studies suggesting that noncompetes reduce employee mobility, depress employee effort, and reduce innovation); Benkler, 13 Ann Rev L & Soc Sci at 235 (cited in note 13) (describing empirical research purporting to show that enforcing noncompetes depresses employee mobility, reduces knowledge spillovers, and undermines innovation); Hyde, 33 Regulation at 9 (cited in note 13) ("Study after study shows how much more productive firms will be if they can hire, free of lawsuits, someone who worked at a rival.").

gains from knowledge sharing and accelerated "*n*-mover" innovation. However, a blanket prohibition of noncompetes implies efficiency losses from uncompensated transfers of intellectual capital to competitors—which, far from being mere efficiency-neutral transfers, may discourage *first*-mover innovation and employee training, which may depress the development of human intellectual capital in the first instance.

Complex problems deserve complex solutions. Contrary to what is hastily becoming conventional wisdom, which is in turn being converted into concrete policy actions, there is no one-size-fits-all solution to this trade-off as a matter of economic analysis. Based on available evidence, there is no reason to believe that the efficiency gains from freely circulating human capital systematically outweigh the efficiency losses from uncompensated uses of intellectual capital. Rather, the net efficiency effect of noncompetes in any particular market depends on the interaction between multiple factors that vary across industries, firms, and types of employees. Even if California's zero-enforcement policy has been *locally* optimal (or at least, sufficiently workable) from an efficiency perspective, it may be suited to a particular type of innovation economy at a particular time—an important but neglected qualification that Gilson made when he originally attributed Silicon Valley's success to California's refusal to enforce noncompetes.[37] At the same time, we emphasize that neither theory nor empirics support an unqualified freedom-of-contract approach that enforces noncompetes in all circumstances absent evidence of fraud or coercion. Rather, we explicitly recognize the uncertainty involved in assessing the net efficiency effects of noncompetes. Using the error-cost approach developed in antitrust analysis and jurisprudence,[38] we embed that uncertainty in our policy analysis, concluding that the common law's reasonableness standard remains the best available instrument to reflect, albeit imperfectly, the trade-off between efficiency gains and losses inherent to limitations on employee mobility in innovation markets.

---

[37]    See Gilson, 74 NYU L Rev at 627–29 (cited in note 8).

[38]    For the leading sources, see Frank H. Easterbrook, *Workable Antitrust Policy*, 84 Mich L Rev 1696, 1711 (1986) ("We want to hold to a minimum the sum of the costs of harmful activity wrongly condoned and useful activity wrongly condemned (or discouraged)."); Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex L Rev 1, 16 (1984) ("[W]e should prefer the error of tolerating questionable conduct, which imposes losses over a part of the range of output, to the error of condemning beneficial conduct, which imposes losses over the whole range of output.").

In sum, our Article makes three important contributions to the literature. First, it exhaustively reviews the widespread contention that noncompetes thwart innovation.[39] Our detailed analysis shows that neither theory nor empirics supports the economic arguments commonly wielded in favor of prohibiting noncompetes.[40] As a matter of theory, conventional wisdom emphasizes that noncompetes impede the circulation of intellectual capital while overlooking that noncompetes may encourage firms to cultivate employees' human capital.[41] As a matter of empirics, we contest the widely accepted view that Silicon Valley surpassed Boston because of supposed differences in noncompete enforcement, which tend to be exaggerated.[42] A careful examination of the evidence shows that the Boston area has remained a significant innovation center and that technological and economic factors better explain Silicon Valley's exceptional trajectory.[43] Second, we uncover serious factual and other deficiencies in several widely cited empirical studies, which cast substantial doubt on those studies' findings and policy implications.[44] Third, based on our exhaustive review of the available evidence, we propose an original error-cost framework to analyze noncompetes, which provides a robust economic rationale for the common law's reasonableness standard.[45]

The Article proceeds as follows. Part I describes the noncompete debate and, in particular, contrasts newly ascendant views favoring the free circulation of human capital with older views that recognize that reasonable contractual limitations on employee mobility may promote social welfare. Part II reexamines the standard narrative of the rise of Silicon Valley and the decline of Route 128, looking closely at multiple factors that may account for Silicon Valley's exceptional success as an innovation center. Additionally, we review more recent empirical studies on the relationship between noncompetes, employee movement, and innovation. Part III revisits the range of policy options with respect to noncompetes, using an error-cost approach that has not been previously applied to the enforcement of noncompetes. We briefly conclude.

---

[39] See Parts I and II.
[40] See Part II.
[41] See Part III.
[42] See Part II.A.
[43] See Part II.A.
[44] See Part II.B.
[45] See Part III.

## I. Old and New Views: From Agnosticism to Abolitionism

In this Part, we review two key stages in the intellectual history of the current debate over noncompetes and other restraints on employee mobility, and situate that debate within a larger body of economic thought relating to the economics of human capital. First, we review an earlier generation of law-and-economics scholarship, which identified the social costs and gains attributable to noncompetes and generally adopted an agnostic position concerning these restraints as a general matter. These scholars were therefore sympathetic to the common law's reasonableness standard, which upholds or invalidates noncompetes on a case-specific basis. Second, we review a more recent school of thought that takes the strong view that the social costs associated with noncompetes typically or almost always outweigh the social gains, and therefore supports ending noncompete enforcement following California's example.

### A. Foundations: Becker and Marshall

Economically informed analysis of noncompetes and other restraints on labor mobility in innovation markets stands at the intersection of two foundational bodies of economic thought: Gary Becker's breakthrough work on the economics of human capital and Alfred Marshall's classic writings on the agglomeration economies that derive from the interchange of intellectual capital. Contemporary discussions of the legal treatment of noncompetes has relied (sometimes implicitly) almost entirely on the work of Marshall, which is a key reference point in the literature on innovation policy, while devoting little attention to the insights of Becker, widely recognized as *the* foundational work in the modern field of labor economics. [46] We review both contributions briefly below and will then integrate these classic insights from innovation policy and labor policy scholarship throughout our analysis of noncompetes and other constraints on the mobility of human capital.

---

[46]  On the importance of Becker's work, see generally Yoram Weiss, *Gary Becker on Human Capital*, 81 J Demographic Econ 27 (2015).

1.  Becker: Human capital as an economic asset.

Nobel Prize–winning economist Gary Becker effectively founded the economic analysis of human capital with the publication of his landmark work, *Human Capital*, in 1962.[47] Becker showed that economic analysis could be applied to the acquisition and cultivation of human capital, whether through education, training, or other mechanisms. From an economic point of view, human capital acquisition involves the use of scarce resources to maximize net expected value, as with any other costly activity. In implementing this analysis, Becker drew a key distinction between *general* and *firm-specific* human capital assets.[48] General human capital refers to technical, managerial, and other skills and knowledge that have value across a broad pool of firms or industries.[49] Firm-specific human capital refers to the narrower set of technical, managerial, and other skills and knowledge that have value (or have greater value) only at a particular firm.[50] The scholarly literature that has followed Becker's work has identified an intermediate form of human capital that is specific to an industry—namely, skills and knowledge that have value within an industry but not more generally.[51] As discussed below, these different types of human capital give rise to different implications when analyzing the efficiency effects of noncompetes and other limitations on employee mobility.

2.  Marshall: Industrial districts and agglomeration economies.

In the innovation context, economic analysis of noncompetes and other limitations on employee mobility often makes reference to the concept of "industrial districts," originated by Alfred Marshall in his landmark treatise, *Principles of Economics*, first

---

[47]  See generally Gary S. Becker, *Human Capital: A Theoretical and Empirical Analysis, with Special Reference to Education* (Chicago 3d ed 1993). Subsequent notes refer to this edition, unless otherwise indicated. This is an updated edition of Gary S. Becker, *Human Capital: A Theoretical and Empirical Analysis, with Special Reference to Education* (National Bureau of Economic Research 1964). Some of the ideas were initially set forth in Gary S. Becker, *Investment in Human Capital: A Theoretical Analysis*, 70 J Pol Econ 9 (1962).

[48]  See Becker, *Human Capital* at 33–51 (cited in note 47).

[49]  See id at 33–34.

[50]  See id at 40.

[51]  See, for example, Derek Neal, *Industry-Specific Human Capital: Evidence from Displaced Workers*, 13 J Labor Econ 653, 653 (1995) (identifying categories of skills that are "specific to firms in a given industry or sector of the economy" and therefore do not fall into the existing categories of firm-specific or general human capital).

published in 1890.[52] In a short passage in that work, Marshall proposed that certain industries benefit collectively from a free-flowing exchange of ideas, even if an individual firm may periodically suffer the loss of some portion of its investment in developing an innovation.[53] In Marshall's famous words: "The mysteries of the trade become no mysteries; but are as it were in the air."[54] The movement of R&D personnel among firms is one of the key mechanisms by which the "mysteries of the trade" are disseminated and, according to Marshall, promote the general long-term welfare of all members of that innovation community. This line of reasoning is the basis for an extensive literature on the "agglomeration economies" that arise in innovation clusters in which geographically proximate firms and other entities draw from a free-flowing pool of human and intellectual capital assets to mutual advantage.[55]

## B.  The Old View: Restricting Labor Mobility Is Good and Bad for Innovation

The recent wave of academic interest in noncompetes is predated by scholars who had examined the efficiency of noncompete clauses and, explicitly or by implication, other restraints on employee mobility. Generally speaking, that view identifies both efficiency gains and losses that in general could arise from the use of noncompetes in innovation markets. Without an empirical methodology by which to quantify those potentially offsetting effects, that literature largely concluded that the net efficiency of noncompetes is indeterminate as a general matter.

### 1.  The credible commitment problem.

Earlier scholars observed that human capital markets suffer from what economists call a credible commitment problem. Specifically, potential employees cannot provide adequate assurance to employers who are reluctant to invest in cultivating the human capital of employees who can simply move to another employer,

---

52  Alfred Marshall, *Principles of Economics* 169 (Palgrave MacMillan 8th ed 1920).
53  Id at 225.
54  Id.
55  See Rainer vom Hofe and Ke Chen, *Whither or Not Industrial Cluster: Conclusions or Confusions?*, 4 Indust Geographer 2, 4–8 (2006) (reviewing the literature on "agglomeration economies").

thereby conferring an advantage on a competitor.[56] When an employee leaves, the employer potentially suffers three costs: (i) it loses its training investment, which may involve a combination of firm-specific and general human capital; (ii) the employee may transmit proprietary information to a competitor; and (iii) the firm must incur costs to recruit and train a substitute employee, which again involves the transmission of firm-specific and general human capital.[57]

Without the ability to block employees from moving to a competitor, and without a sufficient up-front payment from employee to employer to cover the employer's expected costs in the event of the employee's departure, an employer faces two choices. Setting aside the possibility of various substitutes for deterring employee movement (most notably, deferred compensation arrangements and long-term employment contracts), the employer can (i) decline to hire the employee or (ii) hire the employee but underinvest in training (especially training that involves the cultivation of general human capital that has positive postemployment value) and the development and transmission of proprietary, often innovative, information.[58] These concerns account for apprenticeship systems that predate modern intellectual property regimes: limiting the apprentice's ability to switch employers enabled the master to internalize the gains from the intellectual capital transferred to the apprentice.[59] Or, put differently, limiting the apprentice's ability to switch employers enabled the apprentice to credibly commit against expropriating the employer's investment in the apprentice's human capital.

---

[56]    See Paul H. Rubin and Peter Shedd, *Human Capital and Covenants Not to Compete*, 10 J Legal Stud 93, 99–102 (1981) (arguing that employers will reduce investment in employee training absent noncompetes); Edmund W. Kitch, *The Law and Economics of Rights in Valuable Information*, 9 J Legal Stud 683, 685 (1980) (asserting that, absent noncompetes, poaching employers will free ride on training investments by existing employers, who will in turn decline to make those investments); Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv L Rev 625, 647 (1960) (contending that the objective of postemployment restraints is "to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment").

[57]    See note 56 and accompanying text.

[58]    See Kitch, 9 J Legal Stud at 685 (cited in note 56).

[59]    See Rubin and Shedd, 10 J Legal Stud at 93–99 (cited in note 56) (arguing that covenants not to compete do not, as earlier scholars assumed, necessarily reflect an exercise of monopoly power by employers).

### 2. The noncompete solution.

Just like the apprentice contract, the noncompete clause can result in joint efficiency gains by enabling employment transactions (and associated knowledge transfers) that otherwise would not take place. This is beneficial not only for the employer but the employee and the industry as a whole. This point is overlooked in recent discussions of noncompetes that tend to emphasize how these clauses block employment opportunities and suppress innovation.[60] However, it is important not to overlook the possibility that the *absence* of noncompetes can block certain *other* employment opportunities. Assuming the prospective employee is financially constrained and cannot post a sufficient "bond" against expropriating the employer's training investment or R&D assets, an otherwise efficient employment transaction—and the associated cultivation of human capital—may not move forward. In that case, both employer and prospective employee are made worse off.

Even if the absence of noncompetes does not entirely block the employment relationship, it may distort the employer's behavior during the term of employment and, as a result, sometimes disadvantage both the firm and the employee. At least three distortions are possible. First, the inability to enforce noncompetes may induce an employer to modify the internal allocation of team personnel so as to mitigate informational leakage from employee departures. For instance, Apple is famous for its secrecy practices and separate teams that work on different projects so as to minimize information transfer between them.[61] Second, the firm may skew the allocation of training resources toward the cultivation of firm-specific human capital so as to maximize the employee's value in the internal labor market but minimize the employee's value in the external labor market.[62] Third, the firm may underinvest in R&D by reallocating resources to activities in which it is not generating informational assets that an employee can transmit to another employer. In a world in which noncompetes are enforceable at some reasonable cost and high probability, these distortions are mitigated and the firm can allocate resources more efficiently among the available set of innovation and non innovation activities.

---

[60]   See note 9 and accompanying text.

[61]   See Adam Lashinsky, *This Is How Apple Keeps the Secrets* (Fortune, Jan 18, 2012), online at https://fortune.com/2012/01/18/the-secrets-apple-keeps (visited Feb 3, 2020) (Perma archive unavailable).

[62]   See Nicola Meccheri, *A Note on Non-competes, Bargaining and Training by Firms*, 102 Econ Letters 198, 200 (2009).

### 3. A weak objection to noncompetes.

Some commentators argue that noncompetes may discourage employees from cultivating their human capital (or, specifically, general or industry-specific human capital)—which in turn may depress employees' effort or creative output—due to the limited ability to access postemployment opportunities.[63] This objection is not especially persuasive. Discouraging employees from acquiring human capital would appear to be inconsistent with rational profit maximization. Put affirmatively, any employer has an incentive to reward employees who enhance their firm-specific human capital (or some value-maximizing combination of firm-specific, industry-specific, and general human capital) and can therefore make a greater contribution to firm value. While there are inherent measurement and verification difficulties in assessing employees' relative contributions in a team environment,[64] firms clearly use a variety of compensation systems to at least approximately reward employee performance, including promotion, monetary bonuses, and more tailored compensation mechanisms.[65] This is unsurprising: in a competitive market, any firm that includes noncompete clauses in its employment package has a rational self-interest in adopting incentive structures that correct for any underperformance effects that could arise as a result.[66] Market forces reward firms who do so successfully and discipline those who do not.

---

[63]  See On Amir and Orly Lobel, *Driving Performance: A Growth Theory of Noncompete Law*, 16 Stan Tech L Rev 833, 846 (2013) ("An employee who knows their market opportunities are significantly reduced due to an enforceable noncompete restriction will be less driven to perform well and to invest in his own human capital."); Mark Garmaise, *Ties That Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J L Econ & Org 376, 413–14 (2011) (setting forth model in which noncompete enforcement can induce employers to invest in managers' human capital but reduce managers' incentives to do so, in which case the manager's human capital may be lower relative to a zero-enforcement regime).

[64]  For the classic treatment, see Armen A. Alchian and Harold Demsetz, *Production, Information Costs, and Economic Organization*, 62 Am Econ Rev 777, 779 (1972) (discussing the difficulties of determining each individual's contribution when observing a team's output).

[65]  See Robert P. Merges, *The Law and Economics of Employee Inventions*, 13 Harv J L & Tech 1, 38–41 (1999) (discussing the "intra-firm appropriability environment" fostered by employee reward mechanisms).

[66]  Below, we criticize experimental studies that purport to confirm the depressing effects of noncompetes on the cultivation of human capital by noting that they fail to adequately account for the large menu of employee incentive mechanisms used in the actual market. See note 305 and accompanying text.

4. A better objection to noncompetes.

It is certainly the case that enforcing noncompetes limits to some extent the mobility of R&D personnel, which may impede the agglomeration economies that arise from the regular dissemination of knowledge within an industry. To be clear, however, it is not precise to say (as is often said) that a noncompete "binds" an employee to a firm; rather, a noncompete requires that the employee or (more typically) a third party pay a fee demanded by the employer to obtain a waiver of the noncompete.[67] Payments exchanged for waiver of a noncompete are mere wealth transfers without efficiency consequences from a short-term static perspective. Precisely understood, a noncompete is simply a mechanism by which resource-constrained employees can credibly commit to indirectly compensate their employer for training and knowledge leakage costs in the event employees depart for a competitor.[68] The employee's commitment is made credible by providing the employer with a contractual right that can be "sold" to the employee's next employer.

This is not to say that there is no circumstance in which noncompetes can frustrate the efficiency gains associated with the circulation of human capital from one firm to another. First, even when an employer permits an employee otherwise under a noncompete to move to a new firm, the transaction costs of negotiating and executing a waiver of the noncompete generate static costs that would not be incurred if noncompetes were wholly unenforceable. Of course, like all contracting costs, such costs are tolerable when the social gains from contracting (here, for a noncompete) outweigh these costs.

---

[67]  For example, in 2005, Nortel paid Motorola $11.5 million to release its chief operating officer from a noncompete agreement. See Robert McMillan, *Nortel Appoints Ex-Motorola Exec as Operations Chief* (Network World, Jan 19, 2006), archived at https://perma.cc/B4MJ-YTFC.

[68]  Noncompetes may also relieve an employer from having to increase existing employees' compensation to match alternative employment opportunities, given the departure costs imposed by the noncompete. For a theoretical model reaching this result, see Natarajan Balasubramanian, et al, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers* *9–11 (Ross School of Business Working Paper No 1339, Jan 2017), archived at https://perma.cc/3SBZ-UJD8. It should be noted, however, that available evidence is generally inconsistent with this model. The most comprehensive empirical study finds that employees who sign noncompetes earn 6.6 percent *more* on average than employees who do not sign noncompetes (controlling for various other factors), although this wage differential is limited to employees who are presented with a noncompete prior to accepting a job offer. See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *28 (cited in note 11).

Second, when the costs of negotiating and executing the waiver of a noncompete are sufficiently great so as to impede employee turnover, this may generate long-term dynamic efficiency losses to the extent that slowing down employee turnover impedes the transmission of intellectual capital that benefits the industry as a whole. These dynamic efficiency costs present a potential collective action problem because these costs may not be fully internalized by an individual firm in a given industry when that firm makes a decision whether to adopt and enforce a noncompete for a particular employee.

5. Evaluation.

The welfare effects of noncompete agreements can now be summarized. On the one hand, noncompetes support employers' incentives to invest in employees' human capital and R&D projects that would otherwise be subject to expropriation by departing employees. On the other hand, noncompetes raise the transaction costs involved in the circulation of human capital, which may impede the innovation process in the industry as a whole. Given these offsetting effects, earlier scholars generally concluded that economic analysis does not support a definitive position against or in favor of enforcing noncompetes in all circumstances.[69] If noncompetes enable firms to secure gains from training and R&D investments, then barring noncompetes may reduce the common pool of technological knowledge that is available for circulation through employee movement. A ban on noncompetes would yield a net social gain over time only if the disincentive effects arising from uncompensated human capital transfers were exceeded by the agglomeration economies and other benefits associated with the unimpeded circulation of human capital. Without empirical evidence in any particular case, this analytical framework is agnostic in general with respect to the net long-term efficiency of those restraints. However, it does recognize a meaningful range of circumstances in which enforcing noncompetes could make firms and employees better off by resolving the credible commitment problem that might preclude or distort employment relationships.

---

[69]   See note 56 and accompanying text.

### C.  The New View: Restricting Labor Mobility is Bad for Innovation

The traditional approach is intellectually modest in taking the view that enforcing noncompetes *may* have a net positive effect on innovation. By contrast, the new view on noncompetes tends to take the bolder view that enforcing noncompetes usually, if not always, discourages innovation by slowing down the flow of intellectual capital and impeding the agglomeration economies and similar benefits that fuel the innovation process. This new view consists of a two-part logical sequence. In step one, it claims that barring noncompetes accelerates employee movement. Stated precisely, this assertion reflects the assumption that non-competes increase the transaction costs of human capital movements. In step two, the new view makes the stronger assertion that increased circulation of R&D personnel promotes innovation by facilitating knowledge spillovers that benefit the industry as a whole. The normative implication is simple and clear: the law should decline to enforce noncompetes in all circumstances.

#### 1.  Background: Saxenian and Gilson.

The new view relies on the work of AnnaLee Saxenian, a sociologist, and Ronald Gilson, a law professor, both of whom apply the Marshallian concept of agglomeration economies to interpret a key episode in the history of US technology markets. Both Saxenian and Gilson contrasted Silicon Valley with Boston's Route 128 area to argue that institutional mechanisms—cultural norms and organizational forms in Saxenian's analysis[70] and a legal ban on noncompetes in Gilson's analysis[71]—that promote employee mobility can promote innovation by facilitating the flow of intellectual capital among competitors. Both authors identify these institutional differences as key factors in accounting for Silicon Valley's rise over Route 128 as the country's leading innovation center starting in the late 1980s.

More specifically, Gilson argued that California's ban on non-competes represented a solution to a collective-action problem. While no firm individually would agree *not* to adopt a noncompete and thereby expose its human and intellectual capital to competitors, it may be in *all* firms' collective long-term interest to refrain from adopting noncompetes and thereby enjoy the resulting flow

---

[70]  See Saxenian, *Regional Advantage* at 1–9, 29–30, 59–60 (cited in note 8).
[71]  See Gilson, 74 NYU L Rev at 578–79, 602–09 (cited in note 8).

of knowledge spillovers.[72] By implication, Massachusetts firms were caught in a collectively irrational equilibrium in which all firms imposed noncompetes and could not enjoy the collective gains that would result from a more fluid circulation of human capital. Gilson cautioned that this explanation may be specific to Silicon Valley and would not necessarily generalize to other contexts.[73] Nonetheless, a significant body of commentary by legal scholars and economists has endorsed this proposition in stronger formulations and has made largely unqualified policy assertions that enforcing noncompetes and other restraints on employee mobility depresses innovation.[74] For these scholars, California's approach should be the rule, not the exception.

### 2. An initial critique.

The new view on noncompetes reflects a coherent and straightforward application of the standard collective-action problem in economic analysis. However, it is incomplete in significant respects. Specifically, the new view makes little effort to address the efficiency losses inherent to a legal regime in which a voluntary restraint on the mobility of talent is removed from the table of contracting options. Earlier analysis of noncompetes had recognized that an efficiency loss would arise in any circumstance in which an employee could not credibly commit against expropriating the employer's human capital investment and R&D assets. The employer would respond by distorting the terms of employment to limit its training investments or the employees' exposure to R&D assets or by declining to enter into an employment relationship at all.

---

[72]    See id at 596.

[73]    See id at 629.

[74]    See Lobel, *Talent Wants to Be Free* at 67–72 (cited in note 9) (arguing that empirical evidence supports California's "zero tolerance" policy for noncompetes); Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19) (same); Benkler, 13 Ann Rev L & Soc Sci at 235 (cited in note 13) (arguing that empirical evidence suggests that contractual and other legal constraints on employee mobility undermine innovation); Hyde, 33 Regulation at 10–11 (cited in note 13) (arguing that balance of evidence supports adopting California's policy of zero enforcement toward noncompetes); Moffat, 54 Ariz L Rev at 965 (cited in note 9) (advocating for a zero-enforcement policy toward noncompetes); Moffat, 52 Wm & Mary L Rev at 918–21 (cited in note 9) (same).

A recent economic model formulated by Professor James Rauch shows that this loss can extend well beyond just one employment transaction.[75] Consider a sequence of transactions consisting of (i) an initial employment transaction involving a parent firm and an individual employee, followed by (ii) a series of spin-off transactions involving employees who depart from the parent firm to form or join a spin-off firm, and then depart from the spin-off to form a new entity, and so forth. Noncompetes may raise the transaction costs relating to, and even frustrate, some portion, or even all, of the potential spin-off transactions. That is the focus of the "talent wants to be free" literature. However, it is important not to ignore the possibility that the inability to enforce a noncompete may preclude the initial hire by restoring the credible commitment problem, in which case the subsequent stream of spin-off transactions could be stunted or blocked entirely.[76] Moreover, if noncompetes are not enforceable, even a certain portion of the set of spin-offs may face the same credible commitment dilemma and may be wholly precluded or move forward under distorted terms.[77] If that is the case, then compared to a regime in which noncompetes are enforced, talent may be freer but it could well be worse off.

### 3.   The empirical challenge.

As a theoretical matter, the new view on noncompetes, and the accompanying policy arguments in favor of a total or near-total ban, provide no reason to arbitrarily value the social costs attributable to noncompetes—primarily, potentially reduced circulation of intellectual capital (the focus of Marshall's analysis)—more heavily than the social gains—primarily, potentially increased investment in employee training and R&D (the focus of Becker's analysis). Given this uncertainty, we can only make progress toward assessing the relative intellectual strength of the new view based on empirical inquiry. Commentary by scholars and policymakers in favor of a ban on noncompetes often asserts that empirical data shows that noncompetes depress innovation.[78]

---

[75]   See James Rauch, *Dynastic Entrepreneurship, Entry, and Non-Compete Enforcement* *1–2, 19 (National Bureau of Economic Research Working Paper No 21067, Apr 2015), archived at https://perma.cc/TP8G-3372.

[76]   See id at *1–2, 9–11 (showing formally that the efficiency of noncompetes depends in part on a trade-off between these two countervailing effects on the parent firm and spin-off firms).

[77]   See id at *10.

[78]   See note 36.

In the next Part, we look closely at that body of evidence, finding that nearly all of these studies are badly flawed and, even so, common characterizations of their findings often dramatically overstate the policy conclusions that the data can reasonably support.

## II. The Evidence Against Noncompetes: A Close Look

In this Part, we undertake the most comprehensive examination to date of the two principal bodies of empirical evidence that are commonly referenced in support of the "talent wants to be free" school of thought. First, we review in detail the explanation provided by Saxenian and in particular, Gilson, to account for Silicon Valley's dramatic rise over Route 128 as the world's leading innovation center. We find significant reason to doubt that this fundamental shift in economic trajectories can be traced back to relatively fine differences in the enforceability of noncompetes between California and Massachusetts. Second, we review some of the most highly cited empirical studies that purport to show a three-step causal link between bans on noncompetes, increased employee turnover, and increased innovation. This exercise identifies important methodological and other limitations that cast serious doubt on the policy positions for which those studies have been cited.

### A.    Reasons to Doubt the Standard Account of the Rise of Silicon Valley

As of the mid-1970s, Silicon Valley and Route 128 were both viewed as key centers for innovation in the electronics industry, but with different strengths.[79] Silicon Valley excelled in semiconductor chips while Route 128 excelled in minicomputers, a category situated between the supercomputer (or mainframe) segment dominated by IBM and the nascent "microcomputer" (in today's terms, PC) segment pioneered by Apple.[80] Starting in the

---

[79]    See Willem Hulsink, Dick Manuel, and Harry Bouwman, *Clustering in ICT*, in Willem Hulsink and Hans Dons, eds, *Pathways to High-Tech Valleys and Research Triangles: Innovative Entrepreneurship, Knowledge Transfer and Cluster Formation in Europe and the United States* 53, 53–55 (Springer 2008) (stating that Route 128 predated the Silicon Valley technology cluster, which started growing in the 1950s and 1960s and overtook Route 128 in the 1970s); Nancy S. Dorfman, *Route 128: The Development of a Regional High Technology Economy*, 12 Rsrch Pol 299, 300, 313 (1983) (observing that, as of the late 1970s, the Boston area and Silicon Valley had the same number of high-tech employees while the greater San Francisco Bay Area had "about 30 percent more").

[80]    See Hulsink, Manuel, and Bouwman, *Clustering in ICT* at 59 (cited in note 79) (describing how the "minicomputer manufacturers of Route 128 quickly lost ground to the manufacturers of the fast-emerging PCs and workstations in Silicon Valley").

early 1980s, Silicon Valley overtook Route 128 and secured its place as the world's preeminent information technology center. Saxenian attributes the ascendance of Silicon Valley, and the decline of Route 128, to differences in industrial organization and cultural norms.[81] The West Coast environment was characterized by a constant flow of technical personnel among a network of loosely connected firms, which spawned spin-offs that accelerated the innovation process. This structure was supported by industry norms that promoted information sharing and employee mobility.

By contrast, the East Coast environment was characterized by a small number of vertically integrated firms and exhibited little employee turnover. This structure was purportedly supported by industry norms that promoted loyalty to a single employer and discouraged information sharing. Building on Saxenian's narrative, Gilson argued that the free flow of human capital could be attributed in part to California's refusal to enforce noncompetes, while Massachusetts's insistence on enforcing noncompetes may have stagnated the flow of human capital, resulting in a slowdown in innovation.[82] Put together, Saxenian and Gilson's work identifies certain informal and formal institutional characteristics that purportedly set Route 128 on a path to decline, while sending Silicon Valley on an upward trajectory.

Both Saxenian's and Gilson's accounts of the rise of Silicon Valley and decline of Route 128 have been widely adopted in the academic literature.[83] In the discussion below, we identify several considerations that cast doubt on this now-standard account. These include: (i) there were several exceptions (and other legal causes of action) that substantially qualified California's "ban" on noncompetes during this period; (ii) firms could substantially mimic the effect of a noncompete through compensation and other mechanisms; (iii) it is not clear that differences in Massachusetts law on noncompetes and trade secrets resulted in substantial differences in employee mobility as a practical matter; (iv) there are fundamental technological and economic factors that more plausibly account for Silicon Valley's ascendance; and (v) Route 128 has continued to exhibit robust innovative performance.

---

[81]  See Saxenian, *Regional Advantage* at 1–9 (cited in note 8).

[82]  See Gilson, 74 NYU L Rev at 602–09 (cited in note 8).

[83]  As of February 19, 2020, Google Scholar estimates that Saxenian's leading contribution in the area, the book-length *Regional Advantage*, has been cited more than 13,200 times and Gilson's 1999 NYU article on Silicon Valley and Route 128 has been cited more than 900 times. See also note 9 (listing several scholarly publications that refer to and rely on Saxenian's or Gilson's work).

### 1. Did California courts really never enforce noncompetes?

Scholars have not adequately questioned whether California courts in actuality declined to enforce noncompetes during the period in which Silicon Valley overtook Route 128. That seems to be the case based on the California statute, which declares void "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind."[84] Given that blanket prohibition, however, it is curious that California firms often insert noncompete clauses in executive employment agreements. Two studies that focus on adoption rates of noncompetes in executive employment agreements at large publicly traded firms find these clauses in 58–62 percent of agreements with firms headquartered in California, as compared to rates of 70–84 percent at the same types of firms headquartered in other states (which generally enforce noncompetes subject to the reasonableness standard).[85] Even more surprisingly, a broader study involving all types of employees finds that the incidence of noncompetes in California (19 percent) is approximately the same as observed in states that enforce noncompetes.[86]

This discrepancy between law and practice might be attributed to the possibility that technical personnel are unaware

---

[84]  Cal Bus & Prof Code § 16600.

[85]  Specifically, from a sample of 874 CEO employment contracts at S&P 1500 firms executed during 1996–2010, Norman Bishara, Kenneth Martin, and Randall Thomas found that California firms include noncompetes at a rate of 62 percent (compared to 84 percent for firms in other states). See Norman D. Bishara, Kenneth J. Martin, and Randall S. Thomas, *An Empirical Analysis of Noncompetition Clauses and Other Restrictive Postemployment Covenants*, 68 Vand L Rev 1, 34 (2015). Garmaise finds that, in a sample of large, publicly traded firms, approximately 70 percent of firms used noncompetes, including 58 percent of California-based firms. Garmaise, 27 J L Econ & Org at 396 (cited in note 63). Garmaise does not specifically identify the rate of noncompete adoption among firms located in the forty-eight enforcing states, although it would be expected that that rate would be somewhat higher than the 70 percent rate reported for the full sample of all firms in all states. See id.

[86]  See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *19 (cited in note 11). We note two additional points concerning the methodology and findings of the Starr, Prescott, and Bishara study. On methodology, we note that the paper carefully distinguishes in its survey methodology between noncompetes and other related provisions such as nondisclosure or nonsolicitation covenants. This is important because it provides confidence that the findings relate specifically to noncompetes rather than other related provisions in employment agreements. See id at *3–4. On substance, we note that the authors do not find any meaningful change in the incidence of noncompetes in comparing "multi-unit" firms, which have operations in California and other states, and "single-unit" firms, which operate only in California. See id at *19. This is a noteworthy result because it might have been expected that large national firms in particular might include noncompete clauses as a "default" provision in their employment agreements since they mostly operate in states that uphold noncompetes under the common-law reasonableness standard.

of California law and firms include a noncompete clause as an *in terrorem* device to be used against departing employees. That explanation assumes that these personnel do not consult legal advisors, particularly a potential new employer's legal counsel, or review publicly available information about a basic point of law. Alternatively, one might argue that, because knowledgeable employees understand that noncompetes are generally *not* enforceable in California, it is not worth the transaction costs of negotiating with an employer to remove these clauses. At a minimum, it is worth inquiring whether the standard understanding of California law is entirely precise during the period in which Silicon Valley overtook Route 128.

In fact, it is not. Writing in 1989, a treatise on trade secrets law observed: "Despite the clear language of" California's statute, "the California courts do not regard all covenants not to compete . . . invalid *per se*."[87] Specifically, there were at least five important circumstances in which California employers could have had some expectation of being able to enforce a noncompete during the period in which Silicon Valley overtook Route 128. While it remains the case that California courts did not *generally* enforce noncompetes against individuals during this period, it is incorrect to assume that a sufficiently motivated employer would *never* rationally invest resources in enforcing (and therefore could never credibly threaten to seek) enforcement of a noncompete against a departing employee.

    *a) Narrow restraints.*  In 1987, the Ninth Circuit held that noncompetes were enforceable under California law if the noncompete narrowly restrained postemployment opportunities, as distinguished from a general restraint that barred entry into an entire profession.[88] From the 1970s through the 2000s, litigants that pursued variants of the narrow restraint exception achieved

---

[87]  See Melvin F. Jager, *Trade Secrets Law* § 13.01[2] (1989).

[88]  *Campbell v Board of Trustees of Leland Stanford Junior University*, 817 F2d 499, 502 (9th Cir 1987) (citing California law for the proposition that the statutory ban on noncompetes precludes only contractual restraints on entering an "entire business, trade or profession," as distinguished from "only a small or limited part of the business, trade or profession"), quoting *Boughton v Socony Mobil Oil Co*, 231 Cal App 2d 188, 192 (1964). The court purported to apply state law precedent, as set forth in *Boughton*, 231 Cal App 2d at 192, which in turn relied on *King v Gerold*, 240 P2d 710 (Cal App 1952). An earlier Ninth Circuit decision had upheld a clause in a collective bargaining agreement involving the partial forfeiture of certain pension and profit-sharing benefits in the event a retired employee took employment with another firm in the same industry. The court's decision relied on the view that California law does not prohibit an alleged restraint on employee mobility that is "limited in nature and furthers sound public policies." See *Smith v CMTA-IAM Pension Trust*, 654 F2d 650, 660 (9th Cir 1981).

mixed results, sometimes achieving success in (mostly) federal courts but usually not faring well in California state courts.[89] In 1997 and 1999, the Ninth Circuit again applied the exception to uphold a noncompete covenant.[90] Only in 2008, well after Silicon Valley had established its place as the world's technology center, did the California Supreme Court resolve this uncertainty by rejecting the narrow restraint exception.[91]

   *b) Sale of a business.*   Based on a statutory exception,[92] both federal and state courts typically enforced (and continue to enforce) noncompetes executed in connection with the sale of a business. The exception applies to noncompetes entered into by majority target shareholders and possibly other target employees with smaller equity interests.[93] This exception provides some of the legal logic behind the now-popular "acqui-hire" transactional structure, in which a large firm acquires a start-up firm primarily for purposes of retaining the services of its founders and senior managerial and technical personnel. Without a commitment from key personnel that they will remain with or at least not compete with the acquirer for some reasonable period of time, the transaction is not viable. This partially explains why exempting business

---

[89]   For cases recognizing the exception, see *Centeno v Roseville Community Hospital*, 107 Cal App 3d 62, 68–71 (1979); *Latona v Aetna US Healthcare Inc*, 82 F Supp 2d 1089, 1094 (CD Cal 1999); *Cin-Med Associates, Inc v Hemocue, Inc*, 2001 WL 1117562, *3–4 (CD Cal). In *Scott v Snelling & Snelling, Inc*, 732 F Supp 1034, 1042–43 (ND Cal 1990), the court recognized that "California courts may, in some circumstances apply a 'rule of reason' to only partial restrictions on competition" but declined to apply it in the case of a noncompete that imposed postemployment geographic and temporal restrictions. For cases rejecting the exception, see *Golden State Linen Service, Inc v Vidalin*, 69 Cal App 3d 1, 13 (1977); *Liberty Mutual Insurance Co v Arthur J. Gallagher & Co*, 1994 WL 715613, *3 (ND Cal); *Arrowhead Financial Group, Inc v Welty*, 2002 WL 31661269, *6–7 (Cal App); *Jan Marini Skin Research, Inc v Allure Cosmetic USA, Inc*, 2007 WL 1508686, *16 (Cal App); *Thompson v Impaxx, Inc*, 113 Cal App 4th 1425, 1430–31 (2003).

[90]   *General Commercial Packaging, Inc v TPS Package Engineering, Inc*, 126 F3d 1131, 1132–33 (9th Cir 1997) (enforcing a one-year noncompete between a contractor and subcontractor with respect to the contractor's clients); *International Business Machines Corp v Bajorek*, 191 F3d 1033, 1040–41 (9th Cir 1999) (holding that noncompete obligation in stock option agreement did not violate the California statutory ban on noncompetes).

[91]   *Edwards v Arthur Andersen LLP*, 189 P3d 285, 293 (Cal 2008).

[92]   Cal Bus & Prof Code § 16601.

[93]   It is not clear how large that equity interest must be. Rulings have been mixed. See *Hilb, Rogal & Hamilton Insurance Services of Orange County, Inc v Robb*, 33 Cal App 4th 1812, 1816, 1822–25 (1995) (in connection with the merger of an insurance company, upholding a noncompete with an employee of the merged company, who had held a 35 percent ownership interest in the merged company, on ground that a sufficient transfer of goodwill had taken place); *Vacco Industries, Inc v Van Den Berg*, 5 Cal App 4th 34, 48–49 (1992) (finding that a 3 percent interest, which was the ninth largest shareholder interest, in conjunction with an officer position, constituted a substantial shareholder).

acquisitions from noncompete enforcement limitations, which is the rule even in California, is likely to be, and is widely viewed as, efficient.

 *c) Protection of trade secrets.* Since a California Supreme Court decision in 1958,[94] California law has recognized that the statutory bar against noncompetes does not extend to certain postemployment restrictions—most typically, nondisclosure and nonsolicitation covenants—that are enforced for the purpose of protecting an employer's trade secrets or confidential information.[95] Since the 1980s, California courts have periodically applied the trade secret exception to enforce nonsolicitation and nondisclosure obligations (and, in one recent case, even a noncompete clause "construed to bar only the use of confidential source code, software, or techniques"[96]) that were found to be narrowly tailored to protect a trade secret.[97]

---

94 *Gordon v Landau*, 321 P2d 456, 459 (Cal 1958) (upholding a nonsolicitation clause because "it did not prevent defendant from" engaging in the same or similar business as his former employer).

95 See Jager, *Trade Secrets Law* § 13:4 at 13-13 (cited in note 87) (observing that California courts sometimes enforce noncompetes to protect trade secrets or other confidential information). For cases stating this principle, see *Muggill v Reuben H. Donnelley Corp*, 398 P2d 147, 149 (Cal 1965) (stating that § 16600 invalidates noncompete provisions "unless they are necessary to protect the employer's trade secrets"); *Gordon Termite Control v Terrones*, 84 Cal App 3d 176, 178 (1978) (stating that § 16600 "has been construed by the Supreme Court as invalidating contracts not to compete, except where their enforcement is necessary to protect the trade secrets of an employer"); *Loral Corp v Moyes*, 174 Cal App 3d 268, 276 (1985) (stating that § 16600 "does not invalidate an employee's agreement not to disclose his former employer's . . . trade secrets"); *Moss Adams Co v Shilling*, 179 Cal App 3d 124, 130 (1986); *American Paper & Packaging Products, Inc v Kirgan*, 183 Cal App 3d 1318, 1322 (1986) (Section 16600 invalidates noncompetes "unless their enforcement is necessary to protect an employer's confidential information or trade secrets"); *Scott*, 732 F Supp at 1043 (recognizing a judicially created exception to § 16600 to the extent necessary to protect trade secrets).

96 *Richmond Technologies, Inc v Aumtech Business Solutions*, 2011 WL 2607158, *18–19 (ND Cal) (finding the nonsolicitation clause and noninterference clauses "are likely to be found unenforceable" because they "are more broadly drafted than necessary to protect . . . trade secrets," but a noncompete clause and related clause barring the use of confidential information are "likely enforceable as necessary to protect . . . trade secrets").

97 See *Hollingsworth Solderless Terminal Co v Turley*, 622 F2d 1324, 1338 (9th Cir 1980) (vacating and remanding the lower court's invalidation of a postemployment covenants involving nondisclosure of customer lists and nonsolicitation of a former employer's customers); *John F. Matull & Associates, Inc v Cloutier*, 194 Cal App 3d 1049, 1054–55 (1987) (upholding a nonsolicitation obligation); *Morlife, Inc v Perry*, 56 Cal App 4th 1514 (1997) (affirming a nonsolicitation covenant against former employees); *Asset Marketing Systems, Inc v Gagnon*, 542 F3d 748, 758 (9th Cir 2008) (observing that "non-competition agreements are unenforceable [under California law] unless necessary to protect an employer's trade secret"); *Lindzy v Q-Railing USA Co*, 2013 WL 4437164, *6 (Cal App) (finding a nondisclosure clause and a nonsolicitation clause valid).

In 2008, the Supreme Court of California specifically declined to affirm or reject the trade secret exception.[98] A recent federal court opinion summarizes the current state of California law on this point: "Although California courts have consistently 'condemned' agreements that place restraints on the pursuit of a business or profession . . . 'an equally lengthy line of cases has consistently held former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer.'"[99] Simply put: Section 16600 does not preclude an employer from preventing a departing employee via injunctive relief from joining a new employer by enforcing nondisclosure, nonsolicitation, or other similar postemployment obligations when doing so promotes the employer's interest in protecting its trade secrets.

   *d) ERISA.* A California employer can avoid the statutory ban on noncompetes by embedding the noncompete in a deferred compensation or severance pay arrangement governed by the Employee Retirement Income Security Act of 1974[100] (ERISA). These clauses operate as a forfeiture mechanism that conditions entitlement to certain benefits under the plan upon compliance with the noncompete obligation. As observed in practitioner commentary, this exception typically arises in litigation concerning deferred benefit plans for highly compensated executives.[101] In 1981 and 1987, the Ninth Circuit held that ERISA preempts state law, specifically including noncompete restrictions.[102] California state courts have adopted the same position.[103] This enforcement strategy is limited only by the ERISA requirement that a noncompete

---

[98] *Edwards*, 189 P3d at 289 n 4.

[99] *Richmond Technologies*, 2011 WL 2607158 at *18 (internal brackets omitted), citing *Edwards*, 189 P3d at 290–91 and *Retirement Group v Galante*, 176 Cal App 4th 1226, 1237 (2009).

[100] Pub L No 93-406, 88 Stat 829, codified as amended in various sections of Title 26 and Title 29.

[101] See Amy L. Blaisdell and Wendy S. Menghini, *Pulling Tricks Out of a Top Hat: Preemption of Non-Compete Laws Applicable to "Top Hat" Plans* *1 (DRI: The Voice of the Defense Bar, Dec 29, 2010), archived at https://perma.cc/4SYD-PEAV.

[102] See *Clark v Lauren Young Tire Center Profit Sharing Trust*, 816 F2d 480, 481 (9th Cir 1987) (involving a noncompete under Oregon law); *Lojek v Thomas*, 716 F2d 675, 678, 679–80 (9th Cir 1983) (involving a noncompete under Idaho law). Gilson cites a 1965 California Supreme Court decision that invalidated this type of forfeiture provision in a retirement plan. See Gilson, 74 NYU L Rev at 607 n 100 (cited in note 8), citing *Muggill*, 398 P2d at 149. However, *Muggill* would not appear to survive the Ninth Circuit's interpretation of ERISA, which was enacted in 1974.

[103] See, for example, *Weinfurther v Source Services Corp Employees Profit Sharing Plan and Trust*, 759 F Supp 599, 602 (ND Cal 1991).

*The Case for Noncompetes*

forfeiture clause cannot be applied to deprive the employee of benefits accrued after ten years of service.[104]

*e) Choice-of-forum clauses.* California courts will not enforce a noncompete entered into under the law of another state that generally enforces noncompetes. However, prior to 2017, if an employer and former employee were subject to the jurisdiction of an out-of-state court that enforces noncompetes, and the decision was final in that state before any decision in a parallel California action, then a noncompete agreement was typically enforceable within California. In general, the two key factors at issue in such situations were whether (1) the agreement selected another state's courts as the forum for disputes; and (2) whether the employee is now a California resident employed by a California employer. Although California courts will generally not enforce an out-of-state choice-of-law clause, especially if the defendant-employee is a California resident employed by a California firm,[105] prior to 2017, they often respected an out-of-state choice-of-forum clause, even if the other state potentially applied its own law.[106] In practice, this meant that California employees employed by a firm with corporate headquarters out of state—or out-of-state employees moving to California—could be subject to enforceable noncompete restrictions under a properly drafted agreement prior to 2017.[107]

---

[104] 29 USC § 1053(a)(2)(A).

[105] See *Application Group, Inc v Hunter Group, Inc*, 61 Cal App 4th 881, 894–905 (1998).

[106] Compare *Davis v Advanced Care Technologies, Inc*, 2007 WL 2288298, *4–9 (ED Cal) (finding California law applicable to the case despite a Connecticut choice-of-law provision because California had a materially greater interest; the employee was a California resident, the former employer was based in Connecticut, and the new employer was a California-based employer), with *Universal Operations Risk Management, LLC v Global Rescue LLC*, 2012 WL 2792444, *6–7 (ND Cal) (enforcing a forum selection clause despite the strong possibility that the forum state would uphold the covenant not to compete).

[107] See, for example, *Meyer v Howmedica Osteonics Corp*, 2015 WL 728631, *11–12 (SD Cal) (ordering a transfer of forum to New Jersey consistent with the forum selection clause, when there was also a choice of law provision for New Jersey law), citing *Swenson v T–Mobile USA, Inc*, 415 F Supp 2d 1101 (SD Cal 2006) (dismissing a California declaratory relief action in the presence of forum selection clause when the previous action was pending out-of-state); *Universal Operations Risk Management, LLC*, 2012 WL 2792444 at *6–7; *Advanced Bionics Corp v Medtronic, Inc*, 59 P3d 231, 232–34 (Cal 2002) (vacating a lower court's issuance of a temporary restraining order that had blocked the former employer from pursuing a noncompete action it had filed out of state); *Biosense Webster, Inc v Superior Court*, 135 Cal App 4th 827, 830 (2006) (extending the holding of *Advanced Bionics* to circumstances in which no previous action had been filed out of state); *Google, Inc v Microsoft Corp*, 415 F Supp 2d 1018, 1021–22, 1026 (ND Cal 2005) (staying noncompete proceedings pending those in Washington in order to prevent forum shopping). But see *Manchester v Arista Records, Inc*, 1981 US Dist LEXIS 18642, *13–17 (CD Cal) (upholding a choice-of-forum clause in a case involving Cal Labor Code § 2855, which limits

2.  Substitutes for noncompetes.

In addition to the five exceptions described above, California firms could elect (and still can elect) from a large menu of substitute legal and economic instruments to deter employee mobility. To illustrate these alternatives concretely, we can return to the case involving the former Google engineer who took a new position with Uber. As noted previously, the employee had been involved in developing Google's autonomous driving technologies.[108] Under California law, Google would appear to be powerless to prevent the employee from working for Uber. Even assuming that Google cannot wield a noncompete covenant, however, Google has several other credible legal threats at its disposal. Given the existence of these additional legal instruments, any *marginal* preclusive effect that can be reasonably attributed to noncompetes appears to be significantly attenuated, and would need to at least be accounted for in any empirical analysis comparing the differential effects of noncompetes on innovation between California and out-of-state firms.

*a) Patents.*   A firm may use patents to protect against knowledge leakage resulting from employee movement. Although a patent may not cover tacit knowledge per se, it may cover a product or method incorporating that tacit knowledge. Assuming the firm can bear the anticipated enforcement costs, the expropriation risk posed by a departing employee would then be limited to informational assets that fall outside the firm's patent portfolio. A patenting strategy makes any departing employee less attractive to competitors, which implies that the employee will receive fewer or lower offers from other firms and is less likely to leave the current employer. Hence, even in a jurisdiction that is hostile to noncompetes, there may be significant patent-based obstacles that discourage employee movement. Consistent with these expectations, a 2009 empirical study found a deterrent effect on labor mobility in the US semiconductor industry proportional to a firm's propensity to bring patent infringement suits.[109] Another study finds that, while the likelihood of an acquisition increases when a target's employees are subject to noncompetes, that effect weakens in the case of targets that hold strong patent

---

personal service employment contracts to a term of seven years, because the court determined that § 2855 did not apply to the contracts at issue).

[108]   See notes 1 and 4.

[109]   See Rajshree Agarwal, Martin Ganco, and Rosemarie H. Ziedonis, *Reputations for Toughness in Patent Enforcement: Implications for Knowledge Spillovers via Inventor Mobility*, 30 Strategic Mgmt J 1349, 1366–67 (2009).

portfolios, suggesting that patents substitute in part for noncompetes as a device for protecting against knowledge leakage after consummation of the acquisition.[110]

*b) Breach of contract.* If the employee had signed a nondisclosure agreement (NDA) and then took a position with a competing enterprise, Google could potentially bring (or threaten to bring) a breach of contract claim against the employee. As noted earlier, there is no plausible legal challenge under § 16600 to the enforcement of an NDA so long as it is sufficiently tailored to promote the employer's interest in protecting its trade secrets.[111] The credibility of Google's threat to sue to enforce an NDA would depend on the negotiated scope of the definition of "confidential information" in the NDA and the ease with which Google could demonstrate that the employee had actually breached the NDA's confidentiality provisions at his or her new position. In certain jurisdictions, courts are willing to enforce NDAs that encompass information that would not otherwise qualify as a trade secret;[112] in other jurisdictions (including California), Google may be required to show that enforcement of the NDA targets only nonpublic information that would be protected under trade secret law.[113]

Alternatively, Google could bring (or threaten to bring) a breach-of-contract claim if it had entered into a long-term employment contract or a shorter-term employment contract with periodic renewal at the employer's option. (The former option may be unattractive to both employers and employees because it locks each party into a potentially unwanted long-term commitment that is difficult to mitigate even through the most carefully

---

[110] See Kenneth A. Younge, Tony W. Tong, and Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence from a Natural Experiment*, 36 Strategic Mgmt J 686, 691–92 (2015).

[111] See Part II.A.1.c.

[112] See Richard F. Dole Jr, *The Contract Exception to the Uniform Trade Secrets Act and Its Implications for the Federal Defend Trade Secrets Act*, 34 Santa Clara High Tech L J 362, 377 n 80 (2018) (observing that courts in some jurisdictions will enforce NDAs that encompass information that would not qualify as a trade secret, subject to a reasonableness standard); Bishara, Martin, and Thomas, 68 Vand L Rev at 21–23 (cited in note 85) (stating that courts will sometimes enforce an NDA that applies to information that might not otherwise be protected under trade secret law, so long as the NDA is limited in time).

[113] See, for example, *Richmond Technologies*, 2011 WL 2607158 at *19 (noting that a "clause prohibiting use of confidential information is likely enforceable to the extent that the claimed information is protectable as a trade secret"). On this point with respect to California law in particular, see Charles T. Graves, *Nonpublic Information and California Tort Law: A Proposal for Harmonizing California's Employee Mobility and Intellectual Property Regimes Under the Uniform Trade Secrets Act*, 2006 UCLA J L & Tech 1, 37–43.

crafted provisions for early separation under certain circumstances.) In yet another variation, Google could bring a tortious interference with contract claim against Uber, on the ground that Uber was aware of the long-term contract to which the departing engineer was then bound.[114]

   *c) Invention assignment agreements.*  In the technology industries, it is typical for employees to enter into invention assignment agreements, under which an employee agrees in advance that all "inventions" (as defined in the governing agreement) developed by the employee during the course of his or her employment are deemed to belong to the employer.[115] Under such an agreement, Google could bring a claim against the departing employee if the employee is using an "invention" that the employee made while employed by Google. As long as Google's claim could at least survive a motion to dismiss, it could credibly threaten to impose significant discovery and other litigation costs on the employee-defendant (or, more typically, the new employer who may have agreed to indemnify the employee-defendant). In a widely followed litigation over ownership of the "Bratz" line of dolls, involving Mattel (as plaintiff), Mattel's former employee (as codefendant), and a smaller toy manufacturer (as codefendant), an invention assignment agreement provided the basis for several years of protracted litigation that burdened the defendant with substantial legal fees.[116]

   Alternatively, Google and its former employee may have entered into an invention assignment agreement with a "trailer" clause, which would grant Google ownership over any inventions that the former employee developed within a certain amount of time following termination.[117] That too may limit the employee's attractiveness to any potential outside employer. The doctrine of assignor estoppel can have a similar effect in a departing employee scenario. Under that doctrine, some courts have held that

---

   [114] In the actual litigation between Google and Uber, this would not have been a feasible claim because Google and the departing employee were apparently not parties to a long-term contract.

   [115] See Victoria Lee and Mark Lehberg, *Employee Proprietary Information and Inventions Assignment Agreements: What They Do, and What Could Happen Without Them* (DLA Piper, 2018), archived at https://perma.cc/J5QD-3FXX.

   [116] See *Mattel, Inc v MGA Entertainment, Inc*, 616 F3d 904, 909 (9th Cir 2010) (observing that Mattel's ownership interest in the Bratz line of dolls "turns on the interpretation of Bryant's [the former employee's] 1999 employment agreement," which included an invention assignment clause). For a summary of the litigation, see *Barbie and Bratz: The Feud Continues* (WIPO Magazine, Aug 2011), archived at https://perma.cc/6RM2 -W45Y.

   [117] For discussion, see Merges, 13 Harv J L & Tech at 52–53 (cited in note 65).

not only is the employee precluded from arguing against the validity of a patent that the employee assigned to the former employer, but also any new employer of the employee is similarly precluded from doing so. The practical consequence: if the old employer brings a patent infringement suit against the new employer, the latter may be unable to argue in defense that the underlying patent is invalid. Like a trailer clause, this expansive understanding of the assignor estoppel doctrine may limit the attractiveness of an employee to any potential new employer.[118]

  *d) Trade secret misappropriation.*  Google could (and did) bring a trade secret misappropriation claim against the employee and Uber as the new employer, alleging that the employee or Uber had used or disclosed trade secrets belonging to Google.[119] In certain states (although not California today), even absent evidence of use or disclosure, Google could seek an injunction to prevent its former employee from joining Uber if the court found that the employee would *inevitably disclose* the employer's trade secrets in his new position.[120] Trade secret litigation in a departing employee scenario is not an uncommon occurrence in Silicon Valley. Intel, Broadcom, Cisco, Apple, and other Silicon Valley companies have been involved in prominent trade secret disputes involving former employees.[121] Depending on the credibility of any

---

[118] See Mark A. Lemley, *Rethinking Assignor Estoppel*, 54 Houston L Rev 513, 537 (2016) ("[T]he doctrine of assignor estoppel serves effectively as a partial noncompete agreement, preventing inventors from starting new companies or moving to competitors in many circumstances and at least raising the costs of doing so.").

[119] Waymo Complaint at *2–5 (cited in note 1).

[120] Based on a survey of twenty-four states (current as of 2012), courts in only a handful of states explicitly reject the doctrine while the remainder either explicitly recognize the doctrine or, more commonly, apply it occasionally. See Ryan M. Wiesner, *A State-by-State Analysis of Inevitable Disclosure: A Need for Uniformity and a Workable Standard*, 16 Marq Intell Prop L Rev 211, 217–28 (2012). See also M. Claire Flowers, *Facing the Inevitable: The Inevitable Disclosure Doctrine and the Defend Trade Secrets Act of 2016*, 75 Wash & Lee L Rev 2207, 2223 (2018) (finding that not all states bar application of inevitable disclosure doctrine entirely; only those in the Eighth Circuit, California, Kentucky, Louisiana, Maryland, and Massachusetts expressly refused to adopt the doctrine). During the period in which Silicon Valley overtook Route 128 as a technology center, it was uncertain whether a California court could issue injunctive relief under the inevitable disclosure doctrine. See Part II.A.3.

[121] These headline disputes include: Cisco's lawsuit against Arista, a company founded by departing Cisco employees, see Rachael King, *Cisco's Feud with Former Star Executive Turns Personal—and Costly* (Wall St J, Aug 17, 2017), online at https://www.wsj.com/articles/ciscos-feud-with-former-star-executive-turns-personaland-costly-1502980362 (visited Feb 17, 2020) (Perma archive unavailable); Intel's suit against Broadcom involving the departure of former Intel employees, see Karen Alexander, *Intel, Broadcom Settle Suit over Trade Secrets* (LA Times, Nov 22, 2000), archived at https://perma.cc/MQ9J-KEZA; and Apple's suit against Steve Jobs and Next, see Andrew Pollack, *Steven Jobs Settles Suit Filed by Apple* (NY Times, Jan 18, 1986), archived at

such legal threat, and the potential injunction, damages, and litigation costs to which the employee and future employer could be exposed,[122] Google may be able to dissuade Uber from hiring its employee. This effectively occurred in the Google-Uber litigation: first, Levandowski was barred by court order from working on certain projects at Uber; and, second, Uber fired Levandowski in connection with Google's litigation and related allegations of trade-secret theft.[123] Effectively, this approaches the result that would have been achieved if Google had been able to enforce a noncompete covenant against a departing employee.

Aside from these clearly legal mechanisms, Google and Uber might enter into a mutual "no-hire" (also known as antipoaching) agreement. Beginning in 2005, Apple, Google, and other Silicon Valley–based companies reportedly entered into unwritten "no-hire" agreements to protect their trade secrets and to suppress wage competition among one another.[124] Although these arrangements were ultimately dissolved following a settlement with the Department of Justice for alleged antitrust violations,[125] they illustrate how firms that are precluded from using noncompetes

---

https://perma.cc/5LRN-VK4T. For discussion of other trade secret suits involving departing employees, see Everett M. Rogers and Judith K. Larsen, *Silicon Valley Fever: Growth of High-Technology Culture* 91–94 (Basic Books 1984).

[122] Gilson argues that trade secrecy claims are difficult to win (outside of blatant misappropriation) and, as a result, are not typically effective substitutes for noncompetes. Gilson, 74 NYU L Rev at 597–601 (cited in note 8). We feel this understates certain practical and legal realities. Although trade secrecy claims are certainly not as strong as an absolute bar on postemployment opportunities at competitors, they have considerable legal and *in terrorem* force (as Gilson acknowledges to some extent, see id at 600), especially given that, at least during 1984–2002, California law enabled courts to award relief in trade secret cases even in cases of merely "threatened" (rather than actual) misappropriation. See notes 132–34 and accompanying text. For similar views on the potency of California trade secret suits in certain circumstances, see Michael Risch, *Comments on Trade Secret Sharing in High Velocity Labor Markets*, 12 Empl Rts & Empl Pol J 339, 340–42 (2009) (arguing that California trade secret law provides a potent remedy in cases involving the misappropriation of "core" informational assets).

[123] Mullin, *Judge's Order Bars Uber Engineer from Lidar Work* (cited in note 5); Marshall, *Uber Fired Its Robocar Guru* (cited in note 6).

[124] See Lobel, 93 Tex L Rev at 831–35 (cited in note 9) (describing antipoaching cartels entered into by leading Silicon Valley technology firms); Jeff Elder, *Silicon Valley Companies Agree to Pay $415 Million to Settle Wage Case* (Wall St J, Jan 15, 2015), online at https://www.wsj.com/articles/silicon-valley-companies-agree-to-pay-415-million-to-settle -wage-case-1421363288 (visited Feb 17, 2020) (Perma archive unavailable) (describing settlement of class-action antitrust lawsuit against major technology companies alleging "antipoaching" agreements).

[125] US Department of Justice, Press Release, *Justice Department Requires Six High Tech Companies to Stop Entering into Anticompetitive Employee Solicitation Agreements: Settlement Preserves Competition for High-Tech Employees* (Sept 24, 2010), archived at https://perma.cc/RYG6-VEE5.

may have strong incentives to use other mechanisms to dampen labor mobility.

*e) Economic alternatives to noncompetes.* Even in the absence of any alternative legal instrument, employers have another potent mechanism by which to discourage employee movement: they can use deferred compensation mechanisms to encourage employees to remain with the firm.[126] There are multiple methods. Employers can set the vesting schedules of deferred equity compensation (often a substantial portion of an employee's compensation at high-tech firms) so that departing employees suffer an implicit financial penalty by departing prior to the date on which all their options to acquire stock in the company have been triggered. Cisco, a Silicon Valley incumbent and repeat acquirer of startups, typically requires that a target's employees waive vesting rights (in the target's stock) that accelerate upon an acquisition and adopt a new graduated vesting schedule (in Cisco's stock), precisely in order to deter departures by the target's key employees for a certain period of time following the acquisition.[127] Alternatively, an acquisition agreement can skew the division of deal consideration such that a small portion is allocated to the up-front purchase price and the remainder is allocated to a future postacquisition date, contingent on the founders and certain other employees remaining with the acquiror postclosing for a certain period of time.[128] In yet another variation, a recent empirical study shows that S&P 500 firms often pay severance to California-based executives in discretionary installments following separation (as contrasted with lump-sum amounts that the same firms usually pay to non-California-based executives immediately upon separation), subject to compliance

---

[126] See Richard A. Booth, *Give Me Equity or Give Me Death—the Role of Competition and Compensation in Building Silicon Valley*, 1 Entrepreneurial Bus L J 265, 271 (2006) (arguing that deferred equity compensation is used as a replacement for noncompete agreements for purposes of retaining employees). For empirical evidence that stock options promote employee retention, see Paul Oyer and Scott Schaefer, *Why Do Some Firms Give Stock Options to All Employees?: An Empirical Examination of Alternative Theories*, 76 J Fin Econ 99, 109–10, 131–32 (2005) (based on data on firms' stock option grants to middle managers, finding that this practice is primarily used for purposes of retaining employees and "sorting" between higher- and lower-quality employees).

[127] See David Mayer and Martin Kenney, *Economic Action Does Not Take Place in a Vacuum: Understanding Cisco's Acquisition and Development Strategy*, 11 Indust & Innovation 299, 312 (2004).

[128] See Marita A. Makinen, David B. Haber, and Anthony W. Raymundo, *Acqui-Hires for Growth: Planning for Success* *35 (Lowenstein Sandler PC, 2012), archived at https://perma.cc/5XBD-2Q76 (noting that certain acquisitions allocate more than 40 percent of the deal consideration to "incentive pool payments" and "equity grant roll overs . . . contingent on key employees staying with the buyer post-closing").

with noncompete provisions in the executives' employment agreements that are not directly enforceable through breach-of-contract suits.[129]

### 3. Was Massachusetts's noncompete and trade secret law significantly different from California's?

The traditional narrative relies on a significant difference in legal treatment between Massachusetts and California with respect to the enforcement of noncompetes and related doctrines that impact employee mobility. Below we look more carefully at comparative differences between Massachusetts and California law in the enforcement of noncompetes and trade secret law. We do not discern any meaningful differences with respect to trade secret claims. Although we do not contest that there were material differences in the enforceability of noncompetes between the two states during the historical period in question, the comparison is more nuanced than commonly explained, especially taking into account the above-noted exceptions to California's oft-described "ban" on noncompetes.

*a) Trade secrets; inevitable disclosure.* In general, there are few substantial differences in the trade secret doctrines followed by California and Massachusetts courts.[130] Where there are fine differences, these do not necessarily support the conventional expectation that Massachusetts provides stronger trade secret protections. To illustrate these tendencies, we look more closely at the inevitable disclosure doctrine and its evolution in California and Massachusetts during the period in which Silicon Valley rose to preeminence. Under this doctrine, a court can enjoin an individual from working for a new employer on the ground that the individual will inevitably disclose trade secrets belonging to the former employer.[131] This represents a plaintiff-favorable extension of trade secret law, which typically requires that the plaintiff show that the defendant has actually used or disclosed the trade secret after having misappropriated it.

---

[129] See Sarath Sanga, *Incomplete Contracts: An Empirical Approach*, 34 J L Econ & Org 650, 654, 670–77 (2018) (using a data sample consisting of 852 executive contracts disclosed in SEC filings during 1996–2016 by 75 S&P 500 firms that had employees in California and at least one state other than California).

[130] See Gilson, 74 NYU L Rev at 602 (cited in note 8) (stating that "[t]he scope of protection provided by trade secret law in California and Massachusetts appears to be roughly the same"). See also Robert G. Bone, *A New Look at Trade Secret Law: Doctrine in Search of Justification*, 86 Cal L Rev 241, 247 (1998) ("Although trade secret doctrine varies from state to state, the general rules are substantially similar in all jurisdictions.").

[131] See Flowers, 75 Wash & Lee L Rev at 2217 (cited in note 120).

As of the late 1970s and early 1980s, we are not aware of any indication in California or Massachusetts case or statutory law that either jurisdiction had explicitly recognized or rejected the inevitable disclosure doctrine or any equivalent under trade secret law. In 1984, however, it was California—not Massachusetts—that signaled openness to the inevitable disclosure doctrine by adopting the Uniform Trade Secrets Act (UTSA), which became effective the following year. California's version of the UTSA, the California Uniform Trade Secrets Act (CUTSA), follows the language of the model statute and provides that a plaintiff can obtain injunctive relief under trade secret law if the court finds there is "threatened misappropriation."[132] Those two words mattered: in 1996, AMD, a leading California semiconductor manufacturer, successfully relied on the inevitable disclosure doctrine to secure a preliminary injunction preventing more than twelve of its former employees from taking certain positions at their new employer, Hyundai.[133] Given the language in the CUTSA, and the outcome in the AMD-Hyundai litigation, it can be understood why a Silicon Valley practitioner observed in 1997 that it was unclear whether the inevitable disclosure remedy was available under California law.[134]

In 1998, the author of a leading treatise on trade secret law observed that California law authorized courts generally to intervene to protect against "threatened harm" and concluded: "California has never rejected the fundamental idea that underlies the [inevitable disclosure] doctrine."[135] In 1999, a California intermediate appellate court even explicitly adopted the doctrine (although it ruled against the trade secret claimant and the court's opinion was subsequently "depublished" by the California Supreme Court).[136] Commentators observed that the court's opinion reflected the actual law on the ground in some California

---

[132] Cal Civ Code § 3426.2.

[133] See Benjamin A. Emmert, *Keeping Confidence with Former Employees: California Court Apply the Inevitable Disclosure Doctrine to California Trade Secret Law*, 40 Santa Clara L Rev 1171, 1192–95. The case subsequently settled. See *AMD, Hyundai Unit Settle Trade-Secrets Case* (LA Times, Nov 19, 1996), archived at https://perma.cc/45XY-GMP8.

[134] Terrence P. McMahon, Gary E. Weiss, and Sean A. Lincoln, *Inevitable Disclosure: Not So Sure in the West*, Natl L J C35–36 (May 12, 1997).

[135] James Pooley, *When It Comes to Trade Secrets and Employee Mobility, a Little Inevitable Disclosure Is Not Such a Bad Thing*, The Recorder 41 (Nov 1998).

[136] See generally *Electro Optical Industries, Inc v White*, 90 Cal Rptr 2d 680 (Cal App 1999), ordered not to be officially published, 2000 Cal LEXIS 3536 (Cal). Specifically, the Court of Appeal stated: "Although no California court has yet adopted it, the inevitable disclosure rule is rooted in common sense and calls for a fact specific inquiry. We adopt the rule here." 90 Cal Rptr 2d at 684.

lower courts: "The . . . decision now makes explicit what many trade secret practitioners have known for years: California courts will grant narrowly tailored injunctions in appropriate circumstances to prevent a former employee from performing certain tasks for a new employer to minimize the threat to a former employer's trade secrets."[137]

In the immediately ensuing years, the case law shifted in a more defendant-friendly direction, as several federal district courts applying California law[138]—and, in 2002, a California intermediate appellate court—rejected the inevitable disclosure remedy,[139] specifically distinguishing in the latter case between "inevitable disclosure" and the "threatened misappropriation" language in the CUTSA.[140] Nonetheless, a contemporary observer wrote that it remained uncertain whether a California court might apply the inevitable disclosure doctrine, given that the 2002 case was a ruling by an intermediate appellate court.[141] Reflecting this lingering uncertainty, a California court in 2008 recognized the continuing possibility of bringing a trade secret claim based on the "threatened misappropriation" language in the CUTSA.[142] Although it is almost certain today that the inevitable disclosure doctrine is no longer viable in California in view of *Edwards v Arthur Andersen LLP*,[143] during the ascendance of Silicon Valley in the 1980s, 1990s, and early 2000s, this was not the case.

During approximately the same period, the development of the law in Massachusetts concerning the inevitable disclosure

---

[137] Gary E. Weiss and Sean A. Lincoln, *Accepting the Inevitable: The California Court of Appeal Has Finally Adopted the Doctrine of Inevitable Disclosure* (Supplement to the Recorder, Feb 2000).

[138] *GlobeSpan, Inc v O'Neill*, 151 F Supp 2d 1229, 1229 (CD Cal 2001); *Danjaq, LLC v Sony Corp*, 1999 WL 317629, *1 n 1 (CD Cal); *Computer Sciences Corp v Computer Associates International, Inc*, 1999 WL 675446, *5 (CD Cal); *Bayer Corp v Roche Molecular Systems, Inc*, 72 F Supp 2d 1111, 1119–20 (ND Cal 1999).

[139] *Whyte v Schlage Lock Co*, 101 Cal App 4th 1443, 1462–64 (2002).

[140] See id.

[141] See Hyde, *Working in Silicon Valley* at 33–35 (cited in note 9).

[142] See *Central Valley General Hospital v Smith*, 162 Cal App 4th 501, 524–26 (2008) (stating that the rejection of the inevitable disclosure doctrine in *Whyte* does not imply rejection of trade secret claims based on threatened misappropriation, given that the California code explicitly recognizes such claims).

[143] 189 P3d 285 (Cal 2008). Reflecting the post-*Edwards* approach toward noncompetes and employee mobility more generally, a California court in 2009 awarded attorneys' fees as sanctions against a party that sought an injunction based on the inevitable disclosure doctrine (together with other evidence of bad faith). See *FLIR Systems, Inc v Parrish*, 174 Cal App 4th 1270, 1273–74, 1277 (2009). For further discussion, see Charles T. Graves, *Is There an Empirical Basis for Predictions of Inevitable Disclosure?*, 18 Wake Forest J Bus & Intell Prop L 190, 194–96 (2018).

doctrine followed a remarkably similar trajectory, with the only potential difference being that Massachusetts common law provided an even weaker basis for asserting the inevitable disclosure doctrine. Given that Massachusetts (unlike California) had not adopted the UTSA and therefore required that a trade secret claimant show actual use or disclosure by the defendant, there was arguably no basis under Massachusetts common law to issue injunctive relief under a theory of inevitable disclosure. In 1995, a federal district court (applying Massachusetts law) found that it was "inevitable" that a software developer would use his former employer's information in his new position; however, the case involved a noncompete agreement and therefore it was not necessary for the court to address the inevitable disclosure doctrine.[144] In 2002, a federal district court did address the doctrine directly and rejected it, stating: "Massachusetts law provides no basis for an injunction without a showing of actual disclosure."[145] As of 2003, a commentator summed up the state of the law by observing that "no Massachusetts appellate court has ruled on the viability of the inevitable disclosure doctrine, and the few Massachusetts trial court decisions dealing with the doctrine have been decidedly lukewarm about it."[146]

Consistent with our general view stated at the outset of this discussion, with respect to the inevitable disclosure doctrine, it was actually California that was more protective of trade secret holders. Any current differences can be dated either to 2008, the year of the *Edwards v Arthur Andersen LLP* decision (insofar as it signaled California courts' likely rejection of any effort by plaintiffs to seek injunctive relief under the inevitable disclosure doctrine), or 2018, when the Massachusetts legislature adopted its version of the UTSA. This gave rise to the same uncertainty that arose following California's adoption of the UTSA in 1984. Following the model statute, the Massachusetts version refers to "threatened misappropriation,"[147] which could provide a basis for Massachusetts courts to adopt the inevitable disclosure doctrine, although they may adopt California courts' now-prevailing understanding that the "threatened misappropriation" language does

---

[144]  *Marcam Corp v Orchard*, 885 F Supp 294, 296–97 (D Mass 1995).

[145]  *Safety-Kleen Systems, Inc v McGinn*, 233 F Supp 2d 121, 124 (D Mass 2002).

[146]  See Laurence H. Reece III, *Employee Noncompetition Agreements: Recent Developments and Trends*, 88 Mass L Rev 24, 36 (2003).

[147]  Massachusetts Trade Secrets Act, Mass HR 4868, § 19 (cited in note 27) (providing that "threatened misappropriation may be enjoined upon principles of equity, including but not limited to consideration of prior party conduct and circumstances of potential use").

not imply endorsement of the inevitable disclosure doctrine.[148] While that particular point remains unresolved today, it is notable that practitioners have commented that acceptance by Massachusetts courts of the inevitable disclosure doctrine would run counter to those courts' historical tendency to reject or at least resist application of the doctrine.[149]

    *b) Noncompetes.* During the time in which Silicon Valley overtook Route 128, and continuing through the present, it is certainly the case that Massachusetts law, as compared to California law, provided employers with a higher level of confidence in the enforceability of noncompetes. But the differences should not be exaggerated nor should it be assumed that Massachusetts employers have had unfettered ability to enforce noncompetes without constraint. Like almost all states, Massachusetts applies the common-law reasonableness standard. This standard limits the enforceable scope of a noncompete by duration, scope and geography, provided in all cases that the noncompete is deemed necessary to protect the employer's legitimate business interests.[150] For this purpose, Massachusetts courts have defined the employer's legitimate interest narrowly. In a trilogy of cases decided in 1974, the Massachusetts Supreme Court emphasized that noncompetes were enforceable only to the extent required to protect the employer's goodwill, trade secrets, or confidential information.[151] Massachusetts courts apparently took these constraints seriously: writing in 1991, a leading practitioner of trade secret law observed that "Massachusetts courts have often refused to enforce non-competition agreements on the ground that no trade secrets or confidential business information were involved" and that "[i]n

---

[148] For discussion, see Yekaterina Reyzis, *One Step Away from Uniform: Taking a Closer Look at Massachusetts' New Trade Secrets Law* (JDSupra, Nov 21, 2018), archived at https://perma.cc/M472-MVPY.

[149] See id (noting that Massachusetts courts "have long held that the inevitable disclosure doctrine hurts employer mobility and competition"); Andrew T. O'Connor, *New Massachusetts Trade Secret Laws Effective October 1, 2018* (In-House, Sept 12, 2018), archived at https://perma.cc/834P-GUAN (noting that Massachusetts courts "were considered to have effectively rejected (or at least discredited) the 'inevitable disclosure' doctrine").

[150] *Alexander & Alexander, Inc v Danahy*, 488 NE2d 22, 29–30 (Mass App 1986); *New England Canteen Service, Inc v Ashley*, 363 NE2d 526, 528 (Mass 1977); *Analogic Corp v Data Translation, Inc*, 358 NE2d 804, 807 (Mass 1976); *Marine Contractors Co, Inc v Hurley*, 310 NE2d 915, 920–21 (Mass 1974).

[151] See *All Stainless Inc v Colby*, 308 NE2d 481, 485–86 (Mass 1974); *Marine Contractors Co*, 310 NE2d at 920; *National Hearing Aid Centers, Inc v Avers*, 311 NE2d 573, 576–77 (Mass App 1974).

numerous cases, Massachusetts courts have cut back restrictions to make them reasonable."[152]

Other obstacles stood in the way of a Massachusetts employer who sought to enforce a noncompete. Since 1968, Massachusetts courts have recognized the material change doctrine, which bars enforcement of noncompetes if the employee's position and salary changed significantly since starting employment.[153] In 1979 and 1982, the Massachusetts courts extended the reasonableness standard to employment contracts that required employees to forfeit certain deferred compensation upon termination, on the ground that these provisions implicitly operated as noncompetes.[154] Additionally, Massachusetts courts have held that noncompete agreements are to be construed strictly in favor of the employee and, relatedly, have declined to enforce noncompetes if the contractual language has been deemed to be excessively ambiguous.[155] Contrary to the standard narrative, Massachusetts courts during the decline of Route 128 were far from enthusiastic about noncompetes and applied the common-law reasonableness standard to limit their enforceability.

### 4.  Did weak enforcement of noncompetes really cause the Valley to rise?

The standard narrative correctly observes that Massachusetts was an early pioneer of technological innovation. Ironically, the Boston area essentially originated what is now viewed as the Silicon Valley model consisting of a strong academic research complex coupled with a robust venture capital community and substantial movement of human capital among academia, startups, and large firms. In 1946, a Boston firm (the American

---

[152]  Laurence H. Reece III, *Employee Non-Competition Agreements and Related Restrictive Covenants: A Review and Analysis of Massachusetts Law*, 76 Mass L Rev 2, 11–12 (1991), citing *National Hearing Aid Centers*, 311 NE2d at 576–77 (denying injunctive relief on ground that employee had not used any confidential information belonging to the employer); *Richmond Brothers, Inc v Westinghouse Broadcasting Co, Inc*, 256 NE2d 304, 305–06 (Mass 1970) (declining to enforce noncompete on ground that employee's success was not attributable to employer's trade secrets or confidential information).

[153]  *F.A. Bartlett Tree Expert Co v Barrington*, 233 NE2d 756, 758 (Mass 1968).

[154]  *Kroeger v Stop & Shop Companies, Inc*, 432 NE2d 566, 568, 571–72 (Mass App 1982); *Cheney v Automatic Sprinkler Corp of America*, 385 NE2d 961, 965 & n 7 (Mass 1979).

[155]  See, for example, *Lanier Services, Inc v Ricci*, 192 F3d 1, 4–5 (1st Cir 1999) (finding that the term, "facilities management services," was ambiguous as a matter of law, interpreting the phrase against the former employer as the drafting party, and declining to enforce the noncompete). For discussion of additional cases during 1999–2002, see Reece, 88 Mass L Rev at 26 (cited in note 146).

Research and Development Corporation, or ARD) established the first major successful venture capital enterprise.[156] Supported by federal defense funding and local VC investors, MIT and Harvard University labs spawned hundreds of spin-offs throughout the 1960s and 1970s.[157] Those spin-offs included firms that later pioneered the "minicomputer"[158] market such as Digital Equipment Corporation (DEC) (founded in 1957 as a MIT startup with funding from ARD), Wang (founded by a Harvard physicist in the 1950s), Data General (founded in 1968 by ex-DEC engineers), and Prime (founded in 1972 by engineers from Honeywell).[159]

Contrary to Saxenian's account of cultural norms, Paul Ceruzzi describes the most important Route 128 firm, DEC, as having been characterized by a nonhierarchical engineer-driven culture that dispensed with the formalities and bureaucracy of incumbents such as IBM.[160] Certainly, as DEC and other large Route 128 firms grew, they tended to adopt vertically integrated structures.[161] But it would be inaccurate to describe the Route 128 environment in its heyday as a monolithic industry consisting of

---

[156] Saxenian, *Regional Advantage* at 15 (cited in note 8).

[157] See id at 16–17; Martin Kenney and Urs von Burg, *Technology, Entrepreneurship and Path Dependence: Industrial Clustering in Silicon Valley and Route 128*, 8 Indust & Corp Change 67, 85–87 (1999); Edward B. Roberts, *A Basic Study of Innovators; How to Keep and Capitalize on Their Talents*, 11 Rsrch Mgmt 249, 254–55 (1968).

[158] The minicomputer refers to a class of computing devices that delivered computing power at a significantly reduced cost (and physical size) relative to the mainframe market (dominated by IBM). Advances in miniaturization and the development of the microprocessor yielded the "microcomputer" (equivalent to the modern PC), which delivered substantial computer power with a small physical "footprint," thereby rendering obsolete the minicomputer category. For discussion, see Paul E. Ceruzzi, *A History of Modern Computing* 124–26 (MIT 2d ed 2003).

[159] See id at 127 (noting that DEC was founded in 1957 by former MIT researchers with funding from ARD); id at 195 (stating that Data General was founded in 1968 by three former DEC engineers); Saxenian, *Regional Advantage* at 18–19 (cited in note 8) (noting that in 1951, An Wang, a scientist at Harvard, founded Wang Laboratories; in 1957, three scientists left Lincoln Labs to found DEC; in 1968, Edson DeCastro left DEC to found Data General; in 1972, William Poduska left Honeywell to found Prime); Kenney and von Burg, 8 Indust & Corp Change at 85–86 (cited in note 157) (noting that in 1957, Kenneth Olsen, a former MIT researcher, founded DEC with a capital investment from ARD); Lynn E. Browne and Steven Sass, *The Transition from a Mill-Based to a Knowledge-Based Economy: New England, 1940–2000*, in Peter Temin, ed, *Engines of Enterprise: An Economic History of New England* 211–12 (Harvard 2000).

[160] See Ceruzzi, *A History of Modern Computing* at 138 (cited in note 158) ("DEC represented everything that was liberating about computers, while IBM, with its dress code and above all its punched card, represented everything that had gone wrong.").

[161] See Kenney and von Burg, 8 Indust & Corp Change at 86–87 (cited in note 157) (stating that many minicomputer pioneers in the Route 128 area integrated vertically in order to reduce turnaround time and protect chip designs); Sarah Kuhn, *Computer Manufacturing in New England: Structure, Location and Labor in a Growing Industry* 29–33 (Joint Center for Urban Studies of MIT and Harvard University 1982).

a handful of vertically integrated incumbents. Although DEC and three other Route 128 firms (plus IBM) dominated the minicomputer segment in the late 1970s and early 1980s,[162] observers and studies systematically documented that those firms spawned a continuing flow of small-firm spin-offs. [163] An interview-based study of twenty-two Massachusetts-based computer firms between 1965 and 1975 found that half of the firms' products "were the result of direct technology transfer from previous employers and another quarter indirect transfer."[164] A study of patent coauthoring patterns found similarly that Boston innovators were regularly involved in information exchange networks that were comparable in robustness (but not size) to those in Silicon Valley.[165] In a manner akin to accounts of Silicon Valley, qualitative histories observe that Route 128 spin-offs could procure necessary inputs from a disaggregated network of small- to medium-size component producers and suppliers, assemblers, and distributors.[166] A history of the period concludes: "[C]ompanies spinning

---

[162] See Nancy S. Dorfman, *Massachusetts' High Technology Boom in Perspective: An Investigation of Its Dimensions, Causes and of the Role of New Firms* 2–4 (MIT Center for Policy Alternatives 1982).

[163] See Michael H. Best, *The New Competitive Advantage: The Renewal of American Industry* 129–30 (Oxford 2001) (describing "genealogies" of firm spin-offs from entrepreneurial "parent" firms in various technology segments of the Route 128 area); Susan Rosegrant and David R. Lampe, *Route 128: Lessons from Boston's High-Tech Community* 153–57 (Basic Books 1992); Dorfman, 12 Rsrch Pol at 310–11 (cited in note 79) (noting that DEC, the leading technology firm in the Boston area, had spawned multiple spin-offs, and that most new technology firms in the Boston area were founded by former employees of other firms or research laboratories); Elaine Romanelli, *New Venture Strategies in the Minicomputer Industry*, 30 Cal Mgmt Rev 160, 167 (1987) (observing that, during the 1960s and 1970s, almost sixty new minicomputer firms were formed, principally by engineers who had worked for DEC and other major minicomputer manufacturers); Roberts, 11 Rsrch Mgmt at 252 (cited in note 157) (observing that thirty-nine companies had been formed during the 1960s by forty-four former employees of one Boston area electronics firm).

[164] See Dorfman, 12 Rsrch Pol at 310, 316 n 40 (cited in note 79) (describing a 1977 study by the MIT Center for Policy Alternatives).

[165] See Lee Fleming, et al, *Why the Valley Went First: Agglomeration and Emergence in Regional Inventor Networks* *29–30 (working paper, Feb 2003), archived at https://perma.cc/4MA2-KZ5U.

[166] See Franz Tödtling, *Regional Networks of High-Technology Firms—The Case of the Greater Boston Region*, 14 Technovation 323, 330 (1994) (describing regional network in Boston area comprising electronics, component and software firms, some of which act as "suppliers or subcontractors to the [large] minicomputer firms"); AnnaLee Saxenian, *In Search of Power: The Organization of Business Interests in Silicon Valley and Route 128*, 18 Econ & Society 25, 45 (1989) (stating that "research laboratories and firms producing components and services for each other co-located, and cross-fertilizations between the academic world, the federal government and local industry fuelled an ongoing expansion of technologically innovative activity in the [Route 128] region"); Dorfman, 12 Rsrch Pol at 306 (cited in note 79) (stating that the Boston area provides technology firms with access to a network of parts and components suppliers, "all particularly critical to new

off from other companies were at the very heart of the monumental growth that the Route 128 area experienced from the 1960s through the 1980s."[167]

On the West Coast, Silicon Valley pioneered innovations in the semiconductor field and, by the late 1970s, was the recognized leader.[168] Historical accounts of Silicon Valley's semiconductor industry typically attribute its origins to the departure in 1957 of leading engineers from Shockley Transistors to form Fairchild Semiconductor, which generated a sequence of leading semiconductor firms.[169] Semiconductor chips are a critical component in a wide array of computing and electronics products and operated as a launching pad for Silicon Valley to achieve dominance in information technology more generally.[170] Even after lower-cost Japanese producers in the 1980s undermined the local memory chip production industry, Silicon Valley adapted by shifting resources to the design and development of customized chips[171] and developing strengths in hardware and software markets. By contrast, the Massachusetts minicomputer industry did not recover as quickly from the entry of lower-cost workstations and personal computers.[172] Massachusetts had bet on the wrong horse and was unable to recover the lead.

Unlike the legal literature, the economic history and business management literature shows no consensus view as to the factors that best explain why Silicon Valley overtook Route 128 as an information technology center. Starting with Gilson, the legal literature has focused on the explanation advocated by Saxenian, who

---

start-ups that are developing prototypes and to manufacturers of customized equipment for small markets").

[167] See Rosegrant and Lampe, *Route 128* at 154 (cited in note 163).

[168] See Kenney and von Burg, 8 Indust & Corp Change at 68, 80–85 (cited in note 157).

[169] See Ceruzzi, *A History of Modern Computing* at 198 (cited in note 158).

[170] See Kenney and von Burg, 8 Indust & Corp Change at 78 (cited in note 157) ("In the postwar electronics industry, transistors and then integrated circuits were an enabling technology for nearly every important electronic innovation.").

[171] See AnnaLee Saxenian, *Regional Networks and the Resurgence of Silicon Valley*, 33 Cal Mgmt Rev 89, 89–95 (1990) (describing how firms that specialize in the design of customized chips and outsource production enabled Silicon Valley to recover after Japanese firms entered the general-purpose semiconductor markets).

[172] See Ceruzzi, *A History of Modern Computing* at 304–06 (cited in note 158) (describing how minicomputer companies based in the Boston area failed to adapt to the PC revolution); Kenney and von Burg, 8 Indust & Corp Change at 87 (cited in note 157) (stating that the minicomputer industry could not compete with "workstations" that offered comparable computing power at a substantially lower price); Richard N. Langlois, *Organizing the Electronic Century*, in Giovanni Dosi and Louis Galambos, eds, *The Third Industrial Revolution in Global Business* 119, 155 (Cambridge 2013) (same).

attributed this development to cultural norms and vertically integrated structures that constrained the flow of intellectual capital.[173] However, the business management and economic history literature is far less monolithic and identifies other salient reasons why Silicon Valley may have overtaken Massachusetts. Most commonly, these scholars identify factors such as the draw of warm weather, luck (in particular, Shockley Transistors' choice to locate in the Bay Area, which then gave rise to the Fairchild spin-off),[174] and, most compellingly, the fact that Silicon Valley had achieved leadership in a general-purpose technology (namely, the microprocessor pioneered by Intel in the 1970s) that could be applied to a wide variety of industrial, business, and consumer markets.[175] By contrast, the leading Massachusetts firms in the late 1970s and early 1980s had focused on developing specialized minicomputer and other technologies targeted for technical and industrial users.[176] Hence, once-pioneering Massachusetts firms such as DEC tended to focus on technologies that would service existing markets for technical and industrial users, rather than developing innovations—such as the personal computer—that would open up new and much larger markets in the corporate, small business, and home segments.[177]

This is not to say that East Coast firms were innovation laggards as compared to their West Coast counterparts. After all, it was IBM, headquartered in New York State, that in 1981 launched the personal computer, which precipitated the movement from closed "end-to-end" hardware systems to modular

---

[173] See note 8.

[174] In the words of Intel's cofounder: "[L]uck played a role in nearly every component of this story of semiconductors and the birth of Silicon Valley." See Gordon Moore and Kevin Davis, *Learning the Silicon Valley Way*, in Timothy Bresnahan and Alfonso Gambardella, eds, *Building High-Tech Clusters: Silicon Valley and Beyond* 7, 36 (Cambridge 2004).

[175] See Kenney and von Burg, 8 Indust & Corp Change at 80 (cited in note 157) (noting that "the semiconductor found a far greater variety of applications than did the minicomputer" and "the semiconductor was important because it made so many other products possible").

[176] See id (noting that Route 128 specialized in the minicomputer, which was a finished product, rather than a component that could be used to assemble other products); Dorfman, *Massachusetts' High Technology Boom in Perspective* at 2–4 (cited in note 162).

[177] See Kenney and von Burg, 8 Indust & Corp Change at 87 (cited in note 157) (noting the common observation that Route 128 firms such as DEC failed to appreciate the threat posed by workstations and microcomputers, the precursors to the desktop personal computer); Ceruzzi, *A History of Modern Computing* at 243–45 (cited in note 158) (noting DEC's choice to focus on high-performance and larger computers rather than smaller and less expensive personal computers).

"plug-and-play" hardware systems as the standard product architecture in the computing market.[178] That East Coast innovation in turn led to the aforementioned decline of DEC, Wang, and other leading Massachusetts minicomputer firms that operated under closed models in which customers purchased all components from a single firm.[179] IBM's success is attributable in part to its then-novel decision to outsource design and production of many of the PC's components—most notably, the operating system (to Microsoft) and the microprocessor (to Intel)—as well as its inadvertent commoditization of the PC's hardware.[180] But these were strategies that could have been taken by a firm like DEC, which had previously made pioneering contributions to computing technology. In fact, DEC attempted to do just that. In 1988, IBM and DEC collaborated to establish the Open Software Foundation, an effort to develop OS/2, a nonproprietary operating system intended to challenge Microsoft's Windows system.[181] Similarly, some of DEC's Route 128 peers responded (albeit, somewhat belatedly) to the decline of the minicomputer by adopting alternative organizational structures.[182] Moreover, two Route 128 firms launched the first commercially successful spreadsheet applications (Visicalc, released in 1979, and Lotus 1-2-3, released in 1984),[183] which are recognized as key factors in the widespread adoption of the Mac and PC, respectively.[184] Hence, there does not seem to be any compelling reason to attribute the decline of DEC and other leading Massachusetts firms substantially to cultural norms or vertically integrated forms of industrial organization.

A similar observation complicates Gilson's argument that Massachusetts's willingness to enforce noncompetes suppressed labor mobility, which hindered the region's innovative performance. Critically, this argument fails to contemplate that

---

[178] See Langlois, *Organizing the Electronic Century* at 153–54 (cited in note 172).

[179] See Best, *The New Competitive Advantage* at 122 (cited in note 163) (observing that dominant Route 128 firms such as DEC and Wang offered "closed architecture" systems). See also Kenney and von Burg, 8 Indust & Corp Change at 87 (cited in note 157) (noting that Wang had dismissed the commercial importance of personal computers).

[180] See Ceruzzi, *A History of Modern Computing* at 277–78 (cited in note 158); Kenney and von Burg, 8 Indust & Corp Change at 96 (cited in note 157).

[181] See Glenn Rifkin and George Harrar, *The Ultimate Entrepreneur: The Story of Ken Olsen and Digital Equipment Corporation* chs 24–25 (Contemporary Books 1988); John Steffens, *Newgames: Strategic Competition in the PC Revolution* 183–84, 222–23 (Pergamon 1994).

[182] See Tödtling, 14 Technovation at 332 (cited in note 166).

[183] See M. Mitchell Waldrop, *The Origins of Personal Computing*, 285 Scientific Am 84, 90 (Dec 2001).

[184] See James A. Sena, *The PC Evolution and Diaspora*, CrossTalk 23 (Mar/Apr 2012); Langlois, *Organizing the Electronic Century* at 152 (cited in note 172).

Route 128 firms could have chosen *not* to request or enforce noncompetes if competitive pressures in the labor market drove them to do so. Gilson argues that collective-action pressures precluded that possibility.[185] But there is compelling evidence that Route 128 firms sometimes, if not *typically*, elected to forgo adoption and enforcement of noncompetes. Contemporary accounts in the early 1980s observed that Route 128 was characterized by frequent spin-offs,[186] talented engineers often left their employees to form start-ups, and large incumbents were typically parents of multiple spin-off firms.[187] One observer records that Route 128 firms tolerated or even welcomed the movement of technical personnel because they "value[d] the knowledge they obtain[ed] by hiring employees from other firms more than they fear[ed] the loss of proprietary information,"[188] and that entrepreneurs often conceived of ideas "in the lab of an employer."[189] That same observer noted that "[n]ew and expanding firms hire[d] their 'know how' by bidding experienced employees away from competing firms."[190]

These accounts make no mention of the use of noncompetes to restrain employee turnover. Rather, firms attempted to retain valued employees by offering superior terms and more interesting work[191]—something that would have been unnecessary if noncompetes were legally potent. The lesson seems clear: when technical

---

[185]  See Gilson, 74 NYU L Rev at 596 (cited in note 8).

[186]  See David A. Garvin, *Spin-Offs and the New Firm Formation Process*, 25 Cal Mgmt Rev 3, 3 (1983) (observing that, as of the early 1980s, in both Silicon Valley and Route 128, new firms are continuously being formed through "spin-offs" founded by "individuals leaving an existing firm in the same industry").

[187]  See Rosegrant and Lampe, *Route 128* at 29, 153–57 (cited in note 163); Dorfman, *Massachusetts' High Technology Boom in Perspective* at 69 (cited in note 162). Professor Sarah Kuhn observes as follows: (i) "[s]ome firms prefer to hire away employees of other computer manufacturing firms," Kuhn, *Computer Manufacturing in New England* at 72 (cited in note 161); (ii) Route 128 has "an unusually high turnover rate among its technical employees, see id at 124–25, and (iii) Route 128 firms provided survey responses indicating heavy reliance on hiring employees from competitors, see id at 125. Similarly, Nancy Dorfman remarks that the Route 128 area is characterized by a start-up entrepreneurial culture in which firms bid away experienced employees from competitors. See Dorfman, 12 Rsrch Pol at 308 (cited in note 79). She further observed that "scientists repeatedly leave their employers to commercialize and market new products whose concepts they helped to develop in the laboratory of a former employer" and it is a "challenge to find new enterprises whose founders did not come from an academic laboratory or another high tech firm." See id at 310.

[188]  See Dorfman, *Massachusetts' High Technology Boom in Perspective* at 9 (cited in note 162).

[189]  See id at 69.

[190]  See Dorfman, 12 Rsrch Pol at 308 (cited in note 79).

[191]  See Kuhn, *Computer Manufacturing in New England* at 125 (cited in note 161).

talent is scarce and market demand for that talent is high, bargaining leverage shifts to employees and differences in the enforceability of noncompetes make little practical difference. Any employer who sought to enforce a noncompete would be punished in the labor market.[192]

To be certain, there is no comprehensive quantitative evidence on noncompete usage and enforcement during this historical period. However, in more recent times—notably, after California substantially ratcheted up its aversion to noncompetes in 2008 in *Edwards*—Massachusetts and California have exhibited similar rates of employee noncompete usage, even among wholly in-state firms, according to the most comprehensive survey conducted to date.[193] Thus, it seems unlikely that during the historical period in question—when Massachusetts and California noncompete law were more similar than today—that the rate of noncompete usage and enforcement between the two states substantially differed.

There may be an additional material factor behind Silicon Valley's ascendance, which existing scholarship has overlooked. In 1979, the Department of Labor modified the "prudence rule" to permit pension fund trustees to invest in venture capital.[194] Based on this signal from federal regulators, state pension fund trustees took the view that it would be consistent with their fiduciary obligations to invest an appropriate portion of a fund's assets in venture capital and other high-risk "alternative" investments.[195] This change triggered a dramatic inflow of capital into VC investments

---

[192] Of course, monopsonistic labor markets exist, and assuming the predicate conditions for firm coordination in this context are satisfied—small number of employers with large market share, comparable employment positions, observable compensation, and a credible mechanism to punish defections—employers can credibly impose and enforce noncompetes. For discussion, see *Todd v Exxon Corp*, 275 F3d 191, 201–02, 207–14 (2d Cir 2001). However, we have no reason to believe that these challenging conditions were satisfied in the labor markets for highly skilled technical workers in the Route 128 area during this historical period, especially given evidence that this area was characterized by frequent spin-offs during this period. See notes 163–67 and accompanying text.

[193] Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *45 fig 8 (cited in note 11).

[194] Department of Labor, Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule, 44 Fed Reg 37221–22 (1979), amending 29 CFR § 2550.404a-1.

[195] See Paul A. Gompers and Josh Lerner, *What Drives Venture Capital Fundraising?* 155 (Brookings Institution 1998).

and, by the late 1980s, the emergence of pension funds as the single largest investor class in VC funds.[196] Presumably, the same is true of California pension funds' increase in VC investment at approximately the same time, given that CalPERS, the principal California state pension fund, followed the lead of the Department of Labor and directed assets toward venture capital funds, formally establishing an Alternative Investment Management program for this purpose in 1990.[197] Like other state pension funds (including Massachusetts), California state pension funds exhibit a significant in-state bias in their investments in VC and private equity funds.[198] VC funds in turn exhibit an in-state bias in the selection of portfolio firms.[199] The much larger size of the California pension system, combined with the in-state biases of California state pension fund managers and California VC principals, implies that Silicon Valley startups likely had access to a much larger pool of capital than Boston-based startups.[200]

---

[196] See id at 155–56, 163–66 (observing that change in the Department of Labor's "prudent man rule" led to investment in venture capital funds by pension funds, which became the primary source of capital for these funds).

[197] See *CalPERS Private Equity Investments Infuse Billions into California Businesses; Portfolio Is Positioned to Capitalize on Buying Opportunities* (Business Wire, Oct 17, 2003), archived at https://perma.cc/4C74-L6R5 (noting the establishment by CalPERS of Alternative Investment Management Program in 1990 as a vehicle for investing in private equity).

[198] See Yael V. Hochberg and Joshua D. Rauh, *Local Overweighting and Underperformance: Evidence from Limited Partner Private Equity Investments*, 26 Rev Fin Stud 403, 414–25 (2013).

[199] See Adam Lichtenstein, *Home-State Investment Bias in Venture Capital Funds*, 62 Fin Analysts J 22, 23–24 (2006). For further evidence that venture capital funds favor investments in geographically proximate regions, see Claudia B. Schoonhoven and Kathleen M. Eisenhardt, *Regions as Industrial Incubators*, in Edwin S. Mills and John F. McDonald, eds, *Sources of Metropolitan Growth* 210, 244–45 (Transaction 2012).

[200] Although data is not available from the time period in question, to get a sense of the sums involved, consider that, during 2007–2014, CalPERS has held between 8.5 percent and 13.5 percent of its private equity investments in California-based firms. In 2014, it held $31.5 billion of private equity investments, of which 11.5 percent was invested in California-based firms. See CalPERS, *CALPERS Comprehensive Annual Financial Report* *52, 100 (FY 2014); CalPERS, *CALPERS Comprehensive Annual Financial Report* *92 (FY 2010); California State Controller's Office, *CALPERS Comprehensive Annual Financial Report* *83 (FY 2009); CalPERS, *CALPERS Comprehensive Annual Financial Report* *86, 89 (FY 2008). Private equity includes VC investments as well as other investments in firms that are not publicly traded. The Massachusetts Pension Reserves Investment Trust Fund, which manages private equity investments on behalf of the Massachusetts state pension system, reported that, as of June 2014, it held $6.9 billion in investments in private equity, of which $1.4 billion was invested in venture capital. See Massachusetts Pension Reserves Investment Trust Fund, *Comprehensive Annual Financial Report* *35 (2014). The report does not disclose what portion of those funds were allocated to Massachusetts-based investment funds, although it does indicate that 27 percent of its private equity investments were made outside the US. See id at *84. Hence, it is extremely

5.  Did Massachusetts really decline?

The traditional narrative relies both on the rise of Silicon Valley as a center of innovation in the electronics industry and the decline of Route 128. While it is correct that Silicon Valley has achieved a uniquely preeminent position, this narrative overstates both Massachusetts's relative historical prominence as a technology center and its relative retreat from that position in more recent decades.

While Route 128 was an historical pioneer in the IT industry since World War II, the period during which it was clearly a dominant center was a short period limited to the height of the minicomputer market during the late 1970s and early 1980s.[201] Even during that time, there was no single, overwhelmingly dominant innovation center akin to Silicon Valley's place today. Relative to the Boston area's important, but less than preeminent, position as of the early 1980s, it does not appear to have suffered a permanent decline in innovative performance since the collapse of the minicomputer industry.[202] Rather, the Boston area has recovered its place as a leading regional innovation center, even if it no longer rivals Silicon Valley in the IT market. Multiple innovation metrics provide suggestive evidence in support of this view. During 1985–2013, the Bay Area held and expanded its lead in the volume of VC investments while the New England region consistently occupied the second- or third-place position.[203] From 1987 through 2011, Massachusetts maintained consistently high levels of business-funded R&D intensity (defined as R&D funded by businesses as a percentage of "gross state product") in a range of approximately 3–4 percent, outperforming California in all years but one.[204] From 1997 through 2016, California and Massachusetts

[201]  See Best, *The New Competitive Advantage* at 120 (cited in note 163).

[202]  See id at 126–27.

[203]  National Venture Capital Association, *Yearbook* \*35–37 fig 3.08–09 (Thomson Reuters, 2015), archived at https://perma.cc/Y5G3-6DJA.

[204]  Authors' calculations, based on (i) data on state-level R&D expenditures extracted on an alternating year basis from the National Center for Science and Engineering Statistics, *Industrial Research and Development Information System* (National Science Foundation, July 2011), archived at https://perma.cc/82ZP-4YS2, and (ii) data on "gross state product" available from the Bureau of Economic Analysis, *Comprehensive Revision of Gross State Product, 1977–2002, and Accelerated GSP Estimates for 2003* (US Department of Commerce, Dec 15, 2004), archived at https://perma.cc/28C3-RCTV. With respect to item (i), we excluded federal R&D expenditures in order to avoid reflecting any federal subsidies that might understate regional markets' ability to sustain innovation.

have appeared every year among the top three states in terms of business-performed R&D intensity (defined as R&D performed by businesses as a percentage of "private-industry output").[205] After the San Francisco area, the Boston area is the second-most popular location in the US that companies select for their primary R&D center (selected by 230 firms as of 2011, compared to 380 firms for San Francisco).[206]

The Boston area has preserved or regained a significant presence in biotechnology and the life sciences, computer systems design, telecommunications equipment, data storage, technical instruments, and industry-oriented software tools.[207] In fact, the success of the Boston area as a technology cluster since the collapse of the minicomputer industry has now lasted longer than the period during which DEC and its peers were dominant.[208] Notwithstanding Massachusetts's formal tolerance of noncompetes, multiple leading firms in various information technology sectors have spawned a steady flow of new firms providing complementary products and services.[209] In the life sciences (including biotechnology) and medical devices sector in particular, the Boston area is especially prominent (in 2015, biotech firms based in New England raised approximately $10.6 billion from outside investors, while biotech firms based in the San Francisco Bay Area raised approximately $6.5 billion).[210] Trade and scholarly commentary typically situates the Boston area among a triplet of

---

[205] National Center for Science and Engineering Statistics, *Industrial Research and Development Information System* (cited in note 204).

[206] Raymond Wolfe and Brandon Shackelford, *2011 Data Show U.S. Business R&D Highly Concentrated by State and Metropolitan Location* (National Science Foundation, Aug 2014), archived at https://perma.cc/NJC9-TAJU.

[207] See Best, *The New Competitive Advantage* at 126, 127–48, 154, 157 (cited in note 163) (describing "resurgence" of Route 128 area as the local technology industry transitioned from vertically integrated to an "open system . . . model of industrial organization"); Michael Best, Albert Paquin, and Hao Xie, *Discovering Regional Competitive Advantage: Massachusetts High-Tech*, 2 Bus & Econ Hist On-Line 1, 2, 7–21 (2004), archived at https://perma.cc/C6X4-7HAN (describing "resurgence" of the Boston area as an innovation center in the 1990s and providing extensive data showing that the Boston area continues to excel in its historical strengths in complex systems software and engineering); Jason S. Wood, *A Comparison of the Enforceability of Covenants Not To Compete and Recent Economic Histories of Four High-Technology Regions*, 5 Va J L & Tech 14, ¶ 38 (2000) (noting that, contrary to "Gilson's dark portrait of Massachusetts' lack of knowledge spillover effects, the greater Boston area, including Route 128, has recovered nicely from the dark days of the 1980s and early 1990s, and has been a leader in the technology revolution of the mid and late-1990s").

[208] See Best, *The New Competitive Advantage* at 121 (cited in note 163).

[209] See id at 129–30.

[210] See *Beyond Borders 2016: Biotech Financing* *15 (Ernst & Young, 2016), archived at https://perma.cc/C3SS-4CZZ.

leading biotechnology clusters along with the Bay Area and San Diego,[211] in some cases ranking it as the leader among those three locations.[212] As of 2015, the Massachusetts Biotechnology Council stated that Massachusetts employed more personnel in biotechnology R&D than any other state and an MIT report found that, on a per capita basis, Massachusetts received significantly more funding ($351 per capita) from the National Institutes of Health than California ($88 per capita).[213] During 2012–2014, San Francisco firms received each quarter approximately 30–50 percent of funding in the national life sciences industry, while Boston firms received each quarter approximately 20–40 percent of funding.[214]

On a state-to-state level comparison, it may be surprising to learn that Massachusetts and California do not materially differ by multiple measures of innovative health. The State Technology and Science Index, which ranks states' innovation capacities by various objective measures, has ranked Massachusetts in first place since the index was inaugurated in 2002 and through its latest release in 2018.[215] In 2018, California ranked fourth, after having held fourth, third, and third places in 2016, 2014, and 2012, respectively.[216] According to the State New Economy Index, both California and Massachusetts are among the country's leading states on multiple innovation measures (reflecting data as of the years 2012 through 2016), including:

(i)     industry-funded R&D as a percentage of total state GDP (CA: 2.5 percent (ranked third); MA: 2.1 percent (ranked fourth));

---

211  See Shiri M. Breznitz and William P. Anderson, *Boston Metropolitan Area Biotechnology Cluster*, 28 Can J Regional Sci 249, 249 (2005) (noting that Boston, San Diego, and the San Francisco Bay Area "account for a disproportionately high share of total employment and investment" in the US biotechnology industry); Toby Stuart and Olav Sorenson, *The Geography of Opportunity: Spatial Heterogeneity in Founding Rates and the Performance of Biotechnology Firms*, 32 Rsrch Pol 229, 236–37, 249 (2003) (showing that for the period 1983–1995, the Boston area, Southern California, and Northern California exhibited the largest number of new biotechnology firms).

212  *Clusterluck: Boston's Biotech Hub Is Surviving the Challenge from Silicon Valley* (The Economist, Jan 16, 2016), online at https://www.economist.com/business/2016/01/16/clusterluck (visited Feb 17, 2020) (Perma archive unavailable).

213  See id.

214  See *Biotech Funding Surges* *6 fig 13 (PricewaterhouseCoopers, Feb 2015), archived at https://perma.cc/23MW-BQEK.

215  *Massachusetts: State Technology and Science Index* (Milken Institute, 2018), archived at https://perma.cc/WYZ4-AVL6.

216  See *2018 State Technology and Science Index: State Overall Ranking* (Milken Institute, 2018), archived at https://perma.cc/7Z7D-EQX5.

(ii)  patents awarded to companies per one thousand private-sector workers (CA: 14.6 (ranked thirteenth); MA: 15.7 (ranked ninth));

(iii)  venture capital invested as a percentage of state GDP (CA: 1.28 percent (ranked first); MA: 1.27 percent (ranked second)); and

(iv)  employment in high-technology industries as a percentage of total private-sector employment (CA: 6.8 percent (ranked fifth); MA: 7.9 percent (ranked first)).[217]

B.  Empirical Studies: Noncompetes, Mobility, and Innovation

Even if the Silicon Valley / Route 128 narrative were more robust, it would be imprudent to base any policy conclusions on a single historical example. While Japan was once widely viewed as a model of a successful innovation economy, a regime characterized by lifetime job security and oligopolistic market structures would hardly be viewed today as an attractive innovation ecosystem.[218] Recently, empirical and experimental researchers have sought to move beyond the Silicon Valley example and, in doing so, have produced a sizeable body of studies concerning the effect of noncompetes on labor mobility and, in some cases, innovation. Unlike the literature that relies on the Silicon Valley / Route 128 narrative, these studies usefully apply formal methods to a broad sample of state jurisdictions, seeking to exploit interstate differences, or intrastate changes in, the legal treatment of noncompetes to identify the effects of such differences and changes on employee turnover and certain innovation indicators.

These studies fall into two categories. The larger category addresses only or principally whether noncompetes (or specifically, the enforceability of noncompetes) reduce labor mobility. In a companion paper, we review these studies comprehensively and provide a detailed discussion of the contributions and limitations of the most widely cited studies.[219] In that review, we describe significant methodological limitations and identify factual errors

[217]  *The 2017 State New Economy Index* *10, 44, 47, 50 (Information Technology & Innovation Foundation, Nov 2017), archived at https://perma.cc/B8R7-CXAV.

[218]  On the folly of these once-popular views, see Brink Lindsey and Aaron Lukas, *Revisiting the "Revisionists": The Rise and Fall of the Japanese Economic Model* (Cato Institute, July 31, 1998), archived at https://perma.cc/3GZN-SDGH.

[219]  See Jonathan M. Barnett and Ted Sichelman, *Revisiting Labor Mobility in Innovation Markets* *12–29 (USC Gould School of Law Center for Law and Social Science Research Paper Series No CLASS16-13, May 26, 2016), archived at https://perma.cc/V2T9-6UGC.

concerning important points of state law. These shortcomings cast serious doubt on these studies' claims purporting to show a broad causal relationship between the enforcement of noncompetes and reduced labor mobility. For purposes of the review below, however, we will accept as given the findings of this first category of studies—that is, we will assume that the enforceability of noncompetes has some significant incremental effect on labor mobility. This assumption will enable us to focus our review below on a second and smaller group of studies that address the more fundamental question whether the enforceability of noncompetes has a detrimental effect on innovation.

### 1. Nonexperimental studies.

Several empirical studies have sought to test for a relationship between noncompetes, employee mobility, and innovation. Here, we address in detail four of the studies that scholars and policymakers have most heavily cited and relied upon. First, a 2003 study by Professors Toby Stuart and Olav Sorenson (the "Stuart and Sorenson study") examined biotechnology startups founded in the wake of an initial public offering (IPO) or acquisition of a previous company, finding a significant inverse relationship between in-state noncompete enforceability and overall startup formation. Specifically, in the absence of state-level fixed effects, the authors find that "states with weak non-compete regimes realize 217 percent higher founding rates than those that enforce non-compete covenants."[220] Additionally, taking account for state-fixed effects, Stuart and Sorenson find that the median IPO "occurring in . . . a weak enforcement state increases the founding rate [of new biotech firms] . . . by 26 percent."[221] Second, a 2011 study by Professor Mark Garmaise (the "Garmaise study") found that stronger noncompete enforceability, interacted with a measure of in-state competition, tends to suppress R&D spending and that increased enforceability reduces capital investment per

---

Our analysis in that paper focuses on the most widely cited studies, which include: Matt Marx, Jasjit Singh, and Lee Fleming, *Regional Disadvantage? Employee Non-compete Agreements and Brain Drain*, 44 Rsrch Pol 394 (2015); Garmaise, 27 J L Econ & Org 376 (cited in note 63); Matt Marx, Deborah Strumsky, and Lee Fleming, *Mobility, Skills, and the Michigan Non-compete Experiment*, 55 Mgmt Sci 875 (2009); Bruce Fallick, Charles A. Fleischman, and James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rev Econ & Stat 472 (2006).

[220] See Toby Stuart and Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin Sci Q 175, 193 (2003).

[221] Id at 195.

employee.[222] Third, a 2011 study by Professors Sampsa Samila and Olav Sorenson (the "Samila and Sorenson study") found that states that enforce noncompetes dampen the effects of venture capital investment on firm formation and patenting rates.[223] Based on these findings, Samila and Sorenson conclude that the enforceability of noncompetes "significantly impedes entrepreneurship and employment growth."[224] Fourth, a 2015 study by Professors Matt Marx, Jasjit Singh, and Lee Fleming (the "Marx et al. study") found a "brain drain" of inventors from Michigan to states that do not enforce noncompetes after 1985, the year in which Michigan law restored the enforceability of noncompetes.[225] Moreover, the Marx et al. study found that this effect was strongest for more highly skilled inventors.[226] We now address substantial limitations and, in some cases, outright flaws of these studies. Although we do not have space to address every study examining the relationship between noncompetes and innovation, our critique applies to the vast majority of lesser-cited studies on the issue.

*a) Improper characterization of how strongly states enforce noncompetes.* First, all four of these studies, as well as many other studies, oversimplify and largely misjudge the variation in the strength of state-by-state enforcement of noncompetes. Specifically, these studies classify strength of enforcement either (1) in a binary fashion as "enforcing" or "non-enforcing" states, developed from the study by Stuart and Sorenson; or (2) according to a twelve-factor scale developed by Garmaise.[227]

Specifically, Stuart and Sorenson classify each state as "non-enforcing" or "enforcing."[228] They identify six states that, during the period 1985–1996, purportedly "preclude[d] the enforcement of *all* noncompete agreements" and five states that "only enforce[d] non-compete covenants under very specific circumstances."[229] These eleven states are considered nonenforcing.[230] In

---

[222] See Garmaise, 27 J L Econ & Org at 408–10 (cited in note 63).

[223] See Samila and Sorenson, 57 Mgmt Sci at 432, 436 (cited in note 9).

[224] See id at 425.

[225] See Marx, Singh, and Fleming, 44 Rsrch Pol at 397 (cited in note 219).

[226] See id at 402. Inventive skill is measured by the number of citations to an inventor's patents.

[227] See Garmaise, 27 J L Econ & Org at 421–22 (cited in note 63); Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

[228] Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

[229] Id (emphasis added).

[230] Id.

contrast, they identify twenty-six enforcing states that purportedly placed "*no* restrictions" on the enforcement of noncompetes, as well as thirteen other nonenforcing states that followed a "reasonable[ness]" approach or enforced noncompetes limited in time or space.[231] The Samila and Sorenson study as well as the Marx et al. study both rely on Stuart and Sorenson's classification system for their analyses.[232]

This binary approach is inherently inaccurate—all states enforce some noncompete provisions and no states enforce all noncompete provisions. Other than California, North Dakota, and Oklahoma (until 1989), all states during that time period essentially adopted a reasonableness approach to the enforcement of noncompetes, subject to variation in application.[233]

Even if one were to draw an arbitrary line between states, it would result in at most two nonenforcing states during this time period. Consistent with both Professor Norman Bishara's comprehensive state-by-state review[234] and our own independent review, we find that during the relevant time periods, other than California and North Dakota, none of the purported nonenforcing states in the Stuart and Sorenson study—namely, Alaska, Connecticut, Michigan, Minnesota, Montana, Nevada, Oklahoma, Washington, and West Virginia—can plausibly be classified in this manner.

It appears that Stuart and Sorenson primarily examined the language of specific state statutes as reproduced in the 1996 edition of the Malsberger treatise on state enforcement of covenants not to compete,[235] without carefully reviewing the descriptions of actual case law in the same treatise. Critically, any state's effective noncompete regime cannot be accurately described without taking into account *both* applicable statutes and judicial interpretation of those statutes. Montana is a case in point. Apparently on the basis of the Montana statute voiding "contracts in restraint

---

[231] Id (emphasis added).

[232] Samila and Sorenson, 57 Mgmt Sci at 430 (cited in note 9); Marx, Singh, and Fleming, 44 Rsrch Pol at 396 n 2 (cited in note 219).

[233] See Brian Malsberger, *Covenants Not to Compete: A State-by-State Survey* xxv (BNA Books 2004) ("Malsberger 2004"); Brian Malsberger, *Covenants Not to Compete: A State-by-State Survey* xxiii (BNA Books 1996) ("Malsberger 1996"); Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy*, 13 U Pa J Bus L 751, 757 (2011) ("While the majority of states provide some enforcement of noncompete agreements . . . there are only two extreme outliers in terms of restrictions on any noncompete enforceability: California and North Dakota.").

[234] See Bishara, 13 U Pa J Bus L at 767, 771–81, 786–87 (cited in note 233).

[235] See Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

of trade,"[236] which has common origins with California's statute, Stuart and Sorenson classify it as a state that "precludes the enforcement of *all* noncompete agreements."[237] Yet, the Malsberger treatise expressly states that "[d]espite subsection 703, Montana courts have upheld restrictive covenants in employment contracts" under a general reasonableness standard.[238]

For states without statutes, Stuart and Sorenson's summary of the Malsberger treatise is also inaccurate. Our detailed review of the treatise, including cases cited therein, shows that all of their study's supposed nonenforcing states lacking statutes—Alaska, Connecticut, Minnesota, and Washington—are misclassified.[239] Again, these states essentially enforce noncompetes under a reasonableness standard. Indeed, Bishara—completely contrary to Stuart and Sorenson—classifies Connecticut and Washington as the fourth and eighth *strongest* enforcing states in 1991, respectively.[240]

In response to an earlier draft of this Article, Sorenson ran robustness checks to the main estimates in the initial study with Stuart using the Bishara measure of enforceability as well as a separate binary coding scheme in which North Dakota and California are the only nonenforcing states.[241] In these revised models, the results are substantially similar to, and in some cases stronger than, Stuart and Sorenson's initial results.[242]

We are heartened by the fact that Sorenson—unlike Marx et al. or Garmaise—chose to revise his study's initial model to take into account our criticisms. However, even these new results are subject to substantial limitations. First, the major result—that the states with weak noncompete enforcement regimes experience higher absolute founding rates than states with strong regimes that abstract away from state fixed effects—is not determinative because other regional factors may correlate between

---

[236] Mont Code Ann §§ 28-2-703 to -704.

[237] See Stuart and Sorenson, 48 Admin Sci Q at 190 (emphasis added) (cited in note 220).

[238] See Malsberger 1996 at 674–75 (cited in note 233). See also *Dobbins, DeGuire & Tucker, PC v Rutherford, MacDonald & Olson*, 708 P2d 577, 580 (Mont 1985) (adopting a three-part reasonableness test to determine whether to enforce a noncompete).

[239] Specifically, we reviewed Malsberger 1996 at 98–99, 192–94, 604–05, 1136 (cited in note 233).

[240] See Bishara, 13 U Pa J Bus L at 786–87 (cited in note 233) (reviewing Richey and Malsberger's 1991 treatise on noncompete covenants).

[241] See E-mail from Olav Sorenson to Ted Sichelman (Oct 19, 2016) (on file with authors).

[242] See id.

the weak regime and the level of new firm foundings in the region.[243] Second, for the models that take into account state fixed effects by examining new firm foundings following IPOs and acquisitions, the effects with the greatest magnitude are centered in California.[244] This may reflect the fact that California operates in a unique environment not applicable to other states. Third, even though weak enforcement states other than California showed significant declines in new firm foundings following IPOs and interindustry acquisitions, this does not account for the quality of the new firms.[245] As we note below, a more recent study by Starr and others finds that firms founded in strong enforcement states are of higher quality than those in weak enforcement states.[246] Fourth, even the Bishara scale faces significant methodological limitations and has not been independently verified.[247]

The Garmaise study replaces the oversimplified binary approach of Stuart and Sorenson with a graduated twelve-point scale that assigns equal weight (one or zero) to the answers (yes or no) to twelve questions based on those in a later version of the Malsberger treatise[248] regarding the strength and scope of noncompete law in various states.[249] While this is an improvement, this scale is still problematic because there is no legitimate legal or other basis to *equally* weight each of the twelve factors. Comparing two of the factors as an example, it is arguably much more important how a plaintiff must prove the existence of an enforceable covenant not to compete than what counts as sufficient postemployment consideration in considering the strength of a state's noncompete regime.

There are other problems with the Garmaise scale.[250] Garmaise's initial factor—whether the state has a statute bearing on the enforceability of noncompetes (as opposed to mere common law)—does not strike us as indicative one way or the other as to whether the state more strongly enforces noncompete law.[251] Although some very strict states (for example, California and North Dakota)

---

[243] See Stuart and Sorenson, 48 Admin Sci Q at 193–94 (cited in note 220) ("[A] number of omitted regional factors might correlate with both the weak non-compete enforcement dummy and the level of entrepreneurial activity in the region.").

[244] See Sorenson E-mail (cited in note 241).

[245] See note 312 and accompanying text.

[246] See id.

[247] See note 296 and accompanying text.

[248] See Malsberger 2004 at xvii–xviii (cited in note 233).

[249] See Garmaise, 27 J L Econ & Org at 420–22 (cited in note 63).

[250] See id.

[251] See id.

have adopted statutes, so have some states following the flexible, common law reasonableness standard (for example, North Carolina and Ohio).

Next, arbitrary thresholds—such as whether a state has upheld a statewide three-year restriction versus only a two-year one—are not particularly meaningful in the overall scheme of noncompete enforcement. The Malsberger treatise does not of course catalog all the noncompete opinions in a given state—thus, Garmaise could not even answer correctly whether "3-year statewide restrictions have [ever] been upheld" in a particular state.[252] For instance, the applicable Malsberger treatise lists no cases in Wisconsin in which a three-year statewide noncompete was upheld;[253] rather, the treatise cites only a case in Wisconsin for which a three-year noncompete was found unreasonable.[254] But, contrary to Garmaise's scoring, Wisconsin courts in fact had upheld a six-year noncompete and suggested that a three-year noncompete would be reasonable.[255]

Last, for perhaps the most important question—"What is an employer's protectable interest and how is it defined?"—instead of examining the full range of protectable interests, Garmaise curiously focuses on whether an "employer can prevent the employee from future independent dealings with all the firm's customers, not merely with the customers with whom the employee had direct contact."[256] Besides omitting important protectable interests—such as trade secrets, training and development, and ordinary competition—customer relationships are not the type of interest that would typically be of great concern to the top executives at the large, publicly traded firms examined in Garmaise's study. Rather, customer relationships and list restrictions—at least at a large public firm—are more likely to apply to sales personnel, who have direct relationships with the firm's customers, but these personnel were not examined by Garmaise. Variation

---

[252] Id at 422. See Malsberger 2004 at 3332–37 (cited in note 233).

[253] See Malsberger 2004 at 3332–37 (cited in note 233).

[254] See id at 3336, citing *Mutual Service Casualty Insurance Co v Brass*, 625 NW2d 648 (Wis App 2001).

[255] See *Reiman Associates, Inc v R/A Advertising, Inc*, 306 NW2d 292, 296 (Wis App 1981) (upholding a six-year noncompete as reasonable); *Fullerton Lumber Co v Torborg*, 70 NW2d 585, 589–92 (Wis 1955) (remanding for determination of the extent of time as to which a noncompete covenant is reasonable, and suggesting that a minimum period of three years would be supported by the evidence).

[256] See Garmaise, 27 J L Econ & Org at 421 (cited in note 63).

among states in a factor not relevant to the examined class of employees may of course—like Stuart and Sorenson's scale—produce spurious results.

Ultimately, the ideal metric for evaluating a state's noncompete regime is the probability that a typical employee move that *would* be allowed in a hypothetical nonenforcing state *would not* be allowed in any given state. Although it is clearly impossible to achieve such accuracy, neither Stuart and Sorenson nor Garmaise provide sufficient verification for the legitimacy of their indices, such as an empirical analysis of actual cases. Such untested and rough assessments do not make for valid studies.[257]

This concern is confirmed by examining the correlations between the available enforcement scales. The correlation between the Stuart and Sorenson binary scale and the Garmaise twelve-point scale is only 0.43. Bishara constructs an alternate scale[258]— using seven of the twelve questions in the 1991 Richey and Malsberger treatise and the 2009 Malsberger treatise[259]—which, although it raises similar issues as the Garmaise scale, in our opinion is somewhat more likely to be accurate because it uses a graduated scale (unlike Stuart and Sorenson) and differentially weights different factors in the scale (unlike Garmaise). The correlation between the Bishara and Garmaise scales is 0.66, and the correlation between the Bishara and Stuart and Sorenson scales is 0.42.[260]

We recognize that some type of quantitative ranking is a necessary precondition to undertake systematic analysis of the economic effects of noncompete laws. However, given the clear errors in categorization and relatively low correlations among different scales, we are doubtful that the results of studies using the Stuart

---

[257] Garmaise additionally examines individual changes in law in three states by using time-series estimations, see Garmaise, 27 J L Econ & Org at 390–93 (cited in note 63), the limitations of which we address in Barnett and Sichelman, *Revisiting Labor Mobility in Innovation Markets* at *24, Part 3.2.7 (cited in note 219).

[258] See Bishara, 13 U Pa J Bus L at 771, 786–87 (cited in note 233). For an alternate scale modeled on the Bishara scale, see Evan Starr, Natarajan Balasubramanian, and Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt Sci 552, 558 (2018). The Starr and Bishara scales are correlated at 0.94; hence, we ignore the Starr scale.

[259] See Brian Malsberger, *Covenants Not to Compete: A State-by-State Survey* xvii–xviii (BNA Books 2009) ("Malsberger 2009"); P. Jerome Richey and Brian M. Malsberger, *Covenants Not to Compete: A State-by-State Survey* xvi–xvii (BNA 1991).

[260] We thank Norman Bishara for providing the data underlying his scale.

and Sorenson[261] or Garmaise[262] scales to measure the effects of noncompetes on labor mobility can be properly relied upon for empirical study.[263]

A better approach to construct an enforcement scale in our view would be to undertake a comprehensive assessment of the actual extent and conditions in which courts enforce (or not) noncompetes. A large number of actual cases should be randomly selected in each state across a time period of interest. The assessment would identify the outcome in the case along with key factors in each case, including occupation, at-will vs. contract employee, employer- vs. employee-driven termination, industry, term of the noncompete, geographic scope of the noncompete, and other key circumstances, such as whether trade secrets, sale of a business, dissolution of a partnership, choice of law or forum, and substantial employee training were present. Multivariate, logistic regressions could then be constructed to compare how different factors affect outcomes across states. These results could then be substituted, where appropriate, for factors like those in Bishara to construct more accurate scales.

*b) Failure to properly reflect cross-border enforcement of noncompetes.*  Garmaise and Marx et al. include cross-state border job changes in their datasets.[264] The Marx et al. study focuses on the supposed "brain drain" from Michigan to "non-enforcing" states following its decision to enforce noncompetes.[265] Such cross-border moves are complex from a legal perspective, because, as

---

[261] Studies that rely on the Stuart and Sorenson scale include: Kenneth A. Younge and Matt Marx, *The Value of Employee Retention: Evidence from a Natural Experiment*, 25 J Econ & Mgmt Strategy 652, 658–70 (2016); Younge, Tong, and Fleming, 36 Strategic Mgmt J at 692 (cited in note 110).

[262] Studies that rely on the Garmaise scale include: I.P.L. Png and Sampsa Samila, *Trade Secrets Law and Mobility: Evidence from "Inevitable Disclosure"* *20 appx 2 (working paper, Feb 14, 2015), archived at https://perma.cc/MH8D-VWYS; Raffaele Conti, *Do Non-competition Agreements Lead Firms to Pursue Risky R&D Projects?*, 35 Strategic Mgmt J 1230, 1234–35 (2014); Bill Francis, et al, *When Finding a New Job Is Not Easy: The Influence of the State Law of Non-Competition Agreements on the Characteristics of M&As* *9 (working paper, Dec 2007), archived at https://perma.cc/U7JW-3V7A; Sharon Belenzon and Mark Schankerman, *Spreading the Word: Geography, Policy, and Knowledge Spillovers*, 95 Rev Econ & Stat 884, 895 (2013).

[263] Even Sorenson's revised results are subject to substantial qualifications. See notes 241–47 and accompanying text. Nor, as far we know, have these revised results been published in any form.

[264] See Marx, Singh, and Fleming, 44 Rsrch Pol at 394–95 (cited in note 219); Garmaise, 27 J L Econ & Org at 396–97 (cited in note 63).

[265] See Marx, Singh, and Fleming, 44 Rsrch Pol at 394 (cited in note 219).

Garmaise properly notes, the law of the state of the former employer will sometimes apply and, in other instances, the law of the state of the new employer will apply.[266]

Marx et al., however, overlook this complexity and erroneously assume that nonenforcing states *always* apply their own law so as to void a noncompete agreement that falls under the law of another state.[267] Even assuming that Marx et al.'s list of ten "nonenforcing" states is correct—which it is not, as we discussed above—the only nonenforcing states that generally refuse to enforce out-of-state noncompetes on public policy grounds are California and North Dakota.[268] Yet, even California does not always void out-of-state noncompete agreements. California courts sometimes transfer cases to another state or stay proceedings so those in another state can proceed, particularly when the employment agreement selects that other state's law and courts.[269]

Furthermore, and perhaps more importantly, all states—including California—will generally enforce a *prior* judgment of another state that afforded the parties a full and fair opportunity to litigate the matter. Thus, if an employee is subject to jurisdiction in the state of the former employer, which often will be the case, then the former employer can sue the employee in its home state. If the employee is not subject to an exclusive choice-of-forum clause, the employee may then sue for a declaratory judgment in

---

[266] The law of the state of the former employer may either be the state in which the employee was located or some other state, to the extent the employer uses a choice-of-law provision specifying the law of a different state (for example, its state of incorporation or headquarters). See Garmaise, 27 J L Econ & Org at 390 n 9 (cited in note 63); Gillian Lester and Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective*, 31 Comp Labor L & Pol J 389, 396–97 (2009) (discussing the situation in which the choice-of-law clauses select the employer's place of incorporation).

[267] See Marx, Singh, and Fleming, 44 Rsrch Pol at 395, 403 (cited in note 219).

[268] We use the 1996 Malsberger treatise to make this determination, see Malsberger 1996 at 102, 136–37, 156–57, 201–02, 618, 684, 719, 857–58, 907, 1147, 1160 (cited in note 233) (citing various cases), as the 2015 Marx, Singh, and Fleming study relies on the same treatise to classify state enforcement regimes. See Marx, Singh, and Fleming, 44 Rsrch Pol at 396 n 2 (cited in note 219), citing Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220) (relying on the 1996 Malsberger treatise for data on states that do not enforce noncompetes).

[269] California substantially restricted the situations in which it will enforce out-of-state noncompetes starting in 2017, but during the time periods in question of these studies, California courts were sometimes amenable to enforcing, directly or indirectly, out-of-state noncompetes. See notes 105–06 and accompanying text.

the state of the new employer. Although there are important nuances, essentially, whichever court enforces judgment first will typically bind the employee.[270]

The simplification of these doctrinal complexities in the Marx et al. study renders that study's key assumption—namely, that nonenforcing states always apply their own law—flawed, and thus confounds its causal identification strategy. As we explain below, given the small number of annual employee moves out of Michigan to nonenforcing states measured in the Marx et al. study, this flaw could lead to substantial overestimates of the measured effects of noncompetes.

The Garmaise study also suffers from difficulties relating to the treatment of out-of-state moves. Specifically, Garmaise includes within his analysis out-of-state moves, and, unlike the Marx et al. study, assumes for simplicity that these moves are always governed by the law of the state of the *former* employer.[271] Because Garmaise's dataset contains only a little over six hundred within-industry transfers (out-of-industry transfers would generally not be governed by noncompetes), it is essential to know what percentage of those transfers were out-of-state (and Garmaise does not disclose as much). If the percentage is large, then some results in the Garmaise study may not be accurate.

  *c) No data on actual usage of noncompete agreements by state.*  Even if one believes these studies accurately categorize strength of enforcement, no study—other than Garmaise's—provides any measure of the actual usage of noncompete agreements within their sample set or how often employers actually enforce noncompetes. Available evidence suggests widely varying use of noncompete agreements among various executive and technical employee groups,[272] and while there is new evidence regarding

[270] See Lester and Ryan, 31 Comp Labor L & Pol J at 405–20 (cited in note 266); Timothy P. Glynn, *Interjurisdictional Competition in Enforcing Noncompetition Agreements: Regulatory Risk Management and the Race to the Bottom*, 65 Wash & Lee L Rev 1381, 1385–86, 1418–28 (2008).

[271] See Garmaise, 27 J L Econ & Org at 396 n 15 (cited in note 63).

[272] Based on a sample of top-level executives, Garmaise finds a roughly 70 percent usage rate, see Garmaise, 27 J L Econ & Org at 396 (cited in note 63). Based on a sample of CEOs at S&P 1500 companies, Bishara, Martin, and Thomas, 68 Vand L Rev at 2 (cited in note 85), find an 80 percent rate. Based on a sample of founders of VC-backed firms, Professors Steven Kaplan and Per Strömberg find a roughly 70 percent rate. Steven N. Kaplan and Per Strömberg, *Financial Contracting Theory Meets the Real World: An Empirical Analysis of Venture Capital Contracts*, 70 Rev Econ Stud 281, 289 (2003). An IEEE study of engineers reports a 47 percent rate. See Matt Marx, *The Firm Strikes Back: Noncompete Agreements and the Mobility of Technical Professionals*, 76 Am Sociological Rev 695, 702 (2011). A 2015 study finds lower usage rates, reporting about 30 percent for managers and about 35 percent in the engineering, computer, and mathematical fields, see

noncompete usage (which we discuss below),[273] there is no evidence to our knowledge of the rate of enforcement across states. This inability to differentiate firm-level usage and enforcement behavior among states introduces the possibility that the observed variation in mobility is not the result of differing state-level enforcement regimes but rather unobserved variation of firm-level usage and enforcement of noncompete agreements and substitutes for noncompetes, such as trade secret actions.[274] If firms in different states substantially vary in their propensity to use and enforce noncompetes and noncompete substitutes, and this variance is not highly correlated with enforcement strength, regressing on enforcement indices may yield spurious results.

Relatedly, none of these studies attempted to control for the variation in state-level enforceability, much less usage and enforcement of noncompete substitutes, such as patents, trade secrets, stock options, long-term contracts, invention assignments, and the like, which we described earlier.[275] This omission alone can substantially confound any possible causal link between results and noncompete enforceability, usage, and enforcement.[276]

*d) Measurement errors are exacerbated by small data sets.* The previous criticisms are especially salient for the Marx et al. study (as well as a previous study performed by Marx and others in 2009) given the relatively small incremental decrease in absolute terms in labor mobility in Michigan identified in the 2009 and 2015 Marx et al. studies. The 2009 Marx et al. study considers 98,468 inventors and 27,478 inventor moves within Michigan

---

Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *43 fig 4 (cited in note 11). These differences are arguably explained by the different datasets—the studies by Kaplan and Strömberg; Garmaise; and Bishara, Martin, and Thomas focus on the most sophisticated companies, while Starr, Prescott, and Bishara's findings are likely more reflective of firms as a whole. Additionally, Garmaise and Bishara, Martin, and Thomas focus on top-level executives.

[273] See Part III.C.

[274] See Robert W. Gomulkiewicz, *Leaky Covenants-Not-to-Compete as the Legal Infrastructure for Innovation*, 49 UC Davis L Rev 251, 256–57, 277–80 (2015) (arguing that Washington technology firms rarely enforce noncompetes); Risch, 12 Empl Rts & Empl Pol J at 346 (cited in note 122) (acknowledging Gilson's theory that trade secret actions might be substitutes for noncompete actions for firms).

[275] See Part II.A.2. Although some of these instruments fall under federal law, there remains effective variation in state-level enforcement of these instruments due to differing applications of the law at a regional level. See, for example, Mark A. Lemley, *Where to File Your Patent Case*, 38 AIPLA Q J 1, 28–37 (2010).

[276] See Part II.A.2 (noting that any empirical study examining the marginal effects of noncompetes would need to take into account these substitute mechanisms).

over the period 1963–2006.[277] Labor mobility actually increased following the enactment of the Michigan Antitrust Reform Act[278] (MARA) over the full time period from 7.18 percent to 8.98 percent, whereas in other nonenforcing states there was a larger increase, from 7.95 percent to 10.80 percent.[279]

While the Marx et al. studies never report these differences in absolute numbers, they are easy to calculate. Specifically, the difference of in-state mobility in Michigan versus nonenforcing states in absolute terms was roughly 1 percent, equating to an absolute difference of about 100–200 moves per year purportedly lost within Michigan due to the enforcement of noncompetes. For inventors moving out of Michigan, the numbers are much lower—the purported difference of inventors moving out of Michigan to nonenforcing states pre- and post-MARA is in the range of merely twenty to twenty-five inventor moves per year. Given the very small number of job changes upon which the results of these studies are premised, the potentially negating effects of the shortcomings identified above cannot be easily dismissed.[280]

  *e) Unique problems of the Michigan studies.*  The 2009 and 2015 Marx et al. studies[281] have attracted particular attention because they exploit an apparently exogenous change to the legal treatment of noncompetes in a particular jurisdiction, which therefore provides an opportunity to study the effect of noncompete enforceability on inventor mobility and, potentially, innovation. As noted earlier, the legal change was effected by enactment of MARA, which restored the enforceability of noncompetes under Michigan law.

---

[277] See Marx, Strumsky, and Fleming, 55 Mgmt Sci at 880 (cited in note 219). The 2015 Marx, Singh, and Fleming study examines the period 1975–2005. See Marx, Singh, and Fleming, 44 Rsrch Pol at 396 (cited in note 219).

[278] Michigan Antitrust Reform Act § 4a (1987), codified at Mich Comp Laws § 445.774a.

[279] See Marx, Strumsky, and Fleming, 55 Mgmt Sci at 884 (cited in note 219).

[280] Moreover, the Marx et al. studies track the mobility of employees to any firm, rather than mobility to competing firms. No state enforces noncompetes that purport to proscribe employment at *non*competing firms. Thus, in order to isolate the effects of noncompetes, it is essential to track labor mobility solely among competing firms. In empirical terms, an employee who makes an out-of-industry move to a noncompeting firm is, contrary to the implicit assumption of the Marx et al. study, not effectively subject to a noncompete restriction, and hence should not be classified within a "treatment" group. Thus, the number of inventor "moves" of interest to these studies is even lower than the numbers we calculate in the text.

[281] Marx, Singh, and Fleming, 44 Rsrch Pol 394 (cited in note 219); Marx, Strumsky, and Fleming, 55 Mgmt Sci 875 (cited in note 219).

The striking results of the Marx studies—a state restores the enforceability of dormant noncompete provisions, inventor mobility slows down, and inventors flee the jurisdiction for states without enforceable noncompetes (essentially, California)—are commonly cited, including in federal government reports,[282] to support the view that noncompetes are unwise public policy for jurisdictions that seek to cultivate the next Silicon Valley.

However, beyond the serious shortcomings we have already described in these studies, the Marx et al. studies make an erroneous assumption that wholly undermines their identification methodology and hence, their results. Specifically, both the 2009 and 2015 studies assume that, following Michigan's regime change in 1985, preexisting noncompete provisions automatically became enforceable.[283] *This is not the case*. The study authors appear to overlook that MARA included a savings clause providing that the statute repealed by MARA would "remain in force for the purpose" of enforcing any liability under the repealed act.[284] Consistent with this saving clause, Michigan courts declined to enforce noncompetes that were entered into prior to MARA.[285]

In other words, *no* existing employee with noncompete clauses in employment agreements governed by Michigan law became bound by those clauses following MARA. Rather, any employer seeking to bind an existing employee would need to have that employee sign a new agreement or affirmatively assent to a prior agreement, which would generally result in employers incurring transaction costs and possibly providing additional compensation. As a result, one would expect that the number of employees in Michigan actually subject to enforceable noncompetes

---

[282] See, for example, Office of Economic Policy, *Non-compete Contracts* at *18 (cited in note 36); White House, *Non-Compete Agreements* at *7 (cited in note 36). While relying on the Marx et al. "Michigan" studies to support the view that noncompetes depress "labor market dynamism," the White House report did mention that "other authors dispute these findings." White House, *Non-Compete Agreements* at *7 (cited in note 36). This is most likely a somewhat oblique reference to our companion paper on noncompetes. See generally Barnett and Sichelman, *Revisiting Labor Mobility* (cited in note 219).

[283] For instance, the Marx et al. 2015 study states: "Given that the repeal of Public Act No. 05 merely removed the ban and did not stipulate any governing timeframe, all such contracts [i.e., preexisting noncompetes] would have become immediately enforceable." Marx, Singh, and Fleming, 44 Rsrch Pol at 396 (cited in note 219).

[284] Michigan Antitrust Reform Act § 18 (1985), codified at Mich Comp Laws § 445.788. For a detailed description of the history leading up to the passage of MARA, see *Bristol Window and Door, Inc v Hoogenstyn*, 650 NW2d 670, 673–79 (Mich App 2002).

[285] See, for example, *Compton v Joseph Lepak, DDS, PC*, 397 NW2d 311, 316 (Mich App 1986) ("When an agreement or contract is entered into in violation of the statute, repeal of that statute does not make the agreement valid because the Legislature cannot validate a contract which never had a legal existence.").

would be quite low for a considerable period following MARA's passage.

During this transition period, one cannot legitimately consider all Michigan inventors as being subject to enforceable noncompetes—a critical assumption in both papers. The true regime change (that is, taking into account both nominal and effective changes to noncompete enforceability) most likely took considerable time to impact contracting behavior in the market. As a result, the number of inventors who were immediately affected by MARA was small (which impacts the statistical force of the studies' results),[286] and a sizable portion of the studies' results are unlikely to be causally linked to the legal change effected by MARA.

Yet, the 2009 Marx et al. study finds the exact *opposite* of the effects one would expect from a gradual adoption of noncompetes after the enactment of the MARA statute, stating that "the effect of the policy reversal remained strong for several years and then weakened, both in terms of the magnitude and statistical significance of the coefficient on the interaction variable."[287] Thus, it is extremely likely in our view that factors unrelated to the change in noncompete law in Michigan explain the results, if they are at all correct, of the 2009 study. At a bare minimum, the factual misunderstanding of the *non*retroactive effect of the MARA change casts great doubt on the reliability of using the Marx et al. studies as a basis for substantive policy recommendations.

   *f) Correlation, not causality.*  Even if the results in these studies were somehow correct, none of these studies can show causation between noncompete enforcement and their findings of reduced innovation (as indicated by various proxy measures). Other than the Marx et al. study, they are all cross-sectional regressions and cannot rule out omitted variables to explain the observed variation. Additionally, Stuart and Sorenson's major finding (including, as noted earlier, Sorenson's revised major finding) abstracts away from state-level fixed effects, and they properly note that they "must interpret this result cautiously, as a number of omitted regional factors might correlate with both the weak non-compete enforcement dummy and the level of entrepreneurial activity in the region."[288] Stuart and Sorenson's models that take account of state-level fixed effects do not account for unique

---

[286] For further discussion, see Barnett and Sichelman, *Revisiting Labor Mobility* at *22 (cited in note 219).

[287] See Marx, Strumsky, and Fleming, 55 Mgmt Sci at 883 (cited in note 219).

[288] See Stuart and Sorenson, 48 Admin Sci Q at 194 (cited in note 220).

within-state, regional omitted variables that may explain the observed patterns, plus are subject to a number of additional limitations.[289] The Samila and Sorenson study is subject to similar limitations, as well as another endogeneity concern. Specifically, this study uses the number of patents to measure innovative output, but patenting is in part a substitute for noncompete enforcement.[290] Thus, finding increased patenting in states with weak nonenforcement, such as California, is not necessarily meaningful. The Marx et al. study, despite the fact that it examines a seemingly exogenous shock to Michigan law, also suffers from causality concerns because—as explained in the previous Section—the regime change did not apply retroactively.

Aside from causality, some of the studies use rough proxies for innovative activity. Stuart and Sorenson merely examine the relationship of noncompetes to the absolute number of spin-offs following IPOs and acquisitions. Studies on patent value have indicated that a small number of high-quality innovations disproportionately account for the total value of all innovations; in other words, not all innovations—and, hence, not all innovative companies—are created equally.[291] Thus, it is not surprising that a more recent study finds that, while noncompetes may depress the absolute number of same-industry spin-offs, increased enforcement is associated with the founding of higher quality firms, particularly ones that began and continued with more employees and survived for longer periods.[292] Relatedly, another recent study finds that, while noncompetes reduce employee mobility and depress certain indicators of entrepreneurship, increased enforceability is associated with an increase in capital investment at existing "knowledge-intensive" firms,[293] suggesting that noncompetes sometimes support investment incentives consistent with theoretical expectations.

---

[289]  See notes 241–47 and accompanying text.

[290]  Samila and Sorenson, 57 Mgmt Sci at 430 (cited in note 9). As noted previously, Agarwal and coauthors found that aggressive patent litigation by US semiconductor firms discourages labor mobility (presumably, because potential new employers fear litigation and elect not to hire from those firms). See note 109 and accompanying text.

[291]  See John R. Allison, et al, *Valuable Patents*, 92 Georgetown L J 435, 448–65 (2004).

[292]  See Starr, Balasubramanian, and Sakakibara, 64 Mgmt Sci at 567 (cited in note 258). Although this Starr study does not compare the total innovative activity of the startups in nonenforcing and enforcing states, a smaller number of highly innovative startups in enforcing states could outweigh the innovative activity of a larger number of less innovative startups in nonenforcing states.

[293]  See Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* *3–5, 20–21 (working paper, Jan 3, 2018), archived at https://perma.cc/9EQX-GDTU.

*g) Why the limitations of these studies likely affect the validity of their results.* To be certain, the limitations we have discussed above do not mandate that the results in these studies are incorrect. It may be the case that some studies suffer from ordinary measurement error, which would underestimate the size of the effects found in those studies, or the errors we have identified are too minor to plausibly change these studies' results. However, there are strong reasons to doubt that the limitations described above are ordinary measurement errors or essentially trivial, implying that they *are* likely to alter these studies' results—either their size or significance, or even the direction and nature of the effects measured.

First, and perhaps most importantly, the Stuart and Sorenson scale misclassifies eight of ten states as "nonenforcing" but does not misclassify any of the "enforcing" states.[294] Such misclassification is not random, but rather is a one-way systemic error. Stuart and Sorenson's misclassification of "enforcing" and "nonenforcing" states lies at the heart of the empirical instruments in the Marx et al. studies used to measure worker mobility and the potential effects on innovative activity.[295]

Although Garmaise's scale appears to suffer more from random error than systemic error—because in our view, there is no scale, even Bishara's scale,[296] that has been definitively validated—it may be the case that Garmaise's results are subject to the same limitations as the Marx et al. studies. So while the results set forth in the Garmaise study and the Marx et al. studies may be statistically significant, they are not necessarily *meaningful* when determining the role noncompetes play in suppressing innovative activity.

Second, the failure to properly take account of the nonretroactivity of Michigan's change in law via MARA also casts considerable doubt on the reliability of the differences-in-differences methodology employed by the Marx et al. studies. Specifically, it confounds these studies' claims to causal identification, because the only Michigan employees not entering entirely new jobs subject to enforceable noncompetes post-MARA were those selected by their employers for "treatment," in other words, the signing of a noncompete provision. Such selection would not be random, but instead would turn on factors such as whether the employee was

---

[294] See Stuart and Sorenson, 48 Admin Sci Q at 190 (cited in note 220).

[295] See Marx, Singh, and Fleming, 44 Rsrch Pol at 396 n 2, 396–97 (cited in note 219); Marx, Strumsky, and Fleming, 55 Mgmt Sci at 880 (cited in note 219).

[296] See Bishara, 13 U Pa J Bus L at 786–87 (cited in note 233).

at-will, had knowledge of company trade secrets, was highly skilled, and the like.

Third, the failure of the Garmaise study and the Marx et al. studies to properly take account of cross-border moves, as we note above, may systematically overestimate the effects of noncompetes on labor mobility because in some situations these moves would have been governed by a contrary set of laws than assumed in the empirical approaches in these studies.

Fourth, even if these studies' findings are nominally correct, because of various implicit assumptions about the law and external factors that are certainly or very likely inaccurate, one cannot casually attribute decreases in labor mobility wholly to noncompete enforcement trends. For instance, one or more of these studies wrongly assumes that noncompetes govern moves outside of an industry, that firm-level usage and enforcement of noncompetes is constant across states, that high-level executives' mobility would be prone to court decisions regarding the role of customer lists, and that nonretroactive changes in certain laws were exogenous "shocks."

In sum, of the four major nonexperimental studies examining the effects of noncompetes on innovation that we reviewed in detail, all suffer from multiple infirmities. In our view, these infirmities cast substantial doubt on the validity of the findings in these studies. In other words, there is a strong possibility that these errors would reduce the size of the effects in these studies, result in opposite effects, or potentially eliminate statistically significant effects entirely. Although Sorenson's revision of his earlier study nominally confirmed his earlier results, it remains subject to substantial limitations.[297] As such, none of these studies can be relied upon for a general assessment of the role noncompetes play in the innovative process.

All of the additional studies we could locate that find a negative effect on innovation from noncompetes appear to suffer from one or more of these limitations.[298] Given the theoretical reasons to doubt that noncompetes always have a negative effect on innovation, we believe that there is little to no empirical evidence that noncompetes necessarily retard innovation.[299] Rather, as explained later in the Article, noncompetes will sometimes hinder and sometimes foster innovative activity depending on a variety of contextual circumstances.

---

[297] See notes 241–47 and accompanying text.

[298] See notes 261–62 (listing studies relying on flawed scales).

[299] See Barnett and Sichelman, *Revisiting Labor Mobility* at *29 (cited in note 219).

2. Experimental studies.

Professors On Amir and Orly Lobel conducted an experimental study that found that participants in simulated noncompete treatment groups exerted less effort and made more errors than a restriction-free control group.[300] The study's experimental design abstracts away from the limitations of the empirical studies but introduces its own concerns that cast serious doubt on its applicability to any actual technology environment.

In the experimental setup, participants are informed that they will potentially complete two rounds of a given task. Each participant is paid $0.50 for the completion of each task plus a potential bonus. However, individuals in the "full noncompete" group are told they cannot participate in the second round. Individuals in the "partial noncompete" group are told they will receive 20 percent less payment in the second round. Individuals in the "no noncompete" group are given no restrictions. Participants either perform a creative, word association task or an effort-based, matrix addition task. Each participant performs only the first round.[301] Amir and Lobel find a large negative effect on completing the first round of tasks in the full noncompete group, but not the partial noncompete group, for both the creative and effort-based tasks. Additionally, they find a significantly larger error rate on the effort-based task for the full and partial noncompete group.

Based on this experimental result, Amir and Lobel conclude that "[o]ur behavioral experiment demonstrates that certain postemployment contractual restrictions may negatively impact motivation and performance, as evidenced by the greater rates at which individuals abandon tasks."[302] Although we agree that noncompetes may provide some incentives for employees to underinvest in their own human capital, Amir and Lobel's experimental setup does not take into account important real-world mechanisms to offset these effects.

First, as we discussed earlier, one of the major reasons for the use of noncompetes is to provide incentives for firms to invest in the human capital of their employees.[303] Consistent with that theoretical expectation, a study by Starr finds that stronger noncompete enforcement regimes are associated with increased

---

[300] See Amir and Lobel, 16 Stan Tech L Rev at 866 (cited in note 63).
[301] See id at 852–53, 870–74.
[302] Id at 863.
[303] See Part I.B.2.

employee training.[304] Amir and Lobel's setup does not allow for any firm-sponsored training.

Second, the flat payment scheme of $0.50 per task plus a bonus in Amir and Lobel abstracts away from the numerous other performance incentive mechanisms we discussed above—such as vesting options, deferred compensation, and the simple ability for star employees to renegotiate—that are present in a typical employment situation.[305]

Third, contrary to Amir and Lobel's setup, a noncompete agreement *never* means that there is no second round of performance. Employees are engaged in a repeat-play game with employers, who rationally reward high-performing employees and penalize low-performing employees. Simultaneously, employees are engaged in a repeat-play game with potential outside employers. Given the discipline imposed by the common-law reasonableness constraint and competitive labor markets, noncompetes are always limited in duration, geography, and industry scope. As a result, employees may port their industry-specific skills to competitors after a certain amount of time and may port their non-industry-specific skills to noncompetitors at any time. Even during the term of a noncompete, an employee can move to any firm that is willing to pay the price demanded by the existing employer to waive the noncompete.

These three reasons are likely to substantially dampen, if not eliminate, any incentives that noncompetes might otherwise create for employees to underinvest in their own human capital. Indeed, a more recent experimental study performed a similar experiment but found that those in the noncompete group exerted no less effort than those in the control group.[306] Using a more realistic setup, this experiment paid the noncompete group more to compensate for any disincentives created in the noncompete treatment—which is precisely what would be expected to occur in any rational employer-employee bargaining situation.

---

[304] See Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indust & Labor Rel Rev 783, 785, 814 (2019).

[305] See Norman D. Bishara and Evan Starr, *The Incomplete Non-compete Picture*, 20 Lewis & Clark L Rev 497, 522–23 (2015).

[306] See Guido Bünstorf, et al, *Win Shift Lose Stay—An Experimental Test of Non-Compete Clauses* *18–19 (Max Planck Institute for Research on Collective Goods Preprint No 2013/17, Sept 2013), archived at https://perma.cc/K2NM-4L4V.

### 3. Evaluation.

In current policy discussions concerning noncompetes, it is common to find statements referring to empirical studies "showing" that noncompetes depress inventor mobility and, as a result, reduce innovation in general. This interpretation is simply not supported by a close examination of the methodologies and substance of the empirical studies upon which these statements typically rely.[307] Even assuming without further examination that noncompetes have some appreciable marginal effect on inventor mobility—a proposition as to which there is considerable doubt[308]—there is no compelling basis to conclude that any such effect results in reduced innovation compared to a legal environment in which noncompetes had no legal force.

The most recent empirical research on the effects of noncompetes provides even more ground to doubt the conventional characterization of the evidence. That research has reached more nuanced results that are consistent with the older law-and-economics analysis that, as discussed earlier, had emphasized how noncompetes have the potential both to impede employee mobility *and* enhance firms' incentives to invest in cultivating employee capital.[309] In particular, these recent studies have found that the ability to enforce noncompetes can increase incentives at medical practices to make intrafirm client referrals (and thereby increase overall returns),[310] increase capital investment at knowledge-intensive firms while reducing the entry of new firms,[311] and result in the establishment of fewer but higher quality spin-offs from parent firms.[312] Another study finds that legal limitations on

---

[307] For a similar view, see Bishara and Starr, 20 Lewis & Clark L Rev at 498–502, 534–40 (cited in note 305) (finding that existing empirical literature suffers from methodological imperfections and cannot currently support policy actions to impose limitations or outright bans on the use of noncompetes).

[308] See Barnett and Sichelman, *Revisiting Labor Mobility* at *29 (cited in note 219) (stating that, due to methodological and other shortcomings, no existing empirical study can "be relied upon for a general assessment of the role noncompetes play in restricting labor mobility").

[309] See Part I.B.

[310] See Kurt Lavetti, Carol Simon, and William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians* *21, 34 (working paper, June 2018), archived at https://perma.cc/4CU3-LZE5. Specifically, the authors find that practices that used noncompetes for physicians enjoyed greater overall returns, even controlling for physician quality and other potentially relevant factors, which the authors attribute to stronger incentives to invest in advertising and making intrafirm client referrals (given the reduced risk of losing clients in the event of a physician departure).

[311] See Jeffers, *The Impact of Restricting Labor Mobility* at *22–23 (cited in note 293).

[312] See Starr, Balasubramanian, and Sakakibara, 64 Mgmt Sci at 563 (cited in note 258).

worker mobility can increase investment at firms that rely on higher-skill workers.[313] While we do not separately review these more recent studies, it would not be surprising if the empirical literature on noncompetes ultimately established that they result in a mixed bag of welfare effects that vary across firms and industries. That would be fully consistent with theoretical expectations that noncompetes can both promote and dampen overall innovation, and it is therefore indeterminate as to which effect will dominate in any particular case.

## III. Making Noncompete Policy Under Uncertainty

The substantial theoretical and empirical literature on noncompetes (and, by implication, other restraints on employee mobility in innovation markets) appears to arrive at a dead end. Even if it were conceded that noncompetes have some marginal effect on labor mobility, neither the canonical Silicon Valley / Route 128 narrative nor the empirical literature provides support for then drawing an adverse connection between noncompetes and innovation outcomes in general. As a practical matter, however, the law cannot be neutral: it must take *some* position on whether noncompetes should be enforced. In this Part, we offer some tentative conclusions concerning the appropriate legal treatment of noncompetes, applying the error-cost approach from antitrust law that explicitly embeds uncertainty into policy analysis and the adjudicative process.[314]

In the course of this exercise, we identify certain variables that may impact the use and efficiency effects of noncompetes across different industries, firms, and even employee types. While this analysis is preliminary, it conforms to evidence on the rates of use of noncompetes, which suggests that markets tailor the use of noncompetes across employee categories, rather than chronically overusing them as assumed in the collective-action problem that drives Gilson's and the follow-on literature's laudatory characterization of California's noncompete policy. Given that this critical assumption appears to have a limited scope of application as an empirical matter, and in light of the material uncertainties that we identified in the empirical studies that are routinely cited

---

[313] See Ali Sanati, *How Does Labor Mobility Affect Corporate Leverage and Investment?* *3–4 (working paper, Mar 2018), archived at https://perma.cc/NU6M-6DNR.

[314] For the leading statements of this approach in the antitrust literature, see note 38.

in support of precluding noncompetes more broadly (and, by implication, other constraints on employee mobility),[315] we ultimately conclude that the reasonableness standard, applied on a case-specific basis through common law adjudication, is likely the best approach of all.

## A.  Policy Continuum

Throughout our discussion, we keep in mind three categories of policy options. As shown in the graphic below, these options can be located on a continuum extending from full enforcement (Option I), which we call the "per se legal" option, to zero enforcement (Option III), which we call the "per se illegal" option. Note that Option II, which corresponds to the common law's reasonableness standard, encompasses in practical terms a range of more and less stringent variants, which push the option closer toward the full- or zero-enforcement poles of the policy continuum. In practical terms, this intermediate range could encompass a number of different principles under which courts could adjudicate the enforceability of a particular noncompete provision and, in doing so, reflect the complex policy trade-off implicated by the enforcement of these provisions. To take just one example, a state may elect to enforce noncompetes subject to a reasonableness limitation but apply that limitation so that noncompetes are enforced only when the plaintiff shows that the noncompete promoted either the protection of trade secrets or the recovery of a training investment.[316] Such an approach would tend to push the law closer toward zero enforcement (at least in the case of noncompetes that do not generate any offsetting social advantage in the form of increased R&D or training incentives). Alternatively, a state may elect to enforce noncompetes subject to a "blue pencil" rule, according to which a court can "rescue" an otherwise invalid noncompete clause by restricting its durational, geographic or industry scope so that it falls within the boundaries of what the court determines to be reasonable.[317] Such an approach would tend to push the law closer toward full enforcement.

---

[315]  See Part II.B.

[316]  For example, New York courts will enforce a noncompete if it "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v Hirshberg*, 712 NE2d 1220, 1223 (NY 1999).

[317]  See, for example, *Coates v Heat Wagons, Inc*, 942 NE2d 905, 914–15 (Ind App 2011) (endorsing the blue pencil doctrine).

FIGURE 1: POLICY CONTINUUM OF NONCOMPETE ENFORCEMENT



### B.  The "Free Contracting" Baseline

From an economic point of view, a noncompete is a voluntary transaction involving a human capital asset being exchanged for some form of monetary or other compensation. As such, any efficiency analysis must start from the free contracting baseline— that is, the well-established view that voluntary exchanges result in mutual welfare gains for the contracting parties, absent evidence of market failure, such as fraud, coercion, or information asymmetries. Those private welfare gains represent social welfare gains so long as the parties' exchange transaction does not generate negative third-party externalities. The presumptive efficiency of voluntary exchange transactions accounts for the common law's traditional indifference to the substantive fairness of contracts; rather, courts generally determine enforceability based on whether an agreement meets certain formal procedural criteria.[318] While there are limited exceptions to this principle (for example, the unconscionability doctrine, although courts rarely accept it as a defense[319]), it holds true across contract law as a general matter.[320]

From this starting point, the per se legal option is the default policy approach, and California's refusal to enforce the noncompete clause demands justification from an efficiency or other perspective. In fact, based on the free contracting benchmark, even

---

[318] See Alan Schwartz and Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 Yale L J 541, 546, 556 (2003) (arguing that "efficiency is the only institutionally feasible and normatively attractive goal for a contract law that regulates deals between firms"); id at 555 (rejecting the "externality objection" to restricting commercial contract law to the pursuit of welfare-maximization, on the ground that "most commercial contracts affect only the parties to them").

[319] See Colleen McCullough, *Unconscionability as a Coherent Legal Concept*, 164 U Pa L Rev 779, 785–87 (2016).

[320] See Schwartz and Scott, 113 Yale L J at 555 (cited in note 318) (noting that contract law rarely creates "systematic distributional benefits for particular classes of parties").

the reasonableness principle used by the common law to assess the enforceability of noncompetes is suspect. Ignoring circumstances involving fraud, coercion, information asymmetries, or similar market defects, any economic justification for even qualified enforcement of noncompete clauses—let alone a blanket refusal to enforce—must identify significant third-party externalities that are not reflected in the terms of the noncompete clause and the broader employment agreement of which it is typically a part. Efficiency-based arguments for California's aversion toward enforcing noncompetes therefore rely on the reduction in knowledge spillovers, and collective reduction in innovative vigor in general, that would potentially result if noncompetes were enforced. This was precisely the basis for Gilson's characterization of California's refusal to enforce noncompetes as an efficient legal solution to a collective-action problem.

As we have discussed in detail, it is not clear that this theory has a sound basis in fact. Specifically, the extent to which noncompetes *actually* impede efficient human capital transfers and associated knowledge spillovers is empirically contestable and depends on the transaction costs involved in negotiating waivers of noncompetes, the extent to which noncompetes are actually enforced, and the availability of alternative mechanisms to regulate human capital flows. At a minimum, however, it is at least reasonable to assume that noncompetes impose *some* incremental transaction-cost burden relative to a zero-enforcement regime and thereby may have some incremental adverse effect on impeding the agglomeration economies and similar benefits that can promote innovation activity. Additionally, noneconomic considerations of personal autonomy and distributive justice that play an important role in real-world policy debates over noncompetes strongly disfavor a rule of per se legality. Consequently, we set aside per se legal as a policy option and consider the remaining possibilities that efficiency would be maximized by treating noncompetes as either (i) per se illegal (Option III) or (ii) conditionally legal subject to the reasonableness standard (Option II).

C.   Is There Really a Collective Action Problem?

Any argument in favor of zero enforcement must rest on Gilson's justification for California's general refusal to enforce the noncompete clause (the closest real-world approximation of the per se illegal policy option), taking note that Gilson himself cautioned against reflexive application of the California model to all

states and industries.[321] Recall that this argument supposes a world in which all (or at least most) firms would be better off if noncompetes were deemed unenforceable. Without coordination, it is in each firm's individual interest to include a noncompete clause (since it would otherwise unilaterally forfeit human capital assets to its competitors), which ultimately operates to all firms' collective detriment by impeding the flow of human capital and the innovation process in general. Under those assumptions, abolishing noncompetes saves firms from this collectively irrational outcome, which in turn enhances knowledge spillovers, fosters agglomeration economies, and accelerates innovation in the industry as a whole.

This line of argument relies heavily on a single assumption: namely, that when the law enforces noncompetes, firms widely, if not universally, adopt noncompetes, resulting in socially excessive constraints on the circulation of human capital. That is a theoretically plausible but empirically untested assumption, especially given the fact that almost all empirical studies compare mobility and innovation outcomes as a function of noncompete enforceability rather than use. Fortunately, recent empirical work has supplied data that can provide some insight into actual use of noncompetes in real-world technology markets.

Available data on the actual use of noncompetes in employment agreements demonstrate significant variation across different subsets of the labor market. As noted previously, two studies that survey CEOs and other top-level executives find usage rates ranging from 70–84 percent.[322] Another study finds comparable usage rates among venture capital-backed firms: in a sample of 213 venture capital investments in 119 firms during 1987–1999, founders were subject to noncompetes in 70.4 percent (or 73.5 percent excluding California firms) of total investments.[323] Those figures are compatible with the assumption that underlies the efficiency argument against noncompetes: without legal intervention, markets tend toward high, and potentially excessive, use of noncompetes. However, a survey study of engineers in the information technology industry report a lower rate of almost 47 percent.[324] A recent and much larger study by Professor

---

[321] See Gilson, 74 NYU L Rev at 629 (cited in note 8).

[322] See note 85 and accompanying text.

[323] Kaplan and Strömberg, 70 Rev Fin Stud at 289 (cited in note 272).

[324] See Marx, 76 Am Sociological Rev at 702 (cited in note 272). The sample consisted of 1,029 technical personnel (all members of the Institute of Electrical and Electronics Engineers) from a variety of industries.

Evan Starr and colleagues that surveys 11,505 workers across a broader range of industries finds even lower usage rates, reporting usage rates ranging from 31–36 percent in engineering positions, computer and mathematical positions, information industries, and professional and scientific industries.[325] The Starr et al. study further finds significant variation based on the relevant business interest that the employer may have in a noncompete with respect to a particular employee. For example, about one-third of employees subject to noncompetes work with trade secrets, as compared to about 15 percent of employees who only "work with clients or who have client-specific information."[326]

These data have been cited by scholars and policymakers who argue that significant numbers of employees are encumbered by these provisions.[327] One scholar claims that employees are now stuck in a "thicket" and that "[n]oncompete agreements are now required in almost every industry and position."[328] We interpret the data differently. The variation in reported usage rates across occupational and industry categories raises serious doubt as to whether it is reasonable to assume that, when noncompetes are enforceable, employers blindly use them in all circumstances. Consider the finding above that approximately one-third of technical personnel are subject to noncompetes. While that is a significant percentage, it means that approximately *two-thirds* of that work force is *not* subject to any such constraint. Even the high usage rates among top-level executives imply that about *one-third* of the relevant labor pool did not agree to a noncompete. Additionally, it is important to keep in mind that *effective* use of noncompetes almost certainly falls well below *nominal* use. A recent study finds that, in the state of Washington, which enforces noncompetes subject to the reasonableness standard, technology firms cultivate a reputation for nonenforcement[329]—meaning, that the actual use of noncompetes is far less common than the nominal use of noncompetes. That finding is consistent with prior reports (as discussed earlier) that firms in the Route 128 area widely tolerated employee departures and spin-offs during the

---

[325] See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *43–44 (cited in note 11).

[326] See id at *19.

[327] See, for example, Lobel, *Companies Compete but Won't Let Their Workers* (cited in note 19); White House, *Non-Compete Agreements* at *5–7 (cited in note 36); Office of Economic Policy, *Non-compete Contracts* at *11–13 (cited in note 36).

[328] Lobel, 93 Tex L Rev at 791 (cited in note 9).

[329] See Gomulkiewicz, 49 UC Davis L Rev at 256–57, 277–80 (cited in note 274).

economic heyday (and, presumably, competitive market for technical talent) of the 1970s and 1980s, even though Massachusetts law nominally tolerated enforcement subject to the reasonableness standard.[330] Rather than being driven toward widespread use of noncompetes to constrain the outflow of human capital to competitors, actual market behavior shows that firms sometimes or usually *decline* to use or enforce noncompetes.

D.   Why Employers Decline to Use Noncompetes

Significant variation in the use and enforcement of noncompetes does not favor the thesis that markets are prone to suffer from a collective-action problem resulting in inefficient overuse of noncompetes. Rather, it is more consistent with a standard competitive market model in which employers bid for managerial and technical talent by offering different packages of price and nonprice terms. Under competitive conditions, firms seek to attract the most highly valued labor by offering different types of employment agreements, some with and some without noncompetes.

It is entirely plausible that an employer may prefer to offer an employment package without a noncompete. The reason is simple: noncompetes are costly to employers and will not always be worth the price. Prospective employees anticipate that noncompetes will limit postemployment opportunities, which means that employees may be unable to access more lucrative outside employment options during the term of the noncompete and, as a result, will have reduced capacity to renegotiate the terms of employment with the employer in the future. The prospective employee may further anticipate that, given a limited set of outside employment options, the employer could hold up the employee and unilaterally degrade the terms of employment.[331] Based on these expectations, the prospective employee will demand either compensation up-front or, more plausibly, credible assurance that the firm will allocate internal rewards for strong performance that mimic the rewards that would be allocated in the external

---

[330]  See notes 186–90 and accompanying text.

[331]  See Margaret M. Blair, *Firm-Specific Human Capital and Theories of the Firm*, in Margaret M. Blair and Mark J. Roe, eds, *Employees and Corporate Governance* 58, 64–65, 72 (Brookings Institution 1999). Professor Oliver Williamson, the originator of the hold-up concept in the institutional economics literature, makes the same observation but argues that repeat-play forces would typically dissuade employers from engaging in this behavior. See Oliver E. Williamson, *Economic Institutions of Capitalism* 248–49, 259–60 (Free Press 1985).

labor market.[332] If the employer is unwilling to pay the required up-front compensation, cannot credibly commit to reward employees' relative contributions to the firms' team product, or has other mechanisms by which to regulate human capital outflow or protect against knowledge leakage in the event of an employee departure, then, in any of those cases, it may decline to "purchase" a noncompete obligation from the employee.

The "talent wants to be free" school implicitly assumes a world in which employers unilaterally impose or dictate noncompetes and therefore the law must intervene. But that implausibly assumes that employers always or typically are price-setters in the labor market. In most markets, that would typically not be the case and, in technology markets in particular, the very opposite is more likely given the widespread observations that, in many technology market segments, skilled technical labor is scarce and employers bid aggressively to recruit them.[333] Absent market power, we should therefore expect to observe variation in the mix of postemployment constraints as employers compete over a limited talent pool.

More specifically, any such variation in the use of noncompetes will reflect different values placed by employers and employees on two variables:

(i)   $G_f$: the *firm*'s net expected future gains from employee training and knowledge internalization attributable to a noncompete; and

(ii)  $G_e$: the *employee*'s net expected future gains from postemployment opportunities at competitors within the typical duration of a noncompete.[334]

The value of $G_f$ and $G_e$ impacts the firm's and the employee's respective negotiating positions: as the value of $G_f$ rises, the firm

---

[332]  See Blair, *Firm-Specific Human Capital* at 66, 72–73 (cited in note 331). As Blair notes, the latter solution is more plausible because full up-front compensation would induce shirking on the part of the employee. See id at 62, 73. Note that assurance of an internal compensation system would be credible only if an employer entered into a contractual commitment to do so or, in the absence of a contract, pledged reputational capital to support any such assurance.

[333]  For a review of the evidence, see National Science Board, *Revisiting the STEM Workforce* *9 (Feb 4, 2015), archived at https://perma.cc/S9GE-S5WA.

[334]  In some situations, the employee may prefer a noncompete because gains to the employee's human capital from training—which could not occur absent a financing commitment—outweigh anticipated losses from foreclosing potential postemployment opportunities. See Rubin and Shedd, 10 J Legal Stud at 96–97 (cited in note 56). Indeed, a recent study finds that noncompetes are associated with a 5.5 percent increase in the likelihood

is willing to pay a higher price for a noncompete; as the value of $G_e$ rises, the employee will demand a higher price for agreeing to a noncompete. The interaction between these two variables influences the likelihood that any given employer-employee negotiation is likely to yield a noncompete. As the value of $G_f$ rises in value relative to $G_e$, we would expect to see greater adoption of noncompetes since employers value the noncompete highly and employees are willing to "sell" it at a low price; as that ratio is reversed, we would expect to see the opposite outcome. When the values of $G_f$ and $G_e$ are both high (or low), results are likely to be mixed.

We recognize that this model is inherently stylized and, in particular, is vulnerable to the objection that employers and employees in real-world contracting environments do not engage in customized negotiation—rather, employers sometimes include noncompetes in a "take-it-or-leave-it" employment package that does not facilitate term-specific negotiation.[335] This is especially so if the employer demands a noncompete not in the original employment agreement or terms, but only after the employee begins work.[336]

While some evidence supports the view that, in certain market segments, noncompete clauses are not typically negotiated,[337] it should not be automatically concluded that rational negotiation models have no descriptive force in this setting or, equivalently, that employers are free to "impose" noncompetes without paying any price for doing so. First, in the case of top-level executives, the full negotiation assumption almost always holds true as these

---

of receiving training on the job. Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *3 (cited in note 11). In order to address the strongest argument made against noncompetes, we nevertheless assume here that there is a net cost to the employee from agreeing to the noncompete.

[335] See White House, *Non-Compete Agreements* at *9–10 (cited in note 36); Office of Economic Policy, *Non-compete Contracts* at *12–13, 24 (cited in note 36); Marx, 76 Am Sociological Rev at 696 (cited in note 272).

[336] See, for example, Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *52 (cited in note 11) (indicating that only 6.3 percent of survey respondents who reported being asked to sign a noncompete after accepting their job offers attempted to negotiate the noncompete's terms, while this percentage was nearly twice as high for those who had received the noncompete before accepting their job offers).

[337] See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *21 (cited in note 11) (finding that only 10 percent of noncompete signers attempt to negotiate the noncompete); Marx, 76 Am Sociological Rev at 706 tbl 4 (cited in note 272) (finding that 31 percent of surveyed employees received the noncompete request with the job offer, 22 percent received the request after the offer was accepted but prior to the start of work, 24 percent received the request on the first day of work, and 23 percent sometime after the starting work).

agreements are typically entered into with the advice of highly sophisticated counsel specialized in executive compensation matters.[338] Second, in the case of lower-level technical and managerial talent who may well not have the opportunity to negotiate customized terms of employment, the competitive model still has descriptive force even in the absence of transaction-specific negotiation over noncompetes, so long as at least some portion of the market observes employer behavior and disseminates information concerning the terms of employment.[339] Assuming competitive market conditions, that monitoring function may be filled by other employers who have a rational incentive to monitor the use or enforcement of noncompetes by competitors and offer prospective employees an employment package without such restrictions or a demonstrated enforcement record that tolerates employee departures notwithstanding a noncompete.

### 1. Variation in use of noncompetes across employee types.

While further theoretical refinement and empirical inquiry is warranted, this competitive bidding model anticipates the variation observed in available data on the use of noncompetes among executive and technical personnel populations. In particular, it explains the significantly higher usage of noncompetes among top-level executives as compared to lower-level technical personnel. The most comprehensive empirical study on the use of noncompetes finds a correlation between income (which often correlates with higher-skilled occupations) and the incidence of noncompetes. More specifically, that study finds that, whereas 37 percent of employees earning over $100,000 a year are subject

---

[338] Statement made based on one of the authors' personal experiences as a practicing transactional attorney.

[339] For the original version of this argument, made in the debate over the efficiency of contracts of adhesion, see Alan Schwartz and Louis L. Wilde, *Intervening in Markets on the Basis of Imperfect Information: A Legal and Economic Analysis*, 127 U Pa L Rev 630, 637–38 (1979) (arguing that the presence of consumers who engage in "moderate search" can protect consumers who engage in no search from "overreaching firms"). For an application to related debates in copyright-related settings, see Frank H. Easterbrook, *Contract and Copyright*, 42 Houston L Rev 953, 969–70 (2005). As Judge Easterbrook observes, the fact that a particular attribute of a product or service is not routinely negotiated on a transaction-specific basis does not imply that that attribute is being dictated by the supplier. Rather, that question is more profitably analyzed by asking whether the supplier possesses sufficient market power to be in a position to dictate any such term. Nonetheless we recognize that, in the noncompete context, this argument is predicated on the assumption that information is being disseminated in the market concerning a specific employer's noncompete policy, which we recognize may vary from case to case.

to a noncompete, this is only true of 14 percent of employees earning up to $40,000.[340] These findings conform to the expectations of rational bargaining between employers and employees. In the case of a higher-level executive, the employer most likely assigns a high value to $G_f$—that is, the firm prioritizes internalizing the valuable knowledge assets to which a top-level executive would be exposed and is therefore typically prepared to pay a substantial price for obtaining that concession from the employee. By contrast, a lower-level employee may not have comparable exposure to the highest-value knowledge assets, in which case the firm assigns a low value to $G_f$ and is typically willing to forego the noncompete (or, what is functionally equivalent, foregoes enforcement even if a noncompete clause appears in the employment package).

2. Variation in the use of noncompetes across
   industry types.

The competitive bidding model not only anticipates variation in the use and enforcement of noncompetes across employee types, but also across industries. Using this framework, we can roughly anticipate the expected use of noncompetes in different industry types (a research path that may prove fruitful in future empirical inquiries). Industries that exhibit some or all of the following characteristics are less likely to adopt noncompetes: (i) low capital requirements; (ii) short product development times; (iii) rapid product obsolescence; (iv) strong intellectual property protection (including patents, copyrights, and trade secrets); (v) robust complementary assets (such as strong marketing or manufacturing capabilities); and (vi) high levels of industry-specific product interoperability.[341]

Under those conditions, the employer assigns a low value to $G_f$. A firm in industries with these characteristics is less likely to prioritize maintaining control over its knowledge assets because those assets are not particularly costly to develop, even successful

---

[340] See Starr, Prescott, and Bishara, *Noncompetes in the U.S. Labor Force* at *17–18 (cited in note 11).

[341] In industries involving high levels of interoperability, presumably there is substantial information sharing among firms, which is either protected by patents and other forms of intellectual property rights or not at all, at least within the circle of relevant competitors. Either way the gains from internalizing R&D via noncompetes are reduced in this situation. Additionally, interoperability implies that training results in industry-specific capital, which makes the value of intra-industry postemployment opportunities more valuable for employees. Thus, on balance, industries characterized by high levels of interoperability will, all other factors equal, typically fall into this category.

products have short lifetimes, and, in some cases, the product is embedded in a portfolio of IP assets and/or supported by complementary production and distribution assets that are difficult to replicate. For the same reason, employees in this setting are likely to place a high value on $G_e$. In a fast-paced market segment characterized by short product-development times and rapid product obsolescence, employees are likely to demand a high price for accepting noncompetes due to the expectation that a current employer's project is likely to conclude rapidly, in which case the employee may be compelled to seek employment elsewhere. Employment contracts in that type of industry are less likely to include a noncompete clause, and if they do, employers are unlikely to enforce them vigorously given the potential adverse consequences in the ability to recruit talent in the future. The software industry, particularly the Internet-based sector, tends to fit this mold.

Noncompetes are more likely to be selected in markets that exhibit the opposite characteristics. In the biopharmaceutical sector, capital requirements are enormous (approaching or exceeding $1 billion in the case of an FDA-approved drug[342]), product development is long (about ten years on average), product obsolescence is slow, and interoperability is minimal. Given those considerations, the employer is likely to place a high value on internalizing the gains from its R&D investment and therefore should be willing to pay a relatively high price for achieving that objective through restrictions on departing employees. Moreover, the potential costs to a biopharmaceutical employee from a noncompete are presumably lower than in the software industry given longer product development cycles, which—in view of the importance of project-specific knowledge to biopharmaceutical development—tend to ensure longer employee tenures and diminish the number of potential opportunities at competing firms. Consistent with this expectation, empirical evidence shows low levels of employee movement in the Canadian biotechnology industry as compared to the free flow of human capital associated with the semiconductor and other IT industries in Silicon Valley.[343] This observed

---

[342] See Joseph A. DiMasi, Ronald W. Hansen, and Henry G. Grabowski, *The Price of Innovation: New Estimates of Drug Development Costs*, 22 J Health Econ 151, 180–81 (2003). The development cost estimate includes the costs of failed projects previously funded by the pharmaceutical firm. See id.

[343] See Hugh P. Gunz, Martin G. Evans, and R. Michael Jalland, *Career Boundaries in a "Boundaryless" World*, in Maury A. Peiperl, et al, eds, *Career Frontiers: New Conceptions of Working Lives* 24–53 (Oxford 2000).

pattern in human capital flows may be in part a function of institutional design: empirical evidence shows that California biotechnology firms issue stock options with long vesting periods and employees of those firms hold large percentages of firm equity,[344] suggesting that, even when firms operate in a jurisdiction in which noncompetes are unenforceable, they adopt alternative tools to constrain the outflow of human capital.

E.    Error Costs and Noncompete Policy

Economically informed policymaking on noncompetes, and other constraints on employee mobility in innovation markets, must recognize the fundamental uncertainty that attends the selection of any particular point on the policy continuum ranging from full enforcement (equivalent to Option I) to zero enforcement (equivalent to Option III). This is akin to the concept of error cost that occupies a central place in antitrust law and policy: the policymaker recognizes the inevitability of erroneous decisions in general and then selects a legal standard that minimizes the sum of error costs less the administrative costs of implementing any particular standard.[345] Hence, antitrust law reserves per se illegal standards, which have low administrative costs, for practices that usually, or almost always, are expected to result in net social harms (principally, horizontal price-fixing), while retaining rule of reason standards, which have high administrative costs, for practices that do not usually result in net social harms (for example, below-cost predatory pricing).[346] In the case of noncompetes, each option on the policy continuum raises the risks of both under- and over-enforcement relative to the socially optimal level of noncompete enforcement that would be costlessly and perfectly implemented by a hypothetical omniscient regulator. In the case of a per se legal policy (Option I), the market is immune from the risk of underuse of noncompetes but may be exposed to overuse, resulting in suppressed knowledge spillovers and a slowdown in innovation, not to mention concerns regarding personal autonomy and distributive justice. In the case of a per se illegal policy (Option III), the market is immune to the risk of overuse of noncompetes but may be exposed to underuse, resulting in reduced employer incentives to invest in employee training and certain types

---

[344] See Julia Porter Liebeskind, *Ownership, Incentives, and Control in New Biotechnology Firms*, in Margaret M. Blair and Thomas A. Kochan, eds, *The New Relationship: Human Capital in the American Corporation* 299, 306 (Brookings Institution 2000).

[345] See note 38 (listing the leading sources).

[346] See Easterbrook, 63 Tex L Rev at 3 (cited in note 38).

of R&D projects. The intermediate range of policy options (Option II), which correspond to the real-world variants of the common-law reasonableness standard, result in some mix of aggregate overuse or underuse of noncompetes relative to the social optimum.

It is important to appreciate that the error-cost approach contemplates that courts and other policymakers may make mistakes with respect to any individual enforcement action, but, in the aggregate, courts and other policymakers will maximize net social gains over time relative to any other enforcement methodology, taking into account legal transaction costs. Following this long-term net-welfare-maximization standard, the efficient legal regime with respect to noncompetes maximizes over time (i) the gains generated by net-welfare-increasing noncompetes, less (ii) the losses generated by net-welfare-decreasing noncompetes, less (iii) the legal transaction costs incurred to distinguish between "good" and "bad" noncompetes. The selection of any option on the noncompete policy continuum inherently involves the task of distinguishing between net-welfare-increasing and net-welfare-decreasing noncompetes, subject to some positive administrative cost and taking into account some positive probability that any legal rule will sometimes make errors in individual cases in distinguishing between good and bad noncompetes. Options I (per se legal) and III (per se illegal) both have the advantage of low administrative costs as compared to Option II (some version of the reasonableness standard), but take extreme views with respect to the likely distribution of good and bad noncompetes and therefore run the risk of significant error costs in the form of overuse or underuse of noncompetes. Option I ("per se legal") is predicated on the view that noncompetes are always or typically efficient market choices, in which case it is not worthwhile to incur the administrative costs of case-specific adjunction and occasional erroneous enforcement of a "bad" noncompete would be immaterial in the long term. Option III (per se illegal) takes the opposite view with respect to each parameter, except that it agrees that it is not worthwhile to incur the administrative costs of case-specific adjudication. By contrast, Option II takes the intermediate position that the distribution of "good" and "bad" noncompetes may vary sufficiently across industries, employee populations and even individual transactions, so that it is worthwhile to incur the administrative costs required to engage in case-specific adjudication and thereby reduce erroneous enforcement and invalidation

of noncompete clauses. This option is also best in our view for taking account of personal autonomy and distributive justice concerns, which vary depending on the specific circumstances of the employer, employee, and industry.

The earlier generation of law-and-economics scholarship had essentially expressed agnosticism as to the appropriate policy options, on the reasonable ground that available evidence did not provide any firm ground on which to make a choice.[347] Today, we are in a position to take an incrementally firmer view on the efficient legal treatment of noncompetes, grounded in the accumulated body of theoretical and empirical analysis of noncompetes, as well as the larger literature on human capital and agglomeration economies.

An error-cost approach to noncompete policy favors the pliable reasonableness standard set forth several centuries ago in *Mitchel v Reynolds*.[348] While it carries a higher administrative-cost burden compared to Options I and III, the range of more and less generous reasonableness standards encompassed by Option II exhibits a close fit with our best theoretical and empirical understanding—which is to say, our self-acknowledged limited understanding—of the complex efficiency trade-offs involved in enforcing noncompete clauses in any particular case. Moreover, we note that courts' application of the common-law reasonableness standard may not be especially costly given that that inquiry has historically been limited to a defined set of factors, usually limited to duration, geography, and industry scope.[349] Relatedly, we note that the administrative costs under Option III (per se illegality) may in practice be appreciably greater than zero insofar as an absolute ban on noncompetes may lead parties to challenge legal arrangements that arguably mimic the effect of noncompetes but serve legitimate economic functions. This contingency has already been realized in California, where a lower court recently applied the statutory prohibition of noncompetes to an exclusivity clause in a business-to-business agreement, which has never been considered to fall within the purview of that statute.[350]

In sum, the reasonableness limitations that the common law places on the durational, geographic, and industry scope of noncompete obligations may be interpreted as an indirect instrument

---

[347] See Part I.B.5.
[348] 24 Eng Rep 347, 347 (KB 1711).
[349] See note 150 and accompanying text.
[350] See notes 29–30 and accompanying text.

for limiting error costs under conditions of uncertainty with respect to the socially optimal enforcement policy in the case of any particular noncompete. By tolerating noncompetes subject to fairly strict limitations on duration, geographic reach, and industry scope, courts may effectively minimize the expected error costs inherent to the enforcement or nonenforcement of the total population of noncompetes over time, as compared to a regime in which noncompetes were either flatly enforced or prohibited in all cases without qualification. Additionally, if and when evidence concerning the net welfare effects of noncompetes achieves greater certainty, a reasonableness approach provides policymakers with latitude to adjust the permitted scope of noncompetes, an option that is unavailable under either the full-enforcement or zero-enforcement options. While the extreme poles of the policy continuum largely eliminate administrative costs, each is likely to result in significantly higher error costs over time absent extreme and, based on a close reading of the empirical evidence, factually unjustified assumptions with respect to the likely distribution of efficient and inefficient noncompetes in the marketplace.

## Conclusion

Much of current scholarly and policy commentary asserts, often with little qualification, that prohibiting enforcement of noncompetes and other contractual limitations on employee mobility promotes innovation. As one scholar has stated: "[T]here remain no persuasive arguments in favor of enforcing [noncompete] agreements."[351] Based on these types of unqualified statements in the scholarly literature, US senators have proposed—and multiple state legislatures have already taken or are actively considering—actions to substantially limit or even prohibit noncompetes.[352]

We respectfully dissent. The case against noncompetes is typically illustrated by reference to the standard narrative of the rise of Silicon Valley and the decline of Route 128. A close review shows that this historical episode is substantially more complex than has been commonly understood. Technological and economic fundamentals, rather than fine differences in state contract law, most likely account for each region's different innovation trajectories—which, in the medium to long term, has been positive in

---

[351] See Moffat, 52 Wm & Mary L Rev at 879 (cited in note 9).

[352] See notes 19–28 and accompanying text.

both cases.[353] The most widely cited empirical studies of a broader sample of jurisdictions suffer from material limitations and, contrary to repeated characterizations in the policy debate, do not provide compelling support for the view that noncompetes inhibit innovation.[354] Moreover, more recent empirical work has uncovered evidence supporting theoretical claims that noncompetes sometimes induce firms to invest in cultivating employees' human capital.[355]

The current state of our empirical understanding thus continues to track the most refined theoretical analysis of the complex economics of human capital markets, which suggests that the net efficiency effects of noncompetes—and other constraints on employee mobility—in innovation markets will vary across industry types, employee types, and other market parameters.[356] Some market segments may benefit from a high incidence of noncompetes, while others may suffer. Contrary to the direction of recent scholarship, popular commentary, and policy activity, there is little certainty concerning the net efficiency effects of noncompetes in general and reasonable grounds to believe they have a net positive effect in certain innovation environments. If that is the case, then, from an economic point of view, the common law's admittedly uncertain reasonableness standard likely represents the best available approach for balancing the complex trade-offs raised by noncompetes and other constraints on the mobility of human capital in innovation markets.

---

[353] See Part II.A.
[354] See Part II.B.
[355] See notes 310–13 and accompanying text.
[356] See Part II.B.3.

APPENDIX

Changes to State Laws Affecting Noncompetes (2014–2019)[357]

| State (Year) | Change | Reduces Enforceability? |
|---|---|---|
| Delaware (2014) | Bars noncompetes for home inspector trainees. | Y |
| New Hampshire (2014) | Employee must agree to noncompete prior to start of employment. | Y |
| Arkansas (2015) | Specifically authorizes noncompetes in certain circumstances. | N |
| Hawaii (2015) | Prohibits enforcement of non-competes by "technology businesses." | Y |
| Alabama (2016) | Specifically authorizes noncompetes in certain circumstances. | N |
| Connecticut (2016) | Limits enforceable geographic scope and duration of noncom-petes involving physicians. | Y |
| Idaho (2016) (repealed 2018) | Specifically authorizes noncompetes in certain circumstances. | N |
| Illinois (2016) | Bars noncompetes for "low-wage" employees. | Y |
| Oregon (2016) | Maximum term of noncompete limited to eighteen months. | Y |
| Utah (2016) | Maximum term of noncompete limited to twelve months. | Y |

[357] Note that this Table does not cover judicial decisions that may have effectively changed an individual state's treatment of noncompetes. Relevant statutes (with the exception of the 2018 Idaho and Utah amendments) are as follows (corresponding to states listed above from top to bottom): 28 Del Code Ann § 4109; NH Rev Stat Ann § 275:70; Ark Code Ann § 4-75-101 (2015); Hawaii Rev Stat Ann § 480-4; Ala Code § 8-1-190; Conn Gen Stat § 20-14p; Idaho Code § 44-2704(6); 820 ILCS 90/10; Or Rev Stat § 653.295; Utah Code Ann § 34-51-201; Cal Labor Code § 925; Nev Rev Stat § 613.195; Colo Rev Stat § 8-2-113; Neb Rev Stat § 87-404(2); Mass Gen Laws Ann ch 149, § 24L; Washington Substitute HB 1450, Washington House of Representatives, 66th Regular Legislative Sess (Mar 12, 2019); Connecticut Bill No 7424, Connecticut General Assembly, Jan Sess (2019); 26 Me Rev Stat Ann § 599-A(1); Md Labor & Empl Code Ann § 3-716 (as amended); NH Rev Stat Ann § 275-70-a (as amended); North Dakota HB 1351, North Dakota Legislative Assembly, 66th Sess (Jan 9, 2019), codified as amended at ND Cent Code § 9-08-06; RI Gen Laws § 28-58-1 et seq.

| State (Year) | Change | Reduces Enforceability? |
|---|---|---|
| California (2017) | Limits ability of employers to require employees to litigate disputes outside of California or under the laws of another state. | Y |
| Nevada (2017) | Limits noncompetes to terms that are "no greater than is required for the protection of the employer." Authorizes courts to reform noncompetes that are unreasonable. | Y, N[358] |
| Colorado (2018) | Bars noncompetes for physicians. | Y |
| Idaho (2018) | Repeals Idaho 2016 statute relating to noncompetes. | Y |
| Nebraska (2018) | Provides that arbitrator or court may "reform" noncompete provisions in a franchise agreement. | N[359] |
| Utah (2018) | Curtails enforcement of noncompetes in the broadcasting industry. | Y |
| Massachusetts (2018) | Prohibits noncompetes for employees subject to the Fair Labor Standards Act and all other employees terminated without cause. | Y[360] |

---

[358] While the limitations on the enforceability of noncompetes would appear to moderately reduce enforceability relative to the existing reasonableness standard, the specific authorization of courts to reform noncompetes that have excessive duration, scope, or other unreasonable terms tends to enhance enforceability.

[359] This change increases enforceability because it specifically authorizes a court to "blue pencil" a noncompete provision if it is found to be unreasonable in its existing form, rather than ruling the provision to be unenforceable in its entirety.

[360] Note that, while the Massachusetts statute reduced the enforceability of noncompetes in certain cases, it also codified the inevitable disclosure doctrine (which Massachusetts courts have historically resisted), which enables employers to partially mimic the effect of a noncompete. See note 149 and accompanying text.

JA0829

| State (Year) | Change | Reduces Enforceability? |
|---|---|---|
| Washington (2019) | Imposes high salary and compensation minimums on employees and contractors who may be subject to noncompetes; sets presumptive eighteen-month limit on term; requires agreement at time of acceptance of employment or additional compensation; requires additional payment to employees terminated without cause. | Y |
| Connecticut (2019) | Bars noncompetes in home health services industry. | Y |
| Maine (2019) | Bars noncompetes for certain lower-wage workers and, in all cases, requires that employers disclose noncompete prior to offer of employment. | Y |
| Maryland (2019) | Bars noncompetes for certain lower-wage workers. | Y |
| New Hampshire (2019) | Bars noncompetes for certain lower-wage workers. | Y |
| North Dakota (2019) | Clarifies that "goodwill sale" exception to ban on noncompetes can extend to firm's partners, members, or shareholders. | N |
| Rhode Island (2019) | Bars noncompetes for certain lower-wage workers, employees subject to the Fair Labor Standards Act, students, and workers age eighteen or younger. | Y |

## Business Roundtable Comment to the FTC on the NPRM to Ban Non-Competes

*April 17, 2023*

### I.     Introduction

Business Roundtable (BRT) represents more than 200 chief executive officers (CEOs) of America's leading companies, representing every sector of the U.S. economy.  Business Roundtable CEOs lead U.S.-based companies that account for one in four American jobs and almost a quarter of U.S. GDP.   Business Roundtable members develop and advocate for policies to promote a thriving U.S. economy and expanded opportunity for all. With the aim of advancing that goal, we are pleased to submit these comments in response to the U.S. Federal Trade Commission (FTC) Non-Compete Clause Rulemaking, Matter No. P201200.[1]

Business Roundtable acknowledges that non-compete agreements are not appropriate in all circumstances, as courts have recognized.  However, Congress simply did not authorize the FTC to engage in legislative-type rulemaking to expansively prohibit non-compete agreements for all categories of workers and without reference to the relevant scope of competition.  Moreover, the overbroad prohibition on non-compete agreements proposed by the FTC ignores important valid uses that encourage innovation and pro-competitive investment in employees, R&D, and other aspects of business growth that benefit workers and the American economy more broadly.  It also ignores the importance of evaluating the use of non-compete agreements in specific circumstances, as the FTC is instructed to do using its case-by-case adjudicative function.  The FTC should not use a rulemaking to circumvent the analysis required to determine whether non-compete agreements used by a specific company in a specific circumstance are, in fact, unfair methods of competition (UMC).

### II.     The Proposed Rule Exceeds the FTC's Authority.

#### A.     *The statutory framework does not authorize UMC rulemaking.*

Section 5 of the FTC Act directs the FTC to prevent (1) unfair methods of competition, and (2) unfair or deceptive acts and practices.[2]  Section 5(b) specifies that the FTC is to accomplish this goal through adjudication, and Section 6(g) empowers the FTC "[f]rom time to time to classify corporations and . . . to make rules or regulations for the purpose of carrying out the provisions" of the FTC Act.[3]  The most natural reading of this statutory scheme is that the FTC's 6(g) rulemaking must <u>support</u> its adjudicatory function, not replace that function with a legislative-type

---

[1] Press Release, FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition (Jan. 5, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition; Federal Register Notice at https://www.govinfo.gov/content/pkg/FR-2023-01-19/pdf/2023-00414.pdf.

[2] 15 U.S.C. § 45.

[3] *Id.* at §§ 45(b), 46(g).

JA0831

role that would allow the FTC to classify broad swaths of conduct as UMC without considering the specific effects on competition in each individual case.

This natural reading of the text is corroborated by Congress's decision in 1975 to grant the FTC legislative-type rulemaking authority only for unfair or deceptive acts or practices (UDAP) offenses. Section 202(a) of the Magnuson-Moss Warranty Act of 1975 amended the FTC Act to give the FTC express authority to issue UDAP rules, while imposing heightened procedural requirements for such rulemaking.[4]  As amended, the text of the FTC Act provides "the Commission may prescribe . . . rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title)."[5]  Congress specified no such authority for UMC offenses.[6]

This statutory scheme requiring case-by-case adjudication without pre-judgment or classification of conduct in the competition context makes sense in light of the long history of antitrust jurisprudence in the United States. Courts have consistently reiterated that the vast majority of competition concerns must be evaluated on a case-by-case basis for reasonableness because market realities, including the foundational question of who really competes against whom in dynamically changing industries, dictate different conclusions as to similar-sounding conduct. Just as acquiring a competitor is not always an unfair method of competition, nor is contracting for worker exclusivity for a limited time. In particular, courts at the federal and state levels have repeatedly indicated that there are important pro-competitive uses of worker non-competes, meaning that any particular use must be evaluated to ensure it advances a legitimate business justification and is not broader than reasonably necessary to achieve that justification.[7]  Likewise, the Department of Justice (DOJ)—the FTC's sister agency in antitrust enforcement— recently acknowledged the pro-competitive uses of non-compete agreements with workers to include "inducing productive employment or new investment in human capital," but cautioned that the

---

[4] Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).

[5] 15 U.S.C. § 57a(a)

[6] *Id.* ("The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce . . . . The preceding sentence shall not affect any authority of the Commission to prescribe rules . . . with respect to unfair methods of competition in or affecting commerce."). The reference to "any authority" of the FTC to engage in UMC rulemaking—as opposed to "the authority"— reflects Congress's agnostic view on whether the FTC possesses any such authority, leaving the question open for the courts to resolve.

[7] *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) (non-compete agreements may be used if they are "reasonably necessary . . . to the enjoyment by the buyer of the property, good will, or interest in the partnership bought."); *Aya Healthcare Servs. v. AMN Healthcare*, 9 F.4th 1102, 1109 (9th Cir. 2021); *Newburger, Loeb Co., Inc. v. Gross*, 563 F.2d 1057, 1082 (2d. Cir. 1977) ("we have held that a per se ban on all such restrictive covenants [that serve a legitimate business purpose] would not be warranted" and holding that legitimate business purposes include "prevent[ing] a departing employee from expropriating his employer's secrets and clientele"); *Community Hosp. Grp., Inc. v. Moore*, 869 A.2d 884 (N.J. 2005) (investment in the training of a physician was a legitimate interest protectable by a non-compete agreement); *Sharvelle v. Magnante*, 836 N.E.2d 432, 437 (Ind. Ct. App. 2005) (recognizing a clinic's legitimate interest in "its good will, its established patient base, and the time and resources spent to build its practice").

"time period of restraints found reasonable under this doctrine usually has been no more than a few years."[8]

The FTC cites *National Petroleum Refiners Association* for the proposition that "Sections 5 and 6(g) provide the Commission with the authority to issue regulations declaring practices to be unfair methods of competition."[9]  As several legal scholars and commentators have noted, however, that decision is unlikely to be treated as good law.[10]  First, it was decided before Congress passed the Magnuson-Moss Warranty Act and clarified only a limited set of substantive rulemaking powers for UDAP offenses.  Second, the D.C. Circuit's decision rests on a method of statutory interpretation that is now clearly disfavored in the Supreme Court's jurisprudence on administrative law.

After analyzing the statutory text, the D.C. Circuit examined decisions addressing other agencies' rulemaking authority, which at the time established "[t]he need to interpret liberally broad grants of rule-making authority like the one we construe here."[11]  The court emphasized that "there is little question that the availability of substantive rule-making gives any agency an invaluable resource-saving flexibility in carrying out its task of regulating parties subject to its statutory mandate" and extolled the benefits of rulemaking over case-by-case adjudication when developing agency policy.[12]  Substantive rulemaking authority would permit the FTC to carefully consider and develop ideal standards of conduct, avoid the slow development of rules through adjudication, and minimize the unfairness of a case-by-case approach that requires compliance of only the party at issue and leaves other competitors free to commit violations.[13]

The court acknowledged that the more limited view of Section 6(g) was plausible, though, so it considered the legislative history of the FTC Act.[14]  The court characterized the legislative history of Sections 5 and 6(g) as "ambiguous" and found that it did not compel the narrow

---

[8] Statement of Interest of the United States, *Beck v. Pickert Medical Group*, CV-21-02092 (Nev. Dept. 15 Feb. 25, 2022) (citing *Eichorn v. AT&T Corp.*, 248 F.3d 131, 136-37, 145-46 (3d Cir. 2001) (245 days); *Syntex Labs., Inc., v. Norwich Pharmacal Co.*, 315 F. Supp. 45, 56 (S.D.N.Y. 1970) (two years), *aff'd*, 437 F.2d 566 (2d Cir. 1971)).

[9] NPRM at 68, n.226 (citing *Nat'l Petroleum Refiners Ass'n v. Fed. Trade Comm'n*, 482 F.2d 672, 697–98 (D.C. Cir. 1973)).

[10] Thomas W. Merrill, Antitrust Rulemaking: The FTC's Delegation Deficit, CTR. FOR THE STUDY OF THE ADMIN. ST., at 15 (2022); Maureen K. Ohlhausen and Ben Rossen, "Dead End Road: National Petroleum Refiners Association and FTC 'Unfair Methods of Competition' Rulemaking", in RULEMAKING AUTHORITY OF THE U.S. FEDERAL TRADE COMMISSION 31 (Daniel A. Crane ed., 2022); Eugene Scalia, The FTC's Breathtaking Power Grab Over Noncompete Agreements, WALL ST. J. (Jan. 12, 2023); Dissenting Statement of Commissioner Christine S. Wilson: Regarding the Notice of Proposed Rulemaking for the Non-Compete Clause Rule, at 5 (Jan. 5, 2023); Maureen K. Ohlhausen & James F. Rill, Pushing the Limits? A Primer on FTC Competition Rulemaking, in RULEMAKING AUTHORITY OF THE U.S. FEDERAL TRADE COMMISSION 156 (Daniel A. Crane ed., 2022); Thomas W. Merrill & Kathryn T. Watts, Agency Rules with the Force of Law: The Original Convention, 116 HARV. L. REV. 467, 504–05 (2002).

[11] 482 F.2d at 680.

[12] *Id.* at 681–84.

[13] *Id*.

[14] *Id*. at 685.

construction.[15]    Instead, the court reasoned that "[t]his relationship between rule-making's probable benefits and the broad concerns evident when the FTC was created, together with the express language of Section 6(g), help[ed] persuade [the court] that any purported ambiguity of the statute be resolved in favor of the Commission's claim."[16]

This reasoning does not comport with modern principles of statutory interpretation and administrative law.  Since the D.C. Circuit's decision, courts—including the Supreme Court—have cabined agency authority narrowly to the powers expressly in statutory text.[17]  "Federal agencies are creatures of statute.  They possess only those powers that Congress confers upon them."[18]  Importantly, an agency is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."[19]  The FTC Act undoubtedly grants the FTC the authority to restrain UMC and UDAP, but the best reading of the organic statute reflects that the FTC is to enforce its statutory mandate by means of adjudication.  Section 5, the heart of the FTC Act, focuses entirely on adjudication and makes no mention of rulemaking.

The D.C. Circuit in *National Petroleum Refiners* discounted the significance of Section 5 indicating that adjudication is the means for restraining UMC and UDAP, reasoning that Section 5(b) did not use limiting language and that Section 6(g) provides a source of substantive rulemaking authority.[20]  But this approach is in tension with the elephants-in-mouseholes doctrine developed by the Supreme Court in recent years.  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[21]  The Court in *AMG* recently applied similar principles in the context of the FTC's redress authority under the FTC Act:

> But to read those words as allowing what they do not say, namely, as allowing the Commission to dispense with administrative proceedings to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter. In light of the historical importance of

---

[15] *Id*. at 686.

[16] *Id.* at 691.

[17] *Compare Nat'l Petroleum Refiners*, 482 F.2d at 673 *with AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1344 (2021) (explaining that FTC's authority to seek disgorgement as a remedy in federal court turned on "whether this statutory language [in Section 13(b) of the FTC Act] authorizes the Commission to seek, and a court to award, equitable monetary relief such as restitution or disgorgement").

[18] *Judge Rotenberg Educ. Ctr., Inc. v. FDA.*, 20-1087, 2021 WL 2799891, at *6 (D.C. Cir. July 6, 2021).

[19] *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) (quoting *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994)).

[20] 482 F.2d at 675–76.

[21] *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

JA0834

administrative proceedings, that reading would allow a small statutory tail to wag a very large dog.[22]

The "dog" here—substantive UMC rulemaking authority—is at least as large as the canine in *AMG*, for it carries the authority to declare large swaths of conduct illegal under the antitrust laws in a way that would dramatically affect business in the U.S. economy.

The Court in *AMG* also looked to "the structure of the Act" and emphasized that it should be read to "produce[] a coherent enforcement scheme."[23]  Applying the principles enunciated in *Whitman* and *AMG*, Section 5 is best read as specifying the sole means of enforcement (adjudication), and Section 6(g) is best understood as permitting the FTC to specify how it will carry out its adjudicative, investigative, and informative functions.  Thus, Section 6(g) grants ministerial, not legislative, rulemaking authority.

> B.    *Even if Section 6(g) authorizes some UMC rulemaking, the question of whether to adopt a nationwide ban on nearly all non-competes was not properly delegated to the FTC.*

A nationwide ban on non-compete agreements clearly implicates the dispositive disqualifying factors in *West Virginia v. EPA*, the recent decision in which the Supreme Court struck down an EPA rule on the basis that it was a "major question" that Congress would not have delegated to an agency without a clearer expression of authority.[24]  Under the major questions doctrine, an agency's expansive view of its own authority is unlikely to comport with Congress's intent when:

1.    The agency's action is one of "economic and political significance."[25]  In *West Virginia*, the court called the EPA's requirement that a major industry switch to a different input the exercise of "unprecedented power over American Industry."[26]  It cited the troubling cost increases that the policy would create for the energy industry, and determined "[t]he basic and consequential tradeoffs involved in such a choice are ones that Congress would likely have intended for itself."[27]

---

[22] 141 S. Ct. at 1348; *see also id.* at 1349 (using elephants-in-mouseholes doctrine to explain that FTC's "broad reading" of Section 13(b) "could not have been Congress' intent").

[23] *Id*. at 1348–49.

[24] *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  *See also* Dissenting Statement of Commissioner Christine S. Wilson, supra note 10, at 11–12.

[25] 142 S. Ct. at 2608 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160. *See, e.g., Alabama Assn. of Realtors v. Dep't of Health and Human Servs.*, 594 U. S. ___, ___; *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324; *Gonzales v. Oregon*, 546 U. S. 243, 267; *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U. S. ___, ___.)

[26] 142 S. Ct. at 2612.

[27] 142 S. Ct. at 2613. (citing W. Eskridge, Interpreting Law: A Primer on How To Read Statutes and the Constitution 288 (2016) ("Even if Congress has delegated an agency general rule-making or adjudicatory power,

- 5 -

2.  The agency claims "to discover in a long-extant statute an unheralded power" representing a "transformative expansion in [its] regulatory authority."[28]  The problem is even more acute if the agency "located that newfound power in the vague language of an 'ancillary provision[]' of the Act, one that was designed to function as a gap filler and had rarely been used in the preceding decades."[29]

3.  "The agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[30]

Writing in concurrence, Justice Gorsuch enumerated two additional important factors: whether the agency is intruding "where state authority has traditionally predominated" and whether the regulated sector of the economy has "links to every other sector."[31]

All of the *West Virginia* factors, including the two in Justice Gorsuch's concurrence, would be present if the FTC promulgated its proposed ban on non-competes.  The FTC's NPRM undoubtedly seeks to weigh "basic and consequential tradeoffs" between the incentives to invest in business growth and the protection of opportunities for workers who are employed by businesses.  There is no question that the rule would reshape American Industry—the text of the NPRM itself estimates that 1 in 5 employment contracts would be affected.

Second, the FTC is knowingly seeking a "transformative expansion" of its power, based on the vague language of an "ancillary provision"—Section 6(g)—which has rarely been used.[32]  Moreover, there is no question that the meaning of Section 6(g) is ambiguous, at best—even *National Petroleum Refiners* explains the statutory text that way.

Third, Congress has conspicuously and repeatedly declined to enact a nationwide ban on worker non-competes, choosing instead to leave this area of economic regulation to states.  Indeed, the NPRM repeatedly cites a fifty-state survey as short-hand to convey the various approaches to non-

---

judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions.")).

[28] 142 S. Ct. at 2610 (quoting *Utility Air*, 573 U.S., at 324).

[29] *Id.* (quoting *Whitman*, 531 U.S., at 468).

[30] *Id.* (citing *Brown & Williamson*, 529 U. S., at 159–160; *Gonzales*, 546 U.S., at 267–268; *Alabama Assn.*, 594 U. S., at ___, ___ (slip op., at 2, 8)).

[31] 142 S. Ct. at 2618, 2622(quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014); *King v. Burwell*, 576 U.S. 473, 485 (2015)).

[32] *See* Remarks of Chair Lina M. Khan on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act (acknowledging the FTC's "longstanding" approach to "unfair methods of competition" involved a reasonableness test and "assume[d] a case-by-case approach"); Letter from FTC Chair Lina M. Khan to Chair Cicilline and Ranking Member Buck Regarding "Reviving Competition, Part 4: 21st Century Antitrust Reforms and the American Worker (explaining the agency is "adjusting its approach" to labor markets). *See also* Rohit Chopra and Lina M. Khan, *The Case for "Unfair Methods of Competition" Rulemaking*, 87 U. CHI. L. REV. 357 (2020).

competes in the economy today.[33]  While there is no question that federal antitrust law sometimes applies to worker non-competes, it is by far more common for state law to predominate in determining whether a particular restriction is unreasonable.

Finally, the FTC's proposed rule is the epitome of having "links to every other sector."  There is no sector of the economy excepted from the rule—literally every firm would be required to rethink how they contract for labor, and at what cost.[34]  Such a broad rule would affect the way firms produce the goods and services used throughout the economy.

Even if the nationwide ban on non-competes survives the "major questions" doctrine, the legislative-type rulemaking would likely run afoul of the nondelegation doctrine.  That constitutional doctrine requires Congress to provide "an intelligible principle" to guide the legislative discretion of any agency with delegated authority from Congress.[35]  The FTC's long history of disagreement over the contours of its UMC authority, and the areas in which it exceeds the DOJ's authority to enforce the Sherman and Clayton Acts, tends to demonstrate that there is no such intelligible principle to set clear boundaries for the FTC's exercise of discretion.[36]

>    C.    *An overbroad rule would run afoul of the APA as "not in accordance with law" because courts have settled the meaning of "unfair method of competition" with respect to worker non-compete clauses.*

There is still yet another category of legal challenge that is likely to imperil an FTC rule banning all non-compete agreements: the FTC is not writing on a blank slate to define which worker non-competes are "unfair methods of competition."  Courts have already foreclosed the interpretation that the FTC proposes in the NPRM, meaning that such a rule would not be in accordance with law.  More specifically, the Seventh Circuit rejected the FTC's argument that worker non-compete agreements could be categorically treated as unfair methods of competition.[37]

---

[33] Russell Beck, A Brief History of Noncompete Regulation, FAIR COMPETITION LAW (Oct. 11, 2021), https://faircompetitionlaw.com/2021/10/11/a-brief-history-of-noncompete-regulation/.

[34] Some types of firms are excepted by statute from FTC's jurisdiction (such as banks and common carriers). Although they may not be directly affected by the FTC's proposed rule, they would still experience indirect effects because the labor markets in which they compete will be fundamentally transformed.  Indeed, this awkward, distortional effect of the FTC's limited jurisdiction is further indication that Congress did not intend to give the FTC authority to pass a national labor market regulation.

[35] *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *Gundy v. United States*, 139 S. Ct. 2116 (2019).

[36] *Compare* 2015 UMC Policy Statement, Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act, *with* 2022 UMC Policy Statement, Policy Statement Regarding Section 5 Enforcement (ftc.gov).  Compare also Remarks of Chair Lina M. Khan on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act, *with* Dissenting Statement of Commissioner Christine S. Wilson Regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act" | Federal Trade Commission (ftc.gov).

[37] *Snap-On Tools Corp. v. Fed. Trade Comm'n*, 321 F.2d 825, 837 (7th Cir. 1963) ("Restrictive clauses of this kind are legal unless they are unreasonable as to time or geographic scope; but even if this restriction is unreasonable as to geographic scope, we are not prepared to say that it is a per se violation of the antitrust laws.").

- 7 -

The court required the FTC to evaluate the business justification for the agreement, and whether the time and geographic scope were reasonably tailored to advance the business justification. The approach in the NPRM would specifically contradict that holding by dispensing with the need to look at the context and justification for any particular use of a non-compete agreements.

What is more, the Seventh Circuit's approach was consistent with a long history applying the antitrust laws to agreements limiting workers from competing with their employers—many courts had previously confirmed that there are legitimate uses of non-competes.[38] Whatever the FTC's authority is to define unfair methods of competition, it cannot turn legitimate means of competition into "unfair" means in direct contravention of courts that have considered the impact of the conduct. An overly broad rule banning broad swaths of non-compete agreements without analyzing whether they advance legitimate business purposes would do just that.

Additionally, the Supreme Court has recently rejected the logic employed by the NPRM that businesses must narrowly tailor their approach, or use the least restrictive means available, to achieve legitimate business justifications. The NPRM categorizes worker non-competes as an unfair method of competition despite admitting various pro-competitive uses of non-competes, reasoning that those same results could be achieved by non-disclosure clauses, non-solicitation clauses, or trade secret enforcement actions. But the FTC's logic runs afoul of the Supreme Court's recent explanation that "antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes. To the contrary, courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'"[39]

One last legal concern is the FTC's authority to preempt state law. As described above, the settled view is that it is legitimate for businesses to use non-compete agreements in certain circumstances—for instance, to protect trade secrets, confidential business information, and investments in training and the development of goodwill. It is against this background that the federal government has long deferred to the states to legislate more specific contours that might further limit the way businesses use non-competes, in order to advance other interests like worker mobility. If the FTC usurped this role from states by promulgating a rule that purports to preempt less restrictive state laws, then it might run afoul of federal preemption doctrine by preventing

---

[38] *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) (post-employment non-compete agreements ancillary to a transaction were "reasonably necessary . . . to the enjoyment by the buyer of the property, good will, or interest in the partnership bought"); *Newburger, Loeb Co., Inc. v. Gross*, 563 F.2d 1057, 1082 (2d. Cir. 1977) ("we have held that a per se ban on all such restrictive covenants [that serve a legitimate business purpose] would not be warranted").

[39] *NCAA v. Alston*, 594 U.S. ___ (2021), slip op., at 26 (quoting *Rothery Storage*, 792 F. 2d, at 227; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U. S. 36, 58, n. 29 (1977)).

JA0838

states from legislating in the field—for instance, when they decide how to trade off more business growth against maximizing the portion of gains from trade that go to workers.[40]

These various legal infirmities each establish an important reason that the FTC should pursue its laudable goal of rooting out unfair methods of competition in labor markets by evaluating particular uses of non-compete agreements on a case-by-case basis.

## III.    The FTC Should Not Prohibit the Uses of Non-Competes that Are Both Reasonable and Critical for the Economic Growth that Benefits Workers and Consumers.

The proposed rule is not only legally infirm in its origins, but also irrationally broad in its design. By treating nearly all non-competes as *per se* illegal, the proposed rule needlessly prohibits reasonable and valuable uses of non-compete clauses, which protect investments that public policy and the antitrust laws have sought to encourage. If the FTC instead took a case-by-case approach, it could consider whether specific uses of non-compete agreements contributed to these important public policy goals.

The FTC's enforcement approach should, at a minimum, allow companies to use non-compete agreements in the scenarios explained below. BRT's member companies have identified significant costs associated with prohibiting non-compete agreements in these scenarios. If the FTC does not change course, its rule would have the counterproductive effect of stifling competition and worker welfare by imposing such costs on the American economy.

> A.    *Several examples of reasonable uses of non-compete agreements illustrate how the proposed rule is overbroad.*

At a minimum, employers should be able to negotiate non-compete agreements with workers in the following scenarios:

> 1.    <u>Senior executives who have a view of the company's strategic roadmap, or other confidential information about how the company plans to compete.</u>

Businesses have a legitimate and important interest in protecting their competitively sensitive information, including future strategic plans, by limiting the ability of high-level employees with access to this information to immediately work for a competitor. As we discuss in more detail below, this information is not easily defined in a way that could be reduced to a non-disclosure agreement or litigated under trade secret law. Accordingly, under the FTC's proposed rule, an inability to protect this information adequately will deter information sharing and strategic

---

[40] *See Am. Optometric Ass'n v. FTC*, 626 F.2d 896, 910 (D.C. Cir. 1980) (casting doubt that Congress authorized the FTC to "pre-empt state law to the extent of pre-empting the whole field" and "gratuitously intrude[] on the exercise of the police powers of the states).

cohesion within firms, which in turn will result in less business growth on the merits, and reduced productivity throughout the economy.

Moreover, noncompete agreements play a protective function against traditional anticompetitive behavior. Antitrust enforcers have long been concerned that the sharing of competitively sensitive information between rivals could soften the need to compete vigorously. The DOJ recently signaled its amplified concern over such conduct by withdrawing guidance that had historically provided safe harbors for some forms of information sharing; in doing so, it announced heightened concern over dampening competition through information sharing.[41] Hiring rivals' workers is one obvious way that a company could gain access to the plans of its rivals, change tack to match whatever competition its rival is planning, and cease driving toward the most competitive performance. The FTC should recognize the valid pro-competitive use of non-compete agreements to prevent this sort of outcome.

Additionally, the FTC should recognize that workers who fit this description are sometimes compensated for the time they spend not competing. Many executives have severance agreements that pay consideration during a critical period when their knowledge is especially competitively sensitive, but only if the executive does not take employment with a competitor. These contingent payments show both that there would be a real cost to the business if the worker shared their knowledge during this limited period, and that the worker had bargaining leverage to ensure payments reflected at least a portion of that value to the business. In other words, it is unlikely the worker was exploited, and it is likely that the business had a legitimate interest to protect. A rule defining such an arrangement as per se illegal would be too broad to advance the FTC's interest in fair competition.

2.   Personnel who work on competitively important R&D projects or have knowledge of proprietary technologies or methods.

Likewise, when firms use reasonably tailored non-compete agreements to keep significant information about research and development projects or proprietary technologies or methods from falling into the hands of a competitor, their practices align with the goals of the antitrust laws. That is because such uses ensure firms reap the benefits of their own investments in R&D, and thus protect the incentives for businesses to invest in transformative innovation. That investment is an important engine of economic growth and, often, labor productivity and wage growth. The FTC's proposed rule would define such uses as per se unlawful, undermining its own goal of facilitating competition on the merits and worker welfare.

In addition to facilitating free riding, the rule would make it easier for competitors to hire knowledge workers to expropriate insight into a competitor's plans, successes, and failures. This would be valuable competitive intelligence, allowing a competitor to ease up on its innovation push, even if (and maybe especially if) the R&D or business innovation process has not yet yielded legally protectible intellectual property. Accordingly, in BRT members' experience, the option of

---

[41] Justice Department Withdraws Outdated Enforcement Policy Statements | OPA | Department of Justice; Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023 | OPA | Department of Justice.

JA0840

taking legal action to enforce trade secrets or non-disclosure provisions is an ineffective way of protecting their valuable investments in innovation. Among other reasons, experience teaches that enforcing these other provisions comes *after* valuable knowledge has been lost to competitors. It is difficult to monitor ex-employees and discover disclosures, expensive and time-consuming to litigate, impossible to undo the effects of disclosure through litigation, and difficult to prove the causal chain necessary to get damages. Sometimes, the valuable and competitively sensitive information is not even cognizable under the law of trade secrets. Accordingly, the estimated value of litigation is always significantly less than the competitive harm from disclosure, meaning that litigating *ex post* is ineffective and incomplete as a means of protecting procompetitive investments. The proposed rule would thus result in increased cost and uncertainty for businesses, which will now need to rely on trade secret litigation to protect their competitive advantages. This result will also disadvantage relatively small companies with less litigation know-how and smaller administrative budgets.

Additionally, the FTC's rule itself undermines the efficacy of a regime based on NDAs and non-solicitation agreements, because it has vaguely warned that some uses of these provisions might be "de facto" non-compete agreements, and thus banned. This creates uncertainty for businesses that will chill the use of NDAs and non-solicitation agreements, at an even greater cost to businesses trying to protect their innovative efforts.

But even assuming, as the NPRM does, that non-disclosure obligations could reliably keep a former worker from sharing valuable information about R&D and trade secrets through direct communications, it would still be nearly impossible to prevent an ex-employee who goes on to work for a competitor from directing the new company's resources without taking into account their former employer's positions. Trade secret law refers to this phenomenon as the "inevitable disclosure doctrine" and the several U.S. states that have adopted the doctrine restrict worker mobility even without a contractual agreement on the part of the worker with such key knowledge.[42]

But there would be no place for these sort of case-by-case considerations under the FTC's ban. The cost, in terms of growth, would be profound in R&D-intensive industries, and the FTC has not attempted to identify how that cost weighs against the benefits of preventing any unreasonable use of non-competes in those industries in particular. Indeed, the FTC has not even catalogued evidence of, or brought any enforcement actions against, any such unreasonable uses. The FTC's generalized evidence measuring statewide wage effects provides no information about the relative costs and benefits of using non-competes with workers exposed to significant information about R&D. A rule that applies to such workers should at a minimum be informed by specific evidence of how much bargaining leverage workers tend to have in R&D-intensive industries, and whether firms tend to use any unequal bargaining leverage they may have to require non-compete agreements that are broader than necessary to protect R&D investments. Such

---

[42] See Deqiu Chen et al., "Human Capital-Driven Acquisition: Evidence from the Inevitable Disclosure Doctrine," 67 J. Mgmt. Sci. 8, 4653 (Aug. 2021) (showing that U.S. states adopting the inevitable disclosure, which prevents employees with trade secret knowledge from working for competitive firms, have better retention of relevant employees after an acquisition, which explains "a significant increase in the likelihood of being acquired for firms headquartered in states that recognize such a doctrine relative to firms headquartered in states that do not")

evidence will undoubtably show that businesses should be allowed to use non-compete agreements with workers knowledgeable about R&D efforts and proprietary technologies and methods in order to protect the incentives to fully invest in, and staff, R&D projects.

3.    Personnel who receive sophisticated, specialized training or whose position requires on-the-job training or relationship-building.

Many BRT members invest in specialized training or other sophisticated human capital development that is particularized to their industry or business, and they use both long-term incentive payments and non-compete agreements to ensure that the trained workers stay at the company and use their business-provided training to benefit the business, and also to ensure that the training does not work against the business's interests by benefitting free-riding rivals. If they could not use non-compete agreements, then the free-riding rivals could capture the benefit of investments made by other firms by offering the employee a payment that the original employer could not afford because it had already incurred the expense of the training. As the FTC itself recognized, such a dynamic would undermine incentives for firms to invest in training that both enriches the employee's development and improves the firm's productivity.[43] That result is at odds with the goals of the antitrust laws to protect incentives to compete through legitimate means, like the development of one's workforce.

Sometimes, the expensive training may come in the form of on-the-job training, as is often the case for sales agents who become valuable to firms as they gain a reputation for trusted expertise in the market. In this sort of arrangement, younger, inexperienced employees are often paid over their marginal value to the firm on the belief that the firm will recoup the benefit of their skills and expertise later in their careers. Again, if a competitor who would benefit from the same expertise offers the employee a payment to leave just as the employee is producing more benefit than cost, then the rival would be able to compete more cheaply, but only in the short term while it could take advantage of this dynamic. In the long term, the total amount of training would suffer, as the FTC itself recognizes. This would leave all the firms in the economy with less able workforces, which could depress wages.[44]

Businesses that depend on building client relationships and a reputation for excellent client service are warranted in paying employees to perform the task of client development on behalf of the firm. There is no inherent reason that such a contractual relationship is exploitative—employees could bargain for ownership over their client relationships, in exchange for compensation commensurate with the reduced value to the firm. And in many cases, a non-compete agreement is important to protect the intended exchange of value in this freely negotiated exchange of services and value. As state courts routinely recognize, the goodwill created by client development services is easily expropriated by competitors, and protecting against such an

---

[43] NPRM at 45-48 (citing Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clause*, 72 I.L.R. Rev. 783, 796-97 (2019) and Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 22, 28 (2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393.

[44] See Rajshree Agarwal et al., Employee Mobility and Entrepreneurship, STRATEGIC MANAGEMENT JOURNAL (Dec. 2014).

expropriation is a legitimate reason to use a non-compete agreement.[45]  State legislatures have routinely made a similar policy judgment.  An FTC rule overriding this legislative judgment would add to concerns that the FTC was overstepping the authority Congress granted it by preempting an entire field that states traditionally regulate.

### 4.    Key personnel of acquired companies.

Companies buying the assets and goodwill of another firm are warranted in seeking to realize the value of their purchase price by ensuring that the key personnel responsible for the goodwill and possessing sensitive knowledge about the products and plans of the firm being acquired cannot leave and offer those benefits to rivals soon after the close of the transaction. Federal and state common law has routinely affirmed the goal of protecting goodwill through non-compete agreements ancillary to the sale of a business.[46]  The FTC also acknowledges as much in the NPRM.  One of the NPRM's stated purposes of rulemaking is to preserve the ability and incentive for "entrepreneurship and new business formation."[47]  The NPRM recognizes that non-compete agreements collateral to M&A transactions play an important role in achieving that goal. Because non-compete clauses are often vital to protect the value of a business acquired by a buyer, restricting such non-compete clauses would "affect business acquisitions, including the incentives of various market actors to start, sell, or buy businesses."[48]  Evidence from the real world corroborates the FTC's logic that reducing incentives for M&A could be counterproductive to the goal of growth through entrepreneurship and new business formation. Empirical research has

---

[45] *See, e.g.*, *St. Clair Med., PC v. Borgiel*, 270 Mich. App. 260, 266 (2006) ("In a medical setting, a restrictive covenant can protect against unfair competition by preventing the loss of patients to departing physicians."); *Sharvelle v. Magnante*, 836 N.E.2d 432, 437 (Ind. Ct. App. 2005) (recognizing a service business's legitimate interest in "its good will, its established [client] base, and the time and resources spent to build its practice").

[46] *See, e.g., United States v. Addyston Pipe & Steel Co*., 85 F. 271, 281 (6th Cir. 1898) (non-compete agreements may be used if they are "reasonably necessary . . . to the enjoyment by the buyer of the property, good will, or interest in the partnership bought."); *Wenzell v. Ingrim*, 228 P.3d 103 (Ala. 2010) ("Unlike covenants not to compete ancillary to employment contracts, which 'are scrutinized with particular care because they are often the product of unequal bargaining power,' this level of scrutiny is not applied to covenants ancillary to the sale of a business because the contracting parties are more likely to be of equal bargaining power."); *Ellis v. McDaniel*, 95 Nev. 455, 459 (1979) ("[B]ecause the loss of a person's livelihood is a very serious matter, post employment anti-competitive covenants are scrutinized with greater care than are similar covenants incident to the sale of a business.").  See also NPRM at 56 (citing *Woodward v. Cadillac Overall Supply Co.*, 240 N.W. 2d 710, 715 (Mich. 1976) (non-competes ancillary to the sale of a business do not suffer from bargaining power); *Bybee v. Isaac*, 178 P.3d 616, 622 (Idaho 2008) (promote the protection of goodwill); *Centorr-Vacuum Indus., Inc. v. Lavoie*, 609 A.2d 1213, 1215 (N.H. 1992) (do not create undue hardship for the encumbered workers)).

[47] Statement of Chair Lina M. Khan Regarding Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya Regarding the Notice of Proposed Rulemaking to Restrict Employers' Use of Noncompete Clauses at 1, Commission File No. P201200 (Jan. 5, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/statement-of-chair-lina-m-khan-joined-by-commrs-slaughter-and-bedoya-on-noncompete-nprm.pdf.

[48] 88 Fed. Reg. at 3514.

shown that making M&A deals less attractive will tend to stifle the innovative efforts of start-ups, who are often looking to exit by acquisition.[49]

Despite acknowledging this cost, the FTC's rule still bans all non-compete agreements ancillary to M&A transactions, with an extremely limited exception for personnel that own 25% of the equity of a business being sold. While the FTC's stated intent to protect incentives for pro-competitive M&A is laudable, the 25% requirement is substantially unsuited to that goal.

First, a 25% carve out would do nothing to protect the value of a huge number of pro-competitive M&A transactions each year. In 2021, for instance, there were 1,357 venture-capital backed M&A exits. When founders accept venture capital to help build their business, they are typically diluted below the 25% equity threshold. Indeed, the average time from the first venture capital fundraising round to acquisition for those 1,357 businesses was 6.1 years.[50] It is extremely unlikely that venture-capital backed businesses could operate and grow for that length of time without accepting funding that diluted founders' and key employees' equity stake. Under the FTC's proposed rule, then, none of the employees could have been bound by a non-compete, which would have chilled the prospect of M&A, and the corresponding incentives to grow the business while in that nascent, start-up state.

Second, even the FTC and DOJ do not seem to equate 25% ownership with being "key" to the value of a purchased business. The DOJ's most recent publication explaining its procedures for evaluating merger remedies endorses the same fundamental logic as dealmakers in the private market:

> "Incumbent employees often are essential to the productive operation of the divested assets, particularly in the period immediately following the divestiture. For example, they may have unique technical knowledge of particular manufacturing equipment or may be the authors of essential software. While knowledge is often transferrable or reproducible over time, the immediate loss of certain employees may substantially reduce the prospect that the divestiture will preserve competition, at least at the outset.

---

[49] The National Venture Capital Association (NVCA) published data showing, the average annual ratio from 2010 to 2020 of VC-backed acquisitions to IPOs was approximately 13:1. NVCA Yearbook, National Venture Capital Association (2020), https://nvca.org/wp-content/uploads/2021/03/NVCA-2021-Yearbook.pdf. Additionally, empirical research by Gordon M. Phillips and Alexei Zhadov, of the University of Southern California and the University of Lausanne respectively, confirms the hypothesis that the "Possibility of being acquired induces innovations efforts by large and small firms, but especially by the small firms." Gordon M. Phillips and Alexei Zhdanov, *R&D and the Incentives from Merger and Acquistion Activity*, The Review of Financial Studies, Oxford University Press (2012).

[50] NVCA Yearbook, National Venture Capital Association (2022) at 38, https://nvca.org/wp-content/uploads/2022/03/NVCA-2022-Yearbook-Final.pdf.

> To protect against this possibility, the Division may prohibit the merged firm from re-hiring these employees for some limited period."[51]

Accordingly, in court- or Commission-approved final orders requiring the sale of a business in order to remedy a larger merger, the agencies have both sought prohibitions on "key" personnel competing against the divested business.[52]  The text of these court-ordered non-competes is worded flexibly, applying to "key" personnel as determined in good faith by the parties to the divestiture transaction, or applying broadly to all employees who "support[ed]" the functioning of the business being acquired.  Obviously, this is much broader than only restricting employees with more than a 25% ownership in the company being acquired.  The FTC should take a similarly flexible approach to privately negotiated transactions to ensure that acquiring firms can reliably contract for the goodwill of a business.

### 5.     Personnel who are retiring.

Personnel who choose to retire rather than re-enter the labor market are appropriately treated differently under tax laws and social norms.  Executive (non-qualified) retirement plans often have "forfeiture event" provisions (*i.e.*, if the executive competes within X years of leaving, then the company can stop certain of the retirement payments).  In this situation, competition against the firm would act as a proxy to establish that the worker had not really retired (the worker may also be covered by one of the other special scenarios above and so could be at risk of expropriating value from the firm).  But these forfeiture provisions mean that employees are always free to choose between competing and receiving payments.

The FTC's approach should not make it more difficult for companies to contract in a way that provides extra compensation to retirees.  Additionally, as a matter of fairness, the FTC's approach should not retroactively punish firms that have done so by cancelling the existing non-

---

[51] 2020 Merger Remedies Manual (justice.gov).  Prohibiting the merged firm from re-hiring divested employees is a narrower form of non-compete than is typical in privately negotiated transactions. The agencies perhaps use this form of non-compete because consent decrees can bind only the companies that enter them, not the employees who work for those companies, or any other competitor who might hire away the transferred employees.  Regardless, the point is to determine *who* is critical to realizing the strategic goals in the sale of a business. The agency's practice indicates that the sale of a business may not be successful if it does not include a much broader group of employees than just equity owners with 25% share and above.

[52] *See, e.g.*, Final Order, *FTC v. Otto Bock HealthCare North America, Inc*., Dkt No. 9378, at 4, 9-10 (F.T.C. Nov. 6, 2019) available at https://www.ftc.gov/system/files/documents/cases/d09378commissionfinalorder.pdf (listing "Key Employees" to the success of the divestiture, instructing the parties to "work together in good faith to determine whether any additional [employee] should be identified as a Key Employee," and subjecting the merged party to a two-year prohibition on re-hiring);  Final Judgment, *United States v. Thales S.A*., No. 1:19-cv-00569, at 5, 9-10 (D.D.C. 2019) (defining "relevant personnel" as "employees who have supported or whose job related to the Divestiture Assets" and prohibiting defendants from re-hiring those relevant employees for a period of two years);  Final Judgment, *United States v. CVS Health Corp*., No. 1:18-cv-02340, at 3, 10 (D.D.C. 2019) (defining "Relevant Personnel" as "every person providing pharmacy network, product development, and actuarial support for" the divested business, and prohibiting Defendants from re-hiring those relevant employees for a period of one year).

JA0845

compete provisions in contracts with retirees, who then would receive such payments but would be free to come out of retirement.

B.    *The FTC has not justified the costs of prohibiting reasonable uses of non-competes.*

In general, the proposed rule fails to measure the isolated effects of banning *reasonable* uses of non-competes.  For instance, the FTC does not take into account the costs to workers from the likelihood that firms would reduce the use of long-term incentive payments, retention bonuses, and severance payments for workers with competitively sensitive positions.[53]  For workers who were going to retire or move to a non-competitive position anyway, they will lose out on post-employment payments.[54]  For workers who wanted to stay employed with the firm, they will lose out on the consideration offered by businesses that want certainty that their investments in labor will not be utilized to the advantage of their competitors.[55]  The NPRM's statements about general wage effects are inapposite to the costs of the rule for specific workers such as these.

Additionally, the NPRM does not articulate any benefits specific to banning non-competes in the scenarios explained above.  The FTC has therefore failed to justify imposing the explained costs on business and economic growth.

C.    *The NPRM's rationale and evidence for determining that non-compete agreements are "unfair methods of competition" do not apply to these reasonable uses.*

Many of the uses of non-competes discussed above are highly negotiated, and covered workers are well compensated with company equity and additional pay and benefits. Where workers have unique skills or decide to invest in their own development by agreeing to accept training that will make them more valuable employees, they are not being "exploited" by employers who seek to induce their employment and prevent their own investments from being used to harm their competitive interests.  Indeed, for some highly specialized or senior-level professionals, it is commonplace for the worker to have considerably more bargaining power than the employer.  This dynamic results in companies paying retention bonuses that workers agree to forfeit if they go to work for a competitor.  These provisions allow workers to weigh the value of the new position against the various costs that their former employer would have to bear when they leave (as described above).  Long-term incentive payments conditioned on agreeing not to compete allow workers to freely decide whether the benefits outweigh the costs.  A

---

[53] To reduce these costs, the FTC should at a minimum clarify that long-term incentive payments and retention bonuses that are contingent on remaining employed at the firm are not unfair methods of competition.

[54] Severance and retirement payments to former workers may also be more heavily taxed under a tax code provision that exempts certain payments for value (i.e., in exchange for non-compete requirements).  This result would deprive some workers of the expected benefit of their bargain when the FTC's proposed rule comes into effect to cancel existing agreements.

[55] The FTC could minimize these costs by clearly stating an exemption for "voluntary equity awards" where employees can choose to take payments in exchange for promises not to compete, but where the worker's continued employment is not at stake in the transaction.

perverse result of the rule would allow the employee to take the benefit of a bonus payment without having to provide the company that paid it with the promised value.  The FTC's approach should be sensitive to the relative bargaining position, and the benefits of the bargain obtained, in each scenario where they enforce the FTC Act against a worker non-compete.[56]

Additionally, many of these uses do not implicate the FTC's purpose of ensuring that sufficient labor is available to competitors.  That is because the agreements not to compete can sometimes be "bought out" by competitors, meaning that competitors can pay the original employer to release the worker from their obligation not to compete.  Through this mechanism, a new firm can repay the original employer for the investment they made in the worker. Many BRT members use non-compete agreements that specify in the contract the expected loss to the firm if the worker left for a competitor: these look like claw back provisions on earlier-paid bonuses, or promises of future compensation or equity payouts conditional on refraining from competition.  When firms price these provisions in reasonable accordance with the expected value from their investment in the human capital, they are output maximizing and allow for labor mobility, contrary to the justification for the blanket prohibition put forth by the FTC.

The FTC's logic is also incorrect when it suggests that many of these situations can be addressed with NDAs, non-solicits, or trade secret law. As described above, these tools alone are often inadequate and inefficient to protect sensitive business information.  What is more, the proposed rule chills the use of these alternatives because it is unclear what the FTC means when it says that some will be treated as *de facto* non-compete agreements.[57]  The NPRM is therefore wrong when it reasons that non-compete agreements are all unjustifiable because there is a less restrictive way to achieve the same goal.[58]  It is not reasonable to require companies to use an expensive and uncertain alternative.  Additionally, some competitive interests are not protectable at all with NDAs, non-solicits, and trade secret law.  For instance, a senior executive cannot be expected to "unknow" competitively sensitive information, or avoid applying that knowledge to strategic decision-making for the competitor.  In fact, an employee is incentivized to use competitively sensitive information to their advantage to perform well at the competitor. Thus,

---

[56] It may be appropriate for the FTC to use minimum income or salary thresholds to establish a presumption that a worker has significant bargaining power, and therefore to exempt those uses of non-competes from any special treatment under the FTC's "unfair methods of competition" authority, as opposed to the framework for assessing competitive impact that would be applied under the Sherman Act.  However, any such presumption should be used to guide the FTC's own case-by-case enforcement priorities, not to institute a legislative-type rule.  That is because any wage or salary threshold is going to necessarily need to be adapted for industry- and context-specific market realities like the use of apprenticeships, cost of local living, etc.

[57] In order to minimize uncertainty and maximize the efficacy of the alternatives to non-compete agreements, the FTC should at a minimum create a clearer safe harbor for NDAs, non-solicitation agreements, and actions to enforce trade secrets.

[58] Additionally, the FTC may not require companies to use the least restrictive means to achieve legitimate business justifications.  *See NCAA v. Alston*, supra note 39.  As the Supreme Court and the Second Circuit held in cases involving the FTC's UMC authority, "avoided litigation costs" are "legitimate justifications" that an antitrust defendant may show in an antitrust proceeding to show lawfulness under the rule of reason. *FTC v. Actavis, Inc.*, 570 U.S. 136, 156 (2013); *accord 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 121 (reducing litigation costs in a trademark action was a legitimate objective proffered by the defendants for a settlement payment, and "what is reasonably necessary is likely to be determined by competitors during settlement negotiations" (cleaned up)).

their knowledge is often inevitably disclosed at their new employer, but their former employer has no visibility to know when such disclosure has occurred and when it has not.

## IV.    The FTC Should Not Apply Its Rule Retroactively

In addition to all the legal concerns explained above, the FTC would be on especially shaky ground making its rule retroactive to cancel existing non-compete provisions after firms have already made conditional payments to workers.  Such a retroactive application would have the effect of destroying the value that firms bargained for when they relied in good faith on the legality of such provisions.  This result raises constitutional concerns including the possibility that the FTC's rewriting of private contracts is a taking without compensation, or that it did not provide fair notice of the law in violation of the Due Process Clause.

The retroactivity of the proposed rule would also create high, unjustified costs for most businesses throughout the American economy.  The FTC's projected costs associated with retroactivity are unrealistically low.  It does not take into account the lost value firms bargained for when agreeing to exchanges of value for promises not to compete, or the increase in legal costs for companies who have to pursue their interests through NDA or trade secret litigation.  Moreover, it fails to account for the significant time and administrative costs of requiring companies to find ex-employees and renegotiate provisions meant to protect competitively sensitive information

## V.    Conclusion

Case-by-case enforcement is the best use of the FTC's resources and most closely comports with its obligation to take into account the myriad context-specific factors discussed above.  It also avoids the legal infirmities of the rule regarding whether Section 6(g) gives the FTC authority to pass legislative-type rules, and whether Congress could delegate that authority.

Additionally, state law has been active in defining contours of reasonableness that largely follow the reasoning explained above.  Accordingly, the FTC's resources would be better spent bringing specific enforcement actions where a company's use of non-competes is violating their state law, but the bargaining position of workers is too weak to assert those rights effectively.  A policy statement announcing this enforcement intention, which is clearly within the FTC's authority and therefore a significantly superior alternative, would have important deterrent value against the most harmful behavior.

April 17, 2023

*Via electronic submission: http://www.regulations.gov*

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

**Re: Notice of Proposed Rulemaking, Federal Trade Commission; Noncompete Clause
Rule; 88 Fed. Reg. 3482-3546 (January 19, 2023)**

The undersigned organizations, who together represent businesses that provide goods and
services to virtually every American in every corner of the country, submit these comments
regarding the proposed Noncompete Rule.  We strongly oppose the proposal because
noncompetes serve vital business and employee interests and because the FTC lacks legal
authority to issue the proposed rule.

Most importantly, noncompetes serve pro-competitive interests. Courts, scholars, and
economists all have found that noncompetes encourage investment in employees and help to
protect intellectual property.  In every sector of the economy, employers rely on noncompetes to
protect investments in their workforce, to protect trade secrets and other confidential
information, and to structure their compensation programs.  As the FTC's own economist John
McAdams recently explained, noncompetes "allow firms to reduce recruitment and training costs
by lowering turnover," encourage firms to offer higher wages to compensate new employees,
and "increase the returns to research and development," thereby promoting innovation.[1]
Unfortunately, the Commission ignored or downplayed this evidence, thereby undermining
"confidence in the integrity of the rulemaking process or the ultimate outcome."[2]

Moreover, noncompetes promote pro-competitive interests far more effectively than
alternatives such as trade-secret laws or nondisclosure agreements.  By relying on noncompetes
over nondisclosure agreements or trade-secret law, "employers avoid the difficulties of proving
an actual or threatened misappropriation of trade secrets to secure an injunction," a costly and
time-consuming process.[3]  Scholars have found that noncompetes "may represent a more
efficient mechanism to prevent proprietary knowledge transfers in certain circumstances,
particularly when monitoring and the enforcement of trade secrets law is costly."[4]

---

[1] McAdams, *Non-Compete Agreements: A Review of the Literature*, Bureau of Economics Research Paper, 6 (2019),
https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=3513639.

[2] Dissenting Statement of Commissioner Wilson, at
https://www.ftc.gov/system/files/ftc_gov/pdf/p201000noncompetewilsondissent.pdf.

[3] Michael J. Garrison & John T. Wendt, *The Evolving Law of Employee Noncompete Agreements: Recent Trends and
an Alternative Policy Approach*, 45 Am. Bus. L.J. 107, 117 (2008).

[4] Camila Ringeling, Joshua D. Wright, et. al, *Noncompete Clauses Used in Employment Contracts*, Comment of the
Global Antitrust Institute 4-5, & n.7, n.9 (Feb. 7, 2020),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3534374.

Noncompetes are also often used as part of contractual arrangements between the employer and the employee that result in additional compensation to the employee, in the form of added pay, retention bonuses, stock awards, deferred compensation or as part of a severance package. Noncompetes are also essential to the sale of a business. Businesses often have multiple owners with ownership levels beneath the 25 percent threshold recognized by the proposed rule, yet noncompetes would be banned in these instances as well. Employers often make significant investments in providing upskilling for their employees. These investments often require the employee to agree to stay with the employer for a period of time. The proposed rule fails to appropriately recognize any of these applications, all of which fail to demonstrate a clear harm to competition or harm to the employee.

In addition to the damage the proposal would inflict on businesses and employees, the FTC lacks the statutory authority under the FTC Act to issue the rule. Section 5 of the FTC Act empowers the Commission to pursue individual enforcement actions against "unfair methods of competition," and Section 6(g) provides narrow authority to develop internal procedural rules. Neither provision, nor any other, authorizes the FTC to adopt generally applicable substantive rules defining unfair methods of competition. In contrast, Congress has repeatedly granted the FTC the authority to promulgate substantive rules on "unfair or deceptive acts and practices" and other discrete topics, but has declined to authorize regulations addressing unfair methods of competition.

Without express authorization from Congress, the FTC also lacks the constitutional authority to promulgate the proposed rule. As the Supreme Court recently explained, the major-questions doctrine requires that Congress speak clearly if it wishes to assign decisions of "vast economic and political significance" to an agency.[5] That doctrine recognizes that "extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices," even when there is a "colorable textual basis" for the agency's position.[6] Nothing in the FTC Act shows a hint of a decision by Congress to allow the Commission to invalidate contracts affecting tens of millions of workers, particularly given that Congress itself has recently considered legislation that would regulate noncompetes.

Similarly, the proposed rule also runs afoul of the nondelegation doctrine. A statutory delegation is constitutional only so "long as Congress lays down by legislative act an intelligible principle" to cabin the agency's discretion.[7] If the term "unfair methods of competition" is divorced from history and precedent, and if the Commission can condemn any business practice as unfair based on nothing more than "nefarious-sounding adjectives,"[8] then there is effectively no limit to what the Commission could condemn under Section 5.[9]

Finally, the proposed rule also violates bedrock principles of federalism. For centuries, noncompetes have been a matter of state law, and today, forty-seven States enforce reasonable noncompete clauses. If Congress "intends to alter the usual constitutional balance between the

---

[5] *See Nat'l Fed. of Indep. Bus. v. Occupational Health & Saf. Admin.*, 142 S. Ct. 661, 665 (2022).

[6] *West Virginia v. Envt'l Protec. Agency*, 142 S. Ct. 2587, 2609 (2022).

[7] *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019).

[8]    *See* Wilson, dissenting, at note 2.

[9]    *See, e.g.*, *A. L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 539 (1935).

2

States and the Federal government," it must be "unmistakably clear,"[10] particularly when an agency's regulation would disrupt areas of "traditional state regulation."[11]
121314

      While there are many ways for this proposal to be narrowed, because the FTC lacks the authority to issue any regulation on this issue, it should withdraw its proposed rule, and revert to the authority granted to it by Congress to address questions of unfair methods of competition through its adjudicative function.


Sincerely,


**National/Regional**

ACA International

ACT | The App Association

Advanced Medical Technology Association

Aerospace Industries Association (AIA)

Alternative Investment Management Association

American Bakers Association

American Bankers Association

American Beverage Association

American Coatings Association

American Council of Life Insurers

American Financial Services Association

American Hotel & Lodging Association

American Property Casualty Insurance Association

American Staffing Association

American Trucking Associations

ANA - Association of National Advertisers

Associated Builders and Contractors

Associated Equipment Distributors

Associated General Contractors of America

Computer & Communications Industry Association (CCIA)

Consumer Brands Association

Consumer Technology Association

CTIA - The Wireless Association

Direct Selling Association

Electronic Transactions Association

Federation of American Hospitals

Financial Services Institute (FSI)

FMI - The Food Industry Association

Foodservice Equipment Distributors Association

Futures Industry Association

Heating, Air-conditioning, & Refrigeration Distributors International

Independent Community Bankers of America

Independent Electrical Contractors

Independent Insurance Agents & Brokers of America (Big "I")

---

[10] *Gregory v. Ashcroft, 501 U.S. 452, 460 461 (1991).*
[11] *Metro Life Ins. Co. v. Massachusetts, 471 U.S. 724, 740 (1985).*

**JA0851**

Independent Lubricant Manufacturers Association (ILMA)

Industrial Fasteners Institute

International Franchise Association

ISSA, The Worldwide Cleaning Industry Association

Managed Funds Association (MFA)

Medical Alley

MEMA, The Vehicle Suppliers Association

Metals Service Center Institute

Mortgage Bankers Association

National Association of Benefits and Insurance Professionals

National Association of Convenience Stores

National Association of Electrical Distributors

National Association of Manufacturers

National Association of Mutual Insurance Companies

National Association of Security Companies (NASCO)

National Association of Wholesaler-Distributors (NAW)

National Automobile Dealers Association

National Convenience Distributors

National Federation of Independent Business

National Funeral Directors Association

National Independent Automobile Dealers Association (NIADA)

National Lumber & Building Material Dealers Association

National Mining Association

National Newspaper Association

National Pest Management Association

National Propane Gas Association

National Retail Federation

National Roofing Contractors Association

National Truck Equipment Association

National Waste & Recycling Association

NCTA – The Internet & Television Association

NetChoice

North American Association of Food Equipment Manufacturers (NAFEM)

Reinsurance Association of America

Retail Industry Leaders Association

Securities Industry and Financial Markets Association

SIFMA Asset Management Group

U.S. Chamber of Commerce

USTelecom - The Broadband Association

Western States Trucking Association

Wholesale & Specialty Insurance Association (WSIA)

Window Covering Manufacturers Association

Window Covering Safety Council

World Millwork Alliance

**Alabama**

Selma and Dallas County Chamber of Commerce and Tourism Information

**Alaska**

Alaska Chamber of Commerce

**Arizona**

Apache Junction Area Chamber of Commerce

4

**JA0852**

Arizona Chamber of Commerce and Industry

Buckeye Valley Chamber of Commerce

Chandler Chamber of Commerce

Gilbert Chamber of Commerce

Glendale Chamber of Commerce

Greater Flagstaff Chamber of Commerce

Greater Phoenix Chamber of Commerce

Green Valley Sahuarita Chamber of Commerce & Visitor Center

Kingman Area Chamber of Commerce

Lake Havasu Area Chamber of Commerce

Nogales Santa Cruz County Chamber of Commerce

Peoria Chamber of Commerce

Queen Creek Chamber of Commerce

Southwest Valley Chamber of Commerce

Surprise Regional Chamber of Commerce

Tucson Metro Chamber of Commerce

West Valley Chamber of Commerce Alliance

Wickenburg Chamber of Commerce

Yuma County Chamber of Commerce

**Arkansas**

Arkansas State Chamber of Commerce / Associated Industries of Arkansas

Little Rock Regional Chamber of Commerce

**California**

Brea Chamber of Commerce

Carlsbad Chamber of Commerce

Chino Valley Chamber of Commerce

Coalition of California Chambers - Orange County

El Dorado County Chamber of Commerce

Gateway Chambers Alliance

Greater Conejo Valley Chamber of Commerce

Greater San Fernando Valley Chamber of Commerce

La Mesa Chamber of Commerce

Laguna Niguel Chamber of Commerce

Modesto Chamber of Commerce

Norwalk Chamber of Commerce

Palm Desert Area Chamber of Commerce

Port Hueneme Chamber of Commerce

Rancho Cordova Area Chamber of Commerce

Roseville Area Chamber of Commerce

San Juan Capistrano Chamber of Commerce

San Marcos Chamber of Commerce

Santa Barbara South Coast Chamber of Commerce

Sherman Oaks Chamber of Commerce

Simi Valley Chamber of Commerce

Tulare Chamber of Commerce

West Ventura County Business Alliance

**Colorado**

Colorado BioScience Association

Colorado Chamber of Commerce

Greater Woodland Park Chamber of Commerce

**Connecticut**

Connecticut Business and Industry Association

JA0853

**Florida**

Coral Gables Chamber of Commerce

Greater Boca Raton Chamber of Commerce

Stuart/Martin County Chamber of Commerce

**Georgia**

Barrow County Chamber of Commerce

**Hawaii**

Chamber of Commerce Hawaii

**Idaho**

Boise Metro Chamber of Commerce

Cascade Chamber of Commerce

Meridian Chamber of Commerce

Pocatello-Chubbuck Chamber of Commerce

**Illinois**

Chicagoland Chamber of Commerce

Cook County Black Chamber of Commerce

Edwardsville/Glen Carbon Chamber of Commerce

Effingham County Chamber of Commerce

Garfield Park Chamber of Commerce

GLMV Chamber of Commerce

Greater Springfield Chamber of Commerce

Illinois Association of Mutual Insurance Companies

Illinois Chamber of Commerce

Illinois Manufacturers' Association

Joliet Region Chamber of Commerce & Industry

Lombard Area Chamber of Commerce

Naperville Area Chamber of Commerce

Pekin Area Chamber of Commerce

Sauk Valley Area Chamber of Commerce

West Suburban Chamber of Commerce & Industry

Winnetka-Northfield-Glencoe Chamber of Commerce

**Indiana**

Decatur Chamber of Commerce

Indiana Chamber of Commerce

South Bend Regional Chamber of Commerce

Wayne County Area Chamber of Commerce

**Iowa**

Council Bluffs Area Chamber of Commerce

**Kansas**

Wichita Regional Chamber of Commerce

**Kentucky**

Commerce Lexington

Greater Louisville Inc. - The Metro Chamber of Commerce

Kentucky Chamber of Commerce

Northern Kentucky Chamber of Commerce

Union County Chamber of Commerce

**Louisiana**

Bossier Chamber of Commerce

Central Louisiana Regional Chamber of Commerce

Greenwood Chamber of Commerce

6

JA0854

**Maryland**

Maryland Chamber of Commerce

**Massachusetts**

North Shore Chamber of Commerce

**Michigan**

Associated Builders & Contractors of Michigan

Detroit Regional Chamber of Commerce

Grand Rapids Area Chamber of Commerce

Holly Area Chamber of Commerce

Lansing Regional Chamber of Commerce

Michigan Biosciences Industry Association (MichBio)

Michigan Chamber of Commerce

**Minnesota**

Austin Area Chamber of Commerce

Greater Stillwater Chamber of Commerce

Lonsdale Area Chamber of Comme

Marshall Area Chamber of Commerce

Minnesota Chamber of Commerce

Shakopee Chamber and Visitors Bureau

**Missouri**

Missouri Chamber of Commerce and Industry

**Montana**

Billings Chamber of Commerce

Helena Area Chamber of Commerce

Kalispell Chamber of Commerce

Montana Chamber of Commerce

**Nebraska**

Broken Bow Chamber of Commerce

Columbus Area Chamber of Commerce

Kearney Area Chamber of Commerce

Lincoln Chamber of Commerce

Nebraska Chamber of Commerce & Industry

**Nevada**

Carson City Chamber of Commerce

Henderson Chamber of Commerce

Reno + Sparks Chamber of Commerce

Vegas Chamber of Commerce

**New Jersey**

Chamber of Commerce Southern New Jersey

Greater Westfield Area Chamber of Commerce (GWACC)

HealthCare Institute of New Jersey (HINJ)

New Jersey Civil Justice Institute

**New Mexico**

Greater Las Cruces Chamber of Commerce

New Mexico Business Coalition

**New York**

Business Council of New York State

Capital Region Chamber of Commerce

North Country Chamber of Commerce

7

JA0855

**North Carolina**

NC Chamber

**North Dakota**

Chamber Grand Forks / East Grand Forks

**Ohio**

Chillicothe Ross Chamber of Commerce

Cincinnati USA Regional Chamber

Dayton Area Chamber of Commerce

Ohio Chamber of Commerce

Toledo Regional Chamber of Commerce

Union County Chamber of Commerce

**Oklahoma**

Greater Oklahoma City Chamber

State Chamber of Oklahoma

**Oregon**

Grants Pass & Josephine County Chamber of Commerce

Oregon Business & Industry

Oregon State Chamber of Commerce

Springfield Area Chamber of Commerce

**Pennsylvania**

Alle Kiski Strong Chamber of Commerce

Cambria Regional Chamber of Commerce

Carlisle Area Chamber of Commerce

Chester County Chamber of Business and Industry

Greater Latrobe Laurel Valley Chamber of Commerce

Hanover Area Chamber of Commerce

Harrisburg Regional Chamber of Commerce

Indian Valley Chamber of Commerce

Lancaster Chamber of Commerce

Mechanicsburg Chamber of Commerce

Pennsylvania Chamber of Business and Industry

Pennsylvania Food Merchants Association

Peters Township Chamber of Commerce

Pittsburgh Airport Area Chamber of Commerce

Schuylkill Chamber of Commerce

Somerset County Chamber of Commerce

South West Regional Chamber of Commerce

Westmoreland County Chamber of Commerce

**Rhode Island**

Greater Newport Chamber of Commerce

**South Carolina**

Anderson Area Chamber of Commerce

Berkeley County Chamber of Commerce

Charleston Metro Chamber of Commerce

South Carolina Chamber of Commerce

**Tennessee**

Kingsport Chamber of Commerce

**Texas**

Del Rio Chamber Of Commerce

Fort Worth Chamber of Commerce

JA0856

Greater Irving-Las Colinas Chamber of Commerce

Greater Waco Chamber of Commerce

League City Regional Chamber of Commerce

Longview Chamber of Commerce

North Texas Commission

Rowlett Area Chamber & Visitors Center

Sherman Chamber of Commerce

Texas Association of Business

**Utah**

Cache Valley Chamber of Commerce

ChamberWest

Payson Santaquin Area Chamber of Commerce

South Valley Chamber of Commerce

St. George Area Chamber of Commerce

**Virginia**

Blackstone Chamber of Commerce

Central Fairfax Chamber of Commerce

Roanoke Regional Chamber of Commerce

Virginia Chamber of Commerce

**Washington**

Association of Washington Business

Auburn Area Chamber of Commerce

Greater Grays Harbor, Inc.

Greater Yakima Chamber of Commerce

Mercer Island Chamber of Commerce

Moses Lake Chamber of Commerce

Puyallup Sumner Chamber of Commerce

Shelton-Mason County Chamber of Commerce

South Kitsap Chamber of Commerce

Washington Retail Association

West Plains Chamber of Commerce

**West Virginia**

West Virginia Chamber of Commerce

West Virginia Manufacturers Association

**Wisconsin**

Metropolitan Milwaukee Association of Commerce

Wisconsin Manufacturers and Commerce

**Wyoming**

Greater Cheyenne Chamber of Commerce

Jackson Hole Chamber of Commerce



Robert I. Grossman, MD
Dean and Chief Executive Officer

March 20, 2023

The Honorable Lina Khan
Chair
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

**SUBJECT:**   COMMENTS IN SUPPORT OF NON–COMPETE POST−EMPLOYMENT CLAUSES (MATTER N⁰ P201200)

Dear Chair Khan:

On behalf of NYU Langone Health, I am submitting comments in support of the Federal Trade Commission's (FTC) Non-Compete Clause Rule, and specifically addressing why non-compete post-employment clauses should be prohibited in employment agreements with doctors.

The core of NYU Langone's success as the #1 ranked hospital system in New York[1] is our integrated culture devoted to excellence in patient-centered care. It is our belief that non-compete post-employment clauses in doctor employment agreements are anathema to excellence in patient-centered care. We fully support the efforts to ban non-compete clauses in employment agreements. We disagree with the American Hospital Association, American Medical Association, Federation of American Hospitals and the U.S. Chamber of Commerce. We applaud the states of California, Delaware, Massachusetts, New Hampshire and Rhode Island that have banned non-compete clauses in doctor contracts. We have encouraged New York State to follow their example. We're encouraged by the bi-partisan legislation introduced last month by Senators Murphy (D-CT) and Young (R-IN) that would nationally ban non-compete clauses in employment agreements.

The overriding reason to ban non-compete post-employment clauses in doctor agreements is the harm they can deliver to patients.

**NON-COMPETE POST-EMPLOYMENT CLAUSES SHOULD BE PROHIBITED IN MEDICAL PHYSICIAN EMPLOYMENT AGREEMENTS**

Non-compete post-employment clauses impede patient access to doctors, limit a physicians' ability to choose their employer and intentionally restrict physician mobility. Such restrictions are a challenge for the doctor and they are harmful for the patients. Non-compete clauses have significant deleterious impacts on:

- Patient−Doctor Relationship,
- Patient Access, and
- Patient Choice

The enforcement of a non-compete post-employment clause could, for example, negatively impact a long-standing Patient−Doctor relationship, particularly in cases where the physician has been regularly and actively involved in helping the patient manage an ongoing medical condition. If a non-compete post-employment clause requires the doctor to relocate a significant required distance

---

[1]https://health.usnews.com/best-hospitals/area/new-york-ny

JA0858



to continue practicing their specialty, the patient may not be able to continue to see the doctor and the relationship is severed.

Enforcement of a non-compete post-employment clause could also have negative consequences on patient care outside of a long-term Patient–Doctor relationship. Depending on the medical condition and the rarity of the disorder, there may only be a few medical professionals with the expertise to properly care for the patient. Even in the New York metropolitan area, with the depth and breadth of its medical community, there can exist shortages in certain specialties available to serve the needs of the patient population. Requiring a doctor to exit the area, even if it leaves several remaining physicians practicing locally, reduces the number of available specialists which will absolutely hinder patient access by increasing wait times - - that, of course, assumes the remaining doctors have the capacity to take on new patients.

Implementation of a non-compete post-employment clause may also detrimentally impact a patient's choice of physician. If a patient's preferred physician relocates to an area that remains geographically accessible to the patient, but due to network considerations, e.g., the relocation forces the doctor off of the patient's health insurance or health plan network, the financial burden may compel the patient to select another, in-network doctor.

Finally, non-compete post-employment clauses unfairly constrain physicians, creating an intolerably high barrier to leaving a situation that may have become not only disadvantageous, but possibly toxic, for the physician. The doctor, who cannot leave their employer, has no bargaining leverage to improve their own situation or the quality of care for their patients. If the physician, for example, needs the latest endoscope, interoperative MRI, or other specialty needs, and the hospital refuses to provide the equipment, the physician and the patients are put at a significant disadvantage, because the non-compete clause completely prevents curing the disadvantage. It is in the physician's and the healthcare public's interest that skilled doctors be able to effectuate change without having to leave their community, or sit out from their professional practice, for one or more years.

### NYU LANGONE FINDS NON-COMPETE POST-EMPLOYMENT CLAUSES TO BE ANTI-COMPETITIVE

NYU Langone has more than 350 medical office practice locations in the New York metropolitan area that employ approximately 3,450 medical physicians (collectively the "Faculty Group Practice" or "FGP"). The FGP had in excess of 10 million outpatient visits and revenue in excess of $2.4 billion in 2022. The use of fair compensation, appropriate benefits, a culture of quality and safety, and *esprit de corps* are the motivating factors for group's success.

Due to NYU Langone's reputation, award-winning quality, commitment to excellence and patient-centered culture, many physicians from other health care institutions desire to work here, only to find out that they are subject to severe non-compete post-employment clauses in their employment agreements. [Examples of such clauses are included as Appendix 1]

NYU Langone finds non-compete post-employment clauses which block an employee from working for their preferred employer once their employment is terminated to be anti-competitive. In fact, such clauses represent unfair methods of competition and, as you know, Section 5 of the FTC Act states that "unfair methods of competition" are unlawful, and Section 6 of the Act instructs the Commission to make rules and regulations that prohibit such unfair methods. NYU Langone encourages the promulgation of such rules and regulations.



For the record, all of the physicians in the NYU Langone FGP have employment agreements, and during the life of the agreement, the physicians are restricted to working exclusively at NYU Langone. All of our employment agreements are for a stated and reasonable period of time. The restriction does not continue past the date of stated employment. Once an agreement reaches its stated end date, employment either (a) continues through a new or amended agreement, or (b) is concluded.  Under no circumstances, does NYU Langone bind the doctor with any post-employment restrictions that prohibit the doctor from working anywhere.

### FALSE PREMISE OF EMPLOYERS' REASONS FOR NON-COMPETE POST-EMPLOYMENT CLAUSES

Many academic medical centers and large hospital networks in the New York metropolitan area subject their physicians to onerous non-compete post-employment clauses.  They maintain that the restrictive clause is necessary because they have provided the physician with proprietary information, training, and patient contacts.  This argument is totally meritless.  All of the concerns could be mitigated, and probably eradicated, with the inclusion of a highly enforceable non-disclosure agreement and a patient non-solicitation clause in the employment agreement.  The non-compete post-employment clauses are punitive and totally unnecessary.

Some New York area academic medical centers argue that hired doctors represent an *"investment"*. They purchase equipment, hire staff and maintain infrastructure to support the practice of the physician and, therefore, need to protect their investment.  They argue that if the doctor leaves their network for a neighboring competitor, that they will be disadvantaged and it will lead to a loss of revenue.  Yes, that is the nature of competition in a capitalistic society, and a perfect example of why non-compete post-employment clauses need to be eradicated.  It's unfortunate that these competitors are misguided with their focus on doctor-based return-on-investment rather than patient-centered care.

### AMERICAN MEDICAL ASSOCIATION VS AMERICAN BAR ASSOCIATION REGARDING NON-COMPETE POST-EMPLOYMENT CLAUSES

The American Medical Association ("AMA") has taken multiple and inconsistent positions on non-compete post-employment clauses.  AMA's Council on Ethical and Judicial Affairs, Ethical Opinion 11.2.3.1. states:

> Competition among physicians is ethically justifiable when it is based on such factors as quality of services, skill, experience, conveniences offered to patients, fees, or credit terms.
>
> Covenants-not-to-compete restrict competition, can disrupt continuity of care, and may limit access to care.
>
> Physicians should not enter into covenants that:
>
> (a)  Unreasonably restrict the right of a physician to practice medicine for a specified period of time or in a specified geographic area on termination of a contractual relationship; and
>
> (b)  Do not make reasonable accommodation for patients' choice of physician. Physicians in training should not be asked to sign covenants not to compete as a condition of entry into any residency or fellowship program.

The AMA believes, however that non-compete post-employment clauses are allowable so long as the agreements protect a legitimate business interest of the employer, and are reasonable with respect to duration and geography.

JA0860



NYU Langone agrees with the words and spirit of Ethical Opinion 11.2.3.1, but disagrees with the AMA's business interest argument that non-compete post-employment clauses are permissible.

As a juxtaposition to the AMA, the American Bar Association ("ABA") does not equivocate one iota in its position on non-compete post-employment clauses for lawyers. Attorneys are ethically barred from signing non-compete agreements. *Rule 5.6 - ABA, Rules of Professional Conduct, Restrictions of Rights to Practice* states that an attorney shall not enter into an agreement *"that restricts the right of a lawyer to practice after the termination of a relationship."* This ABA ethics rule has been ratified by all state bars and is uniformly followed throughout the United States.

The contrast between the legal profession and the medical professional is unexpected. The legal association is protecting the rights of the lawyers' clients; the medical association **IS NOT** protecting the needs of the doctors' patients. **Conventional wisdom is upended when lawyers are more empathetic than doctors.**

---

We encourage the FTC to move forward with its Non-Compete Clause Rule. We recognize that some hold that the FTC is potentially regulating beyond its Congressionally-mandated authority, as well as not having oversight over not-for-profit hospitals. We don't find these arguments germane. Setting the principle that non-compete clauses are harmful is the correct course of action and we ask the FTC to move expeditiously. NYU Langone will continue to endeavor to seek legislative relief regarding the banning of non-compete clauses with the State Legislature in Albany, and with the Congress of the United States.

Thank you for this opportunity to submit our comments.

Sincerely,

Robert I. Grossman, M.D.
Dean and Chief Executive Officer



The Honorable Lina Khan
March 20, 2023
Page 5

# APPENDIX 1

## Examples of Actual Non-Compete Post-Employment Clauses

As part of our submission to the FTC, we are including excerpts from two actual employment agreements from physicians who worked at other academic medical centers who were interested in working at NYU Langone, but were unaware that their employment agreements included non-compete post-employment clause.

Example #1 below is straightforward and it prohibits the physician from practicing for one-year and cites specific institutions where the physician is prohibited from working. The mere fact that the non-compete post-employment clause cites specific health care institutions and not all health care institutions is a clear indication that the employer's intent of including the clause was *de facto* anti-competitive against the cited institutions.

**EXAMPLE #1**

> By accepting this offer, you hereby covenant and agree that, during the term of this Agreement and until the date that is one (1) year following the cessation of your employment for any reason, you shall not, without the prior written approval of the Senior Vice President of Ambulatory Services, manage, operate, control or engage in the operation of, consult with or for, be employed by or otherwise provide services to or participate in any manner at NYU Langone Medical Center, Mount Sinai Health System, ProHealth Care Associates, LLP, New York Presbyterian Hospital or any of the foregoing entities' subsidiaries, successors or affiliates. The agent, principal, shareholder, partner or representative of, or the holder of an ownership interest in, any person, partnership, firm, corporation or other entity. Notwithstanding anything to the contrary, the provisions of this paragraph shall be waived and shall not be applicable to you if, after the Initial Term, Hospital does not renew this Agreement or offers to renew this Agreement on terms which are materially different than those set forth in this Agreement and such terms are unacceptable to you.

Example #2 on the following page may be the single worst form of a non-compete post-employment clause that NYU Langone has encountered. These are the facts: an ophthalmological surgeon employed by another academic medical center in New York City approached NYU Langone with an interest in joining our faculty medical staff. The surgeon said he had an employment agreement, but said he did not think he had a problem "getting out" of the agreement and working elsewhere. Upon review of his employment agreement, it was quickly determined that he had a significant non-compete post-employment clause. Section 10(b) of the clause has a two-year geographic restriction that stretches far beyond the New York metropolitan area. In addition to the entire City of New York, the restriction includes Nassau, Suffolk, Westchester and Rockland Counties in New York State and Bergen and Hudson Counties in New Jersey. Section 10(e) includes a financial penalty in the event that the restricted covenant is legally challenged and held to be invalid, illegal or unenforceable. In such case, the employee is required to pay the employer liquidated damages of $500 per day for each day the covenant was violated. Section 10(f) mandates that the employer is entitled to recover from the employee any and all attorney's fees and other costs of litigation.



**EXAMPLE 2**

10. <u>Restrictive Covenant:</u>

(a)  In the course of your employment with the University, you will be introduced to the University's referring physicians and patients as well as hospital personnel, other health care providers and the like.  You will also be given the opportunity to become a participating provider in various health maintenance organizations and managed care plans with which the University's physicians have existing contractual relationships.  Termination of your employment for any reason or in any manner after at least two (2) years of employment with the University, followed by your continuing to practice ophthalmology in the same geographic area as the University, would thereby enable you to take many of those sources of the University with you to the detriment of the University.

(b)  In light of the foregoing, except with written permission from the Chair and the Dean, you covenant and agree that in the event your employment with the University terminates for any reason you shall not, for a period of two (2) years thereafter, except with the written consent of the University, either directly or indirectly, within Westchester, Rockland, Nassau, and Suffolk counties, and the five counties that make up the City of New York, and Bergen and Hudson County New Jersey; (i) engage in the practice of Ophthalmology as an employee, independent contractor, shareholder, partner or otherwise and whether as a separate specialty or in conjunction with any other practice of medicine; or (ii) operate or have any financial or other interest in any medical practice involved in the practice of Ophthalmology`.

(c)  In the event of a breach or an alleged breach by you of the provisions of this Section 10, you agree to refrain from violating the restrictive covenant set forth above during any judicial proceeding until such matter is conclusively settled on it merits pursuant to such proceeding.  In connection therewith, you agree that the University shall be entitled to an injunction restraining you from violating the terms of the restrictive covenant set forth here in (without the necessity of securing a bond) and any other legal or equitable remedies available for such a breach or threatened breach.

(d)  If you violate this restrictive covenant and the University brings legal action for injunction or other relief, the University shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the restrictive covenant.  Accordingly, the restrictive covenant shall be deemed to have the duration specified herein, computed from the date the relief is granted by reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by you.

(e)  If any restriction contained in this Section 10 shall be deemed to be invalid, illegal or unenforceable by reason of the extend, duration or geographical scope thereof, or other otherwise, the court making such determination may reduce such extend, duration, geographical scope, other provisions hereof, and in its reduced form, such restriction shall then be enforceable in the manner contemplated hereby.  In addition, the University shall be entitled to liquidated damages in the amount of Five Hundred ($500) Dollars for each day that you are determined to have violated the foregoing restrictive covenant.  This sum shall be considered as liquidated damages and not as a penalty and is agreed to by the parties inasmuch as there is no other precise method of determining the University's damages in the event of your violation of the restrictive covenant.

(f)  It is hereby further agreed that, in the event of any litigation at law or in equity with respect to any breach of the restrictive covenant, the University shall be entitled to recover any and all reasonable attorney's fees and other costs of litigation, even after the termination of this agreement.

(g)  The existence of any claims or causes of action by you against the University whether predicated upon this agreement or otherwise, shall not: constitute a defense to the enforcement by the University of the foregoing restrictive covenant.

(h)  The parties acknowledge that the provisions of this Section 10 are necessary and reasonable in order to protect the University in the conduct of its business, particularly in light of the difficulty in ascertaining damages in the event of a breach.



## APPENDIX 2
## NYU Langone — Who We Are

NYU Langone Health is one of the nation's premier academic medical centers. Our trifold mission to serve, teach, and discover is achieved daily through an integrated academic culture devoted to excellence in patient care, education, and biomedical research.  NYU Langone Health is the name of the combined operations of NYU Langone Hospitals and the two medical schools operated by New York University ("NYU") - the **NYU Grossman School of Medicine** ("NYUGSOM") and the **NYU Long Island School of Medicine** ("NYULISOM"), collectively the NYU "Schools of Medicine".

NYU Langone Hospitals is a quaternary care teaching hospital that operates five inpatient acute care facilities and over 40 ambulatory facilities in Manhattan, Brooklyn, and Long Island. The Manhattan 813-bed inpatient facilities are comprised of the **Kimmel Pavilion** (which also houses the **Hassenfeld Children's Hospital**) and **Tisch Hospital**. **NYU Langone Orthopedic Hospital**, also located in Manhattan, is a 225-bed facility specializing in orthopedic, neurologic, and rheumatologic services. **NYU Langone Hospital-Brooklyn** is a 444-bed facility in the Sunset Park section of Brooklyn. **NYU Langone Hospital-Long Island** is a 591-bed facility located in Mineola, New York.  NYU Langone Hospitals also owns CCC550 Insurance, SCC, which provides professional liability insurance to NYU Langone Hospitals, physicians employed by NYUGSOM, and other non-employed physicians.

As noted above, NYU Langone Hospitals is integrated with two accredited Schools of Medicine, NYUGSOM, which ranked number 2 in the nation for research on the 2023 U.S. News & World Report "Best Graduate Schools" rankings, and NYULISOM, which is focused on education and training physicians and academic leaders in primary care medicine.  Both of these Schools of Medicine operate as unincorporated divisions of NYU. NYUGSOM, employs approximately 3,450 faculty physicians who form the division known as the Faculty Group Practice ("FGP").  FGP physicians deliver patient care at more than 350 practice locations in the New York metropolitan area and two practice locations in Delray Beach and West Palm Beach, Florida.  These physicians constitute the principal clinical service providers for NYU Langone Hospitals' facilities and are connected by NYU Langone Hospitals' enterprise-wide electronic medical record system, Epic.

On March 1, 2022, pursuant to the terms of an Affiliation Agreement, NYULH System became the sole corporate member of each of Long Island Community Hospital at NYU Langone Health, an acute care hospital licensed to operate 306 beds located in Suffolk County.

### Recognition for Quality and Excellence
Management believes that patient-centered, quality care differentiates NYU Langone Health in the marketplace with patients, payors, and employers.  NYU Langone Health has



made substantial investments to ensure full clinical integration across all sites of service and to provide one standard for quality in clinical care with one integrated medical record, made possible by the enterprise-wide Epic system.

Awards and recognition NYU Langone Hospitals has received for the quality of its patient care are as follows:

- NYU Langone Hospitals ranked No. 3 nationally on the 2022-23 U.S. News and World Report Honor Roll, moving up several spots from its No. 8 ranking in 2021. In addition, it now ranks No. 1 in New York.

- NYU Langone Hospitals has 14 specialties nationally ranked in the top 20 rankings by U.S. News and World Report in 2022-23, 11 of them being in the top 10. Of note, NYU Langone Hospitals ranked No. 1 for Neurology and Neurosurgery in the U.S.

- Hassenfeld Children's Hospital tied overall for No. 3 in New York City and No. 9 in the Mid-Atlantic Region on the 2022-23 U.S. News and World Report "Best Children's Hospitals" survey.

- NYU Langone Hospitals achieved a five-star rating on the Centers for Medicare and Medicaid Services (CMS) Hospital Compare for 2022, a rating received by only 13.9% of evaluated hospitals. NYU Langone Hospitals is one of only eight five-star hospitals in New York State.

- NYU Langone, for the past nine years, has received top rankings for overall patient safety and quality of care from Vizient, Inc. In 2022, NYU Langone was recognized as the top performer in the Bernard A. Birnbaum, MD, Quality Leadership Annual Ranking for demonstrating high quality and safety performance.

- NYU Langone's faculty group practice network has been ranked the highest performer for the last eight years among participating medical centers nationwide by Vizient. In 2022, NYU Langone ambulatory care practices ranked No. 1 in Vizient's Ambulatory Care Quality and Accountability Ranking for demonstrating excellence in delivering high-quality outpatient care.

- NYU Langone Hospitals' nurses are recognized for excellence in the care they provide, with every inpatient location in the system receiving Magnet status by the American Nurses Credentialing Center. Most recently, NYU Langone Hospital—Brooklyn became the only hospital in Brooklyn with Magnet recognition. Magnet designation is an honor achieved by only 9.4% of hospitals in the country. This achievement comes after NYU Langone Hospital—Long Island and NYU Langone Orthopedic Hospital were re-designated as Magnet sites in June 2021 and June 2022, respectively.



- NYU Langone Hospitals, which includes its Manhattan Tisch/Kimmel Hospital, NYU Brooklyn and NYU Long Island hospitals, were each awarded an 'A' in the fall 2022 Leapfrog Hospital Safety Grade, a national distinction recognizing NYU Langone Hospitals' achievement in providing the highest level of patient care across the health system and an honor attained by only 29% of hospitals across the country. NYU Langone Hospitals was recognized as the #1 hospital in New York State in Critical Care, Pulmonary Care, and Stroke Care, and #5 in Coronary Intervention in the Healthgrades 2022 State Ranking Awards.

- NYU Langone Hospitals was re-accredited with the Gold Seal of Approval® by the Joint Commission in 2021, the first re-accreditation since NYU Long Island joined the institution.

- NYU Langone Hospitals' Transplant Institute was rated the top lung and heart transplant center in New York State, according to data published by the Scientific Registry of Transplant Recipients (SRTR) in 2022. NYU Langone Hospitals has the highest one-year kidney survival rate in the nation and transplants more kidneys than any other center in New York State.

- NYU Langone Hospitals' Pediatric Congenital Heart Program was recognized by the New York State Department of Health in May 2021 for having the best risk-adjusted survival rate of any hospital in New York State.

- For 10 years in a row, NYU Langone Health has been designated an LGBTQ+ Healthcare Equality Leader by earning a perfect score on the Human Rights Campaign Foundation's Healthcare Equality Index, in recognition of its commitment to providing high-quality, individualized care for all patients.

- NYU Long Island's Medical Intensive Care Unit has received a gold-level Beacon Award for Excellence by the American Association for Critical-Care Nurses— one of just 15 critical care units in New York State to receive a gold-level designation.

- NYU Langone Health is certified as an integrated Comprehensive Stroke Center by The Joint Commission, including NYU Langone's Tisch Hospital, NYU Langone Hospital—Brooklyn, and NYU Langone Hospital—Long Island. The certification acknowledges the highest level of commitment at every level of the institution to deliver timely, lifesaving care to people experiencing a stroke.

An official website of the United States Government.

‹ Back to Document Comments (/document/FTC-2023-0007-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Boyle, George

Posted by the **Federal Trade Commission** on Apr 19, 2023

Docket (/docket/FTC-2023-0007)  / Document (FTC-2023-0007-0001) (/document/FTC-2023-0007-0001)
/ Comment

Comment

Non-compete clauses are absurd. When I worked at a burrito place, they claimed a non-compete. I couldn't go down the street to another burrito shop because I might bring with me the knowledge of how to roll a tortilla around a mess of rice and beans. If you don't see the absurdity in that situation, you have no place making decisions that affect other people's lives. It's out of control. Stop allowing corporations to have control over the lives of people after those people leave the corporations' employ.

**Comment ID**
FTC-2023-0007-15438

**Tracking Number**
lex-7rtu-bcth

Give Feedback

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Mar 6, 2023

JA0867

**International
Center for
Law & Economics**

# Comments of Scholars of Law & Economics and the International Center for Law & Economics

## In the Matter of Non-Compete Clause Rulemaking, Matter No. P201200

*Before the*

**Federal Trade Commission**

April 19, 2023


[laweconcenter.org](laweconcenter.org) | [icle@laweconcenter.org](icle@laweconcenter.org)    @laweconcenter
1104 NW 15th Ave. Ste 300 Portland, OR 97209    503.770.0076

JA0868

## Table of Contents

**Introduction and Executive Summary** ............................................................... 3

**I.  Empirical Evidence on the Effects of NCAs and NCA "Enforceability"
     Does Not Support the Commission's Proposed Federal Ban............................. 11**

   A.  The Existing Studies of NCAs Yield Mixed Results ................................................ 14

      1.  *The evidence shows ambiguous effects of NCAs on wages and mobility and
          supports the argument that they provide procompetitive benefits*............................ 14

      2.  *The downstream effects of NCAs on competition and consumers is theoretically
          ambiguous and empirically unestablished*............................................................ 20

      3.  *The weight of the evidence does not support the claim that NCAs decrease
          innovation* ...................................................................................................... 26

   B.  The Existing Event Studies Depend on Eccentric Events and Their Results Are
       Not Sufficiently Generalizable................................................................................ 30

      1.  *Hawaii changed more than NCAs but only for a small number of tech workers* ............. 31

      2.  *Oregon banned NCAs for hourly and low-wage workers during the depths of the
          Great Recession which muddies general applicability*................................................ 33

      3.  *Michigan's statutory changes were not a clear switch from unenforceable to
          enforceable and back again* ................................................................................ 37

      4.  *California is not a clean event study due to California's unique attributes* .................... 40

   C.  Because There is No Objective Measure of "Enforceability," Many of the Causal
       Studies Contain a Fatal Methodological Weakness................................................. 40

   D.  The Predicted Effects of the Proposed Rule Are Flawed Because Observed
       State-Level Changes May Not Apply Linearly to the Proposed Rule's National-
       Level Policy Change................................................................................................ 50

**II.  The Proposed Rule Fails to Account for NCAs' Procompetitive Benefits
      and Wrongly Assumes Equivalent Benefit from Alternatives to NCAs............. 52**

   A.  Trade Secret Law Protects Different Intangible Assets than NCAs and Is More
       Difficult to Enforce ................................................................................................ 54

   B.  Non-Disclosure Agreements Are Substantially Less Effective than NCAs at
       Encouraging Worker Training and the Sharing of Valuable Information with
       Workers .................................................................................................................. 56

   C.  Fixed Duration Employment Contracts Are Subject to Remedial Limitations
       that Render Them Ineffective Substitutes for NCAs................................................ 57

   D.  The Claim that Higher Wages and Enhanced Benefits Can Substitute for NDAs
       Reflects a Misunderstanding of the Hold-Up Problem............................................ 58


[laweconcenter.org](laweconcenter.org) | [icle@laweconcenter.org](icle@laweconcenter.org)
1104 NW 15th Ave. Ste 300 Portland, OR 97209                    @laweconcenter
                                                                503.770.0076

JA0869

III. The Commission's Relevant Experience, Expertise, and Capacity to Enforce Proposed Rule Is Limited.................................................................59

IV. The Commission's Legal Authority to Issue the Proposed Rule is Contentious—and Dubious ...........................................................................71

    A. The Commission's Claimed Authority to Adopt Competition Rules Is Unlikely to Withstand Judicial Scrutiny...........................................................72

    B. The Proposed Rule Presents Major Questions that Can Be Addressed Only by Congress...........................................................................................74

    C. A Grant of Substantive Statutory Authority Sufficient to Support the Proposed Rule Would Amount to an Impermissible Delegation of Authority .................76

V. Conclusion.........................................................................................................77

Appendix A: Authors and Contributing Signatories ........................................A1

## Introduction and Executive Summary

We appreciate the opportunity to comment on the Commission's Notice of Proposed Rulemaking regarding non-compete clauses, Matter No. P201200 ("NPRM").[1] The authors and contributors to these comments are scholars of law and economics with an interest in ensuring the effective functioning of the antitrust laws and of the Federal Trade Commission. The full list of signatories can be found in Appendix A, *infra*.

The Commission's interest in non-compete agreements, non-compete clauses, non-compete terms, or covenants not to compete (collectively, "NCAs") is understandable and, at some level, laudable. NCAs have been prominent in recent public policy debates, and numerous NCAs may be overbroad, inefficient, or otherwise objectionable. While most policy concerns regarding NCAs are not antitrust concerns (and most NCA-focused litigation not antitrust litigation), a given employer might possess significant market power in one or more specific local labor markets, and might exploit that market power to, e.g., foreclose entry or expansion by would-be competitors. In that regard, a specific NCA, under specific facts and circumstances, might well prompt antitrust concern and, potentially, a finding of liability.

Nevertheless, as explained below, we cannot recommend that the Commission adopt the proposed Non-compete Clause Rule ("Proposed Rule"). It is not supported by the evidence—empirical and otherwise—that is reviewed in the NPRM; neither is it supported by the Commission's experience, authority, or resources.

*First*, while the NPRM amply catalogs *potential* problems associated with non-competes, NCAs, like other vertical restrictions in labor agreements, are not *necessarily* inefficient, anticompetitive, or harmful to either labor or consumer welfare; they can be efficiency-enhancing and pro-competitive. NCAs can solve a range of potential hold-up problems in labor contracting.[2] For example, both firms

---

[1] Non-Compete Clause Rule, 88 Fed, Reg, 3482 (RIN 3084, proposed Jan. 19, 2023) (to be codified at 16 C.F.R. Part 910) [hereinafter NPRM].

[2] *See infra.*, Section II. *See also, e.g.*, Daron Acemoglu & Robert Shimer, *Holdups and Efficiency with Search Frictions*, 40 INT. ECON. REV. 827 (1999). The potential benefits of NCAs, and the importance of context in evaluating them, were discussed at the FTC's 2020 workshop on NCAs. FTC, *Non-competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (Jan. 9, 2020) [hereinafter FTC 2020 NCA Workshop; references to the workshop transcript will be cited by speaker and transcript page number ("Tr.")]. A web page for the workshop, with links to the agenda, speaker biographies, public comments, and a transcript of the proceedings, is at https://www.ftc.gov/news-events/events/2020/01/non-competes-workplace-examining-antitrust-consumer-protection-issues. FTC 2020 NCA Workshop, Kurt Lavetti, Tr. at 144 ("context matters. So although non-compete agreements can reduce earnings on average, in some contexts there's evidence they might systematically increase earnings."); *id.*, the Hon. Noah Phillips, Tr. at 218 ("non-competes can serve good purposes, incentivizing investment in workers and protecting trade secrets, worthy goals in our increasingly knowledge-based economy"); *id.*, Ryan Williams, Tr. at 175-6 (can "say some good things about non-compete contracts"); *id.*, Ryan Nunn, Tr. at 126 (questioning utility of NCAs in various contexts, but noting NCAs can address a hold-up problem in training, and

and workers have incentives to invest in employee training, but employees often lack the resources required to acquire adequate training—especially, but not only, job-specific training on their own. Employers, for their part, may have resource advantages; at the same time, employers may reasonably worry about their likely return on investment in employee training: because experienced labor is alienable, firms may worry that competitors will free ride on their investments by poaching trained employees; employees, for their part, may walk out the door or renegotiate compensation before their employer has recouped its investment. Facing those prospects, firms may tend to under-invest in employee training. Appropriately tailored NCAs can mitigate employers' investment risks, and thereby encourage additional employee training. Firms can face analogous hold-up concerns when it comes to sharing private or privileged information—such as trade secrets or client lists—with their employees.[3] NCAs can mitigate the risk (and risk of hold-up) that firms would face if there were no constraints on job switching. NCAs can also reduce search and training costs by reducing turnover; and the benefits of reduced search costs may be shared, at least to some extent, with employees.[4] As we explain below, these potential benefits find support in both the economic literature and common-law standards of "reasonable" restraints.[5]

*Second*, and most critically, the emerging body of economic literature regarding the effects of NCAs—or the effects of what is purported to be the relative "enforceability" of NCAs—does not support the categorical ban on NCA usage contemplated by the NPRM.[6] Although the Commission proposes to prohibit NCAs across the economy, there appear to be numerous and broad gaps in the literature. For many sectors, industries, and occupations, there appear to be no studies of NCA's effects. More-over, the Commission cites only a single study of the impact of NCA enforceability on downstream prices, and that regards a specific occupation (physicians) delivering heavily regulated services. There are studies investigating wage and mobility effects, but even partial equilibrium analyses of labor markets provide an incomplete picture of the total impact of NCAs on labor markets, even if existing studies are taken at face value. And while some studies do suggest the potential for NCAs to reduce wages or worker mobility under certain circumstances, findings are mixed rather than unidirectional, and many of the relevant studies suffer significant data and methodological limitations. As a working

---

that "[f]irm-sponsored training is more common in states that more stringently enforce their non-compete agreements."). *See also, e.g.*, Norman D. Bishara & Evan Starr, *The Incomplete Noncompete Picture*, 20 LEWIS & CLARK L. REV. 497, 505 (2016) ("Despite the potential cost of noncompetes for individuals and regions, the use and enforcement of noncompetes may also provide both private and social benefits.").

[3] *See, e.g.*, Aandrei Iancu & David Kappos, *Banning Non-compete Agreements Hurts US Companies and Workers*, THE HILL (Mar. 23, 2023) (discussing importance of NCAs in protecting trade secrets); FTC 2020 NCA Workshop, Ryan Williams, Tr. at 178; *id.*, Orly Lobel, Tr. at 12; *id.*, Ryan Nunn, Tr. at 122-5, 134.

[4] *See, e.g.*, John McAdams, *Non-Compete Agreements: A Review of the Literature*, Working Paper (2019), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3513639.

[5] For an early case, see *Mitchel v. Reynolds*, 24 E.R. 347 (1711) (upholding a noncompete contract between a bakery and a baker, upon finding the contract's terms, including a geographic restriction to the same parish as the bakery, reasonable).

[6] *See infra.*, Section I.

paper from the Commission's Bureau of Economics notes, the "more credible empirical studies tend to be narrow in scope, focusing on a limited number of specific occupations . . . or potentially idio-syncratic policy changes with uncertain and hard-to-quantify generalizability."[7] That is not to say that none of the research is useful, but rather that the literature is not comprehensive or settled, and that it cannot support the adoption of sweeping federal regulations that preempt the development of a more nuanced body of state labor and NCA law.

Part of the problem is that measuring this so-called "enforceability" is far from trivial. There is no objective measure of enforceability, and no proven metric for making such a measurement. Studies of enforceability employ similar measurement schema, but these vary in their implementation, and there is no evident benchmark by which to evaluate the alternatives. As we explain in some detail in Section I, below, most of the literature investigating the effects of NCA policy changes—nominally, changes in NCA enforceability—employs one or another version of a triply-subjective scoring rubric. The taxonomy of relevant legal markers, the relative import (that is, weighting) of those markers, and the coding of legal changes all depend on subjective assessments of specific judicial decisions and legislative acts against no specified baseline. None represents the universe of potential policy reforms. And none specifies a theory of enforceability that it seeks to implement. Collectively, the enforceability studies depend on what is, at best, an essentially soft, variable, and heavily coding-dependent method; at worst, it's a black box. The problem might be avoided going forward. Given recent, clear, income-based restrictions on enforcement in nine states and the District of Columbia, the Commission might well collect data to enable event studies without the artifice of enforceability ordering.[8] But those data do not yet exist and have not been analyzed. The absence of such data, and of any objective enforceability metric, tend to undermine many of the results on which the Commission relies.

In addition, the Commission should consider that most labor markets are local, rather than statewide or national.[9] As a corollary, research suggesting that, e.g., certain wage changes associated with changes in NCA enforceability, *on-average and state-wide*, do not resolve the question whether observed effects obtain across all (or nearly all) labor markets in the state or, in the alternative, are dominated by effects in those local labor markets in which key employers enjoy heightened market power. Of direct relevance to the Proposed Rule, "[t]there is little evidence on the likely effects of broad prohibitions of non-compete agreements."[10] Indeed, they do not resolve the question how

---

[7] *Id.*

[8] *See infra* note 150, and accompanying text.

[9] *See* Bur. Labor Stats., *Local Area Unemployment Statistics Geographic Concepts* (Mar. 20, 2020), https://www.bls.gov/lau/laugeo.htm; *see also* Ioana Marinescu & Roland Rathelot, *Mismatch Unemployment and the Geography of Job Search*, 10 AM. ECON. J. MACRO. 42, 42 (2018) ("[J]ob seekers are 35 percent less likely to apply to a job 10 miles (mi.) away from their zip code of residence.").

[10] *Id.*

wage changes are distributed across workers, or whether the observed effects are due to workers receiving raises or, rather, to firm efforts to mitigate hold-up problems by hiring more experienced or better trained workers at higher wages.[11] This remains a developing body of economic literature and—as a related matter—improved data sources. The FTC can and should foster the further development of pertinent economic research before adopting a general rule or, in the alternative, before advising Congress on potential statutory restrictions on NCAs.[12]

*Third*, the Commission has very little experience with NCAs, several very recent settlement agreements notwithstanding.[13] The three 2023 matters discussed in the NPRM were concluded with consent orders announced the day before the Commission's announcement of the NPRM. The Commission's decisions contained no finding or stipulation of an antitrust violation, whether under Section 5 or any other antitrust statute.[14] That does not, of course, establish that the Commission erred in its complaints. Still, the settlements established no legal precedents, and the complaints and orders do little to set forth guidance on the Commission's applications of Section 5 to the specific facts and circumstances underlying the three matters.[15]

---

[11] *See, e.g.*, Stephen G. Bronars, *FTC Evidence that Noncompetes Reduce Wages is Inconclusive*, EDGEWORTH INSIGHTS (Mar. 7, 2023), https://www.edgewortheconomics.com/insight-ftc-evidence-that-non-competes-reduce-earnings-is-inconclusive.

[12] *See* 16 U.S.C. 46(f) ("To make public from time to time such portions of the information obtained by it hereunder as are in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use." *Id.*)

[13] *See infra.*, Section III. *See also* Press Release, *FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers* (Jan. 4, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers. Since publishing the NPRM, the Commission has announced a fourth NCA settlement, also in the glass container industry. *In the Matter of Anchor Glass Container, Corp.*, FTC Matter No. 211 0182 (Mar. 15, 2023) (decision and order).

[14] *In the Matter of Prudential Security, et al.*, FTC File No. 2210026 (Jan. 4, 2023) at 2, https://www.ftc.gov/system/files/ftc_gov/pdf/2210026prudentialsecurityacco.pdf ("This Consent Agreement is for settlement purposes only and does not constitute an admission by Proposed Respondents that the law has been violated as alleged in the Draft Complaint, or that the facts as alleged in the Draft Complaint, other than jurisdictional facts are true."); *In the Matter of Ardagh Group, et al.*, FTC File No. 2110182 (Jan. 4, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2110182-c4785-ardagh-decision-and-order.pdf; *In the Matter of O-I Glass, Inc.*, FTC File No. 2110182 (Jan. 4, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2110182_c4786-o-i-glass-inc-decision-and-order.pdf.

[15] Dissenting Statement of Commissioner Christine S. Wilson, *id.* at 2 ("[E]ach Complaint runs three pages, with a large percentage of the text devoted to boilerplate language. Given how brief they are, it is not surprising that the complaints are woefully devoid of details that would support the Commission's allegations.").

At common law, NCAs might be found reasonable or unreasonable restraints of trade based on their terms, under specific facts and circumstances.[16] Federal law[17] and state laws[18] have tended to hew to this common law tradition, even if state laws vary in their criteria of reasonableness. And while some states impose significant limitations on the ability of employers to enforce NCAs in court, *no state* has adopted the general prohibition on NCA usage that the FTC has proposed. No state chiefly restricts NCAs via a regulatory ban; and no state has adopted the seemingly arbitrary 25% share restriction that the Commission has proposed for permitting certain NCAs in conjunction with the sale of a business.[19] In addition, as noted by several participants in the FTC's 2020 NCA workshop,[20] courts have tended to find that NCAs do not violate the antitrust laws,[21] even if certain NCAs may

---

[16] *Compare Mitchel v. Reynolds*, *supra* note 5 (upholding specific NCA restrictions as reasonable) *with John Dyer's Case*, Year-Book Mich. 2 Hen. V, fo. 5, pl. 26 (1414) (rejecting NCA terms in an indenture contract as void under the common law).

[17] *See Nat'l Soc'y of Prof'l Engrs. v. United States*, 435 U.S. 679, 689 (1978) ("The Rule of Reason suggested by *Mitchel v. Reynolds* has been regarded as a standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction, such as an employment contract or the sale of a going business." (*citing Mitchel v. Reynolds*, 1 P. Wms. 181, 24 Eng. Rep. 347 (1711))); *see also United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 279 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211 (1899) ("It was of importance that business men and professional men should have every motive to employ the ablest assistants, and to instruct them thoroughly; but they would naturally be reluctant to do so unless such assistants were able to bind themselves not to set up a rival business in the vicinity after learning the details and secrets of the business of their employers.").

[18] For a recent overview of state NCA laws, see, e.g., Russell Beck, *Employee Noncompetes: A State-by-State Survey* (last updated Feb. 11, 2023), *available at* https://beckreedriden.com/50-state-noncompete-chart-2.

[19] The only express exception in the Proposed Rule regards NCAs executed in conjunction with the sale of a business, where the NCA applies to a seller who "is a substantial owner of, or substantial member or substantial partner in, the business at the time the person enters into the non-compete clause. Proposed § 910.1(e) would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity." NPRM at 3515. While an exception providing for NCAs in conjunction with the sale of a business is common in states with some general hostility to NCAs, as under Cal. Bus. & Prof. Code § 16601, the identification of a 25% ownership requirement appears arbitrary and excessive. For example, California law permits certain NCAs for, *inter alia*, "[a]ny person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interesting in the business entity." Cal. Bus. & Prof. Code § 16601. We have not found any authority restricting such ownership to anything like a 25% share. That proposed restriction may prove far too narrow, not just when natural persons owning a startup or small business number more than four, but when, e.g., venture capital investment reduces the founders' shares of a startup.

[20] FTC 2020 NCA Workshop, *supra* note 2.

[21] *See, e.g.*, FTC 2020 NCA Workshop, *supra* note 2, Eric Posner, Tr. at 72-73 (("I took upon myself the dreary task of trying to read every antitrust case ever decided involving non-competes, but it turned out not to be that dreary because there are only a handful of such cases – a few dozen or maybe more. Virtually none of them successful, basically they all fail. The plaintiffs always lose in these cases."); *id.*, Randy Stutz, Tr. at 60-68 (discussing difficulties of making out an antitrust case against an NCA under the rule of reason); *Cf.* Business Electronics Corp. v. Sharp Electronics Corp. 485 U.S. 717, 729 n. 3 (1988) (Justice Scalia citing the English common law case of *Mitchel v. Reynolds* in support of the proposition that "[t]he classic 'ancillary' restraint is an agreement by the seller of a business not to compete within the market.") The NPRM notes that the Commission has identified 17 antitrust matters brought by private parties or state or federal antitrust authorities, under either the Sherman Act or state antitrust law, NPRM at 3496, suggesting that two of the matters the plaintiffs "were

violate some state labor or commercial laws. Yet the NPRM contemplates what would be tantamount to a *per se* prohibition of NCA usage.

The Commission's view that NCAs are generally, or even typically, anticompetitive seems to lack any basis in antitrust jurisprudence. Looking beyond the Sherman Act jurisprudence, we have not found any decisions by a federal court holding that an NCA violates Section 5 of the FTC Act or, specifically, the Commission's standalone Section 5 authority over unfair methods of competition. Importantly, while the complaints in the three settled matters identified specific NCA terms, as well as other facts and circumstances, under which the NCAs in question were alleged to violate Section 5, there is no reason to expect that those specific terms or circumstances are representative of the very diverse terms in NCAs, as they are employed across industries, firms, labor markets, and individual employees.

The Commission's limited experience with NCAs—or any vertical restrictions in labor agreements—undercuts the rationale for a general prohibition of NCAs, but it also undercuts the proposal that the Commission serve as a federal regulator of NCAs generally. Specifically, it does not bode well for likely court challenges to the Proposed Rule or the Commission's authority to issue it. And while the Commission notes hearings and workshops it has conducted to gather information about NCAs and other labor competition issues,[22] neither the Commission nor its staff has issued any report summarizing or synthesizing information gathered through those inquiries. Such reporting would be consistent with the FTC's mission under Section 6 of the FTC Act,[23] and it would be an important prologue to any consideration of rulemaking.

*Fourth*, the Commission lacks the resources required for effective enforcement of the Proposed Rule.[24] According to some survey evidence and the NPRM, NCAs now apply to roughly one fifth of all employed persons in the U.S. labor force; that is, nearly 30 million workers.[25] Regulations are not self-enforcing. And while regulation may be, in certain regards, more streamlined than case-by-case enforcement, it still requires investigation of alleged infractions, administration, and, in addition to regulatory challenge mechanisms, the resources to defend at least some challenges to

---

successful to some degree." *Id.* In a 2015 matter, the "degree" of success reported was a federal district court's denial of a motion to dismiss. *Id.* In the other matter—*American Tobacco*—the Supreme Court, in 1911, held that certain covenants not to compete were among a number of practices that, collectively violated the Sherman Act, although the Court expressly did not consider the various practices "legality, isolatedly viewed." *U.S. v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911). The other 15 matters did not reflect some degree of success. NPRM at 3496.

[22] NPRM at 3497-8.

[23] 15. U.S.C. § 46 (especially subsections (a), (b), and (f)).

[24] *See infra.*, Section III.

[25] U.S. Bur. Labor Stats., Monthly Labor Review (Jun. 2022) (reporting 149,785 total employed), https://www.bls.gov/opub/mlr/2022/article/us-labor-market-shows-improvement-in-2021-but-the-covid-19-pandemic-continues-to-weigh-on-the-economy.htm.

regulatory determinations and penalties in federal court. Detection alone may often be a challenge to the extent that many "workers are totally uninformed about the law."[26]

Effective enforcement need not entail detecting, much less penalizing, every violation, but it does require sufficient enforcement activity to establish a credible threat that violations will be penalized, without raising concerns about selective enforcement.[27] Yet the NPRM contains no assessment of the resources required for adequate enforcement of the Proposed Rule or any alternative NCA regulation. Enforcement staff in the Commission's Bureau of Competition ("BC") have substantial antitrust expertise in mergers and diverse conduct matters, but little experience in labor matters and none in the enforcement of competition regulations. Moreover, the Commission has recently reported that BC staff are barely able to meet the Commission's already established and important workload.[28] Adding an obligation to monitor restrictions in labor agreements across all industries and occupations in the U.S. would drain the staff's ability to scrutinize mergers and conduct under settled antitrust law.

*Fifth*, it is not clear that the Commission has the authority to adopt the Proposed Rule.[29] There is a grant of *some type* of rulemaking authority in Section 6(g) of the FTC Act; And there is a 1973 D.C. Circuit opinion in which the court defers to the Commission's interpretation of the scope of its own regulatory authority. But as participants in the FTC workshop and numerous administrative law scholars have recognized, contemporary courts are unlikely to uphold that degree of agency deference. Recent decisions of the Supreme Court have declined to recognize broad grants of regulatory authority without express statutory language that is both specific and cabined in its grant of authority, and the Court has read the plain language of FTC Act narrowly on the specific question of the FTC's remedial powers.

*Finally*, the economic import and the sweep of the Proposed Rule amplify each of the concerns stated above. Subject to very limited exceptions,[30] the Commission proposes to ban the use of NCAs of

---

[26] FTC 2020 NCA Workshop, *supra* note 2, Evan Starr, Tr. at 171.

[27] For a general discussion, see, e.g., A. Mitchell Polinsky & Steven Shavell, *The Theory of Public Enforcement of the Law*, *in* HANDBOOK OF LAW AND ECONOMICS, VOL. 1, C. 6 (A. Mitchell Polinsky & Steven Shavell, eds., 2007); Steven Shavell, *The Optimal Structure of Law Enforcement*, 36 J. LAW & ECON. 255 (1993).

[28] *See, e.g.*, Oversight and Enforcement of the Antitrust Laws, Before the S. Comm. on the Judiciary, Subcomm. on Antitrust, Competition Policy, and Consumer Rights, 117th Cong. (2022) (Prepared Statement of the Fed. Trade Comm.) ("While we constantly strive to enforce the law to the best of our capabilities, there is no doubt that—despite the increased appropriations Congress has provided in recent years—we continue to lack sufficient funding."), https://www.ftc.gov/system/files/ftc_gov/pdf/P210100SenateAntitrustTestimony09202022.pdf.

[29] *See infra.*, Section IV.

[30] The only express exception in the Proposed Rule regards NCAs executed in conjunction with the sale of a business, where the NCA applies to a seller who "is a substantial owner of, or substantial member or substantial partner in, the business at

any duration, and of any geographic or occupational scope, adopted under any business contexts, across the entire U.S. workforce. Moreover, the Commission proposes to ban the maintenance of any existing NCAs, no matter what compensation may have been negotiated or conferred conditional on acceptance of the terms of an NCA. The scope of the Proposed Rule poses a tremendous challenge to the Commission's experience and resources; it greatly outstrips the evidentiary basis cited on behalf of the Proposed Rule; and it increases the very real legal risk the Commission faces, with regard to both the substance of a rule that the Commission might adopt and the Commission's regulatory and enforcement authority.

The Commission's interest in NCAs is laudable. And the Commission is well-positioned to contribute to the further development of economic research regarding NCAs and, specifically, to the further application of Industrial Organization economics to research on NCAs and labor market competition. New research, and a critical synthesis of the relevant hearings and FTC workshops cited in the NPRM, could contribute to case-by-case antitrust enforcement, and to policy debates involving NCAs in Congress and in the states.[31] The Commission is also well positioned to help develop the antitrust case law where NCAs and related vertical restrictions on labor agreements demonstrably harm competition and consumers. These tasks are potentially important; they are tractable, given the Commission's resources, including its human capital; and they fit well within the Commission's jurisdiction. They should precede, not follow, a proposed federal NCA regulation.

---

the time the person enters into the non-compete clause. Proposed § 910.1(e) would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity." NPRM at 3515. While an exception providing for NCAs in conjunction with the sale of a business is common in states with some general hostility to NCAs, as under Cal. Bus. & Prof. Code § 16601, the identification of a 25% ownership requirement appears arbitrary and excessive. For example, California law permits certain NCAs for, *inter alia*, "[a]ny person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interesting in the business entity." Cal. Bus. & Prof. Code § 16601. We have not found any authority restricting such ownership to anything like a 25% share. That proposed restriction may prove far too narrow, not just when natural persons owning a startup or small business number more than four, but when, e.g., venture capital investment reduces the founders' shares of a startup.

[31] For an example of a current legislative proposal, see, e.g., S.379—Freedom to Compete Act of 2023, 118th Cong. (2023-24) (which would amend the Fair Labor Standards Act to prevent the use of NCAs in employment contracts for certain non-exempt employees).

## I.  Empirical Evidence on the Effects of NCAs and NCA "Enforceability" Does Not Support the Commission's Proposed Federal Ban

There is a significant and developing body of literature investigating the economic import of NCAs, but it does not support the Commission's Proposed Rule. Much of the NPRM is devoted to a review of the literature regarding NCA usage and the effects of NCAs (or, in many cases, the effects of the relative "enforceability" of NCAs under the laws of the various states). The Commission's attention to the empirical literature is welcome, and many parts of the discussion comprise useful summaries of published studies or research in progress. Overall, however, the NPRM's discussion of the literature seems uneven. Some acknowledged limitations in the literature are discussed at some length, and others obliquely or not at all. It is not always clear how reliable the Commission finds the relevant methods or how accurate it deems relevant findings. In addition, some of the NPRM's extrapolations from the literature seemed strained.[32] The scope of the Proposed Rule—a sweeping federal ban on the use of NCAs, including those already in effect, even if bargained-for—would seem to demand a far more settled and comprehensive body of economic literature, and far less mixed results, than we see in evidence.

Some studies do suggest the potential for NCAs to reduce wages or worker mobility, at least under certain circumstances. But findings on the effect of NCAs on wages are mixed, rather than unidirectional, and many of the relevant studies evidence significant data and methodological limitations. Some of those limitations cast doubt on the extent to which certain findings may be generalized; others may impugn the findings themselves. Moreover, as discussed at the FTC 2020 NCA Workshop, available findings tend to address *average* effects rather than the distribution of those effects.[33] A substantial number of observations of workers' wages might vary from the average not just in magnitude but in sign; that is, it may be that wages were observed to increase for a large number of workers, which would be of no small import to antitrust (or to contract law). And a key question turns on the local nature of most labor markets,[34] and is—or should be—of special relevance to merits of antitrust intervention: if a wage effect is observed on average, state-wide, is that effect ubiquitous or is it chiefly driven by local labor markets in which key employers enjoy outsize market power? Also, because these studies cannot distinguish the workers *whose* wages appear to increase with legal reform, they do not resolve the question whether the observed average wage effects are due to

---

[32] *See infra* Section I.D.

[33] FTC 2020 NCA Workshop, *supra* note 2, Kurt Lavetti, Tr. at 139.

[34] *See* Local Area Unemployment Statistics Geographic Concepts, BLS, https://www.bls.gov/lau/laugeo.htm (Mar. 20, 2020); *see also* Marinescu & Rathelot, *supra* note 9 ("more than 80% of [all] job applications occur where the applicant and prospective employer are within the same 'commuting zone.'"); PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 552 (5th ed. 2022) (explaining that "commuting costs" limit a supplier's ability to operate in a distant geographic market).

workers receiving raises or, rather, to substitute hiring practices, with some firms seeking to mitigate hold-up problems by hiring more experienced or better trained workers at higher wages.[35]

One notable omission from the NPRM's substantial discussion of the literature is a 2016 paper by Bishara and Starr, leading contributors to the economic literature on NCAs. Bishara and Starr observed serious research challenges, as well as significant data and methodological limitations to the then-available body of research:

> First... identifying the causal effects of noncompete enforceability is a challenging task. Cross-sectional studies must somehow disentangle the effect of noncompete policies across states from the myriad of other potential state policies or state differences that are correlated with noncompete policies. Similarly, studies that examine the before and after effects of a noncompete policy change within a state must separately identify the impact of the noncompete laws from other trends or state level changes that might be occurring simultaneously. These are challenging identification issues to overcome, especially given that very few states have significantly changed their noncompete policies in the last 30 years.[36]

> Second, since not all policy changes equally affect the noncompete-signing population, the measurement of noncompete enforceability is necessarily error-ridden without data on who signs noncompetes.[37]

> Third, because enforceability is the key variable, not noncompete signing status, assumptions about knowledge of noncompete policies among the various actors must be made.[38]

> Fourth, analyses comparing outcomes in high-enforceability versus low-enforceability states cannot disentangle the impact of the potentially increased use of noncompetes in higher-enforceability states from the impact of the noncompete policy on those who do and do not sign noncompetes.[39]

> Fifth, the aggregate perspective cannot directly identify the potential micro-mechanisms at work, and thus limits the potential policy options. For example, how exactly might noncompete enforceability reduce mobility?[40]

While the literature has grown since Bishara and Starr's review, their concerns remain salient. Not incidentally, the NPRM cites at least ten papers cited in the Bishara and Starr critique. However, the

---

[35] *See, e.g.*, Stephen G. Bronars, *supra* note 11.

[36] Bishara & Starr, *supra* note 2, at 537.

[37] *Id.* at 538.

[38] *Id.*

[39] *Id.* at 539.

[40] Id.

Commission seems more confident than Bishara and Starr about the implications of the academic research. For example, when discussing Samila and Sorenson, Bishara and Starr say:

> The authors ambitiously conclude that noncompete enforceability "significantly impedes entrepreneurship and employment growth." Such a conclusion may be too strong, however... [I]t could be that the causal effect of noncompete enforceability on entrepreneurship is positive, but that it is diminished in high venture-capital areas.[41]

Unfortunately, the NPRM recognizes no such qualifications when discussing Samila and Sorenson's results with respect to new business formation,[42] although the Commission is more reserved when discussing the paper's results for innovation.[43]

Other research by Bishara and Starr—jointly and separately—is discussed at length, and cited liberally, throughout the NPRM,[44] and Professor Starr participated as a panelist at the FTC 21st C. Hearings, the FTC 2020 NCA Workshop, and the FTC/DOJ 2021 Labor Competition Workshop. Yet Bishara and Starr's critical review, and the concerns raised therein, are neither cited nor discussed in the NPRM.

Another puzzling omission is a 2019 literature review conducted by staff in the FTC's Bureau of Economics.[45] That literature review was much discussed in comments submitted to the FTC 2020 NCA Workshop, and at the workshop itself.[46] Yet the McAdams paper is not even mentioned in the NPRM. McAdams observes that economic research regarding NCAs "has made important strides."[47] However, he also observes mixed results, and he describes numerous data and methodological limitations running throughout the body of literature. Overall, he finds that the "more credible empirical studies tend to be narrow in scope, focusing on a limited number of specific occupations... or potentially idiosyncratic policy changes with uncertain and hard-to-quantify

---

[41] Bishara & Starr, *supra* note 2, at 525.

[42] *See* NPRM at 3491.

[43] *See id.* at 3492. For example, the Commission admits the paper is not causal: "The study by Samila and Sorensen examines the enforceability of noncompete clauses across all states but does not consider changes in enforceability: they are therefore unable to rule out that their results could be due to underlying differences in the states rather than non-compete clause enforceability."

[44] The NPRM discusses at least 10 of Professor Starr's articles (and co-authored articles) repeatedly, and at length, with more than 40 citations.

[45] *See* McAdams, *supra* note 4. We also note that the named staff author of the review, John McAdams, moderated a session at the FTC 2020 NCA Workshop.

[46] *See, e.g.,* FTC 2020 NCA Workshop, Kurt Lavetti, Tr. at 140 ("There's also a new working paper by John [McAdams] that provides a great overview of this literature.")

[47] McAdams, *supra* note 4, at 4.

generalizability."[48] Of direct relevance to the Proposed Rule, "[t]here is little evidence on the likely effects of broad prohibitions of non-compete agreements."[49]

Research on NCAs is ongoing. Still, most of the studies cited in the NPRM predate the FTC 2020 NCA Workshop and the BE review, and many predate the 2016 Bishara and Starr critique. Not a few of the shortcomings identified in that work were revisited by panelists at the 2020 workshop;[50] these discussions, too, are absent from the NPRM. As a general matter, citations to the records of the workshops and the hearings seem both sparse and highly selective. The NPRM strains to discount positive findings by, among other things, disfavoring research regarding the effects of NCAs themselves in favor of research regarding changes in NCA "enforceability,"[51] conspicuous limitations in the more supporting research notwithstanding. *Ad hoc* and uneven critical scrutiny aside, the implications of the "enforceability" studies are far less clear than they might seem. As we discuss below, there is no objective metric for "enforceability." Instead, relative "enforceability" scores result from various—if related—means of scoring disparate provisions of state statutory and judge-made law on a subjective basis.[52] None of these means is authoritative. And even as soft measurement tools, they fail to account for, much less reliably order, the universe of policy options.

### A.  The Existing Studies of NCAs Yield Mixed Results

*1.  The evidence shows ambiguous effects of NCAs on wages and mobility and supports the argument that they provide procompetitive benefits*

Evidence regarding the impact of NCAs on wages is neither definitive nor unidirectional. Rather, as McAdams observed, it "is mixed." While the NPRM correctly observes that several studies report negative wage effects associated with increased "enforceability" of NCAs[53] or, inversely, positive wage

---

[48] *Id.*

[49] *Id.*

[50] *See*, e.g., FTC 2020 NCA Workshop, Evan Starr, Tr. at 158 (noting "much harder to estimate causal effects using noncompete agreements); Tr. at 159 (lack of studies isolating random variation in use of noncompetes); *Id.*, Ryan Williams, Tr. at 192 (regarding identification issues); *Id.*, Ryan Nunn, Tr. at 192.

[51] The NPRM's misapplication of a model in the Lavetti, Simon, and White paper is one example of a strained attempt to discount—and indeed invert—research findings. NPRM at 3501, 3524. The presentation of an alternative model—one that leads to merely "suggestive" observations, to make an *ad hoc* adjustment to account for an unobserved base rate of "enforceability" is simply conjecture. As we explain below, the "enforceability" assessment itself is deeply problematic. More than that, the NPRM seems to be suggesting a weak rewrite of the paper at issue, without any replication of the original work, all in the service of a finding that no existing study demonstrates or suggests. That is not credible evidence that anyone has demonstrated a negative impact of NCAs or NCA enforceability on physician wages.

[52] For a discussion of some of the difficulties raised by studies' use of "enforceability" assessments, see Jonathan Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. CHI. L. REV. 953 (2020).

[53] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*, Working Paper (2020) at 2, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.

effects associated with decreased or limited "enforceability," other studies suggest positive wage effects, at least for certain categories of highly compensated workers.

Studies also suggest that the effects of NCAs (or enforceability) are context dependent. For example, Starr, Prescott, and Bishara exploit their 2014 survey on NCA usage to study the impact of signing an NCA on wages and other factors, such as training.[54] They find a significant positive association between NCAs and wages, although they also find that the wage differential depends when employees receive notice of their NCAs: their results suggest that employees who learn of their NCAs before accepting a job offer have 9.7% *higher* earnings, but employees who learn of their NCAs after accepting a job offer have "no observable boost in wages or training."[55]

As Alan Meese notes, the top-line lesson of this study is that the *typical* NCA *increases* wages, and distinguishing between properly disclosed and improperly disclosed NCAs—and *encouraging*, not prohibiting, the former—could have significant positive wage effects:

> [Starr, et al.] has also found that 61 percent of employee noncompete agreements are disclosed *before* employees accept employment. Moreover, when employers do disclose such agreements, employees bound by them earn significantly *higher* wages than similarly situated employees not bound by such agreements. Taken together and viewed in their entirety, these data suggest two distinct results. First, the average impact of employee noncompete agreements is to reduce wages, and this result is driven by a subset of *atypical* employee noncompete agreements, i.e., those not initially disclosed to employees. Second, where employee noncompete agreements are disclosed, and the *typical* agreement *is* disclosed, employees receive higher wages than they would have received had they not entered into such agreements. These higher wages presumably reflect the parties' expectations—confirmed by the data—that such agreements will induce additional training and/or the production of information.[56]

Further research into the impact of timing—of when employees become aware of a job's NCA terms—could have significant policy implications. Government intervention to lower workers' information costs, and reduce employee/employer information asymmetries, might be very different from—and

---

[54] Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & ECON. 53 (2021). Note that, whereas the prior Starr study considered the impact of NCA enforceability, this finding by Starr, Prescott, and Bishara has to do with *signing* an NCA.

[55] *Id.* at 75. In a footnote, the authors explain that this is among the observations that may be driven by unobservables. *Id.* at n. 34-35. We are not suggesting that the finding is definitive. Indeed, we spend a large part of these comments on data and methodological questions arising across the body of empirical literature. For those reasons, we suggest that this is an area that merits additional research.

[56] Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57 WAKE FOREST L. REV. 631, 702 (2022). On the inducement of additional training and/or production of information, see *infra* notes 85-90 and accompanying text, and Section II.

less costly than—interventions that prohibit NCA usage. They may also have implications for the distribution of policy effects across workers, firms, and (downstream) consumer welfare.

There are other studies suggesting contexts in which NCAs might increase wages or compensation. For example, Lavetti, Simon, and White conducted a survey of primary care physicians in five states.[57] Nearly 2,000 respondents provided input into panel data on both the use of noncompetes and various labor market outcomes of interest, such as earnings, incentive-based payments, and patient characteristics. Those survey data were analyzed with and without the findings from a 2011 survey by Bishara on the relative strength of enforceability across the states.[58] The results suggest that—at least for physicians—greater enforceability is associated with higher, not lower, compensation:

> Using three years of longitudinal earnings data per physician, we estimate that [NCAs] increase the annual rate of earnings growth by an average of 8 percentage points in each of the first 4 years of a job, with a cumulative effect of 35 percentage points after 10 years on the job.[59]

Analyzing wage growth in terms of enforceability amplifies the difference: cumulative earnings gain over the first ten years is estimated to be 70% among those with NCAs but only 35% for those without them, on average; "comparable estimates are 89% and 36% respectively in the model using variation in state enforceability."[60]

They also find a higher incidence of patient referrals associated with NCAs,[61] which may imply allocative and search efficiencies, and potentially patient benefits, in addition to whatever benefits accrue to the physicians. As the authors note, physicians present an interesting and distinctive occupational case study, in part because the practitioner-patient relationship may be a distinctive and durable form of human capital[62] (or, in the alternative, of good will), and in part because legal restrictions—notably anti-kickback laws—restrict both explicit and implicit payments or revenue-sharing for referrals.[63] Those distinctions may suggest other occupations worth scrutiny; they also suggest limits to the generalizability of the physician organization findings.

---

[57] Kurt Lavetti, et al., *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. HUMAN RESOURCES 1025 (2020). We note that while many of these workers may be employees, others may be partners, other types of co-owners of a practice, or independent contractors.

[58] NPRM at 3495 (citing Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Non-Compete Clauses, Trends, and Implications for Employee Mobility Policy*, 13 U. PA. J. BUS. L. 751, 778–79 (2011)).

[59] Lavetti, et al., *supra* note 57.

[60] *Id.*

[61] *Id.* at 1055-7

[62] *Id.* at 1049.

[63] *Id.* at 1031.

A 2019 study by Kini, Williams, and Yin examines the impact of NCAs on Chief Executive Officer (CEO) compensation. CEOs are distinctive in several ways. For one, due to SEC filings, CEOs are an exception to our typical inability to know which workers are signing NCAs. Second, CEOs are likely to be relatively well informed about the terms of their employment and better equipped to bargain over terms such as NCAs and non-disclosure terms, as well as compensation.[64] The study exploits staggered, state-level changes in NCA enforceability to estimate the relationship between NCA usage on both the CEO compensation and the monitoring of CEO performance.[65] Results suggest that increases in NCA usage and enforceability are both associated with higher total CEO compensation: among other things, the annual total compensation for CEOs with NCAs is 18.4% higher than it is for CEOs without NCAs.[66] Also,

> As stricter enforcement enhances the likelihood that a CEO with an NCA [NCA] will be fired for poor performance and limits the CEO's outside options, the CEO will demand an increase in total compensation for bearing increased job risk. The board agrees to the higher compensation but increases alignment of interest and risk-taking incentives to reduce the possibility of the CEO taking actions that can harm long-term shareholder value but reduce the CEO's short-term job risk.[67]

Other studies also suggest potential efficiencies associated with NCAs, if not higher wages. Garmaise (2011), for example, studied the effects of NCA enforceability on both executive compensation and firm investment by analyzing both time series and cross-sectional variation in enforceability across the states.[68] He found that greater enforceability reduces both compensation growth and total compensation.[69] In addition, he found greater enforceability to be associated with a shift in compensation towards salary, and increased salary growth, relative to other forms of compensation.[70] These

---

[64] Omesh Kini, et al., *CEO Non-Compete Agreements, Job Risk, and Compensation*, 34 REV. FIN. STUD. 4701 (2021).

[65] *Id.* Data regarding CEO contracts were compiled by hand based on SEC filings. The authors were able to identify 7,661 unique CEOs from ExecuComp, but found employment contracts for only 3,192; that is "only 41.67% of all CEOs in the ExecuComp database have employment contracts during our sample period." Still, the study incorporates data on nearly half of all CEOs of publicly traded firms.

[66] *Id.* at 25-6.

[67] *Id.* at 26.

[68] Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J. L. ECON. & ORG. 376 (2011). Data regarding executive compensation and board participation were taken from Standard and Poor's ExecuComp database, which includes such data on the five most highly paid executives for 2,610 large publicly traded U.S. firms; on R&D investment, capital expenditures, and acquisitions were obtained at the firm level from Compustat. *Id.* at 388.

[69] *Id.* at 21 ("For a given executive, a shift to a tougher enforcement regime reduces compensation growth by 8.2%, which is 25% of the mean growth rate."). Garmaise defines total compensation as the sum of salary, bonus, "other annual," total value of restricted stock granted, total value of stock options granted, long-term incentive payouts, and "all other total" as defined and reflected in the ExecuComp data.

[70] *Id.* at 22.

compensation effects represent benefits to the firms: that is, greater enforceability was found to be associated with lower turnover and greater Board of Directors participation, not just lower total compensation growth.[71]

Gurun, Stoffman, and Yonker find decidedly mixed effects. The authors exploit a commercial policy change, rather than a statutory one, to study the impact of NCAs on financial advisors and their industry.[72] Specifically, they use firms' adoption of the "Protocol for Broker Recruiting" ("Protocol") as an event. The Protocol permitted a financial adviser to take client lists and contact information, from a firm participating in the Protocol, to a new place of employment without fear of legal action.[73] In effect, the Protocol reduced both NCA enforceability and enforcement for numerous firms and advisors, even in states with permissive enforcement regimes. Unlike other enforceability studies, this was based on firm-specific data that reflect actual changes in both NCA usage and NCA enforcement.[74]

Adviser turnover was observed to increase, initially and temporarily, after firms join the protocol.[75] Because advisors could decamp for new firms without fear of suit, firms became less willing to fire advisors for misconduct, and broker misconduct increased.[76] In addition, by the second year after adopting the Protocol, "client fees increased by about 13% from pre-adoption levels. After three years, fees remain about 18% higher than pre-adoption fee levels."[77] As the authors note, "[t]hese findings, along with those on higher misconduct rates, call into question whether unlocking clients makes them better off."[78]

---

[71] *Id.* at 25. Garmaise did not, however, find significant impact on firm value or profitability. *Id.* at 27-8.

[72] Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: Non-compete Agreements in the Financial Advisory Industry*, 141 J. FIN. ECON. 1218 (2021).

[73] *See id.* at 1219. Eventually, over 1,500 firms adopted the Protocol. Prior to implementation of the Protocol, NCAs and NCA-related litigation had both been common in the industry.

[74] *Id.* at 1219-20.

[75] *See* Gurun, et al., *supra* note 72, at 1228.

[76] *Id.* at 1220. From a sample of advisors at 100 large firms, it was observed that misconduct tends to increase the likelihood of being fired by 23%, absent the Protocol, "but that this discipline is effectively undone when firms join the protocol." *See also id.* at 1232 ("Once adviser fixed effects are included in the model, the coefficient estimates on "Firm in protocol" become both statistically and economically significant. The estimate in column 4, which is calculated using the sample of advisers working for employers with at least 100 advisers, indicates that the probability that an adviser engages in misconduct increases by 20 bps once his employer joins the protocol. Compared to an unconditional probability of misconduct of 47 bps, this is an increase in likelihood of over 40%.").

[77] *Id.* at 1220.

[78] *Id.*

A 2015 study of hair salons by Johnson and Lipsitz did not examine wage *per se*, but a wage-related aspect of NCAs,[79] surveying NCA use among hair salons by e-mail.[80] Specifically, the study examined the conjecture that NCAs may be used to transfer utility from employees to employers when the market-clearing wage is constrained.[81] Findings supported the hypothesis that the minimum wage will have a negative effect on employment when NCAs are unenforceable, but not when they are.[82] There was also evidence for the proposition that NCAs were surplus maximizing for some salons, but not others; that is, NCAs may be employed by salons that are wage constrained and lack access to credit, to the detriment of the joint surplus (salon plus employee).[83] Like many of the studies discussed in the NPRM, Johnson and Lipsitz depend centrally on survey evidence, and the cross-sectional convenience sample of 218 salon owners[84] is a conspicuous limitation. Still, the study suggests important questions about the total impact of NCAs on labor markets and, for low-income employees, about the potential interaction of NCAs with minimum wage policies on employment. Additional research into these issues with better data could be important, to the extent one is concerned about the total impact of NCAs on labor markets and, especially, on workers.

In the same paper, Johnson and Lipsitz investigate the impact of NCAs on on-the-job training.[85] They find that salons using NCAs are 14% more likely than the mean to provide training to newly hired workers.[86] Starr also observes a training effect—one similar in magnitude—across categories of workers.[87] His results suggest that, if a state were to adopt a policy change in which it moves from non-enforceability of NCAs to average enforceability, the likelihood of worker training would increase 14.7%.[88] Moreover, Starr's results demonstrate that "the positive correlation between noncompete enforceability and training… is driven almost entirely by firm-sponsored training. The relationship between noncompete enforceability and self-sponsored training is practically zero."[89] While Starr, Prescott, and Bishara did not find a relationship between training and the *timing* of employees

---

[79] *See* Matthew S. Johnson & Michael Lipsitz, *Why are Low-Wage Workers Signing Noncompete Agreements?*, J. HUMAN RESOURCES 0619-10274R2 (May 12, 2020).

[80] *Id.*

[81] *Id.* at 2, 17.

[82] *Id.* at 30. ("employment elasticity of the minimum wage in the lowest NCA enforcement states is much more negative (-0.38) than the average effect (p = .024). On the other hand, the point estimate on the interaction term … implies that the employment elasticity of the minimum wage is significantly closer to zero when NCAs are available.")

[83] *Id.* at 28; *see also*, p. 43, Table 6.

[84] *Id.* at 16.

[85] Johnson & Lipsitz, *supra* note 79.

[86] *Id.* at 26.

[87] Evan Starr, *Consider This: Wages, Training, and the Enforceability of Covenants Not to Compete*, 72 INDUS. & LABOR REL. REV. 783 (2019).

[88] *See id.* at 785, 796-7. Note that Starr also observes lower wages associated with increased NCT enforceability. *See id.*

[89] *See id.* at 797.

learning about NCA terms, these and other studies suggest that NCAs can, in fact, ameliorate hold-up problems associated with investments in employee training, as well as potential tradeoffs in labor markets, such as tradeoffs between wages and firms' investments in employee training.[90]

None of our discussion is meant to suggest that the various cited papers based on natural experiments[91] are without value. Indeed, in a body of literature based on so few natural experiments (relative to, e.g., the literature regarding the effects of minimum wages), we do not simply dismiss all the studies that lack a clear causal design. Our purpose, rather, is threefold. First, we mean to point out that the empirical basis for regulatory intervention is limited, especially when one considers federal regulations that would sweep as broadly as the Proposed Rule. Second, as we discuss below, the emerging empirical picture is more complex—and the results more mixed—than the Commission seems to recognize. Third, as discussed by Bishara and Starr, McAdams, and numerous participants in the FTC's 2020 workshop, there remain significant data and methodological limitations across the existing body of literature. Collectively, these undercut both the generality of the Commission's purported findings about the effects of NCAs (or NCA enforceability), and the confidence that the Commission and other policy makers ought to attribute to such findings.

> 2. *The downstream effects of NCAs on competition and consumers is theoretically ambiguous and empirically unestablished*

Setting aside the study of the Broker Protocol,[92] the NPRM notes precisely one study on the downstream price effects of either NCA usage or enforceability, stating that a 2021 paper by Hausman and Lavetti on the effects of physician NCAs, is "the only study of how non-compete clauses affect prices."[93] That suggests a gaping hole in the literature. Antitrust has not yet abandoned (and should not abandon) its concern with consumer welfare and downstream prices.[94]

At the outset, we might wonder how well a study of physician NCAs and health care services prices will generalize across occupations, products, and services. We might also wonder about endogeneity and identification issues, given data limitations on specialty distribution within firms, myriad state

---

[90] *See* FTC 2020 NCA Workshop, Evan Starr, Tr. at 162, 166, 174 (regarding, e.g., evidence of training incentives and wage/training tradeoffs); *id.*, Kurt Lavetti, Tr. at 144-6 (regarding physician compensation and potential referral/patient sharing); *id.*, Ryan Williams, Tr. at 187, et seq. (NCAs and risk management for CEOs). *Cf. id.*, Howard Shelanski, Tr. at 263 (noting "ambiguity" in the research).

[91] The main natural experiment papers cited on wages are: Johnson, et al., *supra* note 53, Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 MGMT. SCI. 143 (2021), and Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Non-Compete Clauses and the Careers of High-Tech Workers*, 57 J. HUMAN RESOURCES S349 (2022).

[92] *See supra* notes 72-77 and accompanying text.

[93] NPRM at 3490 (citing Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 AM. ECON. J. APPLIED ECON. 258 (2021)).

[94] Or with other cognizable downstream effects, such as the impact of qualitative aspects of goods or services, output, etc.

and federal policy changes pertaining to health care reimbursement, background changes in physician practice organization, and a dearth of major state law NCA policy changes in the period in question, 1996-2007.[95] Changes in physician organization have been ongoing for several decades, and include not just a general trend towards consolidation, but increasing vertical integration, as primary and ambulatory care practices are acquired by hospitals, hospital systems, and networks.[96]

The issue of measuring changes in NCA enforceability seems especially salient, given the difficulty of quantifying changes in enforceability associated with legal changes, especially common law ones,[97] soft or subjective elements of the metric used to attempt quantification, and the fact that neither Bishara's approach to measurement nor its implementation in the study seems ever to have been tested against any objective measures of litigation impact. The nature, sensitivity, and specificity of the metric also seem critical given the study's findings, which indicate that the *sign* of the putative effect changes as one shifts one's focus from establishment-level changes to firm-level changes in provider organization.[98]

The NPRM's treatment of the Hausman & Lavetti study seems especially puzzling given the Commission's considerable experience with health care competition matters and, specifically, economic research on health care competition issues conducted by FTC staff in BE. The paper is, in many ways, a careful and thoughtful attempt to investigate the relationship between NCAs and the organization of physician practices. And, indeed, the authors acknowledge various challenges posed by data limitations, among others.[99]

At the same time, the study employs market definitions and analytic methods eschewed in the Bureau's investigations of health care provider mergers. The NPRM also is unclear on the confidence the Commission attaches to the study's striking findings:

> we find that a 100 point increase in the *establishment*-based HHI causes a reduction in negotiated prices of about 1.4 percent to 1.9 percent on average. In contrast, the same increase in

---

[95] *See, e.g.,* Hausman & Lavetti, *supra* note 93, at 259, 269, 271, fig. 1 & table 1.

[96] *See, e.g.,* Martin Gaynor & Deborah Haas-Wilson, *Change, Consolidation, and Competition in Health Care Markets*, 13 J. ECON. PERSP. 141 (1999); DEBORAH HAAS-WILSON, MANAGED CARE AND MONOPOLY POWER: THE ANTITRUST CHALLENGE (2003); Martin Gaynor, et al., *The Industrial Organization of Health-care Markets*, 53 J. ECON. LIT. 235 (2015); DEP'T JUSTICE, FED. TRADE COMM'N. IMPROVING HEALTH CARE: A DOSE OF COMPETITION [Internet]. Washington (DC): FTC; 2004 Jul [cited 2017 Jul 31]. Available from: https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf; Brent D. Fulton, *Health Care Market Concentration Trends in The United States: Evidence and Policy Responses*, 35 HEALTH AFFS. 1520 (2017).

[97] *See* Barnett & Sichelman, *supra* note 52.

[98] *See* Hausman & Lavetti, *supra* note 93, at 260 ("100 point increase in the *establishment*-based HHI causes a reduction in negotiated prices of about 1.4 percent to 1.9 percent on average. In contrast, the same increase in concentration caused by firm-level consolidation holding fixed establishment concentration causes prices to increase by 1.7 percent to 2.1 percent.").

[99] *See id.* at 277-8.

concentration caused by firm-level consolidation holding fixed establishment concentration causes prices to increase by 1.7 percent to 2.1 percent. OLS specifications imply very small (but statistically significant) positive price effects of 0.02 percent or less, consistent with within-state evidence from Baker et al. (2014).[100]

While we should not dismiss surprising results out of hand, these findings seem more a red flag than a credible interval estimate. 100-point changes in HHI are not at all likely to signal competitively significant events. Small changes in concentration are not *necessarily* infra-marginal in their price effects, but this is supposed to be a general result across geographic and service markets, and a decade, not surprising observations in specific geographic and service market. As such, it seems highly unlikely, and at odds with both the FTC's considerable experience with provider mergers and the larger body of health care competition research.[101]

As the Commission is well aware, calculating HHI based on market share is elementary, given a measure of market share: for a given market, one sums the squares of each firm's percentage market share. That's it. And, as the Department of Justice Antitrust Division reports:

> The agencies generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated.[102]

Consider, for example, a geographic market in which 10 firms (10 group practices) provide general pediatric services. For the sake of simplicity, assume that each firm has an identical 10% market share. In that case, the HHI is 1,000 (that is, $10(10^2)$). Suppose, further, that two of the ten firms merge, such that eight non-merging firms each retains its 10% market share, leaving the merged entity with a 20% share. In that case, the HHI would be $8(10^2) + 20^2 = 1,200$. That single acquisition would yield a 200-point change in HHI: double the change that is supposed to be robustly associated with significant price increases. The estimate does not seem credible.

The study employs a commercial database that includes the "medical claims for all active employees and their dependents from a sample of large firms," from 1996-2007.[103] That is a substantial longitudinal (and nationwide) sample, although it is worth noting that this study, like many, lacked access

---

[100] *Id.* at 260.

[101] *See generally, e.g.*, Christopher Garmon, *The Accuracy of Hospital Screening Methods*, 48 RAND J. ECON. 1068 (2017) (reviewing post-merger price changes for 28 hospital mergers, initially published as BE Working Paper).

[102] *See* Herfindahl-Hirschman Index, DEPARTMENT OF JUSTICE (Jul. 31, 2018), https://www.justice.gov/atr/herfindahl-hirschman-index; *see also* Competitive Effects, FEDERAL TRADE COMMISSION (last visited Apr. 12, 2023), https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers/competitive-effects.

[103] Hausman & Lavetti, *supra* note 93, at 269.

to All-Payer Claims databases,[104] and one might wonder whether the sample from large firms skews the data. Moreover, the data include prices for ambulatory care services only. Hence, the extent to which hospitals as organizations, and even group and individual practices, cross-cut the delivery of ambulatory and hospital-based services may be a confounding factor of interest, as their longitudinal business database permits firm-level observations, but does not identify the specialties of the physicians at each firm—and, as we noted above, there is evidence of ongoing vertical integration in health care provider markets.[105] Identification may be especially important here, as the findings are *directionally inverse* depending on the choice of firm-level or establishment-level analysis.

Also noted above, the study depends on "a new database quantifying the variation in state-level NCA laws systematically over time, following the measurement system developed by Bishara (2011)."[106] Note that while a number of the "enforceability" studies cited in the NPRM also follow Bishara's framework, they do not all employ the same scale. Moreover, although the notion of "enforceability"—like the relative stringency of regulations—carries a rough intuitive connotation, there is no objective measure of "enforceability" and, as we discuss below, it is not clear what the study's ordering system measures, or how well.

Hausman and Lavetti acknowledge that their "modeling approach follows the general structure-conduct-performance (SCP) frame- work for estimating effects of market structure on prices, which has several well-known limitations."[107] Indeed, while HHIs may still be used for rough and preliminary screening purposes, merger analysis has, by and large, and for decades, left the SCP framework behind, as both theoretical and empirical work has undermined the approach.[108] We would not expect merger screening or analysis to rely upon regressions of HHIs. Does the Commission's Bureau of Economics contend that they should?

Work from the Bureau of Economics has reinforced the background methodological trend away from the SCP paradigm in provider markets. Both staff and management in the Bureau of Economics have made substantial contributions to the study of competition in health care markets, with a

---

[104] *See* All-Player Claims Databases, AGENCY FOR HEALTHCARE RESEARCH AND QUALITY (February 2018), https://www.ahrq.gov/data/apcd/index.html.

[105] *See supra* note 95.

[106] Hausman & Lavetti, *supra* note 93, at 270.

[107] Hausman & Lavetti, *id.*, at 276.

[108] *See*, e.g., Richard Schmalensee, *Inter-Industry Studies of Structure and Performance, in* 2 HANDBOOK OF INDUSTRIAL ORGANIZATION 951–1009 (Richard Schmalensee & Robert Willig eds., 1989); William N. Evans, Luke M. Froeb & Gregory J. Werden, *Endogeneity in the Concentration–Price Relationship: Causes, Consequences, and Cures*, 41 J. INDUS. ECON. 431 (1993); Steven Berry, *Market Structure and Competition, Redux*, FTC Micro Conference (Nov. 2017), https://www.ftc.gov/system/files/documents/public_events/1208143/22_-_steven_berry_keynote.pdf. *See also* Nathan Miller, et al., *On the Misuse of Regressions of Price on the HHI in Merger Review*, 10 J. ANTITRUST ENFORCEMENT 248 (2022).

focus on the study of provider consolidation.[109] That research seems to have had a significant impact on the courts' treatment of provider mergers. Between 1993 and 2000, the federal antitrust agencies (FTC and DOJ) challenged eight hospital mergers, losing all eight challenges.[110] Hospital merger challenges were nearly abandoned, but the losing streak spurred renewed research efforts, both within the Bureau and across the academy. Critically, BE staff undertook a series of merger retrospective studies, ranging from individual case studies to reviews of dozens of consummated provider mergers.[111] These are, in essence, forensic investigations, aiming "to determine ex post how, if at all, a particular merger affected equilibrium behavior in one or more markets."[112] Such studies complement diverse cross-sectional and theoretical work on hospital mergers, and on provider consolidation more generally.[113] The retrospectives have helped refine merger screening methods employed within the FTC; and they have been widely credited with reversing the way provider mergers are viewed in the courts.[114]

Research on health care competition from BE and elsewhere, coupled with enforcement by the FTC's Bureau of Competition, represents a signal model of the application of applied industrial organization research to policy development and law enforcement. Notably, this research program militates against SCP assumptions in provider mergers, and against the market definition

---

[109] *See, e.g.*, Thomas Koch & Shawn W. Ulrick, *Price Effects of a Merger: Evidence from a Physicians' Market*, 59 ECON. INQUIRY 790 (2021); Keith Brand & Ted Rosenbaum, *A Review of the Economic Literature on Cross-Market Healthcare Mergers*, 82 ANTITRUST L.J. 533 (2019); Thomas Koch, et al., *Physician Market Structure, Patient Outcomes, and Spending: An Examination of Medicare Beneficiaries*, 53 HEALTH SERVS. RES. 3549 (2018); Julie A. Carlson, et al., *Economics at the FTC: Physician Acquisitions, Standard Essential Patents, and Accuracy of Credit Reporting*, 43 REV. INDUS. ORG. 303 (2013); Devesh Raval, et al., *Using Disaster Induced Closures to Evaluate Discrete Choice Models of Hospital Demand*, 53 RAND J. ECON. 561 (2022). *See also, e.g.*, Martin Gaynor & Robert J. Town, *The Impact of Hospital Consolidation–Update*, Robert Wood Johnson Foundation, The Synthesis Project (2012) (Gaynor is a former Director of the FTC's Bureau of Economics); Martin Gaynor & William B. Vogt, *Competition Among Hospitals*, 34 RAND J. ECON. 764 (2003); Leemore S. Dafny, et al., *Regulating Hospital Prices Based on Market Concentration Is Likely to Leave High-Price Hospitals Unaffected*, 40 HEALTH AFF. 1386 (September 2021) (Dafny was Deputy Director for Health Care Antitrust in the FTC's Bureau of Economics from 2012-13; Leemore S. Dafny, *Hospital Industry Consolidation–Still More to Come?*, 370 NEW ENG. J. MED. 198 (2014).

[110] See, e.g., Christopher Garmon, Hospital Mergers—Retrospective Studies to Improve Prediction, CPI Antitrust Chronicle (July 2017).

[111] *See, e.g.*, Garmon, *supra* note 101 (reviewing post-merger price changes for 28 hospital mergers, initially published as BE Working Paper); Deborah Haas-Wilson & Christopher Garmon, *Hospital Mergers and Competitive Effects: Two Retrospective Analyses*, 18 INT. J. ECON. BUS. 17 (2011); Orly Ashenfelter, et al., *Retrospective Analysis of Hospital Mergers*, 18 INT. J. ECON. BUS. 5 (2011); Patrick S. Romano & David J. Balan, *A Retrospective Analysis of the Clinical Quality Effects of the Acquisition of Highland Park Hospital by Evanston Northwestern Healthcare*, 18 INT. J. ECON. BUS. 45 (2010); John Simpson, *Geographic Markets in Hospital Mergers: A Case Study*, 10 INT. J. ECON. BUS. 291 (2003); Michael G Vita & Seth Sacher, *The Competitive Effects of Not-For-Profit Hospital Mergers: A Case Study*, 49 J. INDUS. ECON. 63 (2001).

[112] Joseph Farrell, Paul Pautler, & Michael Vita, *Economics at the FTC: Retrospective Merger Analysis with a Focus on Hospitals*, 35 REV. INDUS. ORG. 369 (2009).

[113] *See* citations referenced *supra*, note 108.

[114] *See Overview of the Merger Retrospective Program in the Bureau of Economics*, FEDERAL TRADE COMMISSION (last visited Apr. 12, 2023), https://www.ftc.gov/policy/studies/merger-retrospective-program/overview.

alternatives employed by Hausman and Lavetti's study. Results suggest, for example, that various "the new screening tools (in particular, WTP and UPP) are more accurate than traditional concentration measures at flagging potentially anticompetitive hospital mergers for further."[115] Results also suggest "no statistically significant relationship between post-merger price change and the HHI screens, regardless of the geographic market or share metric employed."[116] Hausman and Lavetti are aware of the health care competition literature and attempt to address some of its challenges.[117] Still, given BE's research, and given the unlikely numerical findings, the NPRM's discussion of potential limitations to this single study of the downstream effects is curiously oblique:

> Generally, greater concentration may or may not lead to greater prices in all situations and may arise for reasons which simultaneously cause higher prices (indicating, therefore, a noncausal relationship between concentration and prices). In this case, the authors claim that researching the direct link between changes in law governing non-compete clauses and changes in concentration allows them to identify a causal chain starting with greater enforceability of non-compete clauses, which leads to greater concentration, and higher consumer prices.[118]

Both points seem correct as far as they go, but the NPRM is entirely unclear on the question what they imply for the significance of the study's findings. The NPRM states that "[t]here is evidence that non-compete clauses increase consumer prices and concentration in the health care sector."[119] In the NPRM's introduction, the suggestion is broader: "research has also shown that, by suppressing labor mobility, non-compete clauses have negatively affected competition in product and service markets in several ways."[120] Perhaps, but the Commission has identified only one study indicating downstream price effects. Does the Commission find the evidence credible? Or generalizable? The NPRM continues to expound on the study's dubious findings, and on conjectures about the mechanisms at play, at some length.[121] It also extrapolates on the reported findings, suggesting that they are reinforced by "another study, by Michael Lipsitz and Mark Tremblay, [that] shows increased enforceability of non-compete clauses at the state level increases concentration, as measured by employment-based HHI."[122] Does the Commission deem that finding important?

---

[115] Garmon, *Accuracy of Hospital Screening Methods, supra* note 101, at 1070.

[116] *Id.*

[117] *See* Hausman & Lavetti, *supra* note 94, at 275-7.

[118] NPRM at 3490.

[119] *Id.*

[120] NPRM at 3482.

[121] *Id.*

[122] *Id.* (*citing* Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers,* Working Paper (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864).

None of this is to say that NCAs cannot have an anticompetitive effect in health care markets, and it's certainly not meant to suggest that provider consolidation cannot be anticompetitive. BE research and FTC enforcement have demonstrated that health care provider mergers and acquisitions *can* be anticompetitive, under certain facts and circumstances. Many hospital markets are highly concentrated—on any measure—and providers of health care services who have market power might employ NCAs to create (or exacerbate) barriers to entry in both those services markets and input markets, such as professional labor markets. Many provider markets are subject to regulatory barriers to entry as well, such as state law Certificate of Need or Certificate of Public Advantage regimes,[123] which might interact with restraints on labor mobility. Rule of reason inquiry into physician NCAs in specific labor (and service) markets might well find harm to competition and consumers. And further economic research, such as that commenced by Hausman and Lavetti, might well foster successful and pro-consumer antitrust enforcement. But there are serious reasons to doubt the specific interval estimates produced by the one price study available, and there remain questions about the importance of context in assessing the effects of NCAs, and of the distribution of average NCA effects (of whatever accuracy), across distinct labor markets.

In any case, the substantial literature on health care competition, and the distinctive characteristics of health care product, service, and labor markets—highly regulated at the state and federal levels, and subject to a complex mix of public and private payment—strongly suggest that one cannot reliably generalize the results of a single study on NCAs and ambulatory care prices across the entire national work force, much less to the downstream price effects of NCAs across industries, products, and services markets.

  3. *The weight of the evidence does not support the claim that NCAs decrease innovation*

The Commission argues that the "weight of the evidence indicates non-compete clauses decrease innovation."[124] The "weight of the evidence" is unclear. There are, indeed, some studies suggesting that greater NCA "*enforceability*" is associated with some innovation-relevant harm. The main paper that seems to fit the Commission's model of reliable studies on the topic examines seven legal changes from 1992-2008, which were reported to increase or decrease the level of a state's NCA

---

[123] *See, e.g.*, Joint Statement of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Certificate-of-Need Laws and Alaska Senate Bill 62 (2017), https://www.ftc.gov/system/files/documents/advocacy_documents/joint-statement-federal-trade-commission-antitrust-division-us-department-justice-regarding/v170006_ftc-doj_comment_on_alaska_senate_bill_re_state_con_law.pdf; FTC Policy Perspectives on Certificates of Public Advantage, Staff Policy Paper (2022); Statement of the Federal Trade Commission *In The Matter of Phoebe Putney Health Services, Inc., et al.*, FTC Docket No. 9348 (Sep. 4, 2014), https://www.ftc.gov/system/files/documents/public_statements/581041/140905phoebeputneystatement.pdf. The *Phoebe Putney* matter illustrates, among other things, how certificate of need programs can impede effective remedies to demonstrably anticompetitive provider mergers. *Cf. FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216 (2013).

[124] NPRM at 3492.

enforceability.[125] That paper finds, according to the NPRM, "that the value of patents, relative to the assets of the firm, increase by about 31% when non-compete clause enforceability decreases."[126] But overall, findings are mixed, the literature is hardly settled or comprehensive, and there remains the question of the confidence one should attach to existing studies, separately or in aggregate.

For the papers that the Commission cites, two find that the enforceability of NCA increases in innovation, one finds a decrease, and one is ambiguous.[127] On the one hand, citing reasonable limitations, the Commission suggests that it puts relatively less weight on those studies. On the other hand, the Commission seems sufficiently confident to conclude that "enforceability broadly diminishes the rate of innovation,"[128] based on one paper that looks at value of patents, which is but one of several commonly used, and oft-debated, measures of innovation.[129] Later, the Commission admits it "is unable to extrapolate from the relevant studies to quantify or monetize this benefit."[130]

As a background matter—and conspicuous in the economic literature on innovation—innovation (and rates of change in innovation) can be hard to quantify, in part because there are diverse indicators of innovation, but no definitive one.[131] Patents have value and some connection with innovation, but patents vary wildly in their value.[132] Value-adjusted patents are better indicators, but patent value, and the time frame in which it's best evaluated, may be hard to assess, as evidenced by, e.g.,

---

[125] Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency*, Working Paper (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3846964.

[126] NPRM at 3492.

[127] *See* NPMR at 3492-3. The papers are: Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, Fed. Reserve Bank of Phila. Working Paper 21-26 (2021) (finding a correlation that suggests an increase in patenting with enforceability); Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices*, 51 RSCH. POL'Y 1 (2022) (finding enforceability correlates with an increase in the quantity of innovation as measured by the introduction of new medical devices); Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 MGMT. SCI. 425 (2011) (finding a correlation that suggests venture capital induces less patenting when non-competes are enforceable); and Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Riskier R&D Strategies?*, 35 STRATEGIC MGMT. J. 1230 (2014) (finding an ambiguous effect that the Commission summarizes as "riskier research and development strategies lead to more breakthrough innovations, but also lead to more failures, leaving the net impact unclear").

[128] NPRM at 3493.

[129] He, *supra* note 125.

[130] NPRM at 3527.

[131] *See, e.g.*, Thomas M. Jorde & David J. Teece, *Innovation and Cooperation: Implications for Competition and Antitrust*, 4 J. ECON. PERSP. 75 (1990) (regarding the organization requirements (and implications) of innovation, modeling complexities, and common market failures in the "market for know-how").

[132] For a classic review of the literature on the economic significance of patents, and difficulties in determining what aspects of economic activity are, and should be, captured by patent statistics, see Zvi Griliches, *Patent Statistics as Economic Indicators: A Survey*, 28 J. ECON. LIT. 1661, (1990),

FRAND disputes,[133] or the bundles or thickets in which many patents are sold or licensed. Also, patents may be more (or less) relevant given the technology in question, just as trade-secrets and copyrights might have greater or lesser significance depending on the sector and the nature of the tech; for example, trade secrets and copyright might have greater import in areas as diverse as software and biotech. Factors such as venture capital funding, the establishment and growth of startups, etc. also are significant but, again, of varying significance relative to other signals.[134]

*Second*, the theoretical impact of NCAs on innovation is ambiguous, and empirical findings regarding the complex subject of innovation suggest mixed effects associated with NCAs (or, more commonly, with changes in NCA enforceability).[135] For example, a 2018 study by Starr, et al., examines the impact of greater NCA enforceability on the creation, growth, and survival of spinouts and other new entrants, based on matched employer-employee data on 30 states and 5.5 million new firms. On the one hand, it finds that greater enforceability is associated with fewer within-industry spinouts; on the other hand, the within-industry spinouts created in greater enforceability states "tend to start and stay larger, are founded by higher-earners, and are more likely to survive their initial years."[136] They find no impact on entry by firms that are not within industry spinouts.[137] They suggest that greater enforceability may screen the formation of within-industry spinouts by dissuading founders with lower human capital.

---

[133] *See, e.g.*, Eli Greenbaum, *No Forum to Rule Them All: Comity and Conflict in Transnational FRAND Disputes*, 94 WASH. L. REV. 1085 (2019). Because objective valuation of FRAND terms may often be difficult, authorities tend to focus on the conditions under which (and forums in which) good faith negotiation can occur. *Compare* U.S. PTO/U.S. DOJ, *Draft Policy Statement on Licensing Negotiations and Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* (Dec. 19, 2019), https://www.justice.gov/atr/page/file/1228016/download (emphasizing conditions of negotiation) *with* U.S. PTO/NIST/U.S. DOJ, *Withdrawal of 2019 Draft Policy Statement on Licensing Negotiations and Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* (Jun. 8, 2022), https://www.uspto.gov/sites/default/files/documents/SEP2019-Withdrawal.pdf (emphasizing case-by-case evaluation of conduct).

[134] *Cf.* Bronwyn H. Hall & Dietmar Harhoff, *Recent Research on the Economics of Patents*, 4 ANN. REV. ECON. 541 (2012) (reviewing the literature and noting the importance of patents in certain sectors, while also concluding that "the sheer size and growth of the recent literature might lead one to assume that patents are an extremely important instrument of economic development and growth, which therefore attract a great deal of interest from researchers and policy makers. But this seems at odds with the weak evidence that patents serve as an incentive for innovation and the fact that relatively few firms find them an important means of securing returns to innovation").

[135] *See, e.g.*, Evan Starr, Natarajan Balasubramanian & Mariko Sakakibara, *Screening Spinouts? How Non-compete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 MGMT. SCI. 552 (2018); see also FTC 2020 NCA Workshop, Evan Starr, Tr. at 162-163 (observing wage vs. training tradeoffs); *id.*, Lavetti, Tr. at 144-145 (findings indicating wage gains in certain contexts, but not others).

[136] Starr, et al, *supra* note 135 at 552.

[137] *Id.*

A recent working paper by Jeffers suggests that certain labor frictions in knowledge-intensive occupations can play an important role in investment decisions.[138] Using matched employee-employer data from LinkedIn, Jeffers finds that increases in NCA enforceability led to 7-11% declines in worker departures for workers in those occupations where the majority of workers have at least a bachelor's degree. Those declines, in turn, led to increased investment by those firms that rely more on knowledge intensive occupations.[139]

As we discuss below (and as noted in the NPRM), Marx, et al., 2009 exploited a Michigan statutory change—one deemed to increase NCA enforceability—to study worker mobility—specifically, innovator mobility.[140] Their findings suggest the increased enforceability was associated with lower mobility—or job switching rate—of inventors (roughly, employees who are patent holders). However, a 2019 study by Carlino exploited the same legislative event to investigate the effect of NCA enforceability on startups and job creation.[141] Based on a difference-in-differences analysis, he found that an increase in NCA enforceability had a small effect to none-at-all on startups, and a very small, if positive, effect on job creation.[142]

*Third*, a 2020 paper by Barnett and Sichelman in the University of Chicago Law Review reviews ambiguities and limitations (including plain errors) in the NCA innovation literature in detail.[143] One of its key observations is that almost none of the relevant studies has a causal design; that is, the studies that employ cross-sectional regressions cannot be said to show that changes in NCA enforceability *cause* the observed effects.[144] We do not recapitulate their article here, but we commend it to the Commission as another important commentary on the available literature. We note, specifically, as we discuss in Section I.B.3, *infra*, their observation that several of the event studies

---

[138] Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, Working Paper (September 7, 2022), *available at* https://ssrn.com/abstract=3040393.

[139] *Id.* at 1. Jeffers also found decreased entry.

[140] Matt Marx, Deborah Strumsky, and Lee Fleming, *Mobility, Skills, and the Michigan Non-compete Experiment*, 55 MGMT SCI 875 (2009) [hereinafter Marx, et al., 2009].

[141] Gerald Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, Fed. Res. Bank of Philadelphia Working Paper #17-30 (2017) (comparing Michigan with both an all-states control group and with 10 states with statutory limits on NCA enforcement both before and after the Michigan change).

[142] *Id.* at 16, 20.

[143] *See* Barnett & Sichelman, *supra* note 52.

[144] *Id.* at 1010. ("The simplification of these doctrinal complexities in the Marx et al. study renders that study's key assumption—namely, that nonenforcing states always apply their own law—flawed, and thus confounds its causal identification strategy.")

cited by the NPRM depend on oversimple, and in some regards erroneous, readings of Michigan law.[145]

We do not suggest that any specific mixed or positive findings be considered definitive. Rather, the piecemeal, mixed, and in some regards infirm findings might be considered suggestive as to some of the impact of NCAs on factors associated with innovation, but they cannot be considered adequate grounds for the general conclusion that "non-compete clauses decrease innovation"; certainly, they are inadequate if they are to be considered a significant plank in the justification of a sweeping federal ban on NCA usage.

### B.   The Existing Event Studies Depend on Eccentric Events and Their Results Are Not Sufficiently Generalizable

The NPRM notes the importance of event studies —"'natural experiments' resulting from changes in state law"—to assess *the effect* of changes in state law on earnings.[146] According to the NPRM, "[t]he use of a natural experiment allows for the inference of causal effects, since the likelihood that other variables are driving the outcomes is minimal."[147] That observation should be subject to significant qualification, but we agree that event studies *can* support causal inferences and that, broadly speaking, they represent an important means of investigating the economic implications of policy changes.

However, as Starr and others have noted, observable variation in NCA law had long been limited, myriad subtle differences across the states notwithstanding. Workshop panelists and others have noted the difficulty of estimating the causal impact of NCA use, due in part to a dearth of exogenous variation.[148] As Bishara and Starr put it in 2016, "very few states have significantly changed their noncompete policies in the last 30 years."[149] More recent changes in state NCA law may be more significant. In the past several years, nine states and the District of Columbia have adopted income- or wage-based limits on NCA enforcement.[150] These may yield data for informative event studies without the artifice of "enforceability" measurement, but the studies cited in the NPRM predate

---

[145] *Id.* at 1018 ("Marx et al., however, overlook this complexity and erroneously assume that nonenforcing states always apply their own law so as to void a noncompete agreement that falls under the law of another state.").

[146] NPRM at 3486.

[147] *Id.*

[148] *See, e.g.,* FTC 2020 NCA Workshop, Evan Starr, Tr. at 173.

[149] Bishara & Starr, *supra* note 2, at 537.

[150] Since 2019, five states (Maine, Maryland, New Hampshire, Rhode Island, and Virginia have adopted statutes preventing enforcement of NCAs against low-wage workers; and since 2020, four states (Colorado, Illinois, Oregon, and Washington) and the District of Columbia have adopted similar limits pertaining to middle-income (to mid-plus) workers. For a recent overview of state NCA laws, see, e.g., Beck, *supra* note 18. The NPRM's examples of event studies mostly concern estimates of relative "enforceability" across many, and often subtle or ambiguous, changes in state laws, instead of studies that focus on unique, major changes in NCA law. It's not at all clear that these are properly regarded as event studies, but, in any case, as we discuss in detail below, they rest on a soft and problematic metric for legal change.

these statutory changes. Without such changes, the many, highly varied, and mostly subtler legal changes that had been available constrain the likely generalizability of existing NCA event studies. As McAdams observed, "the more credible empirical studies tend to be narrow in scope, focusing on a limited number of specific occupations (e.g., executives) or potentially idiosyncratic policy changes with uncertain and hard-to-quantify generalizability (e.g., banning non-competes for technology workers in Hawaii)."[151]

### *I. Hawaii changed more than NCAs but only for a small number of tech workers*

The Hawaii technology workers study, Balasubramanian, et al., is in many regards well designed and well executed. It exploits a 2015 statutory event in Hawaii to study the effect of NCA enforceability changes on employee wages and mobility.[152] The authors "find that Hawaii's 2015 CNC ban increased new-hire monthly earnings by 4.2 percent, while overall (that is, all worker average) monthly earnings rose 0.7 percent."[153] Supplementing their initial Hawaii analysis with a cross-state analysis, they find that "eight years after starting a job in an average enforceability state, technology workers have about 8 percent fewer jobs and 4.6 percent lower cumulative earnings relative to equivalent workers starting in a nonenforcing state [NCA]."[154] They suggest that their results are consistent with the notion of a significant lock-in effect associated with NCAs. The finding could be especially significant, as the results suggest that the NCA enforcement effects are not confined to low-wage workers.

At the same time, the study seems to illustrate all of McAdams's general concerns about "the more credible empirical studies."[155] Regarding workers' occupations, the authors correctly observe that the relevant statutory change pertained to the tech sector, or "an employee of a technology business."[156] And the statute established that NCAs for tech workers "shall be void and of no force and effect."[157] But there are several wrinkles here.

*First*, the statute did not so neatly address tech workers. Under the Hawaii statute, tech workers do not include employees of "any trade or business that is considered by standard practice as part of the broadcast industry or any telecommunications carrier."[158] That is, the statute covered tech workers, but not those in the telecom or broadcast industries, or, indeed, any tech workers employed by

---

[151] McAdams, *supra* note 4, at 4.

[152] *See* Balasubramanian, et al, *supra* note 91.

[153] *Id.* at S351.

[154] *Id.* at S349.

[155] McAdams, *supra* note 4, at 4.

[156] Haw. Rev. Stat. § 480-4(d) (2021).

[157] *Id.*

[158] *Id.*

any firm "other than a trade or business that derives the majority of its gross income from the sale or license of products or services resulting from its software development or information technology development."[159] Administrative assistants at tech firms were in, but, say, programmers in telecom, government, education, transportation, or health care were out.

*Second*, as the authors acknowledge, the occupational definition was not the law's only idiosyncrasy. The legislation did not simply apply to NCAs. Rather, it restricted a "noncompete clause or a non-solicit clause in any employment contract."[160] Given sufficient state law variation, that wrinkle could be a feature rather than a bug: post-employment restrictions often are bundled,[161] and one might like to study the effects of changes in the law bearing on the various elements of the bundle, jointly and severally. Given the current levels of variation across state laws, it is a limitation.

*In addition*, it's unclear how much of a change the law effected, even for tech workers (as defined), and for NCAs and non-solicit clauses. As the authors acknowledge, the statute was not retroactive;[162] that is, it would apply to new employment agreements, going forward from the effective date, but not to those already in effect. Workers already covered by NCAS were still covered. Moreover, prior to the statutory change, Hawaii NCAs already were subject to "a reasonableness analysis."[163] NCAs could easily fail Hawaii's reasonableness test, as Hawaii courts had considered "the benefits to the employer from noncompete or nonsolicit agreements" to duplicate those of trade secret law, and hence "impose undue hardship upon employees of technology business and the Hawaii economy."[164]

*Finally*, we might wonder whether the Hawaii tech sector (as defined under Hawaii law) is representative of tech sectors in other states. Hawaii is a very small state, with a total population (not just its workforce) numbering approximately 1.4 million (approximately 1.36 million in 2010, and approximately 1.44 million in 2022).[165] And Hawaii does not appear to have a vibrant tech sector, even relative to its small size. One source suggests that there is not a single tech firm among the 100 largest employers in Hawaii.[166]

---

[159] *Id.*

[160] *Id.*

[161] FTC 2020 NCA Workshop, Orly Lobel, Tr. at 10; *id.*, Evan Starr, Tr. at 172-73 (regarding NCAs, non-disclosure, non-solicitation of clients, non-solicitation of co-workers, IP-assignment terms, "most firms... are using all of these provisions together.").

[162] Balasubramanian, et al, *supra* note 91, at S353, n. 9.

[163] *Technicolor, Inc v. Traeger*, 551 P.2d 163 (1976).

[164] *Id.*

[165] *Quick Facts, Hawaii*, US Census Bureau (last visited Apr. 12, 2023), https://www.census.gov/quickfacts/HI.

[166] Chris Kolmar, *100 Largest Employers in Hawaii for 2022*, Zippia (June 2021), https://www.zippia.com/advice/largest-companies-in-hawaii.

In sum, we have a key legislative event that pertains to one industry (not necessarily one occupational category), on an idiosyncratic definition of that industry; the legal change did not apply exclusively to NCAs, it did not apply retroactively to existing NCAs, and it changed the enforceability of NCAs relative to an uncertain, but apparently somewhat stringent, standard of reasonability. It did so in a very small state, where the workforce included some tech workers, but no significant tech industry to speak of. The authors responsibly acknowledge a few of these idiosyncrasies, and their potential to raise "concerns about generalizability."[167] But that seems to put it mildly. It's entirely unclear whether observations that turn on Hawaii's 2015 NCA legislation can be generalized at all, whether to a potential ban on NCA usage, to changes in NCA enforceability that apply beyond the tech industry, or to potential changes in enforceability pertaining to either the tech industry or tech workers anywhere outside Hawaii. To its credit the FTC, likewise, acknowledges the concern about generalizability.[168] At the same time, the Commission seems comfortable making a "preliminary finding" of estimated wage effects across the nation, occupations, and industries based on a "back-of-the-envelope" extrapolation from unpublished findings regarding an idiosyncratic statutory reform in a state with a very small workforce and – even given the state's small size – a relatively small tech industry.[169] Picking the mid-point of this back-of-the-envelope range estimate does not make the Commission's preliminary estimate "conservative," but highly speculative. Respectfully, this does not seem suitable as an estimated effect for a Proposed Rule that would regulate tens of millions of labor agreements.

> 2. *Oregon banned NCAs for hourly and low-wage workers during the depths of the Great Recession which muddies general applicability*

A 2019 paper by Lipsitz and Starr exploits a 2008 statutory change in Oregon's NCA law that "banned [NCAs] for hourly and low-wage workers."[170] The Oregon statutory change, like the Hawaii legislation discussed above, is of interest in part because relatively little of the considerable state-by-state variation in NCA laws has to do with the simple binary question whether, for some tranche of the workforce, NCAs are or are not enforceable in court. And Oregon seems in several regards less of an outlier than Hawaii. First, it's a substantially larger state;[171] and second, a statutory change focused on hourly and low-wage workers may be more generalizable than one that applies to an eccentric segment of the tech industry in a state lacking a significant tech industry. Looking

---

[167] Balasubramanian, et al, *supra* note 91, at S351.

[168] NPRM at 3523 ("Caution is recommended in interpreting this extrapolation, however, since results from one sector within one state may not necessarily inform outcomes that would occur in the rest of the country.").

[169] *Id.* ("Extrapolating from the estimates for Hawaii to the average impact on high-tech workers in each state, a prohibition such as the one in this proposed rule would increase earnings of high-tech workers in the average state by 4.8%.").

[170] *See* Lipsitz & Starr, *supra* note 91, at 162.

[171] *State Population Totals and Components of Change*, US CENSUS BUREAU, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html#v2022 (estimating Oregon's population at 4,237,291 as of July 1, 2020).

specifically at hourly workers and comparing observed changes in Oregon against several groups of control states, Lipsitz and Starr find that, "on average, banning... [NCAs] increased the earnings of hourly workers [in Oregon] by 2-3%, with stronger effects for those in jobs most likely to sign... [NCAs], while raising monthly job-to-job mobility by 17%."

Those are significant effects but, as McAdams notes, the study is subject to potentially confounding factors.

*First*, Oregon's 2008 statutory change coincided with the beginning of "the Great Recession"; that is, with the most significant recession since the Great Depression of 1929-39.[172] McAdams also observes that "[r]esearch on regional recessions finds that the timing of recessions (both the onset and recovery) differs across states," including states in the same census region.[173] Hence, the timing of the statutory change may be regarded as "unfortunate," from a research perspective. Indeed, it

> raises the possibility that the paper's estimated effects are confounded by macroeconomic factors that—similar to [NCAs]—also influence wage growth and worker mobility, as well as by the differential policy responses by states. Indeed, in Lipsitz and Starr (2019), the mobility of workers in Oregon increased (relative to control states) soon after the ban took force in 2008, but average wages did not increase until a full three years post-ban (in 2011). Actual (or threatened) worker mobility is an important channel through which we expect workers to achieve wage growth in Oregon after its ban on non-competes. The fact that Oregon saw an increase in mobility without an increase in average wages raises the possibility that there are confounding factors at play.[174]

*Second*, as with Hawaii, we might question the extent to which the 2008 statute changed the state's law regarding NCAs and low-wage workers. Lipsitz and Starr state that they examine low-wage workers specifically to "focus our empirical analysis on the subset of workers for whom NCAs [NCAs] were enforceable before 2008, but were clearly voidable after 2008."[175] But Lipsitz and Starr themselves note that the NCA restrictions were not retroactive.[176] Hence, low-wage workers who did not change jobs were not among the subset of workers against whom NCAs were enforceable before 2008 but not after, at least not until a post-2008 change of jobs. And as with Hawaii, there were certain other wrinkles in the state law. Exceptions to the employees covered by Oregon's NCA limits included not just professionals—or persons "engaged in administrative, executive or professional

---

[172] McAdams, *supra* note 4 at 17.

[173] *Id.* at n. 34 (citing James D. Hamilton & Michael T. Owyang, *The Propagation of Regional Recessions*, 94 REV. ECON. AND STATS. 935 (2012)).

[174] McAdams, *supra* note 4, at 17-18 (internal citations omitted).

[175] Lipsitz & Starr, *supra* note 91, at 148.

[176] *Id.* at 147 (stating that the law brought about "dramatic changes to Oregon's policy on NCAs, effective January 1, 2008 for new contracts" (pre-existing contracts were governed by the old law)).

work who: (a) Performs predominantly intellectual, managerial or creative tasks; (b) Exercises discretion and independent judgment; and (c) Earns a salary and is paid on a salary basis,"[177] and *inter alia*, federal employees at any wage level,[178] various agricultural workers, including those paid on a piece-rate,[179] and a person "principally engaged in the range production of livestock and earns a salary and is paid on a salary basis,"[180] persons "employed in domestic service on a casual basis in or about a family home,"[181] and persons "engaged in the capacity of an outside salesperson or taxicab operator."[182]

*In addition*, the authors, citing a 2008 law review article by Rassas, note that, pre-2008 Oregon NCAs were subject to a reasonability test, involving "criteria meant to ensure that legitimate business interests were being protected without unduly harming workers."[183] That, of course, raises the question of the extent to which Oregon courts, prior to 2008, found NCAs for low-wage workers to serve legitimate business interest without harm to those workers.

The law review article they cite provides no objective measure, but it plainly suggests that Oregon courts, and indeed Oregon statutory law, were skeptical of NCAs prior to 2008. As Rassas observed,

> The former Oregon statute attempted to balance competing interests of the employee and employer by mostly "codify[ing] the basic common law rules" of reasonableness. Oregon courts imposed additional requirements for enforcement, tipping the balance in favor of the employee's interest in mobility....
>
> Oregon statutory law mandated that non-competes in any industry were void unless "entered into upon the: (a) [i]nitial employment of the employee with the employer; or (b) [s]ubsequent bona fide advancement of the employee with the employer."[184]

Statutory limits on NCAs in Oregon had been in place, undergoing piecemeal changes, since 1977.[185] Reviewing the case law, Rassas emphasizes that "Oregon courts did not take these

---

[177] Or. Rev. Stat. § 653.020(3).

[178] *Id.* at 653.020(4).

[179] *Id.* at 653.020(1)(a)-(d).

[180] *Id.* 653.020(1)(e).

[181] *Id.* at 653.020(2).

[182] *Id.* at 653.020(6).

[183] *Id.*

[184] Melissa Ilyse Rassas, *Explaining the Outlier: Oregon's New Non-Compete Agreement Law & the Broadcasting Industry*, 11 U. PA. J. BUS. L. 452-3 (2009) (internal citations omitted).

[185] Elizabeth H. White & Jonathan G. Rue, *Effective Use of Non-solicitation and Confidentiality Agreements in Oregon after S.B. 169*, K & L GATES HUB (Apr. 1, 2022), https://www.klgates.com/Effective-Use-of-Non-Solicitation-and-Confidentiality-Agreements-in-Oregon-After-SB-169-4-1-2022.

requirements lightly."[186] They imposed, among other things, both geographic and temporal limits on NCAs, which they deemed "'covenant[s] in restraint of trade,' the enforcement of which generally runs counter to public policy."[187] In addition, decisions by federal courts in the Ninth Circuit reinforced the substance of Oregon's statutory restrictions on NCAs. For example, in *Nike, Inc. v. McCarthy*, the Ninth Circuit found it…

> apparent that the legislature intended to permit employers to require existing employees to agree to a noncompete agreement, so long as the employee's job content and responsibilities materially increased and the employee's status within the company likewise improved.    Otherwise, the employer would merely be imposing a new condition for the "same job."   Id. Thus, an advancement would ordinarily include such elements as new, more responsible duties, different reporting relationships, a change in title and higher pay.[188]

And in *Ikon Office Solutions, Inc. v. Am. Office Prods., Inc.*, a federal district court held that, "[u]nder Oregon law, the right not to be subjected to a non-competition agreement, except as authorized… is an 'important employment-related statutory right.'"[189]

We do not argue that Oregon's 2008 legislation was inframarginal in its effects, or that it did not increase the cost of enforcement of NCAs for at least some employers of low-income workers.[190] Rather, given the statutory idiosyncrasies, and the complex pre-2008 restrictions, the magnitude of the change (on any clear measure) is uncertain. Indeed, it is not at all apparent that it represented a major change for hourly and low-income workers. For those reasons, and the confounding timing of the statutory change at issue and the Great Recession, it is not at all clear how the magnitude of Oregon's 2008 change in enforceability compares—or should be compared—with the disparate legal changes observed in control states.

We can ask a further question. When measuring or ordering the relative enforceability of state NCA laws, how should we assess, e.g., restrictions pertaining to a specific occupation (such as, e.g., tech industry employees in Hawaii) relative to those pertaining to, e.g., a certain income level, given that the specifics of the statutes vary? We might consider the percentage of the state's workforce fitting a categorical restriction under state law, the percentage actually or likely covered by NCAs, or various

---

[186] Rassas, *supra* note 184, at 453.

[187] *Id.* (internal citations omitted).

[188] *Nike, Inc. v. McCarthy*, 379 F.3d 576 (9ᵗʰ Cir. 2004).

[189] *Ikon Office Solutions, Inc. v. Am Office Prods., Inc.*, 178 F. Supp. 2d 1154, 1160 (D. Or. 2001) (quoting *Dymock v. Norwest Safety Protective Equip. for Oregon Indus., Inc.*, 172 Or. App. 399, 405-06 (2001)) (expounding the bounds of Oregon noncompetition law).

[190] *See* M. Scott McDonald and Jacqueline C. Johnson, *Across the Board: Changes Are in the Works for Noncompete Agreements*, LITTLER MENDELSON, PC (Aug. 2007), https://www.littler.com/files/press/pdf/17022.pdf (noting that the 2008 bill took "a hard (and more complex) stance on noncompetes").

other measures, and we might consider the domain of the restriction somehow normalized according to, e.g., the stringency of limitation. There is no objectively correct way to do this, but one or another means might be more or less useful for economic or antitrust analysis; and, in any case, we might want to know how it is being done within any given study and across the "enforceability" literature.[191]

### 3. Michigan's statutory changes were not a clear switch from unenforceable to enforceable and back again

Several papers exploit 2005 statutory changes in Michigan—the Michigan Antitrust Reform Act ("MARA")[192]—with or without a subsequent amendment in 2007, to investigate the impact of NCA enforceability on worker mobility, especially as it relates to innovation. MARA—perhaps inadvertently, increased the enforceability of NCAs. Marx, et al. 2009[193] found that the increased NCA enforceability permitted by MARA reduced the mobility—or job switching rate—of inventors; that is, roughly, employees who were patent holders. In a follow-up study, Marx, et al. 2015[194] found what might be viewed as a "brain drain":

> from Michigan to non-enforcing states following the... policy reversal: during a symmetric window from 1975-1996 surrounding [the change], the rate of emigration to non-enforcing states grew in Michigan (0.24%-0.32%) while dropping in states that did not enforce non-competes. The relative risk of post[change] emigration was 1.35 in Michigan, twice as high as in states that continued not to enforce non-competes.[195]

Barnett and Sichelman demonstrate in detail that these studies evidence significant problems in both data and analysis.[196] A central concern has to do with the legal analysis underlying the assessments of changes in enforceability. Marx, et al. (2009)[197] and Marx, et al. (2015)[198] both suppose that NCAs were generally unenforceable, prior to MARA's enactment in 2005, under a statute providing that "[a]ll agreements and contracts by which any person...agrees not to engage in any avocation or employment...are hereby declared to be against public policy and illegal and void."[199] They also argue—not without evidence—that MARA's repeal of Public Act 329 was inadvertent. They also note a 2007 statutory amendment to the pertinent provision of MARA, which represented its

---

[191] See also notes 167 & 168, supra, and accompanying text.

[192] Michigan Antitrust Reform Act § 18, MCL § 445.788.

[193] Marx, et al., 2009, supra note 140.

[194] Matt Marx, Jasmit Singh & Lee Fleming, Regional Disadvantage? Employee Non-compete Agreements and Brain Drain, 44 RES. POL'Y 394 (2015) [hereinafter Marx, et al., 2015].

[195] Id. at 397.

[196] See Barnett & Sichelman, supra note 52.

[197] Marx, et al., 2009, supra note 140 at 875.

[198] Marx, et al., 2015, supra note 194, at 394.

[199] Mich. Public Act No. 329 of 190 (Michigan Antitrust Reform Act § 18, MCL § 445.788.)

retrenchment (not rescission).[200] Specifically, the 2007 amendment added a "reasonableness doctrine" that "did not reinstate the previous ban."[201]

Neither event was quite what the research supposed. As Barnett and Sichelman explain, the assumption that NCAs were unenforceable in Michigan prior to 1985, but generally enforceable from 1985-87,[202] seems to misread the law. Prior to 2005, Michigan courts might uphold NCA terms or approve changes of venue due to, e.g., choice-of-law provisions in the NCAs or the larger employment agreements within which they were situated. Perhaps more important, the authors of the Michigan studies

> appear to overlook that MARA included a "savings clause" that provided that the statute repealed by MARA would "remain in force for the purpose" of enforcing any liability under the repealed act. Consistent with the saving clause, Michigan courts declined to enforce NCAs that were entered into prior to MARA.[203]

That savings clause has implications for both the 2005 and 2007 events. The 2005 adoption of MARA had no bearing on NCAs entered-into prior to the law's enactment and, hence, no bearing on employees actually or putatively subject to NCAs before 2005. Multi-state firms with strong incentives to employ NCA terms would have had a natural incentive to use choice-of-law provisions to impose or maintain those terms in Michigan pre-2005. The studies assume that California's relatively recent decisions disfavoring the application of such choice-of-law clauses to NCAs in California represent the general case, but, as Barnett and Sichelman demonstrate, it does not.[204] Moreover, operative NCAs would have included not just employees subject to extra-Michigan NCAs, but some employees whose employment agreement documents pre-2005 included NCA terms, even if, for those employees, the terms were, at least arguably, unenforceable under Michigan's prior law. As the NPRM notes, and as several authorities have observed, employment agreements commonly contain NCA terms, even in states where such terms are unenforceable; and NCAs are common in engineering and other technical occupations. There are also questions when, to what extent, and on what

---

[200] *Id.* at 445.774a(2).

[201] Marx, et al., 2015, *supra* note 194, at 396.

[202] Barnett & Sichelman, *supra* note 52, at 1022. Marx, et al., 2015 *supra* note 194, at 395, cites as the "governing case," *Application Group Inc. v. Hunter Group Inc.*, 72 CAL. RPTR. 2d 73 (1st Distr. 1998).

[203] Barnett & Sichelman, *supra* note 149, at 1022 (citing *Compton v. Joseph Lepak, D.D.S., P.C.*, 397 N.W.2d 311, 316 (Mich. Ct. App. 1986) ("When an agreement or contract is entered into in violation of the statute, repeal of that statute does not make the agreement valid because the Legislature cannot validate a contract which never had a legal existence.").

[204] *See* Barnett & Sichelman, *supra* note 52, at 1018. Bishara cites *Edwards v. Arthur Anderson, LLP*, 189 P.3d 285 (Cal. 2008) for the proposition that California courts have a strong public policy interest in upholding California NCA law). *See* Norman Bishara, *Fifty Ways to Leave Your Employer, supra* note 58, at 757. *But see, e.g., In re Howmedica Osteonics Corp*, 867 F.3d 390 (3d Cir. 2017) (upholding forum selection clauses specifying New Jersey and Michigan jurisdiction for suit to enforce NCAs against two California residents).

terms, the 2005 policy change fostered the negotiation (or imposition) of NCAs on tech professionals whose employment remained unchanged from 2005-07.

The savings clause also has implications for Michigan's 2007 policy reform, beyond whatever retrenchment was accomplished by the savings clause post-2007. Because the 2005 policy change was smaller than the studies suppose, the effect of its 2007 retrenchment was also smaller than the studies suppose. As noted by Barnett and Sichelman, errors and ambiguities in assessing the magnitude of legal changes are especially salient for the Marx et al. [2015] study (as well as a 2009 study by Marx and others), given the relatively small decrease, in absolute terms, in labor mobility observed in Michigan. The 2009 Marx et al. study considers 98,468 inventors and 27,478 inventor moves within Michigan over the period 1963-2006. In absolute terms, labor mobility increased post-MARA over the full time period from 7.18% to 8.98%, although other "non-enforcing" states saw a larger increase, from 7.95% to 10.80%.[205]

> While the Marx, et al. studies never report these differences in absolute numbers, they are easy to calculate. Specifically, the difference of in-state mobility in Michigan versus non-enforcing states in absolute terms was roughly 1%, equating to an absolute difference of about 100-200 moves per year purportedly lost within Michigan due to the enforcement of noncompetes. For inventors moving out of Michigan, the numbers are much lower.[206]

In brief, errors and uncertainty in assessing legal changes in Michigan and in control states takes on an outsize import given the small number of job changes potentially attributable to the Michigan statutory change.[207]

One might suppose that such misinterpretations of the law represent "mere" coding errors, and that such errors are occasional (and sometimes minor or debatable), adding some degree of random error, and hence noise, to signals of the economic impact of policy changes, while leaving findings directionally—and approximately—intact. But the Michigan case should remind us that, with small numbers of observations and/or small effects, recoding might well render previously observed effects statistically insignificant or nil. As we have seen above, such coding issues seem significant across key event studies in the literature, rather than outlier events. And as we discuss in Section III.D below, such issues point to fundamental questions about the meaning and reliability of the "enforceability" metric on which so many studies—and the Commission's conclusions—rely.

---

[205] *See* Barnett & Sichelman, *supra* note 52, at 1021.

[206] *Id.*

[207] Needless to say, it is highly unlikely that all tech professional job changes in the pertinent interval were caused by the change in NCA enforceability.

### 4. *California is not a clean event study due to California's unique attributes*

Policy discussions of NCAs often look to Gilson's 1999 paper,[208] and a few follow-on cross-sectional studies, suggesting that California's hostility to the enforcement of NCAs helps explain the rise of Silicon Valley and what's taken to be the fall to tech innovation in Massachusetts.[209] Barnett and Sichelman dissect these arguments with some care, and we commend their discussion to the Commission, even as aspects of Gilson's comparison now seem dated.[210] Gilson's account is interesting, but in scientific terms, the Silicon Valley/Rt. 128 comparison seems more of a "just-so story," than an empirical vindication of any specific theory about NCAs. At best, it is an existence proof for the claim that relatively stringent limits on the private enforcement of NCAs can, under some facts and circumstances, co-exist with vibrant tech innovation. But that proposition is not much at issue.

California *would* present an especially difficult case for an event study, not least because of timing questions. California's NCA policy is anchored by a provision in the state's Business and Professions Code from 1941,[211] and that provision has both statutory and case law roots dating to the 19th Century.[212] Data problems for a credible event study abound, and not just because key events in the state's growth—as a center of innovation and otherwise—are hard to tie to any specific legal events regarding NCAs.

## C. Because There is No Objective Measure of "Enforceability," Many of the Causal Studies Contain a Fatal Methodological Weakness

As we noted above, the Commission is well-positioned to contribute to the further development of economic research regarding NCAs and, specifically, to the further application of Industrial Organization economics to research on NCAs and labor market competition. A critical synthesis of the relevant hearings and FTC workshops could contribute to policy debates involving NCAs in

---

[208] Ronald Gilson, *The Legal Infrastructure of High-Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. REV. 575, 578-9, (1999).

[209] *See, e.g.*, Lina Khan, *Noncompetes Depress Wages and Kill Innovation*, N.Y. TIMES (Jan. 9, 2023), https://www.nytimes.com/2023/01/09/opinion/linakhan-ftc-noncompete.html; FTC 2020 NCA Workshop, Orly Lobel, Tr. at 15, 22; Starr, Tr. at 168.

[210] *See* Barnett & Sichelman, *supra* note 52. *See also*, Russell Beck, *Correlation Does Not Imply Causation: The False Case of Silicon Valley and Boston's Route*, FAIR COMPETITION LAW (Jul. 9, 2019), https://faircompetitionlaw.com/2019/07/09/correlation-does-not-imply-causation-the-false-comparison-of-silicon-valley-and-bostons-route-128.

[211] California law provides that "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. California statutes also provide an exception for NCAs for a person selling ownership interest in a business, the assets of a business, or the goodwill of a business. Cal. Bus. & Prof. Code § 16600.

[212] *See, e.g.*, *City Carpet Beating Works v. Jones*, 102 Cal. 506 (Cal. 1894) (*citing* Cal. Civil Code §§ 1673, 1674).

Congress and in the states.[213] Additional studies, and the development of better data sources—perhaps in cooperation with the Department of Labor—are well within the staff's competence, and these too could better inform policymaking and state and federal law enforcement. Moreover, the Commission is well-positioned to help develop the antitrust case law where NCAs and related vertical restrictions on labor agreements demonstrably harm competition and consumers. These tasks are potentially important; they are tractable, given the Commission's resources, including its human capital; and they fit well within the Commission's jurisdiction. They should precede, not follow, a proposed federal NCA regulation.

In the NPRM's account of the empirical evidence, the Commission notes that:

> The belief that studies of non-compete clause use do not reflect causal estimates is shared by the authors of at least one of the studies of non-compete clause use. As noted in Starr et al., "Our analysis of the relationships between noncompete use and labor market outcomes... is best taken as descriptive and should not be interpreted causally." As a result, the Commission gives these studies minimal weight.[214]

We agree that it is important to distinguish between correlation and causation. That is not to say that none of the non-causal studies is suggestive, but we note that the studies to which the Commission ascribes "minimal weight" constitute a significant portion of the available literature. Central to much of the literature—including most of the papers the Commission seems to consider causal—examine the putative effects of NCA "enforceability," or of changes in levels of enforceability, under state law.

On the surface, there is some intuitive appeal to this approach for several reasons. For one, there is survey evidence on the incidence of NCA usage within and across states, but little evidence on the individuals bound by (or perceived to be bound by) NCAs, so it is difficult to study the impact of NCA usage directly. Second, one might suppose that evidence on the effect of various policies (and policy changes) bears directly on the question what legal policy, if any, to impose. Third, at a high level of abstraction, we might have an intuitive sense that some regulations are more stringent than others, and that some jurisdictions are more (or less) plaintiff friendly, whether with regard to NCAs specifically or across most civil suits. For example, it seems plain enough that the decisions of California courts, applying California Business and Professions Code Section 16600, recognize a

---

[213] For an example of a current legislative proposal, see, e.g., S.379—Freedom to Compete Act of 2023, 118th Cong. (2023-24) (which would amend the Fair Labor Standards Act to prevent the use of NCAs in employment contracts for certain non-exempt employees).

[214] NPRM at 3487 (citing Starr, Prescott & Bishara, supra note 54).

stringent restriction on a plaintiff firm's ability to enforce the terms of an NCA against an employee.[215] Hence, we can think of California as a "low enforceability" state.

However, there is no objective measure of "enforceability," and, hence, no established metric with which to detect or approximate such a measure. And if we seek to unpack the notion of enforceability, as prologue to identifying or formulating a useful metric, it seems clear that any number of factors or end points might be relevant to our high-level intuition. For example, we might be interested in the cost (average, median, or modal) of litigating an NCA dispute to its conclusion; we might be interested in the ratio of plaintiff to defendant success in litigating such cases to their conclusion; we might be interested in the frequency with which NCA claims are filed and, if filed, settled or, in the alternative, survive, e.g., motions to dismiss for failure to state a claim or motions for summary judgement. We might also be interested in the way the law—and these various factors—affect not just the incidence of NCAs in a state, but the distribution and terms of those NCAs (or the terms of those NCAs employers seek to enforce). These are all related factors, but they are not equivalent, and, *a priori*, there is no obvious set of them, or weighted sum of them, that is best for all (or any specific) policy purposes.

Given the centrality of "enforceability" to the Commission's empirical brief for regulation, the underlying enforceability metrics and measurements deserve serious scrutiny. Before turning to the specifics of the scoring tools employed in the various NCA studies, we note that the cited studies of enforceability do not use the same metric, even if many of them share some basic assumptions or sources.

The Commission observes that the various studies are based on Malsberger's treatise, *Non-compete Clauses: A State by State Survey*, with some augmented by the 50-state survey conducted by Russell Beck.[216] The Commission also suggests that, while the "studies have defined enforceability of non-compete clauses in slightly different ways, each uses enforceability as a proxy for the chance that a given noncompete clause will be enforced."[217] It is not at all clear that the claim is correct. That is, at least most of the studies appear to lack any express claim about that proxy, and it is not at clear that anyone has ever investigated empirically the link between such measures and such a likelihood. Perhaps it is simply the ratio of suits (perhaps successful) to employees (putatively?) bound by NCAs, or perhaps the likelihood that an NCA will be enforced, conditional on, perhaps an (arguably)

---

[215] California law provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. It also provides for an exception for NCAs for a person selling ownership interest in a business, the assets of a business, or the goodwill of a business. Cal. Bus. & Prof. Code § 16600.

[216] NPRM at 3486, n. 62 (*citing* BRIAN M. MALSBERGER, ET AL., *COVENANTS NOT TO COMPETE: A STATE-BY-STATE SURVEY*, BLOOMBERG BNA (2012) and Beck, *supra* note 18. An earlier version of the Malsberger survey was P. JEROME RICHEY, BRIAN M. MALSBERGER, COVENANTS NOT TO COMPETE, A STATE-BY-STATE SURVEY (1990 & Cum. Supp. 1991).

[217] *Id.* at 3486.

covered employee's departure to subsequent employment, or perhaps the employee's departure to a competing employer.... What is more, the differences in measurement approaches are not obviously trivial. Some of the key studies take pains to critique the way other (apparently key) studies seek to implement their assessments of enforceability.[218] Differences in the approach employed may be especially important when considering relatively small effects, relatively few observations, or analyses based on correlations that barely meet significance thresholds.

*Second*, the various approaches to measuring enforceability are all soft measures; that is, they depend on subjective judgments, and, indeed, on series of subjective judgments. Most of the relevant studies are based, to some extent, on a periodic 50-state review of NCA law by Malsberger and others, as well as a set of accompanying questions suggested to guide state-by-state assessments of NCA laws, as published.[219] For example, Bishara's 2011 study examines state statutory and, chiefly, decisional law regarding NCAs and, based on twelve criteria of enforceability identified by Malsberger, applies "seven questions because they directly address the legal issues relevant to measuring a given jurisdiction's intensity of noncompete enforcement."[220]

1. Is there a state statute of general application that governs the enforceability of covenants not to compete?"

2. What is an employer's protectable interest and how is that defined?"

3. What must plaintiff be able to show to prove the existence of an enforceable covenant not to compete?"

4. [numbered 3a by Bishara, but ranked separately] Does the signing of a covenant not to compete at the inception of the employment relationship provide sufficient consideration to support the covenant?"

5. [labeled 3b and 3c, and scored jointly] Will a change in the terms and conditions of employment provide sufficient consideration to support a covenant not to compete entered into after the employment relationship has begun?

6. Will continued employment provide sufficient consideration to support a covenant not to compete entered into after the employment relationship has begun? If the restrictions in the covenant not to compete are unenforceable because they are overbroad, are the courts permitted to modify the covenant to make the restrictions narrower and to make the covenant enforceable? If so, under what circumstances will the courts allow reduction and what form of reduction will the courts permit?"

---

[218] *See generally, e.g.,* Bishara & Starr, *supra* note 2.

[219] That is, as published in state codes and, to a lesser extent, in published judicial decisions. *See, e.g.,* Richey & Malsberger, *supra* note 216.

[220] Norman Bishara, *Fifty Ways to Leave Your Employer, supra* note 58, at 771.

7. [labeled 8] If the employer terminates the employment relationship, is the covenant enforceable?"[221]

The seven questions were applied to statutory and decisional provisions for each state, with each state receiving a score of zero, five, or ten in response to each question, and then an aggregate score that was a weighted sum of the individual response scores. For example, in applying Question 1,

a score of 10 was awarded to a state that has a statute that favors strong enforcement, a 5 was awarded to a state that either did not have a statute or had a statute that was neutral in its approach to enforcement and a 0 was given to a state that has a statute that disfavors enforcement. This question was given an overall weight of ten.[222]

By way of contrast, for question 3,

a score of 10 was awarded to a state that places a weak burden of proof on the plaintiff employer, a 5 was awarded to a state that has a balanced approach to the burden placed on the employer and a 0 was awarded to a state that places a strong burden of proof on the employer. This question was given an overall weight of 5.[223]

Bishara suggests that:

Ultimately, this research will present a subtle yet authoritative view of the development of noncompete enforcement and provide evidence of trends in enforcement, as well as give guidance for state policymakers, businesses, and employees when evaluating the pros and cons of negotiating and attempting to enforce a noncompete agreement.[224]

We assume that Malsberger's survey was based on a well-informed review of relevant legal materials. At the same time, the review was not comprehensive, and its identification and characterization of relevant holdings and statutory provisions are matters of subjective—if informed—legal judgment. That is, they are not objective measures. Similarly, the twelve factors of import are matters of subjective—if informed—legal judgment.

Building on that review, Bishara applies his own rubric, which includes the scoring scheme (0, 5, or 10), scoring (or coding) of provisions under that scheme, and weighting of the seven scores to enable a weighted sum for each state, and an ordering of the states according to those sums. Given each sum, the ordering is objective, but the rubric is not: the choice of scoring scheme and—critically—the

---

[221] *Id.* at 773-7. It's not clear whether or how answers to individual questions influenced each other. For example, would a given court holding on an employer's protectable interest be scored differently according to the state's statute of general application?

[222] *Id.* at 773.

[223] *Id.* at 775.

[224] *Id.*

scoring and weighting of provisions and holdings under that scheme are all matters of subjective judgement or intuition.

The problem is more than simply that any index is imperfect; the limited inputs and rubric makes it difficult for other scholars to investigate and compare different legal changes. It is worth comparing Bishara's rubric and index to an index like the World Economic Forum's Global Competitiveness Report, for example.[225] The Global Competitiveness Report comprises 12 "pillars," each of which aggregates multiple categories and explicit data points.[226] Any change in the index can be explicitly traced to a change in one of the data points or survey questions. Researchers can adjust weightings (but not the specified data points) as they see fit to test the robustness of the index. From there, researchers using the Global Competitiveness Report can debate whether the index is picking up appropriate policy and legal changes, so that causal estimates are properly identified using changes in the index. We discuss identification further in Section I.D, *infra*.

While Malsberger's identification of pertinent legal decisions and enforceability criteria reflect considered and informed legal judgment, they track a relatively limited amount of the variation observed in state law. Moreover, they are, as we have said, matters of subjective judgment; and we can find no evidence that the criteria (or questions) were ever tested against any specific outcomes. As noted above, it does not appear to be the case that anyone has investigated, empirically, the contention that the enforceability criteria serve as an effective (or accurate) proxy for the likelihood of litigation to enforce an NCA. And to unpack the "theory" of enforceability further, we might consider the varied litigation criteria we listed at the top of this section: there seems never to have been any investigation of the empirical relationship between, e.g., the presence or absence of a state law generally (on some level of generality) and, e.g., the incidence, duration, or cost of NCA enforcement cases litigated to their conclusion. We don't know specifically for what "enforceability" is a proxy, and we don't know how well it serves as a proxy measure for reasonable candidates.

The same can be said of Bishara's rubric and its implementation. Either or both might reflect considered legal judgment. They nonetheless represent subjective assessments; and again, we are unaware of any attempt at empirical assessment of the relationship between any of the individual scores, or the weighted sums of those scores, on any of the enforcement measures we listed at the top of this section. That is not to say that none of the scoring and ranking criteria signals anything of interest. It is, however, intended to underscore that the enforcement measures, (1) constitute a family of related schema, rather than any objective metrics, (2) it's not clear what indicia of relevance that the scores are supposed to function as proxies for, (3) all entail several stages of subjective judgment, and (4) that many other approaches may be available, and perhaps preferrable, for some area

---

[225] KLAUS SCHWAB, WORLD ECONOMIC FORUM GLOBAL COMPETITIVENESS REPORT 2019 (2019), *available at* https://www3.weforum.org/docs/WEF_TheGlobalCompetitivenessReport2019.pdf.

[226] *Id.* at 611-25.

of inquiry or other. We suspect that the combined econometric and legal expertise of the FTC's staff could improve upon these metrics, if tasked to do so.

The various measurement schema employed in the enforceability studies also recall our discussion, above, of the importance of coding to the reported results. The Hawaii, Oregon, and Michigan studies all exploited legal events that were in some regards idiosyncratic and in others simply misread. Hawaii presented an idiosyncratic legal change (bearing on both NCAs and non-solicit terms, for employees of certain tech firms but not others, with no application to existing NCAs), in an idiosyncratic context (a very small state lacking a significant tech sector). The Michigan studies, as discussed, seemed to depend upon readings and coding of a legislative event in Michigan that overstate the regards in which the event effected a change in the law, and perhaps in NCA. Oregon, too, involved a legal change that, while apparently non-trivial, may have affected less legal change than it seemed at first glance; and in any case, the Oregon event coincided with the onset of the Great Recession, which might well have been a confounding factor in assessing observed effects in Oregon against those in control states.

We might also wonder about the enforceability scale employed in the Hausman and Lavetti study of physician organization and health care services prices. That study exploits not a distinct legislative event, but "rich variation in the relevant legal environments" across the states, employing an enforceability rating scheme akin to the one in Bishara.[227] The single example of such changes discussed expressly in the article concerns a judicial decision in Louisiana:

> For example, in *Shreveport Bossier v. Bond* (2001) a Louisiana construction company attempted to enforce an NCA against a carpenter. The state Supreme Court ruled that the NCA could only prevent the carpenter from establishing a new business, but not from joining a pre-existing firm. This decision abruptly changed the law in the state, allowing all workers, including employed physicians, who had previously signed NCAs to escape the restrictions and move to other firms."[228]

This seems to imply that NCAs were generally (or at least typically) enforceable against employees moving to another firm as employees before the decision, but not after. In one regard, that would be simply erroneous. The decision in question, *SWAT 24 Shreveport Bossier v. Bond*,[229] did not change the law of the entire state of Louisiana; it resolved a circuit split.[230]

The extent to which the Louisiana Supreme Court decision changed the law, as read by courts in any of the state's circuits, is unclear. The decision was rendered against a backdrop of Louisiana's

---

[227] Hausman & Lavetti, *supra* note 93, at 263.

[228] *Id.*

[229] SWAT 24 Shreveport Bossier v. Bond, 808 So.2d 294 (La. 2001).

[230] *Id.* at 296, 307.

longstanding "public policy disfavoring noncompetition agreements between employers and employees."[231] Specifically, "[p]rior to the enactment of the first statutory prohibition of noncompetition agreements in 1934, Louisiana courts consistently held these agreements to be unenforceable."[232] Subsequent statutory amendments continued to restrict NCAs, but provided for certain exceptions under which NCAs would be enforceable. At issue in *SWAT 24* had been an exception established under a 1989 statutory amendment that did not expressly address NCAs and could be read narrowly or broadly. Under a narrow reading, a Louisiana court would not uphold an NCA if an employee left to work as an employee of another firm, but it might uphold the NCA if the employee left "to pursue his own competing business."[233] Under a broad reading, an NCA might be found valid even if the employee left to work, as an employee, of another firm. Louisiana's second circuit court of appeals had read the exception narrowly in the matter on appeal, and had done so in prior decisions,[234] but the state's fourth circuit read it more broadly in 1998, as did the third circuit in 1999.[235] The state Supreme Court sustained the narrow reading.

The *SWAT 24* decision describes other potentially relevant aspects of Louisiana law, but, plainly, firms suing to enforce NCAs in Louisiana were subject to significant statutory and decisional constraints prior to the circuit split. And while the third and fourth circuit decisions repudiated in *SWAT 24* did provide employers considerable latitude, this much seems clear, and as close to an objective reading of the law as one can get: the *SWAT 24* decision did not change authoritative reading of the law by courts in Louisiana's second circuit.

It is possible that this represents an isolated coding error in the assessments of enforceability employed by Hausman and Lavetti. *But it is an error in the sole legal example they discuss.* In conjunction with the more central errors underlying, e.g., the Michigan and Hawaii event studies, it highlights a more general issue about the measurement of complex changes in statutory and decisional law, as well as their coding.

First, the legal changes being coded do not occur in a vacuum; judicial decisions as well as statutory reforms are set within a larger legal context that tends to comprise preceding statutory law (where relevant provisions may or may not be confined to a specific chapter or section of state law) and a body of jurisprudence that may include unpublished decisions as well as published ones. And given

---

[231] *Id.* at 298 (citations omitted).

[232] *Id.* at 303.

[233] *Id.* at 303.

[234] *Id.* at 299 (citing Summit Inst. For Pulmonary Medicine & Rehabilitation, Inc. v. Prouty, 691 So.2d 1384 (La. App. 2 Cir. 1997).

[235] *Id.* at 300-1 (*citing Scariano Bros., Inc. v. Sullivan*, 719 So.2d 131 (La. App. 4 Cir. 1998) and *Moreno & Assocs. v. Black*, 741 So.2d 91 (La. App. 3 Cir. 1999).

that most of the legal changes that have been in evidence are relatively subtle ones, we should worry not just about random errors in coding—about noise—but about systematic errors.

Assessing a legal change by any measure may require familiarity with the body of law in that state. Experienced attorneys in the field—especially those experienced in the state in question—might well be accurate judges of the *directional* impact of a pertinent new statutory provision or authoritative decision on, say, the plaintiff's burden in seeking to enforce the terms of an NCA, likely dependent on specifying the sort of burden at issue and the terms and employment context of the NCA in question. We might assume that all of the systems would consider California's broad statutory limit on NCA enforcement to be a strong one, and that (nearly) all coders would code it as such. There remains the question how much the 1941 enactment of the specific provision of the California Business and Professions Code we see today changed the law in California, and in what respects, given antecedent California statutes and common law restrictions on NCAs dating to the 19th Century.[236]

Quantifying the change is another matter, and for most of the statutory changes that might be observed, one that depends more heavily on identifying both the specifics of the statutory provision and some specific effect, or endpoint—some specific dependent variable—on which the change is supposed to bear, as well as the terms and employment context of the NCAs at issue. Practiced attorneys may or may not have reliable intuitions about how to score such changes. The cruder the scale, the better their chances may be, but the cruder scales may not be much help in scoring or ordering the myriad policy variations one observes in NCA law. What's more, even with relatively crude scales, we have no evidence of the degree to which they may be reliable in one or another regard. Intuitive estimates of the relative effects of diverse changes across numerous states might be arbitrary or otherwise unreliable. And again, they have never been tested against any objective standard. The further we move from the best case—a licensed practicing attorney experienced in the employment law of a given state—the less confidence we might have in the ability of those reading, interpreting, and coding the law to estimate the magnitude of any specific change on any specific variable of interest. As we have seen, there seem to be plain and substantial errors at the level of reading and interpreting statutory and judicial reforms underlying key studies in the literature.

As we observed already, the endpoint (or dependent variable) of interest does not appear to have been specified in any of the "enforceability" studies. And the Commission's suggestion that, while the "studies have defined enforceability of non-compete clauses in slightly different ways, each uses

---

[236] California law provides that "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. It also provides for an exception for NCAs for a person selling ownership interest in a business, the assets of a business, or the goodwill of a business. Cal. Bus. & Prof. Code § 16600. Section 16600, in its present form, appears to date to 1941, but the provision has both statutory and common law roots extending into the 19th Century. *See, e.g.*, *City Carpet Beating Works v. Jones*, 102 Cal. 506 (Cal. 1894) (*citing* Cal. Civil Code §§ 1673, 1674).

enforceability as a proxy for the chance that a given noncompete clause will be enforced,"[237] is itself unclear: the likelihood of what specifically, given what (if any) attributes of an NCA and employment context? In brief, we are left with a search for one or several unspecified dependent variables, without any theory of legal change to identify the quantity of interest, much less to guide how we operationalize its measurement.

None of this proves that the various implementations of the Malsberger-based enforceability rating schema do not signal anything, but we have seen that it's not clear *what* they signal, or that they all signal the same thing. Again, there is no objective metric of "enforceability." At best, we have a family of related subjective approaches to quantifying some related aspects of policy reform. At worst—and arguably—we have the results of running various labor indicators through a black box.

Under the best-case scenario, we have a developing body of economic research, some of it suggestive of reasonable concerns we might have, on average, about some of the effects of NCAs. That is not a solid ground on which to rest a sweeping federal regulation. It is, rather, an invitation for the Commission to continue to gather information on, and experience with, the competitive effects of various NCAs. And it is an invitation to the Commission to commit resources to the further development of this body of research, including improved data sources, as well as refined methods and additional findings. For example, as Starr and others have suggested, we have both an over-reliance on survey data on NCA usage and a dearth of data on who is subject (actually or on paper) to an NCA. The Commission might, for example, help refine available survey instruments—perhaps in cooperation with the Department of Labor—and it might employ its Section 6(b) authority to gather direct evidence of NCA usage, and of what terms are employed in what contexts. Moreover, more recent state-level statutory reform—especially wage-based restrictions on NCA enforcement, as in Virginia, Illinois, Massachusetts—may yield data for a series of event studies that do not require the artifice of the enforceability measure.

We might add a final question: whatever it is that the enforceability studies do or do not signal, and however well, how do the various scoring schema, and the empirical results obtained employing them, array the universe of available policy options? We don't have any results suggesting *regulatory* alternatives, as it does not appear that any of the states have approached NCAs via regulation.[238] Not incidentally, we have no documented evidence of the effects of implementing a ban on use or maintenance of NCAs (as in the Proposed Rule), as opposed to limits on the abilities of plaintiff firms to enforce them, in civil court, against former employees. Beyond that, there remains the more

---

[237] NPRM at 3486.

[238] A few states do provide for suits by the employee. 2020 amendments to the Virginia code restrict NCAs for low-wage employees. Va. Code § 40.1-28.7:8. Such employees can bring an action to have a putative NCA declared void, *and* for other equitable relief including restitution and money damages. While violations of the pertinent provision involve attempts to enforce an NCA against a low-wage worker, not the mere existence of sanctioned terms, such violations are subject to regulatory penalties. But as such, neither the administration of those regulatory penalties nor their effects have been studied.

complicated question how the various systems illustrate the differential effects of the myriad policy options a legislature, court, or regulator might consider, from diverse presumptions against (or for) plaintiff firms seeking to enforce NCAs, to "red-pencil" or "blue pencil" latitude for judges, to restrictions on one or another tranche of the income distribution, or one or another set of occupations are, or should be, rated and ordered.

The Commission has asked for input on various policy alternatives to the sweeping regulatory ban proposed in the NPRM. But it is not at all clear that the empirical evidence allows anyone to sort the optional wheat from the potential chaff. Unfortunately for the Commission, this is also an invitation for courts to strike down any Proposed Rule as insufficiently supported.

### D. The Predicted Effects of the Proposed Rule Are Flawed Because Observed State-Level Changes May Not Apply Linearly to the Proposed Rule's National-Level Policy Change

It is not enough to simply lump some studies under the heading of "natural experiment." A natural experiment is just a name given to a situation outside of researchers' control that the user of the term believes allows them to identify a causal estimate. Any causal estimate is identified only with respect to a model. Relative to the model of supply and demand, regressing quantity purchased on price has an identification problem.[239] We cannot say that changes in price cause changes in quantity. But relative to a model of standard consumer theory, there is no identification problem. Variation in price does cause a change in the quantity purchased. Much of the debate surrounding modern empirical economics papers is the extent to which people accept a proposed model or identifying assumptions.

Moreover, the question of causation is not a simple yes or no. For example, the Commission quotes Starr, et al., noting that certain results are "'best taken as descriptive and should not be interpreted causally.'"[240] But in a working paper version of the paper, the authors include an appendix on "Potential Instruments for Noncompetes," which considers policy changes gathered as an instrumental variable for NCAs.[241] An instrumental variable potentially generates a causal estimate under an appropriate model. However, the authors conclude that the regressions "yield implausible estimates."[242] In Section I.B, *supra*, we gave reasons why the identifying assumptions around event studies (such as parallel trends between different states around the Great Recession) may not hold. As the Commission sometimes observes, we should vary the weight we attribute to certain results

---

[239] *See, e.g.*, SCOTT CUNNINGHAM, CAUSAL INFERENCE: THE MIXTAPE 21 (2021).

[240] NPRM at 3487 (*quoting* Starr, Prescott & Bishara, *supra* note 54, at 73.

[241] Starr, Prescott & Bishara, *supra* note 54, at 57.

[242] *Id.*

according to the degree to which we believe the identifying assumptions.[243] Instead of lumping all under "natural experiments," it is important to clearly delineate papers on changes of an enforceability index from papers that study an explicit policy change (Hawaii, Oregon, or Michigan). The latter comprise a much smaller body literature. Both sorts of studies may provide valuable insights, but they rely on fundamentally different identifying assumptions—as do the papers with regressions that the Commission considers not to be natural experiments, which would have a causal interpretation if the model were the regression used in each paper.

Once we are confident that what we are picking up is likely to be a true causal effect, then we can ask about external validity and how that estimate can inform a policy change beyond the scope considered in the data, such as the FTC's Proposed Rule. While the Commission uses a "conservative" estimate of the effect on wages, it does not actually provide a robust defense of this estimate; rather, only a "back-of-the-envelope" extrapolation from a single unpublished study.[244] It is difficult to imagine that such a casual approach will satisfy courts assessing whether there is sufficient empirical support for the specific Proposed Rule.

The NPRM assumes a linear relationship between the enforceability index and the log of wages, and that the linear relationship would hold in the context of a national policy change. There are reasons to place little weight on both steps of the extrapolation since it is so far out of sample.

*First*, the changes picked up in the index used by Johnson, et al. may bear little resemblance to even a state level version of the Proposed Rule.[245] The impact of policy changes at the state level may be linear, supralinear, or sublinear. In other words, there could be linear returns to decreasing enforceability (as assumed), increasing returns, decreasing returns, or even, eventually, negative returns. Taking "the most conservative estimate" does nothing to mitigate this uncertainty, since the estimate technique assumes linearity.[246] Indeed, although a conservative estimate is likely better than the alternative, for any given state (or industry, wage level, type of employee, or any number of other variables) it may still be wildly inaccurate—even *directionally* so.

An alternative would be to use an estimate from a suitable event study, which would allow an explicit comparison between the event study's policy change and the Proposed Rule. If the event study resembled the Proposed Rule, we need to worry about whether the relationship is linear or not, as we have the estimated effect for the relevant treatment, at least at the state level. Unfortunately, no such

---

[243] NPRM at 3487.

[244] *See* Johnson, et al., *supra* note 53.

[245] *Id.*

[246] NPRM at 3522.

event study exists because no state has implemented such a stringent policy against NCAs as the Proposed Rule would be.

*Second*, simply extrapolating from a state policy change—even a comparable one—to a national policy change is not straightforward. It is not obvious that so-called "general equilibrium effects" operate the same at the state level as at the local or national level. For a simple example, state level estimates of the tax elasticity of capital gains are different from what we should predict from a national capital gains tax change.[247] In the context of NCAs, we know that firms set uniform policies across states. This is why workers sign NCAs in states where they are illegal; everyone in the company signs one. Similarly, any estimate of a state policy change will not pick up firm responses that occur only when the policy applies sufficiently broadly. The NPRM suggests that businesses have substitutes for NCAs, such as NDAs.[248] We explain why NDAs do not perfectly replicate NCAs in Section **Error! Reference source not found.**, *infra*. Nevertheless, they may be partial substitutes. In that case, we should expect that businesses will substitute more to NDAs for a national policy change to NCAs than they do for a state policy change. In that case, simply extrapolating from the state estimate will overestimate any effects—good or bad—of the Proposed Rule.

## II.  The Proposed Rule Fails to Account for NCAs' Procompetitive Benefits and Wrongly Assumes Equivalent Benefit from Alternatives to NCAs

As the Commission observes, courts have long recognized that NCAs may "increase employers' incentive to make productive investments, including in worker training, client attraction, or in creating or sharing trade secrets with workers."[249] The Commission concedes that "there is evidence non-compete clauses increase worker training and capital investment (*e.g.*, investment in physical assets, such as machines),"[250] and cites three studies indicating such effects.[251] Nevertheless, it concludes that these well-established, and empirically supported business justifications "do not alter" its

---

[247] See, e.g., Ole Agersnap & Owen Zidar, *The Tax Elasticity of Capital Gains and Revenue-Maximizing Rates*, 3 AM. ECON. REV. INSIGHTS 399 (2021).

[248] NPRM at 3505.

[249] *Id.*

[250] *Id.*

[251] *Id.* at 3493 (citing Starr, *Consider This*, *supra* note 87 (finding that moving from mean NCA enforceability to no NCA enforceability would decrease the number of workers receiving training by 14.7% in occupations that use NCAs at a relatively high rate); Jeffers, *supra* note 138 (finding that knowledge-intensive firms invest 32% less in capital equipment following decreases in the enforceability of NCAs); Johnson & Lipsitz, *supra* note 79 (finding that hair salons that use NCAs train their employees at a higher rate and invest in customer attraction through the use of digital coupons at a higher rate, both by 11 percentage points)).

conclusion that all NCAs, save those that come within its narrow exception for the sale of a business, merit condemnation as unfair methods of competition.

The Commission states two reasons for refusing to account for procompetitive uses of NCAs:

> First, employers have alternatives to non-compete clauses that reasonably achieve the same purposes while burdening competition to a less significant degree. Second, the asserted benefits from these commonly cited justifications do not outweigh the considerable harm from non-compete clauses.[252]

Neither of these reasons justifies the Commission's sweeping NCA ban. Indeed, the NPRM provides no account of the degree to which, and cost at which, such alternatives function as either alternatives or complements to NCAs.

The Commission identifies four "alternatives to non-compete clauses for protecting valuable investments": trade secret lawsuits, non-disclosure agreements (NDAs), fixed-duration employment contracts, and enhanced wages and benefits.[253] None of those alternatives is as effective as an NCA in preserving incentives to make output-enhancing investments that could be taken to the investing employer's rivals, however.

Moreover, any effort by employers to try to *make* these alternatives as effective as an NCA would *also* run afoul of the Commission's' Proposed Rule. The Commission in its Proposed Rule makes *de facto* alternatives to non-compete agreements illegal:

> [T]he following types of contractual terms, among others, may be *de facto* noncompete clauses:
>
> (i) A non-disclosure agreement between an employer and a worker that is written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment with the employer.
>
> (ii) A contractual term between an employer and a worker that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred for training the worker.[254]

While these inclusions may be necessary to achieve the Commission's intended effect – to completely prohibit NCAs, including anything that *functions* like an NCA – they also undermine the

---

[252] NPRM at 3505.

[253] *Id.* at 3505, *et seq.*

[254] NPRM at 3535.

Commission's claim that "alternatives" remain available. And it is precisely to the extent that alternatives actually *function* as alternatives that they would run afoul of the Proposed Rule.

Meanwhile, to the extent these alleged alternatives might be found permissible under the "*de facto*" clause of the Proposed Rule only because they remain *less* effective, this highlights how the Proposed Rule deviates from accepted competition principles: Prevailing antitrust doctrine does not credit less restrictive alternatives that are less effective than the restraints they would replace.[255]

### A.    Trade Secret Law Protects Different Intangible Assets than NCAs and Is More Difficult to Enforce

The Commission maintains that trade secret law provides a substitute means by which an employer may protect valuable information from being transferred to a rival.[256] It states (misleadingly, as explained below) that the Uniform Trade Secrets Act provides legal protection for "information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use, and (2) is the subject of reasonable efforts to maintain its secrecy."[257] The ability to sue workers who misappropriate such information, the Commission says, provides an adequate incentive for employers to produce and engage in the intra-firm sharing of competitively valuable information, negating a key business justification for NCAs. But trade secret law is less effective than NCAs at protecting employer interests for at least five reasons.

*First*, trade secret law provides little to no protection against the appropriation of skills training. Training an employee how to perform the tasks necessary to be a productive worker for an employer is not typically or chiefly a secret to rivals engaged in the same basic business. The benefit those rivals get from hiring the training employer's workers is not secret information but the return on the training employer's sunk training costs. If a firm cannot prevent the loss of such benefits before recouping its investment, it will be less likely to incur such costs in the first place. Trade secret law cannot address that problem.

---

[255] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1076 (9th Cir. 2015) (refusing to credit less restrictive alternative that was not "virtually as effective" as challenged restraint); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001) (requiring plaintiffs show alternative is "virtually as effective" in serving defendant's objective, concluding proposed LRAs were less effective, and ruling in favor of defendants at final net-effects step). *See also* C. Scott Hemphill, *Less Restrictive Alternatives in Antitrust Law*, 116 COLUM. L. REV. 927, 944-5 (2016) ("Equal effectiveness is an explicit limitation in cases, jury instructions, and commentary.").

[256] NPRM at 3506. The Commission points to the Uniform Trade Secrets Act, which provides a state law civil cause of action for trade secret misappropriation; the federal Defend Trade Secrets Act, which establishes a similar cause of action under federal law; and the Economic Espionage Act of 1996, which criminalizes theft of a trade secret for either the benefit of a foreign entity or the economic benefit of anyone other than the owner.

[257] *Id.*, *citing* Uniform Trade Secrets Act § 1(4).

*Second*, trade secret law fails to protect valuable competitive information besides that implicated in employee training. The NPRM misstates the definition of a trade secret in a manner that obscures key limits on the law's protections. The first element of a trade secret defined by the Uniform Trade Secrets Act is not as stated in the NPRM, but is instead "information... that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use...."[258] The Commission's characterization obscures the requirement that a protectable trade secret must "*not be readily ascertainable by proper means*" by rivals. This requirement has often prevented competitively valuable information like customer lists and information about customers' interests and preferences from qualifying for trade secret protection.[259] An employer who cannot protect such information is less likely to compile it, or to share it with workers who may leave for a rival.

*Third*, reliance on trade secret law to protect competitively valuable information tends to limit efficient sharing of such information within the firm. Many businesses operate most effectively when numerous employees are aware of competitively valuable information, such as customer preferences, buying patterns, etc. But the second element of a protectable trade secret is that the information be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[260] The more freely a piece of information is shared *within* a firm, the less likely it is to merit trade secret protection.[261] NCAs, by contrast, do not discourage the intra-firm sharing of competitively sensitive information.

*Fourth*, trade secret law has much higher enforcement costs than NCAs. An employer who believes that its former employee has shared competitively valuable information with a rival must first prove that the information qualifies as a trade secret—i.e., that it (1) has independent economic value, actual or potential; (2) is not generally known to other persons who would benefit from it; (3) is not readily ascertainable by proper means; and (4) is the subject of reasonable efforts to maintain secrecy.[262] It must then show that the departing worker shared the information with a rival. In many cases, the rival could have acquired the competitively valuable information from numerous sources, and it will be difficult for the employer to prove misappropriation. As a practical matter, then, trade

---

[258] *Id. See, e.g.*, Florida Uniform Trade Secrets Act, FL. Stat. § 688, *et seq.* (2022) for an example of the USTA, as adopted by the state of Florida.

[259] *See, e.g., Hamer Holding Group, Inc. v. Elmore*, 202 Ill. App. 3d 994, 560 N.E.2d 907 (1st Dist. 1990) (determining that the plaintiff's customer list information was not protectable as a trade secret because it could be readily duplicated by anyone with access to the Secretary of State's information, even though it cost the plaintiff $60,000 to condense).

[260] USTA § 1(4)(ii).

[261] *See* Michelle L. Evans, *Trade Secret Misappropriation of Former Employer's Customer List* §8, 139 AM. JUR. TRIALS 293 (orig. published 2015) ("Limiting the number of employees within a company who are aware of the trade secret information tends to protect trade secret status.").

[262] *See* UTSA § 1(4).

secret violations will be relatively difficult to detect, and relatively costly to prosecute—again, diminishing their effectiveness as a substitute for NCAs. NCAs, then, are a complement to trade secret protection, not fully covering the same scope, but enabling firms to ensure some degree of trade-secret protection at comparatively lower cost.[263]

*Fifth*, even if an employer succeeds in establishing liability under trade secret law, its remedy will often be inadequate, or even worthless. Once a trade secrete has been appropriated, the cat is out of the bag.[264] An aggrieved employer can seek damages, but those can be extremely difficult to prove with adequate certainty (further adding to enforcement costs above). The appropriating employee will often be judgment-proof, and third-party beneficiaries of the trade secrets will be likely unreachable. Rational employers will often forego trade secret actions even in the rare cases in which they could establish trade secret status, misappropriation, and the degree of their damages without undue cost.

### B.  Non-Disclosure Agreements Are Substantially Less Effective than NCAs at Encouraging Worker Training and the Sharing of Valuable Information with Workers

The Commission observes that:

> Employers that seek to protect valuable investments also have the ability to enter into NDAs [*i.e.*, Non-Disclosure Agreements] with their workers. NDAs, which are also commonly known as confidentiality agreements, are contracts in which a party agrees not to disclose information the contract designates as confidential. NDAs may also prohibit workers from using information that it designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract.[265]

According to the Commission, the availability of NDAs obviates the need for NCAs. But NDAs—like trade secret actions, and for many of the same reasons—are substantially less effective than NCAs at encouraging worker training, client attraction, and the creation and intra-firm sharing of competitively valuable information.

---

[263] *See* Iancu & Kappos, *supra* note 3.

[264] *See id.* ("If a high-level executive at a company that depends on proprietary technology moves to a Chinese competitor, for example, and shares highly confidential information taken from his last employer, that last employer's competitive edge might evaporate forever to China's benefit. By the time the afflicted company sues to enforce trade secret laws, it may be too late; irreparable damage is often done when the information is disclosed to the new employer because that bell can't be unrung."). *See also* Lauren Weber, *FTC Plan to Ban Noncompetes Clauses Shifts Companies' Focus*, WALL ST. J. (Jan. 17, 2023), https://www.wsj.com/articles/ftc-plan-to-ban-noncompete-clauses-shifts-focus-to-deferred-pay-nondisclosure-agreements-11673904728 ("'Once someone goes to another company, you're really on the honor system. You have no way to monitor what information is being disclosed or not.'") (*quoting* Julie Levinson Werner of Lowenstein Sandler LLP).

[265] NPRM at 3507.

Many employer investments, such as skills training, can be transferred to hiring rivals without any disclosure whatsoever. And courts do not enforce NDAs to preclude a trained employee's subsequent *use* of skills funded by a prior employer. Favorable customer relationships created by employer investments also cannot be protected by NDAs. The departing employee who attracts her prior employer's customers engendered by the initial employer's efforts to foster favorable employee/customer interactions does not breach a non-disclosure commitment.

There are also significant practical impediments to using NDAs to protect employer investments in worker training, customer attraction and loyalty, and competitively valuable information. Simply drafting an NDA that could substitute for an NCA poses a challenge because the employer must anticipate and specify ex ante all the categories of information a departing employer might misappropriate and the ways it might do so. To establish liability, the employer must prove that the employee disclosed or illicitly used the information; again, the mere fact that another learned the information does not establish that that the employee disclosed it. If the employer surmounts this hurdle, it must establish its damages with reasonable certainty[266]—challenging when, as is typical, damages comprise lost profits.[267] And, again, departing employees may often be judgment-proof.

Instead of being substitutes, NDAs may be a complement to NCAs, as NCAs may decrease the enforcement costs of NDAs. In that case, we would expect to see NCAs bundled with other trade secret agreements,[268] which we do, especially among higher earning individuals, which we do, as the NPRM points out.[269]

### C. Fixed Duration Employment Contracts Are Subject to Remedial Limitations that Render Them Ineffective Substitutes for NCAs

The Commission states that:

---

[266] Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

[267] *Id.* at § 352, cmt. a ("Courts have traditionally required greater certainty in the proof of damages for breach of contract than in the proof of damages for a tort. ... [This principle] excludes those elements of loss that cannot be proven with reasonable certainty. The main impact of the requirement of certainty comes in connection with recovery for lost profits.").

[268] *See* Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Bundling Employment Restrictions and Value Appropriation from Employees* Working Paper (Jan. 2023) at 35, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403. *See also* NPRM at 3485 n. 42 ("This survey also found that non-compete clauses are often used together with other restrictive employment covenants, including non-disclosure, nonrecruitment, and non-solicitation covenants. Id. at 17 (reporting that respondents that had a noncompete clause reported having all three of the other restrictive employment covenants 74.7% of the time).").

[269] NPRM at 3487 ("Balasubramanian et al. [*supra*, note 91] find that while non-compete clause use is associated with 2.1–8.2% greater earnings (compared with individuals with no post-contractual restrictions), this positive association is due to noncompete clauses often being bundled with non-disclosure agreements.").

> [I]f an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration. An employer can establish a term of employment long enough for the employer to recoup its training investment without restricting a worker's ability to compete with the employer after the worker's employment ends.[270]

The problem with relying on fixed duration employment contracts is the law of contract remedies. Given the repugnancy of involuntary servitudes and the practical difficulty an administering court would face in ensuring that any compelled service is of adequate quality, contract law does not permit specific performance as a remedy for breach of personal service contracts.[271] Hence, no court would order an employee subject to a fixed duration employment contract to abide by her commitment. The remedial options would be either a negative injunction barring the employee from engaging in competing employment[272]—effectively a judicially imposed NCA—or money damages. But here too, lost profits would be difficult to ascertain and, often, impossible to collect.

### D. The Claim that Higher Wages and Enhanced Benefits Can Substitute for NDAs Reflects a Misunderstanding of the Hold-Up Problem

Finally, the Commission maintains that NCAs are unnecessary because employers could prevent their workers from leaving for a rival by providing them with greater benefits:

> Employers that wish to retain their workers can also pay the worker more, offer them better hours or working conditions, or otherwise improve the conditions of their employment. These are all viable alternatives for protecting training investments, and other investments an employer may make, that do not restrict a worker's ability to work for a competitor of the employer or a rival's ability to compete against the worker's employer to attract the worker.[273]

These observations by the Commission betray a fundamental misunderstanding of the hold-up problem that justifies particular NCAs.

Employers often must undertake costly investments to enable their employees to generate as much value as possible. For example, they may provide them with costly training, share competitively valuable information with them, and grant them opportunities to build personal relationships with

---

[270] NPRM at 3507.

[271] Restatement (Second) of Contracts § 367(1) (1981) ("A promise to render personal service will not be specifically enforced."); *id.* at § 367, cmt. a ("A court will refuse to grant specific performance of a contract for service that is personal in nature. The refusal is based in part on the undesirability of compelling the continuance of personal association after disputes have arisen and confidence and loyalty are gone and, in some instances, of imposing what might seem like an involuntary servitude.").

[272] *See, e.g.*, Lumley v. Wagner, 42 Eng. Rep. 687 (1852).

[273] NPRM at 3507.

firm clients. Such investments are made at risk: if the employee leaves before the investing employer has received an adequate return on its investment, the cost of the investment is lost, and perhaps transferred to a rival. A higher wage may be justified for a subsequent employer, as the employee comes with the added value provided by the former employer (e.g., training, knowledge of competitively valuable information, relationships with potential customers). Employees in which employers have invested are thus well-positioned to press their employers for greater compensation. The risk of such hold-up prompts a tendency of employers to underinvest in training and information sharing. NCAs ameliorate such risks and, hence, their tendency to prompt such underinvestment.

To provide greater compensation before firm investments in employees have generated adequate returns is to compensate an employee for the firm's investment. In effect, it endorses, rather than ameliorates, the risk of hold-up. Thus, simple deal-sweetening is not, as the Commission asserts, a "viable alternative[] for protecting training investments[] and other investments an employer may make."[274]

## III.  The Commission's Relevant Experience, Expertise, and Capacity to Enforce Proposed Rule Is Limited

The NPRM states that the

> rulemaking represents the culmination of several years of activity by the Commission related to non-compete clauses and their effects on competition. This activity has included extensive public outreach and fact-gathering related to non-compete clauses, other restrictive employment covenants that may harm competition, and competition in labor markets generally.[275]

Specifically, the NPRM cites to the record of several hearings and workshops: two hearings sessions among the Commission's Hearings on Competition and Consumer Protection in the 21st Century "FTC 21st C. Hearings"),[276] the FTC 2020 NCA Workshop,[277] and a 2021 workshop, jointly sponsored by the FTC and the Antitrust Division, regarding the broader topic of labor market

---

[274] *Id.*

[275] NPRM at 3498.

[276] The FTC convened fourteen sets of Hearings on Competition and Consumer Protection in the 21st Century, running from September 2018 through June 2019. Two sets of hearings were of special relevance: On October 16, 2018, a full day of hearings was devoted to issues to do with Antitrust in Labor Markets, including NCAs; and on June 12th, 2019, one of the panels in the hearing comprising a Roundtable with State Attorneys General included discussion of NCAs and other labor restrictions. Information regarding the full set of hearings, including links to agendas and transcripts for individual hearings, can be found at Fed. Trade Comm'n, Hearings on Competition and Consumer Protection in the 21st Century [hereinafter FTC 21st C. Hearings], https://www.ftc.gov/enforcement-policy/hearings-competition-consumer-protection.

[277] FTC 2020 NCA Workshop, *supra* note 2.

competition. ("FTC/DOJ 2021 Labor Competition Workshop").[278] The Commission also cites three competition matters involving NCAs that were resolved by consent orders on the eve of the Commission's announcement of the NPRM.[279] In addition, the Commission notes a 2019 petition for a rulemaking from the Open Markets institute and various co-signatories.[280]

While we do not doubt that the staff conducted appropriate investigations in each of the three matters – or in a fourth settled in March – we note that the consents were achieved without either trial or adjudication by the Commission, and without any finding or stipulation of any antitrust violations.[281] Moreover, as noted by Commissioner Wilson in her dissenting statement to two of the three orders, the Consent Orders are exceedingly brief, providing little guidance as to how the conduct at issue violated—in the Commission's view—either the FTC Act or the Sherman Act.[282] A fourth matter has been settled since, but that provides little further guidance. And, like two of the three initial matters, it involves facts and circumstances specific to the glass container industry.[283]

In *Prudential Security, et al.*, security guards allegedly were subject to NCAs that barred the guards from undertaking related employment with any of Prudential's competitors, and from starting a competing business. Those prohibitions were alleged to apply for two years following conclusion of the guards' work for the Respondent, anywhere within a 100-mile radius of their main place of work for the Respondent. The NCAs also were alleged to impose liquidated damages of $100,000 per guard, per violation.[284] Such terms seem extreme, given the occupation: they might well be untethered from, e.g., any of the firm's interests in protecting proprietary information or the firm's employee-specific investments;[285] and they might well be inefficient, "unreasonable" (as found by a Michigan state court, applying Michigan law),[286] or otherwise objectionable.

---

[278] Fed. Trade Comm'n and U.S. Dep't Justice, Workshop: Making Competition Work: Promoting Competition in Labor Markets (Dec. 6-7, 2021) [hereinafter FTC/DOJ 2021 Labor Competition Workshop], https://www.ftc.gov/news-events/events/2021/12/making-competition-work-promoting-competition-labor-markets.

[279] Press Release, *FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers* (Jan. 4, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers. Since publishing the NPRM, the Commission has announced a fourth NCA settlement, also in the glass container industry. *In the Matter of Anchor Glass Container, Corp.*, FTC File No. 211 0182 (Mar. 15, 2023) (decision and order)

[280] NPRM at 3497. To the best of our knowledge, the Commission has never reported any evaluation of the 2019 petition.

[281] *See* citations *supra* at note 14.

[282] *See* Dissenting Statement of Commissioner Christine S. Wilson, *supra* note 15.

[283] *See supra* note 279.

[284] *In the Matter of Prudential Security, et al.*, *supra* note 14, at 3.

[285] That is our initial reaction to what are, of course, questions of fact, on which the Commission has not reported.

[286] *Prudential Security, Inc. v. Pack*, No. 18-015809-CB (Mich. Cir. Ct. Dec. 13, 2018).

Based on the available documents, however, it remains unclear whether competition in specific Michigan labor markets was harmed by the conduct at issue. The Commission's complaint alleged harm to "competitive conditions," and to individual security guards in some relevant labor market or markets. [287] The supporting documents also allege that the NCAs were "coercive and exploitative."[288] The Commission opines that such conduct, causing "harm to competitive conditions," constitutes a violation of Section 5's prohibition of unfair methods of competition. It cites, as authority, its recent Policy Statement Regarding Unfair Methods of Competition Under Section 5 of the FTC Act.[289] Indeed, such language is to be found in the policy statement, and terms such as "exploitative" and "coercive" occur in *dicta* in certain Supreme Court decisions. But, as we have noted elsewhere, while those terms are evocative in colloquial usage, they have no established meanings in antitrust jurisprudence; and their meaning, application, and connection to antitrust jurisprudence is not explained in the Commission's policy statement.[290] Critically, novel applications of the Commissions 2022 policy statement have not yet been vindicated in the courts.

It is well established that NCAs can vary along multiple dimensions: duration, geographic scope, occupational scope, application to certain types of firms, and stipulated damages, among others.[291] Even supposing, *arguendo*, that the conduct at issue in *Prudential, et al.*—like the conduct at issue in *Ardagh Group, et al.*, and *O-I Glass*—violated Section 5's prohibition of "unfair methods of competition," the consent orders seem to turn on specific facts and circumstances, such as the duration of the restrictions and the outsize liquidated damages provisions in Prudential, et al. It remains entirely unclear how well information uncovered in the staff's investigations might inform competition analyses of NCAs with different terms, or in other labor markets. As Howard Shelanski—a former Director of the FTC's Bureau of Economics and a former Administrator of the White House Office of Information and Regulatory Affairs during the Obama Administration—noted at the FTC's 2020 workshop, enforcement is a "slow" way to gather the information requisite to the issuance of useful guidance or regulations, in part due to selection bias.[292] That is not to gainsay the importance of developing the case law. Rather, it is to underscore the need to develop a body of case law that reflects the diversity of NCAs, the contexts in which they are employed, and their effects. Three or four settled fact-specific investigations, *in toto*, seem a very slender reed on which to hang a major

---

[287] *In the Matter of Prudential Security*, *supra* note 14, at 5.

[288] *Id.*

[289] NPRM at 3499 (*citing* FTC, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act, Commission File No. P221202 (Nov. 10, 2022)).

[290] *See, e.g.*, Daniel Gilman & Gus Hurwitz, *The FTC's UMC Policy Statement: Untethered from Consumer Welfare and the Rule of Reason*, ICLE Issue Brief (Nov. 23, 2022), https://laweconcenter.org/resources/the-ftcs-umc-policy-statement-untethered-from-consumer-welfare-and-the-rule-of-reason.

[291] For a 50-state review, see Beck, *supra* note 18. *See also* FTC 2020 NCA Workshop, Evan Starr, Tr. at 195 (regarding 14 dimensions along which state NCA laws vary, under categorization in Malsberger, et al. treatise).

[292] FTC 2020 NCA Workshop, *supra* note 2, Howard Shelanski, Tr. at 263.

federal regulation on labor agreements generally. That seems all the more significant, given the history of NCA litigation, both in competition matters and at common law, where the specific terms and conditions, and the context in which they are employed, have tended to determine whether or not specific NCAs were found enforceable or lawful.[293]

With respect to the hearings and workshops mentioned in the NPRM,[294] while not focused exclusively on NCAs, these were significant information-gathering efforts on competition issues in labor markets by FTC staff. The Commission's call for comments, issued in conjunction with the 2020 workshop, solicited responses to various questions, both descriptive and normative, including several on the adequacy of existing NCA laws and regulations; the FTC also asked for input on possible legal reforms. They also addressed the Commission's practical ability and legal authority to advance policy reforms by regulation. The NPRM notes that 328 comments were submitted to the record of the 2020 workshop, and that 27 comments were submitted to the record of the FTC/DOJ 2021 Labor Competition Workshop.[295] In addition, 280 comments were submitted in response to a 2021 call for "public comments on contract terms that may harm competition, including 'non-compete clauses that prevent workers from seeking employment with other firms.'"[296] All of these, according to the NPRM, informed the rulemaking process:

As it has developed this Proposed Rule, the Commission has closely considered the views expressed at these forums and the public comments it has received through these engagement efforts. The comments have informed the Commission's understanding of the evidence regarding the effects of non- compete clauses; the law currently governing non-compete clauses; and the options for how the Commission may seek to restrict the unfair use of non- compete clauses through rulemaking, among other topics.[297]

That may be true, but, as we noted in the Introduction and Executive Summary of these comments, the Commission has never issued a report summarizing or synthesizing the information gleaned from these various endeavors. What is more, references to the evidence gathered through those substantial investigations seem extremely limited and highly selective. The diversity of views and evidence presented at the hearings and workshops, and in submissions to the records of those events, is not in evidence in the NPRM or, specifically, the Proposed Rule. Some well-documented complications get slight treatment in the NPRM, while others are simply absent from the discussion. While workshop presentations and submissions cannot settle the complex questions presented by NCAs and the Proposed Rule, they do offer substantial input on matters ranging from stakeholder views

---

[293] *See* text accompanying notes 16-21, *supra*.

[294] NPRM at 3497-8.

[295] *Id.* at 3497.

[296] *Id.*

[297] *Id.* at 3498.

to legal challenges, to the developing state of the empirical evidence. A proper analysis of the record, rather than summary reference to it, is wanted.

Even a brief survey of the record indicates the complexity of stakeholder viewpoints, policy issues, and evidence. At the FTC's 2020 workshop, panelists and commenters expressed diverse views on the most basic questions whether the FTC could or should regulate NCAs. Several workshop participants and numerous comments endorsed some measure of federal intervention to restrict the use or enforcement of NCAs, at least in some contexts.[298] Some of those comments endorsed federal intervention as a complement to state NCA law. For example, comments submitted jointly by twenty state Attorneys General advocated for "federal rulemaking that is consistent with [the states] ability to pursue enforcement and legislative priorities to the benefit of workers and consumers," while also noting advantages to "the type of experimentation and variation that our system of government is designed to promote,"[299] with the states serving as Brandeisian "laboratories of democracy."[300] At the same time, they recommended that federal rules should not preempt state law.[301]

Other comments took a dimmer view of federal intervention, while also lauding state law variation: "[s]tate laws are sufficient to address any harms that may be associated with noncompete agreements. Federal intervention (whether at the statutory or regulatory level) is not necessary."[302] And the Global Antitrust Institute commented that they were "concerned... that many proposals to address... [concerns about NCAs] through ex ante antitrust regulatory interventions, such as an FTC rule, are ill-suited and will likely do more harm than good."[303]

---

[298] *See generally* Comments submitted to FTC to Hold Workshop on Non-compete Clauses Used in Employment Contracts, Docket No. FTC-2019-0093 [hereinafter NCA Workshop Comments], https://www.regulations.gov/docket/FTC-2019-0093. *See, e.g.,* Comment Submitted by Public Citizen—Alex Harman, Comment #0286; Comment Submitted by Open Markets Inst.—Udit Thakur, Comment #0313; Comment Submitted by United States Senate—9 Signatures, Comment #0017. *See also,* FTC 2020 NCA Workshop *supra* note 2, Eric Posner, Tr. at 71, 74-77.

[299] NCA Workshop Comments, *id.,* Comment Submitted by Office of the Atty. General for the District of Columbia on Behalf of State Attorneys General (20 signatures), Comment #322.

[300] *Id. See also, e.g.,* FTC 2020 NCA Workshop *supra* note 2, Orly Lobel, Tr. at 11.

[301] *Id.*

[302] NCA Workshop Comments, *supra* note 298, Comment Submitted by Russell Beck (and 21 co-signatories), Comment #0319. *See also, e.g.,* Comment of the Global Antitrust Institute, Antonin Scalia Law School, George Mason University, Comment #0243 ("We are concerned, however, that many proposals to address ... [concerns about NCAs] through *ex ante* antitrust regulatory interventions, such as an FTC rule, are ill-suited and will likely do more harm than good."); Comment Submitted by the U.S. Chamber of Commerce—Sean Heather and Glenn Spencer, Comment #0303 ("the Chamber sees as unnecessary rulemaking by the FTC under either its unfair methods of competition authority (assuming such authority even exists), or its unfair and deceptive practices authority."); Comment Submitted by The Center On Executive Compensation ("Center")—Andrew Maletz, Comment #0264 (association representing chief human resources officers of large firms stating that "We believe an FTC rule regarding non-compete agreements is unnecessary.")

[303] *Id.,* Comment of the Global Antitrust Institute, Antonin Scalia Law School, George Mason University, Comment #0243.

Comments from the Antitrust Law Section of the ABA questioned the need for federal interven-tion.[304] They also questioned whether the available evidence provided an adequate foundation for policy reform:

> The Section does not have the impression that the research and analysis of non-compete clauses are far enough along such that lawmakers and policymakers—whether at the federal, state, or local level—have a clear sense of the nature and extent of the harms, an ability to evaluate the adequacy of existing legislative and regulatory regimes to address those harms, and a blueprint for additional legislation or regulation should current regimes be deemed inadequate.[305]

Howard Shelanski stated plainly that an outright ban would be "deeply problematic."[306]

Commissioner Noah Phillips's noted the Commission's extremely limited experience with competi-tion rulemaking in general: "The FTC has issued a competition rule just once in its history, in the 1960s."[307] And several workshop participants also focused on the demands of rulemaking for the FTC or, more specifically, the demands that would attend any rulemaking likely to survive court challenges. Commissioner Phillips argued that the broad language of Section 5 might raise Consti-tutional concerns, including those associated with the Nondelegation Doctrine; and, further, that "[n]ondelegation concerns may also be exacerbated by other factors here, including the lack of clarity in the rulemaking authority, the traditional commitment of the issue to the states, the fact that neither the FTC nor any court has found non-competes to violate the FTC Act's prohibition against unfair methods of competition."[308]

---

[304] We note that the Section has submitted comments in response to the NPRM Comment from the American Bar Ass'n, Antitrust Law Section, FTC-2023-0007-9980, March 2, 2023, *available at* https://www.regulations.gov/comment/FTC-2023-0007-9980. These more recent comments note that the literature remains limited, but that it tends to support the proposition that NCAs for low-wage workers are "generally harmful and not justified" by procompetitive rationales that may apply with other workers. The comment does not appear to advocate for any specific regulation, and it does not appear to address the question whether the FTC, specifically, should adopt a regulation restricting the use of NCAs for low-wage workers. We agree with the Section's claim that the literature remains limited, and with their suggestion that standard rationales for NCAs can seem strained in the case of low-wage workers. Restrictions on low-wage workers may generate various policy concerns. However, as should be clear from our comments overall, we do not agree that the literature provides adequate grounds for the adoption of any FTC competition regulation under Sections 5 and 6(g) the FTC Act.

[305] NCA Workshop Comments, *supra* note 298, Comment Submitted by the Antitrust Law Section of the ABA—Brian R. Henry, Comment #0329.

[306] FTC 2020 NCA Workshop, *supra* note 2, Howard Shelanski, Tr. at 283.

[307] *Id*, Noah Phillips, Tr. at 220.

[308] *Id.* at 221.

Such concerns should be all-the-more salient, given the Supreme Court's recent articulation of the Major Questions Doctrine in *West Virginia v. EPA*.[309] Reviewing certain power plant emissions standards adopted by the Environmental Protection Agency, the Court observed that...

> our precedent teaches that there are "extraordinary cases" that call for a different approach—cases in which the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion, provide a "reason to hesitate before concluding that Congress" meant to confer such authority.[310]

Separation of powers principles, in addition to readings of legislative intent, required "something more than a plausible textual basis for the agency action"; for that reason, given the scope and economic impact of the EPA's regulation, the Court held that EPA had exceeded its statutory authority.

In the NPRM, the Commission contemplates a regulation that would, by the Commission's own estimation, alter the terms of employment for approximately 30 million American workers, with an economic impact of "$250 to $296 billion per year," on wages alone. That is, the Commission asserts that its Proposed Rule would be one of significant economic impact, just as public controversy over NCAs and the proposed preemption of state law suggest significant political impact. Independent of proposed rules and advanced notices of proposed rulemaking, the Commission reports that it has some 18 guides and regulations under review.[311] Most of these were adopted under express statutory authority considerably narrower than the charge of Section 5. The FTC Act comprises no such express grant of authority with respect to NCAs or other terms of labor agreements.

We cannot be certain how the courts might evaluate an FTC NCA regulation, but it's clear enough that the federal courts have increasing concerns about agency deference. With that in mind, adoption of NCA regulations as proposed would seem to pose a substantial risk to the Commission; that is, to both the substance of such regulations and the Commission's regulatory authority in competition matters, at least. A thoroughgoing analysis of the scope of the Proposed Rule and the present (and developing) state of agency deference and statutory interpretation in Supreme Court jurisprudence seems sorely needed. Former FTC Chairman William Kovacic took a less settled position on FTC authority, while also observing that the contemporary judiciary is skeptical of agencies' initiatives to extend their own reach.[312] While Kovacic did not suggest that the courts find all regulatory innovation anathema, he did emphasize the importance of building a comprehensive foundation

---

[309] West Virginia v. Envtl. Prot. Agency, 142 S. Ct. 2587 (2022).

[310] *Id.* at 17.

[311] *See* FTC, *Rules and Guides Currently Under Review*, FTC.GOV (last visited Apr. 12, 2023), https://www.ftc.gov/enforcement/rulemaking/retrospective-review-ftc-rules-guides/rules-guides-currently-under-review.

[312] *See* FTC 2020 NCA Workshop, *supra* note 2, William Kovacic, Tr. at 36. *Cf.* Aaron Nielson, Tr. at 234-44 (stating that it is an "open question" whether courts would sustain a challenge to the FTC's authority.)

for any forays into competition rulemaking likely to survive judicial scrutiny.[313] Howard Shelanski similarly advocated for the further development of the empirical evidence before entertaining rule-making;[314] he also suggested that there was much work—such as the issuance of guidance and the development of research—that the Commission might undertake on NCAs besides, or prior to, regulation.[315]

As discussed in more detail in Section I of these comments, *supra*, various panelists at the FTC 2020 NCA Workshop—including leading contributors to the empirical literature cited in the NPRM—noted significant limitations to the state of the literature, as did comments submitted to the record. For example, Evan Starr noted the difficulty of estimating the causal effects of using NCAs,[316] and the need for more research on those causal effects.[317] Challenges to such research include, *inter alia*, the fact that NCAs are commonly bundled with other restrictions, such as non-solicitation and non-disclosure terms (and attendant selection issues),[318] an over-reliance on survey data,[319] a dearth of longitudinal data,[320] a relative dearth of exogenous variation,[321] and a dearth of findings regarding total welfare implications of NCAs and, specifically, of research on the downstream effects of NCAs on product and service markets, and thereby on consumers.[322] Panelists also suggested mixed results, rather than uniform findings on, e.g., pay, and on potential tradeoffs in labor markets, such as tradeoffs between wages and firms' investments in employee training.[323]

Panelists at the FTC 2020 NCA Workshop also noted mixed results, rather than uniform findings on, e.g., pay, as well as potential tradeoffs in labor markets, such as tradeoffs between wages and firms' investments in employee training.[324] And several panelists noted both observed and potential benefits to NCAs.

---

[313] *See id.*, William Kovacic, Tr. at 37.

[314] *See id.*, Howard Shelanski, Tr. at 264-5.

[315] *See id.*

[316] *See id.*, Evan Starr, Tr. at 158, 173.

[317] *See id.* at 173.

[318] *See id.* at 166.

[319] *See id.* at 174.

[320] *See id.*, at 173.

[321] *See id.*.

[322] *See id.*, Kurt Lavetti, Tr. at 151-2.

[323] *See id.*, Evan Starr, Tr. at 162, 166, 174; Ryan Williams, Tr. at 179, et seq. (negotiation and compensation for CEOs); *id.*, Kurt Lavetti, Tr. at 144-46 (regarding physician compensation); *id.*, Howard Shelanski, Tr at 263 (noting "ambiguity" in the research) and 284 (describing training investments what would not occur under a ban).

[324] *Id.*, Evan Starr, Tr. at 162, 166, 174; Ryan Williams, Tr. at 179, *et seq.* (negotiation and compensation for CEOs); Kurt Lavetti, Tr. at 144-6 (regarding physician compensation); Howard Shelanski, Tr. at 263 (noting "ambiguity" in the research).

For example, Ryan Williams presented research on the effects of NCAs for CEOs suggesting that NCAs provide compensation benefits for the CEOs themselves, and that firms are more likely to fire a CEO for poor performance when there is a NCA in force, which potentially benefits both shareholders and employees.[325] Overall, he said that the findings imply a positive story for CEO NCAs. Similarly, Kurt Lavetti reviewed research suggesting both physician benefits and efficiencies associated physician NCAs.[326] And Commissioner Noah Phillips noted the potential of NCAs to ameliorate hold-up problems in labor agreements by, for example, encouraging investment in worker training and the sharing of proprietary information with employees.[327] In sum, as Kurt Lavetti concluded, "we're still far from reaching a scientific standard of concluding that non-compete agreements are bad for overall welfare."[328]

One more issue seems notable. The NPRM omits any reference to a 2019 literature review conducted by staff in the FTC's Bureau of Economics.[329] That literature review was much discussed in comments submitted to the 2020 workshop and in the workshop itself.[330] Not incidentally, the named staff author of the review, John McAdams, moderated a session at the 2020 workshop. Yet the McAdams paper is not even mentioned in the NPRM. McAdams observes that economic research regarding NCAs "has made important strides."[331] At the same time, however, he observes mixed results, and he describes numerous data and methodological limitations running throughout the body of literature. Overall, he finds that the "more credible empirical studies tend to be narrow in scope, focusing on a limited number of specific occupations... or potentially idiosyncratic policy changes with uncertain and hard-to-quantify generalizability."[332] Of direct relevance to the Proposed Rule, "[t]there is little evidence on the likely effects of broad prohibitions of non-compete agreements."[333]

That, too, is part of the Commission's expertise and experience regarding NCAs. But it is a part that suggests caution, and grounds for research development, rather than a rush to adopt a sweeping uniform regulation like the Proposed Rule. The NPRM's review of the literature is substantial but skewed; and, as we discuss below, the NPRM fails to adequately address many of the well-known

---

[325] *Id.,* Ryan Williams, Tr. at 178.

[326] *Id.,* Kurt Lavetti, Tr. at 144-6.

[327] *Id.,* Noah Phillips, Tr. at 218.

[328] *Id.,* Kurt Lavetti, Tr. at 139.

[329] *See* John McAdams, *Non-Compete Agreements: A Review of the Literature, supra* note 4.

[330] *See, e.g.,* FTC 2020 NCA Workshop, *supra* note 2, Kurt Lavetti, Tr. at 140 (referring to John McAdams, the workshop panel moderator: "There's also a new working paper by John that provides a great overview of this literature.").

[331] *See id.,* at 4.

[332] *See id.*

[333] *See id.*

limitations to available studies. The Proposed Rule carries real risk to the Commission's authority, as well as its resources. As Kovacic said at the 2020 workshop, "the bolder the measure, the stronger the evidentiary armor is going to have to be and the more thoughtful the analyses," if an intervention, and the Commission's authority, are to be sustained.[334] As a general matter of policy, we cannot recommend adoption of so sweeping a rule as the one that the Commission has proposed. That fundamental policy issue aside, it should be conspicuous that a more fulsome development of the record, and a more critical review of the literature, is needed before the FTC proposes any regulation of NCAs.

The imposition of a sweeping federal regulation and the preemption of state law suppose general and durable market failure causing substantial consumer harm. Observation of certain market imperfections, or frictions, falls well short of that mark.[335] Recent empirical findings suggesting potential harms and benefits associated with NCAs in different, and specific, contexts also fall short. The case for regulation also supposes that regulatory intervention can be effective and efficient, yet there is no model in state law for the ban proposed by the FTC, and the NPRM provides no analysis of the likely effects of the difference between the Commission's proposal and state law alternatives. No state has adopted the general prohibition on NCA usage that the FTC has proposed. No state chiefly restricts NCAs via a regulatory ban; and no state has adopted the seemingly arbitrary 25% share restriction that the Commission has proposed for permitting certain NCAs in conjunction with the sale of a business.[336] And while the NPRM includes a casual attempt at a cost-benefit analysis, it lacks even a cursory analysis of the resources that would be required for effective implementation and enforcement of the Proposed Rule. These would not be trivial. As noted in the NPRM, there is survey evidence suggesting that NCAs now apply to roughly one fifth of all employed persons in the

---

[334] *Id.*, William Kovacic, Tr. at 37.

[335] Regarding competition in labor markets generally, see, e.g., Diana Furchtgott-Roth, *Antitrust and Modern U.S. Labor Markets: An Economics Perspective*, HARV. J. L. & PUB. POL'Y PER CURIAM 1 (Summer 2022) ("data from the Bureau of Labor Statistics of the U.S. Department of Labor show that exercise of monopsony power is generally not occurring in today's 21st century economy, nor has it been characteristic of labor markets over the past half century."); Richard A. Epstein, *The Application of Antitrust Law to Labor Markets: Then and Now*, 15 N.Y.U. J. LAW & LIBERTY 709 (2021).

[336] The only express exception in the Proposed Rule regards NCAs executed in conjunction with the sale of a business, where the NCA applies to a seller who "is a substantial owner of, or substantial member or substantial partner in, the business at the time the person enters into the non-compete clause. Proposed § 910.1(e) would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity." NPRM at 3515. While an exception providing for NCAs in conjunction with the sale of a business is common in states with some general hostility to NCAs, as under Cal. Bus. & Prof. Code § 16601, the identification of a 25% ownership requirement appears arbitrary and excessive. For example, California law permits certain NCAs for, *inter alia*, "[a]ny person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interesting in the business entity." Cal. Bus. & Prof. Code § 16601. We have not found any authority restricting such ownership to anything like a 25% share. That proposed restriction may prove far too narrow, not just when natural persons owning a startup or small business number more than four, but when, e.g., venture capital investment reduces the founders' shares of a startup.

U.S. labor force; that is, nearly 30 million workers.[337] Regulations are not self-enforcing: and while regulation may be, in certain regards, more streamlined than case-by-case law enforcement, it still requires investigation of alleged infractions, administration, and, in addition to regulatory challenge mechanisms, compliance monitoring, guidance to industry and workers, periodic rule review, and the resources to defend at least some challenges to agency determinations of violations, and assessments of penalties, in federal court. Detection alone may often be a challenge to the extent that many "workers are totally uninformed about the law."[338]

Effective enforcement need not entail detecting, much less penalizing, every violation, but it does require sufficient enforcement activity to establish a credible threat that violations will be penalized, and that enforcement is not selective. Yet the NPRM contains no assessment of the resources required for adequate enforcement of the Proposed Rule or any alternative NCA regulation. Enforcement staff in the Commission's Bureau of Competition ("BC") have substantial antitrust expertise in mergers and diverse conduct matters, but little experience in labor matters and none in the enforcement of competition regulations. Moreover, the Commission has recently reported that BC staff are barely able to meet the Commission's already established and important workload.[339] Adding an obligation to monitor restrictions in labor agreements across all industries and occupations in the U.S. would be both futile and an unnecessary drain on the staff's ability to scrutinize mergers and conduct under settled antitrust law.

Enforcement burdens would be greater still, given the Commission's proposal "that whether a contractual term is a non-compete clause for purposes of the Rule would depend on a functional test,"[340] rather than a nominal one. Currently, NCAs may be confined to distinct and readily parsed provisions among terms of employment, or they may be drafted in more complex terms, and perhaps distributed across multiple provisions or documents. A general bar on NCA use, subject to substantial regulatory penalties, would encourage firms that value NCAs to seek marginally permissible alternatives and various workarounds; these might tax staff resources further still, from detection and investigation through challenges in either administrative process or federal court.

---

[337] NPRM at 3485. The latest survey from the BLS survey suggests approximately 18%, but survey findings vary somewhat, and, at least roughly, cluster in the neighborhood of 20%. And BLS estimates a workforce of approximately 150 million employed persons. U.S. Bur. Labor Stats., Monthly Labor Review (Jun. 2022) (reporting 149,785 total employed), https://www.bls.gov/opub/mlr/2022/article/us-labor-market-shows-improvement-in-2021-but-the-covid-19-pandemic-continues-to-weigh-on-the-economy.htm.

[338] FTC 2020 NCA Workshop, *supra* note 2, Evan Starr, Tr. at 171.

[339] *See, e.g.*, Oversight and Enforcement of the Antitrust Laws, Prepared Statement of the Federal Trade Commission, *supra* note 28 ("While we constantly strive to enforce the law to the best of our capabilities, there is no doubt that—despite the increased appropriations Congress has provided in recent years—we continue to lack sufficient funding.").

[340] NPRM at 3509.

The Commission's experience with enforcing its own Contact Lens Rule (CLR),[341] which implements a specific statutory charge in the Fairness to Contact Lens Consumers Act (FCLA),[342] may be instructive. The CLR was adopted following "decades of regulatory and research experience regarding the optical goods industry."[343] That experience included adoption and enforcement of the Eyeglass Rule[344] (adopted in its initial form in 1978), and two substantial studies of competition and consumer protection issues regarding regulation and retail sales of contact lenses specifically, with the latter report conducted pursuant to an express statutory charge in the FCLA.[345]

The key provision in both the FCLA and the CLR was a simple "prescription release" requirement: "[w]hen a prescriber completes a contact lens fitting, the prescriber . . . shall provide to the patient a copy of the contact lens prescription."[346] Periodic rule review led the Commission to solicit comments on the CLR in September 2015;[347] review of those comments, and other input, led to an NPRM proposing amendments to the CLR in 2016,[348] a supplemental NPRM in 2019,[349] and publication of amendments to the CLR in 2020.[350] As the Commission explained in amending the rule, there was a "need to improve compliance with the Rule's automatic prescription-release requirement, as well as a need to create a mechanism for monitoring and enforcing the Rule."[351] In plain language, the Commission found that its own rule was difficult to enforce, and that non-compliance was widespread. To quantify the enforcement challenge might be difficult, but one number seems salient: we are aware of precisely zero matters in which the Commission enforced the CLR's prescription release requirement between its initial 2004 effective date and its 2020 amendment.

We do not mean to gainsay the challenge of enforcing the CLR. To the contrary, we believe that the Commission's experience with the CLR illustrates the challenges of drafting, and enforcing, effective

---

[341] 16 C.F.R. § 315.

[342] 15 U.S.C. §§ 7601-7610.

[343] FTC Staff Comment on Proposed Additional Regulations Issued by the North Carolina State Board of Opticians (Jan. 13, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-comment-north-carolina-state-board-opticians-concerning-proposed-regulations-optical-goods/1101ncopticiansletter.pdf.

[344] 15 U.S.C. § 7608.

[345] *See* FTC, *Possible Barriers to E-Commerce: Contact Lenses: A Report From the Staff of the Federal Trade Commission* (Mar. 29, 2004), http://www.ftc.gov/os/2004/03/040329clreportfinal.pdf; FTC, *The Strength of Competition in the Sale of Rx Contact Lenses: An FTC Study* (Feb. 2005), https://www.ftc.gov/reports/strength-competition-sale-rx-contact-lenses-ftc-study.

[346] 16 C.F.R. § 315.3(a)(1).

[347] Contact Lens Rule Request for Comment, 80 FR 53272 (Sept. 3, 2015).

[348] CLR Notice of Proposed Rulemaking, 81 FR 88526 (Dec. 7, 2016).

[349] CLR Supplemental Notice of Proposed Rulemaking, 84 FR 24664 (May 28, 2019)

[350] CLR Final Rule, 85 Fed. Reg. 50668 (2020).

[351] *Id.* at 50671 (*citing* the 2016 CLR NPRM, *supra* note 348).

regulations, even when an agency has decades of experience with the issues those regulations are meant to address.

## IV. The Commission's Legal Authority to Issue the Proposed Rule is Contentious—and Dubious

The NPRM implicates a range of questions regarding the Commission's legal authority. These questions relate both to the scope of the Commission's substantive legal authority to regulate NCAs and to its authority to undertake such regulation through the adoption of a substantive rule, rather than through adjudication.[352] These issues are made all the more complicated given the infrequency with which the Commission has attempted to undertake competition rulemaking in implementation of its Unfair Methods of Competition ("UMC") authority under Section 5 of the FTC Act—arguably, just once in over 100 years of FTC UMC authority. Meanwhile, there is very little judicial authority discussing the Commission's competition rulemaking authority, and none of it is recent.[353] And recent judicial trends exacerbate the issue, as the courts have been increasingly skeptical of claims of regulatory authority such as the Commission makes in the NPRM.

This is a contentious area of law and policy. Several of the key issues are discussed below; other comments submitted to this proceeding develop these arguments in more detail.[354] Our primary purpose here is to emphasize that the Commission's Proposed Rule, if adopted, would regulate into market uncertainty and legal controversy.

The Commission is the nation's chief inter-sectoral regulator of domestic trade and commercial activity. With its statutory mandate to prevent unfair methods of competition comes a corollary mission to promote a robust and competitive marketplace. Uncertainty is anathema to such a marketplace. The Commission's Proposed Rule would upset dozens of state laws. Not incidentally, NCAs already are a topic of extensive legislative discussion at the federal level.[355] If adopted, these rules will be subject to years of litigation. One of the few things that can be said with certainty is that media and other coverage would lead to substantial confusion and disruption for employees and employers alike.

---

[352] *See generally, e.g.,* Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit,* ADMIN. L. REV. (forthcoming 2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4344807.

[353] The most recent case to opine on the Commission's substantive competition rulemaking authority dates to 1973. *See Nat'l Petroleum Refiners Ass'n* v. *Fed. Trade Comm'n,* 482 F.2d 672, 697-8 (D.C. Cir. 1973).

[354] *See, e.g.,* comments submitted to this Docket by TechFreedom, the United States Chamber of Commerce, and the Washington Legal Foundation.

[355] *See* Workforce Mobility Act of 2023, H.R. 731, 118th Cong. (2023-2024) and Workforce Mobility Act of 2023, S. 220, 118th Cong. (2023-2024).

In the comments below, we discuss the following issues: whether the Commission has statutory authority to adopt substantive Unfair Methods of Competition rules (under current D.C. Circuit precedent, yes; but that precedent is unlikely to withstand judicial review today); whether the Proposed Rule presents major questions for the purposes of the Major Questions Doctrine (it does); whether it would withstand judicial scrutiny under the Major Questions Doctrine (it likely would not); and whether the Proposed Rule, if adopted, would be based upon an unconstitutional delegation of authority to the Commission (they likely would be).

### A.  The Commission's Claimed Authority to Adopt Competition Rules Is Unlikely to Withstand Judicial Scrutiny

The Commission's claim of general competition rulemaking authority under Section 6(g) of the FTC Act rests on an ambiguous statutory clause and a 1973 opinion of the D.C. Court of Appeals in National Petroleum Refiners Association v. FTC.[356] That opinion has not been affirmatively repudiated by the Court of Appeals or reversed by the Supreme Court, but there has been little occasion to revisit it: The Commission has not proposed or enforced competition rules since the 1970s. As the Commission is well aware, the *National Petroleum Refiners* Court considered an octane labeling rule that operates chiefly as a consumer protection regulation, although one deemed at the time to have both competition and consumer protection elements. And the case was decided before Congress enacted the Magnuson-Moss Warranty Act,[357] which amended the FTC Act to include substantial procedural constraints on the consumer protection rulemaking that had constituted nearly the whole of the FTC's regulatory activity.[358] What is more, the 1973 opinion reflects a degree of agency deference that is increasingly out of favor with the federal courts.[359]

Other comments will argue the best reading of Section 6(g) in more detail than we undertake here. Our purpose here is more limited. We remind the Commission that its reading of its own authority is contentious.[360] Administrative law scholars have argued that a far more limited reading of 6(g) is likely to prevail in the courts.[361] And, in any case, the Commission must recognize that the promulgation of a broad regulatory prohibition of NCAs under the Commission's UMC authority, first, is

---

[356] *Nat'l Petroleum Refiners*, 482 F.2d at 697-8.

[357] P.L. 93-637 (1975) (codified at 15 U.S.C. § 2301, *et seq.*).

[358] *See, e.g.*, Maureen K. Ohlhausen & Ben Rossen, *Dead End Road: National Petroleum Refiners Association and FTC "Unfair Methods of Competition Rulemaking*, Truth on the Market (Jul. 13, 2022), https://truthonthemarket.com/2022/07/13/dead-end-road-national-petroleum-refiners-association-and-ftc-unfair-methods-of-competition-rulemaking.

[359] *Id.*

[360] *See, e.g.*, Noah Joshua Phillips, *Against Antitrust Regulation*, AM. ENTERPRISE INST. REPORT (Oct. 13, 2022), https://www.aei.org/research-products/report/against-antitrust-regulation.

[361] *See, e.g.*, Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, COLUM. PUB. L. RES. PAPER, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4344807; Thomas W. Merrill, *Re-Reading Chevron*, 70 DUKE L.J. 1153 (2021).

nearly certain to be challenged in the courts and, second, risks both the substantive provisions of such a rule and a Supreme Court repudiation of the Commission's authority to issue substantive or "legislative" competition rules more generally.

Section 6(g) states: that "the Commission shall also have power... from time to time to classify corporations and... to make rules and regulations for the purpose of carrying out the provisions of this Act."[362] For the proponents of a broad rulemaking power, this is taken to be a catch-all provision providing a general power to issue "rules and regulations," subject only to the relatively light-touch procedural requirements for "informal rulemaking" in Section 553 of the Administrative Procedure Act.[363]

As prominent commentators have noted, there is no "plain meaning" of "rules" within the meaning of section 6(g).[364] In *National Petroleum Refiners*, the D.C. Circuit opted to "favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment, particularly where, as here, that interpretation is consistent with the plain meaning of the statute."[365]

A contemporary court, reading the same statutory language, would not likely agree that the meaning of "rules" in section 6(g) is "plain," based on suppositions about the general policy behind the initial enactment of the FTC Act.

Most importantly, we note that the remainder of Section 6 empowers the Commission to investigate and report on the business practices of corporations. More recent amendments have to do with investigating, reporting, consulting, and advising by the Commission.[366] No part of Section 6 expressly authorizes the Commission to undertake any enforcement action or impose any penalties, and the authority it does explicitly grant is limited to information gathering and analysis by the Commission.

Recent judicial trends are far less deferential to administrative agencies, and far more likely to curtail agency discretion in the face of statutory ambiguity. For example, in *AMG Capital Management*, the Supreme Court narrowly interpreted the Commission's power to obtain equitable remedies, repudiating established Commission practice.[367] And, as explained below, in cases like *West Virginia v.*

---

[362] 15 U.S.C. § 6(g) (reference to s.57a(a)(2) omitted).

[363] 5 USC §553.

[364] *See* Merrell, *Antitrust Rulemaking*, *supra* note 352, at 28.

[365] *National Petroleum Refiners*, 482 F.2d, at 689.

[366] *See* Merrell, *Antitrust Rulemaking*, *supra* note 352, at 28.

[367] *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021). The FTC had argued that monetary damages were impliedly available under the power in section 13(b) of the FTC Act to seek injunctive relief, but the Supreme Court disagreed and restricted the Agency to injunctive relief only, without the implicit grant of damage.

*EPA*, the Supreme Court has demonstrated concern with the general breadth of the administrative state and, specifically, has rejected the proposition that courts defer to agency interpretations of vague grants of statutory authority where such interpretations are of major economic and political import.[368]

### B.  The Proposed Rule Presents Major Questions that Can Be Addressed Only by Congress

Adoption of a broad NCA rule such as proposed in the NPRM will likely also face scrutiny under the major questions doctrine. The Supreme Court's recent opinion in *West Virginia v. EPA*[369] has brough substantial attention to the Major Questions Doctrine. While the contours of this doctrine are still being defined by the courts, it stands roughly for the proposition that Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."[370] The Proposed Rule is broad—on the Commission's own account it would affect around 30 million employees and hundreds of billions of dollars in commerce annually. It would also insert the Commission into an area that is already heavily regulated by the states and the federal government: Numerous federal statutes and rules regulate employer/employee relations, and a vast—and active—body of state statutory and judge-made law addresses NCAs specifically. If adopted, the Proposed Rule would clearly be one of vast economic and political significance. Indeed, one could well call the Proposed Rule the very model of a modern major question.

If deemed to be a major question, it beggars belief to think that the courts would find that Congress, through the FTC Act's capacious but general language, has spoken clearly enough to grant the Commission the authority to regulate labor in this way. Both the substance of the Proposed Rule and the mechanism of issuing such rules are likely to be found infirm. The Commission's relevant authority is to proscribe unfair methods of competition. The scope of that authority has long been understood as largely coextensive with, but slightly broader than, the scope of the antitrust laws. Historically, the Commission's UMC authority has been exercised through case-by-case enforcement actions.

The Commission's Proposed Rule would go far beyond the established scope of the FTC's UMC authority, and it would abandon case-by-case enforcement entirely. Indeed, there is no question that traditional *indicia* of anticompetitive conduct are of no relevance to the Proposed Rule. For example, the proposed prohibition is not limited to firms with market power. What's more, there is no legitimate argument that NCAs are *categorically* anticompetitive (or otherwise unfair methods of competition). Many rules are somewhat overinclusive—that goes hand in hand with the legislative prerogative—but the Commission's claim to rulemaking authority is strained at best, and its substantive legal

---

[368] *West Virginia v. Envtl. Prot. Agency*, 142 S. Ct. 2587 (2021).

[369] *Id.*

[370] *Util. Air Regul. Grp. v. Envtl. Prot. Agency*, 573 U.S. 302, 324 (2014).

authority is limited on its face to enforcing the prohibition of unfair methods of competition, not to regulating competition to ensure that broad categories of commercial practices are *on net* competitive.

Moreover, there is no paucity of legislative interest or ability to regulate in this area. Both Congress and the states are very active in the areas that the Commission's rules would regulate.[371]

Other comments in this proceeding take up the arguments that the Proposed Rule presents major questions and would likely be rejected under the Major Questions Doctrine. We add to those comments, both to join in those concerns and to add a broader institutional perspective. The Commission's recent moves towards aggressive use of its Unfair Methods of Competition authority run in the opposite direction of contemporary administrative law. The Commission's recent policy statement on its use of its UMC authority, for instance, cites to myriad cases that are four or more decades old, antedating the modern era of antitrust law, and often rely on *dicta* in doing so.[372] At the same time, in cases like *West Virginia v. EPA*, the Supreme Court has shown concern with the general breadth of the administrative state, and in cases like *AMG Capital*,[373] the Court has taken action to limit, or has shown concern about, the scope of the Commission's authority specifically. And just last week, in Axon Enterprise,[374] the Supreme Court held that defendants in FTC and SEC administrative proceedings need not exhaust agency process on the merits before raising constitutional challenges to the agencies' actions in federal district court.

The cost of risky and resource-draining litigation cannot be gainsaid. Importantly, this observation is endogenous to the question of the Commission's authority: The Commission is the nation's chief inter-sectoral commercial regulator. The Proposed Rule promises to be exceptionally disruptive to the entire American economy—a destabilizing force that runs counter to the Commission's purpose and that should, in any case, be an important consideration, even when the Commission exercises a clear statutory mandate. But here, the only certainty is uncertainty. The Commission is considering regulations that would subject vast swaths of the United States' economy, employees, and employers to confusion and uncertainty. The Commission ought to be more circumspect about the potential to disrupt the process it is charged to protect.

None of this is to reject the Commission's authority to challenge a specific firm's specific use of NCAs under Section 5 of the FTC Act. Through case-by-case basis adjudication, the Commission

---

[371] *See, e.g.*, Workforce Mobility Act of 2023, *supra* note 355.

[372] *See* FTC, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022), available at https://www.ftc.gov/legal-library/browse/policy-statement-regarding-scope-unfair-methods-competition-under-section-5-federal-trade-commission. *See also* Gilman & Hurwitz, *supra* note 290.

[373] *AMG Capital Mgmt.*, 141 S. Ct. 1341.

[374] *Axon Enterprise, Inc. v. F.T.C.*, 598 U.S. __ (2023).

might determine that a specific course of conduct, in a specific factual setting, makes out either a UMC or UDAP claim; that is wholly consistent with the purposes and language of the FTC Act.

### C. A Grant of Substantive Statutory Authority Sufficient to Support the Proposed Rule Would Amount to an Impermissible Delegation of Authority

While the Court's application of the Major Question Doctrine in *West Virginia v. EPA* is grounded in several established strands of constitutional jurisprudence, the precise meaning of the doctrine remains uncertain. One line of inquiry suggests the doctrine is a new instantiation of the Non-Delegation Doctrine. There is some sense to that. The Major Questions Doctrine requires that Congress must clearly—and with some specificity—indicate an agency's authority to engage in significant rulemaking. The non-delegation doctrine, meanwhile, requires that Congress provide an intelligible principle that limits the scope of congressional authority delegated to an agency.[375] But the Non-Delegation Doctrine stands on its own: it could be the case that major questions present delegation issues, but there remain potential non-delegation issues separate from major questions. And the Court has also noted, e.g., separation of powers concerns at play in major questions.

The Non-Delegation Doctrine was famously articulated in *Schechter Poultry*, a 1935 Supreme Court opinion striking down the National Industrial Recovery Act (NIRA).[376] This is a seminal case in the administrative-law canon: decided on the same day as *Humphrey's Executor*, it dealt with the permissibility of Congressional delegations of authority to federal agencies. The central issue is that the United States Constitution vests "all legislative powers" in Congress.[377] Federal agencies are empowered to act on Congress's behalf, which seemingly could violate the Constitution's legislative vesting clause, which would render all agencies unconstitutional.

To resolve this issue, the Court found that Congress can empower agencies to exercise specific powers on Congress's behalf, but that there must be limits to these delegations of authority. The constitutional limit is that "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."[378]

---

[375] Regarding nondelegation generally, see, e.g., Thomas W. Merrill, *Rethinking Article I, Section 1: From Nondelegation to Exclusive Delegation*, 104 COLUM. L. REV. 2097 (2004). *Compare Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (reaffirming the traditional test permitting the delegation of discretionary authority if constrained by an "intelligible principle") *with id.* at 2135-7 (Gorsuch, J. dissenting) (insisting that delegations should be limited to filling the details in statutes with major questions resolved by Congress). *See also* Noah Joshua Phillips, *Against Antitrust Regulation*, supra note 360.

[376] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

[377] U.S. Const., Art. I.

[378] *Schechter Poultry*, 295 U.S. at 529.

*Schechter Poultry* is all-the-more relevant to the Proposed Rule because it discusses that doctrine in direct comparison to the Commission's statutory authority.[379] Both NIRA, which required the National Recovery Agency (NRA) to enforce codes of "fair competition," and the Federal Trade Commission Act, which prohibits "unfair methods of competition," have similar and similarly broad grants of statutory authority. In striking down NIRA, the Court explained its flaws in direct comparison to the FTC's statutory authority to deem certain methods of competition unfair. It explained that...

> "unfair methods of competition" are thus to be determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest.... To make this possible, Congress set up a special procedure. A Commission, a quasi-judicial body, was created. Provision was made [for] formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate evidence, and for judicial review to give assurance that the action of the Commission is taken within its statutory authority.[380]

While the Court does not *expressly* say that it is the case-by-case, adjudicatory nature of the Commission's UMC authority that renders the FTC Act a constitutional delegation of authority, the Court did point to the lack of these specific quasi-judicial procedures in holding NIRA's delegation of authority to the NRA to be unconstitutional.

In other words, if the FTC were successfully to assert that the FTC Act authorizes it to enact broad competition rulemakings like the Proposed Rule, that holding may contain the seeds of its own demise, if the Court determines that such a broad grant of authority without the constraints of adjudicatory process or special Mag-Moss-like procedural rules is contrary to the Non-Delegation Doctrine.

## V.   Conclusion

As we said in the introduction to these comments, we cannot recommend that the Commission adopt the Proposed Rule. It is not supported by the evidence, empirical or otherwise; neither is it supported the Commission's experience, authority, or resources.

Our comments have, like the Commission's own NPRM, reviewed the empirical literature regarding NCAs in some detail. In doing so, we can conclude only that the Commission's conclusions about "the weight of the evidence" are untenable.

---

[379] This discussion draws from the analysis in William C. MacLeod, *Regulating Beyond the Rule of Reason*, __ GEO. MASON. L. REV. __ (*forthcoming*).

[380] *Schechter Poultry*, 295 U.S. at 533-4.

*First*, as made amply clear at the FTC 2020 NCA Workshop, evidence about the effects of NCAs themselves is both limited and mixed. And like the more substantial body of evidence on the putative effects of NCA "enforceability," it is hardly comprehensive. Moreover, as made clear in the literature, and at the FTC's various workshops and hearings regarding NCAs and other labor competition issues, significant data and methodological limitations are observed throughout the relevant empirical literature. These are endemic and far from trivial. While the NPRM's review of the literature responsibly notes many of these limitations in discussing individual studies, the Commission seems wholly to ignore such limitations in making its general observations about the available empirical findings.

*Second*, most of the studies that have employed causal designs depend heavily on a dubious set of "enforceability" metrics. These lack any clearly specified subject; they are variable in their implementation; they depend upon several layers of subjective assessments; and they are highly coding dependent. Each implementation might best be considered a "black box." There is no such thing as an objective measure of enforceability.

*Finally*, most of the studies cited by the Commission have limited relevance to antitrust enforcement. The Commission seems to be in no position to offer even a partial equilibrium analysis of NCA effects. To ignore the question of downstream effects on consumers (and the paucity of evidence in this area) would be irresponsible. What is more, findings on, e.g., average wage effects observed in a particular state tell us little about the question of substitution effects, or about the basic question of the extent to which such average effects—even if taken at face value—may be driven by specific local labor markets in which specific employers exploit a significant degree of monopsony power. As Howard Shelanski observed, "[i]t's very possible that a small employer that ties up six employees in a noncompete has zero effect on the market."[381] At the same time, imposition of an NCA without notice could be a material omission, and potentially actionable under the Commission's UDAP authority.[382]

None of this is to say that the literature is without merit, or that none of the cited studies are suggestive of legitimate policy concerns. It is to say that the existing body of literature is developing and substantially incomplete. Available findings are mixed, there are far too many unanswered questions, and most empirical observations are far too uncertain in their findings and in their generalizability to ground a sweeping federal rule.

But beyond the Proposed Rule's evidentiary infirmities lie still more problems. The Commission plainly lacks both the experience required to ground such a rule and the resources that would be necessary to enforce it. Moreover, as the Commission is aware, adoption of the Proposed Rule would

---

[381] FTC 2020 NCA Workshop, *supra* note 2, Shelanski, Tr. at 293.

[382] *Id.*, Shelanski, Tr. at 191.

be nearly certain to prompt legal challenges to both the substance of the NCA regulations and, more broadly, to the Commission's authority to issue substantive or "legislative" competition rules under Section 6(g) of the FTC Act. While the Commission may be persuaded it has been granted such authority, and might cite a fifty-year-old D.C. Circuit case in support of that proposition, the Commission cannot gainsay changes in judicial construction that have occurred since *National Petroleum Refiners*. More specifically, the Commission cannot ignore the Supreme Court's more recent holdings on non-delegation and major questions that are wholly at odds with the sort of agency deference that obtained in 1973. That is, the Commission cannot ignore either the litigation burden or the risk to its own authority—nor the legal and economic uncertainty—that the adoption of the Proposed Rule would entail.

All is not lost. As we have also discussed, the Commission is in a position to develop better data sources, and the staff are capable of making substantial contributions to the literature. These could include, among other things, development of directly observed data on NCA terms and usage that would reduce, if not obviate, an excessive reliance on survey data. In addition, recent developments in state law—specifically, income-based restrictions on NCA enforcement—should enable data collection and event studies that do not depend upon soft and untested enforceability metrics.

The Commission, Congress, and state policy makers could all benefit from a more extensive development of the Commission's experience with NCAs. We note that the Commission has not issued any report of the findings of its 21st C. Competition Hearings, and that it has not issued any report on its 2020 workshop. We recommend that the Commission undertake a careful review of the records of pertinent FTC hearings and workshops, and that it issue a substantial report of its findings as prologue to any consideration of federal NCA regulations. Importantly, such reports could inform policy reforms that do not rest on antitrust. Recent state-level statutes, such as income-based limits on NCA enforcement, are not merely opportunities for event studies. Rather, they highlight the various policy concerns that might motivate state or federal reforms in labor policy, whether in conjunction with, or apart from, any observations of conduct that exploits market power in violation of the FTC Act or the federal antitrust laws, to the detriment of competition and consumers.

Competition policy can make an important contribution to such potential policy reforms, without necessarily coopting them. For example, it may be that NCAs for low-income workers serve no pro-competitive goal, even if there are many labor markets in which NCAs do not harm competition but prove otherwise politically unobjectionable. That might provide a foundation for further state or federal policy reform, wholly apart from the question whether there are UMC violations that could support FTC competition rulemaking.

Finally, the Commission has asked about alternatives to the Proposed Rule, and "whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards

for different categories of workers."[383] We believe that the existing literature simply does not permit the making of viable inferences regarding the different effects of potential alternative policies, and thus that the issuance of the Proposed Rule or any alternative NCA rule by the Commission would be premature. Further research could confirm the Starr, Prescott, and Bishara finding that the timing of an NCA disclosure bears critically on the wage impact of an NCA, for example.[384] If so, that might ground a general finding that the failure to disclose NCA terms at some point before the commencement of employment is a material omission, perhaps with sufficient frequency and effect to support a Mag-Moss UDAP rulemaking. At present, that too would be premature, however.

Indeed, if the existing evidence is to be taken at face value, arguably the wage-effect evidence, especially that adduced by Starr, Prescott, & Bishara, counsels *against* a broad prohibition on NCAs:

> To be sure, regulatory regimes must sometimes rely on clear rules that ban (or allow) particular conduct, and such rules will be overinclusive or underinclusive. As then-Judge Breyer once explained, the cost of assessing the exact impact of each type of conduct would be prohibitive. The benefits of additional investigation do not always warrant the costs. However, if the anticipated impact on wages should drive the treatment of employee noncompete agreements, the cost of discriminating between contracts likely to reduce such wages and those likely to increase them is extremely low. Agencies and courts need simply ask whether the employer disclosed the agreement before acceptance. If the answer is "yes," any presumption that such an agreement will reduce wages must evaporate. If anything, the presumption should shift in favor of a conclusion that the agreement will produce net benefits.[385]

That is not to say that no enforcement is ever warranted. The Commission has brought and settled four Section 5 cases in which they alleged that specific NCAs, under specific facts and circumstances, violated the prohibition of unfair methods of competition. Although the antitrust analysis in the public documents is not entirely clear, we do not maintain that there have been no NCAs that constitute UMC violations; and there might well be uninvestigated matters in which the Commission might demonstrate actual or likely harm to competition and consumers. In the alternative, as noted above, an FTC investigation might find a UDAP violation under some specific set of facts and circumstances.

But the Proposed Rule at issue here is not tied to credible evidence and is not nearly so restrained. The extensive concerns discussed in this comment militate against the Commission's adoption of the Proposed Rule and, indeed, based on the available record, against any general competition rulemaking restricting the use of NCAs by the Commission.

---

[383] NPRM at 3516.

[384] *See* Starr, Prescott & Bishara, *supra* note 54.

[385] Meese, *supra* note 56, at 702-3.

## Appendix A: Authors and Contributing Signatories

| | |
|---|---|
| **Alden Abbott**<br>Senior Research Fellow, Mercatus Center, George Mason University<br>Former General Counsel, FTC | **Jeremy Kidd**<br>Associate Professor of Law, Drake University Law School |
| **Brian C. Albrecht**<br>Chief Economist, International Center for Law & Economics (ICLE) | **Peter G. Klein**<br>W. W. Caruth Endowed Chair and Professor of Entrepreneurship, Baylor University Hankamer School of Business |
| **Dirk Auer**<br>Director of Competition Policy, ICLE<br>Adjunct Professor, University of Liege in Belgium | **Thomas A. Lambert**<br>Wall Chair in Corporate Law and Governance, University of Missouri Law School |
| **Jonathan M. Barnett**<br>Torrey H. Webb Professor of Law, University of Southern California Gould School of Law | **Daniel A. Lyons**<br>Professor & Associate Dean for Academic Affairs, Boston College Law School |
| **Donald J. Boudreaux**<br>Professor of Economics, George Mason University | **Geoffrey A. Manne**<br>President and Founder, ICLE<br>Distinguished Fellow, Northwestern University Center on Law, Business & Economics |
| **Stephen Dnes**<br>Associate Professor of Law, Northeastern University, London | **Alan J. Meese**<br>Ball Professor of Law, William & Mary Law School |
| **Kenneth G. Elzinga**<br>Robert C. Taylor Professor of Economics, University of Virginia | **George Mocsary**<br>Professor of Law, University of Wyoming College of Law |
| **Luke M. Froeb**<br>William C. Oehmig Chair in Free Enterprise and Entrepreneurship, Vanderbilt University Owen School of Management<br>Former Director, Bureau of Economics, FTC | **Liya Palagashvili**<br>Senior Research Fellow, Mercatus Center, George Mason University |

| | |
|---|---|
| **Harold Furchtgott-Roth** <br> Senior Fellow, Hudson Institute <br> Former Commissioner, FCC | **Jeffrey T. Prince** <br> Professor of Business Economics and Harold A. Poling Chair of Strategic Management, Indiana University <br> Former Chief Economist, FCC |
| **Daniel J. Gilman** <br> Senior Scholar at ICLE <br> Former Attorney-Advisor, Office of Policy Planning, FTC | **Rohan Shah** <br> Incoming Assistant Professor of Economics, University of Mississippi |
| **Janice Hauge** <br> Professor of Economics, University of North Texas | **Ted Sichelman** <br> Judith Keep Professor of Law, University of San Diego School of Law |
| **Justin (Gus) Hurwitz** <br> Professor of Law, University of Nebraska College of Law <br> Director of Law & Economic Programs, ICLE | **Michael E. Sykuta** <br> Associate Professor of Agricultural and Applied Economics, Markets, and Policy, University of Missouri |
| **Keith N. Hylton** <br> William Fairfield Warren Distinguished Professor, Boston University School of Law | **Liad Wagman** <br> John and Mae Calamos Dean Endowed Chair and Professor of Economics, Illinois Institute of Technology Stuart School of Business <br> Former Senior Economic and Technology Advisor, Office of Policy Planning, FTC |
| **Mark Jamison** <br> Gerald L. Gunter Memorial Professor, University of Florida Warrington College of Business | **Gregory J. Werden** <br> Visiting Scholar, Mercatus Center, George Mason University <br> Former Senior Economic Counsel, Antitrust Division, U.S. Department of Justice |
| **Ginger Zhe Jin** <br> Professor of Economics, University of Maryland <br> Former Director, Bureau of Economics, FTC | **Jonathan W. Williams** <br> Professor of Economics and Director of the Center for Regulatory and Industrial Studies, University of North Carolina, Chapel Hill |

# Managed Funds Association
### The Voice of the Global Alternative Investment Industry

Washington, D.C. | New York | Brussels

April 19, 2023

**Via Electronic Submission:** https://www.regulations.gov

April J. Tabor
Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue NW
Suite 1 CC-5610 (Annex C)
Washington, D.C. 20580

### Re: Non-Compete Clause Rulemaking, Matter No. P201200

Dear Ms. Tabor,

Managed Funds Association[1] (**"MFA"**) submits these comments to the Federal Trade Commission (the **"Commission"** or **"FTC"**) in response to the Commission's proposed rule to ban non-compete agreements (**"NCAs"**) between employers and employees (the **"Proposed Rule"**).[2] While MFA understands the Commission's objective of protecting American workers and ensuring their mobility, particularly in farming and manufacturing industries, we believe that the Proposed Rule, as drafted, is too broad for this objective.[3] The Proposed Rule would significantly increase the burdens on organizations while impeding their ability and legitimate need to protect their intellectual property and proprietary interests. The Proposed Rule would have a significant negative impact on MFA members, which include hedge funds, crossover funds, and credit funds. The beneficiaries of these funds are pensions, foundations, and endowments, and their investment returns help secure retirements, fund medical research, and provide college scholarships, among other things.

Accordingly, we urge the Commission to reconsider the Proposed Rule as it would significantly harm MFA members with respect to research, investment, and competitiveness in the United States. To the extent that the Commission determines to move forward with the Proposed

---

[1] Managed Funds Association ("**MFA**") represents the global hedge fund and alternative asset management industry and its investors by advocating for regulatory, tax, and other public policies that foster efficient, transparent, and fair capital markets. MFA's more than 150 member firms collectively manage nearly $2.6 trillion across a diverse group of investment strategies. Member firms help pension plans, university endowments, charitable foundations, and other institutional investors to diversify their investments, manage risk, and generate attractive returns over time. MFA has a global presence and is active in Washington, Brussels, London, and Asia. www.managedfunds.org.

[2] Non-Compete Clause Rule, 88 Fed. Reg. 3482 (proposed Jan. 19, 2023).

[3] The Commission's own recent enforcement actions taken a single day before announcing the Proposed Rule do not prohibit non-compete provisions for senior executives and employees involved in research and development. *See* O-I Glass, Inc., File No. 211-0182, https://www.ftc.gov/system/files/ftc_gov/pdf/2110182o-iglassdraftorderappxa.pdf (Jan. 4, 2023) (Decision and Order Appendix A); Ardagh Glass Group S.A., File No. 211-0182, https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghdraftorderappxa.pdf (Jan. 4, 2023) (Decision and Order Appendix A). This fact is a clear indication that there are legitimate business justifications for such non-compete provisions and is a recognition by a majority of the Commission that a blanket ban on non-compete provisions goes too far.

Rule, we would urge the Commission to provide a carveout[4] to allow for the use of NCAs where the following conditions are satisfied:

(1) The NCA has terms reasonably related to the protection of the firm's business interests, including intellectual property, trade secrets, and confidential and proprietary information, for the purpose of competitive advantage;

(2) The NCA is in effect for no more than two years after termination of employment or the maximum term allowed under state law applicable to the NCA, whichever is shorter;

(3) The NCA applies only to employees earning at least $100,000 per year or the highest wage floor amount in the states that impose wage floors, whichever is higher;

(4) The NCA provides for payment of no less than the ex-employee's base salary[5] during the post-employment period in which the ex-employee's subsequent employment is restricted by the NCA; and

(5) The NCA is otherwise in accord with applicable state law(s).

## I.    MFA Members Rely on Non-Compete Agreements to Protect Their Proprietary Information

MFA members frequently use NCAs with other contractual safeguards to protect some of their most valuable investment assets and proprietary information. Typically, the secrecy of MFA members' proprietary information is an inherent part of its value because such information would have little value if it were widely known and, therefore, priced into the markets. Accordingly, MFA members limit the use of NCAs only to employees whose departure would run the risk of exposing such proprietary information and result in competitive harm. In such cases, NCAs are used to protect proprietary strategies and processes that result from research and development. Indeed, MFA members often file for patent protection (or otherwise rely on trade secret law) in respect of their proprietary technologies, processes, and formulae. However, as explained in further detail below, NCAs afford MFA members unique protection against cases where departing employees misappropriate their proprietary information.

Importantly, NCAs foster the free flow of information within a firm that results in the innovation that is so critical to the competitive process in the investment management industry. Restricting MFA members' use of NCAs would impede the sharing of information within a given firm and limit the number of employees who have access to each firm's proprietary information. Currently, MFA members use NCAs to safely allow covered employees to access a firm's strategies

---

[4] The only exception currently in the Proposed Rule is inadequate because individuals who own less than 25% of a firm, including those with no ownership interests, often have access to the same proprietary information as those who own at least 25% of a given firm.

[5] Provided that the ex-employee's base salary is not less than $100,000, consistent with the third condition.

JA0952

and proprietary information. Having access to such information enables employees to gain valuable experience to progress in their careers, and many often go on to start their own firms, increasing competition in this industry. Without the protection of NCAs, firms would be forced to severely limit the number of employees with access to their proprietary information, and the employees without access would be relegated to working on discrete projects without understanding the broader implications of their work. As a result, employees would likely lose out on career-advancing learning opportunities.

This is not a hypothetical concern. Employees of MFA members already recognize that employees who enter NCAs with their employer receive increased access to the firm's proprietary information, which allows them to have a greater impact within the firm. Because of this fact, there have been instances where the ***employees*** of MFA members have requested to enter NCAs with their employers. The Proposed Rule would prevent employees from making such a choice.

In turn, the use of NCAs allow MFA members to utilize the unique perspectives of each covered employee, which is needed to develop and implement investment strategies for pension plans, university endowments, charitable foundations, and other institutional investors. These investors depend on the innovation that allows MFA members to diversify their investments, manage risk, and generate attractive returns over time.

Significantly, NCAs limit harm to employees in the investment management industry, as such employees are typically compensated during the non-compete period. The net result is that the use of NCAs by MFA members fosters investments in employees and creates the prospect of more competition once the post-term non-compete period ends. Not only do new firms started by former employees benefit from the use of NCAs, but other new entrants do too. Both benefit from knowing that their startup investment in their own proprietary information will be protected. A blanket ban on the use of NCAs would not only harm former employees and new entrants looking to compete, but it would result in less competition overall, which would have a negative effect on investors.

NCAs play a crucial role in allowing MFA members to protect their proprietary information, investment strategy, and investors while balancing the interests of employees.

## II.     A Blanket Ban on Non-Competes Would Harm MFA Members and Their Employees

As discussed in more detail below, NCAs are one of the most effective ways MFA members can ensure protection of their proprietary information, know-how, and investment strategies after their employees with access to such information leave. As noted above, much of the value in MFA members' proprietary information comes from its secrecy, which makes preventative measures, particularly NCAs, necessary. A recent study published on the Commission's website found that "[w]hen NCAs are relaxed, firms become less willing to fire advisers for misconduct and advisers' propensities to engage in misconduct and client fees increase."[6] In the investment management industry, NCAs serve to reduce costs and foster new market entry and competition. As noted above,

---

[6] Amit G. Gurun, Noah Stoffman & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).

1301 Pennsylvania Ave NW, Washington, D.C. 20004 | 546 5th Avenue, New York, NY 10036 | Rue d'Arlon 40, 1000 Brussels, Belgium
ManagedFunds.org

JA0953

Federal Trade Commission
April 19, 2023
Page **4** of **7**

employees in this industry need to have access to proprietary information and strategies to develop their skills and knowledge, which also allows them to deliver better results and client service for investors.

For example, MFA members often create and market new funds centered around specific portfolio managers, generally one or more individuals, who develop and implement the investment strategies of that fund. Before developing a new fund centered around one or more portfolio managers, to justify the substantial financial commitment required to launch and market a new offering, firms typically require assurances that the individual(s) will not misappropriate the firm's existing or future proprietary information and strategies. The Proposed Rule's ban on NCAs would likely dampen the market for new fund launches and, accordingly, put downward pressure on innovation and competition.

The Commission recites two reasons why the Proposed Rule may in fact increase new firm formation: first, workers would be free to launch new firms to compete with their former employer, and second, firms would be more willing to enter markets in which potential sources of labor are not restricted by NCAs. However, these rationales are largely inapposite in the investment management industry.[7] Often, it is the employee's former employer that seeds the new fund launch in return for an economic interest in the general partner entity, as well as the typical exposure of a limited partner and additional, preferential fund-level rights. Further contrary to the Commission's rationales, firms in this industry are generally unwilling to enter the market unless they can reach a sufficient comfort-level that their highly compensated, highly skilled workforce cannot immediately take the firm's proprietary information and strategies to a competitor.

To be sure, strategies employed by private funds vary widely and are highly proprietary. In fact, investors in funds are subject to confidentiality and non-disclosure agreements when they receive confidential information from these funds. It often takes a considerable investment of time, effort, and resources to develop and refine a strategy, and to develop a track record and sufficient reputation, to market that strategy to potential investors. NCAs protect this investment by MFA members. Accordingly, a complete ban on NCAs would have a chilling effect on new fund formations and investments in the investment management industry, which would harm investors.

The Proposed Rule's ban on NCAs could also harm employees in the investment management industry by eliminating the consideration employees are paid for signing NCAs, thereby potentially decreasing wages. Employees who are subject to NCAs are typically sophisticated, highly compensated investment professionals who can negotiate higher wages based, in part, on the requirement that they execute NCAs. The same is also true when NCAs are added or extended while such professionals are employed by MFA members. If NCAs are no longer permitted, the result could be downward pressure on the wages paid to such employees. Indeed, increased weighting toward deferred compensation may be substituted for NCAs,[8] and in such cases, departing employees receive

---

[7] To note, none of the academic studies on which the Commission relies dealt specifically with the investment management industry.

[8] *See* Richard A. Booth, *Give Me Equity or Give Me Death—the Role of Competition and Compensation in Building Silicon Valley*, 1 Entrepreneurial Bus. L. J. 265, 271 (2006) (arguing that deferred equity compensation is used as a

JA0954

neither the compensation associated with an NCA nor unvested awards of deferred compensation.[9] We urge the Commission to consider the potential impact on such wages.

Further, many funds rely heavily on their traders' and developers' knowledge and innovation in developing algorithms for quantitative trading. If a developer were to leave and join another firm, they would be taking that key asset with them, thereby exposing, and immediately devaluing, their former employer's trading strategy and harming its competitive position. Consequently, investors, as the clients of those firms, ultimately bear the costs resulting from firms' loss of intellectual property and the increased costs of doing business. More broadly, absent NCAs, firms would be forced to keep proprietary information limited to only a very select group of employees, stifling the flow of valuable information and ideas that support innovation and bring value to investors.

Contrary to the Commission's view, in practice, confidentiality, non-disclosure, and non-solicitation agreements do not afford MFA members the same level of protection as NCAs. Putting aside the difficulties with detecting misuse of proprietary information, even if detected, it is often too late to do anything meaningful about it. After-the-fact litigation is often an inadequate alternative because the harm has already occurred once the information has been divulged. Moreover, complicated assessments of ownership of investment algorithms can be costly, lengthy, and potentially result in disclosure of proprietary information as part of the litigation process.

Further, the cost and business disruption that engaging in litigation would bring hurts the firm and has a negative impact on the investment management industry as a whole.[10] To the extent that MFA members cannot rely on NCAs, they would be forced to litigate alleged confidentiality breaches much more frequently to protect their proprietary information. There have been many well-publicized cases of such trade secret litigation and the great expense at which the firms involved enforced their rights, including both core litigation expenses (which may be incurred over many years) and collateral expenses, such as those associated with internal investigations, cooperation with federal law enforcement, etc. Consequently, contrary to the objective of the Proposed Rule, a ban on NCAs would likely have a chilling effect on firms hiring their competitors' former employees. Accordingly, a blanket ban on NCAs would harm MFA members and their employees.

## III.    The Proposed Rule Should Carve-Out and Permit Certain NCAs

If the Commission decides to proceed with the Proposed Rule, the Commission should provide a carveout in the Proposed Rule and explicitly allow NCAs that meet the following conditions:

*First*, the NCA has terms reasonably related to the protection of the firm's business interests, including intellectual property, trade secrets, and confidential and proprietary information, for the purpose of competitive advantage. Most states currently employ a reasonableness standard when

---

replacement for NCAs for purposes of retaining employees).

[9] *See* Jonathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U Chi. L. Rev. 953, 991 (2020).

[10] A blanket ban may well harm smaller, budding firms and new entrants as they may not be able to keep their teams together or keep their own proprietary information internal.

1301 Pennsylvania Ave NW, Washington, D.C. 20004 | 546 5th Avenue, New York, NY 10036 | Rue d'Arlon 40, 1000 Brussels, Belgium
ManagedFunds.org

JA0955

examining NCAs.[11] This nearly ubiquitous standard reflects a balance between an employer's legitimate interest in protecting its proprietary information, an employee's mobility (and, more broadly, competitive conditions in labor markets), and the public interest.

*Second*, the NCA is in effect for no more than two years[12] after termination of employment or the maximum term allowed under state law applicable to the NCA, whichever is shorter. Generally speaking, the terms of NCAs in the investment management industry are variable and tailored to the business interests of the particular firm. Anecdotally, we understand that firms may employ NCAs with terms ranging from 12 to 36 months. In consideration of the variability of NCA terms and the business purposes for which they are suited, we urge the Commission to consider an NCA in effect for no more than two years after termination of employment to be presumptively valid. NCAs with a longer term may be valid to the extent reasonably related to the protection of the firm's business interests and not applied on a firm-wide, one-size-fits-all basis.

*Third*, the NCA applies only to employees earning at least $100,000 per year or the highest wage floor amount in the states that impose wage floors, whichever is higher.[13] By the Commission's own admission, this threshold is "relatively high."[14] Indeed, under such a threshold, NCAs would not have been permitted with respect to roughly 84% of workers with wage or salary income in 2021.[15]

*Fourth*, the NCA provides for payment of no less than the ex-employee's base salary[16] during the post-employment period in which the ex-employee's subsequent employment is restricted by the NCA. Crucially, such a requirement, currently only present in two states,[17] ensures that there would not be any economic harm to employees who enter NCAs.

---

[11] Non-Compete Clause Rule, 88 Fed. Reg. at 3494 ("In the 47 states where at least some non-compete clauses may be enforced, courts use a reasonableness inquiry…"); *see, e.g., Data Mgmt., Inc. v. Greene*, 757 P.2d 62, 65 (Alaska 1988); *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283 (Ariz. 1999).

[12] Post-term NCAs of up to two years are permitted in many states. *See* Ala. Code § 8-1-190 (Alabama); Ark. Code Ann. § 4-75-101(d) (Arkansas); Fla. Stat. § 542.335(1)(d)(1) (Florida); Ga. Code Ann. § 13-8-57(b) (Georgia); La. Stat. Ann. § 23:921(C) (Louisiana); S.D. Codified Laws § 53-9-11 (South Dakota).

[13] Only a limited number of states have a wage floor requirement for employee NCAs. *See, e.g.*, D.C. Code Ann. § 32-581.01(6), (10), (13) (Washington, D.C. – at least $150,000, adjusted annually for inflation); 820 Ill. Comp. Stat. Ann. 90/10(a) (Illinois – at least $75,000)); Me. Rev. Stat. Ann. tit. 26 § 599-A(3) (Maine – at or below 400% of the federal poverty level); Md. Code Ann., Lab. & Empl. § 3-716(a) (Maryland – at least either $15 per hour or $31,200 annually); Or. Rev. Stat. § 653.295(1) (Oregon – exceeds $108,575.64 in 2023, adjusted annually for inflation); Wash. Rev. Code Ann. § 49.62.020(1)(b) (Washington – exceeds $100,000, adjusted annually for inflation ($116,593.18 in 2023)).

[14] Non-Compete Clause Rule, 88 Fed. Reg. at 3518 ("An earnings threshold could be relatively high (as in, *e.g.*, the State of Washington, where a non-compete clause is void unless the worker's annual earnings exceed $100,000 for employees…").

[15] U.S. Census Bureau, *PINC-10. Wage and Salary Workers--People 15 Years Old and Over by Total Wage and Salary Income, Work Experience, Race, Hispanic Origin, and Sex*, https://www2.census.gov/programs-surveys/cps/tables/pinc-10/2022/pinc10_1.xlsx (last revised Aug. 17, 2022).

[16] Provided that the ex-employee's base salary is not less than $100,000, consistent with the third condition.

[17] Mass. Gen. Laws Ann. ch. 149, § 24L(b)(vii) (Massachusetts – arrangement must provide for the payment of at least 50% of the employee's highest annualized base salary paid by the employer within the preceding 2 years); Or. Rev. Stat. § 653.295(7) (Oregon – arrangement must provide for the payment of (a) compensation equal to at least 50% of the

1301 Pennsylvania Ave NW, Washington, D.C. 20004 | 546 5th Avenue, New York, NY 10036 | Rue d'Arlon 40, 1000 Brussels, Belgium
ManagedFunds.org

JA0956

Federal Trade Commission
April 19, 2023
Page **7** of **7**

*Finally*, the NCA is otherwise in accord with applicable state law(s).[18]

This narrowly tailored carveout to the Proposed Rule is in fact necessary to achieve the Commission's goal of increasing competition in the labor market, particularly in the financial sector. As discussed at length above, NCAs provide firms with protection—and consequently, comfort—to share their proprietary information with employees, which in turn allows the employees to gain the necessary know-how. The Commission should incorporate this carveout into the Proposed Rule to preserve the benefits derived from NCAs while balancing employers' need to protect their information and the Commission's goal of promoting competition.

\*    \*    \*

We appreciate the opportunity to provide our comments to the Commission regarding the Proposed Rule, and we would be pleased to meet with the Commission or its staff to discuss our comments. If the Commission or its staff have questions or comments, please do not hesitate to call Joseph Schwartz, Director and Counsel, or the undersigned at ██████████.

Respectfully submitted,

/s/ Jennifer W. Han

Jennifer W. Han
Executive Vice President
Chief Counsel & Head of Global Regulatory Affairs
Managed Funds Association

cc:    The Hon. Lina M. Khan, Chair, Federal Trade Commission
The Hon. Rebecca Kelly Slaughter, Commissioner, Federal Trade Commission
The Hon. Alvaro Bedoya, Commissioner, Federal Trade Commission
Elizabeth Wilkins, Director, Office of Policy and Planning, Federal Trade Commission

---

employee's annual gross base salary and commissions at the time of the employee's termination or (b) 50% of $100,533, adjusted annually for inflation, whichever is greater).

[18] For clarity, MFA does not believe that its proposed carveout of the Proposed Rule should alter or otherwise preempt any state laws.

JA0957

**NATIONAL ASSOCIATION OF**
**Manufacturers**

**Brian Walsh**
*Director*
*Labor and Employment Policy*

April 18, 2023

Lina M. Khan
Chair
Federal Trade Commission
600 Pennsylvania Avenue NW
Suite CC-5610 (Annex C)
Washington, DC 20580

Re:    **FTC- 2023-00414; RIN 3084-AB74: Comments on "Noncompete Clause
Rulemaking, Matter No. P201200"**

Dear Chair Khan:

The National Association of Manufacturers (NAM) respectfully submits these comments
in response to the Federal Trade Commission's Proposed Rule on Noncompete Agreements.

The NAM is the largest manufacturing association in the United States. Its more than
14,000 members represent every industrial sector and hail from all 50 states. Manufacturing is
essential to the American economy. Manufacturers employ nearly 13 million men and women,
contribute more than $2.8 trillion to the U.S. economy annually and provide the greatest
economic impact of any major sector. Manufacturing also pays workers over 18% more than the
average for all businesses—on average, manufacturing workers earn $95,990 in pay and
benefits.[1] Taken alone, manufacturing in the United States would be the eighth-largest economy
in the world. The NAM is the voice of this critical ecosystem, and it serves as the leading
advocate for a policy agenda that enables manufacturers to compete in the global economy.

Manufacturers in the United States drive more innovation than any other sector,
performing 55% of private-sector research and development. In 2021 alone, manufacturers
spent nearly $350 billion on R&D.[2] Research is the lifeblood of manufacturing: new products,
new materials and new processes help propel manufacturing in America forward. Noncompete
agreements, and the intellectual property interests they help protect, serve as critical incentives
to encourage private businesses to invest the billions in R&D as well as the development of a
leading industrial infrastructure that serves the economic interests of the United States.

With this manufacturing landscape in mind, the FTC's proposed ban on all noncompete
agreements will lead to a dramatic shift in business operational practices and procedures and
impair the economic engine that is the manufacturing sector by needlessly eliminating long-
standing contracts between employer and employee. Noncompete agreements provide
protection to encourage private sector investment in R&D and infrastructure development and

---

[1]      https://www.nam.org/facts-about-manufacturing/
[2]      Ibid.

NAM FTC Noncompetes Comments
April 18, 2023

support manufacturing competitiveness. According to a recent NAM survey, close to 87% of respondents use covenants such as a noncompete, non-disclosure or non-solicit agreements with around 70% stating that they use noncompete agreements.[3] Manufacturers employ these covenants selectively to cover manufacturing employees with highly specialized skillsets and/or knowledge of confidential, proprietary or strategically important information like senior managers, engineers and sales employees. Manufacturers typically craft their noncompete agreements on an individualized, case-by-case basis, shaped by an employee's role within the company and his unique knowledge, expertise or training.

The proposal as communicated in the January 19 NPRM offers a one-size-fits all approach that would lead to significant disruptions in manufacturing operations, most directly as it relates to the management of human capital, with clear downstream impacts on innovation. Further, the FTC's proposal raises significant concerns regarding the scope of the agency's statutory and constitutional authority. Indeed, the proposed rule transgresses the FTC's properly interpreted authority under the FTC Act, under both the Supreme Court's major questions doctrine and the prohibition on delegation of legislative authority. Moreover, noncompete agreements have been adequately regulated at the state level for over a century through both legislation and common law. Most states permit noncompete agreements that are narrowly tailored to protect a company's legitimate business interests and reasonable in scope. Manufacturers have structured their employment agreements based on this recognized legal framework which provides important protections to both employer and employee.

If the FTC proceeds with this novel rulemaking, manufacturers request that the agency consider how implementation of a blanket ban on noncompetes will impact the unique requirements and demands of advanced manufacturers and other complex businesses that are heavily reliant on innovation. Manufacturers are particularly concerned that a blanket ban on noncompete agreements will:

- Discourage investment in R&D and critical infrastructure;
- Disregard the deliberate and intentional process that manufacturers use to protect their trade secrets and other intellectual property;
- Ignore the threats that manufacturers face from both foreign and domestic competitors related to intellectual property;
- Harm business to business relationships and competitive business strategies;
- Complicate long-standing talent recruitment and retention strategies;
- Exceed the agency's authority under the FTC Act, which does not extend to promulgating binding, substantive competition regulations that outlaw economic arrangements that have legally existed for generations; and
- Disrupt the stability of noncompete agreements that are regulated at the state level.

## Noncompete Agreements Protect Manufacturing Innovation

Manufacturers are innovators and inventors who have a vision for the future and the drive to make it real. From new technologies and lifesaving medicines to sustainability solutions and humanitarian breakthroughs, manufacturers lead the way toward solving challenges today and creating opportunities tomorrow. R&D in the manufacturing sector has risen from $132.5 billion in 2000 to $347.4 billion in 2021.[4] With the right federal policies in place, manufacturers in America will be able to compete with the rest of the world and lead toward more progress for

---

[3]     https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf
[4]     https://www.nam.org/facts-about-manufacturing/

more people. Those policies must include robust intellectual property (IP) protections and enforcement.

The NAM has advocated for policymakers to strengthen the protection of IP rights under domestic laws and international agreements and to pursue policies that reflect the vital importance of manufacturers' IP rights for industrial competitiveness. In fact, the NAM is leading the fight against counterfeit goods and the threat they pose to manufacturers, urging the U.S. government to enact policy and take action to deter IP theft from foreign governments, state-sponsored actors and criminals. Noncompete agreements are a critical preventative tool in the arsenal to combat this threat to manufacturers' IP. It is unsurprising that approximately 93% and 72% of manufacturers surveyed use noncompete agreements to protect their intellectual and industrial processes respectively.[5] The FTC's proposed ban encroaches on the suite of tools on which manufacturers routinely rely to protect their IP, threatening future innovation and continued domestic manufacturing investment.

In 2014, the Center for Responsible Enterprise and Trade (CREATe.org) and PricewaterhouseCoopers (PwC) estimated that the cost of trade secret misappropriation ranged from one to three percent of the U.S. Gross Domestic Product, potentially costing U.S. companies hundreds of billions per year.[6] That number has only increased since 2014. Equally significant, 85 percent of trade secret thefts are committed by either an employee when they move to a competitor or by someone else known to the party whose trade secrets were stolen.[7]

The unique knowledge and capabilities that individual employees gain through training and product development are a built-in feature of the product patents process. For each step of this process to work effectively, maximizing the benefit of the product for the public, these individuals must obtain extensive training and deep expertise on the product. Noncompete agreements encourage manufacturers to make these worthwhile personnel investments, allowing the product experts to collaborate from an innovation center to a factory floor to environments such an operating room and other real-life applications.

For example, R&D necessitates investment in a range of highly skilled workers like engineers, scientists and physicians. Advanced manufacturers in the life sciences sector, in particular, employ tailored noncompete agreements to cover these workers throughout a product's lifecycle. Incorporating the know-how of physicians and other experts in the planning, research, development, testing, marketing and release of new products is critical. This knowledge is later brought to an operating or consultation room where the safe and effective use of a medical device is incredibly valuable yet unprotected by the product patent. Upon release to the public, the engineers who develop the device will educate the sales consultants, who in turn provide training resources and opportunities to the surgeon and surgical team.

Under the current proposal, however, these vital perspectives could only be obtained at risk of revealing critical information to a potential competitor—and thus may ultimately go missing, meaning less employee and management participation as products are researched, developed, tested, marketed and ultimately released to the public. Manufacturers must be able

---

[5]     https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf

[6]     *See* Economic Impact of Trade Secret Theft: A framework for companies to safeguard trade secrets and mitigate potential threats, https://www.innovation-asset.com/hubfs/blog-files/CREATe.org-PwC-Trade-Secret-Theft-FINAL-Feb-2014_01.pdf

[7]     *See* World Intellectual Property Organization, https://www.wipo.int/wipo_magazine/en/2016/01/article_0006.html

to staff R&D teams fulsomely and have access to as many perspectives as possible, including from technical employees at all seniority levels. Banning noncompetes risks further isolation of ideas and siloing of information to prevent potential threats of theft, to the ultimate detriment of American innovation and economic competitiveness.

Further, without noncompetes, manufacturers would be less likely to invest in capital-intensive projects and the necessary trial and error that is inherent in testing new products and processes. This information could easily end up in the hands of a competitor. The competitor would need only wait until the product or process proves its viability and hire the particular worker(s) involved, reaping a windfall from others' hard work, time, and financial resources, and thus discouraging critical investment in innovation. Noncompete agreements cover these situations and allow manufacturers to maintain their competitive edge.

Noncompetes are an essential tool for protecting trade secrets—vital intellectual property that does not qualify for patent protection. Many types of confidential technical information do not meet the legal requirements for patentability, yet the Supreme Court has recognized both the value of such information to businesses that legitimately develop it, and the unfairness of allowing competitors to cut corners by misappropriating that information.[8] Moreover, a business may be uncertain whether a discovery is patentable or not, and decide not to risk disclosing it publicly in a patent application that could be rejected. And business strategy information like customer lists, pricing, and the like are never patentable, but are valuable to their proprietors and attractive targets for competitors.

Non-disclosure agreements are also not a sufficient tool to protect businesses' intellectual property. Enforcement of an NDA requires the company to prove the actual obtaining and use of covered information, which is very difficult to achieve when compared to the deterrent effect of a noncompete. Further, NDAs do not address the reality that it is simply unrealistic to expect that employees will mentally separate the trade secrets they have developed expertise on when they go to a competitor. The current remedies for misappropriation of trade secrets under state laws modeled after the Uniform Trade Secrets Act, and in federal court under The Defend Trade Secrets Act (DTSA), do not prevent misappropriation of trade secrets, but rather only offer a remedy after the misappropriation has occurred. Noncompete agreements are, therefore, a necessary and important complement to non-disclosure agreements and trade secret litigation for companies attempting to protect their proprietary scientific, technical, and business information.

## Noncompete Agreements Protect Business to Business Activity and Company Strategy

Mergers and acquisitions play a critical role in the manufacturing sector. The proposed rule will hinder M&A activity, including the acquisition of startups. These vital transactions provide growth opportunities for both acquiring and acquired companies; they also lead to significant business efficiencies, to include, but not limited to capital formation, jobs, and innovation. For consumers, mergers can decrease prices, increase available goods, and enhance choice. Mergers and acquisitions allow companies of all sizes to evolve and grow, leading to downstream effects that produce lower prices, increase output and create greater

---

[8]    *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481-482 (1974) ("[E]ven though a discovery may not be patentable, that does not destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discover.") (quotation marks omitted)

choice for consumers. Without access to noncompete agreements, it will become harder for manufacturers to protect company assets, leading to dramatic changes in M&A strategy and impacting the roughly half of manufacturers that use noncompetes to protect these critical transactions.

Noncompete agreements are ubiquitous in M&As, especially in transactions involving highly technical or complex businesses. Acquiring companies need not only the original product inventors but also other key talent to sign and abide by noncompete agreements for a defined period in connection with an acquisition. That key talent includes engineers and other workers who maintain first-hand, technical knowledge and expertise on the product and play an integral role in further development and innovation. These concerns are echoed by many manufacturers and are especially salient for manufacturers in the pharmaceutical and chemical sectors.

As an example, in the pharmaceutical and chemical sectors, where business models often include robust M&A activity, manufacturers are especially reliant on enforceable noncompete agreements. Noncompete agreements enable manufacturers to buy businesses from the original inventor or owner—in many cases, small startups or family-owned operations. After doing so, the acquiring company invests in that technology and helps expand the product's reach to a global scale, to the benefit of consumers. Manufacturers are willing to make these acquisitions with the assurance that those inventors and their integral employees have signed noncompetes, preventing them from starting a new business in the same industry to directly compete and potentially destroy the value of the acquired business.

Although the proposed rule includes a limited exception for noncompete clauses between the seller and buyer of a business, this exception is available only where the party restricted by the noncompete clause is an owner, member or partner holding at least a 25% ownership interest in a business entity. But many startups and small companies acquired by larger entities already have private equity involved in their corporate governance structure and ownership meaning that it is extremely unlikely that any single owner, member or partner maintains 25% or more ownership stake. As a result, the agency's 25% threshold for ownership is arbitrary, capricious and unrealistic.

Without noncompetes, manufacturers will spend more time and capital to protect trade secrets and the technologies they have acquired. This will mean more internal controls to capture the information that workers know and more litigation, since courts do not grant injunctions quickly on these matters. The proposed ban is also in tension with the FTC's current stance on mergers and acquisitions—which, like both longstanding antitrust law and state law on the enforceability of noncompetes, recognizes that such agreements can have important pro-competitive effects in the merger context.[9] In the NAM's experience, after a merger agreement

---

[9]    *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) (Taft, J.) (explaining that noncompete agreements in the acquisition context "are generally upheld as valid" when they are "reasonably necessary … to the enjoyment by the buyer of the property, good will, or interest in the partnership bought"), *aff'd*, 175 U.S. 211 (1899); *Shearson Lehman Bros. Holdings, Inc. v. Shmertzler*, 116 A.D.2d 216, 222 (N.Y. App. Div. 1986) ("[N]on-competition agreements … incident to the sale of a business are more liberally enforced 'on the premise that the buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value."); FTC, *Just because it's ancillary doesn't make it legal* (Sept. 30, 2019), https://perma.cc/3T2J-T8UF (noting that "non-compete provisions" entered into as "ancillary parts of a merger or joint venture agreement" will be reviewed by the FTC and allowed to proceed "if they are reasonably necessary for accomplishing the benefits of the transaction, and narrowly tailored to the circumstances surrounding the transaction.").

has been finalized, it is standard to have a cooling off period to avoid any suspicion of collusion or price fixing. The proposed rule, instead, allows employees of an acquired company to leave immediately and start a direct competitor to the company. This departure from widely accepted practice will not only drive up the cost of acquisitions, but divert resources away from scaling and innovating the technology or product that was acquired in the process.

### Noncompete Agreements Support Talent Recruitment and Retention

As manufacturers respond and adapt to ongoing workforce challenges, companies must continuously safeguard their competitive edge by investing in human capital through best-in-class training and competitive compensation packages that support both the company and the individual. The FTC's blanket ban of noncompete agreements is not a workable solution to addressing the challenges the FTC has identified. The agency's viewpoint is prejudiced by the idea that noncompete agreements exist solely to restrict worker mobility. The NAM understands that misuse of these agreements has occurred and recognizes that the FTC has the authority to pursue enforcement proceedings against entities that abuse the law.

The agency, through this rulemaking, misunderstands the fundamental and proper use of noncompete agreements in business and manufacturing environments. Noncompete agreements allow manufacturers to invest in their workers' development while securing their companies' interest in the knowledge acquired in the process. The majority of manufacturers have restricted the use of noncompetes to select employees and tailor those agreements to preserve the interests of both parties. For example, 93% of manufacturers stated that their agreements last no more than 2 years total from the employee's departure.[10]

Manufacturers utilize noncompetes for specific workers because they possess a level of skill and understanding that is critical to a company's ability to consistently and seamlessly conduct business successfully. Through further investment and cross-training, the worker's skills and knowledge are cultivated to help the employer achieve its goals, from developing the latest technological innovation to expanding operations into a new market. Approximately half of manufacturers surveyed stated that they are more likely to invest in their workers if the employee has signed a noncompete.[11] These key workers have been granted exclusive access to the inner workings of a firm. They are appropriately and competitively compensated for the integral roles they serve on behalf of their employers.

At the same time, manufacturing employers recognize that these key workers can depart at any time, taking with them intimate knowledge of the company's proprietary and strategically important information. That is why most manufacturers have tailored their noncompete agreements to balance their legitimate business interests with their investment in their employees. These agreements are used on an as-needed, negotiated basis depending on the information a manufacturer seeks to protect when employees choose to seek other employment. Manufacturers' noncompete agreements are varied and devised using a wide variety of options specific to the individual and protectable interest involved, and can included concepts like "garden leave" (compensating the worker the regular rate of their salary for the duration of the noncompete) in some cases, and identifying specific competitive concerns in others. Employers use noncompete agreements to give themselves protection while they show that the worker is integral to the organization.

---

[10]    https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf
[11]    Ibid.

Across all industrial sectors, the prototypical role within a company that requires the use of a noncompete agreement is that of senior executive. Generally, it is widely recognized and accepted among the manufacturing sector that senior executives possess significant negotiating leverage in their employment relationships and are compensated in return. Applying a noncompete ban to senior executives allows individuals who have the most sophisticated skillset and intimate knowledge of a company to immediately provide those same tools and information to a competitor. Further, compensation for a senior executive often includes equity in the company or garden leave. If the noncompete is voided on the employee's own will, then the compensation is returned to the employer. The agency's proposed rule overlooks the nuances of these compensation arrangements, including the tax implications for both the employer and the executive, creating unnecessary uncertainty for both sides of the agreement.

Manufacturers also utilize noncompete agreements for workers that have developed deep expertise on a product, including, for example, sales and marketing employees. Approximately 87% of manufacturers use noncompetes to protect their customer service and sales information.[12] The workers that are covered in these arrangements have obtained detailed and specific market intelligence on their employer's customer base and hold knowledge of a company's business and investment strategy. These workers are key to supporting the existing market and supporting increased sales and customer growth. Their understanding of a company's growth strategy puts these employees in a unique role to achieve company-wide goals and require a level of protection that a noncompete offers.

Manufacturers similarly rely on noncompetes to protect their investment in product engineers and workers who serve an integral role throughout a product's lifecycle. Engineers are involved in every step of the process from initial product design and development to ultimate fabrication, marketing and sale. In some cases, product maintenance also falls under their purview. This iterative process requires deep involvement by these workers in various components of the manufacturing process and business strategy. Around 65% of manufacturers cover engineers under their noncompete agreements.[13]

In manufacturing, there is a sharing in expertise across the business enterprise. As previously stated, it is not uncommon that an engineer, scientist, or physician is required to be in constant communication and collaboration with other workers in different departments. For example, the engineer will need to work with sales and marketing employees to explain the details surrounding a product. Or they will need to collaborate with high-level senior executives to make sure that the product is delivered on time. Each employee's functional expertise operates with a layer of protection that company assets will not be willfully shared as there is a common understanding to protect what is inherently competitive. The FTC fails to take into account that company expertise is not siloed and that company operations require a multi-pronged approach to protecting what makes the enterprise unique.

## FTC Lacks the Authority to Ban Noncompete Agreements

Apart from being misguided, the proposed ban on noncompetes exceeds the FTC's statutory and constitutional authority, is impermissibly vague and overbroad, and imposes a one-size-fits-all federal mandate on a subject adequately regulated under state law. *See generally* Dissenting Statement of Commissioner Christine S. Wilson, 88 Fed. Reg. 3,540, 3,543-45 (Jan. 19, 2023). This section will explore these serious legal concerns in turn.

---

[12]     Ibid.
[13]     Ibid.

**The Proposal Conflicts With the Major Questions Doctrine**

First, the FTC lacks the authority under the FTC Act to engage in unfair-competition rulemaking. This rulemaking is subject to evaluation under the Supreme Court's major questions doctrine, under which the Court requires an agency to "point to clear congressional authorization for the power it claims," when "the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quotation marks omitted).

As in the Supreme Court's major questions cases, the FTC here has "claim[ed] to discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority" (*West Virginia*, 142 S. Ct. at 2608 (quotation marks omitted)); indeed, as Commissioner Wilson explains, Section 6(g) of the Act was long understood not to provide any substantive rulemaking power, and only a single substantive rule prior to this one (never enforced and later withdrawn) was ever premised solely on the Commission's putative competition authority. 88 Fed. Reg. at 3,544.

More, the noncompete ban plainly represents an "assertion of extravagant statutory power over the national economy." *West Virginia*, 142 S. Ct. at 2608. The proposed rule explains that it would abrogate provisions of 30 million employment contracts—one for every five American workers; *see* 88 Fed. Reg. at 3,485. The Commission further estimates that its rule would result in a transfer of wealth of $250 to $296 billion per year. *Id.* at 3,501. Further underscoring the great "economic and political significance" of the proposed rule, Congress has consistently "considered and rejected" similar proposals. *West Virginia*, 142 S. Ct. at 2614.[14] And finally, as detailed further below, contracts not to compete have thus far been the "particular domain of state law." *Id.* at 2621 (Gorsuch, J., concurring); *see* 88 Fed. Reg. at 3,494 (recognizing that state law governs the enforceability of noncompetes).

Given this overwhelming authority, the Commissioners who voted in favor of the proposed rule concede the applicability of the major questions framework by asserting that "the FTC is operating under clear statutory authority." 88 Fed. Reg. at 3,538. But the FTC Act contains no clear statement authorizing the FTC to lead a substantive competition rulemaking. To the contrary, the grant of substantive power to "prevent persons … from using unfair methods of competition" is located in a statutory section dealing exclusively with individual enforcement proceedings. 15 U.S.C. § 45(a)(2). The notion that by this language Congress meant to empower the FTC to outlaw widely used and lawful business practices, rather than simply to promulgate interpretive or procedural rules for its adjudicative proceedings, runs contrary to the fundamental principle that "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The legislative history further supports the lack of substantive competition rulemaking authority. *See* 88 Fed. Reg. at 3,544 n.45 (collecting legislative history, including a statement

---

[14]     *See* MOVE Act, S. 1504, 114th Congress, 1st Session (2015); LADDER Act, H.R. 2873, 114th Congress, 1st Session, (2015); Freedom for Workers to Seek Opportunity Act, H.R. 4254, 114th Congress, 1st Session (2015); Workforce Mobility Act of 2018, 115th Congress, 2d Session (2018) (recently reintroduced as the Workforce Mobility Act of 2023, S. 220, 118th Congress, 1st Session (2023)); Freedom to Compete Act, S. 2375, 117th Congress, 1st Session (2021).

from the House sponsor of the FTC Act that "the Federal Trade Commission will have no power to prescribe the methods of competition to be used in the future," and the Commission instead "will exercise power of a judicial nature"). The later-enacted Magnuson-Moss Act, which created a complex rulemaking scheme for FTC's *consumer protection* rules, explicitly left the FTC's rulemaking authority with respect to *unfair competition* untouched, meaning that the authority to promulgate substantive competition rules must be located in the original 1914 Act, or nowhere at all. *See* 15 U.S.C. § 57a(a)(1)-(2).

The Commission relies on the D.C. Circuit's decision in *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), for its claim of substantive competition rulemaking power. *See* 88 Fed. Reg. at 3,499 & n.226. The court there applied precisely the opposite presumption than that which the Supreme Court has now mandated in *West Virginia*. Rather than being "reluctant to read into ambiguous statutory text" a delegation of sweeping agency power and thus requiring "clear congressional authorization" (142 S. Ct. at 2609), the D.C. Circuit based its decision on the then-extant principle that "[a]ll authority of the Commission need not be found in explicit language." *National Petroleum*, 482 F.2d at 680; *but see, e.g.*, *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1649 (2022) ("An agency, after all, literally has no power to act … unless and until Congress authorizes it to do so by statute.") (quotation marks omitted). *National Petroleum* is thus incompatible with the modern major questions doctrine.

The specifics of the proposed rule are also lacking in "clear congressional authorization" for another reason: Even apart from the lack of substantive rulemaking authority writ large, the FTC Act certainly does not empower the Commission to promulgate retroactive binding regulations. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). While the proposed rule disclaims retroactivity (88 Fed. Reg. at 3,512), its purpose and effect is to render illegal 30 million existing employment contracts, in addition to preventing such contracts going forward. In sum, the statutory authority for the proposed rule—both in its generalities and its specifics—appears to be at best ambiguous. Under *West Virginia*, that is not enough.

**The Proposal Constitutes an Impermissible Delegation of Legislative Authority**

Second, and apart from the major questions problem, if the FTC Act is construed to authorize substantive rulemaking like that attempted here, it could constitute an unconstitutional delegation of legislative authority. *See generally Gundy v. United States*, 139 S.Ct. 2116 (2019) (plurality op.) (explaining that "Congress . . . may not transfer to another branch powers which are strictly and exclusively legislative," and that "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."); *see also id.* at 2131-2148 (Gorsuch, J., dissenting) (noting the "traditional rule that Congress may leave the executive the responsibility to find facts and fill up details," but Congress itself must "make[] the policy decisions.").

While the Supreme Court has only ever struck down two statutes on nondelegation grounds, one of them empowered the agency in question to do almost *exactly* what the FTC claims power to do here: to promulgate "codes of fair competition." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-543 (1935). The Supreme Court found this delegation unconstitutional and specifically distinguished the FTC Act on the grounds that the "scope" of the FTC Act's "unfair methods of competition" would be "left to judicial determination *as controversies arise*," and contemplated that the FTC would act in a "quasi-judicial" capacity

itself. *Id.* at 532-533 (emphasis added). The FTC's current action would thus overstep the permissible role outlined for the agency in *Schecter Poultry*, instead attempting to unconstitutionally promulgate "codes of fair competition."

## The Proposal is Vague and Overbroad

In addition to exceeding these fundamental limits on the agency's power, the proposed rule is also overly broad and ambiguous in its definition of what qualifies as a noncompete agreement. The proposal claims that other types of restrictive covenants, such as non-disclosure or non-solicit agreements, *may* fall within the ambit of the rule as "de facto" noncompetes depending on the scope of prohibited behavior. The agency offers only a vague explanation as to what type of restrictions would qualify, with the potential to discourage or halt otherwise permissible and valuable business practices. Further, the definition of a worker is ill-defined and the agency must provide greater specificity to those it seeks to regulate.

The rule's retroactive ban on all noncompete agreements is poorly conceived and will create a trail of business consequences ranging from additional paperwork burdens to complex concerns around IP protection. Business decisions have been made with the understanding that these agreements will protect manufacturers' intellectual property and will be enforced properly by courts in the future. Manufacturers will also find it costly and burdensome to re-examine all their employment agreements to ensure that none contain noncompetes or other employment covenants that could be misinterpreted as de facto noncompetes and provide the requisite notice to current and former employees. For the 75% of manufacturers who use non-disclosure agreements, the rule's 180-day implementation period is unrealistic for this type of all-encompassing compliance effort.[15] Additionally, in order to be lawful, any final rule would need to forthrightly address the reliance interests of the businesses, including many manufacturers, that have entered into a variety of employment contracts that the proposed rule would abrogate. As the Supreme Court has made clear, "[i]t would be arbitrary and capricious to ignore such matters," as the FTC has done here. *See DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

## Noncompetes Are Properly Governed by State Law

Lastly, state law has been adequately evaluating noncompetes for centuries with the necessary flexibility for manufacturers. Individual states have picked the regulation that suits their individual policy preferences, ranging from outright bans (in a small minority of states) to no legislation at all. In general, state courts undertake a highly factual inquiry to determine whether a noncompete is valid and consider a company's legitimate business interests, as well as the agreement's geographic scope, duration and scope of proscribed activities. This rule, by contrast, treats noncompetes as *per se* invalid, as opposed to the rule of reason standard that courts have used to assess these agreements for years. As Commissioner Christine S. Wilson explained in her dissent, the proposed rule "represents a radical departure from hundreds of years of legal precedent that employs a fact-specific inquiry into whether a noncompete clause is unreasonable in duration and scope, given the business justification for the restriction."[16]

---

[15]    https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf

[16]    88 Fed. Reg. at 3,540; *see also* Christine Wilson, *Why I'm Resigning as an FTC Commissioner* (Feb. 14, 2023), https://www.wsj.com/articles/why-im-resigning-from-the-ftc-commissioner-ftc-lina-khan-regulation-rule-violation-antitrust-339f115d

NAM FTC Noncompetes Comments
April 18, 2023

**Conclusion**:

Manufacturing innovation and intellectual property are a critical foundation both for a globally competitive manufacturing base here at home and for U.S. global leadership in manufacturing. Patents, trademarks, trade secrets, industrial designs, trade dress, copyrights, genetic resources and other forms of IP are increasingly important to manufacturers large and small, enabling them to research and develop new industries, invest in advanced manufacturing and create new products for their customers around the world. Yet, inadequate global IP rules and growing theft of all forms of intellectual property present a growing challenge for innovative manufacturers, undermining hard-won American manufacturing innovation and the jobs and exports that innovation fuels. The consequences of weak IP protections are severe, and a step in the wrong direction hinders consumer health, safety, national security and rule of law.

This one-size-fits all proposal is unworkable as currently proposed, and threatens to allow trade secrets and other types of closely held company information to be freely accessed by competitors and foreign adversaries. In an already highly competitive and volatile business environment, losses will be incurred and manufacturers will face additional business challenges. Innovation is one of our greatest strengths and a major contributor to economic growth and industrial competitiveness. For this reason, it is important for policymakers both to nurture the creation and application of technology and to vigorously protect intellectual property, as the creation of technology is the creation of intellectual property. Without strong protection, the incentives for future innovation-directed R&D will be diminished.

While the FTC correctly identifies that one-in-five American workers are governed by a noncompete clause as a condition of their employment, the commission oversimplifies the use of noncompete clauses in its justification for this rulemaking. Further, the commission's rationale for pursing this rulemaking does not offer a full picture on the use of noncompete clauses as conditions of employment for complex businesses in highly sensitive and technical industries. Moreover, the retroactive nature of this proposal is likely to cause substantial confusion and damage to employers and employees alike.

Manufacturers are opposed to the commission's proposal in its current form. If the Commission wishes to consider a more tailored approach to restrict noncompete agreements that contemplates certain exemptions, manufacturers request that the current rule be withdrawn and resubmitted with exemptions clearly articulated and justified for the public's consideration.

Thank you for the opportunity to express manufacturers' ongoing concerns with this proposed rulemaking.

*Comments submitted via Regulations.gov by:*

Brian Walsh
Director of Labor and Employment Policy
National Association of Manufacturers
██████████████████████
Washington, DC ██████

JA0968

## RETAIL INDUSTRY LEADERS ASSOCIATION

Suite 700
Washington, DC 20003

www.rila.org

April 19, 2023

*Submitted via www.regulations.gov*

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Ave. NW
Suite CC-5610 (Annex C)
Washington, DC 20580

**Re:     Docket No. FTC-2023-0007: Non-Compete Clause Rule, Matter No. P201200**

Dear Ms. Tabor:

The Retail Industry Leaders Association (RILA) appreciates the opportunity to submit comments on the Federal Trade Commission's (FTC's or the Commission's) proposed rule banning non-compete clauses in employment agreements. *See* 88 Fed. Reg. 3,482 (Jan. 19, 2023).

RILA is a trade association of the world's largest, most innovative, and recognizable retail companies and brands. We convene decision-makers, advocate for the retail industry, and promote operational excellence and innovation. Our aim is to elevate a dynamic retail industry by transforming the environment in which retailers operate. RILA members include more than two hundred retailers, product manufacturers, and service suppliers, who together employ over 42 million Americans and account for $2.7 trillion in annual sales and hundreds of thousands of stores, manufacturing facilities, and distribution centers domestically and abroad.

RILA members fully support dynamic labor markets and competition in the American economy. The retail industry itself is hypercompetitive. Retail companies vigorously compete for a share of consumer spending by providing quality innovative products that meet customers' needs and expectations at a price they can afford. Retailers also compete for skilled talent to strengthen organizations, drive innovation and enhance customer experience.

RILA members agree with the FTC that overbroad and anticompetitive non-compete clauses in employment agreements are not appropriate and should be condemned. However, RILA members that use reasonable non-competes and other restrictive clauses are concerned that the FTC's proposal fails to consider various limited uses of these clauses, which provide benefits to employees and employers alike and do not on balance harm competition. RILA members do not use non-compete clauses for front-line hourly workers. Instead, those members that use non-compete clauses do so only for small number and limited categories of employees—namely,

executives, senior business leaders and skilled employees who are exposed to confidential business information and trade secrets. Non-compete clauses allow these retailers to recruit high quality talent for these kinds of positions, helping them improve the quality of the retailers' products and services, while protecting confidential business information and trade secrets. In exchange for agreeing to a non-compete, impacted employees receive additional benefits such as specialized skills training or compensation (*e.g.*, bonuses, equity, long term incentives, etc.).

A blanket ban on all non-compete clauses (and restrictive covenants deemed "*de facto*" non-compete clauses) is unsupported by the evidence and is unwise policy. Such a ban sweeps in all categories of workers, including those that are highly sophisticated and well compensated. Because non-compete clauses and other restrictive covenants can provide significant societal benefits without being overbroad and anticompetitive, they should be reviewed on a case-by-case basis to determine whether any given clause is reasonably tailored to the circumstances and warrants enforcement.

At a more fundamental level, it is vital for the American system of governance that federal agencies act only within the confines of the authority Congress grants them. To date, Congress has not provided the FTC with the legislative power to issue rules banning non-compete clauses as "unfair methods of competition" (UMC), but rather has only granted the FTC the power to proceed through case-by-case adjudication to prevent unfair methods of competition in commerce. Accordingly, any broad federal policy concerning non-compete clauses should be left to Congress and those agencies they deem to have the expertise and appropriate authority to develop employment policy.

The FTC should reconsider the proposed rule in light of the experiences of the RILA members that use non-compete clauses and given the serious constitutional and other legal concerns associated with this proposed rulemaking.

## Executive Summary

I. When non-compete clauses are properly tailored, they can serve as important tools that provide incentives to employers to invest in employees without unfairly restricting employment mobility. Retailers typically use non-compete clauses only for executive, senior business leaders or highly skilled employees who are exposed to confidential business information and trade secrets. Non-compete clauses allow retailers to operate their businesses effectively and efficiently by ensuring that confidential information and trade secrets they share with certain employees will be protected. Retailers also use non-compete clauses in certain circumstances when they provide skills training for employees. A non-compete prevents such an employee from using that training in competing stores (usually subject to geographic and time limits), protecting the retailer's investment. These limited uses of non-compete clauses are reasonable and overall beneficial to employees, employers, and consumers.

II. The FTC's proposed rule banning nearly all non-compete clauses used by employers under its jurisdiction is unsound public policy that will cause unintended harmful consequences. It

prevents the traditional case-by-case evaluation and enforcement of pro-competitive non-compete clauses, eliminating their benefits to commerce. By including ill-defined "*de facto*" non-compete clauses in the ban, the FTC's proposed rule creates significant uncertainty regarding the legality of other restrictive covenants, without which employers will be further hampered in their ability to protect confidential business information. And by proposing that the ban apply retroactively to existing contracts, the FTC would hugely disrupt the operation of businesses that rely on non-compete clauses and prevent employers from receiving the benefits of contractual provisions that they bargained for.

III. The proposed rule is beyond the FTC's legal authority. The FTC bases the proposed rule on its asserted authority to issue binding rules preventing "unfair methods of competition" in commerce, but Congress has never delegated what would be immense power to regulate the national economy through rulemaking to the FTC. Rather, Congress originally designed the FTC so that the Commission would evaluate conduct on a case-by-case basis. While Congress later provided the FTC with the power to issue binding rules with regard to "unfair or deceptive acts or practices" using specific procedures, it declined to provide the FTC with competition rulemaking authority.

IV. The proposed rule does not withstand constitutional scrutiny. The FTC's reliance on rulemaking grant language, which provides the FTC with authority to issue internal rules, does not pass the major-questions doctrine test. This language is at most ambiguous in scope and does not clearly provide the FTC with the power to decide a major national policy question regarding regulation of non-compete clauses in employment agreements. The FTC Act also does not provide the agency with an intelligible principle to issue rules on "unfair methods of competition," so if the statute were read to grant the agency power to issue the proposed rule, the statute would constitute an unconstitutional delegation of legislative authority. To avoid concluding that the FTC Act is unconstitutional, courts would likely decide that the Act does not grant the FTC the power to issue the proposed rule. Finally, the proposed rule also threatens principles of federalism because the FTC is seeking to regulate an area of contract law that is ordinarily left to the states.

V. The proposed rule Is arbitrary and capricious, in violation of the Administrative Procedure Act. The FTC's conclusion that non-compete clauses are categorically "unfair methods of competition" is based on cherry-picked studies that are inconclusive or methodologically flawed, and the FTC cannot rely on its own experience to support the rule because its experience with non-compete clauses is virtually nonexistent. The same goes for the FTC's proposal to ban "*de facto*" non-compete clauses, which is based on even slimmer support. The proposed rule is also arbitrary and capricious because the FTC failed to consider reliance interests, including those of retailers that have structured their businesses relying on the availability of non-compete clauses that states have deemed legal and those of employees who have benefited financially and professionally from these clauses. Furthermore, the FTC failed to conduct an adequate cost-benefit analysis of the proposed rule.

VI. The FTC should withdraw the proposed rule. It should continue evaluating non-compete clauses on a case-by-case basis so that it can prevent deceptive, unfair, or anticompetitive non-compete clauses without banning reasonable ones that provide benefits to commerce.

All of these issues are discussed in more detail below.

## Comments

## I.    Reasonably Tailored Non-Compete Clauses Are Important Tools for Creating Employment Opportunities

The FTC's proposed rule casts aside the significant benefits provided by reasonable non-compete clauses to employees, employers, consumers, and commerce as a whole. As detailed below, the limited use of appropriately tailored non-compete clauses is a reasonable and helpful tool that can allow employers to provide financial benefits and opportunities to individual employees, including higher wages, additional training, and access to confidential information. RILA members that use non-competes do so in a way that is specifically tailored to the circumstances of their individual businesses.

### A.    Tailored non-compete clauses are beneficial to both employees and employers.

Appropriately tailored non-compete clauses such as those used by a number of RILA members benefit both employees and employers. They provide strong incentives for companies to invest in and financially reward employees, as they ensure to a reasonable degree that employers benefit from training employees and that confidential business information—including business strategies—and company trade secrets will not be taken to competitors immediately upon the departure of an employee.[1]

Employees benefit from non-compete clauses because they can lead to more money in their pockets. As the FTC acknowledges, non-compete clauses are often associated with higher

---

[1] *See* John M. McAdams, Federal Trade Commission, Non-Compete Agreements: A Review of the Literature 13 (2019) ("The bulk of the empirical literature finds that workers signing non-compete agreements, or workers who reside in areas with a higher incidence of NCAs, receive more training [and] more access to information."); Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. Rev. 783, 808 (2019) ("Noncompete enforceability is associated with more training."); Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J.L., Econ., & Org. 376, 379 (2011) (Non-competes "encourage firms to make investments in their managers' human capital."); Johnson, Matthew S., and Michael Lipsitz, *Why are Low-Wage Workers Signing Noncompete Agreements*, 57 J. of Human Resources 689 (2017) (finding that non-competes result in increased training of salon workers).

wages.[2] Prospective and current employees can, and do, bargain for higher pay or other compensation in exchange for a non-compete clause.[3]

A recent survey of RILA members confirms that reasonably tailored non-compete clauses provide mutual benefits. Retailers indicated that retail employees subject to non-compete clauses receive a variety of financial benefits in exchange for agreeing to post-employment restrictions. An overwhelming majority of these companies provide employees receive equity grants or some other long-term incentive as consideration for non-compete clauses. Other financial benefits commonly provided by retailers as consideration include retention payments, bonuses, and severance payments.

Employees can also receive employer-paid specialized skills training as consideration for signing a non-compete agreement. In many instances, this type of training is offered to current company employees who may be in hourly or lowered paid positions within retail stores or distribution centers. Employees benefit from gaining new skills and career-enhancing professional development. The specialized training offered by many retailers can provide individuals not only with a new job opportunity but also with an upward career trajectory and future financial opportunities.

Non-compete clauses are beneficial to employers and commerce as a whole, too. In addition to protecting companies' trade secrets, confidential business information, and investments in employees, non-compete clauses can facilitate information-sharing within organizations to make them more connected, innovative, and effective—bolstering the competitiveness of firms and the economy. Non-competes can also enhance business collaborations among firms by providing guardrails for joint ventures. Without the availability of non-compete clauses, a firm might hesitate to engage in joint-venturing activities or to contribute its best talent to the joint venture for fear that an employee could be stolen by the co-venturer company. Thus, non-compete clauses facilitate the creation and effectiveness of new joint business ventures and help instill new ideas and innovation into the marketplace.

Because properly tailored non-compete clauses provide benefits to both employees and employers and are not unduly restrictive to employee mobility, the vast majority of states allow courts to enforce reasonable non-compete clauses. States have and continue to experiment to determine what limits on non-competes best preserve the balance of interests between businesses, workers, and the economy as a whole.[4] Indeed, courts routinely find that non-compete clauses that are limited in scope, noncoercive and tied to specific business interests— similar to those used by RILA members—are reasonable and even procompetitive.[5] Courts have

---

[2] *See* 88 Fed. Reg. at 3487/2–3 (citing Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020)).

[3] *See* Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 80 (2021) (explaining that the evidence of higher earnings is consistent with the notion that "noncompetes [are] a solution to a holdup problem").

[4] *See infra* at IV.C.

[5] *See, e.g.*, *Eichorn v. AT&T Corp.*, 248 F.3d 131, 148 (3d Cir. 2001); *Behrend v. Comcast Corp.*, 2012 WL 1231794, at *27–28 (E.D. Pa. Apr. 12, 2012); *KW Plastics v. U.S. Can. Co.*, 2001 WL 135722, at *22 (M.D. Ala. Feb. 2, 2001); *see also infra* at IV.C.

found that non-compete clauses lead to myriad competitive benefits, including: (1) increasing incentives for employers to train their employees; (2) ensuring that operations remain fully staffed; and (3) protecting trade secrets or other sensitive information.[6] As one court summed it up, "[t]he recognized benefits of reasonably enforced noncompetition covenants are by now beyond question."[7]

**B.     Retailers use non-compete clauses that are reasonably tailored and reflect unique, fact-specific circumstances.**

Competition is a core trait of the retail industry. Retailers are in constant competition with each other for customers and talent. RILA members do not seek to limit frontline or lower-paid worker mobility by requiring that such workers sign non-compete clauses in unreasonable situations—particularly because doing so would make it more difficult to attract workers in the competitive entry-level job market. Rather, RILA members that use non-compete clauses reasonably tailor the scope of employee positions subject to those clauses, using non-compete clauses for only a small percentage of their workforce. A recent survey of RILA members indicated that the majority of retailers that use non-compete clauses do so with less than 1% of their workforce and an additional quarter use non-competes with less than 10% of their workforce.

Retailers primarily use non-competes with a limited number of executive-level, senior business leaders, or other skilled employees—that is, those who work closely with confidential information and trade secrets. These are positions where it would be difficult for an employee not to use the confidential information, even unintentionally, if the employee were to work in a similar position for a competitor. As the employees involved are ordinarily sophisticated and well-informed, any concerns about information asymmetries and bargaining power in these negotiations are limited. Additionally, the employees involved are typically highly paid and/or receive additional financial compensation in exchange for agreeing to abide by non-compete restrictions.[8]

A few examples modeled off the responses to the recent RILA survey may provide the Commission with insight into how retailers use reasonably tailored non-competes. Retailer A negotiates an employment package with a prospective CEO who will direct the strategic direction of the company. Given the potential for harm to the business should the future CEO with knowledge of Retailer A's business strategies leave the company, the employment package

---

[6] *See Eichorn*, 248 F.3d at 144 (non-compete clauses reasonable to ensure workforce continuity during sale of subsidiary); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (non-compete clauses encourage employers to "train the employee, giving him skills, knowledge, and trade secrets that make the firm more productive"); *Aydin Corp. v. Loral Corp.* 718 F.2d 897, 901 (9th Cir. 1983) ("[Non-compete] covenants often serve legitimate business concerns such as preserving trade secrets and protecting investments in personnel.").

[7] *Innovation Ventures, LLC v. Custom Nutritions Labs., LLC*, 451 F. Supp. 3d 769, 791 (E.D. Mich. 2020) (quoting *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981)).

[8] *E.g.*, *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 530-31 (E.D. Va. 2012) (enforcing non-compete agreements against "executives of a publically traded company" because they were "at the pinnacle of sophistication," received significant "consideration . . . in return for their covenant not to compete," and "stood 'on equal footing at the bargaining table' with their employer" (citation omitted)).

includes a time-limited non-compete clause and other restrictive covenants in exchange for severance pay. Similarly, Retailer B uses time-limited non-compete clauses with employees at the director (or higher) level (who comprise less than .05% of its workforce), as these employees have a direct line of sight into the company's strategic plans and direction, as well as in-depth knowledge of talent pools. The rationale for non-compete clauses in each instance is reasonable. As one retail executive stated in response to the RILA survey, "Since we use noncompete clauses only for VPs and above, we're talking about people who have vast knowledge of the business well beyond their particular job area. It would be impossible for them to work for a competitor without utilizing some of that knowledge and skills they acquired working here even unintentionally. We don't want to invest in people only [for them] to turn around and use it against us."

In another example, Retailer C negotiates a retention agreement with a non-compete clause for a highly skilled employee in charge of the development of a new product that is scheduled to launch shortly. Similarly, Retailer D seeks a non-compete as part of an employment agreement with an employee before he moves to a new position leading a project involving an innovative use of artificial intelligence to make Retailer D's inventory and merchandising operations more efficient. Without the protection of non-competes, Retailers C and D could lose a significant portion of their investments and face competitive disadvantages should the employees take their knowledge of the upcoming product or the new project (and related information regarding the business's operations) to competitors.

Additionally, some RILA members use non-compete clauses justifiably in circumstances where they invest significant resources in specialized skill training for employees. It is fair to use non-compete clauses in these circumstances because both the employee and the employer deserve to receive the benefit of their bargain. Employees gain new career-enhancing skills that provide future financial opportunities, and in exchange retailers should be able to receive the benefit of their investment in the employee for a reasonable time period.

In addition to limiting the use of non-compete clauses to select employee positions, RILA members reasonably tailor their non-compete clauses in other ways. More than 40% of respondents stated that the standard length of time for their non-competes is between 6 months to 1 year. And almost half of RILA member survey respondents indicated that they tailor the length of time of their non-competes depending upon the specific nature and volume of confidential information that the employee has been exposed to, rather than using a standard time period on all non-competes. Accordingly, the length of time that restrictions remain in place are appropriately limited in retailers' non-compete clauses.

Retailers also limit the scope of companies that fall under the definition of "competitor" for purposes of non-compete clauses and frequently list specific companies that offer the same product lines or operate in the same retail pillar (*e.g.*, auto, grocery, general consumables, home improvement, fashion, department store, footwear, pharmacy, sports supply, specialty, or discount). So, for example, to protect its trade secrets and confidential business information, in a retention agreement with its chief financial officer Retailer E, a fashion retailer, tailored a non-compete clause to include a list of direct competitor fashion retailers—for which it provided additional compensation. Under the terms of the agreement, the CFO may seek employment with

any other retailer that is not a direct competitor to Retailer E. The CFO is only limited from moving to a direct competitor fashion retailer for a limited time.

The non-compete clauses used by these RILA members are also limited in geographic scope. Typically, the non-compete restriction in these clauses is directly tied to the geographic scope of the retailer's operations and the justification for the restriction.[9] For example, a regional retailer might limit the scope of its non-competes to the scope of its regional operations, while the geographical scope of the non-compete for a national retailer could justifiably be nationwide. When a non-compete clause is required for client service positions where an employer provides specialized skills training, the non-compete is often limited to locations near the retailer's local stores. This is a reasonable means to encourage employers like certain RILA members to pay for specialized skills training, as otherwise, following their training, former employees could use that training against them by immediately going to work for a competitor or setting up a competing business nearby.

The overall impact of these retailers' narrowly tailored non-compete clauses is not anticompetitive or unfair. Retailers who use non-competes and other restrictive covenants go to great lengths to craft them in such a way as to give companies reasonable protections while providing financial or training benefits to employees and not unreasonably limiting their employment opportunities or mobility. Under a typical retailer's non-compete clause, an employee is prevented only from moving to a "direct" competitor within a defined geographic area for a limited time period. Even in the event that an employee is looking to move to a direct competitor, retailers frequently demonstrate flexibility and will negotiate an accommodation for the employee. Take for example, the situation of Retailer F's former head merchant of women's accessories seeking an employment opportunity with a direct competitor, Retailer G. Retailer F further narrowed its non-compete clause—designed to protect Retailer F's confidential and strategic business information—to allow this former employee to work for Retailer G as a merchant in another product category. After expiration of the reasonable period of time required under the revised clause, its former employee could work as Retailer G's head merchant of women's accessories.

In sum, the non-compete clauses used by certain RILA members in limited circumstances are reasonable. The FTC's proposal to unilaterally ban such clauses will eliminate the many benefits they provide to employees, employers, and the overall economy.

## II.    The FTC's Proposed Blanket Ban On All Non-Compete Clauses Is Bad Public Policy

Plainly put, the FTC's proposed blanket ban on all non-compete clauses is bad public policy. Such a broad ban precludes consideration of the unique facts and circumstances like those detailed here that would make enforcement of a particular non-compete clause appropriate. The proposed rule is also improper because its inclusion of other commonly used restrictive clauses

---

[9] *See, e.g.*, *Coates v. Bastian Brothers, Inc.*, 276 Mich. App. 498, 507–09 (2007) (holding that "noncompetition clause was reasonable" where it "only applied for one year" and was limited to "within one hundred miles of any business location" of the employer); *St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260, 269 (2006) (holding that non-compete clause was enforceable where its geographic scope was reasonably limited to "seven miles" around two of the employer's "offices").

(*e.g.*, non-disclosure clauses, non-solicitation clauses, etc.) as "*de facto*" non-compete clauses would create uncertainty for all stakeholders regarding the legality of such clauses. Further, the proposed retroactive application of the blanket ban would unfairly adversely impact millions of employees and employers and lastly, overall, the proposed rule will have significant unintended consequences.

### A. The variety of facts and circumstances that support reasonably tailored non-compete clauses requires consideration on a case-by-case basis.

RILA members agree that overbroad and anticompetitive non-compete clauses are never appropriate and should not be enforced. However, a rule categorically outlawing *all* non-compete clauses for industries subject to the FTC's authority is like taking a bulldozer to a building that needs only tailored repairs. Retailers' business models and operations are as unique and distinctive as their brands. Thus, the operations of one retailer that support a reasonable non-compete for a specific employee would not be identical to those of another retailer, even one that operates within the same product category. The FTC's proposed blanket ban precludes consideration of the unique facts and circumstances underlying a particular non-compete clause, such as the specific situations like those described above that make it reasonable to enforce retailers' non-competes for certain executives, employees in key positions, highly skilled employees, or employees that the retailers have invested in skills training.

The need for case-by-case consideration of the competitive impact of a specific non-compete clause is even more acute when considering the breadth and range of operations and circumstances across all industries. The FTC's broad-brush approach ignores the untold number of situations where use of a non-compete is reasonable, mutually beneficial, and pro-competitive and instead, improperly labels all non-competes as overbroad and anticompetitive. This ill-advised approach would unilaterally override courts' decades-long experience using case-by-case analysis and recognition of the pro-competitive benefits of reasonable non-compete provisions to employees, employers, and consumers.

We urge the FTC not to abandon its long-held approach of analyzing whether a non-compete is anticompetitive on a case-by-case basis. To the extent there is any change to this federal public policy and approach on non-compete clauses, it should be carefully drafted by Congress and targeted to prevent only overbroad and anticompetitive non-compete clauses.[10] This would permit precisely the case-by-case analysis that states and courts have long felt best assesses whether a particular clause is anticompetitive.[11]

### B. The FTC's proposed ban on "*de facto*" non-compete clauses is similarly overly broad and creates significant uncertainty.

Aside from pure "non-compete clauses," the proposed rule also would ban innumerable *other* types of commonly used restrictive covenants that may also function as so-called "*de facto* non-

---

[10] *See infra* at IV.A, VI.

[11] *See infra* at IV.C, VI.

compete clauses."[12] The standard for what qualifies as a "*de facto*" non-compete clause is hopelessly vague and overly broad, and will create significant business uncertainty, including among RILA members, regarding which covenants are unlawful. According to the proposed rule text, covenants that may qualify as "*de facto*" non-competes may include certain non-disclosure agreements and training repayment agreements that the FTC decides "has the effect of prohibiting the worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer."[13] In the preamble, the FTC also pointed to other covenants, such as client or customer non-solicitation agreements, no-business agreements, no-recruit agreements, and liquidated damages provisions as other possible "*de facto*" non-competes.[14]

Retailers, along with other employers, routinely use some of the covenants that could fall under the FTC's proposed definition of a "*de facto*" non-compete clause (*e.g.*, non-disclosure, confidentiality, repayment, forfeiture, non-solicitation, etc.). In RILA's recent survey, the overwhelming majority of respondents indicated that they use one or more of these clauses. The rule's broad language leaves it entirely unclear whether any of these frequently used covenants would remain legal. Many retailers currently use repayment clauses, under which employees who receive signing bonuses or relocation payments agree to repay those costs if they leave the firm within a designated period of time. These clauses generally have a phased repayment schedule where the longer the employee stays before leaving the company, a smaller percentage would need to be repaid. The rationale for these repayment clauses is fairness. Employers are willing to give employees additional financial benefits beyond their standard salary, which can amount to tens of thousands of dollars, in exchange for a reasonable expectation that the employer will benefit from the employee working for the company for a specified limited amount of time. Without the ability to have and enforce repayment clauses, an employee could accept a job offer with a retailer that includes a signing bonus and relocation payment and then leave the retailer shortly after moving his/her family across country and having the moving costs covered and signing bonus paid.

Retailers may also use repayment clauses when the employer pays the upfront costs of specialized skills training. Examples of such training include commercial driver license training, pilot training on a new type of aircraft, HVAC, elevator, escalator, cosmetology, pet groomer and more. Based on feedback from RILA members, the cost of advanced skills training can be significant, depending on the specific training provided, ranging from a low of $5,000 to over $50,000 for training on specialized equipment. Retailers use repayment agreements that are reasonable in scope and impact and which balance burdens on workers with the value of the investment by the retailer. In exchange for receiving career enhancing training paid for by the employer, an employee agrees to pay back the cost of training if he/she leaves the company within a specified time. The total length of time of a repayment clause is largely dependent on the total costs of the training paid for by the retailer. Lower cost trainings will have a shorter repayment period while higher cost training will typically have a longer repayment period. An employee leaving the company immediately after training will repay a higher percentage of the

---

[12] 88 Fed. Reg. at 3509/3.

[13] *Id.* at 3535/1-2.

[14] *Id.* at 3484/2.

total training costs than an employee who chooses to leave the company toward the end of the repayment period.

Like the other repayment situations described above, the rationale for training repayment agreements is one of fairness. Both the employee and employer deserve to receive the benefit of their bargain. Reasonable repayment clauses do not prevent an employee from leaving the company after receiving the training. Instead, these clauses are intended to help the retailer recover a portion of the costs of the specialized training if the employee leaves the company within a specified time. It should be clear that even with the repayment of training costs, retailers will not be made "whole" as they will still have costs related to employee turnover and will not have the continued benefit of the trained employee's skills.

The rule's standard that such clauses are "*de facto*" non-competes where they are not "reasonably related to the costs the employer incurred for training the worker" is unclear. The proposed rule creates significant doubt as to legality of training-repayment agreements and will certainly have a chilling effect on their use. This raises the possibility that employees may receive contracted-for benefits without having to provide the consideration that they had agreed to. If training-repayment agreements are unlawful, employers would be further disincentivized from covering training and certification costs, as they could ultimately pay for training that would primarily benefit competitors if those employees could immediately leave after receiving the training and work in competition with their former employer.

Forfeiture clauses are another commonly used clause that could get swept up in the FTC's broad net of purported "*de facto*" non-compete clauses. RILA's members often include forfeiture clauses in grants of equity or other long-term investment awards, which are given in recognition of a senior-level employee's contribution to the company and may be paid out over a period of time. These awards typically detail a specific percentage of the total award that is available to the employee immediately and include a vesting schedule listing the future dates of any additional equity or cash awards to be issued. Equity and long-term investment awards are intended to reward and incentivize current company employees. Not surprisingly, these grants include forfeiture clauses, where employees with unvested equity or awards (*i.e.*, those for which the vesting date(s) has not yet passed) forfeit those unvested awards when they leave the company. If forfeiture clauses are deemed to be "*de facto*" non-competes, however, the employer may have to pay for talent that is no longer with the company. To prevent this from occurring, companies would certainly have to revise their current compensation packages and equity and long-term investment award practices to protect their financial resources and investments in talent and minimize financial risks to the company and its shareholders.

Non-solicitation clauses could also get swept under the FTC's proposed ban. These clauses can take two forms: non-solicitation of customers or clients and non-solicitation of employees. As with all the other covenants described here, those retailers that use non-solicitation clauses do so only in those limited situations where the facts and circumstances warrant their use, and the terms of the non-solicitation clause are narrowly tailored to protect an important business interest. For example, retailers do not want employees that provide services to their customers to unfairly gain access to a company's book of customers, then leave to set up a competitor. As another example, in the event of a departure of a senior executive that has been leading an important strategic project for the company, retailers do not want that former senior executive

soliciting former work colleagues who have also been working on the project to leave the company and move to a competitor. Non-solicitation of employee clauses do not prevent any employees from leaving the company to go to work with the former senior executive. The clause merely prohibits the former executive from taking affirmative proactive action to "solicit" the departure of these key employees. While the proposed rule states that it would "generally not include" non-solicitation clauses, the FTC also suggests that such clauses *may* be "*de facto*" non-competes if they are "unusually broad in scope."[15] The Commission does not explain what would make a non-solicitation clause "unusually broad," and will thus also have a chilling effect on businesses—including RILA's members—reasonable use of non-solicitation clauses.

The FTC's vaguely worded proposed ban on "*de facto*" non-competes has the potential to ban standard business clauses (*e.g.*, repayment, forfeiture and non-solicitation) that are commonly used across industries. The threat of a potential FTC enforcement action for these now-uncertain practices will harm employees and chill business activity and innovation.

C.    **The proposed rule's retroactive application would invalidate millions of contracts, adversely affecting employees and employers alike.**

Among its many deficiencies, the proposed rule is perhaps most clearly unfair in its retroactive application, which would invalidate millions of existing non-compete clauses. As discussed further below, the FTC does not have statutory authority to promulgate competition rules.[16] However, assuming for the sake of argument the FTC does has such authority, it certainly does not have the power to ban non-competes retroactively. Agencies such as the Commission generally have statutory authority to impose rules *prospectively*. Indeed, courts have strictly scrutinized agency actions that attempt to retroactively apply regulations.[17] The reasoning behind this heightened scrutiny is simple: under the principles of fairness and due process, individuals and business should have notice of the standards and requirements they will be held to, and thus generally should not be held accountable retroactively for behavior or actions that were previously legal. In those limited circumstances where retroactive application of a rule is allowed, courts have required that the power to do so be explicitly granted by Congress.[18] Such authority is absent here. Nowhere in the FTC's discussion of its purported statutory power to issue competition rules does the Commission point to an express grant of such authority by Congress to regulate *retroactively*.

Moreover, the effects of a retroactive application of the ban would be substantial. Many employers, including those RILA members that use non-competes, have structured their businesses relying on the enforceability of non-compete clauses and other covenants that could be deemed "*de facto*" non-competes. *See infra* at V.B. The FTC's proposed rule would disrupt

---

[15] *Id.* at 3482/3.

[16] *See infra* at III, IV.A–B.

[17] *See Mexichem Flour, Inc. v. EPA*, 866 F.3d 451, 462 (D.C. Cir. 2017) ("The Due Process Clause limits the Government's authority to retroactively alter the legal consequences of an entity's or person's past conduct.").

[18] *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.").

these business models and eliminate guarantees that employers bargained for and accounted for in offering compensation and benefits to their employees. Take for example a senior employee who was recently laid off from the company who signed a time limited non-compete clause as part of a severance payment agreement. The retroactive application of a ban on non-competes would unfairly penalize both the employee (who wants the continued severance payment to support his/her family) and the employer (who willingly agreed to make the severance payment in return for a reasonable non-compete). A company would be faced with a difficult choice: continue to make payments to the former employee despite the elimination of key consideration (the non-compete) or, to the extent that they can legally do so, attempt to renegotiate all outstanding severance agreements with formers employees that contain non-compete clauses to adjust the compensation paid to reflect the lesser value of the consideration without an enforceable non-compete. Neither is an option that retailers should be forced to take.

The FTC's proposed action would insert the agency retroactively into negotiations and prevent employees from accessing benefits for which they were willing to exchange for non-compete clauses. This challenging scenario would be played out across a company's business operations. Retention agreements, severance plans, equity and long-term investment awards, and expanded senior executive retirement pay plans all may potentially include retroactively banned non-competes. The FTC can prevent this chaos by eliminating the retroactive application of the proposed ban. We encourage the Commission to do so.

### D.    The proposed rule will have severe unintended consequences.

Even if the proposed rule is limited to apply *prospectively* only, it will still have a significant negative impact on employees' benefits, compensation, and career advancement opportunities. Wage growth could be impacted if non-compete clauses are prohibited, as employers will no longer pay a premium for them.[19] Without an enforceable non-compete clause to serve as consideration, employers may no longer see the need for severance payments at all, or at least severance payments at current levels. Because the proposed rule would eliminate protections for employers who invest in employees by training them in various specialized career-enhancing skills, employer-paid training will be curtailed, harming employees' professional development and denying them future financial opportunities. Instead of paying the cost of advance skills training for employees, employers could choose to offer those positions only to those applicants that are already certified or have that specific training. This could effectively eliminate a new career path for an employee who may not be able to pay for the specialized skills training she desires without the employer's assistance.

Banning non-competes will significantly heighten the risks of leaked confidential information and trade secrets.[20] The FTC is mistaken that trade-secret law and non-disclosure agreements can adequately protect trade secrets and confidential information.[21] These alternatives are inadequate substitutes for non-compete clauses for several reasons. First, trade-secret litigation is costly and

---

[19] As discussed, non-compete clauses are associated with higher wages. *See supra* at nn. 2–3.

[20] *See, e.g.*, Aaron Levine & Matt Todd, *FTC Noncompete Ban Could Erode Trade Secret Protections*, Law360 (Feb. 28, 2023), https://www.law360.com/articles/1579186/ftc-noncompete-ban-could-erode-trade-secret-protections.

[21] *See* 88 Fed. Reg. at 3505/2–3507/2.

protracted, and eliminating the availability of non-compete clauses threatens to make it only more so.[22] As noted by multiple retailers in response to the recent RILA survey, eliminating retailers' ability to use reasonable non-competes will mean that companies will incur substantial additional legal costs and expenses for enforcement and litigation related to improper disclosure of confidential business information and trade-secret violations. Increased legal costs mean that retailers will have to tighten their budgets, and might have to allocate fewer resources to business innovation or personnel. In addition, trade-secret litigation is often brought after a former employer suspects misappropriation, but once a trade secret is lost, significant harm ensues and cannot be undone. During the lengthy time it can take to establish harm, the negative impact of the unfair competition from misappropriated trade secrets can continue to grow and compound as the business struggles. Also, to the extent the FTC erroneously believes it can apply the non-compete rule extraterritorially, it is critically important that the agency not do so, because global corporations often have little to no other effective means of legal recourse against misappropriated trade secret and confidential information in certain non-U.S. locations. Thus, in these situations, non-compete clauses offer the only protection for this highly sensitive information.

Banning non-compete clauses also will affect the ability to protect valuable confidential business information that does not necessarily meet the threshold for trade-secret protection.[23] Non-disclosure agreements provide insufficient protection for confidential business information because employees in certain positions cannot reasonably operate in similar positions for competitors without necessarily divulging such information.[24] Moreover, the proposed rule even calls into question the enforceability of non-disclosure agreements by stating that they also could be considered *de facto* non-compete clauses.[25]

To avoid these risks, those RILA members who now rely on non-compete clauses to protect their confidential business information will likely have to adjust their business models. They might do so by limiting how much information is shared with employees to the extent possible and restricting the kinds of positions that have access to strategic confidential business information. As one of RILA's members reported, a ban on non-competes would leave the company unable to share trade secret and confidential, proprietary company information outside a very small group.

---

[22] *See, e.g.*, Christina L. Wu, *Noncompete Agreements in California: Should California Courts Uphold Choice of Law Provisions Specifying Another State's Law?*, 51 UCLA L. Rev. 593, 610 (2003) ("Noncompete agreements can also reduce the cost of trade secret litigation. . . . Instead of claiming misappropriation of trade secrets, an employer can simply bring a contract action for breach of the covenant not to compete, which would be less costly and easier to prove.").

[23] *See e.g.*, *Int'l Bus. Machines Corp. v. De Freitas Lima*, 2020 WL 5261336, at *7 (S.D.N.Y. Sept. 3, 2020) (recognizing that the non-compete agreement at issue "protects a broader range of [confidential] information than the common law New York doctrine of 'trade secrets' might protect" and finding the agreement enforceable), *aff'd*, 833 F. App'x 911 (2d Cir. 2021); *Ak Steel Corp., v. Miskovich*, 2014 WL 11881029, at *11 (S.D. Ohio Apr. 17, 2014) ("'[C]onfidential information need not meet the stringent requirements of a trade secret' to constitute a legitimate business interest protectable by a non-compete agreement." (citation omitted)).

[24] *See, e.g.*, *Nike, Inc. v. McCarthy*, 379 F.3d 576, 586 (9th Cir. 2004) (enforcing non-compete agreement with senior executive who had intimate knowledge of the company's "product allocation, product development and sales strategies" and could thus put that to use for its rival by "developing strategic sales plans, providing overall direction for product allocation and shaping product lines").

[25] 88 Fed. Reg. at 3484/2, 3509/2–3510/1.

This will hamper employees' ability to do their jobs effectively and efficiently and hurt their career development and therefore, future financial opportunities. It will also hamper employers' flexibility to run their companies.

The proposed blanket ban on non-competes and purported "*de facto*" non-competes is bad public policy. It will negatively impact employees' wages, compensation and benefits. Opportunities for employees to get career enhancing positions that have access to strategic confidential business information will be limited and employees also will be deprived of specialized skills training. Companies will not be able to structure compensation, benefits and severance packages to meet employees' expectations and will have challenges retaining key talent including senior executives and skilled employees. Retailers also will be unable to recoup training costs and will incur added legal expenses. These costs will negatively impact companies' profitability and shareholder value, reduce innovation, and increase prices for consumers. For all these reasons, the proposed rule should be withdrawn, and federal public policy on non-compete clauses (if any) should instead come from narrowly targeted legislation.

### III.    The FTC Lacks Statutory Authority to Issue Unfair Methods of Competition Rules.

In addition to being bad public policy, the proposed rule goes well beyond the legal authority of the FTC. First, the FTC does not have the authority to issue substantive rules defining unfair means of competition—the authority cited by the proposed rule permits the FTC only to issue *internal* rules governing its own conduct. Second, the lack of FTC authority is validated both by subsequent congressional action, which confirms that the FTC cannot issue substantive rules, and the consistent practice of states exercising authority in this area. Finally, judicial precedent interpreting Section 5 of the FTC Act hems in the FTC and prohibits it from departing from the requirement to conduct case-by-case analysis using the long-followed rule-of-reason standard.

####    A.    The FTC Act does not grant the FTC authority to issue legislative rules.

The FTC says that Section 5 and Section 6(g) of the FTC Act of 1914 authorize the agency "to issue regulations declaring practices to be unfair methods of competition."[26] As discussed briefly in these comments below and in more detail in numerous other comments, the Commission's interpretation of its statutory authority is incorrect.

Section 5 directs the agency to prevent "[u]nfair methods of competition" in commerce.[27] But Congress envisioned that the FTC would enforce this prohibition through case-by-case adjudications.[28] In 1914, it provided the FTC with investigatory, reporting, and procedural powers in Section 6 of the Act, and nestled among these powers to "classify corporations and . . . *to make rules and regulations* for the purpose of carrying out the provisions of this subchapter," including Section 5. However, that delegation of rulemaking authority is much narrower than FTC now claims it to be.[29] In the early 20th century, Congress did not draft broad legislative

---

[26] *Id.* at 3499/1–2.

[27] 15 U.S.C. § 45(a)(1)

[28] *See id.* § 45(b)–(l).

[29] *See id.* § 46 (a), (c)–(d), (g)–(h) (emphasis added).

rulemaking grants without pairing them with sanctions for violations of the rules.[30] Because the FTC Act did not (and does not) provide any sanctions for violations of rules promulgated under Section 6(g), Congress did not mean for such rules to regulate the conduct of private actors.[31] Instead, Congress intended that any rules issued under Section 6(g) would cover only the development of internal agency processes and procedures for implementing the provisions of the statute.[32]

Agency action "based upon a determination of law . . . may not stand if the agency has misconceived the law."[33] Here, the Commission has issued the proposed rule relying on its flawed interpretation of its underlying statutory authority, and therefore its action cannot stand.

### B.    Subsequent congressional action confirms that the FTC lacks authority to issue binding rules on "unfair methods of competition."

For over 50 years, the FTC acted consistently with Congressional intent and did not attempt to issue legislative rules. That changed in the early 1970s when the FTC claimed the power to issue substantive regulations prohibiting certain practices under the authorities in Section 5 and Section 6(g), and in 1973 the D.C. Circuit agreed. That case—*National Petroleum Refiners Association v. FTC*—is the only authority cited by the agency supporting its assertion that it now may issue unfair methods of competition rules.[34] The FTC's reliance on this case for authority to issue a rule banning non-competes is misplaced. *National Petroleum* was wrongly decided. The D.C. Circuit's policy-driven reasoning there was flawed, particularly because it did not consider that in the early 20th century, broad grants of power to issue rules with the force of law were paired with sanctions for violations of those rules—a drafting convention not present in Section 6(g).[35]

Moreover, Congress' subsequent actions in response to *National Petroleum* confirm that it was wrongly decided. In the 1975 Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Congress *expressly authorized* the FTC to issue *consumer-protection* rules— regulations "defining with specificity acts or practices which are unfair or deceptive acts or

---

[30] *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 493–94 (2002).

[31] *See id.* at 549–57.

[32] *See id.* at 504–05 ("The failure to provide any sanction for the violation of rules adopted under section 6(g), along with the placement of the rulemaking grant in section 6, which conferred the FTC's investigative powers, clearly suggests that Congress intended the rulemaking grant to serve as an adjunct to the FTC's investigative duties, regarding which Congress had not given the agency the authority to act with the force of law."); *accord* ABA Section of Antitrust Law, Comments in Connection with the Federal Trade Commission Workshop on "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues," at 54 (Apr. 24, 2020).

[33] *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

[34] *See* 88 Fed. Reg. at 3499/1 n.226 (citing *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 697–98 (D.C. Cir. 1973)).

[35] *See supra* at III.A; *see also* Merrill & Watts, *Agency Rules*, *supra* n.31, at 555–57; Richard J. Pierce, *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works. 1561, at 6, 9 (2021); Maureen K. Ohlhausen & James Rill, *Pushing the Limits? A Primer on FTC Competition Rulemaking* 10–13, U.S. Chamber of Commerce (2021).

practices"—and laid out detailed procedures for the FTC to engage in those rulemaking that are more onerous than the default rulemaking procedures of the Administrative Procedure Act.[36] If the reasoning in *National Petroleum* were correct, then this express rulemaking grant would have been wholly unnecessary. Meanwhile, Congress did *not* grant the FTC authority to issue *competition* rules (*i.e.*, rules declaring a practice to be an unfair method of competition) in the Magnuson-Moss Act.[37] Five years later, Congress amended the FTC Act again to add even more hurdles for the FTC to issue consumer-protection rules, but again did not authorize competition rulemakings.[38] It is highly doubtful that Congress would require that the agency follow strict and onerous procedures to issue consumer-protection rules, but leave open an easier route to issue competition rules, which have much broader implications for the U.S. economy.[39]

In the decades since the Magnuson-Moss and 1980 amendments to the FTC Act, the FTC has not attempted to issue a binding competition rule again until now. To put it another way, with one limited exception, in the 100-plus years since the initial enactment of the FTC Act, and after multiple Congressional tweaks and amendments to the underlying statute, the FTC has consistently recognized the limitations to its statutory authority to issue rules under Section 6(g). RILA and its members urge the Commission to reverse its current flawed course of action and return to its long-held statutorily consistent interpretation of Section 6(g) as precluding the issuance of binding substantive regulations.

### C.    The FTC lacks authority to bypass required individualized case-by-case reviews using the rule-of-reason standard.

The proposed rule also mistakenly asserts that the FTC has authority to depart from the rule-of-reason standard and issue a blanket ban on non-compete clauses. But the rule-of-reason standard, with its statutory and common-law foundation, has been the recognized standard governing non-compete clauses for hundreds of years.[40] The Commission and courts have used the rule-of-

---

[36] Pub. L. No. 93-637, 88 Stat. 2183, 2193–98 (1975) (creating new Section 18 of the FTC Act); *see* 15 U.S.C. § 57a.

[37] *See* 15 U.S.C. § 57a(a)(2) (stating that the section "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce").

[38] *See* Pub. L. No. 96-252, 94 Stat. 374 (1980).

[39] *See* ABA Section of Antitrust Law, Report of the Section Concerning Federal Trade Commission Structures, Powers, and Procedures 340 (1980) ("It clearly would be anomalous if the FTC could adopt an antitrust rule based simply on a notice and comment proceeding under the Administrative Procedure Act, while being required to follow the procedural guards Congress mandated for rules in the consumer protection area.").

[40] *See, e.g.*, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.3 (1988) ("The classic ancillary restraint is an agreement by the seller of a business not to compete within the market." (citing *Mitchel*)); *Eichorn*, 248 F.3d at 144 ("[C]ourts have uniformly found that covenants not to compete should be examined under the rule of reason."); *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983) ("[T]here has been an unbroken line of cases holding that the validity of covenants not to compete under the Sherman Act must be analyzed under the rule of reason."); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 337 (7th Cir. 1967) ("Agreements not to compete are tested by a standard of reasonableness."); *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963) ("Restrictive clauses of this kind are legal unless they are unreasonable as to time or geographic scope…."); *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) (Taft, J.) (noting that agreements "not to compete" are assessed under the rule of reason); *Ulrich v. Moody's Co.*, 2014 WL 12776746,

reason standard to assess the reasonableness of a challenged restraint based on an all-of-the-circumstances analysis.[41] Indeed, courts have repeatedly held that the rule of reason—including its requirement that courts analyze anticompetitive effects based on consumer welfare and consider procompetitive justifications—is applicable to claims brought under Section 5.[42] As then-Commissioner Wilson emphasized in her dissenting statement to the proposed rule, this clear precedent requires the FTC to take a case-by-case, "fact-specific" approach to non-compete clauses, including under Section 5.[43]

Yet the FTC makes almost no effort to account for its radical departure from this long-held legal approach, mentioning the rule of reason only three times in the proposed rule's 65 pages—and two of those are in the same paragraph.[44] The FTC points to no new statutory authority or recent court decisions to justify its actions.[45] Instead, the proposed rule's justification for a blanket ban is based on the FTC's legally erroneous November 2022 Policy Statement purporting to set forth new guidance on "the scope and meaning of unfair methods of competition under Section 5."[46] The 2022 Policy Statement, which did not go through notice-and-comment rulemaking, deviated from the FTC's years-long policy and practice including its most recent formal statement of policy on this issue. The Commission's prior policy statement had been "adopted on a bipartisan basis . . . six years prior because it embodied a sound approach to antitrust law that reflected decades of legal precedent and economic learning."[47] In contrast, the 2022 Policy Statement did not reflect bipartisan support—for good reason—as it, like the proposed rule, abandons the rule of reason and repudiates the consumer welfare statement without a sound legal foundation and, as detailed below, raises significant constitutional issues. The FTC cannot rely on a unilateral, legally flawed policy statement as authority for the proposed rule. The proposed rule should therefore be withdrawn.

---

[41] at *26 (S.D.N.Y. Mar. 31, 2014) (rule of reason applies to non-compete clauses); *see also Addyston Pipe & Steel Co.*, 85 F. at 281–82 (collecting cases spanning 19th century applying rule of reason to non-compete clauses).

[41] *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007) (explaining that the rule of reason "weighs all of the circumstances of a case," allowing courts to determine whether the challenged restraint, in its broader context, imposes "anticompetitive effect[s] that are harmful to the consumer" or "stimulat[es] competition . . . in the consumer's best interest").

[42] *See Boise Cascade Corp. v. FTC*, 637 F.2d 573, 578–79 (9th Cir. 1980) (anticompetitive effects); *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2d Cir. 1984) (business justifications).

[43] 88 Fed. Reg. at 3541/1 (Wilson, dissenting); *Snap-On Tools Corp.*, 321 F.2d at 837 (stating that non-compete clauses "are legal *unless they are unreasonable as to time or geographic scope*" (emphasis added)).

[44] *See* 88 Fed. Reg. at 3496/3, 3517/1–2.

[45] Indeed, the FTC's failure to account for the rule of reason (an important aspect of the problem) is separately arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[46] Policy Statement Regarding the Scope of Unfair Methods of Competition under Section 5 of the Federal Trade Commission Act, Federal Trade Commission File No. P221202 ("Policy Statement") (Nov. 10, 2022), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/p221202sec5enforcementpolicystatement_002.pdf.

[47] *See* Dissenting Statement of Commissioner Christine S. Wilson Regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act" at 1 (Nov. 10, 2022), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyWilsonDissentStmt.pdf.

## IV.    The Proposed Rule Raises Significant Constitutional and Other Legal Issues

### A.    The major-questions doctrine dictates that the FTC lacks authority to issue the proposed rule.

Courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast "economic and political significance."[48] Under the "major-questions doctrine," even where an agency's assertion of rulemaking authority has a "plausible textual basis," an agency lacks the authority to resolve major policy questions absent "clear congressional authorization."[49] As the Supreme Court has explained, it is incorrect to construe vague or cryptic statutory provisions to include "sweeping and consequential authority" to agencies.[50] For example, in *Alabama Association of Realtors v. Department of Health and Human Services*, the Court rejected the Centers for Disease Control and Prevention's attempt to institute a nationwide eviction moratorium in response to the COVID-19 pandemic under its authority to adopt measures "necessary to prevent the . . . spread of " disease.[51]

Regulation of the national economy is certainly a major policy question that is implicated by any unfair methods of competition rule by the FTC. Hence this doctrine teaches that the ambiguous rulemaking provision in Section 6, tucked away among provisions concerning the FTC's investigative powers, cannot be properly read to be a delegation of broad competition rulemaking power. And application of the major-questions doctrine is *especially* clear *here*, where the agency admits its rule would preempt employment laws in 47 states (at least in part) and invalidate roughly one out of every five employment contracts.[52] Recent congressional action also confirms that the issue of a potential national ban on non-compete clauses is a major policy question. Members of Congress have recently introduced bills that would prohibit a substantial portion of non-compete clauses (and in some instances nearly all).[53] As recently as February, members of Congress reintroduced bills in both the House and the Senate for the Workforce Mobility Act, which would prohibit non-compete clauses in most circumstances (although, for example, permit one-year non-compete periods for senior executive employees).[54] Notably, this proposed legislation would treat certain non-compete clauses as violations of the FTC Act's prohibition on "unfair or deceptive acts or practices," not "unfair methods of competition," and would provide joint enforcement authority to the FTC *and* the Department of Labor.[55]

---

[48] *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

[49] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotation marks omitted).

[50] *Id.* at 2608.

[51] 141 S. Ct. 2485, 2487 (2021).

[52] *See* 88 Fed. Reg. at 3485/2, 3494/1

[53] *See, e.g.*, Restoring Workers' Rights Act of 2022, H.R. 8755, 117th Cong. (2022) (bill to amend the Fair Labor Standards Act of 1938 to prevent employers from using non-compete agreements in employment contracts for certain non-exempt employees); Freedom To Compete Act, S.B. 2375, 117th Congress (2021) (similar).

[54] *See* Workforce Mobility Act of 2023, S.B. 220, 118th Cong. (2023); Workforce Mobility Act of 2023, H.R. 731, 118th Cong. (2023).

[55] *See id.* § 6.

Section 6(g) is not a clear grant of legislative power to the FTC in any respect; it certainly is not a clear grant of authority to dictate *employment*-related policy nationwide. Under the major-questions doctrine, the FTC cannot rely on "the previously little-used backwater of" Section 6(g)—the only source of rulemaking authority the FTC relies on—to issue a national ban on non-compete clauses.[56]

### B.    The non-delegation doctrine and constitutional-avoidance doctrine counsel against interpreting the FTC Act to provide the FTC with the authority to issue the proposed rule.

The major-questions doctrine provides a sufficient basis for the FTC to recognize that the proposed rule is beyond its authority, but that conclusion is bolstered by the constitutional-avoidance canon, which counsels avoiding interpreting the ambiguous Section 6(g) as a possibly unconstitutional delegation of legislative power.[57] Congress must articulate an "intelligible principle" for an agency to follow when exercising legislative rulemaking authority; absent an intelligible principle to guide the agency, the grant of authority is an unconstitutional delegation.[58] Section 5 proscribes "unfair methods of competition," but this term is so broad and vague that it is highly questionable whether it qualifies as an "intelligible principle" that can guide the FTC in crafting legislative rules relating to competition.[59] This concern is highlighted by the series of vague adjectives the FTC recently used in its November 2022 Section 5 Policy Statement to describe conduct that it asserts it could ban as "unfair methods of competition": conduct which "may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature" or is "otherwise restrictive or exclusionary, depending on the circumstances."[60] This Policy Statement dramatically expands the category of conduct covered by Section 5. It also makes it even less clear what conduct could be characterized by the FTC as "unfair."[61]

A reading of the FTC Act to grant of statutory authority to promulgate legislative rules defining "unfair methods of competition" would thus be deemed by the courts to be an unconstitutional delegation, given the vagueness of the phrase "unfair methods of competition"—particularly as articulated by the FTC in its November 2022 Policy Statement. Indeed, the Supreme Court held a similar grant of rulemaking power constitutionally impermissible when it struck down "codes of

---

[56] *West Virginia*, 142 S. Ct at 2613.

[57] *See Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980); *FCC v. Fox Television Stations*, 556 U.S. 502, 516 (2009) (explaining that the constitutional-avoidance canon "counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts"). .

[58] *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935) (citation and quotation marks omitted).

[59] *See, e.g.*, *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 454 (1986) (describing the "standard of 'unfairness' under the FTC Act" as "elusive").

[60] Policy Statement, *supra* n.46, at 9.

[61] *See* Wilson, Section 5 Policy Statement Dissent, *supra* n.47, at 2 ("[T]he Policy Statement adopts an 'I know it when I see it' approach premised on a list of nefarious-sounding adjectives, many of which have no antitrust or economic meaning."); *cf. Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (explaining that Congress "has set out an intelligible principle" when it "has made clear to the delegee the general policy [it] must pursue and the boundaries of [its] authority" (quotation marks omitted)).

fair competition" in *A.LA. Schechter Poultry Corp. v. United States*.[62] In doing so, the Supreme Court specifically contrasted Congress's purported grant of authority to issue ex-ante legislative rules called "codes of fair competition" with the FTC's authority to prevent "unfair methods of competition" through case-by-case adjudication.[63] Rules defining conduct as "unfair methods of competition" are very much like "codes of fair competition." Lastly, the constitutional-avoidance canon would instruct a court to reject an interpretation of Section 6(g) that includes a grant of legislative rulemaking authority, since a reading that does not raise constitutional infirmities is just as, if not more, plausible.

### C.    The proposed rule also threatens principles of federalism.

In addition to raising red flags under the major-questions doctrine and non-delegation doctrine, the proposed rule also fails to respect principles of federalism. As the proposed rule acknowledges, it has long been left the states to regulate non-compete clauses relating to employment.[64] States have experimented with a wide variety of regimes in this context: three states ban non-compete clauses nearly in toto;[65] at least thirty-two other states permit some non-compete clauses but bar others depending on industry or job of the worker;[66] and at least ten others allow non-competes with employees who are paid above an established threshold amount.[67] This experimentation has ramped up in recent years, with many states testing out different types and levels of non-compete restrictions in recent decades.[68]

Despite acknowledging this rich tapestry of state law, the proposed rule does not even mention federalism, much less explain why the FTC thinks it appropriate at this late date to intrude into this realm of "traditional state regulation" without clear congressional authority.[69] As explained above, the authority invoked by the FTC for its promulgation of the proposed rule does not support the rule and is very far from the "clear manifestation of congressional purpose" necessary to disrupt the status quo balance of power between the states and the federal

---

[62] *See* 295 U.S. 495, 532–34 (1935).

[63] *Id.* at 532–33 ("What are 'unfair methods of competition' are thus to be determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest.").

[64] *See* 88 Fed. Reg. at 3494/1–3.

[65] *Id.* at 3494/1 (California, North Dakota, and Oklahoma).

[66] *Id.* at 3494/1–2; *see* Russell Beck, Beck Reed Riden LLP, *Employee Noncompetes: A State-by-State Survey* (August 17, 2022) ("Beck Reed Riden Chart") (listing states with exemptions based on industry).

[67] 88 Fed. Reg. at 3594/1–2; *see* Beck Reed Riden Chart (listing states with exemptions based on salary or wage amounts). Other states have unique rules. For instance, in Massachusetts, non-competes cannot govern for more than 12 months, and there is a strict notice requirement. Mass. Gen. Laws Ann. ch. 149, § 24L. In Rhode Island, employers may include non-competes in their contracts with employees, but the circumstances in which courts will enforce the clauses are limited. R.I. Gen Laws § 28–59–3(a)(1). And in Nevada, non-competes may not be used for hourly wage earners. NRS 613.195(3).

[68] *Id.* at 3494/2–3.

[69] *Pegram v. Herdrich*, 530 U.S. 211, 237 (2002).

government in this area.[70] This lack of clear congressional authority makes the proposed rule susceptible to potential legal challenges. In such a situation, because courts must abide by the "guiding principle" of interpretation that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [their] duty is to adopt the latter," courts would likely interpret the FTC Act narrowly in order to avoid constitutional federalism issues.[71]

Without express congressional authority and in light of the significant constitutional major question, non-delegation and federalism concerns raised by the proposed rule, the best course of action for the FTC to take is to retract the rule and wait to take action until Congress determines if, and when, to give the Commission authority to issue competition rules and the parameters of that authority.

## V.    The Proposed Rule Is Arbitrary and Capricious and Otherwise Violates the APA.

Even if the FTC did have the statutory authority to issue a rule banning non-compete clauses (which RILA members do not believe it does, for the reasons articulated above), the proposed rule is still fatally flawed under the Administrative Procedure Act (APA). The evidence cited in the rule to support the ban on non-compete clauses is unreliable and conflicting; the FTC barely considers the reliance interests that all stakeholders (employees and businesses) have in using non-compete clauses that are currently legally permitted; and the proposed rule's cost-benefit analysis is deeply flawed. Accordingly, the proposed rule is flawed and should be withdrawn.

### A.    The FTC's determination that non-compete clauses and other restrictive covenants are "unfair methods of competition" is flawed.

The proposed rule's condemnation of non-compete clauses as "unfair" is misguided and mistaken. In making that determination, the rule largely falls back on conclusory, subjective language like "exploitative and coercive" that is drawn directly from the November 2022 Policy Statement.[72] But that vague language bears no relationship to the governing standard for unfairness under the rule of reason—whether a restraint is "harmful to the consumer."[73] The FTC's resort to these ambiguous standards is no surprise, as the actual evidence cited in the proposed rule regarding the competitive effects—the real standard for evaluating restraints—of non-competes is unreliable and mixed.

The proposed rule cites, in the main, studies that are both inconclusive and methodologically flawed. For instance, many of the studies relied upon by the FTC studied the effect of a few

---

[70] *Id.*; *see also Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so 'unmistakably clear in the language of the statute." (internal quotation marks omitted).)

[71] *Jones v. United States*, 529 U.S. 848, 857 (2000).

[72] 88 Fed. Reg. at 3502/2–3.

[73] *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 877 (restraints unlawful only where they are "harmful to the consumer"); *see also* 15 U.S.C. § 45(n) (act or practice unfair where it "causes or is likely to cause substantial injury to consumers").

state-level policies targeting non-compete clauses.[74] But an FTC economist elsewhere has explained in describing those studies that no broad principles can be extrapolated from them given the differing industries, types of firms, and makeup of the employee base in each state.[75]

The FTC also inconsistently evaluates the extant studies—giving great credence to studies that support a non-compete ban while downplaying and ignoring other studies that have a more favorable or nuanced view of non-competes. For example, relying solely on a study of the healthcare market—in which pricing is incredibly complex—the FTC concludes that non-compete clauses increase prices.[76] But when confronted with studies demonstrating that non-competes increase job-creation rates, the FTC strains to distinguish them—including by unsupported speculation about *why* the job-creation rate may have increased.[77] More broadly, the FTC ignores evidence that reasonably drawn non-competes have procompetitive effects on labor, product, and service markets.[78] By side-stepping an "important aspect" of the issues at hand, the FTC has acted arbitrarily and capriciously.[79] And where it does engage with the issues, its approach to the evidence is "internally inconsistent," which also is arbitrary and capricious.[80]

This is also true for the FTC's ban on "*de facto*" non-compete clauses. For that decision, the rule cites only two court decisions and one law review article.[81] This bare, evidence-free showing is plainly insufficient to support a finding that these restrictive covenants are "unfair."

Finally, the FTC cannot rely on its own experience as evidence supporting the rule, either, because it wholly lacks meaningful adjudication and enforcement experience in the context of non-compete clauses.[82] As then-Commissioner Wilson pointed out in her dissent, the *only* case the FTC has ever litigated challenging a non-compete clause ended in a finding that the clause did *not* violate Section 5.[83] Yet now, the FTC seeks to ban all non-competes across the nation in

---

[74] *See* 88 Fed. Reg. at 3487/2.

[75] *See* John M. McAdams, FEDERAL TRADE COMMISSION, NON-COMPETE AGREEMENTS: A REVIEW OF THE LITERATURE 11 (2019).

[76] *See* 88 Fed. Reg. at 3490/1–2.

[77] *See id.* at 3488/3–3489/1.

[78] *See, e.g.*, Starr *et al.*, *supra* n.3, at 80 (explaining that the evidence of higher earnings is consistent with the notion that "noncompetes [are] a solution to a holdup problem").

[79] *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

[80] *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018); *see Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018) (action was arbitrary and capricious where the "only support for [the action] was the very data it had just dismissed as inaccurate").

[81] *See* 88 Fed. Reg. at 3484 nn.35 & 36, 3507 n.328.

[82] *See Nat'l Tour Brokers Ass'n v. ICC*, 671 F.2d 528, 533 (D.C. Cir. 1982) (agency can "rely[] on its own experience as factual support for its decision to promulgate a rule" *only if* the agency "adequately record[s] and explain[s] that experience on the record").

[83] *See* 88 Fed. Reg. at 3542/1 (citing *Snap-On Tools Corp.*, 321 F.2d at 837).

one fell swoop. The FTC's overreaching behavior is improper, and its reliance on non-existent experience in an attempt to support a rule is arbitrary and capricious.[84]

### B.    The proposed rule gives inadequate consideration to reliance interests.

Under governing Supreme Court precedent, agencies must fully consider any "legitimate reliance" interests of those affected by agency action.[85] The proposed rule does not expressly acknowledge any of the reliance interests that employees and businesses have in employing reasonable non-compete clauses, which are lawful under current laws subject to the rule-of-reason framework used by the FTC, and federal and state courts. By failing to account for significant reliance-interests costs, the proposed rule's cost-benefit analysis is flawed.[86]

For instance, in a recent informal survey of RILA's members, almost all of those who responded currently use non-compete clauses or other restrictive covenants (non-disclosure, non-solicitation, forfeiture, repayment, etc.) for a small number of their employees (*e.g.*, executives, key senior employees, and employees with specialized skills). These retailers have structured their operations around their ability to use non-compete clauses to retain workers in whom they have invested substantial money, and to prevent trade secrets or other confidential financial and planning information from leaking to competitors.[87] Similarly, other restrictive covenants protect companies' book of customers, and investments made in employee training, long-term incentive benefits and signing and relocation bonuses. These companies likely would not have structured their operations in this way if they had known that the FTC would propose an outright ban on their reasonable non-compete clauses. They had no reason to suspect such a ban was forthcoming: after all, as explained above, the clear and consistent approach from all available judicial precedent, which they relied upon, is to analyze non-compete clauses and other restrictive clauses under the rule of reason. *See supra* at II.C.

In addition, employees nationwide have come to rely on the added compensation and benefits associated with reasonable non-competes and other restrictive clauses, including higher wages, generous severance plans and packages, equity awards, and other long-term incentives as well as the opportunity for career-enhancing specialized skill training. All the positive effects of these clauses for employees and employers would be undermined by the proposed rule's ban. *See supra* at II.A. By discounting many costs—such as the forced re-negotiation of thousands of employment contracts—that will ensue because of the proposed ban, the Commission's cost-benefit analysis is faulty and cannot support the rule.

---

[84] *Cf. District of Columbia v. Dep't of Ag.*, 444 F. Supp. 3d 1, 27–28 (D.D.C. 2009) (agency likely acted arbitrarily and capriciously where it relied on "unsupported" assertions of "operational experience").

[85] *Dep't of Homeland Sec. v. Regents*, 140 S. Ct. 1891, 1913 (2020); *see id.* ("When an agency changes course, . . . it must be 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016))).

[86] *See* 88 Fed. Reg. at 3528/1–3530/1.

[87] *Cf. Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021) (non-compete clauses in franchise context prohibit franchisees from "proactively raiding" each other's workers and thus allows them to "collaborate for the benefit of [their customers] without cutting their own throat" (cleaned up)).

The proposed rule does not establish a new policy on a "blank slate."[88] Instead, it attempts bulldoze over the longstanding approach that businesses have been reasonably relying upon in employing non-compete clauses and other commonly used clauses that could be deemed "*de facto*" nom-competes, arbitrarily ignoring the reliance interests employees and businesses have in that approach. In failing to consider these significant reliance interests, the proposed rule fails to meet a key requirement of the APA.

### C.    The FTC's cost-benefit analysis is flawed.

The proposed rule's cost-benefit analysis is also deeply flawed. It both *under*states the costs of the rule (in addition to ignoring many other costs altogether) and *over*states the benefits.

First, as to costs, the few costs the FTC actually acknowledges are significantly understated. For instance, the rule dramatically underestimates the amount companies will have to spend reviewing and revising contracts for incoming, current, and former employees. The rule estimates that process will take only one or four to eight hours of lawyer time, respectively, *per firm*.[89] But companies, including some of RILA's members, use many different types of agreements (*e.g.*, employment agreements, retention agreements, severance plans, severance agreements, equity and long term investment award grants, specialized training programs, signing bonuses, and relocation payment agreements, to name a few) that may contain various forms of non-competes or other clauses. Given the broad range of clauses (*e.g.*, non-disclosure, non-solicitation, repayment clauses, etc.) that potentially could be caught in the "*de facto*" non-compete clause net, this could involve reviewing and analyzing many different agreements and programs involving hundreds of thousands of current and former retail employees. If any revisions to contracts and programs are required, additional time will be needed. In all, this process will likely take hundreds of hours of lawyer time per employer. And those hours would cost, in all likelihood, at least *ten times* more per hour than the FTC estimates.[90]

Likewise, the FTC's estimate that it will take only 20 minutes of a "human resources specialist's" time to engage with each affected employee and notify him or her of the revised contract ignores the upfront costs of determining which of many potential explicit and "*de facto*" non-compete clauses actually apply to which employees.[91] Employers will also need to spend time renegotiating each of these contracts—a cost that will uniquely burden small businesses who do not have substantial internal legal teams or outside counsel relationships. A few RILA members estimated that implementing the proposed rule would initially cost them at least $100,000 to $200,000 each; the combined cost of implementing the proposed rule for all RILA members will be in the tens of millions of dollars. Given that these are only the costs that would

---

[88] *Fox Television Stations, Inc.*, 556 U.S. at 515.

[89] 88 Fed. Reg. at 3528/2.

[90] The FTC's cited figure of $61.54 per hour is the median hourly income of lawyers nationwide. *See* 88 Fed. Reg. at 3528/2–3. The more relevant statistic is the average hourly billing rate of a private-practice lawyer, whether a partner ($749/hour) or an associate ($546/hour). Wolters Kluwer, 2022 *Real Rate Report*, available online at https://www.wolterskluwer.com/en/news/wolters-kluwer-elm-solutions-2022-real-rate-report-indicates-that-timekeeper-rates-continue-to-rise.

[91] 88 Fed. Reg. at 3528/2.

be incurred by RILA's 100-plus members, it is clear that the total costs of implementation across *all* industries throughout the United States would be astronomical.

The FTC's woeful underestimation of implementation cost is indicative of how the Commission treats other costs, too. As discussed in more detail above,[92] the rule gives short shrift to the negative effects a ban will have on business investment, conceding only that it might lead firms to reduce employee training or investment in capital assets that enhance the effectiveness of human capital[93]—which the FTC nowhere attempts to enumerate. Those costs will likely be enormous. The proposed rule also barely addresses the potential that banning non-compete clauses will *reduce* wages, despite citing some studies that support that notion.[94]

Nor does the rule consider the inefficiencies and downsides of alternative practices firms may have to employ to protect their trade secrets in lieu of non-competes, such as limiting workers' access to information, which are likely to both be disruptive and lead to a loss of opportunities for the workers. As explained above, in many cases it will be virtually impossible to wall off confidential business information (including trade secrets) from general business knowledge, forcing companies to minimize the number of employees who can see confidential company information, which will have negative impact on business efficiencies and overall competitiveness of the company.[95] Nor does the proposed rule consider the significant inefficiencies caused by forcing businesses to implement more substantial guardrails *within* their organizations to protect confidential information, without the availability of non-compete clauses. The FTC also minimizes the increased litigation costs to protect trade secrets and confidential business information that are likely to result from barring clear and easy-to-enforce non-competes.[96] Moreover, companies who do not currently employ such alternative provisions would have to *add* them to their contracts and implement related policies and procedures, at substantial expense.

Further, many other obvious costs are ignored entirely by the proposed rule. The rule does not consider, for example, the costs that firms will incur from former employees soliciting the firm's clients or customers. One reason that some firms employ non-compete clauses in worker contracts is to prevent workers from leaving for a competitor and soliciting their clients to come with them.[97] This can be especially damaging to small businesses who cannot withstand the loss of a major client. Lastly, the rule's analysis under the Regulatory Flexibility Act also downplays

---

[92] *See supra* at II.C–D.

[93] 88 Fed. Reg. at 3529/2.

[94] Omesh Kini, Ryan Williams & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation*, 34 Rev. Fin. Stud. 4701, 4707 (2021).

[95] *See supra* II.D.

[96] 88 Fed. Reg. at 3530/1.

[97] *See, e.g.*, Kurt Lavetti, Carol Simon, William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. of Human Resources at 2 (2020).

the costs to small businesses arising from higher worker turnover and worker poaching by other firms.[98]

Second, as to benefits, the rule dramatically overstates the purported social goods that would flow from a ban on non-compete clauses. The rule's benefits calculation is premised on the notion that 30 million workers—or roughly 18% of the workforce—are currently bound by such clauses. But that number is supported by only a single study that relies on a decade-old survey of a nonrepresentative sample of workers.[99] This outdated data fails to account for the fact that many states have limited the use of non-competes in recent years.[100] Companies have responded by reevaluation their use of non-compete clauses, meaning that there are very likely many fewer workers presently bound by non-compete clauses than the FTC's estimate—and thus fewer benefits (if any) could follow from banning non-compete clauses. The results of a recent RILA member survey supports the argument that the number of impacted workers is overstated. The majority of responding members that use non-compete clauses indicate that they do so with less than 1% of their workforce and an additional 26% of respondents use these clauses with 10% or less of their total workforce.

A foundational requirement of the APA is that before imposing a new regulation, an agency must accurately and thoroughly weigh the costs and benefits of doing so. Here, the FTC's flawed cost-benefit analysis, with its overstatement of benefits and understatement of costs, does not satisfy a core requirement of the APA, and therefore the proposed rule should be withdrawn.

## VI.    The FTC Should Abandon the Proposed Rule and Continue Adjudicating Non-Compete Clauses on a Case-By-Case Basis.

RILA members do not support overbroad and anticompetitive non-competes that limit worker mobility. Targeting overbroad and anticompetitive non-compete clauses, however, does not require a blanket ban like the FTC proposes. Moreover, a broad public policy on non-compete clauses is a matter for federal and state elected officials to address. RILA is currently engaged, and looks forward to continuing to engage, with Congress to find a solution that tackles anticompetitive non-competes while still providing employees and businesses flexibility to negotiate mutually beneficial contract provisions.

For all the reasons stated above, the FTC's proposed rule is unlawful and ill-conceived. The FTC lacks the requisite statutory authority for the proposed rule, and it is bad policy in any event. To the extent the FTC seeks to address non-compete clauses going forward, it should not act through rulemaking, but instead remain within the bounds of its statutory authority and evaluate particular non-compete clauses on a case-by-case basis using the rule-of-reason standard.[101] This adjudicatory process established by the FTC's authorizing statute enables the agency to weigh

---

[98] 88 Fed. Reg. at 3531/2–3.

[99] *See id.* at 3485/2–3 (citing Starr *et al.*, *supra* n.3, at 53, 63).

[100] *See id.* at 3494/2–3.

[101] *See, e.g.*, ABA Section of Antitrust Law, Comments, *supra* n.32, at 60 (Apr. 24, 2020) ("As the Commission's historical experience with rulemaking suggests, adjudication may be a superior way to address the potential problem of non-compete clauses.")

any anticompetitive harms that such clauses may cause against their procompetitive benefits.[102] There is no reason that the FTC cannot eliminate truly unfair non-compete clauses using its existing statutory authority and processes.

Lastly, in the proposed rule the FTC implies that it is willing to consider limiting or modifying the rule in some manner. As noted above, RILA and its members do not believe that the FTC's current statutory authority authorizes the Commission to issue any competition rule, including a potentially limited rule on non-competes. However, assuming for the sake of argument that the FTC does have such authority, in the event that the Commission decides to modify or limit the proposed rule in any fashion, under the requirements of the APA, the FTC must repropose any new modified rule and take stakeholder feedback on the new proposal.

**Conclusion**

RILA appreciates the opportunity to provide these comments on the FTC's proposed non-compete clause rule. We would welcome an opportunity to discuss our feedback with the commission.

If you have any questions or need any additional information, please contact Kathleen McGuigan, EVP and Deputy General Counsel, at ███████████████████ or Evan Armstrong, VP Workforce, at ███████████████████

Sincerely,


Kathleen McGuigan
EVP & Deputy General Counsel
Retail Industry Leaders Association

Evan Armstrong
VP Workforce
Retail Industry Leaders Association

---

[102] *See Leegin Creative Leather Prods., Inc.*, 551 U.S. at 885–86.

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Eugene Scalia

April 19, 2023

VIA ELECTRONIC SUBMISSION:  HTTP://WWW.REGULATIONS.GOV

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue, NW
Suite CC-5610 (Annex C)
Washington, DC 20580

Re:    Non-Compete Clause Rulemaking, Matter No. P201200

Dear Ms. Tabor:

Please find enclosed a letter from Ryan, LLC, commenting on the Commission's proposed
Non-Compete Rule.  *See* FTC, *Notice of Proposed Rulemaking:  Non-Compete Clause Rule*,
RIN 3084-AB74, 88 Fed. Reg. 3482, 3534-35 (Jan. 19, 2023).  Thank you for your
consideration.

Respectfully,

Eugene Scalia

Abu Dhabi · Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles
Munich · New York · Orange County · Palo Alto · Paris · San Francisco · Singapore · Washington, D.C.

JA0997



Three Galleria Tower

13155 Noel Road

Suite 100

Dallas, Texas 75240

Main      972.934.0022

Fax       972.960.0613

www.ryan.com

April 19, 2023

*Via electronic submission: http://www.regulations.gov*

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue, NW
Suite CC-5610 (Annex C)
Washington, DC 20580

Re:    Non-Compete Clause Rulemaking, Matter No. P201200

Dear Ms. Tabor:

Ryan, LLC appreciates the opportunity to submit a comment regarding the Commission's proposed Non-Compete Rule. *See* FTC, *Notice of Proposed Rulemaking: Non-Compete Clause Rule*, RIN 3084-AB74, 88 Fed. Reg. 3482, 3534–35 (Jan. 19, 2023). Ryan is a global tax-consulting firm that employs over 2,500 professionals in dozens of offices in the United States.

Ryan strongly supports free and competitive markets. The Proposed Rule does not promote competition. Instead, it will put hard-earned trade secrets and other confidential business information at risk, as well as stifle innovation, workforce development, and productive mergers and acquisitions. It will harm consumers, businesses, workers, and the American economy as a whole. Ryan opposes the Proposed Rule.

The Proposed Rule jettisons centuries of precedent and practice by imposing a blanket prohibition on non-competes and quite possibly on many other restrictive covenants, regardless of a worker's occupation, skill, salary, or knowledge of sensitive, confidential business information. Non-competes and other restrictive covenants serve a vital business purpose, especially in the consulting industry, where methods, approaches, and playbooks developed over years can form the backbone for the services offered to clients. Non-competes and other restrictive covenants are

JA0998

necessary to protect those assets; they prevent a firm's former workers from divulging sensitive information (including confidential data belonging to a firm's clients) to future employers. Tailored uses of non-competes and other restrictive covenants have no anti-competitive effects—in fact, they are beneficial—but the Proposed Rule nevertheless prohibits them, thereby threatening to upend entire industries and disrupt entrenched, highly productive business models.

The Commission should withdraw the Proposed Rule because it is unlawful and arbitrary and capricious. First, the FTC lacks authority to issue the rule. The Federal Trade Commission Act, 15 U.S.C. § 45, does not authorize the Commission to promulgate legislative rules regarding "unfair methods of competition" at all, much less to ban virtually all non-competes in a manner that runs roughshod over centuries of state law and flouts bedrock principles of administrative and constitutional law. Second, the Proposed Rule's sweeping approach of banning all non-competes is irreconcilable with the antitrust laws, those laws' centuries-old common law roots, and basic principles of due process. Third, the Proposed Rule is arbitrary and capricious; its analysis of the evidence on non-competes and its cost-benefit analysis ignore the numerous benefits that non-compete clauses offer to firms, workers, and consumers, which greatly overweigh the Commission's limited and flawed evidence of harms.

## EXECUTIVE SUMMARY

**I.** Ryan is a global tax-consulting firm that employs over 2,500 people in the United States. Ryan is owned and operated by 200-plus principals, who are sought-after tax experts. Principals' shareholder agreements contain post-employment non-competes to protect Ryan's confidential information and to prevent departing principals from poaching Ryan's clients and employees. The Proposed Rule would annul these non-competes, thereby threatening Ryan's trade secrets, stability, and ability to acquire other firms. It would also force Ryan to reduce employee-training opportunities and to silo sensitive information to minimize the risk of departing employees—principals and non-principals alike—taking and sharing confidential information with Ryan's competitors.

**II.** The Proposed Rule is illegal. It exceeds the Commission's statutory authority, as Section 5 of the FTC Act does not authorize the Commission to issue substantive regulations preventing "unfair methods of competition," which can be addressed only through case-by-case adjudication. Section 6(g), which grants the Commission the power to "make rules and regulations

2

for the purpose of carrying out the provisions of this subchapter," is limited to the power to make procedural rules furthering case-by-case adjudication. The Magnusson-Moss Act affirms this. It grants the Commission the power to promulgate substantive rules regarding "unfair or deceptive acts or practices," suggesting that no corresponding authority exists for making rules targeting "unfair methods of competition." Moreover, under the major questions doctrine, no court would conclude that the Commission has the statutory authority to promulgate the Proposed Rule. And even if the Commission did have the statutory authority to issue the Proposed Rule, that grant of authority would violate the Constitution's prohibition on the delegation of legislative power from Congress to the Executive Branch.

**III.** The Proposed Rule's per se ban on non-competes is inconsistent with common law and federal antitrust law and violates due process. Centuries of common law and statutory decisions under the Clayton and Sherman Acts require case-by-case adjudication of the legality of non-competes. The Commission claims that case-by-case adjudication is unnecessary because non-competes always lack valid business justification, but that assertion is wholly unsupported by legal precedent and (as discussed in Part IV) empirical evidence. The Commission's November 2022 Policy Statement, in which it dubiously claimed the power to regulate practices that *could* harm competitive *conditions*—as opposed to demonstrably harming competition itself—does not salvage the Proposed Rule because it is neither legally binding nor legally accurate. Furthermore, due process requires a case-by-case analysis of non-competes because businesses have the right to present reasons why their specific practices are not anti-competitive.

**IV.** The Proposed Rule's justifications for banning non-competes are arbitrary and capricious. The Commission proposes to make an enormous change in the American economy based on an inconsistent analysis of limited, flawed, recent, and inconclusive evidence about the competitive effects of non-competes. The Commission's conclusions, moreover, are in large part dependent on its analysis of non-competes' purported effects on the labor market and workers themselves—but that is not a proper basis for Commission action since its statutory mandate is to protect *consumers*. Moreover, a fair analysis of the evidence shows that, contrary to the Commission's conclusions, non-competes have overall pro-competitive effects in the labor market and are not "exploitive and coercive." They also benefit the market for products and services by increasing innovation, increasing worker training, and decreasing prices. Finally, the

JA1000

Commission's decision to extend its proposed ban to so-called "de facto" non-competes is based on *zero* evidence of anti-competitive effects of those agreements.

**V.**  The Commission's errors in analyzing the evidence to justify the Proposed Rule carry over to its cost-benefit analysis.  The Commission overstates the benefits and understates the costs due to the same mistakes that cause it to mis-analyze the evidence and other mistakes unique to the cost-benefit analysis.  Worse yet, the Commission ignores a host of costs not just to firms, but to workers and the economy as a whole.

## TABLE OF CONTENTS

Page

I.  The Proposed Rule Will Harm Ryan LLC and Thousands of Other Client-Service Businesses. ................................................................................................ 8

    A.  Ryan's business. ................................................................................. 8

    B.  Ryan's use of restrictive covenants is beneficial and legitimate. ......... 9

    C.  The Proposed Rule will disrupt Ryan's business model and harm fair competition in the tax-consulting market. ........................................... 10

II.  The FTC Lacks Statutory Authority to Adopt Unfair Methods of Competition Rules. ................................................................................................................ 12

    A.  The FTC has never had the authority to issue rules defining unfair methods of competition, notwithstanding the D.C. Circuit's 1973 decision in *National Petroleum*. ....................................................................... 13

    B.  The Magnuson-Moss Act confirms *National Petroleum* was incorrect, and supersedes it. ..................................................................................... 15

    C.  The Commission also lacks authority for the Proposed Rule under the major-questions doctrine. ................................................................... 16

    D.  The non-delegation doctrine also prohibits the Proposed Rule. ........... 18

III.  A Per Se Ban on Non-Competes Is Inconsistent with Common Law and the Antitrust Statutes and Violates Due Process. ................................................... 19

    A.  The Commission fails to analyze non-competes individually, as required by the rule of reason and centuries of precedent. .................................. 19

    B.  Due process requires case-by-case analysis of whether non-compete clauses are pro- or anti-competitive. ................................................... 22

## TABLE OF CONTENTS

Page

IV.  The FTC's Evidence and Justifications for a Per Se Ban on Non-Competes Do
Not Withstand Scrutiny ................................................................................ 23

   A.  Non-competes promote competition in the market for products and
   services .................................................................................................. 25

      1.  Non-competes foster innovation and successful business
      formation ........................................................................................ 25

      2.  Non-competes can decrease prices. ............................................... 28

      3.  There is no evidence that non-competes create recruiting
      "deadweight losses," outside the specialized market for CEOs. ............. 29

   B.  Non-competes benefit workers and promote competition in the labor
   market. .................................................................................................. 30

      1.  Non-competes boost job creation. ................................................. 30

      2.  Non-competes promote employer investment in worker training. .......... 30

      3.  Non-competes are associated with higher earnings. ............................. 32

      4.  Workers can and do benefit from and bargain over non-competes. ........ 35

   C.  The focus of the FTC Act is consumer welfare, so any evidence that non-
   competes negatively affect the labor market or supposedly exploit workers
   is not a proper basis for this rulemaking. ............................................... 38

   D.  The studies cited by the FTC are too new, inconclusive, and
   methodologically flawed to justify the Proposed Rule. ........................ 39

   E.  The FTC's evaluation of the evidence and its reasoning are inconsistent. .......... 43

   F.  The FTC cites no empirical evidence whatsoever to support prohibiting
   so-called "de facto non-competes." ....................................................... 45

## TABLE OF CONTENTS

Page

V.    The Commission's Cost-Benefit Analysis Is Flawed. ........................................ 46

A.    The Commission overstates the Proposed Rule's purported benefits.................. 46

B.    The Commission understates the costs it does acknowledge............................. 47

C.    The Commission ignores a number of other costs............................................. 50

    1.    The Commission ignores costs resulting from increased worker turnover. ....................................................................................................... 50

    2.    The Commission ignores other significant costs to firms....................... 52

    3.    The Commission ignores other costs that will affect the economy as a whole................................................................................................. 53

JA1004

I.    **The Proposed Rule Will Harm Ryan LLC and Thousands of Other Client-Service Businesses.**

A.    **Ryan's business.**

Ryan, LLC is a global tax services firm that provides an integrated suite of federal, state, local, and international consulting services to corporate clients to liberate them from the burdens of over-taxation.  Ryan is headquartered in Dallas, Texas, and has dozens of offices across thirty states and the District of Columbia in both major metropolitan areas and smaller markets.  As a global tax-consulting firm, Ryan also has offices in eight countries throughout Europe as well as in Canada, Australia, India, and the Philippines.

Ryan represents leading corporate clients in established and emerging industries ranging from food services and retail to cryptocurrency and telecommunication.  Ryan's tax-consulting services include audit representation, strategic-advisory services and public-affairs services, advanced tax software, and compliance assistance.  Ryan has over 18,000 clients, including 97% of the companies that make up the Dow Jones Industrial Average.  Clients hold Ryan's services in high regard, with over 90% reporting that they are extremely satisfied with Ryan and extremely likely to return.  Ryan's 4,300 employees, over 2,500 of whom are in the United States, express similar satisfaction, as reflected by the numerous employee-satisfaction awards Ryan has won. For instance, Fortune magazine recently named Ryan one of the best workplaces for women, one of the best workplaces in consulting, and one of the best workplaces for millennials, as well as one of the 100 best companies to work for.  *See* Ryan.com, *About Ryan: Awards*, https://tinyurl.com/55vsavnh.

Like other leading consulting firms, Ryan relies on a traditional, principal-driven business model.  Ryan's 200-plus principals are sought-after tax experts who frequently join Ryan after years of experience in the tax industry.  They include former administrative law judges, legislators, policy officials, auditors, attorneys, and statisticians.  Each principal is a Ryan shareholder. Together, they supervise thousands of employees, most notably managers and consultants, who assist in providing Ryan's services.

The methods, approaches, and playbooks for advising clients and solving their problems are often developed through a collaborative process that can take years of research and trial and error to perfect.  Ryan's principals and employees constantly reevaluate and modify those methods,

approaches, and playbooks in light of changing laws and regulations, market trends, and even the identities of the relevant regulators. That know-how is an extraordinarily critical corporate asset.

### B.    Ryan's use of restrictive covenants is beneficial and legitimate.

Ryan uses non-compete clauses in a tailored fashion. Ryan's principals, who make up less than 10% of Ryan's U.S.-based workforce, all are subject to post-employment non-competes pursuant to the terms of their shareholder agreements.[1] The vast majority of Ryan's employees, including its client-facing employees, are not subject to post-employment non-competes. Ryan does not require its non-consultant employees such as administrative assistants, human-resources specialists, and in-house counsel to sign non-compete agreements. All partners and employees are subject to clauses prohibiting the disclosure of confidential information and solicitation of Ryan clients and employees. Non-compete clauses and non-solicitation clauses are temporally limited.

This limited use of non-competes strikes a healthy balance between the interests of Ryan and its departing principals and employees. Ryan appropriately protects its confidential business information and clients' sensitive information and insures itself for a limited period against the threat of client-poaching by tailoring agreements to the seniority of the individuals and, sometimes, the particular risks associated with an individual's access to sensitive information.

In Ryan's experience, non-disclosure agreements are less effective than non-competes. An unauthorized disclosure of confidential business information or confidential client information is more problematic the fresher the information is. Because they are prospective in nature, non-competes alone can prevent even accidental disclosure or use of sensitive information by ensuring that, for a period of time, former workers do not join competing firms. A worker may have no intent to use confidential information but may do so inadvertently in the very process of competing with his former employer. Non-disclosure agreements are inadequate to protect confidential information because they act only retroactively, and, due to the difficulty of learning about and obtaining proof of disclosure, are harder to enforce. Cases involving violations of non-disclosure obligations or theft of confidential business information are also difficult to win and, even when the plaintiff prevails, substantial time often has passed, reducing the effectiveness of any remedy.

---

[1] Ryan has inherited non-compete agreements applicable to non-partners that were entered into by predecessor firms as part of an acquisition. Sometimes it agrees to a non-compete clause with a non-partner where that employee has access to particularly sensitive business information.

9

For example, Ryan has been litigating a case involving an alleged theft of its trade secrets for over two-and-a-half years, yet still has not proceeded to trial. Non-competes thus can be a critical and reasonably tailored tool for preventing both intentional and accidental disclosure of confidential business and client information.

### C. The Proposed Rule would disrupt Ryan's business model and harm fair competition in the tax-consulting market.

Although Ryan's use of non-competes is limited in scope, it is nevertheless essential to Ryan's ability to compete in the tax-consulting market and to provide world-class services to its clients. By erecting a total ban on worker non-competes, the Proposed Rule would overturn Ryan's longstanding business model to the detriment of Ryan, its principals, its employees, and its clients. That risk is heightened by the Proposed Rule's coverage of so-called "de facto non-competes," which would substantially chill both the inclusion of any restrictive covenant in an agreement and the attempted enforcement of the covenant for fear of it being deemed an unfair method of competition subject to FTC enforcement. Far from being pro-competitive, the Proposed Rule would actually have anti-competitive effects on the tax-consulting industry and penalize consumers and employees alike.

First, the Proposed Rule places Ryan's business secrets at considerable risk of exposure. Like other leading consulting firms of varying types, Ryan has developed innovative and highly successful methods, approaches, and models for solving its clients' problems. These methods are often extremely difficult and expensive to develop because they require considerable amounts of manpower, expertise, and resources. Non-competes and other restrictive covenants such as non-disclosure agreements are necessary to protect these methods, which may fall outside the scope of federal and state trade-secrets statutes. The risk of exposure increases as individuals become more senior and gain access to more sensitive information, which is why Ryan requires principals, in particular, to sign non-competes.

Second, the Proposed Rule would lead to more unfair and anti-competitive client-poaching. If the Proposed Rule goes into effect, principals who depart Ryan could immediately solicit the business of Ryan's clients. Of course, Ryan acknowledges that it has no entitlement to its clients' business and appreciates that in a competitive market, clients will frequently shift their business from a firm to its competitor when they believe it can offer higher-quality or lower-cost services. Indeed, some of Ryan's clients were previously clients of Ryan's competitors. The purpose of a

10

non-compete therefore is not to perpetually lock up a client's business but, instead, to prevent principals from engaging in gamesmanship and taking advantage of Ryan's resources for their own business purposes. Non-competes prevent principals from forming relationships with Ryan's clients and learning Ryan's trade secrets with the intent of departing Ryan and promptly poaching the client. The (time-limited) non-compete in Ryan's Shareholder Agreement ensures that Ryan can maximize principal-client interaction without fear of client-poaching in the short term.

Third, the Proposed Rule would similarly lead to more unfair and anti-competitive employee-poaching. If principals were to depart Ryan without non-compete restrictions, they might attempt to bring Ryan's consultants with them. Ryan offers its consultants robust on-the-job training, mentorship and professional-development opportunities, and unparalleled real-world experience. This helps consultants to grow professionally and provide Ryan's clients with the best services in the industry. Ryan realizes that some of its consultants will eventually choose to seek employment elsewhere for personal and professional reasons and does not require the vast majority of its employees to sign non-competes. However, if departing principals were able to solicit the employment of Ryan's consultants, the impact of each departure would be magnified, inflicting considerable human-capital losses upon Ryan. This would disincentivize Ryan from investing in training and offering business opportunities to consultants whom Ryan believes are vulnerable to poaching by recently departed principals. This could result in lower-quality consulting services and a less capable workforce; the Proposed Rule would thereby harm those it purports to protect: consumers and employees.

Fourth, the Proposed Rule would lead to reduced information-sharing and decreased staffing within Ryan. To reduce the harms from departing principals poaching clients and consultants, Ryan would be forced to limit certain principals' access to clients, consultants, and information. That, in turn, would raise the costs of providing client services. Again, this could result in lower-quality client services and fewer professional-development opportunities.

Fifth, the Proposed Rule would curb Ryan's acquisition of smaller tax-consulting firms and hiring of outside experts. When new principals join Ryan, they bring a wealth of expertise and experience, contributing to economies of scale that enable Ryan to pioneer innovative products and services at reasonable cost. But each new addition comes with a corresponding risk of future departure from Ryan and the accompanying loss of confidential business information and client- and consultant-poaching. If the Proposed Rule goes into effect, Ryan's ability to mitigate these

risks will be significantly restricted.[2]  Thus, Ryan likely would make fewer acquisitions and hire fewer new principals, stifling growth and innovation to the detriment of Ryan, its employees, and its clients.

Of course, the effect of the Proposed Rule would not be limited to Ryan.  Innovation by Ryan pushes its competitors to catch-up—i.e., to *compete* with each other—which increases options and improves products and services for consumers.  Impairing Ryan's effectiveness impairs competition in the industry.  Further, Ryan's competitors in the tax consulting industry similarly rely on non-competes to protect their own business secrets and investments in clients and employees.  The Proposed Rule would stifle innovation across the industry, and harm not only Ryan's clients, but all those who rely on tax consultants to reduce their tax burden.

Finally, the Proposed Rule would be bad for individual consultants.  Without the protection of non-competes—and with other restrictive covenants threatened by the proposal—Ryan and other firms would have to guard their business methods and client information more tightly, which would mean more siloing of workers and fewer training and career-growth opportunities.  Without the assurances provided by non-competes, along with the risks that other restrictive covenants may not be enforceable and of higher costs of doing business, compensation growth would be constrained.  In short, employees lose, too.

## II.    The FTC Lacks Statutory Authority to Adopt Unfair Methods of Competition Rules.

The Proposed Rule is breathtaking in its scope and ambition.  In seeking to override the laws of 47 states and to cancel tens of millions of contracts, the Commission dramatically exceeds its statutory authority and triggers significant constitutional concerns.

The Commission claims that "[t]aken together, Sections 5 and 6(g) provide the Commission with the authority to issue regulations declaring practices to be unfair methods of competition."  88 Fed. Reg. at 3499.  In truth, and as the text, history, and structure of the FTC Act make clear, Section 6(g) merely grants the Commission the authority to make procedural rules, not to promulgate substantive rules governing private parties.  The only case to the contrary, *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), was wrongly decided.

---

[2] The Proposed Rule suggests that firms use non-disclosure agreements and trade-secrets lawsuit as alternatives to non-competes.  88 Fed. Reg. at 3505.  These alternatives do nothing to stop former principals from soliciting Ryan's clients and consultants.

In any event, Congress superseded that decision with the Magnuson-Moss Warranty – Federal Trade Commission Improvement Act, which does not grant the FTC the authority to promulgate unfair-method-of-competition rules and confirms that Section 6(g) does not either. Finally, the major-questions and non-delegations doctrines each prohibit reading Section 6(g) to grant the FTC its asserted power to remake the American economy at will.[3]

A. **The FTC has never had the authority to issue rules defining unfair methods of competition, notwithstanding the D.C. Circuit's 1973 decision in *National Petroleum*.**

Section 5 of the FTC Act outlaws "unfair methods of competition" and "empower[s]" the Commission to "prevent persons . . . from using unfair methods of competition." 15 U.S.C. § 45(a)(1)–(2). But from its creation in 1914 until the 1960s, the Commission was understood— including by the Commissioners themselves—to be empowered to prevent unfair methods of competition only through case-by-case adjudication. In 1962, the Commission for the first time claimed that Section 6(g) granted it the authority to make substantive rule by vesting it with "power . . . [f]rom time to time classify corporations and . . . to make rules and regulations for the purpose of carrying out the provisions of this subchapter." This latter understanding was incorrect.

The structure of the FTC Act makes clear that Section 6(g) only grants the Commission the authority to promulgate procedural rules. As mentioned above, Section 5 of the FTC Act empowers the Commission to prevent the use of unfair methods of competition. *See* 15 U.S.C. § 45(a). However, Section 5 also creates a fully fleshed-out system for *how* the Commission is to prevent unfair methods of competition. Specifically, Section 5 empowers the Commission to hold a hearing to determine whether a person is employing an unfair method of competition and to then issue a cease-and-desist order if that method is determined to constitute an unfair method of competition. 15 U.S.C. § 45(b). Section 5 also provides for judicial review, 15 U.S.C. § 45(c),

---

[3] Additionally, as a multimember "independent agency" purportedly shielded from presidential control, the Commission is unconstitutionally structured. Article II of the Constitution vests the entire executive power in the President alone, so "lesser officers" within the Executive Branch "must remain accountable to the President." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020); *see also Collins v. Yellen*, 141 S. Ct. 1761 (2021). Thus, as a general rule, the president must retain "unrestricted removal power." *Id.* at 2198–2200. However, the FTC Act, allows removal of the Commissioners only for "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. Although the Supreme Court upheld the constitutionality of the FTC Act's good-cause provision in *Humphrey's Executor v. United States*, the rationale for that century-old decision, even if it was correct at the time, no longer holds today because the FTC has since been granted numerous indisputably executive powers, including to seek monetary and injunctive relief in court; it is even less intelligible now to say that the agency can act only "quasi legislatively" and "quasi judicially." 295 U.S. 602, 628 (1935); *see* 15 U.S.C. § 45(m) (granting the FTC executive authority).

once such orders become final, *id.* § 45(g)–(j), and for the assessment of penalties for violations of orders, 15 U.S.C. § 45(*l*).  In sum, Section 5 is a self-contained enforcement scheme.

Section 6 lays out ancillary powers of the Commission to aid in the administration of that scheme.  Most of these provisions grant the Commission investigatory powers.  *See* 15 U.S.C. § 46(a), (b), (c), (d), (h), (i), (j).  Some grant the Commission the ministerial powers to make recommendations to the Department of Justice, *see* 15 U.S.C. § 46(e), (k), and to publish reports, *see id.* § 46(f).  And Section 6(g) grants the Commission the power to "classify corporations," and to "make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g).

Read in context, it is clear that Section 6(g) grants only the power to make procedural rules. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Section 6 provides the Commission with ancillary powers to enable it to effectively execute the adjudication-centric regulatory scheme laid out in Section 5.  It is unfathomable that Congress, in one half of one subsection to a different provision, also provided the Commission with the power to issue legislative rules to supplement a fundamentally different, reticulated regulatory scheme, let alone legislative rules to remake broad swaths of the American economy.

The history of the FTC Act and the Commission's interpretation of it bolsters that conclusion.  In 1914, when Congress passed the Act, it was unheard of for Congress to grant an agency broad legislative rulemaking authority without also enacting a provision providing penalties for violating those rules.  *See generally* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 HARV. L. REV. 467, 549–57 (2002).  There is no such provision for Section 6 rules.  *See* 45 U.S.C. § 46.  By contrast, there is now, and was then, a provision for violating orders that result from Section 5 adjudications.  *See* 15 U.S.C. § 45(*l*)–(m); Federal Trade Commission Act, ch. 311 § 5, 38 Stat. 717, 720 (1914) ("If such person . . . fails or neglects to obey such order of the Commission . . .").

Moreover, the fact that the FTC did not understand Section 6(g) to grant it substantive rulemaking authority for approximately the first fifty years of its existence counsels against reading it to do so now.  The Supreme Court has said that "[i]n construing [a provision of the FTC Act], it is helpful to understand how the Commission's authority (and its interpretation of that authority)

has evolved over time." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1345–46 (2021). The FTC was created in 1914 but did not claim to have rulemaking authority until 1962. In fact, between 1914 and 1962, the FTC explicitly disclaimed substantive rulemaking authority on multiple occasions. *See Nat'l Petroleum Refiners Ass'n*, 482 F.2d at 693 & n.27 (explaining that the FTC "indicated intermittently before [1962] that it lacked" the power to promulgate substantive rules). Especially notable, because it was nearly contemporaneous with the original Act, is the FTC's 1922 annual report, which said, "One of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it." Annual Report of the Federal Trade Commission 36 (1922); *see also* Hearings on H.R. 2321 Before the House Committee on Interstate & Foreign Commerce, 82d Cong., 1st Sess., 160 (1951) (statement of Mr. Henry Miller, Assistant General Counsel, FTC) ("[O]ur trade practice rules do not require mandatory labeling because we have felt that we have not the power to require it. . . [W]e can apply the powers we have under the [FTC] Act[, but] those powers cannot be applied quickly enough to provide an over-all and adequate remedy. You have to go through the procedure of an investigation. Then you have to [go through the procedure of an adjudication.]") It is hard to argue that the Commission misunderstood its authority merely 8 years after it was created, but then became enlightened 40 years later.

Despite these textual, structural, and historical reasons to interpret Section 6(g) as granting only the authority to make procedural rules, the D.C. Circuit ruled otherwise in 1973. *See National Petroleum Refiners Ass'n*, 482 F.2d at 697–98. For the reasons explained above, and as others have explained, that decision was incorrect when it was decided. *See* Richard J. Pierce, *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works. 1561, at 6, 9 (2021); Maureen K. Ohlhausen & James Rill, *Pushing the Limits? A Primer on FTC Competition Rulemaking* 10–13, U.S. CHAMBER OF COMMERCE (2021).

**B.    The Magnuson-Moss Act confirms *National Petroleum* was incorrect, and supersedes it.**

In 1975 Congress enacted the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, which simultaneously supersedes *National Petroleum* and demonstrates that it was incorrect from its inception. *See* Pub. L. No. 93-637, 88 Stat. 2183 (1975). The Act authorizes the Commission to promulgate "rules which define with specificity acts or practices which are

unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 57a(a)(1)(B).  That provision would be pointless surplusage if Section 6(g) already granted the Commission the authority to promulgate substantive rules.  *Cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").

What the Magnuson-Moss Act did *not* do is as important as what it did do.  Though the Act explicitly authorized the Commission to promulgate substantive rules regarding unfair or deceptive acts or practices, it said nothing about authorizing the Commission to promulgate substantive rules regarding unfair methods of competition.  These "circumstances support[] a sensible inference that the [rulemaking authority] left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  Moreover, the Magnuson-Moss Act imposed procedural hurdles beyond those required by the Administrative Procedure Act to promulgate rules regarding unfair or deceptive acts.  *See* 15 U.S.C. § 57a(b)–(d).  Particularly given that declaring a practice to be an unfair method of competition can have much broader implications for the economy than declaring an act or practice to be unfair or deceptive, it would be very odd for Congress to impose additional procedural hurdles for consumer-protection rules but to leave competition rules unconstrained.  The only reasonable interpretation is that the Commission has no competition rulemaking authority at all.[4]

### C.    The Commission also lacks authority for the Proposed Rule under the major-questions doctrine.

To the extent there were any ambiguity in the FTC Act, the "major-questions doctrine" would confirm that the Commission lacks authority to promulgate the Proposed Rule.  That doctrine recognizes limitations on a federal agency's authority to enact regulations of "vast economic and political significance."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022).  An agency can promulgate such regulations only if it has "clear congressional authorization" to

---

[4] Congress also provided that its express grant of authority for rules defining unfair and deceptive acts or practices, and accompanying procedural hurdles, did "not affect any authority of the Commission to prescribe rules . . . with respect to unfair methods of competition."  15 U.S.C. § 57a(a)(2).  This disclaimer does not remove the clear implication of providing explicit—yet tightly constrained—authority to promulgate rules defining unfair and deceptive acts or practices, while providing no rulemaking authority regarding unfair methods of competition.  At most, the language is an evasion that confirms Congress withheld the clear authority for competition rules required by the major questions doctrine.  *See infra* at 16–17; *see also* Eugene Scalia, THE MAJOR QUESTIONS DOCTRINE, NATIONAL PETROLEUM, AND THE FEDERAL TRADE COMMISSION'S COMPETITION RULEMAKING AUTHORITY 7–8, AM. ENTERPRISE INST. (Dec. 2022).

undertake a "transformative expansion in [its] regulatory authority." *Id.* at 2609–2610. A "plausible textual basis" in a statute is insufficient. *Id.* at 2609.

There is little doubt that the banning of non-competes presents a major question. First, the Proposed Rule "intrudes into an area that is the particular domain of state law." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021); *see also W. Va. v. EPA*, 142 S. Ct. at 2621 (Gorsuch, J., concurring). Non-competes have been regulated by the common law of contract since before the American Revolution; the Proposed Rule would preempt the laws of 47 states. 88 Fed. Reg. at 3494, 3515.[5] Second, the Proposed Rule is of great "economic significance," *W. Va. v. EPA*, 142 S. Ct. at 2608, since by the Commission's estimate it would invalidate the contracts of "one in five American workers—or approximately 30 million workers," thereby upending reliance interests and entrenched business models, 88 Fed. Reg. at 3485; *see also infra* at 46. Further, its predicted economic impact is over $250 *billion* per year. 88 Fed. Reg. at 3522.

Third, courts are especially likely to invoke the major-questions doctrine when an agency seeks to effectuate "fundamental revision of [a] statute, changing it from one sort of scheme of regulation into an entirely different kind." *West Virginia*, 142 S. Ct. at 2587 (cleaned up). That is precisely what the Proposed Rule attempts to do. The FTC Act's prohibition on "unfair methods of competition," 15 U.S.C. § 45(a), has historically been limited to pricing practices, mergers, and conspiracies in restraint of trade that are independently actionable under the Sherman and Clayton Acts. The FTC Act has never been interpreted to allow the Commission to regulate labor markets, much less to vest the Commission with the power to invalidate contractual terms that have been legal in the majority of jurisdictions for hundreds of years. The Proposed Rule endeavors to transform what is in essence an antitrust statute into a worker-protection law. Protecting workers' economic interests is a task for Congress and the agencies empowered by Congress to do so; it is not the role of a consumer-protection agency.

The Commission lacks the "clear congressional authorization" to decide the major question of whether non-competes are lawful or unlawful across the board and across the country.

---

[5] The federalism canon, which requires a clear Congressional authorization before an agency may "encroach[] upon traditional state power," independently indicates that the FTC lacks the power to regulate non-compete agreements. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172–74 (2001).

**D.      The non-delegation doctrine also prohibits the Proposed Rule.**

The interpretive canon of constitutional avoidance also weighs decisively against the Proposed Rule because using the broad terms of the FTC Act to authorize rules that define and proscribe unfair methods of competition would violate the non-delegation doctrine.

Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Rather, Congress can delegate power to an agency only if it provides an "intelligible principle" by which the agency can exercise it. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The relevant questions, then, are whether Section 5's supposed grant of rulemaking power to the Commission is "legislative" and if so, whether this grant is accompanied by an "intelligible principle" that delineates the scope and purpose of the Commission's purported rulemaking authority.

There is no intelligible principle to guide an unfair method of competition rulemaking. Congress "has set out an intelligible principle" when it "has made clear to the delegee the general policy [it] must pursue and the boundaries of [its] authority." *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (quotation marks omitted). Neither Section 5 nor Section 6(g) does this. Particularly as recently interpreted by the Commission, the determination of which trade practices are "unfair" is a necessarily subjective, value-laden inquiry; the Commission last year expanded the term to encompass any conduct that "may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature" or is "otherwise restrictive or exclusionary, depending on the circumstances." Policy Statement Regarding the Scope of Unfair Methods of Competition under Section 5 of the Federal Trade Commission Act, Federal Trade Commission File No. P221202 (Nov. 10, 2022). The Director of the Bureau of Competition has hailed that purported power as "open-ended." Holly Vedova, Update from the FTC's Bureau of Competition 2 (2023), https://www.ftc.gov/system/files/ftc_gov/pdf/vedova-gcr-law-leaders-global-conference.pdf. But the Constitution does not allow the Commission "to exercise an unfettered discretion to make whatever laws [it] thinks may be needed or advisable." *Schechter*, 295 U.S. at 537. Indeed, the Commission's asserted authority to promulgate rules establishing unfair methods of competition looks eerily like the authority to issue "codes of fair competition" that the National Industrial Recovery Act gave the President—but that the Supreme Court held violated the Constitution in *Schechter*. *See id.* at 532–34. Crucially, *Schechter*

contrasted those constitutionally impermissible "codes" with the Commission's case-by-case adjudication of "unfair methods of competition" under Section 5, indicating that the incremental, case-specific nature of the Commission's authority was instrumental to its constitutionality.  *Id.* at 532–33 ("What are 'unfair methods of competition' are thus to be determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest.").

The constitutional-avoidance canon "counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations*, 556 U.S. 502, 516 (2009).  For this reason too, the FTC Act must not be interpreted to provide a delegation of authority to promulgate rules establishing unfair methods of competition such as the Proposed Rule.

### III.    A Per Se Ban on Non-Competes Is Inconsistent with Common Law and the Antitrust Statutes and Violates Due Process

This rule would be unlawful even if the Commission did have the authority to promulgate substantive unfair method of competition rules.  It contradicts reams of precedent applying the rule of reason, rather than the per se rule, to non-competes under both common law and the antitrust statutes.  Applying the per se rule to non-competes would also violate the Due Process Clause.

#### A.    The Commission fails to analyze non-competes individually, as required by the rule of reason and centuries of precedent.

The Proposed Rule's categorical prohibition of non-competes is arbitrary and capricious and contrary to law because it discards the case-by-case approach of the rule of reason in favor of an unprecedented one-size-fits-all approach to evaluating fairness.

Courts have two approaches to analyzing whether economic agreements violate the antitrust laws.  The first approach, governing the vast majority of agreements, is the rule of reason, which requires an individualized analysis of whether a specific agreement has a substantial adverse effect on competition.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961).  Second, for a few particular types of economic arrangements, courts hold that the arrangement is per se anticompetitive.  *See Leegin Creative Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 888 (2007).  Exclusive dealing agreements, "whether challenged under section 3 of the Clayton Act or section 1 of the Sherman Act . . . [are] judged under the Rule of Reason."  *Roland Mach. Co. v. Dresser*

*Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984). Thus, as federal courts have repeatedly recognized, non-competes must be analyzed under the centuries-old rule of reason. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that covenants not to compete should be examined under the rule of reason."); *see also, e.g.*, *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983). In fact, the rule of reason was first articulated in a 1711 case evaluating a non-compete. *See Mitchel v. Reynolds*, 24 Eng. Rep. 347. Applying the rule of reason more recently, courts have often found that non-competes have pro-competitive effects and are therefore perfectly legal under the Sherman and Clayton Acts.

Non-competes have numerous benefits, and "[t]he per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever.*" In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012)); *see infra* at 25–37 (detailing benefits). The Commission must therefore use the rule of reason to determine whether a specific non-compete violates the FTC Act. Indeed, the only court to have considered whether non-competes are an unfair method of competition under the FTC Act held that non-competes do not violate Section 5 "unless they are unreasonable as to time or geographic scope." *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963). And as Commissioner Wilson explained in her dissent, this was a clear recognition that non-competes must be evaluated on a case-by-case basis, as they have for hundreds of years. 88 Fed. Reg. at 3540.

Rather than analyzing non-competes on a worker-, firm-, or even industry-specific basis, the FTC proposes to declare that nearly every non-compete, everywhere in the country, is anticompetitive and therefore violates Section 5 of the FTC Act. But "statutes will not be interpreted as changing the common law unless they effect the change with clarity." Antonin Scalia & Bryan A. Garner, Reading Law 318 (2012). Section 5 of the FTC Act declared that unfair methods of competition are unlawful. It did not change the application of the rule of reason to non-competes under the antitrust laws at all, and certainly did not change it with the clarity needed to derogate longstanding common law rules. The FTC therefore has no statutory authority to rewrite the antitrust laws. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (An agency action "may not stand if the agency has misconceived the law."). And the Commission certainly cannot

do so without at least grappling with the hundreds of years of precedents it is disregarding.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Commission's apparent justification for declaring non-competes per se unlawful does not actually grapple with the precedents judging them under the rule of reason.  The Commission appears to justify a per se rule for non-competes by first declaring them an unfair method of competition and then reasoning that "business justifications can overcome a finding that conduct is an unfair method of competition" only in "narrow" circumstances.  88 Fed. Reg. at 3504.  In other words, the Commission does not consider the business justifications as part of its determination of whether non-competes are an unfair method of competition, but instead considers only whether the business justification can legalize something that has already been determined to be an unfair method of competition.  That approach merely dodges, and does not directly consider, the application of the rule of reason to non-competes.  Under proper application of the rule of reason, the business justifications are part of the calculus for whether a given non-compete is anti-competitive and thus an unfair method of competition.  *See Aydin Corp.*, 718 F.2d at 901 (applying the rule of reason because non-competes "often serve legitimate business concerns such as preserving trade secrets and protecting investments in personnel"); *see also Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (non-compete clauses encourage employers to "train the employee, giving him skills, knowledge, and trade secrets that make the firm more productive").

The two cases the Commission cites in support of its position that business justifications need not be considered are inapposite.  *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457 (1941), concerned an agreement among manufacturers to boycott certain retailers.  The Supreme Court held that the agreement furthered a monopoly, so there was no need to consider whether the boycott was justifiable or reasonable.  In contrast, the Commission does not claim that firms are colluding to coerce workers.  The second case, *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 371 (1965), instructs that it is "unnecessary" to conduct "extensive economic analysis of market percentages or business justifications" when "anticompetitive effects . . . are clear on the record."  But three hundred years of precedent forecloses this approach towards non-competes; and the revisionist, preliminary administrative record the FTC has cobbled together is anything but clear that non-competes *always* have anticompetitive effects, as discussed at length below.

*Infra* Part IV.  Therefore, these cases do not change the fact that business justifications must be considered as part of the analysis of whether non-competes are unlawful under the rule of reason.[6]

### B.    Due process requires case-by-case analysis of whether non-compete clauses are pro- or anti-competitive.

Abandoning the case-by-case approach to judging non-compete clauses also violates the due process clause.  "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  For hundreds of years, employers have had the opportunity to present reasons why their particular non-compete clause was reasonable, and courts have often agreed.  But under the Proposed Rule, to find that an employer violated Section 5 of the FTC Act, the Commission would only have to find that it had a non-compete clause.  *See* 88 Fed. Reg. at 3535 (explaining that the proposed rule would define entering into a non-compete to be an unfair method of competition).  By adopting a rule that non-competes are per se anti-competitive, despite the long history of courts finding them pro-competitive, the Commission would deny the employer before it the opportunity to present reasons why its particular non-compete was pro-competitive, and thus not an unfair method of competition.  This does not comport with due process's core requirement of an opportunity to be heard.

The resulting procedures by which the FTC would hold hearings only to determine whether an employer used a non-compete also violates the balancing test articulated in *Mathews v. Eldridge* under which "a court evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake."  *Nelson v. Colorado*, 581 U.S. 128, 135 (2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  The private interest in being able to use pro-competitive non-competes is quite strong—for example, they are instrumental to enabling firms to train employees without fear that their investment in their employees will be for naught.  And the risk of an erroneous deprivation

---

[6] The Commission's November 2022 Policy Statement cannot salvage the Proposed Rule.  The Policy Statement arbitrarily and capriciously departs from longstanding Commission practice and judicial precedent by asserting that whether challenged practices have "the tendency to harm competitive conditions" is the lodestone of the Section 5 analysis.  The Commission, in turn, criticizes non-competes as "negatively affect[ing] competitive conditions."  88 Fed. Reg. at 3500.  However, the relevant question is not whether non-competes might harm competitive conditions through reducing worker mobility but whether they actually harm competition itself.  *See Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 487 (1977) ("The antitrust laws . . . were enacted for the protection of competition not competitors.").  The Policy Statement itself cannot override antitrust law.

is quite high under the Proposed Rule; many non-competes are pro-competitive, and these would all be erroneously declared to be unfair methods of competition under the Proposed Rule. Finally, the government has essentially zero interest in abandoning the case-by-case method that has worked for hundreds of years. Therefore, the Proposed Rule violates due process.[7]

## IV.    The FTC's Evidence and Justifications for a Per Se Ban on Non-Competes Do Not Withstand Scrutiny.

The Commission concludes that non-compete agreements are per se anti-competitive. On the contrary, both economic theory and the empirical evidence indicate that, on the whole, non-competes have significant pro-competitive effects and can be good for both companies and workers. Non-competes lead to greater innovation by increasing protections for intellectual property, encouraging internal collaboration, removing disincentives to invest in research and development, and creating incentives for companies to invest in worker training. In particular, non-competes solve a market failure whereby firms free-ride on each other's training of employees; non-competes thus result in more upskilling and reskilling. Greater innovation, along with more and better training, increases productivity, decreases prices for consumers, and benefits the economy. Workers and the labor market also benefit from more and better training and more jobs, as well as from higher wages. The Commission speculates that the Proposed Rule might lead to minor increases in wages for hourly workers. The evidence in support of this proposition is slim and belied by the experience of Ryan and innumerable other companies, as well as by common sense: workers subject to non-competes are often paid more both because they are paid for the non-competes and because their work is more innovative and valuable. Regardless, the wage increases the Commission suggests could result from the Proposed Rule would by the Commission's own admission accrue principally to higher-paid white collar workers, with CEOs

---

[7] Additionally, due process requires a more specific standard for determining when a restrictive covenant constitutes a non-compete. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Due Process Clause entitles people to "notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). And a vague law enables "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. The Proposed Rule violates this bedrock principle of due process by banning so-called "de facto" non-competes without giving any meaningful guidance as to what might constitute a de fact non-compete. The rule says that non-disclosure agreements are acceptable, but also says that such agreements could be deemed de facto non-competes. 88 Fed. Reg. at 3506–07. The FTC says that "unusually broad" non-disclosure agreements might qualify as non-competes but gives zero explanation of how much breadth is acceptable. Worse yet, the FTC says that other unspecified types of agreements might also qualify as de facto non-competes. *See* 88 Fed. Reg. at 3535. This vagueness violates due process.

JA1020

seeing a nearly 10% increase in earnings.  See 88 Fed. Reg. at 3524.  Assuming the Commission is correct that the Proposed Rule would increase earnings, the rich would get richer, while hourly workers would receive a slight bump in pay that would be more than overwhelmed by the inevitable inflation resulting from the impediments to innovation and productivity.

In any event, the evidence on which the Commission relies is too new, too flawed, and too inconclusive to draw such a strong conclusion, and the Commission reaches its desired result by inconsistently scrutinizing the available evidence and by ignoring logical inconsistencies in its reasoning.  Further, it cites no evidence to establish that "de facto" non-competes are anti-competitive or exploitative and coercive.

The Proposed Rule is ultimately a solution in search of a problem.  The states have for decades experimented with how much to restrict the enforceability of non-competes.  Often, those states' experience has led them to conclude that non-competes should be made *more* enforceable.  *See* Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete. Trends, and Implications for Employee Mobility Policy*, 13 U. PA. J. BUS. L. 751, 780 (2011) (explaining that from 1991 to 2009 "there [was] a measurable drift of the aggregate policies in the United States toward greater enforcement").  For example, in 1996 Florida passed a law explicitly clarifying that non-competes were enforceable and loosening the standards with which courts applied to them.  *See* Fla. Stat. Ann. § 542.335; Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study*, 29 J. ECON. & MGMT. STRATEGY 663, app. B (2020) (detailing how the 1996 law increased the enforceability of non-competes).  In 2011, Georgia did the same.  *See* O.C.G.A. §§ 12-8-50–54 (Restrictive Covenant Act).  Sometimes, as the Commission points out, states' experiences have led to the opposite conclusion, with three states banning nearly all non-competes and eleven others plus the District of Columbia limiting their use based on varying compensation thresholds or nonexempt status under the Fair Labor Standards Act.

There are few better illustrations of how "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."  *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).  It is unfortunate that the FTC would interfere with the contractual relationships and business practices of many thousands of American companies when the economy is already teetering on the edge of a recession and that it

would intervene in a labor market that has alternated between overheated, distressed, and overheated in little more than three years. Undoubtedly, non-compete agreements—like many legitimate practices—are sometimes abused. This calls for a case-by-case approach to identify those circumstances, the approach that courts have taken for hundreds of years. Applying a per se ban to a practice that has pro-competitive benefits is illogical, arbitrary, and capricious. Even if the FTC "has the power to prevent" the states' ongoing "experiment" with non-competes, it should set aside its "prejudices," listen to "reason," and withdraw the Proposed Rule. *Id.*

## A. Non-competes promote competition in the market for products and services.

Practical experience, published evidence, and common sense all agree that non-compete clauses promote competition in the market for products and services. They encourage innovation and the formation of successful businesses and can decrease prices. The Commission's arguments to the contrary are unpersuasive. Finally, the Commission's claim that non-competes create economically inefficient deadweight losses is unverifiable and too insubstantial to outweigh the positive effects of non-competes.

### 1. Non-competes foster innovation and successful business formation.

The evidence—and logic—show that non-compete clauses promote innovation in the market for products and services and encourage the launch and growth of successful businesses, all of which is pro-competitive.

To begin, non-competes foster innovation by protecting firms' investments in developing talent, services, and novel solutions. Indeed, it is widely recognized "that stricter non-compete enforceability leads to more innovation, consistent with their reducing information spillovers to competitors." John M. McAdams, FEDERAL TRADE COMMISSION, NON-COMPETE AGREEMENTS: A REVIEW OF THE LITERATURE 19 (2019) (collecting papers). That is true for established firms like Ryan, but is particularly true for new and small firms, whose founders often enter the market with the express intention of developing a product or service that will entice a larger firm to pay a premium to acquire the company, its intellectual property, and its experienced workforce. These small firms rely on non-competes to prevent larger firms from poaching their workers instead of acquiring the business.

Non-competes also promote greater sharing of information and ideas within a firm, because there is less of a risk of those ideas walking out the door the next day. Ryan's experience is that the security provided by non-competes encourages the type of transparent, collaborative internal processes that often catalyze innovative ideas.

Perhaps more importantly, and as discussed in more detail below, *see infra* at 30–32, non-competes lead to better training, and better-trained workers perform more efficiently, make fewer mistakes, and develop better goods and services. This benefits all participants in product and service markets, including the firms that enjoy a higher-performing workforce, and consumers who receive higher quality products and services.

Non-competes also improve innovation and productivity by lengthening worker tenure. Longer-tenured workers have greater familiarity with a firm's business model, products and services, and its physical and human capital. As they gain that expertise, they produce corresponding gains in innovation and are increasingly valuable to their firms. When a talented worker on R&D projects leaves a firm, the project might stall until the worker is replaced, or could falter entirely if the worker is irreplaceable. Hence "firms may be reluctant to invest in risky R&D when departing workers can transfer proprietary information to competitors." McAdams, *Non-Compete Agreements* at 8. Non-competes address this problem, and thereby "create incentives to undertake riskier R&D paths . . . and induce firms to undertake projects in new technological areas." Raffaele Conti, *Do Non-competition Agreements Lead Firms to Pursue Risky R&D Projects?*, 35 STRAT. MGMT. J. 1230, 1231 (2014).

The Commission ignores these benefits of worker tenure, simplistically assuming that the movement of workers between firms necessarily promotes innovation, and that non-competes stifle innovation "by reducing the movement of workers between firms, which decreases knowledge flow between firms." 88 Fed. Reg. at 3492. But worker movement will not necessarily lead to innovation, for multiple reasons. First, non-disclosure agreements, which the Commission lauds as a preferable means of protecting firms' trade secrets, *id.* at 3507, can prevent a worker from resuming her R&D activities at a new firm. Second, the new firm may lack the resources to support a worker in advancing the project she was working on at her prior employer. This is especially likely in industries with high fixed costs and large economies of scale, like drug research, hardware development, and electronics manufacturing. For instance, a leading biologist who leaves a large company with a hundred-million-dollar research budget, state-of-the-art

26

equipment, and dozens of highly qualified subordinate researchers would likely be unable to complete her work on a drug-development project at a smaller startup. And third, a new firm might simply be uninterested in having a new worker complete an R&D project begun at her old firm. The Commission fails to consider these scenarios or other ways in which innovation could be cut short at one firm without compensating advances at the new firm.

The Commission similarly erred by not crediting a study that found that non-competes increased the number of new medical devices. 88 Fed. Reg. at 3492–93; *see* Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices*, 51 RESEARCH POL'Y 1 (2022). The Commission refused to rely on the study because the companies evaluated in the study already operated in the medical device space. That makes no sense; innovation is equally valuable regardless of whether the company coming up with new ideas already works in that area. The Commission's reasoning in rejecting the study is also inconsistent with its decision not to credit a study that found non-competes encourage riskier research and development, because—the Commission reasoned—riskier research and development leads to fewer overall breakthroughs, albeit larger ones. See 88 Fed. Reg. at 3492 (discussing Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Riskier R&D Strategies?*, 35 STRATEGIC MGMT. J. 1230 (2014)). That is, when a study finds that non-competes lead to a larger number of modest innovations, the Commission claims that only big breakthroughs matter. But when another study finds non-competes lead to fewer, but bigger, breakthroughs, the Commission champions the number of breakthroughs as the appropriate measure of innovation. This inconsistency is arbitrary and capricious (*see infra* at 43–45), and in truth, both studies indicate that non-competes increase innovation.

The Commission nevertheless maintains that non-competes reduce competition by reducing the number of firms in the market. But that conclusion is unsupported by the evidence. The Commission cites studies purporting to show that non-competes reduce the number of new businesses formed. *See* 88 Fed. Reg. at 3491. These studies suffer from the same flaws as other studies based on the enforceability of non-competes, including that their conclusions are not generalizable and that they do not control for significant confounding variables. *Infra* at 33–34.

More importantly, these studies fall short because a raw count of new businesses formed is not a sound measure of the amount of competition in the market. "No paper has directly studied the link" between firm entry and competition in product markets. McAdams, *Non-Compete*

*Agreements*, *supra* at 19. Start-ups that form and quickly die do not contribute to a competitive market; a new firm must survive to challenge incumbent firms. The fact is that most startups fail. *See generally* Tom Eisenmann, *Why Start-ups Fail*, HARV. BUS. REV. (2021). Workers who leave established firms for doomed startups damage the market for products and services: The R&D programs of established firms suffer, the startups go out of business, and consumers and workers realize no benefits. Non-competes disincentivize such socially wasteful activity. And the new companies that are formed are more likely to be successful. *See* Evan Starr, Natarajan Balasubramanian, and Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 MGMT. SCI. 552 (2017) (finding that non-competes lead to fewer but more successful startups); *see also* Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, Fed. Reserve Bank of Phila. Working Paper 21–26 at 3 (2021).

Despite the evidence discussed above, the Commission claims the "weight of the evidence indicates non-compete clauses decrease innovation." 88 Fed. Reg. at 3492. Yet that "weight" comes entirely from a single unpublished working paper that bases its conclusion on a limited amount of data from a handful of state policy changes. See 88 Fed. Reg. at 3493 (citing Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* (2021), https://ssrn.com/abstract=3846964). Moreover, the study measures innovation indirectly, by measuring the effect of patent applications on stock prices. As the Commission concedes, though, patents are a poor measure of innovation in this context because patents and non-competes are substitute means of protecting intellectual property. 88 Fed. Reg. at 3492.

Overall, then, the theoretical and empirical evidence indicate that non-competes increase innovation, and, thus, competition in the product and services markets.

### 2. Non-competes can decrease prices.

At least one study has found that non-competes are associated with lower prices. A study of the financial advising market found that firms without non-compete agreements charged their clients higher fees. *See* Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. FIN. ECON. 1218 (2021). The Commission ignores this evidence, claiming that "there is no . . . direct evidence on

the link between non-compete clauses and consumer prices," apart from a single study the Commission prefers instead. 88 Fed. Reg. at 3490.

The Commission concludes that non-competes increase prices based on one study of the healthcare market. *See* 88 Fed. Reg. at 3940 (citing Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 AM. ECON. J. APPLIED ECON. 258, 294 (2021)). But the healthcare market study cannot be generalized to other industries because that market is unusual and complex: it is highly regulated; the supply of labor is restricted by educational and licensing requirements; and most people pay for healthcare only indirectly through health insurance. Simply, health care pricing is notoriously complex (and controversial), and a particularly poor basis for modeling price effects in other industries.[8]

### 3. There is no evidence that non-competes create recruiting "deadweight losses," outside the specialized market for CEOs.

Similar problems plague the Commission's conclusion that non-competes cause a deadweight loss by requiring employers to buy out new hires from their non-competes.[9] The Commission's only evidence of this is a single unpublished working paper studying CEOs. *See* 88 Fed. Reg. at 3491 (citing Liyan Shi, *Optimal Regulation of Noncompete Contracts* (2022)). No firm conclusions can be drawn from that study, for a number of reasons. Most obviously, CEOs "represent only a tiny segment of the labor market" and a "unique subset of employees." Matt Marx, *Reforming Non-Competes to Support Workers* at 7, Brookings Institute (Feb. 2018). The study itself counsels "caution[]" in "extrapolating the results to other labor market segments." Shi, *Optimal Regulation of Noncompete Contracts* at 39. The study also admits "there is no comprehensive buyout data available," so there is no way to validate the model it uses. *See id.* at 33. In short, the study is too slim a reed on which to base conclusions even about CEOs, much less about industry as a whole.

---

[8] To the extent non-competes do increase prices in the healthcare market, it is likely because they increase wages. *See* Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. HUM. RES. 1025, 1042 (2020) (finding that non-competes increase physicians' earnings).

[9] A deadweight loss is a loss in economic surplus created by a market inefficiency.

**B.    Non-competes benefit workers and promote competition in the labor market.**

The Commission concludes that non-competes universally have anti-competitive effects in the labor market and harm workers. But in fact, the evidence shows that non-competes have pro-competitive effects in the labor market and can benefit workers.

### 1.    Non-competes boost job creation.

Non-competes benefit the labor market by boosting businesses' creation of new jobs and their investment in workers. Studies show that non-compete agreements are associated with a greater number of jobs available in the labor market. *See* Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment* 16 (Fed. Reserve Bank of Phila. Working Paper 21–26, 2021); Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 MGMT. SCI. 552, 561 (2018). The Commission acknowledges these studies but refuses to credit them, citing the studies' purported limitations. *See* 88 Fed. Reg. at 3488–89. The studies are the only available evidence on the important association between non-competes and job creation—the Commission cannot simply dismiss the issue out of hand.

### 2.    Non-competes promote employer investment in worker training.

Non-compete agreements also are a pro-competitive solution to a market failure in which firms are incentivized to free-ride on other firms' provision of employee training. *See* Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & ECON. 53, 80 (2021) (explaining that evidence of higher earnings is consistent with the notion that "noncompetes [are] a solution to a holdup problem").

Training is needed to bridge the skills gap. For many jobs, formal education or training is legally required. The Bureau of Labor Statistics estimates that 45% of civilian workers are employed in roles that require credentials "issued by a certification body, industry association, or professional association" or educational certificates, "issued by an educational institution (or a training provider)." Bureau of Labor Statistics, *Occupational Requirements Survey* (2022), available online at https://tinyurl.com/3xm5vfva. And 19% of workers, including electricians, bus drivers, pharmacy technicians, teachers, and medical professionals, are required to hold a

professional license issued by a governmental agency. *Id*. The labor market depends on a sufficient number of workers completing these legally required trainings. Even when not legally required, training improves worker productivity, to the benefit of both the employer and employee. More senior workers who completed their training prior to the development of newer methods or technologies often need further training to remain adept. Workers in technological, medical, and scientific sectors need training to keep abreast of new research and technologies. Workers across the spectrum undeniably can perform their jobs better when taught about new methods and developments in their industry. Training is also required to help workers transition from obsolete professions to areas of job growth. *See* Bureau of Labor Statistics, *Employment Projections*, available online at https://www.bls.gov/emp/tables/fastest-growing-occupations.htm (projecting for the period 2021-2031 a more than 20% increase in jobs like wind turbine service technicians, data scientists, information security analysts, web developers, and solar photovoltaic installers).

All told, American firms spend roughly $90 billion per year on training such as executive development, management training, development of interpersonal skills, technology and sales training, and industry-specific courses. *2021 Training Industry Report*, Training (2021), available online at https://tinyurl.com/khvdpdet. Investment in training by employers is essential because workers often cannot afford to pay for training themselves.

Non-competes are often crucial to employers' decision to invest in training, since non-competes help ensure that the employer receives a return on its investment. As Professor Meese explains, in the absence of non-competes, there is an incentive for employers to free-ride on employee training provided by other firms. Non-competes solve the free-rider problem, leading to more training. *See* Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57 WAKE FOREST L. REV. 631, 679–84 (2022); *see also id.* at 697–704.

The empirical evidence confirms this important link between non-competes and training. *See* McAdams, *Non-Compete Agreements* at 13 ("The bulk of the empirical literature finds that workers signing non-compete agreements, or workers who reside in areas with a higher incidence of NCAs, receive more training [and] more access to information."). Simply put, "[n]oncompete enforceability is associated with more training." Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. REV. 783, 808 (2019). Economists have found that "employees with early notice of a noncompete" receive "more training [and] more information." Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in*

*the U.S. Labor Force*, 64 J.L. & ECON. 53, 80 (2021).  Similarly, non-competes "are related to an increased likelihood of receiving firm-sponsored, off-site and outsider-taught, skill-upgrading training."  Starr, *Consider This*, 72 I.L.R. REV. 783 at 812.  These trends are observed in both white-collar and blue-collar occupations.  *See, e.g.*, Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J.L., ECON., & ORG. 376, 379 (2011) (Non-competes "encourage firms to make investments in their managers' human capital."); Johnson, Matthew S., & Michael Lipsitz, *Why are Low-Wage Workers Signing Noncompete Agreements*, 57 J. HUM. RES. 689 (2017) (finding that non-competes result in increased training of salon workers).[10]

Workers obviously benefit from training, which makes them more valuable to both their current and any future employer—that is, workers can earn more if they are better trained and better skilled.  Training is associated with higher earnings because it increases a worker's human capital and productivity.  Moreover, workers who accept non-competes are compensated for doing so.  That is part of the reason non-competes "are positively associated with wages," and the effect is even larger for more educated and skilled workers—confirming that there is room for bargaining. Rothstein & Starr, *Mobility Restrictions, Bargaining, and Wages* at 19.  In short, when non-competes are "presented along with the job offer," they are associated with more training, greater access to information, and higher wages and job satisfaction, as well as "higher wages earlier in tenure."  Starr et. al, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & ECON. at 57.

### 3.    Non-competes are associated with higher earnings.

The Commission finds that non-competes have an anti-competitive effect in the labor market based entirely on its conclusion that non-compete clauses are associated with reduced earnings.  Wages are reduced, the Proposed Rule theorizes, because non-competes "inhibit[] optimal matches from being made between employers and workers across the labor force."  88 Fed. Reg. at 3486.  But, as the Commission acknowledges, studies that actually set about

---

[10] *See also* Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. HUM. RES. 1025, 1042 (2020) (finding that physicians' earnings grow faster when they work in practices with non-competes, indicating that they are receiving better training from more senior physicians).

measuring the effect of the use of non-competes on earnings find that non-competes are associated with *higher* earnings.  *See* 88 Fed. Reg. at 3487.

Moreover, the studies linking non-competes to reduced earnings are flawed.  The Commission relies on studies that look at changes in wages that accompany changes in state law regarding the enforceability of non-competes.  These studies are too limited and methodologically flawed to bear the weight the Commission gives them.  *See* Stephen G. Bronars, *A Critical Evaluation of the FTC's Empirical Evidence That Prohibiting Non-Compete Clauses Will Increase Earnings*, EDGEWORTH ECONOMICS (Mar. 7, 2023), https://www.edgewortheconomics.com/ publication-ftc-evidence-that-non-competes-reduce-earnings-is-inconclusive.

First, as the Commission's own economist noted when reviewing these studies, they are based on only a small handful of state policy changes, and therefore can't be generalized.  *See* McAdams, *supra* at 11.  Different states have different prevalent industries, different compositions of firms, and different workforces.  As McAdams points out, the only study that examines heterogeneity in the relationship between non-competes and earnings found that non-competes did not matter in a host of industries.  *See id.* (citing Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 REV. ECON. & STAT. 472 (2006)).

Second, because these studies focus on the effect of *enforceability* of non-competes, rather than the *presence* of non-competes, they have multiple confounding variables.  As the Commission notes, the studies "rely on *twelve* concepts of enforceability." 88 Fed. Reg. at 3486 n.52 (emphasis added).[11]  Of these twelve factors, only one—whether there is a state statute—measures whether non-competes are permissible.  These studies do not measure the correlation between non-competes and earnings; instead, they simultaneously measure the effect of all twelve factors on earnings, with no possible way to disaggregate them.  Also, the only study that did attempt to

---

[11] The variables are:  (1) whether there is a statute governing enforceability; (2) how broadly an employers' protectable interest is defined; (3) what standard courts apply to determine whether the clause is enforceable; (4) whether an employment relationship is sufficient consideration to support a non-compete clause that is part of a job offer; (5) whether a change in the terms of employment is sufficient consideration to support a non-compete clause entered into after work has begun; (6) whether continued employment is sufficient consideration for the same; (7) whether courts consider an employee's economic hardships caused by the non-compete clause; (8) whether the employer or employee bears the burden of proof; (9) how broad the geographic restriction can be; (10) whether courts modify or strike overbroad non-compete clauses; (11) whether non-compete clauses are enforceable if the employer terminated the employment relationship; and (12) whether an employer can recover punitive damages for breach.  *See* Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J.L., ECON., & ORG. 376, 421–22 (2011).

disaggregate the factors concluded that it was not the *presence* of non-competes that was associated with reduced earnings, but rather whether *consideration* was required for the non-compete. *See* Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. REV. 783, 799 (2019). That study concludes, "[t]he adoption of consideration policies are associated with higher earnings, while other policies that increase the enforceability of non-competes are associated with more training."

The Commission acknowledges these limitations in the studies but claims that they nevertheless support its conclusions because other studies show that non-compete clauses reduce earnings for workers who are *not* subject to a non-compete clause. 88 Fed. Reg. at 3487. But that is no answer, because those studies are based on the same enforceability index and thus have the same confounding variables. *See* Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 12 (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381; Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961, 966 (2019).

Simply put, the studies the Commission uses to conclude that non-competes are associated with lower earnings, by their own design and admission, have too many confounding variables to support the Commission's desired conclusion. This may explain the observation, in a study the Commission repeatedly cites for other purposes, that in the earnings studies "differences in the enforcement regime . . . yield[ed] implausible estimates." Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & ECON. 53, 73 n.27 (2021).

Even if the evidence conclusively demonstrated that non-competes were correlated with reduced earnings, that by itself would not establish that non-competes have an anti-competitive effect. The Commission commits the basic statistical error of conflating correlation and causation, jumping to the conclusion that reduced earnings evidence that non-competes impede competition by preventing optimal matches. Indeed, the evidence indicates that the labor market is competitive. *See* Diana Furchtgott-Roth, *Antitrust and Modern U.S. Labor Markets: An Economics Perspective*, 19 HARV. J.L. & PUBLIC POL'Y PER CURIAM 1, 2 (2022) ("[D]ata from the Bureau of Labor Statistics of the U.S. Department of Labor show that exercise of monopsony power is generally not occurring in today's 21st century economy, nor has it been a characteristic of labor markets over the past half century."); *see also Number of Unemployed Persons Per Job Opening,*

34

*Seasonally Adjusted*, BUREAU OF LABOR STATISTICS, https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm# (showing there have been more job openings than unemployed persons since May 2021). Given that, it is unclear why the Commission attributes anti-competitive factors to any correlation that exists between non-competes and reduced earnings. The Commission theorizes that reduced earnings result from non-competes, inhibiting optimal matches between firms and employees—but it cites no evidence to support that speculation. There are other, credible explanations. As one example, by reducing turnover, non-competes enable firms to project their headcount more accurately, eliminating the need to hire extra workers to account for attrition. This would reduce demand for labor, and thus earnings. But it wouldn't be anti-competitive; it would reflect a pro-competitive productivity gain.

### 4.    Workers can and do benefit from and bargain over non-competes.

The Commission also asserts that non-compete clauses are "exploitative and coercive" of workers—with the sole exception of "senior executives"—both "at the time of contracting" and "at the time of the worker's potential departure from the firm." 88 Fed. Reg at 3503–04. The Commission's theory is that workers lack bargaining power and are therefore forced into "exploitative" contracts that handcuff them to their employers while offering no benefits. But that narrative is simply not true.

Non-competes can benefit workers. The Commission ignores that workers benefit from non-compete agreements in the form of increased training and increased earnings. *See supra* at 30–35. Both those benefits fatally undermine the Commission's claim that non-competes are inherently "exploitative."

Nor are non-compete clauses by their nature "coercive." *See id.* The Commission's assertion that only "senior executives" have the requisite bargaining power to avoid being "coerced" into a non-compete is demonstrably false. Business owners certainly have negotiating power, even when they own less than 25% of the company. Skilled workers can and often do negotiate their conditions of their employment. There is ample evidence that less skilled workers can affect the terms and conditions of employment, whether through unionization or simply by responding to the market demand for their services—as reflected in the over 12.5% increase in hourly wage rates for production and nonsupervisory workers in the last two years alone. *See* Bureau of Labor Statistics, *The Employment Situation — February 2023*, Table B-8; Bureau of

JA1032

Labor Statistics, *The Employment Situation — February 2022*, Table B-8.  Workers' bargaining power is also the reason that, quite often, they are specially compensated for entering non-compete agreements.

In fact, multiple categories of workers can and do negotiate their terms of employment.  Because "[m]ost employers disclose [non-compete] agreements before the employee accepts the employment offer," non-competes are commonly one of the negotiated terms.  Meese, *Don't Abolish Employee Noncompete Agreements*, *supra* at 677.

First, in many cases, the *owners* of a business are its primary labor force.  For instance, Ryan's principals are both part owners of the firm and drive its services and innovation.  The same is true of other consulting firms and partnership models.  Owners of a business certainly are not in a "disadvantageous bargaining position" vis a vis the business, nor is there reason to worry that they have an information asymmetry.  88 Fed. Reg. at 3494.  This is true, moreover, whether the owner owns more or less than 25% of the business.  This is why the limited nature of the Proposed Rule's exception for the sale of a business is so illogical.  Pursuant to proposed § 910.3, the ban on non-competes would not apply to contracts that are "entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity . . . when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause."  88 Fed. Reg at 3536.  "Substantial" means "at least a 25% ownership interest."  *Id.* at 3535 (Proposed § 910.1(e)).  But the distinctions between, say, a 20% owner and a 30% owner, and between an owner who goes to work for the buyer after the acquisition and an owner who does not, have nothing to do with the relative bargaining power and informational positions of the sellers.  There is no reason to treat these situations differently.  Doing so is arbitrary and capricious.  *See Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.").

Second, *skilled workers* can and do negotiate their terms and conditions of employment.  The American labor market is competitive.  *See* Furchtgott-Roth, *Antitrust and Modern U.S. Labor Markets: An Economics Perspective*, *supra*.  In a competitive labor market, skilled or sought-after workers generally have the opportunity to work at one of several firms and have the freedom to choose the firm that best suits their individual needs.  Countless workers have unique expertise, special talents, or a strong bargaining position due to labor-market conditions.  This gives them

36

leverage in negotiations. Just as senior executives can "negotiate the terms of their employment," 88 Fed. Reg. at 3403, so too can other talented workers, and they often do. Surveys indicate that 42% of college graduates aged 25–35 attempted to negotiate salary or other conditions of employment, and that 85% of those who negotiated succeeded in obtaining at least some of what they sought. Fidelity, *2022 Career Assessment Study*, available online at https://tinyurl.com/yjxvt2hy. Workers including professors,[12] medical professionals,[13] and data scientists[14] negotiate the terms of their employment.

Third, though *less skilled workers* have less bargaining power, they can increase it by unionizing, a fact which the Commission completely ignores. As the petitioners advocating this rulemaking acknowledge, unionized workers "band together and exercise collective power in negotiating with employers [and] can exercise significant power, including by threatening to strike and disrupt the employer's business." Open Markets Inst. et al., *Petition for Rulemaking to Prohibit Worker Non-Compete Clauses*, at 13 (March 20, 2019), available online at https://tinyurl.com/mwsk9han (cited at 88 Fed. Reg. 3497 n.203).

Undoubtedly, there are circumstances where workers feel they have no choice but to sign an unreasonable non-compete agreement. Of course, that agreement by definition would be unenforceable under state law. As for the cases where non-competes are legally "reasonable" but still sub-optimal, the Commission's proposed solution of banning all non-competes is still vastly over-inclusive. "Banning all such agreements because a fraction is suboptimal could unnecessarily destroy wealth, making many employers and employees worse off." Meese, *Don't Abolish Employee Noncompete Agreements*, *supra* at 677. At a minimum, then, the Commission should consider measures such as regulating *when* non-competes are signed, not *whether* they may be signed. *See* Rachel Arnow-Richman, *Cubewrap Contracts and Worker Mobility: The Dilution of Employee Bargaining Power Via Standard Form Noncompetes*, 2006 MICH. ST. L. REV. 963, 984–989 (2006).

---

[12] Vicki Hesli Claypool, et. al, *Determinates of Salary Dispersion among Political Science Faculty: The Differential Effects of Where You Work (Institutional Characteristics) and What You Do (Negotiate and Publish)*, 50 POLITICAL SCI. & POLITICS, 146 (2017).

[13] Bradley S. Eisenman, Ryan D. Wagner, and Edward M. Reece, *Practical Negotiation for Medical Professionals*, 32 Seminars in Plastic Surgery (2018).

[14] Burtch Works Executive Recruiting, *2019 Survey Results: Salary Negotiation in Data Science & Analytics* (2019). Available online at https://www.burtchworks.com/2019/05/06/2019-survey-results-salary-negotiation-in-data-science-analytics/.

**C.    The focus of the FTC Act is consumer welfare, so any evidence that non-competes negatively affect the labor market or supposedly exploit workers is not a proper basis for this rulemaking.**

Even if it were true that non-competes have anti-competitive effects in the labor market or exploit and coerce workers, it would not justify this rulemaking because the lodestar for whether an act or trade practice is an "unfair method of competition" is whether it harms consumers. Put differently, a rule focused on purportedly benefiting workers is outside the Commission's authority. Under federal antitrust statutes, a restraint on trade is lawful unless it is "harmful to the consumer." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 877 (2007); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription.') (quoting Robert Bork, The Antitrust Paradox 66 (1978)). Thus, it is reductions in consumers' welfare, not workers' welfare, that trigger violations.

The same is true of the FTC Act. Congress's purpose in using the term "unfair method of competition," rather than referring explicitly to the Sherman and Clayton Acts, was to allow the FTC to fill in the "interstices" of those laws, not to allow the FTC to define violations out of whole cloth. *E.I. du Pont de Nemours & Co. v. F.T.C.*, 729 F.2d 128, 136 (2d Cir. 1984). And the legislative rulemaking authority the Commission *does* have—to declare acts or practices unfair or deceptive—is limited to those acts or practices that "cause[] or [are] likely to cause substantial injury to consumers." 15 U.S.C. § 45(n); *see also In Matter of Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37 (1984) ("the Commission will find an act or practice deceptive if, first, there is a representation, omission, or practice that, second, *is likely to mislead consumers* acting reasonably under the circumstances, and third, the representation, omission, or practice is material") (emphasis added). Though one member of the Commission would like the FTC to "connect[] the dots with how people participate in the economy as whole people . . . rather than just looking at consumers," Congress did not give it that authority. Flavia Fortes, *US FTC Examines Competition Concerns Considering 'Whole People,' Slaughter Says* (Mar. 2, 2023) (quoting Commissioner Slaughter). Instead, Congress authorized the Commission to protect consumers by ensuring fair competition that maximizes consumer welfare, and by preventing unfair and deceptive practices.

The word "consumers" is not defined in the FTC Act, so it must be given its "ordinary meaning." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011). A consumer is "someone who buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes."

38

Consumer, Black's Law Dictionary (11th ed. 2019); *see also, e.g.*, American Heritage Dictionary (4th ed. 2000) (defining a consumer as "[o]ne that consumes; especially one that acquires goods or services for direct use or ownership rather than for resale or use in production and manufacturing").

Other provisions of the FTC Act and other statutes confirm that Congress used "consumer" in its ordinary sense in the FTC Act. Elsewhere in the Act, for example, the Commission is authorized to seek "such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be." 15 U.S.C. § 57b. If "consumer" included the parties to an employment relationship, it would already include "other persons, partnerships, and corporations," rendering the term's inclusion surplusage. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").[15]

Neither employees nor employers are "consumers" as properly construed. Unless an arrangement between them affects consumer welfare, the arrangement cannot be an unfair method of competition. Therefore, the most relevant evidence would be the effect of non-competes on prices. As explained in Part IV.F.4, *infra*, non-competes can decrease prices, contrary to the Commission's conclusions. In any event, all the evidence that purportedly shows that non-competes have anti-competitive effects in the labor market and exploit and coerce workers is legally insufficient—it still cannot render non-competes a per se unfair method of competition under the FTC Act.

### D. The studies cited by the FTC are too new, inconclusive, and methodologically flawed to justify the Proposed Rule.

Given that the Proposed Rule would upend the policies of 47 states and hundreds of years of precedent regarding non-competes, one would expect the Commission to have strong evidence that non-competes are per se anti-competitive. But in fact, there is plenty of evidence that non-competes are *pro*-competitive, as discussed above. By contrast, there is a paucity of evidence from

---

[15] The Magnuson-Moss Act defines "consumer" as a "buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of [a] . . . warranty, and any other person who is entitled by the terms of such warranty . . . or under applicable State law to enforce against the warrantor . . . the obligations of the warranty." 15 U.S.C. § 2301(3).

which to draw the opposite conclusion.  The academic literature that the Commission cites is too new, too inconclusive, and too flawed to sustain a rule of this magnitude.

In 2019, one of the Commission's own economists reviewed the literature on non-competes and concluded, "there is little evidence on the likely effects of broad prohibitions of non-compete agreements." McAdams, *supra* at 4.  "Data on non-compete use in the U.S. are sparse," this review concluded.  *Id.* at 3.  And the methodological approaches to measuring the competitive effects of non-competes using that sparse data are often flawed.  *See id.* at 10–13.  Even when studies that looked at in-state policy changes were theoretically sound, the "paucity" of those changes made it impossible to assess whether the findings would "extend to other states . . . industries . . . or occupations."  *Id.* at 11.  It also made it impossible to quantify the uncertainty of the studies' findings.  *Id.*  The other methods common in the literature—comparing industries with high and low levels of non-competes and comparing workers who did and did not sign non-competes—had far too many confounding factors to draw any conclusions. *See id.* at 11–13.  McAdams thus concluded that "the existing empirical literature on non-compete agreements suffers from several important limitations that raise questions as to whether it has successfully estimated the causal effect of such agreements on mobility, wages, entrepreneurship, and innovation."  *Id.* at 20.

The FTC staff are not alone in recognizing the weaknesses of this literature.   Other economists reviewing the literature concluded that "many of the most basic questions regarding the use and consequences of noncompetes remain either entirely unanswered or at least unsettled." Norman D. Bishara & Evan Starr, *The Incomplete Noncompete Picture*, 20 Lewis & Clark L. Rev. 497, 497 (2016).  Even at the Commission's 2020 workshop on non-competes, Professor Kurt Lavetti said "[m]ore empirical evidence is necessary before comprehensive curtailing of [non-competes] in all contexts."   Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements, Remarks at the FTC Workshop on Non-Compete Clauses in the Workplace* (Jan. 9, 2020),        https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-slides.pdf.  The studies themselves commonly acknowledge their own limitations and that the need for additional research caveats their findings.[16]

---

[16] *See, e.g.,* Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 81 (2021) ("There are several additional limitations to our work that we hope future research will address."); Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 8 (2021), https://ssrn.com/abstract=3846964  ("[O]wing to the lack of variation in these laws and limited data on the use of non-competes, estimating the impacts of non-competes has proven challenging"); Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 44 (2019),

These limitations persist to this day, with newer studies suffering from the same methodological and data limitations as earlier research. The studies examining in-state policy changes are based on the same "handful of policy changes" as the pre-2019 papers. McAdams, *supra* at 11. The only post-2019 studies the Commission cites to support its position that non-compete enforceability is associated with reduced earnings are based on the same policy changes as the pre-2019 literature.[17] Likewise for the only study the Commission credits in determining that non-competes reduce innovation.[18] There are not enough data to responsibly generalize these studies of a few states to the entire nation.

Even if the studies did purport to conclusively demonstrate that non-competes are anti-competitive, it would be unreasonable for the Commission to rely on them because they are too new and untested. For many of its key findings, the Commission relies exclusively on unpublished working papers that have not been subjected to peer review.[19] "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993); *see also* Jacalyn Kelly, Tara Sadeghieh, & Khosrow Adeli, *Peer Review in Scientific Publications: Benefits, Critiques, & A Survival Guide*, 25 J. INT'L FED'N CLINICAL

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393 ("A limitation of this study is that it cannot quantify the value of … the new firms foregone"); Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 AM. ECON. J. APPLIED ECON. 258, 294 (2021) ("[O]ne question that we cannot fully address in our analysis is whether the estimated changes in concentration and prices are good or bad for consumers.").

[17] *See* Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2 (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381 (creating a data set based on state policies through 2014); Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Non-Compete Clauses and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S349 (2022) (examining a 2015 change in Hawaii).

[18] *See* Zhaozhao He, *Motivating Inventors: Non-competes, Innovation Value and Efficiency* 16 (2021), https://ssrn.com/abstract=3846964 (explaining the data was based on the same policy changes as others).

[19] *See, e.g.*, 88 Fed. Reg.at 3486 (relying solely on J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability* (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3873638, to conclude that workers do not know whether their non-compete is enforceable); *id.* at 3490 (relying on Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864, as the only evidence that non-competes increase concentration outside the healthcare market); *id.* at 3492 (weighing Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* (2021), https://ssrn.com/abstract=3846964, over published studies finding a different result); *id.* at 3507 (relying solely on Rachel Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining In Non-Disclosure Agreements* (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4022812, to conclude that so called de facto non-competes can have anti-competitive effects).

41

CHEMISTRY & LAB'Y MED. 227, 227 (2014) (explaining that peer review "helps ensure that papers . . . draw accurate conclusions based on professionally executed experimentation" and "acts as a filter to prevent [low-quality] work from reaching the scientific community."). Though an agency's consideration is not limited to peer-reviewed work, the Commission's heavy reliance on new and untested papers is suspect—particularly when used to topple centuries of practical experience in virtually every state in the nation.

As for the peer-reviewed studies the Commission does cite, they also are too new and untested to justify such heavy reliance. With time, academic studies often prove to be incorrect either due to methodological flaws or statistical noise. *See* Jonah Lehrer, *The Truth Wears Off*, THE NEW YORKER (Dec. 5, 2010), https://www.newyorker.com/magazine/2010/12/13/the-truth-wears-off (citing numerous examples). And there has not been enough time for scholars who disagree with these studies to publish rebuttals for the FTC to consider; the first rejoinders began appearing in late 2022—more are certain to come. *See, e.g.*, Alan J. Meese, Don't Abolish Employee Noncompete Agreements, 57 WAKE FOREST L. REV. 631, 679–84 (2022).

Finally, it is notable that the same handful of scholars authored most of the studies on which the Commission relies. For example, the Commission cites three separate studies that Professor Lavetti co-authored. *See* 88 Fed. Reg. at 3486 nn.53 & 63, 3490 n.101. Professor Starr co-authored a whopping eight (8) studies cited by the Commission. *See id.* at 3485 nn.42, 46, & 48, 3486 nn.57 & 66, 3488 nn.76 & 87, 3489 n.95. Both Professor Lavetti and Professor Starr have expressly stated that the literature is unsettled. *See supra* at 40. The Commission errs seriously if it believes that this massive regulatory change can be sustained by a spate of recent papers by a coterie of like-minded academics.

Nor can the FTC fall back on its own experience policing non-compete clauses. It has none. Though unfair methods of competition have been unlawful for over one-hundred years, *see* Federal Trade Commission Act, ch. 311 § 5, 38 Stat. 717, 719 (1914), and non-compete agreements date back far longer, *see Mitchel v. Reynolds*, 24 Eng. Rep. 347 (1711), the FTC has brought only four enforcement actions related to non-competes. Three of these were concluded by consent agreements rushed out in the weeks immediately prior to the notice of proposed rulemaking, and the fourth was announced months after. *See* 88 Fed. Reg. at 3542 ("Until yesterday, the Commission had announced no cases . . . to conclude that non-compete clauses harm competition in labor markets . . . Just yesterday, though, the Commission rushed out the

announcement of three consent agreements . . ."); *FTC Takes Action Against Another Company That Imposed Harmful Noncompete Restrictions on Its Workers* (Mar. 15, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-takes-action-against-another-company-imposed-harmful-noncompete-restrictions-its-workers. What hubris, for an agency to declare *per se* illegal a practice that states across the country have been examining for centuries, but which the agency began inspecting in isolated cases just a few weeks earlier. In any final rule, the Commission will have to make a far better showing that it is right, and 47 states and hundreds of years of experience are wrong.

### E.    The FTC's evaluation of the evidence and its reasoning are inconsistent.

The Proposed Rule is further undermined by the patent inconsistencies in the Commission's evaluation of the evidence and in its reasoning. Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce of U.S.A. v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018); *see also Air Line Pilots Ass'n v. F.A.A.*, 3 F.3d 449, 454 (D.C. Cir. 1993).

The Commission repeatedly ignores flaws in studies on which it relies while discrediting contrary studies based on similar (or lesser) limitations. The following are just three examples of the many ways in which the Commission inconsistently evaluates the evidence for and against its position.

First, the Commission overlooks confounding variables in studies that support its conclusion but uses that very ground to discredit studies when it dislikes their conclusions. For example, as detailed above, the studies finding that non-competes are associated with lower earnings have an obvious confounding factor in that they simultaneously measure *twelve* different metrics of how enforceable non-competes are, only one of which is whether non-competes are permitted. The authors of those studies note that limitation in their work, but the Commission overlooks it. The studies that find that non-competes are associated with higher earnings, on the other hand, are discredited by the Commission because of the possibility that "non-compete use and earnings may both be determined by one or more confounding factors." 88 Fed. Reg. at 3487.

Second, the Commission is willing to overlook a lack of causation in studies that support its conclusion, but discredits other studies for the same shortcoming. For example, the Commission credits a study finding that non-compete agreements reduce earnings for workers who

are not themselves subject to an agreement, even though the study admits that its methodology "calls into question the causal relationship outlined in the study." 88 Fed. Reg. at 3488 (citing Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 ORG. SCI. 961, (2019)). The Commission was willing to credit the study, it said, because "the authors employ[ed] tests to increase confidence in the causal interpretation." 88 Fed. Reg. at 3488. The Commission was not willing to extend that same grace, though, to a study finding that non-competes are associated with *higher* earnings. That study's authors had cautioned that their results "should not be interpreted causally," the Commission notes ominously. 88 Fed. Reg. at 3487 (citing Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, *supra* at 73). Yet the Commission declines to note that those authors had "ease[d] . . . concerns about" causation by "using several approaches to assess the sensitivity of our empirical results, including inspecting the robustness of our findings to the inclusion of a rich set of controls in our regression analysis, testing for selection on unobservables, and asking respondents directly about their experiences with noncompetes." Starr et al, *Noncompete Agreements in the U.S. Labor Force*, *supra* at 73. The Commission never explains why it credits one study but not the other.

Third, the Commission generalizes from studies of idiosyncratic markets when the studies support its Proposed Rule, but it declines to do so with studies that contain inconvenient truths. For example, as detailed above, the Commission concludes that non-competes raise prices based on a single study of the healthcare market. *See* 88 Fed. Reg. at 3490. Yet the FTC declines to find that non-competes are associated with higher earnings based on another study of the healthcare market. *See* 88 Fed. Reg. at 3487. Once again, the inconsistency goes unexplained.

In addition to inconsistently evaluating the evidence, the Commission ignores blatant inconsistencies in its reasoning. For example, basic economic theory suggests that when a firm's marginal cost to produce a good or service increases, the price of that good or service will increase. Defying such basic theory, the Commission suggests that somehow eliminating non-competes will *increase* workers' earnings (and thus firms' labor costs) yet simultaneously *decrease* prices. *Compare* 88 Fed. Reg. 3486–88 (non-competes reduce wages), *with id.* at 3490 (non-competes raise prices).

In a similar feat of logical gymnastics, the Commission's reasoning for why eliminating non-competes will increase innovation is flatly inconsistent with its claim that firms can protect

44

their confidential information through alternative means.  The Commission reasons that non-competes impede innovation by "decreas[ing] knowledge flow between firms."  88 Fed. Reg. at 3492.  In other words, non-competes impede innovation by preventing employees from sharing one firm's information with another firm.  But in dismissing the valid business justifications for non-competes, the Commission claims that firms can use non-disclosure agreements and trade secret law to protect their confidential information. 88 Fed. Reg. at 3505.  Both cannot be true: either non-disclosure agreements and trade secret law are sufficient protections for firms to protect their confidential information, in which case eliminating non-competes will not increase the flow of valuable knowledge between firms; or eliminating non-competes will increase knowledge flow, in which case the alternatives are insufficient.

### F.    The FTC cites no empirical evidence whatsoever to support prohibiting so-called "de facto non-competes."

The Proposed Rule does not stop at banning non-competes.  Instead, it also prohibits any "contractual term that is a de facto non-compete clause."  88 Fed. Reg. at 3535.  As examples of the practices that might fall within this impermissibly vague and protean language, *supra* at 22 n.7, the Commission cites non-disclosure agreements and training-repayment agreements.  88 Fed. Reg. at 3484.  88 Fed. Reg. at 3535 (proposed § 910.1(b)(2)).

The Commission has *zero* evidence that non-disclosure agreements, training-repayment agreements, or any other potential contractual agreement that the Commission may one day decide constitute a de facto non-compete have anti-competitive effects.  It merely notes that some scholars and courts have *theorized* that some contract terms may have effects similar to those attributed to non-competes.  *See* 88 Fed. Reg. at 3484 nn.35 & 36, 3507 n.328.  But no empirical work has been done to support that theory, let alone to support a restriction on the range of practices that might fall within the amorphous "de facto" non-compete prohibition.  The Commission may not impose a per se ban on an unknowably large array of contractual agreements that it theorizes *might* act like non-competes and *might* have an anti-competitive effect.

The Commission has an astonishing shortage of evidence to support its per se ban on non-competes.  With no evidence of anti-competitive effects, it has little to stand on beyond buzzwords like "exploitative" and "coercive" from its November 2022 Section 5 Policy Statement.  That is far too little to sustain a rule with the breadth and burdens of the Commission's Proposal.

**JA1042**

V.        **The Commission's Cost-Benefit Analysis Is Flawed.**

As discussed at length above, *supra* at 23–45, the Commission overstates the purported anticompetitive effects of non-competes while understating their procompetitive benefits.  The flaws in the Commission's evaluation of the evidence carry over to its cost-benefit analysis of the rule.  The benefits are overstated, the costs the Commission does identify are understated, and the Commission ignores a host of other costs.  A proper cost-benefit analysis would show that the economic costs of banning non-competes far outweigh the benefits.

A.        **The Commission overstates the Proposed Rule's purported benefits.**

Relying on a small number of contradictory and methodologically flawed studies, the Commission concludes that the Proposed Rule would liberate 30 million workers from supposedly exploitative non-competes and promote innovation and new business formation.  These alleged benefits are speculative and exaggerated.

Citing a single study that relies on a decade-old survey of a nonrepresentative sample of workers, the Commission concludes that 20% of American workers are bound by non-competes. 88 Fed. Reg. at 3485 (citing Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53 (2021)).  As states have restricted the use of non-competes in the last few years, 88 Fed. Reg. at 3594, the Commission likely overestimates the number of workers who supposedly would benefit from its Proposed Rule, and likewise inflates the Proposed Rule's allegedly positive effects on innovation and new business formation.

By the Commission's own admission, the Proposed Rule would have a limited impact on hourly workers.  Citing a study of workers in Oregon, the Commission estimates that hourly workers would see a 2.3% increase in wages if non-competes were no longer enforceable.  88 Fed. Reg. at 3524.  This increase is miniscule.  Hourly Wages for production and nonsupervisory workers increased more than twice that—over 5%—in the one-year period from January 2022 to January 2023; they increased more than *five times* that amount—over 12%—in the two years from January 2021 to January 2023.  *See The Employment Situation — January 2023*, Table B-8; *The Employment Situation — January 2022*, Table B-8.  The estimated 2.3% increase is a fraction of the 6.4% increase in consumer prices just between January 2022 and January 2023.  *See* Bureau of Labor Statistics, *Consumer Price Index — January 2023*.  Even then, the Commission warns that "[c]aution is recommend in interpreting this extrapolation" of the Oregon data, "since results

46

from one segment of the workforce . . . may not necessarily inform outcomes that would occur in the rest of the country."  88 Fed. Reg. at 3524.  The Commission exhibited no such caution, of course, when extrapolating from more favorable data regarding CEO and physician earnings, *supra* at 29, yet another example of its opportunistic treatment of  any available evidence.

**B.    The Commission understates the costs it does acknowledge.**

The Commission discusses only a handful of potential costs.  It significantly underestimates them, leading to a deeply flawed cost-benefit analysis.

First, the Commission downplays the direct costs of compliance.  The Commission observes that the Proposed Rule would require firms to modify the contracts of incoming workers and revise the contracts of current workers.  88 Fed. Reg. at 3528. The Commission estimates that modifying contracts of incoming workers will take just one hour of a lawyer's time per firm, and that revising contracts of current workers will take an average of four to eight lawyer hours per firm.  This is a massive underestimate.  Large companies employing many thousands of people will have many different employment contracts, each of which must be reviewed and analyzed not just for non-competes, but any other restrictive covenant to determine whether the Commission might consider it a "de facto" non-compete.  Lawyers would have to spend hundreds of hours analyzing and revising these contracts.  Small businesses could actually need more attorney time per employee, as they are less likely to consistently use form contracts.

The Commission also vastly underestimates the cost of lawyers at $61.54 per hour.  88 Fed. Reg. at 3528.  That is the reported median hourly income of lawyers nationwide, which includes lawyers who work at nonprofits and for the government, earning substantially less than lawyers for corporations in the private sector.  The Commission should use instead the average hourly billing rate of a private-practice lawyer:  $749 for a partner and $546 for an associate. Wolters    Kluwer,    *2022    Real    Rate    Report*,    available    online    at https://www.wolterskluwer.com/en/news/wolters-kluwer-elm-solutions-2022-real-rate-report-indicates-that-timekeeper-rates-continue-to-rise.

The Commission falsely portrays proposed § 910.2(b)(3) as a solution to the costs of revising the contracts of current workers.  That subsection provides that an employer that notifies workers that their non-competes are no longer effective has satisfied the proposed requirement to rescind non-competes.  88 Fed. Reg. 3528.  The Commission posits that firms can comply with

§ 910.2(b)(3) by having a human-resources specialist spend 20 minutes providing email notice to all workers currently bound by non-competes. Again, this overlooks that under the Proposed Rule, identifying which workers are bound by a now-illegal agreement would require considerable legal analysis. *See* 88 Fed. Reg. 3482 ("The proposed rule would also clarify that whether a contractual provision is a non-compete clause would depend not on what the provision is called, but how the provision functions.").

Nor does the Commission acknowledge the immense costs of developing and implementing other methods of protecting confidential business information. Many companies will put greater restrictions on sensitive information through software and business practices that reduce information sharing and make it more difficult and costly to bring a product or service from conception to completion. These methods of protecting confidential information are more costly to maintain and enforce, as well, as they require ongoing monitoring and can be enforced only after a breach. Non-competes have de minimis set-up costs, act prophylactically, and are much more efficient to enforce.

Second, the Commission improperly minimizes the Proposed Rule's adverse effects on investment. The Commission concedes its proposal might cause firms to reduce training and investment in capital assets that "complement[] human capital." 88 Fed. Reg. at 3528. But it makes no effort to quantify these costs, which may be immense. As discussed in detail below, reduced training and decreased investments in human capital would harm firms, workers, and consumers by impeding innovation and productivity. *Infra* at 51.

Third, the Commission claims that the Proposed Rule "would likely reduce litigation costs associated with non-compete clauses, since there would be little to no uncertainty that the vast majority of those clauses are prohibited." 88 Fed. Reg. 3530. But there would be considerable uncertainty—and subsequently litigation—regarding whether "a restrictive covenant not called a 'non-compete clause' but so unusually broad in scope it functions as such . . . would be within the definition of non-compete clause in proposed § 910.1(b)(1)." 88 Fed. Reg. 3509. In any event, any savings from reduced litigation of non-compete clauses may well be offset by increased compliance costs, *supra* at 47, as well as costs to the Commission in investigation and enforcing the Proposed Rule and to firms in responding to Commission investigations and defending against Commission enforcement actions.

The Commission also acknowledges that litigation costs "associated with trade secret claims or other post-employment restrictions, such as non-disclosure agreements or non-solicitation agreements" would increase. 88 Fed. Reg. at 3530. This is assuredly correct. Valid non-competes are easy to enforce. When a firm learns that a former employee has accepted employment elsewhere in violation of a non-compete—and when the firm determines that the new job poses sufficient threat to warrant legal action—it has all the information it needs to go to court or, in many cases, to avert litigation through a cease-and-desist letter (an often, a negotiated resolution). It is far harder to develop and prosecute a case for violation of a non-disclosure agreement or the trade-secret laws, which typically depends on information outside a company's possession that can be obtained only through costly discovery. This reduces protections for intellectual property, as discussed above, and makes litigation more costly to bring and more difficult to resolve, because of information asymmetries.

Fourth, the Commission glosses over the Proposed Rule's effects on small businesses. The Commission asserts that the Proposed Rule would not "have significant impact on a substantial number of small entities." 88 Fed. Reg. 160. But it considers only "direct compliance costs and the costs of updating contractual practices." *Id.* It does not consider costs resulting from increased worker turnover or the poaching of clients by former employees who leave for large firms. *Infra* at 50–51. Similarly, it proposes that as an alternative to non-competes, employers can simply "pay the[ir] workers more" to encourage workers to remain "long enough for the employer to recoup its training investment." 88 Fed. Reg. 3507. Countless small businesses will be unable to do this; the Commission assumes without basis that firms have cash surpluses, can increase wages at will, and are prepared to pay workers more for contractual terms that give the company less in return. In truth, many small businesses find it hard to afford wage increases, and those that can will pass the costs onto their customers. This means it will be easier for larger firms, which are likelier to have the ability to withstand temporary losses from higher wages, to poach employees from smaller firms than vice versa. In the long run, this would harm competition by promoting consolidation and decreasing business formation, ultimately reducing wage growth.

Fifth, the Commission overlooks the immediate effects of suddenly invalidating an important term in what the Commission estimates to be 30 million employment contracts. Many of these workers were given higher wages in return for agreeing to non-competes. Employers can

be expected to respond by clawing back deferred compensation guarantees and slowing wage growth.

### C.    The Commission ignores a number of other costs.

#### 1.    The Commission ignores costs resulting from increased worker turnover.

The Commission ignores the considerable costs that firms, workers, and consumers incur from worker turnover.  Firms suffer significant costs when workers leave and they have to rehire.  According to one study, which is consistent with Ryan's experience, replacing an employee can cost up to 200% of the employee's annual salary.  Kimberly Gisldorf, Fay Hanleybrown, & Dashell Laryea, *How to Improve the Engagement and Retention of Young Hourly Workers*, HARV. BUS. REV. (Dec. 6. 2017), https://hbr.org/2017/12/how-to-improve-the-engagement-and-retention-of-young-hourly-workers.  Non-competes decrease worker turnover, so if non-competes were made illegal, the costs of worker turnover would increase.  These include hiring costs.  When workers leave their jobs, firms generally replace them.  For educated, specialized, or highly paid workers, replacement is not always easy; firms must promote job vacancies, collect and review applications, evaluate candidates, and conduct interviews.  This often entails hiring additional human-resources staff or outside recruiters, purchasing advertisements in industry publications, and paying for candidates' travel.  There are often opportunity costs when conducting interviews and evaluating candidates because employees performing these tasks must take time away from other duties.

Worker turnover gives rise to the need for new worker training, which is expensive.  For complex jobs, training can take days or weeks.  During this time, new workers are relatively unproductive.  This is a drain on firm resources.  Additionally, firms must pay current employees to train new ones.  The more new employees there are, the greater the costs of training them.

Likewise, the Commission fails to consider the competitive disadvantages that a firm incurs when it trains workers who depart for a competitor.  Firms that excel at training workers are not necessarily the largest, wealthiest, or most successful firms, nor do they necessarily offer the highest salaries.  In a world without non-competes, workers who are new to an industry might rationally seek out firms that offer the best training and plan to depart for a better-paying rival as soon as training is complete.  The result is that firms that offer workers better training in exchange for a lower salary may struggle to retain talent and to remain competitive, and may face challenges

when the workers they trained utilize that training on behalf of a direct competitor. This is especially true if training-repayment agreements would be illegal under the Proposed Rule, which is unclear. Absent these agreements, workers could depart small firms with excellent training programs as soon as training is complete and seek employment at larger firms that pay more.

Although the Commission acknowledges that "worker training . . . would likely decrease under the proposed rule," 88 Fed. Reg at 3528, it neglects to include a full analysis of the costs of decreased training. The longer a firm anticipates retaining a worker, the more the firm will invest in her training. Conversely, a firm has little incentive to train workers that it believes will soon leave. Because the Proposed Rule facilitates "voluntary churn in labor markets," 89 Fed. Reg. at 3522, firms would respond by reducing training and professional-development opportunities. The result would be a less-trained workforce, to the detriment of workers, firms, and consumers alike.

Workers would suffer most from the reduction in training. "The evidence is quite clear that workers who receive training from their bosses are rewarded with higher pay, greater likelihood of promotion, and more job security." David B. Bills and Randy Hodson, *Worker training: A review, critique, and extension*, 25 Research in Social Stratification and Mobility, 258, 292 (2007). Workers who receive more training also report higher levels of job satisfaction and happiness. *See, e.g.*, Ping He, Hank Findley, and Robert Wheatley, *The effects of training on job satisfaction and service quality among temporary employees: the mediating role of affective commitment*, 21 J. OF MGMT. & MARKETING RESEARCH at 3 (2017) (collecting studies).

Reduced worker training harms firms and consumers too. All else being equal, better-trained workers are more productive, more knowledgeable, more efficient, and more innovative. As workers transition between jobs more frequently as a result of the Proposed Rule (if finalized), their familiarity with their current firm will decrease. This will cause reduced job performance, at least during the first few weeks or months at a new firm, which in turn will lead to reduced profits or lower-quality products and services. In tandem with the higher wages that the Proposed Rule would supposedly produce, *see, e.g.*, 89 Fed. Reg. at 3539, this means that consumers will pay more to get less. Additionally, increased worker turnover means that more job vacancies will exist, resulting in a decrease in the supply of products and services.

The Commission accounts for none of these costs.

### 2. The Commission ignores other significant costs to firms.

In addition to downplaying the costs to firms of reduced training, investment, innovation, and compliance, *supra* at 47–50, the Commission fails to take several other predictable costs into account. For instance, although the Commission condemns "non-solicitation agreements" that prohibit workers "from soliciting former clients or customers" of their previous employers, it pays no attention to the costs that solicitation imposes on the prior employer. 89 Fed. Reg. at 3484. Firms often request non-competes to prevent workers who have formed unique relationships with clients—thanks, in part, to resources the firm provided—from leaving and soliciting those clients for a competitor. *See, e.g.*, Kurt Lavetti, Carol Simon, William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. Hum. Res. at 2 (2020). Solicitation is not a zero-sum game in which a firm's losses are always negated by a competitor's gains. Rather, it can wreak havoc upon firms, especially small ones. Consider, for instance, a prominent employee of a small consulting firm or veterinary or medical practice who joins a large national firm and then successfully solicits the small firm's clients. This could cause the small firm to commence layoffs or go out of business, whereas the benefit to the large firm might be marginal or limited to a handful of partners. The Commission fails to consider how non-competes protect firms, especially small firms, by preventing former employees from soliciting clients.

Moreover, the Commission does not account for firms' reliance interest on the legal status quo. Firms that use non-competes have structured their hiring, organizational, logistical, and personnel decisions around the reasonable presumption that centuries-old common-law and statutory precedent regarding the legality of non-competes will remain valid. To these firms, compliance with the Proposed Rule would not be as simple as rewriting contracts and obtaining legal advice. Rather, many firms would have to revise entire business models, especially models centered around selling the services of highly educated and specialized experts. For instance, consulting firms sell the services of expert shareholders, who form close relationships with clients who seek out the services of a specific expert rather than a specific firm. When shareholders transition between firms, clients often follow. Consulting firms therefore use non-competes to prevent shareholders from poaching clients—a problem that non-disclosure agreements and trade-secrets lawsuits cannot solve. *Supra* at 9–11. The Commission does not consider the disruption of entrenched reliance interests in the consulting industry and similar expert-driven industries.

### 3.    The Commission ignores other costs that will affect the economy as a whole.

Finally, the Commission does not discuss several other foreseeable costs that the Proposed Rule would inflict on the economy as a whole.

First, the Commission does not consider inflation.  As discussed above, *supra* at 30–32, the Proposed Rule would lead to increased costs of production through reduced training and limited worker access to information.  That will result in higher prices, worsening the existing inflationary challenges.  The inflationary effects of the Proposed Rule would only be greater if the Commission is correct that the Proposed Rule would increase wages by $250 billion to $300 billion.  *See* 88 Fed. Reg. at 3523.  Yet the Commission does not even discuss inflation, much less whether increased prices would swamp the small wage increases it predicts for hourly workers.  The Commission's failure to consider the inflationary effect of its Proposal is even more stark given that the Proposed Rule's primary beneficiaries—by the Commission's own admission—are CEOs and other highly paid workers, not low wage workers.  *See id.* at 3524.  It is senseless policy to incur the Proposal's likely price impacts, which would further diminish the meager benefit projected for low wage workers, in order to give CEOs and other highly paid workers a pay raise.

Second, the Commission entirely ignores the Proposed Rule's potential impact on shareholders and investors.  The Commission repeatedly claims that the Proposed Rule would lead to higher wages, *see, e.g.*, 88 Fed. Reg. at 3539, and, as discussed above, it may disincentivize firms from training workers, resulting in lower-quality or higher-cost products and services, *supra* at 30–32.  This would result in lower corporate earnings, which would harm shareholders (including pension investments) and chill investment in businesses.

Third, the Commission fails to consider the possibility that firms would respond to a ban on non-competes by outsourcing jobs to countries where non-competes are legal.  Many highly industrialized countries such as Australia, Canada, France, Japan, the Netherlands, and Singapore allow non-competes when necessary to protect a firm's proprietary information.  *See* Association of Corporation Counsel, *Multi-Country Survey on Covenants Not to Compete* (2018).  If non-competes were banned in the United States, American firms with highly sensitive trade secrets and proprietary information might hire non-U.S. workers with whom they can enter non-competes.  Conversely, firms in countries that allow non-competes would be less likely to hire American workers if the Proposed Rule goes into effect.

Fourth, the Commission does not address how state governments would respond to a dramatically altered regulatory environment and federal preemption of their non-compete laws. States that currently allow non-competes might enact legislation that increases the ability of firms to use alternatives such as non-disclosure agreements, trade-secrets actions, bonus clawbacks, and training-costs repayment agreements. States supportive of the Proposed Rule might attempt to supplement the Commission's actions by restricting these alternatives. It is unclear how state governments would respond, but many responses are likely to impose deadweight loss or costs on workers or firms.

Fifth, the Proposal does not account for costs to the federal government. In addition to the Commission's enforcement and litigation costs, the executive branch and military might face increased procurement costs insofar as the Proposed Rule has anticompetitive effects on industries that serve the federal government.

## CONCLUSION

For all the foregoing reasons, the Commission should withdraw the Proposed Rule. It is both unlawful and unwise.

G. Brint Ryan
Chairman and CEO
Ryan, LLC

*Of Counsel*

GIBSON, DUNN & CRUTCHER LLP
Eugene Scalia
Helgi C. Walker
Rachel S. Brass
Svetlana S. Gans
Andrew G.I. Kilberg

**SMALL BUSINESS MAJORITY**

April 19, 2023

The Honorable April J. Tabor
Secretary
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

*Re: Notice of Proposed Rulemaking, Federal Trade Commission; Non-Compete Clause Rule; 88 Fed. Reg. 3482 (RIN: 3084-AB74) (January 19, 2023)*

Dear Secretary Tabor:

As a representative of America's 33 million small businesses, we urge the Federal Trade Commission (FTC) to enact its proposed rule to ban most non-compete agreements. Non-compete agreements are a significant impediment to entrepreneurship, create a non-level playing field and impede the ability of employees to maximize their skills. They are not only a barrier to entry for entrepreneurs, but they also prevent small firms from hiring the most diverse, qualified and skilled talent.

Small Business Majority is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. From our nine offices across the country we engage our network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth. Our work is bolstered by extensive research and deep connections with the small business community that enable us to educate stakeholders about key issues impacting America's entrepreneurs, with a special focus on the smallest businesses and those facing systemic inequities.

Small businesses support banning non-compete agreements because they are antithetical to the free, fair and open competition that is essential to a thriving and equitable economy. Not only do non-compete clauses impede workers' ability to maximize their value in our economy, they create barriers for aspiring entrepreneurs—particularly for people in our most under-resourced communities where the recent surge in business formation has been most pronounced and where entrepreneurship is so vital to building an inclusive economy. Indeed, the growth rate of Black entrepreneurship has tripled in recent years; Hispanic entrepreneurs started businesses 44% faster than their non-Hispanic counterparts; and the rate of women starting new businesses has doubled.

Moreover, non-compete agreements stifle innovation. Indeed, a recent study by the Federal Reserve Bank of Minneapolis found that non-compete contracts limit our economy's potential by making it more difficult for employers and entrepreneurs to recruit new workers and start new businesses. And, non-compete agreements contribute to corporate concentration, and thus higher prices for goods and services.

Our opposition to non-competes is supported by our recent research, which found almost half (46%) of small business owners have been the subject of a non-compete agreement that prevented them from starting or expanding their business. What's more, more than 1 in 3 (35%) said they have been prevented from hiring someone due to a non-compete agreement. Nearly 6 in 10 small businesses support the FTC's proposed rule to ban non-compete agreements, with only 14% opposing the ban.

It is reasonable for a business to protect its proprietary assets and trade secrets; however, non-disclosure or confidentiality agreements are more than sufficient to accomplish this goal. Our research found more than two thirds (69%) of small business owners believe that non-disclosure agreements can protect their confidential information or trade secrets as effectively as a non-compete agreement. In another survey, 87% said that leveling the playing field for small businesses via anti-trust enforcement and restricting non-compete agreements was a priority for policymakers.

It's also important to note that states like California, Oklahoma and North Dakota already prohibit the enforcement of non-compete agreements with no loss of business success and entrepreneurial spirit in any of these states.

We've also heard directly from small business owners around the country about how non-compete agreements have prevented them from starting and growing their businesses or from hiring talented employees. A sample of these stories is included below.

All small business want is a level playing field on which to compete; however, non-compete agreements distort the ability to compete in the marketplace freely and fairly. For these reasons, we urge you to enact this rule to support aspiring entrepreneurs and help small businesses access qualified workers.

Sincerely,

John Arensmeyer,
Founder & CEO
Small Business Majority

**Feedback from small business owners in our network**

"I can only do so much to keep people here. I simply make it difficult for them to want to leave. The best way I can go about it is do what I can to make them stay. I see how companies use non-competes as a weapon and harass people. They inhibit their ability to provide for their families. I think that there needs to be more education for employees. From what I've witnessed, I think non-competes are used to penalize employees and people are manipulated. Companies are really smart about how they use them."

*Jacob Hanson, PR with Panache, Minnesota*

"I think it's a hindrance to people that want to start a small business. I think it's ridiculous. I didn't have a choice but to sign it. I was looking at a promotion and was told what's the big deal? You're not going anywhere, just sign it. It turns out the agreement wasn't well written, however enforceable in the state of Illinois. I had to wait one year before being able to start the business with my partners."

*Jean Underwood, Design Mavens Architecture, Illinois*

"I honestly think doing a better job at your business is the way you compete, not by squashing the competition with legal arguments. I can't control any business except my own, and I succeed if I do a great job with my business. I hope to corner the market on Paint Your Own Pottery in my area just by being awesome at it. I have no problem with disallowing non-competes in most situations."

*Tracy DuCharme, Color Me Mine, Colorado*

**JA1053**

"I have never believed that any employer has the right to restrict opportunities of workers as relative to the worker's well-being and that of their family. As workers gain skills and experience throughout their careers, they must be allowed to use that knowledge to further their livelihoods in ways that are in their best interest."

*Shirley Modlin, 3D Design and Manufacturing, LLC, Virginia*

"I really believe this new ban on non-competes is a very good thing for most small businesses and that it would increase the new small business formation rate. I appreciate the new thinking of the president in proposing it."

*Mike Roach, Paloma Clothing, Oregon*

"It's not fair to them. I understand life changes and is very difficult at this time. So, if they have a better opportunity and a better chance, I won't prevent that. I call it a containment of control. It's like being in prison if I'm making you sign a non-compete but the guy next door has a security company to pay you $3 an hour more and it's within a mile distance from your home. I can totally understand."

*Filipe Monteiro, Guardian Capital Security, Massachusetts*

"Non-compete agreements tend to only benefit the previous employer. Employees working under the mandates of a non-compete agreement are restricted from seeking new employment, preventing them from opportunities to earn more in wages, upward mobility with another company, etc. It prevents the employee from capitalizing on their own skills and knowledge. This is particularly unfair to people who have worked diligently towards self-improvement and have acquired and developed new skills but are restricted to using them for one employer only.

This causes undue stress and psychological burden on employees under the guise of non-compete agreements when they contemplate or actually try to move on from their employer or company. They might need to seek legal employment law assistance and thus incur some costs."

*Leo Carr, Elite Group, Michigan*

"If there are people going out to work, those individuals need my support. There's more of them than just me that can do what I do... But our business is so unique that you can come here and become accustomed to my services... It would be hard to duplicate it if that's your motive. You have to feel confident in what you do. I encourage people to know what their talents and skills are because you can do something that nobody else can. You were put here for a reason. I believe that the more I give, the more that I get back. I don't always get it back from where I give. It's the giving part and the gratitude associated with giving."

*Monica Jackson, Jackson Family Child Care and Foster Family Respite Care, Virginia*

JA1054

    

April 19, 2023

As small business owners and representatives of the small business community, we urge the Federal Trade Commission to enact its proposed rule to ban non-compete agreements. Non-compete agreements are a significant impediment to entrepreneurship, create a non-level playing field and impede the ability of employees to maximize their skills. They are not only a barrier to entry for entrepreneurs, but they also prevent small firms from hiring the most diverse, qualified and skilled talent.

In our economy, competition spurs innovation and leads to lower prices for goods and services. Non-compete agreements stifle free, fair and open competition—the hallmark of a market-based economy that is grounded on a level playing field. It is reasonable for a business to protect its proprietary assets and trade secrets; however, non-disclosure or confidentiality agreements are more than sufficient to accomplish this goal.

We're not alone in opposing non-compete agreements. Small Business Majority's polling found a majority of entrepreneurs say that non-compete agreements are a significant issue for small business, and 1 in 5 reported their own business had been negatively affected by non-compete agreements. In another survey, 87% said that leveling the playing field for small businesses via anti-trust enforcement and restricting non-compete agreements was a priority for policymakers.

What's more, states like California, Oklahoma and North Dakota already prohibit the enforcement of non-compete agreements with no loss of business success and entrepreneurial spirit in any of these states.

For these reasons and more, we urge you to enact this rule to support aspiring entrepreneurs and help small businesses access qualified workers.


Sincerely,


**Organizations:**

American Sustainable Business Network

Main Street Alliance

Pacific Community Ventures

Right to Start

Small Business Majority

Oakland African-American Chamber of Commerce (OAACC), Oakland, CA

Colorado Black Chamber of Commerce (CBCC), Denver, CO

Adelante Community Development, Commerce City, CO

Maryland Small Business Retirement Savings Program, Hunt Valley, MD

California Association for Micro Enterprise Opportunity - CAMEO, San Francisco, CA

SCORE, Sunnyvale, CA

JA1055

New Orleans Business Alliance, New Orleans, LA

West Side Forward, Chicago, IL

Cambridge Local First, Cambridge, MA

African Chamber of Commerce of Colorado, USA, Denver, CO

Rocky Mountain Microfinance Institute (RMMFI), Denver, CO

Denver SCORE, Colorado Springs, CO

Asociacion de Emprendedor@s, Anaheim Hills, CA

Baby Carrier Industry Alliance, Berwick, ME

BPSOS - Boat People SOS, Falls Church, VA

Communities of Tomorrow, Lagrange, GA

Louisiana SBDC at McNeese University, Lake Charles, LA

Morris County Hispanic-American Chamber of Commerce, Morristown, NJ

Illinois Small Business Development Center (SBDC) - Chicagoland Chamber of Commerce, Chicago, IL

Mission Asset Fund, San Francisco, CA

Nebraska Main Street Network, Lincoln, NE

StartUP Columbus, Columbus, GA


**Small Businesses:**

Michael Brey, President, Hobby Works, Laurel, MD

Zachary Davis, CEO, The Glass Jar, LLC, Santa Cruz, CA

Muneer Baig, CRO, SysUSA Inc., Manassas, VA

Tracy Ducharme, Owner, ColorMe Mine, Colorado Springs, CO

John Cavanaugh, President & CEO, Cross Cultural Communications, LLC, Columbus, OH

Marcie Hill, Writer, The Write Design Company, Chicago, IL

Bram Kleppner, CEO, Danforth Pewter, Middlebury, VT

Charlotta Carter, CEO, GRI Technology Solutions, San Mateo, CA

Rene Weston, CEO, Mechanical Doctors LLC, Chicago, IL

Randy Winn, Owner, 4freeCLE, Seattle, WA

Joan Brogdon, CEO, Kin Care, Inc., Chicago, IL

Vincent Cuccia, President/Owner, Vincent Cuccia, Wappingers Falls, NY

Willie Harris, Managing Member, Dunes Construction LLC, Gary, IN

Keri Amso-sorenson, owner, Klassy Group LLP, Post Falls, ID

Steven J Depner, President / Owner, Depner Financial Services, Spokane, WA

Teresa Naber, Realtor, Clients 1st Investments, Inc., Folsom, CA

David Crawford, Agent, Insphere Insurance Solutions, Mandevile, LA

Hilary Noonan, Principal, Syntax Land Design, LLC, Kansas City, MO

Ben Ruesga, Owner, RezPro Event Technology, Phoenix, AZ

Daphne Sizemore, President, Creations Tax Service, Fuleerton, CA

Johnsie Mcswain, President, K9 Sleuth Services Inc., Greensboro, NC

Jorge Hallon, owner, H.E.S. group, Miami, FL

Joey Hutchins, President & CEO, RightDirection Technology Solutions, LLC, Baltimore, MD

David Dixon, President, Dav-Lear Systems, Inc., Diamond Bar, CA

Folake Adeyinka, Manager, Crosslinks home health and staffing, Maplewood, NJ

Nancy Henker, Manager, Simsun LLC, Wellington, NV

Anthony Milton, owner, Synergy Technologies Group, Memphis, TN

Daniel Teresa, HR Consultant, Teresa C. Daniel, PHR, Nashville, TN

Mary Lee, Mlee, Mlee, San Jose, CA

Joe Ruden, Agent, Barrett Insurance, Jonesville, MI

Lori Gibson, Founder, LSG Benefits Group, Garland, TX

Doreen Coppinger, Agent, KHI Financial Solutions, LLC, Fort Dodge, IA

Kimberly Wallace, Manager/Owner, Kimberly's Baskets, Charlotte, NC

David Leavengood, Partner, BestCare Home Care Services, Burbank, CA

Amy Siu, Owner, AccuWorks, LLC, Bloomfield, MI

Marie Poh, Pesident, ABCs, Inc, Silver Spring, MD

Adriane Sanford, Principal, The Sanford Group, LLC, Aurora, CO

Tatyana White, Managing Member, Brillianta, Carlisle, MA

Tracey Winters, Owner, Tri-County Excavating, Inc., Geneva, NY

Jon Doyle, Owner, D Ventures, Suwanee, GA

Leonor Llange Galvan, President, ACCTAX-Accounting & Tax Servic, Lauderhill, FL

Vivian Bennett, Co-Owner, Reproman Reprographics Inc, Cambridge, MA

Annette Warren, President, iSECURE, Rochester, NY

Sean Calhoun, director, Bay Point Electrical Contractors LLC, Port Monmouth, NJ

Kenneth Stroud, CEO, ProSoDel, King George, VA

Bonita Webster, CEO, Indy Medical Supplies LLC, Zionsville, IN

Lisa Smith, Broker, Cornerstone Group, Troy, MI

Erica Osborne, SLP, Yoki Transport & Logistics, Charlotte, NC

Jennifer Duan, President, X-wave Innovations, Inc., Gaithersburg, MD

Larry Jacobson, President, Same, Chicago, IL

Marcus Soriano, Contracts Specialist, Maridian, LLC, Springfield, VA

Inga Boyd, Owner, PETI LLC, Mitchellville, MD

Taj Manocha, CEO, Elegant Album LLC, Piscataway, NJ

Jimmie Ruth Johnson-moore, Owner/President/CEO, Tax Consultants Plus Inc, Missouri City, TX

Mireille Wozniak-Michalak, Founder, Petiole HR, LLC, Seven Hills, OH

Staci Moore, Owner, AnAbsoluteWonder, Atlanta, GA

Christie Colyar, Agent/Broker, HealthMarkets, Austin, TX

Wayne Levin, President & CEO, Predictum Inc, Phoenix, AZ

John Duncan, owner, duncan financial, Inc, Winfield, IL

Bernard Olschewski, President, Bubinga LLC, Owings Mills, MD

Kim Miller, President, Ink Link Marketing, Miami Lakes, FL

O.Michael Hollingsworth, Owner, D.D.W Drug Testing Services, INC., New York, NY

Deborah Washington, member, Deborah Washington, Fort Worth, TX

Rene Ramirez, Owner/Operator, Decorative Concrete Maters, Schertz, TX

Steven Johnson, Owner, Steven C. Johnson, CLU, Rockport, TX

Cindy Milligan, CEO, Milligan Vocal Arts Institute, Woodstock, GA

Myriam Kaplan-pasternak, Founder, HaitiCoffee.com, Inc., Nicasio, CA

L Mates, ceo, premier, West Chester, PA

Benjamin Rosky, Producer, L & A Services, Phoenix, AZ

Cezary Gawel, Owner, Cezary Gawel agency, Linden, NJ

Wendy Mccormick, Director of Group Benefits, ECBM, Media, PA

Paula Sherbrook, Agent, Eben Concepts, Burlington, NC

Jerry Bafford, Independent Agent, United Insurance Group Agency, Memphis, TN

Stefanie Burcham, Partner, Burcham benefits LLC, Knoxville, TN

Connie Selby, Realtor, East Coast Property Solutions, Inc., Mount Airy, MD

Susan Pniewski, Principal, Christopher West Interiors LLC, Virginia Beach, VA

Sajini Thomas, President, G.I.R.S., Memphis, TN

Ethel Alexander, CFO, Alexander's Professional Solutions LLC, St. Louis, MO

Shaheewa Jarrett, COO & General Counsel, Gelin Benefits Group, LLC, Ft. Lauderdale, FL

Daniel Batitsas, Owner, Structure Building Maintenance, Madison, WI

Wendy Kenton, Director of Operations, Sykes/Lady Overland Park Golf Club, Overland Park, KS

Norma Cahue, Administrative Analyst, Norma's Cafe, Oxnard, CA

Jerry Donahue, Administration, Greater Columbia Medical Transport LP, Scranton, PA

Alex Lam, Vice President, Conaxion Inc., Los Angeles, CA

Rochelle Smith Smith, Owner, Elitetress Beauty, Cypress, TX

Susan Carney, Owner, Susan Carney, Winchester, VA

Salim Ali, marketing, Salim Ali, San Antonio, TX

Heather Nelson, owner, Heather Nelson Studio, Springfield, MO

Kelly Kirwan, Owner, Secure Health Partners, Monument, CO

Stacy Ann Paul, Owner, Array of Engineers, LLC, Grand Rapids, MI

Dominique' Reese, President & CEO, Reese Financial Services, Los Angeles, CA

Antonio Angeles, Manager, Freedom Equity Group, San Jose, CA

Deb Wilson, Co-Owner, D & S Wilson Enterprises LLC, Gardnerville, NV

Sarita Parikh, Co-Founder, glow + gather, Castle Rock, CO

Yosmel Gutierrez, franchise owner, Yosmel Gutierrez, Anaheim, CA

Rhonda Williams, Minister, Rhonda Williams, Romulus, MI

Suzanne Dunleavy, Owner, Suzanne Dunleavy, Doylestown, PA

Manolete Garcia, Manager, Westport Manor LLC, Kansas City, MO

John Haslam, Owner, 50 | Northwest, Blaine, WA

Harriet Beskin, Owner, Sofas Etc, Ventura, CA

Maple Campbell, Administrator, Platinum Plus Care, Indianola, MS

Linda Nordahl, Licensed Massage Therapist/Owner, Encouraging Balance Massage Therapy, Marietta, GA

Chartae Richardson, Self-Employed, LTN Services, Inc., Long Beach, CA

Angel Griffin, owner, Firestorm Talent & Entertainment LLC, Huntington Beach, CA

Frank Murray, Owner//Operator, Dove Transportation LLc, Nashville, TN

Thuy Fontelera, principal, Element Structural Engineers, Newark, CA

Melvin Brown, Project Manager, 3rd Generation Design & Construction, LLC, Philadelphia, PA

Tom Smith, Principal, 402 Smith, Inc. DBA Intelligent Office, Princeton, NJ

Michellelynette Hughes, Traveling Physician Assistant, Pathology Assist-Temp, INC., Chantilly, VA

Gary Evereklian, President, Polycontrols USA INC., Carlsbad, CA

Emily Kikue, Owner, Operator, Career Catalyst, Denver, CO

Amanda Webb, Owner, ADW Cleaning LLC, Springfield, OR

Yolanda Crosley, Managing Partner, Strata Consulting & Associates Group, Dallas, TX

Ck Wong, PgM, UtilityWorks, Sunnyvale, CA

Jeffrey Fernald, Vice President, Micro Video Instruments, Inc., Foxboro, MA

Jennifer Leblanc, Owner, ThinkResults, Palo Alto, CA

Michael Hayes, CEO, Michael Hayes Bail Bonds, San Jose, CA

Ronda Bartee, Owner, Zodiaque Consultants LLC, Los Angeles, CA

Lyn Cole, Artistic Director, Rhythm of the Street Dance Studio, Chicago, IL

Joan Galletta, Insurance Agent, JP Perry Insurance, Jacksonville, FL

Jenness Clairmont, Owner, Forest Clinical Services, Ballston Spa, NY

Tracy Ducharme, Owner, Color Me Mine-Alameda, Colorado Springs, CO

Brad Keiller, CEO Managing Member, Nomad Donuts, San Diego, CA

Christian Nwoye, Owner, Ugaland Inc, Tampa, FL

Margaret Yeager, Owner, Pura Vida Coffee, LLC, Hagerstown, MD

Julia Sloan, President, Sloan International Inc., New York, NY

Michael Keith, Member/Owner, Musicality LLC, Albuquerque, NM

Kim Karsh, Owner, Cal Pro Sports, Harbor City, CA

Karen Paris, CEO, KP Express - Virtual Business Services, Suisun City, CA

Dean Schwartz, Owner, SolutionDean, Greenwich, CT

Marilyn Scott, Owner, Cobblestone Bakery, LLC, Chicago, IL

Bonny Wagoner, Owner, Bonny Wagoner - Artist/Illustrator, Columbia City, OR

Cristina Coffing Blain, Mental health therapist, cristina coffing blain, Jacksonville Beach, FL

Ingrid Kreis, Owner/Manager, Ingrid Kreis LLC, Sausalito, CA

Laura Todd, consultant, self, Collierville, TN

Jo Ann Shane, Owner, Shane & Asociates, Fallbrook, CA

Elthello Smith, Owner, eSmith Financial Consultants, Antioch, CA

Thomas Brzezinski, Vice President, Thomas Brzezinski, Pleasant Hill, CA

Kevin A. Flynn, Owner, Flynn & Assoc., Inc., El Cerrito, CA

Rachael Keish, CEO, Keish Environmental, San Jose, CA

Greg Downing, CEO, xRez Studio Inc, DBA Hyperacuity, Long Beach, CA

Karim Zaman, President, Z Venture Capital Frontiers, Inc., Los Angeles, CA

Catherine Mccabe, Producer / Line Producer / UPM, Zocalo Pictures, Phoenix, AZ

Shalon Bowens, CEO, Shalon, Denver, CO

Emi Kamemoto, Founder & Consultant, Defiant Changemakers, Los Angeles, CA

Dean Stephens, Moderator, Researcher, Strategist, Founder, Happy Talk Research, Los Angeles, CA

Lisa Jones, Managing Director, DWIS Consultants, Chicago, IL

Renard Beaty, Owner, Kick Start Martial Arts, Atlanta, GA

Julia Julia, Owner, Sloan Int'l Inc, New York, NY

Marc Wheeler, Managing Partner, Strategic Options, Aurora, CO

Sandi Romena, Owner, Premiere Event Rentals, Sonora, CA

Angela Rosales, Owner, Angela Rosales Child Care, Parker, CO

Kongcha Cha, President, Optima Group, Biols, CA

Michelle Jordan, CEO/Pres., Ethnic Digital Marketing, Montclair, NJ

Joann Thomas, Owner, Jo's Unique Boutique LLC, Lansing, MI

Larry Pierce, Sr. Tax Consultant, HP Tax, Addison, TX

Christopher Schaffer, owner, Schaffer Notary Services, Fairfax, VA

Jerry Lenaz, Proprietor, Cloak & Dagger- Mystery Bookshop, Princeton, NJ

Kehinde Koyejo, Entrepreneur, Kalm Korner by Kehinde, Emeryville, CA

Scott Sonoda, CEO, Leahi Business Services, Honolulu, HI

Lizeth Vaca, owner, elLVee LLC, Los Angeles, CA

Denise Nicholson, Childcare Provider, Nicholson's Tiny Tots, Chicago, IL

**JA1060**

Isabella Dominguez-Konopek, Administrative Director, Anew Therapeutic Services Inc, Los Angeles, CA

Pamela Henderson, Founder/President, 65 Max Foundation, Antioch, CA

Mark Scott Terry, Owner, FI Health & Life, Oklahoma City, OK

Tania Gomez, Aesthetic, Piel by Tania, Canoga Park, CA

Carlos Cordoba, Principal, sherpa marketing, Sherman Oaks, CA

Margaret Schnipper, Founder & Creative Director, Trapper of Colorado, Denver, CO

Regina Silas, CEO, JBS Foundation Inc., Miami-gardens, FL

Justin Shaw, Owner, Justin Shaw, Daytona Beach, FL

Shaun Lechocki, CTO, Shaun Lechocki, Downers Grove, IL

Terry Jenkins, President, Terry Jenkins, Dallas, TX

Kristy Rogers, Founder, KristyRogersConnects, San Jose, CA

Felix Flores, Owner, Raspados Pitufin, Palmdale, CA

Susan Hawkins, President, Susan Hawkins Enterprizes, Southfield, MI

Charles Etsinger, Owner/Operator, charles etsinger, Ewa Beach, HI

Katrice Howard-Lenoir, Owner, Royal Panthera Security & Transportation LLC, Sidell, LA

Erin Wessinger, President, R.Bettis Construction, LLC, Chapin, SC

Paul Novak, President, South Coast Mold, Inc., Irvine, CA

Robert Schulmann, Self-employed, Bethesda, MD

Jean Underwood, Principal, Design Mavens Architecture, Normal, IL

Richard Sterling, Owner, Ricks Automotive Inc, Summit, MS

Willie Spicer Jr, Owner, JDIA Enterprise, Inc, Providence Forge, VA

Lena Carter-Camara, Owner, Lottery, Washington, DC

Carmen L Bonilla, Independent Consultant, Independent Consultant, Newark, NJ

Michelle Tuplin, Owner, Serendipity Books, Chelsea, MI

Chelsea Major, Owner, Pearl House Collective, Meridian, ID

Joyce Perkins, owner, Joyce Perkins, Vallejo, CA

Alison Levin, Owner, Ambrosia Archiving, Denver, CO

Maria Luisa Espinoza, Espinoza FCC AKA Espinoza's PRE-SCH& Child Care, Oxnard, CA

Kim Truong, Owner, Pinkie's Childcare, West Sacramento, CA

Tomasa Lara, Provedora, Lara Valencia, Tomasa Family Childcare, El Centro, CA

Jackie Pawluk, Quality Assurance Manager, Manhattan Toy, Minneapolis, MN

Larry Whitney, partner, Whitney & Whitney Consulting Group, Oakmont, PA

Kevin Crawford, Owner - Chief Fire Investigator, FOCUS Fire Investigations, Faith, NC

Esosa Iredia, Staffing Director, Access Healthcare Staffing & Recruitment, Nevada, NV

Reyna Garcia, CEO, Nationwide Construction Inc, San Bernardino, CA

Greg Verville, owner, GV Photography, Los Angeles, CA

Dana Owens, Owner, DAO Telecommunications, Concord, NC

Diana Cafi, CEO, Healthpro Innovation Workforce Solutions, LLC, Oakbrook Terrace, IL

Jessi Burg, Founder, Outgrow Your Garage, Delta, CO

Oliver Ruiz, Personal Trainer Certifique, Adictionfit Professional Personal Trainer, Miami, FL

Jane Caldwell, business owner, The Rowdy Ladybug, Washington, PA

Misty Henry, Owner, The Makers Resource Shop, Newburgh, IN

Navneet Kaur, CEO, Pfeiffer Genotyping, Gilroy, CA

Manesha Kachroo, Director, SafeQ Services, Pinehurst, TX

Kelvin Torres, Transportation, Sajoma Trucking Llc, Elizabeth, NJ

Frank Macleon, Owner, Frank MacLeon Consulting Services LLC, Cherry Hill, NJ

Chanai Winborn, Owner/Biologist, Lab 111, Boynton Beach, FL

Leo Carr, Executive President, The Elite Group, Southfield, MI

David Holtzclaw, President, Transduction Technologies, Omaha, NE

Maryland Sheridan, Owner/Manager, Clean Culture, Bend, OR

Amanda Cox, Wellness coach, Self-employed, Columbus, IN

Jyoti Jyoti, CEO and Founder, OMSutra, Syosset, NY

Maria Montoya, Owner, Marias Housekeeping, Fresno, CA

Jerina Vincent, Owner, JNJ Gifts and More, Verona, WI

Monica Ashery, Owner, Monica Ashery, Milwaukee, WI

Hadiya Siddiqui, Accountant and finance, Hadiya Siddiqui, Chicago, IL

Antonio Russo, Self-employed, Scarborough, ME

Ronda Barteé, Owner, Zodiaque Consultants LLC, Santa Monica, CA

Semiramis Anspach, Owner, ia's fitness, Victor Ville, CA

Connie Comer, Owner, Sun-Sational Spa & Wellness DBA Tan USA, Saint Augustine, FL

Denise Armstrong, Owner, Denise Armstrong, Winchester, CA

Nikia Johnson, Manger, Son@father, San Augustine, TX

Jorge Salgado, Owner, 6S Machining Enterprises LLC, San Marcos, CA

Milani Dupre, Childcare Provider/ Owner, Augustines Dreams LLC/ DBA Augustines Dreams Learning Center, Sacramento, CA

Holly Daugherty, Managing owner, TBD, Chesapeake, VA

Kathy Beilchick, Partner, The Lannding, Penn Run, PA

Ak "ames" Cyrway, President, The Framemakers, Waterville, ME

Jamila White, CEO/Founder, Doggy Nibbles, Brooklyn, NY

Teresa Mcdonald, CEO, uru Blight Patrol LLC, Los Angeles, CA

Jayna Fleming, Content Creator, Vangarde Marketing Solutions, San Antonio, TX

Laurie Jones, Owner, Jersey Girl Caterers, Fairfield, NJ

Lyssa Limbrecht-Moss, Founder/CEO, Optimal340B, Meridian, ID

Gail Hunter, Designer, GG's Signs & Designs, Batavia, IA

Michael Branco, President, JAG Painting Contractors Inc., Fall River, MA

Kolbey Gardner, Managing Partner, United Strategies Group, Chicago, IL

Betty Pittard, President, BP Consulting, Chattanooga, TN

Teresa Servin, business owner, CSUN, Los Angeles, CA

C. Peters, Retail Merchandiser, Hudsom, Kent, WA

Tonisha Allen, CEO, Smell Me Later LLC, Detroit, MI

Sharon Seymore, CEO, Clear Vision Enterprise LLC, Ontario, CA

Michael Crain, Ceo, NFT Collectibles LLC, Pensacola, FL

Mirza Baig, Self-employed, Mirza Baig, Brooklyn, NY

Greg Dyken, Owner, Punch Creations LLC, Long Beach, CA

Lawrence Malu, CEO, universal choice inc, New York, NY

Mary Esther Ellis, Self Employed, Mary Esther Ellis, Kansas City, MO

Juan Franco, Owner, Mexican restaurant, Chicago, IL

Robert Teaney, Owner, Espey Realty Inc, Lake Elsinore, CA

Ramoulatou Ahamadou-Bradley, Sole Proprietor, Bali's African Shop & Hair Braiding, Saint Louis, MO

Wayne Heffner, Owner, K&W Farm, Charlotte, NC

Magdalen Lagergren, Owner, Magdalen's Pure Skin Care, Rockville, MD

Justice Uche, Manager, Safari Global Market LLC, Lafayette, IN

Keith Hogan, Owner, J&H Supreme Home Builders LLC, Baton Rouge, LA

Somalia Sadler, Founder and CEO, Luxe Financials LLC, Chicago, IL

Frank Nagy, Dental Technologist, ADA, Sunrise, FL

Sarah Miller, Owner, That's Sew Sarah, Foley, AL

Roderick Parks, Owner, Parks Old Style Bar-B-Q, Inc., Detroit, MI

Milton Garcia Zeron, owner, K&G Lighting Supplies, Woodland Hills, CA

Victoria Thayer, manager, Berndt CPA, Madison, WI

Stephen Cannon, CEO/Founder, Priest Lake Builders, LLC, Nashville, TN

Kathy Westmoreland, Cleaning and sitting service, Kathy Westmoreland, Amarillo, TX

Charles Burke, CEO, Burke Group Enterprises LLC, Merritt Island, FL

Robert Harper, Owner, Messtone, Fort Worth, TX

Herman Manzanares, Owner, Los Alamos Lock and Key, Los Alamos, NM

Moris Melendez-Juarez, member, Govall Remodeling, LLC, Rockville, MD

Richard Johnson, Manager, Arrive Alive Driving School Inc, Largo, MD

James Bradly Smith, CFO, Mayo Smith Management LLC, West Monroe, LA

Julie Albin, Owner, Pour Lady Vintage, Stevenson Ranch, CA

Christina Godwin, CEO/Owner, Strategic Business Services LLC, Las Vegas, NV

Hisham Kurdi, Open Heart Surgery, Hisham Sinan Hospital, Columbus, OH

Ernesto Pallares, President & CEO, Intercom Energy Inc., San Diego, CA

Mary D. Welch, CEO & President, Front Page Publishing, Riverside, CA

Sharon Seymore, CEO, Jerklishous LLC, Santa Ana, CA

Dawn Ma, Principal, Q-Architecture, San Francisco, CA

Merline Gallegos, Director, Kelly's Learning Academy, LLC, Las Cruces, NM

Ada Ayala, Real Estate Broker, Ada Ayala & Associates, Ontario, CA

Sam Theodore, Entreprenuer, Self-employed, Oak Park, IL

Gregory Harriott, Home Inspector, Eye and I Home Inspections, Wellington, FL

Mark Garcia, Owner, GlobalEmpireMarketing.com, Bakersfield, CA

Roseline Weah Weah, Business owner, RoselineFashion LLC, Rock Island, IL

Musa Vadnais, Founder, cypherMUSE, LLC, White Bear Lake, MN

Marc Jeris Louis Jean, President, Utica Express Pharmacy Inc, Brooklyn, NY

Kelley Redington, CEO, Unlimited by KSR LLC, Bountiful, UT

Farshid Ghazavi, Civil engineer, CGS, Los Angeles, CA

Sandra Thomas, Owner/CEO, Premiere Consulting Services, Houston, TX

Karla Yatckoske, Founder, CEO, Uplifting Melodies Tutoring, LLC, Chicago, IL

Paranthaman Krishnasamy, CEO, Natura Greena, Mountain View, NJ

Donald Browne, Joe B, DONJAB, Colorado Springs, AL

Kimberley Vuitel, Business Advisor, Kimberley Vuitel, Saint Louis, MO

Nicholas Johnson, President, Portmore Sons Ltd., Queens Village, NY

Virginia Ramsey, CEO, Bargains By the Bins, Laurel, MD

Saira Siddiqui, Business Owner, Infiniti Global Research, LLC, Denver, CO

Megan Wyatt, Owner, Wit & Whimsy Toys, Granite Bay, CA

Nalina Vijayan, Owner, VNT Authentic Catering Services, Covina, CA

John Bunch, consultant, SBDC, Midland, MI

Lakesha Johnson, Other, Avongo, Buffalo, NY

Jenn Grindeland, Owner, The Working Well, Denver, CO

Doris Palacios, Owner, Dream Big Consulting, Los Angeles, CA

Michael Cross, Licensed Massage Therapist, Elements Of Life Wellness, Atlanta, GA

Amiee Lumiere, CEO, Reliant Forex Partners, Houston, TX

Priscila Haro, Administration, Wraps and Prints Inc, Arvin, CA

Kaylie Teague, Executive Director, Steppin' Stone Tax and Accounting Services, West Lafayette, IN

George Varghese, Founder CEO, Coretrust Solutions LLC, North New Hyde park, NY

Aubry Dicks, C/E/O, AD Sales & Service, INC., Bronx, NY

Thalia Garcia, owner, Thalia Garcia, Oakland, CA

Nawab Pickett, President, SamBena Insurance Agency, Shorewood, IL

Amond Irvin, Owner, Freshcuts, Detroit, MI

Kelsie Son, Salon Owner, Stone Parlor, Chanute, KS

Jennifer Ames, Copyeditor, Pet Parent(s) Copyediting, Goldsboro, NC

Sharron Cooper, Manager, Salon Suites Innovation, LLC, Shreveport, LA

Cameron Chisholm, Owners, AgroArbor, Wadsworth, IL

Denise Neff, owner, Skin Refinery Skincare Center, Newburgh, IN

Tracey Miller, Owner, Profit Hub 360 LLC, West Fargo, ND

Amond Irvin, Owner, Freshcuts, Detroit, MI

Ralph Hearn Jr, Owner, Cuttin-up Lawn Care And Grounds Maintenance L.L.C, Louisville, KY

Kisha Collier, CEO/Founder, Funded w/LadyK (FWLK), Victorville, CA

Mariela Seibert, Massage therapist, Lymph Flow, Huntington Beach, CA

Aura Villa, Fundadora, Aura Center, San Jos, CA

Eric Spencer, CFO, C-Town Trucking LLC, Aexandria, VA

Pankaj Modi, President, Radha Distributors, Elk Grove Village, IL

Manuel Lopez, Restaurant owner, Manuel Lopez INC, Staten Island, NY

Gloria Phillips, CEO, Justice For Al, Las Vegas, NV

Norris Krueger, Founder, Entrepreneurship Northwest, Boise, ID

Anne Shay, Business Broker, LBA, Kensington, CA

Filipe Monteiro, Owner, Guardian Capital Security, Wakefield, MA

Merha Woldyohannis, GM, Jambo Motors LLC, Denver, CO

Chekela Turner, Owner, Arielle Properties dba Chekela Turner's Place, Gilbert, AZ

Elizabeth Braddy, President/Owner, Tailoring and Alteration Center Inc., Silver Spring, MD

J.C. Osorio, President & CEO, OSO Enterprise, LLC, Gilbert, AZ

Barbara J Cabreriza, Cocina, Barbara Cabreriza, Miami, FL

Lisa King, Owner, Lisa King, Selmer, TN

John Heinrich, President, The Marketing Doctor, Scottsdale, AZ

Luis Ortega, Auto Mechanic, Quality Car Care  LLC, West Bend, WI

William Joyce, Owner, Electric Doc, Augusta, GA

Jose Díaz, Conductor, J m Díaz trucking, Cleveland, TX

Leslie Cannon Sr., CEO, Col-Ak Can Supply Co., LLC, Reynoldsburg, OH

Thomas Doherty III, Vessel Manager, Republic Services, Villas, NJ

Ruth Swain, CEO, SuchaLady Trucking LLC, University Park, IL

Michael Pipkins Sr., Chef, Michael D's Catering, Wilmington, DE

Gia Warren, self-employed, Phoenix, AZ

Anwar Siddiqui, Business owner, MedShip Surgicals, LLC, Denver, CO

Whitney Tyson, Ceo/Founder, Healthcare Care, LLC., Lavergne, TN

Andrea Thomas, CEO, Beauty Experts Studio LLC, Wilsonville, OR

Tawann Scott, President & CEO, Marie's Hair and Nail Supply, Richmond, VA

Stephans Wilburn, Trustee, Top Tier Builders LLC, Minneapolis and Saint Paul, MN

Teangel Hodo, Entrepreneur, NYA Trucking, Chicago, IL

Tifarrah Williams, CEO, Four Elements Corporation, Sunset Beach, CA

Darrell Walker, Owner, R.E.A. Incorporated / VA Taco, LLC, Dallas, TX

Daphne Bridges, CEO, Faith Enterprise Incorporated, Mint Hill, NC

Jo Collins, President & CEO, Quality Clinical Research Solutions, LLC, Olney, MD

Amberle Webster, Owner, Wiwat Consulting, Northstate, CA

Monique Louvigny, Onsite Event Coordinator, Onsite Event Coordinator, Vallejo, CA

Chris Taylor, Account Manager, High tec industrial services, Troy, OH

William Mugg, Owner, Perfect Image, Upper Marlboro, MD

Lois M Ellis, President/Owner, Hope Whispers Community Organization/Jones Rehab Inc, Canton, OH

Daniel Halos, Financial Advisor, Dabyn Wealth Strategies, Bellevue, WA

Denise Sell, Administrator, IPS Contracting Services, Baltimore, MD

Stacey Nicholls, Owner, Space Cookie Designs, Loveland, CO

Tammy Pritt-Jones, COO, Right Path Transportation, LLC, Montgomery, WV

Michelle Knijnenburg, President, Better Best Living, Colleyville, TX

Sharon Lee, Talent Acquisition Specialist, Sugar and Honey Esthetics, Torrance, CA

Mike Ducker, Business Consultant, Self-Employed, Silver Spring, MD

David Hunt, DR, MFEC, Palmetto, FL

Edgar Moreno, Owner, Legendary Garage Door, Torrance, CA

Lauren Darnall, Brand Manager, Self-employed, Columbus, IN

Hillary Apple, Event/Venue Manager, Fitness Instructor, Self-employed, Columbus, IN

Rachel Monahan, Engineer, Cummins, Columbus, IN

Maddison Mcelroy, Personal Trainer/Fitness Instructor, Self-employed, Columbus, IN

Leeann Steen, Owner/operator, SJS Farms, Sherburn Mn, MN

Lisa Saurs, Founder, Monarcherie Marketing, Decatur, IL

Bhanu Manvar, Lead System Analyst, Information System, Duluth, GA

Shawna Hall-neely, Owner, The Tutoring Spot, Chicago, IL

Armando Omar Bermudez Vila, CEO, Vila's Paradise, Placetas, AL

Barbara Haikal, President/CEO, Synergy Litigation Support Services, Portland, OR

Chelsea Denny, Communications Specialist, Chelsea Denny, Fort Collins, CO

Paul A Poppleton, Vice President, Diversified Facility Solutions, Cincinnati, OH

Gary West, Founder, W W W GROUP, Rancho Cascades, CA

**JA1066**

Troy Vosseller, Co-Founder, gener8tor, Madison, WI

Stephen Hooper, Insurance Agency Owner/Agent, Farmers Insurance Group (management company for Farmers Insurance Exchanges, Kalispell, MT

Peter Thayer, Project manager, Epic Systems Corp, Madison, WI

Gwendolyn Dailey, President/CEO, Dailey's Healthcare Inc, Cheaspeake, VA

Bruce Francis, Administrative Director, Rose Gold Diversified Consultants, San Antonio, TX

Diane Thomas, Owner, Interior Designs Inc, Cleveland, OH

Glenn Hare, Member-Attorney, Hare Law Group LLC, Towson, MD

Silvia Wells, Owner, E.T.A, Memphis, TN

Deborah Magers, CEO, Owner, Decker Therapy Services, LLC, Tampa, FL

Georgia Cerros Alvarenga, Owner, Cerros Mechanical Services, Aurora, CO

Nicole Alford, Self, Brooklyn, NY

Mike Roach, Co-Owner, Paloma Clothing, Portland, OR

Robert Vinson, CEO, Vinson Building Community, Los Angeles, CA



Affiliate: Columbia University Vagelos College of Physicians and Surgeons
A Planetree Hospital
A Magnet® Recognized Hospital

April 1, 2023

The Honorable Lina M. Khan
Chair
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

**Re: Notice of Proposed Rulemaking, Federal Trade Commission; Non-Compete Clause Rule; 88 Fed. Reg. 3482 (RIN: 3084-AB74) (January 19, 2023)**

Dear Chair Khan:

Stamford Health opposes the Federal Trade Commission's (FTC) proposed Non-Compete Clause Rule (the "proposed rule") in its current form.

Stamford Health is a comprehensive, independent non-profit health care system that serves Lower Fairfield and Westchester counties. We employ more than 3,800 people, making us the largest employer in the city of Stamford and one of the largest in Fairfield County. Beyond the lifesaving care we provide 24 hours a day, 365 days a year, we contribute more than $1 billion to our state and local economy and provide more than $106 million in uncompensated care to the residents that need it most. We are committed to providing compassionate, personal care coupled with the most sophisticated services to all residents of lower Fairfield County.

Stamford Health respects the FTC's efforts to address issues of genuine unequal bargaining power between certain employers and certain types of workers. Hospitals and health systems employ a wide variety of personnel, from food service employees in their cafeterias, to nurses, translators, and social workers in their patient rooms, to surgeons in their operating rooms. Some hospital employees are highly trained; some are lower skilled. Some are highly-compensated; some are lower-wage. But hospital employees, especially physicians and senior executives, do not present the same considerations with respect to non-compete agreements as other types of employees. **The proposed regulation errs by seeking to create a one-size-fits-all rule for all employees across all industries. In addition, Congress has not granted the FTC the authority to act in such a sweeping manner.**

**Even if the FTC had the legal authority to issue this proposed rule, now is not the time to upend the health care labor markets with a rule like this.** The COVID-19 pandemic exacerbated existing shortages of skilled health care workers, and shortages will

**JA1068**

persist well beyond the pandemic. Data shows, for example, that nearly one-quarter of health care workers say they are likely to leave the field soon.[1]

Similarly, the United States will face a physician shortage of as many as 124,000 by 2034.[2] A sister federal agency – indeed, the federal agency with far more expertise with the health care workforce – has reached the same conclusion. The Department of Health and Human Services (HHS) has observed that "[s]hortages and maldistribution of health care workers … were a major concern even before the pandemic."[3] The COVID-19 pandemic "put extreme stress on the health care workforce in the United States," causing many hospitals to report "critical staffing shortages."[4] And looking to the future, "many of the impacts the pandemic has had on the workforce are cumulative and may not resolve quickly," and "the longer-term workforce challenges remain."[5]

Despite these long-term workforce challenges, the proposed rule would profoundly transform the health care labor market – particularly for physicians and senior hospital executives. It would instantly invalidate millions of dollars of existing contracts, while exacerbating problems of health care labor scarcity, especially for medically underserved areas. Perhaps most troubling, the FTC would take this monumental step on the apparent basis of economic research that does not actually support the proposed rule.

**As noted, the proposed rule should be withdrawn because Congress has not given the FTC the power to promulgate it. But if the FTC chooses to proceed with a final rule, it cannot invalidate or ban non-compete agreements without far greater particularized study of the health care labor markets. At the very least, any rule that the FTC finalizes must specifically exempt physicians and senior hospital executives or, more generally, highly-skilled, highly-compensated employees using, for instance, categories that are already well-established in federal law under the exemptions from minimum wage and overtime pay provided by Section 13(a)(1) of the Fair Labor Standards Act.**

### A. THE FTC LACKS LEGAL AUTHORITY TO ISSUE THE PROPOSED RULE

Before turning to our specific policy concerns, it is critical to identify our legal objections to the proposed rule. **Put simply, the FTC has no statutory authority to issue a rule that would invalidate both existing and future non-compete agreements.**

---

[1] [1] *See* Kelly Kooch, *23% of healthcare workers likely to leave healthcare soon, poll finds*, Becker's Hospital Review, February 2, 2022. https://www.beckershospitalreview.com/workforce/23-of-healthcareworkers-likely-to-leave-healthcare-soon-poll-finds.html.

[2] *See The Complexities of Physician Supply and Demand: Projections from 2019 to 2034*, Association of American Medical Colleges, June 2021. https://www.aamc.org/media/54681/download.

[3] Department of Health and Human Services, Assistant Secretary for Planning and Evaluation, *Issue Brief: Impact of the COVID-19 Pandemic on the Hospital and Outpatient Clinician Workforce* (May 3, 2022), *at* https://aspe.hhs.gov/sites/default/files/documents/9cc72124abd9ea25d58a22c7692dccb6/aspecovid-workforce-report.pdf.

[4] *Id*.

[5] Id.

Our legal concerns have been well articulated by others, and so we need not to repeat them in great detail here. It is nevertheless important to underscore the proposed rule's many legal shortcomings:

- **First, the proposed rule makes clear that the Commission would be acting under Sections 5 and 6(g) of the FTC Act. But those provisions do not authorize the agency to engage in rulemaking to prohibit business practices that it deems an unfair method of competition.** Critically, the text of Section 6(g)'s rulemaking authority is limited to agency procedural rules, and Congress has been clear in other contexts (e.g., Fairness to Contact Lens Consumers Act, Children's Online Privacy Protection Act, Telemarketing and Consumer Fraud and Abuse Prevention Act) when it intends to grant the FTC substantive rulemaking authority.[6] Similarly, Magnuson-Moss Act of 1975 expressly excluded rulemaking for unfair methods of competition, and the FTC has not attempted to promulgate such a rule in the nearly half-century since that legislation was enacted.[7] Taken together, statutory text, legislative history, and historical agency practice make it clear that the FTC cannot rely on Sections 5 and 6(g) to issue the proposed rule.

- **Second, even if the FTC had some rulemaking authority under those provisions, Congress has not granted it the authority to regulate such an extensive portion of the American economy in one fell swoop.** As a substantive matter, the FTC grounds its authority to act in Section 5's vague term "unfair method of competition." But "[e]xtraordinary grants of regulatory authority are rarely accomplished through words" like that.[8] And make no mistake, if the Commission were to issue anything remotely resembling the proposed rule, it would be an extraordinary exercise of regulatory authority over "a significant portion of the

---

[6] *See generally* Thomas W. Merrill, Antitrust Rulemaking: The FTC's Delegation Deficit, *at* https://administrativestate.gmu.edu/wp-content/uploads/2022/09/Merrill_22-18.pdf ("As evinced by the drafting conventions at the time Congress passed the Federal Trade Commission Act, the original law was never intended to grant legislative rulemaking authority to the FTC. Likewise, Congress repeatedly ratified this interpretation by enacting limited grants of rulemaking power to the FTC in the decades after the original Act. The evidence that the FTC has the power to promulgate legislative rules regulating anticompetitive behavior consists of a single activist D.C. Circuit opinion and a plethora of arguments about why legislative rulemaking power would be a good thing. The Supreme Court should make quick work of these arguments if and when any upcoming rules are challenged."); Thomas W. Merrill and Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*), 116 HARV. L. REV. 467 (2002) (reviewing history and reaching same conclusion).

[7] [7] *See, e.g.*, Am. Bar Ass'n, Comments of the Antitrust Law Section of the American Bar Association in Connection with the Federal Trade Commission Workshop on "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues" 57 (April 24, 2020), https://ourcuriousamalgam.com/wpcontent/uploads/Comment-on-Non-Competes-in-the-Workplace_Final_4.24.2020.pdf ("[G]iven that Magnuson-Moss was enacted to address concerns raised by *National Petroleum Refiners* and similar cases, it's hard to see Section 6(g), with its vague and broad language, as providing a firm footing for informal antitrust rulemaking by the Commission …. There have been no antitrust rules promulgated by the Commission post-Magnuson-Moss. Accordingly, the Section remains skeptical of the Commission's authority under Section 6(g) of the Federal Trade Commission Act

[7] *E.g.*, Chang v. United States, 859 F.

[8] [8]*West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

American economy.'"[9] As the proposed rule itself observes, this rule would impact one in five workers, invalidating millions of private contracts across all American industries. The Commission "must point to clear congressional authorization for the power it claims" here.[10] There is none.

- **Third, even if the FTC had the extraordinary regulatory authority to prospectively prohibit future non-compete agreements, it lacks such authority to act to invalidate existing private contracts.** "Retroactivity is not favored in the law," and an agency may not issue retroactive rules without express congressional authorization.[11] **Here, there is no indication in the text, structure, or history of the FTC Act that Congress intended to grant the Commission the vast authority to retroactively upend millions of preexisting private contracts, worth billions of dollars of negotiated value.** It is typically understood, moreover, that the consideration for a non-compete clause is the employment itself.[12] Put another way, employers have already performed their duty under the contract by hiring the employee; the employee, by contrast, still has not completed her duty to abide by the non-compete agreement. As such, there are legitimate constitutional doubts under the Takings Clause because the FTC would be appropriating services by employees not yet rendered – namely, their agreement not to compete – even though those services had already been paid for.[13] Thus, to the extent the FTC can identify any statutory authority for the retrospective invalidation of agreed-upon contracts, or to the extent the Commission seeks to evade that characterization by inaccurately claiming it is merely halting the enforcement of future enforcement of contract provisions, these constitutional concerns should inform any statutory analysis.[14][15] **Ultimately, given these twin legal infirmities, the FTC, at the very least, should not act retroactively by invalidating existing non-compete agreements.**

---

[9]   [9] *Id.* at 2608 (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014).

[10]  [10] *Id.* at 2609.

[11] Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).

[12] See, e.g., Socko v. Mid-Atlantic Sys. of CPA, Inc., 633 Pa. 555, 126 A.3d 1266, 1275 (2015) ("If a noncompetition clause is executed at the inception of the employment, the consideration...may be the award of the position."); Stone Legal Resources Group, Inc. v. Glebus, No. CA025136, 2002 WL 35654421, at *5 (Mass. Super. Dec. 16, 2002) (there is sufficient consideration at the beginning of employment because the non-competition is signed in exchange for employment); Farm Bureau Serv. Co. of Maynard v. Kohls, 203 N.W.2d 209, (Iowa 1972) ("continuing employment for an indefinite period is sufficient consideration to support a covenant not to compete").

[13] E.g., Chang v. United States, 859 F.2d 893, 895, 899 (Fed. Cir. 1988) ("[A]s the Supreme Court also recognized in Connolly [v. Pension Benefit Guaranty Corp, 475 U.S. 211, 224], "'[t]his is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation."'... Most importantly, the plaintiffs do not complain that the sanctions resulted in a loss of income for services previously provided but not yet paid for, merely the loss of the contingent right to future income for services yet to be rendered." (emphasis added)).

[14] *E.g.*, *Jennings v. Rodriguez*, 138 S.Ct. 830, 842 (2018) ("When 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))).

[15] U.S.C. § 44.

JA1071

- **Fourth, the FTC lacks legal authority to exercise its Section 5 powers with respect to non-profit entities, including non-profit hospitals and health systems.** Section 5 provides that the Commission is "empowered and directed to prevent persons, partnerships, or corporations." But the Act defines "corporations" as "any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members."[16] This text plainly does not include non-profit entities. Although the proposed rule alludes to this legal limitation (88 Fed. Reg. at 3510), any final rule should unmistakably indicate that it does not apply to non-profits, including non-profit hospitals and health systems.

**For all of these reasons, the proposed rule cannot survive legal scrutiny. The Commission should withdraw it. Withdrawing the proposed rule will not mean that non-compete agreements will go unregulated. States have long demonstrated an ability to regulate noncompete agreements in a nuanced manner, consistent with local conditions and markets. In particular, states have demonstrated an ability to address noncompete agreements in the health care field in a thoughtful, finely-drawn manner.** Connecticut is one such example.

**This considered variation, on its own, makes clear that a one-size-fits-all rule for physicians is unwise, let alone a one-size-fits all rule across the entire United States economy.** In addition, state courts have been evaluating the reasonableness of non-compete agreements on a fact-specific basis for decades, and there is no indication that they cannot continue to do so in a responsible and effective manner. There is, therefore, good reason why Congress has not given the Commission or any other federal agency the authority to regulate non-compete agreements. **Consequently, absent any federal statutory authority to impose a sweeping rule of this kind, questions regarding non-compete agreements' enforceability should continue to be left to the states.**

**B. IF THE AGENCY MOVES FORWARD DESPITE THESE LEGAL INFIRMITIES, IT MUST EXEMPT THE HOSPITAL FIELD OR, AT THE VERY LEAST, DOCTORS AND SENIOR HOSPITAL EXECUTIVES FROM ITS BAN ON NON-COMPETE CLAUSES**

"Agencies do not ordinarily have to regulate a particular area all at once."[17] In fact, more often than not, that is the best approach when faced with complex economic issues. In this situation, the FTC not only lacks the legal authority to issue this far-reaching ban on non-compete agreements, it lacks the evidentiary support to do so. As explained below, the weight of the existing research indicates that non-compete agreements for certain categories of employees are beneficial – namely, doctors and senior hospital executives.

---

[16] As explained below (at page 16), the consequences of this differential treatment between non-profit and for-profit hospitals requires further study by the Commission. Without additional study, any application of the proposed rule to the hospital field would be arbitrary and capricious.

[17] *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Federal R.R. Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021).

This is exactly the experience of Stamford Health. Accordingly, if the FTC issues a final rule banning non-compete agreements at all, that rule should exempt hospitals and health systems or, at the very least, be limited to lower-skilled, low wage workers.

## 1. THE EVIDENCE CITED IN THE PROPOSED RULE (AND OTHERWISE AVAILABLE TO THE COMMISSION) DOES NOT SUPPORT APPLYING THE PROPOSED RULE TO PHYSICIANS

One of the FTC's primary justifications for the proposed rule is that it "would increase earnings for workers in all of the subgroups of the labor force for which sufficient data is available."[18] According to the Commission, "the evidentiary record indicates noncompete clauses depress wages for a wide range of subgroups of workers across the spectrum of income and job function."[19]  But the evidentiary record – including the primary study cited by the Commission regarding physicians – demonstrates the opposite. The use of non-compete clauses actually increases the rate of earnings growth for doctors. In addition, the lead author of that study, Professor Kurt Lavetti, presented at a January 2020 FTC workshop on non-competes, where he stated that "both physician firms and workers appear to benefit from the use of non-compete agreements."[20]  Given this evidence already in the administrative record, it would be arbitrary and capricious for the FTC to apply its proposed rule to physicians.

Throughout the proposed rule, the  FTC cites to a study that focuses on physician earnings: Kurt Lavetti, Carol Simon, & William D. White, The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians, 55 J. Hum. Res. 1025, 1042 (2020). As the Commission observes, that study found that the "use of noncompete clauses among physicians is associated with greater earnings (by 14%) and greater earnings growth.[21]

Faced with findings that squarely contradict the FTC's basis for the proposed rule, the Commission attempts to downplay or evade them. Its efforts are unavailing. For example, the proposed rule contends in one breath (at 3487) that the study "does not consider how changes in non-compete clause enforceability affect physicians' earnings," but later concedes that the study concluded (at 3501 n.248) that "there is evidence that increased enforceability of non-compete clauses increases the rate of earnings growth for physicians."[22]  And in an even greater indication that the evidence does not support its preferred policy result, the FTC gratuitously reinterprets data from that study (at 3524) to

---

[18] 88 Fed. Reg. at 3501.

[19] *Id.*

[20] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements*, Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020) (emphasis added), *at* https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-transcript- full.pdf.

[21] 88 Fed. Reg. at 3487.

[22] *See Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("it would be arbitrary and capricious for [an] agency's decision making to be internally inconsistent." (internal quotation marks omitted)).

reach conclusions that the authors never actually studied or reached themselves.[23]  Yet even then, the most the proposed rule can say (at 3501 n.248) is that the "proposed rule may increase physicians' earnings, although the study does not allow for a precise calculation." What is clear is that the only actual study regarding physician pay supports the use of non-competes. The FTC's efforts to avoid that conclusion highlights the lack of any evidentiary basis for applying its proposed rule to that class of workers and demonstrates the arbitrary and capricious nature of the proposed rule. For this reason alone, the Commission should withdraw its proposed rule as to physicians.

To make matters worse, the FTC ignores other features of the study that were presented at one of the Commission's own workshops. There, Professor Lavetti explained: "What we find is that in physician groups that use non-compete agreements, doctors are much more likely to make referrals of their patients to other doctors within the same practice, because they don't have to be as concerned about their fellow colleagues getting to know their patients and then opening a business next-door and poaching the patients."[24]

According to Professor Lavetti, these increased referrals have three important pro-competitive and pro-health care consequences. As noted, doctors, on average, are able to bargain for higher wages over the course of their careers.[25] Employers increase their overall revenue because there is greater intra-institutional referrals.[26] And patients receive better, more integrated care through, what Lavetti called, "this patient-sharing story."[27] The experience of Stamford Health supports these conclusions.[28]

---

[23] *E.g.*, *National Gypsum Co. v. EPA*, 968 F.2d 40, 43–44 (D.C.Cir.1992) (agency cannot "infer" facts not in the record).

[24] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements*, Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020) (emphasis added), *at* https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-transcript- full.pdf.

[25] *Id.* ("For an average physician who signs a non-compete agreement, the net present value of the earnings effect at the time that they sign the contract is positive $650,000 over a single job spell, which is about 15 years, on average. They make substantially more money, and all of that difference comes from larger within-job earnings growth.").

[26] *Id.* ("That, in turn, leads these practices to generate percent more revenue per hour worked.… There's much more fluid referral of patients across doctors within groups that use these types of contracts. These gains don't seem to occur in states that have nonenforceable NCA laws.").

[27] *Id.*; *see, e.g.*, Kaiser Permanent Institute for Health Policy, *An overview of our integrated care model, at* https://www.kpihp.org/integrated-care-stories/overview/ (discussing the benefits of integrated care); Cleveland Clinic, *Integrated Care, at* https://my.clevelandclinic.org/about/community/sustainability/sustainability-global-citizenship/patients/integrated-care#overview-tab (same).

[28] Lavetti, Simon and White's finding that non-compete agreements increase physician wages and intra- firm patient referrals undermines the Commission's reliance on another study by Professor Lavetti that the Commission relies on in the proposed rule. The Commission cites a study by Naomi Hausman and Professor Lavetti for the Commission's assertion (at 3490) that there "is evidence that non-compete clauses increase consumer prices and concentration in the health care sector." Whatever evidence exists, however, should be taken with a grain of salt. As an initial matter, the Hausman-Lavetti study did *not* focus on whether the use or enforceability of non-compete agreements increases concentration; instead, it focused on whether concentration leads to an increase in consumer prices, and only used variation in non-compete agreement enforcement as the natural experiment that generates 'experimental' variation in concentration. Even so, the paper never clearly shows whether increased enforcement causes an increase in *firm-level* concentration,

More to the point, Professor Lavetti's other research likely explains why consumer prices may slightly increase in connection with the enforcement of non-compete agreements. As noted, the Lavetti, Simon and White study indicates that the use of non-compete agreements can increase physician wage growth, which may be passed along to patients as higher prices. Thus, the increased prices associated with noncompete agreement enforcement may be the result of improvements for workers (physicians). Likewise, increased consumer prices may be the result of improved quality of care (e.g., increases intra-institution patient referrals and all of the other reasons, discussed below, why non-compete agreements incentivize investments that lead to improved care), which Hausman and Lavetti do not study. Again, as Professor Lavetti himself testified before the FTC, more evidence is needed, including with respect to his work on concentration and consumer prices. See Kurt Lavetti, Economic Welfare Aspects of Non-Compete Agreements, Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020) (emphasis added), at [https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-transcriptfull.pdf](https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-transcriptfull.pdf) ("Consumers may, of course, value access to convenient, integrated practices, where records and computer systems are shared across locations."); see id. ("Now, a lot of this, I want to caution, comes from the fact that we see smaller establishments. Because establishment size is shrinking, small establishments tend to have higher overhead and, therefore, higher prices.").

All in all, the Commission cannot justify a ban on non-compete agreements for physicians based on the evidence it cites in the proposed rule or what was presented at FTC-sponsored workshops.[29] At a minimum, as Professor Lavetti testified, "more empirical

---

and the proposed rule itself explains (at 3490 n.101) that "[f]or the purposes of consumer outcomes such as a price or product quality, the relevant measure of concentration is at the firm level, since firms are unlikely to compete against themselves on price or quality."

More to the point, Professor Lavetti's other research likely explains why consumer prices may slightly increase in connection with the enforcement of non-compete agreements. As noted, the Lavetti, Simon and White study indicates that the use of non-compete agreements can increase physician wage growth, which may be passed along to patients as higher prices. Thus, the increased prices associated with non- compete agreement enforcement may be the result of improvements for workers (physicians). Likewise, increased consumer prices may be the result of improved quality of care (*e.g.*, increases intra-institution patient referrals and all of the other reasons, discussed below, why non-compete agreements incentivize investments that lead to improved care), which Hausman and Lavetti do not study. Again, as Professor Lavetti himself testified before the FTC, more evidence is needed, including with respect to his work on concentration and consumer prices. *See* Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements*, Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020) (emphasis added), *at* [https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-transcript-full.pdf](https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete-workshop-transcript-full.pdf) ("Consumers may, of course, value access to convenient, integrated practices, where records and computer systems are shared across locations."); *see id.* ("Now, a lot of this, I want to caution, comes from the fact that we see smaller establishments. Because establishment size is shrinking, small establishments tend to have higher overhead and, therefore, higher prices.").

[29] At a minimum, as Professor Lavetti testified, "more empirical evidence is necessary before a comprehensive ban would be scientifically justified to curtail non-competes in all contexts...." *Id.*; *see id.* ("My summary opinion overall, just to wrap up, is that my own opinion is that the scientific standard for a complete ban on non-compete agreements should be quite high. Non-competes have been used for a long time, and the literature is, in a relative

evidence is necessary before a comprehensive ban would be scientifically justified to curtail non-competes in all contexts....”[30]

## 2. ADDITIONAL EVIDENCE DEMONSTRATES THE VALUE OF NON-COMPETE AGREEMENTS FOR PHYSICIANS AND SENIOR HOSPITAL EXECUTIVES

In addition to increasing physician wage growth and promoting patient referrals (and, in turn, integrated care), there are several other benefits of reasonable non-compete agreements with physicians and senior hospital executives.

First, non-compete agreements are valuable tools for protecting investments that hospitals make to recruit doctors and senior executives. This is particularly important in medically underserved areas. According to data from HHS, in March 2020 almost 70% of areas designated as primary medical health professional shortage areas were considered rural or partially rural.[31] This shortage will only worsen in the coming years because the rural physician population is disproportionately older, with one-quarter anticipated to retire by 2030.[32] What’s more, “shortages among one profession or specialty have a domino effect on others,” with serve adverse consequences for rural hospitals.[33] As an expert panel explained last year in a report to Congress and the HHS Secretary:

[L]ack of access to a general surgeon as backup limits the availability of other hospital services such as trauma care, oncology treatment and colonoscopy screening. This interdependence is not limited to general surgeons. Recent reports have highlighted declining access to maternity care in rural communities, in part because hospitals face chronic shortages of maternity-care providers such as family physicians, obstetricians, certified nurse midwives, and labor and delivery nurses, as well as surgeons and anesthesiology providers. Primary care workforce shortages and difficulty accessing specialty services result in unnecessary trips to the emergency room, further straining hospitals that are already underfunded and understaffed.[34]

For these reasons, it is apparent why rural and other understaffed hospitals would want to negotiate reasonable non-compete agreements. If, however, hospitals and health systems

---

sense, nascent compared to the history of the use of non- compete agreements. I think there are policies that can be used to protect vulnerable workers while still permitting non-competes in other contexts.”).

[30] *Id.*; *see id.* (“My summary opinion overall, just to wrap up, is that my own opinion is that the scientific standard for a complete ban on non-compete agreements should be quite high. Non-competes have been used for a long time, and the literature is, in a relative sense, nascent compared to the history of the use of non-compete agreements. I think there are policies that can be used to protect vulnerable workers while still permitting non-competes in other contexts.”).

[31] *See* Health Resources and Services Administration, Bureau of Health Workforce, *Designated Health Professional Shortage Areas Statistics*, First Quarter of Fiscal Year 2022.

[32] *See* Lucy Skinner, et al., *Implications of an Aging Rural Physician Workforce*, N Engl J Med 2019; 381:299-301.

[33] Council on Graduate Medical Education, *Strengthening the Rural Health Workforce to Improve Health Outcomes in Rural Communities* (Apr. 2022), *at* https://www.hrsa.gov/sites/default/files/hrsa/advisory-committees/graduate-medical-edu/reports/cogme-april-2022-report.pdf.

[34] *Id.*

were unable to negotiate reasonable non-compete agreements as a result of the FTC's proposed rule, there would be a range of negative outcomes. For instance, nearby employers could free-ride on the initial hospital's investment in recruiting both doctors and senior executives by offering more pay to convince the employee to move a close by. The initial hospital's investments in searching for candidates, providing a signing bonus, relocation pay, and guaranteeing a salary for a period of time while that physician established herself in the community would be lost. This, in turn, would discourage these kinds of recruiting investments in the first place. Similarly, it would create a classic "holdup problem," whereby the recruited doctor or senior executive would have the ability to threaten to leave her initial hospital unless economically-unsupportable demands are met.[35] Here, the holdup problem would be exacerbated by existing workforce shortages.

Second, non-compete agreements encourage hospitals and health systems to make investments in training their employees. While much of a physician's training occurs in medical school and residency, doctors must stay current with scientific developments and innovation. There is a constant stream of new research and technological innovations with the potential to improve patient care, and every practicing physician is always continuing his or her education. This also is the case for senior executives, who often receive management training, attend conferences and generally develop relevant leadership skills.

In standard economic terms, this kind of continued learning is considered "general human capital," i.e., skills or knowledge that has productive value in other firms, as well as her employing firm.[36] A doctor or executive who receives training in "general human capital" can quit and get a higher wage at another firm on the basis of that increased skill and knowledge. As a result, firms have weaker incentives to invest in training unless a non-compete agreement is in place. Non-compete agreements thus encourage hospitals to make sound investments in training because they know it will redound to their own patients' and communities' benefit. This is exactly the experience of Stamford Health care physicians "turnover reductions appear to be substantial, [but] they are very unlikely to be the primary motivation behind the use of NCAs among physician practices."[37]

Studies support this commonsense economic principle and real-world experience of hospitals. In fact, as FTC economist John McAdams has generally observed: "The bulk of the

---

[35] The previously discussed study by Professor Lavetti and others analyze whether the desire to retain employees motivated firms to negotiate non-compete agreements. The authors found that for primary care physicians "turnover reductions appear to be substantial, [but] they are very unlikely to be the primary motivation behind the use of NCAs among physician practices." Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020). The AHA agrees with this to the extent the study recognizes that limiting turnover is a "substantial" motivation, and emphasizes that not all hospitals have the same motivations for pursuing non-compete agreements. As noted, retention may be a greater motivator for rural or other geographically isolated hospitals.

[36] *See generally* Gary S. Becker, *Human Capital* (3d ed. 1993).

[37] John McAdams, *Non-Compete Agreements: A Review of the Literature*, SSRN Working Paper, SSRN- id3513639, *at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3513639; *see id.* ("The papers relying on state policy changes for identification find that non-competes lead to more firm-sponsored training among top public executives.").

empirical literature finds that workers signing non-compete agreements, or workers who reside in areas with a higher incidence of NCAs, receive more training." In fact, the proposed rule cites two studies but fails to acknowledge the relevant finding with respect to increased training. For example, one study found that for those who accept non-compete agreements before accepting a job, those employees are 11% more likely to have received training in the prior year.[38] Similarly, another study compared workers in states with different degrees of enforcement of non-compete agreements. It found that moving from no enforcement to the average degree of enforcement was associated with a 14% increase in employer-sponsored training of workers and no change in worker-sponsored training.[39] Although these studies did not focus specifically on physicians, the findings are significant because they again align with the experience of Stamford Health. While hospitals and health systems always strive to provide the most cutting-edge medical care and executive leadership, noncompete agreements allow us to best internalize the value of our investments.

Third, non-competes encourage the sharing of proprietary information within hospitals and health systems. For physicians, that information could include anything from patient lists to innovative research and development that can lead to improved care. For senior hospital executives, that proprietary information could include company strategy, internal business processes, names of key suppliers and customers, data with respect to payers, strengths and weaknesses vis-à-vis competitors, and more. Hospitals and health systems will want to protect the intellectual capital acquired by doctors and senior executives from falling into the hands of rivals because this information could give them an advantage. Ultimately, hospitals are by no means unique in this regard, but it is important to emphasize that this is precisely the kind of proprietary information that hospitals and health systems need to retain within their walls to stay competitive and thrive.

Crucially, non-disclosure agreements or other contractual provisions cannot fully protect employers from the outflow of proprietary information because a former employee cannot completely erase information from her own mind. And, in many instances relevant to hospital research, former employees cannot help but rely on valuable information in their subsequent employment (e.g., a medical scientist will not have to rerun all of the same failed experiments she ran for her initial employer, which that initial employer paid for but her next employer will not). What's more, NDAs do not allow employers to monitor ex-employees' disclosures on a regular basis. Reasonable noncompete clauses are thus the only way employers can negotiate protections for their proprietary information.

---

[38] *See* Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 53 (2021); *id*. ("Several of the facts we document are consistent with the traditional economic perspective, which views the noncompete as an efficient contracting device.… [O]ur evidence that employees with early notice of a noncompete are compensated—with higher wages, more training, information, and job satisfaction—is compatible with theories that identify noncompetes as a solution to a holdup problem.").

[39] *See* Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. Rev. 783, 799 (2019). To be sure, the study also found that the same increase in non-compete enforcement was associated with 4% lower hourly wages, which the author attributes to decreased worker bargaining power. This result is based on decreases in hourly wages as workers remain at the same employer. Notably, the previously-discussed study by Lavetti, Simon, and White found an increase in earnings growth for physicians.

Non-compete agreements enable firms to encourage the sharing of proprietary information across the firm because they know that it will be protected. Again, economic studies support this. Similar to his above-quoted observation with respect to training, FTC economist John McAdams found that the "bulk of the research" concludes that non-compete agreements provide workers with "more access to information."[40]  For example, the Starr, Prescott, and Bishara study, discussed above, of non-compete agreements reached before an employee starts employment found that those agreements increased the likelihood, by 7.8%, that the worker reported that her employer shares all job-related information.[41]  Similarly, the Lavetti, Simon, and White study found that non-compete agreements lead to the sharing of information about what they call a firm's "most valuable" asset: client (i.e., patient) relationships.[42]

Regrettably, the proposed rule fails to acknowledge these and other beneficial aspects of non-compete agreements. **Any final rule must take full account of both the existing economic literature and the real-world experience of hospitals and health systems, which has been that non-compete agreements for physicians and senior executives incentivize recruitment, retention, training, investments in career building (e.g., marketing and building individual physician practices) and the sharing of a broad range of proprietary information.**

### 3. ANY FINAL RULE MUST EXEMPT PHYSICIANS AND SENIOR HOSPITAL EXECUTIVES, OR SIMILARLY-SITUATED CATEGORIES OF EMPLOYEES

For all of the reasons stated in the previous two subsections, the FTC should exclude physicians and senior hospital executives from any final rule it may issue. As to physicians, the only available evidence demonstrates that the Commission was simply incorrect when it stated (at 3518) that excluding these kinds of highly-skilled workers "would deny these workers the benefits of higher earnings." As to both physicians and senior executives, the FTC failed to account for the many benefits that reasonable noncompete agreements carry, all of which are supported by both economic research and the real-world experience of Stamford Health. **There is simply no legal, evidentiary, or policy reason to include physicians or senior hospital executives in the FTC's across-the-board ban on non-compete agreements.**

Based on the language of the proposed rule and public statements by FTC officials since its publication, such exclusions would be consistent with what appears to be the Commission's primary goal. Doctors and executives are fundamentally different from other workers that

---

[40] John McAdams, *Non-Compete Agreements: A Review of the Literature*, SSRN Working Paper, SSRN- id3513639, *at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3513639; *see id.* ("Studies relying on cross-sectional comparisons tend to find that non-competes are associated with more training and information sharing.").

[41] *See* Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 53 (2021).

[42] Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020).

have received the most attention from the FTC.[43] Critically, the FTC's core concerns of genuinely unequal bargaining power at the time of hiring or exit do not apply. As the Commission itself found (at 3503), "senior executives are likely to negotiate the terms of their employment and may often do so with the assistance of counsel." In the experience of Stamford Health, the same is true for physicians. These categories of employees negotiate on an even playing field with their employers, especially as compared to lower-skilled and lower-wage workers.

**Accordingly, the Commission should exercise its "great discretion to treat a problem partially" and "regulat[e] in a piecemeal fashion" by exempting physicians and senior hospital executives. It should instead direct its limited resources on those who truly experience unequal bargaining power.[44]**

Relatedly, the FTC requested comment on whether, as a general matter, different standards should apply to highly-skilled and highly-paid workers, and how senior executives could be defined. To the extent the Commission does not wish to simply exclude physicians and senior hospital executives from its rule, it can look to other areas of federal law to more broadly exempt highly-skilled and highly-compensated workers.

In particular, the Fair Labor Standards Act (FLSA) and its implementing regulations provides a closely analogous model. The FLSA generally requires that employees in the United States be paid at least the federal minimum wage for all hours worked and overtime pay at not less than time and one-half the regular rate of pay for all hours worked over 40 hours in a workweek. But, as authorized by statute[45], Department of Labor regulations contain exemptions from this requirement, including for "learned professionals," "highly compensated employees," and even employees in the practice of medicine.[46] **These are finely-drawn, well-established legal categories that the Commission can – and should – look to when re-evaluating its rule regarding non-compete agreements.** Relying on these three categories would address the Stamford Health's concerns about invalidating non-compete agreements for physicians and senior executives. But more important for the Commission's ostensible purposes here, several of the FLSA-exemption categories would carve out those with equal bargaining power, while allowing the Commission to exercise any regulatory authority it believes it has towards protecting lower-skilled and lower-wage employees.

---

[43] *See* CNN, *FTC seeks to ban non-compete clauses, affecting 30M Americans, at* https://www.cnn.com/videos/business/2023/02/11/smr-ftc-noncompete-clauses.cnn (interview with FTC Director of the Office of Planning Elizabeth Wilkins discussing "hair stylists" and "security guards"); PBS News House, *Federal Trade Commission proposes ban on noncompete clauses* (Jan. 5, 2023), *at* https://www.pbs.org/newshour/show/federal-trade-commission-proposes-ban-on-non-compete-clauses (interview with FTC Director of the Office of Planning Elizabeth Wilkins discussing "folks who are flipping burgers" and "middle-wage workers").

[44] *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 409–10 (D.C. Cir. 2013).

[45] 29 U.S.C. § 213(a)(7).

[46] *See* 29 C.F.R. § 541.301 (learned professionals); 29 C.F.R. § 541.304 ("practice of law or medicine"); 29 C.F.R. § 541.601 (highly compensated employees).

**C. CONCLUSION**

For all of the reasons stated above – including its lack of authority to issue it – the FTC should withdraw the proposed rule. If it persists in issuing a final rule, the FTC would serve itself and the public best by heeding the Supreme Court's observation: "Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop…. They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." Massachusetts v. EPA, 549 U.S. 497, 524 (2007). Here, that wise approach requires the Commission to exempt hospital and health systems altogether or, at the very least, more narrowly focus its attention on lower-skilled, lower-wage workers who have genuinely unequal bargaining power vis-àvis their employers.

Sincerely,

Kathleen Silard
President & CEO



U.S. Chamber of Commerce

1615 H Street, NW
Washington, DC 20062-2000
uschamber.com

April 17, 2023

*Via electronic submission: http://www.regulations.gov*

April Tabor, Secretary of the Commission
Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue, NW
Suite CC-5610 (Annex C)
Washington, DC 20580

Re:    Notice of Proposed Rulemaking, Federal Trade Commission; Non-Compete Clause Rule (88 Fed. Reg. 3,482-3,546, January 19, 2023)

Dear Ms. Tabor:

The U.S. Chamber of Commerce appreciates the opportunity to submit comments regarding the Commission's proposed Noncompete Rule.[1]

The Chamber and its membership are strongly opposed to the Proposed Rule. It would categorically ban nearly *all* noncompete agreements—regardless of individual circumstances, such as a worker's skill, job responsibilities, access to competitively sensitive and proprietary information, bargaining power, or compensation—and require that organizations rescind all existing agreements and provide notice to affected workers of such rescission. Such a proposal fails to recognize that noncompete agreements can serve vital procompetitive business and individual interests—such as protecting investments in research and development, promoting workforce training, and reducing free-riding—that cannot be adequately protected through other mechanisms such as trade-secret suits or nondisclosure agreements. For centuries, courts have recognized the procompetitive benefits of noncompete agreements and balanced those benefits against any negative costs imposed by particular noncompete agreements. As perhaps acknowledged by the Commission's request for comments on narrower alternatives, the Commission's categorical ban would sweep in millions of noncompete agreements that pose no harm to competition, and in fact benefit the U.S. business community, economy, workers, and consumers.

---

[1]    *See* Fed. Trade Comm'n, Notice of Proposed Rulemaking: Non-Compete Clause Rule, RIN 3084-AB74, at 213-214 (Jan. 5, 2023).

JA1082

The Commission should withdraw the Proposed Rule for three basic reasons. First, the Commission is not authorized under the Federal Trade Commission Act to promulgate binding regulations related to "unfair methods of competition." The Commission relies on Section 6(g) of the Act, but that provision grants the Commission the narrow authority to develop internal procedural rules related to its powers to investigate suspected violations of the law and to publish reports. Section 6(g) does not empower the Commission to issue sweeping substantive regulations that bind private parties. The major-questions doctrine also cuts firmly against reading such powers into the Act.

Second, noncompete agreements are not categorically "unfair," as history and precedent demonstrate. Noncompete agreements have never been considered *per se* violations of the antitrust laws. On the contrary, courts have long recognized that such agreements serve a range of procompetitive ends. If the statutory phrase "unfair methods of competition" allows the Commission to prohibit agreements not shown to limit competition in any way, then the Commission's authority under the FTC Act would lack any intelligible limiting principle and reflect an unconstitutional delegation of legislative power. And its proposal to retroactively invalidate existing noncompete agreements raises serious due-process concerns.

Third, the Commission's proposal would represent arbitrary and capricious decision-making in violation of the Administrative Procedure Act. The Proposed Rule's justifications for a categorical ban on noncompete agreements rest on an inaccurate and selective assessment of the available research. In particular, the Commission's dismissal of business justifications for noncompete agreements ignores the inadequacy of alternatives and elevates speculative competitive harms over well-recognized procompetitive benefits. The Proposed Rule also would generate considerable uncertainty and frustrate compliance with other laws.

## I.    BACKGROUND

Firms in every sector of the economy rely on noncompete agreements to protect investments in their workforce, to prevent workers with access to confidential information from aiding competitors, and to structure compensation programs. Similarly, employees subject to noncompete agreements benefit from training opportunities and increased compensation or severance payments. Agreements temporarily restricting a worker's ability to work for a competitor have been enforced since the Founding. Each State has developed a legal framework to determine when worker noncompetes are valid and enforceable, virtually always based on a fact-dependent assessment of competing interests. As the Commission's proposal recognizes, there are very few decisions assessing worker noncompetes under the federal antitrust laws, and only one case challenging such an agreement under the FTC Act. In none of those decisions was a noncompete agreement held to violate federal law. Those decisions do not justify any rulemaking, let alone a blanket ban.

### A. Businesses Have Long Entered Into Noncompete Agreements For Reasons That Benefit Both Firms And Workers And Increase Innovation and Competition.

Noncompete agreements benefit both companies and workers. First, these agreements benefit employees by promoting employers' investments in their workers. As the Commission's own economist John McAdams recently explained, noncompete agreements can "solve a 'holdup' problem for certain types of investment (*e.g.*, training, information sharing) into employees," which emerges when employers "forgo making certain investments in their workforce knowing that employees would be able to subsequently quit and appropriate the value of the investment."[2] In other words, employers are more likely to spend resources on employee training and development when they do not fear that the employees will immediately take that knowledge to a competitor. "[B]y discouraging worker attrition before the firm has had the time to recoup the cost of its upfront investment," noncompetes encourage "mutually beneficial" investments.[3] McAdams also notes that noncompete agreements "allow firms to reduce recruitment and training costs by lowering turnover."[4] Noncompetes can also help firms prevent a free-riding problem wherein competitor firms rely on poaching workers to reduce their own training costs. Thus, firms benefit by retaining well-trained employees, and employees benefit from more training opportunities and the stability of lower workplace turnover, which can improve team efficiency and morale.[5]

Second, and relatedly, employees benefit from negotiated noncompetes through increased wages and other benefits exchanged for the noncompete agreement.[6] For

---

[2] John McAdams, *Non-Compete Agreements: A Review of the Literature*, Fed. Trade Comm'n Bureau of Economics Research Paper 6 (2019) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3513639.

[3] *Ibid*.

[4] *Id*. at 3.

[5] *See* Florence Shu-Acquaye, *The Effect of Non-Compete Agreements on Entrepreneurship: Time to Reconsider?*, 10 U. Puerto Rico Bus. L.J. 92, 102 (2019) ("For example, in the area of sports, it is said that professional athletes would benefit from a 'fixed term contract' instead of [hopping] from one team to another. This would result in a 'lower worker turnover' which invariably may result in the employer's readiness to invest even more in the employees through training.").

[6] McAdams, *supra* note 2, at 3, 6; Fed. Trade Comm'n, *Forum Examining Proposed Rule to Ban Noncompete Clauses* at 18-19 (Feb. 16, 2023) (Testimony of LeAnn Goheen) ("Employment agreements that include a non-compete clause are signed in exchange for higher compensation.") (hereinafter Forum); *See also id*. at 42 (Testimony of Eric Poggemiller) (explaining that "many [agreements] have been signed as part of a negotiated severance

instance, many businesses offer forfeiture-for-competition agreements that do not actually restrict where an employee can work. Instead, those agreements condition supplementary payments on an employee's not working for a competitor for a certain amount of time after leaving his or her job.[7] Thus, these agreements, which may fall within the scope of the Proposed Rule, serve as a bargaining chip for both employers and employees.

Third, noncompete agreements protect crucial business information and "increase the returns to research and development," thereby promoting innovation.[8] It is undeniable "that innovation and business developments take large amounts of time, money and trial and error."[9] Without the protections afforded by noncompete agreements, firms will be less willing to engage in this essential development, or to involve a broad range of employees in such efforts. Noncompete agreements are therefore an essential component of how businesses protect their confidential information.[10] Recent scholarship demonstrates that noncompete agreements are not easily replaced by other forms of protection, such as trade-secret laws or nondisclosure agreements. Although trade-secret laws provide some protection, noncompete agreements "may represent a more efficient mechanism to prevent proprietary knowledge transfers in certain circumstances, particularly when monitoring and the enforcement of trade-secrets law is costly."[11]

Finally, noncompete agreements help ensure that stronger competitors enter the marketplace. Recent empirical studies show that, although increased enforcement of noncompete agreements tends to be "associated with fewer spin-off firms within the same industry," the spin-off firms that do emerge must be willing and able to take on incumbent firms protected by noncompetes, and are therefore "larger, faster growing, and have a higher likelihood of surviving the initial years."[12] As a result, evidence

---

payment, which the employee is not otherwise entitled to [and] [s]ometimes they're granted as part of a stock grant").

[7]    *See infra* at 37 (discussing forfeiture-for-competition agreements).

[8]    McAdams, *supra* note 2, at 3.

[9]    Shu-Acquaye, *supra* note 5, at 101.

[10]    *See* Camila Ringeling, et al., *Noncompete Clauses Used in Employment Contracts*, Comment of the Global Antitrust Institute 4-5, & n.7, n.9 (Feb. 7, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3534374.

[11]    *Id.* at 5; *see* discussion of trade-secret litigation *infra* section II.C.1.

[12]    McAdams, *supra* note 2, at 17.

suggests that, even in areas where noncompetes reduce the number of total players in the market, noncompetes encourage the development of more viable market entrants.[13]

### B.    The Longstanding Legal Framework Governing Noncompete Agreements Both Recognizes Their Benefits And Limits Their Overreach.

#### 1.    State law

Noncompete agreements have always been regulated by the States, whether through state statutes or common law.[14]  In some States, legislatures and courts have regulated the use of such agreements for over two centuries.[15]  And the debate over the enforceability of noncompete agreements continues in statehouses around the country, with many States considering new noncompete legislation in the last year.[16]  As a result, there is currently significant variation (and innovation) regarding the treatment of noncompete agreements in the United States.  But the vast majority of States recognize that noncompete agreements provide meaningful benefits to workers and businesses alike, and thus should be enforced in many circumstances.

In most States, noncompete agreements are considered on a case-by-case basis and enforced so long as they are reasonable.  In Michigan, for example, a statute provides factors for courts to consider in determining whether a noncompete agreement is valid and enforceable, including the duration of the agreement, its geographic scope, and the line of business involved.[17]  Those factors resemble the requirements that

---

[13]    *Ibid.*; *see* Forum, *supra* note 6, at 20 (testimony of Jim Paretti) (Commenters also noted the important role that noncompetes have in protecting small, nascent companies, explaining that "restrictive covenants help small startup businesses from large, predatory competitors who can afford to pay over market simply to buy away their key talent.").

[14]    *See* 88 Fed. Reg. 3482, 3482 (Jan. 19, 2023) ("[N]on-compete clauses between employers and workers are traditionally subject to more exacting review under state common law than other contractual terms.").

[15]    *See*, *e.g.*, *Acordia of Ohio, L.L.C.* v. *Fishel*, 978 N.E.2d 823, 830 (Ohio 2012) (Pfeifer, J., dissenting) ("Since the early 18th century . . . many jurisdictions have allowed noncompete agreements to be enforced when they are reasonable.").

[16]    *See* Russell Beck, *42 Noncompete Bills in 18 states – and 3 Federal Bills*, JDSupra (Feb. 6, 2023), https://www.jdsupra.com/legalnews/42-noncompete-bills-in-18-states-and-3-5990096/ (tracking 42 currently debated bills concerning noncompete agreements in 18 state legislatures introduced since the beginning of 2023).

[17]    Mich. Comp. Laws Ann. § 445.774a(1) (a noncompete agreement is valid and enforceable "if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business"); 88 Fed. Reg. at 3494 ("In the 47 states where at least some non-compete clauses may be enforced, courts use a reasonableness inquiry to determine

developed under the common law of many other States to determine when a particular agreement is "reasonable."[18]  Applying that flexible standard, numerous state courts have recognized that businesses have legitimate and procompetitive interests in, among other things, protecting goodwill and investments in worker training,[19] preventing competitors from exploiting access to confidential information,[20] and ensuring that the seller of a business will not turn around and compete for the buyer's clients.[21]

Some States place more restrictive conditions on the enforceability of noncompete agreements.  In Massachusetts, for example, the term of agreements normally must not "exceed 12 months."[22]  Massachusetts also has a strict notice requirement, mandating that the agreement "be provided to the employee by the earlier of a formal offer of employment or 10 business days before the commencement of the employee's employment."[23]  Other States regulate noncompete agreements by making them unenforceable against certain types of workers, particularly low-wage employees.[24]  In Maine, for example, "an employer may not require or permit an employee earning wages at or below 400% of the federal poverty level to enter into a noncompete agreement with the employer."[25]  But again, notwithstanding these restrictions, each of these States recognizes that noncompete agreements "allow

---

whether to enforce a noncompete clause, in addition to whatever statutory limits they are bound to apply.").

[18]    *See Teachout Sec. Servs., Inc.* v. *Thomas*, 2010 WL 4104685, at *2-3 (Mich. Ct. App. Oct. 19, 2010); *see also St. Clair Med., P.C.* v. *Borgiel*, 715 N.W.2d 914, 918 (Mich. Ct. App. 2006) ("[Section] 4a(1) represents a codification of the common-law rule that the enforceability of noncompetition agreements depends on their reasonableness.") (internal quotation marks omitted).

[19]    *See, e.g., Payroll Advance, Inc.* v. *Yates*, 270 S.W.3d 428, 434 (Mo. Ct. App. 2008); *Desantis* v. *Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990).

[20]    *See, e.g., Advance Cont. Equip. & Design LC* v. *Lamere*, 2015 WL 5089167, at *3 (Minn. Ct. App. Aug. 31, 2015); *Frieburger* v. *J-U-B Engineers, Inc.*, 111 P.3d 100, 105 (Idaho 2005); *DeSantis*, 793 S.W.2d at 682;  *Cent. Adjustment Bureau* v. *Ingram Assoc. Inc.*, 622 S.W.2d 681, 685-686 (Ky. App. 1981).

[21]    *See, e.g., Boulanger* v. *Dunkin Donuts Inc.*, 815 N.E.2d 572, 641-643 (2004).

[22]    Mass. Gen. Laws Ann. ch. 149, § 24L(b)(iv).

[23]    *Id.* at § 24L(b)(i).

[24]    *See* R.I. Gen. Laws § 28-59-3(a)(4) ("A noncompetition agreement shall not be enforceable against . . . [a] low-wage employee," defined as an employee whose annual salary is not more than 250% of the federal poverty level); *see also* 820 Ill. Comp. Stat. Ann. 90/10 § 10(a) ("No employer shall enter into a covenant not to compete with any employee unless the employee's actual or expected annualized rate of earnings exceeds $75,000 per year.").

[25]    Me. Rev. Stat. tit. 26, § 599-A(3).

-6-

JA1087

[private] parties to work together to expand output and competition" and thus readily enforces agreements that satisfy the statutory requirements.[26]

Only a few States prohibit noncompete agreements or treat them as largely unenforceable.[27]  In California, for example, an agreement "by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."[28]  Even California provides certain limited exceptions, however, and will enforce noncompete agreements arising in connection with a merger or sale of a business.[29]  In any event, the key point is that from the time of the Founding to the present, the enforceability of noncompete agreements has been governed by state and common law, and States have taken different approaches consistent with principles of federalism.

### 2.    Federal law

As the Commission's proposal recognizes, there has never been a successful challenge to a worker noncompete agreement under the FTC Act, the Clayton Act, or the Sherman Act.[30]  Although a few plaintiffs have pursued federal challenges to worker noncompetes, those claims have uniformly failed.

---

[26]    *Lake Land Employment Group of Akron* v. *Columber*, 804 N.E.2d 27, 30 (Ohio 2004) (explaining that "[m]odern economic realities . . . do not justify a strict prohibition of noncompetition agreements between employer and employee in an at-will relationship" and recognizing that  "[i]f one party can trust the other with confidential information and secrets, then both parties are better positioned to compete with the rest of the world.") (internal quotation marks omitted).

[27]    *See*, *e.g.*, Brandon Kemp, *Noncompetes in Oklahoma Mergers and Acquisitions*, 88 Okla. B.J. 128, 128 (2017) (noncompete agreements "have been prohibited by statute in Oklahoma since 1890," before Oklahoma was admitted as a state).

[28]    Cal. Bus. & Prof. Code § 16600.

[29]    *Id.* §§ 16600-16602.5.  For example, California does not restrict noncompetes to individuals who own above a certain percentage of a business but rather states that "[a]ny member may . . . agree that he or she or it will not carry on a similar business within a specified geographic area."  *Id.* § 16602.5.

[30]    88 Fed. Reg. at 3496-3497.  The Commission cites *United States* v. *American Tobacco Corp.*, 221 U.S. 106 (1911), as an example of a plaintiff's achieving "some degree" of "success" in a challenge to a noncompete provision.   But *American Tobacco* involved a series of anticompetitive acts, including a string of acquisitions that the Court viewed as predatory. Noncompete agreements were discussed in a single sentence, where the Court stated it was not considering the "legality" of the noncompete agreements "isolatedly viewed."  *Id.* at 183.  The Commission also points to *Signature MD, Inc.* v. *MDVIP, Inc.*, 2015 WL 3988959 (C.D. Cal. Apr. 21, 2015).  But that decision, which was resolved at the motion-to-dismiss stage, noted the "legitimate business concerns"  served by noncompete  agreements and held that "the

First, contrary to the approach taken by the Proposed Rule, worker noncompetes are not per se violations of the FTC Act or Sherman Act. *Per se* rules are reserved for situations in which courts have extensive experience with a restraint and are certain that the competitive harms outweigh any competitive benefits.[31]  Under current law, *per se* condemnation is reserved for agreements to fix prices, allocate markets, or rig bids. Worker noncompete agreements, by contrast, do not qualify for *per se* treatment because "postemployment restraints . . . serve legitimate business purposes," such as "prevent[ing] a departing employee from expropriating his employer's secrets and clientele."[32]  In fact, the Seventh Circuit concluded decades ago that "[t]he recognized benefits of reasonably enforced noncompetition covenants are by now beyond question."[33]  Accordingly, courts assess those agreements under a more flexible rule-of-reason framework.

Second, under the rule of reason, a single firm's noncompete agreements will almost never have a substantial effect on competition—an essential prerequisite for liability when an agreement is not a per se violation of the law.[34]  As opposed to agreements among competitors to fix wages or to not poach one another's employees, there will be few if any circumstances in which a single employer's noncompete agreements would harm competition in a relevant market.[35]  And if agreements pass muster under state law, meaning they are necessarily limited in scope and duration, it is hard to see how they would harm competition.  Unsurprisingly, the Commission does not cite a single case where a plaintiff successfully alleged that a noncompete agreement violated the federal antitrust laws.

---

reasonableness of the [noncompete agreements] will ultimately be a factual determination."  *Id.* at *6-7.

[31]  *See Arizona* v. *Maricopa Cty. Med. Soc.*, 457 U.S. 332, 343-344 (1982) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable.").

[32]  *Newburger, Loeb & Co., Inc.* v. *Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977).

[33]  *Lektro-Vend Corp.* v. *Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981); *see also Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1560-1561 (11th Cir. 1983) ("Ever since the decision of the Supreme Court in *United States* v. *Addyston Pipe & Steel Co.* there has been an unbroken line of cases holding that the validity of covenants not to compete under the Sherman Act must be analyzed under the rule of reason.") (citations omitted).

[34]  88 Fed. Reg. at 3496 (citing *Ohio* v. *American Express Co.*, 138 S. Ct. 2274, 2284 (2018)).

[35]  *See, e.g., Caremark Homecare, Inc.* v. *New England Critical Care, Inc.*, 700 F. Supp. 1033, 1035-1036 (D. Minn. 1988).

### C.    The Commission Nonetheless Proposes A Rule That Would Effectively Ban Noncompete Agreements Nationwide.

On January 19, 2023, the Commission issued a proposed rule regarding noncompete agreements, which would ban noncompete agreements nationwide, with only a possible narrow exception for certain agreements connected to the sale of a business. The Proposed Rule is striking in its breadth. It would reach agreements with employees and independent contractors; it defines "non-compete clauses" to include any agreement that "has the effect of prohibiting [a] worker from seeking or accepting employment"; and it draws no distinctions between workers, including based on their status as partner or owners (versus employees or independent contractors), their seniority, their access to competitively sensitive or proprietary information, the skill required to perform their jobs, their bargaining power, or their compensation.[36] If adopted, according to the Commission's own data, the rule would immediately outlaw more than 30 million noncompete provisions negotiated by companies and workers,[37] and require businesses to notify workers those agreements are no longer in effect.[38]

As statutory authority for this rulemaking, the Commission has invoked Sections 5 and 6(g) of the FTC Act. Section 5 "declare[s] unlawful" "[u]nfair methods of competition in or affecting commerce" and "empower[s]" the Commission to "prevent" those acts.[39] Section 6(g) relates to the Commission's investigative powers, and authorizes the Commission to "[f]rom time to time classify corporations and . . . to make rules and regulations for the purpose of carrying out" the FTC Act.[40]

Perhaps acknowledging the impermissible breadth of its proposed categorical ban—and despite stating that it has already evaluated the costs and benefits of possible alternatives[41]—the Commission has requested comments regarding possible alternatives. According to the Commission "[t]hese alternatives flow from two key questions: (1) whether the rule should impose a categorical ban on noncompete clauses or a rebuttable presumption of unlawfulness, and (2) whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers."[42] With respect to the second question, the

---

[36]    88 Fed. Reg. at 3535.

[37]    *Id.* at 3485 ("Based on the available evidence, the Commission estimates that approximately one in five American workers—or approximately 30 million workers—is bound by a non-compete clause.").

[38]    *Id.* at 3511.

[39]    15 U.S.C. § 45(a).

[40]    *Id.* § 46(g).

[41]    88 Fed. Reg. at 3530-3531.

[42]    *Id.* at 3516.

proposed rule explores partial bans that "apply different rules to different categories of workers based on a worker's job function, occupation, earnings, another factor, or some combination of factors."[43]  For example, the Commission has requested comments on an approach that would prohibit noncompete clauses for most workers but not senior executives or other "highly paid and highly skilled workers."[44]  But as presently proposed, its Rule does not include any such distinctions, but rather applies categorically to all noncompete agreements applicable to all categories of workers.

## II.   DISCUSSION

The Commission lacks the legal authority to pursue its proposed Noncompete Rule, both because the FTC Act does not empower the Commission to issue regulations respecting unfair methods of competition and because worker noncompetes are not categorically unfair.  As noted above, noncompetes may even benefit competition in the market for products and services.  And even if the Commission had the legal authority, its sweeping national ban is not supported by the available evidence.  Given these defects, the Commission should rescind its proposal.  If the Commission nonetheless decides to move forward, any alternatives to limit the reach of the Rule would be preferable to the proposed categorical ban.

### A.   The Commission Lacks The Authority To Promulgate Rules Respecting Unfair Methods Of Competition.

Section 5 of the FTC Act declares unlawful "unfair methods of competition" and empowers the Commission to pursue individual enforcement actions to adjudicate potential violations.  The FTC Act has never authorized the Commission to adopt generally applicable substantive rules defining unfair methods of competition, and the Commission did not assert the authority to do so in the century-plus following the enactment of the FTC Act.  The Commission must exercise its Section 5 authority through existing adjudicatory procedures on a case-by-case basis.

The Commission now claims that it can promulgate "unfair method of competition" rules under Section 6(g) of the FTC Act.[45]  But the structure and history of the Act, as well as the Commission's own historical understanding of its authority, demonstrate that Section 6(g) empowers the Commission to develop internal rules to govern its own affairs.  It is not a font of authority to issue substantive rules that bind private parties.  That reading is confirmed by Congress's subsequent amendments to the Act, which reinforce the background understanding that the Commission lacks the authority to issue competition regulations.  And if there were any doubt about the

---

43    *Id.* at 3518.

44    *Id.* at 3502.

45    *Id.* at 3499.

Commission's authority on this score, it is resolved by the major-questions doctrine, which cautions agencies against reading vague and ancillary provisions to authorize powers with "vast economic and political significance."[46]

### 1.    The structure and history of the FTC Act

The FTC Act was enacted in 1914.  Section 5 of the Act "declared unlawful" "unfair methods of competition," and authorized the Commission to enforce that prohibition through individual orders.[47]  Under Section 5, "[w]henever the [C]ommission shall have reason to believe that any [person] has been or is using any unfair method of competition in commerce," the Commission "shall issue and serve upon such person . . . a complaint stating its charges."[48]  That complaint initiates "administrative proceedings" before the Commission, which may require the violator to cease and desist the unlawful practice.[49]  In 1938, Congress amended Section 5 to also prohibit "unfair or deceptive acts or practices in commerce" and gave the Commission the authority to investigate and punish individual violations in the same manner.[50]

Section 6 of the FTC Act is titled "additional powers of Commission."[51]  From its enactment until now, Section 6 has given the Commission various investigative and administrative powers, including the authority to "gather and compile information" as part of its investigations, "to require" regulated parties "to file . . . annual and special" reports,  to "investigate and report the facts relating to any alleged violations of the antitrust [laws]," and to publish reports in the public interest.[52]  As relevant here, Section 6(g) provides the Commission authority to "from time to time classify corporations and . . . to make rules and regulations for the purpose of carrying out the provisions of this subchapter."[53]

The text and structure of the FTC Act demonstrate that Section 6(g) empowers the Commission to develop internal rules needed to "carry[] out" its investigative and reporting functions—*e.g.*, "establishing procedures to protect the confidentiality of . . .

---

[46]    *Util. Air Regulatory Grp.* v. *Envt'l Protection Agency*, 573 U.S. 302, 324 (2014) (quoting *FDA* v. *Brown & Williamson*, 529 U.S. 120, 160 (2000)).

[47]    *See* Federal Trade Commission Act, § 5, 38 Stat. 717, 719 (Sept. 26, 1914).

[48]    *Ibid*.

[49]    *AMG Cap. Mgm't, LLC* v. *Fed. Trade Comm'n*, 141 S. Ct. 1341, 1346 (2021).

[50]    Pub. L. 75-447, § 3, 52 Stat. 111, 111-114 (1938).

[51]    15 U.S.C. § 46.

[52]    *Ibid*.

[53]    *Id*. § 46(g).

information" provided by private companies[54]—not substantive rules that bind private parties.[55]    First, Section 6(g) says nothing whatsoever about unfair methods of competition or any other substantive authority of the Commission.  On the contrary, Section 6(g) makes explicit reference only to "classify[ing] corporations"—an ancillary power related to the Commission's authority to require reports from corporations. Similarly, the surrounding provisions of Section 6 only discuss investigative and reporting powers, further confirming that Congress did not in the second half of Section 6(g) grant the Commission overarching authority to create substantive rules.[56]

Finally, Section 6(g)'s grant of rulemaking authority is not accompanied by any sanction.  At the time of the FTC Act's passage, Congress followed "a convention for indicating whether an agency had the power to promulgate legislative rules," whereby "the inclusion of a separate provision in the statute attaching 'sanctions' to the violation of rules and regulations promulgated under a particular rulemaking grant" was understood to convey substantive rulemaking power.[57]  For instance, the Warehouse Act of 1916 authorized the Secretary of Agriculture to "suspend or revoke any warehouseman's license for any violation of the rules and regulations made under the Act."[58]  Given that history, the omission of any particular sanction for violating Section 6(g) signals that it is only directed at internal administrative matters.

The drafting history of the Act confirms Section 6(g)'s limited place in the overall scheme.    During the congressional debates over the FTC Act, the House of Representatives envisioned the Commission as a purely investigative body.  In the House proposal, the Commission would gather information and produce reports, and then make recommendations to the Attorney General, who would ultimately decide how best to enforce the law.[59]  By contrast, the Senate wanted the Commission to be an enforcement agency in its own right, with the power to punish potential violations through "case-by-case proceedings."[60]  After the two chambers negotiated over the

---

[54]    *Aluminum Co. of Am.* v. *Fed. Trade Comm'n*, 589 F. Supp. 169, 172, 178 (S.D.N.Y. 1984).

[55]    *See Util. Air Reg. Grp.*, 573 U.S. at 321 ("[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" (quoting *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *Gustafson* v. *Alloyd Co., Inc.*, 513 U.S. 561, 570-571 (1995).

[56]    *See AMG Cap. Mgm't*, 141 S. Ct. at 1348 (holding that the "language and structure" of the FTC Act undercut the Commission's claim of disgorgement authority).

[57]    Thomas W. Merrill & Kathryn T. Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 493 (2002).

[58]    *Id.* at 493 n.123.

[59]    *See* Noah Joshua Philips, *Against Antitrust Regulation*, Am. Enter. Inst. 2 (2022), https://www.aei.org/wp-content/uploads/2022/10/Against-Antitrust-Regulation.pdf?x91208.

[60]    *Id.* at 3.

draft legislation, the final FTC Act reflected both visions:  the Senate-proposed enforcement powers became Section 5 of the Act, while the House-proposed investigative powers became Section 6.  Importantly, throughout the entire legislative process, neither the House nor the Senate ever suggested that the Commission would have broad *substantive* rulemaking authority.[61]

### 2.    Subsequent amendments to the FTC Act

Amendments to the FTC Act confirm that the Commission lacks substantive rulemaking authority related to unfair methods of competition.  Congress has repeatedly passed legislation granting the Commission authority to promulgate substantive rules on specific subjects.  That was necessary precisely because the Commission does not have general rulemaking authority related to unfair methods of competition.  And each time Congress has granted the Commission the power to write new regulations, it has clearly identified the substantive authority at issue.

First, in the decades following passage of the FTC Act, Congress enacted a number of laws granting the Commission narrow rulemaking authority to address specific industries.  Those statutes include:

- the Wool Products Labeling Act, 15 U.S.C. § 68d, which authorized the Commission "to make rules and regulations for the manner and form of disclosing information required by this subchapter, and for segregation of such information for different portions of a wool product as may be necessary to avoid deception or confusion, and to make such further rules and regulations under and in pursuance of the terms of this subchapter as may be necessary and proper for administration and enforcement";

- the Textile Fiber Products Identification Act, 15 U.S.C. § 70e(c), which authorized the Commission "to make such rules and regulations, including the establishment of generic names of manufactured fibers, under and in pursuance of the terms of this subchapter as may be necessary and proper for administration and enforcement";

- the Fur Products Labeling Act, 15 U.S.C. § 69f(b), which authorized the Commission "to prescribe rules and regulations governing the manner and form of disclosing information required by this subchapter, and such further rules and regulations as may be necessary and proper for purposes of administration and enforcement of this subchapter";

- the Flammable Fabrics Act, 15 U.S.C. § 1194(c), which authorized the Commission "to prescribe such rules and regulations, including provisions for maintenance of

---

[61]    Merrill & Watts, *supra* note 57, at 505 ("Under established practices for reconciling bills in conference, the Committee could not have granted the FTC legislative rulemaking powers, because neither bill granted the agency such authority."); Philips, *supra* note 59, at 2.

records relating to fabrics, related materials, and products, as may be necessary and proper for administration and enforcement of this chapter. The violation of such rules and regulations shall be unlawful and shall be an unfair method of competition and an unfair and deceptive act or practice, in commerce, under the Federal Trade Commission Act"; and

- the Fair Packaging and Labeling Act, 15 U.S.C. § 1454(a), which authorized the Commission "to promulgate regulations" "with respect to . . . consumer commodit[ies]."

As these examples demonstrate, Congress knows how to specifically give the Commission the power to make substantive rules in furtherance of its "enforcement" authority when it wants to. And Congress would have had no need to provide the Commission with new rulemaking authority related to an unfair method of competition—as it did in the Flammable Fabrics Act—if, as the Proposed Rule assumes, the Commission had that authority all along.

Second, Congress enacted a major overhaul of the Commission's enforcement authority in the Magnuson-Moss Warranty—FTC Improvement Act of 1975. The Magnuson-Moss Act authorized the Commission to issue rules related to its Section 5 enforcement powers. But that legislation singled out *only* the Commission's "unfair or deceptive acts and practices" authority, and left the Commission's authority regarding "unfair methods of competition" unchanged.[62] Moreover, Magnuson-Moss subjected the Commission's new rulemaking powers to extensive procedural requirements, such as the obligation to hold an informal hearing, if requested, that would include, among other things, cross-examination of witnesses by interested parties.[63] By authorizing the Commission to engage in rulemaking subject to more onerous procedural requirements for "unfair and deceptive trade practices," Congress did not bless the Commission's authority to issue more lax rules respecting "unfair methods of competition."[64]

---

[62] Pub. L. 93-637, § 202 (codified at 15 U.S.C. § 57a); *See Comments of the Am. Bar Ass'n in Connection with the Fed. Trade Comm'n Workshop on "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues"* 56 (Apr. 24, 2020) ("Magnuson-Moss represented a compromise between those who opposed the idea of giving the FTC broad legislative rulemaking authority, especially when unaccompanied by restrictions on its exercise, and those who thought that the FTC always had rulemaking authority, but acknowledged that explicit codification of that authority would be helpful.").

[63] 15 U.S.C. § 57a(c).

[64] Congress amended the Commission's rulemaking authority for unfair and deceptive trade practices in 1980. *See* Pub. L. 96-252, 94 Stat. 374. Once again, those amendments said nothing about rulemaking authority for unfair methods of competition. *See* Christine S. Wilson, Commissioner, *Dissenting Statement of Commissioner Christine S. Wilson Regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act"* 15-16 (Nov. 10, 2022) (hereinafter Wilson Dissent).

-14-

Finally, Congress again revisited the Commission's rulemaking authority in 1994 by codifying the agency's policy statement with respect to "unfair or deceptive acts or practices."[65] Those amendments specifically mentioned the Commission's rulemaking procedures under the Magnuson-Moss Act. Here again, Congress's considered judgment of rulemaking for "unfair or deceptive acts or practices," and its complete silence on rulemaking for "unfair methods of competition," further signals that the Commission lacks substantive rulemaking authority under Section 6(g).

All told, Congress has acted many times to empower the Commission to write substantive rules, and it has used unmistakably clear language to do so. Yet it has never seen fit to give the Commission the general power to promulgate regulations respecting unfair methods of competition.

The Commission has long been aware that it lacks the power to issue substantive rules. Before 1962, the Commission never sought to do so. On the contrary, it indicated that it lacked the power to do so.[66] And when Congress revisited the Commission's rulemaking authority a decade later, the Commission's statement to Congress asserted rulemaking authority related only to unfair and deceptive trade practices, rather than unfair methods of competition.[67]

### 3.    Major-questions doctrine

If there were any doubt that the Commission lacks the authority to promulgate "unfair method of competition" rules, the major-questions doctrine cuts decisively against the Commission's interpretation. As the Supreme Court recently explained in

---

[65]  *See* FTC Act Amendments of 1994, Pub. L. 103-312, § 9 (amending the FTC Act to require the Commission find that an "act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition" before declaring it unlawful); *see also Fed. Trade Comm'n* v. *Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015) (discussing the codification of the pre-existing agency policy).

[66]  *National Petroleum Refiners Ass'n* v. *Fed Trade Comm'n*, 482 F.2d 672, 693 (D.C. Cir. 1973) ("[T]he agency itself did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently before that time that it lacked such power."); *see generally* Maureen Olhausen & Ben Rossen, *Dead End Road:  National Petroleum Refiners Association and FTC "Unfair Methods of Competition" Rulemaking*, The FTC's Rulemaking Authority: Concurrences (forthcoming 2023).

[67]  H. Rep. 161, 95th Cong., at 45 (Feb. 23, 1977) (Appendix II, Federal Trade Commission— Agency Views, Statement of Federal Trade Commission by Christian S. White, Asst. Director for Special Statutes).  This report characterizes the Commission's octane rules as implicating only "unfair or deceptive acts and practices," even though the Commission had earlier taken the position that the octane rules also proscribed "unfair methods of competition."  *See* Olhausen & Rossen, *supra* note 66, at 9-10.

*West Virginia* v. *EPA*, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."[68]  That principle recognizes that "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices," even when there is a "colorable textual basis" for the agency's position.[69]

The Commission's claim of competition rulemaking authority undoubtedly qualifies as a major question under *West Virginia*.  As the Proposed Rule demonstrates, the Commission could use regulations related to unfair methods of competition to fundamentally alter the American economy.  Given the expansive scope of Section 5, the Commission's enforcement authority under that statute extends to a wide range of nationwide economic activity, including mergers and acquisitions, exclusive dealing contracts, and even patent suits.[70]  When Congress gave the Commission such broad authority to bring these kinds of enforcement actions, it required the Commission to prove that the *specific conduct* at issue harmed competition, meaning that each enforcement action turned on its particular facts.  But if the Commission has the authority to issue substantive *rules* categorically defining "unfair methods of competition," then it may do so in *all* of the areas to which its Section 5 authority extends, thereby outlawing a massive number of private agreements or business activities without regard to whether each one actually harms competition and upending decades of antitrust jurisprudence on which the business community relies.  Congress would never have authorized the Commission to make nationwide decisions with such "economic and political significance" without saying so explicitly, particularly at a time when administrative rulemaking was still uncommon and Congress was decades away from enacting the APA.[71]

Moreover, at the time of the FTC Act's passage, several amendments providing substantive rulemaking were considered and rejected by Congress.[72]  And after a federal court rejected the Commission's attempt to issue a substantive rule in 1972, Congress once against considered and rejected "legislation that would confer legislative

---

[68]   *West Virginia* v. *Envt'l Protec. Agency*, 142 S. Ct. 2587, 2605 (2022); *Utility Air Regulatory Grp.*, 573 U.S. at 324 (internal quotation marks omitted); *see also Nat'l Fed. of Indep. Bus.* v. *Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022).

[69]   *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted).

[70]   *See* Complaint, *In re Meta Platforms, et al.*, Docket No. 9411 (Aug. 11, 2022); Complaint, *In re Broadcom Inc.*, Docket No. C-4750 (June 29, 2021); Complaint, *In re Abbvie Inc., et al.*, No. 2:14-cv-5151 (E.D. Pa. 2014).

[71]   *West Virginia*, 142 S. Ct. at 2608-2610.

[72]   *See* Thomas M. Dyer & James B. II. Ellis, *FTC's Claim of Substantive Rule-Making Power: A Study in Opposition*, 41 Geo. Wash. L. Rev. 330, 336 (1972).

rulemaking authority on the FTC."[73]   In analyzing a major question, a lack of authority not previously exercised may be "reinforced by the Commission's unsuccessful attempt . . . to secure from Congress an express grant of [the challenged] authority."[74]

Finally, the Commission's claimed authority here is particularly suspect because it rests on a "newfound power in the vague language of an ancillary provision" of a statute.[75]  In *West Virginia*, for example, the Supreme Court noted that a minor provision of the Clean Air Act, which the agency had consistently used to impose requirements on specific sources of pollution, could not be used to require coal plants to subsidize the production of clean energy.[76]  The same logic applies here.  Section 6(g) is a minor part of the FTC Act.  It is housed in a part of the statute that relates to investigative powers, and it refers to rulemaking authority alongside the power to "classify corporations."   Not only does Section 6(g) say nothing directly about substantive rulemaking authority, but it does not mention the Commission's enforcement powers at all.  And prior to its proposed Noncompete Rule, the Commission had not relied on that authority in nearly fifty years.

### 4.    *National Petroleum Refiners*

The Commission's view that Section 6(g) confers substantive rulemaking power to prohibit "unfair methods of competition" relies on a single authority:  the D.C. Circuit's opinion in *National Petroleum Refiners Association* v. *Federal Trade Commission*.[77]  The Commission's reliance is misplaced.  *National Petroleum Refiners* was wrongly decided and is inconsistent with modern principles of statutory interpretation, particularly those that apply when agencies claim a broad grant of statutory authority.

---

[73]   Merrill & Watts, *supra* note 57, at 555.

[74]   *Fed. Trade Comm'n* v. *Bunte Bros.*, 312 U.S. 349, 352 (1941); *see also West Virginia*, 142 S. Ct. at 2610 (noting that "the Agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself").

[75]   *West Virginia*, 142 S. Ct. at 2610 (internal quotation marks omitted); *see also Loving* v. *IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (Kavanaugh, J.) ("In light of the text, history, structure, and context of the statute, it becomes apparent that the IRS never before adopted its current interpretation for a reason: It is incorrect."); *Fin. Plan. Ass'n* v. *SEC*, 482 F.3d 481, 490-91 (D.C. Cir. 2007) (finding a "weakness" in SEC's interpretation when it "flouts six decades of consistent SEC understanding of its authority under" the statute).

[76]   *Ibid.*

[77]   Fed. Trade Comm'n, *A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority* (May 2021), https://www.ftc.gov/about-ftc/mission/enforcement-authority.

In 1971, the Commission adopted a rule declaring it unlawful for gas stations not to post octane-rating numbers on their pumps.[78]  That rule marked the Commission's first attempt to issue a rule enforcing Section 5 in the nearly 60 years since the Act's passage.[79]  When the rule was challenged in court, the district court held that the Act "[did] not confer upon the Federal Trade Commission the authority to promulgate Trade Regulation Rules that have the effect of substantive law."[80]  But the D.C. Circuit reversed, holding that Section 6(g) was a broad grant of substantive rulemaking power to define "unfair methods of competition" and "unfair or deceptive acts or practices."[81]

That conclusion rested on a number of errors.  First, the court reasoned that because Section 5 did not include language *excluding* rulemaking as a means of enforcement, Section 6 could be used to create legislative rules to further the purposes of Section 5.[82]  According to *National Petroleum Refiners*, "unless the legislative history reveals a clear intent to the contrary, courts should resolve any uncertainty about the scope of an agency's rulemaking authority in favor of finding a delegation of the full measure of power to the agency."[83]  As explained above, courts should apply the opposite presumption.  Before an agency claims a broad new power, it must point to clear congressional authorization.  And it must identify more than a statutory "mousehole[]" as support for its newfound authority.[84]

Second, *National Petroleum Refiners* elevated legislative history and policy judgments above the text and structure of the FTC Act.[85]  In so doing, it ignored the many textual indications that Section 6(g) is not a grant of broad substantive rulemaking authority, such as the reference to "classifying corporations."  And it failed to account

---

[78]    Merrill & Watts, *supra* note 57, at 554-55 (2002); *see* 36 Fed. Reg. 23871 (Dec. 16, 1971).

[79]    The Commission first experimented with legislative rulemaking in 1962, when the agency instituted a new procedure: Trade Regulation Rules.  Merrill & Watts, *supra* note 57, at 551-553.  "The actual effect of the rules was unclear because the FTC did not immediately attempt to bring any enforcement actions based on them."  *Id.* at 553.  In 1964, the agency promulgated its first major Trade Regulation Rule dealing with the unfair and deceptive practices surrounding the advertising and labeling of cigarettes.  *Ibid.*  Congress responded to this exercise of rulemaking by overriding the Commission's rule one year later, and "enact[ed] a weak labeling bill as a substitute for the strong restrictions contained in the FTC cigarette rule."  *Id.* at 553.

[80]    *National Petroleum Refiners Ass'n* v. *Fed. Trade Comm'n*, 340 F. Supp. 1343, 1345-49, 1350 (D.D.C. 1972).

[81]    *National Petroleum Refiners Ass'n*, 482 F.2d at 698.

[82]    *Id.* at 675-677.

[83]    Merrill & Watts, *supra* note 57, at 557.

[84]    *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[85]    *National Petroleum Refiners*, 482 F.2d at 686.

for the FTC Act's overall structure, wherein Section 6(g) is a minor part of a provision that grants the Commission no regulatory authority at all.

Finally, *National Petroleum Refiners* disregarded Congress's practice in granting agencies rulemaking authority in other statutes. At the time of the FTC Act's passage, Congress normally paired broad grants of rulemaking authority with specific sanctions applicable to violations of the agency's rule.[86] As discussed above, that was true of many statutes authorizing rulemaking by the Commission prior to the D.C. Circuit's decision. By contrast, Section 6 of the FTC Act provided no specific sanction for violating any rules issued under Section 6(g). In fact, Congress acted within two years of the *National Petroleum Refiners* decision to clearly authorize substantive "unfair and deceptive acts or practices" regulations through the Magnuson-Moss Act, without providing similar authority for "unfair methods of competition."

Notably, although the Commission now invokes *National Petroleum Refiners* as a clear source of substantive rulemaking authority, the Commission did not attempt to issue a substantive competition rule in the half-century after that decision was issued. For the last 50 years, the Commission has not been willing to rely on *National Petroleum Refiners* and test the extent of its rulemaking authority. The rule at issue in *National Petroleum Refiners* thus remains the FTC's only competition rulemaking in more than a century.[87] Further, the Commission has never attempted to write a standalone competition rule, as the rule at issue in *National Petroleum Refiners* relied on the Commission's authority to proscribe both "unfair methods of competition" and "unfair or deceptive acts and practices."

### B.    The Commission Lacks The Authority To Decree That All Worker Noncompete Agreements Are Unfair.

Section 5 proscribes "unfair methods of competition."[88] Although that phrase covers a range of anticompetitive acts and agreements, it cannot be read to include all worker noncompete agreements. Worker noncompete agreements were commonly enforced at the time Congress enacted the FTC Act. Numerous court decisions have

---

[86]    *See* Merrill & Watts, *supra* note 57, at 472.

[87]    *See Loving*, 742 F.3d at 1021 ("And in the circumstances of this case, we find it rather telling that the IRS had never before maintained that it possessed this authority."); *Fin. Plan. Ass'n*, 482 F.3d at 490–91; *see also West Virginia*, 142 S. Ct. at 2609 ("[B]oth separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there. To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims.") (internal citations omitted) (internal quotation marks omitted).

[88]    15 U.S.C. § 45(a).

recognized the procompetitive benefits of such agreements and have upheld them against challenges under the FTC Act and the Sherman Act. Were there any doubt, as with the Commission's interpretation of Section 6(g), its claim of sweeping authority to condemn all worker noncompetes—regardless of whether the individual is a partner or owner, the breadth of the restriction, the nature of the worker's job, or the business interests in enforcing the agreement—does not survive scrutiny under the major-questions doctrine.

To defend the position that *all* worker noncompetes are "unfair," the Commission's proposal invokes its recent Policy Statement on Section 5.[89] The Chamber has previously raised concerns about the Commission's Policy Statement, which marks a fundamental departure from the agency's previous policy and purports to allow the Commission "to deem any business conduct 'unfair' without any showing of harm to consumers, anticompetitive intent, market power, or market definition."[90] The proposed Noncompete Rule highlights each of those concerns. It also demonstrates that, if the Commission is right about the meaning of "unfair methods of competition," then Section 5 constitutes an unconstitutional delegation of legislative power to the Executive Branch.

History, precedent, and ordinary tools of statutory interpretation undercut the Commission's view that worker noncompetes are categorically "unfair." Given the lack of support for the Commission's legal position—and the clear constitutional problems raised by its interpretation—the Commission should reconsider the legal analysis of Section 5 reflected in the proposed Noncompete Rule.

### 1.    The history of noncompete agreements

Noncompete agreements have been known to the common law since the 15th century[91] and have been present in the United States since the Founding.[92] As the Commission's proposal recognizes, state courts have long applied case-specific tests to determine when noncompete agreements are enforceable. When Congress enacted the FTC Act in 1914, covenants "by an . . . agent not to compete with his . . . employer

---

[89]    88 Fed. Reg. at 3499 & n.230.

[90]    *See* Sean Heather, *FTC's Section 5 Policy Statement Effectively Declares Competition Illegal*, U.S. Chamber of Commerce (Nov. 10, 2022), https://www.uschamber.com/finance/antitrust/the-ftcs-section-5-policy-statement-effectively-declares-competition-illegal.

[91]    *See Bradford* v. *New York Times Co.*, 501 F.2d 51, 60 (2d Cir. 1974). The first recorded decision involving a noncompete agreement in the common law appears to be *Dyer's Case* in 1414. Y.B. 2 Hen. V, f.5, pl. (1414).

[92]    *See Pierce* v. *Fuller*, 8 Mass. 223 (1811) (finding valid an early noncompete agreement involving stage coaches between Boston and Providence).

after the expiration of his time to service" were "generally upheld as valid."[93] Courts presume that Congress was well aware of this settled law when it passed the FTC Act.[94] Yet there is no indication that Congress intended the Act to categorically ban as an "unfair method of competition" what was at that time a common (and lawful) business practice.

Precedent also confirms that noncompetes are not categorically "unfair." Courts applying the antitrust laws have recognized that noncompete agreements "often serve legitimate business concerns such as preserving trade secrets and protecting investments in personnel."[95] As a result, those agreements are assessed under the case-specific "rule of reason," rather than through categorical per se rules.[96] In fact, the only litigated decision challenging a noncompete under Section 5 found that the agreement was lawful.[97] Although the Commission acknowledges the weight of authority holding that noncompetes do not invariably violate antitrust laws, they point to no authority going the other way.[98]

The Commission's proposal to categorically ban worker noncompete agreements is a stark departure from this body of law. The Supreme Court has long cautioned against creating new *per se* rules in competition law, noting "[i]t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act."[99] Here, not only is there no "considerable experience" demonstrating that noncompete agreements are anticompetitive, there is a deep and longstanding body of state law suggesting the opposite.

### 2.    Longstanding state regulation of noncompete agreements

The Commission's interpretation of Section 5 is also incompatible with bedrock principles of federalism. If Congress "intends to alter the usual constitutional balance

---

[93] *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) (collecting cases).

[94] *See Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").

[95] *Aydin Corp.* v. *Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983).

[96] *Eichorn* v. *AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001), as amended (June 12, 2001) (collecting cases).

[97] *See Snap-On Tools Corp.* v. *Fed. Trade Comm'n*, 321 F.2d 825, 837 (7th Cir. 1963).

[98] *See supra* note 30.

[99] *United States* v. *Topco*, 405 U.S. 596, 607-608 (1972); *see Broadcast Music, Inc.* v. *Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Not all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints.").

between the States and the Federal government," it must be "unmistakably clear."[100] That principle is particularly apt when an agency's regulation would disrupt areas of "traditional state regulation."[101]

As discussed above, every State has developed its own body of statutory and case law to determine the enforceability of noncompete agreements.[102] Those state-law regimes reflect specific judgments about how best to weigh the interests of workers, employers, and the public at large. Although some States have adopted a restrictive approach to worker noncompete agreements,[103] others are more permissive.[104] In fact, many state-law decisions address the very same concerns that motivate the Commission's proposal. State noncompete laws vary based on the occupation of the worker at issue,[105] and many decisions distinguish between noncompetes that restrict higher-paid and lower-paid workers.[106] And some states continue experimenting, choosing to move towards greater enforceability of noncompetes. In 2011, Georgia passed the Restrictive Covenants in Contracts Act, making noncompete agreements entered into after passage of the Act generally enforceable by statute. Ga. Code Ann. § 13-8-50. The Act does not apply to noncompetes entered into before 2011, which continue to be subject to greater scrutiny.[107] Critically, nearly every state recognizes that worker noncompetes are beneficial in some circumstances and can serve a range of legitimate and procompetitive purposes. *Supra*, at Section I.B.1.[108]

---

[100]    *Gregory* v. *Ashcroft*, 501 U.S. 452, 460 (1991) (internal quotation marks omitted).

[101]    *Metro Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 740 (1985).

[102]    *Compare SWAT 24 Shreveport Bossier, Inc.* v. *Bond*, 808 So. 2d 294, 298 (La. 2001) (Louisiana's "strong public policy restricting these types of agreements") *with BDO Seidman* v. *Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (New York's "prevailing standard of reasonableness in determining the validity" of noncompete agreements).

[103]    88 Fed. Reg. at 3494 (noting that California, North Dakota, and Oklahoma have adopted policies that make noncompete agreements "void for nearly all workers").

[104]    *See supra* section I.B.1.

[105]    *Ibid.*

[106]    *See Braman Chem. Enters.* v. *Barnes*, No. CV064020633S, 2006 WL 3859222, at *22 (Conn. Super. Ct. Dec. 12, 2006); *see also* Va. Stat. § 40.1.28.7:8 ("No employer shall enter into, enforce, or threaten to enforce a covenant not to compete with any low-wage employee.").

[107]    *See Trujillo* v. *Great S. Equip. Sales, LLC*, 657 S.E.2d 581, 583 (Ga. Ct. App. 2008).

[108]    *See e.g.*, Ga. Code Ann. § 13-8-50 ("The General Assembly finds that reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state."); *see also* Robert W. Gomulkiewicz, *Leaky Covenants-Not-to-Compete as the*

The Commission recognized all of this in its Proposed Rule, noting both the states' longstanding regulation of worker noncompete agreements and the tremendous variety of regulatory approaches.[109]  But the Commission's rule nonetheless seeks to federalize a huge swath of state contract law.  Although it is true that both States and the federal government have long exercised power over competition, the federal antitrust laws have not historically been used to challenge ordinary employment and commercial agreements.  Instead, antitrust enforcement in the labor market has focused on agreements among competing employers.  Before adopting a rule that would fundamentally reshape the federal-state balance of power over longstanding contractual agreements between employers and their employees, the Commission should be assured that Congress has approved of its policy.  Congress has never provided such authorization, let alone clearly.

### 3.   Major-questions doctrine

As with the Commission's claim of newfound rulemaking authority under Section 6(g), its attempt to categorically ban all worker noncompetes under Section 5 also violates the major-questions doctrine. The Commission's proposed ban would clearly have "vast economic and political significance."[110]  If the proposed Noncompete Rule is adopted, employers and workers across the United States, in every sector of the economy, would be forced to rescind noncompete clauses.  And the proposed Rule would require employers to engage in a costly effort to provide notice regarding existing noncompetes to all current and former employees.[111]  Given the sheer magnitude of the Rule's implications, the Commission's interpretation "falls comfortably within the class of authorizations that [courts] have been reluctant to read into ambiguous statutory text."[112]

The language "unfair methods of competition" does not clearly authorize a categorical ban on worker noncompete agreements.  The Supreme Court's recent decision in *NFIB* v. *OSHA* is instructive.  In response to the Covid-19 pandemic, the Occupational Safety and Health Administration invoked its broad authority to issue "emergency temporary standards" to promulgate a rule requiring employers to either

---

*Legal Infrastructure for Innovation*, 49 U.C. Davis L. Rev. 251, 255 (2015) ("[M]ost states enforce non-competes that are reasonable as to duration, geographic reach, and scope of work covered."); U.S. Dep't of the Treasury, *Non-compete Contracts: Economic Effects and Policy Implications* 15 (2016) ("Currently, nearly all states will enforce non-compete agreements to some extent.").

[109]   88 Fed. Reg. at 3494-3496.

[110]   *Utility Air Regulatory. Grp.*, 573 U.S. at 324 (internal citation omitted).

[111]   88 Fed. Reg. at 3511.

[112]   *Utility Air Regulatory Grp.*, 573 U.S. at 324.

mandate the vaccination of their workforce or impose weekly testing protocols. Applying the major-questions doctrine, the Supreme Court held that the broad words of the statute did not "plainly authorize[]" the agency's actions.[113]  Although OSHA had the authority to "regulate [Covid-19] risks associated with working in particularly crowded or cramped environments," it could not use that authority to regulate other workplaces where "the danger . . . differs in both degree and kind."[114]  The same logic applies here:  the Commission's proposal tries to exploit ambiguity in a vague phrase like "unfair methods of competition" to pursue an unprecedented policy of vast significance.  Even assuming the Commission may challenge particular noncompetes as injurious to competition, it may not impose a blanket ban on noncompete agreements.

Two additional considerations confirm that Congress should not be understood to have given the Commission the authority to issue a sweeping, nationwide ban on noncompete agreements.  First, the Commission's policy suffers from "a lack of historical precedent."[115]  Never before has the Commission taken the position that worker noncompete agreements are unlawful regardless of their terms or business justifications.  Nor has the Commission ever sought to ban a common business practice as an "unfair method of competition" without any opportunity for the defendant to show that the benefits of the agreement outweigh the harms.[116]  In both respects, the proposed Noncompete Rule is entirely unprecedented.

Second, Congress recently considered and rejected legislation to address worker noncompete agreements at the federal level.[117]  And earlier this year, members of the Senate and House from both parties reintroduced the Workforce Mobility Act, which would have limited the use of worker noncompetes.  That legislation, which has repeatedly been proposed for years without receiving a vote, would give the Commission authority to enforce violations of the statute.[118]  Notably, the legislation would empower the Commission by designating worker noncompetes as "unfair or deceptive acts and

---

[113]  *Nat'l Fed. of Indep. Bus.*, 142 S. Ct. at 665.

[114]  *Id.* at 666.

[115]  *Ibid.*  (citing *Free Enterprise Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)).

[116]  Apart from suits alleging per se violations of the antitrust laws, the Commission has previously argued that business practices should be "*presumptively* unlawful," thereby giving the defendants the chance to demonstrate that the challenged agreement was valid in their particular circumstances.  *Fed. Trade Comm'n* v. *Actavis, Inc.*, 570 U.S. 136, 159 (2013).

[117]  *See, e.g.*, Restoring Workers' Rights Act of 2022, H.R. 8755, 117th Cong. § 2 (2022); Freedom To Compete Act of 2019, S.124, 116th Cong. § 3 (2019).

[118]  Workforce Mobility Act of 2023, S. 220, H.R. 731, 118th Cong., 1st Sess., §§ 3, 6.

practices," not as "unfair methods of competition."[119]  This legislation is strong evidence both that the Commission currently lacks the power to regulate worker noncompetes and that the Commission is wrong to think about those agreements as "unfair methods of competition."

Taken together, the Commission's interpretation of Section 5 in the proposed Noncompete Rule has all of the hallmarks of a major-questions case.  The Commission is claiming the authority to fundamentally transform the economy in a way that improperly "intrude[s] into an area that is the particular domain of state law" and curtails the power of state governments; it is doing so without any historical precedent for its interpretation; and its proposal would achieve through regulatory fiat what Congress has consistently declined to accomplish through the legislative process.[120] The Commission should abandon its effort to do so unless and until Congress provides the necessary authorization.

### 4.    Nondelegation doctrine

To support its novel view of Section 5, the Commission's proposal relies on its recent "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act."[121]  That Policy Statement marked a fundamental departure from longstanding agency policy, which "had been adopted on a bipartisan basis by the Commission six years prior because it embodied a sound approach to antitrust law that reflected decades of legal precedent and economic learning."[122]  According to the Policy Statement, it is now the Commission's view that

---

[119] *Id*. § 6.

[120] *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J, concurring) (internal citation omitted).  Justice Gorsuch's concurrence in *West Virginia* identified three factors to determine when the major-questions doctrine should apply:  first, if Congress has " 'considered and rejected' bills authorizing something akin to the agency's proposed course of action"; second, if the agency "seeks to regulate 'a significant portion of the American economy'"; and finally, if the agency's proposed action "seeks to 'intrud[e] into an area that is the particular domain of state law." *Id*. at 2620-21.  As shown herein, the Commission's interpretation of Section 5 checks all three boxes.

[121] Fed.  Trade  Comm'n,  Comm'n  File  No.  P221202  (Nov.  10,  2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf (hereinafter policy statement).

[122] Wilson Dissent, *supra* note 64, at 1.

"Section 5 reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions."[123]

As the Chamber has previously explained, the Section 5 Policy Statement provides very little guidance on what conduct violates the FTC Act. For instance, it states that conduct is "unfair" when it "goes beyond competition on the merits" and "tends to foreclose or impair the opportunities of market participants."[124] The Commission's Policy Statement has already generated considerable uncertainty for the Chamber and its members and has chilled procompetitive conduct in the marketplace.

As the Proposed Rule demonstrates, the Section 5 Policy Statement also raises grave constitutional concerns. The Commission's view that worker noncompetes are categorically unlawful runs counter to centuries of precedent recognizing that some noncompete agreements serve legitimate business interests. Yet the Commission believes it can nonetheless prohibit all of those agreements—as well as any other agreement that "effectively precludes [a] worker from working in the same field after the conclusion of the worker's employment with the employer"—under Section 5.[125] If that is correct, and the Commission can condemn ordinary business practices as "unfair methods of competition," then Section 5 of the FTC Act reflects an unconstitutional delegation of power from Congress to the Executive Branch.

A statutory delegation to an executive agency is constitutional only so "long as Congress lays down by legislative act an intelligible principle" to cabin the agency's discretion.[126] "[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation."[127] If the term "unfair methods of competition" is not understood in light of history and precedent, and if the Commission can condemn any business practice as unfair based on nothing more than "nefarious-sounding adjectives,"[128] then there is effectively no limit to what the Commission may do under Section 5.[129] To the extent there is any doubt about the proper meaning of "unfair

---

[123] Policy Statement, *supra* note 121, at 1.

[124] *Id.* at 8-9.

[125] 88 Fed. Reg. at 3535.

[126] *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019) (citing *Mistretta* v. *United States*, 488 U.S. 361, 372 (1989)).

[127] *Ibid*.

[128] 88 Fed. Reg. at 3540 (Wilson, Comm'r, dissenting).

[129] *See, e.g.*, *A. L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 539, 551 (1935) (striking down a provision of the National Industrial Recovery Act authorizing "codes of fair competition").

methods of competition," the Commission should interpret the statute to avoid an unlawful delegation of legislative power.

### 5.    Retroactivity

The Commission's proposal also raises significant constitutional and fairness concerns due to its sweeping retroactivity.  As the Supreme Court has noted, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."[130]    That presumption recognizes that "retroactivity is generally disfavored in the law, in accordance with 'fundamental notions of justice' that have been recognized throughout history."[131]  In particular, retroactively applicable regulations may violate the Constitution when they severely disrupt settled expectations.[132]

The Commission's categorical ban would impose considerable retroactive consequences.  The Proposed Rule not only prohibits virtually all noncompete clauses going forward, it seeks to unilaterally void almost every existing noncompete agreement and force employers to notify current and former employees of the now-invalidated clauses.[133]  In doing so, the Proposed Rule undercuts strong reliance interests for both employers and workers, as well as buyers and sellers in the context of negotiated transactions, and undermines the benefit of the bargain obtained by parties for contracts agreed to in the past.  If the Proposed Rule goes into effect, employers may lose the benefit of noncompete agreements they already paid for, while workers may be asked to return severance payments or other compensation that was conditioned on agreeing to a noncompete.[134]

---

[130]  *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[131]  *Eastern Enterprises* v. *Apfel*, 524 U.S. 498, 532-533 (1998) (O'Connor plurality) (quoting *Kaiser Aluminum & Chem. Corp.* v. *Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J. concurring)) (internal citation omitted)).  Although a plurality of Justices held that the statute in *Eastern Enterprises* violated the Takings Clause, Justice Kennedy concurred on the ground that the statute was unconstitutional as a matter of substantive due process.  *See* 524 U.S. at 550.

[132]  *Id.* at 528-529; *see also Verizon West Virginia, Inc.* v. *West Virginia Bureau of Emp. Programs*, 586 S.E.2d 170, 195-196 (W. Va. 2003) (applying *Eastern Enterprises* to a claim based on a retroactive regulation).

[133]  88 Fed. Reg. at 3535.

[134]  Forum, *supra* note 6, at 42 (Testimony of Eric Poggemiller) ("If these contracts are rescinded, rescission typically restores the parties to the position that they occupied prior to the contract.  So would the employer then be entitled to sue the employee to require a repayment of any consideration that's granted?").

The Commission asserts that the Proposed Rule "would not apply retroactively" because all an employer must do is rescind existing noncompete agreements by a compliance date in the future.[135]  But that argument is a complete *non sequitur*. Noncompete agreements in existence today reflect promises made and transactions negotiated in the past.  For instance, an executive who agreed to receive additional compensation from his former employer on the condition that he not work for a competitor would be able to ignore his end of the bargain following the Commission's categorical ban, even though his former employer had already satisfied its part of the deal.  Given the significant retroactive consequences of the proposal, the Commission should wait for a clear statement from Congress confirming its authority to invalidate tens of millions of preexisting contracts before proceeding with its Noncompete Rule.

### C.    The Commission's Proposed Rule Is Poorly Reasoned.

Even if the Commission had the legal authority to issue a rule outlawing noncompete agreements, the Administrative Procedure Act requires that it do so only as the result of a thorough and well-reasoned decision-making process.  The Commission's proposal does not meet that standard for at least five reasons.  First, the Commission drastically underestimates the costs of its proposal by ignoring or minimizing the business justifications for noncompete agreements and by erroneously concluding that the benefits of noncompetes—including intellectual-property and goodwill protection and investments in the labor force—can be achieved through other means.  Second, the Commission overstates the benefits of the Noncompete Rule. Contrary to the Commission's assertions, the economic literature on noncompetes paints a complicated picture, and includes a number of studies demonstrating that noncompete agreements may advance competition and benefit workers.  Third, the Commission fails to justify the considerable breadth of the Noncompete Rule—which applies to independent contractors, exempt organizations, and most agreements connected to the sale of a business—or to account for the significant uncertainty created by many aspects of the Noncompete Rule, such as its definition of "de facto" noncompete agreements.  Fourth, the Commission's proposal does not comply with the requirement to consider burdens on small business under the Regulatory Flexibility Act. Fifth, the Commission's proposal conflicts with other federal laws that recognize or rely on the validity of noncompete agreements.

### 1.    The Commission underestimates the costs of its categorical ban.

The Commission's proposal distorts the available evidence, leaning heavily on inconclusive, ungeneralizable studies, while disregarding more robust research showing that noncompetes can benefit workers and competition.  In the process, the Commission greatly discounts the costs of its proposed categorical ban, an error that

---

[135]  88 Fed. Reg. at 3512.

undermines the entire basis for the Commission's rule. As Commissioner Wilson explained in dissent, "the Commission's decision to rely on cherry-picking evidence that conforms to [a predetermined] narrative provide[s] little confidence in the integrity of the rulemaking process or the ultimate outcome."[136]

First, the Commission gives short shrift to research showing the value of noncompetes. The Commission devotes only four paragraphs to describing the many ways in which noncompete agreements can benefit workers and businesses—a discussion that pales in comparison to the many pages discussing their potential harms. As a result, the Commission overlooks important evidence.[137] One recent study not cited by the Commission concluded that noncompete agreements are "related to increases in firm-sponsored training, riskier [research and development] investments, and increases in firm value and the likelihood of acquisition."[138] Another study emphasizes the importance of noncompete agreements to reducing employee turnover, which can cost businesses "approximately twenty five percent of an employee's annual salary."[139] And one of the studies relied on by the Commission found that "total compensation and incentive pay are higher if CEOs have more enforceable [noncompete agreements]," even though the Commission nowhere mentions that conclusion.[140] In addition to those studies, commenters at the Commission's recent forum on noncompete agreements also explained that "[i]n many states where non-competes are banned, [their] members have problems with recruitment and retention," as well as "problems with proprietary information."[141]

The Commission's proposal failed to give these studies their proper weight. Even though the proposal makes passing reference to research that undermines its ban, it simply asserts that "the evidence that noncompete clauses benefit workers or consumers is scant."[142] Given the body of research showing that noncompetes provide real benefits, that conclusion is not consistent with the existing literature. Indeed, as

---

[136] *Id.* at 3543 (Wilson, Comm'r, dissenting).

[137] Norman D. Bishara & Evan Starr, *The Incomplete Noncompete Picture*, 20 Lewis & Clark L. Rev. 497, 535 (2016) ("Though it is tempting to think that the rapidly expanding empirical noncompete literature has sufficiently answered the interesting and relevant questions for firms, workers, and policymakers . . . there remain severe limitations to our understanding of noncompetes.").

[138] *Ibid.*

[139] Griffin Toronjo Pivateau, *Preserving Human Capital: Using The Noncompete Agreement to Achieve Competitive Advantage*, 4 J. Bus. Entrepreneurship & L. 319, 327 (2011).

[140] Omesh Kini, Ryan Williams & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation*, 34 Rev. Fin. Stud. 4701, 4701 (2021).

[141] Forum, *supra* note 6, at 30 (Testimony of Alex Hendrie).

[142] 88 Fed. Reg. at 3508.

discussed above, courts have repeatedly recognized the competitive benefits of noncompetes, finding that such benefits were "beyond question."[143]

Second, the Commission incorrectly assumes that businesses have alternative means of achieving the legitimate benefits of noncompete agreements. Specifically, it suggests that businesses could use nondisclosure agreements or lawsuits under state trade-secret law as a way to protect their confidential information if noncompete agreements were no longer available. But there are important differences between each of these tools that make nondisclosure agreements and trade secret laws poor substitutes for noncompetes. In particular, the confidential information that businesses may wish to protect is much broader than the scope of trade-secret law, so even if an employer took on the expense of pursuing trade-secret litigation, that alternative could still be inadequate.[144] Additionally, noncompete agreements are prophylactic; they are "used as a means of minimizing the potential for trade secret misappropriation by preventing an employee from working for a competitor or engaging in a competing enterprise" in the first place.[145]

Commenters at the Commission's forum highlighted those important distinctions, noting that noncompetes "provide a different kind of protection" from nondisclosure agreements.[146] In particular, the speakers emphasized that nondisclosures are inadequate because a worker "cannot excise [a company's] confidential information from her brain" and "knows what avenues [a] competitor should follow and what blind alleys it should avoid."[147] Thus a worker can use confidential information from a former employer to provide significant advantages to a competitor without truly violating the terms of a nondisclosure agreement.

Nondisclosure agreements and trade-secret violations are also difficult to prove and costly to litigate. By relying on noncompetes over nondisclosure agreements or trade-secret law, "employers avoid the difficulties of proving an actual or threatened misappropriation of trade secrets to secure an injunction," a costly and time-consuming process.[148] For example, to prove a typical trade-secret violation, an "employer must prove that the employee misappropriated trade secret information," which requires that the employer "separate its trade secrets from the employee's general skill and knowledge," and "prove that the employee took trade secrets through improper

---

[143] *Lektro-Vend Corp.*, 660 F.2d at 265.

[144] Noncompetes can also prevent the transfer of potentially sensitive technology and business secrets to foreign entities, thereby protecting the U.S. economy as a whole.

[145] Michael J. Garrison & John T. Wendt, *The Evolving Law of Employee Noncompete Agreements: Recent Trends and an Alternative Policy Approach*, 45 Am. Bus. L.J. 107, 117 (2008).

[146] Forum, *supra* note 6, at 8 (Testimony of Emily Glendinning).

[147] *Ibid*.

[148] Garrison & Wendt, *supra* note 145, at 117.

means."[149]  Proving one, let alone both, of those features is no easy feat.  Indeed, a recent survey suggests that the median cost of litigating a trade secret case is $4.1 million when between $10 million and $25 million is at risk and $7.4 million when more than $25 million is at risk.[150]

Moreover, some States make trade-secret suits even more difficult to prove by failing to apply the "inevitable disclosure" doctrine.  That doctrine helps a plaintiff-former employer "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."[151]  But many States do not accept that presumption, and thereby require an employer to prove that trade secrets were already used by a competitor before prevailing on its claim.[152]

The Commission's proposal does not meaningfully engage with these differences.  The record compiled by the Commission "provides no evidence that" nondisclosure agreements or trade-secret protections "are effective substitutes for non-compete agreements," and the Commission "cites no instances where these mechanisms have been used effectively in lieu of non-compete clauses."[153]  The Proposed Rule also fails to explain the widespread use of noncompete agreements today despite the availability of other mechanisms to protect employer information—particularly in States with robust trade-secret protections.[154]  If noncompetes are as unnecessary as the Commission suggests, it is unlikely so many businesses would still rely on them.

The Commission's own proposal undermines its suggestion that businesses use nondisclosure agreements as viable alternatives to noncompetes.  The proposed Noncompete Rule defines noncompetes to include "de facto non-compete clauses," a

---

[149]  Robert W. Gomulkiewicz, *Leaky Covenants-Not-to-Compete as the Legal Infrastructure for Innovation*, 49 U.C. Davis L. Rev. 251, 286 (2015).

[150]  Malathi Nayak, Costs Soar for Trade Secrets, Pharma Patent Suits, Survey Finds, Bloomberg Law (Sept. 19, 2019), https://news.bloomberglaw.com/ip-law/costs-soar-for-trade-secrets-pharma-patent-suits-survey-finds.

[151]  *PepsiCo, Inc.* v. *Redmond*, 54 F. 3d 1262, 1269 (7th Cir. 1995).

[152]  *See, e.g.*, *Kinship Partners, Inc.* v. *Embark Veterinary, Inc.*, 2022 WL 72123, at *7 (D. Ore. Jan. 3, 2022) ("Because Oregon law favors employee mobility, the Court declines to adopt the inevitable disclosure doctrine or apply it to this case.").

[153]  88 Fed. Reg. at 3543.

[154]  *Id.* at 3505 ("Trade secret law provides employers with an alternative means of protecting their investments in trade secrets.").

definition the Commission admits would sweep in many nondisclosure agreements.[155] The proposed Noncompete Rule therefore suggests that employers can avoid the costs of its ban by relying on nondisclosure agreements, while also conceding that its ban could prohibit those agreements as well.

Third, the Commission glosses over the costs to workers of its categorical ban. For example, the Commission estimates that "3.1% fewer workers would receive training in a given year, as a result of the proposed rule."[156] Although that decline in workforce training is problematic in its own right, there are reasons to question the Commission's analysis. The Commission's figures are based on a single study, which it then extrapolates across the entire workforce.[157] And the Commission's assessment of costs fails to discuss how the lack of employer-provided training will impact affected workers, including by increasing out-of-pocket training costs or by decreasing workers' competitiveness in the job market. The Commission also fails to consider other losses workers may experience in the face of a non-compete ban, such as lower compensation resulting from employers' reduced motivation to offer long-term incentive-based awards (*e.g.*, company stock).

The Commission also grossly underestimates the costs to businesses of implementing the Proposed Rule, particularly as they are forced to adopt more expensive and time-consuming methods to protect their valuable information. The Commission recognizes that "[f]irms may seek to update their contractual practices by expanding the scope of non-disclosure agreements (NDAs) or other contractual provisions to ensure that they are expansive enough to protect trade secrets and other valuable investments" (though the Commission also says such provisions could be deemed *de facto* noncompetes).[158] The Commission then estimates the total cost of updating those provisions will range from about $246 to $493 in lawyer fees per business.[159] That estimate fails to account for the costs to workers and employers

---

[155]   *Id.* at 3482 (recognizing that "under the proposed definition of 'non-compete clause,' such covenants would be considered non-compete clauses where they are so unusually broad in scope that they function as such").

[156]   *Id.* at 3529.

[157]   *Id.* at 3529 n.504. The cited study, which "examines the effect of noncompete enforceability on training and wages," shows that "[a]n increase from non-enforcement to mean enforceability is associated with a 14% increase in training, which tends to be firm-sponsored and designed to upgrade or teach new skills." *Id.* at 3529 n.504 (citing Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete* (May 24, 2018), https://ssrn.com/abstract=2556669).

[158]   88 Fed. Reg. at 3528.

[159]   *Id.* at 3529. We arrive at this range for individual firms using the Commission's estimate. The Commission assumes that "the average firm that uses a non-compete clause employs the

based on increased reliance on nondisclosure litigation.[160]  Such suits are costly to bring and very difficult to prove.[161]  And the costs of complying with the Commission's proposed rule are magnified by the requirement to notify all current and former workers of rescinded noncompete agreements.   Yet the Commission's cost-benefit analysis leaves out or underestimates many of those important costs.

The Proposed Rule also ignores the costs associated with businesses' inability to protect their confidential information, even when a non-disclosure agreement is in place.  Under the Proposed Rule, employers will be powerless to prevent a key employee from using sensitive, confidential, and critical data or product knowledge to aid a competitor firm.  While perhaps hard to calculate, these costs would be real and significant—the very reason firms use noncompetes in the first place.  At a minimum, there will be *some* cost to protecting sensitive information, and the Proposed Rule wholly ignores that cost and does not even attempt to quantify it.  And those costs will ultimately be borne both by employers who must protect their confidential information to succeed and by employees who rely on that success for their livelihood.

Finally, the Commission's proposal ignores the tax consequences of banning noncompetes.  For tax purposes, "[a] covenant not to compete constitutes an intangible asset."[162]  During acquisitions, companies typically record noncompete agreements as assets of the firm.  But if those agreements are banned, firms would be required to write off those assets, leading to financial costs.

## 2.  The Commission overestimates the benefits of its categorical ban.

The Commission's analysis of benefits attributable to its categorical ban also is deeply flawed.  At various points in the rulemaking, the Commission relies on stale or limited data, without accounting for recent legal developments or contrary research.  All

---

equivalent of four to eight hours of a lawyer's time" and thus "calculate[s] the total expenditure on updating contractual practices to range from $61.54*4*49.4%*6,102,412=$742.07 million to $61.54*8*49.4%*6,102,412=$1.48 billion." *Id.* Using these numbers, we find that the Commission is predicting an individual business will spend between $61.54*4 = $246.16 and $61.54*8= $492.32 on lawyers' fees.

[160]  Rosemary Scott, *FTC's Non-Compete Law Could Propel Rise in Trade Secrets Lawsuits*, BioSpace (Feb. 8, 2023), https://www.biospace.com/article/ftc-s-non-compete-law-could-propel-rise-in-trade-secrets-lawsuits-/.

[161]  *Ibid.* (noting that "when a plaintiff is presenting their case in court, they walk a tightrope between proving sensitive information has been shared and not revealing said information to the public," which is just one of the many difficulties plaintiffs face in bringing these cases).

[162]  *Lorvic Holdings, Inc.* v. *Commissioner of Internal Revenue*, 1998 WL 437287, at *7 (Tax Ct. 1998).

JA1114

told, the limited evidence relied on by the Commission does not support its incredibly broad proposal.

First, the Commission's proposed rulemaking does not fully engage with contrary views.  During its 2020 workshop on noncompete agreements, the Commission heard testimony that economic literature on noncompetes is "[s]till far from reaching a scientific standard for concluding [that noncompete agreements] are bad for overall welfare" and that "welfare tradeoffs are likely context-specific, and may be heterogeneous."[163]  Yet the Commission never explains what has changed in recent years to allay those concerns.

Second, the Commission at numerous points draws major conclusions from stale and incomplete data.  For instance, the Commission's top-line conclusion that "one in five American workers—or approximately 30 million workers—is bound by a non-compete clause," is based in large part on a single study from 2021.[164]  According to the Commission, this study is entitled to considerable weight because it had "the broadest and likely the most representative coverage of the U.S. labor force."[165]  But that paper based all of its findings on a survey conducted nearly a decade earlier.[166]  Reliance on this old survey is particularly concerning because, as the Commission points out, "there is no consistent data available on the prevalence of non-compete clauses over time."[167]  And that study was also based on a nonrepresentative online sample—a selection-bias issue the authors were careful to note in presenting their findings.  The other estimates of the prevalence of noncompetes mentioned by the Commission suffer from limitations as well, either because they rely on unrepresentative samples[168] or cover only subsets of the labor force.[169]  The unreliability of the Commission's estimate of the prevalence of noncompetes is important.  If the Commission's estimate is too high, the Commission may be failing to account for recent state laws that have reduced the number of noncompete agreements and may be overestimating the benefits of its rule against the

---

[163]  Kurt Lavetti, Economic Welfare Aspects of Non-Compete Agreements, Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020), https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete=workshop-slides.pdf.

[164]  88 Fed. Reg. at 3485; *see* Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 53 (2021).

[165]  88 Fed. Reg. at 3485.

[166]  *Ibid*.

[167]  *Id*. at 3486.

[168]  *Id*. at 3485 n.42 ("[A] key limitation of the Payscale.com survey is that it is a convenience sample of individuals who visited Payscale.com during the time period of the survey and is therefore unlikely to be fully representative of the U.S. working population.").

[169]  *Id*. at 3485-3486.

status quo. On the other hand, if the Commission's estimate is too low, it may suggest that more businesses are relying on these agreements, leading to higher compliance costs than the Commission has anticipated if the Rule were to become effective.

The Commission similarly relies on stale and flawed data in its estimate of increased worker earnings. The Commission's analysis of that issue is primarily based on a 2020 economic study,[170] which apparently provides "the most direct estimate of the increase in workers' earnings given a prohibition on non-compete clauses."[171] But that study too relies on an outdated dataset examining noncompete enforceability between 1991 to 2014.[172] The same is true yet again of the Commission's reliance on another study to estimate that its ban would increase worker earnings by 1%. That study relied on case panel data from 1996, 2001, 2004, and 2008.[173] And when the Commission applied that 1% figure to each State to project the benefits of its Rule, it used state-law data that was fifteen years old.[174]

The Commission's failure to rely on more recent data is inconsistent with both its acknowledgment that the legal landscape for worker noncompetes is rapidly evolving and the sheer breadth of its proposed rule. The proposal notes that "States have been particularly active in restricting noncompete clauses in recent years,"[175] and that, of the twelve recent state statutes that restrict the use of noncompetes, "eleven were enacted

---

[170] 88 Fed. Reg. at 3486 n.63; *see* Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2 (2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381.

[171] 88 Fed. Reg. at 3522.

[172] Johnson, Lavetti, & Lipsitz, *supra* note 170, at 2.

[173] 88 Fed. Reg. at 3522; Starr, *supra* note 157.

[174] 88 Fed. Reg. at 3523. Others have noted the errors in the Commission's analysis of worker earnings following its proposed ban. For instance, a recent article explained that all of the studies cited by the Commission to support its wage increase estimate suffer from an "inability to adequately measure employees' skills and relevant prior work experience." Stephen G. Bronars, *FTC Evidence that Non-Competes Reduce Earnings is Inconclusive*, Bloomberg Law (Mar. 7, 2023), https://news.bloomberglaw.com/us-law-week/ftc-evidence-that-non-competes-reduce-earnings-is-inconclusive. Because these studies do not actually compare the job qualifications of new hires at different levels of enforceability, it is impossible to "distinguish between an increase in competition and firms hiring slightly more experienced" workers post-ban. *Id.* In other words, because firms may have a preference to hire more experienced workers if noncompete agreements are unenforceable (meaning they cannot always protect their investments in worker training), any visibly higher earnings are actually related to firms hiring more qualified and skilled employees, not the result of a ban on noncompetes. *Id.*

[175] 88 Fed. Reg. at 3494.

in the past ten years."[176]  By relying on studies of enforcement practices from decades ago, the Commission's analysis ignores the possibility that many of the expected benefits it attributes to its Noncompete Rule have already been realized through developments in state law.  The authors of the 2014 survey relied on by the Commission put the point well:  "When researchers opt to rely on an outmoded and inaccurate binary legal enforcement variable, they are, in effect, incorporating into their empirical analysis demonstrably false assumptions about state legal environments."[177]

The Commission's proposal tried to address this defect in its reasoning by acknowledging that because "some states have passed legislation causing non-compete clauses to be more difficult to enforce for subsets of their workforces, [a] prohibition on non-compete clauses today [would] have a *slightly lesser effect* than a prohibition would have had in 2014."[178]  But the Commission's failure to consider more recent evidence does not just undermine its analysis at the margins; it calls into question the rationale for a categorical ban in the first place. Although an administrative agency may sometimes be forced to rely on outdated research, the APA demands that the agency's chosen policy go no further than the evidence can support.  Here, the Commission has proposed a sweeping noncompete ban that will displace huge swaths of state law on a categorical basis.  Yet the Commission has not pointed to any meaningful evidence evaluating the effects of current state laws on the costs and benefits of worker noncompetes.

The Commission's recent enforcement actions demonstrate the problem.  At the same time the Commission proposed its categorical ban, it also announced three consent orders involving noncompete agreements.[179]  One of those enforcement actions centered on noncompete agreements for a security company in Michigan that imposed very restrictive conditions on former security guards.  But even before the Commission initiated its unprecedented action, a Michigan trial court had already held those agreements could not be enforced as a matter of state law.[180]   As the state court explained, those agreements were "not legally reasonable in scope (100 miles), duration (two years) or the type of service (employment as a security guard) prohibited."[181]  The

---

[176]  *Ibid.*

[177]  James J. Prescott et al., *Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project*, 2016 Mich. St. L. Rev. 369, 386 (2016).

[178]  88 Fed. Reg. at 3522 (emphasis added).

[179]  *FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers*, Fed. Trade Comm'n (Jan. 4, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.

[180]  *Prudential Security, Inc.* v. *Pack*, No. 18-015809-CB (Mich. Cir. Ct. Apr. 18, 2019).

[181]  *Id.* at *2.

other two enforcement actions were brought against the largest U.S. manufacturers of glass food and beverage containers. Both of the companies had imposed extremely broad noncompetes on hundreds of employees.[182] According to the Commission, one company prevented former employees "from working for, owning, or being involved in any other way with any business in the United States" selling similar products.[183] The other was even broader, preventing former employees "from directly or indirectly performing" a similar service "for any business in the United States, Canada, or Mexico."[184] Both sets of agreements exemplify contracts that would be held unlawful under the common law because of their extremely broad geographic scope.[185] As those enforcement actions aptly demonstrate, a federal across-the-board ban is not necessary to address the Commission's concerns about noncompete agreements, and the Commission can hardly claim expertise in the area of noncompetes by cherry-picking a few extreme examples that would likely be invalid under any test.

Third, the Commission suggests that it has identified the benefits from the Proposed Rule through its "years of work on noncompetes."[186] But as Commissioner Wilson noted in her dissent, until the day before the proposed rulemaking was made public, "the Commission had announced no cases (and therefore had no experience and no evidence) to conclude that non-compete clauses harm competition in labor markets."[187] Even more troubling, "the only litigated FTC case challenging a non-compete clause found that a non-compete provision covering franchise dealers did *not* violate Section 5 of the FTC Act."[188] Although the Commission has also sponsored a series of workshops related to noncompetes, the expert views at those workshops also do not support a categorical ban. As discussed above, Professor Kurt Lavetti, the author of three studies cited in the proposed rulemaking, stated at a recent workshop that the economic literature is "[s]till far from reaching a scientific standard for concluding [that non-compete agreements] are bad for overall welfare" and that there is no full understanding of "the distribution of effects on workers."[189] Given this record, the

---

[182] *Supra*, note 179.

[183] *Id.*

[184] *Id.*

[185] Indeed, the state court in *Pack* held that a geographic restraint of "200 mile[s] is not reasonable." No. 18-015809-CB, at *10.

[186] 88 Fed. Reg. at 3537

[187] *Id.* at 3542 (Wilson, Comm'r, dissenting).

[188] *Id.* (citing *Snap-On Tools Corp.* v. *Fed. Trade Comm'n,* 321 F.2d at 837).

[189] *Id.* (citing Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements, Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace* (Jan. 9, 2020), https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete=workshop-slides.pdf.).

Commission has no basis to rely on its experience in forecasting that the proposed rule will benefit workers and employers.

### 3. The Commission's categorical ban is overly broad and will generate considerable uncertainty.

The breadth and imprecision of the Noncompete Rule as currently proposed will create considerable costs for businesses and workers that the Commission has not adequately taken into account.[190]  The Commission's proposed ban relies on vague definitions that sweep in a huge number of private contracts, and the evidence and analysis included in the proposal do not offer sufficient guidance regarding the rule's scope or the rationale for its application to many ordinary commercial agreements.

First, the Commission has defined noncompete agreements to include any "contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer."[191]  As the Commission recognizes, that definition could apply to many agreements that do *not* prohibit employment at another firm or that only refer to nondisclosure obligations.[192]  If the proposed Noncompete Rule were to go into effect as written, businesses would face extreme uncertainty and consequently be forced to spend considerable resources trying to identify *de facto* non-competes.  And the uncertainty regarding that definition would have a chilling effect on research, development, and innovation, causing employers to abandon agreements that protect their confidential information out of fear of unprecedented enforcement actions by the Commission.  The Commission has not accounted for the costs of this uncertainty in its proposal.

Second, the Commission's categorical ban would apply to high-income workers, senior executives, partners, and owners of organizations.  The Commission's own proposal notes that noncompete agreements are not exploitative or coercive in those contexts in part because "many senior executives negotiate their noncompete clauses

---

[190]  Research on regulatory uncertainty suggests that "increased uncertainty can lead to significant reductions in hiring, investment, consumption, and output in the economy." Zhoudan Xie, *Comparing Regulatory Uncertainty with Other Policy Uncertainty Measures*, Reg. Studies Ctr. (Feb. 2, 2022), https://regulatorystudies.columbian.gwu.edu/sites/g/files/zaxdzs4751/files/2022-06/gw-reg-studies-comparing-regulatory-uncertainty-with-other-policy-measures-zxie.pdf.

[191]  88 Fed. Reg. at 3509.

[192]  *Id.* at 3509-3510 (stating that "a covenant between an employer and a worker that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred for training the worker," would be a *de facto* noncompete).

with the assistance of expert counsel."[193]    And the proposal cites research demonstrating that the increased enforcement of noncompete agreements is associated with wage increases for highly skilled workers.[194] Therefore, even taking the Commission's proposal at face value, a categorical ban on noncompete agreements for higher-income workers is not justified by the evidence.

Third, the Commission has defined "worker" to include "a natural person who works, whether paid or unpaid" for "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law."[195]    The Commission's definition reaches employees, independent contractors, and arguably partners and owners.[196]    That definition is inconsistent with the arguments the Commission offers for its categorical ban.    The Proposed Rule repeatedly notes abusive or oppressive practices involving noncompete agreements in employment relationships, particularly in the context of entry-level or low-wage employees. But partners, owners, and independent contractors do not fit this paradigm and their engagements exist outside of the employer-employee relationship.[197] Partners or owners enjoy a position of bargaining power and information symmetry that makes restrictions on competition reasonable and pro-competitive.    And independent contractors will frequently have an economic incentive to negotiate with the firms that engage them.    The Commission did not consider these salient differences in its proposal, nor did it cite any evidence about the effect of noncompete agreements on independent contractors.    Instead, it asserted that it was including independent contractors in its rule out of concern that an employee-only ban would lead employers to misclassify their workers under federal law.[198] But the Commission cannot justify its ban on noncompete agreements for independent contractors based on mere speculation employers might violate other laws.

Fourth, the Commission's proposed Noncompete Rule would apply to noncompete agreements included in the sale of a business, so long as a worker holds less than a 25% stake in the business being sold.[199]    No State has limited noncompete

---

[193]    *Id.* at 3504.

[194]    *Id.* at 3486 (citing Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians*, 55 J. Hum. Res. 1025, 1042 (2020)).

[195]    *See* 15 U.S.C. 57b-1(a)(6).

[196]    88 Fed. Reg. at 3511.

[197]    *See, e.g.*, *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U.S. 318, 327 (1992) (observing that agency law principles, judicial precedent, and "the common understanding," among other sources, all recognize the "difference between an employee and an independent contractor").

[198]    88 Fed. Reg. at 3511.

[199]    *Id.* at 3515.

agreements so drastically in that context. California, for example, enforces any noncompete agreement involved in the sale of a business, regardless of ownership stake.[200] Under the Commission's proposal, noncompete commitments paid for as part of the sale of a business would be invalid for many partnerships and closely held corporations, even though those agreements have long been an important part of commercial transactions. Sellers of a business frequently obtain material financial benefits in a transaction at substantially lower levels of ownership than 25%, and buyers have valid commercial interests in protecting the value of the acquired business through a noncompete. The Commission's proposal is likely to have a chilling effect on the acquisition of partnerships and closely held companies. Although the Commission notes that its 25% threshold is necessary to protect "a few entrepreneurs sharing ownership interest in a startup [that] sell their firm," it makes no attempt to explain why an arbitrary figure of 25% is preferable to a lower threshold.[201] And the Commission fails to account for the obvious fact that the sale of a business does not typically involve unequal bargaining power or coercion.

Fifth, it is unclear whether the definition of noncompete agreements in the Proposed Rule sweeps in forfeiture-for-competition arrangements and clawback provisions typically included in the compensation and benefits programs for highly paid workers. Those provisions "condition an employee's receipt of certain benefits [such as stock options or other compensation] on that employee's promise not to compete with the former employer" for a period of time.[202] By their plain terms, those agreements do not prevent a worker from accepting any employment whatsoever. Instead, the only consequence of taking new employment with a competitor is forfeiting (or being obligated to repay) a bonus, a nonqualified retirement benefit, or other supplementary compensation.[203] The Commission has not explained how such forfeiture or clawback provisions (some of which are governed by the federal Employee Retirement Income Security Act) could harm competition, nor has it accounted for the costs of its ban to workers who have negotiated for increased compensation through those arrangements.

---

[200] Noncompete agreements are permitted in California if the clause is executed in conjunction with the dissolution or sale of a business entity by (i) business owners, (ii) members of limited liability companies, or (iii) partners in a partnership. *See* Cal. Bus. & Prof. Code §§ 16601, 16602, 16602.5.

[201] 88 Fed. Reg. at 3510.

[202] Daniel J. Raker, *A Lower Level of Scrutiny? New Alternatives for an Effective Restraint on Competitive Activity*, 39 Loy. U. Chi. L.J. 751, 751 (2008). Apart from forfeiture-for-competition clauses, the Proposed Rule may also sweep in agreements that allow a "worker" to join a competitor upon the payment of a reasonable liquidated damages amount to compensate an employer for damages resulting from the competitive activity.

[203] *Ibid.*

Sixth, the proposal creates uncertainty and unfairness for employers that compete with businesses outside the Commission's jurisdiction. The Commission lacks the authority to regulate non-profit employers, as well as certain firms from various sectors of the economy.[204]  As a result, the proposed ban on noncompete agreements will not apply to those organizations.  But many employers within the Commission's jurisdiction actively compete with exempt organizations.  For instance, a for-profit hospital may compete with a non-profit hospital.  Under the Commission's rule, the exempt businesses could require noncompete agreements from their workforce, while the non-exempt business could not.[205]  Given the data suggesting that noncompete agreements are associated with increased training and innovation, that disparity will give some employers an unfair competitive advantage.[206]  This unfairness would be greatly reduced if the Commission challenged noncompete agreements case by case. But the proposal's categorical ban will inevitably create winners and losers across a large number of industries where the Commission does not have the authority to regulate every competitor in the market.

For all of those reasons, the Commission's across-the-board rule is both overbroad and imprecise.  Both concerns could be addressed by challenging specific noncompete agreements on a case-by-case basis through the adjudicatory procedures created by the FTC Act, rather than through a rulemaking.  Yet the Commission's proposal does not discuss its authority to engage in adjudication, nor does it explain why it believes rulemaking is preferable to adjudication in this context.

### 4.  The Commission's consideration of burdens on small businesses lacked rigor.

The Regulatory Flexibility Act requires the Commission to consider effects on small businesses as part of its rulemaking.  Although the Commission acknowledged this obligation in its proposal, it concluded that the Noncompete Rule was not expected

---

[204]  88 Fed. Reg. at 3510 (citing 15 U.S.C. §§ 44 and 45(a)(2)).

[205]  As one commenter at the Commission's public forum pointed out, "the non-compete ban would apply to some 20% of hospitals across the country that [are] tax paying hospitals. But the ban would not apply to 80% of hospitals in this country that are tax-exempt."  Forum, *supra* note 6, at 29-30 (Testimony of Kathleen Tenoever).  That commenter further explained, "[t]his uneven playing field between tax paying and tax-exempt hospitals is illogical" and it would also "create significant unintended distortions in the competitive playing field" and "create fundamentally different rules of the game for different entities in the same industry based solely on tax status."  *Id.* at 30.

[206]  *Supra*, at 26-27.

to "have significant impact on a substantial number of small entities."[207]    That conclusion is obviously wrong.

First, the Commission's estimate as to the number of small businesses that would be burdened by the Rule was based on a single, incomplete study.[208]    That study "only counted firms with no union members who said all employees signed noncompetes" and restricted the survey population to "private-sector business establishments of 50 or more employees."[209]    Reliance on one incomplete study to calculate the impact on small businesses risks significantly undercounting the number of firms that will need to comply with the Noncompete Rule.

Second, the Commission's estimate of projected small business costs ignores important considerations.  The Commission's cost estimate assumes between four and eight hours of a lawyer's time to ensure compliance (calculated as $723.7 million and $1.45 billion, respectively).[210]    But as discussed above, the Noncompete Rule would likely trigger new litigation costs for small businesses forced to rely on trade-secret protections, new costs related to businesses' ability to satisfy the demanding standards for injunctive relief, and a bevy of associated costs related to lost business relationships and ideas.  The Commission barely mentions this concern in another part of the rulemaking, stating it is merely "possible" that litigation costs will increase, and the "Commission is not aware of any evidence" to measure this change.[211] As one industry report notes, the Commission's categorical ban will "force biotech companies to find another way to protect themselves against the unlawful sharing of confidential information," likely through the increased use of trade-secret litigation.[212] As that report recognizes, noncompetes are critical to small start-ups in the biotech and other tech sectors and allow them to protect their intellectual property, which may be their defining asset. Eliminating noncompetes for these firms would prevent them from developing and expanding their businesses, and may deal a catastrophic blow if employees with their most important secrets and IP could walk out the door at any time.[213]    And

---

[207]  88 Fed. Reg. at 3531.

[208]  *Id.* at 3531-3532 & n.518.

[209]  Alexander J.S. Colvin & Heidi Shierholz, Econ. Pol'y Inst., Noncompete Agreements 13 (2019).

[210]  88 Fed. Reg. at 3533.

[211]  *Id.* at 3530.

[212]  Scott, *supra* note 154.

[213]  *See* Forum, *supra* note 6, at 47 (Testimony of Sam Westgate) ("We are deeply concerned that if non-compete agreements are not allowed for key employees, the revolving door for those employees could eventually force smaller companies out of business, as they're constantly training new competition, and sensitive internal information is readily available to competitors.

preventing small businesses from recording the value of their noncompete agreements as intangible assets of the firm may significantly diminish the firm's value to potential buyers. The Commission is required to consider those costs to small businesses under the Regulatory Flexibility Act.

Notably, the U.S. Small Business Administration's Office of Advocacy, which is tasked with "represent[ing] the views of small entities before federal agencies and Congress," recently noted its opposition to the Commission's Proposed Rule.[214] The Office of Advocacy explained that the Commission ignored certain costs associated with its proposal, including "the costs of hiring additional legal resources" and "hiring and retaining workers, which some small entities are currently struggling with."[215] It also disagreed with the Commission's "universal ban" and encouraged a more nuanced and targeted approach.[216] This call for caution from another independent agency in the Executive Branch should give the Commission serious pause before it charges ahead with a noncompete ban that will significantly alter the ability of small businesses to compete.

### 5. The Commission's categorical ban conflicts with other federal laws.

Many aspects of federal law recognize the benefits of noncompete agreements. First, the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), of which the United States is a signatory, ensures that "natural and legal persons" have the right to protect commercially valuable secrets through contract law.[217] The Commission's categorical ban would undermine the United States' ability to meet that obligation. Second, the Tax Code recognizes that payments made to a former employee for "refraining from performing services" should not be treated as a bonus subject to higher tax requirements.[218] That policy presumes that some employees will receive adequate consideration for an agreement not to compete, apart from the compensation they received for performing their job. But the Commission's categorical ban would prevent workers from bargaining for that pay. Third, another provision of the federal antitrust laws, Section 8 of the Clayton Act, prohibits simultaneous service as a director

---

It's been our experience that it's very difficult to prove a violation of a non-disclosure agreement.").

[214] Small Bus. Admin., Office of Advocacy, Letter to April Tabor Re: Federal Trade Commission's Non-Compete Clause Rule RIN: 3084-AB74, at 2 (Mar. 20, 2023).

[215] *Id.* at 3.

[216] *Id.* at 3-4.

[217] TRIPS, art. 39(2).

[218] 26 C.F.R. § 1.280G-1.

-43-

JA1124

or officer of two corporations that compete with one another. Under the Commission's rule, a company might violate Section 5 of the FTC Act by simply including a provision in an officer's contract requiring compliance with the Clayton Act. Each of those conflicts would be avoided by a more balanced position that singles out abusive noncompete agreements. If the Commission continues with a categorical ban, those conflicts are unavoidable.

### D. The Commission Should Abandon or Substantially Revise The Proposed Rule.

The Commission lacks the authority to issue rules respecting unfair methods of competition. And Section 5 does not authorize the Commission to issue categorical bans on noncompete agreements. For those reasons, the Commission should abandon its rule. But if the Commission decides to move forward with rulemaking to address noncompetes, there are a number of alternatives it should consider.

First, the Commission should consider issuing a rule under its Section 5 authority related to unfair and deceptive acts and practices. Through the Magnuson-Moss Act, Congress has authorized Commission rulemaking to address consumer protection, and has required the Commission to follow rigorous procedures when crafting rules in that area. The Commission could utilize those procedures to explore a rule requiring greater transparency around noncompete agreements, which would ensure that employees know about these restrictions before accepting a job.

Second, setting to the side the Commission's legal authority, the Commission should revise the definition of "non-compete clause" to exclude *de facto* noncompetes. As explained above, that unbounded definition will create considerable uncertainty about the scope of the Commission's proposed rule and will inevitably sweep in a large number of agreements that do not implicate any of the concerns noted by the Commission. Moreover, the Commission's decision to include *de facto* noncompetes undermines its argument that the benefits of its proposed rule outweigh the costs. The research relied on by the Commission is focused on contractual terms that are clearly noncompetes, not contractual terms that in some way "ha[ve] the effect of prohibiting the worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment."[219] As such, even if the Commission's view of the evidence were correct, it would not support a definition that includes *de facto* noncompetes.

Third, the Commission should also consider any and all alternatives to limit the Rule's scope. Those limits would include the following, which are not mutually exclusive:

---

[219] 88 Fed. Reg. at 3509.

- An amendment to apply the noncompete rule only to new agreements rather than agreements that are already in effect;

- An amendment to the rule's definition of "worker" to exclude independent contractors, partners, and owners;

- An amendment adding an income threshold to allow noncompete agreements for highly paid workers and/or corporate officers;

- An amendment allowing noncompete agreements that are reasonable in scope (duration, geography, etc.);

- An exemption for agreements that involve the sale of a business or equity in a company, regardless of ownership level;

- An exemption for forfeiture-for-competition agreements or agreements that allow a worker to join a competitor upon payment of a reasonable liquidated damages amount, which do not prevent workers from seeking employment with a competitor;

- An exemption permitting noncompete agreements associated with severance, retirement, or garden leave payments; and

- An exemption permitting noncompete agreements associated with intellectual property or confidential business information where the agreement is used in conjunction with other restrictive covenants.

Even with those limitations, the Rule would still exceed the Commission's statutory authority and may impose costs that cannot be justified by the Rule's estimated benefits.  But any more limited alternative is preferable to the categorical ban proposed by the Commission.  Given the number and complexity of available alternatives, the Commission should also take more time to fully analyze each one to determine if it is preferable to existing regulation.

If the Commission determines that the Proposed Rule requires significant changes, the Commission will likely need to resubmit the rule for public comment. Under the APA, a notice of proposed rulemaking must "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully."[220]  That requirement "improves the quality of agency rulemaking by ensuring that agency regulations will be tested by exposure to diverse public comment."[221] When an agency's final rule significantly departs from what was proposed or includes detailed regulations

---

[220] *United States Telecom Ass'n* v. *Fed. Commc'ns Comm'n*, 825 F.3d 674, 700 (D.C. Cir. 2016) (internal quotation marks omitted).

[221] *Small Refiner Lead Phase-Down Task Force* v. *Envt'l Protection Agency*, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal quotation marks omitted).

that were not adequately previewed in the initial proposal, a new round of comment is necessary to afford interested parties an opportunity to participate.[222]

Although the Commission has stated that it is considering certain alternatives, many of the other alternatives listed above were not mentioned in its proposal. And even though the Commission discussed in broad strokes the idea of adding a rebuttable presumption or income threshold, the APA requires agencies to "describe the range of alternatives being considered with reasonable specificity."[223] "Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision-making."[224] For that reason, the mere suggestion of an income threshold or rebuttable presumption does not provide the public with a specific range of alternatives to study and submit reasoned comments. For example, the costs and benefits of an income threshold designed to protect only low-wage workers (*e.g.*, income threshold at 250% of the federal poverty level) would be very different from a threshold meant to apply to every worker except senior executives (*e.g.*, income threshold set at $500,000. Given the significant implications of a nationwide noncompete ban of any form and the legal requirement to provide meaningful opportunities for participation, the Commission should seek additional comments from the public if it makes important changes to the Proposed Rule.

*Sean Heather*

Sean Heather
Senior Vice President
International Regulatory Affairs and Antitrust
U.S. Chamber of Commerce

---

[222] *CSX Transp., Inc.* v. *Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009).

[223] *Small Refiners Lead Phase-Down Task Force*, 705 F.2d at 547.

[224] *Horsehead Res. Dev. Co.* v. *Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994) (internal citations omitted).